**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Christopher Shays
1126 Longworth House Office Building
Washington, D.C.  20515-0740

Martin Meehan
2229 Rayburn House Office Building
Washington, D.C.  20515-2105

                             Plaintiffs,           Civil Action No. 06-CV-____

      v.

United States Federal Election Commission
999 E Street, N.W.
Washington, D.C. 20463-0002

                        Defendant.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiffs Christopher Shays and Martin Meehan, by their undersigned attorneys, for their Complaint against the Federal Election Commission ("FEC" or "Commission"), state as follows:

**I.     INTRODUCTION AND SUMMARY OF THE COMPLAINT**

2.      This action challenges the Commission's failure to adopt lawful regulations governing "coordinated communications," "Federal election activity," and solicitations of soft money by federal officeholders and candidates at state party fundraising events, in compliance with the decisions and judgment in *Shays v. FEC* ("*Shays I*"), 337 F. Supp. 2d 28 (D.D.C. Sept. 18, 2004), *motion for stay denied*, 340 F. Supp. 2d 93 (D.D.C. Oct. 19, 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. July 15, 2005), *reh'g denied*, Oct. 21, 2005.  As demonstrated more fully below, this is a "related case" to

1

*Shays I* within the meaning of this Court's rules because the two cases "involv[e] the same parties and relat[e] to the same subject matter"—namely, the Commission's continuing failure to promulgate lawful regulations governing coordinated communications, Federal election activity, and solicitations by federal officeholders and candidates at state party fundraising events, as required by the opinions and judgment in *Shays I* and by the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81. *See* LCvR40.5(a)(4); *see also* ¶¶ 16-19 below.

3.      BCRA's principal purpose is to ban "soft money"—funds not subject to the contribution limits, source prohibitions, and disclosure requirements of federal law— from federal elections and the federal political process. The passage of BCRA reflects Congress's determination that the growing use of soft money over the past generation has led to corruption and the appearance of corruption in federal elections and in the federal political process. By stemming the flow of soft money, BCRA was intended to help restore the confidence of the American people in their government and political system. BCRA was upheld in all material respects by the Supreme Court in *McConnell v. FEC*, 540 U.S. 93 (2003).

4.      In response to the decisions and judgment in *Shays I*, the Commission held additional rulemaking proceedings during 2005 and 2006 on the rules challenged in this action, along with other rules remanded to the FEC by this Court in *Shays I*. With respect to the rules challenged in this action, the Commission failed to address adequately the questions and instructions of this Court and the D.C. Circuit in *Shays I*, failed to promulgate new rules that comply with BCRA and the *Shays I* mandate, and failed to explain adequately and justify its actions. The challenged regulations thwart and

undermine the purposes of BCRA by allowing soft money to continue to flow into federal elections and the federal political process. Specifically:

(a) In response to *Shays I*, the Commission has amended the "content standards" of its coordination regulations to shrink the scope of the rules even further in many respects and thus to authorize even *more* coordinated activity, not less. *See* 11 C.F.R. § 109.21. Among many other flaws, whereas the previous rules authorized what the D.C. Circuit labeled "a coordinated communication free-for-all" during all but the final 120 days before a primary or general election, 414 F.3d at 100, the amended rules *reduce* the pre-election window to only 90 days in House and Senate races. The Commission also retained and expanded the "gap period" between Congressional primaries and the general election window, thereby authorizing a coordination "free-for-all" during much of the election year in many States. Although the Commission closed the election-year "gap period" in Presidential races, it retained the 120-day pre-primary window that was invalidated in *Shays I*. During all other periods of the election cycle outside of these windows, candidates, political parties, and outside spenders continue to have a complete "safe harbor," 337 F. Supp. 2d at 58, to engage in massive and unregulated coordinated communications so long as they avoid the republication of campaign materials or "express advocacy." 11 C.F.R. 109.21(c). Yet *McConnell*'s "unmistakable lesson" is that express advocacy is a "functionally meaningless" standard that "has not aided the legislative

effort to combat real or apparent corruption." 540 U.S. at 193-94. The Commission's amended coordination regulations fail to satisfy the D.C. Circuit's central requirement—that any "content standard" used in regulating coordinated communications must "rationally separate[] election-related advocacy from other activity falling outside FECA's expenditure definition." 414 F.3d at 100, 102.

(b) The Commission's narrow definitions of "voter registration activity" and "get-out-the-vote activity" ("GOTV activity"), both of which are types of "Federal election activity," will permit state and local parties to continue to fund activities that influence federal elections with substantial amounts of soft money. *See* 11 C.F.R. § 100.24(a)(2)-(3); *see also Shays I*, 337 F. Supp. 2d at 101-07. As interpreted by the Commission, the rules exempt from BCRA's soft money restrictions many voter registration and GOTV activities that are likely to have a substantial effect on federal elections. *See id.*; Ad. Op. 2006-19. That result is entirely incompatible with BCRA's language, structure, and purpose.

(c) The Commission's decision to authorize unbridled solicitations by federal candidates and officeholders at state, district, and local party fundraising events permits federal officeholders and candidates to directly and overtly solicit soft money, contrary to BCRA's language and purpose. *See* 11 C.F.R. § 300.64(b). Moreover, the Commission has failed to explain why a complete carve-out is necessary in this one particular context, given that federal officeholders and candidates are permitted to attend other types of

events, including fundraising events, but not to solicit soft money

contributions. *See* 70 Fed. Reg. 37,547, 37,653 (June 30, 2005); *see also*

*Shays I*, 337 F. Supp. 2d at 92-93 (holding that, in its original Explanation

and Justification ("E&J"), the FEC failed to explain "how examining

speech at fundraising events implicates constitutional concerns that are not

present when examining comments made at other venues").

5.     For the reasons set forth more fully below, this Court should invalidate the

Commission's revised Sections 109.21, 100.24(a)(2)-(3), and 300.64(b) because they are

"arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with

law"; "in excess of [the FEC's] statutory jurisdiction, authority or limitations"; and were

adopted "without observance of procedure required by law."  5 U.S.C. § 706(2)(a), (c),

(d).

## II.     JURISDICTION AND VENUE

6.     This action arises under the Federal Election Campaign Act ("FECA"), 2

U.S.C. §§ 431 *et seq.*, as amended by BCRA; the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 551-706; and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court

has jurisdiction pursuant to 28 U.S.C. § 1331.

7.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)

because the defendant is a United States agency and because a substantial part of the

events or omissions giving rise to these claims occurred in this District.

## III.     PARTIES, STANDING, AND RIPENESS

8.     Plaintiff Christopher Shays is a Member of the United States House of

Representatives from the 4th Congressional District of the State of Connecticut.

Representative Shays was elected in 1987 and reelected in 1988 and every two years

thereafter.  He is a candidate for reelection in November 2006.  Representative Shays was a principal House sponsor of the Bipartisan Campaign Reform Act.  He also was a plaintiff in *Shays I*.

