IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Christopher Shays and Martin Meehan,

                    Plaintiffs,

     v.

United States Federal Election Commission,

                    Defendant.

Civil Action No. 06-CV-1247
(Judge Kollar-Kotelly)

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

The plaintiffs, Christopher Shays and Martin Meehan, by their undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)-(D), respectfully move this Court for a summary judgment holding unlawful and setting aside the following regulations promulgated by the Federal Election Commission as "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law"; "in excess of [the Commission's] statutory jurisdiction, authority, or limitations"; and as having been promulgated "without observance of procedure required by law":

- 11 C.F.R. § 109.21

- 11 C.F.R. § 300.64(b)

- 11 C.F.R. § 100.24(a)(2)-(3)

Support for this motion is set forth in the accompanying Memorandum in Support of Plaintiffs' Motion for Summary Judgment; the accompanying Declarations of Christopher Shays, Martin Meehan, and David L. Anstaett; the supporting Plaintiffs' Exhibits ["PXs"]; the complete

administrative record, filed by the Commission on October 31, 2006 (Dkt. No. 17); and the

separate Plaintiffs' Statement of Material Facts as To Which Plaintiffs Contend There Is No

Genuine Dispute.  Plaintiffs' requested relief is set forth in the accompanying Proposed Order.

      Plaintiffs respectfully request oral argument on this motion.

      Dated this 8th day of December, 2006.

                              Respectfully submitted,

                              _____

| | |
|---|---|
| Roger M. Witten (Bar No. 163261)<br>WILMER CUTLER PICKERING<br>   HALE AND DORR LLP<br>399 Park Avenue<br>New York, New York 10022<br>(212) 230-8800 | Charles G. Curtis, Jr. (*pro hac vice*)<br>Michelle M. Umberger (Bar No. 480620)<br>David L. Anstaett (*pro hac vice*)<br>Lissa R. Koop (*pro hac vice*)<br>HELLER EHRMAN LLP<br>One East Main Street, Suite 201<br>Madison, Wisconsin 53703<br>(608) 663-7460 |
| Randolph D. Moss (Bar No. 417749)<br>WILMER CUTLER PICKERING<br>   HALE AND DORR LLP<br>1875 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20006<br>(202) 663-6000 | Fred Wertheimer (Bar No. 154211)<br>DEMOCRACY 21<br>1825 Eye Street, N.W., Suite 400<br>Washington, D.C. 20006<br>(202) 429-2008 |
| Donald J. Simon (Bar No. 256388)<br>SONOSKY, CHAMBERS, SACHSE,<br>   ENDRESON & PERRY LLP<br>1425 K Street, N.W., Suite 600<br>Washington, D.C. 20005<br>(202) 682-0240 | |

                         *Attorneys for Plaintiffs Christopher Shays*
                              *and Martin Meehan*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Christopher Shays and Martin Meehan,

                                              Plaintiffs,

        v.                                                        Civil Action No. 06-CV-1247
                                                                  (Judge Kollar-Kotelly)
United States Federal Election Commission,

                                              Defendant.

---

MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

---

Roger M. Witten (Bar No. 163261)                Charles G. Curtis, Jr. (*pro hac vice*)
WILMER CUTLER PICKERING                         Michelle M. Umberger (Bar No. 480620)
  HALE AND DORR LLP                             David L. Anstaett (*pro hac vice*)
399 Park Avenue                                 Lissa R. Koop (*pro hac vice*)
New York, New York  10022                       HELLER EHRMAN LLP
(212) 230-8800                                  One East Main Street, Suite 201
                                                Madison, Wisconsin  53703
                                                (608) 663-7460


Randolph D. Moss (Bar No. 417749)               Fred Wertheimer (Bar No. 154211)
WILMER CUTLER PICKERING                         DEMOCRACY 21
  HALE AND DORR LLP                             1825 Eye Street, N.W., Suite 400
1875 Pennsylvania Avenue, N.W.                  Washington, D.C.  20006
Washington, D.C.  20006                         (202) 429-2008
(202) 663-6000


Donald J. Simon (Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
  ENDRESON & PERRY LLP
1425 K Street, N.W., Suite 600
Washington, D.C.  20005
(202) 682-0240


                                *Attorneys for Plaintiffs Christopher Shays*
                                        *and Martin Meehan*

# Table of Contents

Page(s)

Table of Authorities ................................................................................................ iii

Table of Abbreviations ............................................................................................ ix

Introduction and Summary of the Argument .............................................................1

Standards of Review .................................................................................................3

Argument .................................................................................................................5

I.      Plaintiffs' Claims Are Immediately Justiciable. ...................................................5

II.     The Commission's Coordination "Content Standards" Continue to
        Violate FECA, BCRA, and the APA. ..................................................................5

        A.      The Decisions in *Shays I* and the Commission's Proceedings on
                Remand. ..............................................................................................8

        B.      The Record Demonstrates That Many Candidates, Political
                Parties, and Outside Spenders Have Paid For Campaign Ads
                That Ran Outside the Commission's Pre-Election Windows. ...............12

                1.      Early advertising in Presidential campaigns. ..............................13

                2.      Early advertising in Congressional campaigns. .........................19

        C.      Revised Section 109.21 Continues To Apply a "Functionally
                Meaningless" Content Standard During Most of Each Election
                Cycle, Indeed, to an Even Larger Part of the Congressional
                Election Cycle than Did the Previous Version of the Rule....................26

        D.      The Commission Made Arbitrary and Capricious Use of the
                CMAG Data in Attempting To Justify Its Revised Coordination
                Regulation. .........................................................................................31

        E.      The Commission Has Failed To Demonstrate Why Spending
                Will Not Simply Shift to the Unregulated Periods Outside the
                Pre-Election Windows. .......................................................................37

III.    The Commission's Revised Coordination "Conduct Standards" Violate
        FECA, BCRA, and the APA.............................................................................39

        A.      The Revised Common Vendor and Former Employee
                Provisions Will Exacerbate Circumvention of FECA and
                BCRA, and Are Not Adequately Explained or Justified. ....................39

B.      The "Firewall" Safe Harbor Will Lead to Circumvention of FECA and BCRA, and Is Not Adequately Explained or Justified. ................................................................................ 43

IV.    The Regulation Governing Solicitation at State Party Fundraising Events Continues to Violate BCRA and the APA. ................................................ 47

V.    The Commission's "Federal Election Activity" Regulations Unduly Compromise BCRA's Soft Money Restrictions on State, District, and Local Party Committees and Violate the APA. ............................................... 51

A.      Plaintiffs' Challenges to the "Voter Registration" and "Get-Out-The-Vote" Activity Regulations Are Ripe for Judicial Review. ........................ 53

B.      The Commission's Narrow Definition of the "Individualized Means" and "Assist[ance]" Requirements Undermine BCRA's Soft Money Ban, and Are Arbitrary and Capricious. ........................... 54

Conclusion ................................................................................................................ 59

Addendum A — Selected Regulations ................................................. Add. A-1 to A-21

Addendum B — Selected Statutory Provisions .................................... Add. B-1 to B-35

Addendum C — Selected FEC CMAG Charts ...................................... Add. C-1 to C-2

Addendum D — Selected Scripts of Campaign Advertising Run Outside the FEC's Pre-Election Windows ........................ Add. D-1 to D-44

# Table of Authorities

Page(s)

**Cases:**

*AFL-CIO v. FEC,*
    333 F.3d 168 (D.C. Cir. 2003) ...................................................................................4

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ......................................................................................................29

*Bush-Quayle '92 Primary Comm. v. FEC,*
    104 F.3d 448 (D.C. Cir. 1997) ...................................................................................5

*Chamber of Commerce v. FEC,*
    69 F.3d 600 (D.C. Cir. 1995) ...............................................................................5, 58

*\*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
    467 U.S. 837 (1984) ...........................................................................................*passim*

*Cobell v. Norton,*
    240 F.3d 1081 (D.C. Cir. 2001) ...............................................................................60

*Common Cause v. FEC,*
    692 F. Supp. 1391 (D.D.C. 1987) .........................................................................4, 45

*Common Cause v. FEC,*
    692 F. Supp. 1397 (D.D.C. 1988) .............................................................................59

*EPA v. Brown,*
    431 U.S. 99 (1977) ......................................................................................................4

*FEC v. Akins,*
    524 U.S. 11 (1998) ......................................................................................................5

*\*FEC v. Christian Coalition,*
    52 F. Supp. 2d 45 (D.D.C. 1999) .............................................................................29

*FEC v. Democratic Senatorial Campaign Comm.,*
    454 U.S. 27 (1981) ......................................................................................................4

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
    336 F.3d 1094 (D.C. Cir. 2003) ..........................................................................59-60

\*Authorities on which plaintiffs chiefly rely are marked with asterisks.

*McConnell v. FEC,
    540 U.S. 93 (2003) ................................................................................................ passim

*McConnell v. FEC,
    251 F. Supp. 2d 176 (D.D.C. 2003) (three-judge District Court),
    aff'd, 540 U.S. 93 (2003) ...................................................................................... passim

Moreau v. FERC,
    982 F.2d 556 (D.C. Cir. 1993) .......................................................................................4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) .....................................................................................4, 42, 46

*Orloski v. FEC,
    795 F.2d 156 (D.C. Cir. 1986) ............................................................................. passim

Pub. Citizen v. U.S. Dep't of Justice,
    491 U.S. 440 (1989) ......................................................................................................4

Pub. Citizen Health Research Group v. FDA,
    740 F.2d 21 (D.C. Cir. 1984) .......................................................................................60

Randall v. Sorrell,
    126 S. Ct. 2479 (2006) ................................................................................................36

RNC v. FEC,
    76 F.3d 400 (D.C. Cir. 1996) ................................................................................... 4-5

*Shays v. FEC,
    337 F. Supp. 2d 28 (2004),
    aff'd, 414 F.3d 76 (D.C. Cir. 2005) ...................................................................... passim

*Shays v. FEC,
    340 F. Supp. 2d 39 (D.D.C. 2004) ....................................................................1, 3, 5, 9

*Shays v. FEC,
    414 F.3d 76 (D.C. Cir. 2005) ............................................................................... passim

Shays v. FEC,
    424 F. Supp. 2d 100 (D.D.C. 2006) ...........................................................................59

Sierra Club v. Whitman,
    No. 00-2206 CKK/JMF, 2002 WL 393069 (D.D.C. Mar. 11, 2002) ..............................33

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

iv

*St. Lawrence Seaway Pilots' Ass'n v. Collins*,
    362 F. Supp. 2d 59 (D.D.C.), *vacated on other grounds*,
    No. CIV. A. 03-1204, 2005 WL 1138916 (D.D.C. May 13, 2005)...................................60

*United States v. Florida E. Coast Rwy.*,
    410 U.S. 224 (1973)...................................................................................................................33

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)...................................................................................................................4

*Weidel v. Ashcroft*,
    234 F. Supp. 2d 5 (D.D.C. 2002) .........................................................................................46-47

**Constitution, Statutes, Legislation, and Legislative History:**

U.S. Constitution, Art. III .........................................................................................................5

2 U.S.C. § 431(8) .......................................................................................................................5

*2 U.S.C. § 431(9) ........................................................................................................6, 8, 27

*2 U.S.C. § 431(20)(A) .............................................................................................................51

2 U.S.C. § 434(b) .......................................................................................................................5

*2 U.S.C. § 441a(a)(7)(B) ....................................................................................................6, 27

2 U.S.C. § 441a(d) .....................................................................................................................16

2 U.S.C. § 441b .........................................................................................................................29

2 U.S.C. § 441i(b) ......................................................................................................................5

*2 U.S.C. § 441i(e) .............................................................................................................47-48, 51

5 U.S.C. § 553(b) .................................................................................................................33, 52

5 U.S.C. § 706(2) .................................................................................................................3, 59

5 U.S.C. § 7323 ...................................................................................................................50-51

Administrative Procedure Act, codified at 5 U.S.C. §§ 551 *et seq.*........................................ *passim*

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

Bipartisan Campaign Reform Act of 2002,
    Pub. L. No. 107-155, 116 Stat. 81 .............................................................. *passim*

*Bipartisan Campaign Reform Act § 214......................................................7, 29, 39

Bipartisan Campaign Reform Act § 402....................................................................59

Federal Election Campaign Act, codified at 2 U.S.C. §§ 431 *et seq.* ................... *passim*

S. Rep. No. 105-167 (1998)
    (the "Thompson Committee Report")...............................................................31, 40

148 Cong. Rec. S1992-93 (daily ed. Mar. 18, 2002) ..................................................48

148 Cong. Rec. S2139 (daily ed. Mar. 20, 2002) .......................................................48

148 Cong. Rec. S2142 (daily ed. Mar. 20, 2002) .......................................................59

148 Cong. Rec. S2144-45 (daily ed. Mar. 20, 2002) ...............................................7, 40

## Regulations and Agency Materials:

5 C.F.R. § 734.101 ......................................................................................................51

5 C.F.R. § 734.208(b) ..................................................................................................50

5 C.F.R. § 734.303(b) ..................................................................................................50

11 C.F.R. § 100.3(b) ....................................................................................................40

11 C.F.R. § 100.23(a)....................................................................................................7

11 C.F.R. § 100.23(c) (2001)........................................................................................6

11 C.F.R. § 100.24(a)...............................................................................3-4, 53-54, 56

11 C.F.R. § 100.24(a) (2003)......................................................................................52

11 C.F.R. § 100.29(a)..................................................................................................11

11 C.F.R. § 100.133 ....................................................................................................52

11 C.F.R. § 106.4(g) ...................................................................................................42

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

11 C.F.R. § 109(1)(b) (1981) ........................................................................................6

11 C.F.R. § 109.21 ............................................................................................ *passim*

11 C.F.R. § 109.21 (2003) ...................................................................................2, 7, 40

11 C.F.R. § 300.64(b) ......................................................................................2-4, 47

General Public Political Communications Coordinated with
    Candidates and Party Committees; Independent Expenditures; Final Rule,
    65 Fed. Reg. 76,138 (Dec. 6, 2000) ...................................................................29

Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money,
    Final Rule,
    67 Fed. Reg. 49,064 (July 29, 2002).............................................................47, 52

Coordinated and Independent Expenditures; Final Rules,
    68 Fed. Reg. 421 (Jan. 3, 2003) .................................................... 1, 7, 42-43, 46

Candidate Solicitation at State, District, and Local Party
    Fundraising Events; Proposed Rule,
    70 Fed. Reg. 9,013 (Feb. 24, 2005) ...................................................................48

Candidate Solicitation at State, District, and Local Party
    Fundraising Events; Revised Explanation and Justification,
    70 Fed. Reg. 37,649 (June 30, 2005) ......................................................... 48-51

Coordinated Communications; Proposed Rules,
    70 Fed. Reg. 73,946 (Dec. 14, 2005).............................................................32, 44

Electioneering Communications; Final Rules,
    70 Fed. Reg. 75,713 (Dec. 21, 2005)..................................................................1

Definitions of "Agent" for BCRA Regulations on Non-Federal Funds
    or Soft Money and Coordinated and Independent Expenditures;
    Revised Explanation and Justification,
    71 Fed. Reg. 4,975 (Jan. 31, 2006) ....................................................................1

Definition of Federal Election Activity; Final Rules,
    71 Fed. Reg. 8,926 (Feb. 22, 2006) .................................................... 53, 56-58

Coordinated Communications; Proposed Rules,
    71 Fed. Reg. 13,306 (March 15, 2006)..............................................................10

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

Definitions of "Solicit" and "Direct"; Final Rules,
    71 Fed. Reg. 13,926 (March 20, 2006) ...............................................................................1

Internet Communications; Final Rules,
    71 Fed. Reg. 18,589 (Apr. 12, 2006) ................................................................................1

Coordinated Communications; Final Rules,
    71 Fed. Reg. 33,190 (June 8, 2006) ....................................................................... *passim*

FEC Advisory Opinion 1980-64 ......................................................................................52

FEC Advisory Opinion 1982-56 .........................................................................................6

FEC Advisory Opinion 1983-12 ...................................................................................6, 29

FEC Advisory Opinion 1988-22 ...................................................................................6, 29

FEC Advisory Opinion 1990-5 .........................................................................................29

FEC Advisory Opinion 2006-19 ............................................................................. 53-56, 58

First General Counsel's Report,
    EMILY's List Matter Under Review 5506 (Aug. 9, 2005) ........................................43-44

**Secondary Sources:**

Michael Barone & Richard E. Cohen,
    *The Almanac of American Politics 2006* (2005) ............................................................36

Sydney Blumenthal, *The Clinton Wars* (2003) ...............................................................17

Dick Morris, *Behind the Oval Office:*
    *Winning the Presidency in the Nineties* (1997)......................................................... 17, 31

Recent Case, 118 Harv. L. Rev. 2453 (2005) ............................................................... 48

*Oxford English Dictionary* (2d ed. 1989) ................................................................... 32

Scott E. Thomas & Jeffrey H. Bowman,
    *Coordinated Expenditure Limits: Can They Be Saved?*,
    49 Cath. U. L. Rev. 133 (1999)....................................................................................... 6, 29

Bob Woodward, *The Choice* (1996) .............................................................................. 17

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

**Table of Abbreviations**

The following abbreviations are used in this memorandum:

- Add. ___      Addendum A, B, C, or D, attached to this memorandum

- AO      FEC Advisory Opinion

- APA      Administrative Procedure Act

- BCRA      Bipartisan Campaign Reform Act of 2002

- CKK      Hon. Colleen Kollar-Kotelly

- CMAG      Advertising data licensed by the FEC from TNS Media Intelligence/CMAG

- D      Democratic

- DCCC      Democratic Congressional Campaign Committee

- DNC      Democratic National Committee

- E&J      Explanation & Justification

- FEA      Federal election activity

- FEC      Federal Election Commission

- FECA      Federal Election Campaign Act

- KLH      Hon. Karen LeCraft Henderson

- NARAL      National Abortion Rights Action League

- NPRM      Notice of Proposed Rulemaking

- NRSC      National Republican Senatorial Committee

- PX      Plaintiffs' Exhibit

- R      Republican

- RJL          Hon. Richard J. Leon

- RNC          Republican National Committee

- S. Rep. No. 105-167 (1998), *abbreviated as* Thompson Committee Report.

- General Public Political Communications Coordinated With Candidates and Party Committees; Independent Expenditures; Final Rule, 65 Fed. Reg. 76,138 (Dec. 6, 2000) (codified at 11 C.F.R. pts. 100, 109, and 110), *abbreviated as* 65 Fed. Reg. at ____.

- Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money; Final Rule, 67 Fed. Reg. 49,064 (July 29, 2002) (codified at 11 C.F.R. pts. 100, *et al.*), *abbreviated as* 67 Fed. Reg. at ____.

- Coordinated and Independent Expenditures; Final Rules, 68 Fed. Reg. 421 (Jan. 3, 2003) (codified at 11 C.F.R. pts. 100, *et al.*), *abbreviated as* 68 Fed. Reg. at ____.

- Candidate Solicitation at State, District, and Local Party Fundraising Events; Proposed Rule, 70 Fed. Reg. 9,013 (Feb. 24, 2005), *abbreviated as* 70 Fed. Reg. at ____.

- Candidate Solicitation at State, District, and Local Party Fundraising Events; Revised Explanation and Justification, 70 Fed. Reg. 37,649 (June 30, 2005), *abbreviated as* 70 Fed. Reg. at ____.

- Coordinated Communications; Proposed Rules, 70 Fed. Reg. 73,946 (Dec. 14, 2005), *abbreviated as* 70 Fed. Reg. at ____.

- Electioneering Communications; Final Rules, 70 Fed. Reg. 75,713 (Dec. 21, 2005) (codified at 11 C.F.R. pt. 100), *abbreviated as* 70 Fed. Reg. at ____.

- Definitions of "Agent" for BCRA Regulations on Non-Federal Funds or Soft Money and Coordinated and Independent Expenditures; Revised Explanation and Justification, 71 Fed. Reg. 4,975 (Jan. 31, 2006), *abbreviated as* 71 Fed. Reg. at ____.

- Definition of Federal Election Activity; Final Rules, 71 Fed. Reg. 8,926 (Feb. 22, 2006) (codified at 11 C.F.R. pt. 100), *abbreviated as* 71 Fed. Reg. at ____.

- Coordinated Communications; Supplemental Notice of Proposed Rulemaking, 71 Fed. Reg. 13,306 (March 15, 2006), *abbreviated as* 71 Fed. Reg. at ____.

- Definitions of "Solicit" and "Direct"; Final Rules, 71 Fed. Reg. 13,926 (March 20, 2006) (codified at 11 C.F.R. pt. 300), *abbreviated as* 71 Fed. Reg. at ____.

x

- Internet Communications; Final Rules, 71 Fed. Reg. 18,589 (April 12, 2006) (codified at 11 C.F.R. pts. 100, 110, and 114), *abbreviated as* 71 Fed. Reg. at ____.

- Coordinated Communications; Final Rules, 71 Fed. Reg. 33,190 (June 8, 2006) (codified at 11 C.F.R. pt. 109), *abbreviated as* 71 Fed. Reg. at ____.

- Michael Barone & Richard E. Cohen, *The Almanac of American Politics 2006* (2005), *abbreviated as 2006 Almanac of American Politics.*

- Plaintiffs' Statement of Material Facts as to Which Plaintiffs Contend There Is No Genuine Issue (December 8, 2006), *abbreviated as* Pls' St. Mat. Facts.

### Introduction and Summary of the Argument

This APA action arises out of, and is a "related case" to, *Shays v. FEC* ("*Shays I*"), Civ. Action No. 02-CV-1984 (CKK).[1]    Following this Court's October 2004 order that the Commission proceed "expeditiously" so that "revised, compliant regulations will be in place for a major portion of the 2006 election cycle," 340 F. Supp. 2d at 51, the Commission completed some rulemakings during 2005 but dawdled on many others—not even bothering, for example, to issue an NPRM on the coordination issues until December 14, 2005, *fourteen months* after it had been ordered to proceed with dispatch.  *See* pp. 9-10 & n.10 below.

Several of the revised regulations—including arguably the most important one, on coordination—remain unlawful:[2]

- In response to *Shays I*, which criticized the Commission's coordination regulation for being too permissive, the Commission has amended its "content standards" to shrink the scope of the regulation even further and thus to authorize even *more* unregulated coordinated activity, not less.  *See* 11 C.F.R. § 109.21(c).  Under the version struck down in *Shays I*, the Commission set a 120-day pre-election window during which reasonable coordination standards applied.  But outside of that window—which was most of each election cycle—candidates, political parties, and outside spenders had a complete "safe harbor," 68 Fed. Reg. at 430 n.2, to engage in massive and

---

[1]  337 F. Supp. 2d 28 (D.D.C. Sept. 18, 2004), *motion for stay denied*, 340 F. Supp. 2d 39 (D.D.C. Oct. 19, 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. Jul. 15, 2005), *reh'g denied*, Oct. 21, 2005.

[2]  The Commission did remedy the illegality of several of its other regulations in response to the decisions in *Shays I*.  For example, it materially broadened and/or clarified the definitions of "solicit," "direct," and "agent," three of the key statutory terms used in BCRA.  *See* 71 Fed. Reg. 13,933 ("solicit" and "direct"); 71 Fed. Reg. 4,975 ("agent").  It extended the provisions of FECA and BCRA to political advertising appearing on the Internet.  71 Fed. Reg. 18,589.  And it significantly strengthened its rules implementing Title II-A's regulation of "electioneering communications."  *See* 70 Fed. Reg. 75,714.

1

unregulated coordinated communications so long as they avoided the republication of campaign materials or express advocacy. 11 C.F.R. § 109.21(c) (2003). Under the revised version, the Commission has made the pre-election window for Congressional campaigns even *smaller*, thus enlarging the "safe harbor" periods and the opportunities for unrestricted coordination. The amended rule continues to flunk the D.C. Circuit's central test—that any "content standard" used in regulating coordinated communications must "rationally separate[] election-related advocacy from other activity falling outside FECA's expenditure definition." 414 F.3d at 100, 102.

- Although plaintiffs for the most part had not challenged the "conduct standards" of the coordination regulation in *Shays I*, the Commission took advantage of the remand to substantially weaken those standards as well. It created new opportunities for abuse and circumvention of FECA and BCRA by coordination occurring through employees and vendors who work for both a candidate and an outside spender during the same campaign, and within organizations that claim to have "firewalls" separating some employees from others. *See* 11 C.F.R. § 109.21(d), (h).

- This Court in *Shays I* struck down the Commission's broad reading of the "state party fundraiser" exception to the ban on soft money solicitations by federal officeholders and candidates. 337 F. Supp. 2d at 88-93. On remand, the Commission failed once again to offer a rational, cogent explanation for this gaping loophole. *See* 11 C.F.R. § 300.64(b).

- The Commission on remand also has stood by its restrictive and improper definitions of "voter registration activity" and "get-out-the-vote activity," both of which are types

of "Federal election activity." *See* 11 C.F.R. § 100.24(a)(2)-(3); *see also Shays I*, 337 F. Supp. 2d at 98-107. The Commission continues impermissibly to construe these definitions to exempt from BCRA's soft money restrictions many voter registration and GOTV activities that are likely to have a substantial effect on federal elections.

For the reasons set forth more fully below, this Court should invalidate the Commission's revised 11 C.F.R. §§ 109.21, 100.24(a)(2)-(3), and 300.64(b) because they are "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law"; are "in excess of [the FEC's] statutory jurisdiction, authority or limitations"; and were adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## Standards of Review

The governing standards of review are set forth in *Shays I*, 337 F. Supp. 2d at 51-54, 340 F. Supp. 2d at 46-47, 51-54, and 414 F.3d at 96-97. The Commission is not entitled "to discard the trade-offs Congress carefully crafted in devising BCRA in favor of a contrary system of interpretation and regulation"; it may not use its rulemaking authority to create loopholes that "thwart the very essence of the wide-sweeping system of reform enacted by Congress"; and its rules must "reflect the democratic will as outlined in the expressed intent and explicit legislation enacted by [the people's] elected representatives—the Congress." 340 F. Supp. 2d at 52-53.

Each of the challenged regulations violates both *Chevron* step two and the APA's standards of reasoned decisionmaking.[3] The regulations must be rejected under *Chevron* step

---

[3] This Court previously rejected plaintiffs' *Chevron* step one challenges to the earlier versions of these rules. *See* 337 F. Supp. 2d at 58-62, 88-90, 98-100, 102-04. The D.C. Circuit affirmed this Court's *Chevron* step one analysis with respect to the coordination regulation, but it never considered the other regulations involved in this action because this Court invalidated those regulations on other grounds and the Commission elected not to appeal. Given this Court's remand of those regulations on other grounds and the Commission's initiation of new rulemaking proceedings, plaintiffs could not have obtained earlier

*(Footnote continued)*

two because they "are inconsistent with the statutory mandate [and] frustrate the policy that Congress sought to implement." *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32 (1981); *see also id.* at 37.  They also repeatedly ignore the D.C. Circuit's admonition that the FEC may not use "objective, bright-line test[s]" if such tests "*unduly compromise the Act's purposes*" or "*create the potential for gross abuse.*"  *Orloski v. FEC*, 795 F.2d 156, 164-165 (D.C. Cir. 1986) (emphasis added); *see Shays I*, 414 F.3d at 96-97 and 337 F. Supp. 2d at 52.[4]

The challenged regulations also violate the APA's standards of "reasoned analysis."  The Commission repeatedly failed to consider all relevant factors and rationally respond to the record evidence before it, failed to articulate its rationale or to justify its premises on key points, and failed to acknowledge or explain striking departures from its prior regulations and precedents. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 52 (1983).  Instead, in the D.C. Circuit's words in *Shays I*, the Commission once again has issued E&Js that provide no "rational" or "cogent explanation[s]" for its actions, include numerous "bromides" rather than reasoned analysis, advance arguments that "make[] no sense," and utterly fail to establish that its regulations "rationally separate[]" federal electioneering activities that

---

appellate review of this Court's *Chevron* step one determinations with respect to 11 C.F.R. §§ 100.24(a)(2)-(3) and 300.64(b).  *See, e.g., EPA v. Brown*, 431 U.S. 99, 103-04 (1977); *Moreau v. FERC*, 982 F.2d 556, 567-68 (D.C. Cir. 1993); *McConnell v. FEC*, 251 F. Supp. 2d 176, 260-64 (D.D.C.) (three-judge District Court) (per curiam), *aff'd*, 540 U.S. 93, 223 (2003); *see also* PX 11-12.  Plaintiffs respectfully raise those step one challenges again in this action.  *See* nn. 36, 39 below.

[4]  *See also United States v. Mead Corp.*, 533 U.S. 218, 228-29 (2001); *Pub. Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 455 (1989) ("'[S]tatutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.'") (quoting Learned Hand, J.); *AFL-CIO v. FEC*, 333 F.3d 168, 173, 175 (D.C. Cir. 2003); *RNC v. FEC*, 76 F.3d 400, 406-07 (D.C. Cir. 1996) (concluding that one portion of challenged rule failed under *Chevron* step two as "unreasonable and contrary to the statute," because "we doubt that Congress authorized the Commission to accomplish" its asserted purpose through the chosen means); *Common Cause v. FEC*, 692 F. Supp. 1391, 1396 (D.D.C. 1987) ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may—indeed must—intervene and correct the agency.")

Congress intended to regulate from other activities falling outside the scope of FECA and BCRA. 414 F.3d at 97, 100-02, 108, 112, 115; *see also Shays I*, 337 F. Supp. 2d at 53-54.[5]

## Argument

### I.    Plaintiffs' Claims Are Immediately Justiciable.

The accompanying Declarations of Christopher Shays and Martin Meehan set forth each plaintiff's interests in, and injuries caused by, the challenged regulations. Those declarations are updated and expanded versions of the declarations that were held in *Shays I* to establish plaintiffs' Article III and prudential standing to challenge earlier versions of these regulations. *See* 337 F. Supp. 2d at 38-47, *aff'd*, 414 F.3d at 83-95. The prior determinations in *Shays I* are controlling with respect to the identical standing issues in this action.[6] Plaintiffs' facial challenges to these regulations are also ripe for all the reasons set forth in *Shays I*, 337 F. Supp. 2d at 47-50, *aff'd*, 414 F.3d at 95-96.

### II.   The Commission's Coordination "Content Standards" Continue to Violate FECA, BCRA, and the APA.

This Court requires no briefing on the importance of having effective, realistic regulations governing coordinated campaign advertising. *See McConnell v. FEC*, 251 F. Supp.

---

[5]   *See also RNC v. FEC,* 76 F.3d at 407-08; *Chamber of Commerce v. FEC*, 69 F.3d 600, 606 (D.C. Cir. 1995) (rejecting E&J that "provides no explanation" for "differential treatment"); *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453-54 (D.C. Cir. 1997) (rejecting E&J that "'glosses over' precedent and is essentially a bare assertion that the two cases are different").

[6]   *See also Shays I*, 340 F. Supp. 2d at 52-54 (discussing the many "irreparable" injuries caused by the Commission's illegal regulations). In addition, plaintiffs have informational standing to challenge the Commission's coordinated communication and FEA regulations. Whether a communication constitutes a "coordinated" expenditure determines whether it is subject to FECA's "contribution" disclosure requirements. *See* 2 U.S.C. §§ 431(8), 434(b). Similarly, activities determined to be outside the definition of FEA can be funded by state and local parties with undisclosed soft money. *See id.* § 441i(b)(1). In their capacities as voters, candidates, and elected officeholders, plaintiffs have self-evident interests in obtaining full disclosure of campaign-related contributions and expenditures. *See FEC v. Akins*, 524 U.S. 11, 14-15, 21-24 (1998).

5

at 252-57, *aff'd*, 540 U.S. at 219-24; *Shays I*, 337 F. Supp. 2d at 55-65, *aff'd*, 414 F.3d at 97-102.

As the D.C. Circuit emphasized, without such rules, politicians could engage in the "subterfuge"

of "evad[ing] contribution limits and other restrictions by having donors finance campaign

activity directly—say, paying for a TV ad or printing and distributing posters." 414 F.3d at 97.

Thus, FECA has long required that "expenditures … made in cooperation, consultation,

or concert, with, or at the request or suggestion of, a candidate … shall be considered to be a

contribution to such candidate." 2 U.S.C. § 441a(a)(7)(B)(i). To fall within this provision,

spending must (a) constitute an "expenditure," and (b) be "made in cooperation," or otherwise

coordinated, with a candidate. For many years, the Commission's implementing regulations

dealt only with the second requirement—the so-called "conduct" prong. The Commission's

initial coordination rule, for example, provided that spending was "coordinated" if it was based

on "any arrangement, coordination or direction by the candidate or his or her agent .…" 11

C.F.R. § 109.1(b) (1981). The rule had no separate criteria for determining the "content" prong;

it simply required that the spending be an "expenditure," *i.e.,* "for the purpose of influencing" a

federal election. 2 U.S.C. § 431(9)(A).[7]

In 2000, the Commission dramatically narrowed the reach of its coordination regulation

by restricting it to conduct rising to the level of "*substantial* discussions or negotiations … the

result of which is *collaboration or agreement*." 11 C.F.R. § 100.23(c)(2)(iii) (2001) (emphasis

added). The revised rule did not change the content prong of the coordination inquiry; it

---

[7] *See*, *e.g.*, AO 1982-56 (applying standard of whether communication has a "purpose to influence the candidate's election") (PX 1); AO 1983-12 (applying standard of whether communications "are designed to influence the viewers' choice in an election") (PX 2); AO 1988-22 (applying standard of whether communication is in "an election-related context") (PX 3); *see generally* Scott E. Thomas & Jeffrey H. Bowman, *Coordinated Expenditure Limits: Can They Be Saved?*, 49 Cath. U. L. Rev. 133, 152-60 (1999) (PX 6).

continued to require simply that the coordinated activity relate to an "expenditure[]." *Id.* § 100.23(a). Congress determined that the shrunken coordination rule did not reflect "real life campaign practices" and "the real world of campaigns and politics," and in BCRA § 214(b)-(c) repealed the rule and ordered the Commission to try again. 148 Cong. Rec. S2144-45 (daily ed. March 20, 2002) (statements of Sens. McCain and Feingold) (PX 8).

Only in the 2002 rulemaking ordered by Congress did the Commission, for the first time, promulgate a separate "content" test for coordinated communications. Rather than continue to apply the statutory test imposing the coordination rule on *any* "expenditure," the Commission restricted the rule's application to a much narrower set of communications—those containing express advocacy; those republishing a candidate's own materials; those referring to a candidate and publicly disseminated to the relevant electorate within 120 days of the election; and those constituting "electioneering communications" within 30 days of a primary and 60 days of the general election. 11 C.F.R. § 109.21(c)(1)-(4) (2003). Only an ad meeting at least one of these "content" requirements could even potentially be subject to the coordination standard, irrespective of the conduct involved; all other ads would be "filter[ed]" and "screen[ed] out[]" from further scrutiny or regulation. 68 Fed. Reg. at 430 (PX 9). Thus, any ad run by a spender outside the content standard's 120-day time frame would (assuming it did not contain express advocacy or republish campaign materials) enjoy the protection of a "safe harbor," *id.*—no matter how coordinated it actually was. Even if the candidate wrote the ad or dictated it to the outside spender—and no matter how directly the ad promoted the candidate or attacked his opponent—it would be exempted by the Commission from FECA and BCRA's coverage.[8]

---

[8] As the D.C. Circuit explained: "Under the new rules, more than 120 days before an election or primary, a candidate may sit down with a well-heeled supporter and say, 'Why don't you run some ads about my record on tax cuts?' The two may even sign a formal written agreement providing for such ads.

*(Footnote continued)*

Rather than correcting these grievous flaws, the Commission on remand for the most part simply made them *worse*.

