# PLAINTIFFS' EXHIBIT 1

# Federal Election Commission Advisory Opinion Number 1982-56

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

October 29, 1982
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
ADVISORY OPINION 1982-56
James P. Seidensticker, Jr.
Legal Counsel for Congressman Andrew Jacobs, Jr.
United States House of Representatives
Washington, D.C. 20515
Dear Mr. Seidensticker:

This responds to your request for an advisory opinion on behalf of Congressman Andrew Jacobs concerning application of the Federal Election Campaign Act of 1971, as amended ("the Act"), to the appearance of Congressman Jacobs in a series of television advertisements in which he endorses a candidate for local office.

Your request sets forth the following facts: Congressman Andrew Jacobs is the incumbent Democratic Congressman from the 10th District in Indiana, which is located entirely within the boundaries of Marion County, Indiana. Congressman Jacobs is also presently a candidate for reelection to Congress from the 10th District in Indiana. He has recently appeared in a series of television advertisements in which be endorses Ann Delaney, a Democratic candidate for Prosecutor of Marion County. A transcript of the advertisement itself, together with a brief description of the visual, is attached to your request and describes the advertisement as follows:

The opening of the spot is a close-up picture of Ann Delaney with the words across the bottom "Paid for by the Ann Delaney for Prosecutor Committee."

The narrator is reciting: "Ann Delaney is the Democrat running for Marion County Prosecutor so you expect the Democrats to recognize her hardhitting courtroom qualifications." Marion County Sheriff Jim Wells, an incumbent candidate for Sheriff then comes around the corner of the County Court House and says: "Ann Delaney turns arrests into convictions. Vote for Ann Delaney." His name is printed across the picture as he makes his comments. Then Congressman Jacobs comes down the steps of the Federal Building with

"Congressman Andy Jacobs" across the picture and
says: "I think Ann Delaney is one of the best
courtroom prosecutors we've ever had in this
country." Then the narrator continues, "but would
you expect her opponent to agree which he did when
he said 'she's a tiger in the courtroom.'" There
is a picture of just a blank with a tiger behind
it and it comes back to Ann Delaney's face in
close-up. The narrator continues: "Vote for the
tiger; vote for Ann Delaney."

You state that the advertisement runs approximately 30 seconds of
which Congressman Jacobs occupies approximately 7 seconds. The
expenditures made to date by the Ann Delaney for Prosecutor
Committee to run the advertisement total $3,000.
The specific questions presented in your request are
whether, under the foregoing circumstances, the Ann Delaney for
Prosecutor Committee has made an in-kind contribution to
Congressman Jacobs' committee for reelection to Congress, and
whether Congressman Jacobs' committee has received an in-kind
contribution and made an expenditure under the Act. You also
inquire as to the proper reporting of this activity.
The Act defines the term "contribution" as any gift,
subscription, loan, advance, or deposit of money or anything of
value made by any person "for the purpose of influencing any
election for Federal office." 2 U.S.C. SS 431(8)(A)(i)
Commission regulations make it clear that the term "anything of
value" includes all in-kind contributions. See 11 CFR
100.7(a)(1)(iii)(A). The Commission has previously recognized
that although media or other public appearances by candidates may
benefit their election campaigns, the person defraying the costs
of such an appearance will not be deemed to have made a
contribution in-kind to the candidate absent an indication that
such payments are made to influence the candidate's election to
Federal office. See Advisory Opinions 1982-15, 1981-37, 1980-30,
1980-28, 1978-4, 1977-42, 1977-31 (as qualified by Advisory
Opinion 1981-37), copies enclosed. In a similar situation where
an incumbent Member of Congress who was a candidate for
reelection endorsed, via a newspaper advertisement, a candidate
for delegate to a national nominating convention, the Commission
held that the political committee paying for the advertisement
would not be deemed to have made an in-kind contribution to the
Member of Congress' campaign so long as: 1) the purpose of the
advertising is to advocate the election of the candidate
receiving the endorsement, rather than that of the Member of
Congress; and 2) the text of the advertisement emphasizes the
election of the candidate being endorsed, and not the reelection
campaign of the Congressman. See Advisory Opinion 1980-28.
Under the circumstances described in your request, it does
not appear that payment of the expenses associated with the
appearance of Congressman Jacobs in the advertisements would

constitute a contribution in-kind by the Ann Delaney for
Prosecutor Committee. You state that the purpose of the
advertisement, as well as of the Congressman's appearance
therein, is to endorse and influence the election of
Mrs. Delaney. Moreover, the content of the advertisement does
not reflect an intent to influence Congressman Jacobs'
reelection. The advertisement identifies the Congressman only as
"Congressman Andy Jacobs". It contains no mention of his own
candidacy, does not advocate his election or the defeat of his
opponent, and contains no solicitation of funds to his campaign.
Accordingly, payment of the costs incurred in connection with
Congressman Jacobs' appearance would not constitute an in-kind
contribution to his campaign and would not be reportable by his
campaign committee.

The Commission expresses no opinion as to the application,
if any, of the Communications Act of 1934, as amended, the
regulations promulgated thereunder by the Federal Communications
Commission, or of any other statutes, including State law, which
are outside the Commission's jurisdiction.

This response constitutes an advisory opinion concerning
application of the Act, or regulations prescribed by the
Commission, to the specific transaction or activity set forth in
your request. See 2 U.S.C. SS 437f.

# PLAINTIFFS' EXHIBIT 2

# Federal Election Commission Advisory Opinion Number 1983-12

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

June 13, 1983
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
ADVISORY OPINION 1983-12
J. Curtis Herge, Esq.
Sedam & Herge
8300 Greensboro Drive
McLean, Virginia 22102
Dear Mr. Herge:

This responds to your letter of March 23, 1983, supplemented by your letter of April 12, 1983, requesting an advisory opinion on behalf of your client, the National Conservative Political Action Committee ("NCPAC"), concerning application of the Federal Election Campaign Act of 1971, as amended ("the Act"), to a proposed Constituent Congratulations Program.

According to your request, NCPAC proposes to produce and broadcast a series of thirty second television messages about incumbent U.S. Senators. These TV spots will be shown in 1983 and 1984. You state that the scripts of the proposed messages will be substantially similar to the following:

Visual Voice
Footage of Member's In (year of election), (name
Inauguralof state) elected (name of
Member) to be its represen-
tative in Washington, D.C. as
(name of state) United States
Senator.
Footage of MemberSince (year of election), U.S.
at Desk Working Senator (name of Member) has
supported legislation to help
(name of state).
Footage of Working(Name of Member) has helped
Laborers bring defense contracts to
(name of state) ... This means
jobs for (name of state) and a
better military for America.
Footage of Member(Name of Member) has fought to
make government more efficient
and less wasteful...saving
the people of (name of state)

tax dollars.
Congratulations (name of state),
you've elected a winner.
(Name of Member) works...for
(name of state).

You further state that film footage of the Senators to be used in
the proposed messages will be obtained from various sources,
including archives, television stations, and the Senators
themselves.1/ You indicate that when film footage is obtained
from the Senator, or when the Senator cooperates in the shooting
of the film, the Senator will be advised as to the intended use
of the film, will be provided a copy of the script of the
proposed message, and will have the right to refuse to
participate in the program.
In addition, you state that the Constituent Congratulations
Program will be administered without respect to the candidacy or
prospective candidacy of its subjects, although you decline to
state how many of the proposed messages will have as their
subjects Senators whose current terms of office expire in 1985.2/
You note that the Senators will be selected on the basis of
whether, in NCPAC's view, "their records in Congress have been
commendable." Based on this factual situation, you state your
view that the cost of producing and broadcasting the messages
would not constitute a contribution or an expenditure under the
Act, and that any such costs should be considered only as
disbursements and reported by NCPAC as such.

1/ With respect to film footage secured from archives or
television stations, it is not clear from your request whether
any coordination, consultation, or contact with the Senator would
be necessary in order to use such film in the NCPAC program. Nor
does the request indicate whether, even if not obligatory, such
coordination would nevertheless occur.
2/ In your letter of April 12, 1983, responding to questions
posed by the Office of General Counsel by letter of April 4, you
declined to state the number of Senators, and the expiration
dates of their current terms, who will be featured in the
described NCPAC program.

The Commission notes initially that all of the subjects of
the proposed broadcasts are incumbent members of the U.S
Senate.3/ In addition, on the basis of your request, as
supplemented, the Commission further assumes that the principal
if not sole focus of the program will be Senators whose terms of
office expire in 1985. (See footnote two.) Of the 33 Senators
whose seats are up in 1984, two have publicly announced that they
will not be seeking reelection. The remaining 31 have either
filed statements of their 1984 candidacy pursuant to 2 U.S.C.
SS 432(e) and (g), or have raised contributions or made
expenditures with respect to 1984 which, in the aggregate, exceed

$5,000, thereby triggering 1984 candidate status. Thus, for purposes of this opinion the Commission will assume that all of the subjects of the proposed broadcasts are currently candidates under the Act.4/

Under the Act and Commission regulations, the term "contribution" means any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office. 2 U.S.C. SS 431(8); 11 CFR 100.7(a)(1). Similarly, the term "expenditure" is defined to include any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing an election for Federal office. 2 U.S.C. SS 431(9) and 11 CFR 100.8(a)(1). Contributions to candidates whether made in monetary form or in kind are subject to limitation under 2 U.S.C. SS 441a(a). Moreover, under SS 441a(a) (7) (B) (i), expenditures by any person in cooperation, consultation, or concert with a candidate are considered contributions to that candidate and accordingly limited as contributions under SS 441a(a)(1) or (a)(2) to either $1,000 or $5,000 respectively.

The question presented by your request is whether payments by NCPAC for the proposed Constituent Congratulations Program

3/ In your letter of April 12, 1983, you state that NCPAC presently proposes that only members of the United States Senate be featured in the program.

4/ In view of the assumed 1984 candidate status of the Senators to be included in the NCPAC program, the Commission does not reach or address, either explicitly or by implication, any issues with respect to whether expenditures for the proposed programs would in other circumstances result in candidate status, or be attributed to the $5,000 thresholds for candidate status, under 2 U.S.C. SS 431(2) and 11 CFR 100.3(a).

would be considered as having been made for the purpose of influencing a Federal election and would therefore constitute both expenditures and contributions in-kind under the Act if made in coordination or consultation with a candidate. To the extent that coordination or consultation with the subject Senators will take place in order to obtain film footage for use in the broadcasts or for other purposes incident to the subject program, and in light of the facts presented in your request, the Commission concludes that any payments for the proposed messages would constitute expenditures by NCPAC and contributions in-kind to the featured candidates. See 2 U.S.C. SS 441a(a)(7)(B). On the other hand, to the extent film footage for the program does not consist of "campaign materials" and is obtained from, "archives" or "television stations"5/ without any cooperation, consultation, or contact with the subject Senator or any of his or her agents, and to the further extent the program is otherwise implemented without such involvement by the subject Senator or any of his or

her agents, then payments for the subject program would not come within 2 U.S.C. SS 441a(a)(7)(B) and thus would not be contributions in kind. Such payments would, however, be reportable disbursements by NCPAC. 2 U.S.C. SS 434(b)(4) and (b)(6)(B), 11 CFR 104.3(b)(3).

The Commission reaches this conclusion for a number of reasons. First, NCPAC's status as a political committee within the purview of the Act, and as a "political organization" for Federal income tax purposes, see 26 U.S.C. SS 527(e), support the inference that its payments to produce and broadcast the proposed messages are for the purpose of influencing the 1984 Senate elections. The purpose and functions of an organizational entity are material and relevant to the Commission's characterization of the underlying purpose of a specific activity or program of that entity. See Advisory Opinion 1978-56, copy enclosed, in which the Commission held that a national organization's expenses incident to the activities of a candidate, which he pursued in his capacity as chairman of the organization that did not participate in Federal elections, would not be considered contributions to the candidate or expenditures by the organization to influence his nomination.

5/ Since your request, as supplemented, neither describes nor explains the circumstances under which NCPAC may obtain film footage from "archives" or "television stations," nor gives the original source and content of such footage, the Commission does not reach any issues and expresses no opinion concerning the application of 2 U.S.C. SS 441a(a)(7)(B)(ii) to the subject program.

In addition, the content of the proposed messages indicate that an election influencing purpose undergirds the program. Each 30 second spot will prominently feature video footage of a Senator with mention of his or her name five times. The spots include eight verbal references to the State represented by the Senator and make explicit, complimentary comments congratulating the electorates in those states for electing the Senator in a prior election. The fact of a previous election is mentioned three times. These specific references to the Senator's identity, home state, past election, and commendable service to the state are in marked contrast to the cryptic, generalized mention of issues that occurs in the spots. Compare Advisory Opinion 1977-54 (copy enclosed), in which the Commission held that funds contributed by corporations (and others) to advocate opposition to ratification of the Panama Canal treaties would not be considered contributions, even though the issue advocacy campaign was headed by a Congressional candidate, because the focus of the issue advocacy was not limited to the candidate's electorate, and the issue advocacy campaign was not combined with electioneering by the candidate. For other examples of activities held not to be for the purpose of influencing an

election, even though involving the participation of an individual who was a candidate at the time, see Advisory Opinions 1978-4 and 1982-56, copies enclosed. Moreover, the timing of the proposed broadcast, which will be shown during the eighteen months prior to the 1984 general election, is another feature of the program supporting the view that the messages will be for the purpose of influencing a Federal election.

Finally, the Commission notes that the activity in question does not appear to have any specific and significant non-election related aspects that might distinguish it from election influencing activity. No such characteristics have been identified by the requestor. This contrasts sharply with situations considered by the Commission in several prior advisory opinions. For example, in Advisory Opinion 1981-37 (copy enclosed), the Commission held that where the purpose of an activity (in that case a public discussion program moderated by a Congressman) was not to influence the nomination or election of a candidate for Federal office but rather was in connection with the duties of a Federal officeholder, payments for advertising or sponsorship would not result in a contribution or expenditure under the Act. Similarly, in Advisory Opinion 1978-88 (copy enclosed), the fact that the purpose of a candidate's appearance was to make an appeal for funds for a charitable, nonpolitical purpose was central to the Commission's holding that no contribution to the candidate resulted from such an appearance. See also Advisory Opinion 1977-42 (copy enclosed), which recognized that an individual who was also a candidate could, under certain conditions, pursue employment with a broadcast station that would not be viewed as having an election influencing purpose.

Thus, the Commission has recognized that even though certain appearances and activities by candidates may have election related aspects and may indirectly benefit their election campaigns, payments by non-political committee entities to finance such activity will not necessarily be deemed to be for the purpose of influencing an election. The instant case is, however, distinguishable from the cited opinions. The Commission concludes that the proposed messages to be financed by NCPAC are designed to influence the viewers' choices in an election, and therefore the payments to produce and broadcast such programs must be considered to be for the purpose of influencing a Federal election. See Advisory Opinion 1980-106 (copy enclosed). Moreover, to the extent the stated coordination and consultation occurs in obtaining the film clips for NCPAC's use, the expenditures will also result in contributions by NCPAC to the respective Senate candidates who are featured. As contributions, the expenditures will be limited by 2 U.S.C. SS 441a(a). See 2 U.S.C. SS 441a(a)(7)(B) and compare Advisory Opinion 1981-44. This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activity set forth in

your request. See 2 U.S.C. SS 437f.

# PLAINTIFFS' EXHIBIT 3

# Federal Election Commission Advisory Opinion Number 1988-22

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

July 5, 1988
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
ADVISORY OPINION 1988-22
J. Miles Reid
McCormick, Barstow, Sheppard, Wayne a Carruth
P.O. Box 24013
Fresno, California 93779-4013
Dear Mr. Reid:
This responds to your letters of March 31 and May 4, 1988,
requesting an advisory opinion on behalf of the San Joaquin
Valley Republican Associates ("Republican Associates") concerning
application of the Federal Election Campaign Act of 1971, as
amended (the "Act"), and Commission regulations to proposed
activities involving operation of a library, publication of a
newsletter, and sponsorship of debates and luncheons.
Your letters explain that Republican Associates is a non-profit,
non-member, mutual benefit corporation under California
law, and is prohibited by its charter from engaging in "business
activities." You state that Republican Associates is a tax
exempt "political organization" under section 527 of the Internal
Revenue Code, and that all of its income has been for tax-exempt
functions, but that its charter does not permit it to endorse or
financially contribute to political candidates.1/ You also state
that Republican Associates may eventually seek to change its
status from a section 527 organization to a section 501(c)(4)

1/ The term "Political organization" is defined by the Code as "a
party, committee, association, fund, or other organization
(whether or not incorporated) organized and operated primarily for
the purpose of directly or indirectly accepting contributions or
making expenditures, or both, for an exempt function"; "exempt
function" is defined as "influencing or attempting to influence
the selection, nomination, election, or appointment of any
individual to any Federal, State, or local public office or office
in a political organization ..." 26 U.S.C. SS 527(e)(1) and (2).

organization under the Code. As a 501(c)(4) organization,
Republican Associates would be precluded by the general
prohibitions of 2 U.S.C. SS 441b from financing activity "in
connection with" Federal elections from its general corporate

treasury. A section 501(c)(4) organization may, however, make expenditures and contributions to influence Federal elections through a separate segregated fund. 2 U.S.C. SS 441b(b)(2). See Advisory Opinion 1984-17.

You state that Republican Associates was formed for the express purpose of promoting political ideas, that it has "no ties" to any political party and, as previously noted, that it is "unable to endorse or make financial contributions to any political candidate." Republican Associates' "Articles of Incorporation" describe its "specific purpose" as being "to help elect more Republicans to office by enhancing significantly the visibility of the Republican Party, Republican ideas, Republican thought and Republican personalities within the San Joaquin Valley of California."

You propose to engage in four types of activities that, as discussed below, may involve the providing of some benefit to candidates for Federal office: publication and distribution of a Periodical newsletter, sponsorship of luncheons, sponsorship of debates and operation of a "campaign" library. You ask whether, under the Act and regulations, the financing of such activities by Republican Associates would constitute "contributions" to or "expenditures" on behalf of any candidates for Federal office, and, if it finances such activities, whether receipts of Republican Associates would constitute "contributions" to it. Under the Act and Commission regulations, the term "contribution" means any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office. 2 U.S.C. SS 431(8)(A); 11 CFR 100.7(a)(1). Similarly, the term "expenditure" is defined to include any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office. 2 U.S.C. SS 431(9)(A); 11 CFR 100.8(a)(1). Contributions to candidates, whether made in monetary form or "in-kind," are subject to limitation under 2 U.S.C. SS 441a(a). Moreover, expenditures by any person in cooperation, consultation or concert with a candidate are considered contributions to that candidate. 2 U.S.C. SS 441a(a)(7)(B)(i).

Your questions necessarily raise another issue: if the proposed activities or any other activities engaged in by Republican Associates are considered to involve contributions or expenditures "for the purpose of influencing any election for Federal office" under the Act and are made or received in amounts in excess of $1000 in a calendar year, Republican Associates would then be subject to registration and reporting requirements as a "political committee" under the Act. 2 U.S.C. SS 431(4)(a); 11 CFR 100.5(a).2/ For purposes of this opinion, the Commission is not treating Republican Associates as a subordinate committee of a State committee of a political party (see 2 U.S.C. SS 441a(d)) or a local committee of a political party (see 2 U.S.C. SS 431(4)(C); 431(8)(B)(v), (x), (xii); 431(9)(B)(iv), (viii), (ix)). See also

11 CFR 110.7(b), (c); 100.5(e)(4); 2 U.S.C. SS 441a(a)(5) ; 11 CFR
100.5(g).

Your request also broadly raises the question of whether
Republican Associates falls within the exemption from the Act's
prohibition against corporate contributions or expenditures "in
connection with" federal elections prescribed by the U.S. Supreme
Court for independent spending by certain incorporated political
organizations. FEC v. Massachusetts Citizens for Life, Inc.,
107 S.Ct. 616 (1986) ("MCFL"). See 2 U.S.C. SS 441b. Your
description of Republican Associates generally tracks the three
features" of MCFL that the Court found "essential" to its
holding: 1) formed for the express purpose of promoting political
ideas and not engaged in business activities, 2) having no
shareholders or other' persons affiliated so as to have a claim on

2/ Commission regulations permit a political committee that
finances political activity in connection with Federal, State and
local elections to either establish a separate Federal account
that is used for all its receipts and disbursements in Federal
elections or to establish a political committee that will receive
only contributions subject to the prohibitions and limitations of
the Act. 11 CFR 102.5(a)(1). Where a political committee
establishes a separate Federal account, such an account shall
comply with the registration and reporting requirements of the
Act. See generally 11 CFR Parts 102 and 104. Only funds subject
to the prohibitions and limitations of the Act shall be deposited
in such separate Federal account. 11 CFR 102.5(a)(2). All
disbursements, contributions, expenditures, and transfers by the
committee in connection with any Federal election shall be made
from its Federal account. Moreover, no transfers may be made to
the Federal account from any other account maintained by such
organization for the purpose of financing activity in connection
with non-federal elections. 11 CFR 102.5(a)(1). Pursuant to
11 CFR 106.1(c) ,administrative expenses shall be allocated
between the Federal account and any other account maintained by
the political committee for the purpose of financing activity in
connection with non-federal elections. 11 CFR 102.5(a)(1)(i).

its assets or earnings and 3) not established by nor accepting
donations from, business corporations or labor unions (under one
of two hypothetical "alternatives" that your request proposes for
your sources of funding). MCFL, 107 S.Ct. at 631.

The Commission concludes, however, that Republican Associates
would not be entitled to the exception drawn in MCFL that exempts
"independent" spending of voluntary political organizations from
either the prohibitions of SS 441b or the requirements of
registering and reporting a "political committee." First, the
Commission observes that some of Republican Associates' proposed
activity on behalf of candidates would not be "independent
expenditures," but rather would involve coordination with
candidates and result in "in-kind contributions" to candidates.

Second, and more importantly, the Court in MCFL was addressing political organizations "that only occasionally engage in independent spending on behalf of candidates." Id. at 630. The Court stated:

[S]hould MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee ... As such, it would automatically be subject to the obligations and restrictions applicable to those groups whose primary objective is to influence political campaigns.

Id. Therefore, Republican Associates will be required to register a political committee, or register itself as a political committee, if its proposed activity, or any other political activity it conducts, constitutes contributions or expenditures under the Act and crosses the $1000 per year threshold.3/
1. Republican Associates Newsletter
Republican Associates proposes to publish and distribute a monthly or quarterly newsletter that will discuss political events and activity that may be of interest to supporters of the Republican party, including discussions of candidates and campaigns for Federal office and opportunities for involvement in such campaigns. As your request suggests, and the newsletter examples you provided indicate, discussions of candidates may

3/ The Commission notes that its regulations specifically allow political committees to incorporate "for liability purposes only." 11 CFR 114.12(a). See 26 U.S.C. SS 527(e)(1) .

not, or need not necessarily, include statements of actual endorsement or explicit advocacy, but may include statements generally supporting or promoting Republican candidates or criticizing their Democratic opponents. The newsletter will also regularly feature a calendar which lists meetings and events sponsored by various candidates for Federal and other elective offices, by political party organizations, and by Republican Associates itself. Republican Associates will distribute the newsletter to persons who are contributors, who have attended previous Republican Associates' events, and who are prospects for contributing or attending in the future.
Preliminarily, the Commission notes that the proposed newsletter would not appear to fall within the exception to the definition of "expenditure" known as the "press exemption."
2 U.S.C. SS 431(9)(B)(i). It does not seem from your description that the newsletter would be a regularized periodical deriving revenues from subscriptions or advertising, but rather a free communication that Republican Associates will send out to

encourage continued or potential financial and organizational support from among the general public. See Advisory Opinion 1980-109. Furthermore, if Republican Associates' activities trigger registration and reporting requirements as a political committee under the Act, the express statutory language of the "press exemption" excludes publications of political committees. Also, Commission regulations state that expenditures made on behalf of more than one candidate shall be attributed to each candidate in proportion to, and shall be reported to reflect, the benefit reasonably expected to be derived. 11 CFR 106.1(a). In previous advisory opinions involving political party committee newsletter activities, the Commission concluded that a reasonable allocation basis would be the percentage of column inches or space in the newsletter which pertained to Federal elections or candidates for Federal office. Advisory Opinions 1981-3 and 1978-46. Accordingly, payment for costs associated with those candidate-related statements or references in Republican Associates' newsletters that should be attributed to Federal candidates as "contributions" or "expenditures" under the Act should be allocated to those candidates or to a Federal "account," as discussed below, based on column inches in the newsletter or on some other reasonable basis that reflects the benefit reasonably expected to be derived.

The Commission concludes that differing legal consequences will result under the Act and regulations for candidate-related statements or references appearing in the proposed newsletters, depending upon the nature of the statement and whether such statement is made in coordination with the Federal candidate to whom the statement refers. As described below, those consequences determine whether the costs incurred in publishing the newsletters containing such statements or references will be considered to be contributions to or expenditures on behalf of, and, therefore, allocable to, candidates for Federal office, and further determine if or how such costs must be reported to the Commission and whether those costs count toward the threshold for incurring political committee obligations.

a. Independent expenditures.

If statements, comments or references regarding clearly identified candidates appear in the newsletter and expressly advocate their election or defeat, or solicit contributions on their behalf, and such communications are not made with the cooperation, consultation or prior consent of, or at the request or suggestion of, the candidates or their agents, then the payments for the allocable costs incurred in making the communications will constitute "independent expenditures" on behalf of the identified candidates. 2 U.S.C. SS 431(17); 11 CFR 109.1. See Advisory Opinion 1979-80. All such payments count toward the $1000 political committee threshold for registration and reporting requirements, since they constitute "expenditures" on behalf of candidates under the Act.

If such expenditures on behalf of any one candidate exceed

$250 and Republican Associates has not otherwise qualified or does not thereby qualify for reporting obligations as a political committee, then the payments must be reported by letter or other communication to the Commission as an "independent expenditure" on behalf of that candidate or candidates; if such expenditures on behalf of any one candidate do not exceed $250, and Republican Associates does not qualify for reporting obligations as a political committee, then no reporting obligation is incurred on the basis of that activity alone. 2 U.S.C. SS 434(c)(1) and (2); 11 CFR 105.4 and 109.2.

If Republican Associates qualifies for reporting obligations as a political committee, such payments to any person aggregating in excess of $200 in a calendar year must be reported on Schedule E as itemized "independent expenditures" on behalf of that candidate or candidates, and such payments to any person not exceeding $200 in a calendar year must be reported on Schedule E as unitemized. 2 U.S.C. SS 434(b)(6)(B)(iii); 11 CFR 104.3(b)(3)(vii).

b. In-kind contributions.

If statements, comments or references regarding clearly identified candidates appear in the newsletter and are made with the cooperation, consultation or prior consent of, or at the request or suggestion of, the candidates or their agents, regardless of whether such references contain "express advocacy" or solicitations for contributions, then the payment for allocable costs incurred in making the communications will constitute "expenditures" by Republican Associates and "in-kind contributions" to the identified candidates. 2 U.S.C. SS 441a(a)(7)(B) . All such payments count toward the $1000 "political committee" threshold for registration and reporting requirements.

As presented by your proposed and sample newsletters, reportable "in-kind contributions" to candidates would include those instances where," in coordination with candidates, newsletters contained substantive statements generally favoring a candidate or criticizing his opponent or contained references to a candidate's campaign events in a scheduling feature. The Commission bases its conclusion on the presumption that the financing of a communication to the general public, not within the "press exemption," that discusses or mentions a candidate in an election-related context and is undertaken in coordination with the candidate or his campaign is "for the purpose of influencing a federal election." See Advisory Opinion 983-12. Such a communication made in coordination with a candidate presumptively confers "something of value" received by the candidate so as to constitute an attributable "contribution," even though the value of the benefit so conferred may be relatively minor. Given the nature and purposes of your organization as described in your request, it is unlikely that such a presumption of a "purpose of influencing a Federal election" could be rebutted with reference to newsletter activity undertaken in coordination with Federal

candidates. Compare Advisory Opinions 1982-56 and 1978-56.

c. Expenditures lacking express advocacy or coordination.

If statements, comments or references regarding clearly identified candidates appear in the newsletter and do not expressly advocate their election or defeat, nor solicit contributions on their behalf, and such communications are not made with the cooperation, consultation or prior consent of, or at the request or suggestion of, the candidates or their agents, then the payment for allocable costs incurred in making these types of communications will constitute operating expenses generally allocable to federal political activity. Payments for such communications are not specifically allocable to candidates, since they lack "express advocacy" or a solicitation for contributions so as to constitute "independent expenditures," and lack coordination with a candidate in their making, or any other indicia of receipt, so as to constitute "in-kind contributions."4/ Expenses associated with these communications nevertheless constitute "expenditures" for federal political activity within the meaning of the Act, so as to count toward the political committee threshold and to require reporting if made by a political committee.

Payments for these communications that are allocable to federal political activity must be made from funds raised permissibly under the Act and regulations. 11 CFR 102.5(a). If Republican Associates has qualified as a political committee, or crosses the $1000 threshold by engaging in this activity, payments for these communications must be made from a separate federal account or from a political committee which has accepted only contributions subject to the prohibitions and limitations of the Act. 11 CFR 102.5 (a)(1). If Republican Associates does not qualify as a political committee and does not maintain a federal account, it must be able to demonstrate through a reasonable accounting method that sufficient funds permissible under the Act were received by it to permit payments for these communications. 11 CFR 102.5(b)(1)(ii).

Republican Associates Sponsored Luncheons

You state that Republican Associates will sponsor monthly luncheons for those persons who receive the newsletter. Republican Associates will charge attendees an amount that covers the cost of the lunch and the facilities and will keep any excess revenue. The luncheons will feature speakers, some of whom may be candidates for Federal office. Candidates will be permitted to make their literature available, but no campaign posters or other political decorations will be permitted in the facility.

Additionally, Republican Associates will request that candidates not solicit contributions, but will permit requests for campaign volunteers.

A payment of costs to sponsor and finance public appearances by candidates for Federal office that are "campaign-related" is considered made "for the purpose of influencing Federal elections"

4/ The previously cited opinions regarding allocation of newsletter expenses to candidates, Advisory Opinions 1981-3 and 1978-46, involved political party committees, for which coordination with candidates is presumed and "independence" precluded. See FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 28, n.1, (1981).

and to constitute a "contribution" to or "expenditure" on behalf of such candidates, unless such payment is specifically exempted by the Act or regulations. See Advisory Opinions 1986-37 and 1986-26. As sponsor of these luncheons, Republican Associates appears to be responsible for payment of the costs associated with the event and will keep any profits and, presumably, cover any shortages arising out of the receipts from luncheon attendees. The Commission has considered the nature and purposes of an event sponsored by a group and involving the active participation of a candidate for Federal office to determine if such an event is campaign-related. The Commission has stated that if an event involves (i) the solicitation of political contributions or (ii) the express advocacy of a candidate's election or defeat, then the event would be viewed as a campaign event for the purpose of influencing a Federal election; the Commission has also concluded that the absence of express advocacy or solicitations will not preclude a determination that public appearances are campaign-related. See Advisory Opinions 1986-37, 1984-13, 1982-50, and 1982-16.

The active participation by candidates for Federal office as featured speakers at luncheons sponsored by Republican Associates would involve coordination with the candidate in the providing to and receipt of a benefit for the candidate. Payment of the costs of such an appearance would presumptively constitute a "contribution" by Republican Associates to the candidate. Given the nature and purposes of your organization as described in your request, it is unlikely that such a presumption of a "purpose of influencing a Federal election" could be rebutted with reference to your sponsoring of candidate appearances. Compare Advisory Opinions 1931-37, 1981-26, 1930-89 and 1978-4. Payments for luncheon expenses constituting "contributions" to candidates would, of course, count toward the $1000 threshold for qualifying as a political committee and be reportable.

Republican Associates Sponsored Debates

Republican Associates proposes to sponsor and finance debates between candidates for Federal office. In advance of the debates, you will request that candidates not make any solicitation for contributions, but candidates will be permitted to make requests for campaign volunteers.

Commission regulations provide that payments made by a qualified non-profit corporation to finance a nonpartisan candidate debate are exempted from the definition of "contribution" or "expenditure" under the Act. 11 CFR 100.7(b)(21) and 100.3(b)(23). See also 11 CFR 110.13 and

114.4(e). Your request indicates that you are "contemplating seeking status as a 501(c)(4) organization" but are not presently a qualified nonprofit corporation within this exemption. Therefore, sponsorship by Republican Associates of debates involving candidates for Federal office would be considered in the same manner as sponsorship of candidate appearances (discussed above), with an increased likelihood that such appearances would be viewed as campaign-related and that payments to fund such appearances would constitute "contributions" to the participating Federal candidates.

Republican Associates Library

Republican Associates proposes to maintain a library composed of publications concerning "campaign management" and clippings from newspapers and other periodicals related to political events, personalities and issues. Republican Associates will also obtain lists of campaign contributors and registered voters from public records and make those lists available to interested persons. Although use of library materials will be free of charge to all registered Republicans, persons using the library must pay for all copies requested, and Republican Associates will not conduct any research activities on behalf of candidates.

The Commission concludes that funding of a "campaign" library by Republican Associates would constitute general administrative expenses, incurred in the context of its day-to-day operation, and not "contributions" or "expenditures" attributable to any particular Federal candidate. See 11 CFR 106.1(c). If Republican Associates meets the threshold for "political committee" reporting obligations, the operating expenses incurred by Republican Associates to maintain the library would require allocation between federal and non-federal functions on a reasonable basis, and must be so reported. See 11 CFR 106.1(e). The allocable federal share of such expenses must be paid from funds raised permissibly under the Act and regulations for financing federal political activity, and made from a separate federal account or as a political committee which has accepted only contributions subject to the prohibitions and limitations of the Act. See 11 CFR 102.5. Furthermore, the Commission concludes that if Republican Associates provides additional library services for a federal candidate that result from the request of or coordination with such candidate, any additional expenses incurred in providing such services would be attributable to that candidate as an in-kind contribution. See 11 CFR 106.1(a) and 106.1(c).

This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activity set forth in your request.

# PLAINTIFFS' EXHIBIT 4

# Federal Election Commission Advisory Opinion Number 1990-5

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

April 27, 1990

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

ADVISORY OPINION 1990-5

Margaret R. Mueller
8848 Music Street
Novelty, Ohio 44072

Dear Ms. Mueller:

This responds to your letters dated March 12, 1990, and March 24, 1990, requesting an advisory opinion concerning the application of the Federal Election Campaign Act of 1971, as amended ("the Act"), and Commission regulations to publication of a newsletter discussing public policy issues during your campaign for Federal office.

You state that you are a Republican candidate for the U.S. House of Representatives in the 11th District of Ohio, and that you also ran for that seat in 1986 and 1988.1/ Since March of 1989, Music Street Publishing Company, which you own, has been publishing a monthly newsletter called "SPEAKOUT!" You state the newsletter is intended to provide a non-partisan forum for persons whom you met during the 1988 campaign for Congress to speak out on community and governmental problems and issues of general public interest.

Articles appearing in the newsletter have included opinion pieces (including many written by you) dealing with different issues of public concern, such as drug use, taxes, toxic waste cleanup and other environmental matters, and, in particular, Congressional term limitation. Some articles specifically refer to problems in the 11th Congressional District or the northeast corner of Ohio.2/ You write

----------

1/ Your Statement of Candidacy and a Statement of Organization for the 1990 election campaign were received by the Clerk of the House on March 27, 1990. It appears from your filings that your principal campaign committee for the 1986 and 1988 elections will continue to function

as your principal campaign committee for 1990.

2/ For example, the February, 1990, issue contains an article on the growing of marijuana in the district entitled "11th District Shocker," and a questionnaire which includes a question making reference to toxic waste dumps in the 11th District.

monthly editorials expressing your views that are intended to encourage differing responses. Newsletters also contain humor pieces, lists of little known facts, investment advice and other miscellaneous information, and most issues have also included a notice of a SPEAKOUT! meeting to be held each month.

The newsletter has contained several articles regarding Congressional term limitation that were reprinted from other sources and headlined with the title of an organization named "Coalition to End the Permanent Congress."3/ You have also published an article soliciting donations to the group and an editorial written by you endorsing the group's positions on issues. You say you wish to continue to use the name of the organization in the newsletter.

You state that newsletter publication has been funded by your personal funds and through the sale of advertisements.4/ According to the newsletters' masthead, a subscription may be purchased at a price of $20 for 12 monthly issues.

You say you "want to keep the paper going because it is just catching on after a year," and that you would continue publishing the newsletter regardless of whether you are elected to Congress. You state that, during the present campaign, you will "keep it nonpartisan and probably emphasize local and state issues so the paper does not get clouded with federal issues which might be related to my running." It appears, therefore, that you wish to continue your publication as an activity unrelated to the campaign.

You ask whether you may continue publishing the newsletter during your 1990 campaign for Congress. Your request raises the question of whether the Commission considers operating expenses of publishing your newsletter to be expenditures for the purpose of influencing a Federal election under the Act and, therefore, whether payments for such expenses by any person constitute contributions to a Federal candidate under the Act. 2 U.S.C. Sc431(8)(A)(i) and Sc431(9)(A)(i); 11 CFR

----------

3/ You describe the organization, of which you are a board member, as a bipartisan group advocating the limiting of Congressional tenure to 12 years, outlawing political action committees and cutting the franking privilege. You state that the Coalition "has no money to support any candidate"

but "would favor anyone who would End the Permanent Congress." The Commission assumes from your description that the Coalition is not engaged in supporting the election or defeat of specific Federal candidates and is not a "political committee" under the Act.

4/ You state that "no big corporations" have placed ads and that the advertisers have been small businesses. A review of the newsletters submitted by you indicates that a number of advertisements have been paid for by corporations.

100.7(a)(1) and 100.8(a)(1).5/ Your inquiry presents the Commission with the difficult task of reconciling your status as a candidate for Federal office with the assertedly nonpartisan nature of your proposed newsletter publication and distribution activity.

The Commission has frequently considered whether particular activities involving the participation of a Federal candidate, or communications referring to a Federal candidate, result in a contribution to or expenditure on behalf of such a candidate under the Act. The Commission has determined that financing such activities will result in a contribution to or expenditure on behalf of a candidate if the activities involve (i) the solicitation, making or acceptance of contributions to the candidate's campaign, or (ii) communications expressly advocating the nomination, election or defeat of any candidate. Advisory Opinions 1988-27, 1986-37, 1986-26, 1982-56, 1981-37, 1980-22, 1978-56, 1978-15, 1977-54 and 1977-42. The Commission has also indicated that the absence of solicitations for contributions or express advocacy regarding candidates will not preclude a determination that an activity is "campaign-related." Advisory Opinions 1988-27, 1986-37, 1986-26, 1984-13 and 1983-12.

In prior opinions, the Commission has concluded that contributions or expenditures for Federal candidates would not result in circumstances involving candidates serving as chairpersons of political, charitable and issue advocacy organizations (Advisory Opinions 1978-56, 1978-15, and 1977-54, respectively), a candidate appearance endorsing a candidate for local office in television advertisements (Advisory Opinion 1982-56), and a candidate hosting a radio public affairs program (Advisory Opinion 1977-42). The Commission has rarely faced the question of whether candidate involvement is campaign-related, however, in the factual context of activity sponsored or funded by the candidate personally.6/

----------

5/ The publication of a newsletter or small newspaper raises the issue of application of the exemption from treatment as an expenditure or contribution for newspapers, magazines or other regularly published periodicals ("press exemption"). 2 U.S.C. Sc431(9)(B)(i); 11 CFR 100.7(b)(2) and 100.8(b)(2). See

Advisory Opinion 1980-109. The express statutory language of the exemption, however, excludes publications owned by the candidate. By its own terms, the "press exemption" would not be applicable to your newsletter under the facts you have presented.

6/ Advisory Opinion 1978-72 involved a candidate who proposed to publish and sell pamphlets, on a nationwide basis, that set out his views on several philosophical questions. The Commission concluded that receipts from sales of the pamphlets would not constitute contributions under the Act, nor would payments by the candidate be expenditures, as long as the contents of the pamphlets, and advertising for them, did not include solicitations for the candidate's campaign or express advocacy of the election or defeat of any clearly identified

In Advisory Opinion 1983-12, the Commission reviewed a group's proposal to produce and air television commercials that included footage of particular U.S. Senators, comments about a Senator's record in office and a message congratulating the citizens of the appropriate state for having elected their Senator. The Commission observed in that opinion:

... the Commission has recognized that even though certain appearances and activities by candidates may have election related aspects and may indirectly benefit their election campaigns, payments by non-political committee entities to finance such activity will not necessarily be deemed to be for the purpose of influencing an election.

The Commission distinguished its prior opinions to conclude, however, that the portion of the proposed activity involving participation of candidates or their campaigns in providing the film footage would render advertisements produced and aired in cooperation with the candidates contributions for the purpose of influencing those candidates' elections under the Act. Several factual elements presented in that request were signficant in the Commission reaching its conclusion: the requestor was a political committee actively engaged in making contributions to or expenditures on behalf of candidates; the content of the proposed advertising messages made reference to the Senators' previous election and the voters' role in electing a praiseworthy officeholder; the ads were to be run during the time period preceding the 1984 elections; and the activity in question "[did] not appear to have any specific and significant non-election related aspects that might distinguish it from election influencing activity." Compare Advisory Opinion 1984-13 (Congressional candidates of one political party invited to speak at a meeting of an incorporated trade association).

The significance of candidate involvement in activity for which an inference of campaign purpose could be drawn was also noted by the Commission in Advisory Opinion 1988-22, involving proposed newsletter activities by a partisan organization. The Commission described the following legal consequences of activity undertaken in coordination with a candidate's campaign:

If statements, comments or references regarding clearly identified candidates appear in the newsletter and are made with the

----------

(Footnote 6 continued from previous page) candidate. The Commission viewed receipts from the endeavor as "earned business income," and noted the requestor's assertion that "very little of the proceeds or political effect would be applicable to [his] local campaign."

cooperation, consultation or prior consent of, or at the request or suggestion of, the candidates or their agents, regardless of whether such references contain "express advocacy" or solicitations for contributions, then the payment for allocable costs incurred in making the communications will constitute "expenditures" by [the organization] and "in-kind contributions" to the identified candidates. 2 U.S.C. Sc441a(a)(7)(B) ... As presented by your proposed and sample newsletters, reportable "in-kind contributions" to candidates would include those instances where, in coordination with candidates, newsletters contained substantive statements generally favoring a candidate or criticizing his opponent or contained references to a candidate's campaign events in a scheduling feature. The Commission bases its conclusion on the presumption that the financing of a communication to the general public, not within the "press exemption," that discusses or mentions a candidate in an election-related context and is undertaken in coordination with the candidate or his campaign is "for the purpose of influencing a federal election." See Advisory Opinion 1983-12. Such a communication made in coordination with a candidate presumptively confers "something of value" received by the candidate so as to constitute an attributable "contribution," even though the value of the benefit so conferred may be relatively minor.

Given the nature and purposes of your organization as described in your request, it is unlikely that such a presumption of a "purpose of influencing a Federal election" could be rebutted with reference to newsletter activity undertaken in coordination with Federal candidates. Compare Advisory Opinions 1982-56 and 1978-56.

Here, publication of the newsletter has been originated, sponsored, implemented and funded by you, a current candidate for Federal office. SPEAKOUT! was apparently inspired by your experiences as a previous candidate for Congress. It is sent primarily to persons whom you encountered during your prior campaign, many of whom may be potential supporters of your candidacy. Persons involved in your campaign for Congress are also apparently involved in publishing your newsletter. The contents of the newsletters include articles concerning public policy issues that may broadly be related to local and national political concerns, including the makeup of Congress. Therefore, any reference to or discussion of your candidacy or campaign in the newsletter, or presentation of policy issues or opinions closely associated with you or your campaign, would be inevitably perceived by readers as promoting your candidacy, and viewed by the Commission as election-related and subject to the Act.

Editions of the newsletters that you have distributed thus far do not mention your candidacy or campaign for Congress, and, taken alone, may not reveal an apparent or objectively recognizable "purpose to influence" your Congressional race or any particular election to Federal office.7/ The content of the newsletters does suggest other significant purposes of informing the public about current issues of public interest and encouraging discussion of such issues.8/ Although these purposes are not inherently election-related activity and publication of your newsletter is an ongoing enterprise, continued publication of the newsletter since you have become a candidate could potentially be used to advance your candidacy.

The Commission concludes that the expenses incurred in the publication and distribution of your proposed newsletters would be considered expenditures for the purpose of influencing your election to Congress if: (1) direct or indirect reference is made to the candidacy, campaign or qualifications for public office of you or your opponent; (2) articles or editorials are published referring to your views on public policy issues, or those of your opponent, or referring to issues raised in the campaign, whether written by you or anyone

----------

7/ You submitted a copy of a March, 1990, issue which was printed but not distributed. This issue contained a front page article announcing your 1990 candidacy for Congress and featuring your picture, and a full-page article written by

your husband advocating your candidacy. The article
announcing your candidacy contains a statement of your
platform that refers to the Coalition to End the
Permanent Congress. You state that you had 10,000 copies
of this issue printed, but that you sent none out and threw
them away. Instead, you sent out an issue that contained
no references to your candidacy.

8/ Disseminating information and expressing viewpoints
about issues of public policy and community interest are, of
course, strongly protected elements of free speech under
the First Amendment. Buckley v. Valeo, 424 U.S. 1,
42, n. 50 (1976). The U.S. Supreme Court has upheld the
jurisdiction of the FECA in regulating the financing of
similar speech when engaged in by candidates for Federal
office, or groups supporting Federal candidates, "for the
purpose of influencing a Federal election." 2 U.S.C.
Sc431(9)(A)(i); see Buckley, supra, at 46-7, n. 53.
Although the Commission cannot ignore a campaign-related
purpose for types of activity for which no other purpose is
plausible, neither can it impute such purpose to
Constitutionally protected activity lacking an identifiable
nexus to support of a candidate.

else;9/ or (3) distribution of the newsletter is expanded
significantly
beyond its present audience, or in any manner that otherwise indicates
utilization of the newsletter as a campaign communication. The
Commission concludes that each edition of the newsletter should be
viewed separately and in its entirety in determining whether a
newsletter would be considered an expenditure for your campaign. Any
campaign-related content within a particular edition would render
expenses of publishing that edition a campaign expenditure.10/

Publication and distribution of issue content newsletters on an
ongoing basis, and absent the elements described above, would not be
viewed as conferring recognizable benefit or value upon your campaign
for Congress sufficient to invoke the jurisdiction of the Act. The
Commission would not necessarily view continued distribution of this
type of newsletter as campaign-related activity, constituting
expenditures under the Act, however, simply because you have been
identified with its creation or serve as its editor, or because your
name continues to be identified on its masthead as its editor.
Advisory Opinions 1978-56, 1978-15 and 1977-54. See also Advisory
Opinion 1985-38.

You may, of course, publish campaign-related editions of the
newsletter as an activity of the campaign. Your committee would then
assume the costs for that newsletter edition, either directly making
the payments to the providers of goods and services for the newsletter
or paying the Music Street Publishing Company for the expenses in

publishing that issue. In order to avoid a prohibited corporate contribution by the publishing company, the committee must make its payments to the publishing company within a commercially reasonable time. Payments for the production and circulation of the newsletter would be operating expenditures of your campaign committee and reported as such. In addition, payments for advertising space in campaign-related newsletters would be contributions to the campaign and, if made from a corporate source, would be prohibited. 2 U.S.C. Sc441b; 11 CFR 114.2. See Advisory Opinion 1985-39.

This response constitutes an advisory opinion concerning

----------

9/ For example, publication of articles or editorials about the issue of Congressional term limitation or related to the Coalition to End the Permanent Congress would be considered campaign-related, due to your focus upon that issue in your campaign for Congress and your candidacy's association with that organization.

10/ The Commission considered an alternative analysis under which only those portions of a particular newsletter issue that might be viewed as campaign-related would be allocable as a campaign expenditure. The Commission distinguished that allocation approach, due to your involvement in the entirety of the newsletter operation. Compare Advisory Opinions 1988-22, 1981-3 and 1978-46 (publishing of newsletters by partisan organization or party committees).

application of the Act or regulations prescribed by the Commission to the specific transaction or activity set forth in your request. See 2 U.S.C. Sc437f.

Sincerely,

(signed)

Lee Ann Elliott
Chairman for the
Federal Election Commission

Enclosures (AOs 1988-27, 1988-22, 1986-37, 1986-26, 1985-39, 1985-38, 1984-13, 1983-12, 1982-56, 1981-37, 1981-3, 1980-109, 1980-22, 1978-72, 1978-56, 1978-46, 1978-15, 1977-54, and 1977-42)

# PLAINTIFFS' EXHIBIT 5

# UNITED STATES SENATE

# COMMITTEE ON GOVERNMENTAL AFFAIRS

# SPECIAL INVESTIGATION FINAL REPORT

## Chapter 5: The White House Controlled the DNC and Improperly Coordinated the Activities of the DNC and Clinton/Gore '96

## THE WHITE HOUSE CONTROLLED THE DNC AND IMPROPERLY COORDINATED THE ACTIVITIES OF THE DNC AND CLINTON/GORE '96

"That was the other campaign that had problems with that, not mine."—President Clinton, November 8, 1996[1]

In the wake of the President's re-election, questions were raised about allegations of improper fund-raising. The President's response was to shift blame away from himself (and his re-election campaign) and to the DNC. This response was disingenuous. During the 1996 election cycle, the White House, in its thirst for money, took control of the DNC.

First, the White House took control of the DNC's finances, micro-managing how the DNC raised and spent money. Harold Ickes, Deputy Chief of Staff to the President, simply seized the reins of financial power at the DNC. The DNC could not spend any money without prior White House approval. Ickes also exerted direct control over the DNC's Finance Division, the division charged with fund-raising. DNC National Chairman Don Fowler was unsuccessful in contesting Ickes' assumption of power and asserting control over the DNC.

The White House's financial control of the DNC was designed to fund the advertising strategy developed by Dick Morris. Yet White House control was not limited to financial control of the DNC; using the DNC as an adjunct to the re-election campaign led to unprecedented coordination between the DNC, Clinton/Gore '96, and the White House over the content, placement, and production of advertisements. This unprecedented coordination violated the letter and spirit of existing federal campaign laws.

In short, the White House took control of the DNC, particularly its fund-raising apparatus, to squeeze as much money out of the DNC as it could. The purpose of this money was to fuel the White House's massive advertising campaign, which itself was the result of unprecedented illegal coordination. By the end of the campaign, any distinctions remaining between the White House, the DNC, and Clinton/Gore had been obliterated.

### ICKES TAKES CHARGE OF THE DNC AS THE PRESIDENT'S "DESIGNEE"

Despite his being a federal employee, Harold Ickes simply took control of the DNC and ran it from 1995 through the 1996 election. In particular, he micro-managed the DNC's budget, deciding how much DNC money would be spent and on what projects. Moreover, he exercised independent control of the DNC's Finance Division, which controls fund-raising. Ickes did so with the approval of the President; indeed, Ickes was the President's "designee" for handling

[1] News Conference of President Bill Clinton, November 8, 1996, CNN Special Event, Transcript # 96110801V06.

DNC issues. Ickes' control led to friction with the DNC's nominal head, Fowler.

Fowler's involvement with the DNC began in 1971,[2] and as time passed and he remained involved, he developed "an interest in being Chairman of the National Committee."[3] After the Democrats' devastating defeat in the 1994 elections, Fowler was given the chance. At that time, Ickes called Fowler and asked him if he would be interested in serving as the DNC's National Chairman.[4] The position being offered to Fowler was unusual; he was to be part of a "bifurcated" chairmanship, the brain child of Harold Ickes.[5] Senator Christopher Dodd (D–CT) would serve as the DNC's "General Chairman," and be a spokesman for the party. Fowler, as "National Chairman," would be responsible for managing the day-to-day operations of the DNC.[6] Fowler was initially uncertain about serving in this arrangement, but after several subsequent entreaties from Ickes and at least one meeting with the President, Fowler agreed.[7] He began his tenure as National Chairman on January 21, 1995.[8]

Fowler quickly learned the limits of his power as "National Chairman." He realized immediately that he and Ickes "had differences of opinion about how things should be run" at the DNC.[9] They disagreed on an entire range of significant issues from "budget matters" to "the operational thrust of the party."[10] Fowler testified that the disagreements "generally [were] about budget matters."[11] According to Fowler, these disagreements arose as early as the spring or summer of 1995, and persisted until the very end of his service as National Chairman in January 1997.[12]

Fowler vividly remembered once such instance of his disagreeing with Ickes concerning the DNC's fund-raising, an incident in which Fowler was more cautious than Ickes. In the summer of 1995, the *Chicago Sun-Times* reported that the DNC was selling access to the President and to the White House.[13] In response to this report, Fowler proposed that the DNC limit the contributions it would accept to $2,000 per person.[14] Ickes, however, disagreed with Fowler's proposal, and Fowler's recommendation was never implemented by the DNC, despite his nominal control over the organization.[15] In

[2] Deposition of Donald L. Fowler, May 21, 1997, p. 12.
[3] *Id.* at p. 26.
[4] *Id.* at p. 27.
[5] Deposition of Harold Ickes, June 26, 1997, p. 26.
[6] *See generally* Fowler deposition, pp. 26–27; Testimony of Donald L. Fowler, Sept. 9, 1997, pp. 9–10.
[7] Fowler deposition, pp. 27–32.
[8] *Id.* at p. 12.
[9] *Id.* at p. 38.
[10] *Id.* at pp. 38–39; Fowler testimony, p. 20.
[11] Fowler deposition, p. 38.
[12] *Id.* at pp. 38–39. Although Fowler's deposition testimony about his disagreements and problems with Ickes was strongly worded and candid, Fowler tried to hedge his testimony during public hearings. For example, he preferred not to associate himself with his deposition testimony that he and Ickes had differences of opinion that started soon after Fowler arrived and continued until Fowler left. Instead, Fowler testified that he and Ickes had a relationship of "dynamic tension." Fowler testimony, p. 20. In fact, Fowler even quibbled with some of the terms he used in his own deposition. *See* Fowler testimony, pp. 13–15 (disputing that the Finance Division "ignored" his directives, though such was his deposition testimony, and asserting that he "might quibble a little bit with the use of that term on my part").
[13] Lynn Sweet, "The President's Price List," *Chicago Sun-Times*, June 30, 1995, p. 1; *see* Fowler deposition, pp. 344–45;
[14] Fowler deposition, p. 343; Fowler testimony, p. 7.
[15] Fowler deposition, p. 346.

this instance, Ickes demonstrated more enthusiasm than Fowler for raising large sums of money.

Ickes' enthusiasm was not limited to raising money in large sums; he was also enthusiastic about controlling DNC expenditures. In fact, the extent of Ickes' control over the DNC is evident from an April 17, 1996 memorandum from Ickes to Fowler, which addresses the DNC's expenditures. The entire text of that memorandum reads:

> This confirms the meeting that you and I and [White House political affairs director] Doug Sosnik had on 15 April 1996 at your office during which it was agreed that all matters dealing with allocation and expenditure of monies involving the Democratic National Committee ("DNC") including, without limitation, the DNC's operating budget, media budget, coordinated campaign budget and any other budget or expenditure, and including expenditures and arrangements in connection with state splits, directed donations and other arrangements whereby monies from fundraising or other events are to be transferred to or otherwise allocated to state parties or other political entities and including any proposed transfer of budgetary items from DNC related budgets to the Democratic National Convention budget, are subject to the *prior* approval of the White House. It was agreed that a small working committee would be established which would include Chairman Fowler (or his representative), Chairman Dodd (or his representative), B.J. Thornberry, Brad Marshall, Marvin Rosen, Doug Sosnik, and others as may be agreed to, to meet at least once weekly, and more often if necessary, to implement this agreement.[16]

Although Ickes was "not sure" whether he sent the memorandum to Chairman Fowler, he did affirm that it reflected the process in place during 1996 concerning the expenditure of funds by the DNC.[17] The memorandum itself purports to memorialize an agreement struck in a conversation between Fowler, Ickes, and Sosnik. It is difficult to conceive of any more explicit evidence of Ickes' level of control over the DNC than the agreement memorialized in this memorandum.[18]

Fowler, as nominal head of the party, thought that Ickes was usurping his authority. Fowler testified that, although he wouldn't necessarily describe Ickes' involvement as "micro-management,"

> I did feel that he was involved in the management of the DNC in a fashion that I didn't appreciate, that I didn't agree with, that I felt that I should have been the instrument for a management effort and that the management effort should have come through me.[19]

---

[16] *See* Memorandum from Harold Ickes to Don Fowler, April 17, 1996 (Ex. 1) (emphasis in original).

[17] Deposition of Harold Ickes, June 27, 1997, p. 24.

[18] Sosnik testified, "I don't think I would have sent this memorandum." Deposition of Doug Sosnik, June 20, 1997, p. 65.

[19] Fowler deposition, pp. 61–62.

Fowler complained to Ickes about his undue involvement in the management of the DNC. Ickes, according to Fowler, "disagreed" with Fowler's concern, and essentially "ignored" Fowler's objections.[20]

Given that "all matters dealing with allocation and expenditure of monies involving the" DNC were subject to "*prior* approval of the White House,"[21] it is obvious that the White House was most concerned with the DNC's financial condition. In fact, Ickes held regular meetings to discuss DNC operations with Senator Dodd and Fowler.[22] In March 1995, he began weekly meetings held on Wednesday afternoons at the White House to discuss the DNC budget.[23] White House representatives at these meetings included Ickes, Sosnik, and Karen Hancox, Sosnik's deputy. Fowler, Finance Chairman Marvin Rosen, Finance Director Richard Sullivan, Chief Financial Officer Brad Marshall, and Executive Director B.J. Thornberry attended on behalf of the DNC.[24] Ickes ran the meetings.[25]

Ickes did a very thorough job keeping the President and Vice President informed on the daily finances of the DNC. Ickes prepared weekly memoranda to the President and Vice President (copied to various senior White House officials) summarizing the information gleaned from these weekly DNC money meetings. The memoranda generally identified deposits, projected fund-raising, calculated actual fund-raising (including federal, or "hard" dollars raised), documented expenditures, and reviewed the DNC's budget in detail. These memoranda demonstrated the President's concern with the DNC's fund-raising, and the level of control the White House asserted over such fund-raising.

Some of these memoranda provide glimpses into Ickes' attention to the DNC's finances. For example, Ickes' January 2, 1996, memorandum to the President and Vice President (among others) regarding the DNC's proposed 1996 budget notes that Ickes, Sosnik, and Hancox had met with Fowler, Rosen, and others "to review the first draft of the proposed calendar 1996 DNC budget as well as the proposed source of funds."[26] The memorandum then analyzes the DNC budget in great detail, making comments and recommendations. Ickes" January 31, 1996 memorandum to the President and Vice President also analyzes the DNC's budget, noting that "Chairman Fowler was also asked to take a very hard look at the $25 million coordinated campaign's budget and see how much savings could be achieved there."[27] Like many of Ickes' memoranda, Ickes used the passive voice ("Chairman Fowler was also asked") when recounting his instructions to Fowler. The memorandum goes on to note Ickes' suggestion for "a meeting early next week including the President,

---

[20] Fowler deposition at p. 62; Fowler testimony at pp. 22–23.
[21] Ex. 1.
[22] Deposition of Harold Ickes, June 26, 1997, p. 44.
[23] *Id.* at p. 44, p. 55. These meetings have been referred to as "money meetings" and "budget meetings."
[24] *Id.* at p. 56.
[25] Deposition of Karen Hancox, June 9, 1997, p. 19; Sosnik deposition, p. 35.
[26] Memorandum from Harold Ickes to The President et al., January 2, 1996, p. 1 (Ex. 2).
[27] Memorandum from Harold Ickes to The President and The Vice President, January 31, 1996, p. 2 (Ex. 3).

Vice President, Chairman Dodd and Chairman Fowler to review the revised proposed DNC operating budget. . . ."[28]

Collectively, Ickes' weekly memoranda document a White House that closely scrutinized all aspects of the DNC budget. Ickes' memoranda kept the President and the Vice President closely apprised of all details of the DNC's finances on a weekly basis, presumably to advise the President of the status of the fund-raising effort to support his re-election through the DNC's advertising.

The White House's control of the DNC was especially evident in the "special relationship" that developed between the White House and the DNC's Finance Division—the division in charge of fund-raising.[29] This relationship also had its roots in Ickes' involvement with the DNC, and the relationship may have infused the Finance Division with an attitude conducive to abuse and impropriety.

Fowler testified "that the Finance Division had an independent relationship with the White House that sometimes bypassed what my office would do or would be involved in."[30] The officials in the Finance Division believed they derived their authority directly from the White House; in fact, Fowler testified that the Finance Division "thought it had a separate charter from the White House."[31] Because of this "separate charter," the Finance Division believed that it did not have to respond to Fowler's directives.[32] In Fowler's view, the Finance Division had a "disposition to ignore" him.[33]

Of course, organizations do not have "relationships;" people within organizations do. The people within the Finance Division who had the special, independent relationship with White House personnel were principally Rosen and Sullivan.[34] From the White House, Ickes had the most authoritative relationship with Sullivan and Rosen, although Hancox also had frequent contact with them.[35] Sosnik also had a relationship with Sullivan and Rosen.[36]

As a result of these relationships, Rosen and Sullivan both clearly understood that, if they wanted something to happen or not to happen, it was Ickes, not Fowler, who had the final authority to make a decision.[37] Fowler even acknowledged that Rosen and Sullivan knew that, if they disagreed with Fowler, they could go to Ickes, and Ickes could "in every case overrule" Fowler.[38] Sullivan testified that he knew he could go around Fowler to the White House.[39]

---

[28] *Id.*

[29] *See* Fowler deposition, p. 80 (referring to Finance Division's "special relationship with the White House").

[30] *Id.* at p. 75.

[31] *Id.* at p. 79; *see also* Fowler testimony, p. 16.

[32] Fowler deposition, p. 80; Fowler testimony, p. 16.

[33] Fowler deposition, p. 80.

[34] *Id.* at p. 75.

[35] *Id.* at pp. 85–86.

[36] Fowler testimony, pp. 15–16.

[37] *Id.* at p. 86; *See also* Fowler testimony, pp. 23–24.

[38] *Id.*

[39] Sullivan testified that he knew that when Fowler disagreed with either Ickes or Doug Sosnik, Ickes' or Sosnik's position "would usually prevail." Deposition of Richard L. Sullivan, June 4, 1997, p. 60.

Ickes had a somewhat different view of his power. He "absolutely" denied that he circumvented Fowler and dealt directly with the DNC's Finance Division, and testified that Fowler "ran the day-to-day operation of the DNC." Deposition of Harold Ickes, June 26, 1997, p. 208; *see also id.* at pp. 208–10. When Senator Domenici read these portions of Ickes' deposition to him, Fowler dryly noted that he "perhaps would have described it a little differently." Fowler testimony, p. 247.

Needless to say, the Finance Division's unique relationship with the White House created management problems. Fowler testified that "having any division of an organization like that, not being fully integrated in the operations of the other divisions is a problem in the process."[40] Fowler was concerned that this attitude spawned a number of problems, including: insufficient notice to his office regarding events;[41] failure to coordinate dates and participants for events;[42] and failure to follow the Chairman's directives.[43]

As nearly everyone was aware of the tension afflicting the relationship between Ickes and Fowler,[44] including the Vice President,[45] the question that naturally arises is whether the President was aware of the disagreements between Fowler and Ickes, and, if so, with whom the President usually sided. Fowler testified that he did not know what the President understood about Ickes' ability to prevail in the many disagreements between Ickes and Fowler, and he declined to venture an opinion.[46]

Ickes was not so shy. Though he interspersed his comments with allusions to the "latitude" given to Fowler to run the DNC, Ickes' testimony makes clear that he was the President's "designee" for running the DNC:

> Q: If in these Wednesday fund-raising meetings that you chaired in the White House, if there were disagreements about fund-raisers or amounts of money or anything of that nature, did you make the final decision, or how was the authority line there structured?
>
> A: *The President is to have the party.* He is the CEO of the party. *If the President says this is the way I want it, it was up to me to see that it was done, and the chairman understood that*, but beyond that, the chairman had great

[40] Fowler deposition, p.77; *see also* Fowler testimony, p.17. Had the Finance Division's independent relationship with the White House not existed, Fowler believed that he might have had a curative effect on some of the things that went wrong at the DNC during the 1996 election cycle. *See* Fowler testimony at p. 18.

[41] Fowler deposition, pp. 57–58.

[42] *Id.* at p. 74.

[43] *Id.* at pp. 59–60. *See generally* Fowler testimony, pp. 12–13. The most striking example of the latter occurred during the summer of 1996, when Fowler became aware that some DNC fund-raisers were listing the address of contributors as 430 S. Capitol Street, which is the DNC's headquarters. Fowler deposition, pp. 79–80. Fowler testified that he believed "that would never have happened if we had more thorough control over the Finance Division." *Id.* at p. 79. Fowler circulated a memorandum, requiring DNC fund-raisers to obtain the actual address for donors. In the memorandum, Fowler noted, "If you are able to get people to give you checks for thousands of dollars, you really should be able to get them to give you their addresses." Memorandum to DNC Fund-raisers from Don Fowler, August 1, 1996 (Ex. 4). Fowler later learned that the directive was disobeyed, and he blamed the Finance Division's special relationship with the White House for such disobedience. Fowler deposition, pp. 80–83.

[44] Sullivan testified that "there were times when there was tension exhibited between Fowler . . . and Harold Ickes and Doug Sosnik." Deposition of Richard Sullivan, June 4, 1997, p. 57. Sullivan recalled that Fowler and Ickes disagreed often over "state splits," the amount of money the DNC would give to a state party or campaign when a fund-raising event was held within a state. *Id.* at pp. 58–59. Senator Dodd, the DNC's General Chairman, was also aware of the running disagreements between Fowler and Ickes. Fowler deposition, p. 63. Dodd, however, refrained from taking a position concerning these disagreements. *Id.* at 64. Deborah DeLee, Fowler's immediate predecessor at the DNC, also shared Fowler's concerns. She informed Fowler that "she had [had] some of the same problems" with Ickes. *Id.* at 65.

[45] Fowler testified that the Vice President was aware of the running disagreement between Ickes and Fowler, as the Vice President made allusions to it in conversation. Fowler deposition, p. 64.

[46] Fowler testimony, pp. 243–44.

latitude, and there may—whatever disagreements there were, we tried to work out collectively . . .

* * * * *

Q: It turns out the way they structured that, I understand the answer to be that basically the President had ordered that you would be in charge and if there were a disagreement, that you would be the one to make the final decision?

A: No, I didn't say that.

Q: Okay.

A: What I said was that the president of the party, in this case the Democratic, is basically, some people say, the titular leader of the party, but I think any chairman would tell you that his president, that is the party chairman's president, *is the person who basically has the last word.*

Now, *from a very technical point of view*, the party is a separate entity and we all recognize that. It has its own charter and all of that, but the President's opinion has extraordinary weight within the party apparatus, as it should. He is the party's leader. Although we're not a parliamentary system, it's basically, in some sense, similar to that.

* * * * *

But Fowler was a full-time real operational head of the party and acted as such. That's not to say there was not very close consultation with the White House; there was, very close consultation with the White House.

Q: I was trying to get at, and I think you answered in a round-about way, about if there were disagreements and you tried to work it out and whatever, who made the final decision? Was it you or——

A: If there were disagreements, *the President of the United States wanted something, you know what? The President of the United States got his way*. And you know what? That's the way it ought to be.

Q: So you would make the final decision if there were disagreements?

A: *If the President of the United States wanted something and there was a disagreement between the President of the United States and the chairman of the party, the President prevailed. That's the way it should be.*

Q: And in this context of Wednesday meetings, it would be through you as his designee?

A: *Through me as his designee*. I kept the President fully informed, as you can see by reams and reams and reams of documents. . . .[47]

The President, who acknowledged using the DNC as a vehicle for running ads designed to assist his re-election,[48] had to know that the DNC was being run out of Ickes' hip pocket. The logical conclu-

[47] Deposition of Harold Ickes, June 26, 1997, pp. 209–12 (emphasis added).

[48] Transcribed statement of President Bill Clinton, White House Communications Agency videotape, December 7, 1995 (Hay-Adams dinner).

sion is that the President was comfortable with Ickes' serving as his "designee," which may explain why Fowler never went over Ickes' head to try to get any of his decisions overruled.[49] Ickes was merely doing the President's bidding.

COORDINATION IN THE RETENTION AND PAYMENT OF DNC AND CLINTON/GORE '96 MEDIA CONSULTANTS

While Ickes was busy controlling the DNC's purse strings, Dick Morris was busy controlling the closely-coordinated campaign activities of Clinton/Gore '96 and the DNC—the very purpose for which the DNC, under Ickes control, was raising funds. The close coordination commenced in December 1994, when the President made three commitments to Morris to get him to work on the President's behalf: (1) Penn & Schoen would be hired as polling consultants; (2) a White House staff member would be hired as personal liaison for Morris; and (3) Morris would get weekly meetings with the President.[50] These commitments marked the beginning of extensive coordination between the White House, the DNC and Clinton/Gore '96 on a massive advertising campaign to re-elect the President.[51] The coordination included: (1) sharing and compiling consultants' work product between the White House, the DNC and Clinton/Gore for media purposes; (2) extensive contact between the DNC and Clinton/Gore '96 consultants and the White House regarding advertising and polling issues; and (3) weekly strategy meetings held in the White House with DNC and Clinton/Gore '96 representatives specifically designed to coordinate and implement the President's re-election campaign. Moreover, the work of Morris and the other consultants was used for both political and official purposes.[52]

In early October 1994, the President hired Morris for the first time since 1991 to conduct a survey concerning issue positioning and strategy for the 1994 congressional elections.[53] Morris did not have a written agreement concerning these services.[54] In fact, from

[49] Fowler testified, both in his deposition and hearings testimony, that the only people to whom he could have gone to overrule Ickes were the President, the Vice President, and Leon Panetta, Chief of Staff to the President. Fowler testified, however, that he never tried to go over Ickes' head to discuss his concerns about Ickes' intrusion into DNC affairs. Fowler testimony, p. 23; Fowler deposition, p. 64.

[50] Deposition of Richard Morris, August 20, 1997, p. 70: *see* Dick Morris, *Behind the Oval Office* (1997), pp. 24–25. Morris testified that all the statements in his book, *Behind the Oval Office*, were true, Morris deposition, pp. 28; 36–37.

[51] From April through June 1995, Morris described the substance to the consultants' work as follows:

> You decided whether you are going to advertise, what you are going to advertise about, what goals you seek to achieve in the advertisement. You poll the best ways of presenting the ads. Then you try to think of creative and attractive ways of presenting it. You write the ads. You produce them. In general, sometimes you test them before audiences . . . and then you have to decide what markets you are going to run it in, how much money you are going to spend, how many points you are going to buy, what programs you are going to buy it on, and how long you are going to run them.

*See* Morris deposition, p. 79.

[52] *Id.*, at pp. 85–87. Morris defined political activity as activity "designed to promote the re-election of the President or to assist the Democratic Party generically in the 1996 elections" and official activity as activity "undertaken by the President or a member of his staff in connection with his duties as President." *Id.* at p. 87.

[53] *Id.* at p. 25.

[54] *Id.* at p. 43. Morris and the President initially agreed to keep their consulting relationship a secret because of, among other reasons, Morris's work on behalf of Republican clients. *Id.* at p. 46. Morris used the code name "Charlie" to disguise his initial meetings with the President. *Id.* at p. 54.

October 1994 through January 1995, Morris was unaware of whether he was retained by the White House, Clinton/Gore '96 or the DNC, despite performing work that was used by all three entities.[55] In addition, he did not recall receiving any invoices or Internal Revenue Service 1099 forms in connection with his consulting work during this time period.[56] He billed the DNC and Clinton/Gore '96 in one of four different methods: (1) receipt of funds personally, whereupon he would pay a subcontracted "interviewing house"; (2) the "interviewing house" was paid directly; (3) his company, Message Advisors, was paid directly; or (4) Penn & Schoen was paid directly.[57] With regard to whether the DNC, Clinton/Gore '96, or the White House paid for his consulting services, Morris testified as follows:

> I did not understand—I did not know whether it was being done on behalf of the DNC or the Re-Election Committee for the President. I, again, assumed that it was a poll for the President, but I don't know how he elected to pay for it.[58]

At Morris's request, Penn & Schoen began working for the President and the DNC.[59] Mark Penn reported to Ickes, whom Penn believed had the highest authority relative to the DNC and Clinton/Gore '96 work performed by Penn & Schoen.[60] Penn was unsure whether his firm had been retained by the White House, the DNC, or Clinton/Gore '96.[61] He testified as follows:

> Q: And at the time you conducted polling from the spring of '95 through the election, you were not sure, Penn & Schoen was not sure whether or not a specific poll was for the Re-Elect or the DNC; is that correct?
>
> A: Right. We knew that we were doing polling that would work—that would be work for both entities, but we didn't know exactly which poll or part of polls would be for which entity.[62]
>
> * * * * *
>
> Q: Was there ever a time that you were aware of in these creative meetings where you were working simultaneously on a DNC ad and a Re-Elect ad?
>
> A: Yes. I think in '96—in '96 I think there were some points where ideas relative to the DNC and ideas relative

---

[55] *Id.* at p. 62. Morris testified that he did not routinely send out client invoices and that, on occasion, he would receive checks without formally billing a client. *Id.* at pp. 30–32.

[56] *Id.*

[57] *Id.* at pp. 41–42.

[58] *Id.* at pp. 43, 60.

[59] Penn deposition, p. 8. In early 1995, Morris convinced the President to retain the polling firm of Penn & Schoen. Morris deposition, p. 64. For a period of time, Penn & Schoen paid Morris for his consulting work as a subcontractor, such that he received no compensation directly from the White House, the DNC or Clinton/Gore '96. *Id.* at pp. 64–66. Morris also was unaware of whether Penn & Schoen had a written agreement with the White House, the DNC, or Clinton/Gore '96, nor did he know which of those entities paid for their services. *Id.* at pp. 66–67. In July 1996, Morris finally negotiated a compensation arrangement consisting of a $15,000 monthly retainer from the Clinton/Gore Primary Campaign Committee and a percentage of the commissions from DNC and Clinton/Gore '96 media time buys. *Id.* at p. 104.

[60] Penn deposition, pp. 26–28.

[61] *Id.* at pp. 11, 18.

[62] *Id.* at p. 32.

to Clinton/Gore would have been on the table at similar times.[63]

* * * * *

Q: * * * But to the best of your understanding when the bill [for consulting services] was actually—or the invoice was submitted to Ickes, did your firm make an effort to distinguish what work was performed on behalf of either the DNC or the Re-Elect?

A: Typically, no.[64]

THE WHITE HOUSE WEEKLY STRATEGY MEETINGS

Representatives from the White House, the DNC, and Clinton/Gore would meet at the White House approximately once a week at what became known as the weekly strategy meetings (which the President agreed to conduct pursuant to Morris' three conditions). The topics discussed at the weekly strategy meetings included media, polling, speech writing, and policy and issue positioning.[65] All the attendees of the weekly strategy meetings were involved in the process of creating the advertising in various degrees.[66] Morris listed the following individuals as a "typical guest list" for the White House weekly strategy meetings:

> the President; the Vice President; Leon Panetta, chief of staff; Harold Ickes, deputy chief of staff; Evelyn Lieberman, deputy chief of staff; George Stephanopoulos, senior adviser; Don Baer, director of communications; Doug Sosnik, political affairs director; Ron Klain, vice president's chief of staff; Sandy Berger, deputy national security adviser; Senator Chris Dodd of Connecticut; John Hilley, legislative director; Maggie Williams, First Lady's chief of staff; Mike McCurry, press secretary; Henry Cisneros, secretary of Housing and Urban Development; Mickey Kantor, secretary of Commerce; Mack McLarty, adviser and former chief of staff; Peter Knight, campaign manager; Ann Lewis, deputy campaign manager and director of communications; Ron Brown, secretary of Commerce, until his death; Erskine Bowles, deputy chief of staff, until his departure; Jack Quinn, vice president's chief of staff until his appointment as White House counsel; Dick Morris, consultant; Doug Schoen, consultant; Mark Penn, consultant; Bob Squier, consultant; Bill Knapp, consultant.[67]

The weekly strategy meetings, which "became the central forum for campaign strategy and decisions," are a definitive example of the illegal and improper coordination between the White House, the DNC, and Clinton/Gore.[68] Morris chaired the meetings, distributed his weekly agendas summarizing the advice the consultants and he

[63] *Id.* at p. 44.
[64] *Id.* at p. 48.
[65] *See* Morris deposition, p. 124.
[66] *Id.* at p. 187.
[67] *See* Dick Morris, *Behind the Oval Office* (1997), p. 26, note.
[68] *Id.* at p. 26.

planned on giving the President, and received substantive input from most of the attendees.[69]

THE IMPLEMENTATION OF MORRIS' ADVERTISING CAMPAIGN RESULTED IN UNPRECEDENTED, ILLEGAL, AND IMPROPER COORDINATION BETWEEN THE DNC, CLINTON/GORE, AND THE WHITE HOUSE

Ickes' management of the DNC, particularly its fund-raising operation, was designed in large part to quench the White House's thirst for advertising money. The flip side of the same coin was that the White House, the DNC, and Clinton/Gore '96 engaged in extensive coordination to develop, fund, and run that advertising. Simply stated, all practical distinctions between the White House, the DNC, and Clinton/Gore were eliminated.

The White House, the DNC, and Clinton/Gore '96 retained a number of media and advertising consultants, but made little distinction concerning which consulting work was being performed on behalf of each entity. The consultants' work was shared by all three entities, without regard to laws limiting coordination between the DNC and Clinton/Gore '96 or restrictions against White House participation in political activity. The improper coordination between the DNC and Clinton/Gore '96 is demonstrated by the failure of the political consultants to know which entity they were working for with respect to specific assignments. Moreover, these same consultants often were unaware of which entity was paying for their consulting work.

According to Morris, DNC General Counsel Joe Sandler and Lyn Utrecht, Clinton/Gore '96's counsel, "laid down the rules of what advertisements—of what the content of advertisements and the timing of the media buys could be in connection with the Democratic National Committee advertising and in connection with the Clinton-Gore advertising." [70] Morris did not receive any legal advice from Sandler or Utrecht, however, concerning the type of coordination between the White House, Clinton-Gore '96, and the DNC that was permissible when creating the issue advocacy advertisements.[71] In fact, Morris testified that he "never received any information from them which would have indicated any limitations on discussions with the President, the Vice President, or members of the White House staff concerning the advertising that was done by the DNC" and that he was "never advised that there were constraints on that." [72] Moreover, Morris testified "there was no indication of any such constraints in connection with DNC coordination

[69] *Id.*

[70] *See* Morris deposition, pp. 117–18. In the July 26, 1995 agenda, Morris first explained that the campaign would use DNC funds to pay for advertisements. *Id.* at p. 288; *see also* July 26, 1995 meeting agenda (Ex. 5). Morris testified that:

> This agenda was issued after the President had approved and, in fact, was airing crime ads funded by Clinton-Gore. It was also subsequent to my conversation with Bowles in which he advised me to come up with a plan B after I had investigated DNC media and found that that was precisely what I wanted to do anyway.
>
> So, this marks the beginning of the DNC phase of the media campaign and here I recommend that we do media aimed at swing Republican Senators on Medicare during the recess.

Morris deposition, p. 289.

[71] *Id.* at pp. 146–47.

[72] *Id.* at p. 147.

with the Clinton-Gore campaign."[73] He recalled a meeting at Utrecht's office where he specifically was informed that the identical pollsters, consultants, and media creators would be used to prepare advertisements paid for by the DNC and advertisements paid for by Clinton/Gore '96, and, "since it was the same people [working on both DNC and Clinton/Gore '96 advertisements], that the closest of coordination was perfectly acceptable legally."[74] Indeed, the coordination between the DNC and Clinton/Gore '96 was so extensive because the consultants used by each "were the same people."[75]

The coordination in the advertising campaign became so extensive that Mark Penn, a consultant at the firm Penn & Schoen who worked on the President's campaign with Morris, had a White House office from September through December of 1995 located in a coat closet adjacent to Sosnik's office.[76] Penn had access to a computer and a dedicated campaign telephone line.[77] Eventually, Morris had the President "evict" Penn from the office, stating that he "did not think it was appropriate for a political consultant to have an office in the White House, particularly not one that was located 40 or 50 feet away from where the speeches were being written when that consultant had a plethora of commercial clients who had interests in those speeches."[78]

The coordination between the DNC and Clinton/Gore '96 extended to the exact day the media team chose to run a DNC advertisement versus a Clinton/Gore '96 advertisement. For example, Morris testified as follows concerning coordination between placing a DNC or a Clinton/Gore '96 advertisement:

> Q: Now, did anyone ever caution you or advise you as to whether or not a coordination of expenditures like this by the DNC and Clinton/Gore would run afoul of any laws or regulations?
>
> A: No, and indeed, Sandler and Utrecht advised us to do this coordination because their view was that you had to stop your DNC advertising four weeks before a primary, and then you had to start again with Clinton-Gore.
>
> There were some States where we literally pulled an ad off the air, and then the next day went on with a Clinton-Gore ad so that we could continue our hit in the State, but it was an entirely different ad because it was funded differently.[79]

Further demonstrating the close coordination between the DNC and Clinton/Gore '96, the July 26, 1995 meeting agenda states that, with regard to DNC issue advocacy advertising, "[u]se DNC to pay

[73] *Id.* at p. 148.
[74] *Id.* Morris was never instructed by the DNC or Clinton/Gore '96 attorneys that there are legal restrictions against coordinating the consultants and media team efforts with White House officials. *Id.* at p. 164. Indeed, at the time of his deposition on August 20, 1997, Morris still was unaware that such restructions existed. *Id.*
[75] *Id.* at p. 149.
[76] *Id.* at p. 191; *See* Deposition of Mark J. Penn, June 19, 1997, pp. 131–33.
[77] *See* Morris deposition, p. 191.
[78] *Id.* at pp. 192–93.
[79] *Id.* at pp. 339–40.

for it, we [the joint White House, DNC and Clinton/Gore media team] control production."[80] Morris testified he was:

> afraid that there would be an effort made by Ickes to make the DNC ads produced by a separate media creator and I was making the point here that I wanted the same, for us to control the creation of both ads so that we [the November 5th Group] were not sending contradictory messages.[81]

Moreover, specific media planning and fund-raising details were contained in virtually each weekly agenda produced to the Committee. Indeed, Morris testified that the February 22, 1996 agenda contained "the specific underlying factual detail as to how much money of Clinton-Gore we needed for each week" and the need to use Clinton/Gore '96 money to pay for advertisements that could not be paid for by the DNC.[82]

Morris believed the use of issue advocacy to pay for the President's advertising throughout most of 1995 was appropriate because it "had basically nothing to do with re-election advertising."[83] In support of that theory, Morris testified as follows:

> I was not very concerned . . . throughout most of '95 with the President's reelection, per se, because I felt that for the President to have a hope of being re-elected, he first had to win the fight over the budget. He first had to defeat the agenda of the Gingrich-Dole Congress and win the battle associated with the budget and tax cut issues, and I felt that winning that battle was a condition prior to being able to be re-elected President. I felt that if he failed to win that fight, there was no way that he would ever be re-elected.[84]

Regarding whether the DNC issue advocacy advertisements would provide any benefit to the President's re-election effort, however, Morris testified:

> . . . at any point in a presidency, any advertising, any issue advertising the President does whether for health care reform or for the stimulus package or to win the budget fight would eventually accrue to his benefit in the reelection.
>
> * * * * *
>
> I believe that once we won the budget fight, first of all, it was a very important victory for the party, it was a very important substantive issue the President was heavily invested in, and I believe that winning that fight, itself, was a prerequisite to being able to win the election.[85]

---

80 *See* Ex. 5.

81 Morris deposition, p. 296.

82 *Id.* at pp. 338–39; *see also* Feb. 22, 1996 meeting agenda (Ex. 6). The coordination between the DNC and Clinton/Gore '96 extended to the budgeting of advertising expenditures. In order to project his advertising budget, Morris received periodic estimates of the incoming funds from both the DNC and Clinton/Gore '96. *See* Morris deposition, pp. 304–06. Morris testified that his "proposal for advertising totaled 50 million," with $17 million from Clinton/Gore and $33 million from the DNC. *Id.* at p. 304.

83 *Id.* at p. 138.

84 *Id.* at p. 135.

85 *Id.* at p. 293.

Another manner of coordination between the White House, the DNC and Clinton/Gore '96 occurred through the same consultants' use of information obtained for each respective entity in the planning and execution of advertisements. While Morris testified that the consultant team determined whether an advertisement was on behalf of the DNC or Clinton/Gore '96 based on the results of mall tests and other forms of feedback, even the funding for these polls was shared between the DNC and Clinton/Gore '96.[86] In addition, while the nature of a particular advertisement allegedly determined whether it was paid for by the DNC or Clinton/Gore '96, Morris conceded that advertisements originally planned as DNC ads were switched to Clinton/Gore '96.[87] The advertisements were created in the same room, by the same consultants with identical information.[88] In fact, Morris often was unaware of which entity actually paid for advertisements;[89] apparently such distinctions were unimportant. Morris testified that the only thing separating DNC and Clinton/Gore '96 materials "was a bright line running through the middle of our conference table of DNC versus Clinton-Gore."[90]

Morris testified that "[t]here was a review [of the polling] as to the extent to which it was related to the reelection campaign or the Democratic Party generically, but all of it was treated as political."[91] In fact, the only attempts to separate the polling data between the DNC and Clinton/Gore '96 came after the polling was completed.[92] Morris understood that, after polls were conducted, Ickes and Utrecht reviewed them and apportioned the cost between the DNC and Clinton/Gore '96 based on the content of the questions.[93]

Ickes apparently was aware that this close coordination in advertising and polling created legal risks; indeed, he pressed Morris to sign an indemnification agreement so that Morris would be responsible for any FEC fines. Morris testified:

> Ickes was pressing for an indemnification . . . he wanted an indemnification where basically, any violation that the FEC found, we would be indemnifying the campaign and saying, "It's our fault guys." And what we were offering was an indemnification where, if there was any FEC fine of the campaign that resulted from our refusal or inability to produce documentation about the time buy that we would be liable, but that if the FEC ruled that the underlying expenditures themselves were illegal under FEC rule[s] and imposed a fine, we took the position that we were doing this pursuant to the legal advice we were given from Sandler and Utrecht and the instruction we were given from Ickes to follow their legal advice, and therefore, there was no reason for us to indemnify them.[94]

[86] *Id.* at pp. 160–61.
[87] *Id.* at pp. 157–60.
[88] *Id.* at p. 161.
[89] *Id.* at pp. 279–80.
[90] *Id.* at p. 161.
[91] *Id.* at p. 90.
[92] *Id.* at p. 90.
[93] *Id.* at p. 91.
[94] *Id.* at pp. 361–62.

## WHITE HOUSE COORDINATION IN THE DESIGN AND IMPLEMENTATION OF ISSUE ADVOCACY ADVERTISING

The relationship between Morris and Bill Curry provides an example of the coordination between the White House and the DNC and Clinton/Gore media consultants. Curry was the White House staff member specifically hired to work with Morris.[95] The President suggested that Morris work with Curry to implement a "series of principles" to guide the President's "comeback in the face of the Republican victory."[96] Morris made it clear to the President, however, that he "needed Curry to work directly with [him] to implement the entire strategy, not just a piece of it." Morris testified he and Curry:

> would talk frequently, and he would give me his thinking as to what he thought we should be saying in our advertisements, and I would listen to it and I'd take account of it, and I would—and it was one of a number of inputs I received on that.[97]

In addition to the advertising and consulting work, Morris and Curry worked on Presidential "policy initiatives," the President's position on issues of national concern, congressional strategies, speech writing, polling results, and media plans on a regular basis.[98] Morris also testified that "a number of people at the White House [and] at the DNC . . . participated at one point or another in the process of thinking up ideas for a media."[99]

As a result of the early advertising using Clinton/Gore '96 funds and the subsequent use of DNC-funded issue advocacy advertisements, Morris divided White House involvement in campaign advertising into two distinct time periods: April 1995 through June 1995; and July 1995 through August 1996.[100] From April through June 1995, the media consultants conducted polls and created advertisements primarily for Clinton/Gore '96 because they had not yet adopted the concept of using DNC funded issue advocacy advertising.[101] From July 1995 through August 1996, the media consultants conducted polls and created advertisements using DNC funded issue advocacy advertising and, to a limited extent, Clinton/Gore '96 funds.[102] Thus, the coordination that occurred between White House officials, the DNC, and Clinton/Gore '96 is analyzed in these distinct time periods.

Morris testified that among the White House officials who primarily coordinated with the DNC and Clinton/Gore '96 media consultants and representatives were: the President, the Vice President, Leon Panetta, Harold Ickes, George Stephanopoulos, Erskine Bowles, and Doug Sosnik.[103] Morris described the involvement of each of these individuals as follows:

---

[95] *See* Morris deposition, p. 72.
[96] Dick Morris, *Behind the Oval Office* (1997), pp. 37–38.
[97] *See* Morris deposition, p. 74.
[98] *Id.* at pp. 73–74.
[99] *Id.* at p. 76.
[100] Morris resigned during the Democratic National Convention in August 1996 due to a personal scandal. *See* Dick Morris, *Behind the Oval Office* (1997), pp. 331–34.
[101] Morris deposition, pp. 78–90.
[102] *Id.* at pp. 125, 154–55.
[103] *Id.* at p. 76.

*The President*

The President had significant involvement with the Clinton/Gore '96 and DNC media consultants in the areas of polling, advertising, speech-writing, legislation strategy, and general policy advice. The President: (1) reviewed, modified and approved all advertising copy; (2) reviewed, adjusted and approved media time buys;[104] (3) reviewed and modified polling questions; and (4) received briefings on and analyzed polling results.[105] Indeed, a significant amount of the polling work the consultants performed for the President "related to substantive issues in connection with his job as President, but it [also] could be considered political."[106]

The President wanted to keep total control over the advertising campaign designed by Morris and the media consultants.[107] From May through June 1995, Morris testified that the President "insisted on seeing every question before [the consultants] asked it in the questionnaire."[108] In addition to the weekly strategy meetings, Morris met with the President privately to discuss the media campaign.[109] For example, if the media team "had to do an ad and there wasn't a strategy meeting scheduled conveniently," *i.e.*, a rapid response to Republican advertisements, Morris would schedule a private meeting with the President.[110]

The President's participation began with initial discussions concerning the specific details of DNC and Clinton/Gore '96 advertisements.[111] He would review the story lines and scripts and occasionally make detailed and significant changes.[112] Morris testified that the President was the "day-to-day operational director" of the media campaign.[113] The President "worked over every script, watched each ad, ordered changes in every visual presentation, and decided which ads would run when and where."[114] Morris further testified that the President "was as involved [in the DNC and Clinton/Gore '96 media campaign] as any of his media consultants were," "[e]very line of every ad came under his informed, critical, and often meddlesome gaze," such that "[t]he ads [for both the DNC and Clinton/Gore '96] became . . . the work of the President himself."[115] From July 1995 through August 1996, Morris described the President's involvement in the media campaign as follows:

> The President would be heavily involved in the first issue, the discussion of the strategy, and he would look at the ad—and we would present to him at each of these strategy meetings the scripts of media that we wanted to

---

[104] Time buys are the "list of markets . . . to buy ads in and how much you are going to spend in each media market." *Id.* at p. 83. For example, at the March 2, 1995 weekly strategy meeting, the President decided Clinton/Gore '96 would pay for the time buys during that period. *Id.* at pp. 84–86.

[105] *Id.* at pp. 80–84.

[106] *Id.* at p. 81.

[107] *Id.* at p. 167.

[108] *Id.* at pp. 176–77.

[109] *Id.* at p. 190.

[110] *Id.*

[111] *Id.* at p. 177.

[112] *Id.*

[113] *Id.* at pp. 182–83.

[114] *Id.* at p. 183.

[115] *Id.* at pp. 182, 183, 184–88, 189; *see also* Dick Morris, *Behind the Oval Office* (1997), p. 144.

run and the visuals, the animatics that had been tested, and would brief the assembled group, which included the President and the Vice President, on the results of the mall test. And armed with those results, looking at the visual and looking at the script, the President would make fairly specific suggestions as to what he wanted or didn't want included in the final ad.

We would then take those suggestions, and suggestions that were also made by all the other people in the group in the room, including Senator Dodd and Stephanopoulos and a bunch of folks, and we would then have a creative meeting, which was a group meeting of the consultants, right after the-the day after the strategy meeting.[116]

Morris recounted a conversation with the President that demonstrates both the high level of White House coordination with the DNC and Clinton/Gore '96 advertising and its true purpose of supporting the President's re-election. Morris recalled a private Oval Office meeting with the President to discuss the use of comments by Speaker Gingrich and Senator Dole in advertisements.[117] The President stated that he did not want to run "the Dole Medicare quote in our national ad buy" because he feared Senator Dole might lose the Republican nomination if he were associated with the proposed Medicare reforms.[118] Because the President and Morris wanted to run against Senator Dole,[119] Morris wrote an advertisement that "in early November . . . featured Gingrich's quote but not Dole's," and this advertisement ran "for three weeks in about 40 percent of the country during the [federal government] shutdown."[120]

Based on the evidence provided by Morris, it is evident that of all the White House officials involved in the advertising campaign, the President himself was the most actively and intimately involved.

*The Vice President*

From April through June 1995, the Vice President was involved with the DNC and Clinton/Gore '96 concerning polling, advertising, speech-writing, legislation, policy and general advice to a lesser degree than the President.[121] The Vice President reviewed, modified and approved advertisements.[122] From July 1995 through August 1996, the Vice President attended all the strategy meetings and would make suggestions to proposed advertisements.[123] In placing the level of individual involvement in the media campaign and polling work on a scale from one to 100 (with 100 representing the President's level of involvement), the Vice President's participation was roughly 40 percent of the President's level of involvement.[124]

---

[116] *See* Morris deposition, pp. 168–69. Morris and the other consultants also assisted the President with speech writing. *Id.* at p. 197.
[117] *See* Dick Morris, *Behind the Oval Office* (1997), p. 184.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *See* Morris deposition, pp. 187–88.
[122] *Id.*
[123] *Id.* at p. 186.
[124] *Id.* at pp. 187–88.

*Leon Panetta*

From April through June 1995, he had essentially the same involvement in the media campaign as did the Vice President, which included polling, advertising, speech-writing, legislation, policy and general advice.[125] From July 1995 through August 1996, Morris placed Panetta's level of involvement at approximately 50 to 60 percent of the President's level of involvement.[126]

*Harold Ickes*

Morris believed that Ickes was in "minute to minute control over all field activities in connection with the Clinton-Gore campaign or the DNC."[127] Morris understood that Ickes essentially ran the DNC and, until Peter Knight arrived, he also ran the Clinton/Gore '96 re-election campaign.[128] Morris testified that:

> [Ickes] was the one who had to approve any expenditure of money, and he was the one who had to be informed of any polling and had to be informed of any media.
>
> * * * * *
>
> I had the impression that he was in charge of every aspect of the campaign except for the substance of the message which I was in charge of.[129]

Regarding Ickes' involvement with the advertising campaign, Morris testified that, from April through June 1995, Ickes had approximately the same level of involvement in the media campaign as did the President.[130] Ickes did not have final approval (as the President did) and made fewer substantive changes than the President, but he "focused with greater scrutiny than the President on the amount and the distribution of the time buy."[131] For example, Ickes approved every questionnaire, script, time buy or other campaign expenditure.[132] He also chaired all the meetings with Sandler and Utrecht in which it was determined whether an advertisement should come from the DNC or Clinton/Gore '96.[133] In addition, Ickes was "heavily involved" in discussions concerning how much to spend on advertising and whether the President should accept Federal matching funds.[134] From July 1995 through August 1996, Ickes' level of involvement was roughly 10 to 20 percent of the President's level of involvement in the advertising campaign.[135]

*George Stephanopoulos*

Stephanopoulos was a senior White House advisor. From April through June 1995, Stephanopoulos did not have any significant involvement in the media process.[136] He became more involved in

[125] *Id.* at pp. 95–96.
[126] *Id.* at p. 188.
[127] *Id.* at p. 236.
[128] *Id.*
[129] *Id.* at pp. 236–37.
[130] *Id.* at p. 96.
[131] *Id.*
[132] *Id.* at p. 221.
[133] *Id.*
[134] *Id.* at p. 97.
[135] *Id.* at p. 188.
[136] *Id.* at p. 101.

September of 1995 and remained actively involved through Morris' departure from the campaign in August of 1996.[137] On behalf of both the DNC and Clinton/Gore '96, he reviewed advertising copy before it was approved and suggested changes to advertising visuals and advertising themes.[138] He also was in charge of the vetting process for factual accuracy for both DNC and Clinton/Gore '96 advertisements.[139] Beginning in May 1995, Stephanopoulos played a greater role in reviewing the polling conducted by Morris.[140] By September 1995, Stephanopoulos' role "evolved to a point where he received all questionnaires in advance and approved the questions and frequently made suggestions for modifications, additions, or deletions."[141] Morris also called Stephanopoulos "[e]ach morning at seven-twenty . . . with the data from the previous night's interviewing so he could report to the daily seven-thirty meeting that Leon [Panetta] held with the top White House staffers."[142] From July 1995 through August 1996, Stephanopoulos' level of involvement was roughly 70 to 80 percent of the President's level of involvement in the media campaign.[143]

*Erskine Bowles*

Bowles was a White House deputy chief of staff (and now serves as chief of staff). He attended the weekly strategy meetings and acted as a liaison between Morris and the President.[144] Bowles also supported Morris' view that advertising should not be conducted on a piecemeal basis.[145] At Bowles' suggestion, Morris divided the advertising plan into four components, each costing approximately $10 million.[146] From July 1995 through August 1996, Morris placed Bowles' level of involvement at roughly 10 to 20 percent of the President's level of involvement in the media campaign.[147]

*Doug Sosnik*

From July 1995 through August 1996, Sosnik's level of involvement was roughly 30 to 40 percent of the President's level of involvement in the media campaign.[148]

THE PRESIDENT AND VICE PRESIDENT AGREED TO LIMIT THE AMOUNT OF MONEY THEY WOULD SPEND ON THEIR CAMPAIGN, AND THE VIOLATION OF THAT AGREEMENT MAY CONSTITUTE A VIOLATION OF 18 U.S.C. § 371

In addition to the White House's coordination with and control of the DNC in producing and paying for ads containing electioneering messages on behalf of the President's reelection, there is a question as to whether the fundraising and expenditures neces-

[137] *Id.* at p. 103.
[138] *Id.* at p. 101–02.
[139] *Id.* at pp. 102, 106, 170.
[140] *Id.* at p. 107.
[141] *Id.*
[142] *See* Dick Morris, *Behind the Oval Office* (1997), p. 183.
[143] *See* Morris deposition, p. 188.
[144] *Id.* at p. 110.
[145] *Id.* at p. 111.
[146] *Id.*
[147] *Id.* at p. 188.
[148] *Id.*

sitated by the desire to run those ads constitute a "conspiracy to defraud the government."[149]

Under the FECA, a presidential candidate who accepts federal matching funds cannot exceed the applicable expenditure limits for his campaign.[150] To ensure that the statutory scheme and its purposes are complied with, the FECA requires that candidates who receive matching funds under 26 U.S.C. §9037 certify that they will not exceed the FECA expenditure limits.[151]

Here, the certification was made, and the government wrote its check only after being told that what in fact was already occurring (the raising and spending of private money) would not occur. The foresworn fundraising and spending was undertaken using the DNC as a conduit.

As pointed out above, the intent of the FECA in providing limited federal funding is to remove the candidate from the fundraising process and to prevent the raising of large private campaign contributions. The deal the taxpayers make with the candidate is that in exchange for their funding, the candidate will forswear outside money, thereby making it less likely that the election will be influenced or appear to be influenced by big money. Obviously, in the matter before us, the clear purpose of the law was circumvented. If a candidate can easily circumvent those limitations through coordination with a third party, such as by raising unlimited sums for a party committee the candidate controls, that objective of the statute is completely undermined.

The "defraud the United States" portion of section 371 of title 18 is broad in scope and is applicable to any activity that has the effect of defrauding the government. This is the case even if no other criminal statute has been violated. In other words, under section 371 even an act that is not itself a violation of any statute can result in criminal liability if the government is defrauded. Accordingly, the quotation attributed to Attorney General Reno that "a conspiracy has to be a conspiracy to violate specific laws" is incomplete.[152] That statement may be correct in regard to the portion of section 371 dealing with conspiracy "to commit an offense against the United States," but apparently does not address the conspiracy "to defraud the United States," which is the other portion of section 371. So even though it appears that the FECA may have been violated, even if the FECA was not violated, the activity at issue may still constitute a conspiracy to defraud the United States.

For instance, in *United States* v. *Touhey*,[153] the court decided a case in which the defendants conspired to gain control of a bank without reporting the transaction to the FDIC. Because each coconspirator purchased less than 10% of the bank's stock, the group thereby evaded the reporting requirement. Violations of the reporting requirements carry only civil, not criminal penalties. The court held that the defendants' acts defrauded the government by inter-

---

[149] Under 18 U.S.C. §371, "[i]f two or more persons conspire either to commit any offense against the United States, or . . . *to defraud the United States*, or any agency thereof, and commit an overt act in furtherance of the conspiracy, then they have committed a federal criminal offense" (emphasis supplied).

[150] 26 U.S.C. §9035. The expenditure limits are set out at 2 U.S.C. §441a(b)(1)(A).

[151] 26 U.S.C. §9033(b).

[152] David Johnston, "Campaign Finance: Wider Implications; Justice Dept. Reopens Campaign Plot Case," *The New York Times*, December 11, 1997, p. A24.

[153] 867 F.2d 534 (9th Cir. 1989).

fering and obstructing the FDIC's lawful government function of administering the banking laws. Therefore, criminal sanctions were imposed even though the underlying acts were not criminal violations.

The Supreme Court has read section 371 even more broadly. It has consistently held that the participants in a conspiracy need not conspire to violate any particular criminal or civil statute if they conspire to defraud the government. In the leading case, *Dennis* v. *United States,*[154] the defendants submitted false affidavits to the NLRB purporting to satisfy the requirement of federal labor law that union officials not be members of the Communist Party. Such an affidavit was required to be filed before the union could call upon the NLRB to investigate charges. The defendants were alleged to have falsely certified that they were not Communist Party members. The government charged the defendants with conspiracy to defraud the NLRB under section 371.

The Supreme Court found that, unable to secure the benefits of the NLRB without submitting non-Communist affidavits, the union officers deliberately concocted a fraudulent scheme. In furtherance of that scheme, they submitted false affidavits, and then used the NLRB facilities made available to the union.[155] The Court held that such a scheme was a conspiracy to defraud the United States, *whether or not the affidavits were themselves violations of the false statements statute.* As the Court found, section 371 covers "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government."[156] For the Court, the key facts of the conspiracy in *Dennis* were "that petitioners and their co-conspirators could not have obtained the Board's services and facilities without filing non-Communist affidavits; that the affidavits were submitted as part of a scheme to induce the Board to act; that the Board acted in reliance upon the fact that affidavits were filed; and that these affidavits were false. Within the meaning of section 371, this was a conspiracy to defraud the United States or an agency thereof."[157]

The advertisements themselves may be specific and credible evidence that overt acts were carried out in support of the conspiracy to evade the expenditure limits and other FECA requirements. The resulting interference and obstruction of the FEC's lawful function of administering the election laws as a result of either a civil or criminal violation of the FECA may form the basis for a criminal conspiracy to defraud the government under section 371.[158]

As far as the President's use of the DNC to run the money through, a person cannot protect himself from liability by doing something in another's name that he is not allowed to do himself.

---

[154] 384 U.S. 855 (1966).

[155] *Id.* at p. 861.

[156] *Id.*

[157] *Id.* at p. 862.

[158] In the most famous example of an attorney general's use of the discretionary provision of the Independent Counsel Act, Attorney General Meese sought the appointment of an independent counsel to investigate Col. Oliver North. The immediate issue presented in that case was whether any criminal law may have been violated by Col. North's diversion of CIA funds to the Nicaraguan *contra* rebels in light of the Boland Amendment which prohibited the use of CIA funds for that purpose. Violation of the Boland Amendment carried no civil or criminal penalties.

Direct criminal prohibitions are not skirted through indirect violation. *Whittaker* v. *Whittaker Corp.*[159]

Also, "[m]en must turn square corners when they deal with the Government." *Rock Island & L.R.R. Co.* v. *United States.*[160] Ordinary American citizens dealing with the Internal Revenue Service, for example, come to learn this quickly. Under our system of law, the same obligation is placed on the President.

COORDINATION BETWEEN THE DNC, CLINTON/GORE, THE WHITE HOUSE, AND UNION ORGANIZATIONS

Morris testified that in August 1995 Ickes organized and chaired a White House meeting in the Roosevelt Room between representatives of the DNC and Clinton/Gore '96 media team and approximately seven representatives of various labor unions.[161] Morris recalled the meeting was attended by, among other individuals, representatives of the National Education Association, the American Federation of State, County, and Municipal Employees, the American Federation of Labor-Congress of Industrial Organizations, Sosnik, Stephanopoulos and Ickes.[162] During the meeting, both the union representatives and the DNC and Clinton/Gore '96 media team displayed advertisements each had run or were considering running.[163] Morris testified that the union representatives:

> Spoke in turn about what their media plans were that they were planning to advertise in States of Republican Senators, they were going to spend $1 million over the course of the next year on doing it, here are the ads they had already run, here were the ads that they were about to run. It was a full briefing of us by them on their media plans.[164]

Morris testified that the union representatives "suggested to us [Clinton/Gore '96 and the DNC consultants] that there be coordination of the advertising . . . issue-oriented ads about the budget.[165] Morris also recalled the union representatives suggesting Clinton/Gore '96 should run advertisements in states where the unions were not advertising and, in particular, he recalled the following specific suggestion of coordination:

> And I remember in particular they said, for example, we're going to be on in Vermont to go after Jeffords, and you don't care about winning Vermont politically, so we'll do Vermont and you don't.[166]

While Morris could not recall the name of the individual who suggested the coordination, he believed it may have come from the union representatives' time buyer (possibly affiliated with Vic

[159] 639 F.2d 516 (9th Cir. 1981) (corporate insider violates section 6(a) of the Securities Act of 1934 by purchasing company stock for his mother's account over which he "exercised complete control" and selling stock for his own account within six months; this prohibition applies to such person's transactions "for his benefit").
[160] 254 U.S. 141, 143 (1920).
[161] *Id.* at pp. 216, 223.
[162] *Id.* at pp. 216–17.
[163] *Id.* at p. 217.
[164] *Id.* at p. 222.
[165] *Id.* at p. 217.
[166] *Id.*

Fingerhut's agency).[167] Morris testified that Ickes was in favor of the coordination.[168] In contrast, Morris testified that he rejected a coordinated advertising effort between the White House, the DNC, Clinton/Gore '96, and the unions because he believed the union's media strategy was flawed.[169]

## CONCLUSION

One does not expect government officials, with salaries paid by the taxpayers, to manage directly the day-to-day operations of a political party. Yet that is precisely what happened in 1995–96. Ickes ran the DNC as the President's "designee."

The White House's unprecedented level of control over the DNC arose because the DNC was not in any sense independent from the President's re-election effort; the DNC was merely a vehicle for financing Morris' advertising blitz. With the Democratic Party serving primarily as a re-election vehicle, the President wanted control. Ickes obliged that desire, and Fowler was unable to go over Ickes' head, because Ickes was merely doing the President's bidding.

The nation's oldest political party simply became an arm of the White House with the primary mission of re-electing the President. The illegalities and improprieties discussed in this report stem from this simple fact. The President's attempt to slough responsibility for illegal and improper fund-raising by the DNC in 1995–96 by pinning blame on "the other campaign" rings hollow in the light of the facts uncovered by the Committee's investigation and outlined in this report.

[167] *Id.* at p. 222.
[168] *Id.* at pp. 222, 224.
[169] *Id.*

# UNITED STATES SENATE

# COMMITTEE ON GOVERNMENTAL AFFAIRS

# SPECIAL INVESTIGATION FINAL REPORT

## Exhibits for Chapter 5: The White House Controlled the DNC and Improperly Coordinated the Activities of the DNC and Clinton/Gore '96

Doug: – Advisable to send or not? Harold

DS says no.

17 April 1996

MEMORANDUM TO CHAIRMAN FOWLER

| | |
|---|---|
| CC: | Chairman Dodd<br>B.J. Thornberry<br>Marvin Rosen<br>Brad Marshall<br>Doug Sosnik<br>Karen Hancox |
| From: | Harold Ickes |
| Re: | 15 April 1996 meeting |

This confirms the meeting that you and I and Doug Sosnik had on 15 April 1996 at your office during which it was agreed that all matters dealing with allocation and expenditure of monies involving the Democratic National Committee ("DNC") including, without limitation, the DNC's operating budget, media budget, coordinated campaign budget and any other budget or expenditure, and including expenditures and arrangements in connection with state splits, directed donations and other arrangements whereby monies from fundraising or other events are to be transferred to or otherwise allocated to state parties or other political entities and including any proposed transfer of budgetary items from DNC related budgets to the Democratic National Convention budget, are subject to the <u>prior</u> approval of the White House. It was agreed that a small working committee would be established which would include Chairman Fowler (or his representative), Chairman Dodd (or his representative), B.J. Thornberry, Brad Marshall, Marvin Rosen, Doug Sosnik, and others as may be agreed to, to meet at least once weekly, and more often if necessary, to implement this agreement.

**Exhibit 5-1**

Exhibit
5-2

THE PRESIDENT HAS SEEN
1/8/96

96 JAN 4 P3:44

2 January 1996

MEMORANDUM TO THE PRESIDENT
THE VICE PRESIDENT
LEON PANETTA
MAGGIE WILLIAMS
RON KLAIN
DOUG SOSNIK
KAREN HANCOX

CC: Chairman Dodd (w/o enc.)
Chairman Fowler (w/o enc.)
Marvin Rosen (w/o enc.)
Scott Pastrick (w/o enc.)
Richard Sullivan (w/o enc.)
Bobby Watson (w/o enc.)
Brad Marshall (w/o enc.)

From: Harold Ickes

Re: Democratic National Committee proposed calendar 1996 budget

Attached are three documents. The first, dated 21 December 1996 (should be "1995") is captioned "Democratic National Committee Proposed 1996 Budget". The second is an uncaptioned 10 page document, dated 12/21/95 in the upper right corner in my handwriting, which details the proposed "major donor" fundraising events for 1996. This is a very preliminary document, and Marvin Rosen is re-working it. The third is my 18 December 1995 memorandum to Chairman Dodd, et. al., and the answers to the seven questions posed in that memorandum.

On 21 December Doug Sosnik, Karen Hancox, I and others met with Chairman Fowler, Marvin Rosen and others from the Democratic National Committee to review the first draft of the proposed calendar 1996 DNC budget as well as the proposed source of funds.

According to Chairman Fowler, the attached proposed calendar 96 budget includes all DNC related budgets including the media budget, but inadvertently it does not include the $12 million so called 441(a)(d) money that can be spent by the DNC on the Presidential general election next year. Thus, $12 million needs to be added to both the expense side and the revenue side of

EOP 041267

these attached documents.

1. Debt: Line 3 on page 3 of the first document shows a total bank debt of $5.975 million carried over from 1995. This is only for the bank loan and interest. It does not include any unpaid bills from 1995 which may run another million or so. In addition, if the $1.2 million for media for the week beginning 29 December 1995 through 4 January 1996, which has been transferred to the media buyers, is, in fact, spent, the net debt carried over from 1995 will increased by another $1.2 million.

Line 1 on page 3 is zero, but as the footnote indicates, the amount of calendar 1995 debt that will be carried over to 1996 and which, at that time, will supplant the "0" in line 1, will depend upon fundraising as of 31 December (which Marvin Rosen says is ahead of schedule as of 12/21) and the 1995 unpaid bills carried to 1996, which could amount to at least $1 million.

The 1996 budget summary (page 3) does not include any of the $2 million scheduled to be spent for the coordinated campaign effort during calendar '95.

It should be noted that the last column on page 2 captioned "1995 total cost" is based on the 8 June 1995 DNC budget which has been substantially revised downward from the original $41.7 million to about $32 million.

2. Contributions: Line 12 on page 3 of the first document shows $1.3 million for "other contributions" during calendar 1995. This includes the DNC contributions to the three 1995 gubernatorial races. Lines 12, 13 and 14 do not include contributions made to the Oregon special election or the California special Congressional election.

3. Communications: Line 29 on page 3 of the first document shows $2.1 million for communications which includes personnel as well as a half hour/day for two days a week DNC tv program broadcast out of the Harriman Center.

4. 1996 Media budget: Page 5 of the first document details the assumptions for the 1996 DNC media budget, which totals $28.2 million. This may be unrealistically low.

5. Coordinated campaign: Page 7 of the first document shows coordinated campaign spending for the 1991-92 cycle and proposed coordinated campaign spending for 1996. The 4th column from the left, captioned "1991-'92 Total" shows actual payments made by the DNC of $14.3 million for the 1991- 92 period. By contrast, Chairman Fowler expects the DNC to spend some $25.0 million for coordinated campaign efforts during 1996. (In addition the DNC is scheduled to spend $2 million on coordinated campaign activities during 1995.)

EOP 041268

6. Revenue projection 1996: The total of $110 million shown on page 9 of the first document must be increased by $14 million representing the amount of so called 441(a)(d) funds the DNC can spend directly on the 1996 Presidential campaign. Thus the total revenue to be raised is $124.0 million. This does not include revenue to be raised by the DSCC, the DCCC, the DGA, additional fundraising by state parties nor any funds to be raised by individual candidates.

The second document is a very preliminary source of funds document prepared by Marvin Rosen, Scott Pastrick and Richard Sullivan. This will undoubtedly go through several more revisions before being "finalized". In any event, it describes the sources for $111.7 million, which includes $30 million gross from direct mail for 1996.

The third document is my 18 December 1995 memorandum to Chairman Dodd, et. al., and the DNC's response to the seven questions in my memo.

1. Cash Balances: As of 18 December all DNC operating accounts had a total balance of approximately $2.1 million and an additional $670,000 in undeposited checks.

2. Page 5 shows some $2.8 million in unpaid bills as of 19 December.

3. Page 8 shows a total of $5.6 million borrowed against the DNC's $7.0 million line of credit.

4. Page 9 shows a potential debt of $5.2 million as of the end of calendar 1995. If the $1.2 million of media is run beginning the week of 28 December through 4 January 1996, the total potential debt as of the end of calendar 1995 would be approximately $6.4 million.

5. Finally, pages 10 and 11 show deposits from fundraising for the period 23 October - 18 December 1995. As Marvin Rosen pointed out, the fundraising is running ahead of schedule.

Document #1

# Democratic National Committee

## Proposed

## 1996 Budget

December 21, 1996

65

136

## Section 1

## Operating Budget

EOP 041271

Democratic National Committee
1996 Budget Summary

| 20 December 1996 | 1996 # Emp | 1996 Personnel Cost | 1996 Other Costs | 1996 Total Costs | 1995 # Emp | 1995 Total Costs |
|---|---|---|---|---|---|---|
| **Debt Service:** | | | | | | |
| 1 Prior Year's Unfunded Defic.. | | | | | | |
| 2 Principal on Bank Loan | | | | | | |
| 3 Interest on Bank Loan | | | | | | |
| Sub-Total | | 0 | 5,975,000 | 5,975,000 | | 4,450,000 |
| **Fundraising:** | | | | | | |
| 4 Major Donor Fundraising | 52 | 2,368,140 | 9,200,000 | 11,568,140 | 26 | 5,263,470 |
| 5 Direct Mail | 10 | 344,423 | 11,175,000 | 11,519,423 | 6 | 5,442,038 |
| Sub-Total | 62 | 2,712,563 | 20,375,000 | 23,087,563 | 32 | 10,705,508 |
| **Direct White House Support:** | | | | | | |
| 6 Consultants-White House | | | | | | |
| 7 Polling | | | | | | |
| 8 Direct White House Support | | | | | | |
| 9 Arkansas Office | | | | | | |
| 10 VP Liaison | | | | | | |
| 11 Community Service | | | | | | |
| Sub-Total | 20 | 1,031,221 | 4,356,500 | 5,387,721 | 18 | 4,638,994 |
| **Contributions:** | | | | | | |
| 12 Other Contributions | | | | | | |
| 13 Contribution to DLCC | | | | | | |
| 14 Contribution to College Dems | | | | | | |
| Sub-Total | | 0 | 1,150,000 | 1,150,000 | | 1,725,000 |
| **DNC Operations:** | | | | | | |
| 15 Chairman-Fowler | | | | | | |
| 16 Chairman-Dodd | | | | | | |
| 17 Chief of Staff | | | | | | |
| 18 Computer Services | | | | | | |
| 19 Accounting & Travel Office | | | | | | |
| 20 Administration | | | | | | |
| 21 General Counsel | | | | | | |
| 22 Research | | | | | | |
| 23 Secretary's Office | | | | | | |
| 24 DNC Affairs | | | | | | |
| 25 State Chairs | | | | | | |
| 26 Vice Chairs | | | | | | |
| 27 Campaign | | | | | | |
| 28 Consultants-DNC | | | | | | |
| 29 Communications | | | | | | |
| 30 Information Services-External | | | | | | |
| 31 Contingency | | | | | | |
| 32 Cost of State Swaps | | | | | | |
| 33 Retirees | | | | | | |
| Sub-Total | 140 | 7,600,298 | 12,833,500* | 20,433,798 | 108 | 11,209,978 |
| **Investment in DNC for 1996 Campaigns.** | | | | | | |
| 34 Information Services | | | | | | |
| 35 Research | | | | | | |
| 36 Campaign | | | | | | |
| 37 Communications | | | | | | |
| 38 Carryover Reserve for 1996 Campaign | | | | | | |
| Sub-Total | | | | | | 9,000,000 |
| **GRAND TOTAL** | 222 | $ 11,344,082 | $ 44,690,000 | $ 56,034,082 | 158 | $ 41,729,480 |

* Amount depends on fundraising from this date to 12/31/95 and unbudgeted 1995 bills received in 1996

REDACTED

FOP 041272

138

## Section 2

## Media Budget

EOP 041273

**Democratic National Committee**
**1996 Media Budget**

20 December 1996

| | |
|---|---|
| **1 Television (1 Jan-30 Mar 1996)** | |
| Assume ten weeks: $1,200,000 per week | $ 12,000,000 |
| Production costs | 500,000 |
| Total for the period | 12,500,000 |
| **2 Television (1 Sep-7 Nov 1996)** | |
| Assume nine weeks: $1,500,000 per week | 13,500,000 |
| Production costs | 750,000 |
| Total for the period | 14,250,000 |
| **3 Ethnic Media** | |
| Newspapers | 500,000 |
| Radio | 1,000,000 |
| Total for the period | 1,500,000 |
| **Grand Total 1996 Media Budget** | $ 28,250,000 |

140

## Section 3

## Coordinated Campaign Budget

EOP 041275

COORDINATED CAMPAIGNS
DNC Transfers to State Parties

| State | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| Alabama | | | | | | |
| Alaska | | | | | | |
| Arizona | | | | | | |
| Arkansas | | | | | | |
| California | | | | | | |
| Colorado | | | | | | |
| Connecticut | | | | | | |
| Delaware | | | | | | |
| Florida | | | | | | |
| Georgia | | | | | | |
| Hawaii | | | | | | |
| Idaho | | | | | | |
| Illinois | | | | | | |
| Indiana | | | | | | |
| Iowa | | | | | | |
| Kansas | | | | | | |
| Kentucky | | | | | | |
| Louisiana | | | | | | |
| Maine | | | | | | |
| Maryland | | | | | | |
| Massachusetts | | | | | | |
| Michigan | | | | | | |
| Minnesota | | | | | | |
| Mississippi | | | | | | |
| Missouri | | | | | | |
| Montana | | | | | | |
| Nebraska | | | | | | |
| Nevada | | | | | | |
| New Hampshire | | | | | | |
| New Jersey | | | | | | |
| New Mexico | | | | | | |
| New York | | | | | | |
| North Carolina | | | | | | |
| North Dakota | | | | | | |
| Ohio | | | | | | |
| Oklahoma | | | | | | |
| Oregon | | | | | | |
| Pennsylvania | | | | | | |
| Rhode Island | | | | | | |
| South Carolina | | | | | | |
| South Dakota | | | | | | |
| Tennessee | | | | | | |
| Texas | | | | | | |
| Utah | | | | | | |
| Vermont | | | | | | |
| Virginia | | | | | | |
| Washington | | | | | | |
| West Virginia | | | | | | |
| Wisconsin | | | | | | |
| Wyoming | | | | | | |
| D C | | | | | | |
| Voter Reg. | | | | | | |
| TOTAL | 4,332,683 | 3,456,328 | 14,320,011 | 25,024,534 | 19,075,559 | 13,945 [illegible] |

REDACTED

142

# Section 4

# Revenue Budget

EOP 0.

Democratic National Committee
1996 Revenue Projection

20 December 1996

| | |
|---|---|
| Direct Mail (Gross) | $ 30,000,000 |
| Major Donor | 80,000,000 |
| Total | $ 110,000,000 |

144

## Section 5

### Summary

EOP 041

**Democratic National Committee**
**1996 Budget Summary**

20 December 1996

| | |
|---|---|
| **Operating Budget** | $ 56,034,082 |
| **Media Budget** | 28,250,000 |
| **Coordinated Campaign Budget** | 25,024,554 |
| Total Expenditures | 109,308,636 |
| **Revenue Projection** | 110,000,000 |
| **Projected Surplus** | $ 691,364 |

Document #2

12/21/95
DNC
[illegible]

**SUMMARY**

| | | |
|---|---|---|
| POTUS EVENTS | 50,200,000 | See enclosed |
| VPOTUS EVENTS | 10,750,000 | See enclosed |
| FLOTUS/TG/WLF | 5,000,000 | See enclosed fir: quarter requests |
| TRUSTEE | 8,000,000 | See enclosed f quarter requests |
| LABOR | 4,000,000 | |
| NFC | 1,500,000 | |
| ASIAN COUNCIL | 1,000,000 | |
| HISPANIC COUNCIL | 250,000 | |
| AFRICAN AMERICAN | 500,000 | |
| CHAIRMAN'S COUNCIL | 500,000 | |
| DIRECT MAIL | 30,000,000 | |
| TOTAL | 111,700,000 | |

EOP

FIRST QUARTER MONEY ESTIMATES

| MONTH | PRINCIPLE | EVENT/SOURCE | $ AMOUNT |
|---|---|---|---|
| JANUARY | | | |
| | POTUS | DC (Texas Trustees) | 500K |
| | POTUS | New York | 300K |
| | POTUS | Nashville | 200K |
| | VPOTUS | DC (2 dinners) | 400K |
| | VPOTUS | New York (Perelman) | 250K |
| | • FLOTUS/MEG | Philadelphia | 250K |
| | n/a | (Labor, Trustee, etc.) | 1.575 mil. |
| | TOTAL | | 3.475 mil. |
| FEBRUARY | | | |
| | POTUS | New Jersey | 1.5 mil. |
| | VPOTUS | DC (2 Dinners) | 400K |
| | VPOTUS | Miami (DBC Conference) | 200K |
| | VPOTUS | Ft. Lauderdale | 200K |
| | VPOTUS | New York | 200K |
| | VPOTUS | Pittsburgh | 200K |
| | • FLOTUS | L.A. | 250K |
| | • FLOTUS | Miami | 250K |
| | * MEG | Orange County | 50K |
| | n/a | (Labor, Trustee, etc.) | 1.575 mil. |
| | TOTAL | | 4.825 mil. |
| MARCH | | | |
| | POTUS | DC | 3 mil. |
| | POTUS | DC Saxophone | 250K |
| | POTUS | Little Rock | 1 mil. |
| | POTUS | Detroit | 600K |
| | VPOTUS | DC (2 dinners) | 400K |
| | VPOTUS | Columbus | 200K |
| | VPOTUS | Cinncinnati | 200K |
| | VPOTUS | New York/New Jersey | 200K |
| | VPOTUS | Kansas City | 200K |
| | • FLOTUS | New York | 250K |
| | • FLOTUS | Boston | 250K |
| | * MEG | Atlanta | 50K |
| | * MEG | Tennessee | 50K |
| | n/a | (Labor, Trustee, etc.) | 1.575 mil. |
| | TOTAL | | 8.225 mil. |

SECOND QUARTER MONEY ESTIMATES

| MONTH | PRINCIPLE | EVENT/SOURCE | $ AMOUNT |
|---|---|---|---|
| APRIL | | | |
| | POTUS | Florida | 2 mil. |
| | POTUS | Philadelphia | 1 mil. |
| | POTUS | Denver | 1 mil. |
| | POTUS | Baltimore | 750K |
| | VPOTUS | DC (2 dinners) | 400K |
| | VPOTUS | Los Angeles | 200K |
| | VPOTUS | San Jose | 200K |
| | • FLOTUS | DC | 250K |
| | • FLOTUS | Colorado | 250K |
| | + MEG | Pittsburgh | 50K |
| | n/a | (Labor, Trustee, etc) | 1.575 mil. |
| | TOTAL | | 7.675 mil. |
| MAY | | | |
| | POTUS | Los Angeles | 3 mil. |
| | POTUS | Los Angeles (Sax) | 250K |
| | POTUS | San Francisco | 1.5 mil. |
| | POTUS | San Francisco (Sax.) | 100K |
| | POTUS | Hartford | 1 mil. |
| | POTUS | Boston | 2 mil. |
| | POTUS | DC (Jewish) | 1.250 mil. |
| | VPOTUS | DC (2 dinners) | 400K |
| | VPOTUS | New York | 200K |
| | • FLOTUS | TBD | 250K |
| | • FLOTUS | TBD | 250K |
| | + MEG | TBD | 50K |
| | n/a | (Labor, Trustees, etc) | 1.575 mil. |
| | TOTAL | | 11.825 mil. |
| JUNE | | | |
| | POTUS | Houston/Dallas | 1 mil. |
| | POTUS | New York | 3 mil. |
| | POTUS | New York (Sax.) | 250K |
| | VPOTUS | DC (2 dinners) | 400K |
| | VPOTUS | San Antonio | 200K |
| | VPOTUS | Fort Worth | 200K |
| | • FLOTUS | TBD | 250K |
| | • FLOTUS | TBD | 250K |
| | + MEG | TBD | 50K |
| | n/a | (Labor, Trustees, etc) | 1.575 mil. |
| | TOTAL | | 7.175 mil. |

EOP 0....

**POTUS**

TOTAL FROM REQUESTED CITIES - $50,200,000

In addition, we project $13,000,000 from Trustees, Labor and the Asian community through the separate POTUS DC events as noted in the enclosed first quarter requests.

| MONTH | | AMOUNT |
|---|---|---|
| **JAN.** | | |
| DC (Texas) | 1/5 | 500,000 (Truman Arnold) |
| New York | 1/11 | 300,000 (Rescheduled C/G event) |
| Nashville | 1/12 | 200,000 (Rescheduled C/G event) |
| **FEBRUARY** | | |
| New Jersey | | 1,500,000 |
| **MARCH** | | |
| DC | | 3,000,000 |
| DC Saxophone | | 250,000 |
| Little Rock | | 1,000,000 |
| Detroit | | 600,000 (Rescheduled C/G event) |
| **APRIL** | | |
| Florida | | 2,000,000 |
| Philadelphia | | 1,000,000 |
| Denver | | 1,000,000 |
| Baltimore | | 750,000 |
| **MAY** | | |
| Los Angeles | | 3,000,000 |
| Los Angeles Saxophone | | 250,000 |
| San Francisco | | 1,500,000 |
| San Francisco Saxophone | | 100,000 |

| | |
|---|---|
| Hartford | 1,000,000 |
| Boston | 2,000,000 |
| DC Jewish | 1,250,000 |
| **JUNE** | |
| Houston/Dallas | 2,000,000 |
| New York | 3,000,000 |
| New York Saxophone | 250,000 |
| **JULY** | |
| **AUGUST** | |
| Convention | 4,000,000 |
| **SEPTEMBER** | |
| Miami | 2,000,000 |
| DC | 2,000,000 |
| DC Saxophone | 300,000 |
| Chicago | 1,500,000 |
| Denver | 750,000 |
| Philadelphia | 500,000 |
| New Jersey | 750,000 |
| DC Women's Satellite | 1,000,000 |
| **OCTOBER** | |
| New York | 3,000,000 |
| New York Saxophone | 300,000 |
| Los Angeles | 3,000,000 |
| Los Angeles Saxophone | 250,000 |
| Houston | 1,500,000 |
| San Francisco | 1,000,000 |

EOP

151

| Boston | 2,000,000 |
| --- | --- |

EOP 041286

**VPOTUS**

Two Dinners in Washington, DC each month.
Each raises $200,000 for total of $4,000,000 (20 events).

The minimum goal for each event outside of D.C. is $250,000 for a total of $6,750,000 (27 events)

**JAN.**

New York (Perelman)

**FEBRUARY**

Miami (DBC Conference)
Ft. Lauderdale
New York
Pittsburgh

**MARCH**

Columbus
Cincinnati
New York/New Jersey
Kansas City

**APRIL**

Los Angeles
San Jose

**MAY**

New York

**JUNE**

San Antonio
Ft. Worth

**JULY**

Miami
Nashville
Memphis

**AUGUST**

Long Island

**SEPTEMBER**

Raleigh
Atlanta
Birmingham
Pittsburgh
New York/New Jersey

**OCTOBER**

New Orleans
Detroit
Minneapolis
New York

**FLOTUS**

**MONTH**

**JANUARY**

Philadelphia

**FEBRUARY**

L.A.

Miami

**MARCH**

New York

Boston

**APRIL**

Washington, D.C.

Colorado

FIRST QUARTER REQUESTS

MEG

MONTH

JANUARY

Philadelphia

FEBRUARY

Orange County, CA

MARCH

Atlanta

Tennessee

APRIL

Pittsburgh

EOP 041290

Exhibit
5-3

31 January 1996

CONFIDENTIAL

MEMORANDUM TO THE PRESIDENT
THE VICE PRESIDENT

CC: Leon Panetta
Maggie Williams
Ron Klain
Doug Sosnik
Karen Hancox
Chairman Dodd
Chairman Fowler
Marvin Rosen
Brad Marshall

From: Harold Ickes

Re: Estimated DNC and other expenditures for calendar 1996

As shown below, it is estimated that to meet anticipated expenditures by the DNC, GELAC and finish up the Re-elect primary fundraising will run about $160.6 million for calendar 1996. This includes an estimated $56.0 million for the DNC's general operating budget, an additional $44.5 for media time buys for a 31 week period at $1.4 million/week, $25 million for coordinated campaigns, $12 million for the 441(a)(d) expenditures by the DNC during the general election, and $2 million contributions of "federal" dollars to the DCCC (a commitment by the DNC for which has not yet been made).

On 30 January I met with Chairman Fowler, Chairman Dodd, and several people from the DNC as well as Doug Sosnik and Karen Hancox. It was agreed that the DNC would revise its proposed general operating budget by reducing it by $7 million to at least $49 million rather then the original estimated $56 million. If it is reduced to $49 million, that will compare to approximately $34 million in DNC operating expenditures during calendar 1995. This will mean that the DNC's proposed operating budget for 1996 (assuming a $49 million level) would be $15 million more in an election year then the 1995 budget. Of that $15 million

157

increase, $13 million is due directly to additional fundraising costs, of which approximately $6 million represents an increase in the direct mail budget and $7 million represents an increase in the fundraising efforts with regard to "major donors".

Chairman Fowler was also asked to take a very hard look at the $25 million coordinated campaign's budget and see how much savings could be achieved there.

### Estimated expenditures 1996 (in millions)

DNC

| | | | |
|---|---|---|---|
| 1. | General operating budget | 56.0 | |
| 2. | Media fund | 44.5 | (1) |
| 3. | Coordinated campaigns | 25.0 | |
| 4. | 441(a)(d) | 12.0 | (2) |
| 5. | GOTV media | 5.0 | (3) |
| 6. | Contributions to DCCC | 2.0 | |
| 7. | Debt retirement CP/ | | |
| | MI state parties | 1.1 | |
| | SUBTOTAL | 145.6 | |

RE-ELECT

8. GELAC
9. Re-elect primary
   SUBTOTAL

COMMITTEES

**REDACTED**

10. DSCC
11. DCCC
12. DGA
    SUBTOTAL

OTHER

13. State parties
14. Individual Senate/House/
    Gubernatorial candidates
    SUBTOTAL

I suggest a meeting early next week including the President, Vice President, Chairman Dodd and Chairman Fowler to review the revised proposed DNC operating budget and other proposed expenditures listed above.

_____

(1)  - 21 weeks over time at $1.4 million/week per person
      8 January - 31 May 1996.
      (footnote continued on following page)

EOP 027562

- 10 weeks media buy at 1.4/week for period 3 September- 4 November 1996.
- Does not include production.

(2) To be spent by DNC after Labor Day directly promoting the Clinton/Gore ticket.

(3) This has been requested by the DCCC and constitutes federal dollars ($1,000 per person contributions).

(4) Funds for legal and accounting expenditures for the general election campaign.

(5) Remains to be raised by direct mail for the C/G '96 primary campaign. 75% is expected to be matched.

POSSIBLE SOLUTION FOR CAMPAIGN BUDGET

Media Spending

1. Authorize advertising efforts to begin as of Wednesday, March 6th. Implement the proposed time-buy schedule for March-May as of that date.

2. Cut 8-10% from the remaining proposed buy for the months of March-May (limited avails may necessitate something close to this anyway).

3. Resulting media budget:

| | |
|---|---|
| 6/7- 1995 | $2.40 million |
| Mar - May | $1.65 million |
| June - Aug | $7.60 million |
| Production | $0.35 million |
| TOTAL | $12.00 million |

Other Spending

1. Approve budget as submitted yesterday, with an increase of $900,000 in media spending, pursuant to proposal above.

2. Create savings to fund this $900,000 increase by:

-- Reducing travel by $650,000 (by using official travel instead of political as much as possible in April - July, and by reexamining use of DNC funding for VP, HRC, and MBG fundraising trips)

-- Reducing HQ Personnel, Administration, Convention, Finance, Legal, Accounting, and Correspondence by 3% ($250,000)

Exhibit
5-4

# MEMORANDUM

MEMO TO: DNC Fundraisers

FROM: Don Fowler

RE: Donors' Address

DATE: August 1, 1996

When you receive contributions, you must get the addresses of the donors. That seems fairly basic, but some DNC fundraisers are not bothering to do it. From now on, no DNC fundraiser will receive credit for a check until we have a complete address. In the case of a company check, we also must have the name of a contact person.

Besides needing the address for our report to the FEC, we have to have an address to thank the donor. It is terribly embarrassing to me personally, as it should be to you, when a donor is not thanked.

In no circumstances are you to turn in a wrong address just to fill in the blanks. Some of you recently have submitted names with the DNC's address. That is not acceptable.

If you are able to get people to give you checks for thousands of dollars, you really should be able to get them to give you their addresses.

B. Pressure campaign aimed at Swing Republican Senators on medicare during recess

July 26 '95

1. Target recess paid media, funded by DNC, to aim at key moderate Republican Senators

a. Hit small states with moderate Republican Senators

Ashcroft, Missouri
Bond, Missouri
Chaffee, RI
Cohen, Me
Snow, Me
Dominici, NM
Hatfield, Oregon
Packwood, Oregon
Jeffords, Vt
Kasselbaum, Kansas
~~Murkowski, Alaska~~
~~Stevens, Alaska~~
Bennett, Utah

+ Tenn + Col
+ S.D.

b. 1,200 Points in these states would cost $500,000

c. Use DNC to pay for it, we control production

d. In 1983, RNC did ads on inflation in March & July

2. Get constituency groups to bring pressure

3. flesh out Republican ideas and educate media

EXHIBIT
1258
Aug 18 '91 7:53 P.01/05
Feb 22 '96
EXHIBIT
24
Ickes

MEMO FOR PRESIDENT, VICE PRESIDENT, PANETTA, ICKES, LIEBERMAN, LEWIS AND SOSNIK ONLY

Crying Need for use of Clinton Gore media to fill the gap in swing states.

1. In current week:

DNC buy now $375,000 (12% of US)
CG not on the air at all

2. next week:-- 2-27—3-4

DNC buy: $344,000 (12%)
NEED CG Money: $873,000 ( 32%)

Total of US reached: 48%
Money spent: 1.0 million

3. week of 3-4 – 3-11

DNC buy: $650,000 (24%)
CG buy: $537,000 (24%)

Total of US reached: 48%
Money Spent: $1.2 million

4. week of 3-12 – 3-18

DNC buy: $941,000 (33%)
CG buy: $330,000 (15%)

Total of US reached: 48%
Money spent: 1.3 million

Exhibit
5-6

2/22/96

5. week of 3-19 -- 3-25

DNC buy: 1,282,000 (45%)
CG buy: 88,250 (3%)

Total of US reached: 48%
Money spent: 1.4 million

6. week of 3-26 – 4-1

DNC buy: 1,234,000 (43%)
CG buy: 0

7. week of 4-2 -- 5-28

DNC buy: $11,260,000 (43%)
CG buy: $820,000 (6%)

8. Total Clinton Gore Money through May 28: $2.5 mil.

1. Unless Alexander is nominated and we cannot use DNC money to attack him.

2. If Dole is nominated, we need no additional CG money for media before May 28 since we can attack Dole with DNC money

9. Total DNC money now through May 28,$15,733,000

C. Failure to advertise is, once again catching up with us Feb 22 '96

1. two weeks ago we were off the air entirely
2. last week, we advertised to only 26% of US
3. This week, we are hitting only 12% of US
4. Next week, we will scheduled to hit only 12% again
5. This is just not enough to move the country.

D. Vast opportunity -- to develop a condominium on the low 50s while Republicans are in disarray

Feb 22, '96

E. Danger -- That while everybody is talking "Republican", Clinton is nowhere to be seen and we are not exploiting their negatives to build our strength

# PLAINTIFFS' EXHIBIT 6

# COORDINATED EXPENDITURE LIMITS: CAN THEY BE SAVED?

*Scott E. Thomas & Jeffrey H. Bowman**

In *Buckley v. Valeo*,[1] the Supreme Court upheld the Watergate-inspired limits on contributions to federal candidates, but ruled that a similar ceiling on independent expenditures was unconstitutional.[2] In so ruling, the Court recognized the many opportunities for evasion of the contribution limits created by its holding. Thus, the *Buckley* Court drew a specific distinction between expenditures "made *totally independently* of the candidate and his campaign" and "prearranged or *coordinated* expenditures amounting to disguised contributions" that could be constitutionally regulated.[3]

Fueled in large part by the Supreme Court's decisions in *Colorado Republican Federal Campaign Committee v. Federal Election Commission* (*Colorado Republican*)[4] and *Federal Election Commission v. Massachusetts Citizens for Life, Inc.* (*MCFL*),[5] new and important questions have arisen about the coordination issue. Must the Federal Election Commission prove, in effect, a narrow "meeting of the minds" quasi-contractual arrangement before it may make a finding of coordination, or are the provisions of the Federal Election Campaign Act (FECA or the Act)[6] and the "general understanding" language of *Colorado Republican*[7] adequate? Even if coordination is found, does *MCFL* dictate that there must be "express advocacy" present in order for a disbursement to be considered a contribution?[8] How these questions on coordination are re-

* Scott E. Thomas currently serves as Chairman of the Federal Election Commission. He earned his B.A. at Stanford University in 1974 and his J.D. at Georgetown Law Center in 1977. Jeffrey H. Bowman currently serves as the Executive Assistant to the Chairman. He earned his B.S. at the University of Wisconsin-LaCrosse in 1976 and his J.D. at George Washington University in 1979. The opinions in this article are those of the authors and should not be attributed to the Federal Election Commission.

1. 424 U.S. 1 (1976).
2. *See id.* at 143.
3. *Id.* at 47 (emphasis added).
4. 518 U.S. 604 (1996).
5. 479 U.S. 238 (1986).
6. Federal Election Campaign Act of 1971, Pub. L. No. 92-225, 86 Stat. 3 (1971) (codified as amended at 2 U.S.C. §§ 431-55 (1994 & Supp. IV 1998)).
7. *See Colorado Republican*, 518 U.S. at 614.
8. *See Massachusetts Citizens for Life*, 479 U.S. at 249.

solved will have a dramatic impact on the current campaign finance system and the role of "soft money"[9] in that system.

This article will show that a narrow, limited test for coordination, particularly if combined with an "express advocacy" component, will create not only a major loophole in the current contribution limits, but also fresh opportunities for the infusion of soft money into the federal election process. Part I discusses the origins of the current contribution limits and the judicial and congressional concern that those limits not be easily evaded. Part II analyzes the "meeting of the minds" test and the *Colorado Republican* decision by reviewing two recent Commission enforcement actions involving the coordination issue. Part III considers *MCFL* and whether express advocacy is necessary for a finding of a coordinated expenditure. Finally, this article concludes that for effective contribution limitations, reporting provisions, and statute prohibitions, narrow concepts of coordination and express advocacy cannot be applied.

## I. CONGRESSIONAL AND JUDICIAL CONCERN OVER CONTRIBUTION LIMITS

Memories of the Watergate scandal and allegations of "Government for Sale" on both sides of the political aisle were very fresh when Congress passed the Federal Election Campaign Act Amendments of 1974[10] a quarter of a century ago. In fact, legislative debates on campaign finance proposals were often interspersed with discussions on impeachment proceedings. Not surprisingly, the legislative record before Congress when it passed the 1974 Amendments "was replete with specific examples of improper attempts to obtain governmental favor in return for large campaign contributions."[11] Indeed, "[r]evelations of huge contributions from the dairy industry, a number of corporations (illegally) and ambassadors and potential ambassadors . . . dramatize[d] . . . the widespread concerns over the problem of undue influence."[12]

In response to this perception of undue influence, the 1974 Amend-

9. The phrase "soft money" commonly refers to funds that cannot be contributed to a federal candidate or political committee under the Act. These include: contributions in excess of statutorily prescribed limits (2 U.S.C. § 441a (1994)), corporate and labor contributions (2 U.S.C. § 441b (1994)), and contributions by foreign nationals in federal, state, and local elections (2 U.S.C. § 441e (1994)).

10. Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, 88 Stat. 1263.

11. Buckley v. Valeo, 519 F.2d 821, 839 n.37 (D.C. Cir. 1975) (per curiam), *aff'd in part, rev'd in part*, 424 U.S. 1 (1976).

12. *Id.* at 839-40 (footnotes omitted).

HeinOnline -- 49 Catholic U. L. Rev. 134 1999-2000

ments contained two key provisions. One of these provisions stated that "no person shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $1,000."[13] Another provision states that "no person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000."[14]

In *Buckley v. Valeo*, the Supreme Court upheld all of the challenged contribution ceilings against First Amendment attack.[15] The Court found that "the Act's primary purpose—to limit the actuality and appearance of corruption resulting from large individual financial contributions-[provides] . . . a constitutionally sufficient justification for the $1,000 contribution limitation."[16] The Court explained:

> To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.[17]
>
> Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions . . . . Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent."[18]

---

13. 18 U.S.C. § 608(b)(1) (Supp. IV 1970).

14. *Id.* § 608(e)(1).

15. *See Buckley*, 424 U.S. at 35-36, 38, 58. In particular, the *Buckley* Court upheld the $1000 limit on the amount a person could contribute to a candidate or the candidate's principal campaign committee; the $5000 limit on the contributions by a multicandidate political committee to a candidate or the candidate's principal campaign committee; and the overall $25,000 yearly limit on individual contributions. *See id. California Medical Ass'n v. Federal Election Commission* also upheld these provisions. *See* 453 U.S. 182, 194 n.15 (1981).

16. *Buckley*, 424 U.S. at 26.

17. *Id.* at 26-27. In mentioning the "deeply disturbing examples" of impropriety surfacing after the 1972 elections, the Court dropped a footnote and referred to the D.C. Circuit's opinion in *Buckley* "discuss[ing] a number of the abuses uncovered after the 1972 elections." *Id.* at 27 n.28.

18. *Id.* at 27 (quoting United States Civil Serv. Comm'n v. National Ass'n of Letter

The Court found that "Congress was surely entitled to conclude . . . that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions."[19]

By contrast, the *Buckley* Court held unconstitutional the ceiling on *independent* expenditures contained in section 608(e)(1) of the 1974 Amendments.[20] It found that "there was a fundamental constitutional difference between money spent to advertise one's views *independently* of the candidate's campaign and money contributed to the candidate to be spent on his campaign."[21] It was crucial, in the Court's view, that "§ 608(e)(1) limits expenditures for express advocacy of candidates made *totally independently* of the candidate and his campaign."[22] The Court explained:

> Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The *absence of prearrangement and coordination* of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.[23]

In response to the Supreme Court decision in *Buckley*, Congress enacted a definition of "independent expenditure" as part of the Federal

---

Carriers, 413 U.S. 548, 565 (1973)); *see also* Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 208 (1982) ("[I]n *Buckley*[,] . . . we specifically affirmed the importance of preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption."); *California Med. Ass'n*, 453 U.S. at 194-95:

> [In *Buckley*, . . . we] reasoned that such contribution restrictions did not directly infringe on the ability of contributors to express their own political views, and that such limitations served the important governmental interests in preventing the corruption or appearance of corruption of the political process that might result if such contributions were not restrained.

*Id.*

19. *Buckley*, 424 U.S. at 28. The Court went on to state that "Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." *Id.* at 30.

20. *See id.* at 51.

21. Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 497 (1985) (emphasis added).

22. *Buckley*, 424 U.S. at 47 (emphasis added).

23. *Id.* at 47 (emphasis added). The *Buckley* Court held the independent expenditure limits to be unconstitutional "because [it] found no tendency in such expenditures, *uncoordinated* with the candidate or his campaign, to corrupt or to give the appearance of corruption." *Political Action Comm.*, 470 U.S. at 497 (emphasis added).

Election Campaign Act Amendments of 1976, now codified at 2 U.S.C. § 431(17).[24] The legislative history indicates that the purpose behind 2 U.S.C. § 431(17) was to preserve the distinction drawn by the Supreme Court between those expenditures that were "totally independent" of the candidate's campaign and those that were not.[25] In fact, the concern with total independence was so complete that the Conference Report discussing 2 U.S.C. § 431(17) takes great pains specifically to allow for just one type of candidate communication: "[A] general request for assistance in a speech to a group of persons by itself should not be considered to be a 'suggestion' that such persons make an expenditure to further such election or defeat."[26] Apparently, any candidate or campaign request for assistance beyond such general remarks to a group should be construed as a "suggestion" and improper coordination.

The current language of the Act reflects this judicial and congressional concern that independent expenditures be "totally independent." The FECA at 2 U.S.C. § 431(17) defines "independent expenditure" as

> an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made *without cooperation or consultation* with any candidate, or any authorized committee or agent of such candidate, *and which is not made in concert with, or at the request or suggestion of*, any candidate, or any authorized committee or agent of such candidate.[27]

11 C.F.R. § 109.1(b)(4)(i) "clarif[ies] this language"[28] and explains that an expenditure will not be deemed independent if there is "*any* arrangement, coordination or direction by the candidate or his . . . agent prior to the publication, distribution, display, or broadcast of the communica-

---

24. Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283, 90 Stat. 475 (1976) (codified at 2 U.S.C. § 431(17) (1994)).

25. *See* H.R. CONF. REP. NO. 94-1057, at 38 (1976). Specifically, the Conference Report states: "The definition of the term 'independent expenditure' in the conference substitute is intended to be consistent with the discussion of independent political expenditures which was included in *Buckley v. Valeo*." *Id.*

26. *Id.* The legislative history of 2 U.S.C. § 431(17) reflects real congressional concern over the possibility that independent expenditures could be used to circumvent the contribution limitations. *See, e.g., Federal Election Campaign Act Amendments, 1976: Hearing on S. 2911 et al., Before the Subcomm. on Privileges and Elections of the Senate Comm. on Rules and Admin.*, 94th Cong. 77 (1976) (remarks of Senators Cannon, Scott, and Kennedy); *id.* at 85 (statement of Senator Mondale); *id.* at 89 (remarks of Senator Griffin); *id.* at 98 (remarks of Senator Buckley); *id.* at 107-08, 130 (remarks of then Assistant Attorney General Scalia).

27. 2 U.S.C. § 431(17) (1994) (emphasis added).

28. Federal Election Comm'n v. National Conservative Political Action Comm., 647 F. Supp. 987, 990 (S.D.N.Y. 1986).

tion."[29] The regulations further state that an expenditure is presumed not independent if it is:

(A) Based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made; or

(B) Made by or through any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agent.[30]

The Act also provides that expenditures made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate"[31] and subject to the statute's contribution limitations.[32] In *Buckley*, the Court cited this concept with ap-

---

29. 11 C.F.R. § 109.1(b)(4)(i) (1999) (emphasis added).

30. *Id.* In *Political Action Committee*, the Court indicated that coordination may have been established when a multicandidate political action committee and a candidate developed and implemented nearly identical advertising campaigns. *See* Federal Election Comm'n v. Political Action Comm., 470 U.S. 480, 498 (1985). In reviewing the Commission's dismissal of an administrative complaint presenting independent expenditure activity, a court noted the significant fact that the consultants had provided services to the candidate committee *in Florida* and to the multicandidate committee *outside Florida*. *See* Democratic Senatorial Campaign Comm. v. Federal Election Comm'n, 745 F. Supp. 742, 743 (D.D.C. 1990); *see also* Fed. Election Camp. Fin. Guide (CCH) ¶ 5469, at 10,529 (March 12, 1980) ("[T]he time-buyer's continued work for NCPAC would compromise NCPAC's ability to make independent expenditures in opposition to the Democratic candidate.").

31. 2 U.S.C. § 441a(a)(7)(B)(i) (1994). An exception to this rule is found with respect to party-building activities. For example, state and local party committees may spend unlimited amounts for activities such as preparing and distributing slate cards, sample ballots, and campaign materials such as pins, bumper stickers, and yard signs. All of this activity may be coordinated with candidates. *See, e.g.*, 2 U.S.C. §§ 431(8)(B)(v), (x); 431(9)(B)(iv), (viii) (1994). Similarly, the costs of generic voter drives "that urge the general public to register, vote or support candidates of a particular party . . . without mentioning a specific candidate," 11 C.F.R. § 106.5(a)(2)(iv) (1999), are not considered to be a contribution to a particular candidate even though they may be coordinated with a candidate. *See id.* § 106.1(c)(2) (1999).

32. *See* 2 U.S.C. §§ 441a(a)(1)(A)-(C), (a)(3). Under the Act, individuals may contribute no more than $1000 to a candidate per election, no more than $20,000 per year to a national political party, and no more than $5000 per year to any other political committee. *See id.* § 441a(a)(1)(A)-(C). An individual's total aggregate annual contributions may not exceed $25,000. *See id.* § 441a(a)(3).

Multicandidate political committees may contribute $5000 to a candidate per election, $15,000 per year to a national political party's political committees, and $5000 per year to any other political committee. *See id.* § 441a(a)(2)(A)-(C).

HeinOnline -- 49 Catholic U. L. Rev. 138 1999-2000

Case 1:06-cv-01247-CKK Document 18-6 Filed 12/08/2006 Page 99 of 341

proval when it stated that "controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act."[33] The *Buckley* Court construed the term "contribution" to "include not only contributions made directly or indirectly to a candidate, political party, or campaign committee . . . but also *all expenditures* placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate."[34] The Court ruled that, "[s]o defined, 'contributions' have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign."[35] Recognizing the potential for evading contribution limits "by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities," the Court found it was necessary to treat "coordinated expenditures . . . as contributions rather than expenditures . . . [to] prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions."[36]

## II. THE COORDINATION ISSUE

Only once has the Supreme Court applied the above-listed principles to decide whether "coordination" existed based upon a factual record. In *Colorado Republican*, the Court determined that political parties were capable of making independent expenditures on behalf of their candidates running for federal office and that such expenditures were not subject to the coordinated expenditure limits found at 2 U.S.C. § 441a(d).[37] The Court rejected a Federal Election Commission regulation that presumes coordination between political parties and their candidates. Based upon this presumption of coordination, the regulation stated that party committees shall "not make independent expenditures . . . in connection with the general election campaign of a candidate" for federal office.[38]

---

National party committees and state party committees may make coordinated expenditures in connection with the general election campaigns of their party's congressional candidates in amounts calculated on the basis of the relevant state's voting age population. *See id.* § 441a(d). Each of the senatorial campaign committees of the two major parties and the national committee of their party may jointly contribute a total of $17,500 to each candidate for the Senate. *See id.* § 441a(h).

33. Buckley v. Valeo, 424 U.S. 1, 46 (1976).

34. *Id.* at 78 (emphasis added).

35. *Id.*

36. *Id.* at 46-47.

37. *See* Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 614-16 (1996).

38. 11 C.F.R. § 110.7(a)(5) (1999); *cf.* Federal Election Comm'n v. Democratic Sena-

Having concluded that political party committees could make independent expenditures, the Court faced the issue of whether the expenditures made by the Colorado Republican Party were actually "independent." Little information was developed in the record below to prove a presumption of coordination between the political party and its candidates. To the contrary, evidence pointed to a lack of coordination. For example, the Colorado Republican State Party Chairman testified in a deposition that "he arranged for the development of the script *at his own initiative*" and "he, and *no one else*, approved it."[39] Moreover, he further testified that "the only other politically relevant individuals who might have read it were the Party's executive director and political director and that all relevant discussions took place at meetings *attended only by Party staff*."[40] In short, not even a hint of involvement existed on the part of a specific candidate.

The strongest argument for finding coordination came as a general proposition from the State Chairman who admitted, "it was the practice of the Party to 'coordinat[e] with the candidate' 'campaign strategy.'"[41] The State Chairman also acknowledged that he tried to be "'as involved as [he] could be' with the individuals seeking the Republican nomination by making available to them 'all of the assets of the party.'"[42] There was, however, no mention of state party involvement with respect to any specific or particular candidate.

These latter statements were dismissed by the Court as "general descriptions of Party practice," and as "not refer[ring] to the advertising campaign at issue here or to its preparation."[43] Moreover, the Court found that they did not "conflict with, or cast significant doubt upon, the uncontroverted direct evidence that this advertising campaign was developed by the Colorado Party independently and not pursuant to *any general or particular understanding* with [the candidates and their agents]."[44] As a result, the Court treated the state party's "expenditure, for constitutional purposes, as an 'independent' expenditure, not an indirect campaign contribution."[45]

torial Campaign Comm., 454 U.S. 27, 28 n.1 (1981) ("Party committees are considered incapable of making 'independent' expenditures in connection with the campaigns of their party's candidates.").

39. *Colorado Republican*, 518 U.S. at 614 (1996) (emphasis added).
40. *Id.* (emphasis added) (citation omitted).
41. *Id.*
42. *Id.*
43. *Id.*
44. *Id.* (emphasis added).
45. *Id.*

The Supreme Court in *Colorado Republican* found the fact that the advertising campaign had been developed "independently and not pursuant to *any general* or particular *understanding* with a candidate" significant.[46] To read the words "any general . . . understanding" out of the opinion would create an unnecessarily narrow definition of coordination and open a large loophole in the statute. Under such a limited reading, an organization would be allowed to meet with a candidate's campaign team, discuss the candidate's campaign strategy and the development of issues crucial to the campaign, and then make "independent" expenditures based on this detailed knowledge and information. The only apparent restriction would be that an organization could not reach a "particular understanding" with the candidate's campaign team. In other words, the candidate could not himself approve the final, finished advertisement or authorize a buy for the timing and placement of the advertisement. Obviously, such a narrow, limited approach would render the coordination standard meaningless and allow "prearranged or coordinated expenditures amounting to disguised contributions."[47]

Two recent enforcement cases, closed by the Commission, raise the coordination issue. Under Supreme Court precedent and statute, the Commission should have made findings of coordination in both. In the first case, however, the Commission split on whether to pursue the matter, with the declining Commissioners essentially arguing the lack of a "meeting of the minds" on whether an expenditure should be made. In the second case, the Commission found coordination based on a "general understanding" theory.

### *A. FEC Matter Under Review (MUR) 4282*

On November 20, 1995, Catholics for a Free Choice filed a complaint with the Federal Election Commission alleging that the Roman Catholic Archdiocese of Philadelphia (Archdiocese) had made an impermissible

---

46. *Id.* (emphasis added).

47. Buckley v. Valeo, 424 U.S. 1, 47 (1976). For "prudential" reasons, the *Colorado Republican* Court declined to decide the Colorado Party's constitutional challenge to the coordinated party expenditure limits of 2 U.S.C. § 441a(d). *See Colorado Republican*, 518 U.S. at 630-31 (Rehniquist, C.J., Kennedy, J., and Scalia, J., concurring). Rather, the Court remanded the case to the lower courts for further proceedings. *See id.* at 626. On February 18, 1999, the district court issued an opinion finding 2 U.S.C. § 441a(d) unconstitutional. *See* Federal Election Comm'n v. Colorado Republican Election Comm., 41 F. Supp. 2d 1197 (D. Colo. 1999), *appeal docketed*, No. 99-1211 (10th Cir. 1999). The district court found that party committees lack "the ability to exact a *quid pro quo* from a candidate who needs assistance from the party during his or her campaign." *Id.* at 1210-11 (emphasis added).

expenditure as a result of coordination with a federal candidate's campaign. Specifically, the complaint stated that in September, 1994, the Archdiocese planned to distribute to Catholic churches in the diocese a document detailing certain congressional votes made by selected candidates for federal office in Pennsylvania. The complaint charged that "this document was substantially modified based at least in part on contacts with the Senate campaign of then U.S. Representative Rick Santorum."[48] According to the complaint, the number of votes reviewed in the document was lowered in such a way that the number of "correct" votes cast by Senator Harris Wofford was reduced. Moreover, any reference to possible "incorrect" votes cast by candidate Santorum was eliminated.[49]

According to internal letters and documents from the Archdiocese, which were included with the complaint, a special project consultant within the Archdiocese's Office of Public Affairs, prepared for the Archdiocese a draft scorecard of how Pennsylvania's incumbent members of Congress voted on legislation of interest to the Archdiocese. At the request of her supervisor at the Archdiocese, the project consultant faxed the draft scorecard to the Christian Coalition on September 13, 1994 for comments.[50] Negative reaction to the draft scorecard was swift and emphatic. On September 15, 1994, representatives from the Pro-Life Federation and the Pennsylvania Catholic Conference called the Project Consultant and "expressed their great concern that distribution of the scorecard would be disastrous because it makes Sen. Wofford look better or just as good as Rick Santorum" on legislative votes in the scorecard regarding abortion.[51]

At this time, the Archdiocese project consultant indicated that she also received a call from the Santorum campaign. There was no indication in the record that Senator Wofford had ever received a copy of the draft statement or had been afforded an opportunity to comment on the draft

48. Letter from Frances Kissling, President, Catholics for a Free Choice, to Lawrence M. Noble, General Counsel, Federal Election Commission 1 (Oct. 26, 1995) (Federal Election Commission Matter Under Review (MUR) 4282).

49. *See* Federal Election Commission, First General Counsel's Report, 4 (Aug. 15, 1996) (MUR 4282); Letter from Frances Kissling, President, Catholics for a Free Choice, to Lawrence M. Noble, General Counsel, Federal Election Commission 1 (Oct. 26, 1995) (MUR 4282).

50. *See* Federal Election Commission, First General Counsel's Report, 10 (Aug. 15, 1996) (MUR 4282); Facsimile Letter from Karen Keller, Archdiocese of Philadelphia, to Gail Pedrick, Christian Coalition (Sept. 13, 1994) (MUR 4282).

51. Federal Election Commission, First General Counsel's Report, 10 (Aug. 15, 1996) (MUR 4282).

and its impact on the campaign for United States Senate. The Santorum Committee, however, had been afforded such an opportunity and had also concluded that the scorecard made Senator Wofford look better or just as good as Rick Santorum.[52] In fact, counsel for the Santorum campaign admitted as much in the campaign's response to the complaint filed with the Commission:

> Our review of the facts on behalf of our clients indicates that *a representative of the Santorum committee*, in reaction to a complaint received from a voter in Central Pennsylvania called a representative of the Roman Catholic Archdiocese of Philadelphia, *complained that a "scorecard" prepared in the Archdiocese portrayed Senator Wofford in a better light* than then Congressman Santorum and asked how this was done. The Archdiocese representative explained the process which was followed in arriving at the "scorecard." *The representative of the Santorum committee expressed his disagreement*, and that was the end of the conversation.[53]

Apparently reacting to the complaints and criticisms from the Santorum campaign and others, the project consultant's supervisor at the Archdiocese directed her to make a number of changes. First, the supervisor instructed the project consultant to "destroy and I mean really destroy" 150,000 printed copies of the draft scorecard.[54] Then, according to the project consultant, the Archdiocese changed its original selection of roll call votes to produce a lower number of positions where Senator Wofford supported the Archdiocese's position. Under the new version, Senator Wofford was shown to support the Archdiocese's positions on only two out of five Senate votes, whereas the scorecard as originally drafted had accorded the Senator three out of five votes. The new version also removed any reference to Representative Santorum, who originally was shown to support the Archdiocese's positions on only three out of six House votes. After the 150,000 copies of the original scorecard were destroyed, the Archdiocese printed a new scorecard incorporating these changes at a cost of $9000.[55]

---

52. *See* Letter from H. Woodruff Turner, Kirkpatrick & Lockhart LLP, to Mary L. Taksar, Federal Election Commission (Dec. 18, 1995) (MUR 4282).

53. *Id.* (emphasis added).

54. *See* Federal Election Commission, First General Counsel's Report, 12 (Aug. 15, 1996) (MUR 4282); *see also* Letter from Frances Kissling, President, Catholics for a Free Choice, to Lawrence M. Noble, General Counsel, Federal Election Commission 2 (Nov. 20, 1995) (MUR 4282).

55. *See* Federal Election Commission, First General Counsel's Report, 12 (Aug. 15, 1996) (MUR 4282).

The FEC's Office of General Counsel found that although there was no express advocacy in the new scorecards, they should be treated as in-kind contributions to the campaign because the Archdiocese had consulted with campaign personnel regarding changes. Accordingly, the report recommended that the Commission find "reason to believe" the Archdiocese had violated 2 U.S.C. § 441a through making an excessive contribution, and that the Santorum Committee had received an excessive contribution in violation of 2 U.S.C. § 441a(f).[56] A motion to adopt the General Counsel's recommendations was supported by three Commissioners but opposed by two Commissioners (with one vacancy), and thus failed to secure the four affirmative votes necessary to make a "reason to believe" determination and pursue the violation.[57]

This acknowledged consultation between the Santorum Committee and the Archdiocese, and the plain suggestion from the campaign committee to the Archdiocese that the scorecard be changed, lies at the heart of 2 U.S.C. § 441a(a)(7)(B)(i); expenditures made "in cooperation, *consultation*, or concert with, or at the request *or suggestion of*, a candidate, his authorized political committees, or their agents, *shall be considered to be a contribution* to such candidate."[58] Where a candidate's campaign committee contacts an organization concerning a proposed advertisement, comments on and critiques the advertisement, and ultimately expresses disagreement with it for portraying an opposing candidate "in a better light," the advertisement should "be considered to be a contribution to such candidate."[59] This is particularly true where, as here, the Archdiocese had responded to urgings by the Santorum campaign by making changes in the scorecard. Changing the votes in the scorecard to worsen the record of Santorum's opponent in the final brochure was the

56. *See id.* at 15. The General Counsel's Report also recommended that the Santorum Committee had failed to report its receipt of that contribution in violation of 2 U.S.C. § 434(b)(3)(A) and (5)(A). *See id.*

57. *See* 2 U.S.C. § 437g(a)(2) (1994). The FEC is composed of six members. *See* 2 U.S.C. § 437c(a)(1). No more than three members of the Commission may be of the same political party. A majority of at least four votes is required for the Commission to exercise any of its central powers. *See* 2 U.S.C. § 437c(c). For a description of the FEC, its creation, and its early history, see Charles N. Steele & Jeffrey H. Bowman, *The Constitutionality of Independent Regulatory Agencies Under the Necessary and Proper Clause: The Case of the Federal Election Commission*, 4 YALE J. ON REG. 363 (1987).

58. 2 U.S.C. § 441a(a)(7)(B)(i) (emphasis added).

59. *See infra* Part III (discussing the issue of whether an expenditure must "expressly advocate" a particular candidate to constitute coordination subject to contribution limitations). An advertisement would not have to reflect the expressions of a contracting campaign to constitute a contribution. *See infra* note 95 and accompanying text.

contribution.[60] After these changes, it was clear that Senator Wofford no longer was portrayed "in a better light."

In disagreeing with this analysis, Commissioners Aikens and Elliott stated that "we would not agree that mere inquiries, *without a meeting of the minds* of two or more persons on a course of action resulting in expenditures is sufficient for coordination."[61] They concluded that "the Santorum Committee representative's telephone call *was a mere inquiry* to complain about an inaccurate and unfair portrayal of then-Rep. Santorum's voting record."[62] They explained:

> According to a memorandum made by the Archdiocese employee who took the call, the Santorum committee representative *complained* about the portrayal of then Rep. Santorum's voting record *but did not ask for changes* to be made to the scorecard. There was *no* indication that the Santorum Committee had *control* over, or *even knowledge of*, the Archdiocese decision to eliminate Rep. Santorum from the final version.[63]

Nor are Commissioners Aikens and Elliott alone in urging a "meeting of the minds" standard. A representative of the National Republican Senatorial Committee (NRSC) similarly argued that "proof of 'coordination' requires evidence showing a *meeting of the minds* between the candidate's authorized representatives and the spender that such an expenditure will be made in support of the candidate's campaign, or in opposition to his opponent."[64] He emphasized that "[t]he evil of coordinated expenditures is that they allow the candidate to *control* resources that he would otherwise be legally precluded from controlling."[65]

What exactly, however, does a "meeting of the minds" test mean or entail? Is a legal contract required? Hornbook law states that a "meeting of the minds" conveys the idea of "mutual assent"[66] on a bargain between

---

60.  *Cf. infra* note 103 and accompanying text (noting that Commissioner Elliott did not consider the new scorecard to "expressly advocate" Santorum).

61.  Federal Election Commission, Statement of Reasons of Commissioners Aikens and Elliott, 3 (June 8, 1998) (MUR 4116) (emphasis added). It was in their Statement of Reasons on MUR 4116 that Commissioners Aikens and Elliott elucidated their "meeting of the minds" test and discussed its application to the Santorum matter of MUR 4282. *See id.*

62.  *Id.* (emphasis added).

63.  *Id.* (emphasis added); *see also* Federal Election Commission, Statement of Reasons of Commissioners Aikens and Elliott, 3 (Feb. 4, 1997) (MUR 4282).

64.  Comments of the National Republican Senatorial Committee to the Federal Election Commission, 6 (May 30, 1997) (submitted to the FEC for rule-making; original on file with authors) (emphasis added).

65.  *Id.* at 15.

66.  *See* ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 107 (1952).

two parties; "[a] contract, after all, is a meeting of the minds."[67] Thus, based on a hoary principle of contract law, does a "meeting of the minds" test require *actual assent* to a specific expenditure on the part of both the spender *and* the candidate in order to establish coordination? If so, without these mutual expressions of assent, there can be no coordination. Under this theory, in MUR 4282 there was no coordination under a "meeting of the minds" test because the Santorum Committee only made inquiries and comments regarding the expenditure. The Santorum campaign representative complained that the scorecard portrayed the opponent "in a better light" and "expressed his disagreement,"[68] but did not actually "assent" or agree to the finished product. In effect, it appears that there has to be some sort of offer and acceptance in order to find coordination under the Act.

The central problem with the "meeting of the minds" approach is that it runs counter to the statute. Under the Act, an expenditure loses its independence with much less than a "meeting of the minds": "[E]xpenditures made by any person *in cooperation, consultation, or concert, with, or at the request or suggestion of*, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate."[69]

There is no language in the statute providing an even remote basis for a "meeting of the minds" requirement. There certainly is no language stating, "[i]n order for an expenditure to be coordinated there must be evidence of a candidate's agreement to the expenditure or evidence of candidate control." Rather, the Act states broadly that "cooperation" or "consultation" between a candidate and a spender will result in an expenditure being considered a contribution. Likewise, the statute generally states that an expenditure made in response to a "request" or "suggestion" by a candidate will result in a contribution.[70]

A "meeting of the minds" requirement would effectively ignore the broad language of the statute as written by Congress and create, in its stead, a narrow and limited definition of coordination. For example, under the statute an expenditure made by any person after a candidate re-

---

67. Bowsher v. Merck & Co., 460 U.S. 824, 864 (1983) (Blackmun, J., concurring in part, dissenting in part).

68. Federal Election Commission, First General Counsel's Report, 5 (Aug. 15, 1996) (MUR 4282) (quoting Letter from H. Woodruff Turner, Kirkpatrick & Lockhart LLP, to Mary L. Taksar, Federal Election Commission (Dec. 18, 1995) (MUR 4282)).

69. 2 U.S.C. § 441a(a)(7)(B)(i) (1994) (emphasis added); *see also* 2 U.S.C. § 431(17) (defining the term "independent expenditure").

70. *See* 2 U.S.C. § 441a(a)(7)(B)(i).

HeinOnline -- 49 Catholic U. L. Rev. 146 1999-2000

quest or suggestion would lose its independence; under a "meeting of the minds" test, actual agreement between the candidate and the spender on the specific text of a specific advertisement would have to be proven. Moreover, some might go even further and argue that under a "meeting of the minds" test, agreement on the placement and timing of the specific advertisement also would have to be proven in order to establish coordination. Thus, a candidate could make specific comments, requests, or suggestions regarding an entire advertising campaign—including the production and distribution of specific advertisements—so long as the candidate did not actually sign off and approve the final or finished product.[71]

Such a result is not only contrary to the statute, but it also undercuts the rationale of the Supreme Court in *Buckley*. In striking down the Act's limitations on independent expenditures, the Court reasoned that "[t]he absence of prearrangement and coordination of an [independent] expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger *that expenditures will be given as a quid pro quo* for improper commitments from the candidate."[72] Clearly, if a candidate is able to provide comments and suggestions on an advertisement, there is an increase in "the danger that expenditures will be given as a *quid pro quo*."[73]

It is this "danger" that the *Buckley* Court sought to protect against in upholding candidate contribution limits. The Court never required evidence of actual corruption, i.e., an actual *quid pro quo* by contributors, however, as justification for the contribution limits. Rather, the Court found that the *mere opportunity* or potential for a *quid pro quo* creates the appearance of corruption: "of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the *appearance of corruption stemming from public awareness of the opportunities for abuse* inherent in a regime of large individual financial contributions."[74] The Court determined that "Congress was justified in concluding that the in-

---

71. It is interesting to note that in other contexts, express agreements are not required in order to demonstrate a statutory violation. For example, in antitrust law, where an actual "conspiracy to restrain trade" must be proven to demonstrate a statutory violation, "it has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy." United States v. General Motors Corp., 384 U.S. 127, 141, 142-43 (1966). Similarly, in the context of insider trading, "when an insider trades while in possession of material nonpublic information, a strong inference arises that such information was used by the insider in trading." SEC v. Adler, 137 F.3d 1325, 1337 (11th Cir. 1998).

72. Buckley v. Valeo, 424 U.S. 1, 47 (1976) (emphasis added).

73. *Id.*

74. *Id.* at 27 (emphasis added).

terest in safeguarding against the *appearance of impropriety* requires that the *opportunity for abuse* inherent in the process of raising large monetary contributions be eliminated."[75]

Similarly, candidate comments and suggestions on an advertisement create in the public mind an "opportunity for abuse."[76] There is no need for evidence that an actual *quid pro quo* has taken place or that an actual agreement has been reached over the text of an advertisement or its distribution. The mere opportunity or potential for a *quid pro quo* is sufficient. Under *Buckley*, it is only when expenditures are made "*totally independently* of the candidate and his campaign" that they may be considered of "little assistance to the candidate's campaign"[77] and therefore need no ceiling imposed upon them. This total independence "alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate."[78]

In MUR 4282, the public was aware that the scorecard expenditure was not made "totally independently" of the Santorum campaign. Only days before the Senate election, a newspaper article headlined, *Political Scorecard Becomes an Issue: Conservatives Press Philly Archdiocese*, appeared.[79] After noting that the Archdiocese had destroyed the original communication because it made Senator Wofford "'look just as good or better than Rick Santorum,'" the article states that the matter "raises questions about whether the archdiocese bowed to pressure from conservative groups and Santorum's campaign."[80]

The original Archdiocese scorecard in MUR 4282 was of "little assistance" to the Santorum campaign. It made the candidate look bad and

---

75. *Id.* at 30 (emphasis added). Similarly, in *Federal Election Commission v. National Right to Work Committee*, 459 U.S. 197 (1982), the Supreme Court indicated that Congress only has to show a compelling interest in stopping actual or apparent corruption and does not have to show a specific harm. *See id.* at 209-11. The Court further stated that

> While § 441b restricts . . . corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it *is the potential for such influence that demands regulation.* Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.

*Id.* at 210 (emphasis added); *see also* United States v. National Treasury Employees Union, 513 U.S. 454, 473 (1995) ("Congress reasonably *could assume* that payments of honoraria to judges or high-ranking officials in the Executive Branch might generate a[n] . . . appearance of improper influence.") (emphasis added).

76. *Buckley*, 424 U.S. at 27.

77. *Id.* at 47 (emphasis added).

78. *Id.*

79. *See* Brett Lieberman, *Political Scorecard Becomes an Issue: Conservatives Press Philly Archdiocese*, PATRIOT-NEWS (Harrisburg, Pa.), Nov. 4, 1994, at A1.

80. *Id.*

HeinOnline -- 49 Catholic U. L. Rev. 148 1999-2000

placed his opponent in a "better light." Only after the Santorum campaign intervened and commented on the advertisement did the advertisement become something "of value"[81] to the Santorum campaign. Whether there was a formalized agreement or not, the comments and suggestions made by the candidate committee to the Archdiocese may have created "the danger' that [the] expenditures" could result in "a *quid pro quo*."[82] By contrast, a "totally independent" expenditure—one devoid of any consultation between a candidate and a third-party spender—eliminates such opportunity for a *quid pro quo* and resulting public suspicion.

### *B. FEC Matter Under Review (MUR) 4116*

Charles Robb and Oliver North were opponents in Virginia's 1994 election for the United States Senate. Late in the campaign, Mr. North made certain public remarks regarding his views on social security. Within days of these remarks, the campaign manager for the Robb campaign contacted the political director for the National Council of Senior Citizens (NCSC) and suggested that the North campaign was against senior citizens while the Robb campaign was for seniors. The Robb campaign asked the NCSC for its endorsement and requested that NCSC representatives appear at a press conference to be held at Robb campaign headquarters on October 27, 1994.

In preparation for the press conference, communications between the Robb campaign and the NCSC resulted in the sharing of information regarding the social security issue. For example, it appears the Robb campaign supplied NCSC with "talking points" to be used at the press conference.[83] Additionally, the Robb campaign prepared a press release the day before the press conference that contained statements attributed to the Executive Director of NCSC, Mr. Smedley. At the press conference itself, both Mr. Robb and Mr. Smedley strongly criticized Mr. North's views on the social security issue. In fact, the NCSC Executive Director announced that because of Mr. North's recent comments on social security, NCSC was endorsing the Robb campaign. The day after the press conference, the National Council of Senior Citizens Political Action Committee (NCSC-PAC) purchased a radio advertisement criticizing Mr. North for his views on social security and advocating his defeat.

---

81. *Cf.* 2 U.S.C. § 431(8)(A)(i) (1994) (defining the term "contribution" to include "anything of value").

82. *Buckley*, 424 U.S. at 47 (emphasis added).

83. *See* Federal Election Commission, General Counsel's Probable Cause Brief, 14 (Aug. 11, 1997) (MUR 4116).

NCSC-PAC spent a total of $18,800 on the radio advertisement.[84]

The Commission in MUR 4116 unanimously found probable cause to believe that coordination existed between the Robb campaign and NCSC. It did so even though there was no concrete evidence the Robb campaign specifically authorized or approved the NCSC advertisements, let alone their timing or placement. In fact, the Robb campaign broadly denied any coordination with NCSC regarding the advertisements. For example, the Robb campaign's press secretary, who arranged the joint press conference with NCSC, was asked in deposition: "Following the press conference, did you have any further contacts with anyone from NCSC?" In response, he testified, "Not that I recall and there would have been no reason to."[85]

Even though there is no specific evidence of coordination regarding specific advertisements, it appears that the Robb campaign and the NCSC had a "general understanding" regarding development of NCSC-PAC's advertising campaign in the last weeks of the Senate campaign. The request for endorsement, *coupled with* cooperation regarding message content and joint participation in a publicity-seeking press conference held at Robb campaign headquarters, provided clear evidence that there was at least an exchange of campaign strategy and tactics with a view toward having an expenditure made. As a result, the NCSC-PAC advertisement expenditures, begun a day later, were not made independently from the campaign, and thus, constituted an excessive contribution.

The Commission's finding of coordination in MUR 4116 was based on the Supreme Court's decisions in *Buckley* and *Colorado Republican*. In *Buckley*, the Supreme Court drew a specific distinction between expenditures made "*totally independently* of the candidate and his campaign" and "prearranged or *coordinated* expenditures amounting to disguised contributions" which could be constitutionally regulated.[86] In *Colorado Republican*, the Supreme Court helped explain the phrase "totally independently" in finding that an "advertising campaign was developed by

---

84. *Id.* at 15-16. At the same time, the Robb campaign released television advertisements, radio advertisements, and flyers that also criticized the North campaign for its position on social security and cited the NCSC endorsement. It appears the Robb campaign advertisements used statements contained in the NCSC press release distributed at the press conference. Namely, NCSC's declaration that the North plan could "plunge millions of elderly people into poverty" and was capable of "wreaking havoc on the pocketbooks and lives of older Americans" was redistributed. *See id.* at 16. Thus, not only did the Robb campaign persuade NCSC to take a stand on the social security issue, NCSC in return provided fodder for Robb campaign advertisements.

85. Deposition of Bert L. Rohrer, 144-45 (Apr. 22, 1997) (MUR 4116).

86. *Buckley*, 424 U.S. at 47 (emphasis added).

the Colorado Party independently and not pursuant to *any general* or particular *understanding* with a candidate."[87] Unlike the result reached in *Colorado Republican*, however, NCSC-PAC's advertising program was developed pursuant to a "general understanding" with Robb campaign personnel. Given the general understanding that existed between the Robb campaign and NCSC regarding the requested endorsement at the press conference and the parallel treatment of the social security issue, the Commission found unanimously that the NCSC-PAC's advertisements were not made "totally independently" of the Robb campaign.[88]

The expenditures at issue in MUR 4282 involving the Santorum campaign also appeared to be clear examples of expenditures made "in cooperation, *consultation*, or concert, with, or at the request or *suggestion* of, a candidate [or] his authorized political committee."[89] Indeed, unlike MUR 4116 where there appeared to be only a "general understanding" between the Robb campaign and NCSC, the Santorum MUR involved specific consultations between the Santorum Committee and the Archdiocese regarding a specific communication. Oddly, certain Commissioners were reluctant to make even a preliminary "reason to believe"[90] finding to investigate the Santorum campaign, but were willing to investigate and then find "probable cause"[91] against the Robb campaign. Although the Santorum decision was incorrect,[92] the Commission reached the correct decision a year and a half later in MUR 4116.

87. Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 614 (1996) (emphasis added).

88. When probable cause conciliation with the Robb respondents in MUR 4116, under 2 U.S.C. § 437g(a)(4)(A)(i), failed, the Office of General Counsel recommended that the Commission file a civil suit against respondents in United States district court. The Commission ultimately decided, however, to exercise its prosecutorial discretion and not pursue the matter in litigation due to a lack of litigative resources.

89. 2 U.S.C. § 441a(a)(7)(B)(i) (1994) (emphasis added).

90. *Id.* § 437g(a)(2).

91. *Id.* § 437g(a)(4)(A)(i).

92. Through the years, litigation instituted under 2 U.S.C. § 437g(a)(8) has generally left undisturbed divisions among the Commissioners on whether to pursue matters on a coordination theory. *See, e.g.*, Democratic Senatorial Campaign Comm. v. Federal Election Comm'n, 745 F. Supp. 742 (D.D.C. 1990); Stark v. Federal Election Comm'n, 683 F. Supp. 836 (D.D.C. 1988); Branstool v. Federal Election Comm'n, No. 92-0284 (D.D.C. Apr. 4, 1995). There are two common threads running through these cases: (1) courts show deference even to Commissioners who block a four-vote majority, *see Democratic Senatorial Campaign Comm.*, 745 F. Supp. at 745 ("[The Court] need only determine that [its] decision 'was "sufficiently reasonable" to be accepted by a reviewing court.'") (quoting Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39 (1981)), and (2) factually, the evidence of coordination must be strong to overcome broad denials made by respondents under oath. *See id.* at 744-46.

Case 1:06-cv-01247-CKK Document 18-6 Filed 12/08/2006 Page 112 of 341

The foregoing cases illustrate the danger of a "meeting of the minds" test. In essence, a "meeting of the minds" approach would transfer the "totally independently" test of *Buckley* into a "totally controlled by the candidate" test. Only by applying the more encompassing definitions of coordination found in the statute, the Commission's regulations, and the "general understanding" approach of the *Colorado Republican* Court, will the public be protected from the appearance of corruption which the contribution limits are designed to arrest.

## III. THE ROLE OF EXPRESS ADVOCACY IN THE CONTRIBUTION ISSUE

A second major issue in the "coordination" debate involves "express advocacy." Even if coordination is found, must there be express advocacy in order for a disbursement to be considered a contribution subject to the contribution limitations and prohibitions of the Act? This section reviews the origins of the express advocacy issue, the arguments of its proponents in the area of coordination, and the reasons why the FEC has never adopted an express advocacy requirement when it considers coordination.

Express advocacy is an outgrowth of *Buckley v. Valeo*. In addressing one of the many issues which confronted it, the *Buckley* Court sought to draw a distinction between issue advocacy and partisan advocacy focused on a clearly identified candidate. The *Buckley* Court upheld as constitutional certain reporting requirements on expenditures made by individuals and groups that were "not candidates or political committees."[93] The Court, however, did express its concern that these reporting provisions might be applied broadly to communications discussing public issues that also happen to be campaign issues. In order to ensure that expenditures made for pure issue discussion would not be reportable under the Act, the *Buckley* Court construed these reporting requirements "to reach only funds used for communications that *expressly advocate* the election or defeat of a clearly identified candidate."[94]

Ten years after *Buckley*, the Supreme Court returned to the express advocacy standard in *MCFL*. Under the Act, corporations and labor organizations may not make contributions or expenditures from their treasury funds "*in connection with*" federal campaigns, and candidates and their campaign committees may not accept such prohibited contributions or expenditures.[95] In *MCFL*, the Supreme Court interpreted

93. *Buckley v. Valeo*, 424 U.S. 1, 80 (1976).
94. *Id.* (emphasis added) (footnote omitted).
95. *See* 2 U.S.C. § 441b(a) (emphasis added).

HeinOnline -- 49 Catholic U. L. Rev. 152 1999-2000

2 U.S.C. § 441b to mean that expenditures for communications *not coordinated* with a candidate's campaign must expressly advocate a candidate in order to be subject to the 2 U.S.C. § 441b prohibition. As a result of *MCFL*, independent corporate or labor union communications that do not contain express advocacy are allowed under the Act.

Relying on *MCFL*, the district court in *Federal Election Commission v. Colorado Republican Federal Campaign Committee*[96] concluded that a *coordinated* party expenditure must also contain express advocacy in order to be subject to the limitations set forth in the Act.[97] Finding that "'identical words used in different parts of the same act are intended to have the same meaning,'"[98] the district court determined that 2 U.S.C. § 441a(d)(3) and its "expenditures in connection with" language should be interpreted in the same manner as the *MCFL* Court interpreted the "in connection with" language of 2 U.S.C. § 441b.[99] Applying the "express advocacy" test to the radio advertisement at issue in *Colorado Republican*,[100] the district court found that an advertisement run against Senate candidate Tim Wirth did not constitute express advocacy and was not subject to the 2 U.S.C. § 441a(d)(3) coordinated party limitations.[101] The Tenth Circuit reversed, holding that express advocacy is not required for party coordinated expenditures to be subject to the limits in

96. 839 F. Supp. 1448 (D. Colo. 1993), *rev'd and remanded*, 59 F.3d 1015 (10th Cir. 1995), *vacated on other grounds and remanded*, 518 U.S. 604 (1996) (plurality opinion).

97. *See Colorado Republican*, 839 F. Supp. at 1457; *see also* 2 U.S.C. § 441(a)(d).

98. *Colorado Republican*, 839 F. Supp at 1453 (quoting Sullivan v. Stroop, 496 U.S. 478, 484 (1990)).

99. *See id.* at 1453. The district court also suggested that "the Commission itself advocated the adoption of the 'express advocacy' interpretation of 'in connection with' in the context of section 441b(a)." *Id.* at 1454 (quoting Orloski v. Federal Election Comm'n, 795 F.2d 156 (D.C. Cir. 1986)). *Orloski* involved the Commission's approach to an issue that "applies *only* to corporate funding of legislative events sponsored by a congressman." *Orloski*, 795 F.2d at 165 (emphasis added). Moreover, as the D.C. Circuit recognized, the *Buckley* Court "limited [the express advocacy definition] to those provisions curtailing or prohibiting independent expenditures." *Id.* at 167. "This definition is not constitutionally required for those statutory provisions limiting contributions." *Id.*

100. The text of the radio advertisement stated:

> Paid for by the Colorado Republican State Central Committee
> Here in Colorado we're used to politicians who let you know where they stand, and I thought we could count on Tim Wirth to do the same. But the last few weeks have been a real eye-opener. I just saw some ads where Tim Wirth said he's for a strong defense and a balanced budget. But according to his record, Tim Wirth voted against every major new weapon system in the last five years. And he voted against the balanced budget amendment.
> Tim Wirth has a right to run for the Senate, but he doesn't have a right to change the facts.

*Colorado Republican*, 839 F. Supp. at 1451 (quoting Defendant's Statement at ¶ 7).

101. *See id.* at 1456-57.

2 U.S.C. § 441a(d)(3).[102]

Even though the Tenth Circuit rejected the district court's express advocacy requirement, the argument remains alive and well. In MUR 4282, for example, Commissioner Elliott argues that even if there was coordination between the Archdiocese and the Santorum campaign, there was no violation of the statute because there was no express advocacy. In discussing the matter at the Commission table, Commissioner Elliott stated:

> To my way of thinking, the whole discussion of coordination is moot because there is no express advocacy in the guide, and if you don't have that you've got issue discussion and you don't have to do that independently. You can do that with all the coordination you want if there is no express advocacy.[103]

The FEC, however, has stated directly that express advocacy is not required for coordinated expenditures. In Advisory Opinion 1988-22, issued just two years after *MCFL*, the Commission addressed the issue specifically.[104] The Commission found that if public communications about candidates "are made with the cooperation, consultation or prior consent of, or at the request or suggestion of, the candidates or their agents, *regardless of whether such references contain 'express advocacy'* or solicitations for contributions, then the payment . . . will constitute . . . 'in-kind contributions' to the identified candidates."[105]

---

102. *See Colorado Republican*, 59 F.3d 1015, 1022 (10th Cir. 1995). The Tenth Circuit rejected the canon of statutory construction relied upon by the district court, believing: "'[T]he presumption readily yields to the controlling force of the circumstance that words, though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent.'" *Id.* at 1020 (quoting Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87 (1934)). This was particularly true with regard to the distinction between 2 U.S.C. § 441b and the "independent expenditures" at issue in *MCFL*, 479 U.S. 238 (1986), and the coordinated party expenditures considered to be contributions in *Colorado Republican*, 839 F. Supp. 1448. *See Colorado Republican*, 59 F.3d at 1020-21. Of course, the Tenth Circuit was reversed on other grounds in *Colorado Republican* when the Supreme Court rejected the presumption that political parties were incapable of making independent expenditures and found, instead, that the anti-Wirth radio advertisement was an "'independent' expenditure." *See Colorado Republican*, 518 U.S. 604, 614 (1996).

103. Federal Election Commission, Statement of Commissioner Elliott, Commission Executive Session (Sep. 10, 1996) (MUR 4282); *see also* Comments of the National Republican Senatorial Committee to the Federal Election Commission, 12 (May 30, 1997) (submitted to the FEC for rule-making; on file with authors).

104. *See* [1976-1990 Transfer Binder] Fed. Election Camp. Fin. Guide (CCH) ¶ 5932 (1988).

105. *Id.* (emphasis added); *see also* [1976-1990 Transfer Binder] Fed. Election Camp. Fin. Guide (CCH) ¶ 5934 (1988); [1976-1990 Transfer Binder] Fed. Election Camp. Fin. Guide (CCH) ¶ 5875 (1986); [1976-90 Transfer Binder] Fed. Election Camp. Fin. Guide

More recently, in MUR 3918, the Commission found that certain radio advertisements run by Hyatt Legal Services (the Firm) constituted excessive contributions to the 1994 United States Senate campaign of Joel Hyatt.[106] The basis for the Commission's finding was that the Firm's advertisements were coordinated with the candidate and referred to issues raised in the campaign.[107] There was no express advocacy in the Firm's advertisements. In fact, the name "Joel Hyatt" and the candidate's picture were not even seen in the advertisements.[108] Nonetheless, the Commission approved unanimously a conciliation agreement in which the Hyatt campaign and the Firm admitted a violation of the statute and agreed to pay a civil penalty.[109]

The conciliation agreement in MUR 3918 relied, in part, on Commission Advisory Opinion 1990-5.[110] In that opinion, the Commission emphasized that any communication coordinated with a candidate is "for the purpose of influencing" the candidate's election if any of three factors are met: (1) the communication makes direct or indirect reference to the candidacy, campaign, or qualifications for public office of the candidate or the candidate's opponent(s), (2) *the communication makes reference to the candidate's views on public policy issues, or those of the candidate's opponent*, or, (3) if distribution of the communication is expanded significantly beyond its usual audience, or in any other manner that indicates utilization of the communication as a campaign communication.[111]

The Commission concluded unanimously that the Firm's radio advertisements were, in part, for the purpose of influencing Mr. Hyatt's election campaign.[112] There were a number of reasons for this decision. Primarily, the content of the Firm's radio advertisements was drafted by a campaign consultant. Moreover, the advertisements made reference to issues likely to be raised in the campaign.[113] These radio advertisements continued to be broadcast even after those issues had been raised in the

---

(CCH) ¶ 5866 (1986).

106. *See* Conciliation Agreement, In the Matter of Hyatt et al., 8-9 (May 23, 1997) (MUR 3918).

107. *See id.*

108. *See id.* at 5.

109. *See id.* at 1, 9.

110. *Cf.* Conciliation Agreement, In the Matter of Hyatt et al., 8-9 (May 23, 1997) (MUR 3918), *with* [1976-1990 Transfer Binder] Fed. Election Camp. Fin. Guide (CCH) ¶ 5982 (1990) (Advisory Opinion 1990-5).

111. *See* [1976-1990 Transfer Binder] Fed. Election Camp. Fin. Guide (CCH) ¶ 5982 (emphasis added).

112. *See* Conciliation Agreement, In the Matter of Hyatt et al., 5, 7, 9 (May 23, 1997) (MUR 3918).

113. *See id.* at 5-6.

campaign. The Commission found that because the Firm's radio advertisements were coordinated with the candidate's campaign and were aired, in part, for the purpose of influencing the candidate's election, part of their value constituted an in-kind contribution from the Firm to the campaign committee even though there was no express advocacy present.[114]

The Commission's current approach is sound not only from a constitutional and statutory viewpoint, but also as a matter of policy. The Supreme Court has indicated clearly that an express advocacy test does *not* apply to contributions and coordinated expenditures. In *Buckley*, the Court stated flatly that "controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act."[115] The Court defined "contribution" to "include not only contributions made directly or indirectly to a candidate, political party, or campaign committee . . . but also *all* expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate."[116] The Court concluded that "[s]o defined, 'contributions' have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign."[117] It was *only* when the *Buckley* Court considered the statutory provisions as they applied to *independent* expenditures that it found the express advocacy test necessary to avoid vagueness.[118] Likewise, in *MCFL*, the Supreme Court specified that the express advocacy construction was necessary only for the "provision that directly regulates *independent* spending."[119] According to the Court, there is "a fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate to be spent on his campaign."[120] Given this "fundamental difference," there is simply no constitutional basis for applying to contributions the express advocacy test used for independent expenditures.

The statute reflects this constitutional analysis. There is no mention of

114. *See id.* at 4-7; *see also* 2 U.S.C. § 441a(a)(7)(B)(i) (1994).

115. Buckley v. Valeo, 424 U.S. 1, 46 (1976).

116. *Id.* at 78 (emphasis added).

117. *Id.*; *see also* Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 492 (1985) ("[Coordinated expenditures] are considered 'contributions' under the FECA and as such are already subject to FECA's $1000 and $5000 limitations in §§ 441a(a)(1), (2).") (citations omitted).

118. *See Buckley*, 424 U.S. at 78-79.

119. Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 249 (1986) (emphasis added).

120. *Political Action Comm.*, 470 U.S. at 497.

"express advocacy" in any of the statutory provisions involving contributions. The only mentions of "express advocacy" are in the definition of "independent expenditure,"[121] in the disclaimer provision,[122] and in the provision regarding communications to a membership organization's restricted class.[123] As with the "meeting of the minds" test, there is no statutory basis for adding an express advocacy requirement to a coordinated expenditure determination.

Finally, as a policy matter, a requirement that coordinated expenditures must contain express advocacy to be treated as a contribution makes little sense and creates a potentially large loophole in the statute. Suppose, for example, that a candidate solicits a third party to pay the electric bill or rent for the candidate's campaign. Is that a contribution to the campaign? Could a foreign government or a corporation provide a campaign committee with the free use of an airplane? Under an express advocacy requirement, no problem. No express advocacy is present.

Under current Commission analysis, a third party payment of campaign operating expenditures would be considered an in-kind contribution to the campaign. Rather than giving a contribution to the campaign so it can pay its office rent, a third party pays the rent directly. Under an express advocacy requirement, however, a third party payment of campaign operating expenditures would be acceptable and proper. There would be coordination, i.e., the candidate's asking the third party to pay the rent, but there would be no express advocacy, and thus no contribution, to the candidate. The contribution limitations mean very little if a third party can underwrite all of a campaign's operating expenditures.

Not only would payment of a campaign's operating expenditures apparently fall outside of the contribution limitations under an express advocacy requirement, but payment of many candidate advertisements would as well. For example, a recent detailed study of the 1996 Senate race in Minnesota found that less than one-fifth of the candidate advertisements contained express advocacy, less than one-fourth of them featured the candidate addressing the voters, and only twenty-one percent of the candidate advertisements made any reference to the upcoming election.[124] Yet, to argue that candidate communications discussing "is-

121. *See* 2 U.S.C. § 431(17) (1994).

122. *See* 2 U.S.C. § 441d (1994). The 2 U.S.C. § 441d disclaimer provision requires, *inter alia*, the name of the person who paid for a communication and a notice as to whether the communication was authorized by a candidate on "communications expressly advocating the election or defeat of a clearly identified candidate." *Id.* § 441d(a).

123. *See id.* § 431(9)(B)(iii).

124. *See* Paul S. Herrnson and Diana Dwyre, *Party Issue Advocacy in Congressional*

sues" do not constitute legitimate campaign activity is odd, to say the least. "Issues," after all, are what candidates promise to campaign upon and what, presumably, voters are most interested in having discussed. "I intend to campaign on the issue" or "I pledge an issue-oriented campaign" are oft-repeated candidate assurances made during the course of the campaign.[125]

If a third party payment of candidate issue discussion falls outside of the contribution limitations under an express advocacy requirement—and it appears that it does—a very large loophole is opened under the statute. Could a candidate solicit unlimited and unreported contributions from an individual to discuss "issues" on local radio and television the week before a primary or general election? Could a foreign or domestic corporation provide unlimited soft money to underwrite these "issue advertisements"? According to the express advocacy requirement, coordinated payments for such an advertising campaign would *not* be subject to the limitations, prohibitions, or reporting requirements of the Act so long as the advertising did not contain express advocacy.

Further broadening the loophole is the problem of how to define "express advocacy." Under *Buckley*, the purpose of the express advocacy standard is to limit application of the pertinent reporting provision to spending that is *unambiguously related* to the campaign of a particular federal candidate.[126] Under an express advocacy standard, the reporting requirements "shed the light of publicity on spending that is *unambiguously campaign-related*."[127] Unfortunately, the Court provides no definition of what constitutes "spending that is unambiguously related to the campaign of a particular federal candidate" or "unambiguously campaign related." The *Buckley* Court only indicated that express advocacy in-

*Election Campaigns*, *in* THE STATE OF THE PARTIES: THE CHANGING ROLE OF CONTEMPORARY AMERICAN PARTIES 86, 94-95 (John C. Green & Daniel M. Shea eds., 3d ed. 1999).

125. *See, e.g.*, *Inside Politics* (CNN television broadcast, Mar. 16, 1999) (interviewing Steve Forbes: "I never made any personal attacks. I've always discussed issues, principles, in the same way that Ronald Reagan did . . . . We're going to run an issues-oriented campaign."); Kate Thompson, *Campaign Chief Says Forbes Will Hit Peak At Right Time*, SIOUX CITY JOURNAL, June 12, 1999 ("[A]dvice has centered around continuing to hammer Forbes' messages on the issues that Americans care about such as creating opportunity, tax reform, Social Security, education, and health care." (reporting on an interview with Forbes National Campaign Manager Kenneth Blackwell)); G. Robert Hillman, *GOP Rivals Welcome Governor's Decision: They Urge Him to Start Debating Issues*, DALLAS MORNING NEWS, Mar. 3, 1999, at 12A; Paul West, *Gore Campaign Goes into High Gear*, BALTIMORE SUN, Mar. 16, 1999, at 1A ("Polls don't win elections, ideas do. This is going to be about a vision of America." (quoting Vice President Al Gore)).

126. *See* Buckley v. Valeo, 424 U.S. 1, 81 (1976).

127. *Id.* (emphasis added).

cludes communications containing such obvious campaign related words or phrases as "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject'."[128]

We have written elsewhere of the ongoing campaign finance debate over deciding what constitutes express advocacy.[129] In essence, there are two schools of thought. One school relies on the inclusion or exclusion of the words and phrases listed above for determining whether a particular communication contains express advocacy. Under this "magic words" test, express advocacy—the reach of the Act—is avoided so long as the communication does not contain certain key phrases. The Commission's current regulations present an alternative to the "magic words" test and recognize that there is more to express advocacy than a mere list of words.[130] In addition to using the "magic words" test, the regulations incorporate the decision of the Ninth Circuit in *Federal Election Commission v. Furgatch*[131] which states that for a communication "to be express advocacy under the Act . . . it must, *when read as a whole*, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate."[132]

---

128. *Id.* at 44 n.52; *see also id.* at 80. In *Colorado Republican*, the Tenth Circuit concluded that the anti-Wirth advertisement "would not constitute express advocacy within the narrow definition of *Buckley*," *Federal Election Commission v. Colorado Republican Fed. Campaign Committee*, 59 F.3d 1015, 1023 n.10 (1995), despite the fact that it "would leave the . . . (listener) with the impression that the Republican Party sought to 'diminish' public support for Wirth and 'garner support' for the unnamed Republican nominee." *Id.* at 1023. Interestingly, the Supreme Court in *Colorado Republican* characterized the anti-Wirth advertisement as an "independent expenditure." *See* 518 U.S. 604, 614 (1996). As defined by 2 U.S.C. § 431(17), an independent expenditure contains express advocacy. Thus, did the Supreme Court find that the anti-Wirth advertisement constituted express advocacy even though it did not contain any "magic words"?

129. *See generally* Scott E. Thomas & Jeffrey H. Bowman, *Is Soft Money Here to Stay Under the "Magic Words" Doctrine?*, 10 STAN. L. & POL'Y REV. 33 (1998).

130. *See* 11 C.F.R. § 100.22 (1999).

131. 807 F.2d 857 (9th Cir. 1987), *cert. denied*, 484 U.S. 850 (1987); *see also* Express Advocacy, Independent Expenditures, Corporate and Labor Organization Expenditures, 60 Fed. Reg. 35,292, 35,295 (1995) (codified at 11 C.F.R. § 100.22(a)).

132. *Furgatch*, 807 F.2d at 864 (emphasis added). In pertinent part, the regulation states:

> *Expressly advocating* means any communication that—
>
> . . .
>
> (b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—
>
> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

Case 1:06-cv-01247-CKK Document 18-6 Filed 12/08/2006 Page 120 of 341

To date, the circuits are split over how to interpret express advocacy. The First Circuit in *Maine Right to Life Committee v. Federal Election Commission*[133] and the Fourth Circuit in *Federal Election Commission v. Christian Action Network, Inc.*[134] have embraced the rigid "magic words" test.[135] On the other hand, the Ninth Circuit in *Furgatch* concluded that a communication could constitute express advocacy even though it did not contain any of the specific buzzwords or catch phrases listed in *Buckley*.[136] Until the issue of what constitutes express advocacy has been decided by the Supreme Court, the uncertainty will continue.

One outcome, however, is certain. A requirement that specific phrases or words must be present in order to find express advocacy will create a gaping loophole in the Act. As the *Furgatch* court warned:

> A test requiring the magic words "elect," "support," etc., or their nearly perfect synonyms for a finding of express advocacy would preserve the First Amendment right of unfettered expression *only at the expense of eviscerating the [Act]*. "Independent" campaign spenders working on behalf of candidates *could remain just beyond the reach of the Act by avoiding certain key words* while conveying a message that is unmistakably directed to the election or defeat of a named candidate.[137]

To permit a "magic words" test to infect the analysis of coordinated expenditures would be the worst of all worlds. In situations that present the danger of *quid pro quo* consequences, a candidate easily could orchestrate a very helpful advertisement campaign paid for by an interested party that simply avoids a few obvious phrases.

## IV. CONCLUSION

Suppose candidate Smith is slightly behind in the polls, low on money, and needs help. It is the week before the election and he knows that a wealthy contributor is planning to run an independent expenditure advertisement. Smith contacts the contributor and complains that nobody has focused on an important matter in the campaign: various problems in

---

> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

11 C.F.R. § 100.22(b) (1999).

133. 914 F. Supp. 8 (D. Me. 1996), *aff'd per curiam*, 98 F.3d 1 (1st Cir. 1996), *cert. denied*, 118 S. Ct. 52 (1997) (mem.).

134. 110 F.3d 1049 (4th Cir. 1997).

135. *Id.* at 1050, 1060.

136. *Furgatch*, 807 F.2d at 862-63.

137. *Id.* at 863 (emphasis added).

HeinOnline -- 49 Catholic U. L. Rev. 160 1999-2000

Congressman Jones' personal life. Because of this oversight, candidate Smith believes that Congressman Jones is viewed in a better light. Candidate Jones, however, does not want to run such an ad himself for fear of being accused of negative advertising. After changing the advertisement to reflect these suggestions, the wealthy contributor runs it on radio and television the weekend before the election. The advertisement says, "Congressman Jones is a liar, a tax cheat, wife-beater, and absentee legislator—keep that in mind on Tuesday." Is this a coordinated expenditure?

Under the Act, this expenditure to influence the election is made obviously "in cooperation, consultation, or concert, with, or at the request or suggestion of a candidate."[138] In the words of *Buckley*, this expenditure is not made "*totally independently* of the candidate and his campaign."[139] Nor can it be said under the test laid out in *Colorado Republican*, that the expenditure is made without "*any general* or particular *understanding* with a candidate."[140] Because the expenditure has plainly lost its independence, it must be considered for what it is—a contribution to the candidate's campaign.

A "meeting of the minds" approach, however, would conclude that there is no coordination present. Although campaign strategy has been provided to the spender, there is no evidence that the candidate has actually asked that an (independent expenditure) advertisement be run, or that the spender, in turn, has agreed to run an advertisement. Moreover, there is no evidence that the candidate has any control over the text, placement, and distribution of the advertisements. Absent evidence of a particularized agreement between the candidate and the spender, there was no coordination and, consequently, no contribution to the campaign.

Even if there had been a "meeting of the minds" resulting in coordination, the expenditure would remain outside the jurisdiction of the FECA under the "magic words"/express advocacy requirement. So long as an advertisement avoids certain words or phrases such as "vote against" or "defeat," the "magic words" test requires that such an advertisement be considered mere issue discussion. For example, even if candidate Smith actually prepared the above advertisement, described precisely where it should run, and asked the wealthy friend to pay for the advertisement and run it the day before the election, a contribution would not exist because the advertisement does not contain express advocacy. For that

138. 2 U.S.C. § 441a(a)(7)(B)(i) (1994).

139. Buckley v. Valeo, 424 U.S. 1, 47 (1976) (emphasis added).

140. Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 614 (1996) (emphasis added).

matter, the advertisement could be paid for by a foreign dictator or drug cartel. Moreover, because this activity would fall outside the jurisdiction of the Act, it would not need to be reported.

This article concludes that a narrow, limited definition of coordination, along with an express advocacy test, would threaten the integrity of the current campaign finance system. We find that under a "meeting of the minds" test, the amount of allowable cooperation, consultation, and communication between the candidate and the spender would effectively convert what is supposed to be an "independent" expenditure into nothing more than a "disguised contribution."[141] As *Buckley* recognizes, the contribution limitations become meaningless when they are evaded "by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities."[142]

We also conclude that an express advocacy requirement would give the green light for corporations, labor organizations, or even foreign entities to coordinate with candidates and create advertisements that influence elections, but do not contain "magic words" of express advocacy. These coordinated media campaigns could be funded with unlimited soft money raised from prohibited domestic and foreign sources. In addition, none of the soft money used to finance this coordinated candidate activity would be reported to the Federal Election Commission and disclosed to the voting public. As a result, these communications would be completely outside the prohibitions, limitations, and reporting provisions of the Act.

Placing the above activity outside the FECA would ignore the many

---

141. *Cf. Buckley*, 424 U.S. at 47.

142. *Id.* at 46. The Supreme Court has consistently upheld measures designed to prevent the evasion of the contribution limitations. In *Buckley*, the Court upheld the $5000 contribution limitation on what political committees can give to candidates because the limitation serves "the permissible purpose of preventing individuals from *evading the applicable contribution limitations*." *Id.* at 35-36 (emphasis added). The *Buckley* Court also upheld the $25,000 annual contribution limitation because the provision "serves to *prevent evasion of the $1,000 contribution limitation* by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees likely to contribute to that candidate, or huge contributions to the candidate's political party." *Id.* at 38 (emphasis added). Similarly, in *California Medical Ass'n v. Federal Election Commission*, the Court upheld the $5000 limitation on contributions to political action committees because otherwise "an individual or association seeking to *evade the $1,000 limit on contributions* to candidates could do so by channeling funds through a multicandidate political committee." 453 U.S. 182, 198 (1981). More recently, in *Colorado Republican*, the Court observed that it "could understand how Congress, were it to conclude that the potential for *evasion of the individual contribution limits* was a serious matter, might decide to change the statute's limitations on contributions to political parties." 518 U.S. at 617 (emphasis added).

Case 1:06-cv-01247-CKK Document 18-6 Filed 12/08/2006 Page 123 of 341

compelling governmental interests advanced by the Act. With respect to contribution limitations alone,[143] the *Buckley* Court found that "the Act's primary purpose—to limit the actuality and appearance of corruption . . .—[provides] a constitutionally sufficient justification for the $1,000 contribution limitation."[144] The Court explained that "[t]o the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the *integrity of our system of representative democracy is undermined*."[145] Moreover, the Court found that "[o]f almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the *appearance* of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions."[146] The Court determined that "Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also critical . . . if confidence in the system of representative Government is not to be *eroded to a disastrous extent*.'"[147] Thus, the Court found that "Congress was surely entitled to conclude that . . . contribution ceilings were a *necessary* legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions."[148]

As the "independent administrative agency vested with exclusive jurisdiction over civil enforcement of the Act,"[149] the Federal Election Com-

143. Other interests advanced by the Act include the governmental interests behind 2 U.S.C. § 441b prohibitions, *see* Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 257 (1986) ("[T]he corrosive influence of concentrated corporate wealth reflects the conviction that it is important to protect the integrity of the marketplace of political ideas."), and the reporting provisions, *see Buckley*, 424 U.S. at 68, 76 ("The disclosure requirements, as a general matter, directly serve substantial governmental interests"; moreover, disclosure serves to "insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible.").

144. *Buckley*, 424 U.S. at 26.

145. *Id.* at 26-27 (emphasis added).

146. *Id.* at 27.

147. *Id.* (quoting United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 565 (1973)) (emphasis added).

148. *Id.* at 28 (emphasis added). Elsewhere, the Supreme Court has reaffirmed the important governmental interest served by the Act's contribution limitations. *See supra* note 16 and accompanying text.

149. Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 198 n.2 (1982); *see also* 2 U.S.C. §§ 437c(b)(1), 437d(a), (e) (1994); *Buckley*, 424 U.S. at 109 (noting that Congress vested the Commission with "primary and substantial responsibility for administering and enforcing the Act").

We believe that Congress intended the FEC to act as an enforcement-minded agency. House comments on the conference bill creating the Commission reveal a consensus that the legislation provided for a "strong independent commission to enforce provisions of

mission must decide what constitutes a coordinated expenditure subject to the contribution limits. In making this determination, the Commission must be mindful that independent expenditures involve "core First Amendment expression."[150] At the same time, the Commission must also be mindful that the Act's contribution limitations, according to *Buckley*, are necessary to insure that our system of government's integrity is not weakened and that citizen "confidence in the system of representative Government is not . . . eroded to a disastrous extent."[151]

In *Furgatch*, the Ninth Circuit rejected an interpretation of the statute which "would preserve the First Amendment right of unfettered expression only at the expense of eviscerating the . . . Act."[152] So too, the courts and the Commission must not define coordination in limited manner and allow unreported soft money to influence federal elections in the guise of "issue advertisements."[153] To do so would render meaningless the limita-

---

this act." 120 CONG. REC. 35,135 (1974) (remarks of Rep. Armstrong). As summarized by Representative Frenzel, "[t]he establishment of an independent Commission is the key provision in the bill." *Id.* "It will assure judicious, expeditious enforcement of the law, while reversing the long history of nonenforcement." *Id.* Similarly, the Senate sought to create a commission that would vigorously enforce federal election laws. In the words of Senate Minority Leader Hugh Scott: "[W]e urge the committee to resist efforts that would reconstitute the Commission but would strip it of some or all of its principal investigative and enforcement powers." *Federal Election Campaign Act Amendments, 1976: Hearings on S. 2911 et al. Before the Subcomm. on Privileges and Elections of the Senate Comm. on Rules and Admin.*, 94th Cong. 69 (1976). "*The restoration of public confidence in the election process requires an active watchdog in this area, not a toothless lapdog.*" *Id.* (emphasis added).

150. *Buckley*, 424 U.S. at 48.

151. *Id.* at 26-27 (citing United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 565 (1973)).

152. Federal Election Comm'n v. Furgatch, 807 F.2d 857, 863 (9th Cir. 1987).

153. After this article went to press, three district court opinions were issued, which discussed the concept of coordination. In *Federal Election Commission v. Christian Coalition (Christian Coalition)*, 52 F. Supp. 45 (D.D.C. 1999), the district court ruled against the Commission on five of its six coordinated expenditure allegations and found that there was a contested issue of fact on the six. In its decision, the district court ignored the §441a(a)(7)(B)(i) standard of coordination as well as the Commission's regulations, created its own standard of coordination, and applied it to a new concept known as "expressive coordinated expenditures." 52 F. Supp. at 85. Under the district court's approach, the Commission must show there had been "substantial discussion or negotiation" about a communication so the "candidate and spender emerge as partners or joint venturers." 52 F. Supp. at 92.

In *Federal Election Commission v. Public Citizen Inc. (Public Citizen)*, No. 1:97-CV-358 (N.D. Ga. Sept. 15, 1999), another district court found that discussions between a spender and a campaign did "not rise to the level of consultation or coordination." *Id.* at 15. Once again, the district court ignored the Commission's regulations and created its own standard: "Coordination . . . implie[s] 'some measure of collaboration beyond a mere inquiry as to the position taken by a candidate on an issue.'" *Id.* (citing Clifton v. Federal Election Comm'n, 114 F.3d 1309, 1311 (1st Cir.), *cert. denied*, 118 S. Ct. 1036 (1998)).

HeinOnline -- 49 Catholic U. L. Rev. 164 1999-2000

tions, prohibitions, and reporting requirements of the Federal Election Campaign Act.

---

Finally, in *Federal Election Commission v. Freedom Heritage Forum (Freedom Heritage Council),* No. 3:98-CV-549 (W.D. Ky. Sept. 29, 1999), the district court rejected the argument "that actual coordination of a specific disbursement must be shown in order for a disbursement to be characterized as a coordinated expenditure." *Id.* at 3. The district court concluded, however, that the Commission had failed to establish coordination based upon the facts of this case.

It is important to note the decisions of the district courts in *Christian Coalition, Public Citizen* and *Freedom Heritage Council,* are not binding precedent on any other federal court, even in the same district. *See, e.g.,* In re Korean Air Line Disaster, 829 F.2d 1171, 1176 (D.C.Cir. 1987) ("Binding precedent for all [circuits] is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit."), *aff'd,* 490 U.S. 122 (1989); *see also* Richardson v. Selsky, 5 F.3d 616, 623 (2d Cir. 1993); Fox v. Acadia State Bank, 937 F.2d 1516, 1570 (11th Cir. 1991); United States v. Articles of Drug Consisting of 203 Paper Bags, 818 F.2d 569, 572 (7th Cir. 1987).

# PLAINTIFFS' EXHIBIT 7

application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If a denial of the application for asylum and for withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If an approval of the application for asylum or for withholding of removal becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

Dated: November 27, 2000.

**Janet Reno,**

*Attorney General.*

[FR Doc. 00–30601 Filed 12–5–00; 8:45 am]

**BILLING CODE 4410–10–P**

---

**FEDERAL ELECTION COMMISSION**

**11 CFR Parts 100, 109 and 110**

**[Notice 2000—21]**

## General Public Political Communications Coordinated With Candidates and Party Committees; Independent Expenditures

**AGENCY:** Federal Election Commission.

**ACTION:** Final rule; transmittal of regulations to Congress.

**SUMMARY:** The Federal Election Commission is adopting new rules to address expenditures for coordinated communications that include clearly identified candidates, and that are paid for by persons other than candidates, candidates' authorized committees, and party committees. The rules address expenditures for communications made at the request or suggestion of a candidate, authorized committee or party committee; as well as those where any such person has exercised control or decision-making authority over the communication, or has engaged in substantial discussion or negotiation with those involved in creating, producing, distributing or paying for the communication. The Commission is also revising the definition of "independent expenditure," to conform with this new definition. Further changes to the rules on coordination between political party committees and their candidates are awaiting the outcome of a pending Supreme Court case. Additional information is provided in the supplementary information that follows.

**DATES:** Further action, including the announcement of an effective date, will be taken after these regulations have been before Congress for 30 legislative days pursuant to 2 U.S.C. 438(d). A document announcing the effective date will be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Ms. Rosemary C. Smith, Assistant General Counsel, or Ms. Rita A. Reimer, Attorney, 999 E Street, NW., Washington, D.C. 20463, (202) 694–1650 or (800) 424–9530 (toll free).

**SUPPLEMENTARY INFORMATION:** The Commission is issuing final rules at 11 CFR 100.23 that address coordinated communications that include clearly identified candidates, that are paid for by persons other than candidates, candidates' authorized committees, and party committees. The rules address communications made at the request or suggestion of a candidate, authorized committee or party committee; as well as those where a candidate, authorized committee, or party committee has exercised control or decision-making authority over the communication, or has engaged in substantial discussion or negotiation with those involved in creating, producing, distributing or paying for the communication. Other than the requirement that covered communications include a clearly identified candidate, the new rules contain no content standard. The Commission is also revising its rules at 11 CFR 100.16 and 109.1, which define "independent expenditure," to conform with this new definition; and making conforming amendments to 11 CFR 110.14, the section of the Commission's rules that deals with contributions to and expenditures by delegates and delegate committees.

Section 438(d) of Title 2, United States Code, requires that any rules or regulations prescribed by the Commission to carry out the provisions of Title 2 of the United States Code be transmitted to the Speaker of the House of Representatives and the President of the Senate 30 legislative days before they are finally promulgated. Because these rules were approved by the Commission on November 30, 2000, which is less than 30 legislative days before the adjournment of the 106th Congress, the Commission plans to transmit them to Congress on the first day of the 107th Congress, which will occur in January 2001. A Notice announcing the effective date of these rules will be published in the **Federal Register**.

### Explanation and Justification

The Federal Election Campaign Act, 2 U.S.C. 431 *et seq.* ("FECA" or the "Act") prohibits corporations and labor organizations from using general treasury funds to make contributions to a candidate for federal office. 2 U.S.C. 441b(a). It also imposes limits on the amount of money or in-kind contributions that other persons may contribute to federal campaigns. 2 U.S.C. 441a(a). Individuals and persons other than corporations, labor organizations, government contractors and foreign nationals can make independent expenditures in connection with federal campaigns. 11 CFR 110.4(a) and 115.2. Independent expenditures must be made without cooperation or consultation with any candidate, or any authorized committee or agent of a candidate; and they shall not be made in concert with, or at the request or suggestion of, any candidate, or any authorized committee or agent of a candidate. 2 U.S.C. 431(17).

Expenditures that are coordinated with a candidate or campaign are considered in-kind contributions. *Buckley* v. *Valeo,* 424 U.S. 1, 46–47 (1976) (footnote omitted) ("*Buckley*"); *Federal Election Commission v. The Christian Coalition,* 52 F.Supp.2d 45, 85 (D.D.C. 1999) ("*Christian Coalition*"). As such, they are subject to the limits and prohibitions set out in the Act. The Act defines "contribution" at 2 U.S.C. 431(8) to include any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for federal office.

The Commission is promulgating new rules at 11 CFR 100.23 that define the term *coordinated general public political communication.* They generally follow the standard articulated by the United States District Court for the District of Columbia in the *Christian Coalition* decision, *supra.* This decision sets out at length the standards to be used to determine whether expenditures for communications by unauthorized committees, advocacy groups and individuals are coordinated with candidates or qualify as independent expenditures.

*A. History of the Rulemaking*

This rulemaking was originally initiated to implement the Supreme Court's plurality opinion in *Colorado Republican Federal Campaign Committee* v. *Federal Election Commission,* 518 U.S. 604 (1996) (*Colorado I*) concerning the application of section 441a(d) of the FECA. In that decision, the Court concluded that political parties are capable of making independent expenditures on behalf of their candidates for federal office, and that it would violate the First Amendment to subject such

independent expenditures to the section 441a(d) expenditure limits. *Id.* at 2315.

Section 441a(d) permits national, state, and local committees of political parties to make limited general election campaign expenditures on behalf of their candidates, which are in addition to the amount they may contribute directly to those candidates. 2 U.S.C. 441a(d). These section 441a(d) expenditures are commonly referred to as "coordinated party expenditures." Prior to the *Colorado* case, it was presumed that party committees could not make expenditures independent of their candidates.

The Commission notes that not all coordinated expenditures constitute communications. In fact, party committees may use their coordinated expenditure limits to pay for many other types of expenses incurred by candidates, including staff costs, polling and other services.

Following the *Colorado I* Supreme Court decision, the Democratic Senatorial Campaign Committee and the Democratic Congressional Campaign Committee filed a Petition for Rulemaking urging the Commission to (1) repeal or amend 11 CFR 110.7(b)(4) to the extent that that paragraph prohibited national committees of political parties from making independent expenditures for congressional candidates; (2) repeal or amend 11 CFR Part 109 with respect to which expenditures qualify as "independent"; and (3) issue new rules to provide meaningful guidance regarding independent expenditures by the national committees of political parties. Although the Petition for Rulemaking urged changes only in the rules applicable to national committees of political parties, the Commission's rulemaking also sought comment on proposed changes to the provisions governing state and local party committees, as well as coordination by outside groups with either candidates or party committees.

In response to the *Colorado I* decision, the Commission promulgated a Final Rule on August 7, 1996 which repealed paragraph (b)(4) of section 110.7. *See* 61 F.R. 40961 (Aug. 7, 1996). That paragraph had provided that party committees could not make independent expenditures in connection with federal campaigns. On the same date, the Commission also published a Notice of Availability ("NOA") seeking comment on the remainder of the Petitioners" requests. *See* 61 F.R. 41036 (Aug. 7, 1996). No statements supporting or opposing the petition were received by the close of the comment period.

On May 5, 1997 the Commission published an NPRM in which it sought comments on proposed revisions to these regulations. 62 FR 24367 (May 5, 1997). Comments in response to this NPRM were received from Common Cause; the Democratic National Committee ("DNC"); the Democratic Senatorial Campaign Committee ("DSCC") and the Democratic Congressional Campaign Committee ("DCCC") (joint comment); the Internal Revenue Service ("IRS"); the National Republican Congressional Committee ("NRCC"); the National Republican Senatorial Committee ("NRSC"); the National Right to Life Committee; the Republican National Committee ("RNC"); and the United States Chamber of Commerce. On June 18, 1997, the Commission held a public hearing on this Notice, at which witnesses testified on behalf of Common Cause, the DNC, the DSCC and the DCCC, the National Right to Life Committee, the NRSC, and the RNC.

The IRS found no conflict with the Internal Revenue Code or that agency's regulations with regard to any Notice considered in the course of this rulemaking. All other comments received in connection with this rulemaking will be discussed *infra.*

The Commission subsequently decided to hold the 1997 rulemaking in abeyance until it received further direction from the courts. The coordinated spending limits were invalidated on constitutional grounds by the district court in *Colorado Republican Federal Campaign Committee* v. *Federal Election Commission,* 41 F. Supp. 2d 1197 (D. Colo. 1999) (*Colorado II*), on remand from the *Colorado I* Supreme Court decision. In May 2000, that decision was affirmed by the Court of Appeals for the Tenth Circuit. 213 F.3d 1221 (10th Cir. 2000). The Supreme Court has now agreed to review this decision. 2000 WL 1201886 (U.S. Oct. 10, 2000) (No. 00–191).

On December 16, 1998, the Commission published a new NPRM putting forth proposed amendments to its rules governing publicly financed presidential primary and general election candidates. 63 FR 69524 (Dec. 16, 1998). Issues concerning coordination between party committees and their presidential candidates, which had been raised in the earlier NPRM, were addressed in the public funding rulemaking. For example, the 1998 NPRM put forward narrative proposals regarding a content-based standard for coordinated communications made to the general public. It also sought comment on coordination between the national committees of political parties and their presidential candidates with respect to poll results, media production, consultants, and employees whose services are intended to benefit the parties' eventual presidential nominees.

The Commission received seven written comments on coordinated expenditures in response to the 1998 NPRM. Commenters included the Brennan Center for Justice at New York University School of Law ("Brennan Center"); Common Cause and Democracy 21 (joint comment); the DNC; the James Madison Center for Free Speech; Perot '96; the RNC; and the law firm of Ryan, Phillips, Utrecht, & MacKinnon, and Patricia Fiori, Esq. (joint comment). The Commission subsequently reopened the comment period and held a public hearing on March 24, 1999, at which witnesses representing the DNC; the James Madison Center for Free Speech; the RNC; and Ryan, Phillips, Utrecht & MacKinnon presented testimony on coordination issues.

On November 3, 1999, the Commission promulgated new paragraph (d) of section 110.7, addressing pre-nomination coordinated expenditures. 64 FR 59606 (Nov. 3, 1999). The new paragraph states that party committees may make coordinated expenditures in connection with the general election campaign before their candidates have been nominated. It further states that all pre-nomination coordinated expenditures are subject to the section 441a(d) coordinated expenditure limitations, whether or not the candidate with whom they are coordinated receives the party's nomination. Please note that new § 110.7(d) applies to all federal elections. For additional information, see *Explanation and Justification for Section 110.7, Party Committee Coordinated Expenditures and Spending Limits (2 U.S.C. 441a(d)),* 64 FR 42579, 42580–81 (Aug. 5, 1999).

The Commission published the document that serves as the primary basis for these final rules, a Supplemental Notice of Proposed Rulemaking ("SNPRM") addressing general public political communications coordinated with candidates, on December 9, 1999. 64 FR 68951 (Dec. 9, 1999). The Commission received 15 comments in response to the SNPRM, from the Alliance for Justice; the American Federation of Labor-Congress of Industrial Organizations ("AFL-CIO"); the Brennan Center; The Coalition; Common Cause and Democracy 21 (joint comment); the DNC; the DSCC and DCCC (joint

comment); the First Amendment Project of the Americans Back in Charge Foundation; the IRS; the James Madison Center for Free Speech; J. B. Mixon, Jr.; the National Education Association; the NRSC; the RNC; and United States Senators Russell D. Feingold, John McCain, Carl Levin and Richard J. Durbin (joint comment). In addition, the Commission held a public hearing on the SNPRM on February 16, 2000, at which nine witnesses testified on behalf of the Alliance for Justice, the AFL-CIO, the Americans Back in Charge Foundation, the Brennan Center, The Coalition, the DNC, the DSCC and DCCC, the James Madison Center for Free Speech, and the RNC.

*B. The Christian Coalition Decision*

The *Christian Coalition* case arose out of an FEC enforcement action alleging coordination between the Christian Coalition and various federal campaigns in connection with the 1990, 1992, and 1994 elections, resulting in disbursements from the Coalition's general corporate treasury for voter guides, "get out the vote" activities, direct mailings and payments to speakers. The Christian Coalition characterized these activities as independent corporate speech; while the FEC alleged that, because of the varying degrees of interaction between the Christian Coalition and those candidates and their campaigns, the activities must be treated as in-kind contributions that violated the Act's contribution limits and/or prohibitions.

In setting out a working definition of "coordination," the *Christian Coalition* court explained that "the standard for coordination must be restrictive, limiting the universe of cases triggering potential enforcement actions to those situations in which the coordination is extensive enough to make the potential for corruption through legislative *quid pro quo* palpable without chilling protected contact between candidates and corporations and unions." 52 F.Supp.2d at 88–89. The court continued, "First Amendment clarity demands a definition of "coordination" that provides the clearest possible guidance to candidates and constituents, while balancing the Government's compelling interest in preventing corruption of the electoral process with fundamental First Amendment rights to engage in political speech and political association." *Id.* at 91. In its opinion the district court referred to "expressive expenditures," as opposed to expenditures for other types of campaign support, and defined a "coordinated expressive expenditure" as "one for a communication made for the purpose of influencing a federal election in which the spender is responsible for a substantial portion of the speech and for which the spender's choice of speech has been arrived at after coordination with the campaign." Id. at 85, n. 45.

The court went on to explain that "an expressive expenditure becomes 'coordinated,' where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over a communication's: (1) Contents; (2) timing; (3) location, mode, or intended audience (*e.g.*, choice between newspaper or radio advertisement); or (4) 'volume' (*e.g.*, number of copies of printed materials or frequency of media spots). 'Substantial discussion or negotiation' is such that the candidate and spender emerge as partners or joint venturers in the expressive expenditure, but the candidate and spender need not be equal partners." *Id.* at 92. The court acknowledged that "a standard that requires 'substantial' anything leaves room for factual dispute," but reasoned that the standard reflects a reasonable balance between possibly chilling some protected speech and the need to protect against the "real dangers to the integrity of the electoral process" expressive expenditures may present. *Id.*

The district court then applied this standard to the challenged campaign activities. In most instances the court did not find coordination. For example, the court found no coordination between the Christian Coalition and the Bush-Quayle campaign in the preparation of voter guides in connection with the 1992 presidential campaign, explaining that, while the campaign was generally aware President Bush would compare favorably in the eyes of the target audience with the other candidates profiled in the guides, the campaign staff did not seek to discuss the issues that would be profiled or how they would be worded. Nor did they seek to influence the Coalition's decisions as to how many guides would be produced, and when and where they would be distributed. *Id.* at 93–95. Similarly, the fact that a Coalition official served as a volunteer in a 1994 House campaign and also made decisions as to where the Coalition's voter guides would be distributed in connection with that campaign did not amount to coordination where the official did not make his decisions based on any discussions or negotiations with the campaign for which he volunteered. *Id.* at 95–96. In contrast, the court found coordination where the Coalition provided a Senate campaign consultant with a commercially valuable mailing list. *Id.* at 96. The Commission subsequently decided not to appeal the district court's decision.

*C. Other Court Decisions*

In *Clifton* v. *Federal Election Commission*, 114 F.3d 1309 (1st Cir. 1997), *cert. denied*, 118 S.Ct. 1036 (1998) ("*Clifton*"), the United States Court of Appeals for the First Circuit ruled that coordination in the context of voter guides "implie(s) some measure of collaboration beyond a mere inquiry as to the position taken by a candidate on an issue." 114 F.3d at 1311, citing *Buckley*, 424 U.S. at 46–47 and n. 53 (1976). The court invalidated those portions of the Commission's voter guide regulations at 11 CFR 114.4(c)(5)(i) and (ii)(C) that limit any contact with candidates to written inquiries and replies, and generally require all candidates for the same office to receive equal space and prominence in the guide. *Id.* at 1317. The court also invalidated the Commission's voting record rules at 11 CFR 114.4(c)(4) to the extent they could be read to prohibit mere inquiries to candidates. *Id*[1] In *Federal Election Commission* v. *Public Citizen, Inc.*, 64 F.Supp.2d 1327 (N.D. Ga. 1999), a federal district court followed the *Clifton* "collaboration" language in holding that contacts between a public interest group and a candidate made in connection with an advertising campaign to defeat a candidate for the House of Representatives were not coordinated for FECA purposes. The Commission did not appeal that portion of the *Public Citizen* decision that addresses the coordination standard.

*D. General Concerns Raised by Commenters*

The commenters and witnesses raised several general points in connection with the SNPRM. Several noted that the FECA does not use the terms "coordinated" or "coordination" in discussing campaign contributions and expenditures. This regulation uses the single term "coordination" to encompass those expenditures described in 2 U.S.C. 441a(a)(7)(B)(i) as made "in cooperation, consultation, or

[1] On July 20, 1999, the Commission received a Petition for Rulemaking from the James Madison Center for Free Speech, on behalf of the Iowa Right to Life Committee, seeking repeal of the rules at 11 CFR 114.4(c)(4) and (c)(5) to reflect the *Clifton* decision. The Commission published an NOA on this petition on Aug. 25, 1999. 64 FR 46319 (Aug. 25, 1999). Further action on that petition, which is related to the issues addressed in this rulemaking, will be taken by the Commission after this rulemaking has been concluded.

concert with, or at the request or suggestion of, a candidate." The statutory terms are not inherently clear, nor does the Act's legislative history provide much guidance. Thus, these rules will fill what is largely a vacuum in this area. All of the commenters, regardless of the positions they espoused, asked the Commission to issue clear rules that provide the regulated community with sufficient guidance to easily understand which communications come within the definition.

One commenter, citing *Buckley*, 424 U.S. at 48 (1976), argued that the Commission was powerless to act in this area, because it had not shown that covered communications involved actual corruption between those making the communications in question and the recipient candidates. However, after the SNPRM was published, the Supreme Court's decision in *Nixon* v. *Shrink Missouri Government PAC*, 120 S.Ct. 897 (2000) (*Shrink Missouri*) upheld the constitutionality of State contribution limits, which the Court said could be based, *inter alia*, on newspaper accounts that inferred the impropriety of large contributions. *Id.* at 907. While some commenters argued that the holding in *Shrink Missouri* is limited to non-federal contributions, others stated that, in their view, this decision vitiates the need for the Commission to find *quid pro quo* corruption in a particular case before taking action in this area. The Commission agrees with this latter view, that the holding in *Shrink Missouri* is applicable to federal contribution limits.

*E. Content of Covered Communications*

Several commenters urged the Commission to limit the definition of general public political communications to communications that contain "express advocacy" of the election or defeat of a clearly identified candidate, *i.e.*, those covered by the Commission's definition of "express advocacy" as defined at 11 CFR 100.22(a). That paragraph requires the use of individual words or phrases that, in context, can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s). They argued that express advocacy is constitutionally required even for communications specifically requested by a candidate to benefit the candidate's campaign. Other commenters, citing the definition of "independent expenditure" at 2 U.S.C. 431(17), *supra*, argued that any contact with a candidate or campaign should result in coordination.

Several commenters urged the Commission to limit the definition of general public political communications to communications that refer to clearly identified candidates in their status as candidates, or otherwise refer to an election. They noted, for example, that Members of Congress run for office virtually full-time, and argued that communications that referred to them in passing should not be subject to this standard.

The *Buckley* Court emphasized the necessity of avoiding vague or overbroad regulation of political speech. 424 U.S. at 42–44, 77–80. In light of these constitutional concerns, the Commission's goal in adopting § 100.23 is to establish a test that (1) provides reasonable certainty as to which communications between a person and a candidate or a party committee rise to the level of coordination; and (2) properly balances the Commission's "interest in unearthing disguised contributions," *Clifton*, 114 F.3d at 1315, with the right of the citizenry to engage in discussions about public issues with candidates. *Buckley*, 424 U.S. at 14.

The Commission is addressing the constitutional concerns raised in *Buckley* by creating a safe harbor for issue discussion. Section 100.23(d) makes it clear that a candidate's or political party's response to an inquiry regarding the candidate's or party's position on legislative or public policy issues will not suffice to establish coordination. In addition, the Commission's new rules establish a "buffer zone" for protected speech by requiring that discussions or negotiations regarding certain aspects of a communication must be "substantial" and result in "collaboration or agreement" in order to rise to the level of coordination. See § 100.23(c)(2)(iii). At a minimum, this new rule is more protective of First Amendment rights than the standard it is replacing.

The Commission is not adopting any content standard as a part of these rules at this time. There were significant disagreements among commenters over what content standard, if any, should be adopted. There is a substantial argument that any of the content standards suggested could be under-inclusive in the context of coordination. Some advertising by campaigns, for instance, does not include express advocacy and does not refer specifically to candidates as candidates or state that they are running for election. Allowing candidates, campaigns and political parties to ask corporations, labor unions or other persons to sponsor that kind of advertising without limit or disclosure could "give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions." *Christian Coalition*, 52 F.Supp.2d at 88.

The argument that a communication must constitute express advocacy in order to fall within the definition of "expenditure," 2 U.S.C. 431(9), in all circumstances (and thus be controlling for purposes of defining a "coordinated expenditure") is not being addressed in this rulemaking. See *Republican National Committee* v. *Federal Election Commission*, 1:98CV1207 (June 25, 1998 D. D.C.) (slip op.), aff'd, No. 98–5263 (D.C. Cir. Nov. 6, 1998). The term "expenditure" includes any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office. Exceptions to this definition are set forth at section 431(9)(B).

A content element in the definition of coordination may be more useful in the context of political party communications coordinated with candidates, a topic which will be addressed in a subsequent phase of this rulemaking. In the party-candidate context the principal question could become how an expenditure is reported rather than how it is financed or whether it is reported at all. The Commission may revisit the issue of a content standard for all coordinated communications when it considers candidate-party coordination.

*Section 100.16 Definition of "independent expenditure"*

The Commission is amending the definition of independent expenditure in this section to track more closely the statutory definition of independent expenditure. *See* 2 U.S.C. 431(17). It is also adding a conforming amendment, to indicate that the meaning of the phrase "made with the cooperation of, or in consultation with, or in concert with, or at the request or suggestion of, a candidate or any agent or authorized committee of such candidate," is now governed by 11 CFR 100.23, discussed *infra*, instead of former 11 CFR 109.1(b)(4), which has been repealed. Finally, a new cross reference to 11 CFR 109.1 alerts readers to the additional information on independent expenditures contained in that section.

*Section 100.23 Coordinated General Public Political Communications*

The Commission is adding a new section, 11 CFR 100.23, to its rules, to address expenditures for coordinated communications made for the purpose of influencing federal elections that are

paid for by persons other than candidates, candidates' authorized committees, and party committees. The Commission believes it is appropriate to place this language in a separate section of the rules to properly alert the regulated community of this standard.

New § 100.23 generally follows the language of the *Christian Coalition* decision, discussed above. The Commission is, however, using the phrase "expenditures for general public political communications" in place of "expressive expenditure," the term used by the *Christian Coalition* court, because these rules do not address the content standard analysis in *Christian Coalition*, and "expenditures for general public political communications" more precisely describes the types of communications covered by these rules. *See* discussion of § 100.23(c)(1), *infra*.

There was no consensus among the comments and witnesses as to whether the Commission should follow the approach set forth in *Christian Coalition*. Some favored this overall approach although they urged the Commission to limit coverage to communications that contained express advocacy. As explained above, the rules do not address this further limitation. Others opposed this approach, urging retention of a broad definition of coordination.

Although the final rules have been modified somewhat from those proposed in the SNPRM, the Commission continues to believe that the *Christian Coalition* court correctly decided which communications are "coordinated" in this context. While the court recognized that it was establishing a difficult standard to meet, the Commission believes the court correctly concluded that a high standard is required to safeguard protected core First Amendment rights.

*Section 100.23(a) Scope*

Paragraph (a)(1) of this section states that these new rules apply to expenditures for general public political communications paid for by separate segregated funds, nonconnected committees, individuals, or any other person except candidates, authorized committees, and party committees. Paragraph (a)(2) notes that coordinated party expenditures made on behalf of a candidate pursuant to 2 U.S.C. 441a(d) are governed by 11 CFR 110.7.

In the SNPRM, the Commission sought comments on whether the standard for coordination proposed in that document should be applied to political party expenditures for general public political communications that are coordinated with particular candidates. All party committees that commented on the SNPRM argued that they should not be covered by these rules. They urged the Commission to wait until *Colorado II* has been decided before acting in that area, since that decision could have major ramifications for any rules that might have been adopted in the meantime.

In light of *Colorado II*, the Commission is not amending the rules in 11 CFR 110.7 governing coordinated expenditures between party committees and candidates at this point. The Commission expects that additional guidance will be forthcoming in that decision, at which time it will re-examine this aspect of the rulemaking.

*Section 100.23(b) Treatment of General Public Political Communications as Expenditures and Contributions*

As explained above, for purposes of the FECA, a coordinated expenditure is considered both an expenditure by the person making the expenditure and an in-kind contribution to the recipient candidate or political committee. Consistent with such treatment, paragraph (b) of § 100.23 states that any expenditure covered by these rules shall be treated as both an expenditure under 11 CFR 100.8(a) and an in-kind contribution under 11 CFR 100.7(a)(1)(iii). As such, it is subject to the contribution limits of 2 U.S.C. 441a and must be reported as both a contribution and an expenditure as required at 2 U.S.C. 434. Please note that the new rules apply not only to situations in which separate segregated funds and nonconnected committees coordinate their expenditures with candidates, but also where they coordinate with party committees, thus clarifying that party committees can themselves receive coordinated contributions.

*Section 100.23(c) Coordination With Candidates and Party Committees*

This paragraph contains the text of the coordination standard: it addresses what contact between a campaign and a person paying for a communication made in connection with that campaign is sufficient to bring that communication within the purview of these rules. Please note that the standards set forth in paragraphs (2)(i), (2)(ii) and (2)(iii) are alternatives. Communications that meet the standard established by any one of these paragraphs are considered coordinated general public political communications for purposes of these rules.

The SNPRM proposed alternative language for the introductory text of this paragraph. Both Alternatives, designated Alternative 1–A and Alternative 1–B, stated that general public political communications would be considered coordinated if paid for by any person other than a candidate, the candidate's authorized committee, or a party committee, provided that the requirements set forth in paragraphs (c)(2)(i), (c)(2)(ii), or (c)(2)(iii) of this section, *infra*, were met. Alternative 1–B would have added an additional requirement before a communication be considered coordinated, namely that it be distributed primarily in the geographic area in which the candidate was running. Alternative 1-A omitted this geographical restriction.

The SNPRM explained that Alternative 1–B was intended to ensure that costs of national legislative campaigns that refer to clearly-identified candidates, and may be designed or endorsed by one or more of the named candidates, not be considered expenditures on behalf of those candidates' campaigns. The Commission noted, however, two concerns with Alternative 1–B: (1) The definition of "coordination" would exclude media broadcasts to several adjacent states; and (2) the definition of "coordination" would exclude communications disseminated in one state that solicit funds on behalf of a candidate running in another state, if contributors are asked to send their contributions directly to the candidate on whose behalf they are made.

One commenter pointed out that a geographic limit has nothing to do with the concept of coordination. No one addressed the Commission's concern that Alternative 1–B would allow persons to solicit contributions to be sent directly to candidates in another state, without these contributions being considered coordinated. The Commission is adopting Alternative 1–A, because the geographic restriction does not get at the question of whether the parties coordinated a communication.

Please note that, in the SNPRM, the requirement at paragraph (1) of this section that covered communications be paid for by any person other than the candidate, the candidate's authorized committee, or a party committee, was included as part of the introductory text. For clarity, the Commission has decided to place this language in a separate paragraph.

*Section 100.23(c)(2)(i) The "Request or Suggestion" Standard*

The Commission also sought comment on two alternatives of a provision, to be located in paragraph (c)(2)(i), which addressed

communications made at the request or suggestion of the candidate or campaign, and those authorized by a candidate or campaign. Alternative 2–A stated that coordination would occur when a communication is created, produced or distributed at the request or suggestion of, or when authorized by, a candidate, candidate's authorized committee, a party committee, or an agent of any of the foregoing. Alternative 2–B would have limited such coordination to those instances where the parties also discuss the content, timing, location, mode, intended audience, volume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement.

One commenter urged the Commission to adopt Alternative 2–A, because it is consistent with the statutory language. Another found even Alternative 2–B to be overly broad. A party committee argued that the definition was overly broad as applied to party committees; however, as discussed above, that portion of the rulemaking has been held in abeyance pending the Supreme Court's decision in *Colorado II*.

The Commission is adopting an amended version of Alternative 2–A because it is more consistent with the FECA than Alternative 2–B. Section 441a(a)(7)(B)(i) states that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, * * * shall be considered to be a contribution to such candidate." The new rule also reflects the following language in the *Christian Coalition* decision: "The fact that the candidate has requested or suggested that a spender engage in certain speech indicates that the speech is valuable to the candidate, giving such expenditures sufficient contribution-like qualities to fall within the Act's prohibition on contributions." 52 F.Supp.2d at 91. The Commission has accordingly decided to adopt an amended version of Alternative 2–A, so that a communication made at the request or suggestion of a candidate will be considered to be coordinated with that candidate, regardless of whether any of the further contacts that would have been required by Alternative 2–B took place. The Commission emphasizes that this regulation encompasses only requests or suggestions for communications to the general public. Thus, a general appeal for support would clearly not fall within the scope of this regulation.

The proposed rules indicated that general public political communications authorized by candidates or party committees would be considered to be coordinated. The final coordination rules do not cover authorized communications, because these expenditures are already in-kind contributions to the candidates or party committees under 11 CFR 100.7(a)(1)(iii), and thus are not mentioned in the statutory definition of "independent expenditure" at 2 U.S.C. 431(17). Thus, if these communications contain express advocacy or solicit contributions, they must state who paid for them, and if applicable, that they are authorized by the candidate or the candidate's committee. *See* 11 CFR 110.11(a)(1).

The SNPRM sought comments on a hypothetical in which, shortly before an election, a candidate complained to a supporter that no one had publicized various problems in the personal life of his opponent. The supporter then ran such advertisements. Most of those who commented on this hypothetical thought this hypothetical should fall within the "request or suggestion" language. However, some witnesses said that it would not be considered coordinated under either Alternative 2–A or 2–B, and urged the Commission to revise the proposed regulation to ensure that such communications would in fact be considered coordinated. The Commission notes that this hypothetical turns on the precise language used, which would be needed to determine if in fact the candidate requested or suggested that the supporter run the advertisements in question. If the candidate made no request or suggestion, the communication would not be coordinated for purposes of these rules.

In determining whether a particular statement by a candidate or committee constitutes an appeal for an in-kind contribution in the form of a general public political communication, the Commission will consider both whether the requested action appears to be for the purpose of influencing a Federal election and the specificity of the request or suggestion. Such determinations would turn on the same factors addressed specifically in the "substantial discussion" standard, *infra*, with the principal difference being that a request or suggestion could be made by a candidate, authorized committee or party committee without any negotiation or immediate response from an outside group. If such a request or suggestion indicated that a communication with specified content would be valuable or important to a candidate or committee, then payments for the communication would constitute in-kind contributions.

One commenter proposed an additional hypothetical, in which a candidate's campaign committee chose to target only urban areas with campaign advertisements because it could not afford to cover the entire State. The director of a rural Political Action Committee ("PAC") later met the campaign manager and asked whether the campaign would be running ads in rural areas. Told that it would not be, due to lack of money, the rural PAC paid for and distributed the ads. The Commission notes that this mailing would be covered by 11 CFR 109.1(d)(1), part of the Commission's definition of independent expenditures, which states that the financing or dissemination, distribution, or republication of any campaign materials prepared by a candidate, campaign committee or their authorized agent is a contribution by the person making the expenditure, but not an expenditure by the candidate or committee unless coordination is present. *See also* 11 CFR 100.7(a)(1)(iii).

*Section 100.23(c)(2)(ii) The "Control or Decision-Making" Standard*

Paragraph (c)(2)(ii) states that communications are coordinated if the candidate or the candidate's agent, or a party committee or its agent, has exercised control or decision-making authority over the content, timing, location, mode, intended audience, volume of distribution, or frequency of placement of the communication. This standard is based on the *Christian Coalition* definition, 52 F.Supp.2d at 92; and it, too, would turn on the specific actions involved in each case. The commenters did not focus extensively on this portion of the proposed definition.

*Section 100.23(c)(2)(iii) The "Substantial Discussion or Negotiation" Standard*

Under 11 CFR 100.23, a general public political communication is considered coordinated if it is made after substantial discussion or negotiation between the creator, producer or distributor of the communication, or person paying for the communication, and a candidate, candidate's authorized committee or a party committee, regarding the content, timing, location, mode, intended audience, volume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement. The paragraph further provides that substantial discussion or negotiation

can be evidenced by one or more meetings, conversations or conferences regarding the value or importance of that communication for a particular election.

Some commenters expressed uncertainty about the scope of "substantial," which admittedly "leaves room for factual dispute." *Christian Coalition*, 52 F.Supp.2d at 92. By including the word "substantial," the Commission intends to make clear that whether or not "discussions or negotiations" satisfy the requirements of § 100.23(c)(2)(iii) will depend not on their frequency but on their substance. The "substance" must go beyond protected issue discussion to specific information about how to communicate an issue in a way that is valuable or important for the campaign. The Commission has concluded that when the topic of discussion turns from the candidate's views on a political issue to the candidate's views on how to communicate that issue, there is far greater likelihood of collaboration. Thus, numerous discussions with a campaign about a complex or controversial public issue would not be considered "substantial" for the purposes of paragraph (c)(2)(iii), but a brief discussion as to how to phrase an issue, or as to which issues to emphasize, could be considered "substantial."

The word "substantial" applies not only to discussions about the content of a communication, but also to discussions about the timing, location, mode, intended audience, volume of distribution or frequency of placement of a communication. In those circumstances, "substantial" is meant to exclude discussions that do not include enough specific information for collaboration or agreement to occur. For example, if a person states that he is planning to pay for a communication "soon," or to run the ad "on TV," without further probing from the campaign, this would not be considered "substantial."

The Commission recognizes, as did the *Christian Coalition* court, that use of the term "substantial" means that determinations involving this standard will likely be fact-specific. 52 F.Supp.2d at 92. Those seeking additional guidance as to the application of this standard to specific facts and circumstances are encouraged to make use of the Commission's advisory opinion process. *See* 2 U.S.C. 437f and 11 CFR Part 112.

*Section 100.23(d) Exception*

Consistent with *Buckley, Christian Coalition,* and *Clifton*, paragraph (d) of new section 100.23 provides that a candidate's or political party's response to an inquiry regarding the candidate's or the party's position on legislative or public policy issues does not alone make the communication coordinated.

Several commenters urged the Commission to broaden this exception to include, for example, public policy announcements or communications disseminated as part of a public policy debate; and legislative lobbying campaigns, including grass roots lobbying. While the Commission is generally sympathetic to these concerns, it can be difficult to distinguish between lobbying activities and electoral campaigning. As the *Buckley* Court explained, "(T)he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." 424 U.S. at 42. Further, some of these communications may have components that could trigger application of these rules. Thus the Commission is not enacting the blanket exception recommended by these commenters. However, the Commission stresses that such contacts, while not receiving a blanket exception, do not necessarily result in coordination. The test of 11 CFR 100.23 (c) must still be met.

*Section 100.23(e) Definitions*

This paragraph defines the terms "general public political communications," "clearly identified," and "agent" for purposes of these rules. The term "general public political communications" includes those made through a broadcasting station, including a cable television operator; newspaper; magazine; outdoor advertising facility; mailing or any electronic medium, including over the Internet or on a web site. Including cable television broadcasts is consistent with the Commission's candidate debate regulations at 11 CFR 110.13(a)(2), while including communications made over the Internet reflects the expanding role of that medium in federal campaigns.

The definition is limited to those communications having an intended audience of over one hundred people. The exclusion of communications with an intended audience of one hundred people or fewer mirrors the Commission's disclaimer rules at 11 CFR 110.11(a)(3), which exempt from the disclaimer requirements direct mailings of one hundred pieces or less.

The term "general public political communication" is similar to the term "general public political advertising," which appears in three places in the Act and in several sections of the regulations. The latter term has similar and generally consistent meanings in the Act and the Commission's rules. For example, the definitions of "contribution" and "expenditure" at 2 U.S.C. 431(8)(B)(v) and 431(9)(B)(iv) respectively refer to "broadcasting stations, newspapers, magazines, or similar types of general public political advertising." Section 441d(a) of the Act, which addresses communications that require a disclaimer, includes the same list and adds outdoor advertising facilities and direct mailings. The corresponding rules are found at 11 CFR 100.7(b)(9) (definition of "contribution"), 100.8(b)(10) (definition of "expenditure"), and 110.11(a)(1) (communications requiring disclaimers). The Commission therefore believes this term is preferable to "expressive communications," the term used in the *Christian Coalition* decision.

The Commission sought comments on a hypothetical in which a Savings and Loan League runs public service announcements intended to reinforce the public's confidence in the safety of deposits in savings and loan institutions. The announcements, which are run in January of an election year, feature a U.S. Senator who is a candidate for reelection. The commenters who discussed this hypothetical argued that the announcements should not be considered coordinated general public political communications, both because of the timing of the announcements, early in an election year, and because they had no electoral content. Although the Commission is not including a specific time period prior to an election in the text of the new rules, timing is an element of coordination in 11 CFR 100.23(c)(2)(ii) and (iii). The *Christian Coalition* decision supports the idea that the timing of a communication is one aspect of whether it is coordinated with a campaign. *Christian Coalition*, 52 F.Supp. 3d at 92. However, as discussed above, the Commission does not believe that the lack of electoral content is controlling.

This is another situation that would turn on the specific facts. *See* discussion of the first hypothetical discussed in connection with paragraph (c)(2)(i), *supra*.

*Section 100.23(e)(2) Definition of "Clearly Identified"*

The new rules at 11 CFR 100.23(b) limit their coverage to communications that include a "clearly identified candidate." Paragraph (e)(2) of § 100.23 explains that the term "clearly identified candidate" has the same

meaning as that in 11 CFR 100.17, which is based on 2 U.S.C. 431(18). Thus, it includes communications where the candidate's name, nickname, photograph, or drawing appears, or the identity of the candidate is otherwise apparent through an unambiguous reference such as "the President," "your Congressman," or "the incumbent," or through an unambiguous reference to his or her status as a candidate such as "the Democratic Presidential nominee" or "the Republican candidate for Senate in the State of Georgia."

*Section 100.23(e)(3) Definition of "Agent"*

This paragraph notes that the definition of "agent" for purposes of these new rules is identical to that found at 11 CFR 109.1(b)(5), part of the rules defining independent expenditures. The term "agent" in this context means any person who has actual oral or written authority, either express or implied, to make or to authorize the making of expenditures on behalf of a candidate; or any person who has been placed in a position within the campaign organization where it would reasonably appear that in the ordinary course of campaign-related activities he or she may authorize expenditures. The Commission is including this cross reference in 11 CFR 100.23 to clarify that the term has the same meaning in the context of coordinated general public political communications.

*Section 109.1 Independent Expenditures*

In its 1997 NPRM, the Commission sought comment on several proposed revisions to this section, which defines the term "independent expenditure." The commenters and witnesses who addressed this issue at the Commission's 1997 public hearing had equally wide-ranging views this issue. However, those events took place prior to the *Christian Coalition* decision, which the Commission has determined should serve as the basis for this definition.

The Commission is amending the definition of "independent expenditure" in paragraph (a) to track more closely the statutory definition of independent expenditure. *See* 2 U.S.C. 431(17). In addition, the § 109.1(a) Commission has included a cross-reference 11 CFR 100.23, to indicate that the meaning of the phrase "made with the cooperation of, or in consultation with, or in concert with, or at the request or suggestion of, a candidate or any agent of authorized committee of such candidate," is now clarified by § 100.23, instead of by former paragraph (b)(4) of § 109.1. The Commission is deleting paragraph (b)(4) because the standards for coordination set forth in that section were overbroad. *See Christian Coalition*, 52 F.Supp. at 90.

Former § 109.1(b)(4) explained what was meant by the phrase, "made with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate, or any agent, or authorized committee of the candidate." It indicated that this covered "any arrangement, coordination, or direction by the candidate or his or her agent prior to the publication, distribution, display, or broadcast of the communication." This phrase has been clarified, consistent with the *Christian Coalition* decision, and moved to new 11 CFR 100.23(c)(2).

Former paragraph (b)(4) also addressed contacts between the campaign and the person making the expenditure. For example, it included, at former paragraph (b)(4)(i)(A), a presumption that coordination applied to expenditures "based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made." The *Christian Coalition* court, likening this regulation to an "insider trading" standard, held it to be overbroad. 52 F.Supp. 2d at 89–91. The Commission is accordingly revising this paragraph to explain that a communication is "made with the cooperation of, or in consultation with, or at the request or suggestion of, a candidate or any agent or authorized committee of such candidate" if it is a coordinated general public political communication under 11 CFR 100.23.

*Section 110.14 Contributions To and Expenditures By Delegates and Delegate Committees*

This section of the Commission's rules sets forth the prohibitions, limitations and reporting requirements under the Act applicable to all levels of a delegate selection process. Paragraphs (f)(2)(i), (f)(2)(ii), (f)(3)(iii), (*i*)(2)(i), (*i*)(2)(ii), and (*i*)(3)(iii) address independent expenditures and in-kind contributions. The Commission is making conforming amendments to these paragraphs to reflect new 11 CFR 100.23 and revised 11 CFR 109.1.

*Advisory Opinions Superseded*

The Commission has in the past issued Advisory Opinions ("AO") that employed a broader definition of "coordination" than is contained in these new rules. Many of these AOs addressed the "insider trading" situation in which a campaign employee later became involved, or sought to become involved, with an entity that wished to make independent expenditures. This prohibition was found to be overly broad by the *Christian Coalition* court. *See* discussion of revised 11 CFR 109.1(b)(4), *supra*, which has been rewritten to reflect that aspect of the decision. The following AOs are superseded, to the extent they conflict with these new rules: AOs 1999–17, 1998–22, 1996–1, 1993–18, 1982–20, 1980–116, 1979–80.

**Certification of No Effect Pursuant to 5 U.S.C. 605(b) [Regulatory Flexibility Act]**

The Commission certifies that these rules will not have a significant economic impact on a substantial number of small entities. The basis for this certification is that the rules follow court decisions that expand the definition of certain coordinated communications made in support of or in opposition to clearly identified federal candidates. The rules also permit, but do not require, small entities to make independent expenditures. Therefore, there will be no significant economic impact on a substantial number of small entities.

**List of Subjects**

*11 CFR Part 100*

Elections.

*11 CFR Part 109*

Elections, Reporting and recordkeeping requirements.

*11 CFR Part 110*

Campaign funds, Political committees and parties.

For the reasons set out in the preamble, Subchapter A, Chapter I of title 11 of the *Code of Federal Regulations* is amended to read as follows:

## PART 100—SCOPE AND DEFINITIONS (2 U.S.C. 431)

1. The authority citation for Part 100 continues to read as follows:

**Authority:** 2 U.S.C. 431, 434(a)(11), and 438(a)(8).

2. Section 100.16 is revised to read as follows:

### § 100.16 Independent expenditure (2 U.S.C. 431(17)).

The term *independent expenditure* means an expenditure by a person for a communication expressly advocating the election or defeat of a clearly identified candidate that is not made with the cooperation of or in consultation with, or in concert with, or

at the request or suggestion of, a candidate or any agent or authorized committee of such candidate. A communication is "made with the cooperation of, or in consultation with, or in concert with, or at the request or suggestion of, a candidate or any agent or authorized committee of such candidate" if it is a coordinated general public political communication under 11 CFR 100.23. *See* 11 CFR 109.1.

3. Section 100.23 is added to read as follows:

**§ 100.23 Coordinated General Public Political Communications.**

(a) *Scope.*

(1) This section applies to expenditures for general public political communications paid for by persons other than candidates, authorized committees, and party committees.

(2) Coordinated party expenditures made on behalf of a candidate pursuant to 2 U.S.C. 441a(d) are governed by 11 CFR 110.7.

(b) *Treatment of expenditures for general public political communications as expenditures and contributions.* Any expenditure for general public political communication that includes a clearly identified candidate and is coordinated with that candidate, an opposing candidate or a party committee supporting or opposing that candidate is both an expenditure under 11 CFR 100.8(a) and an in-kind contribution under 11 CFR 100.7(a)(1)(iii).

(c) *Coordination with candidates and party committees.* An expenditure for a general public political communication is considered to be coordinated with a candidate or party committee if the communication—

(1) Is paid for by any person other than the candidate, the candidate's authorized committee, or a party committee, and

(2) Is created, produced or distributed—

(i) At the request or suggestion of the candidate, the candidate's authorized committee, a party committee, or the agent of any of the foregoing;

(ii) After the candidate or the candidate's agent, or a party committee or its agent, has exercised control or decision-making authority over the content, timing, location, mode, intended audience, volume of distribution, or frequency of placement of that communication; or

(iii) After substantial discussion or negotiation between the creator, producer or distributor of the communication, or the person paying for the communication, and the candidate, the candidate's authorized committee, a party committee, or the agent of such candidate or committee, regarding the content, timing, location, mode, intended audience, volume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement. Substantial discussion or negotiation may be evidenced by one or more meetings, conversations or conferences regarding the value or importance of the communication for a particular election.

(d) *Exception.* A candidate's or political party's response to an inquiry regarding the candidate's or party's position on legislative or public policy issues does not alone make the communication coordinated.

(e) *Definitions.* For purposes of this section:

(1) *General public political communications* include those made through a broadcasting station (including a cable television operator), newspaper, magazine, outdoor advertising facility, mailing or any electronic medium, including the Internet or on a web site, with an intended audience of over one hundred people.

(2) *Clearly identified* has the same meaning as set forth in 11 CFR 100.17.

(3) *Agent* has the same meaning as set forth in 11 CFR 109.1(b)(5).

## PART 109—INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 434(c))

4. The authority citation for part 109 continues to read as follows:

**Authority:** 2 U.S.C. 431(17), 434(c), 438(a)(8), 441d.

5. Section 109.1 is amended by revising paragraphs (a), (b)(4) and (d)(1) to read as follows:

**§ 109.1 Definitions (2 U.S.C. 431(17)).**

(a) *Independent expenditure* means an expenditure by a person for a communication expressly advocating the election or defeat of a clearly identified candidate that is not made with the cooperation of, or in consultation with, or in concert with, or at the request or suggestion of, a candidate or any agent or authorized committee of such candidate.

(b) * * *

(4) A communication is "made with the cooperation of, or in consultation with, or in concert with, or at the request or suggestion of, a candidate or any agent or authorized committee of such candidate" if it is a coordinated general public political communication under 11 CFR 100.23.

* * * * *

(d)(1) The financing of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered a contribution for the purposes of contribution limitations and reporting responsibilities by the person making the expenditure but shall not be considered an expenditure by the candidate or his authorized committees unless the dissemination, distribution, or republication of campaign materials is a coordinated general public political communication under 11 CFR 100.23

* * * * *

## PART 110—CONTRIBUTION AND EXPENDITURE LIMITATIONS AND PROHIBITIONS

6. The authority citation for part 110 continues to read as follows:

**Authority:** 2 U.S.C. 431(8), 431(9), 432(c)(2), 437d(a)(8), 438(a)(8), 441a, 441b, 441d, 441e, 441f, 441g and 441h.

7. Section 110.14 is amended by revising the introductory text to paragraphs (f)(2)(i) and (f)(2)(ii); paragraph (f)(3)(iii); the introductory text to paragraphs (i)(2)(i) and (i)(2)(ii); and paragraph (i)(3)(iii) to read as follows:

**§ 110.14 Contributions to and expenditures by delegates and delegate committees.**

* * * * *

(f) * * *

(2) * * *

(i) Such expenditures are independent expenditures under 11 CFR part 109 if they are made for a communication expressly advocating the election or defeat of a clearly identified Federal candidate that is not a coordinated general public political communication under 11 CFR 100.23.

* * * * *

(ii) Such expenditures are independent expenditures under 11 CFR part 109 if they are made for a communication expressly advocating the election or defeat of a clearly identified Federal candidate that is not a coordinated general public political communication under 11 CFR 100.23.

* * * * *

(3) * * *

(iii) Such expenditures are not chargeable to the presidential candidate's expenditure limitation under 11 CFR 110.8 unless they were coordinated general public political communications under 11 CFR 100.23.

* * * * *

(i) * * *

* * *

(2) * * *

(i) Such expenditures are in-kind contributions to a Federal candidate if they are coordinated general public political communications under 11 CFR 100.23.

* * * * *

(ii) Such expenditures are independent expenditures under 11 CFR part 109 if they are made for a communication expressly advocating the election or defeat of a clearly identified Federal candidate that is not a coordinated general public political communication under 11 CFR 100.23.

* * * * *

(3) * * *

(iii) Such expenditures are not chargeable to the presidential candidate's expenditure limitation under 11 CFR 110.8 unless they were coordinated general public political communications under 11 CFR 100.23.

* * * * *

Dated: November 30, 2000.

**Darryl R. Wold,**

*Chairman, Federal Election Commission.*

[FR Doc. 00–31013 Filed 12–5–00; 8:45 am]

BILLING CODE 6715–01–P

---

## DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

## 14 CFR Part 25

**[Docket No. NM179; Special Conditions No. 25–168–SC]**

## Special Conditions: Gulfstream Aerospace Corporation Model G–1159, G–1159A, and G–1159B Series Airplanes as Modified by Duncan Aviation; High Intensity Radiated Fields (HIRF)

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final special conditions; request for comments.

**SUMMARY:** These special conditions are issued for the Gulfstream Model G–1159, G–1159A, and G–1159B series airplanes modified by Duncan Aviation. These modified airplanes will have a novel or unusual design feature(s) associated with new avionics/electronics and electrical systems that will perform critical functions. The applicable airworthiness regulations do not contain adequate or appropriate safety standards for the protection of these systems from the effects of high-intensity radiated fields (HIRF). These special conditions contain the additional safety standards the Administrator considers necessary to establish a level of safety equivalent to that established by the existing airworthiness standards.

**DATES:** The effective date of these special conditions is November 29, 2000. Comments must be received on or before January 22, 2001.

**ADDRESSES:** Comments on these special conditions may be mailed in duplicate to: Federal Aviation Administration, Transport Airplane Directorate, Attention: Rules Docket (ANM–114), Docket No. NM179, 1601 Lind Avenue SW., Renton, Washington 98055–4056; or delivered in duplicate to the Transport Airplane Directorate at that address. All comments must be marked: Docket No. NM179. Comments may be inspected in the Rules Docket weekdays, except Federal holidays, between 7:30 a.m. and 4:00 p.m.

**FOR FURTHER INFORMATION CONTACT:** For information concerning the certification program for Gulfstream Model G–1159, G–1159A, and G–1159B series airplanes, contact: Meghan Gordon, Federal Aviation Administration, Transport Airplane Directorate, Standardization Branch, ANM–113, 1601 Lind Avenue SW., Renton, Washington 98055–4056; telephone (425) 227–2138; fax (425) 227–1149.

For information on the general subject of HIRF, contact: Massoud Sadeghi, Federal Aviation Administration, Transport airplane Directorate, Airplane and Flight Crew Interface Branch, ANM–111, 1601 Lind Avenue SW., Renton, Washington 98055–4056; telephone (425) 227–2117; fax (425) 227–1320.

**SUPPLEMENTARY INFORMATION:** The FAA has determined that notice and opportunity for prior public comment hereon are impracticable because these procedures would significantly delay issuance of the approval design and thus delivery of the affected aircraft. In addition, the substance of these special conditions has been subject to the public comment process in several prior instances with no substantive comments received. The FAA therefore finds that good cause exists for making these special conditions effective upon issuance.

### Comments Invited

Although these special conditions are being issued as final special conditions without prior public notice, interested persons are invited to submit such written data, views, or arguments as they may desire. Communications should identify the regulatory docket number and be submitted in duplicate to the address specified above. All communications received on or before the closing date for comments will be considered by the Administrator. The special conditions may be changed in light of the comments received. All comments received will be available in the Rules Docket for examination by interested persons, both before and after the closing date for comments. A report summarizing each substantive public contact with FAA personnel concerning this rulemaking will be filed in the docket. Commenters wishing the FAA to acknowledge receipt of their comments submitted in response to these special conditions must include a self-addressed, stamped postcard on which the following statement is made: "Comments to NM179." The postcard will be date stamped and returned to the commenter.

### Background

On September 13, 2000, and on September 20, 2000, Duncan Aviation, 15745 South Airport Road, Battle Creek, Michigan 49015, submitted applications to the FAA for two Supplemental Type Certificates (STC). These STC's are for modifying Gulfstream Aerospace Model G–1159, G–1159A, and G–1159B series airplanes to include:

- The Collins FDS–2000 Flight Display System; and
- Dual Collins AHS–3000A Altitude Heading Reference Systems.

The FDS–2000 system is a replacement of the existing electro-mechanical Attitude Directional Indicator (ADI) and Horizontal Situational Indicator (HSI) flight instruments. It also provides additional functional capability and redundancy in the system.

The AHS–3000A system is a replacement for the existing electro-mechanical vertical and directional gyros. It also provides additional functional capability and redundancy in the system.

The avionics/electronics and electrical systems installed in the Gulfstream Model G–1159, G–1159A, and G–1159B airplanes have the potential to be vulnerable to high-intensity radiated fields (HIRF) external to the airplane.

The subject Gulfstream airplanes are T-tail, low swept-wing small transport category airplanes. The Model G–1159 airplane is powered by two Rolls Royce SPEY RB (163) 511–8 series engines mounted on pylons extending from the aft fuselage, and it has a maximum takeoff weight of 64,800 pounds. The Models G–1159A and G–1159B are slightly larger than the Model G–1159. These models are powered by two Rolls Royce SPEY RB (163–25) 511–8 series engines, and have a maximum takeoff

# PLAINTIFFS' EXHIBIT 8

Coffees, and Charlie Trie and John Huang and Johnny Chung. And then, of course, the Presidential pardons coming under suspicion at the conclusion of the Clinton administration. We faced questions in this body as we considered bills regulating tobacco and telecommunications and the Patients' Bill of Rights, while at the same time we raised soft money from the industries and interest groups that had a huge stake in those bills. The public watched with increasing skepticism as we appeared to act—or fail to act—on legislation based on the demands of wealthy soft money donors. With the enormous influx of soft money being raised by both parties, with every vote we cast the public wondered, and had reason to wonder, was it the money?

Of course of late we have seen yet another scandal take shape—the Enron debacle. As the Enron story unfolded, I think many of us were reminded why the Supreme Court, in its famous 1976 Buckley versus Valeo decision, said that the appearance of corruption, not just corruption itself, justifies congressional action to place some limits on our campaign finance system.

In the Buckley case, the Supreme Court understood that public mistrust of government is destructive to democracy. From a constitutional point of view, it hardly matters whether that mistrust is based on actual misconduct or simply its appearance.

In the case of Enron's collapse, the need to address public mistrust has been paramount for Congress and the administration as they have investigated the company's alleged wrongdoing. When a corporation such as Enron leaves devastated employees and fleeced shareholders in its wake, the public depends on us—on Congress and the administration—to determine what went wrong and defend the public interest. But the potential for a conflict of interest in a case such as this is clear: Many of the elected officials who were asked to sit in judgment of Enron, including Members of Congress, the Attorney General, and the President of the United States, have been accepting, and even asking for, campaign contributions from Enron for years. And the political parties have pocketed more than $3.5 million in unregulated, unlimited soft money from Enron since 1991.

Congress has moved forward with the investigations into Enron's conduct, despite the potential conflict of interest the political contributions might pose. The reality is that this is all too familiar territory for Congress. Every day Members of Congress accept huge campaign contributions with one hand and vote on issues affecting their contributors with the other. And, every day the public naturally questions whether their Representatives are giving special treatment to the wealthy interests that fund their campaigns and bankroll their political parties.

The Enron scandal, and all the soft money scandals that have come before, illustrate the permanent conflict of interest—the permanent conflict of interest—that unlimited soft money contributions to the parties have created for elected officials in the Capitol and at the White House. Both parties have gladly accepted Enron's soft money contributions over the years, and now those contributions are compromising our ability to address the Enron collapse, and countless other issues that come before the Congress. More than that—more than that—they compromise the public's confidence in our ability, and our will, to do anything about it.

While eliminating soft money will not cure the campaign finance system of every ill, it will, in fact, end a system of unlimited donations that has blatantly put political access and influence up for sale. Enron is just one in a long line of corporations, unions, and wealthy individuals that has exploited the soft money loophole to buy influence with Congress and the executive branch at the very highest levels. So banning soft money will help to untangle the web of money and influence that has made Congress and the White House so vulnerable to the appearance of corruption for far too long.

In the coming days we will face the final test of this long legislative battle and take our final steps toward enacting these hard-fought reforms into law. Passing campaign finance reform is within our grasp, and so, finally, is a renewed integrity for our democratic process.

Of course, while the soft money ban is central to the bill, and is the most important feature of the bill, this bill contains reforms on a variety of other issues.

I say to the Presiding Officer, of course, you were one of the principal authors of very important provisions relating to so-called phony issue ads that make the bill even stronger.

A number of amendments were added on the Senate floor last year that improved and strengthened the bill. Almost all of them are in the bill now before us that we hope, by the end of the week, will be sent to the President.

Mr. President, I ask unanimous consent that a section-by-section analysis of the bill be printed in the RECORD immediately following my statement.

The PRESIDING OFFICER. Without objection, it is so ordered.

(See exhibit 1.)

Mr. FEINGOLD. Thank you, Mr. President.

Mr. President, the debate is finally here. Our bipartisan coalition is strong and resolute. And the moment for reform has arrived.

After 6½ years of work on this bill, and more than a decade of scandals that have threatened the integrity of our legislative process, I do believe this body is ready to get the job done for the American people. I believe the American people have waited long enough.

Mr. President, I yield the floor.

EXHIBIT NO. 1

THE BIPARTISAN CAMPAIGN REFORM ACT OF 2002—SECTION BY SECTION ANALYSIS

TITLE I: REDUCTION OF SPECIAL INTEREST INFLUENCE

Sec. 101(a). Soft Money of Political Parties. Creates new Section 323 of the Federal Election Campaign Act (FECA) to prohibit soft money in federal elections.

Sec. 323(a). National Committees. Prohibits national party committees and entities controlled by the parties from raising, spending, or transferring money that is not subject to the limitations, prohibitions, and reporting requirements of the FECA (i.e., soft money).

Sec. 323(b). State, District and Local Committees. Subject to the Levin amendment, requires any money spent on "Federal election activities" by state or local parties, and entities controlled or acting on behalf of those parties or an association of state or local candidates to be subject to the limitations, prohibitions, and reporting requirements of the FECA (i.e., hard money.) This will close the state party loophole. "Federal election activities" are defined in Section 101(b) of the bill.

Under the Levin amendment, the section permits state or local parties to spend soft money on voter registration and get out the vote activity that does not mention a federal candidate as long as no single soft money donor gives more than $10,000 per year to any state or local party organization for such purposes, the money is not spent on broadcast advertising other than ads that solely mention state or local candidates, the money is not raised by federal candidates, national parties, or party committees acting jointly. The spending of this money will require an allocation of hard money to soft money. The state or local party organization must raise the hard and soft money for this allocation on its own, and money to be spent under this provision may not be transferred between party organizations.

Sec. 323(c). Fundraising Costs. Requires national, state, and local parties to use hard money to raise money that will be used on Federal election activities, as defined by the bill.

Sec. 323(d). Tax-Exempt Organizations. Prohibits national, state, and local parties or entities controlled by such parties from making contributions to or soliciting donations for 501(c) organizations which spend money in connection with federal elections or 527 organizations (other than entities that are political committees under the FECA, state/district/local party committees, or state or local candidates' campaign committees). This provision will prevent the parties from collecting soft money and laundering it through other organizations engaged in federal electioneering.

Sec. 323(e). Federal Candidates. Prohibits federal candidates or individuals holding federal office and any entities established, financed, controlled, or acting on behalf of such candidates or officeholders from raising or spending soft money in connection with federal elections. The restrictions of this section do not apply to federal officeholders who are running for state office and spending non-Federal money on their own elections, so long as they do not mention other federal candidates who are on the ballot in the same election and are not their opponents for state office. The restrictions also do not prevent a federal candidate or officeholder from attending, speaking at, or appearing as a featured guest at a fundraising event for a state or local political party.

Candidates are permitted to solicit up to $20,000 from an individual per year specifically for voter registration and get out of

the vote activities carried out by 501(c) organizations. The provision also clarifies that candidates may solicit unlimited funds for 501(c) organizations where the solicitation does not specify the use of the money, and the organization's principal purpose is not voter registration or get out the vote activities.

Sec. 323(f). State Candidates. Prohibits candidates for state or local office from spending soft money on public communications that promote or attack a clearly identified candidate for Federal office. Exempts communications which refer to a federal candidate who is also a candidate for state or local office.

Taken together, these soft money provisions are designed to shut down the soft money loophole as comprehensively as possible. By including entities established, maintained, controlled, or acting on behalf of federal and state officeholders and candidates, they also prohibit so-called "leadership PACs" or "candidate PACs" from raising or spending soft money in connection with Federal elections and are designed to prevent the evasion of the law by federal or state candidates or officeholders using 501(c)(4) or 527 organizations.

Sec. 101(b). Definitions. Provides definitions for certain terms used in the soft money ban.

Federal election activity means voter registration activities within 120 days before a federal election, get out the vote activity and generic campaign activity in connection with an election in which federal candidates are on the ballot (even if state candidates are also on the ballot), and public communications that refer to a clearly identified federal candidate and support or oppose a candidate for that office (regardless of whether those communications expressly advocate the election or defeat of a candidate.) These are the activities that state parties must pay for with hard money (except as specifically provided under the bill).

Generic campaign activity means campaign activities like general party advertising that promote a political party but not a candidate.

Public communication means a communication to the general public by means of broadcast, cable, satellite, newspaper, magazine, outdoor advertising, mass mailing, telephone bank, or any other general public political advertising.

Mass mailing is a mailing of more than 500 identical or substantially similar pieces within any 30 day period.

Telephone bank means more than 500 calls of an identical or substantially similar nature within a 30 day period.

Sec. 102. Increased contribution limits for state committees of political parties. Increases the amount that individuals can give to state parties from $5,000 to $10,000. See Section 307 for additional increases in contribution limits.

Sec. 103. Reporting requirements. Requires national political party committees, including congressional campaign committees to report all receipts and disbursements and state party committees to report all receipts and disbursements and state party committees to report all receipts and disbursements for Federal election activities and receipts and disbursements for activities permitted by the Levin amendment (i.e., spending of capped soft money donations on certain forms of voter registration and get-out-the-vote). Requires itemized reporting of receipts or disbursements of over $200. Eliminates the building fund exception to the FECA's definition of contribution. Accounts to raise money for office buildings were one of the original soft money accounts before the loopholes exploded in the 1996 election with the use of soft money for political advertising.

TITLE II: NON-CANDIDATE CAMPAIGN EXPENDITURES

SUBTITLE A—ELECTIONEERING COMMUNICATIONS

Section 201–203 have come to be known as the "Snowe-Jeffords amendment."

Sec. 201. Disclosure of Electioneering Communications. Requires anyone who spends over $10,000 in a calendar year on electioneering communications to file a disclosure statement within 24 hours after reaching that amount of spending and again within 24 hours of each additional $10,000 of spending. Electioneering communications are defined as broadcast, cable or satellite communications that mention the name or show the likeness of a clearly identified candidate for Federal office within 60 days of a general election or 30 days of a primary election, convention, or caucus, and which is targeted to the candidate's state/district. Electioneering communications do not include news broadcasts, communications that constitute independent expenditures because they contain express advocacy, or candidate debates and advertisements for candidate debates. The FEC may promulgate additional exceptions for advertisements that do not attack, oppose, promote or support a clearly identified Federal candidate.

The disclosure statement must identify the person or entity making the disbursement, the principal place of business of that person if it is not an individual, the amount of each disbursement of over $200 and the identify of the person receiving the disbursement, and the election to which the communication pertains and the candidate or candidates who are identified. If the disbursement is made from a segregated account to which only individuals can contribute, the disclosure statement must also reveal the names and addresses of the contributors of $1,000 or more to that account. If the disbursement is not made from such a segregated account then all donors of $1,000 to the organization making the expenditure must be disclosed. Money in the segregated account can be used for purposes other than electioneering communications, and the spending on other activities need not be disclosed, but all contributors to the account must be informed that their money might be used for electioneering communications.

Sec. 202. Coordinated Communications As Contributions. Makes clear that electioneering communications that are coordinated with candidates or with political parties are deemed to be contributions to the candidate supported by the communication. Because contributions to candidates are limited in the case of individuals, or prohibited in the case of groups (other than through a PAC), this provision essentially prohibits electioneering communications from being coordinated with candidates or parties.

Sec. 203. Prohibition of Corporate and Labor Disbursements for Electioneering Communications. Bars the use of corporate and union treasury money for electioneering communications. Corporations and unions are prohibited from spending their treasury money on electioneering communications, and groups and individuals may not use corporate or union treasury money for such ads (corporations and unions could finance such advertisements through their political action committees). The provision includes a number of special operating rules designed to prevent evasion of this prohibition through pass-throughs, laundering, or contribution swaps. 501(c)(4) and 527 organizations, which are technically corporations, are permitted to make electioneering communications as long as they use individual money contributed by U.S. citizens, U.S. nationals, or permanent legal residents and make the disclosures required by Section 201 (but see Section 204). If they derive income from business activities or accept contributions from corporations or unions, they must pay for electioneering communications from a separate account to which only individuals can contribute.

Sec. 204. Rules Relating to Certain Targeted Electioneering Communications. Withdraws Section 203's exemption for 501(c)(4) or 527 organizations that run electioneering communications targeted to the electorate of the candidate mentioned in the communications. The net effect of this provision is to apply the Snowe-Jeffords prohibition on running sham issue ads paid for with corporate or union treasury funds to non profit advocacy groups (501(c)(4)'s) and political organizations (527's). Should this provision be struck down as unconstitutional, the prohibition on the use of union or for-profit corporation treasury money for electioneering communications would remain intact, as would the disclosure requirements.

SUBTITLE B—INDEPENDENT AND COORDINATED EXPENDITURES

Sec. 211. Definition of Independent Expenditure. Clarifies the statutory definition of independent expenditure to mean an expenditure expressly advocating the election or defeat of a clearly defined candidate that is not made in coordination with a candidate.

Sec. 212. Reporting Requirements for Certain Independent Expenditures. Requires any person, including a political committee, who makes independent expenditures totaling $10,000 or more until the 20th day before the election to file a report with the FEC within 48 hours. An additional report must be filed within 48 hours of any additional independent expenditures of $10,000 or more. In the last 20 days before the election, a report must be filed within 24 hours of each independent expenditure totaling more than $1,000.

Sec. 213. Independent Versus Coordinated Expenditures by Party. Requires political parties to choose in each election between making the limited expenditures permitted to be coordinated with a candidate under 2 U.S.C. §441a(d) and making unlimited independent expenditures. Parties would make that choice with their first expenditure with respect to a particular election after their nominee has been chosen. If a party makes an independent expenditure, it may not make a coordinated expenditure with respect to that election. If it makes a coordinated expenditure, it may not make an independent expenditure. For purposes of this section, all national and state party committees are considered to be one entity so a national party cannot make an independent expenditure if a state party has made a coordinated expenditure with respect to a particular candidate.

Sec. 214. Coordination with Candidates or Political Parties. Provides that an expenditure made by a person, other than a candidate, in coordination with a political party will be treated as a contribution to the party. In addition, the FEC's current regulations on coordinated communications paid for by persons other than candidates are repealed nine months after enactment. The provision instructs the FEC to promulgate new regulations on coordination between candidates or parties and outside groups, addressing a number of different situations where coordination might be found. It provides that the new regulations shall not require formal collaboration or agreement to establish coordination.

TITLE III: MISCELLANEOUS

Sec. 301. Use of Contributed Amounts for Certain Purposes. Codifies FEC regulations

also use soft money to fund "party building activities," such as get-out-the-vote and voter registration drives. But, again, all of us know that these activities, while vitally important to our democracy, are designed to, and do have an unmistakable impact on both Federal and non-Federal elections. Currently, State parties pay for these activities using a mixture of hard and soft money pursuant to allocation formulae set by the Federal Election Commission. But current allocation rules have proven wholly inadequate to guard against the use of soft money to influence Federal campaigns.

While national parties will no longer be able to transfer soft money to State parties, some State parties will still be able to receive large contributions from corporations, labor unions, and wealthy individuals, subject to state laws. So unless we close the loophole at the State and local level, we will be right back to the unacceptable situation of having non-Federal money—large contributions from corporations, labor unions and wealthy individuals—used to affect Federal elections. That is because, one, many States allow unlimited contributions from individuals, unions, PACs, corporations and national parties to State and local parties; and two, we know from experience that State parties are spending massive sums of soft money to influence Federal elections.

Thus, if left unregulated, or merely subject to existing FEC allocation rules, State and local party activity presents the opportunity for massive evasion. Restrictions on the raising of soft money by Federal candidates and officeholders do not, on their own, prevent evasion of the soft money ban. There will always be persons clearly associated with Presidential or other Federal candidates, but not covered by these provisions, who can raise soft money for state parties to funnel into Federal elections. In addition, those who seek to avoid Federal contribution limits can make huge contributions to State and local parties in order to assist particular Federal candidates.

Current law, of course, requires that State and local parties spend exclusively hard money when they engage in certain activities that affect Federal elections. For example, if a State party were to run an ad expressly advocating the election of a Federal candidate, the party would have to pay for the ad with hard money. The bill simply applies this same principle to an additional category of activities, defined as "Federal election activity," that, in the judgment of Congress, also clearly affect Federal elections. By contrast, as the bill makes clear, activities that affect purely non-Federal elections are left unregulated by the bill, and remain subject to the applicable State law.

Some argue that the soft money given to State parties is used only for "party building" that is wholly unrelated to any activity that in design or practice influences Federal elections. This is demonstrably false. The fact is, much of the soft money that goes to State parties is spent on activities that influence Federal elections. In the 1996 Presidential election, for example, State parties spent many millions of dollars on television ads that promoted their Presidential candidates. The money for these ads, moreover, in many cases was either transferred from the national parties or contributed by donors directly to the State parties.

Some have also argued that the Federal Government lacks the constitutional authority to regulate the collection and use of funds by State and local parties. There can be no serious doubt, however, that the Federal Government has the constitutional authority to regulate activity that affects Federal elections, and that soft money is used at the State and local level for this purpose. In fact, existing law already prohibits State and local parties from using soft money to explicitly support a Federal candidate. All that the bill does is extend this existing law to close existing loopholes, thereby ensuring that activities that actually influence Federal elections are subject to Federal limitations and rules, while leaving purely State and local campaign activities by State parties subject to applicable State law.

Finally, the argument that the bill would somehow undermine the status of State and local parties and prevent them from conducting grassroots campaign activities is similarly incorrect. If anything, the massive influx of soft money from the national parties has turned State and local parties into mere pass-through accounts for the national parties and for large, direct contributions from corporations, unions and wealthy individuals. If anything, the bill will return the State and local parties to the grassroots and encourage them to broaden their bases and reach out to average voters.

It is a key purpose of the bill to stop the use of soft money as a means of buying influence and access with Federal officeholders and candidates. Thus, we have established a system of prohibitions and limitations on the ability of Federal officeholders and candidates to raise, spend, and control soft money.

The bill prohibits Federal officeholders, Federal candidates, their agents, and entities they directly or indirectly establish, finance, maintain or control, from soliciting, receiving, directing, transferring or spending funds in connection with an election for Federal office, including funds for any Federal election activity, unless such funds are "hard money."

Furthermore, it prohibits Federal officeholders, Federal candidates, their agents, or entities they directly or indirectly establish, finance, maintain or control from soliciting, receiving, directing, transferring or spending funds in connection with a non-Federal election from sources prohibited from making "hard money" contributions. It likewise prohibits such individuals and entities from soliciting, receiving, directing, transferring or spending funds—in connection with a non-Federal election—from individuals or Federal PACs that are in excess of the "hard money" amounts permitted to be contributed to candidates and political committees by individuals and Federal PACs.

These provisions break no new conceptual grounds in either public policy or constitutional law. This prohibition on solicitation is no different from the Federal laws and ethical rules that prohibit Federal officeholders from using their offices or positions of power to solicit money or other benefits. Indeed, statutes like these have been on the books for over 100 years for the same reason that we're prohibiting certain solicitations to deter the opportunity for corruption to grow and flourish, to maintain the integrity of our political system, and to prevent any appearance that our Federal laws, policies, or activities can be inappropriately compromised or sold.

For example, the Ethics Reform Act of 1989 generally prohibits Members of Congress or Federal officers and employees from soliciting anything of value from anyone who seeks official action from them, does business with them, or has interests that may be substantially affected by the performance of official duties. No one could seriously argue that this prohibition is without a compelling purpose. The same holds true here. We are prohibiting Federal officeholders, candidates, and their agents from soliciting funds in connection with an election, unless such funds are from sources and in amounts permitted under Federal law. The reason for this is to deter any possibility that solicitations of large sums from corporations, unions, and wealthy private interests will corrupt or appear to corrupt our Federal Government or undermine our political system with the taint of impropriety.

The solicitation rules in the bill are also consistent with Federal criminal laws that prohibit Congressional candidates and incumbents, among others, from knowingly soliciting political contributions from any Federal officer or employee or from any contractor who renders personal services. It is also directly akin in purpose to the Federal criminal law that prohibits any person from soliciting or receiving any political contribution in any Federal room or building occupied in the discharge of a Federal officer's or employer's duties.

The rule here is simple: Federal candidates and officeholders cannot solicit soft money funds, funds that do not comply with Federal contribution limits and source prohibitions, for any party committee—national, State or local.

This, of course, means that a Federal candidate or officeholder may continue to solicit hard money for party committees. A Federal candidate or officeholder may solicit up to $25,000 per

definitions and provisions of this bill, like every other law, are subject to the Supreme Court's decisions.

Mr. FEINGOLD. Madam President, I thank the Senator from Arizona for his excellent presentation on the central provisions of our bill. I wholeheartedly agree with the points he has made.

WEALTHY CANDIDATES

Mr. LEVIN. Mr. President, I would like to ask my colleagues a question concerning the various new limits with respect to individual contributions to candidates in the bill. There is a general increase of the individual contribution limits, but there are also provisions that raise the possibility of additional increases if a candidate faces an opponent who spends a great deal of his or her personal fortune in a race. Can the sponsors discuss their analysis of how those provisions might affect Congress's authority to limit individual contributions?

Mr. McCAIN. I thank the Senator from Michigan for his question. The bill increases the individual contribution limit to a candidate from $1,000 to $2,000 per election. It provides, in addition, higher limits for contributions made to candidates running against opponents who spend large amounts of personal wealth. Those higher contribution limits are set forth in section 304 of the bill.

The Supreme Court in Buckley upheld the $1,000 contribution limit established by the 1974 law as a permissible measure that serves the compelling governmental interests of deterring corruption and the appearance of corruption. This ruling was in substance reaffirmed by the Court's decision in 2000 in Nixon v. Shrink Missouri PAC. It is now very well settled law that Congress has the power to set reasonable limits on individual contributions to candidates. The Court has never said that the number picked by Congress is the upper or lower limit on a reasonable determination. Indeed, it rejected the argument in Shrink, that the diminished purchasing power of the Missouri contribution limit because of inflation caused it to be an unreasonably low amount.

It is possible that someone would attempt to challenge the $2,000 contribution limit in light of the higher limits provided for some races in section 304, and to argue that both limits cannot serve the same interests of preventing corruption. Congress has concluded that contributions in excess of $2,000 present a risk of actual and apparent corruption. Section 304 does not take issue with this conclusion. In this limited context, however, Congress has concluded that the contribution limits—despite their fundamental importance in fighting actual and apparent corruption—should be relaxed to mitigate the countervailing risk that they will unfairly favor those who are willing, and able, to spend a small fortune of their own money to win election.

We believe that Congress can reasonably determine that in the case of a candidate running against a wealthy opponent and having to raise extraordinary amounts of money to keep pace with that opponent's personal spending, that the risk of actual or apparent corruption from higher, yet still limited, contribution limits is small enough to permit candidates to raise those greater contributions in those particular circumstances.

Mr. FEINGOLD. I agree with the comments of the Senator from Arizona. I believe the Court's decisions indicate that a range of contribution limits would be constitutional depending on the circumstances. Certainly, the determination through difficult negotiations in this bill that the limit should be raised to $2,000 per election, but not higher, is an indication that Congress believes that in most races contributions of greater than that amount present the appearance of corruption.

EFFECTIVE DATE

Ms. COLLINS. Madam President, when the McCain-Feingold bill passed the Senate, it was to be effective 30 days after enactment. Would the sponsors please explain the decision to change the effective date of the bill to November 6, 2002, and discuss the transition rules that apply after that date? In addition, can they please clarify their intent concerning the campaign finance rules that will govern runoff elections should there be any in 2002?

Mr. McCAIN. I thank the Senator for her question. Because of the delay in getting the bill through the House, it became clear that there would be a number of very complicated transition rule issues and implementation problems if we were to try to put the bill into effect for the 2002 elections. We reluctantly determined that it would simply not be practical to apply new rules in the middle of the election cycle. To change the rules in the middle of the campaign would have created uncertainty and potential unfairness, particularly since primaries are imminent in some States.

It is our intent, however, that the provisions of this bill will be fully in effect for the 2004 election cycle. In order to provide a certain end to the soft money system, and completely insulate the 2004 elections from that system, the bill provides for an effective date of Wednesday, November 6, 2002, the day after the 2002 elections. After that date, no further soft money will be raised. The November 6, 2002, effective date will permit an orderly transition to the new soft money free world.

Now as to the transition rules, we do allow soft money that the parties raise before November 6, 2002, to be used on expenses incurred in connection with the 2002 elections, and we intend that permission to apply to runoff elections, recounts, or election contests arising out of this year's elections as well. We also do not intend the bill substantive provisions concerning advertising, such as Title II and the "stand by your ad provisions", wealthy candidates, sections 304, 316, and 319, and contributions by minors, section 318, to apply to 2002 runoff elections. In addition, in the event that a runoff election occurs after November 5, 2002, the national party would—until January 1, 2003, be able to spend soft money received before November 6, 2002 to pay for the costs of non-Federal activities incurred in connection with, and before the date of, that runoff election, and the state parties could spend soft money on Federal election activities in connection with the runoff, as under current law.

On the other hand, the increased contribution limits in the bill take effect on January 1, 2003.

Mr. FEINGOLD. I agree with my friend from Arizona. Let me note, in addition, that the new effective date also helps to ensure that an expedited court challenge to the law can be resolved well before the 2004 election campaign gets underway. We recognize that a court challenge to this bill is not only likely, but inevitable. We welcome the challenge and firmly believe the courts will uphold what we have done.

In section 403, the bill provides expedited judicial review rules and rules for an orderly process of intervention in the litigation that could theoretically be filed shortly after the President signs the bill. That this will allow the litigation before a three-judge court here in Washington, DC, to have progressed substantially even before the operative provisions take effect in November. This expedited judicial review process will assist an orderly transition from the old system to the new system under this bill. Furthermore, the FEC is charged with promulgating soft money regulations well before the date that the soft money ban will take effect. In short, with enactment of the bill, promulgations of key regulations, and a prompt and efficient resolution of the litigation, we will be in a position in which a new campaign finance system can be implemented in a certain and sure fashion for the 2004 elections.

SECTION 323(F)(1)

Mr. THOMPSON. Madam President, I understand that questions have been raised about the provisions of the bill that prevent State candidates from spending non-Federal money on ads that mention Federal candidates. Can the sponsors clarify how these provisions might affect a State candidate spending money on an ad that touts that candidate having received the endorsement of a Federal candidate or officeholder?

Mr. FEINGOLD. I am pleased to have the opportunity to clarify this provision, which is one of a number of provisions in the soft money ban intended to prevent new loopholes for spending soft money from developing. New §323(f)(1) prohibits State candidates and officeholders from spending non-Federal money on public communications that refer to a clearly identified candidate

or constructing a State or local party office building. It is the intent of the authors that State law exclusively govern the receipt and expenditure of non-Federal donations by State or local parties to pay for the construction or purchase of State or local party office buildings. Thus, non-Federal donations received by a State or local party committee in accordance with State law could be used to purchase or construct a State or local party office building without any required match consisting of Federal contributions.

CLARIFYING TERMS IN THE BILL

Ms. COLLINS. Madam President, I would like to ask the sponsors a question concerning the term "refers to" in certain provisions of the bill. I have heard the argument made that the definitions of "Federal election activity" and "electioneering communication" are somehow vague because they are defined to include a communication that "refers to a clearly identified candidate for Federal office." Can the sponsors address that argument?

Mr. FEINGOLD. I would be happy to respond to my friend from Maine, and I appreciate her question. In the bill, the phrase "refers to" precedes the phrase "clearly identified" candidate. That latter phrase is precisely defined in the Federal Campaign Election Act to mean a communication that includes the name of a federal candidate for office, a photograph or drawing of the candidate, or some other words or images that identify the candidate by "unambiguous reference." A communication that "refers to a clearly identified candidate" is one that mentions, identifies, cites, or directs the public to the candidate's name, photograph, drawing, or otherwise makes an "unambiguous reference" to the candidate's identity.

SECTION 213

Mr. THOMPSON. Madam President, I would like to ask the sponsors to explain section 213 of the bill concerning independent and coordinated expenditures made by party committees. Can the sponsors also discuss how this provision is consistent with the Supreme Court's decision in the Colorado cases?

Mr. McCAIN. I would be happy to respond to the Senator's question. Section 213 of the bill allows the political parties to choose to make either coordinated expenditures or independent expenditures on behalf of each of their candidates, but not both. This choice is to be made after the party nominates its candidate, when the party makes its first post-nomination expenditure—either coordinated or independent—on behalf of the candidate.

This provision is entirely consistent with the Supreme Court's rulings in the two Colorado Republican cases. In the first of those cases, the Court held that a party had a constitutional right to make unlimited independent expenditures, using hard money funds, on behalf of its candidates. But of course, those party expenditures must be fully and completely independent of the candidate and his campaign. The second Colorado Republican case held that Congress may limit the size of coordinated expenditures made by parties on behalf of their candidates, in order to deter corruption and the appearance of corruption that could result from unlimited expenditures that are coordinated.

This provision fully recognizes the right of the parties to make unlimited independent expenditures. But it helps to ensure that the expenditure will be truly independent, as required by Colorado Republican I, by prohibiting a party from making coordinated expenditures for a candidate at the same time it is making independent expenditures for the same candidate. We believe that once a candidate has been nominated a party cannot coordinate with a candidate and be independent in the same election campaign. After the date of nomination, the party is free to choose to coordinate with a candidate, or to operate independently of that candidate. If it chooses the former, it is subject to the limits upheld in Colorado Republican II. If it chooses the latter, it is free to exercise its right upheld in Colorado Republican I to engage in unlimited hard money spending independent of the candidate.

Section 213 provides, for this purpose only, that all the political committees of a party at both the state and national levels are considered to be one committee for the purpose of making this choice. This will prevent one arm of the party from coordinating with a candidate while another arm of the same party purports to operate independently of such candidate. This provision is intended to ensure that a party committee which chooses to engage in unlimited spending for a candidate is in fact independent of the candidate.

Mr. FEINGOLD. I agree with the Senator from Arizona's answer to the question from the Senator from Tennessee.

SECTION 214

Mr. LIEBERMAN. Madam President, I would like to ask the sponsors a question concerning section 214 of the bill, which deals with coordination. Some concern has been expressed about this provision by outside groups that participate in the legislative process through lobbying and grassroots advertising and also participate in electioneering through their PACs, or currently, through sham issue ads. Can the sponsors explain what is intended by section 214, and answer the concerns expressed by some of these organizations?

Mr. FEINGOLD. I would be happy to address this question, and I thank the Senator from Connecticut for raising it. It is important that our intent in this provision be clear.

The concept of "coordination" has been part of Federal campaign finance law since Buckley versus Valeo. It is a common-sense concept recognizing that when outside groups coordinate their spending on behalf of a candidate with a candidate or a party, such spending is indistinguishable from a direct contribution to that candidate or party. Accordingly, such coordinated spending by outside groups is, and should be, treated as a contribution to the candidate or party that benefits from such spending. As such, it is subject to the source and amount limitations under federal law for contributions to federal candidates and their parties. An effective restriction on outside groups coordinating their campaign-related activities with federal candidates and their political parties is needed to prevent circumvention of the campaign finance laws.

The bill bans soft money contributions to the national political parties, which totaled $463 million during the 2000 election cycle. Specifically, under the bill, corporations and unions can no longer donate amounts from their treasuries to the national parties, and wealthy individuals can no longer write six-figure checks to the national parties. The legislation shuts down the soft money loophole in order to prevent the corruption and unseemly appearances that arise when national parties and Federal officeholders solicit unlimited donations from special interests and then spend those donations to support federal candidates.

Absent a meaningful standard for what constitutes coordination, the soft money ban in the bill would be seriously undermined. In the place of outside special interests donating six-figure checks to the national parties to be spent on Federal elections, these entities could simply work in tandem with the parties and Federal candidates to spend their own treasury funds—soft money—on federal electioneering activities. This would fly in the face of one of the main purposes of the bill to get national parties and Federal candidates out of the business of raising and spending soft money donations.

Unfortunately, based on a single district court decision, the Federal Election Commission's current regulation defining when general public political communications funded by outside groups are considered coordinated with candidates or parties fails to account for certain types of coordination that may well occur in real-world campaigns. The FEC regulation is premised on a very narrowly defined concept of "collaboration or agreement" between outside groups and candidates or parties.

This current FEC regulation fails to cover a range of de facto and informal coordination between outside groups and candidates or parties that, if permitted, could frustrate the purposes of the bill. For example, if an individual involved in key strategic decision-making for a candidate's political advertising resigned from the candidate's campaign committee, immediately thereafter joined an outside organization, and then used inside strategic information from the campaign to develop the organization's imminent soft

Case 1:06-cv-01247-CKK Document 18-6 Filed 12/08/2006 Page 143 of 341

money-funded advertising in support of the candidate, a finding of coordination might very well be appropriate. The FEC regulation, however, would find coordination neither in this circumstance nor in various other situations where most reasonable people would recognize that the outside entities' activities were coordinated with candidates. This would leave a loophole that candidates and national parties could exploit to continue controlling and spending huge sums of soft money to influence federal elections.

The dangers of coordinated soft money spending were noted by Senator FRED THOMPSON during his Committee's review of 1996 election activity. The Minority Report of the Senate Committee on Governmental Affairs states:

> The fact that coordination of soft money spending and fundraising has become commonplace and expected should be examined by Congress. By permitting such coordinated efforts to raise soft money and spend it on political activities that advance the interests of presidential campaigns, the federal election laws create a tremendous loophole to both contribution limits and spending limits. As the Chairman [Senator Thompson] has acknowledged:
>
> Acceptance of this activity would allow any candidate and his campaign to direct and control the activities of a straw man .... For such activity, these straw men could use funds subject to no limit and derived from any source .... If the interpretation is that this is legal and this is proper, then we have no campaign finance system in this country anymore.

To remedy this problem, the bill requires the FEC to reexamine the coordination issue and promulgate new coordination rules. These rules need to make more sense in light of real life campaign practices than do the current regulations. The bill accordingly repeals this FEC regulation and requires that the Commission promulgate a replacement regulation. The bill does not change the basic statutory standard for coordination, which defines and sets parameters for the FEC's authority to develop rules describing the circumstances in which coordination is deemed to exist.

Section 214 directs the FEC to promulgate new regulations on coordinated communications and lists four specific subjects that the FEC must address in those new regulations. It does not dictate how the Commission is to resolve those four subjects.

On one issue, section 214 does direct the outcome of the Commission's deliberations on new regulations. The current FEC regulations say that a communication will be considered to be "coordinated" if it is created, produced or distributed "after substantial discussion" between the spender and the candidate about the communication, "the result of which is collaboration or agreement." This standard is now contained in 11 C.F.R. § 100.23(c)(2)(iii).

The FEC's narrowly defined standard of requiring collaboration or agreement sets too high a bar to the finding of "coordination." This standard would miss many cases of coordination that result from de facto understandings. Accordingly, section 214 states that the Commission's new regulations "shall not require agreement or formal collaboration to establish coordination." This, of course, does not mean that there should not be a finding of "coordination" in those cases where there is "agreement or formal collaboration." But it does mean that specific discussions between a candidate or party and an outside group about campaign-related activity can result in a finding of coordination, without an "agreement or formal collaboration."

Existing law provides that a campaign-related communication that is coordinated with a candidate or party is a contribution to the candidate or party, regardless of whether the communication contains "express advocacy." Accordingly, the bill provides that an "electioneering communication" that is coordinated with a candidate or party is considered a contribution to the candidate or party.

Mr. MCCAIN. If the Senator from Wisconsin would yield, let me elaborate a bit on his discussion, with which I completely agree, and address the specific concern raised by some of these groups.

It is important for the Commission's new regulations to ensure that actual "coordination" is captured by the new regulations. Informal understandings and de facto arrangements can result in actual coordination as effectively as explicit agreement or formal collaboration. In drafting new regulations to implement the existing statutory standard for coordination—an expenditure made "in cooperation, consultation or concert, with, or at the request or suggestion of" a candidate—we expect the FEC to cover "coordination" whenever it occurs, not simply when there has been an agreement or formal collaboration.

On the other hand, nothing in the section 214 should or can be read to suggest, as some have said, that lobbying meetings between a group and a candidate concerning legislative issues could alone lead to a conclusion that ads that the group runs subsequently concerning the legislation that was the subject of the meeting are coordinated with the candidate. Obviously, if the group and the candidate discuss campaign related activity such as ads promoting the candidate or attacking his or her opponent, then coordination might legitimately be found, depending on the nature of the discussions. We do not intend for the FEC to promulgate rules, however, that would lead to a finding of coordination solely because the organization that runs such ads has previously had lobbying contacts with a candidate.

Section 214 represents a determination that the current FEC regulation is far too narrow to be effective in defining coordination in the real world of campaigns and elections and threatens to seriously undermine the soft money restrictions contained in the bill. The FEC is required to issue a new regulation, and everyone who has an interest in the outcome of that rulemaking will be able to participate in it, and appeal the FEC's decision to the courts if they believe that is necessary.

CONTRIBUTIONS BY MINORS

Ms. COLLINS. Madam President, I wanted to ask the sponsors about a provision that was not included in the Senate bill—the prohibition on contributions by minors. Can you explain the justification for this new provision?

Mr. MCCAIN. The Senator is correct that section 318 was added in the House. It is an important provision, and the Senator from Wisconsin and I supported it being included in the bill.

Under the FEC's current regulations at 11 C.F.R. § 110.1(i)(2), children under the age of 18 may make contributions to political candidates and committees as long as the child knowingly and voluntary makes the decision to contribute. In addition, the child must make the contribution out of his or her own funds, which the child is in control of, such as the proceeds of a trust or money in a savings account in the child's own name.

Unfortunately, notwithstanding these regulations, we believe that wealthy individuals are easily circumventing contribution limits to both political candidates and parties by directing their children's contributions. Indeed, the FEC in 1998 notified Congress of its difficulties in enforcing the current provision. Its legislative recommendations to Congress that year cited "substantial evidence that minors are being used by their parents, or others, to circumvent the limits imposed on contributors."

Accordingly, Section 318 of the bill prohibits individuals 17 years old or younger from making contributions or donations to and a candidate or a committee of a political party.

We believe it is appropriate for Congress to prohibit minors from contributing to campaigns because we agree with the Commission that there is substantial evidence that individuals are evading contribution limits by directing their children to make contributions. According to a Los Angeles Times study, individuals who listed their occupation as student contributed $7.5 million to candidates and parties between 1991 and 1998. Upon further investigation, some of these contributions where made by infants and toddlers. In another instance, the paper found that two high school sisters contributed $40,000 to the Democratic Party in 1998. When asked about the contribution, the high school sophomore answered that it was a "family decision."

We believe that this and other examples justify the prohibition on minor contributions that is included in the bill as a way to prevent evasion of the contribution limits in the law. In our view, this provision simply restores the

# PLAINTIFFS' EXHIBIT 9

(e) *Content of verified reports and statements and verification of reports and statements.*

(1) *Contents of verified reports and statement.* If a signed report or statement is submitted, the report or statement shall include:

(i) The reporting person's name, mailing address, occupation, and the name of his or her employer, if any;

(ii) The identification (name and mailing address) of the person to whom the expenditure was made;

(iii) The amount, date, and purpose of each expenditure;

(iv) A statement that indicates whether such expenditure was in support of, or in opposition to a candidate, together with the candidate's name and office sought;

(v) A verified certification under penalty of perjury as to whether such expenditure was made in cooperation, consultation, or concert with, or at the request or suggestion of a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents; and

(vi) The identification of each person who made a contribution in excess of $200 to the person filing such report, which contribution was made for the purpose of furthering the reported independent expenditure.

(2) *Verification of independent expenditure statements and reports.* Every person shall verify reports and statements of independent expenditures filed pursuant to the requirements of this section by one of the methods stated in paragraph (2)(i) or (ii) of this section. Any report or statement verified under either of these methods shall be treated for all purposes (including penalties for perjury) in the same manner as a document verified by signature.

(i) For reports or statements filed on paper (*e.g.*, by hand-delivery, U.S. Mail, or facsimile machine), the person who made the independent expenditure shall certify, under penalty of perjury, the independence of the expenditure by handwritten signature immediately following the certification required by paragraph (e)(1)(v) of this section.

(ii) For reports or statements filed by electronic mail, the person who made the independent expenditure shall certify, under penalty of perjury, the independence of the expenditure by typing the treasurer's name immediately following the certification required by paragraph (e)(1)(v) of this section.

Dated: December 17, 2002.

**David M. Mason,**

*Chairman, Federal Election Commission.*

[FR Doc. 03–91 Filed 1–2–03; 8:45 am]

**BILLING CODE 6715–01–P**

---

## FEDERAL ELECTION COMMISSION

## 11 CFR Parts 100, 102, 109, 110, and 114

**[Notice 2002—27]**

## Coordinated and Independent Expenditures

**AGENCY:** Federal Election Commission.

**ACTION:** Final rules and transmittal of regulations to Congress.

**SUMMARY:** The Federal Election Commission is issuing final rules regarding payments for communications that are coordinated with a candidate, a candidate's authorized committee, or a political party committee. The final rules also address expenditures by political party committees that are made either in coordination with, or independently from, candidates. These final rules implement several requirements in the Bipartisan Campaign Reform Act of 2002 ("BCRA") that significantly amend the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"). Further information is contained in the Supplementary Information that follows.

**EFFECTIVE DATE:** February 3, 2003.

**FOR FURTHER INFORMATION CONTACT:** Mr. John Vergelli, Acting Assistant General Counsel, or Attorneys Mr. Mark Allen (coordinated party expenditures), and Mr. Richard Ewell (coordinated communications paid for by other political committees and other persons), 999 E Street NW., Washington, DC, 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Public Law 107–155, 116 Stat. 81 (March 27, 2002), contains extensive and detailed amendments to the Federal Election Campaign Act of 1971 ("FECA" or "the Act"), as amended, 2 U.S.C. 431 *et seq.* This is one in a series of rulemakings the Commission is undertaking in order to implement the provisions of BCRA and to meet the rulemaking deadlines set out in BCRA.

Section 402(c)(1) of BCRA establishes a general deadline of 270 days for the Commission to promulgate regulations to carry out BCRA, which is December 22, 2002. The final rules do not apply with respect to runoff elections, recounts, or election contests resulting from the November 2002 general election. 2 U.S.C. 431 note.

Because of the brief period before the statutory deadline for promulgating these rules, the Commission received and considered public comments expeditiously. The Notice of Proposed Rulemaking ("NPRM"), on which these final rules are based, was published in the **Federal Register** on September 24, 2002. 67 FR 60,042 (September 24, 2002). The written comments were due by October 11, 2002. The Commission received 27 comments from 21 commenters. The names of the commenters and their comments are available at *http://www.fec.gov/register.htm* under "Coordinated and Independent Expenditures." A public hearing was held on Wednesday, October 23, 2002, and Thursday, October 24, 2002, at which 14 witnesses testified. A transcript of those hearings is also available at *http://www.fec.gov/register.htm.*

Under the Administrative Procedures Act, 5 U.S.C. 553(d), and the Congressional Review of Agency Rulemaking Act, 5 U.S.C. 801(a)(1), agencies must submit final rules to the Speaker of the House of Representatives and the President of the Senate, and publish them in the **Federal Register** at least 30 calendar days before they take effect. The final rules on coordinated and independent expenditures were transmitted to Congress on December 18, 2002.

### Introduction

These final rules primarily address communications that are made in coordination with a candidate, an authorized committee of a candidate, or a political party committee. The regulations set forth the meaning of "coordination." They also set forth statutory requirements for political party committees with respect to the permitted timing of independent and coordinated expenditures, and transfers and assignments.

### Explanation and Justification

*1. Statutory Overview*

FECA limits the amount of contributions to Federal candidates, their authorized committees, and other political committees. 2 U.S.C. 441a(a). Under FECA and the Commission's regulations, these contributions may take the form of money or "anything of value" (the latter is an "in-kind contribution" provided to a candidate or political committee.) *See* 11 CFR 100.52(d)(1). Candidates must disclose

all contributions they receive. 2 U.S.C. 434(b)(2). Since the recipient does not actually receive a cash payment from an in-kind contribution, the recipient must report the value of an in-kind contribution as both a contribution received and an expenditure made so that the receipt of the contribution will be reported without overstating the cash-on-hand in the committee's treasury. *See* 11 CFR 104.13.

*2. Overview of BCRA's Changes to the FECA and Commission Regulations*

In BCRA, Congress revised the FECA's definition of "independent expenditure" in 2 U.S.C. 431(17). The revision added a reference to political party committees and their agents and reworked other aspects of the former definition. Corresponding revisions are being made to the regulations in 11 CFR 100.16.

Congress repealed the Commission's pre-BCRA regulations regarding "coordinated general public political communications" at former 11 CFR 100.23, and directed the Commission to adopt new regulations on "coordinated communications" in their place. Public Law 107–155, sec. 214(b), (c) (March 27, 2002). A new section 11 CFR 109.21 implements this Congressional mandate.

In addition, the new and revised rules implement several new restrictions found in BCRA on the timing of independent and coordinated expenditures made by committees of political parties. 2 U.S.C. 441a(d)(4). Those regulations are located in new 11 CFR part 109, subpart D. Similarly, Congress established new restrictions on transfers between committees of a political party. 2 U.S.C. 441a(d)(4). Those changes, as well as amendments to the rules on the assignment of coordinated party expenditure authority in pre-BCRA 11 CFR 110.7, are reflected in new 11 CFR part 109, subpart D.

Finally, Congress established new reporting obligations for independent expenditures. 2 U.S.C. 434(a)(5) and (g). These reporting obligations have been addressed in a separate rulemaking. *See* Final Rules and Explanation and Justification for Bipartisan Campaign Reform Act of 2002 Reporting, published elsewhere in this issue of the **Federal Register**. The comments received regarding the reporting of independent expenditures have been addressed separately in the Explanation and Justification for the amended reporting rules.

**11 CFR 100.16 Definition of Independent Expenditure**

In light of several Congressional changes to the statutory definition of "independent expenditure" at 2 U.S.C. 431(17), the Commission is making several corresponding changes to the definition of the same term in 11 CFR 100.16. Most significantly, the statutory definition of "independent expenditure" is modified to exclude expenditures coordinated with a political party committee or its agents (in addition to the pre-BCRA exclusion of coordination with candidates). 2 U.S.C. 431(17).

Paragraph (a) of section 100.16 contains the revised pre-BCRA section 100.16. The first sentence of paragraph (a) is being changed by adding a reference to political party committees and their agents, thereby tracking BCRA's changes in 2 U.S.C. 431(17).

In BCRA, Congress deleted the term "consultation" from the list of activities that compromise the independence of expenditures. See 2 U.S.C. 431(17)(B). Notwithstanding that change, in the NPRM the Commission proposed the retention of the term "consultation" because it remains, post-BCRA, in other related provisions of the Act. Most importantly, the term "consultation" was used in a closely related provision added by BCRA itself. See 2 U.S.C. 441a(a)(7)(B)(ii) as amended by Public Law 107–155, sec. 214(a) (expenditures made in "cooperation, *consultation*, or concert, with, or at the request or suggestion of, a national, State, or local committee of a political party"); see also 2 U.S.C. 441a(a)(7)(B)(i) (expenditures that are made in "cooperation, consultation, or concert with, or at the request or suggestion of" candidates, political committees, and agents thereof are contributions) (emphasis added).

Similarly, while Congress referred to expenditures "not made in concert or cooperation with * * * a political party committee or its agents" in 2 U.S.C. 431(17) (emphasis added), it did not refer to agents of a party committee in 2 U.S.C. 441a(a)(7)(B)(ii) when describing coordination with a party committee. The Commission proposed in the NPRM including agents of political party committees as persons who might take actions that would cause a communication to be coordinated with that party committee.

The Commission received one joint comment from two commenters [1] on each of the two proposals above, urging the Commission to include in the final rules both terms as proposed. The final rules retain the term "consultation" in paragraph (a) as an element in the regulatory definition of "independent expenditure," for the reasons outlined in the NPRM. The Commission is similarly including agents of a political party within the scope of its independent expenditure definition. 11 CFR 100.16(a).

In BCRA, Congress repealed the pre-BCRA regulatory definition of "coordinated general public political communication." See former 11 CFR 100.23 (January 1, 2001), repealed by Public Law 107–155, section 214(b) (March 27, 2002). Therefore, in one additional change to paragraph (a) of section 100.16, the Commission is deleting the term "coordinated general public political communication," and replacing it with references to a "coordinated communication" from section 109.21 and a "party coordinated communication" from 11 CFR 109.37.

The Commission is also moving pre-BCRA 11 CFR 109.1(e), which clarifies the basic definition of "independent expenditure," to paragraph (b) of section 100.16, without other changes. This rule provides that expenditures made by a candidate's authorized committee on behalf of that candidate never qualify as independent expenditures.

The Commission is adding a new paragraph (c) to provide examples of activities that would disqualify a communication from being treated as an independent expenditure. This provision does not in any way change the scope of the definition of coordinated communication in 11 CFR 109.21; it is merely intended to provide additional guidance.

**11 CFR 100.23 [Removed and Reserved]**

Prior to the enactment of BCRA, the Commission initiated a series of rulemakings in response to the Supreme Court's ruling on the appropriate application of the so-called "coordinated party expenditure" provisions of FECA. *See Colorado Republican Federal Campaign Committee* v. *Federal Election Commission*, 518 U.S. 604 (1996) (*"Colorado I"*). For example, the Commission addressed the issue of coordination when it promulgated former 11 CFR 100.23 (January 1, 2001) in December 2000. See Explanation and Justification of General Public Political Communications Coordinated with Candidates and Party Committees; Independent Expenditures, 65 FR 76,138 (Dec. 6, 2000). Former section 100.23 defined a new term, "coordinated general public political communication," drawing from judicial guidance in *Federal Election*

[1] For the purposes of this Explanation and Justification, all persons who expressed their views on the rules proposed in the NPRM are referred to as "commenters" without regard to whether those views were expressed to the Commission in writing or through testimony at the hearing.

*Commission* v. *The Christian Coalition,* 52 F.Supp.2d 45, 85 (D.D.C. 1999) (*"Christian Coalition"*), to determine whether expenditures for communications by unauthorized committees, advocacy groups, and individuals were coordinated with candidates or qualified as independent expenditures. Consistent with *Christian Coalition, id.* at 92, the Commission's regulations stated that such coordination could be found when candidates or their representatives influenced the creation or distribution of the communications by making requests or suggestions regarding, or exercising control or decision making authority over, or engaging in "substantial discussion or negotiation" regarding, various aspects of the communications. Former 11 CFR 100.23(c)(2) (January 1, 2001). The regulations explained that "substantial discussion or negotiation may be evidenced by one or more meetings, conversations or conferences regarding the value or importance of the communication for a particular election." Former 11 CFR 100.23(c)(2)(iii) (January 1, 2001). The Commission provided an exception, however, for a candidate's or political party's response to an inquiry regarding the candidate's or party's position on legislative or public policy issues. *See* former 11 CFR 100.23(d) (January 1, 2001).

As explained above, Congress repealed 11 CFR 100.23 in BCRA and directed the Commission to promulgate new regulations to address coordinated communications. Those new regulations are discussed below in the Explanation and Justification for 11 CFR part 109. Accordingly, the Commission is now removing former section 100.23 from Title 11, Chapter 1, of the Code of Federal Regulations.

**11 CFR 102.6(a)(1)(ii) Transfers**

As a result of the enactment of 2 U.S.C. 441a(d)(4) and other provisions from BCRA affecting transfers between political party committees, the Commission revises 11 CFR 102.6(a)(1)(ii) to clarify the interaction of this section with those provisions of BCRA. Before BCRA, the Commission permitted unlimited transfers between or among national party committees, State party committees and/or any subordinate committees. See pre-BCRA 11 CFR 102.6(a)(1)(ii).

First, in BCRA, Congress provided that a national committee of a political party, including a national Congressional campaign committee of a political party, may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of FECA. 2 U.S.C. 441i(a); *see* Explanation and Justification for 11 CFR 300.10(a), 67 FR 49,122 (July 29, 2002).

Second, in BCRA's "Levin Amendment," Congress placed restrictions on how State, district, and local party committees raise "Levin funds" and prohibited certain transfers between political party committees. *See* 2 U.S.C. 441i(b)(2)(C)(i); Explanation and Justification for 11 CFR 300.31, 67 FR 49,124 (July 29, 2002).

Third, also in the Levin Amendment, Congress provided that a State, district, or local committee of a political party that spends Federal funds and Levin funds for the newly defined term, Federal election activity, must raise those funds solely by itself. These committees may not receive or use transferred funds for this purpose. 2 U.S.C. 441i(b)(2)(B)(iv); *see* Explanation and Justification for 11 CFR 300.34(a) and (b), 67 FR 49,127 (July 29, 2002).

Fourth, Congress provided in BCRA that a committee of a political party that makes coordinated party expenditures under 2 U.S.C. 441a(d) in connection with the general election campaign of a candidate shall not, during that election cycle, transfer any funds to, assign authority to make coordinated party expenditures under this subsection to, or receive a transfer from, a committee of the political party that has made or intends to make an independent expenditure with respect to the candidate. 2 U.S.C. 441a(d)(4)(C); *see* Explanation and Justification for 11 CFR 109.35(c), below.

The Commission adds a new opening clause in paragraph (a)(1)(ii) of section 102.6 incorporating these restrictions by reference into the rules regarding the transfer of funds and the use of transferred funds.

The Commission received no comments on this section, and the final rule is unchanged from the proposed rule.

**Part 109—Coordinated and Independent Expenditures (2 U.S.C. 431(17), 441a(a) and (d), and Pub. L. 107–155 Sec. 214(c))**

The Commission is reorganizing 11 CFR part 109 into four subparts in an effort to simplify and clarify its regulations while implementing the Congressional mandates in BCRA regarding payments for coordinated communications and coordinated expenditures by political party committees. Subpart A explains the scope of part 109 and defines the key term "agent." Subpart B, which addresses the reporting and recordkeeping requirements for independent expenditures, has been addressed in a separate rulemaking. *See* Final Rules and Explanation and Justification for Bipartisan Campaign Reform Act of 2002 Reporting, published elsewhere in this issue of the **Federal Register**. Subpart C addresses coordination between a candidate or a political party and a person making a communication. Subpart D sets forth provisions applicable only to political party committees, including those pertaining to independent expenditures and support of candidates through coordinated party expenditures. *See* 2 U.S.C. 441a(d). The special authority for coordinated expenditures by political party committees, previously set forth in pre-BCRA 11 CFR 110.7, is being relocated to 11 CFR 109.32 and other sections in subpart D.

**11 CFR Part 109, Subpart A—Scope and Definitions**

*11 CFR 109.1 When Will This Part Apply?*

New section 109.1 introduces the scope of part 109. Section 109.1 explains that the regulations in part 109 set forth the general reporting requirements for both "independent expenditures" and "coordinated communications." Note that the definition of "agent" found in pre-BCRA section 109.1 is being revised and moved to section 109.3. No comments were received regarding this section.

*11 CFR 109.3 Definitions*

The Commission proposed new 11 CFR 109.3 to define the term "agent," which is used throughout 11 CFR part 109. This definition of agent is based on the same concept that the Commission used in framing the definition of "agent" in the revised "soft money" rules. *See* Final Rules and Explanation and Justification on Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money, 67 FR 49,081 (July 29, 2002). The definition of "agent" proposed in the NPRM focused on whether a purported agent has "actual authority, either express or implied," to engage in one or more specified activities on behalf of specified principals.

In the NPRM, the Commission listed those specific sets of activities, which vary slightly depending on whether the agent engages in those activities on behalf of a national, State, district, or local committee of a party committee, or on behalf of a Federal candidate or

officeholder. See proposed 11 CFR 109.3(a) and (b), respectively. The activities specified in the NPRM closely paralleled the conduct activities associated with coordinated communications, as described in 11 CFR 109.21(b). These activities included requesting or suggesting that a communication be created, produced, or distributed; making or authorizing certain campaign-related communications; and being materially involved in decisions regarding specific aspects of communications. See proposed 11 CFR 109.3(a)(1) through (5) and (b)(1) through (5).

Several commenters requested additional clarification of the meaning of "material involvement," while other commenters suggested broadening this provision to include authority to be "materially involved" in discussions, in addition to decisions, regarding a communication. The Commission notes that the term "materially involved" is merely incorporated into the specified activities of an agent to preserve the parallel structure between the definition of "agent" and the coordination conduct standards in 11 CFR 109.21. See Explanation and Justification of 11 CFR 109.21(d)(2), below.

One commenter noted that because the proposed regulations contemplate the possibility that one candidate for Federal office might pay for a communication that is coordinated with a different candidate for Federal office, proposed 11 CFR 109.3(a)(5) should also be included as a specified activity in 11 CFR 109.3(b). The Commission agrees and is adding a new paragraph (b)(6) to 11 CFR 109.3 to make it clear that a person who works for one candidate and is authorized by that candidate to make a communication on behalf of other candidates based on material information derived from those other candidates, is to be considered an agent.

A number of commenters addressed the general scope of the definition. Seven commenters argued that the proposed definition would be overly broad because it would not expressly limit the definition of "agent" to situations where the person is acting within the scope of his or her "actual authority" as an agent. These commenters also urged the addition of a requirement that an agent's "coordination" conduct (see 11 CFR 109.21(d), below) toward a third party be based on information that was gained only due to his or her role as an agent. One of these commenters asserted that a person should not be considered an "agent" solely based on his or her authority to act, but should only become an agent when he or she takes some action. Two commenters expressed their opposition to any attempt to categorize specific campaign positions or groups of people as agents *per se*, and one additional commenter suggested that if the Commission does include a class of *per se* agents, it should identify the specific persons within the campaign who would be placed in this category.

Several commenters expressed concern as to a candidate's or political party committee's "liability" for a person who qualifies as an agent but takes actions beyond the scope of his or her actual authority. Two other commenters expressed concerns that a principal would assume "liability" for a person who represents more than one candidate or group engaged in specified conduct while "wearing a different hat" (acting on behalf of a different person or group.) One of these commenters recommended an amendment to the rule text to provide that actions must be undertaken "on behalf of the principal" in order for liability to attach to the principal. Another commenter raised a particular concern with respect to common vendors that an "agent" who wears different hats for different groups might be deemed to engage in coordination *per se* by essentially sharing information within his or her own head.

On the other hand, eight commenters, including BCRA's principal sponsors, expressed concern that the scope of the proposed definition was underinclusive and would allow candidates or political parties to effectively coordinate communications with an outside spender through the use of conduits, including lower-level employees, consultants, or others with "apparent authority," who could sit in on a discussion and receive important information and convey that information to the third-party spender. BCRA's principal sponsors and two other commenters asserted that the definition of "agent" should not be drawn too narrowly because the analysis of whether a communication is coordinated should focus on whether the information was conveyed, not who conveyed it, or whether the conveyance was authorized. A different commenter suggested that the Commission's approach would create an incentive for a candidate, authorized committee, or a political party committee to share material information with staff members but make no effort to control the staff members' disclosures to outside entities. Three commenters urged that a person be deemed an agent if he or she discloses information to an outside entity in the absence of a strictly enforced policy against such disclosure. One of these commenters indicated that a non-disclosure agreement might be employed to rebut the presumption of agency.

In the final rules, the Commission recognizes the Congressional determination that a spender can effectively coordinate a communication by acting in cooperation, consultation, or concert, with, or at the request or suggestion of, an agent as well as directly with a candidate, authorized committee, or political party committee. See, *e.g.*, 2 U.S.C. 431(17) and 2 U.S.C. 441a(a)(7)(B)(i). In recognition of the concerns about overbreadth, the Commission is limiting the scope of the definition of "agent" in three ways. For the purposes of a coordination analysis under 11 CFR part 109, a person would only qualify as an "agent" when he or she: (1) Receives actual authorization, either express or implied, from a specific principal to engage in the specific activities listed in 109.3; (2) engages in those activities on behalf of that specific principal; and (3) those activities would result in a coordinated communication if carried out directly by the candidate, authorized committee staff, or a political party official. Contrary to the assertions of several commenters, a principal would not assume "liability" for agents who act outside the scope of their actual authority, nor would a person be considered an "agent" of a candidate if that person approaches an outside spender on behalf of a different organization or person. See Restatement (Second) of Agency § 219(1). The Commission rejects, however, the argument that a person who has authority to engage in certain activities should be considered to be acting outside the scope of his or her authority any time the person undertakes unlawful conduct. It is a settled matter of agency law that liability may exist "for unlawful acts of [] agents, provided that the conduct is within the scope of the agent's authority, whether actual or apparent." *U.S.* v. *Investment Enterprises, Inc.*, 10 F.3d 263, 266 (5th Cir. 1993).

One commenter specifically requested an exemption for "all persons in the legislative offices of federal officeholders" unless the "person dealing with them knows that they are acting on behalf of the officeholder in her capacity as a candidate." The Commission has intentionally avoided promulgating a regulation based on apparent authority, which is the authority of an actor as perceived by a third party, because such authority is often difficult to discern and would place the definition of "agent" in the

hands of a third party. Therefore, in the Commission's judgment, apparent authority is not a sufficient basis for agency for the purposes of revised 11 CFR part 109. The commenter's suggested approach would necessitate a determination of agency solely on the basis of apparent authority and is therefore inconsistent with the structure and purpose of the regulations.

These limitations, however, are not intended to establish any presumption against the creation of an agency relationship. The grant and scope of the actual authority, whether the person is acting within the scope of his or her actual authority, and whether he or she is acting on behalf of the principal or a different person, are factual determinations that are necessarily evaluated on a case-by-case basis in accordance with traditional agency principles. For example, the issue of whether or not an authorized person is acting on behalf of the principal is an objective, fact-based examination that is not dependent on that person's own characterization of whether he or she is acting in an individual capacity or on behalf of a different principal.

As explained in the NPRM, the Commission's pre-BCRA regulations include a special definition of "person" for 11 CFR part 109. See pre-BCRA 11 CFR 109.1(b)(1). The Commission did not include this separate definition of the term "person" in the NPRM because the term is already defined in pre-BCRA 11 CFR 100.10 and the Commission was concerned that a separate definition of "person" in 11 CFR part 109 might be confusing or misinterpreted as permitting labor organizations, corporations not qualified under 11 CFR 114.10(c), or other entities or individuals otherwise prohibited from making contributions or expenditures under the Act and Commission regulations, to pay for coordinated communications or to make independent expenditures. See, *e.g.*, 11 CFR 110.20 and 114.2. The Commission has specifically addressed these prohibitions in 11 CFR 109.22, below, and the Commission did not receive any comments on the inclusion of a separate definition of "person" in 11 CFR part 109. Therefore, no new definition of "person" is included in the final rules.

**11 CFR Part 109, Subpart B—Independent Expenditures**

*11 CFR 109.10 How Do Political Committees and Other Persons Report Independent Expenditures?*

In the NPRM, the Commission included proposed 11 CFR 109.10 on reporting requirements for independent expenditures. The Commission announced in the NPRM its expectation that these rules would not be included in the final rule of this rulemaking but would instead be finalized in a separate rulemaking. The Commission has subsequently promulgated 11 CFR 109.10 as part of a separate rulemaking. See Final Rules and Explanation and Justification for Bipartisan Campaign Reform Act of 2002 Reporting, published elsewhere in this issue of the **Federal Register**. There are no changes to 11 CFR 109.10 in this rulemaking.

*11 CFR 109.11 When is a Non-Authorization Notice (Disclaimer) Required? (2 U.S.C. 441d)*

The Commission is moving the disclaimer requirements for independent expenditures from pre-BCRA 11 CFR 109.3 to new 11 CFR 109.11. There are no substantive changes to this section. Additional changes to disclaimer requirements are provided at 11 CFR 110.11, which the Commission addressed in a separate rulemaking in light of BCRA's changes to the statutory disclaimer requirement. See 2 U.S.C. 441d and Final Rules and Explanation and Justification for Disclaimers, Fraudulent Solicitation, Civil Penalties, and Personal Use of Campaign Funds, 67 FR 76,962 (Dec. 13, 2002).

**11 CFR Part 109, Subpart C—Coordination**

*11 CFR 109.20 What Does "Coordinated" Mean?*

Congress did not define the term "coordinated" in FECA or in BCRA, but it did provide that an expenditure is considered to be a contribution to a candidate when it is "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of," that candidate, the authorized committee of that candidate, or their agents. 2 U.S.C. 441a(a)(7)(B)(i). Similarly, in BCRA, Congress added a new paragraph to section 441a(a)(7)(B) to require that expenditures "made by any person (other than a candidate or candidate's authorized committee) in cooperation, consultation, or concert, with, or at the request or suggestion of, a national, State, or local committee of a political party shall be considered to be contributions made to such party committee." 2 U.S.C. 441a(a)(7)(B)(ii). Also, as explained above, an expenditure is not "independent" if it is "made in cooperation, consultation, or concert, with, or at the request or suggestion of," a candidate, authorized committee, or a political party committee. See 11 CFR 100.16.

New section 109.20(a) implements 2 U.S.C. 441a(a)(7)(B)(i) and (ii) by defining "coordinated" to mean "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents." While the definition of "coordinated" in 11 CFR 109.20(a) potentially encompasses a variety of payments made by a person on behalf of a candidate or political party committee, paragraph (a) is not intended to change current Commission interpretations other than to recognize the addition of the concept of coordination with political party committees under 2 U.S.C. 441a(a)(7)(B)(ii). The Commission notes that it may provide additional guidance in this area through a subsequent rulemaking.

The Commission recognizes, however, that many issues regarding coordination involve communications, and in BCRA Congress required the Commission to address coordinated communications. Public Law 107–155, sec. 214(c) (March 27, 2002). Therefore, the regulations in 11 CFR 109.21, explained below, specifically address the meaning of the phrase "made in cooperation, consultation, or concert, with, or at the request or suggestion of" in the context of communications paid for by a person other than the candidate with whom the communication was coordinated, that candidate's authorized committee, or a political party committee. Similarly, the regulations in 11 CFR 109.37, explained further below, specifically address the meaning of the phrase "made in cooperation, consultation, or concert with, or at the request or suggestion of" in the context of communications paid for by a political party committee.

In addition, paragraph (b) of section 109.20 addresses expenditures that are not made for communications but that are coordinated with a candidate, authorized committee, or political party committee. It is the successor to pre-BCRA 11 CFR 109.1(c). Paragraph (b) is being revised from its predecessor to reflect the addition of the concept of coordination with political party committees under 2 U.S.C. 441a(a)(7)(B)(ii), as well as the replacement of the reference to former 11 CFR 100.23, see Public Law 107–155, section 214(b) (March 27, 2002), and grammatical changes to reflect the new location of the rule. The Commission emphasizes that the relocation of paragraph (b) is not intended to change or alter current Commission interpretations of its predecessor in pre-BCRA section 109.1(c). One commenter asserted that only express advocacy

communications can constitute coordination, and urged the Commission to provide explicitly that non-communication expenditures will *not* be considered to be coordination. The Commission disagrees with the commenter's assertion because Congress has not so limited the statutory provisions relating to coordination. See 2 U.S.C. 431(17) and 441a(a)(7)(B)(i) and (ii). Therefore, the Commission is moving pre-BCRA 11 CFR 109.1(c), to section 109.20(b) with revisions to make it clear that these other expenditures, when coordinated, are also in-kind contributions (or coordinated party expenditures, if a political party committee so elects) to the candidate or political party committee with whom or with which they are coordinated. The exceptions contained in 11 CFR part 100, subpart C (exceptions to the definition of "contribution") and subpart E (exceptions to the definition of "expenditure") continue to apply.

*11 CFR 109.21 What Is a "Coordinated Communication"?*

In BCRA, Congress expressly repealed 11 CFR 100.23, Public Law 107–155, sec. 214(b) (March 27, 2002), and instructed the Commission to promulgate new regulations on "coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committees." Public Law 107–155, sec. 214(c) (March 27, 2002). Congress also mandated that the new regulations address four specific aspects of coordinated communications: (1) Republication of campaign materials; (2) the use of a common vendor; (3) communications directed or made by a former employee of a candidate or political party; and (4) communications made after substantial discussion about the communication with a candidate or political party. See Public Law 107–155, sec. 214(c)(1) through (4) (March 27, 2002).

The Commission is promulgating new 11 CFR 109.21 to comply with this Congressional mandate. This rule applies to communications coordinated with candidates, their authorized committees, political party committees, or the agents of any of the foregoing. Paragraph (a) of this section begins by defining "coordinated communication." Paragraph (b) spells out the treatment of "coordinated communications" as in-kind contributions, which must be reported. Next, paragraph (c) sets out the content standard for coordinated communications. Paragraph (d) establishes conduct standards for the coordination analysis. Paragraph (e) addresses the Congressional guidance that an agreement or formal collaboration is not required for a communication to be considered "coordinated." Paragraph (f) provides a safe harbor for certain inquiries as to legislative and policy issues.

The Commission notes that Congress has provided that candidates and any entity "acting on behalf of 1 or more candidates" must not "solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act. * * *" 2 U.S.C. 441i(e)(1)(A). The Commission has addressed this restriction in a separate rulemaking (see Final Rules and Explanation and Justification on Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money, 67 FR 49,081 (July 29, 2002)), and does not necessarily equate activity resulting in a coordinated communication under 11 CFR 109.21 with "acting on behalf of 1 or more candidates" in 2 U.S.C. 441i(e)(1). Therefore, a determination of whether a coordinated communication exists must be made separately from, and without reference to, a determination of whether an entity is "acting on behalf of 1 or more candidates" under 2 U.S.C. 441i(e)(1)(A).

1. 11 CFR 109.21(a) Definition

Paragraph (a) of new section 109.21 sets forth the required elements of a "coordinated communication," which comprise a three-pronged test. For a communication to be "coordinated," all three prongs of the test must be satisfied. While no one of these elements standing alone fully answers the question of whether a communication is for the purpose of influencing a Federal election, see 11 CFR 100.52(a), 100.111(a), the satisfaction of all three prongs of the test set out in new 11 CFR 109.21 justifies the conclusion that payments for the coordinated communication are made for the purpose of influencing a Federal election, and therefore constitute in-kind contributions. Nevertheless, the Commission notes that the inclusion of one prong of its test, the content standard, could function efficiently as an initial threshold for the coordination analysis.

Under the first prong, in paragraph (a)(1), the communication must be paid for by someone other than a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing. However, a person's status as a candidate does not exempt him or her from this section with respect to payments he or she makes for communications on behalf of a different candidate. Under paragraph (a)(2), the second prong of the three-pronged test is a "content standard" regarding the subject matter of the communication. Under paragraph (a)(3), the third prong of the test is a "conduct standard" regarding the interactions between the person paying for the communication and the candidate or political party committee. A sentence proposed in the NPRM regarding republication of campaign materials is being moved from proposed paragraph (a)(3) in the NPRM to paragraph (c)(2) in the final rules.

Of the seven commenters who specifically commented on this three-part structure for the regulations, two expressed general support for the approach. The other five, including BCRA's principal sponsors, urged the Commission to emphasize the actual conduct and minimize the importance of any content standard. The final rules, however, maintain the same structure as the proposed rules for the reasons described below. The Commission recognizes that a content requirement may serve to exclude some communications that are made with the subjective intent of influencing a Federal election, thereby potentially narrowing the reach of 2 U.S.C. 441a(a)(7)(B)(i) and (ii), but the Commission believes that a content standard provides a clear and useful component of a coordination definition in that it helps ensure that the coordination regulations do not inadvertently encompass communications that are not made for the purpose of influencing a federal election.

2. 11 CFR 109.21(b) Treatment as an In-Kind Contribution; Reporting

Under the Act and the Commission's regulations, a "contribution" is defined as "a gift, subscription, loan ... advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office," subject to a number of specific exceptions. See 11 CFR 100.52(a), *et seq.*; see also 2 U.S.C. 431(8)(A), *et seq.* An "expenditure" is similarly defined as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value made by any person for the purpose of influencing any election for Federal office," and is also subject to a list of specific exceptions. See 11 CFR 100.111(a), *et seq.*; see also 2 U.S.C. 431(9)(A), *et seq.* Thus, a "payment" that is "made for the purpose of influencing any election for Federal

office'' qualifies as either an ''expenditure,'' a ''contribution,'' or both, unless it is specifically excepted.

As explained above, the coordination provisions in the statute, 2 U.S.C. 441a(a)(7)(B)(i) and (ii), state that ''expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of,'' a candidate or a political party committee ''shall be considered to be a contribution'' to that candidate or political party committee. Several commenters argued that the Commission must first determine whether or not the payment for a communication constitutes an ''expenditure'' before proceeding to a coordination analysis. The Commission concludes that, when read as whole sentences, 2 U.S.C. 441a(a)(7)(B)(i) and (ii) require that for a contribution to exist, three requirements must be met: (1) There must be some conduct to differentiate the activity from an ''independent expenditure,'' *see* 2 U.S.C. 431(17); (2) there must be some form of payment; and (3) that payment must be made for the purpose of influencing any election for Federal office. The Commission has determined that a payment that satisfies the content and conduct standards of 11 CFR 109.21 satisfies the statutory requirements for an expenditure in the specific context of coordinated communications, and thereby constitutes a contribution under 2 U.S.C. 441a(a)(7)(B)(i) and (ii).

*A. 11 CFR 109.21(b)(1) General Rule*

Paragraph (b)(1) of section 109.21 provides that a payment for a coordinated communication is made ''for the purpose of influencing'' an election for Federal office, the same phrase used by Congress in the definition of both ''expenditure'' and ''contribution.'' 2 U.S.C. 431(8)(A) and (9)(A). Paragraph (b)(1) also states the general rule that a payment for a coordinated communication constitutes an in-kind contribution to the candidate, authorized committee, or political party committee with whom or with which it is coordinated, unless excepted under subpart C of 11 CFR part 100. Please note that this section encompasses electioneering communications under 11 CFR 100.29(a)(1), in addition to other communications. Congress expressly provided that when these communications are coordinated with a candidate, authorized committee, or political party committee, they must be treated like other coordinated communications in that disbursements for these communications are in-kind contributions to the candidate or party committee with whom or which they were coordinated. See 2 U.S.C. 441a(a)(7)(C). Under BCRA, these coordinated electioneering communications, like other coordinated communications, must be treated as expenditures by the candidate, authorized committee, or political party committee with whom or with which they are coordinated. *Id.*

*B. 11 CFR 109.21(b)(2) In-Kind Contributions Resulting From Conduct Described in Paragraphs (d)(4) or (d)(5) of This Section*

Paragraph (b)(2) clarifies the application of the general rule of paragraph (b)(1) in a particular circumstance. Under the general rule in paragraph (b)(1), a candidate's authorized committee or a political party committee receives an in-kind contribution, subject to the contribution limits, prohibitions, and reporting requirements of the Act. As explained below, two of the conduct standards, found in paragraphs (d)(4) and (d)(5) of section 109.21, do not focus on the conduct of the candidate, the candidate's authorized committee or agents, but focus instead on the conduct of a common vendor or a former employee with respect to the person paying for the communication. To avoid the result where a candidate, authorized committee, or political party committee might be held responsible for receiving or accepting an in-kind contribution that did not result from its conduct or the conduct of its agents, the Commission explicitly provides that the candidate, the candidate's authorized committee, or political party committee does not receive or accept in-kind contributions that result from conduct described in the conduct standards of paragraphs (d)(4) and (d)(5) of this section. This treatment is generally analogous to the handling of republished campaign materials under new 11 CFR 109.23 and the Commission's pre-BCRA regulations. See former 11 CFR 109.1(d)(1). However, please note that the person paying for a communication that is coordinated because of conduct described in paragraphs (d)(4) or (d)(5) still makes an in-kind contribution for purposes of the contribution limitations, prohibitions, and reporting requirements of the Act.

One commenter suggested that the text of paragraph (b)(2) should be clarified to indicate that a candidate or political party committee receives and accepts an in-kind contribution resulting from a coordinated communication in which an agent of either engages in the conduct described in paragraphs (d)(1) through (d)(3). The Commission agrees and is incorporating that suggested change into the final rules.

*C. 11 CFR 109.21(b)(3) Reporting of Coordinated Communications*

Paragraph (b)(3) of 11 CFR 109.21 provides that a political committee, other than a political party committee, must report payments for coordinated communications as in-kind contributions made to the candidate or political party committee with whom or which they are coordinated. Paragraph (b)(3) also clarifies that the recipient candidate, authorized committee, or political party committee with which a communication is coordinated must report the payor's payment for that communication as an in-kind contribution received under 11 CFR 104.13 and must also report making a corresponding expenditure in the same amount. 11 CFR 104.13.

3. 11 CFR 109.21(c) Content Standards

The NPRM sought comments as to whether content standards should be included in the coordinated communications rules, and if so, what the appropriate standard should be. A number of alternative content standards were included in the NPRM. Two commenters opposed the inclusion of any content standard, arguing that to do so would inappropriately narrow the scope of the rules when the conduct of the person paying for the communication and the candidate or political party committee is sufficient, by itself, to eliminate the independence of the communication, thereby creating an in-kind contribution under 2 U.S.C. 441a(a)(7)(B)(i) and (ii). Several other commenters, however, generally supported the inclusion of a content standard, although they disagreed as to what that standard should be.

The Commission is including content standards in the final rules on coordinated communications to limit the new rules to communications whose subject matter is reasonably related to an election. In the NPRM, the Commission proposed three distinct content standards, in paragraph (c), along with three alternatives for a fourth standard. The three proposed standards were an ''electioneering communication'' standard, a standard encompassing the republication of candidate campaign materials, and a standard for communications that ''expressly advocate'' the election or defeat of a clearly identified candidate for Federal office. In addition, the three alternative content standards ranged

from a minimal threshold that would have encompassed any "public communication" that refers to a "clearly identified candidate" (Alternative A), a public communication that "promoted, supported, attacked, or opposed" a candidate for Federal office (Alternative B), and a public communication that was made during a specific time period shortly before an election, was directed to a specific group of voters, and discussed the views or record of a candidate (Alternative C). The Commission proposed that a communication that satisfies any one of the standards would satisfy the "content" requirement of 11 CFR 109.21.

Commenters expressed a wide range of views as to the appropriate content standard. One commenter attempted to craft a stand-alone unitary content standard through a combination of the electioneering communication and republication standards. Four commenters argued that an "express advocacy" content standard is necessary to provide clear guidance and to ensure that the regulation is not vague or overly broad. Most other commenters acknowledged that the three standards of electioneering, republication, and express advocacy clearly comport with guidance from Congress and the courts, but three commenters argued that no additional content standards are warranted in the absence of any further directive from Congress. A joint comment by three commenters urged the Commission to focus the content standard on the content of the communication, rather than "external criteria" such as the timing or distribution of the communication. The same commenters also requested that the Commission adjust its content standard to ensure that communications between a political party committee and its "affiliates" are not covered.

Based generally on the approach taken by Congress with respect to electioneering communications, five commenters recommended a dual time-period approach to the content standard in which communications made 30 to 60 days before an election would be subject to lesser, if any, content restrictions than communications made outside of that time period. BCRA's principal sponsors agreed with this approach in their comments and observed that communications made within 30 days of a primary or 60 days of a general election are usually campaign related. A different commenter also recommended temporal limits, but suggested that any communications made outside the 30 or 60 days should be completely excluded from being treated as coordinated communications. BCRA's principal sponsors specifically rejected this approach in their comments.

After considering the concerns raised by the commenters about overbreadth, vagueness, underinclusiveness, and potential circumvention of the restrictions in the Act and the Commission's regulations, the Commission is setting forth four content standards to implement the statutory requirements. These standards all provide bright-line tests and subject to regulation only those communications whose contents, in combination with the manner of its creation and distribution, indicate that the communication is made for the purpose of influencing the election of a candidate for Federal office.

*A. 11 CFR 109.21(c)(1) Electioneering Communications*

Congress provided in BCRA that when "any person makes * * * any disbursement for any electioneering communication * * * and such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, state, or local political party committee thereof, or an agent or official of any such candidate, party or committee * * * such disbursement shall be treated as a contribution to the candidate supported by the electioneering communication * * * and as an expenditure by that candidate." 2 U.S.C. 441a(a)(7)(C). To implement that statutory directive, the Commission proposed in the NPRM that the first content standard paragraph (c)(1) simply focus on whether the communication is an "electioneering communication" under 11 CFR 100.29. See Final Rule on Electioneering Communications, 67 FR 51,131 (Oct. 23, 2002). Although the proposed rule in the NPRM described a communication "that would otherwise be an electioneering communication," this indirect reference has been removed and replaced with a direct reference to an electioneering communication.

Four commenters opined that the electioneering communication provisions in BCRA are unconstitutional, and opposed their inclusion as a content standard. One of these commenters argued that the electioneering communication content standard should be limited to include only communications containing "express advocacy." The Commission concludes, however, that such an interpretation would undermine the scope of Congress's definition of an electioneering communication, 2 U.S.C. 434(f)(3)(A), especially in light of the Congressional mandate in 2 U.S.C. 441a(a)(7)(C). Another commenter argued that the Commission should nonetheless exclude the electioneering communications from the content standards because Congress did not specifically require its inclusion in that exact manner. In the Commission's judgment, however, including the electioneering communication standard specifically authorized by Congress as one of the content standards in the definition of "coordinated communication" is a simple and straightforward way to implement 2 U.S.C. 441a(a)(7)(C). As one commenter noted, the inclusion of electioneering communications as a content standard promotes consistency because the term is already defined by Congress at 2 U.S.C. 434(f)(3)(A) and in the Commission's new rules at 11 CFR 100.29.

The Commission considered and rejected constructing a separate definition of "coordination" that would have applied specifically to electioneering communications. A separate construction would be redundant because the relevant conduct under it would be identical to the conduct standards for other coordinated communication containing other types of content. Similarly, the Commission notes that Congress provided that an electioneering communication could be coordinated with an "official" of a candidate, party, or committee, in addition to the candidate, committees, and their agents. 2 U.S.C. 41a(a)(7)(C)(ii). The Commission is not, however, separately addressing coordination with an official in the final rule because such an official is subsumed within the definition of "agent" in 11 CFR 109.3.

*B. 11 CFR 109.21(c)(2) Dissemination, Distribution, or Republication of Campaign Material*

The second content standard implements the Congressional mandate that the Commission's new rules on coordinated communications address the "republication of campaign materials." See Public Law 107–155, sec. 214(c)(1) (March 27, 2002). The Commission's former rule on republication of campaign materials, which has been moved from former 11 CFR 109.1(d) to new section 109.23 with minor changes explained below, sets out the required treatment of both the coordinated and uncoordinated dissemination, distribution, or republication of campaign material prepared by a candidate, an authorized committee, or an agent of either. Under section 109.23, discussed below, the

reporting responsibilities of candidates, authorized committees, and political party committees vary depending on whether they "coordinate" with a person financing the dissemination, distribution, or republication of a candidate's campaign material.

In the final rules the "republication" content standard in paragraph (c)(2) of section 109.21 expressly links to paragraph (d)(6) of section 109.21. This link is important because paragraph (d)(6) of this section clarifies the application of the conduct standards of paragraph (d) of this section to the unique circumstances of republication. This change from the NPRM is intended to emphasize the relationship between paragraphs (c)(2) and (d)(6) of section 109.21. In addition, section 11 CFR 109.21(c)(2) includes a cross-reference to 11 CFR 109.23 to ensure that certain uses of campaign material exempted by 11 CFR 109.23(b) from the definition of "contribution" will not satisfy the content standard in 11 CFR 109.21(c)(2).

The Commission is making one change to the republication content standard from the rule proposed in the NPRM. In the NPRM, a communication would have satisfied the content standard proposed in 11 CFR 109.21(c)(2) when "the communication" disseminated, distributed, or republished campaign materials prepared by a candidate. The Commission is changing the standard so that the content standard will only be satisfied when "the public communication" disseminates, distributes, or republishes campaign materials. Although the Commission did not receive specific comments on this point, the Commission is employing the term "public communication," as defined at 11 CFR 100.26, to conform the scope of this standard with the approach the Commission has consistently taken for the other content standards discussed below, with the exception of the "electioneering communication" standard.

*C. 11 CFR 109.21(c)(3) Express Advocacy*

The third content standard in paragraph (c)(3) of section 109.21 states that a communication also satisfies the content standard if it "expressly advocates" the election or defeat of a clearly identified candidate for Federal office. Although the commenters expressed widely differing opinions about whether this "express advocacy" standard should be the sole content standard, none of the commenters opposed including "express advocacy" as a content standard in the regulations.

*D. 11 CFR 109.21(c)(4) Additional Content Standard*

In addition to electioneering communications described in 11 CFR 100.29, communications that republish campaign materials, and communications that "expressly advocate" the election or defeat of a clearly identified candidate, the Commission proposed three other possible content standards in the NPRM and requested comment on additional alternatives. Each of these alternatives was premised on the communication qualifying as a "public communication," with additional requirements. Alternative A required only that the communication qualify as a public communication and contain a reference to a clearly identified candidate for Federal office. Alternative B provided that the communication must also promote, support, attack, or oppose the clearly identified candidate. Alternative C required that the public communication refer to a clearly identified candidate, be made within 120 days of an election, be directed to voters within the jurisdiction of that candidate, and include an "express statement about the record or position or views on an issue, or the character, or the qualifications or fitness for office, or party affiliation," of the clearly identified candidate.

Several commenters criticized Alternative A as overly broad, asserting that a clearly identified candidate is the minimal standard necessary to distinguish "issue ads" from communications made for the purpose of influencing an election. In contrast, several different commenters argued that the requirement of a clearly identified candidate was too restrictive because it would fail to encompass communications urging recipients to "vote Democrat" or "vote Republican." These commenters suggested that at a minimum the Commission expand the reference to include a reference to a "clearly identified political party." Furthermore, two commenters argued that the requirement of a clearly identified candidate also fails to encompass communications that "reflect and reinforce the themes and messages of the campaign."

Five commenters criticized Alternative B, arguing that the terms "promote, support, attack, or oppose" are overly broad. Two different commenters suggested that the proposed standard relied on subjective criteria and would discourage public speech and weaken the value of having a content standard.

Several commenters also criticized Alternative C as overly broad and containing subjective criteria. One commenter specifically objected to including communications containing statements about a candidate's positions on an issue. A different commenter cited a lack of a statutory basis or empirical support for the 120-day time limit and pointed out that the rule might be applied to cover communications made in a jurisdiction other than the jurisdiction of the clearly identified candidate.

In contrast, four commenters expressed general support for this standard, but with the removal of the 120 day limit, which they believed would exclude many coordinated communications made early in the election cycle. Two of these commenters also suggested that the Commission remove the word "express" from the requirement of an "express statement." In addition, a different commenter proposed an alternative standard to cover a communication that (1) "expressly refers to" a candidate in his capacity as a candidate; (2) refers to the next election; and (3) is publicly disseminated and actually reaches 100 eligible voters.

The Commission is including a modified version of Alternative C in the final rules at 11 CFR 109.21(c)(4). Taking into consideration the suggestions of the commenters, this content standard is largely based on, but is somewhat broader than, Congress's definition of an electioneering communication. A communication meets this content requirement if (1) it is a public communication; (2) it refers to a clearly identified candidate or political party; (3) it is directed to voters in the jurisdiction of the clearly identified Federal candidate; and (4) it is publicly distributed or publicly disseminated 120 days or fewer before a primary or general election.

The term "publicly distributed" refers to communications distributed by radio or television (*see* 11 CFR 100.29(b)(3)) and the term "publicly disseminated" refers to communications that are made public via other media, *e.g.*, newspaper, magazines, handbills. In this respect, paragraph (c)(4) reflects the fact that coordinated communications can occur through media other than television and radio. Moreover, for purposes of establishing a content standard in a coordination rule, there is no reason to exclude communications that meet the content requirements of an electioneering communication, but fail to constitute an electioneering communication only because of the media chosen for the communication.

Perhaps most importantly, paragraph (c)(4) creates parallel requirements for those whose communications do not technically qualify as electioneering communications. Because electioneering communications are by definition limited to broadcast, cable, or satellite communications (see 11 CFR 100.29), communications made through other media, such as print communications, are not included under the electioneering communication-based content standard of paragraph (c)(1). Similarly, political committees such as separate segregated funds or non-connected committees do not make electioneering communications because their payments are treated as expenditures. Therefore, under new paragraph (c)(4), for example, where a candidate and the separate segregated fund paying for the communication satisfy the conduct requirements of new 11 CFR 109.21(d), the separate segregated fund makes a coordinated communication if it pays for a newspaper advertisement. Thus, to avoid an arbitrary distinction in the content standards, paragraph (c)(4) applies to all "public communications," a term defined and set forth in BCRA by Congress. 2 U.S.C. 431(22); 11 CFR 100.26. The use of the term "public communication" provides consistency within the regulations and distinguishes covered communications from, for example, private correspondence and internal communications between a corporation or labor organization and its restricted class. The three commenters who specifically addressed the proposed use of this term expressed support for its inclusion. One of these commenters pointed out that the use of "public communication" provides "helpful consistency within the regulations." In addition, a different commenter suggested that the Commission "completely exempt" e-mail and Internet communications from its coordination regulations. By framing the content standard in terms of a "public communication," the Commission addresses that comment. Although the term "public communication" covers a broad range of communications, it does not cover some forms of communications, such as those transmitted using the Internet and electronic mail. 11 CFR 100.26.

This new standard focuses as much as possible on the face of the public communication or on facts on the public record. This latter point is important. The intent is to require as little characterization of the meaning or the content of communication, or inquiry into the subjective effect of the communication on the reader, viewer, or listener as possible. *See Buckley* v. *Valeo*, 424 U.S. 1, 42–44 (1976). The new paragraph (c)(4) is applied by asking if certain things are true or false about the face of the public communication or with limited reference to external facts on the public record. This fourth content standard does not require a description of a candidate's views or positions, a requirement in the proposed rules that raised objections from commenters.

Paragraph (c)(4)(ii) of section 109.21 requires that the public communication must be publicly distributed or publicly disseminated 120 days or fewer before a primary election or a general election. The 120-day time frame is based on 2 U.S.C. 431(20)(A)(i) (see 11 CFR 100.24(b)(1)) and has several advantages. First, it provides a "bright-line" rule. Second, it focuses the regulation on activity reasonably close to an election, but not so distant from the election as to implicate political discussion at other times. As noted, Congress has, in part, defined "Federal election activity" in terms of a 120-day time frame, deeming that period of time before an election to be reasonably related to that election. See 2 U.S.C. 431(20)(A)(i). In contrast, the "express advocacy" content standard in paragraph (c)(3) of section 109.21 applies without time limitation. Similarly, this 120-day time frame is more conservative than the treatment of public communications in the definition of Federal election activity, which regulates public communications without regard to timeframe. 2 U.S.C. 431(20)(A)(iii); 11 CFR 100.24(b)(3).

The Commission has considered, but rejected, the use of a shorter time-frame, specifically, thirty days before a primary election and sixty days before a general election. This shorter time-frame would have been derived by analogy from the definition of "electioneering communication." See 2 U.S.C. 434(f)(3)(A). The shorter time-frames would have had the advantage of symmetry with the electioneering communication definition. There is, however, an important difference between the electioneering communication concept and the paradigm adopted here for regulating coordination. Although this content standard (*i.e.*, paragraph (c)(4)(ii)) is obviously similar to the definition of "electioneering communication," this content standard is only one part of a three-part test (see discussion of paragraph (a) of section 109.21, above), whereas the definition of "electioneering communication" is complete in itself. Under this final rule, even if a political communication satisfies the content standard, the conduct standards must still be satisfied before the political communication is considered "coordinated." In this light, the content standard may be viewed as a "filter" or a "threshold" that screens outs certain communications from even being subjected to analysis under the conduct standards.[2] Thus it is appropriate to consider a broader time-frame when applying this content standard because it serves only to identify political communications that may be coordinated if other conditions (*i.e.*, the conduct standards) are satisfied, and thus may be inappropriately underinclusive if too narrow.

The new standard also encompasses communications that refer to political parties as well as those that identify candidates, as suggested by several commenters. This extension of the content standards implements 2 U.S.C. 441a(a)(7)(B)(ii), added by section 214(c) of BCRA, which provides that expenditures made by any person in coordination with a political party committee is considered to be a contribution to that party committee.

Several commenters said that there should be an exception to the content standards for communications that refer to the "popular name" of a bill or law that includes the name of a Federal candidate who was a sponsor of the bill or law. In addition to questions whether such an exception is necessary in light of the other restrictions explained above, the Commission believes that the "popular name" proposal would also open new avenues for the circumvention of the Act and the Commission's regulations. Because the "popular name" of a bill is not a defined term, and is not subject to specific restrictions by Congress, an exemption for the use of a candidate's name in the popular name of a bill might shield a communication that clearly attacks or supports a candidate by naming the bill in a way that associates the candidate with a popular or disfavored stance. The Commission concludes that if one or more of the conduct standards is met and the communication is directed to voters in that candidate's jurisdiction and made within 60 days of general election, Congress does not intend for such a communication to be exempted from the statutory requirements merely

[2] In effect, the content standard of paragraph (c)(4)(ii) operates as a "safe harbor" in that communications that are publicly disseminated or distributed more than 120 days before the primary or general election will not be deemed to be "coordinated" under this particular content standard under any circumstances.

because the communication contains a reference to a crafted name for a piece of legislation in addition to the name of the clearly identified candidate.

The new standard also incorporates the concept of the "targeting" of the communication as an indication of whether it is election-related. BCRA's principal sponsors commented that a "key factor" in determining whether a communication should be covered under these rules is whether the communication is "targeted" to a specific voter audience. By requiring that the communication be "directed to voters in the jurisdiction of the clearly identified Federal candidate," the Commission is addressing this concern. In order to encompass communications that are coordinated with a political party committee and refer to a political party, but do not refer to a candidate, the Commission also provides that the content standard in paragraph (c)(4) would be satisfied when the communication is directed "to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot." The "directed to voters" requirement focuses on the intended audience of the communication, rather than a quantitative analysis of the number of possible recipients or the expected geographic limits of a particular media, that will be determined on a case-by-case basis from the content of the communication, its actual placement, and other objective indicators of the intended audience. For example, a public communication that otherwise makes express statements about promoting or attacking Representative X or Senator Y for their stance on the "X–Y Bill" does not satisfy this requirement if it is only broadcast in Washington, DC, and not in either Member's district or State. For purposes of new paragraph (c)(4), "jurisdiction" means a member of Congress' district, the State of a U.S. Senator, and the entire United States for the President and Vice President in the general election or before the national nominating convention.

4. 11 CFR 109.21(d) Conduct Standards

Paragraph (d) of section 109.21 lists five types of conduct that satisfy the "conduct standard" of the three-part coordination test. Under these rules, if one of these types of conduct is present, and the other requirements described in paragraphs (a) and (c) are satisfied, the communication is not made "totally independently" from the candidate, the candidate's authorized committee, or the political party committee, *see Buckley*, 424 U.S. at 47, and thus is coordinated. The introductory sentence of paragraph (d) implements the Congressional mandate in BCRA that the coordination regulation not require "agreement or formal collaboration." Pub. L. 107–155, sec. 214(c) (March 27, 2002); *see* more complete discussion below.

In the NPRM, the Commission proposed five categories of conduct that would each satisfy the conduct standard when material information is conveyed or used: (1) A request or suggestion; (2) material involvement in decisions; (3) a substantial discussion; (4) use of a common vendor; and (5) use of a former employee or independent contractor of a campaign committee or political party. Several commenters offered general observations regarding the Commission's approach to a conduct standard in the NPRM. One commenter applauded the Commission's decision to focus on specific transactions leading to a coordinated communication, rather than general contacts between an organization and a campaign. That same commenter, however, complained along with three other commenters that the standards still operated to establish a presumption of coordination and should be further narrowed to require a direct causal link between the sharing of information and its use in a particular communication. One other commenter expressed a concern that the proposed rules would operate to unduly restrict corporations or labor organizations from preparing voter guides or "scorecards" to reflect the positions of candidates on specific legislation or issues.

BCRA's principal sponsors urged the Commission to ensure that lobbying activities would not result in a finding of coordination under the final rules. Similarly, a different commenter suggested that the conduct standards be limited to contacts with a candidate in his or her role as a candidate, rather than simply in the capacity of a legislator. That commenter indicated that without such a restriction the conduct rules would improperly restrict the ability of organizations to coordinate issue advocacy with elected officials. "An action alert from a nonprofit asking the public to call their Senators and urge them to pass McCain-Feingold," the commenter argued, "is more effective if the timing and content can be coordinated with Senator McCain."

*A. 11 CFR 109.21(d)(1) Request or Suggestion*

Under the Act, as amended by BCRA, an expenditure made by any person at the "request or suggestion" of a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing is a contribution to the candidate or political party committee. 2 U.S.C. 441a(a)(7)(B)(i), (ii). The first conduct standard, in 11 CFR 109.21(d)(1), implements this "request or suggestion" statutory provision. This standard has two prongs and satisfying either prong satisfies the conduct standard.

Three commenters requested in a joint comment that the term "suggest" be given additional definition or explanation, proposing that the definition should reflect a suggestion as a "a palpable communication intended to, and reasonably understood to, convey a request for some action." The Commission notes that the "request or suggest" standard is derived from the Supreme Court's Buckley decision and has existed in the Commission's regulations without further definition for over two decades. See *Buckley* v. *Valeo*, 424 U.S. at 47 (finding that "the 'authorized or requested' standard of the Act operates to treat all expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate as contributions"); see also H.R. Doc. No. 95–44, at 55 (Jan. 12, 1977) (Explanation and Justification for 11 CFR 109.1, defining independent expenditure as an "expenditure . . . which is not made * * * at the request or suggestion of" a candidate, authorized committee, or their agents). A determination of whether a request or suggestion has occurred requires a fact-based inquiry that, even under the commenters' proffered explanation, can not be easily avoided through further definition.

A different commenter expressed concern that the proposed rule would have broadly affected communications made with respect to all candidates after the person paying for such communications has received a request or suggestion from any candidate. In this final rule, the Commission does not intend such an application. Neither of the two prongs of this conduct standard can be satisfied without some link between the request or suggestion and the candidate or political party who is, or that is, clearly identified in the communication. Where Candidate A requests or suggests that a third party pay for an ad expressly advocating the election of Candidate B, and that third party publishes such a communication with no reference to Candidate A, no coordination will result between Candidate B and the third party payor. However, a candidate is not removed from the provisions of the conduct standards merely by virtue of being a candidate. If Candidate A is an "agent"

for Candidate B in the example above, then the communication would be coordinated. Similarly, if Candidate A requests that Candidate B pay for a communication that expressly advocates the election of Candidate A, and Candidate B pays for such a communication, that communication is a coordinated communication and Candidate B makes an in-kind contribution to Candidate A.

The first type of conduct, in paragraph (d)(1)(i), is satisfied if the person creating, producing, or distributing the communication does so at the request or suggestion of a candidate, authorized committee, political party committee, or agent of any of the foregoing. The *Buckley* court originally drew on the 1974 House and Senate Reports accompanying the 1974 amendments to the Act when it upheld the section in FECA that distinguished a communication made "at the request or suggestion" of the candidate or political party committee from those that are made "totally independently from the candidate and his campaign." *Buckley*, 424 U.S. at 47 (citing H.R. Rep. No. 93–1239, at 6 (1974) and S. Rep. No. 93–689, at 18 (1974)). A "request or suggestion" is therefore a form of coordination under the Act, as approved by *Buckley*. A request or suggestion encompasses the most direct form of coordination, given that the candidate or political party committee communicates desires to another person who effectuates them.

In the NPRM, the Commission noted that this provision, for example, would not apply to a speech at a campaign rally, but, in appropriate cases, would apply to requests or suggestions directed to specific individuals or small groups for the creation, production, or distribution of communications. One commenter agreed with this approach, requesting that the rule itself more clearly reflect this explanation. However, the Commission is not amending its rules because it could be potentially confusing to delineate in a rule every conceivable situation that could arise. Instead, the Commission offers the following explanation of the new rule. The "request or suggestion" conduct standard in paragraph (d)(1) is intended to cover requests or suggestions made to a select audience, but not those offered to the public generally. For example, a request that is posted on a web page that is available to the general public is a request to the general public and does not trigger the conduct standard in paragraph (d)(1), but a request posted through an intranet service or sent via electronic mail directly to a discrete group of recipients

constitutes a request to a select audience and thereby satisfies the conduct standard in paragraph (d)(1). Similarly, a request in a public campaign speech or a newspaper advertisement is a request to the general public and is not covered, but a request during a speech to an audience at an invitation-only dinner or during a membership organization function is a request to a select audience and thereby satisfies the conduct standard in paragraph (d)(1).

The second way to satisfy the "request or suggestion" conduct standard (paragraph (d)(1)(ii)) is for a person paying for a communication to suggest the creation, production, or distribution of the communication to the candidate, authorized committee, political party committee, or agent of any of the foregoing, and for the candidate, authorized committee, political party committee, or agent to assent to the suggestion. The NPRM explained that this second way of satisfying the conduct standard is intended to prevent circumvention of the statutory "request or suggestion" test (2 U.S.C. 441a(a)(7)(B)(i), (ii)) by, for example, the expedient of implicit understandings without a formal request or suggestion. Two commenters supported the addition of this new prong in order to prevent such circumvention of the Act. Two different commenters suggested that only affirmative assent should satisfy the conduct standard, although one of these commenters proposed that the rule should also cover situations where the parties have a prior agreement that a certain response be taken as an affirmative answer. Three other commenters opposed an assent standard entirely as overly complex and dependent on subjective criteria. One of these commenters argued that such an approach would undermine the Commission's efforts to create bright lines with respect to conduct resulting in coordination, and joined with another of these commenters in expressing concern that such a standard would be too easily triggered in the context of lobbying or other discussions with elected representatives. Another of these commenters also questioned whether certain responses, such as silence or "when a Congressman's eyes light up at the mention of a certain communication," constitute assent. One commenter also questioned whether evidence of circumvention exists to justify this approach. This commenter warned that the assent standard could run afoul of the district court's decision in *Christian Coalition*, which, in the commenter's words, determined that

"coordination does not exist where a union or corporation merely informs a candidate about its own political plans."

The Commission recognizes that the assent of a candidate may take many different forms, but it disagrees that a standard encompassing assent to a suggestion is overly complex. Assent to a suggestion is merely one form of a request; it is "an expression of a desire to some person for something to be granted or done." *See Black's Law Dict.* (6th ed. 1990) p. 1304 (definition of "request"). A determination of whether assent to a suggestion occurs is necessarily a fact-based determination, but no more so than a determination of whether other forms of a request or suggestion occur. The Commission therefore also disagrees with the commenter who suggested that the approach in the NPRM might not be permissible in light of the *Christian Coalition* decision. The Commission did not, as that commenter suggested, propose that coordination could result where a payor "merely informs" a candidate or political party committee of its plans. Rather, under the proposed rule, a candidate or a political party committee will have accepted an in-kind contribution only if there is assent to the suggestion; by rejecting the suggestion, the candidate or political party committee may unilaterally avoid any coordination.

It is the Commission's judgment that the assent to a suggestion must be encompassed by this conduct standard to prevent the circumvention of the requirements of the Act in this area. Therefore, and in light of the reasons set forth in the NPRM and above, the Commission is promulgating the request or suggestion standard without change from its form in the NPRM.

One commenter suggested that the Commission should permit a person to rebut the "presumption" of coordination after a request or suggestion "by demonstrating that the organization had decided to make that communication prior to the contact with the candidate, campaign, or party." The Commission does not agree with the creation of such a "presumption." Instead, a request or suggestion must be based on specific facts, rather than presumed, to satisfy this conduct standard. Thus, the absence of a presumption obviates the need to establish a mechanism for rebuttal.

As discussed above, the *Buckley* Court expressly recognized a request or suggestion by a candidate as a direct form of coordination resulting in a contribution. *Buckley*, 424 U.S. at 47. In the NPRM, the Commission sought

comment on whether the unique nature of requests or suggestions by candidates or political party committees indicates that such conduct should be handled differently under the coordination regulations. Specifically, the Commission asked whether a request or suggestion for a communication by a candidate or political party committee should be viewed as a special case, and as sufficient, in and of itself, regardless of the contents of the communication, to establish coordination. Three commenters opposed any rule in which a request or suggestion, without any content standard, could constitute a coordinated communication. One of these commenters argued that such an approach would permit a "false positive," such as when a group that has long planned a lobby effort meets with a legislator, and the legislator "expresses her hope" that the group will publicize a particular piece of legislation bearing her name. Similarly, another of these commenters asserted that there are "numerous communications that may be made at the request or suggestion of a candidate that have no relationship to any election." The Commission agrees with these commenters' concerns. Even supporters of this approach appeared to acknowledge in their testimony that a request to run an advertisement well before the next election might not be in an "electoral context" and therefore should not necessarily be treated as a coordinated communication under the Commission's regulations. Therefore, the final rules do not create any exception from the content standard for the "request or suggestion" conduct standard.

*B. 11 CFR 109.21(d)(2) Material Involvement*

The second conduct standard, 11 CFR 109.21(d)(2), addresses situations in which a candidate, authorized committee, or a political party committee is "materially involved in decisions" regarding specific aspects of a public communication paid for by someone else. Those specific aspects are listed in paragraphs (i) through (vi) of paragraph (d)(2): (i) The content of the communication; (ii) the intended audience; (iii) the means or mode of the communication; (iv) the specific media outlet used; (v) the timing or frequency of the communication; or (vi) the size or prominence of a printed communication or duration of a communication by means of broadcast, cable, or satellite. Please note that "the specific media outlet used" includes those listed in the definition of "public communication" in 11 CFR 100.26, including the broadcast and print media, mass mailings, and telephone banks. The "content of the communication" would include the script of telephone calls.

One commenter argued that this conduct standard should be limited to situations in which a candidate or political party has "significant control or influence over decisions" regarding the communication. The Commission disagrees, as such a standard would do little to clarify the rule or its application. The same commenter expressed concern about the scope of the "material involvement" standard, arguing that one candidate's actions with respect to a third-party spender might "taint" all of that third-party's communications with respect to different candidates. For the same reasons discussed above in the context of the "request or suggestion" standard, the Commission is not tailoring its rules to address that perceived potential outcome.

Two other commenters characterized the material involvement standard as redundant in light of the "substantial discussion" conduct standard, and one also opposed its inclusion because of vagueness and because Congress did not mandate this specific approach in BCRA, nor was it mandated by *Christian Coalition*. In contrast, four commenters indicated general support for the inclusion of this standard in the final rules and urged the Commission to expand it to cover material involvement in "discussions," in addition to decisions, regarding a communication. The Commission recognizes that there is a potential overlap between the "material involvement" standard and the "substantial discussion" standard explained below. Many activities that satisfy the "substantial discussion" conduct standard will also satisfy the "material involvement" standard, but the "material involvement" standard encompasses some activities that would not be encompassed by the "substantial discussion" standard or any of the other conduct standards. For example, a candidate is materially involved in a decision regarding the content of a communication paid for by another person if he or she has a staffer deliver to that person the results of a polling project recently commissioned by that candidate, and the polling results are material to the payor's decision regarding the intended audience for the communication. However, as explained below, the "substantial discussion" standard would not be satisfied by such delivery without some "discussion" or some form of interactive exchange between the candidate and the person paying for the communication. The Commission thus believes that the "material involvement" standard is necessary to address forms of "real world" coordination that would not be addressed in any of the other conduct standards.

One commenter advised against any interpretation of the rule that would define "material" to require a showing of direct causation. For the purposes of 11 CFR part 109, "material" has its ordinary legal meaning, which is "important; more or less necessary; having influence or effect; going to the merits." *Black's Law Dict.* (6th ed. 1990) p. 976. Thus, the term "materially involved in decisions" does not encompass all interactions, only those that are important to the communication. The term "material" is included to safeguard against the inclusion of incidental participation that is not important to, or does not influence, decisions regarding a communication. The factual determination of whether a candidate's or authorized committee's involvement is "material" must be made on a case-by-case basis.

The "material involvement" standard does not provide a "bright-line" because its operation is necessarily fact-based. Nevertheless the inclusion of a "materiality" requirement serves to protect against overbreadth, consistent with Supreme Court jurisprudence. In construing the meaning of "material" in the context of Securities Exchange Commission regulations, the Supreme Court specifically rejected a "bright-line rule" for materiality:

> A bright-line rule indeed is easier to follow than a standard that requires the exercise of judgment in the light of all the circumstances. But ease of application alone is not an excuse for ignoring the purposes of the Securities Acts and Congress' policy decisions. Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive.

*Basic v. Levinson*, 485 U.S. 224, 236 (1988). Therefore, the "material involvement" standard does not impose a requirement of direct causation, but focuses instead on the nature of the information conveyed and its importance, degree of necessity, influence or the effect of involvement by the candidate, authorized committee, political party committee, or their agents in any of the communication decisions enumerated in 11 CFR 109.21(d)(2)(i) through (vi).

The Commission has considered and rejected the suggestion of the commenter who recommended that "material involvement" be narrowed to

a "but-for" test, which would require proof that the communication would not have occurred *but for* the material involvement of a candidate, authorized committee, political party committee, or agent. The Commission is not adopting this approach or any similar requirement of direct causation in its final rules. Under such an analysis, information would only be "material" if all other potential influences on the content of the communication, its intended audience, its means or mode, the specific media outlet used, the timing or frequency of the communication, or the size, prominence, or duration of the communication could be eliminated. This would result in an extremely intrusive factual determination. For example, under the commenter's suggested approach, a candidate might propose a specific date for publication of a communication, but that candidate would not be materially involved in the decision regarding the timing of the communication unless the Commission could prove that no alternate factor could have led to the same timing decision. Such an approach is also unworkable because foreclosing all potential alternatives imposes an unnecessarily high burden of proof. The Commission also believes that such an approach would be unwarranted because the plain meaning of "material," as explained above, provides sufficient guidance for an inherently fact-based determination. For the same reasons, the Commission rejects any interpretation of "material involvement" that would require a showing that the communication is made "as a result of" the involvement of a candidate, an authorized committee, a political party committee, or an agent.

Instead, a candidate, authorized committee, or political party committee is considered "materially involved" in the decisions enumerated in paragraph (d)(2) after sharing information about plans, projects, activities, or needs with the person making the communication, but only if this information is found to be material to any of the above-enumerated decisions related to the communication. Similarly, a candidate or political party committee is "materially involved in decisions" if the candidate, political party committee, or agent conveys approval or disapproval of the other person's plans. The candidate or representatives of an authorized committee or political party committee need not be present or included during formal decisionmaking process but need only participate to the extent that he or she assists the ultimate decisionmaker, much like a lawyer who provides legal advice to a client is materially involved in a client's decision even when the client ultimately makes the decision.

The Commission notes that as with the "request or suggest" standard, the "material involvement" standard would not be satisfied, for example, by a speech to the general public, but is satisfied by remarks addressed specifically to a select audience, some of whom subsequently create, produce, or distribute public communications. However, it is not necessary that the involvement of the candidate or political party committee be traced directly to one specific communication. Rather, a candidate's or political party committee's involvement is material to a decision regarding a particular communication if that communication is one of a number of communications and the candidate or political party committee was materially involved in decisions regarding the strategy for those communications. For example, if a candidate is materially involved in a decision about the content or timing of a 10-part advertising campaign, then each of the 10 communications is coordinated without the need for further inquiry into the decisions regarding each individual ad on its own.

In order to respond to requests by several commenters for additional clarification about how the standard would operate, the Commission is providing the following hypothetical: Candidate A reads in the newspaper that the Payor Group is planning an advertising campaign urging voters to support Candidate A. Candidate A faxes over her own ad buying schedule to Payor Group, hoping that Payor Group will plan its own ad buying schedule around Candidate A's schedule to maximize the effect of both ad campaigns. The Payor Group subsequently runs ads that are all on NBC and ABC during the 6:00 news hour and during the most expensive weekday timeslot on NBC, whereas Candidate A's ads are run on CBS during the 6:00 news hour and during the most expensive time slot on CBS. When asked, Payor Group acknowledges that it received the fax from Candidate A, but says only that its plans for the timing of the campaign were in flux at the time they received the fax. The analysis under the "materially involved" conduct standard focuses on whether the fax constituted material involvement by the candidate in a decision regarding the timing of the Payor Group communications. Significant facts might include that the Payor Group changed its previously planned schedule, or that Payor Group had not yet made plans and had factored in the fax in its decision to choose CBS and the same time slot, or show in some other way that the fax was "important; more or less necessary, having influence or effect, [or] going to the merits" with respect to the Payor Group's decisions about the timing of its ads. The transmission and receipt of the fax in combination with the correlation of the two ad campaigns gives rise to a reasonable inference that Candidate A's involvement was material to the Payor Group's decision regarding the timing of its ad campaign. If, on the other hand, the example is changed so that the Payor Group's ads run on the same channel right after the candidate's ads in a way that lessens the effect of both ad campaigns, it may be appropriate to conclude that Candidate A's involvement was *not* material to the Payor Group's decision regarding the timing of its ad campaign. In other words, the degree to which the communications overlapped or did not overlap is one indication of whether Candidate A's involvement was material to the timing of the Payor Group communications.

*C. 11 CFR 109.21(d)(3) Substantial Discussion*

In BCRA, Congress also directed the Commission to address "payments for communications made by a person after substantial discussion about the communication with a candidate or political party." Public Law 107–155, sec. 214(c)(4) (March 27, 2002). In the NPRM, the Commission proposed a third conduct standard that would apply when a communication satisfying one or more of the content standards "is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication" and a candidate, authorized committee, political party committee, or an agent of any of the foregoing. 67 FR at 60,065 (September 24, 2002). The proposed rule also specified that a discussion is substantial "if information about the plans, projects, or needs of the candidate or political party committee is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication." 67 FR at 60,066 (September 24, 2002).

Three commenters supported the inclusion of this standard exactly as proposed in the NPRM. Two different commenters, however, characterized this standard as redundant in light of the "material involvement" standard

and suggested that they be combined into a single standard. One other commenter asserted that there was "insufficient quantification" as to the meaning of a "substantial" discussion and recommended that "substantial discussion" join "material involvement" as subjects for future rulemaking consideration. A different commenter advised that "material" should be further defined in the context of this standard. Two commenters advocated a return to the *Christian Coalition* test of whether or not the candidate and the spender emerge as "partners or joint venturers," while one of these commenters urged the Commission to specifically exclude discussions about policy and legislation in this context.

The Commission is including the "substantial discussion" standard in the final rules on coordinated communications because, as stated above, Congress required it to address this issue. Public Law 107–155, sec. 214(c)(4) (March 27, 2002). Under paragraph (d)(3) of 11 CFR 109.21, a communication meets the conduct standard if it is created, produced, or distributed after one or more substantial discussions between the person paying for the communication, or the person's agents, and the candidate clearly identified in the communication, his or her authorized committee, his or her opponent, or the opponent's authorized committee, a political party committee, or their agents. While the Commission recognizes the commenter's concerns that "substantial" and "material" are not set forth as bright-line tests, the Commission views an analysis of a "substantial discussion" as necessarily fact-specific and not naturally conducive to a meaningful bright-line analysis. Nevertheless, the Commission is providing an analytical framework in which a finder of fact determines whether a discussion occurred, whether certain information was conveyed, and whether that information is material to the creation, production, or distribution of the communication. The *Christian Coalition* suggestion that a candidate and spender emerge as "joint venturers" would only serve to confuse readers. The "substantial discussion" conduct standard in this final rule addresses a direct form of coordination between a candidate, authorized committee, political party committee, or their agents and a third-party spender, and the Commission is narrowing the scope of this standard through the additional requirements that the discussion be "substantial" and the information conveyed be "material." Paragraph (d)(3) explains that a "discussion" is "substantial" if information about the plans, projects, activities, or needs of the candidate, authorized committee, or political party committee that is material to the creation, production or distribution of the communication is conveyed to a person paying for the communication. "Discuss" has its plain and ordinary meaning, which the Commission understands to mean an interactive exchange of views or information. "Material" has the meaning explained above in the context of the "materially involved" standard. In other words, the substantiality of the discussion is measured by the materiality of the information conveyed in the discussion.

*D. 11 CFR 109.21(d)(4) Common Vendor*

In BCRA, Congress required the Commission to address "the use of a common vendor" in the context of coordination. Public Law 107–155, sec. 214(c)(2) (March 27, 2002). In the NPRM, the Commission proposed the conduct standard in paragraph (d)(4) of section 109.21 to implement this Congressional mandate. Proposed paragraphs (d)(4)(i) and (ii) provide that a common vendor is a commercial vendor who is contracted to create, produce, or distribute a communication by the person paying for that communication after that vendor has, during the same election cycle, provided any one of a number of listed services to a candidate who is clearly identified in that communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing. Under proposed paragraph (d)(4)(iii), the conduct standard would be satisfied if the common vendor conveys material information about the plans, projects, or needs of a candidate, authorized committee, or political party committee to the person paying for the communication, or if the vendor uses that material information in the creation, production, or distribution of a covered communication.

Many commenters addressed the "common vendor" standard proposed in the NPRM. One commenter asserted that this rule would not be enforceable because the term "common vendor" was "inadequately defined" to cover most vendors. This commenter warned that proposed standard would not reach many vendors who continuously re-organize personnel, merge, or dissolve and reorganize as different entities during or between election cycles. The same commenter believed it was important to include in the list of covered services media production vendors, pollsters, and media buying firms (for purchasing time slots) because they work closely together.

The Commission recognizes the possibility that commercial vendors may attempt to circumvent the new rules by re-organizing as different entities or replacing personnel. However, the Commission notes that the final rules focus on the use or conveyance of information used by a vendor, including its owner, officers, and employees, in providing services to a candidate, authorized committee, or political party committee, rather than the particular structure of the vendor. The specific reference to a vendor's owners and officers was not included in the proposed rule, but is being added to the final rule to address the commenter's concern. Therefore, if an individual or entity qualifies as a commercial vendor at the time that individual or entity contracts with the person paying for a communication to provide any of the specified services, then the individual or entity qualifies as a common vendor to the extent that the same individual or entity, "or any owner, officer, or employee" of the commercial vendor, has provided any of the enumerated services to the candidate during the specified time period. Thus, a commercial vendor may qualify as a common vendor under 11 CFR 109.21(d)(4) even after reorganizing or shifting personnel.

Five commenters argued that the Commission should presume that the conduct standard is satisfied whenever a candidate and an outside spender use the same common vendor. According to these commenters, the rule proposed by the Commission in the NPRM would create an "impossibly high standard to meet" if it required a showing that the common vendor actually "uses" particular information.

In contrast, five different commenters asserted that any such presumption would be overly broad and "taint" the vendor, or submit the candidate, political party committee, vendor, or spender to unwarranted "liability" for communications presumed to be coordinated merely because of the use of the vendor. Several commenters in this latter group were concerned that an overly broad rule would chill speech and discourage vendors from providing services to candidates or political party committees, which the commenters warned would be particularly troublesome in areas where only a limited number of vendors provide specific services. One commenter

argued that the proposed standard could lead to extensive and burdensome investigations that would place spenders at a disadvantage because it would be difficult for them to show that the vendor had not used certain information from a candidate's campaign committee or political party committee to create a communication. One commenter, who described himself as being in the business of "buying media spot time on behalf of various political clients," stated that he had spent a substantial sum of money responding to investigations, and opposed any rule in which "merely associating" with a common vendor might expose the person paying for a communication to the risk of enforcement proceedings. Four of these commenters, however, were generally supportive of the Commission's proposal to require that the common vendor "use or convey" material information to the person making the communication at issue, as opposed to simply providing services to both a candidate or party and the spender.

Similarly, three other commenters expressed concern about the "*per se* inclusion of vendors by class" and suggested that the inclusion of specific types of vendors should merely raise a "rebuttable presumption." These three commenters further noted that the proposed reference to "material information" would include information "used previously" in providing services to the candidate or party. These commenters questioned how a vendor might account for the "use" of material information.

After considering the wide range of comments, the Commission has decided to promulgate a final rule that is similar in many respects to the proposed rule, with certain modifications discussed below. It disagrees with those commenters who contended the proposed standard created any "prohibition" on the use of common vendors, and likewise disagrees with the commenters who suggested it established a presumption of coordination. Instead, the Commission notes that a different group of commenters urged the Commission to adopt such a presumption precisely because they believed the proposed standard did not already contain a presumption and would therefore be difficult to meet. The final rules in 11 CFR 109.21(d)(4) restrict the potential scope of the "common vendor" standard by limiting its application to vendors who provide specific services that, in the Commission's judgment, are conducive to coordination between a candidate or political party committee and a third party spender. But under this final rule, even those vendors who provide one or more of the specified services are not in any way prohibited from providing services to both candidates or political party committees and third-party spenders. This regulation focuses on the sharing of information about plans, projects, activities, or needs of a candidate or political party through a common vendor to the spender who pays for a communication that could not then be considered to be made "totally independently" from the candidate or political party committee.

The only commenter who identified himself as providing vendor services indicated that it is not the common practice for vendors to make use of one client's media plans in executing the instructions of a different client, and sharing "any client information given by another" would "compromise the professional relationship" that is at the "core of any service business." That commenter observed that "[c]ommon vendors, at whatever tier, who avoid such conduct should never be at risk of being deemed an instrument of coordination." No other commenters offered conflicting information on these points. Thus, because the Commission addresses only the use or conveyance of information material to the communication, the final rules narrowly target the coordination activity without unduly intruding into existing business practices.

The common vendor rule is carefully tailored to ensure that all four of the following conditions must be met. First, under 11 CFR 109.21(d)(4)(i), the person paying for the communication, or the agent of such a person, must contract with, or employ, a "commercial vendor" to create, produce, or distribute the communication. The term "commercial vendor" is defined in the Commission's pre-BCRA regulations at 11 CFR 116.1(c) as "any person[] providing goods or services to a candidate or political committee whose usual and normal business involves the sale, rental, lease, or provision of those goods or services." Thus, this standard only applies to a vendor whose usual and normal business includes the creation, production, or distribution of communications, and does not apply to the activities of persons who do not create, produce, or distribute communications as a commercial venture.

The second condition, in paragraph (d)(4)(ii), is that the commercial vendor must have provided certain services to the candidate or political party committee that puts the commercial vendor in a position to acquire information about the campaign plans, projects, activities, or needs of the candidate or political party committee that is material to the creation, production or distribution of the communication. Nine specific services are enumerated in paragraphs (d)(4)(ii)(A) through (I). Providing these services places the "common vendor" in a position to convey information about the candidate's or party committee's campaign plans, projects, activities, or needs to the person paying for the communication where that information is material to the communication.

The third condition is that the new rule only applies to common vendors who provide the specified services during the current election cycle. "Election cycle" is defined in 11 CFR 100.3. The Commission sought comment on whether a different time period, such as a fixed two-year period, would more accurately align the rule with existing campaign practices. One commenter responded that a two-year period would be too long and suggested that the standard should pertain "only to vendors who were common during the election year," or possibly further limited to vendors who provide services during the 30-day period before a primary election or the 60-day period before an election. That commenter also suggested that a time limit be placed on the use or conveyance of information received from a candidate or political party in recognition that such information would eventually become stale and unworthy of restriction. A different commenter, however, suggested that a two-year time limit would be too short because it would not appropriately encompass election activity that takes place throughout the six-year Senate election cycle. Another commenter advised that the time limit for common vendor activities should be limited to the period "during the calendar year in which the candidate's name is on the ballot for election to Federal office." One commenter proposed an alternative in which a vendor's services would not be covered by the rule outside of the 30 days following the time the vendor ceased working for the candidate or political party committee.

The Commission is retaining "election cycle" as the temporal limit in the final rules. The election cycle provides a clearly defined period of time that is reasonably related to an election. The mixture of an election cycle with a calendar year cutoff would likely cause confusion.

The fourth condition, in paragraph (d)(4)(iii), requires that the commercial

vendor "uses or conveys information about the candidate's campaign plans, projects, activities, or needs" or the political party committee's campaign plans, projects, activities, or needs where that information is material to the creation, production, or distribution of the communication. This requirement encompasses situations in which the vendor assumes the role of a conduit of information between a candidate or political party committee and the person making or paying for the communication, as well as situations in which the vendor makes use of the information received from the candidate or political party committee without actually transferring that information to another person. By referring in the final rule to the candidate's "campaign" plans, projects, activities, or needs, the Commission clarifies that this conduct standard is not intended to encompass lobbying activities or information that is not related to a campaign. The Commission notes, however, that to the extent information relates to campaign plans, projects, activities, or needs, that information would be covered by this provision even if that information also related to non-campaign plans, projects, activities, or needs of the candidate.

Several commenters opposed the inclusion of the "use or convey" requirement as being exceedingly difficult to prove, while other commenters viewed it as necessary protection against an unduly burdensome rule. Two of the commenters who supported a general presumption of coordination suggested that a confidentiality agreement might be used to rebut the presumption, while three others opposed a general presumption suggested that the Commission establish a safe harbor for spenders who enter into a confidentiality agreement filed under seal with the Commission. A different commenter suggested that the "use or convey" provision would be "unworkable" unless it provided for some form of exception for the use of an "ethical screen." Otherwise, according to that commenter, a single employee might "disqualify" an entire firm from providing services to both a candidate and a third-party spender.

The final rule does not require the use of any confidentiality agreement or ethical screen because it does not presume coordination from the mere presence of a common vendor. The final rule also does not dictate any specific changes to the business relationship between a vendor and its clients. The Commission does not anticipate that a person who hires a vendor and who, irrespective of BCRA's requirements, follows prudent business practices, will be inconvenienced by the final rule. Nevertheless, the Commission does not agree that the mere existence of a confidentiality agreement or ethical screen should provide a *de facto* bar to the enforcement of the limits on coordinated communication imposed by Congress. Without some mechanism to ensure enforcement, these private arrangements are unlikely to prevent the circumvention of the rules.

The Commission also sought comment on the list of common vendor services covered in paragraph (d)(4)(ii), and specifically whether purchasing advertising time slots for television, radio, or other media should be added to that list. Several commenters recommend excluding the following groups of vendor classes from those listed in the proposed rules on the principle that they lack adequate control as decisionmakers or they have little knowledge of communications: (1) "Media time buyers and others where the technical nature of their services diminishes their role in controlling the content of strategically sensitive communications;" (2) fundraisers; (3) vendors involved in selecting personnel, contractors, or subcontractors; (4) vendors involved in consulting; and (5) vendors involved in identifying or developing voter lists, mailing lists, or donor lists. A media buyer urged the Commission not to include media buyers in the list of covered activities because they have little decisionmaking authority and act within "predetermined strategic parameters including timing, geographic and demographic target audiences, and budget," but do not "create, produce, or distribute" a communication by themselves.

The Commission is incorporating the list of covered common vendor services into the final rules without change from its form in proposed section 109.21(d)(4)(ii) of the NPRM. The Commission recognizes that media buyers might potentially serve a number of different roles at the direction of various clients. Therefore, the Commission is not including "purchasing advertising time slots for television, radio, or other media" as a distinct category in the list of common vendor services covered in paragraph (d)(4)(ii). However, media buyers and other similar service providers are included to the extent that their services fit within one of the other categories already listed in paragraph (d)(4)(ii).

*E. 11 CFR 109.21(d)(5) Former Employee/Independent Contractor*

In BCRA, Congress required the Commission to address in its revised coordination rules "persons who previously served as an employee of" a candidate or political party committee." Public Law 107–155, sec. 214(c)(3) (March 27, 2002). In the NPRM, the Commission proposed 11 CFR 109.21 (d)(5) to implement this Congressional requirement. Proposed paragraph (d)(5) would have applied to communications paid for by a person who was previously an employee or an independent contractor of a candidate, authorized committee, or political party committee, or by the employer of such a person. Under the rule proposed in the NPRM, the "former employee" conduct standard would be satisfied if the former employee or independent contractor "makes use of or conveys" "material information" about the candidate's or political party committee's plans, projects, or needs to the person paying for the communication.

Commenters responding to the proposed rules made many of the same points about the "former employee" standard as they made with respect to the "common vendor" standard. One commenter opposed the proposal in the NPRM that covered the "use" of material information provided by a former employee. Such a standard, that commenter asserted, would be too broad and would amount to a "*per se*" rule that would lead to overly intrusive investigations. In contrast, four commenters argued that the proposed standard was not broad enough and suggested that the Commission establish a presumption of coordination when a former employee or an independent contractor of a campaign committee or political party committee pays for, or his or her current employer pays for, a communication that satisfies the content requirements of this section. These commenters argued that without such a presumption, it would be far too difficult to prove that an employee used material information or conveyed information to the new employer. In addition, however, three of these commenters suggested that the Commission limit the application of this presumption of coordination to a specified class of employees who are likely to "possess material political information." A different commenter indicated that it would be difficult to enforce this conduct standard because the definition of "independent contractor" in the NPRM was underinclusive in that it failed to account for the fact that an independent

contractor might reorganize or change names, making it difficult to verify the identity of the independent contractor or former employee. As with the potential reorganization of common vendors discussed above, the Commission does not believe that new requirements are necessary at this time to address the commenter's concerns. Employees and independent contractors are natural persons, rather than corporations or other entities or legal constructs, so the Commission anticipates that reorganization for the purpose of circumventing the new rules is even less likely than in the context of common vendors.

Three other commenters asserted that Congress had not mandated the proposed rule and expressed concern about the "increased risk of legal liability" for both party committees and former employees" that they believed would "stigmatize" the former employee and make it difficult for that person to find subsequent employment.

This proposed rule would have required that the employment or independent contractor relationship exist during the current election cycle. As discussed above with regard to paragraph (d)(4) on common vendors, the Commission requested comments on whether this time period should be a fixed two-year period, or the same election cycle, but not more than two years. Most comments on this provision were identical to the comments on the temporal requirements in paragraph (d)(4). One commenter believed the two-year time frame was "inappropriate and overly injurious both to corporations trying to communicate about legislative topics and to those former employees of candidates seeking employment with such corporations." In contrast, a different commenter suggested a six-year time period and asserted that the two-year period was too short to fully address the real-world practices in this area. Another commenter offered the same proposal the commenter had offered with respect to common vendors: the former employee should be covered during the calendar year in which the candidate's name is on the ballot for election to Federal office. A fourth commenter suggested that the time frame be limited to the previous two years of the current election cycle.

The final rule in paragraph (d)(5) incorporates the temporal limit of the "election cycle," which is defined in 11 CFR 100.3. This time limit establishes a clear boundary based on an existing definition and ensures that there is a clear link between the conveyance or use of the material information and the time period in which that material might be relevant. In addition, the Commission disagrees with the single commenter who claimed that the two-year limit would harm the job prospects of former employees or inhibit discussions between corporations and candidates or political party committees. The Commission notes that the final rule focuses only on the use or conveyance of information that is material to a subsequent communication and does not in any way prohibit or discourage the subsequent employment of those who have previously worked for a candidate's campaign or a political party committee.

One commenter proposed a "cooling off period" for a former employee instead of a temporal limit based on a calendar year or an election cycle. Under that proposed approach, the former employee or independent contractor of a candidate or political party would have to wait for a certain time period, which the commenter proposed as 30–60 days, before providing services to a person paying for a communication covered by section 109.21(c). After that period, the former employee or independent contractor would not trigger the proposed conduct standard. The Commission is unwilling to impose a complete ban on an individual's employment opportunities, as a "cooling off period" requirement would function. Instead, the Commission views the narrowly tailored approach proposed in the NPRM as preferable and is therefore not incorporating a "cooling off period" into the final rules.

This conduct standard expressly extends to an individual who had previously served as an "independent contractor" of a candidate's campaign committee or a political party committee. One commenter opposed the inclusion of independent contractors, arguing that an "independent contractor" is legally distinct from an "employee" and Congress, recognizing this distinction in other statutes, must have made an intentional decision to exclude independent contractors by using the term "employee" in section 214(c)(3). The Commission disagrees with this assumption and instead notes that the inclusion of independent contractors is entirely consistent with the use of "employee" because both groups receive some form of payment for services provided to the candidate, authorized committee or political party committee. Therefore, the Commission includes the term "independent contractor" in the final rule to preclude circumvention by the expedient of characterizing an "employee" as an "independent contractor" where the characterization makes no difference in the individual's relationship with the candidate or political party committee. This coordination standard also applies to the employer of an individual who was an employee or independent contractor of a candidate, authorized committee, or political party committee. The Commission interprets the Congressional intent behind section 214(c)(3) of BCRA to encompass situations in which former employees, who by virtue of their former employment have been in a position to acquire information about the plans, projects, activities, or needs of the candidate's campaign or the political party committee, may subsequently use that information or convey it to a person paying for a communication. The Commission has added the requirement that the information must be material to the subsequent communication in order to ensure that the conduct standard is not overly broad.

One commenter argued that the proposed rule's incorporation of the phrase "material information used * * * in providing services to the candidate" was vague and overly broad, and should be limited to material information about "campaign strategy and tactics," excluding policy views. This commenter also questioned whether the information must be material to the communication itself, or whether the information used to serve the candidate was material to those services. The Commission notes that in many cases the information may be material to both, but for the purposes of this final rule the Commission is only concerned with whether the information is material to the communication, not to the services previously provided to the candidate. As with the common vendor standard, this requirement encompasses both situations in which the former employee assumes the role of a conduit of information and situations in which the former employee makes use of the information but does not share it with the person who is paying for the communication.

The Commission is including this conduct standard to address what it understands to be Congress' primary concern, which is a situation in which a former employee of a candidate goes to work for a third party that pays for a communication that promotes or supports the former employer/candidate or attacks or opposes the former employer/candidate's opponent. One commenter proposed that the former employer (*i.e.*, the candidate's campaign or a political party committee) must be shown to exercise ongoing control over its former employee. A different

commenter, however, recognized that the Commission's proposed rules would address such a concern by removing the reporting duties that might otherwise be triggered by the actions of the former employee who acted without the knowledge of his or her former employer. This reporting rule is included in the final rules in 11 CFR 109.21(b)(2). This commenter, however, raised a similar concern by suggesting that the final rule should be limited to cover only former employees when they are acting under the direction or control of their new employer, the third-party spender, to ensure that the former employee does not use or convey material information without the spender's knowledge. The Commission notes, however, that such a limitation is unnecessary and confusing in cases where the former employee or independent contractor pays for the communication by himself or herself.

The conduct standard in the final rule in 11 CFR 109.21(d)(5) does not require that the former employee act under the continuing direction or control of, at the behest of, or on behalf of, his or her former employer. This is because a former employee who acts under such circumstances is a present agent, and the revised rules covering agents apply to this individual. See 11 CFR 109.3. To give effect to the statutory language requiring that the Commission's coordination regulations address "former employees" (*see* Pub. L. 107–155, sec. 214(c)(3)) the Commission concluded that a "former employee," as that term is used in the statute, must be different from "agent." Furthermore, the Commission does not find in BCRA, the FECA, or the general legal principles of employer-employee law, a need or justification for such an exception that would, in essence, categorically free employers from responsibility for the actions of their employees. Instead, the Commission reiterates its observation offered above with respect to the "common vendor" standard. Irrespective of the Congressional requirements in BCRA, employers may elect to clearly define the scope of employee responsibilities and to institute prudent policies or practices to ensure that the employee adheres to the scope of those expectations.

One commenter supported an exception to the "common vendor" and "former employee" conduct standards to permit persons in either of those classes to use or convey information if that vendor or former employee "makes use of information in a manner that is adverse to the candidate or political party committee without any coordination with the candidate benefiting from the communication." In the Commission's judgment, such an exception would obfuscate otherwise bright lines and provide a clear path for the circumvention of the Act and the Commission's regulations without offering a discernible benefit. Under the proposed exception, "use of information in a manner that is adverse to the candidate or political party committee" requires a subjective determination of both the interests of the candidate or political party and the effect that the "information" has on those interests.

The Commission also sought comment as to whether this conduct standard should be extended to volunteers, such as "fundraising partners," who by virtue of their relationship with a candidate or a political party committee, have been in a position to acquire material information about the plans, projects, activities, or needs of the candidate or political party committee. Three commenters opposed the inclusion of volunteers. One of these commenters argued that volunteers traditionally participate in more than one campaign at a time and "as a matter of practice, campaigns attempt to make volunteers feel more involved in the campaign by the intentional communication of 'insider' information." While the FECA exempts campaign volunteers from certain requirements, this "practice" of sharing "insider" information is not adequate justification to exclude volunteers. Rather, the Commission recognizes that some, but not all, "volunteers" operate as highly placed consultants who might be given information about the plans, projects, activities, or needs of the candidate or political party committee with the expectation that the "volunteer" will use or convey that information to effectively coordinate a communication paid for by that "volunteer" or by a third-party spender. Nevertheless, the Commission is not extending the scope of the "former employee" standard in its final rules to encompass volunteers for a different reason. The Commission views the choice of the word "employee" in section 214(c)(3) as a significant indication of Congressional intent that the regulations be limited to individuals who were in some way employed by the candidate's campaign or political party committee, either directly or as an independent contractor. The Commission also notes that even though volunteers are not subject to the "former employee" conduct standard, their actions could nonetheless come within a different conduct standard in new 11 CFR 109.21(d). For example, if a candidate requests that a volunteer pay for a communication, and the volunteer does so, the communication is coordinated if the content of the communication satisfies one or more of the content standards in new 11 CFR 109.21(c). Also, in some cases a volunteer may qualify as an agent of a candidate or a political party under the definition in new 11 CFR 109.3.

*F. 11 CFR 109.21(d)(6) Dissemination, Distribution, or Republication of Campaign Materials*

Paragraph (d)(6) clarifies the application of the conduct standards to a candidate or authorized committee after the initial preparation of campaign materials when those materials are subsequently disseminated, distributed, or republished, in whole or in part, by another person. In light of the candidate's initial role in preparing the campaign material that is subsequently incorporated into a republished communication, it is possible that the candidate's involvement in the original preparation of part or all of that content might be construed as triggering *per se* one or more of the conduct standards in paragraph (d) of 11 CFR 109.21. To avoid this result, the Commission is including 11 CFR 109.21(d)(6) in the final rules to clarify that the candidate's actions in preparing the original campaign materials are not to be considered in the conduct analysis of paragraph (d)(1) through (d)(3) of section 109.21. (See above). Instead, 11 CFR 109.21(d)(6) explains that the focus is on the conduct of the candidate that occurs after the initial preparation the campaign materials. For example, if a candidate requests or suggests that a supporter pay for the republication of a campaign ad, the resulting communication paid for by the supporter satisfies both a content standard (republication) and conduct standard (request or suggestion), and is therefore a coordinated communication. However, without that request or suggestion, and assuming no other contacts with the candidate, the candidate's authorized committee, or their agents, the communication does not satisfy the "request or suggestion" conduct standard and is not a coordinated communication even though it contains campaign material prepared by the candidate.

The final rules are being changed from the proposed rules to explain more clearly the application of the conduct standards in paragraphs (d)(4) and (d)(5) to republished campaign materials, as well as to clarify the relationship between paragraph (c)(2) and (d)(6) of

section 109.21 as well as between 11 CFR 109.37(a)(2)(i) and paragraph (d)(6) of section 109.21. The conduct standards in paragraph (d)(4) and (d)(5) would not be affected by (d)(6). Whereas a candidate's or authorized committee's original preparation of campaign materials might have possibly been misconstrued as satisfying the conduct standards in (d)(1) through (d)(3) without the addition of (d)(6), there is no such danger that the (d)(4) "common vendor" standard or the (d)(5) "former employee" standard would be satisfied by the candidate's or authorized committee's original preparation of campaign materials. However, to avoid any potential confusion, the second sentence in paragraph (d)(6) clarifies that a communication that satisfies the conduct standards in (d)(4) or (d)(5) is still a coordinated communication even if the communication only satisfies the content standard in paragraph (c)(2).

5. 11 CFR 109.21(e) No Requirement of Agreement or Formal Collaboration

When Congress, in BCRA, required the Commission to promulgate new regulations on coordinated communications, it specifically barred any regulatory requirement of "agreement or formal collaboration" to establish coordination. Public Law 107–155, sec. 214(c) (March 27, 2002). In the NPRM, the Commission noted that although Congress did not define this phrase, earlier versions of BCRA stated that "collaboration or agreement" was not required to show coordination. See S. 27, 107th Cong., 1st Sess. (as passed by the Senate and transferred to the House, 478 Cong. Rec. H2547 (May 22, 2001)). The phrase "agreement or formal collaboration" reached its final form through a substitute amendment to H.R. 2356 offered by Representative Shays. See H. Amdt. 417, 478 Cong. Rec. H393 through H492 (February 13, 2002). New 11 CFR 109.21(d) provides that each of the five conduct standards can be satisfied "whether or not there is agreement or formal collaboration, which is defined in paragraph (e)," thereby implementing the Congressional prohibition against any requirement of agreement or formal collaboration in the coordination analysis. The final rule follows the proposed rule, with only a small grammatical change.

One commenter supported a distinction between "formal collaboration" and "collaboration." Two other commenters strongly supported this paragraph as proposed in the NPRM. Another commenter recognized the Congressional prohibition on a requirement of agreement or formal collaboration, but urged the Commission to establish clear guidelines as to what is and is not permissible activity. The Commission attaches significance to the addition of the term "formal" as it modifies the term "collaboration." Thus, paragraph (e) states that the conduct standards in paragraph (d) of section 109.21 require some degree of collaboration, but not "formal" collaboration in the sense of being planned or systematically approved or executed.

New paragraph (e) also explains the term "agreement." Coordination under section 109.21 does not require a mutual understanding or meeting of the minds as to all, or even most, of the material aspects of a communication. Any agreement means the communication is not made "totally independently" from the candidate or party. See *Buckley*, 424 U.S. at 47. In the case of a request or suggestion under paragraph (d)(1) of section 109.21, agreement is not required at all.

A fourth commenter suggested that there should be no finding of coordination where "the organization was not seeking the candidate's agreement and would have run the ad anyway." This commenter recommended that the Commission further refine the requirement so that a communication is considered coordinated only if the request, agreement or collaboration of the candidate or political party is shown to lead the organization to change some aspect of the communication.

The Commission is not adopting either of these suggestions as they require a subjective determination of the intent of the spender and are therefore inconsistent with the Commission's approach of establishing clear guidance through objective determinations where possible. Paragraph (e) therefore does not require any particular form of investigation or finding, but simply implements the judgment of Congress by clarifying the two criteria that are not required.

6. 11 CFR 109.21(f) Safe Harbor for Responses to Inquiries About Legislative or Policy Issues

In the NPRM, the Commission requested comment on whether any specific "safe harbor" provisions or exceptions to the conduct or content standards should be included in the final rules. Commenters recommended a number of possible exceptions and safe harbors. As explained below, the Commission is including one of the proposed exceptions in its final rules in 11 CFR 109.21(f).

Several commenters urged the Commission to adopt an exception to the conduct standards for a candidate's response to an inquiry, whether in writing or other form, regarding his or her position on legislative or policy issues. These responses are helpful in preparing voter guides, voting records, in debates or other communications. One commenter cited constitutional considerations and argued that such an exception is required by *Clifton* v. *FEC*, 114 F.3d 1309 (1st Cir. 1997). Another advised that this exception would provide notice that the regulation is not intended to deter certain activities that groups or individuals "might otherwise avoid out of an abundance of caution." A different commenter advocated an exemption for any public communications, including republication of materials from candidates, their committees or political parties, that meet the criteria of 11 CFR 110.13 regarding candidate debates and forums, and 11 CFR 114.4(c) regarding voter registration drives and voter education.

In new section 109.21(f) the Commission is providing a "safe harbor" to address the commenters" concerns that the preparation of a voter guide or other inquiries about the views of a candidate or political party committee might satisfy one of the conduct standards in section 109.21(d). This safe harbor applies to inquiries regarding views on legislation or other policy issues, but does not include a response that conveys information about the candidate's or political party's campaign plans, projects, activities, or needs that is material to the creation, production, or distribution of a subsequent communication.

This exception satisfies the requirements of *Clifton* v. *FEC*, 114 F.3d 1309. See also new 11 CFR 114.4(c)(5), explained below. In *Clifton*, the Court examined the Commission's then-new regulations at 11 CFR 114.4(c)(4) and (5). The Commission's old regulations permitted corporations and labor organizations to prepare and produce "voter guides" to the general public, subject to the following prohibition:

> [T]he corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, except that questions may be directed in writing to the candidates included in the voter guide and the candidates may respond in writing;

11 CFR 114.4(c)(5)(ii)(A) (1996). While *Clifton* invalidated that regulation as unauthorized by the Act, 927 F. Supp. at 500, the Court nevertheless suggested that a safe harbor might have survived.

The safe harbor in new 11 CFR 109.21(f) is more permissive than the regulations at issue in *Clifton* in several respects. First, the regulations in section 109.21 do not institute a general prohibition on *any* contact with the candidate or political party committee, so paragraph (f) functions as a safe harbor from less-restrictive regulations. For example, organizations whose activities are confined to producing voter guides may contact a candidate and discuss aspects of that candidate's campaign plans, projects, activities, or needs without making a coordinated communication so long as the voter guide does not contain express advocacy and it is not directed to voters in a specific jurisdiction and made available within the designated time period directly before an election, as provided in paragraphs 109.21(c)(1) and (4). In addition, whereas the regulations at issue in *Clifton* specifically required that both the inquiry and the response be written, paragraph (f) does not.

Three commenters urged the Commission to adapt its rules to exclude lobbying contacts with a candidate. Similarly, a different commenter proposed an exception for any legislative communication made prior to a vote, hearing, or other legislative consideration of the issue, and that "coincidentally" occurs prior to an election. Another commenter also urged the Commission to exempt grassroots communications that urge the people to contact state, local or national officials urging them to take action in their official capacity so long as they do not refer to the election or an official's status or qualifications as a federal candidate.

The Commission has considered these possible exceptions as well as the statements of BCRA's principal sponsors that the Commission's regulations should not interfere with lobbying activities. Therefore, these final rules are not intended to restrict communications or discussions regarding pending legislation or other issues of public policy. The Commission has determined, however, that sufficient safeguards exist in the final rules to ensure that lobbying and other activities that are not reasonably related to elections will not be unduly restricted. Additional exceptions are unnecessary and inappropriate because they could be exploited to circumvent the requirements of 11 CFR part 109.

One commenter proposed an exemption for a "legislative communication" made during legislative consideration of an issue when the communication "coincidentally" occurs just before an election. This exemption is neither necessary nor workable, as it hinges on a complex analysis of several separate factors, as well as a determination of what qualifies as a "legislative communication." The potential number of communications that might satisfy the content standard, satisfy the conduct standard, and "coincidentally" occur just before an election is likely to be quite small in comparison to the potential number of communications that would actually be made for the purpose of influencing an election but carefully tailored to fit within the proposed exemption.

In addition, one commenter cautioned that exceptions are not appropriate to the extent that they apply to communications that meet the "electioneering communication" content standard. This commenter asserted that the plain language of the BCRA provides the Commission with little to no room to craft exceptions with respect to electioneering communications. The Commission disagrees that any such Congressional directive can be derived from plain language of BCRA in the context of coordinated electioneering communications.

*11 CFR 109.22 Who Is Prohibited From Making Coordinated Communications?*

The Commission requested comment on whether to include a separate section to clarify that any person who is otherwise prohibited under the Act from making a contribution or expenditure is also prohibited from making a coordinated communication. No comments addressed this provision. Section 109.22 is included in the final rules to avoid any potential misconception that 11 CFR 100.16, 11 CFR 109.23, or any portion of 11 CFR part 109 in any way permit a corporation, labor organization, foreign national, or other person to make a contribution or expenditure when that person is otherwise prohibited by any provision of the Act or the Commission's regulations from doing so.

*11 CFR 109.23 How Are Payments for the Dissemination, Distribution, or Republication of Candidate Campaign Materials Treated and Reported?*

The Commission has decided to implement only those regulatory changes that are necessary to implement section 214 of BCRA at this time. In the NPRM, the Commission proposed moving former 11 CFR 109.1(d) to proposed new section 11 CFR 100.57, along with several substantive changes. To whatever extent that proposed 11 CFR 100.57 would have elaborated on former 11 CFR 109.1(d), the Commission has reconsidered and instead is addressing the payments for the republication of campaign materials in new 11 CFR 109.23, which more closely follows former section 109.1(d). New section 109.23 implements post-BCRA 2 U.S.C. 441a(a)(7)(B)(iii), with several changes made to reflect new requirements in BCRA. Paragraph (a) of section 109.23 corresponds to former 11 CFR 109.1(d)(1), and paragraph (b) of section 109.23 addresses the exceptions in former 11 CFR 109.1(d)(2), in addition to several new exceptions.

1. 11 CFR 109.23(a) Financing of the Dissemination, Distribution, or Republication of Campaign Materials Prepared by a Candidate

Paragraph (a) of 11 CFR 109.23 addresses the financing of the dissemination, distribution, or republication of campaign materials prepared by the candidate, the candidate's authorized committee, or their agents and is the successor to former 11 CFR 109.1(d)(1). The only changes from the former rule are the replacement of one cross-reference to former 11 CFR 100.23 (repealed by Congress in BCRA), a clarification that a candidate does not receive or accept an in-kind contribution unless there is coordination, and minor grammatical changes. Paragraph (a) provides that the financing of the distribution, or republication of campaign materials prepared by the candidate, the candidate's authorized committee, or an agent of either is considered a contribution for the purposes of the contribution limitations and reporting responsibilities by the person making the expenditure but is not considered an in-kind contribution received or an expenditure made by the candidate or the candidate's authorized committee unless the dissemination, distribution, or republication of campaign materials is coordinated.

Under former 11 CFR 109.1(d)(1), coordination was determined by whether the dissemination, distribution, or republication of the campaign material qualified as a "coordinated general public political communication" under former 11 CFR 100.23, which was repealed by Congress in BCRA. Therefore, under new 11 CFR 109.23, whether the dissemination, distribution, or republication is coordinated is determined by reference to the new coordinated communication rules in 11 CFR 109.21 and 109.37.

As discussed above in the Explanation and Justification for 11 CFR 109.21(c)(2) and 109.21(d)(6), a

communication that disseminates, distributes, or republishes campaign material prepared by a candidate, the candidate's authorized committee, or an agent of either, and that satisfies one of the conduct standards in section 109.21(d), is a coordinated communication. Under 11 CFR 109.21(b), and by implication from paragraph (a) of section 109.23, the financing of such a "coordinated communication" is an in-kind contribution received by the candidate, authorized committee, or political party committee with whom or with which it was coordinated. In other words, the person financing the dissemination, distribution, or republication of candidate campaign material has provided something of value to the candidate, authorized committee, or political party committee. See 2 U.S.C. 431(8)(A)(i). Note that this is the same result under former section 109.1(d)(1). Even though the candidate, authorized committee, or political party committee does not receive cash-in-hand, the practical effect of this constructive receipt is that the candidate, authorized committee, or political party committee must report the in-kind contribution in accordance with 11 CFR 104.13, meaning that it must report the amount of the payment as a receipt under 11 CFR 104.3(a) and also as an expenditure under 11 CFR 104.3(b).

To the extent that the financing of the dissemination, distribution, or republication of campaign materials finances does not qualify as a coordinated communication, the candidate or authorized committee that originally prepared the campaign materials has no reporting responsibilities and has not received or accepted an in-kind contribution. However, whether or not the dissemination, distribution, or republication qualifies as a coordinated communication under 11 CFR 109.21, paragraph (a) of section 109.23, like former section 109.1(d)(1), requires the person financing such dissemination, distribution, or republication always to treat that financing, for the purposes of that person's contribution limits and reporting requirements, as an in-kind contribution made to the candidate who initially prepared the campaign material. In other words, the person financing the communication must report the payment for that communication if that person is a political committee or is otherwise required to report contributions. Furthermore, that person must count the amount of the payment towards that person's contribution limits with respect to that candidate under 11 CFR 110.1 (persons other than political committees) or 11 CFR 110.2 (multicandidate political committees), and with respect to the aggregate bi-annual contribution limitations for individuals set forth in 11 CFR 110.5.

Although paragraph (a) of 11 CFR 109.23 is nearly otherwise unchanged from former 11 CFR 109.1(d)(1), the new reference to 11 CFR 109.21 has an important impact because new section 109.21 reflects Congress's decision in post-BCRA 2 U.S.C. 441a(a)(7)(B)(ii) that expenditures may be coordinated with a political party committee. Therefore, the republication of campaign material may be coordinated with a political party committee. As explained above, the financing "*by any person* of the dissemination, distribution, or republication of campaign material prepared by a candidate *qualifies as an expenditure for the purposes of 2 U.S.C. 441a(a)(7)(B)(ii).*" *See* 2 U.S.C. 441a(a)(7)(B)(iii) (emphasis added.) Under 2 U.S.C. 441a(a)(7)(B)(ii), "expenditures" that are coordinated with a political party committee "shall be considered to be contributions made to such party committee." Thus, reading 2 U.S.C. 441a(a)(7)(B)(ii) and (iii) together, the Commission concludes that when a person coordinates with a political party committee to finance the dissemination, distribution, or republication of a candidate's campaign material, that financing constitutes a contribution to the political party committee. Therefore, under paragraph (a) of section 109.23, the financing of the dissemination, distribution, or republication of campaign material prepared by a candidate constitutes an in-kind contribution to a political party committee with which it was coordinated, and the amount of that financing must be reported by that political party committee as both an in-kind contribution received and an expenditure made. See 11 CFR 104.13. The Commission notes that section 109.23 does not encompass in this respect the dissemination, distribution, or republication of campaign material prepared by the political party committee, but only campaign material prepared by a candidate.

2. 11 CFR 109.23(b) Exceptions

In the NPRM, the Commission proposed several exceptions to the general "republication" rule proposed 11 CFR 100.57. Proposed 11 CFR 100.57(b) would have clarified that five listed uses of campaign material prepared by a candidate would not qualify as a contribution under proposed 11 CFR 100.57(a). The exceptions were largely drawn from uses already permitted by other rules.

Several commenters focused on the proposed exceptions or proposed additional exemptions. One commenter proposed that republication should not be considered a contribution unless there is coordination. The Commission does not discern any instruction from Congress, nor any other basis, that justifies such a departure from the Commission's longstanding interpretation of the underlying republication provision in the Act, now set forth at 2 U.S.C. 441a(a)(7)(B)(iii). The same commenter also inquired as to whether a corporation or labor organization may pay for the republication of campaign materials for use outside its restricted class, so long as that republication is not coordinated with a candidate under the applicable conduct standards set forth in 11 CFR 109.21(d) (see below). The Commission normally addresses specific inquiries about the application of particular provisions through its Advisory Opinion process, rather than in the rulemaking context, but the Commission takes this opportunity to emphasize that this rulemaking is not intended to change existing law with respect to the practices of corporations or labor organizations. See 11 CFR 109.22. Both the pre- and post-BCRA regulations provide that the financing of the dissemination, distribution, or republication of a candidate's campaign material constitutes a contribution to that candidate. Furthermore, such financing for activities outside the restricted class of a corporation or labor organization would also constitute an expenditure by the labor organization or corporation made in connection with an election for Federal office that would therefore be prohibited by 2 U.S.C. 441b(a). Therefore, a corporation or labor organization may not disseminate, distribute, or republish campaign materials except as provided in 11 CFR 114.3(c)(1).

The same commenter also proposed additional exceptions for paragraph (b) to cover republication and distribution of original campaign material that already exists in the public domain, such as presentations made by candidates, biographies, positions on issues or voting records. The Commission declines to promulgate a "public domain" exception because such an exception could "swallow the rule," given that virtually all campaign material that could be republished could be considered to be "in the public domain." In the event that a campaign retains the copyright to its campaign materials, and the campaign materials

are thus not in the public domain as a matter of law, this means that the republisher would presumably have to obtain permission from the campaign to republish the campaign materials, raising issues of authorization or coordination. See 11 CFR 110.11.

Similarly, a commenter suggested an exception to permit the "fair use" of campaign materials, which would presumably permit the republication of campaign slogans and other limited portions of campaign materials for analysis and other uses provided under the legal tests developed with respect to intellectual property law. This commenter also argued that the "fair use" exception should be available to supporters of the candidate who originally produced the materials, as well as that candidate's opponents.

The Commission, however, believes that a "fair use" exception could swallow the rule. Furthermore, the Commission notes that "fair use" is an exception in the intellectual property arena intended to protect literary, scholastic, and journalistic uses of material without infringing upon the intellectual property rights of those who created the material. The Commission declines to import this concept into the political arena where it would not serve to promote the same important purposes, and where the exceptions to the definitions of "contribution" and "expenditure" already address these concerns. See, *e.g.*, 11 CFR 100.73 and 100.132 (exceptions to the definition of "contribution" and "expenditure," respectively, for news stories, commentary, and editorials.) In the context of intellectual property law, the republication of another person's work is generally viewed as undesirable by the original author, thus the "fair use" exception provides a limited exception to the general limitations on such republication. In contrast, Congress has addressed republication of campaign materials through 2 U.S.C. 441a(a)(7)(B)(iii) in a context where the candidate/author generally views the republication of his or her campaign materials, even in part, as a benefit. Given the different purpose served by intellectual property law and campaign finance law, a "fair use" exception would be inappropriate and unworkable in the campaign arena. Additionally, the Commission believes that such legitimate benefits as would flow from a fair use exception are met through application of 11 CFR 109.23(b)(4).

The Commission is including the exceptions proposed in 100.57(b) in its final rules at CFR 109.23(b). Under 11 CFR 109.23(b)(1), a candidate or political party committee is permitted to disseminate, distribute, or republish its own materials without making a contribution. Paragraph (b)(2) exempts the use of material in a communication advocating the defeat of the candidate or party who prepared the material. For example, Person A does not make a contribution to Candidate B if Person A incorporates part of Candidate B's campaign material into its own public communication that advocates the defeat of Candidate B. However, if the same public communication also urged the election of Candidate B's opponent, Candidate C, and incorporated a picture or quote that had been prepared by Candidate C's campaign, then the result does constitute a contribution to Candidate C.

A third exception, in paragraph (b)(3), makes it clear that campaign material may be republished as part of a *bona fide* news story as provided in 11 CFR 100.73 or 11 CFR 100.132. In paragraph (b)(4), the Commission allows limited use of candidate materials in communications to illustrate a candidate's position on an issue.

Finally, in paragraph (b)(5), the Commission recognizes that a national, State, or subordinate committee of a political party makes a coordinated party expenditure rather than an in-kind contribution when it uses its coordinated party expenditure authority under 11 CFR 109.32 to pay for the dissemination, distribution, or republication of campaign material. This rule is based on former 11 CFR 109.1(d)(2), which provided that a State or subordinate party committee could engage in such dissemination, distribution, or republication as an agent designated by a national committee pursuant to former 11 CFR 110.7(a)(4), but is somewhat broader than former 11 CFR 109.1(d)(2).

**11 CFR Part 109, Subpart D—Special Provisions for Political Party Committees**

*11 CFR 109.30 How Are Political Party Committees Treated for Purposes of Coordinated and Independent Expenditures?*

A national, State, or subordinate committee of a political party may make expenditures up to prescribed limits in connection with the general election campaign of a Federal candidate that do not count against the committees' contribution limits. See 2 U.S.C. 441a(d). These expenditures are commonly referred to as "coordinated party expenditures." Political party committees, however, need not demonstrate actual coordination with their candidates to avail themselves of this additional spending authority. Nor are political party committees restricted as to the nature of the expenditures they may make on behalf of a candidate that are treated as coordinated party expenditures. Political party committees may also make independent expenditures. See *Colorado Republican Federal Campaign Committee* v. *Federal Election Commission,* 518 U.S. 604 (1996) ("Colorado I").

In BCRA, Congress set certain new restrictions on these "coordinated party expenditures" and related restrictions on political party committee independent expenditures. There are also certain new restrictions on transfers and assignments of coordinated party expenditure authorizations between party committees. 2 U.S.C. 441a(d)(4)(A) through (C).

Section 109.30 provides an introduction to subpart D of part 109 that states how political party committees are treated for purposes of coordinated and independent expenditures. This new section first clarifies that political party committees may make independent expenditures subject to the provisions of sections 109.35 and 109.36. (See discussion below.) Second, section 109.30 explains that political party committees may support candidates with coordinated party expenditures and states that these coordinated party expenditures are subject to limits that are separate from and in addition to the contribution limits at 11 CFR 110.1 and 110.2.

No comments were received on this section, and the final rule is unchanged from the proposed rule in the NPRM except that the reference to other 11 CFR part 109, subpart D provisions has been revised to exclude section 109.31.

*11 CFR 109.31 [Reserved]*

The Commission in the NPRM proposed rules at 11 CFR 109.30 to 109.37 regarding political party committees. The Commission is issuing final rules at 11 CFR 109.30 and 109.32 to 109.37, but not at 11 CFR 109.31. The reasons regarding proposed section 109.31 are set forth below.

Under FECA, certain political party committees have long been authorized to make what have come to be known as "coordinated party expenditures." 2 U.S.C. 441a(d). Although this term is used extensively (see, *e.g.*, the Commission's Campaign Guides), it is not formally defined in the Commission's regulations.

The Commission in the NPRM proposed a rule which would have defined "coordinated party expenditure" at 11 CFR 109.31. That proposed definition included payments

made by a national committee of a political party, including a national Congressional campaign committee, or a State committee of a political party, including any subordinate committee of a State committee, under 2 U.S.C. 441a(d) for anything of value in connection with the general election campaign of a candidate, including party coordinated communications defined at 11 CFR 109.37.

The Commission received two comments on section 109.31 in support of the proposed rule. One witness at the hearing criticized this provision, asserting that in conjunction with 11 CFR 109.20 this provision would subject everything political parties do to the coordinated party expenditure limits.

In light of the concern raised, the Commission's recognition that this rule is not required by BCRA, and in order to devote the Commission's resources to the rules that are most directly required by BCRA to be completed this calendar year, the Commission is not issuing a final rule at 11 CFR 109.31. Instead, the Commission is adding and reserving this section and may revisit the "coordinated party expenditures" definition in the future.

The Commission notes, however, that the term "coordinated party expenditures" does appear in the final rules at 11 CFR 109.23(b), 109.20(b), 109.30, 109.32, 109.33, 109.34, and 109.35. To prevent any confusion, the Commission clarifies in the absence of a definition at section 109.31 that the term "coordinated party expenditure" refers to an expenditure made by a political party committee pursuant to 2 U.S.C. 441a(d). The Commission stresses that it is not restricting the traditional flexibility political parties have had in making coordinated expenditures in support of their candidate.

*11 CFR 109.32 What Are the Coordinated Party Expenditure Limits?*

The Commission's restructuring of 11 CFR part 109 includes moving the coordinated party expenditure limits found at former 11 CFR 110.7(a) and (b) to 11 CFR 109.32. This new section retains the basic organizational structure of paragraphs (a) and (b) of former section 110.7, while making the revisions explained below. The final rule is unchanged from the proposed rule in the NPRM except where noted below.

1. 11 CFR 109.32(a) Coordinated Party Expenditure Limits for Presidential Elections

The Commission sets forth in paragraph (a) of section 109.32, in amended fashion, the coordinated party expenditure limit for the national committee of a political party for Presidential elections that appeared at former section 110.7(a). Because political party committees may also make independent expenditures, *Colorado I*, 518 U.S. at 618, the heading of paragraph (a) clarifies that the "expenditures" referred to in section 109.32 are "coordinated party expenditures." See 2 U.S.C. 441a(d). This clarification also appears in paragraphs (a)(1), (2), (3), and (4) of section 109.32.

Paragraph (a)(1) authorizes the national committee of a political party to make coordinated party expenditures in connection with the general election campaign of any candidate for President of the United States affiliated with the party. The final rule deletes the words "the party's" as surplusage that was inadvertently added into the proposed rule. Paragraph (a)(1) is the successor to former 11 CFR 110.7(a)(1) and is unchanged from that rule except for the clarification noted above.

Paragraph (a)(2) sets out the coordinated party expenditure limit, which is two cents multiplied by the voting age population of the United States, following former 11 CFR 110.7(a)(2). Paragraph (a)(2) of section 109.32 also states that this spending limit shall be increased in accordance with 11 CFR 110.17, which the Commission is adding to clarify that this spending limit is subject to increase. Section 110.17 is the successor to former 11 CFR 110.9(c). See Final Rules and Explanation and Justification for Contribution Limitations and Prohibitions, 67 FR 69,928 (November 19, 2002). Paragraph (a)(2) of section 109.32 also refers to 11 CFR 110.18, the definition of the term "voting age population," which is discussed below.

Paragraph (a)(3) provides that any coordinated party expenditure under paragraph (a) of this section is in addition to any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for President of the United States, as well as any contribution by the national committee to the candidate permissible under 11 CFR 110.1 or 110.2. Paragraph (a)(3) is the successor to former 11 CFR 110.7(a)(3) and is substantively unchanged from that rule.

Paragraph (a)(4) provides that any coordinated party expenditures made by the national committee of a political party pursuant to paragraph (a) of this section, or made by any other party committee under authority assigned by a national committee of a political party under 11 CFR 109.33, on behalf of that party's Presidential candidate shall not count against the candidate's expenditure limitations under 11 CFR 110.8. The only change to paragraph (a)(4) from the proposed rule is that the term "designated" has been changed to "assigned" in order to be consistent with the terminology applied in section 109.33.

Paragraph (a)(4) is the successor to former 11 CFR 110.7(a)(6), and is revised to clarify that only the national party committee has coordinated party expenditure authority for Presidential general elections and that any other political party committee making a coordinated party expenditure in such an election must be so assigned by the national committee.

2. 11 CFR 109.32(b) Coordinated Party Expenditure Limits for Other Federal Elections

Paragraph (b) of section 109.32 addresses coordinated party expenditures in other Federal elections, and is the successor to former 11 CFR 110.7(b). Paragraph (b) applies to the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, for Federal elections other than Presidential elections. As in paragraph (a) above, paragraph (b) clarifies that the "expenditures" referred to in paragraphs (b)(1), (2), and (4) are coordinated party expenditures.

Paragraph (b)(1) authorizes the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, to make coordinated party expenditures in connection with the general election campaign of a candidate for Federal office in that State who is affiliated with the party. The phrase "a candidate for Federal office in that State who is affiliated with the party" is changed from the phrase "the party's candidate for Federal office in that State" that was inadvertently included in the proposed rule. Paragraph (b)(1) is the successor to former 11 CFR 110.7(b)(1) and is unchanged from the previous rule except for the clarification noted above.

Paragraph (b)(2)(i) sets out the coordinated party expenditure limit for Senate candidates and for House candidates from a State that is entitled to only one Representative at the greater of two cents multiplied by the voting age population of the State or $20,000. Paragraph (b)(2)(ii) sets out the coordinated party expenditure limit for House candidates from any other State at $10,000. Paragraph (b)(2) follows

former 11 CFR 110.7(a)(2). Paragraph (b)(2) of section 109.32 also refers to 11 CFR 110.18, the definition of the term "voting age population," which is discussed below.

Paragraph (b)(3) provides that the spending limitations in paragraph (b)(2) shall be increased in accordance with 11 CFR 110.17, which is the successor to former 11 CFR 110.9(c). See Final Rules and Explanation and Justification for Contribution Limitations and Prohibitions, 67 FR 69,928 (November 19, 2002). The Commission is adding paragraph (b)(3) to the rule in order to clarify that this limit is subject to increase. The Commission is changing the citation to 11 CFR 110.17(c), as proposed in the NPRM, to a citation to 11 CFR 110.17, to make it consistent with the reference to section 110.17 in paragraph (a)(2) described above.

Paragraph (b)(4) provides that any coordinated party expenditure under paragraph (b) of this section shall be in addition to any contribution by a political party committee to the candidate permissible under 11 CFR 110.1 or 110.2. Paragraph (b)(4) of 11 CFR 109.32 is the successor to former 11 CFR 110.7(b)(3), and is unchanged apart from the clarification noted above and a clarification that the contributions referenced are those made by a political party committee.

The Commission received two comments on this section, one which supported the rule proposed in the NPRM and another which stated the commenter's agreement with the statement of the coordinated party expenditure limits set forth in 2 U.S.C. 441a(d).

*11 CFR 109.33 May a Political Party Committee Assign Its Coordinated Party Expenditure Authority to Another Political Party Committee?*

Section 109.33 restates and clarifies the pre-BCRA rule permitting assignment of coordinated party expenditure authority between political party committees. Section 109.33 replaces the authorizing provisions found in the pre-BCRA regulations at 11 CFR 110.7(a)(4) and (c); further changes to section 110.7 are addressed below.

In light of the new statutory restrictions on coordination and independent expenditures in BCRA, such assignments of coordinated party expenditure authority are prohibited under certain circumstances in which the assigning political party committee has made coordinated party expenditures (using part of the spending authority) and the intended assignee political party committee has made or intends to make independent expenditures with respect to the same candidate during an election cycle. See 2 U.S.C. 441a(d)(4)(C) and 11 CFR 109.35(c). Therefore, paragraph (a) of section 109.33 begins with a cross-reference to 11 CFR 109.35(c), which implements the statutory restrictions on assignments and transfers.

Paragraph (a) of section 109.33 restates the Commission's longstanding policy that a political party committee with authority to make coordinated party expenditures may assign all or part of that authority to other political party committees, and that this interpretation extends to both national and State committees of political parties. See Campaign Guide for Political Party Committees at p.16 (1996). Paragraph (a) of section 109.33 provides that coordinated party expenditure authority may be assigned only to other political party committees. See 2 U.S.C. 441a(d). Pre-BCRA 11 CFR 110.7(a)(4) indicated that coordinated expenditures may be made "through any *designated agent*, including State and subordinate party committees." [Emphasis added.] This limitation of assignment to other political party committees precludes possible circumvention of the new restrictions on transfers and assignments between political party committees found in BCRA. 2 U.S.C. 441a(d)(4)(B), (C). It is the Commission's understanding that, historically, political party committees have not assigned coordinated spending authority to entities that are not party committees, and thus this prophylactic measure should not adversely affect party committees.

Paragraph (a) provides that whenever a political party committee authorized to make coordinated party expenditures assigns another political party committee to use part or all of its spending authority, the assignment must be in writing, must specify a dollar amount, and must be made before the party committee receiving the assignment actually makes the coordinated party expenditure. In this respect, the rule codifies longstanding Commission interpretation. See Campaign Guide for Political Party Committees at p.16 (1996). This provision applies to both national and State party committees wishing to assign their 2 U.S.C. 441a(d) authority.

Paragraph (b) of section 109.33 is the successor to pre-BCRA 11 CFR 110.7(c). It provides that, for purposes of the coordinated spending limits, a State committee includes subordinate committees of the State committee. Unlike its predecessor, pre-BCRA section 110.7(c), paragraph (b) of section 109.33 covers district and local political party committees (see 11 CFR 100.14(b)) to the extent that a State committee assigns to them its coordinated spending authority, given that these district or local committees may not qualify as "subordinate State committees."

Paragraphs (b)(1) and (2) of section 109.33 restate with only minor non-substantive revision the pre-BCRA rule in 11 CFR 110.7(c)(1) and (2) setting out the State committees' methods of administering the coordinated party expenditure authority.

Paragraph (c) of section 109.33 sets forth recordkeeping requirements. This new paragraph (c) provides that a political party committee that assigns its authority to make coordinated party expenditures under this section, or that receives an assignment of coordinated expenditure authority, must maintain the written assignment for at least three years in accordance with 11 CFR 104.14. This three-year requirement is consistent with other recordkeeping requirements in the Act and in the Commission's regulations. See 2 U.S.C. 432(d); 11 CFR 102.9(c).

Although the Commission did not include this precise recordkeeping requirement in proposed section 109.33 in the NPRM, it sought comment more generally on whether to require political party committees to attach copies of written assignments to reports they file with the Commission, or to fax or e-mail them if they are electronic filers. The comments received regarding section 109.33, as described below, did not address the reporting issue.

The Commission has decided to require recordkeeping rather than reporting in section 109.33. Recordkeeping is less burdensome for political party committees and should provide sufficient documentation of assignments of coordinated party expenditure authority should questions subsequently arise. Indeed, the required maintenance of such documentation may serve a political party committee's own interest. See MUR 5246.

The Commission received two comments on this section as proposed in the NPRM. The commenters, while supporting the rule proposed in the NPRM, asserted that it should be made clear that nothing in the rule supersedes the prohibition on political party committees making both coordinated and independent expenditures with respect to a candidate after nomination. See 2 U.S.C. 441a(d)(4)(A); 11 CFR 109.35(b). The Commission does not intend for section 109.33 to supersede that prohibition, which is in the final rules at section 109.35(b). The Commission believes that section

109.35(b), in its final rule formulation, and section 109.35(c) referenced within section 109.33, serve to maintain the prohibition against circumvention through assignments of coordination party expenditure authority under section 109.33.

Finally, the Commission is making a non-substantive change from the NPRM in the title of section 109.33 in the final rule. The Commission is changing the word "limit" to "authority" in order to match the text of the rule. The only other changes to the NPRM aside from the addition of paragraph (c) are non-substantive changes to paragraphs (a) and (b).

*11 CFR 109.34 When May a Political Party Committee Make Coordinated Party Expenditures?*

Section 109.34 restates without substantive revision the pre-BCRA rule in 11 CFR 110.7(d) permitting a political party committee to make coordinated party expenditures in connection with the general election campaign before or after its candidate has been nominated. All pre-nomination coordinated expenditures continue to be subject to the coordinated party expenditure limitations, whether or not the candidate on whose behalf they are made receives the party's nomination. The Commission received one comment on this section, which supported the proposed rule.

*11 CFR 109.35 What Are the Restrictions on a Political Party Committee Making Both Independent Expenditures and Coordinated Party Expenditures in Connection With the General Election of a Candidate?*

In BCRA, Congress prohibits political party committees, under certain conditions, from making both coordinated party expenditures and independent expenditures with respect to the same candidate, and from making transfers and assignments to other political party committees. 2 U.S.C. 441a(d)(4). A critical threshold issue is identifying the political party committees to which these prohibitions apply. Congress provided that for the purposes of these new prohibitions, "all political committees established and maintained by a national political party (including all Congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State committee) shall be considered to be a single political committee." 2 U.S.C. 441a(d)(4)(B). Congress plainly intended to combine certain political party committees into a collective entity or entities for purposes of these prohibitions. 2 U.S.C. 441a(d)(4)(B).

1. 11 CFR 109.35(a) Applicability

In the NPRM, the Commission proposed a rule that divided a political party into a national group of political committees and various State and local groups of political committees for the purposes of implementing the BCRA provisions governing independent and coordinated expenditures by a political party. See 2 U.S.C. 441a(d)(4). The NPRM acknowledged the legislative history supporting a "single committee" interpretation that combined the national, State and local party committees, but proposed the "dual groups" interpretation in order to give the fullest possible effect to the transfer and assignment provision of the same statute. 67 FR at 60,054 (September 24, 2002). Under the transfer and assignment provision, a "committee of a political party" that makes coordinated party expenditures under 2 U.S.C. 441a(d) in connection with the general election campaign of a candidate must not, during that election cycle, transfer any funds to, assign authority to make coordinated party expenditures to, or receive a transfer from, "a committee of the political party" that has made or intends to make an independent expenditure with respect to that candidate. 2 U.S.C. 441a(d)(4)(C). The NPRM questioned whether, without more than one group or aggregation of political party committees, transfers or assignments between political party committees could occur as contemplated in section 441a(d)(4)(C).

Several commenters, including BCRA's principal sponsors, urged that the Commission adopt the "single committee" approach, asserting that it followed from the statutory language as well as the legislative history.

One commenter criticized the "single committee" approach as contrary to *Colorado I*, asserting that this Supreme Court decision permitted political party committees to make both coordinated and independent expenditures.

Several witnesses testifying at the hearing argued that treating all party committees as a single entity is impractical because party committees at the national or State level do not control party committees at lower levels in their organizations. These commenters complained that a local party committee under the "single committee" approach, by making an independent expenditure with respect to a candidate, could preclude the State or national party committee from making coordinated party expenditures with respect to that candidate.

No comments were received that supported the NPRM's "dual groups" approach, although two witnesses testified at the hearing that the dual approach would be preferable to the "single committee" approach (one of these commenters, however, also testified that the BCRA sponsors intended the "single committee" approach).

Commenters favoring the "single committee" approach suggested examples of how the transfer and assignment provision could be given meaningful effect. One commenter proposed that the transfer and assignment provision may apply prior to nomination, unlike the prohibition on making both coordinated and independent expenditures with respect to a candidate, which applies only after nomination. Two commenters suggested that the transfer and assignment provision could be read to prohibit a national party from making coordinated party expenditures with respect to a candidate prior to nomination and then transferring funds to a State party committee that would then try to make supposedly independent expenditures with respect to that candidate.

In the final rules, paragraph (a) of 11 CFR 109.35 generally tracks the statutory language in 2 U.S.C. 441a(d)(4)(B).

2. 11 CFR 109.35(b) Restrictions on Certain Coordinated and Independent Expenditures

Congress provided in BCRA that on or after the date on which a political party nominates a candidate, no "committee of the political party" may make: (1) Any coordinated expenditure under 2 U.S.C. 441a(d) with respect to the candidate during the election cycle at any time after it makes any independent expenditure with respect to the candidate during the election cycle; or (2) any independent expenditure with respect to the candidate during the election cycle at any time after it makes any coordinated expenditure under 2 U.S.C. 441a(d) with respect to the candidate during the election cycle. 2 U.S.C. 441a(d)(4)(A).

Section 109.35(b) generally tracks the statute.

As noted above, the result that any political party committee within the "single committee" could bind all the political party committees within the "single committee" was criticized by several commenters at the hearing. These commenters asserted that this result would preclude a national or State committee of a political party from making a coordinated party expenditure with respect to a nominee if a local

party committee first made an independent expenditure with respect to that same nominee, even of small size and without the State or national committee's prior knowledge or consent. The Commission notes the commenters' concerns, but points out that just that result is the apparent aim of the statute. 2 U.S.C. 441a(d)(4)(A).

3. 11 CFR 109.35(c) Restrictions on Certain Transfers and Assignments

Congress provided in BCRA that a "committee of a political party" that makes coordinated party expenditures with respect to a candidate shall not, during an election cycle, transfer any funds to, assign authority to make coordinated party expenditures under 2 U.S.C. 441a(d) to, or receive a transfer of funds from, a "committee of the political party" that has made or intends to make an independent expenditure with respect to the candidate. 2 U.S.C. 441a(d)(4)(C).

In the final rules, paragraph (c) of 11 CFR 109.35 generally tracks the statutory language in 2 U.S.C. 441a(d)(4)(C).

Finally, the Commission noted in the NPRM that it was not proposing specific rules to implement the statutory language in the transfer and assignment provision that a political party committee "intends to make" an independent expenditure with respect to a candidate. 2 U.S.C. 441a(d)(4)(C). The Commission received no comments on this issue and incorporates no specific language into section 109.35.

4. Impact of Political Party Committee Activity Carried Out Pursuant to Contribution Limits and Coordinated Party Expenditure Authority

2 U.S.C. 441a(d)(4) applies to coordinated party expenditures and to political party committee independent expenditures. Congress did not directly address political party committees' monetary and in-kind contributions to candidates that are subject to the contribution limits under 2 U.S.C. 441a(a) and 441a(h). See 2 U.S.C. 441a(d)(1) (*"Notwithstanding any other provision of law with respect to * * * limitations on contributions,* [political party committees] may make expenditures in connection with the general election campaign of candidates for Federal office, subject to the limitations contained [in this subsection]" [emphasis added]); 2 U.S.C. 441a(d)(4)(A) (addresses coordinated party expenditures made under section 441a(d) and does not directly address contributions). See also 11 CFR 109.30, 109.32.

Political party committees may make in-kind contributions to a candidate in the form of coordinated activity. See 2 U.S.C. 441a(a)(7)(B)(i) and 11 CFR 109.20, discussed above. The Commission notes that such coordination between a political party committee and a candidate may compromise the actual independence of any simultaneous or subsequent independent expenditures the political party committee may attempt with respect to that candidate. Similarly, coordinated party expenditures made by a political party committee with respect to a candidate prior to nomination, see 11 CFR 109.34, may be considered evidence that could compromise the actual independence of any simultaneous or subsequent independent expenditures the political party committee may attempt with respect to that candidate. See 11 CFR 109.35; *Buckley* v. *Valeo*, 424 U.S. at 47 (in striking down limits on independent expenditures, the Court described such expenditures as made *"totally* independently of the candidate and his campaign" [emphasis added]).

Finally, the title of section 109.35 in this Explanation and Justification has been altered from the NPRM to match the title in the rule.

*11 CFR 109.36 Are There Additional Circumstances Under Which a Political Party Committee Is Prohibited From Making Independent Expenditures?*

Prior to the enactment of BCRA, the Commission's rules prohibited a national committee of a political party from making independent expenditures in connection with the general election campaign of a candidate for President. See former 11 CFR 110.7(a)(5). In the NPRM, the proposed rule at 11 CFR 109.36 would have largely deleted this prohibition. The NPRM limited the remaining application of the prohibition to certain circumstances in which the national committee of a political party serves as the principal campaign committee or authorized committee of its Presidential candidate, as permitted under 2 U.S.C. 432(e)(3)(A)(i) and 441a(d)(2). See 11 CFR 102.12(c)(1) and 9002.1(c). Such a prohibition is consistent with 11 CFR 100.16(b) (redesignated from former section 109.1(e)) providing that no expenditure by an authorized committee of a candidate on behalf of that candidate shall qualify as an independent expenditure.

The Commission received several comments on this section, each of which urged the Commission to retain the prohibition at former 11 CFR 110.7(a)(5) regarding national party committee independent expenditures with respect to Presidential nominees. One commenter asserted that neither *Colorado I* nor BCRA require the deletion of the prohibition, and that in light of the significance of this issue, Congress would have expressly addressed it if Congress desired a change in the current regulation. The commenter noted that such a change in the rule is based upon a misinterpretation of BCRA, which should not be read as affirmatively authorizing political party committees to engage in any particular activity. Another commenter claimed that to allow in a broad fashion national party committees to make independent expenditures on behalf of their Presidential candidates is to invite abuse. The commenter stated that Presidential candidates and their parties are so inextricably intertwined as to preclude any meaningful possibility that one can operate "independently" of the other, and that the degree of coordination that exists between a national party committee and its Presidential candidate typically far exceeds even the level of coordination between a party committee and its congressional candidates.

The Commission acknowledges the concerns expressed in the comments but for the following reasons is including 11 CFR 109.36 in the final rules. First, the Commission does not believe it appropriate to retain in its rules a conclusive presumption of coordination after *Colorado I*. Even though *Colorado I* expressly involved only Congressional races, and arguably the likelihood of coordination may be greater between a national party committee and its Presidential nominee, the rule at section 109.36 is consistent with the Supreme Court's decision.

Second, the Commission concludes that Congress in BCRA effectively repealed the prohibition at 11 CFR 110.7(a)(5). See 2 U.S.C. 441a(d)(4). Under a new statutory provision, Congress prohibits political party committees from making both post-nomination independent expenditures and post-nomination coordinated expenditures in support of a candidate. See 2 U.S.C. 441a(d)(4)(A). A national party committee could thus make independent expenditures with respect to a candidate after nomination, if not prohibited under section 441a(d)(4)(A). See 11 CFR 109.35(a). Because this provision appears to apply equally to party committee expenditures on behalf of either Presidential or Congressional candidates, a national party committee may be able to make independent expenditures with respect to a

Presidential candidate under certain circumstances. Thus, while Congress did not specifically require the deletion of the prohibition at former 11 CFR 110.7(a)(5), the Commission has concluded that a provision within BCRA is consistent with that result. To the extent that BCRA, and *Colorado I* as discussed above, do not require the Commission to promulgate the rule at section 109.36, the Commission nonetheless exercises its discretion to do so as a permissible interpretation of BCRA and *Colorado I*.

Finally, the Commission notes that if coordination occurs between a national party committee and its Presidential nominee, it would negate the actual independence of independent expenditures the national party committee attempted with respect to that candidate. See *Buckley* v. *Valeo*, 424 U.S. at 47 (in striking down limits on independent expenditures, the Court described such expenditures as made "totally independently of the candidate and his campaign" [emphasis added]). The Commission recognizes that the ability of a national party committee to make such independent expenditures may be unlikely in practice, but the Commission's rules must allow for such a possibility, and as noted above, must reject a conclusive presumption that such expenditures are always coordinated.

Finally, section 109.36 contains one non-substantive change from the NPRM, and the title of section 109.36 in this Explanation and Justification has been slightly altered from the NPRM to match the title in the rule.

*11 CFR 109.37 What Is a "Party Coordinated Communication"?*

In BCRA, Congress required the Commission to promulgate new regulations on "coordinated communications" that are paid for by persons other than candidates, authorized committees of candidates, and party committees. Public Law 107–155, sec. 214(b), (c); see 11 CFR 109.21 above. Although Congress did not specifically direct the Commission to address coordinated communications paid for by political party committees, the Commission is doing so to give clear guidance to those affected by BCRA.

The Commission in the NPRM proposed a rule which would have been at 11 CFR 109.37, political party coordinated communications, using the same content and conduct standards as proposed in section 109.21 for coordinated communications by other persons.

The Commission received a number of comments on this proposal. The comments fall into two general categories. One group of commenters urged the Commission to defer this party coordinated communication rulemaking, arguing (1) that it is not strictly required by BCRA, (2) that the Commission should be focusing its resources at this time on the rulemaking most directly required by BCRA, and (3) that the comment period was a difficult time for the political parties to focus on the rulemaking because it was shortly before the 2002 general election. These commenters also asserted that party coordinated communications is a complicated subject area, citing the many questions posed in the NPRM in their claim that the Commission should defer this rulemaking.

On the substance of the proposed rule, this group of commenters testified at the hearing that the proposed content and conduct standards were both overbroad. (See the discussion above regarding 11 CFR 109.21). These commenters noted that any coordination standard for political party committees must allow for the regular contacts between a political party committee and its candidates. Another commenter raised an equal protection argument, asserting that a regulation that on its face appears to treat political party committees the same as other persons may as a practical matter have an unequal impact on the political parties.

The other group of commenters relied on the relationship between a political party committee and its candidates for the assertion that the Commission should promulgate a party coordinated communication rule using a rebuttable presumption that the communications are coordinated with candidates. These commenters stated that this presumption could be rebutted by a showing of actual independence. One commenter believed that the Commission's rule should describe ways in which a political party committee could establish its independence from a candidate. Another commenter noted that *Colorado I*, which struck down a conclusive presumption of coordination, does not prevent the use of a rebuttable presumption, and that such a rule is necessary to ensure that political party committee independent expenditures are in fact "totally independent" from candidates as required by the Supreme Court in *Buckley*.

While the Commission recognizes that Congress in BCRA did not specifically direct the Commission to address coordinated communications paid for by political party committees, the Commission is doing so to give clear guidance to those affected by BCRA. Congress determined to regulate political party committees' independent expenditures and coordinated party expenditures, and thus it is appropriate and useful for the Commission to promulgate rules at this time detailing standards for party coordinated communications. See 2 U.S.C. 441a(d)(4) and 11 CFR 109.35, discussed above.

The Commission is promulgating final rules similar to those in proposed section 109.37, generally applying the same regulatory analysis to communications paid for by the political party committees that is applied to communications paid for by other persons. See 11 CFR 109.21(a) through (f). This analysis determines when communications paid for by a political party committee are considered to be coordinated with a candidate, a candidate's authorized committee, or their agents.

Following 11 CFR 109.21(a), section 109.37(a) defines the circumstances in which communications paid for by political party committees are considered to be coordinated with a candidate, a candidate's authorized committee, or agents of any of the foregoing. Under 11 CFR 109.37(a)(1) through (3), such communications are deemed to be "party coordinated communications" when they were paid for by a political party committee or its agent, satisfy at least one of the content standards in section 109.37(a)(2)(i) through (iii), and satisfy at least one of the conduct standards in 11 CFR 109.21(d)(1) through (d)(6), subject to the provisions of 11 CFR 109.21(e) and other conditions.

The party coordinated communication content standards in section 109.37(a)(2)(i) through (iii) are adopted from 11 CFR 109.21(c)(2) through (c)(4). The first content standard, at paragraph (a)(2)(i) of section 109.37, is a public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). The Commission also provides in this content standard that for a communication that satisfies this standard, see the conduct standard in 11 CFR 109.21(d)(6), under which the communication is evaluated. See the discussion above of 11 CFR 109.21(c)(2). This content standard at 11 CFR 109.37(a)(2)(i) for party coordinated communications is the same as the standard set forth for coordinated

communications by other persons in 11 CFR 109.21(c)(2).

The second content standard, at paragraph (a)(2)(ii) of section 109.37, is a public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office. This content standard for party coordinated communications is identical to the standard set forth for coordinated communications by other persons in 11 CFR 109.21(c)(3).

The third content standard, at paragraph (a)(2)(iii) of section 109.37, is a public communication that (1) refers to a clearly identified candidate for Federal office; (2) is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and (3) is directed to voters in the jurisdiction of the clearly identified candidate. 11 CFR 109.37(a)(2)(iii)(A)–(C). See the discussion above of 11 CFR 109.21(c)(4). This content standard at section 109.37(a)(2)(iii) is based on the content standard at section 109.21(c)(4) but limits its coverage to communications that refer to a clearly identified candidate for Federal office.

Finally, the Commission notes that the content standard at 11 CFR 109.21(c)(1), coordinated electioneering communications, is not applied to party coordinated communications because electioneering communications, as defined, exclude communications which constitute expenditures under the Act, which includes political party committee expenditures. See 2 U.S.C. 434(f)(3)(B)(ii); 11 CFR 100.29(c)(3).

For the conduct standards for party coordinated communications, in paragraph (a)(3) of section 109.37, the Commission refers to the conduct standards set forth in 11 CFR 109.21(d)(1) through (d)(6), subject to the provisions of 11 CFR 109.21(e) and other conditions. As in 11 CFR 109.21(d), agreement or formal collaboration is not necessary for a finding that a communication is coordinated. See the discussion above of 11 CFR 109.21(d) and (e). Further, paragraph (a)(3) of section 109.37 provides that a candidate's response to an inquiry about that candidate's positions on legislative or policy issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards in 11 CFR 109.21(d)(1) through (d)(6). This safe harbor parallels the safe harbor at 11 CFR 109.21(f). See the discussion above of 11 CFR 109.21(f).

The Commission also addresses in paragraph (a)(3) of section 109.37 circumstances in which the in-kind contribution results solely from conduct in 11 CFR 109.21(d)(4) or (d)(5). Under these circumstances, the candidate does not receive or accept an in-kind contribution and is not required to report an expenditure. See the discussion above regarding 11 CFR 109.21(b)(2).

Paragraph (b) of section 109.37 explains the treatment of party coordinated communications. This paragraph provides that political party committees must treat payments for communications coordinated with candidates as either in-kind contributions or coordinated party expenditures.

The Commission excepts from 11 CFR 109.37(b) such payments that are otherwise excepted from the definitions of "contribution" and "expenditure" found at 11 CFR part 100 subparts C and E. For example, the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card, sample ballot, palm card, or other printed listing(s) of three or more candidates for any public office for which an election is held in the State in which the committee is organized is not a contribution or an expenditure. 11 CFR 100.80 and 100.140. Thus, if such communications were coordinated with candidates, the payments for such communications would not be treated as either in-kind contributions or as coordinated party expenditures.

For such a payment that a political party committee treats as an in-kind contribution, paragraph (b)(1) of section 109.37 states that it is made for the purpose of influencing a Federal election. See the discussion above regarding 11 CFR 109.21(b).

For such a payment that a political party committee treats as a coordinated party expenditure, paragraph (b)(2) of section 109.37 states that such expenditure is made pursuant to coordinated party expenditure authority under 11 CFR 109.32 in connection with the general election campaign of the candidate with whom it was coordinated.

Finally, paragraphs (b)(1) and (b)(2) of section 109.37 each refer to the reporting obligations flowing from party coordinated communications under 11 CFR part 104.

*11 CFR 110.1 Contributions by Persons Other Than Multicandidate Political Committees*

The Commission clarifies that the section 110.1 limitations on contributions to political committees making independent expenditures apply to contributions made by persons other than multicandidate committees to political party committees that make independent expenditures. See 11 CFR 110.1(n). Paragraph 110.1(n) replaces pre-BCRA paragraph (d)(2) of section 110.1 regarding the application of the contribution limits to contributions to committees that make independent expenditures.

This section is being updated because under pre-BCRA paragraph (d)(2) of section 110.1, the Commission recognized that political committees other than party committees may make independent expenditures, but did not contemplate party committees doing so. See *Colorado I,* 518 U.S. at 618. For example, national party committees may receive contributions aggregating $20,000 per year from individuals, a contribution limit that Congress increased to $25,000 for contributions made on or after January 1, 2003. See 2 U.S.C. 441a(a)(1)(B). Consequently, under BCRA, the $20,000 ($25,000) contribution limit continues to apply when the recipient national party committee uses the contribution to make independent expenditures. The Commission notes that 11 CFR 110.1(h) regarding contributions to political committees supporting the same candidate, remains unchanged except to state that the support to candidates by political party committees may include independent expenditures. The Commission received no comments on this section.

Additional changes to 11 CFR 110.1 are addressed in a separate rulemaking on BCRA's increased contribution limits. See Final Rules and Explanation and Justification for Contribution Limitations and Prohibitions, 67 FR 69,928 (November 19, 2002).

*11 CFR 110.2 Contributions by Multicandidate Political Committees*

The Commission clarifies that the section 110.2 limitations on contributions to political committees making independent expenditures apply to contributions made by multicandidate committees to political party committees that make independent expenditures. See 11 CFR 110.2(k). Paragraph 110.2(k) replaces pre-BCRA paragraph (d)(2) of section 110.2 regarding the application of the contribution limits to contributions to

committees that make independent expenditures.

This section is being updated for the reasons set forth above in the discussion regarding 11 CFR 110.1. The Commission received no comments on this section.

Additional changes to 11 CFR 110.2 were addressed in a separate rulemaking on BCRA's increased contribution limits. See Final Rules and Explanation and Justification for Contribution Limitations and Prohibitions, 67 FR 69,928 (November 19, 2002).

*11 CFR 110.7   Removed and Reserved*

The pre-BCRA regulations at 11 CFR 110.7 contained the coordinated party expenditure limits and related provisions. As explained above, the Commission is moving section 110.7, in amended form, to 11 CFR part 109, subpart D. Specifically, the provisions in section 110.7 are revised and redesignated as follows: 11 CFR 110.7(a) and (b) to 11 CFR 109.32(a) and (b) and 109.36; 11 CFR 110.7(c) to 11 CFR 109.33; and 11 CFR 110.7(d) to 11 CFR 109.34.

*11 CFR 110.8   Presidential Candidate Expenditure Limitations*

As in 11 CFR 109.32(a) and (b) discussed above, the Commission clarifies that the expenditure limits for publicly funded Presidential candidates are increased in accordance with 11 CFR 110.17. See 11 CFR 110.8(a)(2). To accommodate this new section 110.8(a)(2), the Commission is re-designating pre-BCRA paragraphs (a)(1) and (a)(2) as (a)(1)(i) and (a)(1)(ii), respectively.

In 11 CFR 110.8(a)(3), the Commission references the definition of "voting age population" at 11 CFR 110.18. The voting age population is a factor in the calculation of expenditure limitations in 11 CFR 110.8(a). No commenters addressed this section.

The Commission also made additional changes to 11 CFR 110.9(c) in a separate rulemaking, including moving it to 11 CFR 110.17. See Final Rules and Explanation and Justification for Contribution Limitations and Prohibitions, 67 FR 69,928 (November 19, 2002).

*11 CFR 110.14   Contributions to and Expenditures by Delegates and Delegate Committees*

In light of the Congressional repeal of former 11 CFR 100.23, the removal of the separate definition of "independent expenditure" under 11 CFR 109.1, and the removal of 11 CFR 109.2, see Final Rules and Explanation and Justification for Bipartisan Campaign Reform Act of

2002 Reporting, published elsewhere in this issue of the **Federal Register**, the Commission is making several necessary technical revisions to 11 CFR 110.14. These technical revisions were not originally proposed in the NPRM. Within 11 CFR 110.14, the Commission is replacing all references to a "coordinated general public political communication under 11 CFR 100.23" with references to "coordinated communication under 11 CFR 109.21." In addition, the Commission is replacing all citations to former 11 CFR 109.2 with citations to 11 CFR 109.10. Finally, the Commission is replacing all references to independent expenditures under 11 CFR part 109 with references to independent expenditures under 11 CFR 100.16 to reflect the removal of the definition of "independent expenditure" in former 11 CFR 109.1.

*11 CFR 110.18   Voting Age Population*

The Commission is moving pre-BCRA section 110.9(d) regarding voting age population ("VAP") to 11 CFR 110.18 as part of a reorganization of section 110.9. This provision is referenced in sections 109.32(a) and (b) (coordinated party expenditure limits) and 110.8(a)(3) (Presidential candidate expenditure limits) where the VAP is used as a factor in calculating the limits. Section 110.18 is revised from pre-BCRA section 110.9(d) to clarify that the Secretary of Commerce each year certifies to the Commission and publishes in the **Federal Register** an estimate of the VAP pursuant to 2 U.S.C. 441a(e). No comments addressed this provision.

Changes to the other provisions of section 110.9, including paragraph (c) of this section, are addressed in a separate rulemaking. See Final Rules and Explanation and Justification for Contribution Limitations and Prohibitions, 67 FR 69,928 (November 19, 2002).

*11 CFR 114.4   Disbursements for Communications Beyond the Restricted Class in Connection With a Federal Election*

Paragraph (c)(5) of section 114.4 pertains to voter guides paid for by corporations and labor organizations. The Commission makes several changes to this paragraph to conform with other regulatory changes in response to BCRA.

The pre-BCRA version of paragraphs (c)(5)(i) and (ii) of section 114.4 provided that a corporation or labor organization must not, among other things, "contact" a candidate in the preparation of a voter guide, except in writing. In this rulemaking, the Commission is promulgating a safe harbor in the coordination rules that

allows a person, such as a corporation or labor union, to contact a candidate to inquire about the candidate's positions on legislative or policy issues without a subsequent communication paid for by that person being deemed coordinated with the candidate (assuming there are no other actions resulting in coordination). See 11 CFR 109.21(f) and the above discussion relating to this provision.

Accordingly, paragraph (c)(5)(i) of section 114.4 is being amended to delete the prohibition against any contact with a candidate in the preparation of a voter guide.

Paragraph (c)(5)(ii) of section 114.4 is being amended to delete the requirement that contact with the candidate be in writing.

The Commission is also making several non-substantive changes to paragraphs (c)(5)(i) and (ii) of section 114.4 to conform these provisions to the statutory provisions on which they are based. Compare 2 U.S.C. 441a(a)(7)(B) with 11 CFR 114.5(c)(5)(i) and (ii).

The Commission received three comments on this section, all of which urged the Commission to include an exception to the coordination standard at 11 CFR 109.21 for inquiries to candidates in connection with voter guides. The Commission is including the described safe harbor at 11 CFR 109.21(f) to address this concern.

The Commission notes that an appeals court in one circuit invalidated portions of pre-BCRA 11 CFR 114.4(c)(5). See *Clifton* v. *Federal Election Commission*, 927 F. Supp. 493 (D. Me. 1996), *modified in part and remanded in part*, 114 F.3d 1309 (1st Cir. 1997), *cert. denied*, 522 U.S. 1108 (1998). Subsequently a Petition for Rulemaking asked the Commission to repeal its voter guide regulation. See Notice of Availability, 64 FR 46,319 (Aug. 25, 1999). The Commission's present rulemaking consists of changes necessitated by BCRA, although any additional changes to the voter guide regulations could be addressed in a future rulemaking.

**Certification of No Effect Pursuant to 5 U.S.C. 605(b) [Regulatory Flexibility Act]**

The Commission certifies that the attached rules will not have a significant economic impact on a substantial number of small entities. The basis of this certification is that the national, State, and local party committees of the two major political parties, and other political committees are not small entities under 5 U.S.C. 601 because they are not small businesses, small organizations, or small governmental

jurisdictions. Further, individual citizens operating under these rules are not small entities.

To the extent that any political committee may fall within the definition of "small entities," their numbers are not substantial, particularly the number that would coordinate expenditures with candidates or political party committees in connection with a Federal election.

In addition, the small entities to which the rules apply will not be unduly burdened by the proposed rules because there is no significant extra cost involved, as any new potential recordkeeping responsibilities would be minimal and optional. Any commercial vendors whose clients include campaign committees or political party committees were previously subject to different rules regarding coordination, and will not experience a significant economic impact as a result of the new rules because the requirements of these new rules are no more than what is necessary to comply with the new statute enacted by Congress.

**Derivation Table**

The following derivation table identifies the new sections in parts 100, 109, and 110 and the corresponding pre-BCRA rules that addressed those subject areas.

| New section | Old section |
|---|---|
| 100.16(b) | 109.1(e). |
| 109.1 | New. |
| 109.3 | 109.1(b)(5). |
| 109.11 | 109.3. |
| 109.20 | 109.1(c). |
| 109.21 | New. |
| 109.22 | New. |
| 109.23 | 109.1(d). |
| 109.30 | New. |
| 109.31 | New—Reserved. |
| 109.32(a) | 110.7(a) (except para. (a)(4) and para. (a)(5)). |
| 109.32(b) | 110.7(b). |
| 109.33 | 110.7(a)(4) and (c). |
| 109.34 | 110.7(d). |
| 109.35 | New. |
| 109.36 | 110.7(a)(5). |
| 109.37 | New. |
| 110.1(n) | New. |
| 110.2(k) | New. |
| 110.8(a)(2) | New. |
| 110.8(a)(3) | New. |
| 110.18 | 110.9(d). |

**List of Subjects**

*11 CFR Part 100*

Elections.

*11 CFR Part 102*

Political committees and parties, reporting and recordkeeping requirements.

*11 CFR Part 109*

Elections, reporting and recordkeeping requirements.

*11 CFR Part 110*

Campaign funds, political committees and parties.

*11 CFR Part 114*

Business and industry, elections, labor.

For the reasons set out in the preamble, subchapter A of chapter 1 of title 11 of the Code of Federal Regulations is amended as follows:

## PART 100—SCOPE AND DEFINITIONS

1. The authority citation for part 100 is revised to read as follows:

**Authority:** 2 U.S.C. 431, 434, and 438(a)(8).

2. Section 100.16 is revised to read as follows:

**§ 100.16 Independent expenditure (2 U.S.C. 431(17)).**

(a) The term *independent expenditure* means an expenditure by a person for a communication expressly advocating the election or defeat of a clearly identified candidate that is not made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents. A communication is "made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents" if it is a coordinated communication under 11 CFR 109.21 or a party coordinated communication under 11 CFR 109.37.

(b) No expenditure by an authorized committee of a candidate on behalf of that candidate shall qualify as an independent expenditure.

(c) No expenditure shall be considered independent if the person making the expenditure allows a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents to become materially involved in decisions regarding the communication as described in 11 CFR 109.21(d)(2), or shares financial responsibility for the costs of production or dissemination with any such person.

**§ 100.23 [Reserved.]**

3. Remove and reserve § 100.23.

## PART 102—REGISTRATION, ORGANIZATION, AND RECORDKEEPING BY POLITICAL COMMITTEES (2 U.S.C. 433)

4. The authority citation for Part 102 continues to read as follows:

**Authority:** 2 U.S.C. 432, 433, 434(a)(11), 438(a)(8), and 441d.

5. Section 102.6(a)(1)(ii) is revised to read as follows:

**§ 102.6 Transfers of funds; collecting agents.**

(a) * * *

(1) * * *

(ii) Subject to the restrictions set forth at 11 CFR 109.35(c), 300.10(a), 300.31 and 300.34(a) and (b), transfers of funds may be made without limit on amount between or among a national party committee, a State party committee and/or any subordinate party committee whether or not they are political committees under 11 CFR 100.5 and whether or not such committees are affiliated.

* * * * *

6. Part 109 is revised to read as follows:

## PART 109—COORDINATED AND INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 441a(a) and (d), and Pub. L. 107–155 sec. 214(c))

Sec.

**Subpart A—Scope and Definitions**

109.1 When will this part apply?
109.2 [Reserved]
109.3 Definitions.

**Subpart B—Independent Expenditures**

109.10 How do political committees and other persons report independent expenditures?
109.11 When is a "non-authorization notice" (disclaimer) required?

**Subpart C—Coordination**

109.20 What does "coordinated" mean?
109.21 What is a "coordinated communication"?
109.22 Who is prohibited from making coordinated communications?
109.23 Dissemination, distribution, or republication of candidate campaign materials.

**Subpart D—Special Provisions for Political Party Committees**

109.30 How are political party committees treated for purposes of coordinated and independent expenditures?
109.31 [Reserved]
109.32 What are the coordinated party expenditure limits?
109.33 May a political party committee assign its coordinated party expenditure authority to another political party committee?

109.34 When may a political party committee make coordinated party expenditures?
109.35 What are the restrictions on a political party making both independent expenditures and coordinated party expenditures in connection with the general election of a candidate?
109.36 Are there additional circumstances under which a political party committee is prohibited from making independent expenditures?
109.37 What is a "party coordinated communication"?

**Authority:** 2 U.S.C. 431(17), 434(c), 438(a)(8), 441a, 441d; Sec. 214(c) of Pub. L. 107–155, 116 Stat. 81.

## Subpart A—Scope and Definitions

### § 109.1 When will this part apply?

This part applies to expenditures that are made independently from a candidate, an authorized committee, a political party committee, or their agents, and to those payments that are made in coordination with a candidate, an authorized committee, a political party committee, or their agents. The rules in this part explain how these types of payments must be reported and how they must be treated by candidates, authorized committees, and political party committees. In addition, subpart D of part 109 describes procedures and limits that apply only to payments, transfers, and assignments made by political party committees.

### § 109.2 [Reserved]

### § 109.3 Definitions.

For the purposes of 11 CFR part 109 only, agent means any person who has actual authority, either express or implied, to engage in any of the following activities on behalf of the specified persons:

(a) In the case of a national, State, district, or local committee of a political party, any one or more of the activities listed in paragraphs (a)(1) through (a)(5) of this section:

(1) To request or suggest that a communication be created, produced, or distributed.

(2) To make or authorize a communication that meets one or more of the content standards set forth in 11 CFR 109.21(c).

(3) To create, produce, or distribute any communication at the request or suggestion of a candidate.

(4) To be materially involved in decisions regarding:

(i) The content of the communication;

(ii) The intended audience for the communication;

(iii) The means or mode of the communication;

(iv) The specific media outlet used for the communication;

(v) The timing or frequency of the communication; or,

(vi) The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

(5) To make or direct a communication that is created, produced, or distributed with the use of material or information derived from a substantial discussion about the communication with a candidate.

(b) In the case of an individual who is a Federal candidate or an individual holding Federal office, any one or more of the activities listed in paragraphs (b)(1) through (b)(6) of this section:

(1) To request or suggest that a communication be created, produced, or distributed.

(2) To make or authorize a communication that meets one or more of the content standards set forth in 11 CFR 109.21(c).

(3) To request or suggest that any other person create, produce, or distribute any communication.

(4) To be materially involved in decisions regarding:

(i) The content of the communication;

(ii) The intended audience for the communication;

(iii) The means or mode of the communication;

(iv) The specific media outlet used for the communication;

(v) The timing or frequency of the communication;

(vi) The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

(5) To provide material or information to assist another person in the creation, production, or distribution of any communication.

(6) To make or direct a communication that is created, produced, or distributed with the use of material or information derived from a substantial discussion about the communication with a different candidate.

## Subpart B—Independent Expenditures

### § 109.10 How do political committees and other persons report independent expenditures?

(a) Political committees, including political party committees, must report independent expenditures under 11 CFR 104.4.

(b) Every person that is not a political committee and that makes independent expenditures aggregating in excess of $250 with respect to a given election in a calendar year shall file a verified statement or report on FEC Form 5 in accordance with 11 CFR 104.4(e) containing the information required by paragraph (e) of this section. Every person filing a report or statement under this section shall do so in accordance with the quarterly reporting schedule specified in 11 CFR 104.5(a)(1)(i) and (ii) and shall file a report or statement for any quarterly period during which any such independent expenditures that aggregate in excess of $250 are made and in any quarterly reporting period thereafter in which additional independent expenditures are made.

(c) Every person that is not a political committee and that makes independent expenditures aggregating $10,000 or more with respect to a given election any time during the calendar year up to and including the 20th day before an election, must report the independent expenditures on FEC Form 5; or by signed statement if the person is not otherwise required to file electronically under 11 CFR 104.18. (See 11 CFR 104.4(f) for aggregation.) The person making the independent expenditures aggregating $10,000 or more must ensure that the Commission receives the report or statement by 11:59 p.m. Eastern Standard/Daylight Time on the second day following the date on which a communication is publicly distributed or otherwise publicly disseminated. Each time subsequent independent expenditures relating to the same election aggregate an additional $10,000 or more, the person making the independent expenditures must ensure that the Commission receives a new 48-hour report of the subsequent independent expenditures. Each 48-hour report must contain the information required by paragraph (e)(1) of this section.

(d) Every person making, after the 20th day, but more than 24 hours before 12:01 a.m. of the day of an election, independent expenditures aggregating $1,000 or more with respect to a given election must report those independent expenditures and ensure that the Commission receives the report or signed statement by 11:59 p.m. Eastern Standard/Daylight Time on the day following the date on which a communication is publicly distributed or otherwise publicly disseminated. Each time subsequent independent expenditures relating to the same election aggregate $1,000 or more, the person making the independent expenditures must ensure that the Commission receives a new 24-hour report of the subsequent independent expenditures. (See 11 CFR 104.4(f) for aggregation.) Such report or statement shall contain the information required by paragraph (e) of this section.

(e) Content of verified reports and statements and verification of reports and statements.

(1) *Contents of verified reports and statement.* If a signed report or statement is submitted, the report or statement shall include:

(i) The reporting person's name, mailing address, occupation, and the name of his or her employer, if any;

(ii) The identification (name and mailing address) of the person to whom the expenditure was made;

(iii) The amount, date, and purpose of each expenditure;

(iv) A statement that indicates whether such expenditure was in support of, or in opposition to a candidate, together with the candidate's name and office sought;

(v) A verified certification under penalty of perjury as to whether such expenditure was made in cooperation, consultation, or concert with, or at the request or suggestion of a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents; and

(vi) The identification of each person who made a contribution in excess of $200 to the person filing such report, which contribution was made for the purpose of furthering the reported independent expenditure.

(2) *Verification of independent expenditure statements and reports.* Every person shall verify reports and statements of independent expenditures filed pursuant to the requirements of this section by one of the methods stated in paragraph (e)(2)(i) or (ii) of this section. Any report or statement verified under either of these methods shall be treated for all purposes (including penalties for perjury) in the same manner as a document verified by signature.

(i) For reports or statements filed on paper (*e.g.*, by hand-delivery, U.S. Mail, or facsimile machine), the person who made the independent expenditure shall certify, under penalty of perjury, the independence of the expenditure by handwritten signature immediately following the certification required by paragraph (e)(1)(v) of this section.

(ii) For reports or statements filed by electronic mail, the person who made the independent expenditure shall certify, under penalty of perjury, the independence of the expenditure by typing the treasurer's name immediately following the certification required by paragraph (e)(1)(v) of this section.

**§ 109.11 When is a "non-authorization notice" (disclaimer) required?**

Whenever any person makes an independent expenditure for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, such person shall comply with the requirements of 11 CFR 110.11.

## Subpart C—Coordination

**§ 109.20 What does "coordinated" mean?**

(a) *Coordinated* means made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents.

(b) Any expenditure that is coordinated within the meaning of paragraph (a) of this section, but that is not made for a coordinated communication under 11 CFR 109.21 or a party coordinated communication under 11 CFR 109.37, is either an in-kind contribution to, or a coordinated party expenditure with respect to, the candidate or political party committee with whom or with which it was coordinated and must be reported as an expenditure made by that candidate or political party committee, unless otherwise exempted under 11 CFR part 100, subparts C or E.

**§ 109.21 What is a "coordinated communication"?**

(a) *Definition.* A communication is coordinated with a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing when the communication:

(1) Is paid for by a person other than that candidate, authorized committee, political party committee, or agent of any of the foregoing;

(2) Satisfies at least one of the content standards in paragraph (c) of this section; and

(3) Satisfies at least one of the conduct standards in paragraph (d) of this section.

(b) *Treatment as an in-kind contribution and expenditure; Reporting.*

(1) *General rule.* A payment for a coordinated communication is made for the purpose of influencing a Federal election, and is an in-kind contribution under 11 CFR 100.52(d) to the candidate, authorized committee, or political party committee with whom or which it is coordinated, unless excepted under 11 CFR part 100, subpart C, and must be reported as an expenditure made by that candidate, authorized committee, or political party committee under 11 CFR 104.13, unless excepted under 11 CFR part 100, subpart E.

(2) *In-kind contributions resulting from conduct described in paragraphs (d)(4) or (d)(5) of this section.* Notwithstanding paragraph (b)(1) of this section, the candidate, authorized committee, or political party committee with whom or which a communication is coordinated does not receive or accept an in-kind contribution, and is not required to report an expenditure, that results from conduct described in paragraphs (d)(4) or (d)(5) of this section, unless the candidate, authorized committee, or political party committee, or an agent of any of the foregoing, engages in conduct described in paragraphs (d)(1) through (d)(3) of this section.

(3) *Reporting of coordinated communications.* A political committee, other than a political party committee, that makes a coordinated communication must report the payment for the communication as a contribution made to the candidate or political party committee with whom or which it was coordinated and as an expenditure in accordance with 11 CFR 104.3(b)(1)(v). A candidate, authorized committee, or political party committee with whom or which a communication paid for by another person is coordinated must report the usual and normal value of the communication as an in-kind contribution in accordance with 11 CFR 104.13, meaning that it must report the amount of the payment as a receipt under 11 CFR 104.3(a) and as an expenditure under 11 CFR 104.3(b).

(c) *Content standards.* Each of the types of content described in paragraphs (c)(1) through (c)(4) satisfies the content standard of this section.

(1) A communication that is an electioneering communication under 11 CFR 100.29.

(2) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). For a communication that satisfies this content standard, see paragraph (d)(6) of this section.

(3) A public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(4) A communication that is a public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(4)(i), (ii), and (iii) of this section are true.

(i) The communication refers to a political party or to a clearly identified candidate for Federal office;

(ii) The public communication is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and

(iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

(d) *Conduct standards.* Any one of the following types of conduct satisfies the conduct standard of this section whether or not there is agreement or formal collaboration, as defined in paragraph (e) of this section:

(1) *Request or suggestion.*

(i) The communication is created, produced, or distributed at the request or suggestion of a candidate or an authorized committee, political party committee, or agent of any of the foregoing; or

(ii) The communication is created, produced, or distributed at the suggestion of a person paying for the communication and the candidate, authorized committee, political party committee, or agent of any of the foregoing, assents to the suggestion.

(2) *Material involvement.* A candidate, an authorized committee, a political party committee, or an agent of any of the foregoing, is materially involved in decisions regarding:

(i) The content of the communication;

(ii) The intended audience for the communication;

(iii) The means or mode of the communication;

(iv) The specific media outlet used for the communication;

(v) The timing or frequency of the communication; or

(vi) The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

(3) *Substantial discussion.* The communication is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication, or the employees or agents of the person paying for the communication, and the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing. A discussion is substantial within the meaning of this paragraph if information about the candidate's or political party committee's campaign plans, projects, activities, or needs is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication.

(4) *Common vendor.* All of the following statements in paragraphs (d)(4)(i) through (d)(4)(iii) of this section are true:

(i) The person paying for the communication, or an agent of such person, contracts with or employs a commercial vendor, as defined in 11 CFR 116.1(c), to create, produce, or distribute the communication;

(ii) That commercial vendor, including any owner, officer, or employee of the commercial vendor, has provided any of the following services to the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, in the current election cycle:

(A) Development of media strategy, including the selection or purchasing of advertising slots;

(B) Selection of audiences;

(C) Polling;

(D) Fundraising;

(E) Developing the content of a public communication;

(F) Producing a public communication;

(G) Identifying voters or developing voter lists, mailing lists, or donor lists;

(H) Selecting personnel, contractors, or subcontractors; or

(I) Consulting or otherwise providing political or media advice; and

(iii) That commercial vendor uses or conveys to the person paying for the communication:

(A) Information about the clearly identified candidate's campaign plans, projects, activities, or needs, or his or her opponent's campaign plans, projects, activities, or needs, or a political party committee's campaign plans, projects, activities, or needs and that information is material to the creation, production, or distribution of the communication; or

(B) Information used previously by the commercial vendor in providing services to the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, and that information is material to the creation, production, or distribution of the communication.

(5) *Former employee or independent contractor.* Both of the following statements in paragraph (d)(5)(i) and (d)(5)(ii) of this section are true:

(i) The communication is paid for by a person, or by the employer of a person, who was an employee or independent contractor of the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, during the current election cycle; and

(ii) That former employee or independent contractor uses or conveys to the person paying for the communication:

(A) Information about the clearly identified candidate's campaign plans, projects, activities, or needs, or his or her opponent's campaign plans, projects, activities, or needs, or a political party committee's campaign plans, projects, activities, or needs, and that information is material to the creation, production, or distribution of the communication; or

(B) Information used by the former employee or independent contractor in providing services to the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee, or an agent of any of the foregoing, and that information is material to the creation, production, or distribution of the communication.

(6) *Dissemination, distribution, or republication of campaign material.* A communication that satisfies the content standard of paragraph (c)(2) of this section or 11 CFR 109.37(a)(2)(i) shall only satisfy the conduct standards of paragraphs (d)(1) through (d)(3) of this section on the basis of conduct by the candidate, the candidate's authorized committee, or the agents of any of the foregoing, that occurs after the original preparation of the campaign materials that are disseminated, distributed, or republished. The conduct standards of paragraphs (d)(4) and (d)(5) of this section may also apply to such communications as provided in those paragraphs.

(e) *Agreement or formal collaboration.* Agreement or formal collaboration between the person paying for the communication and the candidate clearly identified in the communication, his or her authorized committee, his or her opponent, or the opponent's authorized committee, a political party committee, or an agent of any of the foregoing, is not required for a

communication to be a coordinated communication. *Agreement* means a mutual understanding or meeting of the minds on all or any part of the material aspects of the communication or its dissemination. *Formal collaboration* means planned, or systematically organized, work on the communication.

(f) *Safe harbor for responses to inquiries about legislative or policy issues.* A candidate's or a political party committee's response to an inquiry about that candidate's or political party committee's positions on legislative or policy issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards in paragraph (d) of this section.

**§ 109.22 Who is prohibited from making coordinated communications?**

Any person who is otherwise prohibited from making contributions or expenditures under any part of the Act or Commission regulations is prohibited from paying for a coordinated communication.

**§ 109.23 Dissemination, distribution, or republication of candidate campaign materials**

(a) *General rule.* The financing of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, the candidate's authorized committee, or an agent of either of the foregoing shall be considered a contribution for the purposes of contribution limitations and reporting responsibilities of the person making the expenditure. The candidate who prepared the campaign material does not receive or accept an in-kind contribution, and is not required to report an expenditure, unless the dissemination, distribution, or republication of campaign materials is a coordinated communication under 11 CFR 109.21 or a party coordinated communication under 11 CFR 109.37.

(b) *Exceptions.* The following uses of campaign materials do not constitute a contribution to the candidate who originally prepared the materials:

(1) The campaign material is disseminated, distributed, or republished by the candidate, the candidate's authorized committee, or an agent of either of the foregoing who prepared that material;

(2) The campaign material is incorporated into a communication that advocates the defeat of the candidate or party that prepared the material;

(3) The campaign material is disseminated, distributed, or republished in a news story, commentary, or editorial exempted under 11 CFR 100.73 or 11 CFR 100.132;

(4) The campaign material used consists of a brief quote of materials that demonstrate a candidate's position as part of a person's expression of its own views; or

(5) A national political party committee or a State or subordinate political party committee pays for such dissemination, distribution, or republication of campaign materials using coordinated party expenditure authority under 11 CFR 109.32.

## Subpart D—Special Provisions for Political Party Committees

**§ 109.30 How are political party committees treated for purposes of coordinated and independent expenditures?**

Political party committees may make independent expenditures subject to the provisions in this subpart. See 11 CFR 109.35 and 109.36. Political party committees may also make coordinated party expenditures in connection with the general election campaign of a candidate, subject to the limits and other provisions in this subpart. See 11 CFR 109.32 through 11 CFR 109.35.

**§ 109.31 [Reserved]**

**§ 109.32 What are the coordinated party expenditure limits?**

(a) *Coordinated party expenditures in Presidential elections.*

(1) The national committee of a political party may make coordinated party expenditures in connection with the general election campaign of any candidate for President of the United States affiliated with the party.

(2) The coordinated party expenditures shall not exceed an amount equal to two cents multiplied by the voting age population of the United States. See 11 CFR 110.18. This limitation shall be increased in accordance with 11 CFR 110.17.

(3) Any coordinated party expenditure under paragraph (a) of this section shall be in addition to—

(i) Any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for President of the United States; and

(ii) Any contribution by the national committee to the candidate permissible under 11 CFR 110.1 or 110.2.

(4) Any coordinated party expenditures made by the national committee of a political party pursuant to paragraph (a) of this section, or made by any other party committee under authority assigned by a national committee of a political party under 11 CFR 109.33, on behalf of that party's Presidential candidate shall not count against the candidate's expenditure limitations under 11 CFR 110.8.

(b) *Coordinated party expenditures in other Federal elections.*

(1) The national committee of a political party, and a State committee of a political party, including any subordinate committee of a State committee, may each make coordinated party expenditures in connection with the general election campaign of a candidate for Federal office in that State who is affiliated with the party.

(2) The coordinated party expenditures shall not exceed:

(i) In the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of—

(A) Two cents multiplied by the voting age population of the State (see 11 CFR 110.18); or

(B) Twenty thousand dollars.

(ii) In the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.

(3) The limitations in paragraph (b)(2) of this section shall be increased in accordance with 11 CFR 110.17.

(4) Any coordinated party expenditure under paragraph (b) of this section shall be in addition to any contribution by a political party committee to the candidate permissible under 11 CFR 110.1 or 110.2.

**§ 109.33 May a political party committee assign its coordinated party expenditure authority to another political party committee?**

(a) *Assignment.* Except as provided in 11 CFR 109.35(c), the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, may assign its authority to make coordinated party expenditures authorized by 11 CFR 109.32 to another political party committee. Such an assignment must be made in writing, must state the amount of the authority assigned, and must be received by the assignee committee before any coordinated party expenditure is made pursuant to the assignment.

(b) *Compliance.* For purposes of the coordinated party expenditure limits, *State committee* includes a subordinate committee of a State committee and includes a district or local committee to which coordinated party expenditure authority has been assigned. State committees and subordinate State

committees and such district or local committees combined shall not exceed the coordinated party expenditure limits set forth in 11 CFR 109.32. The State committee shall administer the limitation in one of the following ways:

(1) The State committee shall be responsible for insuring that the coordinated party expenditures of the entire party organization are within the coordinated party expenditure limits, including receiving reports from any subordinate committee of a State committee or district or local committee making coordinated party expenditures under 11 CFR 109.32, and filing consolidated reports showing all coordinated party expenditures in the State with the Commission; or

(2) Any other method, submitted in advance and approved by the Commission, that permits control over coordinated party expenditures.

(c) *Recordkeeping.*

(1) A political party committee that assigns its authority to make coordinated party expenditures under this section must maintain the written assignment for at least three years in accordance with 11 CFR 104.14.

(2) A political party committee that is assigned authority to make coordinated party expenditures under this section must maintain the written assignment for at least three years in accordance with 11 CFR 104.14.

**§ 109.34 When may a political party committee make coordinated party expenditures?**

A political party committee authorized to make coordinated party expenditures may make such expenditures in connection with the general election campaign before or after its candidate has been nominated. All pre-nomination coordinated party expenditures shall be subject to the coordinated party expenditure limitations of this subpart, whether or not the candidate on whose behalf they are made receives the party's nomination.

**§ 109.35 What are the restrictions on a political party committee making both independent expenditures and coordinated party expenditures in connection with the general election of a candidate?**

(a) *Applicability.* For the purposes of this section, all political committees established and maintained by a national political party (including all congressional campaign committees) and all political committees established and maintained by a State political party (including any subordinate committee of a State committee) shall be considered to be a single political committee.

(b) *Restrictions on certain coordinated and independent expenditures.* On or after the date on which a political party nominates a candidate for election to Federal office, no committee of the political party may make:

(1) Any coordinated party expenditure under 11 CFR 109.32 with respect to the candidate during the election cycle at any time after it makes any independent expenditure with respect to the candidate during the election cycle; or

(2) Any independent expenditure with respect to the candidate during the election cycle at any time after it makes any coordinated expenditure under 11 CFR 109.32 with respect to the candidate during the election cycle.

(c) *Restrictions on certain transfers and assignments.* A committee of a political party that makes coordinated expenditures under 11 CFR 109.32 with respect to a candidate shall not, during the election cycle, transfer any funds to, assign authority to make coordinated expenditures under 11 CFR 109.32 to, or receive a transfer of funds from, a committee of the political party that has made or intends to make an independent expenditure with respect to the candidate.

**§ 109.36 Are there additional circumstances under which a political party committee is prohibited from making independent expenditures?**

The national committee of a political party must not make independent expenditures in connection with the general election campaign of a candidate for President of the United States if the national committee of that political party is designated as the authorized committee of its Presidential candidate pursuant to 11 CFR 9002.1(c).

**§ 109.37 What is a "party coordinated communication"?**

(a) *Definition.* A political party communication is coordinated with a candidate, a candidate's authorized committee, or agent of any of the foregoing, when the communication satisfies the conditions set forth in paragraphs (a)(1), (a)(2), and (a)(3) of this section.

(1) The communication is paid for by a political party committee or its agent.

(2) The communication satisfies at least one of the content standards described in paragraphs (a)(2)(i) through (a)(2)(iii) of this section.

(i) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). For a communication that satisfies this content standard, see 11 CFR 109.21(d)(6).

(ii) A public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(iii) A communication that is a public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (a)(2)(iii)(A) through (a)(2)(iii)(C) of this section are true.

(A) The communication refers to a clearly identified candidate for Federal office;

(B) The public communication is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and

(C) The public communication is directed to voters in the jurisdiction of the clearly identified candidate.

(3) The communication satisfies at least one of the conduct standards in 11 CFR 109.21(d)(1) through (d)(6), subject to the provisions of 11 CFR 109.21(e). A candidate's response to an inquiry about that candidate's positions on legislative or policy issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards in 11 CFR 109.21(d)(1) through (d)(6). Notwithstanding paragraph (b)(1) of this section, the candidate with whom a party coordinated communication is coordinated does not receive or accept an in-kind contribution, and is not required to report an expenditure, that results from conduct described in 11 CFR 109.21(d)(4) or (d)(5), unless the candidate, authorized committee, or an agent of any of the foregoing, engages in conduct described in 11 CFR 109.21(d)(1) through (d)(3).

(b) *Treatment of a party coordinated communication.* A payment by a political party committee for a communication that is coordinated with a candidate, and that is not otherwise exempted under 11 CFR part 100, subpart C or E, must be treated by the political party committee making the payment as either:

(1) An in-kind contribution for the purpose of influencing a Federal election under 11 CFR 100.52(d) to the candidate with whom it was coordinated, which must be reported under 11 CFR part 104; or

(2) A coordinated party expenditure pursuant to coordinated party expenditure authority under 11 CFR 109.32 in connection with the general election campaign of the candidate with whom it was coordinated, which must be reported under 11 CFR part 104.

## PART 110—CONTRIBUTION AND EXPENDITURE LIMITATIONS AND PROHIBITIONS

7. The authority citation for part 110 continues to read as follows:

**Authority:** 2 U.S.C. 431(8), 431(9), 432(c)(2), 437d, 438(a)(8), 441a, 441b, 441d, 441e, 441f, 441g, 441h, and 441k.

8. In section 110.1, paragraph (d) is revised and paragraph (n) is added to read as follows:

**§ 110.1 Contributions by persons other than multicandidate political committees.**

* * * * *

(d) *Contributions to other political committees.* No person shall make contributions to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

* * * * *

(n) *Contributions to committees making independent expenditures.* The limitations on contributions of this section also apply to contributions made to political committees making independent expenditures under 11 CFR Part 109.

9. In section 110.2, paragraph (d) is revised and paragraph (k) is added to read as follows:

**§ 110.2 Contributions by multicandidate political committees.**

* * * * *

(d) *Contributions to other political committees.* No multicandidate political committee shall make contributions to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

* * * * *

(k) *Contributions to multicandidate political committees making independent expenditures.* The limitations on contributions of this section also apply to contributions made to multicandidate political committees making independent expenditures under 11 CFR Part 109.

**§ 110.7 [Reserved].**

10. Remove and reserve § 110.7.

11. In section 110.8, paragraph (a) is amended as follows:

(a) Paragraph (a)(1) is redesignated as paragraph (a)(1)(i);

(b) The introductory text is redesignated as paragraph (a)(1);

(c) Paragraph (a)(2) is redesignated as paragraph (a)(1)(ii);

(d) Paragraph (a)(2) is revised; and

(e) A paragraph (a)(3) is added.

The revised text reads as follows:

**§ 110.8 Presidential candidate expenditure limitations.**

(a) * * *

(2) The expenditure limitations in paragraph (a)(1) of this section shall be increased in accordance with 11 CFR 110.17.

(3) Voting age population is defined at 11 CFR 110.18.

* * * * *

12. Section 110.14 is amended as follows:

(a) Paragraph (f)(2)(i) intro text is revised;

(b) Paragraph (f)(2)(ii) intro text is revised;

(c) Paragraph (f)(3)(iii) is revised;

(d) Paragraph (i)(2)(i) intro text is revised;

(e) Paragraph (i)(2)(ii) is revised;

(f) Paragraph (i)(3)(iii) is revised.

The revised text reads as follows:

**§ 110.14 Contributions to and expenditures by delegates and delegate committees.**

(f) * * *

(2) * * *

(i) Such expenditures are independent expenditures under 11 CFR 100.16 if they are made for a communication expressly advocating the election or defeat of a clearly identified Federal candidate that is not a coordinated communication under 11 CFR 109.21.

* * * * *

(ii) Such expenditures are independent expenditures under 11 CFR 100.16 if they are made for a communication expressly advocating the election or defeat of a clearly identified Federal candidate that is not a coordinated communication under 11 CFR 109.21.

* * * * *

(B) The delegate shall report the portion of the expenditure allocable to the Federal candidate as an independent expenditure in accordance with 11 CFR 109.10.

(3) * * *

(iii) Such expenditures are not chargeable to the presidential candidate's expenditure limitation under 11 CFR 110.8 unless they were coordinated communications under 11 CFR 109.21.

* * * * *

(i) *Expenditures by a delegate committee referring to a candidate for public office*—* * *

(2) * * *

(i) Such expenditures are in-kind contributions to a Federal candidate if they are coordinated communications under 11 CFR 109.21.

* * * * *

(ii) Such expenditures are independent expenditures under 11 CFR 100.16 if they are made for a communication expressly advocating the election or defeat of a clearly identified Federal candidate that is not a coordinated communication under 11 CFR 109.21.

(A) Such independent expenditures must be made in accordance with the requirements of 11 CFR part 100.16.

(B) The delegate committee shall report the portion of the expenditure allocable to the Federal candidate as an independent expenditure in accordance with 11 CFR 109.10.

(3) * * *

(iii) Such expenditures are not chargeable to the presidential candidate's expenditure limitation under 11 CFR 110.8 unless they were coordinated communications under 11 CFR 109.21.

* * * * *

13. Section 110.18 is added to read as follows:

**§ 110.18 Voting Age Population.**

There is annually published by the Department of Commerce in the **Federal Register** an estimate of the voting age population based on an estimate of the voting age population of the United States, of each State, and of each Congressional district. The term *voting age population* means resident population, 18 years of age or older.

## PART 114—CORPORATE AND LABOR ORGANIZATION ACTIVITY

14. The authority citation for part 114 continues to read as follows:

**Authority:** 2 U.S.C. 431(8)(B), 431(9)(B), 432, 434(a)(11), 437d(a)(8), 438(a)(8), and 441b.

15. In section 114.4, paragraphs (c)(5)(i) and (c)(5)(ii)(A) are revised to read as follows:

**§ 114.4 Disbursements for communications beyond the restricted class in connection with a Federal election.**

* * * * *

(c) *Communications by a corporation or labor organization to the general public.* * * *

(5) *Voter guides.* * * *

(i) The corporation or labor organization must not act in cooperation, consultation, or concert with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the

preparation, contents and distribution of the voter guide, and no portion of the voter guide may expressly advocate the election or defeat of one or more clearly identified candidate(s) or candidates of any clearly identified political party.

(ii) (A) The corporation or labor organization must not act in cooperation, consultation, or concert with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide;

* * * * *

Dated: December 17, 2002.

**David M. Mason,**

*Chairman, Federal Election Commission.*

[FR Doc. 03–90 Filed 1–2–03; 8:45 am]

BILLING CODE 6715–01–P

# PLAINTIFFS' EXHIBIT 10

**By Electronic Mail**

November 17, 2004

Lawrence Norton, Esquire
General Counsel
Federal Election Commission
999 E Street, N.W.
Washington, DC 20463

Re: Agenda Document 04-105 (Rulemaking Priorities)

Dear Mr. Norton:

We are writing in our capacity as counsel to the plaintiffs in *Shays and Meehan v. FEC*, No. 02-1984 (Ops. of Sept. 18, 2004 and Oct. 19, 2004)(D.D.C.), *appeal pending* Nos. 04-5352 and 04-5373 (D.C. Cir.), to express our concern regarding the proposed rulemaking schedule to replace the regulations invalidated by the district court. This schedule is to be discussed by the Commission at its meeting tomorrow, November 18, 2004.

As you know, in denying the Commission's motion for a stay, Judge Kollar-Kotelly held that the Commission must "instigate proceedings and craft proposed regulations...with reasonable expediency." Op. of Oct. 19, 2004 at 23. The court ruled that the Commission should act expeditiously to ensure that "revised, compliant regulations will be in place for a major portion of the 2006 election cycle" so as to "mitigate against the injury to both Plaintiffs and the public." *Id.* at 20.

We do not believe that the proposed schedule meets this standard. The schedule simply "anticipates" when the Commission "will consider" the *initiation* of a rulemaking, i.e., the publication of a Notice of Proposed Rulemaking. It sets nine tracks of rulemaking to be initiated over a seven-month period, from January through July, 2005. There is no proposal for the length of time each rulemaking will take, and accordingly, no target date for the promulgation of final rules, which is the central issue. (In the case of those rules being appealed, the district court opinion requires the Commission to have "new, fully compliant regulations *ready for immediate implementation* after the expiration of its appeals process." *Id.* at 20 (emphasis added)).

From the date of the initial district court order in September, the Commission thus proposes, in some cases, a period of as long as ten months to undertake even the initiation of a rulemaking. This contrasts sharply with the schedule for rulemaking contained in the

underlying legislation, where Congress required the Commission to initiate *and complete* all rulemaking proceedings within a 270-day period. Pub.L. No. 107-155, Sec. 402(c)(1). Although we do not underestimate the amount of work involved in promulgating (or preparing for final promulgation) new, compliant rules, this task is many orders of magnitude smaller than the work involved in the initial expedited rulemaking.

We call on the Commission to revise the proposed schedule and to establish a public timetable to ensure that all new rules "will be in place for a major portion of the 2006 election cycle," as required by the district court's October 19 decision.

Sincerely,

Donald J. Simon

Charles G. Curtis, Jr.

copy to: Each Commissioner

By Electronic Mail

October 31, 2005

Lawrence H. Norton, Esq.
General Counsel
Federal Election Commission
999 E Street, N.W.
Washington, D.C. 20463

Re: *Shays v. Federal Election Commission*, Case No. CIV.A. 02-1984 (CKK)

Dear Mr. Norton:

Pursuant to LCvR 7(m), we request the opportunity to meet and confer at your earliest convenience about the Commission's compliance with the District Court's October 19, 2004 Opinion and Order in this case. *See* 340 F. Supp. 2d 39.

In denying the Commission's application for a stay pending appeal, the District Court emphasized that plaintiffs and others would suffer "significant, irreparable injury ... if revised regulations [are] not in place by the 2006 election cycle." *Id.* at 52. "The existence of loopholes and unfaithful regulations constitutes a daily injury to both [plaintiffs'] interests and the clearly articulated intent of Congress." *Id.* The Court "decline[d] to stamp the Commission's 'business-as-usual' tactics and request for delay with the judicial imprimatur of approval," and cautioned that the Commission would not be allowed to keep its "flawed rules" in place during the 2006 election cycle through "handsitting, inaction, and needless delay." *Id.* at 41, 52. "[T]he public interest is best served by enforcing Congress' intended campaign finance system expeditiously in order to assuage the harms produced by the Commission." *Id.* at 54.

Accordingly, the District Court directed the Commission to conduct new rulemaking proceedings during its appeal so that "the Commission may have *new, fully compliant regulations ready for immediate implementation after the expiration of its appeal process*." *Id.* at 51 (emphasis added). "These interim steps will substantially increase the likelihood that the revised, compliant regulations will be in place for a major portion of the 2006 election cycle and will mitigate against the injury to both Plaintiffs and public." *Id.* The Court repeatedly emphasized the Commission's duty to proceed with dispatch, and warned that the Commission would not be allowed to delay its required rulemakings and then argue "that it would be too late to change the flawed rules in time for [the 2006] election." *Id.* at 52; *see also id.* at 41 & n.1, 50-54. The Court observed that we "have traversed this well-traveled road before," and that the

Commission would not be permitted "to thwart the very essence of the wide-sweeping system of reform enacted by Congress for another interminable period of years." *Id.* at 52. The Commission elected not to appeal from the District Court's October 19, 2004 Opinion and Order.

Given the Court of Appeals' October 21, 2005 order denying the Commission's petition for rehearing *en banc,* and in light of subsequent statements by at least two Commissioners indicating that the Commission will not seek to petition for certiorari, it appears that the appeals process is at or near its end. Yet the Commission appears nowhere close to having "new, fully compliant regulations ready for immediate implementation after the expiration of [the] appeal process." *Id.* at 51. We have previously written to you expressing our concern about the slow pace of the Commission's response to the District Court's order. *See* Nov. 17, 2004 letter from Simon and Curtis to Norton (enclosed). The Commission has fallen even further behind the inadequate schedule it announced last year: it has adopted only *one* of the 15 required new regulations, and has not even *commenced* rulemaking proceedings on the coordination issue.

Before considering any further litigation steps, we seek the Commission's views on this situation and how the Commission proposes to bring itself into compliance with the District Court's mandate. We ask to meet and confer on these matters at your earliest convenience. Thank you.

Sincerely,

Donald J. Simon /cGc

Donald J. Simon
(202) 682-0240
dsimon@sonosky.com

Charles G. Curtis, Jr.
(608) 663-7480
charles.curtis@hellerehrman.com

Enclosure

cc: Richard B. Bader

**By Electronic Mail**

January 11, 2006

Lawrence H. Norton, Esq.
General Counsel
Federal Election Commission
999 E Street, N.W.
Washington, D.C. 20463

Re: *Shays v. Federal Election Commission*, Case No. CIV.A. 02-1984 (CKK)

Dear Mr. Norton:

As counsel for the plaintiffs Christopher Shays and Martin Meehan, we write in response to the President's recess appointments of three new Commissioners last week, and in follow-up to the LCvR 7(m) written and oral consultations we have had with your office concerning the Commission's failure over the past 16 months to bring itself into full compliance with the opinions, orders, and judgment in *Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. Sept. 18, 2004), *motion for stay pending appeal denied*, 340 F. Supp. 2d 39 (D.D.C. Oct. 19, 2004), *affirmed*, 414 F.3d 76 (D.C. Cir. Jul. 15, 2005), *petition for rehearing en banc denied*, Oct. 21, 2005. We respectfully request that you distribute this letter to the Commissioners.

In March 2002, Congress and the President ordered the Commission to engage in expedited rulemakings to implement BCRA, and instructed the Commission to have all necessary reform regulations in place within 270 days – by the end of 2002. That statutory deadline passed over three years ago. *See* BCRA § 402(c). It has been nearly 16 months since the District Court held that 15 of the Commission's regulations violate BCRA and the APA, and remanded this matter back to the Commission "for further action consistent with this opinion." 337 F. Supp. 2d at 130. It has been nearly 15 months since the District Court denied the Commission's request for a stay pending appeal in a strongly worded decision making clear that the Commission must have a new set of BCRA regulations in effect no later than the start of the 2006 election year. *See* attached Exhibit A. It has been nearly half a year since the D.C. Circuit affirmed the District Court's "exceptionally thorough" opinion in all respects, *see* 414 F.3d at 82, and nearly three months since the full D.C. Circuit denied rehearing *en banc*.

To repeat some history for the benefit of the new Commissioners, the District Court emphasized in its October 2004 decision that plaintiffs and others would suffer

"significant, irreparable injury … if revised regulations [are] not in place by the 2006 election cycle." 340 F. Supp. 2d at 52. "The existence of loopholes and unfaithful regulations constitutes a daily injury to both [plaintiffs'] interests and the clearly articulated intent of Congress." *Id.* The Court "decline[d] to stamp the Commission's 'business-as-usual' tactics and request for delay with the judicial imprimatur of approval," and cautioned that the Commission would not be allowed to keep its "flawed rules" in place during the 2006 election cycle through "handsitting, inaction, and needless delay." *Id.* at 41, 52. "[T]he public interest is best served by enforcing Congress' intended campaign finance system expeditiously in order to assuage the harms produced by the Commission." *Id.* at 54.

Accordingly, the District Court directed the Commission to conduct new rulemaking proceedings during its appeal so that "the Commission may have *new, fully compliant regulations ready for immediate implementation after the expiration of its appeal process*." *Id.* at 51 (emphasis added). "These interim steps will substantially increase the likelihood that the revised, compliant regulations will be in place for a major portion of the 2006 election cycle and will mitigate against the injury to both Plaintiffs and public." *Id.* The Court repeatedly emphasized the Commission's duty to proceed with dispatch, and warned that the Commission would not be allowed to delay its required rulemakings and then argue "that it would be too late to change the flawed rules in time for [the 2006] election." *Id.* at 52; *see also id.* at 41 & n.1, 50-54. The Court observed that we "have traversed this well-traveled road before," and that the Commission would not be permitted "to thwart the very essence of the wide-sweeping system of reform enacted by Congress for another interminable period of years." *Id.* at 52.

The Commission elected not to appeal from the District Court's October 19, 2004 Opinion and Order denying its motion for a stay. The Commission did appeal the District Court's ruling in favor of plaintiffs with regard to the issues of standing and ripeness, and also appealed on the merits with regard to 5 of the 15 regulations invalidated by the District Court. The D.C. Circuit rejected the Commission's appeal on all counts in another strongly worded decision. The full D.C. Circuit has denied rehearing *en banc*.

As we have previously advised, plaintiffs believe the Commission has failed to comply with its obligations to develop new rules as spelled out in the District Court and D.C. Circuit decisions. The Commission has utterly failed to meet its obligation to have "new, fully compliant regulations ready for immediate implementation after the expiration of its appeal process." 340 F. Supp. 2d at 51 (emphasis added). As of the date of our last meet-and-confer letter (Oct. 31, 2005), the Commission had adopted only *one* of the 15 required new regulations and had not even *commenced* rulemaking proceedings on the coordination issue. Since then, the Commission has adopted four more regulations, has finally initiated the coordination rulemaking, and has repeatedly promised that it will now "move forward aggressively to complete action" on all the remaining regulations "by the end of February." Nov. 3, 2005 FEC Press Release attached as Exhibit B.

We acknowledge the progress the Commission has made in the past 60 days, but the Commission nevertheless remains in clear violation of the *Shays* decisions: the appeal process is over, and "new, fully compliant regulations" are not "ready for immediate implementation." 340 F. Supp. 2d at 51. We are now into the 2006 election year, and well into the 2006 election cycle, with numerous illegal "loopholes," "unfaithful regulations," and impermissible "safe harbors" still on the books and in effect. *Id.* at 52.

We have held off returning to the District Court to enforce the *Shays I* judgment based on the Commission's repeated representations that it will bring itself into full compliance by the end of February, that a more expedited schedule is not bureaucratically possible, and that an end-of-February schedule is administratively achievable. Given the start of the New Year, the escalation of campaign activity, the President's recess appointments, and the Commission's cancellation of this week's public meeting, we ask that the Commission promptly and formally renew its pledge to have new, fully compliant regulations in place by the end of February 2006, and not a day later. We further request that the Commission promptly issue a rulemaking schedule for the next two months showing how it intends to meet its end-of-February deadline with respect to the 10 regulations that remain to be addressed.

If we do not receive prompt and sufficient assurances from the Commission that it will meet its end-of-February commitment, plaintiffs will feel free to move Judge Kollar-Kotelly for all appropriate relief without further communication and negotiation with the Commission. We will ask Judge Kollar-Kotelly to hold a status conference at her earliest opportunity at which you can report on and defend the Commission's continuing delays, and we can ask for appropriate additional relief.

Thank you for your consideration of these requests. We would be happy to meet and confer with you or your colleagues at your convenience.

Sincerely,

Charles G. Curtis, Jr.
Heller Ehrman LLP
One East Main Street, Suite 201
Madison, WI 53703
(608) 663-7460

Roger M. Witten
Wilmer Cutler Pickering
Hale and Dorr LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

Randolph D. Moss
Wilmer Cutler Pickering
Hale and Dorr LLP
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000

Donald J. Simon
Sonosky, Chambers, Sachse,
Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240

Fred Wertheimer
Democracy 21
1825 Eye Street, N.W., Suite 400
Washington, D.C. 20006
(202) 429-2008

Enclosures

cc: Richard B. Bader
David Kolker

# PLAINTIFFS' EXHIBIT 11

Nos. 04-5352 and 04-5373

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CHRISTOPHER SHAYS and MARTIN MEEHAN,
*Appellees/Cross-Appellants,*

v.

FEDERAL ELECTION COMMISSION,
*Appellant/Cross-Appellee,*

---

Cross-Appeals from the United States District Court for the District of Columbia,
Civil Action No. 02-1984 (CKK)

---

**MOTION OF CROSS-APPELLANTS CHRISTOPHER SHAYS AND MARTIN MEEHAN FOR VOLUNTARY DISMISSAL OF THEIR CROSS-APPEAL (NO. 04-5373)**

Representatives Christopher Shays and Martin Meehan, by their undersigned counsel, and pursuant to Fed. R. App. P. 42(b), respectfully move for voluntary dismissal of their cross-appeal in No. 04-5373. There have been several developments since Representatives Shays and Meehan filed their Notice of Cross-Appeal in the District Court on October 13, 2004, that, in the judgment of cross-appellants and their counsel, render part of the cross-appeal unnecessary and much of the rest premature and unripe.

*First*, Representatives Shays and Meehan intended to challenge in part the scope of relief granted by the District Court in its September 18, 2004 Opinion and Order. *See Shays v. Federal Election Comm'n*, 337 F. Supp. 2d 28, 129-30 (D.D.C. 2004) (attached as Exhibit A to this motion). On October 19, 2004, however, the District Court denied the appellant/cross-appellee Federal Election Commission's application for a stay pending appeal, and in the course of that denial set forth in much greater detail the process and timetable that the District Court expected the Commission to follow upon remand of the regulations that had been declared unlawful on

one or more grounds by the District Court. *See Shays v. Federal Election Comm'n*, ___ F. Supp. 2d ___, Civ. Action No. 02-1984 (CKK), 2004 WL 2358282 (D.D.C. Oct. 19, 2004) (attached as Exhibit B to this motion). Representatives Shays and Meehan believe that the scope of the District Court's relief, as clarified in the October 19 Opinion and Order, is appropriate and satisfactory. They understand that the Commission does not intend to seek a stay from this Court of the District Court's September 18 Opinion and Order or to appeal from the District Court's October 19 Opinion and Order, and that the Commission intends to conduct the additional rulemaking proceedings required by the District Court.

*Second*, Representatives Shays and Meehan intended to raise on cross-appeal certain issues with respect to specific rules that they anticipated would be included within the scope of the Commission's appeal in No. 04-5352. On October 29, 2004, however, the Commission announced that it is appealing the District Court's ruling with respect to certain regulations[1] but not with respect to others.[2] The Commission also announced on October 29 that it will be opening rulemaking proceedings as to all portions of the challenged regulations that the District Court found defective. Representatives Shays and Meehan do not believe it is necessary to pursue a cross-appeal with respect to any of the regulations included within the scope of the Commission's appeal to this Court (*see* note 1 *infra*). As to the regulations that are not being appealed by the Commission (*see* note 2 *infra*), Representatives Shays and Meehan believe that a cross-appeal is either unnecessary or premature and unripe, given that the Commission will be

[1] Representatives Shays and Meehan understand that the following regulations are included within the scope of the Commission's appeal (together with the Commission's standing and ripeness defenses): 11 C.F.R. § 100.29(b)(3)(i); *id.* § 109.21(c)(4)(i), (ii), and (iii); *id.* § 300.2(m); *id.* § 300.2(n); *id.* § 300.32(c)(4); and *id.* § 300.33(c)(2).

[2] Representatives Shays and Meehan understand that the Commission is not appealing the District Court's ruling and remand with respect to the following regulations: 11 C.F.R. § 100.24(a)(2); *id.* § 100.24(a)(3); *id.* § 100.24(a)(4); *id.* § 100.25; *id.* § 100.29(c)(6); *id.* § 109.3; *id.* § 109.21(c)(iv); *id.* § 300.2(b); and *id.* § 300.64(b).

conducting new rulemaking proceedings and is not challenging the District Court's rulings with respect to these regulations. In particular, it is cross-appellants' understanding of current law that they would not lose any right to seek further judicial review under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), of a regulation that is currently before the Commission as a result of the District Court's remand for further action pursuant to a finding of a defect under the Administrative Procedure Act, 5 U.S.C. §§ 500-596, regardless of whether the text of the regulation changed during the new rulemaking process. In cross-appellants' view, it would be premature to seek further review under *Chevron* while the regulation is still before the Commission, and any attempted appeal at this time would not be ripe.[3]

The only other matters that could be included in a cross-appeal are the District Court's rulings sustaining four of the Commission's challenged regulations.[4] In the interests of further streamlining and expediting this Court's consideration of the central issues in this litigation, Representatives Shays and Meehan have determined not to pursue any cross-appeal with respect to these four regulations.

Counsel for Representatives Shays and Meehan have conferred with counsel for the Commission, who have advised that the Commission agrees that the cross-appeal in No. 04-5373 may be voluntarily dismissed. Counsel for the Commission have further advised that they agree that the issues described above as to the regulations currently before the Commission as a result

---

[3] *See, e.g., EPA v. Brown*, 431 U.S. 99, 103-04 (1977); *Moreau v. Federal Energy Regulatory Comm'n*, 982 F.2d 556, 567-68 (D.C. Cir. 1993); *McConnell v. Federal Election Comm'n*, 251 F. Supp. 2d 176, 260-64 (D.D.C.) (three-judge District Court) (per curiam), *aff'd*, 540 U.S. 93, 223 (2003).

[4] Those regulations appear at 11 C.F.R. § 100.14; *id.* § 300.2(c)(3); *id.* § 300.30(c)(3); and *id.* § 300.32(a)(4).

of the District Court's ruling are unripe for appeal by cross-appellants. The parties also agree that each side will bear its own costs that have been incurred with respect to the cross-appeal.

For these reasons, this Court should grant the motion of Representatives Shays and Meehan for voluntary dismissal of their cross-appeal in No. 04-5373.

Respectfully submitted,

Charles G. Curtis, Jr.
Michelle M. Umberger
David L. Anstaett
HELLER EHRMAN WHITE & McAULIFFE LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663-7460

Brent N. Rushforth
Carl S. Nadler
Shahid A. Buttar
HELLER EHRMAN WHITE & McAULIFFE LLP
1666 K Street, N.W., Suite 300
Washington, D.C. 20006
(202) 912-2000

Fred Wertheimer
Alexandra Edsall
DEMOCRACY 21
1825 Eye Street, N.W., Suite 400
Washington, D.C. 20006
(202) 429-2008

Roger M. Witten
David A. O'Neil
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

Randolph D. Moss
Jonathan G. Cedarbaum
Stacy E. Beck
WILMER CUTLER PICKERING HALE AND DORR LLP
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000

Donald J. Simon
SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240

*Attorneys for Appellees/Cross-Appellants Christopher Shays and Martin Meehan*

Dated this 23rd day of November, 2004

US1DOCS 4777374v1

# PLAINTIFFS' EXHIBIT 12

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 04-5352** **September Term, 2004**

**02cv01984**

**Filed On:**

Christopher Shays and Martin Meehan,
Appellees

v.

Federal Election Commission,
Appellant

Consolidated with 04-5373

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED
DEC 2 2004
CLERK

**ORDER**

Upon consideration of the motion of cross-appellants Christopher Shays and Martin Meehan for voluntary dismissal of their cross-appeal (No. 04-5373), it is

**ORDERED** that case No. 04-5373 be dismissed.

The Clerk is directed to transmit forthwith to the district court a certified copy of this order in lieu of formal mandate as to case No. 04-5373 only.

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: MaryAnne McMain
MaryAnne McMain
Deputy Clerk

DEC - 6 2004

# PLAINTIFFS' EXHIBIT 13

Research, and Consumer Information Order (conducted under the Mushroom Promotion, Research, and Consumer Information Act), under the criteria contained in Section 610 of the Regulatory Flexibility Act (RFA).

**DATES:** Written comments on this document must be received by February 13, 2006.

**ADDRESSES:** Interested persons are invited to submit written comments concerning this notice of review to the Docket Clerk, Research and Promotion Branch, Fruit and Vegetable Programs (FV), Agricultural Marketing Service (AMS), USDA, Stop 0244, Room 2535–S, 1400 Independence Avenue, SW., Washington, DC 20250–0244. Comments should be submitted in triplicate and will be made available for public inspection at the above address during regular business hours. Comments may also be submitted electronically to: *Deborah.simmons@usda.gov* or Internet: *http://www.regulations.gov*. All comments should reference the docket number and the date and page number of this issue of the **Federal Register.** A copy of this notice may be found at: *http://www.ams.usda.gov/fv/rpdocketlist.htm.*

**FOR FURTHER INFORMATION CONTACT:** Debbie Simmons, Research and Promotion Branch, FV, AMS, USDA, Stop 0244, 1400 Independence Avenue, SW., Room 2535–S, Washington, DC 20250–0244; telephone: (888) 720–9915 fax: (202) 205–2800; or e-mail: *Deborah.simmons@usda.gov*.

**SUPPLEMENTARY INFORMATION:** The Mushroom Promotion, Research, and Consumer Information Act of 1990, (7 U.S.C. 6101 *et seq.*) authorized the Mushroom Promotion, Research, and Consumer Information Program which is industry operated and funded, with oversight by USDA. The program's objective is to carry out an effective, continuous, and coordinated program of promotion, research, consumer information, and industry information designed to strengthen the mushroom industry's position in the marketplace, maintain and expand existing markets and uses for mushrooms, develop new markets and uses for mushrooms, and to carry out programs, plans, and projects designed to provide maximum benefits to the mushroom industry.

The program became effective on January 8, 1993, when the Mushroom Promotion, Research, and Consumer Information Order (7 CFR part 1209) was issued. Assessments began in 1993 at the rate of 0.0025 cents per pound and have fluctuated from 0.0010 to 0.0045 cents per pound. The current rate is 0.0024 cents per pound.

Assessments under this program are used to fund retail category management, research concerning nutritional attributes of mushrooms, foodservice training, and industry information and to enable it to exercise its duties in accordance with the Order.

The program is administered by the Mushroom Council (Council) which is composed of producers and may include importers, appointed by the Secretary of Agriculture from nominations submitted by eligible producers or importers. Producer membership on the Board is based upon mushroom production within each of four predestinated geographic regions within the U.S. and a fifth region representing importers, when imports, on average, equal or exceed 35,000,000 pounds of mushrooms annually. All members serve terms of three years.

AMS published in the **Federal Register** (63 FR 8014; February 18, 1999) its plan to review certain regulations, including the Mushroom Promotion, Research, and Consumer Information Order, (conducted under the Mushroom Promotion, Research, and Consumer Information Act), under criteria contained in Section 610 of the Regulatory Flexibility Act (RFA; 5 U.S.C. 601–612). The plan was updated in the **Federal Register** on August 14, 2003 (68 FR 48574). Because many AMS regulations impact small entities, AMS decided, as a matter of policy, to review certain regulations which, although they may not meet the threshold requirement under section 610 of the RFA, warrant review. Accordingly, this notice and request for comments is made for the Mushroom Promotion, Research, and Consumer Information Order.

The purpose of the review is to determine whether the Mushroom Promotion, Research, and Consumer Information Order should be continued without change, amended, or rescinded (consistent with the objectives of the Mushroom Promotion, Research, and Consumer Information Act of 1990) to minimize the impacts on small entities. AMS will consider the continued need for the Order; the nature of complaints or comments received from the public concerning the Order; the complexity of the Order; the extent to which the Order overlaps, duplicates, or conflicts with other Federal rules, and, to the extent feasible, with State and local regulations; and the length of time since the Order has been evaluated or the degree to which technology, economic conditions, or other factors have changed in the area affected by the Order.

Written comments, views, opinions, and other information regarding the Order's impact on small businesses are invited.

Dated: December 8, 2005.

**Lloyd C. Day,**

*Administrator, Agricultural Marketing Service.*

[FR Doc. E5–7336 Filed 12–13–05; 8:45 am]

BILLING CODE 3410–02–P

---

## FEDERAL ELECTION COMMISSION

### 11 CFR Part 109

**[Notice 2005–28]**

### Coordinated Communications

**AGENCY:** Federal Election Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Federal Election Commission requests comment on proposed revisions to its regulations regarding communications that have been coordinated with Federal candidates and political party committees. The Commission's current rules set out a three-prong test for determining whether a communication is "coordinated" with, and therefore an in-kind contribution to, a Federal candidate or a political party committee. In *Shays* v. *FEC*, the Court of Appeals invalidated one aspect of the so-called content prong of the coordinated communications test, because the court believed that the Commission had not provided adequate explanation and justification for the current rules under the Administrative Procedure Act. To comply with the decision of the Court of Appeals, and to address other issues involving the coordinated communication rules, the Commission is issuing this Notice of Proposed Rulemaking. No final decision has been made by the Commission on the issues presented in this rulemaking. Further information is provided in the supplementary information that follows.

**DATES:** Comments must be received on or before January 13, 2006. The Commission will hold a hearing on the proposed rules on January 25 or 26, 2006, or both at 9:30 a.m. Anyone wishing to testify at the hearing must file written comments by the due date and must include a request to testify in the written comments.

**ADDRESSES:** All comments must be in writing, must be addressed to Mr. Brad C. Deutsch, Assistant General Counsel, and must be submitted in either e-mail, facsimile, or paper copy form. Commenters are strongly encouraged to submit comments by e-mail or fax to

ensure timely receipt and consideration. E-mail comments must be sent to either *coordination@fec.gov* or submitted through the Federal eRegulations Portal at *www.regulations.gov*. If e-mail comments include an attachment, the attachment must be in either Adobe Acrobat (.pdf) or Microsoft Word (.doc) format. Faxed comments must be sent to (202) 219–3923, with paper copy follow-up. Paper comments and paper copy follow-up of faxed comments must be sent to the Federal Election Commission, 999 E Street, NW., Washington, DC 20463. All comments must include the full name and postal service address of the commenter or they will not be considered. The Commission will post comments on its website after the comment period ends. The hearing will be held in the Commission's ninth-floor meeting room, 999 E Street, NW., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Mr. Brad C. Deutsch, Assistant General Counsel, Ms. Amy Rothstein, or Mr. Ron B. Katwan, Attorneys, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002, Pub. L. 107–155, 116 Stat. 81 (2002) ("BCRA"), amended the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. 431 *et seq.* (the "Act"), in a number of respects. In the portion of BCRA relevant to this proceeding, Congress repealed the Commission's pre-BCRA regulations regarding "coordinated general public political communications" and directed the Commission to promulgate new regulations on "coordinated communications" in their place. Pub. L. 107–155, sec. 214(b), (c) (2002). On December 17, 2002, the Commission adopted regulations at 11 CFR 109.21 to implement BCRA's provisions regarding payments for communications that are coordinated with a candidate, a candidate's authorized committee, or a political party committee. *See Final Rules and Explanation and Justification on Coordinated and Independent Expenditures,* 68 FR 421 (Jan. 3, 2003) ("*2002 Coordination Final Rules*").

Under the Act, as amended by BCRA, an expenditure "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of" a Federal candidate, a candidate's authorized committee, the national, State, or local committee of a political party, or agents of any of the foregoing, is an in-kind contribution to the candidate or political party committee with which it has been coordinated, and is thus subject to the limitations, prohibitions, and reporting requirements of the Act. 2 U.S.C. 441a(a)(7)(B)(i) and (ii). An "expenditure" is any payment "made by any person for the purpose of influencing any election for Federal office." [1] 2 U.S.C. 431(9)(A)(i).

Thus, under the Act, a payment for a communication constitutes an in-kind contribution if two conditions are satisfied. First, the payment must qualify as an "expenditure"; that is, it must be made for the purpose of influencing a Federal election. Second, the payment must be made "in cooperation, consultation, or concert, with, or at the request or suggestion of" a candidate or political party committee or agents thereof. In addition, the Act provides that any disbursement for an "electioneering communication" [2] that is coordinated with a candidate, a candidate's authorized committee, a political party committee, or agents thereof, is an in-kind contribution to the candidate or political party supported by the communication. 2 U.S.C. 441a(a)(7)(C).

To implement these provisions of the Act, 11 CFR 109.21 sets forth a three-prong test for determining whether a communication is a coordinated communication, and therefore an in-kind contribution to, a candidate, a candidate's authorized committee, or a political party committee. *See* 11 CFR 109.21(a). First, the communication must be paid for by someone other than a candidate, a candidate's authorized committee, a political party committee, or their agents (the "payment prong"). *See* 11 CFR 109.21(a)(1). Second, the communication must meet one of four content standards (the "content prong"). *See* 11 CFR 109.21(a)(2) and (c). Third, the communication must meet one of five conduct standards (the "conduct prong"). *See* 11 CFR 109.21(a)(3) and (d). A communication must satisfy all three prongs to be a "coordinated communication."

**I. The Content Prong**

This rulemaking is being initiated in response to court decisions that invalidated one aspect of the "content prong" of the coordinated communication test. *See Shays* v. *FEC,* 337 F. Supp. 2d 28 (D.D.C. 2004) ("*Shays District*"), *aff'd, Shays* v. *FEC,* 414 F.3d 76 (D.C. Cir. 2005) ("*Shays Appeal*") (*pet. for reh'g en banc denied* Oct. 21, 2005) (No. 04–5352). As described more fully below, the District Court held the content prong as a whole to be invalid, while the Court of Appeals held the Commission's justification for one aspect of the content prong (specifically, the 120-day time frame in the fourth content standard) to be inadequate.

The purpose of the content prong is to "ensure that the coordination regulations do not inadvertently encompass communications that are not made for the purpose of influencing a Federal election." *2002 Coordination Final Rules* at 426. Accordingly, each of the four content standards that comprise the "content prong" identifies a category of communications that satisfies the content prong because its "subject matter is reasonably related to an election." *Id.* at 427.

The first content standard is satisfied if the communication is an electioneering communication. *See* 11 CFR 109.21(c)(1). This content standard implements the statutory directive, described above, that disbursements for coordinated electioneering communications be treated as in-kind contributions to the candidate or political party supported by the communication.

The second content standard is satisfied by a public communication [3] made at any time that disseminates, distributes, or republishes campaign materials prepared by the candidate, the

[1] In addition, the Act specifically provides that the financing of the republication of campaign materials prepared by the candidate, the candidate's authorized committee, or agents thereof, is an expenditure. 2 U.S.C. 441a(a)(7)(B)(iii).

[2] The Act and Commission regulations define an electioneering communication as any broadcast, cable, or satellite communication that (1) refers to a clearly identified candidate for Federal office; (2) is publicly distributed within 60 days before a general election or 30 days before a primary election for the office sought by the candidate referenced in the communication; and (3) can be received by 50,000 or more persons within the geographic area that the candidate referenced in the communication seeks to represent. *See* 2 U.S.C. 434(f)(3)(C); 11 CFR 100.29.

[3] 11 CFR 100.26 defines "public communication" as "a communication by means of any broadcast, cable or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing or telephone bank to the general public, or any other form of general public political advertising. The term public communication shall not include communications over the Internet." The District Court rejected the definition of "public communication" in the Commission's regulations because the definition categorically excludes all Internet communications. *Shays District* at 70. To comply with the *Shays District* decision, the Commission issued a Notice of Proposed Rulemaking that proposes to include certain Internet communications in the definition of "public communication." *See Notice of Proposed Rulemaking on Internet Communications,* 70 FR 16967 (April 4, 2005). The proposed revision to the definition of "public communication" would have the effect of including certain Internet communications in the definition of "coordinated communication," as well. The Commission has not yet issued final rules in this rulemaking.

candidate's authorized committee, or agents thereof. *See* 11 CFR 109.21(c)(2). This content standard implements the Congressional mandate that the Commission's rules on coordinated communications address the "republication of campaign materials." *See* Pub. L. 107–155, sec. 214(c)(1) (2002).

The third content standard is satisfied if a public communication made at any time expressly advocates the election or defeat of a clearly identified candidate for Federal office. *See* 11 CFR 109.21(c)(3); *see also* 11 CFR 100.22. The Commission concluded that express advocacy communications, no matter when such communications are made, can be reasonably construed only as for the purpose of influencing an election.

The fourth content standard is satisfied if a public communication (1) refers to a political party or a clearly identified Federal candidate; (2) is publicly distributed or publicly disseminated 120 days or fewer before an election;[4] and (3) is directed to voters in the jurisdiction of the clearly identified Federal candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot. *See* 11 CFR 109.21(c)(4).

In adopting the 120-day time frame for public communications for the fourth content standard, the Commission sought to create a bright-line rule for public communications that fall short of express advocacy and do not republish campaign materials. The 120-day time frame "focuses the regulation on activity reasonably close to an election, but not so distant from the election as to implicate political discussion at other times." *2002 Coordination Final Rules* at 430. The Commission noted that its intent was "to require as little characterization of the meaning or the content of the communication, or inquiry into the subjective effect of the communication on the reader, viewer, or listener as possible." *2002 Coordination Final Rules* at 430 (citing *Buckley* v. *Valeo,* 424 U.S. 1, 42–44 (1976)). The Commission emphasized that the regulation "is applied by asking if certain things are true or false about the face of the public communication or with limited reference to external facts on the public record." *Id.*

In adopting this time frame, the Commission relied on the fact that, in BCRA, Congress defined "Federal election activity" ("FEA"), in part, as voter registration activity "during the period that begins on the date that is 120 days" before a Federal election. The Commission reasoned that, in doing so, Congress "deem[ed] that period of time before an election to be reasonably related to that election." *Id.* (citing 2 U.S.C. 431(20)(A)(i)).

**II. Overview of Court Decisions in *Shays* v. *FEC***

In *Shays District,* the District Court held that the Commission's coordinated communication regulations did not survive the second step of *Chevron* review.[5] *Shays District* at 61–62. Specifically, the court concluded that limiting the coordinated communication definition to communications that satisfy the content standards at 11 CFR 109.21(c)(1) through (4) would "undercut[] [the Act's] statutory purpose of regulating campaign finance and preventing circumvention of the campaign finance rules." *Id.* at 63. The District Court reasoned that communications that have been coordinated with a candidate, a candidate's authorized committee, or a political party committee have value for, and therefore are in-kind contributions to, that candidate or committee, *regardless of the content, timing, or geographic reach* of the communications. *See Shays District* at 63–64.

The Court of Appeals, however, disagreed "with the district court's suggestion that any standard looking beyond collaboration to content would necessarily 'create an immense loophole,' thus exceeding the range of permissible readings under *Chevron* step two." *Shays Appeal* at 99–100. The Court of Appeals noted that "we can hardly fault the [Commission's] effort to develop an objective, bright-line test [that] does not unduly compromise the Act's purposes." *Shays Appeal* at 99 (internal quotations omitted). Moreover, the Court of Appeals expressly "reject[ed] Shays and Meehan's argument that [the Act] precludes content-based standards under Chevron Step One." *Id.* As the Court of Appeals emphasized, "time, place, and content may be critical indicia of communicative purpose. While election-related intent is obvious, for example, in statements urging voters to 'elect' or 'defeat' a specified candidate or party, the same may not be true of [other types of] ads [.]" *Id.* Instead, the Court of Appeals found that "the challenged regulation's fatal defect is not that the [Commission] drew distinctions based on content, time, and place, but rather that, contrary to the [Administrative Procedure Act], the Commission offered no persuasive justification for * * * the 120-day time-frame and the weak restraints applying outside of it." *Id.* at 100. Specifically, the Court of Appeals concluded that, by limiting "coordinated communications" made outside of the 120-day window to communications containing express advocacy or the republication of campaign materials, "the [Commission] has in effect allowed a coordinated communication free-for-all for much of each election cycle." *Id.*

The Court of Appeals found that the Commission had not adequately explained why "120 days reasonably defines the period before an election when non-express advocacy likely relates to purposes other than 'influencing' a Federal election." *Id.* at 101. Regarding the Commission's reliance on Congress's use of a 120-day time frame in BCRA's definition of FEA as voter registration activity, the Court observed that the Commission had provided no evidence that voter registration activity occurs on cycles similar to "coordinated communications." *Id.* at 100.

For these reasons, the Court of Appeals concluded that the Commission had not provided adequate explanation under the Administrative Procedure Act ("APA") for the Commission's decision to exclude communications distributed more than 120 days before an election, unless a communication contains express advocacy or republishes campaign materials. Therefore, the Court of Appeals affirmed the District Court's invalidation of the Commission's coordinated communication rules. *Id.* at 101.

**III. Alternative Proposals for Revising the Content Prong in 11 CFR 109.21(c)**

The Commission is considering the seven alternatives described below to comply with the Court of Appeals decision in *Shays Appeal.* The regulatory text for each alternative,

[4] The term "election" includes general elections, primary elections, runoff elections, caucuses or conventions, and special elections. *See* 11 CFR 100.2.

[5] The District Court described the *first* step of the *Chevron* analysis, which courts use to review an agency's regulations: "a court first asks 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *See Shays District,* at 51 (*quoting Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council,* 467 U.S. 837, 842–43 (1984)). According to the District Court, in the *second* step of the *Chevron* analysis, the court determines if the agency's interpretation is a permissible construction of the statute that does not "unduly compromise" [the Act's] purposes by "creat[ing] the potential for gross abuse." *See Shays District* at 91, *citing Orloski* v. *FEC,* 795 F.2d 156, 164–65 (D.C. Cir. 1986) (internal citations omitted).

except one,[6] is set forth at the end of this NPRM. The Commission seeks comment on each alternative, including responses to the following questions: Is the alternative too broad or too narrow? Would the alternative potentially include public communications that are not made for the purpose of influencing a Federal election and that therefore should not be restricted and treated as in-kind contributions? Conversely, would the alternative potentially exclude public communications that are made for the purpose of influencing a Federal election and therefore should be treated as an in-kind contribution, provided that the payment and conduct prongs are also satisfied? The Commission invites commenters to provide examples of communications from previous election cycles demonstrating that an alternative may be either underinclusive or overinclusive. Would the alternative address the Court of Appeals' concerns regarding the potential for circumvention of the Act and for corruption or the appearance of corruption? Would the alternative properly effectuate congressional intent? Would the alternative provide sufficient guidance to individuals and organizations seeking to be actively involved in politics and to comply with the Commission's coordination rules?

The Commission notes that the alternatives presented in this NPRM are not limited to the exact terms of the regulatory language set forth for each alternative at the end of the NPRM. Instead, as the narrative describing each alternative makes clear, the final rules may be a variation of one of the alternatives or even a combination of components from different alternatives. The Commission specifically invites comment on whether a combination of components from several different alternatives would be appropriate. The Commission also seeks comment on whether it should adopt a content standard that is not presented as one of the alternatives in this NPRM.

In addition, given that the content prong and the conduct prong of the coordinated communication test were intended to work together, the Commission seeks comment on whether adopting a given alternative with respect to the content prong would necessitate changing the conduct prong in 11 CFR 109.21(d) to ensure that only communications made for the purpose of influencing a Federal election are covered. If so, what amendments to the conduct prong should the Commission consider making?

*Alternative 1—Retain Current 11 CFR 109.21(c)(4) but Revise the Explanation and Justification*

Alternative 1 would retain the current coordinated communication test at 11 CFR 109.21, including the 120-day time frame in the fourth content standard at 11 CFR 109.21(c)(4)(ii), but would revise the Explanation and Justification for 11 CFR 109.21(c)(4)(ii) by providing further explanation supporting the 120-day time frame.[7]

The Court of Appeals emphasized that justifying the 120-day time frame, or another time frame, requires the Commission to undertake a factual inquiry to determine whether the temporal line that it draws "reasonably defines the period before an election when non-express advocacy likely relates to purposes other than 'influencing' a Federal election" or whether it "will permit exactly what BCRA aims to prevent: evasion of campaign finance restrictions through unregulated collaboration." *Shays Appeal* at 101–02. Accordingly, the Commission seeks comment on the following questions raised by the Court of Appeals in *Shays Appeal* regarding the 120-day time frame:

(1) Are a significant number of communications outside the 120-day period made for the purpose of influencing Federal elections, or are communications to influence Federal elections predominantly made within 120 days of an election? Are there specific examples from the 2004 election cycle of communications that the current coordination rules should have reached but did not or, conversely, examples of communications that the current rules should not have reached but did? *Id.* at 102.

(2) Do communications made for the purpose of influencing House, Senate, and Presidential races—all covered by this rule—occur during approximately the same periods in relation to the general election or the primary election, or should different time frames apply to each? *Id.*

(3) If the Commission were to retain the 120-day time frame, would persons aiming to influence elections shift spending outside of that period to avoid the rules' restrictions? Would the same phenomenon potentially take place if the Commission adopted a time frame longer or shorter than 120 days before a Federal election? In 2004, was there any evidence that spending shifted outside the 120-day period to avoid the rules' restrictions? *Id.*

The Commission specifically invites comments in the form of empirical data that show the time periods before an election in which electoral communications generally occur. Do outside persons make electoral communications during time frames that differ from candidates or parties? Do early electoral communications, for example, that occur more than 120 days before an election, have an effect on election results?

On its website, the Commission posts reports filed pursuant to the Act and Commission regulations. Some of these reports include information on independent expenditures by political committees filed under 11 CFR 104.4 and by persons other than political committees under 11 CFR 109.10. Additionally, all political committees must report coordinated expenditures along with all other in-kind contributions under 11 CFR 109.21(b)(3), while political party committees must report their coordinated party expenditures separately under 11 CFR 109.37. *See* Form 3X, line 25 (summarizing entries from Schedule F). For the convenience of commenters, the Commission has extracted these data from the reports and posted them on its website.[8] Do the data provide an empirical basis for retaining the 120-day time frame or establishing another time frame? For example, the data appear to indicate that, during the 2004 election cycle, (1) coordinated party expenditures made in connection with the general election were made mostly after September 1, 2004—roughly within 60 days of the general election, and (2) independent expenditures were made mostly after July 27, 2004—roughly within 90 days of the general election.[9] The Commission invites statistical analyses of these data. Specifically, to what extent is it possible to extrapolate from any identified patterns in party committee coordinated expenditures to

[6] *See* note 11 below.

[7] Although this first alternative proposal to implement the appellate court's decision in *Shays Appeal* would not change 11 CFR 109.21(c)(4), the regulatory text of Alternative 1 as set forth at the end of this NPRM reflects proposed changes to 11 CFR 109.21(c)(4)(ii), to address situations in which multiple candidates for Federal office appear in a given public communication. *See* Section IV–3 below.

[8] These data are available at *http://www.fec.gov/press/coordruledata.shtml.*

[9] A political party committee authorized to make coordinated expenditures may make such expenditures in connection with the general election before or after its candidate has been nominated. *See* 2 U.S.C. 441a(d), 11 CFR 109.34. *See also* 11 CFR 109.32(a). Generally, it is less likely that such expenditures would be made much before a candidate has been nominated. The Commission also notes that expenditures reported by political party committees as "coordinated expenditures" include not only expenditures for communications but also all other coordinated expenditures.

expenditures for coordinated communications by outside groups? Do the data support the conclusion that communications made for the purpose of influencing an election are almost always made, or are generally made, within the last 60 to 90 days before an election?

The Commission also seeks comment on whether other existing analyses provide a basis for choosing a particular time frame. *See, e.g.*, Michael M. Franz et al., *The Election after Reform: Money, Politics and the Bipartisan Campaign Reform Act* ch. 7 (Michael J. Malbin ed., Rowman and Littlefield, forthcoming Mar. 2006), *available at http://www.cfinst.org/studies/ElectionAfterReform/chapters.html;* Ken Goldstein & Joel Rivlin, *Political Advertising in the 2002 Elections* ch. 3 (forthcoming), *available at http://polisci.wisc.edu/tvadvertising;* Craig B. Holman, *Buying Time 2000: Television Advertising in the 2000 Federal Elections* 52–59 (2001), *available at http://www.brennancenter.org/programs/buyingtime2000.html;* Jonathan Krasno & Kenneth Goldstein, *The Facts About Television Advertising and the McCain-Feingold Bill,* 35(2) PS: Political Science and Politics 207 (2002), *draft available at http://www.cfinst.org/studies/papers/goldstein&krasno.pdf;* Donald F. McGahn, Remarks at Campaign Finance Reform Forum, Campaign Finance Institute (Jan. 14, 2005),[10] *available at www.cfinst.org/transcripts/pdf/1-14-05_Transcript_PanelThree.pdf.; see also* data compiled by the University of Wisconsin Advertising Project, *available at http://polisci.wisc.edu/tvadvertising.*

*Alternative 2—Adopt a Different Time Frame*

The Commission seeks comment on whether a time frame other than 120 days would be more appropriate in bringing public communications that are made for the purpose of influencing a Federal election within the coordination regulations, while filtering out public communications that are not made for this purpose.[11] Does empirical evidence support the adoption of a different time frame? Some States hold primary elections early in the election year. Under the current rule, a public communication that refers to a clearly identified candidate and is distributed within the 120-day period preceding a primary election would satisfy the content standard at 11 CFR 109.21(c)(4), but the same public communication distributed shortly after the primary but still more than 120 days before the subsequent general election would not satisfy that standard. Accordingly, rather than retain the current rule covering communications made within the 120-day period before an election, whether primary or general, should the Commission adopt a time frame that covers an uninterrupted period of time starting 120 days (or some other time period) before the primary election up to and including the day of the general election?

The Commission also invites comment on whether to adopt a time frame covering the period from January 1 of each election year through the day of the general election. Would such an "election year" time frame begin too late for States that hold primaries early in the year? Conversely, would an "election year" time frame begin too early for States that hold primaries in September? Would such a time frame be appropriate for Presidential elections?

In addition, the Commission seeks comment on whether to adopt a tiered approach, under which the range of communications that satisfy the fourth content standard would depend on the communication's proximity to an election. For example, for communications made within 120 days before an election, the fourth content standard could be modified to capture any public communication that refers to a political party or clearly identified Federal candidate and is directed to the voters in the relevant geographical areas. For communications made between 120 and 240 days before an election, the fourth content standard could capture only public communications that promote, attack, support, or oppose ("PASO") a political party or a clearly identified Federal candidate.[12] The Commission invites commenters to provide examples of communications from previous election cycles to show whether a given time frame would be either underinclusive or overinclusive.

*Alternative 3—Eliminate the Time Restriction From 11 CFR 109.21(c)(4)*

Alternative 3 would revise 11 CFR 109.21(c)(4) by eliminating any time restriction from the fourth content standard. Specifically, Alternative 3 would remove the requirement that a public communication be publicly distributed or otherwise publicly disseminated 120 days or fewer before an election. *See* 11 CFR 109.21(c)(4)(ii). Alternative 3 would, however, retain the requirements that (1) the public communication refer to a political party or clearly identified candidate and (2) be directed to voters in the jurisdiction of the clearly identified candidate or to voters in the jurisdiction in which one or more candidates of the political party appear on the ballot. *See* 11 CFR 109.21(c)(4)(i) and (iii). Thus, under this alternative, any public communication that refers to a clearly identified candidate or political party and is directed to voters in the relevant jurisdiction would satisfy the content prong of the coordinated communication test, regardless of when it is distributed.

The Commission seeks comment on whether the fourth content standard without a time frame would still be effective in distinguishing communications made for the purpose of influencing a Federal election from communications made for other purposes, such as communications made for the purpose of lobbying for or against certain legislation. The Court of Appeals noted that "to qualify as 'expenditure' in the first place, spending must be undertaken 'for the purpose of influencing' a federal election * * * [T]ime, place, and content may be critical indicia of communicative purpose. While election-related intent is obvious, for example, in statements urging voters to 'elect' or 'defeat' a specified candidate or party, the same may not be true of ads identifying a federal politician but focusing on pending legislation[.]" *Shays Appeal* at 99. Does the fact that a communication refers to a clearly identified candidate or a political party and is directed to voters in the relevant geographical area by itself provide strong evidence that the communication is made for the purpose of influencing a Federal election, even if the communication is made a year or more before that election? Does the Commission have the statutory authority to regulate "other categories of non-electioneering speech—non-express advocacy, for example—outside the 120 days"? *Id.* at 101. How should the Commission separate communications made for the purpose of influencing a Federal election from those without such purpose?

The Commission also invites commenters to provide examples of communications from previous election cycles to show whether Alternative 3

[10] "The hotspot of the campaign didn't start until late September. * * * This cycle was very compressed when it came to the heavy spending. It eventually had in essence a four-week sprint as opposed to the eight- to ten-week sprint that we used to pay for."

[11] Because Alternative 2 does not propose a specific time frame, this NPRM does not set forth regulatory text for Alternative 2.

[12] *See* Alternative 4 below for a more detailed discussion of the PASO standard.

would be either underinclusive or overinclusive.

*Alternative 4—Replace the Content Standard in 11 CFR 109.21(c)(4) With a "PASO" Test*

Alternative 4 would replace the content standard in 11 CFR 109.21(c)(4) with a new standard providing that a public communication would satisfy the content prong of the coordinated communication test if it refers to a political party or a clearly identified Federal candidate, is directed to voters in the jurisdiction of the clearly identified Federal candidate or to voters in a jurisdiction in which one or more Federal candidates of a political party are on the ballot, and the communication PASOs the political party or the clearly identified Federal candidate.[13] Would such a standard have the potential to be unconstitutionally vague in practical application? Or, conversely, would such a standard " 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' "? *McConnell* v. *FEC,* 540 U.S. 93, 170 n.64 (2003) (quoting *Grayned* v. *City of Rockford,* 408 U.S. 104, 108–109 (1972)).

Alternatively, the Commission invites comment on whether Alternative 4, instead of using a PASO standard, should create a safe harbor exemption from the coordinated communication rules for certain kinds of communications. A communication that satisfies these criteria would, as a matter of law, not be treated as a coordinated communication. For example, such criteria could include the following:

- The communication is devoted exclusively to a particular pending legislative or executive branch matter.
- The communication's reference to a clearly identified Federal candidate is limited to urging the public to contact that candidate to persuade the candidate to take a particular position on the pending legislative or executive branch matters.
- The communication does not refer to the political party affiliation or the political ideology (*e.g.,* "liberal," "conservative," etc.) of a clearly identified Federal candidate.
- The communication does not refer to a clearly identified Federal candidate's record or position on any issue.
- The communication does not refer to a clearly identified Federal candidate's character, qualifications, or fitness for office.
- The communication does not refer to an election, voters or the voting public, or anyone's candidacy.

If this criteria-based approach is adopted, should any of the criteria be eliminated from, or added to, the list? If adopted, should the regulation provide that a communication must meet all of the criteria on the list to qualify for the safe harbor exemption or should the regulation follow a more flexible approach and provide that a communication may meet some but not necessarily all of the criteria on the list and still qualify for the exemption? Should satisfaction of one or more specific criteria on the list, by itself, be sufficient to qualify for the exemption? By contrast, should any one or more criteria be critical to the analysis such that failure to meet these criteria would prohibit an organization from taking advantage of the safe harbor?

The Commission seeks comment as to whether Alternative 4 should incorporate a time period limitation, such as a specific number of days before an election. If so, should this time period be 120 days before an election or should a different time frame be adopted? The Commission invites commenters to submit supporting empirical data. The Commission also invites commenters to provide examples of communications from previous election cycles to show whether Alternative 4 would be either underinclusive or overinclusive.

*Alternative 5—Eliminate the Time Restriction From 11 CFR 109.21(c)(4) for Political Committees Only*

Alternative 5 would adopt a bifurcated test under which application of the 120-day time frame would depend on the identity of the person paying for the public communication. If a registered political committee, or an organization that is required to register as a political committee, pays for a public communication that refers to a political party or a clearly identified Federal candidate and the public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more of the candidates of the political party appear on the ballot, then that public communication would be deemed as a matter of law to have been made for the purpose of influencing a Federal election. Such a public communication, when paid for by a political committee, would be deemed to have been made for the purpose of influencing a Federal election regardless of when it is distributed, because a political committee is an organization whose major purpose is to influence elections.[14] Alternatively, should the time frame be eliminated only for public communications that are paid for by registered political committees or organizations that are required to register as political committees if the communication PASOs a political party or a clearly identified Federal candidate?

Under Alternative 5, if the person paying for the public communication is not a registered political committee or an organization that is required to register as a political committee, then the public communication would satisfy the content standard at 11 CFR 109.21(c)(4) only if it occurs 120 days or fewer before an election or during whatever other time frame might be adopted. Are there data to justify the 120-day window? Do the data support another time frame?

The Commission seeks comment on how such a bifurcated test would apply to other entities, such as non-Federal candidates and their campaign organizations. The Commission further seeks comment on how such a bifurcated test should apply to entities organized under section 527 of the Internal Revenue Code that are not registered with the Commission as political committees. The Commission also seeks comment on the effect that this alternative approach would have on a candidate who has contacts that meet the conduct standard with an organization that is not registered as a political committee. If that organization

[13] The PASO standard is found in BCRA and applies primarily to candidates and political party committees with respect to FEA. *See* 2 U.S.C. 431(20)(A)(iii). But Congress also applied the PASO standard to the activity of certain tax-exempt organizations. For example, BCRA prohibits party committees from soliciting funds for, or making or directing donations to, certain tax-exempt organizations that make expenditures or disbursements for FEA, which includes public communications that PASO a Federal candidate. *See* 2 U.S.C. 431(20)(A)(iii) and 441i(d)(1). BCRA also directed the Commission not to exempt any communications that PASO a clearly identified Federal candidate from the electioneering communication provisions. *See* 2 U.S.C. 434(f)(3)(B)(iv). The Commission provided examples of communications that PASO and communications that do not PASO in Advisory Opinion 2003–25.

[14] The Act defines a "political committee" as any committee, club, association, or other group of persons that receives "contributions" or makes "expenditures" aggregating in excess of $1,000 during a calendar year. 2 U.S.C. 431(4)(A). *See also* 11 CFR 100.5. In *Buckley* v. *Valeo,* 424 U.S. 1 (1976), the Supreme Court, in order to avoid vagueness, narrowed the Act's references to "political committee" to prevent their "reach [to] groups engaged purely in issue discussion." 424 U.S. at 79. The Court concluded that "[t]o fulfill the purposes of the Act [the words 'political committee'] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.*

is subsequently found to have inappropriately failed to register as a political committee based on activity that was not known to the candidate, should the Commission provide in the regulation that the candidate would not be deemed to have accepted an in-kind contribution from the organization?

In addition, the Commission invites commenters to provide examples of communications from previous election cycles to show whether Alternative 5 would be either underinclusive or overinclusive.

*Alternative 6—Replace the Fourth Content Standard in 11 CFR 109.21(c)(4) With a Standard Covering Public Communications Made for the Purpose of Influencing a Federal Election*

Alternative 6 would replace the fourth content standard in 11 CFR 109.21(c)(4) with a new standard that would closely track the statute and simply require a communication to be a public communication made for the purpose of influencing a Federal election. The effect of adopting Alternative 6 would be to restrict some public communications that are not covered by current 11 CFR 109.21(c)(4), *i.e.*, communications that are made for the purpose of influencing a Federal election but that are either: (1) Made more than 120 days before an election, or (2) made at any time and do not refer to a political party or a clearly identified Federal candidate. In addition, Alternative 6 would exclude from regulation some communications that are covered by current 11 CFR 109.21(c)(4), *i.e.*, communications that are made within 120 days of an election and that do refer to a political party or a clearly identified Federal candidate but that are not made for the purpose of influencing a Federal election.

Whether a given public communication is for the purpose of influencing a Federal election would depend on the facts and would be decided on a case-by-case basis. This is the approach some Commissioners used before 2002 when the Commission adopted a content prong for its coordinated communication regulations. Under such a case-by-case approach, some public communications would be treated as having been made for the purpose of influencing a Federal election, even though no Federal candidate or political party is referenced in the communication, and regardless of how far in advance of an election such a communication is made. This approach would result in some public communications being restricted as coordinated communications without having to meet a content standard defined in the Commission's regulations. The Commission seeks comment on whether such a case-by-case approach is appropriate and whether it would provide sufficient guidance to candidates, their authorized committees, political party committees, and outside organizations. Would such a standard have the potential to be unconstitutionally vague in practical application? Or, conversely, would such a standard "'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited'"? *McConnell*, 540 U.S. at 170 n.64 (quoting *Grayned*, 408 U.S. at 108–109); *compare Buckley* v. *Valeo*, 424 U.S. 1, 24, n. 24, 46–47, n. 53, 78 (Payments for media advertisements "controlled by or coordinated with the candidate" are treated as contributions, and "for the purpose of influencing" phrase "presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution."). The Commission also invites commenters to provide examples of communications from previous election cycles to show whether Alternative 6 would be either underinclusive or overinclusive.

*Alternative 7—Eliminate the Content Prong in 11 CFR 109.21(c) and Replace It With the Requirement That the Communication Be a Public Communication as Defined in 11 CFR 100.26*

Alternative 7 would eliminate the entire content prong in 11 CFR 109.21(c), and would replace it with the requirement that the communication be a public communication as defined in 11 CFR 100.26.[15] Alternative 7 would also make some conforming amendments. Alternative 7 would be based on the assumption that if an organization or individual works with a candidate or a political party in making a public communication, then the communication inherently has value to the political entity it is coordinated with, regardless of timing or content. Accordingly, in Alternative 7, any public communication that satisfies the *conduct* prong of the coordinated communication test at 11 CFR 109.21(d) would be deemed to have been made for the purpose of influencing a Federal election and thus be a "coordinated communication," regardless of whether it refers to a clearly identified Federal candidate or political party and regardless of when or to whom the communication is distributed.

The Commission notes that, even though Alternative 7 would eliminate the entire content prong, it would nonetheless comply with the statutory requirement that disbursements for coordinated electioneering communications be in-kind contributions to the candidate supported by them and with the congressional mandate that the Commission's coordination rules address the "republication of campaign materials." Specifically, under Alternative 7, *all* public communications (including electioneering communications and communications that republish campaign materials) would be coordinated communications as long as they satisfy the conduct prong.

The Commission seeks comment on whether the conduct prong by itself, without any content prong, would be effective in distinguishing between public communications made for the purpose of influencing a Federal election and public communications made for other purposes, such as public communications made for the purpose of lobbying for or against certain legislation, or for supporting charitable or other non-political causes. Assuming that it is true that a candidate or political party would not coordinate with an outside organization or individual if the resulting communication did not have value for the candidate or political party, does such value necessarily consist of influencing the candidate's election or the election of a political party's candidates? Would the conduct prong by itself, without any content prong, have the potential to be unconstitutionally vague in practical application? Or, conversely, would such a regulation "'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited'"? *McConnell*, 540 U.S. at 170 n.64 (quoting *Grayned*, 408 U.S. at 108–109). The Commission also invites commenters to provide examples of communications from previous election cycles to show whether Alternative 7 would be either underinclusive or overinclusive.

**IV. Other Issues Regarding the Content Prong**

The Commission also seeks comment on the following related issues.

[15] *See* note 3 above.

1. The "Directed to Voters" Requirement in 11 CFR 109.21(c)(4)(iii)

In the event that the Commission decides to retain a content prong, the Commission seeks comment on modifying the requirement in the fourth content standard that a public communication must be directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot. *See* 11 CFR 109.21(c)(4)(iii). While the Act and Commission regulations defining "electioneering communications" require that 50,000 or more persons be able to receive the communication in the relevant geographic area, the fourth content standard does not specify how many persons must be able to receive a communication for it to be classified as a coordinated communication. *See* 2 U.S.C. 434(f)(3)(C); 11 CFR 100.29(b)(3)(ii)(A) and (b)(5). Should 109.21(c)(4)(iii) be deemed satisfied if *any* person in the relevant geographic area can receive the communication? Should 11 CFR 109.21(c)(4)(iii) be changed to specify a minimum number of persons that must be able to receive the communication? If so, what should the required minimum number of persons be? Has the current regulation without a required minimum number presented any difficulties to, or created any confusion for, those seeking to comply with it?

The Commission notes that the fourth content standard applies to "public communications," and thus to communications made by means of newspapers, magazines, periodicals, billboards, mass mailing, and telephone banks. *See* 11 CFR 100.26. Is it appropriate to set a minimum for the "directed to voters" requirement that would exclude small and medium sized publications? If so, should the minimum number be based on the number of copies distributed or on estimates of the number of readers reached by the publications? Similarly, the definition of "public communication" includes limited communications, such as 501 pieces of mail or 501 telephone calls of an identical or substantially similar nature. *See* 2 U.S.C. 431(23) and (24); 11 CFR 100.26, 100.27, 100.29. Would it be appropriate to exclude such limited mass mailings or telephone banks from the "directed to voters" requirement as *de minimis* even though they come within the Commission's definition of "public communication"?

Under the current rules, the second and third content standards (*i.e.*, the republication of campaign material and the express advocacy standards) do not contain a "directed to voters" requirement. Are communications that satisfy these standards so clearly made for the purpose of influencing a Federal election that a "directed to voters" requirement is unnecessary? In the alternative, should such a requirement be added to these two content standards as well?

The Commission also seeks comment on whether to exempt from the coordination regulations communications that are distributed in the jurisdiction of a clearly identified congressional candidate when such distribution is part of, and incidental to, a larger advertising campaign. For example, an advertisement distributed nationally on cable television that refers to a U.S. Representative seeking reelection as one of several sponsors of a piece of legislation will presumably reach voters in the U.S. Representative's district. In such a case, the voters in the U.S. Representative's district would be reached only incidentally as part of the larger lobbying campaign. Would an exemption for communications that reach voters in the jurisdiction of the clearly identified congressional candidate only incidentally provide a reliable way of distinguishing communications that are made for the purpose of influencing a Federal election from lobbying or issue advocacy communications? Would such a standard be sufficiently clear to provide persons with prior notice of the types of communications that are affected? For such a standard to provide effective prior notice, must the Commission specify how many viewers are "incidental"? In the alternative, should the Commission define "incidental" in terms of a certain ratio between the number of persons who can receive the communication in the State or district of the clearly identified Senate or House candidate and the number of persons who can receive the communication outside that State or district? Should such an exemption be limited to public communications that are distributed nationwide? The Commission also invites comment on whether the regulations should provide that such an exemption would apply only if a communication does not PASO the clearly identified candidate.

2. Federal Candidate Endorsements of, and Solicitations of Funds for, Other Federal or Non-Federal Candidates or State Ballot Initiatives

The Commission invites comment regarding the application of the coordinated communication test to situations in which Federal candidates endorse, or solicit funds for, other Federal and non-Federal candidates or State ballot initiatives. In Advisory Opinion 2004–01, the Commission considered a television advertisement that featured President Bush endorsing a congressional candidate. The advertisement was publicly distributed within 120 days of the Presidential primary in the State in which the advertisement aired. The Commission concluded that the "material involvement" conduct standard in 11 CFR 109.21(d)(2) was satisfied because the President's agents "review[ed] the final script in advance of the President's appearance in the advertisements for legal compliance, factual accuracy, quality, consistency with the President's position and any content that distracts from or distorts the 'endorsement' message that the President wishes to convey."[16] Advisory Opinion 2004–01. Similarly, in Advisory Opinion 2003–25, the Commission considered an advertisement featuring a U.S. Senator's endorsement of a candidate for mayor. In that opinion, the Commission determined that it was highly implausible that a Federal candidate would appear in a communication endorsing a local candidate without being materially involved in one or more of the decisions listed in the "material involvement" conduct standard.

The Commission seeks comment on whether to exempt from the coordinated communication rules a Federal candidate's appearance or use of a candidate's name in a communication to endorse other Federal or non-Federal candidates. Do such endorsements benefit the endorsing candidate? The Commission also invites comment on whether any such exemption should be limited to communications that do not PASO the endorsing candidate. Does the fact that the *endorsing* candidate appears in the communication inevitably promote the endorsing candidate?

Similarly, the Commission seeks comment on whether to exempt from the coordinated communication rules a Federal candidate's appearance in a communication that solicits funds for

[16] The Commission further determined that, for advertisements distributed within 120 days of the Presidential primary in the State in which the advertisement aired, the advertisements' production and distribution costs paid for by the congressional candidate's committee but attributable to the President's authorized committee were contributions to the President's committee by the congressional candidate's committee, but that no contribution would result if the President's committee reimbursed the congressional candidate's committee for its attributable share of the costs.

other Federal or non-Federal candidates, party committees, political action committees, or other political committees. Do such solicitations benefit the candidate who makes them? The Commission also invites comment on whether any such exemption should be limited to communications that do not PASO the soliciting candidate, or, in the alternative, do not expressly advocate the election or defeat of the soliciting candidate.

The Commission also seeks comment on whether a similar exemption from the coordinated communication rules should also apply to a Federal candidate's appearance in communications that endorse, or solicit funds for, State ballot initiatives.

3. Proposed Clarification of Application of 120-day Time Frame Requirement in 11 CFR 109.21(c)(4)(ii)

Advisory Opinion 2004–01, discussed above, concerned President Bush's appearance in a television advertisement paid for by a congressional candidate where President Bush endorsed that congressional candidate. The Commission determined that any airing of the advertisement that occurred more than 120 days before the Presidential primary in the State in which the advertisement aired was not an in-kind contribution to President Bush because it did not satisfy the fourth content standard (*i.e.*, 11 CFR 109.21(c)(4)). In making this determination, the Commission looked at whether the communication was aired within 120 days before the non-paying candidate's (*i.e.*, President Bush's) election rather than whether it was aired within 120 days before the paying congressional candidate's election. The regulatory text for Alternative 1 reflects the Commission's proposal to amend its coordinated communication rules to incorporate the approach taken in Advisory Opinion 2004–01 and to make clear that the time frame applies only to the election of a Federal candidate who is clearly identified and who has not paid for the communication.

This alteration would clarify that no in-kind contribution is made under the coordinated communication regulations to a candidate for Federal office who is referred to in a public communication if the referenced candidate will not appear as a Federal candidate on a ballot within 120 days of the distribution of the communication. *See* Advisory Opinion 2005–18, Concurring Opinion of Chairman Thomas, Vice Chairman Toner, Commissioners Mason, McDonald, and Weintraub.

For example, a Senator whose reelection is not until 2008 appears in an advertisement with a 2006 House candidate. The advertisement is aired within 120 days of the House candidate's election, is paid for by the House candidate's campaign committee, and is aired in the State where the Senator will seek reelection in 2008. This advertisement would not be an in-kind contribution to the Senator because the advertisement was not aired within 120 days of the Senator's 2008 election.

The Commission seeks comment on whether the proposed language properly effectuates this clarification.

**V. Issues Regarding the Conduct Prong**

The conduct prong of the Commission's coordinated communication regulations was not challenged in *Shays* v. *FEC*. Nonetheless, the Commission is taking this opportunity to evaluate how certain aspects of the conduct prong work in practice.

*1. The "Request or Suggest" Conduct Standard in 11 CFR 109.21(d)(1)*

The first conduct standard of the coordinated communications test is satisfied if a communication is created, produced or distributed at the request or suggestion of a candidate, a candidate's authorized committee, or a political party committee, or their agents. *See* 11 CFR 109.21(d)(1). The Commission invites comment on whether, even if the Commission decides to retain the *content* prong of the coordinated communication test, it should provide that if the first *conduct* standard is satisfied, the communication would automatically qualify as a coordinated communication without also having to satisfy any of the standards contained in the *content* prong. If a public communication is made at the request or suggestion of a candidate or a political party, then does that communication presumptively have value to the political entity that it was coordinated with, regardless of timing or content? Would such a proposal capture communications that are not made for the purpose of influencing elections? Are there examples of public communications, such as lobbying communications or communications supporting charitable or other non-political causes, that are made at the "request or suggestion" of a Federal candidate but that do not have value for the candidate's campaign?

*2. The "Common Vendor" and "Former Employee" Conduct Standards in 11 CFR 109.21(d)(4) and (5)*

The fourth standard of the conduct prong of the coordinated communication rules involves common vendors, and the fifth standard involves former employees. See 11 CFR 109.21(d)(4) and (5). The Commission intended these standards to implement Congress's requirement in BCRA that the Commission address "the use of a common vendor" and "persons who previously served as an employee of a candidate or a political party committee" in the context of coordination. BCRA, Pub. L. No. 107–55, sec. 214(c)(2) and (3) (2002).

The "common vendor" conduct standard is satisfied if (1) the person paying for the communication contracts with, or employs, a "commercial vendor" to create, produce, or distribute the communication, (2) the commercial vendor has a previous or current relationship with the political party committee or the clearly identified candidate referred to in the communication that puts the commercial vendor in a position to acquire material information about the plans, projects, activities, or needs of the candidate or political party committee, and (3) the commercial vendor uses or conveys material information to the person paying for the communication about the plans, projects, activities, or needs of the candidate or political party committee, or material information used by the commercial vendor in serving the candidate or political party committee. *See* 11 CFR 109.21(d)(4).

The "former employee" conduct standard is satisfied if (1) the person paying for the communication was, or is, employing a person who was an employee of the candidate or the political party committee clearly identified in the communication, and (2) the former employee uses or conveys material information to the person paying for the communication about the plans, projects, activities, or needs of the candidate or political party committee, or material information used by the former employee in serving the candidate or political party committee. *See* 11 CFR 109.21(d)(5).

The first three conduct standards in 11 CFR 109.21(d)(1)–(3) are satisfied only if either the principals themselves (*i.e.*, candidates, their authorized committees, or political party committees) or their agents coordinate with the person paying for the

communication.[17] However, because commercial vendors and former employees might not be agents of a candidate or a political party committee at the time they use or convey material information to a person paying for a communication, the "common vendor" and the "former employee" conduct standards can be satisfied by persons other than the principals themselves or their agents. The Commission seeks comment on whether it should change the coordinated communication regulations to cover common vendors and former employees only if these common vendors and former employees are agents under the Commission's definition of agent in 11 CFR 109.3.[18] Does the Commission have authority under the Act to make this change? If the Commission does make this change, would such agents then be covered by the first three conduct standards in 11 CFR 109.21(d)(1)–(3) or would the "common vendor" and the "former employee" conduct standards still cover some activities not captured by the first three conduct standards? If the Commission revises the common vendor and former employee conduct standards to cover only common vendors and former employees who are also agents, would that render these two conduct standards superfluous? If so, should the Commission then eliminate the conduct standards in 11 CFR 109.21(d)(4) and (5)? Given that BCRA specifically required the Commission to promulgate regulations that addressed payments for the use of common vendors and for communications directed or made by persons who previously served as employees of a candidate or political party, does the Commission have authority under the Act to eliminate 11 CFR 109.21(d)(4) and (5)?

In the rulemaking proceeding that resulted in the *2002 Coordination Final Rules,* the Commission received many comments on the common vendor conduct standard. Some of the comments expressed concern about the potential liability that would attach under the common vendor standard to candidates and party committees who employ the same vendors as other candidates and party committees because of the limited number of qualified vendors in a given geographic area.

The Commission addressed this and other concerns in the *2002 Coordination Final Rules* by limiting the common vendor conduct standard to commercial vendors whose usual and normal business includes the creation, production, or distribution of communications; who have provided certain enumerated services to a candidate or party committee that put the vendor in a position to acquire information about the plans, projects, activities or needs of the candidate or party committee material to the creation, production, or distribution of the communication; who provide the specified services during the current election cycle; and who use or convey information about the candidate's or party committee's campaign plans, projects, activities or needs that is material to the creation, production, or distribution of the communication. *See* 68 FR 436–37. The Commission also excluded lobbying activities and information not related to a campaign from the scope of the rule.

The Commission stated that it did not anticipate that a person who hired a vendor and followed prudent business practices would be inconvenienced by the common vendor conduct standard. *See id.* at 437. The Commission now invites comments on whether this supposition has proven to be correct.

The Commission also seeks comment on whether it should create a rebuttable presumption that a common vendor or former employee has not engaged in coordinated conduct under 11 CFR 109.21(d)(4) and (5), if the common vendor or former employee has taken certain specified actions, such as the use of so-called "firewalls," to ensure that no material information about the plans, projects, activities, or needs of a candidate or political party committee is used or conveyed to a third party. The Commission considered and rejected proposals to establish rebuttable presumptions and safe harbors in the common vendor conduct standard in the *2002 Coordination Final Rules. See id.* More recently, however, the Commission recognized in the context of the first three conduct standards (11 CFR 109.21(d)(1)–(3)) that the presence of a firewall between staff assigned by a political committee to work directly with a candidate and staff assigned by the political committee to work on advertisements supporting that candidate was sufficient to refute certain allegations of coordination in a particular case. *See* Matter Under Review ("MUR") 5506, First General Counsel's Report at 5–8 (Commission found no reason to believe EMILY's List had violated section 441a of the Act based, in part, on a representation by EMILY's List that it had created a firewall whereby employees, volunteers, and consultants who handle advertising buys are "barred, as a matter of policy, from interacting with federal candidates, political party committees, or the agents of the foregoing. These employees, volunteers and consultants are also barred from interacting with others within EMILY's List regarding specified candidates or officeholders.").

If the Commission decides to establish a rebuttable presumption or safe harbor in the common vendor and former employee conduct standards, what factors should the Commission consider in determining whether an effective firewall exists? Is the role of a firewall best addressed on a case-by-case basis through the enforcement process? Aside from setting up firewalls, are there other actions by a common vendor, former employee, or the political committees that engage them that the Commission should consider a safe harbor?

The common vendor conduct standard and the former employee conduct standard incorporate the current election cycle[19] as a temporal limit on their application. *See* 11 CFR 109.21(d)(4)(ii), (d)(5)(i). In the *2002 Coordination Final Rules*, the Commission explained that "[t]he election cycle provides a clearly defined period of time that is reasonably related to an election." *2002 Coordination Final Rules* at 436. The Commission invites comments on how this temporal limit works in practice. Is information about a candidate's campaign plans, products,

[17] The first conduct standard addresses communications produced at the request or suggestion of a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing. See 11 CFR 109.21(d)(1). The second conduct standard addresses communications with which a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing has been materially involved. *See* 11 CFR 109.21(d)(2). The third conduct standard addresses communications produced after one or more substantial discussions between the person paying for the communication, or that person's employees or agents, and the candidate clearly identified in the communication, the candidate's authorized committee, the candidate's opponent, or the opponent's authorized committee, or an agent of any of the foregoing. *See* 11 CFR 109.21(d)(3).

[18] The definition of "agent" includes any person who has actual authority "to make or authorize a communication that meets one or more of the content standards set forth in 11 CFR 109.21(c)" on behalf of a political party committee or a Federal candidate or officeholder. *See* 11 CFR 109.3(a)(2) and (b)(2). For reasons unrelated to the issues addressed in this rulemaking, the *Shays District* court held that the Commission's definition of agent at 11 CFR 109.3 violated APA requirements and remanded the regulation to the Commission for action consistent with its decision. *Shays District* at 88. In order to comply with the *Shays District* decision, the Commission has issued an NPRM that sought comment on whether the Commission should retain the current definition of "agent" and on several alternatives for revising the definition. *See Notice of Proposed Rulemaking on the Definition of "Agent" for BCRA Regulations on Non-Federal Funds or Soft Money and Coordinated and Independent Expenditures,* 70 FR 5382 (Feb. 2, 2005). The Commission has not yet issued final rules in this rulemaking.

[19] The term "election cycle" is defined in 11 CFR 100.3(b).

activities, or needs of such an ephemeral nature that its strategic significance dissipates shortly after the information is communicated, which may be long before the end of the election cycle, or does the information remain relevant throughout the election cycle? If the Commission concludes that the strategic value of such information does not necessarily last throughout an entire election cycle, should the Commission change the common vendor and former employee conduct standards to cover a shorter time frame? If so, how long should such a time frame be? Should the Commission adopt a 60-day time frame based on the Commission's determination, underlying its longstanding rule with respect to polling results, that such information outside of the 60-day time frame is of very little value?[20] Alternatively, does the Commission's experience with the polling regulations provide evidence that the Commission should adopt a 180-day window for its coordination regulations? Alternatively, would retention of the election cycle time frame in the current rule more accurately align the rule with existing campaign practices?

*3. The Use of Publicly Available Information in "Coordinated Communications"—Proposed 11 CFR 109.21(g)*

The Commission seeks comment on whether to create a safe harbor that would make clear as a matter of law that (1) the use of publicly available information in connection with a public communication by any person paying for that public communication does not satisfy any of the conduct standards, and (2) a candidate's or political party committee's conveyance of publicly available information to any person paying for a public communication does not satisfy any of the conduct standards. This safe harbor in proposed 11 CFR 109.21(g) would cover situations in which a candidate, authorized committee, or political party committee has conveyed information publicly, such as, for example, at a campaign rally or on the candidate's or party's Web site or in a press release, or where such information is otherwise publicly available, such as having appeared in newspaper, television, or other press reports. Should such a safe harbor also cover situations in which the person paying for the communication has received the information both from the candidate, authorized committee, or political party committee, in a non-public context and also from a public source? How should the rules treat a situation in which the person paying for the communication did, in fact, receive the information only from the candidate, authorized committee, or political party committee, but could also have obtained the same information from a public source?

The Commission also seeks comment on whether, if it adopts this safe harbor for the use of publicly available information, the burden of establishing whether the information was publicly available should be on the Commission or on the party seeking to make use of the safe harbor. If that burden were on the Commission, how would the Commission be able to establish that the information was not publicly available at the relevant time, given that some information, especially information available through the Internet, may be in the public domain only for a limited time period?

*4. Relationship Between Conduct and Content Standards*

If the Commission broadens or eliminates the content standard for coordinated communications, the Commission seeks comment on whether it would be appropriate to narrow or otherwise modify any of the conduct standards. Are the conduct and content standards properly understood as dynamic and working in conjunction with each other?

## VI. Issue Regarding the Payment Prong

The payment prong (11 CFR 109.21(a)(1)) of the Commission's coordinated communication regulations was not challenged in *Shays v. FEC*. Nonetheless, the Commission is taking this opportunity to seek comment on whether it should clarify one aspect of the payment prong. Specifically, the Commission seeks comment on whether "in whole or in part" should be added to 11 CFR 109.21(a)(1) of the coordinated communication rules. The amendment would clarify that the payment prong is satisfied if a person other than the candidate, the candidate's authorized committee, or political party committee, pays for only part of the costs of the communication. Under this proposed amendment, 11 CFR 109.21(a)(1) would be revised to read, "Is paid, in whole or in part, by a person other than that candidate, authorized committee, political party committee, or agent of any of the foregoing." Does this amendment best effectuate the intended clarification of the payment prong? Would this clarification alter the application of the content or conduct prongs of the coordinated communication rules? Would this clarification inadvertently capture communications properly attributed under the time and space rules set forth at 11 CFR 106.1(a)(1)?

## VII. Party Coordinated Communications (11 CFR 109.37)

The Commission notes that its "party coordinated communication" regulation at 11 CFR 109.37 also contains a three-prong test for determining whether a communication is coordinated between a candidate and a political party committee. Although not addressed in the *Shays* cases, the "party coordinated communication" test in 11 CFR 109.37 has a content prong that is substantially the same as the one for "coordinated communications" in 11 CFR 109.21(c).[21] *See* 11 CFR 109.37(a)(2). If the Commission decides to revise current 11 CFR 109.21 as described in the alternatives set forth above, the Commission seeks comment on whether it should make conforming changes to the party coordinated communication regulations in 11 CFR 109.37.

In addressing the conduct of national party officers under the national party soft money ban at 2 U.S.C. 441i(a), the Supreme Court stated, "[n]othing on the face of [section 441i(a)] prohibits national party officers, whether acting in their official or individual capacities, from sitting down with state and local party committees or candidates to plan and advise how to raise and spend soft money. As long as the national party officer does not personally spend, receive, direct, or solicit soft money, [section 441i(a)] permits a wide range of joint planning and electioneering activity." *McConnell*, 540 U.S. at 160 (citing to Brief for Intervenor-

[20] The Commission's regulations on allocation of polling expenses at 11 CFR 106.4(g) provide that a candidate or political committee that receives poll results from a third party who commissioned and paid for the poll may report the value of the in-kind contribution as an allocated percentage of the original cost of the poll, so long as the candidate or political committee received the poll results more than 15 days after the initial recipient received such results. Section 106.4(g) of the Commission's rules provides three tiers of discounted allocation based on how long the gap is between the original receipt of poll results and their receipt by a candidate or political committee—poll results received by a candidate or political committee between 16 and 60 days following receipt by the initial recipient may be allocated at 50 percent of the original cost; between 61 and 180 days the allocation is at 5 percent of original cost; beyond 180 days, a candidate or political committee need not allocate any amount.

[21] 11 CFR 109.37(a)(2) differs from 11 CFR 109.21(c) in two ways: first, it does not contain a separate content standard for electioneering communications and, second, the content standard in section 109.37(a)(2)(iii), the equivalent of the fourth content standard in section 109.21(c)(4), can be satisfied only by reference to a clearly identified Federal candidate and not, as in section 109.21(c)(4), also by reference to a political party.

Defendants Sen. John McCain *et al.* in No. 02–1674 *et al.*, p. 22, which stated that "BCRA leaves parties and candidates free to coordinate campaign plans and activities, political messages, and fund raising goals with one another"); *see* also Advisory Opinion 2005–02 (incorporating such principles). The Commission seeks comment on the relevance, if any, of this statement to the Commission's coordinated communication regulations. Does *McConnell* render the application of the conduct standards to coordination between a candidate and a political party committee at 11 CFR 109.37(a)(3) obsolete? Does it preclude a finding of coordination under the material involvement prong at 11 CFR 109.21(d)(2)? Does the relationship between national party candidates and their parties justify adopting more permissive conduct standards for "party coordinated communications" in 11 CFR 109.37 than for coordinated communications in 11 CFR 109.21? If so, how should the conduct standards for "party coordinated communications" be amended?

**Certification of No Effect Pursuant to 5 U.S.C. 605(b)**

*Regulatory Flexibility Act*

The Commission certifies that the attached proposed rules, if promulgated, would not have a significant economic impact on a substantial number of small entities. The basis for this certification is that any individuals and not-for-profit entities that would be affected by these proposed rules would not be "small entities" under 5 U.S.C. 601. The definition of "small entity" does not include individuals, but classifies a not-for-profit enterprise as a "small organization" if it is independently owned and operated and not dominant in its field. 5 U.S.C. 601(4).

Moreover, any State, district, and local party committees that would be affected by these proposed rules would be not-for-profit committees that do not meet the definition of "small organization." State political party committees are not independently owned and operated because they are not financed and controlled by a small identifiable group of individuals, and they are affiliated with the larger national political party organizations. In addition, the State political party committees representing the Democratic and Republican parties have a major controlling influence within the political arena of their State and are thus dominant in their field. District and local party committees are generally considered affiliated with the State committees and need not be considered separately.

Furthermore, any separate segregated funds that would be affected by these proposed rules would be not-for-profit political committees that do not meet the definition of "small organization" because they are financed by a combination of individual contributions and financial support for certain expenses from corporations, labor organizations, membership organizations, or trade associations, and therefore are not independently owned and operated.

Most of the other political committees that would be affected by these proposed rules would be not-for-profit committees that do not meet the definition of "small organization." Most political committees are not independently owned and operated because they are not financed by a small identifiable group of individuals. In addition, most political committees rely on contributions from a large number of individuals to fund the committees' operations and activities.

To the extent that any State party committees representing minor political parties or any other political committees might be considered "small organizations," the number that would be affected by this proposed rule would not be substantial, particularly the number that would coordinate expenditures with candidates or political party committees in connection with a Federal election. Accordingly, to the extent that any other entities may fall within the definition of "small entities," any economic impact of complying with these rules would not be significant.

With respect to commercial vendors whose clients include political party committees or other political committees, the proposed rules consider ways to reduce the existing regulatory restrictions. Thus, rather than adding an economic burden, the proposed rules would potentially have a beneficial economic impact on such commercial vendors.

**List of Subjects in 11 CFR Part 109**

Elections, Reporting and recordkeeping requirements.

For the reasons set out in the preamble, the Federal Election Commission proposes to amend Subchapter A of Chapter I of Title 11 of the *Code of Federal Regulations* as follows:

**PART 109—COORDINATED AND INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 441a(a) AND (d), AND PUB. L. 107–55 SEC. 214(c))**

1. The authority citation for Part 109 would continue to read as follows:

**Authority:** 2 U.S.C. 431(17), 434(c), 438(a)(8), 441a, 441d; Sec. 214(c) of Pub. L. 107–55, 116 Stat. 81.

**Alternative 1**

2. Section 109.21 would be amended by revising paragraphs (c)(1) and (c)(4) to read as follows:

**§ 109.21 What is a "coordinated communication"?**

* * * * *

(c) *Content standards.* Each of the types of content described in paragraphs (c)(1) through (c)(4) satisfies the content standard of this section.

(1) An electioneering communication under 11 CFR 100.29.

(2) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). For a communication that satisfies this content standard, see paragraph (d)(6) of this section.

(3) A public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(4) A public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(4)(i), (ii), and (iii) of this section is true. Payment for a public communication that otherwise satisfies paragraphs (c)(4)(i), (ii), and (iii) of this section is not an in-kind contribution to a candidate if the public communication is not publicly distributed or otherwise publicly disseminated 120 days or fewer before that candidate's own election.

(i) The public communication refers to a political party or to a clearly identified candidate for Federal office;

(ii) The public communication is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and

(iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or

more candidates of the political party appear on the ballot.

* * * * *

**Alternative 3**

3. Section 109.21 would be amended by revising paragraphs (c)(4) to read as follows:

**§ 109.21 What is a "coordinated communication"?**

* * * * *

(c) * * *

(4) A public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(4)(i) and (ii) of this section is true.

(i) The public communication refers to a political party or to a clearly identified candidate for Federal office; and

(ii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

* * * * *

**Alternative 4**

4. Section 109.21 would be amended by revising paragraph (c)(4) to read as follows:

**§ 109.21 What is a "coordinated communication"?**

* * * * *

(c) * * *

(4) A public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(4)(i), (ii), and (iii) of this section is true.

(i) The public communication refers to a political party or to a clearly identified candidate for Federal office;

(ii) The public communication promotes, supports, attacks, or opposes or the political party or clearly identified candidate for Federal office; and

(iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

* * * * *

**Alternative 5**

5. Section 109.21 would be amended revising the introductory language for paragraph (c) and by adding a new paragraph (c)(5) to read as follows:

**§ 109.21 What is a "coordinated communication"?**

* * * * *

(c) *Content standards.* Each of the types of content described in paragraphs (c)(1) through (c)(5) satisfies the content standard of this section.

* * * * *

(5) A public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(5)(i), (ii), and (iii) of this section is true.

(i) The public communication is made by a political committee, as defined in 11 CFR 100.5;

(ii) The public communication refers to a political party or to a clearly identified candidate for Federal office; and

(iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

* * * * *

**Alternative 6**

6. Section 109.21 would be amended by revising paragraph (c)(4) to read as follows:

**§ 109.21 What is a "coordinated communication"?**

* * * * *

(c) * * *

(4) A public communication, as defined in 11 CFR 100.26, that is made for the purpose of influencing an election for Federal office.

* * * * *

**Alternative 7**

7. Section 109.3 would be amended by revising paragraphs (a)(2) and (b)(2) to read as follows:

**§ 109.3 Definitions.**

* * * * *

(a) * * *

(2) To make or authorize an electioneering communication as defined in 11 CFR 100.29 or a public communication as defined in 11 CFR 100.26.

* * * * *

(b) * * *

(2) To make or authorize an electioneering communication as defined in 11 CFR 100.29 or a public communication as defined in 11 CFR 100.26.

* * * * *

8. Section 109.21 would be amended by:

a. Revising paragraph (a)(2);

b. Removing and reserving paragraph (c)

c. Revising the first sentence of paragraph (d)(6) to read as set forth below.

The additions and revisions would read as follows:

**§ 109.21 What is a "coordinated communication"?**

* * * * *

(a) * * *

(2) Is an electioneering communication as defined in 11 CFR 100.29 or a public communication as defined in 11 CFR 100.26; and

* * * * *

(c) [Removed and reserved.].

(d) * * *

(6) *Dissemination, distribution, or republication of campaign material.* A communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, shall satisfy the conduct standards of paragraphs (d)(1) through (d)(3) of this section only on the basis of conduct by the candidate, the candidate's authorized committee, or the agents of any of the foregoing, that occurs after the original preparation of the campaign materials that are disseminated, distributed, or republished. * * *

* * * * *

**Proposed Safe Harbor for Use of Publicly Available Information**

9. Section 109.21 would be amended by adding a new paragraph (g) to read as follows:

**§ 109.21 What is a "coordinated communication"?**

* * * * *

(g) *Safe harbor for use of publicly available information.*

(1) The use of publicly available information by any person paying for a public communication in connection with a public communication does not satisfy any of the conduct standards in paragraph (d) of this section.

(2) A candidate's or political party committee's conveyance of publicly available information to any person paying for a public communication does not satisfy any of the conduct standards in paragraph (d) of this section.

**Proposed Clarification of "Payment Prong"**

10. Section 109.21 would be amended by revising paragraph (a)(1) to read as follows:

**§ 109.21 What is a "coordinated communication"?**

(a) * * *

(1) Is paid for, in whole or in part, by a person other than that candidate, authorized committee, political party

committee, or agent of any of the foregoing when the communication:

* * * * *

Dated: December 8, 2005.

**Scott E. Thomas,**

*Chairman, Federal Election Commission.*

[FR Doc. E5–7293 Filed 12–13–05; 8:45 am]

BILLING CODE 6715–01–P

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 71

**[Docket No. FAA–2005–23075; Airspace Docket 05–ASO–12]**

### Proposed Establishment of Class E Airspace; Nicholasville, KY

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** This notice proposes to establish Class E airspace at Nicholasville, KY. Area Navigation (RNAV) Global Positioning System (GPS) Standard Instrument Approach Procedures (SIAPs) Runway (RWY) 9 and RWY 27 have been developed for Lucas Field Airport. As a result, controlled airspace extending upward from 700 feet Above Ground Level (AGL) is needed to contain the SIAPs and for Instrument Flight Rules (IFR) operations at Lucas Field Airport. The operating status of the airport will change from Visual Flight Rules (VFR) to include IFR operations concurrent with the publication of the SIAPs.

**DATES:** Comments must be received on or before January 13, 2006.

**ADDRESSES:** Send comments on this proposal to the Docket Management System, U.S. Department of Transportation, Room Plaza 401, 400 Seventh Street, SW., Washington, DC 20590–0001. You must identify the docket number FAA–2005–23075; Airspace Docket 05–ASO–12, at the beginning of your comments. You may also submit comments on the Internet at *http://dms.dot.gov.* You may review the public docket containing the proposal, any comments received, and any final disposition in person in the Dockets Office between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Docket office (telephone 1–800–647–5527) is on the plaza level of the Department of Transportation NASSIF Building at the above address.

An informal docket may also be examined during normal business hours at the office of the Regional Air Traffic Division, Federal Aviation Administration, Room 550, 1701 Columbia Avenue, College Park, Georgia 30337.

**FOR FURTHER INFORMATION CONTACT:** Mark D. Ward, Manager, Airspace and Operations Branch, Eastern En Route and Oceanic Service Area, Federal Aviation Administration, P.O. Box 20636, Atlanta, Georgia 30320; telephone (404) 305–5586.

**SUPPLEMENTARY INFORMATION:**

#### Comments Invited

Interested parties are invited to participate in this proposed rulemaking by submitting such written data, views or arguments as they may desire. Comments that provide the factual basis supporting the views and suggestions presented are particularly helpful in developing reasoned regulatory decisions on the proposal. Comments are specifically invited on the overall regulatory, aeronautical, economic, environmental, and energy-related aspects of the proposal. Communications should identify both docket numbers and be submitted in triplicate to the address listed above. Commenters wishing the FAA to acknowledge receipt of their comments on this notice must submit with those comments a self-addressed, stamped postcard on which the following statement is made: "Comments to Docket No. FAA–2005–23075/Airspace Docket No. 05–ASO–12." The postcard will be date/time stamped and returned to the commenter. All communications received before the specified closing date for comments will be considered before taking action on the proposed rule. The proposal contained in this notice may be changed in light of the comments received. A report summarizing each substantive public contact with FAA personnel concerned with this rulemaking will be filed in the docket.

#### Availability of NPRMs

An electronic copy of this document may be downloaded through the Internet at *http://dms.dot.gov.* Recently published rulemaking documents can also be accessed through the FAA's Web page at *http://www.faa.gov* or the Superintendent of Document's Web page at *http://www.access.gpo.gov/nara.* Additionally, any person may obtain a copy of this notice by submitting a request to the Federal Aviation Administration, Office of Air Traffic Airspace Management, ATA–400, 800 Independence Avenue, SW., Washington, DC 20591, or by calling (202) 267–8783. Communications must identify both docket numbers for this notice. Persons interested in being placed on a mailing list for future NPRM's should contact the FAA's Office of Rulemaking, (202) 267–9677, to request a copy of Advisory Circular No. 11–2A, Notice of Proposed Rulemaking Distribution System, which describes the application procedure.

#### The Proposal

The FAA is considering an amendment to part 71 of the Federal Aviation Regulations (14 CFR part 71) to establish Class E airspace at Nicholasville, KY. Class E airspace designations for airspace areas extending upward from 700 feet or more above the surface of the earth are published in Paragraph 6005 of FAA Order 7400.9N, dated September 1, 2005, and effective September 16, 2005, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designation listed in this document would be published subsequently in the Order.

The FAA has determined that this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore, (1) is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a Regulatory Evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this rule, when promulgated, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

#### List of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

#### The Proposed Amendment

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

### PART 71—DESIGNATION OF CLASS A, CLASS B, CLASS C, CLASS D, AND CLASS E AIRSPACE AREAS; AIRWAYS; ROUTES; AND REPORTING POINTS

1. The authority citation for Part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

# PLAINTIFFS' EXHIBIT 14

January 13, 2006

**By Electronic Mail**

Mr. Brad C. Deutsch
Assistant General Counsel
Federal Election Commission
999 E Street, NW
Washington, DC 20463

Re:    Notice 2005–28

Dear Mr. Deutsch:

As the principal House and Senate sponsors of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), we appreciate the opportunity to comment on the Commission's proposed changes to the rule governing coordination for purposes of the campaign finance laws.

In BCRA, we included section 214 in order to repeal an earlier Commission regulation that, in our view, had far too narrowly construed the concept of "coordination." That section of BCRA also directed the Commission to draft a new regulation on coordination that did not include the narrow and inappropriate limitation that coordination cover only situations where there is a formal collaboration or agreement between a candidate and a spender. As Senator McCain said on the Senate floor:

> Section 214 represents a determination that the current FEC regulation is far too narrow to be effective in defining coordination in the real world of campaigns and elections and threatens to seriously undermine the soft money restrictions contained in the bill.

148 Cong.Rec. S2145 (daily ed. March 20, 2002). Similarly, Senator Feingold noted:

> This current FEC regulation fails to cover a range of de facto and informal coordination between outside groups and candidates or parties that, if permitted, could frustrate the purposes of the bill.... To remedy this problem, the bill requires the FEC to reexamine the coordination issue and promulgate new coordination rules. *These rules need to make more sense in the light of real life campaign practices than do the current regulations.*

*Id.* at. S2144-45 (emphasis added).

When the Commission undertook its post-BCRA rulemaking to implement the requirement of section 214, we submitted comments that set forth our view on what would constitute effective and appropriate regulations for the coordination standard to remedy the serious problems in the flawed regulations repealed by Congress. We attach those comments here, and re-submit them for the record in this rulemaking.

In repealing an ineffective coordination standard and directing the Commission to issue a new one, we did not intend for the Commission to issue a rule that was, in important ways, even weaker than the one Congress repealed. Yet that is what the Commission did. As the D.C. Circuit Court of Appeals said about the Commission's post-BCRA rule, "To be sure, it seems hard to imagine that Representatives and Senators voting for BCRA would have expected regulations like these." *Shays and Meehan v. FEC*, 414 F.3d 76, 98-99 (D.C. Cir. 2005). We did not.

Unfortunately, the Commission's 2002 rule promulgated after BCRA is deeply flawed. Once again, the Commission wrote a rule that would allow much coordinated activity that was clearly meant to influence an election escape any regulation at all, and thus operate entirely outside the law. One problem this time was that the Commission decided that as a matter of law no ad running more than 120 days before a primary or general election would be considered to be coordinated, no matter how coordinated in fact the ad really was, unless the ad contained express advocacy or constituted republication of campaign materials. Given that the Supreme Court in *McConnell v. FEC*, 540 U.S. 90 (2003), had just declared the express advocacy test to be "functionally meaningless," this meant, in effect, that there would be no coordination rule at all for any ad run more than 120 days before an election.

It is our experience as candidates that campaign ads are in fact run earlier than 120 days before an election – by parties, by outside groups, and by candidates themselves. Certainly there was no basis in BCRA or any other statute for the Commission to conclude to the contrary, with the effect of allowing a candidate or party to write a campaign ad, hand it over to a corporate or union spender and direct that spender where and when to run the ad, using unlimited corporate or union funds. But that is the effect of the Commission's approach. During the debate on BCRA, Senator Feingold made this very point, stressing that no ban on soft money would be effective in the absence of a strong and realistic coordination rule:

> Absent a meaningful standard for coordination, the soft money ban in the bill would be seriously undermined. In the place of outside special interests donating six-figure checks to the national parties to be spent on Federal elections, these entities could simply work in tandem with the parties and candidates to spend their own treasury funds – soft money – on federal electioneering activities.

148 Cong. Rec. S2144.

That is why Representatives Shays and Meehan brought a lawsuit to challenge this regulation, as well as numerous other regulations issued by the Commission to implement BCRA. We strongly agree with the decision of the district court and the D.C. Circuit Court of Appeals in *Shays and Meehan v. FEC,* where this rule was invalidated. Both courts recognized the serious loopholes that are once again opened up by the Commission's coordination rule.

As the D.C. Circuit said, the Commission's rule, which applies only a "functionally meaningless" express advocacy test for coordination outside the 120-day period, means that "the FEC has in effect allowed a coordinated communication free-for-all for much of each election cycle." *Id.* 414 F.3d at 99.

We urge the Commission to adopt a new coordination rule that will provide appropriate and realistic coverage of the ads that are subject to that rule, without infringing on other activities, such as lobbying.

For political committees, the Commission should require that all their expenditures which are coordinated with a candidate, whenever made, are covered by the coordination rule. For political committees, the statute itself defines the term "expenditure" and there is no need for any limitation on this.

As for other types of spenders, such as corporations, labor unions, other groups, individuals and 527s that are not registered as political committees, we agree that it makes sense to treat communications differently depending on how close they are made to an election. But the Commission should carefully set out rules that make sense in the real world both of legislative lobbying and political campaigns.

In Title II of BCRA, Congress identified a pre-election period (30 days before a primary, and 60 days before a general election) as a time when communications that mention candidates can be presumed to be intended to influence elections. We believe that the same reasoning applies to communications that are coordinated with a candidate. Any communication that is coordinated with a candidate, regardless of its content, should be considered a contribution to that candidate if the communication is targeted to the electorate of that candidate within the pre-election period. The fact of the coordination itself indicates that such ads can provide assistance of real value to a candidate, and will usually be run for purposes of influencing the candidate's election. For example, if a candidate asks a corporation or a labor union to run a television advertisement in the last week of a campaign commenting on an important issue in a campaign – such as social security, or medical malpractice reform, or national security – that ad should be considered a contribution to the candidate regardless of whether the candidate, or an opponent, is mentioned.

Second, a longer pre-election period should apply if a communication mentions a clearly-identified candidate, is targeted to the electorate of that candidate, and is coordinated with that candidate or that candidate's opponent. We believe that a period

starting 120 days prior to a primary and running all the way to the general election would be appropriate to capture ads that are mostly likely to be made to influence an election. For states with an early primary, there is a significant period of time after the primary and before the pre-general election period starts. Allowing ads to be coordinated with a candidate in this period, but be defined as falling outside of the coordination rule, would open up enormous opportunities for abuse and fails to recognize the realities of political advertising campaigns in an election year.

Finally, the coordination rule must cover communications that are coordinated with a candidate and made prior to the 120-day pre-primary election period if they are clearly meant to affect a future election, even if the election is some time away. Otherwise, in states with late primaries, the period not covered by the rule would essentially allow campaign contributions by entities not subject to contribution limits. For 527 groups, which have identified themselves with the IRS as "political organizations," any ad that is coordinated, targeted, and promotes, supports, attacks or opposes a candidate should be covered by this rule.

For corporations unions, other groups and individuals, we believe a different standard would be appropriate. Certainly these entities engage in lobbying campaigns that may mention officeholders or candidates. But communications that are coordinated with a candidate and targeted to that candidate's electorate should be covered by the rule if they comment on the character, qualifications, or fitness for office of the candidate or the candidate's opponent or potential opponent.

We urge the Commission to issue a new coordination rule that addresses the inadequacies of the existing rule as confirmed by the courts. Continuing litigation over the rules to implement BCRA disserves the public and those who are required to abide by the rules. We hope the Commission will take this opportunity to promulgate a rule that is consistent with the goals and purposes of the campaign finance laws.

Sincerely,

John McCain
U.S. Senate

Russell D. Feingold
U.S. Senate

Christopher Shays
Member of Congress

Marty Meehan
Member of Congress

5

# PLAINTIFFS' EXHIBIT 15

January 13, 2006

**By Electronic Mail**

Mr. Brad C. Deutsch
Assistant General Counsel
Federal Election Commission
999 E Street, NW
Washington, DC 20463

**Re: Comments on Notice 2005–28: Coordinated Communications**

Dear Mr. Deutsch:

These comments are submitted jointly by the Campaign Legal Center, Democracy 21, and the Center for Responsive Politics in response to the Commission's Notice of Proposed Rulemaking ("NPRM") 2005–28, published at 70 Fed. Reg. 73946 (December 14, 2005), seeking comment on proposed revisions to its regulations regarding communications that have been coordinated with federal candidates and political party committees under 11 C.F.R. § 109.21.

For the reasons set forth below, we oppose the alternative proposed revisions to the content standards of 11 C.F.R. § 109.21(c) set forth in NPRM 2005–28, and urge the Commission to instead adopt our proposed revisions detailed below.

The three commenters request the opportunity to testify at the hearing on this rulemaking, scheduled for January 25–26, 2006.

## I. Coordination in the Pre-BCRA Era

The Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), distinguished for constitutional purposes between limitations on "contributions" to a candidate's campaign, and limitations on "expenditures" by a campaign. *Buckley* also recognized that, to be effective, any limitations on campaign contributions must apply to expenditures made in coordination with a candidate, so as to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." *Id.* at 47.

*Buckley* emphasized the difference between expenditures "made *totally independently* of the candidate and his campaign," *id.* at 47 (emphasis added), and "coordinated expenditures," construing the contribution limits in the Federal Election Campaign Act ("FECA") to include not only contributions made directly to a candidate, political party, or campaign committee, but also "all expenditures placed *in cooperation with or with the consent of* a candidate, his agents or an authorized committee of the candidate ...." *Id.* at 46–

47 n.53 (emphasis added); *see also id.* at 78. The Court noted, "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.*[1]

The 1976 amendments to the FECA codified *Buckley*'s treatment of coordinated expenditures. FECA was amended to provide that an expenditure made "in cooperation, consultation, or in concert with or at the request or suggestion of a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." Pub. L. No. 94–283, § 112, 90 Stat. 475 (codified at 2 U.S.C. § 441a(a)(7)(B)(i)). Conversely, the 1976 FECA amendments defined an "independent expenditure" as:

> an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made *without cooperation or consultation* with any candidate, or any authorized committee or agent of such candidate, *and which is not made in concert with, or at the request or*

---

1 The broad language of *Buckley* regarding coordination was echoed in subsequent Supreme Court decisions on the same topic. In *Colorado Republican Federal Campaign Committee v. FEC,* 518 U.S. 604 (1996) ("*Colorado I*"), the Supreme Court held that a political party ad aired prior to a candidate's nomination would be not be treated as coordinated because the ad was developed "independently and *not pursuant to any general or particular understanding* with a candidate ...." *Id.* at 614 (emphasis added). The Court stressed that "the constitutionally significant fact ... is the lack of coordination between the candidate and the source of the expenditure." *Id.* at 617.

In *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001) ("*Colorado II*"), the Court — again in the context of party spending — underscored "the good sense of recognizing the distinction between independence and coordination." *Id.* at 447. The Court recognized that there is a "*functional, not a formal*" definition of contributions, which includes expenditures made in coordination with a candidate. *Id.* at 443 (emphasis added). Of particular importance, the Court noted that independent expenditures are only those "without any candidate's approval (or wink or nod) ...." *Id.* at 442. Justice Souter explained for the majority:

> There is *no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate*, and there is good reason to expect that a party's right of unlimited coordinated spending would attract increased contributions to parties to finance exactly that kind of spending. *Coordinated expenditures of money donated to a party are tailor-made to undermine contribution limits.*

*Id.* at 464 (emphasis added). The Court went on to hold that limitations on coordinated party spending are subject to "the same scrutiny we have applied to political actors, that is, scrutiny appropriate for a contribution limit ...." Applying that scrutiny, the Court concluded that "a party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of contribution limits." *Id.* at 465.

> *suggestion of*, any candidate, or any authorized committee or agent of such candidate.

Pub. L. No. 94–283, § 102, 90 Stat. 475 (emphasis added) (codified at 2 U.S.C. § 431(17)).[2]

Under the interpretive rules promulgated by the FEC in 1980, an expenditure was not considered "independent" if made pursuant to:

> ...any arrangement, coordination or direction by the candidate or his or her agent prior to the publication, distribution, display or broadcast of the communication. An expenditure will be presumed to be so made when it is –
>
> (A) Based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made; or
>
> (B) Made by or through any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agents.

11 C.F.R. § 109.1(b) (1980).

The standard for coordinated activity was narrowed by a district court in *FEC v. Christian Coalition*, 52 F. Supp. 2d 45 (D.D.C. 1999). There, in the view of the court, the FEC took the position that "any consultation between a potential spender and a federal candidate's campaign organization about the candidate's plans, projects, or needs renders any subsequent expenditures made for the purpose of influencing the election 'coordinated,' i.e., contributions." *Id.* at 89. The district court found the FEC's treatment of such expenditures to be constitutionally overbroad because "the spender should not be deemed to forfeit First Amendment protections for her own speech merely by having engaged in some consultations or coordination with a federal candidate." *Id.* at 91.

Instead, the district court formulated its own, "narrowly tailored" definition of coordination, providing that coordination could be found where 1) an expenditure was "requested or suggested" by a candidate, or 2) where there had been "substantial discussion or negotiation between the campaign and the spender over" a communication's contents, timing, audience or the like, "such that the candidate and the spender emerge as partners or joint venturers in the expressive expenditure ...." *Id.* at 92.

The court's analysis in the *Christian Coalition* case — the decision of a single federal judge — has serious flaws. The court formulated such a narrow definition of coordination conduct that it failed to encompass even the extensive discussions about strategic matters

2 The FECA definition of "independent expenditure" is limited to expenditures for "express advocacy," the courts have held that this limitation is not required by *Buckley*. *See, e.g., FEC v. Christian Coalition*, 52 F. Supp. 2d 45, 87 n. 50 (D.D.C. 1999).

between campaign officials and Coalition leaders that took place in that case. Further, the court's standard would allow virtually unfettered communication between candidates and outside groups, so long as one side simply provides information to the other without eliciting a response. Yet that information could plainly be sufficient for an outside spender to craft an ad that would be of great value to the candidate.[3]

Aware that its decision would be controversial, the court invited the FEC to appeal, *id.* at 98 (finding that there are questions of law "as to which there is substantial ground for difference of opinion and ... an immediate appeal ... may materially advance the ultimate termination of the litigation"), and the Commission's counsel recommended it do so. Yet a majority of the Commission refused to appeal, leaving in place the district court decision. As Commissioners Thomas and McDonald pointed out in dissenting from this decision, "Not only is the district court's narrow and restrictive standard of coordination found nowhere in the [FECA] and Commission's regulations, but also it runs directly contrary to *Buckley* where the Supreme Court considered independent expenditures as those made 'totally independent of the candidate and his campaign.'"[4]

Not only did the Commission fail to appeal the district court's controversial decision, it embraced the decision by repealing its longstanding coordination regulations and codifying

---

[3] It should be noted that the court in *Christian Coalition* did definitively reject the argument that the coordination rules should apply only to ads that contain express advocacy. Judge Green said such a limitation on the scope of coordination:

> ...would misread *Buckley* and collapse the distinction between contributions and independent expenditures in such a way as to give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions Were this standard adopted, it would open the door to unrestricted corporate or union underwriting of numerous campaign-related communications that do not expressly advocate a candidate's election or defeat.
>
> For example, expensive, gauzy candidate profiles prepared for television broadcast or use at a national political convention, which may then be broadcast, would be paid for from corporate or union treasury funds. Such payment would be every bit as beneficial to the candidate as a cash contribution of equal magnitude and would equally raise the potential for corruption. Even more pernicious would be the opportunity to launch coordinated attack advertisements, through which a candidate could spread a negative message about her opponent, at corporate or union expense, without being held accountable for negative campaigning....Allowing such coordinated expenditures would frustrate both the anti-corruption and disclosure goals of the Act.

52 F. Supp. 2d at 88 (citations omitted).

[4] *See* Statement for the Record of Commissioners Thomas and McDonald in *Federal Election Commission v. Christian Coalition* (Dec. 20, 1999), *available at*: http://www.fec.gov/members/thomas/thomasstatement04.htm.

a version of the court's standard into new rules. *See* 65 Fed. Reg. 76138 (Dec. 6, 2000); *see also* 66 Fed. Reg. 23537 (May 9, 2001) (final rule and effective date); 11 C.F.R. § 100.23.

The new rules, however, were even more restrictive than the district court's opinion. Although the court nowhere held that an actual "agreement or collaboration" was necessary to find coordination, the new regulations adopted this standard, permitting a finding of coordination only where there have been "substantial discussions or negotiations between the spender and the candidate ... the result of which is collaboration or agreement." 11 C.F.R. 100.23(c)(2)(iii). The new rule, like the *Christian Coalition* decision, was itself controversial; Commissioners Thomas and McDonald said it was "far too narrowly drafted and will make evasion of the [FECA] commonplace."[5]

## II. "Coordination" Under BCRA and *McConnell*

In the Bipartisan Campaign Reform Act of 2002 (BCRA), Congress dealt with the *Christian Coalition* standard for coordination, and the Commission's regulation embracing it.

In BCRA, Congress amended FECA by extending the law's coordination provisions beyond candidates to include expenditures coordinated with party committees. *See* 2 U.S.C. § 441a(a)(7)(B)(ii). More importantly, section 214 of BCRA repealed the FEC's controversial 2000 coordination rule and directed the FEC to promulgate new coordination rules that do not require "agreement or formal collaboration" before the FEC can conclude that an expenditure is coordinated. Senator Feingold explained the intent behind this provision:

> The concept of "coordination" has been part of Federal campaign finance law since Buckley v. Valeo. It is a common-sense concept recognizing that when outside groups coordinate their spending on behalf of a candidate with a candidate or a party, such spending is indistinguishable from a direct contribution to that candidate or party .... An effective restriction on outside groups coordinating their campaign-related activities with federal candidates and their political parties is needed to prevent circumvention of the campaign finance laws ....
>
> Absent a meaningful standard for what constitutes coordination, the soft money ban in the bill would be seriously undermined. In the place of outside special interests donating six figure checks to the national parties to be spent on Federal elections, these entities could simply work in tandem with the parties and Federal candidates to spend their own treasury funds — soft money — on federal electioneering activities. This would fly in the face of

---

[5] *See, e.g.,* Statement of Reasons of Commissioner Thomas and Chairman McDonald in *In re The Coalition, et al.,* MUR 4624 (FEC Sept. 7, 2001); *See also* Statement of Reasons of Commissioners Thomas and McDonald in *In re Republicans for Clean Air*, MUR 4982 (FEC Apr. 23, 2002); *see generally* Scott E. Thomas & Jeffrey H. Bowman, *Coordinated Expenditure Limits: Can They Be Saved?,* 49 Cath. U. L. Rev. 133 (1999); Scott E. Thomas & Jeffrey H. Bowman, *Obstacles to Effective Enforcement of the Federal Election Campaign Act,* 52 Admin. L. Rev. 575 (2000).

> one of the main purposes of the bill to get national parties and Federal candidates out of the business of raising and spending soft money donations ....
>
> This current FEC regulation fails to cover a range of de facto and informal coordination between outside groups and candidates or parties that, if permitted, could frustrate the purposes of the bill. For example, if an individual involved in key strategic decision-making for a candidate's political advertising resigned from the candidate's campaign committee, immediately thereafter joined an outside organization, and then used inside strategic information from the campaign to develop the organization's imminent soft money-funded advertising in support of the candidate, a finding of coordination might very well be appropriate. The FEC regulation, however, would find coordination neither in this circumstance nor in various other situations where most reasonable people would recognize that the outside entities' activities were coordinated with candidates. This would leave a loophole that candidates and national parties could exploit to continue controlling and spending huge sums of soft money to influence federal elections .... To remedy this problem, the bill requires the FEC to reexamine the coordination issue and promulgate new coordination rules. *These rules need to make more sense in the light of real life campaign practices than do the current regulations.*

148 Cong. Rec. S2144–45 (daily ed. March 20, 2002) (emphasis added). Senator McCain elaborated on the intent of Section 214:

> It is important for the Commission's new regulations to ensure that actual "coordination" is captured by the new regulations. *Informal understandings and de facto arrangements can result in actual coordination as effectively as explicit agreement or formal collaboration.* In drafting new regulations to implement the existing statutory standard for coordination — an expenditure made "in cooperation, consultation or concert, with, or at the request of suggestion of" a candidate — *we expect the FEC to cover "coordination" whenever it occurs, not simply when there has been an agreement or formal collaboration ....*
>
> Section 214 represents a determination that the current FEC regulation is far too narrow to be effective in defining coordination in the real world of campaigns and elections and threatens to seriously undermine the soft money restrictions contained in the bill. The FEC is required to issue a new regulation, and everyone who has an interest in the outcome of that rulemaking will be able to participate in it, and appeal the FEC's decision to the courts if they believe that is necessary.

*Id.* at S2145 (daily ed. March 20, 2002) (emphasis added).

Section 214 of BCRA was challenged on First Amendment grounds in *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 219–23 (2003). The Court began its analysis by noting:

> Ever since our decision in *Buckley*, it has been settled that expenditures by a noncandidate that are controlled by or coordinated with the candidate and his campaign may be treated as indirect contributions subject to FECA's source and amount limitations. Thus, FECA § 315(a)(7)(B)(i) long has provided that expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate.

*McConnell*, 540 U.S. at 219 (internal citations and quotation marks omitted) (quoting *Buckley*, 424 U.S. at 46 and 2 U.S.C. § 441a(a)(7)(B)(i)).

The *McConnell* plaintiffs/appellants argued that BCRA Section 214 and the mandated new implementing regulations were "overbroad and unconstitutionally vague because they permit a finding of coordination even in the absence of an agreement." *McConnell*, 540 U.S. at 220. The Court was "not persuaded that the presence of an agreement marks the dividing line between expenditures that are coordinated — and therefore may be regulated as indirect contributions — and expenditures that truly are independent." *Id.* at 221. The Court explained:

> [T]he rationale for affording special protection to wholly independent expenditures has nothing to do with the absence of an agreement and everything to do with the functional consequences of different types of expenditures. Independent expenditures are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view. *By contrast, expenditures made after a "wink or nod" often will be as useful to the candidate as cash.* For that reason, Congress has always treated expenditures made "at the request or suggestion of" a candidate as coordinated.

*McConnell*, 540 U.S. at 221–22 (internal citations and quotation marks omitted) (quoting *Colorado II*, 533 U.S. at 446) (emphasis added). The Court thus continued to adopt a broad view — a "wink or nod" view — of what constitutes coordination, a position it had earlier set forth in both *Colorado I* ("general or particular understanding") and *Colorado II* ("wink or nod").

The Court rejected the claim that BCRA Section 214 is "overbroad because it permits a finding of coordination or cooperation notwithstanding the absence of a pre-existing agreement." *McConnell*, 540 U.S. at 222. The Court further held that "FECA's definition of coordination gives fair notice to those to whom [it] is directed and is not unconstitutionally

vague." *Id.* at 223 (internal citation and quotation marks omitted) (quoting *American Communications Ass'n v. Douds,* 339 U.S. 382, 412 (1950)).[6]

### III. The Commission's First Rulemaking on "Coordinated and Independent Expenditures"

In September 2002, the Commission published NPRM 2002–16, seeking comment on proposed rules regarding "Coordinated and Independent Expenditures." 67 Fed. Reg. 60042 (Sept. 24, 2002).

For the first time, the Commission proposed *content* standards to define, in part, what constitutes a "coordinated communication." *See* 11 C.F.R. § 109.21(c). Prior to this, the Commission's regulations had set forth no separate "content" test for a coordinated communication; rather the regulatory language addressed only the "conduct" that constituted coordinated activity. Thus, prior to 2002, the Commission's regulations were silent as to what "content" a communication must contain in order to be treated as an in-kind contribution, if coordinated. The statutory provision on coordination, 2 U.S.C. § 441a(a)(7), of course, applies to "expenditures" made by a person in cooperation, consultation or concert with a person. The Commission generally implemented this statutory rule — and thus implicitly the "conduct" definition of coordination — by reference to whether the spending at issue was an "expenditure," *i.e.,* whether it was "for the purpose of influencing" an election. *See, e.g.,* Ad. Ops. 1982–56 (applying standard of whether communication has a "purpose to influence the candidate's election"); 1983–12 (applying standard of whether communications "are designed to influence the viewers' choices in an election"); 1988–22 (applying standard of whether communication is in "an election-related context").

In the 2002 NPRM, the Commission proposed four content standards for communication that would fall within the scope of the coordination regulation: (1) electioneering communication; (2) republished campaign materials; (3) express advocacy; and (4) "public communication," as defined in 11 C.F.R. § 100.26, made within 120 days of an election, targeted to the identified candidate's voters, and including express statements about the candidate's party affiliation, views on an issue, character, or qualifications for office. *See* 67 Fed. Reg. at 60065 (proposed alternative "C" for 11 C.F.R. § 109.21(c)(4)).

The Campaign Legal Center, Democracy 21 and the Center for Responsive Politics each submitted written comments on the notice, and opposed the content regulation proposed by the Commission, particularly the 120-day time frame.[7] The Center for Responsive

---

6 The *McConnell* plaintiffs/appellants also challenged the 2002 coordination regulations adopted by the FEC after passage of BCRA (discussed immediately below), but the Court affirmed the district court ruling that such a challenge was not ripe for consideration. *McConnell*, 540 U.S. at 223.

7 *See* Comments of the Campaign and Media Legal Center on Notice 2002–16 (Oct. 11, 2002) at 3; Comments of Democracy 21 on Notice 2002–16 (Oct. 11, 2002) at 12; Comments of the Center for Responsive Politics on Notice 2002–16 (Oct. 11, 2002) at 4.

Politics stated succinctly: "Alternative C should be modified to eliminate the 120-day limitation so that it applies throughout the election cycle." Comments of the Center for Responsive Politics on Notice 2002–16 at 6. Democracy 21 elaborated:

> Alternative C adopts an approach that has merit to it, but should not be confined to a time frame, as proposed. Even outside a period of 120 days before an election, *coordinated* public communications can greatly benefit a candidate — and it is the fact of coordination itself which should raise suspicions that the communication is being made for campaign purposes. Alternative C would allow a large class of overtly coordinated expenditures to go unregulated simply because they fall outside of a time frame proximate to the election.

Comments of Democracy 21 on Notice 2002–16 at 13 (emphasis in original). Similarly, the Campaign Legal Center commented:

> Alternative C for paragraph (c)(4) presents a framework worth pursuing, in light of the Commission's approach here to developing coordination rules. We do suggest that the Commission broaden the time frame during which this test would apply. In light of the fact that the public communication in question would be "directed to voters in the jurisdiction of the clearly identified federal candidate," that it would characterize the candidate's stance on issues or qualifications, and that there would be coordination with that candidate, his or her opponent, or a political party ..., the prospect that the advertisement is being made for campaign purposes is high even outside the 120-day period specified in the current draft.

Comments of the Campaign and Media Legal Center on Notice 2002–16 at 5.

At the meeting in December, 2002 to consider its final rule, Commissioner Thomas proposed an amendment that would have eliminated the 120-day period, stating in a memo to the Commission:

> As I indicated earlier, I am opposed to an approach in the coordination rulemaking whereby communications outside certain timeframes can fully escape any coordination analysis. In my view, the Commission would thereby be making coordinated communications legal that heretofore have been clearly illegal. This approach would sanction hard hitting 'issue ads' paid for by a person without any limit whatsoever, even if the benefiting candidate produced the ad, selected the media to be used, and picked the precise time and place for the ad to run! Imagine the storied Yellowtail ad ... run nonstop at the behest of an opponent from the date of the primary in an early primary state through early July, or run nonstop from January through early May in a late primary state. This goes even beyond the misguided *Christian Coalition* analysis, and certainly runs counter to the intent behind the BCRA provisions that voided the Commission's regulations because they were too porous. It

> would allow the worst of the present 'issue ad' problems, and compound it by allowing full-scale coordination with the benefiting candidates.[8]

Ultimately, the Commission adopted the 120-day rule set forth in the NPRM. In the Explanation and Justification (E&J) for the final rule, it said:

> The 120-day time ... has several advantages. First, it provides a "bright-line" rule. Second, it focuses the regulation on activity reasonably close to an election, but not so distant from the election as to implicate political discussion at other times. As noted, Congress has, in part, defined "Federal election activity" in terms of a 120-day time frame, deeming that period of time before an election to be reasonably related to that election. See 2 U.S.C. 431(20)(A)(i). In contrast, the "express advocacy" content standard in paragraph (c)(3) of section 109.21 applies without time limitation. Similarly, this 120-day time frame is more conservative than the treatment of public communications in the definition of Federal election activity, which regulates public communications without regard to timeframe.

Final Rules and Explanation and Justification for Coordinated and Independent Expenditures, 68 Fed. Reg. 421, 430 (Jan. 23, 2003).

Finally, with regard to the 120-day time frame, the Commission explained in a footnote: "In effect, the content standard of paragraph (c)(4)(ii) operates as a 'safe harbor' in that communications that are publicly disseminated or distributed more than 120 days before the primary or general election will not be deemed to be 'coordinated' under this particular content standard under any circumstances." *Id.* at 430 n.2.

## IV. *Shays v. FEC* Decisions

In *Shays v. FEC,* 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd,* 414 F.3d 76 (D.C. Cir. 2005) (pet. for reh'g *en banc* denied Oct. 21, 2005), the principal House sponsors of BCRA challenged, *inter alia*, the Commission's "content" regulation in section 109.21, and particularly the 120-day rule.

### A. The district court decision

As explained by the district court in *Shays*:

---

8 Commissioner Scott E. Thomas, FEC Agenda Document No. 02–90–A, 1 (Agenda Item for the Meeting of Dec. 5, 2002); *available at*: http://www.fec.gov/agenda/agendas2002/mtgdoc 02-90a.pdf. Commissioner Thomas' motion to amend the draft final rule and eliminate the 120-day period failed by a vote of 2–4. *See* Minutes of an Open Meeting of the Federal Election Commission December 5, 2002, 6 (approved Dec. 18, 2002); *available at*: http://www.fec.gov/agenda/agendas2002/approve02-96.pdf.

> Plaintiffs object[ed] to the fact that under this regulation, unless the communication constitutes "express advocacy" or is a republication of a candidate's own materials, the regulation only bars coordinated communications within 120 days of an election, primary or convention. They contend[ed] that under the plain language of the new rules, a candidate will now be able to help create an advertisement touting his virtues or attacking his opponent's, and then persuade a corporation or union to sponsor it using treasury funds, so long as the advertisement is run more than 120 days before any primary, convention, or general election and avoids any "express advocacy" or republication of campaign materials. Furthermore, Plaintiffs note[d] that under the regulations, if the coordinated communication does not refer to a candidate or political party by name then the communication may be broadcast at any time.

*Shays*, 337 F. Supp. 2d at 57–58 (footnotes and internal citations omitted). The court noted that the defendant FEC did not dispute this interpretation of the regulations and itself described the rule as a "safe harbor" for communications distributed more than 120 days before an election. *Id.* at 58.

The district court found, in applying the *Chevron* step-two analysis as to whether the challenged regulation "is based on a permissible construction of the statute," that it is:

> ...readily apparent that ... Congress left a large gap between the obviously impermissible and the obviously permissible. This gap creates the potential for a broad range of differing interpretations of the Act, the legitimacy of each being heavily dependent upon the degree to which it undercuts the statutory purposes .... If the FEC's interpretation unduly compromises the Act's purposes, it is not a reasonable accommodation under the Act, and it would therefore not be entitled to deference.

*Shays*, 337 F. Supp. 2d at 62 (quoting *Orloski v. Federal Election Comm'n,* 795 F.2d 156, 164 (D.C.Cir.1986)). The court did find that the regulation "compromises" the Act:

> [I]t has been a tenet of campaign finance law since *Buckley* that FECA, in an effort to prevent circumvention of campaign finance regulations, treats expenditures coordinated with candidates or political parties as contributions to those with whom the expenditures were coordinated. The basic premise of coordinated expenditure restrictions is that if political campaigns and outside entities are able to coordinate the outside entity's political expenditures, then the campaign finance contribution and expenditure regulations could be eviscerated.

*Shays*, 337 F. Supp. 2d at 62 (internal citation omitted). The court explained further that:

> FECA, in an effort to prevent circumvention, provides that "expenditures made by any person in cooperation, consultation, or concert, with, or at the

> request or suggestion of a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." 2 U.S.C. § 441a(a)(7)(B)(i); *see also id.* § 441a(a)(7)(B)(ii) (same for political parties). BCRA Section 214 did nothing to change this requirement; it merely ordered the FEC to promulgate new regulations regarding coordinated communications, and provided some guidance. *Nor did Congress evince any intent to qualify the reach of this provision of FECA, or to exclude from its reach any particular type of "coordination." Such a move would run counter to the basic notion that a coordinated expenditure, by virtue of its coordination (not its content), is valuable to the political entity with which it is coordinated.*

*Shays*, 337 F. Supp. 2d at 62–63 (emphasis added).

Citing the legislative history of section 214 of BCRA, the court said: "Clearly, the statements by Senators McCain and Feingold make clear that the purpose of passing Section 214 of BCRA was not to exempt certain acts of coordination, but rather to enlarge the concept of what constitutes 'coordination' under campaign finance law." *Shays*, 337 F. Supp. 2d at 64.

The district court concluded that:

> ...pursuant to step two of the *Chevron* analysis, the FEC's exclusion of coordinated communications made more than 120 days before a political convention, general or primary election, as well as any that do not refer to a candidate for federal office or a political party and any not aimed at a particular candidate's electorate or electorate where a named political party has a candidate in the race, undercuts FECA's statutory purposes and therefore these aspects of the regulations are entitled to no deference. A communication that is coordinated with a candidate or political party has value to the political actor. To exclude certain types of communications regardless of whether or not they are coordinated would create an immense loophole that would facilitate the circumvention of the Act's contribution limits, thereby creating "the potential for gross abuse." *Orloski,* 795 F.2d at 165. The FEC's regulation therefore is "not a reasonable accommodation under the Act," *Orloski,* 795 F.2d at 164 (internal quotation marks omitted), and fails *Chevron* step two.

*Shays*, 337 F. Supp. 2d at 64–65.

**B. The D.C. Circuit decision.**

The Commission appealed the district court's decision with regard to, *inter alia*, the 120-day coordination content rule to the D.C. Circuit Court of Appeals. *See Shays*, 414 F.3d 76, 97–102. Like the district court, the D.C. Circuit began its analysis by acknowledging that "FECA has long restricted coordination of election-related spending between campaigns and

outside groups." *Id.* at 97. The reason for such restrictions, according to the circuit court, "is obvious." *Id.* The court explained: "Without a coordination rule, politicians could evade contribution limits and other restrictions by having donors finance campaign activity directly — say, paying for a TV ad or printing and distributing posters." *Id.*

The court explained that, through passage of BCRA, Congress ordered the Commission to adopt new coordination regulations that do not require agreement of formal collaboration to establish coordination. In response, the Commission adopted a rule which, more than 120 days before an election, "covers only communications that either recycle official campaign materials or expressly advocate the election or defeat of a clearly identified candidate for federal office." *Id.* at 98 (internal quotation marks and citation omitted).

The court noted that plaintiffs/appellees Congressmen Shays and Meehan argued that "this limitation on the rule's coverage outside the 120-day window offers politicians and their supporters an unreasonably generous safe harbor." *Id.* at 98. The court offered several examples to illustrate the Congressmen's concerns:

> Under the new rules, more than 120 days before an election or primary, a candidate may sit down with a well-heeled supporter and say, "Why don't you run some ads about my record on tax cuts?" The two may even sign a formal written agreement providing for such ads. Yet so long as the supporter neither recycles campaign materials nor employs the "magic words" of express advocacy—"vote for," "vote against," "elect," and so forth— the ads won't qualify as contributions subject to FECA. Ads stating "Congressman X voted 85 times to lower your taxes" or "tell candidate Y your family can't pay the government more" are just fine. And even within 120 days of the election (though Shays and Meehan appear not to challenge this aspect of the rule), supporters need only avoid communications that identify candidates or parties by name. Ads regarding, say, economic effects of high taxes or tragic consequences of foreign wars are not contributions — again, even if formally coordinated with the official campaign.

*Id.* at 98. The circuit court noted that the district court had found that the coordination regulations "undercut FECA's statutory purposes and thus were entitled to no *Chevron* two deference." *Id.* at 98 (internal citation and quotation marks omitted).

The circuit court reached the same result — holding the coordination regulations to be invalid — but did so "for slightly different reasons." *Id.* at 98. Applying *Chevron* step-one analysis, the circuit court agreed with the district court that Congress had not spoken directly to the 120 day issue. But the circuit court found it "hard to imagine that Representatives and Senators voting for BCRA would have expected regulations like [those adopted by the Commission]." *Id.* at 98–99. The circuit court explained:

> Although Congress abrogated the FEC's old "collaboration or agreement" standard, the new rule permits significant categories of expression— e.g., non-express advocacy more than 120 days before an election— even where

> formal collaboration or agreement occurs. And while BCRA's "electioneering communication" provisions ... disavow the "express advocacy" test — a standard *McConnell* describes as "functionally meaningless" — the FEC has resurrected that standard here, allowing unrestricted collaboration outside the 120 days so long as the communication's paymasters avoid magic words and redistribution.

*Id.* at 99 (internal citation omitted). Nevertheless, given the "lack of guidance" from Congress in the statute, the court declined to rule that "BCRA clearly forecloses the FEC's approach." *Id.* Instead, the court expressed its belief that the FEC could construe FECA "as leaving space for collaboration between politicians and outsiders on legislative and political issues involving only a weak nexus to any electoral campaign." *Id.*

The circuit court reiterated that the Supreme Court in *McConnell* described the express advocacy test as "functionally meaningless." *Id.* (quoting *McConnell*, 540 U.S. at 193). The court found it obvious that Commission was required to find all express advocacy and republication of campaign materials to be subject to the coordination rules, but noted that "the Commission took the further step of deeming these two categories adequate by themselves to capture the universe of electorally oriented communication outside the 120-day window." This action, the court found, "requires some cogent explanation, not least because *by employing a 'functionally meaningless' standard outside that period, the FEC has in effect allowed a coordinated communication free-for-all for much of each election cycle*." *Id.* (emphasis added). The court explained at length:

> We see nothing in the FEC's official explanation that satisfies APA standards. The Commission's source for the 120-day period was an unrelated BCRA provision requiring hard money financing for state party voter registration drives within 120 days of an election. Drawing on this provision, the FEC explained that "Congress has, in part, defined 'Federal election activity' in terms of a 120-day time frame, deeming that period of time before an election to be reasonably related to that election." 68 Fed. Reg. at 430. Yet this observation has no bearing on the issue before us absent evidence that registration activity and electoral advocacy occur on similar cycles. For all we know from this record, registration efforts may significantly influence elections only in the immediate run-up to the vote, whereas candidate-centered advertisements may affect voters even when broadcast more than 120 days before the race closes. In fact, in a companion provision to the voter registration rule, BCRA imposes even stricter financing restrictions — without temporal limitation — on "public communication[s] that refer[ ] to a clearly identified candidate for Federal office ... and that promote[ ] or support[ ] a candidate for that office, or attack[ ] or oppose[ ] a candidate for that office." 2 U.S.C. § 431(20)(A)(iii). Although the FEC acknowledged that its 120-day content standard was "more conservative" than this provision, *see* 68 Fed. Reg. at 430, it never explained why the time-frame for voter registration was more relevant than BCRA's rule for "public communications," seemingly a far more comparable subject-matter.

*Id.* at 100 (internal citation omitted) (emphasis added).

In addition to rejecting the Commission's "public communications" explanation for the 120-day period incorporated into the coordination rule, the court also rejected the FEC's other explanations for the coordination rule. Specifically, the court rejected the Commission's arguments that the rule's 120-period is reasonable:

- because it provides an easily understood "bright line";
- because it focuses on activity "reasonably close to an election, but not so distant from the election as to implicate political discussion at other times"; and
- because it is twice as long as BCRA's 60-day electioneering communication window.

*See id.* at 100–01. The court dismissed these rationales, explaining:

> The first of these bromides provides no independent basis for the rule: a bright line can be drawn in the wrong place. The second does not so much answer the question as ask it. *Why* is 120 days "reasonably close" but not "so distant"? Without further explanation, we have no assurance that 120 days reasonably defines the period before an election when non-express advocacy likely relates to purposes other than "influencing" a federal election — the line drawn by the statute's "expenditure" definition, 2 U.S.C. § 431(9)(A)....
>
> [T]he proposition that 120 days is twice 60 and four times 30, though arithmetically indisputable, is no reason to select that number over any other. Why not triple 60, or multiply 30 by one-and-a-half? ... [N]othing should prevent the FEC from regulating other categories of non-electioneering speech — non-express advocacy, for example — outside the 120 days.

*Id.* at 101 (emphasis in original).

The court also rejected the Commission's argument that "limiting its standard to express advocacy and campaign redistribution outside the 120 days preserves space for political activities unrelated to elections." *Id.* at 101. The court explained that, though the Commission's regulation might achieve this goal, "so would regulating nothing at all, and that would hardly comport with the statute." *Id.* The court explained further:

> Notwithstanding its obligation to attempt to avoid unnecessarily infringing on First Amendment interests, the Commission must establish, consistent with APA standards, that its rule rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition. The record before us, however, provides no assurance that the FEC's standard does not permit substantial coordinated expenditure, thus tossing out the proverbial

> baby (spending qualifying as contributions) with the bath water (political advocacy).

*Id.* at 101–02 (internal citations and quotation marks omitted).

Finally, the court declined a request by plaintiffs/appellees Shays and Meehan that the court take judicial notice "that substantial election-oriented advertising occurred beyond the 120-day window in recent presidential races," but noted that such a fact, if true, "would undercut the Commission's view that it has drawn the line in the right place." *Id.* at 102. The court found that the Commission was in the best position to make such a factual inquiry. The court posed the following questions to the Commission for consideration in this court-ordered rulemaking:

> Do candidates in fact limit campaign-related advocacy to the four months surrounding elections, or does substantial election-related communication occur outside that window? Do congressional, senatorial, and presidential races — all covered by this rule — occur on the same cycle, or should different rules apply to each? And, perhaps most important, to the extent election-related advocacy now occurs primarily within 120 days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged rules' restrictions?

*Id.* at 102. The court advised that the Commission "carefully consider these questions, for if it draws the line in the wrong place, its action will permit exactly what BCRA aims to prevent: evasion of campaign finance restrictions through unregulated collaboration." *Id.*

The circuit court summarized its holding regarding the Commission's coordination rule as follows:

> [W]hile we accept the FEC's premise that time, place, and content may illuminate communicative purpose and thus distinguish FECA "expenditures" from other communications, we detect no support in the record for the specific content-based standard the Commission has promulgated. Accordingly, finding the rule arbitrary and capricious under the APA, we shall affirm the district court's invalidation.

*Id.*

## V. Revising the Content Standards of 11 C.F.R. § 109.21(c)

We start this discussion with a contemporary illustration of the problem. Senator Rick Santorum (R-PA) is a candidate for reelection in the 2006 Pennsylvania Senate election. (The primary election in Pennsylvania is to be held on May 16, 2006; the general election is on November 7, 2006). According to the *National Journal,* Americans for Job Security (AJS) — a section 501(c)(6) corporation — made a $500,000 ad buy on November 18, 2005

— *178 days before the primary election* — to run the following ad statewide in Pennsylvania:

> **ANNOUNCER [v/o]:** Most Saturdays they get together in the park, 8 a.m. sharp.
>
> Pennsylvania families relax a little more these days because Rick Santorum is getting things done everyday.
>
> Over $300 billion in tax relief, eliminating the marriage penalty, increasing the per child tax credit – all done.
>
> And now Rick Santorum is fighting to eliminate unfair taxes on family businesses.
>
> Call and say thanks because Rick Santorum is the one getting it done.
>
> *(Text on screen: Senator Rick Santorum; (717)231-7540; Paid for by Americans for Job Security.*[9]

We have no information to indicate that this ad was coordinated by AJS with the Santorum campaign — *i.e.,* whether the campaign suggested the themes or content for the ad, indeed, whether Senator Santorum personally wrote the ad and suggested to AJS the timing and markets to air it. But under the Commission's existing coordination regulation, he could have.

The ad does not meet any "content" standard of the existing rule: it is not an "electioneering communication" (because it is being run outside the applicable 30/60 day time periods), 11 C.F.R. § 109.21(c)(1); it does not republish or disseminate campaign material prepared by the candidate, *id.* at § 109.21(c)(2); it does not contain express advocacy, *id.* at § 109.21(c)(3) — and, although it refers to a candidate and was directed to voters in that candidate's jurisdiction, it was not "disseminated 120 days or fewer before a general, special or runoff election ...," *id.* at § 109.21(c)(4).

Thus, no matter how closely coordinated in fact this ad was — indeed, even if it was written by Senator Santorum — AJS can continue to use an unlimited amount of corporate funds to pay for running this ad, or similar ads, throughout Pennsylvania until January 15, 2006, the beginning of the 120-day pre-primary period. And then AJS can spend more corporate funds in coordination with Senator Santorum to again run this ad, or similar ads, from May 17, 2006 until July 9, 2006, when the 120-day pre-general election period begins.

The American for Job Security ad promoting Senator Santorum is far from the only example of an ad that is plainly intended to influence a campaign and that is being run outside the 120-day window — and thus not captured by the Commission's existing rule.

---

[9] A copy of the ad script from the *National Journal* is attached as an exhibit in APPENDIX VI–14.

Although the D.C. Circuit did not facially invalidate the existing 120-day rule, it expressed deep skepticism of it, and required a substantial showing to be made, based on a factual record, that the rule reasonably separates election-influencing ads from others. As the Commission states in the NPRM:

> The Court of Appeals emphasized that justifying the 120-day time frame, or another time frame, requires the Commission to undertake a factual inquiry to determine whether the temporal line that it draws "reasonably defines the period before an election when non-express advocacy likely relates to purposes other than 'influencing' a Federal election" or whether it "will permit exactly what BCRA aims to prevent: evasion of campaign finance restrictions through unregulated collaboration."

70 Fed. Reg. at 73949 (quoting *Shays*, 414 F.3d at 101–02).

Before commenting on any of the Commission's proposed revisions to the content standards, we submit, for the record, evidence of election-influencing advertising broadcast more than 120 days prior to the election the ad was intended to influence. After presenting this evidence, we propose an alternative approach to a content standard that includes elements from several of the proposals contained in the NPRM. For reasons we discuss below, none of the alternatives proposed by the Commission, in itself, adequately or effectively implements the coordination provision in the statute. Finally, we comment briefly on other questions raised in the NPRM.

### A. Substantial Election-Related Communication Occurs Outside the 120-day Time Frame Established by 11 C.F.R. § 109.21(c)

The D.C. Circuit Court of Appeals in *Shays* asked whether "substantial election-related communication occur[s] outside" the 120-day regulatory time frame." *Shays*, 414 F.3d at 102. Our review of political advertising data compiled by the *National Journal* reveals overwhelming evidence that substantial election-related advertising does, in fact, occur outside the 120-day regulatory time frame.

We have divided the advertising data into two groups: (1) presidential election advertising preceding the election by more than 120 days; and (2) congressional election advertising preceding the election by more than 120 days. Within these two groups, we have organized the information according to election year, and also according to whether the ad was intended to influence a primary or general election. We have compiled data on advertising in the 2004 and 2006 congressional elections, as well as the 1996, 2000 and 2004 presidential elections. This data is summarized below, with scripts of **more than 200 advertisements** included in **APPENDICES I** through **VI**. We include data on advertising by independent organizations, political party committees and candidates. Advertising by any and all of these groups more than 120 days before an election establishes the simple fact that substantial election-related communication does occur outside the 120-day regulatory time

frame — creating the potential for circumvention of contribution limits through coordinated efforts.

**1. Presidential Election Advertising Preceding the Election By More Than 120 Days**

The presidential election campaign of 1995–96 not only marked the birth of widespread soft money candidate-specific issue advertising, but also the unprecedented launch of broadcast campaign advertising during the summer preceding the presidential primary elections. As two election scholars explained at length:

> The Clinton campaign aired some advertising in 1995, praising Clinton's position on gun control. But the campaign hit on a more innovative strategy — to use party soft money to run "issue advertisements" that did not specifically call for the reelection of Clinton but that would serve to bolster his image. At the urging of consultant Dick Morris, Clinton raised enough soft money to fund an $18 million advertising campaign during the summer and fall of 1995. One such ad charged that the "Dole-Gingrich" budget tried to cut Medicare, but Clinton cut taxes for working families. Eventually, this kind of spending topped $44 million. An FEC preliminary audit of the Clinton campaign held that this party spending was really campaign spending and asked for a repayment of $7 million. Nevertheless, the Commission itself voted 6–0 that the spending was issue advocacy and that no repayment was needed.

WESLEY JOE & CLYDE WILCOX, FINANCING THE 1996 ELECTION 50–51 (John C. Green ed., 1999) (citations omitted).

According to the Commission's audit of the Clinton/Gore '96 Primary Committee, Inc., the committee began broadcasting campaign ads in June 1995 — *more than eight months before the first 1996 presidential primary*. *See* FEC, *Report of the Audit Division on Clinton/Gore '96 Primary Committee, Inc.*, Agenda Doc. No. 98–85, 12 (Nov. 19, 1998; for the meeting of Dec. 3, 1998). The committee spent $2.3 million on advertising between June 27 and July 24, 1995. *Id.* at 15. Advertising paid for by the Democratic National Committee (DNC), coordinated with the Clinton/Gore '96 primary committee, began airing in August, 1995. *Id.* Between August 16, 1995 and August 28, 1996, the DNC spent more than $42 million on advertising coordinated with the Clinton/Gore campaign. *Id.* This coordinated advertising campaign is detailed in the audit report, *id.* at 9-43, wherein the Commission's audit staff recommended that the Commission find the cost of producing and broadcasting the ads to be an in-kind contribution from the DNC to the Clinton/Gore committee. *Id.* at 43.

The success of the Clinton-DNC early advertising strategy encouraged candidates, party committees and independent organizations to repeat the strategy prior to the 2000 presidential election. According to the *National Journal*: "In 1995 President Clinton and the Democratic National Committee took early advertising to new levels. And in 1998, an FEC ruling on 'issue ads' threw open the doors for others to follow suit. As a result, 1999 saw

more ads airing earlier than ever before." *The Ads of 1999*, NATIONAL JOURNAL (Dec. 23, 1999); APPENDIX I–2. **APPENDIX I** contains this *National Journal* article, as well as nine others describing more than eighteen television and radio ads intended to influence the 2000 presidential primaries, but broadcast in at least one state more than 120 days before that state's primary election.[10]

The National Abortion and Reproductive Rights Action League (NARAL), for example, began broadcasting two ads attacking "Republican hopefuls" George W. Bush and Elizabeth Dole in Iowa and New Hampshire in March 1999 — ten months before Iowa's January 24, 2000 caucus and New Hampshire's February 1, 2000 primary. *NARAL Ads Target Bush, Dole*, NATIONAL JOURNAL (Mar. 24, 1999); APPENDIX I–23.

In April 1999, the Republican Leadership Council began airing ads targeting Al Gore in California and nationally on CNN, poking fun at Gore's statement that he invented the Internet. *RLC Targets Gore's Internet Statement*, NATIONAL JOURNAL (Apr. 6, 1999); APPENDIX I–19.

In June 1999, candidates began running campaign ads. On June 2, 1999, presidential candidate Steve Forbes launched a national $10 million television ad campaign. *Forbes Launches National Ad Blitz*, NATIONAL JOURNAL (June 2, 1999); APPENDIX I–16. Similarly, presidential candidate John McCain began airing campaign ads June 28, 1999. *McCain Campaign Unveils Its First Ad*, NATIONAL JOURNAL (June 29, 1999); APPENDIX I–12.

These ads, along with the others detailed in **APPENDIX I**, make clear that candidates and independent organizations spent millions of dollars on broadcast advertising more than 120 days prior to the 2000 presidential primaries.

In addition to not encompassing the non-candidate ads run more than 120 before primary elections, the current regulation does not cover ads run after the primaries but more than 120 days before the general election. **APPENDIX II** contains thirteen *National Journal* articles describing television and radio ads broadcast by candidates, parties and independent groups in at least one state after that state's primary, but before July 10, 2000 — the 120th day preceding the November 7, 2000 presidential general election.

The Democratic National Committee (DNC) and the Republican National Committee (RNC) were clearly among the most active advertisers during the summer of 2000. The first seven articles in **APPENDIX II** describe soft-money candidate-specific issue ads by both national committees. All of the ads avoid the use of magic words and, thus, would not be covered by the Commission's current coordination content standards. The script of the DNC's ad launched June 8, 2000, after all state primaries had ended, read:

---

[10] The 2000 presidential primaries and caucuses began January 24 in Iowa and concluded June 6 in New Jersey, Alabama, Montana, South Dakota and New Mexico. *See* Ian Christopher McCaleb, *Compressed Primary Schedule Yields More Than 70 Events in Five Months*, CNN.COM (Jan. 7, 2000); *available at*: http://archives.cnn.com/2000/ALLPOLITICS/stories/01/07/other.wrap.

> **ANNOUNCER** [v/o]: Every week, Bob Darthez has to afford his groceries and prescription drugs. He's worked a lifetime, but now he's at the mercy of the big drug companies. They're using money and lobbyists to stop progress in Washington.
>
> Al Gore is taking them on. Fighting for a Medicare prescription drug benefit for seniors like Bob Darthez.
>
> **AL GORE**: People can't afford these ridiculously high prices for prescription medicines. When their doctors prescribe medicine for their health and their well-being, they ought to be able to take it.
>
> *(On screen: The Gore Plan; www.1-877-leadnow.com; Paid for by the Democratic National Committee)*

*Dems Fire First With Health Care Spot*, NATIONAL JOURNAL (June 8, 2000); APPENDIX II–14.

The RNC responded several days later with its own soft-money ad praising George W. Bush's Social Security plan. Like the DNC, the RNC avoided express advocacy and, as a result, its ad would not have been covered by the Commission's current content standards. The script read:

> **ANNOUNCER** [v/o]: With our nation at peace and more prosperous than ever, now is the time to find real solutions to America's problems.
>
> George Bush knows that to keep our commitment to seniors we must strengthen and improve Social Security now -- or the retirement of the Baby Boom generation will push it near bankruptcy. He's proposing a bipartisan plan to strengthen and improve Social Security.
>
> The Bush plan guarantees everyone at or near retirement every dollar of their benefits. No cuts in Social Security. You paid into it; it's your money, and it will be there for you. And the Bush plan gives younger workers a choice to invest a small part of their Social Security in sound investments they control for higher returns.
>
> Learn more about George Bush's voluntary plan for personal Social Security retirement accounts. The Bush blueprint: Better for seniors today, better for all of us tomorrow.
>
> *(On screen: www.SocialSecurityBlueprint.com; Paid for by the Republican National Committee)*

*GOP's Turn At Soft-Money Game*, NATIONAL JOURNAL (June 13, 2000); APPENDIX II–12.

In addition to political party committees, independent organizations were also active with presidential advertising campaigns in the spring and summer of 2000. The Coalition to Protect Americans Now broadcast television ads alleging that Al Gore "would give the Kremlin a veto over American missile defenses." *Bring Back The Cold War?*, NATIONAL JOURNAL (June 1, 2000); APPENDIX II–18. *See also New Group Blasts Admin's Defense System*, NATIONAL JOURNAL (May 24, 2000); APPENDIX II–20. A group named Shape the Debate aired televisions ads in March 2000 attacking Al Gore's character — repeatedly calling him a hypocrite. *See Shaping the Debate About Gore*, NATIONAL JOURNAL (March 30, 2000); APPENDIX II–24.

In short, the *National Journal* articles in **APPENDIX II** make clear that candidates, parties and independent organizations spent millions of dollars on broadcast advertisements in the months following state primaries, but more than 120 days before the general election in 2000.

The trend of early campaign advertising continued in the 2003–04 presidential election cycle. **APPENDIX III** contains twenty-two *National Journal* articles describing more than twenty-five ads intended to influence the 2004 primary elections, but broadcast in at least one state more than 120 days prior to that state's primary.[11]

The Reform Voter Project, for example, began airing television ads in Iowa and New Hampshire criticizing President Bush's environmental record on February 18, 2003 — *eleven months* prior to the 2004 Iowa caucus and *a year before* the New Hampshire primary. It is this targeting of the ads to Iowa and New Hampshire, combined with the ad's direct attack on President Bush's character, that makes clear the advertiser's intent to influence the 2004 elections. The script of the ad read:

> *(On screen: Group of kids singing, holding hands and dancing in a circle on a green field under blue skies.)*
>
> **KIDS**: Ring around the rosey...
>
> **ANNOUNCER** [v/o]: As air pollution increases, more kids get asthma attacks.
>
> **KIDS**: ... a pocket full of posies...
>
> **ANNOUNCER** [v/o]: Pollution that comes from big corporations who gave millions of dollars to elect President Bush.
>
> *(On screen: www.whatdiditbuy.com)*

---

[11] The 2004 presidential primary elections and caucuses began January 13 in Washington, D.C. and concluded June 8 in Montana and New Jersey. A comprehensive list of 2004 presidential primary dates can be found on the Commission's Web site. *See* FEC, 2004 Presidential Primary Dates and Candidate Filing Deadlines For Ballot Access (May 26, 2004); *available at*: http://www.fec.gov/pubrec/fe2004/2004pdates.pdf.

**KIDS**: ... ashes, ashes...

**ANNOUNCER** [v/o]: Now President Bush is letting those special interests pollute the air even more.

**KIDS**: ... we all fall down.

*(On screen: Child breathes from an asthma inhaler while standing in front of smokestacks.)*

**ANNOUNCER** [v/o]: Don't you wish we had a president who stood up for us, not his special interest contributors?

*(On screen: Paid for by Reform Voter Project)*

*Group Says Bush Enviro Policy Tied To Cash*, NATIONAL JOURNAL (Feb. 19, 2003); APPENDIX III–49.

In May 2003, MoveOn.org began airing television ads in 21 media markets criticizing President Bush's "tax cuts for the rich." *Group Makes Bloody Case Against Tax Cut*, NATIONAL JOURNAL (May 14, 2003); APPENDIX III–47. The League of Conservation Voters, MoveOn.org, and Win Without War all ran television advertisements during the summer of 2003 criticizing President Bush, as described in detail by *National Journal* articles in **APPENDIX III**.

Howard Dean was the first presidential candidate to begin broadcast advertising when he hit the Iowa airwaves in mid-June, 2003. *See* Mark H. Rodeffer, *In First Ad, Dean Hits Bush And Democrats*, NATIONAL JOURNAL (June 17, 2003); APPENDIX III–45. Dean was joined in July by Rep. Dennis Kucinich, who launched a radio ad campaign in Iowa. *See* Mark H. Rodeffer, *Willie Nelson Plugs Kucinich On Iowa Radio*, NATIONAL JOURNAL (July 31, 2003); APPENDIX III–36. John Edwards became the third presidential hopeful to engage in broadcast advertising when he debuted three television ads in Iowa and New Hampshire during the first week of August. *See* Mark H. Rodeffer, *Edwards Highlights Working-Class Roots*, NATIONAL JOURNAL (Aug. 7, 2003); APPENDIX III–29. Rep. Richard Gephardt joined the air wars on September 2, when he went on the air in Iowa and New Hampshire. *See* Meg Kinnard, *Gephardt Debut Plugs Blue-Collar Roots*, NATIONAL JOURNAL (Sept. 2, 2003); APPENDIX III–20. And Senator John Kerry converted his September 2 announcement speech into two television ads that debuted in Iowa a day later. *See* Meg Kinnard, *Kerry's First Ads Use Announcement Speech*, NATIONAL JOURNAL (Sept. 4, 2003); APPENDIX III–17.

As evidenced by the articles in **APPENDIX III**, candidates and independent groups spent millions of dollars on television advertising throughout 2003 to influence the 2004 presidential primaries — advertising which did not meet the content standard of the existing coordination regulation.

Finally, with regard to presidential election advertising, **APPENDIX IV** contains sixty-one *National Journal* articles describing more than seventy television and radio advertisements intended to influence — but broadcast more than 120 days prior to — the November 2, 2004 presidential general election. All articles in **APPENDIX IV** note the states in which the ads ran. Every ad contained in **APPENDIX IV** was broadcast in at least one state after that state's primary election,[12] but before July 5, the 120th day preceding the November general election.

The number of advertisements detailed in **APPENDIX IV** clearly indicates that candidates and independent organizations engage in extensive political advertising more than 120 days before presidential general elections. President Bush launched his general election television ad campaign during the first week of March 2004, airing four ads nationwide on cable television and targeting the ads to eighteen battleground states via broadcast television. *See* Jennifer Koons, *Bush Debut Lauds Steady Leadership*, NATIONAL JOURNAL (Mar. 4, 2004); APPENDIX IV–147. MoveOn.org responded immediately to the President's ads with an ad buy of its own in seventeen battleground states. The script of the MoveOn.org ad read:

> *(On screen: Worker leaves factory at night, drives home, picks up stack of bills, sees sleeping family)*
>
> **ANNOUNCER** [v/o]: Times are tough. So you work overtime to make ends meet. Then you find out George Bush wants to eliminate overtime pay for eight million workers. Two million jobs lost. Jobs going overseas. And now, no overtime pay.
>
> When it comes to choosing between corporate values and family values, face it, George Bush is not on our side.
>
> *(On screen: Paid for by MoveOn.org Voter Fund)*

Meg Kinnard, *MoveOn.org: Bush Not In Sync With Workers*, NATIONAL JOURNAL (March 4, 2004); APPENDIX IV–145.

The conservative independent group Citizens United then responded to the MoveOn.org ads with a television ad of its own aiming to undercut John Kerry's populist message. The script of the Citizens United ad read:

> *(On screen: Photographs of the candidate, boats in a harbor and various pieces of real estate; John Kerry)*
>
> **ANNOUNCER** [v/o]: Massachusetts Senator John Kerry.

---

[12] A comprehensive list of 2004 presidential primary dates can be found on the Commission's Web site. *See* FEC, 2004 Presidential Primary Dates and Candidate Filing Deadlines For Ballot Access (May 26, 2004); *available at*: http://www.fec.gov/pubrec/fe2004/2004pdates.pdf.

Hairstyle by Christophe's: $75.

Designer shirts: $250.

Forty-two-foot luxury yacht: $1 million.

Four lavish mansions and beachfront estate: Over $30 million.

*(On screen: Kerry with his Massachusetts Sen. Edward Kennedy)*

Another rich, liberal elitist from Massachusetts who claims he's a man of the people. Priceless.

*(On screen: John Kerry; www.citizensunited.org; 866-458-2004; Paid For By Citizens United)*

Jennifer Koons, *Group Slams Kerry's 'Lavish' Lifestyle*, NATIONAL JOURNAL (Mar. 9, 2003); APPENDIX IV–143.

Finally, with the Democratic Party nomination locked up, John Kerry launched his general election television ad campaign in sixteen general election battleground states on March 13, 2004. *See* Jennifer Koons, *Kerry Counters Bush Claims On Taxes*, NATIONAL JOURNAL (Mar. 15, 2003); APPENDIX IV–134. From this point onward, the battleground state airwaves were flooded with advertisements by both candidates and their supporters — leaving no doubt that "substantial election-related communication occur[s] outside" the 120-day regulatory time frame. *Shays*, 414 F.3d at 102.

The advertising campaigns described by the articles in **APPENDICES I** through **IV** make clear that extensive advertising took place more than 120 days prior to the 2000 and 2004 presidential primary elections, as well as between the presidential primary elections and the start of the 120-day period preceding the presidential general elections in both 2000 and 2004. Whether these public communications were, in fact, coordinated with federal candidates or national party committees is unimportant. The important facts are that candidates, parties and independent organizations do attempt to influence federal elections outside the 120-day timeframe established by 11 C.F.R. § 109.21(c) and that the content standards established by section 109.21(c), therefore, permit substantial coordinated spending for the purpose of influencing federal elections. In other words, the current coordination rule's content standards "permit exactly what BCRA aims to prevent: evasion of campaign finance restrictions through unregulated collaboration." *Shays*, 414 F.3d at 102. No explanation or justification of the current rule will change these simple facts.

**2. Congressional Election Advertising Preceding the Election By More Than 120 Days**

The 120-day time frame of 11 C.F.R. § 109.21(c) not only permits evasion of contribution limits through unregulated coordination in presidential elections, but also in

congressional elections. **APPENDIX V** contains 55 *National Journal* articles describing more than sixty-five television and radio ads broadcast more than 120 days prior to the 2004 primary and general congressional elections. Some noteworthy differences exist between the advertising patterns in presidential and congressional elections.[13]

**APPENDIX V** contains ads by candidates, parties and independent organizations. In Alaska, for example, the U.S. Chamber of Commerce began running classic sham issue ads in support of Senator Lisa Murkowski in November 2003 — *nine months* before Alaska's August 24, 2004 primary election. The script of a Chamber of Commerce ad entitled "Fighting" read:

> **ANNOUNCER** [v/o]: Alaskans are hurting. Unemployment, taxes. But in Washington, we have a fresh, experienced face fighting for jobs, a better economy, lower taxes and the individual liberty we love. Senator Lisa Murkowski.
>
> Some are trying to stop progress and stop ANWR, but Lisa Murkowski brings her knowledge of Alaska to Washington, so she can fight those who want to impose their agenda on our land. Call Lisa Murkowski. Thank her for fighting for Alaska jobs.
>
> *(On screen: Call Lisa Murkowski; 907-271-3735; Paid For By The U.S. Chamber Of Commerce)*

Meg Kinnard, *Chamber Praises Murkowski's Efforts*, NATIONAL JOURNAL (Nov. 25, 2003); APPENDIX V–10.

Candidates likewise began airing campaign ads long before the current coordination regulation's 120-day time period had begun. Colorado Senate candidate Mike Miles began airing television ads in early October 2003 — *more than ten months* prior to Colorado's August 10, 2004 primary election. *See* Meg Kinnard, *Miles Promotes Roles As Soldier, Teacher*, NATIONAL JOURNAL (Oct. 25, 2003); APPENDIX V–12.

---

[13] Congressional primary elections are typically held in closer proximity to general elections — with the gap between the two elections in 2004 being less than 120 days in half of the states. (A comprehensive list of 2004 congressional primary election dates can be found on the Commission's Web site. *See* FEC, *2004 Congressional Pre-Election Reporting Dates*; *available at*: http://www.fec.gov/info/charts_primary_dates.htm.) **APPENDIX V**, therefore, contains a smaller percentage of ads run between the primary and general elections than do the appendices pertaining to presidential elections. However, the large number of ads described in **APPENDIX V** is testament to the fact that extensive congressional election advertising occurs more than 120 days before primaries. For this reason, the Commission's proposal to merely eliminate the gap in coverage of 11 C.F.R. § 109.21(c) between primary and general elections is an insufficient means of preventing circumvention of federal contribution limits through unregulated coordination.

One other noteworthy difference is that congressional candidates also rely more heavily on radio advertising than do presidential candidates. **APPENDIX V**, therefore, contains a higher percentage of radio ad descriptions than do the appendices pertaining to presidential elections.

Illinois was among the most active states for early congressional campaign advertising in 2003–04. Senate hopeful Blair Hull became the first Illinois congressional candidate to air television and radio advertisements when he launched his broadcast advertising campaign in June 2003 — *more than eight months* before the state's March 13, 2004 primary. *See* Meg Kinnard, *Hull Gets an Early Start For Illinois Senate*, NATIONAL JOURNAL (June 24, 2003); APPENDIX V–57. As detailed in articles found in **APPENDIX V**, Hull was joined by candidates John Cox, Jack Ryan, Gery Chico, Andy McKenna, and Dan Haynes in running ads more than 120 days prior to the primary election. In all, **APPENDIX V** contains fourteen articles describing nineteen ads run by these candidate more than 120 days prior to the primary.

Candidate for the U.S. House of Representatives also got in on the early advertising action during the 2003–04 election cycle. A competitive race in North Carolina's 5th District prompted two candidates to begin broadcast advertising more than 120 days prior to the state's July 20, 2004 primary election. Candidate Jim Snyder launched a television ad campaign in early August 2003 — *nearly one year* prior to the primary election. *See* Meg Kinnard, *N.C.-05's Snyder Praises Bush, Scorns Gore*, NATIONAL JOURNAL (Aug. 22, 2003); APPENDIX V–126. Candidate Jay Helvey joined Snyder on the air later in 2003. *See* Meg Kinnard, *Helvey Laments Job Losses For N.C.-05*, NATIONAL JOURNAL (Dec. 10, 2003); APPENDIX V–123.

As was the case in the 2004 congressional elections, candidates running in 2006, as well as the parties and independent groups that support them, have gotten off to an early start with campaign advertising. **APPENDIX VI** contains the scripts of fourteen television and radio ads running more than 120 days prior to the 2006 congressional primary elections.[14] The National Republican Senatorial Committee in July 2005 launched its first salvo in the party's attempt to unseat Democratic Senator Robert Byrd — *more than nine months* before West Virginia's May 9, 2006 primary election. *See National Republican Senatorial Committee: "Change,"* NATIONAL JOURNAL (July 29, 2005); APPENDIX VI–24. Similarly, the Montana Democratic Party in August 2005 launched a television attack on long-time Republican Senator Conrad Burns — *ten months* before Montana's June 6, 2006 primary election. *See Montana Democratic Party: "Smell Test,"* NATIONAL JOURNAL (Aug. 10, 2005); APPENDIX VI–4.

As detailed in **APPENDIX VI**, Senate candidates in New York, North Dakota, Rhode Island and Wisconsin launched ad campaigns in September 2005. *See, e.g., John Spencer For Senate: "Pirro,"* NATIONAL JOURNAL (Sept. 6, 2005); APPENDIX VI–9; *Steve Laffey For Senate: "Mess,"* NATIONAL JOURNAL (Sept. 14, 2005); APPENDIX VI–20; *Kent Conrad For Senate: "45 Days,"* NATIONAL JOURNAL (Sept. 19, 2005); APPENDIX VI–11. Finally, as noted in the introductory remarks to this section of our comments, independent organizations such as Americans For Job Security have already run ads in 2006

---

14 A comprehensive list of 2006 congressional primary election dates can be found on the Commission's Web site. *See 2006 Congressional Pre-Election Reporting Dates*; *available at*: http://www.fec.gov/info/charts_primary_dates.shtml.

congressional races. *See Americans For Job Security: "Record,"* NATIONAL JOURNAL (Nov. 22, 2005); APPENDIX VI–14.

Like the advertising campaigns described by the articles in **APPENDICES I** through **IV**, the advertisements detailed in **APPENDICES V** and **VI** make clear that extensive political advertising took place more than 120 days before the 2004 and 2006 congressional elections. As stated above with regard presidential election advertising, the question of whether these public communications were, in fact, coordinated with federal candidates or national party committees is unimportant. The important fact is that candidates, parties and independent organizations do attempt to influence congressional elections more than 120 days before the elections — and the Commission's existing coordination rules present the opportunity for such ads to be coordinated without regulation. The content standards established by 11 C.F.R. § 109.21(c), therefore, "permit exactly what BCRA aims to prevent: evasion of campaign finance restrictions through unregulated collaboration." *Shays*, 414 F.3d at 102. No explanation or justification of the current rule will change this simple fact.

**B. Proposed Revision of 11 C.F.R. § 109.21(c)**

The Commission invites comment on "whether it should adopt a content standard that is not presented as one of the alternatives in this NPRM." 70 Fed. Reg. at 73949. Finding that none of the alternatives presented in NPRM 2005–28 adequately and effectively implements the law, we propose the following regulatory approach — which includes elements from several of the alternatives presented in the NPRM.

This approach would address the problems with the Commission's existing rule, by replacing current subsection (4) — the existing 120-day rule — with the following proposed subsections (4), (5) and (6):

(4) A public communication, as defined in 11 C.F.R. § 100.26, made by a political committee, which is an expenditure directed to voters in the jurisdiction of the candidate with whom the communication is coordinated, or if coordinated with a political party, is an expenditure directed to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

(5) A public communication, as defined in 11 C.F.R. § 100.26, made by an organization described in section 527 of the Internal Revenue Code and not registered as a political committee, which:

(i) (A) is distributed or disseminated during the period beginning 30 days prior to the primary election or 60 days prior to the general election of the federal candidate with whom the communication is coordinated, or, if coordinated with a political party, during the period beginning 30 days prior to the primary election or 60 days prior to the general election in which one or more candidates of the political party appear on the ballot, and (B) is directed to voters in the jurisdiction of that

candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot, regardless of whether the communication refers to a clearly identified candidate for federal office, or party; or

(ii) (A) is distributed or disseminated during the period beginning 120 days prior to the primary election and ending on the day of the general election, (B) refers to a clearly identified candidate for federal office or to a political party, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot; or

(iii) (A) is distributed or disseminated more than 120 days prior to the primary election, (B) promotes, attacks, supports or opposes a clearly identified candidate for federal office, or if the ad is coordinated with a political party, promotes, attacks, supports or opposes the party or its candidates, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

(6) A public communication, as defined in 11 C.F.R. § 100.26, made by any person other than a political committee or other organization described in section 527 of the Internal Revenue Code which:

(i) (A) is distributed or disseminated during the period beginning 30 days prior to the primary election or 60 days prior to the general election of the federal candidate with whom the communication is coordinated, or, if coordinated with a political party, during the period beginning 30 days prior to the primary election or 60 days prior to the general election in which one or more candidates of the political party appear on the ballot, and (B) is directed to voters in that candidate's jurisdiction, regardless of whether the communication refers to a clearly identified candidate for federal office, or party; or

(ii) (A) is distributed or disseminated during the period beginning 120 days prior to the primary election and ending on the day of the general election, (B) refers to a clearly identified candidate for federal office or to a political party, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot; or

(iii) (A) is distributed or disseminated more than 120 days prior to the primary election, (B) refers to the character or the qualifications or fitness for office of a clearly identified candidate for federal office, or if the ad is coordinated with a political party, refers to the character or the qualifications or fitness for office of the party generically or of

> candidates of that party, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

The effect of this regulatory language would be as follows for a public communication that is the product of coordinated activity between the spender and a candidate or political party (*i.e.*, activity that meets the "conduct" standards of 11 C.F.R. § 109.21(d)), and that is disseminated to the electorate of that candidate or that party if it has candidates on the ballot:

? If the ad is sponsored by a federal *political committee,* and is an "expenditure" (*i.e.*, for the purpose of influencing the election of the candidate with whom it is coordinated), it meets the "content" test and is therefore a "coordinated communication," regardless of when it is run.

? If the ad is sponsored by *any person other than a federal political committee* (*e.g.*, a 527 group not registered as a political committee, an individual, corporation, labor union or other non-profit group) and is distributed *in the immediate pre-election period* (*i.e.*, 30 days before a primary election or 60 days before a general election), the ad meets the "content" test if it is coordinated with a candidate or party, whether or not the ad refers to a candidate or party. In other words, in this immediate pre-election period, any ad by an outside spender that is coordinated with a candidate or party is a "coordinated communication."[15]

? If the ad is sponsored by *any person other than a federal political committee* and is distributed *during the period beginning 120 days prior to the primary election and ending on the day of the general election*, and the ad refers to a clearly identified candidate or political party, it meets the "content" test and is therefore a "coordinated communication." (This is similar to the Commission's 2002 rule).

? If the ad is sponsored by a *527 group* that is not registered as a political committee, is distributed *more than 120 days prior to the primary election*, and the ad promotes, attacks,

---

[15] This point is to address a flaw in the 2002 rule that the plaintiffs in the *Shays* litigation brought to the court's attention. Plaintiffs argued that the 2002 rule permitted coordination right up to the day of the election on "thematic" ads — ads that echo a candidate's positions on key issues but do not mention the name of the candidate (or party). Such ads, the plaintiffs argued, could be of significant benefit to the candidate, particularly if coordinated. The D.C. Circuit noted this problem as well. In describing the 2002 rule, the court said:

> And even within 120 days of the election ..., supporters need only avoid communications that identify candidates or parties by name. Ads regarding, say, economic effects of high taxes or tragic consequences of foreign wars are not contributions — again, even if formally coordinated with the official campaign.

414 F.3d at 98.

supports or opposes a clearly identified candidate or party, the ad meets the "content" test and is a "coordinated communication."

? Finally, if the ad is sponsored by a *person other than a political committee or 527 group*, is distributed more than 120 days prior to the primary election, and refers to the character or the qualifications or fitness for office of a clearly identified candidate for federal office or party, the ad meets the "content" test and is a "coordinated communication."

The rationales for this approach are as follows:

**i. Political committee/527 test.** First, this approach takes account of a fundamental distinction between political committees and section 527 groups, on the one hand, and all other spenders, on the other. It is based on a principle of campaign finance law, first set forth in *Buckley,* that groups whose "major purpose" is to influence elections are subject to broader regulatory standards than individuals or groups without such a major purpose. 424 U.S. at 79. Thus, for instance, the Court stated in *Buckley* that its First Amendment concerns about potential vagueness in regulatory standards — a concern that gave rise to the "express advocacy" test — was applicable only to non-major purpose groups, and not to political committees and other entities, like 527 groups, in the business of influencing elections.[16]

For political committees, the "content" test is an easy one — and is provided by the statute itself. As noted above, section 441a(a)(7)(B)(i) — which is the statutory basis for the coordination rule — states that "*expenditures*" made "in cooperation, consultation or concert with, or at the request or suggestion of" a candidate "shall be considered to be a contribution to such candidate." 2 U.S.C. § 441a(a)(7)(B)(i) (emphasis added). The term "expenditures"

---

[16] In discussing the statutory definition of "expenditure" as money spent "for the purpose of influencing" a federal election, the Court said:

> To fulfill the purposes of the Act, [political committees] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.
>
> But when the maker of the expenditure is not within these categories — when it is an individual other than a candidate or a group other than a "political committee" — the relation of the information sought to the purposes of the Act may be too remote. To insure that the reach of [the disclosure provision] is not impermissibly broad, we construe "expenditure" for purposes of that section in the same way we construed the terms of [the spending limit] — to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate.

*Id.* at 80 (emphasis added).

is defined by statute to mean payments "for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i).[17]

For political committees — groups registered with Commission as entities whose major purpose is to influence federal elections — no further regulatory definition is required. The Commission's regulations already include obligations imposed on political committees with regard to their "expenditures." *See, e.g.,* 11 C.F.R. § 104.3(b)(1) (requirement to report "expenditures"); *id.* at § 104.3(b)(3) (requirement to itemize "expenditures" in excess of $200); *id.* at § 104.9 (uniform reporting requirements for "expenditures"); *id.* at § 106.1 (requiring allocation of "expenditures" by political committees). None of these regulations has, or needs, any further limitation on the definition of "expenditure" for purpose of applying that term to political committees — there is no time frame limit or further content limit. If the spending by a committee is "for the purpose of influencing" a federal election, it is an "expenditure" by the committee and subject to regulation as such. The same should be true for purposes of applying the coordination rule of section 441a(a)(7)(B)(i) to "expenditures" by a political committee: if such "expenditures" for public communications are coordinated under the "conduct" standard and targeted to voters of the candidate with whom they were coordinated, they should be treated as "coordinated communications."

With regard to section 527 groups not registered as political committees — groups that have self-identified to the Internal Revenue Service as "political organizations" — similar principles apply because such groups, like political committees, have a principal purpose to influence elections as a matter of their tax status, and thus are groups whose activities "are, by definition, campaign related." For such groups, we believe the Commission should apply a PASO test outside the 120-day pre-primary period as a means to determine if they are making an "expenditure" within the meaning of section 441a(a)(7)(B)(i).[18] If a 527 political organization coordinates with a candidate on a public communication that promotes or supports that candidate (or attacks or opposes his opponent), it is appropriate to treat that spending as an in-kind contribution to the candidate. There is no constitutional bar to applying the PASO test to 527 groups. In *McConnell,* the Court approved a PASO test for party committees as constitutionally sufficient, 540 U.S. at 170 n. 64, and in so doing reaffirmed its *Buckley* analysis that vagueness concerns do not apply to such "major purpose" spenders.[19]

---

[17] The term "expenditure" is further defined in the Commission's regulations. 11 C.F.R. § 100.110 – 100.154.

[18] During the period beginning 120 days before a primary and ending on the day of the general election, 527 groups and other non-committee entities should be subject to the same test.

[19] These commenters have taken the position in a prior rulemaking that the Commission should issue a regulation to require section 527 "political organizations," subject to certain specified exceptions, to register as political committees under FECA if they make expenditures that PASO a federal candidate. *See* Comments of Democracy 21, the Campaign Legal Center and the Center for Responsive Politics on Notice 2004-6 (April 5, 2004), at 20-23.

In the case of non-major purpose spenders — *e.g.,* individuals, corporations, unions, certain tax-exempt organizations — the proposed rule primarily relies on a bright-line time-frame test, similar to that which the Commission adopted in the 2002 coordination rulemaking, but also includes an important provision covering coordinated activity outside the 120-day time period. This preserves the advantages previously recognized by the Commission in having a time frame test to govern the election activities of non-major purpose groups.

**ii. Time frame test.** Our proposed rule incorporates the advantages of the time frame test of the 2002 rule for any person other than a federal political committee, in that it establishes a bright line for purposes of applying a *per se* rule for coordinated communications that are disseminated within the 30/60 day period and meet the conduct test, and a *per se* rule for coordinated communications that refer to a candidate or party and are disseminated during the period beginning 120 days prior to the primary. We think the use of a time frame test in this fashion has advantages that the Commission previously discussed in its E&J on the 2002 rule. 68 Fed. Reg. at 430. Yet the proposed rule also addresses the three ways in which the Commission's 2002 time frame-based rule was impermissibly under-inclusive.

First, as discussed above, the proposed rule addresses the problem of "thematic" ads that are coordinated with a candidate and run right before the election to augment the candidate's own ads. The rule thus applies a narrow time frame test — a 30/60 day standard — for communications coordinated with a candidate and that are disseminated to the candidate's electorate right before an election. Such ads, run at the suggestion of the candidate, or after substantial discussion with the candidate, or with the material involvement of the candidate, can provide important support for the candidate whether or not the ads refer to the candidate by name. As noted above, the D.C. Circuit in *Shays* recognized this problem. 414 F.3d at 98. In the immediate pre-election period, the fact of coordination alone is evidence that the spending is for the purpose of influencing the election.

Second, the proposed rule eliminates the "gap" between the date of the primary election and the beginning of the 120-day pre-general election period. No time frame test will be sufficient if it fails to cover ads run in this period — a period *during the election year itself* when candidates, parties and outside groups are plainly engaged in campaign spending. It is both an intuitive proposition, and one supported by the material discussed above and submitted here for the record, that post-primary spending in the election year that refers to a candidate and is targeted to the electorate of that candidate is overwhelming likely to be for the purpose of influencing the candidate's election, even if it is more than 120 days before the general election. If that spending is also coordinated with the candidate, it should be treated under the coordination rules as an in-kind contribution.

Third, the rule incorporates two different tests for coordinated spending *outside*, (*i.e.*, prior to) the period 120 days before the primary election — one for 527 "major purpose" groups not registered as federal political committees; and another for non-major purpose entities. As the factual material discussed above clearly establishes, campaign ads are run more than 120 days before primary elections. To allow an outside spender to run *any kind of*

*ad*, no matter how obviously oriented to a candidate's campaign it is, in coordination with a candidate, in this time frame prior to the 120-day period, was a fatal flaw in the 2002 rule. If such ads are coordinated and refer to a candidate, are targeted to the electorate of the candidate, and make certain kinds of claims about that candidate that are indicia of campaign ads (*i.e.*, in the case of 527 organizations, promoting or attacking candidates; in the case of other non-committee entities, references to qualifications or fitness for office) as opposed to discussing a legislative issue, then the ad similarly would be treated as a campaign ad and, if coordinated, subject to the campaign finance laws. In discussing a similar test proposed in the 2002 NPRM (but then rejected), the Commission said:

> This possible content standard would attempt to focus as much as possible on the face of the public communication or on facts on the public record. This latter point is important. The intent would be to require as little characterization of the meaning or the content of communication, or inquiry into the subjective effect of the communication on the reader, viewer or listener as possible.... [This Alternative] would be applied by asking if certain things are true or false about the face of the public communication or with limited reference to external facts on the public record.

67 Fed. Reg. at 60049.

Ultimately, the Commission decided against this approach, and instead to cover only communications within the 120-day pre-election period. We think the Commission must re-examine this alternative for communications *outside* that same time period.

**iii. Targeting test.** Each of the "content" standards applies only to ads directed to the voters in the jurisdiction of the candidate referred to in the ad. This targeting restriction is in itself a significant limitation on the scope of the "content" standard. Even if a group ran a lobbying ad that was coordinated with Senator A and touted Senator A's support of legislation, the ad would fall outside the content standard for the purposes of a Senate race, unless it ran in Senator A's state. Yet there would be no reason for the group to run a lobbying ad in Senator A's state since, by definition, he already supports the legislation at issue. If the ad does run in Senator A's state, touting his support of the legislation, it is a reasonable inference that the purpose of the ad is thus not to increase support for the legislation, but rather to increase support for Senator A (*i.e.*, to influence his campaign). As such, the ad can reasonably be treated as related to the election, and if coordinated with Senator A, as subject to the campaign finance laws.

**iv. Conduct test.** Finally, it is an obvious point — but one worth emphasizing — that none of the "content" tests, alone, impose any restrictions on the communications described by those content tests. Rather, such ads are subject to the campaign finance laws *only if, in addition, they are in fact coordinated with a candidate.* The "conduct" tests for coordination impose a wholly separate, and significant, set of tests to determine whether ads that meet the content test are treated as "coordinated communications" and are accordingly subject to the campaign finance laws.

Thus, even if a spender's ads meet the content tests by, *e.g.,* referring to a candidate within the applicable time frame, they are not covered by the coordination provisions of the campaign finance laws *unless* the spender runs the ads "at the request or suggestion" of that candidate, 11 C.F.R. § 109.21(d)(1); or after "material involvement" of that candidate in determining the content, intended audience, media, timing, etc., of the ad, *id.* at § 109.21.(d)(2); or if the ads are based on "substantial discussion" with that candidate about the creation, production or distribution of the ad, where "material information" relating to the ads is conveyed in the course of such discussions, *id.* at § 109.21(d)(3).[20]

These *conduct* tests themselves thus pose a substantial independent barrier to the treatment of any ads as coordinated under the campaign finance laws. As the Commission correctly noted in the 2002 E&J:

> Under this final rule [setting forth a 120-day period as a content test], even if a political communication satisfies the content standard, the conduct standards must still be satisfied before the political communication is considered "coordinated." In this light, the content standard may be viewed as a "filter" or a "threshold" that screens out certain communications from even being subjected to analysis under the conduct standards. Thus it is appropriate to consider a broader time frame when applying this content standard because it serves only to identify political communications that may be coordinated if other conditions (*i.e.,* the conduct standards) are satisfied, and thus may be inappropriately underinclusive if too narrow.

68 Fed. Reg. at 430.

And to an important extent, the conduct tests themselves are a significant indicator that the ads may well be intended to influence the candidate's election. The Commission correctly notes in the NPRM that "if an organization or individual works with a candidate or political party in making a public communication, then the communication inherently has value to the political entity it is coordinated with…." 70 Fed. Reg. at 73952. Where a candidate "requests" an ad, or has "material" involvement in the content of the ad, or engages in "substantial" discussion about the ad — and where the ad then mentions that candidate and is broadcast to the electorate of that candidate — it is a fair inference that the ad is related to the candidate's election.

## VI. Comments on the Commission's Proposed Alternative Revisions to 11 C.F.R. § 109.21(c)

The discussion above in explanation of our proposed regulation anticipates the comments we would make about each of the seven alternatives proposed in the NPRM. Below, we briefly set forth separate comments on each of the alternatives.

---

[20] In addition, the conduct tests are met if the ads result, under tightly limited circumstances, from the use of "common vendors" by the spender and the candidate, *id.* at § 109.21(d)(4), or are based on information from a "former employee" of the candidate, *id.* at § 109.21(d)(5).

A. Alternative 1 — Retain the current rule. We oppose this alternative, for reasons set forth above. The current rule is plainly under-inclusive in that it permits unlimited coordination between a candidate and spender on ads run in the period after the date of the primary and before the beginning of the 120-day pre-election period, and on ads in the period prior to 120 days before the primary. As the attached exhibits show, candidates, parties and outside groups run ads in both of these periods that are clearly for the purpose of influencing federal elections. To maintain the current rule would mean, in effect, that a candidate could sit down with a spender, draft such ads, and direct the spender where and when to place the ads. The spender — *e.g.,* a corporation or labor union — could then use an unlimited amount of its treasury funds — *i.e.,* soft money — to pay for such ads. This rule, in effect, reinstates a version of the old soft money system. As the D.C. Circuit aptly noted, this rule "has in effect allowed a coordinated communication free-for-all for much of each election cycle." *Shays,* 414 F.3d at 100. We believe this approach is contrary to law, and cannot be adequately explained or justified by the Commission.

B. Alternative 2 — Adopt a different time frame. As noted in our comments above, we believe the Commission can use a time frame approach for its basic rule for spending by non-major purpose groups and 527 groups not registered as federal political committees, so long as there is a supplemental test for the period outside the time frame. As the NPRM suggests, and as is reflected in our proposed rule, the "gap" between the date of the primary election and the beginning of the 120-day pre-general election period should be filled, so the time frame test should simply start at the point 120 days prior to the primary election. For the period within this time frame, reference to a candidate and targeting to the candidate's electorate (for ads by entities other than federal political committees) would satisfy the content test. Prior to the time frame, the Commission should use the test set forth and described above.

C. Alternative 3 — Eliminate the time frame. This alternative proposes that any ad which refers to a candidate and is directed to voters in the candidate's jurisdiction satisfies the content test, no matter when the ad is run. For spenders other than political committees, we believe this approach is not preferable because it fails to include a sufficient nexus to the statutory requirement that a coordinated "expenditure" be "for the purpose of influencing" a federal election. Such a nexus is provided in our proposed approach, outside the time frame, by the PASO and "character, qualifications, or fitness for office" tests for 527 groups and other non-committee entities, respectively. By contrast, as we discuss above, we do not believe that a time frame test is necessary or appropriate for public communications by political committees. Rather, a more direct test — "for the purpose of influencing" — can be used to determine if spending by a political committee constitutes an "expenditure."

D. Alternative 4 — a PASO test. As set forth above, we recommend the Commission use an "expenditure" test for political committees, and a PASO test for other 527 groups which are not registered as political committees. When such groups, which are in the business of influencing elections, spend funds for public communications, those expenditures "can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related." *Buckley,* 424 U.S. at 80. Thus, it is appropriate, and constitutional, to apply the basic statutory "expenditure" test to political

committees, and the PASO test to other 527 groups, without the need for bright line narrowing to address vagueness concerns. By contrast, for non-"major purpose" spenders, we do not recommend that the Commission use a PASO test, for the reasons set forth above. Our approach does, however, incorporate one element of Alternative 4, by using a "character-qualifications-fitness" test for ads run outside the 120 day time frame period. This test sets forth reasonably ascertainable criteria to judge ads that have the typical characteristics of campaign ads in the period prior to the applicable time frame.

E. Alternative 5 — Eliminate the time frame for political committees. We agree with a bifurcated approach set forth in this Alternative that treats political committees (and other 527 groups) differently than non-major purpose spenders. As this Alternative correctly suggests, an "expenditure" by a political committee should satisfy the "content" test of the coordination rule, without regard to a time frame. For political committees, the statutory definition of "expenditure" — spending "for the purpose of influencing" a federal election — provides sufficient guidance for application of this rule, without any additional regulatory definition, as it does for application of other FECA rules applicable to political committee "expenditures," such as the reporting requirements of section 434. For similar reasons, explained above, we think that public communications by other 527 groups that are coordinated with candidates or parties should be subject to the coordination rules — regardless of how proximate the communication is to an election.

F. Alternative 6 — a "for the purpose of influencing" standard. This approach effectively would re-impose the longstanding implied "content" rule — a determination of whether the spending at issue is an "expenditure" — that the Commission used prior to the 2002 post-BCRA regulation.[21] As we noted above, the pre-2002 rule did not set forth any separate "content" standard at all, but only a "conduct" test. As a practical matter under that rule, the Commission implicitly applied a statutory "content" standard, in that the coordinated speech had to constitute an "expenditure," 2 U.S.C. § 441a(a)(7)(B)(i) — that is, it had to be "for the purpose of influencing" an election. If the Commission now made this the explicit "content" test in the regulation, it would effectively be returning to, and codifying, its pre-2002 practice.

We support this approach for political committees, as discussed above. We also support a very similar approach for other 527 groups, by using the closely related PASO test instead of a "for the purpose of influencing" test. Further, we think it is within the Commission's authority to adopt this approach for non-major purpose groups. The Commission used an implied "for the purpose of influencing" test for over 25 years following *Buckley,* without either court challenge on vagueness grounds, or any apparent inability in the regulated community to understand and apply the standard, at least as to coordinated spending. But greater clarity and simplicity, and hence greater guidance to the regulated community, can be provided by the rule we suggest — relying on a time frame test

---

21 As the NPRM notes, "This is the approach some Commissioners used before 2002 when the Commission adopted a content prong for its coordinated communications regulations." 70 Fed. Reg. 73952. Yet as we discuss above, advisory opinions in the 1980's routinely used a bare "for the purpose of influencing" test to determine if coordinated spending constituted an "expenditure." *See* p.8, *supra.*

for any spending proximate to an election, supplemented by the additional criteria we propose to identify campaign ads, and hence "expenditures," outside the time frame.

G. Alternative 7 — Eliminate the content test. Under this approach, any "public communication" at any time by any spender that is coordinated with a candidate would be treated as a coordinated expenditure. This is similar to Alternative 3, which proposes to eliminate the time frame, but goes beyond it in also eliminating the need to refer to a candidate at all, no matter how remote in time to the election the communication is made. Indeed, this Alternative seems to go beyond Alternative 6 by eliminating even a bare "for the purpose of influencing" test. We think this approach is overbroad in that it is not based on capturing only "expenditures" — *i.e.,* money spent "for the purpose of influencing" a federal election. But "expenditure" is the statutory touchstone of the coordination rule set forth in section 441a(a)(7)(B)(i), and any content standard to implement this statutory provision must relate to capturing such "expenditures," apart from the conduct standard.

## VII. Comments on Proposed Coordination Regulation Revisions Not Required By the *Shays* Decisions

In addition to addressing the current coordination regulation's 120-day time frame issue, as required by the *Shays* decisions, the Commission also proposes in NPRM 2005–28 to address a variety of issues not raised in the *Shays* litigation.

The Commission, for example, "seeks comment on whether to exempt from the coordinated communication rules a Federal candidate's appearance or use of a candidate's name in a communication to endorse other Federal or non-Federal candidates." 70 Fed. Reg. at 73953. The Commission likewise "seeks comment on whether to exempt from the coordinated communication rules a Federal candidate's appearance in a communication that solicits funds for other Federal or non-Federal candidates, party committees, political action committees, or other political committees." *Id.* at 73953–54. The Commission further solicits comment on whether such an exemption should be created for federal candidate appearances in communications that endorse or solicit funds for state ballot initiatives. We oppose the creation of such exemptions as neither justified not appropriate.

The Commission also asks, with regard to the conduct standards of 11 C.F.R. § 109.21(d), whether the Commission should provide by regulation that if the first conduct standard is satisfied (*i.e.*, the communication is created, produced or distributed at the request or suggestion of a candidate, a candidate's authorized committee, or a political party committee, or their agents), then "the communication would automatically qualify as a coordinated communication without also having to satisfy any of the standards contained in the *content* prong." 70 Fed. Reg. at 73954. A public communication made at the request or suggestion of a candidate or a political party does presumptively have value to the candidate or party which requested it, regardless of timing or content. We support the Commission's proposed *per se* rule providing that when the first conduct standard is satisfied, the communication automatically qualifies as a coordinated communication.

Regarding the "common vendor" and "former employee" conduct standards of 11 C.F.R. § 109.21(d)(4)–(5), the Commission asks whether it should amend these provisions "to cover common vendors and former employees only if these common vendors and former employees are agents under the Commission's definition of agent in 11 CFR 109.3." 70 Fed. Reg. 73955. We strongly oppose this proposal to limit the applicability of 11 C.F.R. § 109.21(d)(4)–(5) to "agents," as defined in 11 C.F.R. § 109.3. Doing so would fundamentally compromise the purposes and intent of BCRA § 214(c)(2)–(3) and, consequently, would constitute an impermissible construction of the statute.

With further regard to the "common vendor" and "former employee" conduct standards of 11 C.F.R. § 109.21(d)(4)–(5), the Commission asks:

> [W]hether it should create a rebuttable presumption that a common vendor or former employee has not engaged in coordinated conduct under 11 CFR 109.21(d)(4) and (5), if the common vendor or former employee has taken certain specified actions, such as the use of so-called "firewalls," to ensure that no material information about the plans, projects, activities, or needs of a candidate or political party committee is used or conveyed to a third party.

70 Fed. Reg. at 73955. We oppose the creation of such a presumption as a fiction that is in direct conflict with the statute. The "firewall" concept has no basis in statutory federal campaign finance law, and the creation of an exemption from the coordination rules based on the "firewall" concept, or any similar concept, would fundamentally compromise the purposes and intent of BCRA § 214(c)(2)–(3) and would constitute an impermissible construction of the statute.

In addition to proposing changes to the "common vendor" and "former employee" aspects of the conduct standards in 11 C.F.R. § 109.21(d), the Commission proposes amending the conduct standards with regard to use of publicly available information. Specifically, the Commission proposes:

> to create a safe harbor that would make clear as a matter of law that (1) the use of publicly available information in connection with a public communication by any person paying for that public communication does not satisfy any of the conduct standards, and (2) a candidate's or political party committee's conveyance of publicly available information to any person paying for a public communication does not satisfy any of the conduct standards.

70 Fed. Reg. at 73956. We oppose such a broadly-written regulatory exemption. The Commission may reasonably create a safe harbor for the use of publicly available information so long as the information was *actually obtained from a public medium* (*e.g.*, newspaper, Web site, campaign rally, etc.), with *no direct or individualized contact* between the candidate or party committee disseminating the information and person paying for the public communication. Such a safe harbor, however, cannot legally include any instance in which "the person paying for the communication has received the information . . . from the

candidate, authorized committee, or political party committee, in a nonpublic context" — even when such information is also available from a public source. *Id.*

Finally, the Commission notes in NPRM 2005–28 that the Supreme Court in *McConnell* stated:

> [n]othing on the face of [section 441i(a)] prohibits national party officers, whether acting in their official or individual capacities, from sitting down *with state and local party committees or candidates* to plan and advise how *to raise and spend soft money*. As long as the national party officer does not personally spend, receive, direct, or solicit soft money, [section 441i(a)] permits a wide range of joint planning and electioneering activity.

70 Fed. Reg. at 73956 (quoting *McConnell*, 540 U.S. at 160 (citing to Brief for Intervenor-Defendants Sen. John McCain *et al.* in No. 02–1674 *et al.*, p. 22)) (emphasis added).

The Commission asks whether this passage from *McConnell* "render[s] the application of the conduct standards to coordination between a candidate and a political party committee at 11 CFR 109.37(a)(3) obsolete?" 70 Fed. Reg. at 73957. The answer to this question is no. This passage from the *McConnell* decision by no means renders obsolete the application of conduct standards to coordination between a candidate and a political party. The *McConnell* passage makes clear that BCRA leaves room for national party officers to discuss with state and local party committees and candidates how to raise and spend soft money *for the purpose of influencing state and local elections* and for *limited* electioneering activity that may impact both state and federal elections (*e.g.*, Levin Fund activity). The overwhelming majority of expenditures for the purpose of influencing federal elections, however, must be made with federally permissible funds. The party coordinated communication provisions of 11 C.F.R. § 109.37 apply with full force to all such expenditures.

We appreciate the opportunity to submit these comments.

Sincerely,

| *\/s/ Fred Wertheimer* | */s/ J. Gerald Hebert* | */s/ Lawrence M. Noble* |
|---|---|---|
| Fred Wertheimer<br>Democracy 21 | J. Gerald Hebert<br>Paul S. Ryan<br>Campaign Legal Center | Lawrence M. Noble<br>Center for Responsive Politics |

Donald J. Simon
Sonosky, Chambers, Sachse
Endreson & Perry LLP
1425 K Street, NW – Suite 600
Washington, DC 20005

Counsel to Democracy 21

Paul S. Ryan
The Campaign Legal Center
1640 Rhode Island Avenue, NW – Suite 650
Washington, DC 20036

Counsel to the Campaign Legal Center

# PLAINTIFFS' EXHIBIT 16



FINANCING
THE 1996
ELECTION
JOHN C. GREEN
EDITOR

# Financing the 1996 Election

John C. Green, Editor

M.E.Sharpe
Armonk, New York
London, England



Copyright © 1999 by Citizens' Research Foundation

All rights reserved. No part of this book may be reproduced in any form without written permission from the publisher, M. E. Sharpe, Inc., 80 Business Park Drive, Armonk, New York 10504.

**Library of Congress Cataloging-in-Publication Data**

Financing the 1996 election / edited by John C. Green.
p. cm.
Includes bibliographical references and index.
ISBN 0-7656-0384-5 (cloth : alk. paper)
ISBN 0-7656-0385-3 (pbk. : alk. paper)
1. Campaign funds—United States. 2. Presidents—United States—Election—1996. 3. United States—Congress—Elections, 1996.
4. United States—Politics and government—1993– .
I. Green, John Clifford, 1953– .
JF1991.F566 1999
324.7'8'097309049—dc21 99-31066
CIP

Printed in the United States of America

The paper used in this publication meets the minimum requirements of American National Standard for Information Sciences—Permanence of Paper for Printed Library Materials, ANSI Z 39.48-1984.

BM (c) 10 9 8 7 6 5 4 3 2 1
BM (p) 10 9 8 7 6 5 4 3 2 1





h Foundation

reproduced in any form
r, M. E. Sharpe, Inc.,
York 10504.

ublication Data

John C. Green.

and index.
k. paper)
k. paper)
dents—United States—
ess—Elections, 1996.
nment—1993– .
53– .

99-31066

f America

ninimum requirements of
mation Sciences—
ibrary Materials,

5 4 3 2 1
5 4 3 2 1

# Contents

About the Editor and Contributors vii
Tables and Figures xi
Acknowledgments xv

1. The End of an Era: Introduction and Overview
*John C. Green* 3

2. Spending in the 1996 Elections
*Herbert E. Alexander* 11

3. Financing the 1996 Presidential Nominations: The Last Regulated Campaign?
*Wesley Joe and Clyde Wilcox* 37

4. Financing the 1996 Presidential General Election
*Anthony Corrado* 63

5. Financing the 1996 Congressional Elections
*Paul S. Herrnson* 95

6. Individual Donors in the 1996 Federal Elections
*Peter L. Francia, Rachel E. Goldberg, John C. Green, Paul S. Herrnson, and Clyde Wilcox* 127

7. Spitting on the Umpire: Political Parties, the Federal Election Campaign Act, and the 1996 Campaigns
*Robert Biersack and Melanie Haskell* 155

8. Interest Groups and Issue Advocacy in 1996
*Diana Dwyre* 187

9. The Reinvigorated Reform Debate
*Robert E. Mutch* 215

References 241
Index 251

3

WESLEY JOE AND CLYDE WILCOX

# Financing the 1996 Presidential Nominations: The Last Regulated Campaign?

The American process of selecting party nominees for presidential elections is long and complicated, with much as stake. At the beginning of the process, there are often many candidates in both major parties, advocating a range of policy agendas. At the end, only two candidates are left, who define the policy content of their respective parties and, if successful in the general election, the political agenda for the nation as a whole. But even the losing candidates can have an impact on national politics. Sometimes their ideas take root in the campaigns of their party's nominee: In 1988, for example, many observers noted that George Bush borrowed themes from Jack Kemp and Pat Robertson in his general election campaign. Often ideas of losing candidates, such as the flat-tax proposals of Republican candidates Phil Gramm and Steve Forbes in 1996, take on a new life as rallying cries for party factions or are incorporated into more general party appeals. Moreover, losing candidates can often negotiate for changes in party rules, as Jesse Jackson did in 1984 and Pat Robertson in 1988. And they sometimes end up in the cabinet of the party nominee, as did Jack Kemp after the 1988 campaign, or their importance may be symbolically acknowledged through major speeches at the party convention, as occurred in 1992 at the GOP convention.

Candidates who seek their party's nomination for the presidency must mount their own campaigns. They must decide their positions on key issues and which issues will form the core of their campaign. They must develop a strategy to win and a set of tactics to implement this





Table 3.1

**Presidential Prenomination Spending, 1996**

| | |
|---|---|
| Democratic Party | |
| Clinton | $ 38,105,490 |
| Republican Party | |
| Alexander | $ 16,353,539 |
| Buchanan | 24,489,005 |
| Dole | 42,173,706 |
| Dornan | 341,718 |
| Forbes | 41,657,444 |
| Gramm | 28,038,313 |
| Keyes | 4,252,471 |
| Lugar | 7,631,213 |
| Specter | 3,391,843 |
| Taylor | 6,504,966 |
| Wilson | 7,219,912 |
| Reform Party | |
| Perot | $ 8,031,229 |
| Lamm | 289,500 |
| Total | $234,378,164[a] |

*Source*: Federal Election Commission.
[a]Includes some minor candidates not identified in this table.

strategy. Above all, they must raise enough money to get their message to the primary election and caucus voters. As the nomination period has become increasingly compressed in recent years, the importance of early money has grown. Money does not buy victory, but without it a candidate cannot get on the plane and fly to the next stop, cannot answer his or her opponents charges with a television advertisement, cannot commission a poll, or even pay for pizza to feed campaign workers. Money is a necessary but not sufficient condition for victory in presidential nomination politics. In 1996, more than a dozen major- and minor-party candidates spent $234 million—of which nearly one-quarter came from federal matching funds—on prenomination campaigns (Table 3.1).

In many ways, the financing of the 1996 presidential nominations resembled closely those of 1984. Like Ronald Reagan, President Bill Clinton was a popular incumbent with a strong economy who faced no intraparty opposition, and was a formidable fund-raiser. Thus, Clinton

was able to spend all of his "primary election" money on the general election—either attacking his likely GOP opponent Senator Bob Dole or building his own support. Like Reagan, Clinton raised early soft money to enable his party to expand its machinery and to aid his candidacy indirectly. Like Walter Mondale, Dole was a respected party leader facing a near-impossible task—to hold off a strong set of challengers within his party, while looking ahead to a difficult general election.

Yet the financing of the 1996 campaigns differed importantly from the 1984 and any other earlier election. Clinton helped his party raise prodigious amounts of soft money long before the start of the campaign, and apparently worked closely with Democratic Party officials to fashion advertising designed to bolster Clinton's image. Reform Party candidate Ross Perot ran a second time, accepting matching funds and spending more than $8 million of his own money to finance his campaign. Most importantly, two millionaire businessmen sought the GOP nomination: Maurice Taylor, who spent $6.5 million of his own money, and Steve Forbes, who loaned his campaign $37.5 million. Forbes spent record sums early in the campaign and forced Dole to spend up to the legal limit to win the nomination.

In the end, the campaign finance laws were once again stretched, this time perhaps to the breaking point. Many aspects of the Clinton fund-raising effort were investigated by journalists, a Senate committee, and the Justice Department, calling attention to new and widespread practices (Wilcox 1999). A growing number of observers, including academics, politicians, and practitioners, called for campaign finance reform. As campaign professionals looked ahead to the 2000 campaigns, with an early California primary and an even more front-loaded calendar, they predicted that the scramble to raise campaign funds would be even more frantic. And with the advent of new spending techniques, such as issue advocacy, the 1996 nomination contest may have been the last fought under the post-Watergate campaign finance system embodied by the Federal Election Campaign Act (FECA).

Before we can discuss the specifics of the 1996 campaign, however, we must first describe the regulatory framework that guided this activity. Candidates choose their fund-raising strategies by assessing their resources and then considering the constraints of rules and of existing fund-raising practices.





**The Regulations**

The 1974 amendments to FECA serve as the primary set of regulations on presidential nomination finance. This legislation was passed in response to the abuses of President Nixon's Committee to Re-Elect the President (CREEP). The 1972 presidential election was the most expensive to that point in history: The Nixon campaign spent a record $56 million, and the McGovern camp spent $40 million. In the investigations that followed, it was revealed that the Nixon campaign had essentially extorted illegal contributions from major companies and laundered the money. Moreover, there were many very large contributions from individuals who were later rewarded with ambassadorships.

In response to these revelations, Congress passed a set of comprehensive amendments to the FECA that radically transformed the financing of presidential nomination campaigns. Contributions to presidential nomination candidates were limited in size, federal money was provided to help candidates campaign, and a strict system of disclosure was established so that citizens could learn who was financing each candidate's efforts. Amendments to the law in 1979 and subsequent court decisions have further modified the law.

The regulatory regime can be summarized as follows:

1. *Limits:* The law limits contributions from individuals to $1,000 per candidate during the primary elections. Interest groups (through PACs) are limited to $5,000 per candidate, and the candidates themselves can give their own campaigns $50,000 if they accept matching funds (described below).

If candidates do not accept matching funds, they can give or loan unlimited amounts to their own campaigns. Individuals and interest groups can give unlimited amounts to the political parties for party-building activity—these large party gifts are called *soft money.* Soft money cannot be spent on the campaigns of specific federal candidates, and cannot be coordinated with those campaigns. Individuals and interest groups (through PACs) can spend unlimited amounts to advocate the election or defeat of a candidate. Individuals and groups can also spend unlimited amounts to advertise their positions on issues and can feature the images of candidates in these advertisements as long as they do not expressly call for the election or defeat of the candidate. Those advertisements that expressly advocate the election or defeat of a candidate (called *independent expenditures*) must be fi-



nanced through FECA guidelines, which include contribution limits and the disclosure of spending to the FEC. Those that merely advocate an issue (called *issue advocacy*) need not be disclosed and can be financed from interest group treasuries and from contributions from individuals of unlimited amounts.

2. *Matching funds:* Each year American taxpayers can contribute $3 through a checkoff to a public fund, which is used to help finance the primary election campaigns, the party conventions, and the general election campaigns. During the primary elections, candidates can qualify for public matching funds by raising $100,000 in amounts of $250 or less, with $5,000 coming from each of twenty states. Once a candidate has met this criterion, the first $250 of any contribution from one individual is matched by money from the federal fund. There is an overall cap on total matching funds that any one campaign can receive: In 1996 that amount was slightly more than $13 million. Candidates can lose their ability to qualify for matching funds by doing poorly in primary elections and caucuses.

3. *Spending limits:* All candidates who accept matching funds must abide by state and overall spending limits. The state limits are based on the state's voting-age population, not on the strategic importance of the state. This means that the limits for critical early states, such as New Hampshire, are approximately the same as for Alaska and the District of Columbia. State limits are routinely ignored and evaded with a variety of tactics by all candidates (Wilcox 1991), and by 1996 reported figures on statewide spending were meaningless. The overall limit, however, has more force. In 1996, candidates could spend $30.9 million on campaign costs and another $6.2 million to raise the money.

In 1996, this "hard dollar" regulatory framework was stretched to the breaking point. The Clinton and Dole campaigns benefited from issue advocacy campaigns run by the national party committees and financed with soft money. This spending enabled both campaigns to circumvent federal laws restricting contributions and spending without giving up substantial federal matching funds.

### Regulations, Resources, and Candidate Fund-Raising Strategies

The regulations provide constraints on fund-raising that influence the way candidates raise money. Under FECA regulations, most candi-



dates have relied primarily on three sources to finance their campaigns: individual contributions, the matching funds associated with individual contributors, and loans that can be secured against the promise of matching funds. Although PACs are a major source of funding for congressional candidates, in presidential elections they are mostly invisible (Wilcox 1991). In 1996, no presidential candidate raised as much as 4 percent of their total receipts from PACs (Wayne 1998).

Table 3.2 shows the sources of funds for major presidential nomination candidates from 1980 through 1996. Individuals were the main source for all candidates, and the ratio between individual gifts and matching funds reflects primarily the size of the average contribution: Candidates with relatively more matching funds receive smaller contributions. Thus, in 1996 Patrick Buchanan received 67 percent as much in matching funds as he received in individual contributions, because he relied primarily on small contributions, but Governor Pete Wilson received matching funds that amounted to only 29 percent of his total individual contributions because his fledgling campaign relied more heavily on large donations. A number of candidates borrow money against their matching funds: In 1996 Lamar Alexander was able to borrow money against his matching funds in 1995 to keep his campaign afloat. Candidates can loan their own campaigns unlimited amounts if they do not accept matching funds, and Table 3.2 shows that Steve Forbes ended his campaign owing himself more than $37 million. Candidates loan the money to their campaigns rather than give it outright because if they win they can usually attract sufficient contributions to recoup some of the investment. In 1992 Patrick Buchanan reclassified a contribution to his campaign as a loan and was able to repay that amount to himself when the campaign finished in the black.

Prior to the FECA, candidates often launched their campaigns by asking a few wealthy people for very large contributions. This pattern applied even for candidates with strong ideological appeals: Herbert Alexander reports that Eugene McCarthy in 1968 received $2.5 million from fifty individuals (Alexander 1971). In 1996 it would have taken 2,000 contributors each giving the maximum amount (along with the subsequent matching funds) to have raised that amount. Clearly, the FECA requires candidates to contact many more potential contributors. This means that it is important for candidates to begin their candidacies quite early. In 1968 Robert Kennedy was able to raise $11 million in eleven weeks, mostly from large contributors, but such fund-raising

Table 3.2

**Presidential Prenomination Campaigns: Sources of Receipts: 1980–1996**
(in thousand $)

| | Individuals | Matching funds | Loans | PACs and parties |
|---|---|---|---|---|
| 1996 | | | | |
| Clinton | 28,866 | 13,412 | 0 | 3 |
| Alexander | 12,823 | 4,573 | 2,650 | 290 |
| Buchanan | 15,698 | 10,540 | 53 | 18 |
| Dole | 30,564 | 13,546 | 4,300 | 1,237 |
| Dornan | 300 | 0 | 6 | 1 |
| Forbes | 4,297 | 0 | 37,885 | 15 |
| Gramm | 16,128 | 7,356 | 2,434 | 420 |
| Keyes | 3,517 | 1,263 | 1 | 4 |
| Lugar | 4,844 | 2,657 | 1,435 | 129 |
| Specter | 2,326 | 1,010 | 551 | 163 |
| Wilson | 5,776 | 1,724 | 160 | 253 |
| 1992 | | | | |
| Brown | 4,560 | 857 | 600 | 0 |
| Clinton | 14,179 | 4,240 | 1,900 | 3 |
| Harkin | 2,780 | 1,734 | 0 | 330 |
| Kerrey | 3,457 | 1,784 | 10 | 280 |
| Tsongas | 4,775 | 1,443 | 550 | 2 |
| Buchanan | 4,817 | 2,877 | 0 | 27 |
| Bush | 23,969 | 6,785 | 0 | 36 |
| 1988 | | | | |
| Babbitt | 2,265 | 1,079 | 905 | 1 |
| Dukakis | 19,401 | 9,040 | 0 | 9 |
| Gephardt | 6,313 | 2,896 | 2,528 | 661 |
| Gore | 8,015 | 3,853 | 1,560 | 517 |
| Jackson | 12,282 | 7,608 | 5,169 | 47 |
| Simon | 6,147 | 3,603 | 3,037 | 300 |
| Bush | 22,567 | 8,393 | 50 | 673 |
| Dole | 17,430 | 7,618 | 0 | 849 |
| du Pont | 5,502 | 2,551 | 828 | 0 |
| Kemp | 10,568 | 5,877 | 3,300 | 65 |
| Robertson | 20,637 | 9,691 | 9,553 | 0 |
| 1984 | | | | |
| Glenn | 6,683 | 3,325 | 2,655 | 398 |
| Hart | 8,919 | 5,328 | 7,720 | 9 |
| Jackson | 5,139 | 3,061 | 637 | 31 |
| Mondale | 17,415 | 9,495 | 7,672 | 1 |
| Reagan | 16,485 | 10,100 | 200 | 131 |

*(continued)*



Table 3.2 *(continued)*

| | | | | |
|---|---|---|---|---|
| 1980 | | | | |
| Carter | 13,000 | 5,052 | 0 | 500 |
| Kennedy | 7,761 | 3,863 | 2,653 | 240 |
| | | | | |
| Anderson | 3,910 | 2,680 | 175 | 24 |
| Bush | 10,929 | 5,716 | 4,467 | 131 |
| Connally | 11,784 | 0 | 578 | 210 |
| Crane | 3,480 | 1,755 | 40 | 2 |
| Dole | 902 | 446 | 50 | 46 |
| Reagan | 13,886 | 7,193 | 5,513 | 288 |

*Source*: FEC Reports on Financial Activity: Final Presidential Reports 1980, 1984, 1988, and final press releases for 1992, 1996.

*Note:* Final receipts exclude any repaid loans.

speed is unthinkable today, since it would take 8,000 contributors giving the maximum amount to raise that much money, and first the candidate would need to qualify for matching funds.

Because the maximum contribution limit was not indexed to inflation, the value of a $1,000 contribution, and the difficulty of raising it, has declined over time. Consequently, many candidates seek to raise substantial portions of their individual contributions in large donations of $750 or more. To do this, candidates enlist a few top-level campaign solicitors, who build networks of solicitors. Each solicitor is asked to raise a certain amount—for example, $1 million. Solicitors ask others to give and then raise an additional $100,000 apiece. The resulting pyramid of contributions usually raises substantial sums, often through invitations to fund-raising dinners and other events (Brown, Powell, and Wilcox 1995). The success of a fund-raising campaign often depends on how many layers exist in the fund-raising pyramids.

The availability of matching funds makes profitable impersonal forms of solicitation. Candidates rent lists of donors to organizations, party committees, and even to other candidates; they then solicit those lists through direct-mail letters and telephone calls. For example, the Buchanan campaign solicited members of conservative organizations such as pro-gun groups. In the 1992 campaign, Buchanan also rented Jack Kemp's contributor list and raised more money from those donors than Kemp ever had. Although direct-mail fund-raising is an expensive way to raise money, it is made more profitable by matching funds. A $50 contribution to Buchanan was worth $100 to the campaign be-



cause it was fully matched from the federal fund. Moreover, it is not uncommon for individuals who make one small donation to a campaign through the mail to respond to multiple solicitations (Brown, Powell, and Wilcox 1995).

Most campaigns use a mix of these networks of personal solicitations and impersonal appeals, but the resources available to each candidate help determine the precise blend of fund-raising tactics. Brown, Powell, and Wilcox (1995) reported that more than 70 percent of Bob Dole's contributors in the 1988 campaign were contacted through personal solicitation networks, and that the overwhelming majority of Buchanan's 1992 contributors were solicited through the mail.

Candidates with influence over the congressional agenda (party leaders, committee chairs, policy entrepreneurs) can often assemble national networks of personal solicitation, working through businesses and groups that seek access to Congress. Washington lobby firms can help assemble the networks, which may include substantial numbers of contributors who do not really care if the candidate wins the presidency, since giving is also a way of securing access for lobbying. Candidates who are sitting or former governors often can tap into business networks in their home state. Indeed, governors usually rely on in-state money for a substantial amount of their early cash. Candidates can also use their religion and ethnicity to develop networks of personal solicitation. In 1988, Michael Dukakis raised substantial sums through networks of Greek restaurateurs (Berke 1987; Brown, Powell, and Wilcox 1995) and Jews, while Jesse Jackson raised money in black churches (Hertzke 1993; Brown, Powell, and Wilcox 1995).

In contrast, candidates with more extreme ideological views can often develop large direct-mail lists that can raise substantial sums. In 1988, televangelist and Christian Right leader Marion "Pat" Robertson raised record amounts of money through direct-mail solicitations: His first report to the Federal Election Commission (FEC) contained the names of 70,000 contributors and was delivered in a sixteen-foot truck (Wilcox 1992).

The 1996 campaigns involved candidates with a range of resources. Bill Clinton ran unopposed for the Democratic nomination (except for the perennial fringe candidate Lyndon LaRouche) and therefore could count on the party apparatus and the trappings of the presidency as key fund-raising resources. In addition, although Clinton had governed as a centrist Democrat and coopted GOP issues such as the death penalty





and welfare reform, he could count on the ideological wing of the party to support him when control of Congress shifted to the GOP in 1994.

Bob Dole had a long and well-established network of solicitors from his 1980 and 1988 presidential bids, and from his multiple Senate reelection campaigns as well. A survey of Dole's 1988 contributors found an unusual number of lobbyists, many of whom cared little about whether he would ultimately win the White House, since he remained a valuable friend in the Senate even if he lost (Brown, Powell, and Wilcox 1995). Lamar Alexander and Pete Wilson could count on in-state networks to generate their early money. Patrick Buchanan, Bob Dornan, and Alan Keyes could use their ideological credentials to solicit conservative money through direct-mail appeals.

Table 3.3 shows the distribution of contributions by size for major nomination candidates from 1980 through 1996. The trend toward increasing reliance on large contributions, especially among GOP candidates, continued. In 1996, Alexander, Dole, Gramm, Specter, and Wilson all raised at least one-half of their money in large contributions, mostly of $1,000. In contrast, candidates representing the ideological extreme of the GOP relied more on small contributions: Patrick Buchanan raised a record 91 percent of his money in small contributions, and Dornan and Keyes both raised more than 80 percent of their far less impressive totals in this fashion. Bill Clinton used a mix of mail appeals and large fund-raising events and therefore received a mix of small and large contributions.

Table 3.4 shows the percentage of individual contributions received in-state by each candidate. Alexander, Gramm, Lugar, Specter, and Wilson all raised significant sums from their home states. This reflects two realities. First, most campaigns begin by soliciting past contributors to the candidate's gubernatorial, Senate, or House campaigns, and most of these donors reside in the candidate's home state. Second, unsuccessful campaigns seldom expand beyond that initial core of support, which means that they ultimately receive little money outside their state. In contrast, more successful campaigns rely on in-state donors for "seed money," then build networks that extend beyond the state. In 1991 Clinton raised more than one-third of his early money from Arkansas, hardly a money center in American politics, but in 1992 Arkansas provided just slightly more than 5 percent of his total individual contributions. Similar trends are evident for Lamar Alexander in the 1996 cam-



Table 3.3

**Presidential Prenomination Campaigns: Individual Contributions by Size, 1980–1992** (in percentages)

| | $1–$499 | $500–$749 | $750–$1,000 |
|---|---|---|---|
| 1996 | | | |
| Clinton | 38 | 5 | 57 |
| | | | |
| Alexander | 17 | 17 | 66 |
| Buchanan | 91 | 3 | 6 |
| Dole | 39 | 7 | 55 |
| Dornan | 87 | 5 | 7 |
| Forbes | 41 | 10 | 49 |
| Gramm | 37 | 10 | 53 |
| Keyes | 86 | 6 | 9 |
| Lugar | 51 | 13 | 36 |
| Specter | 38 | 11 | 50 |
| Wilson | 14 | 15 | 71 |
| 1992 | | | |
| Brown | 100 | 0 | 0 |
| Clinton | 38 | 20 | 42 |
| Harkin | 73 | 8 | 19 |
| Kerrey | 41 | 16 | 43 |
| Tsongas | 60 | 13 | 26 |
| | | | |
| Buchanan | 83 | 6 | 12 |
| Bush | 9 | 9 | 82 |
| 1988 | | | |
| Babbitt | 35 | 12 | 54 |
| Dukakis | 37 | 20 | 42 |
| Gephardt | 43 | 19 | 38 |
| Gore | 44 | 17 | 39 |
| Jackson | 88 | 4 | 7 |
| Simon | 61 | 12 | 27 |
| | | | |
| Bush | 22 | 12 | 66 |
| Dole | 36 | 12 | 51 |
| du Pont | 45 | 14 | 40 |
| Kemp | 68 | 9 | 22 |
| Robertson | 89 | 3 | 8 |
| 1984 | | | |
| Glenn | 37 | 18 | 45 |
| Hart | 68 | 10 | 23 |
| Jackson | 86 | 6 | 8 |
| Mondale | 52 | 17 | 31 |
| | | | |
| Reagan | 63 | 9 | 29 |

*(continued)*





Table 3.3 *(continued)*

| | | | |
|---|---|---|---|
| 1980 | | | |
| Carter | 32 | 18 | 50 |
| Kennedy | 59 | 11 | 31 |
| Anderson | 87 | 6 | 8 |
| Bush | 57 | 18 | 25 |
| Connally | 43 | 13 | 44 |
| Crane | 91 | 4 | 5 |
| Dole | 43 | 18 | 39 |
| Reagan | 59 | 11 | 30 |

*Source:* FEC Reports of Financial Activity: Presidential Final Reports 1980, 1984, 1988, and final press release for 1992.

paign, who raised 47 percent of his individual contributions in 1995 in his home state, but only 27 percent in 1996.

In contrast, Bob Dole raised relatively little money in Kansas. Dole had amassed a long list of national supporters, both from his days as Senate majority leader and from his two presidential campaigns. His tax-exempt foundation had also helped him develop a reliable list of national contributors. The ideological candidates—Buchanan and Keyes—both raised most of their money out of their home state. Dornan's short-lived campaign drew heavily from his home district in California: Apparently his attempts at national direct mail failed. Steve Forbes also drew from diverse geographic constituencies, although if his personal loans to his campaign were figured in, nearly all of his money would have come from New Jersey.

**The Money Chase in 1996**

As in previous campaigns, in 1996 the candidates struggled to win the early fund-raising race, often called the "invisible primary" (Buell 1996). Journalists of all types devoted considerable air time, column space, and web pages to stories about that financial contest—who was raising the most money, who had the most money on hand, who was running up the largest debts. These stories were written on the assumption that money is an important indicator of a candidate's support and that money was a vital tool in helping candidates reach the voters. Indeed, articles as early as October 1995 began to discount candidates who had done less well than expected in the fund-raising race—nearly five months before the first caucus or primary was held (Fritsch 1995a). In 1996 the candidates raised

Table 3.4

**Presidential Prenomination Campaigns: Percentage of Individual Contributions Raised in the Home State, 1996**

| | |
|---|---|
| Clinton | 4.71 |
| Alexander | 43.08 |
| Buchanan | 4.15 |
| Dole | 4.73 |
| Dornan | 22.20 |
| Forbes | 11.72 |
| Gramm | 39.35 |
| Keyes | 1.47 |
| Lugar | 64.51 |
| Specter | 53.91 |
| Wilson | 61.64 |

*Source:* Federal Election Commission.

money earlier than ever: Three candidates had raised more than $20 million by the end of 1995, and two others had raised more than $10 million. Once again, the two candidates who had raised the largest amounts by December in the year prior to the primary elections—Bill Clinton and Bob Dole—won the party nomination.

### *The Democrats*

Although Clinton's popularity began rebounding almost as soon as the GOP took control of Congress in 1994, the Clinton White House was greatly worried by the 1996 reelection campaign, and this led them to raise prodigious amounts of soft money very early in the electoral process. Two specters haunted President Clinton and his close advisers: Gingrich and Carter. The 1994 midterm elections produced an electoral earthquake, giving the GOP control of both the Senate and House of Representatives for the first time since the Eisenhower era. Many White House officials believed that the voters had not so much embraced the Republicans' Contract with America as they had rebuked Clinton. Early in 1995, journalists, commentators, and others publicly questioned the president's relevance, and Clinton and his advisers feared that the president's weak political position would invite a challenge to his renomination campaign and even cost him his office.



The top White House point man for the reelection effort, Deputy Chief of Staff Harold Ickes, knew this road well. A veteran of Senator Edward M. Kennedy's challenge to President Jimmy Carter's renomination in 1980, Ickes remembered how an acrimonious primary campaign mortally wounded Carter, who ultimately lost reelection in a surprisingly lopsided defeat. The Clinton administration's fears were well founded. Senator Bob Kerrey, a Clinton rival for the presidential nomination in 1992, contemplated such a challenge.

Determined to avoid Carter's fate, Clinton and his staff began the active renomination campaign earlier than had any previous incumbent president. The Clinton campaign helped the Democratic Party raise prodigious amounts of soft money in 1995, and afterward the methods of this fund-raising came under close scrutiny. It was widely alleged that Clinton had hosted intimate coffees in the White House where he asked for contributions, that he had allowed future "friends of Bill" to have pajama parties in the Lincoln bedroom if they made large contributions, and that convicted felons and other dubious characters had attended fund-raising events. The media coverage of these stories was extensive, and this eventually led to a congressional investigation and widespread criticism from even usually sympathetic sources. Reports that Vice President Albert Gore had solicited contributions from his White House office telephone, and that he had attended a fund-raiser at a Buddhist temple where contributors were reimbursed by the temple, led to calls for an independent counsel, although after a lengthy investigation Attorney General Janet Reno declined. More importantly, an entire network of foreign money, some of which appears to have come from the Chinese government, forced the DNC to return millions of dollars in contributions, and led some Republicans to charge that the administration had sold national security for foreign money. Overall, the Clinton administration and the DNC appear to have relaxed their usual scrutiny of fund-raising after the 1994 elections and to have taken previous practices to new lows of decorum (Wilcox 1999).

The Clinton campaign aired some advertising in 1995, praising Clinton's position on gun control (Corrado 1997a). But the campaign hit on a more innovative strategy—to use party soft money to run "issue advertisements" that did not specifically call for the reelection of Clinton but that would serve to bolster his image. At the urging of consultant Dick Morris, Clinton raised enough soft money to fund an $18 million advertising campaign during the summer and fall of



1995. One such ad charged that the "Dole-Gingrich" budget tried to cut Medicare, but Clinton cut taxes for working families. Eventually, this kind of spending topped $44 million (Marcus and Babcock 1997). An FEC preliminary audit of the Clinton campaign held that this party spending was really campaign spending and asked for a repayment of $7 million. Nevertheless, the Commission itself voted 6–0 that the spending was issue advocacy and that no repayment was needed (Abramson 1998). The decision sets the stage for a potential radical change in the financing of presidential campaigns, which we discuss in the conclusion to this chapter.

Clinton also had no difficulty raising hard money for the campaign. Indeed, the campaign had raised fully $25 million by the end of 1995, a record amount. The campaign even considered forgoing matching funds and thus avoiding any spending limits, although it eventually decided that such a move would undermine the president's image as a supporter of campaign finance reform. Instead, the campaign accepted the more than $9 million for which its 1995 fund-raising qualified, meaning that Clinton had essentially completed his hard money fund-raising before the 1996 campaign got under way. Overall, Clinton spent perhaps $5 million less than Dole in raising his campaign money, which allowed him to spend more money on media buys.

Unchallenged within his party, the president could use his "primary election" money to boost his image and to attack Bob Dole once Dole's nomination was assured. The party continued its soft money spending on issue ads for Clinton throughout 1996. Thus Clinton had a formidable financial advantage over Dole: All of his primary election money went to the general election, whereas Dole had to spend his money fending off Gramm, Buchanan, and Forbes, and Clinton could count on party soft money eighteen months before the election—something that became available to Dole only after he clinched the nomination.

Clinton's early fund-raising is unusual among sitting presidents. Table 3.5 shows the dynamics of fund-raising over time for all nomination campaigns since 1980. Jimmy Carter in 1980, Ronald Reagan in 1984, and George Bush in 1992 all started their fund-raising later in the election cycle, despite the fact that both Carter and Bush faced intraparty challenges. Whether Clinton's quick start was an idiosyncratic result of his electoral insecurity following the 1994 elections or another sign of the historic pressure to raise money earlier in the election cycle remains to be seen.





Table 3.5

**Presidential Prenomination Campaigns: The Dynamics of Funds Raised, 1980–1996** (in million $)

| | Sept. | Dec. | Jan. | Feb. | Mar. | Apr. | May |
|---|---|---|---|---|---|---|---|
| **1996** | | | | | | | |
| Clinton | 25.64 | 31.50 | 32.12 | 34.66 | 39.06 | 40.43 | 40.42 |
| | | | | | | | |
| Alexander | 11.52 | 12.54 | 15.53 | 16.04 | 16.88 | 17.58 | 17.57 |
| Buchanan | 7.22 | 10.73 | 14.52 | 17.43 | 20.02 | 21.80 | 21.79 |
| Dole | 24.62 | 31.98 | 33.99 | 38.90 | 41.96 | 43.15 | 43.15 |
| Forbes | 17.97 | 25.44 | 32.73 | 37.69 | 40.57 | 42.10 | 42.10 |
| Gramm | 20.76 | 25.72 | 27.86 | 27.86 | 28.72 | 28.79 | 28.78 |
| Keyes | 1.70 | 2.08 | 2.45 | 2.81 | 3.23 | 3.55 | 3.54 |
| Lugar | 5.90 | 7.37 | 7.77 | 7.58 | 7.71 | 7.74 | 7.73 |
| Specter | 3.02 | 3.20 | 3.20 | 3.23 | 3.23 | 3.49 | 3.49 |
| Wilson | 5.35 | 6.35 | 6.47 | 6.90 | 6.90 | 7.33 | 7.33 |
| **1992** | | | | | | | |
| Brown | 0.05 | 0.52 | 0.94 | 1.46 | 3.41 | 6.02 | 6.02 |
| Clinton | 0.20 | 3.29 | 5.47 | 8.61 | 12.87 | 16.64 | 20.33 |
| Harkin | 0.71 | 2.17 | 3.56 | 4.61 | 4.75 | 4.85 | 4.85 |
| Kerrey | 0.22 | 1.91 | 3.26 | 4.92 | 5.26 | 5.40 | 5.53 |
| Tsongas | 0.79 | 1.31 | 1.88 | 3.75 | 6.23 | 6.67 | 6.77 |
| | | | | | | | |
| Buchanan | 0 | 0.71 | 1.72 | 4.22 | 6.16 | 7.05 | 7.77 |
| Bush | 0 | 9.96 | 14.17 | 18.97 | 23.63 | 27.08 | 30.95 |
| **1988** | | | | | | | |
| Babbitt | 1.92 | 2.45 | 3.57 | 3.93 | 4.01 | 4.11 | 4.24 |
| Dukakis | 7.74 | 10.37 | 14.69 | 17.56 | 20.99 | 4.43 | 27.89 |
| Gephardt | 3.46 | 5.90 | 8.08 | 9.57 | 11.66 | 12.16 | 12.30 |
| Gore | 2.70 | 3.94 | 5.99 | 7.53 | 10.94 | 12.37 | 12.83 |
| Jackson | 1.04 | 1.40 | 2.68 | 4.15 | 7.42 | 12.28 | 16.93 |
| Simon | 2.04 | 6.06 | 9.00 | 10.68 | 11.62 | 11.92 | 12.21 |
| | | | | | | | |
| Bush | 12.73 | 19.06 | 26.29 | 27.75 | 29.92 | 32.06 | 32.58 |
| Dole | 7.96 | 14.32 | 21.09 | 23.12 | 25.52 | 26.88 | 27.31 |
| du Pont | 3.43 | 5.54 | 8.23 | 8.68 | 8.81 | 9.09 | 9.11 |
| Kemp | 6.30 | 10.21 | 15.93 | 17.55 | 18.20 | 18.99 | 19.44 |
| Robertson | 11.74 | 16.41 | 29.70 | 34.69 | 37.01 | 38.10 | 38.60 |
| **1984** | | | | | | | |
| Glenn | 4.25 | 6.42 | 9.01 | 12.45 | 13.15 | 13.36 | 13.47 |
| Hart | 1.55 | 1.88 | 2.83 | 3.82 | 12.05 | 16.41 | 19.92 |
| Jackson | 0 | 0.35 | 0.76 | 1.57 | 1.94 | 3.61 | 5.55 |
| Mondale | 6.95 | 11.45 | 16.48 | 18.25 | 23.01 | 25.92 | 29.82 |
| | | | | | | | |
| Reagan | 0 | 3.77 | 4.81 | 10.85 | 16.43 | 23.17 | 26.25 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1980 | | | | | | | |
| Carter | 2.42 | 5.75 | 8.53 | 11.13 | 12.98 | 14.71 | 16.46 |
| Kennedy | 0 | 3.89 | 6.11 | 7.67 | 9.49 | 11.06 | 13.62 |
| Anderson | 0.29 | 0.51 | 0.66 | 1.58 | 4.52 | 6.87 | 6.96 |
| Bush | 2.43 | 4.46 | 6.56 | 9.41 | 14.47 | 18.68 | 20.51 |
| Connally | 4.30 | 9.16 | 10.01 | 11.64 | 12.66 | 12.85 | 12.99 |
| Crane | 2.94 | 3.27 | 4.11 | 4.51 | 4.95 | 5.19 | 5.22 |
| Dole | 0.51 | 0.78 | 1.27 | 1.35 | 1.43 | 1.43 | 1.47 |
| Reagan | 2.79 | 7.21 | 12.02 | 16.36 | 18.91 | 21.55 | 24.49 |

*Source:* FEC Reports of Financial Activity: Final Presidential Reports 1980, 1984, 1988, and monthly press releases for 1991 and 1992.

*Note:* Figures represent total cumulative receipts of campaign committees for each reporting period.

### *The Republicans*

Overall, the Republican contenders continued a trend toward earlier fund-raising that was briefly interrupted by the late start to the 1992 campaign. The early frontrunner in the dollar dash was Senator Phil Gramm of Texas, who kicked off his campaign with a fund-raising dinner in Dallas that raised more than $4 million (Verhovek 1996), where he told a cheering throng, "I have the most reliable friend that you can have in American politics, and that is ready money" (Fritsch 1995a). Gramm also transferred almost $5 million from his Senate account, giving him a substantial amount of early money. Gramm spent heavily early in 1995 on building campaign organizations and events, spending nearly $9.5 million by the end of June. Gramm invested heavily in 1995 on a series of straw polls, hoping that his strong showing would make him an acceptable alternative to Dole. But Gramm's fund-raising foundered in the third quarter of 1995, as his networks failed to expand much beyond his Texas base. The problems were the same as those that doomed his candidacy: He was not a personally attractive candidate, and his issue positions did not appeal to a distinctive party constituency. His defeats in Louisiana and Iowa led him to drop out early, despite having spent more than $27 million.

By the third quarter of 1995, Senator Bob Dole led the GOP fund-raising race. Dole tapped his preexisting networks of personal solicitors among lobbyists and corporate executives, and even raised a sizable amount from PACs. Dole's fund-raising skills and donor lists were honed by House and Senate races, two previous presidential bids,





a leadership PAC, and two foundations that he had sponsored. By one estimate, Dole had raised $100 million through these various entities over the course of his career (Babcock and Marcus 1996). Dole had used his PAC, Campaign America, to develop a list of reliable donors of smaller amounts, who would respond to mail solicitations. The PAC also paid for Dole's travels to stump for GOP candidates, enabling Dole to develop a large donor base as well. By 1994, Campaign America led all leadership PACs in fund-raising. Dole's Better America Foundation, aimed at promoting GOP goals using Dole as a spokesman, also helped him cultivate his financial constituency and build political IOUs. Dole disbanded the foundation during the campaign under strong criticism that it was a mechanism for excessive spending.

The Dole plan was to raise nearly $16 million through the mail (some of which would be in the form of large contributions), $10 million at events, $7 million through solicitations by the candidate and the network, and $2 million from PACs. By the end of December, he had raised nearly $25 million, more than any candidate in any past campaign. This qualified Dole for more than $9 million in matching funds, which meant that nearly all of Dole's hard money fund-raising was completed before the campaign began. Unlike Clinton, however, Dole was not an automatic party nominee, and so he could not rely on issue ads from party soft money until after he had cinched the nomination. Moreover, because the federal fund did not have enough money to cover all required payouts in January, Dole and others had to borrow money from banks against a federal guarantee. The matching funds were not all paid to the Dole campaign until April.

Dole's advantage over Gramm was even larger than the fund-raising totals suggest, for he had more available cash than Gramm. Table 3.6 shows the cash on hand and debts of major campaigns in 1996 at different time periods. In December and January, Dole had an approximately 4–1 advantage over Gramm in available cash. Note, however, the huge sums sitting in the Clinton campaign bank account during this period.

Dole's other centrist opponents were Lamar Alexander and Senator Richard Lugar of Indiana. Alexander's flannel shirts belied an image of an insider politician who raised significant sums in the Washington lobbying community. Alexander raised significant sums in 1995, but as his candidacy never found a niche, and as his fortunes sagged, his fund-raising dried up. Senator Lugar's campaign, which stressed foreign policy and threats of international terrorism, barely registered

Table 3.6

**Presidential Prenomination Campaigns: Cash on Hand and Debt of Major Candidates, 1996, by Period** (in million $)

| | 12/95 | 1/96 | 2/96 | 3/96 | 4/96 | 5/96 | 6/96 | 7/96 |
|---|---|---|---|---|---|---|---|---|
| Clinton | | | | | | | | |
| Cash | 13.44 | 17.86 | 16.76 | 15.60 | 19.34 | 18.03 | 17.10 | 17.65 |
| Debt | 0.39 | 0.67 | 0.62 | 0.65 | 0.62 | 0.63 | 0.61 | 0.61 |
| Alexander | | | | | | | | |
| Cash | 0.61 | 0.43 | 0.72 | 0.11 | 0.67 | 1.24 | 1.18 | 1.17 |
| Debt | 1.59 | 0.09 | 1.44 | 0.50 | 0.02 | 0.00 | 0.00 | 0.00 |
| Buchanan | | | | | | | | |
| Cash | 0.11 | 0.10 | 0.26 | 0.08 | 0.13 | 0.99 | 0.22 | 0.21 |
| Debt | 1.44 | 1.39 | 3.08 | 2.89 | 2.89 | 2.14 | 1.65 | 1.82 |
| Dole | | | | | | | | |
| Cash | 4.35 | 4.84 | 0.57 | 0.72 | 1.90 | 3.24 | 2.50 | 2.43 |
| Debt | 0.76 | 5.45 | 6.71 | 4.63 | 1.10 | 0.94 | 1.07 | 0.11 |
| Forbes | | | | | | | | |
| Cash | 0.04 | 0.30 | 0.10 | 0.17 | 0.09 | 0.30 | 0.47 | 0.24 |
| Debt | 16.81 | 23.65 | 30.70 | 36.81 | 37.68 | 37.96 | 37.94 | 37.89 |
| Gramm | | | | | | | | |
| Cash | 1.18 | 1.52 | 1.66 | 0.60 | 0.70 | 0.74 | 0.70 | 0.66 |
| Debt | 0.91 | 1.78 | 2.94 | 1.93 | 0.21 | 0.01 | 0.00 | 0.00 |

*Source:* Federal Election Commission.

with the public. Table 3.4 shows that Lugar never extended his fund-raising network much beyond his home-state constituency.

Patrick Buchanan once again raised money in small contributions through direct-mail solicitations and drew attention with his populist crusade. With a stronger economy in 1996, Buchanan sounded more cultural themes: His "lock and load" theme excited NRA supporters, and his talk of "culture wars" appealed to moral conservatives. Buchanan raised far more money in 1996 than he had in 1992: Table 3.5 shows that he had raised more than $7 million by December of 1995, compared with only $700,000 in 1991. He ultimately raised more than $20 million, nearly three times his 1992 totals. His strong showing in New Hampshire worried the conservative core of the party, who feared that if Buchanan was the nominee, the party would lose control of



Congress. But although Buchanan remained a thorn in Dole's side, his campaign did not become the rallying point for the Christian Right wing of the GOP. This may have been because his Catholicism was unattractive to Evangelical Protestants or because pragmatic Christian Right leaders such as Ralph Reed worked hard to deliver the nomination to Dole (Drew 1997). Dole's other conservative challengers—Alan Keyes and Bob Dornan—raised little money and were not a factor in the race.

Dole also faced two challenges from his left—Governor Pete Wilson from California and Senator Alan Specter from Pennsylvania. Neither campaign took off—and in the case of Wilson this surprised many observers. Generally, sitting governors can mobilize significant resources for presidential campaigns, and California's recovering economy would seem to be a substantial base to launch any campaign. By the end of 1995, Wilson had raised only $5 million, significantly less than Lamar Alexander, a former governor of Tennessee, a much smaller state. Wilson had promised many of his core contributors that he would not seek the presidency when he had sought their financial help for his gubernatorial reelection campaign, and the fact that a President Wilson would leave California with a Democratic governor did not sit well with that state's wealthiest contributors. Moreover, neither Wilson nor Specter could find many early states where the party electorate would favor their moderate positions on social issues, and thus their campaigns died on the vine.

Dole's most serious challenge came from millionaire Steve Forbes, who spent nearly $18 million in the second half of 1995—$14 million of it in the fourth quarter—in a media campaign that aimed squarely at Dole. Most of this money went into media buys, where Forbes ripped Dole for his record on taxes and spending. Where most candidates spent time and money raising campaign funds, Forbes simply wrote another check to the campaign and devoted his time and money to advertising. When Forbes spent an additional $7 million in January, the other candidates began to pay serious attention (Corrado 1997a). Forbes's spending got him significant media attention and propelled his rise in the polls, but he was unable to overcome Dole's organizational advantage in key states. In Arizona, Forbes won by spending more than $4 million, perhaps a record amount for that state, but Dole won handily in South Carolina, swept the South, and the race was over. Dole had spent years cultivating party officials and activists in every

state of the union, and when the race narrowed, he could count on their support.

With Maury Taylor spending nearly $6 million and Ross Perot $8 million, Forbes might initially seem to be just another millionaire out on a lark to buy an expensive toy—the presidency. But Forbes showed considerable determination and is running for the 2000 race, having adjusted his positions on social issues to appeal to the Christian Right. His 1996 campaign was mostly focused on a single issue—the flat tax. Such a tax would have benefited Forbes personally: Citizens for Tax Justice, a liberal policy group that ferrets out information on tax breaks for the rich, estimated that it would save Forbes more than $1.9 billion in taxes over his lifetime, partially by easing a tax burden on his inheritance. If this figure is true, then Forbes's $37 million might be thought a shrewd investment. Forbes sold the plan as tax "simplification" on the campaign trail and downplayed the obvious redistributive aspects of the proposal. Although Forbes could never beat Dole in the critical states, his flat tax did attract enormous attention and eventually was trumpeted by conservative House Republicans. Indeed, even Dole eventually began to promote a "flatter" tax system. Richard Lugar, whose campaign never got off the ground, argued that "the reason the flat tax is generally more popular is that it's been marketed with extraordinary multiples of any other policy than I have seen in the campaign" (Holmes 1996).

The ultimate effect of Forbes's spending was to drive Dole to spend almost the legal limit during the primaries, leaving him legally unable to raise and spend money from late March until the convention in July. By the New York primary, Dole was forced to recycle older, generic ads and broadcast them exclusively on cable TV in an effort to stay within the spending limits.

### *The Reform Party*

For most of the period leading up to the presidential nomination contests, Reform Party founder Ross Perot was coy about the prospects of his candidacy. Although Perot conceded that he would run if drafted by his party, he insisted that he was looking for someone else to head the ticket. On July 9, 1996, a former Colorado governor, Richard Lamm, announced his candidacy for the Reform Party nomination. Lamm, who was a Democratic governor, stressed many of Perot's



original issues—a balanced budget and the need to plan for the retirement of the baby-boom generation. Two days later, Perot announced that he would himself run for the nomination.

Perot financed the Reform Party himself, paying for its ballot access petitions, its eighty-four full-time workers, and more than $700,000 per month in operating costs. Moreover, it was clear that Perot was qualified to receive some $32 million in federal campaign funds if he accepted overall spending limits and limits on his own contributions to the campaign, but there was some question whether Lamm would qualify for those funds.

The Reform Party used a complicated system for selecting its presidential nominee, involving mailed ballots to party members and those who had signed ballot access petitions, followed by a convention at which both candidates spoke, and then a runoff election (by telephone, mail, and electronic balloting) between the two candidates. There were a number of irregularities in the balloting: Many Lamm supporters and even Lamm himself had difficulties receiving ballots, while other Reform Party members received multiple ballots. Only a tiny percentage of available ballots were returned. The convention itself was run by Perot, and Lamm supporters were unable to show their signs on the floor because they were apparently six inches longer than regulation. Perot reported contributing more than $8 million of his own money to the nomination process and raising more than $80,000 in individual contributions. Lamm contributed $5,000 of his own money and raised $224,000 in individual donations. The outcome was never in doubt, and the public was not especially interested. After the contest, Lamm complained about the process and praised but did not endorse Perot.

**Postprimary Spending**

After Dole secured the nomination, he had spent almost the legal limit for the primary election period and was therefore officially unable to spend real money on the campaign until the convention, when he would accept the federal grant. In May, Dole had between $1 million and $2 million of spending authority left, while Clinton had more than $20 million (Marcus 1996a).

Clinton used this time quite profitably, pounding Dole in advertising and further lowering Dole's ratings. Into the brink stepped the Republican National Committee, with party issue advertising designed to boost



Dole's chances. The FEC preliminary audit determined that this spending was general election advocacy of Dole's campaign and suggested a $17.7 million payback to the federal fund. The FEC ruled that no money was owed, as it did for the Clinton campaign. The GOP also paid for Dole's travel costs after he won the nomination, but Dole still faced a severe financial disadvantage. After struggling to win his party's nomination while Clinton spent millions boosting his own image and attacking Dole, Dole was unable to mount a massive spending campaign to gain momentum going into the fall. In the end, it probably did not matter—Dole stood little chance of winning in 1996 no matter how much he spent. But the systematic advantage of incumbent presidents who do not face an internal party challenge is something that reformers may wish to consider as they begin to draw plans for a new regulatory regime.

**Creative Campaigning**

Every successive presidential nomination contest brings new challenges to the existing FECA regulations. In 1984 Walter Mondale, up against a spending limit and fighting off a strong challenge from Senator Gary Hart, encouraged his potential delegates to form committees of their own and to accept money from labor and other interests to fund their campaigns to win election as delegates to the convention. After the campaign, the Mondale campaign paid a fine.

During the 1988 campaign and those after, many candidates formed leadership PACs, which helped their campaigns in several ways. First, candidate PACs could hire and pay for the candidate's main consultants in the months before any official declaration of candidacy. Second, the PAC could raise money and give it to federal, state, and local party candidates, creating a web of political debts. In the process, the PAC could pay for the candidate's travel across the country to speak on behalf of these candidates, and coincidentally build a political network. A candidate's strongest supporters could give $5,000 to the PAC and an additional $1,000 to the campaign, thereby easing the burdens of the contribution limits. Perhaps the most significant advantage of candidate PACs, however, was in the development and honing of various types of donor lists, which could later be solicited by the campaign (Wilcox 1991; Corrado 1993).

By the early 1990s, many candidates were forming foundations,



which often performed the same functions as leadership PACs. Yet foundations had two obvious advantages over candidate PACs. First, foundations could raise the money in unlimited amounts, since they were not obviously involved in electoral activity and were not bound by FECA contribution limits. Second, there need be no disclosure of the contributors to the foundation or of the foundation's spending.

An example of such a foundation in 1996 was American Cause, associated with Patrick Buchanan. The foundation enabled Pat to travel, to research issues, and to develop a stronger political base. Similarly, donors who wanted to assist Senator Bob Dole's presidential prospects gave over $4 million to the Better America Foundation. The Associated Press reported that the tax-exempt "conservative think tank" spent $1.5 million on a poll, a TV ad that included Dole, and other efforts that could have helped a Dole nomination campaign. Under pressure from the press and Democrats, Dole dissolved the foundation in June 1995, released the donor list, and returned $2.5 million to eighty-six individual and corporate donors, including such major contributors as T. Boone Pickens and billionaire Ronald O. Perelman, who gave $250,000.

Nine days after President Bush's defeat in 1992, Lamar Alexander returned to Tennessee to begin his bid for the 1996 Republican presidential nomination. As part of the effort, he founded the Republican Exchange Satellite Network (RESN), a tax-exempt group that broadcast monthly television messages from Alexander to the homes of party activists. The network beamed Alexander's phone-in show to more than 3,000 sites in all fifty states, and also provided the funds to hire an organizer in Iowa. Alexander credited the network with helping him develop the fund-raising base and organization for his presidential campaign. The network raised more than $4.5 million before it was disbanded, including eleven individuals and three corporations that gave more than $100,000.

"Raising money for the network helped Alexander introduce himself to wealthy donors who subsequently both gave money to his presidential campaign and agreed to help Alexander raise funds through their established networks" (Marcus and Babcock 1995). A number of contributors to RESN later hosted fund-raisers for Alexander. Alexander himself noted, "Of all the things it did for me, I'd say it was probably the financial network that was most important. It turned out to be a lot better than a PAC" (cited in Marcus and Babcock 1995).



Alexander also formed a PAC, Republicans for the 1990s, which raised more than $430,000 in two years, but the PAC could only accept contributions in amounts of $5,000 or less and had to report the names of its donors. Alexander kept the donors to his network secret until pressured to reveal them during the campaign.

The staff of RESN largely became the staff of the Alexander campaign; thus the network allowed Alexander to pay his staff and some consultants before the campaign began. It paid for Alexander's travel across the country, paid for staff to research issues that he used during the campaign, and helped him stay visible in early states such as Iowa. The network mailed a newsletter monthly to some 15,000 GOP activists and officeholders.

### The Last Regulated Campaign?

By far the most important new development in the 1996 prenomination campaign was issue advocacy spending. A series of decisions by federal courts have allowed advertising that raises policy issues and may even use the picture of a candidate, so long as that advertisement does not expressly call for the election of a specific candidate. Some of the Democratic Party issue ads that helped Bill Clinton in 1995 used the same film clips and some of the same voiceovers as the Clinton campaign ads—indeed, they were distinguishable only by their failure to call explicitly for the president's reelection.

When the FEC ignored the advice of its auditors and lawyers and accepted this activity at the end of the 1996 campaign, they opened the door to significant extra spending and essentially eliminated spending limits in presidential campaigns. By some estimates the Democratic issue ads for Bill Clinton through the end of the primary elections totaled more than Clinton was legally allowed to spend—and Clinton spent $37 million of "primary" campaign money as well. For an incumbent president, there is now no barrier to raising unlimited soft money and spending it in carefully crafted advertising designed to bolster his or her image. Moreover, challengers can also ignore the spending limits once they have clinched the nomination.

Soft money is raised in a very different way from the money accepted by candidate campaign committees. Contributions need not come from individuals or PACs; they can come from corporate, labor union, or other group treasuries, and they can come in unlimited



amounts. Such contributions raise potentially troubling issues about corruption and the appearance of corruption. When individuals give $1,000 to a presidential candidate, they cannot expect much in return, but a contribution of $500,000 or an industrywide contribution of $4 million is perhaps a different matter. Issue advertising need not come from political parties; it can come from individuals or interest groups as well. During the Iowa caucuses, some real estate interests spent money on advertisements that argued against the flat tax, which would have ended the mortgage interest tax deduction and therefore perhaps lowered the value of homes.

In the 2000 campaign, it is quite possible that soft-money–financed issue advocacy campaigns will be waged by candidate foundations that raise money in unlimited amounts from large donors and spend it to advocate the issues for which a candidate stands. Such a development would herald the effective end of the FECA, and pre-FECA rules would again apply: large donations from wealthy individuals and interest groups, collected and spent in secret. Indeed, it might even be possible for wealthy candidates to spend their own money on issue ads while raising and spending money under the FECA guidelines, thereby accepting federal matching funds.

Whatever happens in 2000, it seems likely that 1996 will be the last campaign governed by the FECA regulations. It is ironic that the FEC commissioners, selected to uphold the FECA system, ultimately chose to undermine it instead. In the next election, it is likely to be much harder to "follow the money," and there will surely be much more money to follow.

# PLAINTIFFS' EXHIBIT 17

AGENDA DOCUMENT NO. 98-85

FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

RECEIVED
FEDERAL ELECTION COMMISSION
SECRETARIAT

Nov 19 3 41 PM '98

November 19, 1998

**MEMORANDUM**

**TO:** The Commissioners

**THROUGH:** James A. Pehrkon
Acting Staff Director

**FROM:** Robert J. Costa
Assistant Staff Director
Audit Division

AGENDA ITEM
For Meeting of: 12/3/98

**SUBJECT:** REPORT OF THE AUDIT DIVISION ON CLINTON/GORE '96 PRIMARY COMMITTEE, INC.

Attached for your review is the subject audit report. Also attached are five memoranda from the Office of General Counsel which together contain a legal analysis of the audit report. The legal analysis was provided in separate memoranda so that needed revisions could be made more timely. The narrative portion of the Committee's response to the Exit Conference Memorandum is also attached. Immediately following this memorandum is a table of contents for the entire package to aid in locating subject matter in all of the documents. In order to provide a convenient page reference, the package has been page numbered consecutively at the bottom of the pages beginning with the first page of the audit report. Those page numbers are the ones noted on the table of contents.

The Office of General Counsel and the Audit Division are in agreement with the contents of the audit report. . Certain portions of the Primary Committee's response have been expunged pursuant to 11 C.F.R. Part 2.

In addition to the documents referenced in the Audit Reports, the Audit Division reviewed the following information in reaching these conclusions: (1) documents obtained from the candidate committees, the national and state party committees, and media and polling vendors; (2) committee responses to the ECMs; (3) documents made publicly-available by the Senate Governmental Affairs Committee Report on the Investigation of Illegal or Improper Activities in Connection with 1996 Federal Election Campaigns; and (4) disclosure reports and other documents available to the Commission.

This report is being circulated for placement on the Agenda for the Open Session Meeting of December 3, 1998.

A complete copy of the Primary Committee's response, including Exhibits, is available in the Commission Secretary's Office. Should you have any questions, please contact Tom Nurthen (Audit Manager) or Leroy Clay (Lead Auditor) at 694-1200.

Attachments:

Table of Contents

Report of the Audit Division on Clinton/Gore '96 Primary Committee, Inc.

Legal Analyses, dated October 1, 1998, October 13, 1998, October 21, 1998, October 26, 1998 and October 27, 1998

Narrative Portion of the Primary Committee's Response to the Exit Conference Memorandum

TABLE OF CONTENTS

| Audit Report Section | Audit Report Page Number | Audit Report Recommendation Page Number | Legal Analysis Page Number | Narrative of Committee Response Page Number | Audit Report Exhibit Page Number |
|---|---|---|---|---|---|
| Background | 1 | | | | |
| Audit Authority | 1 | | | | |
| Audit Coverage | 1 | | | | |
| Campaign Organization | 2 | | | | |
| Audit Scope and Procedures | 2-6 | | | 120-122 | |
| Audit Findings and Recommendations Non-Repayment Matters | 6 | | | | |
| Receipt of Prohibited Contributions Resulting From Extensions of Credit By Commercial Vendors (Penn & Schoen) | 6-9 | | 89-90 | 124-126 | |
| Audit Findings and Recommendations Repayment Matters | 9 | | | | |
| Receipt of an Apparent Excessive Contribution - Media Ads Paid For By The Democratic National Committee | 9-43 | 43 | 104-118 | 144-182 | 73-87 |
| Apparent Non-Qualified Campaign Expenses | 44 | | | | |
| Bismarck Enterprises | 46-47 | 47 | 89-90 | 127 | |
| AT&T Capital Corp. | 47-48 | 48 | 89-90 | 127 | |
| Salary and Overhead | 48-50 | 50 | 92-93 | 127-130 | |
| Morris & Carrick, Inc. | 50-53 | 53 | 93 | 130-133 | |

TABLE OF CONTENTS

| Audit Report Section | Audit Report Page Number | Audit Report Recommendation Page Number | Legal Analysis Page Number | Narrative of Committee Response Page Number | Audit Report Exhibit Page Number |
|---|---|---|---|---|---|
| Sheraton New York Hotel & Towers | 53-56 | | 93-94 | 133-135 | |
| Expenditure Limitation | 56 | | | | |
| Additional Expenditures Considered Exempt Legal and Accounting | 57-58 | | | 135 | |
| Expenses in the Legal and in the Matching Fund Departments Not Considered 100% Exempt Compliance | 58-61 | | 95-98 | 135-137 | |
| Refunds Incorrectly Offset Against the Expenditure Limitation | 61-62 | | | 137-138 | |
| Amounts Due the GELAC - Salary And Overhead | 62-63 | | | 138-139 | |
| Amounts Due the General Committee - Sublease Payments | 63 | | | 139 | |
| Analysis of Expenditures Subject To Limitation | 64-67 | 67 | | | |
| Determination of Net Outstanding Campaign Obligations | 67-70 | | 89-90 | 139-140 | |
| Stale Dated Checks | 71 | 71 | 89-90 | 141 | |
| Recap of Amounts Due U.S. Treasury | 72 | | | | |



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

# REPORT OF THE AUDIT DIVISION ON CLINTON/GORE '96 PRIMARY COMMITTEE, INC.

## I. BACKGROUND

### A. AUDIT AUTHORITY

This report is based on an audit of the Clinton/Gore '96 Primary Committee, Inc. (the Primary Committee). The audit is mandated by Section 9038(a) of Title 26 of the United States Code. That section states that "After each matching payment period, the Commission shall conduct a thorough examination and audit of the qualified campaign expenses of every candidate and his authorized committees who received payments under section 9037." Also, Section 9039(b) of Title 26 of the United States Code and Section 9038.1(a)(2) of the Commission's Regulations state that the Commission may conduct other examinations and audits from time to time as it deems necessary.

In addition to examining the receipt and use of Federal funds, the audit seeks to determine if the campaign has materially complied with the limitations, prohibitions, and disclosure requirements of the Federal Election Campaign Act of 1971(FECA), as amended.

<u>This report is a staff document. The analysis of the facts, interpretation of applicable law, and the conclusions reached have not been considered or approved by the Commission.</u>

### B. AUDIT COVERAGE

The audit of the Primary Committee covered the period from its inception, April 10, 1995 through December 31, 1997. The Primary Committee reported an opening cash balance of $-0-; total receipts of $44,753,599; total disbursements of $44,603,123; and a closing cash balance of $150,476.

C. CAMPAIGN ORGANIZATION

The Primary Committee registered with the Federal Election Commission on April 14, 1995. The Treasurer of the Primary Committee is Ms. Joan Pollitt. The Primary Committee maintains its headquarters in Washington, DC.

During the period audited, the Primary Committee maintained depositories in the District of Columbia, Arkansas, Georgia, New York and Texas. To handle its financial activity, the Primary Committee utilized a total of 9 bank accounts. From these accounts the campaign made approximately 23,654 disbursements. Approximately 293,043 contributions from 190,426 persons were received. These contributions totaled $28,987,800.

In addition to the above contributions, the Primary Committee received $13,412,198 in matching funds from the United States Treasury. This amount represents 87% of the $15,455,000 maximum entitlement that any candidate could receive. The Candidate was determined eligible to receive matching funds on October 31, 1995. The Primary Committee made a total of 9 matching fund requests totaling $14,245,229. The Commission certified 94.15% of the requested amount. For matching fund purposes, the Commission determined that President Clinton's candidacy ended on August 28, 1996. This determination was based on Section 9032(6) of Title 26 of the United States Code which states that the matching payment period ends "on the date on which the national convention of the party whose nomination a candidate seeks nominates its candidate for the office of President of the United States, ..." see also 11 CFR §9032.6. On August 2, 1996 the Primary Committee received its final matching fund payment to defray expenses incurred through August 28, 1996 and to help defray the cost of winding down the campaign.

D. AUDIT SCOPE AND PROCEDURES

In addition to a review of the committee's expenditures to determine the qualified and non-qualified campaign expenses incurred by the campaign (see Finding III.B.), the audit covered the following general categories:

1. The receipt of contributions or loans in excess of the statutory limitations;

2. the receipt of contributions from prohibited sources, such as those from corporations or labor organizations (see Finding II.A.);

3. proper disclosure of contributions from individuals, political committees and other entities, to include the itemization of contributions when required, as well as the completeness and accuracy of the information disclosed;

4. proper disclosure of disbursements including the itemization of disbursements when required, as well as, the completeness and accuracy of the information disclosed;

5. proper disclosure of campaign debts and obligations;

6. the accuracy of total reported receipts, disbursements and cash balances as compared to campaign bank records;

7. adequate recordkeeping for campaign transactions;

8. accuracy of the Statement of Net Outstanding Campaign Obligations filed by the Clinton/Gore '96 Primary Committee, Inc. to disclose its financial condition and to establish continuing matching fund entitlement (see Finding III.E.);

9. the Primary Committee's compliance with spending limitations (see Finding III.D.); and

10. other audit procedures that were deemed necessary in the situation (see Finding III.F.).

As part of the Commission's standard audit process, an inventory of campaign records is normally conducted prior to the audit fieldwork. This inventory is conducted to determine if the auditee's records are materially complete and in an auditable state.

The inventory began on January 6, 1997. Due to the unavailability of records, the Audit staff suspended fieldwork on January 22, 1997. Prior to leaving, an itemized list of records needed was provided to the Primary Committee. These records, consisting of: bank statements and enclosures for three campaign depositories; check registers for certain operating and payroll accounts; records relative to in-kind contributions, campaign travel, campaign materials, Primary Committee credit cards, media placements, public opinion polls, fundraising, event and allocation codes; workpapers detailing FEC report preparation and components for the Statement of Net Outstanding Campaign Obligations; copies of all Primary Committee contracts/agreements; copies of IRS forms 940 and 941; a listing of key personnel, including positions and responsibilities; and, Computerized Magnetic Media for disbursements were initially requested in writing during the period January 7, 1997 through January 22, 1997.

In a letter dated January 29, 1997, the Primary Committee was notified that the records were to be made available on or before February 21, 1997; with respect to records not made available, the Commission would issue subpoenas for production of the

records not only to the Primary Committee, but also to vendors, banks or any other persons in possession of relevant materials. In addition, the Audit staff identified records that, at a minimum, had to be made available before fieldwork could resume.

In addition, on January 8, 1997, the Audit staff was instructed that all requests for vendor files would be directed to a designated staff person and that such requests would be limited to documentation associated with a block of no more than 500 checks (e.g., check numbers 1000 - 1499). The Audit staff met with Primary Committee representatives on January 15, 1997 in an attempt to reach a workable solution as to access. A solution was not reached and Primary Committee counsel was notified that we were prepared to recommend subpoenas for all vendor files in the event that a reasonable solution could not be worked out. On February 19, 1997, Audit Division representatives met with Primary Committee counsel to discuss resuming fieldwork and access to vendor files. A workable solution as to access was reached.

Audit fieldwork resumed on February 24, 1997. However, the Primary Committee continued to delay production of records. The Audit staff was informed that attorneys had to review all records prior to them being made available to the Audit staff. In certain instances, the Primary Committee refused to make records available and in other instances, were not initially accurate as to the existence and/or availability of certain records requested. For example, the Primary Committee refused to make available bank records pertaining to the bank account maintained by the media vendors who placed and paid for media buys on behalf of the Primary Committee (see Finding III.A.). Further, the Primary Committee refused to make available, without conditions and/or restrictions, copies of all polls conducted on its behalf. With respect to certain electronic spreadsheets for fundraising and/or legal and accounting allocations, as well as other computerized records, Primary Committee representatives stated on numerous occasions that such records could not or would not be made available in a computerized format. When continuing to inquire why these records could not be made available in a computerized format, the Audit staff was informed by the Primary Committee's accountant that the Primary Committee's Chief Counsel had said that computerized records were not to be made available to the Audit staff. The Audit staff made repeated attempts to meet with Counsel, however, no such meeting was ever scheduled. Near the end of fieldwork, in 1998, certain electronic spreadsheet records were eventually provided.

As a result, during the period May 28, 1997 through February 3, 1998, the Audit staff requested the Office of General Counsel to prepare subpoenas for the production of records. The Commission issued 22 subpoenas to either the Primary Committee or respective vendors in order to obtain records generally made available to the Audit staff at the beginning of fieldwork.[1]

---

[1] Records concerning payments made by the Primary Committee's media vendors on behalf of the Democratic National Committee are not in this category

It is the opinion of the Audit staff that the delays in production of records by the Primary Committee resulted in wasting numerous staff hours which directly delayed he completion of the audit fieldwork a minimum of four months.

Accordingly, the scope of work performed was limited due to delays encountered in obtaining records necessary to perform the audit. Certain findings in the Memorandum were supplemented with information obtained from sources other than the Primary Committee.

The Primary Committee as part of its response to the Exit Conference Memorandum made various comments concerning the Audit staff's discussion of the scope of the audit. The Primary committee asserted that this section of the audit report provided a distorted and incomplete view of the process, and then provides certain examples of "mischaracterizations" included therein. Further, the Primary Committee claimed that "[d]espite its full cooperation with these numerous and often conflicting requests, always maintained a cooperative posture during the audit process "*for all information requested that was reasonably within the scope of the audit.*" (Emphasis not in original.)

Various examples and explanations were cited, such as: logistical problems inherent with the Primary Committee's move to new offices; the auditors' demand for additional office space at that location; that "no existing record in the Primary Committee's possession was refused;" that the Audit Division refused all attempts at cooperative compromise pertaining to gaining access to the Primary Committee's media vendor's records; and that the auditors repeatedly insisted that particular records which the Primary Committee "did not have" in a computerized format be created.

The Audit staff stands by the scope limitation and related discussion as presented in the Exit Conference Memorandum and this report. The candidate agreed as a condition to obtaining matching funds to: furnish all documents related to disbursements and receipts, including computerized information; furnish all documentation relating to disbursements made on the candidate's behalf by other organizations; permit an audit and examination of all receipts and disbursements including those made by the candidate, authorized committee or any agent authorized to make expenditures on behalf of the candidate or authorized committee. Further, the candidate agreed to facilitate the audit by making available in one central location office space, records and such personnel as are necessary to conduct the audit and examination. The candidate and committee agreements provided for at 11 CFR §9033.1 were signed in October, 1995.

As detailed above, certain records necessary to the conduct of the audit were not made available at the commencement of audit fieldwork in January, 1997 and in some cases were not made available until subpoenas were issued by the Commission to compel production. The Primary Committee is entitled to express its opinion and attempt to explain why it feels "[i]t would be utterly inappropriate for such a distorted and one-

sided description of the process to be included in the proposed draft Final Audit Report." The Primary Committee's response will be included in the documents available to the Commission when the audit report is considered in open session.

Unless specifically discussed below, no material non-compliance was detected. It should be noted that the Commission may pursue further any of the matters discussed in the audit report in an enforcement action.

## II. FINDINGS AND RECOMMENDATIONS - NON-REPAYMENT MATTERS

### A. RECEIPT OF PROHIBITED CONTRIBUTIONS RESULTING FROM EXTENSIONS OF CREDIT BY COMMERCIAL VENDORS

Section 441b(a) of Title 2 of the United States Code states, in part, that it is unlawful for any corporation to make a contribution in connection with any election for Federal office.

Section 116.3(a) of Title 11 of the Code of Federal Regulations states that a commercial vendor that is not a corporation may extend credit to a candidate, a political committee or another person on behalf of a candidate or political committee. An extension of credit will not be considered a contribution to the candidate or political committee provided that the credit is extended in the ordinary course of the commercial vendor's business and the terms are substantially similar to extensions of credit to nonpolitical debtors that are of similar risk and size of obligation. Section 116.3(b) of Title 11 of the Code of Federal Regulations states that a corporation in its capacity as commercial vendor may extend to a candidate, a political committee or another person on behalf of a candidate or political committee provided that the credit extended in the ordinary course of the corporation's business and the terms are substantially similar to extensions of credit to nonpolitical debtors that are of similar risk and size of obligation.

Section 116.3(c) of Title 11 of the Code of Federal Regulations states that in determining whether credit was extended in the ordinary course of business, the Commission will consider: (1) whether the commercial vendor followed its established procedures and its past practice in approving the extension of credit; (2) whether the commercial vendor received prompt payment in full if it previously extended credit to the same candidate or political committee; and (3) whether the extension of credit conformed to the usual and normal practice in the commercial vendor's trade or industry.

During our review of selected Primary Committee disbursements, the Audit staff noted that on October 28, 1996, the Primary Committee made three payments to the polling firm of Penn + Schoen Associates, Inc. (Penn + Schoen) which included reimbursements for travel expenses, totaling $74,970, incurred by Mark Penn, Douglas Schoen and Jill Kaufman between May 4, 1995 and June 30, 1996. The invoices were

dated October 28, 1996, and were date stamped as received by the Primary Committee also on October 28, 1996.

The Primary Committee paid approximately $1.8 million (16 payments) to Penn + Schoen, the Primary Committee's main polling firm, during the period covered by this audit. It appeared that other payments to this vendor were made in a timely manner. During audit fieldwork the Audit staff was unable to determine if Penn + Schoen followed its established procedures and its past practices relative to this extension of credit nor were we able to determine whether the extension of credit conformed to the usual and normal practice in the vendor's industry. The reimbursement policy in Penn + Schoen's consulting agreement made no mention as to time frames for the billing and payment of travel expenses. According to a Dun + Bradstreet Public Record Search, Penn, Schoen + Berland Associates, Inc. (former name: Penn + Schoen Associates, Inc.), was incorporated in the state of New York on October 30, 1984 and was still active as of January 17, 1998.

The Primary Committee provided documentation in the form of an affidavit from Rick Joseph who is the Controller at Penn + Schoen. He is responsible for preparing and sending invoices to clients for services rendered and expenses incurred. Mr. Joseph stated the Controller position was vacant for approximately four months prior to his employment (September 3, 1996) and that due to inadequate staffing, during this vacancy, Penn + Schoen did not regularly bill its clients for invoices that required research or back-up documentation. Mr. Joseph stated further that soon after his employment, he discovered that invoices for travel expenses incurred between May, 1995 and June, 1996, on behalf of Clinton/Gore '96 Primary Committee, Inc. had either not been invoiced to the Primary Committee or were invoiced, but lacked the correct back-up documentation. The Controller continued by stating that while the position of Controller was vacant an accounting assistant forwarded ten invoices to the Primary Committee totaling $45,331, for travel dating back to May, 1995, however, Penn + Schoen was notified by the Primary Committee that these invoices did not contain all the necessary back-up documentation. During August - September, 1996, as requested by the Primary Committee, Penn + Schoen continued to provide additional documentation to support its reimbursement requests. The Controller stated that he rebilled the Primary Committee on October 28, 1996 for $37,548 to comply with the Primary Committee's travel reimbursement policies. Penn + Schoen was reimbursed for this amount on October 28, 1996. Mr. Joseph stated that he sent an invoice on October 4, 1996 to the Primary Committee for the amounts of $32,037 and $16,605 with back-up receipts for Mark Penn's and Douglas Schoen's travel dating back to January 1, 1996. These invoices were revised on October 28, 1996 to comply with the Primary Committee's travel reimbursement policies. The Primary Committee reimbursed Penn + Schoen for the amounts of $30,262 and $14,830 on October 28, 1996.

In the Exit Conference Memorandum (the Memorandum), the Audit staff recommended that, the Primary Committee provide additional documentation or any other comments to demonstrate that the credit extended ($74,970 in travel expenses

incurred) by the vendor was in the normal course of its business, including statements from the vendor and did not represent a prohibited contribution. The information provided should include examples of other customers or clients of similar size and risk for which similar services have been provided and similar billing arrangements have been used. Also, information concerning billing policies for similar clients and work, advance payment policies, debt collection policies, and billing cycles should be included.

In response to the Memorandum, the Primary Committee stated that the Commission regulations and advisory opinions do not provide a set time in which payment must be made, but only require that the billings be handled in the vendor's normal course of business. It further stated that the documentation confirms that the vendor handled its respective billings in the normal and ordinary course of its business in accordance with 11 CFR § 116.3.

The Primary Committee also submitted another affidavit from Mr. Joseph, the current Controller at Penn + Schoen. Mr. Joseph stated that the project manager generally oversees the billing with respect to his or her project. "*Generally*, our normal business practice is to bill on a current basis for our services, such as polling. However, it is also *generally* our normal billing practice, unless a credit risk is perceived with respect to a particular client or other special circumstances exist, to *usually* bill most of our reimbursable travel expenses at or about the conclusion of a project." (Emphasis not in original.)

Mr. Joseph stated further that an effort was made to advance the billing process for travel expenses billed to Clinton/Gore '96 rather than waiting until at or near the conclusion of a project. However, the effort was not successful for the following reasons:

- Mark Penn and Doug Schoen, the project managers, traveled at that time on a continual basis and were extremely busy, it was very difficult for them to find the time, given their schedules, to gather their expense documentation or to review and sign off on expense reports. They were simply too busy performing services under the pressure of a campaign to perform the project manager's travel expense billing function in advance of the completion of the project.
- The accounting department, consisting of only a Controller and an assistant, was understaffed and thus not equipped to step in and perform the project manager's function.
- Given the size of the client and the project, the billing process, the understaffing and staff turnover in the accounting department, the hectic travel schedules of the principals, the project managers involvement in the project as well as other projects, Clinton/Gore '96 was billed travel reimbursements at or about the

conclusion of the project, which, at the time was the same billing method customarily applied to other clients similarly situated.

Thus, according to Mr. Joseph, the billing for travel reimbursements to Clinton/Gore '96 was in the ordinary course of business.

In the Audit staff's opinion, the affidavit from Mr. Joseph could be interpreted that with respect to the Primary Committee, Penn + Schoen's normal billing practice for travel expenses would be to bill on a current basis as opposed to at the conclusion of the project. He stated "generally our normal billing practice, unless a credit risk is perceived with respect to a particular client or other special circumstances exist [is] to usually bill most of our reimbursable travel expenses at or about the conclusion of a project." Mr. Joseph appears to be stating that Penn + Schoen was aware of the importance of billing the Primary Committee for travel expenses on a timely basis. However, due to understaffing and/or staff turnover, timely billing was not possible. The Primary Committee did not submit, as recommended, documentation from Penn + Schoen such as examples of other customers or clients of similar size and risk for which similar services have been provided and similar arrangements have been used. Such documentation is critical in determining if an extension of credit was made in the ordinary course of business.

In the opinion of the Audit staff, the Primary Committee did not demonstrate that the extension of credit by Penn + Schoen conformed to the usual and normal practice in its business or in its industry as required by 11 CFR § 116.3.

As a result, the amount of the contribution made by Penn + Schoen remains at $74,970.

## III. FINDINGS AND RECOMMENDATIONS - REPAYMENT MATTERS

### A. RECEIPT OF AN APPARENT EXCESSIVE CONTRIBUTION - MEDIA ADS PAID FOR BY THE DEMOCRATIC NATIONAL COMMITTEE

Section 441a (a)(2)(A) of Title 2 of the United States Code states in part that no multicandidate political committee shall make contributions to any candidate and his authorized political committees with respect to any election to Federal office which, in the aggregate, exceed $5,000. Section 441a (a)(7)(B) states that expenditures made by any person in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate. The section then states that the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered to be an expenditure. The purpose, content and timing of any speech-related expenditure distinguish coordinated activity that gives rise to a contribution from other interaction.

Section 441a(d) of Title 2 of the United States Code provides that the national committee of a political party may make a limited amount of "coordinated party expenditures" in connection with the general election campaign of its Presidential candidate that are not subject to, and do not count toward, the contribution and expenditure limitations at 2 U.S.C. §§441a(a) and (b) including the expenditure limitation for publicly-funded candidates. *See also* 11 CFR §110.7(a)(6). A coordinated party expenditure in excess of the 2 U.S.C. §441a(d)(2) limitations would be subject to the contribution limitations.

In determining whether specific communications paid for by parties were coordinated expenditures subject to the 2 U.S.C. §441a(d) limitations, the Commission has considered whether the communication refers to a "clearly identified candidate" and contains an "electioneering message" in Advisory Opinions ("AO") 1984-15 and 1985-14. Section 431(18) of Title 2 of the United States Code defines the term "clearly identified" to mean that the name of the person involved appears, a photograph or drawing of the candidate appears; or the identity of the candidate is apparent by unambiguous reference. In AO 1984-15, the Commission stated that the definition of "electioneering message" includes statements designed to urge the public to elect a certain candidate or party, or which would tend to diminish public support for one candidate and garner support for another candidate. Citing AO 1984-15, the Commission also stated in AO 1985-14 that "expenditures pursuant to 2 U.S.C. §441a(d) may be made without consultation or coordination with any candidate and may be made before the party's general election candidates are nominated."

Section 100.7(a) of Title 11 of the Code of Federal Regulations states, in part, that a contribution includes a gift, subscription, loan, advance, or deposit of money or anything of value for the purpose of influencing a Federal election. Anything of value includes all contributions in-kind.

Section 100.8(a)(1) of Title 11 of the Code of Federal Regulations defines an expenditure to include any purchase, payment, distribution, loan, advance, deposit, gift of money or anything of value, made by any person for the purpose of influencing any election for federal office. Section 100.8(a)(1)(iv)(A) of Title 11 of the Code of Federal Regulations states "anything of value" includes in-kind contributions. Section 104.13(a)(1) and (2) of Title 11 of the Code of Federal Regulations requires that each in-kind contribution be reported as both a contribution and an expenditure.

Section 441a(f) of Title 2 of the United States Code prohibits candidates or political committees from knowingly accepting any contribution that violates the contribution limitations.

Section 9032.9 of Title 11 of the Code of Federal Regulations defines a qualified campaign expense as a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value that is:

- incurred by or on behalf of a candidate or his or her authorized committee from the date the individual becomes a candidate through the last day of the candidate's eligibility;
- made in connection with his or her campaign for nomination; and,
- neither the incurrence nor payment of which constitutes a violation of any law of the United States or of any law of any State in which the expense is incurred or paid.

An expenditure is made on behalf of a candidate, including a Vice Presidential candidate, if it is made by:

- an authorized committee or any other agent of the candidate for the purpose of making an expenditure;
- any person authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate to make the expenditure; or
- a committee which has been requested by the candidate, by an authorized committee of the candidate, or by an agent of the candidate to make the expenditure, even though such committee is not authorized in writing.

Section 9034.4(e) of Title 11 of the Code of Federal Regulations provides the following rules that apply to candidates who receive public funding in both the primary and general election. Any expenditure for goods or services that are used exclusively for the primary election campaign are attributed to the primary committee's expenditure limits; any expenditure for goods or services that are used exclusively for the general election campaign are attributed to the general election limits. The costs of a campaign communication that does not include a solicitation are attributed based on the date on which the communication is broadcast, published or mailed. Media production costs for media communications that are broadcast or published both before and after the date of the candidate's nomination are attributed 50% to the primary election limits and 50% to the general election limits. Distribution costs, including such costs as air time and advertising space in newspapers, shall be paid for 100% by the primary or general election campaign depending on when the communication is broadcast or distributed. The relevant date for determining whether an expense is for the primary or general election is the candidate's date of nomination.

Section 9035.1(a)(1) of Title 11 of the Code of Federal Regulations, states, in part, that no candidate or his authorized committees shall knowingly incur expenditures in connection with the candidate's campaign for nomination that in the aggregate exceed $10,000,000 as adjusted under 2 U.S.C. §441a(c).

Section 441a(b) and (c) of Title 2 of the United States Code makes publicly-funded candidates subject to expenditure limitations. Section 9033(b)(1) of Title 26 of the United States Code requires that, to be eligible to receive public financing in the primary election, a candidate must certify to the Commission that, *inter alia*, he or she and his or her authorized committees will not incur qualified campaign expenses in excess of the expenditure limitation. Section 441a(f) of Title 2 of the United States Code prohibits candidates or political committees from knowingly making expenditures in violation of the primary election expenditure limitation at 2 U.S.C. §441a(b).

## BACKGROUND

During the audit fieldwork, the Audit staff requested station documentation for all media ads placed on behalf of the Primary Committee by its media vendor. Further, the Audit staff requested bank statements, including all enclosures, for all bank accounts maintained by the media vendor and used to make payments for media ads placed on behalf of the Primary Committee.[2] The Primary Committee stated initially that bank statements for the media vendor's account used to handle the Primary Committee's activity, although requested would not be provided to the Audit staff because the bank account used by the media vendor also contained activity related to other clients. Subsequently, the Primary Committee provided certain canceled checks purported to represent checks issued by its media vendor for Primary Committee media buys; station documentation for certain media flights was also provided.[3]

Based on our review of the documentation made available, the Audit staff determined that the Primary Committee's media vendors were Squier Knapp Ochs Communications (SKO) and November 5 Group, Inc. (Nov 5). Primary Committee media ads[4] that aired in June 1995 through March 1996 were placed by SKO. Starting in May 1996 through August 21, 1996, all Primary Committee media ads were placed by Nov 5.[5] Both SKO and Nov 5 maintained at least one bank account each at the National Capital Bank of Washington. From these accounts, funds were disbursed to television stations in payment of media ads on behalf of the Primary Committee. According to a newspaper article (The Washington Post, Sunday, January 4, 1998, A Section) Robert D. Squier, William N. Knapp, Mark Penn, Douglas Schoen and Dick Morris were each a partner in Nov 5.

2 For Title 26 audits of primary and general election candidates, these records may also be examined at the offices of the media firm.

3 Media flights represent a period of time in which one or more media ads were placed.

4 Throughout this Memorandum, "Primary Committee ad" refers to an advertisement paid for by the Primary Committee. It does not include ads that may be related to the primary election but were paid for by the DNC either directly or through various Democratic state party committees.

5 No Primary Committee media ads were placed during the period August 1995 through February 1996.

Mr. Squier and Mr. Knapp are partners at SKO, the Primary Committee's principal media vendor. Mr. Penn and Mr. Schoen are partners at Penn + Schoen Associates, Inc. (PSA) the Primary Committee's polling firm.[6] Mr. Morris was a media consultant.

In addition, the Audit staff noted instances where canceled checks issued by SKO/Nov 5 contained annotations such as "DNC" or "DEMOCRATIC NATIONAL COMM/STATE PARTY." Station documentation (also known as station affidavits) issued by the broadcast station contained information such as the date, time, name or other reference to an ad aired, amount charged for air time, and the television station that aired an ad, as well as a section that contained the name of the advertiser and product. In many instances, the advertiser/product section contained references such as "democratic national committee", "dnc/clinton gore '96" or "dnc."

On July 2, 1997, the Commission issued subpoenas to the Primary Committee, SKO, and Nov 5 in order to obtain media reconciliations, station documentation not previously provided, all bank statements, all canceled checks and debit advices issued by the media vendor on behalf of the Primary Committee and all deposit tickets/slips and credit advices associated with the deposit of Primary Committee funds into any account(s) maintained by SKO or Nov 5.[7]

Counsel for the Primary Committee responded on behalf of the Primary Committee, SKO and Nov 5. In response, media reconciliations, all missing station documentation for flights, and a VHS tape of Primary Committee media ads were made available for review. SKO and Nov 5's bank statements and enclosures represented as specifically related to Primary Committee transactions were also made available. However, the bank statements contained redactions.

In order to obtain all bank records related to these accounts, the Commission issued a subpoena to the National Capital Bank of Washington on September 3, 1997, for all bank statements, enclosures, including canceled checks, deposit items and all debit and credit advices for the identified accounts maintained and used by SKO and Nov 5. The period covered was April 1995 through December 31, 1996. The National Capital Bank of Washington (the Bank) submitted bank statements, and all enclosures which could be retrieved from the Bank's records systems for the accounts requested.

---

6 It appears that the results of polls, advertising tests and mall tests were used to develop media ads.

7 Media reconciliations were prepared by the media firm and contained information such as, client name, flight date, ad name, broadcast stations used, check number used to pay a specific station, gross billing, net paid to station, net due to stations, commission charged, amount due from client and amount received from client.

On January 16, and 30, 1998, the Commission issued additional subpoenas to SKO and Nov 5 in order to obtain additional media documentation including media reconciliations (in electronic format), certain bank records, VHS tapes, and station documentation for all advertisements paid from the SKO and Nov 5 accounts by or on behalf of the DNC or any state or local party committee, or was associated in any way with the DNC or any state or local party committee. The period covered was April 1, 1995 through August 28, 1996.

The Audit staff reviewed all documentation provided by the Primary Committee and all documentation received as a result of the above subpoenas. Our review found that during the period June 1995 through August 28, 1996, media ads were placed by SKO and/or Nov 5, the cost of which was funded directly or indirectly by the Democratic National Committee (the DNC).[8] The cost of the DNC media ads was $42,373,336.[9] During the same period Primary Committee media ads were placed by SKO and/or Nov 5, the cost of which ($11,731,101) was funded by the Primary Committee.

Our review also found that the DNC wired funds directly to SKO and/or Nov 5 bank accounts. In addition, the DNC itemized on its FEC reports disbursements of funds directly to state party committees; once received the state party committees wired funds to either SKO's or Nov 5's bank accounts. In the case of one state party committee, the Pennsylvania Democratic Committee, it was noted that in excess of $4,000,000 was wired to identified accounts maintained by SKO and Nov 5. Credit advices included with SKO's and Nov 5's bank statements identified the funds as wire transfers originating from CoreStates Bank. These credit advices contained the following notation "CORESTATE PHIL [apparently Philadelphia] ORG=COMMERCIAL LOAN HARRISBURG HARRISBURG FIS ORG #0101 PA 00".[10]

## PLACEMENT OF PRIMARY COMMITTEE AND DNC ADS BY SKO AND NOV 5

The chart below depicts the dates of and amounts due to broadcast stations relative to the placement of Primary Committee ads and DNC ads[11] undertaken by SKO

---

[8] Audit work performed to prepare this Memorandum did not include an examination of the DNC's or state parties' bank or other internal financial records. Disclosure reports (DNC/State party committees) filed with the FEC were reviewed.

[9] This figure represents the amount due to broadcast stations relative to ads placed and aired.

[10] On February 28, 1998, the Commission issued a subpoena to CoreStates Bank in order to obtain any and all documentation associated with the apparent commercial loan. To date a satisfactory response has not been received. Preliminary responses received appear to indicate that the source of funds wired to SKO and Nov 5 was not, in whole or part, from the proceeds of a commercial loan issued by CoreStates Bank. Currently, an affidavit has been sent to CoreStates Bank seeking confirmation of issues addressed in the subpoena.

[11] Throughout this Memorandum, "DNC ad" refers to any advertisement paid for by the DNC either directly or through various Democratic state party committees.

and/or Nov 5. This information was obtained from media reconciliations prepared by SKO and/or Nov 5.

| Primary Committee Ads | | DNC Ads | |
|---|---|---|---|
| Run Dates | Amounts due to stations | Run Dates | Amounts due to stations |
| 06/27/95 - 07/24/95 | $2,304,274 | | |
| | | 08/16/95 - 03/05/96 | $15,692,881 |
| 03/08/96 - 03/25/96 | $38,932 | 03/07/96 - 03/27/96 | 2,487,795 |
| | | 03/30/96 - 05/03/96 | 5,021,284 |
| 05/04/96 - 05/31/96 | 1,185,882 | 05/04/96 - 05/31/96 | 3,293,351 |
| | | 06/01/96 - 07/09/96 | 11,169,521 |
| 07/09/96 - 08/21/96 | 7,972,013 | 07/10/96 - 08/21/96 | 2,764,252 |
| | | 08/21/96 - 08/28/96 | 1,944,252 |
| Total | $11,731,101 | | $42,373,336 |

Initially, during the period June 27, 1995 through July 24, 1995 only Primary Committee ads were aired. During the period August 16, 1995 through March 5, 1996 no Primary Committee ads aired; however, nearly $15.7 million was spent by the DNC to broadcast DNC ads. The next period, March 7, 1996 through March 27, 1996, both Primary Committee and DNC ads were aired. These patterns continued through August 21, 1996. Only DNC ads aired during the period from August 22, 1996 to August 28, 1996 (the Candidate's date of ineligibility).

To recap, first only Primary Committee ads were run (6/27/95 - 7/24/95), then only DNC ads (8/16/95 - 3/5/96), followed by both Primary Committee and DNC ads run (3/8/96 - 3/21/96). Finally, no Primary Committee ads were placed after August 21, 1996; however, during the period August 21, 1996 through August 28, 1996, placement cost for DNC ads, totaled $1,944,252 (excluding commissions). It should be noted that the DNC reported the cost of DNC ads which aired August 15, 1996 through August 28, 1996 as expenditures pursuant to 2 U.S.C. §441a(d).

As can be easily identified, two distinct patterns exist. They are: 1) periods of time when only Primary Committee ads were aired and periods of time when only DNC ads were aired; and, 2) periods of time when both DNC and Primary Committee ads were aired.

**EVIDENCE OF COORDINATION**

The items discussed below indicate coordination and cost sharing between the Primary Committee and the DNC. As of the close of audit fieldwork, documentation with respect to allocations of costs between the Primary Committee and the DNC had not been reviewed.

Shared Production Expenses

On May 8, 1996, SKO invoiced the Primary Committee $10,605.96 for production expenses related to a shoot in Iowa (2/10/96 - 2/11/96), dubbing/shipping costs and film shoot and travel expenses. Attached to the invoice was a breakdown of expenses which totaled $21,211.91. These expenses were allocated equally between the Primary Committee and the DNC. The Primary Committee paid SKO $10,605.96 toward these expenses. Information was not available with which to verify the DNC's payment. On the same date, SKO invoiced the Primary Committee $10,605.68 for expenses associated with "Shoot footage of Clinton at White House for Video - 'Iowa/New Hampshire'." Supporting documentation for all related sub-contract expenses was annotated with the DNC's account code. The Primary Committee paid SKO $10,605.68 on May 31, 1996

In another instance involving SKO, the Primary Committee was invoiced $23,076.90 for expenses related to B-roll shoot (2/29/96 - 3/20/96). Attached to the invoice was a breakdown of expenses, which totaled $46,153.80. These expenses were allocated equally between the Primary Committee and the DNC. The Primary Committee paid SKO $23,076.90. Information was not available with which to verify the DNC's payment.

Finally, on September 16, 1996, SKO invoiced the Primary Committee $15,829.65 for expenses associated with an ad entitled "Nobody". Supporting documentation includes an invoice from Interface Video Systems, Inc. for dubbing/satellite charges totaling $1,215. Of the 5 detailed charges noted on this invoice,

three charges, totaling $984, were annotated C/G and two charges, totaling $231, were annotated DNC. The SKO invoice included only the Primary Committee's portion of the dubbing and satellite charges ($984). The job title line states " 'Nobody' and 'Them' / 75 VHS and 23 BCSP/Mike McMillen." The words "Nobody" and "Them" were annotated C/G and DNC respectively.

As discussed below under The TV Ads, the Primary Committee ad Nobody and the DNC ad Them were exactly the same in audio and video content.[12] Both ads ran in August, 1996.

Of the remaining 10 SKO invoices issued to the Primary Committee and associated with production expenses, all but two contained annotations indicating DNC related charges.

PLACEMENT OF ADS

Coordination between the Primary Committee and the DNC as evidenced in the placement of certain ads by Nov 5 was noted during our review.

During the period May 25, 1996 to May 31, 1996, Nov 5 on behalf of the Primary Committee placed ads totaling $1,101,062. During the same period, Nov 5 on behalf of the DNC placed ads totaling $563,253. The DNC ads and the Primary Committee ads were placed with the same 112 broadcast stations. With respect to ads placed with 109 (of the 112) stations, the checks issued by Nov 5 to the stations on behalf of the DNC or the Primary Committee were in the same amount. For example, during this period, Nov 5 placed ads at the broadcast station WCCO. Nov 5 issued check number 2146 in the amount of $13,855 to the station on behalf of the DNC for ads placed. This check was annotated "dnc/state party committee". In addition, Nov 5 issued check number 2431 in the amount of $13,855 to the same station on behalf of the Primary Committee for ads placed. However, it should be noted that the media reconciliation for this period indicated that only $73,049 in ads were placed on behalf of the DNC. In response to our inquiry, a representative of Nov 5 stated, "[t]he media buy was scaled back considerably after the checks were sent to the stations. The stations kept the money and applied the surplus to the next media buy placed by the DNC. The actual amounts are reflected in the media reconciliations previously provided to you."

Even though the DNC's media flight "was scaled back considerably" the initial placement of the ads indicates coordination with ads placed on behalf of the Primary Committee.

[12] Near the end of each ad a "PAID FOR BY ..." appears superimposed on the video portion, for the DNC ad the payer is the DNC or a state party organization, for the Primary Committee ad, the payer is the Primary Committee.

Furthermore, for other DNC media flights and Primary Committee media flights both covering the same time period, Primary Committee and DNC ads were placed at the same stations, however, the amounts charged by the stations were not exactly the same with respect to DNC ads versus Primary Committee ads as placed.

Another indicator of coordination between the Primary Committee and the DNC involves a standard form memorandum for authorization of production and air time purchased. One section of this memorandum states "The cost will be allocated a_______% for the DNC and _______% for Clinton/Gore '96." The next line states "attorneys to determine." The following individuals were named recipients of this memorandum: Peter Knight (Primary Committee - Campaign Manager), Ted Carter (Primary Committee - Chief Operating Officer/Deputy Campaign Manager), Harold Ickes (then White House Deputy Chief of Staff), B.J. Thornberry (DNC Chief of Staff), Bill Knapp (Media Consultant, SKO/Nov 5), Jeff King (DNC Finance Division), Doug Sosnik (White House Political Affairs Director), Brad Marshall (DNC Chief Financial Officer), Lyn Utrecht (Primary Committee 's General Counsel) and Joan Pollitt (Treasurer - Primary Committee).

One authorization memorandum, dated July 3, 1996, from Harold Ickes and Doug Sosnik to Jennifer O'Connor (then Special Assistant to the President) authorized SKO to produce 1 spot. Within the section entitled "other" the memorandum states:

> Tobacco [13]
> 1) C-G buy - $617,000 - 7/9 - 7/16
> 2) DNC buy - $1.1 [million] - 7/10 - 7/16
> 3) dubbing and shipping - c-g - $5,000
> 4) production - $14,000 - c-g

With respect to allocation, the memorandum states "attorneys to determine".

Nov 5 placed Primary Committee ads totaling $468,682 (First Time) and $915,627 (Hold) during the period July 9, 1996 through July 16, 1996 and July 11, 1996 through July 18, 1996 respectively. Nov 5 placed DNC ads totaling $457,030 during the period July 10, 1996 through July 16, 1996. The Primary Committee ad "First Time" addressed children trying smoking for the first time. The DNC ad "Enough" included, among other topics, school anti-drug programs.

In First Time, President Clinton's stated position to "stop ads that teach our children to smoke" is contrasted to Dole's stated position of opposing an FDA limit on tobacco ads that appeal to children and his position that "cigarettes aren't necessarily addictive" and presents to the viewer a choice "Bob Dole or President Clinton who's really protecting our children?" The DNC ad, entitled Enough (the audio and video portion is very similar to DNC ads "Another" and "Increased" which also ran in late June

[13] The Audit staff did not receive a copy of an ad(s) entitled "tobacco" in VHS format.

and early July, 1996) contrasts President Clinton's stated accomplishments in the areas of immigration, crime, and school anti-drug programs to stated positions attributed to republicans or Dole/Gingrich such as opposing the protection of U.S. workers from replacement by foreign workers and the stated consequences of "the Dole Gingrich budget" such as to repeal approved funding for 100,000 new police and to authorize less funding for school anti-drug programs. The DNC ad concludes with "only President Clinton's plan protects our jobs our values."

The Primary ad mentioned Bob Dole and his views which are contrasted to President Clinton's - the DNC ad mentioned the Dole Gingrich budget and Dole Gingrich attempts to cut funding to programs endorsed by President Clinton. The former presents a stated choice Dole or Clinton, while the DNC ad presents the clear message that "only President Clinton's plan protects our jobs our values." In the opinion of the Audit staff, both ads are designed to garner public support for a certain candidate, namely President Clinton and diminish public support for Bob Dole. A detailed discussion of the content of all 37 DNC ads aired during the primary period is included below.

Another indicator of coordination is contained in an authorization memorandum from Jennifer O'Connor (then Special Assistant to the President) to Peter Knight, B.J. Thornberry, Brad Marshall, Ted Carter, Joan Pollitt, Lyn Utrecht and Joe Sandler (General Counsel of the DNC), with a copy going to Harold Ickes. This memorandum relates, in part, "Harold has authorized payment of the following Squier/Knapp/Ochs/ invoices with corresponding authorization forms. Authorization is to pay only costs which meet the DNC and Re-elect policies, including travel policies."[14] The memorandum listed authorizations to purchase both production and air time with respect to the DNC and the Primary Committee.

Polling[15]

In response to an Audit staff inquiry concerning various polls conducted on behalf of the DNC and the Primary Committee, Mark Penn, as president of PSA, stated in an affidavit that

> "beginning in April 1995 until November 1996, I presented polling results at meetings held at the White House residence, generally on a weekly basis. The results were presented simultaneously to the representatives of Clinton/Gore, the White House and the DNC who were in attendance at these meetings."

[14] The Audit staff has not reviewed any of these "policy" documents at this time.

[15] The Regulations, at 11 CFR 106.4 - Allocation of Polling Expenses - provides for the sharing of poll results and allocation of costs related thereto. The cost of all Primary Committee and DNC (primary) polls totaled $3,183,216. The cost allocated to the Primary Committee was $1,732,752 (54%) while the DNC share totaled $1,450,464 (46%). The Audit staff viewed this allocation of costs as reasonable.

Mr. Penn also states he presented polling results to Senator Chris Dodd and Donald Fowler, Co-Chairmen of the DNC, at separate briefings.

In response to our inquiry, Joseph E. Sandler, General Counsel of the DNC, in a letter, dated April 8, 1998, to Lyn Utrecht, General Counsel of the Primary Committee stated, in part.

> "this will respond to your request for information about the distribution of information from polls conducted by Penn, Schoen & Berland (formerly known as Penn & Schoen) jointly for the Democratic National Committee ("DNC") and either Clinton/Gore '96 Primary Committee or Clinton/Gore '96 General Committee, the costs of polls have been shared by the DNC and one of the Clinton/Gore committees.
>
> The purpose of these polls, conducted during 1995 and 1996, was to determine the Democratic Party's message and political strategy for purposes both of creating Party communications, including Party-sponsored media and Party-created campaign materials, and of developing message and strategy for the field operations run by the state Democratic Parties, with assistance and partial funding by the DNC, on behalf of the entire Democratic ticket in the 1996 general election.
>
> I am advised that, to these ends:
>
> (1) All poll results were made available in full to the DNC's media consultants (Squier/Knapp/Ochs, Message Advisors, Sheinkopf & Associates and Marius Penczner, and November 5 Group) who created Party issue advertising for the DNC and Democratic state party committees, advertising which was run in 1995 and 1996."

In the Audit staff's opinion, the above items discussed under Production, Ad Placement and Polling demonstrate that coordination between the White House, DNC, SKO, Nov 5 and the Primary Committee existed with respect to the development and placement of both Primary Committee and DNC media ads.

## The TV Ads

The information discussed above was gleaned from our review of bank records, media flight reconciliations for time buys (prepared by SKO or Nov 5), affidavits and invoices issued by the broadcast stations, internal documents prepared by the Primary Committee related to the planning and purchase of TV air time, production invoices and related documents, most of which were obtained as a result of subpoenas issued by the Commission to SKO and NOV 5 and their bank, and the Primary Committee. Also obtained via subpoena were video tapes represented to contain all ads placed or run on

behalf of the Primary Committee or the General Committee; video tapes represented to contain all ads paid for or run on behalf of the DNC or any state or local party committee, or associated in any way with the DNC or any state or local party committee, and related to any transactions in two bank accounts used by SKO and Nov 5 for the period April 1, 1995 through November 5, 1996. In response to these subpoenas the Audit staff received a total of 13 video cassettes containing 13 Primary Committee ads, 53 General Committee ads, and 812 DNC ads.[16]

As noted in the previous sections, there was apparently coordination between the DNC and the Primary Committee concerning the production and placement of television ads during the period from April 1995 to August 1996. The Final Report of the Committee on Governmental Affairs, United States Senate - Investigation of Illegal or Improper Activities in Connection with 1996 Federal Election Campaigns (the Senate Report) provides additional information. According to the report, representatives from the White House, the DNC, and Clinton/Gore would meet at the White House approximately once a week to discuss media, polling, speech writing and policy and issue positioning.[17] In July, 1995, it was first explained that DNC funds would be used to pay for ads during the primary campaign period.[18] According to testimony provided by Richard Morris, the General Counsel of the DNC and the General Counsel of the Primary Committee "laid down the rules of what advertisements—of what the content of advertisements and the timing of the media buys could be in connection with the Democratic National Committee advertising and in connection with the Clinton-Gore advertising."[19] Finally, Exhibit 5-6 of the Senate Report - a memo for the President, Vice President, Panetta, Ickes, Lieberman, Lewis and Sosnik only, apparently dated February 22, 1996, sets forth the amount of funds relative to DNC media buys and "CG" media buys from February 1996 through May 28, 1996. In summarizing the amounts for DNC and CG buys, this language is included:

"8. Total Clinton Gore Money through May 28: $2.5 mil.

1. Unless Alexander is nominated and we cannot use DNC money to attack him.

2. If Dole is nominated, we need no additional CG money media before May 28 since we can attack Dole with DNC money

[16] In the case of the DNC ads, there appeared to be 59 ads which were then duplicated for use by various state party organizations. The content of the ads is identical except for the 2 U.S.C. 441d(a)(3) statement (e.g., paid for by the Ohio Democratic Party).

[17] Senate Report at page 116, citing Morris deposition, p. 124.

[18] According to media records, the DNC ads first ran between 8/18/95-8/31/95.

[19] Morris deposition, pp. 117-18 as cited in the Senate Report.

9. Total DNC money now through May 28, $15,733,000"

The placement cost for DNC media buys for the period 2/13/96 through 5/31/96 was about $12 million; the placement cost for Primary Committee media buys for the period 3/8/96 through 5/31/96 was $1.72 million.

Notwithstanding the excerpts from the Senate Report cited above, the evidence developed during audit fieldwork, in the Audit staff's opinion, demonstrates that coordination existed between the DNC and the Primary Committee concerning the production of ads and the purchase of broadcast time to air those ads.

Our review of 37 DNC ads made available and which, according to station invoices and the media firms' reconciliations of DNC buys, ran during the primary campaign period indicates that President Clinton, the candidate, was clearly identified in these ads, and that the ads appeared to convey electioneering messages.

A review of the audio and video portions of each of the 37 DNC ads found that the candidate in addition to being featured in the video portion of ads is referred to during the audio portion as "President Clinton", "the 42nd president", "the president" - in one ad, the candidate's voice is the entire audio portion.

SAME AUDIO AND SAME VIDEO AS PRIMARY COMMITTEE ADS

In the case of three separate DNC ads which ran during the period 8-15-96 through 8-28-96, the audio and video content of the DNC ads are exact facsimiles[20] of three separate Primary Committee ads (and nearly identical to a fourth) which ran during the period 8-2-96 through 8-21-96. The ad number, name of ad and text appear at Exhibit #1. The DNC paid nearly $2.1 million to run these ads (plus one additional - Risky, discussed below) during the period beginning two weeks prior to the candidate's nomination at the convention. In August, 1996, the Primary Committee using its ads with the same content as the DNC's, paid $4.1 million to run ad flights containing these ads.

Two pairs of ads (P11[21] REAL TICKET CG13-30 & D795 DOLE/GINGRICH DNC1228-30; P12 NOBODY CG14-30 &D796 THEM DNC1229-30) raise the question of who should be in the oval office given the stated consequences "if it were Bob Dole sitting here [in the Oval Office]." The last pair (P13 BACK CG09-30 & D794 SCHEME DNC1227-30) conveys to the viewer -"president clinton meeting our challenges bob dole gambling with our future." In the Audit staff's opinion, all of the above ads contain an

[20] Near the end of each ad a "PAID FOR BY ..." appears superimposed on the video portion, for the DNC ads the payer is identified as the DNC or a state party organization, for the Primary Committee ads, the payer is identified as the Primary Committee.

[21] This identifier was assigned by the Audit staff to denote a Primary Committee ad (e.g., P1 through P13); similarly to denote a DNC ad, the Audit staff assigned identifiers D1 through D812

electioneering messa; e - the content of each ad is designed to urge the public to elect a certain candidate - namely President Clinton instead of Bob Dole.

The cost of these DNC ads was reported by the DNC as an expenditure made pursuant to 2 U.S.C. §441a(d) on behalf of the Candidate's general election campaign

CLINTON'S POSITIONS VS DOLE'S POSITIONS

The Audit staff identified five DNC ads which aired during 1996 in which the candidate's position on the budget, Medicare, education, taxes, assault weapons, welfare, children, the economy is juxtaposed to Dole's positions or Dole's legislative record (see Exhibit #2 for text of ads). Three of the five ads (No, Proof, and Facts) ran between 3/29/96 and 5/3/96 in flights involving $5 million in placement costs to broadcast stations. The voice-over relates to the viewer "Dole says no to the Clinton's plans it's time to say yes to the Clinton plans yes to America's families."

The fourth ad, entitled Economy, discusses the President's position on jobs, unemployment benefits, women-owned companies, job training and interest rates and points out that under "the Dole GOP bill" and "a Dole amendment" these areas of the economy would suffer. This scenario is then contrasted with information on "today['s]" economy - record construction jobs, lower mortgage rates, new jobs - highlighting "the President's plan for a better future."

The fifth ad in this category, entitled Risky, contrasts the President's tax cut or tax proposals which would benefit working families against Dole's legislative record on taxes and the purported effect of these taxes on Medicare, education and the environment. The Economy and Risky ads ran during the period 7/24/96 through 8/28/96 in flights where the air time charges totaled nearly $4 million (Economy $2.0 million; Risky $1.94 million in same flight with Them mentioned above).

Here again, as was the case in the previous discussion, the viewer is presented with a choice between two candidates—the President and his stated accomplishments and proposals shown as favorable versus Dole and his record as stated and possible consequences of his positions and proposals.

CLINTON'S POSITIONS VS "DOLE GINGRICH" POSITIONS

The third category of ads classified by the Audit staff involved 12 ads in which the President's record and/or positions are compared to the record and/or positions or proposals represented as associated with "the Dole Gingrich budget plan," "Dole Gingrich attack ad," and "Dole and Gingrich" voting record or proposals. These ads, the text of which is at Exhibit #3, portray the President's stated accomplishments on topics such as Medicare, education, taxes, environment, budget, and immigration compared to the attempts and seemingly undesirable effects of actions or proposed actions attributed to Dole Gingrich. These ads ran in flights which aired during the period from 4/12/96

through 7-19-96 (one ad Table also ran during 1/18/96-2/1/96); the placement cost for flights totaled $18 million. Although Dole is "coupled" with Gingrich in these ads, during this time period Dole was the "presumptive nominee." The message conveyed to the viewer is a choice between the President and his policies and Dole

## CLINTON'S POSITIONS VS "THE REPUBLICANS'" POSITIONS

During the primary period mainly from 8/16/95 to 1/24/96,[22] 13 DNC ads were aired that discussed President Clinton's position on topics such as Medicare, education, taxes, welfare reform, environment, family medical leave, and a balanced budget; the placement cost for flights during this period containing these ads was $13.35 million. Against these positions, the stated positions, goals, and consequences of various proposals tied to "republicans in Congress", the republican budget, or just "republicans" are discussed (see Exhibit #4). In 7 of these ads, although not mentioned in the audio portion by name, Dole is pictured at least once during the video portion.

The remaining four DNC ads, entitled Dreams, Victims, Challenge, Welfare, are thematic in nature and present topics such as the President's college tuition tax cut, the President's balanced budget, the President's plan for welfare reform, and the President's plan to address women victims of domestic abuse (see Exhibit #5). Three of the four DNC ads ran in flights during the period 2/13/96 through 3/27/96; the DNC ad, entitled Dreams ran 6/12/96 through 6/18/96. President Clinton is featured at least twice in the video portion of each ad, and "the President's plan" or proposals made by the President are mentioned in the voice-over or audio portion of each ad.

It appeared, based on information analyzed as of the close of audit fieldwork, the placement of DNC ads was coordinated with the placement of the Primary Committee ads. Further, the DNC ad campaign was developed, implemented, and coordinated with the Primary Committee. Finally, it is the opinion of the Audit staff that the cost of the DNC ad campaign, calculated at $46,580,358 (placement costs of $42,373,336, commissions of $4,173,339 and identified production costs of $33,683) using records currently available, should be viewed as an in-kind contribution to the Primary Committee.

The topic of the cost of DNC ads being viewed as in-kind contributions to the Primary Committee was discussed briefly at the conference held at the close of audit fieldwork. The General Counsel of the Primary Committee stated that the Commission's regulations and advisory opinions, and court decisions permit issue advertising by the DNC and strongly disagreed with the Audit staff's opinion that media ads placed and aired on behalf of the DNC represent an in-kind contribution to the Primary Committee and applicable to the overall expenditure limitation.

---

[22] Two DNC ads, entitled Help and Stop, ran between 3/29/96 and 5/31/96.

In the Memorandum, the Audit staff recommended that the Primary Committee demonstrate that the media program described above did not constitute an in-kind contribution from the DNC to the Primary Committee. The demonstration should have included evidence that the DNC media program was not coordinated with the Primary Committee and that the ads aired did not contain an electioneering message.

In response to the Memorandum, the Primary Committee stated "[t]he Democratic National Committee and numerous Democratic state party committees broadcast a series of issue advocacy media advertisements in late 1995 and early 1996."

It should be made clear that the ads, in question, were ads produced by SKO or Nov5 on behalf of the DNC. Our review did not reveal any payments made by state party committees relative to the cost of producing the ads in question. Even though numerous state party committees wired funds to the Primary Committee's media firms, the cost of air time to broadcast the ads was, in fact, funded by the DNC. The DNC wired funds from its federal and non-federal accounts to state party committees and provided the following wire transfer instructions:

"The DNC has sent two wires to your accounts which are noted above. In accordance with normal allocations procedures for administrative/generic expenses, you should transfer the amount of money sent to your non-federal account to your federal account. You should then send <u>one wire from your Federal account</u> to the media firm listed below in the amount of the total funds sent to you.

**Please send <u>one</u> wire to Squire Knapp Ochs per the information listed below:**

Bank Name: National Capitol Bank, 316 Pennsylvania Ave., S.E. Washington, D.C. 20003

Account Name: November 5 Group, Inc.

Bank Account Number: [account number contained in original]

ABA Routing Number: 054 000 056

***** This transfer needs to be done A.S.A.P. Please call Maureen Garde at 202-479-5136 to confirm that this wire has been made, complete the attached form, and fax it to Maureen at 202-479-5135. Thank you for your help.*****" [Emphasis in original]

The appropriateness of this type of funding by the DNC through the various state party committees is beyond the scope of this report.

The response further stated that the Memorandum cited certain alleged occurrences as evidence of coordination between the DNC and the Primary Committee.

The Primary Committee did not dispute that the ads were coordinated, but objected to the "Audit Division's inaccurate and misleading discussion of the facts pertaining to the ads, and, in some instances (although irrelevant) disagrees that the facts cited show coordination." The Primary Committee deemed this evidence of coordination as totally irrelevant and riddled with factual errors.

The Primary Committee objected to the Audit staff's use of invoices that indicated production cost was shared between the DNC and the Primary Committee. It stated "in only one of the three instances of shared production expenses cited in the Memoranda is the name of the ad provided, and in that one case, the Audit Division has the facts wrong. According to [the] Audit staff, a September 16, 1996 SKO invoice apparently relates to the ads 'Nobody' and 'Them.' The Audit Division states that the Primary Committee and the DNC each paid for a portion of this invoice. The ad 'Nobody' is a Primary Committee ad that never aired, and the ad 'Them' is a DNC ad which was attributed to the 441a(d) limitation. There was only one ad, a 441a(d) ad aired by the DNC, so the facts are not accurate as stated by the Audit Division."

As another example of "inaccurate and misleading discussion", the Primary Committee objected to comparisons made with respect to DNC and Primary Committee media buys during the period May 25 through May 31, 1996, as well as comparisons made with respect to other media buys that occurred during similar flights. Even though the Primary Committee did not dispute the facts presented in the Memorandum, it concluded "the Audit staff has allegedly documented a 'similar pattern' in the placement of ads in a week when the Primary committee paid over $1.1 million to broadcast ads while the DNC paid only $73,049. The disparity in the amounts purchased by each entity is so large that it is impossible to make any comparisons about similar patterns in the placement of ads based on these facts."

With respect to all other media flights on all other dates, the Primary Committee stated, the Audit staff made the general conclusion that Primary Committee and DNC ads were placed at the same stations, but added that the amounts charged by the stations were not exactly the same. Despite the fact that this statement related to millions of dollars in ads, no documentation or specific facts were provided to support the conclusion.

The remainder of the Primary Committee's response with respect to "inaccurate and misleading discussion" covered (1) the standard form used by Clinton/Gore '96 and the DNC for authorization of production and time buys, (2) a July 3, 1996 authorization memorandum from Harold Ickes and Doug Sosnik referring to two alleged buys, (3) an authorization memorandum to Primary committee and DNC staff indicating the Harold Ickes had authorized payment of certain SKO invoices, (4) statements made by a Primary Committee and Democratic Party polling consultant and the DNC's General Counsel, and (5) information gathered and conclusions reached by the U.S. Senate Committee on Governmental Affairs in its report on the 1996 campaign.

It is the opinion of the Audit staff that the facts presented in the Memorandum were presented fairly and demonstrated that coordination occurred between the Primary Committee, the White House, and the DNC.

With respect to the Primary Committee's ad entitled "Nobody", this ad, according to documentation made available by the Primary Committee and its media firm did in fact run. Station documentation, some of which was notarized and/or signed by a station representative, contained language to the effect "we warrant that the actual broadcast information on this invoice was taken from our records." During the period August 15, 1996 through August 21, 1996, the ad "Nobody" aired. For example, documentation reviewed for television station KNSD (Los Angeles, CA), indicated that an ad coded CG1430 aired August 20th and August 21st. Code CG1430 was the product/film number assigned to the ad "Nobody." The cost of this ad was $4,275. The cost of all ads aired on this station during this period, including "Nobody", totaled $13,451.25. The invoice contained no reconciling items which, if present, would have indicated that an ad(s) did not air. Primary Committee funds were apparently used to pay this station and the station was listed on the media reconciliation for Primary Committee ads placed during the period.

The Audit staff did not copy all station invoices for this flight (August 15, 1996 through August 21, 1996), however, invoices copied indicated the ad "Nobody" also aired at television stations KOAA - CO (8/20 - 8/21), WCPX - FL (8/21), KOMU - MO (8/19 through 8/21), WKRC - OH (8/20 - 8/21), KDRV - OR (8/20 - 8/21), WPVI - PA (8/20), WUXP - TN (8/20 - 8/21), WTVC - TN (8/19 - 8/21), WKOW - WI (8/20 - 8/21), KHQ - WA (8/19 - 8/22)[23] and WRAL - NC (8/20 - 8/21).

The Primary Committee's assertion that the ad Nobody never aired is puzzling at best, given the documentation in the Primary Committee's records.

The discussion in the Memorandum concerning media ads placed by both the DNC and the Primary Committee during the period May 25, 1996 through May 31, 1996 was factually correct. Even though approximately $500,000 in ads placed by the DNC were not aired, as noted in the Memorandum, the fact that the DNC ads were originally placed at the same stations for the same amount during the same period as Primary Committee ads can be and should be used as a basis to conclude coordination existed between the DNC and the Primary Committee.

As previously stated, during that period Nov 5 on behalf of the Primary Committee placed ads totaling $1,101,062. During the same period, Nov 5 on behalf of the DNC placed ads totaling $563,253. DNC ads and Primary Committee ads were placed with the same 112 broadcast stations. With respect to ads placed with 109 (of the 112) stations, the checks issued by Nov 5 to the stations on behalf of the DNC or the

[23] Even though the invoice indicated the ad was aired on 8/22/96, the station is listed on the media reconciliation made available for ads aired 8/15/96 through 8/21/96

Primary Committee were in the same amount. The Memorandum also noted that the media reconciliation prepared by Nov 5 for this period indicated that only $73,049 in ads were actually placed [actually aired] on behalf of the DNC.

The import of this example, which was not refuted or even addressed by the Primary Committee in its response, was and still is — the DNC and Primary Committee media flights as originally planned, if aired would have resulted in Primary ads and DNC ads being aired by the same stations during the same time periods by design. The Audit Division is not in possession of any information, nor did the Primary Committee offer any explanation, as to why the DNC ad flight was "scaled back" nearly $500,000 or 87% of the planned amount.

With respect to other ads placed on behalf of both the DNC and the Primary Committee at the same stations during the same period but not always for the same amount, it should be noted that the Primary Committee had the same media reconciliations and station documentation as reviewed by the Audit staff. Further, during the response period provided in the Memorandum, the Primary Committee requested and received copies of certain workpapers in support of statements/facts contained in the Memorandum. At no time did the Primary Committee request workpapers concerning DNC and Primary Committee ads aired during similar periods of time but not always for the same amounts.

The Memorandum contained information noted in a Report of the United States Senate Committee on Governmental Affairs. The Memorandum cited certain statements by Richard Morris. The Primary Committee objected to the inclusion of information from a memorandum, apparently dated February 22, 1996, which stated, in part, if Dole is nominated, we need no additional CG money for media before May 28 since we can attack Dole with DNC money. The Primary Committee stated: "the Audit Division misunderstood the point of Mr. Morris' statement, which was that issue ads had to discuss current Members of Congress in the context of legislative debate in Congress. In fact, as is reflected in his sworn testimony, Mr. Morris' memo demonstrates how forcefully and precisely the DNC and Clinton/Gore '96 communicated the rules on issue advertising to those preparing the ads. Indeed, it is astonishing that the Audit Division would reach an incorrect interpretation of Mr. Morris' memo when his sworn testimony on the issue is available."

The Primary Committee misinterpreted the point of Mr. Morris' statement. According to the testimony, Mr. Morris' statement referred to his understanding of the so called issue ad cutoff date. Mr. Morris stated "if Dole is nominated, don't worry about it, because he's in the Senate, and the budget is the big fight, and it's continuing, and we can continue to compare the President's position with Dole's position straight through the 28th of May, which was the Memorial Day cut-off that Sandler and Utrecht had decreed."

Apparently, the so called May 28, 1996 cut-off date was set by Mr. Sandler and Ms. Utrecht. In response to the question "[a]re you aware that timing is a key factor in

FEC determination of express advocacy." Mr. Morris answered, "[y]es. We were informed [of] that by Sandler and by Utrecht, and that is why they set the deadline of Memorial Day as being the last day on which we could run issue—on which we could run DNC ads." In this deposition, Mr. Morris related that the Memorial Day cutoff date was extended because the RNC continued to run its issue ads.

The inclusion of this information was merely to further substantiate the level of coordination that existed between the DNC, Primary Committee and the White House.

Moreover, language contained in a piece of correspondence obtained by the Audit staff subsequent to the issuance of the Memorandum seems to provide some insight to the DNC's "issue ad" activity. The language below is excerpted from a "MEMORANDUM FOR HAROLD ICKES" from Joe Sandler discussing the Colorado Republican case then before the U.S. Supreme Court. The memorandum was dated February 8, 1996, approximately two weeks prior to the apparent date (February 22, 1996) of the aforementioned Morris memorandum.

> "The FEC has adopted a vague and fuzzy test for determining when a party communication or activity counts against these limits: it counts if it contains an 'electioneering' message about a clearly identified candidate. (This is the standard we are applying (albeit aggressively) in the current DNC media campaign, to avoid having the ads count towards the limit on expenditures for Clinton/Gore)."

It should be noted that the DNC ads continued to run through August 7, 1996. The cost of DNC ads aired during the period August 15, 1996 through August 28, 1996 were reported by the DNC as being made on behalf of President Clinton's general election campaign pursuant to 2 U.S.C. §441a(d).

With respect to the remainder of the Primary Committee's assertions concerning the use of standard forms, memoranda authorizing media buys, statements made by DNC/Primary Committee polling consultant and statements made by the DNC's general counsel, again, the Audit staff merely introduced certain documents made available during fieldwork as evidence of coordination between the DNC, the Primary Committee and the White House as they related to the DNC ads and the Primary Committee ads.

According to the Primary Committee "issue ads" were timed to avoid airing in proximity to the 1996 election; no DNC "issue ads" were run after early August 1996; no "issue ads" were broadcast during the entire general election period; and, it was the DNC stated policy to not broadcast any "issue ads" in a state within thirty days of that state's

primary election in order to ensure that the ad could never be construed to have any connection whatsoever with an election.[24]

Finally, the Primary Committee stated the Memorandum presented a flawed analysis of the DNC "issue advocacy ads" and concluded they were either coordinated with the Primary Committee or "imbued" with an electioneering message. It was the Primary Committee's opinion that the position taken by the Audit Division that the DNC "issue ads" contained electioneering messages simply cannot be supported either as a matter of fact or law. In support of its opinion, the Primary Committee questioned the Audit staff's analysis with respect to DNC ads that contained the same audio and same video as Primary Committee ads; ads that compared Clinton's positions vs. Dole s positions and Clinton's positions vs. Dole Gingrich positions; and, Clinton's positions vs. The Republicans positions.

<u>Same Audio and Same Video as Primary Committee Ads</u>

The Primary Committee stated the Audit staff correctly observed that in the case of three separate DNC ads which ran during the period August 15, 1996 through August 28, 1996, the audio and video content of the DNC ads were exact facsimiles of three separate Primary Committee ads and nearly identical to a fourth DNC ad which ran during the period August 2, 1996 through August 21, 1996. With respect to the 4 DNC ads, the Primary Committee stated "[w]hether an electioneering message is present, however, is irrelevant because the expenditures for each of those ads was attributed to the DNC's 441a(d) expenditures. Thus, it was entirely appropriate for the ads to have included an electioneering message as well as to have expressly advocated the election of President Clinton the defeat of his opponent. There is absolutely no reason for barring the DNC from airing an advertisement which is identical to a Primary Committee ad when that ad is charged to the 441a(d) limit."

Finally, the Primary Committee stated rather ironically that "[w]hat is particularly troubling about the Audit Division's finding is that it demonstrates complete carelessness in reviewing materials provided by the Committees. The Audit staff was provided with a complete set of media reconciliations from the November 5 Group.

These reconciliations provided the cost and dates of broadcasting of the DNC issue ads ...There is no excuse for the error because contrary evidence was for all intents and purposes staring the auditors in the face. On those very same reconciliations for the periods 8/15/96 through 8/28/96, the phrase '441 MONEY' appears on every sheet in the upper left-hand corner. It is inexcusable that the appearance of that phrase on every single media reconciliation for the period in question did not trigger even a question in the auditors' minds that the broadcasts could have reflected 441a(d) expenditures."

---

[24] In a footnote, the Primary Committee stated "while this 30-day pre-primary rule was observed for virtually all of the ads, in a few instances ads were run within thirty days of a primary, generally when these stations failed to pull them as requested."

The Primary Committee appears to concede that the DNC ads aired during the period August 2, 1996 through August 28, 1996 contained electioneering messages and mention of a clearly identified candidate(s). It should be noted that Nov 5 media reconciliations for the DNC ads were not provided to the Audit staff until the final days of the audit fieldwork and not all the reconciliations in question (8/15/96 through 8/28/96) were annotated with the phrase "441 Money." Reports filed by the DNC did disclose expenditures to Nov 5 for media placed on behalf of President Clinton pursuant to 2 U.S.C. §441a(d) in the amount of $2,394,409. According to the media reconciliations, the funds were used to pay for ads placed and aired prior to the Candidate's date of nomination (8/28/96) in the amount of $2,234,812 (including commissions).

Since the above expenditures paid for ads aired prior to the Candidate's date of nomination, the Audit staff does not consider the expenditures made pursuant to 2 U.S.C. §441a(d). The fact that the DNC reported them as 441a(d) expenditures is not controlling. In the Audit staff's opinion the "bright line" regulations at 11 CFR §9034.4(e) apply because in-kind contributions are also expenditures by the recipient candidate. The "bright line" rules apply consistently to all campaign expenditures, including in-kind contributions paid for by a national party committee. The general "bright line" rule is that goods and services used exclusively for the primary or general election campaign are allocable to that election. Otherwise, expenditures for media and other communications used for both the primary and general elections are attributed between the primary and general elections based upon whether the date of broadcasts or publication is before or after the date of nomination (11 CFR §9034.4(e)(6)). Furthermore, this approach voids the possibility of having expenditures for identical media ads on behalf of the Candidate, broadcast prior to the date of nomination, treated as primary and general election expenditures depending on whether the Primary Committee or DNC paid for them. As noted at Exhibit 1, DNC ads entitled Dole/Gingrich, Them, and Scheme were identical to Primary Committee ads entitled Real Ticket, Nobody and Back. The ads do not appear to be exclusively related to the general election. The DNC ads and Primary Committee ads were aired in August 1996 prior to the Candidate's date of nomination.

<u>Clinton's Positions vs. Dole's Positions, Clinton's Positions vs. Dole Gingrich Postitions, and Clinton's Positions vs. The Republicans Positions</u>

The Primary Committee identified certain DNC ads in which President Clinton's position on the budget, medicare, education, taxes was compared to Dole's positions or Dole's legislative record as well as ads which contrasted President Clinton's position with that of Republicans as to various legislative proposals. According to the Primary Committee, this is exactly what "issue advocacy ads" were supposed to do.

With respect to the Primary Committee assertions that only in a few instances, which resulted only when stations failed to pull them as requested, ads were run within

30 days of a primary, it should be noted that DNC ads were run within 30 days of 12 different state primaries/caucus. In one instance with respect to the Washington (State) primary held on March 26, 1996, DNC ads, with a placement cost of $132,617, were aired during the period March 7, 1996 through March 25, 1996. The Primary Committee offered no evidence that the DNC requested such ads be pulled.

Irrespective of whether DNC ads ran within 30 days of a state's primary election date, it remains the opinion of the Audit staff that DNC ads in question, viewed separately or in total, contained an electioneering message and referenced a clearly identified candidate.

Our comments in response to arguments put forth by the Primary Committee concerning its view of what the appropriate legal standard under which the DNC ads should be evaluated are contained below.

A. THE LEGAL STANDARD

The Primary Committee argued that the Audit staff, in reaching its conclusion that DNC-funded media should be treated as an in-kind contribution to the Primary Committee improperly abandoned the "express advocacy" and "electioneering message" standards, and, contrary to law, applied a "purpose, content and timing" test. Response at 2-4.

The Audit Division agrees that, in cases involving spending for speech-related activity, which is made in cooperation with, or at the request of, a candidate (including the candidate's authorized political committees and/or their agents), the spending may be considered a contribution to the candidate if the resulting communication "clearly identifies" a candidate for federal office and contains an "electioneering message." *See* AOs 1985-14; 1984-15.[25] The Audit Division's reference

[25] The term "clearly identified" means that the name of the person involved appears, a photograph or drawing of the candidate appears; or the identity of the candidate is apparent by unambiguous reference. 2 U.S.C. § 431(18). Section 100.17 of the Commission's regulations amplifies the statute by defining "clearly identified" as meaning the candidate's name, nickname, photograph, or drawing appears, or the identity of the candidate is otherwise apparent through an unambiguous reference such as "the President," "your Congressman," or "the incumbent," or through an unambiguous reference to his or her status as a candidate such as "the Democratic presidential nominee" or "the Republican candidate for the Senate in the State of Georgia".

The definition of "electioneering message" includes statements designed to urge the public to elect a certain candidate or party, or which would tend to diminish public support for one candidate and garner support for another candidate. *FEC v. Colorado Republican Federal Campaign Committee*, 59 F.3d 1015, 1023 (10th Cir. 1995) (citing AO 1984-15), *rev'd on other grounds*, 518 U.S. 604 (1996) (The Court did not address the content of the advertisements at issue), *see* AO 1985-14 ("electioneering messages include statements 'designed to urge the public to elect a certain candidate or party'") (citing *United States v. United Auto Workers*, 352 U.S. 567, 587 (1957)).

to the purpose, timing and content of the advertisements at issue is consistent with the clearly identified candidate/electioneering message standard.[36]

Advisory Opinion 1984-15 involved two television advertisements which the RNC proposed to broadcast. These proposed advertisements each began with an image of a then-current candidate for the Democratic presidential nomination. The audio component of each advertisement then set forth the candidate's statement or position on an issue, and was followed by a reply or retort to that statement. Both advertisements ended with the statement "Vote Republican." The Commission determined that these advertisements had "[t]he clear import and purpose . . . to diminish support for any Democratic Party presidential nominee and to garner support for whoever may be the eventual Republican Party nominee . . . ." The Commission further determined that the advertisements "effectively advocate the defeat of a clearly identified candidate." Based on these determinations, the Commission explained that "expenditures for these advertisements benefit the eventual Republican presidential candidate and are made with respect to the presidential general election and in connection with the presidential general election campaign." The Commission concluded that expenditures for the advertisements therefore would be reportable either as contributions subject to the limitation set forth at 2 U.S.C. § 441a(a)(2)(A), or as coordinated party expenditures subject to the limitation set forth at 2 U.S.C. § 441a(d).

AO 1985-14 involved television, radio and print advertisements, and mailers, which the Democratic Congressional Campaign Committee (DCCC) proposed to publish, and which purported to describe Republican policies. A tendered script for a television/radio advertisement encouraged the viewer/listener to "[l]et your Republican Congressman know that you don't think this is funny . . . ," or in another version of the same advertisement, "[l]et the Republicans in Congress know what you think about their sense of humor." Another script for a television/radio advertisement urged one to let "your Republican Congressman" (or in a variant, "the Republicans in Congress") "know that their irresponsible management of the nation's economy must end -- before it's too late." The DCCC submitted alternative scripts, which added the closing statement "Vote Democratic" to both of these advertisements. A sample proposed mailer included the statement "[l]et Congressman X know how you feel." A variant added the exhortation to "Vote Democratic."

Citing AO 1984-15, the Commission concluded that amounts used to fund the communications would be expenditures subject to the limitation set forth at 2 U.S.C. § 441a(d) if the advertisement funded by that amount "(1) depicted a clearly identified candidate and (2) conveyed an electioneering message." Applying this standard, the Commission determined that advertisements which referred to "the Republicans in Congress" were not subject to limitation under 2 U.S.C. § 441a(d), regardless whether the

[36] As discussed below, the Audit Division does not agree with the Committees' argument that the "express advocacy" standard must be met before such spending constitutes a contribution to the candidate

advertisement closed with the statement "Vote Democratic." The Commission also concluded that advertisements which referred to "your Republican Congressman" were not subject to limitation under 2 U.S.C. § 441a(d), if the advertisement did not close with the statement "Vote Democratic." However, the Commission on a tie vote was unable to decide whether advertisements which referred to "your Republican Congressman" and which closed with the statement "Vote Democratic" were subject to limitation under 2 U.S.C. § 441a(d). Finally, the Commission concluded that the costs of production and distribution of the proposed mailer would be subject to limitation under section 441a(d).

Significantly, the Commission's determination that the costs of the proposed mailer were subject to limitation under section 441a(d) was based on the Commission's assumptions that the reference to "Congressman X" indicated that the mailer would identify particular congressmen by name, and that the distribution of the mailer would include all or part of the district represented by the congressman identified in that mailer. Likewise, the Commission in AO 1985-14 made clear that its evaluation of whether or not the television/radio advertisements were subject to limitation under 2 U.S.C. § 441a(d) was made with reference to proposed dates on which the advertisements were to be run, stating that:

> [The] proposed program is for the purposes of influencing the 1986 election process and [. . .] these activities will be scheduled for approximately the next month [June 1985] and for September 1985. The Commission emphasizes that this opinion is limited to the timetable you have specified and does not address the implementation of the same or a similar program at some later date.

The Commission's reference to the place and the timing of the communicative activity makes clear that the determination whether spending for a particular communication contains an electioneering message requires at least some reference to the context in which the communication is published.[27] Accordingly, the

[27] The Commission in AO 1985-14 assumed that the media campaign was developed without cooperation or consultation with any candidate, and based its analysis on the theory that the limitations under 2 U.S.C. § 441a(d) apply to party expenditures irrespective of ... a candidate. Likewise, AO 1984-15 involved an RNC ... Commission was ...

Audit Division properly examined the broadcast dates and locations in reaching its conclusion that the advertisements in question in this audit should be treated as contributions.

Likewise, the purpose of the advertisements was a necessary and proper consideration which had to be weighed before the Audit Division in this audit could reach its conclusion that the DNC sponsorship of the media campaign constitutes an in-kind contribution to the Primary Committee. In AO 1985-14 the Commission explicitly relied on the representation in the Advisory Opinion Request that the media program had "the clear purpose of influencing voter perceptions of these candidates with a view toward weakening their positions as candidates for re-election . . . ." Similarly, in AO 1984-15, the conclusion that the proposed television advertisements were subject to regulation as contributions or coordinated party expenditures was explicitly based, in part, on the opinion that "the clear import and *purpose* of [the] proposed advertisements [was] to diminish support for whoever may be the presidential nominee and to garner support for whoever may be the eventual Republican Party nominee." Indeed, with one exception, a purpose of influencing a federal election is an indispensable element for concluding that any disbursement of funds (or other thing of value) is a contribution or coordinated party expenditure within the meaning of the Act.[28] *See* 2 U.S.C. §§ 431(8)(A)(i), (9)(A); 441a(d).

B. ANALYSIS

The Primary Committee also argued that, under all relevant precedents, the advertisements in question qualified for treatment as issue advocacy that is not subject to regulation as contributions or coordinated party expenditures. Response at 4-24. In particular, the Primary Committee argued that political parties were permitted to coordinate with party candidates when making party expenditures, and that the Audit Division's recitation of facts related to such coordination is both irrelevant and inaccurate. *Id.* at 5-13. The Primary Committee further asserted that the advertisements did not contain "express advocacy" or an "electioneering message" but only addressed pending legislation. *Id.* at 13-24.

1. Coordination

The Primary Committee strenuously argued that coordination between a party and its candidates is both permissible and presumed under current law. Response at 5-7. Referring to the Supreme Court's decision in *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996), the Committees quote a

518 U.S. at 612. Thus, the issue whether or not the Section 441a(d)(2) limit applies in the absence of actual coordination between a national committee and its Presidential nominee is unsettled

[28] The payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge is a contribution, regardless of purpose. 2 U.S.C. § 431(8)(A)(ii).

section of the Commission's brief in that case, in which the Commission explained its presumption that party expenditures are made in coordination with its candidates. *Id.* at 5. The Committees urge that the Commission cannot, in the context of an audit, reverse this presumption, and suggest that such a reversal "can only occur through the rule-making process." *Id.*

In *Colorado Republican Federal Campaign Committee* the Supreme Court rejected the Commission's position that it may presume coordination between a party and its congressional candidates, holding that the First Amendment prohibits enforcement of 2 U.S.C. § 441a(d)(3) limits with respect to expenditures for media, if the expenditure, as a matter of fact, was made independent of any coordination or consultation with the candidate. 518 U.S. at 619-23. The Court did not extend this holding to the Section 441a(d)(2) limit applicable to Presidential campaigns, declining to "address issues that might grow out of the public funding of Presidential campaigns". 518 U.S. at 612. Thus, the issue whether or not the Section 441a(d)(2) limit applies in the absence of actual coordination between a national committee and its Presidential nominee is unsettled. In light of this uncertainty, the Audit Division in this audit properly scrutinized whether the media campaign funded by the DNC was implemented in cooperation with, or at the request of, the candidate and/or his campaign committees.

The Primary Committee also argued that the Audit Division's examination of coordination between the candidate and the committees was improper because 2 U.S.C. § 441a(a)(7)(B) does not apply to party expenditures for issue advocacy. Response at 7-8. The Primary Committee urged that the Commission "has never relied on the coordinated expenditure provision at 2 U.S.C. § 441a(a)(7)(B) when applying the expenditure limits because it has always presumed political parties coordinate their expenditures with their candidates." *Id.* at 8. The Primary Committee concluded that "under the electioneering message standard, it is solely the content that is determinative without regard to coordination or any other factors external to the ad." *Id.* The Audit Division respectfully disagrees with the Primary Committee's characterization of the law. As discussed above, the electioneering message standard necessarily involves an examination of not only the content of a communication, but also the time, place and purpose of the communication.

2. <u>Electioneering Message</u>

The Primary Committee next argued that the DNC funded advertisements did not contain an electioneering message. Response at 13-18. The Primary Committee first reiterated its position that the electioneering message standard refers solely to the content of a communication, citing Advisory Opinions 1985-14 and 1995-25 in support of this conten ion. Response at 13-14.

As set forth in detail above, the Audit Division believes that, contrary to the Primary Committee's arguments, AO 1985-14 supports the proposition that the electioneering message standard requires an examination of the time, place and

37

Commission in AOs 1985-14 and 1995-25 held did not contain an electioneering message. Response at 16-18. The Audit Division believes that its conclusion that DNC-funded media in this audit should be treated as an in-kind contribution to the Primary Committee was consistent with the analysis expressed in AO 1985-14.

As discussed above, the Commission in AO 1985-14 concluded that the 2 U.S.C. § 441a(d) limit did not apply to advertisements which referred to "the Republicans in Congress" (regardless whether the advertisement closed with the statement "Vote Democratic"), nor to advertisements which referred to "your Republican Congressman" (if the advertisement did not close with the statement "Vote Democratic"). Thus, the advertisements which the Commission in AO 1985-14 concluded were not subject to Section 441a(d) did not depict a "clearly identified candidate."

In contrast, the advertisements in question in this audit explicitly identify President Clinton and, in some cases, Senator Dole. Because these advertisements also address the policies of the President and his Republican opponents in a way which, on its face, appears calculated to encourage the viewer to vote for President Clinton, the Audit Division believes that the advertisements at issue meet both the "clearly identified candidate" and "electioneering message" tests. Indeed, because the advertisements in this matter do identify specific Republican and Democratic candidates for President, these advertisements are more akin to the proposed mailer, also at issue in AO 1985-14, in which the DCCC intended to identify specific congressmen by name. Based on its understandings that the proposed mailers would identify particular congressmen by name, and that the distribution of the mailer would include all or part of the district represented by the congressman identified in that mailer, the Commission concluded that the costs of production and distribution would be subject to limitation under the Act.

The Primary Committee's reliance on AO 1995-25 is equally misplaced. As discussed above, AO 1995-25 explicitly declined to reach the issue whether or not the advertisements under scrutiny in that case contained and electioneering message, and left open the question whether or not the ads would qualify as coordinated expenditures on behalf of any general election candidates of the party under 2 U.S.C. § 441a(d). Thus, even if the Primary Committee was correct in its contention that the advertisements in question in this audit were "indistinguishable" from the advertisements in AO 1995-25, that similarity is meaningless with respect to the application of the electioneering message analysis in this audit. Whatever similarities may be drawn between the content of the advertisements in the two cases, in this audit it appears that the timing and the geographic placement of the media were in fact calculated to serve the purpose of garnering support for President Clinton's re-election campaign.

3. Express Advocacy

The Primary Committee further argued that the express advocacy standard, rather that the clearly identified candidate/electioneering message standard, was

the appropriate ... particular party expenditure for media. Response at 4 ("[a] communication ... can never reach the level of an any explicit exhortation to vote for a specific candidate express advocacy communication and therefore, is constitutionally protected speech."), 18-23.

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court of the United States held only that expenditures for communications that are independent from a candidate (and his or her committee and agents) are protected from governmental regulation by the First Amendment if the communications do not "in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S. at 44. The Court made equally clear that communications that are authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate are to be treated as contributions by the person or group making the expenditure. 424 U.S. at 46-47, n.53. The Court recognized that coordinated expenditures are treated as in-kind contributions subject to the contribution limitations in order to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." 424 U.S. at 46-47.

Consistent with *Buckley*, courts have not applied the "express advocacy" test to contributions or coordinated expenditures. *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 259-60 (1986)("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending" (citing *FEC v. National Conservative Political Action Committee*, 470 U.S. 480 (1985); *California Medical Association v. FEC*, 453 U.S. 182, 194, 196-97 (1981); and *Buckley*, 424 U.S. at 20-22)); *see also FEC v. Colorado Republican Federal Campaign Committee*, 59 F.3d 1015 (10th Cir. 1995) (reversing district court holding that express advocacy was necessary for communication to qualify as an expenditure under 2 U.S.C. § 441a(d)), *vacated and remanded on other grounds*, 518 U.S. 604 (1996) (plurality op.); *Orloski v. FEC*, 795 F.2d 156, 166-167 (D.C. Cir. 1986). The Audit Division believes that application of the express advocacy test to coordinated party expenditures is unwarranted.

First, not all coordinated expenditures are communicative. For instance, suppose a candidate asks a supporter to pay the campaign committee's electric bill, and the supporter does so with a personal check. The conclusion that the supporter has thus made an in-kind contribution, in that he has made an expenditure of money to pay for a thing of value to the campaign and has done so at the request or suggestion of the candidate, is entirely consistent with the definition of "expenditure" at 2 U.S.C. § 431(9)(A) and with 2 U.S.C. § 441a(a)(7)(B)(i), which provides that coordinated expenditures are contributions. Yet, there is surely no "express advocacy" in the electric bill, the supporter's act of paying for it, or the check with which he pays for it.

Second, the vagueness concerns that animated the Supreme Court's application of the express advocacy test to independent expenditures in *Buckley* are not

the appropriat : test for determining whether the Section 441a(d) limit applies to a particular party expenditure for media. Response at 4 ("[a] communication which lacks an explicit exhortation to vote for a specific candidate can never reach the level of an express advocacy communication and therefore, is constitutionally protected speech."), 18-23.

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court of the United States held only that expenditures for communications that are independent from a candidate (and his or her committee and agents) are protected from governmental regulation by the First Amendment if the communications do not "in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S. at 44. The Court made equally clear that communications that are authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate are to be treated as contributions by the person or group making the expenditure. 424 U.S. at 46-47, n.53. The Court recognized that coordinated expenditures are treated as in-kind contributions subject to the contribution limitations in order to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." 424 U.S. at 46-47.

Consistent with *Buckley*, courts have not applied the "express advocacy" test to contributions or coordinated expenditures. *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 259-60 (1986)("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending" (citing *FEC v. National Conservative Political Action Committee*, 470 U.S. 480 (1985); *California Medical Association. v. FEC*, 453 U.S. 182, 194, 196-97 (1981); and *Buckley*, 424 U.S. at 20-22)); *see also FEC v. Colorado Republican Federal Campaign Committee*, 59 F.3d 1015 (10th Cir. 1995) (reversing district court holding that express advocacy was necessary for communication to qualify as an expenditure under 2 U.S.C. § 441a(d)), *vacated and remanded on other grounds*, 518 U.S. 604 (1996) (plurality op.); *Orloski v. FEC*, 795 F.2d 156, 166-167 (D.C. Cir. 1986). The Audit Division believes that application of the express advocacy test to coordinated party expenditures is unwarranted.

First, not all coordinated expenditures are communicative. For instance, suppose a candidate asks a supporter to pay the campaign committee's electric bill, and the supporter does so with a personal check. The conclusion that the supporter has thus made an in-kind contribution, in that he has made an expenditure of money to pay for a thing of value to the campaign and has done so at the request or suggestion of the candidate, is entirely consistent with the definition of "expenditure" at 2 U.S.C. § 431(9)(A) and with 2 U.S.C. § 441a(a)(7)(B)(i), which provides that coordinated expenditures are contributions. Yet, there is surely no "express advocacy" in the electric bill, the supporter's act of paying for it, or the check with which he pays for it.

Second, the vagueness concerns that animated the Supreme Court's application of the express advocacy test to independent expenditures in *Buckley* are not

present in the case of coordinated expenditures. In the context of "independent expenditures," the *Buckley* Court limited the phrase "for the purpose of . . . influencing" to reach only "communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S. at 80. It did so because it was concerned that the Act's requirements for disclosure of independent expenditures above a certain dollar threshold "could be interpreted to reach groups engaged purely in issue discussion." *Id.* at 79. However, the Court stated that the phrase "for the purpose of . . . influencing" "presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution," *id.* at 23-24 n.24, an understanding that the Court acknowledged included coordinated expenditures, *id.* at 46, 78. In other words, because "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application," *id.* at 42, it would be difficult to know in advance without the express advocacy standard whether a given *independent* communication had a sufficient nexus to a Federal election to be subject to the Act; but in the case of a *coordinated* communication some, and perhaps all, of the required nexus to a Federal election may be found *in the act of coordination itself*. *Id.* at 78 ("So defined, 'contributions' have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign."). *See also Colorado Republican*, 518 U.S. at 617 ("[T]he constitutionally significant fact . . . is the lack of coordination between the candidate and the source of the expenditure.").

Third, the application of a strict "express advocacy" test to coordinated expenditures undermines the statutory purpose of protecting the electoral process from real or apparent corruption in a way that application of the same test to independent expenditures does not. As the Court noted in *Buckley*, "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." 424 U.S. at 47. By negative inference, one must conclude that the Court recognized that the presence of prearrangement and coordination of an expenditure with the candidate or his or her agent presents at least as much, if not greater, danger of corruption or its appearance as does a direct contribution to the candidate. This danger is a "constitutionally sufficient justification" for the Act's limitations and prohibitions on contributions. *See id.* at 26. However, strict application of an express advocacy test to coordinated expenditures would render the Act's limitations and prohibitions on contributions (which were upheld in *Buckley*) ineffective. The *Buckley* Court explained:

> The exacting interpretation of the statutory language necessary to avoid unconstitutional vagueness [in the ceiling on independent expenditures] thus undermines the [expenditure limitation's] effectiveness . . . by facilitating circumvention by those seeking to exert improper influence on a candidate or office-holder. It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that

> skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign. Yet no substantial societal interest would be served by a loophole-closing provision designed to check corruption that permitted unscrupulous persons and organizations to expend unlimited sums of money in order to obtain improper influence over candidates for elective office.

*Buckley*, 424 U.S. at 45. In the very next paragraph, the Court went on to say that the prior Act's limitations on expenditures were in any event not necessary to close a loophole in the Act's contribution limitations, because the Act treated coordinated expenditures as contributions, thus closing the loophole. *Id.* at 45-46. It is inconceivable that the Court would have so held if it viewed coordinated expenditures as subject to the same narrowing construction as independent expenditures.[10]

Having argued that express advocacy is the appropriate standard, the Primary Committee argued that the DNC-funded advertisements satisfied neither the express advocacy nor the electioneering message standard. Response at 23-24. For the reasons set forth above, the Audit Division's position is that the express advocacy standard does not apply to the media expenditures in question. The Audit Division does not, however, dispute that the advertisements in question do not contain "express advocacy." For the reasons stated above, the Audit Division believes that the advertisements do meet the clearly identified candidate/electioneering message standard.

4. The Media Campaign

The Primary Committee next argued that, even under the Audit Division's "erroneous" analysis, the DNC-funded media should not be treated as contributions. Response at 24-36. In support of its argument, the Primary Committee presented a lengthy and detailed explanation why the media campaign was related to pending legislation and targeted to "key" congressional districts. *Id.* at 25-33. The Primary Committee also contended that the advertisements in question were timed to avoid proximity to the general election. *Id.* at 33-34. Finally, the Primary Committee argued that the Audit Division subjected the advertisements to a "faulty" or "flawed" analysis when it concluded that the advertisements contained an electioneering message.

---

10 It should be noted that these "quid pro quos" may constitute violations of the Act if they are in excess of contribution limitations (e.g., in excess of $1,000 for individuals) or if the contribution is prohibited (e.g. corporate or labor organization contributions). *See* 2 U.S.C. §§ 441a(a)(2)(A); 441b(a). Moreover, the contributions are considered expenditures of the committees receiving the contribution. The fact that the subject coordinated expenditure is considered an expenditure of the recipient committee is particularly relevant in the context of publicly-financed political committees which must comply with expenditure limitations. Expenditures made in excess of a publicly-financed committee's expenditure limitation constitute non-qualified campaign expenses which must be repaid to the U.S. Treasury, and the act of exceeding an expenditure limitation results in a violation of the law. 2 U.S.C. § 441a; 26 U.S.C. § 9035. If the coordinated expenditures made on behalf of publicly-financed committees are allowed to go on unfettered, the expenditure limitations would be eviscerated.

*Id.* at 34-36. The Primary Committee's argument was supported by the affidavit of William Knapp, a principal in Squier, Knapp & Ochs during the campaign, in which he stated that the Response "accurately summarizes the issues and targeting for the DNC issue ads."

The Audit Division does not dispute that the advertisements in fact address pending political issues. However, the facts ascertained during the audit indicate that the primary purpose for addressing these issues was to assist President Clinton's re-election. It further appears that those facts which might otherwise demonstrate that the purpose and "targeting" of the advertisements were related to an overall party agenda (rather than the President's re-election) are true because of a deliberate effort to conceal the actual purpose of the advertisements.

For example, an agenda for a September 13, 1995, meeting with President Clinton sets forth the matter of "Campaign/DNC Advertising Financial Strategy." The agenda further sets forth a recommendation of four flights of television advertisements. For the period January 15 to April 15, 1996, the agenda describes the media flight as follows:

a. answers to Republican *primary attacks* on us
b. $15 million - run in *primary states which are also swing states for us*
c. *Need to work to make it state parties/DNC*
   1. *create* relationship to current legislation
   2. *defend more Dems than Clinton; attack more Republicans than Dole*
   3. *run in non primary states as well*
   4. *run in some areas well before primary*
d Ultimately, likely about $3 mil out of campaign and $12 mil out of party

(emphasis added). Entries for other media flights contain similar references to targeting "swing states" with media funded by the DNC and state parties. A similar memorandum, dated February 22, 1996, estimates campaign spending through May 28, 1996 as follows:

. . . Total Clinton Gore Money through May 28: $2.5 mil.
1. Unless Alexander in nominated and we cannot use DNC money to attack him.
2. If Dole is nominated, we need no additional CG money for media before May 28 since we can attack Dole with DNC money.

With respect to 4.a. above (answers to Republican *primary attacks* on us), it should be noted that during the period April 1996[31] through August 1996, the Republican National Committee (RNC) aired a series of ads apparently designed to

[31] To date, records have not been made available to determine if any RNC ads were placed and aired by the RNC prior to April 1996.

diminish support for President Clinton. These ads addressed a balanced budget (More Talk and Even More Talk), immigration (More), welfare (Case Study and Who) and taxes (The Pledge and Surprise). The Democratic National Committee during the same period in apparent response to these RNC ads aired a number of ads. DNC ads entitled Same, Proof, Side, Defend, Risky and Values addressed the Candidate's positions on taxes, welfare reform and budget, while DNC ads entitled Increased, Another and Enough discussed the Candidate's positions and policies on immigration. The text of these DNC ads are included at Exhibits 2 and 3.

For example, in June 1996 an RNC ad entitled "More" points out that President Clinton's spending which benefited illegal immigrants has gone up while wages for the typical American worker have gone down and that President Clinton opposed efforts to stop giving benefits to illegal immigrants (see Exhibit 6 for text of the ad "More"). Subsequent to the RNC ad being aired, the DNC, apparently in response, aired ads entitled "Increased," "Another" and "Enough." The audio portion of the three ads were similar. Each begins with, "[a]nother negative republican ad misleading ["wrong" was used in the ad Another]. President Clinton increased border patrols 40 percent to catch illegal immigrants, record number of deportations, no welfare for illegal aliens ... ." The DNC ads ran on many of the same broadcast stations as well as on other stations within the targeted area that aired the RNC ad.

It thus appears that media funded by the DNC either directly or indirectly through various democratic state parties was used for campaign purposes such as answering Republican "primary attacks" and influencing voter preferences in primary and swing states. Furthermore while it is true that the advertisements in question were ran at times and in locations which suggest that the purpose of the advertisements was something other than garnering support for President Clinton, it appears that this is true because of a deliberate effort to conceal the actual purpose and strategy behind the advertisements. Finally, it appears clear that the amount of DNC funds to be committed to the advertisements varied depending on who received the Republican nomination. Under these facts, the Audit Division concluded that the DNC-funded media should be treated an in-kind contribution to the Primary Committee.

**RECOMMENDATION #1**

The Audit staff recommends that the Commission determine that the cost of producing and broadcasting the ads discussed above and attributed to the Primary Committee $46,580,358, represents an in-kind contribution from the DNC to the Primary Committee. It is also recommended that it be determined that this in-kind contribution is attributable to the Primary Committee's spending limitation.

Should the Commission's analysis of the facts, interpretation of applicable law, and conclusions be different from that presented above, the amount to be added to Primary Committee' spending limitation could be changed or eliminated.