# PLAINTIFFS' EXHIBIT 132

February 1, 2006

**By Electronic Mail**

Mr. Brad C. Deutsch
Assistant General Counsel
Federal Election Commission
999 E Street, NW
Washington, DC 20463

Re:    **Supplemental Comments on Notice 2005–28: Coordinated
        Communications**

Dear Mr. Deutsch:

During Mr. Noble's testimony on January 26, 2006 at the hearing in this rulemaking, Commissioner Mason raised two matters to which we believe a response is in order. We ask that the Commission include these supplemental comments in the record of this proceeding.

**1. Ads outside the 120 day period.** In Appendices to our principal comments, we submitted a total of 236 discrete ad scripts that were aired outside both the 120-day pre-primary election and the 120-day pre-general election time periods in the 2000, 2004 and 2006 election cycles.[1]

Our principal point in submitting these ads was to respond to the question raised by the D.C. Circuit Court of Appeals in the *Shays* litigation as to whether "campaign-related advocacy" is limited "to the four months surrounding elections, or does substantial election-oriented advertising occur outside that window?" *Shays v. FEC,* 414 F.3d 76, 102 (D.C. Cir. 2005). The ads contained in the Appendices plainly show that substantial "campaign-related advocacy" by candidates, parties and outside groups occurs more than 120 days prior to both primary and general elections.[2]

---

[1]    Certain ad scripts were English and Spanish versions of the same ad. We count those as one ad.

[2]    This point is reinforced by an article earlier this week in *Roll Call,* which discusses a new ad campaign launched this week by Club for Growth in relation to the 2006 Rhode Island Senate primary, which will be held on September 12, 2006 – more than seven months from now. The article states that CFG "launched its first television ad supporting Cranston Mayor Stephen Laffey's bid to unseat Sen. Lincoln Chafee (R-R.I.) in September's GOP primary." The article also states that, in addition to the Club for Growth ad, "Laffey began airing ads for the GOP primary fight last September. And the National Republican Senatorial Committee has aired ads attacking Laffey." *See*

2

Commissioner Mason questioned Mr. Noble about whether certain ads in our Appendices fell into the 120-day *pre-convention* period also encompassed in the content standard of the Commission's coordination rule, 11 C.F.R. § 109.21(c)(4)(ii).

The 120-day pre-convention time frame in the rule has no effect on four of the six Appendices submitted with our comments: the two Appendices containing ads prior to the 120-day pre-primary period in the 2000 and 2004 presidential campaigns (Appendices I and III), and the two Appendices containing ads relating to the 2004 and 2006 congressional campaigns (Appendices V and VI). (Congressional campaign ads are not subject to the presidential nominating convention time frame.) There are a total of 136 ads in these four Appendices.

The ads contained in Appendices II and IV were run in the period after the presidential primary elections in 2000 and 2004, and before the beginning of the 120-day pre-general election period. When these ads were run, the nomination contests had been decided in both parties, and the presumptive nominees were known. It is clear from the content of the ads and their context, that these ads were intended to influence the *general election*, not the nomination process.

Thus, for instance, MoveOn PAC ran an ad on April 27, 2004 (App. IV-77) that compared the military services of John Kerry and President Bush, and ended with the conclusion, "This election is about character. It's between John Kerry, who left no man behind, and George Bush, who simply left." We think it is obvious that the ad is aimed at influencing the general election, not the Republican or Democratic nominating process.

The same is true of the ads run by the candidates themselves. An ad by the Bush campaign, for instance, aired on April 26, 2004 (App. IV-82), talks only of John Kerry's record on national security, which it calls "troubling." Conversely, an ad by the Kerry campaign, aired on May 13, 2004 (App. IV-60), said that "George Bush is taking America in the wrong direction" and "we can defeat George Bush, but to do it, your voice needs to be heard."

Given that these ads were sponsored by a candidate who was the presumptive party nominee at the time the ad was run, and given that the ads criticized the presumptive nominee of the other party, the only logical conclusion is that the ads were for the purpose of influencing the general election, not the nomination.

Thus, the ads in Appendices II and IV all stand for the proposition that "campaign-related advocacy" takes place more than 120 days prior to the election that the ads were aimed at. This is responsive to the Court's question as to whether "substantial election-

---

Apps. VI-16, VI-18, VI-20. We attach a copy of the *Roll Call* article, dated January 30, 2006. Thus, in this one race, a candidate, a party committee and an outside group have all run ads well outside the 120-day pre-primary period – in the candidate's case, a year before the primary.

3

related communication occur[s] outside" the 120-day pre-election window. We continue to believe the ads in these two Appendices have a high probative value to the Court's inquiry.

Nonetheless, we do also want to be responsive to Commissioner Mason's specific question about the effect of the 120-day pre-convention timeframe on the ads in Appendices II and IV.

Applying that rule, 12 of the ads in Appendix II, and 53 of the ads in Appendix IV fall within the pre-convention time frame and are thus covered by the content test in the existing rule.[3] One ad in Appendix II,[4] and 34 ads in Appendix IV,[5] were run after the primary election in at least one state, but prior to the 120 day pre-convention time frame, and are thus not covered by the content test in the existing rule.

Thus, there remain 171 discrete ads in the Appendices attached to our comments which were run outside the 120 day window in the Commission's existing content rule.[6]

**2. "Character, qualifications or fitness."** On a separate matter, Commissioner Mason asked Mr. Noble about the origin of the standard we propose for the content test that should be applied to ads outside the 120-day window as it relates to spenders who are not political committees or section 527 groups. In our comments, we propose that an ad outside the window meet the content test if it "refers to the character or qualifications or fitness for office of a clearly identified candidate...." Comments at 29.

The origin of this test is the NPRM in the Commission's 2002 rulemaking on coordination. In "Alternative C" of the proposed content tests, the Commission proposed a test that a public communication meet the content standard if it "makes express statements about the record or position or views on an issue, *or the character, or the qualifications or fitness for office,* or party affiliation" of a clearly identified candidate. 67 Fed. Reg. at 60065 (Alternative C) (Sept. 24, 2002) (emphasis added). This, in turn, appears based on a proposal made by the Commission in the 2002 Title II NPRM, where the Commission proposed an

---

[3]    The Commission has never clarified the methodology of how to apply the pre-convention time-frames to ads run in this period. Because the two party conventions are held on different dates, the applicable time frame is different, depending on which convention an ad is attributed to. Since these ads are, in substance, directed to the general election, not the nominating conventions, the methodology to be used is not obvious. For purposes of the count set forth above, we adopted a conservative approach: ads clearly identifying a single presidential candidate were considered to be in connection with the party nominating convention of that candidate, and ads clearly identifying more than one presidential candidate were considered to be in connection with both party conventions, and thus measured by both windows.

[4]    App. II-24.

[5]    Apps. IV-74, IV-77, IV-80, IV-84, IV-86 (2 ads), IV-98, IV-100, IV-102 (7 ads), IV-108, IV-121, IV-123 through IV-154 (17 ads).

[6]    This consists of the 136 ads, discussed above, from Appendices I, III, V and VI, and the 35 ads from Appendices II and IV.

4

exception to the definition of "electioneering communications" for broadcast ads which contain "no reference to the candidate's record, position, statement, *character, qualifications, or fitness for an office* or to an election, candidacy or voting...." 67 Fed. Reg. at 51145 (Alternative 3-B) (Aug. 7, 2002) (emphasis added).

Our proposal in this matter is based in part on these earlier proposals made by the Commission. As we noted in our comments, the Commission characterized this test in the 2002 coordination NPRM as an objective standard that would "focus as much as possible on the face of the public communication" and would "require as little characterization of the meaning or the content of the communication, or inquiry into the subjective effect of the communication on the reader, viewer or listener as possible...." 67 Fed. Reg. at 60049.

We appreciate the opportunity to submit these supplemental comments.

Sincerely,

/s/ Fred Wertheimer                /s/ J. Gerald Hebert              /s/ Lawrence M. Noble

Fred Wertheimer                    J. Gerald Hebert                  Lawrence M. Noble
Democracy 21                       Paul S. Ryan                     Center for Responsive Politics
                                   Campaign Legal Center

Donald J. Simon
Sonosky, Chambers, Sachse
        Endreson & Perry LLP
1425 K Street, NW – Suite 600
Washington, DC 20005

Counsel to Democracy 21

Paul S. Ryan
The Campaign Legal Center
1640 Rhode Island Avenue, NW – Suite 650
Washington, DC 20036

Counsel to the Campaign Legal Center

Copy to:  Each Commissioner
          Lawrence H. Norton, Esq.
          Rosemary Smith, Esq.

78048.1



## Club for Growth Airing Anti-Chafee Ads

January 30, 2006
*By Nicole Duran,*
*Roll Call Staff*

The Club for Growth on Friday launched its first television ad supporting Cranston Mayor Stephen Laffey's bid to unseat Sen. Lincoln Chafee (R-R.I.) in September's GOP primary.

**Related Stories**

Reynolds Confident GOP Will Keep Majority

In a 30-second spot titled "Impossible," the anti-tax, pro-business group proclaimed Laffey the savior of the Ocean State's second-largest city.

"When the City of Cranston faced bankruptcy, some might have thought change was impossible," a narrator intones as the words flash on screen. "Steve Laffey knew better. Leaving a successful business career to become mayor, Laffey demanded a thorough audit, cut costs, took on the special interests and brought the city back."

Later it shows a picture of Laffey and maintains that he can cut "pork barrel" spending in the Senate.

In a radio commercial that began airing Thursday, the club takes aim at Chafee.

"In the U.S. Senate, Lincoln Chafee votes against the Republican Party more often than any other Republican," the minute-long ad called "Bells and Whistles" states. "That's right. Chafee votes with liberal Democrats John Kerry and Hillary Clinton over 60 percent of the time.

"No wonder Chafee publicly proclaimed he didn't even vote to re-elect President Bush."

Then in a trademark Club for Growth complaint, the ad continues: "Chafee voted for higher income taxes and pushed $48 billion in higher government spending. Then Chafee voted to spend $230 million on that 'Bridge to Nowhere' boondoggle up in Alaska. That's amazingly liberal. That's Lincoln Chafee."

A campaign spokesman for Chafee dismissed the ad campaign.

"The main thing here is the Club for Growth is an extremist organization that is trying to impose a litmus test," said the spokesman, Ian Lang. "It's really all about an effort to purify the party and they don't care at all about Rhode Islanders because if they did, they'd try to support Lincoln Chafee."

Both the TV and radio ads will run for 10 days statewide — meaning airtime was bought on Providence stations, which cover the whole state — according to the club, which declined to disclose how much the ads cost.

Laffey began airing ads for the GOP primary fight last September. And the National Republican Senatorial Committee has aired ads attacking Laffey.

Club for Growth Airing Anti-Chafee Ads

Rhode Island Secretary of State Matt Brown, one of two Democrats running for Senate, has aired three separate ads this month. The Democratic frontrunner, former state Attorney General Sheldon Whitehouse, has yet to put ads on TV.

Copyright 2006 © Roll Call Inc. All rights reserved.

# PLAINTIFFS' EXHIBIT 133

13306

# Proposed Rules

Federal Register

Vol. 71, No. 50

Wednesday, March 15, 2006

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## FEDERAL ELECTION COMMISSION

**11 CFR Part 109**

[Notice 2006–5]

**Coordinated Communications**

**AGENCY:** Federal Election Commission.

**ACTION:** Supplemental notice of proposed rulemaking; re-opening of comment period.

**SUMMARY:** The Federal Election Commission is making public data related to its ongoing rulemaking regarding coordinated communications and is re-opening the public comment period for the Notice of Proposed Rulemaking ("NPRM") published on December 14, 2005. The Commission requests additional comments on alternatives presented in the NPRM in light of data regarding the timing of campaign advertising in recent elections. No final decision has been made by the Commission on the issues presented in this rulemaking. Further information is provided in the supplementary information that follows.

**DATES:** Comments must be received on or before March 22, 2006.

**ADDRESSES:** All comments must be in writing, must be addressed to Mr. Brad C. Deutsch, Assistant General Counsel, and must be submitted in either e-mail, facsimile, or paper copy form. Commenters are strongly encouraged to submit comments by e-mail or fax to ensure timely receipt and consideration. E-mail comments must be sent to either *coordination@fec.gov* or submitted through the Federal eRegulations Portal at *http://www.regulations.gov*. If e-mail comments include an attachment, the attachment must be in either Adobe Acrobat (.pdf) or Microsoft Word (.doc) format. Faxed comments must be sent to (202) 219–3923, with paper copy follow-up. Paper comments and paper copy follow-up of faxed comments must be sent to the Federal Election Commission, 999 E Street, NW., Washington, DC 20463. All comments must include the full name and postal service address of the commenter or they will not be considered. The Commission will post comments on its Web site after the comment period ends.

**FOR FURTHER INFORMATION CONTACT:** Mr. Brad C. Deutsch, Assistant General Counsel, Mr. Ron B. Katwan or Ms. Esa L. Sferra, Attorneys, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** On December 14, 2005, the Commission published a Notice of Proposed Rulemaking ("NPRM") proposing to amend its current rules at 11 CFR 109.21 that set forth a three-prong test for determining whether a communication is a coordinated communication, and therefore an in-kind contribution to a candidate, a candidate's authorized committee, or a political party committee. 70 FR 73946 (Dec. 14, 2005). The NPRM proposed seven different alternatives for revising the content prong of the coordinated communications test in response to the decisions in *Shays* v. *FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004) ("*Shays District*"), *aff'd*, *Shays* v. *FEC*, 414 F.3d 76 (D.C. Cir. 2005) ("*Shays Appeal*") (pet. for reh'g en banc denied Oct. 21, 2005) (No. 04–5352). In *Shays Appeal*, the Court of Appeals invalidated one aspect of the content prong—the 120-day time frame—because the court believed that the Commission had not provided an adequate explanation and justification under the Administrative Procedure Act. *Shays Appeal* at 100. The Court of Appeals emphasized that justifying the 120-day time frame (or any other time frame) requires the Commission to undertake a factual inquiry to determine the appropriate time frame regarding "election-related advocacy." *Id.* at 102.

The Court of Appeals ordered the Commission to consider carefully certain questions in promulgating new rules, including: "Do candidates in fact limit campaign-related advocacy to the four months surrounding elections, or does substantial election-related communication occur outside that window? Do congressional, senatorial, and presidential races—all covered by this rule—occur on the same cycle, or should different rules apply to each?" *Shays Appeal*, 414 F.3d at 102.

In the NPRM, the Commission specifically requested that commenters submit empirical data showing the time period before an election during which campaign communications generally occur. NPRM at 73949. None of the commenters on this rulemaking provided empirical data in response to the Commission's request. One joint comment did provide, however, a compilation of selected campaign advertisements run before certain elections that took place during several recent election cycles.

The Commission held a public hearing on this rulemaking on January 25–26, 2006, at which eighteen commenters testified. At the close of the hearings, the Commission still had not received any empirical data regarding the timing of campaign advertisements.

Therefore, the Commission is issuing this Supplemental Notice of Proposed Rulemaking ("SNPRM") to invite comment on data that the Commission has now licensed from TNS Media Intelligence/CMAG. These data, which can be accessed from the Commission's Web site at *http://www.fec.gov/law/law_rulemakings.shtml#coordinated*, provide information regarding television advertising spots run by Presidential, Senate, and House candidates during the 2004 election cycle. The Commission has also provided graphical representations of these data, which are also available at this Web site address.

This SNPRM also re-opens the comment period for this rulemaking. The Commission seeks additional comment, in light of the information presented by these data, on the issues and questions raised in the NPRM regarding the content prong time frame. See NPRM at 73948–52. Comments are due on or before March 22, 2006.

Dated: March 8, 2006.

**Michael E. Toner,**

*Chairman, Federal Election Commission.*

[FR Doc. 06–2551 Filed 3–14–06; 8:45 am]

**BILLING CODE 6715–01–P**

---

## FEDERAL HOUSING FINANCE BOARD

**12 CFR Parts 900, 917, 925, 930, 931 and 934**

[No. 2006–03]

**RIN 3069–AB30**

**Excess Stock Restrictions and Retained Earnings Requirements for the Federal Home Loan Banks**

**AGENCY:** Federal Housing Finance Board.

# PLAINTIFFS' EXHIBIT 134

# P1 - Total Number of Media Spots Airing During Entire Presidential Election Cycle – Democratic Party Presidential Candidates



**Number of Media Spots**

**Days Before General Election**

**Day Zero is 11/2/2004, the 2004 General Election Date**

**Rep Nat'l Conv 8/30-9/2 (-64 to -61)**

**Dem Nat'l Conv 7/26-7/29 (-99 to -96)**

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem

# P2 - Total Estimated Cost of Media Spots Airing During Entire Presidential Election Cycle – Democratic Party Presidential Candidates



**Estimated Cost of Media Spots (in dollars)**

**Days Before General Election**

| Dem Nat'l Conv 7/26-7/29 (-99 to -96) | Rep Nat'l Conv 8/30-9/2 (-64 to -61) | Day Zero is 11/2/2004, the 2004 General Election Date |

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem

# P3 - Total Number of Media Spots Airing During Entire Presidential Election Cycle – Republican Party Presidential Candidates



**Number of Media Spots**

**Days Before General Election**

| Day Zero is 11/2/2004, the 2004 General Election Date |
|---|

| Rep Nat'l Conv 8/30-9/2 (-64 to -61) | Dem Nat'l Conv 7/26-7/29 (-99 to -96) |
|---|---|

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem



**P4 - Total Estimated Cost of Media Spots Airing During Entire Presidential Election Cycle – Republican Party Presidential Candidates**

Estimated Cost of Media Spots (in dollars)

Days Before General Election

| Dem Nat'l Conv. 7/26-7/29 (-99 to -96) | Rep Nat'l Conv 8/30-9/2 (-64 to -61) | Day Zero is 11/2/2004, the 2004 General Election Date |

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem

P5 - Total Number of Media Spots Airing During Entire Presidential Election Cycle – Other Party Presidential Candidate

# P6 - Total Estimated Cost of Media Spots Airing During Entire Presidential Election Cycle – Other Party Presidential Candidates



**Estimated Cost of Media Spots (in dollars)**

14K, 12K, 10K, 8K, 6K, 4K, 2K, 0K

**Days Before General Election**

0, -30, -60, -90, -120

Day Zero is 11/2/2004, the 2004 General Election Date

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep,
6/6 (-149) HI-Rep,
PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep,
UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep,
ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep,
MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem,
VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS,
TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem,
GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem,
UT-Dem
2/28 (-248) AS-Rep,
VI-Rep
3/2 (-245) CA, CT, GA, MD, MA,
MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem,
DE-Dem, MO, NM-Dem,
ND, OK, SC-Dem



P7 - Number of Media Spots Airing On or Before Presidential Primary / Caucus / Convention in All Media Markets Fully Contained within a Single "Battleground" State*

**Number of Media Spots**

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 50.25% |
| 0 - 60 | 78.87% |
| 0 - 90 | 87.46% |
| 0 - 120 | 91.56% |
| 0 - 150 | 96.67% |
| 0 - 180 | 98.58% |

Total Count:    45,474

Day Zero is all Primary/Caucus/Convention Dates

Days Before Primary/Caucus/Convention

* The Media Markets fully contained within a single "Battleground" State are:  Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

## P8 - Estimated Cost of Media Spots Airing On or Before Presidential Primary / Caucus / Convention in All Media Markets Fully Contained within a Single "Battleground" State*





**Estimated Cost of Media Spots (in dollars)**

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 52.63% |
| 0 - 60 | 85.15% |
| 0 - 90 | 93.38% |
| 0 - 120 | 95.11% |
| 0 - 150 | 98.24% |
| 0 - 180 | 99.64% |
| Total Cost: | $16,411,945.00 |

Day Zero is all Primary/Caucus/Convention Dates

**Days Before Primary/Caucus/Convention**

* The Media Markets fully contained within a single "Battleground" State are:  Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

# P9 - Number of Media Spots Airing On or Before Presidential General Election in All Media Markets Fully Contained within a Single "Battleground" State*



| Days to Election | Percentage |
|---|---|
| 0 - 30 | 32.35% |
| 0 - 60 | 51.91% |
| 0 - 90 | 58.95% |
| 0 - 120 | 69.33% |
| 0 - 150 | 76.83% |
| 0 - 180 | 84.92% |
| 0 - 210 | 93.64% |
| 0 - 240 | 99.93% |

Total Count: 204,688

**Number of Media Spots**

**Days Before General Election**

Day Zero is 11/2/2004, the 2004 General Election Date

| Dem Nat'l Conv 7/26-7/29 (-99 to -96) | Rep Nat'l Conv 8/30-9/2 (-64 to -61) |

* The Media Markets fully contained within a single "Battleground" State are: Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

| Primary/Caucus/Conv. 294 to 271 Days Before General Election 1/19 (-288) IA 2/3 (-273) AZ-Dem | Primary/Caucus/Conv. 270 to 241 Days Before General Election 2/7 (-269) MI-Dem, WA-Dem 2/17 (-259) WI 3/2 (-245) OH | Primary/Caucus/Conv. 240 to 211 Days Before General Election 3/9 (-238) FL, WA-Rep | Primary/Caucus/Conv. 210 to 181 Days Before General Election 4/13 (-203) CO 4/27 (-189) PA 5/1 (-185) NV-Rep | Primary/Caucus/Conv. 180 to 151 Days Before General Election 5/8 (-178) AZ-Rep 5/18 (-168) AR 5/22 (-164) MI-Rep |

# P10 - Estimated Cost of Media Spots Airing On or Before Presidential General Election in All Media Markets Fully Contained within a Single "Battleground" State*



* The Media Markets fully contained within a single "Battleground" State are: Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

## PRESIDENTIAL GRAPHS – NOTES

### Election Cycle Graphs

- The general election date, 11/2/04, is represented on the x-axis as day "0".
- Any data for media spots paid for by a Presidential candidate on the general election ballot that aired on or before the general election are represented on the graphs. The data for each such media spot appears on the graphs in relation to the general election date (day "0").
- The dates of each primary/caucus/convention are listed below each graph. These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted. The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.

### Media Markets Fully Contained within a Single "Battleground" State Graphs

- The TNS Media Intelligence/CMAG ("CMAG") data lists a "Media Market" for each media spot paid for by a Presidential candidate.
- CMAG Media Markets correspond to *Nielsen Media Group* Designated Market Areas ("DMAs"), *available at* www.nielsenmeida.com/DMAs.html.
- Many DMAs extend into multiple States. The CMAG data for media spots in these DMAs do not specify which State's primary/caucus/convention is relevant for any given media spot.
- In order to isolate data geographically limited to "Battleground" States, a list of DMAs contained within a single State was compared against a list of the "Battleground" States in the 2004 Presidential election, resulting in a list of 23 single-State DMAs in 11 "Battleground" States. The relevant primary/caucus/convention for any media spots paid for by a Presidential candidate in any of these single-State DMAs is assumed to be the primary/caucus/convention of the single State within that DMA.
- 49% of the total number of media spots in the CMAG data, and 54% of the total estimated cost, paid for by Presidential candidates are represented on the Media Markets Fully Contained within a Single "Battleground" State graphs.

Primary/Caucus/Convention Graphs

- Because primaries/caucuses/conventions are held on several different dates, in order to compare media spots aired before each primary/caucus/convention, the primary/caucus/convention date in each of the 11 "Battleground" States is represented on the x-axis as day "0".

- For example, the Ohio primary was held on 3/2/04 and the Pennsylvania primary was held on 4/27/04. Both of these primaries are represented as day "0" on the graph. Accordingly, a media spot that aired in Ohio on 2/21/04 (10 days before the Ohio primary) would be represented on the graph at day "–10". Similarly, a media spot that aired in Pennsylvania on 4/17/04 (10 days before the Pennsylvania primary) would also appear on the graph at day "–10".

- Every Democratic Party and Republican Party Presidential candidate was assumed to be on the candidate list for every Presidential caucus and Presidential convention.

- Any data for media spots paid for by a Presidential candidate on a primary ballot (or assumed to be on a caucus/convention candidate list) that aired in a Media Market that is fully contained within a single "Battleground" State on or before that primary/caucus/convention date are represented on the graphs. The data for each such media spot appears on the graphs in relation to that primary/caucus/convention date (day "0").

- Any data for media spots paid for by "Other" Party Presidential candidates are not represented on the graphs.

General Election Graphs

- The general election date, 11/2/04, is represented on the x-axis as day "0".

- Any data for media spots paid for by a Presidential candidate on a general election ballot that aired in a Media Market that is fully contained within a single "Battleground" State on or before the general election date, but after that candidate's primary/caucus/convention dates, are represented on the graphs. The data for each such media spot appears on the graphs in relation to the general election date (day "0").

- The dates of each primary/caucus/convention in the 11 "Battleground" States are listed below each graph. These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted. The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.

- Any data for media spots paid for by "Other" Party Presidential candidates are not represented on the graphs.

List of Media Markets Fully Contained within a Single "Battleground" State

| DMA | State |
|-----|-------|
| Phoenix | AZ |
| Tucson | AZ |
| Little Rock | AR |
| Colorado Spring | CO |
| Ft. Myers | FL |
| Miami | FL |
| Orlando | FL |
| Tampa | FL |

| DMA | State |
|-----|-------|
| West Palm Beach | FL |
| Cedar Rapids | IA |
| Des Moines | IA |
| Detroit | MI |
| Flint | MI |
| Grand Rapids | MI |
| Las Vegas | NV |
| Cleveland | OH |

| DMA | State |
|-----|-------|
| Columbus | OH |
| Harrisburg | PA |
| Johnstown | PA |
| Wilkes-Barre | PA |
| Seattle | WA |
| Madison | WI |
| Milwaukee | WI |

Presidential Graphs – Notes
Page 4 of 6

List of DMAs Contained Within a Single State

- A list of DMAs that are fully-contained within a single State was determined from *Warren Communications News, Inc.* at http://warren.365media.com/warren/Searchasp?d=155.
- **Note.** Although the CMAG data lists Manchester, NH, as a separate Media Market (television station WMUR), *Nielsen Media Group* does not have a Manchester DMA; WMUR is in the Boston DMA.

| | DMA | States with counties within DMA |
|---|---|---|
| 1 | Albany, NY | MA, NY, VT |
| 2 | Albuquerque, NM | AZ, CO, NM |
| 3 | Atlanta, GA | AL, GA |
| 4 | **Austin, TX** | **TX** |
| 5 | Baltimore, MD | MD |
| 6 | Baton Rouge, LA | LA, MS |
| 7 | **Birmingham, AL** | **AL** |
| 8 | Boston, MA | MA, NH, VT |
| 9 | Buffalo, NY | NY, PA |
| 10 | Burlington, VT | NH, NY, VT |
| 11 | Cedar Rapids, IA | IA |
| 12 | **Champaign, IL** | **IL** |
| 13 | Charleston, WV | KY, OH, WV |
| 15 | Charlotte, NC | NC, SC, VA |
| 16 | Chattanooga, TN | GA, NC, TN |
| 17 | Chicago, IL | IL, IN |
| 18 | Cincinnati, OH | IN, KY, OH |
| 19 | **Cleveland, OH** | **OH** |
| 20 | **Colorado Springs, CO** | **CO** |
| 21 | **Columbia, SC** | **SC** |
| 22 | **Columbus, OH** | **OH** |
| 23 | **Dallas, TX** | **TX** |
| 24 | Davenport, IA | IL, IA |
| 25 | Dayton, OH | IN, OH |

| | DMA | States with counties within DMA |
|---|---|---|
| 26 | Denver, CO | CO, NE, SD, WY |
| 27 | **Des Moines, IA** | **IA** |
| 28 | **Detroit, MI** | **MI** |
| 29 | El Paso, TX | NM, TX |
| 30 | Evansville, | IL, IN, KY |
| 31 | **Flint, MI** | **MI** |
| 32 | **Fresno, CA** | **CA** |
| 33 | **Ft. Myers, FL** | **FL** |
| 34 | **Grand Rapids, MI** | **MI** |
| 35 | Green Bay, WI | MI, WI |
| 36 | Greensboro, NC | NC, VA |
| 37 | Greenville, SC | GA, NC, SC |
| 38 | **Harrisburg, PA** | **PA** |
| 39 | **Hartford, CT** | **CT** |
| 40 | **Honolulu, HI** | **HI** |
| 41 | **Houston, TX** | **TX** |
| 42 | Huntsville, AL | AL, TN |
| 43 | **Indianapolis, IN** | **IN** |
| 44 | **Jackson, MS** | **MS** |
| 45 | Jacksonville, FL | FL, GA |
| 46 | **Johnstown, PA** | **PA** |
| 47 | Kansas City, KS/MO | KS, MO |
| 48 | Knoxville, TN | KY, TN |
| 49 | **Las Vegas, NV** | **NV** |

| | DMA | States with counties within DMA |
|---|---|---|
| 50 | Lexington, KY | KY |
| 51 | Little Rock, AR | AR |
| 52 | Los Angeles, CA | CA |
| 53 | Louisville, KY | IN, KY |
| 54 | Madison, WI | WI |
| 55 | Memphis, TN | AR, MI, MO, TN |
| 56 | Miami, FL | FL |
| 57 | Milwaukee, WI | WI |
| 58 | Minneapolis, MN | MN, WI |
| 59 | Mobile, AL | AL, FL |
| 60 | Nashville, TN | KY, TN |
| 61 | New Orleans, LA | LA, MS |
| 62 | New York, NY | CT, NJ, NY, PA |
| 63 | Norfolk, VA | NC, VA |
| 64 | Oklahoma City, OK | OK |
| 65 | Omaha, NE | IA, MO, NE |
| 66 | Orlando, FL | FL |
| 67 | Paducah, KY | IL, KY, MO, TN |
| 68 | Philadelphia, PA | DE, NJ, PA |
| 69 | Phoenix, AZ | AZ |
| 70 | Pittsburgh, PA | MD, PA, WV |
| 71 | Portland, ME | ME, NH |
| 72 | Portland, OR | OR, WA |
| 73 | Providence, RI | MA, RI |
| 74 | Raleigh, NC | NC, VA |
| 75 | Richmond, VA | VA |

| | DMA | States with counties within DMA |
|---|---|---|
| 76 | Roanoke, VA | VA |
| 77 | Rochester, NY | NY |
| 78 | Sacramento, CA | CA |
| 79 | Salt Lake City, UT | ID, NV, UT, WY |
| 80 | San Antonio, TX | TX |
| 81 | San Diego, CA | CA |
| 82 | San Francisco, CA | CA |
| 83 | Savannah, GA | GA, SC |
| 84 | Seattle, WA | WA |
| 85 | Shreveport, LA | AR, LA, OK, TX |
| 86 | South Bend, IN | IN, MI |
| 87 | Spokane, WA | ID, MT, OR, WA |
| 88 | Springfield, MO | AR, MO |
| 89 | St. Louis, MO | IL, MO |
| 90 | Syracuse, NY | NY |
| 91 | Tampa, FL | FL |
| 92 | Toledo, OH | MI, OH |
| 93 | Tri-Cities, TN | KY, TN, VA |
| 94 | Tucson, AZ | AZ |
| 95 | Tulsa, OK | KS, OK |
| 96 | Waco, TX | TX |
| 97 | Washington, DC | DC, MD, PA, VA, WV |
| 98 | West Palm Beach, FL | FL |
| 99 | Wichita, KS | KS, NE |
| 100 | Wilkes-Barre, PA | PA |
| 101 | Youngstown, OH | OH, PA |

List of "Battleground" States

- A list of "Battleground" States was determined from the following sources: *Cook Political Report,*
(http://www.cookpolitical.com/column/2004/021704.php); *ABC News/Washington Post*
(http://www.abcnews.go.com/sections/us/WorldNewsTonight/battlegrounds_poll_040422.html); *National Journal*
(http://nationaljournal.com/members/campaign/2004/swingstates/); *Wall Street Journal/Zogby International*
(http://online.wsj.com/public/resources/documents/info-battleground04-print.html).

| "Battleground" States | | |
|---|---|---|
| Arizona | Michigan | Ohio |
| Arkansas | Minnesota | Oregon |
| Colorado | Missouri | Pennsylvania |
| Florida | Nevada | Tennessee |
| Iowa | New Hampshire | Washington |
| Louisiana | New Mexico | West Virginia |
| Maine | North Carolina | Wisconsin |

## 2004 PRESIDENTIAL PRIMARY DATES

Establishing the date for a Presidential Primary, and determining the type of Presidential Primary held, varies from State to State.  This is due to differences in State statutes, party constitutions, party rules and regulations, party by-laws, and delegate selection plans.  In some States, a Caucus and/or Convention may be held instead of a Presidential Primary Election.  Other states may use a combination of both Caucuses and Primaries for delegate selection.  This State-by-State variation should be kept in mind when examining this listing of dates for the 2004 Presidential Primaries.

| STATE | PRIMARY DATE | CAUCUS DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Alabama | 6/1 | | | 154 |
| Alaska | | 3/20 (D) | | 227 |
| | | | 5/21-5/22 (R) | 164 |
| American Samoa[1] | | 3/8 (D) | | 239 |
| | | 2/28 (R) | | 248 |
| Arizona | 2/3 (D) | | | 273 |
| | | 5/8 (R) | | 178 |
| Arkansas | 5/18 | | | 168 |
| California | 3/2 | | | 245 |
| Colorado | | 4/13 | | 203 |
| Connecticut | 3/2 | | | 245 |
| Delaware | 2/3 (D) | | | 273 |
| | | | 5/14-5/15 (R) | 171 |
| D.C. | 1/13 | | | 294 |
| | | 2/10 (R) | | 266 |
| | | 2/14 (D) | | 262 |
| Florida | 3/9 | | | 238 |
| Georgia | 3/2 | | | 245 |
| Guam[1] | | 3/20 (D) | | 227 |
| | | | 2/21 (R) | 255 |
| Hawaii | | 2/24 (D) | | 252 |
| | | | 6/4-6/6 (R) | 149 |
| Idaho | 5/25 | | | 161 |
| | | 2/24 (D) | | 252 |
| Illinois | 3/16 | | | 231 |
| Indiana | 5/4 | | | 182 |
| Iowa | | 1/19 | | 288 |
| Kansas | | 3/13 (D) | | 234 |
| | | | 4/24 (R) | 192 |
| Kentucky | 5/18 | | | 168 |
| Louisiana | 3/9 | | | 238 |
| Maine | | 2/8 (D) | | 268 |
| | | 5/15 (R) | | 171 |
| Maryland | 3/2 | | | 245 |
| Massachusetts | 3/2 | | | 245 |
| Michigan | | 2/7 (D) | | 269 |
| | | 5/21-5/22 (R) | | 164 |
| Minnesota | | 3/2 | | 245 |
| Mississippi | 3/9 | | | 238 |
| Missouri | 2/3 | | | 273 |

| STATE | PRIMARY DATE | CAUCUS DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Montana | 6/8 | | | 147 |
| Nebraska | 5/11 | | | 175 |
| Nevada | | 2/14 (D) | | 262 |
| | | | 4/29-5/1 (R) | 185 |
| New Hampshire | 1/27 | | | 280 |
| New Jersey | 6/8 | | | 147 |
| New Mexico | 6/1 | | | 154 |
| | | 2/3 (D) | | 273 |
| New York | 3/2 | | | 245 |
| North Carolina | | 4/17 (D) | | 199 |
| | | | 5/21-5/23 (R) | 163 |
| North Dakota | | 2/3 | | 273 |
| Ohio | 3/2 | | | 245 |
| Oklahoma | 2/3 | | | 273 |
| Oregon | 5/18 | | | 168 |
| Pennsylvania | 4/27 | | | 189 |
| Puerto Rico [1] | | 6/6 (D) | | 149 |
| Rhode Island | 3/2 | | | 245 |
| South Carolina | 2/3 (D) | | | 273 |
| | | | 3/27 (R) | 220 |
| South Dakota | 6/1 | | | 154 |
| Tennessee | 2/10 | | | 266 |
| Texas | 3/9 | | | 238 |
| Utah [2] | 2/24 (D) | | | 252 |
| | | | 5/8 (R) | 178 |
| Vermont | 3/2 | | | 245 |
| Virginia | 2/10 (D) | | | 266 |
| | | | 6/5 (R) | 150 |
| Virgin Islands [1] | | 4/17 (D) | | 199 |
| | | 2/28 (R) | | 248 |
| Washington | | 2/7 (D) | | 269 |
| | | 3/9 (R) | | 238 |
| West Virginia | 5/11 | | | 175 |
| Wisconsin | 2/17 | | | 259 |
| Wyoming | | 3/20 (D) | | 227 |
| | | | 5/8 (R) | 178 |

Notes:
1. Presidential General Elections are not held in American Samoa, Guam, Puerto Rico and the Virgin Islands.
2. In Utah, whether a Presidential Primary Election is held is dependent upon funding by the legislature, which did not occur for 2004. Consequently, the Utah State Democratic Party scheduled a party-run Presidential preference primary for 2/24/04.



S1 - Total Number of Media Spots Airing On or Before Senate Primary/Caucus/Convention

Number of Media Spots

Days Before Primary/Caucus/Convention

Day Zero is all Primary/Caucus/Convention Dates

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 69.01% |
| 0 - 60 | 91.60% |
| 0 - 90 | 99.13% |
| 0 - 120 | 99.47% |
| 0 - 150 | 99.95% |
| 0 - 180 | 100.00% |
| | |
| Total Count: | 89,096 |



S2 - Total Estimated Cost of Media Spots Airing On or Before Senate Primary Election/Caucus/Convention

Estimated Cost of Media Spots (in dollars)

Days Before Primary/Caucus/Convention

Day Zero is all Primary/Caucus/Convention Dates

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 75.19% |
| 0 - 60 | 93.32% |
| 0 - 90 | 99.34% |
| 0 - 120 | 99.55% |
| 0 - 150 | 99.95% |
| 0 - 180 | 100.00% |

Total Cost:     $47,303,049



# S3 - Total Number of Media Spots Airing On or Before Senate General Election

**Number of Media Spots**

**Days Before General Election**

Day Zero is 11/2/2004, the 2004 General Election Date

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 69.87% |
| 0 - 60 | 94.73% |
| 0 - 90 | 99.61% |
| 0 - 120 | 99.72% |
| 0 - 150 | 99.73% |
| 0 - 180 | 100.00% |

**Total Count:** 149,310

**Primary/Caucus/Conv. 60 to 31 Days Before General Election**
9/4 (-59) GU
9/7 (-56) AZ, NV
9/11 (-52) DE, VI
9/14 (-49) DC, MA MN, NH, NY, RI, VT, WA, WI
9/18 (-45) HI

**Primary/Caucus/Conv 90 to 61 Days Before General Election**
8/5 (-89) TN
8/10 (-84) CO, CT
8/17 (-77) WY
8/24 (-70) AK
8/31 (-63) FL

**Primary/Caucus/Conv. 120 to 91 Days Before General Election**
7/20 (-105) GA, NC
7/27 (-98) OK
8/3 (-91) KS, MI, MO

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) MI-Other
6/8 (-147) IA, ME, MT, NJ, ND, SC, VA
6/22 (-133) UT

**Primary/Caucus/Conv. 181+ Days Before General Election**
11/9/03 (-359) PR
3/6 (-241) KS-Other
3/13 (-234) TX-Other
3/16 (-231) IL
4/17 (-199) MI-Other, UT-Other
4/27 (-189) PA
5/2 (-184) SSC-Other
3/2 (-245) CA, MD, OH
3/9 (-238) MS, TX
3/14 (-233) UT-Other
3/20 (-227) TX-Other
4/24 (-173) IN-Other, SC-Other
5/1 (-185) WV-Other
5/4 (-182) IN

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/6 (-180) SC-Other
5/8 (-178) CT, UT, VA-Dem
5/10 (-176) CT
5/11 (-175) NE, WV
5/15 (-171) CT-Rep, KS-Other, VA
5/18 (-168) AR, KY, OR
5/22 (-164) CT-Rep, UT-Other, VA
5/23 (-163) MI-Other
5/24 (-162) CT-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD



## S4 - Total Estimated Cost of Media Spots Airing On or Before Senate General Election

**Estimated Cost of Media Spots (in dollars)**

Day Zero is 11/2/2004, the 2004 General Election Date

**Days Before General Election**

| Days to Election | Percentage |
| --- | --- |
| 0 - 30 | 74.47% |
| 0 - 60 | 97.20% |
| 0 - 90 | 99.85% |
| 0 - 120 | 99.91% |
| 0 - 150 | 99.91% |
| 0 - 180 | 100.00% |
| **Total Cost:** | **$106,454,740** |

**Primary/Caucus/Conv. 60 to 31 Days Before General Election**
9/4 (-59) GU
9/7 (-56) AZ, NV
9/11 (-52) DE, VI
9/14 (-49) DC, MA
MN, NH, NY, RI,
VT, WA, WI
9/18 (-45) HI

**Primary/Caucus/Conv. 90 to 61 Days Before General Election**
8/5 (-89) TN
8/10 (-84) CO, CT
8/17 (-77) WY
8/24 (-70) AK
8/31 (-63) FL

**Primary/Caucus/Conv. 120 to 91 Days Before General Election**
7/20 (-105) GA, NC
7/27 (-98) OK
8/3 (-91) KS, MI, MO

**Primary/Caucus/Conv. 181+ Days Before General Election**
11/9/03 (-359) PR
3/2 (-245) CA, MD, OH
3/6 (-241) KS-Other
3/9 (-238) MS, TX
3/13 (-234) TX-Other
3/14 (-233) UT-Other
3/16 (-231) IL
3/20 (-227) TX-Other
4/17 (-199) MI-Other, UT-Other
4/24 (-173) IN-Other, SC-Other
4/27 (-189) PA
5/1 (-185) WV-Other
5/2 (-184) SSC-Other
5/4 (-182) IN

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) MI-Other
6/8 (-147) IA, ME, MT,
NJ, ND, SC, VA
6/22 (-133) UT

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/6 (-180) SC-Other
5/8 (-178) CT, UT, VA-Dem
5/10 (-176) CT
5/11 (-175) NE, WV
5/15 (-171) CT-Rep,
KS-Other, VA
5/18 (-168) AR, KY, OR
5/22 (-164) CT-Rep,
UT-Other, VA
5/23 (-163) MI-Other
5/24 (-162) CT-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

## SENATE GRAPHS – NOTES

### Primary/Caucus/Convention Graphs

- Because primaries/caucuses/conventions are held on several different dates, in order to compare media spots aired before each primary/caucus/convention, the primary/caucus/convention date is represented on the x-axis as day "0".
- For example, the Ohio primary was held on 3/2/04 and the Pennsylvania primary was held on 4/27/04.  Both of these primaries are represented as day "0" on the graph.  Accordingly, a media spot that aired in Ohio on 2/21/04 (10 days before the Ohio primary) would be represented on the graph at day "– 10".  Similarly, a media spot that aired in Pennsylvania on 4/17/04 (10 days before the Pennsylvania primary) would also appear on the graph at day "–10".
- Any data for media spots paid for by a Senate candidate on a primary ballot, or caucus/convention candidate list, that aired on or before that primary/caucus/convention date are represented on the graphs.  The data for each such media spot appear on the graphs in relation to that primary/caucus/convention date (day "0").
- Any candidate identified both as either a Democratic or Republican Party candidate *and* as an Other party candidate was treated as only a Democratic or Republican Party candidate with respect to primaries/caucuses/conventions.

### General Election Graphs

- The general election date, 11/2/04, is represented on the x-axis as day "0".
- Any data for media spots paid for by a Senate candidate on the general election ballot that aired on or before the general election date, but after that candidate's primary/caucus/convention date, are represented on the graphs.  The data for each such media spot appear on the graphs in relation to the general election date (day "0").
- The dates of each primary/caucus/convention are listed below each graph.  These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted.  The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.
- Two States held "primary runoff" elections (SC on 6/22/04 and GA on 8/10/04).  Any data regarding media spots aired after these States' primary dates (SC on 6/9/04 and GA on 7/20/04), but before these States' primary "runoff" dates, are not represented on the graphs.

## 2004 CONGRESSIONAL PRIMARY DATES
Note:  **S** Indicates Senate Election

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Alabama | S | 6/1 | | 154 |
| Alaska | S | 8/24 | | 70 |
| American Samoa[1] | | n/a | | |
| Arizona | S | 9/7 | | 56 |
| Arkansas | S | 5/18 | | 168 |
| California | S | 3/2 | | 245 |
| Colorado | S | 8/10 | | 84 |
| Connecticut | S | 8/10 | | 84 |
| | | | 5/10 (D) | 176 |
| | | | 5/10 (R) District 4 | 176 |
| | | | 5/15 (R) Districts 2, 3 | 171 |
| | | | 5/22 (R) District 5 | 164 |
| | | | 5/24 (R) District 1 | 162 |
| Delaware | | 9/11 | | 52 |
| D.C. | | 9/14 | | 49 |
| Florida | S | 8/31 | | 63 |
| Georgia | S | 7/20 | | 105 |
| Guam | | 9/4 | | 59 |
| Hawaii | S | 9/18 | | 45 |
| Idaho | S | 5/25 | | 161 |
| Illinois | S | 3/16 | | 231 |
| Indiana | S | 5/4 | | 182 |
| | | | 4/24 (Other) | 192 |
| Iowa | S | 6/8 | | 147 |
| Kansas | S | 8/3 | | 91 |
| | | | 3/6 (Other) | 241 |
| | | | 5/15 (Other) | 171 |
| Kentucky | S | 5/18 | | 168 |
| Louisiana[2] | S | n/a | | |
| Maine | | 6/8 | | 147 |
| Maryland | S | 3/2 | | 245 |
| Massachusetts | | 9/14 | | 49 |
| Michigan | | 8/3 | | 91 |
| | | | 4/17 (Other) | 199 |
| | | | 5/23 (Other) | 163 |
| | | | 6/5 (Other) | 150 |
| Minnesota | | 9/14 | | 49 |
| Mississippi | | 3/9 | | 238 |
| Missouri | S | 8/3 | | 91 |
| Montana | | 6/8 | | 147 |
| Nebraska | | 5/11 | | 175 |
| Nevada | S | 9/7 | | 56 |
| New Hampshire | S | 9/14 | | 49 |
| New Jersey | | 6/8 | | 147 |

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| New Mexico | | 6/1 | | 157 |
| New York | S | 9/14 | | 49 |
| North Carolina | S | 7/20 | | 105 |
| North Dakota | S | 6/8 | | 147 |
| Ohio | S | 3/2 | | 245 |
| Oklahoma | S | 7/27 | | 98 |
| Oregon | S | 5/18 | | 168 |
| Pennsylvania | S | 4/27 | | 189 |
| Puerto Rico | | 11/9/03 | | 359 |
| Rhode Island | | 9/14 | | 49 |
| South Carolina | S | 6/8 | | 147 |
| | | | 4/24 (Other) | 192 |
| | | | 5/6 (Other) | 180 |
| South Dakota | S | 6/1 | | 154 |
| Tennessee | | 8/5 | | 89 |
| Texas | | 3/9 | | 238 |
| | | | 3/13 (Other) Districts 7, 16, 18, 20, 29, 30, 32 | 234 |
| | | | 3/20 (Other) All Remaining Districts | 227 |
| Utah [3] | S | 6/22 | | 133 |
| | | | 5/8 (D),  (R) | 178 |
| | | | 5/22 (Other) | 164 |
| | | | 3/14 (Other) | 233 |
| | | | 4/17 (Other) | 199 |
| Vermont | S | 9/14 | | 49 |
| Virginia [4] | | 6/8 | | 147 |
| | | | 5/8 (D) District 5 | 178 |
| | | | 5/15 (D) Districts 1, 6, 7, 9, 10 | 171 |
| | | | 5/15 (R) Districts 3, 8 | 171 |
| | | | 5/22 (D) District 4 | 164 |
| | | | 5/22 (R) District 9 | 164 |
| Virgin Islands | | 9/11 | | 52 |
| Washington | S | 9/14 | | 49 |
| West Virginia | | 5/11 | | 175 |
| | | | 5/1 (Other) | 185 |
| Wisconsin | S | 9/14 | | 49 |
| Wyoming | | 8/17 | | 77 |

**Notes:**
1. In American Samoa, no Primary Election was held.  A General Election was held on 11/2/04.
2. In Louisiana, no Primary Election was held.  The election for candidates seeking Federal office is the General Election, which was held on 11/2/04.  A General Runoff Election was held on 12/4/04.
3. In Utah, nominating Conventions are held by the parties prior to the Primary.
4. In Virginia, parties may choose to nominate candidates by Convention rather than by Primary.



H1 - Total Number of Media Spots Airing On or Before House Primary/Caucus/Convention

Number of Media Spots

Days Before Primary/Caucus/Convention

Day Zero is all Primary/Caucus/Convention Dates

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 80.21% |
| 0 - 60 | 88.16% |
| 0 - 90 | 91.44% |
| 0 - 120 | 97.26% |
| 0 - 150 | 98.92% |
| 0 - 180 | 99.06% |
| Total Count: | 35,205 |



## H2 - Total Estimated Cost of Media Spots Airing On or Before House Primary/Caucus/Convention

Estimated Cost of Media Spots (in dollars)

Days Before Primary/Caucus/Convention

Day Zero is all Primary/Caucus/Convention Dates

| Days To Election | Percentage |
|---|---|
| 0 - 30 | 84.65% |
| 0 - 60 | 92.68% |
| 0 - 90 | 96.21% |
| 0 - 120 | 99.00% |
| 0 - 150 | 99.58% |
| 0 - 180 | 99.66% |
| Total Cost: | $17,253,099 |



## H3 - Total Number of Media Spots Airing On or Before House General Election

**Number of Media Spots**

**Days Before General Election**

Day Zero is 11/2/2004, the 2004 General Election Date

| Days To Election | Percentage |
| --- | --- |
| 0 - 30 | 77.77% |
| 0 - 60 | 98.09% |
| 0 - 90 | 99.72% |
| 0 - 120 | 99.84% |
| 0 - 150 | 99.96% |
| 0 - 180 | 99.98% |

Total Count:    131,665

**Primary/Caucus/Conv. 60 to 31 Days Before General Election**
9/4 (-59) GU
9/7 (-56) AZ, NV
9/11 (-52) DE, VI
9/14 (-49) DC, MA
MN, NH, NY, RI, VT, WA, WI
9/18 (-45) HI

**Primary/Caucus/Conv 90 to 61 Days Before General Election**
8/5 (-89) TN
8/10 (-84) CO, CT
8/17 (-77) WY
8/24 (-70) AK
8/31 (-63) FL

**Primary/Caucus/Conv. 120 to 91 Days Before General Election**
7/20 (-105) GA, NC
7/27 (-98) OK
8/3 (-91) KS, MI, MO

**Primary/Caucus/Conv. 181+ Days Before General Election**
11/9/03 (-359) PR
3/2 (-245) CA, MD, OH
3/6 (-241) KS-Other
3/9 (-238) MS, TX
3/13 (-234) TX-Other
3/14 (-233) UT-Other
3/16 (-231) IL
3/20 (-227) TX-Other
4/17 (-199) MI-Other, UT-Other
4/24 (-173) IN-Other, SC-Other
5/1 (-185) WV-Other
5/2 (-184) SSC-Other
4/27 (-189) PA

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) MI-Other
6/8 (-147) IA, ME, MT, NJ, ND, SC, VA
6/22 (-133) UT

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/6 (-180) SC-Other
5/8 (-178) CT, UT, VA-Dem
5/10 (-176) CT
5/11 (-175) NE, WV
5/15 (-171) CT-Rep, KS-Other, VA
5/18 (-168) AR, KY, OR
5/22 (-164) CT-Rep, UT-Other, VA
5/23 (-163) MI-Other
5/24 (-162) CT-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD



H4 - Total Estimated Cost of Media Spots Airing On or Before House General Election

**HOUSE GRAPHS – NOTES**

**Primary/Caucus/Convention Graphs**

- Because primaries/caucuses/conventions are held on different dates, in order to compare media spots aired before each primary/caucus/convention, the primary/caucus/convention date is represented on the x-axis as day "0".

- For example, the Ohio primary was held on 3/2/04 and the Pennsylvania primary was held on 4/27/04. Both of these primaries are represented as day "0" on the graph. Accordingly, a media spot that aired in Ohio on 2/21/04 (10 days before the Ohio primary) would be represented on the graph at day "–10". Similarly, a media spot that aired in Pennsylvania on 4/17/04 (10 days before the Pennsylvania primary) would also appear on the graph at day "–10".

- Any data for media spots paid for by a House candidate on a primary ballot, or caucus/convention candidate list, that aired on or before that primary/caucus/convention date are represented on the graphs. The data for each such media spot appear on the graphs in relation to that primary/caucus/convention date (day "0").

- "Special elections" were held in five States in 2003 and 2004. Three of these were held before that State's primary (HI, TX, KY) and two were held on the same date as that State's primary (SD, NC). Any data for media spots paid for by candidates on the ballot for these "special elections" appear on the graphs in relation to these States' primary election dates (day "0").

| State | Special Election Date | Primary Election Date | Days Before Primary Election |
|-------|----------------------|----------------------|------------------------------|
| HI    | 1/4/03               | 9/18/04              | 623                          |
| TX    | 5/3/03               | 3/9/04               | 311                          |
|       | 6/3/03               |                      | 280                          |
| KY    | 2/17/04              | 5/18/04              | 91                           |
| SD    | 6/1/04               | 6/1/04               | 0                            |
| NC    | 7/20/04              | 7/20/04              | 0                            |

- Any candidate identified both as either a Democratic or Republican Party candidate *and* as an Other party candidate was treated as only a Democratic or Republican Party candidate with respect to primaries/caucuses/conventions.

**General Election Graphs**

- The general election date, 11/2/04, is represented on the x-axis as day "0".

- Any data for media spots paid for by a House candidate on the general election ballot that aired on or before the general election date, but after that candidate's primary/caucus/convention date, are represented on the graphs. The data for each such media spot appear on the graphs in relation to the general election date (day "0").

- The dates of each primary/caucus/convention are listed below each graph. These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted. The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.

- Primary "runoff" elections were held in four States (TX Dist. 1, 10, 15, 17, 28 on 4/13/04; AL Dist. 5 on 6/29/04; GA Dist. 6, 8 on 8/10/04; NC Dist. 5, 10 on 8/17/04). Any data regarding media spots that aired after these States' primary dates (TX on 3/9; AL on 6/1/04; GA on 7/20/04; NC on 7/20/04) but before these primary "runoff" dates, are not represented on the graphs.

## 2004 CONGRESSIONAL PRIMARY DATES
Note:  **S** Indicates Senate Election

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Alabama | S | 6/1 | | 154 |
| Alaska | S | 8/24 | | 70 |
| American Samoa[1] | | n/a | | |
| Arizona | S | 9/7 | | 56 |
| Arkansas | S | 5/18 | | 168 |
| California | S | 3/2 | | 245 |
| Colorado | S | 8/10 | | 84 |
| Connecticut | S | 8/10 | | 84 |
| | | | 5/10 (D) | 176 |
| | | | 5/10 (R) District 4 | 176 |
| | | | 5/15 (R) Districts 2, 3 | 171 |
| | | | 5/22 (R) District 5 | 164 |
| | | | 5/24 (R) District 1 | 162 |
| Delaware | | 9/11 | | 52 |
| D.C. | | 9/14 | | 49 |
| Florida | S | 8/31 | | 63 |
| Georgia | S | 7/20 | | 105 |
| Guam | | 9/4 | | 59 |
| Hawaii | S | 9/18 | | 45 |
| Idaho | S | 5/25 | | 161 |
| Illinois | S | 3/16 | | 231 |
| Indiana | S | 5/4 | | 182 |
| | | | 4/24 (Other) | 192 |
| Iowa | S | 6/8 | | 147 |
| Kansas | S | 8/3 | | 91 |
| | | | 3/6 (Other) | 241 |
| | | | 5/15 (Other) | 171 |
| Kentucky | S | 5/18 | | 168 |
| Louisiana[2] | S | n/a | | |
| Maine | | 6/8 | | 147 |
| Maryland | S | 3/2 | | 245 |
| Massachusetts | | 9/14 | | 49 |
| Michigan | | 8/3 | | 91 |
| | | | 4/17 (Other) | 199 |
| | | | 5/23 (Other) | 163 |
| | | | 6/5 (Other) | 150 |
| Minnesota | | 9/14 | | 49 |
| Mississippi | | 3/9 | | 238 |
| Missouri | S | 8/3 | | 91 |
| Montana | | 6/8 | | 147 |
| Nebraska | | 5/11 | | 175 |
| Nevada | S | 9/7 | | 56 |
| New Hampshire | S | 9/14 | | 49 |
| New Jersey | | 6/8 | | 147 |

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| New Mexico | | 6/1 | | 157 |
| New York | S | 9/14 | | 49 |
| North Carolina | S | 7/20 | | 105 |
| North Dakota | S | 6/8 | | 147 |
| Ohio | S | 3/2 | | 245 |
| Oklahoma | S | 7/27 | | 98 |
| Oregon | S | 5/18 | | 168 |
| Pennsylvania | S | 4/27 | | 189 |
| Puerto Rico | | 11/9/03 | | 359 |
| Rhode Island | | 9/14 | | 49 |
| South Carolina | S | 6/8 | | 147 |
| | | | 4/24 (Other) | 192 |
| | | | 5/6 (Other) | 180 |
| South Dakota | S | 6/1 | | 154 |
| Tennessee | | 8/5 | | 89 |
| Texas | | 3/9 | | 238 |
| | | | 3/13 (Other) Districts 7, 16, 18, 20, 29, 30, 32 | 234 |
| | | | 3/20 (Other) All Remaining Districts | 227 |
| Utah [3] | S | 6/22 | | 133 |
| | | | 5/8 (D),  (R) | 178 |
| | | | 5/22 (Other) | 164 |
| | | | 3/14 (Other) | 233 |
| | | | 4/17 (Other) | 199 |
| Vermont | S | 9/14 | | 49 |
| Virginia [4] | | 6/8 | | 147 |
| | | | 5/8 (D) District 5 | 178 |
| | | | 5/15 (D) Districts 1, 6, 7, 9, 10 | 171 |
| | | | 5/15 (R) Districts 3, 8 | 171 |
| | | | 5/22 (D) District 4 | 164 |
| | | | 5/22 (R) District 9 | 164 |
| Virgin Islands | | 9/11 | | 52 |
| Washington | S | 9/14 | | 49 |
| West Virginia | | 5/11 | | 175 |
| | | | 5/1 (Other) | 185 |
| Wisconsin | S | 9/14 | | 49 |
| Wyoming | | 8/17 | | 77 |

**Notes:**
1. In American Samoa, no Primary Election was held.  A General Election was held on 11/2/04.
2. In Louisiana, no Primary Election was held.  The election for candidates seeking Federal office is the General Election, which was held on 11/2/04.  A General Runoff Election was held on 12/4/04.
3. In Utah, nominating Conventions are held by the parties prior to the Primary.
4. In Virginia, parties may choose to nominate candidates by Convention rather than by Primary.

# PLAINTIFFS' EXHIBIT 135

March 22, 2006

**By Electronic Mail**

Mr. Brad C. Deutsch
Assistant General Counsel
Federal Election Commission
999 E Street, NW
Washington, DC  20463

Re:     **Comments on Supplemental Notice 2006–5: Coordinated Communications**

Dear Mr. Deutsch:

These supplemental comments are submitted jointly by the Campaign Legal Center, Democracy 21, and the Center for Responsive Politics in response to the Commission's Supplemental Notice of Proposed Rulemaking ("SNPRM") 2006–5, published at 71 Fed. Reg. 13306 (March 15, 2006), which re-opens the comment period in the rulemaking on coordinated communications, and seeks comment on new data which the Commission has introduced into the record of this proceeding.

The Campaign Legal Center, Democracy 21 and the Center for Responsive Politics filed joint comments at the initial stage of this proceeding,[1] and a representative of each organization testified at the public hearing held in this matter.

## I.     Introduction: The Commission's New Data Is Not Responsive to the Central Issue.

The CMAG data entered into the record by the Commission proves only the obvious: that candidates run more campaign ads close in time to election day than temporally distant from it, and that the number of campaign ads run by candidates increases as election day approaches. This should come as a surprise to no one.  We certainly do not dispute the point.[2]

This data is not, however, dispositive of the central issue before the Commission.

---

[1]     *See* Comments of the Campaign Legal Center, Democracy 21, and the Center for Responsive Politics on Notice 2005–28 (January 13, 2006) (with appendices); *available at* http://www.fec.gov/pdf/nprm/coord_commun/coordination_nprm_comments.shtml.

[2]     For instance, at the Commission hearings on this matter, a representative of Democracy 21 testified, "I don't contest the proposition that more money is spent within 120 days than is spent outside 120 days or that more money is spent…within 60 days than between 60 and 120 days….I think that's not the issue." Transcript of Hearing of January 25, 2006 at 71 (Simon testimony).

2

The key problem with the current regulation is neither that it uses a time-frame test for coordination, nor that it uses the 120-day period as the time frame. As our opening comments state, we *support* a time frame test as an element of the coordination rules, and in particular, we support the use of a 120-day period.[3]

Rather, the problem with the current regulation is that, outside the 120 day pre-election window, the only test for coordination is whether an ad contains express advocacy.[4]  Yet as the D.C. Circuit noted, that test is "functionally meaningless," *Shays v. FEC,* 414 F.3d 76, 99 *quoting McConnell v. FEC,* 540 U.S. 93, 193 (2003).  The court said that using the express advocacy test as the standard outside the 120-day window "in effect allow[s] a coordinated communication free-for-all for much of each election cycle."  414 F.3d at 100.[5]

Thus, in our view, the question before the Commission is not whether to keep the 120-day rule or replace it with a different time frame, but whether to *supplement* that standard with some test — but one more robust than the "meaningless" test of express advocacy — that would apply to those non-express advocacy campaign ads that do run outside the 120-day time frame.[6]

In this light, the task before the Commission is to decide whether, as we believe, a supplemental test is necessary, or whether, as the *Shays* court put it, the express advocacy and re-publication tests are "adequate *by themselves* to capture the universe of electorally oriented communication outside the 120-day window."  414 F.3d at 100 (emphasis added).

Further, the Commission has to address the "most important" question raised by the *Shays* court: whether "candidates and collaborators" would "simply shift coordinated spending" to outside the 120 pre-election period if the current rule remains unchanged.  414 F.3d at 102.

Only if there has been a showing that non-express advocacy campaign ads that have been run, or will be run, outside the 120 day time frame are insignificant, could the Commission

---

[3]    Our comments make clear that we support a time frame test for non-"major purpose" spenders, such as corporations, labor unions and individuals. *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 33 ("Our proposed rule incorporates the advantages of the time frame test of the 2002 rule for any person other than a federal political committee...."). However, we urge the Commission to modify the time frame test in order to eliminate the "gap" between the primary election and the beginning of the 120-day pre-general election period. *See id.*

[4]    Re-publication of campaign material also meets the "content" test outside the window.  11 C.F.R. § 109.21(c)(2). For purposes of this discussion, however, we assume that, as a practical matter, express advocacy is the only test outside the 120-day window.

[5]    In the *Christian Coalition* case, Judge Green called the argument that express advocacy should be the content test for the coordination rules to be "untenable," "fanciful," "unpersuasive," "pernicious," and designed to "frustrate both the anti-corruption and disclosure goals of the Act." *FEC v. Christian Coalition,* 52 F. Supp. 2d 45, 87–88 & n.50 (D.D.C. 1999).

[6]    In our earlier comments, for instance, we suggested that the supplemental test should be whether an ad "refers to the character or the qualifications or fitness for office of a clearly identified candidate for federal office." *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 28–31.

3

justify leaving the current content test in place. Both the data we submitted with our earlier comments, and the CMAG data now submitted by the Commission, demonstrate that this showing simply has not been, and cannot be, made.

In addressing these questions, the Commission should keep in mind that the coordination rules have a particularly important role in the campaign finance laws, because they serve to police the integrity of the statutory limits and source prohibitions on contributions, and thus serve the same compelling interests in deterring corruption and the appearance of corruption as are served by the limits and prohibitions on direct contributions.

Spending by a corporation or labor union within 120 days of an election for a non-express advocacy public communication that clearly identifies a federal candidate and is directed to the electorate of that candidate is prohibited only if the ad is "coordinated" with the candidate — *i.e.*, is the product of coordinated conduct — in which case the spending is treated as an in-kind contribution.[7]

But because, under the current regulations, express advocacy is the only content test for coordination outside the 120-day period, then spending for the *same non-express advocacy ad* run more than 120 days before the election would *never* be considered "coordinated" as a matter of law — no matter how coordinated in fact the conduct might be between the corporate or union spender and the candidate, even to the extent of a candidate drafting the text of an ad that plainly promotes and supports his campaign, which a corporate spender then simply funds.

Thus, as a practical matter, the Commission's coordination rule authorizes unlimited *in-kind contributions* to candidates from any source, including corporations and labor unions, in the form of expenditures coordinated in fact with the candidates, so long as the coordinated spending does not involve express advocacy and takes place prior to the 120-day pre-election period.

Although a corporate or union officer could not walk up to a candidate and hand the candidate a check for $100,000 as a contribution, that same corporate or union officer could take an ad script from a candidate that promotes his campaign, and agree to spend $100,000 in soft money to run the ad where and when the candidate directs him to, so long as the spending takes place outside the 120-day period.

Given that the coordination rules thus go to the heart of the campaign finance laws, the question for the Commission is whether a regulation which, in the view of the court, allows a

---

[7]    The same spending is not prohibited if it is done independently of a candidate, because the ban on corporate and union independent expenditures in 2 U.S.C. § 441b applies only to express advocacy communications. *See FEC v. Massachusetts Citizens for Life,* 479 U.S. 238 (1986); 11 C.F.R. § 114.2(a). Thus, for instance, a corporation on the day before the election can pay for a newspaper ad that promotes a federal candidate but does not expressly advocate his election, so long as the ad is developed and run independently of the candidate. But the Commission has never construed section 441b to apply an express advocacy test for <u>coordinated</u> communications, and the courts have rejected that idea. *See* n.5, *supra.* (Note, however, that a non-express advocacy <u>broadcast</u> ad aired within 60 days of an election, even if independent of a candidate, would be subject to the Title II provisions governing an "electioneering communication.")

4

"coordinated communication free-for-all for much of each election cycle," and which authorizes unlimited in-kind soft money contributions to federal candidates in the period more than 120 days before an election, poses a serious threat to the integrity of the statute so as to require modification of the rule by providing *some* standard, other than a "functionally meaningless" one, for coordination outside the 120-day period.

## II.    A Substantial Number of Ads Air Outside the 120–day Period.

The potential danger to the statute described above is not merely a theoretical matter. Campaign ads are in fact aired outside the 120-day period covered by the existing rule.

It is unquestionably true that most campaign ads are run within 120 days of an election. But the Court of Appeals in *Shays* ordered the Commission to consider whether *substantial* election-related communication occurs outside the 120-day window. 414 F.3d at 102. Just because *most* ads are run within 120 days of an election does not mean that the ads running outside of the 120-day period are *insubstantial*, either in the number of such ads or in dollar value. Indeed, the material we submitted for the record with our earlier comments, additional data we submit with these supplementary comments (detailed below), and the new data proffered by the Commission that prompted this SNPRM, all demonstrate that a substantial number of campaign ads are in fact run outside the 120-day window.

Nowhere is this problem more obvious, or more egregious in its impact, than for ads that fall in the "gap" period between the primary election and the beginning of the 120-day pre-general election period. For states with early primary election dates, the "gap" extends from February or March, until July, *of the election year*. To say that ads run by a corporate or union spender that refer to a candidate, and that support or promote the re-election of that candidate (or attack his opponent), may be fully and explicitly coordinated with and controlled by that candidate because they do not contain express advocacy is an invitation to abuse. No less problematic is the converse case — where a late primary is not held until the early fall, so there is no "gap" period, but the 120-day pre-primary period does not begin until May. In those states, a corporate or union spender could fully coordinate with a candidate on non-express advocacy ads that promote his campaign, and run those ads for the first four months *of the election year*. If nothing else, the Commission must address these aggravated consequences in the election year itself of its current, flawed rule.

In our earlier submission, we included more than 170 ads by candidates, parties and outside groups that have actually been aired in recent campaigns in the pre-120 day period. Attached to these comments, as an addendum to **APPENDIX VI** of our January comments, we include the scripts of a thirteen more television and radio ads intended to influence — but running more than 120 days before — the 2006 congressional primary elections.

Even if the number of ads outside the 120-day window is small as a percentage of the overall number of candidate ads in an election cycle, those ads can have significance in a given race, and more importantly, can represent a significant amount of money that is being spent by a corporation, union or wealthy individual to pay for such ads.

5

For instance, as we discussed in our January comments, a section 501(c)(6) corporation made a $500,000 ad buy in Pennsylvania last November — 178 days before the primary election — to run ads that clearly promoted Senator Rick Santorum (R-PA), who is in a closely contested and important 2006 Senate race.[8] Under the Commission's 120-day rule, these ads could have been *fully coordinated* with the Santorum campaign. That would have amounted to a *de facto* $500,000 in-kind corporate contribution to the Santorum campaign that would be lawful under the Commission's current coordination regulation.

So too, as we discuss below, the CMAG data submitted by the Commission shows that substantial campaign advertising does take place outside the 120-day window, and that candidates spend significant sums on such ads.

### III.    The CMAG Data on Ads Airing Prior to the 2004 Presidential Primaries/Caucuses in Battleground States.

According to the Commission's new data, 8.44% of all ads run prior to the 2004 presidential primaries/caucuses in media markets contained within a single battleground state were aired more than 120 days before the primaries/caucuses. *See* Graph P7. This amounts to more than 3,800 ads which, according to the Commission's data on graph P8, were valued at more than $802,544 (4.89% of $16,411,945).

On its own terms, this is a substantial amount of spending outside the 120-day window. But the CMAG data presented by the Commission almost surely understates the spending. By presenting data only for media markets *contained fully within a single battleground state*, the Commission's data underestimates the number and value of ads that have been run in battleground states. For example, although the Commission identifies Pennsylvania as a

---

[8]    The text of the ad reads:

> **ANNOUNCER [v/o]:** Most Saturdays they get together in the park, 8 a.m. sharp.
>
> Pennsylvania families relax a little more these days because Rick Santorum is getting things done everyday.
>
> Over $300 billion in tax relief, eliminating the marriage penalty, increasing the per child tax credit – all done.
>
> And now Rick Santorum is fighting to eliminate unfair taxes on family businesses.
>
> Call and say thanks because Rick Santorum is the one getting it done.
>
> (*Text on screen: Senator Rick Santorum; (717)231-7540; Paid for by Americans for Job Security*

A copy of the ad script from the *National Journal* is attached as an exhibit in App. VI–14 to our opening comments.

6

battleground state, graphs P7 and P8 do not contain ad data from the Philadelphia media market, Pennsylvania's largest media market and the fourth largest media market in the nation, nor from the Pittsburgh media market, the state's second-largest media market.[9] Neither media market meets the criterion of being contained with a single battleground state. Thus, whatever ads were run in those two major markets are not captured by the CMAG data. Similarly, graphs P7 and P8 do not contain ad data from the battleground state of Colorado's largest media market, Denver; nor from the battleground state of Nevada's second-largest media market, Reno; nor from the battleground state of Ohio's third-largest media market, Cincinnati; nor from the battleground state of Wisconsin's second-largest media market, Green Bay; nor from the battleground state of Washington's second-largest media market, Spokane.[10]

In short, major party candidates in the 2004 presidential primary elections/caucuses spent hundreds of thousands of dollars running thousands of ads more than 120 days prior to the primary elections or caucuses. Under the Commission's existing coordination regulations, such ads could lawfully have been coordinated with, and paid for by, corporations, labor unions and other special interest organizations — thus undermining the statutory limits on the amounts and sources of in-kind contributions. We submit that such coordinated activity should be considered substantial, particularly in light of the threat posed by the 120-day rule to undermine provisions of law at the heart of the statute.

IV.    **The CMAG Data on Ads Airing Prior to the 2004 Presidential General Election in Battleground States.**

The Commission's Graphs P9 and P10 display data regarding ads aired prior to the 2004 presidential general election in battleground states. The data make clear that 30.67% of 2004 presidential general election ads ran more than 120 days before the general election. This amounts to more than 62,700 ads which, according to the Commission's data on Graph P10, were valued at more than $45,868,132 (26.62% of $172,307,036).

Although Graphs P9 and P10 do note the dates of the Democratic and Republican national conventions, the graphs do not display the data in time frames relative to the convention dates. (Nor has the Commission produced separate graphs using the convention start date as "day zero.") Consequently, it is impossible to determine from the graphs how much advertising occurred more than 120 days prior to the conventions. Nevertheless, it is possible to estimate, based on these graphs, that between five and ten percent of the ads represented on the graphs aired more than 120 days before the conventions. Furthermore, given that both parties' nomination contests had been decided at the time when these ads ran, and the presumptive

---

[9]    *See* Neilson Media Research, *210 Designated Market Areas: Nielson Media Research Local Universe Estimates, available at* http://www.nielsenmedia.com/DMAs.html.

[10]    *Id.*

7

nominees were known, it is clear that the ads were intended to influence the *general election*, not the party conventions.[11]

Also, for the reasons stated in the preceding section, the Commission's data underestimates, perhaps substantially, the actual number and value of ads by presenting data only for media markets *contained fully within a single battleground state*, and thus eliminating several major media markets.

In short, major party candidates in the 2004 presidential general election spent more than $45 million running approximately 62,700 of ads more than 120 days prior to the general election. Such advertising is plainly not insubstantial and, if coordinated with corporations, labor unions and other special interests, would undeniably undermine statutory limits on the amounts and sources of in-kind contributions.

## V.    The CMAG Data on Ads Airing Prior to the 2004 Congressional Primaries/Caucuses.

The Commission's data sets for ads aired prior to the 2004 congressional primaries/caucuses are incomplete.

The Commission's data set on Senate primaries contains no ads by 2004 Senate candidates aired in 2003, yet such ads were in fact aired.[12]  Colorado Senate candidate Mike Miles, for example, began airing television ads in October 2003[13] — more than ten months prior to Colorado's August 10, 2004 primary — yet the earliest Miles ad date in the Commission's data set is August 5, 2004.

Similarly, Illinois Senate candidate Blair Hull began airing television ads in June 2003[14] — more than eight months before the state's March 13, 2004 primary — yet the earliest Hull ad date in the Commission's data set is January 9, 2004. Illinois Senate candidate Gerry Chico began airing television ads in October 2003,[15] yet the earliest Chico ad date in the Commission's data set is January 19, 2004.

---

[11]    According to the notes on graphs P9 and P10, the CMAG data controls for the primary date, and only advertisements run after the primary election in a given state are represented on the graphs. *See* "Presidential Graphs – Notes" at 2 (General Election Graphs).

[12]    The Commission's Senate data set contains information on a small number of 2002 ads related to 2002 general elections and a December 7, 2002 runoff election for a Louisiana Senate seat, but contains no 2003 ads for 2004 Senate election campaigns.  It appears as though CMAG did not begin collecting ads for the 2004 Senate elections until January 2004.

[13]    *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 26 and App. V–12.

[14]    *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 27 and App. V–57.

[15]    *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 27 and App. V–41.

8

Likewise, the Commission's data set on House primaries contains no ads by 2004 House candidates aired in 2003, yet such ads were in fact aired.[16]  For example, North Carolina House District 5 candidate Jim Snyder began airing ads in August 2003[17] — eleven months prior to North Carolina's July 20, 2004 primary — yet the Commission's data set includes no ads by Snyder, who dropped out of the race in November 2003.  North Carolina House District 5 candidate Jay Helvey began airing ads in December 2003,[18] yet the earliest Helvey ad in the Commission's data set is January 1, 2004.

Due to the omission of important congressional candidate advertising data from the Commission's data sets, the Commission can validly draw no conclusions from its data regarding the substantiality of congressional candidate advertising more than 120 days before primary elections.

## VI.    The CMAG Data Has Significant Limitations and Does Not Address the "Most Important" Question Raised by the Court.

Even to the extent that the CMAG data purports to show that most candidate ads are run within 120 days of an election, the data has significant limitations for purposes of showing that ads run outside that time period are insubstantial.  Because of these limitations, the data is likely to materially understate the number of ads run outside the 120-day period and the amount of money spent on such ads.  For this reason, we do not believe that the Commission can properly rely on the CMAG data to draw the conclusion that only an insubstantial number of campaign ads are run outside the 120-day period.

Some of these limitations are noted above — *e.g.,* the exclusion in key states of major media markets that are not wholly contained within a state, and the apparent failure to include 2003 data in the congressional primary election data sets.  But there are other important limitations as well.

### A.    CMAG Data Sets Contain Only Television Ads.

The CMAG data addresses only TV ads, and there is no evidence in the record to draw conclusions about how many campaign ads are run outside the 120-day window by means of other types of "public communications" — such as radio ads, newspaper ads, direct mail, or phone banks, all of which are subject to the coordination rules.  There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that there is only an insignificant amount of campaign activity in these other media outside the 120-day period.

---

[16]     The Commission's House data set contains a small number of ads related to a December 7, 2002 runoff election in Louisiana's House District 5 and a January 2003 special election in Hawaii's House District 2, but contains no 2003 ads for 2004 House election campaigns.  It appears as though CMAG did not begin collecting ads for the 2004 House elections until January 2004.

[17]     *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 27 and App. V–126.

[18]     *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 27 and App. V–123.

9

**B.    CMAG Data Sets Contain Only Candidate Ads, Not Ads Run By Parties and Outside Groups.**

The CMAG data includes only ads run by candidates themselves.  Although ads run by candidates have high probative value because they are unquestionably campaign ads even in the absence of express advocacy, candidate ads alone do not come close to capturing the relevant universe of campaign ads for purposes of analyzing the coordination rules.  Obviously, ads run by political parties are highly relevant as well and, as our earlier submission shows, ads by the political parties extolling their candidates are indeed run outside the 120-day window.[19]

Similarly, the CMAG data fails to include any ads run by outside groups.  Again, our submission shows that such groups, typically non-profit corporations, do run ads outside the 120-day period, as the Santorum ad run by Americans for Job Security, discussed above, illustrates.  We have submitted numerous other ads run by outside groups in this period.[20]

Indeed, campaign ads by the parties or by outside groups might play a more significant role than candidate ads in the very early stages of a campaign.  Candidates may tend to save their money for advertising close to the election, but parties and outside groups may be willing to spend early money as a way to help their candidates.  Reliance on such early ads might very well increase significantly if spending by the outside groups could be overtly coordinated with a candidate, as would be permitted under the current regulation.  But the CMAG data does not address the extent of ads run by parties or outside groups.  Accordingly, there is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that there is only an insignificant number of campaign ads run by political parties or outside groups, prior to the 120-day period.

**C.    CMAG Data Does Not Reflect Diversity Among Campaigns.**

The CMAG data, in gross, does not control for different kinds of campaigns.  Even if it were true that candidates (or parties, or outside groups) do not engage in substantial early advertising in *most* races, they may do so in *certain particular* races, *i.e.,* highly-competitive contests, such as a Senate race that has national dimensions.[21]  Early advertising may have a

---

[19]    In the best known example of this, the Democratic National Committee spent millions of dollars running ads in the summer of 1995 promoting the re-election of President Clinton, well before the 1996 primary season, as an explicit part of the Clinton campaign re-election strategy.  *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 19.  *See also, e.g., id.* at App. V–92 (South Dakota Republican Party ad targeting Senator Daschle); *id.* at 27 and App. VI–24 (NRSC ad targeting Senator Byrd); *id.* at 27 and App. VI–4 (Montana Democratic Party ad targeting Senator Burns).

[20]    *See, e.g.,* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 20 and App. I–23 (NARAL ads targeting Bush and Dole); *id.* at 20 and App. I–19 (Republican Leadership Council ads targeting Gore); *id.* at 22 and App. III–49 (Reform Voter Project ads targeting Bush); *id.* at 26 and App. V–10 (U.S. Chamber of Commerce ads supporting Senator Murkowski).

[21]    Senator Tom Daschle's unsuccessful re-election campaign in 2004, for instance, was a highly visible and nationally noted race.  Daschle began advertising as early as July, 2003, *see* App. V–90, 94, 96, 98, 102, approximately *11 months* before the June 1, 2004 primary election.  The South Dakota

10

heightened importance in such races, and may particularly attract money from parties or outside groups, not reflected in the CMAG data. The data we submitted in our earlier comments suggests that early advertising is often clustered in specific hotly-contested races — rather than distributed evenly throughout all contests. For example, at least six candidates vying for an Illinois Senate seat in 2004 began advertising more than 120 days prior to the state's 2004 primary election.[22] Even if such highly-competitive contests constitute a comparatively small percentage of the total number of races each cycle, the role of early advertising in that small percentage of races may be very important and, consequently, should be considered *substantial*. There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that such campaign ads, clustered in highly-competitive races, are rendered insignificant or insubstantial simply because they constitute a small percentage of total ads run.

### D.    CMAG Data Does Not Predict The Likelihood That Coordinated Advertising Will Shift Outside 120-Day Time Period.

Finally, the CMAG data obviously does not address the question which the D.C. Circuit deemed to be the "most important" one to be considered by the Commission: "[T]o the extent election-related advocacy now occurs primarily within 120-days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged restrictions?" *Shays,* 414 F.3d at 102.

The existing 120-day content test has been under the cloud of court challenge virtually since the day of its promulgation, and throughout the 2004 campaign covered by the CMAG data. Under those circumstances, spenders may have chosen not to risk reliance on the current rule, and therefore the effect of the rule cannot be discerned only from 2004 campaign data. But if the Commission were to re-promulgate the same rule, it would be giving a green light to a future "coordinated communication free-for-all," 414 F.3d at 100, outside the 120 day period.

Nothing in the CMAG data provides reason to believe this will not happen. Nor has the Commission otherwise developed a record to so conclude. Indeed, in a period where the trend is towards longer, not shorter campaigns, and earlier campaign spending, particularly in highly contested campaigns,[23] the logical likelihood is that candidates, parties and outside groups will

---

Republican Party also ran ads attacking Daschle more than 120 days before the election, *see* App. V-92, as did Club for Growth, *see* App. V-100.

[22]    *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 27 and App. V–28 through V–59.

[23]    The presidential election campaign of 1995–96 marked, for the first time, the launch of candidate and party advertising during the summer preceding the presidential primary election. *See* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at 19. The 1999–2000 presidential election campaign, according to the National Journal, entailed "more ads airing earlier than ever before." *The Ads of 1999,* NATIONAL JOURNAL (Dec. 23, 1999); *available at* Comments of the Campaign Legal Center, *et al.* on Notice 2005–28 at App. I–2. The trend continued during the 2003–04 presidential election campaign, when ads began airing in February 2003 — eleven months prior to the 2004 Iowa caucus and a year before the New Hampshire primary. *See id.* at 22 and App. III–49.

11

seize on a loophole that allows overt circumvention of the section 441a contribution limits and the section 441b source prohibitions, in order to engage in early campaign spending. There is nothing to prevent a wholesale shift in coordinated spending to the pre-120 day period, where so doing will freely allow candidates to take advantage of unlimited corporate or union treasury funds to pay for ads written and controlled by the candidates. Nothing the Commission has adduced in this record provides comfort to the contrary, or otherwise answers the "most important" question posed by the Court.

## VII. Conclusion.

The task set by the Court is for the Commission to show that its current 120-day rule "rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition." *Shays*, 414 F.3d. at 102. The court asked whether candidates do "in fact limit campaign-related advocacy to the four months surrounding elections," *id* at 102, and the answer is clearly no. Both the CMAG data and the scores of actual ads we have submitted for the record demonstrate that candidates do run campaign ads outside the 120-day window.

The CMAG data fails to satisfy the standard set by the D.C. Circuit for justifying the Commission's existing 120-day rule. Although it demonstrates that most television ads run by candidates are aired in temporal proximity to the election, it also demonstrates that, for example in the 2004 presidential race, thousands of ads with a value of millions of dollars, were run outside the 120-day window. Because these ads were all run by candidates themselves, there is no question but that these ads were for the purpose of influencing the election. Yet they all avoided express advocacy — or easily could have been altered to do so.

This data alone thus proves that the 120-day test does not "reasonably define[] the period before an election when non-express advocacy likely relates to purposes other than 'influencing' a federal election...." *Shays*, 414 F.3d at 101. The bare fact that an ad is aired more than 120 days before an election cannot be used as a sufficient proxy, in combination with no more than an express advocacy test, to show that there is "only a weak nexus to any electoral campaign." *Id.* at 99.

While the ads run by candidates outside the window may not be "substantial" as a percentage of all ads run,[24] they are substantial both in the number of ads and dollar amounts. This substantiality is heightened in importance by the fact that, because such ads fall outside the Commission's legal definition of "coordination," candidates could write the ads, direct their placement, and then have the ads funded entirely with soft money by corporations, labor unions and wealthy supporters. This substantiality is further heightened by the fact that such ads are often clustered in certain highly-competitive races.

When viewed in this perspective, the Commission's reliance on the "functionally meaningless" express advocacy standard as the sole test outside the 120-day window "will

---

[24]    Although in the case of the 2004 presidential general election data presented on Graphs P9 and P10, the data indicates that a very substantial percentage of the total number of ads are run outside the 120-day pre-general election window.

12

permit exactly what BCRA aims to prevent: evasion of campaign finance restrictions through unregulated collaboration." *Shays*, 414 F.3d at 102.

For this reason, we conclude that the Commission is required to promulgate an additional content standard to apply outside the 120-day time period — a standard that will capture non-express advocacy campaign ads that should be subject to the coordination rules.

We appreciate the opportunity to submit these supplemental comments.

Sincerely,

*/s/ Fred Wertheimer*          */s/ J. Gerald Hebert*          */s/ Lawrence M. Noble*

Fred Wertheimer            J. Gerald Hebert            Lawrence M. Noble
Democracy 21              Paul S. Ryan               Center for Responsive Politics
                         Campaign Legal Center


Donald J. Simon
Sonosky, Chambers, Sachse
       Endreson & Perry LLP
1425 K Street, NW – Suite 600
Washington, DC 20005

Counsel to Democracy 21

Paul S. Ryan
The Campaign Legal Center
1640 Rhode Island Avenue, NW – Suite 650
Washington, DC 20036

Counsel to the Campaign Legal Center

# PLAINTIFFS' EXHIBIT 136

(3) The lender must certify that the equity requirement was determined using balance sheets prepared in accordance with GAAP and met upon giving effect to the entirety of the loan in the calculation, whether or not the loan itself is fully advanced, as of the date the guaranteed loan is closed.

\*　\*　\*　\*　\*

Dated: May 30, 2006.

**Thomas C. Dorr,**

*Under Secretary, Rural Development.*

[FR Doc. E6–8891 Filed 6–7–06; 8:45 am]

**BILLING CODE 3410-XY-P**

## NUCLEAR REGULATORY COMMISSION

### 10 CFR Parts 170 and 171

**RIN: 3150–AH83**

### Revision of Fee Schedules; Fee Recovery for FY 2006; Correction

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Final rule; correction.

**SUMMARY:** This document corrects a final rule appearing in the **Federal Register** on May 30, 2006 (71 FR 30722) concerning the licensing, inspection, and annual fees charged to NRC applicants and licensees in compliance with the Omnibus Budget Reconciliation Act of 1990, as amended. This action is necessary to correct typographical and printing errors.

**DATES:** *Effective Date:* July 31, 2006.

**FOR FURTHER INFORMATION CONTACT:** Tammy Croote, telephone 301–415–6041; Office of the Chief Financial Officer, U.S. Nuclear Regulatory Commission, Washington, DC 20555–0001.

**SUPPLEMENTARY INFORMATION:**

■ 1. On page 30735, in the third column, in the last line of the continued paragraph, the reference to "Section III.B.3.a–" is corrected to read "Section III.B.3.a–h".

■ 2. On page 30741, under Table XIV.—ANNUAL FEE SUMMARY CALCULATIONS FOR THE SPENT FUEL STORAGE/REACTOR DECOMMISSIONING FEE CLASS, in the first column, in the fourth line, the phrase "60 prorated annual fee" is corrected to read "60 percent prorated annual fee".

### § 171.16  [Corrected]

■ 3. On page 30755, the second sentence of footnote 1 is corrected to read, "However, the annual fee is waived for those materials licenses and holders of

certificates, registrations, and approvals who either filed for termination of their licenses or approvals or filed for possession only/storage licenses before October 1, 2005, and permanently ceased licensed activities entirely by September 30, 2005."

### § 171.19  [Corrected]

■ 4. On page 30756, in the first complete paragraph, the third sentence is corrected to read, "The materials licensees that are billed on the anniversary date of the license are those covered by fee categories 1C, 1D, 2(A)(2), 2(A)(3), 2(A)(4), 2B, 2C, 3A through 3P, and 4B through 9D."

Dated at Rockville, Maryland, this 2nd day of June, 2006.

For the Nuclear Regulatory Commission.

**Peter J. Rabideau,**

*Acting Chief Financial Officer.*

[FR Doc. E6–8923 Filed 6–7–06; 8:45 am]

**BILLING CODE 7590-01-P**

## FEDERAL ELECTION COMMISSION

### 11 CFR Part 109

**[Notice 2006–10]**

### Coordinated Communications

**AGENCY:** Federal Election Commission.

**ACTION:** Final rules and transmittal of rules to Congress.

**SUMMARY:** The Federal Election Commission is revising its regulations regarding communications that are coordinated with Federal candidates and political party committees. The Commission's rules set out a three-prong test for determining whether a communication is "coordinated" with, and therefore an in-kind contribution to, a Federal candidate or a political party committee. These final rules implement the recent decision of the Court of Appeals in *Shays* v. *Federal Election Commission*, in which the court determined that the Commission needs to provide a more complete explanation and justification for its rules pursuant to the Administrative Procedure Act. To comply with the court's decision, and to address other issues involving the coordinated communication rules, the Commission is issuing these Final Rules and Explanation and Justification. Further information is provided in the supplementary information that follows.

**DATES:** Effective July 10, 2006.

**FOR FURTHER INFORMATION CONTACT:** Mr. Brad C. Deutsch, Assistant General Counsel, Mr. Ron B. Katwan, Ms. Margaret G. Perl, or Ms. Esa L. Sferra, Attorneys, 999 E Street, NW.,

Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:**

**Scope of Regulatory Changes**

The Commission is revising its regulations regarding communications that are coordinated with Federal candidates and political party committees. The Commission is: (1) Revising the fourth content standard at 11 CFR 109.21(c)(4) to establish separate time frames for communications referring to political parties, Congressional and Presidential candidates; (2) creating a safe harbor for certain endorsements and solicitations by Federal candidates; (3) revising the temporal limit of the common vendor and former employee conduct standards; (4) creating a safe harbor for the use of publicly available information; (5) creating a safe harbor for the establishment and use of a firewall; (6) clarifying that the payment prong of the coordinated communication test is satisfied if an outside person pays for only part of the costs of a communication; and (7) revising 11 CFR 109.37 to include the applicable time frame and safe harbor revisions in 11 CFR 109.21.

**Transmission of Final Rules to Congress**

Under the Administrative Procedure Act, 5 U.S.C. 553(d), and the Congressional Review of Agency Rulemaking Act, 5 U.S.C. 801(a)(1), agencies must submit final rules to the Speaker of the House of Representatives and the President of the Senate and publish them in the **Federal Register** at least 30 calendar days before they take effect. The final rules that follow were transmitted to Congress on June 2, 2006.

**Explanation and Justification**

**I. Background**

*A. Bipartisan Campaign Reform Act and 2002 Coordination Rulemaking*

The Bipartisan Campaign Reform Act of 2002,[1] ("BCRA"), repealed the Commission's pre-BCRA regulations regarding "coordinated general public political communications" and directed the Commission to promulgate new regulations on "coordinated communications" in their place.[2] Congress specified in BCRA that the Commission's new regulations "shall not require agreement or formal collaboration to establish coordination."

---

[1] Pub. L. 107–155, 116 Stat. 81 (2002); amending the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. 431 *et seq.* (the "Act" or "FECA").

[2] Pub. L. 107–155, sec. 214(b), (c) (2002).

BCRA, sec. 214(c), 116 Stat. 81 at 95. "Apart from this negative command—'shall not require'—BCRA merely listed several topics the rules 'shall address,' providing no guidance as to how the FEC should address them." *Shays v. FEC,* 414 F.3d 76, 97–98 (D.C. Cir. 2005). On December 17, 2002, the Commission promulgated regulations as required by BCRA. *See* 11 CFR 109.21; *see also, Final Rules and Explanation and Justification on Coordinated and Independent Expenditures,* 68 FR 421 (Jan. 3, 2003) ("*2002 Coordination Final Rules*").

The Commission's 2002 coordinated communication regulations set forth a three-prong test for determining whether a communication is a coordinated communication, and therefore an in-kind contribution to, and an expenditure by, a candidate, a candidate's authorized committee, or a political party committee. *See* 11 CFR 109.21(a). First, the communication must be paid for by someone other than a candidate, a candidate's authorized committee, a political party committee, or their agents (the "payment prong"). *See* 11 CFR 109.21(a)(1). Second, the communication must satisfy one of four content standards (the "content prong"). *See* 11 CFR 109.21(a)(2) and (c). Third, the communication must satisfy one of five conduct standards (the "conduct prong"). *See* 11 CFR 109.21(a)(3) and (d). A communication must satisfy all three prongs to be a "coordinated communication."

*B. Content Prong Challenged in Shays v. FEC*

In 2003, Representatives Shays and Meehan brought suit in Federal District Court challenging, among other Commission regulations, the content prong of the Commission's coordination regulations. *See Shays v. FEC,* 337 F. Supp. 2d 28 (D.D.C. 2004) ("*Shays District*"), *aff'd, Shays v. FEC,* 414 F.3d 76 (D.C. Cir. 2005) ("*Shays Appeal*") (*pet. for reh'g en banc denied* Oct. 21, 2005) (No. 04–5352). The content prong is comprised of four sub-categories of communications. A communication that falls in any of the four categories satisfies the prong. The purpose of the content prong is to "ensure that the coordination regulations do not inadvertently encompass communications that are not made for the purpose of influencing a Federal election," and therefore are not "expenditures" subject to regulation under the Act. *See 2002 Coordination Final Rules* at 426. Accordingly, each of the four content standards that comprise the "content prong" identifies a category of communications whose

"subject matter is reasonably related to an election." *Id.* at 427.

The first content standard is satisfied if the communication is an electioneering communication. *See* 11 CFR 109.21(c)(1).[3] This content standard implements the statutory directive that disbursements for coordinated electioneering communications be treated as in-kind contributions to, and expenditures by, the candidate or political party supported by the communication.

The second content standard is satisfied by a public communication[4] made at any time that disseminates, distributes, or republishes campaign materials prepared by a candidate, a candidate's authorized committee, or agents thereof. *See* 11 CFR 109.21(c)(2). This content standard implements Congress's mandate that the Commission's rules on coordinated communications address the "republication of campaign materials." *See Pub. L.* 107–155, sec. 214(c)(1) (2002). The Commission concluded that communications that disseminate, distribute, or republish campaign materials, no matter when such communications are made, can be reasonably construed only as for the purpose of influencing an election.

The third content standard is satisfied if a public communication made at any time expressly advocates[5] the election or defeat of a clearly identified candidate for Federal office. *See* 11 CFR 109.21(c)(3). The Commission concluded that express advocacy communications, no matter when such communications are made, can be reasonably construed only as for the purpose of influencing an election.

The fourth content standard in the 2002 rule is satisfied if a public communication (1) refers to a political party or a clearly identified Federal candidate; (2) is publicly distributed or publicly disseminated 120 days or fewer before an election;[6] and (3) is directed to voters in the jurisdiction of the clearly identified Federal candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot. *See* 11 CFR 109.21(c)(4) (2002).

In incorporating the 120-day time frame into the fourth content standard, the Commission sought to create a bright-line rule that provided clear guidance for those seeking to produce and distribute public communications that do not republish campaign materials and do not contain express advocacy, communications that are already covered by the second and third content standards, respectively. The 120-day time frame "focuses the regulation on activity reasonably close to an election, but not so distant from the election as to implicate political discussion at other times." *2002 Coordination Final Rules* at 430. The Commission noted that its intent was "to require as little characterization of the meaning or the content of the communication, or inquiry into the subjective effect of the communication on the reader, viewer, or listener as possible." *Id.* (citing *Buckley v. Valeo,* 424 U.S. 1, 42–44 (1976)). The Commission emphasized that the regulation "is applied by asking if certain things are true or false about the face of the public communication or with limited reference to external facts on the public record." *Id.*

In adopting this time frame, the Commission relied in part on the fact that, in BCRA, Congress defined "Federal election activity" ("FEA") as, *inter alia,* voter registration activity "during the period that begins on the date that is 120 days" before a Federal election. The Commission concluded that, in doing so, Congress "deem[ed] that period of time before an election to be reasonably related to that election." *Id.* (citing 2 U.S.C. 431(20)(A)(i)).

### 1. Shays District Court Decision

The District Court held that the "content prong" of the Commission's coordinated communication regulations satisfied the first step of *Chevron* analysis, but did not satisfy the second

---

[3] The Act and Commission regulations define an "electioneering communication" as any broadcast, cable, or satellite communication that (1) refers to a clearly identified candidate for Federal office; (2) is publicly distributed within 60 days before a general election or 30 days before a primary election for the office sought by the candidate referenced in the communication; and (3) can be received by 50,000 or more persons within the geographic area that the candidate referenced in the communication seeks to represent. *See* 2 U.S.C. 434(f)(3); 11 CFR 100.29.

[4] 11 CFR 100.26 defines a "public communication" as "a communication by means of any broadcast, cable or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing or telephone bank to the general public, or any other form of general public political advertising. The term general public political advertising shall not include communications over the Internet, except for communications placed for a fee on another person's Web site." *See Final Rules and Explanation and Justification: Internet Communications,* 71 FR 18589 (published April 12, 2006; effective May 12, 2006); *see also* 2 U.S.C. 431(22).

[5] The term "expressly advocating" is defined in the Commission's regulations at 11 CFR 100.22.

[6] The term "election" includes general elections, primary elections, runoff elections, caucuses or conventions, and special elections. *See* 11 CFR 100.2.

step of *Chevron* review.[7] *Shays District* at 62–65. The District Court concluded that limiting the coordinated communication definition to communications that satisfy the content standards at 11 CFR 109.21(c)(1) through (4), "undercuts FECA's statutory purposes and therefore these aspects of the regulations are entitled to no deference." *Shays District* at 65. The District Court reasoned that communications that have been coordinated with a candidate, a candidate's authorized committee, or a political party committee have value for, and therefore are in-kind contributions to, that candidate or committee, regardless of the content, timing, or geographic reach of the communications. *Id.* at 63–64. Therefore, the Commission's exclusion of communications under the 120-day test failed the second step of *Chevron* review. *Id.* at 64–65.

2. Shays Court of Appeals Decision

The Commission appealed the District Court's decision. In 2005, a three-judge panel of the Court of Appeals for the D.C. Circuit considered the Commission's appeal. *See Shays Appeal* at 97–102. The Court of Appeals found that the Commission's regulations satisfied *Chevron* step one, and, contrary to the District Court's opinion, satisfied *Chevron* step two as well. *Shays Appeal* at 99–100. The Court of Appeals concluded: "Accordingly, we reject Shays's and Meehan's argument that FECA precludes content-based standards under *Chevron* step one. And for the same reasons, we disagree with the district court's suggestion that any standard looking beyond collaboration to content would necessarily 'create an immense loophole,' thus exceeding the range of permissible readings under *Chevron* step two." *Shays Appeal* at 99–100.

In reaching its holding, the Court of Appeals found that Congress provided the Commission with an "open-ended directive" under which to promulgate coordination regulations. *Shays Appeal* at 97–98. "[I]n the BCRA provision most clearly on point—the directive calling for new regulations—Congress studiously avoided prescribing any specific standard, save abrogation of the 'collaboration or agreement' test. Given this 'lack of guidance in the statute,' we cannot say that BCRA clearly forecloses the FEC's approach. Nor do we see clearly contrary intent, as do Shays and Meehan, in FECA's preexisting 'expenditure' and 'contribution' definitions." *Id.* at 99 (internal citation omitted).

The Court of Appeals noted that under the statute, a communication that is a coordinated expenditure "shall be considered to be a contribution," and the Commission "lacks discretion to exclude that communication from its coordinated communication rule." *Id.* at 99. "Yet to qualify as [an] 'expenditure' in the first place, *spending must be undertaken 'for the purpose of influencing'* a federal election (or else involve 'financing' for redistribution of campaign materials)." *Id.* (emphasis added). The Court of Appeals emphasized that "time, place, and content may be critical indicia of communicative purpose." *Shays Appeal* at 99. The Court of Appeals recognized, "Insofar as such statements may relate to political or legislative goals independent from any electoral race— goals like influencing legislators' votes or increasing public awareness—we cannot conclude that Congress unambiguously intended to count them as 'expenditures' (and thus as 'contributions' when coordinated). To the contrary, giving appropriate *Chevron* deference, we think the FEC could construe the expenditure definition's purposive language as leaving space for collaboration between politicians and outsiders on legislative and political issues involving only a weak nexus to any electoral campaign. Moreover, we can hardly fault the FEC's efforts to develop an 'objective, bright-line test [that] does not unduly compromise the Act's purposes,' considering that we approved just such a test for 'contribution' in *Orloski*. 795 F.2d at 165." *Id.* Accordingly, the Court of Appeals concluded that the Commission's regulation satisfied *Chevron* steps one and two. *Id.* at 99– 100.

While finding the content prong was a permissible construction of Congressional intent, the Court of Appeals held that the content prong was inadequately explained under the Administrative Procedure Act. *Id.* at 100. The Court of Appeals stated, "while we accept the FEC's premise that time, place, and content may illuminate communicative purpose and thus distinguish FECA 'expenditures' from other communications, we detect no support in the record for the specific content-based standard the Commission has promulgated." *Id.* at 102. In response to this finding by the Court of Appeals, the Commission opened the present rulemaking.

*C. Notice of Proposed Rulemaking and Supplemental Notice of Proposed Rulemaking*

The Commission published a Notice of Proposed Rulemaking (*"NPRM"*) on December 14, 2005, in which it sought comment on a number of alternatives for retaining or revising the content standard of the coordinated communication regulations and on several other issues involving the coordinated communication rules. *See* 70 FR 73946 (December 14, 2005). The comment period closed on January 13, 2006. The Commission received written comments from 28 commenters. The Commission held a public hearing on January 25 and 26, 2006, at which 18 witnesses testified. The comments and a transcript of the public hearing are available at *http://www.fec.gov/law/ law_rulemakings.shtml#coordinated*.[8]

In the *NPRM*, the Commission specifically requested that commenters submit empirical data showing the time period before an election during which campaign communications generally occur. *NPRM* at 73949. None of the commenters provided empirical data in response to the Commission's request, either in written comments or at the public hearing. One joint comment did provide a compilation of selected advertisements run during recent election cycles.

Because no commenters provided empirical data in response to the Commission's request, the Commission licensed data from TNS Media Intelligence/CMAG (*"CMAG"*) regarding television advertising spots run by Presidential, Senate, and House of Representatives candidates during the 2004 election cycle. CMAG is a leading provider of political advertising tracking and provides media analysis services to a wide variety of clients, including national media organizations, foundations, academics, and Fortune 100 companies. *See* www.tnsmi-cmag.com. CMAG also provided data to the Brennan Center in conjunction with its 2000 study "Buying Time," which was cited by BCRA's principal sponsors

---

[7] The District Court described the first step of the *Chevron* analysis, which courts use to review an agency's regulations: "a court first asks 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *See Shays District* at 51 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43 (1984)). According to the District Court, in the second step of the *Chevron* analysis, the court determines if the agency's interpretation is a permissible construction of the statute that does not "unduly compromise" the Act's purposes by "creat[ing] the potential for gross abuse." *See Shays District* at 91 (citing *Orloski v. FEC,* 795 F.2d 156, 164–65) (D.C. Cir. 1986) (internal citations omitted).

[8] For purposes of this document, the terms "comment" and "commenter" apply to both written comments and oral testimony at the public hearing.

in support of BCRA's provisions. *See, e.g.,* 148 Cong. Rec. S2141 (daily ed. March 20, 2002) (statement of Sen. McCain) ("According to the Brennan Center's 'Buying Time 2000' study, less than one percent of the group-sponsored soft-money ads covered by this provision of the bill were genuine issue discussion, more than 99 percent of these ads were campaign ads. This degree of accuracy is more than sufficient to overcome any claim of substantial overbreadth.").

The Commission produced graphical representations derived from the CMAG data and made these graphs available on its Web site. The Commission then published a Supplemental Notice of Proposed Rulemaking ("*SNPRM*") in the **Federal Register** on March 15, 2006, that reopened the comment period for this rulemaking. 71 FR 13306 (March 15, 2006). The graphs and data are available at the Commission's Web site at *http://www.fec.gov/pdf/nprm/ coord_commun/ suppNPRMmaterials.shtml.*[9] In the *SNPRM*, the Commission sought additional comment, in light of the information presented by the data, on the issues and questions raised in the *NPRM* regarding the content prong time frame.

The reopened comment period for the *SNPRM* closed on March 22, 2006. The Commission received written comments on the *SNPRM* from 12 commenters, which are also available at *http:// www.fec.gov/law/ law_rulemakings.shtml#coordinated.*

## II. Revised Time Frames for Coordinated Communications (11 CFR 109.21(c)(4))

### A. The Commission Has Determined To Retain the Content Prong With Revised Time Frames

The *Shays* Court of Appeals emphasized that retaining a time frame as part of the fourth content standard requires the Commission to undertake a factual inquiry to determine whether the temporal line it draws "reasonably defines the period before an election when non-express advocacy likely relates to purposes other than

'influencing' a federal election." *Shays Appeal* at 101–02. The Court presented three questions to guide the Commission's inquiry: (1) "Do candidates in fact limit campaign-related advocacy to the four months surrounding elections, or does substantial election-related communication occur outside that window?"; (2) "Do congressional, senatorial, and presidential races—all covered by this rule—occur on the same cycle, or should different rules apply to each?"; and (3) "[T]o the extent election-related advocacy now occurs primarily within 120 days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged rules' restrictions?" *Id.* at 102.

Based on its inquiry into the Court of Appeals' questions, the Commission has decided to retain the existing content prong, but revise the applicable time frames in the fourth content standard at 11 CFR 109.21(c)(4). The revision creates separate time frames for communications based on whether they refer to (1) Congressional candidates, (2) Presidential candidates, or (3) political parties. For those communications that refer to Senate and House of Representatives candidates in Congressional primary[10] and general elections, the revised time frame begins 90 days before each candidate's election and ends on the date of that candidate's election. For communications that refer to Presidential candidates, the revised time frame covers, on a State-by-State basis, the period of time from 120 days before the date of a Presidential primary up to and including the date of the general election.[11]

For those communications that reference political parties and do not reference a clearly identified Federal candidate, when such communications occur in a non-Presidential election cycle, the revised time frame period

begins 90 days before each election and ends on the date of that election; when such communications occur in a Presidential election cycle, the revised time period covers, on a State-by-State basis, the period of time from 120 days before the date of a primary through the general election. For communications that reference a political party and a clearly identified Federal candidate, the applicable time frame is either the Congressional or Presidential candidate time period, depending upon (1) whether the communication is coordinated with the political party committee or the candidate, (2) whether the upcoming general election is a Presidential or non-Presidential election, and (3) whether the communication is aired in the referenced candidate's jurisdiction.

### 1. Senate and House Candidates Conduct Nearly All Campaign-Related Advocacy Within 60 Days of an Election

The data obtained by the Commission respond directly to the first question posed by the Court of Appeals: "Do candidates in fact limit campaign-related advocacy to the four months surrounding elections, or does substantial election-related communication occur outside that window?" *Shays Appeal* at 102. This question is relevant to the Commission's inquiry because the purpose of the content standard is to provide a bright-line delineation between those coordinated advertisements that are for the purpose of influencing an election—and therefore are "expenditures" regulated by the Act—and those that are not. As the *Shays* Court of Appeals stated, "Insofar as such statements may relate to political or legislative goals independent from any electoral race—goals like influencing legislators' votes or increasing public awareness—we cannot conclude that Congress unambiguously intended to count them as "expenditures" (and thus as 'contributions' when coordinated)." *Shays Appeal* at 99 ("[T]o qualify as [an] 'expenditure' in the first place, spending must be undertaken 'for the purpose of influencing' a federal election.").

Any time a candidate uses campaign funds to pay for an advertisement, it can be presumed that this advertisement is aired for the purpose of influencing the candidate's election. Additionally, candidates and their campaign staff are experienced and knowledgeable in matters of advertising strategy and are highly motivated to run advertisements at a time when they are likely to influence voters. Thus, data showing when candidates spend their own campaign funds on advertisements

---

[9] Available at *http://www.fec.gov/pdf/nprm/ coord_commun/suppNPRMmaterials.shtml* are ten graphs covering Presidential election data, four graphs covering Senate election data, and four graphs covering House election data, as well as an explanation of the methodology used for each graph. These graphs are titled, and referenced herein, as P1–P10, S1–S4, and H1–H4, respectively. An additional chart regarding Presidential spending in individual "battleground" States, *see* note 21, below, is available at *http://www.fec.gov/pdf/nprm/ coord_commun/chart_20060407.pdf.* This chart is referenced herein as Chart P11.

[10] The method of choosing nominees for election to Federal office, either by a primary or a preference election, a caucus, or a convention, differs from State to State. This document uses the term "primary election" to refer to any election that chooses a nominee for the general election. *See also* note 6, above.

[11] Thus, if State A conducts its Presidential primary on February 1st of the Presidential election year, the time frame in State A for Presidential candidates would begin on approximately October 1st of the year preceding the Presidential general election. Similarly, if State B held its Presidential primary on June 1st of the Presidential election year, the time frame in State B for Presidential candidates would begin on approximately February 1st of the Presidential election year and end on the date of the Presidential general election.

provide an empirical basis for predicting when advertising that has the purpose of influencing a Federal election occurs. Moreover, in the context of coordination, a candidate has an incentive to ask an outside group to pay for advertisements to be aired precisely during the time period when the candidate believes these advertisements would be effective. Advertisements run outside of the effective time frame are of little value to the candidate, and therefore do not present the potential for corruption or the appearance of corruption that BCRA and the Act intend to prevent.

Commenters agreed that a time frame is helpful in identifying communications that are made for the purpose of influencing an election. As one commenter noted: "The Commission is reasonable in its belief that election-influencing communications are generally susceptible to temporal definition and limitation. The Commission should continue to determine where that temporal limitation is." Moreover, commenters generally agreed that proximity to an election factors into the value of the communication.

The data analyzed by the Commission show that nearly all Senate and House candidate advertising takes place within 60 days of an election. Senate candidates aired 91.60 percent and 94.73 percent of their advertisements within 60 days of the primary and general election, respectively.[12] This represented 93.32 percent and 97.20 percent of the estimated costs of advertisements the Senate candidates ran before the primary and general elections, respectively.[13] House candidates aired 88.16 percent and 98.09 percent of their advertisements within 60 days of the primary and general election, respectively.[14] This represented 92.68 percent and 98.75 percent of the estimated costs of the advertisements House candidates ran before the primary and general elections, respectively.[15]

The data show that a minimal amount of activity occurs between 60 and 90 days before an election, and that beyond 90 days, the amount of candidate advertising approaches zero. Senate candidates aired only 0.87 percent and 0.39 percent of their advertisements more than 90 days before their primary and general elections, respectively,[16] which represented 0.66 percent and

0.15 percent of the total estimated costs of advertisements run by Senate candidates before the primary and general elections, respectively.[17] Similarly, House candidates aired only 8.56 percent and 0.28 percent of their advertisements more than 90 days before their primary and general elections, respectively.[18] This represented 3.79 percent and 0.13 percent of the total estimated costs of advertisements run by House candidates before the primary and general elections, respectively.[19]

The data are consistent with the comments received by the Commission. Commenters stated that a 60-day time frame comports with the practical reality of when candidates run advertisements. Comments submitted by the Democratic National Committee, the Democratic Senatorial Campaign Committee, the Democratic Congressional Campaign Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee ("NRCC") all stated that in their experience, coordinated activities occurred within 60 days of the 2004 elections. The NRCC further stated that both its coordinated and independent expenditures for the 2004 general election were all made within 60 days of that election.

A 60-day time frame is also consistent with past Congressional, Supreme Court, and Commission findings. As one commenter stated, "this time period [60 days] would be consistent with Congressional line-drawing in the context of electoral and political speech in the BCRA itself." Comments submitted by the BCRA Congressional sponsors in 2002 stated, "Title II of BCRA reflects congressional judgment that communications concerning federal elected officials during the 60 day period prior to a general election and the 30 day period prior to a primary is usually campaign related." In *McConnell v. FEC*, the Supreme Court upheld the 30- and 60-day time frames for electioneering communications, concluding that Congress had adequately explained its decision to regulate the "virtual torrent of televised election-related ads during the periods immediately preceding federal elections' and that "[t]he record amply justifies Congress' line drawing." *McConnell v. FEC*, 540 U.S. 93, 207–08 (2003). As the FEC successfully argued in *McConnell*:

The timing requirement is also directly tied to Congress's objective of capturing advertisements that are likely to influence the outcome of federal elections. The record 'overwhelmingly demonstrate[s] the appropriateness of BCRA's sixty and thirty day benchmarks,' and confirms with remarkable clarity the common-sense conclusion 'that issue advertisements aimed at influencing federal elections are aired in the period right before an election. Supp. App. 725sa–728sa, 847sa–848sa (Kollar-Kotelly) (discussing evidence); *see id.* at 851sa ('The sixty and thirty day figures are not arbitrary numbers selected by Congress, but appropriate time periods tied to empirically verifiable data.')

Brief for the Federal Election Commission *et al.* at 94, *McConnell v. FEC*, 540 U.S. 93 (2003) (discussing the timing requirement under the definition of electioneering communication).

The record before Congress when passing BCRA and before the Supreme Court in *McConnell* included the Brennan Center's "Buying Time" study, which further supports the conclusion that the vast majority of election related advocacy occurs immediately before an election. The Brennan Center found that, "[i]n the 2000 election, genuine issue ads are rather evenly distributed throughout the year, while group-sponsored electioneering ads make a sudden and overwhelming appearance immediately before elections." Craig B. Holman and Luke P. McLoughlin, "Buying Time 2000: Television Advertising in the 2000 Federal Elections," 56 (2002). Another study supported the 60-day time frame and was entered into the Congressional Record by Senator Snowe. Jonathan Krasno and Kenneth Goldstein, "The Facts About Television Advertising and the McCain-Feingold Bill," 35(2) PS: Political Science and Politics 207 (2002); *see also* 147 Cong. Rec. S3070–01, S3074 (2001). This study found that in 1998 and 2000 "the greatest deluge of issue ads began appearing after Labor Day." *Id.* at S3075.

The 60-day time frame is also consistent with existing Commission regulations. As a commenter stated, "Setting the time period at 60 days is also supported by the FEC's regulatory time periods for the depreciation of polling data in 11 CFR 106.4(g), under which the FEC has determined that on the 61st day after the polling event, the data is worth only 5% of its original value."

Therefore, in response to the Court of Appeals' first question, the data analyzed and comments reviewed by the Commission establish that Senate and House candidates focus their campaign advocacy not during the last 120 days before an election, but during

---

[12] *See* Graphs S1 and S3.

[13] *See* Graphs S2 and S4.

[14] *See* Graphs H1 and H3.

[15] *See* Graphs H2 and H4.

[16] *See* Graphs S1 and S3.

[17] *See* Graphs S2 and S4.

[18] *See* Graphs H1 and H3.

[19] *See* Graphs H2 and H4.

the last 60 days before an election. Moreover, beyond 90 days from an election, Senate and House candidate advertising nearly ceases. As suggested by the Court of Appeals' second question, however, the data on Presidential candidates show a different advertising pattern, and are discussed below.

2. Campaign Advertising in Presidential Races Occurs on a Different Cycle Than in Senate and House Races

The data and comments examined by the Commission respond directly to the second question posed by the Court of Appeals: "Do congressional, senatorial, and presidential races—all covered by this rule—occur on the same cycle, or should different rules apply to each?" *Shays Appeal* at 102. The data show that advertising in the Presidential race does in fact occur on a different cycle than advertising in Senate and House races. Appreciable spending occurred outside of the 120-day time frame with regard to the Presidential general election.[20] Specifically, in the media markets contained within individual "battleground" States,[21] the 120-day time frame before the general election covered less than 75 percent of the estimated spending.[22]

Under the Commission's 2002 regulations, the general election coordinated communication window effectively extended further back than 120 days before the general election because the Presidential nominating conventions of the political parties are also elections for purposes of determining whether a communication satisfies the fourth content standard in former 11 CFR 109.21(c)(4). *See* 11 CFR 100.2(e). Accordingly, in 2004, the general election coordinated communication window overlapped with the coordinated communication windows before the Presidential nominating conventions and therefore the coordination regulations applied for the entire 184 days before the general election for Republican Presidential candidates and for 219 days before the general election for Democratic Presidential candidates.[23] Even with this extended general election window, however, in several States there was still a time period between the primary elections and the start of the extended window during which public communications were not covered by the 120-day time frame in the 2002 rules ("gap period"). Moreover, the length of the gap period was solely a function of the parties' selection of convention dates. To the extent advertising was continuous during the time period between the primary and general elections, the amount that was subject to the existing 120-day rule depended on the dates the parties set for their conventions, rather than on the purposeful application of the rule.

The Commission received several comments addressing the issue of communications made during the Presidential gap periods. Some commenters were in favor of regulating communications run during this gap period, noting that post-primary communications are "overwhelmingly likely to be for the purpose of influencing the candidate's election." One joint commenter submitted voluminous appendices and argued that a significant amount of campaign advertising occurs during this gap period.[24] As another commenter argued, "a period starting 120 days prior to a primary and running all the way to the general election would be appropriate to capture ads that are most likely to influence an election." In contrast, other commenters argued against extending the regulation into this gap period, asserting that campaigns do not advertise significantly during this time, and therefore, according to some, regulation would unnecessarily infringe on constitutionally protected speech. A commenter representing a political party committee argued that political party committees would already be covered by Federal reporting and spending limitations and that covering this gap period is therefore unnecessary.

The CMAG data show that, in 2004, Presidential candidates spent appreciable amounts on advertisements run during the gap period between the State primaries and the beginning of the 184-day Republican and the 219-day Democratic extended general election windows, respectively. Specifically, in media markets contained fully within individual "battleground" States, the Republican Presidential candidate spent a total of $9,475,679 on television advertisements run during the gap period, which amounted to 14 percent of the total costs of media spots aired by the Republican Presidential candidate in those media markets after the State primaries.[25] In some of these media markets, the percentage was significantly higher.[26] For example, in the Seattle, WA, media market, 38 percent of the post-primary Republican spending occurred during the gap period, and, in the Madison and Milwaukee, WI, media markets, 20 percent of the post-primary Republican spending occurred during the gap period.[27] Democratic Presidential candidates spent $1,221,045 on post-primary television advertisements that occurred during the gap period.[28] Thus, nearly $10.7 million was spent by Presidential candidates on television advertisements during the gap periods.[29]

In response to the Court of Appeals' second question, the data and comments confirm that campaign advertising in Presidential races does in fact take place on a different cycle than Senate and House races. Rather than the 60-day cycle in Senate and House races, the data and comments confirm that nearly all Presidential advertisement spending took place during the time period from 120 days before the primary elections up through the date of the general election. According to the data, in the 2004 election cycle, over 99 percent of the estimated media spot spending by Presidential candidates in media markets fully contained within individual "battleground" States occurred during this time period.[30] This time period is now fully covered by the Commission's revised content standard at 11 CFR 109.21(c)(4).

---

[20] *See* Graphs P2 and P4.

[21] The Commission decided to limit the data appearing in these graphical representations to those States in which the 2004 Presidential race was the most highly contested. The States determined to be the 2004 "battleground" States are: Arizona, Arkansas, Colorado, Florida, Iowa, Louisiana, Maine, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Washington, West Virginia, and Wisconsin. A list of "battleground" States was determined from the following sources: *Cook Political Report* (*http://www.cookpolitical.com/column/2004/021704.php*); *ABC News/Washington Post* (*http://www.abcnews.go.com/sections/us/WorldNewsTonight/battlegrounds_poll_040422.html*); *National Journal* (*http://nationaljournal.com/members/campaign/2004/swingstates/*); *Wall Street Journal/Zogby International* (*http://online.wsj.com/public/resources/documents/info-battleground04-print.html*).

[22] *See* Graph P10.

[23] The general election coordinated communication window began on July 5, 2004, for all candidates. The Republican National Convention was held on August 30–September 2, 2004, and the coordinated communication window for that convention began on May 2, 2004, which was 184 days before the general election. The Democratic National Convention was held on July 27–29, 2004, and the coordinated communication window for that convention began on March 28, 2004, which was 219 days before the general election.

[24] Some of the advertisements presented by the commenter were run during the pre-convention window, and therefore, were covered by the Commission's existing coordination regulations.

[25] *See* Chart P11.

[26] *See* Chart P11.

[27] *See* Chart P11.

[28] *See* CMAG Data.

[29] *See* Chart P11 and CMAG Data.

[30] *See* Graphs P8 and P10.

3. The Minimal Value of Advertising Outside of the Revised Time Frames Limits the Risk of Corruption From Candidates and Collaborators Shifting Coordinated Spending to Outside the Time Frames

The data and comments reviewed by the Commission also respond to the third question posed by the Court of Appeals: "[T]o the extent election-related advocacy now occurs primarily within 120 days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged rules' restrictions?" *Shays Appeal* at 102. As discussed above, candidates have little incentive to ask outside groups to pay for advertisements aired outside of periods where the candidates' own spending indicates they would be effective. Therefore, outside of those time periods where candidate advertising occurs, there is little risk that coordinated activity presents the risk or appearance of corruption.

As discussed above, the data and comments analyzed in response to the Court of Appeals' first question overwhelmingly support a 60-day time frame for Congressional candidate communications. However, in order to foreclose the possibility that candidates and groups will shift spending outside the applicable time frame, the Commission has determined to set the Congressional time frame at 90 days. Congressional candidates aired a minimal percentage of their advertisements more than 60 days before an election, and beyond 90 days aired virtually no advertisements.[31] Candidates have little or no incentive to shift spending beyond 90 days. The limited value of advertising beyond 90 days is reflected in the data, with Senate candidates spending less than a quarter of one percent of their television advertising budgets on spots that aired between 90 and 120 days before either a primary or a general election.[32] Similarly, House candidates spent less than three percent of their television advertising budgets on spots that aired between 90 and 120 days before a primary election[33] and less than a quarter of one percent of their television advertising budgets on spots that aired between 90 and 120 days before a general election.[34]

For Presidential candidates, while the data show that the existing 120-day time frames captured a majority of

[31] *See* Graphs S1, S3 and H1, H3.
[32] *See* Graphs S2 and S4.
[33] *See* Graph H2.
[34] *See* Graph H4.

Presidential spending, some appreciable spending occurred in the gap period not covered by the current 120-day rule.[35] Accordingly, the Commission has determined to close the gap period and extend the applicable time frame from 120 days before the primary election in a State continuously through the day of the general election in that State. This revised time frame would have covered more than 99 percent of Presidential advertising spending in 2004.[36]

One group of commenters, including plaintiffs in the *Shays* litigation, argued that the 120-day time frame was under-inclusive and should be supplemented with a complex, multi-factored approach that would use a different test, based not on time but instead on the identity of the entity paying for any communication made outside of the 120-day time period. The commenters proposed the Commission adopt the following regulation:

(4) A public communication, as defined in 11 CFR 100.26, made by a political committee, which is an expenditure directed to voters in the jurisdiction of the candidate with whom the communication is coordinated, or if coordinated with a political party, is an expenditure directed to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

(5) A public communication, as defined in 11 CFR 100.26, made by an organization described in section 527 of the Internal Revenue Code and not registered as a political committee, which:

(i)(A) Is distributed or disseminated during the period beginning 30 days prior to the primary election or 60 days prior to the general election of the federal candidate with whom the communication is coordinated, or, if coordinated with a political party, during the period beginning 30 days prior to the primary election or 60 days prior to the general election in which one or more candidates of the political party appear on the ballot, and (B) is directed to voters in the jurisdiction of that candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot, regardless of whether the communication refers to a clearly identified candidate for federal office, or party; or

(ii)(A) Is distributed or disseminated during the period beginning 120 days prior to the primary election and ending on the day of the general election, (B) refers to a clearly identified candidate for federal office or to a political party, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot; or

(iii)(A) Is distributed or disseminated more than 120 days prior to the primary election,

[35] *See* Chart P11.
[36] This figure represents Presidential spending in media markets fully contained within individual "battleground" States. *See* Graphs P8 and P10.

(B) promotes, attacks, supports or opposes a clearly identified candidate for federal office, or if the ad is coordinated with a political party, promotes, attacks, supports or opposes the party or its candidates, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

(6) A public communication, as defined in 11 CFR 100.26, made by any person other than a political committee or other organization described in section 527 of the Internal Revenue Code which:

(i)(A) Is distributed or disseminated during the period beginning 30 days prior to the primary election or 60 days prior to the general election of the federal candidate with whom the communication is coordinated, or, if coordinated with a political party, during the period beginning 30 days prior to the primary election or 60 days prior to the general election in which one or more candidates of the political party appear on the ballot, and (B) is directed to voters in that candidate's jurisdiction, regardless of whether the communication refers to a clearly identified candidate for federal office, or party; or

(ii)(A) Is distributed or disseminated during the period beginning 120 days prior to the primary election and ending on the day of the general election, (B) refers to a clearly identified candidate for federal office or to a political party, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot; or

(iii)(A) Is distributed or disseminated more than 120 days prior to the primary election, (B) refers to the character or the qualifications or fitness for office of a clearly identified candidate for federal office, or if the ad is coordinated with a political party, refers to the character or the qualifications or fitness for office of the party generically or of candidates of that party, and (C) is directed to voters in the jurisdiction of the clearly identified candidate, or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

The Commission believes the record does not support the time frames in the commenters' proposed regulation, nor the disparate regulatory schemes for various entities. Moreover, the Commission agrees with other witnesses at the hearing that if the Commission were to adopt the proposed regulation, its complexity would likely place an extreme burden upon the regulated community. The commenters also submitted summaries of advertisements from recent election cycles that, according to the commenters, were run more than 120 days before the primary or general election they were intended to influence. However, at the hearing, these commenters acknowledged that there was no evidence that any of these advertisements had been coordinated with a candidate or a political party

committee. The lack of evidence that these advertisements were coordinated with candidates comports with the conclusion drawn from the CMAG data and comments; specifically, that candidates perceive little value in airing advertisements beyond 90 days from an election, and have little incentive to seek such advertising in exchange for political favoritism.

4. Communications That Refer to Political Parties

As set forth in new 11 CFR 109.21(c)(4)(iii) and (iv), communications that refer to political parties are now subject to different time periods depending upon: (1) Whether the communication is coordinated with a candidate or political party committee; (2) whether the upcoming general election is a midterm or Presidential election; and (3) if the communication also refers to a clearly identified Federal candidate, whether it is run in the clearly identified candidate's jurisdiction.

When communications are paid for by outside groups, refer to a political party, are coordinated with a *candidate*, and are publicly distributed or otherwise disseminated in that candidate's jurisdiction, they can generally be presumed to be for the purpose of influencing that candidate's election whether or not they also refer to the candidate with whom they are coordinated. Accordingly, it is appropriate to use the time frame established for communications that refer to a House or Senate candidate (90 days before a primary, special, or general election) where the communications refer only to a political party and not to a clearly identified Federal candidate, but are coordinated with a House or Senate candidate and distributed in that candidate's jurisdiction, even if such communications are distributed during a Presidential election cycle. *See* 11 CFR 109.21(c)(4)(iii)(A). Similarly, if a communication were coordinated with a Presidential candidate, it would be appropriate to use the same 120-day time period established for communications referring to Presidential candidates. *See* 11 CFR 109.21(c)(4)(iii)(A).

A communication that refers to a political party without referring to a clearly identified Federal candidate, otherwise satisfies the content prong, is paid for by an outside group, and is coordinated with a *political party*, can generally be presumed to be for the purpose of influencing the elections of all of the party's candidates within that jurisdiction during the relevant time

period before an election. During a midterm election cycle (in which only House and Senate candidates are on the ballot), new 11 CFR 109.21(c)(4)(iii)(B) provides that communications referring to political parties are subject to the same 90-day time period as communications referring to House and Senate candidates. Likewise, the new rules provide that during a Presidential election cycle, communications referring to political parties are presumed to be for the purpose of influencing the elections of all of the party's candidates, including the party's Presidential candidate. Accordingly, such communications are subject to the same 120-day time period as communications referring to Presidential candidates. *See* new 11 CFR 109.21(c)(4)(iii)(C).

If the communication refers to both a political party and a clearly identified Federal candidate, the communication is subject to the time frame applicable to that clearly identified candidate under 11 CFR 109.21(c)(4)(i) or (ii) when the communication is coordinated with either a candidate or a political party and is distributed or disseminated within the clearly identified candidate's jurisdiction. *See* 11 CFR 109.21(c)(4)(iv)(A) and (B). Such communication is subject to the applicable time frames for party references when coordinated with a political party and distributed and disseminated outside the candidate's jurisdiction. *See* 11 CFR 109.21(c)(4)(iv)(C). Any such communication coordinated with a candidate, but distributed outside that candidate's jurisdiction, would not constitute a coordinated communication.

5. Other Considerations

In the Commission's judgment, the foregoing time frames encompass the periods in which effective political party, Congressional, and Presidential election-related advertising occurs, and therefore political parties, candidates, and collaborators will have little incentive to shift spending outside of these time frames. None of the commenters submitted any evidence that, during the recent election cycles during which the Commission's 2002 coordination rules were in effect, House or Senate candidates asked outside groups to run advertisements more than 90 days before House or Senate primary or general elections. Since the 2002 rule took effect, the Commission has received very few complaints alleging that House or Senate candidates or their agents coordinated with outside groups to produce or distribute

communications that ran between 90 and 120 days before a House or Senate primary or general election. Moreover, commenters did not submit any evidence that during the recent election cycles in which the Commission's 2002 coordination rules were in effect, Presidential candidates or their agents asked outside groups to run advertisements more than 120 days before Presidential primaries or the general election.

Retaining a longer time frame that is not supported by the record could potentially subject political speech protected under the First Amendment to Commission investigation. Subjecting activity to investigation that the evidence shows is unlikely to be for the purpose of influencing Federal elections could chill legitimate lobbying and legislative activity. As the Supreme Court has emphasized, where First Amendment rights are affected, "[p]recision of regulation must be the touchstone," *Endenfield* v. *Fane*, 507 U.S. 761, 777 (1993).

The Court of Appeals emphasized that it "can hardly fault the [Commission's] effort to develop an objective, bright-line test." *Shays Appeal* at 99. As the D.C. Circuit noted in an analogous context, "a subjective test based on a totality of the circumstances * * * would inevitably curtail permissible conduct." *Orloski* v. *FEC*, 795 F.2d 156 (D.C. Cir. 1986). In *Orloski*, the D.C. Circuit further warned that:

[A] subjective test would also unduly burden the FEC with requests for advisory opinions * * * and with complaints by disgruntled opponents who could take advantage of a totality of the circumstances test to harass the sponsoring candidate and his supporters. It would further burden the agency by forcing it to direct its limited resources toward conducting a full-scale, detailed inquiry into almost every complaint, even those involving the most mundane allegations.

*Id.* at 165.

Considering the political, expressive, and associational rights at stake, the Commission has determined not to extend the time frame beyond that period supported by the record.

*B. Revised 11 CFR 109.21(c)(4)*

The Commission continues to believe that an objective, bright-line coordination test provides the clearest guidance to candidates, political party committees, and outside organizations. Moreover, as discussed above, the CMAG data show that in the 2004 election cycle, nearly all television advertisements paid for by candidates were aired within certain time frames before an election. These data, therefore, provide empirical support for the

Commission's decision to use time frames as part of a bright-line test for determining whether a communication is made for the purpose of influencing Federal elections.

Accordingly, as set forth in new 11 CFR 109.21(c)(4)(i), public communications that refer to a Senate or House of Representatives candidate are subject to two 90-day time periods. One time period runs from 90 days before any primary in which the Congressional candidate is on the ballot through the date of the primary. Then, another time period starts 90 days before any general election in which the candidate is on the ballot and runs through the date of the general election. In some States, these periods will overlap if a primary election is held fewer than 90 days before a general election.

Under new 11 CFR 109.21(c)(4)(ii), communications that refer to a candidate for President or Vice President are subject to a single time period that begins 120 days before a State's primary election up to and including the date of the general election.

Under new 11 CFR 109.21(c)(4)(iii), communications that refer to a political party but not to a clearly identified Federal candidate are subject to different time periods under different circumstances. For those communications that are coordinated with a candidate and reference a political party, but do not reference a clearly identified Federal candidate, the time frame that would be applicable if that candidate were clearly identified in the communication under 11 CFR 109.21(c)(4)(i) or (ii) applies when the communication is distributed or disseminated within that candidate's jurisdiction. *See* 11 CFR 109.21(c)(4)(iii)(A). For communications coordinated with a political party committee and distributed during the two-year election cycle ending in a non-Presidential general election, one time period runs from 90 days before any primary in which a candidate of that party is on the ballot through the date of the primary. *See* 11 CFR 109.21(c)(4)(iii)(B). Then, another time period begins 90 days before any general election in which a candidate of that party is on the ballot and runs through the date of the general election. In some States, these periods will overlap if a primary election is held fewer than 90 days before a general election. For communications coordinated with a political party committee and distributed during the two-year election cycle ending in a Presidential general election, a single time period begins 120 days before a candidate of that party's

primary election in a State up to and including the date of the general election. *See* 11 CFR 109.21(c)(4)(iii)(C).

Under new 11 CFR 109.21(c)(4)(iv), communications that refer to both a political party and a clearly identified candidate are subject to the time frame applicable to that clearly identified candidate under 11 CFR 109.21(c)(4)(i) or (ii) when the communication is distributed or disseminated within the clearly identified candidate's jurisdiction. *See* 11 CFR 109.21(c)(4)(iv)(A) and (B). However, communications that refer to both a political party and a clearly identified candidate, are coordinated with a political party committee, and are distributed outside the clearly identified candidate's jurisdiction are subject to the time period that would apply to communications that refer only to a political party. *See* 11 CFR 109.21(c)(4)(iv)(C).

*C. Clarification of Time Frame Requirement*

The Commission is also taking this opportunity to clarify that a public communication satisfies the content standards in 11 CFR 109.21(c)(4)(i) and (ii) with respect to a candidate for Federal office only if the public communication is publicly distributed or otherwise publicly disseminated during the relevant time periods before an election in which that candidate or another candidate seeking election to the same office is on the ballot.

This clarification addresses the situation presented in Advisory Opinion 2004–01 (Bush-Cheney/Kerr). This advisory opinion concerned President Bush's appearance in a television advertisement paid for by a Congressional candidate in which President Bush endorsed that Congressional candidate. The Commission determined that any airing of the advertisement that occurred more than 120 days before the Presidential primary in a State in which the advertisement aired was not an in-kind contribution to President Bush because it did not satisfy the fourth content standard (*i.e.*, 11 CFR 109.21(c)(4)). Thus, in determining whether the Congressional candidate's payment for the communication would be an in-kind contribution to President Bush, the Commission looked at whether the communication was aired within 120 days before President Bush's election rather than whether it was aired within the time period applicable to the paying Congressional candidate.

In the *NPRM*, the Commission sought comment on whether it should clarify its coordinated communication rules to

incorporate the approach taken in Advisory Opinion 2004–01 and to make clear that a public communication satisfies the content prong with respect to a Federal candidate only if it is distributed within the applicable time period before that candidate's election. For example, a Senator whose reelection is not until 2008 appears in an advertisement with a 2006 candidate for the House of Representatives. The advertisement is aired within 90 days of the House candidate's election, is paid for by the House candidate's campaign committee, and is disseminated in the State where the Senator will seek reelection in 2008. The proposed clarification of the rule would explain that the advertisement would not be an in-kind contribution to the Senator because the advertisement was not aired within 90 days of the Senator's 2008 election. Two commenters supported the proposed clarification and no commenters opposed it. Accordingly, the Commission is revising 11 CFR 109.21(c)(4)(i) and (ii) to make clear that the public communication at issue must be publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction before the clearly identified candidate's election in that jurisdiction. Read in conjunction with the "payment prong" at 11 CFR 109.21(a), which requires that the communication be paid for by someone other than the candidate at issue, this revision codifies the Commission's decision in Advisory Opinion 2004–01. *See also* Advisory Opinion 2005–18 (Reyes) (Concurring opinion of Commissioners Thomas, Toner, Mason, McDonald, and Weintraub).

The Commission notes that 11 CFR 109.21(c)(4)(i) and (ii) also cover advertisements coordinated with a candidate and disseminated within the applicable time period before an election of that candidate's opponent or potential opponent.[37] For example, Candidate Smith has already won the Democratic nomination for the U.S. Senate in State A, but the Republican Party has not yet held its primary in that State. At the request or suggestion of Candidate Smith, Organization X pays to run advertisements a week before the Republican primary attacking Candidate Jones, who is the frontrunner in the Republican primary race for U.S. Senate in State A and hopes to compete in the subsequent general election against Smith. Although Candidate Smith is not on the ballot in the Republican primary

---

[37] *See* note 44, below (defining "potential opponent" and identifying criteria that must be met for a person to be a "candidate" under the Act.).

Federal Register / Vol. 71, No. 110 / Thursday, June 8, 2006 / Rules and Regulations **33199**

in State A and his general election is more than 90 days away, the advertisement attacking Candidate Jones is an in-kind contribution to Candidate Smith because its purpose is to oppose Candidate Smith's potential opponent in the general election and thus influence Smith's election.

### III. Alternative Proposals for Revising the Content Prong Not Adopted

The *NPRM* presented seven alternatives for retaining or revising the "content prong" of the 2002 coordination rules at 11 CFR 109.21(c). The Commission sought comment on each of these alternatives, as well as on whether a combination of components from different alternatives would be appropriate. Alternative 1 was to retain the 120-day time frame and Alternative 2 was to replace it with another time frame. In light of the Court of Appeals' rejection of the District Court's conclusion that "FECA precludes content-based standards," (*Shays Appeal*, 414 F.3d at 99), and in light of the Court of Appeals' ruling that "time, place, and content may be critical indicia of communicative purpose," (*Id.* at 99) the Commission has decided to adopt a combination of Alternative 1 and Alternative 2 based on a careful review of the comments and the CMAG data on candidate advertising during the 2004 election cycle. The Commission has therefore decided not to adopt any of the remaining five alternatives, each of which is discussed briefly below.

#### Alternative 3

Alternative 3 was to eliminate the time frame from the fourth content standard altogether. Commenters generally opposed this approach because they believed it would be unconstitutionally overbroad and would unnecessarily sweep into the area of "grassroots lobbying" efforts. One group of commenters argued that such an approach was adequate for political committees, but was overbroad with regard to speakers other than political committees.

The Commission agrees with the majority of the commenters who believe that eliminating the time frame from the fourth content standard in 11 CFR 109.21(c)(4) would unnecessarily capture a substantial amount of speech that is unrelated to elections, thereby raising substantial First Amendment issues. This alternative would apply to *any* public communication that refers to a Federal candidate and is publicly disseminated in the jurisdiction of the Federal candidate, even if the communication is made years before any election in which the candidate

participates and is made without any purpose of influencing a Federal election. Such an approach is inconsistent with the Court of Appeals' recognition that "to qualify as [an] 'expenditure' in the first place, spending must be undertaken 'for the purpose of influencing' a federal election." *Shays Appeal* at 99. Such an approach also runs counter to the Court of Appeals' conclusion that the Commission may appropriately apply a content standard to determine which communications are made for the purpose of influencing a Federal election and that the timing of a communication may be a critical indicium of an election-influencing purpose. *Shays Appeal* at 99. Such an approach is not justified by the need to prevent circumvention of the Act's contribution limits because, as discussed above, the CMAG data show that public communications made by candidates for the purpose of influencing a Federal election overwhelmingly take place within certain limited time frames before elections (*i.e.*, 90 days before House and Senate elections and 120 days before Presidential primaries through the day of the general election).

#### Alternative 4

Alternative 4 proposed to replace the time frame in the fourth content standard with a test based on whether a communication promotes, supports, attacks, or opposes ("PASOs")[38] a political party or clearly identified Federal candidate. No commenter fully supported Alternative 4. One group of commenters argued that a PASO standard should not be applied to political committees but should be applied to entities described in section 527 of the Internal Revenue Code that are not registered with the Commission

as political committees. Other commenters proposed combining the PASO standard with a time restriction, namely, the 30/60-day time frame used in the "electioneering communication" regulations.[39] Other commenters opposed adoption of a PASO standard, arguing that a PASO standard in place of a time frame is unworkable, inadequate, and overly broad. One joint commenter asserted that the legislative history in BCRA's coordination provisions implies that the Commission lacks the authority to use a PASO standard as part of the coordinated communication test. In rejecting a PASO standard, most commenters agreed that the Commission should continue to use a bright-line rule to determine whether a communication satisfies the content prong of the coordinated communication test. As one commenter stressed, "We agree with the Court of Appeals when it said it could 'hardly fault the [Commission's] effort to develop an objective, bright-line test [that] does not unduly compromise the Act's purpose.' Thus, we urge the Commission to maintain a bright-line test in the area of coordination."

The Commission agrees with the commenters that an objective, bright-line test, based on a sound evidentiary record, provides the clearest guidance to those seeking to comply with the coordination regulations. The Commission also invited comment on whether under Alternative 4, instead of using a PASO standard, the Commission should create a safe harbor exemption from the coordinated communication rules for certain types of communications that are not made for the purpose of influencing Federal elections. Several commenters supported the creation of such a safe harbor. One joint commenter argued that adopting a more focused safe harbor is both "the most supportive [approach] of political speech and the most consistent with the legislative history of BCRA's coordination provisions." In this vein, as discussed below, the Commission is adding a safe harbor for public communications in which a Federal candidate endorses another candidate, or solicits contributions for certain tax-exempt organizations, candidates, and political committees. *See* Section V, below, and new 11 CFR 109.21(g). The Commission, however, has determined that a temporal standard, rather than a PASO standard, best effectuates the purposes of the Act, while providing clear guidance to the regulated community.

---

[38] The PASO standard is found in BCRA and applies to candidates and political party committees with respect to Federal Election Activity ("FEA"). *See* 2 U.S.C. 431(20)(A)(iii). Congress also applied the PASO standard to the activity of certain tax-exempt organizations. For example, BCRA prohibits party committees from soliciting funds for, or making or directing donations to, certain tax-exempt organizations that make expenditures or disbursements for FEA, which includes public communications that PASO a Federal candidate. *See* 2 U.S.C. 431(20)(A)(iii) and 441i(d)(1). In addition, BCRA directed the Commission not to exempt any communications that PASO a clearly identified Federal candidate from the electioneering communication provisions. *See* 2 U.S.C. 434(f)(3)(B)(iv). The Supreme Court, in rejecting a constitutional vagueness challenge to the PASO standard, held that "the words 'promote,' 'oppose,' 'attack,' and 'support' * * * provide explicit standards for those who apply them and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.' " *McConnell v. FEC*, 540 U.S. 93, 170 n.64 (2003) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972)).

[39] *See* note 3, above.

**33200**    **Federal Register** / Vol. 71, No. 110 / Thursday, June 8, 2006 / Rules and Regulations

*Alternative 5*

Alternative 5 proposed to eliminate the time frame from the fourth content standard for political committees only. Many of the commenters opposed this approach. Several commenters argued that by eliminating a time frame only for political committees, the Commission would be presuming that communications paid for by political committees are made solely for the purpose of influencing Federal elections, when they believed that many of a political committee's communications are made for other purposes, such as issue advocacy. Another commenter objected that such an approach would retain the existing time frame for organizations that are not subject to the prohibitions and limitations of the Act while tightening regulation for organizations that are already subject to numerous regulations because of their status as political committees. As that commenter pointed out, political committees are subject to the Act's contribution limits and prohibitions, are required to disclose their activities to the Commission, and receive relatively small contributions, mostly from individuals. In addition, several commenters opposed this alternative because it is not supported by empirical evidence. One joint commenter, however, supported Alternative 5 based on the assertion that groups whose 'major purpose' is to influence elections should be subject to broader regulatory standards. Accordingly, the joint commenter concluded that under Alternative 5, "an 'expenditure' by a political committee should satisfy the 'content' test without regard to a time frame." For the same reason, the commenter also urged the Commission to abolish the time frame for public communications made by entities described in section 527 of the Internal Revenue Code.

The Commission has decided not to adopt Alternative 5 because, as discussed above, the Court of Appeals rejected the argument that "FECA precludes content-based standards" and concluded that "time, place, and content may be critical indicia of communicative purpose." *Shays Appeal* at 99. As discussed above, the CMAG data provide overwhelming empirical support for the Commission's decision to use time frames as part of a bright-line test for determining whether a communication is made for the purpose of influencing Federal elections. In contrast, there is no evidence that political committees are more likely than other groups to coordinate

communications outside of these time frames.

*Alternative 6*

In Alternative 6, the Commission proposed to replace the fourth content standard with a test that simply relies on the statutory language "made for the purpose of influencing a Federal election." The majority of commenters were opposed to this standard because they believe it would require the Commission to determine whether a public communication is a coordinated communication based on a totality of the circumstances test and would fail to give those subject to the Commission's regulations adequate notice of what behavior will come within the coordination regulations. One joint commenter believed that adoption of this alternative would deter individuals and organizations from making public communications regarding policy matters because "they would have no idea whether their subsequent public communication would be covered by the prohibition on coordinated expenditures."

On the other hand, some commenters argued that modified versions of Alternative 6 might be acceptable. For example, one commenter suggested that the alternative should include the 30/60-day temporal limit used in the electioneering communication regulations.[40] Another joint commenter supported the use of a "for the purpose of influencing a Federal election" test as part of a complex, tiered approach that would apply different content standards depending on the identity of the entity paying for the communication.

The Commission has decided not to adopt Alternative 6 because a bright-line test based on proximity to an election provides the clearest guidance to those seeking to comply with the regulations and provides a more manageable standard for enforcement than the more general "for the purpose of influencing a Federal election" standard.

*Alternative 7*

Alternative 7 proposed to eliminate the entire content prong in 11 CFR 109.21(c) and replace it with the requirement that the communication be a public communication as defined in 11 CFR 100.26. This proposal was universally rejected by commenters. Some commenters disapproved of this alternative on the grounds that it would be overbroad, was not supported by any evidence in the record or indication of Congressional intent, would have unintended consequences, and would

unnecessarily chill constitutionally protected speech. Another commenter asserted that this proposal was in direct contradiction with the legislative history of BCRA, which demonstrated that Congress "affirmatively intended that any coordination regulation issued by the Commission should protect against interference with lobbying and similar activities."

When the Commission promulgated the *2002 Coordination Final Rules*, it stated "the Commission believes that a content standard provides a clear and useful component of a coordination definition in that it helps ensure that the coordination regulations do not inadvertently encompass communications that are not made for the purpose of influencing a federal election." *2002 Coordination Final Rules*, 68 FR at 426. In order to ensure that the coordination regulations do not inadvertently encompass communications not made for the purpose of influencing a Federal election, the Commission is rejecting Alternative 7.

## IV. The "Directed to Voters" Requirement in 11 CFR 109.21(c)(4)

The 2002 rules provided that to satisfy the fourth content standard, a public communication must be directed to voters in the jurisdiction where the clearly identified candidate is on the ballot or where one or more candidates of the political party are on the ballot. *See* former 11 CFR 109.21(c)(4)(iii). The Commission is removing the phrase "directed to voters in the jurisdiction." In the revised rule, to satisfy the content standard in 11 CFR 109.21(c)(4), a public communication must be "publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction" or, if the public communication refers to a political party, but not to a clearly identified Federal candidate, in a jurisdiction in which one or more candidates of a political party appear on the ballot. These revisions clarify that a communication is potentially for the purpose of influencing a Federal election where the persons receiving the communication that is coordinated can vote for or against the referenced candidate or candidate's opponent in that election, or in the case of a general party reference, a candidate of the referenced party in that election. The revisions also clarify that for communications that refer solely to a political party and are coordinated with a candidate, the analysis turns on whether the communication is publicly distributed or otherwise publicly

---

[40] *See* note 3, above.

disseminated in the jurisdiction of the candidate with whom it is coordinated.[41]

The *NPRM* also sought comment on whether the fourth content standard at former 11 CFR 109.21(c)(4)(iii) should be changed to specify a minimum number of persons that must be able to receive a communication and, if so, what the required minimum number of persons should be. The Act and Commission regulations defining "electioneering communication" require that 50,000 or more persons be able to receive an "electioneering communication" in the jurisdiction where the clearly identified Federal candidate is on the ballot.[42] Similarly, the definitions of "mass mailing" and "telephone bank" contained in the Act and Commission regulations as part of the definition of "public communication" contain a minimum threshold of 500. *See* 2 U.S.C. 431(23) and (24); 11 CFR 100.27, 100.28, and 100.29 (defining "mass mailing" as a mailing of more than 500 pieces of mail of an identical or substantially similar nature sent within a 30-day period and "telephone bank" as more than 500 telephone calls of an identical or substantially similar nature made within a 30-day period). In contrast, the fourth content standard does not specify how many persons must be able to receive a communication for it to be classified as a coordinated communication. *See* 2 U.S.C. 434(f)(3)(C); 11 CFR 100.29(b)(3)(ii)(A) and (b)(5).

The Commission has decided not to specify a minimum number of persons that must be able to receive a communication for the fourth content standard to apply. While the 50,000 threshold for "electioneering communication" and the 500 threshold for mass mailings and telephone banks are contained in BCRA, there is no analogous statutory provision to suggest that Congress intended either of these thresholds, or any other threshold, for coordinated communications. Moreover, because the coordinated communication rules apply to different types of communications, no single minimum threshold is appropriate for all communications. For example, unlike the "electioneering communication" provisions, which cover only broadcast, cable, and satellite communications (*i.e.*, television and radio advertisements), the coordinated communication rules apply to print

media and telephone banks as well. Adopting, for instance, a 50,000 or even 30,000-person threshold could have the effect of creating a blanket exemption for print advertisements placed in small town newspapers with a relatively low circulation.

In the *NPRM*, the Commission also invited comment on whether a "directed to voters in the candidate's jurisdiction" requirement should be added to the second and third content standards, which cover the republication of campaign materials and express advocacy. Three commenters supported adding the requirement to the second and third content standards because, in the words of one of these commenters, a communication "cannot be said to influence the outcome of an election if the people cannot vote in that particular election." In contrast, a different commenter argued that BCRA does not permit the Commission to add a "directed to voters" requirement for the republication of campaign materials content standard.

The Commission has decided not to add a "directed to voters in the candidate's jurisdiction" requirement to the second and third content standards. The purpose of the content prong of the coordinated communication test is to determine whether a communication has the purpose of influencing a Federal election. Communications that expressly advocate the election or defeat of a Federal candidate or republish campaign materials are by their very nature for the purpose of influencing a Federal election and therefore are in-kind contributions if their creation or distribution is coordinated with a candidate or political party committee.

### V. Safe Harbor for Endorsements and Solicitations by Federal Candidates (New 11 CFR 109.21(g))

*A. Endorsements of, and Solicitations for, Federal or Non-Federal Candidates, Political Committees, and Certain Tax-Exempt Organizations*

The Commission is creating a new safe harbor in 11 CFR 109.21(g) for endorsements by Federal candidates of other Federal and non-Federal candidates, and for solicitations by Federal candidates for other Federal and non-Federal candidates, political committees, and certain tax-exempt organizations described in section 501(c) of the Internal Revenue Code as permitted by 11 CFR 300.65.[43]

Specifically, the new regulation provides that a public communication in which a candidate for Federal office endorses another candidate for Federal or non-Federal office, or solicits funds for another candidate, or for a political committee or section 501(c) organization as permitted by 11 CFR 300.65, is not a coordinated communication with respect to the endorsing or soliciting Federal candidate unless the public communication PASOs the endorsing or soliciting candidate, or another candidate who seeks election to the same office as the endorsing or soliciting candidate.[44] This safe harbor applies regardless of the timing and proximity to an election of the endorsement or solicitation.

Most commenters who addressed this issue supported the creation of a safe harbor on the grounds that such communications are not intended to benefit the endorsing or soliciting candidate's election and are not made for the purpose of influencing the endorsing or soliciting candidate's election. *See Shays Appeal* at 99 ("[T]o qualify as [an] expenditure in the first place, spending must be undertaken 'for the purpose of influencing'' a federal election."). One commenter stated "solicitations are regularly directed to individuals who are not even eligible to vote for the soliciting candidate." Another commenter observed that "often the solicitation is directed to an audience whose members include few, if any, of the candidate's own electorate." In the context of endorsements, one commenter argued that "[a] coordinated expenditure,

---

[41] For communications coordinated between a candidate and a political party and paid for by a political party. *see* 11 CFR 109.37.

[42] *See* note 3, above.

---

[43] 11 CFR 300.65 permits a Federal candidate or officeholder to make certain solicitations of funds on behalf of any organization described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a). *See also* 2 U.S.C. 441i(e)(4). The

---

Commission notes that those organizations not covered by this safe harbor are not subject to a coordination finding, unless their activities separately meet the conduct, content, and payment prongs.

[44] The phrase "another candidate who seeks election to the same office as the endorsing or soliciting candidate" covers not only a candidate's actual opponent but also a candidate's potential opponent, *i.e.*, a candidate who seeks election to the same office as the endorsing or soliciting candidate but who has not yet secured his or her party's nomination and therefore is not yet an opponent. *See* 11 CFR 100.3(a) and 2 U.S.C. 431(2) [setting forth the criteria that must be met for a person to be a "candidate" under the Act). Thus, for example, an advertisement in which a Presidential candidate endorses a candidate for Senate but that also attacks one of the opposing party's candidates for nomination for President would satisfy the fourth content standard at 11 CFR 109.21(c)(4) because it attacks a candidate seeking election to the same office as the endorsing Presidential candidate. In Subpart C of 11 CFR Part 109 the term "opponent" includes a candidate's potential opponent. The term "candidate's opponent" turns on whether the opponent will be an opponent of the soliciting or endorsing candidate during the two-year election cycle and whether the opponent qualifies as a candidate for the same office.

treated as a contribution subject to the limits and source restrictions, must meet the test of benefiting a candidate. This is not true of an endorsement, which is a speech act performed for the benefit of another." Similarly, another commenter noted that the "purpose of a federal candidate's endorsement message is to aid the *endorsed* candidate * * * not to aid the *endorsing* candidate's own election," (emphasis in original) while another commenter observed that "endorsements are seldom, if ever, of electoral value to the endorsing candidate."

The *NPRM* invited comment on whether any safe harbor for endorsements and solicitations by Federal candidates should be limited to communications that do not PASO or, alternatively, do not expressly advocate, the endorsing or soliciting candidate or the candidate's opponent or potential opponent. Most commenters, including two who had opposed the proposed safe harbors in their written comments, agreed that it would be appropriate for the Commission to create the proposed safe harbors so long as they do not extend to communications intended to influence the election of the endorsing or soliciting candidate. Moreover, at the hearing, most commenters agreed that the PASO standard would be an appropriate and workable standard for determining whether communications containing endorsements or solicitations have the purpose of influencing the endorsing or soliciting candidates' elections. Congress has already determined that a State candidate who wishes to sponsor an advertisement featuring a Federal candidate is prohibited by 2 U.S.C. 441i(f) from promoting or supporting the Federal candidate with non-Federal funds. *See* 2 U.S.C. 441i(f) and 11 CFR 300.71. A witness from a reform organization stated that "if the endorsement doesn't promote the candidate doing the endorsement, then it should be okay * * * [T]here should be a standard, whether it's a PASO standard or for the purpose of influencing."

The coordinated communication regulation identifies communications that are for the purpose of influencing a Federal election. *See* 2 U.S.C. 431(9) and 11 CFR 109.21. Because the Commission agrees that endorsements and solicitations are not made for the purpose of influencing the endorsing or soliciting candidate's own election, the Commission is adopting a safe harbor for endorsements of Federal and non-Federal candidates and solicitations made by a Federal candidate for Federal or non-Federal candidates, certain tax-

exempt organizations as permitted by 11 CFR 300.65, and for political committees. There is no evidence that Congress intended to restrict the established practice of candidate endorsements and solicitations when the endorsements and solicitations do not PASO the endorsing or soliciting candidate. To the contrary, in floor statements regarding BCRA, Senator Feingold explained that the relevant BCRA provisions would not prohibit "spending non-Federal money to run advertisements that mention that [State candidates] have been endorsed by a Federal candidate * * * so long as those advertisements do not support, attack, promote, or oppose the Federal candidate." 148 Cong. Rec. S2143 (daily ed. Mar. 20, 2002). The Commission's safe harbor for candidate endorsements is fashioned consistent with this legislative history.

The new rule at 11 CFR 109.21(g) provides that a communication is eligible for the safe harbor only if it does not PASO the endorsing or soliciting candidate or another candidate seeking election to the same Federal office as the endorsing or soliciting candidate.[45] When the safe harbor is applicable, the endorsing or soliciting candidate (and the candidate's agents) may be involved in the development of the communication, in determining the content of the communication, as well as determining the means or mode and timing or frequency of the communication.

The new regulation addresses issues presented in Advisory Opinions 2004–01 (Bush-Cheney/Kerr) and 2003–25 (Weinzapfel). As discussed above, in Advisory Opinion 2004–01, the Commission considered a television advertisement that featured President Bush endorsing a Congressional candidate. The Commission determined that, for any advertisement distributed within 120 days of the Presidential primary in the State in which the advertisement aired, the advertisement's production and distribution costs paid for by the Congressional candidate's committee but attributable to the President's authorized committee were contributions to the President's authorized committee from the Congressional candidate's committee. Similarly, in Advisory Opinion 2003–25, the Commission considered an advertisement featuring a U.S. Senator

endorsing a mayoral candidate and concluded that the communication did not satisfy the fourth content standard because it was not distributed within 120 days of a Federal election.[46]

These advisory opinions are superseded to the extent they concluded that communications containing endorsements by Federal candidates are in-kind contributions to the endorsing Federal candidate if they otherwise satisfy the coordinated communication test, irrespective of whether the communication PASOs the endorsing candidate.

### B. Endorsements of, and Solicitations for, State Ballot Initiatives

In the *NPRM*, the Commission also sought comment on whether a similar safe harbor should apply to a Federal candidate's appearance in communications that endorse, or solicit funds for, State ballot initiatives. Only two commenters addressed the safe harbor proposal and both supported such a safe harbor, arguing that, like endorsements of other candidates, endorsements of State ballot initiatives are not made for the purpose of influencing the election of the endorsing candidate, but rather to influence the outcome of the State ballot initiative. No other commenters addressed the proposal. In light of the limited record produced by the commenters regarding a safe harbor for ballot initiatives, the Commission has decided not to extend a safe harbor for endorsements and solicitations for State ballot initiatives at this time.

### VI. Amendments to the Conduct Prong (11 CFR 109.21(d) and (h))

The conduct prong of the Commission's coordinated communication regulations was not challenged in *Shays* v. *FEC*. Nonetheless, in the *NPRM*, the Commission took the opportunity to seek comment on how certain aspects of the conduct prong have worked in practice since the coordination regulations were promulgated in 2002. Several issues regarding the conduct prong are addressed below.

### A. The "Request or Suggest" Conduct Standard (11 CFR 109.21(d)(1))

In the *NPRM*, the Commission invited comment on whether a communication that is paid for by a person other than a candidate, authorized committee, political party committee, or their agents and that satisfies the first

---

[45] The Act, as amended by BCRA, generally prohibits Federal candidates and officeholders from soliciting funds on behalf of other Federal or non-Federal candidates, unless the funds are subject to the limitations and prohibitions of the Act. 2 U.S.C. 441i(e)(1)(A) and (B). *See also* 11 CFR 300.61 and 300.62.

[46] The Commission also determined in Advisory Opinion 2003–25 that the proposed advertisement did not PASO the endorsing Federal candidate.

conduct standard (*i.e.*, it is made at the request or suggestion of a candidate or a political party) should automatically qualify as a coordinated communication without also having to satisfy one of the content standards. Specifically, the Commission asked whether a public communication paid for by another person that is made at the request or suggestion of a candidate or a political party committee presumptively has value to that candidate, or political party, regardless of its timing or content.

One commenter supported this proposal generally, while all other commenters addressing this issue opposed it. This latter group of commenters asserted that the proposal could turn "grassroots lobbying," or issue advocacy communications, into in-kind contributions solely because the communication was created at the request or suggestion of a candidate or political party committee. One commenter stated that "[a]n officeholder that suggests that his constituents engage in grassroots lobbying is not suggesting that the constituents engage in communications that are for the purpose of influencing an election." Another commenter asserted that a request or suggestion by a candidate should not be enough to show that a communication is a coordinated communication under the Commission's regulations because "[a]bsent some other indicia of an electoral nexus, the fact that a communication is made at the request or suggestion of a candidate is not sufficient to demonstrate that it is the functional equivalent of a campaign contribution." Additionally, another commenter stated that "interactions between members of Congress or staff with citizens and citizens groups on legislative issues, strategies, and policies do NOT automatically taint subsequent public communications regarding that issue, legislation or matter by the citizens or citizens group." (emphasis in original).

The Commission agrees with these commenters that the "request or suggestion" conduct prong should not be amended. In BCRA floor debate, Senator McCain clarified that:

[N]othing in the section 214 should or can be read to suggest * * * that lobbying meetings between a group and a candidate concerning legislative issues could alone lead to a conclusion that the group runs subsequently concerning the legislation that was the subject of the meeting are coordinated with the candidate * * *. We do not intend for the FEC to promulgate rules, however, that would lead to a finding of coordination solely because the organization had run such ads has previously had lobbying contacts with a candidate.

148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. McCain).

When the Commission promulgated the *2002 Coordination Final Rules,* it stated that "the Commission believes that a content standard provides a clear and useful component of a coordination definition in that it helps ensure that the coordination regulations do not inadvertently encompass communications that are not made for the purpose of influencing a federal election." *2002 Coordination Final Rules,* 68 FR 421, 426. The Court of Appeals recognized that "statements may relate to political or legislative goals independent from any electoral race—goals like influencing legislators'' votes or increasing public awareness" and that "the FEC could construe the expenditure definition's purposive language as leaving space for collaboration between politicians and outsiders on legislative and political issues involving only a weak nexus to any electoral campaign." *Shays Appeal* at 99. Therefore, consistent with the Court of Appeals' observations and the comments received in this proceeding, and in order to ensure that the coordination regulations are tailored to reach only communications made for the purpose of influencing a Federal election, the Commission is not amending the "request or suggest" conduct standard.

*B. "Common Vendor" and "Former Employee" Conduct Standards (11 CFR 109.21(d)(4) and (5))*

The fourth and fifth conduct standards involve common vendors and former employees, respectively. *See* 11 CFR 109.21(d)(4) and (5). These two conduct standards implement the requirement of BCRA that the Commission address "the use of a common vendor" and "persons who previously served as an employee of a candidate or a political party" in the context of coordination. *See* BCRA, Pub. L. 107–155, sec. 214(c)(2) and (3) (2002).

The "common vendor" conduct standard in the 2002 coordination rules is satisfied if (1) the person paying for a communication contracts with, or employs, a "commercial vendor" to create, produce, or distribute the communication; (2) the commercial vendor has provided one or more specified types of services, within the "current election cycle,"[47] to the clearly

---

[47] The term "election cycle" is defined in 11 CFR 100.3(b) ("An election cycle shall begin on the first day following the date of the previous general election for the office or seat which the candidate seeks * * * The election cycle shall end on the date on which the general election for the office or seat that the individual seeks is held.").

identified candidate, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee or political party committee; and (3) the commercial vendor uses or conveys information about the campaign plans, projects, activities, or needs of the candidate or political party committee that is material to the creation, production, or distribution of the communication obtained from the work done for the candidate or political party committee when working for the person paying for the communication. See former 11 CFR 109.21(d)(4).

Similarly, the "former employee" conduct standard in the 2002 coordination rules is satisfied if (1) the person paying for a communication was, or is, employing a person who was a former employee or independent contractor, within the "current election cycle," of the clearly identified candidate or the political party committee referred to in the communication; and (2) the former employee uses or conveys material information about the plans, projects, activities, or needs of the candidate or political party committee obtained from work done for the candidate or political party committee when working for the person paying for the communication. *See* former 11 CFR 109.21(d)(5).

The *NPRM* sought comment on whether these two conduct standards should be limited to cover only common vendors and former employees who are agents of a candidate or political party, and whether the Commission should change the temporal limit of the "current election cycle" in the standards. The Commission has decided not to limit these conduct standards to agents, but to revise the temporal limit in the common vendor and former employee conduct standards to encompass 120 days rather than the entire "current election cycle."

1. Agents

First, the Commission sought comment on whether it should change the coordinated communication regulations to cover common vendors and former employees only if they are agents of the candidate or political party committee under the Commission's definition of "agent" in 11 CFR 109.3. The *NPRM* also asked if the Commission should instead eliminate the common vendor and former employee conduct standards since restricting these standards to agents would render these standards superfluous because, if limited to agents, the conduct of former employees and common vendors would already be covered by the first three

conduct standards at 11 CFR 109.21(d)(1) through (d)(3).

The commenters were divided as to whether restricting these conduct standards to agents, or eliminating the standards completely, was within the Commission's statutory authority. Some commenters argued that BCRA sections 214(c)(2) and (3) did not mandate that the Commission restrict common vendors and former employees, but only that the Commission consider these issues when deciding what coordination rules to adopt. These commenters argued that the Commission is authorized to restrict or eliminate these standards after proper consideration of the issue. In contrast, other commenters argued that limiting the common vendor and former employee conduct standards would "fundamentally compromise" the purpose and intent of BCRA's requirement.

After consideration of the comments and the BCRA provisions regarding common vendors and former employees, the Commission has decided not to change the conduct standards in this manner at this time. The Commission recognizes that these conduct standards focus on the conduct of third party vendors and former employees who might no longer be the candidate's or political party committee's agents, and therefore apply to some persons not covered by the other conduct standards. However, under 11 CFR 109.21(b)(2), a candidate or a political party committee with whom a communication is coordinated does not receive or accept an in-kind contribution if the coordination only results from conduct under the common vendor and former employee standards. *See* 11 CFR 109.21(b)(2). Coupled with this pre-existing safeguard, these conduct standards continue to apply regardless of whether the common vendor or former employee would be considered an agent under 11 CFR 109.3.

### 2. Election Cycle Temporal Limit

The *NPRM* also sought comment regarding whether the Commission should revise the current "election cycle" temporal limit in the common vendor and former employee conduct standards. Many commenters suggested that including the entire election cycle in the conduct standard was over-inclusive, especially with regard to six-year Senate election cycles. One commenter noted that the "revolving door" ethics rules for Congress limit subsequent employment for only one year, and argued that no other ethics rule included as long a period as the current rule in these conduct standards.

One commenter observed that a "temporal limit of an entire election cycle creates significant and unnecessary legal risks for individuals who are not in a position to violate the coordination rules." Many commenters observed that information relevant to the common vendor and former employee conduct standards, such as campaign strategy, tends to have a "very short shelf life," that is, it becomes irrelevant quickly during an election year. Some commenters suggested revising the temporal limit to a 60-day period based upon the Commission's long-standing rule at 11 CFR 106.4(g) regarding the valuation of polling information, which treats poll results that are between 61 to 180 days old as "worth" only 5 percent of their initial value. Poll results more than 180 days old need not be reported as having any value. *See* 11 CFR 106.4(g).

In contrast, other commenters opposed any shortening of the temporal limit for these conduct standards. These commenters argued that the 2002 rule properly addresses the danger of coordination presented by candidates' campaign committees and political party committees using common vendors and by individual employees moving back and forth between different candidates and political party committees during the same election cycle. These commenters stated that the "election cycle" temporal limit was a bright-line rule appropriately drawn by the Commission to avoid the dangers of coordination.

The Commission explained in the *2002 Coordination Final Rules* that the temporal limit in the common vendor and former employee standards was not intended to serve as a "cooling off" period where employment was forbidden. *2002 Coordination Final Rules* at 438. Nevertheless, many commenters noted that the "election cycle" temporal limit operated in practice as a "period of disqualification" in which a vendor or former employee may not work on any particular matter for particular clients merely because that vendor or employee once worked with a candidate or political party at some point during the election cycle. These commenters stated that the rule had a "chilling effect" on the retention of consultants and employees because organizations want to avoid the speculative allegations of improper coordination. One commenter asserted that the "election cycle" temporal limit "caused substantial harm to individuals who lacked any material information that could be used for coordination purposes, and yet who were targeted in FEC complaints."

These commenters described the difficult process that political committees use to interview and investigate commercial vendors, many of whom are in short supply, to determine if the commercial vendor is "tainted" under these standards before contracting with these vendors for political work. The record also indicates that some commercial vendors feel compelled under this rule to refuse work from political committees near the beginning of an election cycle in order to preserve the ability to work for a political party or a candidate as the election approaches.

After considering the comments, which reflect experience in the recent election cycles under these rules, the Commission concludes that an "election cycle" limit is overly broad and unnecessary to the effective implementation of the coordination provisions. The more appropriate temporal limit for the common vendor and former employee conduct standards is 120 days. This temporal limit begins on the last day of the most recent employment or provision of services, not on the dates when the communication is publicly distributed or is paid for. Therefore, the 120-day period starts on the last day of an individual's employment with a candidate or political party committee, or on the last day when a commercial vendor performed any of the services listed in 11 CFR 109.21(d)(4)(ii) for a candidate or political party committee. If the former employee or commercial vendor performs any work for the candidate or political party committee after the official termination of employment or contract, including any projects or plans formulated during the employment or contractual relationship to be performed after official termination, the calculation of the 120-day period will restart from that date. Thus, under the Commission's revised rule, the 120-day period begins on the last day that goods or services are provided.

Reducing the temporal limit to 120 days will not undermine the effectiveness of the conduct standards and will not lead to circumvention of the Act. The record in this rulemaking indicates that material information regarding candidate and political party committee "campaigns, strategy, plans, needs, and activities"—the information that is central to the common vendor and former employee conduct standards—does not remain "material" for long periods of time during an election cycle. Indeed, both national and local events tend to render campaign plans and strategy obsolete on

a very rapid basis. Moreover, as some commenters noted, much of the information gained working for candidates during primary races becomes largely irrelevant for general elections. As one commenter noted:

If you're involved in a primary race and you've got a competitive primary, you are totally focused on how to win the nomination. And all your polling and all the information that you're getting; all the strategy that you're working out is basically focused on how do you win that election. It is an entirely different process when you get into the general election * * * The information you had about a primary is [largely] irrelevant * * * [W]hat is happening in the world in June could be very different by the time you get to October or September * * * [Y]ou're not going to have a lot of relevant information that's going to make a difference anyway.

Thus, the Commission agrees that it is unlikely that participation in early strategy decisions for a Senate candidate in the beginning of a six-year election cycle provides material information that is relevant and useful to a communication created five years later in the final stages of the general election campaign, or even six months later. This approach is consistent with the Commission's polling regulations, which recognize that polling information quickly loses its value with the passage of time. *See* 11 CFR 106.4(g).

Based on all the evidence and comments received by the Commission and the Commission's experience in enforcing the common vendor regulations in prior enforcement actions, the Commission concludes that a limit of 120 days is more than sufficient to reduce the risk of circumvention of the Act.

*C. Safe Harbor for the Use of Publicly Available Information (11 CFR 109.21(d)(2)–(5))*

In the *NPRM*, the Commission sought comment on whether to create a safe harbor for the use of publicly available information. Specifically, the safe harbor was proposed to ensure that the use or conveyance of publicly available information in creating, producing, or distributing a communication would not, in and of itself, satisfy any of the conduct standards in 11 CFR 109.21(d).

All commenters addressing this issue supported a safe harbor to some extent. The Commission agrees and is adding a safe harbor for the use of publicly available information. Although the safe harbor proposed in the *NPRM* would have applied to all five conduct standards and would have been set forth in a new paragraph, the Commission has decided that the new safe harbor more

appropriately applies to only four of the five conduct standards, and is being added to the paragraphs currently containing those four conduct standards.

Some commenters expressed concern that the safe harbor proposed in the *NPRM* would preclude certain communications from satisfying the coordinated communications test simply because a portion of a given communication was based on publicly available information, even if a candidate privately conveyed a request that a communication be made. To address this concern, the new safe harbor does not apply to the "request or suggestion" conduct standard in 11 CFR 109.21(d)(1). Moreover, the four conduct standards that are being revised to include a safe harbor for the use of publicly available information all concern conduct that conveys material information that is subsequently used to create a communication, whereas the "request or suggestion" conduct standard concerns only a candidate's or political party's request or suggestion that a communication be created, produced or distributed, and is not dependent upon the nature of information conveyed. *See* 11 CFR 109.21(d)(2) (requiring *material involvement* regarding the communication's content, intended audience, means or mode, specific media outlet, timing or frequency, and size, prominence, or duration); 109.21(d)(3) (requiring a *substantial discussion* about campaign plans, projects, activities, or needs); and 109.21(d)(4) and (5) (requiring use or conveyance by a *common vendor* or *former employee* of information about campaign plans, projects, activities, or needs). Thus, new language in paragraphs 109.21(d)(2), (d)(3), (d)(4)(iii), and (d)(5)(ii) explains that the conduct standards contained in 11 CFR 109.21(d)(2) through (d)(5) are not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source.

Under the new safe harbor, a communication created with information found, for instance, on a candidate's or political party's Web site, or learned from a public campaign speech, is not a coordinated communication if that information is subsequently used in connection with a communication. The Commission emphasizes that this treatment of the use of publicly available information is consistent with the Commission's historical treatment of the use of such information. *See 2002 Coordination Final Rules,* 68 FR at 432–434 (noting

that the conduct standards would not apply to "a speech at a campaign rally" and could not be satisfied by "a speech to the general public"); *see also FEC v. Public Citizen,* 64 F. Supp. 2d 1327 (N.D. Ga. 1999) (finding that an organization's expenditures for communications supporting a candidate did not qualify as coordinated expenditures because the organization used information disseminated to the public by the candidate's campaign). This treatment is also consistent with legislative history indicating that certain conduct does not amount to coordination. *See* H.R. Conf. Rep. No. 94–1057, at 38 (April 28, 1976) ("[A] general request for assistance in a speech to a group of persons by itself should not be considered to be a "suggestion" that such persons make an expenditure to further such election or defeat.").

To qualify for the safe harbor, the person paying for the communication bears the burden of showing that the information used in creating, producing, or distributing the communication was obtained from a publicly available source. The person paying for the communication may meet this burden in a wide variety of ways. For example, the person paying for a communication may demonstrate that media buying strategies regarding a communication were based on information obtained from a television station's public inspection file, and not on *private* communications with a candidate or political party committee.[48] Other sources of public information for the purposes of the safe harbor include, but are not limited to: Newspaper or magazine articles; candidate speeches or interviews; materials on a candidate's Web site or other publicly available Web site; transcripts from television shows; and press releases.

The Commission emphasizes that a communication that does not fall within this safe harbor will not automatically be presumed to satisfy the conduct prong of the coordinated communication test. For a coordinated communication to be established, the use of such non-public information must satisfy the conduct prongs, and the communication must also satisfy the content and payment prongs.

---

[48] *See, e.g.,* Matter Under Review ("MUR") 5506 (EMILY's List), First General Counsel's Report at 7 (the Committee "states that it made its decisions about placing and pulling ads based on information that television stations are required to make public.")

*D. Safe Harbor for Establishment and Use of a Firewall (New 11 CFR 109.21(h))*

The *NPRM* sought comment on whether to create a rebuttable presumption that a common vendor or former employee has not engaged in coordinated conduct under 11 CFR 109.21(d)(4) or (5), if the vendor or employee has taken certain specified actions, such as the use of "firewalls," to ensure that no information about the campaign plans, projects, activities, or needs of a candidate or political party committee that is material to the creation, production or distribution of the communication is used or conveyed to a third party. The *NPRM* did not include any proposed regulatory text. The *NPRM* also discussed the Commission's finding in a recent enforcement matter that the facts produced by a respondent indicating that a firewall had been established within a political committee were sufficient to refute allegations of coordination under the first three conduct standards in 11 CFR 109.21(d)(1)–(3). *See* MUR 5506 (EMILY's List), First General Counsel's Report at 5–8.

Many commenters supported the idea of a safe harbor and argued that a candidate, political party committee, or other organization should be able to rely upon assurances from a commercial vendor that it maintains a firewall to prevent any coordination with one of the vendor's other clients. Some commenters urged the Commission to codify its analysis in MUR 5506 and implement a safe harbor with respect to all of the conduct standards. These commenters argued that a safe harbor applicable to all conduct standards would reduce the "chilling effect" of the coordination rules with regard to organizations conducting lobbying-related meetings with officeholders who are also candidates and would encourage and enhance compliance with the coordination regulations. Many commenters also supported a firewall safe harbor as a way for organizations to respond to speculative complaints alleging coordination when organizations are faced with trying to "prove a negative" by showing that coordination did not occur.

Some commenters described various approaches that political party committees and other committees have used in the past to avoid the possibility of coordination when some employees of a committee work on independent expenditures at the same time that other employees of the committee work with candidates or political party committees

on lobbying or other issues. The commenters described how specific employees are placed on separate teams (or "silos") within the organization, so that information does not pass between the employees who work on independent expenditures and the employees who work with candidates and their agents.

As these commenters noted, the Supreme Court has recognized that political party committees have the right to make unlimited independent expenditures [49] and that establishing firewalls and similar screening policies is an effective way to simultaneously protect that right and avoid improper coordination. Other commenters opposed the creation of a firewall safe harbor, arguing that such a safe harbor could compromise BCRA.

The Commission has decided to add a safe harbor provision at new 11 CFR 109.21(h) regarding the establishment and use of a firewall. This safe harbor codifies the Commission's conclusions in MUR 5506 (EMILY's List). The Commission concludes that it is possible for a commercial vendor or other employer to create an effective firewall between different employees or between different units within its organization that prevents information obtained from one client from being used on behalf of another, and thereby prevents its staff from conveying information from one client to another. Similarly, a political committee with an effective firewall can prevent involvement by, and discussions between, a candidate or political party committee and the individuals creating the communication. In the context of a political party committee, use of a firewall can ensure that staff responsible for the party's coordinated party expenditures do not share or convey information to staff who are simultaneously exercising the party's constitutional right to make unlimited independent expenditures.[50]

Accordingly, the new regulation provides that the conduct standards in 11 CFR 109.21(d) are not met if a commercial vendor, former employee, or political committee has designed and implemented an effective firewall that meets the requirements of this new provision. In order to be eligible for the safe harbor, the firewall must be

designed and implemented to prohibit the flow of information about the candidate's or political party committee's campaign plans, projects, activities, or needs between those employees or consultants providing services for the person paying for the communication and those employees or consultants who currently provide, or previously provided, services for the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee. See new 11 CFR 109.21(h)(1).

The safe harbor provision does not dictate specific procedures required to prevent the flow of information referenced in new 109.21(h) because a firewall is more effective if established and implemented by each organization in light of its specific organization, clients, and personnel. One example of procedures that, if implemented, would satisfy this first requirement is the firewall described by EMILY's List in MUR 5506. That organization's firewall procedures stated that employees, volunteers, and consultants who handle advertising buys were "barred, as a matter of policy, from interacting with Federal candidates, political party committees, or the agents of the foregoing. These employees, volunteers, and consultants [were] also barred from interacting with others within EMILY's List regarding specified candidates or officeholders." *See* MUR 5506 (EMILY's List), First General Counsel's Report at 6–7. The EMILY's List firewall prohibited personnel who worked directly with the candidate committees from discussing and conveying material information to the staff who handled the advertising buys.

Any firewall must also be described in a written policy that is distributed to all relevant employees, consultants and clients affected by the policy. *See* new 11 CFR 109.21(h)(2). "All relevant employees" includes all employees or consultants actually providing services to the person paying for the communication or the candidate or political party committee. To ensure that the firewall is in place before any information is shared between the relevant employees, the written firewall policy should be distributed to all relevant employees before those employees begin work on the communication referencing the candidate or political party. In an enforcement context, the Commission will weigh the credibility and specificity of any allegation of coordination against the credibility and

[49] *See Colorado Republican Federal Campaign Committee v. Federal Election Commission,* 518 U.S. 604, 614, 618 (1996).

[50] In *McConnell v. FEC,* 540 U.S. 93, 213–214 (2003), the Supreme Court struck down a provision of BCRA (sec. 213) that required political parties to choose between making coordinated and independent expenditures after nominating a candidate.

specificity of the facts presented in the response showing that the elements of the safe harbor are satisfied. A person paying for a communication seeking to use the firewall safe harbor should be prepared to provide reliable information (e.g., affidavits) about an organization's firewall, and how and when the firewall policy was distributed and implemented.

The Commission notes that common leadership or overlapping administrative personnel does not defeat the use of a firewall. Moreover, mere contact or communications between persons on either side of a firewall does not compromise the firewall, as long as the firewall prevents information about the candidate's or political party committee's campaign plans, projects, activities or needs from passing between persons on either side of the firewall.

Once a firewall has been established, for the firewall to be vitiated and the safe harbor to be inapplicable, material information about the candidate's or political party committee's campaign plans, projects, activities or needs must pass between persons on either side of the firewall. The safe harbor does not apply if there is specific information indicating that, despite the firewall, either (1) information about the candidate's or political party committee's campaign plans, projects, activities or needs that is material to the creation, production, or distribution of the communication was used by the commercial vendor, former employee, or political committee; or (2) the common vendor, former employee, or political committee conveyed this information to the person paying for the communication. *See* new 11 CFR 109.21(h). The Commission emphasizes that the addition of this firewall safe harbor provision to the coordinated communication rules does not *require* commercial vendors, former employees and political committees to use a firewall. The Commission will not draw a negative inference from the lack of such a screening policy.

## VII. Amendment to the Payment Prong (11 CFR 109.21(a)(1))

The Commission is amending the payment prong (11 CFR 109.21(a)(1)) of the Commission's coordinated communication test to read, "Is paid for, *in whole or in part,* by a person other than that candidate, authorized committee, or political party committee." The addition of "in whole or in part" clarifies that the payment prong is satisfied not only when a person other than the candidate, the candidate's authorized committee, or

political party committee, pays for the entire cost of a communication, but also if that person pays for only part of the costs. This clarification is consistent with the approach the Commission has taken in previous advisory opinions. *See* Advisory Opinions 2004–29 (Akin) and 2004–01 (Bush-Cheney/Kerr). The Commission notes that where a candidate or political party committee pays its allocable share of a joint communication, the payment prong has not been triggered and the communication is not a coordinated communication with respect to that candidate or political party.

## VIII. Political Party Coordinated Communication Provisions (11 CFR 109.37)

In the NPRM, the Commission noted that the party coordinated communication regulations at 11 CFR 109.37 also contain a three-prong test for determining whether a communication is coordinated between a candidate and a political party committee. This "party coordinated communication" test in 11 CFR 109.37, which governs coordinated communications paid for by political party committees, has a content prong that is substantially the same as the one for "coordinated communications" in 11 CFR 109.21(c).[51] *See* 11 CFR 109.37(a)(2). Although the party coordinated communication regulations were not addressed in the *Shays* litigation, the Commission sought comment on whether it should make any changes to the 120-day time frame in 11 CFR 109.37 consistent with any changes made to the coordinated communication rules in 11 CFR 109.21. One commenter focused solely on this issue and encouraged the Commission to retain the 120-day time frame while adding a PASO standard. Other commenters noted only that their comments on this issue are the same as their comments on the coordinated communication rules in 11 CFR 109.21 regarding the 120-day time frame.

The Commission is revising its rules regarding party coordinated communications to ensure consistency with the revisions to the fourth content standard at 11 CFR 109.21(c)(4). Thus, revised section 109.37(a)(2)(iii), like revised section 109.21(c)(4), establishes

---

[51] 11 CFR 109.37(a)(2) differs from 11 CFR 109.21(c) in two ways: first, it does not contain a separate content standard for electioneering communications and, second, the content standard in section 109.37(a)(2)(iii), the equivalent of the fourth content standard in section 109.21(c)(4), can be satisfied only by reference to a clearly identified Federal candidate and not, as in section 109.21(c)(4), also by reference to a political party.

separate time frames for communications referring to Congressional and Presidential candidates. For communications referring to Congressional candidates in primary and general elections, the revised time frame begins 90 days before each election and ends on the date of that election. For communications referring to Presidential candidates, the revised time frame covers, on a State-by-State basis, the entire period of time beginning 120 days before the date of a primary up to and including the date of the general election. Because the content standard in 11 CFR 109.37(a)(2) is not satisfied by a communication that refers only to a political party, revised 11 CFR 109.37, unlike revised 11 CFR 109.21(c)(4), does not contain a separate time frame for communications that refer to political parties.

The justification for the revised time frame in 11 CFR 109.37(a)(2)(iii) is the same as the justification for the revision of 11 CFR 109.21(c)(4). The CMAG data show that in the 2004 election cycle, nearly all television advertisements paid for by House and Senate candidates were aired within 90 days before primary or general elections and that nearly all advertisements paid for by Presidential candidates were aired during the time period that begins 120 days before a State's primary election up to and including the date of the general election. As discussed above, data showing when candidates spend their own campaign funds on advertisements provide an empirical basis for determining when advertising that has the purpose of influencing a Federal election occurs. Moreover, a candidate has an incentive to ask a political party committee to pay for advertisements to be aired precisely during the time period when the candidate believes these advertisements would be effective, which, as shown above, are the time periods when the candidate herself pays for such advertisements to be aired. The CMAG data, therefore, provide empirical support for using the revised time frames as part of a bright-line test for determining when a communication that is paid for by a political party committee and is coordinated with a candidate is made for the purpose of influencing Federal elections. Finally, the Commission has been presented with no evidence that the revised time frame in 11 CFR 109.37(a)(2)(iii) would permit circumvention of the Act.

For the reasons discussed above, the Commission also incorporates into 11 CFR 109.37 the safe harbor provisions at new 11 CFR 109.21(d)(2)–(5) for use of publicly available information, as well

as the safe harbors at new 11 CFR 109.21(g) and (h) for endorsements and solicitations by Federal candidates, and for the establishment and use of a firewall.

## IX. Technical Changes Including Amendments to References to "Agents" (11 CFR 109.20, 109.21, and 109.23)

The Commission is also making certain technical, non-substantive changes to its coordinated communication rules to simplify them and enhance readability. One technical change of note is the Commission is adding a sentence to 11 CFR 109.20(a) that explains that any reference in the coordinated communication rules to a candidate, a candidate's authorized committee, or a political party committee, also refers to any agent of the candidate, the candidate's authorized committee, or the political party committee. The Commission is adding this sentence to make explicit that an agent is included whenever a candidate, an authorized committee, or a political party committee is referenced, in order to remove the duplicative references to agents in 11 CFR 109.21 and 109.23.

### Certification of No Effect Pursuant to 5 U.S.C. 605(b) (Regulatory Flexibility Act)

The Commission certifies that the attached rules do not have a significant economic impact on a substantial number of small entities. The basis for this certification is that any individuals and not-for-profit entities that are affected by these rules are not "small entities" under 5 U.S.C. 601. The definition of "small entity" does not include individuals, but classifies a not-for-profit enterprise as a "small organization" if it is independently owned and operated and not dominant in its field. 5 U.S.C. 601(4).

Moreover, any State, district, and local party committees that are affected by these proposed rules are not-for-profit committees that do not meet the definition of "small organization." State political party committees are not independently owned and operated because they are not financed and controlled by a small identifiable group of individuals, and they are affiliated with the larger national political party organizations. In addition, the State political party committees representing the Democratic and Republican parties have a major controlling influence within the political arena of their State and are thus dominant in their field. District and local party committees are generally considered affiliated with the State committees and need not be

considered separately. To the extent that any State party committees representing minor political parties or any other political committees might be considered "small organizations," the number that are affected by this proposed rule is not substantial, particularly the number that coordinate communications with candidates or other political committees in connection with a Federal election.

Furthermore, any separate segregated funds that are affected by these proposed rules are not-for-profit political committees that do not meet the definition of "small organization" because they are financed by a combination of individual contributions and financial support for certain expenses from corporations, labor organizations, membership organizations, or trade associations, and therefore are not independently owned and operated.

Most of the other political committees that are affected by these proposed rules are not-for-profit committees that do not meet the definition of "small organization." Most political committees are not independently owned and operated because they are not financed by a small identifiable group of individuals. In addition, most political committees rely on contributions from a large number of individuals to fund the committees' operations and activities. To the extent that any other entities fall within the definition of "small entities," any economic impact of complying with these rules is not significant.

With respect to commercial vendors whose clients include candidates, political party committees or other political committees, the final rules provide cost-effective methods for complying with the Act that are not required and that will reduce certain regulatory restrictions. Thus, rather than adding an economic burden, the rules potentially have a beneficial economic impact on such commercial vendors.

## List of Subjects in 11 CFR Part 109

Elections, Reporting and recordkeeping requirements.
■ For the reasons set out in the preamble, the Federal Election Commission is amending Subchapter A of Chapter I of Title 11 of the *Code of Federal Regulations* as follows:

## PART 109—COORDINATED AND INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 441a(a) AND (d), AND PUB. L. 107–155 SEC. 214(c))

■ 1. The authority citation for part 109 continues to read as follows:

**Authority:** 2 U.S.C. 431(17), 434(c), 438(a)(8), 441a, 441d; Sec. 214(c) of Pub. L. 107–155, 116 Stat. 81.

■ 2. In § 109.20, paragraph (a) is revised to read as follows:

### § 109.20  What does "coordinated" mean?

(a) *Coordinated* means made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee. For purposes of this subpart C, any reference to a candidate, or a candidate's authorized committee, or a political party committee includes an agent thereof.

\*    \*    \*    \*    \*

■ 3. Section 109.21 is revised as follows:
■ a. Revise paragraph (a)(1);
■ b. Revise paragraph (b)(2);
■ c. Revise paragraphs (c)(2), (3), and (4);
■ d. Revise paragraphs (d)(1), (2), (3), (4), and (5);
■ e. Revise paragraph (e);
■ f. Add paragraph (g);
■ g. Add paragraph (h);
The additions and revisions read as follows:

### § 109.21  What is a "coordinated communication"?

(a) \*    \*    \*
(1) Is paid for, in whole or in part, by a person other than that candidate, authorized committee, or political party committee;

\*    \*    \*    \*    \*

(b) \*    \*    \*
(2) *In-kind contributions resulting from conduct described in paragraphs (d)(4) or (d)(5) of this section.* Notwithstanding paragraph (b)(1) of this section, the candidate, authorized committee, or political party committee with whom or which a communication is coordinated does not receive or accept an in-kind contribution, and is not required to report an expenditure, that results from conduct described in paragraphs (d)(4) or (d)(5) of this section, unless the candidate, authorized committee, or political party committee engages in conduct described in paragraphs (d)(1) through (d)(3) of this section.

\*    \*    \*    \*    \*

(c) \*    \*    \*
(2) A public communication, as defined in 11 CFR 100.26, that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate or the candidate's authorized committee, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). For a

communication that satisfies this content standard, see paragraph (d)(6) of this section.

(3) A public communication, as defined in 11 CFR 100.26, that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(4) A public communication, as defined in 11 CFR 100.26, that satisfies paragraph (c)(4)(i), (ii), (iii), or (iv) of this section:

(i) *References to House and Senate candidates.* The public communication refers to a clearly identified House or Senate candidate and is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general, special, or runoff election, or primary or preference election, or nominating convention or caucus.

(ii) *References to Presidential and Vice Presidential candidates.* The public communication refers to a clearly identified Presidential or Vice Presidential candidate and is publicly distributed or otherwise publicly disseminated in a jurisdiction during the period of time beginning 120 days before the clearly identified candidate's primary or preference election in that jurisdiction, or nominating convention or caucus in that jurisdiction, up to and including the day of the general election.

(iii) *References to political parties.* The public communication refers to a political party, does not refer to a clearly identified Federal candidate, and is publicly distributed or otherwise publicly disseminated in a jurisdiction in which one or more candidates of that political party will appear on the ballot.

(A) When the public communication is coordinated with a candidate and it is publicly distributed or otherwise publicly disseminated in that candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing a reference to that candidate applies;

(B) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated during the two-year election cycle ending on the date of a regularly scheduled non-Presidential general election, the time period in paragraph (c)(4)(i) of this section applies;

(C) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated during the two-year election cycle ending on the date of a Presidential general election, the time period in paragraph (c)(4)(ii) of this section applies;

(iv) *References to both political parties and clearly identified Federal candidates.* The public communication refers to a political party and a clearly identified Federal candidate, and is publicly distributed or otherwise publicly disseminated in a jurisdiction in which one or more candidates of that political party will appear on the ballot.

(A) When the public communication is coordinated with a candidate and it is publicly distributed or otherwise publicly disseminated in that candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing a reference to that candidate applies;

(B) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing only a reference to that candidate applies;

(C) When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated outside the clearly identified candidate's jurisdiction, the time period in paragraph (c)(4)(iii)(B) or (C) of this section that would apply to a communication containing only a reference to a political party applies.

(d) * * *

(1) *Request or suggestion.* (i) The communication is created, produced, or distributed at the request or suggestion of a candidate, authorized committee, or political party committee; or

(ii) The communication is created, produced, or distributed at the suggestion of a person paying for the communication and the candidate, authorized committee, or political party committee assents to the suggestion.

(2) *Material involvement.* This paragraph, (d)(2), is not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source. A candidate, authorized committee, or political party committee is materially involved in decisions regarding:

(i) The content of the communication;
(ii) The intended audience for the communication;
(iii) The means or mode of the communication;
(iv) The specific media outlet used for the communication;

(v) The timing or frequency of the communication; or

(vi) The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

(3) *Substantial discussion.* This paragraph, (d)(3), is not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source. The communication is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication, or the employees or agents of the person paying for the communication, and the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee. A discussion is substantial within the meaning of this paragraph if information about the candidate's or political party committee's campaign plans, projects, activities, or needs is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication.

(4) *Common vendor.* All of the following statements in paragraphs (d)(4)(i) through (d)(4)(iii) of this section are true:

(i) The person paying for the communication, or an agent of such person, contracts with or employs a commercial vendor, as defined in 11 CFR 116.1(c), to create, produce, or distribute the communication;

(ii) That commercial vendor, including any owner, officer, or employee of the commercial vendor, has provided any of the following services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, during the previous 120 days:

(A) Development of media strategy, including the selection or purchasing of advertising slots;

(B) Selection of audiences;
(C) Polling;
(D) Fundraising;
(E) Developing the content of a public communication;
(F) Producing a public communication;
(G) Identifying voters or developing voter lists, mailing lists, or donor lists;
(H) Selecting personnel, contractors, or subcontractors; or

(I) Consulting or otherwise providing political or media advice; and

(iii) This paragraph, (d)(4)(iii), is not satisfied if the information material to the creation, production, or distribution of the communication used or conveyed by the commercial vendor was obtained from a publicly available source. That commercial vendor uses or conveys to the person paying for the communication:

(A) Information about the campaign plans, projects, activities, or needs of the clearly identified candidate, the candidate's opponent, or a political party committee, and that information is material to the creation, production, or distribution of the communication; or

(B) Information used previously by the commercial vendor in providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, and that information is material to the creation, production, or distribution of the communication.

(5) *Former employee or independent contractor.* Both of the following statements in paragraphs (d)(5)(i) and (d)(5)(ii) of this section are true:

(i) The communication is paid for by a person, or by the employer of a person, who was an employee or independent contractor of the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, during the previous 120 days; and

(ii) This paragraph, (d)(5)(ii), is not satisfied if the information material to the creation, production, or distribution of the communication used or conveyed by the former employee or independent contractor was obtained from a publicly available source. That former employee or independent contractor uses or conveys to the person paying for the communication:

(A) Information about the campaign plans, projects, activities, or needs of the clearly identified candidate, the candidate's opponent, or a political party committee, and that information is material to the creation, production, or distribution of the communication; or

(B) Information used previously by the former employee or independent contractor in providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, and that information is

material to the creation, production, or distribution of the communication.

\* \* \* \* \*

(e) *Agreement or formal collaboration.* Agreement or formal collaboration between the person paying for the communication and the candidate clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, is not required for a communication to be a coordinated communication. *Agreement* means a mutual understanding or meeting of the minds on all or any part of the material aspects of the communication or its dissemination. *Formal collaboration* means planned, or systematically organized, work on the communication.

\* \* \* \* \*

(g) *Safe harbor for endorsements and solicitations by Federal candidates.* (1) A public communication in which a candidate for Federal office endorses another candidate for Federal or non-Federal office is not a coordinated communication with respect to the endorsing Federal candidate unless the public communication promotes, supports, attacks, or opposes the endorsing candidate or another candidate who seeks election to the same office as the endorsing candidate.

(2) A public communication in which a candidate for Federal office solicits funds for another candidate for Federal or non-Federal office, a political committee, or organizations as permitted by 11 CFR 300.65, is not a coordinated communication with respect to the soliciting Federal candidate unless the public communication promotes, supports, attacks, or opposes the soliciting candidate or another candidate who seeks election to the same office as the soliciting candidate.

(h) *Safe harbor for establishment and use of a firewall.* The conduct standards in paragraph (d) of this section are not met if the commercial vendor, former employee, or political committee has established and implemented a firewall that meets the requirements of paragraphs (h)(1) and (h)(2) of this section. This safe harbor provision does not apply if specific information indicates that, despite the firewall, information about the candidate's or political party committee's campaign plans, projects, activities, or needs that is material to the creation, production, or distribution of the communication was used or conveyed to the person paying for the communication.

(1) The firewall must be designed and implemented to prohibit the flow of information between employees or consultants providing services for the person paying for the communication and those employees or consultants currently or previously providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee; and

(2) The firewall must be described in a written policy that is distributed to all relevant employees, consultants, and clients affected by the policy.

■ 4. In § 109.23, paragraph (b)(1) is revised to read as follows:

**§ 109.23   Dissemination, distribution, or republication of candidate campaign materials.**

\* \* \* \* \*

(b) \* \* \*

(1) The campaign material is disseminated, distributed, or republished by the candidate or the candidate's authorized committee who prepared that material;

\* \* \* \* \*

■ 5. In § 109.37, paragraphs (a)(2) and (3) are revised to read as follows:

**§ 109.37   What is a "party coordinated communication"?**

(a) \* \* \*

(2) The communication satisfies at least one of the content standards described in paragraphs (a)(2)(i) through (a)(2)(iii) of this section.

(i) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). For a communication that satisfies this content standard, see 11 CFR 109.21(d)(6).

(ii) A public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(iii) A public communication, as defined in 11 CFR 100.26, that satisfies paragraphs (a)(2)(iii)(A) or (B) of this section:

(A) *References to House and Senate candidates.* The public communication refers to a clearly identified House or Senate candidate and is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's

general, special, or runoff election, or primary or preference election, or nominating convention or caucus.

(B) *References to Presidential and Vice Presidential candidates.* The public communication refers to a clearly identified Presidential or Vice Presidential candidate and is publicly distributed or otherwise publicly disseminated in a jurisdiction during the period of time beginning 120 days before the clearly identified candidate's primary or preference election in that jurisdiction, or nominating convention or caucus in that jurisdiction, up to and including the day of the general election.

(3) The communication satisfies at least one of the conduct standards in 11 CFR 109.21(d)(1) through (d)(6), subject to the provisions of 11 CFR 109.21(e), (g), and (h). A candidate's response to an inquiry about that candidate's positions on legislative or policy issues, but not including a discussion of campaign plans, projects, activities, or needs, does not satisfy any of the conduct standards in 11 CFR 109.21(d)(1) through (d)(6). Notwithstanding paragraph (b)(1) of this section, the candidate with whom a party coordinated communication is coordinated does not receive or accept an in-kind contribution, and is not required to report an expenditure that results from conduct described in 11 CFR 109.21(d)(4) or (d)(5), unless the candidate, authorized committee, or an agent of any of the foregoing, engages in conduct described in 11 CFR 109.21(d)(1) through (d)(3).

\*    \*    \*    \*    \*

Dated: June 2, 2006.
**Michael E. Toner,**
*Chairman, Federal Election Commission.*
[FR Doc. 06–5195 Filed 6–7–06; 8:45 am]
**BILLING CODE 6715–01–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

**15 CFR Parts 736 and 744**

**[Docket No. 060531141–6141–01]**

**RIN: 0694–AD76**

### Correction to General Order Concerning Mayrow General Trading and Related Entities

**AGENCY:** Bureau of Industry and Security, Commerce.

**ACTION:** Final rule; Correction.

**SUMMARY:** The Bureau of Industry and Security is correcting a final rule that

appeared in the **Federal Register** on June 5, 2006 (71 FR 32272). This rule corrects an inadvertent error in the telephone number listed in the **FOR FURTHER INFORMATION CONTACT:** section of the preamble.

**FOR FURTHER INFORMATION CONTACT:**
[Corrected] Michael D. Turner, Director, Office of Export Enforcement, Bureau of Industry and Security, Department of Commerce, P.O. Box 273, Washington, DC 20044; Phone: (202) 482–1208, x3; E-mail: *rpd2@bis.doc.gov;* Fax: (202) 482–0964.

**Eileen Albanese,**
*Director, Office of Export Services.*
[FR Doc. E6–8961 Filed 6–7–06; 8:45 am]
**BILLING CODE 3510–33–P**

---

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

**15 CFR Part 902**

**50 CFR Part 648**

**[Docket No. 060314069–6138–002; I.D. 030306B]**

**RIN 0648–AT25**

### Fisheries of the Northeastern United States; Atlantic Sea Scallop Fishery; Framework 18

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** This final rule implements Framework Adjustment 18 (Framework 18) to the Atlantic Sea Scallop Fishery Management Plan (FMP), which was developed by the New England Fishery Management Council (Council). The following management measures are implemented by this rule: Scallop fishery specifications for 2006 and 2007 (open area days-at-sea (DAS) and Scallop Access Area trip allocations); scallop Area Rotation Program adjustments; and revisions to management measures that would improve administration of the FMP. In addition, a seasonal closure of the Elephant Trunk Access Area (ETAA) is implemented to reduce potential interactions between the scallop fishery and sea turtles, and to reduce finfish and scallop bycatch mortality.

**DATES:** Effective June 15, 2006.

**ADDRESSES:** Copies of Framework 18, the Regulatory Impact Review (RIR), including the Initial Regulatory

Flexibility Analysis (IRFA), and the Environmental Assessment (EA) are available on request from Paul J. Howard, Executive Director, New England Fishery Management Council (Council), 50 Water Street, Newburyport, MA 01950. These documents are also available online at *http://www.nefmc.org.* NMFS prepared a Final Regulatory Flexibility Analysis (FRFA), which is contained in the Classification section of the preamble of this rule. Copies of the FRFA and the Small Entity Compliance Guide are available from the Regional Administrator, Northeast Regional Office, NMFS, One Blackburn Drive, Gloucester, MA 01930–2298, and are also available via the internet at *http://www.nero.nmfs.gov.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this rule should be submitted to the Regional Administrator at One Blackburn Drive, Gloucester, MA, 01930, and by e-mail to *David_Rostker@omb.eop.gov,* or to the Federal e-rulemaking portal *http://www.regulations.gov,* or fax to (202) 395–7285.

**FOR FURTHER INFORMATION CONTACT:**
Peter W. Christopher, Fishery Policy Analyst, 978–281–9288; fax 978–281–9135.

**SUPPLEMENTARY INFORMATION:**

### Background

The Council adopted Framework 18 to the Atlantic Sea Scallop FMP on November 17, 2005, and submitted it to NMFS on December 16, 2005, for review and approval. Framework 18 was developed and adopted by the Council to meet the FMP's requirement to adjust biennially the management measures for the scallop fishery. The FMP requires the biennial adjustments to ensure that measures meet the target fishing mortality rate (F) and other goals of the FMP and achieve optimum yield (OY) from the scallop resource on a continuing basis. A proposed rule for Framework 18 was published on March 30, 2006 (71 FR 16091). The public comment period for the proposed rule ended on April 14, 2006. This rule implements management measures for the 2006 and 2007 fishing years, which are described in detail below.

### Approved Management Measures

In the proposed rule, NMFS requested comments on all proposed management measures, and specifically highlighted a provision relating to the harvest of research set-aside from within an Access Area if the yellowtail flounder

# PLAINTIFFS' EXHIBIT 137

AUG 9 2005
RECEIVED
FEDERAL ELECTION
COMMISSION
SECRETARIAT

2005 AUG -9 P 3: 20

**FEDERAL ELECTION COMMISSION**
**999 E Street, N.W.**
**Washington, D.C. 20463**

**FIRST GENERAL COUNSEL'S REPORT**

**SENSITIVE**

MUR 5506
DATE COMPLAINT FILED: 08/04/04
DATE OF NOTIFICATION: 08/11/04
DATE ACTIVATED: 05/10/05

STATUTE OF LIMITATIONS: August 3, 2009

| | |
|---|---|
| **COMPLAINANT:** | Lori Glasser |
| **RESPONDENTS:** | Emily's List and Britt Cocanour, in her official capacity as treasurer[1] |
| | Florida Women Vote! – A Project of Emily's List |
| | Campaign for Florida's Future, formerly known as Betty Castor for U.S. Senate, and William R. Lewis, in his official capacity as treasurer[2] |
| **RELEVANT STATUTES:** | 2 U.S.C. § 441a |
| | 11 C.F.R. § 100.29 |
| | 11 C.F.R. § 109.21 |
| **INTERNAL REPORTS CHECKED:** | Disclosure Reports |
| **FEDERAL AGENCIES CHECKED:** | Internal Revenue Service |

## I.    INTRODUCTION

This matter involves alleged coordination between Betty Castor, a 2004 Senate candidate in Florida, and Emily's List, a political action committee. Emily's List is registered with the Commission as a multicandidate political committee and supports Democratic, pro-choice female candidates. Emily's List endorsed Castor and, apparently, actively supported her.[3] Castor won a

---

[1] At the times relevant to the complaint allegations, Joseph Solmonese served as the treasurer for Emily's List.

[2] At the times relevant to the complaint allegations, Charles L. Lester served as the treasurer for Betty Castor for U.S. Senate, Betty Castor's principal campaign committee. Earlier this year, the committee changed its status to a multicandidate committee under the name Campaign for Florida's Future fka Betty Castor for U.S. Senate and changed its treasurer to William R. Lewis.

[3] See, e.g., Anita Kumar, Castor's ties to group draw fire, St. Petersburg Times, July 18, 2004.

MUR 5506                                          2
First General Counsel's Report

1    highly contested Democratic Primary in August but lost a close General Election in November to

2    Mel Martinez.

3              Complainant Lori Glasser alleges that Emily's List and "Florida Women Vote! – A

4    Project of Emily's List" made excessive contributions to Betty Castor for U.S. Senate ("Castor

5    Committee") in the form of coordinated television advertisements. The complaint alleges that

6    the coordination of the television advertising is evidenced by frequent contacts between Emily's

7    List and the Castor Committee, the Castor Committee's employment of a former Emily's List

8    employee, the withdrawal of television advertisements by Castor in locations where Emily's List

9    ads aired, and Castor's public acknowledgment of the help Emily's List gave to her campaign.

10   The Castor Committee and Emily's List separately deny that the advertisements were coordinated

11   despite frequent contacts between the two committees.

12             As more fully set forth below, this Office recommends that the Commission find no

13   reason to believe that Emily's List made, or that the Castor Committee knowingly received,

14   excessive contributions in the form of coordinated television advertisements. Furthermore,

15   because Florida Women Vote! – A Project of Emily's List appears not to be a separate legal

16   entity but merely a program within Emily's List, this Office recommends that the Commission

17   dismiss the complaint as to Florida Women Vote! – A Project of Emily's List.

18   II.    FACTUAL SUMMARY AND LEGAL ANALYSIS

19             A payment for a coordinated communication is an in-kind contribution to the candidate's

20   authorized committee with which it is coordinated and must be reported as an expenditure made

21   by that candidate's authorized committee. 11 C.F.R. § 109.21(b)(1). In addition, as an in-kind

22   contribution, the costs of a coordinated communication must not exceed a political committee's

23   applicable contribution limits. See 2 U.S.C. § 441a.

1    To determine whether a communication is coordinated, 11 C.F.R. § 109.21 sets forth a

2    three-pronged test:  (1) the communication must be paid for by a person other than a Federal

3    candidate, a candidate's authorized committee, or political party committee, or any agent of any

4    of the foregoing; (2) one or more of the four content standards set forth in 11 C.F.R. § 109.21(c)

5    must be satisfied; and (3) one or more of the six conduct standards set forth in 11 C.F.R.

6    § 109.21(d) must be satisfied.  *See* 11 C.F.R. § 109.21(a).  This Report will discuss each prong in

7    turn.

8    **A.    Payment Prong**

9    The payment prong of the coordination regulation, 11 C.F.R. § 109.21(a)(1), is clearly

10   satisfied.  Emily's List admits that its Florida Women Vote! project paid for the advertisements

11   alleged to have been coordinated.  *See* Emily's List Response ("EL Response"), at 2.

12   **B.    Content Prong**

13   The content prong is satisfied if the communications at issue meet at least one of four

14   content standards:  (1) a communication that is an electioneering communication as defined in

15   11 C.F.R. § 100.29(a); (2) a public communication that republishes, disseminates, or distributes

16   candidate campaign materials; (3) a public communication containing express advocacy; or (4) a

17   public communication, in relevant part, that refers to a clearly identified federal candidate, is

18   publicly distributed or disseminated 120 days or fewer before a primary or general election, and

19   is directed to voters in the jurisdiction of the clearly identified candidate.  *See* 11 C.F.R.

20   § 109.21(c).[4]

---

[4]  In *Shays v. FEC*, No. 04-5352 (D.C. Cir. July 15, 2005), the Appellate Court affirmed the District Court's invalidation of the fourth "public communication" content standard of the coordinated communications regulation. The District Court had remanded the matter back to the Commission, but in a ruling subsequent to the remand, the District Court explained that the "deficient rules technically remain 'on the books,'" pending promulgation of a new regulation. *Shays v. FEC*, 340 F. Supp. 2d 39, 41 (D.D.C. 2004).  This Office believes that despite the Appellate Court ruling, the public communication standard is still in effect until a new standard is promulgated, particularly in cases like this where the standard, held to be underinclusive, is met.

MUR 5506
First General Counsel's Report

4

1    Although the complainant did not provide copies of any ads or transcripts, and this Office

2    has not been able to locate any through publicly available information, one or more Emily's List

3    advertisements may nevertheless meet the fourth content standard. First, the complaint was filed

4    on August 4, 2004, 27 days before the August 31 primary, and noted that the advertisements at

5    issue were "recently purchased television advertising" in Jacksonville, Orlando, and Gainesville,

6    indicating that the advertisements aired within the 120-day time frame set forth in the fourth

7    content standard. See Complaint, at 2-3. Moreover, news reports indicate that Emily's List ads

8    clearly referring to Castor started airing in several parts of Florida on August 3,[5] and that an

9    Emily's List ad criticizing Martinez aired in October, within 120 days before the November 2,

10   2004 General Election.[6] Finally, in their responses, the Castor Committee and Emily's List

11   neither admit nor deny that the ads satisfy the content prong of the coordination regulation.[7]

12       It appears that the content prong of the coordination regulation may be satisfied, as one or

13   more Emily's List advertisements likely constitute a public communication that referred to a

14   clearly identified federal candidate, was publicly distributed or disseminated 120 days or fewer

15   before a primary or general election, and was directed to voters in the jurisdiction of the clearly

16   identified candidate. Accordingly, we now turn to an analysis under the conduct prong.

17

---

[5] See, e.g., Steve Bousquet and Anita Kumar, TV likely to be kingmaker in GOP Senate race, The St. Petersburg Times Online, Aug. 10, 2004; Ken Thomas, EMILY criticism deepens, The Associated Press, Aug. 3, 2004 (describing ad as touting Castor's health insurance program for low-income children); Anita Kumar and Steve Bousquet, Martinez, Castor foes claim campaign fouls, The St. Petersburg Times Online, Aug. 3, 2004 (describing ad as focusing on Castor's views on health care); Beth Reinhard, Florida candidates assailed, Miami Herald, Aug. 3, 2004 (describing ad as focusing on health insurance program started by Castor).

[6] See, e.g., Brendan Farrington, Martinez Calls On Castor To Pull Al-Arian Ad, Associated Press, Oct. 13, 2004 (describing ad as criticizing Martinez on stem cell research, health care and the minimum wage).

[7] The Castor Committee states that because the conduct prong is not met, the content prong need not be examined. It further states that it only has some recollection of seeing the ads on television but does not know their content exactly and would want to be provided with copies if the Commission were to pursue this matter further. See Castor Committee Response ("CC Response"), at 2, n. 2.

MUR 5506                                    5
First General Counsel's Report

1          C.    **Conduct Prong**

2          The Commission's regulations set forth six types of conduct between the payor and the

3    committee, whether or not there is agreement or formal collaboration, that can satisfy the conduct

4    prong. *See* 11 C.F.R. § 109.21(d). Only four of these standards are relevant here.[8] The first

5    three standards – (1) request or suggestion, (2) material involvement, and (3) substantial

6    discussion – do not appear to be met, and the respondents sufficiently rebut the allegations that

7    are made. Finally, the former employee standard does not appear satisfied, as the complaint does

8    not identify any former employees of the Castor campaign who may have been involved in the

9    creation, production, or distribution of the advertisements at issue.

10          1.    **Request or suggestion, material involvement, substantial discussion**

11          Under the first standard, the communication is coordinated if it is created, produced, or

12    distributed at the request or suggestion of a candidate or an authorized committee, or if the

13    communication is created, produced, or distributed at the suggestion of the payor and the

14    candidate or authorized committee assents to the suggestion. *See* 11 C.F.R. § 109.21(d)(1). The

15    second standard requires that the candidate, his or her committee, or their agents be materially

16    involved in the content, dissemination, or timing of the communication. *See* 11 C.F.R. §

17    109.21(d)(2). The third standard requires that the communication be created, produced, or

18    distributed after at least one substantial discussion about the communication between the person

19    paying for the communication, or that person's employees or agents, and the candidate or his or

20    her authorized committee, his or her opponent or opponent's authorized committee, a political

21    party committee, or any of their agents. A "substantial discussion" includes informing the payor

---

[8] The complaint does not address the common vendor and republication standards; moreover, the respondents affirmatively deny that they used a common vendor. *See* Emily's List Response ("EL Response"), at 2; CC Response, at 5.

1    about the campaign's plans, projects, activities, or needs, or providing the payor with information

2    material to the communication. *See* 11 C.F.R. § 109.21(d)(3).

3        The complaint alleges that coordination took place through direct contacts between the

4    campaign and Emily's List. *See* Complaint, at 2. The complaint states that many Emily's List

5    "operatives" raised money for the Castor campaign and helped with publicity, finance and

6    research, such as gathering information on opponents' records, that one Emily's List employee

7    was dedicated to the Castor campaign and called the campaign daily, and that "numerous other

8    Castor employees were hired based on EMILY's List decisions." *See id.* Further, the complaint

9    alleges that the coordinated communications are evidenced by Castor's withdrawal of television

10   advertisements in Jacksonville, Orlando, and Gainesville as Emily's List began to run ads in

11   those markets. *See id.,* at 3. The complaint, thus, alleges that the Emily's List and Castor

12   advertising activities "are the 'functional equivalent' of one large purchase" and "buttress[] the

13   obvious coordination strategy between EMILY's List and the Castor Campaign." *See id.* Finally,

14   the complainant points to Castor's public "admissions" that Emily's List wrote her "over

15   $650,000 worth of checks," helped her raise money, and provided advice and support to the

16   campaign, as an acknowledgement that her campaign had "substantial discussions" with Emily's

17   List, thereby constituting coordination. *See id.,* at 3-4.

18       However, the responses submitted by Emily's List and the Castor Committee provide

19   enough facts to sufficiently rebut the complaint. Emily's List, while acknowledging that it gave

20   support to the Castor campaign, claims that its internal policies and procedures ensured that no

21   coordination occurred. *See* EL Response, at 2. Emily's List explains that Women Vote!, a

22   project within Emily's List, handles advertising buys, and that the employees, volunteers, and

23   consultants who worked on the project were "barred, as a matter of policy, from interacting with

24   federal candidates, political party committees, or the agents of the foregoing. These employees,

7

1   volunteers and consultants are also barred from interacting with others within EMILY's List

2   regarding specified candidates or officeholders." *See id.* Likewise, the Castor Committee denies

3   that it had any knowledge of or involvement with the Emily's List ads in that neither it nor any of

4   its agents discussed, suggested or assented to them. *See* Castor Committee Response, ("CC

5   Response"), at 4. The Castor Committee further states that it made its decisions about placing

6   and pulling ads based on information that television stations are required to make public "and not

7   based on any communications with or information from Emily's List." *See id.,* at 5; *see also* EL

8   Response, at 5. Lastly, the Castor Committee argues that the speech Castor gave thanking

9   Emily's List for its fundraising efforts does not demonstrate that a substantial discussion about

10   the ads occurred because no information material to the later-created ads was conveyed. *See* CC

11   Response, at 5.

12       In essence, Emily's List appears to suggest that there was a firewall between these two

13   groups of Emily's List workers in that it maintains that the staff assigned to work directly with

14   the Castor Committee had no discussions with the staff assigned to Florida Women Vote! about

15   the advertisements at issue and imparted no knowledge or information about the Castor

16   campaign to Florida Women Vote! staff. *See id.,* at 1-3. And the principal piece of information

17   that might otherwise cause us to doubt either the effectiveness or existence of the firewall – the

18   apparently uncontroverted fact that the Castor Committee went off the air in certain markets

19   when Emily's List went on – is adequately rebutted by the Castor Committee's assertion that it

20   made its decisions based on information that it did not obtain from Emily's List.

21

MUR 5506
First General Counsel's Report

8

1   On balance, available information does not provide a sufficient basis to investigate

2   whether the Respondents may have engaged in conduct that meets one or more of the first three

3   conduct standards.

4            2.    **Former employee**

5        The complaint also alleges that coordination occurred through a former employee –

6   specifically, Castor's campaign manager, Deborah Reed, who "worked on other Emily's List

7   campaigns." *See* Complaint, at 2. The former employee conduct standard addresses a situation

8   where a former employee or independent contractor of a candidate committee is employed by the

9   payor of an alleged coordinated communication, that person provides or uses information about

10  the clearly identified candidate's campaign plans, projects, activities, or needs, and that

11  information is material to the creation, production, or distribution of the communication. *See*

12  11 C.F.R. § 109.21(d)(5). The complaint seems to allege the reverse situation – that coordination

13  occurred through Castor's campaign manager who previously had worked on other Emily's List-

14  endorsed campaigns. *See* Complaint, at 2. We agree with both Respondents that the former

15  employee conduct standard is not applicable here because it only covers conduct by a campaign

16  committee's former employee, not the conduct of a third-party former employee who later works

17  for a campaign committee, as the complaint alleges. Moreover, there is no information that Reed

18  or any former employee was involved in the creation, production, or distribution of the

19  advertisements at issue. Thus, the facts alleged do not provide a sufficient predicate to

20  investigate whether the former employee conduct standard is satisfied.

21           D.    **Conclusion**

22       In short, the allegations set forth in the complaint are sufficiently rebutted by the

23  Respondents. Accordingly, this Office recommends that the Commission find no reason to

MUR 5506
First General Counsel's Report

9

1    believe that the Castor Committee or Emily's List violated the Act, and that the Commission

2    dismiss the complaint as to Florida Women Vote! – A Project of Emily's List.

## III.    RECOMMENDATIONS

1.  Find no reason to believe that Emily's List and Britt Cocanour, in her official
    capacity as treasurer, violated 2 U.S.C. § 441a by making excessive in-kind
    contributions in the form of coordinated expenditures to Campaign for
    Florida's Future, formerly known as Betty Castor for U.S. Senate, and
    William R. Lewis, in his official capacity as treasurer.

2.  Find no reason to believe that Campaign for Florida's Future, formerly known
    as Betty Castor for U.S. Senate, and William R. Lewis, in his official capacity
    as treasurer, violated 2 U.S.C. § 441a by knowingly receiving excessive in-
    kind contributions in the form of coordinated expenditures.

3.  Dismiss the complaint as to Florida Women Vote! – A Project of Emily's List.

4.  Approve the appropriate letters.

5.  Close the file.

_8/9/05_
Date

Lawrence H. Norton
General Counsel

Lawrence Calvert
Deputy Associate General Counsel
for Enforcement

Julie Kara McConnell
Acting Assistant General Counsel

Elena Paoli
Attorney

# PLAINTIFFS' EXHIBIT 138



Monday,
May 20, 2002

Part III

# Federal Election Commission

11 CFR Parts 100, 102 et al.
Prohibited and Excessive Contributions;
Non-Federal Funds or Soft Money;
Proposed Rule

**FEDERAL ELECTION COMMISSION**

**11 CFR Parts 100, 102, 104, 106, 108, 110, 114, 300, and 9034**

**[Notice 2002–7]**

**Prohibited and Excessive Contributions; Non-Federal Funds or Soft Money**

**AGENCY:** Federal Election Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Federal Election Commission seeks comments on proposed changes to its rules relating to funds raised, received, and spent by party committees under the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"). The proposed rules are based on the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which adds to the Act new restrictions and prohibitions on the receipt, solicitation, and use of certain types of non-Federal funds, which are commonly referred to as "soft money." BCRA and the proposed rules prohibit national parties and Federal candidates and officeholders from raising non-Federal funds. They also generally require State, district, and local party committees to fund "Federal election activity," including voter registration and get-out-the-vote ("GOTV") drives, with money raised pursuant to the limitations, prohibitions, and reporting requirements of the Act, or with a combination of funds subject to various requirements of the Act and BCRA. They also address fundraising by Federal and non-Federal candidates and officeholders on behalf of political party committees, other candidates, and non-profit organizations.

BCRA's general effective date is November 6, 2002, the day following the November 2002 general election, although national party committees that received soft money prior to that date may use these funds for certain purposes before January 1, 2003. The changes to the Act's contribution limits take effect on January 1, 2003.

Further information is contained in the Supplementary Information that follows. Please note that the Commission has not made a final decision on any of these proposals.

**DATES:** Comments must be received on or before May 29, 2002. The Commission will hold a hearing on these proposed rules on June 4 and 5, 2002, at 9:30 a.m. Commenters wishing to testify at the hearing must so indicate in their written or electronic comments.

**ADDRESSES:** All comments should be addressed to Ms. Rosemary C. Smith,

Assistant General Counsel, and must be submitted in either electronic or written form. Electronic mail comments should be sent to *BCRAsoftmon@fec.gov* and must include the full name, electronic mail address, and postal service address of the commenter. Electronic mail comments that do not contain the full name, electronic mail address, and postal service address of the commenter will not be considered. Faxed comments should be sent to (202) 219–3923, with printed copy follow-up to ensure legibility. Written comments and printed copies of faxed comments should be sent to the Federal Election Commission, 999 E Street, NW., Washington, DC 20463. Commenters are strongly encouraged to submit comments electronically to ensure timely receipt and consideration. The hearing will be held in the Commission's ninth floor meeting room, 999 E St. NW., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Ms. Rosemary C. Smith, Assistant General Counsel, or Attorneys Ruth Heilizer (definitions), Jonathan L. Levin (office buildings), Dawn Odrowski (national parties and tax-exempt organizations), Rita A. Reimer (Federal and State candidates), John C. Vergelli (Levin funds), or Anne A. Weissenborn (parties), 999 E Street NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Public Law 107–155, 116 Stat. 81 (March 27, 2002), contains extensive and detailed amendments to the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"), 2 U.S.C. 431 *et seq.* This is the first of a series of Notices of Proposed Rulemakings ("NPRM") the Commission will publish over the next several months in order to meet the rulemaking deadlines set out in BCRA.

This NPRM addresses BCRA's new limitations on party, candidate, and officeholder solicitation and use of non-Federal funds. Section 402 of BCRA establishes a 90-day deadline for the Commission to promulgate these rules. Since BCRA was signed into law on March 27, 2002, the 90-day deadline is June 25, 2002.

*Future NPRMs will address:* (1) Electioneering communications and issue ads; (2) coordinated and independent expenditures; (3) the so-called "millionaire's amendment," which increases contribution limits for congressional candidates facing self-financed candidates on a sliding scale, based on the amount of personal funds the opponent contributes to his or her

campaign; (4) the increase in contribution limits; and (5) other new and amended provisions, including contribution prohibitions and reporting. This last NPRM will address contributions by minors, foreign nationals, and U.S. nationals; inaugural committees; fraudulent solicitations; disclaimers; personal use of campaign funds; and civil penalties. BCRA's deadline for promulgation of these remaining rules is 270 days after the date of enactment, or December 22, 2002. The Commission also plans to address BCRA's impact on national nominating conventions in a separate rulemaking.

Because of the extremely tight deadline for promulgating these rules, the Commission must adhere to a shorter-than-usual timeline for receiving and considering public input on the proposed rules that follow. This schedule will be strictly adhered to. Comments on this NPRM must be received no later than May 29, 2002. Commenters who wish to testify at the June 4 and 5, 2002 public hearing must so indicate in their comments, also by May 29, 2002.

**Introduction**

The Act limits the amount that individuals can contribute to candidates, political committees, and political parties for use in Federal elections. 2 U.S.C. 441a. The Act also prohibits corporations and labor organizations from contributing their general treasury funds for these purposes. 2 U.S.C. 441b. Contributions from national banks, 2 U.S.C. 441b(a); government contractors, 2 U.S.C. 441c; foreign nationals, 2 U.S.C. 441e; and minors, new 2 U.S.C. 441k, as enacted by BCRA; as well as contributions made in the name of another, 2 U.S.C. 441f; are also prohibited. These strictures regulate what is often referred to as "hard money," or Federal funds.

Some donations that do not meet the FECA hard money requirements, for example, corporate and labor organization general treasury contributions, may not be used for Federal elections, and are referred to as non-Federal funds.[1] Non-Federal funds

---

[1] Because the term "soft money" is used by different people to refer to a wide variety of funds under different circumstances, the Commission has decided to use the term "non-Federal funds" in the rules rather than the term "soft money." BCRA itself does not use the term except in the heading of Title I of BCRA and the headings within Title IV. Some donations that do not meet the Act's hard money requirements, for example, those from foreign nationals, national banks, and Federal corporations, may not be used at all. Nonetheless, the Commission seeks comment on whether use of the term "soft money" would in some instances be a better approach.

may not be used for the purpose of influencing any election for Federal office. Funds raised that are used by State or local parties or State or local candidates wholly on non-Federal elections may be governed by State or local law. Prior to BCRA's revisions, the FECA permitted national party committees, Federal candidates, and officeholders to raise money not subject to some of the Act's source limitations and prohibitions. Beginning November 6, 2002, under BCRA, national party committees "may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act." 2 U.S.C. 441i(a).

BCRA also provides that State, district, and local political party committees must pay for "Federal election activities," which is a new term introduced and defined by BCRA. 2 U.S.C. 431(20), 441i(b)(1), with entirely Federal funds or, in some cases, a mixture of Federal funds and a new type of non-Federal funds, which the proposed rules call "Levin funds." These two provisions are related in that the latter is intended to prevent evasion of the former. A national political party committee may not evade the restrictions in BCRA by merely transferring its spending for Federal election activity to State, district, or local party committees. The State, district, and local party committees must spend Federal funds on these activities. *See* 148 Cong. Rec. H408–409 (daily ed. Feb. 13, 2002) (statement of Rep. Shays).

The "Levin Amendment" (named after Sen. Levin of Michigan who offered it) provides an exception or refinement to the requirement that State, district, and local party committees must spend only hard money for Federal election activities. The Levin Amendment provides that State, district, and local political party committees may use funds that do not meet all of the Act's limitations, prohibitions, and reporting requirements for a portion of certain Federal election activities if certain conditions are satisfied. *See* 2 U.S.C. 441i(b)(2)(A). The proposed regulations refer to these funds, which are a subset of non-Federal funds, as "Levin funds," a term which would be defined in the proposed regulations. BCRA does not permit national party committees, candidate committees, separate segregated funds, or nonconnected committees to raise or spend Levin funds.

A State, district, or local political party committee may spend under the Levin Amendment if the expenditure or disbursement is allocated between Federal funds and Levin funds. BCRA contemplates that the Commission will adopt regulations prescribing the allocation requirements. 2 U.S.C. 441i(b)(2)(A). *See* below. Under BCRA, Federal candidates and officeholders may not solicit or receive non-Federal funds in connection with a Federal election, and may raise only limited amounts in connection with non-Federal elections. 2 U.S.C. 441i(e)(1) and (2). These far-reaching amendments affect many other aspects of the Act and the Commission's rules. For example, the prohibition on Federal candidate and officeholder solicitation of non-Federal funds, and national party committees' solicitation or receipt of non-Federal funds, applies to convention committees, which are established by national committees under 11 CFR 9008.3(a). These statutory changes could apply to other entities as well. *See* 2 U.S.C. 441i(a)(2). As noted above, BCRA's impact on national nominating conventions will be addressed in a separate rulemaking. It also will be necessary to rewrite the Commission's allocation rules at 11 CFR part 106. *See* below.

The proposed rules are described and explained below. In several sections the Commission has identified specific questions, issues, or alternatives for which it seeks comments. In addition, the Commission welcomes comments that address issues not raised in this NPRM.

## Scope, Effective Date, and Organization

The Commission proposes to prescribe new rules for non-Federal funds of political party committees. The bulk of these rules would be in 11 CFR part 300. Proposed 11 CFR 300.1 addresses the scope of new part 300, sets forth the effective date of the provisions contained in the new part, and outlines the organization of the new part. Specifically, proposed paragraph (a) of section 300.1 states that proposed new part 300 would implement changes to the FECA, enacted by Title I of BCRA. It also notes that nothing in part 300 is intended to alter the definitions, restrictions, liabilities, and obligations imposed by sections 431–455 of Title 2 of the United States Code or in the regulations prescribed thereunder in 11 CFR parts 100–116.

The effective date of BCRA, except where otherwise stated, is November 6, 2002. *See* 2 U.S.C. 431 note, section 402(a). Paragraph (b) of proposed section 300.1 states that part 300 would

take effect on November 6, 2002, except for the following: (1) Where otherwise stated in part 300; (2) subpart B of part 300 relating to State, district, and local party committees will not apply with respect to runoff elections, recounts, or election contests resulting from elections held prior to November 6, 2002; (3) the increase in individual contribution limits to State party committees as set forth in proposed 11 CFR 110.1(c)(5) will apply to contributions made on or after January 1, 2003, and (4) national parties must spend any remaining non-Federal funds received before November 6 and in their possession on that date before January 1, 2003, subject to the transition rules set forth in proposed 11 CFR 300.12.

Finally, paragraph (c) of section 300.1 indicates that part 300 would be organized into five subparts, with each subpart addressing a specific category of persons affected by BCRA. Specifically, subpart A of part 300 prescribes rules pertaining to national party committees; subpart B prescribes rules pertaining to State, district, and local party committees and organizations; subpart C addresses rules affecting certain tax-exempt organizations; subpart D prescribes rules pertaining to Federal candidates and Federal officeholders; and subpart E prescribes rules pertaining to State and local candidates. BCRA also requires changes in these parts of Title 11 of the *Code of Federal Regulations,* which are also addressed in this rulemaking.

## Definitions

The proposed rules would amend an existing definition and add several new ones. Some of the new definitions would be added to current 11 CFR part 100 because they would have general applicability in Title 11 of the *Code of Federal Regulations.* The remaining new definitions would be added to proposed new 11 CFR part 300. The definitions are explained below.

### 1. Proposed 11 CFR 100.24 Definition of "Federal Election Activity"

BCRA amends 2 U.S.C. 431 by adding a new term, "Federal election activity," which consists of certain activities that State and local committees of political parties must pay for with either Federal funds or a combination of Federal funds and Levin funds. As stated above, Levin funds are funds which are exempt from the restrictions and prohibitions of the Act, but which are limited, under BCRA, to $10,000 per donor and which must comply with State law.

The proposed definition of Federal election activity, which would be incorporated into proposed new 11 CFR

**35656**    **Federal Register** / Vol. 67, No. 97 / Monday, May 20, 2002 / Proposed Rules

100.24, tracks BCRA by including in Federal election activity the following activities when they occur in close proximity to, or in connection with, a Federal election: Voter registration; voter identification; GOTV drives; and public communications that refer to clearly identified Federal candidates, even if candidates for State and local offices are also mentioned. ("Generic campaign activities" are discussed below.)

With respect to "voter registration activity," which is addressed in proposed 11 CFR 100.24(a)(1), "special elections" are excluded, pursuant to BCRA. However, with regard to proposed 11 CFR 100.24(a)(2), which addresses other activities conducted in connection with an election, such as voter identification and GOTV activities, BCRA does not exclude "special elections." Therefore, under proposed 11 CFR 100.24(a)(2), voter identification and GOTV activities would constitute Federal election activity if conducted in connection with special elections.

Proposed 11 CFR 100.24(a)(2)(i) would set forth examples of "voter identification," such as activities designed to determine registered voters, likely voters, or voters indicating a preference for a candidate or political party. The Commission seeks comments as to whether those are appropriate examples of voter identification, or whether they are too broad or too narrow. Do efforts to identify potential voters for State or local candidates, without any mention of a Federal candidate, constitute Federal election activity? Should there be a *de minimis* level of voter identification activities related to Federal elections that would nonetheless not render certain activities "Federal election activities" under BCRA? For example, would a State committee's purchase of a list of voters from a vendor for the purpose of State fundraising constitute "Federal election activity"? Should "voter identification" be read in conjunction with "GOTV" to reach only those activities intended to identify voters for GOTV purposes? Should there be a defined time period that distinguishes "voter identification" from GOTV activities? For example, is an activity designed to identify supporters of a gubernatorial candidate "voter identification" if conducted several weeks or months before an election, but "GOTV" if conducted within a week of the election? What other examples of "voter identification" should be included in the regulations?

The Commission also notes that some examples of "voter identification," such as activities designed to determine

registered voters or likely voters, may sometimes be conducted on a nonpartisan basis. Nonpartisan activities intended to encourage individuals to vote or to register to vote appear to come within the definition of "Federal election activity" under BCRA. Nevertheless, should non-partisan GOTV drives be excluded from the definition of "Federal election activity" in 11 CFR 100.24? *See* 2 U.S.C. 431(9)(B)(ix). Is it appropriate to treat certain party or candidate-initiated or 501(c) activities as nonpartisan voter drives? If so, under what conditions?

Proposed 11 CFR 100.24(a)(2)(iii) contains the following examples of GOTV activities: Transporting voters to the polls; contacting voters on election day or shortly before to encourage voting, but without referring to any clearly identified candidate for Federal office; and distributing printed slate cards, sample ballots, palm cards, or other printed listing(s) of three or more candidates for any public office. The Commission seeks comments as to whether there should be a *de minimis* level of GOTV activities related to Federal elections that would nonetheless not render these activities "Federal election activities" under BCRA.

In addition, the Commission seeks comments concerning additional examples of GOTV activity for possible inclusion in the final version of this proposed rule. The Commission also seeks comments on whether printed slate cards, sample ballots, and palm cards should properly be considered GOTV activities or "public communications."

The Commission notes that, although slate cards, sample ballots, and printed listings of three or more candidates are exempted from the Act's definitions of "contribution" and "expenditure," (*see* 2 U.S.C. 431(8)(b)(v) and (9)(b)(iv)), they could be viewed as falling within the term "Federal election activities" under BCRA. Should they?

The Commission also notes that voter identification, GOTV, and generic campaign activity are only "Federal election activities" under BCRA when they are conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State of local office also appears on the ballot.) The Commission seeks comments on how this requirement should be construed and implemented—specifically, during what period(s) of time should a Federal candidate be deemed to be on the ballot? Congress clearly intended to establish certain periods of time in

which a Federal candidate is not deemed to be on the ballot. How should the Commission proceed in effectuating Congress' intent?

The Commission notes that there are a variety of ways in which Federal candidates may qualify to have their names placed on the ballots of their States and that these processes are governed by State law. In addition, the method by which a candidate for Federal office obtains a position on the ballot is likely to differ for primaries and general elections. In some cases, one State political party may choose its candidate for Federal office before other State political parties choose their candidates. Should the Commission construe the statutory language "on the ballot" to encompass the period of time beginning on the earliest date that any Federal candidate could qualify for a position on the ballot according to the time periods specified in the applicable State law or should the time period begin on the day the filing period for Federal offices closes under State law? In the alternative, does this time period begin on January 1 of any Federal election year, that is, each even-numbered year? Or should the time period begin on the date that any individual has become a Federal candidate under the Act? *See* 2 U.S.C. 431(2) and 11 CFR 100.3(a)(1) through (4) regarding the definition of "candidate" for FECA purposes. In some States, most non-Federal elections are held in odd-numbered years. Should the Commission only exempt from "Federal election activity" that voter identification, GOTV, and generic campaign activity that occurs in such States in odd-numbered years?

Proposed 11 CFR 100.24(a)(3) follows new 2 U.S.C. 431(20) by providing that a public communication that refers to a clearly identified candidate for Federal office would constitute "Federal election activity" that must be paid for with Federal funds if the communication promotes, supports, attacks, or opposes any candidate for that Federal office. This is true even if a candidate for State or local office is also mentioned or identified. However, public communications that do not promote, support, attack, or oppose any Federal candidate, as well as certain contributions to State or local candidates, the costs of State, district, or local political conventions or similar meetings and conferences, and grassroots materials that refer only to non-Federal candidates would be specifically excluded from the definition of "Federal election activity."

"Public communication" is defined in proposed 11 CFR 100.26, discussed

below. Thus, the definition of "Federal election activity" in proposed 11 CFR 100.24 and BCRA would extend beyond communications expressly advocating a vote for or against a candidate. Note that a proposed definition of "promote or support or attack or oppose" is set forth in proposed 11 CFR 300.2(l), which is discussed below.

BCRA also crafted 2 U.S.C. 431(20) to exempt from the definition of "Federal election activity" certain expenditures or disbursements by State, district, or local committees of political parties for certain activities which may be paid for with non-Federal funds. These activities are:

(1) Public communications that refer to a clearly identified candidate for State or local office, provided that the public communications are not voter registration activity, voter identification, generic campaign activity, or GOTV activity, as those terms are defined in proposed 11 CFR 100.24(a). This exception does not apply, for example, to a telephone bank on the day before an election where there is a federal candidate on the ballot and where GOTV phone calls are made to over 500 voters where the calls only refer to a State or local candidate (proposed 11 CFR 100.24(b)(1)).

(2) Contributions to candidates for State or local office, provided that the contributions are not for Federal election activities (proposed 11 CFR 100.24(b)(2)).

(3) The costs of State, district, or local political conventions, meetings or conferences (proposed 11 CFR 100.24(b)(3)).

(4) The costs of grassroots campaign materials, including buttons, bumper stickers, handbills, brochures, posters and yard signs, that name or depict no Federal candidate (proposed 11 CFR 100.24(b)(4)).

(5) Voter registration activity before or after the dates during which this activity becomes Federal election activity (proposed 11 CFR 100.24(b)(5)).

(6) GOTV and voter identification activities in elections in which no candidate for Federal office appears on the ballot (proposed 11 CFR 100.24(b)(6)).

The Commission also seeks comments concerning additional examples of "grassroots" activities.

*2. Proposed 11 CFR 100.25 Definition of "Generic Campaign Activity"*

Proposed section 100.25 contains the new statutory definition of "generic campaign activity," which is campaign activity that promotes a political party, and not a candidate for Federal office or for non-Federal office. The proposed

rules would add to the statutory definition those activities that oppose a political party without opposing specific candidates. Activities in opposition to a particular party or candidate may be construed as a form of promoting the other party or other candidates. Unlike "voter registration activity," as described in 11 CFR 100.24(a)(1), the Commission is proposing to interpret "generic campaign activity" to apply to special elections. In addition, the Commission seeks comment on the extent, if any, to which the exclusions for exempt activities in 11 CFR 100.7(b)(9), (15), (17) and 100.8(b)(8), (10), and (16), should apply to the definition of "generic campaign activity."

*3. Proposed 11 CFR 100.26 Definition of "Public Communication"*

BCRA amends 2 U.S.C. 431 by adding a new definition for the term "public communication." BCRA defines "public communication" to include communication by broadcast, cable, satellite, newspaper, magazine, outdoor advertising facility, mass mailing or telephone bank to the general public, or any other form of general public political advertising. In proposed 11 CFR 100.26, the Commission has not included the Internet as a form of "general public political advertising" because this provision of BCRA does not refer to the Internet. However, the Commission seeks comments as to whether the definition of "public communication" in proposed 11 CFR 100.26 should include or exclude communications provided through the use of World Wide Web sites available to the public, widely distributed electronic mail, or other uses of the Internet, such as "Webcasts" or the transmission of high-quality voice, graphics, or video advertisements.

A letter sent by Chairman Mason and Commissioner Smith requested that Congress clarify whether the term "public communication" was intended to encompass communications sent over the Internet. The letter noted that the definition included "any other form of general public political advertising," and stated: "The Commission has treated Internet web pages available to the public and widely-distributed e-mail as forms of 'general public political communication.' Thus, the new definition combined with the Commission's established interpretation of the FECA could command regulation of Internet and e-mail communications." *See* 148 Cong. Rec. S2340 (daily ed. March 22, 2002). Congress did not express agreement or disagreement with this interpretation.

*4. Proposed 11 CFR 100.27 Definition of "Mass Mailing"*

BCRA amends 2 U.S.C. 431 by adding a new definition of the term "mass mailing." This new definition, which is set out in proposed 11 CFR 100.27, would include any mailing by United States mail or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period.

The term "substantially similar" is also used in the Commission's disclaimer regulations at 11 CFR 110.11(a)(3). When these rules were adopted in 1995, the Commission explained that technological advances now permit what is basically the same communication to be personalized to include the recipient's name, occupation, geographic location, and similar variables. Communications are considered "substantially similar" for purposes of the disclaimer rules if they would be the same but for such individualization. *See* Explanation and Justification for Regulations on Communications Disclaimer Requirements, 60 FR 52069, 52070 (Oct. 5, 1995). The Commission is proposing that the term "substantially similar" as used in proposed 11 CFR 100.27 have the identical meaning, and is including language to this effect in the text of the rule. However, it welcomes comments as to whether some other definition of "substantially similar" would be more appropriate in this context.

*5. Proposed 11 CFR 100.28 Definition of "Telephone Bank"*

BCRA amends 2 U.S.C. 431 by adding a new definition of the term "telephone bank." This new definition, which is set out in proposed 11 CFR 100.28, would include more than 500 telephone calls of an identical or substantially similar nature within any 30-day period. The Commission is also proposing to address the meaning of "substantially similar" in the text of the rules. *See* discussion of proposed 11 CFR 100.27, above.

*6. Proposed 11 CFR 300.2 Definitions*

In proposed new section 300.2, the Commission seeks comments on draft definitions for the following terms: "501(c) organization that makes expenditures or disbursements in connection with a Federal election"; "agent"; "directly or indirectly establish, finance, maintain, or control"; "disbursement"; "donation"; "Federal account"; "Federal funds"; "Levin account"; "Levin funds"; "non-Federal account"; "non-Federal funds"; "promote, support, attack, or oppose";

and "to solicit or direct." Several of these terms are adapted from existing rules.

Several key terms are discussed in further detail below. In addition, the Commission notes that proposed 11 CFR 300.2 defines several phrases, such as "directly or indirectly establish, finance, maintain, or control," "to solicit or direct," and "promote or support or attack or oppose," rather than attempting to define the individual words in each phrase. Comments are sought on this approach, and on the clarity and scope of these definitions.

A. Definition of "Agent"

With respect to the definition of "agent," the Commission seeks comments as to when an agent is acting "on behalf of" a principal. Additionally, the Commission seeks comments as to the circumstances under which a principal, such as a party committee or a candidate, would be held liable for the actions of an agent, such as an individual soliciting funds on behalf of the committee for a 501(c) organization. For example, must such an individual be a paid employee of the principal (*i.e.,* the candidate or officeholder) in order to qualify as an agent or would a vendor or independent consultant hired by a candidate or political committee qualify as an agent? Could a principal be held responsible for the actions of a volunteer who solicited impermissible funds if the volunteer was making solicitations pursuant to general written or oral instructions from the principal? Would a volunteer qualify as an agent if a principal had knowledge that a volunteer was making impermissible solicitations using the candidate's name without being specifically directed by the principal to do so? In addition, should a principal only be held liable if an agent has actual, as opposed to apparent, authority to engage in the alleged actions at issue? Similarly, should a principal only be held liable if an agent has express, rather than implied, authority to act? Or should the Commission not attempt to define agency concepts in this part of the regulations, but instead leave the concepts undefined for purposes of BCRA and rely on common law definitions? Please note that the latter approach would depart from the approach taken regarding the definition of agency in the current independent expenditure rules. *See* 11 CFR 109.1(b)(5).

B. Definition of "Directly or Indirectly Establish, Finance, Maintain, or Control"

Proposed 11 CFR 300.2(c) would define "directly or indirectly establish, finance, maintain, or control," a term that is used in several provisions of BCRA. (The phrase "established, financed, maintained, or controlled" already appears in the Commission's "affiliation" regulation. *See* 2 U.S.C. 441a(a)(5), 11 CFR 100.5(g).) The term appears in BCRA in the context of State, district, and local political party committees (*see, e.g.,* 2 U.S.C. 441i(b)(2)(B)(iii)) and of Federal candidates and officeholders (*see, e.g.,* 2 U.S.C. 441i(e)(1)).

In BCRA, "directly or indirectly establish, finance, maintain, or control" is used in one context which seems to be akin to the current affiliation rule, that is, determining when ostensibly separate entities share a contribution limit. *See* 2 U.S.C. 441i(b)(2)(B)(iii). This usage would suggest that the existing affiliation regulation is helpful in understanding what is meant by "directly or indirectly establish, finance, maintain, or control." The term, "directly or indirectly establish, finance, maintain, or control," however, is also used in what seems to be a slightly different manner. For example, a State, district, or local committee of a political party must not use as "Levin funds" (a term that would also be defined in this section) any funds transferred to it from, among other persons, "any other State, local, or district committee of any State party, * * * or * * * any entity directly or indirectly established, financed, maintained, or controlled [by the State party committee]." 2 U.S.C. 441i(b)(2)(B)(iv)(I), (IV); *see also* 2 U.S.C. 441i(e)(1). This latter usage suggests a different purpose, namely preventing the proliferation of committees or organizations as a means of evading the Levin Amendment transfer prohibition, as well as other BCRA prohibitions.

The definition in proposed 11 CFR 300.2(c) would accommodate both of the usages of the term "directly or indirectly establish, finance, maintain, or control." Proposed paragraph (c)(1) would begin by enumerating the persons to whom the regulation would apply, and would employ the shorthand "sponsor" to refer to these persons. Also in proposed paragraph (c)(1), the statutory concept of "indirect" establishment, financing, maintenance, or control would be addressed by including actions taken by a sponsor's agents, and those taken on behalf of the

sponsor, or at the sponsor's behest, within the definition.

Proposed paragraph (c)(1)(i) would provide that a sponsor "directly or indirectly establishes, finances, maintains, or controls" an entity if the sponsor and the entity would be considered affiliated under 11 CFR 100.5(g).

Given that the term, "directly or indirectly establish, finance, maintain, and control," seems also to have a somewhat broader meaning in other contexts, proposed paragraphs (c)(1)(ii) through (c)(1)(vi) would go on to state other conditions in which a sponsor would "directly or indirectly establish, finance, maintain, or control" an entity. The Commission seeks comment on whether this term should be interpreted to extend beyond the current affiliation standard.

Proposed paragraph (c)(1)(ii) would focus on the establishment of entities by sponsors, and would extend to the conversion of an existing entity. Note that the proposed phrase, "alone or in combination with others," would extend this provision to circumstances in which a sponsor (or its agents) was not solely responsible for the establishment of the entity, but worked with one or more other persons to establish the entity. The Commission seeks comment on whether this proposed paragraph should apply only to entities established by a sponsor after a given date (perhaps November 6, 2002, which is the effective date of BCRA), provided that the sponsor and the entity are not affiliated and do not satisfy the conditions in proposed paragraphs (c)(1)(iii) through (vi). In the alternative, should there be a rebuttable presumption that entities organized before a given date are not directly or indirectly established by a sponsor, provided that the sponsor and the entity are not affiliated and do not satisfy the conditions in proposed paragraphs (c)(1)(iii) through (vi)?

Proposed paragraph (c)(1)(iii) would address financing of an entity by a sponsor. It would state that providing a "significant amount of the entity's funding at any point" would suffice to constitute "financing." The proposed paragraph would enumerate three factors to be used in gauging the "significance" of funding. These factors would go to the magnitude, frequency, and duration of funding, and to how recently or distantly (in time) the funding has been provided. For example, a sponsor that had provided a sizable, but one-time contribution to an entity many years earlier would be able to assert that the one-time nature of the contribution, combined with its

remoteness in time, make this funding not "significant," as the term is used here.

Proposed paragraph (c)(1)(iv) would address the maintenance of an entity by a sponsor. It would state that providing certain services to an entity would constitute "maintaining" the entity. The Commission seeks comment on whether there should be a *de minimis* exception to this provision. For example, if a party committee provides a *de minimis* amount of administrative services to a party-related organization, such as a governor's association, should this activity be included in this provision?

Proposed paragraphs (c)(1)(v) and (c)(1)(vi) would go to control of an entity by a sponsor. Proposed paragraph (c)(1)(v) would focus on control, whether formal or informal, by the sponsor of solicitation of contributions and donations, and of making expenditures or disbursement, by the entity. Proposed paragraph (c)(1)(vi) would focus on more formal or structural decision-making relationships between the sponsor and the entity.

The Commission seeks comment on several aspects of these conditions. In proposed paragraph (c)(1)(ii), a sponsor would "directly or indirectly establish, finance, maintain, or control" an entity if the sponsor provided "any funding" for the formation or organization of the entity. The Commission seeks comment as to whether there should be a *de minimis* exception to the proposed "any funding" rule. Proposed paragraph (c)(1)(iii) would provide that a sponsor would "directly or indirectly establish, finance, maintain, and control" an entity if the sponsor "provides a significant amount of the entity's funding at any point in the entity's existence." The Commission seeks comment about whether "at any point" should be replaced with a temporal limit (e.g., "within the past 5 years").

Proposed paragraph (c)(2) would provide a mechanism for a sponsor or an entity to request a determination by the Commission through the advisory opinion process that the sponsor is no longer deemed to finance, maintain, or control an entity, even if it established the entity.

### C. Definition of "Donation"

BCRA uses but does not define the term "donation." The Commission proposes to define a "donation" in 11 CFR 300.2(e) as a payment, gift, subscription, loan, advance, deposit, or anything of value given to a non-Federal candidate or party committee, but not including a contribution or transfer. Comments are sought on specifically excluding from "donation" some of the

exemptions to "contribution" set forth in existing 11 CFR 100.7(b). Under this approach, the following would not be donations: Funds received solely for the purpose of determining whether an individual would become a Federal candidate (existing 11 CFR 100.7(b)(1)(i)); any cost incurred in covering or carrying a news story, commentary, or editorial by any broadcasting station, newspaper, magazine, or other periodical publisher (existing 11 CFR 100.7(b)(2)); individual volunteer services provided without compensation to Federal candidates and political committees (existing 11 CFR 100.7(b)(3)); the costs of providing the use of residential premises or of church or community rooms in the course of volunteering personal services to candidates or political parties (existing 11 CFR 100.7(b)(4) and (5)); the cost of invitations, food, and beverages in accordance with existing 11 CFR 100.7(b)(6); unreimbursed transportation and subsistence costs under existing 11 CFR 100.7(b)(7); and the staging of candidate debates in accordance with existing 11 CFR 100.7(b)(20) and (21). The Commission seeks comments concerning whether each of these activities should be expressly exempted from the definition of "donation." What, if any, additional expenses should be excluded from the definition of "donation"? For example, are there particular activities that have been recognized through the Commission's advisory opinion process as exempt from the definition of "contribution" (e.g., funds given to a candidate's legal defense fund) that should be exempt from the definition of "donation" as well?

### D. Definitions of "Levin Funds" and "Levin Accounts"

As explained above, BCRA's Levin Amendment provides that State, district, and local political party committees may spend certain non-Federal funds for Federal election activities if those funds comply with certain prohibitions, limitations, and reporting requirements added to the Act by BCRA. 2 U.S.C. 441i(b)(2)(A)(ii). Thus, these funds are unlike Federal funds, which are fully subject to the Act's requirements, and unlike "regular" non-Federal funds because they are subject to certain additional requirements under BCRA. Proposed paragraph (i) of proposed 11 CFR 300.2 would define these funds as "Levin funds," with the intention that "Levin funds" become a definite, unambiguous reference to such funds. Note that the proposed definition contemplates that a State, district, or local political party

committee would be permitted to spend Levin funds on non-Federal activity or Federal election activity. As explained more thoroughly below in the discussion of proposed 11 CFR 300.32, the Commission seeks comment as to whether the Levin Amendment (2 U.S.C. 441i(b)(2)) should be interpreted to permit the spending of Levin funds for any purpose other than Federal election activity.

The Commission is considering requiring State, district, and local political party committees to set up a separate account to handle Levin funds if they raise and spend such funds. Proposed paragraph (h) of proposed 11 CFR 300.2 would define "Levin account" as these separate accounts for handling Levin funds, which would be established under proposed 11 CFR 300.30. Again, the intention is that the term would become an unambiguous reference to such accounts. The Commission seeks comment as to whether a requirement for mandatory Levin accounts would be more or less burdensome than the alternative of allowing party committees to deposit and spend Levin funds from any non-Federal account. The alternative approach would include a requirement that the committee must be able to show by a reasonable accounting method that the non-Federal portion of an expenditure for Federal election activities under the Levin Amendment (*see* 2 U.S.C. 441i(b)(2)(A)) was comprised of lawful Levin funds.

### E. Definition of "Promote or Support or Attack or Oppose"

BCRA uses the terms, "promote," "support," "attack," and "oppose" in both the Levin Amendment and elsewhere, but does not define these terms. The proposed rules at 11 CFR 300.2(*l*) include a definition, which incorporates the concept of "unmistakably and unambiguously" encouraging actions to elect or defeat a clearly identified candidate. *Cf. Buckley v. Valeo*, 424 U.S. 1, 43–44 (1976) (restricting the reach of former 18 U.S.C. 608(e)'s "clearly identified" to "an explicit and unambiguous reference to the candidate.") The Commission has also included language in section 300.2(*l*) from its existing express advocacy regulations, 11 CFR 100.22(a) and (b), but has broadened the scope of these provisions in order to effectuate BCRA's intention of enlarging the scope of regulated communications. The Commission seeks comments as to whether its proposed definition is too broad or too narrow, and why. Specifically, the Commission seeks

comments as to what definition is most likely to survive Constitutional scrutiny.

F. Definition of "To Solicit or Direct"

Lastly, proposed 11 CFR 300.2(m) contains a definition of "to solicit or direct" a contribution or donation. The draft definition would include a request, suggestion. or recommendation to make a contribution or donation, including those made through a conduit or intermediary. However, the definition does not construe advice or guidance as to applicable laws to constitute a "solicitation." The Commission seeks comments as to how the concept of "solicitation" should be applied to a series of conversations which, taken together, constitute a request for contributions or donations, but which do not do so individually. Comment is also sought as to whether the proposed definition is too broad or narrow, as well as whether the term "direct" in BCRA should be interpreted to follow the earmarking rules regarding contributions directed through a conduit or intermediary under 2 U.S.C. 441a(a)(8). Comment is also sought as to whether the passive providing of information in response to an unsolicited request for information should be specifically excluded from this definition.

**National Party Committees**

BCRA prohibits national party committees from raising and spending non-Federal funds, that is, funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act. See 2 U.S.C. 441i(a). In explaining the purpose of this prohibition, BCRA co-sponsor, Congressman Shays, stated: "The purpose of these provisions is simple: to put the national parties entirely out of the soft money business." According to Congressman Shays, the corrupting dangers of funds raised outside the Act's prohibitions, limitations, and reporting requirements is present in the funding of national parties given that they operate at the national level and "are inextricably intertwined with Federal officeholders and candidates, who raise money for them * * *" 148 Cong. Rec. H408–409 (daily ed. February 13, 2002) (statement of Rep. Shays).

The Commission is proposing to place the regulations that address this prohibition in a new part of the Code of Federal Regulations, 11 CFR part 300, subpart A. In addition to proposing this new subpart, the Commission is also proposing to amend current 11 CFR 102.5 to conform with BCRA's prohibition on national party committees and Federal candidates and officeholders from raising and spending non-Federal funds.

*1. Proposed 11 CFR 300.10    General Prohibitions*

The proposed rules at 11 CFR 300.10 track the language of BCRA in prohibiting national party committees from soliciting, receiving, or directing to another person "a contribution, donation, or transfer of funds or any other thing of value," or spending funds that are not subject to the Act's prohibitions, limitations, and reporting requirements. Accordingly, national party committees would no longer be able to accept funds from corporations or labor organizations or funds from individuals and others that exceed the limitations of the Act. Further, all expenditures and disbursements made by a national party committee, including donations to State and local candidates and donations or transfers to State parties, would be made with Federal funds.

The national party ban on raising and spending non-Federal funds has widespread application. BCRA expressly provides that the prohibition on raising and spending non-Federal funds also applies to the national party congressional committees (currently, the Democratic Senatorial Campaign Committee, the National Republican Senatorial Committee, the Democratic Congressional Campaign Committee, and the National Republican Congressional Committee). to officers and agents acting on behalf of a national party committee or a national party congressional committee, and to any entities directly or indirectly established, financed, maintained, or controlled by either. 2 U.S.C. 441i(a)(1) and (2). "The provision is intended to be comprehensive at the national party level. Simply put, the national parties and anyone operating on behalf of them are not to raise or spend nor [sic] to direct or control soft money." 148 Cong. Rec. H408–409 (daily ed. February 13, 2002) (statement of Rep. Shays).

The proposed rules track the statutory language. See proposed 11 CFR 300.10(a) and (c). Consequently, Federal candidates or Federal officeholders, or anyone else acting on behalf of a national party committee would not be able to raise or spend non-Federal funds or direct them to other persons. Similarly, party-created entities such as convention committees, which are established by a national party committee in accordance with 11 CFR 9008.3(a)(2) to conduct the daily operations of a party's national nominating convention, would not be able to raise or spend, or direct to other

persons, funds from corporations or labor organizations, or funds from individuals or other entities in amounts that exceed the Act's contribution limitations. In a subsequent rulemaking, the Commission will seek comment on whether BCRA bans national party committees, and their officers and agents, from directing non-Federal funds to a host committee in light of the statutory language that they are not permitted to direct non-Federal funds to other persons. See 2 U.S.C. 441i(a)(1).

The proposed rules also make clear that national parties cannot raise, spend, or direct to another person Levin funds. See proposed 11 CFR 300.10(a)(3). The Commission seeks comments on whether the rules should contain specific examples of "entities directly or indirectly established, maintained, financed, or controlled by a national party committee," and if so, what entities should be included.

*2. Proposed 11 CFR 300.11    Prohibition on National Party Fundraising for Certain Tax-Exempt Organizations*

In addition to prohibiting national parties from raising and spending non-Federal funds, BCRA prohibits national party committees, their officers and agents, and entities directly or indirectly established, financed, maintained, or controlled by them from raising funds for, or making or directing donations to, certain tax-exempt organizations. 2 U.S.C. 441i(d)(1). BCRA's prohibition on this type of donor and fundraising activity extends only to tax-exempt organizations with a political purpose or that conduct activities in connection with a Federal election.

Specifically, the party fundraising ban extends to organizations exempt from taxation under 26 U.S.C. 501(c) that "[make] expenditures or disbursements in connection with an election for Federal office (including expenditures or disbursements for Federal election activity)." 2 U.S.C. 441i(d)(1). (Organizations formed under 26 U.S.C. 501(c) are referred to as "501(c) organizations" below.) The ban also extends to political organizations exempt from taxation under 26 U.S.C. 527. These entities are defined in the Internal Revenue Code as parties, committees, associations, funds, or other organizations organized and operated primarily to directly or indirectly accept contributions and make expenditures for the "exempt function" of influencing or attempting to influence the selection, nomination, election or appointment of an individual to a Federal, State, or local public office, political organization office, or election of Presidential and

Vice Presidential electors. 26 U.S.C. 527(e)(1) and (2). BCRA excludes certain section 527 organizations from the prohibition: Political committees, State, district, and local party committees and the authorized committees of State and local candidates.

Again, the proposed rules track the statute. *See* proposed 11 CFR 300.11. A section 501(c) organization that "makes expenditures or disbursements in connection with a Federal election" is defined as an organization that operates, supports, finances, or controls a political committee, as defined under the Act, makes expenditures and disbursements in connection with Federal election activity, finances voter registration at any time, or finances voter guides, candidate surveys and candidate questionnaires that refer to one or more Federal candidates. *See* proposed 11 CFR 300.2(a). As explained above, the definition of "Federal election activity" would generally follow the statutory definition of that term. *See* proposed 11 CFR 100.24. This ban on party fundraising for certain tax-exempt organizations would ensure that national parties could not direct non-Federal funds they formerly raised themselves to other organizations that engage in election activity that could directly or indirectly support Federal candidates.

The Commission requests comment on whether any other types of disbursements and expenditures by 501(c) organizations should bring those organizations within the proposed 11 CFR 300.12 prohibition and whether the prohibition should contain a temporal requirement. For example, should the prohibition encompass a 501(c) organization that has made disbursements and expenditures in connection with a Federal election at any time in the past, within the past three election cycles, within the past three years, or within some other time frame? The Commission also seeks comments on whether the rules should include additional guidance as to how a national party committee, or anyone else, could determine whether a particular 501(c) organization falls within the prohibition.

Comments are sought as to whether a safe harbor provision should be provided for a national party committee that takes certain actions before fundraising for, or donating to, a 501(c) organization to determine that the organization does not engage in the election activity described? Examples of such actions could include: (1) A national party obtains a 501(c) organization's publicly available application for tax-exempt status or

annual Form 990 tax returns and determines from that information that the organization has not reported making, or indicated plans to make, expenditures or disbursements in connection with a Federal election; or (2) with respect to future activity by a 501(c) organization or an organization that has applied for, but not yet obtained, tax-exempt status, obtains a certification from the organization indicating that it does not engage in or plan to engage in the type of election activity described.

Finally, the Commission seeks comment on what it means for a national party to "direct donations." Pursuant to proposed 11 CFR 300.2(m), "to direct" a donation would mean to request, suggest, or recommend that another person donate something of value to a section 501(c) or section 527 organization. So construed, could a national party committee or its agent respond to an unsolicited request for information about organizations that share a party's political, social, or philosophical goals?

Please note that the proposed section 300.11 prohibition on national party fundraising for, and donating to, certain tax exempt organizations would extend to a broader group than the prohibition in proposed section 300.10 on non-Federal fundraising by national party committees. Both 300.10 and 300.11 apply to national party and national congressional committees, officers and agents acting on behalf of them, and entities indirectly or directly established, financed, maintained, or controlled by them. In accordance with the statute, the 300.11 prohibition would also apply to officers and agents acting on behalf of entities directly or indirectly established, financed, maintained, or controlled by national party and national congressional campaign committees, and to entities directly or indirectly established, financed, maintained, or controlled by an agent of national party or congressional campaign committees. As is the case for the proposed 11 CFR 300.10 prohibition, the Commission seeks comments on whether the final rules should provide examples of entities directly or indirectly established, financed, maintained, or controlled by an agent of national party or congressional campaign committees, as well as examples of officers and agents acting on behalf of them and of entities directly or indirectly established, financed, maintained, or controlled by an agent of national party committees or congressional campaign committees.

*3. Proposed 11 CFR 300.12    Transition Rules*

BCRA's prohibitions on non-Federal funds raised and spent by national parties become effective on November 6, 2002. Accordingly, through November 5, 2002, a national party can use funds in non-Federal accounts in any way permissible under current law. Beginning on November 6, 2002, national parties can no longer accept non-Federal funds. Non-Federal funds that remain in a national party's possession after the November 5, 2002 general election are covered by BCRA's transition rules. *See* 2 U.S.C. 431 note, section 402(b)(2). Under these rules, non-Federal funds received by a national party before November 6, 2002 must be used before January 1, 2003 solely to: (1) Retire outstanding non-Federal debts or non-Federal obligations incurred solely in connection with an election held before November 6, 2002; or (2) to pay non-Federal expenses or retire outstanding non-Federal debts or obligations incurred solely in connection with any run-off election, recount, or election contest resulting from an election held prior to November 6, 2002. *See* 2 U.S.C. 431 note, section 402(b)(2)(B)(i) and (ii). These remaining non-Federal funds could not be used for building fund expenses or for outlays that would qualify as "expenditures" under the Act. Non-Federal funds contained in national party building fund accounts are treated separately and are described below. Non-Federal funds of State and local party committees would be covered by proposed 11 CFR part 300, subpart B.

The proposed transition rules governing the use of non-Federal funds remaining in a national party's possession, other than non-Federal funds contained in building funds, are set forth in 11 CFR 300.12(a) through (c). The proposed rules track the statutory language. In addition, the proposed rules would also indicate that current allocation regulations applicable to national party non-Federal accounts will remain in effect during the transition period. *See* proposed 11 CFR 300.12(d).

BCRA appears to restrict the use of excess non-Federal funds by national party committees to the specific purposes described above. It does not address what happens if national party committees have any non-Federal funds remaining after they have disbursed funds for those purposes. The Commission seeks comments as to whether any funds remaining may be disgorged to the United States Treasury or to a charitable organization or

whether they may be used in any other way.

BCRA treats non-Federal funds contained in national party building fund accounts more stringently. Under current law, funds in a national party building fund account can be used only for the purchase or construction of the national party committees' office building or facility. Beginning November 6, 2002, however, any funds remaining in a national party building fund account cannot be used for any building fund purposes. *See* 2 U.S.C. 431 note, 402(b)(2)(B)(iii). Hence, the proposed 11 CFR 300.12(e) would require any funds on deposit in such accounts on November 6, 2002 to be either disgorged to the United States Treasury or donated to an organization described in 26 U.S.C. 170(c) no later than December 31, 2002.

### 4. Proposed 11 CFR 300.13   Reporting

BCRA requires national party committees, including national congressional campaign committees, and any subordinate committee of either, to report all receipts and disbursements during a reporting period. 2 U.S.C. 434(e). The proposed rules track the statutory language. *See* proposed 11 CFR 300.13(a). The Commission seeks comments on whether this provision is intended to require reporting by existing entities that currently are not required to report, and if so, the identification of such entities.

The proposed rules would also require national party committees to file termination reports for their non-Federal accounts to disclose the disposition of all non-Federal funds. *See* proposed 11 CFR 300.13(b). Proposed 11 CFR 300.13(c) identifies the current reporting regulations applicable to non-Federal accounts, including building funds, which will remain in effect to accomplish this.

### 5. Effect on Joint Fundraising Rules

The ban on national party non-Federal fundraising would affect the Commission's joint fundraising rules, found at 11 CFR 102.17 (FECA) and 11 CFR 9034.8 (Presidential Primary Matching Payment Act). The Commission is, therefore, proposing to add introductory language to each of these sections, advising readers that "[n]othing in this section shall permit any person to solicit, receive, direct, transfer, or spend" any non-Federal funds prohibited under 11 CFR part 300.

## State, District, and Local Party Committee, and Organizations

While BCRA completely prohibits national party committees from receiving, soliciting, using, and transferring non-Federal funds after November 5, 2002, State, district, and local party committees and organizations may continue to solicit and use non-Federal funds, consistent with State law for certain purposes. 2 U.S.C. 441i(b). Proposed 11 CFR part 300, subpart B, which is explained in more detail below, would implement the new statutory provisions governing these non-Federal funds that apply to State, district, and local party committees and party organizations that are not political committees under the FECA.

### 1. Proposed Revisions to 11 CFR 100.14   State, District, or Local Committee of a Political Party

The Levin Amendment, as set out in 2 U.S.C. 441i(b)(2), refers to "State, district, and local committees of a political party." The Commission's regulations already define "State committee" and "subordinate committee," and "party committee." 11 CFR 100.14, 100.5(e)(4); *see also* 2 U.S.C. 431(15). The proposed rules that follow would amend section 100.14 to conform with the Levin Amendment, and to harmonize sections 11 CFR 100.14 and 100.5(e)(4).

In proposed paragraph (a), status as a State committee would be determined by reference to the party by-laws or State law, with an eye to limiting the definition to organizations that are part of "the official party structure." This change would create a parallel with the current 11 CFR 100.5(e)(4), and would allow the proposed amended regulation to cover those States in which party committee status is a matter of State law and those in which it is a matter of party by-laws. There would also be a grammatical correction.

In proposed paragraph (b), there would be, in addition to a grammatical correction, the same change with regard to "official party structure" as in proposed paragraph (a), and the addition of the phrase, "as determined by the Commission," to the end of the paragraph. This added language would standardize the treatment of "State committees" and "subordinate committees" in the section (existing paragraph (a) already includes this statutory phrase). The added language would also give the Commission the necessary authority and flexibility to ensure that district and local

committees are treated consistently and fairly.

Proposed paragraph (c) would be a new provision defining "district or local committee." This proposed definition would parallel proposed paragraph (a) but for political subdivisions below the State level, and would encompass those political party committees that do not necessarily operate formally under the "control or direction" of the State party committee. The key criterion for determining status as a district or local party committee would again be "the official party structure," whether that is a matter of State law or the party's by-laws.

### 2. Proposed Revisions to 11 CFR 106.5

The creation of a new part 300 to cover all aspects of party committee activity has rendered considerable portions of present section 106.5 either outdated or duplicative. As presently constituted, the proposed revision of this section will state in broad terms the general principles that after December 31, 2002, (1) national party committees are no longer permitted to raise and spend non-Federal funds, and thus are unable to allocate expenses between Federal and non-Federal accounts, and (2) that State, district, and local party committees that make expenditures and disbursements in connection with both Federal and non-Federal elections must either use only Federal funds for these purposes or must establish separate accounts and allocate expenditures between or among those accounts pursuant to the requirements of part 300. References to Levin activities and accounts have been added and references to specific sub-sections of part 300 are included in the draft revisions.

Although all references to "exempt activities" have been dropped from section 106.5, comments are solicited with regard to the relationship of such activities, as defined by 11 CFR 100.7(b)(9), (15) and (17) and 11 CFR 100.8(b)(10), (16) and (18), to the concept of "Federal election activity" in BCRA. Do these exempt activities remain separate allocable categories of State, district, and local party expenditures, or are they subsumed within "voter registration," "voter identification," "get-out-the vote," and "generic campaign activities" now included in what are termed "Levin activities" in the proposed regulations? Would voter registration activity outside the time frame of 120 or fewer days before an election be an example of remaining "exempt activity?" Would solely volunteer participation in the distribution of campaign materials take

such activity out of "Levin activity" for purposes of the kinds of funds that would be permissible to make such expenditures?

As discussed below, allocation accounts might be retained as they appear at present section 106.5.

*3. Proposed 11 CFR 300.30  Accounts*

The Commission is considering whether or not to require State, district, and local party committees to maintain three separate accounts. These would include a Federal account to be used for both Federal and mixed Federal and non-Federal activities; a second account, known as a Levin account, to be used to meet Levin activities, i.e., certain costs of voter registration within a fixed time period, voter identification, GOTV, and generic campaign activity pursuant to proposed 11 CFR 300.32; and a third account to be used for State, district, and/or local activities. The perceived need for these three separate accounts is based upon BCRA's apparent separation of State, district, and local party campaign activity into three distinct categories for which there are three distinct sets of conditions as to the funds that may be used to pay for each type of activity.

Consequently, the proposed rules in this section have been written to require that State, district, and local party committees maintain these three separate accounts. Comments are sought, however, as to whether, in the alternative, accounting procedures designed to track Levin receipts, expenditures, and disbursements could be adequate for purposes of enforcing BCRA with respect to these types of Federal election activities. Comments are also sought as to whether the requirement of a third account would serve as an unnecessary administrative burden or would it in fact create an accounting aid for the committees affected? Would it be more appropriate to leave to each committee the decision of whether or not to set up a separate Levin account? Would it be reasonable to require State party committees to maintain a separate Levin account, but only to recommend that district and local party committees do the same? Would three separate accounts promote greater transparency?

The proposed regulations in section 300.30(a)(4) require that, in order for contributions to be deposited into a State, district, or local committee's Federal account, either the solicitation of the contributions must expressly state the committee's intent to use the contributions for Federal elections, or the solicitation must expressly state that only permissible contributions can be accepted into the Federal account, or the contributor must expressly designate the contribution for use in Federal elections. The Commission would presume that all contributions that meet these requirements, and are within the contribution limitations and prohibitions of the Act, may be deposited into the Federal account.

The proposed regulations in section 300.30(a)(8) state that Federal funds may be used for non-Federal activities, provided that the contributors of the Federal funds have been informed that their contributions would be subject to the limitations and prohibitions of the Act and provided that the disbursements are reported pursuant to section 300.36. (*See, e.g.,* Advisory Opinion 2000–24 in which the Commission found the use of a non-Federal account to be permissive, not mandatory. *See also* the Explanation and Justification for revisions of the Commission's allocation regulations at 55 FR 26058 (June 26, 1990) and at 57 FR 8990, 8991 (March 13, 1992)).

The proposed regulations at section 300.30(b) provide that a State, district, and local committee would be permitted to deposit into its Levin account only those donations solicited and received for that account pursuant to proposed 11 CFR 300.31, and would have to use this account to make disbursements and expenditures only for the activities permitted by proposed 11 CFR 300.32 or for other, non-Federal activity permitted by State law. Comments are sought on whether this permission to use Levin funds for non-Federal activities is in keeping with the intent of BCRA.

In order for donations to be placed in the Levin account, either the solicitations for the donations would have to expressly state that donations will be subject to the special limitations and prohibitions of section 300.31, or there would have to be an express designation by the donors to the Levin account.

The proposed regulations in 11 CFR 300.30(c) would clarify that State, district, and local party committees would also be able to maintain a non-Federal account to be used for State, district, or local election activities.

The proposed regulation in section 300.30(a)(6) would continue the Commission's well-established requirement that State, district, and local party committees make all allocable expenditures and disbursements from their Federal accounts. Transfers into the Federal account from a non-Federal account of the non-Federal portions of allocable disbursements and expenditures would be permitted only within a specified period of time which is set out in 11 CFR 300.34. The same approach and time frame are being proposed for Levin activities with regard to the payment of non-Federal portions of Levin expenses.

As an alternative to using the Federal account for all Federal and mixed expenditures, the Commission could also continue to permit, but not require, State, district, and local party committees to establish separate allocation accounts for purposes of making allocated expenditures for administrative and/or Levin expenses. Comments are sought on whether allocation accounts should still be permitted and whether there should be a second, separate Levin allocation account for use in financing Levin activities.

*4. Proposed 11 CFR 300.31  Receipt of Levin Funds*

BCRA places several restrictions on how State, district, and local political party committees raise Levin funds. Proposed 11 CFR 300.31 would implement these restrictions. Proposed paragraph (a) would state as a general proposition a key point in the statute: a State, district, or local political party committee that spends Levin funds must raise those funds solely by itself. 2 U.S.C. 441i(b)(2)(B)(iv).

Proposed 300.31(b) would elaborate on the statutory requirement that Levin funds must be raised from donations that comply with the laws of the State in which the State, district, or local party committee is organized. 2 U.S.C. 441i(b)(2)(B)(iii). More specifically, proposed paragraph (c) would clarify the status of donations from sources that are permitted under State law, but prohibited by the Act. A prime example is donations from corporations and labor organizations. Under Section 441b of the Act, "[i]t is unlawful * * * for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election" for Federal office. 2 U.S.C. 441b(a). Under the campaign finance laws of several States, however, donations by corporations or labor organizations to political party committees are legal. Proposed 300.31(c) would clarify that in such States, a political party committee may solicit and accept donations of Levin funds from corporations and labor organizations, subject to the other conditions of the Act. (Of course, if donations from corporations or labor organizations to a political party committee are illegal in a State, political party committees in that State would not be able to accept Levin fund donations from those sources.)

Proposed paragraph (d) would address amount limitations on donations of Levin funds to a State, district, or local party committee. The Levin Amendment places a $10,000 per calendar year per donor limitation on donations to a State, district, and local political party committee intended for use as Levin funds. 2 U.S.C. 441i(b)(2)(B)(iii). Proposed paragraph (d)(1) would clarify that this is an aggregate limit per recipient committee (i.e., the aggregate limit applies separately to each party committee). *See* discussion of proposed 11 CFR 300.31(d)(3), below. The amount limitation applies to a person, including "any person established, financed, maintained, or controlled by such person." The Commission seeks comment on whether its current "affiliation" regulation (11 CFR 100.5(g)) would appropriately determine whether a person is "established, financed, maintained, or controlled," within the meaning of this proposed paragraph.

Proposed paragraph (d)(2) would address those cases where State law generally imposes an amount limitation on donations to a State, district, or local party committee that differs from the amount limitation in 2 U.S.C. 441i(b)(2)(B)(iii) and proposed paragraph (d)(1). Proposed paragraph (d)(2) would attempt to strike a balance between respect for State law and protecting the integrity of the Levin Amendment amount limitation. It would make clear that lower State law amount limitations control over the amount limitation in the Levin Amendment, but that the Levin Amendment amount limitation would control where State law amount limitations exceed the limitation in proposed paragraph (d)(1).

A question may arise as to whether State, district, and local committees of the same political party would be affiliated for purposes of applying the donation amount limitation in proposed paragraph (d)(1). *See generally* 11 CFR 110.3. Proposed paragraph (d)(3) addresses this issue. The proposed paragraph would clarify that such committees are not considered affiliated *only* for the purpose of determining compliance with proposed paragraph (d)(1). *See* 148 Cong. Rec. H410 (daily ed. Feb. 13, 2002) (statement of Rep. Shays).

The Levin Amendment restricts the manner in which State, district, and local party committees may raise Levin funds. Proposed paragraph (e) would restate these restrictions, clarifying that the Commission's joint fundraising regulation, 11 CFR 102.17,

does not otherwise sanction this activity. Proposed paragraph (f) would operate similarly in implementing the Levin Amendment's prohibition against joint fundraising of Levin funds by more than one State, district, or local committee of a political party, including such parties from more than one State. The final sentence of proposed paragraph (f) would clarify that the mere use of common vendors by two or more State, district, or local political party committees would not in and of itself constitute joint fundraising within the meaning of the proposed paragraph.

## 5. Proposed 11 CFR 300.32 Expenditures and Disbursements

Proposed 11 CFR part 300, subpart B would encompass political party committee expenditures and disbursements of Federal funds and of Levin funds. Proposed 11 CFR 300.32 would address both kinds of spending, and would clarify that BCRA does not affect spending of non-Federal funds for State or local political activity.

Proposed paragraph (a)(1) would clarify that spending by a State, district, or local political party committee "for the purpose of influencing" a Federal election (*see* 11 CFR 100.8) must use Federal funds; that is, nothing in BCRA changes the existing requirements for that type of spending. *See* 148 Cong. Rec. H409 (daily ed. March 12, 2002) (statement of Rep. Shays). In addition, this proposed paragraph would require that an association or similar group of candidates for State or local office, or an association of State or local officeholders, would have to make expenditures for Federal election activity solely with Federal funds. Comments are sought about whether or not this term should be further defined in the proposed regulations, and if so, about examples of such associations or groups to include in the regulations. Proposed paragraph (a)(2) would make clear that the general rule in BCRA is that a State, district, or local political party committee spending on Federal election activity must use Federal funds for that spending, except as provided in the Levin Amendment. 2 U.S.C. 441i(b)(1).

The proposed rules interpret BCRA as requiring that local party organizations that do not qualify as political committees are nonetheless subject to the requirement to use Federal funds for Federal election activity. (*See also* proposed 11 CFR 300.36(a) regarding recordkeeping for such local party organizations.) The Commission seeks comment on this interpretation and whether, alternatively, use of the term "committee" in 2 U.S.C. 441i(b)(1)

should be read to exclude local party organizations which do not otherwise qualify as political committees under 2 U.S.C. 431(4).

Proposed paragraphs (a)(3) and (a)(4) would address the costs of fundraising, providing that a State, district, or local committee of a political party must use exclusively Federal funds to pay for all costs of raising funds for its Federal account and its Levin account. *See* 2 U.S.C. 441i(c). The Commission seeks comment on this interpretation of section 441i(c) with regard to Levin funds. In particular, the Commission seeks comment on (1) whether proposed paragraph (a)(4) could be limited to the direct costs (*see* current 11 CFR 106.5(a)(2)(ii)) of raising Levin funds; and (2) whether the costs of fundraising for Levin funds could be allocated between a party committee's Federal and non-Federal accounts under the "funds received" method. *See* current 11 CFR 106.5(f). Comments are also sought as to whether, generally, greater specificity should be provided in proposed section 300.32 as to the nature of fundraising costs in this section.

Proposed paragraph (b) would list the types of activities for which a State, district, or local political party committee may spend Levin funds in accordance with this proposed part. Proposed paragraph (b)(1) would spell out expressly the two kinds of Federal election activity for which Levin funds may be spent, *see* 2 U.S.C. 441i(b)(2)(A), and provide that such spending must be made subject to the conditions set out in proposed paragraph (c). Proposed paragraph (b)(2) would provide that a State, district, or local political party committee may also spend Levin funds for any purpose that is lawful under State law, and that such spending need not comply with proposed paragraph (c). (*See* below.) The Commission seeks comment on proposed paragraph (b)(2), specifically whether this broader use of Levin funds is within the intended scope of 2 U.S.C. 441i(b)(2)(A).

While the Levin Amendment would permit the spending of Levin funds as set out in proposed paragraph (b), it places restrictions and conditions on that spending when it is for Federal election activity. Proposed paragraph (c) would set out in one place important restrictions and conditions that are stated in different sections of BCRA. Proposed paragraph (c)(1) would implement the restriction that the Federal election activity paid for partly with Levin funds must not refer to a clearly identified Federal candidate. *See* 2 U.S.C. 441i(b)(2)(B)(i). Proposed paragraph (c)(2) would implement the restriction that the Federal election

activity paid for partly with Levin funds must not be for any broadcasting, cable, or satellite communications, other than a communication that refers solely to a clearly identified candidate for State or local office. *See* 2 U.S.C. 441i(b)(2)(B)(ii). Proposed paragraph (c)(4) would implement the Levin Amendment's requirement that spending under its authority must be allocated between Federal funds and Levin funds pursuant to the proposed regulation covering allocation. *See* 2 U.S.C. 441i(b)(2)(A)(i), (ii); *see* proposed 11 CFR 300.33, below. Finally, proposed paragraph (c)(3) would tie together the provisions of this proposed regulation with proposed 11 CFR 300.31 on raising Levin funds, above.

Proposed paragraph (d) would serve as a clarifying reminder that spending of non-Federal funds by a State, district, or local political party committee for State or local political activity, including the raising of solely non-Federal funds, remains a matter of State law. The proposed final sentence would clarify that a disbursement of non-Federal funds made under State law by a State, district, or local political party committee that is not directed by the disbursing committee for the purpose of influencing a Federal election or for Federal election activity shall not be an expenditure under 11 CFR 100.8 or an expenditure or disbursement for Federal election activity.

*6. Proposed 11 CFR 300.33    Allocation of Expenses*

Section 441i(b)(1) of Title 2, United States Code, states that State, district, and local party committees must make all disbursements and expenditures for Federal election activity from their Federal accounts. This requirement holds even when the expenses involved are also related to non-Federal election activity. Generally, the costs of mixed Federal and non-Federal election activities cannot be allocated between Federal and non-Federal accounts. The only exception to the rule against the use of non-Federal funds in connection with Federal election activity involves activities to be funded from a Levin account, pursuant to Section 441i(b)(2).

Section 441i(b)(2)(A) permits State, district, and local party committees, under certain conditions, to use Levin funds for particular categories of activity, including voter registration, voter identification, GOTV, and generic campaign activities, in connection with Federal and non-Federal elections. These funds must have been received pursuant to specific requirements, and to be used to meet expenses related to voter registration activity within 120

days of a Federal election and/or expenses related to voter identification, GOTV activities, and generic campaign activities when a Federal candidate appears on the ballot, and must be used in situations in which disbursements and expenditures for the permitted activities are allocated between a committee's Federal and Levin accounts. Section 441i(b)(2)(A) permits the use of Levin funds for these purposes "to the extent that" the costs of the activities are allocated. Thus, if a committee wishes to use other than Federal funds for such costs, it must allocate a portion to its Federal account.

Comments are sought with regard to the relationships between the activities for which Levin funds may be used and "exempt activities" as defined by 11 CFR 100.7(b)(9), (15) and (17) and 11 CFR 100.8(b)(10), (16) and (18). In particular, information is requested on whether there remain exempt activities that should not be deemed "Federal election activity." For example, would voter registration activity outside the time frame of 120 or fewer days before an election be an example of remaining "exempt activity" that would be allocable between Federal and non-Federal accounts (as opposed to Federal and Levin accounts), but that would not count as an "expenditure" for purposes of political committee status? In the alternative, should voter registration activity outside the 120-day time frame be considered 100% non-Federal activity?

With the exception of salaries, BCRA does not address administrative costs directly, either as a category of expenditures and disbursements or as allocable expenditures. BCRA defines "Federal election activity" at 2 U.S.C. 431(b)(20) as including specified categories of activity that do not include administrative costs.

With regard to salaries, BCRA, for purposes of defining "Federal election activity," distinguishes between salaries paid those who spend more than 25% of their compensated time in any given month on activities in connection with Federal elections, who must be paid only with Federal funds, and those who do not spend that amount of time on these activities. Therefore, proposed section 300.33 would require State, district, and local committees to use only Federal funds to pay the salaries of those employees who spend more than 25% of their time in a particular month on activities in connection with Federal election activity. The proposed regulations also require that the salaries of those employees who spend 25% or less of their time in a given month on activities in connection with a Federal

election be allocated between the committee's Federal and non-Federal accounts. Salaries of those employees who spend no time in a given month on activities in connection with a Federal election could be paid solely from the non-Federal account.

Comments are sought as to whether State, district, and local party committees should be permitted to pay the salaries of employees who spend 25% or less of their time on Federal election activity with non-Federal funds, rather than be required to allocate those payments. The 100% non-Federal alternative is not set out in the proposed rules. For purposes of administering the 25% rule for salary payments, comments are sought as to whether the proposed regulations should require that any of the following three alternative methods be used by State, district, and local party committees to document decisions as to the accounts from which all or portions of employees' salaries have been paid. First, employees could be required to keep contemporary time logs documenting their Federal and non-Federal activities. Secondly, employees could be required at the end of each month to certify in writing the percentage or amount of time spent on Federal election activity. Or, thirdly, a responsible party official could keep a monthly tally sheet for the all employees. Please note that none of these options appear in the proposed rules that follow.

In lieu of requiring 100% Federal payments for certain other administrative costs, the proposed rules would continue the Commission's policy of permitting the allocation of those costs between the Federal and non-Federal accounts of State, district, and local party committees, unless such expenses are directly attributable to a Federal candidate, in which case they would have to be paid only with Federal funds. Allocable administrative costs would include rent, office equipment (calculators, computers, copiers, facsimile machines, furniture), office supplies, postage for other than mass mailings, and utilities. Other allocable administrative costs would include routine building maintenance, upkeep and repairs.

Comments are requested regarding whether the Commission should continue requiring allocation of administrative costs other than certain salaries, if a committee desires to use some non-Federal funds for these purposes. BCRA requires certain Federal election activities, fundraising costs and certain salaries to be paid with Federal funds. As a result, significant amounts

**35666** Federal Register / Vol. 67, No. 97 / Monday, May 20, 2002 / Proposed Rules

of activity that were once allocable will have to be paid for exclusively with Federal funds. BCRA also delineates which Federal election activities may be allocated between Federal funds and Levin funds. The Commission seeks comments on whether administrative expenses that are not identified in BCRA have a significant enough impact on Federal elections to require continued allocation of such expenses, or whether a State, district, or local committee should be able to pay administrative expenses, other than certain salaries, with 100% non-Federal funds, depending upon applicable State law.

The proposed rules address the issue of appropriate minimum amounts of Federal funds to be required both for administrative expenses, when allocable, and for the Federal portions of costs of the specified Levin activities for which the use of non-Federal funds is also permitted. One goal of the allocation regulations is to assure that activities deemed allocable are not paid for with a disproportionate amount of non-Federal or Levin funds. Another goal is to simplify the allocation process, in particular by establishing formulas that do not vary from State to State and that do not require measurements of time or space. Therefore, the proposed rules establish a fixed formula for all States that would vary only in terms of whether or not a Presidential campaign and/or a Senate campaign is to be held in a particular election year.

The following formulas have been derived by taking averages of the ballot composition-based allocation percentages reported by State party committees in four groupings of States selected for their diversities of size and geographic location and for the particular elections held in each state in 2000 and 2002. The groupings were: (1) Six states (Alabama, Colorado, Illinois, New Hampshire, Oklahoma, and Oregon) in which there was a Presidential but no Senate campaign in 2000; (2) 10 states (California, Delaware, Georgia, Florida, Michigan, New York, North Dakota, Texas, Vermont, and Wyoming) in which there were both a Presidential campaign and a Senate campaign in 2000; (3) six states (Delaware, Georgia, Michigan, Oklahoma, Texas and Wyoming) in which there will be a Senate campaign in 2002; and (4) six states (California, Florida, New York, North Dakota, Vermont and Washington) in which there will be no Senate campaign in 2002.

In 2000, the Federal percentages for the two parties in six States with only

a Presidential campaign ranged from 20%–33.33%, with an average of 28%, while the Federal percentages for the two parties in ten States which held both Presidential and Senate campaign that year ranged from 30% to 43%, with an average of 36%. In 2002, the Federal percentages for the two parties in six States with a Senate campaign range from 20% to 25%, with an average of 21%, while the Federal percentages for the two parties in six States with no Senate campaign range from 11.11% to 16.67, with an average of 15%.

The proposed rules would apply the average percentages in each of the four groupings of States to all 50 states, resulting in the following proposed minimum percentages for Federal shares of administrative costs and for Federal shares of costs of the voter registration, voter identification, GOTV, and generic campaign activities permitted to be paid in part with Levin funds, pursuant to 2 U.S.C. 441i(b)(2):

(i) Presidential only election year—28% of costs

(ii) Presidential and Senate election year—36% of costs

(iii) Senate only election year—21% of costs

(iv) Non-Presidential and Non-Senate election year—15% of costs.

Comments are solicited as to whether a set percentage approach to allocation of both administrative and Levin expenses is preferable to a State-by-State ballot composition ratio approach, and as to whether the formula proposed by the Commission serves the purposes of the Act.

Voter registration activities undertaken 120 days or less before an election and no later than the election itself are included among the activities for which Levin funds may be used by State, district, and local party committees. The proposed regulations assume that activity outside this time frame would fall outside the general provisions of 2 U.S.C. 441i(b)(i), which prohibits the use of non-Federal funds for Federal election activities, including activities that are wholly or in part in connection with a Federal election. Therefore, the proposed regulations in 11 CFR 300.33(b)(3) state that the expenses of voter registration activity outside the 120-day time frame could be paid entirely with non-Federal funds or they could be allocated between Federal and non-Federal accounts.

In the alternative, the regulations could state that, because voter registration activities undertaken more than 120 days before an election would be outside the time frame for the use of Levin funds, the expenses for such

activities would fall within the general provisions of 2 U.S.C. 441i(b)(i), which prohibits the use of non-Federal funds for Federal election activities, including activities that are wholly or in part in connection with a Federal election. Under this approach, expenses for voter registration activity outside the 120-day time frame would have to be paid entirely with Federal funds.

Comments are solicited as to which of these alternative approaches to expenses for voter registration activities more than 120 days before an election would most closely track the intent of BCRA.

The proposed regulations in 11 CFR 300.33(c) set out the categories of costs that may not be allocated. These include the costs of activities that refer to clearly identified Federal candidates, the costs of activities that refer to both Federal and State or local elections and certain fundraising costs.

Comments are sought as to whether fundraising costs would include a portion of a committee's overhead or only direct costs such as telephone banks, postage, printing, catering, banquet hall rental, and other such expenses related to a particular fundraising program. Comments are also sought as to whether costs related to raising funds only for non-Federal activity may be paid entirely from a non-Federal account.

The proposed regulations at 11 CFR 300.33(d) address the issue of transfers from a State, district, or local party committee's non-Federal account to cover the non-Federal portion of allocated administrative costs, and transfers from the committee's Levin account to meet that account's portion of the costs of allocated expenditures made pursuant to 2 U.S.C. 441i(b)(2). The proposed regulations employ the language of the present regulations at 11 CFR 106.5(g)(1)(i) and (2)(ii)(B), which require the use of the party committee's Federal account to pay the entire amounts of allocable expenses, with subsequent reimbursement by other accounts, and the limitation of such reimbursements to a set time frame of 10 days before and 60 days after the payment from the Federal account, unless a vendor requires an advance payment and the payment is based on a reasonable estimate. The proposed regulation continues the present rule's admonition at 11 CFR 106.5(g)(2)(B)(iii) that any payment outside this time frame, absent the need for an advance payment of a reasonably estimated amount, would result in the presumption of a loan of non-Federal funds to the Federal account and a violation of the Act.

*7. Conforming Amendments to 11 CFR 104.10 and 106.1*

A. Allocation of Expenses Among Candidates and Activities

Current section 104.10 addresses the reporting of expenses that are allocated among more than one clearly identified candidate (paragraph (a)) and expenses that are allocated among specific types of mixed Federal/non-Federal activities by political party committees and by separate segregated funds and nonconnected committees (paragraph (b)). However, BCRA has defined different categories of allocable expenses, including some of those areas falling within Federal election activity. Some of the allocable activity areas set out in current 11 CFR 106.5 [allocation of mixed Federal/non-Federal activities by party committees] are now subsumed by Federal election activity. In addition, under BCRA, mixed fundraising activity must be done with Federal funds, and the use of non-Federal funds by national party committee has been eliminated. Hence, the Commission proposes to divide the rules for reporting of allocable expenses into three sections: 11 CFR 104.10 would apply to political committees that are separate segregated funds or nonconnected committees; new 11 CFR 104.17 would address administrative expenses and some other activities by political committees that are State, district, or local party committees; and new 11 CFR 300.36 would cover reporting of payments allocated between Federal funds and Levin funds.

BCRA has no impact on the support by separate segregated funds and nonconnected committees of one or more clearly identified Federal and non-Federal candidates or such committees' allocation of specific categories of mixed Federal/non-Federal activities. Thus, revised section 104.10(a), which addresses payments entailing combined expenditures and disbursements on behalf of more than one clearly identified Federal and non-Federal candidates, would be changed very little. It would be amended to clarify the type of committee subject to this section and would delete references to current section 106.5(g), which addresses non-Federal to Federal transfers made by party committees for the purpose of mixed payments.

In revised section 104.10(b), the references to the Senate and House campaign committees of a political party would be deleted. In the discussion of itemization of allocated disbursements for administrative and generic voter drive expenses at proposed paragraph (b)(1)(ii), the

specific reference to the types of committees using the funds expended method would be deleted because all committees addressed in this regulation would use the funds expended method for those two allocation categories. References to exempt activities would be deleted because separate segregated funds and nonconnected committees do not engage in those activities. References to various paragraphs in 11 CFR 106.5, which currently pertains to party committees, would also be deleted.

B. Allocation of Expenses Between Candidates

Current section 106.1 addresses the allocation of expenses among more than one candidate. Paragraph (a)(1) sets out the general rule for allocation of an expenditure made on behalf of more than one clearly identified Federal candidate. It also addresses allocation of a payment involving both an expenditure made on behalf of one or more clearly identified Federal candidates and a disbursement on behalf of one or more non-Federal candidates. In view of the language of newly proposed section 300.33(c)(1), new language would be added to section 106.1(a)(1) making it clear that a party committee must only use Federal funds in both types of situations. *See also* newly proposed section 100.24(a)(3). Comments are requested as to whether the requirement that a State, district, or local party committee use only Federal funds for all payments made on behalf of both clearly identified Federal and clearly identified non-Federal candidates is appropriate under BCRA. (*See also* the narrative for newly proposed section 104.17 which addresses reporting of such activity by party committees.)

In view of the rearrangement and renumbering of the allocation reporting regulations, paragraph (a)(2) would be amended to conform to different section citations. It would also delete the citation to party committee transfer procedures in the event of a payment on behalf of clearly identified Federal and non-Federal candidates.

Paragraph (e) refers to allocation of activities that entail specific types of mixed Federal/non-Federal activity, other than payments on behalf of clearly identified candidates. The paragraph would be amended to conform to the new allocation categories and new allocation citation.

*8. Proposed 11 CFR 300.34    Transfers*

As explained above, the Levin Amendment permits spending on certain Federal election activity subject

to certain restrictions and conditions, one of which is that the spending must be allocated between Levin funds and Federal funds. 2 U.S.C. 441i(b)(2)(A)(i), (ii). The Levin Amendment also requires that a State, district, or local committee must raise solely by itself all money spent under the Levin Amendment. 2 U.S.C. 441i(b)(2)(B)(iv). By the plain language of the last-cited provision, this restriction extends to the Federal funds component of the expenditure or disbursement allocated between Levin funds and Federal funds. *See* 148 Cong. Rec. H410 (daily ed. February 13, 2002) (Rep. Shays).

This provision of the Levin Amendment could cause confusion given the existing rule that party committees of the same political party may transfer Federal funds among themselves without limit on amount. *See* 11 CFR 102.6(a)(1)(ii). Proposed paragraph (a) of proposed section 300.34 would make clear that 11 CFR 102.6(a)(1)(ii) does not override the Levin Amendment as to transfers of Federal funds. Specifically, the committee must not use such transferred Federal funds to pay the Federal portion of Federal election activity that may be funded with a mixture of Federal funds and Levin funds under proposed 11 CFR 300.32 and 300.33. The Commission emphasizes that revisions to section 102.6(a) regarding transfers may be forthcoming in a future rulemaking to implement changes to 2 U.S.C. 441a(d) made by BCRA. The present discussion and this rulemaking extend only to Title I of BCRA. Pub L. 107–155, March 27, 2002. The proposed final sentence would state as a positive requirement that a State, district, or local political party committee that spends Levin funds must raise the Federal funds component of those funds by itself. As already mentioned above, the Levin Amendment imposes this fundraising requirement. 2 U.S.C. 441i(b)(2)(B)(iv).

In the same provision, the Levin Amendment specifically forbids certain transfers of Levin funds; that is, a State, district, or local party committee may not use as Levin funds any funds transferred to it by certain persons. 2 U.S.C. 441i(b)(2)(B)(iv)(I) through (IV). Proposed 11 CFR 300.34(b)(1) and (b)(2) would implement these transfer prohibitions by expressly identifying these persons.

*9. Proposed 11 CFR 300.35    Office Buildings*

BCRA repealed the provision at 2 U.S.C. 431(8)(B)(viii) exempting from the definition of contribution any donation of money or anything of value,

or loan, to a national or State party committee that is specifically designated to "defray any cost for construction or purchase of any office facility not acquired for the purpose of influencing the election of any candidate in any particular election for Federal office." In the technical amendments, however, Congress provided for the use of funds that were not subject to the limitations and prohibitions of the Act for the purchase or construction of a State or local party committee office building. This provision, which is an addition to the section on preemption at 2 U.S.C. 453, states: "Notwithstanding any other provision of this Act, a State or local committee of a political party may, subject to State law, use exclusively funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act for the purchase or construction of an office building for such State or local committee." 2 U.S.C. 453(b).

The current text of 11 CFR 114.1(a)(2)(ix) follows the repealed statutory provision and would be deleted and replaced with an annotated cross-reference to proposed new 11 CFR 300.35. The texts of the regulations currently at 11 CFR 100.7(b)(12) and 100.8(b)(13), which are similar to the current text of section 114.1(a)(2)(ix), would be deleted in a separate rulemaking that the Commission is publishing concurrently with this rulemaking. The receipt and use of funds for the purchase or construction of a national party committee's office building would be addressed in proposed section 300.10, which would allow only federal funds to be used for such purpose.

Proposed new section 300.35 would address four areas in implementing 2 U.S.C. 453(b)(1). First, it would provide for the application of State law to the activities, and would provide that generally Federal law will not preempt the application of State law. Second, it would explain the meaning of "purchase or construction of a party office building." Third, it would provide that, if the funds are not used for the purpose as defined, they are to be treated as disbursements for other purposes and Federal law would apply. Finally, it would address the transitional requirements for the current State party office facility funds established under the repealed statutory section.

*A. Application of State Law*

Senator McConnell, the principal speaker in support of the technical amendments after their introduction in the Senate, described the party office building provision as "[r]especting the primacy of State law in financing State and local party buildings." 148 Cong. Rec. S2339 (daily ed. March 22, 2002) (statement of Sen. McConnell). During floor debate prior to Senate passage of the main bill, in anticipation of the adoption of technical amendments, Senator Feingold described the proposal as providing that Federal law would no longer allow a State or local party committee to receive non-Federal donations to purchase or construct an office building where such donations violated State law, that State law governs the receipt and disbursement of non-Federal donations by State or local parties for such purpose, and that there is no "required match consisting of Federal contributions." 148 Cong. Rec. S2143–2144 (daily ed. March 20, 2002) (statement of Sen. Feingold).

Paragraph (a) of proposed section 300.35 would set out the basic provision that funds raised outside the limits and prohibitions of the Act may be used, and that State law would govern whether they may be raised and used for the purchase or construction of a State or local party office building. Paragraph (a) would also incorporate language from the repealed statute and deleted regulations to the effect that the exemptions from Federal limits and prohibitions are premised on the idea that the building is not purchased or constructed for the purpose of any particular Federal candidacy. The building is being purchased or constructed for the functioning of the party, which entails the support of most or all of the party's candidates over a number of years; this concept did not change with the repeal of 2 U.S.C. 431(8)(B)(viii) and the enactment of 2 U.S.C. 453(b). The purchase or construction of the building for a particular Federal candidacy would entail the use of impermissible funds in a manner contrary to the basic purpose of the Federal law.

Paragraph (b) of section 300.35 would explain the coverage of State law. Paragraph (b)(1) would provide that Federal law will not preempt State law as to the non-Federal account activity, except where the funding does not fit the definition of the purchase or construction of an office building and would be another type of disbursement. Commission advisory opinions have addressed the question of whether the repealed contribution exemption, which permitted donations to a building fund from such Federally impermissible sources as corporations, preempted State law prohibitions on the use of such funds for campaign purposes.

Advisory Opinions 2001–12, 1998–8, 1998–7, 1997–14, 1993–9, 1991–5, and 1986–40. The Commission stated in these opinions that Congress decided not to place restrictions on the subject even though it could have determined that the purchase of the facility was for the purpose of influencing a Federal election, that Congress took the affirmative step of deleting the receipt and disbursement of funds for such activity from the proscriptions of the Act, and that there was no indication that Congress intended to limit the preemptive effect to some allocable portion of the purchase costs. Proposed new section 300.35, in effect, would supersede these Commission decisions as to Federal preemption with respect to the purchase or construction of an office building. Corporate donations and donations that would be excessive under Federal law may be used for the purchase or construction of a State party office building where State law permits (and this has been expanded to local party office buildings), but if the State law forbids corporate donations and donations in excess of a particular amount, Federal law would not preempt that law and such donations could not be made for that purpose.

Paragraph (b)(2) would provide that funds contributed to a Federal account that are then used to purchase or construct a State or local party office building must still comply with the limits and prohibitions of the Act. The committee's reports filed with the Commission would disclose the Federal account's receipts and disbursements that were used for the building purchase or construction as contributions received and disbursements made. Although this proposed section would address the use of Federal account funds, State law is the primary determinant as to the financing of these buildings and would still control whether such funds may be used. Thus, the Federal law would not preempt a State regulatory attempt to determine, using a reasonable accounting method, whether the Federal account funds used for the purchase or construction originated from contributions that would be impermissible or excessive under State law. Consistent with this State coverage, a State would be able to require the committees to file reports disclosing the Federal account's receipts and disbursements of funds used for the building purchase or construction. This would not entail a replication of the Federal reports; it would merely entail the disbursements for the activity covered by this section and the contributions that, under a reasonable

accounting method, were the source of such disbursements.

Although receipts and disbursements from the non-Federal accounts would have to be in compliance with State law, and both Federal and State law would apply to the permissibility of receipts and disbursements from the Federal account, proposed new section 300.35 would not contemplate a Commission enforcement action against a party committee for violating State law. Such an action, which would interpret and apply State law, would be the State's responsibility. Moreover, although the new provision would not require the establishment of a separate bank account or book account for the receipt and disbursement of funds for purchase or construction of the office building, Federal law would not preempt a State law requirement to establish such an account.

Under paragraph (b)(3), Levin funds would be usable for the purchase or construction of an office building provided that State law permits the use of such funds.

In accordance with these provisions as to the application of State law, current section 108.7(c), which lists types of State laws that are not superseded by the Act and the regulations, would be amended to include the application of State law to the purchase or construction of a State or local party office building in accordance with proposed section 300.35.

B. Definition of ''Purchase or Construction of an Office Building''

In view of the Commission's prior advisory opinions interpreting the scope of the repealed exception, it is necessary to delineate more precisely the scope of the activity covered under the new exception. In order to explain the scope of activities under which the funds would not be subject to the limitations and prohibitions of the Act (except for contributions to Federal accounts) and would be subject to State law, the proposed rules would define three terms: office building, purchase, and construction.

Section 453(b) of FECA refers to the purchase or construction of an ''office building'' rather than an ''office facility'' as found in the repealed section. The term ''building'' is a narrower term that indicates a more restricted range of covered expenses. In recent advisory opinions applying the repealed section, the Commission has stated that expenses that would be considered capital expenditures under the Internal Revenue Code would be payable from the building fund. *See* Advisory

Opinions 2001–12, 2001–01, and 1998–7; *see also* 26 CFR 1.263(a)–(1) and 1.263(a)–(2). This has been interpreted by some to mean that the building fund may pay for the purchase of office machinery, equipment, and furniture. *See* Advisory Opinion 2001–12. The proposed rules interpret the use of the term ''building'' instead of ''facility'' as a basis for ensuring that this proposed section would not include what are more appropriately administrative expenses for the operation of the party, rather than the purchase or construction of an office building.

Specifically, proposed paragraph (c)(1) would ensure that items such as office equipment, machinery, and furniture would not be considered a part of the building and that the exemption afforded by this section would not extend to such payments; such payments would instead be allocable administrative expenses. The definition of ''building'' would extend only to the building itself and accompanying land, but this definition would not be meant to exclude a portion of the building, such as an office suite or one or more floors of a building, that a committee may purchase instead of an entire building. Although structural components and certain other fixtures, as described in proposed paragraph (c)(1), would not by themselves constitute a building, they would appear in the proposed regulation to convey the idea of what would be part of the building's structure, as opposed to the office equipment and machinery and similar items. The term ''structural component'' would be derived from the tax regulations, at 26 CFR 1.148–1; it would apply to such features as interior walls, floors, ceilings, windows, doors, stairwells and elevators, central air conditioning or heating systems, sprinkler systems, plumbing and plumbing fixtures, and electrical and data transmission wiring and lighting fixtures. There may be other fixtures that are not strictly ''structural components'' that are essential to the operation or appearance of the building. (*See* the discussion below as to when the installation of a significant number of structural components as part of a major restoration or renovation will qualify as construction of an office building.)

One particularly relevant illustration of the distinction between a structural component and an item that would not be part of the building pertains to audio-visual production facilities. Although a studio with special lighting, acoustical paneling, and special wiring in the walls may be built during the general construction of the building and would

be considered part of the building, equipment such as recording equipment and cameras that are placed in the studio would not be part of the building's structure for the purposes of the proposed regulation.

The Commission seeks comment on whether the proposed definition of ''building'' should include, rather than explicitly exclude, items such as office equipment, machinery, or furniture. More generally, the Commission seeks comment on whether BCRA's use of the term ''building'' instead of ''facility'' contemplated a narrowing of the range of expenses falling within the exemption.

Proposed paragraph (c)(1) would also refer to the purpose of the party's use of the building, which is solely for its own party administration and election campaign support purposes. A party office building would not include floors or offices within the building or portions of the underlying land that are not used, or set aside for use, for party committee purposes. A party would be able to purchase a portion of a building such as a floor or suite to be its office building, but a party owning an entire building would not be able to rent or sell space in the building to others. The Commission seeks comment on whether a State or local party committee should be permitted to purchase an entire building and lease parts of it at fair market rates in order to generate income. In addition, the Commission seeks comment on whether the sources of the funds used to purchase or construct the office building should govern or guide the Commission in the determination of the lawful uses of such income. For example, would the purchase of a building with non-Federal funds require that the rental income generated be deposited in a non-Federal account and only used for non-Federal purposes? Would the purchase of the building with Federal funds allow rental income to be deposited in a Federal account and used for Federal purposes? What approach should be taken when revenue is generated from a building that was purchased with proceeds from a building fund that contains both Federal and non-Federal funds?

In the definition of ''purchase'' at proposed paragraph (c)(2), the payment to acquire the sole legal title would, of course, include down payments and mortgage payments. The proposed rule would draw from advisory opinions that limited the kinds of payments that would fall within the repealed exception. These opinions excluded payments for ongoing ''operating expenses'' such as property taxes and assessments (Advisory Opinion 1983–8)

or administrative expenses such as rent, building maintenance, utilities, and "office equipment expenses." Advisory Opinions 2001–12, 2001–01 and 1988–12.

In defining "construction," proposed paragraph (c)(3) would distinguish between expenses that constitute the erection of the building or the extensive renovation of a building on one hand, and costs for the upkeep, repair, or more piecemeal replacement of structural components. This distinction is derived from Advisory Opinion 1998–7 where the Commission, drawing from the tax code, distinguished the cost of incidental repairs that do not materially add to the property's value nor appreciably prolong its life, but "keep it in an ordinary efficient operating condition" from "repair work [that] reaches a level to constitute wholesale restoration or renovation of a structure." The distinction may be illustrated by the following examples:

Example A—Expansion of the size of the building (*i.e.*, changing the size or position of the outer perimeter of the structure) would constitute "construction."

Example B—A single large scale project (with a specific time deadline) entailing the replacement of a number of various structural components throughout the building to improve the building's habitability and function; for example, expanding, contracting, or altering the configuration of a significant number of rooms within the building coupled with replacements of a significant number of other structural components throughout the building such as installation of new electrical wiring throughout the building, and new climate control and plumbing systems would also constitute "construction."

Example C—The replacement on a periodic basis of structural components where such replacement is not part of a single large scale renovation project with a specific time deadline would not constitute "construction" under this section.

The definitions in proposed paragraph (c) may not include all of the possibilities for expenses for the purchase or construction of a party office building. In seeking comments on this proposed regulation, the Commission asks whether more examples should be included in what is or is not included in the particular sub-definitions, or whether the advisory opinion process would best serve that purpose. For example, should payments for a long-term lease with an option to purchase the rented building be included within the definition of

purchase? More generally, the Commission seeks comment on what constitutes the purchase or construction of a party office building.

C. Office Building-Related Expenses Not Qualifying Under Proposed Paragraph (c)

An expense that is not included within the definition of the purchase or construction of an office building would most likely be an administrative expense of the party. Depending on the circumstances, such an expense may be support for a particular candidate or in some other category, rather than an administrative expense. If the expense is an administrative expense, it would be allocable under proposed 11 CFR 300.33 and a sufficient amount of Federal account funds would have to be used for the expense. In addition, the provisions of the Act would apply to the sources that are properly used for allocable expense purposes. The Commission notes that the portion of this NPRM describing the allocation rules at proposed section 300.33 asks for comments on whether administrative expenses should be allocable between Federal and non-Federal accounts, or whether such funds should be considered as entirely Federal or entirely non-Federal.

D. Transitional Provisions for State Party Building or Facility Account

Up to and including November 5, 2002, the funds in a State party office facility account can be used only for the purchase or construction of a State party office facility. Starting on November 6, those funds, if used for the purchase or construction of the office building, would be subject to State law, and State law may determine that the funds may not be used for that purpose, as would be provided in proposed new section 300.35. The proposed rule would also state what the funds may not be used for.

10. Proposed 11 CFR 300.36   Reporting Federal Election Activity; Recordkeeping

BCRA establishes certain reporting requirements for State, district, and local committees that finance Federal election activities. *See* 2 U.S.C. 434(e)(2). This requirement extends generally to all receipts and disbursements for Federal election activities if the aggregate amount of receipts and disbursements for such activity is $5,000 or more per calendar year, 2 U.S.C. 434(e)(2)(A), and specifically extends to receipts and disbursements of Levin funds. 2 U.S.C. 434(e)(2)(B). Because spending under

the Levin Amendment is allocated between Federal funds and non-Federal funds not otherwise subject to the Act's prohibitions, limitation, and reporting requirements (*i.e.*, Levin funds), Congress has specifically required Federal disclosure of certain otherwise non-Federal receipts and disbursements of State, district, and local committees (*i.e.*, the Levin funds).

Proposed paragraph (a) of this section would apply to State, district, and local political party committees that have not qualified as political committees under 11 CFR 100.5. Although such an organization would not have reporting requirements under BCRA (*see* 2 U.S.C. 434(e)(2)), it would be required under proposed paragraph (a)(1) to demonstrate through a reasonable accounting method that it had sufficient Federal funds on hand to pay the required Federal portion of the costs of Federal election activity under proposed 11 CFR 300.32 and 300.33. Proposed paragraph (a)(1) would also require such a party organization to keep records of Federal receipts and disbursements and to make those records available to the Commission upon request.

Proposed paragraph (a)(2) would clarify that a payment of Federal funds for the costs of Federal election activity, or for the Federally allocated portion of the costs of Federal election activity, would constitute an expenditure, within the meaning of 11 CFR 100.8, unless an exclusion from the definition of expenditure in 11 CFR 100.8(b) applies. Thus, such payments would constitute expenditures for purposes of determining whether or not a State, district, or local political party organization becomes a political committee, under 11 CFR 100.5. The Commission seeks comment on this interpretation and whether, alternatively, disbursements for Federal election activity that do not otherwise qualify as "expenditures" or "exempt activities" should be excluded from the threshold for determining political committee status. Proposed paragraph (a)(2) would also state that a payment of Federal funds for the costs of Federal election activity, or for the Federally allocated portion of the costs of Federal election activity, that meets the definition of "exempt activities" (*see* 11 CFR 100.8(b)(10), (16), and (18)) would be treated as exempt activities in accordance with applicable provisions of the current (*i.e.*, pre-BCRA) regulations.

Proposed paragraph (b) of proposed section 300.36 would apply to State, district, and local political party committees that have qualified as political committees under 11 CFR

100.5. Proposed paragraph (b)(1) would provide that such committees must report all receipts and disbursements of Federal funds for all or part of the costs of Federal election activity. Proposed paragraph (b)(1) would go on to state that this requirement holds even if the committee has less than $5,000 of aggregate receipts and disbursements for Federal election activity. *See* 2 U.S.C. 434(e)(2)(A). The final sentence of proposed paragraph (b)(1) would provide that a disbursement of Federal funds for the costs of, or for the Federally allocated portion of the costs of, Federal election activity is reportable as an expenditure, unless an exclusion in 11 CFR 100.8(b) applies.

Proposed paragraph (b)(2) would ' implement the broader reporting provisions of 2 U.S.C. 434(e)(2)(A) and (B). The proposed first sentence would state the basic rule that all receipts and disbursements for Federal election activity must be reported if the political committee has had an aggregate of $5,000 or more of such receipts and disbursements in a calendar year. The proposed second sentence would make it clear that this basic reporting rule extends to the otherwise non-Federal funds spent for Federal election activity under the Levin Amendment (that is, to the Levin funds).

Proposed paragraph (b)(2)(i) would spell out the requirements for reporting payments for the costs of Federal election activity that are allocated between Federal funds and Levin funds. It would identify certain information, such as name, address, amount, and description of purpose, which must be provided for each reportable payment. Proposed paragraph (b)(2)(i) would require activity-by-activity itemization of a reportable payment that covers the costs of more than one Federal election activity. Proposed paragraph (b)(2)(ii) would implement BCRA's itemization provision for receipts and disbursements to or from any person of more than $200 in a calendar year. *See* 2 U.S.C. 434(e)(3).

Proposed paragraph (b)(3) is intended to alert the reader to the rules for reporting payments allocated between Federal funds and non-Federal funds that are not covered in proposed paragraph (b)(2). As explained above, proposed paragraph (b)(2) would apply only to payments for Federal election activity allocated between Federal funds and Levin funds under proposed 11 CFR 300.33. The reporting regulation for other payments allocated between Federal funds and non-Federal funds would be contained in proposed new 11 CFR 104.17. For example, section 104.17 would address reporting of

administrative expenses and salaries of employees who spend 25% of their time, or less, on Federal elections.

Proposed paragraph (c) would implement BCRA's new requirement for monthly filing by party committees that come under new section 434(e) of the Act. This would be accomplished by referring to the Commission's existing regulation specifying monthly reporting, i.e., 11 CFR 104.5(c)(3). The Commission seeks comments on the applicability of the $50,000 annual threshold for electronic filing to receipts and disbursements for Federal election activities. *See* 11 CFR 104.18.

Finally, proposed paragraph (d) would support the disclosure provisions outlined above by adding a recordkeeping requirement. This would be accomplished by referring to the Commission's existing regulation on recordkeeping, 11 CFR 104.14. This requirement is necessary to ensure that sufficient documentation exists to ensure compliance with the disclosure provisions of BCRA.

With regard to reporting and recordkeeping, the Commission seeks comments about what, if any, reporting requirements an association or similar group of candidates for, or holders of, State and local office (*see* 2 U.S.C. 441i(b)(1)) that is not a political committee has under 2 U.S.C. 434(e)(2).

## 11. Proposed 104.17 Reporting of Allocable Expenses by Party Committees

As indicated in the description of section 104.10, the proposed rules would divide the present regulations at that section into several regulations to cover reporting of specific allocation areas by specific types of reporting entities. New section 104.17, which is currently reserved space, would address reporting by party committees of allocable expenses. Reporting requirements with regard to activity allocated between Federal and Levin accounts pursuant to 11 CFR 300.30 and 11 CFR 300.33 are also addressed in 11 CFR 300.36.

Proposed 11 CFR 104.17(a) would address payments on behalf of more than one clearly identified candidate, including non-Federal candidates. Current section 104.10 provides for allocated Federal/non-Federal spending when a combined payment is made on behalf of both Federal and non-Federal clearly identified candidates. Under BCRA and as provided in the proposed revisions of section 106.1(a), however, it appears that all such payments must be made entirely from Federal funds. Hence, proposed 11 CFR 104.17(a) would provide for the reporting of all allocations between or among clearly

identified Federal and non-Federal candidates as Federal activity. Comments are solicited as to whether this requirement that State, district and local committees of political parties use Federal funds for activity on behalf of clearly identified Federal and clearly identified non-Federal candidates is appropriate under BCRA. (*See also* 11 CFR 300.30).

Proposed 11 CFR 104.17(b)(1) would require explanations of the percentages used to allocate payments for specific categories of State, district and local party activity. The Commission is also contemplating requiring the assignment of unique identifying codes to some allocable activities as is required in current 11 CFR 104.10(b)(2). (For example, the reporting of exempt costs now requires such identifiers.) Comments are sought as to whether such unique identifying codes for activities would be of utility in tracking any of the allocable expenditures for activities. Also, should activities that have been included under exempt costs (now apparently subsumed by other categories) require such identifiers?

Proposed 11 CFR 104.17(b)(2) would address the reporting of transfers between State, district and local party accounts for allocable expenses, while proposed 11 CFR 104.17(b)(3) would set out the details required in the reporting of disbursements for allocable activity by State, district and local committees of political parties.

## 12. Proposed 11 CFR 300.37 Prohibitions on Fundraising for and Donating to Certain Tax Exempt Organizations

Just as it prohibits national parties from fundraising for, or making or directing donations to, certain tax exempt organizations, BCRA also prohibits State, district, and local party committees, their officers and agents acting on their behalf, and entities directly or indirectly established, maintained, financed, or controlled by them from doing so. 2 U.S.C. 441i(d)(i). Thus, the proposed rules at 11 CFR 300.37 relating to State, district, and local party committees would mirror the proposed rules at 11 CFR 300.11 relating to national party committees. *See* discussion above.

The Commission seeks comments on one component of the proposed rules as they apply to State, district, and local party committees. Proposed 11 CFR 300.37(a)(3), like proposed 11 CFR 300.11(a)(3), would mirror 2 U.S.C. 441i(d) in extending the prohibition on fundraising for, or donating to, section 527 organizations "except for a political committee; a State, district, or local

**35672**    **Federal Register** / Vol. 67, No. 97 / Monday, May 20, 2002 / Proposed Rules

committee of a political party; or the authorized campaign committee of a State or local candidate." The proposed rules would interpret "political committee" as it is currently defined in 11 CFR 100.5. Under this construction, State, district, and local party committees could fundraise for, or donate to, a section 527 organization that is a Federal political committee under the Act, but they could not do so for a section 527 organization that is a State-registered political action committee ("PAC") that supports only non-Federal candidates. The Commission seeks comment as to whether another interpretation of "political committee" is warranted that would permit State, district, and local party committees to donate to this type of State-registered section 527 organization.

**Tax-Exempt Organizations**

For the convenience of readers interested in locating rules pertaining to fundraising and donations to tax-exempt organizations, subpart C of new part 300 would combine in a single place the prohibitions on national, State, district, and local party committee donations to, and fundraising for, certain 501(c) and 527 tax-exempt organizations and the rules governing fundraising by Federal candidates and officeholders for 501(c) organizations. Proposed 11 CFR 300.50 would mirror proposed rule 11 CFR 300.11. Proposed 11 CFR 300.51 would mirror proposed rule 300.37. Proposed 11 CFR 300.52 would mirror proposed 11 CFR 300.65. *See* the discussion in proposed 11 CFR 300.11 and 300.37 above and 300.65 below.

**Federal Candidates and Officeholders**

BCRA places limits on the amounts and types of funds that can be raised by Federal candidates and officeholders for both Federal and State candidates. *See* 2 U.S.C. 441i(e). The Commission is proposing to place the regulations that address these limitations in 11 CFR part 300, subpart D.

*1. General Prohibitions*

The restrictions apply to Federal candidates and officeholders, their agents, and entities directly or indirectly established, maintained, or controlled by, or acting on behalf of, any such candidate(s) or officeholder(s). As defined in 2 U.S.C. 431(3) and existing 11 CFR 100.4, "Federal office" means the office of President or Vice President of the United States, Senator or Representative in, or Delegate or Resident Commissioner to, the Congress of the United States. There is a similar definition of "Federal officeholder" in 11 CFR 113.1(c). Please note that these restrictions encompass candidate PACs and leadership PACs. Persons covered by these restrictions may not "solicit, receive, direct, transfer or spend" non-Federal funds unless certain requirements are satisfied.

BCRA prohibits any Federal candidate or officeholder, his or her agent, or any entity described above, from raising non-Federal funds in connection with an election for Federal, State, or local office. 2 U.S.C. 441i(e)(1)(A) and (B); proposed 11 CFR 300.61. These prohibitions encompass raising money for section 527 organizations, whether or not such organizations are Federal political committees. With limited exceptions, such persons may raise and spend Federal money in connection with a non-Federal election only in amounts and from sources that are consistent with State law, and that do not exceed the Act's contribution limits or come from prohibited sources under the Act. 2 U.S.C. 441i(e)(1)(B); proposed 11 CFR 300.62.

The prohibitions in 11 CFR 300.61 and 300.62 encompass "leadership" and "candidate" PACs since these PACs are entities directly or indirectly established, financed, maintained, or controlled by, Federal candidates and/or officeholders. Specifically, leadership PACs and candidate PACs are political organizations set up by congressional leaders and other Federal candidates and officeholders as a way to support other candidates' campaigns. In 2001, at least 110 members of Congress had leadership PACs.

As Senator McCain explained in the Senate debate, "A Federal officeholder or candidate is prohibited from soliciting contributions for a Leadership PAC that do not comply with the Federal hard money source and amount limitations." *See* 148 Cong. Rec. S2140 (Daily ed. March 20, 2002) (statement of Sen. McCain). Consequently, under proposed 11 CFR 300.61, Federal candidates, Federal officeholders, and their leadership PACs and candidate PACs cannot solicit, receive, direct, transfer, or spend funds for a Federal account of a leadership or candidate PAC unless the funds are subject to the prohibitions, limitations, and reporting requirements of the Act. Similarly, Federal candidates, Federal officeholders, and their leadership PACs and candidate PACs cannot solicit, receive, direct, transfer, or spend funds for a non-Federal account of a leadership PAC or candidate PAC unless the funds are subject to the prohibitions and limitations of the Act. Thus, neither the Federal nor non-Federal accounts of a Federal candidate's leadership PAC or candidate PAC could receive or spend corporate treasury or labor organization funds or funds from individuals and political committees that exceed the limitations of the Act. Additionally, funds in the non-Federal account of these PACs must not be used for Federal election activities or in connection with a Federal election. *See* 148 Cong. Rec. S2140 (Daily ed. March 20, 2002) (statement of Sen. McCain).

*2. Exceptions for State and Local Candidates and for Fundraising Events*

An exception applies when a Federal candidate or Federal officeholder is also a candidate for State or local office. Such candidates may raise and spend non-Federal funds for their State campaign, as long as their activities are consistent with State law and refer only to their status as a State or local candidate, to other candidates for that same office, or both. 2 U.S.C. 441i(e)(2); proposed 11 CFR 300.63. Please note that if a State or local candidate is simultaneously a candidate for Federal office, he or she must raise and spend only Federal funds in connection with the Federal campaign.

BCRA contains a further exemption, for Federal candidates and officeholders who attend, speak, or appear as a featured guest at a State, district, or local party committee fundraising event. *See* 2 U.S.C. 441i(e)(3); proposed 11 CFR 300.64. The Commission seeks comment on how it should construe and implement this provision, particularly in light of the separate general prohibition on Federal candidates and officeholders from soliciting non-Federal funds in connection with an election for Federal, State, or local office.

Sen. McCain explained in the Senate debate that "[t]he rule here is simple: Federal candidates and officeholders cannot solicit soft money funds, funds that do not comply with Federal contribution limits and source prohibitions, for any party committee—national, State, or local." 148 Cong. Rec. S2139 (daily ed. March 20, 2002) (statement of Sen. McCain). Thus, under the proposed rules, while such individuals may attend, speak, or be a featured guest at a State or local party fundraising event, they cannot solicit funds at any such event.

However, the Commission seeks comments on whether the fundraising event provision is a total exemption from the general solicitation ban, whereby Federal candidates and officeholders and their agents may attend and speak freely at such events without restriction or regulation. In

addition, the Commission seeks comments on how it should construe BCRA's phrase permitting Federal candidates and officeholders to "attend, speak, or be a featured guest" at a fundraising event. Specifically, the phrase "featured guest" strongly suggests that State, district, or local party committees may publicize in advance that a Federal candidate or officeholder will be attending and speaking at an event. Does this mean that Federal candidates and officeholders may be referred to in invitation materials for the event? May they appear as members of a host committee of an event? May they be honored at the event? Should the general solicitation bar be construed to mean that Federal candidates and officeholders are strictly prohibited from doing anything that would constitute a "solicitation" under the Internal Revenue Code that would trigger IRS disclaimer obligations?

*3. Exception for Tax-Exempt Organizations*

BCRA also addresses solicitations on behalf of 501(c) organizations that are made by Federal candidates, Federal officeholders, and individuals who are agents of either. 2 U.S.C. 441i(e)(4). BCRA makes clear that these individuals may make general solicitations on behalf of 501(c) organizations, without regard to the source or amount solicited, as long as the solicitation does not specify how the funds will or should be spent and as long as the solicitation is not for a 501(c) organization whose principal purpose is to conduct certain Federal election activity as described in 11 CFR 300.2(a), such as voter registration, voter identification, GOTV activities, or generic campaign activity. BCRA prohibits these individuals from specifically soliciting funds for the above-described Federal election activity, or for 501(c) organizations whose principal purpose is to conduct those Federal election activities, unless the solicitation is made to an individual and the amount solicited does not exceed $20,000 per year. No solicitations may be made on behalf of 501(c) organizations for funds to use for public communications that refer to a clearly identified Federal candidate and that promote, support, attack, or oppose the candidate. *See* 148 Cong. Rec. H408 (daily ed. February 13, 2002) (statement of Rep. Shays). Thus, for example, a Federal candidate may make a general solicitation to a corporation or labor organization on behalf of the Red Cross, but may not solicit a corporation or labor organization for GOTV activities

conducted by a 501(c)(4) organization. These provisions also apply to organizations that have applied for 501(c) tax exempt status, where the application is still pending. The proposed rules track these provisions. *See* 11 CFR 300.65.

The BCRA provision relating to candidate/officeholder solicitations on behalf of 501(c) organizations specifically applies only to individuals described in 2 U.S.C. 441i(e)(1). Section 441i(e)(1) of FECA applies to Federal candidates, individual holding Federal office, their agents, and entities directly or indirectly established, financed, maintained, or controlled by, or acting on behalf of either Federal candidates and Federal officeholders. Thus, the proposed rules construe BCRA to permit only individuals to make the solicitations—that is, Federal candidates, Federal officeholders, and individuals acting as their agents. An entity acting as a candidate's agent or an entity directly or indirectly established, financed, maintained, or controlled by a candidate could not make these general or specific solicitations on behalf of a 501(c) organization. However, the Commission seeks comments as to whether another interpretation is warranted.

The Commission also notes that the language encompassing an "agent" of Federal candidates and officeholders in Section 441i(e)(1), unlike the "agent" language in Sections 441i(a)(2) and 441i(d), does not include the limiting phrase, "agent acting on behalf of." The Commission seeks comment as to whether Section 441i(e)(1) should be similarly construed as applying to an agent acting on behalf of a Federal candidate or officeholder or whether the absence of this limiting language was intended to confer a different meaning on the use of the term "agent" in this provision.

The Commission also seeks comments on whether the proposed rules should address how to identify organizations whose principal purpose is to conduct the described Federal election activity. Should a 501(c) organization's major activities, as identified in publicly available information such as its application for tax-exempt status or annual Form 990 tax returns, be used to determine whether an organization's principal purpose is to conduct Federal election activity? Although those publicly available tax forms would reveal the past major activities of an organization or the major activities planned by the organization at the time it applied for tax exempt status, additional information would be needed to determine the principal purpose of an

organization that has applied for, but not yet obtained, tax exempt status, and to ascertain the current major activities of a 501(c) organization. Thus, should Federal candidates and officeholders be required to obtain a certification from an organization on whose behalf the candidate or officeholder wants to solicit funds that its principal purpose is not to conduct the described Federal election activity? Should the rules include a knowledge standard prohibiting solicitations for unlimited funds from any source if a Federal candidate, Federal officeholder, or individual acting on their behalf has knowledge that an organization is planning to conduct the described Federal election activity?

Finally, the Commission seeks comments on whether the rules should further address a Federal candidate's or Federal officeholder's responsibility when specifically soliciting individuals for funds for a 501(c) organization to use in conducting Federal election activity. For example, if a Federal candidate is soliciting a donation of $20,000 from an individual who serves as the CEO of a major corporation, should the candidate be required to inform the individual that personal funds are being solicited and not funds from the individual's corporation?

**Communications by State and Local Candidates**

Proposed Subpart E would implement two provisions of BCRA regarding State and local candidates. BCRA prohibits State and local candidates and officeholders from funding certain public communications with non-Federal funds. *See* 2 U.S.C. 441i(f)(1); proposed 11 CFR 300.71. They may, however, use Federal funds for these communications. The prohibition on use of non-Federal funds communications encompasses communications that refer to a clearly identified candidate for Federal office, if the communication promotes, supports, attacks, or opposes any candidate for that Federal office, regardless of whether the communication expressly advocates voting for or against any candidate.

In addition, BCRA contains an exception that permits State and local candidates to use non-Federal funds for communications that merely refer to Federal candidates in another context. 2 U.S.C. 441i(f)(2); proposed 11 CFR 300.72. For example, State and local candidates may note that they have been endorsed by Federal candidates, or that they agree or disagree with a Federal candidate's position on a certain issue. *See* 148 Cong. Rec. S2142–43 (daily ed. March 20, 2002) (statement of Sen.

Feingold]. They would also be able to use non-Federal funds to refer to a bill or law by its popular name where that name happens to include the name of a Federal candidate. These examples are included in proposed 11 CFR 300.2(l)(ii), the definition of "promote, support, attack, or oppose," which is cross-referenced in proposed 11 CFR 300.72.

A State or local candidate or officeholder may also use non-Federal funds for communications made in connection with an election for State or local office, that refer only to the sponsoring individual or to any other candidate for the State or local office held or sought by that individual, or both. *Id.*

## Certification of No Effect Pursuant to 5 U.S.C. 605(b)

### [Regulatory Flexibility Act]

The Commission certifies that the attached proposed rules, if promulgated, will not have a significant economic impact on a substantial number of small entities. The basis for this certification is that the national, State, and local party committees of the two major political parties are not small entities under 5 U.S.C. 601, and the number of other small entities to which the rules would apply is not substantial.

### List of Subjects

*11 CFR Part 100*

Elections.

*11 CFR Part 102*

Political committees and parties, reporting and recordkeeping requirements.

*11 CFR Part 104*

Campaign funds, political committees and parties, reporting and recordkeeping requirements.

*11 CFR Part 106*

Campaign funds, political committees and parties, political candidates.

*11 CFR Part 108*

Elections, reporting and recordkeeping.

*11 CFR Part 110*

Campaigns, political parties and committees.

*11 CFR Part 114*

Business and industry, elections, labor.

*11 CFR Part 300*

Campaign funds, nonprofit organizations, political committees and

parties, political candidates, reporting and recordkeeping requirements.

*11 CFR Part 9034*

Campaign funds, reporting and recordkeeping requirements.

For reasons set out in the preamble, Subchapters A, B and F of Chapter I of title 11 of the *Code of Federal Regulations* would be amended as follows:

## PART 100—SCOPE AND DEFINITIONS (2 U.S.C. 431)

1. The authority citation for 11 CFR part 100 would continue to read as follows:

**Authority:** 2 U.S.C. 431; 434(a)(11), 438(a)(8).

2. Section 100.14 would be revised to read as follows:

### § 100.14  State committee, subordinate committee, district, or local committee (2 U.S.C. 431(15)).

(a) *State committee* means the organization that by virtue of the bylaws of a political party or the operation of state law is part of the official party structure, and is responsible for the day-to-day operation of the political party at the State level, including an entity that is directly or indirectly established, financed, maintained, or controlled by that organization, as determined by the Commission.

(b) *Subordinate committee of a State committee* means any organization that is part of the official party structure, and is responsible for the day-to-day operation of the political party at the level of city, county, neighborhood, ward, district, precinct, or any other subdivision of a State or any organization under the control or direction of the State committee, as determined by the Commission.

(c) *District or local committee* means any organization that by virtue of the bylaws of a political party or the operation of State law is part of the official party structure, and is responsible, under State law, for the day-to-day operation of the political party at the level of city, county, neighborhood, ward, district, precinct, or any other subdivision of a State, including an entity that is directly or indirectly established, financed, maintained, or controlled by the district or local committee, as determined by the Commission.

3. Section 100.24 would be added to read as follows:

### § 100.24  Federal election activity (2 U.S.C. 431(20)).

(a) *Federal election activity* means—

(1) Voter registration activity during the period that begins on the date that is 120 calendar days before the date that a regularly scheduled Federal election is held and ends on the date of the election. For purposes of voter registration activity, the term "election" does not include any special election;

(2) The following activities conducted in connection with an election in which one or more candidates for Federal office appears on the ballot (regardless of whether one or more candidates for State or local office also appears on the ballot):

(i) Voter identification, including canvassing, and other activities designed to determine registered voters, likely voters, or voters indicating a preference for a specific candidate or political party; or

(ii) Generic campaign activity, as defined in 11 CFR 100.25;

(iii) Get-out-the-vote activity. Examples of get-out-the-vote activity include transporting voters to the polls, contacting voters on election day or shortly before to encourage voting but without referring to any clearly identified candidate for Federal office, and distributing printed slate cards, sample ballots, palm cards, or other printed listing(s) of three or more candidates for any public office;

(3) A public communication that refers to a clearly identified candidate for Federal office, regardless of whether a candidate for State or local election is also mentioned or identified and that promotes, supports, attacks, or opposes any candidate for Federal office. This paragraph applies regardless of whether the communication expressly advocates a vote for or against a Federal candidate; or

(4) Services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(b) *Exceptions. Federal election activity* does not include any amount expended or disbursed by a State, district, or local committee of a political party for:

(1) A public communication that refers solely to one or more clearly identified candidates for State and local office. This exception does not apply to a public communication that is voter registration activity, voter identification, generic campaign activity, or get-out-the-vote activity under paragraphs (a)(1) or (a)(2) of this section;

(2) A contribution to a candidate for State or local office, provided the contribution is not designated to pay for

voter registration activity, voter identification, generic campaign activity, get-out-the-vote activity, or a public communication as set forth in paragraphs (a)(1) through (4) of this section;

(3) The costs of a State, district, or local political convention or other similar meeting or conference;

(4) The costs of grassroots campaign materials, including buttons, bumper stickers, handbills, brochures, posters and yard signs, that name or depict only candidates for State or local office;

(5) Voter registration activity at any time other than the period of time that is 120 days before the date that a regularly scheduled Federal election is held through the date of the election; and

(6) Get-out-the-vote and voter identification activities in elections in which no candidate for Federal office appears on the ballot.

4. Section 100.25 would be added to read as follows:

**§ 100.25   Generic campaign activity (2 U.S.C. 431(21)).**

*Generic campaign activity* means a campaign activity that promotes or opposes a political party and does not promote or oppose a Federal candidate or a non-Federal candidate.

5. Section 100.26 would be added to read as follows:

**§ 100.26   Public communication (2 U.S.C. 431(22)).**

*Public communication* means a communication by means of any broadcast, cable or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing or telephone bank to the general public, or any other form of general public political advertising.

6. Section 100.27 would be added to read as follows:

**§ 100.27   Mass mailing (2 U.S.C. 431(23)).**

*Mass mailing* means a mailing by United States mail or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period. For purposes of this section, substantially similar means communications that have been personalized to include the recipient's name, occupation, geographic location, or similar types of individualization.

7. Section 100.28 would be added to read as follows:

**§ 100.28   Telephone bank (2 U.S.C. 431(24)).**

*Telephone bank* means more than 500 telephone calls of an identical or substantially similar nature within any 30-day period. For purposes of this

section, *substantially similar* means communications that have been personalized to include the recipient's name, occupation, geographic location, or similar types of individualization.

**§§ 100.29–100.50   [Added and Reserved]**

8. Sections 100.29 through 100.50 would be added and reserved.

9. Sections 100.1 through 100.50 would be designated as subpart A— General Definitions, and Subpart B would be added and reserved.

**PART 102—REGISTRATION, ORGANIZATION, AND RECORDKEEPING BY POLITICAL COMMITTEES (2 U.S.C. 433)**

10. The authority citation for part 102 would continue to read as follows:

**Authority:** 2 U.S.C. 432, 433, 434(a)(11), 438(a)(8), 441d.

11. Section 102.5 would be revised to read as follows:

**§ 102.5   Organizations financing political activity in connection with Federal and non-Federal elections, other than through transfers and joint fundraisers.**

(a) *Organizations that are political committees under the Act, other than National Party committees.*

(1) Each organization, including a State, district, or local party committee, that finances political activity in connection with both Federal and non-Federal elections and that qualifies as a political committee under 11 CFR 100.5 shall either:

(i) Establish a separate Federal account in a depository in accordance with 11 CFR part 103. Such account shall be treated as a separate Federal political committee which shall comply with the requirements of the Act including the registration and reporting requirements of 11 CFR part 102 and 104. Only funds subject to the prohibitions and limitations of the Act shall be deposited in such separate Federal account. All disbursements, contributions, expenditures, and transfers by the committee in connection with any Federal election shall be made from its Federal account, except as otherwise permitted for State, district, and local party committees by 11 CFR part 300. No transfers may be made to such Federal account from any other account(s) maintained by such organization for the purpose of financing activity in connection with non-Federal elections, except as provided by 11 CFR 300.34 and 106.6(e). Administrative expenses for political committees other than party committees shall be allocated pursuant to 11 CFR part 106 between such

Federal account and any other account maintained by such committee for the purpose of financing activity in connection with non-Federal elections. Administrative expenses for State, district, and local party committees are subject to 11 CFR part 300; or

(ii) Establish a political committee which shall receive only contributions subject to the prohibitions and limitations of the Act, regardless of whether such contributions are for use in connection with Federal or non-Federal elections. Such organization shall register as a political committee and comply with the requirements of the Act.

(2) Only contributions meeting the conditions set forth in paragraphs (a)(2)(i), (ii), or (iii) of this section may be deposited in a Federal account established under 11 CFR 102.5(a)(1)(i) or may be received by a political committee established under 11 CFR 102.5(a)(1)(ii).

(i) Contributions designated for the Federal account;

(ii) Contributions that result from a solicitation which expressly states that the contribution will be used in connection with a Federal election; or

(iii) Contributions from contributors who are informed that all contributions are subject to the prohibitions and limitations of the Act.

(3) Any party committee solicitation that makes reference to a Federal candidate or a Federal election shall be presumed to be for the purpose of influencing a Federal election, and contributions resulting from that solicitation shall be subject to the prohibitions and limitations of the Act. This presumption may be rebutted by demonstrating to the Commission that the funds were solicited with express notice that they would not be used for Federal election purposes.

(b) *Organizations that are not political committees under the Act.* Any organization that makes contributions or expenditures but does not qualify as a political committee under 11 CFR 100.5, including any State, district, or local party organization that makes contributions, expenditures and exempted payments under 11 CFR 100.7(b)(9), (15) and (17) and 11 CFR 100.8(b)(10), (16) and (18), or payments for certain Federal election activities under 11 CFR 300.32(b), shall either:

(1) Establish separate accounts to which only funds subject to the prohibitions and limitations of the Act, and only funds solicited for activities undertaken pursuant to 11 CFR 300.32, shall be deposited and from which contributions, expenditures, exempted payments, and payments for certain

Federal activities shall be made. Such organization shall keep records of deposits to and disbursements from such accounts and, upon request, shall make such records available for examination by the Commission; or

(2) Demonstrate through a reasonable accounting method that whenever such organization makes a contribution, expenditure, exempted payment or payment for certain Federal election activities, that organization has received sufficient funds subject to the limitations and prohibitions of the Act or to the requirements of 11 CFR 300.31 to make such contribution, expenditure or payment. Such organization shall keep records of amounts received or expended under this subsection and, upon request, shall make such records available for examination by the Commission.

(c) *National party committees.* National party committees are prohibited from raising and spending non-Federal funds. Therefore, these committees are not included in this section.

12. Section 102.17 would be amended by adding introductory language to paragraph (a) to read as follows:

### § 102.17 Joint fundraising by committees other than separate segregated funds.

(a) *General.* Nothing in this section shall permit any person to solicit, receive, direct, transfer, or spend any non-Federal funds prohibited under 11 CFR part 300.

\* \* \* \* \*

## PART 104—REPORTS BY POLITICAL COMMITTEES (2 U.S.C. 434)

13. The authority citation for part 104 would continue to read as follows:

**Authority:** 2 U.S.C. 431(1), 431(8), 431(9), 432(i), 434, 438(a)(8), 438(b), 439a.

14. Section 104.8 would be amended by revising paragraphs (e) and (f) to read as follows:

### § 104.8 Uniform reporting of receipts.

\* \* \* \* \*

(e) For reports covering activity on or before December 31, 2002, national party committees shall disclose in a memo Schedule A information about each individual, committee, corporation, labor organization, or other entity that donates an aggregate amount in excess of $200 in a calendar year to the committee's non-Federal account(s). This information shall include the donating individual's or entity's name, mailing address, occupation or type of business, and the date of receipt and amount of any such donation. If a donor's name is known to have changed

since an earlier donation reported during the calendar year, the exact name or address previously used shall be noted with the first reported donation from that donor subsequent to the name change. The memo entry shall also include, where applicable, the information required by paragraphs (b) through (d) of this section.

(f) For reports covering activity on or before December 31, 2002, national party committees shall also disclose in a memo Schedule A information about each individual, committee, corporation, labor organization, or other entity that donates an aggregate amount in excess of $200 in a calendar year to the committee's building fund account(s).

This information shall include the donating individual's or entity's name, mailing address, occupation or type of business, and the date of receipt and amount of any such donation. If a donor's name is known to have changed since an earlier donation reported during the calendar year, the exact name or address previously used shall be noted with the first reported donation from that donor subsequent to the name change. The memo entry shall also include, where applicable, the information required by paragraphs (b) through (d) of this section.

15. Section 104.9 would be amended by revising paragraphs (c), (d), and (e) to read as follows:

### § 104.9 Uniform reporting of disbursements.

\* \* \* \* \*

(c) For reports covering activity on or before December 31, 2002, national party committees shall report in a memo Schedule B the full name and mailing address of each person to whom a disbursement in an aggregate amount or value in excess of $200 within the calendar year is made from the committee's non-Federal account(s), together with the date, amount and purpose of such disbursement, in accordance with 11 CFR 104.9(b). As used in 11 CFR 104.9, purpose means a brief statement or description as to the reasons for the disbursement. *See* 11 CFR 104.3(b)(3)(i)(A).

(d) For reports covering activity on or before December 31, 2002, national party committees shall report in a memo Schedule B the full name and mailing address of each person to whom a disbursement in an aggregate amount or value in excess of $200 within the calendar year is made from the committee's building fund account(s), together with the date, amount and purpose of such disbursement, in accordance with 11 CFR 104.9(b). As

used in 11 CFR 104.9, purpose means a brief statement or description as to the reasons for the disbursement. *See* 11 CFR 104.3(b)(3)(i)(A).

(e) For reports covering activity on or before December 31, 2002, national party committees shall report in a memo Schedule B each transfer from their non-Federal account(s) to the non-Federal account(s) of a State or local party committee.

16. Section 104.10 would be revised to read as follows:

### § 104.10 Reporting by separate segregated funds and nonconnected committees of expenses allocated among candidates and activities.

(a) *Expenses allocated among candidates.* A political committee that is a separate segregated fund or a nonconnected committee making an expenditure on behalf of more than one clearly identified candidate for Federal office shall allocate the expenditure among the candidates pursuant to 11 CFR 106.1. Payments involving both expenditures on behalf of one or more clearly identified Federal candidates and disbursements on behalf of one or more clearly identified non-Federal candidates shall also be allocated pursuant to 11 CFR 106.1. For allocated expenditures, the committee shall report the amount of each in-kind contribution, independent expenditure, or coordinated expenditure attributed to each Federal candidate. If a payment also includes amounts attributable to one or more non-Federal candidates, and is made by a political committee with separate Federal and non-Federal accounts, then the payment shall be made according to the procedures set forth in 11 CFR 106.6(e), as appropriate, but shall be reported pursuant to paragraphs (a)(1) through (a)(4), as follows:

(1) *Reporting of allocation of expenses attributable to specific Federal and non-Federal candidates.* In each report disclosing a payment that includes both expenditures on behalf of one or more Federal candidates and disbursements on behalf of one or more non-Federal candidates, the committee shall assign a unique identifying title or code to each program or activity conducted on behalf of such candidates, shall state the allocation ratio calculated for the program or activity, and shall explain the manner in which the ratio was derived. The committee shall also summarize the total amounts attributed to each candidate, to date, for each joint program or activity.

(2) *Reporting of transfers between accounts for the purpose of paying expenses attributable to specific Federal*

*and non-Federal candidates.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall report each transfer of funds from its non-Federal account to its Federal account or to its separate allocation account for the purpose of paying such expenses. In the report covering the period in which each transfer occurred, the committee shall explain in a memo entry the allocable expenses to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one program or activity, the committee shall itemize the transfer, showing the amounts designated for each program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates.

(3) *Reporting of allocated disbursements attributable to specific Federal and non-Federal candidates.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall also report each disbursement from its Federal account or its separate allocation account in payment for a program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates. In the report covering the period in which the disbursement occurred, the committee shall state the full name and address of each person to whom the disbursement was made, and the date, amount, and purpose of each such disbursement. If the disbursement includes payment for the allocable costs of more than one program or activity, the committee shall itemize the disbursement, showing the amounts designated for payment of each program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates. The committee shall also report the amount of each in-kind contribution, independent expenditure, or coordinated expenditure attributed to each Federal candidate, and the total amount attributed to the non-Federal candidate(s). In addition, the committee shall report the total amount expended by the committee that year, to date, for each joint program or activity.

(4) *Recordkeeping.* The treasurer shall retain all documents supporting the committee's allocation on behalf of specific Federal and non-Federal candidates, in accordance with 11 CFR 104.14.

(b) *Expenses allocated among activities.* A political committee that is a separate segregated fund or a nonconnected committee and that has established separate Federal and non-Federal accounts under 11 CFR 102.5(a)(1)(i) shall allocate between those accounts its administrative expenses and its costs for fundraising and generic voter drives according to 11 CFR 106.6, as appropriate, and shall report those allocations according to paragraphs (b) (1) through (5), as follows:

(1) *Reporting of allocation of administrative expenses and costs of generic voter drives.*

(i) In the first report in a calendar year disclosing a disbursement for administrative expenses or generic voter drives, as described in 11 CFR 106.6(b), the committee shall state the allocation ratio to be applied to these categories of activity according to 11 CFR 106.6(c), and the manner in which it was derived.

(ii) In each subsequent report in the calendar year itemizing an allocated disbursement for administrative expenses or generic voter drives:

(A) The committee shall state the category of activity for which each allocated disbursement was made, and shall summarize the total amount spent by the Federal and non-Federal accounts that year, to date, for each such category.

(B) The committees shall also report in a memo entry the total amounts expended in donations and direct disbursements on behalf of specific State and local candidates, to date, in that calendar year.

(2) *Reporting of allocation of the direct costs of fundraising.* In each report disclosing a disbursement for the direct costs of a fundraising program, as described in 11 CFR 106.6(b), the committee shall assign a unique identifying title or code to each such program or activity, shall state the allocation ratio calculated for the program or activity according to 11 CFR 106.6(d), and shall explain the manner in which the ratio was derived. The committee shall also summarize the total amounts spent by the Federal and non-Federal accounts that year, to date, for each such program or activity.

(3) *Reporting of transfers between accounts for the purpose of paying allocable expenses.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall report each transfer of funds from its non-Federal account to its Federal account or to its separate allocation account for the purpose of paying such expenses. In the report covering the period in which each transfer occurred, the committee shall explain in a memo entry the allocable expenses to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one activity, the committee shall itemize the transfer, showing the amounts designated for administrative expenses and generic voter drives, and for each fundraising program, as described in 11 CFR 106.6(b).

(4) *Reporting of allocated disbursements.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall also report each disbursement from its Federal account or its separate allocation account in payment for a joint Federal and non-Federal expense or activity. In the report covering the period in which the disbursement occurred, the committee shall state the full name and address of each person to whom the disbursement was made, and the date, amount, and purpose of each such disbursement. If the disbursement includes payment for the allocable costs of more than one activity, the committee shall itemize the disbursement, showing the amounts designated for payment of administrative expenses and generic voter drives, and for each fundraising program, as described in 11 CFR 106.6(b). The committee shall also report the total amount expended by the committee that year, to date, for each category of activity.

(5) *Recordkeeping.* The treasurer shall retain all documents supporting the committee's allocated disbursements for three years, in accordance with 11 CFR 104.14.

17. Part 104 would be amended by adding section 104.17 to read as follows:

### §104.17   Reporting of allocable expenses by party committees.

(a) *Expenses allocated among candidates.* A national party committee making an expenditure on behalf of more than one clearly identified candidate for Federal office must report the allocation between or among the named candidates pursuant to 11 CFR 106.1. A national party committee making expenditures and disbursements on behalf of one or more clearly identified Federal candidates and on behalf of one or more clearly identified non-Federal candidates must report the allocation among all named candidates pursuant to 11 CFR 106.1. A State, district or local party committee making expenditures and disbursements for Federal election activity as defined at 11 CFR 100.24 on behalf of one or more clearly identified Federal and one or more clearly identified non-Federal candidates must make the payments from its Federal account and must report the allocation among all named

candidates. For allocated expenditures, the committee must report the amount of each in-kind contribution, independent expenditure, or coordinated expenditure attributed to each candidate.

(1) *Reporting of allocation of expenses attributable to specific Federal and non-Federal candidates.* In each report disclosing an expenditure and/or disbursement that reflects payments on behalf of one or more Federal candidates and/or on behalf of one or more non-Federal candidates, the committee must assign a unique identifying title or code to each program or activity conducted on behalf of such candidates, and shall state and explain the manner in which the percentage of costs applied to each candidate was derived, pursuant to 11 CFR 106.1. The committee must also summarize the total amounts attributed to each candidate, to date, for each program or activity.

(2) *Recordkeeping.* The treasurer must retain all documents supporting the committee's allocations on behalf of specific Federal and non-Federal candidates, in accordance with 11 CFR 104.14.

(b) *Expenses allocated among activities.* A State, district or local committee of a political party that has established separate Federal and Levin accounts under 11 CFR 300.30 must report, pursuant to 11 CFR 300.36, all payments that are allocable between these accounts pursuant to the allocation rules at 11 CFR 300.33(a) and (b). A State, district or local committee of a political party that has established separate Federal and non-Federal accounts under 11 CFR 102.5 and 11 CFR 300.30 must report all payments that are allocable between these accounts pursuant to the allocation rules at 11 CFR 300.33(a) and (b).

(1) *Reporting of allocations of expenses for activities.*

(i) In the first report in a calendar year disclosing a disbursement allocable pursuant to 11 CFR 300.33, a State, district or local committee must state and explain the allocation percentage to be applied to each category of activity (e.g., 36% Federal/64% non-Federal in Presidential and Senate election years) pursuant to 11 CFR 300.33(b).

(ii) In each subsequent report in the calendar year itemizing an allocated disbursement, the State, district or local party committee must state the category of activity for which each allocated disbursement was made, and must summarize the total amounts expended by the Federal and non-Federal accounts that year, to date, for each such category.

(iii) In each report disclosing disbursements for allocable activity as described in 11 CFR 300.33, the State, district or local party committee must assign a unique identifying code to each such activity.

(2) *Reporting of transfers between the accounts of State, district and local party committees for allocable expenses.* A State, district or local committee of a political party that pays allocable expenses in accordance with 11 CFR 300.33(d) must report each transfer of funds from its non-Federal account or its Levin account to its Federal account for the purpose of payment of such expenses. In the report covering the period in which each transfer occurred, the committee must explain in a memo entry the allocable expenses to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one activity, the committee must itemize the transfer, showing the amounts designated for each category of expense, as described in 11 CFR 300.33(b).

(3) *Reporting of allocated disbursements.* A State, district or local committee of a political party that pays allocable expenses in accordance with 11 CFR 300.33(d) must report each allocable disbursement from its Federal account (*see* 11 CFR 300.36). In the report covering the period in which the disbursement occurred, the committee must state the full name and address of each individual or vendor to which the disbursement was made, the date, amount and purpose of each such disbursement, and the amounts allocated between Federal and Levin accounts or Federal and non-Federal accounts. If the disbursement includes payment for the allocable costs of more than one activity, the committee shall itemize the disbursement, showing the amounts designated for payments of certain salaries, of other administrative costs and of costs for voter registration outside 120 days before an election, as described in 11 CFR 300.33. The committee must also report the total amount expended by the committee that year, to date, for each category of activity.

(4) *Recordkeeping.* The treasurer must retain all documents supporting the committee's allocations of expenditures and disbursements for the costs and activities cited at paragraph (b) of this section, in accordance with 11 CFR 104.14.

## PART 106—ALLOCATIONS OF CANDIDATE AND COMMITTEE ACTIVITIES

18. The authority citation for part 106 would continue to read as follows:

**Authority:** 2 U.S.C. 438(a)(8), 441a(b), 441a(g).

19. Section 106.1 would be amended by revising paragraphs (a)(1), (a)(2), and (e) to read as follows:

### § 106.1  Allocation of expenses between candidates.

(a) *General rule.*

(1) Expenditures, including in-kind contributions, independent expenditures, and coordinated expenditures made on behalf of more than one clearly identified Federal candidate shall be attributed to each such candidate according to the benefit reasonably expected to be derived. For example, in the case of a publication or broadcast communication, the attribution shall be determined by the proportion of space or time devoted to each candidate as compared to the total space or time devoted to all candidates. In the case of a fundraising program or event where funds are collected by one committee for more than one clearly identified candidate, the attribution shall be determined by the proportion of funds received by each candidate as compared to the total receipts by all candidates. These methods shall also be used to allocate payments involving both expenditures on behalf of one or more clearly identified Federal candidates and disbursements on behalf of one or more clearly identified non-Federal candidates. Party committees must use only Federal funds for such payments. *See* 11 CFR 100.24(a)(5).

(2) An expenditure made on behalf of more than one clearly identified Federal candidate shall be reported pursuant to 11 CFR 104.10(a) or 104.17(a), as appropriate. A payment by a separate segregated fund or a nonconnected committee that also includes amounts attributable to one or more non-Federal candidates, and that is made by a political committee with separate Federal and non-Federal accounts, shall be made according to the procedures set forth in 11 CFR 106.6(e), but shall be reported pursuant to 11 CFR 104.10(a).

\*    \*    \*    \*    \*

(e) Party committees, separate segregated funds, and nonconnected committees that make disbursements for certain salaries, other administrative expenses, fundraising, generic voter drives, Levin activities, or certain voter registration activities, in connection with both Federal and non-Federal

elections, shall allocate their expenses in accordance with 11 CFR 106.6 or 300.33, as appropriate.

20. Section 106.5 would be revised to read as follows:

### § 106.5   Allocation of expenses between Federal and non-Federal activities by party committees.

(a) National party committees are prohibited from raising or spending non-Federal funds. Therefore, these committees shall not allocate expenditures and disbursements between Federal and non-Federal accounts. Only Federal accounts may be used.

(b) State, district, and local party committees that make expenditures and disbursements in connection with Federal and non-Federal elections shall make those expenditures and disbursements entirely from funds subject to the prohibitions and limitations of the Act, or from accounts established pursuant to 11 CFR 102.5 and 11 CFR 300.30. Political committees that have established separate Federal, Levin and/or non-Federal accounts under 11 CFR 102.5(a)(1)(i) and 11 CFR 300.30 shall allocate expenses according to 11 CFR 300.33. Party organizations that are not political committees but have established separate Federal, Levin and/or non-Federal accounts under 11 CFR 102.5(b)(1)(i) and 11 CFR 300.30, or that make Federal and non-Federal disbursements from a single account under 11 CFR 102.5(b)(1)(ii) and any Levin payments from a separate account, shall also allocate their Federal and non-Federal expenses according to 11 CFR 300.33.

## PART 108—FILING COPIES OF REPORTS AND STATEMENTS WITH STATE OFFICERS (2 U.S.C. 439)

21. The authority citation for part 108 would continue to read as follows:

**Authority:** 2 U.S.C. 434(a)(2), 438(a)(8), 439, 453.

22. Section 108.7 would be amended by revising paragraphs (c)(4) and (c)(5) and adding paragraph (c)(6) to read as follows:

### § 108.7   Effect on State law (2 U.S.C. 453).

\*      \*      \*      \*      \*

(c) \* \* \*

(4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses;

(5) Candidate's personal financial disclosure; or

(6) Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35.

## PART 110—CONTRIBUTION AND EXPENDITURE LIMITATIONS AND PROHIBITIONS

23. The authority citation for part 110 would continue to read as follows:

**Authority:** 2 U.S.C. 431(8), 431(9), 432(c)(2), 437d(a)(8), 438(a)(8), 441a, 441b, 441d, 441e, 441f, 441g, 441h.

24. Section 110.1 would be amended by adding new paragraph (c)(5) to read as follows:

### § 110.1   Contributions by persons other than multicandidate political committees (2 U.S.C. 441a(a)(1)).

\*      \*      \*      \*      \*

(c) \* \* \*

(5) On or after January 1, 2003, no person shall make contributions to a political committee established and maintained by a State committee of a political party in any calendar year that, in the aggregate, exceed $10,000.

\*      \*      \*      \*      \*

## PART 114—CORPORATE AND LABOR ORGANIZATION ACTIVITY

25. The authority citation for part 114 would continue to read as follows:

**Authority:** 2 U.S.C. 431(8)(B), 431(9)(B), 432, 434(a)(11), 437d(a)(8), 438(a)(8), 441b.

26. Section 114.1 would be amended by revising paragraph (a)(2)(ix) to read as follows:

### § 114.1   Definitions.

(a) \* \* \*

(2) \* \* \*

(ix) Donations to a State or local party committee used for the purchase or construction of its office building are subject to 11 CFR 300.35. No exception applies to contributions or donations to a national party committee that are made or used for the purchase or construction of any office building or facility; or

\*      \*      \*      \*      \*

27. Part 300 would be added to subchapter B read as follows:

## PART 300—NON-FEDERAL FUNDS

Sec.
300.1   Scope, effective date, and organization.
300.2   Definitions.

### Subpart A—National Party Committees

300.10   General prohibitions on raising and spending non-Federal funds (2 U.S.C. 441(i)(a) and (c)).
300.11   Prohibition on fundraising for and donating to certain tax-exempt organizations, (2 U.S.C. 441i(d)).
300.12   Transition rules.
300.13   Reporting (2 U.S.C. 431 note and 434(e)).

### Subpart B—State, District, and Local Party Committees and Organizations

300.30   Accounts.
300.31   Receipt of Levin funds.
300.32   Expenditures and disbursements.
300.33   Allocation.
300.34   Transfers.
300.35   Office buildings.
300.36   Reporting Federal election activity; recordkeeping.
300.37   Prohibitions on fundraising for and donating to certain tax-exempt organizations (2 U.S.C. 441i(d)).

### Subpart C—Tax-exempt Organizations

300.50   Prohibited fundraising by national party committees (2 U.S.C. 441i(d)).
300.51   Prohibited fundraising by State, district, and local party committees (2 U.S.C. 441i(d)).
300.52   Fundraising by Federal candidates and Federal officeholders (2 U.S.C. 441i(e)(4)).

### Subpart D—Federal Candidates and Officeholders

300.60   Scope (2 U.S.C. 441i(e)(1)).
300.61   Federal elections (2 U.S.C. 441i(e)(1)(A)).
300.62   Non-Federal elections (2 U.S.C. 441i(e)(1)(B)).
300.63   Exception for State party candidates (2 U.S.C 441i(e)(2)).
300.64   Exemption for attending or speaking at fundraising events.
300.65   Exceptions for certain tax-exempt organizations.

### Subpart E—State and Local Candidates

300.70   Scope (2 U.S.C. 441i(f)(1)).
300.71   Federal funds required for certain public communications (2 U.S.C. 441i(f)(1)).
300.72   Federal funds not required for certain communications (2 U.S.C. 441i(f)(2)).

**Authority:** 2 U.S.C. 434(e), 438(a)(8), 441a(a)(1), 441i, 453.

### § 300.1   Scope, effective date, and organization.

(a) *Introduction.* This part implements changes to the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"), enacted by Title I of the Bipartisan Campaign Finance Reform Act of 2002 ("BCRA"), Public Law 107–155. Unless expressly stated to the contrary, nothing in this part alters the definitions, restrictions, liabilities, and obligations imposed by sections 431–455 of Title 2, United States Code, or regulations prescribed thereunder (11 CFR parts 100–116).

(b) *Effective dates.*

(1) Except as otherwise specifically provided in this part, this part shall take effect on November 6, 2002; however, subpart B of this part shall not apply with respect to runoff elections, recounts, or election contests resulting from elections held prior to such date. *See* 11 CFR 300.12 for transition rules applicable to subpart A of this part.

(2) The increase in individual contribution limits to State committees of political parties, as described in 11 CFR 110.1(c)(5), shall apply to contributions made on or after January 1, 2003.

(c) *Organization of part.* Part 300, which generally addresses non-Federal funds and closely related topics, is organized into five subparts. Each subpart is oriented to the perspective of a category of persons facing issues related to non-Federal funds.

(1) Subpart A of this part prescribes rules pertaining to national party committees, including general non-Federal funds prohibitions, fundraising, and donation prohibitions with regard to certain tax-exempt organizations, transition rules as BCRA takes effect, and reporting.

(2) Subpart B of this part pertains to State, district, and local political party committees and organizations. Subpart B of this part focuses on the so-called "Levin Amendment" to BCRA, "building fund" issues, and fundraising and donation prohibitions with regard to certain tax-exempt organizations.

(3) Subpart C of this part addresses non-Federal funds issues from the perspective of tax-exempt organizations, setting out rules about prohibited fundraising for certain tax-exempt organizations by national party committees, State, district, and local party committees, and Federal candidates and officeholders.

(4) Subpart D of this part includes regulations about non-Federal funds issues facing Federal candidates and officeholders in Federal and non-Federal elections, and exceptions for those who are also State candidates, for attending and speaking at fundraising events, and with regard to certain tax-exempt organizations.

(5) Subpart E of this part focuses on State and local candidates, including regulations about the Federal funds for certain public communications, and exceptions for entirely non-Federal communications.

(6) For rules pertaining to convention and host committees, *see* 11 CFR part 9008.

## § 300.2  Definitions.

(a) A *501(c) organization that makes expenditures or disbursements in connection with a Federal election* includes an organization that:

(1) Establishes, finances, maintains, supports, or controls a political committee;

(2) Makes expenditures or disbursements for Federal election activity;

(3) Finances voter registration at any time; or

(4) Finances voter guides, candidate questionnaires, or candidate surveys that refer to one or more candidates for Federal office.

(b) *Agent* means any person who has actual express oral or written authority to act on behalf of a candidate, officeholder, or a national committee of a political party, or a State, district or local committee of a political party, or an entity directly or indirectly established, financed, maintained, or controlled by a party committee. An agent has actual authority if he or she has instructions, either oral or written, from the candidate or a committee official.

(c) *Directly or indirectly establish, maintain, finance, or control.* This paragraph applies to State, district, or local committees of a political party, candidates, and holders of Federal office, which shall be referred to as "sponsors" in this paragraph.

(1) A sponsor directly or indirectly establishes, finances, maintains, or controls an entity if one or more of the following conditions are satisfied as a result of actions taken by the sponsor, or by an officer, employee, or agent of the sponsor acting on behalf of the sponsor or at the sponsor's behest:

(i) The sponsor and the entity are affiliated under 11 CFR 100.5(g).

(ii) The sponsor, alone or in combination with other persons, forms, organizes, or otherwise creates the entity, including providing any of the funds used to form, organize or create the entity. As used in this paragraph, "forms, organizes, or otherwise creates" includes the conversion, reorganization, or redirection of a pre-existing entity.

(iii) The sponsor provides a significant amount of the entity's funding at any point in the entity's existence, whether by contribution (including in-kind contribution), donation (including in-kind donation), transfer, or other means. In determining whether or not this condition is satisfied, one or more of the following factors, any one of which may be dispositive, may be considered:

(A) The percentage of the entity's total funding in a given calendar year represented by the amount of funding provided by the sponsor.

(B) Whether the sponsor provided funding to the entity on a one-time basis or more systematically over a period of time, including the frequency, regularity, and duration of funding.

(C) The amount of time that has elapsed since the sponsor last provided funding to the entity.

(iv) The sponsor provides or has provided legal, accounting, consulting, administrative, or other services to the entity.

(v) The sponsor, alone or in combination with other persons, sets or has set policies for soliciting contributions or donations to the entity or for the making of expenditures or disbursements by the entity.

(vi) The same person or persons has or has had decision-making authority over the management of both the sponsor and the entity.

(2) Determinations by the Commission.

(i) A sponsor or entity may request an advisory opinion of the Commission to determine whether the sponsor is no longer directly or indirectly financing, maintaining, or controlling the entity for purposes of this part. The request for such an advisory opinion must meet the requirements of 11 CFR part 112.

(ii) Notwithstanding the fact that a sponsor may have established an entity within the meaning of paragraph (c)(1)(ii) of this section, the committee or the entity may request an advisory opinion of the Commission determining that the relationship between the sponsor and the entity has been severed. The request for such an advisory opinion must meet the requirements of 11 CFR part 112, and must specifically include a complete description of all facts relevant to showing that all connections between the sponsor and the entity have been severed for at least five years.

(d) *Disbursement* means any purchase or payment made by a political committee or organization that is not a political committee.

(e) For purposes of part 300, *donation* means a payment, gift, subscription, loan, advance, deposit, or anything of value given to a non-Federal candidate, a party committee, 501(c) organization, or a section 527 organization, but does not include contributions or transfers.

(f) *Federal account* means an account at a financial depository institution or other account that contains funds to be used in connection with a Federal election.

(g) *Federal funds* mean funds that comply with the limitations, prohibitions, and reporting requirements of the Act.

(h) *Levin account* means an account established by a State, district, or local committee of a political party pursuant to 11 CFR 300.30 for purposes of making expenditures or disbursements for Federal election activity or non-Federal activity (subject to State law) under 11 CFR 300.32.

(i) *Levin funds* mean non-Federal funds that comply with the limitations, prohibitions, and reporting requirements set out in subpart B of this part, which are or will be disbursed by a State, district, or local committee of a political party for Federal election activity or non-Federal activity (subject to State law) under 11 CFR 300.32.

(j) *Non-Federal account* means an account at a financial depository institution or other account which contains funds to be used in connection with a State or local election.

(k) *Non-Federal funds* mean funds that are not subject to the limitations and prohibitions of the Act.

(l) *Promote, support, attack, or oppose.*

(1) A communication *promotes, supports, attacks, or opposes* a candidate if, when taken as a whole and with limited reference to external events, such as the proximity to the election, the communication:

(i) Expressly advocates the election or defeat of that clearly identified candidate; or

(ii) Unmistakably and unambiguously encourages action to elect or defeat a clearly identified candidate, even if it also encourages some other kind of action.

(2) For purposes of paragraph (l)(1), a communication does not *promote, support, attack, or oppose* a candidate for Federal office if:

(i) The communication is made in connection with an election for State or local office, and does not refer to any candidate for Federal office; or

(ii) The communication refers to a candidate for Federal office but the reference to the Federal candidate consists only of:

(A) The fact that the Federal candidate endorsed another Federal, State, or local candidate;

(B) The fact that another Federal, State, or local candidate agrees or disagrees with the Federal candidate's position on an issue or on legislation; or

(C) A reference to a bill or law by its popular name where that name includes the name of the Federal candidate.

(m) *To solicit or direct* means to request or suggest or recommend that another person make a contribution or donation, including through a conduit or intermediary, to a candidate, a political committee, or a political organization described in 26 U.S.C. 527 or a tax-exempt organization described in 26 U.S.C. 501(c). A solicitation does not include merely providing information or guidance as to the requirements of applicable law.

## Subpart A—National Party Committees

### § 300.10  General prohibitions on raising and spending non-Federal funds (2 U.S.C. 441i(i)(a) and (c)).

(a) *Prohibitions.* A national committee of a political party, including a national party congressional campaign committee, must not:

(1) Solicit, receive, or direct to another person a contribution, donation, or transfer of funds, or any other thing of value that are not subject to the prohibitions, limitations and reporting requirements of the Act; or

(2) Spend any funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act; or

(3) Solicit, receive, direct or transfer to another person, or spend, Levin funds.

(b) *Fundraising costs.* A national committee of a political party, including a national party congressional campaign committee, must use only Federal funds to raise funds that are used, in whole or in part, for expenditures and disbursements for Federal election activity.

(c) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee or a national party congressional campaign committee; and

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a national party committee or a national congressional campaign committee.

### § 300.11  Prohibitions on fundraising for and donating to certain tax-exempt organizations (2 U.S.C. 441i(d)).

(a) *Prohibitions.* A national committee of a political party, including a national party congressional campaign committee, must not solicit any funds for, or make or direct any donations to the following organizations:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax-exempt status under section 26 U.S.C. 501(c) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527, except for a political

committee; a State, district, or local committee of a political party; or the authorized campaign committee of a State or local candidate.

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee, including a national party congressional committee;

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a national party committee, including a national party congressional committee, or an officer or agent acting on behalf of such entity; and

(3) An entity that is directly or indirectly established, financed, maintained, or controlled by an agent of a national committee of a political party, including a national party congressional committee.

### § 300.12  Transition rules.

(a) *Permissible uses of excess non-Federal funds.* Non-Federal funds received before November 6, 2002, by a national committee of a political party, including a national party congressional campaign committee, must be used before January 1, 2003. Subject to the restrictions in paragraphs (b) and (e) of this section, such funds may be used only as follows:

(1) To retire outstanding debts or obligations that were incurred solely in connection with an election held prior to November 6, 2002; or

(2) To pay expenses, retire outstanding debts, or pay for obligations incurred solely in connection with any run-off election, recount, or election contest resulting from an election held prior to November 6, 2002.

(b) *Prohibited uses of non-Federal funds.* Non-Federal funds received by a national committee of a political party, including a national party congressional campaign committee, before November 6, 2002, and in its possession on that date, may not be used for the following purposes:

(1) To pay any expenditure as defined in 2 U.S.C. 431(9);

(2) To retire outstanding debts or obligations that were incurred for any expenditure; or

(3) To defray the costs of the construction or purchase of any office building or facility.

(c) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee or a national party congressional campaign committee; and

(2) An entity that is directly or indirectly established, financed,

maintained, or controlled by a national party committee or a national congressional campaign committee.

(d) *Treatment of Federal and non-Federal accounts during transition period.* The following provisions applicable to the allocation of, and payment for, expenses between Federal and non-Federal accounts of national party committees shall remain in effect between November 6 and December 31, 2002: 11 CFR 106.5(a), 106.5(b), 106.5(c), 106.5(f) and 106.5(g).

(e) *National party committee office building or facility accounts.* Before November 6, 2002, the national committee of a political party, including a national party congressional campaign committee, may accept funds into its party office building or facility account, established pursuant to repealed § 431(8)(B)(viii), and may use the funds in the account only for the construction or purchase of an office building or facility. After November 5, 2002, the national committees may no longer accept funds into such an account and must not use such funds for the purchase or construction of a national party office building or facility. Funds on deposit in any party office building or facility account on November 6, 2002, must be either disgorged to the United States Treasury or donated to an organization described in 26 U.S.C. 170(c) no later than December 31, 2002.

### § 300.13   Reporting (2 U.S.C. 431 note and 434(e)).

(a) *In general.* The national committee of a political party, a national party campaign committee, and any subordinate committee of either, shall report all receipts and disbursements during the reporting period.

(b) *Termination report for non-Federal accounts.* Each committee described in paragraph (a) of this section shall file a termination report disclosing the disposition of all funds in all non-Federal accounts and building fund accounts by January 31, 2003.

(c) *Transitional reporting rules.*

(1) The reporting requirements in 11 CFR 104.9(c) for national party committee non-Federal accounts shall remain in effect for the report covering activity between November 6 and December 31, 2002.

(2) The reporting requirements in 11 CFR 104.8(e) for national party committee non-Federal accounts shall remain in effect for the report covering activity between November 6 and December 31, 2002.

(3) The reporting requirements in 11 CFR 104.8(f) and 104.9(d) for national party committee building fund accounts shall remain in effect for the report

covering activity between November 6 and December 31, 2002.

### Subpart B—State, District, and Local Party Committees and Organizations

### § 300.30   Accounts.

(a) *Federal Account.*

(1) Each State, district, and local party organization that qualifies as a political committee under 11 CFR 100.5 and that finances political activity in connection with both Federal and non-Federal elections shall:

(i) Establish a Federal account in a depository, in accordance with 11 CFR part 103, which shall be treated as a separate political committee and be required to comply with the requirements of the Act including the registration and reporting requirements of 11 CFR part 102 and part 104; or

(ii) Establish a separate Federal political committee that shall register As a political committee and comply with the requirements of the Act.

(2) Each State, district, and local party organization that does not qualify as a political committee under 11 CFR 100.5 and that finances political activity in connection with both Federal and non-Federal elections shall—

(i) Establish a Federal account in a depository; or

(ii) Demonstrate by a reasonable accounting method that whenever such organization makes a contribution or expenditure, that organization has received sufficient funds that are permissible under the Act to make such contribution or expenditure. Such organization shall keep records of amounts received or expenditures under this subsection and, upon request, shall make such records available for examination by the Commission.

(3) Only contributions that are permissible pursuant to the limitations and prohibitions of the Act shall be deposited into any Federal account established pursuant to paragraphs (a)(1) or (2) of this section, regardless of whether such contributions are for use in connection with Federal and non-Federal elections.

(4) Only contributions solicited and received pursuant to the following conditions may be deposited in a Federal account established under paragraph (a)(1) or (2) of this section:

(i) Contributions must be designated by the contributors for the Federal account;

(ii) The solicitation must expressly state that contributions may be used wholly or in part in connection with a Federal election; or

(iii) The solicitation must expressly state that all contributions are subject to

the prohibitions and limitations of the Act.

(5) All disbursements, contributions, and expenditures by a State, district, or local party committee made wholly or in part in connection with a Federal election must be made from the committee's Federal account, except as permitted by 11 CFR 300.32.

(6) Expenditures and disbursements for costs that are allocable pursuant to 11 CFR 300.33 must be made from the Federal account in their entirety, with the shares of a non-Federal account or of a Levin account being then transferred to the Federal account pursuant to 11 CFR 300.34.

(7) No transfers may be made to such Federal account from any other account(s) maintained by a State, district, or local party committee or from any other party committee at any level for the purpose of financing activity in connection with Federal elections, except as provided by 11 CFR 300.33 and 11 CFR 300.34.

(8) State, district, and local party committees may choose to make non-Federal disbursements from the Federal account, provided that such disbursements are reported pursuant to 11 CFR part 104 and provided that contributors of the Federal funds so used were notified about their contributions were subject to the limitations and prohibitions of the Act.

(b) *Levin account.*

(1) Any State, district, or local party committee, whether or not it qualifies as a political committee under the Act and including any organization that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and any officer or agent of such a committee or organization, that intends to engage in voter registration, voter identification, get-out-the-vote activity, and/or generic campaign activity pursuant to 11 CFR 300.32 must maintain a separate account in a depository for this purpose. This account shall be known as a Levin account.

(2) Only donations solicited and received pursuant to either of the following conditions may be deposited in a Levin account established under paragraph (b)(1) of this section:

(i) Donations must be designated by the donors for the Levin account; or

(ii) Donors have been informed that donations will be subject to the special donation limitations and prohibitions of 2 U.S.C. 441i(b)(2)(B) and 11 CFR 300.31(c) and (d).

(3) A State, district, or local party committees may use its Levin account to make expenditures or disbursements for

the categories of activities described at 11 CFR 300.32 or for other, non-Federal activities permissible under State law.

(4) A State, district, or local party committee may use its Levin account to make expenditures or disbursements only if all of the following conditions are met:

(i) The expenditure or disbursement does not pay for an activity that refers to a clearly identified candidate for Federal office;

(ii) The expenditure or disbursement does not pay for any part of the costs of any broadcasting, cable, or satellite communication, other than a communication that refers solely to a clearly identified candidate for State or local office; and

(iii) The Levin funds used for the expenditure or disbursement have been solicited, donated, received, and deposited in accordance with this part.

(c) *Non-Federal account.*

(1) Any State, district, or local party committee that makes disbursements solely in connection with State or local elections must establish a separate non-Federal account in a depository. The funds deposited into this account may be governed by State law.

(2) Disbursements, contributions, and expenditures made wholly or in part in connection with Federal elections must not be made from any non-Federal account, except as permitted by 11 CFR 300.33 and 11 CFR 300.34.

**§ 300.31   Receipt of Levin funds.**

(a) *General rule.* Levin funds expended or disbursed by any State, district, or local committee must be raised solely by the committee that expends or disburses them.

(b) *Compliance with State law.* Each donation of Levin funds solicited or accepted by a State, district, or local committee of a political party must be lawful under the laws of the State in which the committee is organized.

(c) *Donations from sources permitted by State law but prohibited by the Act.* If the laws of the State in which a State, district, or local committee of a political party is organized permit donations to the committee from a source prohibited by the Act and this chapter, the committee may solicit and accept donations of Levin funds from that source, subject to paragraph (d) of this section.

(d) *Donation amount limitation.*

(1) *General rule.* A State, district, or local committee of a political party must not solicit or accept from any person (including any person established, financed, maintained, or controlled by such person) one or more donations of

Levin funds aggregating to more than $10,000 in a calendar year.

(2) *Effect of different State limitations.* If the laws of the State in which a State, district, or local committee of a political party is organized limit donations to that committee to less than the amount specified in paragraph (d)(1) of this section, then the State law amount limitations shall control. If the laws of the State in which a State, district, or local committee of a political party is organized permit donations to that committee in amounts greater than the amount specified in paragraph (d)(1) of this section, then the amount limitations in paragraph (d)(1) of this section shall control.

(3) *No affiliation of committees for purposes of this paragraph.* For purposes of determining compliance with paragraph (d) of this section only, State, district, and local committees of the same political party shall not be considered affiliated. A person (including any person established, financed, maintained, or controlled by such person) may donate up to $10,000 per calendar year to each State, district, and local committee of political party.

(e) *No Levin funds from a national party committee or a Federal candidate or officeholder.* A State, district, or local committee of a political party disbursing Levin funds pursuant to 11 CFR 300.32 must not accept or use for those purposes any donations or other funds that are solicited, received, directed, transferred, or spent by or in the name of any of the following persons:

(1) A national committee of a political party (including a national congressional campaign committee of a political party). Notwithstanding 11 CFR 102.17, a State, district, or local committee of a political party must not raise Levin funds by means of joint fundraising with a national committee of a political party.

(2) A Federal candidate, individual holding Federal office, or an entity directly or indirectly established, financed, maintained, or controlled by or acting on behalf of one or more candidates or individuals holding Federal office. Notwithstanding 11 CFR 102.17, a State, district, or local committee of a political party must not raise Levin funds by means of joint fundraising with a Federal candidate, individual holding Federal office, or an entity directly or indirectly established, financed, maintained, or controlled by or acting on behalf of one or more candidates or individuals holding Federal office. A Federal candidate or individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district,

or local committee of a political party at which Levin funds are raised. *See* 11 CFR 300.64.

(f) *Certain joint fundraising prohibited.* Notwithstanding 11 CFR 102.17, a State, district, or local committee of a political party must not raise Levin funds by means of joint fundraising with any other State, district, or local committee of any political party, or the agent of such a committee. This prohibition includes State, district, and local committees of a political party organized in another State. The use of a common vendor for fundraising by more than one State, district, or local committee of a political party, or the agent of such a committee, shall not, by itself, be deemed joint fundraising for purposes of this paragraph.

**§ 300.32   Expenditures and disbursements.**

(a) *Federal funds.*

(1) A State, district, or local committee of a political party that makes an expenditure or disbursement for the purpose of influencing a Federal election must use Federal funds for the expenditure, subject to the provisions of this chapter. An association or similar group of candidates for State or local office, or an association or similar group of individuals holding State or local office, must make any expenditures or disbursements for Federal election activity solely with Federal funds.

(2) Except as provided in this part, a State, district, or local committee of a political party that makes expenditures or disbursements for Federal election activity must use Federal funds for that purpose, subject to the provisions of this chapter.

(3) State, district, and local party committees that engage in fundraising for Federal activities must pay all costs related to such fundraising only with Federal funds.

(4) State, district, and local party committees that engage in fundraising for a Levin account must pay all costs related to raising such funds only with Federal funds.

(b) *Levin funds.* A State, district, or local committee of a political party may spend Levin funds in accordance with this part on the following types of activity:

(1) Subject to the conditions set out in paragraph (c) of this section, the following types of Federal election activity:

(i) Voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election; and

(ii) Voter identification, get-out-the-vote, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State of local office also appears on the ballot).

(2) Any use that is lawful under the laws of the State in which the committee is organized. A disbursement of Levin funds under this paragraph need not comply with paragraph (c) of this section, except as required by State law.

(c) *Conditions and restrictions on spending Levin funds for Federal election activity.*

(1) The Federal election activity for which the expenditure or disbursement is made must not refer to a clearly identified Federal candidate for Federal office.

(2) The expenditure or disbursement must not pay for any part of the costs of any broadcasting, cable, or satellite communication, other than a communication that refers solely to a clearly identified candidate for State or local office.

(3) The expenditure or disbursement must be made from funds raised in accordance with 11 CFR 300.31.

(4) The expenditure or disbursement must be allocated between Federal funds and Levin funds according to 11 CFR 300.33.

(d) *Non-Federal funds.* A State, district, or local committee of a political party that makes disbursements for non-Federal activity may make those disbursements from its Federal or non-Federal funds, subject to the laws of the State in which it is organized. A State, district, or local party committee that engages in fundraising for solely non-Federal funds may pay the costs related to such fundraising from any account, subject to State law, including a Federal account. A disbursement of non-Federal funds made under State law by a State, district, or local committee of a political party that is not directed by the disbursing committee for the purpose of influencing a Federal election or for Federal election activity shall not be an expenditure under 11 CFR 100.8 or an expenditure or disbursement for Federal election activity.

§ 300.33 **Allocation.**

(a) *Costs allocable by State, district, and local party committees.*

(1) *Salaries.* State, district, and local party committees may allocate the salaries of employees who spend 25% or less of their time in any given month on Federal election activity between the committee's Federal and non-Federal accounts. The salaries of those

employees who spend more than 25% of their time in any given month on Federal election activity must be paid only with Federal funds.

(2) *Administrative costs.* State, district, and local party committees may allocate administrative costs, including rent, utilities, office equipment, office supplies, postage for other than mass mailings, and routine building maintenance, upkeep and repair, between their Federal and non-Federal accounts, except that any such expenses directly attributable to a clearly identified Federal candidate must be paid only from the Federal account.

(3) *Costs of voter registration within a certain time period, voter identification, get-out-the-vote, and generic campaign activity.* State, district, and local party committees that have established a Federal account and a separate Levin account pursuant to 11 CFR 300.30(b), must allocate disbursements or expenditures between these two accounts for:

(i) Voter registration activity during the period that begins on the date that is 120 days before the date of a regularly scheduled Federal election and that ends on the date of the election, provided that the activity does not clearly identify a Federal candidate; and

(ii) Voter identification, get-out-the-vote activity, or generic campaign activities conducted in connection with an election in which a candidate for Federal office is on the ballot.

(b) *Allocation percentages, ratios and record-keeping.*

(1) *Salaries.* Committees must keep time records for all employees for purposes of determining the percentage of time spent on activities in connection with a Federal election. Allocations of salaries will be undertaken as follows:

(i) Salaries of employees who spend more than 25% of their compensated time in a given month on activities in connection with a Federal election must be paid 100% from the Federal account.

(ii) Salaries of employees who spend 25% or less of their compensated time in a given month on activities in connection with a Federal election shall be allocated between the committee's Federal and non-Federal account.

(iii) Salaries of employees who spend no time in a given month on activities in connection with a Federal election may be paid solely from the non-Federal account.

(2) *Administrative costs.* State, district, and local party committees that choose to allocate administrative expenses may do so subject to the following requirements:

(i) *Presidential election years.* In any year in which a Presidential candidate,

but no Senate candidate appears on the ballot, State, district, and local party committees must allocate at least 28% of administrative expenses to their Federal accounts.

(ii) *Presidential and Senate election year.* In any year in which a Presidential candidate and a Senate candidate appear on the ballot, State, district, and local party committees must allocate at least 36% of administrative expenses to their Federal accounts.

(iii) *Senate election year.* In any year in which a Senate candidate, but no Presidential candidate, appears on the ballot, State, district and local party committees must allocate at least 21% of administrative expenses to their Federal account.

(iv) *Non-Presidential and non-Senate year.* In any year in which neither a Presidential nor a Senate candidate appears on the ballot, State, district and local party committee must allocate at least 15% of administrative expenses to their Federal account.

(3) *Levin activities—Voter registration, voter identification, get-out-the-vote, and generic campaign activity.* State, district, and local party committees that choose to make expenditures and disbursements in connection with activities described in paragraph (a)(3) of this section must allocate such expenditures and disbursements between their Federal and Levin accounts. The allocation must result in the following minimum percentages to their Federal accounts:

(i) *Presidential election years.* In any year in which a Presidential candidate, but no Senate candidate appears on the ballot, State, district, and local party committees must allocate at least 28% of expenses for activities described in paragraph (a)(2) of this section to their Federal account.

(ii) *Presidential and Senate election year.* In any year in which a Presidential candidate and a Senate candidate appear on the ballot, State, district, and local party committees must allocate at least 36% of expenses for activities described in paragraph (a)(2) of this section to their Federal account.

(iii) *Senate election year.* In any year in which a Senate candidate, but no Presidential candidate, appears on the ballot, State, district, and local party committees must allocate at least 21% of expenses for activities described in paragraph (a)(2) of this section to their Federal account.

(iv) *Non-Presidential and non-Senate year.* In any year in which neither a Presidential nor a Senate candidate appears on the ballot, State, district, and local party committee must allocate at least 15% of expenses for activities

described in paragraph (a)(2) of this section to their Federal account.

(4) *Other voter registration activities.* Expenses for voter registration activities undertaken by a State, district, or local party committee outside the period beginning 120 days before an election and ending on the date of the election may be paid with 100% non-Federal funds, or they may be allocated between the committee's Federal and non-Federal accounts.

(5) *Other get-out-the-vote activities when no Federal candidate is on the ballot.* Expenses for voter identification, get-out-the-vote, and generic campaign activity when no Federal candidate is on the ballot that are undertaken by a State, district, or local party committee may be paid with 100% non-Federal funds, or they may be allocated between the committee's Federal and non-Federal accounts.

(c) *Costs not allocable by State, district, and local party committees.* The following costs incurred by State, district, and local party committees shall be paid only with Federal funds:

(1) *Activities that refer to clearly identified Federal candidates.* Disbursements by State, district, and local party committee for activities that refer to a clearly identified candidate for Federal office must not be allocated between or among Federal, non-Federal and Levin accounts. Only Federal funds may be used.

(2) *Activities that refer to Federal and to State and/or local elections.* With the exception of activities described in paragraph (a)(3) of this section, disbursements by State, district, and local party committee for activities that do not refer to a clearly identified Federal candidate, but that are wholly or in part in connection with Federal elections, must not be allocated between or among Federal, non-Federal and Levin accounts. Only Federal funds may be used.

(3) *Fundraising costs.* Disbursements for fundraising costs incurred by State, district, and local party committees for funds to be used, in whole or in part, for Federal election activity, including the activities described at paragraph (a)(3) of this section, must not be allocated between or among Federal, non-Federal and Levin accounts. Only Federal funds may be used. However, if such disbursements are for solely non-Federal fundraising costs, non-Federal funds may be used.

(d) *Transfers between accounts to cover allocable expenses.* State, district, and local party committees may transfer funds from their non-Federal or Levin accounts to their Federal accounts solely to meet allocable expenses and only pursuant to the following requirements:

(1) *Payments from Federal accounts.* State, district, and local party committees must pay the entire amount of an allocable expense from their Federal accounts and must transfer funds from their non-Federal account to the Federal account for administrative expenses or from their Levin account for expenses related to activities identified in paragraph (a)(2) of this section.

(2) *Timing.*

(i) State, district, and local party committees must transfer funds from their non-Federal or Levin accounts to their Federal accounts to meet allocable expenses no more than 10 days before and no more than 60 days after the payments for which they are designated are made from a Federal account, except that transfers may be made more than 10 days before a payment is made from the Federal account if advance payment is required by the vendor(s) and if such payment is based on a reasonable estimate of the activity's final costs as determined by the committee and the vendor(s) involved.

(ii) Any portion of a transfer from a committee's non-Federal account to its Federal account that does not meet the requirement of paragraph (d)(2)(i) of this section shall be presumed to be a loan or contribution from the non-Federal account or the Levin account to the Federal account, in violation of the Act.

### § 300.34   Transfers.

(a) *Federal funds.* Notwithstanding 11 CFR 102.6(a)(1)(ii), a State, district, or local committee of a political party must not use any Federal funds transferred to it from, or otherwise accepted by it from, any of the persons enumerated in paragraphs (b)(1) and (b)(2) of this section as the Federal component of an expenditure for Federal election activity under 11 CFR 300.32. A State, district, or local committee of a political party must itself raise the Federal component of an expenditure allocated between Federal funds and Levin funds under 11 CFR 300.32 and 300.33.

(b) *Levin funds.* Levin funds must be raised solely by the State, district, or local committee of a political party that expends or disburses the funds. A State, district, or local committee of a political party must not use a Levin funds any funds transferred or otherwise provided to the committee by:

(1) Any other State, district, or local committee of any political party, any officer or agent acting on behalf of such a committee, or any entity directly or indirectly established, financed, maintained or controlled by such a committee; or,

(2) The national committee of any political party (including a national congressional campaign committee of a political party), any officer or agent acting on behalf of such a committee, or any entity directly or indirectly established, financed, maintained or controlled by such a committee.

(c) *Allocation transfers.* Transfers of Levin funds between the accounts of a State, district, or local committee of a political party for allocation purposes must comply with 11 CFR 300.33.

### § 300.35   Office buildings.

(a) *General provision.* A State or local party committee may raise and spend funds for the purchase or construction of its office building, and such funds are not subject to the limitations, prohibitions, and disclosure provisions of the Act. Funds raised and spent for the purchase or construction of an office building are subject to State law. An office building must not be purchased or constructed for the purpose of influencing the election of any candidate in any particular election for Federal office. For purposes of this section, the term *local party committee* shall include a *district party committee.*

(b) *Application of State law.* Amounts raised and spent by a State or local party committee for the purchase or construction of its office building are subject to State law as set forth in paragraphs (b)(1) and (b)(2) of this section.

(1) *Non-Federal account.* If a State or local party committee uses non-Federal funds, Federal law does not preempt or supersede State law as to the source of funds used, the permissibility of the disbursements, or the reporting of the receipt and disbursement of such funds, except as provided in paragraph (d) of this section.

(2) *Federal account.* If a State or local party committee uses funds from its accounts containing only Federal funds, Federal law does not supersede or preempt State law as to the permissibility of the disbursements, except as provided in paragraph (d) of this section. Federal law also does not preempt or supersede any State law that purports to prohibit or limit the source of the funds, as ascertained by application of a reasonable accounting method prescribed under State law.

(3) *Levin funds.* Levin funds may be used for the purchase or construction of a State or local party committee office building, if permitted by State law.

(c) *Definition of "purchase or construction of an office building."*

(1) *Office building* means a structure and the land underlying the structure, comprised of structural components and

fixtures essential to the operation or appearance of the building, and that is lawfully occupied and used by a State or local party committee solely for its own party administration and election campaign support purposes. The term does not include office furnishings, furniture, equipment and machinery (such as computers, file cabinets, photocopiers or audio-visual production equipment).

(2) *Purchase* means any payment to acquire the sole legal title to the building, including fees directly related to the acquisition of the building, such as sales commissions and real estate closing or settlement fees. Purchase does not include payments for the rent or leasing of an office building, property taxes and similar assessments, building maintenance, utility services, and office equipment.

(3) *Construction* includes the design and erection of the structure of a building. Construction does not include the maintenance or repair of the building or its structural components, unless the repair work reaches a level to constitute major restoration or renovation of the building.

(d) *Allocation of expenses not within the definition of "purchase or construction of an office building."* If funds raised by a State or local party committee are used for an expense for its office building and the expense does not fall within the definitions in paragraph (c) of this section, the expense is an allocable administrative expense unless it falls within another category, such as support for a Federal or non-Federal candidate. If the expense is an allocable administrative expense, 11 CFR 300.33 applies, and the administrative expense is subject to the limitations and prohibitions of the Act.

(e) *Transitional Provisions for State Party Building or Facility Account.* Up to and including November 5, 2002, the State committee of a political party may accept funds into its party office building or facility account, established pursuant to repealed 2 U.S.C. 431(8)(B)(viii), and use the funds in the account only for the construction or purchase of an office building or facility. Starting on November 6, 2002, the funds in the account will be subject to the provisions of paragraphs (a) through (c) of this section if used for a State party office building. They may not be used for Federal account or Levin account purposes. They may be used for any non-Federal purposes, as permitted under State law.

## § 300.36 Reporting Federal election activity; recordkeeping.

(a) *Requirements for a State, district, or local committee of a political party that is not a political committee.*

(1) A State, district, or local committee of a political party that is not a political committee (*see* 11 CFR 100.5) must demonstrate through a reasonable accounting method that whenever it makes a payment of Federal funds for Federal election activity (*see* 11 CFR 300.32 and 300.33) it has received sufficient funds subject to the limitations and prohibitions of the Act to make the payment. Such an organization must keep records of amounts received or expended under this paragraph and, upon request, shall make such records available for examination by the Commission.

(2) A payment of Federal funds for Federal election activity shall constitute an expenditure for purposes of determining whether a State, district, or local committee of a political party qualifies as a political committee under 11 CFR 100.5, unless the payment is excluded from the definition of expenditure under 11 CFR 100.8. A payment of Federal funds for Federal election activity that meets the criteria of 100.8(b)(10), (16), or (18) (*exempt activities*) shall be treated as a payment for exempt activity in accordance with all applicable provisions of this chapter, including, but not limited to, 11 CFR 100.5(c).

(b) *Requirements for a State, district, or local committee of a political party that is a political committee.*

(1) *Reporting disbursements of Federal funds for Federal election activity.* A State, district, or local committee of a political party that is a political committee (*see* 11 CFR 100.5) must report all disbursements of Federal funds for Federal election activity, including the Federally allocated portion of a payment for Federal election activity. This requirement applies whether or not the committee's aggregate total receipts and disbursements for Federal election activity is $5,000 or more during the calendar year. For purposes of this paragraph, a disbursement of Federal funds for Federal election activity (*see* 11 CFR 300.32 and 300.33) by a State, district, or local committee of a political party that is a political committee shall be deemed an expenditure and reported as such, unless the disbursement is excluded from the definition of expenditure under 11 CFR 100.8.

(2) *Reporting all receipts and disbursements for Federal election activity; threshold.* In addition to the requirements of paragraph (b)(1) of this

section, a State, district, or local committee of a political party must report all receipts and disbursements made for Federal election activity if the aggregate amount of such receipts and disbursements is $5,000 or more during the calendar year. The disclosure required by this paragraph must include receipts and disbursements of Federal funds and of Levin funds used for Federal election activity, notwithstanding the otherwise non-Federal nature of the Levin funds.

(i) *Reporting of payments for Federal election activity allocated between Federal funds and Levin funds.* A State, district, or local committee of a political party that makes a payment for Federal election activity that is allocated between Federal funds and Levin funds (*see* 11 CFR 300.33) must report for each such payment the full name and address of each person to whom the payment was made, the date of the payment, amount and purpose of the payment, and the amount of and explanation for the allocation percentage used for the payment, as provided in 11 CFR 104.17(b). If the payment is for the allocable costs of more than one Federal election activity, the committee must itemize the payment, showing the amounts designated for each Federal election activity. The committee must also report the total amount paid for Federal election activity that calendar year, to date, for each Federal election activity.

(ii) *Itemization.* The disclosure required by paragraph (b)(2) of this section must include, in addition to any other applicable reporting requirement of this chapter, the itemized disclosure of receipts and disbursements of $200 or more to or from any person for Federal election activities, as provided in part 104.

(3) *Reporting of other payments allocated between Federal funds and non-Federal funds.* A State, district, or local committee of a political party that makes a payment for costs allocable between Federal and non-Federal funds, other than the costs of Federal election activity that is allocated between Federal funds and Levin funds under 11 CFR 300.33, must comply with 11 CFR 104.17.

(c) *Filing Schedule.* A State, district, or local committee of a political party that must file reports under paragraph (b) of this section must comply with the monthly filing schedule in 11 CFR 104.5(c)(3).

(d) *Recordkeeping.* A State, district, or local committee of a political party that must file reports under paragraph (b) of

this section must comply with the requirements of 11 CFR 104.14.

### § 300.37  Prohibitions on fundraising for and donating to certain tax-exempt organizations (2 U.S.C. 441i(d)).

(a) *Prohibitions.* A State, district, or local committee of a political party must not solicit any funds for, or make or direct any donation to:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax exempt status under 26 U.S.C. 501(c) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527 except for a political committee; a State, district, or local committee of a political party; or the authorized campaign committee of a state or local candidate.

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a State, district or local committee of a political party;

(2) An entity that is directly or indirectly established, financed, maintained or controlled by a State, district or local committee of a political party or an officer or agent acting on behalf of such entity; and

(3) An entity that is directly or indirectly established, financed, maintained or controlled by an agent of a State, district or local committee of a political party.

### Subpart C—Tax-Exempt Organizations

### § 300.50  Prohibited fundraising by national party committees (2 U.S.C. 441i(d)).

(a) *Prohibitions on fundraising and donations.* A national committee of a political party, including a national party congressional campaign committee, must not solicit any funds for, or make or direct any donations to:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax-exempt status under 26 U.S.C. 501(c) and that makes

expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527, except for a political committee; a State, district, or local committee of a political party; or the authorized campaign committee of a State or local candidate.

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee, including a national party congressional committee;

(2) An entity that is directly or indirectly established, financed, maintained or controlled by a national party committee, including a national party congressional committee, or an officer or agent acting on behalf of such an entity; or

(3) An entity that is directly or indirectly established, financed, maintained, or controlled by an agent of a national committee of a political party, including a national party congressional committee.

### § 300.51  Prohibited fundraising by State, district, and local party committees (2 U.S.C. 441i(d)).

(a) *Prohibitions.* A State, district, or local committee of a political party must not solicit any funds for, or make or direct any donation to:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax-exempt status under 26 U.S.C. 501(c) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527, except for a political committee; a State, district, or local committee of a political party; or the authorized campaign committee of a State or local candidate.

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a State, district, or local committee of a political party;

(2) An entity that is directly or indirectly established, financed, maintained or controlled by a State, district or local committee of a political

party or an officer or agent acting on behalf of such an entity; and

(3) An entity that is directly or indirectly established, financed, maintained or controlled by an agent of a State, district, or local committee of a political party.

### § 300.52  Fundraising by Federal candidates and Federal officeholders (2 U.S.C. 441i(e)(4)).

(a) *General solicitations.* A Federal candidate, an individual holding Federal office, or an individual who is an agent of either may make a general solicitation of funds on behalf of any organization described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a), or an organization that has submitted an application for determination of tax-exempt status under 26 U.S.C. 501(c), without regard to the source or amount of funds, only if all of the following conditions apply:

(1) The solicitation does not specify how the funds will or should be spent;

(2) The solicitation is not for a 501(c) organization whose principal purpose is to conduct:

(i) Voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election; or

(ii) Voter identification, get-out-the-vote activity or generic campaign activity conducted in connection with an election in which a Federal candidate appears on the ballot even if a candidate for State or local office also appears on the ballot; and

(3) The solicitation is not for the activities described in paragraph (a)(2) of this section.

(b) *Specific solicitations.*

(1) A Federal candidate, an individual holding Federal office, and an individual who is an agent of either may make a solicitation explicitly to obtain funds to carry out the activities described in paragraph (a)(2) of this section, only if the following conditions are met:

(i) The solicitation is made only to individuals; and

(ii) The amount solicited from any individual during any calendar year does not exceed $20,000.

(2) A Federal candidate, an individual holding Federal office, and an individual who is an agent of either may make a solicitation explicitly for an entity whose principal purpose is to conduct any of the activities described in paragraph (a)(2) of this section, only if the following conditions are met:

(i) The solicitation is made only to individuals; and

(ii) The amount solicited from any individual during any calendar year does not exceed $20,000.

**Subpart D—Federal Candidates and Officeholders**

**§ 300.60   Scope (2 U.S.C. 441i(e)(1)).**

This subpart applies to:
(a) Federal candidates,
(b) Individuals holding Federal office,
(c) Agents of a Federal candidate or individual holding Federal office, and
(d) Entities that are directly or indirectly established, financed, maintained, or controlled by, or acting on behalf of, one or more Federal candidates or individuals holding Federal office.

**§ 300.61   Federal elections (2 U.S.C. 441i(e)(1)(A)).**

No person described in 11 CFR 300.60 shall solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity as defined in 11 CFR 100.24, unless the amounts consist of Federal funds that are subject to the limitations, prohibitions, and reporting requirements of the Act.

**§ 300.62   Non-Federal elections (2 U.S.C. 441i(e)(1)(B)).**

No person described in 11 CFR 300.60 shall solicit, receive, direct, transfer, or spend or disburse funds in connection with any non-Federal election, unless the amounts consist of Federal funds that are subject to the limitations and prohibitions of the Act.

**§ 300.63   Exception for State party candidates (2 U.S.C. 441i(e)(2)).**

Section 300.62 shall not apply to a Federal candidate or individual holding Federal office who is a candidate for State or local office, if the solicitation, receipt or spending of funds is permitted under State law; and refers only to that State or local candidate, to any other candidate for that same State or local office, or both. If an individual is simultaneously running for both Federal and State or local office, the individual must raise, accept, and spend only Federal funds for the Federal election.

**§ 300.64   Exemption for attending or speaking at fundraising events (2 U.S.C. 441i(e)(3)).**

Notwithstanding the provisions of 11 CFR 100.24, 300.61 and 300.62, a Federal candidate or individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party, including a fundraising event at which Levin funds are raised, or at which non-Federal funds are raised. Such candidate or individual holding Federal office shall not solicit, receive, direct, transfer, or spend funds or participate in any other fundraising aspect of any such event.

**§ 300.65   Exceptions for certain tax-exempt organizations.**

(a) *General solicitations.* A Federal candidate, an individual holding Federal office, and an individual who is an agent of either may make a general solicitation of funds on behalf of any organization described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a), or an organization that has submitted an application for determination of tax-exempt status under 26 U.S.C. 501(c), without regard to the source or amount of funds, only if all of the following conditions apply:
(1) The solicitation does not specify how the funds will or should be spent;
(2) The solicitation is not for a 501(c) organization whose principal purpose is to conduct:
(i) Voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election; or
(ii) Voter identification, get-out-the-vote activity or generic campaign activity conducted in connection with an election in which a Federal candidate appears on the ballot even if a candidate for State or local office also appears on the ballot; and
(3) The solicitation is not for the activities described in paragraph (a)(2) of this section.
(b) *Specific solicitations.*
(1) A Federal candidate, an individual holding Federal office, and an individual who is an agent of either may make a solicitation explicitly to obtain funds to carry out the activities described in paragraph (a)(2) of this section, only if:
(i) The solicitation is made only to individuals; and
(ii) The amount solicited from any individual during any calendar year does not exceed $20,000.
(2) A Federal candidate, an individual holding Federal office, and an individual who is an agent of either may make a solicitation explicitly for an entity whose principal purpose is to conduct any of the activities described in paragraph (a)(2) of this section only if:
(i) The solicitation is made only to individuals; and
(ii) The amount solicited from any individual during any calendar year does not exceed $20,000.

**Subpart E—State and Local Candidates**

**§ 300.70   Scope (2 U.S.C. 441i(f)(1)).**

This subpart applies to any candidate for State or local office, individual holding State or local office, or an agent of any such candidate or individual. For example, this subpart applies to an individual holding Federal office who is a candidate for State or local office. This subpart does not apply to an association or similar group of candidates for State or local office or of individuals holding State or local office.

**§ 300.71   Federal funds required for certain public communications (2 U.S.C. 441i(f)(1)).**

No individual described in 11 CFR 300.70 shall spend any amounts for a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified), and that promotes or supports any candidate for that Federal office, or attacks or opposes any candidate for that Federal office (regardless of whether the communication expressly advocates a vote for or against a candidate) unless the amounts consist of Federal funds that are subject to the limitations, prohibitions, and reporting requirements of the Act. *See* definition of *public communication* at 11 CFR 100.26.

**§ 300.72   Federal funds not required for certain communications (2 U.S.C. 441i(f)(2)).**

The requirements of section 11 CFR 300.71 shall not apply if the communication:
(a) Is in connection with an election for State or local office, and refers to one or more candidates for State or local office or to a State or local officeholder but does not promote, support, attack, or oppose any candidate for Federal office; or
(b) Comes within the scope of 11 CFR 300.2(*l*)(2)(ii).

**PART 9034—ENTITLEMENTS**

28. The authority citation for Part 9034 would continue to read as follows:

**Authority:** 26 U.S.C. 9034 and 9039(b).

29. Section 9034.8 would be amended by adding introductory language to paragraph (a) to read as follows:

**§ 9034.8   Joint fundraising.**

(a) *General.* Nothing in this section shall permit any person to solicit, receive, direct, transfer, or spend any non-Federal funds prohibited under 11 CFR part 300.

*    *    *    *    *

Dated: May 10, 2002.

**David. M. Mason,**

*Chairman, Federal Election Commission.*

[FR Doc. 02–12177 Filed 5–15–02; 10:13 am]

**BILLING CODE 6715–01–P**

# PLAINTIFFS' EXHIBIT 139



**Monday,**
**July 29, 2002**

**Part II**

# Federal Election Commission

**11 CFR Parts 100, et al.**
**Prohibited and Excessive Contributions:**
**Non-Federal Funds or Soft Money; Final**
**Rule**

49064    **Federal Register** / Vol. 67, No. 145 / Monday, July 29, 2002 / Rules and Regulations

**FEDERAL ELECTION COMMISSION**

**11 CFR Parts 100, 102, 104, 106, 108, 110, 114, 300, and 9034**

[Notice 2002 –11]

**Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money**

**AGENCY:** Federal Election Commission.

**ACTION:** Final rules and transmittal of regulations to Congress.

**SUMMARY:** The Federal Election Commission is revising its rules relating to funds raised, received, and spent by party committees under the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"). The revisions are based on the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which adds to the Act new restrictions and prohibitions on the receipt, solicitation, and use of certain types of non-Federal funds, which are commonly referred to as "soft money." BCRA and the revised rules prohibit national parties from raising or spending non-Federal funds. They also permit State, district, and local party committees to fund certain "Federal election activity," including certain voter registration and get-out-the-vote ("GOTV") drives, with money raised pursuant to new limitations, prohibitions, and reporting requirements under BCRA, or with a combination of funds subject to various requirements of the Act and BCRA. They also address fundraising by Federal and non-Federal candidates and Federal officeholders on behalf of political party committees, other candidates, and non-profit organizations. Further information is contained in the Supplementary Information that follows.

**DATES:** The effective date is November 6, 2002, except for 11 CFR 106.7(a) which is effective January 1, 2003.

**FOR FURTHER INFORMATION CONTACT:** Mr. John C. Vergelli, Acting Assistant General Counsel; or Attorneys Mr. Anthony T. Buckley, Mr. Jonathan M. Levin, Ms. Dawn Odrowski, Ms. Anne A. Weissenborn, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Public Law 107–155, 116 Stat. 81 (March 27, 2002), contains extensive and detailed amendments to the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"), 2 U.S.C. 431 *et seq.* This is the first of a series of rulemakings the Commission is undertaking this year in order to meet the rulemaking deadlines set out in BCRA. These rules address BCRA's new limitations on party, candidate, and officeholder solicitation and use of non-Federal funds.[1]

Section 402(c)(2) of BCRA establishes a 90-day deadline for the Commission to promulgate these rules. Since BCRA was signed into law on March 27, 2002, the 90-day deadline was June 25, 2002.[2] The Commission promulgated these rules on June 22, 2002. The new rules will take effect on November 6, 2002, the day following the November 2002 general election, except rules that take effect after the transition period. 2 U.S.C. 431 note.

Because of the extremely tight deadline for promulgating these rules, the Commission adhered to a shorter-than-usual timeline for receiving and considering public comments. The Notice of Proposed Rulemaking ("NPRM") on which these rules are based was published in the **Federal Register** on May 20, 2002. 67 FR 35654 (May 20, 2002). Comments were received from the Alliance for Justice; the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"); the American Federation of State, County, and Municipal Employees ("AFSCME"); the Association of State Democratic Chairs ("ASDC"); Dr. Peter Bearse; the California Republican Party; the Campaign and Media Legal Center; the Center for Responsive Politics ("CRP") and FEC Watch (joint comment); Common Cause and Democracy 21 (joint comment); the Connecticut Republican State Central Committee; the Democratic National Committee ("DNC"); the Democratic Senatorial Campaign Committee ("DSCC") and the Democratic Congressional Campaign Committee ("DCCC") (joint comment); Development Strategies Corporation; Benjamin L. Ginsberg, Esq.; Ms. Janice P. Johnson; the Latino Coalition and National Taxpayer Network, Inc. (joint comment); the Michigan Democratic Party ("MDP"); Mindshare Internet Campaigns L.L.C.; the NAACP National Voter Fund ("NAACP NVF"); the National Republican Congressional Committee ("NRCC"); OMB Watch; Senators John S. McCain and Russell D. Feingold, and Representatives Christopher Shays and Marty Meehan (joint comment), and a supplemental comment from Senator McCain; Representative Bob Ney; Norman D. Petrick; and the Republican National Committee ("RNC").

The Commission held a public hearing on the NPRM on June 4 and 5, 2002, at which it heard testimony from representatives of the ASDC; the AFL-CIO; the Campaign and Media Legal Center; Common Cause and Democracy 21; CRP and FEC Watch; the DNC, DSCC and DCCC; the Latino Coalition and Taxpayer Network, Inc.; NAACP NVF; the RNC; the RNCC, and the Republican State Chairmen; and Mr. Ginsberg. Please note that, for purposes of this document, the terms "commenter" and "comment" cover both written comments and oral testimony at the public hearing.

Under the Administrative Procedures Act, 5 U.S.C. 553(d), and the Congressional Review of Agency Rulemaking Act, 5 U.S.C. 801(a)(1), agencies must submit final rules to the Speaker of the House of Representatives and the President of the Senate and publish them in the **Federal Register** at least 30 calendar days before they take effect. The final rules on Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money were transmitted to Congress on July 16, 2002.

**Explanation and Justification**

**I. Terminology**

Because the term "soft money" is used by different people to refer to a wide variety of funds under different circumstances, the Commission is using the term "non-Federal funds" in the final rules rather than the term "soft money." BCRA does not use the term "soft money" except in the heading of Title I and the headings within Title IV. Nonetheless, the Commission sought comment on whether use of the term "soft money" would in some instances be preferable.

Not all commenters addressed this issue, and several of those who did not address the issue used the term "soft money" throughout their comments. Most of those who addressed this question, however, urged the Commission to use the terms "Federal funds" and "non-Federal funds" in

---

[1] Future rulemakings will address: (1) Electioneering communications and issue ads; (2) coordinated and independent expenditures; (3) the so-called "millionaires" amendment," which increases contribution limits for congressional candidates facing self-financed candidates on a sliding scale, based on the amount of personal funds the opponent contributes to his or her campaign; (4) the increase in contribution limits; and (5) other new and amended provisions, including contribution prohibitions and reporting. This last rulemaking will address contributions by minors, foreign nationals, and U.S. nationals; inaugural committees; fraudulent solicitations; disclaimers; personal use of campaign funds; and civil penalties. BCRA's impact on national nominating conventions will be addressed in a separate rulemaking.

[2] BCRA's deadline for promulgation of the remaining rules is 270 days after the date of enactment, or December 22, 2002.

place of what they characterized as the often-misunderstood term "soft money." One commenter urged the Commission to use the terms "regulated" and "unregulated" funds, arguing that the terms "Federal" and "non-Federal" funds are also confusing. However, the terms "Federal" and "non-Federal" have been used by the Commission for many years throughout the rules and are thus familiar to those active in this area. *See,* for example, 11 CFR 102.5 ("Federal" and "non-Federal" accounts); 11 CFR 106.5 ("Federal" and "non-Federal" disbursements). The terms "regulated" and "unregulated" could also be subject to different interpretations. Moreover, non-Federal funds are regulated by State law. The Commission is, therefore, using the terms "Federal" and "non-Federal" throughout the text of the regulations and the accompanying Explanation and Justification.

## II. The Statutory Framework

The Act limits the amount that individuals can contribute to candidates, political committees, and political parties for use in Federal elections. 2 U.S.C. 441a. The Act also prohibits corporations and labor organizations from contributing their general treasury funds for these purposes. 2 U.S.C. 441b. Contributions from national banks, 2 U.S.C. 441b(a); government contractors, 2 U.S.C. 441c; foreign nationals, 2 U.S.C. 441e; and minors, new 2 U.S.C. 441k, as enacted by BCRA; as well as contributions made in the name of another, 2 U.S.C. 441f; are also prohibited. These strictures regulate what is often referred to as "hard money," or Federal funds.

Some donations that do not meet the FECA hard money requirements, for example, corporate and labor organization general treasury contributions, may not be used for Federal elections, and are referred to as non-Federal funds. Non-Federal funds may not be used for the purpose of influencing any election for Federal office. Funds raised that are used by State or local parties or State or local candidates on non-Federal elections are governed by State or local law. Prior to BCRA's revisions, the FECA permitted national party committees, Federal candidates, and officeholders to raise money not subject to some of the Act's source limitations and prohibitions. Beginning November 6, 2002, under BCRA, national party committees "may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions,

and reporting requirements of this Act." 2 U.S.C. 441i(a).

BCRA also requires State, district, and local political party committees to pay for "Federal election activities," which is a new term introduced and defined by BCRA, 2 U.S.C. 431(20), with entirely Federal funds or, in some cases, a mix of Federal funds and a new type of non-Federal funds, which the rules call "Levin funds." These two provisions are related in that the latter is intended to prevent evasion of the former. A State, district, or local political party committee may not evade the restrictions in BCRA by receiving funds transferred from a national party committee and spending those funds on Federal election activity. A State, district, or local party committee must spend Federal and Levin funds it raises itself on these activities. *See* 148 Cong. Rec. H408–409 (daily ed. Feb. 13, 2002) (statement of Rep. Shays).

As discussed below, these new and revised rules partially supersede the following advisory opinions relating to preemption as to party office buildings: Advisory Opinions 2001–12, 2001–1, 1998–8, 1998–7, 1997–14, 1993–9, 1991–5, and 1986–40. Other advisory opinions may no longer be relied upon to the extent they conflict with BCRA. Further guidance will be forthcoming in future advisory opinions and rulemakings.

### III. Part 100—Scope and Definition

*11 CFR 100.14 Definition of "State Committee, Subordinate Committee, District, or Local Committee"*

Several provisions of BCRA refer to "State, district, and local committees of a political party." *See, e.g.,* the "Levin Amendment," 2 U.S.C. 441i(b)(2). In the NPRM, the Commission pointed out that the terms "State committee," "subordinate committee," and "party committee," are already defined in the regulations, although "district committee" and "local committee" are not. 11 CFR 100.14, 100.5(e)(4); *see also* 2 U.S.C. 431(15).

In paragraph (a) of section 100.14, status as a State committee is determined by reference to the party bylaws or State law. This provision, which did not draw comment, allows the regulation to cover those States in which party committee status is a matter of State law and those in which it is a matter of party bylaws.

The proposed regulation published in the NPRM provided, in paragraphs (a), (b), and (c), with regard to "State committees," "subordinate committees," and "district or local committees," respectively, that an

organization must be "part of the official party structure" and be "responsible for the day-to-day operation of the political party" to meet the definition. Three commenters, including the principal Congressional sponsors of BCRA, objected to this conjunctive requirement. These commenters collectively believe that limiting the definition to organizations that are part of the "official party structure" will open the door to purportedly "unofficial" party organizations that would be able to avoid BCRA's requirement while "manifestly engaged in party operations." Instead, they propose a disjunctive definition, which would provide that a party organization meets the respective definitions if it is part of the official party structure *or* responsible for the day-to-day operation of the party. The Commission has concluded that requiring a committee to be part of the official party structure before it satisfies the regulatory definition is an important safeguard, ensuring that BCRA's provisions sweep only as far as necessary to accomplish its ends. The Commission also believes that its definition of "subordinate committee of a State, district, or local committee," which includes any organization that is directly or indirectly established, financed, maintained, or controlled by the State, district, or local committee fully addresses the sponsor's regulatory concerns in this area.

Paragraph (b) is a new provision defining "district or local committee." (This provision was labeled paragraph (c) in the NPRM, while subordinate committees were covered by paragraph (b). In the final rules, the Commission has covered subordinate committees in paragraph (c). This reordering of paragraphs within section 100.14 reflects the priority given to district and local party committees in BCRA.) This definition largely parallels paragraph (a) but for political subdivisions below the State level, and encompasses those political party committees that do not necessarily operate formally under the "control or direction" of the State party committee. In the final rules, the Commission has deleted the phrase, "including an entity that is directly or indirectly established, financed, maintained, or controlled by the district or local committee."

The principal Congressional sponsors of BCRA commented that the words, "under State law," as they appeared in the NPRM, are redundant given the preceding reference to "operation of State law." The Commission agrees, and has deleted the redundant words in the final rule.

**49066**    **Federal Register** / Vol. 67, No. 145 / Monday, July 29, 2002 / Rules and Regulations

Three commenters objected to adding language, "as determined by the Commission," in paragraph (b) of section 100.14. An association of State party officials stated, referring to paragraph (b), "there should be no discretion left to the Commission to decide whether a particular organization is a local party committee." A national party committee described status as a local committee as a "quintessential State and local" issue. The Commission has not included the phrase, "as determined by the Commission," in paragraph (b) of section 100.14.

With regard to subordinate committees, in paragraph (c) of section 100.14, the phrase, "as determined by the Commission," which was included in the proposed regulation published in the NPRM, has not been included in the final rules. The Commission has concluded that this language, which refers to the availability of the advisory opinion process, is not appropriate with regard to committees other than State committees, whose status as State party committees, as determined by the Commission, makes them eligible for higher contribution limits and permits them to make coordinated expenditures under FECA. The principal Congressional sponsors of BCRA commented that, as proposed in the NPRM, this definition did not, but should, include within the definition an entity that is directly or indirectly established, financed, maintained, or controlled by the subordinate committee. The Commission has included such a provision in paragraph (c) of section 100.14 of the final rules.

*11 CFR 100.24 Definition of "Federal Election Activity"*

Many of the operative provisions of Title I of BCRA use the term "Federal election activity" ("FEA"). *See, e.g.,* 2 U.S.C. 441i(b)(1), (2), 2 U.S.C. 441i(d). Congress defined the term at 2 U.S.C. 431(20). The Commission is adopting new regulation 11 CFR 100.24 to implement the statutory definition.

The definition of FEA proposed in the NPRM drew numerous comments urging divergent interpretations of key statutory terminology. Many of these comments focused on four important phrases that are used in the statutory definition at 2 U.S.C. 431(20). In light of these comments, the Commission has revised the regulation proposed in the NPRM by adding a new first paragraph, 11 CFR 100.24(a), which defines these four terms for the purposes of the rest of the regulation and for use in part 300 of chapter 1 of Title 11. These terms are "voter registration activity" (*see* 2 U.S.C. 431(20)(A)(i)), "in connection

with an election in which a candidate for Federal office appears on the ballot," "get-out-the-vote activity" ("GOTV"), and "voter identification" (*see* 2 U.S.C. 431(20)(A)(ii)).

*A. Elections in Which Federal Candidates "Appear on the Ballot"*

The statutory definition of FEA provides that certain activities are FEA if they are "in connection with an election in which a candidate for Federal office appears on the ballot." 2 U.S.C. 431(20)(A)(ii). Congress clearly intended to establish certain periods of time in which no candidates for Federal office appear on the ballot. The NPRM requested comment as to how to interpret this statutory provision. Several commenters, including the principal Congressional sponsors of BCRA, urged the Commission to construe this phrase to mean "starting at the beginning of a two-year Federal election cycle, except in states holding regularly scheduled state elections in odd-numbered years." These commenters argued that this approach is "consistent with the Commission's current practice with respect to allocation of generic voter drive and administrative expenses," and comports with the plain meaning of the statute.

In contrast, two commenters, a national party committee and a labor organization, urged the Commission to pick a date certain, January 1 of even-numbered years, to identify the time-frame that is "in connection with an election in which a candidate for Federal office appears on the ballot." The commenters commended this approach as "practical" and "reasonable." One of these commenters suggested that the concept of even-numbered Federal election years is already familiar, and that party activities are "more diverse" in odd-numbered years, in that they are more focused on local and State activities. The Commission notes that a large number of State and local elections take place in odd-numbered years (e.g., mayoral elections in some large cities). Activities in connection with such elections are presumably not "conducted in connection with an election in which a candidate for Federal office appears on the ballot," even under the most expansive reading of the statute.

A civil rights organization urged the Commission to interpret the term, "in connection with an election in which a candidate for Federal office appears on the ballot," to mean that period of time beginning on the day on which a Federal candidate is actually certified for the ballot in a given jurisdiction.

This commenter argues this interpretation is the plainest possible reading of the statute. This civil rights organization also cautioned that an overly broad definition of when a candidate "appears on the ballot" would unduly hamper their legitimate fundraising efforts, and thus impede many, if not all, of their non-partisan GOTV efforts. A Latino rights group and a taxpayers' organization suggested that the Commission interpret the statutory term to mean the earliest date on which a Federal candidate could qualify for the ballot in a given jurisdiction.

Paragraph (a)(1) of 11 CFR 100.24 defines "in connection with an election in which a candidate for Federal office appears on the ballot" to mean two specific periods of time. The first begins on the earliest filing deadline for access to the primary election ballot for Federal candidates, as determined by State law, or in those States that do not conduct primaries, on January 1 of each even-numbered year. This time period ends on the date of the general election, up to and including the date of any general runoff. This definition of "in connection with an election in which a candidate for Federal office appears on the ballot" closely tracks the statutory language of 2 U.S.C. 431(20)(A)(ii) by tying the definition to the actual date that Federal candidates appear on the ballot. Although this definition may result in all fifty States having different time-periods in which "a candidate for Federal office appears on the ballot," for purposes of the Act, there will be only one relevant date in any particular State. Thus, this is not at all burdensome on State and local party committees, who are the primary actors affected by this clause, especially since many of these committees must already pay attention to State dates in order to file certain pre-election reports with the Commission. Finally, this definition harmonizes the rule for regularly scheduled Federal elections and special elections for Federal office held outside normal election time frames. (*See* next paragraph.)

The second time-frame that is "in connection with an election in which a candidate for Federal office appears on the ballot" occurs in odd-numbered years in which a special election for a Federal office occurs. Paragraph (a)(1)(ii) prescribes that the period beginning on the date the special election date is set and ending on the day of the special election is considered to be "in connection with an election in which a candidate for Federal office appears on the ballot."

## B. Voter Registration Activity

BCRA does not define "voter registration activity," as that term is used in the statutory definition of "Federal election activity," although "voter registration activity" is "Federal election activity" only when it is conducted 120 days or fewer before a regularly scheduled Federal election. 2 U.S.C. 431(20)(A)(i). Paragraph (a)(2) of section 100.24, in the final rules, defines voter registration activity to encompass individualized contact for the specific purpose of assisting individuals with the process of registering to vote. The definition in paragraph (a)(2) also includes the costs of printing and distributing voter registration information, such as registration forms, and voting information, for example, pamphlets of similar materials explaining the voter-registration process.

The Commission has expressly rejected an approach whereby merely encouraging voter registration would constitute Federal election activity. The regulation requires concrete actions to assist voters, rather than mere exhortation. A more expansive definition would run the risk that thousands of political committees and grassroots organizations that merely encouraged voting as a civic duty, who have never been subject to Federal regulation for such conduct, would be swept into the extensive reporting and filing requirements mandated under Federal law.

## C. Get-Out-the-Vote

Based upon the comments received in response to the rules proposed in the NPRM, the testimony at the public hearing, and its own analysis of BCRA, the Commission has concluded that it must define GOTV in a manner that distinguishes the activity from ordinary or usual campaigning that a party committee may conduct on behalf of its candidates. Stated another way, if GOTV is defined too broadly, the effect of the regulations would be to federalize a vast percentage of ordinary campaign activity.

The Commission received several comments on this topic. A State political party and an association of State party officials argued that the timing (i.e., relative to the election) should not be relevant to determining whether an activity is GOTV. Rather, both commenters suggested that GOTV "should refer to actual communications with voters for the purpose of encouraging them to vote." Two public interest groups agreed that timing relative to the election is not relevant to

determining whether an activity is GOTV. Neither group, however, suggests an actual definition of the term. The Congressional sponsors "strongly disagree with the suggestion that * * * voter contacts may constitute [GOTV] only if they occur 'on Election day or shortly before.' Contacting voters to encourage voting is [GOTV] whenever it occurs." A labor organization suggested that timing is relevant, and urged that the Commission's definition of GOTV be limited to activities that occur on election day.

In the final rules, at 11 CFR 100.24(a)(3), the Commission adopts a definition of "GOTV activity" as "contacting registered voters * * * to assist them in engaging in the act of voting." This definition is focused on activity that is ultimately directed to *registered* voters, even if the efforts also incidentally reach the general public. Second, GOTV has a very particular purpose: assisting registered voters to take any and all necessary steps to get to the polls and cast their ballots, or to vote by absentee ballot or other means provided by law. The Commission understands this purpose to be narrower and more specific than the broader purposes of generally increasing public support for a candidate or decreasing public support for an opposing candidate.

Paragraph (a)(3) provides a list of two examples of get-out-the-vote activity that is intended to assist in applying the regulation to particular factual situations. The first example, in paragraph (a)(3)(i), is activity whereby an individual is provided specific information on voting within 72 hours of an election, such as the date of the election, the location of polling places, and the hours the polls are open. The second example, in paragraph (a)(3)(ii), is offering to transport or actually transporting voters to the polls.

The regulation explicitly excludes "any communication by an association or similar group of candidates for State and local office or of individuals holding State or local office if such communication refers only to one or more state or local candidates." Similar to the exclusion for voter identification discussed below, this exclusion keeps State and local candidates' grassroots and local political activity a question of State, not Federal law. Interpreting the statute to extend to purely State and local activity by State and local candidates would potentially bring into the Federal regulatory scheme thousands of State and local candidates that are currently outside the Federal system. The Commission declines to undertake such a vast federalization of

State and local activity without greater direction from Congress.

In the NPRM, the Commission posed several questions as to how the term "get-out-the-vote" activity should be interpreted in the statute. Among the issues raised was whether there should be an exception for "non-partisan" GOTV. In their comment, the principal Congressional sponsors of BCRA strongly opposed a non-partisan exception as "flatly inconsistent with BCRA." They argued that the plain language of the statute does not permit such an exception. Three other commenters, all of whom are public interest groups, make the same general argument. These commenters, and the Congressional sponsors, each opposed regulations that might contemplate "non-partisan" voter-drive activities by party committees and candidates, which one of the commenters labeled as "oxymoronic."

In contrast, one commenter, a non-profit corporation, urged the Commission to adopt a "non-partisan exception" for non-profit organizations that engage in non-partisan voter-drive activities such as GOTV and voter registration. This group noted that the proposed regulations would restrict fundraising on behalf of a non-profit by political party committees and Federal candidates if the non-profit spent money for FEA. It contended that, if the Commission fails to distinguish between partisan and non-partisan voter-drive activities, the efforts of legitimate, non-partisan groups to encourage voting will be hampered, perhaps fatally, in the case of some organizations. This commenter also argued that the Commission should create a "safe harbor" to allow political party committees and Federal candidates to raise funds on behalf of section 501(c)(3) organizations that legally engage in non-partisan voter-drive activities.

In Title I of BCRA, Congress expressly addressed party fundraising for tax-exempt organizations. Congress specifically provided that national, State, district, and local political party committees "shall not solicit any funds for, or make or direct any donations to" section 501(c) organizations that spend money on Federal election activity. 2 U.S.C. 441i(d)(1). The Commission does not discern, from the plain language of section 441i(d)(1), any authority to craft a regulatory exception to the definition of FEA that would modify the effect of section 441i(d)(1). This conclusion is supported by the fact that Congress did provide a limited exception for fundraising by Federal candidates on behalf of 501(c) organization that engage in FEA. *See* 2 U.S.C. 441i(e)(4)(B)

(which provides that a Federal candidate is permitted to raise up to \$20,000 per calendar year from individuals for a section 501(c) organization, even if the organization engages in certain FEA.) Clearly, Congress could have crafted a non-partisan exception, but did not do so with regard to party committees' GOTV drives. Therefore, the Commission declines to adopt a "non-partisan" exception in 11 CFR 100.24 with regard to the definition of FEA.

In the NPRM, the Commission solicited comments as to whether there should be a *de minimis* exception allowing a certain, nominal amount of GOTV related to a Federal election that would nonetheless not render these activities as FEA. The principal Congressional sponsors of BCRA and a public interest group commented that there is no basis in the statute for a *de minimis* exception, and that such an exception "would be contrary to the plain meaning of the statute." A labor organization, a national party, and a State political party committee support the inclusion of a *de minimis* exception. The State party committee suggests a \$5,000 exception, so that "informal and occasional GOTV and grassroots activities do not invoke the full force of federal regulations." One of the labor organizations asserts the exception would prevent the regulation from having a "strict liability" aspect. The Commission declines to adopt a *de minimis* exception in 11 CFR 100.24.

### D. Slate Cards, Sample Ballots, and Other Exempt Activities

In the NPRM, the Commission specifically sought comment as to the use of printed slate cards, sample ballots, palm cards, and similar listings of three or more candidates in the context of GOTV. The Commission also sought comment about the larger issue of the relationship of "exempt activities" to "Federal election activities." 67 FR 35656.

The term "exempt activities" refers to three types of spending by State and local party organizations, each of which is excluded from the statutory definitions of contribution and expenditure in 2 U.S.C. 431(8) and (9). That is, a payment by a State or local party organization for an exempt activity is not a "contribution," within the meaning of the Act, to a candidate benefited by the activity, nor an "expenditure," within the meaning of the Act, by the party organization.

Slate cards are one type of exempt activity. A payment for the "costs of preparation, display, or mailing or other distribution . . . with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office," is not a contribution or expenditure. The exclusion does not apply to spending for displaying the slate card "on broadcast stations, or in newspapers, magazines, or similar types of general public political advertising." 2 U.S.C. 431(8)(B)(v) (contribution); 2 U.S.C. 431(9)(B)(iv) (expenditure). *See also* 11 CFR 100.7(b)(9), 100.8(b)(10). Note that the exemption extends to the costs of a mass mailing of the slate card.

"The original intent of the slate card amendment was to allow parties to print slate cards, sample ballots, etc., to educate voters and encourage straight party voting without being subject to the disclosure provisions and contribution and expenditure limitations in Federal law." H.R. Rep. No. 93–1239, at 142 (1974) (House Committee on Administration Report on the Federal Election Campaign Act Amendments of 1974) (Supp. View of Rep. Frenzel). Other statements in the legislative history tend to confirm this view of the intent behind the provision. *See, e.g.,* H.R. Rep. No. 93–1438, at 65 (1974) (Conference Report on Federal Election Campaign Act Amendments of 1974) (intent of provision "is to allow State and local parties to educate the general public as to the identity of the candidates of the party.")

Several commenters have addressed the relationship between FEA and exempt activities, including slate cards. One State party committee commented that it understands BCRA to have "clearly redefined all such * * * activities as Federal election activities that must be funded entirely by hard money." The principal Congressional sponsors of BCRA commented that slate cards, sample ballots, and palm cards should be included in GOTV. With regard to the larger issue of the relationship between all exempt activities and FEA, the principal sponsors urged that if an activity constitutes FEA, then it must be treated as such. A public interest group argues that "federal election activity subsumes all previously allocable expenses," with certain exceptions not relevant here.

In a joint comment, a national party committee and two Congressional campaign committees advocated the opposite conclusion: "Congress did not leave any suggestion in the legislative history that these important exceptions were somehow overridden * * * by BICRA." These commenters argued that the Commission's current treatment of exempt activities is consistent with BCRA because BCRA focuses on "soft money" spending for "issue advertising," whereas exempt activities are, by definition, at the grassroots level. Thus, they conclude, "exempt activities should not be deemed to be 'Federal election activity,' and that the costs of exempt activities should continue to be allocated between Federal and non-Federal funds," by which they mean non-Federal funds other than Levin funds. Another national party committee, a State party committee, and a labor organization made essentially the same points, agreeing that the definition of Federal election activity should exclude exempt activities.

The Commission does not interpret the Act, as amended by BCRA, to permit blanket conclusions about the relationship of exempt activities and FEA, in the sense of asserting that all exempt activities are necessarily now FEA, or *vice versa.* It is clear that not all exempt activities are FEA. For example, voter registration activities undertaken by a State or local political party on behalf of the Presidential ticket more than 120 days before a regularly scheduled election is an exempt activity under 2 U.S.C. 431(8)(B)(xii) and (9)(B)(ix), but not a Federal election activity. 11 CFR 100.24(b)(1). It is also clear that some activities satisfy one of the definitions of exempt activities and simultaneously satisfy one of the definitions of FEA. For example, voter registration activities undertaken by a State or local political party on behalf of the Presidential ticket fewer than 120 days before a regularly scheduled election satisfy both the definition of exempt activity and of Federal election activity. 2 U.S.C. 431(8)(B)(xii), (9)(B)(ix), and 20(A)(i).

In cases where a given activity undertaken by a State, district, or local political party committee is both an exempt activity and a Federal election activity, the issue is how it may or must be paid for. On this point, BCRA and the Commission's pre-BCRA regulations appear to be in conflict. Under BCRA, as interpreted in these final rules, if the activity is deemed a FEA, it must be paid for with Federal funds, Levin funds, or with an allocated mix of Federal and Levin funds. *See* 11 CFR 300.32(b). Under the Commission's pre-BCRA regulations, if the activity is deemed an exempt activity that is combined with non-Federal activity it may be paid for with an allocated mix of Federal and non-Federal funds. 11 CFR 100.7(b)(9), (15), (17), 100.8(b)(10), (16), (18), and 106.5(a)(2)(iii). *See Common Cause* v. *Federal Election Com'n,* 692 F.Supp. 1391, 1394–1396 (D.D.C. 1987). The *Common Cause* case directly addressed two of the three categories of exempt activities:

campaign materials used by volunteers (*see* 11 CFR 100.7(b)(15) and 100.8(b)(16)) and voter registration and GOTV activities on behalf of the Presidential ticket (*see* 11 CFR 100.7(b)(17) and 100.8(b)(18)), establishing that allocation of payments for these activities between Federal and non-Federal funds was properly a matter for the Commission to address in its regulations. *Common Cause*, 692 F.Supp. at 1396. While not directly addressed in *Common Cause*, the allocation of the costs of slate cards is also addressed in the Commission's regulations, but not in FECA. Compare 2 U.S.C. 431(8)(B)(v) and (9)(B)(iv) (which does not specifically provide for allocation) with 11 CFR 100.7(b)(9) and 100.8(b)(10) (which provides for allocation).

Since the Commission's regulations may not override the Act, as amended by BCRA, if an activity undertaken by a State, district, or local political party committee simultaneously constitutes both exempt activity and Federal election activity, that activity must now be paid for as a Federal election activity, not as an exempt activity.

The Commission emphasizes, however, that payments by a State, district, or local political party committee for an activity that is within one of the exempt activity categories remains excluded from the definitions of "contribution" and "expenditure." That is, the conclusion explained in the preceding paragraph goes only to how the activity must be paid for, not to characterizing the payment as a contribution or expenditure under the Act.

With these considerations in mind, the Commission sees no valid reason to handle slate cards differently from any other type of exempt activity with regard to the definition of Federal election activity. If a State, district, or local political party committee uses slate cards as part of GOTV activity, or in a public communication that promotes or supports, or attacks or opposes a Federal candidate, then the committee must pay for the costs of these slate cards as a Federal election activity (*see* 2 U.S.C. 431(20)(A)(ii), (iii)), although these payments are excluded from the definition of "expenditure." On the other hand, if a State, district, or local political party committee uses slate cards mentioning Federal and non-Federal candidates in the course of campaigning that does not constitute Federal election activity, then it may allocate the costs of these slate cards between Federal and non-Federal funds.

*E. Voter Identification*

In BCRA, Congress included "voter identification" within the definition of "Federal election activity." 2 U.S.C. 431(20)(A)(ii). In the NPRM, the Commission sought comment as to whether the proposed definition was too narrowly or broadly crafted, and, in the alternative, what activities should be incorporated into the definition of "voter identification." A consortium of non-profit groups expressed concern that the term "voter identification" could be read too broadly by encompassing "efforts to identify the shared interests of individuals for non-electoral purposes." They urged the Commission to restrict the definition to "activities designed primarily to identify the political preferences of individuals in order to influence their voting." Similarly, a State political party commented that the definition in the proposed regulation was "far too broad and instead should be defined to include only activity that involved actual contact of voters, by phone, in person or otherwise, to determine their likelihood of voting generally or their likelihood of voting for a specific Federal candidate." This State party committee specifically urged that the final definition exclude the costs of "acquisition or enhancement of a list of voters, or the acquisition of publicly available demographic information regarding these voters," arguing that such functions are properly treated as administrative expenses because they are part of the party's "fundamental functions." Several national party committees offered essentially similar views. A labor organization commented that "voter identification" should be defined as telephone calls or canvassing "to identify voters for other Federal election activities," and agreed that gathering data about voters should be excluded. Another labor organization commented that "voter identification" should be limited to determining voter intent with regard to specific Federal candidates only.

In contrast, the principal Congressional sponsors of BCRA commented that "voter identification" should include all activities designed to determine registered voters, likely voters, or voters indicating a preference for a specific candidate or party." They also commented that voter identification efforts should not be excluded simply because no mention is made of a Federal candidate. A public interest group commented that "voter identification" includes "all efforts to identify voters, even if done in the name of state and local candidates."

With regard to the Commission's question, posed in the NPRM, about distinguishing voter identification from GOTV, the principal Congressional sponsors commented that the distinction "makes no difference" because both types of activity are covered under the same provision of BCRA (*see* 2 U.S.C. 431(20)(A)(ii)). A public interest group urged the Commission not to limit voter identification to efforts to identify voters for other Federal election activities, arguing that only a "tortured reading" of the statute allows [GOTV] activity to modify "voter identification." A labor union disagreed, arguing that only voter identification for the purposes of GOTV should be included. Another public interest group argued against distinguishing the two activities according to proximity in time to the election. (*See* previous discussion under the discussion of GOTV.)

The Commission requested comments as to whether the regulations should include a *de minimis* exception to voter identification activities. One labor union requested that there be a *de minimis* exception, particularly to allow for the maintenance and development of voter files during non-election years. Both the Congressional sponsors and a public interest group argued that such an exception would be contrary to the plain language and intent of BCRA.

In paragraph (a)(4) of section 100.24, the Commission adopts a definition of "voter identification" that includes the costs of "creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting or likelihood of voting for specific candidates." The Commission notes that "voter identification" is one of the types of Federal election activity that will occur only during those times when a candidate for Federal office appears on the ballot. *See* 11 CFR 100.24(a)(1).

The Commission recognizes that even during the period when a Federal candidate appears on the ballot, the act of acquiring a voter list in and of itself does not constitute voter identification. Committees have a number of reasons for acquiring voter lists, including fundraising and off-year party building activities. Such activity, on its face, does not constitute "voter identification" with respect to the statute, as there lacks a nexus between the activity and the statutory language that contemplates activity "in connection with an election in which a candidate appears on the ballot."

The final rule excludes from the definition certain voter identification undertaken by groups or associations of State or local candidates or

officeholders, solely in reference to State or local candidates. The Commission included this exclusion because it finds it implausible that Congress intended to federalize State and local election activity to such an extent without any mention of the issue during the floor debate for BCRA. BCRA makes voter identification a subset of Federal election activity, and the regulatory implications of engaging in Federal election activity are significant. For the Commission to exercise its discretion so as to sweep within Federal regulation candidates for city council, or the local school board, who join together to identify potential voters for their own candidacies, the Commission would require more explicit instruction from Congress.

*F. Definition of "Federal Election Activity"*

Paragraph (b) of section 100.24 defines Federal election activity. Paragraph (b)(1) implements 2 U.S.C. 431(20)(A)(i) by including voter registration activity during the period that begins on the date that is 120 calendar days before the date of a regularly scheduled Federal election. "Special elections" are not "regularly scheduled," and therefore excluded from the definition. Paragraph (b)(2) of section 100.24 implements 2 U.S.C. 431(20)(A)(ii) by including with the definition of Federal election activity voter identification, GOTV, and generic campaign activity when they are conducted in connection with an election in which a Federal candidate appears on the ballot.

11 CFR 100.24(b)(3) follows new 2 U.S.C. 431(20) by providing that a public communication that refers to a clearly identified candidate for Federal office would constitute "Federal election activity" that must be paid for with entirely Federal funds if the communication promotes, supports, attacks, or opposes any candidate for that Federal office. This is true even if a candidate for State or local office is also mentioned or identified. "Public communication" is defined in proposed 11 CFR 100.26, discussed below. Public communications falling within this category of the definition of "Federal election activity" extend beyond communications expressly advocating a vote for or against a candidate.

11 CFR 100.24(b)(4) implements 2 U.S.C. 431(20)(A)(iv) by providing that Federal election activity includes services provided during any month by an employee of a State, district, or local committee of a political party who spends over 25% of that individual's compensated time on activities in connection with a Federal election. There were no comments on this definition. A number of issues involving employees are discussed below in the Explanation and Justification for section 300.33. The Commission has concluded that the statute is clear on its face, and therefore paragraph (b)(4) follows that statutory language without additional interpretation.

*G. Activities Excluded From the Definition of "Federal Election Activity"*

In BCRA, Congress specifically excluded certain activities from the definition of Federal election activity. 2 U.S.C. 431(20)(B). Activities falling within one of the exceptions may be paid for with entirely non-Federal funds. 11 CFR 100.24(c) implements these statutory exceptions. Paragraphs (c)(1) through (c)(4) of section 100.24 parallel the statutory exclusions at 2 U.S.C. 431(20)(B)(i) through (iv).

Paragraph (c)(1) excludes a public Communication that refers solely to one or more clearly identified State or local candidates, and does not promote or support, or attack or oppose, a clearly identified candidate for Federal office, provided that the public communication is not a voter registration activity, or GOTV, or voter identification. 2 U.S.C. 431(20)(B)(i). As an example of the application of this paragraph, this exception does not apply to a telephone bank on the day before an election where there is a Federal candidate on the ballot and where GOTV phone calls are made to over 500 voters, even if the calls only refer to a State or local candidate. 2 U.S.C. 431(20)(B)(i); *see* 11 CFR 100.24(b)(2).

Paragraph (c)(2) excludes a contribution to a State or local candidate, provided that the contribution is not designated to pay for voter registration activity, voter identification, GOTV, generic campaign activity, a public communication promoting or supporting, or attacking or opposing, a clearly identified Federal candidate, or employee services as set forth in paragraphs (b)(1) through (b)(4) of section 100.24. 2 U.S.C. 431(20)(B)(ii). In the final rules, the Commission has added a reference to employee services as set forth in paragraph (b)(4) for the sake of completeness.

Paragraph (c)(3) excludes the costs of State, district, or local political conventions, meetings, or conferences. The principal Congressional sponsors of BCRA commented that this approach was too broad, in that it included "a meeting or conference," whereas the statutory provision it implemented, 2 U.S.C. 431(20)(B)(iii), refers only to "conventions." These commenters failed to note, however, that meetings or conferences do not fall within the statutory definition of Federal election activity, and this remains true whether the Commission explicitly states it or not. Therefore, paragraph (c)(3) excludes the costs of a State, district, or local convention, meeting or conference. 2 U.S.C. 431(20)(B)(iii). The principal Congressional sponsors otherwise supported paragraphs (c)(1) through (c)(4).

Paragraph (c)(4) excludes the costs of grassroots campaign materials that name or depict only State and local candidates. 2 U.S.C. 431(20)(B)(iv). The list of examples of such materials in paragraph (c)(4) includes certain items not mentioned in the statute. The Commission received no comments objecting to the additional items.

In the version of the regulation published in the NPRM, the Commission included two additional exceptions that it has subsequently determined should not be listed as exceptions to the definition of Federal election activity in paragraph (c). These provisions would have covered voter registration activity at any time other than the period of time that is within 120 days of a regularly scheduled Federal election, and GOTV and voter identification in elections in which no Federal candidate appears on the ballot. While these activities are not Federal election activities, under certain circumstances payments for these activities must be allocated between Federal funds and non-Federal funds. *See* 11 CFR 106.5. In this regard, these two types of activities differ from the activities described in paragraphs (c)(1) through (c)(4) of section 100.24, which always may be paid for with entirely non-Federal funds. Therefore, the Commission has removed these two provisions from the final regulation.

*11 CFR 100.25  Definition of "Generic Campaign Activity"*

Section 100.25 implements the statutory definition of "generic campaign activity," which has been added to the Act by BCRA. "Generic campaign activity" is defined in BCRA as campaign activity "that promotes a political party and does not promote a candidate or non-Federal candidate." 2 U.S.C. 431(21).

Generic campaign activity is a form of Federal election activity when it takes place in connection with an election in which a candidate for Federal office appears on the ballot. 11 CFR 100.24(b)(2)(ii). The Commission is defining "in connection with an election in which a candidate for

**Federal Register** / Vol. 67, No. 145 / Monday, July 29, 2002 / Rules and Regulations    **49071**

Federal office appears on the ballot'' to include special elections fitting that description. 11 CFR 100.24(a)(1). Therefore, generic campaign activity may, in principle, occur in connection with a special election in which a candidate for Federal office appears on the ballot, provided, of course, that the elements of the definition are otherwise satisfied. An association of State party officials commented favorably on this approach. A public interest group pointed out that Advisory Opinion 1998–9, which was issued to a State party committee, addressed a special election in which only one Federal office was at stake, and thus only one candidate of the party on the ballot. The Commission opined that under such circumstances a candidate was clearly identified, and allocable ''generic activities'' by the party under pre-BCRA 11 CFR 106.5(a)(2)(iv) were thus not possible with regard to that special election. The final regulation is consistent with the reasoning of Advisory Opinion 1998–9 in defining ''generic campaign activity.''

The final regulation elaborates on the statute by including within the definition of ''generic campaign activity'' those activities that oppose a political party without opposing a specific candidate. A labor organization commented that the regulation impermissibly goes beyond the statute by including activities in opposition to another party. In the Commission's experience, however, such activities in opposition to another party implicitly promote the party undertaking the activities, and are thus properly included in the definition. A national party committee also argued against the approach taken in the proposed regulation, characterizing it as ''confusing'' because it is framed in terms of promoting and opposing the party, which ''unnecessarily clouds the distinction of voter registration and GOTV activities.'' This commenter would have the Commission define ''generic campaign activity'' as an ''activity that promotes or opposes the particular party's ticket, without mentioning or referring to candidates by name.'' The Commission believes most of these concerns are addressed in the definitions of voter registration activity and GOTV at 11 CFR 100.24(a)(2) and (3), respectively. Also, the distinction drawn by the commenter, that is, between promoting the party and promoting the party's ticket, is limited in practical application. Whether an activity is characterized as voter registration, GOTV, or generic campaign activity, it is treated as a Federal

election activity when conducted in certain relation to a Federal election, *see* 100.24(b)(1) and (2), and is, in each case, a Federal election activity on which Levin funds may be spent, *see* 11 CFR 300.32(b)(1).

In the version of the regulation proposed in the NPRM, ''generic campaign activity'' would have been defined as a ''campaign activity'' that promotes or opposes a political party but not a candidate. In the final rules, the definition instead refers to a ''public communication'' that promotes or opposes a political party but not a candidate. The Commission made this change to ensure that the definition encompasses only the external activities of a political party committee, that is, activities targeted to the public. This interpretation is also consistent with the plain meaning of the statutory provision, since it is difficult to envision how a campaign activity could effectively promote or oppose a political party without it taking the form of a public communication. This interpretation is also consistent with Advisory Opinion 1998–9, which dealt with numerous campaign activities that involved public communications.

In the final rules, the Commission has added the words ''clearly identified'' to qualify the phrase, ''Federal candidate or a non-Federal candidate.'' The intent of this addition is to remove ambiguity from the definition.

In the NPRM, the Commission sought comment on the extent, if any, to which the exclusions for exempt activities in 11 CFR 100.7(b)(9), (15), and (17) and 100.8(b)(8), (10), and (16), should apply to the definition of ''generic campaign activity.'' A public interest group commented that ''exempt activities should not be excluded from the definition of 'generic campaign activity.' '' An association of State party officials commented that there appears to be no overlap between exempt activities and generic campaign activities since the former, ''by definition, reference a clearly identified Federal candidate,'' while the latter, by definition, may not.

The Commission understands two of the categories of exempt activities, slate cards (*see* 11 CFR 100.7(b)(9) and 100.8(b)(8)) and voter registration on behalf of the Presidential ticket (*see* 11 CFR 100.7(b)(17) and 100.8(b)(16)), to have no applicability to payments for generic campaign activity. This is so because these two types of exempt activities, by their nature, promote one or more candidates, and activities that promote a candidate are outside the scope of the definition of generic campaign activity. The remaining

category of exempt activity—payments for certain campaign materials used by party volunteers (*see* 11 CFR 100.7(b)(15) and 100.8(b)(10))—may in certain circumstances also qualify as generic campaign activity under 11 CFR 100.25. If the campaign materials used by the volunteers promote only the party, and do not promote a candidate, then this activity would be both exempt and a generic campaign activity. A public interest group included an essentially similar analysis of this point in their comment.

*11 CFR 100.26   Definition of ''Public communication''*

BCRA amends 2 U.S.C. 431 by adding a new definition for the term ''public communication.'' BCRA defines ''public communication'' to include communications by broadcast, cable, satellite, newspaper, magazine, outdoor advertising facility, mass mailing or telephone bank to the general public, or any other form of general public political advertising.

The Commission did not include the Internet as a form of ''general public political advertising'' in proposed 11 CFR 100.26 because this provision of BCRA does not refer to the Internet. The Commission, however, sought comment as to whether the definition of ''public communication'' in proposed 11 CFR 100.26 should include or exclude communications provided through the use of World Wide Web sites available to the public, widely distributed electronic mail, or other uses of the Internet, such as ''Webcasts'' or the transmission of high-quality voice, graphics, or video advertisements.

Many commenters addressed this issue. A national political party, an association of State party officials, an LLC that provides technical services to campaigns, a State political party, a public interest group, and a labor union urged the Commission not to include the Internet in the definition of ''public communication.'' Four commenters pointed to the lack of inclusion of the Internet in the list of modes of public communications, noting that Congress had had an opportunity to include the Internet in this definition, but declined to do so.

A number of commenters argued that the Internet provides a low cost way for parties and other interested persons to disseminate their message widely, and the Commission should not attempt to regulate their doing so. The commenter who provides technical services to campaigns wrote, ''[the Internet] is an open, decentralized platform on which every user has the capacity to reach literally every other user. Candidates

and interest groups can and do use this medium to engage in meaningful, two-way dialogue * * *. Congress did not include other forms of two-way dialogue such as candidate forums, rallies, debates, or other events that are open to the public.''

The same commenter noted the practical impossibility in fashioning restrictions on Internet communications given the rapidly changing environment: ''Although the Internet itself has been in existence since the early 1970s, it is only recently that the medium has emerged in the mainstream * * * Internet technology continues to evolve, and so does its application.''

Other commenters were strongly opposed to the exclusion of the Internet from the media classified as public communications. The principal Congressional sponsors of BCRA and three public interest groups who support campaign finance reform argued that failure to include the Internet in this definition could carve out an exception for a widespread and growing form of political advertising. A public interest group echoed the words of the Congressional sponsors: ''A broad *per se* exclusion of that nature would be inadvisable because it could permit state and local party entities to exploit rapidly developing technology and new communications media to re-create or prolong the current soft money system.''

The Commission has considered the issue of Internet communication, both in the context of this rulemaking, as well as in previous rulemakings and the advisory opinion process. The Commission concludes that excluding the Internet from the definition of ''public communication'' is consistent with the plain meaning of the statute, consistent with Congress' decision not to include the Internet in the statutory definition of ''public communication,'' and is the best policy decision with regard to implementation of BCRA.

The Commission is convinced that the exclusion is appropriate from the perspective of statutory construction because the Internet is excluded from the list of media that constitute public communication under the statute. BCRA does not reference the ''Internet'' or ''electronic mail'' in this section, although Congress used the terms ''Internet,'' ''website,'' and ''World Wide Web address'' in other sections of BCRA. *See*, for example, 2 U.S.C. 434 note, enacted by BCRA section 201 (Federal Communications Commission to compile and maintain on its website information the FEC may need to carry out Title 2, Subtitle A, of BCRA, relating to electioneering communications); 2 U.S.C. 438a, as enacted by BCRA section

502 (Commission to maintain a website of election reports). Congress has also used the terms ''Internet'' and ''electronic mail'' in other statutes and distinguished them from ''telecommunications services.'' *See* Communications Decency Act of 1996, 47 U.S.C. § 230(f)(1) (defining ''Internet'') and 231(e)(4) (including ''electronic mail'' and excluding ''telecommunications services'' from definition of ''Internet access service''). BCRA does reference ''any other form of general public political advertising'' in the definition of ''public communication.'' General language following a listing of specific terms, however, does not evidence Congressional intent to include a separate and distinct term that is not listed, such as the Internet. *See* Sutherland Statutes and Statutory Construction, section 47; 17 *Ejusdem generis*, Vol. 2A (6th ed. 2000). It is also noted that there is no indication in the legislative history that Congress contemplated including the Internet in the definition of public communication.

Perhaps most important, there are significant policy reasons to exclude the Internet as a public communication. The Commission fails to see the threat of corruption that is present in a medium that allows almost limitless, inexpensive communication across the broadest possible cross-section of the American population. Unlike media such as television and radio, where the constraints of the medium make access financially prohibitive for the general population, the Internet is by definition a bastion of free political speech, where any individual has access to almost limitless political expression with minimal cost. As one public interest group who favors campaign finance reform argued: ''There are good policy reasons for leaving the Internet out of the definition, as it is cheap and widely available. Internet communications are not part of the campaign finance problem, and should not be regulated as such unless Congress specifically mandates it.''

### 11 CFR 100.27   Definition of ''Mass Mailing''

BCRA amends 2 U.S.C. 431 by adding a new definition of the term ''mass mailing'' at section 431(23). This definition, which is set out in new 11 CFR 100.27, includes any mailing by United States mail or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period. For the reasons explained in the Explanation and Justification for 11 CFR 100.26, the term ''mass mailing'' excludes

communications sent over the Internet. It also excludes ''electronic mail.'' *Cf.* 47 U.S.C. 231(e)(4) (''electronic mail'' is included in the definition of ''Internet access service'').

The term ''substantially similar'' is also used in the Commission's disclaimer regulations at 11 CFR 110.11(a)(3). When the disclaimer rules were adopted in 1995, the Commission explained that technological advances now permit what is basically the same communication to be personalized to include the recipient's name, occupation, geographic location, and similar variables. Communications are considered ''substantially similar'' for purposes of the disclaimer rules if they would be the same but for such individualization. *See Explanation and Justification for Regulations on Communications Disclaimer Requirements*, 60 FR 52069, 52070 (Oct. 5, 1995). The Commission proposed in the NPRM that the term ''substantially similar'' in 11 CFR 100.27 have the identical meaning.

Several commenters expressed the view that this definition of ''substantially similar'' is too narrow as applied to mass mailings. They pointed out, for example, that the sponsoring group could change an internal sentence every 490 letters and thereby escape coverage under this definition. Also, many communications are largely identical but contain a separate paragraph addressing a targeted group, such as retired teachers or those with a particular hobby. The Commission has therefore revised the final rules to state that communications are considered substantially similar for purposes of this section if they include substantially the same template or language, but vary in non-material respects such as communications customized by the recipient's name, occupation, or geographic location.

### 11 CFR 100.28   Definition of ''Telephone Bank''

BCRA amends 2 U.S.C. 431 by adding a new definition of the term ''telephone bank'' at section 431(24). This definition, which is set out in new 11 CFR 100.28, includes more than 500 telephone calls of an identical or substantially similar nature within any 30-day period. A telephone bank does not include electronic mail sent over telephone lines. *See* 47 U.S.C. 231(e)(4) (distinguishing ''electronic mail'' from ''telecommunications services''). Nor does it include Internet communications transmitted over telephone lines, for the reasons discussed above in the Explanation and Justification for 11 CFR 100.26.

The Commission also proposed addressing the meaning of "substantially similar" in the text of the rules. *See* discussion of 11 CFR 100.27, above. As with the definition of "mass mailing," discussed above, several commenters urged the Commission to broaden the definition of "substantially similar" contained in the proposed rules. They pointed out that, even more so than with mass mailings, phone conversations, even those where the caller is using a prepared script, are likely to vary somewhat from call to call. The Commission accordingly has revised the language of section 100.28 as proposed in the NPRM to provide that, consistent with the definition of "mass mailing" contained in section 100.27, communications are considered substantially similar for purposes of section 100.28 if they include substantially the same template or language, but vary in non-material respects such as communications customized to the recipient's name, occupation, or geographic location.

## IV. Part 102—Registration, Organization, and Recordkeeping by Political Committees

*11 CFR 102.5    Organizations Financing Political Activity in Connection With Federal and Non-Federal Elections, Other Than Through Transfers and Joint Fundraisers: Accounts and Accounting*

This section continues to set out requirements for accounts or accounting methods that must be established and maintained by organizations, including political committees, that fund activities in connection with Federal elections and non-Federal elections. The section has, however, been revised in several respects. 2 USC 441i(a) expressly prohibits national party committees from raising and spending non-Federal funds. Paragraph 102.5(c) addresses the application of this section to national party committees, while corresponding changes have been made to other portions of 11 CFR 102.5 to clarify that various provisions are now applicable to only State, district, and local party committees and organizations. While this section will continue to apply to all these party committees between November 6, 2002 and December 31, 2002, after the latter date, national party committees will no longer be covered by its provisions.

Paragraph (a)(1) remains largely unchanged except for the addition of language clarifying that State, district, and local party committees are the party organizations covered in these provisions, the addition of certain citations to other regulatory provisions,

including 11 CFR part 300, and the separate discussions of administrative expenses incurred by party committees and by other political committees that are not party committees.

Paragraph (a)(2) is revised to require committees to meet at least one of the three listed conditions for depositing contributions into their Federal accounts. The purpose of this regulation is to assure that funds placed in this account are from contributors who know the intended use of their contributions, and the Commission believes that this purpose can be fulfilled by means of either contributor designations, solicitations for express purposes, or solicitations or notifications that inform contributors that their contributions are subject to the prohibitions and limitations of the Act.

New paragraph (a)(3) addresses the new category of "Levin funds" created by BCRA to be used by State, district, and local party committees for certain Federal election activity. These funds are subject to certain prohibitions and limitations pursuant to 11 CFR 300.31 and may be used by these party committees to pay allocable shares of particular Federal election activities under particular circumstances, including voter registration, voter identification, get-out-the-vote and generic campaign activities. *See also* 11 CFR 100.24 and 11 CFR 300.32(b) and 300.33.

The NPRM proposed requiring State, district, and local party committees to establish separate Levin accounts. Responses to the NPRM from the principal Congressional sponsors of BCRA urged retention of this requirement; however, several other responses, in particular those from party committees, requested the Commission to make such separate accounts an option rather than a requirement. One commenter stated that "although it would seem generally prudent to establish separate 'Levin accounts,' imposing such a requirement in the regulations would be problematic," noting that some States prohibit party committees from establishing more than one depository account. In light of theses concerns, and because BCRA's statutory provisions do not mandate the creation of separate Levin accounts, revised paragraphs (a)(3)(i) and (ii) set out generally two alternative methods of accounting for Levin funds: a separate Levin account and the use of a reasonable accounting method approved by the Commission that will permit the committee to demonstrate that funds received and disbursed by the party committee in its existing non-Federal

account meet the requirements of the Act as amended by BCRA. Paragraph (a)(3)(ii) also requires those party committees electing not to establish a separate Levin account to maintain records of funds used for Levin activities and to make these records available to the Commission upon request. Party committees intending to undertake activities pursuant to 11 CFR 300.32(b) are urged to consult 11 CFR 300.30(c) for more detailed rules regarding alternative required accounts and accounting methods.

A comment submitted in response to the NPRM expressed concern that the draft regulations could have been construed as allowing Federal candidates and officeholders to solicit funds that would be excessive or prohibited under Federal law, if the solicitation being used stated that the funds would be used for a non-Federal purpose. To address this concern, paragraph (a)(4) has been added to emphasize that the restrictions on solicitations by Federal candidates and Federal officeholders in 11 CFR 300.31(e) and 11 CFR part 300, subpart D, apply to solicitations for State, district, and local party committees.

The final rules also include a new paragraph (a)(5) that clarifies the permissibility of State, district, and local party committees and organizations creating separate allocation accounts to be used for funding Levin activities that are allocable between Federal and Levin funds pursuant to 11 CFR 300.33 and for funding other activities allocable between a committee's Federal and non-Federal funds pursuant to 11 CFR 106.7. *See also* the Explanation and Justification below for new 11 CFR 106.7 and for new 11 CFR 300.33.

11 CFR 102.5(b) addresses organizations that are not political committees. Pursuant to paragraph (b)(1), when such organizations make contributions and expenditures or payments for exempt activities under 11 CFR 100.7(b)(9), (15), and (17) and 100.8(b)(10), (16), and (18), they must maintain records of the related receipts and disbursements and must make those records available to the Commission upon request. These organizations must also be able to demonstrate through a reasonable accounting method that funds used to make contributions, expenditures, and payments for exempt activities meet the requirements of the Act.

Paragraph (b)(2) of 11 CFR 102.5 applies to those State, district, and local party organizations that are not political committees but that wish to undertake Federal election activities pursuant to

11 CFR 300.32(b). Pursuant to 11 CFR 102.5(b)(2)(i) and (ii), these party organizations are given a choice of accounting methods: establishment of a separate Levin account or use of a reasonable accounting method approved by the Commission that will permit the organization to demonstrate that permissible funds from its existing accounts were used for permissible activities. They must also make their records of funds received and expended for these activities available to the Commission upon request. Party organizations that intend to undertake activities pursuant to 11 CFR 300.32(b) are urged to consult 11 CFR 300.30(c) for more detailed rules regarding alternative required accounts and accounting methods.

*11 CFR 102.17 Joint Fundraising by Committees Other Than Separate Segregated Funds*

The ban on national party non-Federal fundraising affects the Commission's joint fundraising rules at 11 CFR 102.17. The Commission is, therefore, adding introductory language to this section, advising readers that "[n]othing in this section shall supersede 11 CFR part 300, which prohibits any person from soliciting, receiving, directing, transferring, or spending any non-Federal funds, or from transferring Federal funds for Federal election activities." Part 300 is discussed below.

**V. Part 104—Reports by Political Committees**

*11 CFR 104.8 and 104.9 Uniform Reporting of Receipts and Disbursements*

As of November 6, 2002, BCRA prohibits national committees of political parties and entities directly or indirectly established, financed, maintained, and controlled by them, including their subordinate committees, from raising and spending non-Federal funds. BCRA further requires that national party committees, including subordinate committees thereof, dispose of all non-Federal funds by December 31, 2002 in accordance with 11 CFR 300.12, and report the disposition of those funds pursuant to section 300.13. Since national party committees will no longer maintain non-Federal accounts, including office building and facility accounts, the national party non-Federal account reporting rules at 11 CFR 104.8(e) and (f), and 11 CFR 104.9(c), (d) and (e) will no longer be necessary. Therefore, the final rules covering receipts by non-Federal accounts at 11 CFR 104.8(e) and (f), and disbursements

in the form of transfers to State and local party committees at 11 CFR 104.9(e), have been amended so that they apply to reports covering non-Federal account activity through December 31, 2002. In contrast, the final rules governing disbursements of non-Federal funds at 11 CFR 104.9(c) and (d) are amended to remain in effect for reports covering activity on or before March 31, 2003, rather than December 31, 2002 as provided in the NPRM. This change is prompted by the Commission's decision to permit national party committees to refund to donors by December 31, 2002 any excess non-Federal funds as provided in 11 CFR 300.12(c) and (d). Any refund checks not cashed by February 28, 2003, must be disgorged to the United States Treasury by March 31, 2003. Consequently any such disgorgements must be reported in disclosure reports covering activity through that date.

*11 CFR 104.10 Reporting by Separate Segregated Funds and Nonconnected Committees of Expenses Allocated Among Candidates and Activities*

Section 104.10 of the pre-BCRA regulations addressed the reporting of expenses that are allocated among more than one clearly identified candidate (paragraph (a)) and expenses that are allocated among specific types of mixed Federal/non-Federal activities by political party committees and by separate segregated funds and nonconnected committees (paragraph (b)). However, allocation with respect to certain mixed party activities has changed as a result of BCRA, notably in the introduction of the use of Levin funds. Some of the activity that was allocable under former 11 CFR 106.5 (allocation of mixed Federal/non-Federal activities by party committees) is now Federal election activity under certain circumstances. In addition, most of the categories are now allocated according to specified percentages. Moreover, the use of non-Federal funds by national party committees has been eliminated.

In view of these new circumstances, the rules for reporting of allocable expenses are being divided into three sections: 11 CFR 104.10 applies to political committees that are separate segregated funds or nonconnected committees; new 11 CFR 104.17 applies to payments allocated between the Federal and non-Federal accounts of State, district, and local party committees; and new 11 CFR 300.36 covers payments allocated by those party committees between Federal funds and Levin funds, pursuant to 11 CFR 300.32(b)(1) and 300.33.

Pre-BCRA section 104.10(a), which addressed payments entailing combined expenditures and disbursements on behalf of more than one clearly identified Federal and non-Federal candidate, is being changed very little at this point. Paragraph (a) is being amended to specify that it applies only to separate segregated funds and nonconnected committees, and to delete references to section 106.5(g) (now section 106.7(f)), which addresses non-Federal to Federal transfers made by party committees for the purpose of mixed payments.

Similar changes are being made to paragraph (b) of section 104.10. In view of the removal of party committees from this section, other adjustments are being made. In the discussion of itemization of allocated disbursements for administrative and generic voter drive expenses, the references to the Senate and House campaign committees of a political party are being deleted from paragraph (b)(1)(i) and (ii). In paragraph (b)(1)(ii), the specific reference to the types of committees using the funds expended method is being deleted because all committees addressed in this regulation would use the funds expended method for those two allocation categories. References to exempt activities are also deleted because those exemptions do not apply to the activities of separate segregated funds and nonconnected committees.

The only specific comments received on section 104.10 were general expressions of support from the principal Congressional sponsors of BCRA and two commenters on behalf of State party committees. Consequently, the final rules follow the proposed rules, except for two small reversions back to the pre-BCRA regulation. Instead of citing to 11 CFR 106.1 specifically as the regulation providing instructions on allocation for candidate support, the revised citation is to 11 CFR part 106 because 11 CFR 106.4 is applicable to the allocation of polling costs.

*11 CFR 104.17 Reporting of Allocable Expenses by Party Committees*

As indicated in the Explanations and Justifications for 11 CFR 104.10 and 106.1, pre-BCRA section 104.10 has been divided into two sections for the reporting of allocable payments. Section 104.10 now addresses reporting of allocable expenses by separate segregated funds and non-connected committees. Section 104.17, which had been a reserved section prior to the enactment of BCRA, now addresses reporting of allocable expenses by party committees.

Paragraph (a) of new section 104.17 addresses allocation of the support of candidates, including Federal and non-Federal candidates, by national party committees and by State, district, and local party committees. As indicated below, national party committees must use all Federal funds, while State, district, and local party committees may use a mixture of Federal and non-Federal funds under certain circumstances. Paragraph (b) of this section addresses the reporting of the allocation of expenditures and disbursements for mixed Federal/non-Federal activities that are not Federal election activities undertaken by State, district, and local party committees. These include, for example, administrative costs and the costs of exempt activities that do not fall within the definition of Federal election activity. Reporting requirements with regard to specific Federal election activities allocable between Federal and Levin funds pursuant to 11 CFR 300.33 are addressed separately in 11 CFR 300.36.

The NPRM included proposed 11 CFR 104.17(a) to address payments on behalf of more than one clearly identified candidate, including payments that entail an expenditure on behalf of one or more Federal candidates and a disbursement on behalf of one or more non-Federal candidates. The NPRM explained that all such payments must be made with Federal funds and must be reported.

Proposed paragraphs (a)(1) and (a)(2) provided for the use of a unique identifying title or code for each program or activity conducted on behalf of more than one candidate and for the retention of records in accordance with 11 CFR 104.14. These requirements were in pre-BCRA 11 CFR 104.10.

The Commission sought comments on the proposed requirement that a State, district, or local party use only Federal funds for the combined payments on behalf of clearly identified Federal and clearly identified non-Federal candidates. As indicated in the Explanation and Justification of 11 CFR 106.1, a number of commenters noted that materials and communications that refer to both Federal and non-Federal candidates, but are not public communications and do not otherwise meet the definition of Federal election activity, should continue to be subject to allocation based on the time or space devoted to each candidate. Other commenters asserted that only Federal funds could be used.

The final rule in 11 CFR 104.17 clarifies the issue as to the use of Federal funds. Paragraph (a) makes clear

that, where a national party committee makes a payment that consists of both an expenditure on behalf of a Federal candidate and a disbursement on behalf of a non-Federal candidate, the amounts attributed to each candidate must be disclosed, but only a Federal account may be used.

Paragraph (a) changes the approach taken in the NPRM with respect to State, district, and local party committees, which, unlike national party committees, may have non-Federal accounts under BCRA. The application of the new Federal election activity provisions of BCRA means that many disbursements by State, district, and local party committees mentioning Federal candidates that in the past were allocable between Federal and non-Federal accounts pre-BCRA must now be paid solely with Federal funds. There will still be, however, other payments entailing expenditures by State, district, and local party committees on behalf of Federal candidates and disbursements by these committees on behalf of non-Federal candidates that will not be Federal election activities; these will continue to be allocable between Federal and non-Federal accounts.

Accordingly, paragraph (a)(1) in the final rule generally follows pre-BCRA 11 CFR 104.10(a)(1), including the retention of the requirement of unique identifying titles or codes. All report entries that reflect the same allocable program or activity will share the same title or code to better track the particular program or activity. The use of unique identifiers for other various categories of mixed party activities is discussed below.

Paragraphs (a)(2) and (a)(3) of 11 CFR 104.17 follow pre-BCRA 11 CFR 104.10 with a minor citation change. Paragraph (a)(2) includes reporting of transfers to allocation accounts, which did not appear in either paragraph (a) or (b) of proposed 11 CFR 104.17. Proposed paragraph (a)(2), addressing recordkeeping, is re-numbered as (a)(4) in the final rules.

Section 104.17(b) in the NPRM addressed the reporting of all allocations of disbursements for activities of State, district, and local party committees, including disbursements for allocable Federal election activities, i.e., certain activities eligible to be paid in part with Levin funds pursuant to 11 CFR 300.33. For purposes of clarity, the final rule covers only the reporting of disbursements for allocable party activities that are not Federal election activities. The reporting of allocable Federal election activities is subject to the rules in 11 CFR 300.36.

Section 104.17(b) establishes that State, district, and local party committees that have set up Federal and non-Federal accounts, including any allocation accounts being used to make disbursements for allocable activities, must report all payments that are allocated pursuant to 11 CFR 106.7.

Paragraph (b)(1)(i) requires statements by State, district, and local party committees in their initial reports at the beginning of a calendar year of the percentages the committee will use for payments to be allocated between Federal and non-Federal accounts for specific categories of party activity. Paragraph (b)(1)(ii) requires a statement of the category for each allocable disbursement and the total amounts spent that year for each category. These requirements are similar to those contained in the pre-BCRA regulations.

With regard to a requirement of unique identifiers in the reports of allocable activities, the NPRM asked for comments as to whether such identifying codes would be useful. The principal Congressional sponsors of BCRA in their comments left this decision to the Commission, although they stated that identifying codes would be of "significant utility in greater specificity in reporting." Two of the comments from party committees argued against such a requirement, arguing that the purpose of the codes in the past had been to distinguish among activities that had differing allocation ratios and that use of the same allocation ratio made the codes unnecessary.

The final rule at paragraph (b)(1)(iii) of 11 CFR 104.17 requires party committees to assign unique identifiers to certain allocable activities, excluding allocable administrative costs. This requirement follows requirements in the pre-BCRA regulations at 11 CFR 104.10(b)(2) with regard to the reporting of the direct costs of fundraising and the costs of exempt activities. Paragraph (b)(1)(iii) also specifies that unique identifying titles or codes are not required for salaries and wages under 11 CFR 106.7(c)(1) because salaries and wages are not allocable.

The Commission recognizes that, as noted by certain party committees in their comments, the rules will now require use of the same set of percentages in a given year for almost all allocable party activity categories, thereby weakening one of the previous rationales for using unique identifiers for some categories of activities. Such identifying mechanisms are, however, still needed to enable reviewers of a party committee's reports, including members of the public, to track

accurately the specific transactions involved in a particular allocable activity. It is significant that party committees frequently make many disbursements to the same vendor for differing purposes and that a number of vendors may be paid for similar activities. Thus, the Commission is requiring that certain allocable activities or programs carry a unique identifying title or code. The Commission has also concluded that, while unique identifiers for administrative costs would be of some utility, it will continue the practice of not requiring them in order to avoid imposing an additional administrative burden on party committees. All entries of disbursements to pay for an allocated program or activity must include a reference to the unique identifier, if an identifier is required for that allocation category. In addition, each reporting entry of a transfer (from the non-Federal account to the Federal or allocation account) for a program or activity must include a reference to the unique identifier, if an identifier is required for that allocation category.

Paragraph (b)(2) of 11 CFR 104.17 addresses the reporting of transfers from the non-Federal to the Federal account, or from both accounts into the allocation account, of funds to be used for allocable expenses. As did the pre-BCRA rules, this paragraph requires memo entries on reports as to the allocable expenses for which the transfer is being made and the date of the transfer. If more than one activity is covered by a transfer, the report must itemize the amounts designated for each category of expense. The Commission received no comments on this provision.

Section 104.17(b)(3)(i) sets out the details required in the reporting of disbursements for allocable activity by State, district, and local committees of political parties.

Section 104.17(b)(3)(ii) addresses the reporting of State, district, and local party disbursements for activity that is allocable between a committee's Federal and Levin funds by referring the reader to the requirements of 11 CFR 300.36.

Section 104.17(b)(4) requires the retention of all documents supporting allocations of expenditures and disbursements for three years, consistent with FECA.

## VI. Part 106—Allocations of Candidate and Committee Activities

*11 CFR 106.1    Allocation of Expenses Between Candidates*

Pre-BCRA 11 CFR 106.1 addressed the allocation of expenditures and/or

disbursements among more than one candidate. Paragraph (a)(1) set out the general rule for allocation of an expenditure made on behalf of more than one clearly identified Federal candidate. It also addressed allocation of a payment involving both an expenditure made on behalf of one or more clearly identified Federal candidates and a disbursement on behalf of one or more non-Federal candidates. The proposed regulation in the NPRM added language indicating that a party committee must use only Federal funds for both kinds of situations, not just the first one. This was based on proposed 11 CFR 300.33(c)(1), which stated that only Federal funds could be used for activities that referred to a Federal candidate. It was also based on BCRA and proposed 11 CFR 100.24(a)(3), which provided that only Federal funds may be used for a public communication that refers to a clearly identified Federal candidate and that promotes, attacks, supports, or opposes the candidate (regardless of whether a non-Federal candidate is also mentioned).

The NPRM divided pre-BCRA section 104.10, which addressed reporting of allocation by nonconnected committees and separate segregated funds, as well as by party committees, into two sections: 11 CFR 104.10 for nonconnected committees and separate segregated funds, and 11 CFR 104.17 for party committees. In view of this rearrangement, the proposed rules in paragraph (a)(2) of section 106.1 added a reference to 11 CFR 104.17(a) to cover party committee reporting. In addition, the pre-BCRA rules addressing allocation among Federal and non-Federal candidates was modified in the NPRM to delete the citation to party committee transfer procedures. This was premised on the position that such payments had to be made entirely with Federal funds.

The NPRM proposed no changes to pre-BCRA paragraphs (b), (c), and (d) of 11 CFR 106.1. Paragraph (e) is a signpost to the sections that address allocation of specific types of mixed Federal/non-Federal activity, other than expenditures and/or disbursements on behalf of clearly identified candidates. The NPRM proposed to delete from this paragraph a reference to 11 CFR 106.5, to add a reference to 11 CFR 300.33, and to amend the list of allocation categories to conform to other proposed regulations, including a deletion of exempt activities.

The NPRM narrative asked whether the proposed requirement that a State, district, or local party committee use

only Federal funds for all payments made on behalf of both a clearly identified Federal and clearly identified non-Federal candidates is appropriate under BCRA. The NPRM also asked for comments on, and discussed whether exempt party activities[3] for both Federal and non-Federal candidates (i.e., entailing disbursements for Federal candidates that were exempt from the definition of contribution or expenditure) still exist as an allocable category after passage of BCRA.

Three commenters on behalf of party committees stated that not every activity that mentions a clearly identified Federal candidate must be paid for exclusively with Federal funds. They argued that materials and communications that refer to both Federal and non-Federal candidates but are not public communications and do not otherwise meet the definition of Federal election activity should continue to be subject to allocation based on time or space devoted to the Federal and non-Federal candidates as under the pre-BCRA regulations. One of these commenters also argued that the costs of "non-communicative activities" that result in an in-kind contribution and donation to Federal and non-Federal candidates respectively should continue to be allocable between Federal and non-Federal accounts.

The principal Congressional sponsors of BCRA stated that BCRA required the proposed result for such payments by State, district, and local party committees. Another commenter referred to several specific provisions in BCRA to support the view that only Federal funds can be used for the payment on behalf of both a Federal and non-Federal candidate: (1) 2 U.S.C. 441i(b)(1), which provides that costs for Federal election activity shall be paid for with Federal funds; and (2) 2 U.S.C. 441i(b)(2)(A) and (B), which allow for allocation of some Federal election activities but not when the activity refers to a clearly identified Federal candidate. A third commenter agreed that national party committees must use only Federal funds for payments involving both expenditures on behalf of a Federal candidate and disbursements on behalf of a non-Federal candidate but did not comment on State, district, or local party committees.

The comments on the relationship of Federal election activities to exempt activities are summarized in the

---

[3] For discussion of exempt activities, *see* Explanation and Justification for 11 CFR 100.24, above; *see also* 2 U.S.C. 431(8)(B)(v), (ix), and (xi), and 431(9)(B)(iv),(viii), and (ix).

Explanation and Justification of 11 CFR 100.24, above. Some commenters concluded that exempt activities should not be included within Federal election activity at all or that many exempt activities are not redefined as Federal election activity. Thus, they concluded that there are a number of exempt activities that are not Federal election activity. Others believe that exempt activities are nearly or completely subsumed by, or redefined as, Federal election activity. Within both groups, there was a variety of opinion as to the precise relationship.

The final rule at 11 CFR 106.1 has been changed from the proposed regulation with respect to the use by a party committee of both Federal and non-Federal funds for a payment that is an expenditure on behalf of a clearly identified Federal candidate and a disbursement on behalf of a clearly identified non-Federal candidate. Any such payment that is for a Federal election activity requires the use of Federal funds only, as set out in 11 CFR 106.1(a)(2). The final rule, in paragraph (a)(2), also includes references to other sections to the effect that payments for Federal election activities that are also attributable to clearly identified candidates are subject to new 11 CFR 300.33 and that the allocation among the particular candidates must be reported, in accordance with 11 CFR 104.17(a).

However, a payment that is not for Federal election activities but that is an expenditure on behalf of a clearly identified Federal candidate and also a disbursement on behalf of a clearly identified non-Federal candidate is either allocable between Federal and non-Federal accounts or payable with Federal funds only. Hence, the last sentence of proposed paragraph (a)(1), indicating that only Federal funds can be used, is deleted from the final rules. In addition, the final rule does not include language from proposed paragraph (a)(2) to the effect that only separate segregated funds and nonconnected committees may make a payment that includes an expenditure of Federal funds on behalf of a Federal candidate and a disbursement on behalf of a non-Federal candidate. Moreover, the reference to party committee transfer procedures for allocable expenses is added back into paragraph (a)(2).

Paragraph (a)(1) of the final rule includes also the appropriate method for attributing expenditures and disbursements among candidates in the case of a phone bank. This method is derived from pre-BCRA 11 CFR 106.5(e) (re-numbered 11 CFR 106.7), which addressed Federal/non-Federal

allocation in the analogous situation of exempt activities. This method, which has provided guidance for allocation of expenditures and disbursements for direct candidate support, is no longer in the new regulations after December 31, 2002 for other mixed party activities. Therefore, the regulations at 11 CFR 106.1 directly address phone banks.

Federal election activity includes some of the activities that also meet the definition of exempt activities. As indicated in the Explanation and Justification of 11 CFR 100.24, a Federal election activity that, pre-BCRA, would have been allocable as an exempt activity, is now a Federal election activity covered by the allocation rules at 11 CFR 300.33. Under 11 CFR 106.7, however, exempt activities still exist as an allocable category of expenses in a number of situations. Hence, a complete list of particular allocable costs other than those addressed in 11 CFR 106.1 should include exempt activities. The final rule at 11 CFR 106.1(e) does not list individual allocation categories but still serves as a signpost to sections addressing the allocation of mixed Federal/non-Federal or mixed Federal/Levin payments.

Exempt party activities also relate to section 106.1 as follows. If an activity supporting clearly identified Federal and non-Federal candidates is a Federal election activity and is not also an exempt activity, the portion of the payment attributable to each Federal candidate is an expenditure for that candidate, and may constitute an in-kind contribution, an independent expenditure, or a coordinated expenditure. If the payment is for a Federal election activity that is also an exempt activity, the amounts are exempted from the definition of "expenditure" or "contribution." Although the expense must be paid for entirely with Federal funds, only the amounts that are attributable to the Federal candidates or Federal elections (but using the new percentages in 11 CFR 106.7) count toward the political committee registration threshold at 2 U.S.C. 431(4)(C) for local party committees, which is more than $5,000 in exempt activity payments. See 11 CFR 100.5(c) and the Explanation and Justification for 11 CFR 100.24(a) and 11 CFR 300.36(a).

### 11 CFR 106.5   Allocation of Expenses Between Federal and Non-Federal Activities by National Party Committees

The NPRM proposed amending 11 CFR 106.5 to explain the allocation rules for State, district, and local party committees. Proposed paragraph (a) also stated that because national party

committees would no longer be able to raise and spend non-Federal funds, they would no longer be able to allocate their expenses between their Federal and non-Federal accounts. *See* 67 FR 35679. While this is true after December 31, 2002, national party committees will be able to spend non-Federal funds for limited purposes during the transition period of November 6, 2002, through December 31, 2002. For discussion of the transition period, *see* the Explanation and Justification for 11 CFR 300.12, below. The Commission realizes that the regulations need to contain allocation rules for national party committees during this transition period. Therefore, the final rules include several technical amendments to section 106.5 to make it applicable solely to national party committees and only during the transition period. The current allocation rules remain unchanged for national party committees. The final rules that apply to State, district, and local party committees, set out in proposed 11 CFR 106.5, are being designated as new 11 CFR 106.7 in the final rules. *See* below.

Consistent with this reorganization, the word "national" is placed before "party committees" in several places in 11 CFR 106.5, including the title of the section, to clarify that this section only applies to national party committees. A title is added to paragraph (a)(1) for consistency because all other paragraphs under paragraph (a) have titles. Paragraphs (a)(2)(iii), (d), and (e) are removed and reserved because they apply to State, district, and local party committees. Paragraph (h) is added to be a sunset provision. Paragraph (h) states that section 106.5 only applies during the transition period and will no longer be effective after December 31, 2002.

### 11 CFR 106.7   Allocation of Expenses Between Federal and Non-Federal Accounts by Party Committees, Other Than for Federal Election Activities

Section 106.7 sets forth rules governing the allocation of certain expenses between the Federal and non-Federal accounts of political parties. Much of new section 106.7 covers topics formerly addressed in pre-BCRA 11 CFR 106.5. The final rules addressing allocation of expenditures and disbursements at 11 CFR 106.7 and 11 CFR 300.33 separate between the two sections respectively those activities that are not "Federal election activity" and those that are. This reorganization is based in large part upon the need to clarify in the rules the relationship between "exempt activities" and "Federal election activities," particularly given certain timing

parameters involved in the sub-set of Federal election activities that may be paid in part with Levin funds. *See* 11 CFR 300.32 and 300.33. Therefore, 11 CFR 106.7 addresses allocation of expenses for all State, district, and local party activity that falls outside the definition of Federal election activity, which are allocable between Federal and non-Federal accounts. In contrast, 11 CFR 300.33 addresses the allocation of those types of Federal election activity that may be allocated between Federal and Levin accounts.

*A. Allocable Activities That Are Not FEA*

The content of 11 CFR 106.7(a) and (b) remains much the same as the NPRM, when it was designated 11 CFR 106.5(a) and (b), although new language has been added to emphasize that these provisions address activities other than Federal election activities. These paragraphs state the general principles that after December 31, 2002: (1) National party committees are no longer permitted to raise and spend non-Federal funds,[4] and thus are unable to allocate expenses between Federal and non-Federal accounts; and (2) State, district, and local party committees that make expenditures and disbursements for activities other than Federal election activities in connection with both Federal and non-Federal elections must either use only Federal funds for these purposes or must establish separate Federal and non-Federal accounts and allocate expenditures between or among those accounts.

The prohibitions on national party committee use of non-Federal funds has resulted in the complete elimination of pre-BCRA 11 CFR 106.5(b) and (c). Thus, the provisions in new 11 CFR 106.7(b) through (f) only apply to State, district, and local party committees, and do not apply to national party committees.

*B. Salaries and Wages*

Paragraph 106.7(c) addresses costs that must be either paid totally from Federal accounts or allocated by State, district, and local party committees between their Federal and non-Federal accounts. Under paragraph (c)(1), however, State, district, and local party committees must pay entirely with funds that comply with State law the salaries and wages of employees who spend 25% or less of their compensated time on Federal election activity or an activity in connection with Federal elections. The inclusion of "wages" is

intended to include hourly employees. The compensation of other employees who spend more time on Federal election activity or activity in connection with Federal elections is addressed in paragraph (d)(1)(ii) and new 11 CFR 300.33. BCRA defines "Federal election activity" to include the cost of all services provided by an employee in any month in which the individual spends more than 25% of his or her compensated time on activities in connection with a Federal election. 2 U.S.C. 431(20)(A)(iv). This federalizes a high proportion of salary payments that were previously paid for with an allocation of Federal and non-Federal dollars. By requiring the salaries and wages related to many activities that are primarily, or even entirely, State or local in their orientation to be paid for with Federal funds, when the amount of time spent on them exceeds 25%, Congress clearly expressed its desire to federalize these costs. By implication, Congress appears to have concluded that salaries for employees spending 25% or less of their time on activities in connection with a Federal election or on Federal election activities do not have to be paid from any mix of Federal funds. Thus, this new regulation in 11 CFR 106.7(c) is in accord with Congressional intent, and it comports with Congress's expectation that the Commission would develop allocation regulations for Federal election activity paid for in part with Levin funds.

The proposed regulations at 11 CFR 300.33(b)(1) would have required State, district, and local party committees to keep time records for all employees, the purpose being to provide documentation for allocation purposes. The NPRM set out three possible alternative methods by which a committee could collect such documentation. In response to the NPRM, a State party committee asserted that time sheets would be "burdensome," that written certifications by employees would be "equally impractical," but that a tally sheet kept by the employer would be "more reasonable." The same commenter nonetheless urged the Commission not to require any particular method of documentation. For the reasons noted by the commenters, the final rule at 11 CFR 106.7(d)(1) requires only that a monthly log be kept of the percentage of time each employee spends in connection with a Federal election.

*C. Administrative Costs*

One category of allocable expenses in 11 CFR 106.7 is "administrative costs." Under paragraph (c)(2), these costs

cover administrative expenses except for employee salaries and wages. The final rule requires allocation of these costs between a party committee's Federal and non-Federal accounts, unless they can be attributed to a clearly identified Federal candidate, in which case they are totally Federal costs to be paid with Federal funds.

A number of the comments received in response to the NPRM argued that, because BCRA does not address administrative costs, State, district, and local party committees should be able to pay them totally out of their non-Federal accounts. One commenter representing a State party emphasized the many State and local elections and ballot initiatives with which his party is involved as compared to the number of Federal elections. Other commenters, however, including the principal Congressional sponsors of BCRA, argued that BCRA was never intended to change the allocations required by the pre-BCRA regulations, and that administrative costs should continue to be allocable between Federal and non-Federal accounts.

While the Commission recognizes that non-Federal activity consumes a large portion of State party time and finances, there is no doubt that Federal candidates benefit from such party committees' efforts to reach and motivate potential voters. The Commission also agrees that nothing in BCRA or the legislative history suggests that Congress intended the Commission to abandon its longstanding allocation requirement for these expenses. Therefore, the final rules continue to require allocation of administrative costs under a simplified allocation method discussed below.

*D. Exempt Activities*

Under the Act, as amended by BCRA, how the costs of voter registration, voter identification, get-out-the-vote ("GOTV") and other campaign activities that may promote or oppose a political party without promoting or opposing a candidate are allocated depends on whether such activities come within the definition of "Federal election activity" or not. *See* 11 CFR 100.24(a), (b). Numerous commenters focused upon the relationship between the provisions in FECA and in the Commission's regulations that exempt certain party activities from the definitions of "contribution" and "expenditure" and the provisions in BCRA establishing "Federal election activities" as a general category, and activities for which Levin funds may be used. The comments and the Commission's determinations in this regard are discussed in the Explanation

---

[4] The actual ban on this activity takes effect on November 6, 2002.

and Justification for 11 CFR 100.24 defining "Federal election activity."

The final rules in 11 CFR 106.7(c)(3) set out the permitted allocations of costs for categories of party expenditures and disbursements for activities that are exempt party activities but are not Federal election activities. The party committee must either pay the costs of this activity from its Federal account or allocate the costs between its Federal and non-Federal accounts.

*E. Fundraising Costs*

11 CFR 106.7(c)(4) addresses the direct costs of a fundraising program or event when the State, district, or local party committee is raising both Federal and non-Federal funds for itself. The NPRM indicated that all *direct* fundraising costs must be paid from a Federal account, while other fundraising-related costs not directly related to particular fundraising programs or events could be allocated between Federal and non-Federal accounts as administrative costs.

There was no consensus among the public comments addressing this topic. The principal Congressional sponsors of BCRA supported the proposed rules that would have required entirely Federal funds to be used for these purposes. A public interest group and a party committee urged the Commission to continue to use the previous funds received method for allocating these fundraising costs. Two party committees urged allocation of only those fundraising costs that are directly associated with a particular fundraising program or event.

The Commission observes that BCRA requires the use by State, district, and local party committees of funds "subject to the limitations, prohibitions, and reporting requirements of this Act." 2 U.S.C. 441i(c). Thus, the Commission has concluded that not only Federal funds, but Levin funds as well, may be used to raise funds that are used, in whole or in part, for Federal election activities. *See* 11 CFR 300.33(c)(3). Non-Federal funds may not be used. The reasons for this conclusion are set out in greater details in the Explanation and Justification for 11 CFR 300.32 below.

With regard to fundraising purposes other than Federal election activity, the final rule at 11 CFR 106.7(c)(4) permits the direct costs of fundraising to be allocated between Federal and non-Federal funds, provided that none of the proceeds so raised will ever be used for Federal election activities. In addition, the rule requires the segregation of the proceeds in bank accounts that are never used for Federal election activity. Paragraph (c)(4) specifies that direct

costs of fundraising include the solicitation costs and the costs of planning and administering a particular fundraising event or program.

*F. Certain Voter Drive Activities*

11 CFR 106.7(c)(5), which did not appear in the version of the regulation published in the NPRM, addresses expenses, other than salaries and wages, for voter-drive activities and other party committee activities that are not candidate-specific and that do not qualify as Federal election activities. These may include, for example, certain voter identification, GOTV, or other activities that do not promote or oppose a Federal candidate or non-Federal candidate, and that do not qualify as Federal election activities because they are not in connection with an election in which a Federal candidate appears on the ballot. *See* 11 CFR 100.24(a)(1) and (b)(2). Paragraph (c)(5) provides that the costs of such activities may be allocated between the Federal and non-Federal accounts of the State, district, or local party committee.

*G. Allocation Percentages and Recordkeeping*

One goal of the final rule is to assure that activities deemed allocable are not paid for with a disproportionate amount of non-Federal funds. Another goal is to simplify the allocation process, in particular by establishing formulas that do not vary from State to State. Therefore, in lieu of the State-by-State ballot composition ratios for administrative costs and generic campaign activity and in lieu of the time or space method applied to exempt State activities, which were required at 11 CFR 106.7(d)(2) and (3) establish fixed percentages for all States for certain activities. The percentages vary only in terms of whether or not a Presidential campaign and/or a Senate campaign is to be held in a particular election year.

In the NPRM, the Commission set out proposed required allocation percentages for the Federal shares of salaries and other compensation paid employees who spend 25% or less of their time on Federal elections, for administrative expenses, and for exempt party activities that are not Federal election activities. For the reasons explained above, the Commission has decided that no salaries and wages are to be allocated. With regard to administrative costs and exempt activities, State, district, and local party committees must allocate no less than the following amounts to their Federal

accounts during the following years (and in the preceding year):

(i) Presidential only election year—28% of costs

(ii) Presidential and Senate election year—36% of costs

(iii) Senate only election year—21% of costs

(iv) Non-Presidential and Non-Senate election year—15% of costs.

These figures were derived by taking averages of the ballot composition-based allocation percentages reported by State party committees in four groupings of States selected for their diversities of size and geographic location and for the particular elections held in each State in 2000 and 2002. The groupings were: (1) Six States (Alabama, Colorado, Illinois, New Hampshire, Oklahoma, and Oregon) in which there was a Presidential but no Senate campaign in 2000; (2) 10 States (California, Delaware, Georgia, Florida, Michigan, New York, North Dakota, Texas, Vermont, and Wyoming) in which there were both a Presidential campaign and a Senate campaign in 2000; (3) six States (Delaware, Georgia, Michigan, Oklahoma, Texas, and Wyoming) in which there will be a Senate campaign in 2002; and (4) six States (California, Florida, New York, North Dakota, Vermont, and Washington) in which there will be no Senate campaign in 2002.

In 2000, the Federal percentages for the two parties in six States with only a Presidential campaign ranged from 20% to 33.33%, with an average of 28%, while the Federal percentages for the two parties in ten States which held both Presidential and Senate campaign that year ranged from 30% to 43%, with an average of 36%. In 2002, the Federal percentages for the two parties in six States with a Senate campaign ranged from 20% to 25%, with an average of 21%, while the Federal percentages for the two parties in six States with no Senate campaign ranged from 11.11% to 16.67%, with an average of 15%. The rules apply the average percentages in each of the four groupings of States to all 50 States.

One comment on the proposed rules from a public interest organization addressed the Commission's proposed fixed percentages by providing two alternatives to the Commission's figures. The first alternative would have set a flat 33% requirement for Federal shares of what the commenter termed "Levin expenditures" (*see* 11 CFR 300.33) and for allocable costs other than administrative costs in odd-numbered years or in non-Presidential election years, and a flat 40% requirement for Federal shares of these same categories

of activities in Presidential election years. This alternative would also have required a 25% allocation for administrative costs in all years. The commenter based these percentages on what were termed "the current assumption" as to what State party committees spend in certain years.

The second alternative urged by this commenter adopted the Commission's calculations, but called for the use of the higher percentages in the sample States for what the response termed "Levin spending" and for voter registration outside the 120 day period before an election, plus the average percentages for non-Levin expenses such as administrative costs. The commenter also urged the Commission to be clear that its allocation percentages apply to a two-year election cycle, not just to the year of a Federal election.

The comment submitted on behalf of the principal Congressional sponsors of BCRA with regard to fixed allocation percentages was very similar to that of the public interest organization's response cited above in that, as one alternative approach, it called for at least a 33% Federal allocation of what it termed "Levin activities" and of voter registration activities outside the 120 period before an election, plus 25% Federal allocations for administrative expenses. It also called for 40% Federal allocations of Levin activities and of voter registration activities that are not Federal election activities in Presidential election years. This alternative assumed the application of the percentages to two-year Federal election cycles. As a second alternative, this commenter also agreed to use of the Commission's percentages for administrative costs in a two year cycle, but urged the application over that cycle of the highest, not the average, Federal percentages for what it termed "Levin activities and voter registration activities that are not 'Federal election activity' * * * ." Another comment from a public interest organization also called for use of the highest percentages in the identified States, not the average percentages.

The comments received from party committees with regard to fixed percentages for Federal allocations ranged from support for the Commission's position to giving party committees a choice at the beginning of each cycle between the proposed formula and ballot composition ratios.

The final rules at 11 CFR 106.7(d) include the phrase, "and in the preceding year," to clarify that the allocation formula in this section apply to both years of a Federal election cycle.

With regard to the amounts of the fixed minimum Federal allocations, the final rules adopt the percentages contained in the NPRM because they represent averages of actual allocation ratios used in specific States at specific times, not assumptions as to possible State, district, and local party behavior in the future. These percentages represent a clear, bright line test intended to be more easily understood and applied than the previous regulations, consistent with statutory intent. As noted above, the percentages apply throughout a two-year cycle—i.e., from January 1st of odd-numbered years through December 31st of even-numbered years.

## H. Allocable Fundraising Costs

The NPRM sought comment as to whether costs of fundraising, other than fundraising for Federal election activities, should be allocated under the "funds received" method in previous 11 CFR 106.5(f). Two commenters, a political party organization and a public interest organization, supported the idea of using the "funds received" method for fundraising where the funds raised are not used for Federal election activity.

The Commission has decided to continue the use of the "funds received" method for allocating direct costs of fundraising. This is set out in a new 11 CFR 106.7(d)(4). Under this method, the State, district, or local party committee must allocate based on the ratio of funds received into the Federal account to the total receipts for the fundraising program or event. The ratio must be estimated prior to each such program or event based upon a reasonable prediction and, as provided in the rule, subsequent adjustments must be made, if necessary. New 11 CFR 106.7(e)(4) clarifies that fundraising costs for Federal election activities are governed by new 11 CFR 300.32.

## I. Non-Allocable Costs

Section 106.7(e) sets out those activities that are not allocable between Federal and non-Federal accounts. Paragraph (e)(1) requires that a payment for any activity that refers only to one or more candidates for Federal office must not be allocated between Federal and non-Federal accounts. These costs must be paid for entirely with funds from a Federal account. Paragraphs (e)(2) and (3) indicate that employee salaries and wages under certain conditions must not be allocated between Federal and non-Federal accounts, but must be paid for entirely with non-Federal funds.

## J. Transfers

Section 106.7(f), which addresses transfers to pay for allocable activities, is similar to the proposed rule, with the addition of language providing for allocation accounts as an alternative to the use of Federal accounts for initial payments of allocable expenditures and disbursements. This provision tracks for the most part the language and requirements of pre-BCRA 11 CFR 106.5(g). No comments addressed the continuation of this requirement. Reimbursements from a non-Federal account to a Federal account must take place within a specified number of days. The continuation of these timing provisions will ensure that party committees need not change this aspect of their operations.

Section 106.7(f)(2)(ii), like former 11 CFR 106.5(g)(2)(B)(iii), explains that any payment outside this time frame, absent the need for an advance payment of a reasonably estimated amount, could result, depending on the circumstances, in a loan of non-Federal funds to the Federal account and a violation of the Act. No commenters addressed this provision.

## VII. Part 108—Filing Copies of Reports and Statements With State Officers

### 11 CFR 108.7    Effect of State Law

Section 108.7 addresses Federal preemption of State law based on 2 U.S.C. 453(a) and its legislative history. Paragraph (c) lists the types of State laws that are not preempted or superseded by the Act and the regulations. BCRA amended the Act at 2 U.S.C. 453(b), providing for the application of State law to the use of non-Federal funds for the purchase or construction by a State or local party of its office building. Federal preemption continues to exist when Federal funds are used. This amendment is implemented in new section 300.35. Paragraph (c) of section 108.7 is therefore being amended to include the application of State law to the use of non-Federal funds for the purchase or construction of a State or local party office building in accordance with 11 CFR 300.35.

## VIII. Part 110—Contribution and Expenditure Limitations and Prohibitions

### 11 CFR 110.1    Contributions by Persons Other than Multicandidate Political Committees

BCRA amended 2 U.S.C. 441a(a)(1) to raise the amount that individuals may donate to State committees of political parties from $5,000 to $10,000 in any

calendar year. New 11 CFR 110.1(c)(5) incorporates this increased contribution limitation, which is effective January 1, 2003. The principal Congressional sponsors of BCRA included in their comment an emphasis upon the fact that this is an increase in the limitation on Federal funds. No other comments on this provision were received.

## IX. Part 114—Corporate and Labor Organization Activity

### 11 CFR 114.1    Definitions

The pre-BCRA text of 11 CFR 114.1(a)(2)(ix) follows the repealed statutory provision as to the purchase or construction by a national or State party committee of an office facility. It is therefore being deleted and replaced with an annotated cross-reference to new 11 CFR 300.35 which describes how the purchase or construction of an office building by a State or local party committee may be funded. A national committee's office building must be purchased or constructed only with Federal funds. *See* new section 300.10. The texts of the regulations currently at 11 CFR 100.7(b)(12) and 100.8(b)(13), which are similar to the pre-BCRA text of section 114.1(a)(2)(ix), are the subject of a separate rulemaking. *See Notice of Proposed Rulemaking*, 67 FR 40881 (June 14, 2002).

## X. Part 300—Non-Federal Funds

### 11 CFR 300.1    Scope and Effective Date, and Organization

The bulk of the new rules that address non-Federal funds of political party committees are contained in 11 CFR part 300. Section 300.1 addresses the scope of new part 300, sets forth the effective date of the provisions contained in the new part, and outlines the organization of the new part. Specifically, paragraph (a) of section 300.1 states that new part 300 implements changes to the FECA enacted by Title I of BCRA. It also notes that nothing in part 300 is intended to alter the definitions, restrictions, liabilities, and obligations imposed by sections 431–455 of Title 2 of the United States Code or in the regulations prescribed thereunder in 11 CFR parts 100–116.

The effective date of BCRA, except where otherwise stated, is November 6, 2002. *See* 2 U.S.C. 431 note, section 402(a). Consistent with BCRA, paragraph (b) of section 300.1 states that part 300 takes effect on November 6, 2002, except for the following: (1) Where otherwise stated in part 300; (2) subpart B of part 300 relating to State, district, and local party committees does not apply with respect to runoff

elections, recounts, or election contests resulting from elections held prior to November 6, 2002; (3) the increase in individual contribution limits to State party committees as set forth in proposed 11 CFR 110.1(c)(5) applies to contributions made on or after January 1, 2003; and (4) national parties must spend any remaining non-Federal funds received before November 6 and in their possession on that date by January 1, 2003, subject to the transition rules set forth in proposed 11 CFR 300.12.

Finally, paragraph (c) of section 300.1 explains that part 300 is organized into five subparts, with each subpart addressing a specific category of persons affected by BCRA. Subpart A of part 300 prescribes rules pertaining to national party committees; subpart B prescribes rules pertaining to State, district, and local party committees and organizations; subpart C addresses rules affecting certain tax-exempt organizations; subpart D prescribes rules pertaining to Federal candidates and Federal officeholders; and subpart E prescribes rules pertaining to State and local candidates. In addition, BCRA requires changes in other parts of Title 11 of the *Code of Federal Regulations*, which are also addressed in this rulemaking. One commenter supported the provisions of this section. The final rules follow the proposed rules, with the exception of minor revisions to clarify the scope of each subpart.

### 11 CFR 300.2    Definitions

A. 11 CFR 300.2(a)    Definition of "501(c) organization that makes expenditures or disbursements in connection with a Federal Election"

New 11 CFR 300.2(a) defines a 501(c) organization "that makes expenditures or disbursements in connection with a Federal election." BCRA prohibits national and State party committees, their officers and agents, and certain entities associated with them, from soliciting any funds for, or making or directing any donations to, 501(c) organizations that fit this definition. The NPRM sought comments on whether the definition of 501(c) organizations affected by the prohibition on party fundraising and donations should contain a temporal requirement so that this prohibition is not overbroad and does not encompass, for example, an organization that made expenditures and disbursements in connection with a Federal election many years ago but has not done so recently and does not plan to do so in the future.

Commenters were in general agreement that a temporal requirement was a good idea. Several commenters

suggested that the prohibition should encompass organizations that have made expenditures and disbursements in connection with a Federal election during the past three election cycles, or six years. Other commenters stated that the definition was overbroad without a temporal requirement but offered no suggestion for a specific time frame.

The final rule at 11 CFR 300.2(a) defines a 501(c) organization "that makes expenditures or disbursements in connection with a Federal election" as one that plans to make such expenditures or disbursements, including for Federal election activity, within the current election cycle or plans to pay a debt incurred in a prior election cycle for making such expenditures or disbursements. Because BCRA uses the present tense in referring to affected 501(c) organizations, the Commission believes that the prohibition on party fundraising should only apply to Section 501(c) organizations that undertake such spending within the current two-year election cycle. The definition in new 11 CFR 300.2(a) also includes organizations that plan to pay debts incurred in a prior election cycle for such expenditures or disbursements. This will prevent, for example, an organization from certifying that it does not plan to make expenditures or disbursements in connection with a Federal election in the current 2-year election cycle, if it receives donations or fundraising assistance from a party committee and uses those funds to pay off debt incurred for such expenditures or disbursements relating to a prior election cycle.

The proposed definition in the NPRM would have also delineated the types of activity that constitute expenditures or disbursements in connection with a Federal election. One commenter expressed support for this proposed rule. The final rule does not, however, set out specific activities that constitute such expenditures or disbursements. Federal election activity is defined at new 11 CFR 100.24 so that one component of the definition is clear. Moreover, the Commission believes that advisory opinions and closed enforcement matters provide guidance as to what constitutes activities in connection with a Federal election. Attempting to include specific activities in the definition in 11 CFR 300.2(a) might result in an overbroad definition.

B. 11 CFR 300.2(b)    Definition of "Agent"

Many of the prohibitions and restrictions of BCRA apply to a principal entity, such as a political party

committee or a candidate, and to the "agents" of such principals where they act on behalf of those principals. *See, e.g.,* 2 U.S.C. 441i(a)(1), (2); 2 U.S.C. 441i(b)(1); 2 U.S.C. 441i(e)(1). Congress did not define the term, "agent," in BCRA. In the NPRM, the Commission proposed a regulatory definition framed in terms of "a person who has actual express oral or written authority" to act on behalf of a principal. This definition would have defined "actual authority" as "instructions, either oral or written," from the principal. The Commission solicited comments on several aspects of this proposed definition, such as the potential applicability of the definition to volunteers, whether the principal's actual knowledge of the putative agent's activities is relevant, and the potential applicability of the concept of apparent authority.

The Commission received many comments on the proposed definition of agent. Several commenters found the proposed definition "too narrow." One described the requirement that an agent's authority must be actual and express to be a "loophole that would utterly swallow the rule," arguing that in the "real world" fundraising is accomplished largely through agents without express authority in a "technical" or "legal" sense. The principal Congressional sponsors of BCRA commented that the proper definition of "agent" is critical to prevent evasion of the "soft-money" prohibitions at the center of Title I of BCRA. The definition, they believe, should encompass "anyone who has an agency relationship under common law," including apparent authority. The principal Congressional sponsors and a public interest group commented that the new definition should not be narrower than the definition of agent currently used by the Commission in regulating independent expenditures. *See* 11 CFR 109.1(b)(5). The sponsors also commented that the Commission should not exclude volunteers and vendors *per se.* A public interest group also urged the Commission to include apparent authority within the definition. This group argued that "bestowing" a title or position on an individual implies that the individual is working on behalf of the principal who bestowed the title or position.

In contrast, other commenters, comprised of national and State political party committees and labor organizations, applauded the proposed rule's conjunctive requirement that the agent's authority must be actual and express. Three national party committees commented that the definition should be further limited to

individuals with "substantive decision-making authority." Many of these commenters stressed that the Commission should consider two issues in implementing the regulatory definition of "agent." The first issue is the nature of an agent's "individual liability" for his or her own actions. The second issue is the perceived "vicarious liability" of the principal. With regard to the first issue, several commenters, including a State party committee, an association of State party officials, and several national party committees, suggested the Commission use 11 CFR 109.1(b)(5) as a model for the new definition, presumably modified to provide that authority must be actual and express. Regarding the second issue, several commenters urged the Commission to give full effect to a requirement that the agent must be acting on behalf of the principal before the principal incurs liability derived from the agent's actions. Two labor organizations commented that the principal's derivative liability should not extend beyond activities the agent has been specifically authorized to conduct. Two national party committees commented that the final definition must impose liability only when a principal exercises actual control over the actions of the agent, arguing that it would be unfair to impose liability for actions beyond the principal's control. Another commenter, framed its suggestion in terms of limiting a principal's liability to actions taken by an agent on the principal's "explicit instructions."

The final rules define "agent" for purposes of Title I of BCRA as "any person who has actual authority, either express or implied." The final rules make clear that the definition of "agent" is limited to those individuals who have actual authority, express or implied, to act on behalf of their principals and does not apply to individuals who do not have any actual authority to act on their behalf, but only "apparent authority" to do so. The final regulation thus differs from the regulation proposed in the NPRM. The Commission makes this change for reasons articulated by the United States Supreme Court. In *Community for Creative Non-Violence* v. *Reid,* 490 U.S. 730, 739 (1989) the High Court held that the defining of statutory terms should be guided by "settled meaning under * * * the common law * * * unless the statute otherwise dictates." In this regard, the Commission notes that under the common law of agency, an "agent's authority may be actual or apparent." *Moriarty* v. *Glueckert Funeral Home,*

*Ltd.,* 155 F.3d 859, 865–866 (7th Cir. 1998) (quoting Restatement (Second) of Agency, 26). But the Supreme Court has made it equally clear that not every nuance of agency law should be incorporated into Federal statutes where full incorporation is not necessary to effect the statute's underlying purpose. *See Faragher* v. *City of Boca Raton,* 524 U.S. 775, 802 n.3 (1998) (The "obligation is not to make a pronouncement of agency law in general or to transplant [the Restatement (Second) of Agency into a Federal statute, but] is to adapt agency concepts to the [statute's] practical objectives.")

For these reasons, the definition of "agent" in the final regulation does not incorporate apparent authority. "[A]pparent authority to do an act is created as to a third party by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third party to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency, 27. As has been noted by commenters, apparent authority is largely a concept created to protect innocent third parties who have suffered monetary damages as a result of reasonably relying on the representations of individuals who purported to have, but did not actually have, authority to act on behalf of principals. Unlike other legislative areas, such as consumer protection and anti-fraud legislation, BCRA does not affect individuals who have been defrauded or have suffered economic loss due to their detrimental reliance on unauthorized representations. Rather, the Commission interprets Title I of BCRA to use agency concepts to prevent evasion or avoidance of certain prohibitions and restrictions by individuals who have actual authority and who do act on behalf of their principals. In this light, apparent authority concepts are not necessary to give effect to BCRA.

It is necessary, however, to define "agent" to include implied and express authority in order to fully implement Title I of BCRA. Otherwise, agents with actual authority would be able to engage in activities that would not be imputed to their principals so long as the principal was careful enough to confer authority through conduct or a mix of conduct and spoken words. The comments and testimony received by the Commission perhaps reveal some confusion about the term "implied authority." Implied authority *is* a form of actual authority. *Moriarty, supra,* 155 F.3d at 865–866 (7th Cir. 1998) (quoting Restatement (Second) of Agency, 26)

(actual authority may be express or implied). Implied authority should not be confused with apparent authority, which is a distinct concept. Restatement (Second) of Agency, 8, cmt a. It is well settled that whether an agent has implied authority is within the control of the principal. Thus, the Commission emphasizes that a principal may not be held liable, under an implied actual authority theory, unless the principal's own conduct reasonably causes the agent to believe that he or she had authority. For example, a party committee cannot be held liable for the actions of a rogue or misguided volunteer who purported to act on behalf of the committee, unless the committee's own written or spoken word, or other conduct, caused the volunteer to reasonably believe that the committee desired him or her to so act. Once an agent has actual authority, however, "[u]nless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." Restatement (Second) of Agency, 35; *see U.S.* v. *Flemmi,* 225 F.3d 78, 85 (1st Cir. 2000).

Title I of BCRA refers to "agents" in order to implement specific prohibitions and limitations with regard to particular, enumerated activities on behalf of specific principals. The final regulation limits the scope of the definition accordingly in paragraphs (b)(1) through (b)(4). Each provision in paragraphs (b)(1) through (b)(4) is tied to a specific provision in Title I of BCRA that relies on agency concepts to implement a specific prohibition or limitation. The Commission emphasizes that, under the Commission's final regulation, a principal cannot be held liable for the actions of an agent unless (1) the agent has actual authority, (2) the agent is acting on behalf of his or her principal, and (3) the agent is engaged in one of the specific activities described in paragraphs (b)(1) through (4).

Paragraph (b)(1) limits a national party committee's liability to an agent's authorized actions with regard to two activities. The first is soliciting, directing, or receiving any contribution, donation, or transfer of funds on behalf of the national party committee. 2 U.S.C. 441i(a)(1), (2). The second is soliciting funds for, or making or directing donations to, section 501(c) and 527 organizations. 2 U.S.C. 441i(d).

Paragraph (b)(2) limits the liability of State, district, or local political party committees to the actions of an agent who has actual authority in four particular areas. The first is to make

expenditures or disbursements of any funds for Federal election activity on behalf of the State, district or local party committee. 2 U.S.C. 441i(b)(1). The second is to transfer, or to accept a transfer of, funds to make expenditures or disbursements for Federal election activity on behalf of the State, district or local party committee. 2 U.S.C. 441i(b)(2)(B)(iv). The third is to engage in joint fundraising activities on behalf of the State, district or local party committee with any person if any part of the funds raised are used, in whole or in part, to pay for Federal election activity. 2 U.S.C. 441i(b)(2)(C). The fourth is to solicit funds for, or to make or direct donations to, section 501(c) and 527 organizations. 2 U.S.C. 441i(d).

Paragraph (b)(3) limits the liability of a Federal candidate to the actions of an agent who has actual authority to solicit, receive, direct, transfer, or spend funds in connection with any election on behalf of the Federal candidate. 2 U.S.C. 441i(e)(1). The Commission notes that the exception to 2 U.S.C. 441i(e)(1)'s general rule found in paragraph (e)(2) of that section also applies to agents of such Federal candidates who are or were State or local candidates.

Paragraph (b)(4) applies to State candidates, and limits their liability to actions taken by their agents who have actual authority to spend funds for public communications on their behalf. 2 U.S.C. 441i(f).

Under the Commission's final rules defining "agent," a principal can only be held liable for the actions of an agent when the agent is acting on behalf of the principal, and not when the agent is acting on behalf of other organizations or individuals. Specifically, it is not enough that there is some relationship or contact between the principal and agent; rather, the agent must be acting on behalf of the principal to create potential liability for the principal. This additional requirement ensures that liability will not attach due solely to the agency relationship, but only to the agent's performance of prohibited acts for the principal. In light of the foregoing, it is clear that individuals, such as State party chairmen and chairwomen, who also serve as members of their national party committees, can, consistent with BCRA, wear multiple hats, and can raise non-Federal funds for their State party organizations without violating the prohibition against non-Federal fundraising by national parties.

C. 11 CFR 300.2(c)    Definition of "Directly or Indirectly Established, Financed, Maintained, or Controlled"

11 CFR 300.2(c) defines "directly or indirectly establish, finance, maintain, or control," a term that is used in several provisions of BCRA. The term appears in BCRA in the context of national party committees (*see* 2 U.S.C. 441i(a)(2)), of State, district, and local political party committees (*see, e.g.,* 2 U.S.C. 441i(b)(2)(B)(iii)), and of Federal candidates and Federal officeholders (*see, e.g.,* 2 U.S.C. 441i(e)(1)). The phrase "established, financed, maintained, or controlled," without the modifier "directly or indirectly," was already used in the anti-proliferation provisions of the FECA and in the Commission's "affiliation" regulation. *See* 2 U.S.C. 441a(a)(5); 11 CFR 100.5(g), and 110.3.

Paragraph (c)(1) of section 300.2 enumerates the persons to whom the regulation applies, and employs the shorthand "sponsor" to refer collectively to these persons. A public interest group commented that the regulation should apply to national, as well as to State, district, and local political party committees. Accordingly, given that the term, "directly or indirectly established, financed, maintained, or controlled," is applied to national party committees in 2 U.S.C. 441i(a)(2), the Commission is incorporating this suggestion in the final regulation. Another commenter suggested that agents should be included in the description of the term "sponsor," rather than addressed in another part of the rule. The final rules also adopt this suggestion. In paragraph (c)(1), the statutory concept of "indirect" establishment, financing, maintenance, or control is addressed by including actions taken by a sponsor's agents on behalf of the sponsor.

The version of 11 CFR 300.2(c) proposed in the NPRM defining the term "directly or indirectly establish, finance, maintain, or control" included factors that extended beyond the affiliation provisions of 11 CFR 100.5(g). Several commenters, including an association of State party officials, several national party committees, and two State party committees, objected to this portion of the regulation proposed in the NPRM, and suggested uniformly that the final regulation should be based solely upon the existing affiliation regulation in 11 CFR 100.5(g), which one commenter described as "relatively well-established and well-understood." A Latino rights group and a taxpayers' organization concurred with this approach. In addition, a civil rights

organization stated that the regulation proposed in the NPRM was "not only vague as to provide no practical guidance, but also is likely to deem entities as being 'controlled' by a party committee when the BCRA never intended to reach such entities." On the other hand, two public interest groups supported the Commission's proposed use of factors extending beyond the reach of 11 CFR 100.5(g), one of whom argued that Congress used the term, "directly or indirectly established, financed, maintained, or controlled," in several contexts to "make it clear that Congress wanted to move beyond the current affiliation rules."

The Commission has concluded that the affiliation factors laid out in 11 CFR 100.5(g) properly define "directly or indirectly established, financed, maintained, or controlled" for purposes of BCRA. Therefore, in paragraph (c)(2), the affiliation factors found at 11 CFR 100.5(g)(4)(ii) have been recast in the terminology demanded by the BCRA context. Paragraphs (c)(2)(i) through (x) of section 300.2 generally correspond to paragraphs (g)(4)(ii)(A) through (J) of section 100.5. This change in terminology, for example, substituting "entity" for "committee," and "sponsor" for "sponsoring organization," recognizes that affiliation concepts are being applied in a different context. Besides the changes in terminology, the words "and otherwise lawfully" have been added to the phrase about joint fundraising in paragraphs (c)(2)(vii) and (viii) of section 300.2(c). This addition is intended to preclude any confusion that might arise between these provisions and the joint fundraising restrictions in subpart B of part 300.

In the NPRM, the Commission sought comment on whether this regulation should be based on the actions and activities of entities occurring solely after November 6, 2002, the effective date of BCRA. The Commission considered taking this course of action to prevent a retroactive application of BCRA or, specifically, to prevent the actions and activities of entities before November 6, 2002, that are legal under current law from creating potential legal liability based on the new requirements of BCRA, which do not take effect until after November 5, 2002. The Commission also asked, alternatively, whether there should be a rebuttable presumption that entities organized before a given date are not directly or indirectly established by a sponsor, provided that the sponsor and the entity are not affiliated. 67 FR 35658.

The principal Congressional sponsors of BCRA and two public interest groups

opposed these options. The principal Congressional sponsors stated, "There is nothing in the statutory language that permits the term * * * to apply only to entities established after the effective date of the Act * * *." Such a rebuttable presumption, they continued, would "create an obvious loophole for organizations established or controlled by members of Congress that are currently raising soft money." One of the public interest groups commented that "grandfathering" existing entities would "effectively prop the [soft-money] loophole open." The other public interest group opposing this idea said: "This would, as a practical matter, allow the activity sought to be regulated by BCRA to continue on an unregulated basis through the preexisting entity."

A non-profit organization commented that the Commission should not apply the new regulation to existing entities that may have been directly or indirectly established, financed, maintained, or controlled by a sponsor because, "otherwise, the rule would go against any conceivable precept of the BCRA having an effective date after the 2002 general elections." This organization asserted, "the only relevant question * * * is whether an entity is controlled by a sponsor after the effective date of BCRA." This organization supported the idea of a rebuttable presumption. Several party committees urged the Commission to apply the regulation if there is affiliation "on or after the effective date of BCRA." Notably, a civil rights organization concluded that "the only relevant question for the purposes of BCRA is whether an entity is controlled by a sponsor after the effective date of BCRA." The civil rights organization further stated that "we agree with the Commission's suggestion that there should be a rebuttable presumption that entities 'organized' before a given date are not directly or indirectly established by a sponsor. [To proceed otherwise] would go against any conceivable precept of the BCRA having an effective date after the 2002 elections."

For the foregoing reasons, the Commission has concluded that BCRA should not be interpreted in a manner that penalizes people for the way they ordered their affairs before the effective date of BCRA. This will help ensure that BCRA is not enforced in a retroactive manner with respect to activities that were legal when performed. Therefore, the Commission has added, in the final rules, a new paragraph (c)(3). The paragraph, under the heading, "safe harbor," provides that on or after November 6, 2002 (the effective date of BCRA), an entity shall not be deemed to

be directly or indirectly established, maintained, or controlled by another entity unless, based on the entities' actions and activities solely after November 6, 2002, they satisfy the requirements of 11 CFR 300.2(c). The Commission notes that financing, within the meaning of this definition, presents special considerations. Therefore, with regard to financing, paragraph (c)(3) provides that if an entity receives funds from another entity prior to November 6, 2002, and the recipient entity disposes of the funds prior to November 6, 2002, the receipt of such funds prior to November 6, 2002 shall have no bearing on determining whether the recipient entity is financed by the sponsoring entity within the meaning of 11 CFR 300.2(c). If funds received from another entity prior to November 6, 2002, are spent by the recipient entity on or after that date, that fact will be relevant to a determination under section 300.2(c).

In the NPRM, the Commission sought comment as to whether there should be an exception for a *de minimis* level of funding by a sponsor. 67 FR 35659. Only one commenter, a State party committee, supported this idea and suggested $5,000 for this purpose. The Commission has not included a *de minimis* exception in the final regulation. Such an exception does not square with the overall, situation-specific approach of the regulation, which is to weigh factors such as "[w]hether a sponsor or its agent provides funds or goods in a significant amount or on an ongoing basis to the entity" "in the context of the overall relationship between sponsor and the entity." *See* 11 CFR 300.2(c)(2), (c)(2)(vi). Nor does a *de minimis* exception appear to be supported by the plain language of the statute.

Paragraph (c)(4) (which was labeled (c)(2) in the version of the regulation proposed in the NPRM) provides a mechanism for a sponsor or an entity to request a determination by the Commission through the advisory opinion process that the sponsor is no longer deemed to finance, maintain, or control an entity, even if the sponsor established the entity. There have been several changes from the version of the regulation published in the NPRM. In paragraph (c)(4)(i), the Commission has clarified that the requestor of an advisory opinion must demonstrate that the entity is not directly or indirectly financed, maintained, or controlled by the sponsor. Under paragraph (c)(4)(ii) of the final rules, the requestor must demonstrate that all material connections between the sponsor and

the entity have been severed for two years.

The Commission notes that nothing in paragraph (c)(4) should be construed to require any given entity that has not directly or indirectly established, financed, maintained, or controlled another entity to obtain a determination to that effect before the two entities may operate independently of each other. Therefore, in the final rules, the Commission has added a new paragraph (c)(4)(iii), which provides that nothing in section 300.2(c) should be construed to require entities that are separate organizations on November 6, 2002, to obtain an advisory opinion to operate separately from one another.

### D. 11 CFR 300.2(d) Definition of "Disbursement"

Both FECA and BCRA use the term "disbursement," but do not provide a definition. The NPRM contained a proposed definition of "disbursement" as "any purchase or payment made by a political committee or organization that is not a political committee." One commenter pointed out that this term should not be limited to payments by political parties or organizations, since it covers spending by individuals or entities that do not constitute political parties or organizations. *See,* for example, 2 U.S.C. 441(b)(1), which refers to disbursements by (among others) "an association or similar group of candidates * * * or of individuals." The Commission, therefore, is revising the proposed definition in the final rule to clarify that it covers purchases and payments by a political party or other person, including an organization that is not a political committee, that is nevertheless subject to FECA or BCRA.

### E. 11 CFR 300.2(e) Definition of "donation"

In BCRA, Congress uses but does not define the term "donation." The Commission proposed in the NPRM to define a "donation," in 11 CFR 300.2(e), as a payment, gift, subscription, loan, advance, deposit, or anything of value given to a non-Federal candidate, party committee, 501(c) organization, or 527 organization, but not including a contribution or transfer.

Comments were sought on specifically excluding from "donation" some of the exemptions to "contribution" set forth in existing 11 CFR 100.7(b). The comments were split on this approach.

The Commission did not include these exemptions, or any others, in the final rule, because donations in many cases will be essentially a matter of State law, and thus the inclusion or

exclusion of certain payments should be left to State campaign finance law. For example, in the Levin Amendment, donations of Levin funds must be in accordance with State law, with one Federal limitation: a $10,000 amount limitation per year per donor. 2 U.S.C. 441(b)(2)(B)(iii). The Commission believes States should be free to craft their own exemptions to donations of Levin funds, subject only to the $10,000 overall limitation imposed by BCRA.

Several commenters asked the Commission to specifically incorporate additional exemptions, such as money spent for redistricting, election recounts, FECA civil penalties, and legal defense funds. The exemption for recounts is addressed in the Commission's current rules at 11 CFR 100.7(b)(20); as are payments for civil penalties, *cf.* 11 CFR 9034.4(b)(4). The Commission's interpretations on the raising and spending of funds for the purposes of redistricting were done in the context of Advisory Opinions that interpreted the terms "contribution" and "expenditure." *See* Advisory Opinions 1990–23 and 1982–37. The question of legal defense funds implicates not only the definition of "contribution," but also the Commission's personal use regulations at 11 CFR 113.1(g) in the case of a candidate legal defense fund. With respect to legal defense funds or any other legal expenses incurred by national party committees, the Commission does not interpret the broad language of 2 U.S.C. 441(a) to permit the receipt or use of any non-Federal funds for such purposes.

As with the exemptions in 11 CFR 100.7(b), discussed above, State laws may address each of these payments in a variety of different ways. In addressing these issues, the Commission does not believe it is appropriate to require States to follow the Commission's precedents, which were established to implement the specific, detailed provisions of the FECA regarding "contributions" and "expenditures" for the purpose of influencing Federal elections. Moreover, to do so could present issues involving the preemption of State law.

Several commenters suggested that the definition of "donation" be expanded to include anything of value given to a "person," to conform with the use of this term in 11 CFR 300.10, 300.11, 300.37, 300.50, and 300.51. The Commission has made this change to 11 CFR 300.2(e), given the broad statutory reach of the term "donation" in 2 U.S.C. 441(a)(1). The Commission has also deleted the reference to "transfers," because those are covered elsewhere in these rules. *See* 11 CFR 300.34.

### F. 11 CFR 300.2(f) Definition of "Federal Account"

Paragraph (f) of section 300.2 defines "Federal account" as an account at a campaign depository that contains funds to be used in connection with a Federal election. The term "financial depository institution" proposed in the NPRM has been changed to the more accurate term "campaign depository." *See* 2 U.S.C. 432(h) and 11 CFR 103.2.

Some commenters asked the Commission to include in this definition the requirement that only Federal funds and funds transferred for the purpose of paying the non-Federal share of allocated expenditures may be deposited into these accounts. This topic is treated elsewhere in the Commission's rules and in this rulemaking. *See* 11 CFR 103.3, 106.5(g), 300.30, and 300.33.

### G. 11 CFR 300.2(g) Definition of "Federal Funds"

Paragraph (g) of section 300.2 defines "Federal funds" to mean funds that comply with the limitations, prohibitions, and reporting requirements of the FECA. The Commission received no comments regarding this definition.

### H. 11 CFR 300.2(h) Definition of "Levin Account"

Section 300.2(h) defines "Levin account" as an account established by a State, district, or local committee of a political party pursuant to 11 CFR 300.30 for purposes of making expenditures or disbursements for Federal election activity or non-Federal activity (subject to State law) under 11 CFR 300.32(b). The Commission revised the definition proposed in the NPRM to clarify that these accounts must be established at a campaign depository in accordance with 2 U.S.C. 432(h).

The NPRM raised substantive questions on the operation of these accounts. The comments that addressed these questions are discussed in connection with 11 CFR 300.30, below.

### I. 11 CFR 300.2(i) Definition of "Levin Funds"

As explained above, BCRA's Levin Amendment provides that State, district, and local political party committees may spend certain non-Federal funds for Federal election activities if those funds comply with certain requirements. 2 U.S.C. 441(b)(2)(A)(ii). Thus, these funds are unlike Federal funds, which are fully subject to the Act's requirements, and unlike ordinary non-Federal funds because they are subject to certain additional requirements under BCRA.

Section 300.2(i) defines these funds as "Levin funds," with the intention that "Levin funds" become a definite, unambiguous reference to such funds. The Commission has slightly modified the definition proposed in the NPRM for streamlining purposes, but has made no substantive changes.

One commenter requested that the Commission use a "functionally descriptive" term, such as "specially allocated," for these funds, rather than the name of their legislative sponsor. It proved difficult, however, to draft a term that clearly and unambiguously includes these funds, while excluding all others. For that reason, the Commission has retained the term "Levin funds" in the final rules.

Two commenters suggested that the definition should include the limits on the use of the term "Levin funds" found at 2 U.S.C. 441i(b)(2)(A). These restrictions go to the use of the funds, and are implemented in 11 CFR 300.32, to which the definition in 11 CFR 300.2(i) already expressly refers. Therefore, these restrictions are not repeated in this definitional paragraph.

**J. 11 CFR 300.2(j)   Definition of "Non-Federal Account"**

Section 300.2(j) defines "non-Federal account" as an account that contains funds to be used in connection with a State or local election or allocable expenses under 11 CFR 106.7, 300.30, or 300.33. The term "financial depository institution" proposed in the NPRM has been deleted because non-Federal accounts are not required to comply with 2 U.S.C. 432(h).

Consistent with the revisions to 11 CFR 106.7 discussed above, the definition has been expanded to include accounts used for payment of certain allocable activities. The account may also serve as a depository for Levin funds, provided that the committee complies with the requirements of 11 CFR 300.30, below.

No commenters addressed this paragraph.

**K. 11 CFR 300.2(k)   Definition of "Non-Federal Funds"**

This section defines "non-Federal funds" as funds that are not subject to the limitations and prohibitions of the Act. No commenters addressed this definition.

**L. 11 CFR 300.2(m) and (n)   Definitions of "To Solicit," and "To Direct"**

The NPRM proposed a definition of "to solicit or direct" a contribution or donation, which would be located at 11 CFR 300.2(m). The proposed definition included a request, suggestion, or

recommendation to make a contribution or donation, including those made through a conduit or intermediary. The Commission's final rule defines "to solicit" as "to ask another person to make a contribution or donation, or transfer of funds, or to provide anything of value, including through a conduit or intermediary." Similarly, the Commission defines "to direct" as "to ask a person who has expressed an intent to make a contribution, donation, or transfer of funds, or to provide anything of value, to make that contribution, donation, or transfer of funds, or to provide that thing of value, including through a conduit or intermediary."

Comment was sought as to whether the proposed definition was too broad or narrow, as well as to whether the term "direct" in BCRA should be interpreted to follow the earmarking rules regarding contributions directed through a conduit or intermediary under 2 U.S.C. 441a(a)(8). Comment was also sought as to whether the passive providing of information in response to an unsolicited request for information should be specifically excluded from this definition.

Two commenters, a labor organization and a public interest organization, expressed qualified support for the proposed rule. The labor organization stated that it concurred with the proposed rule, and that it particularly endorsed the express acknowledgment that the mere provision of information or guidance as to applicable legal requirements does not fall within the statutory language. The public interest organization stated that the proposed rule was "generally consistent" with the letter and spirit of BCRA. For purposes of clarity, it suggested that the proposed rule be revised to read: "Merely providing information or guidance as to the requirements of applicable law is not a solicitation."

In contrast, five commenters argued that the proposed rule was too vague or broad. A group representing certain State parties stated that the phrase "request, suggest and recommend" is an invitation for endless Commission investigation. This commenter urged that "solicit" be limited to an explicit request that a person make a contribution. This commenter also supported including examples in the Explanation and Justification of what is not soliciting or directing. Likewise, national party political organizations asserted that the final rule should not contain a reference to "suggestion" because that is too vague a term, and compels inquiry into whether a communication conveys a sense, or

creates an impression, of a solicitation. These commenters believed BCRA's rules should be concrete. This group further urged that clear exclusions should be provided, such as for inquiries into positions or issues, as well as political speech or commentary to an audience who may respond with contributions in the absence of an express request for them.

Another commenter, a public interest organization, stated that "ambiguous standards" such as "suggest[ion]" or "series of conversations" will merely lead to confusion. This commenter suggested that the Commission look to past advisory opinions for guidance. Similarly, a State and a national political party argued that "request, suggest and recommend" is unconstitutionally vague and potentially overbroad, as it would involve an investigation into what a person meant in a series of conversations, and would thus chill political speech. A Latino rights group and a taxpayers' organization commented that in light of the "severe restrictions now imposed by BCRA," there need to be "clear definitive guidelines" in this area. Specifically, the Latino rights group and the taxpayers' organization argued that "[a]mbiguous standards such as 'suggestion' or a 'series of conversations' which taken together constitute a request for a contribution or donation, but which do not do so individually' will lead to more confusion and allegations of violations." Several party committee commenters argued that solicitation should be confined to an explicit request that an entity make a contribution.

Three commenters argued that the proposed rule was too lenient. One public interest organization stated that the discussion should include scenarios where a person suggests where a contributor, who has already decided to make a contribution, should send their contribution. This commenter read the proposed rule as confining itself to candidates, committees and nonprofits, and suggested it should also apply to solicitations from individuals, partnerships, labor organizations, and corporations. Another public interest organization agreed with the first point of the previous response. The sponsors of BCRA stated that the proposed definition failed to capture the plain meaning of the words and to effectuate the central goal of the law. They supported the position regarding suggestions to already-willing contributors. These commenters read the proposed rule in the same manner as the public interest organization, as if

it only applies to candidates, committees and nonprofits. They stated that, "certain provisions in the Act apply to soliciting contributions from any 'person,' which would obviously include individuals and corporations." They urged that the rule be modified to reflect this.

The Commission has determined that the concepts of "to solicit" and "to direct" embody different activity, and they thus should be separately defined. Accordingly, 11 CFR 300.2(m) defines "to solicit," and 11 CFR 300.2(n) contains the definition of "to direct." Both definitions include "transfer of funds" and "anything of value" in addition to "contribution" and "donation," because the phrases "transfer of funds" and "anything of value" or "any other thing of value" appear several times *in seriatim* with "contribution" and "donation" in applicable rules. *See, e.g.,* 11 CFR 300.2(b)(1)(i).

Comments were sought as to whether the concept of soliciting should apply to a series of conversations which, when taken together, constitute a request for contributions or donations. BCRA's sponsors and several public interest organizations supported applying the definition to a series of conversations if, when taken as a whole, they are consistent with a solicitation, stating that, otherwise, restrictions will be easily circumvented. One group of national political party organizations opposed applying the rule to a series of conversations, stating that it would involve heavy government involvement in deciphering political speech and that the Commission should look only at express statements.

The Commission does not believe it is appropriate to promulgate a regulation that would require examination of a private conversation to impute intent when the conversation is not clear on its face. The Commission is concerned that the ability to impute intent could lead to finding a violation when the individual who made the comment may have had no intention whatever of soliciting a contribution. Such a result is not dictated by BCRA's statutory language, and would raise constitutional concerns.

For the reasons set forth above, the Commission is not defining "to solicit" in terms of a series of conversations.

Regarding the definition of the term "to direct," the Commission sought comment as to whether it should be interpreted to follow earmarking rules under 2 USC 441a(a)(8). A group of State party leaders supported limiting "to direct" to the definition at 11 CFR 110.6(b)(2), as did one of the national

political parties. One of the public interest organizations opposed this approach, stating that this was inconsistent with BCRA and far too narrow an approach. None of the commenters explained their criticisms in detail.

This issue of the meaning of "to direct" is also tied to another question asked by the Commission: whether the passive providing of information in response to an unsolicited request for information should be specifically excluded in this definition. Two commenters, a public interest organization and the sponsors, felt that the Commission should not exclude providing information if that information includes the names of organizations to which contributions can be made. One commenter, a national political party, said that such information should be excluded, because any other approach would be unworkable and would lead to endless accusations and investigations.

The Commission concludes that a precise definition in this context is necessary to avoid vague and overbroad application of the term. Therefore, the regulation defines "to direct" as "to ask a person who has expressed an intent to make a contribution, donation, or transfer of funds, or to provide anything of value, to make that contribution, donation, or transfer of funds, or to provide that thing of value."

The final rules in 11 CFR 300.2(m) and (n) each include a statement indicating that merely providing information or guidance as to the requirements of particular law is not solicitation or direction. Each rule confines itself to defining the term as it appears in part 300 of the Commission's regulations.

M. 11 CFR 300.2(o)    Definition of "Individual Holding Federal Office"

New section 300.2(o), which parallels 11 CFR 100.4 (definition of "Federal office") and 11 CFR 113.1(c) (definition of "Federal officeholder"), has been added for the reader's convenience. Consistent with those sections and 2 U.S.C. 431(3), it states that "individual holding Federal office" means an individual elected to or serving in the office of President or Vice President of the United States; or a Senator or a Representative in, or Delegate or Resident Commissioner to, the Congress of the United States. It does not, however, include officeholders who are appointed to positions such as the secretaries of departments in the executive branch, or other positions that are not filled by election.

**Subpart A—National Party Committees**

*11 CFR 300.10    General Prohibitions on Raising and Spending Non-Federal Funds*

BCRA prohibits national party committees from raising and spending non-Federal funds, that is, funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act. *See* 2 U.S.C. 441i(a). The Commission is placing the regulations that address this prohibition in a new part of the Code of Federal Regulations, 11 CFR part 300, subpart A. In addition to this new subpart, the Commission is amending several sections of its current rules to conform to these prohibitions. *See* Explanation and Justification for 11 CFR 102.5 and 106.5.

Paragraph (a) of new section 300.10 tracks the language of BCRA, which prohibits national party committees from soliciting, receiving, or directing to another person "a contribution, donation, or transfer of funds or any other thing of value," or spending funds that are not subject to the Act's prohibitions, limitations, and reporting requirements. Accordingly, as of November 6, 2002, BCRA's effective date, national party committees must not receive or solicit or direct to another person contributions or donations from corporations, labor organizations or other prohibited sources, and must not receive or solicit or direct to another person contributions or donations from individuals and others that exceed the amount limitations of the Act. Additionally, after a brief transition period set forth in 11 CFR 300.12, discussed below, all expenditures and disbursements made by a national party committee, including donations to State and local candidates and donations and transfers to State party committees, must be made with funds that comply with the limitations, prohibitions, and reporting requirements of the Act.

BCRA's ban on the raising and spending of non-Federal funds by national party committees has widespread application. Tracking the language in 2 U.S.C. 441i(a)(1) and (2), 11 CFR 300.10(a) and (c) provide that the ban on raising and spending non-Federal funds also applies to the national congressional campaign committees (currently, the Democratic Senatorial Campaign Committee, the National Republican Senatorial Committee, the Democratic Congressional Campaign Committee, and the National Republican Congressional Committee), to officers and agents acting on behalf of a national party committee or a national congressional campaign committee, and

to any entities directly or indirectly established, financed, maintained, or controlled by either. As noted by one of BCRA's congressional co-sponsors during the congressional debate, "[t]he provision is intended to be comprehensive at the national party level. Simply put, the national parties and anyone operating on behalf of them are not to raise or spend, nor to direct or control, soft money." 148 Cong. Rec. H408–409 (daily ed. February 13, 2002) (statement of Rep. Shays).

Thus, under BCRA and 11 CFR 300.10, a Federal candidate or a Federal officeholder acting on behalf of a national congressional campaign committee must not solicit or direct to any person funds from corporations or labor organizations, or funds from individuals or entities in amounts that exceed the Act's contribution limits.

Section 300.10(a)(3) makes clear that national parties cannot raise, spend, or direct to another person Levin funds. *See* 2 U.S.C. 441i(b)(2)(A) and (B) and 11 CFR 300.31, discussed below.

Section 300.10(b) tracks the statutory language at 2 U.S.C. 441i(c). It provides that national parties and others covered by section 300.10(a) must use only Federal funds to finance Federal election activity.

The NPRM noted that the Commission would address in a subsequent rulemaking whether BCRA bans national party committees, and their officers and agents, from directing non-Federal funds to a host committee for a national party convention in light of the statutory language that they are not permitted to direct non-Federal funds to other persons. *See* 2 U.S.C. 441i(a)(1). In comments submitted to the NPRM, BCRA's sponsors stated that since BCRA prohibits national parties and their agents from soliciting or directing non-Federal funds to any person, they could not raise or direct non-Federal funds to host committees. 2 U.S.C. 431(11) of FECA defines "person" to include "a committee * * * or any other organization or group of persons * * * " It has also been suggested that no further rulemakings are necessary, as a host committee would be treated as any other 501(c) organization under the Act. The Commission has decided that the sponsor's interpretation of BCRA and additional issues concerning BCRA's effect on conventions will be addressed, if necessary, in a future rulemaking on national party conventions.

Virtually all of the commenters opined that the definition of "agent" was critically important to many of BCRA's provisions, including 11 CFR 300.10.

The breadth of the national party non-Federal funds prohibition is limited in 2 U.S.C. 441i(a)(2) and in 11 CFR 300.11(c) to the extent the prohibition applies to officers and agents "acting on behalf" of national parties. This limiting construction appears in other Federal statutes and indeed, in some State campaign finance laws. The Commission also has decided to limit the definition of "agent" to those individuals who have actual authority to act on behalf of their principals. *See* Explanation and Justification for 11 CFR 300.2(b) above.

Several party committee commenters expressed the view that, despite BCRA's broad prohibition on national parties' raising and spending non-Federal funds, the Commission should consider a rule that would permit national parties to continue to maintain non-Federal accounts devoted specifically to support State and local candidates as long as funds raised for such an account meet the source and contribution limits of the Act. The party committees' position is based on the NPRM's discussion of "leadership PACs" maintained by Federal candidates and on statements made by a principal BCRA sponsor during the Senate debate. 148 Cong. Rec. S2140 (daily ed. February 20, 2002) (statement of Senator McCain). Specifically, Senator McCain interpreted 2 U.S.C. 441i(e)(1)(A) and (B) (*see* 11 CFR 300.61 and 300.62) to permit a Federal candidate or officeholder to raise funds for both a Federal and non-Federal account of a leadership PAC, provided that the funds raised for the non-Federal account met the source and contribution limits of the Act. The party committees' comments specifically referenced another statement made by Senator McCain suggesting that an officeholder could solicit a donation up to the Act's contribution limits for the non-Federal account of a leadership PAC, even if the donor had already contributed to the PAC's Federal account. The application of these statutory provisions to leadership PACs and candidate PACs is discussed below. *See* Explanation and Justification for 11 CFR 300.62. Regardless of the application of BCRA to leadership PACs and candidate PACs under 2 U.S.C. 441i(e)(1), however, the plain language of the ban on national party non-Federal fundraising at 2 U.S.C. 441i(a) cannot be plausibly construed to allow party committees to continue to raise non-Federal funds for any purpose. The language is broad in prohibiting a national party committee from soliciting, receiving, or directing to another person "a contribution,

donation, or transfer of funds or any other thing of value" or spending funds that are not subject to the Act's limitation, prohibitions, and reporting requirements. A separate "non-Federal" account, even if it contained funds that complied with the prohibitions of the Act, would not contain funds complying with the amount limitations of the Act, if for example, individuals gave $20,000 per year to a national party's account and also gave another $20,000 to the party's "non-Federal" account as suggested by the party committee commenters.

The legislative history supports this statutory interpretation. As noted above, a primary sponsor of BCRA in the House specifically explained the national party non-Federal funds ban as follows: "The soft money provisions of the Shays-Meehan bill regarding the national political parties operate in a straight-forward way. The national parties are prohibited entirely from raising or spending any soft money * * * The purpose of these provisions is simple: to put the national parties entirely out of the soft money business." 148 Cong. Rec. H408 (daily ed. February 13, 2002) (statement of Rep. Shays). According to Congressman Shays, the prohibition "covers all activities of the national party committees, even those that might appear to affect only non-Federal elections." Shays further explained the reason for the ban: "Because the national parties operate at the national level, and are inextricably intertwined with Federal officeholders and candidates, who raise money for the national party committees, there is a close connection between the funding of the national parties and the corrupting dangers of soft money on the federal political process." *Id.* at H409.

In addition, a comment by one of BCRA's principal sponsors stated that Congress' intent was absolutely clear that BCRA prohibits national party committees from raising, spending or directing non-Federal funds. He further pointed out that an amendment that would have allowed party committees to continue to raise "soft money" subject to limits on the amounts and purposes failed. The Commission notes that a House amendment that would have continued to permit national parties to raise non-Federal funds for certain activities in amounts not exceeding $20,000 per year per person was defeated. *See* 148 Cong. Rec. H459-H465 (daily ed. February 13, 2002).

Finally, the party committee commenters also maintained that the Commission should define the term "donation," which is not defined in BCRA, to exclude funds received by

national party committees for certain purposes such as funds provided for redistricting, legal expense funds, and the payment of civil penalties for violations of the Act. The parties argued that the Commission has, over time, recognized these activities as wholly exempt from the reach of FECA.

As discussed in the Explanation and Justification for the definition of "donation" at 300.2(e), the plain language of BCRA, supported by the legislative history, indicates that the ban on national party raising and spending non-Federal funds was intended to be broad, prohibiting a party from raising, receiving, or directing to another person " a contribution, donation or transfer of funds, or *any other thing of value*" or spending "*any funds*" that are not subject to the Act's limitations, prohibitions, and reporting requirements (emphasis added). Consequently, neither 11 CFR 300.10 nor the definition of "donation" in 11 CFR 300.2(e) contains a sweeping exclusion of donations that would permit national parties to raise funds for these purposes under any and all circumstances. See the Explanation and Justification for 11 CFR 300.2(e) (definition of "donation").

*11 CFR 300.11 Prohibitions on Fundraising for and Donating to Certain Tax-Exempt Organizations*

BCRA prohibits national party committees, their officers and agents, and entities directly or indirectly established, financed, maintained, or controlled by them from raising any funds for, or making or directing any donations to, certain tax-exempt organizations. 2 U.S.C. 441i(d). BCRA's prohibition on this type of donor and fundraising activity extends only to tax-exempt organizations with a political purpose or that conduct activities in connection with a Federal election. Specifically, this prohibition extends to organizations exempt from taxation under 26 U.S.C. 501(c) that "[make] expenditures or disbursements in connection with an election for Federal office (including expenditures or disbursements for Federal election activity)." *Id.* (Organizations formed under 26 U.S.C. 501(c) are referred to as "501(c) organizations" below.) The ban also extends to political organizations exempt from taxation under 26 U.S.C. 527 (referred to as "section 527 organizations" below). These entities are defined in the Internal Revenue Code as parties, committees, associations, funds, or other organizations organized and operated primarily to directly or indirectly accept contributions and make expenditures

for the "exempt function" of influencing or attempting to influence the selection, nomination, election or appointment of an individual to a Federal, State, or local public office, political organization office, or election of Presidential and Vice Presidential electors. 26 U.S.C. 527(e)(1) and (2). BCRA excludes from the prohibition section 527 organizations as discussed below.

The regulations implementing this provision are set forth in new 11 CFR 300.11. A parallel provision of this regulation, 11 CFR 300.50, and others affecting tax-exempt organizations that appear elsewhere in part 300, have been placed together in subpart C for the convenience of those interested in locating rules pertaining to fundraising and donations to tax-exempt organizations.

Section 300.11 as proposed closely tracked the language of BCRA. The final rule has taken into account comments received on questions posed in the NPRM, as discussed below. The Commission also notes that since 11 CFR 300.37 contains a comparable provision applicable to State, district, and local party committees, the discussion below also applies to those entities unless otherwise indicated.

A. General Prohibition

Paragraphs (a)(1) and (2) of the final rules in section 300.11 remain unchanged from the proposed rule except for minor language changes to the description of national congressional campaign committees to conform with other formulations of the phrase.

Paragraph (a)(3) of the final rules implements BCRA's prohibition on national party committee fundraising for, and donating to, a section 527 organization unless the organization is a "political committee," a State or local party committee, or an authorized committee of a State or local candidate. In the context of a parallel provision in 11 CFR 300.37 applicable to State, district, and local party committees, the NPRM asked whether "political committee" should mirror the definition of that term in 2 U.S.C. 431(4), which would encompass only organizations that make contributions and expenditures in connection with Federal elections, or whether the term should be interpreted to also encompass State-registered political committees that support only State and local candidates.

As discussed in the Explanation and Justification for 11 CFR 300.37, commenters supported a broader interpretation of "political committee" in the context of donations by State and

local party committees. None of the commenters addressed this issue in the context of the national party prohibition, however. The Commission concludes that the broad prohibition applicable to national party fundraising and spending in 2 U.S.C. 441i(a) (see 11 CFR 300.10) prevents a broader construction of "political committee" in 11 CFR 300.11. Thus, 2 U.S.C. 441i(a) prohibits national party committees from soliciting or directing to another person "a contribution, donation or transfer of funds or any other thing of value" or spending any funds that are not subject to the limitations, prohibitions and reporting requirements of the Act. Funds solicited or directed by a national party committee to a State-registered section 527 organization are not subject to the reporting requirements of the Act. Accordingly, in the final rules, paragraph (a)(3)(i) of 11 CFR 300.11 prohibits national party committees from soliciting funds for, or making donations to a section 527 "political committee" unless the organization is a "political committee" as defined in 11 CFR 100.5.

Paragraph (b) of 11 CFR 300.11, which describes the other persons and entities to whom the prohibition applies, remains unchanged from the proposed rule. The NRPM asked whether the final rule should provide examples of the types of persons and entities covered by this provision, and sought specific examples that might illuminate the scope of this provision. Although many commenters expressed approval for including examples as to who is covered by the provision, none provided specific examples. The final rule does not include specific examples.

The NPRM also sought comments on whether the regulations should contain a temporal requirement so that the prohibition on national and State party fundraising and donations to non-profits is appropriately circumscribed and does not encompass, for example, an organization that made expenditures and disbursements in connection with a Federal election many years ago but has not done so recently and does not plan to do so in the future. After further consideration, the Commission has determined that a temporal requirement is unnecessary because the statutory language, "makes expenditures and disbursements * * *" is in the present tense. Thus, the final rules do not contain a temporal requirement. The definition of a 501(c) organization "that makes expenditures and disbursements in connection with a Federal election" at 11 CFR 300.2(a) encompasses an organization's activities in the current two-year election cycle only. *See* the

Explanation and Justification of 11 CFR 300.2(a) for further discussion.

One non-profit organization urged the Commission to exclude 501(c)(3) organizations from the party committee fundraising/donation prohibition. This commenter argued that because 501(c)(3) organizations are required by tax law to undertake only election-related activity that cannot benefit any particular candidate or party, they should not be subject to the prohibition. However, the plain language of BCRA applies to all 501(c) organizations that make disbursements or expenditures in connection with Federal elections, including expenditures and disbursements for Federal election activity. Financing certain voter registration and GOTV activities are considered Federal election activities under BCRA and new 11 CFR 100.24. Moreover, even nonpartisan voter registration and GOTV activities are capable of having an impact on Federal elections. Indeed, BCRA's co-sponsors specifically indicated in their comments that nonpartisan voter registration drives or GOTV activities were not intended to be excluded from the definition of Federal election activity. The Commission notes that this provision does not prohibit non-profit organizations from undertaking any type of voter registration or GOTV activities. Because Congress clearly could have excluded 501(c)(3) organizations from this provision but chose not to do so, the final rules do not include any such exclusion or exemption.

**B. Safe Harbor Provisions**

The NPRM asked whether a safe harbor provision should be provided so that a national or State party committee and others affected by the prohibition may raise funds for or make donations to a section 501(c) or a section 527 organization if they take certain steps to ensure that the organization is not one that falls within the prohibition. The NPRM listed examples of possible safe harbors such as requiring party committees to: (1) Obtain and examine a 501(c) organization's application for tax-exempt status or annual IRS Form 990 returns to determine whether the organization has reported making, or indicates plans to make, expenditures or disbursements in connection with a Federal election, or (2) with respect to current or planned activity, obtain and examine a certification from the organization that indicates it does not make, or plan to make, such expenditures.

The commenters agreed that the regulations should provide a safe harbor for national and State party committees.

The commenters split, however, on what the safe harbor should be. The primary sponsors of BCRA and one public interest group suggested that section 501(c) and section 527 organizations be required to file sworn certifications with the Commission, enforceable under 18 U.S.C. 1001, upon which a party committee could rely in determining whether it could solicit funds for, or make or direct donations to, such organizations. These sponsors of BCRA urged that party committees be held strictly liable for any violations of the Act if, in the absence of such a certification, an organization misrepresents itself.

Without addressing the concept of a safe harbor, another public interest group commented that a party committee should be required to obtain a sworn certification from a section 501(c) or a section 527 organization for whom it wishes to solicit or to whom it wishes to donate or direct funds.

Several party committee commenters expressed approval for a safe harbor that would permit a party committee to obtain and rely on applications for tax-exempt status or IRS Form 990 returns to determine whether it could permissibly fundraise for, or donate to, a tax-exempt organization. One commenter suggested that party committees be given a choice between obtaining certifications or relying upon publicly available tax documents. A labor organization argued that the regulations should not require party committees to investigate non-profits it wishes to donate to or assist. Rather, this commenter urged that the Commission adopt specific language that a party committee could use, presumably in a cover letter, when it makes a donation to a 501(c) to serve as a safe harbor "from prosecution." The commenter suggested that the party committee merely be required to state to the section 501(c) organization that any funds it donated cannot be used for activities that would "constitute an expenditure in a Federal election."

In considering how to implement these BCRA provisions, the Commission has concluded that a safe harbor is an appropriate way to help ensure that party committees, and others to whom 11 CFR 300.11 and 300.37 apply, comply with the Act. The Commission believes that requiring a 501(c) organization to file a certification with the Commission would be burdensome. However, requiring party committees and others covered by this provision to obtain a written certification from an official with knowledge of an organization's activities is the best way to ensure that the party committee or

other person has information as to whether a particular organization engages in certain election-related activities. IRS Form 990s may not clearly show whether an organization has undertaken specific election-related activities. Moreover, these forms do not provide information on current activities. Accordingly, new paragraph (c) of the final rule provides that a party committee may obtain and rely upon a certification from a section 501(c) organization to determine whether it may permissibly raise funds for, or make or direct donations to, the organization.

New paragraph (d) of the final rule sets forth specific criteria a certification must include. These criteria are: (1) That the certification is a signed written statement by an officer or other authorized representative with knowledge of the organization's activities; (2) that the certification states that, within the current two-year election cycle, the organization has not made, and does not intend to make, expenditures or disbursements in connection with an election for Federal office (including for Federal election activity); and (3) that the certification states that the organization does not intend to pay debts incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior two-year election cycle. The Commission believes that a requirement that the certification be sworn to is unnecessary and that a certification is sufficiently reliable if it is made in writing by an official of a tax-exempt organization with knowledge of the organization's activities. Moreover, requiring that the certification contain a statement that an organization does not intend to pay Federal-election related debts from a prior cycle will help ensure that the prohibition is not evaded.

New paragraph (e) states that a certification cannot be relied upon if a national party committee, its officers or agents, or others covered by the prohibition has actual knowledge that the certification is false.

Finally, the NPRM sought comments on whether it would be considered "directing" a donation if a party committee responded to an unsolicited request for information about organizations that share a party's political, social, or philosophical goals. Commenters who addressed this point stated that sharing such information would be permissible. One party commenter opined that it would be unconstitutional to try to prohibit this sharing of information as well as

difficult to enforce. A public interest group commenter noted that responding to such requests was permissible but would amount to "directing" a donation if the donor's request or the party's response was in connection with a proposed "or potential" donation.

The Commission agrees that a rule prohibiting this type of information-sharing is not necessary to enforce BCRA and would create significant constitutional concerns. Therefore, new paragraph (f) of the final rules states that it is not prohibited for a national party or its agents to respond to a request for information about a tax-exempt group that shares the party's political or philosophical concerns.

*11 CFR 300.12    Transition Rules*

One of the BCRA amendments to the FECA prohibits national party committees from raising and spending non-Federal funds after November 5, 2002, the effective date of BCRA.[5] 2 U.S.C. 431 note. BCRA, however, created a transition period between November 6, 2002 and December 31, 2002, that permits national party committees to spend non-Federal funds in their accounts as of November 5, 2002, for certain expenses and debts. The rules governing the use of non-Federal funds by national party committees, including national congressional campaign committees, during this transition period are set forth in 11 CFR 300.12.

A. Permissible Uses of Excess Non-Federal Funds During the Transition Period

Paragraph (a) of section 300.12 describes the two permissible uses of funds in a national committee's non-Federal accounts, other than an office building or facility account, as of November 5, 2002. They are: (1) To retire outstanding non-Federal debts or non-Federal obligations incurred solely in connection with an election held before November 6, 2002; or (2) to pay non-Federal expenses or retire outstanding non-Federal debts or obligations incurred solely in connection with any run-off election, recount, or election contest resulting from an election held prior to November 6, 2002. BCRA expressly provides that, subject to the restrictions incorporated into paragraph (b) of 11 CFR 300.12, these non-Federal funds must be used solely for the two enumerated purposes and must be spent before January 1, 2003. 2 U.S.C. 431 note.

The NPRM sought comments on whether the use of the word "solely" in the enumeration of the permissible uses of non-Federal funds in paragraph (a) during the transition period precluded permitting any funds remaining thereafter to be disgorged to the United States Treasury or donated to a charitable organization. The Commission received several comments on this issue as well as suggestions for other permissible uses under paragraph (a).

The commenters split on whether the Commission should permit remaining non-Federal funds in any non-Federal account to be donated to charity. BCRA's sponsors and one public interest group stated that BCRA provides no statutory basis for transferring any non-Federal funds as of November 6, 2002, to non-profit organizations and doing so could undermine a central purpose of the law which is to prohibit national party non-Federal funds from being used in the 2004 elections. Since charitable organizations under section 170 include section 501(c)(3) organizations, the sponsors pointed out that there is a potential that any donated funds could be used for Federal election purposes in the next election. Section 501(c)(3) organizations are permitted to engage in voter registration, get-out-the-vote activities, and other activities defined as "Federal election activities" in BCRA.

The sponsors suggested, instead, that any funds remaining in a national party committee's non-Federal accounts be either disgorged to the United States Treasury or refunded to donors on a *pro rata* basis. Another commenter concurred with this suggestion, pointing out that because the statutory language only permitted specific uses during the transition period, any funds remaining thereafter must be disgorged or refunded.

On the other hand, other commenters believed that permitting donations to at least some charitable organizations was permissible. A public interest group commented that the Commission could require disgorgement or permit donations to charitable organizations as long as the charitable organization is not one that the national parties would be prohibited from donating to under 11 CFR 300.10(b). A commenter from a non-profit organization maintained that BCRA should be construed to permit national parties to use any non-Federal funds remaining after payment of non-Federal election-related debts for any purpose currently permitted under FECA. According to this commenter such a construction is warranted because BCRA is silent as to the

disposition of funds during the transition period after permissible debts are paid under paragraph (a) of 11 CFR 300.12, and only specific uses are prohibited in paragraph (b). The commenter further stated that the rules should permit national parties to transfer non-Federal funds remaining after non-Federal debt is paid to 501(c) organizations because these organizations are required to engage in non-partisan charitable or social welfare activity under tax law. None of the party committee commenters addressed this issue.

The final rules address the disposal of excess non-Federal funds in new paragraph (c), discussed below. Other minor changes made to paragraph (a) in the final rules include: the word "only" has been changed to "solely" to better track the language used in BCRA and a reference to paragraph (e) has been deleted. Changes in the organization of 11 CFR 300.12 are discussed below.

B. Prohibited Uses of Non-Federal Funds After November 5, 2002

BCRA provides that the permissible uses of non-Federal funds enumerated in paragraph (a) are subject to certain restrictions. The final rules at 11 CFR 300.12(b) set forth these restrictions. Specifically, paragraph (b) states that national party committees will no longer be able to use non-Federal funds for any of the following activities after November 5, 2002: (1) To pay any expenditure as defined in 2 U.S.C. 431(9); (2) to retire outstanding debts or obligations that were incurred for any expenditure; or (3) to defray the costs of the construction or purchase of any office building or facility. The final rules track the language in the proposed rules. The Commission did not receive any comments concerning this paragraph, other than those pertaining to building funds, which are discussed below.

C. Disposal of Remaining Non-Federal Funds

New paragraph (c) provides that any non-Federal funds remaining after payment for permissible debts and obligations described in paragraph (a) must be either disgorged to the United States Treasury or returned by check to the donors by December 31, 2002. This approach gives effect to the use of the word "solely" in 2 U.S.C. 431 note, and to the legislative intent to prohibit national party non-Federal money from being used in future Federal elections. The Commission did not adopt the suggestion that refunds must be made to contributors on a *pro rata* basis. National party committees have the

---

[5] The raising and spending of non-Federal funds by State, district, and local committees or organizations are addressed in 11 CFR part 300, subpart B, discussed below.

option of making these refunds on a last-in, first-out (LIFO) or first-in, first-out (FIFO) basis. Paragraph (c) further provides that all refund checks not cashed by donors by February 28, 2003 must be disgorged to the United States Treasury by March 31, 2003. The latter provision ensures that the national party committees do not make use of any uncashed refund checks. Requiring either disgorgement to the United States Treasury or refunds to donors is consistent with the Commission's practice in enforcement matters when a contributor has made, and a political committee has accepted, funds prohibited under the Act.

**D. National Party Committee Office Building or Facility Accounts**

BCRA treats non-Federal funds contained in national party building fund accounts more stringently than non-Federal funds in the national party committees' other non-Federal accounts. Under current law, funds in a national party building fund account may be used only for the purchase or construction of the national party committees' office building or facility. Beginning November 6, 2002, however, any funds remaining in a national party building fund account must not be used for the purchase or construction of any office building or facility. *See* 2 U.S.C. 431 note. Consequently, the Commission proposed requiring that funds on deposit in any party office building or facility account be disgorged to the United States Treasury or donated to a organization described in 26 U.S.C. 170(c) no later than December 31, 2002.

As discussed above, although some commenters suggested that national party committees be permitted to donate the remaining non-Federal funds to a charitable organization, other commenters noted that such organizations include organizations exempt under 26 U.S.C. 501(c)(3) which could result in non-Federal funds making their way into future Federal elections since 501(c)(3) organizations may engage in Federal election activity such as voter registration and get-out-the-vote activities. For this reason, the final rule in 11 CFR 300.12(d) follows the approach taken in paragraph (c) for disposal of excess non-Federal funds: Paragraph (d) requires that non-Federal funds remaining in national party building and office facility accounts on November 6, 2002 be disgorged or refunded to donors by December 31, 2002. As in paragraph (c), any refund checks not cashed by donors by February 28, 2003, must be disgorged to the United States Treasury by March 31, 2003.

Additionally, in their comments, the sponsors pointed out that while the proposed rule only prohibited excess building funds from being used to construct or purchase a national party office building, the statutory language prohibits the use of such funds to defray construction or purchase costs for "any" office building or facility. *See* 2 U.S.C. 431 note. Paragraph (d) of the final rules also incorporates this change.

**E. Application**

The final rule at 11 CFR 300.12(e) clarifies that the transition rules apply to officers and agents acting on behalf of a national party committee or a national congressional campaign committee, and to entities that are directly or indirectly established, financed, maintained, or controlled by a national party committee or a national congressional campaign committee. The Commission did not receive any comments relating to this provision. The final rule follows the proposed rule at 300.12(e) except that it has been redesignated as paragraph (e).

**F. Allocation and Payment of Expenses During the Transition Period**

Section 300.12(f) clarifies that the allocation rules applicable to national party non-Federal and Federal accounts in revised 11 CFR 106.5 remain in effect during the transition period. No comments addressed this provision. The final rules in paragraph (f) are identical to proposed paragraph (f).

*11 CFR 300.13 Reporting*

BCRA requires national party committees, including national congressional campaign committees, and any subordinate committee of either, to report all receipts and disbursements during regular reporting periods. 2 U.S.C. 434(e). New 11 CFR 300.13(a) tracks the statutory language.

The NPRM sought comment on whether this provision of BCRA was intended to require reporting by existing entities that currently are not required to report and sought the identity of any such entities. The primary sponsors of BCRA commented that the term "subordinate committee" was intended to ensure that any new committees created by the national party committees would file required reports for all receipts and disbursements. The sponsors further stated that this provision requires existing entities that are subordinate to the national parties to report all of their receipts and disbursements whether or not they are required to do so under current law. The sponsors and several other public interest group commenters identified

the College Democrats and College Republicans as subordinate committees of the national parties. None of the party committee commenters addressed this point.

Although neither BCRA nor FECA contains a definition of a "subordinate committee" of a national political party, the phrase is used in 2 U.S.C. 441a(a)(4). That provision states that limitations on contributions do not apply to transfers between and among political committees that are national, State, district, or local committees of the same political party "including any subordinate committee thereof." In Advisory Opinion 1976–112, the Commission concluded that Democrats Abroad was a subordinate committee of the Democratic National Committee for purposes of 2 U.S.C. 441a(a)(4). The advisory opinion noted that the group was "an organization of American citizens living overseas who support the basic principles of the National Democratic Party," had a central office in London, and local clubs in several countries that anticipated reaching political committee status. The Commission concluded that Democrats Abroad functioned as a part of the official structure of the Democratic Party and represented the Democratic Party to Americans living in foreign countries. Factors relied upon in this conclusion included: the group held fundraisers, the proceeds of which were donated to the DNC; the Democratic Party charter authorized a voting delegate from the group to participate at the 1976 party convention; the Call to Convention gave the group three votes to be cast by six delegates elected by group members in accordance with the rules of the party's Compliance Review Commission; the group was allowed representation on the Standing Committee of the Democratic Party; and the group functioned as a party committee by participation in voter registration and GOTV drives for the Democratic Party in 1976. The Commission specifically rejected the conclusion that Democrats Abroad was the equivalent of a State party committee based on the statutory definitions of "State committee" and "State."

Based on the prior construction of the term in Advisory Opinion 1976–112, the Commission concludes that a "subordinate committee" of a national party committee is one that is affiliated with, and participates in, the official party structure of the national party committee. As applied to a particular group, whether an organization is a subordinate committee of a national party is a factual determination. Based on the broad legislative intent to

prohibit national parties from raising and spending non-Federal funds, however, the Commission further concludes that a subordinate committee for purposes of 11 CFR 300.13(a) is an entity that is directly or indirectly established, financed, maintained, or controlled by a national committee of a political party.

Since national party committees and entities directly or indirectly established, financed, maintained, or controlled by them cannot solicit, receive, direct, or spend non-Federal funds as of November 6, 2002, and must dispose of all funds in their non-Federal accounts as of December 31, 2002, 11 CFR 300.13(b) requires national party committees and their subordinate committees to file termination reports for all non-Federal accounts, whether or not a subordinate committee was required to file disclosure reports under FECA prior to BCRA. Paragraph (b) of the final rule also takes into consideration the Commission's determination that excess non-Federal funds must be either refunded to donors or disgorged to the United States Treasury. If a national party committee does not issue refund checks, the national party committee must file a termination report for all non-Federal accounts, including building fund accounts by January 31, 2003. If a national party committee issues refund checks to donors, it must file a termination report covering the period ending March 31, 2003 disclosing the refunds and the disgorgement of any refund checks not cashed by February 28, 2003.

Paragraph (c) of § 300.13 makes clear that the reporting regulations at 11 CFR 104.8 and 104.9 applicable to non-Federal accounts, including building funds, will remain in effect during the transition period. Paragraph (c)(2) provides that reporting requirements at 11 CFR 104.9(c) and (d) covering disbursements from non-Federal account and building fund accounts remain in effect for reports covering the period through March 31, 2003. In contrast, under paragraph (c)(1), the reporting requirements at 11 CFR 104.8(e) and (f), covering receipts of non-Federal and building fund accounts and 11 CFR 104.9(e) covering non-Federal account transfers to State party committees, remain in effect only until December 31, 2002.

## Subpart B—State, District, and Local Party Committees and Organizations

### 11 CFR 300.30 Accounts

Under proposed 11 CFR 300.30 in the NPRM, State, district, and local party

organizations would have been required to maintain certain separate Levin accounts in depositories if they paid for the costs of voter registration within a fixed time period or for certain voter identification, GOTV, and generic campaign activity pursuant to 11 CFR 100.24 and 300.32(b)(1). Several of the comments received in response to the NPRM agreed with the proposal that all State, district, and local party committees and organizations be required to maintain separate Levin accounts, no matter the organization's size, level of activity and political committee status, if they desired to undertake certain Federal election activities pursuant to 11 CFR 300.32(b). Other comments raised directly or indirectly the issue of whether the Commission should or even could require such accounts, particularly in light of laws in certain States either limiting the number of non-Federal accounts that a State party organization may hold or, more often, requiring numerous such accounts for varying purposes. It was also argued that the number of non-Federal accounts held by a party committee or party organization is a State, not a Federal issue.

The final rules do not require a separate Levin account. Instead, State, district, and local party organizations that decide to undertake activities pursuant to 11 CFR 300.32(b) may deposit Levin funds in either a separate Levin account or their non-Federal account. If a committee's non-Federal account also functions as its Levin account, it must demonstrate through a reasonable accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) that it has sufficient Levin funds to cover the non-Federal share of any disbursement it makes for allocable Federal election activity.

The Commission recognizes that some States already require multiple accounts, while a few may prohibit more than one account for all activity. Most importantly, the Commission is very aware of, and concerned about, the complexities of FECA as amended by BCRA, and wants to provide party organizations with procedural flexibility to facilitate compliance with the substantive conditions and restrictions arising from the Levin Amendment.

The NPRM proposed a requirement that, in order for donations to be placed in a Levin account, either the solicitations for the donations must have expressly stated that donations will be subject to the special limitations and prohibitions of section 300.31, or there must have been an express

designation to the Levin account by the donors. Several commenters objected to these requirements, arguing that they are not in BCRA and would be unnecessary, inappropriate, and could make it difficult for State, district and local party committees to engage in bona fide Levin activities. The Commission agrees, and the final rules contain no such requirement.

Paragraph (a) provides an overview of the section and specifies that 11 CFR 300.30 applies to any State, district, or local committee or organization of a political party that has receipts or makes disbursements for Federal election activity, whether or not such committee is a political committee under 11 CFR 100.5.

Paragraph (b) describes the requirements for four different types of accounts: Federal accounts, Levin accounts, non-Federal accounts, and allocation accounts. Paragraph (b)(1) provides for the use of non-Federal accounts by State, district, and local party committees, to the extent permitted by State law, and lists the provisions under which non-Federal funds may be used in connection with Federal elections. Paragraph (b)(2) provides for an account solely for Levin funds, and references 11 CFR 300.31 and 300.32(b), which track the statutory requirements for raising Levin funds and disbursing Levin funds, respectively.

Paragraph (b)(3)(i) requires that only contributions permissible under the Act be deposited into a State, district, or local party committee's Federal account, even when such funds may be used in connection with both Federal and non-Federal elections. It also requires a cross-reference to 11 CFR 103.3, which explains the procedure for dealing with impermissible funds. Paragraph (b)(3)(ii) describes the information that must be provided to or received from contributors regarding contributions deposited in a Federal account. Paragraph (b)(3)(iii) requires that only Federal accounts or allocation accounts be used to make disbursements, contributions, or expenditures in connection with Federal elections. This procedure tracks the longstanding requirements at 11 CFR 106.5 for transfers to Federal accounts or to allocation accounts for shared Federal and non-Federal activity.

Paragraph (b)(3)(iv) provides that, when a Federal rather than an allocation account is to be used to make allocable expenditures, the initial payment must be made from the Federal account with timely reimbursements from other accounts involved in a transaction. Paragraph (b)(3)(v) prohibits transfers

into a party committee's Federal account from other accounts of the same party committee or from other party committees or party organizations to pay for Federal election activity, except as permitted by 11 CFR 300.30(b)(3)(iv), 300.33, and 330.34. The language of this paragraph in the NPRM has been changed to better track the requirements of BCRA.

The NPRM requested comments on whether the Commission should continue to permit the use of allocation accounts for purposes of making allocable expenditures. The consensus of those responding to this question was in the affirmative. Therefore, a new paragraph (b)(4) is being added expressly permitting the establishment of such allocation accounts in lieu of making all allocated expenditures from a Federal account and setting out the requirements for the use of such allocation accounts. Paragraphs (b)(4)(i) and (ii) state that only certain funds may be deposited in each allocation account, depending upon whether the purpose of the account is to make expenditures and disbursements that have been allocated between a party committee's Federal and non-Federal accounts or to make expenditures and disbursements that have been allocated between its Federal and Levin accounts. This rule is necessitated by the requirements in BCRA that define the specific funds that can and cannot be used for such activities. Paragraph (b)(4)(iii) requires that, once allocation accounts are established, they must be used for all allocable expenses so long as the accounts are maintained. Pursuant to paragraph (b)(4)(iv) and (v), only the amount needed to meet the allocable share of expenses may be transferred into these allocation accounts and no funds from these accounts may be transferred out to other accounts.

Paragraph (c) provides three different options for paying for Federal election activity. Paragraph (c)(1) requires that one or more Federal account be established, which would need to be used to pay for Federal election activity that is not allocable, as well as to pay the Federal portion of Federal election activity that is allocable. Paragraph (c)(1) also allows Federal funds to be used in non-Federal elections, provided that the contributors of the Federal funds have been informed that their contributions will be subject to the limitations and prohibitions of the Act and provided that the disbursements are reported pursuant to section 300.36. The phrase "subject to State law" has been added in response to a comment on the NPRM.

Paragraph (c)(2) provides the option of having at least three separate accounts: one or more Federal, Levin, and non-Federal accounts.

Paragraph (c)(3) provides that if a committee opts not to have a separate Levin account, but instead uses its non-Federal account for depositing and disbursing Levin funds, the committee must demonstrate through a reasonable accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) that the committee has sufficient Levin funds on hand to cover disbursements for Levin activity.

Paragraph (d) requires all party organizations to keep records and to make them available to the Commission upon request.

*11 CFR 300.31 Receipt of Levin Funds*

In BCRA, Congress placed several restrictions on how State, district, and local political party committees raise Levin funds. New 11 CFR 300.31 implements these statutory restrictions. Paragraph (a) states as a general proposition a key point in the statute: a State, district, or local political party committee that spends Levin funds must raise those funds solely by itself. 2 U.S.C. 441i(b)(2)(B)(iv).

Paragraphs (b) and (c) of section 300.31 elaborate on the statutory requirement that Levin funds must be raised from donations that comply with the laws of the State in which the State, district, or local party committee is organized. 2 U.S.C. 441i(b)(2)(B)(iii). Paragraph (b) states this as a general requirement. More specifically, paragraph (c) clarifies a key point on donations from sources that are permitted under State law, but prohibited by the Act. A prime example is donations from corporations and labor organizations. Under 2 U.S.C. 441b of the Act, "[i]t is unlawful * * * for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election" for Federal office. 2 U.S.C. 441b(a). Under the campaign finance laws of several States, however, donations by corporations or labor organizations to political party committees are legal. Section 300.31(c) clarifies that in such States, a political party committee may solicit and accept donations of Levin funds from corporations and labor organizations, subject to the other conditions of the Act. (Of course, if donations from corporations or labor organizations to a political party committee are illegal in a State, political party committees in that State would

not be able to accept Levin fund donations from those sources.)

Three commenters expressed concern that section 300.31(c), as published in the NPRM, could be misinterpreted to allow donations from foreign nationals. One of these commenters suggested adding the phrase, "other than 2 U.S.C. 441e," after the word "chapter." Although the sweeping nature of the 2 U.S.C. 441e as amended by BCRA seems to preclude the possibility that a donation by a foreign national to a party committee could be lawful under any State law, the Commission has revised paragraph (c) of section 300.31 as suggested.

The principal Congressional sponsors commented that paragraph (c) should not be misinterpreted to allow a donation of Levin funds to a State, district, or local political party committee from a person established, financed, maintained, or controlled by a person forbidden from providing Levin funds to the committee. The Commission has addressed this concern in paragraphs (e) and (f) of section 300.31. (See discussion below.)

Paragraph (d), in general, addresses amount limitations on donations of Levin funds to a State, district, or local party committee. In the Levin Amendment, Congress placed a $10,000 per calendar year per donor limitation on donations to a State, district, and local political party committee to be used as Levin funds. This statutory amount limitation applies to a person, including "any person established, financed, maintained, or controlled by such person." 2 U.S.C. 441i(b)(2)(B)(iii). Paragraph (d)(1) clarifies that this is an aggregate limit per recipient committee (i.e., the aggregate limit applies separately to each party committee) and, therefore, a person may contribute to an unlimited number of State, district, and local committees of a political party. See discussion of 11 CFR 300.31(d)(3), below. Paragraph (d)(1) did not draw comment. In the NPRM, the Commission sought comment on whether its current "affiliation" regulation (11 CFR 100.5(g)) would appropriately determine whether a person is "established, financed, maintained, or controlled," within the meaning of this paragraph. The Commission received no comments on this point. The Commission, in this rulemaking, is adopting 11 CFR 300.2(c), which is based on 11 CFR 100.5(g), which should be applied to determine whether certain persons share a $10,000 per year per committee contribution amount limitation under paragraph (d)(1).

Paragraph (d)(2) addresses those cases in which State law imposes an amount limitation on donations to a State, district, or local party committee that differs from the amount limitation in 2 U.S.C. 441i(b)(2)(B)(iii) and paragraph (d)(1). Paragraph (d)(2) strikes a balance between respect for State law and protecting the integrity of the Levin Amendment amount limitation. It makes clear that lower State law amount limitations prevail over the $10,000 limitation in the Levin Amendment, but that the Levin Amendment $10,000 limit controls where State law amount limitations exceed $10,000. There were no public comments on paragraph (d)(2).

Paragraph (d)(3) of section 300.31 addresses the question of whether State, district, and local committees of the same political party are affiliated for purposes of applying the donation amount limitation as set forth in paragraphs (d)(1) and (d)(2) of section 300.31. *See generally* 11 CFR 110.3. The paragraph clarifies that such committees are not considered affiliated only for the purpose of determining compliance with paragraph (d)(1). *See* 148 Cong. Rec. H410 (daily ed. Feb. 13, 2002) (statement of Rep. Shays).

The last sentence of paragraph (d)(3) is intended to make clear that there is no limit to the number of State, district, and local committees to which a person may donate Levin funds. The phrase "individually or together with" in paragraph (d)(3) is intended to clarify that the amount limitations in paragraphs (d)(1) and (d)(2) apply collectively to the amounts donated to a particular party committee by a person and by any entities established, financed, maintained, or controlled by such person.

Three commenters discussed paragraph (d)(3). A national party committee supported the provision. Another commenter suggested that there should be a "rebuttable presumption" of affiliation of party organizations "at the same political or geographic unit" in order to prevent a possible proliferation of party organizations each with its own $10,000 per donor limit. The legislative history indicates, however, that Congress contemplated the possibility of such a proliferation of party committees and chose to address it by imposing a ban on transfers of Levin funds between party committees rather than by affiliating the committees under a single contribution limit. 148 Cong. Rec. H410 (daily ed. Feb. 13, 2002) (statement of Rep. Shays); *see* 2 U.S.C. 441i(b)(2)(B)(iv). Therefore, the Commission has not adopted this suggestion.

As mentioned above in the discussion of paragraph (a) of section 300.31, a key point made in the statute is that expenditures and disbursements of Levin funds by a State, district, or local political party committees must be "made solely from funds raised by the * * * committee which makes such expenditure or disbursement * * *." 2 U.S.C. 441i(b)(2)(B)(iv). Congress elaborated on this fundamental requirement by specifically providing that Levin funds must not be "solicited, received, directed, transferred, or spent by or in the name of" a national committee of a political party, including a national Congressional campaign committee, or a Federal candidate or individual holding Federal office. 2 U.S.C. 441i(b)(2)(C)(i). This statutory prohibition extends to an agent acting on behalf of a national party committee or a candidate or Federal officeholder, and to any entity that is directly or indirectly established, financed, maintained, or controlled by a national party committee or a candidate or Federal officeholder. 2 U.S.C. 441i(a)(2), and (e)(1); *see* 2 U.S.C. 441i(b)(2)(C).

Paragraph (e) of section 300.31 implements these specific statutory restrictions. Paragraph (e)(1) provides that a State, district, or local political party committee must not "accept or use" as Levin funds any funds "solicited, received, directed, transferred or spent" by a national committee of a political party, including a national Congressional campaign committee. Paragraph (e)(2) extends the same prohibition to funds "solicited, received, directed, transferred or spent" by a Federal candidate or officeholder. Two commenters pointed out that paragraphs (e)(1) and (e)(2), as published in the NPRM, did not consistently or expressly refer to agents of, or to entities directly or indirectly established, financed, maintained, or controlled by, national party committees and Federal candidates and officeholders. The prohibition in paragraph (e)(1) has been revised in the final regulation to extend explicitly to agents of, and to entities directly or indirectly established, financed, maintained, or controlled by, national party committees and by Federal candidates and officeholders. Similarly, paragraph (e)(2) has been revised to refer expressly to agents of Federal candidates and officeholders.

Confusion could arise about the relationship of the Commission's long standing joint fundraising regulation, 11 CFR 102.17, and the restrictions imposed in paragraphs (e)(1) and (e)(2) of section 300.31. Therefore, both paragraphs (e)(1) and (e)(2) explicitly

provide that 11 CFR 102.17 does not permit joint fundraising of Levin funds by a State, district, or local political party committee, and a national party committee or a Federal candidate or officeholder. Paragraph (e)(1) also clarifies that a State, district, or local political party committee may jointly raise, under 11 CFR 102.17, Federal funds not to be used for Federal election activity.

Congress specifically addressed other joint fundraising of Levin funds by providing that a State, district, or local political party committee must not use as Levin funds any amounts "solicited, received, or directed through fundraising activities conducted jointly by two or more State, local, or district committees of any political party or their agents." 2 U.S.C. 441i(b)(2)(C)(ii). This prohibition extends across State lines. *Ibid.* New paragraph (f) implements this statutory prohibition against joint fundraising of Levin funds by more than one State, district, or local committee of a political party, including such parties from more than one State. Paragraph (f) also clarifies that nothing in BCRA forbids two or more State, district, or local political party committees from jointly raising Federal funds that are not to be used for Federal election activity.

The provisions of paragraphs (e)(1), (e)(2), and (f) of section 300.31 regarding joint fundraising drew several comments. A national party committee suggested that the Commission clarify that these joint fundraising prohibitions extend only to Levin funds. In response, the Commission emphasizes that the section heading and the language in the introduction to paragraph (e) explicitly limit the scope of these provisions to "Levin funds." Similarly, the Commission emphasizes that paragraph (f) explicitly refers to "Levin funds."

One commenter approved of the scope of joint fundraising provisions of paragraphs (e)(1), (e)(2), and (f), stating that the joint fundraising prohibition should extend beyond particular "events" to all fundraising activities for Levin funds that are conducted jointly. Conversely, three commenters, a national party committee, a State party committee, and an association of State party officials, urged the Commission to limit the reach of the joint fundraising prohibition in paragraphs (e)(1), (e)(2), and (f) to "specific joint fundraising events," in contrast to joint fundraising "activities." They urge that such joint fundraising "activities" for Levin funds should be permitted. In support, they quote Rep. Shays, who said, "joint fundraisers between state committees or state and local committees are not

permitted * * * The joint fundraising prohibition will prevent a single fundraiser for multiple state and local party committees." 148 Cong. Rec. H410 (daily ed. Feb. 13, 2002). These commenters apparently have focused upon Rep. Shays' use of the term "single fundraiser," which they seem to interpret to mean a dinner, a speech, or similar "event." Presumably, a fundraising "activity," such as a direct mail campaign, would be permitted under the commenters' suggested interpretation. In response, the Commission notes that statements by any member of Congress during the floor debate should not be used to contradict the plain language of the statute. BCRA itself broadly refers to "fundraising *activities* conducted jointly" by State, district, or local political party committees. 2 U.S.C. 441i(b)(2)(C)(ii) (emphasis added). In addition, the specific statement made by Rep. Shays, referring to a "single fundraiser," could easily encompass either a dinner or a specific direct mail campaign.

In the final rules, the Commission has added as a separate paragraph (g) a rule stated in the NPRM as the final sentence of paragraph (f). Paragraph (g), under the heading "Safe harbor," provides that the use of a common vendor by more than one State, district, or local political party committees does not constitute joint fundraising within the meaning of section 300.31. In the version of the regulation published in the NPRM (then in paragraph (f)), the rule would have provided that the use of a common vendor would not, by itself, be deemed joint fundraising. The Commission revised this language in order to provide a "bright-line" rule. The principal Congressional sponsors of BCRA, responding to the NPRM, agreed with this provision in principle, but noted that use of a common vendor may, in some circumstances, be a means of carrying out actual 'joint fundraising' schemes. The sponsors urged the Commission to be "highly attentive" to this practice.

### 11 CFR 300.32    Expenditures and Disbursements

11 CFR part 300, subpart B, generally addresses expenditures and disbursements of Federal funds and of Levin funds for Federal election activities. 11 CFR 300.32 specifically addresses both kinds of spending by a State, district, or local political party committee, and clarifies that BCRA does not affect spending of non-Federal funds for purely State or local activity. 11 CFR 300.32 also implements part of 2 U.S.C. 441i(b)(1), which requires that an

association or similar group of candidates for State or local office, or an association of State or local officeholders, must make expenditures or disbursements for Federal election activity solely with Federal funds.

In the NPRM, the Commission solicited comments about the term, "association or similar group of candidates for State or local office, or an association of State or local officeholders," specifically asking whether it should be further defined in the regulations, and if so, about examples of such associations or groups to include in the final regulations. The Commission received no comments on this point, nor did the Commission receive any other comments about paragraph (a)(1).

Paragraph (a)(1) requires that an association or similar group of candidates for State or local office, or an association of State or local officeholders, must make expenditures or disbursements for Federal election activity solely with Federal funds. Paragraph (a)(2) makes clear that the general rule in BCRA is that a State, district, or local party committee spending on Federal election activity must use Federal funds for that spending, except as provided in 2 U.S.C. 441i(b)(1). The Commission received no comments regarding this provision.

Paragraphs (a)(3) and (a)(4) address how State, district, or local party committees must pay the costs of raising funds used to pay for Federal election activities. In BCRA, Congress required that spending by a State, district, or local committee of a political party "to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act." 2 U.S.C. 441i(c). As published in the NPRM, paragraphs (a)(3) and (a)(4) sought to implement section 441i(c) as it applied to Federal funds raised for Federal election activity and Levin funds raised for Federal election activity, respectively.

In the NPRM, the Commission sought comment about section 441i(c) with regard to Levin funds. In particular, the Commission sought comment on (1) whether proposed paragraph (a)(4) could be limited to the direct costs (see pre-BCRA 11 CFR 106.5(a)(2)(ii)) of raising Levin funds; and (2) whether the costs of fundraising for Levin funds could be allocated between a party committee's Federal and non-Federal accounts under the "funds received" method. *See* pre-BCRA 11 CFR 106.5(f). Comments were also sought as to

whether, generally, greater specificity should be provided in proposed section 300.32 as to the nature of fundraising costs in this section. 67 FR 35664.

The Commission received several comments about paragraphs (a)(3) and (a)(4). The principal Congressional sponsors of BCRA and a public interest group suggested that both paragraphs (a)(3) and (a)(4) should be clarified by including the statutory language, "in whole or in part." The Commission has included this suggestion in the final regulation. The added language better conforms the scope of the regulation to the scope of the statute.

Another commenter suggested that both paragraphs (a)(3) and (a)(4) should be limited to the direct costs of raising funds to be spent for Federal election activity, in contrast to the regulation proposed in the NPRM, which would have covered all costs of fundraising. The Commission has included this suggestion in the final rules. The purposes of 2 U.S.C. 441i(c) are adequately served by regulating only the direct costs of raising funds for Federal election activity. This limitation also avoids unnecessary confusion about allocation of administrative costs in the fundraising context in that covering the direct costs of fundraising is consistent with the Commission's longstanding regulation of fundraising costs. Given this change in the final regulation, the Commission has imported language from its pre-BCRA allocation regulation describing what constitutes direct costs.

A public interest group supported paragraph (a)(4) of the NPRM, while a State party commenter objected to paragraph (a)(4) to the extent that it forbids a State, district, or local political party committee from spending Levin funds to raise Levin funds. This commenter suggests that Levin funds are subject to the limitations, prohibition, and reporting requirements of the Act, as specified in 2 U.S.C. 441i(c).

The Commission notes that 2 U.S.C. 441i(b)(2)(A), which addresses the use of Levin funds for certain Federal election activity, refers to "amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection)." Although that statutory phrase is somewhat incomplete, in that it omits any reference to the reporting requirements for Levin activity that are found in a different section of the Act (2 U.S.C. 434(e)), it is nonetheless a recognition that Levin funds are subject to requirements of the Act.

Yet even without this phrase, the Commission would find that Levin

funds are subject to the limitations and prohibitions found in the Act at 2 U.S.C. 441i(b)(2), and the reporting requirements found in the Act at 2 U.S.C. 434(e)(2)(A). The Commission notes that 2 U.S.C. 441i(b)(2)(B) places a $10,000 limit on Levin funds donated to any one State, district, or local committee of a political party, which is greater than the amount limitation for contributors to authorized committees under 2 U.S.C. 441a(a)(1)(A), but less than the amount limitation for contributors to national committees under 2 U.S.C. 441a(a)(1)(B). The Commission finds that even though there are different amount limitations that apply to different contexts in the Act, that does not cause any of those limitations to not be limitations "of the Act." Similarly, 2 U.S.C. 441i(b)(2)(B) and 441i(b)(2)(C)—which, among other things, prohibit the use of Levin funds for activity that refers to a Federal candidate and prohibit the receipt of Levin funds raised by other party committees—contain different prohibitions than other sections of the Act (*see*, e.g., 2 U.S.C. 441b), but are prohibitions "of the Act" nonetheless. And finally, reporting requirements under the Act can vary depending on the amount and nature of the receipt or disbursement, as well as on the nature of the entity that is receiving and disbursing the amount at issue. *See* 2 U.S.C. 434. The same variables apply to the reporting requirements for funds raised and disbursed for Federal election activity. *See* 2 U.S.C. 434(e). In light of the statutory limitations, prohibitions and reporting requirements to which Levin funds are subject, the Commission concludes that State, district, and local party committees or organizations may spend Levin funds to raise Levin funds.

Paragraph (b) of section 300.32 lists the types of activities for which a State, district, or local political party committee may spend Levin funds. Paragraph (b)(1) spells out the two kinds of Federal election activity for which Levin funds may be spent, *see* 2 U.S.C. 441i(b)(2)(A), and provides that such spending must be made subject to the conditions set out in paragraph (c) of section 300.32. The principal Congressional sponsors of BCRA suggested that the word "only" be included to preclude any possible misinterpretation of the provision. The Commission has adopted this suggestion in the final regulation.

Paragraph (b)(2) of section 300.32, as proposed in the NPRM, drew several comments. A national party committee and a State party committee supported the provision. The principal

Congressional sponsors of BCRA and a public interest group expressed concern that paragraph (b)(2) could be misinterpreted to allow spending of Levin funds for the Federal election activities described in 2 U.S.C. 431(20)(A)(iii) and (iv). In response to this concern, the Commission has added the language, "other than the Federal election activities defined in 11 CFR 100.24(b)(3) and (4)," which implement section 431(20)(A)(iii) and (iv).

As published in the NPRM, paragraph (b)(2) of section 300.32 would have allowed a State, district, or local political party committee to spend Levin funds for any purposes allowed by State law, and would have also provided that such spending was not subject to paragraph (c) (*see* below). The principal Congressional sponsors of BCRA expressed concern that the latter provision could be misinterpreted to allow fundraising and unallocated spending of Levin funds otherwise forbidden in other regulations. The Commission agrees. Therefore, the final rule, paragraph (b)(2), exempts spending of Levin funds for purposes permissible under State law from only paragraphs (c)(1) and (c)(2) of section 300.32 because those two paragraphs are specifically focused on spending for Federal election activities. As revised, the final rule subjects all spending of Levin funds to paragraphs (c)(3) and (c)(4). The heading for paragraph (c) has been changed slightly in the final rule to conform with this change.

While the Levin Amendment permits the spending of Levin funds for the purposes set out in paragraphs (b)(1) and (2), it places restrictions and conditions on that spending when it is for Federal election activity. Paragraph (c) sets out in one place important restrictions and conditions that are stated in different sections of BCRA. Paragraph (c)(1) implements the restriction that the Federal election activity paid for partly with Levin funds must not refer to a clearly identified Federal candidate. *See* 2 U.S.C. 441i(b)(2)(B)(i). Paragraph (c)(2) implements the restriction that the Federal election activity paid for partly with Levin funds must not be for any broadcast, cable, or satellite communications, other than a communication that refers solely to a clearly identified candidate for State or local office. *See* 2 U.S.C. 441i(b)(2)(B)(ii). Paragraph (c)(3) ties together the provisions of this regulation with 11 CFR 300.31, which covers the raising of Levin funds. Paragraph (c)(4) requires allocable Federal election activity (i.e., voter registration, voter identification, GOTV, or generic

campaign activity that does not refer to a clearly identified Federal candidate and is not a broadcast, cable, or satellite communication) that exceeds in the aggregate $5,000 in a calendar year to be paid for either entirely with Federal funds, or with a combination of Federal funds and Levin funds pursuant to the allocation percentages set forth in 11 CFR 300.33. Disbursements that aggregate $5,000 or less in a calendar year for this restricted category of Federal election activity may be paid for entirely with Federal funds, entirely with Levin funds, or pursuant to the allocation percentages set forth in 11 CFR 300.33.

In implementing 2 U.S.C. 441i(b)(2)(A), the Commission chose to permit a greater amount of Levin funds to be used when disbursements for allocable Federal election activity do not exceed in the aggregate $5,000 in a calendar year for several reasons. First, the Commission notes that the reporting requirements for Federal election activity contain an exception for activity below $5,000 in the aggregate in a calendar year. *See* 2 U.S.C. 434(e)(2)(A). While that exception applies to aggregate receipts and disbursements, rather than just aggregate disbursements, it does suggest that Congress did not take a rigid approach to low levels of Federal election activity. Second, the Commission is particularly sensitive to the nature of the Federal election activity to which this provision applies: Grassroots activities for which references to Federal candidates are prohibited. There is a far weaker nexus between Federal candidates and this category of Federal election activity than other types of Federal election activity for which Levin funds are prohibited. Finally, the Commission notes that $5,000 is only half of what any single donor may donate (subject to State law) to each and every State, district, and local party committee under 2 U.S.C. 441i(b)(2), so there is no danger that allowing a committee to use entirely Levin funds for allocable Federal election activity that aggregates $5,000 or less in a calendar year will somehow lead to circumvention of the amount limitations set forth in 2 U.S.C. 441i(b)(2). The distinction in paragraph (c)(4) between allocable Federal election activity below $5,000 and allocable Federal election activity above $5,000 reflects these considerations.

Paragraph (d) serves as a clarifying reminder that spending of non-Federal funds by a State, district, or local political party committee for State or local political activity, including the raising of non-Federal funds, remains a matter of State law. In response to

several comments, the Commission is making two minor clarifications to this paragraph in the final rules. First, the paragraph heading has been changed to refer to "activities," rather than "funds," as it read in the NPRM, to be more descriptive of the actual subject of the paragraph. Second, the first sentence of the paragraph now refers to spending "Federal, *Levin*, or non-Federal" funds to conform this paragraph with paragraph (b)(2) of section 300.32.

*11 CFR 300.33 Allocation of Costs of Federal Election Activity*

The final regulations in this section address only the allocations of expenditures and disbursements by State, district, and local party committees for Federal election activity, pursuant to the requirements of BCRA. The requirements for allocations by these committees of other categories of expenditures and disbursements that are not Federal election activity are to be found at 11 CFR 106.7. This division of rules represents an attempt to clarify how different categories of activities are addressed with regard to allocation, depending upon their nature, timing and, in certain instances, the presence or absence of a Federal candidate on the ballot, i.e., whether they come or do not come within the definition of "Federal election activity" at 11 CFR 100.24. Provisions at proposed 11 CFR 300.33 that addressed activities not within the definition of Federal election activity now appear in new 11 CFR 106.7. *See also* the Explanation and Justification for 11 CFR 106.7.

Section 441i(b)(1) of Title 2, United States Code, states that State, district, and local party committees must make all disbursements and expenditures for Federal election activity with Federal funds, with one exception. This requirement holds even when the expenses involved are also related to activities in connection with non-Federal elections. The exception to the required use of Federal funds in connection with Federal election activity involves certain activities to be paid in part with Levin funds, pursuant to 2 U.S.C. 441i(b)(2).

Section 441i(b)(2)(A) permits State, district, and local party committees, under certain conditions, to use Levin funds from a Levin or non-Federal account for particular categories of activity, including voter registration, voter identification, get-out-the-vote ("GOTV"), and generic campaign activities during the time periods when they constitute Federal election activity. These funds must have been received by a party committee pursuant to specific limitations, and are to be used to meet

expenses related to voter registration activity that takes place within 120 days of a Federal election and/or expenses related to voter identification, GOTV activities, and generic campaign activities that are conducted when a Federal candidate appears on the ballot. Such activities must not refer to a clearly identified candidate for Federal office. Section 441i(b)(2)(A) permits the use of Levin funds for these purposes "to the extent that" the costs of the activities are allocated. Levin funds may also be used for non-Federal purposes permissible under State law. *See* 11 CFR 300.32(b)(2).

Paragraphs 300.33(a)(1) and (2) of the proposed regulations, which addressed the costs of salaries and wages paid to employees who spend less than 25% of their time in connection with Federal elections and of other administrative costs, are being replaced by new 11 CFR 106.7(c)(1) and (d)(1) for the reasons explained in the Explanation and Justification for that section.

In the final rules, 11 CFR 300.33(a) addresses costs that may be allocated between Federal and Levin funds. Paragraphs (a)(1) and (a)(2) represent a division of the proposed rule into two parts, the first addressing voter registration within 120 days of the date of an election and the second the costs of voter identification, GOTV, and generic campaign activities occurring during time periods when they constitute Federal election activity. The relevant time periods for the latter categories of activity are set out at 11 CFR 100.24(a)(1). Both paragraphs (a)(1) and (a)(2) are subject to 11 CFR 300.32(c), which permits committees to fund these activities entirely with Levin funds only when the disbursements for the activities do not exceed $5,000 in the aggregate in a calendar year.

Paragraph (b) of section 300.33 sets out fixed minimum amounts of Federal funds to be required for the Federal portions of costs of the specified activities for which allocation between Federal and Levin funds is permissible. One goal of the allocation rules is to assure that activities deemed allocable are not paid for with a disproportionate amount of Levin funds. Another goal is to simplify the allocation process, in particular by establishing formulas that do not vary from State to State and that do not require measurements of time or space. Therefore, in lieu of the State-by-State ballot composition ratios for generic campaign activity and in lieu of the time or space method applied to exempt State party activities in the pre-BCRA regulations, the rules establish a fixed formula for all States that would vary only in terms of whether or not a

Presidential campaign and/or a Senate campaign is to be held in a particular election year.

In the NPRM, the Commission set out allocation percentages for the Federal shares of the allocable Federal election activities described in paragraph (a). The final rules at 11 CFR 300.33(b)(1) through (4) use the same minimum Federal percentages. True, State, district, and local party committees and organizations must allocate no less than the following amounts to their Federal accounts:

(i) Presidential only election year—28% of costs

(ii) Presidential and Senate election year—36% of costs

(iii) Senate only election year—21% of costs

(iv) Non-Presidential and Non-Senate election year—15% of costs

As with the percentages used in 11 CFR 106.7 for the allocation of activities that are not Federal election activities, the percentages for those allocable Federal election activities that may be paid for in part with Levin funds were derived by taking averages of the ballot composition-based allocation percentages reported by State party committees in four groupings of States selected for their diversities of size and geographic location and for the particular elections held in each State in 2000 and 2002. The groupings were: (1) Six States (Alabama, Colorado, Illinois, New Hampshire, Oklahoma, and Oregon) in which there was a Presidential but no Senate campaign in 2000; (2) ten States (California, Delaware, Georgia, Florida, Michigan, New York, North Dakota, Texas, Vermont, and Wyoming) in which there were both a Presidential campaign and a Senate campaign in 2000; (3) six States (Delaware, Georgia, Michigan, Oklahoma, Texas, and Wyoming) in which there will be a Senate campaign in 2002; and (4) six States (California, Florida, New York, North Dakota, Vermont, and Washington) in which there will be no Senate campaign in 2002.

In 2000, the Federal percentages for the two parties in six States with only a Presidential campaign ranged from 20% to 33.33%, with an average of 28%, while the Federal percentages for the two parties in the ten States that held both Presidential and Senate campaigns that year ranged from 30% to 43%, with an average of 36%. In 2002, the Federal percentages for the two parties in six States with a Senate campaign ranged from 20% to 25%, with an average of 21%, while the Federal percentages for the two parties in six States with no Senate campaign ranged from 11.11% to

16.67%, with an average of 15%. The rules apply the average percentages in each of the four groupings of States to all 50 States.

As discussed in the Explanation and Justification for 11 CFR 106.7, one comment on the NPRM from a public interest organization addressed the Commission's proposed fixed percentages by discussing two alternatives to the Commission's figures. The first alternative would have set a flat 33% requirement for Federal shares of what the response termed "Levin expenditures" and for allocable costs other than administrative costs in odd-numbered years or in non-Presidential election years, and a flat 40% requirement for Federal shares of these same categories of activities in Presidential election years. The commenter based these percentages on what was termed "the current assumption" as to what State party committees spend in certain years.

The second alternative posed by the same commenter adopted the Commission's calculations, but called for the use of the higher percentages in the sample States for what the response termed "Levin spending" and for voter registration outside the 120 day period before an election, plus the average percentages for certain non-Levin expenses. The commenter also urged the Commission to apply the allocation percentages to a two-year election cycle, not just to the year of a Federal election.

The comment submitted on behalf of the principal Congressional sponsors of BCRA with regard to fixed allocation percentages was very similar to that of the public interest organization's response cited above in that, as one alternative approach, it called for at least a 33% Federal allocation of what it termed "Levin activities" and of voter registration activities outside the 120 day period before an election. It also called for 40% Federal allocations of Levin activities and of voter registration activities that are not Federal election activities in Presidential election years. This alternative urged the application of the percentages to two-year Federal election cycles. As a second alternative, this commenter also agreed to use of the Commission's percentages for administrative costs in a two year cycle, but urged the application over that cycle of the highest, not the average, Federal percentages for what it termed "Levin activities" and voter registration activities that are not 'Federal election activity'. * * * *"] Another comment from a public interest organization also called for use of the highest percentages in the identified States, not the average percentages.

Comments on the NPRM received from party committees with regard to fixed percentages for Federal allocations ranged from support for the Commission's position to giving party committees a choice at the beginning of each cycle between the proposed formula and ballot composition ratios.

The final rules at paragraph 300.33(b) retain the fixed percentage approach to allocation proposed in the NRPM and adopt the percentages proposed in the NPRM to disbursements for Federal election activities. As discussed above, disbursements for salaries and wages, and allocations of administrative costs, are addressed at 11 CFR 106.7. The final rules at 11 CFR 300.33(b) also contain additional language to clarify that the allocation percentages must be used for activities that occur within the time periods described in 11 CFR 100.24, time periods that establish when specific activities are to be treated as "Federal election activity" under BCRA. The time periods differ between voter registration on the one hand and voter identification, GOTV, and generic campaign activities on the other. *See* 11 CFR 100.24(a) and (b). As explained in the Explanation and Justification for 11 CFR 100.24, the complete two-year cycle approach urged by some commenters has not been adopted for Federal election activities.

With regard to the amounts of the fixed minimum Federal allocations, the Commission has retained the percentages contained in the NPRM because they represent averages of actual allocation ratios used in specific States at specific times, not assumptions of State, district, and local party behavior. The Explanation and Justification for 11 CFR 106.7 explains the basis for this approach in greater detail.

Paragraphs (c)(1) and (2) of section 300.33 set out the categories of Federal election activity costs that must not be allocated between Federal funds and Levin funds. These categories include: (1) The costs of public communications as defined at 11 CFR 100.26, which must be paid with all Federal funds, and (2) the costs of salaries and wages for employees who spend more than 25% of their compensated time in a month on activities in connection with a Federal election, which must also be paid entirely with Federal funds. The costs of salaries and wages for employees that spend 25% or less of their compensated time in a month on activities in connection with a Federal election must be paid entirely with non-Federal funds that comply with State law. *See* 11 CFR 106.7(c)(1). This approach to salaries and wages is

explained more fully in the Explanation and Justification for 11 CFR 106.7.

Section 300.33(c)(3) requires that the *direct* costs of raising funds for Federal election activities be paid solely from the party committee's Federal funds, pursuant to 2 U.S.C. 441i(e), or with Levin funds. The Explanation and Justification for 11 CFR 106.7 and 300.32 explain the reasons for this approach. The proposed rules had indicated that non-Federal funds could be used in certain limited fundraising situations involving non-Federal activity. This language has been deleted from the final rules for the reasons explained in the accompanying Explanation and Justification for 11 CFR 106.7.

Paragraph 300.33(d) addresses transfers of Levin funds from a State, district, or local party committee's Levin account or from its non-Federal account to its Federal account or to an allocation account to meet the Levin fund portion of the costs of allocable expenditures made pursuant to 2 U.S.C. 441i(b)(2). The final rule largely tracks pre-BCRA 11 CFR 106.5(g) by requiring that reimbursements from a Levin account or from a non-Federal account to a Federal account or to an allocation account take place within a specified number of days. New paragraph (d), like former 11 CFR 106.5(g)(2)(B)(iii), states that any payment outside this time frame, absent the need for an advance payment of a reasonably estimated amount, could result, depending upon the circumstances, in a loan to the Federal account and a violation of the Act. No commenters addressed this provision.

*11 CFR 300.34    Transfers*

As explained above, the Levin Amendment permits spending on certain Federal election activities subject to restrictions and conditions, one of which is that the spending must be allocated between Levin funds and Federal funds. 2 U.S.C. 441i(b)(2)(A)(i), (ii). A State, district, or local committee must raise by itself all money spent under the Levin Amendment. 2 U.S.C. 441i(b)(2)(B)(iv). Congress expressly stated that a State, district, or local committee must not use as Levin funds "any funds provided to such committee" by certain enumerated entities. These entities are: any other State, district, or local committee; any national political party committee; any agent of a political party committee; and any entity directly or indirectly established, financed, maintained, or controlled by a political party committee. 2 U.S.C. 441i(b)(2)(B)(iv)(I) through (IV). By the plain language of these provisions, these restrictions

extend to the Federal funds component of the disbursement allocated between Levin funds and Federal funds. *See* 148 Cong. Rec. H410 (daily ed. February 13, 2002) (Rep. Shays).

This provision of the Levin Amendment could cause confusion given the pre-existing rule that party committees of the same political party may transfer Federal funds among themselves without limit on amount. *See* 11 CFR 102.6(a)(1)(ii).[6] Paragraph (a) of section 300.34 makes clear that 11 CFR 102.6(a)(1)(ii) does not override the Levin Amendment as to transfers of Federal funds. Specifically, the committee must not use such transferred Federal funds to pay the Federal portion of Federal election activity. A State party committee and an association of State party officials commented that this provision about transferred Federal funds should apply only to transferred Federal funds "earmarked" for spending under the Levin Amendment by the transferring committee. The Commission has not adopted this suggestion in the final rules. Congress, at 2 U.S.C. 441i(b)(2)(B)(iv), specifically bars a State, district, or local committee spending Federal funds (and Levin funds) for Federal election activity from using transferred funds. How a transferring committee may or may not characterize the transfer is irrelevant to this prohibition.

In response to the NPRM, a public interest group noted that a State, district, or local party committee's Federal account may commingle Federal funds raised by the committee itself, which are eligible for spending for Federal election activities, and transferred Federal funds, which are not so eligible. This commenter suggested that the Commission should require party committees to use "a reasonable and industry-accepted accounting method" to ensure that they have sufficient self-raised, non-transferred Federal funds to cover expenditures for Federal election activities as the expenditures are made. The Commission has responded to this suggestion in the final rules. Paragraph (a) of section 300.34 is organized into two paragraphs. Paragraph (a)(1) contains the language published in the NPRM, without change. Paragraph (a)(2) provides that a State, district, or local political party committee must demonstrate through a reasonable

accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) that its Federal account has sufficient Federal funds raised by the committee itself to make a given disbursement of Federal funds for Federal election activity. Paragraph (a)(2) alternatively permits, but does not require, a State, district, or local political party committee to establish a separate Federal account to use for spending on Federal election activities, and into which it deposits only Federal funds it has raised by itself.

The principal Congressional sponsors of BCRA commented that 11 CFR 300.34 should not be interpreted to forbid a State, district, or local political party committee from using Federal funds raised lawfully on its behalf by a Federal or State candidate or officeholder as long as the funds are contributed directly to the party committee. The Commission agrees with the sponsors' interpretation, and emphasizes that 11 CFR 300.34 applies to transfers of funds from the persons described in paragraphs (b)(1) and (b)(2).

The final sentence of paragraph (a)(1) states as a positive requirement that a State, district, or local political party committee that spends Levin funds must raise the Federal funds component of those funds by itself. As already mentioned above, the Levin Amendment imposes this fundraising requirement. 2 U.S.C. 441i(b)(2)(B)(iv).

The Levin Amendment specifically forbids particular transfers of Levin funds; that is, a State, district, or local party committee may not use as Levin funds any funds transferred to it by certain persons. 2 U.S.C. 441i(b)(2)(B)(iv)(I) through (IV). 11 CFR 300.34(b)(1) and (b)(2) implement these transfer prohibitions by expressly identifying these persons to, and from, which transfers must not be made.

Paragraph (c) of section 300.34 cross-refers to 11 CFR 300.30, which sets forth the permissible account structures for Levin funds, and 11 CFR 300.33, in which are the rules for allocation transfers between the accounts of a given State, district, or local political party committee.

### 11 CFR 300.35    Office Buildings

BCRA repealed 2 U.S.C. 431(8)(B)(viii), which had exempted from the definition of contribution any donation of money or anything of value, or loan, to a national or State party committee that is specifically designated to "defray any cost for construction or purchase of any office

facility not acquired for the purpose of influencing the election of any candidate in any particular election for Federal office." In subsequent technical amendments, however, Congress enacted 2 U.S.C. 453(b), which states: "Notwithstanding any other provision of this Act, a State or local committee of a political party may, subject to State law, use exclusively funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act for the purchase or construction of an office building for such State or local committee." 2 U.S.C. 453(b).

New section 300.35 addresses three areas in implementing 2 U.S.C. 453(b). Paragraphs (a) and (b) provide for the application of State law to the source and use of funds, and provide that Federal law will not preempt the application of State law with respect to the use of non-Federal funds and Levin funds, but that Federal law will preempt State law if Federal funds are used. Paragraph (c) specifically allows a party committee to lease space in its office building to others with conditions on the deposit of funds into a Federal or non-Federal account. Finally, paragraph (d) addresses the transitional requirements for the current State party office building funds established under the repealed statutory section.

### A. Application of State Law

A principal sponsor of the technical amendments described the party office building provision as "[r]especting the primacy of State law in financing State and local party buildings." 148 Cong. Rec. S2339 (daily ed. March 22, 2002) (statement of Sen. McConnell). A principal sponsor of BCRA described the proposal as providing that Federal law would no longer allow a State or local party committee to receive non-Federal donations to purchase or construct an office building where such donations violated State law, that State law governs the receipt and disbursement of non-Federal donations used by State or local parties for such purposes, and that there is no "required match consisting of Federal contributions." 148 Cong. Rec. S2143–2144 (daily ed. March 20, 2002) (statement of Sen. Feingold).

The final rule at paragraph (a) of new section 300.35 provides that a State or local party committee may spend either Federal funds or non-Federal funds that are not subject to the limitations, prohibitions, or disclosure provisions of the Act, so long as such funds are not contributed or donated by a foreign national. If non-Federal funds are used, they are subject to State law. If Federal funds are used, they are subject to

---

[6] The Commission emphasizes that revisions to section 102.6(a) regarding transfers may be forthcoming in a future rulemaking to implement changes to 2 U.S.C. 441a(d) made by BCRA. The present discussion and this rulemaking extend only to Title I of BCRA. Pub. L. 107–155, March 27, 2002.

Federal law. The paragraph also incorporates language from the repealed statute and deleted regulations to the effect that the exemptions from Federal limits and prohibitions are based on the building not being purchased or constructed for the purpose of any particular Federal candidacy, but, rather, for the functioning of the party, which entails the support of most or all of the party's candidates over a number of years. The purchase or construction of the building to assist the campaign of a particular Federal candidate would entail the use of impermissible funds in a manner contrary to the basic purpose of the Federal law.

Paragraph (b) explains the coverage of State law with respect to non-Federal funds or Levin funds received by a State or local party that are spent for the purchase or construction of its office building. Other than with respect to donations by foreign nationals, Federal law would not preempt State law as to the source of non-Federal funds, State restrictions on the use of those funds (i.e., the State can prohibit or limit the use of funds with respect to the purchase or construction), or the reporting of the receipt and disbursement of those funds. In addition, Levin funds (which also exclude foreign national funds) may be used for purchase or construction, subject to State law.

The application of State law to the use of non-Federal funds is derived directly from the wording of 2 U.S.C. 453(b) and from Congressional statements. Commission advisory opinions have addressed the question of whether the repealed contribution exemption, which permitted donations to a building fund from such Federally impermissible sources as corporations, preempted State law prohibitions on the use of such funds for campaign purposes. Advisory Opinions 2001–12, 1998–8, 1998–7, 1997–14, 1993–9, 1991–5, and 1986–40. The Commission stated in these opinions that: (1) Congress decided not to place restrictions on the subject even though it could have determined that the purchase of the facility was for the purpose of influencing a Federal election; (2) Congress took the affirmative step of deleting the receipt and disbursement of funds for such activity from the proscriptions of the Act; and (3) there is no indication that Congress intended to limit the preemptive effect to some allocable portion of the purchase costs. New section 300.35 supersedes these Commission advisory opinions to the extent that they might pertain to Federal preemption with respect to use of funds from a State (and now local) party

committee's non-Federal account for the purchase or construction of its office building. For example, corporate donations and donations that are excessive under Federal law, and that are in a non-Federal account, may be used for the purchase or construction of a State party office building where State law permits, and if State law forbids corporate donations and donations in excess of a particular amount, Federal law would not preempt the application of State law prohibiting the use of funds from a party committee's non-Federal account.

Although receipts and disbursements from the non-Federal accounts must comply with State law, section 300.35 does not contemplate that the Commission would take enforcement action against a party committee for violating State law with respect to the purchase or construction of its office building. Such an action is the State's responsibility. Moreover, although section 300.35 does not require the establishment of a separate bank account or book account for the receipt and disbursement of non-Federal funds for purchase or construction of the office building, Federal law does not preempt a State law requirement to establish such an account.

Paragraphs (a) and (b) of the proposed rules in the NPRM differed from the final rules. They were revised, in part, in response to public comments. Proposed paragraph (a) did not refer to the prohibition on contributions or donations from foreign nationals. In addition, paragraphs (a) and (b) provided that if the party committee used funds from the Federal account, Federal law would not preempt State law as to the permissibility of the disbursements and as to the source of funds where State law establishes additional limits or prohibitions.

Several commenters remarked on the provisions in proposed paragraphs (a) and (b) relating to the application of State law. Two commenters representing party committees expressed the concern that, with respect to the use of Federal account funds, Federal law would not supersede a State law that would further limit or prohibit contributions. They stated that this could conceivably prevent a party committee from using 100 percent Federal funds to pay for a building. They asserted that there is no support in the BCRA legislative history for this proposition, and that BCRA's intent was simply to allow State and local parties to pay for their buildings entirely with non-Federal funds and would not require them to use non-Federal funds.

Three comments, including one from the four principal sponsors of BCRA, stated that the provisions regarding application of State law should not be read to allow for the use of contributions or donations by foreign nationals to pay for the purchase or construction of the party office buildings. They indicated that BCRA was not intended to allow for such funds to be used. Two of those commenters recommended that these rules should make this prohibition clear.

As indicated above, the final rules reflect commenter input on both of these issues. The Commission notes that the exemption from Federal preemption at section 453(b) refers to the use of "exclusively funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act," subject to State law. It did not extend non-preemption to Federal funds. The Commission concurs with those commenters who interpret BCRA as allowing use of funds from the committee's non-Federal account, so long as they complied with State law, but as not subjecting funds from the committee's Federal account to State law. Hence, funds in the Federal account (that are lawful under Federal law) may be used, even if they are not in compliance with the limitations and prohibitions of State law.

The final rules in paragraphs (a) and (b) also reflect the comments on the explicit inclusion of a ban on the use of funds contributed or donated by foreign nationals, and incorporate such a ban. The prohibition at 2 U.S.C. 441e is so sweeping and explicit (including an explicit prohibition of donations "to a committee of a political party") that it would be difficult to read the intent of BCRA as allowing for the use of such funds by a party committee for those activities. One of BCRA's principal sponsors stated that BCRA "prohibits foreign nationals from making any contribution to a committee of a political party or any contribution in connection with federal, state or local elections * * * This clarifies that the ban on contributions [by] foreign nationals applies to soft money donations." 148 Cong. Rec. S1994 (daily ed. March 18, 2002) (statement of Senator Feingold). *See also United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999). This ban also applies to any in-kind contribution or donation by a foreign national such as a direct payment to a seller, builder, or other vendor for purchase or construction.

Paragraphs (a) and (b) of the final rules include technical changes to state more clearly than the proposed rule that

the pertinent funds include funds that are in the accounts but were not received specifically for the purchase or construction, as well as funds specifically received for that purpose. In addition, the sentence in paragraph (a) discussing the application of State law is changed to conform to other parts of the regulation emphasizing that this exemption is meant to apply only to a State or local committee paying for its own building.

B. Proposals Excluded From the Final Rule

The proposed rule included two paragraphs, (c) and (d), which are not included in the final rule. Proposed paragraph (c) would have defined "purchase or construction of an office building" by defining the individual terms, "office building," "purchase," and "construction." The terms were defined to explicitly include and exclude certain items or actions. The proposed definition of "office building," particularly as it pertained to the explicit exclusion of certain items, would have treated the use of the term "building" in 2 U.S.C. 453(b), instead of the term "facility" in the repealed exemption, as signifying a Congressional intent to narrow the scope of the covered items. Recent advisory opinions stated that expenses that were "capital expenditures" under the Internal Revenue Code would be payable by the building fund (as opposed to business expenses). These opinions have been interpreted to allow building fund payments to purchase office equipment, furniture, and similar items. *See* Advisory Opinions 2002–12, 2001–01, and 1998–7; *see also* 26 CFR 1.263(a)–(1) and 1.263(a)–(2).

Proposed exclusions explicitly listed in the draft definitions of "purchase" and "construction" were drawn from exclusions specified in previous Commission advisory opinions (in those aspects of the opinions that did not pertain to Federal preemption). The NPRM narrative for these definitions also included examples of what would and would not constitute "construction." Proposed paragraph (d) would have stated that an expense that did not fit within the definition of "purchase or construction of an office building" would be an allocable administrative cost unless it fell within another category, such as a support of a Federal candidate.

The Commission sought comment on whether the proposed definition of "building" should include, rather than explicitly exclude, items such as office equipment, machinery, or furniture. More generally, the Commission sought

comment on whether BCRA's use of the term "building" instead of "facility" contemplated a narrowing of the range of expenses falling within the exemption.

Three commenters representing party committees asserted that BCRA did not intend the change in terminology from "facility" to "building" to represent a change in the expenses covered by the exemption. One commenter noted that the McCain-Feingold bill as passed by the Senate in 2001 eliminated the building fund exemption for national and State parties and also provided that "Federal election activity" would specifically not include "the cost of constructing or purchasing an office facility or equipment for a State, district, or local committee." An amendment adopted by the House eliminated a transition provision allowing national party committees to spend building fund donations raised prior to the effective date of the new law, and that amendment also eliminated the language as to the purchase of an office facility or equipment. The commenter characterized the technical amendment now in effect as merely a restoration of the deleted provision on the State and local office facility or equipment, noting that one of BCRA's principal sponsors characterized this as a non-substantive amendment.

One of the party committee commenters urged the Commission to continue to use principles from the Internal Revenue Code "such that capital expenditures would be allowed from the building fund (subject to state law) and ongoing expenses would not." Two of the party committee commenters maintained that the question of narrowing the definition is a moot point because they believe that if certain costs were not deemed to be within the definition, they would be classified as administrative costs and should be payable with 100% non-Federal funds.

In contrast, three comments, including one from the principal sponsors, maintained that the change from "facility" to "building" indicated a Congressional intent to narrow the scope of the exemption and that items such as office equipment, machinery, or furniture should not be included within the exemption. They agreed with the proposed definition of "office building." The sponsors also stated that it was their intent that administrative expenses related to office buildings should be allocable between Federal and non-Federal accounts or Federal and Levin accounts.

The Commission also sought comment on whether more examples should be included in the sub-

definitions of "purchase" or "construction," or whether the advisory opinion process would best suit that purpose. Specifically, it asked whether payments for a long-term lease with an option to purchase the rented building should be included within the definition of purchase. One commenter stated that, to avoid abuses, the Commission should establish a bright line rule that treats purchases as falling within the exemption and leases as administrative expenses.

The final rule does not include the proposed definitions of "office building," "purchase," or "construction," or the proposed allocation provision. The Commission does not view section 453(b) as evidence of any Congressional intent to narrow or otherwise change the scope of the activities (from that of the repealed exemption) for which building fund monies may be donated or spent. Specifically, the Commission concludes that BCRA does not supercede or in any way displace the Commission's various advisory opinions regarding building fund activities as applied to State, district or local political party committees. Accordingly, those advisory opinions remain in force and effect. The Commission believes that State and local party committees needing information as to the scope of the costs covered can receive guidance from the Commission's previous advisory opinions.

C. Leasing a Portion of the Office Building to Others

Paragraph (c) of the final rule allows a State or local party committee to lease a portion of its office building to others at the usual and normal rental charge. The sources of funds will determine the account in which the rent revenues can be deposited.

This provision did not appear in the NPRM. The Commission requested comments, however, on whether a party that owned an entire office building would also be able to lease space in the building to others at fair market rates in order to generate income. The Commission also sought comments on whether the sources of the funds used to purchase or construct the office building should govern or guide the Commission in the determination of the lawful uses of such income.

One commenter, speaking on behalf of party committees, stated that party committees should be permitted to rent space in their office buildings to State and local candidates regardless of the source of funds used to purchase the buildings. The comment from the principal sponsors of BCRA stated that

BCRA permits a party committee to generate income by leasing parts of its building and describes how to determine whether the funds may be deposited in a Federal or non-Federal account. Specifically, a purchase in whole or in part with non-Federal funds would require the deposit of rental income into the non-Federal account to be used only for non-Federal purposes. Rental income generated from a building purchased solely with Federal funds may be deposited in the committee's Federal account only if all the revenues collected comply with the limitations, prohibitions, and reporting requirements of the Act.

The Commission has concluded that the source of funds used to construct or purchase the building must determine where the rental revenues may be deposited. If only Federal funds were used, the revenues may be deposited in the Federal account. If any non-Federal funds were used, the revenues must be deposited in a non-Federal account, provided that State law permits. These requirements ensure that the committee's Federal account is not indirectly funded (through rental payments) by donations that do not meet the requirements of the Act, such as corporate donations.

Consistent with the jurisdiction of State law over non-Federal accounts, the rule provides that the revenue received by the non-Federal account must comply with State law. The rental amounts deposited in the Federal account would have to be disclosed as an "other receipt," pursuant to 11 CFR 104.3(a)(4)(vi). The Commission notes that the purchase or rental of a committee asset is considered a contribution, unless excepted through the advisory opinion process with respect to specific types of assets or particular circumstances (e.g., isolated sales of specific committee assets developed or purchased for the committee's own use, rather than for fundraising, and campaign equipment and leftover supplies of an authorized committee wishing to terminate). *See, e.g.,* Advisory Opinions 1992–24, 1991–34, 1990–26, 1989–4, and 1986–14; *see also* 11 CFR 100.7(a)(2). Commission advisory opinions have also interpreted the regulations to allow a committee to invest its funds and to treat the interest, dividends, or other returns on the investment (under particular circumstances) as "other receipts." *See* Advisory Opinions 1999–8, 1989–6, and 1986–18. The Commission views the leasing of portions of the building as the equivalent of obtaining income through the investment of committee assets or funds. Under particular circumstances,

such leasing out may also be viewed as an isolated sale of a unique committee asset purchased for the committee's own use. Hence, the payment of rent for office building space to the party committee at the usual and normal charge is not a contribution. If the tenant pays rent in excess of the usual and normal charge and the rent is deposited in the Federal account, then the amount in excess would be a contribution and reportable as such. An excess payment from a corporate tenant would be in violation of 2 U.S.C. 441b. *See* Advisory Opinions 1992–24 and 1990–26.

**D. Transitional Provisions for State Party Building or Facility Account**

The final rule at 11 CFR 300.35(d) addresses office building accounts set up by State party committees under repealed 2 U.S.C. 431(8)(B)(viii). The regulation states that up to and including November 5, 2002, such accounts may accept funds that are "designated for the purchase or construction of an office building." The rule then states that, starting on November 6, 2002, the funds in the account may not be used for Federal account or Levin account purposes but may be used for any other non-Federal purposes as permitted by State law.

The NPRM differed from the final rule in two respects. Like the final rule, the proposed rule provided that, up until November 5, 2002, a State party committee could accept funds into the account, but then indicated that the funds in the account could only be used for the construction or purchase of an office building or facility. In place of the language on the use of the funds in the account, the final rule states that it applies to funds "designated for the purchase or construction of an office building." Both the final rule and the proposed rule provide that, starting on November 6, 2002, the funds are not useable for Federal account or Levin account purposes but may be used for any other non-Federal purposes, as permitted by State law. However, the proposed rule also would have provided that the funds would be subject to specific paragraphs of the proposed rule, including the definitional paragraph that is now deleted.

Two commenters from the party committees criticized the NPRM version of the transitional provisions, stating that unlike the national party building and facility fund transition provisions in BCRA, there is no BCRA provision covering the spending of funds by the already existing State party office facility fund. One of those commenters criticized the State law limitation on the

use of the funds from the account once BCRA goes into effect, noting that the funds had been lawfully raised under the exemption in the repealed statutory section.

The final rule as to the use of building fund accounts prior to the effective date of BCRA is not meant to deviate from any current permissible uses of those accounts. As to the use of those accounts after the effective date, the regulation was written to conform the treatment of the funds in the accounts established under the repealed statutory section with BCRA and still allow their use for election purposes. As unlimited non-Federal funds, they could not be used for Federal account or Levin account purposes. As such, however, they may be used for non-Federal purposes, and the Commission also recognizes the control by State law over the permissibility of such funds.

*11 CFR 300.36   Reporting Federal Election Activity; Recordkeeping*

BCRA establishes certain reporting requirements for State, district, and local committees that are political committees and that finance Federal election activities. *See* 2 U.S.C. 434(e)(2). This requirement for these political committees extends generally to all receipts and disbursements for Federal election activities if the aggregate amount of receipts and disbursements for such activity is $5,000 or more per calendar year. 2 U.S.C. 434(e)(2)(A), and specifically extends to receipts and disbursements of Levin funds. 2 U.S.C. 434(e)(2)(B). These requirements added by BCRA are in addition to the existing FECA requirements to report expenditures of Federal funds under 2 U.S.C. 434. *See* also 11 CFR part 104.

Paragraph (a) of new section 300.36 applies to two types of entities. The first is a State, district, or local political party committee that has not qualified as a political committee under 2 U.S.C. 431(4) or 11 CFR 100.5. The second is an association or similar group of candidates for State or local office or of individuals holding State or local office (*see* 2 U.S.C. 441i(b)(1)) that has not qualified as a political committee under 11 CFR 100.5. In the NPRM, the Commission sought comments as to what, if any, reporting requirements an association or similar group of candidates for, or holders of, State and local office may have under 2 U.S.C. 434(e)(2) if it is not a political committee. The Commission received one comment, from a public interest group, which suggested that the result should depend on whether the association or similar group has attained

**49104**    **Federal Register**/Vol. 67, No. 145/Monday, July 29, 2002/Rules and Regulations

political committee status under 11 CFR 100.5. The Commission has concluded that such an association or similar group that has not qualified as a political committee has no reporting requirements under 2 U.S.C. 434(e)(2) because that section, by its own terms, applies to "political committees." The Commission further concludes such an association or similar group is in a position analogous to a political party organization that is not a political committee under 11 CFR 100.5 to the extent both engage in Federal election activity. Therefore, in the final rules, such an association or similar group that has not qualified as a political committee under 11 CFR 100.5 must comply with paragraph (a) of section 300.36.

Paragraph (a) recognizes that neither type of organization has reporting requirements under BCRA because it is not a political committee. *See* 2 U.S.C. 434(e)(2). Under paragraph (a)(1), both types of organizations must demonstrate through a reasonable accounting method that they have sufficient Federal funds on hand to pay the required Federal portion of the costs of Federal election activity under 11 CFR 300.32 and 300.33. Paragraph (a)(1) also requires each type of organization to keep records of Federal receipts and disbursements and to make those records available to the Commission upon request. A State party committee and an association of State party officials commented in support of paragraph (a)(1), to the extent that it applies to political party committees.

A national party committee commented in opposition to proposed paragraph (a)(2), which would have required a payment for Federal election activity to be treated as an expenditure, regardless of whether it qualified as an expenditure under the statutory definition. *See* 2 U.S.C. 431(9). This commenter objected to characterizing a payment of Federal funds for Federal election activity as an expenditure "even if such activity does not reference any Federal candidate." A State party committee and an association of State party officials made very similar comments, citing Advisory Opinion 1999–4. The State party committee characterizes this advisory opinion as "rul[ing] that only disbursements that influence a specific Federal election count towards the Federal portion in [11 CFR 100.5(c)]." The State party committee's primary concern is that "thousands" of local and district committees not currently required to register and file reports with the Commission will be required to do so. One of the commenters stated that the

Commission has "effectively acknowledged" in paragraph (a)(1) of section 300.36 that "Congress did not intend first-dollar disclosure of" Federal election activity spending. Conversely, a public interest group commented in support of this paragraph.

Paragraph (a)(2) clarifies that a payment of Federal funds or Levin funds for the costs of Federal election activity does not constitute an expenditure for purposes of determining whether or not a State, district, or local political party committee, or an association or similar group of candidates for State or local office or of individuals holding State or local office, becomes a political committee, under 11 CFR 100.5, unless the payment otherwise qualifies as an expenditure under 2 U.S.C. 431(9). Paragraph (a)(2) also states that a payment of Federal funds for the costs of Federal election activity that refers to a clearly identified Federal candidate and that meets the definition of "exempt activities" (*see* 11 CFR 100.8(b)(10), (16), and (18)) is to be treated as a payment for exempt activities for the purposes of determining political committee status under 2 U.S.C. 431(4)(C) and 11 CFR 100.5(c).

Paragraph (b) of section 300.36 applies to State, district, and local political party committees, and to an association or similar group of State and local candidates and officeholders, that disburse Federal funds for Federal election activities and that have qualified as political committees under 11 CFR 100.5. The heading of paragraph (b)(1) is revised from the version of the regulation published in the NPRM. The new heading makes clear that paragraph (b)(1) applies to State, district, and local political party committees that have qualified as political committees and that have less than $5,000 in total receipts and disbursements for Federal election activity (*see* 2 U.S.C. 434(e)(2)(A)), and to an association or similar group of candidates for State or local office or of individuals holding State or local office at all times. Paragraph (b)(1) provides that such committees must report all receipts and disbursements of Federal funds for all or part of the costs of Federal election activity. Paragraph (b)(1) goes on to state that this requirement applies even if the committee has less than $5,000 of aggregate receipts and disbursements for Federal election activity. *See* 2 U.S.C. 434(e)(2)(A). A national party committee and a State party committee commented in opposition to the requirement of itemization of Federal receipts for Levin activity, because "Federal receipts will be used fungibly for multiple purposes."

The Commission points out that Federal receipts are not fungible, as far as spending for Federal election activity goes, to the extent that receipts include transfers from other party committees. A State, district, or local committee must not use transferred funds for Federal election activity spending. 2 U.S.C. 441i(b)(2)(B)(iv). Moreover, Congress has specifically required itemization of these receipts. 2 U.S.C. 434(e)(3). The final sentence of 11 CFR 300.36(b)(1) provides that a disbursement of Federal funds or Levin funds for Federal election activity will not be deemed an expenditure and reported as such, unless it satisfies the definition of expenditure in 2 U.S.C. 431(9).

In the final rules, the Commission has corrected an inadvertent omission that appeared in the version of paragraph (b)(1) of section 300.36 published in the NPRM. The words "receipts and" have been inserted before the word "disbursement" in the second sentence. The preamble of 11 CFR 300.36(b)(1) correctly discussed the paragraph, referring to "receipts and disbursements." 67 FR 35671. The Commission has also deleted an unnecessary and potentially confusing introductory clause in one of the sentences in this paragraph.

Paragraph (b)(2) implements the broader reporting provisions of 2 U.S.C. 434(e)(2)(A) and (B) with regard to State, district, and local political party committees. The heading of this paragraph has been revised from the version of the regulation published in the NPRM. The change is intended to make clear that this paragraph applies to State, district, and local political party committees that are political committees and that have $5,000 or more of total receipts and disbursements for Federal election activity. 2 U.S.C. 434(e)(2)(A) and (B). Paragraph (b)(2) does not apply to an association or similar group of State and local candidates and officeholders that disburses Federal funds for Federal election activities because such groups are not authorized to raise and spend Levin funds, and thus may not allocate disbursements for Federal election activity between Federal funds and Levin funds. *See* 2 U.S.C. 441i(b)(2), which applies only to party committees. These committees always report under part 104 of Title 11 because they may have no Levin funds to report pursuant to paragraph (a), discussed above.

The first sentence of paragraph (b)(2) states the basic rule that all receipts and disbursements for Federal election activity must be reported if the political committee has an aggregate of $5,000 or more of such receipts and

disbursements in a calendar year. The second sentence makes it clear that this basic reporting rule extends to Levin funds used for Federal election activity.

Paragraphs (b)(2)(i) through (iv) have been revised, or added, since the version of the regulation published in the NPRM. As published in the NPRM, the regulation would have referred the reader to 11 CFR 104.17(b) to identify important elements of information that must be reported under this section 300.36. Instead, paragraphs (b)(2)(i) through (iv), as adopted in the final rules, state these requirements expressly, for the convenience of the reader. These requirements generally parallel the requirements adopted in 11 CFR 104.17(b) with certain modifications appropriate to the context of expenses allocated among Federal election activities.

Paragraph (b)(2)(i) pertains to disclosure of the methods State, district, or local committees use to report allocating expenses for Federal election activity between Federal funds and Levin funds. Paragraph (b)(2)(i)(A) of section 300.36 specifies that a committee must state the allocation percentages for Federal election activity disbursements that are used in its reports. This paragraph includes a specific cross-reference to 11 CFR 300.33(b), where these allocation percentages for Federal election activity are set out.

Paragraph (b)(2)(i)(B) of section 300.36 requires the committee to report which allocable category of Federal election activity a given allocated disbursement falls into. In paragraph (b)(2)(i)(B), the reference to allocable category of Federal election activity means the type of Federal election activity as defined in 11 CFR 100.24 (e.g., voter registration activity as defined in section 100.24(b)(1), or voter identification as defined in section 100.24(b)(2)(i)). Note that expenses for certain categories of Federal election activity are not allocable between Federal funds and Levin funds (e.g., public communications that promote or support, or attack or oppose, a clearly identified Federal candidate under 11 CFR 100.24(b)(3)). *See* 11 CFR 300.33(a).

Paragraph (b)(2)(ii) pertains to reporting of allocation transfers between a Levin or non-Federal account and a Federal account, or among a Levin or non-Federal account, a Federal account, and a designated allocation account for allocated Federal election activity. All transfers related to a category of Federal election activity must identify that category. Paragraph (b)(2)(iii) specifies the elements of information that must be reported for an allocated disbursement

for Federal election activity, including the name and address of the payee, the date of the payment, and the purpose of the payment. This paragraph also sets out itemization requirements for disbursements covering more than one program or activity. Paragraph (b)(2)(iv) covers itemization of disbursements of more than $200. 2 U.S.C. 434(e)(3).

Paragraph (b)(3) alerts the reader to the rules for reporting payments allocated between Federal funds and non-Federal funds that are not covered in paragraph (b)(2). As explained above, paragraph (b)(2) applies only to payments for Federal election activity allocated between Federal funds and Levin funds under 11 CFR 300.33. The reporting regulation for payments allocated between Federal funds and non-Federal funds are contained in 11 CFR 104.17. For example, section 104.17 addresses reporting of administrative expenses.

Paragraph (c)(1) implements BCRA's new requirement for monthly filing by party committees that come under new section 434(e) of the Act. 2 U.S.C. 434(e)(4). This is accomplished by referring to the Commission's existing regulation specifying monthly reporting, e.g., 11 CFR 104.5(c)(3).

In the NPRM, the Commission sought comments on the applicability of the $50,000 annual threshold for electronic filing to receipts and disbursements for Federal election activities. *See* 11 CFR 104.18. The Commission received two comments. An association of State party officials opposed applying receipts and disbursements for Federal election activities toward the electronic filing threshold because these "will also be disclosed on the party committee's regularly filed reports." The Commission notes that this comment, while true, could be applied to any committee with regard to electronic filing. A public interest group commented that receipts and disbursements for Federal election activity should apply to the electronic filing threshold.

Consistent with 2 U.S.C. 434(a)(11), paragraph (c)(2) of section 300.36 provides that contributions and expenditures of Federal funds for Federal election activity apply to the $50,000 threshold for mandatory electronic filing. When determining whether a receipt of Federal funds for Federal election activities is a contribution, the Commission's regulation at 11 CFR 100.7, including the exclusions in paragraph (b) of that section, must be applied. Similarly, when determining whether a disbursement of Federal funds for Federal election activity is an

expenditure, the Commission's regulation at 11 CFR 100.8, including the exclusions in paragraph (b) of that section, must be applied. The Commission discerns no reason why a contribution or expenditure should be treated differently for this purpose simply because it is related to a Federal election activity. The Commission emphasizes that this provision does not apply to receipts and disbursements of Levin funds for Federal election activity, and does not apply to receipts and disbursements that are not "contributions" or "expenditures" as defined by the FECA.

Finally, paragraph (d) of section 300.36 supports the disclosure provisions outlined above by adding a recordkeeping requirement. Paragraph (d) refers to the Commission's existing regulation on recordkeeping, 11 CFR 104.14. This requirement is necessary to ensure that sufficient documentation exists to ensure compliance with the disclosure provisions of BCRA.

*11 CFR 300.37    Prohibitions on Fundraising for and Donating to Certain Tax-Exempt Organizations*

BCRA prohibits State, district, and local party committees, their officers and agents acting on their behalf, and entities directly or indirectly established, maintained, financed, or controlled by them, from soliciting any funds for, or making or directing any donations to certain tax exempt organizations engaged in certain election-related activity. 2 U.S.C. 441i(d). Except as discussed below, the ban on State party fundraising for tax-exempt organizations at new 11 CFR 300.37 mirrors the provision applicable to the prohibition on national party committee fundraising for these organizations at new 11 CFR 300.11. *See* Explanation and Justification for 11 CFR section 300.11 above for a discussion of comments received in response to specific questions raised in the NPRM.

Paragraph (a)(3) implements BCRA's prohibition on State party committee fundraising for, and donations to, a section 527 organization unless the organization is a "political committee," a State or local party committee, or an authorized committee of a State or local candidate. The NPRM asked whether the term "political committee" in 11 CFR 300.37 should mirror the definition of that term in 2 U.S.C. 431(4), which would encompass only organizations that make contributions and expenditures in connection with Federal elections or whether it should be interpreted to also encompass State-registered political committees that support only State and local candidates.

BCRA's cosponsors stated that it would be in keeping with the intent of BCRA to permit State, district, and local party committees "to make a non-federal donation to a section 527 organization registered as a State PAC as long as such a State PAC does not make expenditures and disbursements in connection with an election for Federal office, including expenditures and disbursements for Federal election activity." Several party committee commenters and at least one public interest group agreed with this approach. One public interest commenter disagreed, stating that permitting State and local party committees to fundraise for, or donate to, State political committees "would be contrary to the letter and spirit of BCRA."

Accordingly, in the final rules, new paragraph (a)(3)(iv) of section 300.37 permits a State, District or local party committee to solicit funds for, or donate to, a political committee registered under State law that supports only State or local candidates and does not make expenditures or disbursements in connection with an election for Federal office, including expenditures and disbursements for Federal election activity. The Commission agrees with the sponsors and other commenters that this new paragraph is consistent with the major purpose of BCRA—to prohibit non-Federal funds from being used in connection with Federal elections. As long as the section 527 organization for which funds are being raised exclusively supports non-Federal candidates and does not finance activities that could benefit Federal candidates, such as get-out-the-vote activities in connection with an election in which a Federal candidate appears on the ballot, BCRA's intent is preserved.

As discussed in the Explanation and Justification for 11 CFR 300.11, a safe harbor provision has been added at 11 CFR 300.37(c). Because 11 CFR 300.37(a) permits State, district and local party committees to solicit funds for, or donate funds to, section 527 organizations that are State-registered political committees and that meet certain other requirements, paragraph (c)(2) of the final rules contains an additional safe harbor provision applicable to those organizations. This safe harbor is similar to the safe harbor provision applicable to section 501(c) organizations in paragraph (c)(1). The safe harbor provides that a State, district, and local party committee may obtain and rely upon a certification from certain section 527 organizations to determine whether such organizations

fall outside the fundraising/donations prohibition.

Paragraph (d) of 11 CFR 300.37 sets forth the criteria for the certification for both 501(c) organizations and certain section 527 organizations. This paragraph for the most part tracks the criteria for certifications by section 501(c) organizations set forth in 11 CFR 300.11(d). *See* Explanation and Justification for 11 CFR 300.11. Additionally, paragraph (d)(1) of 11 CFR 300.37 provides that in the case of a section 527 organization that is a State-registered political committee pursuant to paragraph (a)(3)(iv), the certification is a written statement signed by the committee treasurer. As the individual who oversees expenditures of a political committee, the treasurer has knowledge of the types of activities undertaken by the organization. The remaining certification requirements are identical to those for section 501(c) organizations.

New paragraphs (e) and (f) of 11 CFR 300.37 mirror the provisions in 11 CFR 300.11(e) and (f) as applied to State, district, and local party committees and other covered persons rather than national party committees. *See* Explanation and Justification for 11 CFR 300.11.

**Subpart C—Tax-exempt Organizations**

For the convenience of readers interested in locating rules pertaining to fundraising and donations to tax-exempt organizations, subpart C of new part 300 combines in a single place the prohibitions on national, State, district, and local party committee donations to, and fundraising for, certain 501(c) and 527 tax-exempt organizations and the rules governing fundraising by Federal candidates and officeholders for 501(c) organizations.

The proposed rules for 11 CFR 300.50 (national party prohibition) and 11 CFR 300.51 (State party prohibition) were identical to proposed 11 CFR 300.11 (national party prohibition) and proposed 11 CFR 300.37 (State party prohibition), respectively.

The final rule at 11 CFR 300.50 (national party prohibition) is identical to the final rule at 11 CFR 300.11; the final rule at 11 CFR 300.51 (State party prohibition) is identical to the final rule at 11 CFR 300.37; and the final rule at 11 CFR 300.52 (regulations governing Federal candidate and officeholder solicitations for 501(c) organizations) is identical to the final rule at 11 CFR 300.65. The Explanation and Justification for 11 CFR 300.11, 300.37 and 300.65 apply to 11 CFR 300.50, 300.51 and 300.52, respectively.

**Subpart D—Federal Candidates and Officeholders**

*11 CFR 300.60    Scope*

BCRA places limits on the amounts and types of funds that can be raised by Federal candidates and officeholders for both Federal and State candidates. *See* 2 U.S.C. 441i(e). The Commission is placing the regulations that address these limitations in 11 CFR part 300, subpart D.

Section 300.60 explains that these restrictions apply to Federal candidates and officeholders, their agents, and entities directly or indirectly established, maintained, or controlled by, or acting on behalf of, any such candidate(s) or officeholder(s). As defined in 2 U.S.C. 431(3) and existing 11 CFR 100.4, "Federal office" means the elective office of President or Vice President of the United States, Senator or Representative in, or Delegate or Resident Commissioner to, the Congress of the United States. There is a similar definition of "Federal officeholder" in 11 CFR 113.1(c). As noted above, the Commission is adding a comparable definition at 11 CFR 300.2(o). Persons covered by the restrictions in this subpart may not "solicit, receive, direct, transfer or spend" non-Federal funds unless certain requirements are satisfied, and subject to certain exceptions explained below.

No comments were received on this section.

*11 CFR 300.61    Federal Elections*

Section 300.61 as proposed in the NPRM prohibited any Federal candidate or officeholder, his or her agent, or any person described in section 300.60, above, from soliciting, receiving, directing, transferring, or spending non-Federal funds in connection with an election for Federal office, including funds for any Federal election activity described in 11 CFR 100.24, discussed above. 2 U.S.C. 441i(e)(1)(A). One commenter urged the Commission to construe this language to prohibit a candidate only from raising non-Federal funds that would eventually benefit the candidate's own campaign. Because the Commission does not find support in the statutory language for this approach, it is not incorporating this recommendation.

The principal sponsors of BCRA asked the Commission to include "disburse" in the list of specified actions, so as to clarify that a person described in 11 CFR 300.60 must use Federal funds when disbursing funds in connection with an election for Federal office. The Commission appreciates the desire for uniformity between sections

300.61 and 300.62, discussed below; and also notes that drawing a distinction between funds that are "spent" and funds that are "disbursed" for certain purposes could prove problematic. Accordingly, it is adding "disburse" to the list of covered activities in section 300.60.

*11 CFR 300.62    Non-Federal Elections*

BCRA also prohibits any Federal candidate or officeholder, his or her agent, or any other person described in § 300.60, from raising, receiving, directing, transferring, or spending or disbursing funds in connection with any non-Federal election, unless the funds are not in excess of the amounts permitted with respect to contributions to candidates and political committees and are not from sources prohibited by the Act from making contributions in connection with Federal elections. 2 U.S.C. 441i(e)(1)(B).

The NPRM limited this restriction to Federal funds subject to the limitations and prohibitions of the Act. One comment requested the Commission to remove the term "Federal" from this definition, to make it cover all funds that are subject to the limitations and prohibitions of the Act. The Commission is making this change, which is consistent with the statutory language; and is making additional changes to further parallel the statutory language.

In discussing proposed 11 CFR 300.61 and 300.62, the NPRM stated that these prohibitions encompassed "leadership PACs" and "candidate PACs" because they are entities "directly or indirectly established, financed, maintained, or controlled by" Federal candidates and/ or officeholders as defined in 11 CFR 300.2(c). Generally, "leadership PACs" and "candidate PACs" are political organizations set up by congressional leaders and other Federal candidates and officeholders, in part, as a way to support other candidates' campaigns. Although candidate PACs and leadership PACs are not specifically mentioned, the legislative history indicates that 2 U.S.C. 441i(e)(1) is intended to prohibit Federal officeholders and candidates from soliciting any funds for these committees that do not comply with FECA's source and amount limitations. *See* 148 Cong. Rec. S2140 (Daily ed. March 20, 2002) (statement of Sen. McCain). Consequently, the NRPM stated that Federal candidates and officeholders and their leadership and candidate PACs must not solicit, receive, direct, transfer, or spend funds for such a PAC's Federal or non-Federal account unless the funds complied with

the Act's source and limitations requirements.

The comments of the national party committees construed the NPRM statements, in light of statements made in the Senate debates, to mean that a person could contribute $5,000 to the Federal account of a "leadership" PAC and could donate an additional $5,000 to the non-Federal account of the same committee. These commenters expressed support for such an interpretation of the proposed rules and further argued that the national party ban on raising and spending non-Federal funds found at 2 U.S.C. 441i(a) should be construed similarly. As noted elsewhere, the Commission believes that the plain language of 2 U.S.C. 441i(a) prevents such an interpretation as to the national party committees. No other commenters addressed this point in their written comments, although some commenters testified that the statutory language could be interpreted either to permit solicitations of $5,000 each for a Federal and non-Federal account of a leadership PAC in light of the floor statements, or not to permit such PACs to have non-Federal accounts at all. Another commenter argued that the statutory language did not include the term "non-Federal accounts," but instead permitted a Federal officeholder to solicit, receive, direct and spend funds "in connection with non-Federal elections."

The Commission notes first that the definition of an entity "directly or indirectly established, financed, maintained, or controlled" is being modified in the final rules from the definition contained in the proposed rule at section 300.2(c). The final rule defines this phrase by incorporating the affiliation factors set forth at 11 CFR 100.5(g)(4)(ii). Consequently, 11 CFR 300.62, permitting solicitations and spending for funds "in connection with" a non-Federal election applies to a candidate PAC or leadership PAC to the extent that the PAC comes within the new definition of 11 CFR 300.2(c). Secondly, in discussing BCRA's restrictions on the solicitation and spending of non-Federal funds by Federal candidates and officeholders, the co-sponsors stated that these provisions were part of a "system of prohibitions and limitations on the ability of Federal officeholders and candidates, to raise, spend and control soft money" in order "to stop the use of soft money as a means of buying influence and access with Federal officeholders and candidates." *See* 148 Cong. Rec. S2139 (Daily ed. March 20, 2002) (statement of Sen. McCain). In light of this purpose, the Commission

notes that new 11 CFR 300.62 permits Federal candidates and officeholders to solicit, receive, direct, transfer, spend, or disburse funds in connection with Federal and non-Federal elections only from sources permitted under the Act and only when the combined amounts solicited and received from any particular person or entity do not exceed the amounts permitted under the Act's contribution limits and are not from prohibited sources. In other words, a Leadership PAC that comes within the definition of 11 CFR 300.2(c) can raise up to a *total* of $5,000 from any particular person or entity, regardless of whether the funds are contributed to the PAC's Federal account, donated to its non-Federal account, or allocated between the two. In addition, the Commission agrees with commenters who pointed out that 11 CFR 300.62 does not permit Federal candidates and officeholders, their agents and entities established, financed, maintained, or controlled by them to solicit, receive, direct, transfer, spend, or disburse non-Federal funds for Federal elections.

*11 CFR 300.63    Exception for Non-Federal Candidates*

An exception to the fundraising prohibition applies when a Federal candidate or Federal officeholder is a candidate for State or local office. 2 U.S.C. 441i(e)(2). Such candidates may raise and spend non-Federal funds for their State campaign, as long as their activities are consistent with State law and refer only to their status as a State or local candidate, to other candidates for that same office, or both. This exception is reflected in new 11 CFR 300.63. Please note that if a State or local candidate is simultaneously a candidate for Federal office, he or she must raise and spend only Federal funds in connection with the Federal campaign. No comments addressed this provision.

*11 CFR 300.64    Exemption for Attending, Speaking, or Appearing as a Featured Guest at Fundraising Events*

BCRA contains an exemption from the fundraising prohibition for Federal candidates and officeholders who attend, speak, or appear as a featured guest at a State, district, or local party committee fundraising event. 2 U.S.C. 441i(e)(3). The NPRM sought comment on how to construe and implement this exemption, particularly in light of the separate general prohibition on Federal candidates and officeholders soliciting non-Federal funds in connection with an election for Federal, State, or local office. The NPRM sought comment on the provision in light of Sen. McCain's

explanation in the Senate debate that Federal candidates and officeholders "cannot solicit soft money funds, funds that do not comply with Federal contribution limits and source prohibitions, for any party committee— national, State, or local." 148 Cong. Rec. S2139 (daily ed. March 20, 2002) (statement of Sen. McCain). The Commission initially sought comment on a rule proposing that, while such individuals could attend, speak, or be a featured guest at a State or local party fundraising event, they could not say anything that could be construed as soliciting or otherwise seeking non-Federal funds. In the alternative, the NPRM sought comment on whether the fundraising event provision was a total exemption from the general solicitation ban, whereby Federal candidates and officeholders and their agents may attend and speak freely at such events. The phrase "featured guest" strongly suggests that State, district, or local party committees may publicize in advance that a Federal candidate or officeholder will be attending and speaking at an event, and the Commission sought comments on whether this means that Federal candidates and officeholders may be referred to in invitation materials for the event, or appear as members of a host committee, or be honored at the event.

The Commission received a range of comments on these issues. Some advocated a restrictive approach, arguing that any other construction would undercut the fundraising prohibition. Others noted that it could be almost impossible for a Federal candidate or officeholder not to become involved in at least indirect fundraising, such as thanking people in a rope line for their support, by virtue of the fact that they are appearing and speaking at a fundraising event, which the statutory exemption expressly permits. Some claimed that monitoring every word the speaker said could turn the Commission into "speech police," raising First Amendment concerns. U.S. CONST. amend. I ("Congress shall make no law * * * abridging the freedom of speech * * *"). Also, the fact that a candidate or officeholder is to be honored at an event implies that his or her name or picture may appear prominently on invitations, flyers, and other material distributed in connection with the event.

The Commission has decided to construe the statutory exemption permitting Federal candidates and officeholders to attend, speak, and appear as a featured guest at State, district or local party committee fundraising events without regulation or restriction. This conclusion is compelled by the plain language of the section and the structure of the section within BCRA. The structure of the statute requires the Commission to construe the provision as a total exemption to the solicitation prohibition, applicable to Federal candidates and officeholders, when attending and speaking at party fundraising events, because the statutory section is styled as such. To conclude otherwise would require the Commission to read the restrictions itemized in the general prohibition into a statutory exemption that clearly and unambiguously excludes those restrictions by it own terms. It would also require the Commission to regulate and potentially restrict what candidates and officeholders say at political events, which is contrary to the plain meaning of the statutory exemption and would raise serious constitutional concerns. Accordingly, candidates and officeholders are free under the rule to speak at such functions without regulation or restriction. In addition, as several commenters urged, State, district, and local party committees are free within the rule to publicize featured appearances of Federal candidates and officeholders at these events, including references to these individuals in invitations. The Commission concludes, however, that Federal candidates and officeholders are prohibited from serving on "host committees" for a party fundraising event or from personally signing a solicitation in connection with a State, local, or district party fundraising event, on the basis that these pre-event activities are outside the permissible activities described above flowing from a Federal candidate's or officeholder's appearance or attendance at the event. The rule, consistent with the statute, places no restriction on the speech of Federal candidates and individuals holding Federal office at these fundraising events.

### 11 CFR 300.65    Exceptions for Certain Tax-Exempt Organizations

In 2 U.S.C. 441i(e)(1), BCRA prohibits candidates and officeholders from soliciting, receiving, directing, transferring, or spending funds unless the funds meet the source and amount restrictions of the Act. See also new 11 CFR 300.61 and 11 CFR 300.62. BCRA creates two exceptions from that general rule in 2 U.S.C. 441i(e)(4): (1) It allows candidates, officeholders, and individuals who are agents acting on behalf of either to make general solicitations, without source or amount restrictions for a 501(c) organization unless the "principal purpose" of the organization is to conduct certain Federal election activity, specifically voter registration, voter identification, GOTV activities, or generic campaign activity, so long as the solicitation is not to obtain funds in connection with a Federal election; and (2) it permits Federal candidates and officeholders, and individuals who are agents acting on their behalf, to make a solicitation explicitly to obtain funds for a 501(c) organization whose principal purpose is to conduct Federal election activity as described above or for a 501(c) organization to conduct these activities provided that only individuals are solicited for no more than $20,000 per calendar year. The final rule at 11 CFR 300.65 implements these exceptions for Federal candidate and officeholder solicitations for 501(c) organizations. It mirrors the final rule at 11 CFR 300.52 contained in subpart C, discussed above.

In response to the NPRM, BCRA's principal sponsors and a public interest group stated that the proposed rule at 11 CFR 300.52(a)(1) (mirrored in 300.65(a)(1)) could be interpreted to prohibit candidate/officeholder solicitations that were not meant to be prohibited. The proposed rules stated that a Federal candidate or officeholder may make a general solicitation on behalf of a 501(c) organization without regard to source or amount restrictions "only if the solicitation does not specify how the funds will or should be spent," if the solicitation is not for a 501(c) organization whose principal purpose is to conduct certain enumerated Federal election activity, and if the solicitation is not for that enumerated Federal election activity. These commenters expressed concern that the proposed regulation could be erroneously interpreted as prohibiting Federal candidates or officeholders from making a general or specific solicitation, without source or amount limitations, for an organization such as the Red Cross, which engages in no "electoral activities" whatsoever. BCRA's principal sponsors also argued that this provision could be interpreted to prohibit specific solicitations, without source or amount limitations, for a 501(c) organization whose principal purpose is not to engage in Federal election activity, but who nonetheless engages in some election activity, provided that the solicitation is not for activity in connection with an election. The sponsors argued that the final rules should permit such specific solicitations. The examples given by the sponsors to illustrate this point included a specific solicitation for the

NAACP College Fund or the NRA firearms training program, even though the NAACP and the NRA engage in certain election activity.

The Commission agrees that 11 CFR 300.65 should not be misinterpreted to prohibit candidates, officeholders, or their agents from soliciting funds for a 501(c) organization that engages in no election activity, such as the Red Cross. Accordingly, the final rule at 11 CFR 300.65 addresses the commenters' concerns by more specifically setting forth the circumstances under which Federal candidates, officeholders, and their agents can make general solicitations on behalf of 501(c) organizations, without regard to source or limitation, and by setting forth in paragraph (b) the circumstances under which they can made specific, limited solicitations to individuals to obtain funds to carry out certain Federal election activities.

In response to a question in the NRPM regarding the scope of the term "agent" in 2 U.S.C. 441i(e), the sponsors stated that it was their intent that the restrictions on candidate/officer holder solicitations apply to an agent "acting on behalf of" either. Accordingly, the final rule states throughout that it applies to an individual who is an agent "acting on behalf of" a Federal candidate or officeholder. BCRA's sponsors and the same public interest commenter also pointed out that proposed 11 CFR 300.52(b)(2) (mirrored in proposed 11 CFR 300.65(b)(2)) did not make clear that the specific solicitations permitted for Federal election activity or organizations principally engaged in such activities applies only to 501(c) organizations and not to other tax exempt organizations, such as section 527 organizations. The Commission agrees. Accordingly, the introductory language in the final rule specifically states that the requirements for solicitations in the rule apply to 501(c) organizations.

Paragraph (c) of the final rule enumerates the specific types of Federal election activity for which a Federal candidate or officeholder can make specific solicitations and incorporates the definitions of those activities at 11 CFR 100.24(a). Because BCRA permits limited solicitations only for specific Federal election activities, new paragraph (d) of the final rule makes clear that solicitations are not permitted for other election activities, including Federal election activity such as public communications promoting or opposing clearly identified Federal candidates. *See* 11 CFR 100.24(b)(3).

In response to questions raised in the NPRM, BCRA's principal sponsors, a public interest group, and a non-profit organization agreed that 11 CFR 300.65 should include a safe harbor provision for Federal candidates, officeholders, and their agents, similar to the one for party committees in 11 CFR 300.11 and 11 CFR 300.37. Accordingly, new paragraph (e) provides that a Federal candidate, officeholder, or agent acting on behalf of either, may obtain and rely upon a certification from a section 501(c) organization in determining the scope of the permissible solicitations they may make on behalf of the organization. Paragraph (e) also sets forth the requirements for such a certification: the certification is a written statement signed by an officer or other authorized representative of the organization with knowledge of the organization's activities; the certification states the organization's principal purpose is not to conduct election activities, including Federal election activities described in paragraph (c) of this section; and the certification states that the organization does not intend to pay debts incurred in a prior election cycle for expenditures and disbursements made in connection with an election for Federal office (including for Federal election activity).

A non-profit organization raised several concerns about the restrictions on Federal officeholders soliciting for 501(c) organizations. First, the non-profit group maintained that the regulations should create a presumption that the principal purpose of any 501(c) organization is not to conduct election activity because "under federal tax law, no 501(c) organization may conduct partisan electoral activity as its primary purpose." The commenter was concerned that requiring a candidate or officeholder to verify whether or not an organization engages in election activity as its principal purpose will "result in an unnecessary chilling effect on their assistance" to 501(c) organizations. The commenter was also concerned that IRS Form 990 tax returns and other tax forms mentioned in the NPRM as possible ways to determine an organization's activities or principal purpose would not provide a candidate or officeholder with the necessary information. Second, the commenter urged that any definition of "principal purpose" be based on a multi-year average of an organization's expenditures for Federal election activity to more accurately capture an organization's actual level of electoral activity, which necessarily occurs closer to elections. Finally, the group urged that the regulations include a safe harbor permitting candidates and

officeholders to appear at a Section 501(c) organization's fundraiser or convention as long as no solicitations are made for funds for election activities, or alternatively, for any funds.

Determining whether a particular organization's principal purpose is to conduct election activities, such as voter registration or GOTV, is a fact-based determination that must be made as to a particular organization. Thus, creating a presumption that the principal purpose of any 501(c) organization is not to engage in election activity is inappropriate and could conflict with IRS determinations. As for including a definition of "principal purpose" that is based on a multi-year average of an organization's election expenditures, the Commission lacks sufficient information to establish a particular percentage or average at this time. Finally, the Commission notes that the general and specific solicitations contemplated in 11 CFR 300.65 may take place at a fundraising event conducted by the 501(c) organization.

The Commission agrees with the commenter that IRS Form 990s may not clearly indicate whether or not an organization engages in specific election activities. Therefore, the safe harbor provision in the final rule does not require a Federal candidate or office holder to obtain or rely upon such forms.

As for the concern that Federal candidates and officeholders will be chilled from assisting 501(c) organizations in fundraising, the safe harbor provided in paragraph (e) is intended to ease concerns as to inadvertent violations of the Act, as amended by BCRA. On the other hand, new paragraph (f) of the final rules makes clear that a Federal candidate, Federal officeholder, or individual agents acting on behalf of either may not rely upon a certification obtained from an organization if the individual has actual knowledge that the certification is false. This provision is identical to the provisions applicable to party committees in 11 CFR 300.11 and 300.37.

## Subpart E—State and Local Candidates

### 11 CFR 300.70 Scope

Subpart E implements two provisions of BCRA regarding State and local candidates. 2 U.S.C. 441i(f)(1), (2). Section 300.70 explains that this subpart applies to any candidate for State or local office, individual holding State or local office, or an agent acting on behalf of any such candidate or individual. 2 U.S.C. 441i(f)(1). For example, the subpart applies to an

individual holding Federal office who is a candidate for State or local office. It does not, however, apply to an association or similar group of candidates for State or local office, or of individuals holding State or local office, because they are not addressed in this section of BCRA. The Commission received no comments on this section.

*11 CFR 300.71   Federal Funds Required for Certain Communications*

BCRA prohibits State and local candidates and officeholders from funding certain public communications with non-Federal funds. 2 U.S.C. 441i(f)(1). This prohibition is contained in new 11 CFR 300.71. The prohibition on use of non-Federal funds encompasses *public communications* that refer to a clearly identified candidate for Federal office, if the communication promotes, supports, attacks, or opposes any candidate for that Federal office, regardless of whether the communication expressly advocates voting for or against any candidate. *See* 2 U.S.C. 431(20)(A)(iii). The section contains a cross reference to section 11 CFR 100.26, which defines the new term *public communication* for purposes of the Act. State and local candidates and officeholders may, however, use Federal funds for these public communications.

No commenters addressed this section.

*11 CFR 300.72   Federal Funds Not Required for Certain Communications*

BCRA contains an exception to the prohibition on the use of Federal funds for certain public communications that permits State and local candidates and officeholders to use non-Federal funds for public communications that refer to Federal candidates but do not promote, support, attack, or oppose any candidate for Federal office. 2 U.S.C. 441i(f)(2). This exception is set forth at new 11 CFR 300.72. Section 300.72 follows the statutory language.

**XI. Part 9034—Entitlements**

*11 CFR 9034.8   Joint Fundraising*

The ban on national party non-Federal fundraising affects the Commission's joint fundraising rules under the Presidential Primary Matching Payment Act at 11 CFR 9034.8. The Commission is, therefore, adding introductory language to this section, advising readers that "[n]othing in this section shall supersede 11 CFR part 300, which prohibits any person from soliciting, receiving, directing, transferring, or spending any non-Federal funds, or from transferring

Federal funds for Federal election activities."

**Certification of No Effect Pursuant to 5 U.S.C. 605(b) [Regulatory Flexibility Act]**

The Commission certifies that the attached proposed rules, if promulgated, will not have a significant economic impact on a substantial number of small entities. The basis for this certification is that the national, State, and local party committees of the two major political parties are not small entities under 5 U.S.C. 601, and the number of other small entities to which the rules would apply is not substantial.

**List of Subjects**

*11 CFR Part 100*

Elections.

*11 CFR Part 102*

Political committees and parties, reporting and recordkeeping requirements.

*11 CFR Part 104*

Campaign funds, political committees and parties, reporting and recordkeeping requirements.

*11 CFR Part 106*

Campaign funds, political committees and parties, political candidates.

*11 CFR Part 108*

Elections, reporting and recordkeeping.

*11 CFR Part 110*

Campaigns, political parties and committees.

*11 CFR Part 114*

Business and industry, elections, labor.

*11 CFR Part 300*

Campaign funds, nonprofit organizations, political committees and parties, political candidates, reporting and recordkeeping requirements.

*11 CFR Part 9034*

Campaign funds, reporting and recordkeeping requirements.

For reasons set out in the preamble, Chapter I of title 11 of the Code of Federal Regulations is amended as follows:

**PART 100—SCOPE AND DEFINITIONS (2 U.S.C. 431)**

1. The authority citation for 11 CFR part 100 continues to read as follows:

**Authority:** 2 U.S.C. 431; 434(a)(11), 438(a)(8).

2. Section 100.14 is revised to read as follows:

**§ 100.14   State committee, subordinate committee, district, or local committee (2 U.S.C. 431(15)).**

(a) *State committee* means the organization that by virtue of the bylaws of a political party or the operation of State law is part of the official party structure and is responsible for the day-to-day operation of the political party at the State level, including an entity that is directly or indirectly established, financed, maintained, or controlled by that organization, as determined by the Commission.

(b) *District or local committee* means any organization that by virtue of the bylaws of a political party or the operation of State law is part of the official party structure, and is responsible for the day-to-day operation of the political party at the level of city, county, neighborhood, ward, district, precinct, or any other subdivision of a State.

(c) *Subordinate committee of a State, district, or local committee* means any organization that at the level of city, county, neighborhood, ward, district, precinct, or any other subdivision of a State or any organization under the control or direction of the State committee, and is directly or indirectly established, financed, maintained, or controlled by the State, district, or local committee.

3. Sections 100.24, 100.25, 100.26, 100.27, and 100.28 are added to read as follows:

**§ 100.24   Federal election activity (2 U.S.C. 431(20)).**

(a) As used in this section, and in part 300 of this chapter,

(1) *In connection with an election in which a candidate for Federal office appears on the ballot* means:

(i) The period of time beginning on the date of the earliest filing deadline for access to the primary election ballot for Federal candidates as determined by State law, or in those States that do not conduct primaries, on January 1 of each even-numbered year and ending on the date of the general election, up to and including the date of any general runoff.

(ii) In an odd-numbered year, the period beginning on the date on which the date of a special election in which a candidate for Federal office appears on the ballot is set and ending on the date of the special election.

(2) *Voter registration activity* means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity

includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

(3) *Get-out-the-vote activity* means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting. Get-out-the-vote activity shall not include any communication by an association or similar group of candidates for State or local office or of individuals holding State or local office if such communication refers only to one or more State or local candidates. Get-out-the-vote activity includes, but is not limited to:

(i) Providing to individual voters, within 72 hours of an election, information such as the date of the election, the times when polling places are open, and the location of particular polling places; and

(ii) Offering to transport or actually transporting voters to the polls.

(4) *Voter identification* means creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates. This paragraph shall not apply to an association or similar group of candidates for State or local office or of individuals holding State or local office if the association or group engages in voter identification that refers only to one or more State or local candidates.

(b) As used in part 300 of this chapter, *Federal election activity* means any of the activities described in paragraphs (b)(1) through (b)(4) of this section.

(1) Voter registration activity during the period that begins on the date that is 120 calendar days before the date that a regularly scheduled Federal election is held and ends on the date of the election. For purposes of voter registration activity, the term "election" does not include any special election.

(2) The following activities conducted in connection with an election in which one or more candidates for Federal office appears on the ballot (regardless of whether one or more candidates for State or local office also appears on the ballot):

(i) Voter identification.

(ii) Generic campaign activity, as defined in 11 CFR 100.25.

(iii) Get-out-the-vote activity.

(3) A public communication that refers to a clearly identified candidate for Federal office, regardless of whether a candidate for State or local election is also mentioned or identified, and that promotes or supports, or attacks or opposes any candidate for Federal office. This paragraph applies whether or not the communication expressly advocates a vote for or against a Federal candidate.

(4) Services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(c) *Exceptions. Federal election activity* does not include any amount expended or disbursed by a State, district, or local committee of a political party for any of the following activities:

(1) A public communication that refers solely to one or more clearly identified candidates for State or local office and that does not promote or support, or attack or oppose a clearly identified candidate for Federal office; provided, however, that such a public communication shall be considered a Federal election activity if it constitutes voter registration activity, generic campaign activity, get-out-the-vote activity, or voter identification.

(2) A contribution to a candidate for State or local office, provided the contribution is not designated to pay for voter registration activity, voter identification, generic campaign activity, get-out-the-vote activity, a public communication, or employee services as set forth in paragraphs (a)(1) through (4) of this section.

(3) The costs of a State, district, or local political convention, meeting or conference.

(4) The costs of grassroots campaign materials, including buttons, bumper stickers, handbills, brochures, posters, and yard signs, that name or depict only candidates for State or local office.

### § 100.25  Generic campaign activity (2 U.S.C. 431(21)).

*Generic campaign activity* means a public communication that promotes or opposes a political party and does not promote or oppose a clearly identified Federal candidate or a non-Federal candidate.

### § 100.26  Public communication (2 U.S.C. 431(22)).

*Public communication* means a communication by means of any broadcast, cable or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing or telephone bank to the general public, or any other form of general public political advertising. The term public communication shall not include communications over the Internet.

### § 100.27  Mass mailing (2 U.S.C. 431(23)).

*Mass mailing* means a mailing by United States mail or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period. A mass mailing does not include electronic mail or Internet communications. For purposes of this section, *substantially similar* includes communications that include substantially the same template or language, but vary in non-material respects such as communications customized by the recipient's name, occupation, or geographic location.

### § 100.28  Telephone bank (2 U.S.C. 431(24)).

*Telephone bank* means more than 500 telephone calls of an identical or substantially similar nature within any 30-day period. A telephone bank does not include electronic mail or Internet communications transmitted over telephone lines. For purposes of this section, *substantially similar* includes communications that include substantially the same template or language, but vary in non-material respects such as communications customized by the recipient's name, occupation, or geographic location.

4. Sections 100.29 through 100.50 are added and reserved.

5. Sections 100.1 through 100.50 are designated as subpart A—General Definitions.

## PART 102—REGISTRATION, ORGANIZATION, AND RECORDKEEPING BY POLITICAL COMMITTEES (2 U.S.C. 433)

6. The authority citation for part 102 continues to read as follows:

**Authority:** 2 U.S.C. 432, 433, 434(a)(11), 438(a)(8), 441d.

7. Section 102.5 is revised to read as follows:

### § 102.5  Organizations financing political activity in connection with Federal and non-Federal elections, other than through transfers and joint fundraisers: Accounts and Accounting.

(a) *Organizations that are political committees under the Act, other than national party committees.*

(1) Each organization, including a State, district, or local party committee, that finances political activity in connection with both Federal and non-Federal elections and that qualifies as a political committee under 11 CFR 100.5 shall either:

(i) Establish a separate Federal account in a depository in accordance with 11 CFR part 103. Such account shall be treated as a separate Federal

political committee that must comply with the requirements of the Act including the registration and reporting requirements of 11 CFR parts 102 and 104. Only funds subject to the prohibitions and limitations of the Act shall be deposited in such separate Federal account. *See* 11 CFR 103.3. All disbursements, contributions, expenditures, and transfers by the committee in connection with any Federal election shall be made from its Federal account, except as otherwise permitted for State, district, and local party committees by 11 CFR part 300 and paragraph (a)(5) of this section. No transfers may be made to such Federal account from any other account(s) maintained by such organization for the purpose of financing activity in connection with non-Federal elections, except as provided by 11 CFR 300.33, 300.34, 106.6(c), and 106.7(f). Administrative expenses for political committees other than party committees shall be allocated pursuant to 11 CFR 106.6 between such Federal account and any other account maintained by such committee for the purpose of financing activity in connection with non-Federal elections. Administrative expenses for State, district, and local party committees are subject to 11 CFR 106.7 and 11 CFR part 300; or

(ii) Establish a political committee that shall receive only contributions subject to the prohibitions and limitations of the Act, regardless of whether such contributions are for use in connection with Federal or non-Federal elections. Such organization shall register as a political committee and comply with the requirements of the Act.

(2) Only contributions meeting any of the conditions set forth in paragraphs (a)(2)(i), (ii), or (iii) of this section may be deposited in a Federal account established under paragraph (a)(1)(i) of this section, see 11 CFR 103.3, or may be received by a political committee established under paragraph (a)(1)(ii) of this section:

(i) Contributions designated for the Federal account;

(ii) Contributions that result from a solicitation which expressly states that the contribution will be used in connection with a Federal election; or

(iii) Contributions from contributors who are informed that all contributions are subject to the prohibitions and limitations of the Act.

(3) State, district, and local party committees that intend to expend Levin funds raised pursuant to 11 CFR 300.31 for activities identified in 11 CFR 300.32(b)(1) must either:

(i) Establish one or more separate Levin accounts pursuant to 11 CFR 300.30(c)(2); or

(ii) Demonstrate through a reasonable accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) that whenever such organization makes a payment that organization has received sufficient funds subject to the limitations and prohibitions of the Act or the requirements of 11 CFR 300.30(c)(1) or (3) to make such payment. Such organization shall keep records of amounts received or expended under this paragraph and, upon request, shall make such records available for examination by the Commission.

(4) Solicitations by Federal candidates and Federal officeholders for State, district, and local party committees are subject to the restrictions in 11 CFR 300.31(e) and 11 CFR part 300, subpart D.

(5) State, district, and local party committees and organizations may establish one or more separate allocation accounts to be used for activities allocable pursuant to 11 CFR 106.7 and 11 CFR 300.33.

(b) *Organizations that are not political committees under the Act.*

(1) Any organization that makes contributions, expenditures, and exempted payments under 11 CFR 100.7(b)(9), (15) and (17) and 11 CFR 100.8(b)(10), (16) and (18), but that does not qualify as a political committee under 11 CFR 100.5, must keep records of receipts and disbursements and, upon request, must make such records available for examination by the Commission. The organization must demonstrate through a reasonable accounting method that, whenever such an organization makes a contribution or expenditure, or payment, the organization has received sufficient funds subject to the limitations and prohibitions of the Act to make such contribution, expenditure, or payment.

(2) Any State, district, or local party organization that makes payments for certain Federal election activities under 11 CFR 300.32(b) must either:

(i) Establish one or more Levin accounts pursuant to 11 CFR 300.30(b) into which only funds solicited pursuant to 11 CFR 300.31 may be deposited and from which payments must be made pursuant to 11 CFR 300.32 and 300.33. See 11 CFR 300.30(c)(2)(i); or

(ii) Demonstrate through a reasonable accounting method approved by the Commission (including any method embedded in software provided or

approved by the Commission) that whenever such organization makes a payment that organization has received sufficient funds subject to the limitations and prohibitions of the Act or the requirements of 11 CFR 300.31 to make such payment. Such organization shall keep records of amounts received or expended under this paragraph and, upon request, shall make such records available for examination by the Commission. See 11 CFR 300.30(c)(2)(ii).

(3) All such party organizations shall keep records of deposits to and disbursements from such Federal and Levin accounts, and upon request, shall make such records available for examination by the Commission.

(c) *National party committees.* Between November 6, 2002, and December 31, 2002, paragraphs (a) and (b) of this section apply to national party committees. After December 31, 2002, national party committees are prohibited from raising and spending non-Federal funds. Therefore, this section does not apply to national party committees after December 31, 2002.

8. Section 102.17 is amended by adding introductory language to paragraph (a) to read as follows:

**§ 102.17    Joint fundraising by committees other than separate segregated funds.**

(a) *General.* Nothing in this section shall supersede 11 CFR part 300, which prohibits any person from soliciting, receiving, directing, transferring, or spending any non-Federal funds, or from transferring Federal funds for Federal election activities.

\*    \*    \*    \*    \*

**PART 104—REPORTS BY POLITICAL COMMITTEES (2 U.S.C. 434)**

9. The authority citation for part 104 continues to read as follows:

**Authority:** 2 U.S.C. 431(1), 431(8), 431(9), 432(i), 434, 438(a)(8), 438(b), 439a.

10. Section 104.8 is amended by revising paragraphs (e) and (f) to read as follows:

**§ 104.8    Uniform reporting of receipts.**

\*    \*    \*    \*    \*

(e) For reports covering activity on or before December 31, 2002, national party committees shall disclose in a memo Schedule A information about each individual, committee, corporation, labor organization, or other entity that donates an aggregate amount in excess of $200 in a calendar year to the committee's non-Federal account(s). This information shall include the donating individual's or entity's name,

mailing address, occupation or type of business, and the date of receipt and amount of any such donation. If a donor's name is known to have changed since an earlier donation reported during the calendar year, the exact name or address previously used shall be noted with the first reported donation from that donor subsequent to the name change. The memo entry shall also include, where applicable, the information required by paragraphs (b) through (d) of this section.

(f) For reports covering activity on or before December 31, 2002, national party committees shall also disclose in a memo Schedule A information about each individual, committee, corporation, labor organization, or other entity that donates an aggregate amount in excess of $200 in a calendar year to the committee's building fund account(s). This information shall include the donating individual's or entity's name, mailing address, occupation or type of business, and the date of receipt and amount of any such donation. If a donor's name is known to have changed since an earlier donation reported during the calendar year, the exact name or address previously used shall be noted with the first reported donation from that donor subsequent to the name change. The memo entry shall also include, where applicable, the information required by paragraphs (b) through (d) of this section.

11. Section 104.9 is amended by revising paragraphs (c), (d), and (e) to read as follows:

### § 104.9  Uniform reporting of disbursements.

\*    \*    \*    \*    \*

(c) For reports covering activity on or before March 31, 2003, national party committees shall report in a memo Schedule B the full name and mailing address of each person to whom a disbursement in an aggregate amount or value in excess of $200 within the calendar year is made from the committee's non-Federal account(s), together with the date, amount, and purpose of such disbursement, in accordance with paragraph (b) of this section. As used in this section, *purpose* means a brief statement or description as to the reasons for the disbursement. *See* 11 CFR 104.3(b)(3)(i)(A).

(d) For reports covering activity on or before March 31, 2003, national party committees shall report in a memo Schedule B the full name and mailing address of each person to whom a disbursement in an aggregate amount or value in excess of $200 within the calendar year is made from the committee's building fund account(s),

together with the date, amount, and purpose of such disbursement, in accordance with paragraph (b) of this section. As used in this section, *purpose* means a brief statement or description as to the reasons for the disbursement. *See* 11 CFR 104.3(b)(3)(i)(A).

(e) For reports covering activity on or before December 31, 2002, national party committees shall report in a memo Schedule B each transfer from their non-Federal account(s) to the non-Federal accounts of a State or local party committee.

12. Section 104.10 is revised to read as follows:

### § 104.10  Reporting by separate segregated funds and nonconnected committees of expenses allocated among candidates and activities.

(a) *Expenses allocated among candidates.* A political committee that is a separate segregated fund or a nonconnected committee making an expenditure on behalf of more than one clearly identified candidate for Federal office shall allocate the expenditure among the candidates pursuant to 11 CFR part 106. Payments involving both expenditures on behalf of one or more clearly identified Federal candidates and disbursements on behalf of one or more clearly identified non-Federal candidates shall also be allocated pursuant to 11 CFR part 106. For allocated expenditures, the committee shall report the amount of each in-kind contribution, independent expenditure, or coordinated expenditure attributed to each Federal candidate. If a payment also includes amounts attributable to one or more non-Federal candidates, and is made by a political committee with separate Federal and non-Federal accounts, then the payment shall be made according to the procedures set forth in 11 CFR 106.6(e), but shall be reported pursuant to paragraphs (a)(1) through (a)(4) of this section, as follows:

(1) *Reporting of allocation of expenses attributable to specific Federal and non-Federal candidates.* In each report disclosing a payment that includes both expenditures on behalf of one or more Federal candidates and disbursements on behalf of one or more non-Federal candidates, the committee shall assign a unique identifying title or code to each program or activity conducted on behalf of such candidates, shall state the allocation ratio calculated for the program or activity, and shall explain the manner in which the ratio was derived. The committee shall also summarize the total amounts attributed to each candidate, to date, for each joint program or activity.

(2) *Reporting of transfers between accounts for the purpose of paying expenses attributable to specific Federal and non-Federal candidates.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall report each transfer of funds from its non-Federal account to its Federal account or to its separate allocation account for the purpose of paying such expenses. In the report covering the period in which each transfer occurred, the committee shall explain in a memo entry the allocable expenses to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one program or activity, the committee shall itemize the transfer, showing the amounts designated for each program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates.

(3) *Reporting of allocated disbursements attributable to specific Federal and non-Federal candidates.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall also report each disbursement from its Federal account or its separate allocation account in payment for a program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates. In the report covering the period in which the disbursement occurred, the committee shall state the full name and address of each person to whom the disbursement was made, and the date, amount, and purpose of each such disbursement. If the disbursement includes payment for the allocable costs of more than one program or activity, the committee shall itemize the disbursement, showing the amounts designated for payment of each program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates. The committee shall also report the amount of each in-kind contribution, independent expenditure, or coordinated expenditure attributed to each Federal candidate, and the total amount attributed to the non-Federal candidate(s). In addition, the committee shall report the total amount expended by the committee that year, to date, for each joint program or activity.

(4) *Recordkeeping.* The treasurer shall retain all documents supporting the committee's allocation on behalf of specific Federal and non-Federal candidates, in accordance with 11 CFR 104.14.

(b) *Expenses allocated among activities.* A political committee that is a separate segregated fund or a nonconnected committee and that has established separate Federal and non-Federal accounts under 11 CFR 102.5(a)(1)(i) shall allocate between those accounts its administrative expenses and its costs for fundraising and generic voter drives according to 11 CFR 106.6, and shall report those allocations according to paragraphs (b) (1) through (5) of this section, as follows:

(1) *Reporting of allocation of administrative expenses and costs of generic voter drives.*

(i) In the first report in a calendar year disclosing a disbursement for administrative expenses or generic voter drives, as described in 11 CFR 106.6(b), the committee shall state the allocation ratio to be applied to these categories of activity according to 11 CFR 106.6(c), and the manner in which it was derived.

(ii) In each subsequent report in the calendar year itemizing an allocated disbursement for administrative expenses or generic voter drives:

(A) The committee shall state the category of activity for which each allocated disbursement was made, and shall summarize the total amount spent by the Federal and non-Federal accounts that year, to date, for each such category.

(B) The committees shall also report in a memo entry the total amounts expended in donations and direct disbursements on behalf of specific State and local candidates, to date, in that calendar year.

(2) *Reporting of allocation of the direct costs of fundraising.* In each report disclosing a disbursement for the direct costs of a fundraising program, as described in 11 CFR 106.6(b), the committee shall assign a unique identifying title or code to each program or activity, shall state the allocation ratio calculated for the program or activity according to 11 CFR 106.6(d), and shall explain the manner in which the ratio was derived. The committee shall also summarize the total amounts spent by the Federal and non-Federal accounts that year, to date, for each such program or activity.

(3) *Reporting of transfers between accounts for the purpose of paying allocable expenses.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall report each transfer of funds from its non-Federal account to its Federal account or to its separate allocation account for the purpose of paying such expenses. In the report covering the period in which each transfer occurred,

the committee shall explain in a memo entry the allocable expenses to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one activity, the committee shall itemize the transfer, showing the amounts designated for administrative expenses and generic voter drives, and for each fundraising program, as described in 11 CFR 106.6(b).

(4) *Reporting of allocated disbursements.* A political committee that pays allocable expenses in accordance with 11 CFR 106.6(e) shall also report each disbursement from its Federal account or its separate allocation account in payment for a joint Federal and non-Federal expense or activity. In the report covering the period in which the disbursement occurred, the committee shall state the full name and address of each person to whom the disbursement was made, and the date, amount, and purpose of each such disbursement. If the disbursement includes payment for the allocable costs of more than one activity, the committee shall itemize the disbursement, showing the amounts designated for payment of administrative expenses and generic voter drives, and for each fundraising program, as described in 11 CFR 106.6(b). The committee shall also report the total amount expended by the committee that year, to date, for each category of activity.

(5) *Recordkeeping.* The treasurer shall retain all documents supporting the committee's allocated disbursements for three years, in accordance with 11 CFR 104.14.

13. Part 104 is amended by adding § 104.17 to read as follows:

### § 104.17 Reporting of allocable expenses by party committees.

(a) *Expenses allocated among candidates.* A national party committee making an expenditure on behalf of more than one clearly identified candidate for Federal office must report the allocation between or among the named candidates. A national party committee making expenditures and disbursements on behalf of one or more clearly identified Federal candidates and on behalf of one or more clearly identified non-Federal candidates must report the allocation among all named candidates. These payments shall be allocated among candidates pursuant to 11 CFR part 106, but only Federal funds may be used for such payments. A State, district, or local party committee making expenditures and disbursements for Federal election activity as defined at 11 CFR 100.24 on behalf of one or

more clearly identified Federal and one or more clearly identified non-Federal candidates must make the payments from its Federal account and must report the allocation among all named candidates. A State, district, or local party committee making expenditures and disbursements on behalf of one or more clearly identified Federal and one or more clearly identified non-Federal candidates where the activity is not a Federal election activity may allocate the payments between its Federal and non-Federal account and must report the allocation among all named candidates. For allocated expenditures, the committee must report the amount of each in-kind contribution, independent expenditure, or coordinated expenditure attributed to each candidate. If a payment also includes amounts attributable to one or more non-Federal candidates, and is made by a State, district, or local party committee with separate Federal and non-Federal accounts, and is not for a Federal election activity, then the payment shall be made according to the procedures set forth in 11 CFR 106.7(f), but shall be reported pursuant to paragraphs (a)(1) through (a)(4) of this section, as follows:

(1) *Reporting of allocation of expenses attributable to specific Federal and non-Federal candidates.* In each report disclosing a payment that includes both expenditures on behalf of one or more Federal candidates and disbursements on behalf of one or more non-Federal candidates, the committee must assign a unique identifying title or code to each program or activity conducted on behalf of such candidates, state the allocation ratio calculated for the program or activity, and explain the manner in which the ratio applied to each candidate was derived. The committee must also summarize the total amounts attributed to each candidate, to date, for each program or activity.

(2) *Reporting of transfers between accounts for the purpose of paying expenses attributable to specific Federal and non-Federal candidates.* A State, district, or local party committee that pays allocable expenses in accordance with 11 CFR 106.7(f) shall report each transfer of funds from its non-Federal account to its Federal account or to its separate allocation account for the purpose of paying such expenses. In the report covering the period in which each transfer occurred, the State, district, or local party committee shall explain in a memo entry the allocable expenses to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one

program or activity, the State, district, or local party committee must itemize the transfer, showing the amounts designated for each program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates.

(3) *Reporting of allocated disbursements attributable to specific Federal and non-Federal candidates.* A State, district, or local committee that pays allocable expenses in accordance with 11 CFR 106.7(f) shall also report each disbursement from its Federal account or its separate allocation account in payment for a program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates. In the report covering the period in which the disbursement occurred, the State, district, or local party committee shall state the full name and address of each person to whom the disbursement was made, and the date, amount, and purpose of each such disbursement. If the disbursement includes payment for the allocable costs of more than one program or activity, the committee shall itemize the disbursement, showing the amounts designated for payment of each program or activity conducted on behalf of one or more clearly identified Federal candidates and one or more clearly identified non-Federal candidates. The State, district, or local party committee must also report the amount of each in-kind contribution, independent expenditure, or coordinated expenditure attributed to each Federal candidate, and the total amount attributed to the non-Federal candidate(s). In addition, the State, district, or local party committee must report the total amount expended by the committee that year, to date, for each joint program or activity.

(4) *Recordkeeping.* The treasurer of a State, district, or local party committee must retain all documents supporting the committee's allocations on behalf of specific Federal and non-Federal candidates, in accordance with 11 CFR 104.14.

(b) *Allocation of activities that are not Federal election activities.* A State, district, or local committee of a political party that has established separate Federal and non-Federal accounts, including related allocation accounts, under 11 CFR 102.5 must report all payments that are allocable between these accounts pursuant to the allocation rules in 11 CFR 106.7. Disbursements for activities that are allocable between Federal and Levin accounts, including related allocation

accounts, must be reported pursuant to 11 CFR 300.36.

(1) *Reporting of allocations of expenses for activities that are not Federal election activities.*

(i) In the first report in a calendar year disclosing a disbursement allocable pursuant to 11 CFR 106.7, a State, district, or local committee shall state and explain the allocation percentages to be applied to each category of allocable activity (e.g., 36% Federal/64% non-Federal in Presidential and Senate election years) pursuant to 11 CFR 106.7(d).

(ii) In each subsequent report in the calendar year itemizing an allocated disbursement, the State, district, or local party committee shall state the category of activity for which each allocated disbursement was made, and shall summarize the total amounts expended from Federal and non-Federal accounts, or from allocation accounts, that year to date for each such category.

(iii) In each report disclosing disbursements for allocable activities as described in 11 CFR 106.7, the State, district, or local party committee shall assign a unique identifying title or code to each such program or activity, and shall state the applicable Federal/non-Federal percentage for any direct costs of fundraising. Unique identifying titles or codes are not required for salaries and wages pursuant to 11 CFR 106.7(c)(1), or for other administrative costs allocated pursuant to 11 CFR 106.7(c)(2).

(2) *Reporting of transfers between the accounts of State, district, and local party committees and into allocation accounts for allocable expenses.* A State, district, or local committee of a political party that pays allocable expenses in accordance with 11 CFR 106.7 shall report each transfer of funds from its non-Federal account to its Federal account, or each transfer from its Federal account and its non-Federal account into an allocation account, for the purpose of payment of such expenses. In the report covering the period in which each transfer occurred, the State, district, or local party committee must explain in a memo entry the allocable expenses to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one activity, the State, district, or local party committee must itemize the transfer, showing the amounts designated for each category of expense as described in 11 CFR 106.7.

(3) *Reporting of allocated disbursements for certain allocable activity that is not Federal election activity.*

(i) A State, district, or local committee of a political party that pays allocable expenses in accordance with 11 CFR 106.7 shall report each disbursement from its Federal account for allocable expenses, or each payment from an allocation account for such activity. In the report covering the period in which the disbursement occurred, the State, district, or local committee shall state the full name and address of each individual or vendor to which the disbursement was made, the date, amount, and purpose of each such disbursement, and the amounts allocated to Federal and non-Federal portions of the allocable activity. If the disbursement includes payment for the allocable costs of more than one activity, the State, district, or local party committee must itemize the disbursement, showing the amounts designated for payments of particular categories of activity as described in 11 CFR 106.7. The State, district, or local party committee must also report the total amount paid that calendar year to date for each category of allocable activity.

(ii) A State, district, or local committee of a political party that pays allocable expenses from a Federal account and a Levin account in accordance with 11 CFR 300.33 shall report disbursements from those accounts according to the requirements of 11 CFR 300.36.

(4) *Recordkeeping.* The treasurer of a State, district, or local party committee must retain all documents supporting the committee's allocations of expenditures and disbursements for the costs and activities cited at paragraph (b) of this section, in accordance with 11 CFR 104.14.

## PART 106—ALLOCATIONS OF CANDIDATE AND COMMITTEE ACTIVITIES

14. The authority citation for part 106 continues to read as follows:

**Authority:** 2 U.S.C. 438(a)(8), 441a(b), 441a(g).

15. Section 106.1 is amended by revising paragraphs (a)(1), (a)(2), and (e) to read as follows:

### § 106.1 Allocation of expenses between candidates.

(a) *General rule.*

(1) Expenditures, including in-kind contributions, independent expenditures, and coordinated expenditures made on behalf of more than one clearly identified Federal candidate shall be attributed to each such candidate according to the benefit reasonably expected to be derived. For

example, in the case of a publication or broadcast communication, the attribution shall be determined by the proportion of space or time devoted to each candidate as compared to the total space or time devoted to all candidates. In the case of a fundraising program or event where funds are collected by one committee for more than one clearly identified candidate, the attribution shall be determined by the proportion of funds received by each candidate as compared to the total receipts by all candidates. In the case of a phone bank, the attribution shall be determined by the number of questions or statements devoted to each candidate as compared to the total number of questions or statements devoted to all candidates. These methods shall also be used to allocate payments involving both expenditures on behalf of one or more clearly identified Federal candidates and disbursements on behalf of one or more clearly identified non-Federal candidates.

(2) An expenditure made on behalf of more than one clearly identified Federal candidate shall be reported pursuant to 11 CFR 104.10(a) or 104.17(a), as appropriate. A payment that also includes amounts attributable to one or more non-Federal candidates, and that is made by a political committee with separate Federal and non-Federal accounts, shall be made according to the procedures set forth in 11 CFR 106.6(e) or 106.7(f), but shall be reported pursuant to 11 CFR 104.10(a) or 104.17(a). If a State, district, or local party committee's payment on behalf of both a Federal candidate and a non-Federal candidate is for a Federal election activity, only Federal funds may be used for the entire payment. For Federal election activities, the provisions of 11 CFR 300.33 and 104.17(a) will apply to payments attributable to candidates.

\*      \*      \*      \*      \*

(e) State, district, and local party committees, separate segregated funds, and nonconnected committees that make mixed Federal/non-Federal payments for activities other than an activity entailing an expenditure for a Federal candidate and disbursement for a non-Federal candidate, or that make mixed Federal/Levin fund payments, shall allocate those expenses in accordance with 11 CFR 106.6, 106.7, or 300.33, as appropriate.

16. Section 106.5 is revised to read as follows:

### §106.5 Allocation of expenses between federal and non-federal activities by national party committees.

(a) *General rules.*

(1) *Disbursements from Federal and non-Federal accounts.* National party committees that make disbursements in connection with Federal and non-Federal elections shall make those disbursements entirely from funds subject to the prohibitions and limitations of the Act, at accounts established pursuant to 11 CFR 102.5. Political committees that have established separate Federal and non-Federal accounts under 11 CFR 102.5(a)(1)(i) shall allocate expenses between those accounts according to this section. Organizations that are not political committees but have established separate Federal and non-Federal accounts under 11 CFR 102.5(b)(1)(i), or that make Federal and non-Federal disbursements from a single account under 11 CFR 102.5(b)(1)(ii), shall also allocate their Federal and non-Federal expenses according to this section. This section covers:

(i) General rules regarding allocation of Federal and non-Federal expenses by party committees;

(ii) Percentages to be allocated for administrative expenses and costs of generic voter drives by national party committees;

(iii) Methods for allocation of administrative expenses, costs of generic voter drives, and of fundraising costs by national party committees; and

(iv) Procedures for payment of allocable expenses. Requirements for reporting of allocated disbursements are set forth in 11 CFR 104.10.

(2) *Costs to be allocated.* National party committees that make disbursements in connection with Federal and non-Federal elections shall allocate expenses according to this section for the following categories of activity:

(i) Administrative expenses including rent, utilities, office supplies, and salaries, except for such expenses directly attributable to a clearly identified candidate;

(ii) The direct costs of a fundraising program or event including disbursements for solicitation of funds and for planning and administration of actual fundraising events, where Federal and non-Federal funds are collected by one committee through such program or event; and

(iii) [Removed and reserved]

(iv) Generic voter drives including voter identification, voter registration, and get-out-the-vote drives, or any other activities that urge the general public to register, vote or support candidates of a particular party or associated with a particular issue, without mentioning a specific candidate.

(b) *National party committees other than Senate or House campaign committees; fixed percentages for allocating administrative expenses and costs of generic voter drives.*

(1) *General rule.* Each national party committee other than a Senate or House campaign committee shall allocate a fixed percentage of its administrative expenses and costs of generic voter drives, as described in paragraph (a)(2) of this section, to its Federal and non-Federal account(s) each year. These percentages shall differ according to whether or not the allocable expenses were incurred in a presidential election year. Such committees shall allocate the costs of each combined Federal and non-Federal fundraising program or event according to paragraph (f) of this section, with no fixed percentages required.

(2) *Fixed percentages according to type of election year.* National party committees other than the Senate or House campaign committees shall allocate their administrative expenses and costs of generic voter drives according to paragraphs (b)(2) (i) and (ii) as follows:

(i) *Presidential election years.* In presidential election years, national party committees other than the Senate or House campaign committees shall allocate to their Federal accounts at least 65% of their administrative expenses and costs of generic voter drives.

(ii) *Non-presidential election years.* In all years other than presidential election years, national party committees other than the Senate or House campaign committees shall allocate to their Federal accounts at least 60% each of their administrative expenses and costs of generic voter drives.

(c) *Senate and House campaign committees of a national party; method and minimum Federal percentage for allocating administrative expenses and costs of generic voter drives.*

(1) *Method for allocating administrative expenses and costs of generic voter drives.* Subject to the minimum percentage set forth in paragraph (c)(2) of this section, each Senate or House campaign committee of a national party shall allocate its administrative expenses and costs of generic voter drives, as described in paragraph (a)(2) of this section, according to the funds expended method, described in paragraphs (c)(1)(i) and (ii) as follows:

(i) Under this method, expenses shall be allocated based on the ratio of Federal expenditures to total Federal and non-Federal disbursements made by the committee during the two-year

Federal election cycle. This ratio shall be estimated and reported at the beginning of each Federal election cycle, based upon the committee's Federal and non-Federal disbursements in a prior comparable Federal election cycle or upon the committee's reasonable prediction of its disbursements for the coming two years. In calculating its Federal expenditures, the committee shall include only amounts contributed to or otherwise spent on behalf of specific federal candidates. Calculation of total Federal and non-Federal disbursements shall also be limited to disbursements for specific candidates, and shall not include overhead or other generic costs.

(ii) On each of its periodic reports, the committee shall adjust its allocation ratio to reconcile it with the ratio of actual Federal and non-Federal disbursements made, to date. If the non-Federal account has paid more than its allocable share, the committee shall transfer funds from its Federal to its non-Federal account, as necessary, to reflect the adjusted allocation ratio. The committee shall make note of any such adjustments and transfers on its periodic reports, submitted pursuant to 11 CFR 104.5.

(2) *Minimum Federal percentage for administrative expenses and costs of generic voter drives.* Regardless of the allocation ratio calculated under paragraph (c)(1) of this section, each Senate or House campaign committee of a national party shall allocate to its Federal account at least 65% each of its administrative expenses and costs of generic voter drives each year. If the committee's own allocation calculation under paragraph (c)(1) of this section yields a Federal share greater than 65%, then the higher percentage shall be applied. If such calculation yields a Federal share lower than 65%, then the committee shall report its calculated ratio according to 11 CFR 104.10(b), and shall apply the required minimum Federal percentage.

(3) *Allocation of fundraising costs.* Senate and House campaign committees shall allocate the costs of each combined Federal and non-Federal fundraising program or event according to paragraph (f) of this section, with no minimum percentages required.

(d) [Reserved].

(e) [Reserved].

(f) *National party committees; method for allocating direct costs of fundraising.*

(1) If Federal and non-Federal funds are collected by one committee through a joint activity, that committee shall allocate its direct costs of fundraising, as described in paragraph (a)(2) of this section, according to the funds received

method. Under this method, the committee shall allocate its fundraising costs based on the ratio of funds received into its Federal account to its total receipts from each fundraising program or event. This ratio shall be estimated prior to each such program or event based upon the committee's reasonable prediction of its Federal and non-Federal revenue from that program or event, and shall be noted in the committee's report for the period in which the first disbursement for such program or event occurred, submitted pursuant 11 CFR 104.5. Any disbursements for fundraising costs made prior to the actual program or event shall be allocated according to this estimated ratio.

(2) No later than the date 60 days after each fundraising program or event from which both Federal and non-Federal funds are collected, the committee shall adjust the allocation ratio for that program or event to reflect the actual ratio of funds received. If the non-Federal account has paid more than its allocable share, the committee shall transfer funds from its Federal to its non-Federal account, as necessary, to reflect the adjusted allocation ratio. If the Federal account has paid more than its allocable share, the committee shall make any transfers of funds from its non-federal to its federal account to reflect the adjusted allocation ratio within the 60-day time period established by this paragraph. The committee shall make note of any such adjustments and transfers in its report for any period in which a transfer was made, and shall also report the date of the fundraising program or event that serves as the basis for the transfer. In the case of a telemarketing or direct mail campaign, the date for purposes of this paragraph is the last day of the telemarketing campaign, or the day on which the final direct mail solicitations are mailed.

(g) *Payment of allocable expenses by committees with separate Federal and non-Federal accounts.*

(1) *Payment options.* Committees that have established separate Federal and non-Federal accounts under 11 CFR 102.5(a)(1)(i) or (b)(1)(i) shall pay the expenses of joint Federal and non-Federal activities described in paragraph (a)(2) of this section according to either paragraph (g)(1)(i) or (ii), as follows:

(i) *Payment by Federal account; transfers from non-Federal account to Federal account.* The committee shall pay the entire amount of an allocable expense from its Federal account and shall transfer funds from its non-Federal account to its Federal account solely to

cover the non-Federal share of that allocable expense.

(ii) *Payment by separate allocation account; transfers from Federal and non-Federal accounts to allocation account.*

(A) The committee shall establish a separate allocation account into which funds from its Federal and non-Federal accounts shall be deposited solely for the purpose of paying the allocable expenses of joint Federal and non-Federal activities. Once a committee has established a separate allocation account for this purpose, all allocable expenses shall be paid from that account for as long as the account is maintained.

(B) The committee shall transfer funds from its Federal and non-Federal accounts to its allocation account in amounts proportionate to the Federal or non-Federal share of each allocable expense.

(C) No funds contained in the allocation account may be transferred to any other account maintained by the committee.

(2) *Timing of transfers between accounts.*

(i) Under either payment option described in paragraphs (g)(1)(i) or (ii) of this section, the committee shall transfer funds from its non-Federal account to its Federal account or from its Federal and non-Federal accounts to its separate allocation account following determination of the final cost of each joint Federal and non-Federal activity, or in advance of such determination if advance payment is required by the vendor and if such payment is based on a reasonable estimate of the activity's final cost as determined by the committee and the vendor(s) involved.

(ii) Funds transferred from a committee's non-Federal account to its Federal account or its allocation account are subject to the following requirements:

(A) For each such transfer, the committee must itemize in its reports the allocable activities for which the transferred funds are intended to pay, as required by 11 CFR 104.10(b)(3); and

(B) Except as provided in paragraph (f)(2) of this section, such funds may not be transferred more than 10 days before or more than 60 days after the payments for which they are designated are made.

(iii) Any portion of a transfer from a committee's non-Federal account to its Federal account or its allocation account that does not meet the requirements of paragraph (g)(2)(ii) of this section shall be presumed to be a loan or contribution from the non-Federal account to a Federal account, in violation of the Act.

(3) *Reporting transfers of funds and allocated disbursements.* A political committee that transfers funds between accounts and pays allocable expenses according to this section shall report each such transfer and disbursement pursuant to 11 CFR 104.10(b).

(h) *Sunset provision.* This section applies from November 6, 2002, to December 31, 2002. After December 31, 2002, *see* 11 CFR 106.7(a).

17. Section 106.7 is added to part 106 to read as follows:

**§ 106.7    Allocation of expenses between Federal and non-Federal accounts by party committees, other than for Federal election activities.**

(a) National party committees are prohibited from raising or spending non-Federal funds. Therefore, these committees shall not allocate expenditures and disbursements between Federal and non-Federal accounts. All disbursements by a national party committee must be made from a Federal account.

(b) State, district, and local party committees that make expenditures and disbursements in connection with both Federal and non-Federal elections for activities that are not Federal election activities pursuant to 11 CFR 100.24 may use only funds subject to the prohibitions and limitations of the Act, or they may allocate such expenditures and disbursements between their Federal and their non-Federal accounts. State, district, and local party committees that have established separate Federal and non-Federal accounts under 11 CFR 102.5(a)(1)(i) shall allocate expenses between those accounts according to paragraphs (c) and (d) of this section. Party organizations that are not political committees but have established separate Federal and non-Federal accounts, or that make Federal and non-Federal disbursements from a single account, shall also allocate their Federal and non-Federal expenses according to paragraphs (c) and (d) of this section. In lieu of establishing separate accounts, party organizations that are not political committees may choose to use a reasonable accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) pursuant to 11 CFR 102.5 and 300.30.

(c) *Costs allocable by State, district, and local party committees between Federal and non-Federal accounts.*

(1) *Salaries and wages.* State, district, and local party committees must pay salaries and wages from funds that comply with State law for employees who spend 25% or less of their time in

any given month on Federal election activity or activity in connection with a Federal election. *See* 11 CFR 300.33(c)(2).

(2) *Administrative costs.* State, district, and local party committees may either pay administrative costs, including rent, utilities, office equipment, office supplies, postage for other than mass mailings, and routine building maintenance, upkeep and repair, from their Federal account, or allocate such expenses between their Federal and non-Federal accounts, except that any such expenses directly attributable to a clearly identified Federal candidate must be paid only from the Federal account.

(3) *Exempt party activities that are not Federal election activities.* State, district, and local party committees may pay expenses for party activities that are exempt from the definitions of contribution and expenditure under 11 CFR 100.7(b)(9), (15), or (17), and 100.8(b)(10), (16), or (18), that are conducted in conjunction with non-Federal activity, and that are not Federal election activities pursuant to 11 CFR 100.24, from their Federal accounts, or may allocate these expenses between their Federal and non-Federal accounts.

(4) *Certain fundraising costs.* State, district, and local party committees may allocate the direct costs of certain fundraising programs or events between their Federal and non-Federal accounts provided that none of the proceeds from the activities or events will ever be used for Federal election activities. The proceeds of fundraising allocated pursuant to this paragraph must be segregated in bank accounts that are never used for Federal election activity. Direct costs of fundraising include disbursements for the planning and administration of specific fundraising events or programs.

(5) *Voter-drive activities that do not qualify as Federal election activities and that are not party exempt activities.* Other than for salaries and wages as described in paragraph (c)(1) of this section, expenses for voter identification, voter registration, and get-out-the-vote drives, and any other activities that urge the general public to register or vote, or that promote or oppose a political party, without promoting or opposing a candidate or non-Federal candidate, that do not qualify as Federal election activities and that are not exempt party activities, must be paid with Federal funds or may be allocated between the committee's Federal and non-Federal accounts.

(d) *Allocation percentages, ratios, and record-keeping.*

(1) *Salaries and wages.* Committees must keep a monthly log of the percentage of time each employee spends in connection with a Federal election. Allocations of salaries and wages shall be undertaken as follows:

(i) Salaries and wages paid for employees who spend 25% or less of their compensated time in a given month on Federal election activities or on activities in connection with a Federal election shall be paid from funds that comply with State law.

(ii) Salaries and wages paid for employees who spend more than 25% of their compensated time in a given month on Federal election activities or on activities in connection with a Federal election must be paid only from a Federal account. *See* 11 CFR 300.33(c)(2), and paragraph (e)(2) of this section.

(2) *Administrative costs.* State, district, and local party committees that choose to allocate administrative expenses may do so subject to the following requirements:

(i) *Presidential election years.* In any even year in which a Presidential candidate, but no Senate candidate appears on the ballot, and in the preceding year, State, district, and local party committees must allocate at least 28% of administrative expenses to their Federal accounts.

(ii) *Presidential and Senate election year.* In any even year in which a Presidential candidate and a Senate candidate appear on the ballot, and in the preceding year, State, district, and local party committees must allocate at least 36% of administrative expenses to their Federal accounts.

(iii) *Senate election year.* In any even year in which a Senate candidate, but no Presidential candidate, appears on the ballot, and in the preceding year, State, district, and local party committees must allocate at least 21% of administrative expenses to their Federal account.

(iv) *Non-Presidential and non-Senate year.* In any even year in which neither a Presidential nor a Senate candidate appears on the ballot, and in the preceding year, State, district, and local party committees must allocate at least 15% of administrative expenses to their Federal account.

(3) *Exempt party activities and voter drive activities that are not Federal election activities.* State, district, and local party committees that choose to allocate expenses for exempt activities conducted in conjunction with non-Federal activities and voter drive activities, that are not Federal election activities, must do so subject to the following requirements:

(i) *Presidential election years.* In any even year in which a Presidential candidate, but no Senate candidate appears on the ballot, and in the preceding year, State, district, and local party committees must allocate at least 28% of these expenses to their Federal accounts.

(ii) *Presidential and Senate election year.* In any even year in which a Presidential candidate and a Senate candidate appear on the ballot, and in the preceding year, State, district, and local party committees must allocate at least 36% of these expenses to their Federal accounts.

(iii) *Senate election year.* In any even year in which a Senate candidate, but no Presidential candidate, appears on the ballot, and in the preceding year, State, district, and local party committees must allocate at least 21% of these expenses to their Federal account.

(iv) *Non-Presidential and non-Senate year.* In any even year in which neither a Presidential nor a Senate candidate appears on the ballot, and in the preceding year, State, district, and local party committee must allocate at least 15% of these expenses to their Federal account.

(4) *Fundraising for Federal and non-Federal accounts.* If Federal and non-Federal funds are collected by a State, district, or local party committee through a joint fundraising activity, that committee must allocate its direct fundraising costs using the funds received method and according to the following procedures:

(i) The committee must allocate its fundraising costs based on the ratio of funds received into its Federal account to its total receipts from each fundraising program or event. This ratio shall be estimated prior to each such program or event based upon the committee's reasonable prediction of its Federal and non-Federal revenue from that program or event, and must be noted in the committee's report for the period in which the first disbursement for such program or event occurred, submitted pursuant to 11 CFR 104.5. Any disbursements for fundraising costs made prior to the actual program or event must be allocated according to this estimated ratio.

(ii) No later than the date 60 days after each fundraising program or event from which both Federal and non-Federal funds are collected, the committee shall adjust the allocation ratio for that program or event to reflect the actual ratio of funds received. If the non-Federal account has paid more than its allocable share, the committee shall transfer funds from its Federal to its

non-Federal account, as necessary, to reflect the adjusted allocation ratio. If the Federal account has paid more than its allocable share, the committee shall make any transfers of funds from its non-Federal to its Federal account to reflect the adjusted allocation ratio within the 60-day time period established by this paragraph. The committee shall make note of any such adjustments and transfers in its report for any period in which a transfer was made, and shall also report the date of the fundraising program or event that serves as the basis for the transfer. In the case of a telemarketing or direct mail campaign, the date for purposes of this paragraph is the last day of the telemarketing campaign, or the day on which the final direct mail solicitations are mailed.

(e) *Costs not allocable by State, district, and local party committees between Federal and non-Federal accounts.* The following costs incurred by State, district, and local party committees shall be paid only with Federal funds:

(1) Disbursements for State, district, and local party committees for activities that refer only to one or more candidates for Federal office must not be allocated. All such disbursements must be made from a Federal account.

(2) *Salaries and wages.* Salaries and wages for employees who spend more than 25% of their compensated time in a given month on activities in connection with a Federal election must not be allocated. All such disbursements must be made from a Federal account. *See* 11 CFR 300.33(c)(2).

(3) *Federal election activities.* Activities that are Federal election activities pursuant to 11 CFR 100.24 must not be allocated between Federal and non-Federal accounts. Only Federal funds, or a mixture of Federal funds and Levin funds, as provided in 11 CFR 300.33, may be used.

(4) *Fundraising Costs.* Expenses incurred by State, district, and local party committees directly related to programs or events undertaken to raise funds to be used, in whole or in part, for activities in connection with Federal and non-Federal elections that are Federal election activities pursuant to 11 CFR 100.24 must not be allocated between Federal and non-Federal accounts. Except as provided in 11 CFR 300.32(a)(4), all such disbursements must be made from a Federal account.

(f) *Transfers between accounts to cover allocable expenses.* State, district, and local party committees may transfer funds from their non-Federal to their Federal accounts or to an allocation account solely to meet allocable

expenses under this section and only pursuant to the following requirements:

(1) *Payments from Federal accounts or from allocation accounts.*

(i) State, district, and local party committees must pay the entire amount of an allocable expense from their Federal accounts and transfer funds from their non-Federal account to the Federal account solely to cover the non-Federal share of that allocable expense; or

(ii) State, district, or local party committees may establish a separate allocation account into which funds from its Federal and non-Federal accounts may be deposited solely for the purpose of paying the allocable expenses of joint Federal and non-Federal activities.

(2) *Timing.*

(i) If a Federal or allocation account is used to make allocable expenditures and disbursements, State, district, and local party committees must transfer funds from their non-Federal to their Federal or allocation account to meet allocable expenses no more than 10 days before and no more than 60 days after the payments for which they are designated are made from a Federal or allocation account, except that transfers may be made more than 10 days before a payment is made from the Federal or allocation account if advance payment is required by the vendor(s) and if such payment is based on a reasonable estimate of the activity's final costs as determined by the committee and the vendor(s) involved.

(ii) Any portion of a transfer from a committee's non-Federal account to its Federal or allocation account that does not meet the requirement of paragraph (f)(2)(i) of this section shall be presumed to be a loan or contribution from the non-Federal account to the Federal or allocation account, in violation of the Act.

## PART 108—FILING COPIES OF REPORTS AND STATEMENTS WITH STATE OFFICERS (2 U.S.C. 439)

18. The authority citation for part 108 continues to read as follows:

**Authority:** 2 U.S.C. 434(a)(2), 438(a)(8), 439, 453.

19. Section 108.7 is amended by revising paragraphs (c)(4) and (c)(5) and adding paragraph (c)(6) to read as follows:

### § 108.7  Effect on State law (2 U.S.C. 453).

\*    \*    \*    \*    \*

(c) \* \* \*

(4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses;

(5) Candidate's personal financial disclosure; or

(6) Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35.

## PART 110—CONTRIBUTION AND EXPENDITURE LIMITATIONS AND PROHIBITIONS

20. The authority citation for part 110 continues to be read as follows:

**Authority:** 2 U.S.C. 431(8), 431(9), 432(c)(2), 437d(a)(8), 438(a)(8), 441a, 441b, 441d, 441e, 441f, 441g, 441h.

21. Section 110.1 is amended by adding new paragraph (c)(5) to read as follows:

### §110.1  Contributions by persons other than multicandidate political committees

(2 U.S.C. 441a(a)(1)).

\*    \*    \*    \*    \*

(c) \* \* \*

(5) On or after January 1, 2003, no person shall make contributions to a political committee established and maintained by a State committee of a political party in any calendar year that, in the aggregate, exceed $10,000.

\*    \*    \*    \*    \*

## PART 114—CORPORATE AND LABOR ORGANIZATION ACTIVITY

22. The authority citation for part 114 continues to read as follows:

**Authority:** 2 U.S.C. 431(8)(B), 431(9)(B), 432, 434(a)(11), 437d(a)(8), 438(a)(8), 441b.

23. Section 114.1 is amended by revising paragraph (a)(2)(ix) to read as follows:

### §114.1  Definitions.

(a) \* \* \*

(2) \* \* \*

(ix) Donations to a State or local party committee used for the purchase or construction of its office building are subject to 11 CFR 300.35. No exception applies to contributions or donations to a national party committee that are made or used for the purchase or construction of any office building or facility; or

\*    \*    \*    \*    \*

24. Subchapter C consisting of part 300 is added to Chapter I to read as follows:

## SUBCHAPTER C—BIPARTISAN CAMPAIGN REFORM ACT OF 2002— (BCRA) REGULATIONS

## PART 300—NON-FEDERAL FUNDS

Sec.

300.1  Scope, effective date, and organization.
300.2  Definitions.

### Subpart A—National Party Committees

300.10  General prohibitions on raising and spending non-Federal funds (2 U.S.C. 441; (a) and (c)).
300.11  Prohibition on fundraising for and donating to certain tax-exempt organizations (2 U.S.C. 441; (d)).
300.12  Transition rules.
300.13  Reporting (2 U.S.C. 431 note and 434 (e)).

### Subpart B—State, District, and Local Party Committees and Organizations

300.30  Accounts.
300.31  Receipt of Levin funds.
300.32  Expenditures and disbursements.
300.33  Allocation of costs of Federal election activity.
300.34  Transfers.
300.35  Office buildings.
300.36  Reporting Federal election activity; recordkeeping.
300.37  Prohibitions on fundraising for and donating to certain tax-exempt organizations (2 U.S.C. 441i (d)).

### Subpart C—Tax-Exempt Organizations

300.50  Prohibited fundraising by national party committees (2 U.S.C. 441i(d)).
300.51  Prohibited fundraising by State, district, and local party committees (2 U.S.C. 441i(d)).
300.52  Fundraising by Federal candidates and Federal officeholders (2 U.S.C. 441i(e)(4)).

### Subpart D—Federal Candidates and Officeholders

300.60  Scope (2 U.S.C. 441i (e)(1)).
300.61  Federal elections (2 U.S.C. 441i (e)(1)(A)).
300.62  Non-Federal elections (2 U.S.C. 441i (e)(1)(B)).
300.63  Exception for State party candidates (2 U.S.C. 441i (e)(2))
300.64  Exemption for attending, speaking, or appearing as a featured guest at fundraising events (2 U.S.C. 441i (e)(3)).
300.65  Exceptions for certain tax-exempt organizations (2 U.S.C. 441i (e)(1) and (4)).

### Subpart E—State and Local Candidates

300.70  Scope (2 U.S.C. 441i (f)(1)).
300.71  Federal funds required for certain public communications (2 U.S.C. 441i(f)(1)).
300.72  Federal funds not required for certain communications (2 U.S.C. 441i(f)(2)).

**Authority:** 2 U.S.C. 434(e), 438(a)(8), 441a(a)(i), 441i, 453.

### §300.1  Scope and effective date, and organization.

(a) *Introduction.* This part implements changes to the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"), enacted by Title I of the Bipartisan Campaign Finance Reform Act of 2002 ("BCRA"). Public Law 107–155. Unless expressly stated to the contrary, nothing in this part alters the definitions, restrictions, liabilities, and obligations imposed by sections 431 to 455 of Title 2, United States Code, or regulations prescribed thereunder (11 CFR parts 100 to 116).

(b) *Effective dates.*

(1) Except as otherwise specifically provided in this part, this part shall take effect on November 6, 2002. However, subpart B of this part shall not apply with respect to runoff elections, recounts, or election contests resulting from elections held prior to such date. *See* 11 CFR 300.12 for transition rules applicable to subpart A of this part.

(2) The increase in individual contribution limits to State committees of political parties, as described in 11 CFR 110.1(c)(5), shall apply to contributions made on or after January 1, 2003.

(c) *Organization of part.* Part 300, which generally addresses non-Federal funds and closely related topics, is organized into five subparts. Each subpart is oriented to the perspective of a category of persons facing issues related to non-Federal funds.

(1) Subpart A of this part prescribes rules pertaining to national party committees, including general non-Federal funds prohibitions, fundraising, and donation prohibitions with regard to certain tax-exempt organizations, transition rules as BCRA takes effect, and reporting.

(2) Subpart B of this part pertains to State, district, and local party committees and organizations. Subpart B of this part focuses on "Levin Amendment" to BCRA; office buildings; and fundraising and donation prohibitions with regard to certain tax-exempt organizations.

(3) Subpart C of this part addresses non-Federal funds from the perspective of tax-exempt organizations, setting out rules about prohibited fundraising for certain tax-exempt organizations by national party committees, State, district, and local party committees, and Federal candidates and officeholders.

(4) Subpart D of this part includes regulations pertaining to soliciting non-Federal funds from the perspective of Federal candidates and officeholders in Federal and non-Federal elections; including exceptions for those who are also State candidates and exemptions for those attending, speaking, and appearing as featured guests at fundraising events, or who solicit for certain tax-exempt organizations.

(5) Subpart E of this part focuses on State and local candidates, including regulations about using Federal funds for certain public communications, and

exceptions for entirely non-Federal communications.

(6) For rules pertaining to convention and host committees, see 11 CFR part 9008.

## § 300.2  Definitions.

(a) *501(c) organization that makes expenditures or disbursements in connection with a Federal election.* A 501(c) organization *that makes expenditures or disbursements in connection with a Federal election* as that term is used in 11 CFR 300.11, 300.37, 300.50, and 300.51 includes an organization that, within the current election cycle, plans to:

(1) Make expenditures or disbursements in connection with an election for Federal office including for Federal election activity; or

(2) Pay a debt incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior election cycle.

(b) *Agent.* For the purposes of part 300 of chapter I, agent means any person who has actual authority, either express or implied, to engage in any of the following activities on behalf of the specified persons:

(1) In the case of a national committee of a political party:

(i) To solicit, direct, or receive any contribution, donation, or transfer of funds; or,

(ii) To solicit any funds for, or make or direct any donations to, an organization that is described in 26 U.S.C 501(c) and exempt from taxation under 26 U.S.C. 501(a) (or has submitted an application for determination of tax exempt status under 26 U.S.C. 501(a)), or an organization described in 26 U.S.C. 527 (other than a political committee, a State, district, or local committee of a political party, or the authorized campaign committee of a candidate for State or local office).

(2) In the case of a State, district, or local committee of a political party:

(i) To expend or disburse any funds for Federal election activity; or

(ii) To transfer, or accept a transfer of, funds to make expenditures or disbursements for Federal election activity; or

(iii) To engage in joint fundraising activities with any person if any part of the funds raised are used, in whole or in part, to pay for Federal election activity; or

(iv) To solicit any funds for, or make or direct any donations to, an organization that is described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a) (or has submitted

an application for determination of tax exempt status under 26 U.S.C. 501(a)), or an organization described in 26 U.S.C. 527 (other than a political committee, a State, district, or local committee of a political party, or the authorized campaign committee of a candidate for State or local office).

(3) In the case of an individual who is a Federal candidate or an individual holding Federal office, to solicit, receive, direct, transfer, or spend funds in connection with any election.

(4) In the case of an individual who is a candidate for State or local office, to spend funds for a public communication (*see* 11 CFR 100.26).

(c) *Directly or indirectly establish, maintain, finance, or control.*

(1) This paragraph (c) applies to national, State, district, and local committees of a political party, candidates, and holders of Federal office, including an officer, employee, or agent of any of the foregoing persons, which shall be referred to as "sponsors" in this section.

(2) To determine whether a sponsor directly or indirectly established, finances, maintains, or controls an entity, the factors described in paragraphs (c)(2)(i) through (x) of this section must be examined in the context of the overall relationship between sponsor and the entity to determine whether the presence of any factor or factors is evidence that the sponsor directly or indirectly established, finances, maintains, or controls the entity. Such factors include, but are not limited to:

(i) Whether a sponsor, directly or through its agent, owns controlling interest in the voting stock or securities of the entity;

(ii) Whether a sponsor, directly or through its agent, has the authority or ability to direct or participate in the governance of the entity through provisions of constitutions, bylaws, contracts, or other rules, or through formal or informal practices or procedures;

(iii) Whether a sponsor, directly or through its agent, has the authority or ability to hire, appoint, demote, or otherwise control the officers, or other decision-making employees or members of the entity;

(iv) Whether a sponsor has a common or overlapping membership with the entity that indicates a formal or ongoing relationship between the sponsor and the entity;

(v) Whether a sponsor has common or overlapping officers or employees with the entity that indicates a formal or ongoing relationship between the sponsor and the entity;

(vi) Whether a sponsor has any members, officers, or employees who were members, officers or employees of the entity that indicates a formal or ongoing relationship between the sponsor and the entity, or that indicates the creation of a successor entity;

(vii) Whether a sponsor, directly or through its agent, provides funds or goods in a significant amount or on an ongoing basis to the entity, such as through direct or indirect payments for administrative, fundraising, or other costs, but not including the transfer to a committee of its allocated share of proceeds jointly raised pursuant to 11 CFR 102.17, and otherwise lawfully;

(viii) Whether a sponsor, directly or through its agent, causes or arranges for funds in a significant amount or on an ongoing basis to be provided to the entity, but not including the transfer to a committee of its allocated share of proceeds jointly raised pursuant to 11 CFR 102.17, and otherwise lawfully;

(ix) Whether a sponsor, directly or through its agent, had an active or significant role in the formation of the entity; and

(x) Whether the sponsor and the entity have similar patterns of receipts or disbursements that indicate a formal or ongoing relationship between the sponsor and the entity.

(3) *Safe harbor.* On or after November 6, 2002, an entity shall not be deemed to be directly or indirectly established, maintained, or controlled by another entity unless, based on the entities' actions and activities solely after November 6, 2002, they satisfy the requirements of this section. If an entity receives funds from another entity prior to November 6, 2002, and the recipient entity disposes of the funds prior to November 6, 2002, the receipt of such funds prior to November 6, 2002 shall have no bearing on determining whether the recipient entity is financed by the sponsoring entity within the meaning of this section.

(4) *Determinations by the Commission.*

(i) A sponsor or entity may request an advisory opinion of the Commission to determine whether the sponsor is no longer directly or indirectly financing, maintaining, or controlling the entity for purposes of this part. The request for such an advisory opinion must meet the requirements of 11 CFR part 112 and must demonstrate that the entity is not directly or indirectly financed, maintained, or controlled by the sponsor.

(ii) Notwithstanding the fact that a sponsor may have established an entity within the meaning of paragraph (c)(2) of this section, the sponsor or the entity

**49122**    Federal Register / Vol. 67, No. 145 / Monday, July 29, 2002 / Rules and Regulations

may request an advisory opinion of the Commission determining that the relationship between the sponsor and the entity has been severed. The request for such an advisory opinion must meet the requirements of 11 CFR part 112, and must demonstrate that all material connections between the sponsor and the entity have been severed for two years.

(iii) Nothing in this section shall require entities that are separate organizations on November 6, 2002 to obtain an advisory opinion to operate separately from each other.

(d) *Disbursement. Disbursement* means any purchase or payment made by:

(1) A political committee; or

(2) Any other person, including an organization that is not a political committee, that is subject to the Act.

(e) *Donation.* For purposes of part 300, *donation* means a payment, gift, subscription, loan, advance, deposit, or anything of value given to a person, but does not include contributions.

(f) *Federal account. Federal account* means an account at a campaign depository that contains funds to be used in connection with a Federal election.

(g) *Federal Funds. Federal funds* mean funds that comply with the limitations, prohibitions, and reporting requirements of the Act.

(h) *Levin account. Levin account* means an account at a campaign depository established by a State, district, or local committee of a political party pursuant to 11 CFR 300.30, for purposes of making expenditures or disbursements for Federal election activity or non-Federal activity (subject to State law) under 11 CFR 300.32.

(i) *Levin funds* mean funds that are raised pursuant to 11 CFR 300.31 and are or will be disbursed pursuant to 11 CFR 300.32.

(j) *Non-Federal account* means an account that contains funds to be used in connection with a State or local election or allocable expenses under 11 CFR 106.7, 300.30, or 300.33.

(k) *Non-Federal funds* mean funds that are not subject to the limitations and prohibitions of the Act.

(l) [Reserved].

(m) *To solicit.* For the purposes of part 300, *to solicit* means to ask that another person make a contribution, donation, transfer of funds, or otherwise provide anything of value, whether the contribution, donation, transfer of funds, or thing of value, is to be made or provided directly, or through a conduit or intermediary. A solicitation does not include merely providing

information or guidance as to the requirement of particular law.

(n) *To direct.* For the purposes of part 300, *to direct* means to ask a person who has expressed an intent to make a contribution, donation, or transfer of funds, or to provide anything of value, to make that contribution, donation, or transfer of funds, or to provide that thing of value, including through a conduit or intermediary. Direction does not include merely providing information or guidance as to the requirement of particular law.

(o) *Individual holding Federal office. Individual holding Federal office* means an individual elected to or serving in the office of President or Vice President of the United States; or a Senator or a Representative in, or Delegate or Resident Commissioner to, the Congress of the United States.

**Subpart A—National Party Committees**

**§ 300.10   General prohibitions on raising and spending non-Federal funds (2 U.S.C. 441i(a) and (c)).**

(a) *Prohibitions.* A national committee of a political party, including a national congressional campaign committee, must not:

(1) Solicit, receive, or direct to another person a contribution, donation, or transfer of funds, or any other thing of value that is not subject to the prohibitions, limitations and reporting requirements of the Act;

(2) Spend any funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act; or

(3) Solicit, receive, direct, or transfer to another person, or spend, Levin funds.

(b) *Fundraising costs.* A national committee of a political party, including a national congressional campaign committee, must use only Federal funds to raise funds that are used, in whole or in part, for expenditures and disbursements for Federal election activity.

(c) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee or a national congressional campaign committee; and

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a national party committee or a national congressional campaign committee.

**§ 300.11   Prohibitions on fundraising for and donating to certain tax-exempt organizations (2 U.S.C 441i(d)).**

(a) *Prohibitions.* A national committee of a political party, including a national

congressional campaign committee, must not solicit any funds for, or make or direct any donations to the following organizations:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax-exempt status under 26 U.S.C. 501(c) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527, unless the organization is:

(i) A political committee under 11 CFR 100.5;

(ii) A State, district, or local committee of a political party; or

(iii) The authorized campaign committee of a State or local candidate;

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee, including a national congressional campaign committee;

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a national party committee, including a national congressional campaign committee, or an officer or agent acting on behalf of such an entity;

(3) An entity that is directly or indirectly established, financed, maintained, or controlled by an agent of a national, State, district, or local committee of a political party including a national congressional campaign committee.

(c) *Determining whether a section 501(c) organization makes expenditures or disbursements in connection with Federal elections.* In determining whether a section 501(c) organization is one that makes expenditures or disbursements in connection with a Federal election, including expenditures or disbursements for Federal election activity, pursuant to paragraphs (a)(1) and (2) of this section, a national committee of a political party, including a national congressional campaign committee, or any other person described in paragraph (b) of this section, may obtain and rely upon a certification from the organization that satisfies the criteria described in paragraph (d) of this section.

(d) *Certification.* A national committee of a political party, including

a national congressional campaign committee, or any person described in paragraph (b) of this section, may rely upon a certification that meets all of the following criteria:

(1) The certification is a signed written statement by an officer or other authorized representative of the organization with knowledge of the organization's activities;

(2) The certification states that within the current election cycle, the organization has not made, and does not intend to make, expenditures or disbursements in connection with an election for Federal office (including for Federal election activity); and

(3) The certification states that the organization does not intend to pay debts incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior election cycle.

(e) If a national committee of a political party or any person described in paragraph (b) of this section has actual knowledge that the certification is false, the certification may not be relied upon.

(f) It is not prohibited for a national party or its agent to respond to a request for information about a tax-exempt group that shares the party's political or philosophical goals.

### § 300.12  Transition rules.

(a) *Permissible uses of excess non-Federal funds.* Non-Federal funds received before November 6, 2002, by a national committee of a political party, including a national congressional campaign committee, and in its possession on that date, must be used before January 1, 2003. Subject to the restrictions in paragraph (b) of this section, such funds may be used solely as follows:

(1) To retire outstanding debts or obligations that were incurred solely in connection with an election held prior to November 6, 2002; or

(2) To pay expenses, retire outstanding debts, or pay for obligations incurred solely in connection with any run-off election, recount, or election contest resulting from an election held prior to November 6, 2002.

(b) *Prohibited uses of non-Federal funds.* Non-Federal funds received by a national committee of a political party, including a national congressional campaign committee, before November 6, 2002, and in its possession on that date, may not be used for the following purposes:

(1) To pay any expenditure as defined in 2 U.S.C. 431(9);

(2) To retire outstanding debts or obligations that were incurred for any expenditure; or

(3) To defray the costs of the construction or purchase of any office building or facility.

(c) Any non-Federal funds remaining after payment of debts and obligations permitted in paragraph (a) of this section must be either disgorged to the United States Treasury, or returned by check to the donors, no later than December 31, 2002. Any refund checks not cashed by February 28, 2003 must be disgorged to the United States Treasury by March 31, 2003.

(d) *National party committee office building or facility accounts.* Before November 6, 2002, a national committee of a political party, including a national congressional campaign committee, may accept funds into its party office building or facility account, established pursuant to repealed 2 U.S.C. 431(8)(B)(viii), and may use the funds in the account only for the construction or purchase of an office building or facility. After November 5, 2002, the national party committees may no longer accept funds into such an account and must not use such funds for the purchase or construction of any office building or facility. Funds on deposit in any party office building or facility account on November 6, 2002, must be either disgorged to the United States Treasury or returned by check to the donors no later than December 31, 2002. Any refund checks not cashed by February 28, 2003 must be disgorged to the United States Treasury by March 31, 2003.

(e) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee or a national congressional campaign committee; and

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a national party committee or a national congressional campaign committee.

(f) *Treatment of Federal and non-Federal accounts during transition period.* The following provisions applicable to the allocation of, and payment for, expenses between Federal and non-Federal accounts of national party committees shall remain in effect between November 6 and December 31, 2002: 11 CFR 106.5(a),(b), (c), (f) and (g).

### § 300.13  Reporting (2 U.S.C. 431 note and 434(e)).

(a) *In general.* The national committee of a political party, any national congressional campaign committee of a political party, and any subordinate committee of either, shall report all receipts and disbursements during the reporting period.

(b) *Termination report for non-Federal accounts.* Unless a committee described in paragraph (a) of this section issues refund checks to donors as permitted by 11 CFR 300.12(c), each committee described in paragraph (a) of this section must file a termination report disclosing the disposition of funds in all non-Federal accounts and building fund accounts by January 31, 2003. Each committee that issues refund checks to donors must file a termination report covering the period ending March 31, 2003 disclosing the disposition of any refund checks not cashed by February 28, 2003, as required by 11 CFR 300.12(c) and (d).

(c) *Transitional reporting rules.*

(1) The reporting requirements covering receipts in 11 CFR 104.8(e) and (f) and disbursements in 11 CFR 104.9(e) for national party committee non-Federal accounts and building fund accounts shall remain in effect for the reports covering activity between November 6 and December 31, 2002.

(2) The reporting requirements covering disbursements in 11 CFR 104.9 (c) and (d) for national party committee non-Federal accounts and building fund accounts shall remain in effect for the reports covering activity between November 6, 2002 and March 31, 2003.

## Subpart B—State, District, and Local Party Committees and Organizations

### § 300.30  Accounts.

(a) *Scope and introduction.* This section applies to State, district, or local committees or organizations of a political party, whether or not the committee is a political committee under 11 CFR 100.5, that have receipts or make disbursements for Federal election activity. Paragraph (b) of this section describes and explains the types of accounts available to a political party committee or organization covered by this section. Paragraph (c) of this section sets out the account structure that must be maintained by a political party committee or organization covered by this section.

(b) *Types of accounts.* Each State, district, and local party organization or committee that has receipts or makes disbursements for Federal election activity must establish one or more of the following types of accounts, pursuant to paragraph (c) of this section.

(1) *Non-Federal accounts.* The funds deposited into this account are governed by State law. Disbursements, contributions, and expenditures made wholly or in part in connection with

49124   Federal Register / Vol. 67, No. 145 / Monday, July 29, 2002 / Rules and Regulations

Federal elections must not be made from any non-Federal account, except as permitted by paragraph (c)(3)(ii) of this section, 11 CFR 102.5(a)(4), 11 CFR 106.7(d)(1)(i), 11 CFR 300.33 and 11 CFR 300.34.

(2) *Levin account.* The funds deposited into this account must comply with 11 CFR 300.31. Such funds may be used for the categories of activities described at 11 CFR 300.32(b).

(3) *Federal account.* Federal accounts may be used for the deposit of contributions and the making of expenditures pursuant to the following conditions:

(i) Only contributions that are permissible pursuant to the limitations and prohibitions of the Act may be deposited into any Federal account, regardless of whether such contributions are for use in connection with Federal or non-Federal elections. *See* 11 CFR 103.3 regarding impermissible funds.

(ii) Only contributions solicited and received pursuant to the following conditions may be deposited in a Federal account:

(A) Contributions must be designated by the contributors for the Federal account;

(B) The solicitation must expressly state that contributions may be used wholly or in part in connection with a Federal election; or

(C) The contributor must be informed that all contributions are subject to the limitations and prohibitions of the Act.

(iii) All disbursements, contributions, and expenditures made wholly or in part by any State, district, or local party organization or committee in connection with a Federal election must be made from either:

(A) A Federal account, except as permitted by 11 CFR 300.32; or

(B) A separate allocation account (*see* paragraph (b)(4) of this section).

(iv) If all payments in connection with a Federal election, including payments for Federal election activities, are to be made from a Federal account, expenditures and disbursements for costs that are allocable pursuant to 11 CFR 106.7 or 11 CFR 300.33 may be made from the Federal account in their entirety, with the shares of a non-Federal account or of a Levin account being transferred to the Federal account pursuant to 11 CFR 106.7 and 11 CFR 300.33.

(v) No transfers may be made to a Federal account from any other account(s) maintained by a State, district, or local party committee or organization from any other party organization or committee at any level for the purpose of financing activity in connection with Federal elections, except as provided by paragraph (b)(3)(iv) of this section or 11 CFR 300.33 and 300.34.

(4) *Allocation accounts.* At the discretion of the party committee or organization, separate allocation accounts may be established for purposes of making allocable expenditures and disbursements.

(i) Only funds from the party organization's or committee's Federal and non-Federal accounts may be deposited into an allocation account used to make allocable expenditures and disbursements for activities in connection with Federal and non-Federal elections.

(ii) Only funds from the party organization's or committee's Federal account and Levin funds from its non-Federal or Levin account(s) may be deposited into an allocation account used to make allocable expenditures and disbursements for activities undertaken pursuant to 11 CFR 300.32(b).

(iii) Once a party organization or committee has established a separate allocation account for activities in connection with Federal and non-Federal elections and a separate account for activities undertaken pursuant to 11 CFR 300.32(b), all allocable expenses must be paid from the appropriate allocation account for as long as that account is maintained.

(iv) The party organization or committee must transfer to the appropriate allocation account funds from its Federal and non-Federal or Levin accounts in amounts proportionate to the Federal, non-Federal and Levin shares of each allocable expense pursuant to 11 CFR 106.7 and 11 CFR 300.33. The transfers must be made pursuant to 11 CFR 300.33 and 300.34.

(v) No funds contained in an allocation account may be transferred to any other account maintained by the party committee or organization.

(vi) For reporting purposes, all allocation accounts must be treated as Federal accounts.

(c) *Required account or accounts.* Each State, district, and local party organization or committee that has receipts or makes disbursements for Federal election activity must establish its accounts in accordance with paragraphs (c)(1), or (c)(2), or (c)(3) of this section.

(1) One or more Federal accounts in a campaign depository, in accordance with 11 CFR part 103, which must be treated as a separate political committee and be required to comply with the requirements of the Act including the registration and reporting requirements of 11 CFR part 102 and part 104. State, district, and local party organizations or committees may choose to make non-Federal disbursements, subject to State law, and disbursements for Federal election activity from a Federal account provided that such disbursements are reported pursuant to 11 CFR 104.17 and 11 CFR 300.36, and provided that contributors of the Federal funds so used were notified that their contributions were subject to the limitations and prohibitions of the Act.

(2) Establish at least three separate accounts in depositories as follows—

(i) One or more Federal accounts;

(ii) One or more Levin accounts; and

(iii) One or more Non-Federal accounts.

(3) Establish two separate accounts in depositories as follows:

(i) One or more Federal accounts, and;

(ii) An account that must function as both a Non-Federal account and a Levin account. If such an account is used, the State, district, and local party must demonstrate through a reasonable accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) that whenever such organization makes a disbursement for activities undertaken pursuant to 11 CFR 300.32(b), that organization had received sufficient contributions or Levin funds to make such disbursement.

(d) *Recordkeeping.* All party organizations or committees must keep records of deposits into and disbursements from such accounts, and, upon request, must make such records available for examination by the Commission.

**§ 300.31   Receipt of Levin funds.**

(a) *General rule.* Levin funds expended or disbursed by any State, district, or local committee must be raised solely by the committee that expends or disburses them.

(b) *Compliance with State law.* Each donation of Levin funds solicited or accepted by a State, district, or local committee of a political party must be lawful under the laws of the State in which the committee is organized.

(c) *Donations from sources permitted by State law but prohibited by the Act.* If the laws of the State in which a State, district, or local committee of a political party is organized permit donations to the committee from a source prohibited by the Act and this chapter, other than 2 U.S.C. 441e, the committee may solicit and accept donations of Levin funds from that source, subject to paragraph (d) of this section.

(d) *Donation amount limitation.*
(1) *General rule.* A State, district, or local committee of a political party must not solicit or accept from any person (including any entity established, financed, maintained, or controlled by such person) one or more donations of Levin funds aggregating more than $10,000 in a calendar year.

(2) *Effect of different State limitations.* If the laws of the State in which a State, district, or local committee of a political party is organized limit donations to that committee to less than the amount specified in paragraph (d)(1) of this section, then the State law amount limitations shall control. If the laws of the State in which a State, district, or local committee of a political party is organized permit donations to that committee in amounts greater than the amount specified in paragraph (d)(1) of this section, then the amount limitations in paragraph (d)(1) of this section shall control.

(3) *No affiliation of committees for purposes of this paragraph.* For purposes of determining compliance with paragraph (d) of this section only, State, district, and local committees of the same political party shall not be considered affiliated. Subject to the amount limitations specified in paragraphs (d)(1) and (d)(2) of this section, a person (including any entity directly or indirectly established, financed, maintained, or controlled by such person) may donate without additional limitation to each and every State, district, and local committee of a political party.

(e) *No Levin funds from a national party committee or a Federal candidate or officeholder.* A State, district, or local committee of a political party disbursing Levin funds pursuant to 11 CFR 300.32 must not accept or use for such purposes any donations or other funds that are solicited, received, directed, transferred, or spent by or in the name of any of the following persons:

(1) A national committee of a political party (including a national congressional campaign committee of a political party), any officer or agent acting on behalf of such a national party committee, or any entity that is directly or indirectly established, financed, maintained, or controlled by such a national party committee. Notwithstanding 11 CFR 102.17, a State, district, or local committee of a political party must not raise Levin funds by means of joint fundraising with a national party committee, any officer or agent acting on behalf of such a national party committee, or any entity that is directly or indirectly established, financed, maintained, or

controlled by such a national party committee. Nothing in this section shall be construed to prohibit a State, district, or local committee of a political party from jointly raising. under 11 CFR 102.17, Federal funds not to be used for Federal election activity with a national committee of a political party, or its agent, or any entity directly or indirectly established, financed, maintained, or controlled by such a national party committee.

(2) A Federal candidate, or an individual holding Federal office, or an agent of a Federal candidate or officeholder, or an entity directly or indirectly established, financed, maintained, or controlled by, or acting on behalf of, one or more Federal candidates or individuals holding Federal office. Notwithstanding 11 CFR 102.17, a State, district, or local committee of a political party must not raise Levin funds by means of joint fundraising with a Federal candidate, an individual holding Federal office, or an entity directly or indirectly established, financed, maintained, or controlled by, or acting on behalf of, one or more candidates or individuals holding Federal office. A Federal candidate or individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party at which Levin funds are raised. *See* 11 CFR 300.64.

(f) *Certain joint fundraising prohibited.* Notwithstanding 11 CFR 102.17, a State, district, or local committee of a political party must not raise Levin funds by means of joint fundraising activity with any other State, district, or local committee of any political party, the agent of such a committee, or an entity directly or indirectly established, financed, maintained, or controlled by such a committee. This prohibition includes State, district, and local committees of a political party organized in another State. Nothing in this section shall be construed to prohibit two or more State, district, or local committees of a political party from jointly raising, under 11 CFR 102.17, Federal funds not to be used for Federal election activity.

(g) *Safe Harbor.* The use of a common vendor for fundraising by more than one State, district, or local committee or a political party, or the agent of such a committee does not constitute joint fundraising within the meaning of this section.

**§ 300.32  Expenditures and disbursements.**
(a) *Federal funds.*
(1) An association or similar group of candidates for State or local office, or an

association or similar group of individuals holding State or local office, must make any expenditures or disbursements for Federal election activity solely with Federal funds.

(2) Except as provided in this part, a State, district, or local committee of a political party that makes expenditures or disbursements for Federal election activity must use Federal funds for that purposes, subject to the provisions of this chapter.

(3) State, district, and local party committees that raise Federal funds to be used, in whole or in part, for Federal election activities must pay the direct costs of such fundraising only with Federal funds. The direct costs of a fundraising program or event include expenses for the solicitation of funds and for the planning and administration of actual fundraising programs and events.

(4) State, district, and local party committees that raise Levin funds to be used, in whole or in part, for Federal election activity must pay the direct costs of such fundraising with either Federal or Levin funds. The direct costs of a fundraising program or event include expenses for the solicitation of funds and for the planning and administration of actual fundraising programs and events.

(b) *Levin funds.* A State, district, or local committee of a political party may spend Levin funds in accordance with this part on the following types of activity:

(1) Subject to the conditions set out in paragraph (c) of this section, only the following types of Federal election activity:

(i) Voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election; and

(ii) Voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot).

(2) Any use that is lawful under the laws of the State in which the committee is organized, other than the Federal election activities defined in 11 CFR 100.24(b)(3) and (4). A disbursement of Levin funds under this paragraph need not comply with paragraphs (c)(1) and (c)(2) of this section, except as required by State law.

(c) *Conditions and restrictions on spending Levin funds.*
(1) The Federal election activity for which the disbursement is made must

not refer to a clearly identified candidate for Federal office.

(2) The disbursement must not pay for any part of the costs of any broadcasting, cable, or satellite communication, other than a communication that refers solely to a clearly identified candidate for State or local office.

(3) The disbursement must be made from funds raised in accordance with 11 CFR 300.31.

(4) The disbursements for allocable Federal election activity that exceed in the aggregate $5,000 in a calendar year may be paid for entirely with Federal funds or may be allocated between Federal funds and Levin funds according to 11 CFR 300.33. Disbursements for Federal election activity that may be allocated and that aggregate $5,000 or less in a calendar year may be paid for entirely with Federal funds, entirely with Levin funds, or may be allocated between Federal funds and Levin funds according to 11 CFR 300.33.

(d) *Non-Federal activities.* A State, district, or local committee of a political party that makes disbursements for non-Federal activity may make those disbursements from its Federal, Levin, or non-Federal funds, subject to the laws of the State in which it is organized. A State, district, or local party committee that engages in fundraising for solely non-Federal funds may pay the costs related to such fundraising from any account, subject to State law, including a Federal account.

§ 300.33   Allocation of costs of Federal election activity.

(a) *Costs of Federal election activity allocable by State, district, and local party committees and organizations.*

(1) *Costs of voter registration.* Subject to the conditions of 11 CFR 300.32(c), State, district, and local party committees and organizations may allocate disbursements or expenditures, except salaries and wages for employees, between Federal funds and Levin funds for voter registration activity, as defined in 11 CFR 100.24(a)(2), that takes place during the period that begins on the date that is 120 days before the date of a regularly scheduled Federal election and that ends on the date of the election, provided that the activity does not refer to a clearly identified Federal candidate.

(2) *Costs of voter identification, get-out-the-vote activity, or generic campaign activities within certain time periods.* Subject to the conditions of 11 CFR 300.32(c), State, district, and local party committees and organizations may allocate disbursements or expenditures,

except salaries and wages for employees, between Federal funds and Levin funds for voter identification, get-out-the-vote activity, or generic campaign activities, as defined in 11 CFR 100.24(a)(3) and (4) and 11 CFR 100.25, that are conducted in connection with an election in which a candidate for Federal office is on the ballot and within the time periods set forth in 11 CFR 100.24(a)(1), provided that the activity does not refer to a clearly identified Federal candidate.

(b) *Allocation percentages.* State, district, and local party committees and organizations that choose to allocate between Federal funds and Levin funds their expenditures and disbursements, except for salaries and wages, in connection with activities described in paragraph (a) of this section that take place within the time periods set forth in 11 CFR 100.24(a)(1) or paragraph (a) of this section must allocate the following minimum percentages to their Federal funds:

(1) *Presidential election years.* If a Presidential candidate, but no Senate candidate appears on the ballot, State, district, and local party committees and organizations must allocate at least 28% of expenses for activities described in paragraph (a) of this section to their Federal funds.

(2) *Presidential and Senate election year.* If a Presidential candidate and a Senate candidate appear on the ballot, State, district, and local party committees and organizations must allocate at least 36% of expenses for activities described in paragraph (a) of this section to their Federal funds.

(3) *Senate election year.* If a Senate candidate, but no Presidential candidate, appears on the ballot, State, district, and local party committees and organizations must allocate at least 21% of expenses for activities described in paragraph (a) of this section to their Federal funds.

(4) *Non-Presidential and non-Senate year.* If neither a Presidential nor a Senate candidate appears on the ballot, State, district, and local party committees and organizations must allocate at least 15% of expenses for activities described in paragraph (a) of this section to their Federal funds.

(c) *Costs of Federal election activity not allocable by State, district, and local party committees.* The following costs incurred by State, district, and local party committees and organizations must be paid only with Federal funds:

(1) *Public communications.* Expenditures for public communications as defined in 11 CFR 100.26 by State, district, and local party committees and organizations that refer

to a clearly identified candidate for Federal office and that promote, support, attack, or oppose any such candidate for Federal office must not be allocated between or among Federal, non-Federal, and Levin accounts. Only Federal funds may be used.

(2) *Salaries and wages.* Salaries and wages for employees who spend more than 25% of their compensated time in a given month on Federal election activity or activities in connection with a Federal election must not be allocated between or among Federal, non-Federal, and Levin accounts. Only Federal funds may be used. Salaries and wages for employees who spend 25% or less of their compensated time in a given month on Federal election activity or activities in connection with a Federal election shall be paid from funds that comply with State law.

(3) *Fundraising costs.* Disbursements for direct fundraising costs incurred by State, district, and local party committees and organizations for funds to be used, in whole or in part, for Federal election activity, including the activities described in paragraph (a) of this section, must not be allocated between or among Federal, non-Federal and Levin funds. Only Federal or Levin funds may be used.

(d) *Transfers between accounts to cover allocable expenses.* State, district, and local party committees and organizations may transfer Levin funds from their Levin or non-Federal accounts to their Federal accounts or to allocation accounts solely to meet expenses allocable pursuant to paragraphs (a)(1) and (2) of this section and only pursuant to the following methods:

(1) *Payments from Federal accounts or from allocation accounts.*

(i) If Federal accounts are used to make payments for allocable activities, State, district, and local party committees and organizations must pay the entire amount of allocable expenses from their Federal accounts and transfer Levin funds from their Levin or non-Federal accounts to their Federal accounts solely to cover the portions of the expenses for which Levin funds may be used; or

(ii) State, district, and local party committees and organizations may establish separate allocation accounts into which Federal funds and Levin funds may be deposited solely for the purpose of paying allocable expenses.

(2) *Timing.*

(i) If Federal or allocation accounts are used to make allocable expenditures and disbursements, State, district, and local party committees and organizations must transfer Levin funds

to their Federal or allocation accounts to meet allocable expenses no more than 10 days before and no more than 60 days after the payments for which they are designated are made from a Federal or allocation account, except that transfers may be made more than 10 days before a payment is made from the Federal or allocation account if advance payment is required by the vendor(s) and if such payment is based on a reasonable estimate of the activity's final costs as determined by the committee and the vendor(s) involved.

(ii) Any portion of a transfer of Levin funds to a party committee or organization's Federal or allocation account that does not meet the requirement of paragraph (d)(2)(i) of this section shall be presumed to be a loan or contribution from the Levin or non-Federal account to the Federal or allocation account, in violation of the Act.

§ 300.34    Transfers.

(a) *Federal funds.*
(1) Notwithstanding 11 CFR 102.6(a)(1)(ii), a State, district, or local committee of a political party must not use any Federal funds transferred to it from, or otherwise accepted by it from, any of the persons enumerated in paragraphs (b)(1) and (b)(2) of this section as the Federal component of an expenditure or disbursement for Federal election activity under 11 CFR 300.32. A State, district, or local committee of a political party must itself raise the Federal component of an expenditure or disbursement allocated between Federal funds and Levin funds under 11 CFR 300.32 and 300.33.

(2) A State, district, or local committee of a political party that makes an expenditure or disbursement of Federal funds for Federal election activities must demonstrate through a reasonable accounting method approved by the Commission (including any method embedded in software provided or approved by the Commission) that the Federal funds used to make the expenditure or disbursement do not include Federal funds transferred to the committee in violation of this section. Alternatively, a State, district, or local committee of a political party may establish a separate Federal account into which the committee deposits only Federal funds raised by the committee itself, and from which all expenditures or disbursement of Federal funds for Federal election activities are made.

(b) *Levin funds.* Levin funds must be raised solely by the State, district, or local committee of a political party that expends or disburses the funds. A State, district, or local committee of a political

party must not use as Levin funds any funds transferred or otherwise provided to the committee by:
(1) Any other State, district, or local committee of any political party, any officer or agent acting on behalf of such a committee, or any entity directly or indirectly established, financed, maintained or controlled by such a committee; or,
(2) The national committee of any political party (including a national congressional campaign committee of a political party), any officer or agent acting on behalf of such a committee, or any entity directly or indirectly established, financed, maintained, or controlled by such a committee.

(c) *Allocation transfers.* Transfers of Levin funds between the accounts of a State, district, or local committee of a political party for allocation purposes must comply with 11 CFR 300.30 and 11 CFR 300.33.

§ 300.35    Office buildings.

(a) *General provision.* For the purchase or construction of its office building, a State or local party committee may spend Federal funds or non-Federal funds that are not subject to the limitations, prohibitions, and disclosure provisions of the Act, so long as such funds are not contributed or donated by a foreign national. *See* 2 U.S.C. 441e. If non-Federal funds are used, they are subject to State law. An office building must not be purchased or constructed for the purpose of influencing the election of any candidate in any particular election for Federal office. For purposes of this section, the term *local party committee* shall include a *district party committee.*

(b) *Application of State law.* Non-Federal funds received by a State or local party committee that are spent for the purchase or construction of its office building are subject to State law as set forth in paragraphs (b)(1) and (2) of this section.

(1) *Non-Federal account.* If a State or local party committee uses non-Federal funds, Federal law does not preempt or supersede State law as to the source of funds used, the permissibility of the disbursements, or the reporting of the receipt and disbursement of such funds, except as provided in paragraph (a) of this section.

(2) *Levin funds.* Levin funds may be used for the purchase or construction of a State or local party committee office building, if permitted by State law.

(c) *Leasing a portion of the party office building.* A State or local party committee may lease a portion of its office building to others to generate income at the usual and normal charge.

If the building is purchased or constructed in whole or in part with non-Federal funds, all rental income shall be deposited in the committee's non-Federal account and used only for non-Federal purposes. Such rental income and its use must also comply with State law. If the building is purchased or constructed solely with Federal funds, the rental income may be deposited in the Federal account. The receipt of such funds shall be reported in compliance with 11 CFR 104.3(a)(4)(vi).

(d) *Transitional Provisions for State Party Building or Facility Account.* Up to and including November 5, 2002, the State committee of a political party may accept funds into its party office building or facility account, established pursuant to repealed 2 U.S.C. 431(8)(B)(viii), designated for the purchase or construction of an office building. Starting on November 6, 2002, the funds in the account may not be used for Federal account or Levin account purposes, but may be used for any non-Federal purposes, as permitted under State law.

§ 300.36    Reporting Federal election activity; recordkeeping.

(a) *Requirements for a State, district, or local committee of a political party, or an association or similar group of candidates for State or local office or of individuals holding State or local office, that is not a political committee.*

(1) A State, district, or local committee of a political party, or an association or similar group of candidates for State or local office or of individuals holding State or local office, that is not a political committee (*see* 11 CFR 100.5) must demonstrate through a reasonable accounting method that whenever it makes a payment of Federal funds or Levin funds (if it is permitted to spend Levin funds) for Federal election activity (*see* 11 CFR 300.32 and 300.33) it has received sufficient funds subject to the limitations and prohibitions of the Act to make the payment. Such an organization must keep records of amounts received or expended under this paragraph and, upon request, shall make such records available for examination by the Commission.

(2) Notwithstanding the foregoing, a payment of Federal funds or Levin funds for Federal election activity shall not constitute an expenditure for purposes of determining whether a State, district, or local committee of a political party, or an association or similar group of candidates for State or local office or of individuals holding State or local office, qualifies as a

political committee under 11 CFR 100.5, unless the payment otherwise qualifies as an expenditure under 2 U.S.C. 431(9). A payment of Federal funds for Federal election activity that refers to a clearly identified Federal candidate and that meets the criteria of 11 CFR 100.8(b)(10), (16), or (18) *(exempt activities)* shall be treated as a payment for exempt activity in accordance with all applicable provisions of this chapter, including, but not limited to, 11 CFR 100.5(c).

(b) *Requirements for a State, district, or local committee of a political party, or an association or similar group of candidates for State or local office or of individuals holding State or local office, that is a political committee.*

(1) *Requirements for a State, district, or local committee of a political party that has less than $5,000 of aggregate receipts and disbursements for Federal election activity in a calendar year, and for an association or similar group of candidates for State or local office or of individuals holding State or local office at all times.* This paragraph applies to a State, district, or local committee of a political party that is a political committee, and that has less than $5,000 of aggregate receipts and disbursements for Federal election activity in a calendar year; and, at all times, to an association or similar group of candidates for State or local office or of individuals holding State or local office that is a political committee (*see* 11 CFR 100.5). Such a party committee or association of candidates or officeholders must report all receipts and disbursements of Federal funds for Federal election activity, including the Federally allocated portion of a payment for Federal election activity. A disbursement of Federal funds or Levin funds for Federal election activity (*see* 11 CFR 300.32 and 300.33) by either such a party committee or association of candidates or officeholders shall not be deemed an expenditure and reported as such pursuant to 11 CFR part 104, unless the disbursement otherwise qualifies as an expenditure under 2 U.S.C. 431(9).

(2) *Requirements for a State, district, or local committee of a political party that has $5,000 or more of aggregate receipts and disbursements for Federal election activity in a calendar year.* A State, district, or local committee of a political party that is a political committee (*see* 11 CFR 100.5) must report all receipts and disbursements made for Federal election activity if the aggregate amount of such receipts and disbursements is $5,000 or more during the calendar year. The disclosure required by this paragraph must include

receipts and disbursements of Federal funds and of Levin funds used for Federal election activity.

(i) *Reporting of allocation of expenses between Federal funds and Levin funds.* A State, district, or local committee of a political party that makes a disbursement for Federal election activity that is allocated between Federal funds and Levin funds (*see* 11 CFR 300.33) must report for each such disbursement:

(A) In the first report of a calendar year disclosing an allocated disbursement for Federal election activity, the committee must state the allocation percentages to be applied for allocable Federal election activity pursuant to 11 CFR 300.33(b).

(B) In each subsequent report in the calendar year itemizing an allocated disbursement for Federal election activity, the committee must state the category of Federal election activity (*see* 11 CFR 100.24(b)) for which each allocated disbursement was made, and must disclose the total amounts disbursed from Federal funds and Levin funds for that year to date for each such category.

(ii) *Reporting of allocation transfers.* A committee that makes allocated disbursements for Federal election activities in accordance with 11 CFR 300.33(d) shall report each transfer of Levin funds from its Levin or non-Federal account, to its Federal account, and each transfer from its Levin or non-Federal account into an allocation account, for the purpose of making such disbursements. In the report covering the period in which each transfer occurred, the committee must explain in a memo entry the allocated disbursement to which the transfer relates and the date on which the transfer was made. If the transfer includes funds for the allocable costs of more than one category of Federal election activity, the committee must itemize the transfer, showing the amounts designated for each category.

(iii) *Reporting of allocated disbursements.* For each disbursement allocated between Federal funds and Levin funds, the committee must report the full name and address of each person to whom the disbursement was made, the date of the disbursement, amount, and purpose of the disbursement. If the disbursement is for the allocable costs of more than one category of Federal election activity, the committee must itemize the disbursement, showing the amounts designated for each category. The committee must also disclose the total amount disbursed from Federal funds

and Levin funds for Federal election activity that calendar year, to date, for each category of Federal election activity.

(iv) *Itemization.* The disclosure required by paragraph (b)(2) of this section must include, in addition to any other applicable reporting requirement of this chapter, the itemized disclosure of receipts and disbursements of $200 or more to or from any person for Federal election activities.

(3) *Reporting of disbursements allocated between Federal funds and non-Federal funds, other than Levin funds.* A State, district, or local committee of a political party that makes a disbursement for costs allocable between Federal and non-Federal funds, other than the costs of Federal election activity that is allocated between Federal funds and Levin funds under 11 CFR 300.33, must comply with 11 CFR 104.17.

(c) *Filing.*

(1) *Schedule.* A State, district, or local committee of a political party, or an association or similar group of candidates for State or local office or of individuals holding State or local office, that must file reports under paragraph (b) of this section must comply with the monthly filing schedule in 11 CFR 104.5(c)(3).

(2) *Electronic filing.* Receipts of Federal funds for Federal election activity that constitute contributions under 11 CFR 100.7, and disbursements of Federal funds for Federal election activity that constitute expenditures under 11 CFR 100.8, apply when determining whether a political committee must file reports in an electronic format under 11 CFR 104.18.

(d) *Recordkeeping.* A State, district, or local committee of a political party, or an association or similar group of candidates for State or local office or of individuals holding State or local office, that must file reports under paragraph (b) of this section must comply with the requirements of 11 CFR 104.14.

**§ 300.37 Prohibitions on fundraising for and donating to certain tax-exempt organizations (2 U.S.C. 441i(d)).**

(a) *Prohibitions.* A State, district, or local committee of a political party must not solicit any funds for, or make or direct any donations to:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax-exempt status under 26 U.S.C. 501(c) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527, unless the organization is:

(i) A political committee under 11 CFR 100.5;

(ii) A State, district, or local committee of a political party;

(iii) The authorized campaign committee of a State or local candidate; or

(iv) A political committee under State law, that supports only State or local candidates and that does not make expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity.

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a State, district, or local committee of a political party;

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee or a political party or an officer or agent acting on behalf of such an entity; or

(3) An entity that is directly or indirectly established, financed, maintained, or controlled by an agent of a State, district, or local committee of a political party.

(c) *Determining whether an organization makes expenditures or disbursements in connection with a Federal election.*

(1) In determining whether a section 501(c) organization is one that makes expenditures or disbursements in connection with a Federal election, including expenditures or disbursements for Federal election activity, pursuant to paragraphs (a)(1) and (2) of this section, a State, district, or local committee of a political party or any other person described in paragraph (b) of this section, may obtain and rely upon a certification from the organization that satisfies the criteria described in paragraph (d) of this section.

(2) In determining whether a section 527 organization is a State-registered political committee that supports only State or local candidates and does not make expenditures or disbursements in connection with a Federal election, including expenditures or disbursements for Federal election activity, pursuant to paragraph (a)(3)(iv)

of this section, a State, district, or local committee of a political party or any other person described in paragraph (b) of this section, may obtain and rely upon a certification from the organization that satisfies the criteria described in paragraph (d) of this section.

(d) *Certification.* A State, district, or local committee of a political party or any person described in paragraph (b) of this section may rely upon a certification that meets all of the following criteria:

(1) The certification is a signed written statement by an officer or other authorized representative of the organization with knowledge of the organization's activities or by the treasurer of the State-registered political committee described in paragraph (a)(3)(iv) of this section;

(2) The certification states that within the current election cycle, the organization or political committee has not made, and does not intend to make, expenditures or disbursements in connection with an election for Federal office (including for Federal election activity); and

(3) The certification states that the organization or political committee does not intend to pay debts incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior election cycle.

(e) If a State, district, or local committee of a political party or any person described in paragraph (b) of this section has actual knowledge that the certification is false, the certification may not be relied upon.

(f) It is not prohibited for a State, district, or local committee of a political party or its agents to respond to a request for information about a tax-exempt group that shares the party's political or philosophical goals.

## Subpart C—Tax-Exempt Organizations

### § 300.50  Prohibited fundraising by national party committees (2 U.S.C. 441i(d)).

(a) *Prohibitions on fundraising and donations.* A national committee of a political party, including a national congressional campaign committee, must not solicit any funds for, or make or direct any donations to the following organizations:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including

expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax-exempt status under 26 U.S.C. 501(c) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527, unless the organization is:

(i) A political committee under 11 CFR 100.5;

(ii) A State, district, or local committee of a political party; or

(iii) The authorized campaign committee of a State or local candidate;

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a national party committee, including a national congressional campaign committee;

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a national party committee, including a national congressional campaign committee, or an officer or agent acting on behalf of such an entity; or

(3) An entity that is directly or indirectly established, financed, maintained, or controlled by an agent of a national, State, district, or local committee of a political party, including a national congressional campaign committee.

(c) *Determining whether a section 501(c) organization makes expenditures or disbursements in connection with Federal elections.* In determining whether a section 501(c) organization is one that makes expenditures or disbursements in connection with a Federal election, including expenditures or disbursements for Federal election activity, pursuant to paragraphs (a)(1) and (2) of this section, a national committee of a political party, including a national congressional campaign committee, or any other person described in paragraph (b) of this section, may obtain and rely upon a certification from the organization that satisfies the criteria described in paragraph (d) of this section.

(d) *Certification.* A national committee of a political party, including a national congressional campaign committee, or any person described in paragraph (b) of this section, may rely upon a certification that meets all of the following criteria:

(1) The certification is a signed written statement by an officer or other authorized representative of the organization with knowledge of the organization's activities;

(2) The certification states that within the current election cycle, the organization has not made, and does not intend to make, expenditures or disbursements in connection with an election for Federal office (including for Federal election activity); and

(3) The certification states that the organization or political committee does not intend to pay debts incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior election cycle.

(e) *Reliance on false certification.* If a national committee of a political party or any person described in paragraph (b) of this section has actual knowledge that the certification is false, the certification may not be relied upon.

(f) *Requests for information.* It is not prohibited for a national party or its agent to respond to a request for information about a tax-exempt group that shares the party's political or philosophical goals.

### § 300.51  Prohibited fundraising by State, district, or local party committees (2 U.S.C. 441i(d)).

(a) *Prohibitions.* A State, district, or local committee of a political party must not solicit any funds for, or make or direct any donations to:

(1) An organization that is described in 26 U.S.C. 501(c) and exempt from taxation under section 26 U.S.C. 501(a) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity;

(2) An organization that has submitted an application for tax-exempt status under 26 U.S.C. 501(c) and that makes expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity; or

(3) An organization described in 26 U.S.C. 527, unless the organization is:

(i) A political committee under 11 CFR 100.5;

(ii) A State, district, or local committee of a political party;

(iii) The authorized campaign committee of a State or local candidate; or

(iv) A political committee under State law, that supports only State or local candidates and that does not make expenditures or disbursements in connection with an election for Federal office, including expenditures or disbursements for Federal election activity.

(b) *Application.* This section also applies to:

(1) An officer or agent acting on behalf of a State, district, or local committee of a political party;

(2) An entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee or a political party or an officer or agent acting on behalf of such an entity; or

(3) An entity that is directly or indirectly established, financed, maintained, or controlled by an agent of a State, district, or local committee of a political party.

(c) *Determining whether an organization makes expenditures or disbursements in connection with a Federal election.*

(1) In determining whether a section 501(c) organization is one that makes expenditures or disbursements in connection with a Federal election, including expenditures or disbursements for Federal election activity, pursuant to paragraphs (a)(1) and (2) of this section, a State, district, or local committee of a political party or any other person described in paragraph (b) of this section, may obtain and rely upon a certification from the organization that satisfies the criteria described in paragraph (d) of this section.

(2) In determining whether a section 527 organization is a State-registered political committee that supports only State or local candidates and does not make expenditures or disbursements in connection with a Federal election, including expenditures or disbursements for Federal election activity, pursuant to paragraph (a)(3)(iv) of this section, a State, district, or local committee of a political party or any other person described in paragraph (b) of this section, may obtain and rely upon a certification from the organization that satisfies the criteria described in paragraph (d) of this section.

(d) *Certification.* A State, district, or local committee of a political party or any person described in paragraph (b) of this section may rely upon a certification that meets all of the following criteria:

(1) The certification is a signed written statement by an officer or other authorized representative of the organization with knowledge of the organization's activities or by the treasurer of the State-registered political committee described in paragraph (a)(3)(iv) of this section;

(2) The certification states that within the current election cycle, the organization or political committee has not made, and does not intend to make, expenditures or disbursements in

connection with an election for Federal office (including for Federal election activity); and

(3) The certification states that the organization does not intend to pay debts incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior election cycle.

(e) If a State, district, or local committee of a political party or any person described in paragraph (b) of this section has actual knowledge that the certification is false, the certification may not be relied upon.

(f) It is not prohibited for a State, district, or local committee of a political party or its agents to respond to a request for information about a tax-exempt group that shares the party's political or philosophical goals.

### § 300.52  Fundraising by Federal candidates and Federal officeholders (2 U.S.C. 441i(e)(1)&(4)).

A Federal candidate, an individual holding Federal office, and an individual agent acting on behalf of either may make the following solicitations of funds on behalf of any organization described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a), or an organization that has submitted an application for determination of tax-exempt status under 26 U.S.C. 501(c):

(a) *General solicitations.* A Federal candidate, an individual holding Federal office, or an individual agent acting on behalf of either, may make a general solicitation of funds, without regard to source or amount limitation, if:

(1) The organization does not engage in activities in connection with an election, including any activity described in paragraph (c) of this section; or

(2)(i) The organization conducts activities in connection with an election, but the organization's principal purpose is not to conduct election activities or any activity described in paragraph (c) of this section; and

(ii) The solicitation is not to obtain funds for activities in connection with an election or any activity described in paragraph (c) of this section.

(b) *Specific solicitations.* A Federal candidate, an individual holding Federal office, or an individual agent acting on behalf of either, may make a solicitation explicitly to obtain funds for any activity described in paragraph (c) of this section or for an organization whose principal purpose is to conduct that activity, if:

(1) The solicitation is made only to individuals; and

(2) The amount solicited from any individual does not exceed $20,000 during any calendar year.

(c) *Voter registration, voter identification, get-out-the-vote activity and generic campaign activity.* This section applies to only the following types of Federal election activity:

(1) Voter registration activity, as described in 11 CFR 100.24(a)(2), during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election; or

(2) The following activities conducted in connection with an election in which one or more Federal candidates appear on the ballot (*see* 11 CFR 100.24(a)(1)), regardless of whether one or more State candidates also appears on the ballot:

(i) Voter identification as described in 11 CFR 100.24(a)(4);

(ii) Get-out-the-vote activity as described in 11 CFR 100.24(a)(3); or

(iii) Generic campaign activity as defined in 11 CFR 100.25.

(d) *Prohibited solicitations.* A Federal candidate, an individual holding Federal office, and an individual who is an agent acting on behalf of either, must not make any solicitation on behalf of any organization described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a), or an organization that has submitted an application for determination of tax-exempt status under 26 U.S.C. 501(c) for any election activity other than a Federal election activity as described in paragraph (c) of this section.

(e) *Safe Harbor.* In determining whether a 501(c) organization is one whose principal purpose is to conduct election activities, including activity described in paragraph (c) of this section, a Federal candidate, an individual holding Federal office, or an individual agent acting on behalf of either, may obtain and rely upon a certification from the organization that satisfies the following criteria:

(1) The certification is a signed written statement by an officer or other authorized representative of the organization with knowledge of the organization's activities;

(2) The certification states that the organization's principal purpose is not to conduct election activities, including election activity described in paragraph (c) of this section; and

(3) The certification states that the organization does not intend to pay debts incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior election cycle.

(f) If a Federal candidate, an individual holding Federal office, or an individual agent acting on behalf of either has actual knowledge that the certification is false, the certification may not be relied upon.

## Subpart D—Federal Candidates and Officeholders

### § 300.60  Scope (2 U.S.C. 441i(e)(1)).

This subpart applies to:

(a) Federal candidates;

(b) Individuals holding Federal office (*see* 11 CFR 300.2(o));

(c) Agents acting on behalf of a Federal candidate or individual holding Federal office; and

(d) Entities that are directly or indirectly established, financed, maintained, or controlled by, or acting on behalf of, one or more Federal candidates or individuals holding Federal office.

### § 300.61  Federal elections (2 U.S.C. 441i(e)(1)(A)).

No person described in 11 CFR 300.60 shall solicit, receive, direct, transfer, spend, or disburse funds in connection with an election for Federal office, including funds for any Federal election activity as defined in 11 CFR 100.24, unless the amounts consist of Federal funds that are subject to the limitations, prohibitions, and reporting requirements of the Act.

### § 300.62  Non-Federal elections (2 U.S.C. 441i(e)(1)(B)).

A person described in 11 CFR 300.60 may solicit, receive, direct, transfer, spend, or disburse funds in connection with any non-Federal election, only in amounts and from sources that are consistent with State law, and that do not exceed the Act's contribution limits or come from prohibited sources under the Act.

### § 300.63  Exception for State party candidates (2 U.S.C. 441i(e)(2)).

Section 300.62 shall not apply to a Federal candidate or individual holding Federal office who is a candidate for State or local office, if the solicitation, receipt or spending of funds is permitted under State law; and refers only to that State or local candidate, to any other candidate for that same State or local office, or both. If an individual is simultaneously running for both Federal and State or local office, the individual must raise, accept, and spend only Federal funds for the Federal election.

### § 300.64  Exemption for attending, speaking, or appearing as a featured guest at fundraising events (2 U.S.C. 441i(e)(3)).

Notwithstanding the provisions of 11 CFR 100.24, 300.61 and 300.62, a Federal candidate or individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party, including but not limited to a fundraising event at which Levin funds are raised, or at which non-Federal funds are raised. In light of the foregoing:

(a) State, district, or local committees of a political party may advertise, announce or otherwise publicize that a Federal candidate or individual holding Federal office will attend, speak, or be a featured guest at a fundraising event, including, but not limited to, publicizing such appearance in pre-event invitation materials and in other party committee communications; and

(b) Candidates and individuals holding Federal office may speak at such events without restriction or regulation.

### § 300.65  Exceptions for certain tax-exempt organizations (2 U.S.C. 441i(e)(1) and (4)).

A Federal candidate, an individual holding Federal office, and an individual agent acting on behalf of either may make the following solicitations of funds on behalf of any organization described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a), or an organization that has submitted an application for determination of tax-exempt status under 26 U.S.C. 501(c):

(a) *General solicitations.* A Federal candidate, an individual holding Federal office or an individual agent acting on behalf of either, may make a general solicitation of funds, without regard to source or amount limitation, if:

(1) The organization does not engage in activities in connection with an election, including any activity described in paragraph (c) of this section; or

(2)(i) The organization conducts activities in connection with an election, but the organization's principal purpose is not to conduct election activities or any activity described in paragraph (c) of this section; and

(ii) The solicitation is not to obtain funds for activities in connection with an election or any activity described in paragraph (c) of this section.

(b) *Specific solicitations.* A Federal candidate, an individual holding Federal office, or an individual agent acting on behalf of either, may make a solicitation explicitly to obtain funds for any activity described in paragraph (c)

of this section or for an organization whose principal purpose is to conduct that activity, if:

(1) The solicitation is made only to individuals; and

(2) The amount solicited from any individual does not exceed $20,000 during any calendar year.

(c) *Voter registration, voter identification, get-out-the-vote activity and generic campaign activity.* This section applies to only the following types of Federal election activity:

(1) Voter registration activity, as described in 11 CFR 100.24(a)(2), during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election; or

(2) The following activities conducted in connection with an election in which one or more Federal candidates appear on the ballot (see 11 CFR 100.24(a)(1)), regardless of whether one or more State candidates also appears on the ballot:

(i) Voter identification as described in 11 CFR 100.24(a)(4);

(ii) Get-out-the-vote activity as described in 11 CFR 100.24(a)(3); or

(iii) Generic campaign activity as defined in 11 CFR 100.25.

(d) *Prohibited solicitations.* A Federal candidate, an individual holding Federal office, and an individual who is an agent acting on behalf of either, must not make any solicitation on behalf of any organization described in 26 U.S.C. 501(c) and exempt from taxation under 26 U.S.C. 501(a), or an organization that has submitted an application for determination of tax-exempt status under 26 U.S.C. 501(c) for any election activity other than a Federal election activity as described in paragraph (c) of this section.

(e) *Safe Harbor.* In determining whether a 501(c) organization is one whose principal purpose is to conduct election activities, including activity described in paragraph (c) of this section, a Federal candidate, an individual holding Federal office, or an individual agent acting on behalf of either may obtain and rely upon a certification from the organization that satisfies the following criteria:

(1) The certification is a signed written statement by an officer or other authorized representative of the organization with knowledge of the organization's activities;

(2) The certification states that the organization's principal purpose is not to conduct election activities, including election activities described in paragraphs (c) of this section.

(3) The certification states that the organization does not intend to pay debts incurred from the making of expenditures or disbursements in connection with an election for Federal office (including for Federal election activity) in a prior election cycle.

(f) If a Federal candidate, an individual holding Federal office, or an individual agent acting on behalf of either has actual knowledge that the certification is false, the certification may not be relied upon.

## Subpart E—State and Local Candidates

### § 300.70 Scope (2 U.S.C. 441i(f)(1)).

This subpart applies to any candidate for State or local office, individual holding State or local office, or an agent acting on behalf of any such candidate or individual. For example, this subpart applies to an individual holding Federal office who is a candidate for State or local office. This subpart does not apply to an association or similar group of candidates for State or local office or of individuals holding State or local office.

### § 300.71 Federal funds required for certain public communications (2 U.S.C. 441i(f)(1)).

No individual described in 11 CFR 300.70 shall spend any funds for a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified), and that promotes or supports any candidate for that Federal office, or attacks or opposes any candidate for that Federal office (regardless of whether the communication expressly advocates a vote for or against a candidate) unless the funds consist of Federal funds that are subject to the limitations, prohibitions, and reporting requirements of the Act. *See* definition of *public communication* at 11 CFR 100.26

### § 300.72 Federal funds not required for certain communications (2 U.S.C. 441i(f)(2)).

The requirements of section 11 CFR 300.71 shall not apply if the public communication is in connection with an election for State or local office, and refers to one or more candidates for State or local office or to a State or local officeholder but does not promote, support, attack, or oppose any candidate for Federal office.

## PART 9034—ENTITLEMENTS

25. The authority citation for Part 9034 continues to read as follows:

**Authority:** 26 U.S.C. 9034 and 9039(b).

26. Section 9034.8 is amended by adding introductory language to paragraph (a) to read as follows:

### § 9034.8 Joint fundraising.

(a) *General.* Nothing in this section shall supersede 11 CFR part 300, which prohibits any person from soliciting, receiving, directing, transferring, or spending any non-Federal funds, or from transferring Federal funds for Federal election activities.

\* \* \* \* \*

Dated: July 16, 2002.

**Karl J. Sandstrom,**

*Vice-Chairman, Federal Election Commission.*

[FR Doc. 02–18311 Filed 7–26–02; 8:45 am]

**BILLING CODE 6715–01–P**

# PLAINTIFFS' EXHIBIT 140

**9013**

(b) The approved insurance provider must immediately report in writing all operational and financial changes that could cause a material adverse impact upon its approved premium reduction plan to the Director of the Reinsurance Services Division, or a designee or successor.

(c) All procedural issues, questions, problems or clarifications with respect to implementation of the premium reduction plan must be timely addressed by the approved insurance provider.

(d) The approved insurance provider must implement the premium reduction plan in accordance with the terms and conditions of approval.

(e) All producers insured by the approved insurance provider will automatically receive the premium reduction contained in the approved premium reduction plan.

(f) An independent certified public accountant must certify to the reasonableness, accuracy, and completeness of all actual costs relating to the efficiencies and the total dollar in premium reduction for the reinsurance year the premium reduction plan will be offered, in a format approved by RMA, not later than April 1 after the annual settlement for the reinsurance year (The costs associated with such certification will be at the approved insurance provider's expense and must be included in the approved insurance provider's projected expenses for the purposes of determining an efficiency);

(g) The approved insurance provider must provide semi-annual reports, or more frequently as determined by RMA, that permit RMA to accurately evaluate the effectiveness of the premium reduction plan, in the manner specified by RMA. At a minimum, each report must contain:

(1) The number of producers making initial application for insurance by State;

(2) The average number of acres insured under all policies by State before and after implementation of the premium reduction plan;

(3) The number of small producers, limited resources farmers as defined in section 1 of the Basic Provisions, 7 CFR 457.8, women and minority producers making application as result of the implementation of the marketing plan;

(4) The average coverage level purchased by producers insured by the approved insurance provider before implementation of the premium reduction plan and after;

(5) The number of agents selling and servicing policies on behalf of the approved insurance provider by State; and

(6) The number, substance, and final or pending resolution of complaints from producers regarding the service received under the premium reduction plan.

(h) If at any time RMA discovers that the cost reduction or efficiencies contained in the premium reduction plan are not attained, are not sufficient to cover the dollar amount of premium reduction, or that the reduction in premium is not corresponding to the efficiency, RMA will require that the amount of efficiency used to determine the premium reduction for the next applicable reinsurance year be limited to the actual cost savings obtained for the reinsurance year, excluding any financial reserve plan measures that may have been used to make up for the effects of the deficiency.

(i) RMA will closely monitor the approved insurance provider's efforts to market the premium reduction plan to small producers, limited resources farmers as defined in section 1 of the Basic Provisions, 7 CFR 457.8, women and minority producers to ensure that no unfair discrimination takes place and if it is discovered, RMA may withdraw approval for the premium reduction plan, in accordance with paragraph (n) of this section.

(j) The approved insurance provider is solely liable for all damages caused by any mistakes, errors, misrepresentations, or flaws in the premium reduction plan or its implementation.

(k) The approved insurance provider must fully cooperate with RMA in its periodic review of the operations of the approved insurance provider for the purpose of assuring that the efficiencies are generated, that the projected cost reductions materialize, that the premium reduction plan is administered in the manner presented in the revised Plan of Operations, that the solvency and operational capacity of the approved insurance provider remains unimpaired, and that the interests of producers and taxpayers are protected.

(l) The approved insurance provider may be required by RMA to modify its implementation of an approved premium reduction plan to ensure compliance with 7 CFR 400.714–720, the Act, regulations, the SRA, and any applicable policy provisions and approved procedures, and to protect the interests of producers and taxpayers, and the integrity of the program.

(m) At its sole discretion and upon written notice, RMA may withdraw or modify its approval of any premium reduction plan if RMA determines that:

(1) The approved premium reduction plan, or its implementation, no longer satisfies all the terms and conditions in 7 CFR 400.714–720;

(2) There have been instances of unfair discrimination;

(3) The stated efficiencies have not been realized or the approved premium reduction is not provided to all existing policyholders and producers as required by subsection (e); or

(4) The integrity of the crop insurance program is jeopardized in any way, as determined by RMA, by the premium reduction plan.

(n) If any condition in paragraph (m) of this section exists, RMA will notify the approved insurance provider in writing:

(1) That approval has been withdrawn or a modification to the premium reduction plan is required;

(2) The date such withdrawal is effective or modifications must be made;

(3) If modified, such modification must be approved by RMA before implementation;

(4) The basis for such withdrawal or modification; and

(5) If approval is withdrawn, the approved insurance provider must cease offering the associated premium reduction effective for the next sales closing date.

Signed in Washington, DC, on February 17, 2005.

**Ross J. Davidson, Jr.,**

*Manager, Federal Crop Insurance Corporation.*

[FR Doc. 05–3435 Filed 2–23–05; 8:45 am]

**BILLING CODE 3410–08–P**

# FEDERAL ELECTION COMMISSION

## 11 CFR Part 300

**[Notice 2005–6]**

## Candidate Solicitation at State, District, and Local Party Fundraising Events

**AGENCY:** Federal Election Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Federal Election Commission seeks comments on proposed changes to its rule regarding appearances by Federal officeholders and candidates at State, district, and local party fundraising events under the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"). The current regulation contains an exemption permitting Federal officeholders and candidates to speak at State, district, and local party fundraising events "without restriction or regulation." This regulation was challenged in *Shays* v. *FEC.* The U.S. District Court for the District of

Columbia held that this regulation implementing the Bipartisan Campaign Reform Act of 2002 was based on a permissible construction of the statute. However, the district court also held that the Commission had not provided adequate explanation of its decision to permit Federal candidates and officeholders to speak "without restriction or regulation," and therefore had not satisfied the reasoned analysis requirement of the Administrative Procedure Act. The district court remanded the regulation to the Commission for further action consistent with the court's opinion. Accordingly, in order to comply with the court's decision, the Commission now revisits the exemption for candidate and Federal officeholder speech at State, district, and local party fundraising events. The Commission has made no final decision on the issues presented in this rulemaking. Further information is provided in the supplementary information that follows.

**DATES:** Comments must be received on or before March 28, 2005. If the Commission receives sufficient requests to testify, it may hold a hearing on this proposed rule. Commenters wishing to testify at the hearing must so indicate in their written or electronic comments.

**ADDRESSES:** All comments should be addressed to Ms. Mai T. Dinh, Assistant General Counsel, and must be submitted in either electronic or written form. Commenters are strongly encouraged to submit comments electronically to ensure timely receipt and consideration. Electronic mail comments should be sent to statepartyfr@fec.gov and may also be submitted through the Federal eRegulations Portal at www.regulations.gov. All electronic comments must include the full name, electronic mail address, and postal service address of the commenter. Electronic comments that do not contain the full name, electronic mail address, and postal service address of the commenter will not be considered. If the electronic comments include an attachment, the attachment must be in the Adobe Acrobat (.pdf) or Microsoft Word (.doc) format. Faxed comments should be sent to (202) 219–3923, with printed copy follow-up. Written comments and printed copies of faxed comments should be sent to the Federal Election Commission, 999 E Street, NW., Washington, DC. 20463. The Commission will post public comments on its Web site. If the Commission decides that a hearing is necessary, the hearing will be held in the Commission's ninth floor meeting room, 999 E Street, NW., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Ms. Mai T. Dinh, Assistant General Counsel, Mr. J. Duane Pugh Jr., Senior Attorney, or Ms. Margaret G. Perl, Attorney, 999 E Street, NW., Washington, DC 20463 (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Public Law 107–155, 116 Stat. 81 (2002), places limits on the amounts and types of funds that can be raised by Federal officeholders and candidates for both Federal and State elections. See 2 U.S.C. 441i(e). These restrictions also apply to their agents, and entities directly or indirectly established, financed, maintained, or controlled by, or acting on behalf of, any such candidate(s) or Federal officeholder(s) ("covered persons"). Covered persons may not "solicit, receive, direct, transfer or spend" non-Federal funds in connection with an election for Federal, State, or local office except under limited circumstances. See 2 U.S.C. 441i(e); 11 CFR part 300, subpart D.

Section 441i(e)(3) states that "notwithstanding" the prohibition on raising non-Federal funds, including Levin funds, in connection with a Federal or non-Federal election in section 441i(b)(2)(C) and (e)(1), "a candidate or an individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party." Id. During the rulemaking implementing this provision, the Commission initially sought comment on a rule proposing that, while such individuals could attend, speak, or be a featured guest at a party fundraising event, they could not say anything that could be construed as soliciting or otherwise seeking non-Federal funds, including Levin funds. See Notice of Proposed Rulemaking on Prohibited and Excessive Contributions; Non-Federal Funds or Soft Money, 67 FR 35654, 35672 (May 20, 2002). In the alternative, the NPRM sought comment on whether the fundraising event provision was a total exemption from the general solicitation ban, whereby Federal officeholders and candidates and their agents may attend and speak freely at such events without restriction or regulation. Id.

The Commission considered a range of comments on the scope of the fundraising provision. Ultimately, the Commission decided to construe the statutory provision broadly, permitting Federal officeholders and candidates to attend, speak, and appear as a featured guest at State, district, and local

fundraising events "without restriction or regulation." See Final Rules on Prohibited and Excessive Contributions; Non-Federal Funds or Soft Money, 67 FR 49064, 49108 (July 29, 2002); 11 CFR 300.64(b).

In Shays v. FEC, 337 F. Supp.2d 28 (D.D.C. 2004), the district court held that the Commission's explanation and justification for the fundraising provision in 11 CFR 300.64(b) did not satisfy the reasoned analysis requirement of the Administrative Procedure Act ("APA") in two respects.[1] First, the district court held that the Commission's construction of BCRA as permitting Federal officeholders and candidates to speak at State, district, and local party fundraising events "without restriction or regulation" is not compelled by the language of the statute. Id. at 92–93. The court concluded that the BCRA provision "is ambiguous in that it can be read in more than one way." Id. at 89. Specifically, the court concluded that the statute "can be read to either be a carve-out for unabashed solicitation by federal candidates and officeholders at state, district or local committee fundraising events, or to simply make clear that merely attending, speaking or being the featured guest at such an event is not to be construed as constituting solicitation per se." Id. Second, the district court stated "the FEC has not explained how examining speech at fundraising events implicates constitutional concerns that are not present when examining comments made at other venues." Id. at 93. The court remanded the regulation to the Commission for further action consistent with its opinion. Id. at 130.

To comply with the district court's order, the Commission is issuing this notice of proposed rulemaking to provide proposed revisions to the explanation and justification for the final rules it adopted concerning the provision allowing Federal officeholders and candidates to speak without restriction or regulation at fundraising events for State, district, and local party committees. See 11 CFR 300.64. As an alternative to providing a new

---

[1] Although the court held that the fundraising exemption regulation failed to satisfy the APA, it found the regulation did not necessarily run contrary to Congress's intent in creating the fundraising exemption and was based on a permissible construction of the statute. Id. at 90, 92 (finding the regulation survived Chevron review). Moreover, the court stated that it "cannot find on the current record that the Commission's regulation on its face 'unduly compromises the Act's purposes' by 'creat[ing] the potential for gross abuse.'" Id. at 91 (quoting Orloski v. FEC, 795 F.2d 156, 164, 165 (DC Cir. 1986)). See also Shays, 337 F. Supp.2d at 92 ("the court cannot find that the Commission has unduly compromised FECA's purposes").

explanation for the current rule, this NPRM also includes a proposed rule that would replace current section 300.64 with a rule barring candidates and Federal officeholders from soliciting or directing non-Federal funds when attending or speaking at party fundraising events. Both approaches are explained below.

## Proposed Revisions to the Explanation and Justification for Current 11 CFR 300.64

The Commission seeks comment on the following proposed three paragraphs to be included in a revised explanation and justification for current 11 CFR 300.64:

"In promulgating current 11 CFR 300.64(b), the Commission construed 2 U.S.C. 441i(e)(3) to exempt Federal officeholders and candidates from the general solicitation ban, so that they may attend and speak without restriction or regulation at party fundraising events. The district court recognized that section 441i(e)(3) was ambiguous and upheld the Commission's interpretation of this section as a permissible reading under *Chevron* step one. *See* 337 F. Supp.2d at 89–90. The district court also upheld the current section 300.64(b) under *Chevron* step two review because the regulation did not unduly compromise FECA. *Id.* at 92.

"Section 300.64 effectuates the balance Congress struck between the appearance of corruption engendered by soliciting sizable amounts of soft money and the legitimate and appropriate role Federal officeholders and candidates play in raising funds for their political parties. Just as Congress expressly permitted these individuals to raise non-Federal funds when they themselves run for non-Federal office (*see* 2 U.S.C. 441i(e)(2)), and to solicit limited amounts of non-Federal funds for certain 501(c) organizations (*see* 2 U.S.C. 441i(e)(4)), Congress also enacted 2 U.S.C. 441i(e)(3) to provide a mechanism whereby Federal officeholders and candidates could continue to play a role at State, district and local party committee fundraising events at which non-Federal funds are raised. The limited nature of this statutory exemption embodied in 11 CFR 300.64 is evident in that it does not permit Federal officeholders and candidates to solicit non-Federal funds for State, district or local party committees in pre-event publicity or through other mechanisms. Nor does it extend to fundraising on behalf of national party committees.

"In implementing this statutory scheme, the Commission is mindful that evaluating speech in the context of a party fundraising event raises First Amendment concerns where it is difficult to discern what specific words would be merely 'speaking' at such an event without crossing the line into soliciting or directing non-Federal funds. *See* 11 CFR 300.2(m) (definition of 'to solicit') and 300.2(n) (definition of 'to direct'). As the U.S. Supreme Court has observed, 'solicitation is characteristically entwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views.' *Schaumburg* v. *Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). A regulation that permitted speaking at a party event, the central purpose of which is fundraising, but prohibited soliciting would require candidates to tease out words of general support for the political party and its causes from words of solicitation for non-Federal funds for that political party. A complete exemption in section 300.64(b) that allows Federal officeholders and candidates, in these limited circumstances, to speak and attend without restriction or regulation, including solicitation of non-Federal or Levin funds, avoids these concerns." [2]

The Commission seeks comments on these proposed revisions to the explanation and justification or comments that provide alternative rationales for the complete exemption in current 11 CFR 300.64(b). Additionally, the district court voiced concern that the current 300.64(b) "creates the potential for abuse." *See* 337 F. Supp.2d at 91. The Commission seeks public comment as to any potential for abuse under the current rule.

The Commission also notes, as the *Shays* court observed, that under BCRA, outside the context of State, district and local party fundraisers, "nonfederal money solicitation is almost completely barred." *Id.* at 92. From time to time, the Commission has been asked to permit attendance and participation by Federal officeholders and candidates at various functions other than those for State, district and local parties, where non-Federal funds will be raised. Subject to various restrictions, the Commission has allowed this. *See, e.g.,* Advisory Opinions 2003–36 and 2003–03. The Commission requests comment on whether these advisory opinions, allowing attendance at such functions, struck the proper balance. Alternatively, are these advisory opinions inconsistent with BCRA's language and intent? Does the permission granted in 2 U.S.C. 441i(e)(3) to attend, speak, or be a featured guest at State, district and local party events, by implication, prohibit Federal officeholders and candidates from doing so at other fundraising events unless such events are solely and exclusively raising Federal funds? [3]

Should the Commission specifically bar attendance by a Federal officeholder or candidate at a non-State, district or local party fundraising event when the officeholder or candidate knows or reasonably should know that solicitations otherwise prohibited when made by the candidate or officeholder will take place at the event? Alternatively, should Advisory Opinions 2003–03 and 2003–36 be incorporated into the Commission's regulations? If so, should other modifications be added?

## Alternative Proposed 11 CFR 300.64

Although providing a revised explanation and justification for current 11 CFR 300.64 would comply with the district court's decision in *Shays* v. *FEC*, the Commission is also considering an alternative approach. This approach would replace current section 300.64 with a rule barring candidates and Federal officeholders from soliciting, receiving, directing, transferring or spending any non-Federal funds, including Levin funds, when speaking at party fundraising events.

The proposed rule would redesignate the introductory paragraph of 11 CFR 300.64 as paragraph (a) and amend it to state that Federal officeholders and candidates may not solicit, receive, direct, transfer, or spend non-Federal funds at any such event. Current section 300.64(a) would be redesignated as paragraph (b) without any substantive changes, and current section 300.64(b) would be deleted entirely.

### Proposed 11 CFR 300.64(a)

The proposed rule would limit the scope of section 300.64 by replacing the complete exemption for speaking "without restriction or regulation" in current 11 CFR 300.64(b) with a narrower exception under which Federal candidates and officeholders would still be able to speak at or attend any party fundraising event (as the

---

[2] These concerns are more of an issue for these types of party fundraisers where Federal funds and non-Federal funds may both be raised than for national party committee fundraisers where only Federal funds may be raised.

[3] *See* 2 U.S.C. 441i(e)(1)(B) (permitting solicitations by Federal candidates for State candidates so long as such solicitations comply with the source prohibitions and amount restrictions under the Act for Federal candidates). *See also* 2 U.S.C. 441i(e)(4) (permitting certain solicitations, with restrictions, by Federal officeholders and candidates for funds to be used by certain tax-exempt organizations for certain types of Federal election activity).

**9016**    **Federal Register** / Vol. 70, No. 36 / Thursday, February 24, 2005 / Proposed Rules

statute clearly authorizes), but they would not be able to *solicit, receive, direct, transfer or spend* non-Federal funds, including Levin funds, at the party fundraising event. This proposed rule would interpret section 441i(e)(3) as an exception that makes clear that the mere attendance or speaking by a candidate in this circumstance should not be equated with a solicitation prohibited by section 441i(e)(1). However, this safe harbor would not apply to a candidate or Federal officeholder who uses words that solicit or direct non-Federal funds. *See* 11 CFR 300.2(m) (definition of "to solicit") and 300.2(n) (definition of "to direct").

The district court in *Shays* v. *FEC* held that this interpretation is another permissible reading of the statute. *See* 337 F. Supp.2d at 89–90. The Commission seeks public comment on this alternative approach.

The alternative approach raises an issue about interpreting BCRA in light of *Shays* v. *FEC*. In that opinion, the district court stated: "the plain reading of [BCRA] makes clear that Levin funds are funds 'subject to [FECA's] limitations, prohibitions, and reporting requirements.'" *Shays* v. *FEC*, 337 F. Supp.2d at 118. Does this mean that 2 U.S.C. 441i(e)(1) does not prohibit covered persons from soliciting Levin funds? Although 2 U.S.C. 441i(b)(2)(B)(iii) and (C) nonetheless generally prohibit State parties from treating funds raised by covered persons as Levin funds, do the cross-references between subsection (e)(3) and subparagraph (b)(2)(C) create an exception permitting State party committees to treat funds solicited by covered persons at fundraising events as Levin funds? The Commission seeks comment on how it should interpret 2 U.S.C. 441i(b)(2), (e)(1), and (e)(3), in light of *Shays* v. *FEC*.

In addition, if the Commission were to adopt this alternative approach, would it be appropriate to permit written notices or oral disclaimers similar to those discussed in Advisory Opinions 2003–03 and 2003–36 for other fundraising events? The opinions addressed appearances, speeches, and solicitations by covered persons at fundraising events where non-Federal funds were being raised. Those opinions permitted covered persons to solicit funds and comply with 2 U.S.C. 441i(e)(1) by using either written notices or oral disclaimers. Alternatively, would another type of notice or disclaimer be more appropriate?

## Certification of No Effect Pursuant to 5 U.S.C. 605(b) [Regulatory Flexibility Act]

The Commission certifies that the attached proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. The basis for this certification is that the proposed rule is an exception from the requirements of a general rule applicable to Federal officeholders and candidates. In addition, the other organizations affected by this rule are State, district and local party committees of the two major political parties, which are not "small entities" under 5 U.S.C. 601 because they are not small businesses, small organizations, or small governmental jurisdictions. To the extent that any of these political party committees may fall within the definition of "small entities," their number is not substantial.

## List of Subjects in 11 CFR Part 300

Campaign funds, nonprofit organizations, political committees and parties, political candidates, reporting and recordkeeping requirements.

For reasons set out in the preamble, Subchapter C of Chapter 1 of title 11 of the *Code of Federal Regulations* would be amended to read as follows:

## PART 300—NON-FEDERAL FUNDS

1. The authority citation for part 300 would continue to read as follows:

**Authority:** 2 U.S.C. 434(e), 438(a)(8), 441a(a), 441i, 453.

2. Section 300.64 would be revised to read as follows:

### § 300.64 Exception for attending, speaking, or appearing as a featured guest at fundraising events (2 U.S.C. 441i(e)(3)).

(a) Notwithstanding the provisions of 11 CFR 100.24, 300.61 and 300.62, a Federal candidate or individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party, including but not limited to a fundraising event at which Levin funds are raised, or at which non-Federal funds are raised. Such candidate or individual holding Federal office shall not solicit, receive, direct, transfer or spend non-Federal funds, including Levin funds, at any such event.

(b) State, district, or local committees of a political party may advertise, announce or otherwise publicize that a Federal candidate or individual holding Federal office will attend, speak, or be a featured guest at a fundraising event, including, but not limited to, publicizing such appearance in pre-

event invitation materials and in other party committee communications.

Dated: February 17, 2005.

Scott E. Thomas,

*Chairman, Federal Election Commission.*

[FR Doc. 05–3471 Filed 2–23–05; 8:45 am]

BILLING CODE 6715–01–U

## FARM CREDIT ADMINISTRATION

**12 CFR Parts 611, 612, 614, 615, 618, 619, 620, 630**

**RIN 3052–AC19**

**Organization; Standards of Conduct and Referral of Known or Suspected Criminal Violations; Loan Policies and Operations; Funding and Fiscal Affairs, Loan Policies and Operations, and Funding Operations; General Provisions; Definitions; Disclosure to Shareholders; Disclosure to Investors in Systemwide and Consolidated Bank Debt Obligations of the Farm Credit System**

**AGENCY:** Farm Credit Administration.

**ACTION:** Proposed rule; extension of comment period.

**SUMMARY:** The Farm Credit Administration (FCA, we, us, or our) is extending the comment period for 60 days on our proposed rule affecting the governance of the Farm Credit System so all parties will have more time to respond.

**DATES:** Please send your comments to us on or before May 20, 2005.

**ADDRESSES:** Comments may be sent by electronic mail to *reg-comm@fca.gov,* through the Pending Regulations section of our Web site at *http://www.fca.gov,* or through the Government-wide *http:// www.regulations.gov* portal. You may also send written comments to S. Robert Coleman, Director, Regulation and Policy Division, Office of Policy and Analysis, Farm Credit Administration, 1501 Farm Credit Drive, McLean, Virginia 22102–5090, or by facsimile transmission to (703) 734–5784.

You may review copies of comments we receive at our office in McLean, Virginia, or from our Web site at *http://www.fca.gov.* Once you are in the Web site, select "Legal Info," and then select "Public Comments." We will show your comments as submitted, but for technical reasons we may omit items such as logos and special characters. Identifying information you provide, such as phone numbers and addresses, will be publicly available. However, we will attempt to remove electronic-mail addresses to help reduce Internet spam.

# PLAINTIFFS' EXHIBIT 141

1

FEDERAL ELECTION COMMISSION

PUBLIC HEARING

Tuesday, May 17, 2005

10:00 a.m.

9th Floor Meeting Room
999 E Street, N.W.
Washington, D.C.  20463

2

**COMMISSION MEMBERS PRESENT:**

SCOTT E. THOMAS, Chairman
MICHAEL E. TONER, Vice Chairman
LAWRENCE H. NORTON, General Counsel
ELLEN L. WEINTRAUB, Commissioner
DANNY LEE McDONALD, Commissioner
DAVID M. MASON, Commissioner
BRADLEY A. SMITH, Commissioner
ROBERT J. COSTA, Deputy Staff Director for Audit
 and Review

3

**AGENDA**

**PANEL I**  Public Hearing on Candidate
Solicitation of State, District and Local
Party Fundraising Events

WITNESSES:                                        PAGE

William J. McGinley, National Republican
Senatorial Committee                                8

Lawrence M. Noble, The Center for Responsive
Politics                                           16

Paul S. Ryan, The Campaign Legal Center           21



**PANEL II**  Public Hearing on Candidate
Solicitation of State, District and Local
Party Fundraising Events

WITNESSES:                                        PAGE

Robert F. Bauer, Perkins Coie, LLP                77

Thomas J. Josefiak, Republican National
Committee                                          81

Donald J. Simon, Democracy 21                      87

4

**AGENDA** (CONTINUED)

**PANEL III**  Public Hearing on the Definition
of "Agent" for BCRA Regulations on
Non-Federal Funds or Soft Money and
Coordinated and Independent Expenditures

WITNESSES:                                         PAGE

Lawrence M. Noble, The Center for Responsive
Politics                                           147

Paul S. Ryan, The Campaign Legal Center           153

Karl J. Sandstrom, Association of State
Democratic Chairs                                  158

Donald J. Simon, Democracy 21                      162

**PANEL IV**  Public Hearing on Payroll Deductions
by Member Corporations for Contributions to a
Trade Association's Separate Segregated Fund

WITNESSES:                                         PAGE

Laurence E. Gold, American Federation of
Labor and Congress of Industrial
Organizations                                      244

Diane Casey-Landry, America's Community
Bankers                                            238

Pamela J. Whitted, National Stone,
Sand & Gravel Association                          247

P R O C E E D I N G S

CHAIRMAN THOMAS:  Good morning, everybody.
This special session of the Federal Election
Commission for Tuesday, May 17th, 2005 will please
come to order.

I would like to welcome everyone to the
Commission's hearing on three sets of our rules.
The first relates to candidate solicitations at
state, district and local party fund-raising events.
The second relates to the definition of "agent" for
BCRA regulations.  And the third relates to payroll
deductions by member corporations for contributions
to a trade association's separate segregated
funding.

Each of the proposed rules that we're
discussing today was included in a notice of
proposed rulemaking that the Commission recently
published in the Federal Register.  The Commission
issued the proposed rules regarding candidate
solicitations and the definition of "agent" in
response to the District Court's decision in Shays
v. FEC.  The Commission issued the proposed rules on
payroll deductions for contributions to a trade
association's SSF in response to a petition for
rulemaking filed by America's Community Bankers, one
of the witnesses appearing today.

6

I'd like to thank very briefly our staff and the Office of General Counsel for their hard work on these rulemakings. I'd also like to thank all of the people who took the time and effort to comment on the proposed rules, and in particular those who have come here today to give us the benefit of their practical experience and expertise on issues raised by the proposed rule.

I would like to describe briefly the format that we will be following today. The witnesses have been divided into four panels. The first two panels will focus on the proposed candidate solicitation rules. A third panel will focus on the definition of "agent", and the fourth panel will focus on payroll deductions.

Each panel will last for one hour. Each witness will have 5 minutes for his or her opening statement. We have a light system at the witness table to help you keep track of your time. The green light will start to flash when you have, I am told, 34 seconds left. The yellow light will go on when you have 30 seconds left, and the red light means that it's time to wrap up your remarks. The balance of the time is reserved for questioning by the Commission.

For each panel we will have at least one round of questions from the Commissioners, the General Counsel and our Staff Director.  There will be a second round only if time permits.  I would like to remind my colleagues that we're not required to use our entire questioning time, although it is brief in each case, given that we need to go through Commissioners, the General Counsel and the Staff Director.

There will be a short break between the first two panels, followed by a lunch break with the last two panels this afternoon.  As you can see, we have a full day ahead of us, and we would appreciate everyone's cooperation helping us to stay on schedule.

So Panel I, if you can please step forward.  Our first panel consists of William McGinley, who is General Counsel to the National Republican Senatorial Committee; Lawrence Noble, Executive Director of the Center for Responsive Politics; and Paul Ryan, who is with the Campaign Legal Center.  We will work with the alphabet system here, unless you gentleman have decided otherwise?  Mr. McGinley, you can proceed first, and then we'll go with Mr. Noble and then Mr. Ryan.

Mr. McGinley, when you're ready, please begin.

MR. McGINLEY:  Mr. Chairman, Mr. Vice Chairman, Commissioners, I want to thank you for the opportunity to speak on the Commission's notice of proposed rulemaking regarding Federal candidates and office holders attending and speaking at State and local party fund-raising events.

The NRSC supports retaining the existing rule which permits federal officeholders and candidates to speak at these events without restriction, and amending the explanation, the justification supporting the rule to satisfy the court's concerns.

The NRSC supports retaining the existing rule for the following reason.  Contrary to how these events are portrayed by some members of the regulated community, state and local party fundraisers are by and large not large dollar events.  Rather, many of these events are low dollar fundraisers that constitute gatherings of grass roots volunteers and activist who are so important to the political parties' operations.  These are the people who volunteer their time to stuff envelopes, man the phone banks and perform the literature drops for the party and its candidates.

In addition, these events are unique
opportunities for federal officeholders and
candidates to interact with a large number of
volunteers and grass roots activists at one event.
In this sense they facilitate communication between
volunteers and grass roots party supporters and
candidates and officeholders.  In short, I've heard
these events described as unique opportunities for
interaction and characterized as "watering the grass
roots."

Number two, in most instances the benefit
from these events flow to the state and local
parties.  The benefit does not flow to the federal
candidate or the officeholder.  Therefore, the
argument that these events are a vehicle for
circumventing the soft money ban is not availing.
State and local parties receive the financial
benefit in some instances at a cost to the federal
officeholder who must come to the same people for
contributions to his or her campaign committee.  In
this sense there may be a real tradeoff for the
federal officeholder or candidate's appearance,
which does not necessarily work to his or her
benefit.

Moreover, the participation of a federal
officeholder or candidate energizes the activists

and the volunteers.  This differentiates these types
of event from appearances before single-issue local
nonprofit organizations.  Party activists and
volunteers are motivated by hearing from the party's
leaders such as United States Senators.  They are
not motivated by the single issues, but instead
support the candidates of the party.  In short,
these events promote a sense of political party
identity.

Third, in most instances the money for the
event has already been raised.  Therefore, the
candidate or officeholder's appearance and speech is
not a solicitation.  Rather, they typically ask for
continued general support for the political party,
thank the people in attendance for their past and
present support of that party.

As the Commission points out in the draft
amendments to the Rules E&J candidates and
officeholders are barred from soliciting nonfederal
dollars in pre-event publicity such as direct mail
or phone calls.  In fact, the original E&J goes so
far to state that candidates and officeholders are
not permitted to serve on host committees for these
types of fundraising events that raise nonfederal
dollars.

Accordingly, the current regulation and exemption serves as an important purpose by reassuring federal officeholders and candidates that participating in state and local party events will not expose them to legal jeopardy.  This protection also serves to preserve the important relationship between local and grass roots party volunteers and federal candidates and officeholders.

The NRSC also opposed any change to the rules that will chill the interaction between federal officeholders, candidates and grass roots supporters and volunteers.  Specifically, the NRSC believes that the rules should provide the regulated community with clear notice concerning which activities are permitted and which ones are prohibited.  If the Commission adopts a proposed rule change, there is too much opportunity for someone to second guess and misinterpret a speech made at this type of event.  Limiting the candidate/officeholder protection to the ability to "attend, speak or be a featured guest" may chill participation in such events by candidates and officeholders.

As the Commission is aware, painfully aware I'm sure, the current definition of "solicit" is on appeal and therefore uncertain.  Assuming the

12

definition changes, what will constitute a
solicitation?  Many speeches contain informational
political persuasion and requests for support.  At
which point will such a speech cross the line if
given at a state or local party fundraiser?  Are
these examples of solicitations:  "Thank you for
your continued support."  "The state party plays a
crucial role that can only be fulfilled with your
support."  Are these statements solicitations?

     The question here for this type of rule is
not whether the candidate knows when he or she is
going to make a solicitation.  Rather the question
is whether we're going to have a rule that allows
candidates and officeholders to be placed at the
mercy of those who would misinterpret or
mischaracterize the speech they give at these types
of events.

     The NRSC urges the Commission to retain the
bright line exception for candidates and
officeholders in the current rule.

     In addition, we also ask the Commission to
take into consideration that each state's
contribution limits are different, but not federal
accounts of state parties.  Some states have more
restrictive rules than the federal rules.  Will
candidates and officeholders then be permitted to

show up and speak at these types of events, as
opposed to those states, such as Virginia or
Illinois, where unlimited corporate contributions
are permitted?  Federal candidates and officers need
a uniform rule to give them guidance on what they
can do and what they can't do.

It's also important to remember that many
county parties do not maintain federal accounts.
This means that federal candidates and officeholders
would not have an opportunity to ask for financial
support for county parties subject to the federal
limits and prohibitions.  If the law is vague or if
it provides an opportunity for someone to
misinterpret a candidate for officeholder's remarks,
they may stay away from these types of events.

Finally, the NRSC would like to take this
opportunity to ask the Commission to codify the
holdings in AO 2003-3 and 2003-35.  The NRSC
believes there should not be a barrier between
federal candidates and officeholders and candidates
running for state and local office.  Codifying these
AOs will ensure that federal candidates and
officeholders can attend and speak at events
benefiting associations of state and local
candidates or officeholders.

14

        In some states these organizations are part
of the party structure, and therefore arguably
covered by the rule.  In other states, however,
these organizations are not part of the party
structure and may be considered analogous to a state
PAC.  In those instances the NRSC would appreciate
the opportunity to have this rule clarified and
applied on a uniform basis instead of just to the
holdings of the AOs.  This will facilitate
interaction between federal and state candidates and
officeholders, which the NRSC believes is good for
the political process.

        Finally, there was a question in the NPRM
about the court's interpretation of Levin funds and
whether those monies are subject to FECA's
limitations, prohibitions and reporting
requirements.  The NRSC would agree that the
position that the federal candidates and
officeholders should be permitted to raise such
monies for state and local party committees if it
adopts the court's interpretation of that issue.

        With that, Mr. Chairman, I would be happy
to take your questions.

        CHAIRMAN THOMAS:  Thank you.  You will be
punished severely later.

        [Laughter.]

CHAIRMAN THOMAS:  That was very helpful.

Mr. Noble?

MR. NOBLE:  Mr. Chairman, Mr. Vice

Chairman, General Counsel, staff, Mr. Deputy Staff

Director--I see you drew the short straw today--I am

pleased to have the opportunity here to testify on

this rulemaking.  Since we did submit comments and I

will be available for questions, I'm going to try to

keep my opening statement short.

One of the essential provisions of BCRA is

the prohibition on candidates and federal

officeholders soliciting soft money contributions.

While broad, the ban does have two exceptions, one

explicitly allowing solicitations for contributions

for 501(c) organizations and another allowing

soliciting nonfederal funds if the candidate or

federal officeholder is running for nonfederal

office, and both of these make sense.

The statute also makes clear that the ban

does not prohibit a federal candidate from appearing

and speaking at a state party committee fundraiser.

It is in interpreting this last section that I think

the FEC made a wrong turn.  Rather than reading this

exception as allowing what it said it allowed,

appearing and speaking at a state party committee

fundraiser, the Commission decided that it would

read the provision as allowing the federal
candidates to also solicit soft money at the event.
In our view this runs contrary to the statute, its
goals, and undermines a core provision of BCRA.  We
are here now because the D.C. Court struck down this
attempt to open a new soft money loophole.  As the
Commission points out in the NPRM the court found
that the FEC's interpretation violated the
Administrative Procedures Act because there was not
a sufficiently reasoned analysis justifying the
rule.

            We urge the FEC to take this opportunity to
correct the rule and give full meaning to the
congressional ban on soft money fundraising by
candidates.  This means adopting the alternative
proposal and making it clear that federal candidates
cannot solicit, receive, direct, transfer of any
nonfederal funds, even at state party committee
events.

            The statutory path to this result is clear.
441i(e) provides a broad ban on candidates'
solicitation of soft money.  Section (e)(3) provides
that this does not prevent them from appearing and
speaking at the event.  What is notable about this
is unlike the exception for soliciting for 501(c)
organizations, any exception that allows them to

solicit for their own nonfederal campaigns, this
section does not mention solicitation.

I would also note--and this is going back
to the older FECA--that Congress does know how to
write broad exceptions.  If you look at 441(b) and
the permission or the exemption from the definition
of contribution or expenditure for communicating
with what's called the restricted class, Congress
said they can communicate with them on any subject.
You do not have that here.  Congress did not use
that type of language.

Given the goals of BCRA this makes perfect
sense.  Without (e)(3) candidates would not be
allowed to appear at a state party committee event
where soft money was raised.  However, in
recognition of the federal candidate's relationship
to the state party, congress avoided that result
with (e)(3).  But it did not give permission to
candidates to use state party events as a forum to
digging back into the soft money fundraising and
neither should the Commission.

Let me, in closing, address the fact that
the court did say that your interpretation of the
law may in fact be permissible under Chevron.  If
the court is saying that you may be able to come up
with a rationale that justifies your interpretation

of the law, your regulation, I think the rationale
you've put forward misses that mark by a very wide
margin because I think all you have done is in
effect restated what you said before, that you think
this strikes a balance.

But at best all the court was really saying
to you was you have a choice.  You can either
continue to enact rules that carve little loopholes
in the law, or you can enact rules that truly serve
the laws and goals.  You may get away with the
former, but at what cost?  In so doing, you not only
undermine the law and further undermine the public's
faith in the Agency, but you feed the public
cynicism about this being an insider's game, that no
matter what rules Congress passes, the FEC will try
to find a way to let members of Congress do what
they want to do.

We urge you not to take that road, and we
urge you to use this opportunity now to really
correct a past mistake and enact a regulation that
does follow the statute.

I would note--I don't have any lights at
all, so let me tell you what I did this summer.

[Laughter.]

MR. NOBLE:  Thank you.

CHAIRMAN THOMAS:  We were trying to figure this out.  I didn't even hit the right button apparently.  So you got the former employee special allowance on that one I think.

MR. NOBLE:  Thank you.

CHAIRMAN THOMAS:  Mr. Ryan?

MR. RYAN:  Good morning, Mr. Chairman, Commissioners, Commission staff.  It's a pleasure to be here this morning commenting on this proposed rulemaking.  As the Chairman noted, I am representing the Campaign Legal Center, which I serve as Associate Legal Counsel.

I am here today to strongly urge you to adopt the proposal to replace current section 300.64 with a new rulemaking clear that federal candidates and officeholders are prohibited from soliciting or directing any nonfederal funds, including Levin funds while attending or speaking at state, district or local party committee fundraising events.

As noted in the written comments submitted jointly by the Campaign Legal Center, Democracy 21, and the Center for Responsive Politics, the existing regulation which allows candidates and officeholders to speak at state party fundraising events without restriction or regulation is both inconsistent with

the framework of BCRA and also contrary to the
purposes of BCRA soft money prohibition.

BCRA's prohibition on federal candidate and
officeholder solicitation of nonfederal funds
contains only two exceptions:  BCRA allows a federal
officeholder who is a candidate for a state or local
office to solicit nonfederal funds solely in
connection with the state or local election; BCRA
also allows a federal candidate or officeholder to
solicit nonfederal funds for a 501(c) organization
under certain circumstances.

These two exceptions to the general
prohibition on federal candidate of officeholder
solicitation of nonfederal funds both explicitly
used the term "solicitation" to make clear that
these provisions do indeed create an exception to
the general ban on candidate or officeholder
solicitation of nonfederal funds.

By contrast, the adjacent BCRA provision
found at 441i(e)(3) permitting federal candidates to
attend, speak or be a featured guest at a
fundraising event for a state, district or local
party fundraising event, neither mentions nor
permits candidates solicitation of nonfederal funds
at these events.  Instead the fundraising event
provision found at (e)(3) creates a safe harbor for

candidates to be present at and to speak at, but not
to solicit soft money at state party fundraiser
events.

In short, Congress used the term
"solicitation" in (e)(2) and (e)(3) where it
intended to permit solicitation of nonfederal funds
and omitted the term solicitation--I'm sorry.
Congress used the term "solicitation" in (e)(2) and
(e)(4), where it intended to permit solicitation of
nonfederal funds, but Congress omitted the term
"solicitation" in (e)(3), where it did not intend to
permit solicitation of nonfederal funds.

The District Court in Shays stated, "The
Commission's interpretation likely contravenes what
Congress intended when it enacted the provision, as
well as what the Court views to be the more natural
reading of the statute."

Nevertheless, the Court in Shays indicated
that the existing regulation, 300.64, might be valid
if and only if the Commission formulates an
explanation and justification for the current
regulation that meets the APA's requirement for
reason analysis.

The NPRM offers a new three-paragraph E&J
for the current rule, but the Campaign Legal Center
believes that this proposed new explanation and

justification fails to meet the APA's reasoned analysis requirement.

For these reasons, along with the reasons elaborated upon in our written comments, the Campaign Legal Center urges you to adopt the proposed new Rule 300.64, making clear that federal candidates and officeholders are prohibited from soliciting or directing any nonfederal funds including Levin funds when attending or speaking at state, district and local party committee fundraising events.

Thank you for your time and I'll look forward to your questions.

CHAIRMAN THOMAS:  Thank you.

I will start the questions.  Let me see if I can get this rolling.  I'm going to try to give myself less than 5 minutes because I had to give the opening blather at the beginning, took up some of our time.

Let me ask you, Mr. McGinley, you would like us to take the approach of just modifying the E&J to better explain what we were doing when we passed the reg. the way it currently exists.  Do you think we've done a good enough job explaining the difference between candidates or officeholders appearing at party-related events versus their

appearances and assistance, say, with nonfederal
candidates?  It seems to me we may have to do a
better job if we that way of trying to somehow
rationalize why they would have sort of an open-
ended allowance at party-related events, but yet
when they go over and deal with a nonfederal
candidate, trying to help a nonfederal candidate
raise nonfederal funds, we would, at least as things
stand now, try to impose those kind of conditions
that we set out in say the Cantor Advisory Opinion
and so forth?  Can you help me with that?

          MR. McGINLEY:  Sure.  I think what was
discussed as far as the statutory construction and
the "notwithstanding" phrase is a broad exception to
the ban on soft money.  One of the reasons why the
NRSC is also advocating codifying AO 2000-03 is
because we believe that federal officeholders and
candidates should be permitted to show up at those
events.  Those types of events that are raising
state permissible monies for state candidates that
can only be used in connection with state and local
elections that by the very regulations we're talking
about, they can't use it for advertising, that PASO
federal candidate, that there is no influence on a
federal election with those types of monies, and
therefore the regulations should not prohibit or bar

24

the candidates from appearing at those types of
events.

Would the conditions laid out in the
Advisory Opinion be unacceptable to the NRSC?  As I
stated in my comments, we would like the ability for
federal candidates and officeholders to speak
without restriction at these types of events.  It's
not a question of whether the candidate or the
officeholder believes or intends to be soliciting
the money. What we're trying to avoid is the
opportunity for either political opponents or for
regulators after the fact to misinterpret the intent
and the effect of what they say at these types of
events to cause them to become solicitations covered
by the soft money ban.  Parties occupy a unique role
in the political process.  They're not single-issue
entities.  They are often coalitions, a broad
spectrum of issues that bring the people together to
coalesce behind the local, the state and the federal
candidates.  We believe that that relationship and
that type of unique entity, its relationship with
the federal candidates and officeholders, there's
not the opportunity for corruption that might
otherwise be present in some of the single-issue
fundraisers that you see for the nonprofit groups
that are exempted under the statute.

25

                    CHAIRMAN THOMAS:  Thank you.

          Let me ask Larry and/or Paul if you would
respond sort of on the same topic.  I noted that in
the comments of the chief sponsors of the
legislation, they very clearly state that they think
the Commission has erred in the Advisory Opinion
issued to Cantor and others, in which it does seem
to allow federal candidates or officials to actually
appear at a nonfederal candidate's fundraising event
where soft money would be raised, perhaps by persons
other than the federal candidate appearing.  But the
mere appearance in the view of the sponsors, I
gather, is a form of solicitation that would cross
the line if indeed there were nonfederal funds
actually being raised at that event.

          Are you bringing that argument to us here
today as well?

                    MR. NOBLE:  Yes, we are, and obviously, we
don't speak for the sponsors.  When the RGA advisory
period was up before the Commission we did file a
comment saying that the appearance at the event, if
there were proper disclaimers, would not in and of
itself be a solicitation, but we made it clear in
the opening statement that we disagreed with the
overall rule, but given this overall rule, in

effect, you are dealing with the hierarchy of what you can do at various events.

And so our view is that if you start from scratch, which you now have a chance to do, and set the rule in such a way that at the state party event the candidate can appear but cannot solicit contributions. Then at the nonparty events, if you will, the candidates should not be allowed to attend if there's solicitation of nonfederal money going on.

CHAIRMAN THOMAS: Okay, thanks.

MR. RYAN: The Campaign Legal Center agrees with Larry and the Senators' approach. We believe that the two Advisory Opinions at issue are likely consistent with the existing regulation, but to the extent that these opinions permit federal candidates and officeholders to participate in nonparty soft money fundraising events, they misinterpret BCRA's soft money prohibition.

And to that extent they should be superseded by a new rule that makes clear that federal candidates are permitted to attend, but not solicit, at state party, state, district and local party fundraising events, and are not permitted to attend nonparty soft money fundraising events.

CHAIRMAN THOMAS:  All right.  I just wanted to be clear on your position.  Thank you.

Vice Chairman Toner, you're up.

VICE CHAIRMAN TONER:  Thank you, Mr. Chairman.

Mr. Noble, Mr. Ryan, Mr. McGinley, thank you for being here.  I appreciate it very much.  It appears we're going to have a number of rulemakings in the next few months to deal with a number of these issues.

Mr. Ryan, I'd like to begin with you.  You indicate in your written comments that the current rule has the potential for abuse, as you put it, and you describe the current regulation as opening an obvious loophole in the law.  The question I have, is there any evidence thus far, while the rule's been in effect for the last three years, that there have been any abuses, that any candidate or officeholder has sought to undermine the soft money ban while this rule's been in place.  Is there any evidence of that?

MR. RYAN:  I don't know of any particular instances that I can point to, but I do know that Congress, in enacting BCRA soft money ban, was concerned about and sought to prohibit federal

candidate and officeholder solicitation and receive soft money.

The Supreme Court in McConnell took this congressional concern very seriously, recognized that soft money posed a significant threat of corruption or the appearance of corruption.

In this proceeding we believe it's the responsibility of the Commission to justify what we interpret as the opening of a loophole that will reinstate potentially this flow of soft money. The fact that it may not have been--the loophole may not have been used or abused up until this point is by no means dispositive of the issue or the fact that we urge the Commission to close the loophole before it's exploited.

VICE CHAIRMAN TONER: So to be clear, at this point you don't have any advice at hand that the current regulation has been abused.

MR. RYAN: Correct.

VICE CHAIRMAN TONER: Mr. Noble, Mr. McGinley made the point that in his view, when people go to these state party fundraising events, these state candidate events, oftentimes money's already been given and they're going after that fact. And Mark Brewer, the Chairman of the Association of State Democratic Chairs made a

similar point in his written comments, and I'll read

from Mr. Brewer.  He says, "It is difficult to

identify any regulatory benefit to be derived by

additional restrictions on what a candidate might

say to an audience that has already chosen to attend

and contribute."  What do you say about that?

MR. NOBLE:  Well, I think this is missing

the point of BCRA and the ban on candidates

soliciting soft money.  Actually, you can go to your

previous question.  Congress said that there is a

harm in having candidates solicit soft money,

period.  The Supreme Court upheld that, adding

knowledge that there was a harm found.  The harm in

itself is the soliciting of the soft money.  So

whether or not the money has already been solicited,

having a candidate appear at a soft money event,

state party event, and then further solicit soft

money, in and of itself is a violation of the law,

in and of itself is an abuse.  And so I don't think

you have to show anything beyond that.

So regardless of whether most of the

solicitation went on in advance of the event,

regardless of whether people are showing up there,

whether or not--because the federal officeholders

there are showing up for some other reason, whether

or not there has been any appearance of a quid pro

quo in a specific contribution is all irrelevant.
The fact is what Congress wanted to do was break the
pattern of having candidates, federal candidates
federal officeholders soliciting soft money. And
they also have that prohibition for state party
committee events. The only exception is it allows
them at least to appear at state party committee
events.

        VICE CHAIRMAN TONER: Do you concur with
Mr. Ryan that thus far there hasn't been any
evidence that any candidate or officeholder has
abused the current rule?

        MR. NOBLE: Well, as I said, it depends on
what your definition of abuse is. I don't know for
a fact whether or not any federal candidates have
solicited soft money at party events. If they have,
then, yes, I think there has been abuse of the
statute, not of the rule, of the statute. I think
the rule abuses the statute. And so I think that is
a problem. If nobody has done it, then it doesn't
mean that your rule is valid. It just means that
nobody's taking advantage of it.

        VICE CHAIRMAN TONER: And I understand that
you wouldn't view that conclusion as controlling
even if everyone agreed that there hadn't been any
instances thus far. I was just trying to get a

sense of whether you thought there had been any
documented instances.

And I also wanted to follow up--and I
understand you don't speak for the sponsors--but in
reading their comments, as I understand it, in their
view, in terms of state candidate fundraising events
of state PAC events it would, in their view, it
should be illegal for any federal candidate or
officeholder to even go to those events where soft
money is being raised, no matter how the event is
structured and no matter what is said there.  Do you
agree with that?

MR. NOBLE:  Yes.  I mean I think that,
again, the exception is for state party committee
events, speaking at state party committee events.
When you get beyond that, then I think there's a ban
on them being involved in soft money fundraisers.

VICE CHAIRMAN TONER:  So Harry Reid or Bill
Frist, it would unlawful for them to go to a
Democratic Governors Association event or an RGA
event where soft money is being raised, no matter
how that event is structured, no matter what was
said there?

MR. NOBLE:  Yes.  When you say no matter
what it said there, I'm trying to think whether
there are variations on it, but, yes, generally yes.

            VICE CHAIRMAN TONER:  And, Mr. Ryan, you
concur with that?

            MR. RYAN:  Yes.  To the extent that the
event in question meets what is articulated in the
statute as a fundraising event.  I think this raises
a point that the Commission may consider adopting a
regulation defining "fundraising event" to give more
definite bounds to where this--and that does and
does not apply.

            VICE CHAIRMAN TONER:  They would be totally
prohibited from going, no matter how it's
structured.

            MR. RYAN:  Yes.

            VICE CHAIRMAN TONER:  Okay, thank you.

            CHAIRMAN THOMAS:  Thank you.

            Commissioner Weintraub.

            COMMISSIONER WEINTRAUB:  Thank you, Mr.
Chairman.

            I'd like to follow up a little bit on that
last one, because it seems to me there's a fairly
obvious way that one could structure it where it
would be not a problem, particularly in light of Mr.
McGinley's testimony that a lot of these events are
low dollar events anyway.  If it's set up so that
they're asking for all the solicitations in
connection with the event solicit federally

permissible funds, funds that would fall under the limits that a federal officeholder could raise anyway.  In that instance, wouldn't you agree that a federal officeholder could attend?

        MR. NOBLE:  If there was no raising of soft money, which means that there was no raising of money outside the limitations and prohibitions of the federal law.  Then you get into a question of whether in fact soft money is being raised at the event but the money is not going to a hard money account.  It is in fact still raising of soft money.

        COMMISSIONER WEINTRAUB:  So you would say that even if it was a $25--because, you know, you're losing me here, Mr. Noble.  You had me before and you're losing me.  Even if it was a $25 fundraiser for a local candidate, where, you know, it's somebody house.  Let's say former staffer--because this happens all the time--former staffer for a member of Congress decides to run for office. They're having a local event, $25 a head, and they invite their former boss to come just to show his or her support.  You're saying the boss couldn't show up at that?

        MR. NOBLE:  You could carve--I'm reluctant to say this because every time I end up saying you could carve out an exception, there it goes.  But I

34

understand your point about basically setting it up
structurally so in fact what they're doing is
raising hard money.  And that's something I'd want
to think about further, about whether or not you
could set up in that way.

My concern about that, to be very honest
about it, is every time you set up something like
that it immediately crosses over the line, and you
have them raising in fact soft money.  But if they
set up a limit--obviously they could appear at an
event where hard money is being raised.  There's no
doubt about that.  So if you set--

COMMISSIONER WEINTRAUB:  The definition, if
you're running for state office it's not technically
hard money.

MR. NOBLE:  Hard money, right, right.

COMMISSIONER WEINTRAUB:  But if it's
federally permissible, what's the problem?

MR. NOBLE:  I think in that case you might
be able to do that.  I'd have to think further about
it.  I mean I don't I don't want to lose you.

COMMISSIONER WEINTRAUB:  Don't--

MR. NOBLE:  It's so rare that I--

COMMISSIONER WEINTRAUB:  You're right.  I'm
telling you, you had me before, so please, don't get
out there.

[Laughter.]

COMMISSIONER WEINTRAUB:  Mr. McGinley, let me ask you.  You've raised the constitutional argument, and of course, that often gets raised in this context, understandably, and let me say that I'm very sympathetic to your views about how important it is for federal office holders to be able to have interactions with people who are active in party and state politics, and local politics, at all levels of the organization.  But haven't we already sort of crossed the rubicon on the constitutional argument?  The fact is that federal officeholders and candidates aren't allowed to raise soft money in a variety of contexts.  Why is it more unconstitutional in the context of a state party fundraiser than it would be anywhere else where they're subject to the limits?

MR. McGINLEY:  Well, briefly, I think I would say that it--you know, the party fundraisers and the party gatherings, one point I would like to make that I didn't include in my comments is that in many instance, state party or local party conventions themselves double as fundraisers. Federal candidates and officeholders showing at these types of gathering, talking where they may be collecting donations at the door to help defray the

expenses, those monies, if they're going to the
nonfederal account, may satisfy some of the
commenters' definition of soft money, because it's
raised outside the rubric of federal law.  In that
instance, we don't want to bar federal officeholders
from speaking at these types of conventions.  Their
comments are associational.  They implicate the
right of association.

        COMMISSIONER WEINTRAUB:  Well, wouldn't
that be true anyway they show up, that they're
associating with somebody?

        MR. McGINLEY:  Yes, yes.  But the law says
that they can't and we're not going to--

        COMMISSIONER WEINTRAUB:  Well, that they
can be there.

        MR. McGINLEY:  Right.  Being there is one
thing.  Soliciting money is another.  And I think
one of the points to make about--and maybe going
back to what Mr. Chairman asked me earlier--is that
the AOs go to the solicitation of the money.  It
talks about what types of monies that they can
raise.  I mean part 300.62 talks about the ability
of federal officeholders or candidates to raise
money in connection with state and local elections
that are consistent with the limitations or
prohibitions under the act.  It doesn't require them

to be subject to the reporting requirements under
the act as well.

So in other words, a state and local
candidate isn't required to set up a federal PAC in
order to have a federal officeholder show up.  A
county party conceivably could have a federal
officeholder to show up to raise otherwise federally
permissible money.

COMMISSIONER WEINTRAUB:  I'm running out of
time.  Let me try one more.  I'm going to interrupt
you so I can throw one more question at the other
side of the panel.

And that is, what can you say to reassure
Mr. McGinley and others who might be concerned the
federal officeholders just won't show up at these
events at all because they'll be worried that
something that they say will be misconstrued?

MR. NOBLE:  I understand the concern.
Obviously there's a concern anytime you're talking
about possible federal investigation.  But I think
the reality is that every day they have to be
concerned about what they say and how they abide by
certain laws.  I think if they follow normal
precautions they're not going to have trouble.  I
think that if they go to an event and they do not
solicit--from a state party committee event now--do

not solicit a soft money contribution, they're fine.
The Commission in another context is going to have
to define what solicitation is.

         And by the way, just to try to get you back
all the way, I realize now that if you look at
(e)(1)(B)(i), it does say that if the funds are not
in excess of the amounts permitted with respect to
contributions to candidates, to federal
officeholders.  So if they do raise money I think
you could base it on that and say, in your previous
question, if they do in fact raise money that is
under the federal limits and within the federal
prohibitions, that they can do it.  Do I have you
again?

                    [Laughter.]

                    CHAIRMAN THOMAS:  Thank you.

                    Next we go to Commissioner Mason.

                    COMMISSIONER MASON:  Thank you, Mr.
Chairman, and thank you, witnesses.

         I want to try to do something that for
lawyers may be an unnatural act, and that is to try
to get you to give me a yes or no answer to the
question of, I think let's take the one that looks
most obvious to me, the agreement to serve as the
featured guest at a fundraiser.  If a federal
candidate makes that agreement and knows this is

going to be publicized in connection with
invitations to the fundraising event, does that
constitute a solicitation within the meaning of
441i(e)?  Mr. Ryan?

        MR. RYAN:  Not necessarily.  But again,
this hinges, the answer hinges on the regulation
that you have already adopted.

        COMMISSIONER MASON:  I'm asking you to
construe the law though.  We're talking about what
the regulation ought to be.  So what should our
regulations say?

        MR. RYAN:  In this context of (e)(3), no.
Being a featured guest is not a solicitation.

        COMMISSIONER MASON:  Being a featured guest
is not a solicitation.

        MR. RYAN:  In the context of (e)(3).

        COMMISSIONER MASON:  So why is the rule
different for an organization other than a political
party?

        MR. RYAN:  Because (e)(3) is what applies
in the context of state, district and local party
fundraising events.  It's very explicitly stated,
and we need to work within the statutory test, and
the statute explicitly permits a federal candidate
or officeholder to attend, speak or be a featured
guest at one of these fundraising events.

COMMISSIONER MASON:  But if it's not a
solicitation it's not barred by 441i(e) to begin
with.

MR. RYAN:  Which is why I stated that it's
not a solicitation in the context of (e)(3), in the
context of fundraising events by state, district and
local party committees.

COMMISSIONER MASON:  Well, what you're
doing is trying to use the exception to draw the
limit or the context of the original ban.  I don't
think you're turning the statutory interpretation
upside down.  If solicitation--if appearing or
speaking or being a featured guest is a solicitation
you don't need the exception.  If that exception
applies to a solicitation ban it would seem to me
those three activities don't constitute
solicitations, at least standing on their own.

I don't understand how you can turn this
upside down and say we're going to define the basic
prohibition based on the exception.  Can you help me
with that?

MR. NOBLE:  I don't think you're defining
the prohibition based on the exception.  I think
what you're looking at is seeing how broad the
exception is.  And since I'm no longer required to
give a yes or no answer, I think in part if depended

what the solicitation said, what the original
invitation said, the idea being that the
officeholder, the federal officeholder can attend
and be at the event, but it's clear that they cannot
do pre-events soft money solicitations.  And so
you're in a different situation when you're dealing
with state party committees than you are in dealing
with nonstate party committees or other types of
committees.

          COMMISSIONER MASON:  And I'm trying to
understand why it's different.

          MR. NOBLE:  Because you have an explicit
exception, (e)(3), for them being able to appear and
speak at an event.

          COMMISSIONER MASON:  But the exception is
to the ban on solicitation.

          MR. NOBLE:  Right.

          COMMISSIONER MASON:  And so are you saying
that simply being a featured guest for a fundraising
event, an understanding that will carry with it some
sort of advertising or publicity, not that they
would agree.  In other words, let's say the
candidate strictly says "All I can do is agree to be
a featured guest.  I can't do anything else.  You
can't mix me in with the host committee or any of

that other stuff, but, yes, I can do that.  Does
that or does that not constitute a solicitation?

          MR. NOBLE:  Under (e)(3) it doesn't because
Congress said they can appear, so then by doing that
what Congress in effect said was that's not going to
be considered a solicitation.

          COMMISSIONER MASON:  Would it otherwise
constitute a solicitation under (e)(1)?

          MR. NOBLE:  Depending on what the document
you're talking about said, yes, it could very well.

          COMMISSIONER MASON:  Well, depending on
what?  Let's say it's the simplest case and the most
plain vanilla, innocent limited featured guest--

          MR. NOBLE:  And it's a soft money event.

          COMMISSIONER MASON:  And it's a soft money
event.

          MR. NOBLE:  Then it's a solicitation for
the soft money event, yes.

          COMMISSIONER MASON:  And so (e)(3) is an
exception to the solicitation ban?

          MR. NOBLE:  It is--I would say it's a
partial exception to what would otherwise be
considered a solicitation because it says "appear."
It doesn't say they can solicit money.  It says
"appear."  I understand there's some overlap there,
yes.

COMMISSIONER MASON:  And so I'm still
trying to understand if--why this is different for
state parties than for anybody else.  In other
words, why is the definition in (e)(1) changed for
organizations which are not mentioned in the
exception in (e)(3)?

MR. NOBLE:  Because in (e)(3) Congress
carved out a special exception for state party
committees, recognizing the relationship that
federal candidates have with state party committees.
So it gave them a certain amount of leeway when
dealing with state party committees that it did not
give in any other context, because there is no
other--well, there are two other context where it
explicitly says you can solicit.  But outside those
three contexts, you don't have that same leeway.

CHAIRMAN THOMAS:  Thank you.

We'll move on to Commissioner McDonald.

COMMISSIONER McDONALD:  Mr. Chairman, thank
you.  Thank all of you for coming this morning.

I'll start with you, Mr. McGinley.  Are
you--well, let me ask you first of all, you like to
be called William or Bill?

MR. McGINLEY:  Bill is fine.

COMMISSIONER McDONALD:  If you don't mind,
I'm not too interested in these last names.

44

Bill, let me ask you this.  You said in your opening remarks--and this is always kind of a discussion we've had for years around here--that most of these monies are really small fundraisers. I think Commissioner Weintraub alluded to it as well.  What can you tell me about that?  I mean do you have something that reflects that, and what would you constitute as a small fundraiser, just out of curiosity?

MR. McGINLEY:  I think that a lot of these fundraisers, especially in the context of county or local organizations, not the statewide organizations, are designed for two purposes.  I think the first is, is to provide financial support to the local party, which means you want to get as broad a participation as possible, so we're talking 25, 50, $100, state-regulated money permissible under the state laws.  We're not talking unregulated 527s.

The second thing is, is they're designed to broaden the volunteer base, to build the list of people that these local parties can energize, motivate and deploy on or around election day to perform the valuable party operations of getting out the vote, voter identification, voter registration,

all those types of activities that we think are
valuable to the process.

          COMMISSIONER McDONALD:  Let me just follow
if I might, going back to kind of a theme that Vice
Chairman Toner used, which is--and I agree with you
because I started out in county politics and I was
county secretary of the election board, so I
certainly concur with what you're saying.  But I was
just trying to think about the empirical data.  Do
you have something that kind of reflects that?  I
mean I'm sure you all have probably taken a pretty
good look at what's going on out there.  Do you have
some empirical data in relationship to the counties
as opposed to the states, for example, what kind of
money we are talking about, how many events there
are and so on?

          MR. McGINLEY:  One of the problems is, is
that it's going to vary by state.  I mean some
states have extremely low limits that are lower than
the federal limit.  And in those cases, I mean,
those type of limits are going to probably skew the
data and maybe overtake some of the states, like I
said, Virginia or an Illinois where it permits--
unlimited contributions are permitted.

          As far as empirical data, I can't point to
anything right now.  I am confident that I can go

back and dig up some type of data to get you an
average contribution size to a political party.

Now, if it's anything like the federal
level, given the volume of people who contribute and
the types of dollars and the types of response
mechanisms that are employed to get these donations,
I would suspect that it's a fairly low dollar
amount.  I would be very surprised if it was over
$250.  I can't point to anything concrete, but that
is simply a guesstimation by my part.

COMMISSIONER McDONALD:  No, and I
appreciate that.  It's a tough question.  I'm just
trying to get some sense of it because when we are
talking about those kind of things, obviously, the
first thing that comes to my mind is what is the
definition so we can have something to work with,
but I can appreciate the dilemma.

Let me if I could just a minute, say to
Larry that one of the reasons that the Chairman
didn't turn the light on of course was you didn't
acknowledge the other four commissioners, and we
were very hurt.

[Laughter.]

MR. NOBLE:  I apologize.

COMMISSIONER McDONALD:  I noticed that
immediately.  Was it something I had said?

Let me ask about the thing that maybe strikes me as the most tricky, which is if you have a Democratic Governors Association program going on, and as an example, on one day there's an effort to raise money--I think all these are tied in some sense to trying to raise money--but the next day there are a panel of federal officials, for example, that want to come in and maybe they want to talk about reapportionment, maybe they want to talk about Social Security, maybe they want to--you know, whatever it might be.

What is your view of that? I mean is there--going back to a point Ms. Weintraub made about structuring possibilities, is it inclusive in say a 3-day event, for example, or would it be--I'm just trying to figure out what you would normally do. I'm trying to think logically of how you would approach this, and if I came in and spoke on day one about Social Security, that on day two, or maybe to close out, possibly the other way around, money was being raised. What would be the logistics there and what would you anticipate I would need to do about that to be in safe harbor, for lack of a better term, or would there be one?

MR. NOBLE: That's a very fact-intensive question. I mean you would have to look at the

event and see how the event structured.  Was the
whole event structured as a fundraising event with
several days?  Were there separate events going on?
I mean I can think of a variety of different
scenarios where if somebody would say the whole
event was a soft money fundraising event and it
lasted for several days, and not every moment were
they saying, "Make contributions," but the whole
tenor of the event, for 3 days, for a week, was a
fundraising event.  There may be others where there
were separate events going on in the same place.

There are going to be a lot of factual
questions in these.

COMMISSIONER McDONALD:  The reason I wanted
to have something fact-specific as much as I could
is that the other side of it is, going back to the
Vice Chairman's point and my colleague's points
about kind of a vagueness in information--and I take
your point.  I'm just saying that as a practical
matter I think that's one of the things that comes
to mind, and I go back to something Mr. McGinley,
Bill, if I may, said early on, which is, I don't
want to see people inadvertently get in trouble.
That I don't want to see because I think that would
really be kind of putting things up on its head it
seems like to me.

MR. NOBLE: But if I may, Mr. Commissioner,
right now they have to figure out--prior to BCRA
they had to figure out was it a fundraising event
because they'd have to cost their fundraising
events, and allocating it they would have to figure
out what was the fundraising event? So they're used
to doing that.

COMMISSIONER McDONALD: Very good point.

CHAIRMAN THOMAS: Commissioner Smith?

COMMISSIONER SMITH: Thank you, Mr.
Chairman.

I have a question for either Mr. Ryan or
Mr. Noble. I guess we'll ask Mr. Ryan because we've
just seen you less here.

Mark Brewer, writing for the Michigan
Democratic Party notes that any sophisticated big
dollar contributor's decision to contribute is
highly unlikely to turn on whether the candidate
speaker has expressly solicited continuing support
for the party committee. If the candidate's
objective is to encourage nonfederal contributions,
speaking favorably of the importance of the state
party at her election achieves that objective. The
candidate is unlikely to raise more money because
she endorses her--or reduces her endorsement of the

state party activity to an express request for
additional financial support.

In light of those comments, I guess, would
you disagree and think that that is not true, and
assuming that we felt in our experience, in our
expertise, that it is true, would it be your opinion
then that a federal candidate could not appear at
one of these state fundraisers or local fundraising
events, and speak favorably of the importance of the
state party to his or her election?

MR. RYAN:  I think that it's again a fact-
intensive inquiry, and it touches in part on what
constitutes speaking favorably.  If speaking
favorably also entails mentioning money and the need
to donate, supporting by donating, then that would
constitute a solicitation in my mind.

Congress drew a line in the sand here.
Congress drew a line to prohibit the solicitation of
soft money for reasons that we're all familiar with.
The fact that there may be some gray areas or some
difficult areas in which one might question the
potential of a particular transaction to corrupt a
federal party or a federal elected official, a
candidate, does not change the fact that Congress
drew this line in the sand and said in most cases
these are going to be much easier questions.  It's

51

the job of the Commission to appreciate and respect
the line that Congress drew, and to prohibit the
solicitation of soft money, notwithstanding these
situations in which one might doubt the corrupting
effect of the exchange of money.

COMMISSIONER SMITH:  See, here's the
problem I have.  Congress drew a line in the sand.
If so, at a minimum they drew it down below the tide
line and it was washed over many times and I think
they knew that that would be the case.

I was not wild about this provision when I
voted for it a couple years ago, but I've actually
become more supportive of the current reg. for many
reasons that have come out at this very hearing.
Nobody can say so far--we're early, but nobody can
say that there's any evidence of any abuses, and I
haven't seen any.  And the analysis I get just seems
very conclusory.  Well, Congress drew a line in the
sand.  Well, what line exactly did they draw?  It
was said at one point that they had carved out two
exceptions and only two exceptions.

Well, no, I think part of the issue is did
they carve out two exceptions or three exceptions?
And that's precisely the issue.  If Congress were
here--Congress's intent was to sever this
connection.  That's a line in the sand.  But their

intent was also to allow officeholders, obviously, to speak at these events, and I think they were balancing many intents between local and state party activity and other activity.  My experience is that Mr. McGinley is correct when he says that there is the possibility of a great deal of chilling at these events otherwise.  That's what I've noticed and that's how I think the system seems to work.  One intent of Congress obviously was to strike a balance.

So I just feel like the analysis I get is awfully conclusory, like I'm sort of being yelled at.  This is what Congress did, you must do X, when it's not clear that that's what Congress did.  As the court noted in the case, that the regulation we passed in fact passed as a Chevron Step 1.

In any case, I probably only have got a minute or so left, but what I notice at these things is we've got one set of comments from several groups, and they get to bring up three speakers for one set of comments, which seems to me to run the risk of drowning out other speakers who only get one speaker for one set of comments.

So, Mr. McGinley, whatever time I have left, if there's anything else that you want to

address here as we close out this panel, or respond
to, I'll give you that time.

        MR. McGINLEY:  Thank you, Commissioner
Smith.  I would simply want to make three points,
just to follow up on some of the testimony.  The
first is, is that these types of state and local
events are not insider games.  I mean these truly
are the events where the state party, the local
party volunteers and grass roots activists gather to
support and hear what's happening here in Washington
from the federal officeholders or candidates.  So in
that respect I don't think that these are as an end
run around the soft money ban.

        Number two, we keep talking about soft
money.  Well, we need to define what soft money is.
Soft money is money raised outside the limitations
and prohibitions of federal law.  It doesn't have to
be reported to the Commission.  Therefore, something
is permissible under state law, is permissible in
amount, is permissible in source under state law, it
seems that a federal officeholder or candidate
should be permitted to solicit it.  The corrupting
influence seems to rise above the amount limitations
or from the prohibited sources.  We don't have the
corrupting influence from these low dollars events.
These are grass roots activists.

54

Finally, I would urge the Commission to take into consideration codifying once again the association of state and local candidates and officeholders.  In many states there's an NRSC equivalent for state senators at the local level. These may or may not be part of the party structure. It seems it would be some benefit to the grass roots activists, to the volunteers, and to the other people who actually do the ground games there to be able to hear from the federal officeholders and candidates at the types of events where these people gather.  It facilitates communication between state and local officeholders and candidates and federal officeholders and candidates, and energizes the volunteer base of the parties.

CHAIRMAN THOMAS:  Thank you.

Mr. General Counsel.

MR. NORTON:  Thank you, Mr. Chairman, and thank you to the panel for coming.

The brief that was filed by Congressmen Shays and Meehan in the pending litigation argues, with respect to the definition of "solicit" that it ought to be defined to be more than simply to ask, but instead to seek eagerly or actively to seek to effect or to induce or persuade, and the Court cites Justice Scalia from the Wrigley case, who said,

"Solicitation includes not just explicit verbal
requests but also any speech or conduct that
implicitly invites the desired result.  Thus, a
salesman who extols the virtue of his company's
product to the retailer of a competitive brand is
engaged in solicitation even if he does not come
right out and ask the retailer to buy some."

          Mr. Ryan, I know this isn't your brief, but
you're a signer of an amicus brief in the litigation
and I assume you'd support the argument there.  What
if an officeholder is at a state party event that's
raising nonfederal funds and the officeholder gives
a foreign policy speech about the importance of
homeland security, and concludes by praising the
important work of the state party chairman to keep
open the state's largest Air National Guard base?
That seems to me analogous to extolling the virtues
of the product to the retailer who's selling your
competitor's brand.  Would you say that under those
circumstances a federal officeholder would be
soliciting at a state party event?

          MR. RYAN:  I would say that likely they
were not, and I would point to Judge Tatel's
comments at the Appellate Court hearing last
Thursday on this issue.  And Judge Tatel pointed
out, in questioning the Commission's attorney, that

what is at issue here with regards to the
solicitation is whether there is any indication of
suggestion related to money.  And the product at
issue in the context of the prohibition on
solicitation of soft money is soft money.  Is there
any indication or suggestion--is there any extolling
of the virtues of soft money contributions as part
of this particular federal elected official or
candidate's comments or not?  And this will be a
fact-intensive inquiry.  And when it is suggested
that--

        MR. NORTON:  I'm giving you the facts.  I
mean that was the speech and that was the sum-up
line at the end of the speech.  The speech was all
about policy and homeland security, and the speech
concludes with the line, "I'd like to praise the
important work of the state party chairman in
fighting to keep open the state's largest Air
National Guard base."

        MR. RYAN:  I think that most likely would
not be a solicitation.

        MR. NORTON:  What about, picking up on Mr.
McGinley's comments earlier, the officeholder
concludes by saying something like, "I'm grateful to
those of you who have supported the party in the
past.  You're helping us to get the party's message

to our communities and remain accountable to the
public we serve."  Is that without "more" a
solicitation?

        MR. RYAN:  I think that's moving towards
the line of solicitation, but perhaps not in and of
itself a solicitation, but moving towards the line.

        MR. NORTON:  Is it moving towards the line
in large part because the officeholder is giving a
speech at a fundraising event as opposed to being in
some other context?

        MR. RYAN:  It's moving towards the line
because there seems to be--there is a well known
implication that "supported" often equates to funds,
contributions, and the context this comment is being
made and the context to a fundraiser, as you've
noted.

        MR. NORTON:  So it's relevant that the
candidate is making the comment at a fundraiser?

        MR. RYAN:  I think that's one factor that
may be part of an agency's inquiry into whether or
not this constitutes a solicitation.

        MR. NORTON:  Doesn't that in part
demonstrate the difficulty that a candidates faces
in preparing to speak at a fundraiser and in the
difficulty the Commission faces in monitoring
speech?  What you're talking about is someone

standing up, speaking to a group of people who are
there because the party is seeking donations from
them.  And so the candidate, it seems to me, runs a
risk, without the regulation that's in place now,
that any statement could be construed in that
environment as fundraising.  Isn't the risk
increased in that environment because it's a
fundraising event?

      MR. RYAN:  I think that the Commission in
drafting the advisory opinions that are at issue in
this particular rulemaking engage in the activity of
trying to draw some lines about recognizing the
context of a fundraiser, and determining within that
context what may and what may not reasonably
interpret it as a solicitation.  In doing so, the
Commission has recognized, (A) that it is possible
to create such guidelines, and (B) that it is
necessary not only in the context of fundraisers,
but in candidate activity more generally to create
those guidelines.

      MR. NORTON:  Mr. Noble, would you agree
that the line is mentioning money, or would you say
that a general expression of support thanking the
attendees for their support might constitute a
solicitation if made at a fundraising event?

MR. NOBLE:  I agree with Paul.  I think if you're at a fundraising event and you start talking about supporting the party, then you are getting close to that line, and the Commission's going to have to draw that line.  I'm not sure there's going to be--I mean, you know, I think everybody agrees that when you get close to the line there's going to be debate about where, which side you fall on the line, and the Commission is going to have to draw some lines there and try to say what's---try to describe what's going on and why it feels that way.

But I do think when you're talking about a fundraising event and you start mentioning supporting the party, "I'm glad you're all here to support the party today," that, yes, then you are coming very close to the fundraising line.  If on the other hand you talk about foreign policy and homeland security, then, no, you're not involved in a solicitation.

MR. NORTON:  Thank you very much.

Thank you, Mr. Chairman.

CHAIRMAN THOMAS:  Mr. Deputy Staff Director Bob Costa.

MR. COSTA:  I have no questions at this time.

CHAIRMAN THOMAS:  Very well.

Do any of my colleagues have an absolutely emergency question that they need to inquire of this panel, even a non-emergency question? Commissioner Weintraub.

COMMISSIONER WEINTRAUB: Just one. I just wanted to seek some clarification from Mr. Ryan and Mr. Noble, who seem to endorse the view that if one is actively soliciting money at one of these events, that that would be a bad thing. I'm not sure I understand what it means to actively solicit, as opposed to passively solicit? I mean I'm just not sure what it means.

MR. NOBLE: I think what that addresses is the idea that Congress, in (e)(3), carved out an exception to allow them to appear at a fundraiser. One could argue--and the argument had been made previously--that the mere appearance at a fundraiser is in and of itself a solicitation, and in the other contexts I think it would be a solicitation or maybe a solicitation.

Here what it is saying is that the mere appearance at the fundraiser. The state party committee fundraiser does not make it a solicitation.

VICE CHAIRMAN TONER: If I could follow up on that question?

CHAIRMAN THOMAS:  Vice Chairman Toner.

VICE CHAIRMAN TONER:  Mr. Noble, I just want to make sure I'm clear.  The General Counsel had a hypothetical talking about homeland security and an officeholder attends that, speaks on that topic, and it is at a fundraising event, soft money is being raised.  It's your position that if in the speech there is any phraseology talking about the importance of people there to support the party, that that would be unlawful?

MR. NOBLE:  No.  And I said that might be misconstrued.  No, it depends the context it's said in.  So, for example, if you're talking about the context "It is important to support the party and let Congress know that we need this bill passed," or "Let Congress know that the base in our state should not be closed down," then you're dealing with a different context.

VICE CHAIRMAN TONER:  So using the phraseology of support the issues discussed, not a problem, but if there was any statement that said, "Hey, it's important for you to support the Florida Democratic Party," that that would be unlawful?

MR. NOBLE:  Again, this is very fact-intensive depending on what's going on around that.

If it's a soft--it's a large soft money fundraiser, yes.

CHAIRMAN THOMAS:  Commissioner Smith.

COMMISSIONER SMITH:  Thank you, Chairman Thomas.  I know we want to get this done, but this just raised--so let's vary the circumstances a little bit.  Let us suppose that the federal officeholder is there appearing, and the featured speaker at what is billed as a fundraising event, and the person introducing him not a federal candidate or officeholder, says, "And now Senator Jones is going to tell you why your continued financial support of the party is so important." Does the Senator then have to say, "I'm sorry, I'm going to have to pass on this one?"  I mean what does he do?

MR. NOBLE:  Well, also keep in mind--and I apologize for not mentioning this before--that there are ways that they can then give a disclaimer about what they're talking about.

COMMISSIONER SMITH:  So if he then gets up and says, "Now, I want you to be clear that despite what State Rep. Smith just said, in fact, I'm not asking you to give any money to the party."

MR. NOBLE:  Or "I'm not asking giving money
outside the federal prohibition thing."  That's the
rules you have.

COMMISSIONER SMITH:  What does that
accomplish?  I mean what person doesn't get the
message there?

MR. NOBLE:  Well, whether or not Congress
was wise in carving out this exception is another
point.  I mean I'm bothered by the exception, but
they did carve out an exception that does require
you to draw certain lines.  Now if Congress had said
in (e)(3) "and may solicit contributions at that
event," you wouldn't have this issue.  They didn't
say that.

COMMISSIONER SMITH:  But if it doesn't say,
if it doesn't make any sense, then why shouldn't--
isn't the better interpretation the one that the
Court agreed could be a permissible interpretation,
that they intended to allow the person to simply
speak and not worry about it?

MR. NOBLE:  No, I disagree because I didn't
say it doesn't make any sense.  I said there's some
very hard questions in this.

A lot of this depends on which end of the
telescope you're looking at it.  If you're looking
at it from the end that you're trying to ban the

64

solicitation of soft money by federal officeholders, then this makes perfect sense, which is it is banned, you can't do it. Congress carved out two exceptions--and by the way, when you said before two exceptions versus three exceptions I think what I was very clear about is there are two exceptions that mention the word "solicit." There's a third exception that allows him to appear at a fundraiser.

COMMISSIONER SMITH: Because we're over time, I want to get back--

MR. NOBLE: No, but I think it's important for this. That if you look at it from that level, what the Congress is doing is carving out certain exceptions. One of them allows them to appear but they can't solicit contributions.

COMMISSIONER SMITH: Well, we're over. I do think there are two ends in the telescope and one is whether you think people ought to be allowed to generally speak, and the other is whether you come at it from the position that those rights aren't so important.

Thank you, Mr. Chairman.

CHAIRMAN THOMAS: Thank you panel. We will move along. We are planning to get our next panel underway at 11:15. So that gives us, as near as I

can tell, about 7 or 8 minutes.  That should be
enough for bathroom breaks, et cetera.

Thank you.

[Recess.]

CHAIRMAN THOMAS:  Let us get underway.  I
am getting a signal we can proceed.

Our second panel we will take up now.  We
are going to reconvene, the second part of our
triple header.  It consists of Robert Bauer of the
Perkins Coie law firm; Thomas Josefiak, chief
counsel to the Republican National Committee and a
former Commissioner; and Donald Simon of Sonosky,
Chambers, Sachse, Endreson & Perry, here on behalf
of Democracy 21.

Once again, we'll go alphabetically.  Mr.
Bauer will go first, followed by Mr. Josefiak, and
then Mr. Simon, unless you have worked out some
other arrangement.  Mr. Bauer, please proceed.  Good
morning.  Good to see you.

MR. BAUER:  Good morning.  I will be very,
very brief.  I have submitted comments, and I assume
that the Commissioners are most interested in asking
questions and developing a dialogue.  So I would
organize my few introductory remarks around two
questions:  What is the gain of changing the rule
the Commission originally adopted?  And what is the

# PLAINTIFFS' EXHIBIT 142

## Regulatory Flexibility Certification

In accordance with the Regulatory Flexibility Act of 1980 (5 U.S.C. 605(b)), the NRC certifies that this rule will not, if issued, have a significant economic impact on a substantial number of small entities. This direct final rule consists of an administrative change to the company name and does not affect any small entities.

## Backfit Analysis

The NRC has determined that the backfit rule (10 CFR 50.109 or 10 CFR 72.62) does not apply to this direct final rule because this amendment does not involve any provisions that would impose backfits as defined. Therefore, a backfit analysis is not required.

## Small Business Regulatory Enforcement Fairness Act

In accordance with the Small Business Regulatory Enforcement Fairness Act of 1996, the NRC has determined that this action is not a major rule and has verified this determination with the Office of Information and Regulatory Affairs, Office of Management and Budget.

## List of Subjects in 10 CFR Part 72

Administrative practice and procedure, Criminal penalties, Manpower training programs, Nuclear materials, Occupational safety and health, Penalties, Radiation protection, Reporting and recordkeeping requirements, Security measures, Spent fuel, Whistleblowing.

■ For the reasons set out in the preamble and under the authority of the Atomic Energy Act of 1954, as amended; the Energy Reorganization Act of 1974, as amended; and 5 U.S.C. 552 and 553; the NRC is adopting the following amendments to 10 CFR Part 72.

## PART 72—LICENSING REQUIREMENTS FOR THE INDEPENDENT STORAGE OF SPENT NUCLEAR FUEL, HIGH-LEVEL RADIOACTIVE WASTE, AND REACTOR-RELATED GREATER THAN CLASS C WASTE

■ 1. The authority citation for Part 72 continues to read as follows:

**Authority:** Secs. 51, 53, 57, 62, 63, 65, 69, 81, 161, 182, 183, 184, 186, 187, 189, 68 Stat. 929, 930, 932, 933, 934, 935, 948, 953, 954, 955, as amended, sec. 234, 83 Stat. 444, as amended (42 U.S.C. 2071, 2073, 2077, 2092, 2093, 2095, 2099, 2111, 2201, 2232, 2233, 2234, 2236, 2237, 2238, 2282); sec. 274, Pub. L. 86–373, 73 Stat. 688, as amended (42 U.S.C. 2021); sec. 201, as amended, 202, 206, 88 Stat. 1242, as amended, 1244, 1246 (42 U.S.C. 5841, 5842, 5846); Pub. L. 95–601, sec.

10, 92 Stat. 2951 as amended by Pub. L. 102–486, sec. 7902, 106 Stat. 3123 (42 U.S.C. 5851); sec. 102, Pub. L. 91–190, 83 Stat. 853 (42 U.S.C. 4332); secs. 131, 132, 133, 135, 137, 141, Pub. L. 97–425, 96 Stat. 2229, 2230, 2232, 2241, sec. 148, Pub. L. 100–203, 101 Stat. 1330–235 (42 U.S.C. 10151, 10152, 10153, 10155, 10157, 10161, 10168); sec. 1704, 112 Stat. 2750 (44 U.S.C. 3504 note).

Section 72.44(g) also issued under secs. 142(b) and 148(c), (d), Pub. L. 100–203, 101 Stat. 1330–232, 1330–236 (42 U.S.C. 10162(b), 10168(c),(d)). Section 72.46 also issued under sec. 189, 68 Stat. 955 (42 U.S.C. 2239); sec. 134, Pub. L. 97–425, 96 Stat. 2230 (42 U.S.C. 10154). Section 72.96(d) also issued under sec. 145(g), Pub. L. 100–203, 101 Stat. 1330–235 (42 U.S.C. 10165(g)). Subpart J also issued under secs. 2(2), 2(15), 2(19), 117(a), 141(h), Pub. L. 97–425, 96 Stat. 2202, 2203, 2204, 2222, 2244 (42 U.S.C. 10101, 10137(a), 10161(h)). Subparts K and L are also issued under sec. 133, 98 Stat. 2230 (42 U.S.C. 10153) and sec. 218(a), 96 Stat. 2252 (42 U.S.C. 10198).

■ 2. In § 72.214, Certificate of Compliance 1007 is revised to read as follows:

### § 72.214   List of approved spent fuel storage casks.

\*     \*     \*     \*     \*

Certificate Number: 1007.
Initial Certificate Effective Date: May 7, 1993.
  Amendment Number 1 Effective Date: May 30, 2000.
  Amendment Number 2 Effective Date: September 5, 2000.
  Amendment Number 3 Effective Date: May 21, 2001.
  Amendment Number 4 Effective Date: February 3, 2003.
  Amendment Number 5 Effective Date: September 13, 2005.
SAR Submitted by: BNG Fuel Solutions Corporation.
SAR Title: Final Safety Analysis Report for the Ventilated Storage Cask System.
Docket Number: 72–1007.
Certificate Expiration Date: May 7, 2013.
Model Number: VSC–24.

Dated at Rockville, Maryland, this 14th day of June, 2005.

For the Nuclear Regulatory Commission.

**Luis A. Reyes,**

*Executive Director for Operations.*

[FR Doc. 05–12889 Filed 6–29–05; 8:45 am]

BILLING CODE 7590–01–P

## FEDERAL ELECTION COMMISSION

## 11 CFR Part 300

[Notice 2005–17]

## Candidate Solicitation at State, District, and Local Party Fundraising Events

**AGENCY:** Federal Election Commission.

**ACTION:** Revised Explanation and Justification.

**SUMMARY:** The Federal Election Commission is publishing a revised Explanation and Justification for its rule regarding appearances by Federal officeholders and candidates at State, district, and local party fundraising events under the Federal Election Campaign Act of 1971, as amended ("FECA"). The rule, which is not being amended, contains an exemption permitting Federal officeholders and candidates to speak at State, district, and local party fundraising events "without restriction or regulation." These revisions to the Explanation and Justification conform to the decision of the U.S. District Court for the District of Columbia in *Shays* v. *FEC*. Further information is provided in the supplementary information that follows.

**DATES:** Effective June 30, 2005.

**FOR FURTHER INFORMATION CONTACT:** Ms. Mai T. Dinh, Assistant General Counsel, Mr. Robert M. Knop, Attorney, or Ms. Margaret G. Perl, Attorney, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107–155, 116 Stat. 81 (2002), limits the amounts and types of funds that can be raised in connection with Federal and non-Federal elections by Federal officeholders and candidates, their agents, and entities directly or indirectly established, financed, maintained, or controlled by, or acting on behalf of Federal officeholders or candidates ("covered persons"). *See* 2 U.S.C. 441i(a). Covered persons may not "solicit, receive, direct, transfer or spend" non-Federal funds in connection with an election for Federal, State, or local office except under limited circumstances. *See* 2 U.S.C. 441i(e); 11 CFR part 300, subpart D.

Section 441i(e)(3) of FECA states that "notwithstanding" the prohibition on raising non-Federal funds, including Levin funds, in connection with a Federal or non-Federal election in section 441i(b)(2)(C) and (e)(1), "a candidate or an individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party." *Id.* During its 2002 rulemaking to implement this provision, the Commission considered competing interpretations of this provision. The Commission decided to promulgate rules at 11 CFR 300.64(b) construing the statutory provision to permit Federal officeholders and candidates to attend, speak, and appear as featured guests at fundraising events for a State, district, and local committee of a political party

("State party") "without restriction or regulation." *See* Final Rules on Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money, 67 FR 49064, 49108 (July 29, 2002).

In *Shays* v. *FEC,* the district court held that the Commission's Explanation and Justification for the fundraising provision in 11 CFR 300.64(b) did not satisfy the reasoned analysis requirement of the Administrative Procedure Act, 5 U.S.C. 553 (2000) ("APA"). *See* 337 F. Supp. 2d 28, 93 (D.D.C. 2004), *appeal pending* No. 04–5352 (D.C. Cir.). The court held, however, that the regulation did not necessarily run contrary to Congress's intent in creating the fundraising exemption, was based on a permissible construction of the statute, and did not "unduly compromise[] the Act's purposes." *Id.* at 90–92 (finding the regulation survived *Chevron* review).[1] The Commission did not appeal this portion of the district court decision.

To comply with the district court's order, the Commission issued a Notice of Proposed Rulemaking to provide proposed revisions to the Explanation and Justification for the current rule in section 300.64. *See* Notice of Proposed Rulemaking on Candidate Solicitation at State, District and Local Party Fundraising Events, 70 FR 9013, 9015 (Feb. 24, 2005) ("NPRM"). As an alternative to providing a new Explanation and Justification for the current rule, the NPRM also proposed revisions to current section 300.64 that would prohibit Federal officeholders and candidates from soliciting or directing non-Federal funds when attending or speaking at State party fundraising events. *See id.* at 9015–16. The NPRM sought public comment on both options.

The public comment period closed on March 28, 2005. The Commission received eleven comments from sixteen commenters in response to the NPRM, including a letter from the Internal Revenue Service stating "the proposed explanation and the proposed rules do not pose a conflict with the Internal

Revenue Code or the regulations thereunder." The Commission held a public hearing on May 17, 2005 at which six witnesses testified. The comments and a transcript of the public hearing are available at *http://www.fec.gov/law/law_rulemakings.shtml* under "Candidate Solicitation at State, District and Local Party Fundraising Events." For the purposes of this document, the terms "comment" and "commenter" apply to both written comments and oral testimony at the public hearing.

The commenters were divided between those supporting the current exemption in section 300.64 and those supporting the alternative proposed rule. Several commenters urged the Commission to retain the current exemption as a proper interpretation of 2 U.S.C. 441i(e)(3). One commenter argued that section 441i(e)(3) created a total exemption because Congress knew that State and local parties requested Federal officeholders and candidates to speak at these fundraisers to increase attendance, but that these appearances do not create any *quid pro quo* contributions for the speaker. Some commenters stressed the importance of the relationship between Federal and State candidates and stated that the current exemption properly recognizes the need for Federal officeholders and candidates to participate in State party fundraising events.

Some commenters viewed the alternative proposed rule requiring a candidate to avoid "words of solicitation" as problematic because it would necessitate Commission review of speech at such events. These commenters asserted that the alternative rule would cause Federal officeholders and candidates to refuse to participate in State party fundraising events for fear that political rivals will attempt to seize on something in a speech as an impermissible solicitation. One commenter noted that Federal officeholders and candidates, who are attending State party fundraisers, are expected to thank attendees for their past and continued support for the State party, and without a complete exemption, such a courtesy could be treated as a solicitation.

Another commenter noted that party committees and campaign staff have worked hard over the past two years doing training, following Commission meetings and advisory opinions, and absorbing enforcement cases as they have developed. Another commenter noted that State parties have already had to adjust their fundraising practices during the 2004 election cycle to comply with BCRA. Two commenters

argued that further regulatory changes at this point would only increase the costs of compliance and fundraising for State parties that already operate on a small budget.

In contrast, some commenters supported the alternative proposed rule that would bar Federal candidates and officeholders from soliciting non-Federal funds when appearing and speaking at State party fundraising events. Some commenters argued that the *Shays* opinion, while upholding section 300.64 under *Chevron,* criticized the Commission's interpretation as "likely contraven[ing] what Congress intended \* \* \* as well as \* \* \* the more natural reading of the statute \* \* \*." (*Quoting Shays,* 337 F. Supp. 2d at 91.) Thus, these commenters argued that the structure of section 441i(e) as a whole, as well as the specific wording of section 441i(e)(3), when compared to the exceptions for candidates for State and local office and certain tax-exempt organizations (sections 441i(e)(2) and (e)(4), respectively), demonstrate that section 441i(e)(3) should not be construed as a total exemption from the soft money solicitation prohibitions. Accordingly, these commenters argued that the legislative history of BCRA better supports the interpretation in the alternative proposed rule. These commenters also argued that the Commission's proposed Explanation and Justification did not sufficiently address the district court's concern as to why the Commission believed that monitoring speech at State party fundraising events is more difficult or intrusive than in other contexts where solicitations of non-Federal funds are almost completely barred. *Shays,* 337 F. Supp. 2d at 93. Finally, these commenters noted that Federal officeholders and candidates should be able to distinguish speaking from "soliciting," as they are required to do in other situations such as charitable activity governed by the Senate Ethics Rules or political activity regulated by the Federal Hatch Act, 5 U.S.C. 7323, and could properly tailor their speeches to comply with the alternative proposed rule.

The Commission has decided, after carefully weighing the relevant factors, to retain the current exemption in section 300.64 permitting Federal officeholders and candidates to attend, speak, or be featured guests at State party fundraising events without restriction or regulation. The reasons for this decision are set forth below in the revised Explanation and Justification for current section 300.64.

---

[1] The district court described the first step of the *Chevron* analysis, which courts use to review an agency's regulations: "a court first asks 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *See Shays,* at 51 (quoting *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council,* 467 U.S. 837, 842–43(1984)). In the second step of the *Chevron* analysis, the court determines if the agency interpretation is a permissible construction of the statute which does not "unduly compromise" FECA's purposes by "creat[ing] the potential for gross abuse." *See Shays* at 91, *citing Orloski* v. *FEC,* 795 F.2d 156, 164–65 (D.C. Cir. 1986) (internal citations omitted).

**Explanation and Justification**

*11 CFR 300.64—Exemption for Attending, Speaking, or Appearing as a Featured Guest at Fundraising Events*

11 CFR 300.64(a)

The introductory paragraph in 11 CFR 300.64 restates the general rule from the statutory provision in section 441i(e)(3): "[n]otwithstanding the provisions of 11 CFR 100.24, 300.61 and 300.62, a Federal candidate or individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party, including but not limited to a fundraising event at which Levin funds are raised, or at which non-Federal funds are raised."

The Commission clarifies in section 300.64(a) that State parties are free within the rule to publicize featured appearances of Federal officeholders and candidates at these events, including references to these individuals in invitations. However, Federal officeholders and candidates are prohibited from serving on "host committees" for a party fundraising event at which non-Federal funds are raised or from signing a solicitation in connection with a party fundraising event at which non-Federal funds are raised, on the basis that these pre-event activities are outside the statutory exemption in section 441i(e)(3) permitting Federal candidates and officeholders to "attend, speak, or be a featured guest" at fundraising events for State, district, or local party committees.

11 CFR 300.64(b)

In promulgating 11 CFR 300.64(b), the Commission construes 2 U.S.C. 441i(e)(3) to exempt Federal officeholders and candidates from the general solicitation ban, so that they may attend and speak "without restriction or regulation" at State party fundraising events. The Commission bases this interpretation on Congress's inclusion of the "notwithstanding paragraph (1)" phrase in section 441i(e)(3), which suggests Congress intended the provision to be a complete exemption. *See Cisneros* v. *Alpine Ridge Group*, 508 U.S. 10, 18 (1993) ("[T]he Courts of Appeals generally have 'interpreted similar "notwithstanding" language * * * to supercede all other laws, stating that a clearer statement is difficult to imagine.' ") (internal citation omitted).

Although some commenters argue that section 441i(e)(3) of FECA does not permit solicitation because Congress did not include the word "solicit" in that exception, the *Shays* court stated:

"[w]hile it is true that Congress created carve-outs for its general ban in other provisions of BCRA utilizing the term 'solicit' or 'solicitation,' *see 2 U.S.C. 441i(e)(2), (4)*, these provisions do not conflict with the FEC's reading of Section (e)(3)." *See Shays*, 337 F. Supp. 2d at 90; *see also Shays* at 89 ("However, as Defendant observes, 'if Congress had wanted to adopt a provision allowing Federal officeholders and candidates to attend, speak, and be featured guests at state party fundraisers but denying them permission to speak about soliciting funds, Congress could have easily done so.' ").

Furthermore, construing section 441i(e)(3) to be a complete exemption from the solicitation restrictions in section 441i(e)(1) gives the exception content and meaning beyond what section 441i(e)(1)(B) already permits. Section 441i(e)(1)(A) establishes a general rule against soliciting non-Federal funds in connection with a Federal election. Section 441i(e)(1)(B) permits the solicitation of non-Federal funds for State and local elections as long as those funds comply with the amount limitations and source prohibitions of the Act. In contrast to assertions by commenters that without section 441i(e)(3) candidates would not be able to attend, appear, or speak at State party events where soft money is raised, the Commission has determined that under section 441i(e)(1)(B) alone, Federal officeholders and candidates would be permitted to speak and solicit funds at a State party fundraiser for the non-Federal account of the State party in amounts permitted by FECA and not from prohibited sources. *See* Advisory Opinions 2003–03, 2003–05 and 2003–36. Section 441i(e)(3) carves out a further exemption within the context of State party fundraising events for Federal officeholders and candidates to attend and speak at these functions "notwithstanding" the solicitation restrictions otherwise imposed by 441i(e)(1). Interpreting section 441i(e)(3) merely to allow candidates and officeholders to attend or speak at a State party fundraiser, but not to solicit funds without restriction, would render it largely superfluous because Federal candidates and officeholders may already solicit up to $10,000 per year in non-Federal funds from non-prohibited sources for State parties under section 441i(e)(1)(B).

The Commission agrees with one commenter who stated that the "more natural" interpretation of 2 U.S.C. 441i(e)(3) is that found in current section 300.64. The Commission also believes that such an interpretation is more consistent with legislative intent.

Section 300.64(b) effectuates the careful balance Congress struck between the appearance of corruption engendered by soliciting sizable amounts of soft money, and preserving the legitimate and appropriate role Federal officeholders and candidates play in raising funds for their political parties. Just as Congress expressly permitted these individuals to raise and spend non-Federal funds when they themselves run for non-Federal office (*see* 2 U.S.C. 441i(e)(2)), and to solicit limited amounts of non-Federal funds for certain 501(c) organizations (*see* 2 U.S.C. 441i(e)(4)), Congress also enacted 2 U.S.C. 441i(e)(3) to make clear that Federal officeholders and candidates could continue to play a role at State party fundraising events at which non-Federal funds are raised. The limited nature of this statutory exemption embodied in 11 CFR 300.64 is evident in that it does not permit Federal officeholders and candidates to solicit non-Federal funds for State parties in written solicitations, pre-event publicity or through other fundraising appeals. *See* 11 CFR 300.64(a).

The commenters also stressed the importance of the unique relationship between Federal officeholders and candidates and their State parties. They emphasized that these party fundraising events mainly serve to energize grass roots volunteers vital to the political process.

By definition, the primary activity in which persons attending or speaking at State party fundraising events engage is raising funds for the State parties. It would be contrary to BCRA's goals of increasing integrity and public faith in the campaign process to read the statute as permitting Federal officeholders and candidates to speak at *fundraising* events, but to treat only some of what they say as being in furtherance of the goals of the entire event. As one commenter noted regarding Federal candidate appearances at State party fundraising events, "the very purpose of the candidate's invited involvement—or at least a principal one—is to aid in the successful raising of money. So there is little logic, and undeniably the invitation to confusion, in allowing candidates to speak and appear in aid of fundraising purposes, while insisting that the candidate's speech be free of apparent fundraising appeals." Determining what specific words would be merely "speaking" at such an event without crossing the line into "soliciting" or "directing" non-Federal funds raises practical enforcement concerns. *See* 11 CFR 300.2(m) (definition of "to solicit") and 300.2(n) (definition of "to direct"). A regulation

that permitted speaking at a party event, the central purpose of which is fundraising, but prohibited soliciting, would require candidates to perform the difficult task of teasing out words of general support for the political party and its causes from words of solicitation for non-Federal funds for that political party. As the U.S. Supreme Court stated in *Buckley* v. *Valeo*:

[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.

424 U.S. 1, 43 (1976); *see also Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U.S. 620, 632 (1980) (noting that "solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views"); *Thomas* v. *Collins*, 323 U.S. 516, 534–35 (1945) (stating that "[g]eneral words create different and often particular impressions on different minds. No speaker, however careful, can convey exactly his meaning, or the same meaning, to the different members of an audience * * * [I]t blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim"); *Grayned* v. *City of Rockford*, 408 U.S. 104, 116 (1972) (holding that "[t]he nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable." * * * The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.").

A complete exemption in section 300.64(b) that allows Federal officeholders and candidates to attend and speak at State party fundraising events without restriction or regulation avoids these significant concerns. A number of commenters noted the potential impact of these concerns if the Commission did not retain current 11 CFR 300.64(b). For example, one commenter "strongly urge[d] the Commission not to adopt a 'speak but don't solicit' rule. As noted in the NPRM itself, such a rule would 'require candidates to tease out' appropriate words from inappropriate ones." This commenter further stated that he "also

fear[s] the outcome if a 'middle ground' is adopted, wherein federal officeholders and candidates could attend fundraisers but not use words that might be deemed solicitation for money. This would, first and foremost, open up a whole new battleground in politics, as every statement made by a Congressman at his party's Jefferson/Jackson day (or Lincoln Day) dinner will be scrutinized to see if it complies with requirements." Another commenter noted that current 11 CFR 300.64 "applies only to the speeches that a Federal officeholder or candidate may give at a State or local party event. It reflects the practical realities of these events. As a featured speaker, an officeholder is expected to thank the attendees for their past and continued support of the party. Without the current exemption, this common courtesy might well be treated as a violation of the ban on the solicitation of non-Federal funds. The Commission would then be placed in the position of determining whether a normal and expected expression of gratitude or request for support crosses some indeterminate line and violates the law." Another commenter urged the Commission to retain the current regulation so that Federal officeholders and candidates would not be exposed to "legal jeopardy" because the proposed alternative rule would leave "too much opportunity for someone to second guess and misinterpret a speech made at this type of event." The same commenter stated that the Commission is faced with the question of whether or not to adopt a rule "that allows candidates and officeholders to be placed at the mercy of those who would misinterpret or mischaracterize the speech they give."

At the hearing, the Commission explored a number of scenarios involving a Federal officeholder or candidate speaking at a party fundraising event. The discussion illustrates the difficulty for not only the Commission, but also Federal officeholders and candidates, in parsing speech under the alternative proposed rule. For example, when asked whether statements like "I'm glad you're here to support the party," and "thank you for your continuing support of the party," constitute solicitation, the commenters who favor the alternative proposed rule could not give definitive answers. They acknowledged that the word "support" may be construed as a solicitation when spoken at a fundraising event but not when spoken at other types of events. Likewise, commenters who favored the current rule expressed uncertainty as to

whether these phrases would be construed as solicitations when spoken at a fundraising event.

The commenters disagreed as to whether a Federal officeholder or candidate delivering a speech under a banner hung by the State party reading "Support the 2005 State Democratic ticket tonight" would be construed as impermissible solicitation unless explicit disclaimers were included in the speech. Some commenters noted that even a "pure policy" speech, otherwise permissible at a non-fundraising event, could constitute an impermissible solicitation in the context of a State party fundraising event. Finally, many commenters could not provide a clear answer as to whether a policy speech that included a statement of support for the "important work" of the State party chairman on a particular issue (such as military base closures in the state) could be construed as an impermissible solicitation. In each of these examples the commenters stated that an analysis of the particular facts and circumstances surrounding the speech would be required in order to determine whether a speech would be solicitation. However, the commenters analyzed the facts and circumstances differently, and when presented with the same facts and circumstances, they could not come to agreement on whether the speech was a solicitation.

The inability of the commenters to provide clear answers to these scenarios demonstrates how parsing speech at a State party fundraising event is more difficult than in other contexts and why it would be especially intrusive for the Commission to enforce the alternative proposed rule. As illustrated during the discussion at the hearing and observed by one of the commenters, whether a particular message is a solicitation may depend on the person hearing the message—what one person interprets as polite words of acknowledgement may be construed as a solicitation by another person. The likelihood of this misinterpretation occurring increases at a State party fundraising event because of the Federal officeholders' and candidates' unique relationship to, and special identification with, their State parties.

The Commission believes that the alternative rule would, as a practical matter, make the statutory exception at 2 U.S.C. 441i(e)(3) for appearances at State and local party fundraising events a hollow one. Given that the Federal officeholder's appearance would be, by definition, at a fundraising event, it would be exceedingly easy for opposing partisans to file a facially plausible complaint that the candidate or Federal

Federal Register / Vol. 70, No. 125 / Thursday, June 30, 2005 / Rules and Regulations    **37653**

officeholder's words or actions at the event constituted a "solicitation." In such circumstances, the Commission believes that Federal officeholders and candidates would be reluctant to appear at State party fundraising events, as doing so would risk complaints, intrusive investigations, and possible violations based on general words of support for the party.

Some commenters argued that Federal officeholders and candidates should be able to distinguish between permissible speech and an impermissible solicitation under the alternative rule because Federal employees are already required to make such judgments when involved in political activity pursuant to the Hatch Act. *See* 5 U.S.C. 7323; 5 CFR 734.208(b). Under the Hatch Act and its implementing regulations, a Federal employee "may give a speech or keynote address at a political fundraiser * * * as long as the employee does not solicit political contributions." *See* 5 CFR 734.208, Example 2. However, there are significant differences between the requirements of the Hatch Act and the Commission's regulations which make it much easier for Federal employees to know which words are words of solicitation under the Hatch Act scheme, than under the alternative proposed rule.

Although the Hatch Act restriction appears similar to the proposed alternative rule banning Federal officeholders and candidates from soliciting money when speaking at State party fundraising events, the Hatch Act is a narrower standard that provides clear guidance to speakers to distinguish permissible speech. First, the implementing regulations for the Hatch Act contain a narrow definition of "solicit" meaning "to request expressly" that another person contribute something. *See* 5 CFR 734.101. Thus, for example, the Hatch Act regulations explain that an employee may serve as an officer or chairperson of a political fundraising organization so long as they do not personally solicit contributions, *see* 5 CFR 734.208, Example 7, while Federal officeholders and candidates may not serve in such capacity under 2 U.S.C. 441i(e) and 11 CFR 300.64. Moreover, in order to violate the Hatch Act, a Federal employee must "knowingly" solicit contributions—a higher standard than that employed in FECA and Commission regulations. Thus, a Federal employee would not be penalized for unintentionally crossing the line into "solicitation" under the Hatch Act, whereas the alternative proposed rule would reach situations where the Federal officeholder or candidate speech could be construed as

an impermissible solicitation, regardless of the speaker's knowledge or intent.

A commenter cited the Senate Ethics Manual explaining Rule 35 of the Senate Code of Official Conduct, arguing that Federal officeholders and candidates know how to ask for money and avoid asking for money. The Senate rule targets solicitation of gifts from registered lobbyists and foreign agents and applies to situations not analogous to State party fundraising events. Rule 35 prohibits Senators and their staff from soliciting charitable donations from registered lobbyists and foreign agents but makes an exception, among others, for a fundraising event attended by fifty or more people. Thus, at a fundraising event attended by fifty or more people, including registered lobbyists and foreign agents, senators do not need to be concerned that their speech soliciting charitable donations is an impermissible solicitation of a gift under Rule 35.

Many commenters stressed the need for Federal officeholders and candidates to have clear notice regarding what speech would be allowable at these State party fundraising events, as the unwary could unintentionally run afoul of a more restrictive rule. A complete exemption in section 300.64(b) that allows Federal officeholders and candidates, in these limited circumstances, to attend and speak at State party committee fundraising events without restriction or regulation, including solicitation of non-Federal or Levin funds, avoids these concerns and the practical enforcement problems they entail. The exemption provides a straightforward, clear rule that Federal officeholders and candidates may easily comprehend and that the Commission may practically administer. It also fully complies with the plain meaning of BCRA.

Furthermore, as noted above, current 11 CFR 300.64 is carefully circumscribed and only extends to what Federal candidates and officeholders say at the State party fundraising events themselves. The regulation tracks the statutory language by explicitly allowing Federal candidates and officeholders to attend *fundraising* events and in no way applies to what Federal candidates and officeholders do outside of State party fundraising events. Specifically, the regulation does not affect the prohibition on Federal candidates and officeholders from soliciting non-Federal funds for State parties in fundraising letters, telephone calls, or any other fundraising appeal made before or after the fundraising event. Unlike oral remarks that a Federal candidate or officeholder may

deliver at a State party fundraising event, when a Federal candidate or officeholder signs a fundraising letter or makes any other written appeal for non-Federal funds, there is no question that a solicitation has taken place that is restricted by 2 U.S.C. 441i(e)(1). Moreover, it is equally clear that such a solicitation is not within the statutory safe harbor at 2 U.S.C. 441i(e)(3) that Congress established for Federal candidates and officeholders to attend and speak at State party fundraising events.

Finally, there does not appear to be evidence of corruption or abuse under the current rule that dictates a change in Commission regulations. Commenters both favoring and opposed to the regulation in its current form agreed that there is no evidence that the operation of this exemption in the past election cycle in any way undermined the success of BCRA cited by its Congressional sponsors. Congress specifically allowed Federal candidates and officeholders to attend and speak at State party *fundraising* events. The statute permits attendance where non-Federal funds are being raised, and policing what may be said in both private and public conversations with donors at such events does little to alleviate actual or apparent corruption. One commenter pointed out that most of these fundraising events require a contribution to the State party as the cost of admission, and do not present a significant danger of corruption from solicitation at the event itself by speakers. As one commenter noted, "it is difficult to identify any regulatory benefit to be derived by additional restrictions on what a candidate might say to an audience that already has chosen to attend and contribute [when] without any overt solicitation, the candidate's appearance at the event already makes clear the importance that she attaches to the party's overall campaign efforts." The Commission agrees with the commenters that additional restrictions on what a candidate may say once at the fundraising event provides little, if any, anti-circumvention protection since, as one commenter noted in oral testimony, "the ask has already been made * * * The people are already there. They are motivated to be there" and the funds have already been received by the party committee before the Federal candidate and officeholder speaks at the fundraising event. A commenter observed, "most political events I am familiar with involve the raising of funds as a condition of admission as opposed to a solicitation at an event."

Another commenter stated that "in most instances the money for the event has already been raised. Therefore, the candidate or officeholder's appearance and speech [are] not a solicitation."

Another commenter noted that most of these fundraising events are small-dollar events targeted at grass roots volunteers where donations are usually less than $100, and do not include corporations or single-interest groups. An additional commenter stated that "Congress knew that state and local party committees request officeholders speak at party events to increase attendance and the party's yield from the event. It was also aware that speeches at these events are unlikely of themselves to foster the quid pro quo contributions that the law seeks to curb." Thus, many of these events already comply with amount limitations and source prohibitions for solicitation under section 441i(e)(1)(B). In contrast, other commenters asserted that there was a potential for abuse if Federal candidates and officeholders make phone calls from the event asking donors for non-Federal funds, or gather together a group of wealthy donors and label it a "State party fundraising event" in order to benefit from the exemption in section 300.64. However, in response to Commission questioning at the hearing, no commenter could point to any reports of such activity in the past election cycle. If the Commission detects evidence of abuse in the future, the Commission has the authority to revisit the regulation and take action as appropriate, including an approach targeted to the specific types of problems that are actually found to occur.

**Additional Issues**

*1. Other Fundraising Events*

In the NPRM, the Commission sought public comment regarding certain advisory opinions issued by the Commission permitting attendance and participation by Federal officeholders and candidates at events where non-Federal funds would be raised for State and local candidates or organizations, subject to various restrictions and disclaimer requirements. *See NPRM* at 9015; Advisory Opinions 2003–03, 2003–05, and 2003–36. Some commenters stated that the analysis in those advisory opinions was correct and consistent with BCRA's exceptions permitting Federal officeholders and candidates to raise money for State and local elections within Federal limits and prohibitions under section 441i(e)(1)(B). One commenter noted that these advisory opinions were based on the

Commission's regulation at 11 CFR 300.62, which was not challenged in the *Shays* litigation and need not be reexamined here. Another commenter urged the Commission to incorporate the holdings of these advisory opinions into its regulations so that Federal officeholders and candidates could continue to rely on them. One commenter also suggested that any additional restrictions beyond the disclaimers required in these advisory opinions would raise constitutional concerns. In contrast, other commenters asserted that these advisory opinions were incorrect and that the Commission should supersede them with a regulation that completely bars attendance at soft money fundraising events that are not hosted by a State party. The Commission does not believe it is necessary to initiate a rulemaking to address the issues in Advisory Opinions 2003–03, 2003–05, and 2003–36 at this time.

*2. Levin Funds*

The Commission also sought comment on how it should interpret 2 U.S.C. 441i(b)(2), (e)(1), and (e)(3) in light of language from *Shays* stating that Levin funds are "funds 'subject to [FECA's] limitations, prohibitions, and reporting requirements.'" *See NPRM* at 9016. Most comments regarding this inquiry opposed any interpretation of these provisions that would allow Federal officeholders and candidates to solicit Levin funds without restriction, with some commenters noting that the Commission has consistently referred to Levin funds as non-Federal funds, including in recent final rules published in 2005. However, one commenter stated that Federal officeholders and candidates should be allowed to raise Levin funds. This issue of interpretation was relevant only to the alternative approach proposed in the NPRM. Because the Commission has decided to retain its rule in section 300.64 with a revised Explanation and Justification, the Commission need not further address this question of statutory interpretation.

Dated: June 23, 2005.

**Scott E. Thomas,**

*Chairman, Federal Election Commission.*

[FR Doc. 05–12863 Filed 6–29–05; 8:45 am]

**BILLING CODE 6715–01–P**

# DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 23**

[Docket No. CE230, Special Condition 23–170–SC]

**Special Conditions; Raytheon Model King Air H–90 (T–44A) Protection of Systems for High Intensity Radiated Fields (HIRF)**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final special conditions; request for comments.

**SUMMARY:** These special conditions are issued to ARINC Inc., 1632 S. Murray Blvd., Colorado Springs, CO 80916 for a Supplemental Type Certificate for the Raytheon Model King Air H–90 (T–44A) airplane. These airplanes will have novel and unusual design features when compared to the state of technology envisaged in the applicable airworthiness standards. The novel and unusual design features include the installation of the Rockwell Collins Pro Line 21 Avionics System. This system includes Electronic Flight Instrument Systems (EFIS), electronic displays, digital Air Data Computers (ADC), and supporting equipment. The applicable regulations do not contain adequate or appropriate airworthiness standards for the protection of these systems from the effects of high intensity radiated fields (HIRF). These special conditions contain the additional safety standards that the Administrator considers necessary to establish a level of safety equivalent to the airworthiness standards applicable to these airplanes.

**DATES:** The effective date of these special conditions is June 22, 2005.

Comments must be received on or before August 1, 2005.

**ADDRESSES:** Comments may be mailed in duplicate to: Federal Aviation Administration, Regional Counsel, ACE–7, Attention: Rules Docket Clerk, Docket No. CE230, Room 506, 901 Locust, Kansas City, Missouri 64106. All comments must be marked: Docket No. CE230. Comments may be inspected in the Rules Docket weekdays, except Federal holidays, between 7:30 a.m. and 4 p.m.

**FOR FURTHER INFORMATION CONTACT:** Wes Ryan, Aerospace Engineer, Standards Office (ACE–110), Small Airplane Directorate, Aircraft Certification Service, Federal Aviation Administration, 901 Locust, Room 301, Kansas City, Missouri 64106; telephone (816) 329–4127.

# PLAINTIFFS' EXHIBIT 143

ADMINISTRATIVE LAW — JUDICIAL REVIEW — DISTRICT COURT FOR THE DISTRICT OF COLUMBIA INVALIDATES REGULATIONS IMPLEMENTING BIPARTISAN CAMPAIGN REFORM ACT. — *Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004).

Between 1977 and 2002, Federal Election Commission (FEC) regulations allowed unregulated and unrestricted contributions to political parties — soft money — to influence federal elections.[1]  Concerned about the corrupting influence of soft money, Congress passed the Bipartisan Campaign Reform Act of 2002[2] (BCRA or the Act), often referred to as McCain-Feingold.  Recently, in *Shays v. FEC*,[3] the United States District Court for the District of Columbia invalidated fifteen FEC regulations implementing BCRA.[4]  Among the regulations invalidated was the FEC's interpretation of a BCRA provision that allowed federal candidates and officeholders, notwithstanding the Act's other restrictions, to "attend, speak, or be a featured guest at" certain fundraising events.[5]  The FEC interpreted this language to permit politicians to solicit soft money while at such events — conduct otherwise prohibited.[6]  Although the court struck down this regulation because of flaws in the rulemaking process,[7] it should have invalidated the agency interpretation at Step One of the *Chevron* analysis.[8]  Properly interpreted, the statute's meaning is clear: it merely guarantees that politicians can attend, speak, or be featured guests at such fundraisers without per se violating BCRA.

In 2002, after seven years of legislative battles,[9] a ride on the Straight Talk Express,[10] and a winter of corporate scandals,[11] BCRA's sponsors[12] persuaded Congress to "plug the soft-money loophole"[13]

---

[1] *See* McConnell v. FEC, 124 S. Ct. 619, 648–50 (2003) (recounting the origination and growth of soft money through regulatory loopholes).

[2] Pub. L. No. 107-155, 116 Stat. 81 (codified primarily in scattered sections of 2 and 47 U.S.C.A. (West 2005)).

[3] 337 F. Supp. 2d 28 (D.D.C. 2004).

[4] *See id.* at 130–31.

[5] 2 U.S.C.A. § 441i(e)(3) (West 2005).

[6] 11 C.F.R. § 300.64(b) (2005).

[7] *See Shays*, 337 F. Supp. 2d at 92–93.

[8] *See* Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

[9] *See* Editorial, *Election Law Coup d'État*, N.Y. TIMES, June 24, 2002, at A18.

[10] *See generally* JOHN MCCAIN WITH MARK SALTER, WORTH THE FIGHTING FOR 367–89 (2002) (recounting Senator McCain's presidential campaign).

[11] *See* Robert O'Brien, *Tyco Sinks 20%, WorldCom Falls as Market Supplies Lots of Drama*, WALL ST. J., Jan. 30, 2002, at C2; Rebecca Smith, *Enron Files for Chapter 11 Bankruptcy, Sues Dynegy*, WALL ST. J., Dec. 3, 2001, at A3.

[12] Senators McCain and Russell Feingold sponsored the Senate version of the bill; Congressmen Christopher Shays and Martin Meehan sponsored the House version.

[13] McConnell v. FEC, 124 S. Ct. 619, 654 (2003) (describing the purpose of Title I of BCRA).

*HARVARD LAW REVIEW* [Vol. 118:2453]

with the Act. Under the Federal Election Campaign Act of 1971[14] (FECA), soft money contributions were exempt from donation limits and could be used to influence federal elections.[15] A bipartisan 1998 Senate investigation found that soft money had undermined campaign finance laws;[16] both parties exchanged access for contributions.[17] Public outrage at such practices sparked a grassroots movement[18] that led to BCRA.

The FEC promulgated the challenged regulations soon after BCRA's passage.[19] Congressmen Christopher Shays and Martin Meehan, cosponsors of the House bill, filed suit in the United States District Court for the District of Columbia, challenging the FEC's implementation of BCRA's provisions on soft money, coordinated communications, and electioneering communications.[20]

On cross-motions for summary judgment, Judge Kollar-Kotelly reviewed nineteen provisions of the FEC regulations.[21] The court upheld four.[22] The court invalidated four regulations at Step One of *Chevron* because Congress had "directly spoken to the precise question at issue"[23] and the FEC had not listened.[24] The court invalidated five rules at Step Two of *Chevron*, finding that they were impermissible in-

---

[14] Pub. L. No. 92-225, 86 Stat. 3 (1972) (codified as amended at scattered sections of 2, 18, and 47 U.S.C.).

[15] See *McConnell*, 124 S. Ct. at 648–50 (summarizing the history and use of soft money).

[16] S. REP. NO. 105-167, pt. 4, at 7515 (1998).

[17] *Id.* pt. 1, at 41–42, 195–200; *id.* pt. 5, at 7968–71.

[18] See, e.g., Frank Bruni, *89, and 2000 Miles To Go for 'Democracy'*, N.Y. TIMES, Apr. 27, 1999, at A16 (interviewing then eighty-nine-year-old Doris Haddock, a.k.a. "Granny D," while she promoted campaign finance reform by walking across the country).

[19] See *Shays*, 337 F. Supp. 2d at 37–38.

[20] See *id.* at 36–38, 55, 72, 124. The suit initially was stayed pending the outcome of *McConnell v. FEC*, 124 S. Ct. 619, which upheld most of the Act against constitutional challenges. See generally The Supreme Court, 2003 Term—Leading Cases, 118 HARV. L. REV. 248, 364–71 (2004) (providing a detailed report of the Court's decision in *McConnell* and concluding that the Court "largely approved" BCRA).

[21] Judge Kollar-Kotelly first dispatched challenges to standing and ripeness. See *Shays*, 337 F. Supp. 2d at 38–50.

[22] See *id.* at 93–97 (upholding 11 C.F.R. § 300.2(c)(3) (2005), which excludes actions taken prior to November 6, 2002, from assessment of whether an entity is established or controlled by another entity); *id.* at 117–20 (upholding 11 C.F.R. § 300.32(a)(4), which allows the use of Levin funds to raise more Levin funds); *id.* at 120–21 (upholding 11 C.F.R. § 300.30(c)(3), which sets accounting standards for state, district, and local parties taking part in federal election activities); *id.* at 121–24 (upholding 11 C.F.R. § 100.14, which includes "state committee," "district committee," and "local committee" within "the official party structure").

[23] Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984).

[24] See *Shays*, 337 F. Supp. 2d at 65–71 (invalidating 11 C.F.R. § 109.21(c)(4), which excludes the Internet from coordinated communication regulation); *id.* at 107–08 (invalidating 11 C.F.R. § 100.24(a)(4), which defines "voter identification" in election activity regulations); *id.* at 114–17 (invalidating 11 C.F.R. § 300.32(c)(4), which creates a de minimis exception for Levin funds); *id.* at 128–29 (invalidating 11 C.F.R. § 100.29(b)(3)(i), which requires that communications be funded to qualify as electioneering communications).

terpretations of ambiguous statutory language,[25] in part because some "unduly compromise[d] the Act's purposes."[26]    The court found that the six remaining regulations survived *Chevron* review but failed to comport with the requirements of the Administrative Procedure Act[27] (APA): four were "arbitrary and capricious" under the APA and *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,[28] and two were invalid because their notice of proposed rulemaking was inadequate under the APA.[29]    The court remanded the fifteen invalidated regulations to the FEC for action consistent with the opinion.[30]

Among the regulations the court found permissible under *Chevron* but unacceptable under *State Farm* was 11 C.F.R. § 300.64(b).[31]    The court began its consideration of this regulation by examining the relevant statutory language: "Notwithstanding [the Act's restrictions on solicitation and other activity], a candidate or an individual holding Federal office may attend, speak, or be featured guests at a fundraising event for a State, district, or local committee of a political party."[32] The FEC regulation interpreted this provision to mean that "[c]andidates and individuals holding Federal office may speak at such events without restriction or regulation,"[33] and that "speaking" includes a range of activities, including solicitation of soft money, otherwise forbidden by the Act.[34]

---

[25]    *See id.* at 56–65 (invalidating 11 C.F.R. § 109.21(c), which creates content requirements for communication to be considered coordinated with a political candidate or party); *id.* at 73–75, 78–80 (invalidating 11 C.F.R. § 300.2(m), which defines "solicit"); *id.* at 73–77 (invalidating 11 C.F.R. § 300.2(n), which defines "direct"); *id.* at 108–12 (invalidating 11 C.F.R. § 100.25, which defines "generic campaign activity"); *id.* at 113–14 (invalidating 11 C.F.R. § 300.33(c)(2), which allows employees of state, local, and district committees of political parties who spend less than twenty-five percent of their time on federal election activity to be paid with soft money).

[26]    *See, e.g., id.* at 62 (quoting *Orloski v. FEC*, 795 F.2d 156, 164 (D.C. Cir. 1986)).

[27]    5 U.S.C. §§ 551–559, 701–706 (2000 & Supp. II 2002).

[28]    463 U.S. 29 (1983); *see Shays*, 337 F. Supp. 2d at 71–72 (invalidating 11 C.F.R. § 109.3, which defines "agent" for purposes of the Act's regulation of coordinated communications); *id.* at 80–88 (invalidating 11 C.F.R. § 300.2(b), which defines "agent" for purposes of the Act's soft money provisions); *id.* at 88–93 (invalidating 11 C.F.R. § 300.64(b), which allows federal candidates and officeholders to speak without restriction at fundraisers for state, district, and local committees of political parties); *id.* at 124–28 (invalidating 11 C.F.R. § 100.29(c)(6), which exempts 501(c)(3) organizations from electioneering communications regulations).

[29]    *See Shays*, 337 F. Supp. 2d at 98–101 (invalidating 11 C.F.R. § 100.24(a)(2), which defines "voter registration activity"); *id.* at 101–07 (invalidating 11 C.F.R. § 100.24(a)(3), which defines "get-out-the-vote activity").

[30]    *Id.* at 130.

[31]    *See id.* at 88–93. The court invalidated the regulation as "arbitrary and capricious" because the explanation and justification for the rule failed *State Farm*'s reasoned analysis requirement. *See id.* at 92–93.

[32]    2 U.S.C.A. § 441i(e)(3) (West 2005); *see Shays*, 337 F. Supp. 2d at 88.

[33]    11 C.F.R. § 300.64(b).

[34]    *See* Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money, 67 Fed. Reg. 49,064, 49,108 (July 29, 2002), *cited in Shays*, 337 F. Supp. 2d at 88.

At Step One of *Chevron*, the court found the statute ambiguous, susceptible to interpretation either as "a carve-out for unabashed solicitation by federal candidates and officeholders at . . . fundraising events, or [as a simple clarification] that merely attending, speaking, or being the featured guest at such an event is not to be construed as constituting solicitation *per se*."[35]  The FEC argued that the plain language and structure of BCRA favored its interpretation, and that an interpretation that called for monitoring of speech at fundraising events would be constitutionally problematic.[36]  The plaintiffs' analysis focused on the fact that Congress had not used the term "solicit" in § 441i(e)(3), arguing that Congress's use of the word in neighboring subsections that explicitly create exemptions suggests that Congress did not intend to do the same here.[37]  The parties also differed on how the "notwithstanding" proviso operated.[38]  Ultimately, the court agreed with the FEC that Congress's use of the term "solicit" to create other exemptions for solicitation did not clearly conflict with the agency's interpretation and held that § 441i(e)(3) is ambiguous.[39]

At Step Two, the court was unwilling to hold the FEC's interpretation unreasonable, though it recognized that it "likely contravenes what Congress intended when it enacted the provision, as well as what the Court views to be the more natural reading of the statute."[40]  The plaintiffs had argued that the regulation flew in the face of congressional intent, as articulated by Senator John McCain on the Senate floor, that "[f]ederal candidates and officeholders cannot solicit soft money funds . . . for any party committee — national, State or local."[41]  But the court found that BCRA provisions allowing solicitation in limited circumstances undermined the persuasiveness of Senator McCain's statement, and that the legislative record was otherwise "bare."[42]  Although the court acknowledged the possibility of manipulation, it nonetheless held that the record was insufficient to support a finding that the regulation created "the potential for gross abuse,"[43] concluding that the interpretation was permissible at Step Two.[44]

---

[35] *Shays*, 337 F. Supp. 2d at 89–90.

[36] *See id.* at 88.

[37] *See id.* at 89.

[38] *See id.*

[39] *Id.* at 90.  The Court was also unwilling to apply at Step One a canon that provisos should be narrowly construed when their breadth is uncertain; this refusal was motivated by the belief that the canon requires ambiguity for its application and finding ambiguity at Step One would have required the court to move to Step Two. *See id.* at 90 n.57 (citing 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 47:08 (6th ed. 2000)).

[40] *Id.* at 91 (footnote omitted).

[41] *Id.* at 90 (quoting 148 CONG. REC. S2139 (daily ed. Mar. 20, 2002)).

[42] *See id.* at 91.

[43] *Id.* (quoting *Orloski v. FEC*, 795 F.2d 156, 165 (D.C. Cir. 1986)).

[44] *Id.* at 92.

The *Shays* court erred in holding that § 441i(e)(3) is ambiguous and that the FEC's regulation was a permissible interpretation of the Act. The section reads:

> Notwithstanding paragraph (1) or subsection (b)(2)(C) of this section, a candidate or an individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party.[45]

The section's meaning is clear: notwithstanding the restrictions on fundraising by federal candidates and officeholders, those individuals can attend, speak, or be featured guests at certain fundraising events without per se violating the Act's rules. The FEC's interpretation errs on two fronts. First, it interprets "speak" in § 441i(e)(3) to cover not only speeches to attendees, but also whispered requests to individuals. Second, it treats § 441i(e)(3) as a "total carve out"[46] from the Act's coverage, allowing candidates to engage in express solicitation and other prohibited conduct while speaking. By holding this errant interpretation reasonable, the court allowed the FEC to twist the statute's language and open a loophole Congress never intended.

The FEC's first mistake was reading "speak" in the Act's text to include any oral communication, grouping intimate conversations with addresses to the attendees.[47] Although the FEC's reading conforms to one definition of "speak,"[48] the proper interpretation is that Congress here used "speak" to mean "to express one's views before a group: make a talk or address."[49] Because ambiguity is not created by mere "definitional possibilities,"[50] courts look to context, which demands this

---

[45] 2 U.S.C.A. § 441i(e)(3) (West 2005).

[46] Editorial, *supra* note 9 (quoting FEC Commissioner Michael Toner); *see also* Candidate Solicitation at State, District, and Local Party Fundraising Events, 70 Fed. Reg. 9013, 9015–16 (proposed Feb. 24, 2005) (to be codified at 11 C.F.R. § 300.64(a)) (contrasting the regulation's "complete exemption" with an alternative that would assure candidates that attending or speaking would not be per se solicitation).

[47] *See* Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money, 67 Fed. Reg. 49,064, 49,108 (July 29, 2002) ("[T]he Commission . . . construe[s] the provision as a total exemption to the solicitation prohibition, applicable to Federal candidates and officeholders, when attending and speaking at party fundraising events . . . ."); Federal Election Commission's Response in Support of Its Motion and in Opposition to Plaintiff's Motion for Summary Judgment at 42 n.63, *Shays* (No. 02-CV-1984) ("BCRA clearly provides that Federal candidates and officeholders may do more than simply give a speech at a fundraiser.").

[48] *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2185 (1981) ("[T]o give oral expression to thoughts, opinions, or feelings: engage in talk or conversation . . . .").

[49] *Id.*

[50] Brown v. Gardner, 513 U.S. 115, 118 (1994); *see also* MCI Telecomms. Corp. v. AT&T Co., 512 U.S. 218, 225–27 (1994); NLRB v. Federbush Co., 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used . . . ."). *But see* Nat'l R.R. Passenger Corp. v. Boston & Me. Corp., 503 U.S. 407, 417–19 (1992) (finding ambiguity on the basis of multiple definitions).

*HARVARD LAW REVIEW* [Vol. 118:2453

reading. "Attending" and "being a featured guest at" a fundraiser are familiar and specific ways politicians give their imprimatur to an event. Giving remarks at an event, "speaking," is also a familiar and specific way politicians give their imprimatur to a fundraiser. Common sense and the canon of *noscitur a sociis* require that "speak" receive this specific meaning in order to remain coherent with the surrounding text.[51] The provision assures politicians that none of these familiar and specific acts will be considered "solicitation by [them] . . . or in [their] name."[52]

Reading the statute from the perspective of federal candidates and officeholders is necessary because they are the provision's audience.[53] When a statute addresses an audience more narrow than the general population, courts should read it as that interpretive community would.[54] Politicians would understand "speak" in "attend, speak, or be a featured guest at a fundraising event" as allowing them to give a speech without violating the Act.

The FEC also erred in reading § 441i(e)(3) as a "total carve out" from the Act's coverage, rather than as an assurance that certain activities would not be per se violations. Under the FEC's reading, the same solicitation that would violate the Act if contained in a fundraising letter would be acceptable if made at a fundraising event.[55] This interpretation violates the clear meaning of § 441i(e)(3), which assures politicians that they can attend, speak, or be featured guests at fundraisers without per se violating the Act.

The FEC's interpretation might be plausible if § 441i(e)(3) were read in isolation, but when placed within the context of the whole Act, it becomes clear that the FEC is mistaken. First, when BCRA exempts certain activities from its coverage, it uses the same term — "so-

---

[51] *Cf. Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 719–21 (1995) (Scalia, J., dissenting) (reading "harm" in the phrase "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" as only covering intentional harm).

[52] 2 U.S.C.A. § 441i(b)(2)(C) (West 2005).

[53] *See id.* § 441i(e) (regulating the behavior of federal officeholders and candidates).

[54] *See Cont'l Can Co. v. Chi. Truck Drivers*, 916 F.2d 1154, 1157 (7th Cir. 1990) (Easterbrook, J.) ("Words do not have meanings given by natural law. . . . [S]uccessful communication depends on meanings shared by interpretive communities."); *see also In re Erickson*, 815 F.2d 1090, 1092–94 (7th Cir. 1987) (Easterbrook, J.) (discussing and illustrating the importance of audience in statutory interpretation); John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2457 (2003) (explaining that textualists "believe that statutes convey meaning only because members of a relevant linguistic community apply shared background conventions for understanding how particular words are used in particular contexts").

[55] Uncertainty regarding how the FEC will define "solicit" on remand, *see Shays*, 337 F. Supp. 2d at 73–75, 78–80 (invalidating 11 C.F.R. § 300.2(m), which defines "solicit"), complicates the question of when candidate speech (whether at a fundraiser, in a letter, or over the phone) will qualify as solicitation. This is surely an uncomfortable inquiry from a First Amendment perspective. Nevertheless, it is the inquiry BCRA demands and *McConnell* upheld.

*RECENT CASES*

licit" — that it uses when prohibiting the conduct.[56]  Courts, presuming that variations in statutory language are meaningful,[57] should regard § 441i(e)(3)'s use of other terms as a deliberate choice not to exempt politicians at fundraisers from the Act's coverage.[58]  Further, a cursory look at § 441i shows that § 441i(e)(4) is titled "Permitting certain solicitations."[59]  Congress's choice to enumerate contexts in which solicitation is permitted, and not to place "attending, speaking, and being a featured guest" at fundraisers within that enumeration, suggests that § 441i(e)(3) should not be read to permit solicitation.[60]

Consideration of BCRA's statutory purpose and legislative history, whether at Step One or Two of *Chevron*,[61] further supports invalidation of the FEC regulation.  The Act's purpose is to "plug the soft-money loophole."[62]  As the *McConnell* Court noted, many BCRA provisions do not directly regulate soft money; rather, they are "anticircumvention measures" that close potential channels through which the newly banned funds could flow.[63]  When Congress created exemptions that could conflict with this purpose, it did so in precise, detailed, and cabined language.[64]  In the absence of such clear instruction from Congress, BCRA provisions should not be interpreted to open up new loopholes for soft money.

Legislative history further undercuts the FEC's reading of § 441i(e)(3).  When Senate cosponsor Russell Feingold debated the bill on the floor, he introduced into the record a section-by-section explanation of the Act.  The portion describing the segment of the bill that

---

[56] *See* 2 U.S.C.A. § 441i(e)(2) ("Paragraph (1) [the general prohibition on solicitation] does not apply to the solicitation, receipt, or spending of funds by [a federal candidate or officeholder] who is or was also a candidate for a State or local office solely in connection with such election . . . ."); *id.* § 441i(e)(4)(A) ("Notwithstanding any other provision of this subsection, a [federal candidate or officeholder] may make a general solicitation of funds on behalf of [certain tax exempt organizations] where such solicitation does not specify how the funds will or should be spent."); *id.* § 441i(e)(4)(B) ("In addition to the general solicitations permitted under subparagraph (A), [a federal candidate or officeholder] may make a solicitation explicitly to obtain funds for carrying out the activities described . . . .").

[57] *See* P. ST. J. LANGAN, MAXWELL ON THE INTERPRETATION OF STATUTES 282 (12th ed. 1969), *cited in* WILLIAM N. ESKRIDGE, JR. ET AL., CASES AND MATERIALS ON LEGISLATION 834 (3d ed. 2001).

[58] *Cf.* United States v. Fisher, 6 U.S. (2 Cranch) 358, 388–97 (1805) (finding that a "change of language strongly implies an intent to change the object of legislation").

[59] 2 U.S.C.A. § 441i(e)(4).

[60] *Cf.* Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 724 (1995) (Scalia, J., dissenting) (reasoning that Congress's careful prohibition of an action in one part of a statute bars courts from inferring the prohibition when similar language is omitted from another).

[61] The debate over when (and if) statutory purpose and legislative history should be consulted during *Chevron* review is live. *See* ESKRIDGE ET AL., *supra* note 57, at 1076–78.

[62] McConnell v. FEC, 124 S. Ct. 619, 654 (2003).

[63] *See, e.g., id.* at 676 (noting that "the restrictions on the use, transfer, and raising of Levin funds are justifiable anticircumvention measures").

[64] *See, e.g.,* 2 U.S.C.A. § 441i(b)(2) (allowing Levin funds).

was to become § 441i(e) discussed permitted solicitations but did not include § 441i(e)(3). Rather, his presentation stated that the "restrictions [do] not prevent" politicians from attending, speaking, or being featured guests at state or local fundraisers.[65] In other words, politicians could engage in these activities without per se violating the Act.

Further, the "dog didn't bark" canon[66] suggests that silence in legislative history can be probative.[67] Here, nothing in the legislative history suggests that § 441i(e)(3) might be interpreted as the FEC proposes. Although it may be true that dogs have failed to bark at danger on rare occasions,[68] they most often do.[69] That Common Cause, Senator McCain, and a pack of other self-styled watchdogs failed to bark about § 441i(e)(3) suggests that Congress neither intended nor envisioned the FEC's interpretation.

The FEC chose not to appeal the ruling on the fundraiser regulation[70] and has reopened the rulemaking process pursuant to the remand.[71] Its Notice of Proposed Rulemaking, in addition to trumpeting that the *Shays* court held its interpretation of § 441i(e)(3) reasonable, contains two proposals: The first restates the original interpretation, correcting for the procedural error faulted in *Shays*.[72] The second interprets § 441i(e)(3) as intended and written — as a guarantee to politicians that they can attend, speak, or be featured guests at certain fundraising events without per se violating the Act's restrictions.[73] The FEC should adopt the latter rule, both because it "must give effect to the unambiguously expressed intent of Congress"[74] and because it should not turn Congress's attempt to "plug the soft-money loophole" into an occasion to open another one.

---

[65] *See* 148 CONG. REC. S1992 (daily ed. Mar. 18, 2002) (statement of Sen. Feingold).

[66] *See* William N. Eskridge, Jr. & Philip P. Frickey, *The Supreme Court, 1993 Term— Foreword: Law as Equilibrium*, 108 HARV. L. REV. 26, 101 (1994).

[67] *See* Chisom v. Roemer, 501 U.S. 380, 396 n.23 (1991) (deducing from the lack of congressional discussion of a possible construction of a statutory provision that Congress did not intend that meaning).

[68] *See id.* at 406 (Scalia, J., dissenting) (citing an isolated example from history of dogs failing to bark when danger loomed).

[69] *See generally* STANLEY COREN, THE PAWPRINTS OF HISTORY: DOGS AND THE COURSE OF HUMAN EVENTS 1–13 (2002) (recounting the historical importance — and dependability — of dogs as sentinels).

[70] *See* Press Release, Federal Election Comm'n, FEC Votes on Specifics of *Shays v. FEC* Appeal (Oct. 29, 2004), http://www.fec.gov/press/press2004/20041029shays.html (last visited Apr. 10, 2005).

[71] *See* Candidate Solicitation at State, District, and Local Party Fundraising Events, 70 Fed. Reg. 9013 (proposed Feb. 24, 2005) (to be codified at 11 C.F.R. pt. 300).

[72] *See id.*

[73] *See id.*

[74] Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).

# PLAINTIFFS' EXHIBIT 144

Federal Election Commission Advisory Opinion Number 1980-64                    Page 1 of 3

# Federal Election Commission Advisory Opinion Number 1980-64

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

July 9, 1980
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
ADVISORY OPINION 1980-64
Mr. Robert H. Chanin
General Counsel
National Education Association
1201 16th Street, N.W.
Washington, D.C. 20036
Dear Mr. Chanin:
This responds to your letter of May 22, 1980, requesting
an advisory opinion concerning application of the Federal
Election Campaign Act of 1971, as amended ("the Act") and
Commission regulations to the proposed payment by the National
Education Association ("NEA") from its general treasury funds
to NEA members who have been selected to serve as delegates
to the 1980 Democratic and Republican national nominating
conventions for their travel and subsistence expenses incurred
in attending the conventions.
According to your letter, NEA is a labor organization, comprised
essentially of professional employees of public school
districts. You explain that several NEA members who have been
elected to serve as delegates to the 1980 Democratic and Republican
national nominating conventions have indicated that the
travel and subsistence expenses involved in attending the conventions
will place a significant strain on their personal resources.
In order to relieve the strain, NEA proposes to use its general
treasury funds to pay the travel and subsistence expenses of
its members who are delegates. Thus, the question raised by
your request is whether NEA way use its general treasury funds
to pay the delegate travel and subsistence expenses of the NEA
members who have been selected to serve as delegates to the
1980 Democratic and Republican national nominating conventions?
The Commission concludes that NEA may not pay for the
travel and subsistence expenses of its members who are delegates
to the Democratic and Republican national nominating conventions.
Section 110.14(f) of the Commission's proposed regulations*/
which addresses delegate selection, see 45 Fed. Reg. 34865 (1980),
specifically states that "all contributions to and expenditures
by any delegate ... are subject to the prohibitions of 11 CFR
110.4(a), Part 114 and 2 U.S.C. SS SS 441b and 441e." Section 441b

contains a general prohibition against corporate and labor organization
contributions and expenditures made in connection with
a federal election. Section 110.14(d) of those same proposed
regulations states that expenditures by a delegate to defray costs
incurred for his/her selection are not subject to 11 CFR Part 110
and 2 U.S.C. SS 441a. It further explains that such costs include
the costs of travel and subsistence during the delegate selection
process, including the national nominating convention. Nothing in
the explanation and justification of the regulations concerning
contributions to and expenditures by delegates to national nominating
conventions, nor the proposed regulations themselves
indicates that payments by a corporation or labor organization
to defray delegate expenses was intended to be permissible.
Thus, payment for the travel and subsistence expenses of NEA
members who are delegates to the national nominating conventions,
as well as other expenses of such delegates, are subject to
the prohibitions of SS 441b and SS 441e.
NEA in its request suggests that payments for travel and
subsistence to their members who are delegates is permissible
under the statutory exception for "nonpartisan ... get-out-the-vote
campaigns by a labor organization aimed at its members ...."
2 U.S.C. SS 441b(b)(2)(B). The Commission disagrees with this
interpretation. Although 2 U.S.C. SS 441b(b)(2)(B) provides that
general treasury funds of a labor organization may be used for non-partisan
registration and get-out-the-vote campaigns aimed at its
members and their families, that is not the situation presented
by NEA's request.

*/ The Commission transmitted these proposed regulations to
Congress on May 14, 1980. If neither House of Congress
disapproves the regulation within 30 legislative days after
its transmittal, the Commission way prescribe these regulations.
2 U.S.C. SS 438(d).

"Registration" and "get-out-the-vote drive" are terms of
art used in campaign or election parlance. Those terms generally
connote efforts to increase the number of persons who
register to vote and once registered, to maximize the number
of eligible voters who go to the polls. The legislative
history of the Hansen amendment, see 117 Cong. Rec. 43379
(1971), presently 2 U.S.C. SS 441b(b)(2), talks in those terms
and discusses various types of registration and get-out-the-vote
activity. Nowhere in that discussion is there any mention
of encouraging or facilitating attendance of delegates at
a nominating convention. Polling places are mentioned in
terms of where the public votes, but certainly not as the convention
floor. Moreover, Commission regulation SS 114.3(c)(3) which
elaborates on permissible get-out-the-vote activity by a labor
organization directed toward its membership, does so in terms
of both registration and get-out-the-vote drives. It is obvious
from such joint treatment that the permissibility of get-out-the-vote

activity by either a labor organization or a corporation was not meant to reach attendance of delegates at a national nominating convention.

This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activity set forth in your request. See 2 U.S.C. SS 437f.

# PLAINTIFFS' EXHIBIT 145

**23068**    Federal Register / Vol. 70, No. 85 / Wednesday, May 4, 2005 / Proposed Rules

Dated: April 29, 2005.

**Kenneth C. Clayton,**

*Acting Administrator, Agricultural Marketing Service.*

[FR Doc. 05–8861 Filed 5–3–05; 8:45 am]

**BILLING CODE 3410-02-P**

---

**FEDERAL ELECTION COMMISSION**

**11 CFR Part 100**

**[Notice 2005–13]**

**Definition of Federal Election Activity**

**AGENCY:** Federal Election Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Federal Election Commission seeks comments on proposed changes to its rules defining "Federal election activity" under the Federal Election Campaign Act of 1971, as amended ("FECA"). The proposed changes would retain the existing definition of "voter registration activity" and modify the existing definitions of "get-out-the-vote activity" and "voter identification" consistent with the ruling of the U.S. District Court for the District of Columbia in *Shays* v. *FEC.* The Commission has made no final decision on the issues presented in this rulemaking. Further information is provided in the supplementary information that follows.

**DATES:** Comments must be received on or before June 3, 2005. If the Commission receives sufficient requests to testify, it may hold a hearing on these proposed rules. Anyone wishing to testify at the hearing must file written comments by the due date and must include a request to testify in the written comments.

**ADDRESSES:** All comments must be in writing, addressed to Ms. Mai T. Dinh, Assistant General Counsel, and submitted in either electronic, facsimile or hard copy form. Commenters are strongly encouraged to submit comments electronically to ensure timely receipt and consideration. Electronic comments must be sent to either FECdef@fec.gov or submitted through the Federal eRegulations Portal at http://www.regulations.gov. If the electronic comments include an attachment, the attachment must be in Adobe Acrobat (.pdf) or Microsoft Word (.doc) format. Faxed comments should be sent to (202) 219–3923, with hard copy follow-up. Hard copy comments and hard copy follow-up of faxed comments should be sent to the Federal Election Commission, 999 E Street, NW., Washington, DC 20463. All comments must include the full name

and postal service address of the commenter or they will not be considered. The Commission will post comments on its Web site after the comment period ends. If the Commission decides a hearing is necessary, the hearing will be held in the Commission's ninth floor meeting room, 999 E Street, NW., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Ms. Mai T. Dinh, Assistant General Counsel, Mr. J. Duane Pugh Jr., Senior Attorney, or Ms. Margaret G. Perl, Attorney, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Public Law No. 107–155, 116 Stat. 81 (2002), amended FECA by adding a new term, "Federal election activity" ("FEA"), that describes certain activities that State, district, and local party committees must pay for with either Federal funds [1] or a combination of Federal and Levin funds.[2] 2 U.S.C. 431(20) and 441i(b)(1); *see also* 2 U.S.C. 441i(d)(1) (prohibiting national, State, district or local party committees from soliciting or directing non-Federal funds to 501(c) tax-exempt organizations which engage in FEA); 2 U.S.C. 441i(e)(4) (limiting Federal candidate and officeholder solicitations for funds on behalf of 501(c) tax-exempt organizations whose principal purpose is to conduct certain types of FEA). The Commission further defined FEA in 11 CFR 100.24. In *Shays* v. *FEC,* 337 F. Supp.2d 28, 101, 106–07 (D.D.C. 2004), *appeal docketed,* No. 04–5352 (D.C. Cir. Sept. 28, 2004) ("*Shays*"), the district court held that certain parts of the definitions of "voter registration activity" and "get-out-the-vote activity" ("GOTV") in 11 CFR 100.24(a)(2) and (3), respectively, had not been promulgated with adequate notice and opportunity for comment. In addition, the district court held that certain aspects of the definitions of "get-out-the-vote activity" and "voter identification" in 11 CFR 100.24(a)(3) and (4), respectively, were inconsistent with Congressional intent. *Shays* at 104, 107 n.83, and 108.[3] The district court

---

[1] "Federal funds" are funds subject to the limitations, prohibitions, and reporting requirements of the Act. *See* 11 CFR 300.2(g).

[2] "Levin funds" are funds that are raised by State, district or local party committees pursuant to the restrictions in 11 CFR 300.31 and disbursed subject to the restrictions in 11 CFR 300.32. *See* 11 CFR 300.2(i).

[3] The district court described the first step of the *Chevron* analysis, which courts use to review an agency's regulations: "a court firsts asks 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is

remanded the case for further action consistent with the court's decision. The Commission has initiated this rulemaking to comply with the district court order.

*1. 11 CFR 100.24(a)(2)—Definition of "Voter Registration Activity"*

BCRA does not define "voter registration activity" other than to specify that it is only FEA when it is conducted 120 days or fewer before a regularly scheduled Federal election. *See* 2 U.S.C. 431(20)(A)(i). Current section 100.24(a)(2) defines voter registration activity to mean "contacting individuals by telephone, in person, or by *other individualized means to assist them in registering to vote.*" (Emphasis added). The definition also includes a non-exhaustive list of examples of costs that are included, such as printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

In *Shays,* the plaintiffs argued that the requirement that voter registration activity "assist" in the registration of voters impermissibly narrowed the definition because it excludes from its reach encouragement that does not constitute actual assistance. *See Shays* at 98. The district court found that the Commission's interpretation of section 431(20)(A) does not conflict with the expressed intent of Congress. *Shays* at 99–100. "[T]he Court note[d] that it is possible to read the term 'voter registration activity' to encompass those activities that actually register persons to vote, as opposed to those that only encourage persons to do so without more. [citation omitted]. Moreover, the Court [did not] find based on the record presented that the 'common usage' of the term 'voter registration activity' necessarily includes the latter type of activities." *Id.* at 99.[4]

The court also held that the question of whether the regulation satisfies step two of the *Chevron* test—whether the Commission's interpretation of the statute is a permissible one—was not ripe for review. While the court found that the regulation is not an impermissible construction of BCRA,

---

the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *See Shays* at 51 (quoting *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council,* 467 U.S. 837, 842–43 (1984)).

[4] The Court also noted an apparent discrepancy between 11 CFR 100.133 and 11 CFR 106.5(a)(2)(iv) with regard to the definition of voter registration and get-out-the-vote activity. *See Shays* at 99 n.71, 103 n.77. However, any such comparison is no longer relevant since the latter regulation sunsetted on December 31, 2002.

the court concluded that it lacked sufficient knowledge on the scope of the regulation to determine whether it "unduly compromises the Act's purposes." *Shays* at 100 (*citing Orloski v. FEC,* 795 F.2d 156, 164 (D.C. Cir. 1986)). In this regard, the court noted that "[w]hile it is clear that mere encouragement does not fall within the scope of the regulation, it is possible that encouragement coupled with a direction of how one might register could constitute 'assist[ance]' under the provision." *Shays* at 100.

The district court also determined that the promulgation of this regulation did not satisfy the APA's notice requirement because the notice of proposed rulemaking did not indicate that the Commission would seek to limit the term "voter registration activity" to those activities that assist the registration of voters. *See Shays* at 100–01. The Commission has, therefore, initiated this rulemaking to cure what the court concluded was a notice problem and to consider the comments it receives on the current rule.

The Commission is concerned that a definition of "voter registration activity" that includes merely "encouraging" people to register to vote may sweep too broadly. The current regulations seek to balance the need to cover the core voter registration activity targeted by the statute with the public policy interest of encouraging the civic act of voting. Also, the Commission's experience indicates that exhortations to register and vote are so frequent in political party communications (and often spontaneous) that attaching any campaign finance significance to every "don't forget to vote" uttered by speakers at political party events or written in a political party flyer may be unduly burdensome to the political party committees and could overwhelm the administrative and enforcement capacity of the Commission. As the Commission noted when it promulgated the regulation, "[a] more expansive definition would run the risk that thousands of political committees and grassroots organizations that merely encouraged voting as a civic duty, who have never been subject to Federal regulation for such conduct, would be swept into the extensive reporting and filing requirements mandated under Federal law." *See Explanation and Justification for Regulations on Prohibited and Excessive Contributions; Non-Federal Funds or Soft Money,* 67 FR 49064, 49067 (July 29, 2002) ("*Soft Money E&J*"). Consequently, the proposed regulation, which is identical to the current rule, would rely on the individual contact and "assist"

requirements to narrow the scope of "voter registration activity" to a standard that is enforceable, and yet is otherwise as broad as possible.

Although the Commission is not proposing any changes to current 11 CFR 100.24(a)(2), it seeks comment on whether it should address the concerns raised by the district court by amending the regulation, expanding the explanation and justification for the final rules, or providing guidance through a case-by-case application of the rules in advisory opinions and the enforcement process. Substantively, the Commission seeks comment on the following questions. Should the Commission define "assist" to include encouragement coupled with a direction as to how one might register? Does the "assist" limitation or the "individualized means" requirement exclude any activities that should be included in the definition of "voter registration activity?" Are there other specific activities that the Commission should include or exclude from the definition of "voter registration activity?"

*2. Proposed 11 CFR 100.24(a)(3)— Definition of "Get-Out-the-Vote Activity"*

In BCRA, Congress also included GOTV within the definition of FEA without further defining the term. *See* 2 U.S.C. 431(20)(A)(ii). Current section 100.24(a)(3) defines GOTV as "contacting registered voters by telephone, in person, or by *other individualized means to assist them in engaging in the act of voting.*" *See* 11 CFR 100.24(a)(3) (emphasis added). For the reasons stated above, the current definition of GOTV does not encompass merely encouraging voters to go to the polls. Section 100.24(a)(3) includes an exception to the definition of GOTV for communications by "an association or similar group of candidates for State or local office or of individuals holding State or local office" where those communications refer only to State or local candidates. *See* 11 CFR 100.24(a)(3). In addition, the current rule provides a non-exhaustive list of examples of GOTV activity such as providing information to individual voters regarding the date, time and location of polling places within 72 hours of an election, and offering to transport, or actually transporting, voters to the polls. *See* 11 CFR 100.24(a)(3)(i)–(ii).

The district court found that the term "get-out-the-vote activity" in section 431(20)(A)(ii) was not defined by Congress and can be read in different ways, and concluded that excluding

mere encouragement of people to vote in section 100.24(a)(3) reflected a permissible reading under *Chevron* step one. *See Shays* at 101–05. The court also upheld the 72-hour provision, noting that current section 100.24(a)(3) makes clear that the list of examples is non-exhaustive. However, the court expressed uncertainty regarding "what, if any, activity conducted outside the 72-hour window [in 11 CFR 100.24(a)(3)(i)] would be considered GOTV activity," and therefore, as with the "assist" requirement in section 100.24(a)(2), could not reach a decision as to *Chevron* step two. *See Shays* at 103 (emphasis in original). With respect to the exception for State and local candidate and officeholder associations in the current GOTV definition, the court found that it "runs contrary to Congress's clearly expressed intent" as enacted in BCRA and fails step one of *Chevron. See Shays* at 104.

To conform to the district court's opinion, proposed section 100.24(a)(3) would remove the exception for communications by associations or similar groups of candidates for State or local office, or of State or local officeholders, that refer only to State or local candidates. This exception was included in the 2002 rules because the Commission was concerned that the underlying provision would require Federal registration and reporting for a broad swath of State and local election activity, "sweep[ing] within Federal regulation candidates for city council, or the local school board, who join together to identify potential voters for their own candidacies. * * *" *See Soft Money E&J,* 67 FR at 49070. The Commission seeks public comment on whether there are other alternatives to address the Commission's concerns while still satisfying Congressional intent as determined by the *Shays* court.

Further, what impact would there be from removing the exception for groups of non-Federal candidates? Would such groups of non-Federal candidates have to pay for the full amount of FEA with Federal funds? *Compare* 2 U.S.C. 441i(b)(1) with (b)(2); *see also* 11 CFR 300.32(a)(1). Could groups of non-Federal candidates that are political committees be permitted to allocate under current 11 CFR 106.6 even though the FEA allocation regulations at 11 CFR 300.33 do not apply to groups of non-Federal candidates? *See also* 2 U.S.C. 441i(b)(2). In addition, would groups of non-Federal candidates that are not political committees be allowed to allocate their FEA given that they are not covered by 11 CFR 106.6?

The district court also held that the promulgated regulation defining GOTV

did not meet the APA's notice requirement for the same reasons it articulated with regard to the definition of "voter registration activity." *See Shays* at 106–07. The proposed rules do not include any amendments to section 100.24(a)(3), or the non-exhaustive list of activities that constitute GOTV activities in current 11 CFR 100.24(a)(3)(i) and (ii). The Commission included these two examples of GOTV to assist in applying the regulation to particular factual situations. The *Shays* court found that "[t]he regulation makes clear that the examples it provides are non-exhaustive." *Shays* at 103. The Commission seeks comment on the examples of GOTV activity identified in section 100.24(a)(3). Should this non-exclusive list be changed in any way? Should the specific reference to activity within 72 hours of an election be changed in any way? Is 72 hours an appropriate period within which to specify activity included as GOTV? Would some other time frame be appropriate? Should the Commission provide more specificity as to when it will consider activity taking place more than 72 hours before an election to be GOTV?

*3. Proposed 11 CFR 100.24(a)(4)— Definition of "Voter Identification"*

"Voter identification" is another term used in the BCRA definition of FEA that is not defined by the statute. *See* 2 U.S.C. 431(20)(A)(ii). Current section 100.24(a)(4) defines voter identification as "creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates." 11 CFR 100.24(a)(4). The current definition does not include voter list acquisition because the Commission concluded that political party committees may acquire voter lists for a number of reasons other than for voter identification in connection with an election in which a Federal candidate appears on the ballot. Such reasons include fundraising and off-year party building activities. *See Soft Money E&J,* 67 FR at 49069. Section 100.24(a)(4) also contains an exception for associations of State and local candidates and/or officeholders identical to the exception to the definition of GOTV in section 100.24(a)(3).

The district court in *Shays* "agree[d] that one may obtain a voter list and not be engaged in an activity aimed at identifying voters. But whatever the intent, inherent in the acquisition of such a list is the identification of voters." *Shays* at 108. Because the court

saw "no evidence that *Congress intended* to exclude certain forms of activities that identify voters when it used the term 'voter identification' " the court held that the Commission's decision not to include acquisition of voter lists in the definition of "voter identification" failed *Chevron* step one. *Shays* at 108 (emphasis in original). The court held that the exception for State and local candidate and officeholder associations violated *Chevron* step one for the same reasons discussed above regarding the same exclusion in the GOTV regulation. *Shays* at 107 n.83.

To comport with this ruling, proposed section 100.24(a)(4) would include acquisition of voter lists in the definition of "voter identification." Thus, the acquisition of voter lists would be considered FEA if it occurs after the earliest filing deadline for the ballot in an even-numbered year and after the date is set for a special election in which a candidate for Federal office appears on the ballot. *See* 11 CFR 100.24(a)(1) and 100.24(b)(2). The Commission would use the date the information was purchased to determine whether the acquisition of a voter list falls within the FEA timeframes and would therefore be a Federal election activity. This interpretation would have the advantage of being a bright-line rule for the Commission and political parties. In addition, this interpretation would be consistent with the reporting requirements, as a political party would report the disbursement for a voter list at the time of purchase. The Commission seeks comment on whether this application of the rule would encourage State party committees to purchase voter lists outside the FEA window so that they would be able to allocate their purchases under 11 CFR 106.7(d)(3) (using a mix of Federal and non-Federal funds) rather than being required to allocate under 11 CFR 300.33 (using a mix of Federal and Levin funds). Do voter lists lose sufficient value over time so that the benefit of being able to use a mix of Federal and non-Federal funds would be outweighed by having an up-to-date voter list closer to an election? Would the use of the purchase date raise other concerns?

Alternatively, the Commission also seeks comment on an alternative application of the rule that would use the date the voter list was used to determine whether the acquisition of a voter list falls within the FEA timeframes and would therefore be a Federal election activity. Under this alternative, a voter list that was purchased before the FEA period would nonetheless be subject, at least in part, to Federal and

Levin funds requirements whenever it was used within the FEA period. Triggering the FEA provisions based on the use of a voter list would discourage any attempts to avoid those requirements by purchasing a list early for intended use during the FEA period. However, this approach could raise allocation and valuation issues if the voter list is purchased outside the FEA window and used by the political party committee both inside and outside the window.

The Commission is concerned about how this proposed rule may affect a State party committee's ability to acquire a voter list in preparation for a general election in an odd-numbered year in which a special election to fill a Federal office is called contemporaneously with its acquisition of a voter list. The purpose of the definition of "in connection with an election in which a candidate for Federal office appears on the ballot" in 11 CFR 100.24(a)(1) is to ensure that the regulation would not affect activities that are purely non-Federal in nature. *See Soft Money E&J,* 67 FR at 49066. In the situation described above, requiring a State party committee to use Federal funds to acquire a voter list that it will use only for a general election where no candidate for Federal office is on the ballot may be beyond the purpose of the regulations relating to Federal election activity. The Commission seeks comment on whether the regulation should include a limited exception to the definition of "voter identification" for acquisition of voter lists if the State, or local party committee does not actually use the voter list in connection with any election where a Federal candidate appears on the ballot.

Proposed section 100.24(a)(4) also would remove the exception for associations or groups of candidates for State or local office, and associations of State and local officeholders, that engage in voter identification activity that refers only to State or local candidates. Is there another approach that would address the Commission's concerns while still comporting with Congressional intent, as determined by the *Shays* court? As discussed above, the Commission is also seeking public comment regarding the impact of removing this exception for groups of non-Federal candidates, and the ability of those groups to pay for FEA by allocating between Federal and non-Federal funds under existing regulations at 11 CFR 106.6.

*4. Proposed 11 CFR 100.24(a)(1)—Definition of "In Connection With an Election in Which a Candidate for Federal Office Appears on the Ballot"*

Voter identification, GOTV, and generic campaign activity constitute FEA when those activities are conducted "in connection with an election in which a candidate for Federal office appears on the ballot." 2 U.S.C. 431(20)(A)(ii). In defining this phrase, a Commission regulation establishes the timeframe in which these activities are FEA, and are collectively "type 2 FEA." 11 CFR 100.24(a)(1)(i) and (ii). The Commission is considering whether to make some limited exceptions and one change to the operation of the type 2 FEA time periods in current 11 CFR 100.24(a)(1)(i) and (ii).

Proposed revisions to section 100.24(a)(1)(ii) would change the operation of type 2 FEA time periods that are related to special elections for Federal office. Currently, this provision is limited so that it only applies in odd numbered years, and the proposed revisions would eliminate this limitation. While many special elections that occur in even numbered years will fall in time periods already covered by paragraph (a)(1)(i), the removal of the limitation could extend the type 2 FEA time period when a State schedules a special election for Federal office before the type 2 FEA time period under paragraph (a)(1)(i) has begun. The Commission seeks comment on this proposed change.

The Commission is concerned that treating State party committees' voter drives that are related to a State or local election as FEA because of an upcoming special election for Federal office would unduly federalize an election that was initially scheduled to decide State and local races. To address this issue, the Commission is considering adopting an exception to section 100.24(a)(1)(ii) so that the type 2 FEA time periods would not include the period before any special election for Federal office that is scheduled to be held on the same date as a previously scheduled State or local election. This exception does not appear in the proposed rules that follow. Is such an exception consistent with FECA, as amended by BCRA? Would an exception that is limited to voter drives that refer only to State or local candidates be too narrowly tailored to address this concern? Alternatively, should any voter drives that refer to candidates for Federal office be excluded from the exception so that the FEA rules would still apply to such voter drives?

Proposed new section 100.24(a)(1)(iii) would create an exception to type 2 FEA time periods for certain municipal elections. The municipal elections that would be subject to the exception are those that take place on a date other than Federal election dates, but still during the type 2 FEA timeframe specified in 11 CFR 100.24(a)(1)(i). The rationale for such an exception might be that municipalities have chosen an election date apart from State or Federal elections in an effort to disentangle State and Federal contests from local elections to leave the local elections nonpartisan. If that local election date is nonetheless within the type 2 FEA timeframes specified in 11 CFR 100.24(a)(1), then all of the FEA requirements of Federal law would apply, chief among them the requirement that State, district or local committees of political parties use only Federal or a combination of Federal and Levin funds to pay for type 2 FEA. 2 U.S.C. 441i(b).

The Commission seeks comment on this proposed exception, which is reflected in the proposed regulatory language that follows. Is the exception adequate to address the concerns? Is it consistent with FECA, as amended by BCRA? Do any practical considerations tend either to support or to oppose such an exception?

Alternatively, the regulation could be revised to address the same concerns more narrowly. One example of a more limited exception would be to exclude GOTV that takes place within 72 hours before an election that does not include an election for Federal office. The 72-hour standard is borrowed from the Commission's first example of the non-exhaustive list of examples of GOTV in 11 CFR 100.24(a)(3)(i). The Commission seeks comment on whether GOTV that takes place only shortly before a local election where no Federal candidates are on the ballot may merit an exception from the type 2 FEA time periods, while an exception for other forms of FEA may not be appropriate. Would any other limitations on the exception be more suitable? Please note that the proposed regulation text that follows does not reflect the more narrow alternative exceptions to the type 2 FEA time periods.

The Commission also seeks comment on whether similar exceptions would be appropriate for voter registration activity, or type 1 FEA. BCRA establishes that voter registration activity is Federal election activity "during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election." 2 U.S.C. 431(20)(A)(i). Would any exceptions to this timeframe to address any of the situations described above be permissible under BCRA? If so, should any such exceptions be adopted?

**Certification of No Effect Pursuant to 5 U.S.C. 605(b) (Regulatory Flexibility Act)**

The Commission certifies that the attached proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. The basis for this certification is that the organizations affected by this proposed rule are State, district, and local party committees, which are not "small entities" under 5 U.S.C. 601. These not-for-profit committees do not meet the definition of "small organization" which requires that the enterprise be independently owned and operated and not dominant in its field. 5 U.S.C. 601(4). State political party committees are not independently owned and operated because they are not financed and controlled by a small identifiable group of individuals, and they are affiliated with the larger national political party organizations. In addition, the State political party committees representing the Democratic and Republican parties have a major controlling influence within the political arena of their State and are thus dominant in their field. District and local party committees are generally considered affiliated with the State committees and need not be considered separately. To the extent that any State party committees representing minor political parties might be considered "small organizations," the number affected by this proposed rule is not substantial.

**List of Subjects in 11 CFR Part 100**

Elections.

For reasons set out in the preamble, subchapter A of chapter 1 of title 11 of the Code of Federal Regulations would be amended as follows:

**PART 100—SCOPE AND DEFINITIONS (2 U.S.C. 431)**

1. The authority citation for 11 CFR part 100 would continue to read as follows:

**Authority:** 2 U.S.C. 431, 434, and 438(a)(8).

2. In § 100.24, paragraphs (1)(i), (ii), (iii), (2), (3), and (4)(a) would be revised to read as follows:

**§ 100.24   Federal Election Activity (2 U.S.C. 431(20)).**

(a) * * *

(1) * * *

**23072**    **Federal Register**/Vol. 70, No. 85/Wednesday, May 4, 2005/Proposed Rules

(i) Except as provided in paragraph (a)(1)(iii) of this section, the period of time beginning on the date of the earliest filing deadline for access to the primary election ballot for Federal candidates as determined by State law, or in those States that do not conduct primaries, on January 1 of each even-numbered year and ending on the date of the general election, up to and including the date of any general runoff.

(ii) The period beginning on the date on which the date of a special election in which a candidate for Federal office appears on the ballot is set and ending on the date of the special election.

(iii) In municipalities that elect local officials in elections that do not coincide with primary or general elections for Federal office but occur during the period described in paragraph (a)(1)(i) of this section, the following periods of time are excluded from the periods described in paragraphs (a)(1)(i) and (a)(1)(ii) of this section:

(A) For municipalities that hold local elections before primary elections for Federal office, from the beginning of the period described in paragraph (a)(1)(i) up to and including the date of the municipal election; and

(B) For municipalities that hold primary elections for Federal office before local elections, from the day after the primary election for Federal office up to and including the date of the municipal election.

(2) *Voter registration activity* means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

(3) *Get-out-the-vote activity* means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting. Get-out-the-vote activity includes, but is not limited to:

(i) Providing to individual voters, within 72 hours of an election, information such as the date of the election, the times when polling places are open, and the location of particular polling places; and

(ii) Offering to transport or actually transporting voters to the polls.

(4) *Voter identification* means acquiring information about potential voters, including, but not limited to, obtaining voter lists and creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates.

\*    \*    \*    \*    \*

Dated: April 29, 2005.

**Scott E. Thomas,**

*Chairman, Federal Election Commission.*

[FR Doc. 05–8864 Filed 5–3–05; 8:45 am]

**BILLING CODE 6715-01-P**

---

**FEDERAL ELECTION COMMISSION**

**11 CFR Parts 106 and 300**

**[NOTICE 2005–12]**

**State, District, and Local Party Committee Payment of Certain Salaries and Wages**

**AGENCY:** Federal Election Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Federal Election Commission is seeking comment on proposed changes to regulations regarding payments by State, district or local party committees for salaries and wages of employees who spend 25 percent or less of their compensated time in a month on Federal election activity and activity in connection with Federal elections. Currently, these committees may use funds whose only restriction is that they comply with State law. The proposed changes would require these expenses to be paid using at least some Federal funds, consistent with the ruling of the United States District Court for the District of Columbia in *Shays* v. *Federal Election Commission.* The Commission is appealing this ruling to the DC Circuit. In the interim, the Commission is initiating this rulemaking. The Commission has not made any final decision on the issues presented in this rulemaking. Further information is provided in the supplementary information that follows.

**DATES:** Comments must be received on or before June 3, 2005. If the Commission receives sufficient requests to testify, it may hold a hearing on the proposed rules. Anyone wishing to testify at the hearing must file written comments by the due date and must include a request to testify in the written comments.

**ADDRESSES:** All comments must be in writing, addressed to Ms. Mai T. Dinh, and submitted in either electronic, facsimile, or hard copy form. Commenters are strongly encouraged to submit comments electronically to ensure timely receipt and consideration. Electronic comments must be sent to either *StatePartyWages@fec.gov* or submitted through the Federal eRegulations Portal at *http://www.regulations.gov.* If the electronic comments include an attachment, the attachment must be in the Adobe Acrobat (.pdf) or Microsoft Word (.doc) format. Faxed comments must be sent to (202) 219–3923, with hard copy follow-up. Hard copy comments and hard copy follow-up of faxed comments must be sent to the Federal Election Commission, 999 E Street, NW., Washington, DC 20463. All comments must include the full name and postal service address of the commenter or they will not be considered. The Commission will post comments on its Web site after the comment period ends. If the Commission decides a hearing is necessary, the hearing will be held in the Commission's ninth floor meeting room, 999 E Street NW., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Ms. Mai T. Dinh, Assistant General Counsel, or Mr. Anthony T. Buckley, Attorney, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107–155, 116 Stat. 81 (March 27, 2002), contained extensive and detailed amendments to the Federal Election Campaign Act of 1971, as amended (the "Act"), 2 U.S.C. 431 *et seq.* Under BCRA, State, district and local party committees ("State party committees") must pay the salaries and wages of employees who spend more than 25 percent of their compensated time per month on Federal election activity and activities in connection with a Federal election (collectively "Federal-related activities") entirely with Federal funds.[1] 2 U.S.C. 431(20)(A)(iv) and 441i(b)(1). However, BCRA is silent on what type of funds State party committees must use to pay the salaries and wages of employees who spend some, but not more than 25 percent, of their compensated time per month on Federal-related activities. In 2002, the Commission promulgated 11 CFR 106.7(c)(1) and (d)(1)(i), and 300.33(c)(2) to address salaries and wages for both types of employees. Under these rules, State party committees may pay the salaries or wages of employees who spend 25 percent or less of their compensated time each month on these activities

---

[1] "Federal funds" are funds that are subject to the contribution limitations, source prohibitions, and reporting requirements of the Act. 11 CFR 300.2(g).

# PLAINTIFFS' EXHIBIT 146

After consideration of all relevant material presented, including the information and recommendation submitted by the Committee and other available information, it is hereby found that this rule, as hereinafter set forth, will tend to effectuate the declared policy of the Act.

Pursuant to 5 U.S.C. 553, it is also found and determined upon good cause that it is impracticable, unnecessary, and contrary to the public interest to give preliminary notice prior to putting this rule into effect, and that good cause exists for not postponing the effective date of this rule until 30 days after publication in the **Federal Register** because: (1) The 2005–06 crop year began on August 1, 2005, and the order requires that the rate of assessment for each crop year apply to all assessable raisins acquired during the year; (2) this action decreases the assessment rate; (3) handlers are aware of this action which was recommended at a public meeting and is similar to other assessment rate actions issued in past years; and (4) this rule provides a 60-day comment period, and all comments timely received will be considered prior to finalization of this rule.

**List of Subjects in 7 CFR Part 989**

Grapes, Marketing agreements, Raisins, Reporting and recordkeeping requirements.

■ For the reasons set forth in the preamble, 7 CFR part 989 is amended as followed:

**PART 989—RAISINS PRODUCED FROM GRAPES GROWN IN CALIFORNIA**

■ 1. The authority citation for 7 CFR part 989 continues to read as follows:

**Authority:** 7 U.S.C. 601–674.

■ 2. Section 989.347 is revised to read as follows:

**§ 989.347  Assessment rate.**

On and after August 1, 2005, an assessment rate of $7.50 per ton is established for assessable raisins produced from grapes grown in California.

Dated: February 15, 2006.

**Lloyd C. Day,**

*Administrator, Agricultural Marketing Service.*

[FR Doc. 06–1582 Filed 2–21–06; 8:45 am]
**BILLING CODE 3410-02-P**

**DEPARTMENT OF AGRICULTURE**

**Commodity Credit Corporation**

**7 CFR Part 1427**

**RIN 0560–AH29**

**Cottonseed Payment Program; Correction**

**AGENCY:** Commodity Credit Corporation, USDA.

**ACTION:** Correcting amendment.

**SUMMARY:** This document corrects the final regulations published on January 26, 2006 to provide assistance to producers and first-handlers of the 2004 crop of cottonseed in counties declared a disaster by the President due to 2004 hurricanes and tropical storms. A correction is needed to change a reference from "cotton" to "cottonseed."

**DATES:** Effective February 22, 2006.

**FOR FURTHER INFORMATION CONTACT:** Chris Kyer, phone: (202) 720–7935; e-mail: *chris.kyer@wdc.usda.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

This document corrects the final regulations published on January 26, 2006 (71 FR 4231–4234) to provide assistance to producers and first-handlers of the 2004 crop of cottonseed in counties declared a disaster by the President due to 2004 hurricanes and tropical storms. In the final rule, section 1427.1103(b) mistakenly refers to cotton, rather than cottonseed, in stating that "Cotton must not have been destroyed or damaged by fire, flood, or other events such that its loss or damage was compensated by other local, State, or Federal government or private or public insurance or disaster relief payments" in order to be eligible under the Cottonseed Payment Program. This correction changes the term "cotton" to "cottonseed."

**List of Subjects in 7 CFR Part 1427**

Agriculture, Cottonseed.

■ Accordingly, 7 CFR part 1427 is corrected as follows:

**PART 1427—COTTON**

■ 1. The authority citation for 7 CFR part 1427 continues to read as follows:

**Authority:** 7 U.S.C. 7231–7239; 15 U.S.C. 714b, 714c; Pub. L. 108–324, Pub. L. 108–447.

■ 2. Revise § 1427.1103(b) to read as follows:

**§ 1427.1103  Eligible cottonseed and counties.**

\*    \*    \*    \*    \*

(b) Cottonseed must not have been destroyed or damaged by fire, flood, or other events such that its loss or damage was compensated by other local, State, or Federal government or private or public insurance or disaster relief payments.

Signed in Washington, DC, on February 15, 2006.

**Michael W. Yost,**

*Acting Executive Vice President, Commodity Credit Corporation.*

[FR Doc. 06–1645 Filed 2–21–06; 8:45 am]
**BILLING CODE 3410-05-P**

**FEDERAL ELECTION COMMISSION**

**11 CFR Part 100**

[Notice 2006–2]

**Definition of Federal Election Activity**

**AGENCY:** Federal Election Commission.
**ACTION:** Final rules.

**SUMMARY:** The Federal Election Commission ("Commission") is revising its rules defining "Federal election activity" ("FEA") under the Federal Election Campaign Act of 1971, as amended ("FECA"). These final rules modify the definitions of "get-out-the-vote activity" and "voter identification" consistent with the ruling of the U.S. District Court for the District of Columbia in *Shays* v. *FEC.* The final rules retain the definition of "voter registration activity" that the Commission promulgated in 2002, and provide a fuller explanation of what this term encompasses in response to the district court's decision. The Commission is also revising the definition of "in connection with an election in which a candidate for Federal office appears on the ballot" for FEA purposes. Further information is provided in the supplementary information that follows.

**DATES:** *Effective Date:* These rules are effective on March 24, 2006.

**FOR FURTHER INFORMATION CONTACT:** Ms. Mai T. Dinh, Assistant General Counsel, Mr. J. Duane Pugh Jr., Senior Attorney, or Ms. Margaret G. Perl, Attorney, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Bipartisan Campaign Reform Act of 2002 ("BCRA"), Public Law No. 107–155, 116 Stat. 81 (2002), amended FECA by adding a new term, "Federal election activity," to describe certain activities that State, district, and local party

committees must pay for with either Federal funds or a combination of Federal and Levin funds.[1] 2 U.S.C. 431(20) and 441i(b)(1). The FEA requirements apply to all State, district, and local party committees regardless of whether they are registered as political committees with the Commission. The term also affects fundraising on behalf of tax-exempt organizations. National, State, district, and local party committees are prohibited from soliciting or directing non-Federal funds to tax-exempt entities organized under 26 U.S.C. 501(c) that engage in FEA or make other disbursements or expenditures in connection with a Federal election. 2 U.S.C. 441i(d)(1). Also, Federal candidates and officeholders may make only limited solicitations for funds on behalf of tax-exempt entities organized under 26 U.S.C. 501(c) whose principal purpose is to conduct certain types of FEA. 2 U.S.C. 441i(e)(4).

BCRA identifies four types of FEA: Voter registration activity (Type I); voter identification, get-out-the-vote activity ("GOTV activity"), or generic campaign activity (Type II); public communications that refer to clearly identified Federal candidates and that promote, support, attack or oppose ("PASO") a candidate for that office (Type III); and services provided by an employee of a State, district, or local political party committee who spends more than 25 percent of that individual's compensated time on activities in connection with a Federal election (Type IV). *See* 2 U.S.C. 431(20)(A)(i)–(iv). Only the first two types of FEA are implicated in this rulemaking. The Commission defined the different components of Types I and II FEA in 11 CFR 100.24. *Final Rules and Explanation and Justification on Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money*, 67 FR 49064, 49066 (July 29, 2002) ("*Soft Money E&J*").

In 2004, the Commission's rules defining "voter registration activity," "GOTV activity," and "voter identification" were reviewed by the U.S. District Court for the District of Columbia in *Shays* v. *FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (DC Cir. 2005) ("*Shays*"). The district court invalidated certain aspects of these regulations because they did not

satisfy the first step of the test set out in *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*").[2] *Shays*, 337 F. Supp. 2d at 98–100, 102–103. The district court held that other aspects of these regulations satisfied the *Chevron* step one analysis, but the 2002 NPRM did not fully notice the approach taken in the final rule, as required by the Administrative Procedure Act, 5 U.S.C. 553(b)(3) ("APA"). *Shays*, 337 F. Supp. 2d at 101, 105–107. The district court remanded the regulations to the Commission for further action consistent with the court's decision. *Id.* at 130. The Commission did not appeal the district court's ruling on these regulations.

In response to the district court's decision, the Commission published a Notice of Proposed Rulemaking on May 4, 2005. *See Notice of Proposed Rulemaking on the Definition of Federal Election Activity*, 70 FR 23068 (May 4, 2005) ("*2005 NPRM* or *NPRM*"). The NPRM proposed possible modifications to the definitions of "voter registration activity," "GOTV activity," and "voter identification." The NPRM also proposed several changes to the definition of "in connection with an election in which a candidate for Federal office appears on the ballot" in 11 CFR 100.24(a)(1). The public comment period for the NPRM closed on June 3, 2005. The Commission received written comments from 14 commenters. The Commission held a public hearing on August 4, 2005, at which six witnesses testified. After the hearing, the Commission reopened the comment period until September 29, 2005 to allow interested parties to submit additional information or comments. *See Notice to Reopen Comment Period on the Definition of Federal Election Activity*, 70 FR 51302 (August 30, 2005). The Commission received two additional comments during this period. All comments and a transcript of the public hearing are available at *http://www.fec.gov/law/law_rulemakings.shtml* under "Definition of Federal Election Activity." For purposes of this document, the terms "comment" and "commenter" apply to both written comments and oral testimony at the public hearing.

These final rules remove the exception to the definitions of "get-out-the-vote activity" and "voter identification" for associations or other similar groups of candidates for State and local office. These final rules also remove the reference to "within 72 hours of an election" from the definition of "get-out-the-vote activity" and amend the definition of "voter identification" so as to include "acquiring information about potential voters, including, but not limited to, obtaining voter lists." The final rules retain the current definition of "voter registration activity," and provide a fuller explanation of what this term encompasses. The Commission is also revising the definition of "in connection with an election in which a candidate for Federal office appears on the ballot" to remove restrictions on the rules for special elections to odd-numbered years.

Under the APA, 5 U.S.C. 553(d), and the Congressional Review of Agency Rulemaking Act, 5 U.S.C. 801(a)(1), agencies must submit final rules to the Speaker of the House of Representatives and the President of the Senate and publish them in the **Federal Register** at least 30 calendar days before they take effect. The final rules that follow were transmitted to Congress on February 10, 2006.

**Explanation and Justification**

*A. Definitions of "Voter Registration Activity" (11 CFR 100.24(a)(2)) and "GOTV Activity" (11 CFR 100.24(a)(3))*

BCRA uses the terms "voter registration activity" and "get-out-the-vote activity" within the definition of FEA. Congress did not, however, define those terms. *See* 2 U.S.C. 431(20)(A)(i)–(ii).[3] In 2002, the Commission defined "voter registration activity" to mean "contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms." 11 CFR 100.24(a)(2). Similarly, Commission regulations define "GOTV activity" to mean

---

[1] "Federal funds" are funds subject to the limitations, prohibitions, and reporting requirements of the Act. *See* 11 CFR 300.2(g). "Levin funds" are funds raised by State, district, and local party committees pursuant to the restrictions in 11 CFR 300.31 and disbursed subject to the restrictions in 11 CFR 300.32. *See* 11 CFR 300.2(i).

[2] The first step of the *Chevron* analysis, which courts use to review an agency's regulations, asks whether Congress has directly spoken to the precise questions at issue. The second step considers whether the agency's resolution of an issue not addressed in the statute is based on a permissible construction of the statute. *See Shays*, 337 F. Supp. 2d at 51–52 (citing *Chevron*, 467 U.S. at 842–43).

[3] The statute states that voter registration activity (Type I FEA) is FEA only when it is conducted 120 days or fewer before a regularly scheduled Federal election. *See* 2 U.S.C. 431(20)(A)(i). BCRA also specifies that GOTV activity (Type II FEA) is FEA only when it is conducted "in connection with an election in which a candidate for Federal office appears on the ballot," *see* 2 U.S.C. 431(20)(A)(ii), which the Commission defined in 11 CFR 100.24(a)(1), as discussed below.

"contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting." 11 CFR 100.24(a)(3). This provision also includes a non-exhaustive list of examples of different types of GOTV activity. *See* 11 CFR 100.24(a)(3)(i)–(ii).

The *Shays* plaintiffs argued that the requirement that voter registration and GOTV activity "assist" in the registration of voters or the act of voting impermissibly narrowed the statutory definition of "FEA" by excluding activities that only "encourage" registration and voting. *See Shays,* 337 F. Supp. 2d at 98–99, 102–103. The district court did not invalidate these definitions on *Chevron* grounds. Instead, the district court found that the Commission's interpretation of section 431(20)(A) is permissible under the *Chevron* step one analysis because it does not conflict with expressed Congressional intent. *Shays,* 337 F. Supp. 2d at 99–100, 102–103. Specifically, the district court noted that "it is possible to read the term 'voter registration activity' to encompass those activities that actually register persons to vote, as opposed to those that only encourage persons to do so without more. Moreover, the Court [did not] find based on the record presented that the 'common usage' of the term 'voter registration activity' necessarily includes the latter type of activities." *Shays,* 337 F. Supp. 2d at 99 (internal citation omitted); *see also Shays,* 337 F. Supp. 2d at 102–03 (GOTV activity). With respect to *Chevron* step two, the district court concluded that the "exact parameters of the Commission's regulation[s] are subject to interpretation," and absent further guidance, the plaintiffs' challenges were not ripe. *Shays,* 337 F. Supp. 2d at 100 (voter registration activity); *see also Shays,* 337 F. Supp. 2d at 105 (GOTV activity). The district court concluded that if the parameters were sufficiently broad, it would alleviate any concerns that the regulations would "unduly compromise[] the Act." *Shays,* 337 F. Supp. 2d at 100 and 105 (citing *Orloski v. FEC,* 795 F.2d 156, 164 (D.C. Cir. 1986)).

The Commission remanded these regulations to the Commission because the court found that the NPRM for 11 CFR 100.24 did not provide sufficient notice that the Commission might limit the definitions of "voter registration" and "GOTV activity" to activities that "assist" individuals to register to vote or to vote. *Shays,* 337 F. Supp. 2d at 101, 105–107; *see also Notice of Proposed Rulemaking on Prohibited and Excessive Contributions; Non-Federal*

*Funds or Soft Money,* 67 FR 35654 (May 20, 2002) ("2002 NPRM"). The district court concluded that the final rules could not have been reasonably anticipated based on the 2002 NPRM proposals and therefore interested parties did not have an adequate opportunity to comment. *Shays,* 337 F. Supp. 2d at 101, 105–107.

The Commission's 2005 NPRM proposed retaining the "assist" requirement in these definitions. The purpose of retaining the "assist" requirement is to exclude "mere encouragement" from the scope of the rules. In proposing to retain the "assist" requirement, the Commission was concerned that regulations that included activities that merely encouraged people to register and vote may sweep too broadly. The proposed rule addresses the financing of the voter registration and GOTV activities that Congress sought to regulate. At the same time, the Commission reviewed the statutory language and the legislative history of the FEA provision and found no evidence that Congress intended to capture every State or local party event where an individual ends a speech with the exhortation, "Don't forget to vote!" Both Congress and the Commission are aware that such speech is ubiquitous and often spontaneous in an election year.

The 2005 NPRM sought public comment on how to address the district court's concerns that the scope of the 2002 rules might be too narrow. In addition, the Commission asked whether there were any particular activities that should be specifically included in, or excluded from, these provisions.

Several commenters supported the Commission's proposal to retain the current definitions of "voter registration activity" and "GOTV activity." These commenters argued that the "assist" requirement effectuates BCRA and gives State, district, and local party committees a rule that is understandable. Some commenters asserted that including "encouragement" to register and/or to vote would broaden the reach of these provisions to cover nearly every activity of State, district, and local party committees. These commenters stated that local party committees would find it particularly difficult to comply with more expansive rules. According to these commenters, most local parties are small volunteer-centered organizations that operate largely autonomously from the State and national committees. Many local party committees do not have the resources to comply with the complexities of Federal law, and their

response to BCRA has been to avoid voter registration and GOTV activities that might trigger Federal reporting and financing requirements. These commenters urged the Commission not to expand the FEA definitions because any further expansion of these definitions could preclude local parties at the grassroots level from answering simple voter inquiries about where to register or from referring voters to those who could legally assist them in registering.

Other commenters urged the Commission to amend the definitions of "voter registration activity" and "GOTV activity" to include "encouragement" to register and/or to vote, arguing that this approach would better reflect Congressional intent, and that the "assist" requirement improperly narrows the reach of these provisions. These commenters urged the Commission to adopt a standard such that a "mere exhortation to register to vote," without any additional activity to assist the individual in doing so, would be covered by the FEA definitions and funding requirements. These commenters argued that any concerns about the FEA definition sweeping too broadly are alleviated by the fact that the rule applies only to State, district, or local party committees[4] and that the funding requirements on voter registration activity are limited to the period of 120 days before a Federal election.

The Commission has decided to retain the current definitions of "voter registration activity" and "GOTV activity," which exclude mere encouragement of registration and/or voting from these definitions. *See* 11 CFR 100.24(a)(2) and (a)(3). The district court emphasized that "it is possible to read the term 'voter registration activity' to encompass those activities that actually register persons to vote, as opposed to those that only encourage persons to do so without more. Moreover, the Court [did not] find based on the record presented that the 'common usage' of the term 'voter registration activity' necessarily includes the latter type of activities." *Shays,* 337 F. Supp. 2d at 99 (internal citation omitted); *see also Shays,* 337 F. Supp. 2d at 102–03 (GOTV activity).

The Commission's regulations are consistent with BCRA, which seeks to regulate the funds used to influence Federal elections. The final rules regulate actual voter registration activity

---

[4] However, as noted above, the FEA definition also affects the ability of national, State, district or local party committees and Federal candidates and officeholders to raise funds for tax-exempt entities organized under 26 U.S.C. 501(c).

without capturing incidental speech, such as responding to voter inquiries by providing publicly available information, such as the address on the FEC's website for the National Voter Registration Form or the 1–800 number of a State's Division of Elections. Should a State, district, or local party expend funds actually to register individuals to vote, such uses of funds are clearly covered by the Commission's regulations.

Moreover, in the Commission's extensive enforcement experience, general exhortations to register to vote and to vote are so common in political party communications that including encouragement to register to vote and to vote would be overly broad, is not necessary to effectively implement BCRA, and could have an adverse impact on grassroots political activities. As the Supreme Court has repeatedly stressed, where First Amendment rights are affected, "[p]recision of regulation must be the touchstone." *Edenfield* v. *Fane,* 507 U.S. 761, 777 (1993). The Commission notes that these definitions will not lead to circumvention of FECA because the regulations prohibit the use of non-Federal funds for disbursements that State, district, and local parties make for those activities that actually register individuals to vote. Additionally, many programs for widespread encouragement of voter registration to influence Federal elections would be captured as public communications under Type III FEA.

Commenters who supported including "encouragement" in the definitions noted that these definitions do not exactly match the definition of "voter registration and get-out-the-vote activities" in 11 CFR 100.133. Section 100.133 exempts from the definition of "expenditure" the costs of non-partisan activity "designed to encourage individuals to register to vote or to vote." However, the district court agreed with the Commission that these regulations are not in conflict. *Shays,* 337 F. Supp. 2d at 100. Indeed, these regulations are consistent because both provisions promote the public policy goal of encouraging civic participation through voter registration and voting. For reasons similar to the policy rationale that underlies the exception to the funding restrictions on expenditures in section 100.133, the Commission declines to impose FEA funding restrictions on State, district, and local party committees' mere "encouragement" of registering to vote or voting.

Therefore, the Commission is reaffirming its interpretation of the statutory FEA provision in its definitions at 11 CFR 100.24(a)(2) and (a)(3).

1. Examples of "Voter Registration Activity"

As stated above, the district court concluded that the scope of the "assist" requirement was unclear. *Shays,* 337 F. Supp. 2d at 100. Commenters disagreed about whether particular State, district, or local party committee activities would meet the current definition of "voter registration activity." The Commission has decided to include some additional examples in this Explanation and Justification to provide more guidance on which activities are, and are not, covered by this rule. These examples are illustrations only.[5]

The following are examples of activity that *are* Type I FEA voter registration activity:

1. At a county fair, a local political party committee sponsors a booth. The booth has banners reading, "Don't forget to register to vote!" Party staff at the booth provides voter registration forms and answers questions about completing and submitting the forms. They also accept completed forms and mail them to the appropriate governmental agency.

2. A State party committee conducts a phone bank contacting possible voters. The party staff making the calls encourages the individuals to register to vote, provides information about how to register to vote, and offers to mail registration forms with a prepaid postage envelope to the individuals.

Both of these examples illustrate activity where a State, district, or local party committee is providing potential voters with personal assistance in registering to vote. Both examples go beyond general statements encouraging voter registration. In example 1, providing registration forms and personal assistance in completing and submitting those forms are actions that actually assist individuals in registering to vote. In example 2, the State party committee is affirmatively contacting individual potential voters to provide them with registration information and offering to provide registration forms. Therefore, these examples would satisfy the definition of "voter registration activity" and are FEA if conducted within 120 days of a Federal election.

The following is an example of activity that is *not* Type I FEA voter registration activity:

3. A guest speaker at a local party committee rally for a mayoral candidate

extols the virtues of the candidate and concludes his remarks by stating: "Don't forget to register and vote!"

In contrast to examples 1 and 2 above, example 3 involves a State or local party committee speaker merely encouraging registration and voting without any additional concrete action that would be considered personal assistance to potential voters. General statements of encouragement alone are not enough to trigger the FEA definition. Congress did not express an intent in BCRA to require that Federal funds be used for an entire State or local party committee rally on behalf of non-Federal candidates on the basis of speeches that merely encourage the audience to register to vote. Additionally, this type of party event would not lead to actual or apparent corruption of Federal candidates or officeholders. Under BCRA, Congress continued to allow these organizations to use non-Federal funds for this type of State, district, or local activity generally, and there is no legislative history or administrative record that general encouragement to vote is similar to the other corrupting activity Congress was concerned with when it required certain activity to be funded with Federal dollars.

Congress, as a policy matter, has historically recognized the importance of encouraging voters to register to vote and to vote in a variety of ways. *See, e.g.,* FECA, 2 U.S.C. 431(9)(B)(ii) (exception to the definition of "expenditure" for non-partisan voter registration efforts and GOTV activity); Voting Rights Act of 1965, 42 U.S.C. 1973b(a)(1)(F)(iii) (a jurisdiction which wants to terminate "Section 5" coverage must show that it has "engaged in * * * constructive efforts, such as expanded opportunity for convenient registration"); National Voter Registration Act of 1993, 42 U.S.C. 1973gg(b)(1) (purpose of the Act is to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office"); Help America Vote Act of 2002, 42 U.S.C. 15483 (standards for computerized statewide voter registration lists and registering to vote by mail). The Commission believes that BCRA should be interpreted to be faithful to these purposes.

2. Examples of "GOTV Activity"

The Commission's 2002 definition of "GOTV activity" included examples of activity that meet the "assist" requirement for GOTV activity in 11 CFR 100.24(a)(3)(i) and (ii). The first example is "[p]roviding to individual voters, *within 72 hours of an election,* information such as the date of the election, the times when polling places

---

[5] All of these examples exclude public communications that PASO any Federal candidate and, therefore, would not raise the possibility of otherwise qualifying as Type III FEA. *See* 11 CFR 100.24(b)(3).

are open, and the location of particular polling places." 11 CFR 100.24(a)(3)(i) (emphasis added). The district court rejected the plaintiffs' challenge to the 72-hour provision in the first example at 11 CFR 100.24(a)(3)(i), noting that the general definition of "GOTV activity" in section 100.24(a)(3) makes clear that the list of examples is non-exhaustive. *Shays*, 337 F. Supp. 2d at 103. Similar to its *Chevron* step two analysis of the "assist" requirement discussed above, the district court held that the 72-hour provision was not ripe for review because it was unclear what activity the Commission would consider to be GOTV activity if conducted outside of this 72-hour window. *Shays*, 337 F. Supp. 2d at 105.

The NPRM sought public comment as to whether to revise the list of examples of GOTV activity in 11 CFR 100.24(a)(3)(i)–(ii) to address the district court's ruling on the 72-hour example. Most of the commenters urged the Commission to remove the 72-hour example, although for different reasons. Some commenters argued that GOTV activity occurs weeks and months before an election, and this example could suggest that no GOTV activity is covered until 72-hours before the election. Other commenters claimed that this example created confusion for State, district, and local party committees as to the timing, method, and content of communications that might be considered GOTV activity. Many commenters noted that it was unclear how the Commission would apply the 72-hour provision with regard to absentee balloting and early voting, which is now available in most states. One commenter argued that the Commission should include an exhaustive, yet narrow, list of covered activities in the definition of "GOTV activity," while another commenter urged the Commission to eliminate all of the regulatory examples.

Activity conducted earlier than 72 hours before the election that meets the general definition of "GOTV activity" in 11 CFR 100.24(a)(3) is Type II FEA. As the Commission explained in the *Soft Money E&J*, the non-exhaustive list of examples in section 100.24(a)(3)(i)–(ii) is merely illustrative of the types of activity that would satisfy the definition of "GOTV activity." *See Soft Money E&J*, 67 FR at 49067. For example, a State party committee could hire a consultant a month prior to the election to design a GOTV program for the State party committee and recruit volunteers to drive voters to the polls on election day. The consultant's work performed well before the 72-hour time period would be considered Type II FEA and must be paid for by the State party

committee only with Federal funds or an allocated mix of Federal and Levin funds. Also, the definition of "GOTV activity" would apply equally to actions taken with regard to absentee balloting or early voting.

The 72-hour provision in the first example was included in the rule as an effort to provide an example of what activity would clearly be covered by the definition of "GOTV activity," and was not intended to exclude activity in any other timeframe. The Commission based the example on its understanding that the execution of most GOTV activity tends to occur within 72 hours of an election. However, based on the comments received by the Commission, it appears that the 72-hour provision in the first example has given rise to uncertainty and potential confusion over whether GOTV activity conducted earlier in the election cycle would not be covered by the rule. No such time limitation exists, and the removal of the 72-hour reference will clarify that this has always been the case. Therefore, the Commission is removing the phrase "within 72 hours of an election" from the example in 11 CFR 100.24(a)(3)(i). The remainder of the example in section 100.24(a)(3)(i) gives proper guidance as to the type of activity covered by the rule, regardless of when it occurs inside the Type II FEA window.

### B. Definition of "Voter Identification" (11 CFR 100.24(a)(4))

In 2002, the Commission's regulations defined "voter identification" to mean "*creating or enhancing voter lists* by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates." *See* 11 CFR 100.24(a)(4) (2002) (emphasis added). This definition did not include the initial acquisition of a voter list because the Commission concluded that political party committees might acquire voter lists for a number of reasons other than for voter identification in connection with an election in which a Federal candidate appears on the ballot. Such reasons include fundraising and off-year party building activities. *See Soft Money E&J*, 67 FR at 49069. The district court in *Shays* held that the Commission's decision not to include acquisition of voter lists in the definition of "voter identification" failed *Chevron* step one. *Shays*, 337 F. Supp. 2d at 108.

To comport with this ruling, the NPRM proposed revising section 100.24(a)(4) to include the acquisition of voter lists in the definition of "voter identification." Most of the commenters

agreed that the Commission is required to include the acquisition of voter lists.

The NPRM also sought comment on whether the Commission should use the date a voter list is purchased or the date a voter list is used to determine whether the acquisition of a voter list occurs "in connection with an election in which a candidate for Federal office appears on the ballot," as defined in 11 CFR 100.24(a)(1). A few commenters urged the Commission to adopt a "use" test to foreclose the possibility of State, district, and local party committees purchasing a list outside the FEA period and then using it inside the FEA period. Most commenters, however, supported the "purchase" test, noting the burdensome tracking that would be required of State, district, and local party committees under a "use" test. In addition, these commenters noted that a "purchase" test would not unfairly burden State, district, and local party committees that acquire lists in odd-numbered years for voter identification uses outside of the FEA windows. Some commenters also noted that a "use" test would effectively eliminate the FEA window for voter identification because any subsequent "use" of a voter list would reach back and retroactively convert a non-FEA acquisition into FEA.

The Commission has decided to amend the definition of "voter identification" to include "acquiring information about potential voters, including, but not limited to, obtaining voter lists." *See* revised 11 CFR 100.24(a)(4). Under the new rule, the acquisition of a voter list is considered FEA if it occurs after the earliest filing deadline for the ballot in an even-numbered year and for those States that do not conduct primaries, on January 1 of an even-numbered year, and after the date is set for a special election in which a candidate for Federal office appears on the ballot. *See* 11 CFR 100.24(a)(1) and 100.24(b)(2). Under these revised rules, State, district, and local party committees should use the date the information was purchased, rather than the date the information was used, to determine whether the acquisition of a voter list falls within the FEA timeframes. The revised rule states that "[t]he date a voter list is acquired shall govern whether a State, district, or local party committee has obtained a voter list." *See* revised 11 CFR 100.24(a)(4). Any acquisition of voter lists during the FEA period would come within this revised definition, and must be paid for with Federal funds or an allocated mix of Federal and Levin funds. The purchase of any voter list before the FEA period begins may be made with an allocated mixture of

Federal and non-Federal funds under 11 CFR 106.7(c). Any subsequent use of the voter list during the FEA period will not be considered a separate FEA cost unless the political party is also "enhancing" the voter list by verifying or adding information. *See* 11 CFR 100.24(a)(4).

This approach has a number of benefits. It provides a simple, bright line rule. In addition, this interpretation is consistent with the Commission's reporting requirements, as political party committees are required to report disbursements for a voter list at the time of purchase. *See* 11 CFR 300.36. Finally, the Commission's rule allows for off-year party fundraising and party building activities not connected to Federal elections by using voter lists acquired outside of the FEA window without automatic imposition of the FEA rules.

The NPRM also sought public comment on a proposed exception to the definition of "voter identification" when a State party committee uses the voter list in connection with an election where no Federal candidates appear on the ballot. *See NPRM,* 70 FR at 23070. Most of the commenters who discussed this proposed exception opposed it as exceeding the Commission's statutory authority under BCRA. The Commission has decided not to adopt any new exceptions to the voter identification provision at this time. Additionally, this proposed exception would be challenging for State, district, and local party committees to apply and for the Commission to enforce because it is difficult to determine when a voter list is, or is not, "used" by a State party committee. Finally, any acquisitions of voter lists to be used in odd-numbered year, non-Federal elections would most likely occur outside the FEA timeframes, and would therefore not be considered FEA.

### C. Exceptions for Non-Federal Candidate Associations in GOTV Activity (11 CFR 100.24(a)(3)) and Voter Identification (11 CFR 100.24(a)(4))

The 2002 regulatory definitions of "GOTV activity" and "voter identification" included exceptions for associations or similar groups of candidates for State or local office or of individuals holding State or local office (collectively "non-Federal candidate associations"). *See* 11 CFR 100.24(a)(3) and (4). The Commission intended that these exceptions would keep State and local candidates' grassroots and local political activity a question of State, not Federal law. *See Soft Money E&J,* 67 FR at 49067. The Commission decided not to interpret BCRA in a way that would

"undertake * * * a vast federalization of State and local activity without greater direction from Congress." *See id.,* 67 FR at 49067.

The district court found that these exceptions "run[] contrary to Congress's clearly expressed intent" as enacted in BCRA and fail step one of *Chevron. See Shays,* 337 F. Supp. 2d at 104 and 107 n.83. The district court also observed that the Supreme Court rejected the federalism concerns underlying these exceptions in *McConnell* v. *FEC,* 540 U.S. 93 (2003). *See Shays,* 337 F. Supp. 2d at 104 (citing *McConnell,* 540 U.S. at 186).

To comply with the district court's opinion, the NPRM proposed removing from both definitions the exceptions for non-Federal candidate associations. *See NPRM,* 70 FR at 23072. The NPRM also sought comment on the impact of removing the exceptions, and whether other alternatives could address the Commission's concerns while still satisfying Congressional intent as determined by the *Shays* court. *See id.,* 70 FR at 23069 and 23070.

Several commenters agreed that BCRA or the district court's decision in *Shays* requires the removal of these exceptions from the definitions of "GOTV activity" and "voter identification." One commenter urged the Commission to leave the definition of "FEA" undisturbed "to the maximum extent permitted by the court's judgment in *Shays.*" All of the commenters who addressed the issue believed that non-Federal candidate associations would be required to use Federal funds for FEA in the absence of these exceptions. No commenter provided any specific alternatives that would address the Commission's concerns that gave rise to these exceptions and satisfy Congressional intent as determined by the *Shays* court.

In light of these comments and the district court's reasoning, the Commission has decided to remove the exception for non-Federal candidate associations from the definitions of "GOTV activity" and "voter identification." *See* revised 11 CFR 100.24(a)(3) and (4). These revisions require that non-Federal candidate associations use only Federal funds to pay for FEA. *See* 2 U.S.C. 441i(b)(1) and 11 CFR 300.32(a)(1).

### D. Type II FEA Time Periods (11 CFR 100.24(a)(1))

BCRA provides that voter identification, GOTV activity, and generic campaign activity constitute FEA only when "conducted in connection with an election in which a candidate for Federal office appears on

the ballot (regardless of whether a candidate for State or local office also appears on the ballot)." 2 U.S.C. 431(20)(A)(ii). In 2002, the Commission defined this period as beginning on the date of the earliest filing deadline for a primary election ballot for Federal candidates in each particular State and ending on the date of the general election, up to and including any runoff election date. *See* 11 CFR 100.24(a)(1)(i) (2002). For States that do not hold primary elections, the period begins January 1 of each even-numbered year. *Id.* For special elections in which Federal candidates are on the ballot, the period begins when the date of the special election is set and ends on the date of the special election. *See* 11 CFR 100.24(a)(1)(ii). By its terms, the 2002 rule for special elections applied in odd-numbered years only. *Id.*[6]

#### 1. FEA Time Period for Special Elections During Odd-Numbered Years

In the NPRM, the Commission proposed eliminating the odd-numbered year limitation on the Type II FEA time period for special elections. *NPRM,* 70 FR at 23071 and 23072. All of the commenters who addressed this topic supported the proposed change. The Commission has decided to remove the limitation from former 11 CFR 100.24(a)(1)(ii) that made it applicable only to those special elections that take place in odd-numbered years. For any special elections that are scheduled in even-numbered years, the same Type II FEA time period should apply. Therefore, the phrase "In an odd-numbered year," no longer appears in revised 11 CFR 100.24(a)(1)(ii).

#### 2. Other Proposed Changes to Type II FEA Time Period.

The NPRM also sought comment on limited exceptions to the Type II FEA time period in 11 CFR 100.24(a)(1). *See NPRM,* 70 FR 23071 and 23072. The Commission received several comments on the issues raised in the NPRM. The Commission is promulgating an Interim Final Rule in a separate rulemaking to address these issues.

### Certification of No Effect Pursuant to 5 U.S.C. 605(b) (Regulatory Flexibility Act)

The Commission certifies that the attached final rule will not have a significant economic impact on a substantial number of small entities. The basis for this certification is that the organizations affected by this rule are State, district, and local party committees, which are not "small

---

[6] None of these rules was challenged in *Shays.*

entities" under 5 U.S.C. 601. These not-for-profit committees do not meet the definition of "small organization," which requires that the enterprise be independently owned and operated and not dominant in its field. 5 U.S.C. 601(4). State political party committees are not independently owned and operated because they are not financed and controlled by a small identifiable group of individuals, and they are affiliated with the larger national political party organizations. In addition, the State political party committees representing the Democratic and Republican parties have a major controlling influence within the political arena of their State and are thus dominant in their field. District and local party committees are generally considered affiliated with the State committees and need not be considered separately. To the extent that any State party committees representing minor political parties might be considered "small organizations," the number affected by this rule is not substantial.

## List of Subjects in 11 CFR Part 100

Elections.

■ For the reasons set out in the preamble, Subchapter A of Chapter 1 of Title 11 of the *Code of Federal Regulations* is amended as follows:

## PART 100—SCOPE AND DEFINITIONS (2 U.S.C. 431)

■ 1. The authority citation for 11 CFR part 100 continues to read as follows:

**Authority:** 2 U.S.C. 431, 434, and 438(a)(8).

■ 2. In section 100.24, paragraph (a) is revised to read as follows:

### § 100.24   Federal Election Activity (2 U.S.C. 431(20)).

(a) As used in this section, and in part 300 of this chapter,

(1) *In connection with an election in which a candidate for Federal office appears on the ballot* means:

(i) The period of time beginning on the date of the earliest filing deadline for access to the primary election ballot for Federal candidates as determined by State law, or in those States that do not conduct primaries, on January 1 of each even-numbered year and ending on the date of the general election, up to and including the date of any general runoff.

(ii) The period beginning on the date on which the date of a special election in which a candidate for Federal office appears on the ballot is set and ending on the date of the special election.

(2) *Voter registration activity* means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

(3) *Get-out-the-vote activity* means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting. Get-out-the-vote activity includes, but is not limited to:

(i) Providing to individual voters information such as the date of the election, the times when polling places are open, and the location of particular polling places; and

(ii) Offering to transport or actually transporting voters to the polls.

(4) *Voter identification* means acquiring information about potential voters, including, but not limited to, obtaining voter lists and creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates. The date a voter list is acquired shall govern whether a State, district, or local party committee has obtained a voter list within the meaning of this section.

\*    \*    \*    \*    \*

Dated: February 10, 2006.

**Michael E. Toner,**

*Chairman, Federal Election Commission.*

[FR Doc. 06–1679 Filed 2–21–06; 8:45 am]

**BILLING CODE 6715-01-P**

## DEPARTMENT OF THE TREASURY

**Office of the Comptroller of the Currency**

**12 CFR Part 3**

**[Docket No. 06–02]**

**RIN 1557–AC90**

## FEDERAL RESERVE SYSTEM

**12 CFR Parts 208 and 225**

**[Regulation H and Y; Docket No. R–1087]**

## FEDERAL DEPOSIT INSURANCE CORPORATION

**12 CFR Part 325**

**RIN 3064–AC46**

## Risk-Based Capital Guidelines; Market Risk Measure; Securities Borrowing Transactions

**AGENCIES:** Office of the Comptroller of the Currency, Treasury; Board of Governors of the Federal Reserve System; and Federal Deposit Insurance Corporation.

**ACTION:** Final rule.

**SUMMARY:** The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (Board), and the Federal Deposit Insurance Corporation (FDIC) (collectively, the Agencies) are issuing a final rule that amends their market risk rules to revise the risk-based capital treatment for cash collateral that is posted in connection with securities borrowing transactions. This final rule will make permanent, and expand the scope of, an interim final rule issued in 2000 (the interim rule) that reduced the capital requirement for certain cash-collateralized securities borrowing transactions of banks and bank holding companies (banking organizations) that have adopted the market risk rule. This action more appropriately aligns the capital requirements for these transactions with the risk involved and provides a capital treatment for U.S. banking organizations that is more in line with the capital treatment to which their domestic and foreign competitors are subject.

**DATES:** *Effective:* February 22, 2006.

**FOR FURTHER INFORMATION CONTACT:** *OCC:* Margot Schwadron, Risk Expert, Capital Policy (202) 874–6022, or Carl Kaminski, Attorney, Legislative and Regulatory Activities Division (202) 874–5090, Office of the Comptroller of the Currency, 250 E Street, SW., Washington, DC 20219.

# PLAINTIFFS' EXHIBIT 147

# Federal Election Commission Advisory Opinion Number 2006-19

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

6

FEDERAL ELECTION COMMISSION
Washington, DC 20463
June 5, 2006

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

ADVISORY OPINION 2006-19

Laurence S. Zakson, Esq.
Reich, Adell, Crost & Cvitan
3550 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90010

Dear Mr. Zakson:

We are responding to your advisory opinion request on behalf of the Los Angeles County Democratic Party Central Committee ("LACDP") concerning the application of the Federal Election Campaign Act of 1971, as amended ("the Act"), and Commission regulations to certain communications LACDP is planning to undertake in connection with an election to be held on June 6, 2006. Because the communications in question promote only non-Federal candidates, will not be made in close proximity to the date of the election, are insufficiently targeted, and are not individualized, they do not constitute get-out-the-vote activity, and thus do not constitute Federal election activity.

Background

The facts presented in this advisory opinion are based on your letters received on May 8 and May 10, 2006.

LACDP is a local party committee that is registered with the Commission as a political committee. On June 6, 2006, the voters in the City of Long Beach ("Long Beach"), located within Los Angeles County, will vote for local

candidates in the non-partisan, general election as well as
for Federal candidates in the primary election. LACDP
intends to make pre-recorded, electronically dialed
telephone calls and send direct mail to all voters
registered as Democrats in Long Beach between four and
fifteen days prior to the election (i.e., between May 22 and
June 2, 2006). Sample scripts of these telephone calls and
a draft of the direct-mail piece are attached to this
advisory opinion. See Attachment A. The telephone scripts
state that Election Day is June 6, a certain candidate is
endorsed by the Democratic Party for Long Beach Mayor, and
voters are urged to vote for that mayoral candidate on June
6, 2006. The direct-mail piece conveys a similar message,
and also identifies municipal candidates endorsed by LACDP
for City Council and School Board. Both the telephone
scripts and the direct-mail piece state the date on which
the election will be held, but neither refers to any
candidate for Federal office. See id.

Question Presented

Do LACDP's planned communications to all registered
Democrats in Long Beach, California constitute "Federal
election activity" that must be paid for entirely with
Federal funds or a mix of Federal funds and Levin funds?

Legal Analysis and Conclusions

No, LACDP's planned communications to all registered
Democrats in Long Beach, California do not constitute
"Federal election activity" that must be paid for entirely
with Federal funds or a mix of Federal funds and Levin
funds. Accordingly, LACDP may pay for the planned
communications entirely out of non-Federal funds. See 11
CFR 100.24(c)(1).1

The Bipartisan Campaign Reform Act of 2002, Pub. L. No.
107-155, 116 Stat. 81 (2002) ("BCRA"), amended the Act by
adding a new term, "Federal election activity" ("FEA"), to
describe certain activities that State, district, and local
party committees must pay for with either Federal funds or a
combination of Federal and Levin funds.2 2 U.S.C. 431(20)
and 441i(b)(1). BCRA's requirements regarding FEA apply to
all State, district, and local party committees and
organizations, regardless of whether they are registered as
political committees with the Commission. Id.

As amended by BCRA, the Act specifies that voter
identification, get-out-the-vote ("GOTV") activity, and
generic campaign activity (collectively, "Type II FEA")
constitute FEA only when these activities are conducted "in

connection with an election in which a candidate for Federal office appears on the ballot." 2 U.S.C. 431(20)(A)(ii); 11 CFR 100.24(b)(2). As part of the definition of "Federal election activity," the Commission also defined the phrase "in connection with an election in which a candidate for Federal office appears on the ballot" ("Type II FEA time period"). See 11 CFR 100.24(a)(1); see also Explanation and Justification for Final Rules on Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money, 67 Fed. Reg. 49064 (July 29, 2002); Explanation and Justification for Interim Final Rule on Definition of Federal Election Activity, 71 Fed. Reg. 14357 (March 22, 2006). In States such as California that conduct primaries, the Type II FEA time period begins on the date of the earliest filing deadline for access to the primary election ballot for Federal candidates and ends on the date of the general election, up to and including the date of any general runoff election.3 See 11 CFR 100.24(a)(1)(i). Thus the Type II FEA time period in California in 2006 is from March 10, 2006 to November 7, 2006.4

The definition of "Federal election activity" includes a definition of "get-out-the-vote activity." See 11 CFR 100.24(a)(3). "Get-out-the-vote activity" means "contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting." Id. Get-out-the-vote activity "includes, but is not limited to: (i) Providing to individual voters information such as the date of the election, the times when polling places are open, and the location of particular polling places; and (ii) Offering to transport or actually transporting voters to the polls." Id.

In two recent Explanations and Justifications, the Commission provided additional guidance with respect to the meaning of the complementary terms "individualized means" and "assist," as used in the definition of "get-out-the-vote activity." In 2002, the Commission stated that "GOTV has a very particular purpose: assisting registered voters to take any and all necessary steps to get to the polls and cast their ballots, or to vote by absentee ballot or other means provided by law. The Commission understands this purpose to be narrower and more specific than the broader purposes of generally increasing public support for a candidate or decreasing public support for an opposing candidate." 67 Fed. Reg. at 49067. In 2006, the Commission reiterated this view, stating, "[I]n the Commission's extensive enforcement experience, general exhortations to register to vote and to vote are so common in political party communications that including encouragement to register to vote and to vote would be overly broad, is not necessary to effectively

implement BCRA, and could have an adverse impact on grassroots political activities." 71 Fed. Reg. at 8929. For this reason, the Commission explained that it "declines to impose FEA funding restrictions on State, district, and local party committees' mere `encouragement' of registering to vote or voting." Id.

The Commission considers several facts in your request as relevant to the analysis of whether the proposed communications would be GOTV activities. First, the communications promote the election of only non-Federal candidates. Second, LACDP will conduct the proposed communications four or more days prior to the election; the more removed from election day, the less effect the communications are likely to have on motivating recipients to go to the polls. A communication made several days prior to an election is more likely to be a "general exhortation" to vote or "mere encouragement" to vote, as opposed to a communication that assists a voter in engaging in the act of voting by individualized means. Third, there is no indication that LACDP has engaged in any activity to target these communications to any specific subset of Democratic voters. Rather, LACDP intends to send the communications to all registered Democrats in Long Beach. The proposed direct-mail piece is a "form letter" that will not provide any individualized information to any particular recipient (such as the location of the particular recipient's polling place). The proposed pre-recorded, electronically dialed telephone calls are the functional equivalent of a "form letter" and, similarly, do not provide any individualized information to any particular recipient. Thus, the planned communications are generic in nature and do not provide any individualized assistance to voters. Fourth, the communications contain only the date of the election and do not include such additional information as the hours and location of the individual voter's polling place. Merely including the date of an election in a communication that advocates the election or defeat of only State and local candidates does not turn that communication into GOTV activity.

Based on these facts, the Commission concludes that LACDP's proposed communications do not constitute assisting voters in engaging in the act of voting by individualized means. See 11 CFR 100.24(a)(3). Thus, the proposed communications would not be GOTV activities, and therefore are excluded from the definition of Federal election activity under 11 CFR 100.24(c)(1).

This response constitutes an advisory opinion concerning the application of the Act and Commission

regulations to the specific transaction or activity set
forth in your request. See 2 U.S.C. 437f. The Commission
emphasizes that if there is a change in any of the facts or
assumptions presented, and such facts or assumptions are
material to a
conclusion presented in this advisory opinion, then the
requestor may not rely on that conclusion as support for its
proposed activity.

Sincerely,

(signed)

Michael E. Toner
Chairman

FEDERAL ELECTION COMMISSION
Washington, DC 20463

CONCURRING OPINION IN ADVISORY OPINION 2006-19
OF
COMMISSIONER HANS A. VON SPAKOVSKY

The Federal Election Commission has approved Advisory
Opinion 2006-19 for the Los Angeles County Democratic Party
Central Committee ("the LACDP") by a vote of 5-1. The
opinion, dated June 5, 2006, advises the LACDP that its
proposed communications to municipal election voters do not
constitute "get-out-the-vote activity" under the Bipartisan
Campaign Reform Act of 2002 ("BCRA"), and therefore are not
subject to the restrictions and funding requirements imposed
by federal campaign finance law. I voted with the majority
and agree fully with the Advisory Opinion issued. I write
separately only to detail the existence of additional
grounds for finding that the proposed activity does not
constitute Federal election activity.

The City of Long Beach, California, is holding a
municipal general election on June 6, 2006. (This election
is referred to both as a "run-off" election and a
"concurrent" election.) The City of Long Beach held a
nonpartisan primary election on April 11, 2006.5 The
election on June 6, 2006, features those races in which no
candidate received a majority of the votes cast in April.6
Incidentally, June 6 is also the date that the State of
California is holding its state primary elections.7

The LACDP wishes to make voters aware of which candidates it
has endorsed in the municipal general election and encourage
voters to support these candidates. The municipal general

election, like the April 11 primary, is nonpartisan. The State primary ballot, however, is partisan, and voters will cast either a Democratic or Republican ballot. Thus, voters will not be made aware of the municipal election candidates' partisan affiliations or tendencies simply by looking at the ballot. The LACDP's desire to make its proposed communications is certainly understandable in these circumstances.

When Long Beach voters go to the polls on June 6, they will confront an unusual situation. Each polling place will feature two separate voting locations. At one location, voters will vote a ballot dedicated to the municipal candidates running for Mayor, City Council, and School Board. At the second location, voters will vote a different ballot dedicated to county, State, and Federal primary candidates. As the City of Long Beach's government website states:

On Tuesday, June 6, residents will vote at one polling place on two different ballots; one for City candidates and one for State and County candidates and issues. Voters will visit two sign-in tables at the same polling place, and will use two different voting systems to cast their ballots. Absentee voters will need to vote and send in two ballots, one for the City and another for the County and State.8

In other words, voters will have the choice of voting one or both ballots.

According to the City of Long Beach, two ballots will be used because "Tuesday June 6th 2006 is a concurrent election, when the city's election takes place on the same day as the Statewide Primary. In the City of Long Beach, city ballots need to be cast and counted separately from the county, because the City of Long Beach uses a different voting system than the county."9 The City of Long Beach obviously regards its municipal elections as separate and distinct from county, State, and Federal elections.

The LACDP's proposed activity relates exclusively to the municipal ballot. The Bipartisan Campaign Reform Act of 2002 ("BCRA") defined the term "Federal election activity" to include, in relevant part, "voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot)."10 Obviously, there is no Federal candidate on the municipal ballot. Thus, not only are the proposed

communications not GOTV activity, they are also not being "conducted in connection with an election in which a candidate for Federal office appears on the ballot." The plain and unambiguous language of the statute indicates that the LACDP's proposed activity is not "Federal election activity," and is thus not subject to the restrictions of federal campaign finance law.

June 5, 2006

_____/S/_____
Commissioner Hans A. von Spakovsky

_____

1 The allocation requirement set forth at 11 CFR 106.7(c)(5) is inapplicable to the communications at issue. The section applies only to certain communications that do not promote or oppose a Federal candidate or non-Federal candidate. As noted above, the proposed communications are candidate-specific.

2 "Federal funds" are funds subject to the amount limitations, source prohibitions, and reporting requirements of the Act. See 11 CFR 300.2(g). "Levin funds" are funds raised by State, district, and local party committees pursuant to the restrictions in 11 CFR 300.31 and disbursed subject to the restrictions in 11 CFR 300.32. See 11 CFR 300.2(i).

3 In States that do not hold primary elections, the Type II FEA time period begins on January 1 of each even-numbered year and ends on the date of the general election. See 11 CFR 100.24(a)(1)(i).

4 This date assumes that there will be no general runoff election.

5 See City of Long Beach Charter, Art. XIX, 1901 ("The primary and general municipal elections for elective officers of the City shall be held in even numbered years, on the second Tuesday in April and the first Tuesday after the first Monday in June, respectively . . . ."), available at http://cms.longbeach.gov/cityclerk/refer/charter/intro.htm.

6 See City of Long Beach Charter, Art. XIX, 1906 ("In the event that any candidate for nomination to an elective office shall receive a majority of the votes cast for all the candidates for nomination to such office at any primary nominating election, the candidate so receiving such majority shall be deemed to be and declared by the City Council to be elected to such office."), available at http://cms.longbeach.gov/cityclerk/refer/charter/intro.htm. Sample ballots provided by the City of Long Beach, City Clerk's Department, indicate that voters will cast votes for Mayor, City Council Member (Districts 2, 3, and 5), and

Board of Education Member (District 5) on June 6.
7 The state primary ballots include county, State, and
Federal offices, along with State ballot initiative
measures.
8 http://www.longbeach.gov/news/displaynews.asp?NewsID=1756
(last visited May 22, 2006).

9 http://www.2votetuesday.com/ (last visited May 22, 2006).
10 2 U.S.C. 431(20)(A)(ii) (emphasis added).