## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
)
CHRISTOPHER SHAYS and                      )
MARTIN MEEHAN,                             )
)
                Plaintiffs,            )
)        Civil Action No. 06-CV-1247 (CKK)
       v.                                )
)        MOTION FOR
FEDERAL ELECTION COMMISSION,               )        SUMMARY JUDGMENT
)
                Defendant.             )
_____ )

## DEFENDANT FEDERAL ELECTION COMMISSION'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, defendant Federal Election Commission ("the Commission") moves this Court for summary judgment in this facial challenge to four regulatory provisions: 11 C.F.R. 100.24(a)(2)-(3), 300.64(b), and 109.21. The Commission is filing with this motion a Memorandum in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, a Statement of Material Facts Not in Genuine Dispute, a Statement of Genuine Issues and Objections, and a proposed Order. See LCvR7 and 56.1 (D.D.C.) and the Court's October 16, 2006, scheduling order. On October 31, 2006, the Commission filed the Administrative Record for the regulations (Docket #17).

The Commission's motion rests on the grounds that the four regulations at issue satisfy review under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and the requirements of the Administrative Procedure Act.

Wherefore, the Commission respectfully moves this Court to grant this Motion for Summary Judgment, as outlined above and supported fully in the Memorandum that accompanies this Motion.

Respectfully submitted,

/s/ Lawrence H. Norton

Lawrence H. Norton
General Counsel

/s/ Richard B. Bader

Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

/s/ David Kolker

David Kolker
Assistant General Counsel
(D.C. Bar # 394558)

/s/ Vivien Clair

Vivien Clair
Attorney

/s/ Greg J. Mueller

Greg J. Mueller
Attorney
(D.C. Bar # 462840)

January 19, 2007

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTOPHER SHAYS and MARTIN MEEHAN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-CV-1247 (CKK) |
| FEDERAL ELECTION COMMISSION, | ) ) | FEC MEMORANDUM |
| Defendant. | ) ) ) | |

_____

## DEFENDANT FEDERAL ELECTION COMMISSION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

_____

Lawrence H. Norton
General Counsel

Richard B. Bader
Associate General Counsel

David Kolker
Assistant General Counsel

Vivien Clair
Attorney

Greg J. Mueller
Attorney

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

January 19, 2007

# TABLE OF CONTENTS

**Page**

BACKGROUND .............................................................................................1

    A.    The Parties .............................................................................1

    B.    Substantive and Procedural Background...................................2

        1.    The Definitions of "Voter Registration Activity" and
            "Get-Out-The-Vote Activity" (11 C.F.R. 100.24(a)(2), (3)) ......2

        2.    Attendance by Federal Candidates and Officeholders
            at State, District, and Local Party Fundraisers
            (11 C.F.R. 300.64) ....................................................................5

        3.    The Coordinated Communication Provision
            (11 C.F.R. 109.21) ....................................................................7

            a.    "Content" Element (11 C.F.R. 109.21(c)) ...........................7

            b.   "Conduct" elements (11 C.F.R. 109.21(d)(4), (5)
               (common vendor/former employee) and 109.21(h)
               (firewall safe harbor)) .......................................................10

ARGUMENT..................................................................................................12

I.    STANDARD OF REVIEW .......................................................12

    A.    Summary Judgment..............................................................12

    B.    The Commission's Construction of the Act Is Entitled
         to Deference under Chevron ..............................................12

    C.    Review of the Regulations under the APA Is Deferential ...................13

II.    THIS COURT SHOULD NOT REVISIT ITS RULINGS IN SHAYS I
    THAT 11 C.F.R. 100.24(a)(2), 100.24(a)(3), AND 300.64 SATISFY
    PART OR ALL OF CHEVRON REVIEW …………………………..  14

III.    THE REGULATORY DEFINITIONS OF "VOTER REGISTRATION
    ACTIVITY" AND "GET-OUT-THE-VOTE ACTIVITY" PASS
    CHEVRON REVIEW AND SATISFY APA REQUIREMENTS...................15

A.  11 C.F.R. 100.24(a)(2):  Defining the Term
    "Voter Registration Activity" ..............................................................16

B.  11 C.F.R. 100.24(a)(3):  Defining the Term
    "Get-Out-the-Vote Activity" ..............................................................20

IV.  THE REVISED EXPLANATION AND JUSTIFICATION FOR
     11 C.F.R. 300.64 SATISFIES THE APA'S REASONED
     ANALYSIS REQUIREMENT ..........................................................................23

V.   THE COORDINATED COMMUNICATION REGULATIONS
     ARE LAWFUL ..............................................................................................31

A.  Background ........................................................................................32

B.  The Revised Coordination Content Standard Is Not Arbitrary
    and Capricious and Has Been Comprehensively Explained ................34

    1.  The Timing of an Advertisement May Indicate Its Purpose,
        and the Regulation's Content Timeframes Are Supported
        By Reliable Empirical Data ..........................................................34

    2.  The Commission's Line Drawing Accommodates Core First
        Amendment Concerns and Does Not Compromise the Act ..........42

C.  The Commission's Reliance on the CMAG Data Is Not Arbitrary
    and Capricious and Did Not Violate the APA ....................................49

    1.  The CMAG Data Are Comprehensive and Reliable....................49

    2.  The Commission's Use of the CMAG Data Did Not Violate
        the Procedural Requirements of the APA ....................................52

D.  The "Common Vendor" and "Former Employee" Conduct
    Standards Are Not Arbitrary and Capricious........................................53

E.  The Firewall Conduct Regulation Is Not Arbitrary
    and Capricious ....................................................................................56

CONCLUSION..........................................................................................................60

## TABLE OF AUTHORITIES

**Page**

CASES

AFL-CIO v. FEC, 333 F.3d 168 (D.C. Cir. 2003)........................................................32

American Public Communications Council v. Federal Communications
    Commission, 215 F.3d 51 (D.C. Cir. 2000)....................................................42, 56

Arkansas v. Oklahoma, 503 U.S. 91 (1992) ................................................................46

Ash v. Cort, 496 F.2d 416 (3d Cir. 1974) ....................................................................22

Association of American R.R. v. Surface Transp. Bd., 306 F.3d 1108
    (D.C. Cir. 2002) ....................................................................................................14

Assn'n of Battery Recyclers v. EPA, 208 F.3d 1047 (D.C. Cir. 200) ..........................53

AT&T Corp. v. FCC, 349 F.3d 692 (D.C. Cir. 2003)...................................................13

Barnhart v. Thomas, 540 U.S. 20 (2003) .....................................................................46

BellSouth Corp. v. FCC, 162 F.3d 1215 (D.C. Cir. 1999) ...........................................52

Boyce Motor Lines v. United States, 342 U.S. 337 (1952) ...........................................56

Buckley v. Valeo, 424 U.S. 1 (1976)............................................................................19

Casey v. Planned Parenthood, 14 F.3d 848 (3d Cir. 1994)...........................................15

Cellco Partnership v. FCC, 357 F.3d 88 (D.C. Cir. 2004) ...........................................14

Cisneros v. Alpine Ridge Group, 508 U.S. 10 (1993) ..................................................24

Chen v. Ashcroft, 381 F.3d 221 (3rd Cir. 2004)...........................................................45

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.
    837 (1984).......................................................................................................passim

Chrysler Corp. v. U.S. EPA, 631 F.2d 865 (D.C. Cir. 1980).......................................46

Colorado Repub. Fed. Campaign Comm. v. FEC, 518 U.S. 604 (1996) ....................57

Core Communications, Inc. v. Level 3 Communications, 455 F.3d 267
    (D.C. Cir 2006) ..........................................................................................41

Covad Communications Co. v. FCC, 450 F.3d 528 (D.C. Cir. 2006)........13, 45, 53, 56

Donnelly v. F.A.A., 411 F.3d 267 (D.C. Cir. 2005) ....................................................26

Duncan v. Walker, 533 U.S. 167 (2001).....................................................................26

Earthlink, Inc. v. FCC, 462 F.3d 1 (D.C. Cir. 2006) ............................................41, 42

Edenfield v. Fane, 507 U.S. 761 (1993) ...............................................................18, 42

Envtl. Action, Inc. v. FERC, 939 F.2d 1057 (D.C. Cir. 1991) ...................................41

FCC v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775 (1978) .......................41

FCC v. WNCN Listeners Guild, 450 U.S. 582 (1981) .................................................41

FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27 (1981) ......................13

FEC v. National Conservative PAC, 647 F.Supp. 987 (S.D.N.Y. 1986).....................23

FEC v. NRA, 254 F.3d 173 (D.C. Cir. 2001) ..............................................................13

Florida League of Professional Lobbyists v. Meggs, 87 F.3d 457 (11th Cir. 1996) ...47

Flynn v. Commissioner of IRS, 269 F.3d 1064 (D.C. Cir. 2001)................................44

GCI Health Care Centers, Inc. v. Thompson, 209 F.Supp.2d 63 (D.D.C. 2002) .........12

Hagelin v. FEC, 411 F.3d 237 (D.C. Cir. 2005) ........................................................46

Hercules, Inc. v. EPA, 598 F.2d 91 (D.C. Cir. 1978) ..................................................52

Industrial Union Dep't, AFL-CIO v. Hodgson, 499 F.2d 467 (D.C. Cir. 1974) ....42, 51

KCST-TV, Inc. v. FCC, 699 F.2d 1185 (D.C. Cir. 1983) ............................................52

LaShawn A. v. Barry, 87 F.3d 1389 (D.C. Cir. 1996) (en banc)..................................15

Lignite Energy Council v. EPA, 198 F.3d 930 (D.C. Cir. 1999)..................................51

McConnell v. FEC, 540 U.S. 93 (2003) ................................................2, 19, 35, 36, 48

Milk Industry Foundation v. Glickman, 132 F.3d 1467 (D.C. Cir. 1998)....................40

Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm
    Mutual Automobile Ins. Co., 463 U.S. 29 (1983)..............................................13, 56

National Cable & Telecomms. Ass'n v. Brand X Internet Servs.,
    125 S.Ct. 2699 (2005)........................................................................................13

New York v. United States EPA, 413 F.3d 3 (D.C. Cir. 2005) ....................................14

Ohio v. Akron Center for Reproductive Health, 497 U.S. 502 (1990)........................47

Orloski v. FEC, 795 F.2d 156 (D.C. Cir. 1986)..................................................3, 43, 44

Perot v. FEC, 97 F.3d 553 (D.C. Cir. 1996) ...............................................................59

Personal Watercraft Industry Ass'n v. Department of Commerce, 48 F.3d 540
    (D.C. Cir. 1995) ..............................................................................................53

Pharmaceutical Research and Mfrs. v. Thompson, 362 F.3d 817 (D.C. Cir. 2004) ....33

Process Gas Consumers Group v. FERC, 292 F.3d 831 (D.C. Cir. 2002) ..................41

Public Citizen, Inc. v. National Hwy. Traffic Safety Admin., 374 F.3d 1251
    (D.C. Cir. 2004) ..............................................................................................13

San Luis Obispo Mothers For Peace v. Nuclear Regulatory Comm'n, 789 F.2d 26
    (D.C. Cir. 1986) (en banc) ...............................................................................14

Sec'y of Labor v. Keystone Coal Mining Corp., 151 F.3d 1096 (D.C. Cir. 1998).......46

Sec'y of Labor, Mine Safety and Health Admin. v. Federal Mine Safety
    and Health Review Comm'n, 111 F.3d 913 (D.C. Cir. 1997) ...............................45

Segar v. Civiletti, 508 F. Supp. 690 (D.D.C. 1981)....................................................50

Segar v. Smith, 738 F.2d 1249 (D.C. Cir. 1984) ........................................................50

Shays v. FEC ("Shays I"), 337 F.Supp.2d 28 (D.D.C. 2004)..............................passim

Shays v. FEC ("Shays I Appeal"), 414 F.3d 76 (D.C. Cir. 2005) ........................1, 8, 9

Terry v. Reno, 101 F.3d 1412 (D.C. Cir. 1996)...................................................20, 48

Trout v. Lehman, 702 F.2d 1094 (D.C. Cir. 1983), vacated on other grounds,
    465 U.S. 1056 (1984)........................................................................................50

United States v. Alaw, 327 F.3d 1217 (D.C. Cir. 2003)................................................34

United States v. American College of Physicians, 475 U.S. 834 (1986).....................17

United States v. Kanchanalak, 192 F.3d 1037 (D.C. Cir. 1999)...................................13

United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515 (1946)........................52

United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488 (D.C. Cir. 2004)......43

Verizon Communications, Inc. v. FCC, 535 U.S. 467, 539 (2002).............................13

West Virginia v. EPA, 362 F.3d 861 (D.C. Cir. 2004)................................................53

## STATUTES AND REGULATIONS

Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155,
    116 Stat. 81 (2002)....................................................................................passim

Federal Election Campaign Act of 1971, Pub. L. No. 92-225, Title II, § 205,
    86 Stat. 10 (1972)……………………………………………………………… 21

Federal Election Campaign Act of 1971, as amended, 2 U.S.C. 431-55............. passim

Help America Vote Act of 2002, 42 U.S.C. 15483 .....................................................20

National Voter Registration Act of 1993, 42 U.S.C. 1973gg(b)(1)..............................20

Voting Rights Act of 1965, 42 U.S.C. 1973b(a)(1)(F)(iii) .........................................20

2 U.S.C. 431(9)(A)(i)..................................................................................................32

2 U.S.C. 431(9)(B)(ii).............................................................................................20, 22

2 U.S.C. 431(17)(A) ...................................................................................................48

2 U.S.C. 431(17)(B).....................................................................................................48

2 U.S.C. 431(20) .............................................................................................................2

2 U.S.C. 431(20)(A)(i).....................................................................................................2

2 U.S.C. 431(20)(A)(ii)....................................................................................................2

2 U.S.C. 431(20)(A)(iii)................................................................................................19

2 U.S.C. 434(f)(3) ...............................................................................................48

2 U.S.C. 437c(b)(1) ..........................................................................................1, 2

2 U.S.C. 437d(a) .................................................................................................1

2 U.S.C. 437d(a)(8) .............................................................................................2

2 U.S.C. 437d (e) ................................................................................................1

2 U.S.C. 437f(c)(1) ............................................................................................23

2 U.S.C. 437g .....................................................................................................1

2 U.S.C. 437g(a)(2) ...........................................................................................58

2 U.S.C. 441a(a) ...............................................................................................57

2 U.S.C. 441a(a)(7)(B)(i) ...............................................................................7, 32

2 U.S.C. 441a(a)(7)(C) .......................................................................................7

2 U.S.C. 441a(d) ...............................................................................................57

2 U.S.C. 441b ....................................................................................................22

2 U.S.C. 441b(b)(2)(B) ......................................................................................22

2 U.S.C. 441i(a) ................................................................................................30

2 U.S.C. 441i(b) ............................................................................................2, 22

2 U.S.C. 441i(b)(1) ........................................................................................2, 19

2 U.S.C. 441i(b)(2) ............................................................................................19

2 U.S.C. 441i(b)(2)(C) .........................................................................................6

2 U.S.C. 441i(d)(4) ............................................................................................17

2 U.S.C. 441i(e) ........................................................................................5, 6, 26

2 U.S.C. 441i(e)(1) ..............................................................................................6

2 U.S.C. 441i(e)(1)(A) ..................................................................................5, 30

2 U.S.C. 441i(e)(1)(B) ............................................................................24, 25, 26

2 U.S.C. 441i(e)(2)............................................................................................25

2 U.S.C. 441i(e)(3)........................................................................6, 24, 25, 27

2 U.S.C. 441i(e)(4)..................................................................................17, 25

2 U.S.C. 441i(e)(4)(A)..........................................................................6, 24

2 U.S.C. 441i(e)(4)(B)..................................................................................24

5 U.S.C. 553..................................................................................................24

5 U.S.C. 553(b)(3).......................................................................................14

5 U.S.C. 553(c)............................................................................................14

5 U.S.C. 706(2)(A).......................................................................................13

5 U.S.C. 706(2)(D).......................................................................................14

5 U.S.C. 7323..............................................................................................31

5 U.S.C. 7323(a)(2).....................................................................................31

5 U.S.C. 7323(a)(4).....................................................................................31

18 U.S.C. 607(a)(1) (2000 & Supp. II) .......................................................30

18 U.S.C. 602(a)(4)......................................................................................31

26 U.S.C. 501(c) ..........................................................................................6

28 U.S.C., Fed. R. Civ. P. 56 .....................................................................12

5 C.F.R. 734.101..........................................................................................31

11 C.F.R. 100.22..........................................................................................8

11 C.F.R. 100.22(b)......................................................................................41

11 C.F.R. 100.23..........................................................................................32

11 C.F.R. 100.24(a)......................................................................................19

11 C.F.R. 100.24(a)(2)...........................................................................passim

11 C.F.R. 100.24(a)(3)...........................................................................passim

11 C.F.R. 100.24(a)(3)(i) ................................................................21

11 C.F.R. 100.24(a)(3(ii) ...............................................................21

11 C.F.R. 100.133 .........................................................................19

11 C.F.R. 106.4(g) .........................................................................56

11 C.F.R. 109.20(a) ........................................................................54

11 C.F.R. 109.21 ............................................................................17

11 C.F.R. 109.21(c)(1) ..................................................................7, 8

11 C.F.R. 109.21(c)(2) ..................................................................7, 8

11 C.F.R. 109.21(c)(3) .....................................................................8

11 C.F.R. 109.21(d) ........................................................................56

11 C.F.R. 109.21(c)(4) ..................................................................8, 39

11 C.F.R. 109.21(d)(1) ....................................................................54

11 C.F.R. 109.21(d)(3) ....................................................................54

11 C.F.R. 109.21(d)(4) ................................................................10, 54

11 C.F.R. 109.21(d) (5) ...............................................................10, 54

11 C.F.R. 109.21(h) ........................................................................11

11 C.F.R. 109.21(h)(2) ....................................................................58

11 C.F.R. 112.1(b) ..........................................................................23

11 C.F.R. 112.1(c) ..........................................................................23

11 C.F.R. 112.5(a)(1)(2) ..................................................................23

11 C.F.R. 300.2(g) ...........................................................................2

11 C.F.R. 300.2(i) ............................................................................2

11 C.F.R. 300.2(m) ....................................................................27, 31

11 C.F.R. 300.2 (n) ...................................................................................................27

11 C.F.R. 300.31 ......................................................................................................2

11 C.F.R. 300.32 ......................................................................................................2

11 C.F.R. 300.64 ...............................................................................................passim

11 C.F.R. 300.64(b) ................................................................................................6

LCvR 40.5(a) ..........................................................................................................15

## MISC.

Advisory Opinion 2003-03 .....................................................................................25

Advisory Opinion 2003-05 .....................................................................................25

Advisory Opinion 2003-36 .....................................................................................25

Advisory Opinion 2006-19 .....................................................................................22

117 Cong. Rec. 43,386-388 (Nov. 30, 1971)..........................................................22

147 Cong. Rec. S3184 (daily ed. March 30, 2001)..................................................33

147 Cong. Rec. S3184-S3185 (daily ed. Mar. 30, 2001)...........................................33

148 Cong. Rec. S2141 (daily ed. March 20, 2002)..................................................33

148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) .....................................................33

67 Fed. Reg. 35,655. ................................................................................................2

67 Fed. Reg. 49,064 ........................................................................................3, 21, 28

68 Fed. Reg. 436 .............................................................................................56, 59

S.27, Bipartisan Campaign Reform Act of 2001, 107th Cong. § 214 (2001)..............33

SENATE ETHICS MANUAL, 108th Cong., 1st Sess. 75-76 (2003 ed. ................................31

# GLOSSARY

| | | |
|---|---|---|
| A.R. | = | Administrative Record |
| AO | = | Advisory Opinion |
| APA | = | Administrative Procedure Act |
| BCRA | = | Bipartisan Campaign Reform Act of 2002 |
| CMAG | = | TNS Media Intelligence/CMAG |
| DCCC | = | Democratic Congressional Campaign Committee |
| DNC | = | Democratic National Committee |
| DSCC | = | Democratic Senatorial Campaign Committee |
| E&J | = | Explanation and Justification |
| FEC | = | Federal Election Commission |
| FECA | = | Federal Election Campaign Act of 1971, as amended, 2 U.S.C. 431-455 |
| GOTV | = | Get out the vote |
| MUR | = | Matter Under Review |
| NPRM | = | Notice of Proposed Rulemaking |
| NRCC | = | National Republican Congressional Committee |
| NRSC | = | National Republican Senatorial Committee |
| Shays I | = | Shays v. FEC, 337 F.Supp.2d 28 (D.D.C. 2004) |
| Shays I Appeal | = | Shays v. FEC, 414 F.3d 76 (D.C. Cir. 2005) |
| SNPRM | = | Supplemental Notice of Proposed Rulemaking |

The parties have filed cross-motions for summary judgment in this facial challenge to four regulations promulgated by the Federal Election Commission ("FEC" or "Commission") to implement the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81 (2002), amending the Federal Election Campaign Act of 1971 ("Act" or "FECA"), 2 U.S.C. 431-55.  This Court should grant the Commission's motion for summary judgment and deny plaintiffs' motion because the Commission has resolved the problems identified in <u>Shays v. FEC</u> ("<u>Shays I</u>"), 337 F.Supp.2d 28 (D.D.C. 2004), and <u>Shays v. FEC</u> ("<u>Shays I Appeal</u>"), 414 F.3d 76 (D.C. Cir. 2005).  The Commission's expanded Explanation and Justification ("E&J") for the regulatory definitions of "voter registration activity" and "get-out-the-vote activity" (11 C.F.R. 100.24(a)(2) and (a)(3)) establishes that those definitions further the purposes underlying the Act and reflect policy choices well within the Commission's discretion. The revised E&J for the regulation (11 C.F.R. 300.64) governing attendance by federal officeholders and candidates at state and local fundraising events presents a reasoned and comprehensive justification for the Commission's rule.  Lastly, in determining what constitutes a "coordinated expenditure" under the Act, the revised coordinated communications rule (11 C.F.R. 109.21) reasonably draws a bright line that is fully supported by the rulemaking record and the Commission's thorough explanation.

## BACKGROUND

### A.     The Parties

Plaintiffs Christopher Shays and Martin Meehan are Members of the United States House of Representatives and were the principal House sponsors of BCRA.  Complaint ¶¶ 8-9.

The Commission is the independent agency of the United States government with exclusive jurisdiction to administer, interpret, and civilly enforce the Act.  <u>See</u> 2 U.S.C. 437c(b)(1), 437d(a), (e), and 437g.  The Act authorizes the Commission to "formulate policy

with respect to" the Act, 2 U.S.C. 437c(b)(1), and to promulgate "such rules … as are necessary to carry out the provisions" of the Act.  2 U.S.C. 437d(a)(8).  Congress specifically directed the Commission to promulgate regulations implementing BCRA.  <u>See</u> BCRA §§ 214(b), (c); 402(c).

### B.    Substantive and Procedural Background[1]

#### 1.    The Definitions of "Voter Registration Activity" and "Get-Out-The-Vote Activity" (11 C.F.R. 100.24(a)(2), (3))

BCRA added a new term to the Act, "Federal election activity," that describes certain activities that state, district, and local party committees must pay for with either "Federal funds" or a combination of Federal and "Levin funds." 2 U.S.C. 431(20), 441i(b)(1).[2]  Congress included "voter registration activity" among the activities encompassed by "Federal election activity," <u>see</u> 2 U.S.C. 431(20)(A)(i), but did not define the subsidiary term other than to provide that it is only "Federal election activity" if conducted 120 days or fewer before a regularly scheduled federal election.  <u>Id</u>.  Congress also included "get out the vote activity" ("GOTV") within BCRA's definition of "Federal election activity," but without further definition beyond specifying that GOTV is "Federal election activity" if "conducted in connection with an election in which a candidate for Federal office appears on the ballot."  <u>See</u> 2 U.S.C. 431(20)(A)(ii).

---

[1]    "A.R." references are to the Administrative Record filed on October 31, 2006, Docket #17.  That record, filed on DVD, consists of three volumes, each of which is an individual file. Each volume consists of numbered documents ("Doc. _") that can be retrieved by clicking on the particular document number under the "Bookmarks" tab.  Each record page has a unique "A.R." number that may be accessed by typing the number into the page number field at the bottom center of the document or by clicking on the desired number under the "Pages" tab (or, in earlier versions of Adobe Acrobat, the "Thumbnails" tab).  The A.R. page ranges in each volume are as follows:  Vol. I, A.R. 1-428; Vol. II, A.R. 429-678; and Vol. III, A.R. 679-2223.  For the convenience of the Court, a small subset of these pages (A.R. 2191-2223) is attached as an addendum to this memorandum.

[2]    "Federal funds" are funds subject to the limitations, prohibitions, and reporting require-ments of the Act.  <u>See</u> 11 C.F.R. 300.2(g).  "Levin funds" may be raised and spent by state and local political party committees under more lenient restrictions than those applicable to federal funds.  <u>See</u> 2 U.S.C. 441i(b); 11 C.F.R. 300.2(i), 300.31, 300.32; <u>McConnell v. FEC</u>, 540 U.S. 93, 163-64 (2003); Doc. 23, A.R. 678 (Commission "has consistently referred to Levin funds as non-Federal funds"); 67 Fed. Reg. 35,655 (Levin funds are "a subset of non-Federal funds").

In 2002, the Commission issued regulations further defining "voter registration activity" and "GOTV activity."  See 67 Fed. Reg. 49,064, 49,067-68, 49,110-111 (July 29, 2002); 11 C.F.R. 100.24(a)(2) (2003 ed.) ("Voter registration activity"); 11 C.F.R. 100.24(a)(3) (2003 ed.) ("GOTV activity").   The Commission explained that, in defining "voter registration activity," it tried to avoid requiring "thousands of political committees and grassroots organizations" to comply with the Act's "extensive reporting and filing requirements" merely because they encourage voting.  67 Fed. Reg. 49,067.  To avoid such an overly broad approach, the Commission opted for a regulation that "require[d] concrete actions to assist" would-be registrants.  Id. Similar considerations led the Commission to define "GOTV activity" by focusing on a state, district, or local party's assisting registered voters to take some step necessary for voting.  Id.

In Shays I, this Court found that the Commission's interpretation of "voter registration activity" and "GOTV activity" satisfies Chevron step one review.  "[I]t is possible to read the term 'voter registration activity' to encompass those activities that actually register persons to vote, as opposed to those that only encourage persons to do so without more."  337 F.Supp.2d at 99.  The Court reached a similar conclusion regarding "GOTV activity" because the term could mean either "any activity that is intended to get people to go out and vote, including encouraging them to do so" or "activities that actually physically get[ ] people to the polls."  Id. at 103.

