IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTOPHER SHAYS AND MARTIN MEEHAN | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) At Law No. 06-CV-1247<br>) (Judge Kollar-Kotelly) |
| UNITED STATES FEDERAL ELECTION COMMISSION | )<br>)<br>) |
| Defendants | ) |

**BRIEF OF AMICUS CURIAE**

Amicus Curiae The Center for Competitive Politics, ("CCP"), by counsel, files this Brief of Amicus Curiae in support of the position of Defendant United States Federal Election Commission ("FEC" or the "Commission").

## I.   PRELIMINARY STATEMENT

Plaintiffs claim throughout their Complaint and Motion for Summary Judgment that the FEC's content standard is a new and novel creation. *See, e.g.*, Memorandum in Support of Plaintiffs' Motion for Summary Judgment, at 6 ("The rule had no separate criteria for determining the "content" prong."); *id.* at 7 ("Only in the 2002 rulemaking ordered by Congress did the Commission, for the first time, promulgate a separate 'content' test for coordinated communications."); Compl. at ¶ 27. This gives the mistaken impression that the challenged regulations represent an abrupt departure from previous Commission standards, and thus are contrary to the intent of Congress in passing the Bipartisan Campaign Reform Act ("BCRA").

Nothing could be further from the truth. The FEC's application of a content standard long predates BCRA. Pre-BCRA, the Commission consistently, if not formally,

applied the express advocacy content standard when determining whether allegedly coordinated expenditures qualified as "contributions," *i.e.*, disbursements made "for the purpose of influencing any election." This express advocacy standard is consistent with the Constitution and the Supreme Court's repeated admonishments to regulate as narrowly as possible where core First Amendment principles are implicated, and was known to Congress at the time BCRA was passed.

## II.   ARGUMENT

### A.   Contrary To Plaintiffs' Assertions, The FEC Used An Express Advocacy Content Standard Pre-BCRA.

The Commission historically used two tests — a coordination test and a content test — to evaluate whether an expenditure violated the coordinated expenditures provision of the Federal Election Campaign Act ("FECA"), the legislation that BCRA revised and expanded. While the Commission has used the test in various forms, sometimes more formally than others, there can be little doubt that the Commission understood for years before BCRA was implemented that coordinated expenditures only violated FECA if they expressly advocated the election or defeat of a candidate.

Prior to 2000, the views of the FEC Commissioners with regard to the threshold for beginning an investigation into an allegedly coordinated expenditure were heterodox. *See In re Alabama Republican Party, et al.*, MUR 4538, Statement of Reasons, Chairman David M. Mason & Commissioner Bradley A. Smith (May 23, 2002) (Mason and Smith Statement of Reasons, *Alabama Republican Party*) (Ex. A). This precluded a formal rule. Yet it was clear that a number of Commissioners were in practice applying a test that was, for all intents and purposes, a content test. Commissioner Eliot and her successor, Commissioner Smith, believed that express advocacy was required before an

inquiry could be initiated, due to First Amendment overbreadth concerns. *Id.* at 1. Similarly, Commissioner Sandstrom subjected proposed inquiries to a content examination, and would only initiate an investigation if there was express advocacy by a party, basing his position on due process concerns. *Id.* at 1-2. Commissioner Thomas used a slightly more liberal variant of the content standard now used by the FEC, requiring an expenditure be "for the purpose of influencing" an election in order to be considered a coordinated communication. *Id.* at 2.

In 1999, four Commissioners (then Vice-Chairman Wold and Commissioners Elliott, Mason and Sandstrom) explained their rejection of staff repayment recommendations pertaining to the Dole and Clinton 1996 presidential campaigns by noting that the coordinated communications made by party committees did not meet a clear content test, which the Commissioners believed was required, "[e]ven in the context of coordinated, or presumably coordinated, communications." *On The Audits of "Dole For President Committee, Inc." et al.*, Statement of Reasons, Vice Chairman Darryl R. Wold and Commissioners Lee Ann Elliott, David M. Mason, and Karl J. Sandstrom, at 4 (June 24, 1999) (Ex. B). Thus, even before 2000, a consistent majority of the FEC commissioners used one form or another of the present content test before voting to commence an investigation.

