IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Christopher Shays and Martin Meehan,

                              Plaintiffs,

        v.                                          Civil Action No. 06-CV-1247
                                                    (Judge Kollar-Kotelly)
United States Federal Election Commission,

                              Defendant.

---

REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Roger M. Witten (Bar No. 163261)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
(212) 230-8800


Randolph D. Moss (Bar No. 417749)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000


Donald J. Simon (Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY LLP
1425 K Street, N.W., Suite 600
Washington, D.C.  20005
(202) 682-0240

Charles G. Curtis, Jr. (*pro hac vice*)
Michelle M. Umberger (Bar No. 480620)
David L. Anstaett (*pro hac vice*)
Lissa R. Koop (*pro hac vice*)
HELLER EHRMAN LLP
One East Main Street, Suite 201
Madison, Wisconsin  53703
(608) 663-7460


Fred Wertheimer (Bar No. 154211)
DEMOCRACY 21
1825 Eye Street, N.W., Suite 400
Washington, D.C.  20006
(202) 429-2008


*Attorneys for Plaintiffs Christopher Shays
and Martin Meehan*

# Table of Contents

Page(s)

Table of Authorities ............................................................................................ iii

Table of Abbreviations ........................................................................................ ix

Argument in Reply ................................................................................................ 1

I.    Plaintiffs' Claims Are Immediately Justiciable. ................................................ 1

II.   The Commission's Coordination "Content Standards" Continue to
      Violate FECA, BCRA, and the APA. .............................................................. 1

      A.    The Commission Has Virtually Ignored One of the Two
            Principal Issues On Remand: The Need to Justify "The Weak
            Restraints" That Govern Outside the Commission's Pre-
            Election Windows. ............................................................................... 3

            1.    The Commission Did Not Historically Use, and
                  Congress in 2002 Certainly Did Not Authorize, an
                  "Express Advocacy" Standard in Regulating
                  *Coordinated* (as Opposed to *Independent*) Expenditures. .......... 5

            2.    Express Advocacy Is An Underinclusive Standard in All
                  of Its Forms For Use in Regulating Coordinated
                  Expenditures. ................................................................................. 9

            3.    The Commission's Constitutional Avoidance Arguments
                  Already Have Been Rejected. ........................................................ 12

      B.    The Commission Made Arbitrary and Capricious Use of the
            CMAG Data in Attempting To Justify Its Revised Coordination
            Regulation. ........................................................................................ 14

            1.    The Commission's Own Data Show That Substantial
                  Campaign Advertising Occurs Outside Its Pre-Election
                  Windows. ...................................................................................... 15

            2.    The Commission's Methodology Is Fundamentally
                  Flawed Because It Focuses on the *Aggregate* of Federal
                  Campaigns Rather Than *Strongly Contested* Campaigns. .......... 18

            3.    The Commission's Exclusion of New Hampshire and
                  Other Important Early Primaries from Its Analysis of
                  Early Advertising in Presidential Primaries Is Arbitrary
                  and Capricious. ............................................................................. 20

i

4.       The Commission's 2004 House and Senate Data Sets
Exclude Virtually All Ads Run in 2003 and Are
Therefore Completely Unreliable. ...........................................................22

C.       The Commission Acted Arbitrarily and Capriciously In
Disregarding the Extensive Record Evidence Showing That a
Substantial Amount of Campaign Advertising Occurs Outside
the Commission's Pre-Election Windows. ...........................................................23

D.       The Commission Has Failed To Demonstrate Why Spending
Will Not Simply Shift to the Unregulated Periods Outside Its
Pre-Election Windows. ...........................................................29

III.    The Commission's Revised Coordination "Conduct Standards" Violate
FECA, BCRA, and the APA. ...........................................................31

A.       The Commission's Weakened Common Vendor and Former
Employee Conduct Standards Impermissibly Authorize the
Unregulated Exchange of Material Inside Information Between
Recent Campaign Insiders and Outside Spenders. ...................................31

B.       The Commission's "Firewall Safe Harbor" Invites Gross Abuse
and Has Not Been Adequately Explained or Justified. .............................36

IV.     The Regulation Governing Solicitation at State Party Fundraising
Events Continues to Violate BCRA and the APA. ...........................................39

V.      The Commission's "Federal Election Activity" Regulations Unduly
Compromise BCRA's Soft Money Restrictions on State, District, and
Local Party Committees and Violate the APA. ...........................................43

Conclusion ...........................................................45

# Table of Authorities

Page(s)

**Cases:**

*Action on Smoking & Health v. CAB,*
699 F.2d 1209 (D.C. Cir. 1983) ..................................................................... 26

*AFL-CIO v. FEC,*
333 F.3d 168 (D.C. Cir. 2003) ...................................................................... 13

*Akins v. FEC,*
101 F.3d 731 (D.C. Cir. 1996) (*en banc*),
*vacated on other grounds*, 524 U.S. 11 (1998) .............................................. 14

*Ala. Power Co. v. Costle,*
636 F.2d 323 (D.C. Cir. 1979) ...................................................................... 17

*\*Buckley v. Valeo,*
424 U.S. 1 (1976) ..................................................................................... 2, 7

*Canadian Ass'n of Petroleum Producers v. FERC,*
254 F.3d 289 (D.C. Cir. 2001) ...................................................................... 26

*Chem. Mfrs. Ass'n v. EPA,*
28 F.3d 1259 (D.C. Cir. 1994) ...................................................................... 28

*Cheng v. GAF Corp.,*
631 F.2d 1052 (2d Cir. 1980), *vacated on other grounds,*
450 U.S. 903 (1981) .................................................................................... 37

*Christianson v. Colt Indus. Operating Corp.,*
486 U.S. 800 (1988) .................................................................................... 42

*Colorado Republican Fed. Campaign Comm. v. FEC,*
518 U.S. 604 (1996) ..................................................................................... 7

*Columbia Falls Aluminum Co. v. EPA,*
139 F.3d 914 (D.C. Cir. 1998) ................................................................ 22, 27

*\*Common Cause v. FEC,*
692 F. Supp. 1391 (D.D.C. 1987) ........................................................... 38-39

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

iii

*Covad Commc'ns Co. v. FCC*,
  450 F.3d 528 (D.C. Cir. 2006) ....................................................................... 26

*DeCora Inc. v. DW Wallcovering, Inc.*,
  899 F. Supp. 132 (S.D.N.Y. 1995) ................................................................. 37

*EchoStar Satellite L.L.C. v. FCC*,
  457 F.3d 31 (D.C. Cir. 2006) ........................................................................ 10

*EDF, Inc. v. EPA*,
  82 F.3d 451 (D.C. Cir. 1996) ........................................................................ 17

*Elec. Power Supply Ass'n v. FERC*,
  391 F.3d 1255 (D.C. Cir. 2004) ................................................................30-31

*EPA v. Brown*,
  431 U.S. 99 (1977) ....................................................................................... 42

*FEC v. Akins*,
  524 U.S. 11 (1998) ......................................................................................... 1

*\*FEC v. Christian Coalition*,
  52 F. Supp. 2d 45 (1999) .........................................................................7-8, 13

*FEC v. Furgatch*,
  807 F.2d 857 (9th Cir. 1987) ................................................................. 10, 12

*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002) .............................................................. 20, 28

*Honeywell Int'l, Inc. v. EPA*,
  372 F.3d 441 (D.C. Cir. 2004) ...................................................................... 25

*Lamie v. United States Tr.*,
  540 U.S. 526 (2004) ..................................................................................... 42

*\*McConnell v. FEC*,
  251 F. Supp. 2d 176 (D.D.C.),
  *aff'd in part, rev'd in part*,
  540 U.S. 93 (2003) .............................................................2, 10-11, 14

*\*McConnell v. FEC*,
  540 U.S. 93 (2003) .......................................................................*passim*

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

iv

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
      463 U.S. 29 (1983) ...................................................................................................passim

Ne. Md. Waste Disposal Auth. v. EPA,
      358 F.3d 936 (D.C. Cir. 2004) ...................................................................................26-27

*Orloski v. FEC,
      795 F.2d 156 (D.C. Cir. 1986) ....................................................................................... 2

PPL Wallingford Energy LLC v. FERC,
      419 F.3d 1194 (D.C. Cir. 2005) .................................................................................... 26

Pub. Citizen v. Burke,
      843 F.2d 1473 (D.C. Cir. 1988) .................................................................................... 14

Pub. Citizen v. FTC,
      869 F.2d 1541 (D.C. Cir. 1989) .................................................................................... 17

*Randall v. Sorrell,
      126 S. Ct. 2479 (2006) .................................................................................................. 18

Regular Common Carrier Conference v. United States,
      793 F.2d 376 (D.C. Cir. 1986) ..................................................................................... 31

Sabre, Inc. v. DOT,
      429 F.3d 1113 (D.C. Cir. 2005) .................................................................................... 42

SEC v. Chenery Corp.,
      318 U.S. 80 (1943) ........................................................................................................ 10

*Shays v. FEC,
      337 F. Supp. 2d 28 (D.D.C. 2004), aff'd,
      414 F.3d 76 (D.C. Cir. 2005) ................................................................................passim

*Shays v. FEC,
      340 F. Supp. 2d 39 (D.D.C. 2004) ......................................................................5, 44-45

*Shays v. FEC,
      414 F.3d 76 (D.C. Cir. 2005) ...............................................................................passim

St. James Hosp. v. Heckler,
      760 F.2d 1460 (7th Cir. 1985) ...................................................................................... 27

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

*Univ. of Great Falls v. NLRB*,
    278 F.3d 1335 (D.C. Cir. 2002) ...............................................................................13-14

**Constitution, Statutes, Legislation, and Legislative History:**

U.S. Constitution, Art. III. .............................................................................................1-2

2 U.S.C. § 431(8) .............................................................................................................. 1

*2 U.S.C. § 431(9)(A)................................................................................................ 1, 3, 16

2 U.S.C. § 434(b)(4) ..................................................................................................... 1, 26

2 U.S.C. § 438(a) ............................................................................................................. 26

2 U.S.C. § 438a ............................................................................................................... 26

*2 U.S.C. §441a(a)(7).................................................................................................... 8, 16

2 U.S.C. § 441b ............................................................................................................ 7, 16

2 U.S.C. § 441i(b) ............................................................................................................. 1

2 U.S.C. § 441i(e) ......................................................................................................41-42

5 U.S.C. § 706(2) ............................................................................................................. 45

Administrative Procedure Act, codified at 5 U.S.C. §§ 551 *et seq.*......................................*passim*

Bipartisan Campaign Reform Act of 2002,
    Pub. L. No. 107-155, 116 Stat. 81 ...........................................................................*passim*

*Bipartisan Campaign Reform Act § 214.................................................................9, 14, 32-33

Federal Election Campaign Act, codified at 2 U.S.C. §431 *et seq.* ....................................*passim*

S. Rep. No. 105-167 (1998)
    (the "Thompson Committee Report")...........................................................................32

147 Cong. Rec. S3124-25 (daily ed. Mar. 29, 2001) ...................................................44

148 Cong. Rec. H408-11 (daily ed. Feb. 13, 2002) ....................................................44

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

vi

148 Cong. Rec. S2143-45 (daily ed. Mar. 20, 2002) ....................................................8-9, 34, 44

**Regulations and Agency Materials:**

11 C.F.R. § 100.22(b) ................................................................................................. 9-11

11 C.F.R. § 100.24(2) .......................................................................................................43

11 C.F.R. § 100.24(3) .......................................................................................................43

11 C.F.R. § 106.4(g) .................................................................................................. 35-36

11 C.F.R § 109.21(d) (2003).............................................................................................31

11 C.F.R § 109.21(d) .......................................................................................................32

11 C.F.R. § 109.21(h) .......................................................................................................36

60 Fed. Reg. 35,292 (July 6, 1995).................................................................................11

65 Fed. Reg. 76,138 (Dec. 6, 2000).................................................................................8

68 Fed. Reg. 421 (Jan. 3, 2003) ................................................................................ 37-38

71 Fed. Reg. 8,926 (Feb. 22, 2006) .................................................................................44

71 Fed. Reg. 33,190 (June 8, 2006) ....................................................................... *passim*

FEC Advisory Opinion 2006-19 .......................................................................................43

FEC Advisory Opinion 2003-36 .......................................................................................41

FEC Advisory Opinion 2003-5 .........................................................................................41

FEC Advisory Opinion 2003-3 .........................................................................................40

FEC Advisory Opinion 1990-5 ...........................................................................................6

FEC Advisory Opinion 1988-22 .........................................................................................6

FEC Advisory Opinion 1983-12 .........................................................................................6

FEC Advisory Opinion 1982-56 .........................................................................................6

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

**Secondary Sources:**

ABA Code of Professional Responsibility DR 5-105(D) ............................................................. 37

Michael Barone & Richard E. Cohen,
   *The Almanac of American Politics 2006* (2005) ............................................................. 20

Comment, *The Chinese Wall Defense to Law-Firm Disqualification*,
   128 U. Pa. L. Rev. 677 (1980) ......................................................................................... 37

Dick Morris, *Behind the Oval Office:*
   *Winning the Presidency in the Nineties* (1997) ............................................................. 27

Restatement (Third) of the Law Governing Lawyers (2000) ....................................................... 37

Scott E. Thomas & Jeffrey J. Bowman,
   *Coordinated Expenditure Limits:  Can They Be Saved?*,
   49 Cath. U. L. Rev. 133 (1999) ......................................................................................... 6

18A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper,
   *Federal Practice and Procedure* (2d ed. 2002) ............................................................. 42

32 Charles Alan Wright & Charles H. Koch,
   *Federal Practice and Procedure* (2006) ......................................................................... 25

*Authorities on which plaintiffs chiefly rely are marked with asterisks.

**Table of Abbreviations**

The following abbreviations are used in this memorandum:

- Add. D          The collection of political ads attached as Addendum D to
  Plaintiffs' Motion for Summary Judgment, Dkt. No. 18 (Dec. 8,
  2006)

- AO              FEC Advisory Opinion

- APA             Administrative Procedure Act

- BCRA            Bipartisan Campaign Reform Act of 2002

- CCP             Center for Competitive Politics

- CKK             Hon. Colleen Kollar-Kotelly

- CMAG            Advertising data licensed by the FEC from TNS Media
  Intelligence/CMAG

- D               Democratic

- DMA             Designated Market Area

- DNC             Democratic National Committee

- E&J             Explanation & Justification

- FEA             Federal election activity

- FEC             Federal Election Commission

- FECA            Federal Election Campaign Act

- NRCC            National Republican Congressional Committee

- PAC             Political Action Committee

- PASO            Promote, attack, support, or oppose

- PGN             Presidential Graphs—Notes

- PX   Plaintiffs' Exhibit to Plaintiffs' Motion for Summary Judgment, Dkt. No. 18 (Dec. 8, 2006)

- R   Republican

- RGA   Republican Governors' Association

- RNC   Republican National Committee

- SPX   Supplemental Plaintiffs' Exhibit to Plaintiffs' Reply Memorandum and Memorandum in Opposition to Defendant's Motion for Summary Judgment

- S. Rep. No. 105-167 (1998), *abbreviated as* Thompson Committee Report.

