# SUPPLEMENTAL PLAINTIFFS' EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 96-1781 (JHG) (AK) |
| | ) | |
| | ) | |
| v. | ) | OPPOSITION |
| | ) | |
| | ) | |
| THE CHRISTIAN COALITION, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF FEDERAL ELECTION COMMISSION'S**

**OPPOSITION TO DEFENDANT'S**

**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.  THE "EXPRESS ADVOCACY" TEST APPLICABLE TO
     RESTRICTIONS ON INDEPENDENT  EXPENDITURES
     DOES NOT APPLY TO COORDINATED EXPENDITURES ........................4

     A.   The Constitution Does Not Require That Coordinated
          Expenditures Contain Express Advocacy To Be Treated
          As Contributions ...................................................................4

     B.   If Coordinated Expenditures Could Not Be Regulated Unless
          They Pay For Express Advocacy Communications, The
          Underlying Purposes Of The Act Would Be Defeated .............................8

     C.   The Language Of The Act Does Not Limit Coordinated
          Expenditures To Those That Pay For Communications
          With Express Advocacy.........................................................12

     D.   The Commission Has Not Impermissibly Changed Its
          Position On Whether Coordinated Expenditures Must
          Contain Express Advocacy ....................................................18

          1.   The Commission Has Never Adopted CC's Position That
               Expenditures Coordinated By A Corporation And Candidate Must
               Contain Express Advocacy To Be Treated As Contributions ...........18

          2.   The Commission's Prosecutorial Decision In Orloski Is
               Not A Legal "Precedent" That Would Need To Be Explained
               If It Had Been Changed .................................................21

III.  CHRISTIAN COALITION COORDINATED ITS CAMPAIGN
      EXPENDITURES WITH SEVERAL FEDERAL CANDIDATES ...............24

      A.  The FECA Defines Coordinated Expenditures In Terms Of
          Communications Made With A Candidate .............................................24

          1.  Coordination With Candidates Occurs When Campaign
              Information Is Shared, Regardless Whether It Is Confidential ..........26

          2.  The Commission Is Not Required To Demonstrate A
              Specific Causal Relationship Between The Coordination With
              The Candidate And The Subsequent Campaign Expenditure ...........28

      B.  CC Distorts The Commission's Actual Interpretation Of
          Coordination, Which Is Not Unconstitutionally Vague...........................32

      C.  The Facts Demonstrate An Abundance Of Coordination
          Between CC And Several Federal Candidates .........................................39

          1.  Coordination With The National Republican Senatorial
              Committee ......................................................................................42
          2.  Coordination With The Helms For Senate Committee ....................44
          3.  Coordination With The Bush-Quayle '92 Committee .....................45
          4.  Coordination With The Inglis For Congress Committee .................51
          5.  Coordination With The North For Senate Committee .....................52
          6.  Coordination With The Hayworth For Congress Committee ...........54

      D.  CC's Remaining Coordination Defenses Must Also Fail.......................56

          1.  CC's Complaints About The FEC's Investigation Are Irrelevant
              To The Issues Before The Court.......................................................56

              a.  The Commission's discovery in this case has no bearing on
                  the proper construction of the substantive provisions of
                  the Act...................................................................................56

              b.  The Commission's discovery in this case was appropriate..........59

          2.  The Doctrine Of Unconstitutional Conditions Is Inapplicable
              Here..............................................................................................62

IV.    CHRISTIAN COALITION VIOLATED 2 U.S.C. 441b WHEN IT MADE
       EXPENDITURES EXPRESSLY ADVOCATING THE ELECTION OR
       DEFEAT OF CLEARLY IDENTIFIED FEDERAL CANDIDATES ............63

       A.    The Commission's Interpretation Of "Express Advocacy"
             Does Not Unconstitutionally Limit "Issue Advocacy"............................63

       B.    Christian Coalition Expressly Advocated The Election Or Defeat
             Of Three Clearly Identified Federal Candidates ......................................66

             1.  Ralph Reed Expressly Advocated The Defeat Of Pat Williams........66

             2.  CC's "Reclaim America" Mailing Expressly Advocated The
                 Election Or Defeat Of Numerous Clearly Identified Candidates ......67

             3.  The Georgia CC Expressly Advocated The Election
                 Of Newt Gingrich .........................................................................69

CONCLUSION...............................................................................................................70

II.    THE "EXPRESS ADVOCACY" TEST APPLICABLE TO RESTRICTIONS
       ON INDEPENDENT EXPENDITURES DOES NOT APPLY TO
       COORDINATED EXPENDITURES

A.    The Constitution Does Not Require That Coordinated Expenditures Contain
      Express Advocacy To Be Treated As Contributions

The Supreme Court has repeatedly explained that the compelling governmental interest

behind restrictions on contributions, which include coordinated expenditures, establishes a

"fundamental constitutional difference" between contributions and independent expenditures.

FEC v. National Conservative Political Action Comm. ("NCPAC"), 470 U.S. 480, 497 (1985);

Colorado Republican Federal Campaign Comm. v. FEC ("Colorado Republican"), 518 U.S. 604,

617 (1996) ("[T]he constitutionally significant fact ... is the lack of coordination between the

candidate and the source of the expenditure") (citation omitted).  "We have consistently held that

restrictions on contributions require less compelling justification than restrictions on independent

spending."  FEC v. Massachusetts Citizens for Life, Inc. ("MCFL"), 479 U.S. 238, 259-60

(1986).  In particular, as the D.C. Circuit has long recognized, the Supreme "Court limited [the

express advocacy requirement] to those provisions curtailing or prohibiting independent

expenditures.  This definition is not constitutionally required for those statutory provisions

limiting contributions."  Orloski v. FEC, 795 F.2d 156, 167 (D.C. Cir. 1986).