9.    Plaintiff Martin Meehan is a Member of the House of Representatives from the 5th Congressional District of the Commonwealth of Massachusetts. Representative Meehan was elected in 1992 and has been reelected every two years thereafter.  He is a candidate for reelection in November 2006.  Representative Meehan was a principal House sponsor of the Bipartisan Campaign Reform Act.  He also was a plaintiff in *Shays I*.

10.    Defendant United States Federal Election Commission is a federal agency created pursuant to FECA, 2 U.S.C. § 437c.  BCRA requires the FEC to promulgate regulations to implement its provisions, including on the subject of coordinated communications, Federal election activity, and solicitations made at state party fundraising events.

11.    This Court and the D.C. Circuit already have determined that plaintiffs have Article III and prudential standing to challenge the Commission's regulation of coordinated communications, Federal election activity, and solicitations made at state party fundraising events.  *See Shays I*, 337 F. Supp. 2d at 38-47, *aff'd*, 414 F.3d at 83-95. Those determinations are preclusive with respect to the identical standing issues in this action.  As in *Shays I*, plaintiffs are United States citizens, elected Members of Congress, candidates for reelection to Congress, voters, recipients of campaign contributions, fundraisers, and members of national and state political parties.  Each plaintiff faces personal, particularized, and concrete injury in the event that the revised Sections 109.21,

100.24(a)(2)-(3), and 300.64(b) are allowed to stand.

12.     In particular, as federal officers and as candidates for federal office, plaintiffs and their campaign opponents are regulated by FECA and BCRA and are among those whom BCRA seeks to insulate from the actual or apparent corrupting influence of special interest soft money.  In the following ways, each of these regulations creates an "illegal structuring of [the] competitive environment" that inflicts cognizable harm on plaintiffs and their supporters.  *Shays I*, 414 F.3d at 85; *see also id.* at 87.

(a) The revised coordinated communications regulations injure plaintiffs by continuing to provide a "safe harbor" to their electoral opponents and opposing political parties to engage in unregulated coordination of political advertising with outside spenders.  The rules authorize plaintiffs' opponents and supporters of their opponents to evade contribution limits and reporting requirements and to circumvent the prohibition on expenditures of corporate and union treasury funds, thus influencing federal elections in which the plaintiffs are candidates.

(b) The "Federal election activity" regulations injure plaintiffs by permitting the state and local party committees that support plaintiffs' opponents to evade the restrictions BCRA places on the use of soft money to fund activities that influence federal elections.

(c) The Commission's decision to authorize unrestricted soft-money solicitations by federal officeholders and candidates at state, district, and local fundraising events enables plaintiffs' opponents (and other federal officeholders and candidates who support plaintiffs' opponents) to attend

such party fundraisers and solicit soft money "without restriction or regulation."  11 C.F.R. § 300.64(b).

13.    Plaintiffs also have informational standing to challenge the Commission's coordinated communication regulations.  Whether a communication constitutes a "coordinated" expenditure determines whether it is subject to FECA's "contribution" disclosure requirements.  *See* 2 U.S.C. §§ 431(8), 434(b).  Because plaintiffs, in their capacities as voters, candidates, and elected officeholders, have self-evident interests in obtaining full disclosure of campaign-related contributions and expenditures, they have informational standing to challenge the revised Section 109.21's continued authorization of candidates, parties, and outside spenders to hide information that is required by law to be disclosed.

14.    In denying the Commission's post-judgment motion for a stay in *Shays I*, this Court determined that the Commission's unlawful BCRA regulations "constitute[] a daily injury to both [plaintiffs'] interests and the clearly articulated intent of Congress," and that plaintiffs suffer "significant, irreparable injury" from the absence of effective BCRA-implementing regulations.  340 F. Supp. 2d at 52.  This Court also found that the Commission's unlawful rules irreparably harm the public interest.  *See id.* at 53-54.  The Commission did not appeal these determinations, which are preclusive with respect to the identical injury and public interest issues in this action.

15.    Plaintiffs' challenges to the Commission's revised versions of 11 C.F.R. §§ 109.21, 100.24(a)(2)-(3), and 300.64(b) are ripe for all the reasons set forth in the prior opinions of this Court and the D.C. Circuit in *Shays I*.  As with the challenge to the earlier regulations, this complaint presents purely legal challenges that are fit for

immediate review, and the plaintiffs would suffer substantial hardship if judicial review of the regulations were delayed. *See* 337 F. Supp. 2d at 47-50; 414 F.3d at 95-96. The courts' prior determinations on these issues are preclusive with respect to the identical ripeness issues in this action. This Court's concerns about ripeness with respect to the rules defining "Federal election activity" have now been resolved, as the Commission has further clarified the scope of Sections 100.24(a)(2)-(3). *See* 337 F. Supp. 2d at 100, 105; *see also* Ad. Op. 2006-19; ¶¶ 56-57 below.

## IV.    RELATED CASE STANDARDS

16.    *Shays I* was dismissed by this Court with prejudice, and the Commission has exhausted its appeals in that case. *See* LCvR 40.5(a)(4).

17.    This action involves the identical parties, identically aligned, as in *Shays I*. *See id.*

18.    This action "relat[es] to the same subject matter" as *Shays I*. *Id.* Although *Shays I* challenged a number of BCRA regulations in addition to the coordinated communication, Federal election activity, and state party fundraiser provisions that are the subject of this complaint, the regulations challenged here were among the lead issues in plaintiffs' challenge in *Shays I*, in this Court's opinion, and, with regard to Section 109.21, in the D.C. Circuit's affirmance. The coordination, Federal election activity, and state party fundraiser issues here obviously "relate[] to" the coordination, Federal election activity, and state party fundraiser issues in *Shays I*; the central question in this case is whether the Commission has repaired the unlawful defects in those regulations that were identified by this Court and the D.C. Circuit in *Shays I*. There is a substantial, and often complete, overlap between the legal and factual issues in this case and those in *Shays I* regarding the legality of the Commission's rules on coordination, Federal election

activity, and state party fundraisers.

19.     Treating this action as a "related case" to *Shays I* would significantly advance the purposes underlying this Court's related case rule.  The interests of judicial economy will be served if the Court that decided *Shays I* decides this case, because the primary issue here is whether the Commission complied with the mandate of *Shays I*. This Court already is familiar with the governing statutes, with the events that led to BCRA's enactment, with the Commission's implementing regulations, and with the flaws in those regulations identified in *Shays I.*

## V.     THE REVISED VERSION OF THE COORDINATION REGULATIONS, 11 C.F.R. § 109.21, VIOLATES FECA, BCRA, AND THE APA.

20.     The Commission adopted its revised coordination rules on April 7, 2006. The revised coordination rules were transmitted to Congress on June 2, were published in the *Federal Register* on June 8, and took effect on July 10, 2006.  *See* 71 Fed. Reg. at 33,190.

21.     The coordination regulations challenged in this action mark the third time in less than six years that the Commission has promulgated unlawful regulations governing coordinated communications.