A.     **The Decisions in *Shays I* and the Commission's Proceedings on Remand.**

This Court held in *Shays I* that Section 109.21 failed step two of *Chevron* review because it "create[d] an immense loophole that would facilitate the circumvention of [federal] contribution limits, thereby creating 'the potential for gross abuse.'"  337 F. Supp. 2d at 63, 65 (quoting *Orloski*, 795 F.2d at 165); *see also* 337 F. Supp. 2d at 91 ("The coordinated communications regulation, on its face, create[s] an enormous loophole which runs contrary to the entire rationale for the special treatment of coordinated communications.").  The D.C. Circuit "reach[ed] the same result, though for slightly different reasons," emphasizing that Section 109.21 authorized "a coordinated communication free-for-all for much of each election cycle." 414 F.3d at 98, 100.

The Commission argued to the D.C. Circuit that this Court had imposed a *per se* prohibition against *any* consideration of the "time, place, and content" of coordinated advertising, even if the result was to regulate ads that clearly were not "for the purpose of influencing any election for Federal office."  2 U.S.C. § 431(9)(A)(i).  Plaintiffs responded that this Court's decision had done no such thing, and clearly had based its "content" analysis of what constitutes a "coordinated expenditure" on the statutory definition of "expenditure"—whether the spending is "for the purpose of influencing" a federal election.  The D.C. Circuit concluded that "time, place, and content" standards may be used in fashioning appropriate coordination

---

Yet so long as the supporter neither recycles campaign materials nor employs the 'magic words' of express advocacy—'vote for,' 'vote against,' 'elect,' and so forth—the ads won't qualify as contributions subject to FECA.  Ads stating 'Congressman X voted 85 times to lower your taxes' or 'tell candidate Y your family can't pay the government more' are just fine."  414 F.3d at 98; *see also* 337 F. Supp. 2d at 57-58.

regulations, but that "the Commission must establish, consistent with APA standards, that its rule *rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition*." 414 F.3d at 99, 102 (emphasis added). The D.C. Circuit concluded that the E&J for Section 109.21 fell woefully short of that requirement, and gave detailed instructions for the Commission to follow on remand. *See id.* at 100-02.[9]

Over plaintiffs' repeated objections (*see* PX 10), the Commission delayed for *fifteen months* after this Court's final judgment in *Shays I* before getting around to issuing an NPRM on the coordination issues on December 14, 2005.[10] The Commission proposed various alternatives for content standards to screen out advertising that was not for the purpose of influencing a federal election, including a re-promulgation of the 120-day test invalidated by this Court and the D.C. Circuit. The Commission questioned whether political advertising occurs outside the 120-day window, and sought comment and testimony on this issue.

One set of commenters submitted a detailed compendium of hundreds of political ads from recent election cycles praising or attacking clearly identified federal candidates aired by

---

[9]   The D.C. Circuit struck the content standards down on APA grounds alone, and expressly reserved judgment on whether any given combination of "time, place, and content" standards would pass muster under a *Chevron* step two analysis. *See* 414 F.3d at 96-97.

[10]   The Commission sought a stay pending its appeal to the D.C. Circuit, but this Court rejected further delays in a strongly worded October 19, 2004 decision ordering the Commission to take immediate steps to ensure that the coordination and other unlawful regulations would be repaired in time for the 2006 election cycle. The Court ordered the Commission to proceed so that it would have "*new, fully compliant regulations ready for immediate implementation after the expiration of its appeal process.*" 340 F. Supp. 2d at 51 (emphasis added). The Court emphasized that plaintiffs and others would suffer "significant, irreparable injury … if revised regulations [are] not in place by the 2006 election cycle." *Id.* at 52. The Court "decline[d] to stamp the Commission's 'business-as-usual' tactics and request for delay with the judicial imprimatur of approval," and warned that the Commission would not be allowed to keep its "flawed rules" in place during the 2006 election cycle through "handsitting, inaction, and needless delay." *Id.* at 41, 52. The Court cautioned that we "have traversed this well-traveled road before," and that the Commission would not be permitted "to thwart the very essence of the wide-sweeping system of reform enacted by Congress for another interminable period of years." *Id.* at
*(Footnote continued)*

candidates, political parties, and special interest groups well outside the Commission's 120-day pre-election window—sometimes nine months, a year, or even more before the contested election. (*See* PX 18-131.) After the written comment period had closed and the public hearings had been held, the Commission *sua sponte* introduced into the record an enormous mass of new data that it had licensed from TNS Media Intelligence/CMAG ("CMAG") regarding some TV ads run by Presidential, Senate, and House candidates during a portion of the 2004 election cycle. It issued a Supplemental NPRM that gave interested parties only *five business days* to analyze and comment on this massive new data set. *See* 71 Fed. Reg. at 13,306 (PX 133).

The Commission has now promulgated a revised version of 11 C.F.R. § 109.21 that once again violates both *Chevron* step two and the APA's requirements for reasoned decisionmaking, and that flouts the mandate of this Court in *Shays I* as affirmed by the D.C. Circuit. The regulation continues impermissibly to carve large areas of coordinated political advertising out from regulatory control based on certain "bright-line" content standards. Like the earlier version, the new rule sets a pre-election window of effective regulation—for Presidential campaigns, the period in each state beginning 120 days prior to its Presidential primary or caucus and ending on the day of the general election, and for House and Senate campaigns, the period within 90 days of a primary, caucus, convention, or general election (as compared with the previous 120-day window). Any coordinated political ads run outside of these windows are subject to FECA's contribution limits, source prohibitions, and disclosure requirements only if they "expressly advocate[] the election or defeat of a clearly identified candidate for Federal

---

52. At least with respect to the coordination issues, the Commission has done just that—it granted itself the full relief that this Court had denied in its ruling on the stay motion, and then some.

office" or disseminate "campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing." Section 109.21(b)-(c).[11]

Thus, in response to this Court's decision striking down the 120-day pre-election window as not sufficiently inclusive, the FEC's new rule provides for an *even shorter* 90-day period with regard to House and Senate races. For Congressional races, the new rule also retains the election-year "gap period" that begins on primary night and runs until the general election window begins. During this gap period, only months before the general election, coordinated advertising is subject to no meaningful regulation at all.[12] Although the new rule closes the election-year gap period in Presidential races, it retains the 120-day pre-primary window struck down in *Shays I.* Thus, coordinated Presidential campaign advertising continues to have a safe harbor more than 120 days before a state's primary or caucus, so long as the ads avoid express advocacy or republication. The Commission's expanded loopholes create an immense opportunity for candidates and parties to engage in massive, unregulated coordination with corporations, unions, wealthy individuals, and interest groups—free from any federal contribution limits, source restrictions, or even disclosure requirements—during these periods.[13]

---

[11]   The coordination regulations also apply to "electioneering communications," but those by definition take place within the 90- and 120-day pre-election windows discussed in text. 11 C.F.R. § 109.21(c)(1); *see also id.* § 100.29(a). To fall within the 90- and 120-day pre-election windows, ads must also be "public communications," refer to political parties or "clearly identified" federal candidates, and be disseminated in the jurisdiction in which the candidate or party is competing. *Id.* § 109.21(c)(3).

[12]   For example, in a state that holds an April primary for nominations to federal office, Congressional candidates now have a "safe harbor" to engage in massive and unregulated coordination of advertising with parties and outside spenders up until the January before the primary (*i.e.*, 90 days before the primary), and again between the April primary and early August (*i.e.*, 90 days before the November general election), so long as they avoid express advocacy or republication.

[13]   This Court and the D.C. Circuit identified an additional loophole in the Commission's content standards: "[E]ven within 120 days of the election …, supporters need only avoid communications that identify candidates or parties by name. Ads regarding, say, economic effects of high taxes or tragic consequences of foreign wars are not contributions—again, even if formally coordinated with the official

*(Footnote continued)*

B.     **The Record Demonstrates That Many Candidates, Political Parties, and Outside Spenders Have Paid For Campaign Ads That Ran Outside the Commission's Pre-Election Windows.**

The Commission attempts to justify its remarkable expansion of the coordination "free-for-all" condemned by this Court and the D.C. Circuit by arguing that, as an "empirical" matter, (1) "*effective* political party, Congressional, and Presidential election-related advertising" does not "occur[]" outside the revised 90- and 120-day pre-election windows; (2) ads run outside of these windows are of "*little*" or "*minimal* value" to candidates; (3) ads using non-express advocacy are "*unlikely to be for the purpose of influencing Federal elections*" if run outside these windows; and (4) such ads "therefore do not present the potential for corruption or the appearance of corruption that BCRA and [FECA] intend to prevent," and thus may be exempted from federal contribution limits, source prohibitions, and disclosure requirements. 71 Fed. Reg. at 33,194, 33,196-97 (emphasis added) (PX 136).

These conclusions fly in the face of extensive record evidence demonstrating that many federal candidates, political parties, and outside interest groups have run electioneering ads during the "safe harbor" periods established by revised Section 109.21, sometimes nine months, a year, or more before the relevant primary or general election. All of the ads that follow in this section were aired outside of the Commission's revised pre-election windows and most of them avoided express advocacy, and thus would have fallen into the Commission's regulatory "safe harbor." Such ads could have been written and produced by a candidate and then paid for by a

---

campaign." 414 F.3d at 98; *see also* 337 F. Supp. 2d at 57-58. The D.C. Circuit observed in passing that plaintiffs in *Shays I* "appear[ed] not to challenge" this aspect of the content standards. 414 F.3d at 98. To the contrary, plaintiffs in *Shays I* objected to this loophole in their pleadings, their district court briefs, and their D.C. Circuit brief. Plaintiffs have again challenged this aspect of the rule in this case. *See* Compl. ¶ 31 ("Such advertisements and communications, by emphasizing issues and playing upon themes of concern to a candidate, may influence the outcome of an election even without mentioning a candidate or

*(Footnote continued)*

corporation, labor union, or wealthy individual, without being a "coordinated expenditure" (*i.e.*, contribution) by the spender.

### 1.    Early advertising in Presidential campaigns.

#### a.    Early candidate advertising.

"In 1995 President Clinton and the Democratic National Committee took early advertising to new levels." (PX 27.)  After the Democrats lost control of Congress in the 1994 mid-term elections, President Clinton turned, at the urging of his advisor Dick Morris, to early TV advertising in the critical swing states.  According to the Commission's own audit records, cited in detail to the Commission in this rulemaking, the Clinton/Gore '96 Primary Committee, Inc., began broadcasting campaign ads in June 1995—eight months before the first 1996 presidential primary—and spent $2.3 million on such ads between June 27 and July 24, 1995 alone.  (PX 15 at 19; *see* PX 17 at 15.)  In August 1995, the President's reelection campaign began a carefully coordinated nationwide media advertising campaign sponsored by the DNC and funded with soft money solicited by the President, Vice President, and other party leaders— well over 120 days before any of the caucuses or primaries began.  *See* pp. 16-17 below.

The year "1999 saw more ads airing earlier than ever before." (PX 27.)  The earliest candidate ads were run by Steve Forbes in late March 1999 in Iowa and New Hampshire, *nearly ten months* before the January 24, 2000 Iowa caucuses.  (Add. D-2,[14] PX 19.)  Mr. Forbes began a "national ad blitz" two months later, running millions of dollars of cable TV, radio, and newspaper ads during the summer of 1999 touting his views on income taxes, the Social Security

---

party by name.").  Commenters also challenged this aspect of the content standards in their rulemaking submissions to the Commission.  (PX 15 at 30 & n.15, *see also id.* at 33.)

[14] Citations to "Add. D-__" are to selected advertisements in the administrative record that are reprinted in Addendum D to this brief.

system, and the need for a new "moral compass." (*See* Add. D-3, PX 21.) Forbes continued his national cable TV ad campaign through late 1999. (*See* PX 25-26.) Other GOP presidential candidates also began running TV ads during the summer of 1999. Senator John McCain aired his first ad—a biographical spot focusing on his military record—on June 28 in California, over eight months before that state's March 7, 2000 primary. (Add. D-5, PX 23.) Lamar Alexander began running TV ads in Iowa in July and August, over five months before the caucuses, arguing that front-runner George W. Bush's huge fundraising lead was threatening Iowa's significance in the nominating process. (Add. D-6, PX 24: "The presidency ought to be about raising children, farm prices and standards—not just raising money. I've been all over Iowa because the presidency's too important to be bought or inherited. It ought to be earned.")

Four years later, with President Bush assured of his party's renomination, the early primary advertising in the 2004 cycle took place among Democrats. Former Vermont Governor Howard Dean led the way, beginning with a $300,000 TV ad buy in Iowa that ran from June 17 through July 2, 2003—well over half a year before the January 19, 2004 Iowa caucuses. The ads criticized President Bush and "Democrats in Washington," argued that it was "time for Democrats to be Democrats again," and urged viewers to help "take our country back." (Add. D-9, PX 30; *see also* PX 31.) Dean followed with TV ad campaigns in New Hampshire and Texas beginning in August 2003, over five months before the January 27, 2004 primary in New Hampshire and half a year before the March 9, 2004 Texas primary. (PX 36, 39.) Dean's campaign made a two-week, $1 million TV ad buy beginning August 29 in Arizona, New Mexico, Oklahoma, South Carolina, Wisconsin, and Washington. (PX 44, 46.) The earliest primary in any of those states was February 3, 2004, over five months after the ads began running.

14

Other Democrats scrambled to respond to Governor Dean's early advertising. Representative Dennis Kucinich began running radio ads in Iowa on July 31, 2003, featuring the song "On The Road Again" and an endorsement by Willie Nelson. (Add. D-11, PX 34.) Senator John Edwards went on the air beginning on August 5, spending $150,000 in the first week alone to run three ads in Iowa and New Hampshire stressing his humble origins.[15] Representative Richard Gephardt began airing cable TV ads throughout Iowa and New Hampshire on September 2, 4-1/2 months before the Iowa caucuses, stressing biographical themes very similar to the Edwards ads.[16] The eventual Democratic nominee, Senator John Kerry, announced his candidacy for President on September 2, 2003, and within 24 hours his campaign was airing two TV ads on broadcast networks in six Iowa media markets and on cable outlets throughout the state. (Add. D-14, PX 42.) The Kerry campaign began airing ads in New Hampshire and Massachusetts on September 4, nearly five months before the New Hampshire primary. (Add. D-15, PX 43.) The following week, it started running a biographical ad in Iowa and New Hampshire stressing Kerry's war record. (Add. D-15, PX 45: "John Kerry. The 25-year-old swift boat commander who won 3 Purple Hearts and the Silver Star for bravery, then came home and helped rally the nation against that war.")

> **b.    Early party advertising.**

Political parties also use early media advertising to support or attack clearly identified Presidential candidates. The Commission's coordination rule creates a double loophole for such

---

[15] Add. D-12, PX 37: "My grandmother came from a family of sharecroppers. My father worked in a cotton mill all his life, and I helped out there in the summers. I'll never forget the people there …." Senator Edwards expanded his TV advertising to South Carolina on August 18, 2003—5-1/2 months before the February 2, 2004 primary—advising viewers that "I was born right here in South Carolina" and that "I will never forget where I come from and who I'm fighting for." (PX 38; *see also* PX 40.)

ads.  *First*, because party ads run outside the pre-election window are not subject to the coordination rule unless they contain express advocacy or republish campaign materials, such ads may be fully coordinated with the candidates they support and still be treated as "independent" party expenditures, outside the parties' coordinated spending limits.  *See* 2 U.S.C. § 441a(d).  *Second*, a corporation, union, or wealthy individual can simply sponsor ads written and produced by the party, without that coordinated spending being treated as a "contribution" to the party.

As noted, the DNC on August 16, 1995 began heavy TV advertising in key battleground states in support of President Clinton's reelection—long before the start of the primary and caucus season—funded by soft money contributions raised by the President and other party leaders.  *See* p. 13 above.  The administrative record, which includes citations to the Commission's own audit reports, demonstrates that the DNC aired nearly $15.7 million in TV ads between mid-August 1995 and early March 1996 and eventually spent more than $42 million on such advertising, much of it closely coordinated with President Clinton and the Clinton/Gore Committee.  (PX 15 at 19; *see also* PX 16 at 50-51; PX 17 at 9-16.[17])  The DNC ads focused on the differences between President Clinton and the "Dole-Gingrich" Congress on a variety of carefully poll-tested issues such as Medicare, education, taxes, welfare reform, the environment, family medical leave, and a balanced budget.  (PX 16 at 50-51; PX 17 at 24, 31.)  Dick Morris,

---

[16]  Add. D-13, PX 41:  "My mother was a secretary, and my dad delivered milk door to door. They struggled so I could go to college …  It's people like my folks who make America great."

[17]  The FEC's audit staff determined that the DNC's "issue ads" were thinly disguised campaign commercials for President Clinton, but the Commission voted not to proceed with an enforcement action because the ads had not used express advocacy.  (PX 15 at 19.)  The Commission's failure to pursue these and other blatant soft-money coordinated advertising abuses led to Congressional inquiry and, eventually, BCRA's enactment.  *See McConnell*, 251 F. Supp. 2d at 441-42 (CKK) and 540 U.S. at 129-32.

for one, had no doubt that the early TV ads were Clinton's "secret weapon" and "the key to success" in 1996 over Senator Dole; the successful tactic is now campaign legend.[18]

In the next Presidential election cycle, the Republican Leadership Council ran TV ads in the spring and summer of 1999 attacking Democratic frontrunner Al Gore. One such ad ran in Iowa, New Hampshire, Tennessee, and Washington, D.C., attacked Gore as a life-long "leader" in the effort to raise taxes, and invited viewers to join Republicans in "fighting for lower taxes, less government and more freedom." (Add. D-4, PX 22.) Another ad, which ran on CNN nationwide and in selected broadcast and cable TV markets, ridiculed Gore's assertion that he "took the initiative in creating the Internet" and purported to send a message from "Earth to Gore. Stop trying to re-invent reality." (Add. D-4, PX 20.) The tables were turned four years later: in July 2003, the DNC began airing attack ads against President Bush, half a year before the first caucuses and nearly *sixteen months* before the general election. (PX 35; *see also* Add. D-16, PX 47.)

---

[18]  *See*, *e.g.*, Dick Morris, *Behind the Oval Office: Winning the Presidency in the Nineties*, at 138-39 (1997) ("Why did Clinton win so easily in 1996? Why did his lead hardly vary? What was his strength with the voters that Dole could never shake? In my opinion, the key to Clinton's victory was his early television advertising. … Week after week, month after month, from early July 1995 more or less continually until election day in '96, sixteen months later, we bombarded the public with ads. The advertising was concentrated in the key swing states: California, Washington, Oregon, Colorado, New Mexico, Louisiana, Arkansas, Tennessee, Kentucky, Florida, North Carolina, New Jersey, Pennsylvania, Ohio, Michigan, Wisconsin, Illinois, Minnesota, Missouri, and Iowa. During this period, television viewers in these states saw, on average, 150 to 180 airings of a Clinton or a DNC commercial, about one every three days for a year and a half. This unprecedented campaign was the key to success."). *See also* Sydney Blumenthal, *The Clinton Wars*, at 148 (2003) ("Clinton's advertisements began running seventeen months before Election Day on November 5, 1996—an unprecedented move. Every ad, without exception, was centered on issues, comparing and contrasting the President's stance with Gingrich's and the Republicans'. By the end of 1995, on the eve of the second government shutdown, nearly half the electorate, especially in strategically important states, had seen the commercials, and almost a third had seen thirty of them. Because they were not broadcast in Washington, these early ads went almost completely unnoticed by the media. The entire country was below their radar. But Clinton was already beginning to win the election."); Bob Woodward, *The Choice*, at 212-14, 233-39 (1996) (discussing 1995 Clinton/DNC advertising campaign). The Commission's own audit records, cited in the administrative record, confirm these accounts. (PX 17 at 1-43.)

17

c.      **Early advertising by outside spenders.**

Special interest groups also engage in early Presidential campaign advertising.  Under the Commission's regulation, such ads may be fully coordinated with candidates so long as they avoid express advocacy and republication.  The earliest examples in the 2000 election cycle were two TV ads run in Iowa and New Hampshire beginning on March 22, 1999 by NARAL attacking various GOP candidates as "anti-choice"—over ten months before the Iowa caucuses and New Hampshire primary.  (Add. D-1, PX 18.)

Early outside advertising increased substantially in the 2004 Presidential election cycle.  The Reform Voter Project began airing TV ads in Iowa, New Hampshire, and Massachusetts in February 2003, more than *eleven months* before the Iowa caucuses, that were critical of President Bush's environmental record.  (Add. D-7, PX 28.)  The League of Conservation Voters began airing similar ads in California and Washington, D.C. in June 2003.  (PX 32.)  The most notable outside spender, however, was MoveOn.org, which began saturation advertising (10 times/daily) in mid-May 2003 of anti-Bush commercials on cable news channels in 21 markets throughout the country—eight months before the Iowa caucuses and *nearly a year* before the primaries in some of the targeted states.[19]  The first ad told the story of a group of parents who sold blood to raise money for their children's school, asking:  "Is this the America we want to live in?  George Bush:  putting rich people first."  (Add. D-8, PX 29.)  In July MoveOn.org ran cable and newspaper ads branding Bush a "MISLEADER" on Iraq.  (Add. D-10, PX 33.)  In November 2003, it continued with saturation TV advertising in nine battleground states—some of whose

---

[19]      The initial flights of ads were run in Washington, D.C.; Philadelphia and Pittsburgh, Pennsylvania; Miami, Orlando, and Tampa, Florida; St. Louis and Kansas City, Missouri; Cleveland, Dayton, and Toledo, Ohio; Milwaukee, Wisconsin; St. Paul, Minnesota; Reno, Nevada; Portland, Augusta, and Bangor, Maine; Grand Rapids, Michigan; and Omaha, Lincoln, and North Platte, Nebraska. (PX 29.)

primaries were still well over four months away—comparing President Bush to Herbert Hoover. (Add. D-17, PX 48.)  By the next month, MoveOn.org was running anti-Bush ads on cable stations nationwide.  (Add. D-17, PX 49.)

> ### 2.    Early advertising in Congressional campaigns.

Congressional campaign advertising has followed similar trends in recent election cycles. The record demonstrates that Congressional candidates, their parties, and outside spenders all place great value on early campaign advertising in key races—well over 90 days before the primary or general elections.  All of this political advertising is now exempt from FECA's contribution limits, source prohibitions, and disclosure requirements so long as it does not use express advocacy or republish campaign materials.  Thus, in principle, many of the ads discussed below could have been written by the candidate and simply paid for at the candidate's behest by a corporation, labor union, or wealthy individual, free of any disclosure requirements.

> ### a.    Early candidate advertising.

The record includes dozens of examples in the last two Congressional election cycles alone of candidate advertising begun well before the traditional campaign season, sometimes a year or more in advance of the contested primary or general election.  Some of these ads were run by incumbents perceived as being particularly vulnerable in their party's primary election or the general election.  For example, Senate Majority Leader Tom Daschle (D-SD) began running 2004 reelection ads on TV on July 9, 2003, nearly *eleven months* before the South Dakota primary and *sixteen months* before the general election.  (Add. D-25, PX 87.)  Over the next several months, Daschle's campaign aired a series of TV spots touting his work for the state's citizens.  (Add. D-27, PX 89; *see* PX 90-91, 93.)  Similarly, Senator Arlen Specter (R-PA), who faced a strong primary challenger in his 2004 reelection campaign, began airing radio ads in the first week of September 2003 (nearly eight months before the April 27, 2004 primary) and began

statewide TV ads on November 5 (nearly six months before the primary).  In the words of the *National Journal*, the ads "sketche[d] Specter as a former 'tough Philadelphia DA' who continue[d] to take down evil-doers in his current job in the U.S. Senate."  (PX 79; *see also* PX 81.)  The ads proclaimed that, "[w]ith America under attack, more than ever we need a senator with courage, clout and conviction.  We need Pennsylvania's Republican Senator Arlen Specter."  (Add. D-21, PX 79; *see also* Add. D-22, PX 81.)  The record contains many similar examples of early advertising by incumbents.[20]

Many other early TV and radio ads are run by candidates who are challenging an incumbent either in the primary or general election.  As noted above, for example, Senator Specter faced a strong primary challenger in the 2004 campaign.  Representative Pat Toomey began running TV and radio ads on June 23, 2003, *more than ten months* before the 2004 Republican primary, criticizing Specter's "liberal" voting record and introducing himself as "[a] new conservative leader for Pennsylvania."  (Add. D-20, PX 78.)  The radio ads were rebroadcast later that summer during "The Rush Limbaugh Show," and Toomey began airing new radio ads in early September 2003 linking Specter to Senators Daschle, Clinton, and Kennedy.  (Add. D-21, PX 79.)  Similarly, Cranston, Rhode Island Mayor Stephen Laffey began running TV ads in his primary challenge to incumbent Republican Senator Lincoln Chafee on

---

[20]  *See*, *e.g.*, PX 51-53 (Sen. Lisa Murkowski (R-AK) began running statewide re-election ads on February 9, 2004, over six months before the August 24 primary, detailing various ways in which she was "fighting for our Alaska values" on issues of energy, education, the Second Amendment, and the Pledge of Allegiance); Add. D-37, PX 112 (Sen. Kent Conrad (D-ND) began running statewide broadcast and cable TV ads on September 17, 2005, nearly nine months before the June 13, 2006 primary, in which various state officials told viewers that "Kent gets the job done for North Dakota"); Add. D-33, PX 108 (statewide TV ads run by Sen. Conrad Burns (R-MT) beginning January 24, 2006, more than four months before the Republican primary and more than nine months before the general election, responding to DNC attack ads about his relationship with Jack Abramoff:  "Those attack ads—they're just a big bunch of you know what. … I don't know who Abramoff influenced, but he never influenced me."); and PX 127-28 (reporting on a $ 1 million TV ad buy for Sen. Herb Kohl (D-WI) that began airing statewide on March 9, 2006, more than six months before the Democratic primary).

September 13, 2005—*a full year* before the September 12, 2006 Rhode Island primary.  (Add. D-38, PX 114.)  On the Democratic side of the Rhode Island Senate race, campaign ads began running in early January 2006, *more than nine months* before the primary.  (*See* PX 117-19.)

One of the most striking examples of early TV advertising in the 2006 campaign cycle was run by John Spencer (R-NY), who eventually won his party's nomination to challenge incumbent Senator Hillary Rodham Clinton.  On August 25, 2005—*over a year* before New York's September 12, 2006 primary—Spencer began running statewide cable TV ads attacking Jeanine Pirro, one of his early Republican opponents who subsequently withdrew from the race:

> **ANNOUNCER**  [v/o]:  She's a liberal's liberal.  Supports gun control, abortion on demand, mandatory gay rights.  Hillary Clinton?  How about Jeanine Pirro.  Pirro has been an activist for the most liberal positions.
>
> (*Text on screen:*  New York Post *masthead; War of the Roses*)
>
> She's not running to beat Hillary Clinton – she's running to be Hillary Clinton.  The only conservative in the race for U.S. Senate is John Spencer.  Committed to protecting our rights, and protecting you, the taxpayer.
>
> **JOHN SPENCER** [v/o]:  I'm John Spencer, and because I am a conservative, I approve this message.

(Add. D-35, PX 111.)  There are many other examples of early broadcast advertising by candidates who are challenging incumbents.[21]

---

[21]  *See, e.g.*, PX 94 (Representative George Nethercutt (R-WA) began running statewide TV ads in his challenge to Senator Patty Murray (D-WA) five months before the September 21, 2004 primary election); PX 96 (Wisconsin Republican Senate candidate Russ Darrow began running statewide TV and radio ads on April 28, 2004, more than 4-1/2 months before the September 14 primary; the ads labeled incumbent Russell Feingold as "the wrong Russ for Wisconsin" and Darrow as "the right Russ for Wisconsin"); PX 98 (Maine Republican House nominee Charles Summers began running TV ads on June 13, 2004, immediately after winning his party's primary and nearly five months before the general election); Add. D-30, PX 104 (Pennsylvania Republican House candidate Frank Ryan began running radio ads on August 15, 2003—over eight months before his party's April 27, 2004 primary—to defend himself against news reports that he had ignored child support orders and that his ex-wife had filed for a protective order against him in the early 1990s); PX 110 (TV advertising began in Nebraska Senate race on November 15, 2005—nearly six months before the May 9, 2006 primary); PX 129 (Illinois Republican House candidate David McSweeney began running cable TV ads on November 2, 2005, over 4-1/2

*(Footnote continued)*

Another type of Congressional race that often features early advertising is where the incumbent announces his retirement or candidacy for another office, setting off a contest in both parties to fill the open seat. For example, after incumbent Senator Peter Fitzgerald (R-IL) announced in April 2003 that he would not seek a second term, an expensive ad war broke out in June 2003—nearly nine months before the March 16, 2004 primary—with six candidates ultimately airing TV and radio ads during the summer and fall of 2003.[22] Similarly, after Senator Earnest Hollings (D-SC) announced on August 4, 2003 that he would not seek another term, one Republican Senate candidate began a statewide TV ad campaign on September 2—*over nine months* before the State's June 8, 2004 primary—and another began airing primary ads in early January 2004. (*See* PX 84-86.) Likewise, after Senator James Jeffords (I-VT) announced that he would not seek reelection in 2006, one Republican Senate candidate began airing TV ads in mid-December 2005 and another began his ad campaign in late January 2006—although the primary was not held until September 12, 2006. (*See* PX 123-25.)[23]

---

months before his party's March 21, 2006 primary); Add. D-43, PX 131 (Wisconsin Democratic House candidate Bryan Kennedy began running districtwide TV ads against incumbent James Sensenbrenner on September 26, 2005, *nearly a year* before the September 12, 2006 primary).

[22] Democratic businessman Blair Hull was first on the air on June 23, 2003, with a $750,000 statewide TV and radio ad campaign. (Add. D-19, PX 61; *see also* PX 62-64.) Between August and October 2003, two other Democratic Senate candidates and three Republican candidates began extensive radio and TV ad campaigns, including several statewide TV ad buys. *See* PX 65-74, discussing broadcast ads aired by Democrats Gery Chico and Dan Hynes and Republicans John Cox, Jack Ryan, and Andy McKenna.

[23] For other examples of early broadcast advertising in races to succeed an incumbent who was either retiring or seeking other elective office, *see*, *e.g.*, PX 54 (TV advertising in race to succeed retiring Sen. Ben Nighthorse Campbell (R-CO) began on September 22, 2003, more than *ten months* before the August 10, 2004 primary); PX 56-60 (in race to succeed Senator Zell Miller (D-GA), Republican Herman Cain began extensive statewide TV ad campaign on February 2, 2004—over 5-1/2 months before the July 20 primary); PX 75 (in race to succeed retiring Senator John Breaux (D-LA), Rep. Chris John (D-LA) began a "heavy rotation" of radio ads on June 8, 2004—nearly five months before the November 2 primary election); PX 99 (in race to succeed his retiring father, Representative Nick Smith (R-MI), Brad Smith began radio ads throughout the district in early February 2004, six months before the August 3

*(Footnote continued)*

b.      **Early party advertising.**

Political party committees often engage in early advertising campaigns in particularly important Senate and House races, well before the Commission's 90-day pre-election window. During the 2004 election cycle, for example, the South Dakota Republican Party began airing ads on December 1, 2003 on statewide "agriculture-related radio stations" attacking Democratic incumbent Senator Tom Daschle for having failed to secure passage of ethanol legislation—a full six months before the June 1, 2004 primary and *over eleven months* before the 2004 general election.  (Add. D-29, PX 92.)  The DCCC was on the air even earlier, beginning its media advertising campaign in July 2003 with TV ads run in thirteen media markets attacking eight Republican incumbents for their votes in support of the GOP prescription drug plan.  (*See* PX 100.)

During the 2006 Congressional election cycle, the NRSC launched its first TV ads against Democratic Senator Robert Byrd in July 2005, *more than nine months* before West Virginia's May 2006 primary election and *almost a year and a half* before the general election. The ads argued that "[a] lot's changed" since Byrd first went to Congress in 1952 during the Korean War, and that Byrd no longer supported American soldiers, "working families," or the sanctity of the American flag.  (Add. D-42, PX 126.)  The NRSC also trained its early fire on

---

primary); PX 97 (in race for open House seat, Republican Steve Scalise began airing radio ads in May 2004, nearly a half year before Louisiana's Republican primary); PX 101-03 (discussing early advertising run by Republican candidates seeking to fill an open North Carolina House seat, including an ad for Jim Snyder that began airing in August 2003—more than eight months before the primary); Add. D-31, PX 106 (after Senator Mark Dayton (DFL-MN) announced that he would not seek reelection in 2006, his eventual successor, Amy Klobuchar, began airing radio ads in northeastern Minnesota in mid-November 2005—more than half a year before the June 9, 2006 DFL primary); PX 105 (after Senator Paul Sarbanes (D-MD) decided not to seek another term, Democrat Allan Lichtman began his TV ads on March 10, 2006—six months before Maryland's September 12 primary); PX 122 (in race to succeed retiring Senator Bill Frist (R-TN), Representative Harold Ford, Jr. (D-TN) began running statewide TV ads on March 6, 2006, five months before the August 3 Democratic primary).

Steve Laffey, the conservative challenger to incumbent Lincoln Chafee (R-RI) in the September 2006 primary.  *Nearly eleven months* before the primary, the NRSC was running ads attacking Laffey's political record and ethics, calling him "slick," "strange," "bizarre," a serial tax-raiser, and the Mayor of "Laffeyland."  (Add. D-39, PX 115; Add. D-40, PX 116.)  The Montana Democratic Party began running ads attacking Republican Senator Conrad Burns's integrity in August 2005, *ten months* before the June 2006 primary and over *fifteen months* before the general election.  (Add. D-32, PX 107; Add. D-34, PX 109.)

**c.    Early advertising by outside spenders.**

Outside spenders recognize the value of early political advertising in key Congressional races, and spend their money accordingly.  Some special interest groups run early ads that praise incumbents who have promoted their agendas.  In the 2004 Alaska Senate race, for example, the U.S. Chamber of Commerce began airing TV ads supporting endangered Republican incumbent Lisa Murkowski in mid-November 2003—*nine months* before the GOP primary and *nearly a full year* before the general election:

> **ANNOUNCER** [v/o]:  Alaskans are hurting.  Unemployment, taxes.  But in Washington, we have a fresh, experienced face fighting for jobs, a better economy, lower taxes and the individual liberty we love.  Senator Lisa Murkowski.  Some are trying to stop progress and stop ANWR, but Lisa Murkowski brings her knowledge of Alaska to Washington, so she can fight those who want to impose their agenda on our land.  Call Lisa Murkowski.  Thank her for fighting for Alaska jobs.

(Add. D-18, PX 50.)  Likewise, a group calling itself "Americans for Job Security" made a $500,000 TV ad buy in November 2005 touting the virtues of incumbent Senator Rick Santorum (R-PA)—nearly half a year before the Pennsylvania primary and *nearly a full year* before the general election (Add. D-41, PX 113):

> **ANNOUNCER** [v/o]:  Most Saturdays they get together in the park, 8 a.m. sharp.  Pennsylvania families relax a little more these days because Rick Santorum is getting things done everyday.  Over $300 billion in tax relief; eliminating the marriage penalty, increasing the per child tax credit – all done.  And now Rick Santorum is fighting to

24

eliminate unfair taxes on family businesses.  Call and say thanks because Rick Santorum is the one getting it done.