Under Chevron step two, the Court concluded that the definitions were "not impermissible" constructions of the statute, Shays I, 337 F.Supp.2d at 100, 103, 105.  The Court also concluded that whether the regulations "unduly compromise" the purposes underlying the Act was not ripe for resolution; "more guidance on the true scope" of the regulations was necessary for that determination.  Id. at 100 (citing Orloski v. FEC, 795 F.2d 156, 164 (D.C. Cir. 1986)).  However, the Court held that the Commission's Notice of Proposed Rulemaking

("NPRM") did not satisfy the notice requirements of the Administrative Procedure Act ("APA") because the public could not reasonably have anticipated the final rules. Id. at 100-01, 105.

On remand, the Commission initiated a rulemaking "to comply with the district court order" (Vol. I, Doc. 7, A.R. 42).[3] In its NPRM of May 4, 2005 ("2005 NPRM"), the Commission restated its "concern[ ] that a definition of 'voter registration activity' that includes merely 'encouraging' people to register to vote may sweep too broadly" (A.R. 43). A similar concern underlay its approach to the definition of "GOTV activity" (id.). Thus, the NPRM did not propose any changes to 11 C.F.R. 100.24(a)(2), but the regulation would continue to be "as broad as possible" while incorporating "individual contact and 'assist' requirements" (Vol. I, Doc. 7, A.R. 43). The 2005 NPRM provided notice and sought comments about "amending the regulation, expanding the explanation and justification for the final rules, or providing guidance through a case-by-case application of the rules in advisory opinions and in the enforcement process" (id.). The Commission received written comments, and on August 4, 2005, the Commission held a public hearing on the definition of "Federal election activity." See Vol. I, Docs. 8-18.

On February 9, 2006, the Commission voted to promulgate the same definition of "voter registration activity" as in 2002, with a fuller explanation of that term. Vol. I, Docs. 24-26. The rule states, 11 C.F.R. 100.24(a)(2):

> *Voter registration activity* means contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote. Voter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms.

---

[3]    More generally, on remand the Commission undertook rulemakings concerning 23 different rules, issued nine separate NPRMs, received 916 comments from 1,019 commenters, held eight days of hearings, and compiled thousands of pages of documents. Contrary to plaintiffs' suggestion (Br. 9 & n.10), these proceedings began promptly, and all of them were completed within a few months of the Solicitor General's decision not to seek certiorari in Shays I.

The Commission explained that "[t]he purpose of retaining the 'assist' requirement is to exclude 'mere encouragement' from the scope of the rules" (Vol. I, Doc. 27, A.R. 424).  The expanded E&J includes additional examples of voter registration activities falling within the meaning of "federal election activity" and examples of activities that do not (A.R. 425).

The Commission promulgated a modified version of the 2002 rule on "GOTV activity":

> *Get-out-the vote activity* means contacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting.  Get-out-the-vote activity includes, but is not limited to:
>     (i) Providing to individual voters information such as the date of the election, the times when polling places are open, and the location of particular polling places; and
>     (ii) Offering to transport or actually transporting voters to the polls.

11 C.F.R. 100.24(a)(3).  This version eliminates the phrase "within 72 hours of an election" in example (i) as well as an exemption invalidated in Shays I, 337 F.Supp.2d at 104, regarding associations of state and local candidates.  See id. at 103, 105;  Vol. I, Doc. 27, A.R. 426.  The expanded E&J explains that the Commission never intended to suggest that GOTV activity may occur only within a 72-hour period before an election, so it removed the reference to a specific time period to avoid confusion.  Id.

### 2.      Attendance by Federal Candidates and Officeholders at State, District, and Local Party Fundraisers (11 C.F.R. 300.64)

BCRA regulates solicitations by federal candidates and officeholders.  See 2 U.S.C. 441i(e).  The first part of paragraph (1) of that section "[i]n general" prohibits those individuals from, inter alia, soliciting funds "in connection with an election for Federal office, including funds for any Federal election activity" unless the funds are federal funds.  2 U.S.C. 441i(e)(1)(A).  The second part of paragraph (1), however, permits federal candidates and officeholders to solicit nonfederal funds in connection with any election for a nonfederal office in amounts that may be contributed to federal candidates and political committees and are not

from sources the Act prohibits.  2 U.S.C. 441i(e)(1)(B).  Paragraph (3) is entitled "Fundraising events" and states that, "[n]otwithstanding  paragraph (1) and [2 U.S.C. 441i](b)(2)(C)," a federal candidate or officeholder "may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party."  2 U.S.C. 441i(e)(3).[4]

The regulation at issue in <u>Shays I</u> and again here, 11 C.F.R. 300.64, implements paragraph (e)(3) and specifies that a "fundraising event … includ[es] but [is] not limited to a fundraising event at which Levin funds are raised, or at which non-Federal funds are raised." Section 300.64(b) states that "[c]andidates and individuals holding Federal office may speak at such events without restriction or regulation."

In <u>Shays I</u>, this Court concluded that 11 C.F.R. 300.64 satisfies <u>Chevron</u> steps one and two.  337 F.Supp.2d at 89-90, 91-92.  However, the Court also concluded that, "[i]n the absence of any further explanation," 337 F.Supp.2d at 93, the Commission's E&J failed to provide a "reasoned analysis" in support of the regulation, in violation of the APA.  On remand, the Commission issued an NPRM (Vol. II, Doc. 6) on February 24, 2005, to comply with <u>Shays I</u> by revisiting 11 C.F.R. 300.64(b).  The NPRM sought comment on revisions to the E&J for the original 11 C.F.R. 300.64 and also on a proposal to bar federal candidates and officeholders from soliciting or directing nonfederal funds when attending or speaking at party fundraising events. <u>See</u> Doc. 6, A.R. 467, 468.  The Commission received written comments (Vol. II, Docs. 7-16),

---

[4]      Two other provisions of section 441i(e) refer to paragraph 441i(e)(1).  Paragraph (2) states that paragraph (1) "does not apply" under certain conditions to the solicitation of funds by a federal candidate or officeholder who is also a candidate for a state or local office and is soliciting funds in connection with that election.  Paragraph (4)(A) states that, "[n]otwithstanding any other provision of this subsection," a federal candidate or officeholder may make a general solicitation of funds to certain tax-exempt organizations described in section 501(c) of the Internal Revenue Code.  2 U.S.C. 441i(e)(4)(A).  Paragraph (4)(B) permits federal candidates or officeholders to solicit funds for certain kinds of federal election activity or for an entity whose principal purpose is to conduct those activities, if the solicitation is made only to individuals and the amount solicited from any individual during a calendar year does not exceed $20,000.

and on May 17, 2005, held a public hearing on the proposals.  <u>See</u> Vol. II, Docs. 17-19.  On June 30, 2005, the Commission issued a revised E&J (Vol. II, Doc. 23), along with supplementary information, explaining why, "after carefully weighing the relevant factors" (<u>id</u>. at A.R. 674), the Commission decided to retain the original rule rather than adopt the alternative proposal.

### 3. The Coordinated Communication Provision (11 C.F.R. 109.21)

The Act provides that coordinated expenditures, <u>i.e.</u>, "expenditures made by any person in cooperation, consultation, or concert with or at the request or suggestion of a candidate, his authorized political committees, or their agents, shall be considered a contribution to such candidate."  2 U.S.C. 441a(a)(7)(B)(i).  The regulations set out a three-prong test for determining when a communication is "coordinated" with a federal candidate or a political party committee — based on payment (not challenged here), content, and conduct.

### a. "Content" Element (11 C.F.R. 109.21(c))

The content prong identifies four subcategories of communications, each of which identifies a category of communications whose subject matter is reasonably related to an election.  A communication that falls into any of the subcategories satisfies the content prong. E&J for 2006 Coordination Rulemaking, Vol. III, Doc. 52, A.R. 2162.

The first content standard is satisfied if the communication is an electioneering communication.  <u>See</u> 11 C.F.R. 109.21(c)(1). This content standard implements the statutory directive that disbursements for coordinated electioneering communications be treated as in-kind contributions to, and expenditures by, the candidate or political party supported by the communication.  2 U.S.C. 441a(a)(7)(C).

The second content standard is satisfied by a public communication made at any time that disseminates, distributes, or republishes campaign materials prepared by a candidate, a candidate's authorized committee, or agents thereof.  <u>See</u> 11 C.F.R. 109.21(c)(2).  This content

standard implements Congress's mandate that the Commission's rules address the "republication of campaign materials."  See BCRA § 214(c)(1).

The third content standard is satisfied if a public communication made at any time expressly advocates the election or defeat of a clearly identified candidate for federal office.  See 11 C.F.R. 109.21(c)(3); 11 C.F.R. 100.22.  The Commission concluded that express advocacy is "for the purpose of influencing an election," no matter when it occurs.  Vol. III, A.R. 2162.

The fourth content standard is satisfied if a communication refers to a clearly identified federal candidate or political party and is publicly distributed within a prescribed timeframe (within 90 days of an election for the House or Senate, and from 120 days before a presidential primary through the general election) to voters in the jurisdiction where the clearly identified candidate is running or the jurisdiction in which one or more candidates of the identified party appear on the ballot.  11 C.F.R. 109.21(c)(1)-(4).

*i.  The Shays I Decisions on Section 109.21(c).*  This Court decided in Shays I that 11 C.F.R. 109.21(c)(1)-(4) satisfies Chevron step one.  337 F.Supp.2d at 61-62.  Under Chevron step two, the Court found that "[the agency's] construction of the statute is facially permissible." Id. at 62.  The Court found the regulation invalid nonetheless, concluding that any consideration of the content of a communication would facilitate circumventing the Act's contribution limits. Id. at 62-65.  The D.C. Circuit, however, disagreed "with the district court's suggestion that any standard looking beyond collaboration to content would necessarily 'create an immense loophole,' thus exceeding the range of permissible readings under Chevron step two."  414 F.3d at 99-100.  The D.C. Circuit concluded, "we can hardly fault the [Commission's] effort to develop an objective, bright-line test [that] does not unduly compromise the Act's purposes."  Id. at 99 (internal quotations omitted).  Moreover, the court expressly "reject[ed] Shays and Meehan's argument that [the Act] precludes content-based standards under Chevron Step One,"

id., and emphasized, "time, place, and content may be critical indicia of communicative purpose." The D.C. Circuit found that "the challenged regulation's fatal defect is not that the FEC drew distinctions based on content, time, and place, but rather that, contrary to the APA, the Commission offered no persuasive justification for ... the 120-day time-frame and the weak restraints applying outside of it." Id. at 100. On that limited basis, the court affirmed the district court's invalidation of the Commission's coordinated communication rules and remanded the matter back to the Commission. Id. at 101.

    ***ii. FEC Proceedings on Remand.*** The Commission published a new NPRM (Vol. III, Doc. 8, A.R. 747-60) on December 14, 2005, that proposed seven alternatives addressing coordinated communications. Written comments were received from 28 entities during the comment period, which closed on January 13, 2006. The Commission held a public hearing on January 25 and 26, 2006, at which 18 witnesses testified. Vol. III, Docs. 29-30, A.R. 1433-2036.

    On March 13, 2006, the Commission published on its website a Supplemental Notice of Proposed Rulemaking ("SNPRM") making public data it had licensed from TNS Media Intelligence/CMAG ("CMAG") regarding television advertising by presidential and congressional candidates during the 2004 election cycle. Vol. III, Doc. 34, A.R. 2049-50. On March 15, 2006, the SNPRM was published in the Federal Register. A.R. 2051. The comment period was re-opened until March 22, 2006, and 12 commenters submitted additional material. A.R. 2164.

    In the final rule (Vol. III, Doc. 52) the Commission adjusted the timeframe for congressional elections from 120 days to 90 days because the data showed virtually no candidate advertisements outside the 90-day period. A.R. 2165, 2167. Senate candidates as a group aired only 0.87 percent and 0.39 percent of their advertisements more than 90 days before their primary and general elections, respectively. This advertising represented 0.66 percent and 0.15 percent of the total estimated costs of advertisements run by Senate candidates before the primary and general

elections, respectively.  House candidates as a group aired only 8.56 percent and 0.28 percent of their advertisements more than 90 days before their primary and general elections, respectively. This represented 3.79 percent and 0.13 percent of the total estimated costs of advertisements run by House candidates before the primary and general elections, respectively.

For presidential elections, the Commission determined that appreciable spending occurred in the "gap period" between some primaries and the 120-day period before the general election.  Vol. III, A.R. 2167.  The Commission, therefore, adjusted the presidential rule to extend from 120 days before the primary election in a state through the general election.  Id.  The data before the Commission showed that this revised timeframe would have covered more than 99 percent of presidential advertising in 2004.  Id.

> ### b. "Conduct" elements (11 C.F.R. 109.21(d)(4), (5) (common vendor/former employee) and 109.21(h) (firewall safe harbor))

*i. Common vendor/former employee.*  The conduct elements of the coordination rule also address when a person paying for a communication ("payer") obtains information about a candidate's or political party's plans, projects, activities, or needs from a common vendor or former employee of a candidate or party and then uses that information in a communication. 11 C.F.R. 109.21(d)(4), (5).

In BCRA § 214(c), Congress directed the Commission to address in its regulations "payments for the use of a common vendor" and "payments for communications directed or made by persons who previously served as an employee of a candidate or a political party .... " In response, the Commission promulgated the "common vendor" conduct standard in the 2002 coordination rules.  That standard is satisfied if (1) the payer contracts with, or employs, a "commercial vendor" to create, produce, or distribute the communication; (2) the commercial vendor has provided specified types of services, within the "current election cycle," to the candidate, the candidate's opponent, or a political party committee; and (3) when working for the

payer, the commercial vendor uses or conveys material information about the campaign plans, projects, activities, or needs of the candidate or political party committee that is material to the creation, production, or distribution of the communication obtained from the work done for the candidate or party committee.  Vol. III, A.R. 2174.

Similarly, the "former employee" conduct standard in the 2002 coordination rules is satisfied if (1) the payer employs a person who was a former employee of a candidate or political party within the "current election cycle," and (2) when working for the payer, the former employee uses or conveys material information obtained from work done for the candidate or political party.

In 2005 the Commission amended the rule to make it applicable while a commercial vendor or employee is working for a political committee, and then continuing for another 120 days.  This adjustment substituted the 120-day period in place of the prior time period that spanned an entire election cycle.  Vol. III, A.R. 2174.  This adjustment was based on information in the rulemaking record indicating how the former rule actually functioned in practice.

*ii.  Firewall safe harbor.*  The firewall safe harbor provision provides that conduct will not be considered coordinated if a vendor or former employee implements an effective firewall that shields material information in the possession of the vendor, former employee, or political committee from the payer.  11 C.F.R. 109.21(h).  To qualify, the firewall must be designed and implemented to prohibit the flow of relevant information between those employees or consultants providing services for the payer and those employees or consultants who currently provide, or previously provided, services for the candidate or a political party committee.  Vol. III, A.R. 2177-78.

Any firewall must be described in a written policy distributed to all relevant employees, consultants, and clients affected by the policy, including all employees or consultants actually

providing services to the payer or to the candidate or party committee.  Vol. III, A.R. 2177.  The

regulation requires that a firewall be put in place before any information has been shared

between the relevant employees, and that the written firewall policy be distributed to all relevant

employees before those employees begin work on the communication referencing the candidate

or political party.  Id.  The safe harbor does not apply, however, if material information was

shared despite the existence of the firewall.  A.R. 2178.

## ARGUMENT

**I.    STANDARD OF REVIEW**

**A.    Summary Judgment**

"In ruling on cross-motions for summary judgment, the court shall grant summary

judgment only if one of the moving parties is entitled to judgment as a matter of law upon

material facts that are not genuinely disputed."  GCI Health Care Centers, Inc. v. Thompson,

209 F.Supp.2d 63, 67 (D.D.C. 2002) (citations omitted).  See Fed. R. Civ. P. 56.  "Summary

judgment is … appropriate where, as here, review is on the administrative record."  GCI Health

Centers, 209 F.Supp.2d at 67-68 (citations omitted).

**B.    The Commission's Construction of the Act Is Entitled to Deference
    under Chevron**

The two-step analytic framework from Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc., 467 U.S. 837 (1984), governs judicial review of regulations embodying

the Commission's interpretation of the Act.  If Congress "has directly spoken to the precise

question at issue," a court "must give effect to [Congress's] unambiguously expressed intent";

but "if the statute is silent or ambiguous with respect to the specific issue," the court must defer

to the Commission's interpretation as long as it is "based on a permissible construction of the

statute," that is, is a "reasonable" interpretation.  Id. at 842-43, 844.  "[I]f the Commission's

reading of the statute is reasonable, Chevron requires … [the court] 'to accept the agency's

construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.'" Covad Communications Co. v. FCC, 450 F.3d 528, 537 (D.C. Cir. 2006) (quoting National Cable & Telecomms. Ass'n v. Brand X Internet Servs., 125 S.Ct. 2688, 2699 (2005)); FEC v. NRA, 254 F.3d 173, 187 (D.C. Cir. 2001) (same).

"When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." Chevron, 467 U.S. at 866. "'[T]he job of judges is to ask whether the Commission made choices reasonably within the pale of statutory possibility.'" AT&T Corp. v. FCC, 349 F.3d 692, 699 (D.C. Cir. 2003) (quoting Verizon Communications, Inc. v. FCC, 535 U.S. 467, 539 (2002)). The Commission, which has broad discretionary authority over the administration, interpretation, and civil enforcement of the Act, "is precisely the type of agency to which deference should presumptively be afforded." FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981). Accord, United States v. Kanchanalak, 192 F.3d 1037, 1049 (D.C. Cir. 1999).

### C.    Review of the Regulations under the APA Is Deferential

Plaintiffs challenge the Commission's regulations under the APA.[5]    See Complaint ¶¶ 5, 68-70.  A court can set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A).   Under this "highly deferential standard," Public Citizen, Inc. v. National Hwy. Traffic Safety Admin., 374 F.3d 1251, 1260 (D.C. Cir. 2004), "the scope of [judicial] review … is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983).  Accord, e.g., Public Citizen, 374 F.3d at 1260.  In particular, "[t]he standard of review 'does not' …'permit …

---

[5]    "Neither FECA nor BCRA contain[s] provisions providing for direct review of the FEC's regulations." Shays I, 337 F.Supp.2d at 48 n.15.

[a court] to substitute … [its] policy judgment for that of the Agency.'" New York v. United States EPA, 413 F.3d 3, 18 (D.C. Cir. 2005) (internal citation omitted). See also, e.g., Cellco Partnership v. FCC, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (arbitrary-and-capricious review "presum[es] the validity of agency action"). "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." San Luis Obispo Mothers For Peace v. Nuclear Regulatory Comm'n, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc).

Under 5 U.S.C. 706(2)(D), a court sets aside agency action that is made "without observance of procedure required by law." Section 553 of the APA requires that NPRMs include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. 553(b)(3). Section 553 also requires an agency, after notice and comment on a proposed rule, to "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. 553(c).

## II.     THIS COURT SHOULD NOT REVISIT ITS RULINGS IN SHAYS I THAT 11 C.F.R. 100.24(a)(2), 100.24(a)(3), AND 300.64 SATISFY PART OR ALL OF CHEVRON REVIEW

This Court in Shays I concluded that (i) 11 C.F.R. 300.64 satisfies Chevron steps one and two, (ii) 11 C.F.R. 100.24(a)(2) satisfies Chevron step one, and (iii) 11 C.F.R. 100.24(a)(3) satisfies Chevron step one in part. Shays I, 337 F.Supp.2d at 90, 92, 100, 103.[6] See supra pp. 3, 6. Because the Court has already decided these matters, the rulings are, at the least, the law of the case (if issue preclusion does not apply).

The doctrine of the law of the case promotes judicial economy by avoiding repeated litigation of issues decided during the course of a single case or a closely related case. See, e.g., Association of American R.R. v. Surface Transp. Bd., 306 F.3d 1108, 1110-11 (D.C. Cir. 2002) (stating on second review after prior remand to agency: "There is not much left to this case. We

---

[6]     Lack of ripeness precluded the Court from determining whether the latter two regulatory provisions fully satisfy Chevron step two. Shays I, 337 F.Supp.2d at 100, 105; supra p. 3.

have already decided that the Board's reading of the statute is permissible …. Neither the law of the circuit nor the law of the case permits us to reconsider that issue, despite the Petitioner's efforts to have us do so."); LaShawn A. v. Barry, 87 F.3d 1389, 1393, 1395 (D.C. Cir. 1996) (en banc); Casey v. Planned Parenthood, 14 F.3d 848, 856 n.11 (3d Cir. 1994) ("law of the case rules apply to subsequent rulings by the same judge in the same case or a closely related one").

As plaintiffs noted in asserting that Shays I and this case are "related cases," this "action involves identical parties, identically aligned as Shays I" and "'relat[es] to the same subject matter.'" Complaint ¶¶ 17, 18 (quoting LCvR 40.5(a)).  Indeed, their complaint states that "[t]here is a substantial, and often complete, overlap between the legal and factual issues in this case and those in Shays I regarding the legality of the Commission's rules on coordination, Federal election activity, and state party fundraisers."  Id. at ¶ 18.  In these circumstances, this Court should not revisit its rulings that three of the regulations at issue here satisfy Chevron step one and are "permissible" constructions of the Act under Chevron step two and that one of the regulations also satisfies the requirement that it not undermine the Act, a determination that was not yet ripe for resolution in regard to the two other regulations.[7]

## III.   THE REGULATORY DEFINITIONS OF "VOTER REGISTRATION ACTIVITY" AND "GET-OUT-THE-VOTE ACTIVITY" PASS CHEVRON REVIEW AND SATISFY APA REQUIREMENTS

In Shays I, this Court concluded that the voter registration regulation and the main part of the GOTV regulation pass Chevron step one review and, under step two, embody a permissible construction of the Act.  See supra p. 3.  The Court further concluded that it could not determine whether the regulations "unduly compromise[ ]" the Act's purposes because of "ambiguity as to what acts are encompassed by the regulation," but "depending on how the Commission enforces

---

[7]     In the Shays I appeal, the court found that plaintiffs had standing to challenge the regulations at issue.  The Commission is not at this time contesting plaintiffs' standing.

this regulation, it is quite possible that the regulation will not 'unduly compromise[] the Act.'" 337 F.Supp.2d at 100, 105.  However, the Court found that the 2002 NPRM violated the APA's notice requirements for both regulations.  Id. at 101, 106.  As explained below, on remand the Commission initiated a new rulemaking on "federal election activity" that satisfied APA notice requirements and resulted in an expanded E&J and a modified GOTV regulation.

### A.      11 C.F.R. 100.24(a)(2):  Defining the Term "Voter Registration Activity"

The regulation defining "voter registration activity" presumptively covers the funding of all activities by state, district, or local party organizations that actually assist individuals to register to vote.  As the Commission explained in its expanded E&J, the regulation excludes only mere expressions of encouragement, or general exhortations, to register to vote.  See Doc. 27, A.R. 424-25.[8]  With this exclusion, the regulation is consistent with BCRA and the longstanding public policy goal of encouraging civic participation through voter registration, and presents an administratively manageable, practical, and understandable definition.

To preserve the traditional role of state and local party organizations in encouraging voter registration and to avoid unnecessarily infringing on their First Amendment interests, the Commission included an "assist" requirement and an "individualized means" requirement that exclude the mere expression of encouragement to register to vote.  See Doc. 7, A.R. 43; Doc. 27, A.R. 424, 425.  "In the Commission's extensive enforcement experience, general exhortations to register to vote and to vote are … common in political party communications" (id. at A.R. 425). Every state and local party gathering that ended with a routine "Now remember to register to vote!" would otherwise be transformed into a "federal election activity" that could be financed only by federally regulated funds. See supra p. 2.[9]  There is no statutory language or legislative

---

[8]      All citations to the A.R. in Part III of this memorandum are to Volume I of the Record.

[9]      Defining "voter registration activity" broadly to include mere encouragement would also affect the ability of party committees and federal candidates to raise funds for section 501(c)

history suggesting that Congress intended BCRA to limit the traditional role of state and local party organizations in encouraging citizens to register to vote. Commenters with experience with such organizations explained that a more restrictive regulation could adversely affect the willingness of local political parties, especially those primarily staffed by volunteers, to engage in voter registration activities. See, e.g., Doc. 8, A.R. 49, 189-90, 195-97, 225. In particular, it was noted that a definition of "voter registration activity" that included mere encouragement could preclude local parties at the grassroots level from responding to simple, general voter inquiries. See Doc. 8, A.R. 50; Doc. 18, A.R. 198-99; Doc. 27, A.R. 424, 425.

The regulation itself is nevertheless very broad and states that "[v]oter registration activity includes, but is not limited to, printing and distributing registration and voting information, providing individuals with voter registration forms, and assisting individuals in the completion and filing of such forms." 11 C.F.R. 100.24(a)(2). The examples in the expanded E&J clarify the regulation's scope. The Commission made clear the nonexclusive nature of these examples by preceding them with the phrase "[v]oter registration activity includes, but is not limited to," and reiterated that the enumerated examples "are illustrations only" (Doc. 27, A.R. 425). See United States v. American College of Physicians, 475 U.S. 834, 843 (1986) ("Attributing to the term 'example' its ordinary meaning, we believe that Example 7 is best construed as an illustration of one possible application under given circumstances of the regulatory standard.").

The expanded E&J (Doc. 27) includes three detailed examples (A.R. 425). The first two "illustrate activity where a State, district, or local party committee is providing potential voters with personal assistance in registering to vote" (id.). The examples include providing voter registration forms, providing answers about how to complete them, and mailing completed forms

_____

charities that organize nonpartisan voter registration drives. The solicitation rules regarding these entities depend on the meaning of "federal election activity." See 2 U.S.C. 441i(d), (e)(4).

to the appropriate government agency (id.).  In contrast, a third example sets forth activity that is not "voter registration activity."  That example "involves a State or local party committee speaker merely encouraging registration and voting without any additional concrete action that would be considered personal assistance to potential voters" (id.).  The expanded E&J also indicates (id.) that "responding to voter inquiries by providing publicly available information, such as the address on the FEC's website for the National Voter Registration Form or the 1-800 number of a State's Division of Elections" would not qualify as "voter registration activity."[10] Whether a specific action or series of actions by a party organization constitutes "voter registration activity" thus depends on the particular facts.