Developments in the law made it increasingly difficult for the FEC to maintain this *ad hoc* approach. In *FEC v. Christian Coalition*, 52 F. Supp. 2d 45 (D.D.C. 1999), Judge Green found that the lack of a formal content inquiry "[n]ot only . . . heavily burden[s] communication leading up to the expenditure, but . . . also neglects the fact that expressive coordinated expenditures contain the political speech of the spender; more

3

than the "speech by proxy" involved in a cash contribution." *Id.* at 91. While that decision was heavily criticized by FEC Commissioners for not going far enough to protect First Amendment rights, *see In re The Coalition*, MUR 4624, Statement for the Record, Commissioner Bradley A. Smith, (Nov. 6, 2001) (Smith Statement for the Record, *NRCC*) (Ex. C), and did not *require* the FEC to adopt express advocacy as a minimum content standard, the weaker test enunciated by the Court still marked a court-mandated movement toward a more formalized definition of the content test used for defining a "coordinated expenditure" within the meaning of FECA. Still, under the narrower test enunciated by the *Christian Coalition* court, the FEC continued to operate under a *de facto* express advocacy test. *See* Mason and Smith Statement of Reasons, Alabama Republican Party, at 5 (citing examples from the campaigns of Johnson in South Dakota and Karpan in Wyoming). Indeed, in the Karpan matter, the Commission expressly found that there had been coordination with the DSCC, but nonetheless dismissed the matter because of the nature of the allegedly coordinated speech. *Id.* at 5-6.

This culminated in the Commission's 2002 decision in MUR 4538 to formalize what had previously been the unannounced position of the Commission. *See id.*; *In re Alabama Republican Party*, MUR 4538, Statement of Reasons, Commissioner Karl J. Sandstrom, (May 23, 2002) (Sandstrom Statement of Reasons, *Alabama Republican Party*) (Ex. D).[1] After lengthy discussions and debate, the Commission explained, "[t]he Commission's policy guidance and the absence of a consistent enforcement policy have, separately or together, made it impossible for the Commission to cite political parties for

---

[1] Commissioner Wold was unable to sign this Statement of Reasons because he left the Commission before the Statement of Reasons was issued. Even the votes of these three Commissioners, however, would preclude a prosecution absent express advocacy.

coordinating non-express advocacy communications with candidates." Mason and Smith Statement of Reasons, *Alabama Republican Party*, at 7. The Commission thus announced "we will not be making party coordination findings on further matters arising out of 1998 and 2000 elections absent express advocacy communications." *Id.* at 8.

Congress itself recognized this evolution in the Commission's voting patterns. The Senate version of BCRA, as passed in 2001, altered the definition of contribution by adding a new subsection to include specifically all coordinated expenditures, regardless of whether or not those expenditures included express advocacy. The original Senate bill would have included in its definition of expenditure:

> (iii) any coordinated expenditure or other disbursement made by any person in connection with a candidate's election, ***regardless of whether the expenditure or disbursement is for a communication that contains express advocacy***; or
>
> (iv) any expenditure or other disbursement made in coordination with a national committee, State committee, or other political committee of a political party by a person (other than a candidate or a candidate's authorized committee) in connection with an election, ***regardless of whether the expenditure or disbursement is for a communication that contains express advocacy***.

Bipartisan Campaign Reform Act of 2001 (Engrossed As Agreed to or Passed By Senate), S. 27, 107th Cong. § 214(a)(1)(C) (2001) (Ex. E) (emphasis added). The Senate clearly would not have felt the need to single out communications containing express advocacy if it did not believe that the FEC was already using that standard in evaluating whether or not to proceed with an investigation. Significantly, this definition ultimately was not included in the final version of BCRA.

The Commission's formal adoption of a content standard in its post-BCRA regulations was therefore not novel, nor did it represent any movement against the flow

5

of campaign finance law in general or BCRA in particular. Rather, by codifying a content standard, it merely formalized what the FEC's practice had been for the better part of the previous decade. Further, the post-BCRA content standard adopted by the FEC actually brings within the scope of the law substantially more activity than was covered by the pre-BCRA standard used by the Commission, by regulating a large swath of political speech that occurs in the various pre-election "windows," regardless of whether or not the speech expressly advocates the election or defeat of a political candidate. Plaintiff's repeated statements to the contrary are therefore incorrect.

> **B.    A Content Standard is Consistent With The Supreme Court's Repeated Admonishments to Give Core Political Speech Sufficient Breathing Space.**

The Plaintiffs deride the Commission's continued use of the content standard as a "functionally meaningless test" that creates a "free-for-all" of coordinated activity during the safe harbor periods. But Plaintiffs fail to acknowledge that the Commission adopted this test in recognition of the cautionary note the Supreme Court voiced in *Buckley*: Because campaign finance laws "operate in an area of the most fundamental First Amendment activities," they must be interpreted to avoid a chilling effect on freedoms of speech and association. *Buckley*, 424 U.S. at 14, 41 n.47.

> [V]ague laws may not only 'trap the innocent by not providing fair warning' or foster 'arbitrary and discriminatory application' but also operate to inhibit protected expression by inducing 'citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.' 'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

*Id.* at 41 n.48.