- Express Advocacy; Independent Expenditures; Corporate and Labor Organization Expenditures; Final Rule, 60 Fed. Reg. 35,292 (July 6, 1995), *abbreviated as* 60 Fed. Reg. at ___.

- General Public Political Communications Coordinated With Candidates and Party Committees; Independent Expenditures; Final Rule, 65 Fed. Reg. 76,138 (Dec. 6, 2000), *abbreviated as* 65 Fed. Reg. at ____.

- Coordinated and Independent Expenditures; Final Rules, 68 Fed. Reg. 421 (Jan. 3, 2003), *abbreviated as* 68 Fed. Reg. at ___.

- Definition of Federal Election Activity; Final Rules, 71 Fed. Reg. 8,926 (Feb. 22, 2006), *abbreviated as* 71 Fed. Reg. at ____.

- Coordinated Communications; Final Rules, 71 Fed. Reg. 33,190 (June 8, 2006), *abbreviated as* 71 Fed. Reg. at ____.

- Plaintiff Federal Election Commission's Opposition to Defendant's Motion for Summary Judgment in *FEC v. Christian Coalition*, D.D.C. Civ. No. 96-1781 (JHG)

- Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Dkt. No. 18 (Dec. 8, 2006), *abbreviated as* Pls' Br.

- Statement of Material Facts as to Which Plaintiffs Contend There Is No Genuine Issue, Dkt. No. 18 (Dec. 8, 2006), *abbreviated as* Pls' St. Mat. Facts.

- Memorandum in Support of Federal Election Commission's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, Dkt. No. 19 (Jan. 19, 2007), *abbreviated as* FEC Br.

- Defendant Federal Election Commission's Statement of Genuine Issues, Dkt. No. 19 (Jan. 19, 2007), *abbreviated as* FEC St. Gen. Issues

- Brief of *Amicus Curiae* The Center for Competitive Politics, Dkt. No. 23 (Jan. 29, 2007), *abbreviated as* CCP *Amicus* Br.

## Argument in Reply

### I.    Plaintiffs' Claims Are Immediately Justiciable.

Plaintiffs' opening brief, proposed findings, and declarations demonstrate that plaintiffs have Article III and prudential standing, and that their facial challenges are ripe for review. Pls' Br. at 5; Pls' St. Mat. Facts ¶¶ 18-23. Although the Commission disputes plaintiffs' proposed facts concerning standing and ripeness (*see* FEC St. Gen. Issues ¶¶ 18-23), its brief declares cryptically that "[t]he Commission is not *at this time* contesting plaintiffs' standing." FEC Br. at 15 n.7 (emphasis added). Regardless of the Commission's position, the decisions in *Shays I* on standing and ripeness are both *stare decisis* and issue preclusive. *See Shays v. FEC*, 337 F. Supp. 2d 28, 38-50 (D.D.C. 2004), *aff'd*, 414 F.3d 76, 82-96 (D.C. Cir. 2005).[1]

### II.    The Commission's Coordination "Content Standards" Continue to Violate FECA, BCRA, and the APA.

The Commission devotes much of its brief to attacking straw men. Contrary to the Commission's repeated claims, there is no dispute that the coordination analysis is (and always has been) governed by a statutory "content standard"—FECA's requirement that funds must be spent "*for the purpose of influencing any election for Federal office*" in order to be treated as an "expenditure." 2 U.S.C. § 431(9)(A); *see* FEC Br. at 8-9, 32, 34 (emphasis added). Neither plaintiffs nor this Court asserted otherwise in *Shays I*. *See* Pls' Br. at 8-9.

Nor is there any dispute that "time, place, and content may be critical indicia of communicative purpose," and that there is room for the use of bright-line standards in

---

[1]    Plaintiffs also have standing under the informational standing analysis of *FEC v. Akins*, 524 U.S. 11, 14-15, 21-24 (1998). If a paid TV ad is not deemed to be a "coordinated" expenditure, it is exempt from FECA's "contribution" disclosure requirements. *See* 2 U.S.C. §§ 431(8), 434(b). Likewise, if state and local party activities are deemed not to be FEA, they can be funded with undisclosed soft money. *See id.* § 441i(b)(1). As voters, candidates, and elected officeholders, plaintiffs suffer Article III

*(Footnote continued)*

implementing the statutory coordination provisions. *Shays I*, 414 F.3d at 99; FEC Br. at 8, 42-45. But "a bright line can be drawn in the wrong place," thereby unlawfully excluding ads that, although free of express advocacy, are nonetheless run "for the purpose of influencing" a federal election. *Shays I*, 414 F.3d at 80, 101; *see also Orloski v. FEC*, 795 F.2d 156, 165 (D.C. Cir. 1986) (Commission may not employ an "objective, bright-line test" that would "unduly compromise the Act's purposes" or "create the potential for gross abuse"). That is precisely what the Commission has done here, once again.[2]

Nor is there any dispute that TNS Media Intelligence/CMAG is a reliable organization whose advertising data may be used in evaluating the efficacy of campaign finance measures. The Commission wastes much time in attempting to prove what this Court already has held and plaintiffs repeatedly have advocated—that CMAG data can be a useful analytical tool. *See* FEC Br. at 35-38.[3] The fault is not with the CMAG data, but with the way in which the Commission

---

harm from failing to obtain these statutorily required disclosures. *See also Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976).

    [2] The Commission's reliance on *Orloski* is misplaced. The D.C. Circuit in that case allowed the Commission to adopt an "objective, bright-line test" only because, in that specific context, the test did *not* "create the potential for gross abuse." 795 F.2d at 165. At issue was "corporate funding of legislative events sponsored by a congressman" close to an election. *Id.* "[T]he corporate donations consisted of 'in excess of one thousand hamburgers, an unknown quantity of salad and potato salad and bus transportation.'" *Id.* (citation omitted). *Orloski* allowed the use of a bright line only because corporate sponsors of such events "can make little more than insignificant, indirect donations to a candidate's potential warchest" and were "unlikely" to "significantly increase the level of campaign spending." *Id.* at 165-66. Here, on the other hand, the Commission's bright line has opened an enormous loophole that invites massive coordinated advertising expenditures.

    [3] This Court found in *McConnell* that CMAG is "a legitimate source of data for use in studies seeking to understand the contours of political advertising, recognizing it has certain limitations." *McConnell v. FEC*, 251 F. Supp. 2d 176, 583-84 (D.D.C.) (three-judge District Court) (CKK) (Finding ¶ 2.12.1), *aff'd in part, rev'd in part*, 540 U.S. 93 (2003). Plaintiffs and BCRA's other co-sponsors made extensive use of CMAG data in defending BCRA's constitutionality before the three-judge District Court and the Supreme Court.

has manipulated and misused those data, drawn unwarranted and plainly erroneous conclusions from them, and selectively chosen to exclude highly relevant data from its analysis.

Having spent much of its brief arguing matters that are not in dispute, the Commission focuses scant attention on the crucial issues identified by the D.C. Circuit, this Court, and plaintiffs that are very much in dispute.

A.    **The Commission Has Virtually Ignored One of the Two Principal Issues On Remand: The Need to Justify "The Weak Restraints" That Govern Outside the Commission's Pre-Election Windows.**

The D.C. Circuit instructed the Commission to consider on remand not only *when* the period of heightened pre-election regulation should begin, but also what standards should govern *outside* that period, *i.e.*, during most of each election cycle.  The D.C. Circuit pointedly observed that the Commission had authorized "a coordinated communication free-for-all for much of each election cycle" by "allowing unrestricted collaboration outside the 120 days so long as the communication's paymasters avoid" redistributing campaign materials or using express advocacy, which the Court called "weak restraints."  *Shays I*, 414 F.3d at 99-100.  The Court instructed the Commission to demonstrate on remand why it "deem[ed] these two categories adequate by themselves to capture the universe of electorally oriented communication outside the 120-day window." *Id.* at 100.  The Commission had to prove—no matter where it drew the time line for heightened regulation—that non-express advocacy beyond that line "*likely relates to purposes other than 'influencing' a federal election*—the line drawn by the statute's 'expenditure' definition, 2 U.S.C. § 431(9)(A)." *Shays I*, 414 F.3d at 101 (emphasis added).

Plaintiffs focused at length on this issue in their opening brief, demonstrating why this Court correctly held in *Shays I* that any reliance on an express advocacy content standard for most of the election cycle "create[s] an immense loophole that would facilitate the circumvention of [federal] contribution limits, thereby creating 'the potential for gross abuse'" and "run[ning]

contrary to the entire rationale for the special treatment of coordinated communications." 337 F. Supp. 2d at 63, 65, 91 (citations omitted); *see* Pls' Br. at 26-31. The Commission, on the other hand, virtually ignores this issue, restricting its discussion largely to one paragraph buried on page 48 of its brief.

The Commission's response, on its face, fails in several important respects to comply with the D.C. Circuit's standard. The Court of Appeals instructed that any content standard had to seek "to capture the *universe* of electorally *oriented* communication outside the 120-day window," whereas the Commission merely claims that "the regulation will capture the *overwhelming majority* of electorally *significant* advocacy that occurs far before the election." *Compare Shays I*, 414 F.3d at 100, *with* FEC Br. at 48 (emphasis added). Moreover, the Commission nowhere attempts to prove that coordinated non-express advocacy that occurs outside its pre-election windows "*likely* relates to purposes other than 'influencing' a federal election—the line drawn by the statute's 'expenditure' definition." *Shays I*, 414 F.3d at 101 (emphasis added).

The Commission has utterly failed to meet its burden of demonstrating why its revised rule—which, for Presidential campaigns, maintains the *same* 120-day pre-primary period as the rule invalidated in *Shays I*, and for Congressional campaigns, *shrinks* the applicable time frame from 120 to 90 days—will not, outside those periods, cause the same "coordinated communication free-for-all" condemned by the D.C. Circuit in *Shays I*. 414 F.3d at 99-100. The undeniable legal effect of the Commission's rule is that any spender—a corporation, labor union, wealthy individual, or even foreign government—can openly collaborate with a candidate on the text, timing, or target audience of an ad campaign, and spend an unlimited amount of undisclosed soft money at the direct behest of the candidate to run those ads outside the regulation's time

frame, no matter how overtly the ads promote the candidate by name or attack his opponent by name, so long as the ads avoid express advocacy—the standard deemed "functionally meaningless" by the Supreme Court in *McConnell v. FEC*, 540 U.S. 93, 193 (2003).

Three election cycles have now come and gone since BCRA's enactment, and yet the Commission's express-advocacy content standard *still* remains in place. Although this Court warned the Commission in 2004 not to let the 2006 election cycle slip by without putting more effective regulations into effect, *see Shays v. FEC*, 340 F. Supp. 2d 39, 51-54 (D.D.C. 2004), we are now waist-deep in the 2008 campaign and no closer to having a lawful coordination regulation. As the record so clearly demonstrates, candidates, parties, and outside groups have spent millions of dollars on early candidate-centered non-express advocacy ads in previous election cycles. There is every reason to believe that the 2008 cycle will involve even earlier and more expensive advertising.

This Court should not simply remand for the Commission to dawdle some more while another election cycle slips away. The Commission's use of an express advocacy standard not only is insufficiently explained and justified, but violates *Chevron* step two as well. The Court should so hold (again), should retain jurisdiction, and should ensure that the Commission really closes this safe harbor down this time around. *See* Pls' Br. at 59-60 & n.43.[4]

**1.    The Commission Did Not Historically Use, and Congress in 2002 Certainly Did Not Authorize, an "Express Advocacy" Standard in Regulating *Coordinated* (as Opposed to *Independent*) Expenditures.**

The Commission and its *amicus*, the Center for Competitive Politics ("CCP"), argue that Congress in 2002 intended through BCRA to *authorize* the use of an express advocacy standard

---

[4] The D.C. Circuit based its coordination decision on failure-to-explain grounds, and specifically reserved judgment on the *Chevron* step two issues. *See Shays I*, 414 F.3d at 96-97. This Court was correct before on *Chevron* step two, and it should reach the same result again.

in regulating *coordinated* advertising campaigns.   CCP claims that, "[p]re-BCRA, the Commission *consistently*, if not formally, applied the express advocacy content standard when determining whether allegedly coordinated expenditures qualified as 'contributions,'" and that Congress legislated based on this understanding.   CCP *Amicus* Br. at 1-2 (emphasis added).   The Commission adds that, by abandoning the express advocacy standard for "electioneering communications" covered by BCRA Title II-A, "Congress made a deliberate decision to *continue* to rely upon express advocacy in other contexts."   FEC Br. at 48 (emphasis added).

These arguments, as applied to *coordinated* expenditures, are frivolous.  The Commission during the 1980s and 1990s *repeatedly* rejected the use of an express advocacy test in connection with coordinated expenditures.[5]  Although some Commissioners (including Bradley Smith, now head of the CCP) began pushing in the late 1990s to adopt an express advocacy test for coordinated expenditures, the Commission *repeatedly* rejected that approach in the years leading up to BCRA.[6]   Indeed, the actual position of "the Commission" is best illustrated by its

---

[5]  *See especially* AO 1990-5 (PX 4), AO 1988-22 (PX 3), AO 1983-12 (PX 2), and AO 1982-56 (PX 1).  For a much more accurate analysis than that contained in CCP's *amicus* brief of the Commission's traditional refusal to use an "express advocacy" standard in regulating coordinated expenditures, *see* Scott E. Thomas & Jeffrey J. Bowman, *Coordinated Expenditure Limits: Can They Be Saved?*, 49 Cath. U. L. Rev. 133, 152-60 (1999) (PX 6).  As then-Commissioner Thomas and his coauthor demonstrated based on an analysis of the FEC's rules, Advisory Opinions, and enforcement proceedings, the Commission as of 1999 "has never adopted an express advocacy requirement when it considers coordination."  *Id.* at 152.