The Buckley Court understood "contribution" to "include not only contributions made

directly or indirectly to a candidate, political party, or campaign committee ... but also all

expenditures placed in cooperation with or with the consent of a candidate, his agents, or an

authorized committee of the candidate."  424 U.S. at 78.  "So defined, 'contributions' have a

sufficiently close relationship to the goals of the Act, for they are connected with a candidate or

his campaign."  Id.  The Court did not refer to express advocacy in this discussion nor when

analyzing the constitutionality of the contribution limits. 424 U.S. at 24-38. The Act's limitations

on contributions and coordinated expenditures are justified by the compelling governmental

interest in foreclosing opportunities for the corruption of candidates: "To the extent that large

contributions are given to secure political quid pro quo's from current and potential office

holders, the integrity of our system of representative democracy is undermined...." Id. at 26-27.

Contrary to CC's repeated mischaracterizations (Memorandum ("Mem.") at 24, 35, 39-40

& n.16), the Court in Buckley clearly treated coordinated expenditures as contributions and

limited the express advocacy requirement to truly independent expenditures. In its lengthy

discussion of the Act's original independent expenditure limitation, former section 608(e)(1), the

Court first narrowly construed that provision to avoid unconstitutional vagueness by adopting the

"express advocacy" requirement. 424 U.S. at 40-44. Even with this narrow construction,

however, the Court found that section 608(e)(1)'s limit on independent expenditures by

individuals and groups other than political committees was unconstitutional: "We find that the

governmental interest in preventing corruption and the appearance of corruption is inadequate to

justify § 608(e)(1)'s ceiling on independent expenditures." Id. at 45 (emphasis added). The

Court then specifically addressed and rejected the argument that section 608(e)(1)'s limits were

necessary to prevent evasion of the contribution limits through indirect contributions such as

coordinated expenditures. The Court explained that because "such controlled or coordinated

expenditures are treated as contributions rather than expenditures under the Act," the Act's

"contribution ceilings rather than § 608(e)(1)'s independent expenditure limitation prevent

attempts to circumvent the Act through prearranged or coordinated expenditures amounting to

disguised contributions." Id. at 46-47 (footnote omitted; emphasis added). Immediately

following this explicit classification of coordinated expenditures as contributions, the Court

emphasized that the express advocacy requirement applied only to independent expenditures: "By contrast [to the ceiling on contributions and coordinated expenditures] § 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign." Id. at 47 (emphasis added). Therefore, an integral part of the Court's own reasoning about why the "independent expenditure ceiling thus fails to serve any substantial governmental interest in stemming the reality or appearance of corruption," was that a narrow limit on independent expenditures for express advocacy would be ineffective in closing a loophole for coordinated expenditures — in part because that loophole had already been closed by treating coordinated expenditures as contributions. Id. at 47-48.

Contrary to CC's argument (Mem. 35), the Supreme Court has never "definitively construed the phrase 'in connection with any election,'" and held that express advocacy is a necessary part of all prohibited corporate activity under section 441b. Similarly, CC is mistaken when it argues (Mem. 40 & n.16) that the term "expenditure" has been "defined by the courts to be limited to those communications that contain express advocacy." CC's arguments are grounded on a strained attempt to read the Buckley Court's application of the "express advocacy" test to independent expenditures into the Act's definition of the terms "contribution" and "expenditure" based on similarities in statutory language. Among other things, these arguments confuse the difference between a narrowing construction adopted to avoid constitutional problems in specific applications, with a more general interpretation of what the language in a statutory provision means. In Buckley, the Court applied the "express advocacy" test to independent expenditures for constitutional reasons — ones that are inapplicable to limits on contributions — not because it interpreted the statutory phrase "for the purpose of influencing" to mean "express advocacy." See Akins v. FEC, 101 F.3d 731, 741-42 (D.C. Cir. 1996) (en banc)

("'Contributions' — when defined as direct or indirect contributions to a candidate ... or expenditures placed with the cooperation or consent of a candidate — were determined to 'have a sufficiently close relationship to the goals of the Act,' ... [but] the meaning of 'expenditure' ... posed line-drawing difficulties" that led the Court to construe "expenditure <u>for purposes of</u> ... section [434(e)] to reach only funds that expressly advocate....") (quoting <u>Buckley</u>, 424 U.S. at 78-70; emphasis added), <u>vacated on other grounds</u>, 118 S.Ct. 1777 (1998).[1]

In fact, the term "expenditure" is defined broadly by the Act to include, <u>inter alia</u>, "anything of value, made by any person for the purpose of influencing any election for Federal office," 2 U.S.C. 431(9)(A)(i), and as already explained, the term takes on vastly different constitutional meanings depending upon whether it is part of the phrase "independent expenditure" rather than "coordinated expenditure." In <u>MCFL</u>, the Court considered a corporate newsletter containing express advocacy that had been placed in public areas for general distribution. 479 U.S. at 244 n.2. In that context, the Court explicitly relied upon the general definition in section 431(9)(A)(i) when it construed the scope of the term "expenditure" in section 441b. 479 U.S. at 245-46. While the Court ultimately found that the express advocacy requirement was constitutionally necessary when applied to the kind of "independent spending" that was at issue in <u>MCFL</u>, <u>id.</u> at 249, the starting point of the Court's analysis was the Court's and Congress's historical understanding that the FECA and its predecessors broadly regulated "political expenditure[s]," <u>id.</u> at 247 — without any reference to the express advocacy standard. Thus, when the <u>MCFL</u> Court adopted the express advocacy standard for independent corporate