22.     <u>The Commission's first set of unlawful coordination regulations.</u>  In December 2000, the Commission adopted rules that significantly narrowed the scope of the regulations that traditionally had governed coordinated communications.  *See* 11 C.F.R. § 100.23 (2001); *see also* 65 Fed. Reg. 76,138 (Dec. 6, 2000).  Those regulations required interactions rising to the level of "collaboration or agreement" between a candidate and outside spender in order to trigger coverage by the coordination rules.  11 C.F.R. § 100.23(c)(2)(iii) (2001).  Congress repealed those regulations in March 2002

pursuant to Section 214 of BCRA because they were "far too narrow to be effective in defining coordination in the real world of campaigns and elections and threaten[ed] to seriously undermine the soft money restrictions contained in" BCRA.  148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. McCain).  This Court and the Supreme Court both upheld Congress's repeal of the 2000 regulations and instructions for new rulemaking in opinions emphasizing the need for a realistic, functional approach in regulating coordinated communications.  *See McConnell v. FEC*, 251 F. Supp. 2d 176, 252-57 (D.D.C. 2003) (per curiam), *aff'd*, 540 U.S. 93,  217-24 (2003).

23.    The Commission's second set of unlawful coordination regulations.  In response to Congress's repeal of the 2000 coordination regulations and instructions for developing new rules, the Commission adopted another set of deeply flawed coordination regulations in December 2002.  *See* 11 C.F.R. § 109.21 (2003); *see also* 68 Fed. Reg. 421 (Jan. 3, 2003).  Breaking sharply with three decades of agency and judicial precedent, the Commission for the first time ever granted candidates, political parties, and outside spenders what it called a "safe harbor," allowing them to engage in coordinated political advertising exempt from all federal contribution limits, source prohibitions, and disclosure requirements during *most* of each election cycle, so long as the advertising avoided "express advocacy" or the republication of campaign materials.  *See* 68 Fed. Reg. at 430 n.2.  Under the new Section 109.21, heightened coordination standards governed only during the final 120 days before an election; all other periods of the election cycle were in essence subject only to the express advocacy standard—a standard that Congress and the courts have found to be "functionally meaningless."  *McConnell*, 540 U.S. at 193; *Shays I*, 337 F. Supp. 2d at 57 n.26 and 414 F.3d at 100.

24.     This Court held in September 2004 that 11 C.F.R. § 109.21 "r[an]
completely afoul of [the] basic tenet of campaign finance law" that coordinated
communications, like contributions, have great value to candidates, and that failing to
regulate such communications accordingly "create[s] an immense loophole that would
facilitate the circumvention of [federal] contribution limits, thereby creating 'the potential
for gross abuse.'"  *Shays I*, 337 F. Supp. 2d at 63, 65 (quoting *Orloski v. FEC*, 795 F.2d
164, 165 (D.C. Cir. 1986)).  The D.C. Circuit "reach[ed] the same result, though for
slightly different reasons," concluding that Section 109.21 authorized "a coordinated
communication free-for-all for much of each election cycle."  414 F.3d at 98, 100.  The
D.C. Circuit further held that "time, place, and content" standards may be used in
fashioning appropriate coordination regulations, but that "the Commission must establish,
consistent with APA standards, that its rule *rationally separates election-related
advocacy from other activity falling outside FECA's expenditure definition*."  *Id.* at 99,
102 (emphasis added).  The D.C. Circuit concluded that the Commission's Explanation
and Justification for Section 109.21 fell far short of that requirement, and the court gave
detailed instructions for the Commission to follow on remand.  *See id.* at 99-102.

25.     The Commission's third set of unlawful coordination regulations.
Notwithstanding this Court's detailed instructions for reasonable expedition, *see* 340 F.
Supp. 2d at 52-54, the Commission inexcusably delayed even *beginning* its remanded
coordination rulemaking until December 14, 2005—*fifteen months* after this Court's
September 2004 final judgment.  The Commission has now promulgated a revised
version of 11 C.F.R. § 109.21 that once again violates the substantive requirements of the
federal campaign finance statutes and the procedural requirements of the APA.  This

revised version of Section 109.21 constitutes "strike three" for the Commission in its attempts to regulate coordinated political advertising, and produces precisely what this Court warned against in 2004: unlawful agency action that "seeks to thwart the very essence of the wide-sweeping system of reform enacted by Congress for another interminable period of years." *Shays I*, 340 F. Supp. 2d at 52.

26.    The FEC's revised version of Section 109.21 thwarts and undermines the language and Congressional purposes of the governing campaign finance statutes, the APA's requirements for reasoned decisionmaking, and the mandate of this Court in *Shays I* as affirmed by the D.C. Circuit.

**A.    Revised Section 109.21 Continues To Apply a "Functionally Meaningless" Content Standard During Most of Each Election Cycle, Indeed, to an Even Larger Part of the Congressional Election Cycle than Did the Previous Version of the Rule.**

27.    The most significant flaw in revised Section 109.21 is that it continues impermissibly to carve large areas of coordinated political advertising out from regulatory control based on certain "bright-line" content standards. Until adopting these "content standards" in late 2002, the Commission had always recognized that any general public political communication made for the purpose of influencing a federal election must be subject to the governing coordination regulations without reference to any so-called "bright-line" content restrictions. The Commission has historically recognized that political advertising may attempt to influence federal elections in a variety of ways throughout an election cycle, and that communications that in fact attempt to influence the outcome of a federal election must be subject to the coordination regulations irrespective of any narrow time frame test or other bright-line rules.

28.    Like the original version of Section 109.21 struck down in *Shays I*, the

revised version continues to provide that political advertising and other public communications that seek to influence the outcome of a federal election are subject to the coordination provisions only if one or more of the following "content standards" is met:

    (a)  The communication qualifies as an "electioneering communication" under 11 C.F.R. § 100.29.

    (b)  The communication disseminates "campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing," with certain exceptions not material here.

    (c)  The communication "expressly advocates the election or defeat of a clearly identified candidate for Federal office."

    (d)  The communication (i) is a public communication; that (ii) refers to a political party or to a "clearly identified" candidate for federal office; (iii) "is publicly distributed or otherwise publicly disseminated" within a certain time frame—for Presidential candidates, the period beginning 120 days prior to a Presidential primary and ending on the day of the general election, and for Congressional candidates, within 90 days of a primary, convention, or general election (as compared with the previous 120-day window); and (iv) is directed at voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the party appear on the ballot.

11 C.F.R. § 109.21(c)(1)-(4).

      29.   These "content standards" perpetuate and exacerbate nearly all of the loopholes identified by this Court and the D.C. Circuit in *Shays I*. *See* 337 F. Supp. 2d at

56-66; 414 F.3d at 97-102.  The rule invalidated in *Shays I* provided for a "content" standard that included advertisements naming a candidate and run within 120 days of an election.  In response to the decisions in *Shays I* invalidating that rule as contrary to law because it was not sufficiently inclusive, the FEC's new rule provides for an *even shorter* 90-day period with regard to House and Senate races.  For Congressional races, the new rule also retains the election-year "gap period" that begins on primary night and runs until the general election window begins.  During this "gap period," coordinated advertising is subject to no meaningful regulation at all.  Although the new rule closes the election-year gap period in Presidential races, it retains the 120-day pre-primary window struck down in *Shays I.*  Thus, coordinated Presidential campaign advertising continues to have a "safe harbor" more than 120 days before a State's primary or caucus, so long as the ads avoid express advocacy or republication.