Other ads run by outside spenders focus on attacking rather than promoting a clearly identified candidate.  The conservative Club For Growth has run aggressive early attack ads in the last two Congressional election cycles.  On August 7, 2003, for example, the Club began airing an ad on broadcast and cable TV stations in South Dakota ridiculing Democratic Senator Tom Daschle as a rich elitist out of touch with his state.  The ad—which aired *fifteen months* before the general election—cost approximately $50,000 to air and was timed "[t]o coincide with [Daschle's] annual driving trip across his home state" (Add. D-28, PX 88):

> *(In background: voices sing "Tom's house is a very, very, very big house" to the tune of Crosby, Stills, Nash & Young's "Our House")*
>
> **ANNOUNCER**  [v/o]:  It's a long way from Aberdeen to Foxhall Road.
>
> *(On screen:  road sign reading "Aberdeen; Home of U.S. Senator Tom Daschle)*
>
> This is Tom Daschle's new $2 million house on Washington's ritzy Foxhall Road.
>
> *(On screen: street sign for 2900 block of Foxhall Road NW)*
>
> It's a great place to entertain Hollywood liberals, politicians and lobbyists.  In Washington, Daschle opposes cutting taxes for South Dakota families.  Maybe they don't want tax relief on Foxhall Road.
>
> **WAYNE GREENFIELD**:  But we sure can use it here in Aberdeen.
>
> *(On screen:  Wayne & Joyce Greenfield; Aberdeen, SD; www.clubforgrowth.org, Paid For By The Club For Growth)*

The Club For Growth turned its sights on liberal incumbent Lincoln Chafee (R-RI) in his 2006 primary contest against Steve Laffey, discussed on pages 20-21, 23-24 above.  The Club began airing radio attack ads against Senator Chafee on January 28, 2006—nearly nine months before the primary—calling him "amazingly liberal" and an ally of "liberal Democrats John Kerry and Hillary Clinton."  PX 121 ("Call Sen. Chafee. Tell him Rhode Island can't afford high

taxes."). The Club also simultaneously began airing TV ads praising Mayor Laffey's record and urging viewers: "Tell Steve Laffey to keep fighting for taxpayers." (PX 120.)

The 2004 Pennsylvania Republican Senate primary battle between incumbent Arlen Specter and challenger Pat Toomey, discussed on pages 19-20 above, witnessed attack ads run by outside spenders against each of the candidates. The "Republican Main Street Partnership" began airing ads against Toomey in early November 2003, over five months before the primary election, questioning whether he was a "real conservative" and whether he supported the American troops in Iraq. (Add. D-22, PX 80; *see also* Add. D-23, PX 82.) In response, the American Conservative Union began airing ads in early December 2003 during "The Rush Limbaugh Show" critical of "some Washington big shots" who were attacking Toomey for his vote against President Bush's Medicare prescription bill. (Add. D-24, PX 83.)[24]

C.    **Revised Section 109.21 Continues To Apply a "Functionally Meaningless" Content Standard During Most of Each Election Cycle, Indeed, to an Even Larger Part of the Congressional Election Cycle than Did the Previous Version of the Rule.**

The E&J reads as if the Commission faced only one assignment on remand: identifying and justifying when a pre-election period of heightened regulation of coordinated expenditures should begin (*e.g.*, 60, 90, 120, 180, or more days prior to the election in issue). But the D.C. Circuit made clear that the Commission was required to address *two* distinct (though related)

---

[24]    For other examples of early broadcast advertising run by outside groups attacking clearly identified candidates for election, *see, e.g.*, PX 55 (radio ad run by "People for a Better Florida" accusing Republican candidate Mel Martinez of being "on the wrong side" of the medical liability reform issue; the ad began airing in late March 2004, over five months before the August 31 primary); Add. D-43, PX 130 (October 2005 TV ad run by "American Family Voices and Public Campaign Action Fund," accusing Representative Roy Blunt (R-MO) of money laundering: "Money laundering—It's a dirty business. A first-degree felony that Tom DeLay was just indicted for. But there's more dirty laundry. DeLay sent $150,000 to Congressman Blunt. Then Blunt funneled DeLay's money to his son's campaign and a company that hired DeLay's wife. Just another example of politics awash with dirty money. Big money's making Washington spin out of control. It's time to clean up Congress.").

issues:  (1) "the 120-day time frame," and (2) "the weak restraints applying outside of it."  414 F.3d at 100.  As to the latter issue, the Court of Appeals noted with evident skepticism that the Commission had "resurrected" the discredited "express advocacy" test, thereby authorizing "a coordinated communication free-for-all for much of each election cycle" by "allowing unrestricted collaboration outside the 120 days so long as the communication's paymasters avoid magic words and redistribution" of campaign materials.  *Id.* at 99-100.  The D.C. Circuit emphasized that the Commission must demonstrate, through evidence and "cogent explanation," why it "deem[ed] these two categories adequate by themselves to capture the universe of electorally oriented communication outside the 120-day window."  *Id.* at 100.  In other words, the Commission was required to establish on remand that these categories of express advocacy and republication "*rationally separate[] election-related advocacy from other activity falling outside of FECA's expenditure definition*."  *Id.* at 102 (emphasis added).  In repromulgating its coordination rule, it had to prove—no matter where it drew the time line for heightened regulation—that non-express advocacy beyond that line "likely relates to purposes other than 'influencing' a federal election—the line drawn by the statute's 'expenditure' definition, 2 U.S.C. § 431(9)(A)."  *Shays I*, 414 F.3d at 101.

The Commission's E&J woefully fails to satisfy any of these requirements.  Indeed, it does not even try.  The Commission admits, as it must, that FECA, including the dictate that coordinated expenditures are to be treated as "contributions," 2 U.S.C. § 441a(a)(7)(B), applies to media advertising that is run "for the purpose of influencing any election for Federal office" 365 days a year, every year of the election cycle, without any temporal limitation, *id.* § 431(9)(A)(i).  If such a temporal limitation could be found in FECA, the Commission would have no statutory authority to regulate even express advocacy ads outside its pre-election

27

windows.  But the Commission concedes that such ads are subject to FECA and BCRA "*at any time*" and "*no matter when such communications are made*," because such ads "*can be reasonably construed only as for the purpose of influencing an election*."  71 Fed. Reg. at 33,191 (emphasis added) (PX 136).  The Commission thereby concedes that *some* ads run outside its pre-election windows *do* have value to candidates and thus *do* present a risk of corruption or the appearance of corruption if they are coordinated.  The question then becomes whether the Commission is correct that early ads are "effective" and of "value" to a candidate *only* when they contain express advocacy or republish campaign materials.  *Id.* at 33,193-94, 33,196.  The Commission offers no explanation or justification for believing this is so; nothing in the CMAG data suggests this might be so; and such a position conflicts with the opinions in *McConnell* and *Shays I*, with the legislative history of BCRA, and with the record evidence in this case.

*McConnell*'s "unmistakable lesson" is that the express advocacy standard is "functionally meaningless" in the context of regulating supposedly *independent* spending, and "has not aided the legislative effort to combat real or apparent corruption[.]"  540 U.S. at 193-94; *see also Shays I*, 414 F.3d at 100 and 337 F. Supp. 2d at 57-58 & nn.26, 28; *McConnell*, 251 F. Supp. 2d at 303-07 (KLH); *id.* at 591-92, 606-16, 650-51 (CKK); *id.* at 874-90 (RJL).  It defies explanation how the Commission could conclude that such a standard—discredited not only in *McConnell* but by BCRA's legislative history—should be extended to the regulation of *coordinated* as well as *independent* communications.  Moreover, in its Advisory Opinions and enforcement proceedings, the Commission repeatedly has held through the years that coordinated communications are reached by FECA and treated as contributions "*regardless of whether such*

28

[*communications*] *contain 'express advocacy*.'"[25]  In promulgating the 2000 coordination rules

that were repealed by BCRA § 214 for being under-inclusive, the Commission cautioned that an

express advocacy content standard could eviscerate several of FECA's core purposes.  65 Fed.

Reg. at 76,141 (PX 7).  Judge Green in *FEC v. Christian Coalition* also rejected arguments

seeking to engraft an express advocacy standard onto the regulation of coordinated

communications, concluding that those arguments were "untenable," "fanciful," "unpersuasive,"

"pernicious," and threatened to "frustrate both the anti-corruption and disclosure goals of

[FECA]."  52 F. Supp. 2d 45, 87-88 & n.50 (D.D.C. 1999).[26]  It is no defense for the

Commission to say that it only allows these evils for three-quarters of each House election cycle

(*i.e.*, for all but two 90-day windows every two years) and imposes much more realistic standards

in the months immediately before a primary or general election.   This would be like

promulgating a rule to implement the ban on corporate and union contributions, 2 U.S.C. § 441b,

that allowed corporations and unions to make such contributions for 18 months of each House

cycle so long as they obeyed the ban during the other 6 months, when presumably most

contributions are raised.

Few of the early campaign ads discussed above used express advocacy, confirming the

observations of this Court and the D.C. Circuit in *Shays I*:  candidates *themselves* rarely use

---

[25]  AO 1990-5 (emphasis added) (PX 4); *see also* AO 1988-22 (PX 3) and 1983-12 (PX 2); Thomas & Bowman, 49 Cath. U. L. Rev. at 152-60 (PX 6) (collecting additional authority).

[26]  As Judge Green concluded, "importing the 'express advocacy' standard into § 441b's contribution prohibition would misread *Buckley* and collapse the distinction between contributions and independent expenditures in such a way as to give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions.  Were this standard adopted, it would open the door to unrestricted corporate or union underwriting of numerous campaign-related communications that do not expressly advocate a candidate's election or defeat."  52 F. Supp. 2d at 88.  *Buckley*'s narrowing construction of independent expenditures to include only express advocacy does not apply to coordinated expenditures, and the Commission has not argued otherwise.  *See id.* at 86-89; *see also Orloski*, 795 F.2d at 167.

express advocacy in their own ads because it is "an ineffective campaign strategy," so any restriction of the coordination regulation to ads using express advocacy will inevitably set off "a coordinated communication free-for-all" during the portion of the cycle that this "meaningless" standard governs.  337 F. Supp. 2d at 58 n.28; 414 F.3d at 100; *see also McConnell*, 540 U.S. at 193-94 & n.77.  Even though for the most part they avoided words of express advocacy, the ads discussed above were clearly broadcast for the purpose of influencing federal elections:  they praised or attacked clearly identified federal candidates; they were targeted at the candidates' relevant electorates; and in many instances they were paid for by the candidates themselves, who presumably knew what was valuable to them.  *See* 71 Fed. Reg. at 33,193-94.

Yet the Commission would have this Court conclude that all of these ads were "*unlikely to be for the purpose of influencing Federal elections*" since they were run early in the campaign cycle and avoided words of express advocacy.  *Id.* at 33,197 (emphasis added).  That is absurd.  What purpose other than electioneering was possibly served by ads that urged voters to "Call Tom Daschle and tell him to deliver for South Dakota" (Add. D-29), "Call Conrad Burns:  tell him to start working for Montana" (Add. D-32), "Call Lisa Murkowski.  Thank her for fighting for Alaska jobs" (Add. D-18), and "Call and say thanks because Rick Santorum is the one getting it done" (Add. D-38)?  Because the Commission has once again failed to "establish, consistent with APA standards, that its rule rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition," its revised content standards must be invalidated for this reason alone.  *Shays I*, 414 F.3d at 102.  Given the Commission's repeated failures to rationally explain its rule, this Court should go further and invalidate the revised regulation under *Chevron* step two, because it reflects an "altogether impermissible

interpretation[] of FECA and BCRA" that no amount of explanation can justify. *Shays I*, 414 F.3d at 97; *see also* 337 F. Supp. 2d at 62-65.

> **D.    The Commission Made Arbitrary and Capricious Use of the CMAG Data in Attempting To Justify Its Revised Coordination Regulation.**

The Commission brushed aside all of the examples of early advertising before it, observing simply that "there was no evidence that any of these advertisements had been coordinated with a candidate or a political party committee." 71 Fed. Reg. at 33,196-97. This is wrong on at least two levels. *First*, there is ample evidence in the record that at least some of these ads were coordinated—witness the 1995 Clinton/DNC coordinated advertising campaign that was condemned by the FEC's own Audit Committee and by a Senate investigating committee, helped spark the reform movement that led to BCRA's eventual enactment, and would have enjoyed a complete "safe harbor" under the Commission's revised standards because it avoided express advocacy.[27]

*Second*, the salient question is not whether such ads have in fact been coordinated with candidates. The D.C. Circuit ordered the Commission to "undertake[]" an "inquiry" as to whether there is "substantial election-related communication occur[ing] outside" the agency's 120-day pre-election window. 414 F.3d at 102. The question, as the Commission recognized elsewhere in its E&J, is whether candidates themselves ever place "value" on such early advertising, so that allowing corporations, unions, and the wealthy to secretly bankroll such

---

[27] *See* pp. 13, 16-17 above. Some of the evidence of coordination is reviewed in the FEC Audit Committee's report cited above. (*See* PX 17.) This evidence is also discussed in Volume I of the Thompson Committee Report, ch. 5, pp. 107-65, *passim* (PX 5). *See also* Dick Morris, *Behind the Oval Office*, at 144 (during 1995, "the president became the day-to-day operational director of our TV-ad campaign. He worked over every script, watched each ad, ordered changes in every visual presentation, and decided which ads would run when and where. … Every line of every ad came under his informed, critical, and often meddlesome gaze. Every ad was *his* ad.").

advertising might increase the risk of corruption and apparent corruption. 71 Fed. Reg. at 33,193-96. The administrative record demonstrates that candidates and their parties often find such ads to be extremely valuable—particularly in high-profile races involving endangered incumbents, challengers seeking to gain early ground against incumbents, and candidates scrambling to stand out from the crowd in races to fill open seats. Under the Commission's rule, all of these ads could have been freely coordinated between the candidates, their parties, and outside spenders, without any regard for FECA's contribution limits, source prohibitions, or disclosure requirements, so long as they avoided express advocacy and republication.

The Commission also dismissed the relevance of these early ads because they were not "empirical data." 71 Fed. Reg. at 33,192. That is manifestly wrong—a compilation of advertising during particular time periods, as gathered by the *National Journal*, is certainly a collection of factual information assembled through "observation" or "experience." IV Oxford English Dictionary 264 (2d ed. 1989); V *id.* at 188. The record also includes many details about which media outlets carried particular ads, and for what period, and at what cost—clearly "empirical data" that warranted some kind of reasoned analysis and response from the Commission.[28]

Rather than deal with this evidence, the Commission reopened the record so that it could make its own eleventh-hour submission of the CMAG data regarding certain TV ads run by Presidential, Senate, and House candidates during a portion of the 2004 campaign cycle. Even

---

[28] In its NPRM inviting "comments in the form of empirical data," the Commission also "invite[d] commenters to provide examples of communications from previous election cycles demonstrating that an alternative may be either underinclusive or overinclusive." 70 Fed Reg. at 73,949 (PX 13). The NPRM also asked for information about whether "early electoral communications, for example, that occur more than 120 days before an election, have an effect on election results?" *Id.* The examples of early advertising that were submitted by commenters were clearly responsive to these requests, contrary to the Commission's insinuations in the E&J.

putting to one side the Commission's improper last-minute procedures in adding these data to bolster its case—it gave interested parties only *five business days* to analyze and respond to a mass of raw data[29]—the CMAG data do not support, and in many respects undermine, the revised Section 109.21.    They demonstrate only the obvious—that most TV ads run by candidates are run in the period immediately leading up to a primary or general election.    Just because *most* candidate TV ads are run during this period, however, does not mean that the ads run earlier in the election cycle are *insubstantial*.    The Commission acknowledges, for example, that 8.56% of all candidate TV ads run in 2004 House primary races included in the CMAG data set were run outside its new 90-day pre-primary window.    71 Fed. Reg. at 33,194; *see also* PX 134 at Graph H1 and notes.    Similarly, 8.44% of all candidate TV ads run prior to the 2004 Presidential primaries/caucuses in the selected media markets studied by the Commission were run outside the 120-day pre-election window.    PX 134 at Graph P7 and notes.    Even under the Commission's impermissibly constricted analysis, figures like these translate into thousands of TV ads and millions of dollars of advertising expenditures that are no longer subject to regulation under the coordination rules so long as they avoid republication or express advocacy. The Commission's approach of declaring the first eight percent of Presidential primary ads to be insubstantial and thus exempt from regulation is no different in effect from a regulation purporting to exempt the first eight percent of campaign donations made by corporations and

---

[29]   "[T]he D.C. Circuit consistently has held that notice under [the APA] must 'afford interested parties a reasonable opportunity to participate in the rulemaking process.'"    *Sierra Club v. Whitman*, No. 00-2206 CKK/JMF, 2002 WL 393069, at *5 (D.D.C. Mar. 11, 2002) (citations omitted); *see also* 5 U.S.C. § 553(b); *United States v. Florida E. Coast Rwy.*, 410 U.S. 224, 243-44 (1973) (notice must be given "sufficiently in advance of the entry of the final order to give [interested persons] adequate time to formulate and to present objections to the Commission's proposal").

labor unions from Section 441b's ban on contributions of corporate and union treasury funds, on the ground that such amounts are supposedly insubstantial when viewed in the aggregate.[30]

The Commission's reliance on the 2004 CMAG data is arbitrary and capricious in many further respects:

**General methodological flaws**.  The CMAG data involve only TV ads.  The Commission has not even considered how many campaign ads are run outside the 90- and 120-day windows by means of *other* types of "public communications" that are subject to FECA and BCRA's coordination provisions—including radio ads, Internet ads, newspaper ads, and direct mail.  The record demonstrates that many early ads are run on these other media.[31]  There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that there is only an insignificant amount of campaign activity in these other media outside the Commission's pre-election windows.

Moreover, the CMAG data focus only on candidate ads, not on ads run by political parties and outside groups.  Yet the record demonstrates that parties and outside groups often run early media ads extolling the virtues of favored candidates and attacking disfavored candidates, representing the expenditure of millions of dollars.  *See* pp. 18-19, 24-26 above.  The Commission refused to analyze or respond to this evidence of early political advertising.  All of

---

[30]  *See* Addendum C, which reprints several of the Commission's graphs and highlights the substantial portions of ads falling outside the pre-election windows.

[31]  For examples of early radio advertising, all ignored by the Commission, *see*, *e.g.*, PX 19, 21, 34, 46 (Howard Dean radio ads targeted to black audiences), 51, 53, 55, 60-61, 64 (Illinois Senate radio ads run on stations "popular with black listeners"), 66, 70, 75, 76-77 (liberal candidate ads run during the "Arnie Arnesen Show"), 79 (conservative candidate ads run during "The Rush Limbaugh Show"), 82, 83 (more radio ads on Rush Limbaugh), 92 (South Dakota Senate radio ads run on "agriculture-related radio stations"), 97, 99, 104, 106, 121.  For examples of early advertising on other media, *see*, *e.g.*, PX 21 (newspaper), 33 (newspaper), 47 (Internet).

these ads would have been freed of any functionally meaningful regulation under the Commission's revised rule.

**Flaws in Presidential Primary Methodology.** The CMAG 2004 Presidential primary data that are selectively relied on by the Commission significantly understate early primary advertising expenditures in several respects. The Commission initially restricted its analysis to the twenty-one states that were the key "battleground[s]" *in the general election.* (*See* 71 Fed. Reg. at 33,195 & n.21; PX 134 at Presidential Graphs—Notes ("PGN"), pp. 1, 6.) This methodology excludes many states with historically important primaries simply because they were not "battlegrounds" in the 2004 *general* election—states like California, New York, Texas, Illinois, Massachusetts, South Carolina, Indiana, Nebraska, and others.

Even as to these "battleground States," the Commission considers data only for media markets that are *fully contained* within a single state's boundaries. (*See* 71 Fed. Reg. at 33,195; PX 134 at PGN, pp. 1, 3-5.) This methodology is flawed in at least two important respects: *first*, it narrows the list of twenty-one battleground states to eleven states, because only eleven of the twenty-one have media markets fully contained within them; *second*, it excludes many important media markets within these eleven surviving states because the markets spill across state lines. For example, studying early advertising in the Pennsylvania Presidential primary is a meaningless exercise when one excludes, as has the Commission, the Philadelphia and Pittsburgh media markets. (*See* PX 134 at PGN, p. 5.) The actual number of advertisements and amount of spending that occurred more than 120 days before the 2004 Pennsylvania Presidential primary was certainly much greater than acknowledged by the Commission.

Even more amazingly, because the battleground state of New Hampshire has no media market that rests entirely within state lines, *the Commission has entirely excluded it from its*

*analysis of the significance of early advertising in the Presidential primaries.* (*See* PX 134 at PGN, pp. 3-5.) The New Hampshire primary has been viewed for generations as "the epicenter of the political universe, the site where the contest for the presidency of the most powerful nation in the history of the world is temporarily centered[.]" *2006 Almanac of American Politics* at 1047. Purporting to analyze the importance of early media advertising in the Presidential primaries without including New Hampshire is like purporting to study the great U.S. Presidents without including Abraham Lincoln.

**Flaws in Congressional Primary Methodology.** The Commission's merged data sets on House and Senate primaries *contain no ads by 2004 House or Senate candidates that were broadcast in 2003*, yet the record demonstrates that many such ads were aired, often eight to ten months before the primary. *See* Pls' St. Mat. Facts ¶ 11; pp. 19-26 above. For inexplicable reasons, the Commission's merged data sets exclude the millions of dollars of TV and radio advertising run during 2003 in connection with the 2004 Senate and House races discussed above. Thus, the Commission's data sets are defined to exclude precisely those ads they are supposed to test for. These omissions render the Commission's pre-primary Congressional data sets meaningless and the conclusions it draws from those data arbitrary and capricious.

**Failure to Focus On Strongly Contested Races.** The Supreme Court has instructed that campaign finance laws must be evaluated not on the basis of their impact on "the *average* campaign," but from the perspective of their impact on "*strongly contested*" campaigns. *Randall v. Sorrell*, 126 S. Ct. 2479, 2496 (2006) (emphasis in original) (*re* contribution limits). In other words, "the critical question concerns not simply the *average* effect" of a campaign finance measure, "but, more importantly," its effect in "*competitive*" races. *Id.* (emphasis in original). Yet the Commission wholly fails to consider the *concentration* and *intensity* of early political

advertising in strongly contested races.  For example, of the 3,838 early TV ads included in the Commission's partial sample of Presidential campaign ads in 2003-04, 2,968 (77%) ran in Iowa, representing expenditures of $486,709.  *See* Pls' St. Mat. Facts ¶ 12.  These "early" Iowa ads constituted *sixteen percent* of all Iowa TV ads run before the caucuses.  *Id.* ¶ 13.  This is before taking into account the Davenport market (excluded by the Commission, *see* PX 134 at PGN, pp. 1, 4), party and special interest group advertising (also excluded), and all forms of non-TV advertising such as radio, Internet, newspaper, and mass mailings (also all excluded).

Other examples of strongly contested campaigns that generate early media advertising include highly competitive Senate races with national dimensions (*e.g.*, the 2004 Daschle and Specter re-election campaigns, the 2006 Santorum, Chafee, and Burns re-election campaigns, etc.); and campaigns to fill open House or Senate seats.  *See* pp. 19-26 above.  There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that such campaign advertisements, clustered in highly competitive races of national significance, are rendered insignificant simply because they constitute a small percentage of total advertisements run in every district nationwide.  Indeed, the Commission's rule is all the more egregious because it permits unregulated coordination even with corporate and union spenders in *precisely* those races that may be most competitive or most important—and where an unregulated infusion of coordinated outside spending may have the most impact.

E.     **The Commission Has Failed To Demonstrate Why Spending Will Not Simply Shift to the Unregulated Periods Outside the Pre-Election Windows.**

The Commission also has failed to provide an acceptable response to what the D.C. Circuit called "perhaps [the] most important" question—"to the extent election-related advocacy now occurs primarily within 120 days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged rules'

restrictions?"  *Shays I*, 414 F.3d at 102.  The Commission's only response to this query was to offer the "bromide," *id.* at 101, that, since the CMAG data show that candidates themselves place "little" or "minimal" value on early advertising, "there is little risk that coordinated activity presents the risk or appearance of corruption."  71 Fed. Reg. at 33,196 (PX 136).  For all of the reasons set forth above, this misreads the CMAG data and ignores the substantial record evidence of early advertising by candidates, parties, and special interest groups, especially in high-profile, hotly contested races.

The Commission's blithe dismissal of these risks is eerily reminiscent of its reassurances during the mid- to late-1990s when it relaxed the restraints on the use of soft money to pay for coordinated non-express advocacy advertising—regulatory loopholes that "subverted," "eroded," and "circumvent[ed]" FECA; left the Nation's campaign finance system in "utter disarray," "an elaborate fiction," and "so riddled with loopholes as to be rendered ineffective"; and thereby helped trigger a crisis in public confidence that ultimately required the intervention of Congress, the President, and the federal judiciary.  *McConnell*, 540 U.S. at 126, 142 & n.44, 145, 166-67; *McConnell*, 251 F. Supp. 2d at 651-53, 655 (CKK).  The Commission does not have a credible record in predicting the effects of its regulatory "safe harbors" on the flow of special interest soft money into federal election campaigns.   *McConnell* emphasizes the "hard lesson of circumvention" that is "taught" by "the entire history of campaign finance regulation": regulatory loopholes will be exploited by those "scrambling to find another way to purchase influence."  540 U.S. at 165.  "Money, like water, will always find an outlet."  *Id.* at 224.  The Commission has pointed to no evidence suggesting that it will be any different here.[32]

_____

[32]  Although the Commission closed the election year "gap period" in Presidential campaigns— the period between the early primaries and the fall campaign during which there were no meaningful coordination standards in place—it insisted on preserving that election year regulatory "gap" in
*(Footnote continued)*

III.    **The Commission's Revised Coordination "Conduct Standards" Violate FECA, BCRA, and the APA.**

*Shays I* dealt primarily with coordination "*content* standards," not "*conduct* standards." The Commission, however, took advantage of this Court's remand of the content standards to open up several new loopholes in the conduct standards as well.

A.    **The Revised Common Vendor and Former Employee Provisions Will Exacerbate Circumvention of FECA and BCRA, and Are Not Adequately Explained or Justified.**

Section 214(c) of BCRA instructs the Commission to "address [in the new coordination regulation] … payments for the use of a common vendor … [and] payments for communications directed or made by persons who previously served as an employee of a candidate or a political party."  Congress's concern was that media consultants and other vendors who work for both a candidate and a supposedly "independent" outside spender can use their inside knowledge of the candidate's strategy and message to shape the work done for the outside spender, resulting in *de facto* coordination.  Likewise, a highly placed campaign employee who leaves to work for an

---

Congressional campaigns.  71 Fed. Reg. at 33,195.  Thus, in Congressional races with a March primary, party nominees will be able to engage in unregulated coordinated advertising with their parties, corporations, unions, and the wealthy from primary night up to early August (90 days before the November election).  The Commission contends that the CMAG data demonstrate that Congressional campaign ads run during these gap periods are of little or no value to candidates (unlike in Presidential races), and that there is thus no need to regulate coordinated communications containing non-express advocacy during these election-year periods.  *Id.* at 33,193-95.

The Commission's reliance on the CMAG data for this proposition is arbitrary and capricious for all of the reasons spelled out above.  The Commission fails to consider non-TV advertising, fails to assess party and outside special interest group ads during these "gaps," and fails to acknowledge record evidence that such ads are in fact run during election-year gap periods in Congressional as well as Presidential races.  *See*, *e.g.*, PX 98 (within days after winning the June 8, 2004 Republican Congressional primary in Maine's First District, Charles Summers was running TV ads inviting viewers to "meet Charlie," a "devoted husband and father [who] lives our Maine values").  The Commission also fails to offer any reason to believe that soft money will not simply flow to funding ads in Congressional races that have regulatory gap periods during the spring and summer months of the election year.  If (as the Commission acknowledges) such ads have value in Presidential races, why not potentially in Congressional races as well?

outside spender can take her inside knowledge with her to frame the outsider's spending for the candidate's best advantage.[33]

To accommodate these Congressional concerns, the Commission in 2003 decided to apply the coordination regulation to any situation in which a common vendor or former employee actually "use[d] or convey[ed] to the person paying for the communication" any "*material*" inside information about "campaign plans, projects, activities, or needs" of the candidate or his opponent at any point during the "*current election cycle*" (which began on "the first day following the date of the previous general election for the office or seat which the candidate [sought]" and ended "on the date on which the general election for the office or seat that individual [sought was] held"). 11 C.F.R. §§ 109.21(d)(4)-(5) (2003) (emphasis added); *see id.* § 100.3(b).

In response to complaints from political staffers and consultants that these provisions made it more difficult for them to switch jobs and attract new clients, the Commission took advantage of the *Shays I* remand to shrink the temporal application of these "conduct" provisions from the entire "current election cycle" down to a mere 120-day window.[34] Thus, for a Senate race, the regulation's coverage is now *over 2,000 days shorter* than before the Commission's revision (only 120 days out of a six-year cycle), and for a House race, *over 600 days shorter* (only 120 days out of two years).

---

[33]  *See* 148 Cong. Rec. S2144-45 (daily ed. Mar. 20, 2002) (statements of Sens. Feingold and McCain) (PX 8).  The use of common vendors to facilitate coordination was also examined in the Thompson Committee Report, Vol. I, ch. 5, pp. 107-65, *passim* (PX 5).

[34]  "[T]he 120-day period starts on the last day of an individual's employment with a candidate or political party committee, or on the last day when a commercial vendor performed any of the services listed in 11 C.F.R. 109.21(d)(4)(ii) for a candidate or political party committee."  71 Fed. Reg. at 33,204 (PX 136).

The Commission's total deregulation of potential coordination through common vendors and former employees after only 120 days violates both *Chevron* step two and the APA's standards of reasoned decisionmaking.  *See* pp. 3-5 above.  It is entirely divorced from, and will instead work to undermine, the central purposes of FECA and BCRA.  The E&J for the 120-day window consists of the same kind of "bromides" and unproven assertions that led this Court and the D.C. Circuit to invalidate the content standards in *Shays I*.  *See* 414 F.3d at 101.  Why should common vendors or former employees be able to take advantage of material inside information from a candidate's campaign simply because more than 120 days have elapsed?  How does that possibly promote BCRA's purposes and help prevent circumvention of FECA?  Why is 120 days the appropriate time for these conduct standards to expire, as opposed to 180 days or 365 days, or something more?  "[A] bright line can be drawn in the wrong place."  *Id.*  "[T]he proposition that 120 is twice 60 and four times 30, though arithmetically indisputable, is no reason to select that number over any other.  Why not triple 60, or multiply 30 by one-and-a-half?"  *Id.*

Other than its declared desire to make it easier for political staffers and consultants to change jobs and attract new clients, the Commission's only justification for its drastic reduction in the temporal scope of these conduct standards was that "material information regarding … 'campaigns, strategy, plans, needs, and activities' … does not remain 'material' for long periods of time during an election cycle[,]" or from a primary to a general election, and therefore "[t]he more appropriate temporal limit … is 120 days."  71 Fed. Reg. at 33,204-05 (quoting 11 C.F.R. § 109.21(d)(4)).  Again, why 120 rather than 30 or 180 or 365 or more?  Although it may be true in some instances that information obtained early in an election cycle will no longer be material by the time of the general election (a fact that would in any event remove such a communication from the reach of these provisions, which require that "information [be] *material* to the creation,

production or distribution of the communication"), the Commission's explanation hardly reflects reasoned decisionmaking and makes no effort to consider whether at least *some* inside campaign information might remain "material" for more than 120 days.  Consider a detailed state-by-state master plan prepared by a Hamilton Jordan or a Karl Rove at the very beginning of a campaign; why should it be treated as *per se* worthless after 120 days?  What about a campaign's opposition research files and dossiers of embarrassing private details about the other side?  Surely such sensitive information retains potential political value for much longer than a mere 120 days.[35]

The E&J leaves other important questions unanalyzed and unanswered.  For example, why is it any more appropriate now for vendors and former employees to be free to pass along material inside information after several months have gone by than it was in 2003 when the Commission rejected such a proposal?  *See* 68 Fed. Reg. at 436 (PX 9).  This unexplained about-face from the previous E&J in itself renders the regulation arbitrary and capricious.  *See State Farm*, 463 U.S. at 42, 52 (agency that relaxes a regulation must offer a "reasoned analysis" and "justification for rescinding" its earlier approach).  Moreover, although the Commission asserts based on its "experience" that "a limit of 120 days is *more than sufficient* to reduce the risk of circumvention," 71 Fed. Reg. at 33,205 (emphasis added), it does not explain why or how. Merely paying lip-service to its duty to promote BCRA's purpose of preventing the flow of unregulated money into federal campaigns is not enough; the Commission had a duty to explain *how* its new common vendor and former employee regulations would not "unduly compromise the Act's purposes" or "create the potential for gross abuse."  *Orloski*, 795 F.2d at 165.

---

[35]  The Commission's analogy to its polling regulations, 71 Fed. Reg. at 33,204-05, is misplaced. Those regulations treat poll results as having at least some "worth" for 180 days.  *See* 11 C.F.R. § 106.4(g).  Why don't the conduct standards apply at least for that length of time?  Moreover, the short half-life of polling data hardly defines the universe of the potentially material inside "[i]nformation about the campaign plans, projects, activities, or needs" of a candidate or political party.

B.    The "Firewall" Safe Harbor Will Lead to Circumvention of FECA and BCRA, and Is Not Adequately Explained or Justified.

The Commission also took advantage of the *Shays I* remand to establish for the first time a "safe harbor" that creates a "rebuttable presumption" that coordination has not occurred where "a commercial vendor, former employee, or political committee has designed and implemented an effective firewall[.]"  71 Fed. Reg. at 33,206.  Because this new "safe harbor" from the coordination regulation is so vague as to lead to almost certain circumvention, and because the Commission has failed adequately to explain how this provision furthers BCRA's purposes in light of the Commission's *rejection* of the same provision in 2003, the Court should invalidate new Section 109.21(h).

In 2003, the Commission rejected an identical proposal for a safe harbor where there were ethical screens between employees of common vendors serving third party spenders and candidates, or within third party spenders employing former employees of the beneficiary of the communication, because it did "not agree that the mere existence of a confidentiality agreement or ethical screen should provide a *de facto* bar to the enforcement of the limits on coordinated communication imposed by Congress."  68 Fed. Reg. at 437 (PX 9).  The Commission stressed that, "[w]ithout some mechanism to ensure enforcement, these private arrangements are unlikely to prevent the circumvention of the rules."  *Id.*

In the intervening period between 2003 and the *Shays I* remand, the Commission ruled on a complaint brought against EMILY's List and the Betty Castor for Senate Committee, alleging that EMILY's List made excessive contributions to Castor's campaign resulting from coordinated TV ads.  *See* First General Counsel's Report, EMILY's List Matter Under Review 5506 (Aug. 9, 2005) (PX 137).  The complaint alleged that the close, daily contacts between EMILY's List staff and the Castor campaign resulted in coordinated spending by EMILY's List,

as evidenced by the fact that Castor's campaign stopped running ads in areas where the EMILY's List ads were run. *Id.* at 6. EMILY's List defended itself by arguing that it had set up an internal firewall to separate its staff into two groups: one "assigned to work directly with the Castor Committee" and another (organized as an affiliated project of EMILY's List called "Florida Women Vote!") that was responsible for the pro-Castor ads. The first group, according to EMILY's List, "had no discussions with the staff assigned to Florida Women Vote! about the advertisements at issue and imparted no knowledge or information about the Castor campaign to Florida Women Vote! staff." *Id.* at 7. The Commission accepted the mere assertion of this "firewall" as a complete defense, which allowed EMILY's List to operate both in "coordination" with Castor and "independently" of her at the same time. *Id.* at 7-8.