In contrast to the clear and administratively manageable standard adopted by the Commission, the vague regulation advocated by plaintiffs included mere encouragement to register to vote.  If "[p]recision of regulation must be the touchstone" where First Amendment rights are affected, Edenfield v. Fane, 507 U.S. 761, 777 (1993), then the discussion at the August 4, 2005, hearing amply demonstrated why an "encouragement" test is simply too vague.[11]

Including mere encouragement is also unnecessary to effectively implement BCRA, which seeks to regulate the funds used to influence federal elections.  The Commission's regulation captures what really matters — the financing of actual voter registration activity — without stifling local political parties, causing administrative nightmares, or leading to

---

[10]    Plaintiffs misread (Br. 57 n.42) this example (Doc. 27, A.R. 425). The salient facts are that the individual initiated the inquiry and the party limited its response to referring the inquirer to a governmental source. The example does not state, as plaintiffs suggest, that the response "'informed someone of where they may register to vote'" (quoting 337 F.Supp.2d at 99 n.72).

[11]    See, e.g., Doc. 18, A.R. 139, 168, 187, 259-60, 275-78; compare id. at 139 ([Q:]  "So any State party event at which a speaker merely urges someone to register to vote would be Federal election activity when done in the last 120 days before an election with no exceptions." [A:]  ("Within — yes, within the specified time periods.") (Paul Ryan), with id. at 168 ("There may very well be passing conversations where somebody says, and by the way, you should vote, which is a practical matter, and end up not being covered.  Where that exact line is will have to be determined on a case-by-case basis.") (Lawrence Noble).

circumvention of the Act.  The Commission's regulation does not permit circumvention of the Act because it does not allow the use of federally unregulated funds for disbursements made by state and local parties for activities that actually register individuals to vote.  See 11 C.F.R. 100.24(a) and Doc. 27, A.R. 425, Example 1.  Furthermore, as the E&J notes (A.R. 425), "many programs for widespread encouragement of voter registration to influence Federal elections would be captured as public communications under [2 U.S.C. 431(20)(A)(iii)]" because they also support or oppose federal candidates, and thus would be required to be financed entirely with federal funds.  See 2 U.S.C. 441i(b)(1), (2).

Similarly, permitting nonfederal funds to be used for a state, district, or local party event at which a speaker concluded his remarks with "Don't forget to register and vote!" will not lead to any actual or apparent corruption of any federal candidates or officeholders, the primary justification for FECA, including BCRA.  See Buckley v. Valeo, 424 U.S. 1, 25, 26, 45, 53 (1976); McConnell v. FEC, 540 U.S. 93, 142, 185 n.72, 187 (2003).  When it enacted BCRA, Congress continued to allow state, district, and local party organizations to use at least some nonfederal funds for voter registration and GOTV activities.  See 2 U.S.C. 441i(b)(2) (Levin funds).  Furthermore, there is "no legislative history or administrative record that general encouragement to register to vote or to vote is similar to the corrupting activity Congress was concerned with when it required certain activity to be funded with Federal dollars" (Doc. 27, A.R. 425), and plaintiffs have cited none.[12]

As the Commission explained (Doc. 27, A.R. 425), its regulation is consistent with longstanding congressional policy to support and encourage voter registration.  This policy is reflected not only in FECA itself, see 2 U.S.C. 431(9)(B)(ii) ("expenditure" does not include

---

[12]     In Shays I, this Court correctly rejected plaintiffs' argument that Commission regulations concerning voter registration activities by corporations and unions, see 11 C.F.R. 100.133, conflict with the regulation defining "voter registration activity."  337 F.Supp.2d at 99-100.

"nonpartisan activity designed to encourage individuals to vote or to register to vote"), but in all of the important federal statutes governing voting rights.  See, e.g., Voting Rights Act of 1965, 42 U.S.C. 1973b(a)(1)(F)(iii); National Voter Registration Act of 1993, 42 U.S.C. 1973gg(b)(1); Help America Vote Act of 2002, 42 U.S.C. 15483.[13]

**B.    11 C.F.R. 100.24(a)(3):  Defining the Term "Get-Out-the-Vote Activity"**

The Commission's regulation defining "GOTV activity" covers all actions by state or local party organizations that actually assist individual registered voters to vote and excludes only mere expressions of encouragement, or general exhortations, to vote.  See Doc. 27, A.R. 424.  Like the voter registration regulation, the GOTV regulation does not "unduly compromise[ ]" the Act, see Shays I, 337 F.Supp.2d at 105, but is entirely consistent with the Act, provides an understandable and administratively manageable definition, and should be upheld.

After reviewing the statutory language and the legislative history of the "federal election activity" provision, the Commission "found no evidence that Congress intended to capture every state or local party event where an individual ends a speech with the exhortation, 'Don't forget to vote!'" (Doc. 27, A.R. 424).  The Commission noted that "[b]oth Congress and the Commission are aware that such speech is ubiquitous and often spontaneous in an election year" (id.).  By retaining the "assist" and the "individualized means" requirements, the Commission excluded "mere encouragement" from the scope of the rule.  Thus, the rule focuses specifically on the Act's purpose of regulating the funds used to influence federal elections by capturing actual GOTV activity — getting registered voters to cast ballots.  See also 67 Fed. Reg. at 49,067 ("The Commission understands th[e] purpose [of GOTV activity] to be … more specific than the

---

[13]    In their complaint (¶ 60), plaintiffs alleged that the May 4, 2005, NPRM failed to notify the public that the Commission "might limit" the scope of "voter registration activity" and "GOTV activity" in its final rulemaking with its interpretation of the "'individualized means' and 'assist[ance]' requirements."  Because plaintiffs have presented no argument whatsoever in their opening brief to support this allegation, they have waived the issue.  See, e.g., Terry v. Reno, 101 F.3d 1412, 1415 (D.C. Cir. 1996).

broader purposes of generally increasing public support for a candidate or decreasing public support for an opposing candidate.").

The regulation's examples provide guidance for identifying GOTV activities that "assist" individuals in engaging in the act of voting. Providing individual voters information such as the date of the election, the times when polling places are open, and the location of particular polling places comes within the regulation, as does offering to transport or actually transporting voters to the polls. 11 C.F.R. 100.24(a)(3)(i), (ii). In its E&J (Doc. 27, A.R. 426), the Commission included an additional example of GOTV activity:  a state party committee hires a consultant one month before an election to design a GOTV program and recruit volunteers to drive voters to the polls on election day (id.). The Commission further stated that its definition of "GOTV activity" would "apply equally to actions taken with regard to absentee balloting or early voting" (id.).

Like the voter registration regulation, the GOTV regulation makes clear that the examples included in the regulation are not exhaustive ("Get-out-the-vote activity includes, but is not limited to …"). See also Shays I, 337 F.Supp.2d at 103. To clarify that the regulation applies without time limitation, the Commission also deleted a timeframe reference ("within 72 hours of an election") that had appeared in the first example in the 2002 version of the GOTV regulation, but that was "not intended to exclude activity in any other timeframe." See supra p. 5; Doc. 27, A.R. 426. The revised examples share the requirement that mere encouragement and exhortations alone are not GOTV activity, although an exhortation combined with action to help an individual registered voter to vote will be GOTV activity. Whether a particular action is GOTV activity depends on the particular facts.

The history of another provision of the FECA, 2 U.S.C. 441b, supports the Commission's "GOTV activity" regulation. In 1971, Congressman Hanson successfully offered an amendment to the bill that eventually became the Federal Election Campaign Act of 1971, Pub. L. No. 92-

225, Title II, § 205, 86 Stat. 10 (1972).  The amendment included language permitting

corporations and unions to finance certain "nonpartisan registration and get-out-the-vote

campaigns" (now codified at 2 U.S.C. 441b(b)(2)(B)).  The legislative history of this amendment

strongly suggests that Congress understood GOTV in that context to mean personal assistance,

such as going door-to-door to communicate with voters and transporting voters to the polls.  See

117 Cong. Rec. 43,386-388 (Nov. 30, 1971) (remarks of Cong. Crane, Ashbrook, and Hays).

The Third Circuit understood the legislative history that way as well.  Ash v. Cort, 496 F.2d 416,

425 (3d Cir. 1974) ("The debates … indicate that members of Congress had a fairly specific and

limited type of activity in mind when speaking of 'get-out-the-vote' drives, primarily door-to-

door canvassing and escorting people to the polls."), rev'd on other grounds, 422 U.S. 66 (1975).

The Commission's interpretation of "GOTV activity" accurately reflects the longstanding

congressional recognition of the importance of GOTV in other provisions of the Act.  See Doc.

27, A.R. 425; 2 U.S.C. 431(9)(B)(ii) (exception to the definition of "expenditure" for, inter alia,

nonpartisan GOTV activity).

  Contrary to plaintiffs' criticism (Br. 54-55), the Commission did not unduly narrow the

regulation in Advisory Opinion ("AO") 2006-19, 1 Fed. Election Camp. Fin. Guide (CCH)

¶ 6505 (June 5, 2006) (available at http://ao.nictusa.com/ao/no/060019.html).  In that opinion,

the Commission considered proposed activities by a local party committee in connection with a

nonpartisan, municipal general election to be held on the same day as a federal primary election.

The local party committee proposed to make pre-recorded, electronically dialed telephone calls

and send a form letter to all registered Democratic voters in the City of Long Beach between four

and fifteen days prior to the municipal election to urge the recipient to vote for a particular

candidate for mayor (and other selected local candidates).  In advising that the proposed

communications did "not constitute assisting voters in the act of voting by individualized

means," the Commission found several facts to be decisive:  The communications promoted the election of only nonfederal candidates; the time when the committee would make the communications supported the conclusion that the communications were likely to be "mere encouragement" to vote (i.e., were designed simply to increase general public support for a municipal candidate); and the generic communications did "not provide any individualized information to any particular recipient (such as the location of the particular recipient's polling place)"or "the hours" the polling place would be open.

The Commission based its conclusion on the particular combination of facts presented and might well have decided otherwise if the facts had differed.  An advisory opinion concerns only a "specific transaction or activity" and may be relied upon only by the requester or another person "involved in any specific transaction or activity which is indistinguishable in all its material aspects" from that examined in the AO.  2 U.S.C. 437f(c)(1); 11 C.F.R. 112.1(b), (c); 11 C.F.R. 112.5(a)(1)(2).  See FEC v. National Conservative PAC, 647 F.Supp. 987, 992, 995 (S.D.N.Y. 1986) (reliance on AO unwarranted where facts different).  Thus, plaintiffs fail to acknowledge the totality of the circumstances presented in AO 2006-19 and improperly generalize about the Commission's views and intentions from one limited advisory opinion.

In sum, the Commission has corrected the problems identified by this Court in Shays I.  The GOTV regulation is broader than plaintiffs mistakenly represent, reflects the statutory language and longstanding congressional policy, provides a workable definition, and fulfills the Act's purposes.  The Court should accord full Chevron deference to the Commission's definition of "GOTV activity" and uphold the regulation.

## IV.    THE REVISED EXPLANATION AND JUSTIFICATION FOR 11 C.F.R. 300.64 SATISFIES THE APA'S REASONED ANALYSIS REQUIREMENT

Because Shays I found that 11 C.F.R. 300.64 satisfies Chevron review, that decision leaves unresolved only one issue:  Whether the Commission's revised and expanded E&J

articulates a reasonable explanation for the regulation, which permits federal candidates and officeholders to attend and speak "without restriction or regulation" at state and local party fundraisers. See 5 U.S.C. 553.

When it enacted BCRA, Congress decided to permit federal candidates and officeholders to raise nonfederal funds under certain circumstances. See, e.g., 2 U.S.C. 441i(e)(1)(B) (permitting federal candidates or officeholders to solicit funds in connection with any election for nonfederal office provided the contributions satisfy federal amount and source restrictions); 2 U.S.C. 441i(e)(4)(A) (permitting federal candidates or officeholders to make general solicitations for certain section 501(c) organizations); 2 U.S.C. 441i(e)(4)(B) (permitting federal candidates or officeholders to make specific solicitations for section 501(c) organizations of up to $20,000 from individuals). See supra p. 6 n.4.  Thus, a nonexistent congressional intent to eliminate, rather than merely to limit, solicitation of nonfederal funds by such individuals provides no basis for the Court to reject the Commission's regulation. See Doc. 23, A.R. 675.[14]

The E&J explains that the Commission "base[d] … [its] interpretation on Congress's inclusion of the 'notwithstanding paragraph (1)' phrase in section 441i(e)(3)" (Doc. 23, A.R. 675).  As the Supreme Court has noted,  "the Courts of Appeals generally have 'interpreted similar "notwithstanding" language … to super[s]ede all other laws, stating that a clearer statement is difficult to imagine.'"  Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) (quoted at A.R. 675).  Accordingly, the Commission concluded that the "notwithstanding" phrase "suggests Congress intended the provision to be a complete exemption" (Doc. 23, A.R. 675).  In Shays I, this Court found the phrase to be ambiguous, but that it could be read as "a carve-out for unabashed solicitation by federal candidates and officeholders" and thus consistent with the Commission's interpretation.  337 F.Supp.2d at 89-90.

---

[14]    A.R. citations in this part of the memorandum are to Volume II of the Record.

The revised E&J also notes (Doc. 23, A.R. 675) that this Court in Shays I rejected the argument that 2 U.S.C. 441i(e)(3) does not permit solicitations merely because Congress did not include the word "solicit" in that exception. "While it is true that Congress created carve-outs for its general ban in other provisions of BCRA utilizing the term 'solicit' or 'solicitation,' see 2 U.S.C. 441i(e)(2), (4), these provisions do not conflict with the FEC's reading of Section (e)(3)" (Doc. 23, A.R. 675, quoting Shays I, 337 F.Supp.2d at 90). This Court further agreed with the Commission that "'if Congress had wanted to adopt a provision allowing Federal officeholders and candidates to attend, speak, and be featured guests at state party fundraisers but denying them permission to speak about soliciting funds, Congress could easily have done so'" (id., quoting Shays I, 337 F.Supp.2d at 89).

The E&J explains that, unlike the alternative favored by plaintiffs, the Commission's interpretation reconciles section 441i(e)(3) with the exception in section 441i(e)(1)(B).

> In contrast to assertions by commenters that without section 441i(e)(3) candidates would not be able to attend, appear, or speak at State party events where soft money is raised, the Commission has determined that under section 441i(e)(1)(B) alone, Federal candidates and officeholders would be permitted to speak and solicit funds at a State party fundraiser for the non-Federal account of the State party in amounts permitted by FECA not from prohibited sources. See Advisory Opinions 2003-03, 2003-05 and 2003-36.

Doc. 23, A.R. 675. Interpreting section 441i(e)(3) merely to allow federal candidates and officeholders to attend or speak at a state, district, or local fundraiser but not to solicit funds renders the provision a virtual surplusage, since those individuals "may already solicit up to $10,000 per year in non-Federal funds from non-prohibited sources for State parties under section 441i(e)(1)(B)" (id.).[15] The Commission's regulation properly avoids making section

---

[15]     At the hearing, even opponents of the current regulation agreed that 2 U.S.C. 441i(e)(1)(B) allows federal officeholders and candidates to solicit nonfederal funds subject to federal limits and source prohibitions at state and local party fundraisers. Doc. 18, A.R. 553 (Lawrence Noble), A.R. 608-09 (Donald Simon).

441i(e)(3) a "largely superfluous" provision (Doc. 23, A.R. 675).  See, e.g., Duncan v. Walker, 533 U.S. 167, 174 (2001) (It is "a cardinal principle of statutory construction that a statute ought, upon the whole, be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (internal quotation marks omitted); Donnelly v. F.A.A., 411 F.3d 267, 271 (D.C. Cir. 2005) ("We must strive to interpret a statute to give meaning to every clause and word, and certainly not to treat an entire subsection as mere surplusage").

The regulation is consistent with legislative intent because it "effectuates the careful balance Congress struck between the appearance of corruption engendered by soliciting sizable amounts of soft money, and preserving the legitimate and appropriate role Federal officeholders and candidates play" at the state and local level (Doc. 23, A.R. 675).  The Supreme Court in McConnell noted this balancing when it upheld 2 U.S.C. 441i(e), stating that sections 441i(e)(1)(B) and 441i(e)(3) "preserve the traditional fundraising role of federal officeholders by providing limited opportunities for federal candidates and officeholders to associate with their state and local colleagues through joint fundraising activities."  540 U.S. at 183.  In addition, comments by Republican and Democratic Party representatives on the 2005 NPRM forcefully reminded the Commission of the importance of the role that Congress preserved when it enacted this fundraiser exception.  In summarizing those comments, the E&J explains that they "stressed the importance of the unique relationship between Federal officeholders and candidates and their State parties.  They emphasized that these party fundraising events mainly serve to energize grass roots volunteers vital to the political process" (Doc. 23, A.R. 675).  See also, e.g., Doc. 18, A.R. 523-26.  As the representative for the National Republican Senatorial Committee commented, these events "water[ ] the grass roots" (Doc. 18, A.R. 524) (internal quotation marks omitted).

Especially in light of the Commission's recent broadening of its regulations defining the terms "solicit" and "direct," a narrower interpretation of section 441i(e)(3) would interfere with the traditional relationship between federal candidates and state and local parties.  On remand from Shays I, the Commission adopted broad definitions of "solicit" and "direct" that encompass even indirect solicitations, as determined by objective criteria such as context and not by the speaker's intent.  See Shays I, 337 F.Supp.2d at 73-80 and 414 F.3d at 102-07; 71 Fed. Reg. 13,926 (March 20, 2006); 11 C.F.R. 300.2(m), (n).  All speech during a fundraiser is presented in the context of an event whose very purpose is raising funds.  Thus, commenters on the 2005 NPRM were understandably concerned about the possible "chilling effect" of a broader notion of "solicit" in the context of a fundraiser hosted by a state or local party.  See, e.g., Doc. 15, A.R. 505, 509; Doc. 18, A.R. 526-27, 585-87, 608; Doc. 23, A.R. 675.  These commenters stated, and the Commission agreed, that federal candidates and officeholders might refuse to appear at such fundraising events out of fear of unwittingly making an illegal solicitation or, if they did attend, would be at the mercy of political partisans who might purposefully mischaracterize their remarks as solicitations and file complaints against them with the Commission.  See Doc. 23, A.R. 676-77.  See also, e.g., Doc. 16, A.R. 513 (Allowing speech but not solicitation "would … open up a whole new battleground in politics …. The wiser path for federal officeholders and candidates will be to avoid the minefield altogether and simply decline invitations," thereby "leading [them] to grow more isolated from local parties.") (Michael Bassett, Chairman of the Ottawa County (Ohio) Democratic Central Committee) (quoted in part in Doc. 23, A.R. 676). The Commission shares the concern of these commenters that federal candidates and officeholders "would risk complaints, intrusive investigations, and possible violations based on general words of support for the party" (Doc. 23, A.R. 677).

The E&J also notes (Doc. 23, A.R. 677) that "11 C.F.R. 300.64 is carefully

circumscribed."  The "safe harbor" provided by the regulation "only extends to what Federal

candidates and officeholders say at the State party fundraising events themselves" (id.).  The

exception "in no way applies to what … [those individuals] do outside of State party fundraising

events" (id.).  The Commission prohibits federal officeholders and candidates from serving on

"host committees" for party fundraising events that seek nonfederal funds, and from signing any

solicitation in connection with such an event (id. at 675).  In addition, federal officeholders and

candidates may not solicit nonfederal funds in any pre-event publicity or through other fund-

raising appeals (id.).  See also id. at 677 ("[T]he regulation does not affect the prohibition on

Federal candidates and officeholders from soliciting non-Federal funds for State parties in

fundraising letters, telephone calls, or any other fundraising appeal made before or after the

fundraising event."); 67 Fed. Reg. 49065, 49108 (July 29, 2002) (original E&J for final rule)

(same).  Moreover, the regulatory exception applies only to fundraisers undertaken by a state,

district, or local party organization on its own behalf.  See Doc. 23, A.R. 678.

    The Commission concluded that additional restrictions would provide little, if any, anti-

circumvention protection.  Commenters explained that, in their experience, "the ask [for funds]

has already been made" before a fundraising event, and those present have already made their

contribution before arriving.  Doc. 23, A.R. 677; Doc. 18, A.R. 525, 605.  Thus, a state or local

party often receives contributions before a fundraising event.  Doc. 23, A.R. 677-78.  Indeed, the

cost of admission to the event often serves as the contribution (id.).  In these circumstances, it is

not the role of the speaker who is a federal candidate or officeholder actively to solicit

contributions, but he or she may well thank the attendees for their support.  See, e.g., Doc. 15,

A.R. 506.  Several commenters also noted that local party fundraisers in particular typically raise

their contributions from individuals and not from corporations or other entities and in low-dollar

amounts, usually $100 or less, well within federal limits (Doc. 23, A.R. 678; Doc. 18, A.R. 523,

559).  In sum, the record indicates that the challenged provision does not present a significant

opportunity for corruption or the appearance of corruption.  See Doc.23, A.R. 677-78.[16]

In Shays I, this Court faulted the Commission for failing to explain why monitoring

speech for solicitations would be "more vexing in the context of state political party fundraisers

than … [it is] outside of such venues where nonfederal money solicitation is almost completely

barred."  337 F.Supp.2d at 92.  The revised E&J fully satisfies this concern.

First, three factors make a state or local fundraising event distinctive:  the essential

fundraising nature of the event, the close ties between federal officeholders or candidates and

their state and local party organizations, and the role that federal officeholders and candidates

traditionally play in supporting state and local party organizations (and attracting their vital

volunteers).  "By definition, the primary activity in which persons attending or speaking at State

party fundraising events engage is raising funds for the State [and local] parties" (Doc. 23, A.R.

675).  Moreover, the hosts of the state or local fundraiser are permitted to publicize the

appearance of the federal officeholder or candidate as the featured speaker at the event (id.).  As

one commenter remarked, "the very purpose of the candidate's [or officeholder's] invited

involvement — or at least a principal one — is to aid in the successful raising of money" (Doc.

12, A.R. 497 (Robert Bauer); quoted in Doc. 23, A.R. 675).  See also, e.g., Doc. 15, A.R. 508

("Congress was certainly aware that allowing a candidate to be the featured speaker at a major

nonfederal fundraising event would allow a State party to increase the amount of nonfederal

---

[16]       The E&J observes (Doc. 23, A.R. 677) that none of the commenters — neither those who
supported retaining the current language of section 300.64 nor those who favored the alternative
proposal to prohibit completely solicitation by federal officeholders and candidates at these
events — could cite any evidence that this provision had undermined BCRA in the last election
cycle.  See also, e.g., Doc. 18, A.R. 542, 545, 596; Doc. 6 (2005 NPRM), A.R. 467 (seeking
public comment on whether any potential for abuse).  If any corruption or significant abuse
occurs in the future, the Commission has the authority to take appropriate and targeted action.
See infra pp. 42, 51.

funds raised.") (Mark Brewer, president, Association of State Democratic Chairs); Doc. 18, A.R. 600-01 (Bauer). Thus, the nature of the event, the statute's explicit recognition that the candidate or officeholder may serve as the "featured guest," and the underlying relationship between these speakers and the party committees make it extremely difficult for speakers to disassociate themselves from the central purpose of the entire event — fundraising — and their speech will necessarily be understood in that context.

Second, it is unclear to what other venues the Court was referring. For example, if a federal candidate or officeholder is the featured speaker at a fundraiser for a national party organization, the speaker need not worry about misinterpretations of his or her speech or usual courtesies (e.g., "Thanks for supporting the party") because BCRA prohibits national party committees from raising nonfederal funds, 2 U.S.C. 441i(a), but permits the committees and federal candidates to solicit federal funds, 2 U.S.C. 441i(e)(1)(A). In that venue, a general solicitation would normally, in the post-BCRA world, be interpreted as a request for federal funds, with little or no risk of confusion. The same holds true when a candidate solicits funds for his or her own campaign committee or for another federal candidate.[17] If a candidate or office-holder speaks at an event that is not billed as a fundraiser at all, then there is much less (if any) risk that a general expression of gratitude or request for political support could be construed, in context, as a subtle solicitation for nonfederal funds. In sum, beyond the state or local party fundraiser scenario, the opportunities for a candidate's or officeholder's words to be misconstrued are rare.

---

[17]    Plaintiffs implausibly suggest (Br. 49-50) that a past donor's conversation with a Member of Congress in his office presents the same interpretive quandary as a speech by a federal officeholder or candidate at a state or local party fundraiser. The officeholder's conversation with the donor, unlike the officeholder's speech for a state or local party organization, is not a part of a fundraising event for a close ally, with its attendant implication that every speech relates to fundraising. Indeed, it could not be, for federal law prohibits soliciting or receiving political contributions in any federal building or in the office of anyone who receives a salary from the United States Treasury. 18 U.S.C. 607(a)(1) (2000 & Supp. II).

Finally, some commenters noted (see Doc. 23, A.R. 677) that the Hatch Act, 5 U.S.C. 7323, regulates political speech and that federal employees seem to be able to abide by its restrictions. The Hatch Act, however, differs in crucial respects from the FECA and the Commission's regulations. As the E&J explains (Doc. 23, A.R. 677), the implementing regulations for the Hatch Act "contain a narrow definition of 'solicit' meaning 'to request expressly' that another person contribute something. See 5 CFR 734.101." In addition, a federal employee must "knowingly" "solicit" contributions to violate the law. 5 U.S.C. 7323(a)(2), (4); 18 U.S.C. 602(a)(4). The Commission's current definition of "solicit," 11 C.F.R. 300.2(m), which plaintiffs have not challenged, is broader and includes neither limitation. Thus, unlike the FECA and its implementing regulations, the Hatch Act and its regulations assure speakers that they will not risk violating the law if they make a general request for support of a political cause, even in the context of a state or local party fundraiser.[18]

In sum, the revised E&J contains a strongly reasoned and comprehensive analysis that more than adequately supports the Commission's adoption of 11 C.F.R. 300.64.

## V.    THE COORDINATED COMMUNICATION REGULATIONS ARE LAWFUL

As plaintiffs concede (Br. 9), the task before the Commission on remand was to promulgate a rule that "rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition." 414 F.3d at 102 (emphasis added). The Commission's revised rule and accompanying E&J have done precisely that by providing an "assurance that [its] standard does not permit substantial coordinated expenditures" to go unregulated. Id.

---

[18]    Commenters further relied upon the Senate Code of Official Conduct, but that is also inapposite. It prohibits Senators and their staffs from soliciting charitable donations from registered lobbyists and foreign agents, but makes an exception, among others, for a fundraising event attended by 50 or more persons. See Doc. 23, A.R. 677; SENATE ETHICS MANUAL, 108th Cong., 1st Sess. 75-76 (2003 ed.) (available at http://ethics.senate.gov/downloads/pdffiles/manual.pdf.) The Senate Code thus gives speakers complete freedom to speak at fundraisers attended by 50 or more people.