Precisely because of the risk of chilling core First Amendment freedoms, the Supreme Court consistently construed FECA's use of the term "expenditure" to include

only "express advocacy" disbursements. Throughout *Buckley* — the starting point for any discussion of FECA and BCRA — the Supreme Court gave the term "expenditure" a narrowing construction. With regard to section 608(e)(1) of FECA, which provided that "[n]o person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which . . . exceeds $1000," the Court held that the phrase "relative to" was unconstitutionally vague. To cure that deficiency, the Court adopted the express advocacy test. *Buckley*, 424 U.S. at 41-44. With regard to the FECA's disclosure provisions, the Court again noted the inherent vagueness in FECA's definition of "expenditure" in terms of money disbursed "for the purpose of influencing any election." Again, the Court adopted the "express advocacy" test. *Id.* at 76-80.

In *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 248-49 (1986) ("*MCFL*"), the Court remained true to this core lesson of *Buckley*. Interpreting FECA's restrictions on corporate expenditures, the Court, again citing vagueness and overbreadth concerns, held that "an expenditure must constitute 'express advocacy' in order to be subject to" the corporate expenditure restrictions. *Id.*

By formally incorporating the express advocacy content standard into its coordinated communications regulations, the Commission acted consistent with a long line of Supreme Court precedent. To avoid chilling fundamental First Amendment freedoms implicated by § 441a's restrictions on coordinated communication, the FEC properly concluded that the term "expenditure" must be given a narrow and precise construction.

The FEC knew all too well that the risks identified in *Buckley* and *MCFL* were not hypothetical: One need only look at the Commission's experience when it lost sight

7

of the express advocacy standard in formulating and enforcing coordinated communications regulations. Over time, the Commission came to recognize that a conduct standard alone failed to provide adequate guidance to persons making independent political expenditures to "prevent the specter of investigation and litigation from chilling constitutionally protected speech." Smith Statement for the Record, *The Coalition*, at 4.

Prior to that, however, the absence of a formal bright-line content standard led to fruitless investigations that caused exactly the result that *Buckley* court sought to avoid — the suffocation of First Amendment freedoms by inadequately demarking forbidden areas. Without a content standard, individuals accused of illicit coordination lacked the benefit of a ready and inexpensive defense to an FEC investigation. Instead, they were subjected to highly intrusive investigations — including invasive file review, public disclosure of confidential strategies, and depositions of leaders — to determine whether invariably imprecise conduct standards had been satisfied.

Consider the example of the *NRCC* investigation. In 1997, the Democratic National Committee ("DNC") filed a complaint alleging that Republican party affiliated committees and associations had violated FECA in 1996 through allegedly "coordinated" activities. The Commission ultimately found no violation, but subjected the respondents to four years of instrusive investigation. *Id.* at 2. As Commissioner Smith aptly observed at the time,

> Despite the fact that the Commission has now found no violations in this case, I strongly suspect that the [DNC] considers its complaint to have been a success. The complaint undoubtedly forced their political opponents to spend hundreds of thousands, if not millions of dollars in legal fees, and to devote countless hours of staff, candidate, and executive time to responding to discovery and handling legal matters. Despite our

8

>finding that their activities were not coordinated and so did not violate the Act, I strongly suspect that the huge costs imposed by the investigation will discourage similar participate by these and other groups in the future.
>
>We cannot fault [DNC] for pursuing its goals through the legal tools made available to it . . . . These complaints are usually filed as much to harass, annoy, chill, and dissuade their opponents from speaking as to vindicate any public interest in preventing "corruption or the appearance of corruption."

*Id.* at 2.

Fortunately, the Supreme Court anticipated this problem in *Buckley* and again in *MCFL* and provided a workable solution -- the "express advocacy" content standard that the Commission has invoked here.

## **CONCLUSION**

The FEC's use of content standards is nothing new, and for years before the passage of BCRA, that standard effectively has been "express advocacy." Contrary to plaintiffs' assertions, the FEC's explicit use of that standard does not mark a retreat from Commission's prior standards, but rather regulates more conduct that was covered under pre-BCRA regulations. It represents the culmination of years of informal understandings and agreements at the Commission, and a recognition of the need to give First Amendment freedoms necessary "breathing room." This breathing room will be curtailed substantially should the present regulations be struck down in favor of a more restrictive approach. The regulations are consistent with the statute and Congressional intent and therefore should be upheld.

Date: January 19, 2007

Respectfully submitted,

**THE CENTER FOR COMPETITIVE POLITICS**

_____
Counsel

Harry M. Johnson, III (DC Bar No. IL-002)
Sean P. Trende (Motion for Admission Pending)
George P. Sibley, III (Motion for Admission *pro hac vice* Pending)
**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219-4074
(804) 788-8200
(804) 788-8218 (facsimile)

*Counsel for The Center for Competitive Politics*

Case 1:06-cv-01247-CKK    Document 23-2    Filed 01/29/2007    Page 10 of 11

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 19th day of January, 2007, served a copy of the foregoing pleading, by e-mail pursuant to this Court's rules for non-party electronic service, and by mailing the same by United States mail, properly addressed, and first class postage prepaid on counsel for all parties.

_____