[6]  To be sure, some Commissioners (led by Mr. Smith) voted to block investigations of alleged coordination that did not involve express advocacy.  But Mr. Smith's 2001 Statement for the Record in MUR 4624, on which the CCP *amicus* brief heavily relies, was not joined by *any* other Commissioner. Moreover, Mr. Smith recognized in that statement that a majority of the Commission did *not* support an express advocacy test for coordinated communications.  *See* CCP *Amicus* Br., Ex. C at 13 n.22.  The CCP *amicus* brief also relies heavily on the 2002 Statement of Reasons by Messrs. Mason and Smith in MUR 4538, but that document was just that—the views of two individual Commissioners.  *Amicus* plays fast and loose in arguing that these two Commissioners were speaking for "the Commission."  CCP *Amicus* Br. at 4-5.  *Amicus* attempts to transform then-Commissioner Sandstrom's vote in this same MUR into an imagined three-vote bloc for an express-advocacy content standard.  *See id.* at 4-5.  (Curiously, the brief then stretches beyond reason to surmise that a fourth member, Commissioner Wold, would have signed

*(Footnote continued)*

successful advocacy on the question in court.  In October 1998, the Commission filed a brief in

*FEC v. Christian Coalition* responding to the Coalition's strenuous statutory and constitutional

arguments for the use of an express advocacy content standard in regulating coordinated

communications.  The Commission's own brief then, in summarizing why that standard would

eviscerate FECA, still stands as the best refutation of the Commission's position now:

> If coordinated expenditures could be regulated as contributions only if they paid
> for communications that contain express advocacy, the Act's regulation of
> contributions would be narrowed to the point of ineffectiveness. … [Christian
> Coalition's] construction would allow all corporations, labor organizations,
> wealthy individuals, and even foreign interests, to work out a specific plan with a
> candidate to spend unlimited funds to help the candidate's election, as long as the
> resulting communications avoid express advocacy.  *See Buckley*, 424 U.S. at 44
> n.52.  Such spending could include advertisements promoting the candidate or
> savaging his opponent, as well as providing a fully equipped campaign office or a
> private jet.  [Christian Coalition's] construction would also render the Act's
> recordkeeping and reporting requirements ineffective, open the door to the secret
> political deals the Act was designed to foreclose, and flout the "'compelling'
> governmental interest in assuring the electoral system's legitimacy, protecting it
> from the appearance and reality of corruption."  *Colorado Republican*, 518 U.S. at
> 609.

FEC *Christian Coalition* Br. at 8-9 (SPX 1).  Judge Greene found the Commission's arguments

compelling, and definitively rejected the use of express advocacy as an appropriate content test

for coordination.  *See FEC v. Christian Coalition*, 52 F. Supp. 2d 45, 88 (D.D.C. 1999):

> [I]mporting the "express advocacy" standard into § 441b's contribution
> prohibition would misread *Buckley* and collapse the distinction between
> contributions and independent expenditures in such a way as to give short shrift to
> the government's compelling interest in preventing real and perceived corruption
> that can flow from large campaign contributions.  Were this standard adopted, it

---

this Statement of Reasons and thus would supposedly have created a Commission majority, but was
"unable" to do so "because he left the Commission before the Statement of Reasons was issued."  *Id.* at 4
n.1.)  Mr. Sandstrom did *not* adopt an express advocacy standard, but simply concluded that the
Commission's then-current content analysis was not clear enough to meet his due process concerns.  *See*
Ex. D to CCP *Amicus* Brief.  At best, as of 2001 there was no majority on the Commission for any
particular content test.  *See* Thomas Statement of Reasons in MUR 4994, at 8-15 (Dec. 19, 2001) (SPX 7)
(summarizing tortured history of FEC's unraveling of legal standards in the area of coordinated
communications).

would open the door to unrestricted corporate or union underwriting of numerous campaign-related communications that do not expressly advocate a candidate's election or defeat.  *Cf.* 2 U.S.C. § 441a(a)(7)(B)(ii).

For example, expensive, gauzy candidate profiles prepared for television broadcast or use at a national political convention, which may then be broadcast, would be paid for from corporate or union treasury funds.  Such payment would be every bit as beneficial to the candidate as a cash contribution of equal magnitude and would equally raise the potential for corruption.  … Even more pernicious would be the opportunity to launch coordinated attack advertisements, through which a candidate could spread a negative message about her opponent, at corporate or union expense, without being held accountable for negative campaigning.  Coordinated expenditures for such communications would be substantially more valuable than dollar-equivalent contributions because they come with an "anonymity premium" of great value to a candidate running a positive campaign.  Allowing such coordinated expenditures would frustrate both the anticorruption and disclosure goals of the Act.  The First Amendment requires that the statute be construed to permit only narrowly tailored restrictions on speech that advance the Government's anti-corruption interest, but the Coalition's position allows for no restrictions at all on such expenditures.

Far from attacking the decision and reasoning in *Christian Coalition* (as do Mr. Smith and the CCP[7]), the Commission in its 2001 rulemaking on coordination embraced that decision in once again explicitly rejecting an express advocacy content test:

There is a substantial argument that any of the content standards suggested could be under-inclusive in the context of coordination.  Some advertising by campaigns, for instance, does not include express advocacy and does not refer specifically to candidates as candidates or state that they are running for election.  Allowing candidates, campaigns and political parties to ask corporations, labor unions or other persons to sponsor that kind of advertising without limit or disclosure could "give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions."

65 Fed. Reg. at 76,141 (*quoting Christian Coalition*, 52 F. Supp. 2d at 88) (PX 7).  Congress enacted BCRA on this understanding—that "[e]xisting law provides that a campaign-related

---

[7]    The CCP directs this Court's attention to Mr. Smith's statement criticizing Judge Greene's analysis in *Christian Coalition* "for not going far enough to protect First Amendment rights" and urging the Commission to refuse to follow that decision.  *See* CCP *Amicus* Br. at 4; *id.* Ex. C, at 13-15.

communication that is coordinated with a candidate or party is a contribution to the candidate or party, *regardless of whether the communication contains 'express advocacy*.'" 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statement of Sen. Feingold) (PX 8) (emphasis added).

This Court already has considered and rejected the Commission's recycled arguments about the intended scope of BCRA § 214. *See* FEC Br. at 32-34. As this Court held in *Shays I*, Section 214 "did nothing to change" FECA's definitions of "contribution" and "expenditure," and Congress had "no intention" of authorizing the Commission to restrict its coordination regulations to ads containing express advocacy. 337 F. Supp. 2d at 62-63; *see also Shays I*, 414 F.3d at 98-99 ("it seems hard to imagine that Representatives and Senators voting for BCRA would have expected regulations like these"); 148 Cong. Rec. S2145 (statement of Sen. Feingold) (Section 214 "*does not change the basic statutory standard* for coordination, which defines and sets parameters for the FEC's authority to develop these rules") (emphasis added).

### 2. Express Advocacy Is An Underinclusive Standard in All of Its Forms For Use in Regulating Coordinated Expenditures.

*McConnell*'s "unmistakable lesson" is that express advocacy is a "functionally meaningless" standard that "has not aided the legislative effort to combat real or apparent corruption." 540 U.S. at 193-94. As plaintiffs emphasized in their opening brief, "[i]t defies explanation how the Commission could conclude that such a standard—discredited not only in *McConnell* but by BCRA's legislative history—should be extended to the regulation of *coordinated* as well as *independent* communications." Pls' Br. at 28.

Neither the E&J nor the Commission's brief responds to this argument. The brief, however, cryptically claims that "[t]he Commission's regulation interpreting 'express advocacy' is broader than the 'magic words' approach, *see* 11 C.F.R. 100.22(b)," and that given "the breadth of section 100.22(b)" and several other considerations, "the regulation will capture the

*overwhelming majority* of electorally *significant* advocacy" occurring outside the pre-election windows. FEC Br. at 48 (emphasis added). The subsection to which the Commission refers codifies the so-called "*Furgatch* test" for defining express advocacy in the context of independent expenditures. Subsection 100.22(b), promulgated in 1995, derives from *FEC v. Furgatch,* 807 F.2d 857 (9th Cir. 1987), which this Court described in *McConnell* as "a case that has been largely discredited." 251 F. Supp. 2d at 601 (CKK).

This is the first time in the four years the Commission has been defending its express advocacy content standard that it has suggested that the long-dormant *Furgatch* test might be used in the coordination context, and the suggestion is hardly more than a passing comment.[8] The APA's standards do not allow agencies to offer *post hoc* justifications like these in the midst of litigation.[9] But even considering the Commission's oblique argument on its own merits, it is clear that *Furgatch* express advocacy, though certainly broader than the "magic words" form of express advocacy, is far more restrictive than the statutory test of whether an expenditure is "for the purpose of influencing" a federal election, and considerably more restrictive than a "promote, attack, support, or oppose" ("PASO") test, an "electioneering message" test, or other potential content standards.[10] *Furgatch* express advocacy must contain an "electoral" message that is "unmistakable, unambiguous, and suggestive of only one meaning," and must "encourage[]

---

[8] The Commission also has begun in recent months to use the *Furgatch* standard in other contexts. *See, e.g.*, MURs 5511 and 5525 (Swift Boat Veterans and POWs for Truth); MUR 5753 (League of Conservation Voters); MUR 5754 (MoveOn.org).

[9] *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943); *EchoStar Satellite L.L.C. v. FCC*, 457 F.3d 31, 36 (D.C. Cir. 2006) (courts "must rely only upon the reasons given by the agency, not 'counsel's *post hoc* rationalizations for agency action'") (citation omitted).

[10] For additional examples of potential alternatives, see the rulemaking comments of the Congressional sponsors of BCRA (including the plaintiffs here) (PX 14) and three reform groups (PX 15).

*actions to elect or defeat*" a clearly identified candidate.   11 C.F.R. § 100.22(b) (emphasis added).  As the Commission emphasized in its E&J for subsection 100.22(b), it is not enough to meet this test that an ad "discuss a candidate's character, qualifications, or accomplishments," such as stating "that the candidate has been caring, fighting and winning for his or her constituents," or that the candidate has "miss[ed] many votes" or committed "specific acts of misfeasance or malfeasance while in office."  60 Fed. Reg. at 35,294 (SPX 2).  Rather, such statements, analyzed "in context," must "have *no other reasonable meaning* than to encourage *actions to elect or defeat* the candidate in question."  *Id.* (emphasis added).  This clearly is narrower than a PASO or similar test.

In the rulemaking at issue in this case, the Commission was presented by commenters with the texts of dozens of ads run over the course of several campaign cycles, yet it took no opportunity to identify which of those ads might be covered by subsection 100.22(b).  Many of the commercials—especially those run by outside groups—tend to use sham "issue advocacy" appeals that are focused on praising a particular candidate.[11]  These appeals often avoid "unmistakable" and "unambiguous" exhortations to "elect" the public official in the ad, but nevertheless are intended to promote and support that candidate, and do have that effect.[12] Consider also negative TV attack ads that focus on a public official's controversial stands on the issues, alleged character flaws, or malfeasance in office without calling on viewers to defeat the

---

[11]   *See, e.g.*, Pls' Br. Add. D-18, PX 50 ("Call Lisa Murkowski" and "[t]hank her for fighting" against "those who want to impose their agenda on our [Alaskan] land"); *id.* Add. D-38, PX 113 ("Call and say thanks because Rick Santorum is the one getting it done."); PX 120 ("Tell Steve Laffey to keep fighting for taxpayers.").  *See generally* Pls. Br. at 15-19, 23-26.

[12]   *See McConnell*, 540 U.S. at 126-29, 189-202; *McConnell*, 251 F. Supp. 2d at 529-37 (Findings ¶¶ 2.3 to 2.4), 591-92, 606-16 (CKK); *Shays I*, 414 F.3d at 100-01; *Shays I*, 337 F. Supp. 2d at 57-58 & nn.26, 28.

official.[13]  There is often no express "electoral message" in such negative ads, but the context demonstrates that they are clearly run for the purpose of influencing an election.  Clever advertising consultants can readily draft around both the magic-words and the *Fugatch* versions of express advocacy.

The Commission for four years has sought to justify its express advocacy content standard by emphasizing the need for "bright-line" standards that will promote "clarity," "regulatory simplicity," and "ease of administration."  FEC Br. at 1, 44 (internal quotations and citations omitted); *see also* 71 Fed. Reg. at 33,197-33,200 (PX 136).  Yet there is nothing to suggest that the *Furgatch* test is any simpler to administer than a more inclusive PASO test. Thus, the *only* justification offered by the Commission for rejecting a PASO standard—that it "would not provide the 'clearest guidance to those seeking to comply with the coordination regulations,'" FEC Br. at 44 (quoting 71 Fed. Reg. at 33,199)—logically applies to a *Furgatch* standard as well.  This failure of the Commission's justifications to match the regulation it has adopted (as now recharacterized in its litigation briefs) is another example of arbitrary and capricious action.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency's E&J must provide a "'rational connection between the facts found and the choice made'") (citation omitted).

### 3.    The Commission's Constitutional Avoidance Arguments Already Have Been Rejected.

The Commission contends that an express advocacy standard is necessary because "a less objective test *could* unnecessarily chill speech on public issues protected by the First

---

[13]    *See*, *e.g.*, Add. D-28, PX 88 (accusing Sen. Tom Daschle of consorting with "Hollywood liberals, politicians and lobbyists" while opposing tax relief for "South Dakota families"); PX 121 ("Call Sen. Chafee.  Tell him Rhode Island can't afford high taxes."); Add. D-43, PX 130 (accusing Rep. Roy Blunt of money laundering activities).

Amendment" by threatening to "capture" speech that constitutes "genuine legislative debate and lobbying."  FEC Br. at 42, 46, 48 (emphasis added); *see also id.* at 32.  The Commission and its supporting *amicus*, the CCP, warn that anything less than a bright line standard *could* be abused by political opponents or overzealous regulators, thereby further chilling genuine issue advocacy. *See id.* at 44; CCP *Amicus* Br. at 6-9.  The CCP, in fact, complains that the Commission *did* abuse the nonexpress advocacy standard by engaging in "invasive file review, public disclosure of confidential strategies, and depositions of leaders" of such groups as the National Republican Congressional Committee in connection with allegations of coordinated expenditures by the "Coalition" business group in the 1996 campaign.  *See* CCP *Amicus* Br. at 8-9.

The D.C. Circuit disposed of this argument in *Shays I*, where the Commission argued that its "weak restraints" outside the 120-day pre-election window "preserve[d] space for political activities unrelated to elections."  414 F.3d at 101.  The Court responded:

> True enough, but so would regulating nothing at all, and that would hardly comport with the statute.  Notwithstanding its obligation to "attempt to avoid unnecessarily infringing on First Amendment interests," *AFL-CIO*, 333 F.3d at 179, the Commission must establish, consistent with APA standards, that its rule rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition.  …  The record before us, however, provides no assurance that the FEC's standard does not permit substantial coordinated expenditure, thus tossing out the proverbial baby (spending qualifying as contributions) with the bath water (political advocacy).

*Id.*; *see also Christian Coalition*, 52 F. Supp. 2d at 88-89 ("some room for fact-intensive inquiry is inevitable"; coordination analysis involves "a necessarily fact-intensive inquiry allowing for extensive FEC inquiry into the nature and extent of communications between the alleged contributor and campaign").[14]

---

[14]    The Commission's First Amendment avoidance argument waives its claim to *Chevron* deference, because determining the requirements of the First Amendment is the province of the judiciary. *See, e.g.*, *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002) (no deference to agency

*(Footnote continued)*

As for the CCP's claims that the NRCC was abused by the FEC as the result of lax coordination standards, it bears recalling that the "Coalition," a business group that engaged in extensive sham issue advertising in 1996, was formed at the specific behest of Rep. John Boehner (R-OH) and other Republican leaders; that the NRCC and the Coalition shared common media advisors, common pollsters, common film footage, and even common scripts; and that there was an extensive, ongoing "pattern of communications and interactions" between the NRCC and the Coalition. *See* General Counsel's Report in MUR 4624, at 36 (Apr. 20, 2001) (SPX 3); *see also id.* at 2, 12-35. Despite this evidence of coordination, the case was dropped after the Commission adopted its "agreement" conduct requirement in 2001; the General Counsel's office did not believe it could meet that heightened standard. Report at 2, 42-43. This episode drew significant criticism and helped build support for the repeal of the Commission's "agreement" requirement pursuant to BCRA § 214(b).[15]

### B.    The Commission Made Arbitrary and Capricious Use of the CMAG Data in Attempting To Justify Its Revised Coordination Regulation.