---

[1]    Although the D.C. Circuit's <u>Akins</u> decision is no longer binding precedent, and the Commission has differed with some of its conclusions regarding the definition of "political committee," the Commission has never disputed the Circuit's conclusion that there is a fundamental constitutional distinction between contributions and independent expenditures.

expenditures under section 441b, it never suggested that it was narrowing the general term "expenditure" for all purposes or overturning decades of precedent. Such a question was not even presented since there had been no suggestion of coordination between a candidate and MCFL before the Court.[2]

**B.      If Coordinated Expenditures Could Not Be Regulated Unless They Pay For Express Advocacy Communications, The Underlying Purposes Of The Act Would Be Defeated**

If coordinated expenditures could be regulated as contributions only if they paid for communications that contain express advocacy, the Act's regulation of contributions would be narrowed to the point of ineffectiveness. Cf. California Medical Ass'n v. FEC ("CMA"), 453 U.S. 182, 197-99 (1981) (plurality) (danger of evasion of limits on contribution to candidates justified prophylactic limitation on contributions to political action committees). CC's construction would allow all corporations, labor organizations, wealthy individuals, and even foreign interests, to work out a specific plan with a candidate to spend unlimited funds to help the candidate's election, as long as the resulting communications avoid express advocacy. See Buckley, 424 U.S. at 44 n.52. Such spending could include advertisements promoting the

---

[2]      The Court's differing use of the term "expenditure" is also unmistakable in Buckley's discussion of the Act's disclosure requirements, where the Court took a two-pronged approach and construed the requirement to report "expenditures" differently as applied to political committees versus other persons. 424 U.S. at 79-82. The Court was concerned that the term "expenditure" could be unconstitutionally vague when applied to independent expenditures by individuals and groups who are not primarily engaged in influencing elections. Id. at 79. Thus, regarding the requirement to disclose such independent expenditures, the Court found it necessary to narrow the definition of "expenditure" with the express advocacy standard. Id. at 80. However, with regard to political committees whose major purpose is campaign advocacy, the Court concluded that all of their "[e]xpenditures … can be assumed to fall within the core area sought to be addressed by Congress" because they "are, by definition, campaign related." Id. at 79. Thus, all "expenditures" by political committees — broadly defined without the narrowing express advocacy standard — are constitutionally subject to the Act's disclosure requirements.

candidate or savaging his opponent, as well as providing a fully equipped campaign office or a private jet. CC's construction would also render the Act's recordkeeping and reporting requirements ineffective, open the door to the secret political deals the Act was designed to foreclose, and flout the "'compelling' governmental interest in assuring the electoral system's legitimacy, protecting it from the appearance and reality of corruption." Colorado Republican, 518 U.S. at 609.

When it adopted the express advocacy standard, the Supreme Court recognized that it would not be difficult to "devis[e] expenditures that skirt[] the restriction on express advocacy of election or defeat but nevertheless benefit[] the candidate's campaign." Buckley, 424 U.S. at 45. Thus, applying the coordinated expenditure limits only to money spent on express advocacy would "facilitat[e] circumvention by those seeking to exert improper influence upon a candidate or officeholder" and "permit[] unscrupulous persons and organizations to [contribute] unlimited sums of money in order to obtain improper influence over candidates for elective office." Id. Because of the ease with which the express advocacy requirement can be evaded, the Court found that narrowing the coverage of the Act's limits on independent expenditures to express advocacy rendered them fatally underinclusive, id., but, as explained above, an important factor in the Court's reasoning was that this narrow prohibition was not meant to cover coordinated expenditures because they were separately regulated by treating them as contributions. Indeed, CC offers no reason why, if the Buckley Court had thought coordinated expenditures are limited to express advocacy, it did not find the limits on coordinated expenditures fatally underinclusive, as it did for independent expenditures.

In a footnote (Mem. 9 n.3), CC tries to minimize the devastating consequences of its own argument by stating that the "express advocacy requirement applies to communications, not to

payment for other types of expenses incurred by candidates, such as office rent and staff costs."
But CC cannot have it both ways for the Act draws no such distinctions. CC cannot argue that
"express advocacy" is an across-the-board requirement for the term "expenditure" wherever it
appears in the Act, but then disavow its own categorical argument only in circumstances that
show it is impossible to reconcile with the Act. While it is true that it is absurd to suggest that
coordinated expenditures for non-communicative items such as rent and office supplies must
contain express advocacy to be regulated as contributions, that absurdity reveals the weakness in
CC's otherwise unqualified claims about the requirement of express advocacy.

What is critically absent from CC's argument (see, e.g., Mem. 38-40) is any recognition of
the compelling governmental interests that underlie the Act's and Supreme Court's treatment of
coordinated expenditures as contributions — the interests in preventing the appearance and
actuality of corruption. If a spender is providing a valuable benefit to a candidate, and if the
candidate requests, acquiesces in, or provides information to assist the expenditure, it makes little
difference whether the expenditure pays for express advocacy, cars, pollsters, staff, or
advertisements that attack the opponent's voting record. What matters is that money has been
spent to benefit the candidate that does not have to come out of the candidate's bank account —
and that the candidate had been consulted in advance. The consultation and cooperation with the
candidate before the expenditure is what creates the opportunity for corruption, the appearance of
corruption, and perhaps, actual corruption. The precise nature of the goods and services
thereafter purchased has little to do with the fundamental corrupting circumstances that the Act
was designed to eradicate.