30.     The revised Section 109.21 purports to authorize brazen violations of federal campaign finance statutes.  Under the revised rule, for example, a candidate may write a proposed advertisement touting his virtues or attacking his opponent(s) and then persuade a corporation or union to saturate the airwaves with the advertisement using its corporate or union treasury funds, so long as the advertisement is run outside the pre-election window and avoids any express advocacy.  Thus, in a State that holds an April primary for nominations to federal office, Congressional candidates will be able to engage in blatant and unregulated coordination of advertising with outside spenders up until the January before the primary (*i.e.*, 90 days before the primary), and again between the April primary and early August (*i.e.*, 90 days before the November general election).  As evidence in the administrative record demonstrates, these are often crucial periods in

which candidates, political parties, and special interest groups seek to communicate with the electorate.  The Commission's loopholes create an immense incentive for candidates and political parties to engage in massive, unregulated coordination with corporations, unions, wealthy individuals, and interest groups—free from any contribution limitations, source restrictions, or even disclosure requirements—during these periods.

31.    Similarly, under revised Section 109.21, a candidate or party will continue to be able to engage in massive, open, and unregulated coordination with corporate and union spenders at any time—even on the eve of a primary, convention, or general election—so long as the coordinated advertisements and other communications do not "refer[] to a political party" or to a "clearly identified" candidate for federal office.  Such advertisements and communications, by emphasizing issues and playing upon themes of concern to a candidate, may influence the outcome of an election even without mentioning a candidate or party by name.  Under both the original and revised Section 109.21, even if there were evidence that a candidate was writing such "issue ads," scheduling their air times to run adjacent to the candidate's own campaign advertisements on the same themes, and soliciting corporations and unions to run the ads using their general treasury funds for the purpose of helping his campaign, such activities would entirely escape regulation or restriction because they do not satisfy any of the Commission's "content standards."

32.    There is no acceptable justification for these continued loopholes. Coordinated communications that are "for the purpose of influencing any election for Federal office," 2 U.S.C. § 431(9)(A)(i), are subject to FECA *throughout* the election cycle; otherwise, there would be no authority for the Commission to regulate express

advocacy and the republication of campaign materials during the entire cycle.

Accordingly, the D.C. Circuit emphasized that the Commission on remand must provide

"some cogent explanation" for "deeming these two categories adequate *by themselves* to

capture the universe of electorally oriented communication outside the [pre-election]

window." 414 F.3d at 100 (emphasis added). The Commission has entirely failed to

explain how the "functionally meaningless" express advocacy standard, *McConnell*, 540

U.S. at 193, coupled with a prohibition against the republication of campaign materials,

could possibly meet this requirement.

> **B.     The Commission Made Arbitrary and Capricious Use of CMAG Data
> in Attempting To Justify Its Revised Coordination Rules.**

33.     The Commission's Explanation and Justification for revised Section

109.21 attempts to excuse the lack of any effective "content standard" outside the pre-

election windows by arguing that candidates' own advertising purchases demonstrate that

ads run outside of these periods have "little" or "minimal" value to candidates, "and

therefore do not present the potential for corruption or the appearance of corruption that

BCRA and [FECA] intend to prevent." 71 Fed. Reg. at 33,194, 33,196. The

Commission relies almost exclusively on a set of data that it licensed from TNS Media

Intelligence/CMAG ("CMAG") regarding television advertising spots run by

Presidential, Senate, and House candidates during the 2004 campaign. The Commission

added these data into the administrative record at the eleventh hour, after the written

comment period had closed and after it had held public hearings on proposed revisions to

Section 109.21; it issued a Supplemental Notice of Proposed Rulemaking ("SNPRM")

that gave interested parties only five business days to respond to the new CMAG data.

*See* 71 Fed. Reg. 13,306 (Mar. 15, 2006) ("Comments must be received on or before

March 22, 2006."). Even putting to one side the Commission's improper procedures, *see* ¶¶ 37-38 below, the CMAG data do not support, and in many respects undermine, the revised Section 109.21.

34. The CMAG data demonstrate the obvious—that the vast majority of television advertisements run by candidates are run in the months immediately leading up to an election. Just because *most* candidate TV advertisements are run during this period, however, does not mean that the advertisements run earlier in the election cycle are *insubstantial*. *See Shays I*, 414 F.3d at 102 (asking whether "substantial election-related communication" occurs outside the Commission's pre-election window). The Commission acknowledges, for example, that 8.56% of all candidate TV ads run in 2004 House races included in the CMAG data set were run outside its new 90-day pre-election window. Similarly, 8.44% of all candidate TV ads run prior to the 2004 Presidential primaries/caucuses included in the CMAG data set were run outside the Commission's 120-day pre-election window in Presidential contests. Even under the Commission's impermissibly restrictive analysis, *see* ¶¶ 35-36 below, figures like these translate into thousands of TV ads and millions of dollars of advertising expenditures that are no longer subject to regulation under the coordination rules (so long as they avoid republication or express advocacy). The Commission fails to justify why such spending should be dismissed as "insubstantial" and unworthy of regulation, and it fails to give any persuasive reason to believe that the existence of its "safe harbors" will not result in the flow of more advertising dollars to those periods outside the regulatory windows. *See Shays I*, 414 F.3d at 102 ("perhaps [the] most important question" is whether candidates and their supporters would "simply shift" coordinated spending outside the windows).

35. The Commission's reliance on the 2004 CMAG data is arbitrary and capricious in a number of additional respects, including but not limited to the following:

(a) The CMAG data address only TV ads, and there is no evidence in the record to draw conclusions about how many campaign ads are run outside the 90- and 120-day windows by means of other types of "public communications"—including radio ads, newspaper ads, direct mail, or phone banks, all of which are subject to the coordination rules. There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that there is only an insignificant amount of campaign activity in these other media outside the Commission's pre-election windows.

(b) The CMAG data focus only on candidate ads, not on ads run by political parties and outside groups. Yet the administrative record includes many examples of election-related ads run by parties and outside groups extolling the virtues of favored candidates and attacking disfavored candidates, representing the expenditure of millions of dollars, run outside the Commission's 90- and 120-day windows. In the best known example, the Democratic National Committee is reported to have spent $18 million in soft money on TV ads attacking Senator Bob Dole and extolling President Clinton during the summer and fall of 1995, long before the Commission's 120-day pre-primary window would have kicked in. The record contains many other examples of party and interest group advertising during 1999 and 2003 as part of the early maneuvering in the

2000 and 2004 campaigns, respectively—all of which the Commission ignored in its E&J, and all of which would have been freed of any functionally meaningful regulation under the Commission's revised rules.

(c) The CMAG data, in gross, do not control for different kinds of campaigns. Even if it were true that candidates (or parties, or outside groups) do not engage in substantial early advertising in *most* races, they often do so in *certain* races, such as highly competitive Senate races with national dimensions (*e.g.*, the 2004 Daschle re-election campaign, the 2006 Santorum re-election campaign, etc.). There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that such campaign advertisements, clustered in highly competitive races, are rendered insignificant or insubstantial simply because they constitute a small percentage of total advertisements run nationwide.