Although the Commission in its post-remand NPRM requested comments on whether a firewall safe harbor should apply to the common vendor and former employee sections of the conduct standard, the final version of the rule sweeps much more broadly, covering each of the conduct standards found in section 109.21(d), and allowing any group to simply allege it has an internal "firewall" that allows different parts of the same organization to coordinate and operate independently of a candidate at the same time. *Compare* 70 Fed. Reg. at 73,955 *with* 71 Fed. Reg. at 33,206. The firewall need not even be complete in order to be deemed "effective" by the Commission; the safe harbor is not defeated by "common leadership or overlapping administrative personnel." 71 Fed. Reg. at 33,207. Thus, the head of a group such as EMILY's List is free to direct both those employees of the organization who are coordinating with a candidate and those employees who are making supposedly "independent" organizational expenditures for the same candidate. The presumption of non-coordination based on the mere assertion of a firewall can only be overcome if there is "specific information indicating that,

despite the firewall, either (1) information about the candidate's or political party committee's campaign plans … that is material to the creation, production, or distribution of the communication was used by the commercial vendor, former employee, or political committee; or (2) the common vendor, former employee, or political committee conveyed this information to the" payor. *Id.*

The Commission's firewall safe harbor is fatally flawed in several respects. *First*, the Commission fails to provide even a modicum of guidance to the regulated community as to what actually constitutes an "effective" firewall. The E&J notes that "[t]he safe harbor provision does not dictate specific procedures required to prevent the flow of information referenced in new 109.21(h) …." 71 Fed. Reg. at 33,206. Instead, the Commission directs the regulated community to emulate the EMILY's List firewall. *Id.* EMILY's List, however, simply alleged that its employees were "barred, as a matter of policy, from interacting with Federal candidates [and] … also barred from interacting with others within EMILY's List regarding specified candidates or officeholders." *Id.* (quotation and citation omitted). This provides no details about how, precisely, the policy must be implemented, what the policy must say, or what measures an organization must take to ensure that the policy is not breached. This is an open invitation to circumvent FECA's regulation of coordinated communications through paper "firewalls." Where "the Commission provides no guidance whatsoever" to the regulated community, "the potential for abuse, intended or no, is obvious" and "a revision of the Commission's regulations to ensure … compliance with the FECA is warranted." *Common Cause v. FEC*, 692 F. Supp. at 1396. "It is not for the Commission to evade [FECA's] mandate by permitting" safe harbors "and providing no guidance or supervision to those in whose interest it is to use as much 'soft money' in federal elections as they can." *Id.*

45

*Second*, the E&J does not provide the sort of reasoned explanation required under the APA.   Indeed, the Commission's abrupt shift in policy goes entirely unaddressed.   The Commission concluded in 2003 that it "[did] not agree that the mere existence of a confidentiality agreement or ethical screen should provide a *de facto* bar to the enforcement of the limits on coordinated communication imposed by Congress."  68 Fed. Reg. at 437.  Now it does, but it does not explain what factors led it to change its mind.  Similarly, the Commission concluded in 2003 that a firewall safe harbor should be rejected because, "[w]ithout some mechanism to ensure enforcement, these private arrangements are unlikely to prevent the circumvention of the rules."  *Id.*  What has led the Commission to change its mind on the dangers of circumvention?  The E&J offers no "reasoned analysis" or "justification for rescinding" the earlier approach.  *State Farm*, 463 U.S. at 42, 52.  Nor does it adequately explain why the safe harbor would not "unduly compromise the Act's purposes" or "create the potential for gross abuse."  *Orloski*, 795 F.2d at 165.

So what is the Commission's "enforcement mechanism," the manner by which it will prevent rampant coordination?  Simply put, the Commission will apparently take an accused party's word that its purportedly independent spending is "independent," even if the same group at the same time is overtly engaged in coordinated activities with a candidate—it simply needs to assert it has a firewall "policy," and that mere assertion, absent specific evidence of actual coordination, will serve to terminate any further inquiry.  Short of an accused spender or candidate committee confessing that it engaged in coordination, an unlikely scenario given the sophistication of these parties, it is hard to imagine what type of evidence would be adequate, in the Commission's view, to rebut the presumption.  *See, e.g.*, *Weidel v. Ashcroft*, 234 F. Supp. 2d

5, 7 (D.D.C. 2002) ("courts are sensitive to the reality that 'smoking guns,' *i.e.*, direct evidence or admissions of an improper motive, are rarely available").

**IV.    The Regulation Governing Solicitation at State Party Fundraising Events Continues to Violate BCRA and the APA.**

BCRA provides that federal candidates and officeholders shall not "solicit, receive, direct, transfer or spend" soft money.  2 U.S.C. § 441i(e).  Notwithstanding this prohibition, candidates and officeholders may still "attend, speak or be a featured guest" at a state party fundraising event without violating the ban.  *Id.* § 441i(e)(3).  Title 11 C.F.R. § 300.64(b), which purports to implement this exception, provides that federal candidates and officeholders may attend and speak at such events "*without restriction or regulation*" (emphasis added).  The rule allows federal candidates and officeholders not only to attend, speak, and be a featured guest at a state party fundraising event, but to engage in blatant soft-money solicitations and shakedowns at such events "without restriction or regulation."

In its original E&J, the Commission justified this loophole on the ground that anything other than a total exemption would require it to monitor what candidates and officeholders say at such events, "rais[ing] serious constitutional concerns."  67 Fed. Reg. at 49,108 (PX 139).  In *Shays I*, this Court held that the total exemption was arbitrary and capricious because the Commission had failed to explain why examining speech would "in any way [be] more vexing in the context of state political party fundraisers than … outside of such venues where nonfederal money solicitation is almost completely barred."  337 F. Supp. 2d at 92; *see also id.* at 93 ("[T]he FEC has not explained how examining speech at fundraising events implicates constitutional concerns that are not present when examining comments made at other venues.").  Following this Court's remand, the Commission issued a new NPRM, soliciting public comment on two alternative approaches to the state party fundraiser exemption.  The first option was to revise

47

only the E&J, leaving the existing rule's "without restriction or regulation" loophole intact. The second option was to revise the regulation itself so as to narrow the scope of the exemption by "barring candidates and Federal officeholders from soliciting or directing non-Federal funds when attending or speaking at party fundraising events." 70 Fed. Reg. at 9,014-15 (PX 140). In its June 30, 2005 revised E&J, the Commission announced it would take the former approach. However, the revised E&J suffers from the same fatal defects this Court identified in *Shays I*, and Section 300.64(b)'s loophole remains invalid.[36]

Although undeniably wordier, the revised E&J provides little new in the way of actual reasoning justifying the Commission's blanket authorization for federal candidates and officeholders to solicit unlimited soft money donations at state party fundraisers. The Commission insists that distinguishing between solicitations and informational speech "at a State party fundraising event is more difficult than in other contexts," and that it would therefore "be especially intrusive for the Commission to enforce the alternative proposed rule," but it fails to explain *why* that distinction is more difficult in the state party fundraiser context. 70 Fed. Reg. at 37,652 (PX 142). Indeed, because many of the precedents and comments to which the

---

[36] Plaintiffs also continue to believe that Section 300.64(b) is invalid under both *Chevron* steps. BCRA's authorization for federal candidates and officeholders to "attend, speak, or be a featured guest" at a state party fundraiser, 2 U.S.C. § 441i(e)(3), cannot reasonably be read as a wholesale exemption from the statute's general soft money solicitation ban, but rather is intended to allow federal candidates and officeholders to attend and speak at such fundraisers without *per se* violating BCRA. This reading is supported by BCRA's language and structure, which provide that a federal candidate may "speak" at a fundraising event but separately set forth explicitly the limited situations in which "solicitations" are permitted. *Compare* 2 U.S.C. § 441i(e)(3) (entitled "Fundraising events") *with* 2 U.S.C. § 441i(e)(4) (entitled "Permitting certain solicitations"). It is also supported by BCRA's legislative history, *see* 148 Cong. Rec. S2139 (daily ed. Mar. 20, 2002) (statement of Sen. McCain) ("Federal candidates and officeholders cannot solicit soft money funds … for any party committee—national, State or local.") (PX 8); *id.* at S1992-93 (daily ed. Mar. 18, 2002) (statement of Sen. Feingold) (section-by-section analysis of BCRA describing explicitly when federal candidates are "permitted to solicit" soft money but describing § 441i(e)(3) as merely not "prevent[ing]" candidates from "speaking at" a fundraiser) (PX 8), as well as Congress's "evident purpose" to "shut down the soft-money system." *Shays I*, 414 F.3d at 105. *See also* Recent Case, 118 Harv. L. Rev. 2453, 2457 (2005) (analysis of § 441i(e)(3)) (PX 143).

Commission cites speak of the difficulty *in general* of distinguishing solicitations from informative or persuasive speech, they undermine the Commission's conclusion that there is something uniquely difficult about making that distinction in the state party fundraiser context. For instance, the Commission asserts that "whether a particular message is a solicitation may depend on the person hearing the message—what one person interprets as polite words of acknowledgment may be construed as a solicitation by another person." *Id.* But this possibility (and any purported constitutional concerns arising from it) can exist in *any* context where a solicitation might be made.[37] The Commission's further claim that the "likelihood of [such] misinterpretation occurring increases at a State party fundraising event because of the Federal officeholders' and candidates' unique relationship to, and special identification with, their State parties" adds nothing. *Id.* Simply positing the existence of a "unique relationship" between federal candidates and state parties does not explain why distinguishing solicitous from non-solicitous speech is "especially intrusive" in one particular context but not others. *Id.*

Equally flawed is the Commission's reliance on a series of hypotheticals it posed to commenters at its May 17, 2005 hearing on the revised E&J. The Commission contends that these examples show that there is "uncertainty" whether a statement such as "'thank you for your continuing support of the party' constitute[s] solicitation" when "spoken at a fundraising event." *Id.* But whether this particular remark, or others like it, is addressed to a gathering at a state party fundraiser, to a group of lobbyists, or to a generous party contributor visiting a Senator's

---

[37] Thus, the Commission's reliance on several Supreme Court cases recognizing the possibility that different listeners may take away varied interpretations of the same speech, 70 Fed. Reg. at 37,652, is misplaced. At most it rehashes the Commission's argument in the original E&J that regulation of candidate solicitations in general raises constitutional concerns. It does not explain why solicitations at a state party fundraiser raise unique concerns and additionally ignores the Supreme Court's decision in *McConnell* upholding the candidate solicitation ban in its entirety as a "valid anticircumvention measure[]" in the face of a First Amendment challenge. 540 U.S. at 181-84.

office, there is always the possibility that different listeners may interpret the same statement differently and that the candidate or officeholder will need to take this into account. The Commission raises "practical enforcement concerns" and objects to the fact that "an analysis of the particular facts and circumstances surrounding the speech would be required in order to determine whether a speech [delivered at a state party fundraiser] would be solicitation," but here again, no explanation is supplied as to why this is not true of speech in any number of circumstances that might require the Commission to engage in line drawing. *Id.* at 37,651-52. The Commission's hypotheticals do not prove that line drawing is "more vexing" at a state party fundraiser than in other circumstances, let alone supply a "rational justification" for a rule that undeniably allows a federal officeholder to shake people down for unlimited amounts of soft money in the face of Congress's "evident purpose" and "intent to shut down the soft money system." *Shays I*, 414 F.3d at 105.[38]

The Commission also tries to distinguish the Hatch Act, which permits a federal employee to "give a speech or keynote address at a political fundraiser … as long as the employee does not solicit political contributions," *see* 5 U.S.C. § 7323; 5 C.F.R. § 734.208(b) & ex. 2; id. § 734.303(b), but it fails to explain why Section 300.64(b) could not similarly

---

[38] Other hypothetical examples offered by the Commission to justify its rule are simply farfetched. The E&J states that "[s]ome commenters noted [at the May 17, 2005 hearing] that even a 'pure policy' speech, otherwise permissible at a non-fundraising event, could constitute an impermissible solicitation in the context of a State party fundraising event." 70 Fed. Reg. at 37,652. This is little more than an argument that *anything* said at a fundraiser might reasonably be regarded as a solicitation, a position that is implausible, contrary to the statutory exemption that expressly permits candidates to "speak" at fundraisers, and was not endorsed by commenters favoring the alternative rule rejected by the Commission that would allow candidates to speak but not to solicit soft money donations at state party fundraisers. *See, e.g.,* FEC Public Hearing Tr. at 59 (May 17, 2005), *available at* http://www.fec.gov/law/RulemakingArchive.shtml#cand_solicit_party (noting that a candidate who "talk[s] about foreign policy and homeland security" at a state party fundraiser is "not involved in a solicitation") (remarks of Mr. Noble of the Center for Responsive Politics) (PX 141); *id.* at 56 (same) (remarks of Mr. Ryan of the Campaign Legal Center).

"provide[] clear guidance to speakers to distinguish permissible speech" from prohibited solicitations as the Hatch Act does.  70 Fed. Reg. at 37,653.  The Commission argues that the Hatch Act employs a "narrow definition of 'solicit' meaning 'to request expressly' that another person contribute something" and that the statute contains a scienter requirement so that one cannot violate the act without "knowingly" soliciting contributions.  *Id.* (citing 5 C.F.R. § 734.101); *see also* 5 U.S.C. § 7323(a)(2).  That the definition of "solicit" is narrower in the Hatch Act context than under BCRA does not, however, explain why a "*complete* exemption" from the BCRA solicitation ban is either necessary or appropriate.  The E&J never explains why it is infeasible to use a narrower exemption that would avoid what this Court described as an "interpretation [that] likely contravenes what Congress intended when it enacted" Section 441i(e)(3) and that undoubtedly "creates the potential for abuse."  *Shays I*, 337 F. Supp. 2d at 91.

## V.    The Commission's "Federal Election Activity" Regulations Unduly Compromise BCRA's Soft Money Restrictions on State, District, and Local Party Committees and Violate the APA.

This Court already has devoted extensive analysis to the special provisions in BCRA governing "Federal election activity"—those activities that Congress deemed most likely to influence federal elections.  *See Shays I*, 337 F. Supp. 2d at 97-114, *aff'd*, 414 F.3d at 109-112; *McConnell*, 251 F. Supp. 2d at 458-62, 465-68, 688-90, 702-04 (CKK), *aff'd*, 540 U.S. at 161-71.  "Voter registration activity" and "get-out-the-vote activity" are two types of FEA.  2 U.S.C. § 431(20)(A)(i)-(ii).  Activities determined to be outside the definitions of "voter registration" and "GOTV" activity—and therefore outside the definition of FEA—can be funded by state and local parties with unlimited amounts of soft money.  Accordingly, the scope given to the definitions of "voter registration" and "GOTV" activity by the Commission largely determines

the reach and effectiveness of BCRA's FEA provisions—and thus the effectiveness of its ban on soft money.

Following BCRA's enactment, the Commission first promulgated regulations defining "voter registration" and "GOTV" activity in its 2002 rulemaking.  *See* 11 C.F.R. § 100.24(a)(2)-(3) (2003); 67 Fed. Reg. 49,066 (July 29, 2002) (PX 139).  This Court invalidated certain aspects of these definitions after finding that the Commission had not provided adequate notice of the narrow approach taken in the final rules, as required by the APA, 5 U.S.C. § 553(b)(3).  *See* 337 F. Supp. 2d at 101, 106.  The Court also considered substantive challenges to the definitions, particularly plaintiffs' argument that the Commission had narrowed these terms to include only activities that "*assist*" voters to register or vote.  Plaintiffs argued that the Commission had historically included within the meaning of these terms efforts to *encourage* (as well as to assist) registration and voting, and that Congress intended BCRA's FEA provisions to be similarly encompassing.  This Court concluded that these challenges were not ripe for review under *Chevron* step two because "the exact parameters of the Commission's regulation [we]re subject to interpretation."  337 F. Supp. 2d at 100; *see also id.* at 105.  Nonetheless, this Court cautioned that if the regulations were not given a sufficiently encompassing interpretation they might well "'unduly compromise[] the Act.'"  *Id.* (quoting *Orloski*, 795 F.2d at 164) (voter registration activity); *see also id.* at 105 (GOTV activity).[39]

---

[39]  The Court sustained the Commission's definitions under *Chevron* step one.  *See* 337 F. Supp. 2d at 98-100, 102-03.  Plaintiffs continue to believe that the Commission's regulations fail *Chevron* step one because they contradict the common usage of the terms "voter registration activity" and "GOTV activity" as reflected in other FEC regulations and advisory opinions, *see, e.g.,* 11 C.F.R. § 100.133 (voter registration and GOTV activities are those "designed to *encourage* individuals to register to vote or to vote"); AO 1980-64 (voter registration and GOTV activities "generally connote efforts to increase the number of persons who register to vote and once registered, to maximize the number of eligible voters who go to the polls") (PX 144), as well as the common sense notion that telephoning potential voters who

*(Footnote continued)*

In February 2006, the Commission re-promulgated Sections 100.24(a)(2)-(3), leaving intact the former regulations' limitation that only activities that "assist" voters through "individualized means" may constitute "voter registration" and "GOTV" activity. The Commission has now confirmed that state and local parties may fund substantial amounts of activities that influence federal elections with soft money—an irrational result that is entirely inconsistent with and unduly compromises BCRA's core purposes.

A.     **Plaintiffs' Challenges to the "Voter Registration" and "Get-Out-The-Vote" Activity Regulations Are Ripe for Judicial Review.**

Several developments since this Court's remand have clarified the narrow scope of the Commission's rules, rendering them ripe for review. *First*, in re-promulgating Sections 100.24(a)(2)-(3), the Commission sought to "provide a fuller explanation" in its E&J "to provide more guidance on which activities are, and are not, covered" by the rules. 71 Fed. Reg. at 8,927-30 (PX 146). *Second*, in June 2006, the Commission issued AO 2006-19 (PX 147) to the Los Angeles County Democratic Party Central Committee, applying the GOTV definition to a set of concrete facts. The Commission concluded that a form letter or a pre-recorded, electronically dialed telephone call disseminated just days before an election, providing voters with information such as the date of the election, but not containing information tailored *specifically* to a given recipient, is not an "*individualized* means" of "assist[ance]" and thus does not constitute GOTV activity within the meaning of BCRA. These developments have removed any ambiguity regarding the scope of the voter registration and GOTV definitions and made clear that the Commission has given them an exceedingly narrow reading. Under these circumstances, the "regulations' parameters" have been clarified sufficiently to enable this Court to determine

a party believes will support its candidates for federal office and urging them to register or go to the polls is a voter registration or GOTV activity.

"whether or not the Act's purposes are compromised and the extent of the compromise." *Shays I*, 337 F. Supp. 2d at 100, 105.

    B.    **The Commission's Narrow Definition of the "Individualized Means" and "Assist[ance]" Requirements Undermine BCRA's Soft Money Ban, and Are Arbitrary and Capricious.**

Under the Commission's repromulgated rules, "[v]oter registration activity means contacting individuals by telephone, in person, or by other *individualized means* to *assist* them in registering to vote," and "[g]et-out-the-vote activity means contacting registered voters by telephone, in person, or by other *individualized means*, to *assist* them in engaging in the act of voting." 11 C.F.R. § 100.24(a)(2)-(3) (emphasis added). In AO 2006-19, the Commission explained the meaning of these terms in the course of reviewing a local party's plan to "make pre-recorded, electronically dialed telephone calls and send direct mail to all voters registered as Democrats" in Long Beach, California "between four and fifteen days prior to [an] election" that involved both local and federal candidates. Both the telephone script and the direct-mail piece informed registered Democrats of the date of the election and urged them to vote for a local candidate. The Commission's opinion addresses the question whether these communications constitute FEA that must be paid for, at least in part, with hard money. The Commission concluded that the communications could be paid for entirely with soft money, notwithstanding the presence of federal candidates on the ballot who stood to benefit from the local party's GOTV efforts.

Central to the Commission's conclusion was its interpretation of the terms "individualized means" and "assist[ance]" in the definition of "get-out-the-vote" activity. *See* AO 2006-19 (describing "the meaning of the[se] complementary terms"). Specifically, the Commission stated:

> [T]here is no indication that the [local committee] has engaged in any activity to target these communications to any specific subset of Democratic voters. Rather, [the local committee] intends to send the communications to all registered Democrats in Long Beach. The proposed direct-mail piece is a "form letter" that will not provide any individualized information to any particular recipient (such as the location of the particular recipient's polling place). The proposed pre-recorded, electronically dialed telephone calls are the functional equivalent of a "form letter" and, similarly, do not provide any individualized information to any particular recipient. Thus, the planned communications are generic in nature and do not provide any individualized assistance to voters.

The Commission has effectively read into the definition of GOTV activity a requirement that a communication be tailored to provide "individualized information" beyond the date of an election to each individual recipient or "subset" of recipients in order to fall within the regulation's requirement to "assist" a voter by "individualized means."[40]

Thus, although "common sense dictates" that "any efforts [by state or local parties] that increase the number of like minded registered voters who actually go to the polls" will "directly assist [a] party's candidates for federal office," *McConnell*, 540 U.S. at 167-68, under the Commission's construction, within days of a federal election a state party can send out multiple direct mailings to every potential voter sympathetic to its cause urging them to register and vote, and can blanket the state with automated telephone calls by celebrities identifying the date of an election and exhorting recipients to get out to vote, without being deemed to be engaged in voter registration or GOTV activity. Indeed, the more people that a communication is intended to reach, and the more money the party spends, the less likely it is that the communication will be an "individualized means" of "assist[ance]" subject to BCRA's soft money restrictions on FEA. This perverse result, which removes from regulation many of the most far-reaching and

---

[40] Although AO 2006-19 addressed the scope of GOTV activity, there is no basis to believe that the term "individualized means" would have a different meaning in the context of "voter registration activity," given the substantial similarity of the terms' definitions and statutory purposes.

sophisticated voter registration and GOTV activities, "unduly compromises the Act's purposes"

and therefore fails review under *Chevron* step two. *See Orloski*, 795 F.2d at 164.[41]

The E&J for the "voter registration activity" rule reiterates the Commission's narrow

interpretation of Section 100.24(a)(2)'s "assist[ance]" requirement.  The E&J emphasizes that

only "those activities that *actually register* individuals to vote" or "provid[e] potential voters

with *personal assistance* in registering to vote" qualify as FEA.  *See* 71 Fed. Reg. at 8,929

(emphasis added).  The examples provided in the E&J demonstrate that more than providing

information, direction, and encouragement is necessary:  in one instance the party worker

collected and mailed voter registration forms to the appropriate agency, and in the other example

the party worker offered "to mail registration forms with a prepaid envelope." *Id.*  In *Shays I*,

this Court noted that "[w]hile it is clear that mere encouragement [to register] does not fall within

---

[41]    AO 2006-19 also resolves an ambiguity in Section 100.24(a)(3) that was raised by this Court
in *Shays I*, providing further confirmation that the Commission has opted for a very narrow reading of its
GOTV activity definition.  In *Shays I*, this Court noted that the "Commission has made clear that
providing a person with the date of the election constitutes GOTV activity if it occurs within 72 hours of
an election. . . .  However … it is unclear how the Commission will treat such activity taking place more
than 72 hours before an election."  337 F. Supp. 2d at 105 (internal citation omitted).  As noted *supra*, the
communications at issue in AO 2006-19 provided recipients with the date of the election.  However, the
Commission determined that because the local party "will conduct the proposed communications four or
more days prior to the election" they were not likely to "assist[] a voter in engaging in the act of voting by
individualized means."  Indeed, the Commission reasoned that communications made just four days
before the polls open are *not* "made in close proximity to the date of the election" and found it significant
that "the communications [at issue] contain only the date of the election and do not include such
additional information as the hours and location of the individual voter's polling place."  Accordingly, it
is now clear that, under the Commission's rules, communications that encourage persons to vote *and*
provide them with the date of the election, standing alone, do not constitute GOTV activity when made
more than 72 hours before an election, leaving state and local parties free to fund such efforts entirely
with soft money notwithstanding the presence of federal candidates on the ballot.

Ironically, in its February 2006 E&J, the Commission stated that "[a]ctivity conducted earlier
than 72 hours before the election that meets the general definition of 'GOTV activity' in 11 C.F.R.
100.24(a)(3)" is FEA and emphasized that "[n]o [72-hour] time limitation exists."  71 Fed. Reg. at 8,930.
Nevertheless, in AO 2006-19, the Commission determined that certain activity was not covered by
Section 100.24(a)(3) in large part because "communications four or more days prior to the election" are
"more likely to be [] general exhortation[s]' to vote or 'mere encouragement' to vote, as opposed to a
*(Footnote continued)*

the scope of the regulation, it is possible that encouragement coupled with a direction of how one might register could constitute 'assistance' under the provision" and that "[s]uch an interpretation could remedy what might otherwise be a regulation that 'unduly compromises the Act.'" 337 F. Supp. 2d at 100 (quoting *Orloski*, 795 F.2d at 164).  It is now clear that the Commission has rejected such a saving construction.[42]

Even if this Court were to conclude that the Commission's voter registration and GOTV regulations are not "altogether impermissible interpretations of FECA and BCRA" and therefore survive *Chevron* step two, the Commission "has given no rational justification for them, as required by the APA's arbitrary and capricious standard." *Shays I*, 414 F.3d at 97.  Rather than genuinely considering the impact of its rules on Congress's desire to prevent the use of state and local parties to circumvent BCRA's soft money ban, the E&J merely sets up straw men that the Commission easily knocks down.   The Commission argues that in promulgating Section 100.24(a)(3)'s definition of GOTV activity it "found no evidence that Congress intended to capture every State or local party event where an individual ends a speech with the exhortation, 'Don't forget to vote!'"   71 Fed. Reg. at 8,928.   The Commission's innocuous example notwithstanding, its GOTV rule permits unlimited direct mail and robocalling operations paid for entirely with soft money to saturate a state with communications identifying the date of an election and urging a party's adherents to vote for a state candidate up to four days before an

---

communication that assists a voter in engaging in the act of voting by individualized means."  This result is difficult to square with the Commission's assurance that no 72-hour time limitation exists.

[42]  In noting that the scope of the Commission's definition of "voter registration activity" was not yet clear in *Shays I*, this Court also observed that "merely informing someone of where they may register to vote could fall within the scope of the regulation."  337 F. Supp. 2d at 99 n.72.  The Commission's February 2006 E&J explains that state party efforts to "refer[] voters to those who could legally assist them in registering" or "providing publicly available information" to that effect do *not* constitute "voter registration activity."  71 Fed. Reg. at 8,928-29.

election in which the same party's federal candidates likewise appear on the ballot.  *See* AO 2006-19.  The Commission does not even attempt to explain how its rule can be squared with Congress's avowed intent to regulate state and local party GOTV activities that also "confer substantial benefits on federal candidates" and thereby "create[] a significant risk of actual and apparent corruption."  *McConnell*, 540 U.S. at 168.  It certainly provides no "persuasive justification," *Shays I*, 414 F.3d at 100, for its failure to design a rule that would exempt the routine or spontaneous speech-ending exhortations identified in the E&J without opening a gaping loophole permitting unlimited soft money spending on large-scale GOTV activities that unquestionably benefit federal candidates.

Likewise, the Commission frets in the E&J about federalizing party "rall[ies]" featuring "speeches that merely encourage the audience to register to vote" and limiting a party's ability to passively respond to "simple voter inquiries about where to register."  71 Fed. Reg. at 8,928-29.  But the Commission fails to explain why a rule could not accommodate these types of activities without exempting all proactive registration efforts undertaken by parties except those that succeed in "actually register[ing]" voters.  *Id.* at 8,929.  The Commission further states that its "voter registration activity" rule "will not lead to circumvention of FECA" because it "prohibit[s] the use of non-Federal funds for disbursements that actually register individuals to vote." *Id.*  But this cursory statement fails entirely to present a reasoned explanation as to *how* its rule, which allows parties to spend soft money to encourage registration *and* provide "direction [as to] how one might register," *Shays I*, 337 F. Supp. 2d at 100, will effectuate Congress's goal of preventing "state committees [from] function[ing] as an alternate avenue" for the flow of soft money into federal elections.  *McConnell*, 540 at 164; *see also Chamber of Commerce v. FEC*, 69 F.3d at 606 (statement in NPRM that rule "is 'consistent with the FECA's legislative history'"

without "further elaboration" is insufficient under the APA). The Commission's failure to explain how its rule would "prevent[] the flow of soft money into federal campaigns" is "simply fatal [] under hornbook administrative law." *Shays v. FEC*, 424 F. Supp. 2d 100, 115, 116 (D.D.C. 2006) ("*Shays II*"); *see also Shays I*, 414 F.3d at 111 (noting that "[b]efore BCRA, donors could lavish soft money on … pre-election voter registration drives, notwithstanding the obvious benefits such efforts would have for federal candidates" but that now "such activities must be financed entirely with federal money").

## Conclusion

In flagrant violation of this Court's orders, the Commission has allowed yet another election cycle to slip by without putting effective, compliant BCRA regulations into effect. The 2008 election cycle is already underway. For all of the reasons set forth above, this Court should "hold unlawful and set aside," 5 U.S.C. § 706(2), the challenged FEC regulations. And given the Commission's continuing inability to issue timely, compliant BCRA regulations, this Court should order the Commission to commence new rulemaking proceedings within thirty days of the Court's decision, and should retain jurisdiction over this matter to ensure the Commission's timely and sufficient compliance.[43]

---

[43] Back in March 2002, Congress gave the Commission 90 days to promulgate regulations implementing BCRA's soft money prohibitions and 270 days to promulgate regulations carrying out its other titles. *See* BCRA § 402(c). In this way Congress sought to insure that with the "promulgation of key regulations … a new campaign finance system can be implemented in a certain and sure fashion for the 2004 elections." 148 Cong. Rec. S2142 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold) (PX 8). The Commission's illegal regulations and foot-dragging—including its failure to issue an NPRM on the coordination issues until *fourteen months* after it had been ordered by this Court to proceed expeditiously—have frustrated this Congressional goal not only for the 2004 elections, but for the 2006 elections as well. This Court has ample authority to insure that the 2008 elections are not similarly corrupted. *See Common Cause v. FEC*, 692 F. Supp. 1397, 1401, 1402 (D.D.C. 1988) (noting "the Commission's lack of expedition in meeting the court's mandate," "retain[ing] jurisdiction," and "requir[ing] the FEC to report its progress toward the promulgation of new rules" governing soft money); *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)

*(Footnote continued)*

Dated this 8th day of December, 2006.

Respectfully submitted,

Roger M. Witten (Bar No. 163261)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

Charles G. Curtis, Jr. (*pro hac vice*)
Michelle M. Umberger (Bar No. 480620)
David L. Anstaett (*pro hac vice*)
Lissa R. Koop (*pro hac vice*)
HELLER EHRMAN LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663-7460

Randolph D. Moss (Bar No. 417749)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

Fred Wertheimer (Bar No. 154211)
DEMOCRACY 21
1825 Eye Street, N.W., Suite 400
Washington, D.C. 20006
(202) 429-2008

Donald J. Simon (Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
   ENDRESON & PERRY LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240

*Attorneys for Plaintiffs Christopher Shays
and Martin Meehan*

---

(even where delay is not yet unreasonable court "may nevertheless retain jurisdiction over the case in order to monitor the agency's assurances that it is proceeding as diligently as possible with the resources available to it"); *id.* at 1100 ("statutory timetable 'or any other indication of the speed with which [the Congress] expects the agency to proceed'" weigh in favor of court intervention) (citation omitted); *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001) ("[F]ederal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations, and have the authority to compel regular progress reports in the meantime."); *Pub. Citizen Health Research Group v. FDA*, 740 F.2d 21, 32, 35 (D.C. Cir. 1984) (in face of agency "recalcitrance" the "APA empowers the court to evaluate the pace of the agency decisional process and to order expedition if the pace lags unreasonably" including "ordering rulemaking to begin immediately and proceed expeditiously, and ordering periodic reports to the court concerning the pace of the rulemaking"); *St. Lawrence Seaway Pilots' Ass'n v. Collins*, 362 F. Supp. 2d 59, 75 (D.D.C.) (court may "retain jurisdiction over this case until the defendants issue a new final rule" to "ensure that the delay does not move into the realm of unreasonableness"), *vacated on other grounds*, No. CIV. A. 03-1204, 2005 WL 1138916 (D.D.C. May 13, 2005).

# Addendum A

# Selected Regulations

1 of 1 DOCUMENT

Title 11 -- Federal Elections ; Revised as of January 01, 1981

Chapter I -- Federal Election Commission

SUBCHAPTER A -- GENERAL

PART 109 -- INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 434(c))

§  109.1 Definitions (2 U.S.C. 431(17)).

*11 CFR 109.1*

(a) "Independent expenditure" means an expenditure by a person for a communication expressly advocating the election or defeat of a clearly identified candidate which is not made with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate or any agent or authorized committee of such candidate.

(b) For purposes of this definition --

(1) "Person" means an individual, partnership, committee, association, or any organization or group of persons, including a separate segregated fund established by a labor organization, corporation, or national bank (see Part 114) but does not mean a labor organization, corporation, or national bank.

(2) "Expressly advocating" means any communication containing a message advocating election or defeat, including but not limited to the name of the candidate, or expressions such as "vote for," "elect," "support," "cast your ballot for," and "Smith for Congress," or "vote against," "defeat," or "reject."

(3) "Clearly identified candidate" means that the name of the candidate appears, a photograph or drawing of the candidate appears, or the identity of the candidate is otherwise apparent by unambiguous reference.

(4) "Made with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate or any agent or authorized committee of the candidate" means --

(i) Any arrangement, coordination, or direction by the candidate or his or her agent prior to the publication, distribution, display, or broadcast of the communication. An expenditure will be presumed to be so made when it is --

(A) Based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made;

(B) Made by or through any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agent;

(ii) But does not include providing to the expending person upon request Commission guidelines on independent expenditures.

(5) "Agent" means any person who has actual oral or written authority, either express or implied, to make or to authorize the making of expenditures on behalf of a candidate, or means any person who has been placed in a position within the campaign organization where it would reasonably appear that in the ordinary course of campaign-related activities he or she may authorize expenditures.

(c) An expenditure not qualifying under this section as an independent expenditure shall be a contribution in-kind to the candidate and an expenditure by the candidate, unless otherwise exempted.

(d)(1) The financing of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their au-

11 CFR 109.1

thorized agents shall be considered a contribution for the purpose of contribution limitations and reporting responsibilities by the person making the expenditure but shall not be considered an expenditure by the candidate or his authorized committees unless made with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate or any authorized agent or committee thereof.

(2) This paragraph does not affect the right of a State or subordinate party committee to engage in such dissemination, distribution, or republication as agents designated by the national committee pursuant to § 110.7(a)(4).

(e) No expenditure by an authorized committee of a candidate on behalf of that candidate shall qualify as an independent expenditure.

SOURCE: 45 FR 15118, Mar. 7, 1980

AUTHORITY: 2 U.S.C. 431(17), 434(c), 438(a)(8), 441d.

11 C.F.R. § 100.23 (2001)

## § 100.23 Coordinated General Public Political Communications.

(a) *Scope*—(1) This section applies to expenditures for general public political communications paid for by persons other than candidates, authorized committees, and party committees.

(2) Coordinated party expenditures made on behalf of a candidate pursuant to 2 U.S.C. 441a(d) are governed by 11 CFR 110.7.

(b) *Treatment of expenditures for general public political communications as expenditures and contributions.* Any expenditure for general public political communication that includes a clearly identified candidate and is coordinated with that candidate, an opposing candidate or a party committee supporting or opposing that candidate is both an expenditure under 11 CFR 100.8(a) and an in-kind contribution under 11 CFR 100.7(a)(1)(iii).