(emphasis added).  As explained below, whenever a regulatory line is drawn, some activity will fall on the unregulated side of the line, and the Commission's rule must "rationally," not perfectly, capture election-related activity so as to prevent a "substantial" amount of such communication from evading regulation.  Especially when dealing with core First Amendment activity, the Commission is not required to interpret the Act in a way that maximizes the risk that non-election speech will be chilled or punished, but "must attempt to avoid unnecessarily infringing on First Amendment interests."  AFL-CIO v. FEC, 333 F.3d 168, 179 (D.C. Cir. 2003).  As the D.C. Circuit explained, "giving appropriate Chevron deference, we think the FEC could construe the expenditure definition's purposive language as leaving space for collaboration between politicians and outsiders on legislative and political issues involving only a weak nexus to any electoral campaign."  414 F.3d at 99.

## A.    Background

For three decades, the Act has provided that a coordinated expenditure, i.e., one made "in cooperation, consultation, or concert with or at the request or suggestion of a candidate, his authorized political committees, or their agents, shall be considered a contribution to such candidate."  2 U.S.C. 441a(a)(7)(B)(i).  In turn, an "expenditure" is defined to include "anything of value … made … for the purpose of influencing any election for Federal office."  2 U.S.C. 431(9)(A)(i).  BCRA expressly repealed the Commission's existing coordination regulations that relied largely upon "collaboration or agreement" with a candidate as a test for "coordinated general public political communications" (former 11 C.F.R. 100.23), and instructed the Commission to develop new regulations.  BCRA §§ 214(b), (c).  Congress placed only two restrictions on the Commission's discretion in formulating the new regulations:  they (1) "shall not require agreement or formal collaboration to establish coordination," and (2) "shall" address

four specific aspects of coordinated communications "[i]n addition to <u>any subject determined by</u> <u>the Commission</u>."  BCRA § 214(c) (emphasis added).

Beyond the factors listed in the statute, BCRA is totally silent on what else the Commission should consider in defining coordination.  This broad delegation of authority was the direct result of Congress's inability to agree upon its own definition of coordinated expenditures.  When the bill that became BCRA was introduced in the Senate, it contained a broad definition of "coordinated activity."  <u>See</u> S.27, Bipartisan Campaign Reform Act of 2001, 107th Cong. § 214 (Jan. 22, 2001).  However, when the Senate was unable to reach agreement on a new statutory definition of coordination, Senator McCain introduced an amendment that, <u>inter</u> <u>alia</u>, delegated to the Commission the authority to fashion a new definition.  Amendment No. 165, 147 Cong. Rec. S3184 (March 30, 2001).

> There is one thing I want to make very clear and reiterate:  While this amendment in-
> structs the FEC to consider certain issues in the new rule-making, it doesn't require the
> FEC to come out any certain way or come to any definite conclusion one way or another.

147 Cong. Rec. S3184-3185 (Mar. 30, 2001) (statement of Sen. Feingold).  <u>See</u> <u>also</u> 148 Cong. Rec. S2145 (Mar. 20, 2002) (Sen. Feingold and Sen. McCain).

When Congress delegates this type of authority, the fullest measure of <u>Chevron</u> deference is required.  <u>See</u> <u>supra</u> pp. 12-14.  "When Congress has 'explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance or manifestly contrary to the statute." <u>Pharmaceutical Research and Mfrs. v. Thompson</u>, 362 F.3d 817, 822 (D.C. Cir. 2004) (quoting <u>Chevron</u>, 476 U.S. at 844).

In <u>Shays I</u>, the D.C. Circuit held that, "[r]egarding <u>Chevron</u> step one, we agree that Congress has not spoken directly to the issue at hand."  414 F.3d at 98.  The Court also rejected

the plaintiffs' argument that "FECA precludes content-based standards under <u>Chevron</u> step one," as well as the "district court's suggestion that any standard looking beyond collaboration to content would necessarily 'create an immense loophole,' thus exceeding the range of permissible readings under <u>Chevron</u> step two."  <u>Id.</u> at 99-100 (quoting 337 F.Supp.2d at 65).[19]  The Court found, however, that the Commission's explanation for the regulation was inadequate under the APA.  <u>Id.</u> at 97, 100.  On remand, the Commission therefore conducted a rulemaking, promulgated a revised rule, and supported it with a detailed E&J.  Doc. 52, A.R. 2161-73.[20]

### B.    The Revised Coordination Content Standard Is Not Arbitrary and Capricious and Has Been Comprehensively Explained

"[T]o qualify as an 'expenditure' in the first place, spending must be undertaken 'for the purpose of influencing' a federal election … [a]nd as the FEC points out, time, place, and content may be critical indicia of communicative purpose."  <u>Shays I</u>, 414 F.3d at 99 (citations omitted).  Thus, subjecting communications to the "coordinated expenditure" limits regardless of when made or whether they even mention any election, candidate, or political issue, would improperly exceed the reach of the underlying definition of "expenditure."  In short, the Act effectively requires consideration of content to classify a communication as a coordinated "expenditure."

### 1.    The Timing of an Advertisement May Indicate Its Purpose, and the Regulation's Content Timeframes Are Supported By Reliable Empirical Data

Mass communications that occur shortly before an election are more likely to be for the purpose of influencing an election than those much earlier, especially if they mention a candidate or political party.  In <u>McConnell</u>, the Supreme Court approved Congress's timing restrictions in

---

[19]    These holdings are now the law of the case.  <u>See</u> <u>supra</u> pp. 14-15; <u>United States v. Alaw</u>, 327 F.3d 1217, 1220 (D.C. Cir. 2003).  Moreover, plaintiffs no longer challenge the regulation under <u>Chevron</u> step one.  <u>See</u> Shays Br. 10.

[20]    All references within this section are to Volume III of the record.

the "electioneering communication" provision, relying heavily upon the empirical evidence before it (including a study called "Buying Time") that showed that "almost all" of the broadcast ads that mentioned candidates and were "specifically intended to affect election results" were "aired in the 60 days immediately preceding a federal election."  540 U.S. at 127.  The Court also rejected the claim that the provision "is underinclusive because it leaves advertising 61 days in advance of an election entirely unregulated," noting that "[t]he record amply justifies Congress' line-drawing."  McConnell, 540 U.S. at 206, 208; see also E&J, A.R. 2165 ("'Buying Time' study … further supports the conclusion that the vast majority of election related advocacy occurs immediately before an election").  The Court thus upheld Congress's judgment that the timing of public communications can be a decisive factor in determining whether speech is sufficiently election-related to warrant regulation.  The temporal criteria in the Commission's fourth content standard are the same kind of reasonable line drawing approved by the Court.

To address questions raised by the D.C. Circuit in Shays I, the Commission in its NPRM "specifically invite[d] comments in the form of empirical data that show the time periods before an election in which electoral communications generally occur."[21]  A.R. 750, 2163. Unfortunately, although some commenters provided unscientific anecdotal evidence, no commenters (including the plaintiffs) provided any studies, statistical samples, or other empirical evidence that would help provide an overview of the frequency, pattern, and intensity of political advertising.  See infra pp. 47-48.  To fill that void, the Commission licensed data from TNS Media Intelligence/CMAG ("CMAG") regarding television advertising spots run by presidential, Senate, and House of Representatives candidates during the 2004 election cycle.  A.R. 2163.  As

---

[21]     The Court suggested three inquiries, 414 F.3d at 102:  "Do candidates in fact limit campaign-related advocacy to the four months surrounding elections, or does substantial election-related communication occur outside the window?  Do congressional, senatorial, and presidential races … occur on the same cycle…?  And, perhaps most important, to the extent election-related advocacy now occurs primarily within 120 days, would candidates and colla-borators aiming to influence elections simply shift coordinated spending outside that period…?"

the Commission explained in its E&J, and not contested by plaintiffs, "CMAG is a leading

provider of political advertising tracking and provides media analysis services to a wide variety

of clients, including national media organizations, foundations, academics, and Fortune 100

companies. See www.tnsmicmag.com." Id. CMAG provided the data used for the 2000

"Buying Time" study, relied upon by BCRA's principal sponsors in formulating its provisions.

See, e.g., 148 Cong. Rec. S2141 (daily ed. March 20, 2002) (statement of Sen. McCain). CMAG

data were also heavily relied upon by the courts in McConnell. See 540 U.S. at 206; 251

F.Supp.2d 583-587 (Kollar-Kotelly); id. at 796-98 (Leon).

     The focus of the D.C. Circuit's questions was the pattern of candidate spending over

time, and the CMAG data unequivocally reveal that virtually all of it takes place within 90 days

of congressional elections. CMAG monitors more than 560 television stations in 101 major

markets, 21 hours per day (5:00 a.m. - 2:00 a.m.). A.R. 2187 (from DVD open

"CMAG_READ_ME" file). In McConnell, this Court "accept[ed] the CMAG data as a valid

database." 251 F.Supp.2d 176, 561 n.88 (Kollar-Kotelly). In particular, the Court explained, id.

at 583-84, that,

> [t]he evidence shows that CMAG is used as the basis for many political science
> studies which are peer-reviewed and published by the top political science journals in
> the country, and is a regular resource for politicians and political parties. Given the
> widespread acceptance of CMAG in academic political circles, and the fact that
> Plaintiffs were unable to demonstrate that its flaws result in bias, I accept the CMAG
> data as a legitimate source of data for use in studies seeking to understand the
> contours of political advertising, recognizing it has certain limitations.

The data CMAG provided the Commission include "all candidate sponsored ads for federal races

(US House, US Senate, President) from 11/6/02 - 11/2/04," A.R. 2187 (from DVD open

"CMAG_READ_ME" file), and the Commission analyzed well over half a million ad airings.

See A.R. 2197, 2199, 2209, 2211, 2216, 2218; FEC Fact ¶ 35.

In response to the D.C. Circuit's first question, 414 F.3d 102, the data show that "substantial election-related communication" does <u>not</u> occur outside the 90-day line drawn by the Commission for congressional races. The data show that almost all congressional candidates run their ads within 60 days of election and only a small fraction are run between 60 and 90 days before an election. A.R. 2165. Beyond 90 days, this candidate advertising "nearly ceases." A.R. 2167. <u>See</u> A.R. 2209-12, 2216-19 (graphs reproduced in addendum).

> Senate candidates aired 91.60 percent and 94.73 percent of their advertisements within 60 days of the primary and general election, respectively. This represented 93.32 percent and 97.20 percent of the estimates costs of advertisements the Senate candidates ran before the primary and general elections, respectively….
>
> The data show that a minimal amount of activity occurs between 60 and 90 days before an election, and that beyond 90 days, the amount of candidate advertising approaches zero. Senate candidates aired only 0.87 percent and 0.39 percent of their advertisements more than 90 days before their primary and general elections, respectively, which represented 0.66 percent and 0.15 percent of the total estimated costs…. Similarly, House candidates aired only 8.56 percent and 0.28 percent of their advertisements more than 90 days before their primary and general elections, respectively. This represented 3.79 percent and 0.13 percent of the total estimated costs of advertisements run by House candidates….

A.R. 2165 (footnotes omitted). The Commission's decision to use a 90-day period for House and Senate races was thus directly responsive to the D.C. Circuit's analysis and supported by substantial empirical evidence.

These data about candidates' advertising are also entirely consistent with the Buying Time studies in the BCRA record and the testimony of the national political party committees during the rulemaking. The Buying Time studies reported that the vast majority of election-related advocacy financed by interest groups occurs immediately before an election: "In the 2000 election, genuine issue ads are rather evenly distributed throughout the year, while group-sponsored electioneering ads make a sudden and overwhelming appearance immediately before elections." Craig B. Holman and Luke P. McLoughlin, "Buying Time 2000: Television Adver-

tising in the 2000 Federal Elections" at 56 (2002); A.R. 2165. Similarly, the national party com-

mittees provided evidence that in 2004 the parties' coordinated activity took place within 60 days

of the relevant election. A.R. 2165. See A.R. 2113 (comments of NRCC: "[d]uring the 2004

election cycle, all coordinated expenditures made by the NRCC for the 2004 general election

were made within 60 days of the general election"); A.R. 2119-20 (similar comments of NRSC).

In response to the D.C. Circuit's second question, 414 F.3d at 102, the Commission

analyzed the CMAG data and other relevant evidence, and concluded that advertising for

presidential campaigns follows a different pattern than congressional races. Under the

Commission's 2002 regulations, the presidential general election coordinated communication

window effectively extended further back than 120 days before the general election because the

parties' presidential nominating conventions were also treated as elections under the fourth

content standard. Thus, as a practical matter, in 2004 the coordination regulations applied for

184 days before the general election for Republican candidates and 219 days for Democratic

candidates. A.R. 2166. Even with this extended period, however, in several states there was a

"gap period" between the primary elections and the start of the general election period — with

varying lengths depending upon the dates chosen by states for their primaries. The CMAG data

revealed that in media markets contained within individual "battleground" states, an appreciable

amount of advertising took place during the gap period. In these markets the Republican

presidential candidate spent almost $9.5 million on television ads during the gap period, or "14

percent of the total costs of media spots aired by the Republican Presidential candidate in those

media markets after the State primaries…. Democratic Presidential candidates spent $1,221,045

on post-primary television advertisements that occurred during the gap period." Id.

The Commission closed this gap for presidential campaigns in its revised content

standard. Under the revised rule, a communication will satisfy the fourth content standard for

presidential races if it takes place at any time beginning 120 days before the primary election up

through the date of the general election.

> According to the [CMAG] data, in the 2004 election cycle, over 99 percent of the
> estimated media spot spending by Presidential candidates in media markets fully
> contained within individual "battleground" States occurred during this time
> period. This time period is now fully covered by the Commission's revised
> content standard at 11 C.F.R. 109.21(c)(4).

A.R. 2166 (footnote omitted). See A.R. 2191-2200 (graphs reproduced in addendum). Thus, the

rule's distinct and lengthy time period for presidential races is entirely reasonable and supported

by substantial evidence. The CMAG data showed no similar pattern of "gap" spending by

congressional candidates.

In response to the D.C. Circuit's third question, 414 F.3d at 102, the Commission

reasonably concluded that the minimal value of advertising outside the revised timeframes limits

the risk that candidates and collaborators would shift their coordinated spending to earlier times.

The candidates' own spending pattern directly indicates the kind of advertising they believe to be

effective in influencing voters, and they have little incentive to ask outside groups to pay for

advertisements that they themselves find of minimal use. Although the Commission concluded

that the record "overwhelmingly support[s] a 60-day time frame for Congressional candidate

communications," its revised rule took a more cautious approach. A.R. 2167. "[I]n order to

foreclose the possibility that candidates and groups will shift spending outside the applicable

time frame, the Commission has determined to set the Congressional time frame at 90 days." Id.

The temporal element of the Commission's 2002 coordination regulation was in effect for

four years, and the instant rulemaking record contains no evidence that candidates and

collaborators engaged in increased unlawful coordination or shifted their coordinated activity

earlier in the election cycle to avoid the challenged rules' restrictions. Although some

commenters submitted examples of ads that were run outside 120 days, they presented no

evidence that they were coordinated with candidates. More generally, "[n]one of the commenters submitted any evidence that, during the recent election cycles during which the Commission's 2002 coordination rules were in effect, House or Senate candidates asked outside groups to run advertisements more than 90 days before House or Senate primary or general elections." A.R. 2168. Indeed, when the Commission specifically inquired about this issue at the rulemaking hearing, "these commenters acknowledged that there was no evidence that any of these advertisements had been coordinated with a candidate or a political party committee." A.R. 2167-68; A.R. 1617-18 (testimony of Paul Ryan); A.R. 1619 (testimony of Marc Elias). Likewise, none of the commenters who professed concern about the Commission's proposed rule suggested that they had filed any administrative complaints with the Commission alleging acts of coordination, or had even contemplated doing so. See generally A.R. 968-1007 (comments of Campaign Legal Center, Democracy 21, and Center for Responsive Politics). To the contrary, as the Commission explained in its E&J, "[s]ince the 2002 rule took effect, the Commission has received very few complaints alleging that House or Senate candidates or their agents coordinated with outside groups to produce or distribute communications that ran between 90 and 120 days before a House or Senate primary or general election." A.R. 2168.

Regarding the possibility that coordinated spending might shift outside the rule's time-frames, the Commission's judgment is entitled to particularly deferential review. "[A]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise' are entitled to 'particularly deferential' review as long as they are reasonable." Core Communications, Inc. v. Level 3 Communications, 455 F.3d 267, 282 (D.C. Cir 2006) (quoting Milk Industry Foundation v. Glickman, 132 F.3d 1467, 1478 (D.C. Cir. 1998)). "[T]he Commission's decisions must sometimes rest on judgment and prediction rather than pure factual determinations. In such cases complete factual support for the Commission's ultimate conclusions is

not required, since 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'" FCC v. WNCN Listeners Guild, 450 U.S. 582, 594-95 (1981) (quoting FCC v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 814 (1978)); accord Earthlink, Inc. v. FCC, 462 F.3d 1, 13 (D.C. Cir. 2006).

Here, the Commission necessarily must make predictions about how actors wishing to influence a federal election will behave in the future under a new regulatory regime.  The Commission reasonably made its judgment based on the available evidence of recent political advertising practices, its experience in this area, and its consideration of what incentives exist for such actors.  "[A]s long as they are reasonable, [agency predictive judgments] need not rest on 'pure factual determinations."  Earthlink, 462 F.3d at 13.  "Even if we were skeptical of the Commission's conclusion regarding existing regulatory controls, however, that conclusion embodies precisely the sort of prediction about the behavior of a regulated entity to which — in the absence of contrary evidence — we ordinarily defer.  As we have repeatedly observed, 'it is within the scope of the agency's expertise to make … a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.'"  Process Gas Consumers Group v. FERC, 292 F.3d 831, 838 (D.C. Cir. 2002) (quoting Envtl. Action, Inc. v. FERC, 939 F.2d 1057, 1064 (D.C. Cir. 1991)).[22] Indeed, there are circumstances where agency decisionmaking "is legislative in character ... where explicit factual findings are not possible, and the act of decision is essentially a prediction based upon pure legislative judgment, as when a Congressman decides to vote for or against a

---

[22]     For example, in Core Communications Inc., 455 F.3d at 281-82, the FCC decided to forbear enforcing growth caps for telecommunications bound for internet service providers.  The D.C. Circuit held that the FCC could reasonably rely on declining dial-up subscriber base data as a proxy to predict a decline in overall dial-up usage, despite not having specific data predicting overall declines in dial-up usage.  Id.  While petitioners explained that usage per dial-up subscriber could significantly increase because subscribers must remain online longer than broadband users to receive the same content, the Court ruled that the FCC's predictive judgment that there would be an overall decline in dial-up usage was entitled to deference.  Id.

particular bill." Industrial Union Dep't, AFL-CIO v. Hodgson, 499 F.2d 467, 474-75 (D.C. Cir. 1974). If the Commission's predictive judgments are not borne out, it can revisit whether the regulation needs to be amended to address unexpected changes in advertising patterns or attempts to circumvent the Act. See Earthlink, 462 F.3d at 13 (the agency "is fully capable of reassessing the situation if its predictions are not borne out"). "[W]e cannot require an agency to enter precise predictive judgments on all questions as to which neither its staff nor interested commenters have been able to supply certainty." American Public Communications Council v. Federal Communications Commission, 215 F.3d 51, 56 (D.C. Cir. 2000).

### 2. The Commission's Line Drawing Accommodates Core First Amendment Concerns and Does Not Compromise the Act

Longer timeframes or a less objective test could unnecessarily chill speech on public issues protected by the First Amendment. As the Commission explained, A.R. 2168:

> Retaining a longer time frame that is not supported by the record could potentially subject political speech protected under the First Amendment to Commission investigation. Subjecting activity to investigation that the evidence shows is unlikely to be for the purpose of influencing Federal elections could chill legitimate lobbying and legislative activity. As the Supreme Court has emphasized, where First Amendment rights are affected, "[p]recision of regulation must be the touchstone," Edenfield v. Fane, 507 U.S. 761, 777 (1993).

The D.C. Circuit agreed that the Commission could ensure that its rule gives breathing space for politicians to collaborate with outsiders on "legislative and political issues involving only a weak nexus to any electoral campaign," 414 F.3d at 99, and as the data discussed above demonstrate, advertising before the periods defined by the Commission likely has only a "weak nexus" (if any) to election day.[23]

---

[23]    During the Commission's 2002 rulemaking, plaintiffs agreed that the Commission should take care to avoid discouraging legitimate non-electoral collaboration. Plaintiffs commented "that a lobbying meeting between a group and a candidate should not trigger a finding that subsequent communication is coordinated." Comments of Shays and Meehan, at 5, October 11, 2002, submitted in Administrative Record in Shays I, filed on March 17, 2004.

The D.C. Circuit further approved the "FEC's effort to develop an 'objective, bright-line test [that] does not unduly compromise the Act's purposes,' considering that [the Court] approved just such a test for 'contribution' in Orloski." 414 F.3d at 99 (quoting 795 F.2d at 165). Indeed, Orloski is directly on point and supports the Commission's line drawing here. In that case, the Court recognized that Congress did not intend to "prohibit all corporate donations," id. at 163, and that the Act's

> purposes must be read against the clear statutory language that prohibits some corporate donations, but, by necessary implication, permits others. It becomes readily apparent upon reading the statute and its purposes in this way that Congress left a large gap between the obviously impermissible and the obviously permissible. This gap creates the potential for a broad range of differing interpretations of the Act....

Id. at 164. The Court then deferred to the Commission's interpretation, even though, "[c]learly, the FEC's interpretation is one of the most favorable to corporations and incumbents that the agency could have adopted." Id. at 165. Like the rule at issue here, the Commission's interpretation at issue in Orloski relied in part upon the express advocacy standard to create a bright-line definition to distinguish non-political congressional events from campaign events. See id. at 160. Most important, the Court explicitly noted the gray area — indeed, the overlap — between these two kinds of events: "any corporate funding of congressional events indirectly influences the election." Id. at 163 (emphasis added). In short, the Court did not require the Commission to regulate every bit of corporate spending that could in some way affect an election. The Commission is not required to maximize regulation; "no legislation pursues its purposes at all costs." United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 495 (D.C. Cir. 2004). Here, as advertising become more and more remote from the election, the likelihood of its influencing a federal election greatly diminishes, and the Commission's rule is reasonable even if a very small number of early, non-express-advocacy ads might have some speculative, minimal effect on an election.

The Orloski decision not only upheld the Commission's interpretation as reasonable, but also held that "[a]dministrative exigencies mandate that the FEC adopt an objective, bright-line test[,]… necessary to enable donees and donors to easily conform their conduct to the law and to enable the FEC to take the rapid, decisive enforcement action that is called for in the highly-charged political arena." 795 F.2d at 165. Those concerns are even more important here, where the activity at issue is actual speech to influence legislation, not simply corporate donations of food to a congressional event, as was the case in Orloski. Also, as in Orloski, the Commission was concerned that "disgruntled opponents" could "take advantage of a totality of the circumstances test to harass the sponsoring candidate and his supporters." A.R. 2168 (quoting Orloski, 795 F.2d at 165). Although the Commission sought comment on a standard that would use a "promote, attack, support, or oppose standard" ("PASO") criterion outside the pre-election period, "most commenters agreed that the Commission should continue to use a bright-line rule," and the Commission concluded that a PASO standard would not provide the "clearest guidance to those seeking to comply with the coordination regulations." A.R. 2170.

More generally, bright-line rules can satisfy APA review, even when they are underinclusive to some extent, because of the clarity and administrability they provide. In Flynn v. Commissioner of IRS, 269 F.3d 1064 (D.C. Cir. 2001), former IRS employees challenged a regulation allowing only current employees to bring a tax court action regarding retirement plan amendments. In Flynn, as here, Congress had expressly delegated the authority to define the specific scope of the statute at issue. Id. at 1070. The court held that the regulation was not arbitrary or capricious, despite the "categorical distinction between current and former employees" which did "not map perfectly" onto the relevant categories of interests. Id. The court noted that "regulatory simplicity and ease of administration" may have been among the "reasonable objectives" in crafting the regulatory scheme. Id. It found nothing precluding a rule

that "corresponds roughly" to the categories of employees affected by plan amendments and concluded that the agency's approach was not "unreasonably underinclusive." Id. at 1070-1071. Similarly, in Chen v. Ashcroft, 381 F.3d 221 (3rd Cir. 2004), the court upheld a Board of Immigration Appeals interpretation of a statutory definition of "persecution" to apply to spouses, but not fiancés or other non-spouses, of those forced to undergo abortions. The court stressed that the Board's "bright-line" rule using marital status as a "proxy" satisfied Chevron analysis in view of the Board's heavy workload and its "interest in promoting administrability and verifiability," noting that "a rule is not irrational just because it is underinclusive to some extent." Id. at 229-30.

The Commission's factual conclusions and line-drawing must be upheld if supported by substantial evidence, even if the agency could have reached another result. "Congress gave the Commission — not the [plaintiffs] or this Court — discretion in regulatory line-drawing. The mere fact that the Commission's exercise of its discretion resulted in a line that the [plaintiffs] would have drawn differently is not sufficient to make it unlawful." Covad Communications, 450 F.3d at 543. "An agency's conclusion 'may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.'" Sec'y of Labor, Mine Safety and Health Admin. v. Federal Mine Safety and Health Review Comm'n, 111 F.3d 913, 918 (D.C. Cir. 1997) (citation omitted).

The 90-day period for congressional races and 120-day period for presidential races (with the "gap period" closed) are reasonably drawn lines based on the comprehensive data from CMAG and other evidence in the record. The Commission determined that more than 99% of the spending for advertising run by Senate candidates was for ads run within 90 days of an election and more than 96% of the spending for ads run by House candidates was for ads run within 90 days of an election. A.R. 2165; FEC Fact 37-38. As discussed above, the data

indicate that little incentive exists to coordinate with candidates outside these time windows in light of the lack of interest that candidates have largely shown in advertising at those early times, and the Commission's predictive judgment on this is entitled to deference.  The Commission's enforcement docket indicates that early coordination has not occurred to any great extent since the regulation has been in effect, and no evidence of any kind was presented during the rulemaking about a single coordinated expenditure outside these windows.  A.R. 2168.  When an agency's decision is supported by this kind of substantial evidence, that is the end of the Court's inquiry:  "[t]his sensibly deferential standard of review does not allow us to reverse reasonable findings and conclusions, even if we would have weighed the evidence differently."  Sec'y of Labor v. Keystone Coal Mining Corp., 151 F.3d 1096, 1104 (D.C. Cir. 1998).  See also Chrysler Corp. v. U.S. EPA, 631 F.2d 865, 890 (D.C. Cir. 1980) ("This court may not displace the Administrator's 'choice between two fairly conflicting views,' even if we 'would justifiably have made a different choice had the matter been before (us) de novo.'") (citation omitted).  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992) ("The court should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence").  Accord Hagelin v. FEC, 411 F.3d 237, 243 (D.C. Cir. 2005).