The Commission's principal justification for its 90- and 120-day pre-election windows is that, according to its selected subset of CMAG data, the "vast majority" of candidate-sponsored ads are run within these time windows, and only "a very small percentage of election-related ads" fall "outside." FEC Br. at 37, 46. The Commission deems that this "very small percentage"

---

analysis of "constitutional concerns, an area of presumed judicial, rather than administrative, competence"); *Akins v. FEC*, 101 F.3d 731, 740 (D.C. Cir. 1996) (*en banc*), *vacated on other grounds*, 524 U.S. 11 (1998); *Pub. Citizen v. Burke*, 843 F.2d 1473, 1478 (D.C. Cir. 1988) (no deference to "gloss" that agency puts on regulations so as to avoid constitutional problems).

[15] *See* Statement of Reasons of Comm. Thomas and Chmn. McDonald in *The Coalition*, MUR 4624, at 8-10 (Sept. 7, 2001) (SPX 9); *see also McConnell*, 251 F. Supp. 2d at 542-45 (Finding ¶ 2.6.2) (CKK). As Commissioner Thomas and Chairman McDonald emphasized, the AFL-CIO and Coalition coordination allegations "presented the potential for massive violations of the campaign finance laws. No government attorney should be faulted for zealously trying to do the public's business under these circumstances." (SPX 9 at 12-13 n.7.)

does not represent an "appreciable" number of TV ads or campaign dollars, when considered in the context of the national aggregate. *Id.* at 38, 46. It contends that its coordination regulation should be analyzed in relation to "the vast mainstream of election ads," not "a small number of unusual ads" at the margins. *Id.* at 47. These arguments fail on many grounds.

        1.       **The Commission's Own Data Show That Substantial Campaign Advertising Occurs Outside Its Pre-Election Windows.**

Even taking the Commission's use of the CMAG data at face value, the Commission draws conclusions from those data that are both erroneous and internally contradictory. For example, the Commission's data show that 8.56% of all candidate TV ads run in 2004 House primary races fell outside the 90-day pre-primary window. Pls' Br. at 33. Similarly, 8.44% of all candidate TV ads run prior to the 2004 Presidential primaries/caucuses in the selected media markets studied by the Commission were outside the 120-day pre-election window. *Id.* In addition, the Commission has now conceded in response to plaintiffs' proposed findings that, according to the Commission's own CMAG data, fully *sixteen percent* of all Presidential candidate TV ads run in Iowa before the January 2004 caucuses were aired outside the Commission's 120-day pre-caucus window. *See* Pls' St. Mat. Facts ¶ 13; FEC Response ¶ 13. Addendum D to plaintiffs' opening brief includes several examples of these spring and summer 2003 ads run by the Dean, Kucinich, Edwards, Gephardt, and Kerry campaigns in Iowa.[16]

The Commission nowhere attempts to justify its unspoken premise that 8% of all House primary advertising, 8% of all pre-primary Presidential advertising, and *16%* of all pre-caucus Presidential advertising in Iowa are somehow *de minimis* figures. Even using the Commission's woefully underinclusive data, these figures logically translate to thousands of ads and millions of

---

[16] *See* Add. D-9, Add.-11 to Add.-15; *see also* PX 30-31, 34, 37-38, 40-42, 45.

dollars outside the pre-election windows.[17]  The Commission's treatment of these as *de minimis* amounts—as "a small number of unusual ads" and "little more than a distracting distortion"—is impermissible for at least two reasons.    *First*, the relevant statutory provisions are "extraordinarily rigid."  *Shays I*, 414 F.3d at 113-14 (internal quotation marks and citations omitted); *see also Shays I*, 337 F. Supp. 2d at 116-17.  FECA's definition of "expenditure" reaches to "*any* purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office" (with specified exceptions), and *any* such "expenditure" that is coordinated with a candidate or political party is deemed to be a contribution.  2 U.S.C. §§ 431(9)(A)(i), 441a(a)(7)(B) (emphasis added).  Section 441b's ban on corporate and union contributions likewise extends to "any contribution," without hint of a *de minimis* exemption.  Surely the Commission, in implementing the ban on corporate and union contributions, could not promulgate a rule *authorizing* such contributions up to a certain "*de minimis*" amount, or

---

[17]    The Commission has now conceded, for example, that its subset of CMAG data shows that Presidential candidates spent nearly a half million dollars on TV advertising in Iowa more than 120 days before the January 2004 caucuses.  *See* Pls' St. Mat. Facts ¶ 12 ($486,709); FEC St. Gen. Issues ¶ 12 (no response).  The true amount of electoral spending in Iowa falling outside the Commission's pre-caucus window is certainly much larger, given that (1) the Commission only included the Cedar Rapids and Des Moines Designated Marketing Areas ("DMAs") in its figures, and excluded TV ads broadcast from stations in Davenport, Sioux City, Mason City, and Waterloo; and (2) the Commission ignored all forms of non-TV advertising such as radio, Internet, newspaper, and mass mailings.  Similarly, according to the Commission's subset of CMAG data, a total of $802,544 was spent by Presidential candidates on TV advertising outside the 120-day window in the subset of markets it examined.  *See* PX 134 (Chart P8 (4.89% of $16,411,945).)    By extrapolation, this suggests pre-window Presidential advertising expenditures of millions of dollars nationwide (again, excluding all forms of advertising other than TV).  The figures in Chart 8 only reflect TV ads in a small set of 23 DMAs—those media markets fully contained within a single "battleground" state's boundaries.  This excludes the vast majority of the 101 media markets monitored by CMAG (including many of the largest and most expensive media markets like New York, Los Angeles, Chicago, Houston, *et al.*), together with all spending that occurs outside of CMAG-monitored markets.  Thus, the $802,544 in early TV ads in 23 DMAs translates into total early TV advertising of millions of dollars.  Likewise, according to the Commission's own data, $653,892 was spent by House candidates on TV advertising outside the 90-day pre-primary window.  *See* PX 134 (Chart
*(Footnote continued)*

*authorizing* such contributions so long as they occurred outside a three-month pre-election window (on the theory that most contributions are made closer to the election).  By the same token, there is no statutory room for the Commission to treat thousands of ads representing millions of dollars in expenditures as a *de minimis* "distracting distortion" that can be excused from compliance with meaningful coordination regulations.  FEC Br. at 47.

> *Second*, as the D.C. Circuit explained in another context in *Shays I*:

> [E]ven absent [statutory] rigidity, "[t]he authority to create these [*de minimis*] exceptions does not extend to 'a situation where the regulatory function does provide benefits, in the sense of furthering regulatory objectives, but the agency concludes that the acknowledged benefits are exceeded by the costs.'" … Instead, situations covered by a de minimis exemption must be truly de minimis. That is, they must cover *only situations where "the burdens of regulation yield a gain of trivial or no value,"* … for otherwise the exemption reflects impermissible "second-guessing [of] Congress's calculations[.]"

414 F.3d at 114 (citations omitted, emphasis added).  The Commission bears the burden of proof on these matters.  *Shays I*, 337 F. Supp. 2d at 117.  It has not even tried to carry its burden of demonstrating why the first *16%* of pre-caucus Presidential candidate TV advertising in Iowa should be excluded from effective coordination regulation, or why the first 8% of House primary TV advertising should be deemed too "trivial" to warrant such regulation.  Plaintiffs' counsel are unaware of any case in which potential statutory violations involving the expenditure of hundreds of thousands and millions of dollars have ever been treated as *de minimis* matters.  *See Shays I*, 414 F.3d at 115 ("Nor does $ 5,000 strike us as an obviously trivial amount.").[18]

---

H2 (3.79% of $17,253,099).)  The Commission nowhere explains why these six- and seven-figure aggregate expenditures should be deemed "insubstantial."

[18]  *See also EDF, Inc. v. EPA*, 82 F.3d 451, 466 (D.C. Cir. 1996); *Pub. Citizen v. FTC*, 869 F.2d 1541, 1556-57 (D.C. Cir. 1989) (striking down agency's *de minimis* exemption for "personal utilitarian item[s], such as a pencil or cap or T-shirt or golf ball"); *Ala. Power Co. v. Costle*, 636 F.2d 323, 360-61 (D.C. Cir. 1979).

The Commission is also inconsistent in what it treats as a "substantial" expenditure and what it deems to be a "trivial" expenditure. For example, the Commission justifies its decision to close the Presidential election-year "gap period" by noting that 14% of President Bush's post-primary TV advertising occurred during the regulatory gap—a figure the Commission deems "appreciable." 71 Fed. Reg. at 33,195; FEC Br. at 38. Why is 14% an "appreciable" number but 16%—the percentage of pre-caucus Presidential candidate TV ads run in Iowa more than 120 days before the caucuses—a "minimal" and "very small number"? FEC Br. at 38-39, 43. Similarly, the Commission explains that it closed the Presidential election-year gap period in part because "Democratic Presidential candidates spent $1,221,045" during that period. 71 Fed. Reg. at 33,195; FEC Br. at 38. Why is that an "appreciable" sum, but not the millions of dollars spent during the pre-primary windows for Presidential, Senate, and House elections? *See* n.17 above. The Commission's internal inconsistencies reinforce the illegality of its revised content rule.

**2. The Commission's Methodology Is Fundamentally Flawed Because It Focuses on the *Aggregate* of Federal Campaigns Rather Than *Strongly Contested* Campaigns.**

The Commission's opening brief failed entirely to respond—even by way of a footnote—to plaintiffs' application here of *Randall v. Sorrell*, 126 S. Ct. 2479 (2006). *See* Pls' Br. at 36-37. *Sorrell* instructs that campaign finance laws must be evaluated not on the basis of their impact on "the *average* campaign," but from the perspective of their impact on "*strongly contested*" races. 126 S. Ct. at 2496 (emphasis in original) (*re* contribution limits). In other words, "the critical question concerns not simply the *average* effect" of a campaign finance measure, "but, more importantly," its effect in "*competitive*" races. *Id.* (emphasis in original). Yet the Commission entirely fails to consider the *concentration* and *intensity* of early political advertising in strongly contested races, and instead focuses solely on aggregate numbers. Having had its attention called to this mistake, the Commission has simply stayed silent.

18

"Value" is measured at the margin—in the most "strongly contested" races—not in the broad aggregates. The Commission's own CMAG data demonstrate this point. Of the 3,838 early TV ads included in the Commission's partial sample of Presidential campaign ads in 2003-04, 2,968 (77%) ran in Iowa, representing expenditures of $486,709 and constituting 16% of all pre-caucus TV ads run in Iowa. *See* Pls' St. Mat. Facts ¶ 12-13; FEC St. Gen. Issues ¶¶ 12-13 (not disputing these calculations). *Sixteen percent* certainly is an "appreciable" and "substantial" number! One would expect the figures for pre-primary advertising in the first-in-the-nation New Hampshire primary to be similar to Iowa, if not even more heavily tilted to early ads. We do not know, however, because the Commission *excluded the New Hampshire primary entirely from its analysis of the use of early pre-primary advertising*. *See* Part II-B-3 below. The administrative record contains many examples of early Iowa and New Hampshire ads run by Presidential candidates, political parties, and special interest groups, often six to nine months before the caucus and primary dates.[19]

Other examples of "strongly contested" campaigns that generate early media advertising include highly competitive Senate races with national dimensions (*e.g.*, the 2004 Daschle and Specter re-election campaigns, the 2006 Santorum, Chafee, and Burns re-election campaigns, etc.), and campaigns to fill open House or Senate seats.[20] There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that such campaign advertisements, clustered in highly competitive races of national significance, are rendered insignificant simply because they constitute "a very small percentage" of total advertisements run in every district

---

[19] *See* Pls' Br. at 13-15, 17-18; Add. D-1 to D-4, D-6 to D-9, D-11 to D-15; PX 18-19, 21-22, 28, 37-39, 41-43, 45.

[20] *See* Pls' Br. at 19-26; Add. D-19 to D-25, D-27 to D-29, D-31 to D-34, D-38 to D-41; PX 54, 56-75, 78-93, 97, 99, 101-03, 105-06, 108-09, 113-125.

nationwide.  FEC Br. at 46.  Indeed, the Commission's rule is all the more egregious because it permits unregulated coordination, even with corporate and union spenders, in *precisely* those races that may be most competitive or most important—and where an unregulated infusion of coordinated outside spending may have the most impact.

Although these central flaws in the Commission's focus were brought to its attention both in rulemaking comments (*see* PX 135 at 9-10) and in plaintiffs' opening brief (*see* Pls' Br. at 36-37), the Commission has refused even to address this fundamental analytical issue.  The Commission "entirely failed to consider an important aspect of the problem[.]"  *State Farm*, 463 U.S. at 43; *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1050-51 (D.C. Cir. 2002) (failure to respond).  Having failed twice to address this issue, the Commission should not be heard to do so now in reply.

3.    **The Commission's Exclusion of New Hampshire and Other Important Early Primaries from Its Analysis of Early Advertising in Presidential Primaries Is Arbitrary and Capricious.**

New Hampshire's first-in-the-nation Presidential primary has been the most important Presidential primary for at least the last half-century.[21]  Yet, as demonstrated in plaintiffs' opening brief, the Commission entirely *excluded* the New Hampshire primary from its analysis of pre-primary TV advertising because it did not fit within the Commission's modeling methodology.  That is, although New Hampshire is one of the 21 "battleground" states selected for inclusion by the Commission, it does not have a single Nielsen "Designated Market Area"

---

[21]  "New Hampshire has done much to change the political world—not just the United States, but the entire world:  It gave a huge boost to Dwight Eisenhower's candidacy in 1952, it prompted the retirement of Lyndon Johnson in 1968, it sent on his way to power first Jimmy Carter in 1976, then Ronald Reagan in 1980 and George H.W. Bush in 1988.  The lever by which this small state moves the world is New Hampshire's first-in-the-nation presidential primary[.]"  Michael Barone & Richard E. Cohen, *The Almanac of American Politics 2006*, at 1047 (2005).

("DMA") that is monitored by CMAG, and therefore is completely *excluded* from the Commission's analysis of early Presidential campaign advertising.[22]  Yet the record before the Commission demonstrates the significance of early TV advertising in the nation's first primary state.  2000 Republican primary candidate Steve Forbes began running TV ads in New Hampshire in March 1999, eleven months before the primary, and continued for much of the rest of that year.[23]  2004 Democratic primary candidates Dean, Edwards, Gephardt, and Kerry all began their New Hampshire primary TV advertising campaigns well before the Commission's 120-day pre-primary window.[24]  There is also a history of parties and special interest groups running early political ads in New Hampshire, in some cases nearly a year before the primary.[25]

The Commission ignored all of this evidence in the rulemaking.  The only statement in the Commission's entire brief that even arguably responds to plaintiffs' point about the irrationality of excluding New Hampshire is footnote 28 on page 49, which explains that, "[b]ecause certain states do not have media markets among the 101 tracked by CMAG, not all states or races are included in the CMAG data."  That does not excuse the Commission's failure to study pre-primary advertising in New Hampshire, which is arguably the most important state of all.  If the Commission's chosen methodology does not account for the New Hampshire primary, the Commission should find a better methodology.