Finally, when CC tries to rely (Mem. 44-46) upon the fundamental distinction between
contributions and independent expenditures, it again ignores the compelling governmental

interests that the Court in <u>Buckley</u> found when it upheld limits on contributions and coordinated expenditures. While it is true that the Court found that communications made through independent expenditures were more direct expressions of speech than those made through contributions, the Court's decision to uphold the contribution limits rested primarily upon its recognition that contributions provide a much greater potential for corruption. Because coordinated expenditures carry the same risk of corruption as do direct contributions, limits on coordinated expenditures are constitutional for the same reason. What matters for constitutional purposes is whether coordinated expenditures present an opportunity for corruption, <u>i.e.</u>, for inducement or coercion. Moreover, once there has been coordination, it may be inaccurate to say that the resulting speech really comes solely from the spender who pays for it, since the speech itself may have been altered based on the needs or suggestions of the candidate. In any event, once an opportunity for corruption exists, the outward appearance of the resulting expenditure does not diminish the corruption. Indeed, the mere fact that the coordination remains secret may itself make the resulting expenditure more valuable, and the candidate's desire to keep the coordination secret may increase the potential to influence the candidate in the future. For example, a candidate may stand to gain extra advantage when a seemingly nonpartisan voter guide appears to be the independent work of a respected third party, instead of another publication from the candidate's campaign headquarters.[3] An organization's offer to help a candidate and spend

---

[3]    Indeed, in this case, Chuck Cunningham, CC's Director of Voter Education, explained in September 1994 at CC's Road to Victory Conference that when distributing voter guides, one strategy is to complement the efforts of the candidate's campaign to maintain an appearance of distance from the candidate: "The purpose is not to print one voter guide and then give it to the campaign and have them print more, and them distribute it. The purpose is to set up a network outside of that that in some ways will supplement or complement those efforts." Transcript [88] at 34; FEC Fact 2.346.

substantial amounts publicizing the candidate's virtues or his or her opponent's vulnerabilities, in

exchange for legislative favors, is a paradigm of a corrupt <u>quid</u> <u>pro</u> <u>quo</u>.

**C.    The Language Of The Act Does Not Limit Coordinated Expenditures To Those That Pay For Communications With Express Advocacy**

The plain language of the Act clearly states that independent expenditures and coordinated

expenditures are mutually exclusive, and that coordinated expenditures are treated like

contributions, without any requirement that they be used to pay for express advocacy.

CC's construction of that plain language, however, would nullify important provisions of the Act

and must be rejected.  "An endlessly reiterated principle of statutory construction is that all words

in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage."

<u>Qi-Zhuo v. Meissner</u>, 70 F.3d 136, 139 (D.C. Cir. 1995).  In addition, "where Congress includes

particular language in one section of a statute but omits it in another section of the same Act, it is

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion."  <u>Rodriguez v. United States</u>, 480 U.S. 522, 525 (1987).

The Act's general definition section provides that "independent expenditure" means

> an expenditure by a person expressly advocating the election or defeat of a
> clearly identified candidate which is made without cooperation or consultation
> with any candidate, or any authorized committee or agent of such candidate,
> <u>and</u> which is not made in concert with, or at the request or suggestion of, any
> candidate, or any authorized committee or agent of such candidate.

2 U.S.C. 431(17) (emphasis added).  This definition makes clear that an expenditure is an

independent expenditure only if it <u>both</u> contains express advocacy <u>and</u> lacks coordination with the

candidate.  <u>See</u> <u>also</u> 11 C.F.R. 109.1; Advisory Opinion ("AO") 1979-80 [1976-1990 Transfer

Binder] Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5469 at p. 10,526 (1980) ("For an expenditure to

qualify as independent, each element in that definition must be satisfied").  In contrast, the general

definition of "expenditure" states that it includes "anything of value, made by any person for the purpose of influencing any election for Federal office," 2 U.S.C. 431(9)(A)(i), without any reference to "express advocacy." But if, as CC claims, all expenditures must contain express advocacy to be considered true "expenditures" under the Act, then the express advocacy requirement of section 431(17) would be surplusage. The same is true of 2 U.S.C. 441d(a) and 431(9)(B)(iii).

Most important here, since an expenditure must meet both the express advocacy and "without" coordination criteria to be an independent expenditure, all expenditures made in "cooperation or consultation" with a federal candidate fall outside the definition of independent expenditure — regardless of whether they may contain express advocacy — and must be treated as coordinated expenditures.

The Supreme Court has indicated that the general definition section (2 U.S.C. 431) applies to the Act as a whole, including the prohibition on corporate and union contributions and expenditures in section 441b; the separate definition in section 441b(b)(2) concerning such contributions and expenditures only states what these terms in section 441b "shall include," not the limits of what they mean. MCFL, 479 U.S. at 246 n.3. More generally, when the Court in MCFL distinguished corporate independent expenditures from other spending under section 441b, it relied upon Buckley's discussion of independent expenditures, which arose outside the context of section 441b. 479 U.S. at 248-49. Of course, by the time MCFL was decided, the definition of independent expenditure in section 431(17) had been added to the Act, and the Court never suggested that its interpretation of section 441b was in tension or conflict with section 431(17).