(d) The CMAG data presented by the Commission understate early advertising expenditures by presenting data only for media markets contained fully within a single battleground state. This selection process excludes many important multi-state media markets, such as Philadelphia, Pittsburgh, Denver, Reno, Cincinnati, Green Bay, Spokane, and many others. The actual number of advertisements and amount of spending outside the pre-election windows is thus certainly much greater than suggested by the Commission's limited data set.

(e) The Commission's data set on House and Senate primaries contains no ads by 2004 House or Senate candidates aired in 2003, yet the record

demonstrates that many such ads were aired, often eight to ten months before the primary. These omissions render the Commission's pre-primary Congressional data set meaningless.

(f)  The Commission attempts to use the CMAG data to demonstrate that ads run outside of its chosen time frames have "little" or "minimal" value to candidates, and thus "do not present the potential for corruption or the appearance of corruption" justifying regulation. 71 Fed. Reg. at 33,194, 33,196. The Commission nevertheless applies its coordination regulations to any ads run outside the time frames that either contain express advocacy or republish a candidate's own campaign materials. The Commission thereby concedes that *some* ads run outside the time frames *do* have value to candidates and thus *do* present a risk of corruption or the appearance of corruption if they are coordinated. The question then becomes whether the Commission is correct that early coordinated ads are "valuable" to a candidate *only* where they contain express advocacy or republish his own campaign materials. The Commission offers no explanation or justification for believing this is so; nothing in the CMAG data suggests this might be so; and such a position conflicts with the opinions in *McConnell* and *Shays I*, with the legislative history of BCRA, and with evidence in the administrative record in this case.

36.    The Commission received many examples of advertising aired by candidates, political parties, and outside groups during the "safe harbor" periods established by revised Section 109.21. These examples included ads run in the 1996,

2000, and 2004 Presidential election cycles, sometimes 9-12 months before the first

caucus or primary.  These examples also included many early ads run in 2004 and 2006

House and Senate races.  For example, the administrative record demonstrates that,

during the present election cycle, the National Republican Senatorial Committee

launched its first TV ads against Democratic Senator Robert Byrd in July 2005, more

than nine months before West Virginia's May 2006 primary election; that the Montana

Democratic Party launched TV attacks against Republican Senator Conrad Burns in

August 2005, ten months before the June 2006 primary; and that Americans for Job

Security made a half-million dollar ad buy in November 2005 touting the virtues of

Republican Senator Rick Santorum, nearly half a year before the Pennsylvania primary.

These and many other examples add up to thousands of ads and millions of dollars in

expenditures in clear support of, or opposition to, named federal candidates.  The

Commission dismissed all of this evidence on the grounds that there was no evidence of

*actual* coordination behind any of these advertisements, but that reasoning misses the

point.  The point is that these ads demonstrate that candidates, political parties, and

outside spenders have repeatedly recognized the value of early advertising by running

thousands of such ads and spending millions of dollars on them, often six months to a

year before the primary or caucus.  Accordingly, these ads belie the Commission's claim

that early public communications are of "little" or "minimal value" to candidates.

### C.     The Commission Failed To Provide Adequate Opportunity for Parties To Comment on the CMAG Data, in Violation of the APA.

37.     The Commission did not publish the original Notice of Proposed

Rulemaking ("NPRM") to amend the coordination rules until December 14, 2005—

fifteen months after this Court's final decision in *Shays I*.  70 Fed. Reg. 73,946.  Three

months after publication of the NPRM, two months after interested parties had submitted comments on the NPRM, and seven weeks after witnesses had testified at a hearing on the proposed rule, the FEC *sua sponte* added into the administrative record the enormous new CMAG database that it had recently licensed, and published the SNPRM to invite comment on the data. 71 Fed. Reg. at 13,306. The Commission allowed only five business days for comment. *See ¶* 33 above.

38.     The CMAG data included many thousands of pages of underlying data, summarized in over thirty pages of charts. Given the volume and complexity of the CMAG data, the unreasonably short comment period significantly impaired the ability of interested parties to analyze and comment on those data, and the public was therefore denied the opportunity to participate meaningfully in the rulemaking process. The brevity of the comment period is particularly egregious in this case given the Commission's fifteen-month delay in issuing the original NPRM on the coordination question. The Commission's failure to afford interested parties a meaningful "opportunity to participate in the rule making" violates the APA, 5 U.S.C. § 553(c).

> **D.     The Commission Has Failed To Demonstrate Why Spending Will Not Simply Shift to the Unregulated Periods Outside the Pre-Election Windows.**

39.     The Commission has failed to provide an acceptable response to what the D.C. Circuit called "perhaps [the] most important" question—"to the extent election-related advocacy now occurs primarily within 120 days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged rules' restrictions?" *Shays I*, 414 F.3d at 102. The Commission's only response to this query was to argue that, since the CMAG data show that candidates themselves place "little" or "minimal" value on early advertising, "there

is little risk that coordinated activity presents the risk or appearance of corruption." 71 Fed. Reg. at 33,196. For all of the reasons set forth above, this misreads the CMAG data and ignores the substantial record evidence of early advertising by candidates themselves, especially in high-profile, hotly contested races.

**E.      The Commission's Closing of the Presidential "Gap Period" but Not the Congressional "Gap Period" Is Arbitrary and Capricious.**

40.      Section 109.21 originally created a "gap period" for Presidential, House, and Senate races in the many States that hold primary elections more than 120 days before the general election. For example, in a State with an April primary, no effective coordination rules were in place from primary night until early the following July (*i.e.*, 120 days before the November general election). The rule authorized a "coordinated communication free-for-all" during this gap period. *Shays I*, 414 F.3d at 100.

41.      In its revised Section 109.21, the Commission has closed such election-year "gap periods" in Presidential races, but not in House or Senate races. The Commission contends that the CMAG data demonstrate that ads run during these gap periods in House and Senate races are of little or no value to candidates, and that there is thus no need to regulate coordinated communications containing non-express advocacy during these periods. The Commission's reliance on the CMAG data for this proposition is arbitrary and capricious, and ignores the record evidence showing that ads are often run during these election-year "gap periods" in Congressional as well as Presidential races.

**F.      The Revised "Conduct Standards" Will Exacerbate Circumvention of FECA and BCRA, and Are Not Adequately Explained or Justified by the Commission.**

42.      The revised common vendor/former employee provisions. Although not part of this Court's review in *Shays I*, the Commission undertook in the 2006 rulemaking

to modify those provisions of the 2002 coordination regulations that addressed the

potential for coordination between an outside spender and common vendors and former

employees of campaigns.  *See* 11 C.F.R. § 109.21(d)(4)-(5).  As revised, the regulations

apply for a drastically shorter period than the 2002 rules provided, the result of which is

to increase opportunities for circumvention of federal campaign finance laws.