(c) *Coordination with candidates and party committees.* An expenditure for a general public political communication is considered to be coordinated with a candidate or party committee if the communication—

(1) Is paid for by any person other than the candidate, the candidate's authorized committee, or a party committee, and

(2) Is created, produced or distributed—

(i) At the request or suggestion of the candidate, the candidate's authorized committee, a party committee, or the agent of any of the foregoing;

(ii) After the candidate or the candidate's agent, or a party committee or its agent, has exercised control or decision-making authority over the content, timing, location, mode, intended audience, volume of distribution, or frequency of placement of that communication; or

(iii) After substantial discussion or negotiation between the creator, producer or distributor of the communication, or the person paying for the communication, and the candidate, the candidate's authorized committee, a party committee, or the agent of such candidate or committee, regarding the

68

**Federal Election Commission**

content, timing, location, mode, intended audience, volume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement. Substantial discussion or negotiation may be evidenced by one or more meetings, conversations or conferences regarding the value or importance of the communication for a particular election.

(d) *Exception.* A candidate's or political party's response to an inquiry regarding the candidate's or party's position on legislative or public policy issues does not alone make the communication coordinated.

(e) *Definitions.* For purposes of this section:

(1) *General public political communications* include those made through a broadcasting station (including a cable television operator), newspaper, magazine, outdoor advertising facility, mailing or any electronic medium, including the Internet or on a web site, with an intended audience of over one hundred people.

(2) *Clearly identified* has the same meaning as set forth in 11 CFR 100.17.

(3) *Agent* has the same meaning as set forth in 11 CFR 109.1(b)(5).

[65 FR 76146, Dec. 6, 2000]

EFFECTIVE DATE NOTE: At 65 FR 76146, Dec. 6, 2000, § 100.23 was added, effective after these regulations have been before Congress for 30 legislative days pursuant to 2 U.S.C. 438(d).

Add. A-4

11 C.F.R. § 100.24 (2003)

**Federal Election Commission**                                              **§ 100.24**

§ 100.24 **Federal election activity** (2 U.S.C. 431(20)).

(a) As used in this section, and in part 300 of this chapter,

(1) *In connection with an election in which a candidate for Federal office appears on the ballot* means:

(i) The period of time beginning on the date of the earliest filing deadline for access to the primary election ballot for Federal candidates as determined by State law, or in those States that do not conduct primaries, on January 1 of each even-numbered year and ending on the date of the general election, up to and including the date of any general runoff.

(ii) In an odd-numbered year, the period beginning on the date on which the date of a special election in which a candidate for Federal office appears on the ballot is set and ending on the date of the special election.

(2) *Voter registration activity* means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

(3) *Get-out-the-vote activity* means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting. Get-out-the-vote activity shall not include any communication by an association or similar group of candidates for State or local office or of individuals holding State or local office if such communication refers only to one or more State or local candidates. Get-out-the-vote activity includes, but is not limited to:

(i) Providing to individual voters, within 72 hours of an election, information such as the date of the election, the times when polling places are open, and the location of particular polling places; and

(ii) Offering to transport or actually transporting voters to the polls.

(4) *Voter identification* means creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates. This paragraph shall not apply to an association or similar group of candidates for State or local office or of individuals holding State or local office if the association or group engages in voter identification that refers only to one or more State or local candidates.

(b) As used in part 300 of this chapter, *Federal election activity* means any of the activities described in paragraphs (b)(1) through (b)(4) of this section.

(1) Voter registration activity during the period that begins on the date that is 120 calendar days before the date that a regularly scheduled Federal election is held and ends on the date of the election. For purposes of voter registration activity, the term "election" does not include any special election.

(2) The following activities conducted in connection with an election in which

55

one or more candidates for Federal office appears on the ballot (regardless of whether one or more candidates for State or local office also appears on the ballot):

(i) Voter identification.

(ii) Generic campaign activity, as defined in 11 CFR 100.25.

(iii) Get-out-the-vote activity.

(3) A public communication that refers to a clearly identified candidate for Federal office, regardless of whether a candidate for State or local election is also mentioned or identified, and that promotes or supports, or attacks or opposes any candidate for Federal office. This paragraph applies whether or not the communication expressly advocates a vote for or against a Federal candidate.

(4) Services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(c) *Exceptions. Federal election activity* does not include any amount expended or disbursed by a State, district, or local committee of a political party for any of the following activities:

(1) A public communication that refers solely to one or more clearly identified candidates for State or local office and that does not promote or support, or attack or oppose a clearly identified candidate for Federal office; provided, however, that such a public communication shall be considered a Federal election activity if it constitutes voter registration activity, generic campaign activity, get-out-the-vote activity, or voter identification.

(2) A contribution to a candidate for State or local office, provided the contribution is not designated to pay for voter registration activity, voter identification, generic campaign activity, get-out-the-vote activity, a public communication, or employee services as set forth in paragraphs (a)(1) through (4) of this section.

(3) The costs of a State, district, or local political convention, meeting or conference.

(4) The costs of grassroots campaign materials, including buttons, bumper stickers, handbills, brochures, posters, and yard signs, that name or depict only candidates for State or local office.

[67 FR 49110, July 29, 2002]

56

Federal Election Commission

§ 109.21

### § 109.21  What is a "coordinated communication"?

(a) *Definition.* A communication is coordinated with a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing when the communication:

(1) Is paid for by a person other than that candidate, authorized committee, political party committee, or agent of any of the foregoing;

(2) Satisfies at least one of the content standards in paragraph (c) of this section; and

(3) Satisfies at least one of the conduct standards in paragraph (d) of this section.

(b) *Treatment as an in-kind contribution and expenditure; Reporting*—(1) *General rule.* A payment for a coordinated communication is made for the purpose of influencing a Federal election, and is an in-kind contribution under 11 CFR 100.52(d) to the candidate, authorized committee, or political party committee with whom or which it is coordinated, unless excepted under 11 CFR part 100, subpart C, and must be reported as an expenditure made by that candidate, authorized committee, or political party committee under 11 CFR 104.13, unless excepted under 11 CFR part 100, subpart E.

(2) *In-kind contributions resulting from conduct described in paragraphs (d)(4) or (d)(5) of this section.* Notwithstanding paragraph (b)(1) of this section, the candidate, authorized committee, or political party committee with whom or which a communication is coordinated does not receive or accept an in-

145

kind contribution, and is not required to report an expenditure, that results from conduct described in paragraphs (d)(4) or (d)(5) of this section, unless the candidate, authorized committee, or political party committee, or an agent of any of the foregoing, engages in conduct described in paragraphs (d)(1) through (d)(3) of this section.

(3) *Reporting of coordinated communications.* A political committee, other than a political party committee, that makes a coordinated communication must report the payment for the communication as a contribution made to the candidate or political party committee with whom or which it was coordinated and as an expenditure in accordance with 11 CFR 104.3(b)(1)(v). A candidate, authorized committee, or political party committee with whom or which a communication paid for by another person is coordinated must report the usual and normal value of the communication as an in-kind contribution in accordance with 11 CFR 104.13, meaning that it must report the amount of the payment as a receipt under 11 CFR 104.3(a) and as an expenditure under 11 CFR 104.3(b).

(c) *Content standards.* Each of the types of content described in paragraphs (c)(1) through (c)(4) satisfies the content standard of this section.

(1) A communication that is an electioneering communication under 11 CFR 100.29.

(2) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). For a communication that satisfies this content standard, see paragraph (d)(6) of this section.

(3) A public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(4) A communication that is a public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(4)(i), (ii), and (iii) of this section are true.

(i) The communication refers to a political party or to a clearly identified candidate for Federal office;

(ii) The public communication is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and

(iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

(d) *Conduct standards.* Any one of the following types of conduct satisfies the conduct standard of this section whether or not there is agreement or formal collaboration, as defined in paragraph (e) of this section:

(1) *Request or suggestion.*

(i) The communication is created, produced, or distributed at the request or suggestion of a candidate or an authorized committee, political party committee, or agent of any of the foregoing; or

(ii) The communication is created, produced, or distributed at the suggestion of a person paying for the communication and the candidate, authorized committee, political party committee, or agent of any of the foregoing, assents to the suggestion.

(2) *Material involvement.* A candidate, an authorized committee, a political party committee, or an agent of any of the foregoing, is materially involved in decisions regarding:

(i) The content of the communication;

(ii) The intended audience for the communication;

(iii) The means or mode of the communication;

(iv) The specific media outlet used for the communication;

(v) The timing or frequency of the communication; or

(vi) The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

(3) *Substantial discussion.* The communication is created, produced, or distributed after one or more substantial

discussions about the communication between the person paying for the communication, or the employees or agents of the person paying for the communication, and the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing. A discussion is substantial within the meaning of this paragraph if information about the candidate's or political party committee's campaign plans, projects, activities, or needs is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication.

(4) *Common vendor.* All of the following statements in paragraphs (d)(4)(i) through (d)(4)(iii) of this section are true:

(i) The person paying for the communication, or an agent of such person, contracts with or employs a commercial vendor, as defined in 11 CFR 116.1(c), to create, produce, or distribute the communication;

(ii) That commercial vendor, including any owner, officer, or employee of the commercial vendor, has provided any of the following services to the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, in the current election cycle:

(A) Development of media strategy, including the selection or purchasing of advertising slots;

(B) Selection of audiences;

(C) Polling;

(D) Fundraising;

(E) Developing the content of a public communication;

(F) Producing a public communication;

(G) Identifying voters or developing voter lists, mailing lists, or donor lists;

(H) Selecting personnel, contractors, or subcontractors; or

(I) Consulting or otherwise providing political or media advice; and

(iii) That commercial vendor uses or conveys to the person paying for the communication:

(A) Information about the clearly identified candidate's campaign plans, projects, activities, or needs, or his or her opponent's campaign plans, projects, activities, or needs, or a political party committee's campaign plans, projects, activities, or needs and that information is material to the creation, production, or distribution of the communication; or

(B) Information used previously by the commercial vendor in providing services to the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, and that information is material to the creation, production, or distribution of the communication.

(5) *Former employee or independent contractor.* Both of the following statements in paragraph (d)(5)(i) and (d)(5)(ii) of this section are true:

(i) The communication is paid for by a person, or by the employer of a person, who was an employee or independent contractor of the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, during the current election cycle; and

(ii) That former employee or independent contractor uses or conveys to the person paying for the communication:

(A) Information about the clearly identified candidate's campaign plans, projects, activities, or needs, or his or her opponent's campaign plans, projects, activities, or needs, or a political party committee's campaign plans, projects, activities, or needs, and that information is material to the creation, production, or distribution of the communication; or

(B) Information used by the former employee or independent contractor in providing services to the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the

147

opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, and that information is material to the creation, production, or distribution of the communication.

(6) *Dissemination, distribution, or republication of campaign material.* A communication that satisfies the content standard of paragraph (c)(2) of this section or 11 CFR 109.37(a)(2)(i) shall only satisfy the conduct standards of paragraphs (d)(1) through (d)(3) of this section on the basis of conduct by the candidate, the candidate's authorized committee, or the agents of any of the foregoing, that occurs after the original preparation of the campaign materials that are disseminated, distributed, or republished. The conduct standards of paragraphs (d)(4) and (d)(5) of this section may also apply to such communications as provided in those paragraphs.

(e) *Agreement or formal collaboration.* Agreement or formal collaboration between the person paying for the communication and the candidate clearly identified in the communication, his or her authorized committee, his or her opponent, or the opponent's authorized committee, a political party committee, or an agent of any of the foregoing, is not required for a communication to be a coordinated communication. *Agreement* means a mutual understanding or meeting of the minds on all or any part of the material aspects of the communication or its dissemination. *Formal collaboration* means planned, or systematically organized, work on the communication.

(f) *Safe harbor for responses to inquiries about legislative or policy issues.* A candidate's or a political party committee's response to an inquiry about that candidate's or political party committee's positions on legislative or policy issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards in paragraph (d) of this section.

11 C.F.R. § 100.3

**Federal Election Commission**                                                     **§ 100.5**

candidate under this section, contributions or expenditures shall be aggregated on an election cycle basis. An election cycle shall begin on the first day following the date of the previous general election for the office or seat which the candidate seeks, unless contributions or expenditures are designated for another election cycle. For an individual who receives contributions or makes expenditures designated for another election cycle, the election cycle shall begin at the time such individual, or any other person acting on the individual's behalf, first receives contributions or makes expenditures in connection with the designated election. The election cycle shall end on the date on which the general election for the office or seat that the individual seeks is held.

**§ 100.3  Candidate (2 U.S.C. 431(2)).**

(a) *Definition. Candidate* means an individual who seeks nomination for election, or election, to federal office. An individual becomes a candidate for Federal office whenever any of the following events occur:

(1) The individual has received contributions aggregating in excess of $5,000 or made expenditures aggregating in excess of $5,000.

(2) The individual has given his or her consent to another person to receive contributions or make expenditures on behalf of that individual and such person has received contributions aggregating in excess of $5,000 or made expenditures aggregating in excess of $5,000.

(3) After written notification by the Commission that any other person has received contributions aggregating in excess of $5,000 or made expenditures aggregating in excess of $5,000 on the individual's behalf, the individual fails to disavow such activity by letter to the Commission within 30 days of receipt of the notification.

(4) The aggregate of contributions received under 11 CFR 100.3(a) (1), (2), and (3), in any combination thereof, exceeds $5,000, or the aggregate of expenditures made under 11 CFR 100.3(a) (1), (2), and (3), in any combination thereof, exceeds $5,000.

(b) *Election cycle.* For purposes of determining whether an individual is a

49

Add. A-11

LEXSTAT 11 CFR 100.24

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2006, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE NOVEMBER 21, 2006 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 11 -- FEDERAL ELECTIONS
CHAPTER I -- FEDERAL ELECTION COMMISSION
SUBCHAPTER A -- GENERAL
PART 100 -- SCOPE AND DEFINITIONS (2 U.S.C. 431)
SUBPART A -- GENERAL DEFINITIONS

**Go to the CFR Archive Directory**

*11 CFR 100.24*

§ 100.24 Federal election activity (2 U.S.C. 431(20)).

(a) As used in this section, and in part 300 of this chapter,

(1) In connection with an election in which a candidate for Federal office appears on the ballot means:

(i) The period of time beginning on the date of the earliest filing deadline for access to the primary election ballot for Federal candidates as determined by State law, or in those States that do not conduct primaries, on January 1 of each even-numbered year and ending on the date of the general election, up to and including the date of any general runoff.

(ii) The period beginning on the date on which the date of a special election in which a candidate for Federal office appears on the ballot is set and ending on the date of the special election.

(iii) Voter Identification and Get-Out-the-Vote Activities Limited to Non-Federal Elections.

(A) Notwithstanding paragraphs (a)(1)(i) and (ii) of this section, in connection with an election in which a candidate for Federal office appears on the ballot does not include any activity or communication that is in connection with a non-Federal election that is held on a date separate from a date of any Federal election and that refers exclusively to:

(1) Non-Federal candidates participating in the non-Federal election, provided the non-Federal candidates are not also Federal candidates;

(2) Ballot referenda or initiatives scheduled for the date of the non-Federal election; or

(3) The date, polling hours and locations of the non-Federal election.

(B) Paragraph (a)(1)(iii) of this section shall not apply to any activities or communications after September 1, 2007.

(2) Voter registration activity means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

(3) Get-out-the-vote activity means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting. Get-out-the-vote activity includes, but is not limited to:

11 CFR 100.24

(i) Providing to individual voters information such as the date of the election, the times when polling places are open, and the location of particular polling places; and

(ii) Offering to transport or actually transporting voters to the polls.

(4) Voter identification means acquiring information about potential voters, including, but not limited to, obtaining voter lists and creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates. The date a voter list is acquired shall govern whether a State, district, or local party committee has obtained a voter list within the meaning of this section.

(b) As used in part 300 of this chapter, Federal election activity means any of the activities described in paragraphs (b)(1) through (b)(4) of this section.

(1) Voter registration activity during the period that begins on the date that is 120 calendar days before the date that a regularly scheduled Federal election is held and ends on the date of the election. For purposes of voter registration activity, the term "election" does not include any special election.

(2) The following activities conducted in connection with an election in which one or more candidates for Federal office appears on the ballot (regardless of whether one or more candidates for State or local office also appears on the ballot):

(i) Voter identification.

(ii) Generic campaign activity, as defined in *11 CFR 100.25*.

(iii) Get-out-the-vote activity.

(3) A public communication that refers to a clearly identified candidate for Federal office, regardless of whether a candidate for State or local election is also mentioned or identified, and that promotes or supports, or attacks or opposes any candidate for Federal office. This paragraph applies whether or not the communication expressly advocates a vote for or against a Federal candidate.

(4) Services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(c) Exceptions. Federal election activity does not include any amount expended or disbursed by a State, district, or local committee of a political party for any of the following activities:

(1) A public communication that refers solely to one or more clearly identified candidates for State or local office and that does not promote or support, or attack or oppose a clearly identified candidate for Federal office; provided, however, that such a public communication shall be considered a Federal election activity if it constitutes voter registration activity, generic campaign activity, get-out-the-vote activity, or voter identification.

(2) A contribution to a candidate for State or local office, provided the contribution is not designated to pay for voter registration activity, voter identification, generic campaign activity, get-out-the-vote activity, a public communication, or employee services as set forth in paragraphs (a)(1) through (4) of this section.

(3) The costs of a State, district, or local political convention, meeting or conference.

(4) The costs of grassroots campaign materials, including buttons, bumper stickers, handbills, brochures, posters, and yard signs, that name or depict only candidates for State or local office.

**HISTORY:** *[67 FR 49064, 49110,* July 29, 2002; *71 FR 8926, 8932,* Feb. 22, 2006; *71 FR 14357, 14360,* Mar. 22, 2006]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*2 U.S.C. 431,* 434, 438(a)(8).

**NOTES:** [EFFECTIVE DATE NOTE: *71 FR 8926, 8932,* Feb. 22, 2006, revised paragraph (a), effective Mar. 24, 2006; *71 FR 14357, 14360,* Mar. 22, 2006, added paragraph (a)(1)(iii), effective Mar. 24, 2006.]
NOTES APPLICABLE TO ENTIRE TITLE:

CROSS REFERENCES: Other regulations implementing section 401 of the Federal Election Campaign Act of 1971 appear in:

Office of the Secretary, Department of Transportation: 14 CFR part 374a

Federal Communications Commission: 47 CFR part 64 (subpart H), *47 CFR § § 73.1910-73.1944*

Interstate Commerce Commission: 49 CFR part 1325

964 words

Federal Election Commission                                                    § 100.29

§ 100.29  Electioneering communication
    (2 U.S.C. 434(f)(3)).

    (a)    *Electioneering    communication*
means any broadcast, cable, or sat-
ellite communication that:
    (1) Refers to a clearly identified can-
didate for Federal office;
    (2) Is publicly distributed within 60
days before a general election for the
office sought by the candidate; or with-
in 30 days before a primary or pref-
erence election, or a convention or cau-
cus of a political party that has au-
thority to nominate a candidate, for
the office sought by the candidate, and
the candidate referenced is seeking the
nomination of that political party; and
    (3) Is targeted to the relevant elec-
torate, in the case of a candidate for
Senate or the House of Representa-
tives.

Add. A-15

LEXSTAT 11 CFR 109.21

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2006, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE NOVEMBER 29, 2006 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 11 -- FEDERAL ELECTIONS
CHAPTER I -- FEDERAL ELECTION COMMISSION
SUBCHAPTER A -- GENERAL
PART 109 -- COORDINATED AND INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 441A(A) AND (D),
AND PUB. L. 107-155 SEC. 214(C))
SUBPART C -- COORDINATION

**Go to the CFR Archive Directory**

*11 CFR 109.21*

§ 109.21 What is a "coordinated communication"?

(a) Definition. A communication is coordinated with a candidate, an authorized committee, a political party commit-
tee, or an agent of any of the foregoing when the communication:

(1) Is paid for, in whole or in part, by a person other than that candidate, authorized committee, or political party
committee;

(2) Satisfies at least one of the content standards in paragraph (c) of this section; and

(3) Satisfies at least one of the conduct standards in paragraph (d) of this section.

(b) Treatment as an in-kind contribution and expenditure; Reporting -- (1) General rule. A payment for a coordi-
nated communication is made for the purpose of influencing a Federal election, and is an in-kind contribution under *11
CFR 100.52(d)* to the candidate, authorized committee, or political party committee with whom or which it is coordi-
nated, unless excepted under 11 CFR part 100, subpart C, and must be reported as an expenditure made by that candi-
date, authorized committee, or political party committee under *11 CFR 104.13*, unless excepted under 11 CFR part 100,
subpart E.

(2) In-kind contributions resulting from conduct described in paragraphs (d)(4) or (d)(5) of this section. Notwith-
standing paragraph (b)(1) of this section, the candidate, authorized committee, or political party committee with whom
or which a communication is coordinated does not receive or accept an in-kind contribution, and is not required to re-
port an expenditure, that results from conduct described in paragraphs (d)(4) or (d)(5) of this section, unless the candi-
date, authorized committee, or political party committee engages in conduct described in paragraphs (d)(1) through
(d)(3) of this section.

(3) Reporting of coordinated communications. A political committee, other than a political party committee, that
makes a coordinated communication must report the payment for the communication as a contribution made to the can-
didate or political party committee with whom or which it was coordinated and as an expenditure in accordance with *11
CFR 104.3(b)(1)(v)*. A candidate, authorized committee, or political party committee with whom or which a communi-
cation paid for by another person is coordinated must report the usual and normal value of the communication as an in-
kind contribution in accordance with *11 CFR 104.13*, meaning that it must report the amount of the payment as a receipt
under *11 CFR 104.3(a)* and as an expenditure under *11 CFR 104.3(b)*.

(c) Content standards. Each of the types of content described in paragraphs (c)(1) through (c)(4) satisfies the content standard of this section.

(1) A communication that is an electioneering communication under *11 CFR 100.29*.

(2) A public communication, as defined in *11 CFR 100.26*, that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate or the candidate's authorized committee, unless the dissemination, distribution, or republication is excepted under *11 CFR 109.23(b)*. For a communication that satisfies this content standard, see paragraph (d)(6) of this section.

(3) A public communication, as defined in *11 CFR 100.26*, that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(4) A public communication, as defined in *11 CFR 100.26*, that satisfies paragraph (c)(4)(i), (ii), (iii), or (iv) of this section:

(i) References to House and Senate candidates. The public communication refers to a clearly identified House or Senate candidate and is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general, special, or runoff election, or primary or preference election, or nominating convention or caucus.

(ii) References to Presidential and Vice Presidential candidates. The public communication refers to a clearly identified Presidential or Vice Presidential candidate and is publicly distributed or otherwise publicly disseminated in a jurisdiction during the period of time beginning 120 days before the clearly identified candidate's primary or preference election in that jurisdiction, or nominating convention or caucus in that jurisdiction, up to and including the day of the general election.

(iii) References to political parties. The public communication refers to a political party, does not refer to a clearly identified Federal candidate, and is publicly distributed or otherwise publicly disseminated in a jurisdiction in which one or more candidates of that political party will appear on the ballot.

(A) When the public communication is coordinated with a candidate and it is publicly distributed or otherwise publicly disseminated in that candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing a reference to that candidate applies;

(B) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated during the two-year election cycle ending on the date of a regularly scheduled non-Presidential general election, the time period in paragraph (c)(4)(i) of this section applies;

(C) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated during the two-year election cycle ending on the date of a Presidential general election, the time period in paragraph (c)(4)(ii) of this section applies.

(iv) References to both political parties and clearly identified Federal candidates. The public communication refers to a political party and a clearly identified Federal candidate, and is publicly distributed or otherwise publicly disseminated in a jurisdiction in which one or more candidates of that political party will appear on the ballot.

(A) When the public communication is coordinated with a candidate and it is publicly distributed or otherwise publicly disseminated in that candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing a reference to that candidate applies;

(B) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing only a reference to that candidate applies;

(C) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated outside the clearly identified candidate's jurisdiction, the time period in paragraph (c)(4)(iii)(B) or (C) of this section that would apply to a communication containing only a reference to a political party applies.

(d) Conduct standards. Any one of the following types of conduct satisfies the conduct standard of this section whether or not there is agreement or formal collaboration, as defined in paragraph (e) of this section:

(1) *Request or suggestion.* (i) The communication is created, produced, or distributed at the request or suggestion of a candidate, authorized committee, or political party committee; or

(ii) The communication is created, produced, or distributed at the suggestion of a person paying for the communication and the candidate, authorized committee, or political party committee assents to the suggestion.

(2) *Material involvement.* This paragraph, (d)(2), is not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source. A candidate, authorized committee, or political party committee is materially involved in decisions regarding:

(i) The content of the communication;

(ii) The intended audience for the communication;

(iii) The means or mode of the communication;

(iv) The specific media outlet used for the communication;

(v) The timing or frequency of the communication; or

(vi) The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

(3) *Substantial discussion.* This paragraph, (d)(3), is not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source. The communication is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication, or the employees or agents of the person paying for the communication, and the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee. A discussion is substantial within the meaning of this paragraph if information about the candidate's or political party committee's campaign plans, projects, activities, or needs is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication.

(4) *Common vendor.* All of the following statements in paragraphs (d)(4)(i) through (d)(4)(iii) of this section are true:

(i) The person paying for the communication, or an agent of such person, contracts with or employs a commercial vendor, as defined in *11 CFR 116.1(c)*, to create, produce, or distribute the communication;

(ii) That commercial vendor, including any owner, officer, or employee of the commercial vendor, has provided any of the following services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, during the previous 120 days:

(A) Development of media strategy, including the selection or purchasing of advertising slots;

(B) Selection of audiences;

(C) Polling;

(D) Fundraising;

(E) Developing the content of a public communication;

(F) Producing a public communication;

(G) Identifying voters or developing voter lists, mailing lists, or donor lists;

(H) Selecting personnel, contractors, or subcontractors; or

(I) Consulting or otherwise providing political or media advice; and

(iii) This paragraph, (d)(4)(iii), is not satisfied if the information material to the creation, production, or distribution of the communication used or conveyed by the commercial vendor was obtained from a publicly available source. That commercial vendor uses or conveys to the person paying for the communication:

(A) Information about the campaign plans, projects, activities, or needs of the clearly identified candidate, the candidate's opponent, or a political party committee, and that information is material to the creation, production, or distribution of the communication; or

(B) Information used previously by the commercial vendor in providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, and that information is material to the creation, production, or distribution of the communication.

(5) Former employee or independent contractor. Both of the following statements in paragraphs (d)(5)(i) and (d)(5)(ii) of this section are true:

(i) The communication is paid for by a person, or by the employer of a person, who was an employee or independent contractor of the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, during the previous 120 days; and

(ii) This paragraph, (d)(5)(ii), is not satisfied if the information material to the creation, production, or distribution of the communication used or conveyed by the former employee or independent contractor was obtained from a publicly available source. That former employee or independent contractor uses or conveys to the person paying for the communication:

(A) Information about the campaign plans, projects, activities, or needs of the clearly identified candidate, the candidate's opponent, or a political party committee, and that information is material to the creation, production, or distribution of the communication; or

(B) Information used by the former employee or independent contractor in providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, and that information is material to the creation, production, or distribution of the communication.

(6) Dissemination, distribution, or republication of campaign material. A communication that satisfies the content standard of paragraph (c)(2) of this section or *11 CFR 109.37(a)(2)(i)* shall only satisfy the conduct standards of paragraphs (d)(1) through (d)(3) of this section on the basis of conduct by the candidate, the candidate's authorized committee, or the agents of any of the foregoing, that occurs after the original preparation of the campaign materials that are disseminated, distributed, or republished. The conduct standards of paragraphs (d)(4) and (d)(5) of this section may also apply to such communications as provided in those paragraphs.

(e) Agreement or formal collaboration. Agreement or formal collaboration between the person paying for the communication and the candidate clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, is not required for a communication to be a coordinated communication. Agreement means a mutual understanding or meeting of the minds on all or any part of the material aspects of the communication or its dissemination. Formal collaboration means planned, or systematically organized, work on the communication.

(f) Safe harbor for responses to inquiries about legislative or policy issues. A candidate's or a political party committee's response to an inquiry about that candidate's or political party committee's positions on legislative or policy issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards in paragraph (d) of this section.

(g) Safe harbor for endorsements and solicitations by Federal candidates. (1) A public communication in which a candidate for Federal office endorses another candidate for Federal or non-Federal office is not a coordinated communication with respect to the endorsing Federal candidate unless the public communication promotes, supports, attacks, or opposes the endorsing candidate or another candidate who seeks election to the same office as the endorsing candidate.

(2) A public communication in which a candidate for Federal office solicits funds for another candidate for Federal or non-Federal office, a political committee, or organizations as permitted by *11 CFR 300.65*, is not a coordinated communication with respect to the soliciting Federal candidate unless the public communication promotes, supports, attacks, or opposes the soliciting candidate or another candidate who seeks election to the same office as the soliciting candidate.

(h) Safe harbor for establishment and use of a firewall. The conduct standards in paragraph (d) of this section are not met if the commercial vendor, former employee, or political committee has established and implemented a firewall that meets the requirements of paragraphs (h)(1) and (h)(2) of this section. This safe harbor provision does not apply if specific information indicates that, despite the firewall, information about the candidate's or political party committee's campaign plans, projects, activities, or needs that is material to the creation, production, or distribution of the communication was used or conveyed to the person paying for the communication.

(1) The firewall must be designed and implemented to prohibit the flow of information between employees or consultants providing services for the person paying for the communication and those employees or consultants currently or previously providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee; and

(2) The firewall must be described in a written policy that is distributed to all relevant employees, consultants, and clients affected by the policy.

**HISTORY:** *[68 FR 421, 453,* Jan. 3, 2003; *71 FR 33190, 33208,* June 8, 2006]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*2 U.S.C. 431*(17), 434(c), 438(a)(8), 441a, 441d; Sec. 214(c) of Pub. L. 107-155, 116 Stat. 81.

**NOTES:** [EFFECTIVE DATE NOTE: *71 FR 33190, 33208,* June 8, 2006, amended this section, effective July 10, 2006.]
NOTES APPLICABLE TO ENTIRE TITLE:
CROSS REFERENCES: Other regulations implementing section 401 of the Federal Election Campaign Act of 1971 appear in:
Office of the Secretary, Department of Transportation: 14 CFR part 374a
Federal Communications Commission: 47 CFR part 64 (subpart H), *47 CFR § § 73.1910-73.1944*
Interstate Commerce Commission: 49 CFR part 1325


NOTES APPLICABLE TO ENTIRE PART:
[PUBLISHER'S NOTE: For Federal Register citations concerning Part 109 Explanation and Justifications, see: *71 FR 4975,* Jan. 31, 2006.]

2830 words

11 C.F.R. § 300.64

Federal Election Commission

§ 300.65

§ 300.64 Exemption for attending, speaking, or appearing as a featured guest at fundraising events (2 U.S.C. 441i(e)(3)).

Notwithstanding the provisions of 11 CFR 100.24, 300.61 and 300.62, a Federal candidate or individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party, including but not limited to a fundraising event at which Levin funds are raised, or at which non-Federal funds are raised. In light of the foregoing:

(a) State, district, or local committees of a political party may advertise, announce or otherwise publicize that a Federal candidate or individual holding Federal office will attend, speak, or be a featured guest at a fundraising event, including, but not limited to, publicizing such appearance in pre-event invitation materials and in other party committee communications; and

(b) Candidates and individuals holding Federal office may speak at such events without restriction or regulation.

Add. A-21

# Addendum B

# Selected Statutory Provisions

Excerpts from the United States Code are from the Federal Election Campaign Laws compiled by the Federal Election Commission, October 2005, available at: http://www.fec.gov/law/law.shtml

116 STAT. 94                    PUBLIC LAW 107–155—MAR. 27, 2002

### SEC. 214. COORDINATION WITH CANDIDATES OR POLITICAL PARTIES.

(a) IN GENERAL.—Section 315(a)(7)(B) of the Federal Election Campaign Act of 1971 (2 U.S.C. 441a(a)(7)(B)) is amended—

(1) by redesignating clause (ii) as clause (iii); and

(2) by inserting after clause (i) the following new clause:

"(ii) expenditures made by any person (other than a candidate or candidate's authorized committee) in cooperation, consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee; and".

(b) REPEAL OF CURRENT REGULATIONS.—The regulations on coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committees adopted by the Federal Election Commission and published in the Federal Register at page 76138 of volume 65, Federal Register, on December 6, 2000, are repealed as of the date by which the

PUBLIC LAW 107–155—MAR. 27, 2002          116 STAT. 95

Commission is required to promulgate new regulations under sub-
section (c) (as described in section 402(c)(1)).

(c) REGULATIONS BY THE FEDERAL ELECTION COMMISSION.—          2 USC 441a note.
The Federal Election Commission shall promulgate new regulations
on coordinated communications paid for by persons other than
candidates, authorized committees of candidates, and party commit-
tees. The regulations shall not require agreement or formal
collaboration to establish coordination. In addition to any subject
determined by the Commission, the regulations shall address—

(1) payments for the republication of campaign materials;

(2) payments for the use of a common vendor;

(3) payments for communications directed or made by per-
sons who previously served as an employee of a candidate
or a political party; and

(4) payments for communications made by a person after
substantial discussion about the communication with a can-
didate or a political party.

(d) MEANING OF CONTRIBUTION OR EXPENDITURE FOR THE PUR-
POSES OF SECTION 316.—Section 316(b)(2) of the Federal Election
Campaign Act of 1971 (2 U.S.C. 441b(b)(2)) is amended by striking
"shall include" and inserting "includes a contribution or expendi-
ture, as those terms are defined in section 301, and also includes".

  
116 STAT. 112          PUBLIC LAW 107–155—MAR. 27, 2002

2 USC 431 note.     **SEC. 402. EFFECTIVE DATES AND REGULATIONS.**

(a) GENERAL EFFECTIVE DATE.—

(1) IN GENERAL.—Except as provided in the succeeding provisions of this section, the effective date of this Act, and the amendments made by this Act, is November 6, 2002.

(2) MODIFICATION OF CONTRIBUTION LIMITS.—The amendments made by—

(A) section 102 shall apply with respect to contributions made on or after January 1, 2003; and

(B) section 307 shall take effect as provided in subsection (e) of such section.

(3) SEVERABILITY; EFFECTIVE DATES AND REGULATIONS; JUDICIAL REVIEW.—Title IV shall take effect on the date of enactment of this Act.

(4) PROVISIONS NOT TO APPLY TO RUNOFF ELECTIONS.— Section 323(b) of the Federal Election Campaign Act of 1971 (as added by section 101(a)), section 103(a), title II, sections 304 (including section 315(j) of Federal Election Campaign Act of 1971, as added by section 304(a)(2)), 305 (notwithstanding subsection (c) of such section), 311, 316, 318, and 319, and title V (and the amendments made by such sections and titles) shall take effect on November 6, 2002, but shall not apply with respect to runoff elections, recounts, or election contests resulting from elections held prior to such date.

(b) SOFT MONEY OF NATIONAL POLITICAL PARTIES.—

PUBLIC LAW 107–155—MAR. 27, 2002          116 STAT. 113

(1) IN GENERAL.—Except for subsection (b) of such section, section 323 of the Federal Election Campaign Act of 1971 (as added by section 101(a)) shall take effect on November 6, 2002.

(2) TRANSITIONAL RULES FOR THE SPENDING OF SOFT MONEY OF NATIONAL POLITICAL PARTIES.—

(A) IN GENERAL.—Notwithstanding section 323(a) of the Federal Election Campaign Act of 1971 (as added by section 101(a)), if a national committee of a political party described in such section (including any person who is subject to such section under paragraph (2) of such section), has received funds described in such section prior to November 6, 2002, the rules described in subparagraph (B) shall apply with respect to the spending of the amount of such funds in the possession of such committee as of such date.

(B) USE OF EXCESS SOFT MONEY FUNDS.—

(i) IN GENERAL.—Subject to clauses (ii) and (iii), the national committee of a political party may use the amount described in subparagraph (A) prior to January 1, 2003, solely for the purpose of—

(I) retiring outstanding debts or obligations that were incurred solely in connection with an election held prior to November 6, 2002; or

(II) paying expenses or retiring outstanding debts or paying for obligations that were incurred solely in connection with any runoff election, recount, or election contest resulting from an election held prior to November 6, 2002.