Plaintiffs' brief rests largely on the unremarkable proposition (Br. at 12-26) that a very small percentage of election-related ads have been broadcast outside the regulation's timeframes.  But whenever a line is drawn, events will occur on both sides of it; otherwise, the line would serve no purpose.  "The proper Chevron inquiry is not whether the agency construction can give rise to undesirable results in some instance … but rather whether, in light of the alternatives, the agency construction is reasonable."  Barnhart v. Thomas, 540 U.S. 20, 29 (2003).  Plaintiffs' impractical alternative appears to be a blurry line that would capture so much speech that genuine legislative debate and lobbying would be chilled, while serving no significant anti-

corruption purpose beyond what the Commission's regulation already accomplishes.

The statistics discussed above derive from a systematic, unbiased review of the vast majority of broadcast advertising paid for by candidates during an entire election cycle.  See supra pp. 36-40; infra pp. 49-52.  Indeed, the data set includes well in excess of half a million airings of television ads.  FEC Fact ¶ 35.  Although some commenters provided the Commission with anecdotal evidence about several dozen ads, no commenter even attempted to provide a systematic overview akin to what the CMAG data reveal.  Plaintiffs' strategy of applying a magnifying glass to a small number of unusual ads, while wearing blinders to the vast mainstream of election ads, is little more than a distracting distortion.  None of the ads highlighted by plaintiffs that were run less than a decade ago was alleged, by either the plaintiffs or any other party during the rulemaking, to involve coordinated spending.  Thus, what plaintiffs present is tantamount to a list of worst-case hypothetical examples, but they do not suffice to substitute their policy preferences for the Commission's.  See Ohio v. Akron Center for Reproductive Health, 497 U.S. 502, 514 (1990) (plurality opinion) (provision should not be invalidated "on a facial challenge based upon a worst-case analysis that may never occur"); Florida League of Professional Lobbyists v. Meggs, 87 F.3d 457, 461 (11th Cir. 1996) ("As for the League's hypothesized, fact-specific worst case scenarios, we also decline to accept the facial challenge based on these perceived problems.").[24]

---

[24]    Plaintiffs rely almost exclusively upon a cherry-picked collection of press reports (Plaintiffs' Exhibits ("PX") 18-131) that describe radio and television ads based on statements from campaigns or campaign press releases.  See, e.g., Br. at 22 n.23 (citing PX 54, a report based on what campaign "told" press); id. (PX 70 "according to a Oct. 6 press release [ad] went on the air").  On their face, these press releases are inherently unreliable because they are based on statements from campaigns and often merely reflect their hopes or goals for the future.  See PX 76 ("plans to run later this week").  Other press accounts acknowledge the advertisements' anomaly; for example, one press article describing the 2004 Illinois Senate Race notes that the ad it describes was "believed to be earlier than any other candidate [ad] in Illinois history."  PX 61.

Finally, plaintiffs also argue (Br. 26-31) that the content regulation is too narrow because, outside the 90/120-day periods, it only covers republication of campaign materials and express advocacy communications.  It is true that <u>McConnell</u> upheld BCRA's electioneering communication provision in part because the Court found that the "magic words" interpretation of express advocacy was not constitutionally required and did little to capture the electoral advocacy that filled the airwaves in the 60 days before the general election.  However, Congress made a deliberate decision to continue to rely upon express advocacy in other contexts.  <u>See</u> 2 U.S.C. 431(17)(B).[25]  The Commission's regulation interpreting "express advocacy" is broader than the "magic words" approach, <u>see</u> 11 C.F.R. 100.22(b), and the Commission's coordinated regulation reaches well beyond express advocacy during the 90 days before an election.  Thus, given the rarity of early candidate ads, the breadth of section 100.22(b), the relevant timeframes far ahead of the election (when subtle ads without express advocacy are less likely to be under-stood as election ads), and the coverage of all republished campaign materials, the regulation will capture the overwhelming majority of electorally significant advocacy that occurs far before the election, without unnecessarily chilling protected speech and association during that period.[26]

---

[25]    Express advocacy remains a part of the definition of independent expenditure for <u>all</u> non-broadcast communications at all times, and even for broadcast communications outside the timeframes of the electioneering communication provision.  <u>See</u> 2 U.S.C. 431(17)(A), 434(f)(3).

[26]    In a footnote, plaintiffs state (at 11-12 n.13) that they are also challenging another aspect of the coordination rule:  that a communication must clearly identify a candidate or political party to satisfy the content standard.  Plaintiffs fail, however, to include any argument in this footnote, so any claim on this point has been waived.  <u>Terry v. Reno</u>, 101 F.3d 1412, 1415 (D.C. Cir. 1996) (reference to issue without briefing constitutes waiver).  In any event, if no party or candidate is even identified in an ad, an electoral, rather than legislative purpose is highly unlikely.  Congress did not include any such ads in its definition of electioneering communication, nor did it suggest that such ads be considered by the Commission during its coordinated expenditure rulemaking.  Moreover, no evidence of any such coordinated ads was submitted to the Commission during the actual rulemaking.

C.      **The Commission's Reliance on the CMAG Data Is Not Arbitrary and Capricious and Did Not Violate the APA**

1.      **The CMAG Data Are Comprehensive and Reliable**

Plaintiffs argue (Br. 34-37) that the Commission's use of the CMAG data is arbitrary and capricious because of various alleged flaws, but similar CMAG data were relied upon by the Supreme Court in McConnell and provide substantial evidence for the Commission's rule. In particular, plaintiffs complain that the CMAG data include only television advertising purchased by candidates and do not include certain multi-state markets. However, whatever limits the CMAG data have are inconsequential, and none of the flaws plaintiffs allege undermines the usefulness of the data or the Commission's reliance upon this comprehensive information. In its findings of fact in McConnell, this Court explained that "no evidence has been presented that the data is biased in one way or the other based on the fact that CMAG does not cover 20 percent of American households or local cable channels." 251 F.Supp.2d at 583 (Kollar-Kotelly). The same is true here.

As explained supra pp. 35-38, the focus of the D.C. Circuit's questions was on the pattern of candidate advertising, and that is exactly what the CMAG data captured.[27] CMAG captures information from more than 560 television broadcasters, but it does not include every small broadcaster or any radio stations.[28] From a statistical perspective, however, what matters is whether there is any reason to believe that the data is unrepresentative or skewed. In other words, plaintiffs have presented no evidence to suggest that if additional data had been captured,

---

[27]     The CMAG data did not include the contents of the ads themselves, so obtaining data about ads purchased by non-candidates would not have provided information about whether such ads mentioned candidates, or if so, in what context. As explained supra pp. 35-38, however, evidence from McConnell and testimony in this rulemaking from the national party committees suggest that the pattern of spending by interest groups and political parties is similar to that of candidate spending.

[28]     Although CMAG provided only a limited number of ads from 2003, they were requested by the Commission and provided where available. A.R. 2187 (from DVD open "CMAG_READ_ME" file). Because certain states do not have any media markets among the 101 tracked by CMAG, not all states or races are included in the CMAG data.

the overall pattern of spending would have looked any different in a way that would undercut the Commission's conclusions.  See Segar v. Smith, 738 F.2d 1249, 1276-77 (D.C. Cir. 1984) (where there was no reason to believe that among experienced personnel one racial group was more likely to possess certain prior work experience, it did not matter that a statistical analysis failed to control for that qualification).

Moreover, no commenter, including the plaintiffs, presented any comprehensive data comparable to CMAG data during the rulemaking, and plaintiffs have not questioned the accuracy of the data itself.

> But unquantified, speculative, and theoretical objections to the proffered statistics are properly given little weight by the trial court:
>
>> When a plaintiff submits accurate statistical data, and a defendant alleges that relevant variables are excluded, defendant may not rely on hypothesis to lessen the probative value of plaintiff's statistical proof.  Rather, defendant … must either rework plaintiff's statistics incorporating the omitted factors or present other proof undermining plaintiff's claims.

Trout v. Lehman, 702 F.2d 1094, 1102 (D.C. Cir. 1983), vacated on other grounds, 465 U.S. 1056 (1984) (quoting Segar v. Civiletti, 508 F. Supp. 690, 712 (D.D.C. 1981)).  The plaintiffs here have done nothing to "rework" the CMAG data nor did they present any other proof to the Commission that contradicts it.

As the D.C. Circuit has also recognized, the "appropriate degree of refinement of [a] statistical analysis … may depend upon the quality and control of the available data."  Id., 702 F.3d at 1101.  Thus, for example, CMAG simply does not collect data from radio broadcasting as it does from television, so such information was not available to the Commission — just as it was unavailable to the Supreme Court in McConnell when it upheld the electioneering communication provision.  There is simply no evidence in the record that the pattern of electoral advocacy on radio is significantly different from television, let alone that it is significantly more likely to take place early in the election cycle and to avoid the use of express advocacy.  An

agency "may compensate for a shortage of data through use of other qualitative methods, including reasonable extrapolation." Lignite Energy Council v. EPA, 198 F.3d 930, 934 (D.C. Cir. 1999). Of course, regarding the possibility that patterns of broadcast advertising may change in response to the coordination regulation, no data about the future can yet exist. "Where existing methodology or research … is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information." Industrial Union Dep't, AFL-CIO v. Hodgson, 499 F.2d at 474 n.18 (citation omitted). Thus, if "insufficient data is presently available to make a fully informed factual determination[,] [d]ecision making must in that circumstance depend to a greater extent upon policy judgments and less upon purely factual analysis." Id. at 474.

For the presidential races, the Commission limited its analysis to the media markets contained within the 21 most highly contested "battleground" states. A.R. 2166 n.21. By focusing on such states, the Commission actually took a statistically conservative approach because such states would be presumed to have the most advertising, even if they are not representative of the entire nation.[29] Although plaintiffs complain (Br. 35-36) that this approach did not include a couple of important states, plaintiffs did not submit any of their own data from these locations or attempt to show that the key percentages would change overall if more states were included in the analysis; not surprisingly, for example, plaintiffs do not even acknowledge that the percentages of early advertising would likely drop if non-battleground states were added to the data. More generally, plaintiffs present no analysis of the existing data that would suggest that there is any significant variation in the timing of advertising from state to state. In any

---

[29] The Commission omitted several battleground states that did not have their media markets contained within their respective borders because there would have been no simple way to match broadcasts to particular state primary elections when those broadcasts reached more than one state.

event, plaintiffs' criticism about the presidential race data has no bearing on the congressional

races, where the CMAG data was not limited to battleground states.

Finally, plaintiffs argue (Br. 31) that the Commission ignored "examples of early

advertising before it," but there is no requirement in administrative law that an agency's

explanation for its decision must recite or discuss each piece of evidence, whether supportive or

adverse, that formed part of the record.  See United States v. Pierce Auto Freight Lines, Inc.,

327 U.S. 515, 529 (1946) ("the Commission is not compelled to annotate to each finding the

evidence supporting it"); cf. BellSouth Corp. v. FCC, 162 F.3d 1215, 1224 (D.C. Cir. 1999) ("the

agency is not required to author an essay for the disposition of each application") (quoting

KCST-TV, Inc. v. FCC, 699 F.2d 1185, 1191-92 (D.C. Cir. 1983)).  The Commission is entitled

to a presumption of regularity in its administrative decisionmaking, see, e.g., Hercules, Inc. v.

EPA, 598 F.2d 91, 123 (D.C. Cir. 1978), and it is clear from the extensive record that the

Commission in fact reviewed the relevant and available evidence.

> **2.    The Commission's Use of the CMAG Data Did Not Violate the Procedural Requirements of the APA**

Although plaintiffs' complaint (¶ 38) appeared to allege that the Commission's use of the

CMAG data violated the procedural requirements of the APA, plaintiffs abandoned that claim in

their brief when they (Br.  33) "put[] to one side the Commission's [allegedly] improper last-

minute procedures" to consider the CMAG data in the rulemaking.  In any event, any such

argument has no basis in fact or law.  The supplemental data were obtained after the public was

invited to submit data in response to the original NRPM.  When no one submitted such data, the

Commission sought and obtained such information from an outside vendor.  While the formal

supplemental comment period was seven days (from March 15 through March 22, 2006),

commenters actually had nine days (from March 13, the day the Commission published the

notice on its website, until March 22, 2006).  Neither plaintiffs nor anyone else requested

additional time to comment on the data, so they have waived the right to complain about that now. Covad Communications, 450 F.3d at 548-50. Moreover, nine other sets of comments were submitted, while plaintiffs chose to submit nothing. The fact that others commented is a strong indication that the notice was adequate.[30]

"Agencies may develop additional information in response to public comments and rely on that information without starting anew 'unless prejudice is shown.'" Personal Watercraft Industry Ass'n v. Department of Commerce, 48 F.3d 540, 544 (D.C. Cir. 1995) (citation omitted). "The party objecting has the burden of 'indicat[ing] with "reasonable specificity" what portions of the documents it objects to and how it might have responded if given the opportunity.'" Id. (citations omitted); see also West Virginia v. EPA, 362 F.3d 861, 869 (D.C. Cir. 2004). Plaintiffs have the data that is now before the Court, yet they offer no explanation about the nature of the comments they would have made during the rulemaking if given more time; that silence is dispositive. "The short of the matter is that petitioners have identified no relevant information they might have supplied had they anticipated [the agency's] final rule. We therefore hold that [the agency] complied with the notice and comment requirements." Ass'n of Battery Recyclers, Inc., 208 F.3d at 1059.

**D.    The "Common Vendor" and "Former Employee" Conduct Standards Are Not Arbitrary and Capricious**

The fourth and fifth conduct standards address common vendors and former employees of candidates or political parties and were originally promulgated in 2002 as part of the BCRA rulemaking. 11 C.F.R. 109.21(d)(4), (5). During the rulemaking necessitated by the Shays I

---

[30]    See A.R. 2052-56 (comments of Chamber of Commerce); A.R. 2057-59 (comments of Alliance for Justice); A.R. 2060-61 (comments of Internal Revenue Service); A.R. 2062-65 (comments of DNC); A.R. 2066-68 (comments of DSCC and DCCC); A.R. 2069-2110 (comments of Democracy 21, Campaign Legal Center, Center for Responsive Politics); A.R. 2111-13 (comments of NRCC); A.R. 2114-17 (comments of Center for Competitive Politics); A.R. 2118-21 (comments of NRSC).

remand, the Commission re-evaluated these rules based on their application in practice and reasonably concluded, as explained in the E&J, that the temporal limit in these standards should be more carefully tailored to reflect the actual marketplace for political consultants and employees. A.R. 2175-76. Under the revised rule, these conduct standards apply whenever a commercial vendor or former employee performs work for a candidate or party, and then continues for another 120 days.

This regulation reaches beyond people who act as agents of a candidate or political party, because agents "would already be covered by the first three conduct standards at 11 CFR 109.21(d)(1) through (d)(3)." A.R. 2174-75. See also 11 C.F.R. 109.20(a); A.R. 2179 (technical amendment). Although the Commission considered eliminating the common vendor and former employee standard entirely and limiting the conduct standard to persons vested with agency authority, it decided that broader coverage was appropriate to ensure that improper coordination does not take place through the conduct of a former employee or common vendor. A.R. 2175.

Contrary to plaintiffs' characterization (Br. 40), the revised regulation does not "shrink" the relevant time period to a "mere 120-day window," but instead includes any time when the common vendor is actively "common" between the organizations or candidate and then contin-ues for 120 days after the last day of the most recent employment or provision of services. A.R. 2175. If an employee leaves a candidate's or party's employment and later performs additional work after employment has terminated, the last day when work is performed restarts the 120-day clock. Thus, the covered time period is inevitably longer than 120 days and in some cases much longer. Indeed, if a vendor begins working for a candidate as soon as that person announces his or her candidacy, and continues working for that candidate until at least 120 days before the election, then the regulation in practice applies to that vendor for the entire election cycle.

Commenters raised numerous problems with the 2002 version of this rule.  In practice, the earlier version functioned as an extended cooling off period and caused substantial harm to individuals who were essentially blacklisted and could not obtain further employment for extended periods of time.  Indeed, one commenter noted that the ethics rules in Congress only limit subsequent employment for one year, and no other such ethics rule has a time period even close to the potential length of this rule — six years in the case of Senate election cycles.  A.R. 2175; A.R. 1867-68.  "These commenters stated that the rule had a 'chilling effect' on the retention of consultants and employees because organizations want to avoid the speculative allegations of improper coordination."  A.R. 2175; A.R. 875 (comments of Ellen Malcolm on behalf of EMILY's List:  "entire election cycle creates significant and unnecessary legal risks for individuals"); A.R. 765 (comments of NRSC: explaining "heavy process penalty" for an alleged violation).  Commenters described the significant interviewing and investigative burden associated with hiring commercial vendors, who can be in short supply, especially in smaller markets.  A.R. 2175.  Some commercial vendors felt compelled under the prior rule to refuse work from political committees early in an election cycle in order to preserve their ability to work for a political party or candidate as the election approaches.  Id.

The Commission reasonably concluded that the 120-day rule will not undermine the effectiveness of the conduct standards or lead to circumvention of the Act.  There was testimony that material information that could be the basis of a coordinated expenditure has a very short "shelf life" in politics.  A.R. 2175.  Witnesses explained how campaign information from a primary election tends to be irrelevant in a general election that usually has a very different focus.  A.R. 1852, 2176.  Also, similar to the rationale that underlies the Commission's polling regulations (which have never been challenged), national and local events tend to render

campaign plans and strategy obsolete on a fairly rapid basis.  A.R. 2176.  <u>See</u> 11 C.F.R. 106.4(g) (after 61 days, polling information retains only 5% of its value).

Plaintiffs argue (Br. 41) that the 120-day period is arbitrary and that the Commission failed to explain why it is departing from the longer period in its earlier rule.  All line drawing, however, is inherently arbitrary in some sense.  <u>See</u> <u>Boyce Motor Lines v. United States</u>, 342 U.S. 337, 340-41 (1952); <u>see also</u> <u>American Public Communications Council</u>, 215 F.3d at 56 ("Any figure that it might have chosen ... would likely be challenged); <u>Covad Communications Co.</u>, 450 F.3d at 543.  Here, as explained above, the Commission explained why it was adopting a time period tied to when a vendor's or employee's work actually took place, rather than a one-size-fits-all approach.  Contrary to plaintiffs' claim (Br. 42) that this was an "unexplained about-face," this rule is consistent with the goals of the prior rulemaking, where the Commission stated that it was not attempting to "create any prohibition on the use of common vendors" and did not seek to "unduly intrud[e] into existing business practices."  68 Fed. Reg. 436.  The Commission has merely fine-tuned its rule to meet its earlier goal more precisely, with the benefit of evidence from its enforcement experience regarding how the prior rule functioned in practice.[31]

E.    **The Firewall Conduct Regulation Is Not Arbitrary and Capricious**

The firewall safe harbor provision in 11 C.F.R. 109.21(d) is a reasonable means of accommodating the right of political parties and other political committees to make unlimited independent expenditures, while simultaneously safeguarding against unlawful coordinated expenditures.  The regulation provides that an expenditure is not coordinated if a vendor, former employee, or political committee creates an effective firewall, which is a barrier erected within

---

[31]    Plaintiffs' reliance (Br. 42) on <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.</u>, 463 U.S. 29 (1983), is misplaced.  That case did not involve a revised calibration of a time period, but a total rescission of car safety regulation.  Here, although the Commission considered rescinding the common vendor and former employee provisions and relying solely upon the inclusion of "agents" for this kind of activity, it declined to do so.  In any event, the Commission's reasoning satisfies the "reasoned analysis" requirement of <u>State Farm</u>, <u>id.</u> at 42.

an organization to bifurcate staff so as to prevent the flow of information from one set of staffers to the other.  With this barrier in place, staffers that are shielded from certain information conveyed by a candidate to others within the same organization may plan, produce, and distribute independent expenditures relating to that candidate, because they do not have access to the information needed to satisfy any of the "conduct" prong.  To qualify for the safe harbor, the firewall must be designed and implemented to prohibit the flow of relevant information between those employees or consultants providing services to the person or entity paying for the communication and those employees or consultants who currently provide, or previously provided, services for the candidate or a political party committee.  A.R. 2177-78.

The Supreme Court has held that political party committees (and most others) have a constitutional right to make unlimited independent expenditures.  Colorado Repub. Fed. Campaign Comm. v. FEC, 518 U.S. 604, 614, 618 (1996) ("Constitution … grants to individuals, candidates, and ordinary political committees the right to make unlimited independent expenditures").  See also McConnell, 540 U.S. at 213-214.  The Act also permits political party committees to make coordinated expenditures up to certain limits on behalf of their candidates, 2 U.S.C. 441a(d), along with direct contributions to those candidates, 2 U.S.C. 441a(a).  Because there is inherent tension between these two rights, the Commission adopted the firewall provision to provide guidance to political party committees seeking to exercise their rights to make both unlimited independent expenditures and limited coordinated expenditures in a manner that ensures the coordinated expenditure limits are not exceeded.

Despite plaintiffs' deeply flawed assertions (Br. 44-46), the specific requirements of the firewall safe harbor are demanding.  Any firewall must actually be effective:  it must be established before any information has been shared between relevant employees, and described in a written policy that is distributed to all employees, consultants, and clients affected by the

policy before those employees begin work on the communication referencing the candidate or political party.  11 C.F.R. 109.21(h)(2).  "Relevant employees" includes all employees or consultants actually providing services to the person paying for the communication or the candidate or political party committee.  Most importantly, the safe harbor will not apply if there is any specific information indicating that, despite the firewall, material information has passed through it.  A.R. 2178.

Contrary to plaintiffs' assertions (Br. 44, 46), an organization cannot take advantage of the firewall safe harbor by "simply alleg[ing] that it has an internal 'firewall,'" and the Commission will not simply "take an accused party's word."  As the E&J makes perfectly clear, the Commission will, as it does in every enforcement matter, review the evidence presented by both the accuser and the accused, and weigh the credibility and specificity of any allegation of coordination against the credibility and specificity of the facts presented in the response showing that the elements of the safe harbor are satisfied.  A.R. 2177-78.  An entity seeking to use the firewall safe harbor must be "prepared to provide reliable information (e.g., affidavits) about an organization's firewall, and how and when the firewall policy was distributed and implemented."  A.R. 2178.  If an organization cannot meet its burden of proof and the Commission determines that the firewall was inadequately designed or was breached after its creation, the organization will not be able to avail itself of the safe harbor, and the Commission may find reason to believe that a violation of the Act has taken place and investigate.  See 2 U.S.C. 437g(a)(2).

Plaintiffs also complain (Br. 45) that the Commission failed to provide adequate "guidance to the regulated community as to what actually constitutes an 'effective' firewall."  However, as explained above, the Commission has specified the basic requirements of a firewall, indicated how it should be structured and implemented, and provided an example (see A.R. 2177, discussing MUR 5506).  The Commission believes that one size does not fit all when it

comes to firewalls, and firewalls will be more effective when they are established and implemented in light of an organization's own particular needs. Furthermore, it is not the Commission's proper role to micromanage the internal workings of political organizations. In light of these considerations, however, any group seeking to take advantage of the firewall bears the burden of showing that its firewall was properly implemented and functioned effectively. See Perot v. FEC, 97 F.3d 553, 559-60 (D.C. Cir. 1996) (under the Commission's debate regulations, an organization has "leeway to decide which specific criteria to use" in selecting candidates for debates, but it "runs the risk the FEC will subsequently determine that it ... violated [the law]"). If any organization is unsure whether its firewall is adequate, it can seek an advisory opinion from the Commission. Id. (organization "acts at its peril, unless it first secures an FEC advisory opinion pursuant to 2 U.S.C. § 437f").

Finally, plaintiffs argue that the Commission previously rejected a safe harbor proposal in 2003. Br. 43 (citing 68 Fed. Reg. 437). Contrary to plaintiffs' assertions, the proposal put forward by two commenters during the 2003 rulemaking was not "identical" to the new rule. The 2003 proposal contemplated a common vendor signing an agreement promising to maintain the confidentiality of information received from a client. The Commission rejected the proposal because it determined not to presume coordination based on the mere presence of a common vendor. 68 Fed. Reg. 437. In other words, when no presumption exists, there is no need to rebut it. The firewall provision, moreover, concerns the internal workings of a single organization that has the right to make both independent and coordinated expenditures, and therefore needs to separate personnel who work within the organization. Thus, the 2003 proposal and firewall safe harbor are simply not comparable and, contrary to plaintiffs' argument (Br. 46), there has been no "abrupt shift" in the Commission's policy. The Commission's mechanism for enforcement is clear: organizations may establish firewalls that satisfy the new regulation, but if they fail to

abide by its criteria or the firewall fails, the Commission will pursue whatever enforcement action is necessary.

## CONCLUSION

For the reasons set out above, this Court should grant the Commission's motion for summary judgment and deny plaintiffs' motion for summary judgment.