As plaintiffs argued in their opening brief, a study that purports to evaluate the significance of early advertising in the Presidential primaries without considering New

---

[22]  *See* PX 134 at Graphs P7 and P8 and PGN, pp. 1, 4-6.

[23]  *See* Add. D-2 and D-3; PX 19, 21, 25-26.

[24]  *See* Add. D-12 to D-13, D-15; PX 37, 39, 41, 43, 45.

[25]  *See* Add. D-1, D-4, D-7; PX 18, 22, 28.

Hampshire deserves about as much deference as a study purporting to rank the great Presidents without considering Lincoln. The Commission's complete exclusion of many other historically important primary states is similarly flawed.[26] "An agency's use of a model is arbitrary if that model 'bears no rational relationship to the reality it purports to represent,'" and if the modeling methodology is challenged, "'the agency must provide a *full analytical defense*.'" *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (citations omitted). The Commission has not even attempted to carry this burden, other than saying that this is the way its modeling methodology works. That is not a permissible answer under the APA.

### 4. The Commission's 2004 House and Senate Data Sets Exclude Virtually All Ads Run in 2003 and Are Therefore Completely Unreliable.

Plaintiffs demonstrated in their opening brief that the Commission's merged data sets on House and Senate primaries do not contain a single ad by a single 2004 House or Senate candidate that was broadcast in 2003. *See* Pls' Br. at 36; Pls' St. Mat. Facts ¶ 11. The Commission has now *admitted* that its merged House and Senate data sets for some unexplained reason omit all 2003 data with respect to ads broadcast in connection with the 2004 campaign. FEC St. Gen. Issues ¶ 11 ("No response to the first sentence.") The administrative record demonstrates that many such ads were aired during 2003 in hotly contested races around the country—for example, the races for the seats held by Senators Tom Daschle (D-SD) and Arlen

---

[26] As plaintiffs' opening brief demonstrated, by restricting its Presidential advertising analysis to those States deemed to be "battlegrounds" *in the general-election campaign*, the Commission significantly skewed the analysis of early advertising *in the primary States*. The Commission's methodology excludes many States with historically significant primaries simply because they were not "battlegrounds" in the 2004 general election—including California, New York, Texas, Illinois, Massachusetts, South Carolina, Indiana, Nebraska, and others. *See* Pls' Br. at 35. The Commission nowhere disputes this point, but simply argues that narrowing its analysis to "battleground States" arguably overstates the amount of advertising in the *general* election. FEC Br. at 51. That may or may not be so, but it says nothing about the extent, significance, and value of early advertising in the Presidential *primary* cycle.

Specter (R-PA), and the races to fill open Senate seats in Colorado, Georgia, Illinois, Louisiana, and South Carolina.[27]  None of these ads is accounted for in the Commission's data sets.

The Commission's only defense is that, "[a]lthough CMAG provided only a limited number of ads from 2003, they were requested by the Commission and provided where available."  FEC Br. at 49 n.28; *see also* FEC Statement ¶ 11 (reiterating that Commission had "requested" the missing 2003 data).[28]  Whether or not the Commission "requested" the missing data, the fact remains that the Commission's merged data sets exclude millions of dollars of TV and radio advertising run during 2003 in connection with the 2004 Senate and House races discussed on pp. 19-23 of plaintiffs' opening submission.  The Commission's House and Senate data sets are worthless.  They exclude *precisely* those early ads they are supposed to test for!

### C.     The Commission Acted Arbitrarily and Capriciously In Disregarding the Extensive Record Evidence Showing That a Substantial Amount of Campaign Advertising Occurs Outside the Commission's Pre-Election Windows.

The administrative record before the Commission included numerous examples of, and details about, early TV and radio advertising in the 1995-96 Presidential campaign; the 1999-2000 Presidential campaign; the 2003-04 Presidential, Senate, and House campaigns; and the 2005-06 Senate and House campaigns.  These examples include the infamous 1995 Clinton/DNC coordinated issue advertising campaign, in which the Clinton campaign and the Democratic Party spent millions of dollars on early coordinated TV advertising funded with soft money

---

[27]  *See* Pls' Br. at 19-23; Add. D-19 to D-22, D-25 to D-27, D-30; PX 54, 61-74, 76-79, 81, 84, 87, 89-91, 101-04.

[28]  The "limited number of ads from 2003" referred to by the Commission relates to some stray advertising associated with special races late in 2002 and early in 2003.  *See* FEC St. Gen. Issues ¶ 11, Pls' St. Mat. Facts ¶ 11.  As noted above, the Commission has conceded that its merged House and Senate data sets contain no ads by 2004 House or Senate candidates that were broadcast in 2003.

contributions solicited by the President and other party leaders.  The examples also include many early ads run by Democratic and Republican Presidential candidates in 1999 and 2003 in Iowa, New Hampshire, and other early caucus and primary states.  The examples also include numerous ads run in strongly contested Senate and House races by vulnerable incumbents (*e.g.*, Sens. Specter, Chafee, Daschle, Murkowski, and Burns); by challengers taking on a sitting incumbent (*e.g.*, Rep. Pat Toomey and Mayor Steve Laffee); and by candidates scrambling to fill an open seat (as with the 2004 open Senate seats in Colorado, Illinois, South Carolina, Georgia, and Louisiana, and the 2006 open Senate seats in Vermont, Minnesota, Maryland, and Tennessee).[29]

The Commission refuses to address any of this substantial evidence.  It dismisses all of these examples of early advertising as "unscientific anecdotal evidence" involving "a small number of unusual ads" and a "very small number of early, non-express advocacy ads [that] might have some speculative, minimal effect on an election."  FEC Br. at 35, 43, 47.  The Commission asserts that this "very small percentage" of early ads is "little more than a distracting distortion" and is "*tantamount to a list of worst-case hypothetical examples.*"  *Id.* at 47 (emphasis added).

The Commission's characterization of *actual historical examples* of early TV advertising in the 1995-96, 1999-2000, 2003-04, and 2005-06 campaigns as "tantamount to a list of *worst-case hypothetical examples*" is spurious.  There is nothing "hypothetical" about these early TV and radio ads.  They are actual ads.  They actually ran.  They actually were aired outside the Commission's 90-day and 120-day pre-election windows.  Candidates, parties, and outside groups actually paid for them.  The Commission objects that the *National Journal* reports on

---

[29] *See* Pls' Br. at 19-23; Add. D-1 to D-44; PX 50-131.

these ads are a "cherry-picked collection of press reports" and "press accounts" that are "*inherently unreliable*." FEC Br. at 47 & n.24 (emphasis added); FEC St. Gen. Issues ¶ 11. There was nothing "cherry-picked" about these reports. The commenters reviewed all *National Journal* coverage in two Presidential cycles (1999-2000 and 2003-04) and two Congressional cycles (2003-04 and 2005-06), and included all ads that would have run outside the Commission's revised pre-election windows. *See* PX 15 at 16-28. Nor do the rules of hearsay apply to rulemaking proceedings when the agency is presented with reliable, trustworthy information; such evidence warrants a reasoned response, not the back of the bureaucratic hand.[30]

The Commission cannot seriously dispute that millions of dollars were spent on TV advertising on behalf of President Clinton during the summer of 1995, more than 120 days before the first caucus or primary. Nor can the Commission truly dispute that Steve Forbes spent millions of dollars in media advertising during 1999 for his 2000 presidential campaign, or that several Democratic candidates began running TV ads in Iowa and New Hampshire more than 120 days before the Iowa caucus and the New Hampshire primary. And does the Commission really dispute that significant sums have been spent on early TV ads in strongly contested House and Senate races by vulnerable incumbents, challengers taking on sitting incumbents, and contestants for open seats? If the Commission had any genuine doubts about this record evidence, why did it not simply check its *own* records to see if the named candidates and their committees had reported significant disbursements to broadcast stations and media buyers during

---

[30] *See, e.g.*, *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 447 (D.C. Cir. 2004) ("Circuit law … makes abundantly clear that administrative agencies may consider hearsay evidence as long as it bears satisfactory indicia of reliability.") (internal quotations and citations omitted); *see also* 32 Charles Alan Wright & Charles H. Koch, *Federal Practice and Procedure: Judicial Review* § 8235, at 379-81 (2006).

these early time periods?  The defendant is, after all, the official government repository of all required expenditure reports and other relevant campaign finance data.[31]

The Commission's brief evinces a stubborn belief that the agency was entitled to restrict its analysis to what it deemed to be "scientific" evidence found in "studies, statistical samples, or other empirical evidence," and completely ignore what it deemed to be "unscientific anecdotal evidence" such as the hundreds of ads discussed in the *National Journal* reports.  FEC Br. at 35, 47.  The Commission had no such right to avoid analyzing the potential significance of this information.  It had a duty to "examine the relevant data" and "explain the evidence which [was] available."  *State Farm*, 463 U.S. at 43, 52.  In addition, the Commission was required "to respond *meaningfully* to objections raised" by commenters.  *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (emphasis added, internal quotes and citations omitted); *see also Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems") (internal quotes and citations omitted).  "Unless the Commission answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned."  *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001); *see also Action on Smoking & Health v. CAB*, 699 F.2d 1209, 1217 (D.C. Cir. 1983) (APA's right to comment on proposed rules "is meaningless unless the agency responds to significant points raised by the public") (internal quotes and citation omitted).  Moreover, the Commission "at all times 'retains a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule,' and therefore must justify its

---

[31] *See, e.g.*, 2 U.S.C. § 434(b)(4) (reporting requirements for disbursements); *id.* § 438(a) (FEC recordkeeping, public access, and reporting obligations); *id.* § 438a ("Maintenance of website of election reports.").

basic 'assumption[s] even if no one objects … during the comment period.'" *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004) (citations omitted); *see also Columbia Falls*, 139 F.3d at 923.  The Commission's position is particularly untenable given that the so-called "anecdotal" evidence it is trying to ignore demonstrates the incompleteness of and omissions from the Commission's *own* so-called "empirical" evidence.[32]

Perhaps the most astonishing aspect of both the Commission's E&J and its opening brief is their refusal even to acknowledge the 1995 Clinton/DNC coordinated advertising scandal.  As discussed in the rulemaking comments, President Clinton and the DNC spent millions of dollars in TV advertising during 1995 and 1996, much of it outside the Commission's 120-day pre-primary windows.  Pls' Br. at 13, 16-17.  Beginning in August 1995, much of this advertising was paid for with corporate and union soft money raised by the President and other party officials.  The record evidence of this early coordinated advertising consists not of press reports, but of the Commission's *own* audit reports and excerpts from the Thompson Committee's report. *See* PX 5, 17.  As Dick Morris emphasized, the early TV advertising campaign on behalf of President Clinton was the "secret weapon" and "the key to success."  Dick Morris, *Behind the Oval Office: Winning the Presidency in the Nineties*, at 138-39 (1997) (quoted at greater length in Pls' Br. at 17 n. 18, 31 n.27).  The resulting scandal helped build the support for campaign

---

[32]  Thus the Commission is far out of bounds in demanding that, for their comments to be given meaningful consideration, commenters must submit "studies, statistical samples, or other empirical evidence," a "systematic overview," "comprehensive data comparable to CMAG data," or analyses that "'rework' the CMAG data" to "'incorporate[] the omitted factors.'"  FEC Br. at 35, 47, 50-51 (citations omitted).  Some of the cases cited by the Commission involve the responsibility of *private* litigants to respond to their opponents' expert testimony. *See id.* at 50 (citing Title VII decisions involving parties' use of statistical evidence).  That is not the relevant model here.  As discussed above, it is the *Commission's* responsibility to consider comments and investigate potential problems with its proposals and methodology.  "[I]t is an agency's duty to establish the statistical validity of the evidence before it prior to reaching conclusions based on that evidence, not the public's duty to inform the agency of statistical invalidities in its evidence." *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1467 n.5 (7th Cir. 1985).

finance reform that eventually led to BCRA's enactment.  As plaintiffs demonstrated, the Commission's content standards would allow the very same type of coordination to occur all over again early in the election cycle (or indeed, coordination between a candidate and corporate or union spenders) so long as the ads avoid express advocacy, as President Clinton and the DNC did in 1995.  Such an outcome cannot be squared with BCRA's letter, purpose, or spirit.

The Commission's response to this objection, raised both in the rulemaking comments and in plaintiffs' opening brief, is to *ignore the objection entirely*.  There is not a single mention of President Clinton or the 1995-96 campaign *anywhere* in the Commission's E&J or its court papers.  The closest reference to this 1995-96 scandal in the Commission's brief is the remarkable statement:  "None of the ads highlighted by plaintiffs *that were run less than a decade ago* was alleged … to involve coordinated spending."  FEC Br. at 47 (emphasis added).  This refusal to address one of the key scandals that led to BCRA's enactment is too clever by half.  It is yet another important instance in which the Commission has "entirely failed to consider an important aspect of the problem[.]"  *State Farm*, 463 U.S. at 43; *see Fox Television Stations, Inc. v. FCC*, 280 F.3d at 1050-51.  It is precisely the sort of "high-handed and conclusory" response that "bespeaks a 'let them eat cake' attitude that ill-becomes an administrative agency whose obligation to the public it serves is discharged if only it avoids being arbitrary and capricious."  *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265-66 (D.C. Cir. 1994); *see also Shays I*, 340 F. Supp. 2d at 52-53 (Commission may not use its rulemaking authority to create loopholes that "thwart the very essence of the wide-sweeping system of reform enacted by Congress").

### D.   The Commission Has Failed To Demonstrate Why Spending Will Not Simply Shift to the Unregulated Periods Outside Its Pre-Election Windows.

The D.C. Circuit instructed the Commission that "perhaps [the] most important" question of all was, "to the extent election-related advocacy now occurs primarily within 120 days, would candidates and collaborators aiming to influence elections simply shift coordinated spending outside that period to avoid the challenged rules' restrictions?" *Shays I*, 414 F.3d at 102. The Commission responds that, since early advertising has only "minimal value," there will be "little incentive" for candidates and outside spenders to take advantage of the content standards' "safe harbor." FEC Br. at 39, 45-46. Since candidates themselves "largely" have avoided early advertising, the Commission asserts, there is no reason to believe they will ask their parties and outside supporters to sponsor early ads if they may now legally do so. *Id.* at 46.