CC's argument (Mem. 35-36) that the MCFL Court "definitively ruled" that express advocacy is required "to constitute an 'expenditure' subject to § 441b(b)" is simply false; that

decision applied the express advocacy standard to the "prohibition of § 441b" concerning

corporate independent expenditures, 479 U.S. at 249 (emphasis added), which is stated in section

441b(a), not 441b(b). In fact, the exceptions in section 441b(b) that CC attempts to expand and

incorporate into section 431 were not even at issue in MCFL. Substantively, the exceptions in

section 441b(b)(2) have nothing to do with the express advocacy standard, but instead permit

corporations and labor unions to make certain campaign-related expenditures, despite the general

prohibition of section 441b(a): communications with their stockholders or members, certain

nonpartisan voter registration and get-out-the-vote drives, and the administration of separate

segregated funds.[4]

Moreover, CC argues (Mem. 35-36) that the reference in the general definition of

contribution, 2 U.S.C. 431(8)(B)(vi), to section 441b(b) indirectly incorporates the express

advocacy requirement into that general definition; but as just shown, MCFL's discussion of

express advocacy involved only section 441b(a), not section 441b(b). In addition, CC's

incorporation argument is an exact parallel of an argument rejected in MCFL. As CC admits

(Mem. 36 n.13), the exclusion to "contribution" in section 431(8)(B)(vi) upon which it relies is

---

[4]     Contrary to CC's suggestion (Mem. 36 n.14), the Commission's regulations that describe activities that are exempt under section 441b(b)(2) do not support CC's position. See 11 C.F.R. 114.1-114.4. These regulations provide greater detail about which activities constitute exempt expenditures, and the touchstone is whether the recipients of the communications are part of the "restricted class," such as stockholders of a corporation or members of a labor union. 11 C.F.R. 114.1(j). Although the regulations allow coordination with candidates if the subsequent expenditures are directed only at the restricted class, the regulations make clear that such coordination may make it impossible for the corporation or union to make a subsequent independent expenditure to communicate to the general public: "[S]uch coordination may be considered evidence that could negate the independence of subsequent communications to those outside the restricted class by the corporation, labor organization or its separate segregated fund, and could result in an in-kind contribution." 11 C.F.R. 114.2(c). Accord AO 1996-1, 2 Fed. Elec. Camp. Fin. Guide (CCH) ¶ 6183, at p. 12,155 (1996).

the same exclusion that appears in section 431(9)(B)(v) in the general definition of "expenditure." Yet, in MCFL (479 U.S. at 246 n.3), the Court disapproved the argument that the language of section 441b(b)(2) that states what " 'contribution or expenditure' shall include" carries over to narrow the Act's general definition of "expenditure" in section 431(9)(B)(v), explaining (id.), "§ 441b(b)(2) says that expenditures 'include' payments to a candidate, a term that indicates that activities not specifically enumerated in that section may nonetheless be encompassed by it."

CC also asserts (Mem. 37-38) that FEC v. Akins, 118 S.Ct. 1777 (1998), supports reading an express advocacy requirement into the general definition of "expenditure" in section 431 through the limited exceptions in section 441b(b). But Akins supports the Commission's position, not CC's. First, the issue presented by the parties in Akins was whether the American Israel Public Affairs Committee ("AIPAC") was a "political committee" under the Act, not whether it had violated section 441b. Second, although the case did involve exceptions to the definition of "expenditure," the Court focused on the general exception in section 431(9)(B)(iii), which exempts certain expenditures made to communicate to "members" of a "membership organization." 118 S.Ct. at 1781. Third, as the D.C. Circuit had explained in greater detail, the facts of the case clearly involved coordinated expenditures, many of which did not involve express advocacy. See Akins, 101 F.3d at 734 (appellants alleged that AIPAC "used full-time staff to meet with nearly every candidate for federal office, systematically disseminated campaign literature including candidates' position papers, and conducted regular meetings and phone calls with AIPAC supporters"). Fourth, the underlying basis of the D.C. Circuit's decision had been that because of the fundamental constitutional distinction between independent expenditures and contributions, a narrow interpretation for "political committee" was not necessary if the group's disbursements involved only contributions or coordinated expenditures.

Although the Supreme Court did not reach the merits of the D.C. Circuit's construction of "political committee," there was never any "contention that AIPAC's disbursements were independent expenditures," and the D.C. Circuit accepted the Commission's finding that "AIPAC likely made campaign contributions in excess of $1,000," without applying the express advocacy standard to AIPAC's coordinated expenditures. 101 F.3d at 744 & n.13. Thus, when the Supreme Court proceeded to hold that the case should be remanded to the Commission to reconsider the "membership" issue, the importance and relevancy of that issue necessarily depended upon the fact that statutory "expenditures" had been made — otherwise it would have been senseless to inquire further about whether one of the exceptions to the definition of "expenditure" was applicable. In turn, because the underlying expenditure determination itself rested on the Commission's conclusion that either express advocacy communications or coordinated expenditures had taken place, the decision in Akins fully supports the Commission's view that express advocacy is not necessary to treat a coordinated expenditure as a contribution under the Act.

Furthermore, another provision of the Act, 2 U.S.C. 441a(a)(7)(B)(i), states that for purposes of the contribution limits in subsection 441a(a):

> expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate[.]

This provision explicitly states Congress's intention that coordinated expenditures be considered contributions — without an express advocacy requirement like the one in section 431(17) — and nothing in section 441b concerning prohibited corporate expenditures specifies a different meaning in its use of the same term "contribution."

Although section 441b does not contain an explicit provision like section 441a(a)(7)(B)(i),

Congress had no reason to include such a provision in section 441b at the time it was enacted.