43.     Section 214(c) of BCRA specifically instructs the Commission to "address

. . . payments for the use of a common vendor . . . [and] payments for communications

directed or made by persons who previously served as an employee of a candidate or a

political party."  In response to this statutory directive, the Commission in 2002 adopted a

common vendor rule, former 11 C.F.R. § 109.21(d)(4), providing that the "conduct

prong" of the coordination rules would be met if (1) the person paying for the

communication contracted with a commercial vendor to create, produce, or distribute the

communication; (2) the commercial vendor had provided one or more specified types of

services to the clearly identified candidate or her opponent during the "current election

cycle" (which began on "the first day following the date of the previous general election

for the office or seat which the candidate seeks" and ended "on the date on which the

general election for the office or seat that individual seeks is held," 11 C.F.R. § 100.3(b));

and (3) the commercial vendor used or conveyed to the person paying for the

communication information about the campaign plans, projects, or needs of the identified

candidate or party committee that was material to the creation, production, or distribution

of the communication and which the vendor obtained from work done for the candidate

or party committee when working for the person paying for the communication.

44.     Similarly, the Commission's 2002 "former employee" rule, former 11

C.F.R. § 109.21(d)(5), provided that the conduct prong would be met if the party paying

for the communication was employing a person who was a former employee of the

identified candidate within the current election cycle, and the former employee conveyed

information material to the communication regarding the campaign plans, projects, or

needs of the identified candidate obtained from work done for the candidate when

working for the person paying for the communication.

45.     The Commission's 2006 coordination rule, instead of strengthening

prohibitions on coordination with common vendors and former employees, significantly

shortens the period of time in which the regulation is applicable.  Rather than continuing

to apply the coordination prohibition during the current election cycle, new Sections

109.21(d)(4) and (5) provide that the regulation is only effective during a period of 120

days beginning on the last day that goods or services were provided to the candidate.  *See

also* 71 Fed. Reg. at 33,204.  This is a significant weakening of the regulation, especially

in the case of Senate campaigns, in which the former regulation covered a six-year period

and in which it now covers only 120 days.

46.     The Commission's reasons for drastically reducing the temporal limit are

arbitrary and capricious.  The Explanation and Justification provides, in a purely

conclusory manner, that since "information that is central to the common vendor and

former employee conduct standards . . . does not remain 'material' for long periods of

time during an election cycle," then "[t]he more appropriate temporal limit for the

common vendor and former employee conduct standards is 120 days."  71 Fed. Reg. at

33,204.  The Commission fails to explain why it chose the 120-day period rather than a

period of any other duration.

47.   The Commission's new safe harbor for "firewalls." The Commission in its revised rules has for the first time created a "firewall" standard enabling an organization to avoid the coordination rules so long as its coordination takes place behind an asserted "firewall." The new rule established by 11 C.F.R. § 109.21(h) creates a "rebuttable presumption" that coordination has not occurred where "a commercial vendor, former employee, or political committee has designed and implemented an effective firewall." 71 Fed. Reg. at 33,206. This rule gives rise to new opportunities to circumvent BCRA's coordination rules. Indeed, in the 2002 rulemaking, the Commission itself considered and rejected this provision because it found that "[w]ithout some mechanism to ensure enforcement, [such] private arrangements are unlikely to prevent the circumvention of the rules." 68 Fed. Reg. at 436-37. The Commission failed in its Explanation and Justification for the revised rules to explain adequately its decision to adopt a rule that it explicitly rejected just three years ago.

48.   The firewall provision creates a safe harbor that is applicable to all of the conduct standards found in 11 C.F.R. § 109.21(d). *See* 71 Fed. Reg. at 33,206. The presumption that coordination has not occurred arises so long as the firewall is "designed and implemented to prohibit the flow of information about the candidate's . . . plans, projects, activities, or needs between those employees or consultants providing services for the person paying for the communication and those employees or consultants who currently provide, or previously provided, services" for the identified candidate (or her opponent). *Id.* The revised rule, however, does not require a complete firewall. Rather, it allows "common leadership" of an organization to operate on both sides of the wall, *id.* at 33,207, thus permitting, for instance, the head of an organization to communicate both

with those employees in the organization working directly with a candidate and those employees who are spending money for the organization on behalf of that candidate in a purportedly "independent" capacity. Moreover, the revised rule "does not dictate specific procedures required to prevent the flow of information referenced in new 109.21(h)," *id.* at 33,206, and the Commission provides no further guidance as to what effective implementation of such a firewall would look like. Instead, the Commission relies exclusively on its decision in the EMILY's List Matter Under Review ("MUR"), FEC MUR 5506 ("EMILY's List"), which provided that, because EMILY's List asserted that it had a "policy" of barring its employees who handled advertising buys from interacting with federal candidates and party committees, as well as "'with others within EMILY's List regarding specified candidates or officeholders,'" it was presumed that coordination had not taken place and no further inquiry would be made. 71 Fed. Reg. at 33,206 (quoting MUR 5506 (EMILY's List), First General Counsel's Report at 6-7).

49.     Because EMILY's List offered no specific details regarding its implementation of the firewall, and because the Commission has provided no further guidance, the rule is an open invitation to coordinate. Under the new rule, a vendor, such as a media consultant, can work simultaneously for a candidate and an outside spender, so long as the vendor asserts it has a firewall "policy." The outside spender (advised by the common vendor) can engage in unlimited "independent" expenditures promoting the candidate served by the same media consultant without that spending being considered coordinated. Similarly, a political committee (such as EMILY'S List) can work closely in coordination with a candidate while simultaneously claiming the right to make unlimited "independent" expenditures promoting that candidate, so long as the committee

asserts it has a firewall "policy."  Both of these results undermine and contravene Congress's purpose in enacting BCRA's coordinated communications provisions.

## VI.    THE REVISED VERSIONS OF THE REGULATIONS DEFINING "FEDERAL ELECTION ACTIVITY," 11 C.F.R. § 100.24(A)(2)-(3), VIOLATE BCRA AND THE APA.

50.    Following this Court's decision in *Shays I*, the Commission adopted revised "Federal election activity" rules on February 9, 2006, and transmitted those revised rules to Congress the next day.  The revised rules were published in the *Federal Register* on February 22, 2006, and took effect on March 24, 2006.  *See* 71 Fed. Reg. 8926.

51.    BCRA prohibits state parties from using unregulated soft money to influence federal elections by defining certain campaign activities conducted by state, district, and local parties as "Federal election activity," and by requiring that such activity be funded with hard money, or with a mixture of federal and Levin funds.  *See* 2 U.S.C. §§ 431(20), 441i(b).  Congress enacted these provisions to end the widespread circumvention of FECA that occurred when national parties and federal officeholders and candidates channeled soft money to state parties to be spent to influence federal elections. In furtherance of that goal, Congress defined as "Federal election activity" those activities that it deemed most likely to influence federal elections.

52.    "Voter registration activity" and "get-out-the-vote activity" are types of "Federal election activity."  2 U.S.C. § 431(20)(A).  Activities determined to be outside the definitions of "voter registration" and "get-out-the-vote" activity—and therefore outside the definition of "Federal election activity"—can be funded by state and local parties, in whole or in part, with soft money.  Accordingly, the scope given to the definitions of "voter registration" and "get-out-the-vote" by the FEC largely determines

the reach and effectiveness of BCRA's "Federal election activity" provisions.