(ii) PROHIBITION ON USING SOFT MONEY FOR HARD MONEY EXPENSES, DEBTS, AND OBLIGATIONS.—A national committee of a political party may not use the amount described in subparagraph (A) for any expenditure (as defined in section 301(9) of the Federal Election Campaign Act of 1971 (2 U.S.C. 431(9))) or for retiring outstanding debts or obligations that were incurred for such an expenditure.

(iii) PROHIBITION OF BUILDING FUND USES.—A national committee of a political party may not use the amount described in subparagraph (A) for activities to defray the costs of the construction or purchase of any office building or facility.

(c) REGULATIONS.—

(1) IN GENERAL.—Except as provided in paragraph (2), the Federal Election Commission shall promulgate regulations to carry out this Act and the amendments made by this Act that are under the Commission's jurisdiction not later than 270 days after the date of enactment of this Act. **Deadline.**

(2) SOFT MONEY OF POLITICAL PARTIES.—Not later than 90 days after the date of enactment of this Act, the Federal Election Commission shall promulgate regulations to carry out title I of this Act and the amendments made by such title. **Deadline.**

§ 431          FEDERAL ELECTION CAMPAIGN LAWS

(8)   (A)   The term "contribution" includes—

(i)     any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

(ii)    the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

(B)   The term "contribution" does not include–

(i)     the value of services provided without compensation by any individual who volunteers on behalf of a candidate or political committee;

(ii)    the use of real or personal property, including a church or community room used on a regular basis by members of a community for noncommercial purposes, and the cost of invitations, food, and beverages, voluntarily provided by an individual to any candidate or any political committee of a political party in rendering voluntary personal services on the individual's residential premises

2

or in the church or community room for candidate-related or political party-related activities, to the extent that the cumulative value of such invitations, food, and beverages provided by such individual on behalf of any single candidate does not exceed $1,000 with respect to any single election, and on behalf of all political committees of a political party does not exceed $2,000 in any calendar year;

(iii) the sale of any food or beverage by a vendor for use in any candidate's campaign or for use by or on behalf of any political committee of a political party at a charge less than the normal comparable charge, if such charge is at least equal to the cost of such food or beverage to the vendor, to the extent that the cumulative value of such activity by such vendor on behalf of any single candidate does not exceed $1,000 with respect to any single election, and on behalf of all political committees of a political party does exceed $2000 in any calendar year;

(iv) any unreimbursed payment for travel expenses made by any individual on behalf of any candidate or any political committee of a political party, to the extent that the cumulative value of such activity by such individual on behalf of any single candidate does not exceed $1,000 with respect to any single election, and on behalf of all political committees of a political party does not exceed $2,000 in any calendar year;

(v) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply to any cost incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines, or similar types of general public political advertising;

(vi) any payment made or obligation incurred by a corporation or a labor organization which, under section 441b(b) of this title, would not constitute an expenditure by such corporation or labor organization;

3

§ 431    FEDERAL ELECTION CAMPAIGN LAWS

(vii) any loan of money by a State bank, a federally chartered depository institution, or a depository institution the deposits or accounts of which are insured by the Federal Deposit Insurance Corporation...[1] or the National Credit Union Administration, other than any overdraft made with respect to a checking or savings account, made in accordance with applicable law and in the ordinary course of business, but such loan—

(I)    shall be considered a loan by each endorser or guarantor, in that proportion of the unpaid balance that each endorser or guarantor bears to the total number of endorsers or guarantors;

(II)    shall be made on a basis which assures repayment, evidenced by a written instrument, and subject to a due date or amortization schedule; and

(III)    shall bear the usual and customary interest rate of the lending institution;

(viii) any legal or accounting services rendered to or on behalf of—[2]

(I)    any political committee of a political party if the person paying for such services is the regular employer of the person rendering such services and if such services are not attributable to activities which directly further the election of any designated candidate to Federal office; or

(II)    an authorized committee of a candidate or any other political committee, if the person paying for such services is the regular employer of the individual rendering such services and if such services are solely for the purpose of ensuring compliance with this Act or chapter 95 or chapter 96 of title 26, but amounts paid or incurred by the regular employer

---

[1] The omitted language is an obsolete reference to the Federal Savings and Loan Insurance Corporation, which in past years provided account or deposit insurance. This corporation was abolished and its functions transferred in 1989. See note at 12 U.S.C. § 1437 for a fuller explanation.

[2] Section 103(b) of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 431(8)(B) to strike subsection (viii) (regarding donations to party building funds) and redesignate subsections (ix) through (xv) as subsections (viii) through (xiv) respectively. This amendment is effective as of November 6, 2002.

4

for such legal or accounting services shall be reported in accordance with section 434(b) of this title by the committee receiving such services;

(ix)  the payment by a State or local committee of a political party of the costs of campaign materials (such as pins, bumper stickers, handbills, brochures, posters, party tabloids, and yard signs) used by such committee in connection with volunteer activities on behalf of nominees of such party: *Provided*, That—

(1)  such payments are not for the cost of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, bill-board, direct mail, or similar type of general public communication or political advertising;

(2)  such payments are made from con-tributions subject to the limitations and prohibitions of this Act; and

(3)  such payments are not made from con-tributions designated to be spent on behalf of a particular candidate or particular candidates;

(x)  the payment by a candidate, for nomination or election to any public office (including State or local office), or authorized committee of a candidate, of the costs of campaign materials which include information on or reference to any other candidate and which are used in connection with volunteer activities (including pins, bumper stickers, handbills, brochures, posters, and yard signs, but not including the use of broadcasting, newspa-pers, magazines, billboards, direct mail, or similar types of general public communication or political advertising): *Provided*, That such payments are made from contributions subject to the limitations and prohibitions of this Act;

(xi)  the payment by a State or local committee of a political party of the costs of voter registration and get-out-the-vote activities conducted by such committee on behalf of nominees of such party for President and Vice President: *Provided*, That—

(1)  such payments are not for the costs of campaign materials or activities used in connection

5

with any broadcasting, newspaper, magazine, bill-board, direct mail, or similar type of general public communication or political advertising;

(2)   such payments are made from con-tributions subject to the limitations and prohibitions of this Act; and

(3)   such payments are not made from con-tributions designated to be spent on behalf of a particular candidate or candidates;

(xii)  payments made by a candidate or the authorized committee of a candidate as a condition of ballot access and payments received by any political party committee as a condition of ballot access;

(xiii) any honorarium (within the meaning of section 441i[1] of this title); and

(xiv)[2]any loan of money derived from an advance on a candidate's brokerage account, credit card, home equity line of credit, or other line of credit available to the candidate, if such a loan is made in accordance with applicable law and under commercially reasonable terms and if the person making such loan makes loans derived from an advance on the candidate's brokerage account, credit card, home equity line of credit, or other line of credit in the normal course of the person's business.

(9)   (A)   The term "expenditure" includes—

(i)    any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and

(ii)   a written contract, promise, or agreement to make an expenditure.

(B)   The term "expenditure" does not include—

(i)    any news story, commentary, or editorial dis-tributed through the facilities of any broadcasting station,

---

[1]This is an obsolete reference to a section of the law repealed in 1991 and not to current section 441i.

[2] Section 502(6) of the Department of Transportation and Related Agencies Appropriations Act, 2001, Pub. Law No. 106-346 amended 2 U.S.C. § 431(8)(B) by adding new subsec-tion (xv). Section 103(b) of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 431(8)(B) to redesignate subsection (xv) as subsection (xiv). This amendment is effective as of November 6, 2002.

6

newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate;

(ii)  nonpartisan activity designed to encourage individuals to vote or to register to vote;

(iii)  any communication by any membership organization or corporation to its members, stockholders, or executive or administrative personnel, if such membership organization or corporation is not organized primarily for the purpose of influencing the nomination for election, or election, of any individual to Federal office, except that the costs incurred by a membership organization (including a labor organization) or by a corporation directly attributable to a communication expressly advocating the election or defeat of a clearly identified candidate (other than a communication primarily devoted to subjects other than the express advocacy of the election or defeat of a clearly identified candidate), shall, if such costs exceed $2,000 for any election, be reported to the Commission in accordance with section 434(a)(4)(A)(i) of this title, and in accordance with section 434(a)(4)(A)(ii) of this title with respect to any general election;

(iv)  the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply to costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines, or similar types of general public political advertising;

(v)  any payment made or obligation incurred by a corporation or a labor organization which, under section 441b(b) of this title, would not constitute an expenditure by such corporation or labor organization;

(vi)  any costs incurred by an authorized committee or candidate in connection with the solicitation of contributions on behalf of such candidate, except that this clause shall not apply with respect to costs incurred by an authorized committee of a candidate in excess of an

7

amount equal to 20 percent of the expenditure limitation applicable to such candidate under section 441a(b), but all such costs shall be reported in accordance with section 434(b);

(vii) the payment of compensation for legal or accounting services—

(I)   rendered to or on behalf of any political committee of a political party if the person paying for such services is the regular employer of the individual rendering such services, and if such services are not attributable to activities which directly further the election of any designated candidate to Federal office; or

(II)   rendered to or on behalf of a candidate or political committee if the person paying for such services is the regular employer of the individual rendering such services, and if such services are solely for the purpose of ensuring compliance with this Act or chapter 95 or chapter 96 of title 26, but amounts paid or incurred by the regular employer for such legal or accounting services shall be reported in accordance with section 434(b) by the committee receiving such services;

(viii) the payment by a State or local committee of a political party of the costs of campaign materials (such as pins, bumper stickers, handbills, brochures, posters, party tabloids, and yard signs) used by such committee in connection with volunteer activities on behalf of nominees of such party: *Provided,* That—

(1)   such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;

(2)   such payments are made from contributions subject to the limitations and prohibitions of this Act; and

(3)   such payments are not made from contributions designated to be spent on behalf of a particular candidate or particular candidates;

(ix)   the payment by a State or local committee of a political party of the costs of voter registration and get-

8

TITLE 2. THE CONGRESS                    § 431

out-the-vote activities conducted by such committee on behalf of nominees of such party for President and Vice President: *Provided,* That—

    (1)  such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;

    (2)  such payments are made from contributions subject to the limitations and prohibitions of this Act; and

    (3)  such payments are not made from contributions designated to be spent on behalf of a particular candidate or candidates; and

(x)  payments received by a political party committee as a condition of ballot access which are transferred to another political party committee or the appropriate State official.

9

2 U.S.C. § 431(20)

§ 431        FEDERAL ELECTION CAMPAIGN LAWS

(20) *Federal election activity.*[2]

(A) *In general.* The term 'Federal election activity' means—

(i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;

(ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot);

(iii) a public communication that refers to a clearly identified candidate for Federal office (regardless

[1]Section 211 of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 431 by revising the definition of an independent expenditure. This amendment is effective as of November 6, 2002.

[2]Section 101(b) of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 431 by adding new paragraphs (20) through (24). This amendment is effective as of November 6, 2002.

10

Add. B-13

of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

(iv)  services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(B)  *Excluded activity.* The term 'Federal election activity' does not include an amount expended or disbursed by a State, district, or local committee of a political party for—

(i)  a public communication that refers solely to a clearly identified candidate for State or local office, if the communication is not a Federal election activity described in subparagraph (A)(i) or (ii);

(ii)  a contribution to a candidate for State or local office, provided the contribution is not designated to pay for a Federal election activity described in subparagraph (A);

(iii)  the costs of a State, district, or local political convention; and

(iv)  the costs of grassroots campaign materials, including buttons, bumper stickers, and yard signs, that name or depict only a candidate for State or local office.

11

Add. B-14

2 U.S.C. § 434(b)

(b)  *Contents of reports.* Each report under this section shall disclose—

      (1)   the amount of cash on hand at the beginning of the reporting period;

      (2)   for the reporting period and calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all receipts, and the total amount of all receipts in the following categories:

          (A)   contributions from persons other than political committees;

          (B)   for an authorized committee, contributions from the candidate;

25

FEDERAL ELECTION CAMPAIGN LAWS

(C)   contributions from political party committees;

(D)   contributions from other political committees;

(E)   for an authorized committee, transfers from other authorized committees of the same candidate;

(F)   transfers from affiliated committees and, where the reporting committee is a political party committee, transfers from other political party committees, regardless of whether such committees are affiliated;

(G)   for an authorized committee, loans made by or guaranteed by the candidate;

(H)   all other loans;

(I)   rebates, refunds, and other offsets to operating expenditures;

(J)   dividends, interest, and other forms of receipts; and

(K)   for an authorized committee of a candidate for the office of President, Federal funds received under chapter 95 and chapter 96 of title 26;

(3)   the identification of each—

(A)   person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

(B)   political committee which makes a contribution to the reporting committee during the reporting period, together with the date and amount of any such contribution;

(C)   authorized committee which makes a transfer to the reporting committee;

(D)   affiliated committee which makes a transfer to the reporting committee during the reporting period and, where the reporting committee is a political party committee, each transfer of funds to the reporting committee from another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfer;

(E)   person who makes a loan to the reporting committee during the reporting period, together with the identification of any endorser or guarantor of such loan, and date and amount or value of such loan;

26

TITLE 2. THE CONGRESS                    § 434

(F)   person who provides a rebate, refund, or other offset to operating expenditures to the reporting committee in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of such receipt; and

(G)   person who provides any dividend, interest, or other receipt to the reporting committee in an aggregate value or amount in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office),  together with the date and amount of any such receipt;

(4)   for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all disbursements, and all disbursements in the following categories:

(A)   expenditures made to meet candidate or committee operating expenses;

(B)   for authorized committees, transfers to other committees authorized by the same candidate;

(C)   transfers to affiliated committees and, where the reporting committee is a political party committee, transfers to other political party committees, regardless of whether they are affiliated;

(D)   for an authorized committee, repayment of loans made by or guaranteed by the candidate;

(E)   repayment of all other loans;

(F)   contribution refunds and other offsets to contributions;

(G)   for an authorized committee, any other disbursements;

(H)   for any political committee other than an authorized committee—

(i)   contributions made to other political committees;

(ii)   loans made by the reporting committees;

(iii)   independent expenditures;

(iv)   expenditures made under section 441a(d) of this title; and

(v)   any other disbursements; and

27

§ 434                 FEDERAL ELECTION CAMPAIGN LAWS

(I)    for an authorized committee of a candidate for the office of President, disbursements not subject to the limitation of section 441a(b);

(5)   the name and address of each—

(A)  person to whom an expenditure in an aggregate amount or value in excess of $200 within the calendar year is made by the reporting committee to meet a candidate or committee operating expense, together with the date, amount, and purpose of such operating expenditure;

(B)  authorized committee to which a transfer is made by the reporting committee;

(C)  affiliated committee to which a transfer is made by the reporting committee during the reporting period and, where the reporting committee is a political party committee, each transfer of funds by the reporting committee to another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfers;

(D)  person who receives a loan repayment from the reporting committee during the reporting period, together with the date and amount of such loan repayment; and

(E)  person who receives a contribution refund or other offset to contributions from the reporting committee where such contribution was reported under paragraph (3)(A) of this subsection, together with the date and amount of such disbursement;

(6)   (A)   for an authorized committee, the name and address of each person who has received any disbursement not disclosed under paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such disbursement;

(B)  for any other political committee, the name and address of each—

(i)   political committee which has received a contribution from the reporting committee during the reporting period, together with the date and amount or any such contribution;

(ii)  person who has received a loan from the reporting committee during the reporting period, together with the date and amount of such loan;

28

Add. B-18

(iii)  person who receives any disbursement during the reporting period in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office) in connection with an independent expenditure by the reporting committee, together with the date, amount, and purpose of any such independent expenditure and a statement which indicates whether such independent expenditure is in support of, or in opposition to, a candidate, as well as the name and office sought by such candidate, and a certification, under penalty of perjury, whether such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such committee;

(iv)  person who receives any expenditure from the reporting committee during the reporting period in connection with an expenditure under section 441a(d) of this title, together with the date, amount, and purpose of any such expenditure as well as the name of, and office sought by, the candidate on whose behalf the expenditure is made; and

(v)  person who has received any disbursement not otherwise disclosed in this paragraph or paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office) from the reporting committee within the reporting period, together with the date, amount, and purpose of any such disbursement;

(7)  the total sum of all contributions to such political committee, together with the total contributions less offsets to contributions and the total sum of all operating expenditures made by such political committee, together with total operating expenditures less offsets to operating expenditures, for both the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office); and

(8)  the amount and nature of outstanding debts and obligations owed by or to such political committee; and where such debts and obligations are settled for less than their reported amount or value, a statement as to the circumstances and conditions under which such debts or obligations were extinguished and the consideration therefor.

29

2 U.S.C. § 441a(a)(7)

TITLE 2. THE CONGRESS            § 441a

(7)   For purposes of this subsection—
    (A)  contributions to a named candidate made to any
political committee authorized by such candidate to accept

59

§ 441a                FEDERAL ELECTION CAMPAIGN LAWS

contributions on his behalf shall be considered to be contributions made to such candidate;

(B) (i) expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate;

(ii)[1] expenditures made by any person (other than a candidate or candidate's authorized committee) in cooperation, consultation, or concert, with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee; and

(iii) the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered to be an expenditure for purposes of this paragraph; and

(C) if—

(i) any person makes, or contracts to make, any disbursement for any electioneering communication (within

---

[1] Section 214 of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 441a(a)(7) by redesignating subparagraph (B)(ii) as (B)(iii) and inserting new subparagraph (ii). Section 202 of BCRA further amended section 441a(a)(7) by redesignating subparagraph (C) as (D) and inserting new subparagraph (C). These amendments are effective as of November 6, 2002. Section 214 of BCRA also contained the following provisions, codified at Note, 2 U.S.C. § 441a, in regard to Federal Election Commission regulations implementing section 441a(a)(7):

"(b) *Repeal of current regulations.* The regulations on coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committtees adopted by the Federal Election Commission and published in the Federal Register at page 76138 of Volume 65, Federal Register, on December 6, 2000 are repealed as of the date by which the Commission is required to promulgate new regulations under subsection (c) (as described in section 402(c)(1)).

(c) *Regulations by the Federal Election Commission.* The Federal Election Commission shall promulgate new regulations on coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committees. The regulations shall not require agreement or formal collaboration to establish coordination. In addition to any subject determined by the Commission, the regulations shall address--

(1) payments for the republication of campaign materials;
(2) payments for the use of a common vendor;
(3) payments for communications directed or made by persons who previously served as an employee of a candidate or a political party; and
(4) payments for communications made by a person after substantial discussion about the communication with a candidate or a political party."

60

TITLE 2. THE CONGRESS                    § 441a

the meaning of section 304(f)(3)) (2 U.S.C. § 434(f)(3));
and

(ii)   such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee;

such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party; and

(D)   contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be contributions made to or for the benefit of the candidate of such party for election to the office of President of the United States.

61

(d)   *Expenditures by national committee, State committee, or subordinate committee of State committee in connection with general election campaign of candidates for Federal office.*[1]

(1)   Notwithstanding any other provision of law with respect to limitations on expenditures or limitations on contributions, the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, may make expenditures in connection with the general election campaign of candidates for Federal office, subject to the limitations contained in paragraphs (2), (3) and (4) of this subsection.

(2)   The national committee of a political party may not make any expenditure in connection with the general election campaign of any candidate for President of the United States who is affiliated with such party which exceeds an amount equal to 2 cents multiplied by the voting age population of the United States (as certified under subsection (e) of this section). Any expenditure under this paragraph shall be in addition to any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States.

(3)   The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—

(A)   in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of—

(i)   2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or

(ii)   $20,000; and

(B)   in the case of a candidate for election to the office

---

[1]Section 213 of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 441a(d) by making a conforming amendment to subparagraph (1) and by adding subparagraph (4). This amendment is effective as of November 6, 2002.

§ 441a                  FEDERAL ELECTION CAMPAIGN LAWS

of Representative, Delegate, or Resident Commissioner in any other State, $10,000.

(4)    *Independent versus coordinated expenditures by party.*[2]

(A)    *In general.* On or after the date on which a political party nominates a candidate, no committee of the political party may make—

(i)    any coordinated expenditure under this subsection with respect to the candidate during the election cycle at any time after it makes any independent expenditure (as defined in section 301(17)) (2 U.S.C. § 431(17)) with respect to the candidate during the election cycle; or

(ii)    any independent expenditure (as defined in section 301(17)) (2 U.S.C. § 431(17)) with respect to the candidate during the election cycle at any time after it makes any coordinated expenditure under this subsection with respect to the candidate during the election cycle.

(B)    *Application.* For purposes of this paragraph, all political committees established and maintained by a national political party (including all congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State committee) shall be considered to be a single political committee.

(C)    *Transfers.* A committee of a political party that makes coordinated expenditures under this subsection with respect to a candidate shall not, during an election cycle, transfer any funds to, assign authority to make coordinated expenditures under this subsection to, or receive a transfer of funds from, a committee of the political party that has made or intends to make an independent expenditure with respect to the candidate.

---

[2] In *McConnell v. FEC*, 540 U.S. 93 (2003), the Supreme Court ruled that section 441a(d)(4) was unconstitutional.

64

2 U.S.C. § 441b

§ 441a-1          FEDERAL ELECTION CAMPAIGN LAWS

## § 441b.  Contributions or expenditures by national banks, corporations, or labor organizations

(a)    It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner

72

to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

(b) (1) For the purposes of this section the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(2) For purposes of this section and section 79l(h) of title 15,[1] the term "contribution or expenditure" includes a contribution or expenditure, as those terms are defined in section 301 (2 U.S.C. § 431), and also includes[2] any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication, but shall not include

(A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject;

---

[1]15 U.S.C. § 79l(h) provides:
(h) Political contributions forbidden.
   It shall be unlawful for any registered holding company, or any subsidiary company thereof, by use of the mails or any means or instrumentality of interstate commerce, or otherwise, directly or indirectly—
   (1) to make any contribution whatsoever in connection with the candidacy, nomination, election or appointment of any person for or to any office or position in the Government of the United States, a State, or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing; or
   (2) to make any contribution to or in support of any political party or any committee or agency thereof.
   The term "contribution" as used in this subsection includes any gift, subscription, loan, advance, or deposit of money or anything of value, and includes any contract, agreement, or promise, whether or not legally enforceable, to make a contribution.
[2]Sections 203(a) and 214(d) of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 441b(b)(2). These amendments are effective as of November 6, 2002.

73

FEDERAL ELECTION CAMPAIGN LAWS

(B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and

(C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

(3)  It shall be unlawful—

(A)  for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

(B)  for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

(C)  for any person soliciting an employee for a contribution to such a fund to fail to inform such employee at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

(4)  (A)  Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful—

(i)  for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and

(ii)  for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

(B)  It shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail

74

addressed to stockholders, executive or administrative person-
nel, or employees at their residence and shall be so designed
that the corporation, labor organization, or separate segregated
fund conducting such solicitation cannot determine who makes
a contribution of $50 or less as a result of such solicitation and
who does not make such a contribution.

(C)   This paragraph shall not prevent a membership or-
ganization, cooperative, or corporation without capital stock,
or a separate segregated fund established by a membership
organization, cooperative, or corporation without capital stock,
from soliciting contributions to such a fund from members of
such organization, cooperative, or corporation without capital
stock.

(D)   This paragraph shall not prevent a trade association
or a separate segregated fund established by a trade association
from soliciting contributions from the stockholders and execu-
tive or administrative personnel of the member corporations of
such trade association and the families of such stockholders or
personnel to the extent that such solicitation of such stockhold-
ers and personnel, and their families, has been separately and
specifically approved by the member corporation involved, and
such member corporation does not approve any such solicita-
tion by more than one such trade association in any calendar
year.

(5)   Notwithstanding any other law, any method of soliciting
voluntary contributions or of facilitating the making of voluntary
contributions to a separate segregated fund established by a corpora-
tion, permitted by law to corporations with regard to stockholders
and executive or administrative personnel, shall also be permitted to
labor organizations with regard to their members.

(6)   Any corporation, including its subsidiaries, branches, di-
visions, and affiliates, that utilizes a method of soliciting voluntary
contributions or facilitating the making of voluntary contributions,
shall make available such method, on written request and at a cost
sufficient only to reimburse the corporation for the expenses incurred
thereby, to a labor organization representing any members working
for such corporation, its subsidiaries, branches, divisions, and affili-
ates.

(7)   For purposes of this section, the term "executive or ad-
ministrative personnel" means individuals employed by a corporation
who are paid on a salary, rather than hourly, basis and who have
policymaking, managerial, professional, or supervisory responsibili-
ties.

75

§ 441b                FEDERAL ELECTION CAMPAIGN LAWS

(c)    *Rules relating to electioneering communications.*[1]

(1)    *Applicable electioneering communication.* For purposes of this section, the term 'applicable electioneering communication' means an electioneering communication (within the meaning of section 304(f)(3)) (2 U.S.C. § 434(f)(3)) which is made by any entity described in subsection (a) of this section or by any other person using funds donated by an entity described in subsection (a) of this section.

(2)    *Exception.* Notwithstanding paragraph (1), the term 'applicable electioneering communication' does not include a communication by a section 501(c)(4) organization or a political organization (as defined in section 527(e)(1) of the Internal Revenue Code of 1986) made under section 304(f)(2)(E) or (F) of this Act (2 U.S.C. § 434(f)(2)(E) or (F)) if the communication is paid for exclusively by funds provided directly by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)(20))). For purposes of the preceding sentence, the term 'provided directly by individuals' does not include funds the source of which is an entity described in subsection (a) of this section.

(3)    *Special operating rules.*

(A)    *Definition under paragraph (1).* An electioneering communication shall be treated as made by an entity described in subsection (a) if an entity described in subsection (a) directly or indirectly disburses any amount for any of the costs of the communication.

(B)    *Exception under paragraph (2).* A section 501(c)(4) organization that derives amounts from business activities or receives funds from any entity described in subsection (a) shall be considered to have paid for any communication out of such amounts unless such organization paid for the communication out of a segregated account to which only individuals can contribute, as described in section 304(f)(2)(E) (2 U.S.C. § 434(f)(2)(E)).

---

[1]Section 203(b) of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 441b to add paragraphs (c)(1) through (5). This amendment is effective as of November 6, 2002.

76

(4)  *Definitions and rules.* For purposes of this subsection—
   (A) the term 'section 501(c)(4) organization' means—

    (i)  an organization described in section 501(c)(4) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code; or

    (ii)  an organization which has submitted an application to the Internal Revenue Service for determination of its status as an organization described in clause (i); and

    (B)  a person shall be treated as having made a disbursement if the person has executed a contract to make the disbursement.

(5)  *Coordination with Internal Revenue Code.* Nothing in this subsection shall be construed to authorize an organization exempt from taxation under section 501(a) of the Internal Revenue Code of 1986 to carry out any activity which is prohibited under such Code.

(6)  *Special rules for targeted communications.*[1]

    (A)  *Exception does not apply.* Paragraph (2) shall not apply in the case of a targeted communication that is made by an organization described in such paragraph.

    (B)  *Targeted communication.* For purposes of subparagraph (A), the term 'targeted communication' means an electioneering communication (as defined in section 304(f)(3)) (2 U.S.C. § 434(f)(3)) that is distributed from a television or radio broadcast station or provider of cable or satellite television service and, in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

    (C)  *Definition.* For purposes of this paragraph, a communication is 'targeted to the relevant electorate' if it meets the requirements described in section 304(f)(3)(C) (2 U.S.C. § 434(f)(3)(C)).

---

[1]Section 204 of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended section 441b(c) to add paragraph (6). This amendment is effective as of November 6, 2002.

77

### § 441i.   Soft money of political parties[1]

(a)   *National committees.*

(1)   *In general.* A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

(2)   *Applicability.* The prohibition established by paragraph (1) applies to any such national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee.

(b)   *State, district and local committees.*

(1)   *In general.* Except as provided in paragraph (2), an amount that is expended or disbursed for Federal election activity by a State, district, or local committee of a political party (including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

(2)   *Applicability.*

(A)   *In general.* Notwithstanding clause (i) or (ii) of section 301(20)(A) (2 U.S.C. § 431(20)(A)), and subject to subparagraph (B), paragraph (1) shall not apply to any amount expended or disbursed by a State, district, or local committee of a political party for an activity described in either such clause to

---

[1]Prior to its repeal on August 14, 1991, by Section 6(d) of the Legislative Branch Appropriations Act, 1991, Pub. L. No. 102–90, section 441i regulated the acceptance of honoraria by Senators and officers and employees of the U.S. Senate. Section 309 of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, amended the Act to add a new section 441i, concerning nonfederal funds of political parties. This amendment is effective as of November 6, 2002.

83

§ 441i            FEDERAL ELECTION CAMPAIGN LAWS

the extent the amounts expended or disbursed for such activity are allocated (under regulations prescribed by the Commission) among amounts—

(i)    which consist solely of contributions subject to the limitations, prohibitions, and reporting requirements of this Act (other than amounts described in subparagraph (B)(iii)); and

(ii)    other amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection).

(B)    *Conditions.* Subparagraph (A) shall only apply if—

(i)    the activity does not refer to a clearly identified candidate for Federal office;

(ii)    the amounts expended or disbursed are not for the costs of any broadcasting, cable, or satellite communication, other than a communication which refers solely to a clearly identified candidate for State or local office;

(iii)    the amounts expended or disbursed which are described in subparagraph (A)(ii) are paid from amounts which are donated in accordance with State law and which meet the requirements of subparagraph (C), except that no person (including any person established, financed, maintained, or controlled by such person) may donate more than $10,000 to a State, district, or local committee of a political party in a calendar year for such expenditures or disbursements; and

(iv)    the amounts expended or disbursed are made solely from funds raised by the State, local, or district committee which makes such expenditure or disbursement, and do not include any funds provided to such committee from—

(I)    any other State, local, or district committee of any State party,

(II)    the national committee of a political party (including a national congressional campaign committee of a political party),

(III)    any officer or agent acting on behalf of any committee described in subclause (I) or (II), or

(IV)    any entity directly or indirectly established, financed, maintained, or controlled by any committee described in subclause (I) or (II).

84

(C)  *Prohibiting involvement of national parties, federal candidates and officeholders, and state parties acting jointly.* Notwithstanding subsection (e) (other than subsection (e)(3)), amounts specifically authorized to be spent under subparagraph (B)(iii) meet the requirements of this subparagraph only if the amounts—

(i)  are not solicited, received, directed, transferred, or spent by or in the name of any person described in subsection (a) or (e); and

(ii)  are not solicited, received, or directed through fundraising activities conducted jointly by 2 or more State, local, or district committees of any political party or their agents, or by a State, local, or district committee of a political party on behalf of the State, local, or district committee of a political party or its agent in one or more other States.

(c)  *Fundraising costs.* An amount spent by a person described in subsection (a) or (b) to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

(d)  *Tax-exempt organizations.* A national, State, district, or local committee of a political party (including a national congressional campaign committee of a political party), an entity that is directly or indirectly established, financed, maintained, or controlled by any such national, State, district, or local committee or its agent, and an officer or agent acting on behalf of any such party committee or entity, shall not solicit any funds for, or make or direct any donations to—

(1)  an organization that is described in section 501(c) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code (or has submitted an application for determination of tax exempt status under such section) and that makes expenditures or disbursements in connection with an election for Federal office (including expenditures or disbursements for Federal election activity); or

(2)  an organization described in section 527 of such Code (other than a political committee, a State, district, or local committee of a political party, or the authorized campaign committee of a candidate for State or local office).

85

(e)    *Federal candidates.*

(1)    *In general.* A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not—

(A)    solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act; or

(B)    solicit, receive, direct, transfer, or spend funds in connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds—

(i)    are not in excess of the amounts permitted with respect to contributions to candidates and political committees under paragraphs (1), (2), and (3) of section 315(a) (2 U.S.C. § 441a(a)); and

(ii)    are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

(2)    *State law.* Paragraph (1) does not apply to the solicitation, receipt, or spending of funds by an individual described in such paragraph who is or was also a candidate for a State or local office solely in connection with such election for State or local office if the solicitation, receipt, or spending of funds is permitted under State law and refers only to such State or local candidate, or to any other candidate for the State or local office sought by such candidate, or both.

(3)    *Fundraising events.* Notwithstanding paragraph (1) or subsection (b)(2)(C), a candidate or an individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party.

(4)    *Permitting certain solicitations.*

(A)    *General solicitations.* Notwithstanding any other provision of this subsection, an individual described in paragraph (1) may make a general solicitation of funds on behalf of any organization that is described in section 501(c) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code (or has submitted an application

86

for determination of tax exempt status under such section) (other than an entity whose principal purpose is to conduct activities described in clauses (i) and (ii) of section 301(20)(A)) (2 U.S.C. § 431(20)(A)) where such solicitation does not specify how the funds will or should be spent.

(B) *Certain specific solicitations.* In addition to the general solicitations permitted under subparagraph (A), an individual described in paragraph (1) may make a solicitation explicitly to obtain funds for carrying out the activities described in clauses (i) and (ii) of section 301(20)(A) (2 U.S.C. § 431(20)(A)), or for an entity whose principal purpose is to conduct such activities, if—

(i) the solicitation is made only to individuals; and

(ii) the amount solicited from any individual during any calendar year does not exceed $20,000.

(f) *State candidates.*

(1) *In general.* A candidate for State or local office, individual holding State or local office, or an agent of such a candidate or individual may not spend any funds for a communication described in section 301(20)(A)(iii) (2 U.S.C. § 431(20)(A)(iii)) unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act.

(2) *Exception for certain communications.* Paragraph (1) shall not apply to an individual described in such paragraph if the communication involved is in connection with an election for such State or local office and refers only to such individual or to any other candidate for the State or local office held or sought by such individual, or both.

87

**Addendum C**

**Selected FEC CMAG Charts**

# P7 - Number of Media Spots Airing On or Before Presidential Primary / Caucus / Convention in All Media Markets Fully Contained within a Single "Battleground" State*



| Days to Election | Percentage |
|---|---|
| 0 - 30 | 50.25% |
| 0 - 60 | 78.87% |
| 0 - 90 | 87.46% |
| 0 - 120 | 91.56% |
| 0 - 150 | 96.67% |
| 0 - 180 | 98.58% |
| Total Count: | 45,474 |

Early 2004 Presidential campaign ads that would have enjoyed a "safe harbor" from the coordination regulation under revised 11 C.F.R. § 109.21(c).
Source:  Adapted from PX 134.

**Number of Media Spots**

**Days Before Primary/Caucus/Convention**

Day Zero is all
Primary/Caucus/
Convention Dates

* The Media Markets fully contained within a single "Battleground" State are:    Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

## H1 - Total Number of Media Spots Airing On or Before House Primary/Caucus/Convention



| Days to Election | Percentage |
|------------------|-----------|
| 0 - 30 | 80.21% |
| 0 - 60 | 88.16% |
| 0 - 90 | 91.44% |
| 0 - 120 | 97.26% |
| 0 - 150 | 98.92% |
| 0 - 180 | 99.06% |
| **Total Count:** | 35,205 |

Early 2004 House campaign ads that would have enjoyed a "safe harbor" from the coordination regulation under revised 11 C.F.R. § 109.21(c).
Source:  Adapted from PX 134.

**Days Before Primary/Caucus/Convention**

Number of Media Spots

Day Zero is all Primary/Caucus/Convention Dates

**Addendum D**

**Selected Scripts of Campaign Advertising
Run Outside the FEC's Pre-Election Windows**

I.    **Selected Early Advertising in the 2000 Presidential Campaign.**

TV ads run by the National Abortion and Reproductive Rights Action League
Iowa and New Hampshire
Debut date:    March 22, 1999 (307 days before the January 24, 2000 Iowa caucuses, and 315
          days before the February 1, 2000 New Hampshire primary)
Source:  PX 18

### Script Of "Different"

Is Elizabeth Dole really that different from these Republican hopefuls? **Pat Robertson** calls Dole, "... a dear friend... I'd love to se her in the White House."