Respectfully submitted,

/s/ Lawrence H. Norton
Lawrence H. Norton
General Counsel

/s/ Richard B. Bader
Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

/s/ David Kolker
David Kolker
Assistant General Counsel
(D.C. Bar # 394558)

/s/ Vivien Clair
Vivien Clair
Attorney

/s/ Greg J. Mueller
Greg J. Mueller
Attorney
(D.C. Bar # 462840)

January 19, 2007                    FOR THE DEFENDANT
                                    FEDERAL ELECTION COMMISSION
                                    999 E Street, N.W.
                                    Washington, D.C. 20463
                                    (202) 694-1650

<u>Shays and Meehan v. FEC</u>, 06-CV-1247 (CKK)

# Addendum

(Submitted in support of FEC's Motion For Summary Judgment and
Opposition To Plaintiffs' Motion For Summary Judgment)

A.R. Pages 2191-2223



**P1 - Total Number of Media Spots Airing During Entire Presidential Election Cycle – Democratic Party Presidential Candidates**

**Number of Media Spots**

**Days Before General Election**

Day Zero is 11/2/2004, the 2004 General Election Date

Rep Nat'l Conv 8/30-9/2 (-64 to -61)

Dem Nat'l Conv 7/26-7/29 (-99 to -96)

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep,
6/6 (-149) HI-Rep,
PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep,
UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep,
ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep,
MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem,
VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS,
TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem,
GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem,
UT-Dem
2/28 (-248) AS-Rep,
VI-Rep
3/2 (-245) CA, CT, GA, MD, MA,
MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem,
DE-Dem, MO, NM-Dem,
ND, OK, SC-Dem

Shays v. FEC,
06-CV-1247 (CKK),
A.R. Page:
2191



**P2 - Total Estimated Cost of Media Spots Airing During Entire Presidential Election Cycle – Democratic Party Presidential Candidates**

**Estimated Cost of Media Spots (in dollars)**

**Days Before General Election**

**Day Zero is 11/2/2004, the 2004 General Election Date**

**Rep Nat'l Conv** 8/30-9/2 (-64 to -61)

**Dem Nat'l Conv** 7/26-7/29 (-99 to -96)

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WV-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MH-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem

**Shays v. FEC, 06-CV-1247 (CKK), A.R. Page: 2192**

# P3 - Total Number of Media Spots Airing During Entire Presidential Election Cycle – Republican Party Presidential Candidates



**Number of Media Spots**

**Days Before General Election**

| Dem Nat'l Conv 7/26-7/29 (-99 to -96) | Rep Nat'l Conv 8/30-9/2 (-64 to -61) | Day Zero is 11/2/2004, the 2004 General Election Date |
|---|---|---|

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem

# P4 - Total Estimated Cost of Media Spots Airing During Entire Presidential Election Cycle – Republican Party Presidential Candidates



**Estimated Cost of Media Spots (in dollars)**

**Days Before General Election**

**Dem Nat'l Conv** 7/26-7/29 (-99 to -96)

**Rep Nat'l Conv** 8/30-9/2 (-64 to -61)

**Day Zero is 11/2/2004, the 2004 General Election Date**

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WV-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem



**P5 - Total Number of Media Spots Airing During Entire Presidential Election Cycle – Other Party Presidential Candidate**

Number of Media Spots

Days Before General Election

Day Zero is 11/2/2004, the 2004 General Election Date

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

**Primary/Caucus/Conv. 210 to 181 Days Before General Election**
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

**Primary/Caucus/Conv. 240 to 211 Days Before General Election**
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

**Primary/Caucus/Conv. 270 to 241 Days Before General Election**
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

**Primary/Caucus/Conv. 294 to 271 Days Before General Election**
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem

**Shays v. FEC, 06-CV-1247 (CKK), A.R. Page: 2195**



P6 - Total Estimated Cost of Media Spots Airing During Entire Presidential Election Cycle – Other Party Presidential Candidates

Estimated Cost of Media Spots (in dollars)

Days Before General Election

Day Zero is 11/2/2004, the 2004 General Election Date

Primary/Caucus/Conv. 150 to 121 Days Before General Election
6/5 (-150) VA-Rep
6/6 (-149) HI-Rep, PR-Dem
6/8 (-147) MT, NJ

Primary/Caucus/Conv. 180 to 151 Days Before General Election
5/8 (-178) AZ-Rep, UT-Rep, WY-Rep
5/11 (-175) NE, WV
5/15 (-171) DE-Rep, ME-Rep
5/18 (-168) AR, KY, OR
5/22 (-164) AK-Rep, MI-Rep
5/23 (-163) NC-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

Primary/Caucus/Conv. 210 to 181 Days Before General Election
4/13 (-203) CO
4/17 (-199) NC-Dem, VI-Dem
4/24 (-192) KS-Rep
4/27 (-189) PA
5/1 (-185) NV-Rep
5/4 (-182) IN

Primary/Caucus/Conv. 240 to 211 Days Before General Election
3/8 (-239) AS-Dem
3/9 (-238) FL, LA, MS, TX, WA-Rep
3/13 (-234) KS-Dem
3/16 (-231) IL
3/20 (-227) AK-Dem, GU-Dem, WY-Dem
3/27 (-220) SC-Rep

Primary/Caucus/Conv. 270 to 241 Days Before General Election
2/7 (-269) MI-Dem, WA-Dem
2/8 (-268) ME-Dem
2/10 (-266) DC-Rep, TN, VA-Dem
2/14 (-262) DC-Dem, NV-Dem
2/17 (-259) WI
2/21 (-255) GU-Rep
2/24 (-252) HI-Dem, ID-Dem, UT-Dem
2/28 (-248) AS-Rep, VI-Rep
3/2 (-245) CA, CT, GA, MD, MA, MN, NY, OH, RI, VT

Primary/Caucus/Conv. 294 to 271 Days Before General Election
1/13 (-294) DC
1/19 (-288) IA
1/27 (-280) NH
2/3 (-273) AZ-Dem, DE-Dem, MO, NM-Dem, ND, OK, SC-Dem

Shays v. FEC, 06-CV-1247 (CKK), A.R. Page: 2196



# P7 - Number of Media Spots Airing On or Before Presidential Primary / Caucus / Convention in All Media Markets Fully Contained within a Single "Battleground" State*

**Number of Media Spots**

Day Zero is all Primary/Caucus/Convention Dates

**Days Before Primary/Caucus/Convention**

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 50.25% |
| 0 - 60 | 78.87% |
| 0 - 90 | 87.46% |
| 0 - 120 | 91.56% |
| 0 - 150 | 96.67% |
| 0 - 180 | 98.58% |
| Total Count: | 45,474 |

* The Media Markets fully contained within a single "Battleground" State are: Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

**Shays v. FEC, 06-CV-1247 (CKK), A.R. Page: 2197**



P8 - Estimated Cost of Media Spots Airing On or Before Presidential Primary / Caucus / Convention in All Media Markets Fully Contained within a Single "Battleground" State*

Estimated Cost of Media Spots (in dollars)

Days Before Primary/Caucus/Convention

Day Zero is all Primary/Caucus/ Convention Dates

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 52.63% |
| 0 - 60 | 85.15% |
| 0 - 90 | 93.38% |
| 0 - 120 | 95.11% |
| 0 - 150 | 98.24% |
| 0 - 180 | 99.64% |
| Total Cost: | $16,411,945.00 |

* The Media Markets fully contained within a single "Battleground" State are: Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

# P9 - Number of Media Spots Airing On or Before Presidential General Election in All Media Markets Fully Contained within a Single "Battleground" State*



**Number of Media Spots**

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 32.35% |
| 0 - 60 | 51.91% |
| 0 - 90 | 58.95% |
| 0 - 120 | 69.33% |
| 0 - 150 | 76.83% |
| 0 - 180 | 84.92% |
| 0 - 210 | 93.64% |
| 0 - 240 | 99.93% |
| **Total Count:** | 204,688 |

**Days Before General Election**

Day Zero is 11/2/2004, the 2004 General Election Date

| Dem Nat'l Conv 7/26-7/29 (-99 to -96) | Rep Nat'l Conv 8/30-9/2 (-64 to -61) |
|---|---|

Primary/Caucus/Conv. 294 to 271 Days Before General Election
1/19 (-288) IA
2/3 (-273) AZ-Dem

Primary/Caucus/Conv. 270 to 241 Days Before General Election
2/7 (-269) MI-Dem, WA-Dem
2/17 (-259) WI
3/2 (-245) OH

Primary/Caucus/Conv. 240 to 211 Days Before General Election
3/9 (-238) FL, WA-Rep

Primary/Caucus/Conv. 210 to 181 Days Before General Election
4/13 (-203) CO
4/27 (-189) PA
5/1 (-185) NV-Rep

Primary/Caucus/Conv. 180 to 151 Days Before General Election
5/8 (-178) AZ-Rep
5/18 (-168) AR
5/22 (-164) MI-Rep

* The Media Markets fully contained within a single "Battleground" State are: Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Wilkes-Barre, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

# P10 - Estimated Cost of Media Spots Airing On or Before Presidential General Election in All Media Markets Fully Contained within a Single "Battleground" State*



**Estimated Cost of Media Spots (in dollars)**

**Days Before General Election**

Day Zero is 11/2/2004, the 2004 General Election Date

Rep Nat'l Conv 8/30-9/2 (-64 to -61)

Dem Nat'l Conv 7/26-7/29 (-99 to -96)

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 37.17% |
| 0 - 60 | 57.91% |
| 0 - 90 | 63.96% |
| 0 - 120 | 73.38% |
| 0 - 150 | 79.90% |
| 0 - 180 | 88.94% |
| 0 - 210 | 95.25% |
| 0 - 240 | 99.96% |

**Total Cost:**    $172,307,036.00

Primary/Caucus/Conv. 294 to 271 Days Before General Election
1/19 (-288) IA
2/3 (-273) AZ-Dem

Primary/Caucus/Conv. 270 to 241 Days Before General Election
2/7 (-269) MI-Dem, WA-Dem
2/17 (-259) WI
3/2 (-245) OH

Primary/Caucus/Conv. 240 to 211 Days Before General Election
3/9 (-238) FL, WA-Rep

Primary/Caucus/Conv. 210 to 181 Days Before General Election
4/13 (-203) CO
4/27 (-189) PA
5/1 (-185) NV-Rep

Primary/Caucus/Conv. 180 to 151 Days Before General Election
5/8 (-178) AZ-Rep
5/18 (-168) AR
5/22 (-164) MI-Rep

* The Media Markets fully contained within a single "Battleground" State are:   Phoenix, AZ; Tucson, AZ; Little Rock, AR; Colorado Spring, CO; Ft. Myers, FL; Miami, FL; Orlando, FL; Tampa, FL; West Palm Beach, FL; Cedar Rapids, IA; Des Moines, IA; Detroit, MI; Flint, MI; Grand Rapids, MI; Las Vegas, NV; Cleveland, OH; Columbus, OH; Harrisburg, PA; Johnstown, PA; Seattle, WA; Madison, WI; Milwaukee, WI.

# PRESIDENTIAL GRAPHS – NOTES

**Election Cycle Graphs**

- The general election date, 11/2/04, is represented on the x-axis as day "0".

- Any data for media spots paid for by a Presidential candidate on the general election ballot that aired on or before the general election are represented on the graphs. The data for each such media spot appears on the graphs in relation to the general election date (day "0").

- The dates of each primary/caucus/convention are listed below each graph. These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted. The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.

**Media Markets Fully Contained within a Single "Battleground" State Graphs**

- The TNS Media Intelligence/CMAG ("CMAG") data lists a "Media Market" for each media spot paid for by a Presidential candidate.

- CMAG Media Markets correspond to *Nielsen Media Group* Designated Market Areas ("DMAs"), *available at* www.nielsenmeida.com/DMAs.html.

- Many DMAs extend into multiple States. The CMAG data for media spots in these DMAs do not specify which State's primary/caucus/convention is relevant for any given media spot.

- In order to isolate data geographically limited to "Battleground" States, a list of DMAs contained within a single State was compared against a list of the "Battleground" States in the 2004 Presidential election, resulting in a list of 23 single-State DMAs in 11 "Battleground" States. The relevant primary/caucus/convention for any media spots paid for by a Presidential candidate in any of these single-State DMAs is assumed to be the primary/caucus/convention of the single State within that DMA.

- 49% of the total number of media spots in the CMAG data, and 54% of the total estimated cost, paid for by Presidential candidates are represented on the Media Markets Fully Contained within a Single "Battleground" State graphs.

Primary/Caucus/Convention Graphs

- Because primaries/caucuses/conventions are held on several different dates, in order to compare media spots aired before each primary/caucus/convention, the primary/caucus/convention date in each of the 11 "Battleground" States is represented on the x-axis as day "0".

- For example, the Ohio primary was held on 3/2/04 and the Pennsylvania primary was held on 4/27/04. Both of these primaries are represented as day "0" on the graph. Accordingly, a media spot that aired in Ohio on 2/21/04 (10 days before the Ohio primary) would be represented on the graph at day "– 10". Similarly, a media spot that aired in Pennsylvania on 4/17/04 (10 days before the Pennsylvania primary) would also appear on the graph at day "–10".

- Every Democratic Party and Republican Party Presidential candidate was assumed to be on the candidate list for every Presidential caucus and Presidential convention.

- Any data for media spots paid for by a Presidential candidate on a primary ballot (or assumed to be on a caucus/convention candidate list) that aired in a Media Market that is fully contained within a single "Battleground" State on or before that primary/caucus/convention date are represented on the graphs. The data for each such media spot appears on the graphs in relation to that primary/caucus/convention date (day "0").

- Any data for media spots paid for by "Other" Party Presidential candidates are not represented on the graphs.

General Election Graphs

- The general election date, 11/2/04, is represented on the x-axis as day "0".

- Any data for media spots paid for by a Presidential candidate on a general election ballot that aired in a Media Market that is fully contained within a single "Battleground" State on or before the general election date, but after that candidate's primary/caucus/convention dates, are represented on the graphs. The data for each such media spot appears on the graphs in relation to the general election date (day "0").

- The dates of each primary/caucus/convention in the 11 "Battleground" States are listed below each graph. These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted. The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.

- Any data for media spots paid for by "Other" Party Presidential candidates are not represented on the graphs.

Presidential Graphs – Notes
Page 3 of 6

List of Media Markets Fully Contained within a Single "Battleground" State

| DMA | State |
|-----|-------|
| Phoenix | AZ |
| Tucson | AZ |
| Little Rock | AR |
| Colorado Spring | CO |
| Ft. Myers | FL |
| Miami | FL |
| Orlando | FL |
| Tampa | FL |

| DMA | State |
|-----|-------|
| West Palm Beach | FL |
| Cedar Rapids | IA |
| Des Moines | IA |
| Detroit | MI |
| Flint | MI |
| Grand Rapids | MI |
| Las Vegas | NV |
| Cleveland | OH |

| DMA | State |
|-----|-------|
| Columbus | OH |
| Harrisburg | PA |
| Johnstown | PA |
| Wilkes-Barre | PA |
| Seattle | WA |
| Madison | WI |
| Milwaukee | WI |

Presidential Graphs – Notes
Page 4 of 6

List of DMAs Contained Within a Single State

- A list of DMAs that are fully-contained within a single State was determined from *Warren Communications News, Inc.* at http://warren.365media.com/warren/Searchasp?d=155.
- **Note.** Although the CMAG data lists Manchester, NH, as a separate Media Market (television station WMUR), *Nielsen Media Group* does not have a Manchester DMA; WMUR is in the Boston DMA.

| | DMA | States with counties within DMA |
|---|---|---|
| 1 | Albany, NY | MA, NY, VT |
| 2 | Albuquerque, NM | AZ, CO, NM |
| 3 | Atlanta, GA | AL, GA |
| 4 | **Austin, TX** | **TX** |
| 5 | Baltimore, MD | MD |
| 6 | Baton Rouge, LA | LA, MS |
| 7 | **Birmingham, AL** | **AL** |
| 8 | Boston, MA | MA, NH, VT |
| 9 | Buffalo, NY | NY, PA |
| 10 | Burlington, VT | NH, NY, VT |
| 11 | Cedar Rapids, IA | IA |
| 12 | **Champaign, IL** | **IL** |
| 13 | Charleston, WV | KY, OH, WV |
| 15 | Charlotte, NC | NC, SC, VA |
| 16 | Chattanooga, TN | GA, NC, TN |
| 17 | Chicago, IL | IL, IN |
| 18 | Cincinnati, OH | IN, KY, OH |
| 19 | **Cleveland, OH** | **OH** |
| 20 | **Colorado Springs, CO** | **CO** |
| 21 | **Columbia, SC** | **SC** |
| 22 | **Columbus, OH** | **OH** |
| 23 | **Dallas, TX** | **TX** |
| 24 | Davenport, IA | IL, IA |
| 25 | Dayton, OH | IN, OH |

| | DMA | States with counties within DMA |
|---|---|---|
| 26 | Denver, CO | CO, NE, SD, WY |
| 27 | **Des Moines, IA** | **IA** |
| 28 | **Detroit, MI** | **MI** |
| 29 | El Paso, TX | NM, TX |
| 30 | Evansville, | IL, IN, KY |
| 31 | **Flint, MI** | **MI** |
| 32 | **Fresno, CA** | **CA** |
| 33 | **Ft. Myers, FL** | **FL** |
| 34 | **Grand Rapids, MI** | **MI** |
| 35 | Green Bay, WI | MI, WI |
| 36 | Greensboro, NC | NC, VA |
| 37 | Greenville, SC | GA, NC, SC |
| 38 | **Harrisburg, PA** | **PA** |
| 39 | **Hartford, CT** | **CT** |
| 40 | **Honolulu, HI** | **HI** |
| 41 | **Houston, TX** | **TX** |
| 42 | Huntsville, AL | AL, TN |
| 43 | **Indianapolis, IN** | **IN** |
| 44 | **Jackson, MS** | **MS** |
| 45 | Jacksonville, FL | FL, GA |
| 46 | **Johnstown, PA** | **PA** |
| 47 | Kansas City, KS/MO | KS, MO |
| 48 | Knoxville, TN | KY, TN |
| 49 | **Las Vegas, NV** | **NV** |

Presidential Graphs – Notes
Page 5 of 6

| | DMA | States with counties within DMA |
|---|---|---|
| 50 | **Lexington, KY** | **KY** |
| 51 | **Little Rock, AR** | **AR** |
| 52 | **Los Angeles, CA** | **CA** |
| 53 | Louisville, KY | IN, KY |
| 54 | **Madison, WI** | **WI** |
| 55 | Memphis, TN | AR, MI, MO, TN |
| 56 | **Miami, FL** | **FL** |
| 57 | **Milwaukee, WI** | **WI** |
| 58 | Minneapolis, MN | MN, WI |
| 59 | Mobile, AL | AL, FL |
| 60 | Nashville, TN | KY, TN |
| 61 | New Orleans, LA | LA, MS |
| 62 | New York, NY | CT, NJ, NY, PA |
| 63 | Norfolk, VA | NC, VA |
| 64 | **Oklahoma City, OK** | **OK** |
| 65 | Omaha, NE | IA, MO, NE |
| 66 | **Orlando, FL** | **FL** |
| 67 | Paducah, KY | IL, KY, MO, TN |
| 68 | Philadelphia, PA | DE, NJ, PA |
| 69 | **Phoenix, AZ** | **AZ** |
| 70 | Pittsburgh, PA | MD, PA, WV |
| 71 | Portland, ME | ME, NH |
| 72 | Portland, OR | OR, WA |
| 73 | Providence, RI | MA, RI |
| 74 | Raleigh, NC | NC, VA |
| 75 | **Richmond, VA** | **VA** |

| | DMA | States with counties within DMA |
|---|---|---|
| 76 | **Roanoke, VA** | **VA** |
| 77 | **Rochester, NY** | **NY** |
| 78 | **Sacramento, CA** | **CA** |
| 79 | Salt Lake City, UT | ID, NV, UT, WY |
| 80 | **San Antonio, TX** | **TX** |
| 81 | **San Diego, CA** | **CA** |
| 82 | **San Francisco, CA** | **CA** |
| 83 | Savannah, GA | GA, SC |
| 84 | **Seattle, WA** | **WA** |
| 85 | Shreveport, LA | AR, LA, OK, TX |
| 86 | South Bend, IN | IN, MI |
| 87 | Spokane, WA | ID, MT, OR, WA |
| 88 | Springfield, MO | AR, MO |
| 89 | St. Louis, MO | IL, MO |
| 90 | **Syracuse, NY** | **NY** |
| 91 | **Tampa, FL** | **FL** |
| 92 | Toledo, OH | MI, OH |
| 93 | Tri-Cities, TN | KY, TN, VA |
| 94 | **Tucson, AZ** | **AZ** |
| 95 | Tulsa, OK | KS, OK |
| 96 | **Waco, TX** | **TX** |
| 97 | Washington, DC | DC, MD, PA, VA, WV |
| 98 | **West Palm Beach, FL** | **FL** |
| 99 | Wichita, KS | KS, NE |
| 100 | **Wilkes-Barre, PA** | **PA** |
| 101 | Youngstown, OH | OH, PA |

Presidential Graphs – Notes
Page 6 of 6

List of "Battleground" States

• A list of "Battleground" States was determined from the following sources: *Cook Political Report*, (http://www.cookpolitical.com/column/2004/021704.php); *ABC News/Washington Post* (http://www.abcnews.go.com/sections/us/WorldNewsTonight/battlegrounds_poll_040422.html); *National Journal* (http://nationaljournal.com/members/campaign/2004/swingstates/); *Wall Street Journal/Zogby International* (http://online.wsj.com/public/resources/documents/info-battleground04-print.html).

| "Battleground" States | |
|---|---|
| Arizona | Ohio |
| Arkansas | Oregon |
| Colorado | Pennsylvania |
| Florida | Tennessee |
| Iowa | Washington |
| Louisiana | West Virginia |
| Maine | Wisconsin |
| Michigan | |
| Minnesota | |
| Missouri | |
| Nevada | |
| New Hampshire | |
| New Mexico | |
| North Carolina | |

# 2004 PRESIDENTIAL PRIMARY DATES

Establishing the date for a Presidential Primary, and determining the type of Presidential Primary held, varies from State to State. This is due to differences in State statutes, party constitutions, party rules and regulations, party by-laws, and delegate selection plans. In some States, a Caucus and/or Convention may be held instead of a Presidential Primary Election. Other states may use a combination of both Caucuses and Primaries for delegate selection. This State-by-State variation should be kept in mind when examining this listing of dates for the 2004 Presidential Primaries.

| STATE | PRIMARY DATE | CAUCUS DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Alabama | 6/1 | | | 154 |
| Alaska | | 3/20 (D) | 5/21-5/22 (R) | 227 164 |
| American Samoa [1] | | 3/8 (D) 2/28 (R) | | 239 248 |
| Arizona | 2/3 (D) | 5/8 (R) | | 273 178 |
| Arkansas | 5/18 | | | 168 |
| California | 3/2 | | | 245 |
| Colorado | | 4/13 | | 203 |
| Connecticut | 3/2 | | | 245 |
| Delaware | 2/3 (D) | | 5/14-5/15 (R) | 273 171 |
| D.C. | 1/13 | 2/10 (R) 2/14 (D) | | 294 266 262 |
| Florida | 3/9 | | | 238 |
| Georgia | 3/2 | | | 245 |
| Guam [1] | | 3/20 (D) | 2/21 (R) | 227 255 |
| Hawaii | | 2/24 (D) | 6/4-6/6 (R) | 252 149 |
| Idaho | 5/25 | 2/24 (D) | | 161 252 |
| Illinois | 3/16 | | | 231 |
| Indiana | 5/4 | | | 182 |
| Iowa | | 1/19 | | 288 |
| Kansas | | 3/13 (D) | 4/24 (R) | 234 192 |
| Kentucky | 5/18 | | | 168 |
| Louisiana | 3/9 | | | 238 |
| Maine | | 2/8 (D) 5/15 (R) | | 268 171 |
| Maryland | 3/2 | | | 245 |
| Massachusetts | 3/2 | | | 245 |
| Michigan | | 2/7 (D) 5/21-5/22 (R) | | 269 164 |
| Minnesota | | 3/2 | | 245 |
| Mississippi | 3/9 | | | 238 |
| Missouri | 2/3 | | | 273 |

| STATE | PRIMARY DATE | CAUCUS DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Montana | 6/8 | | | 147 |
| Nebraska | 5/11 | | | 175 |
| Nevada | | 2/14 (D) | | 262 |
| | | | 4/29-5/1 (R) | 185 |
| New Hampshire | 1/27 | | | 280 |
| New Jersey | 6/8 | | | 147 |
| New Mexico | 6/1 | | | 154 |
| | | 2/3 (D) | | 273 |
| New York | 3/2 | | | 245 |
| North Carolina | | 4/17 (D) | | 199 |
| | | | 5/21-5/23 (R) | 163 |
| North Dakota | | 2/3 | | 273 |
| Ohio | 3/2 | | | 245 |
| Oklahoma | 2/3 | | | 273 |
| Oregon | 5/18 | | | 168 |
| Pennsylvania | 4/27 | | | 189 |
| Puerto Rico [1] | | 6/6 (D) | | 149 |
| Rhode Island | 3/2 | | | 245 |
| South Carolina | 2/3 (D) | | | 273 |
| | | | 3/27 (R) | 220 |
| South Dakota | 6/1 | | | 154 |
| Tennessee | 2/10 | | | 266 |
| Texas | 3/9 | | | 238 |
| Utah [2] | 2/24 (D) | | | 252 |
| | | | 5/8 (R) | 178 |
| Vermont | 3/2 | | | 245 |
| Virginia | 2/10 (D) | | | 266 |
| | | | 6/5 (R) | 150 |
| Virgin Islands [1] | | 4/17 (D) | | 199 |
| | | 2/28 (R) | | 248 |
| Washington | | 2/7 (D) | | 269 |
| | | 3/9 (R) | | 238 |
| West Virginia | 5/11 | | | 175 |
| Wisconsin | 2/17 | | | 259 |
| Wyoming | | 3/20 (D) | | 227 |
| | | | 5/8 (R) | 178 |

**Notes:**
1. Presidential General Elections are not held in American Samoa, Guam, Puerto Rico and the Virgin Islands.
2. In Utah, whether a Presidential Primary Election is held is dependent upon funding by the legislature, which did not occur for 2004. Consequently, the Utah State Democratic Party scheduled a party-run Presidential preference primary for 2/24/04.