This argument fails for all the reasons discussed above: candidates have run millions of dollars of early advertising in recent election cycles, even by the Commission's own deeply flawed statistical analysis; and early advertising can have *substantial* value, particularly in seriously contested races, whether analyzed using the Commission's methodology or by using case studies of early advertising in Presidential, Senate, and House campaigns. *Sixteen percent* of all pre-caucus Presidential TV advertising in Iowa is a substantial figure, and the millions of dollars in early advertising documented in the CMAG data are "appreciable" sums, even if they represent only "a small number" of all campaign TV ads considered in the aggregate. FEC Br. at 38, 47; *see* pp. 15-18 above. The 1995 Clinton/DNC coordinated advertising campaign offers a textbook example of the potential importance of early advertising, one that has become campaign legend. *See* Pls' Br. at 16-17 & n.18. There is every reason to believe, if the Commission's "safe harbors" are allowed to remain, they will be exploited. This is the repeated lesson of campaign finance regulation. *See, e.g.*, *McConnell*, 540 U.S. at 224 ("Money, like water, will

always find an outlet."); *Shays I*, 414 F.3d at 115 ("[I]f regulatory safe harbors permit what BCRA bans, we have no doubt that savvy campaign operators will exploit them to the hilt, reopening the very soft money floodgates BCRA aimed to close."). The Commission insists that its predictive acumen is entitled to deference (FEC Br. at 46), but it offers absolutely no reason to believe that the outcome will be any different here than in response to its previous loopholes.

Nor, as plaintiffs demonstrated in their opening brief, is there any reason to believe that soft money will not flow into the election-year "gap periods" in House and Senate races that the Commission's revised rules have made even *larger* by shrinking the pre-general election window from 120 days to 90 days. *See* Pls' Br. at 37-39 n.32. If (as the Commission acknowledges) such "gap period" ads have value in *Presidential* races, why not potentially in House and Senate races as well? *Id.* The Commission's response, once again, is to ignore the issue altogether.

The Commission also argues that its content standard loopholes will not be exploited because there is "no evidence" that candidates, parties, and their supporters have *actually* taken advantage of them in recent years and *actually* coordinated their advertising efforts. *See* FEC Br. at 39-40, 46. The Commission claims that no one has "filed any administrative complaints … alleging acts of coordination" outside of the pre-election windows. *Id.* at 40; *see also id.* at 46 ("The Commission's enforcement docket indicates that early coordination has not occurred *to any great extent* since the regulation has been in effect[.]") (emphasis added). But the Commission's whole point in adopting its "safe harbor" regulation was to *legalize* such activity; why would anyone file an enforcement action claiming that someone had taken advantage of what is now explicitly *authorized* by the agency's regulation?[33]

---

[33] Moreover, it is well established that, where a rule authorizes secrecy and nondisclosure, plaintiffs are not required to point to evidence of any secret activity. "[I]t would be absurd to require [plaintiffs] to guess about when secret communications" authorized by the rule in violation of the statute

*(Footnote continued)*

In any event, proving that coordination has *actually* occurred is not the point. The Commission rests the defense of its rule on its assertion that early advertising simply does not occur in more than a *de minimis* amount, and therefore the need for effective restraints on coordination outside the time frames of its rule is moot. As plaintiffs have demonstrated, the administrative record fatally undermines the Commission's core premise. It should not now be heard to shift to plaintiffs a new burden of proving not only that candidates *do* value early advertising but that they have *actually* coordinated such ads with outside spenders. The mere fact that the Commission's rule plainly *authorizes* multi-million dollar loopholes in federal contribution limits, source prohibitions, and disclosure requirements is sufficient to invalidate it. Certainly the Commission can offer no assurance that the opportunity for such extravagant circumvention of the statute created by its "safe harbor" will *not* be exploited.

## III. The Commission's Revised Coordination "Conduct Standards" Violate FECA, BCRA, and the APA.

### A. The Commission's Weakened Common Vendor and Former Employee Conduct Standards Impermissibly Authorize the Unregulated Exchange of Material Inside Information Between Recent Campaign Insiders and Outside Spenders.

The Commission's original 2003 BCRA "conduct" standards governing former employees and common vendors covered any conveyance by these individuals of any "*material*" inside information at any point during the "current election cycle." 11 C.F.R. § 109.21(d)(4)-(5) (2003) (emphasis added). The revised standards, however, now only govern during periods of actual overlapping services and for 120 days after the employee or vendor stops providing services to one of the overlapping parties. Outside these time frames, even "*material*" inside

---

were taking place; "[t]he mere statement of the suggestion exposes its absurdity." *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1262-64 (D.C. Cir. 2004); *see also Regular Common Carrier Conference v. United States*, 793 F.2d 376, 378-79 (D.C. Cir. 1986) (Scalia, J.).

information can be conveyed and actually used without restriction. For example, a media expert employed by the RNC could leave his job in November before the election year and, by the following March, be free to go to work for outside spenders and share with them any "*material*" inside information he had acquired at the RNC about "campaign plans, projects, activities, or needs of the candidate or his opponent" for the rest of the election cycle—without *any* restriction on the use of this material inside information (unless another conduct standard was triggered). *See* 11 C.F.R. §§ 109.21(d)(4)-(5) (emphasis added); *see generally* Pls' Br. at 39-40.

This is more than a hypothetical, as information in the Commission's own files demonstrates. In November 1995, Chuck Greener left his job as the RNC's Communications Director, having presumably acquired a wealth of material inside information on the party's strategy, polling, opposition research, and other valuable information. The following spring (more than 120 days after leaving the RNC), he was hired by the Management Committee of the "Coalition" to help select and oversee the consultants and vendors working for the Coalition on pro-Republican sham issue ads. Greener was in a position to use his inside knowledge in helping to craft and implement the Coalition's sham issue advertising campaign beginning in the spring of 1996, while carrying on back-channel coordination with his friends and former colleagues at the RNC. The Coalition and the RNC used overlapping pollsters and vendors. The coordinated advertising activities of the Coalition and the RNC were the subject of investigations by the Commission and the Thompson Committee; this and other scandals helped spark support for what eventually became BCRA § 214.[34] Yet under the Commission's revised regulation, once 120 days had passed, a former party official in Mr. Greener's position could with impunity pass

---

[34] *See* General Counsel's Report in *The Coalition*, MUR 4624, at 19-22 (SPX 3) (*re* Greener involvement); *see also* Thompson Committee Report, Vol. 4, pp. 5969-74, and Vol. 6, pp. 8944-45 (SPX 8).

32

along material inside "[i]nformation about the campaign plans, projects, activities, or needs" for use in "the creation, production, or distribution" of public communications run by outside spenders.  Here again, the Commission has used its rulemaking power to exempt from effective regulation *precisely* the kinds of coordinated activities that moved Congress to enact BCRA.

As plaintiffs' opening brief demonstrated, this revision is an obvious example of agency deregulation that triggers the "presumption … *against* changes in current policy that are not justified by the rulemaking record."   *State Farm*, 463 U.S. at 42 (emphasis added).   The Commission strongly resists being subject to *State Farm* standards; it insists that it has not relaxed the regulation, but "merely fine-tuned its rule to meet its earlier goal more precisely" by making "a revised calibration of a time period."  FEC Br. at 56 & n.31.  As the controversy over the Commission's content standards has shown, however, the "calibration of a time period" can have enormous regulatory consequences and is just the sort of bureaucratic "chang[e] [in] course" that is subject to *State Farm* standards.  463 U.S. at 42; *see Shays I*, 414 F.3d at 96-97, 100-02.

The Commission does not meet those standards.  To begin, its declared purpose—to shorten the duration of regulatory prohibitions in order "to reflect the actual marketplace for political consultants and employees"—is highly questionable.  FEC Br. at 54.  BCRA was not enacted for the benefit of "political consultants and employees," but instead for the purpose of combating actual and apparent corruption by *regulating* the behavior of these and other political actors who move between campaigns and outside spenders and by so doing, can facilitate circumvention of the law.  Although plaintiffs agree that political consultants and employees should be accommodated where that can be done consistent with the goals of BCRA § 214, plaintiffs oppose any such accommodation that would compromise those goals—*i.e.*, ensuring

33

that the coordination rules "make more sense in light of real life campaign practices" and "cover 'coordination' *whenever it occurs*."  148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (statements of Sens. Feingold and McCain) (emphasis added) (PX 8).  There is no discussion in either the E&J or the Commission's opening brief focused on this most important issue:  what standards are necessary to ensure that "real life" coordination is regulated "*whenever it occurs*"?

Even assuming that promoting business opportunities for political consultants and other vendors was one of the Commission's proper missions, the chosen means go much further than necessary.  Contrary to the Commission's insinuations, the 2003 version of the rule did not bar *employment* for an entire election cycle, but merely the actual use of "material" inside information obtained from the former employer or client when working on public communications for the new employer or client.  Scientific researchers, corporate employees, attorneys, judicial clerks, and many other professionals are subject to enduring post-employment restrictions on the use of their former employer's material inside information in their new jobs, and there is no why reason why political consultants and employees cannot observe similar norms.  Nor is there any reason that political consultants and employees, unlike other professionals in the "marketplace," require only an abbreviated time period in which meaningful post-employment restrictions actually apply.  If the Commission's concern is that hiring a former campaign employee or vendor might open an outside spender up to attack, it can prescribe standards for how to insulate the new employee or vendor from any work on overlapping matters, thereby giving the outside spender a safe harbor from a finding of unintended

coordination.[35]  Why not consider this and other more carefully focused measures rather than authorizing an inside-information "free for all" after only a 120-day cooling-off period?

How does the Commission justify removing *all* restraints on a former employee or vendor's use of even *material* inside information only 120 days after leaving the campaign? Such information, the Commission argues, "has a very short 'shelf life' in politics" and "tends to be irrelevant" within a short time.  FEC Br. at 55.  Why 120 days rather than 180 days, or 365 days?  The Commission responds:  "All line drawing, however, is inherently arbitrary in some sense."  FEC Br. at 56.  This is the same type of argument that was rejected by the D.C. Circuit in the context of bright-line content standards:  "[T]he proposition that 120 is twice 60 and four times 30, though arithmetically indisputable, is no reason to select that number over any other. Why not triple 60, or multiply 30 by one-and-a-half?"  *Shays I*, 414 F.3d at 101.  "[A] bright line can be drawn in the wrong place."  *Id.*  The Commission offers nothing in support of its "bromide," *id.*, that "a limit of 120 days is *more than sufficient* to reduce the risk of circumvention."  71 Fed. Reg. at 33, 205 (emphasis added); *see* FEC Br. at 55-56.

As plaintiffs argued in their opening brief, it is easy to imagine certain inside campaign information that can remain "material" and valuable for more than 120 days—for example, a detailed campaign master plan, opposition research files, dossiers of embarrassing private information, etc.  *See* Pls' Br. at 41-42.  The Commission has offered no response to those arguments, and it should not be heard to argue the point for the first time in its reply.  The Commission's analogy to its polling regulations (FEC Br. at 55-56) is misplaced; those regulations presume that polling data retain at least some value for a full 180 days.  *See* 11

---

[35]  For the reasons discussed in Part III-B below, the Commission's present "firewall safe harbor" regulation does not adequately serve this purpose.

C.F.R. § 106.4(g). Why are polling data (which would seem to have a fairly short shelf-life) deemed to retain value for 180 days but inside information like opposition research files (which would seem to be potentially valuable for the entire election cycle) deemed to retain value only for 120 days? The Commission's E&J and brief are silent on these and many other issues. The Commission fails *State Farm* review across the board. *See* 463 U.S. at 42-43.[36]

## B. The Commission's "Firewall Safe Harbor" Invites Gross Abuse and Has Not Been Adequately Explained or Justified.

The declared purpose of the Commission's new "firewall safe harbor" in 11 C.F.R. § 109.21(h) is to "codif[y] the Commission's conclusions in MUR 5506 (EMILY's List)," and the E&J points to that MUR for guidance on how to implement the firewall. 71 Fed. Reg. at 33,206. The respondent in that case was able to block further investigations by simply (a) "*claim[ing]* that its internal policies and procedures ensured that no coordination occurred," and (b) "*assert[ing]* that it made its decisions based on information that it did not obtain" through coordination. PX 137 at 6-7 (emphasis added). Nothing more was required to bar further inquiry and close the file. A careful review of MUR 5506 shows that many of the Commission's arguments in its brief about the rigors of its firewall standard (*see* FEC Br. at 58-59) are simply litigation spin.

Firewalls and similar devices are extremely controversial. Courts have often rejected the use of firewalls in other contexts—for example, in small- and medium-sized law firms where it is difficult to segregate personnel; where the overlapping matters are both ongoing; and where key

---

[36] The Commission's rule on its face authorizes the use of *material* information in making coordinated expenditures. If the information is being used, by definition this means it is "useful" and has not outlived its "shelf life." It is irrational for the Commission to say that it needs to allow people to use inside campaign information but then to justify that by saying that it is doing so only because the information is no longer likely to be useful.

individuals straddle both sides of the wall.[37]  The Commission's firewall is especially lax: by simply claiming an effective firewall, a spender is able to create what the Commission calls "a rebuttable presumption" of *non*-coordination that can be overcome only by "specific information" demonstrating that material inside information has been conveyed.  71 Fed. Reg. at 33,206-07.[38]

    Once again, the Commission is using "safe harbors" to shield campaign operatives, media consultants, and other political actors from the rigors of BCRA's requirements.  The Commission seems to be more concerned with providing outside spenders with "safe harbors" to avoid investigations than with ensuring that the letter and spirit of BCRA are fully implemented. There is no discussion in the Commission's E&J or brief about how this "firewall" safe harbor will in any way further BCRA's purposes and avoid undermining its provisions.  There is no analysis of the potential instances of coordination that might escape investigation because of this safe harbor.  Nor is there any reasoned discussion why the Commission has more faith in firewalls now than it did in 2003, when it concluded that "the mere existence of … an ethical screen should [not] provide a *de facto* bar" to the investigation of alleged coordination, and that,

---

[37]    *See, e.g.*, Restatement (Third) of the Law Governing Lawyers § 124, Comment d, and Reporter's Note thereto (2000) (collecting cases); ABA Code of Professional Responsibility DR 5-105(D); *Cheng v. GAF Corp.*, 631 F.2d 1052, 1057-58 (2d Cir. 1980), *vacated on other grounds*, 450 U.S. 903 (1981); *DeCora Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 139-42 (S.D.N.Y. 1995); Comment, *The Chinese Wall Defense to Law-Firm Disqualification*, 128 U. Pa. L. Rev. 677 (1980).

[38]    The Commission has even further undermined the efficacy of its firewall by providing that the presumption of non-coordination is not rebutted even where there are "common leadership or overlapping administrative personnel" who operate on both sides of the so-called firewall.  71 Fed. Reg. at 33,207.  As noted in plaintiffs' opening brief, this means that the head of a group such as EMILY's List is free to direct both those employees of the organization who are coordinating with a candidate and those employees who are making supposedly "independent" organizational expenditures for the same candidate at the same time.  *See* Pls' Br. at 44-45.  The Commission's brief ignores this point.