Before MCFL in 1986, the Supreme Court had not drawn a constitutional distinction for purposes

of section 441b between corporations' contributions to a candidate and their independent

expenditures. As explained above, however, in MCFL the Court held (479 U.S. at 248-49) that

the prohibition on independent corporate expenditures could only be applied to communications

that "expressly advocate" the election or defeat of a candidate, but the Court did not apply this

standard to corporate contributions. See Orloski, 795 F.2d at 167. Thus, although the

contribution/expenditure distinction is now critical under section 441b, before MCFL there would

have been no reason for Congress to specify in section 441b that coordinated expenditures be

treated like contributions, since that provision prohibited all contributions and expenditures on

equal terms. "Since there is a presumption that a given term is used to mean the same thing

throughout a statute," Brown v. Gardner, 513 U.S. 115, 118 (1994) (citing Atlantic Cleaners &

Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932)), this canon of statutory construction

supports treating coordinated expenditures as contributions under section 441b, as they are in

section 441a(a)(7)(B)(i), without creating an express advocacy requirement.[5]

---

[5]      Consistent with this analysis, the Court itself in NCPAC (470 U.S. at 492) relied upon
section 441a(a)(7)(B)(i) in its construction of unauthorized expenditures and contributions in the
Presidential Election Campaign Fund Act, 26 U.S.C. 9012(f), even though the latter provision is
in a different statute and, like section 441b, contains no cross reference to section
441a(a)(7)(B)(i). See also Colorado Republican, 518 U.S. at 621 (The failure of the "Party
Expenditure Provision [2 U.S.C. 441a(d)] to distinguish between coordinated and independent
expenditures [does not] indicate a congressional judgment that such a distinction is impossible or
untenable … Instead, the use of the unmodified term 'expenditure' is explained by Congress'
desire to limit all party expenditures when it passed the 1974 amendments, just as it had limited all
expenditures by individuals, corporations, and other political groups.") (Breyer, J.).

Indeed, when Congress amended the Act after <u>Buckley</u> but before <u>MCFL</u>, it confirmed its

intention that the express advocacy test <u>not</u> apply to coordinated expenditures or contributions

generally. In 1976, Congress incorporated the express advocacy standard in the Act's definition

of "independent expenditure," as well as in other provisions of the Act. 2 U.S.C. 431(17),

431(9)(B)(iii), 441d(a). However, Congress chose not to incorporate any reference to express

advocacy in the definitions of "contribution" and "expenditure." 2 U.S.C. 431(8)(A), 431(9)(A),

441a(a)(7)(B)(i). The court should therefore "presume[] that Congress act[ed] intentionally and

purposely in [enacting] the disparate" language of these provisions. <u>Rodriguez</u>, 480 U.S. at 525.

**D.    The Commission Has Not Impermissibly Changed Its Position On Whether Coordinated Expenditures Must Contain Express Advocacy**

CC argues at length (Mem. 8-15) that the Commission has impermissibly departed from its

prior precedent, but this argument is both factually and legally wrong.

**1.    The Commission Has Never Adopted CC's Position That Coordinated Expenditures Must Contain Express Advocacy To Be Treated As Contributions**

Contrary to CC's argument (Mem. 8-9), the Commission has never "held that, in order for

a communication which is coordinated with a candidate to be deemed to be an 'in-kind'

contribution, it must contain express advocacy." The sole authority upon which CC relies for this

extraordinary claim actually supports the Commission's position in this case, and CC's argument

contorts the case beyond recognition. In <u>Orloski</u>, the D.C. Circuit reviewed the Commission's

decision not to investigate an administrative complaint pursuant to 2 U.S.C. 437g(a)(8); under

that deferential provision, the courts can overturn the Commission's decision only if the dismissal

was based on an "impermissible interpretation of the Act" or if it was "arbitrary or capricious, or

an abuse of discretion." <u>Id.</u> at 161. The substantive issue was the "test for distinguishing

permissible donations to non-political events from prohibited corporate donations to campaign events." Id. The court, quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), and FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981) (FEC "is precisely the type of agency to which deference should presumptively be afforded"), found the Commission's interpretation permissible. 795 F.2d at 164-67.

The Orloski court explained that the interpretation at issue "applie[d] only to corporate funding of legislative events sponsored by a congressman." 795 F.2d at 165. Orloski had complained to the Commission that Congressman Ritter, an incumbent seeking re-election, had received corporate contributions in the form of free bus rides and food for a picnic at which he spoke. Id. at 158. Thus, Orloski involved the special question of accommodating the difference between the "legitimate and necessary efforts of legislators to communicate with their constituents and activities designed to win elections by legislators in their other role as politicians." Buckley, 424 U.S. at 84 n.112. While it is true that the Commission examined Ritter's speech and incorporated an express advocacy element in its definition of what constitutes a campaign event in that limited context, neither in Orloski nor in any other context has the Commission ever taken the general position that coordinated expenditures or contributions must contain express advocacy to be regulable under 2 U.S.C. 441b.

Although the Orloski court found that the "FEC's interpretation is one of the most favorable to corporations and incumbents that the agency could have adopted," it nevertheless held that it was a permissible choice. 795 F.2d at 165, 167. In reaching that conclusion, the court explicitly stated (id. at 167) (emphasis added):

> To be sure, the [Supreme] Court limited [the express advocacy requirement] to those provisions curtailing or prohibiting independent expenditures. <u>This definition is not constitutionally required for those statutory provisions limiting contributions</u>.