53.     Following the enactment of BCRA, the FEC first promulgated regulations defining "voter registration" and "get-out-the-vote" activity in its 2002 rulemaking.  *See* 11 C.F.R. § 100.24(a)(2)-(3) (2002); 67 Fed. Reg. 49,066 (July 29, 2002).  In *Shays I*, this Court reviewed those regulations and invalidated certain aspects of them after finding that the Commission had not provided adequate notice of the narrow approach taken in the final rules, as required by the APA, 5 U.S.C. § 553(b)(3).  *See* 337 F. Supp. 2d at 101, 106.

54.     This Court also considered substantive challenges to these regulations in *Shays I*.  In particular, it considered plaintiffs' contention that the definitions of "voter registration" and "get-out-the-vote" activities violated BCRA because those terms included only activities that "by *individualized* means . . . *assist*" voters to register or vote.  Plaintiffs argued that the Commission had historically included within the meaning of these terms efforts to encourage (as well as to assist) registration and voting, and that Congress intended BCRA's "Federal election activity" provisions to be similarly encompassing.  This Court concluded that these challenges were not ripe for review because "the exact parameters of the Commission's regulation [we]re subject to interpretation."  337 F. Supp. 2d at 100.  Nonetheless, this Court cautioned that if the regulations were not given a sufficiently encompassing interpretation they might well "'unduly compromise[] the Act.'"  *Id.* (quoting *Orloski*, 795 F.2d at 164) (voter registration activity); *see also id.* at 105 (GOTV activity).

55.     In February 2006, after providing notice and opportunity for comment, the FEC re-promulgated Sections 100.24(a)(2)-(3), leaving intact the limitation that only

activities that "*assist*" voters by "*individualized* means" may constitute "voter registration" or "get-out-the-vote" activity.  The Commission did revise the definition of "GOTV activity" to eliminate an exception for associations of state and local candidates invalidated by this Court in *Shays I*, and to remove a provision that suggested that "GOTV activity" only includes activities conducted within 72 hours of an election, *see* 71 Fed. Reg. at 8929-31, which this Court called into question in *Shays I*, 337 F. Supp. 2d at 103-04.  The Commission did not revise the definition of "voter registration activity." *See* 71 Fed. Reg. at 8927-29.

56.    Under the current rules, "[v]oter registration activity means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote."  11 C.F.R. § 100.24(a)(2).  Similarly, "[g]et-out-the-vote activity means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting."  *Id.* § 100.24(a)(3).  In examples provided in the Explanation and Justification for the new rules and in a subsequent Advisory Opinion, the Commission has very narrowly interpreted the scope of the "individualized means" and "assist[ance]" requirements contained in these definitions. *See* 71 Fed. Reg. at 8929; Ad. Op. 2006-19.  In so doing, the Commission has dramatically limited the scope of BCRA's "Federal election activity" provisions.

57.    The Commission further substantially limited the scope of the "individualized means" requirement in Advisory Opinion 2006-19, which it issued after the effective date of the re-promulgated rules.  In that Opinion, the Commission concluded that a form letter or a pre-recorded, electronically dialed telephone call that provides information to voters, such as the date of the election or location of a polling

place, but that does not contain information tailored specifically to a given recipient, is

not an "individualized means" of assistance and thus does not constitute "get-out-the-

vote-activity" within the meaning of BCRA. Ad. Op. 2006-19. Although that Opinion

was issued specifically in regard to the scope of GOTV activity, there is no basis to

believe that the term "individualized means" would have a different meaning in the

context of "voter registration activity," given the substantial similarity of the terms'

definitions and statutory purpose. By effectively reading into both definitions a

requirement that a communication be tailored to each individual recipient in order to fall

within the regulation's requirement to "assist" by "individualized means," the

Commission has removed from regulation many of the most far-reaching and substantial

voter registration and GOTV activities. Under the Commission's construction, a state

party can send out multiple direct mailings to every potential voter in the state urging

them to register and vote, and can blanket the State with automated telephone calls

exhorting recipients to get out to vote, without being deemed to be engaged in voter

registration or GOTV activity. Thus, the more people that a communication is intended

to reach, the less likely it is that the communication will constitute "Federal election

activity" and be subject to BCRA's soft money restrictions—a result entirely at odds with

BCRA's purpose.

58.     The Commission's examples in its E&J of what constitutes "voter

registration activity" also demonstrate that it has construed narrowly Section

100.24(a)(2)'s "assist[ance]" requirement. In the Commission's first example, a local

political party staff member "provides voter registration forms *and* answers questions

about completing and submitting the forms[, and] *also* accept[s] completed forms and

mail[s] them to the appropriate agency." 71 Fed. Reg. at 8929 (emphasis added).  In the second example, a "State party committee conducts a phone bank contacting possible voters.  The party staff making the calls encourages the individuals to register to vote, provides information about how to register to vote, *and* offers to mail registration forms with a prepaid postage envelope to the individuals." *Id.* (emphasis added).  If providing voter registration forms and information that helps individuals to register were enough to constitute "assist[ance]," the additional actions included by the FEC at the end of each example would be entirely superfluous.  The Commission's inclusion of the additional actions therefore suggests that the provision of registration forms or information about registering is insufficient to constitute "assist[ance]."  The stringent assistance requirement suggested by the Commission substantially limits the meaning of "voter registration activity."

59.    By so narrowly defining the "individualized means" and "assist[ance]" requirements of Sections 100.24(a)(2)-(3), the Commission has invited state and local parties to fund substantial amounts of activities that influence federal elections with soft money—a result that is entirely inconsistent with BCRA's purpose.  As this Court suggested might happen in *Shays I*, the narrow scope the Commission has given to BCRA's "Federal election activity" provisions through these rules is contrary to and unduly compromises the Act.  *See* 337 F. Supp. 2d at 100 (citing *Orloski*, 795 F.2d at 164).

60.    The Commission also failed to provide notice in the NPRM for either the original or the revised rule that it might in its final rulemaking limit the scope of "voter registration" and "get-out-the-vote" activities in this manner.  *See* 67 Fed. Reg. 35,654

(May 20, 2002); 70 Fed. Reg. 23,068 (May 4, 2005).  Because the interpretation of the

"individualized means" requirement adopted by the Commission could not have been

anticipated by interested parties during either of the comment periods, those parties were

effectively denied opportunity to offer comments that could persuade the agency to

modify its rule.  *See* 5 U.S.C. § 706(2)(d); *see also Shays I*, 337 F. Supp. 2d at 100-01,

106.

### VII.   THE REGULATION GOVERNING SOLICITATION AT STATE PARTY FUNDRAISING EVENTS, 11 C.F.R. § 300.64(B), CONTINUES TO VIOLATE BCRA AND THE APA.

61.     The Commission issued a revised Explanation and Justification for the

state party fundraiser exception on June 23, 2005, which was published in the *Federal*

*Register* on June 30, 2005.  *See* 70 Fed. Reg. 37,649.