And on a woman's right to choose, Dole admits she supports a constitutional amendment to outlaw almost all abortions. No wonder a newspaper noted Dole has "... strong anti-abortion positions."

Like the rest of the Republicans on the far right -- Elizabeth Dole is anti-choice."

### Script Of "Hopeful"

Which Republican Presidential hopeful said 'I will do everything in my power to restrict abortions.'

[Picture of **Pat Buchanan**]

Nope. George W. Bush did.

And which Presidential hopeful said he would back a constitutional amendment to outlaw almost all abortions.

[Picture of **Dan Quayle**]

Again it's George W. Bush.

So which Presidential hopeful said, "I think the Republican Party ought to maintain its pro-life tenor?"

[Picture of **Steve Forbes**]

George W. Bush did.

Get the picture? George W. Bush is anti-choice

<u>Radio ad run by Steve Forbes in response to NARAL attack ads</u>
Iowa and New Hampshire
Debut date:     March 26, 1999 (303 days before the January 24, 2000 Iowa caucuses, and 311
                days before the February 1, 2000 New Hampshire primary)
Source:  PX 19

---

**Script Of "Fight Back"**

**FORBES:** Here we go again. Al Gore's extreme liberal friends are already attacking me with negative TV ads. This is Steve Forbes. The extremist National Abortion League is running an ad attacking me and George Bush.

I don't know about Governor Bush, but I'm ready to fight back. I believe all life must be defended.

America's having a change of heart about abortion. A growing majority supports restrictions. I support parental consent. Al Gore doesn't. I would stop using taxpayer funds for abortion. Al Gore won't. And I oppose partial birth abortions. Al Gore doesn't.

I'm Steve Forbes. The next time you see an ad attacking me -- ask Vice President Gore why he's hiding, while his liberal friends do his dirty work.

For the facts, check our Web site at Forbes2000.com. That's Forbes2000.com.

Examples of TV ads run by Steve Forbes beginning in June 1999
Nationwide cable TV
Debut date:     June 2, 1999 (235 days before the January 24, 2000 Iowa caucuses, and 243
                days before the February 1, 2000 New Hampshire primary)
Source:  PX 21

### Script Of "Bear"

Forbes: Politicians shouldn't raid the Social Security trust fund. They shouldn't be
stealing from it, plundering it. That belongs to the American people. You know, if you
put a pot of honey in a forest, bears are going to come along and put their paws in it.
They can't help it -- it's their nature. You put a pot of money in Washington, politicians
are gonna come along and put their paws on it. They can't help it. And that's why we
should phase in a new system, with the bulk of your payroll tax, your Social Security tax
-- especially if you're a younger person -- goes directly into your retirement account. And
that way we won't have to depend on Washington politicians. Instead we'll do what we do
in America when we have a problem -- take the power away from those that can't handle
right, and return it to we the people. I trust the American people more on this than I do
those in Washington.

### Script Of "Dream"

You know the American people, God bless 'em, spend most of their time concerned about
their families, their communities, their work. They don't always pay a lot of attention to
politics. But at a time like this, America's direction is being decided, each and every day.
It's gonna take an outsider, who's not part of the political process, who's not caught up in
the day-to-day, the give-and-take, the compromise with special interests. It's gonna take
someone with executive experience, who knows how the world works and doesn't work,
who has an appreciation for the greatness of the American people, but also knows what
the barriers are. To people truly moving ahead. To truly realizing the American Dream,
which as you know, is allowing each of us and all of us the chance to discover and to
develop to the fullest our God-given talents. And anything that stands in the way of the
dream we must fight, and anything that enhances the dream we must support.

### Script Of "Compass"

America today is on the cusp of what should be one of the most extraordinary years in
human history. The real question is, will we realize these glittering opportunities, or are
we going to be know to future generations as an era of missed opportunities? And I
believe that America today can experience a new birth of freedom, but we have to make
it happen. And it's going to take leadership, and it's going to take a sense of direction. It's
gonna take a moral compass.

Examples of anti-Gore TV ads aired by the Republican Leadership Council, Spring 1999
"Reality" ad—run in California
Debut date: April 5, 1999 (336 days before the March 7, 2000 California primary)
Source: PX 20

Script of "Reality"

(Sound of logging on to the Internet.)

**GORE**: I took the initiative in creating the Internet.

**ANNOUNCER:** Reality check. The Internet was created in 1969 by the Pentagon.

Gore said, "I lived on a farm. My father taught me how to take up hay all day long in the hot sun."

Well, not quite. Gore grew up in the top floor suite of a luxury hotel in Washington, D.C.

Gore also said, "I undertook the task to reinvent the federal government."

Yeah, right.

Earth to Gore. Stop trying to re-invent reality.

**INTERNET VOICE:** Good-bye.

"Leadership" ad—run in Iowa, New Hampshire, Tennessee, and Washington, D.C.
Debut date:    June 15, 1999 (222 days before the January 24, 2000 Iowa caucuses and 230 days
                before the February 1, 2000 New Hampshire primary)
Source: PX 22

Script For 'Leadership'

**ANNOUNCER (V/O):** Al Gore has always been a leader.

As a young congressman, Gore lead the fight for higher income taxes.

As senator, he did it again.

And as vice president, Gore cast the deciding vote for the largest tax increase in history.

He's wrong. We're the Republican Leadership Council. We're fighting for lower taxes, less government and more freedom.

Join us. Together, we'll make higher taxes history.

Premier TV ad run by John McCain
California
Debut date:  June 28, 1999 (252 days before the March 7, 2000 California primary)
Source:  PX 23

Script Of "Join The Fight"

**ANNOUNCER [V/O]:** He's always put America's interests ahead of his own. The son and grandson of Navy admirals, John McCain became a decorated Navy pilot. Shot down over Vietnam, McCain spent five and a half years as a prisoner of war in Hanoi.

John McCain is running for president to reform government. He's fighting to stop special interests from raiding Social Security to line their own pockets. Thousands in the military are on food stamps, because we can't get money away from the special interests. No one is more tested, or better prepared, to lead America.

**McCAIN:** My number one committment is to bold conservative reform of government. But whether it's lowering taxes, improving schools or cracking down on government waste, the big-money special interests stand in the way.

Washington caters to their demands instead of listening to you. I need your help to clean up our campaign finance system and make government work for you for a change. Call now and join me in taking our country back.

Example of TV ads run by Lamar Alexander beginning in July 1999

Iowa

Debut date:     July 30, 1999 (177 days before the January 24, 2000 Iowa caucuses)

Source:  PX 24

**Script Of "Auction" (TV)**

**TELEVISION REPORTER**: This just in: The Iowa caucuses have been canceled. An auction is underway on the White House lawn.

*(Cut to lawn)*

**AUCTIONEER**: Twenty-five, now 30, 30 now 40, 40 now 50.

**REPORTER**: The nomination is going to the bidder with the most cash.

**AUCTIONEER**: Fifty million, going once, twice, I've sold it for 50 million.

*(Cut to Alexander)*

**ALEXANDER**: The presidency ought to be about raising children, farm prices and standards -- not just raising money. I've been all over Iowa because the presidency's too important to be bought or inherited. It ought to be earned.

## II.     Selected Early Advertising in the 2004 Presidential Campaign.

Example of TV ads run by the Reform Voter Project
Iowa and New Hampshire
Debut date:     February 18, 2003 (334 days before the January 19, 2004 Iowa caucuses and 342
                days before the January 27, 2004 New Hampshire primary)
Source:  PX 30

Script of "Ashes, Ashes" (TV)

*(On screen: Group of kids singing, holding hands and dancing in a circle on a green field under blue skies.)*

**KIDS**: Ring around the rosey...

**ANNOUNCER** [v/o]: As air pollution increases, more kids get asthma attacks.

**KIDS**: ... a pocket full of posies...

**ANNOUNCER** [v/o]: Pollution that comes from big corporations who gave millions of dollars to elect President Bush.

*(On screen: www.whatdiditbuy.com)*

**KIDS**: ... ashes, ashes...

**ANNOUNCER** [v/o]: Now President Bush is letting those special interests pollute the air even more.

**KIDS**: ... we all fall down.

*(On screen: Child breathes from an asthma inhaler while standing in front of smokestacks.)*

**ANNOUNCER** [v/o]: Don't you wish we had a president who stood up for us, not his special interest contributors?

*(On screen: Paid for by Reform Voter Project)*

Example of TV ads run by MoveOn.org
Aired on cable news channels in 21 markets nationwide
Debut date:    May 12, 2003 (251 days before the January 19, 2004 Iowa caucuses and 259
                days before the January 27, 2004 New Hampshire primary)
Source:  PX 29

Script of "Blood" (TV)

*(On screen: April 13, 2003; Eugene, Oregon; a Dramatization)*

**ANNOUNCER** [v/o]: You can always count on Americans in a crisis, so these people gave
blood. Though not for our troops in Iraq, no. George Bush's tax cuts for the rich have meant less
money for education. So they had to sell their blood to raise money for their children's school.
Now Bush wants to cut $9 billion from education to pay for more tax cuts for the rich. Is this the
America we want to live in? George Bush: putting rich people first.

*(On screen: Paid for by MoveOn.org)*

Howard Dean's first Iowa TV ad
Debut date:    June 17, 2003 (215 days before the January 19, 2004 Iowa caucuses)
Source:  PX 30

### Script of "Straight Talk" (TV)

**HOWARD DEAN**: I'm Howard Dean. It's time for the truth, because the truth is that George Bush's foreign policy isn't making us safer. His tax cuts are ruining our economy and costing us jobs. And too many Democrats in Washington are afraid to stand up for what we believe in.

*(On screen: www.deanforamerica.com)*

Well, I believe it's time to put people back to work, to provide health insurance for every American, and time for Democrats to be Democrats again. That's why I'm running for president. That's why I approved this message. I'm Howard Dean, and it's time to take our country back.

*(On screen: Approved by Howard Dean and Paid for by Dean for America)*

TV ad run by MoveOn.org and Win Without War
Washington, D.C. and New York
Debut date:    July 14, 2003 (188 days before the January 19, 2004 Iowa caucuses and 196
               days before the January 27, 2004 New Hampshire primary)
Source:  PX 33

Script of "Misleader" (TV)

ANNOUNCER [v/o]: George Bush told us Iraq was a nuclear threat.

*(On screen: "[Saddam Hussein] is seeking nuclear weapons... He is moving ever closer to developing a nuclear weapon." October 7, 2002)*

He said they were trying to purchase uranium.

*(On screen: "Saddam Hussein recently sought significant quantities of uranium from Africa." January 28, 2003)*

That they were rebuilding their nuclear facilities.

*(On screen: "Iraq is rebuilding facilities at sites that have been part of its nuclear program." October 7, 2002)*

So we went to war.

Now there's evidence we were misled. And almost every day, Americans are dying in Iraq.

*(On screen: Word "MISLEADER" over image of Bush's face)*

We need the truth, not a cover-up. Log on to MisLeader.org today.

*(Paid for by MoveOn.org and Win Without War)*

Radio ads run by Dennis Kucinich
Iowa
Debut date:    July 31, 2003 (171 days before the January 19, 2004 Iowa caucuses)
Source:  PX 34

## Script of "Best Person for the Job" (Radio)

*(Beginning of Willie Nelson song, "On the Road Again")*

**WILLIE NELSON**: Hey Iowa, this is Willie Nelson. I don't usually get too involved in politics, but this is more about getting involved with America.

I've looked at the candidates for president, and I think the best person for the job is Congressman Dennis Kucinich. I know Dennis. He speaks up for Americans who need a stronger voice, for family farmers and workers, for the environment. And a Kucinich administration will put the interests of heartland Americans above the greed of big corporations.

I encourage you all to visit his Web site at Kucinich.us and come out and see him in person when he's in your area. I'll be doing all I can to raise his profile, including a concert with his campaign right here in Iowa on Labor Day.

This is Willie Nelson saying support Dennis Kucinich for president, and we'll see you down the road.

**ANNOUNCER**: Paid for by Kucinich for president.

*(Cheers from an audience)*

## Script of "Tell Him I Sent You" (Radio)

*(Beginning of Willie Nelson song, "On the Road Again")*

**WILLIE NELSON**: Hey Iowa, this is Willie Nelson. I don't usually get too involved in politics, but I'm supporting Congressman Dennis Kucinich for president. I know Dennis, and I know he speaks up for heartland Americans who need a stronger voice. So say hi to Dennis the next time he visits your community here in Iowa. Tell him I sent you. And check out his Web site at Kucinich.us.

**ANNOUNCER**: Paid for by Kucinich for president.

<u>Examples from first round of TV ads by John Edwards</u>
Iowa and New Hampshire
Debut date:     August 5, 2003 (167 days before the January 19, 2004 Iowa caucuses and 174
                  days before the January 27, 2004 New Hampshire primary)
Source:  PX 37

### Script of "Plan" (TV)

**JOHN EDWARDS**: My grandmother came from a family of sharecroppers. My father worked in a cotton mill all his life, and I helped out there in the summers. I'll never forget the people there -- women in bandanas, men with grease on their faces and lint in their hair. Their jobs were hard but they took pride in work, and they wanted to give their kids a better life. As a lawyer and a senator, I've spent my whole life working for folks just like them, whose voices are way too often ignored.

George Bush -- he comes from a very different place. He believes if we take care of folks at the top, that somehow the whole country will be lifted. And now we know the cost: millions of jobs lost, pensions destroyed, the price of health care and college, soaring. The CEOs are doing great, but too many Americans aren't.

I'm John Edwards. I'm running for president and I approve this message because I have a specific plan to get our country moving again -- and it begins with one simple truth: America works best when it works for all of us.

*(On screen: For a copy of the Edwards plan: www.johnedwards2004.com; John Edwards for President; Paid For By Edwards For President; Message Approved By John Edwards)*

### Script of "College" (TV)

**JOHN EDWARDS**: My grandmother started out as a sharecropper. My father worked in a mill all his life, had a high school education. I was the first person in my family to go to college, and that's the America I believe in. I want to make college available to every young person who wants to go and -- big "and" -- is willing to work for it.

*(On screen: The Edwards Plan: A free year of college tuition for students who work; www.johnedwards2004.com)*

You know, I worked my way through college, it didn't hurt me a lick. There is nothing that the people in this country aren't capable of doing if we give them the chance.

I'm John Edwards and I approve this message.

*(On screen: John Edwards for President; Paid For By Edwards For President; Message Approved By John Edwards)*

Examples from first round of TV ads by Dick Gephardt
Iowa and New Hampshire
Debut date:    August 5, 2003 (167 days before the January 19, 2004 Iowa caucuses and 174
              days before the January 27, 2004 New Hampshire primary)
Source:  PX 41

Script of "Struggle" (TV)

*(On screen: www.DickGephardt2004.com)*

**RICHARD GEPHARDT**: I'm Dick Gephardt, and I approve this message because I want to stop George Bush and fight for America's middle class.

President Bush and I see things very differently. My mother was a secretary, and my dad delivered milk door to door. They struggled so I could go to college. They taught me to do what's right, no matter the consequences. I owe them more than I can say.

*(On screen: Gephardt, President; Paid For By Gephardt For President And Approved By Dick Gephardt)*

It's people like my folks who make America great. I won't forget them as president.

Script of "Leader" (TV)

**ANNOUNCER** [v/o]: 1993. The economy is in a tailspin. Every Republican opposes Bill Clinton's economic plan.

*(On screen: man holds sign reading "Promises, Promises... Still No Work"; photo of Newt Gingrich and other GOP members of Congress)*

But Democratic leader Dick Gephardt digs in and wins the fight in Congress by one vote. The result: the longest expansion ever. Millions of new jobs.

*(On screen: Dick & Jane Gephardt; www.DickGephardt2004.com)*

**RICHARD GEPHARDT**: I'm Dick Gephardt. We took the political heat, but we did what was right. Now we have to get rid of the Bush tax cuts to create new jobs and guarantee health care for all. That's why I approve this message.

*(On screen: Gephardt, President; Paid For By Gephardt For President And Approved By Dick Gephardt)*

Add. D-13

Examples from first round of TV ads by John Kerry
Iowa
Debut date:    September 3, 2003 (137 days before the January 19, 2004 Iowa caucuses)
Source:  PX 42

Script of "Strength" (TV)

*(On screen: Des Moines, Iowa; September 2, 2003)*

**JOHN KERRY**: Three million jobs lost, too many of them in the heartland. That is an astonishing failure. If I am president, I will roll back the Bush tax cuts for the wealthy so we can invest in education, health care and the skills of our workers.

We need to be on the side of America's middle class, and a tax cut for them is the right way to strengthen our economy. I'm John Kerry, and I approved this message.

*(On screen: JohnKerry.com; Authorized By John Kerry And Paid For By John Kerry For President)*

Script of "Iowa Announcement" (TV)

*(On screen: Des Moines, Iowa; September 2, 2003)*

**JOHN KERRY**: I believe the courage of Americans can change this country. I believe the resolve of Americans can break the grip of special interests and bring back jobs and finally open up health care to all.

Your courage can make sure that we do what's right for our country, and I am honored to join you as a candidate for the president of the United States of America. I'm John Kerry, and I approved this message.

*(On screen: JohnKerry.com; Authorized By John Kerry And Paid For By John Kerry For President)*

Examples from other early TV ads by John Kerry
Iowa and New Hampshire
Debut date:    September 9, 2003 (131 days before the January 19, 2004 Iowa caucuses and 139
                days before the January 27, 2004 New Hampshire primary)
Source:  PX 45

### Script of "Courage" (TV)

*(On screen: Senate Foreign Relations Committee, 1971; Lt. John Kerry (Ret.))*

**JOHN KERRY** [testifying before committee]: How do you ask a man to be the last man to die in Vietnam? How do you ask a man to be the last man to die for a mistake?

**ANNOUNCER** [v/o]: John Kerry. The 25-year-old swift boat commander who won 3 Purple Hearts and the Silver Star for bravery, then came home and helped rally the nation against that war.

Ever since, he's been on the front lines of the fights that matter. The new senator who defended a woman's right to choose...

*(On screen: Sen. John Kerry (Dem.), Senate Foreign Relations Committee)*

... sounded the alarm on terrorism years before 9-11...

*(On screen: cover of Kerry's book, "The New War: The Web of Crime That Threatens America's Security")*

... stopped George Bush and the oil companies from drilling in the Arctic Wildlife Refuge.

*(Headline on screen: "Kerry takes on Bush over Arctic drilling" -- Boston Herald, 1/23/02)*

... Now he's running for president.

**JOHN KERRY**: We need to get some things done in this country -- affordable health care, rolling back tax cuts for the wealthy, really investing in our kids.

*(On screen: John Kerry; JohnKerry.com)*

But right now, too many in politics are afraid to take on the powerful interests, or they're like George Bush and are working hand-in-hand with them. I believe the courage of Americans can change this country.

*(On screen: The courage to do what's right for America.)*

I'm John Kerry, and that's why I approved this message.

*(On screen: Approved By John Kerry. Paid For By Kerry For President; JohnKerry.com)*

Example of early anti-Bush TV ad run by the Democratic National Committee
Pennsylvania (also "emailed to 1.4 million Democratic activists")
Debut date:    October 20, 2003 (189 days before the April 27, 2004 Pennsylvania Presidential
               primary)
Source:  PX 47

Script of "Getting Worse" (TV)

*(Headline on screen: "Shadow of Wrongdoing Falls Across the Bush Oval Office" --* Financial
Times, *10/1/03)*

**ANNOUNCER NO. 1** [v/o]: It keeps getting worse. Scandals in the Bush White House.

*(Headline on screen: "Spy Leaks Rocks Bush" -- the* Boston Herald, *9/30/03)*)

Now, they illegally leak the identity of an American CIA agent...

*(Headline on screen: "Leak Probe Adds to Bush's Woes" -- UPI, 9/30/03)*

... all to hide Bush administration deceptions about the war in Iraq.

*(Former President Bush Says Leakers are Traitors)*

**GEORGE H.W. BUSH** [footage from April 26, 1999, dedication ceremony for the George
Bush Center for Intelligence]: I have nothing but contempt and anger for those who betray the
trust. They are, in my view, the most insidious of traitors.

*(Headline on screen: "Bush Must Come Clean on 'Revenge' Leak" -- the* Virginian-Pilot,
*9/30/03)*

**ANNOUNCER NO. 1** [v/o]: He's right about this one. It's time for an independent investigation
and the truth.

**ANNOUNCER NO. 2** [v/o]: The Democratic National Committee is responsible for the content
of this advertisement.

*(On screen: Sign the petition at www.democrats.org/justice; The Democratic National
Committee Is Responsible For The Content Of This Advertising. Paid For By The Democratic
National Committee. www.democrats.org. Not Authorized By Any Candidate Or Candidate's
Committee)*

Examples of late 2003 anti-Bush TV ads run by MoveOn.org

"Hoover 2M" ran in Arkansas, Colorado, Minnesota, Missouri, Ohio, Pennsylvania, Washington, Wisconsin, and West Virginia
Debut date:     November 24, 2003
Source:  PX 48

Script of "Hoover 2M" (TV)

ANNOUNCER [v/o]: George Bush is doing something Bill Clinton didn't do, his father didn't do, not Reagan, or Carter, or Ford or Nixon. Not LBJ or JFK. Not Eisenhower or Harry Truman. Not in any of FDR's four terms. No.

George Bush is going to be the first president since Herbert Hoover to lead an economy that loses jobs. Over two million so far. Didn't George Bush say his tax cuts would create jobs?

*(On screen: picture of Bush and the word "LEADER"; letters "MIS" move into frame to form "MISLEADER"; Paid for by MoveOn.org Voter Fund)*

"Santa" ad ran on "cable stations nationally"
Debut date:  December 9, 2003
Source:  PX 49

Script of "Santa" (TV)

ANNOUNCER [v/o]: Christmas is coming early to George Bush's big contributors.

*(On screen: Santa's gloved hands hold a long hand-written Christmas list. He puts checks after: "High drug prices," "no-bid contracts," "cut overtime pay" and "TV network giveaway.")*

Drug companies got higher prices in the Medicare bill. Defense contractors got no-bid contracts in Iraq. Now George Bush is pushing a huge spending bill that will eliminate overtime pay for millions of workers and give media corporations even more control of the airwaves.

*(On screen: Camera pans down to Santa's cowboy boots.)*

Yes, big contributors, there is a Santa Claus. But he's not at the North Pole.

*(On screen: Photo of George Bush. The words "mis" and "leader" come over his image. At the bottom of the screen, "Paid for by MoveOn.org Voter Fund.")*

He's in the White House.

**III.    Selected Early Advertising in the 2004 Senate and House Campaigns**

<u>Alaska</u>

<u>TV ad run by the U.S. Chamber of Commerce in support of Senator Lisa Murkowski (R-AK)</u>
Debut date:  November 18, 2003 (279 days before the August 24, 2004 Alaska primary)
Source:  PX 50

Script of "Fighting" (TV)

**ANNOUNCER** [v/o]: Alaskans are hurting. Unemployment, taxes.

But in Washington, we have a fresh, experienced face fighting for jobs, a better economy, lower taxes and the individual liberty we love. Senator Lisa Murkowski.

Some are trying to stop progress and stop ANWR, but Lisa Murkowski brings her knowledge of Alaska to Washington, so she can fight those who want to impose their agenda on our land. Call Lisa Murkowski. Thank her for fighting for Alaska jobs.

*(On screen: Call Lisa Murkowski; 907-271-3735; Paid For By The U.S. Chamber Of Commerce)*

**Illinois**

First TV ad run by Blair Hull (D-IL)
Debut date:  June 23, 2003 (266 days before the March 16, 2004 Illinois primary)
Source:  PX 61

**Script of "Bio" (TV)**

*(On screen: Paid For By Blair Hull For Senate; Democrat for U.S. Senate)*

**ANNOUNCER** [v/o]: Blair Hull. A successful businessman who build an investment company from scratch. But Hull's story is more than something from the business page -- it's an American story.

His parents, New Deal Democrats, both worked to help families struggling through the Depression.

Blair served four years in the military and used the GI bill to go through school. His first car cost 25 dollars -- the same as his union card. He taught high school math and physics, worked as a Fuller Brush salesman and raised four children.

*(On screen: four years U.S. Army; joined union in 1962; High School Teacher; father)*

In 1980, he started his own investment firm, taking on the big Chicago firms to make trading fairer for the small investor. With hard work and teamwork, he created jobs and built a successful company.

*(On screen: www.BlairHull.com; creating jobs)*

**BLAIR HULL**: I'm Blair Hull, and I approved this ad because we need to create jobs here in Illinois and provide affordable health care to our families.

**ANNOUNCER** [v/o]: Blair Hull. Democrat for the U.S. Senate. He'll work for you.

*(On screen: Blair Hull, Democrat For U.S. Senate Approved This Ad)*

**Pennsylvania**

TV and radio ads run by Representative Pat Toomey (R-PA) in his primary challenge to
    incumbent Senator Arlen Specter (R-PA)
Debut date:  June 23, 2003 (308 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 78

### Script of "Conservative" (TV)

**ANNOUNCER** [v/o]: For 22 long years, Arlen Specter has compiled one of the most
liberal records of any Republican senator.

*(On screen: Arlen Specter; 1980; 1986; 1992; 1998; "Second most liberal Republican
senator" -- source: 2003* National Journal*)*

Finally, there's a conservative alternative. Pat Toomey is a three-term conservative
Republican congressman. Toomey led the fight for the Bush tax cut, and Citizens Against
Government Waste rated Toomey the No. 1 Pennsylvania congressman.

*(On screen: Toomey Rated #1 on Cutting Wasteful Spending)*

Pat Toomey. A new conservative leader for Pennsylvania.

*(On screen: Pat Toomey for U.S. Senate; Paid For By Toomey For Senate;
www.pattoomey.org)*

**PAT TOOMEY** [v/o]: I'm Pat Toomey, and I authorized this message.

### Script of "Running" (Radio)

**ANNOUNCER**: Are you tired of seeing Republicans in Washington vote with the liberal
Democrats? For 22 long years, Pennsylvania's Arlen Specter has compiled one of the
most liberal records of any Republican senator.

Finally, there's a conservative alternative. Pat Toomey is a three-term conservative
Republican congressman. Toomey led the fight for the Bush tax cut, and Citizens Against
Government Waste rated Pat Toomey the No. 1 Pennsylvania congressman. Listen to Pat
Toomey.

**PAT TOOMEY**: I believe in the conservative principles of limited government, personal
freedom and traditional values. In Congress, I've cut wasteful Washington spending and
led the fight for the Bush tax cut. But our principles are blocked in the Senate by liberal
Republicans who side with the Democrats. That's why I'm running for the United States
Senate.

**ANNOUNCER**: Pat Toomey. A new conservative leader for Pennsylvania.

**PAT TOOMEY**: I'm Pat Toomey, and I authorized this message.

Add. D-20

Radio ad run by incumbent Senator Arlen Specter (R-PA)
Debut date:  September 1, 2003 (238 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 79

### Script of "Courage" (Radio)

**ANNOUNCER**: With America under attack, more than ever we need a senator with courage, clout and conviction. We need Pennsylvania's Republican Senator Arlen Specter.

Arlen Specter, the tough Philadelphia DA, who went on to write the landmark Armed Career Criminal Act. Arlen Specter, who for nearly two decades has warned us about the threat of terrorism. Arlen Specter, who wrote the law that authorizes the death penalty for terrorists. Arlen Specter, who's taking on the bureaucrats to expose and shut down fake Islamic fronts who give money to terrorists. And it's Arlen Specter who's leading the charge to arrest terrorists who murder Americans abroad and bring them back to justice in the USA.

It's why President Bush, Vice President Cheney, Senator Rick Santorum and Republicans across Pennsylvania proudly endorse Senator Arlen Specter for re-election. Pennsylvania's Arlen Specter. Courage, clout, conviction. Fighting and winning for Pennsylvania and America.

**ARLEN SPECTER**: This is Senator Arlen Specter, and I authorized this message.

Radio ad run by Representative Pat Toomey
Debut date:  September 2, 2003 (237 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 79

### Script of "The Worst" (Radio)

**ANNOUNCER**: America's leading conservative news magazine, *National Review*, recently called Arlen Specter the worst Republican senator. Why would they say that?

Because for 22 years, Arlen Specter has compiled one of the most liberal voting records of any Republican senator. Specter voted with Tom Daschle to shrink the Bush tax cut. That's liberal. Specter voted with Hillary Clinton against medical malpractice reforms and joined Ted Kennedy to allow human cloning. And, amazingly, Specter voted to subject American troops to trial in an international criminal court. That's really liberal.

Finally, there's a conservative alternative. Pat Toomey is a three-term Republican congressman. Toomey led the fight for the Bush tax cut, and Toomey's rated the best congressman at cutting government waste.

Pat Toomey -- a new conservative leader for Pennsylvania.

**PAT TOOMEY**: I'm Pat Toomey, and I authorized this message.

Radio ad run by the "Republican Main Street Partnership"
Debut date:  November 10, 2003 (168 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 80

### Script of "Wild Dash to the Right" (Radio)

*(race car noises)*

**ANNOUNCER** [over loudspeaker]: We're here at Nazareth Speedway, watching Pat Toomey make a wild dash to the right. That's right. Pat Toomey is running like crazy towards the conservative team, despite a record that would make any real conservative scream in pain.

Pat Toomey says he's a family guy, but he actually voted against Henry Hyde's amendment to prohibit the sale of explicit sexual material to children under 17. Pat Toomey calls himself a supporter of our men and women in uniform, but he voted twice against raising the salaries of our combat men and women, twice against better military housing and medical care. And he's waffled so many times on protecting our steel industry, we have nothing left to protect.

*(sound of race car screeching to a halt and crashing)*

Call Pat Toomey at (610) 439-6330. Tell him if he wants to sound like a conservative, he's got to stop voting against our men and women in uniform.

Paid for by the Republican Main Street Partnership.

TV ad run by incumbent Senator Arlen Specter (R-PA)
Debut date:  September 1, 2003 (238 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 81

### Script of "America Attacked" (TV)

**ANNOUNCER** [v/o]: With America under attack, more than ever, we need Senator Arlen Specter.

Arlen Specter, the tough Philadelphia DA -- a lifetime fighting violent crime.

He offered the Terrorist Death Penalty Act, and is leading the charge to hunt down terrorists who murder Americans abroad.

Pennsylvania's Arlen Specter -- courage, clout, conviction. Fighting and winning for Pennsylvania and America.

*(On screen: Endorsed by President Bush)*

**ARLEN SPECTER**: This is Arlen Specter, and I've authorized this message.

*(On screen: Arlen Specter; Paid For By Citizens For Arlen Specter)*

Add. D-22

Radio ad run by the "Republican Main Street Partnership"
Debut date:  December 2, 2003 (146 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 82

### Script of "Slamming the Door" (Radio)

*(Door bell)*

**WOMAN**: It's nice to be able to trust your elected officials. To let them into your confidence. And then some slam the door on your expectations.

*(Door slams shut)*

Pat Toomey told seniors: no senior should face unacceptable choices between medicine and other necessities. Then on November 22nd, he voted against the Medicare bill and its prescription coverage for sick seniors who cannot afford their medicines.

*(Door slams shut)*

Pat Toomey slammed the door on President Bush -- who championed the Medicare bill -- and every other Republican member of Congress from Pennsylvania.

Just like he slammed the door on increased benefits for our men and women in uniform.

*(Door slams shut)*

Like he turned his back on steel jobs and slammed the door on the Pennsylvanians who need him most.

*(Door slams shut)*

When people's futures are on the line, promises must be kept. Call Pat Toomey at (610) 439-6330. Tell him he must keep his promises -- to seniors, to our men and women in uniform and to us.

Paid for by Republican Main Street Partnership.

Radio ad run by the American Conservative Union
Debut date:  December 15, 2003 (133 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 83

Script of "Toomey Thanks" (Radio)

**FEMALE ANNOUNCER**: Congressman Pat Toomey could have gone along with big spenders. He didn't. Pat Toomey courageously stood with Pennsylvania's taxpayers. He voted no on the 2 trillion-dollar unfunded Medicare drug bill -- a bill that will force thousands of Pennsylvania citizens to lose their current prescription coverage. That's called leadership. It's what Pennsylvania has come to expect from Pat Toomey.

But now some Washington big shots are attacking Pat Toomey. They're wrong. Thank you, Pat Toomey, for standing firm.

**MALE ANNOUNCER**: Paid for by the American Conservative Union.

**South Dakota**

First round of TV advertising run by Senator Tom Daschle (D-SD) in his 2004 re-election
      campaign
Debut date:  July 9, 2003 (327 days before the June 1, 2004 South Dakota primary)
Source:  PX 87

Script of "Citizen Co-Sponsor" (TV)

*(On screen: Aurora, South Dakota)*

**DON ENDRES**: This is the third ethanol plant that we've been involved with.

*(On screen: Gary Duffy, Former President SD Corn Utilization Council)*

**GARY DUFFY**: We have gone from no ethanol production and a lot of our corn being
shipped out of state to growing one out of every three rows of corn for ethanol production
in South Dakota.

*(On screen: Ron Alverson, Former President of SD Corn Growers Assoc.)*

**RON ALVERSON**: As a corn grower, it means a better price and a better market.

*(On screen: Don Endres, Verasun Energy)*

**DON ENDRES**: We enjoy a very robust ethanol industry in South Dakota, directly as a
result of Tom's hard work in Washington.

*(On screen: Sen. Tom Daschle)*

**TOM DASCHLE**: I've been fighting the ethanol fight now for 25 years. Originally, it
was in large measure the oil companies who were opposed to us. So we've always had a
struggle. But at the end of the day, we've always won those fights.

[Continued on Next Page]

**ANNOUNCER** [v/o]: Now, Tom Daschle is close to passing new energy legislation that would triple ethanol production in South Dakota.

*(Headlines on screen: "Daschle sponsors bill to boost ethanol"; "Daschle: Committee vote set for ethanol bill")*

**DON ENDRES**: Daschle's legislation could mean as many as 10,000 new jobs. That's very important to the state.

*(Headline: "Ethanol growth looms for S.D.")*

**RON ALVERSON**: There's 10 ethanol plants in South Dakota right now, and this could mean that growing to 20 to 30.

*(On screen: Map of South Dakota with 10 cities highlighted -- Aberdeen, Aurora, Big Stone City, Chancellor, Groton, Hudson, Huron, Scotland, Watertown and Wentworth)*

**ANNOUNCER** [v/o]: Call to become a citizen co-sponsor of Daschle's plan to expand ethanol.

*(On screen: Toll Free 1-866-213-5200; Approved by Tom Daschle And Paid For By A Lot Of People Supporting Tom Daschle Committee)*

**TOM DASCHLE**: I'm Tom Daschle, and I approve of this message to the people of South Dakota.

Second round of TV advertising run by Senator Tom Daschle (D-SD) in his 2004 re-election campaign

Debut date:  August 14, 2003 (291 days before the June 1, 2004 South Dakota primary)

Source:  PX 89

### Script of "TriCare Prime" (TV)

*(On screen: Craig Towns, Pres., SD National Guard Enlisted Assoc.)*

**CRAIG TOWNS**: We've had people called up and deployed, left their families, left their homes within 48 hours, leaving behind children, jobs, communities. Then they have to come home and worry about their family being taken care of medically.

*(On screen: Senator Tom Daschle)*

**TOM DASCHLE**: When I heard that National Guardsmen, South Dakota Guardsmen and women, actually got benefits when they went to war and lost benefits when they came home to peace, I couldn't believe it.