S1 - Total Number of Media Spots Airing On or Before Senate Primary/Caucus/Convention

Number of Media Spots

Days Before Primary/Caucus/Convention

Day Zero is all Primary/Caucus/Convention Dates

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 69.01% |
| 0 - 60 | 91.60% |
| 0 - 90 | 99.13% |
| 0 - 120 | 99.47% |
| 0 - 150 | 99.95% |
| 0 - 180 | 100.00% |
| Total Count: | 89,096 |

Shays v. FEC,
06-CV-1247 (CKK),
A.R. Page:
2209



S2 - Total Estimated Cost of Media Spots Airing On or Before Senate Primary Election/Caucus/Convention

Estimated Cost of Media Spots (in dollars)

Days Before Primary/Caucus/Convention

Day Zero is all Primary/Caucus/Convention Dates

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 75.19% |
| 0 - 60 | 93.32% |
| 0 - 90 | 99.34% |
| 0 - 120 | 99.55% |
| 0 - 150 | 99.95% |
| 0 - 180 | 100.00% |
| Total Cost: | $47,303,049 |

Shays v. FEC,
06-CV-1247 (CKK),
A.R. Page:
2210



# S3 - Total Number of Media Spots Airing On or Before Senate General Election

**Number of Media Spots**

**Days Before General Election**

Day Zero is 11/2/2004, the 2004 General Election Date

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 69.87% |
| 0 - 60 | 94.73% |
| 0 - 90 | 99.61% |
| 0 - 120 | 99.72% |
| 0 - 150 | 99.73% |
| 0 - 180 | 100.00% |

Total Count: 149,310

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/6 (-180) SC-Other
5/8 (-178) CT, UT, VA-Dem
5/10 (-176) CT
5/11 (-175) NE, WV
5/15 (-171) CT-Rep, KS-Other, VA
5/18 (-168) AR, KY, OR
5/22 (-164) CT-Rep, UT-Other, VA
5/25 (-161) MI-Other
5/24 (-162) CT-Rep
5/22 (-163) ID
5/4 (-182) AL, NM, SD

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) MI-Other
6/8 (-147) IA, ME, MT, NJ, ND, SC, VA
6/22 (-133) UT

**Primary/Caucus/Conv. 120 to 91 Days Before General Election**
7/20 (-105) GA, NC
7/27 (-98) OK
8/3 (-91) KS, MI, MO

**Primary/Caucus/Conv. 90 to 61 Days Before General Election**
8/5 (-89) TN
8/10 (-84) CO, CT
8/17 (-77) WY
8/24 (-70) AK
8/31 (-63) FL

**Primary/Caucus/Conv. 60 to 31 Days Before General Election**
9/4 (-59) GU
9/7 (-56) AZ, NV
9/11 (-52) DE, VI
9/14 (-49) DC, MA MN, NH, NY, RI, VT, WA, WI
9/18 (-45) HI

**Primary/Caucus/Conv. 181+ Days Before General Election**
11/9/03 (-359) PR
3/6 (-241) KS-Other
3/13 (-234) TX-Other
3/16 (-231) IL
4/17 (-199) MI-Other, UT-Other
4/27 (-189) PA
5/2 (-184) SSC-Other
3/2 (-245) CA, MD, OH
3/9 (-238) MS, TX
3/14 (-233) UT-Other
3/20 (-227) TX-Other
4/24 (-173) IN-Other, SC-Other
5/1 (-185) WV-Other
5/4 (-182) IN

Shays v. FEC,
06-CV-1247 (CKK),
AER Page:
2211

# S4 - Total Estimated Cost of Media Spots Airing On or Before Senate General Election

**Estimated Cost of Media Spots (in dollars)**



Day Zero is 11/2/2004, the 2004 General Election Date

**Days Before General Election**

| Days to Election | Percentage |
| --- | --- |
| 0 - 30 | 74.47% |
| 0 - 60 | 97.20% |
| 0 - 90 | 99.85% |
| 0 - 120 | 99.91% |
| 0 - 150 | 99.91% |
| 0 - 180 | 100.00% |

**Total Cost:** $106,454,740

**Primary/Caucus/Conv. 60 to 31 Days Before General Election**
9/4 (-59) GU
9/7 (-56) AZ, NV
9/11 (-52) DE, VI
9/14 (-49) DC, MA
MN, NH, NY, RI,
VT, WA, WI
9/18 (-45) HI

**Primary/Caucus/Conv. 90 to 61 Days Before General Election**
8/5 (-89) TN
8/10 (-84) CO, CT
8/17 (-77) WY
8/24 (-70) AK
8/31 (-63) FL

**Primary/Caucus/Conv. 120 to 91 Days Before General Election**
7/20 (-105) GA, NC
7/27 (-98) OK
8/3 (-91) KS, MI, MO

**Primary/Caucus/Conv. 181+ Days Before General Election**
11/9/03 (-359) PR          3/2 (-245) CA, MD, OH
3/6 (-241) KS-Other       3/9 (-238) MS, TX
3/13 (-234) TX-Other      3/14 (-233) UT-Other
3/16 (-231) IL            3/20 (-227) TX-Other
4/17 (-199) MI-Other, UT-Other   4/24 (-173) IN-Other, SC-Other
4/27 (-189) PA            5/1 (-185) WV-Other
5/2 (-184) SSC-Other      5/4 (-182) IN

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) SC-Other
6/8 (-147) IA, ME, MT,
NJ, ND, SC, VA
6/22 (-133) UT

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/6 (-180) SC-Other
5/8 (-178) CT, UT, VA-Dem
5/10 (-176) CT
5/11 (-175) NE, WV
5/15 (-171) CT-Rep,
KS-Other, VA
5/18 (-168) AR, KY, OR
5/22 (-164) CT-Rep,
UT-Other, VA
5/25 (-163) MI-Other
5/27 (-... ) CT-Rep
5/28 (... ) ID
5/... (...) AL, NM, SD

Senate Graphs – Notes
Page 1 of 1

## SENATE GRAPHS – NOTES

### Primary/Caucus/Convention Graphs

- Because primaries/caucuses/conventions are held on several different dates, in order to compare media spots aired before each primary/caucus/convention, the primary/caucus/convention date is represented on the x-axis as day "0".

- For example, the Ohio primary was held on 3/2/04 and the Pennsylvania primary was held on 4/27/04. Both of these primaries are represented as day "0" on the graph. Accordingly, a media spot that aired in Ohio on 2/21/04 (10 days before the Ohio primary) would be represented on the graph at day "– 10". Similarly, a media spot that aired in Pennsylvania on 4/17/04 (10 days before the Pennsylvania primary) would also appear on the graph at day "–10".

- Any data for media spots paid for by a Senate candidate on a primary ballot, or caucus/convention candidate list, that aired on or before that primary/caucus/convention date are represented on the graphs. The data for each such media spot appear on the graphs in relation to that primary/caucus/convention date (day "0").

- Any candidate identified both as either a Democratic or Republican Party candidate *and* as an Other party candidate was treated as only a Democratic or Republican Party candidate with respect to primaries/caucuses/conventions.

### General Election Graphs

- The general election date, 11/2/04, is represented on the x-axis as day "0".

- Any data for media spots paid for by a Senate candidate on the general election ballot that aired on or before the general election date, but after that candidate's primary/caucus/convention date, are represented on the graphs. The data for each such media spot appear on the graphs in relation to the general election date (day "0").

- The dates of each primary/caucus/convention are listed below each graph. These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted. The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.

- Two States held "primary runoff" elections (SC on 6/22/04 and GA on 8/10/04). Any data regarding media spots aired after these States' primary dates (SC on 6/9/04 and GA on 7/20/04), but before these States' primary "runoff" dates, are not represented on the graphs.

Shays v. FEC,
06-CV-1247 (CKK),
A.R. Page:
2213

## 2004 CONGRESSIONAL PRIMARY DATES
Note:  **S** Indicates Senate Election

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Alabama | S | 6/1 | | 154 |
| Alaska | S | 8/24 | | 70 |
| American Samoa[1] | | n/a | | |
| Arizona | S | 9/7 | | 56 |
| Arkansas | S | 5/18 | | 168 |
| California | S | 3/2 | | 245 |
| Colorado | S | 8/10 | | 84 |
| Connecticut | S | 8/10 | | 84 |
| | | | 5/10 (D) | 176 |
| | | | 5/10 (R) District 4 | 176 |
| | | | 5/15 (R) Districts 2, 3 | 171 |
| | | | 5/22 (R) District 5 | 164 |
| | | | 5/24 (R) District 1 | 162 |
| Delaware | | 9/11 | | 52 |
| D.C. | | 9/14 | | 49 |
| Florida | S | 8/31 | | 63 |
| Georgia | S | 7/20 | | 105 |
| Guam | | 9/4 | | 59 |
| Hawaii | S | 9/18 | | 45 |
| Idaho | S | 5/25 | | 161 |
| Illinois | S | 3/16 | | 231 |
| Indiana | S | 5/4 | | 182 |
| | | | 4/24 (Other) | 192 |
| Iowa | S | 6/8 | | 147 |
| Kansas | S | 8/3 | | 91 |
| | | | 3/6 (Other) | 241 |
| | | | 5/15 (Other) | 171 |
| Kentucky | S | 5/18 | | 168 |
| Louisiana[2] | S | n/a | | |
| Maine | | 6/8 | | 147 |
| Maryland | S | 3/2 | | 245 |
| Massachusetts | | 9/14 | | 49 |
| Michigan | | 8/3 | | 91 |
| | | | 4/17 (Other) | 199 |
| | | | 5/23 (Other) | 163 |
| | | | 6/5 (Other) | 150 |
| Minnesota | | 9/14 | | 49 |
| Mississippi | | 3/9 | | 238 |
| Missouri | S | 8/3 | | 91 |
| Montana | | 6/8 | | 147 |
| Nebraska | | 5/11 | | 175 |
| Nevada | S | 9/7 | | 56 |
| New Hampshire | S | 9/14 | | 49 |
| New Jersey | | 6/8 | | 147 |

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| New Mexico | | 6/1 | | 157 |
| New York | S | 9/14 | | 49 |
| North Carolina | S | 7/20 | | 105 |
| North Dakota | S | 6/8 | | 147 |
| Ohio | S | 3/2 | | 245 |
| Oklahoma | S | 7/27 | | 98 |
| Oregon | S | 5/18 | | 168 |
| Pennsylvania | S | 4/27 | | 189 |
| Puerto Rico | | 11/9/03 | | 359 |
| Rhode Island | | 9/14 | | 49 |
| South Carolina | S | 6/8 | | 147 |
| | | | 4/24 (Other) | 192 |
| | | | 5/6 (Other) | 180 |
| South Dakota | S | 6/1 | | 154 |
| Tennessee | | 8/5 | | 89 |
| Texas | | 3/9 | | 238 |
| | | | 3/13 (Other) Districts 7, 16, 18, 20, 29, 30, 32 | 234 |
| | | | 3/20 (Other) All Remaining Districts | 227 |
| Utah [3] | S | 6/22 | | 133 |
| | | | 5/8 (D),  (R) | 178 |
| | | | 5/22 (Other) | 164 |
| | | | 3/14 (Other) | 233 |
| | | | 4/17 (Other) | 199 |
| Vermont | S | 9/14 | | 49 |
| Virginia [4] | | 6/8 | | 147 |
| | | | 5/8 (D) District 5 | 178 |
| | | | 5/15 (D) Districts 1, 6, 7, 9, 10 | 171 |
| | | | 5/15 (R) Districts 3, 8 | 171 |
| | | | 5/22 (D) District 4 | 164 |
| | | | 5/22 (R) District 9 | 164 |
| Virgin Islands | | 9/11 | | 52 |
| Washington | S | 9/14 | | 49 |
| West Virginia | | 5/11 | | 175 |
| | | | 5/1 (Other) | 185 |
| Wisconsin | S | 9/14 | | 49 |
| Wyoming | | 8/17 | | 77 |

**Notes:**
1.  In American Samoa, no Primary Election was held.  A General Election was held on 11/2/04.
2.  In Louisiana, no Primary Election was held.  The election for candidates seeking Federal office is the General Election, which was held on 11/2/04.  A General Runoff Election was held on 12/4/04.
3.  In Utah, nominating Conventions are held by the parties prior to the Primary.
4.  In Virginia, parties may choose to nominate candidates by Convention rather than by Primary.



**H1 - Total Number of Media Spots Airing On or Before House Primary/Caucus/Convention**

**Number of Media Spots**

**Days Before Primary/Caucus/Convention**

Day Zero is all Primary/Caucus/Convention Dates

| Days to Election | Percentage |
|---|---|
| 0 - 30 | 80.21% |
| 0 - 60 | 88.16% |
| 0 - 90 | 91.44% |
| 0 - 120 | 97.26% |
| 0 - 150 | 98.92% |
| 0 - 180 | 99.06% |
| Total Count: | 35,205 |



# H2 - Total Estimated Cost of Media Spots Airing On or Before House Primary/Caucus/Convention

**Estimated Cost of Media Spots (in dollars)**

**Days Before Primary/Caucus/Convention**

Day Zero is all Primary/Caucus/ Convention Dates

| Days To Election | Percentage |
|---|---|
| 0 - 30 | 84.65% |
| 0 - 60 | 92.68% |
| 0 - 90 | 96.21% |
| 0 - 120 | 99.00% |
| 0 - 150 | 99.58% |
| 0 - 180 | 99.66% |
| **Total Cost:** | **$17,253,099** |



# H3 - Total Number of Media Spots Airing On or Before House General Election

**Number of Media Spots**

Day Zero is 11/2/2004, the 2004 General Election Date

**Days Before General Election**

| Days To Election | Percentage |
|---|---|
| 0 - 30 | 77.77% |
| 0 - 60 | 98.09% |
| 0 - 90 | 99.72% |
| 0 - 120 | 99.84% |
| 0 - 150 | 99.96% |
| 0 - 180 | 99.98% |

Total Count: 131,665

**Primary/Caucus/Conv. 60 to 31 Days Before General Election**
9/4 (-59) GU
9/7 (-56) AZ, NV
9/11 (-52) DE, VI
9/14 (-49) DC, MA
MN, NH, NY, RI,
VT, WA, WI
9/18 (-45) HI

**Primary/Caucus/Conv. 90 to 61 Days Before General Election**
8/5 (-89) TN
8/10 (-84) CO, CT
8/17 (-77) WY
8/24 (-70) AK
8/31 (-63) FL

**Primary/Caucus/Conv. 120 to 91 Days Before General Election**
7/20 (-105) GA, NC
7/27 (-98) OK
8/3 (-91) KS, MI, MO

**Primary/Caucus/Conv. 181+ Days Before General Election**
11/9/03 (-359) PR
3/6 (-241) KS-Other
3/13 (-234) TX-Other
3/16 (-231) IL
4/17 (-199) MI-Other, UT-Other
4/27 (-189) PA
5/2 (-184) SSC-Other
3/2 (-245) CA, MD, OH
3/9 (-238) MS, TX
3/14 (-233) UT-Other
3/20 (-227) TX-Other
4/24 (-173) IN-Other, SC-Other
5/1 (-185) WV-Other
5/4 (-182) IN

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) MI-Other
6/8 (-147) IA, ME, MT,
NJ, ND, SC, VA
6/22 (-133) UT

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/6 (-180) SC-Other
5/8 (-178) CT, UT, VA-Dem
5/10 (-176) CT
5/11 (-175) NE, WV
5/15 (-171) CT-Rep,
KS-Other, VA
5/18 (-168) AR, KY, OR
5/22 (-164) CT-Rep,
UT-Other, VA
5/23 (-163) MI-Other
5/24 (-162) CT-Rep
5/26 (-161) ID
6/1 (-158) AL, NM, SD

# H4 - Total Estimated Cost of Media Spots Airing On or Before House General Election




**Estimated Cost of Media Spots (in dollars)**

Day Zero is 11/2/2004, the 2004 General Election Date

**Days Before General Election**

| Days to Election | Percentage |
| --- | --- |
| 0 - 30 | 83.58% |
| 0 - 60 | 98.75% |
| 0 - 90 | 99.87% |
| 0 - 120 | 99.92% |
| 0 - 150 | 99.99% |
| 0 - 180 | 100.00% |

**Total Cost:** $91,892,310.00

**Primary/Caucus/Conv. 60 to 31 Days Before General Election**
9/4 (-59) GU
9/7 (-56) AZ, NV
9/11 (-52) DE, VI
9/14 (-49) DC, MA MN, NH, NY, RI, VT, WA, WI
9/18 (-45) HI

**Primary/Caucus/Conv 90 to 61 Days Before General Election**
8/5 (-89) TN
8/10 (-84) CO, CT
8/17 (-77) WY
8/24 (-70) AK
8/31 (-63) FL

**Primary/Caucus/Conv. 120 to 91 Days Before General Election**
7/20 (-105) GA, NC
7/27 (-98) OK
8/3 (-91) KS, MI, MO

**Primary/Caucus/Conv. 181+ Days Before General Election**
11/9/03 (-359) PR
3/6 (-241) KS-Other
3/13 (-234) TX-Other
3/16 (-231) IL
4/17 (-199) MI-Other, UT-Other
4/27 (-189) PA
5/2 (-184) SSC-Other
3/2 (-245) CA, MD, OH
3/9 (-238) MS, TX
3/14 (-233) UT-Other
3/20 (-227) TX-Other
4/24 (-173) IN-Other, SC-Other
5/1 (-185) WV-Other
5/4 (-182) IN

**Primary/Caucus/Conv. 150 to 121 Days Before General Election**
6/5 (-150) MI-Other
6/8 (-147) IA, ME, MT, NJ, ND, SC, VA
6/22 (-133) UT

**Primary/Caucus/Conv. 180 to 151 Days Before General Election**
5/6 (-180) SC-Other
5/8 (-178) CT, UT, VA-Dem
5/10 (-176) CT
5/11 (-175) NE, WV
5/15 (-171) CT-Rep, KS-Other, VA
5/18 (-168) AR, KY, OR
5/22 (-164) CT-Rep, UT-Other, VA
5/23 (-163) MI-Other
5/24 (-162) CT-Rep
5/25 (-161) ID
6/1 (-154) AL, NM, SD

Shays v. FEC, 06-CV-1247 (CKK), A.R. Page: 2219

# HOUSE GRAPHS – NOTES

## Primary/Caucus/Convention Graphs

- Because primaries/caucuses/conventions are held on different dates, in order to compare media spots aired before each primary/caucus/convention, the primary/caucus/convention date is represented on the x-axis as day "0".

- For example, the Ohio primary was held on 3/2/04 and the Pennsylvania primary was held on 4/27/04. Both of these primaries are represented as day "0" on the graph. Accordingly, a media spot that aired in Ohio on 2/21/04 (10 days before the Ohio primary) would be represented on the graph at day "– 10". Similarly, a media spot that aired in Pennsylvania on 4/17/04 (10 days before the Pennsylvania primary) would also appear on the graph at day "–10".

- Any data for media spots paid for by a House candidate on a primary ballot, or caucus/convention candidate list, that aired on or before that primary/caucus/convention date are represented on the graphs. The data for each such media spot appear on the graphs in relation to that primary/caucus/convention date (day "0").

- "Special elections" were held in five States in 2003 and 2004. Three of these were held before that State's primary (HI, TX, KY) and two were held on the same date as that State's primary (SD, NC). Any data for media spots paid for by candidates on the ballot for these "special elections" appear on the graphs in relation to these States' primary election dates (day "0").

| State | Special Election Date | Primary Election Date | Days Before Primary Election |
|-------|----------------------|----------------------|------------------------------|
| HI | 1/4/03 | 9/18/04 | 623 |
| TX | 5/3/03 | 3/9/04 | 311 |
| | 6/3/03 | | 280 |
| KY | 2/17/04 | 5/18/04 | 91 |
| SD | 6/1/04 | 6/1/04 | 0 |
| NC | 7/20/04 | 7/20/04 | 0 |

- Any candidate identified both as either a Democratic or Republican Party candidate *and* as an Other party candidate was treated as only a Democratic or Republican Party candidate with respect to primaries/caucuses/conventions.

House Graphs – Notes
Page 2 of 2

## General Election Graphs

- The general election date, 11/2/04, is represented on the x-axis as day "0".

- Any data for media spots paid for by a House candidate on the general election ballot that aired on or before the general election date, but after that candidate's primary/caucus/convention date, are represented on the graphs. The data for each such media spot appear on the graphs in relation to the general election date (day "0").

- The dates of each primary/caucus/convention are listed below each graph. These dates reflect joint Democratic, Republican, and Other Party primaries unless otherwise noted. The number of days each primary/caucus/convention occurred before the general election is indicated, as a negative number, in parentheses after the date.

- Primary "runoff" elections were held in four States (TX Dist. 1, 10, 15, 17, 28 on 4/13/04; AL Dist. 5 on 6/29/04; GA Dist. 6, 8 on 8/10/04; NC Dist. 5, 10 on 8/17/04). Any data regarding media spots that aired after these States' primary dates (TX on 3/9; AL on 6/1/04; GA on 6/1/04; NC on 7/20/04) but before these primary "runoff" dates, are not represented on the graphs.

**Shays v. FEC,**
**06-CV-1247 (CKK),**
**A.R. Page:**
**2221**

## 2004 CONGRESSIONAL PRIMARY DATES
Note:  **S** Indicates Senate Election

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| Alabama | S | 6/1 | | 154 |
| Alaska | S | 8/24 | | 70 |
| American Samoa[1] | | n/a | | |
| Arizona | S | 9/7 | | 56 |
| Arkansas | S | 5/18 | | 168 |
| California | S | 3/2 | | 245 |
| Colorado | S | 8/10 | | 84 |
| Connecticut | S | 8/10 | | 84 |
| | | | 5/10 (D) | 176 |
| | | | 5/10 (R) District 4 | 176 |
| | | | 5/15 (R) Districts 2, 3 | 171 |
| | | | 5/22 (R) District 5 | 164 |
| | | | 5/24 (R) District 1 | 162 |
| Delaware | | 9/11 | | 52 |
| D.C. | | 9/14 | | 49 |
| Florida | S | 8/31 | | 63 |
| Georgia | S | 7/20 | | 105 |
| Guam | | 9/4 | | 59 |
| Hawaii | S | 9/18 | | 45 |
| Idaho | S | 5/25 | | 161 |
| Illinois | S | 3/16 | | 231 |
| Indiana | S | 5/4 | | 182 |
| | | | 4/24 (Other) | 192 |
| Iowa | S | 6/8 | | 147 |
| Kansas | S | 8/3 | | 91 |
| | | | 3/6 (Other) | 241 |
| | | | 5/15 (Other) | 171 |
| Kentucky | S | 5/18 | | 168 |
| Louisiana[2] | S | n/a | | |
| Maine | | 6/8 | | 147 |
| Maryland | S | 3/2 | | 245 |
| Massachusetts | | 9/14 | | 49 |
| Michigan | | 8/3 | | 91 |
| | | | 4/17 (Other) | 199 |
| | | | 5/23 (Other) | 163 |
| | | | 6/5 (Other) | 150 |
| Minnesota | | 9/14 | | 49 |
| Mississippi | | 3/9 | | 238 |
| Missouri | S | 8/3 | | 91 |
| Montana | | 6/8 | | 147 |
| Nebraska | | 5/11 | | 175 |
| Nevada | S | 9/7 | | 56 |
| New Hampshire | S | 9/14 | | 49 |
| New Jersey | | 6/8 | | 147 |

**Shays v. FEC,
06-CV-1247 (CKK),
A.R. Page:
2222**

| STATE | | PRIMARY DATE | CONVENTION DATE | DAYS BEFORE GENERAL ELECTION 11/2/04 |
|---|---|---|---|---|
| New Mexico | | 6/1 | | 157 |
| New York | S | 9/14 | | 49 |
| North Carolina | S | 7/20 | | 105 |
| North Dakota | S | 6/8 | | 147 |
| Ohio | S | 3/2 | | 245 |
| Oklahoma | S | 7/27 | | 98 |
| Oregon | S | 5/18 | | 168 |
| Pennsylvania | S | 4/27 | | 189 |
| Puerto Rico | | 11/9/03 | | 359 |
| Rhode Island | | 9/14 | | 49 |
| South Carolina | S | 6/8 | | 147 |
| | | | 4/24 (Other) | 192 |
| | | | 5/6 (Other) | 180 |
| South Dakota | S | 6/1 | | 154 |
| Tennessee | | 8/5 | | 89 |
| Texas | | 3/9 | | 238 |
| | | | 3/13 (Other) Districts 7, 16, 18, 20, 29, 30, 32 | 234 |
| | | | 3/20 (Other) All Remaining Districts | 227 |
| Utah [3] | S | 6/22 | | 133 |
| | | | 5/8 (D),  (R) | 178 |
| | | | 5/22 (Other) | 164 |
| | | | 3/14 (Other) | 233 |
| | | | 4/17 (Other) | 199 |
| Vermont | S | 9/14 | | 49 |
| Virginia [4] | | 6/8 | | 147 |
| | | | 5/8 (D) District 5 | 178 |
| | | | 5/15 (D) Districts 1, 6, 7, 9, 10 | 171 |
| | | | 5/15 (R) Districts 3, 8 | 171 |
| | | | 5/22 (D) District 4 | 164 |
| | | | 5/22 (R) District 9 | 164 |
| Virgin Islands | | 9/11 | | 52 |
| Washington | S | 9/14 | | 49 |
| West Virginia | | 5/11 | | 175 |
| | | | 5/1 (Other) | 185 |
| Wisconsin | S | 9/14 | | 49 |
| Wyoming | | 8/17 | | 77 |

**Notes:**
1. In American Samoa, no Primary Election was held.  A General Election was held on 11/2/04.
2. In Louisiana, no Primary Election was held.  The election for candidates seeking Federal office is the General Election, which was held on 11/2/04.  A General Runoff Election was held on 12/4/04.
3. In Utah, nominating Conventions are held by the parties prior to the Primary.
4. In Virginia, parties may choose to nominate candidates by Convention rather than by Primary.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| CHRISTOPHER SHAYS and ) | |
| MARTIN MEEHAN, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 06-CV-1247 (CKK) |
| v. ) | |
| ) | FEC STATEMENT OF |
| FEDERAL ELECTION COMMISSION, ) | MATERIAL FACTS NOT |
| ) | IN GENUINE DISPUTE |
| Defendant. ) | |
| _____ ) | |

## FEDERAL ELECTION COMMISSION'S STATEMENT
## OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Federal Rule of Civil Procedure 56 and LCvR 56.1 of the Rules of the United

States District Court for the District of Columbia, the Federal Election Commission

("Commission" or "FEC") submits the following statement of material facts about which there is

no genuine issue or dispute.[1]

---

[1]     "A.R." references in this Statement of Material Facts are to the Administrative Record filed on October 31, 2006, Docket #17. That record, filed on DVD, consists of three volumes, each of which is an individual file. Each volume consists of numbered documents ("Doc. __") that can be retrieved by clicking on the particular document number under the "Bookmarks" tab. Each record page has a unique "A.R." number that may be accessed by typing the number into the page number field at the bottom center of the document or by clicking on the desired number under the "Pages" tab (or, in earlier versions of Adobe Acrobat, the "Thumbnails" tab). The A.R. page ranges are: Vol. I (1-428), Vol. II (429-678), and Vol. III (679-2223).  For the convenience of the Court, a small subset of these pages (A.R. 2191-2223) is attached as an addendum to the Commission's memorandum of law.

**Background**

1.        Plaintiffs Christopher Shays and Martin Meehan are Members of the United States House of Representatives and were the principal House sponsors of the Bipartisan Campaign Reform Act ("BCRA").  Complaint  ¶¶ 8-9.

2.        The FEC is the independent agency of the United States government with exclusive jurisdiction to administer, interpret, and civilly enforce the Federal Election Campaign Act ("FECA").  See 2 U.S.C. 437c(b)(1), 437d(a) and (e), and 437g.

3.        In 2002, the Commission promulgated final rules and an Explanation and Justification ("E&J") to implement BCRA's provisions concerning a new statutory term, "Federal election activity."  Prohibited and Excessive Contributions:  Non-Federal Funds or Soft Money; Final Rule ("2002 Rules"), 67 Fed. Reg. 49,064 (July 29, 2002).