"[w]ithout some mechanism to ensure enforcement, these private arrangements are unlikely to prevent the circumvention of the rules."  68 Fed. Reg. at 437 (PX 9).[39]

Nor has the Commission offered sufficient guidance to the regulated community on what constitutes an "effective" firewall.  The E&J simply embraced the methodology followed in the EMILY's List MUR.  *See* 71 Fed. Reg. at 33,206.  There, EMILY's List merely reported to the Commission that its employees were "'barred, as a matter of policy, from interacting with … others within EMILY's List regarding specified candidates or officeholders,'" and the Commission just took the organization at its word.  PX 137 at 6-7.  This is no guidance at all.  It does not describe for the regulated community the who, what, when, and where of an effective firewall "policy," or how to ensure effective enforcement of what may sound on paper like a good firewall but prove in actual practice to be a tissue paper.  These omissions are particularly dangerous given the repeated episodes in the history of campaign finance regulation in which vague standards have been abused by those seeking to escape federal contribution limits, source prohibitions, and disclosure requirements.   Where "the Commission provides no guidance whatsoever" to the regulated community, "the potential for abuse, intended or no, is obvious" and "a revision of the Commission's regulations to ensure … compliance with the FECA is warranted."  *Common Cause v. FEC*, 692 F. Supp. 1391, 1396 (D.D.C. 1987).  "It is not for the Commission to evade [FECA and BCRA's] mandate by permitting" safe harbors "and providing no guidance or supervision to those in whose interest it is to use as much 'soft money' in federal

---

[39]   The Commission claims that its 2003 discussion involved a specific proposal that was "simply not comparable" to the "firewall safe harbor."  FEC Br. at 59.  But the 2003 E&J involved consideration of a broader range of proposals, and evinced a general skepticism about the efficacy of firewalls and self-regulation that is wholly absent from the latest E&J.  The Commission neither acknowledges nor explains this shift in course.  *See State Farm*, 463 U.S. at 42, 52.

elections as they can." *Id.*; *see* Pls' Br. at 45. The Commission's response to plaintiffs' reliance on *Common Cause* is simply to ignore the case.

## IV.    The Regulation Governing Solicitation at State Party Fundraising Events Continues To Violate BCRA and the APA.

This Court observed in *Shays I* that the Commission's interpretation of the state party fundraiser provision "likely contravenes what Congress intended when it enacted the provision, as well as what the Court views to be the more natural reading of the statute"; "could lead to widespread abuse"; and had not been adequately explained or justified. 337 F. Supp. 2d at 91-92 & n.59. The Court instructed the Commission, in particular, to explain why its purported First Amendment concerns were "in any way more vexing in the context of state political party fundraisers than they are outside of such venues where nonfederal money solicitation is almost completely barred." *Id.* at 92; *see also id.* at 93 (instructing Commission to explain "how examining speech at [state party] fundraising events implicates constitutional concerns that are not present when examining comments made at other venues").

The Commission responds in its E&J and brief by claiming that "three factors make a state or local [party] fundraising event distinctive:  the essential fundraising nature of the event, the close ties between federal officeholders or candidates and their state and local party organizations, and the role that federal officeholders and candidates traditionally play in supporting state and local party organizations (and attracting their vital volunteers)." FEC Br. at 29. Given these three supposedly "distinctive" factors, the Commission claims that it would be "extremely difficult" to distinguish between speech at state party fundraisers that solicited soft money and speech that did not. *Id.* at 29-30. Yet all of these "distinctive factors" apply with equal force to state *candidate* fundraisers, which fall outside the terms of the statutory safe harbor regarding state *party* fundraisers. That is, a state *candidate* fundraiser has an "essential

39

fundraising nature"; there are "close ties" between federal and state officeholders and candidates from the same party; and federal officeholders and candidates have "traditionally" provided strong support to their state counterparts in the same party. Nevertheless, the Commission has not hesitated in the context of state *candidate* fundraisers to provide guidance about how a federal candidate can be a featured guest at, attend, speak at, and help publicize such events *without* engaging in forbidden soft money fundraising.

Specifically, the Commission has concluded that a federal officeholder or candidate may attend, speak at, and participate in other ways at state *candidate* fundraisers and similar events at which soft money is being raised, "provided that by his own speech and conduct" he avoids soliciting any funds beyond those authorized by FECA. *See* AO 2003-3 (SPX 4). In these contexts, the "covered person" must, if he makes *any* solicitation, "clearly and conspicuously" advise attendees that he "is only soliciting federally permissible funds." *Id.* The Commission has provided detailed guidance about what covered persons may or may not say at such events, including suggested written and oral disclaimers. *Id.* ("I am only asking for up to $2,000 from individuals and I am not asking for corporate, labor or minors' funds.").[40] The Commission has extended this disclaimer approach to federal officeholder and candidate appearances in other

---

[40] *See especially* AO 2003-3's answer to the question whether, at state *candidate* fundraisers, it is permissible for a "covered person" to make "'general solicitations' of funds that do not request specific amounts." The Commission responded: "Yes, provided that written notices are clearly and conspicuously displayed at state candidate fundraising events at which Federally impermissible funds are raised indicating that the covered person is only soliciting federally permissible funds. If written notices are provided the covered person may legally make general requests for financial support at state candidate fundraising events without any oral disclaimer that only Federal permissible funds are being requested. Alternatively, if written notices are not provided at the event, the covered official may make the following public oral disclaimer: 'I am only asking for up to $2,000 from individuals and I am not asking for corporate, labor or minors' funds.' If such a public oral disclaimer is made at the event it only need be made once, and is not required to be made during a covered person's one-on-one discussions with donors or other people at the event. This should not, however, be construed to permit a covered person to inoculate a solicitation of non-Federal funds by reciting a rote limitation, but then encouraging the potential donor to disregard the limitation."

non-federal fundraising contexts.  *See* AO 2003-05 (SPX 5) (participation in PAC fundraising activities); AO 2003-36 (SPX 6) (participation in RGA fundraising activities).

The Commission nowhere attempts to explain why this disclaimer approach for state *candidate* fundraising events could not just as readily be followed in the context of state *party* fundraising events.  The approach would respond to the Commission's professed concerns about federal officeholders and candidates "refus[ing] to appear at such [state party] fundraising events out of fear of unwittingly making an illegal solicitation" (FEC Br. at 27); a Commission-approved disclaimer would eliminate that fear while also avoiding opening a gaping loophole that authorizes "unabashed solicitation" of unlimited sums of soft money.  *Shays I*, 337 F. Supp. 2d at 92.  The Commission has failed to demonstrate, and cannot demonstrate, that the First Amendment concerns are any more "vexing" in the context of state *party* fundraisers than they are in the context of state *candidate* fundraisers or other events.  *Id.*

Having failed to carry this burden, the Commission attempts to reargue the statutory construction issues and to persuade the Court that 2 U.S.C. § 441i(e)(3), contrary to the ruling in *Shays I*, clearly authorizes federal officeholders and candidates to engage in "unabashed solicitation" of soft money at state party fundraisers.  *See* FEC Br. at 24-26.  This Court has already rejected the Commission's argument, emphasizing that the provision is "ambiguous" and that "the FEC's interpretation is not *mandated* by the terms of the Act."  337 F. Supp. 2d at 92-93 (emphasis added).  There is no reason for the Court to revisit these issues.[41]

---

[41]    In any event, the Commission's statutory construction arguments are unavailing.  The Commission contends that, since it has now interpreted 2 U.S.C. § 441i(e)(1)(B) to allow attendance at state candidate soft-money fundraisers (subject to certain restrictions and required disclaimers), § 441i(e)(3) must be construed as authorizing unbridled soft-money solicitations in order to avoid being rendered "'*largely* superfluous.'"  FEC Br. at 25-26 (citation omitted) (emphasis added).  But an agency cannot render part of a statute "superfluous."  At the time of BCRA's enactment, Congress could not foresee how the Commission would regulate participation in state candidate fundraisers and similar

*(Footnote continued)*

The Commission argues that allowing federal officeholders and candidates to solicit unlimited amounts of soft money "'without restriction or regulation'" is consistent with other exemptions in BCRA that permit these individuals "to raise nonfederal funds under certain circumstances." FEC Br. at 24 (citing 2 U.S.C. §§ 441i(e)(1)(B), 441i(e)(4)(A), and 441i(e)(4)(B)). But as the Supreme Court emphasized, these provisions "tightly constrain[]" the exempted solicitations. *McConnell*, 540 U.S. at 181 n.70 (discussing § 441i(e)(1)(B)). The Commission's state party fundraiser exemption, on the other hand, provides for no constraints at all and authorizes unlimited soft-money shakedowns "without restriction or regulation" *in this one context alone*. The Commission has failed to explain why such a complete carve-out is either necessary, desirable, or consistent with BCRA's underlying goals.[42]

---

events, but wanted to ensure that federal officeholders and candidates could at least (and at most) attend and speak at state party fundraisers. Any apparent surplusage is occasioned only by the Commission's *post hoc* interpretation of § 441i(e)(1)(B), not by Congressional action. And even if Congress had been redundant, the "preference for avoiding surplusage constructions is not absolute" and can be offset by other canons of construction, including the avoidance of a result that is inconsistent with the statute's overall structure and purposes. *Lamie v. United States Tr.*, 540 U.S. 526, 536 (2004); *see also Sabre, Inc. v. DOT*, 429 F.3d 1113, 1122 (D.C. Cir. 2005) ("[l]egislative drafters often use apparently redundant language").

[42] The Commission claims that plaintiffs' *Chevron* arguments against the state party fundraiser exception are barred by "the law of the case" and "issue preclusion" (*i.e.*, collateral estoppel). *See* FEC Br. at 14-15. Plaintiffs agree that this Court's earlier *Chevron* rulings about this exception are the law of the case, but this doctrine is simply a rule of practice, not a mandatory bar to reconsideration of the issue. *See, e.g.*, *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-18 (1988). Particularly if the Court considers the FEC's statutory construction arguments again, it should reconsider plaintiffs' earlier arguments. *See* Pls' Br. at 48 & n.36. Plaintiffs never had a chance to appeal these issues in *Shays I* because the Commission decided not to appeal and began new administrative proceedings on the rule instead, thus rendering judicial review unripe. *See EPA v. Brown*, 431 U.S. 99, 103-04 (1977); *see also* PX 11 at 2-4 (noting that FEC counsel agreed that issues were not ripe for appeal). Because plaintiffs were not able to appeal the *Chevron* issues on their merits, issue preclusion does not apply. *See* 18A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4433, at 102-04 (2d ed. 2002) (collecting authorities).

## V.    The Commission's "Federal Election Activity" Regulations Unduly Compromise BCRA's Soft Money Restrictions on State, District, and Local Party Committees and Violate the APA.

The Commission has not disputed that plaintiffs' challenges to 11 C.F.R. §§ 100.24(2)-(3) are now ripe.  Pls' Br. at 53-54.  Moving to the merits, the Commission repeatedly raises the straw-man argument that state and local party rallies and similar campaign efforts should not be transformed into "Federal election activity" ("FEA") simply because someone says "Don't forget to register and vote!" at the end of his remarks.  FEC Br. at 19; *see also id.* at 16, 18-20.  It is not difficult, however, to draft a rule that excludes these sorts of incidental, routine exhortations without going to the extreme of also excluding, *e.g.*, expensive telephone bank GOTV campaigns.  Yet by requiring "*personal assistance*" with the acts of registering or voting through "*individualized means*" in order to constitute FEA, the Commission has done just that.  As demonstrated in plaintiffs' opening brief, under the Commission's definitions, "within days of a federal election a state party can send out multiple direct mailings to every potential voter sympathetic to its cause urging them to register and vote, and can blanket the state with automated phone calls by celebrities identifying the date of an election and exhorting recipients to get out to vote, without being deemed to be engaged in voter registration or GOTV activity."  Pls' Br. at 55.  These expensive efforts can accordingly be funded entirely with soft money.

The Commission's brief *does not dispute* plaintiffs' reading of its definitions, but merely argues that every case turns on its "particular facts."  FEC Br. at 18, 21.  The Commission dismisses plaintiffs' reliance on AO 2006-19—which advised that robocalls and form letters that identify the date of an election and are distributed as few as four days before the polls open are *not* FEA because they are *not* individualized means of providing personal assistance—on the grounds that the opinion turned "on the particular combination of facts presented and might well have been decided otherwise if the facts had been different."  *Id.* at 23.  That makes no sense.

Robocalls and mass mailings made just days before an election in which a federal candidate appears on the ballot informing voters of the election's date are either "individualized means" of "personal assistance" or they are not. The equivocation in its brief notwithstanding, the Commission's advisory opinion concludes that these operations do *not* constitute FEA under the challenged rules, and therefore may be funded entirely with soft money.[43]

The Commission insists, however, that its extremely narrow definitions of "voter registration" and GOTV activities serve important "public policy goal[s]," such as encouraging "civic participation" and "grassroots political activities" through soft-money expenditures. FEC Br. at 16; 71 Fed. Reg. at 8,929. But these are not policy calls for the Commission to make. Congress already has struck a detailed, highly reticulated balance through the Levin Amendment, whose specific purpose was to encourage party voter registration and GOTV activities by allowing, for these two activities alone, "far less onerous controls than those for hard money," subject to detailed restrictions and safeguards to prevent circumvention and abuse. *Shays I*, 414 F.3d at 113. This Congressional balancing act was intended to accommodate *precisely* those concerns that the Commission now raises.[44] "It would not be in the public interest to discard the trade-offs Congress carefully crafted in devising BCRA in favor of a contrary system of interpretation and regulation." *Shays I*, 340 F. Supp. 2d at 53. "Congress enacted a specific

---

[43] The Commission's argument is reminiscent of *Shays I*, where the FEC "refused to disavow" plaintiffs' construction of its rules or to "reassure" the D.C. Circuit that plaintiffs' reading was wrong, but simply argued instead that every situation would turn on its own facts. 414 F.3d at 103, 105. The Court of Appeals did not allow the Commission to evade the legal issues in this manner. *Id.*

[44] *See, e.g.*, 147 Cong. Rec. S3124-25 (daily ed. Mar. 29, 2001) (statement of Sen. Levin) (purpose of amendment was to "allow the use of some non-Federal dollars by State parties for voter registration and get out the vote," which are "fundamental basic activit[ies]" and "some of the most core activities in which State parties are involved") (SPX 10); *see also* 148 Cong. Rec. H408-11 (daily ed. Feb. 13, 2002) (statement of Rep. Shays) (SPX 11); 148 Cong. Rec. S2143 (Mar. 20, 2002) (statements of Sens. McCain & Feingold) (SPX 12).

regime balancing money, access, free speech, and fair elections"; it is not for the FEC to re-jigger the balance. *Id.*

### Conclusion

This Court should "hold unlawful and set aside," 5 U.S.C. § 706(2), the challenged regulations, and should grant the further relief requested at pages 59-60 and note 43 of plaintiffs' opening brief. The Commission has not responded to plaintiffs' request for further relief, and should not be heard to argue this point in its "reply."

Dated this 16th day of February, 2007.