CC ignores this legal conclusion and instead claims that the Commission's prosecutorial decision in the narrow circumstances of <u>Orloski</u> — which involved "corporate donations ... of 'in excess of one thousand hamburgers, an unknown quantity of salad and potato salad and bus transportation' " at an incumbent's legislative event, <u>id.</u> at 165 — is at odds with the Commission's longstanding position that coordinated campaign expenditures do not require express advocacy to be treated as contributions under section 441b.

As CC concedes (Mem. 14 n.6), however, prior to any of CC's activity at issue in this case, the Commission had explicitly opined that if published comments about candidates "are made with the cooperation, consultation or prior consent of, or at the request or suggestion of, the candidates or their agents, <u>regardless of whether such references contain 'express advocacy'</u> or solicitations for contributions, then the payment ... will constitute ... 'in-kind contributions' to the identified candidates." AO 1988-22 [1976-1990 Transfer Binder] Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5932, at p. 11,468 (1988) (emphasis added). This advisory opinion came just two years after <u>MCFL</u> and shortly after the Commission's prosecutorial decision in <u>Orloski</u>, yet the Commission found it unnecessary even to mention <u>Orloski</u> in the advisory opinion. <u>See also</u> AO 1990-5 [1976-1990 Transfer Binder] Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5982, at p. 11,612 (1990) (expenses incurred to publish a newsletter of a company owned by a federal candidate would be considered coordinated campaign expenditures if, <u>inter alia</u>, "articles or editorials are published referring to [the candidate's] views on public policy issues, or those of [the candidate's] opponent"); AO 1983-12 [1976-1990 Transfer Binder] Fed. Elec. Camp. Fin. Guide (CCH)

¶ 5718 (1983).[6]  Ironically, directly contrary to CC's suggestion (Mem. 14 n.6) that advisory

opinions have less precedential weight than prosecutorial decisions <u>not</u> to pursue an investigation,

Orloski itself noted that "Congress requires the Commission to issue advisory opinions … upon

receipt of a written request.  <u>See</u> 2 U.S.C. § 437f.  This implies that Congress intended the

Commission to fill in gaps left in the statute…."  795 F.2d at 164.  <u>See also</u> <u>FEC v. Ted Haley</u>

<u>Congressional Comm.</u>, 852 F.2d 1111, 1115 (9th Cir. 1988) ("interpretation of FECA by the FEC

through its regulations and advisory opinions is entitled to due deference and is to be accepted by

the court unless demonstrably irrational or clearly contrary to the plain meaning of the statute").

> **2.    The Commission's Prosecutorial Decision In <u>Orloski</u> Is Not A
> Legal "Precedent" That Would Need To Be Explained If It
> Had Been Changed**

Even if Christian Coalition were correct (Mem. 11-15) — which it is not — that the

Commission's position here is in conflict with its view of coordination in <u>Orloski</u>, the Commission

would not be required to "give a 'reasoned analysis' to explain a change in interpretation"

---

[6]    When the Supreme Court in <u>Akins</u> remanded the case to the Commission, it relied in part
on the Commission's position as reflected in the General Counsel's reports to the Commission.
The General Counsel's Report of May 29, 1992, included the following discussion (<u>reprinted in</u>
Joint Appendix in <u>Akins</u> at 175-76):

> We disagree with AIPAC's attempt to impose an express advocacy standard for
> judging all of its political activities on behalf of candidates….  [O]nce AIPAC has held
> such meetings and discussions with a candidate, any subsequent activity or
> communication AIPAC undertakes regarding that candidate that goes beyond its
> "members" under the Act would have to be viewed as activity or communications
> undertaken in coordination or consultation or in concert with the candidate and the
> candidate's campaign….  Because such activity or communication would then
> constitute an in-kind contribution to the candidate, we do not believe an express
> advocacy standard is appropriate or required.

The reports of the General Counsel provide the substantive basis for a Commission determination
to dismiss a complaint on the General Counsel's recommendation.  <u>FEC v. Democratic Senatorial</u>
<u>Campaign Comm.</u>, 454 U.S. 27, 38-39 n.19 (1981).

(CC Mem. 11).  CC's arguments on this point confuse the legal distinctions among rulemakings, adjudications, and prosecutorial enforcement decisions.

Neither the Commission's prosecutorial decision not to investigate in <u>Orloski</u>, nor its decision to file an enforcement action in this case, is the kind of agency decision that is considered "precedent."  They are merely exercises of prosecutorial discretion.  While the courts have specific statutory authority to review the Commission's decision to dismiss an administrative complaint, 2 U.S.C. 437g(a)(8), courts "have no statutory authority to review the FEC's decision to sue (as compared, under this unique statute, to a decision not to sue…[)]."  <u>FEC v. Legi-Tech, Inc.</u>, 75 F.3d 704, 709 (D.C. Cir. 1996).  In addition, such prosecutorial decisions are neither agency adjudications nor rulemakings that require notice and comment under the Administrative Procedure Act.  They decide no one's rights; they create no binding rules.  Thus, CC's reliance (Mem. 11-12) on cases like <u>Bush-Quayle '92 Primary Comm. v. FEC</u>, 104 F.3d 448 (D.C. Cir. 1997), which involve agency adjudications, are simply irrelevant.  Similarly, CC's claim (Mem. 15, 18) that the Commission is attempting in this enforcement action to adopt a new rule of law or "codify" a new definition of coordination is absurd:  the FEC here is the plaintiff in an enforcement action, not an agency rendering a decision in an adjudication or promulgating a new regulation.