62.     BCRA provides that federal candidates and officeholders shall not "solicit,

receive, direct, transfer, or spend" soft money.  2 U.S.C. § 441i(e).  Notwithstanding that

prohibition, candidates and officeholders may "attend, speak or be a featured guest" at a

state party fundraising event without violating the solicitation ban.  *Id.* § 441i(e)(3).  Title

11 C.F.R. § 300.64(b) implements the exception to BCRA's solicitation ban and provides

that federal candidates and officeholders may attend, speak at, and solicit funds at such

events "without restriction or regulation."  The Commission first promulgated this rule in

July 2002.  *See* 67 Fed. Reg. 49,064, 49,108 (July 29, 2002).  The rule allows federal

candidates and officeholders not only to attend, speak, and be a featured guest at a state

party fundraising event, but also to solicit soft money without limit or restriction.

63.     In *Shays I*, this Court held that the Commission's decision to allow federal

officeholders and candidates to solicit for soft money at state party fundraisers "without

restriction or regulation" was arbitrary and capricious.  337 F. Supp. 2d at 88.  The Court

concluded that the FEC failed to give reasons in its Explanation and Justification for why the concerns raised by a rule that permitted candidates to attend state party fundraisers but not to solicit soft money at such events would be "in any way more vexing in the context of state political party fundraisers than they are outside of such venues where nonfederal money solicitation is almost completely barred." *Id.* at 92. The Commission's revised E&J for the rule suffers from the same fatal defect this Court identified in *Shays I*. *See* 67 Fed. Reg. 49,108.

64. In its new E&J, the Commission insists that distinguishing between solicitations, on the one hand, and informational speech, on the other, "at a State party fundraising event is more difficult than in other contexts," and that it would therefore "be especially intrusive for the Commission to enforce the alternative proposed rule," but it fails to explain *why* that distinction is more difficult in the state party fundraiser context. *See* 70 Fed. Reg. at 37,652. Indeed, several arguments the FEC makes in its E&J serve to undermine that very point. First, many of the precedents and comments to which the Commission cites speak of the difficulty in general of distinguishing solicitations from informative or persuasive speech, rather than to the unique difficulty of making that distinction in the state party fundraiser context. *See id.* Second, the Commission endeavors to distinguish the Hatch Act, which permits a federal employee to "give a speech or keynote address at a political fundraiser . . . as long as the employee does not solicit political contributions," *see* 5 U.S.C § 7323; 5 C.F.R. § 734.208(b), but it fails to explain why Section 300.64(b) could not similarly "provide[] clear guidance to speakers to distinguish permissible speech," as the Hatch Act does. 70 Fed. Reg. at 37,653. Indeed, the Commission does nothing to distinguish the Hatch Act from BCRA. *Id.*

Finally, the Commission suggests that the unique difficulty encountered in the state party fundraiser context arises largely from "Federal officeholders' and candidates' unique relationship to, and special identification with, their State parties," but it fails to explain that special relationship or why it makes any difference in this case.  *Id.* at 37,652.

65.     The Commission's continued failure to provide a reasoned basis for Section 300.64(b)'s broad exemption of solicitations made by federal officeholders and candidates at state party fundraisers fails to meet the APA's requirements for reasoned decisionmaking, 5 U.S.C. § 706(2)(a), as well as the mandate of this Court in *Shays I* that the Commission explain why this broad exemption is uniquely necessary in the state party fundraising context, 337 F. Supp. 2d at 92.

66.     Section 300.64(b) is contrary to the language, structure, and underlying purposes of Title I of BCRA.

## VIII.  LEGAL BASES FOR CHALLENGING THE COMMISSION'S REVISED REGULATIONS

67.     This Court should not afford deference to the FEC in reviewing the revised 11 C.F.R. §§ 109.21, 100.24(a)(2)-(3), and 300.64(b).  The regulations are contrary to the plain text of FECA and BCRA, the clear intent of Congress, the agency's own historic practices and interpretations, and governing judicial precedents.  The regulations also contravene BCRA's purpose of reducing opportunities to circumvent the federal campaign finance regime and are therefore unreasonable interpretations of the statute.

68.     In addition, the regulations described above are in excess of the FEC's statutory jurisdiction, authority and right, and accordingly are invalid pursuant to 5 U.S.C. § 706(2)(c).

69.    The revised regulations also are not reasonably supported by the Commission's explanations and justifications, and the Commission has failed to offer any rational reasons for its rejection of alternative approaches to the regulations.  The regulations are therefore arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and, as such, are invalid pursuant to 5 U.S.C. § 706(2)(a).

70.    The FEC also failed to give adequate notice of some of the rules it adopted, and it failed to articulate a rational basis for its decision to adopt these regulations which, in many cases, are inconsistent with past positions and interpretations taken by the Commission.  For these and other reasons, the FEC's regulations described above are invalid pursuant to 5 U.S.C. §§ 553(c) and 706(2)(d).

71.    Finally, the FEC failed on remand to follow the binding standards and instructions set forth in the opinions of this Court and the D.C. Circuit, and failed adequately to address the questions and concerns set forth in the *Shays I* decisions.

## IX.    REQUESTED RELIEF

72.    Plaintiffs request the following relief:

A.    That the Court declare that the revised 11 C.F.R. §§ 109.21, 100.24(a)(2)-(3), and 300.64(b) are contrary to law, arbitrary and capricious, and otherwise unlawful;

B.    That the Court enjoin the operation of 11 C.F.R. §§ 109.21, 100.24(a)(2)-(3), and 300.64(b) until such time as those regulations have been corrected to comply with governing federal campaign finance statutes;

C.    That the Court order the Commission to commence expedited rulemaking proceedings and to adopt appropriate interim regulations to govern during the

pendency of its rulemaking proceedings, and that the Court retain jurisdiction over this matter to ensure the Commission's timely and sufficient compliance with the Court's decision; and

> D.    That the Court grant such other and further relief as it deems

proper.


DATED: July 11, 2006                     Respectfully submitted,


                                         _Michelle M. Umberger_
                                         _____
                                         Charles G. Curtis, Jr.
                                         Michelle M. Umberger (Bar No. 480620)
                                         David L. Anstaett
                                         Lissa R. Koop
                                         HELLER EHRMAN LLP
                                         One East Main Street, Suite 201
                                         Madison, Wisconsin  53703
                                         (608) 663-7460


Roger M. Witten (Bar No. 163261)         Randolph D. Moss (Bar No. 417749)
WILMER CUTLER PICKERING                  WILMER CUTLER PICKERING
    HALE AND DORR LLP                         HALE AND DORR LLP
399 Park Avenue                          1875 Pennsylvania Avenue, N.W.
New York, New York  10022                Washington, D.C.  20006
(212) 230-8800                           (202) 663-6000


Donald J. Simon (Bar No. 256388)         Fred Wertheimer (Bar No. 154211)
SONOSKY, CHAMBERS, SACHSE,               DEMOCRACY 21
ENDRESON & PERRY LLP                     1825 Eye Street, N.W., Suite 400
1425 K Street, N.W., Suite 600           Washington, D.C.  20006
Washington, D.C.  20005                  (202) 429-2008
(202) 682-0240