I introduced legislation that simply said regardless of your circumstance, you're going to be eligible for health insurance. We call it TriCare Prime.

**ANNOUNCER** [v/o]: The Senate passed Daschle's plan to provide health insurance for guard families. Now Tom needs our help to make it law.

*(On screen: Support Guard Health Insurance; Call 1-866-213-5200)*

**CRAIG TOWNS**: I know Tom served in uniform himself during the Vietnam era. He has a feeling of what the soldiers and airmen go through, and it's a great asset for the state of South Dakota to have such a well-recognized leader in the Senate.

**TOM DASCHLE**: I'm Tom Daschle, and I approve of this message.

*(On screen: Approved By Tom Daschle and Paid For By A Lot Of People Supporting Tom Daschle Committee)*

Anti-Daschle TV ad run by the Club for Growth
Debut date:  August 7, 2003 (298 days before the June 1, 2004 South Dakota primary)
Source:  PX 88

Script of "Foxhall Road" (TV)

*(In background: voices sing "Tom's house is a very, very, very big house" to the tune of Crosby, Stills, Nash & Young's "Our House")*

**ANNOUNCER** [v/o]: It's a long way from Aberdeen to Foxhall Road.

*(On screen: road sign reading "Aberdeen; Home of U.S. Senator Tom Daschle)*

This is Tom Daschle's new $2 million house on Washington's ritzy Foxhall Road.

*(On screen: street sign for 2900 block of Foxhall Road NW)*

It's a great place to entertain Hollywood liberals, politicians and lobbyists. In Washington, Daschle opposes cutting taxes for South Dakota families. Maybe they don't want tax relief on Foxhall Road.

**WAYNE GREENFIELD**: But we sure can use it here in Aberdeen.

*(On screen: Wayne & Joyce Greenfield; Aberdeen, SD; www.clubforgrowth.org, Paid For By The Club For Growth)*

Anti-Daschle radio ad run by the Republican Party of South Dakota
Debut date:  December 1, 2003 (182 days before the June 1, 2004 South Dakota primary)
Source:  PX 92

Script of "Clout" (Radio)

**RANDY FREDERICK**: The Republican Party of South Dakota paid for this ad and is responsible for its content.

**ANNOUNCER**: Passing the ethanol energy bill in Congress could have meant a lot of new jobs for South Dakota, and it would have created new markets for our farmers.

Tom Daschle had the opportunity to deliver for us, but he didn't. When it counted, he couldn't even get one third of his Senate Democrats to support the bill.

If Daschle has clout, he would have delivered. Call Tom Daschle and tell him to deliver for South Dakota.

**Pennsylvania's 17th Congressional District**

Radio ad run by Frank Ryan (R-PA)
Debut date:  August 19, 2003 (251 days before the April 27, 2004 Pennsylvania primary)
Source:  PX 104

Script of "Unforgivable" (Radio)

**FRANK RYAN**: I'm Frank Ryan. Six months ago, I made one of the most important decisions of my life. I decided to run for Congress. Things have been going great -- I

received support from seniors and hard-working families, and more contributions than any other Republican.

Then something unforgivable happened. An opponent gave the press private information about a painful divorce my family endured years ago. They even leaked the confidential psychological evaluation of my children. I have turned this alleged criminal action over to the authorities. The intent of their smear campaign was clear -- to get me to withdraw from the race.

I can assure you this decorated Marine doesn't quit that easily. Dropping out would be like giving in to a terrorist. Other candidates can spread threats and lies, but I'm focused on issues that affect us all. Our troops are in Iraq, and our health care and Social Security systems are broken. My campaign is about serious solutions to serious problems.

We all make mistakes. Not all marriages end happily. I've learned from my experience. I know what will make me an even better congressman. This is Frank Ryan, and I've authorized every word of this message.

Paid for by friends of Frank Ryan.

## IV.    Selected Early Advertising in the 2006 Senate and House Campaigns

### Minnesota

First radio ad run by Democratic Senate candidate Amy Klobuchar
Debut date:  November 14, 2005 (301 days before the September 12, 2006 Minnesota primary)
Source:  PX 106

### Script of "Raking It In" (Radio)

**FEMALE ANNOUNCER**: Today, ExxonMobil announced the biggest profits in U.S. history, $10 billion in three months.

**MALE ANNOUNCER**: The oil companies are raking it in. And you know who's paying.

What's the Republican leadership in Washington doing?

Absolutely nothing.

Well, Amy Klobuchar thinks there's something we can do -- make the oil companies that are profiteering pay a penalty. The more they gouge, the more they pay.

Klobuchar says the money should help people pay for home heating oil and also invest for the long term in homegrown energy like ethanol and biomass, wind and solar.

A comprehensive national energy policy.

We know Amy Klobuchar. She's a tough prosecutor who's targeted criminals who prey on seniors and children.

Her grandpa worked in the Ely mines and taught her to stand up for working people.

Now, Amy Kbbuchar's running for the United States Senate. Learn more. Go to amyklobuchar.com. Solutions for people, for a change.

**AMY KLOBUCHAR**: This is Amy Klobuchar. I'm running for U.S. Senate. I approve this message, and hope you'll join us.

**MALE ANNOUNCER**: Paid for by the Klobuchar for Minnesota Committee.

**Montana**

TV ad run by the Montana Democratic Party attacking incumbent Senator Conrad Burns (R-MT)
Debut date:  August 8, 2005 (301 days before the June 6, 2006 Montana primary)
Source:  PX 107

Script of "Smell Test" (TV)

**ANNOUNCER** [v/o]: Is Conrad Burns looking out for Montana? In Washington, he takes $136,000 from notorious lobbyist Jack Abramoff -- now under federal investigation. Then Burns fights for and passes legislation to give Abramoff's client -- a wealthy Michigan Indian Tribe -- $3 million.

*(Text on screen:* Billings Gazette*; 5/24/05; Official FEC Reports, 2001-2004)*

The *Billings Gazette* says Burns' legislation "doesn't pass the smell test." Call Conrad Burns: tell him to start working for Montana. The Montana Democratic Party is responsible for the content of this ad.

*(Text on screen:* Billings Gazette*; 4/17/05; 406-449-5401; Paid For By The Montana Democratic Party; www.MontanaDemocrats.org; And Not Authorized By Any Candidate Or Candidate's Committee)*

<u>TV ad run by Senator Burns in response to Democratic Party of Montana attack ads</u>
Debut date:  January 24, 2006 (132 days before the June 6, 2006 Montana primary)
Source:  PX 108

**Script of "Long Time" (TV)**

**CONRAD BURNS**: Folks here in Montana have known Phyllis and me for a long time...

*(Text on screen: Senator Conrad Burns)*

They also know the work that we've done for our home state.

Now, I'm not going to stand here and let the Democratic Party of Montana play politics with my reputation.

Those partisan Democratic ads are just that -- politics.

The worst kind of politics.

Montanans deserve better.

Now I've worked in and around stockyards all my life.

Those attack ads -- they're just a big bunch of you know what.

Plus, they are paid for by the same Democrats who took money from Jack Abramoff's clients.

He's the guy that ripped off his Indian clients for millions and lied to anybody and everybody.

I don't know who Abramoff influenced, but he never influenced me.

Montana is my life, and I'm proud of what I've done here.

So I am going to keep on doing the right thing: delivering on jobs, health care, agriculture, veterans and more.

That's why you elected me, and political attack ads won't stop that.

I'm Conrad Burns, and I approved this message to set the record straight.

*(Text on screen: www.ConradBurns.com; Approved By Conrad Burns & Paid For By Friends Of Conrad Burns 2006)*

TV ad run by the Montana Democratic Party in response to Senator Burns's TV defense ads
Debut date:  January 28, 2006 (128 days before the June 6, 2006 Montana primary)
Source:  PX 109

### Script of "Influence" (TV)

**CONRAD BURNS** [from ad]: I don't know who Abramoff influenced, but he never influenced me...

*(Text on screen: Senator Conrad Burns)*

**ANNOUNCER** [v/o]: But after receiving $5,000 from indicted lobbyist Jack Abramoff's associate, Sen. Burns changed his vote, helping Abramoff.

*(Text on screen: FEC reports; Roll Call, 3/1/05 "Burns changed vote on bill about the Marianas islands" [Missoulian 1/21/06])*

Burns says: "Set the record straight." Montana's newspapers do just that: "Burns changed position after donation."

*(Text on screen: [ Billing Gazette, 12/3/05])*

"Burns helped Abramoff tribes get money."

*(Text on screen: [ Billings Gazette, 11/24/05])*

Burns is delivering all right: but not for Montana.

The Montana Democratic Party is responsible for the content of this ad.

*(Text on screen: Paid For By The Montana Democratic Party; www.MontanaDemocrats.org; And Not Authorized By Any Candidate Or Candiate's Committee)*

**New York**

TV ad run by Republican Senate candidate John Spencer
Debut date:  August 25, 2005 (382 days before the September 12, 2006 New York primary)
Source:  PX 111

### Script of "Pirro" (TV)

**ANNOUNCER** [v/o]: She's a liberal's liberal. Supports gun control, abortion on demand, mandatory gay rights.

Hillary Clinton? How about Jeanine Pirro.

Pirro has been an activist for the most liberal positions.

*(Text on screen:* New York Post *masthead; War of the Roses)*

She's not running to beat Hillary Clinton -- she's running to be Hillary Clinton.

The only conservative in the race for U.S. Senate is John Spencer. Committed to protecting our rights, and protecting you, the taxpayer.

**JOHN SPENCER** [v/o]: I'm John Spencer, and because I am a conservative, I approve this message.

*(Text on screen: johnspencer.com; Paid For By Spencer For Senate)*

**North Dakota**

TV re-election ad run by incumbent Kent Conrad (D-ND)
Debut date:  September 17, 2005 (268 days before the June 13, 2006 North Dakota primary)
Source:  PX 112

### Script of "45 Days" (TV)

**MICHAEL BROWN**: I think the base would have closed without Sen. Conrad's leadership.

*(Text on screen: Michael Brown; Mayor, Grand Forks)*

**BRUCE FURNESS**: Kent's leadership was crucial.

*(Text on screen: Bruce Furness; Mayor, Fargo)*

**PAUL DIEDERICH**: $1.5 billion in highway funds -- it's the most ever. Kent brought this home for North Dakota.

*(Text on screen: Paul Diederich; Pres., Industrial Builders, Inc.)*

**ROBERT CARLSON**: The energy bill is a real bright spot for North Dakota. Kent Conrad led the effort.

*(Text on screen: Robert Carlson; President, ND Farmer's Union)*

[Continued on Next Page]

**ANNOUNCER** [v/o]: Kent Conrad -- from leading the fight to save our bases to bringing home billions with the new highway bill, the new energy bill, creating new jobs in cutting-edge industries.

*(Text on screen: "The delegation worked tirelessly to save the bases"; Grand Forks Herald; 7/05/04; "Highway bill has big bucks for N.D."; Bismarck Tribune, 7/29/05; "N.D. wins with energy bill"; The Forum, 8/04/05)*

**DENNIS HILL**: We have our coal. We have our wind. We have our renewable fuels. Kent saw that there was great opportunity in those industries.

*(Text on screen: Dennis Hill, GM, ND Assoc. of Rural Electric Cooperatives)*

**JOHN MARSHALL**: We had 17 Air Force bases in this region. There's only three left, two of them are in the state of North Dakota. Sen. Conrad took care of that.

*(Text on screen: John Marshall, Chairman, Council on Military Relations)*

**JOANN RENFROW**: Sen. Conrad never gave up.

*(Text on screen: JoAnn Renfrow; Base Retention Committee)*

**KENT CONRAD**: You know, the last 45 days have just been a remarkable period. Things we've been working on for four or five years, all coming together.

*(Text on screen: Senator Kent Conrad)*

**BRUCE FURNESS**: Sen. Conrad is very effective.

*(Text on screen: Bruce Furness; Mayor, Fargo)*

**LINDA COATES**: He's got the clout.

*(Text on screen: Linda Coates, City Commissioner, Fargo)*

**MICHAEL BROWN**: He got everyone working together Independents, Republicans and Democrats.

*(Text on screen: Michael Brown; Mayor, Grand Forks)*

**KENT CONRAD**: The fact that we've worked together shows that you can accomplish great things with team work.

**PAUL DIEDERICH**: Kent gets the job done for North Dakota.

*(Text on screen: Paul Diederich; Pres., Industrial Builders, Inc.; Paid For By Friends Of Kent Conrad)*

**KENT CONRAD**: I'm Kent Conrad, and I approve this message.

**Pennsylvania**

TV ad run by "Americans for Job Security" in support of Senator Rick Santorum (R-PA)
Debut date:  November 18, 2005 (178 days before the May 16, 2006 Pennsylvania primary)
Source:  PX 113

### Script of "Record" (TV)

**ANNOUNCER** [v/o]: Most Saturdays they get together in the park, 8 a.m. sharp.

Pennsylvania families relax a little more these days because Rick Santorum is getting things done everyday.

Over $300 billion in tax relief, eliminating the marriage penalty, increasing the per child tax credit -- all done.

And now Rick Santorum is fighting to eliminate unfair taxes on family businesses.

Call and say thanks because Rick Santorum is the one getting it done.

*(Text on screen: Senator Rick Santorum; (717) 231-7540; Paid For By Americans for Job Security)*

**Rhode Island**

First round of TV ads run by Cranston, Rhode Island Mayor Steve Laffey in his primary
      challenge to incumbent Senator Lincoln Chafee (R-RI)
Debut date:  September 13, 2005 (363 days before the September 12, 2006 Rhode Island
      primary)
Source:  PX 114

Script of "Mess" (TV)

**STEVE LAFFEY**: We've got record gas prices and what are the Washington politicians
doing? They give billions to big oil companies and keep us dependent on the Middle
East.

*(Text on screen: Mayor Steve Laffey; U.S. Senate; www.ElectLaffey.com)*

I'm Steve Laffey. We can lower gas prices, protect the environment and develop
alternative energy if we have the courage to stand up to the special interests.

I'm running for the U.S. Senate, and I approve this message because Washington is a
mess. And neither the Republicans nor the Democrats are doing a thing about it.

*(Text on screen: Steve Laffey Makes A Difference; Paid For By Laffey U.S. Senate And
Approved By Steve Laffey.)*

Add. D-39

First round of TV ads run by the National Republican Senatorial Committee attacking Mayor
     Laffey
Debut date:  October 3, 2005 (343 days before the September 12, 2006 Rhode Island
     primary)
Source:  PX 115

Script of "Slick" (TV)

ANNOUNCER [v/o]: Have you seen this guy Steve Laffey?

STEVE LAFFEY [from candidate's TV ad]: I'm Steve Laffey...

ANNOUNCER [v/o]: In his TV ads, he complains about oil companies, but he's the
same Steve Laffey who ran a company selling oil industry stocks on Wall Street.
Profiting from offshore drilling.

*(Text on screen:* Wall Street Journal, *5/3/00;* Investment Dealers' Digest *3/24/97, 2/3/97)*

The oil companies made a fortune. Steve Laffey made a fortune.

*(Text on screen: Laffey 'profited' from oil, says GOP committee,* Warwick Beacon
*9/20/05; Morgan Keegan SEC Filing 10/2000)*

Now Laffey says he will...

STEVE LAFFEY [from candidate's TV ad]: ...stand up to the special interests.

ANNOUNCER [v/o]: Slick. Steve Laffey. Laughing all the way to the bank.

The National Republican Senatorial Committee is responsible for the content of this ad.

*(Text on screen: Paid For By The National Republican Senatorial Committee And Not
Authorized By Any Candidate Or Candidate's Committee. www.nrsc.org)*

<u>Second round of TV ads run by the National Republican Senatorial Committee attacking Mayor Laffey</u>
Debut date:  October 17, 2005 (329 days before the September 12, 2006 Rhode Island primary)
Source:  PX 116

**Script of "LaffeyLand Tales" (TV)**

**ANNOUNCER** [v/o]: The strange adventures of Steve Laffey...

Mayor Laffey's administration spent tax dollars to sound-proof his office.

*(Text on screen:* Providence Journal-Bulletin*; 1/7/04)*

Laffey spent thousands on spy cameras to spy on employees.

*(Text on screen:* Providence Journal-Bulletin*; 9/3/03)*

Bizarre. But the joke's on us.

Laffey gave Cranston the highest property taxes in Rhode Island.

*(Text on screen: Rhode Island Public Expenditure Council)*

Laffey raised taxes twice, and admits he may do it again.

*(Text on screen:* Providence Journal-Bulletin*; 1/29/03; 3/31/04; 5/11/05)*

Tax and Spend Steve Laffey. Nobody's laughing now.

*(Text on screen: The National Republican Senatorial Committee is responsible for the content of this advertising; Paid For By National Republican Senatorial Committee And Not Authorized By Any Candidate Or Candidate's Committee. www.nrsc.org)*

**West Virginia**

TV ad run by the National Republican Senatorial Committee attacking incumbent Senator Robert
    Byrd (D-WV)
Debut date:  July 29, 2005 (283 days before the May 9, 2006 West Virginia primary)
Source:  PX 126

Script of "Change" (TV)

ANNOUNCER [v/o]: 1952... war in Korea and Robert Byrd went to Congress. A lot's
changed since then.

Byrd voted for soldiers in the 50s. Today, against body armor in the war on terror.

*(Text on screen: H.R. 5969, July 2, 1953; CQ Vote #400, 10/17/2000)*

Then, he stood with working families. Today he votes higher taxes for the middle class.

*(Text on screen: H.R. 8363, 2/7/1964; CQ Vote #179, 5/23/2003; CQ Vote #247,
8/6/1993)*

Then, Byrd protected our flag. Now, he votes to allow flag burning.

*(Text on screen:* The Washington Post*, 3/29/2000; CQ Vote #48, 3/29/2000)*

Sen. Byrd. We all agree he's changed. But is it good for West Virginia?

The NRSC is responsible for the content of this ad.

*(Text on screen: Paid For By National Republican Senatorial Committee And Not
Authorized By Any Candidate Or Candidate's Committee; www.NRSC.org)*

**Missouri's 7th Congressional District**

TV ad run by American Family Voices/Public Campaign Action Fund attacking incumbent
      Representative Roy Blunt (R-MO)
Debut date:  October 21, 2005 (290 days before the August 8, 2006 Missouri primary)
Source:  PX 130

**Script of "Laundromat" (TV)**

**ANNOUNCER** [v/o]: Money laundering -- It's a dirty business. A first-degree felony that Tom DeLay was just indicted for. But there's more dirty laundry.

DeLay sent $150,000 to Congressman Blunt. Then Blunt funneled DeLay's money to his son's campaign and a company that hired DeLay's wife.

Just another example of politics awash with dirty money. Big money's making Washington spin out of control. It's time to clean up Congress.

*(Text on screen: CleanerCongress.org; Paid For By American Family Voices And Public Campaign Action Fund)*

Add. D-43

## Wisconsin's 5th Congressional District

TV ad run by Democratic primary candidate Bryan Kennedy attacking incumbent Representative
        Jim Sensenbrenner (R-WI)
Debut date:  September 26, 2005 (350 days before the September 12, 2006 Wisconsin primary)
Source:  PX 131

Script of "Wisconsin Way" (TV)

ANNOUNCER [v/o]: When President Bush needed billions of dollars to help rebuild
Iraq, Jim Sensenbrenner said yes.

*(Text on screen: Source: H.R. 3289, Vote 601 11/06/03)*

When the tsunami hit Asia, Jim Sensenbrenner voted again to send our money overseas.

*(Text on screen: Source: H.R. 1268, Vote 77 5/11/05)*

But when our fellow Americans on the Gulf Coast needed help, Jim Sensenbrenner
turned his back on them and voted no.

*(Text on screen: Source: H.R. 3673, Vote 460 9/8/05)*

BRYAN KENNEDY: Saying "no" to our fellow Americans in need is just wrong. I'm
Bryan Kennedy. I'm running to replace Jim Sensenbrenner in Congress, and I approve
this message.

*(Text on screen: Paid For & Authorized By Bryan Kennedy For Congress; American Red
Cross; 800-HELP-NOW)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Christopher Shays and Martin Meehan,

                                    Plaintiffs,

            v.                                          Civil Action No. 06-CV-1247
                                                        (Judge Kollar-Kotelly)

United States Federal Election Commission,

                                    Defendant.

---

PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH
PLAINTIFFS CONTEND THERE IS NO GENUINE ISSUE

---

Pursuant to LCvRs 7(h) and 56.1, plaintiffs Christopher Shays and Martin Meehan

hereby submit the following statement of material facts as to which there is no genuine issue, to

accompany their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and § 10(e) of

the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)-(D) ["APA"].  This is a facial

challenge under the APA to regulations promulgated by the Federal Election Commission

["FEC" or "Commission"] to implement the Bipartisan Campaign Reform Act of 2002, Pub. L.

No. 107-155, 116 Stat. 81 ["BCRA"].  As such, this action focuses predominantly not on issues

of fact, but on questions of law, particularly the construction of BCRA, the construction of the

Federal Election Campaign Act ["FECA"], and the Commission's compliance with BCRA,

FECA, and the APA's rulemaking standards.

1.      In March 2002, Congress passed, and the President signed into law, the Bipartisan

Campaign Reform Act of 2002.

2.      Defendant United States Federal Election Commission is a federal agency created pursuant to § 310 of the Federal Election Campaign Act Amendments of 1974, 2 U.S.C. § 437c(a)(1).

3.      Congress directed the Commission to promulgate regulations to implement the provisions of Titles I and II of BCRA.  BCRA's rulemaking provisions gave the Commission 90 days to promulgate regulations implementing Title I of the Act, and 270 days to promulgate regulations implementing Title II.  *See* BCRA §§  214(c), 402(c).

4.      On May 20, 2002, the Commission published its Notice of Proposed Rulemaking ["NPRM"] regarding regulations to implement Title I of BCRA.  *See* Prohibited and Excessive Contributions; Non-Federal Funds or Soft Money; Proposed Rule, 67 Fed. Reg. 35,654. (Plaintiffs' Exhibit ["PX"] 138).  After receiving written comments, holding a public hearing on June 4 and 5, 2002, and conducting an open meeting on June 19, 20, and 22, 2002, the Commission adopted its Title I regulations on June 22, 2002.  The final regulations were transmitted to Congress on July 16, 2002, in compliance with the Congressional Review of Agency Rulemaking Act, 5 U.S.C. § 801(a)(1).  The Title I regulations were published in the Federal Register on July 29, 2002, in compliance with the Administrative Procedure Act, 5 U.S.C. § 553(d).  These original Title I regulations, including those governing soft money solicitation at state party fundraising events and federal election activities of state and local parties, became effective on November 6, 2002.  *See* Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money; Final Rule, 67 Fed. Reg. 49,064 (July 29, 2002) (codified at 11 C.F.R. pts. 100, *et al.*) (PX 139).

5.      On September 24, 2002, the Commission published its NPRM regarding regulations to implement BCRA § 214(b)-(c), which repealed the Commission's former rule on

2

"coordinated communications" and directed the Commission to promulgate new regulations on the subject. *See* Coordinated and Independent Expenditures; Proposed Rule, 67 Fed. Reg. 60,042. After receiving written comments, the Commission held a public hearing on its coordination NPRM on October 23 and 24, 2002, at which it heard testimony from various witnesses. After conducting an open meeting, the Commission adopted its coordination regulations on December 5, 2002. The regulations were transmitted to Congress on December 18, 2002, in compliance with the Congressional Review of Agency Rulemaking Act, 5 U.S.C. § 801(a)(1). The coordination regulations were published in the Federal Register on January 3, 2003, in compliance with the Administrative Procedure Act, 5 U.S.C. § 553(d). These original coordination regulations became effective on February 3, 2003. *See* Coordinated and Independent Expenditures, 68 Fed. Reg. 421 (Jan. 3, 2003) (codified at 11 C.F.R. pts. 109, *et al.*) (PX 9).

6.     On October 8, 2002 plaintiffs Christopher Shays and Martin Meehan filed a complaint for declaratory and injunctive relief in this Court challenging a number of the Commission's rules implementing Title I of BCRA. On January 21, 2003, plaintiffs amended their complaint to, *inter alia*, add a challenge to the Commission's newly enacted coordination regulations promulgated pursuant to Title II of BCRA. In a Memorandum Opinion and Order dated September 18, 2004, this Court invalidated a number of the Commission's regulations, including regulations governing coordinated communications, soft money solicitation at state party fundraising events, and federal election activities conducted by state and local parties, and remanded the regulation to the Commission for further action consistent with the Court's opinion. *See Shays v. FEC*, 337 F. Supp. 2d 28, 35 & n.1, 55-65, 88-93, 97-107, 129-130 (D.D.C. 2004) ["*Shays I*"]. On October 19, 2004, this Court denied the Commission's motion to

stay the Court's ruling pending appeal. *See* 340 F. Supp. 2d 39 (D.D.C. 2004). On July 15, 2005, the United States Court of Appeals for the District of Columbia Circuit affirmed the decisions of this court challenged by the Commission on appeal "in all respects." 414 F.3d 76, 79 (D.C. Cir. 2005). The Commission's petition for rehearing was denied on October 21, 2005.

7.      On February 24, 2005, the Commission published its NPRM on remand regarding candidate solicitation at state, district, and local party fundraising events. *See* Candidate Solicitation at State, District, and Local Party Fundraising Events; Proposed Rule, 70 Fed. Reg. 9,013. (PX 140). After receiving written comments, the Commission held a public hearing on its candidate solicitation NPRM on May 17, 2005, at which it heard testimony from various witnesses. After conducting an open meeting on June 23, 2005, the Commission decided not to amend its rule governing candidate solicitation of soft money at state, district, and local party fundraising events and instead approved a revised explanation and justification for the existing rule. The revised explanation and justification was published in the Federal Register on June 30, 2005. *See* Candidate Solicitation at State, District, and Local Party Fundraising Events; Revised Explanation and Justification, 70 Fed. Reg. 37,649 (codified at 11 C.F.R. pts. 300, *et al.*) (PX 142).

8.      On May 4, 2005, the Commission published its NPRM on remand regarding federal election activities of state and local parties, including the definitions of "voter registration" and "get-out-the-vote" activity. *See* Definition of Federal Election Activity; Proposed Rule, 70 Fed. Reg. 23,068 (PX 145). After receiving written comments, the Commission held a public hearing on the federal election activity NPRM on August 4, 2005, at which it heard testimony from various witnesses. After conducting an open meeting, the Commission adopted its revised federal election activity regulations on February 9, 2006. The

final regulations were transmitted to Congress on February 10, 2006, in compliance with the Congressional Review of Agency Rulemaking Act, 5 U.S.C. § 801(a)(1). The federal election activity regulations were published in the Federal Register on February 22, 2006, in compliance with the Administrative Procedure Act, 5 U.S.C. § 553(d). The federal election activity rules challenged in this action became effective on March 24, 2006. *See* Definition of Federal Election Activity, Final Rules, 71 Fed. Reg. 8926 (Feb. 22, 2006) (codified at 11 C.F.R. pts. 100, *et al.*) (PX 146).

9.    On December 14, 2005, fourteen months after this Court denied the Commission's motion for a stay pending appeal, the Commission published its NPRM on remand regarding coordinated communications. *See* Coordinated Communications; Proposed Rule, 70 Fed. Reg. 73,946 (PX 13). After receiving written comments, the Commission held a public hearing on the coordination NPRM on January 25 and 26, 2006, at which it heard testimony from various witnesses. On March 15, 2006, after the written comment period had closed, the Commission published a supplemental NPRM ["SNPRM"] that re-opened the rulemaking record, added a substantial data set that the Commission had licensed from TNS Media Intelligence/CMAG ["CMAG"] regarding some television ads run by Presidential, Senate, and House candidates during a portion of the 2004 election cycle, and gave interested parties only five business days to analyze the new data and submit written comments. *See* Coordinated Communications; Supplemental Notice of Proposed Rulemaking, 71 Fed. Reg. 13306 (PX 133). The Commission never held a public hearing to discuss the new data introduced in the SNPRM.

10.    After conducting an open meeting, the Commission adopted its revised coordinated communications regulations on April 7, 2006. The final regulations were transmitted to Congress on June 2, 2006, in compliance with the Congressional Review of

Agency Rulemaking Act, 5 U.S.C. § 801(a)(1). The coordination regulations were published in the Federal Register on June 8, 2006, in compliance with the Administrative Procedure Act, 5 U.S.C. § 553(d). The coordinated communications regulations challenged in this action became effective on July 10, 2006. *See* Coordinated Communications; Final Rule, 71 Fed. Reg. 33,190 (June 8, 2006) (codified at 11 C.F.R. pts. 109, *et al.*) (PX 136).

11.    A review of the Commission's "Merged Senate" and "Merged House" data sets (the Commission merged CMAG data with information from official state ballot materials and used the merged data sets to create its graphical representations), opened in MS Access or comparable database program, demonstrates that the sets contain no ads by 2004 House or Senate candidates that were broadcast in 2003. Yet the administrative record demonstrates that many such ads were aired, often eight to ten months before the primary. The data sets do include some stray advertising associated with special races late in 2002 and early in 2003, but there are no ads relating to 2004 primary and general election races until calendar year 2004 itself. For examples of the millions of dollars in TV advertising run during 2003 with respect to 2004 cycle Congressional races, *see*, *e.g.*, PX 50, 54, 61-74, 76-84, 87-92, 95, 100, 104.

12.    According to the Commission's "Merged Presidential" data set, 8.44% of all Presidential campaign ads run in the selected DMAs within eleven general-election battleground states prior to the 2004 primaries (3,838 out of 45,474) were aired more than 120 days before the relevant primary for each DMA. *See* Graph P7. According to the Commission's data on Graph 8, these 3,838 ads were valued at more than $802,544 (4.89% of $16,411,945). Of the 3,838 total "early" ads, 2,968 (77%) were run in Iowa. These 2,968 early Iowa ads were valued at $486,709 (61% of the total $802,544 value of all early ads included within the Commission's restricted data set).

6

13.     The 2,968 early Iowa ads constituted sixteen percent of the total 18,657 pre-Iowa caucus TV ads included within the Commission's constricted data set.

14.     Plaintiff Christopher Shays is a Member of the United States House of Representatives from the 4th Congressional District of the State of Connecticut.  Dec. 5, 2006 Declaration of Christopher Shays ("Shays Decl.") ¶ 1.  Representative Shays was first elected in 1987, re-elected in 1988 and every two years thereafter, and next faces re-election in November 2008.  *Id.*

15.     Plaintiff Martin Meehan is a Member of the House of Representatives from the 5th Congressional District of the Commonwealth of Massachusetts.  Dec. 5, 2006 Declaration of Martin Meehan ("Meehan Decl.") ¶ 1.  Representative Meehan was first elected in 1992, re-elected every two years thereafter, and next faces re-election in November 2008.  *Id.*

16.     Plaintiffs were principal House sponsors of the legislation enacted as BCRA. They spent many years seeking to promote the enactment of this reform legislation.  Shays Decl. ¶ 2; Meehan Decl. ¶ 2.

17.     With other sponsors, plaintiffs submitted written comments on the FEC's proposed rules implementing BCRA's soft money and coordination provisions, including comments submitted during rulemaking proceedings undertaken in response to the decisions and judgment of this Court in *Shays I*.  The Commission rejected many of the concerns, objections, and proposals set forth in plaintiffs' rulemaking comments.  *Id*.

18.     Plaintiffs are both citizens of the United States, members of Congress, candidates, voters, recipients of campaign contributions, fundraisers, and political party members.  Shays Decl. ¶ 3; Meehan Decl. ¶ 3.  In those capacities, each plaintiff is subject to regulation under FECA, BCRA, and the Commission's implementing regulations, and their activities are also

7

directly affected by the fact that others, including their potential contributors and supporters, their potential election opponents, contributors to and supporters of their opponents, and contributors to and supporters of both political parties are subject to the same regulation under FECA, BCRA, and the Commission's implementing regulations. *Id.*

19.     If any of the campaign finance reforms embodied in BCRA is subverted, eroded, or circumvented by the Commission's implementing regulations, plaintiffs believe they will be forced once again to raise money, campaign, and attempt to discharge their important public responsibilities in a system that is widely perceived to be, and they believe in many respects will be, significantly corrupted by the influence of special-interest money.  Shays Decl. ¶ 4; Meehan Decl. ¶ 4.

20.     The Commission's revised coordinated communications regulations directly affect plaintiffs by continuing to provide a "safe harbor" to their electoral opponents and opposing political parties to engage in unregulated coordination of political advertising with outside spenders.  Shays Decl. ¶ 5; Meehan Decl. ¶ 5.  The rules authorize plaintiffs' opponents and supporters of their opponents to evade contribution limits and reporting requirements and to circumvent the prohibition on expenditures of corporate and union treasury funds, thus influencing federal elections in which they are candidates.  *Id.*

21.     Similarly, the Commission's regulations that implement the loophole-closing extension of BCRA's soft money provisions to the funding for certain state and local activities that affect federal elections, including certain get-out-the-vote and voter registration efforts in elections where federal candidates are on the ballot, will directly and personally impact plaintiffs as candidates who run in elections that could be influenced by those very state and local party activities.  Shays Decl. ¶ 6; Meehan Decl. ¶ 6.  In particular, the regulations permit state and

local party committees that support plaintiffs' opponents to evade the restrictions BCRA places on the use of soft money to fund activities that affect federal elections, posing a strong risk that unregulated soft money will again be used in an attempt to influence elections in which plaintiffs are candidates.  *Id.*

22.     Likewise, the Commission's regulation authorizing unrestricted soft-money solicitations by federal officeholders and candidates at state, district, and local party fundraising events directly affects plaintiffs by enabling their election opponents (and other federal officeholders and candidates who support their opponents) to solicit soft money at such party fundraisers for potential use against plaintiffs "without restriction or regulation."  Shays Decl. ¶ 7; Meehan Decl. ¶ 7.  The regulation also affects plaintiffs in their capacities as party members who might be expected to raise soft money for use at the state and local party level.  *Id.*

23.     Many FECA and BCRA provisions require the disclosure of campaign finance information by covered persons and entities.  For example, whether a communication constitutes a "coordinated" expenditure determines whether it is subject to FECA's "contribution" disclosure requirements.  Similarly, activities determined to be outside the definition of FEA can be funded by state and local parties with undisclosed soft money.  If the Commission's regulations do not faithfully implement these disclosure provisions, plaintiffs will be deprived of information to which they are entitled as voters, candidates, and elected officeholders under FECA and BCRA.  Shays Decl. ¶ 8; Meehan Decl. ¶ 8.

Dated this 8th day of December, 2006.

Respectfully submitted,

_____

| | |
|---|---|
| Roger M. Witten (Bar No. 163261)<br>WILMER CUTLER PICKERING<br>    HALE AND DORR LLP<br>399 Park Avenue<br>New York, New York  10022<br>(212) 230-8800 | Charles G. Curtis, Jr. (*pro hac vice*)<br>Michelle M. Umberger (Bar No. 480620)<br>David L. Anstaett (*pro hac vice*)<br>Lissa R. Koop (*pro hac vice*)<br>HELLER EHRMAN LLP<br>One East Main Street, Suite 201<br>Madison, Wisconsin  53703<br>(608) 663-7460 |

| | |
|---|---|
| Randolph D. Moss (Bar No. 417749)<br>WILMER CUTLER PICKERING<br>    HALE AND DORR LLP<br>1875 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20006<br>(202) 663-6000 | Fred Wertheimer (Bar No. 154211)<br>DEMOCRACY 21<br>1825 Eye Street, N.W., Suite 400<br>Washington, D.C.  20006<br>(202) 429-2008 |

Donald J. Simon (Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY LLP
1425 K Street, N.W., Suite 600
Washington, D.C.  20005
(202) 682-0240

*Attorneys for Plaintiffs Christopher Shays*
*and Martin Meehan*

10