4.        The new regulations defined, inter alia, "Voter registration activity" and "Get-out-the-vote activity" ("GOTV activity"), statutory terms that define in part "Federal election activity."  See 2002 Rules, 67 Fed. Reg. at 49,066, 49,067-068, 49,110-111 (codified at 11 C.F.R. 100.24(a)(2), (a)(3) (2003 ed.)).  See also 2 U.S.C. 431(20); 11 C.F.R. 100.24(b).

5.        In that same rulemaking, the Commission promulgated final rules and an E&J to implement a provision concerning the attendance by federal candidates and officeholders at state, district, and local party fundraisers.  2002 Rules, 67 Fed. Reg. at 49,107-108 (codified at 11 C.F.R. 300.64 (2003 ed.)).  See also 2 U.S.C. 441i(e)(3).

6.        In 2003, the Commission promulgated final rules and an E&J to implement BCRA's provisions regarding payments for communications that are coordinated with a candidate, a candidate's authorized committee, or a political party committee.  Coordinated and

Independent Expenditures, 68 Fed. Reg. 421 (Jan. 3, 2003) (codified at 11 C.F.R. 109.21 (2003 ed.)).  See also BCRA § 214(b), (c).

7.    The new coordinated communication rules set forth a three-prong test for determining whether a communication is a coordinated communication.  See 11 C.F.R. 109.21(a)(1), (a)(2), (a)(3), and (c) (2003 ed.).

8.    In a suit filed in 2002, Christopher Shays and Martin Meehan challenged the validity of, among other regulations, 11 C.F.R. 100.24(a)(2) and (a)(3), 109.21(c), and 300.64(b) (2003 ed.).  See Shays v. FEC, 337 F.Supp.2d 28 (D.D.C. 2004) ("Shays I"), aff'd, 414 F.3d 76 (D.C. Cir. 2005).

9.    No one appealed the district court's resolution of the challenges to 11 C.F.R. 100.24(a)(2)-(a)(3) and 300.64(b).  See Shays v. FEC, 414 F.3d at 79; Vol. I, Doc. 7, A.R. 423; Vol. II, Doc. 23, A.R. 674.

10.    The Commission appealed the district court's resolution of the challenge to the coordinated communication regulations.  See Shays v. FEC, 414 F.3d at 79; Vol. III, Doc. 52, A.R. 2161.

### A.    Attendance by Federal Candidates and Officeholders at State, District, and Local Party Fundraisers (11 C.F.R. 300.64)

11.    On February 24, 2005, in response to the district court's decision in Shays I, the Commission issued an NPRM on "Solicitation at State, District, and Local Party Fundraising Events" by federal candidates and officeholders.  Vol. II, Doc. 6, A.R. 465-68 (70 Fed. Reg. 9013 (Feb. 24, 2005)).

12.    The fundraiser NPRM proposed revisions to the E&J for the existing fundraiser regulation, 11 C.F.R. 300.64 (2003 ed.), and, as an alternative, also proposed revising the regulation to prohibit federal officeholders and candidates from soliciting or directing nonfederal

funds when attending or speaking at state, district, or local party fundraising events.  Vol. II, Doc. 6, A.R. 466-67.  The NPRM sought comments on both options.  Id. at 467-68.

13.     The Commission received 11 written comments (Vol. II, Docs. 7-16, A.R. 469-514) during the comment period on the fundraiser NPRM, including comments from Christopher Shays and Martin Meehan (with Senators McCain and Feingold) (Doc. 11, A.R. 488-95).  Some commenters favored retaining the existing regulation and only revising the E&J, while other commenters urged the Commission to adopt the proposed alternative regulation.  See Vol. II, Docs. 7-16, A.R. 469-514.

14.     On April 25, 2005, the Commission issued a notice of public hearings to be held on May 17, 2005; the topics included solicitations by federal candidates and officeholders at state, district, and local party fundraising events.  Vol. II, Doc. 17, A.R. 515 (70 Fed. Reg. 21,163 (April 25, 2005)).

15.     The Commission devoted the morning session of the public hearings on May 17, 2005, to solicitations by federal candidates and officeholders at state, district, and local party fundraising events.  See Vol. II, Doc. 18, A.R. 516-638 (transcript).   Six individuals made oral comments.  A.R. 518.   Some commenters favored only revising the E&J and others favored the Commission's adopting the proposed alternative regulation.  See A.R. 516-638.

16.     The Commission voted on June 23, 2005, to approve a revised E&J for the fundraiser regulation.  Vol. II, Doc. 22, A.R. 672.

17.     On June 30, 2005, the Commission promulgated the revised E&J for final rule 11 C.F.R. 300.64.  Vol. II, Doc. 23, A.R. 673-78 (70 Fed. Reg. 37,649 (June 30, 2005)).

B.    The Definitions of "Voter Registration Activity" and "Get-Out-The-Vote Activity" (11 C.F.R. 100.24(a)(2), (3))

18.    On May 4, 2005, on remand from the district court's decision in Shays I, the Commission initiated a rulemaking on the definition of "Federal election activity."  Vol. I, Doc. 7, A.R. 42-46 (NPRM) (70 Fed. Reg. 23,068 (May 4, 2005)).

19.    In the NPRM, the Commission did not propose any changes to the regulatory definition of the subsidiary term "voter registration activity," 11 C.F.R. 100.24(a)(2), including the requirement that the state, district, or local party organization "assist" would-be registrants through "individualized means."  Vol. I, Doc. 7, A.R. 43.  However, the Commission did seek comments on various procedural and substantive issues and indicated it would issue an expanded E&J.  Id.

20.    In regard to the regulatory definition of the subsidiary term "GOTV activity," the Commission proposed eliminating an invalidated exemption for certain groups of state or local candidates and officeholders.  Vol. I, Doc. 7, A.R. 43.  The Commission sought comment on whether also to remove a reference to 72 hours in example (i) in 11 C.F.R. 100.24(a)(3), a reference that the district court had not invalidated.  Vol. I, Doc. 7, A.R. 44.

21.    The Commission received eight comments during the comment period in response to its May 2005 NPRM on the definition of "Federal election activity."  Vol. I, Docs. 8-15, A.R. 47-97.  Plaintiffs Shays and Meehan (with Senators McCain and Feingold) were among those submitting written comments.  Vol. I, Doc. 12, A.R. 82-87.  The commenters disagreed on what would be acceptable definitions of "voter registration activity" and "GOTV activity."  See Vol. I, Docs. 8-15, A.R. 47-97.

22.    On July 22, 2005, the Commission announced that it would hold a public hearing on August 4, 2005, regarding the definition of "Federal election activity."  Vol. I, Doc. 17, A.R.

102 (70 Fed. Reg. 42,282 (July 22, 2005)). Six individuals testified at the August 4, 2005, public

hearing. Vol. I, Doc. 18, A.R. 103, 105. Some commenters favored the Commission's

broadening the definitions of "voter registration activity" and "GOTV activity" to include mere

exhortations to register to vote or to vote, while others opposed such broadening. See Doc. 18,

A.R. 104-280 (transcript).

23. On August 30, 2005, the Commission published a notice to reopen the comment

period on the "Federal election activity" NPRM for 30 days. Vol. I, Doc. 20, A.R. 377 (70 Fed.

Reg. 51,302 (Aug. 30, 2005)). The Commission received two additional written comments.

Doc. 21, A.R. 378-82, and Doc. 22, A.R. 383-85.

24. On February 9, 2006, the Commission voted to approve final rules on the

definition of "Federal election activity" and an expanded E&J. Vol. I, Doc. 26, A.R. 420.

25. The Commission issued final rules defining "voter registration activity" and

"GOTV activity" and an expanded E&J on February 22, 2006. Vol. I, Doc. 27, A.R. 422-28

(71 Fed. Reg. 8926 (Feb. 22, 2006)).

### C.    The Coordinated Communication Provision (11 C.F.R. 109.21)

26. The Commission published an NPRM (Vol. III, Doc. 8, A.R. 747-60) on

December 14, 2005, that proposed seven alternatives addressing coordinated communications.

27. The Commission in its NPRM "specifically invite[d] comments in the form of

empirical data that show the time periods before an election in which electoral communications

generally occur." A.R. 750, 2163.

28. Written Comments were received from 28 entities during the comment period, which

closed on January 13, 2006. The Commission held a public hearing on January 25 and 26, 2006,

at which 18 witnesses testified. A.R. 1433-2036.

29.    Although some commenters provided unscientific anecdotal evidence, no commenters provided any studies, statistical samples, or other empirical evidence that would help provide an overview of the frequency, pattern, and intensity of political advertising.  E&J for 2006 Coordination Rulemaking, Vol. III, Doc. 52, A.R. 2163.

30.    On March 13, 2006, the Commission published on its website a Supplemental Notice of Proposed Rulemaking ("SNPRM") making public data it had licensed from TNS Media Intelligence/CMAG ("CMAG") regarding television advertising by Presidential, Senate, and House of Representatives candidates during the 2004 election cycle.  Vol. III, Doc. 34, A.R. 2049-50.  On March 15, 2006 the SNPRM was published in the Federal Register.  A.R. 2051.

31.    While the formal supplemental comment period was seven days (from March 15 through March 22, 2006), commenters actually had nine days (from March 13, the day the Commission published the notice on its website, until March 22, 2006).  In response to the SPRM, 12 commenters submitted additional material.  A.R. 2164; A.R. 2052-56 (comments of Chamber of Commerce); A.R. 2057-59 (comments of Alliance for Justice); A.R. 2060-61 (comments of Internal Revenue Service); A.R. 2062-65 (comments of DNC); A.R. 2066-68 (comments of DSCC and DCCC); A.R. 2069-2110 (comments of Democracy 21, Campaign Legal Center, Center for Responsive Politics); A.R. 2111-13 (comments of NRCC); A.R. 2114-17 (comments of Center for Competitive Politics); A.R. 2118-21 (comments of NRSC).  No one requested additional time to comment on the data.

32.    CMAG is a leading provider of political advertising tracking and provides media analysis services to a wide variety of clients, including national media organizations, foundations, academics, and Fortune 100 companies.  See www.tnsmicmag.com, A.R. 2163.

33.     CMAG monitors more than 560 television stations in 101 major markets, 21 hours per day (5:00 a.m. - 2:00 a.m.).  A.R. 2187 (from DVD open "CMAG_READ_ME" file).

34.     CMAG provided the data used for the 2000 "Buying Time" study, relied upon by BCRA's principal sponsors in formulating its provisions.  See, e.g., 148 Cong. Rec. S2141 (daily ed. March 20, 2002) (statement of Sen. McCain).  CMAG data were also heavily relied upon by the courts in McConnell.  See 540 U.S. at 206; 251 F.Supp.2d 583-587 (Kollar-Kotelly); id. at 796-98 (Leon).

35.     The data CMAG provided the Commission include "all candidate sponsored ads for federal races (US House, US Senate, President) from 11/6/02 - 11/2/04," A.R. 2187 (from DVD open "CMAG_READ_ME" file), and the Commission analyzed well over half a million ad airings.  See A.R. 2197, 2199, 2209, 2211, 2216, 2218 (combining total from each cited page to obtain total number of ad airings.)

36.     The CMAG data show that substantial election-related communication by candidates does not occur outside the 90-day line drawn by the Commission for congressional races.  The data show that almost all congressional candidates run their ads within 60 days of election and only a small fraction of the ads are run between 60 and 90 days before an election.  A.R. 2164.  Beyond 90 days, this candidate advertising nearly ceases.  A.R. 2167; A.R. 2216 (Graph H1), A.R. 2218 (Graph H3), A.R. 2209 (Graph S1); A.R. 2211 (Graph S3).

37.     Senate candidates as a group aired only 0.87 percent and 0.39 percent of their advertisements more than 90 days before their primary and general elections, respectively.  This advertising represented 0.66 percent and 0.15 percent of the total estimated costs of advertisements run by Senate candidates before the primary and general elections, respectively.

A.R. 2165; A.R. 2209 (Graph S1), A.R. 2211 (Graph S3), A.R. 2210 (Graph S2), A.R. 2212 (Graph S4).

38.    House candidates as a group aired only 8.56 percent and 0.28 percent of their advertisements more than 90 days before their primary and general elections, respectively.  This represented 3.79 percent and 0.13 percent of the total estimated costs of advertisements run by House candidates before the primary and general elections, respectively.  A.R. 2165;  A.R. 2216 (Graph H1), A.R. 2218 (Graph H3), A.R. 2217 (Graph H2), A.R. 2219 (Graph H4).

39.    For presidential elections, the CMAG data revealed that in media markets contained within individual "battleground" states an appreciable amount of spending occurred in the "gap period" between some primaries and the 120-day period before the general election.  A.R. 2167.  In these markets the Republican presidential candidate spent almost $9.5 million on television ads during the gap period, or 14 percent of the total costs of media spots aired by the Republican Presidential candidate in those media markets after the State primaries….  Democratic Presidential candidates spent $1,221,045 on post-primary television advertisements that occurred during the gap period.  A.R. 2167.

40.    The CMAG data showed that in 2004 a timeframe beginning 120 days before the primaries and continuing until the general election would have covered more than 99 percent of presidential advertising in 2004.  A.R. 2167.   "According to the [CMAG] data, in the 2004 election cycle, over 99 percent of the estimated media spot spending by Presidential candidates in media markets fully contained within individual "battleground" States occurred during this time period.  This time period is now fully covered by the Commission's revised content standard at 11 C.F.R. 109.21(c)(4)."  A.R. 2166 (footnote omitted); A.R. 2198 (Graph P8); A.R. 2200 (Graph P10).

41.    The Buying Time studies reported that the vast majority of election-related advocacy financed by interest groups occurs immediately before an election:  "In the 2000 election, genuine issue ads are rather evenly distributed throughout the year, while group-sponsored electioneering ads make a sudden and overwhelming appearance immediately before elections."  Craig B. Holman and Luke P. McLoughlin, "Buying Time 2000: Television Advertising in the 2000 Federal Elections" at 56 (2002); A.R. 2165.

42.    The Commission received evidence that in 2004 the national party committees' coordinated activity took place within 60 days of the relevant election.  A.R. 2165.  See A.R. 2113 (comments of NRCC: "[d]uring the 2004 election cycle, all coordinated expenditures made by the NRCC for the 2004 general election were made within 60 days of the general election"); A.R. 2119-20 (similar comments of NRSC).

43.    The temporal element of the Commission's 2002 coordination regulation has been in effect for four years, and the rulemaking record contains no evidence that candidates and collaborators engaged in increased unlawful coordination or shifted their coordinated activity earlier in the election cycle to avoid the challenged rules' restrictions.

44.    Some commenters submitted examples of ads that were run more than 120 days before an election, but they presented no evidence that the ads were coordinated with candidates. More generally, none of the commenters submitted any evidence that, during the recent election cycles during which the Commission's 2002 coordination rules were in effect, House or Senate candidates asked outside groups to run advertisements more than 90 days before House or Senate primary or general elections.  A.R. 2168.  When the Commission specifically inquired about this issue at the rulemaking hearing, these commenters acknowledged that there was no evidence that any of these advertisements had been coordinated with a candidate or a political party

committee.  A.R. at 2167-68; A.R. 1617-18 (testimony of Paul Ryan); A.R. 1619 (testimony of

Marc Elias).

45.    None of the commenters who professed concern about the Commission's

proposed rule suggested that they had filed any administrative complaints with the Commission

alleging acts of coordination, or had even contemplated doing so.  See generally A.R. 968-1007

(comments of Campaign Legal Center, Democracy 21, and Center for Responsive Politics).

46.    As the Commission explained in its E&J, "[s]ince the 2002 rule took effect, the

Commission has received very few complaints alleging that House or Senate candidates or their

agents coordinated with outside groups to produce or distribute communications that ran between

90 and 120 days before a House or Senate primary or general election."  A.R. 2168.

> **D.    "Conduct" elements (11 C.F.R. 109.21(d)(4), (5) (common vendor/former employee) and 109.21(h) (firewall safe harbor))**

47.    The Commission published an NPRM (Vol. III, Doc. 8, A.R. 747-60) on

December 14, 2005, that included the proposed common vendor/former employee rule and the

firewall safe harbor.  The Commission held a public hearing on January 25 and 26, 2006, which

included testimony on these provisions.  A.R. 1433-2036.  The E&J and final rules were

published on June 8, 2006.  (Vol. III, Doc. 52, A.R. 2161-2182).

48.    The conduct elements of the coordination rule address, inter alia, when a person

paying for a communication ("payer") obtains information about a candidate's or political

party's plans, projects, activities, or needs from a common vendor or former employee of a

candidate or party and then uses that information in a communication.

11 C.F.R. 109.21(d)(4), (5).

49.    In 2005 the Commission amended the rule to make it applicable whenever a

commercial vendor or employee is working for a candidate or party committee, and also for

another 120 days after such employment ceases.  This adjustment to the rule was based on information in the record before the Commission regarding how the former rule functioned in practice.  A.R. 2174.

50.    Commenters raised numerous problems with the 2002 version of this rule.  In practice, the earlier version functioned as an extended cooling-off period and caused substantial harm to individuals who were effectively blacklisted and could not obtain further employment for extended periods of time.  A.R. 2175; A.R. 1867-68.

51.    Commenters stated that the 2002 rule had a "chilling effect" on the retention of consultants and employees because organizations want to avoid speculative allegations of improper coordination.  A.R. 2175; A.R. 875 (comments of Ellen Malcolm on behalf of EMILY's List:  "entire election cycle creates significant and unnecessary legal risks for individuals"); A.R. 765 (comments of NRSC: "heavy process penalty" for an alleged violation). Commenters also described the significant interviewing and investigative burden associated with hiring commercial vendors, who can be in short supply, especially in smaller markets.  A.R. 2175.

52.    Material information that could be the basis of a coordinated expenditure has a very short "shelf life" in politics.  A.R. 2175.  Witnesses explained how campaign information from a primary election tends to be irrelevant in a general election, which usually has a very different focus.  A.R. 1852, 2176.

53.    The Commission adopted the firewall safe harbor provision after considering the need to safeguard against unlawful coordination when an entity exercises its right to make both independent and coordinated expenditures.  Commenters during the rulemaking explained, inter alia, the potential chilling effect of the coordination rules in the absence of firewall safe harbor

and the various approaches that political committees have taken to avoid the possibility of

coordination when some employees of a committee work on independent expenditures at the

same time that other employees of the committee work with candidates or political party

committees on lobbying or other issues.  A.R. 2177.

Respectfully submitted,

/s/ Lawrence H. Norton

Lawrence H. Norton
General Counsel

/s/ Richard B. Bader

Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

/s/ David Kolker

David Kolker
Assistant General Counsel
(D.C. Bar # 394558)

/s/ Vivien Clair

Vivien Clair
Attorney

/s/ Greg J. Mueller

Greg J. Mueller
Attorney
(D.C. Bar # 462840)

January 19, 2007                    FOR THE DEFENDANT
                                    FEDERAL ELECTION COMMISSION
                                    999 E Street, N.W.
                                    Washington, D.C. 20463
                                    (202) 694-1650

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
CHRISTOPHER SHAYS and                )
MARTIN MEEHAN,                              )
                                                    )
                    Plaintiffs,               )
                                                    )          Civil Action No. 06-1247 (CKK)
            v.                                      )
                                                    )          STATEMENT OF
FEDERAL ELECTION COMMISSION,    )          GENUINE ISSUES
                                                    )
                    Defendant.              )
_____)

**DEFENDANT FEDERAL ELECTION COMMISSION'S**
**STATEMENT OF GENUINE ISSUES**

Pursuant to Local Civil Rules ("LCvR") 7(h) and 56.1, defendant Federal Election

Commission ("FEC" or "Commission") submits the following Statement of Genuine Issues and

Objections to Plaintiffs' Statement of Material Facts, filed December 8, 2006 ("Plaintiffs'

Statement"). This statement contains the Commission's responses and objections to the

statement of facts submitted by plaintiffs in support of their motion for summary judgment.

These responses and objections are presented below in numbered paragraphs tracking the

numbering scheme in Plaintiffs' Statement.

1-2.    No response.

3.    Bipartisan Campaign Reform Act ("BCRA") §§ 214(c) and 402(c) speak for

themselves.

4-5    No response.

6.    The plaintiffs' complaint, filed on October 8, 2002, and the judicial decisions in

Shays v. FEC speak for themselves.

7.     No response.

8.     No response.

9.     No response, except that the record demonstrates that interested parties actually had nine days to submit written comments about the CMAG data.  <u>See</u> FEC Fact 7.

10.     No response.

11.     No response to the first sentence.  The record controverts the remainder of the paragraph.  The citations plaintiffs supply show press accounts of a few dozen ads and do not support the proposition that "many such ads were aired" relative to the total number ads run during the election cycle.  <u>See</u> FEC Fact 35 (the Commission analyzed more than half a million ad airings).  All of these press accounts are hearsay, and many of them say nothing about the cost of the advertising they report.  <u>See</u> PX 50, 54, and 66.  One press account describes a campaign's announcement of a $750,000 ad campaign, but does not report when, or even if, the ads the campaign planned to purchase actually ran.  PX 61.  That total dollar figure may also include later dollar figures in subsequent exhibits describing parts of the same ad campaign.  <u>See</u> PX 61 (describing purported  $750,000 ad buy), PX 64 ($30,000 of advertising that was likely included in the $750,000 figure).  The data CMAG provided to the Commission include "all candidate sponsored ads for federal races (US House, US Senate, President) from 11/6/02 - 11/2/04," A.R. 2187 (from DVD open "CMAG_READ_ME" file).  Although CMAG provided only a limited number of ads from 2003, they were requested by the Commission and those that were run in the CMAG monitored media markets were provided.  A.R. 2187 (from DVD open "CMAG_READ_ME" file).  Because certain states do not have any media markets among the 101 tracked by CMAG, not all states or races are included in the CMAG data.

12.     No response, except that the record controverts plaintiffs' characterization of the Commission's data set as "restricted."  See FEC Fact 35.

13.     No response, except that the record controverts plaintiffs' characterization of the Commission's data set as "constricted."  See FEC Fact 35.

14-16.  No response.

17.     No response to the first sentence.  To the extent that the second sentence suggests that the Commission did not consider plaintiffs' views, it is controverted by the record.  The Commission did adopt changes supported by plaintiffs, in the regulations before the Court and in others from which plaintiffs have not sought further review.  Moreover, the Commission gave serious consideration to plaintiffs' views along with those of other commenters, even when it did not ultimately adopt them.  See, e.g.,  A.R. 2165 (quoting plaintiffs' comments in E&J); A.R. 2166 (same); A.R. 2167 (describing consideration of plaintiffs' preferred rule).

18.     No response to the first sentence.  The Commission objects to the remainder of this paragraph as vague and speculative.  How plaintiffs are "directly affected by ... others" is not described in any specific way and such future behavior is contingent on many variables.

19.     The Commission objects to this paragraph to the extent it alleges that the Commission's regulations at issue have "subverted, eroded or circumvented" BCRA.  The Commission further objects to the paragraph for lack of foundation insofar as it relies on plaintiffs' assertions that if such alleged subversion occurs, they "believe" they will be "forced once again" to raise money, campaign, and discharge public responsibilities in a system that is "widely perceived to be, and [plaintiffs] believe in many respects will be, significantly corrupted by the influence of special-interest money."  Plaintiffs' general beliefs are irrelevant to this matter, plaintiffs supply no specific factual basis for these beliefs, and they fail to identify any

specific person or explain how any specific impending activity will affect plaintiffs' actions, rendering the assertions vague, speculative and conclusory. The Commission further objects on the grounds that plaintiffs have not been and will not be "forced" by the Commission to do any of the things they allege, nor do plaintiffs provide any evidence based upon personal knowledge for such allegations. In addition, plaintiffs provide no factual basis for a nexus between the Commission's regulations and any public perception that plaintiffs are part of a "system" that will be "significantly corrupted."

20.    The Commission objects to the paragraph for lack of foundation insofar as it relies on plaintiffs' assertions that the Commission's regulations "directly affect" them. Plaintiffs supply no specific factual basis for these general assertions, and fail to identify any specific person or explain how any specific impending activity will affect plaintiffs' actions, rendering the assertions vague, speculative and conclusory. The Commission further objects to this paragraph to the extent it alleges that the Commission's regulations permit circumvention of the Federal Election Campaign Act ("FECA").

21.    The Commission objects to the paragraph for lack of foundation insofar as it relies on plaintiffs' assertions that the Commission's regulations "will directly and personally impact plaintiffs as candidates" whose campaigns "could be influenced by those very state and local party activities." Plaintiffs supply no specific factual basis for these general assertions, and fail to identify any specific person or explain how any specific impending activity will affect plaintiffs' actions, rendering the assertions vague, speculative and conclusory. The Commission further objects to this paragraph to the extent it alleges that the Commission's regulations permit circumvention of the Federal Election Campaign Act.

22.    The Commission objects to the paragraph for lack of foundation insofar as it relies on plaintiffs' assertions that the Commission's regulations "directly affect[] plaintiffs" and that plaintiffs' will be affected in their "capacities as party members" who "might be expected" to raise soft money for use at the state and local party level.  Plaintiffs supply no specific factual basis for these general assertions, and fail to identify any specific person or explain how any specific impending activity will affect plaintiffs' actions, rendering the assertions vague, speculative and conclusory.

23.    The Commission objects to the first three sentences because they are legal descriptions and conclusions which are not appropriately included in a statement of facts.  The Commission objects to the fourth sentence to the extent it alleges that Commission regulations do not "faithfully implement" BCRA or FECA disclosure provisions.  The Commission further objects to the paragraph for lack of foundation insofar as it relies on plaintiffs' assertions that they "will be deprived of information to which they are entitled .... "  Plaintiffs fail to identify any particular regulations that are depriving them of any particular information, fail to explain why they are entitled to such information or how they are harmed by the lack of it, supply no specific factual basis for their general assertions, and fail to identify any specific person or explain how any specific impending activity will affect plaintiffs' activities, rendering the assertions vague, speculative and conclusory.  To the extent this sentence alleges that certain activities will harm plaintiffs as federal candidates or otherwise, or that the Commission has caused such harm, plaintiffs provide no specific factual basis for such claims.

Respectfully submitted,

/s/ Lawrence H. Norton
Lawrence H. Norton
General Counsel

5

/s/ Richard B. Bader
Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

/s/ David Kolker
David Kolker
Assistant General Counsel
(D.C. Bar # 394558)

/s/ Vivien Clair
Vivien Clair
Attorney

/s/ Greg J. Mueller
Greg J. Mueller
Attorney
(D.C. Bar # 462840)

January 19, 2007                    FOR THE DEFENDANT
                                    FEDERAL ELECTION COMMISSION
                                    999 E Street, N.W.
                                    Washington, D.C. 20463
                                    (202) 694-1650