Respectfully submitted,

Roger M. Witten (Bar No. 163261)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

Charles G. Curtis, Jr. (*pro hac vice*)
Michelle M. Umberger (Bar No. 480620)
David L. Anstaett (*pro hac vice*)
Lissa R. Koop (*pro hac vice*)
HELLER EHRMAN LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663-7460

Randolph D. Moss (Bar No. 417749)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

Fred Wertheimer (Bar No. 154211)
DEMOCRACY 21
1825 Eye Street, N.W., Suite 400
Washington, D.C. 20006
(202) 429-2008

Donald J. Simon (Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
   ENDRESON & PERRY LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
(202) 682-0240

*Attorneys for Plaintiffs Christopher Shays
and Martin Meehan*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Christopher Shays and Martin Meehan,

                        Plaintiffs,

        v.

United States Federal Election Commission,

                        Defendant.

Civil Action No. 06-CV-1247
(Judge Kollar-Kotelly)

---

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

---

Pursuant to Local Civil Rules ("LCvR") 7(h) and 56.1, plaintiffs Christopher Shays and Martin Meehan submit the following Responses and Objections to Defendant Federal Election Commission's Statement of Material Facts Not in Genuine Dispute.  This statement contains the plaintiffs' responses and objections to the Commission's Statement of Material Facts Not in Genuine Dispute, submitted in support of its motion for summary judgment.  *See* Dkt. No. 19 (Jan. 19, 2007).   These responses and objections are presented below in numbered paragraphs tracking the numbering scheme in the Commission's Statement.

1.      No response.

2.      No response.

3.      No response.

4.      No response.

5.      No response.

6.      No response.

7.      No response.

8.      No response.

9.      Disputed.  Plaintiffs filed a Notice of Cross-Appeal in this Court on October 13, 2004, with the intent of challenging this Court's resolution with respect to these and other regulations.  Plaintiffs never had a chance to pursue this appeal, however, because the Commission thereafter decided not to appeal the Court's remand of these specific regulations and began new administrative proceedings instead, thus rendering judicial review unripe.  *See EPA v. Brown*, 431 U.S. 99, 103-04 (1977); *see also* PX 11 at 2-4 (noting that FEC counsel agreed that issues with respect to these regulations were not ripe for appeal).  Thus, plaintiffs moved for voluntary dismissal of their cross-appeal, the FEC agreed, and the D.C. Circuit so ordered.  *See* PX 11-12.

10.      No response.

11.      No response.

12.      No response.

13.      No response.

14.      No response.

15.      No response.

16.      No response.

17.      No response.

18.      No response.

19.      As to sentence one, the May 4, 2005 NPRM asked for comments on the following questions: "Should the Commission define 'assist' to include encouragement coupled with a direction as to how one might register?  Does the 'assist' limitation or the 'individualized means'

requirement exclude any activities that should be included in the definition of 'voter registration activity'?  Are there other specific activities that the Commission should include or exclude from the definition of 'voter registration activity'?"  70 Fed. Reg. at 23,069.  No response is required to sentence two.

20.    No response.

21.    No response.

22.    No response.

23.    No response.

24.    No response.

25.    No response.

26.    No response.

27.    This is only a partial, materially incomplete excerpt from the Commission's "invitation" in its E&J.  The Commission also "invite[d] commenters to provide examples of communications from previous election cycles demonstrating that an alternative may be either underinclusive or overinclusive."  70 Fed. Reg. at 73,949 (PX 13).  The NPRM also asked for information about whether "early electoral communications, for example, that occur more than 120 days before an election, have an effect on election results[]"  *Id.*  The examples of early advertising that were submitted by commenters were clearly responsive to these requests, contrary to the Commission's insinuations.

28.    No response.

29.    This is manifestly false.  Commenters submitted hundreds of examples of TV and radio ads run by federal candidates, political parties, and outside interest groups during the "safe harbor" periods established by revised 11 C.F.R. § 109.21, sometimes nine months, a year, or

more before the relevant primary or general election.  *See* PX 15-132.  Compilations of advertising during particular time periods, as gathered by the highly respected, nonpartisan *National Journal*, are certainly collections of factual information assembled through "observation" or "experience" (the definition of empirical data).  *See* IV Oxford English Dictionary 264 (2d ed. 1989); V *id.* at 188.

30.     As to sentence one, plaintiffs are unable to verify that the Commission published the Supplemental Notice of Proposed Rulemaking on its website on Saturday, March 13, 2006.  A visit to the website reveals that the page is undated.  *See* Coordinated Communications, Supplemental Notice of Proposed Rulemaking, http://www.fec.gov/pdf/nprm/coord_commun/suppNPRMmaterials.shtml.  No response to the second sentence.

31.     As to the first sentence, and as noted in ¶ 30 above, plaintiffs are unable to verify that any notice was published on defendant's website on Saturday, March 13, 2006.  Plaintiffs also note in response to the first sentence that defendant's calculation of the formal supplemental comment period to be seven days would include Saturday and Sunday.  No response to the second sentence.

32.     No response.

33.     No response.

34.     No response.

35.     The Commission knows this is false.  Its merged data sets on House and Senate primaries do not contain a single ad by a single 2004 House or Senate candidate that was broadcast in 2003.  *See* Pls' St. Mat. Facts ¶ 11.  The Commission has now *admitted* that its merged House and Senate data sets for some unexplained reason omit all 2003 data with respect

to ads broadcast in connection with the 2004 campaign.  FEC St. Gen. Issues ¶ 11 ("No response to the first sentence.")  The administrative record demonstrates that many such ads were aired during 2003 in hotly contested races around the country—for example, the races for the seats held by Senators Tom Daschle (D-SD) and Arlen Specter (R-PA), and the races to fill open Senate seats in Colorado, Georgia, Illinois, Louisiana, and South Carolina.  *See* Pls' Br., Add. D-19 to D-22, D-25 to D-27, D-30; PX 54, 61-74, 76-79, 81, 84, 87, 89-91, 101-04.  None of these ads is accounted for in the Commission's data sets.  The Commission's only defense is that, "[a]lthough CMAG provided only a limited number of ads from 2003, they were requested by the Commission and provided where available."  FEC Br. at 49 n.28; *see also* FEC St. Gen. Issues ¶ 11 (reiterating that Commission had "requested" the missing 2003 data).  The "limited number of ads from 2003" referred to by the Commission relates to some stray advertising associated with special races late in 2002 and early in 2003.  *See* FEC St. Gen. Issues ¶ 11; Pls' St. Mat. Facts ¶ 11.  As noted above, the Commission has conceded that its merged House and Senate data sets contain no ads by 2004 House or Senate candidates that were broadcast in 2003.  Whether or not the Commission "requested" the missing data, the fact remains that the Commission's merged data sets exclude millions of dollars of TV and radio advertising run during 2003 in connection with the 2004 Senate and House races.  The Commission's House and Senate data sets are worthless and exclude *precisely* those early ads they are supposed to test for.

36.    Plaintiffs agree that most TV advertising in Senate and House races occurs within 90 days of the primary or general election.  However, even a small percentage of ads run outside a pre-election window translates into thousands of ads and hundreds of thousands, if not millions, of dollars.  Moreover, the Commission fails to account for radio, Internet, print, and newspaper advertisements, or for the concentration and intensity of advertising.  Early TV ads

tend to be concentrated in strongly competitive races of national significance. There is no basis in the CMAG data, or otherwise in the record, for the Commission to conclude that such campaign advertisements, clustered in highly competitive races of national significance, are rendered insignificant simply because they constitute a small percentage of total advertisements run in every district nationwide.

37.    The Commission's statistics are inherently unreliable because its merged data sets do not include any TV ads run during 2003 for 2004 House and Senate races. *See* ¶ 35 above. Moreover, even a small percentage of a large nationwide aggregate number represents a substantial amount and value of advertising. *See* ¶ 36 above.

38.    Same responses and objections as in ¶ 37 above. According to the Commission's own data, $653,892 was spent by House candidates on TV advertising outside the 90-day pre-primary window. *See* PX 134 (Chart H2 (3.79% of $17,253,099).) The Commission nowhere explains why these aggregate expenditures should be deemed "insubstantial."

39.    Plaintiffs tend to agree with the statements in this paragraph, but the Commission is also inconsistent in what it treats as a "substantial" expenditure and what it deems to be a "trivial" expenditure. For example, why is 14% an "appreciable" number but 16%—the percentage of pre-caucus Presidential candidate TV ads run in Iowa more than 120 days before the caucuses—a "minimal" and "very small number"? Similarly, why is $1,221,045 an "appreciable" sum, but not the millions of dollars spent outside the pre-primary windows for Presidential, Senate, and House elections? The Commission's internal inconsistencies reinforce the illegality of its revised content rule.

40.    This paragraph is objectionable on many levels. By limiting its analysis to "media markets fully contained within individual 'battleground' States," the Commission limited

its data set to a grand total of 23 DMAs. This excludes the vast majority of the 101 media markets monitored by CMAG, together with all spending that occurs outside of CMAG-monitored TV markets. Among other flaws, this approach excludes New Hampshire's first-in-the-nation primary along with many of the most critical primary contests in both parties (including California, New York, Texas, Illinois, Massachusetts, South Carolina, Indiana, Nebraska, and others).

41.     Although plaintiffs agree that the majority of election-related advocacy financed by interest groups occurs in the months immediately before a primary or general election, there is nevertheless a substantial amount of such advocacy earlier in the cycle as well, outside of the Commission's pre-election windows. For examples in the administrative record, *see, e.g.*, PX 18, 28-29, 32-33, 43, 48-50, 55, 80, 82-83, 88, 113, 120-21.

42.     No response, except that the record also demonstrates that party committees have often engaged in early TV and radio advertising outside of the Commission's pre-election windows. *See, e.g.*, PX 15-17, 20, 22, 35, 47, 92, 100, 107, 109, 115-16, 126.

43.     Plaintiffs object to this supposed "fact" for two principal reasons. First, the Commission's whole point in adopting its "safe harbor" regulation was to *legalize* such activity; why would anyone file an enforcement action claiming that someone had done what is now explicitly *authorized* by the agency's regulation? Moreover, it is well established that, where a rule authorizes secrecy and nondisclosure, plaintiffs are not required to point to evidence of any secret activity. "[I]t would be absurd to require [plaintiffs] to guess about when secret communications" authorized by the rule in violation of the statute were taking place; "[t]he mere statement of the suggestion exposes its absurdity." *Elec. Power Supply Ass'n v. FERC*, 391 F.3d

1255, 1262-64 (D.C. Cir. 2004); *see also Regular Common Carrier Conference v. United States*, 793 F.2d 376, 378-79 (D.C. Cir. 1986) (Scalia, J.).

44.    Same objections as in ¶ 43 above.  In addition, the Commission overlooks the infamous Clinton/DNC coordinated advertising campaign that began in August 1995, well outside the 120-day pre-election windows in the targeted states.  *See* PX 15-17.  This is a legendary example of how early coordinated TV advertising can change the course of a political campaign, yet the Commission has refused throughout the rulemaking and litigation even to acknowledge this page from our recent political history.  *See, e.g.*, Dick Morris, *Behind the Oval Office:  Winning the Presidency in the Nineties*, at 138-39 (1997) ("Why did Clinton win so easily in 1996?  Why did his lead hardly vary?  What was his strength with the voters that Dole could never shake?  In my opinion, the key to Clinton's victory was his early television advertising.  …  Week after week, month after month, from early July 1995 more or less continually until election day in '96, sixteen months later, we bombarded the public with ads.  The advertising was concentrated in the key swing states:  California, Washington, Oregon, Colorado, New Mexico, Louisiana, Arkansas, Tennessee, Kentucky, Florida, North Carolina, New Jersey, Pennsylvania, Ohio, Michigan, Wisconsin, Illinois, Minnesota, Missouri, and Iowa.  During this period, television viewers in these states saw, on average, 150 to 180 airings of a Clinton or a DNC commercial, about one every three days for a year and a half.  This unprecedented campaign was the key to success."); Sydney Blumenthal, *The Clinton Wars*, at 148 (2003) ("Clinton's advertisements began running seventeen months before Election Day on November 5, 1996—an unprecedented move.  Every ad, without exception, was centered on issues, comparing and contrasting the President's stance with Gingrich's and the Republicans'.  By the end of 1995, on the eve of the second government shutdown, nearly half the electorate,

especially in strategically important states, had seen the commercials, and almost a third had seen thirty of them.  Because they were not broadcast in Washington, these early ads went almost completely unnoticed by the media.  The entire country was below their radar.  But Clinton was already beginning to win the election."); Bob Woodward, *The Choice*, at 212-14, 233-39 (1996) (discussing 1995 Clinton/DNC advertising campaign).  The Commission's own audit records, cited in the administrative record, confirm these accounts.  (PX 17 at 1-43.)

      45.     Same objections as in ¶ 43 above.

      46.     Same objections as in ¶ 43 above.

      47.     No response.

      48.     No response.

      49.     As to sentence one, 11 C.F.R. § 109.21(d)(4) and (5) were already applicable during the period when an employee or vendor was actively employed by a candidate or party committee because the original version of the rule made it applicable during the "current election cycle" (beginning on the first day following the previous general election for the office sought and ending on the date of the general election).  The amended rule limits the rule's applicability to the period of actual employment and the following 120 days.  Outside of that period, according to the amended rule, material information gained during employment may be shared with an outside spender without penalty.

      50.     The common vendor and former employee provisions do not prohibit employment of individuals who were previously employed by or provided services to the candidate that is the subject of the communication.  Rather, they were promulgated to prevent former employees and common vendors from giving material information gained during employment to outside spenders, thereby circumventing the coordination rules.

51.     The common vendor and former employee provisions do not prohibit employment of individuals who were previously employed by or provided services to the candidate that is the subject of the communication.   Rather, they were enacted to prevent former employees and common vendors from giving material information gained during employment to outside spenders, thereby circumventing the coordination rules.

52.     There is ample information collected in the course of a campaign that may remain material for long periods of time, such as opposition research, the campaign's master strategy, a computerized mailing list, etc.  If information gained in employment at the outset of a campaign really has such a short "shelf life," it would not be "material," as the regulation requires, and would not, according to the Commission's logic, be used for coordinated communicative expenditures.

53.     Although the Commission may well have adopted the firewall safe harbor provision "to safeguard against unlawful coordination when an entity exercises its right to make both independent and coordinated expenditures," the means it chose—an ill-defined standard for an "effective" firewall and a presumption that coordination has not occurred where such a firewall is alleged to exist—only serve to make coordination easier to hide.

Dated this 16th day of February, 2007.

Respectfully submitted,

Roger M. Witten (Bar No. 163261)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
(212) 230-8800

Charles G. Curtis, Jr. (*pro hac vice*)
Michelle M. Umberger (Bar No. 480620)
David L. Anstaett (*pro hac vice*)
Lissa R. Koop (*pro hac vice*)
HELLER EHRMAN LLP
One East Main Street, Suite 201
Madison, Wisconsin  53703
(608) 663-7460

Randolph D. Moss (Bar No. 417749)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

Fred Wertheimer (Bar No. 154211)
DEMOCRACY 21
1825 Eye Street, N.W., Suite 400
Washington, D.C.  20006
(202) 429-2008

Donald J. Simon (Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY LLP
1425 K Street, N.W., Suite 600
Washington, D.C.  20005
(202) 682-0240

*Attorneys for Plaintiffs Christopher Shays
    and Martin Meehan*