A single decision not to prosecute — even if based upon a legal interpretation rather than explicit reliance on prosecutorial discretion — is not equivalent to a "<u>general enforcement policy</u> … where the agency has expressed the policy as a formal regulation after the full rulemaking process … or has otherwise articulated it in some form of universal policy statement."  <u>Crowley Caribbean Transport, Inc. v. Peña</u>, 37 F.3d 671, 676 (D.C. Cir. 1994) (emphasis in original;

citations omitted). [7] Clearly, the enforcement decision in Orloski was never defended as involving

or relying upon a general policy about the definition of coordinated expenditure, and no

rulemaking had taken place.

CC's assertion (Mem. 14) that the "FEC failed to give fair notice" of its interpretation of

coordinated expenditure is wrong as a matter of both law and fact. Legally, as we have explained,

the FEC is relying here upon the plain language of the Act, Supreme Court precedent, and the

Commission's published advisory opinions, of which CC obviously had notice. Even CC

acknowledges (Mem. 14 n.6) that AO 1988-22 explicitly stated that express advocacy is not

required for coordinated expenditures.

Factually, CC's claim that it lacked notice of the Commission's interpretation rings hollow

in light of a memorandum written by Ralph Reed and presented at CC's August, 1991, state

leadership retreat. Entitled "Legal Compliance in the Printing and Distribution of Voter Guides"

(FEC004-1350-1352), the memorandum states that "under FEC law ... the expenditure must be

truly independent, which generally means no communication, coordination, or cooperation with

the candidate, the campaign, or an officer or staff member of the campaign" (FEC004-1351).

Notably absent is any suggestion that coordination with a candidate is permissible as long as the

voter guide does not contain express advocacy. Rather than demonstrating that CC had been

lulled into believing that Orloski or any other precedent allowed coordination in the absence of

---

[7]      Even general policy statements do not require notice and comment when they are
modified. "An agency policy statement does not seek to impose or elaborate or interpret a legal
norm. It merely represents an agency position with respect to how it will treat — typically
enforce — the governing legal norm." Syncor Intern. Corp. v. Shalala, 127 F.3d 90, 94 (D.C.
Cir. 1997) (citations omitted). See also Lutheran Church-Missouri Synod v. FCC, ___ F.3d ___,
1998 WL 611116, *1 (D.C. Cir. Sep. 15, 1998) ("a 'policy statement' ... does not bind the
Commission to a result in any particular case").

express advocacy, the Legal Compliance memorandum demonstrates that CC was fully aware of the Commission's construction of the governing law. Moreover, in neither its September 1995 Response to the General Counsel's Brief submitted to the Commission before this action was filed, nor in its Answer before this Court, has CC ever alleged that it relied upon any regulations, advisory opinions, or other statements by the Commission in making the coordinated expenditures at issue.

In sum, at best CC "engag[ed] in 'brinkmanship' " when it engaged in a practice of consulting with its favored candidates prior to making its expenditures, and "tumble[d] (over) the brink." NLRB v. Gissel Packing Co., 395 U.S. 575, 620 (1969) (citation omitted). See also United States v. Wurzbach, 280 U.S. 396, 399 (1930). CC's conscious choice to take this course of action does not indicate that the statute or the Commission's interpretation is unconstitutionally vague, nor that CC was deprived of adequate notice of the law.

## III.  CHRISTIAN COALITION COORDINATED ITS CAMPAIGN EXPENDITURES WITH SEVERAL FEDERAL CANDIDATES

### A.  The FECA Defines Coordinated Expenditures In Terms Of Communications With A Candidate

Under the Act, the touchstone of whether an expenditure loses its independence and must be treated as a contribution is whether a person making the expenditure has acted in "cooperation, consultation, or concert" with a candidate or his or her agents:

> [E]xpenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate.

2 U.S.C. 441a(a)(7)(B)(i). Accord 2 U.S.C. 431(17). CC, however, ignores the statutory definitions and attempts (Mem. 62-63) to create new criteria not included in the Act for finding

Commission no later than 5:00 p.m. on February 20, 1998, and produces all financial documents from the state and/or local affiliate(s) upon which it will rely in support of its contention that the action was *ultra vires* to the Commission no later than 5:00 p.m. on March 13, 1998. Any *ultra vires* claims not specifically identified and supported as set forth in this paragraph by February 20 and March 13, 1998 are waived in this litigation[.]

Since the Georgia mailing was clearly a "correspondence" or "communication" in connection with a federal election in 1994, and since it used the term "Christian Coalition" several times, it is clearly covered by the stipulation. CC has not even argued to this Court that the Georgia CC mailing was an *ultra vires* action, much less provide any evidence to support such an argument. CC is therefore liable for this violation of section 441b and for the failure to report this independent expenditure to the Commission.

## CONCLUSION

For the foregoing reasons, as well as those explained in our opening memorandum, the Commission requests that this Court deny The Christian Coalition's motion for summary judgment and instead declare that The Christian Coalition violated the Act, permanently enjoin it from engaging in such unlawful activity in the future, and impose an appropriate and proportional civil remedy.

Respectfully submitted,

Lawrence M. Noble
General Counsel
(D.C. Bar # 244434)

Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)


Stephen E. Hershkowitz
Assistant General Counsel
(D.C. Bar # 282947)


Robert W. Bonham, III
Senior Attorney
(D.C. Bar # 397859)


David Kolker
Attorney
(D.C. Bar # 394558)


Holly J. Baker
Attorney


Erin K. Monaghan
Attorney
(D.C. Bar # 438434)


October 8, 1998

FOR THE PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650