# SUPPLEMENTAL PLAINTIFFS' EXHIBIT 2



**Thursday**
**July 6, 1995**

Part VI

# Federal Election Commission

11 CFR Parts 100, 106, 109, and 114
Express Advocacy; Independent
Expenditures; Corporate and Labor
Organization Expenditures; Final Rule

**FEDERAL ELECTION COMMISSION**

**11 CFR Parts 100, 106, 109, and 114**

[Notice 1995–10]

**Express Advocacy; Independent Expenditures; Corporate and Labor Organization Expenditures**

**AGENCY:** Federal Election Commission.

**ACTION:** Final rule; Transmittal of regulations to Congress.

**SUMMARY:** The Commission is issuing revised regulations that define the term ''express advocacy'' and describe certain nonprofit corporations that are exempt from the prohibition on independent expenditures. The new rules implement portions of several decisions issued by the Federal courts in recent years. These rules were originally part of a larger rulemaking on the scope of permissible and prohibited corporate and labor organization expenditures. The Commission expects to complete the remaining portions of the original rulemaking by issuing additional revisions to the regulations at a later date.

**DATES:** Further action, including the announcement of an effective date, will be taken after these regulations have been before Congress for 30 legislative days pursuant to 2 U.S.C. 438(d).

**FOR FURTHER INFORMATION CONTACT:** Ms. Susan E. Propper, Assistant General Counsel, 999 E Street, N.W., Washington, D.C. 20463, (202) 219–3690 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** The Commission is today publishing the final text of revisions to its regulations at 11 CFR 100.17, 106.1(d) and 109.1(b) and the text of new regulations at 11 CFR 100.22 and 114.10. Generally, these regulations implement sections 431(17), 431(18) and 441b of the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. 431 et seq. [''FECA'' or ''the Act'']. These regulations have been revised in accordance with a number of Federal court decisions involving section 441b.

Section 441b prohibits corporations and labor organizations from using general treasury monies to make contributions or expenditures in connection with Federal elections. The new regulations provide further guidance on what constitutes an expenditure, and describe certain corporations that are exempt from the independent expenditure prohibition. However, these new rules do not apply to contributions, whether monetary or in-kind.

In *Federal Election Commission* v. *Massachusetts Citizens for Life, Inc.,* 479 U.S. 238 (1986) [''*MCFL*''], the Supreme Court held that expenditures must constitute express advocacy to be subject to the prohibition of section 441b. *MCFL* at 249. In addition, the Court concluded that the prohibition on independent expenditures in section 441b cannot constitutionally be applied to nonprofit corporations having certain essential features. The Court said that corporations that (1) are formed for the express purpose of promoting political ideas and cannot engage in business activities; (2) have no shareholders or other persons affiliated so as to have a claim on the corporation's assets or earnings; and (3) are not established by a business corporation or labor organization and have a policy against accepting donations from such entities, cannot be subject to the independent expenditure prohibition.

Based on this decision, the National Right to Work Committee filed a Petition for Rulemaking urging the Commission to revise 11 CFR 114.3 and 114.4 to conform to the statement in the *MCFL* opinion that ''express advocacy'' is the appropriate standard for determining when communications by corporations and labor organizations are prohibited under section 441b. *See* Notice of Availability of Petition for Rulemaking, National Right to Work Committee, 52 FR 16275 (May 4, 1987). Thus, the Petition took the position that the Commission's partisan/nonpartisan standards governing corporate and labor organization communications to the entity's restricted class and the general public are unconstitutional under *MCFL.*

The Commission subsequently sought public input on whether to initiate a rulemaking to determine the extent to which the *MCFL* decision necessitated changes in the Part 114 rules governing independent expenditures by corporations possessing the three essential features, changes in the scope of the ''independent expenditure'' provisions at 11 CFR Part 109, or the implementation of an ''express advocacy'' test for all corporations and labor organizations covered by 11 CFR Part 114. Advance Notice of Proposed Rulemaking, 53 FR 416 (January 7, 1988) [''Advance Notice'' or ''ANPRM''].

The Commission received over 17,000 comments in response to the Advance Notice. Nearly all of the commenters submitted virtually identical letters urging the Commission to act favorably on NRWC's rulemaking petition, and to limit application of its regulations to communications expressly advocating the election or defeat of candidates so as to avoid impinging upon First Amendment rights. The Commission also received detailed comments from seven sources, and held a public hearing on November 16, 1988 at which two commenters testified as to how the Commission should implement the *MCFL* opinion. The detailed comments and testimony reflect a wide range of views as to how the Commission should proceed in response to the *MCFL* decision.

In subsequent litigation, two lower courts relied upon an express advocacy standard to evaluate corporate communications under section 441b of the FECA. In *Faucher* v. *Federal Election Commission,* 743 F. Supp. 64 (D. Me. 1990), the court invalidated the Commission's voter guide regulations at 11 CFR 114.4(b)(5)(i). The Court concluded that the Commission's voter guide rule is not authorized by the FECA ''as interpreted by the Supreme Court in [*MCFL*], to the extent that the regulation makes the permissibility of voter guides * * * hinge upon on whether such guides are 'nonpartisan' in a broad sense that includes issue advocacy rather than the narrower test of 'express advocacy.' '' *Id.* at 72. Similarly, in *Federal Election Commission* v. *National Organization of Women,* 713 F. Supp. 428 (D.D.C. 1989) [''*NOW*''], another district court applied an express advocacy test to determine whether section 441b permitted an incorporated membership organization to use general treasury funds for membership recruitment letters directed to the general public. The court concluded that the letters in question did not go beyond issue discussion to express electoral advocacy. The Commission appealed both of these lower court decisions.

Shortly after the *MCFL* opinion, a court of appeals decision held that speech need not include any of the specific words listed in *Buckley* v. *Valeo,* 424 U.S. 1, 44 n.52 (1976) to constitute express advocacy. *Federal Election Commission* v. *Furgatch,* 807 F.2d 857, 862–63 (9th Cir.), *cert. denied,* 484 U.S. 850 (1987). Instead, the appropriate inquiry is whether the communication, when read as a whole and with limited reference to external events, is susceptible to no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. *Id.* at 864.

In addition, the Supreme Court provided further guidance on the exception from the independent expenditure prohibition for nonprofit corporations in *Austin* v. *Michigan Chamber of Commerce,* 494 U.S. 652 (1990). In *Austin,* the Court interpreted a Michigan statute very similar to

section 441b of the FECA. The *Austin* decision prompted the Commission to issue a second notice seeking further comments on what changes to its regulations were warranted. Request for Further Comment, 55 FR 40397 (Oct. 3, 1990), comment period extended 55 FR 45809 (Oct. 31, 1990). This notice also welcomed comments on the express advocacy questions raised by the *Faucher* and *NOW* decisions.

Eight commenters responded to the second notice, including some who reiterated their earlier positions. Most, but not all, of the commenters urged the Commission to adopt an express advocacy test for expenditures under section 441b. One comment favored the development of definitions which precisely set out what activity will be deemed within the scope of the FECA under such a standard, while another comment supported the use of a case by case approach. There was also some support for revising the regulations to reflect the approach to express advocacy taken into the *Furgatch* opinion. The Commission also received specific suggestions for delineating the class of nonprofit corporations falling within *MCFL*'s exception from the independent expenditure prohibition. Two comments advocated a broad scope for the exemption, while a third comment emphasized the narrowness of the group of organizations possessing the three essential features delineated in *MCFL* and *Austin*.

Subsequently, the Court of Appeals for the First Circuit upheld the district court's decision in *Faucher. Faucher* v. *Federal Election Commission,* 928 F.2d 468 (1st Cir. 1991). *cert. denied sub nom. Federal Election Commission* v. *Keefer et al.,* 502 U.S. 820 (1991). The Commission sought certiorari in *Faucher,* arguing that the express advocacy standard should not be made applicable to the 441b prohibition on corporate expenditures. On October 7, 1991, the Supreme Court denied the petition for certiorari, and thus declined to consider narrowing or otherwise modifying the statements it made in *MCFL* regarding the scope of section 441b. Accordingly, the Commission moved for the dismissal of its appeal in *NOW* and resumed consideration of several substantial changes to its regulations necessitated by the *MCFL* decision.

The Commission published a Notice of Proposed Rulemaking on July 29, 1992 seeking public comment on draft rules codifying the reduced scope of the prohibition on corporate expenditures. 57 FR 33548 (July 29, 1992). The proposed language set forth the general rule that corporations and labor

organizations are prohibited from making expenditures for communications to the general public expressly advocating the election or defeat of a clearly identified candidate. The draft regulations also sought to establish criteria for determining whether nonprofit corporations qualify for the exemption from section 441b's prohibition on independent expenditures.

The Commission received 35 separate comments on the NPRM from 32 commenters between July 29, 1992 and November 22, 1993. The Commission also received 149 form comments during that period. The Commission held a public hearing on October 15 and 16, 1992, at which 15 of these commenters testified on the issues presented in the *MCFL* decision and the proposed rules. The comments and testimony are discussed in more detail below.

As indicated above, this rulemaking process has involved a broader range of issues regarding the scope of permissible and prohibited corporate and labor organization expenditures than is reflected in the final rules being promulgated today. The rulemaking with regard to the other issues is continuing, and the Commission expects to issue additional new rules revising 11 CFR Parts 110 and 114 at a later date. These subsequent changes will replace the partisan/nonpartisan standards in sections 110.13, 114.1, 114.2, 114.3, 114.4 and 114.12(b) with language prohibiting corporations and labor organizations from making expenditures for communications to the general public expressly advocating the election or defeat of clearly identified candidates. Specifically, these provisions govern candidate debates, candidate appearances, distributing registration and voting information, voter guides, voting records, conducting voter registration and get-out-the-vote drives and use of meeting rooms. At the same time, the Commission intends to address issues which have arisen regarding activities undertaken by incorporated colleges and universities, the use of logos, trademarks and letterheads, endorsements of candidates, activities which facilitate the making of contributions, and coordination between candidates and corporations or labor organizations which results in in-kind contributions. These issues, not previously addressed in the rules, involve activities that are also impacted by the express advocacy standard and the case law in this area.

Section 438(d) of Title 2, United States Code requires that any rules or regulations prescribed by the

Commission to carry out the provisions of Title 2 of the United States Code be transmitted to the Speaker of the House of Representatives and the President of the Senate 30 legislative days before they are finally promulgated. These regulations were transmitted to Congress on June 30, 1995.

### Explanation and Justification

Generally, the new and amended rules contain the following changes. First, the definitions of ''express advocacy'' and ''clearly identified'' at 11 CFR 109.1 (b)(2) and (b)(3) have been moved to new 11 CFR 100.22 and revised 11 CFR 100.17, respectively. They have been reworded to provide further guidance on what types of communications constitute express advocacy of clearly identified candidates, in accordance with the judicial interpretations found in *Buckley, MCFL, Furgatch, NOW* and *Faucher.*

Second, new section 114.10 has been added to implement the *MCFL* Court's conclusion that nonprofit corporations possessing certain essential features may not be bound by the restrictions on independent expenditures contained in section 441b. This new section expressly permits certain corporations to use general treasury funds for independent expenditures, and sets out the reporting obligations for these corporations.

Part 100—Scope and Definitions (2 U.S.C. 431)

*Section 100.17   Clearly Identified (2 U.S.C. 431(18))*

The definitions of ''clearly identified'' in 11 CFR 106.1(d) and ''clearly identified candidate'' in 11 CFR 109.1(b)(3) have been removed and replaced by a revised definition in section 100.17. It is not necessary for this definition to appear in multiple locations throughout these regulations.

The NPRM sought comments on two alternative approaches regarding the requirement that the candidates be ''clearly identified.'' Alternative A–1 indicated that this would include candidates of a clearly identified political party and a clearly identified group of candidates, such as the ''pro-life'' candidates in the *MCFL* case. Alternative A–2 did not specifically mention clearly identified groups of candidates or candidates of clearly identified political parties.

Several commenters and witnesses argued that under Alternative A–1, it could be too difficult to determine the candidates in the group. Examples cited were buttons that read ''Elect Women

for a Change'' or ''Vote Pro-Choice,'' without more. The language was intended to apply to a situation, for example, where one insert in a mailing lists voting records or positions on specific issues and clearly indicates which of the named candidates shares the speaker's views. If another insert urges the reader to vote in favor of candidates who share its views, this is considered to be advocating the election of those clearly identified candidates. Similarly, the *MCFL* case involved a flyer which urged voters to vote for ''pro-life'' candidates, and included a list of ''pro-life candidates.'' Thus, in this example, several ''pro-life'' candidates were clearly identified to the reader.

In light of comments, the wording of new section 100.22(a) has been reworked to refer to ''one or more clearly identified candidate(s)'' to more clearly state what was intended. In addition, section 100.17 has been modified to provide some additional examples of when candidates are considered to be ''clearly identified.''

### Section 100.22  Expressly Advocating

The definition of express advocacy previously located in 11 CFR 109.1(b)(2) has been replaced with a revised definition in new section 100.22. The placement of the definition of express advocacy in Part 100—Scope and Definitions is intended to ensure that the reader will be able to locate it more easily. Also, while express advocacy is an important component of any independent expenditure, it is also the legal standard used in determining whether other types of activities are expenditures by corporations or labor organizations under 11 CFR Part 114. Please not that the terms ''communication containing express advocacy'' and ''communication expressly advocating the election or defeat of one or more clearly identified candidates'' have the same meaning.

The NPRM presented the possibility of creating a separate definition of ''express advocacy'' for inclusion in Part 114 that would apply only to corporations and labor organizations governed by that Part. The NPRM indicated that the purpose of promulgating a separate definition would be to focus more specifically on implementing the *MCFL* Court's dictate that ''express advocacy'' is the standard when determining what is an expenditure under 2 U.S.C. § 441b. The Notice suggested that a separate definition could center on whether a communication urged action with respect to a federal election rather than on whether the communication also

related to a clearly identified candidate. Thus, this approach would have taken a different view of ''express advocacy'' for organizations subject to the prohibitions of section 441b.

There was little support for separate definitions from the comments and testimony. The difficulty the commenters and witnesses had in trying to determine what the courts meant by ''express advocacy,'' and what they thought the Commission had in mind, amply demonstrate that it would be extremely confusing to work with separate definitions for corporations and labor organizations on one hand, and candidates, committees and individuals on the other. Consequently, separate definitions of express advocacy have not been included in the final rules.

### 1. Alternative Definitions Presented in the NPRM

The NPRM sought comments on two alternative sets of revisions to the definition of express advocacy. Alternatives A–1 and A–2 were similar in several respects. They both continued to list the specific phrases set forth in the *Buckley* opinion as examples of express advocacy. Both alternatives recognized that all statements and expressions included in a communication must be evaluated in terms of pertinent external factors such as the context and timing of the communication. In addition, both proposed definitions clearly indicated that communications consisting of several pieces of paper will be read together.

The alternative definitions in the NPRM differed in several respects. Under Alternative A–1, express advocacy included suggestions to take actions to affect the result of an election, such as to contribute or to participate in campaign activity. In contrast, Alternative A–2 indicated that express advocacy constitutes an exhortation to support or oppose a clearly identified candidate, and that there must be no other reasonable interpretation of the exhortation other than encouraging the candidate's election or defeat, rather than another type of action on a specific issue. Nevertheless, Alternative A–2 also specifically stated that ''with respect to an election'' includes references such as ''Smith '92'' or ''Jones is the One.''

There was no consensus among the commenters and witnesses regarding either alternative definition of express advocacy. While there was more support for Alternative A–2 than A–1, specific portions of both alternatives troubled a number of commenters and witnesses. Some objected that

Alternative A–1 was too narrow in that it did not cover all express, implied, or reasonably understood references to an upcoming election. Others argued Alternative A–1 was too broad, and preferred Alternative A–2. However, there was also considerable sentiment expressed that Alternative A–2 was also too broad, and should be further limited to avoid running afoul of the First Amendment considerations that are involved.

To illustrate the difficulty involved in applying an ''express advocacy'' standard, the Commission included Agenda Document #92–86–A in the rulemaking record. This document contained seven hypothetical advertisements, each of which is assumed to be published within two weeks of an election. Several written comments and witnesses mentioned these examples in analyzing the proposals contained in this Notice, but there was no consensus as to which examples, if any, contained express advocacy.

In commenting on the proposed rules, the Internal Revenue Service indicated that 26 U.S.C. § 501(c)(3) prohibits certain nonprofit organizations from participating or intervening in political campaigns on behalf of or in opposition to candidates for elective public office. The IRS stated that prohibited political activity under the Internal Revenue Code is much broader in scope than the express advocacy standard under the FECA. The Commission expresses no opinion as to any tax ramifications of activities conducted by nonprofit corporations, since these questions are outside its jurisdiction.

The definition of express advocacy included in new section 100.22 includes elements from each definition, as well as the language in the *Buckley, MCFL* and *Furgatch* opinions emphasizing the necessity for communications to be susceptible to no other reasonable interpretation but as encouraging actions to elect or defeat a specific candidate. Please note that exhortations to contribute time or money to a candidate would also fall within the revised definition of express advocacy. The expressions enumerated in *Buckley* included ''support,'' a term that encompasses a variety of activities beyond voting.

### 2. Examples of Phrases That Expressly Advocate

The previous definition of express advocacy in 11 CFR 109.1(b)(2) included a list of expressions set forth in *Buckley*. Both alternatives in the NPRM would have largely retained this list of phrases that constitute express

advocacy. The revised definition in 11 CFR 100.22(a) includes a somewhat fuller list of examples. The expressions enumerated in *Buckley*, such as "vote for," "Smith for Congress," and "defeat" have no other reasonable meaning than to urge the election or defeat of clearly identified candidates.

### 3. Communications Lacking Such Phrases

The NPRM also addressed communications that contain no specific call to take action on any issue or to vote for a candidate, but which do discuss a candidate's character, qualifications, or accomplishments, and which are made in close proximity to an election. An example is a newspaper or television advertisement which simply states that the candidate has been caring, fighting and winning for his or her constituents. Another example is a case in which a candidate is criticized for missing many votes, or for specific acts of misfeasance or malfeasance while in office.

Under Alternative A–2, these types of communications would have constituted exhortations if made within a specified number of days before an election, and if they did not encourage any type of action on any specific issue, such as, for example, supporting pro-life or pro-choice legislation. Comments were requested as to what an appropriate time frame should be—as short as 14 days, or as long as six months, prior to an election, or some other time period considered reasonable.

Some commenters opposed treating these communications as express advocacy on the grounds that there is not a clear call to action. Others argued that such communications, particularly when made by a candidate's campaign committee, were clearly intended to persuade the listener or reader to vote for the candidate.

Communications discussing or commenting on a candidate's character, qualifications, or accomplishments are considered express advocacy under new section 100.22(b) if, in context, they have no other reasonable meaning than to encourage actions to elect or defeat the candidate in question. The revised rules do not establish a time frame in which these communications are treated as express advocacy. Thus, the timing of the communication would be considered on a case-by-case basis.

### 4. Communications Containing Both Issue Advocacy and Electoral Advocacy

The final rules, like the proposed rules, treat communications that include express electoral advocacy as express

advocacy, despite the fact that the communications happen to include issue advocacy, as well. Several comments pointed out that the legislative process continues during election periods, and argued that if a legislative issue becomes a campaign issue, the imposition of unduly burdensome requirements on those groups seeking to continue their legislative efforts and communicate with their supporters is unconstitutional. These concerns are misplaced, however, because the revised rules in section 100.22(b) do not affect pure issue advocacy, such as attempts to create support for specific legislation, or purely educational messages. As noted in *Buckley*, the FECA applies only to candidate elections. See, e.g., 424 U.S. at 42–44, 80. For example, the rules do not preclude a message made in close proximity to a Presidential election that only asked the audience to call the President and urge him to veto a particular bill that has just been passed, if the message did not refer to the upcoming election or encourage election-related actions. In contrast, under these rules, it is express advocacy if the communication described above urged the audience to vote against the President if the President does not veto the bill in question.

Nevertheless, to alleviate the commenters' concerns, the definition of express advocacy in new section 100.22(b) has been revised to incorporate more of the *Furgatch* interpretation by emphasizing that the electoral portion of the communication must be unmistakable, unambiguous and suggestive of only one meaning, and reasonable minds could not differ as to whether it encourages election or defeat of candidates or some other type of non-election action.

Both alternative definitions of express advocacy included consideration of the context and timing of the communication, and indicated that communications consisting of several pieces of paper will be read together. Several commenters and witnesses were troubled by the perceived vagueness and uncertainty inherent in the use of the phrases "taken as a whole," "in light of the circumstances under which they were made," and "with limited reference to external events." They argued that they would not be able to ascertain in advance which facts and circumstances would be considered by the Commission. Some of the commenters and witnesses acknowledged the difficulty of crafting a clear and precise standard in the First Amendment context.

The final rules in section 100.22 retain the requirement that the communication be read "as a whole and with limited reference to external events" because *MCFL* makes clear that isolated portions of a communication are not to be read separately in determining whether a communication constituted express advocacy. *See* 479 U.S. at 249–50. Further, the *Furgatch* opinion evaluated the contents of the communication in question "as a whole, and with limited reference to external events." 807 F.2d at 864. The external events of significance in *Furgatch* included the existence of an upcoming presidential election and the timing of the advertisement a week before the general election. However, please note that the subjective intent of the speaker is not a relevant consideration because *Furgatch* focuses the inquiry on the audience's reasonable interpretation of the message. *Furgatch,* 807 F.2d at 864–65.

### 5. "Vote Democratic" or "Vote Republican"

In the NPRM, Alternative A–2 treated as express advocacy messages such as "Vote Republican" or "Vote Democratic" if made within a specified period prior to a special or general election or an open primary. Again, comments were sought on time periods ranging from 14 days to 6 months prior to an election, or any other time period considered reasonable. Alternatively, the period between the primary and general elections was suggested as the time when such messages refer to clearly identified candidates. In contrast, Alternative A–1 treated these phrases as express advocacy if made at any time after specific individuals have become Republican or Democratic candidates within the meaning of the FECA in the geographic area in which the communication is made. The NPRM also sought comments on when a message such as "Vote Democratic" or "Vote Republican" refers to one or more clearly identified candidates, rather than being just a message of support for a party.

The views of the commenters and witnesses reflected little consensus regarding these messages. Several were supportive of Alternative A–2, and suggested that a 90 day time frame would be appropriate. Others felt that such messages are always express advocacy because they aim at influencing the outcome of elections. Conversely, some commenters argued that these messages cannot be express advocacy if there are no declared candidates yet running for the party's

nomination or if the nominee of the party has not yet been selected.

Section 100.22 of the final rules does not specify a time frame or triggering event that will cause these messages to be considered express advocacy. Instead, messages such as "Vote Democratic" or "Vote Republican" will be evaluated on a case-by-case basis to determine whether they constitute express advocacy under the criteria set out in 11 CFR 100.22(b).

## Part 106—Allocations of Candidate and Committee Activities

### Section 106.1   Allocation of expenses between candidates

A conforming amendment has been made to paragraph (d) of section 106.1. Previously, this paragraph restated the definition of "clearly identified." It has been revised to refer the reader to the definition located in 11 CFR 100.17.

## Part 109—Independent Expenditures (2 U.S.C. 431(17), 434(c))

### Section 109.1   Definitions (2 U.S.C. 431(17))

The revised rules incorporate a technical amendment to the definition of "person" in the independent expenditure provisions in section 109.1(b)(1). The revision clarifies that "person" includes qualified nonprofit corporations, which are discussed more fully below. This change reflects that in *MCFL*, the Court upheld the right of qualified nonprofit corporations to make independent expenditures, but this decision did not extend to other corporations.

Conforming amendments have also been made to paragraphs (b)(2) and (b)(3) of section 109.1. These sections had contained definitions of "expressly advocating" and "clearly identified candidate." As explained above, they have been revised to refer the reader to the definitions located in sections 100.22 and 100.17, respectively.

## Part 114—Corporate and Labor Organization Activity

### Section 114.2   Prohibitions on Contributions and Expenditures

Paragraph (b) of section 114.2 has been revised to reflect the exception recognized in the *MCFL* decision, which allows certain nonprofit corporations to use their general treasury funds to make independent expenditures. The Commission anticipates making further changes to this provision when it completes the remaining portions of this rulemaking.

### Section 114.10   Qualified Nonprofit Corporations

In *MCFL*, the Supreme Court reviewed the application of the independent expenditure prohibition in section 441b to MCFL, a small, nonprofit corporation organized to promote specific ideological beliefs. The Court concluded that, because MCFL did not have the potential to exert an undesirable influence on the electoral process, it did not implicate the concerns that legitimately prompted regulation by Congress. Consequently, the Court found section 441b unconstitutional as applied to MCFL.

The Court cited "three features essential to [its] holding that [MCFL] may not constitutionally be bound by § 441b's restriction on independent spending." 479 U.S. at 264. First, MCFL was formed for the express purpose of promoting political ideas and cannot engage in business activities. Second, it has no shareholders or other persons affiliated so as to have either a claim on the corporation's assets or earnings, or any other economic disincentives to disassociate with the corporation. Third, it was not established by a business corporation or a labor union, and it has a policy of not accepting contributions from such entities. *MCFL* at 264. The Court said that section 441b's prohibition on independent expenditures is unconstitutional as applied to nonprofit corporations with these three characteristics.

Section 114.10 of the final rules is based on this part of the *MCFL* decision, and on the Court's subsequent decision in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990). Section 114.10 lists the features of those corporations that are exempt from section 441b's prohibition on independent expenditures. It also sets out the reporting requirements for these corporations. A detailed explanation of section 114.10 is set out below.

### 1. General Issues Raised by the NPRM and the Commenters

a. The name given to exempt corporations. One preliminary question is the name to be used for corporations that are exempt from the independent expenditure prohibition. The Commission specifically sought comments on this issue in the Notice of Proposed Rulemaking. The NPRM referred to them as "exempt corporations." However, the Commission and some of the commenters expressed concern that this name might cause confusion, because the term "exempt" is so closely associated with the Internal Revenue Code.

The NPRM contained an alternative version of proposed section 114.10 that used the phrase "qualified corporation" as the name for these organizations. The Commission believes this phrase is easy to use, and clearly distinct from terms used in other areas of the law. However, the Commission has also added the word "nonprofit" to make this phrase more descriptive. Thus, the name "qualified nonprofit corporation" or "QNC" will be used to refer to organizations that are exempt from the independent expenditure prohibition.

b. General concerns expressed by commenters. Some of the comments received contained general observations on the Commission's efforts to promulgate rules regarding the exemption recognized in *MCFL*. One commenter objected to any Commission effort to issue rules in this area, arguing that Commission action will inevitably narrow the standards that were clearly stated in *MCFL* and *Austin*, and would make the Commission an arbiter of First Amendment rights. The commenter alleges that this is a role for which the Commission has no constitutional or Congressionally conferred authority.

However, the Commission disagrees, and has decided to issue regulations in this area. Although the *MCFL* opinion may be quite specific by judicial standards, it leaves many administrative questions unanswered. Without new rules, the Commission would have to apply the *MCFL* decision on an *ad hoc* basis, which could result in inconsistency and would provide no guidance to the regulated community. In addition, the Commission's regulations are more readily available to the regulated community than the text of court decisions, and serve as the primary reference for Commission policy. Consequently, the rules should reflect court decisions that significantly affect the application of the FECA.

Many of the commenters felt that the proposed rules were too restrictive. One commenter said that the essence of the decision is that organizations more like voluntary political associations than business firms cannot be subjected to section 441b. This commenter argued that the three stated features should provide organizations with a safe harbor but should not be absolutely required.

As will be discussed further below, several provisions specifically criticized as too restrictive by the commenters have been eliminated from the final rules. However, it is important that the three features enunciated by the Supreme Court be included in the final rules as a threshold requirement for an

exemption from the independent expenditure prohibition. The *MCFL* Court described these three features as "essential to [its] holding that [MCFL] may not constitutionally be bound by § 441b's restriction on independent spending." 479 U.S. at 263–64. The clear implication is that a corporation that does not have all three of these features can be subject to this restriction.

The U.S. Court of Appeals decision in *Day* v. *Holahan*, 34 F.3d 1356 (8th Cir. 1994), does not affect this conclusion. In that case, the Eighth Circuit decided that a Minnesota statute that closely tracked the Supreme Court's three essential features was unconstitutional as applied to a Minnesota nonprofit corporation. The Commission believes the Eighth Circuit's decision, which is controlling law in only one circuit, is contrary to the plain language used by the Supreme Court in *MCFL*, and therefore is of limited authority.

The Notice sought comments on two versions of section 114.10 that represent contrasting approaches for defining the *MCFL* exemption. The first version set out the essential features listed in the *MCFL* opinion as threshold requirements for an exemption from the independent expenditure prohibition. By following the long-standing presumption that all incorporated entities are subject to the independent expenditure prohibition in section 441b, and requiring corporations that claim to be exempt from that prohibition to demonstrate that they are entitled to an exemption, this version sought to fit the *MCFL* decision into the existing statutory framework.

The second version took the opposite approach. It presumed a broad class of corporations would be exempt from section 441b's independent expenditure prohibition, unless they have a characteristic that would bring them within the Commission's jurisdiction.

The Commission has decided to follow the first approach and incorporate the rules into the existing framework for section 441b. The Supreme Court did not conclude that all of section 441b is unconstitutional on its face. Rather, it held that one portion of section 441b, the prohibition on independent expenditures, is unconstitutional as applied to a narrow class of incorporated issue advocacy organizations. The Court explicitly reaffirmed the validity of section 441b's prohibition on corporate contributions. 479 U.S. at 259–60. Thus, the broad prohibition on the use of corporate treasury funds contained in section 441b still exists, and the Commission's

responsibility for enforcing that provision remains in place.

The Commission is aware that most of the comments were in accord with the second version. These commenters argued that all organizations are entitled to unlimited First Amendment rights regardless of whether they are incorporated, and that any Commission action that has the effect of limiting those rights is unconstitutional. They felt that the first version would define the category of exempt corporations too narrowly, and would burden the speech activity of corporations that are entitled to an exemption.

However, there is a long history of regulating the political activity of corporations, and the Supreme Court has recognized the compelling governmental interest in regulating this activity on numerous occasions. "The overriding concern behind the enactment of the [statutory predecessor to section 441b] was the problem of corruption of elected representatives through the creation of political debts. * * * The importance of the governmental interest in preventing this occurrence has never been doubted." *First National Bank of Boston* v. *Belotti*, 435 U.S. 765, 788, n.26 (1978). "This careful legislative adjustment of the federal electoral laws . . . to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference. . . . [I]t also reflects a permissible assessment of the dangers posed by those entities to the electoral process." *FEC* v. *National Right to Work Committee*, 459 U.S. 197, 209 (1982).

The *MCFL* decision reaffirms, rather than casts doubt upon, the validity of Congressional regulation of corporate political activity. In its opinion, the *MCFL* Court said "[w]e acknowledge the legitimacy of Congress' concern that organizations that amass great wealth in the economic marketplace not gain unfair advantage in the political marketplace." *MCFL*, 479 U.S. at 263. The Court found the application of section 441b to MCFL unconstitutional not because this governmental interest was not compelling in general, but because MCFL was different from the majority of entities addressed by section 441b. Consequently, this governmental interest was not implicated by MCFL's activity. *Id.* The Court also acknowledged that MCFL-type corporations are the exception rather than the rule, saying that "[i]t may be that the class of organizations affected by our holding today will be small." *Id.* at 264. Thus, the Commission's task is to incorporate this narrow exception to the independent expenditure

prohibition into the regulations so that they protect the interests of organizations that are like MCFL without undermining the FECA's legitimate legislative purposes. The Commission has concluded that the first approach is better suited to this task.

### 2. Scope and Definitions

Paragraph (a) is a scope provision that explains, in general terms, the purposes of section 114.10. Paragraph (b) defines four terms for the purposes of this section.

*a. The promotion of political ideas.* The first term is the phrase "the promotion of political ideas." The *MCFL* Court said one of MCFL's essential features was that "it was formed for the express purpose of promoting political ideas, and cannot engage in business activities." 479 U.S. at 264. Paragraph (b)(1) clarifies what this phrase means for the purposes of section 114.10. Under paragraph (b)(1), the promotion of political ideas includes issue advocacy, election influencing activity, and research, training or educational activity that is expressly tied to the organization's political goals.

The Commission added the last phrase, which is based on language in the *Austin* decision, in response to several commenters who felt that the proposed definition was too narrow. These commenters said that many organizations engage in certain activities that are not pure advocacy but are directly related to their advocacy activities. They argued that organizations should be allowed to conduct these activities without losing their exemption from the independent expenditure prohibition. The Commission agrees, and has added the last phrase to the final rules to serve this purpose.

*b. Express purpose.* Paragraph (b)(2) defines the term "express purpose," as that term is used in section 114.10. As indicated above, the Supreme Court said that MCFL was formed for the express purpose of promoting political ideas and cannot engage in business activities. *Id.* Paragraph (b)(2) states that a qualified nonprofit corporation's express purpose is evidenced by the purpose stated in the corporation's charter, articles of incorporation, or bylaws. It also may be evidenced by any purpose publicly stated by the corporation or its agents, and any activities in which the corporation actually engages.

Generally, if an organization's organic documents set out a purpose that cannot be characterized as issue advocacy, election influencing activity, or research, training or educational activity

expressly tied to political goals, the organization will not be a qualified nonprofit corporation. However, paragraph (b)(2)(i) contains an exception to this rule. If a corporation's organic documents indicate that the corporation was formed for the promotion of political ideas and "any lawful purpose" or "any lawful activity," the latter statement will not preclude a finding under paragraph (c)(1) that the corporation's only express purpose is the promotion of political ideas. The Commission recognizes that it is common for corporations to use boilerplate purpose statements elicited from their state's incorporation statute when they prepare their articles of incorporation. These statements will not prevent such an organization from being a qualified nonprofit corporation.

One commenter objected to including those purposes evidenced by the activities in which the corporation actually engages. The commenter argued that this rule would allow the Commission to analyze the motives behind the corporation's activities.

The Commission has decided to include this provision in the final rules. Generally, corporations engage in activities that further the goals of the corporation. Thus, the corporation's activities tend to provide a more objective and complete indication of the corporation's reasons for existing. In contrast, if the Commission could look only to a corporation's organic documents for the corporation's purpose, a corporation with an appropriate purpose statement in its organic documents would be exempt from the independent expenditure prohibition, regardless of whether the activities in which it actually engages were consistent with its stated purpose or with the exemption recognized in the *MCFL* opinion.

The Commission does not intend to engage in extensive speculation about the motivations of qualified nonprofit corporations. However, it is necessary for the Commission to consider the activities in which a corporation actually engages in order to completely assess the corporation's purpose.

*c. Business activities.* Paragraph (b)(3) defines the term "business activities" for the purposes of these rules. Under paragraph (b)(3), "business activities" generally includes any provision of goods and services that results in income to the corporation. It also includes any advertising or promotional activity that results in income to the corporation, other than in the form of membership dues or donations. Thus, a corporation that publishers a newsletter or magazine and sells advertising space

in that publication will be engaging in business activities, and will not be a qualified nonprofit corporation.

However, the definition specifically excludes fundraising activities that are expressly described as requests for donations that may be used for political purposes, such as supporting or opposing candidates. Fundraising activities conducted under these circumstances will not be considered business activities under these rules.

This definition reflects a critical distinction made by the Supreme Court in *MCFL*. The definition includes those activities that closely resemble the commercial activities of a business corporation because these activities generate financial resources that, like those of a business corporation, "are not an indication of popular support for the corporation's political ideas * * * [but] reflect instead the economically motivated decisions of investors and customers." 479 U.S. at 258. Thus, these "resources amassed in the economic marketplace" can create "an unfair advantage in the political marketplace." *Id.* at 257.

In contrast, the definition specifically excludes activities that generate resources that reflect "popular support for the corporation's political ideas." *Id.* at 257. Fundraising activities that are described to potential donors as requests for donations that will be used for political purposes will generate donations that reflect popular support for the corporation's political ideas. Consequently, they do not pose the risk of giving the corporation an unfair advantage in the political marketplace.

In some cases, the fundraising activities of a qualified nonprofit corporation closely resemble business activities in that they involve a provision of goods that results in income to the corporation. For example, a qualified nonprofit corporation may sell T-shirts or calendars in order to generate funds to support its political activity. MCFL itself held garage sales, bake sales and raffles to raise funds for these purposes. However, if the corporation discloses that the activities are an effort to raise funds for its political activities, such as supporting or opposing candidates, the activities will not be considered business activities for the purposes of these rules, notwithstanding their close resemblance to ordinary business transactions."This ensures that political resources reflect political support." *NCFL* at 264.

The Commission notes that this exclusion is limited to direct fundraising by the corporation. If a corporation sells items through a third party, such as a retail store or catalog

mail order outlet, this will generally be considered a business activity, even if the item is accompanied by a notification that a portion of the proceeds will be used to support the corporation's political activities. The sale of items by a third party that is not a qualified nonprofit corporation justifies the application of the independent expenditure prohibition.

*d. Shareholders.* Paragraph (b)(4) states the term "shareholder" has the same meaning as the term "stockholder," as defined in section 114.1(h) of the Commission's current rules.

### 4. The Essential Features

The Supreme Court said "MCFL has three features essential to our holding that it may not constitutionally be bound by § 441b's restriction on independent spending." *MCFL* at 263–64. These features have been incorporated into paragraph 114.10(c) of the final rules. A qualified nonprofit corporation is a corporation that has all the characteristics set out in this paragraph. Corporations that do not have all of these characteristics are not qualified nonprofit corporations, and therefore are bound by the independent expenditure prohibition.

*a. Purpose.* Paragraph (c)(1) states that a qualified nonprofit corporation is one whose only express purpose is the promotion of political ideas. In other words, if a corporation's organic documents, authorized agents, and actual activities indicate that its purpose is issue advocacy, election influencing activity, or research, training or other activity expressly tied to the organization's political goals, the corporation may be a qualified nonprofit corporation. However, if the documents, agents or activities indicate any other purpose, the corporation will be subject to the independent expenditure prohibition.

As indicated above, the rules contain an exception for boilerplate purpose statements in a corporation's organic documents. If a corporation's organic documents indicate that the corporation was formed for the promotion of political ideas and "any lawful purpose" or "any lawful activity," the latter statement will not preclude a finding under paragraph (c)(1) that the corporation's only express purpose is the promotion of political ideas.

One commenter argued that requiring the promotion of political ideas to be an organization's only express purpose would exclude organizations that do educational and research work on political topics with which they are concerned. It would also exclude

organizations that train people in advocacy techniques, an important part of the activities of many nonprofit corporations. The Commission has addressed these concerns by broadening the definition of the phrase "the promotion of political ideas" in paragraph (b)(1) to include these activities. This definition is discussed in detail above.

b. *Business activities.* Under paragraph (c)(2), a corporation must be unable to engage in business activities in order to be a qualified nonprofit corporation. Paragraph (c)(2) tracks the language of the *MCFL* decision in that it limits the exemption to corporations that cannot engage in business activities. Thus, in order to be exempt, business activities must be proscribed by the corporation's organic documents or other internal rules.

However, as indicated above, fundraising activities that are expressly described as requests for donations to be used for political purposes are not business activities. Consequently, a qualified nonprofit corporation can engage in fundraising activities without losing its exemption, so long as it makes the appropriate disclosure.

Most of the commenters objected to a complete prohibition on business activities. One commenter argued that the presence of minimal business activities would not have changed the result in *MCFL*. This commenter said that, despite the Supreme Court's reliance on the absence of business activities, a prohibition should not be read into the opinion, since it would unreasonably limit the activities of these organizations.

However, the plain language of the *MCFL* opinion endorses a complete prohibition on business activities. The Court said "MCFL has three features *essential* to our holding that it cannot constitutionally be bound by § 441b's restriction on independent spending. First, it was formed for the express purpose of promoting political ideas, and cannot engage in business activities." *MCFL*, 479 U.S. at 264 (emphasis added). This statement clearly supports a total ban on business activities.

In addition, other parts of the opinion make it clear that the Court based its conclusion on the complete absence of any business activities, and strongly suggest that the presence of business activities would have changed the result. Earlier, the Court said that "the concerns underlying the regulation of corporate political activity are simply absent with regard to MCFL. It is not the case * * * that MCFL merely poses less of a threat of the danger that has

prompted regulation. Rather, it does not pose such a threat at all." 479 U.S. at 263. In order to pose no such threat, a corporation must be free from resources obtained in the economic marketplace. Only those corporations that cannot engage in business activities are free from these kinds of resources.

This approach will not unreasonably limit the activities of a qualified nonprofit corporation. The corporation has at least two options for generating revenue under the final rules. First, the corporation can engage in unlimited fundraising activities, so long as it informs potential donors that it is seeking donations that will be used for political purposes, such as supporting or opposing candidates. Second, the corporation can establish a separate segregated fund and make its independent expenditures exclusively from that fund.

Several other commenters also felt that a limited amount of business activity should be allowed, and argued that the Commission should incorporate the tax law concepts of related and unrelated business activity into the final rules. Under this approach, income from activity that is related to the corporation's mission would not be considered business activity, and as such, would not affect its qualified nonprofit corporation status. In addition, qualified nonprofit corporations would be permitted to engage in some unrelated business activity, so long as it does not become the organization's primary purpose.

However, reliance on these tax law concepts would be inappropriate here because the tax code was drafted to serve different purposes. Section 501(c)(4) of the tax code grants tax exempt status to organizations that promote the social welfare. In exercising its administrative discretion, the Internal Revenue Service has concluded that it is appropriate to allow social welfare organizations to engage in some unrelated business activity so long as it does not become their primary purpose, apparently believing that a limited amount of business activity is not incompatible with the promotion of social welfare.

In contrast, section 441b seeks to prevent the use of resources amassed in the economic marketplace to gain an unfair advantage in the political marketplace. The *MCFL* Court concluded that a complete prohibition on the use of resources amassed in the economic marketplace is necessary to serve this purpose. Thus, the Commission has incorporated this prohibition into the final rules.

c. *Shareholders/disincentives to disassociate.* The second feature that distinguished MCFL from other corporations was that "it ha[d] no shareholders or other persons affiliated so as to have a claim on its assets or earnings." 479 U.S. at 264. The Supreme Court said this "ensures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity." *Id.* Later, in *Austin,* the Court said that persons other than shareholders may also face disincentives to disassociate with the corporation. "Although the Chamber also lacks shareholders, many of its members may be similarly reluctant to withdraw as members even if they disagree with the Chamber's political expression, because they wish to benefit from the Chamber's nonpolitical programs. * * * The Chamber's political agenda is sufficiently distinct from its educational and outreach programs that members who disagree with the former may continue to pay dues to participate in the latter." 494 U.S. at 663.

These characteristics have been incorporated into paragraph (c)(3) of the final rules. In the interests of clarity, the rules separate these two characteristics into separate subparagraphs. Only those corporations that have the characteristics set out in both subparagraphs are exempt from the independent expenditure prohibition.

i. Shareholders. Under paragraph (c)(3)(i), a qualified nonprofit corporation is one that has no shareholders or other persons affiliated in a way that could allow them to make a claim on the organization's assets or earnings. Thus, if any of the persons affiliated with a corporation have an equitable or ownership interest in the corporation, the corporation will not be a qualified nonprofit corporation.

One commenter said the limitation on persons with claims against the corporation is unnecessary, and also said it should be coupled with an explanation that this restriction will not deprive a corporation of the right to have dues-paying members.

The Commission believes this limitation is necessary to ensure that associational decisions are based entirely on political considerations. However, this limitation will not adversely affect corporations with dues-paying members. In most cases, dues payments are not investments made with an expectation of return or repayment. They do not give members any right to the corporation's assets or earnings. Consequently, the existence of

dues-paying members will not affect the corporation's exempt status.

Two commenters expressed concern that paragraph 114.10(c)(3)(i) could be read to deny exempt status to corporations with employees or creditors, because an employee of a qualified nonprofit corporation could have a claim against the corporation for wages, and a creditor could have a claim against the corporation on a debt.

The Commission has revised this provision in accordance with these comments. Claims held by employees and creditors with no ownership interest in the corporation arise out of arms-length employment or credit relationships, rather than an equitable interest in the corporation. Consequently, they will not be treated as claims on the corporation's assets or earnings that affect the corporation's exemption from the independent expenditure prohibition.

ii. Disincentives to disassociate. Paragraph (c)(3)(ii) limits the exemption to corporations that do not offer benefits that are a disincentive for recipients to disassociate themselves with the corporation on the basis of its position on a political issue. Thus, if the corporation offers a benefit that recipients lose if they end their affiliation with the corporation, or cannot obtain unless they become affiliated, the corporation will not be a qualified nonprofit corporation. This provision ensures that the associational decisions of persons who affiliate themselves with the corporation are based exclusively on political, rather than economic, considerations.

The rule contains examples of benefits that will be considered disincentives to disassociate with the corporation. First, credit cards, insurance policies and savings plans will be considered disincentives to disassociate. Consequently, corporations that offer such things as affinity credit cards or life insurance will not be qualified nonprofit corporations.

Second, training, education and business information will be considered disincentives to disassociate from the corporation, unless the corporation provides these benefits to enable the persons who receive them to help promote the group's political ideas. This provision allows a qualified nonprofit corporation to provide its volunteers with the training and information they need to advocate its issues. However, if the corporation provides other kinds of training or information that is not needed for its issue advocacy work, the corporation will not be a qualified nonprofit corporation.

One commenter objected to paragraph (c)(3)(ii), saying that it would prevent most organizations from qualifying for the exemption. Other commenters urged the Commission to distinguish between benefits that are related to the corporation's issue advocacy work, or grow out of it, and those that are unrelated to that work, saying that only the latter should be regarded as disincentives to disassociate. These commenters also recommended that a substantiality test be used, so that benefits that are insubstantial or create an insignificant disincentive to disassociate would not disqualify the corporation.

The Commission has revised this section to address some of the concerns raised by the commenters. As indicated above, paragraph 114.10(c)(3)(ii) has been revised to say that, if a corporation provides training or education that is necessary to promote the organization's political ideas, the training will not be considered an incentive to associate or disincentive to disassociate.

However, the Commission has decided against including a substantiality test for benefits that ostensibly create a less significant disincentive to disassociate with the corporation. Any disincentive, no matter how small, can influence an individual's associational decisions, particularly where the "cost" to the individual of obtaining the benefit is only a small yearly donation to the corporation. For example, a corporation might offer donors access to affinity credit cards with no annual fee. Although the actual dollar value of such a benefit may be insignificant, it could easily offset the donor's annual donation to the corporation. Thus, membership levels would partially reflect the popularity of the benefit being offered, rather than exclusively reflecting the popularity of the group's political ideas.

Including a substantiality test would also force the Commission to determine which benefits are substantial enough to influence a particular individual's decision whether or not to continue associating with an organization. The Commission is reluctant to make these difficult subjective determinations if they can be avoided. Consequently, the final rule does not contain a substantiality threshold for disincentives to disassociate with the corporation.

e. *Relationship with business corporations and labor organizations.* The Supreme Court said that one of the reasons MCFL was exempt from the independent expenditure prohibition was that it "was not established by a

business corporation or labor union, and it is its policy not to accept contributions from such entities." *MCFL,* 479 U.S. at 264. This characteristic has been incorporated into paragraph (c)(4) of the final rules. The final rule has been broken down into three subparagraphs for purposes of clarity.

Paragraph (c)(4)(i) implements the first part of the Court's statement. Only corporations that were not established by a business corporation or labor organization can be eligible for an exemption from, the independent expenditure prohibition. Thus, corporations that are set up by business corporations or labor organizations cannot be qualified nonprofit corporations.

Paragraph (c)(4)(ii) limits the exemption to corporations that do not directly or indirectly accept donations of anything of value from business corporations or labor organizations. This includes donations received directly from these entities, and donations that pass through a third organization. Thus, if a corporation accepts donations from an organization that accepts donations from these entities, the corporation will not be a qualified nonprofit corporation.

The rule also limits the exemption to corporations that can provide some assurance that they do not accept donations from business corporations or labor organizations. Under paragraph (c)(4)(iii), if the corporation can demonstrate, through accounting records, that it has not accepted any donations from business corporations and labor organizations in the past from business corporations and labor organizations in the past, it will be eligible for the exemption. If it is unable, for good cause, to make this showing, it can provide adequate assurance by showing that it has a documented policy against accepting donations from these entities. In order to be documented, this policy must be embodied in the organic documents of the corporation, the minutes of a meeting of the governing board, or a directive from the person that controls the day-to-day operation of the corporation.

Most of the commenters objected to an absolute ban on the acceptance of business corporation and labor organization donations, arguing that a ban is not necessary and is not supported by the court decisions. Several commenters argued that *MCFL's* third requirement is met when an organization is free from the influence of business corporations. Others urged the Commission to focus not on the level of donations but on whether the

corporation is acting as a "conduit" for business corporation and labor organization funds. One commenter suggested that the Commission engage in factual analyses to determine whether an organization is under the influence of a business corporation or labor organization or is acting as a conduit for the funds of such an organization.

However, the language of the *MCFL* opinion supports a prohibition on business corporation and labor organization donations. The *MCFL* Court said that one of the features "essential to [its] holding that [MCFL] may not constitutionally be bound by § 441b's restriction on independent spending" was that "MCFL was not established by a business corporation or a labor union, and *it is its policy not to accept contributions from such entities*." 479 U.S. at 263–64 (emphasis added). The Court concluded that the existence of this policy "prevents [qualified nonprofit] corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace." *Id.* Thus, although the *MCFL* Court was concerned that business corporations and labor organizations could improperly influence qualified nonprofit corporations and use them as conduits to engage in political spending, the Court saw MCFL's policy of not accepting business corporation or labor organization donations as the way to address these concerns.

The *Austin* decision explains why a complete prohibition on these donations is necessary to serve the purposes of section 411b. In concluding that the Michigan Chamber of Commerce was not an MCFL-type corporation, the Court recognized that the danger of "unfair deployment of wealth for political purposes" exists whenever a business corporation or labor organization is able to funnel donations through a qualified nonprofit corporation. "Because the Chamber accepts money from for-profit corporations, it could, absent application of [Michigan's version of section 441b], serve as a conduit for corporate political spending." *Austin*, 494 U.S. at 664. "Business corporations * * * could circumvent the [independent expenditure] restriction by funneling money through the Chamber's general treasury." *Id.*

Therefore, the Commission has limited the exemption to corporations that do not accept donations from business corporation or labor organizations. The Commission believes it would be impractical to engage in factual analyses to determine whether an organization is actually influenced by a business corporation or labor organization or is acting as a conduit for the funds of these entities. Furthermore, nothing in the Court's decisions suggests that the Commission must engage in such an inquiry. In fact, the Court has specifically said that, with regard to the application of section 441b, it will not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *FEC* v. *National Right to Work Committee*, 459 U.S. 197, 210 (1982) ("*NRWC*").

Two commenters said it is impossible to screen out all such donations, and asserted that incidental or inadvertent business corporation or labor organization receipts should be permitted. One commenter suggested a *de minimis* test for a qualified nonprofit corporation's overall level of corporate or labor support, and limits on the percentage that could be accepted from a single contributor. Another commenter said the Commission should allow qualified nonprofit corporations to accept a *de minimis* amount of corporate or labor organization donations, so long as the corporation segregates these donations in a separate account and allocates expenses so that the corporate funds are not used to make independent expenditures.

In applying this rule, the Commission will distinguish inadvertent acceptance of prohibited donations from knowing acceptance of a *de minimis* amount of prohibited donations. Inadvertently accepted prohibited donations will not affect a corporation's qualification for an exemption from the independent expenditure prohibition. However, knowingly accepted prohibited donations will void a corporation's exemption, even if the corporation accepts only a *de minimis* amount. The Commission notes that political committees are required to screen their receipts for prohibited contributions. Most committees do so successfully, even though many of them are small and have limited resources. Qualified nonprofit corporations will also be expected to adopt a mechanism for screening their receipts for prohibited contributions in order to remain exempt from the independent expenditure prohibition.

Finally, the Commission notes that, in most cases, the prohibition on indirect business corporation and labor organization donations in paragraph (c)(4)(ii), discussed above, will not affect qualified nonprofit corporations that receive grants from organizations that are tax exempt under section 501(c)(3). Some qualified nonprofit corporations, all of which are section 501(c)(4) tax exempt organizations under the final rules, may receive grants from section 501(c)(3) organizations. Because section 501(c)(3) organizations can accept donations from business corporations and labor organizations, paragraph (c)(4)(ii) could be read to disqualify an otherwise qualified nonprofit corporation if it receives a grant from a section 501(c)(3) organization.

However, under IRS rules, section 501(c)(4) organizations that receive funds from a section 501(c)(3) organization are required to use those funds in a way that is consistent with the section 501(c)(3) organization's exempt purpose. Since political campaign intervention is never consistent with a section 501(c)(3) organization's exempt purpose, the recipient section 501(c)(4) organization is not supposed to use the grant for campaign activity. "[O]therwise, public funds might be spent on an activity that Congress chose not to subsidize." *Regan* v. *Taxation With Representation*, 461 U.S. 540, 544 (1982). So long as these safeguards exist, the Commission will not regard a grant from a section 501(c)(3) organization to a qualified nonprofit corporation as an indirect donation from a business corporation or labor organization. Consequently, the grant will not affect the organization's exemption from the independent expenditure prohibition.

*f. Section 501(c)(4) status.* Paragraph (c)(5) of the final rules limits the exemption from the independent expenditure prohibition to corporations that are described in 26 U.S.C. 501(c)(4). Section 501(c)(4) describes a class of organizations known as social welfare organizations that are exempt from certain tax obligations. Under section 501(c)(4), a social welfare organization is not organized for profit but is operated exclusively for the promotion of social welfare. A corporation must be a social welfare organization in order to be exempt from the prohibition on independent expenditures.

IRS regulations state that the promotion of social welfare does not include "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate." 26 CFR 1.501(c)(4)–1(a)(2)(ii). However, the rules also state that an organization is operated exclusively for the promotion of social welfare if it is "primarily" engaged in promoting the common good and general welfare of the people of the community. 26 CFR 1.501(c)(4)–1(a)(2)(i). Thus, the rules allow social welfare organizations to engage in a limited amount of political activity.

The commenters expressed varying views on this provision and its relationship to the rest of the proposed rules. Two commenters argued that section 501(c)(4) organizations should be presumptively exempt, regardless of whether they have any of the other characteristics of a qualified nonprofit corporation. In contrast, two other commenters said that the additional characteristics should be included in the final rules. These two commenters noted that the Internal Revenue Code allows business corporations and labor organizations to make direct donations to section 501(c)(4) organizations. Thus, the additional characteristics must be included in order to limit the exemption from the independent expenditure prohibition to the kind of organizations described in the *MCFL* opinion.

The Commission has decided not to recognize a presumption that social welfare organizations are qualified nonprofit corporations solely because of their section 501(c)(4) status. Although the characteristics of a social welfare organization overlap to some extent with MCFL's three essential features, they are not identical. This difference results from the fact that the tax code was written to serve different purposes than the FECA. Thus, it would be inappropriate to presume that all social welfare organizations are entitled to an exemption from the independent expenditure prohibition.

Furthermore, the Internal Revenue Service often uses general legal principles to enforce the provisions of the tax code. Thus, there will often be no clearly stated IRS rule or policy that the Commission can refer to in making its determinations. In addition, filing for formal recognition of tax exempt status under section 501(c)(4) is permissive, not required. As a result, the Commission will not be able to rely on the IRS for verification of an organization's tax exempt status.

Therefore, the Commission has decided to include the additional characteristics in the final rules, and limit the exemption from the independent expenditure prohibition to corporations with these characteristics.

*5. Other Requirements Not Included in the Final Rules*

The Notice of Proposed Rulemaking contained a number of proposed requirements that are not included in the final rules. These proposals are summarized below.

*a. Affiliation with a separate segregated fund.* One proposal would have denied the exemption to corporations that have a separate segregated fund. This proposal would

have the effect of requiring corporations that have separate segregated funds to make independent expenditures solely from that fund, regardless of whether they have the characteristics of a qualified nonprofit corporation.

The commenters were universally opposed to this proposal. One commenter said such a rule would be impossible to apply, and would lead to a nonsensical result whereby small, unsuccessful groups would be able to make independent expenditures with general treasury funds, while larger, more successful groups would be required to use their separate segregated funds. Another commenter said that there is no governmental interest in denying the exemption to organizations with separate segregated funds, because the existence of such a fund does not create a danger that the organization will flood the electoral process with business profits. A third commenter objected to this criterion, arguing that the constitutional theory underlying the *MCFL* decision did not rely upon MCFL's allegations of the difficulty faced by small nonprofits attempting to comply with FEC regulations.

Although a bright line rule such as this one would be very useful in implementing the Court decisions, the Commission has not included this proposal in the final rules. Consequently, corporations with these characteristics will be exempt from the independent expenditure prohibition regardless of whether they have a separate segregated fund.

*b. Eligibility to file IRS Form 990EZ.* The NPRM proposed to limit the exemption from the independent expenditure prohibition to corporations with limited financial resources by requiring them to be eligible to file their tax returns on Internal Revenue Service Form 990EZ. Form 990EZ is available to organizations that have gross receipts during the year of less than $100,000 and total assets at the end of the year of less than $250,000.

Most commenters objected to this proposal. Several commenters observed that an organization's size was not included in the list of essential features, and also said that it has no relationship to the justification given for the regulation of corporate political speech. One commenter argued that the filing eligibility levels are so low that most "substantial" organizations would not qualify for an exemption.

In contrast, one commenter supported the use of the Form 990EZ eligibility thresholds as a criterion for an exemption from the independent expenditure prohibition. This commenter thought it should be used to

prevent groups with extensive financial resources from exacting political debts from candidates by giving them significant support. He argued that there is a compelling state interest in preventing organizations from seeking a quid pro quo.

The Commission is concerned that this proposal may be difficult to administer, and so has decided not to include it in the final rules. The Internal Revenue Service submitted comments in which it noted that only those section 501(c)(4) organizations that are formally recognized as tax exempt can file Form 990 or 990EZ. Organizations that are not formally recognized must file as taxable organizations, usually on Form 1120. Consequently, there may not be an easy way to confirm an organization's eligibility to file Form 990EZ. In addition, organizations with less than $25,000 in annual gross receipts have no real need to seek formal recognition, since they are not required to file tax returns at all. Thus, there will be no way to confirm the filing eligibility of these organizations.

The IRS also noted that the eligibility requirements for filing Form 990EZ may change from time to time. This would have the effect of changing the eligibility requirements for an exemption from the independent expenditure prohibition.

Consequently, the Commission has excluded this proposal from the final rules. Corporations with the characteristics in paragraph (c) will be exempt regardless of whether they are eligible to file Form 990EZ.

*c. Less sophisticated fundraising techniques.* The narrative portion of the NPRM indicated that the Commission was considering limiting the exemption to groups that use the less sophisticated fundraising techniques typically employed by grass roots organizations. One criterion considered would deny the exemption to organizations that utilize more formalized fundraising methods such as direct mail solicitation.

However, the Commission has decided not to include this in the final rules. Corporations with the characteristics set out in paragraph (c) will be exempt from the independent expenditure prohibition regardless of how they raise funds, so long as their fundraising activity is not business activity under paragraph (b)(3) of the final rules.

*6. Reconstituting as a Qualified Nonprofit Corporation*

The Commission recognizes that some corporations that are not qualified nonprofit corporations may wish to reconstitute themselves so that they

qualify for an exemption from the independent expenditure prohibition. In order to become a qualified nonprofit corporation, a corporation must adopt the essential characteristics set out in paragraph (c) of the final rules. In addition, the corporation must purge its accounts of corporate and labor organization donations and implement a policy to ensure that it does not accept these donations in the future. Once it adopts the essential characteristics, purges its accounts, and implements such a policy, the corporation will become a qualified nonprofit corporation.

### 7. Permitted Corporate Independent Expenditures

Paragraph (d) states that qualified nonprofit corporations can make independent expenditures, as defined in 11 CFR Part 109, without violating the prohibitions on corporate expenditures in 11 CFR Part 114. However, this paragraph also emphasizes that qualified nonprofit corporations remain subject to the other requirements and limitations in Part 114, in particular, the prohibition on corporate contributions, whether monetary or in-kind.

The Commission received no comments on this provision, and has retained it in the final rules.

### 8. Reporting Requirements

Paragraph (e) requires a corporation that makes independent expenditures to certify that it is a qualified nonprofit corporation under this section and report its independent expenditures. The procedures for certifying exempt status are set out in paragraph (e)(1). The requirements for reporting independent expenditures are set out in paragraph (e)(2).

Under paragraph (e)(1), the corporation must certify that it is eligible for an exemption from the independent expenditure prohibition. This certification must be submitted no later than the date upon which the corporation's first independent expenditure report is due under paragraph (e)(2), which will be described in detail below. However, the corporation is not required to submit this certification prior to making independent expenditures. The certification can be made as part of FEC Form 5, which the Commission will be modifying for use in this situation. Or, the corporation can submit a letter that contains the name, address, signature and printed name of the individual filing the report, and certifies that the corporation has the characteristics set out in paragraph (c).

One of the alternatives set out in the NPRM would have required qualified nonprofit corporations to submit much more detailed information in order to qualify for exempt status. The Commission decided not to include these requirements in the final rules in order to minimize the reporting burdens on qualified nonprofit corporations. Instead, the Commission has decided to require only that corporations certify that they have the characteristics of a qualified nonprofit corporation when they make independent expenditures. This will ensure that corporations claiming to be exempt are aware of the characteristics required to qualify for an exemption.

Paragraph (e)(2) states that qualified nonprofit corporations must comply with the independent expenditure reporting persons who make independent expenditures in excess of $250 in a calendar year to report those expenditures using FEC Form 5. This report must include the name and mailing address of the person to whom the expenditures was made, the amount of the expenditure, an indication as to whether the expenditure was in support of or in opposition to a candidate, and a certification as to whether the corporation made the expenditure in cooperation or consultation with the candidate. The names of persons who contributed more than $200 towards the expenditure must also be reported.

Thus, the final rules treat qualified nonprofit corporations as individuals for the purposes of the reporting requirements. This is one of the least burdensome reporting schemes contained in the FECA. The *MCFL* Court specifically endorsed this approach when it said that the disclosure provisions of 2 U.S.C. 434(c) will "provide precisely the information necessary to monitor [the corporation's] independent spending activity and its receipt of contributions." *MCFL*, 479 U.S. at 262. None of the commenters discussed the proposed independent expenditure reporting requirements.

In another part of its opinion, the *MCFL* Court also said that "should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee." *MCFL*, 479 U.S. at 262. The proposed rules set out a test for determining a corporation's major purpose, and also contained proposed reporting requirements related to that test. These reporting requirements were set out in paragraph (e) of the proposed rules.

As will be discussed further below, the Commission has decided not to address this part of the Court's opinion in the final rules being promulgated today, preferring to do so at a later date as part of a separate rulemaking. Consequently, the reporting requirements related to the major purpose test have been deleted from paragraph (e) of the final rules. However, these rules may eventually be amended to require reporting of information related to the major purpose concept. Any such changes will be made as part of the separate rulemaking.

### 9. Solicitation Disclosure

Section 114.10(f) of the final rules states that when a qualified nonprofit corporation solicits donations, the solicitation must inform potential donors that their donations may be used for political purposes, such as supporting or opposing candidates. This rule, which has been modified slightly from the proposed rule, requires qualified nonprofit corporations to include a disclosure statement in their solicitations for donations.

One commenter called this an "unjustifiable roadblock" to the exercise of constitutional rights by small nonprofit corporations, and speculated that the people who run these organizations won't know about this requirement until after a complaint is filed against them.

However, this disclosure requirement directly serves the purposes of the *MCFL* exemption. In carving out this exemption, the Supreme Court said "[t]he rationale for regulation is not compelling with respect to independent expenditures by [MCFL]" because "[i]ndividuals who contribute to appellee are fully aware of its political purposes, and in fact contribute precisely because they support those purposes." *MCFL* at 260–61. "*Given a contributor's awareness of the political activity of [MCFL]*, as well as the readily available remedy of refusing further donations, the interest [of] protecting contributors is simply insufficient to support § 441b's restriction on the independent spending of MCFL." *Id.* at 262 (emphasis added).

The *MCFL* Court went on to endorse the disclosure requirement as a way to ensure that persons who make donations are aware of how those donations may be used. The Court said the need to make donors aware that their donations may be used to "urge support for or opposition to political candidates" can be met by "simply requiring that contributors be informed that their money may be used for such a purpose." *MCFL*, 479 U.S. at 261.

Furthermore, the Commission does not regard anticipated ignorance of a regulation as a legitimate argument against the promulgation of that regulation, particularly when the regulation will implement the Commission's statutory mandate and the holding of a Supreme Court decision.

Therefore, the Commission has included this requirement in the final rules. The Commission does not expect this requirement to impose a significant burden on qualified nonprofit corporations. For example, corporations need not say anything more than ''donations to xyz organization may be used for political purposes, such as supporting or opposing candidates,'' or similar language, in order to satisfy this requirement. This will ensure that donors are aware of the corporation's campaign activity.

*10. Non-authorization Notification*

Paragraph (g) of the final rules requires qualified nonprofit corporations that make independent expenditures to comply with the disclaimer requirements in 11 CFR 110.11. Section 110.11 requires any person financing an express advocacy communication to include a statement in the communication identifying who paid for it. 11 CFR 110.11(a)(1). This statement must also identify the candidate or committee who authorized the communications, unless the communications was not authorized by any candidate or committee, in which case, it must so indicate. 11 CFR 110.11(a)(1)(iii). Thus, a qualified nonprofit corporation that finances an independent expenditure must include a disclaimer that states the name of the corporation and indicates that the communication was not authorized by any candidate or candidate's committee. The Commission received no comments on this provision.

*11. Major Purpose*

In *MCFL,* the Court said that ''should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee. * * * As such, it would automatically be subject to the obligations and restrictions applicable to those groups whose primary objective is to influence political campaigns.'' 479 U.S. at 262 (citation omitted).

The NPRM sought comments on a number of issues related to this part of the Court's opinion. For example, the notice set out two alternative versions of a test for determining whether a qualified nonprofit corporation's major purpose is making independent expenditures. The notice also specifically sought comments on whether these tests should turn on whether independent expenditures are ''a'' major purpose or ''the'' major purpose of the corporation. As discussed above, the notice also contained proposed requirements for reporting the information that the Commission would need for these tests. Several commeters submitted views on these issues.

The Commission has decided not to address this part of *MCFL* in the final rules. In its administration of the Act, the Commission is applying a major purpose concept in other contexts that do not involve qualified nonprofit corporations. The Commission would prefer to promulgate a major purpose test that will govern in all of these situations. Such a rule is beyond the scope of this rulemaking.

Therefore, the Commission has decided to initiate a separate rulemaking to address this part of *MCFL* and other outstanding issues. Any further definition or refinement of the major purpose concept and the associated reporting requirements will be done in that rulemaking. The comments submitted on these issues in response to the NPRM will be considered as part of this separate rulemaking.

However, in the meantime, the Commission cautions, that, ''should [a qualified nonprofit corporation's] independent spending become so extensive that [its] major purpose may be regarded as campaign activity,'' it will be treated as a political committee under the FECA and subject to the applicable regulations.

**Certification of No Effect Pursuant to 5 U.S.C. § 605(b) [Regulatory Flexibility Act]**

The attached final rules will not, if promulgated, have a significant economic impact on a substantial number of small entities. The basis for this certification is that the definition of express advocacy will not have a significant economic impact on a substantial number of small entities. In addition, as anticipated by the Supreme Court in *MCFL,* there may not be a substantial number of small entities affected by the final rules. The new disclosure rules for qualified nonprofit corporations, which are small entities, are the least burdensome requirements possible under the FECA.

**List of Subjects**

*11 CFR Part 100*

Elections

*11 CFR Part 106*

Campaign funds
Political candidates
Political committees and parties

*11 CFR Part 109*

Campaign funds
Elections
Polticial candidates
Political committees and parties
Reporting requirements

*11 CFR Part 114*

Business and industry
Elections
Labor

For the reasons set out in the preamble, Subchapter A, Chapter I of Title 11 of the *Code of Federal Regulations* is amended as follows:

**PART 100—SCOPE AND DEFINITIONS (2 U.S.C. 431)**

1. The authority citation for 11 CFR Part 100 continues to read as follows:

**Authority:** 2 U.S.C. 431, 438(a)(8).

2. 11 CFR Part 100 is amended by revising section 100.17 to read as follows:

**§ 100.17   Clearly identified (2 U.S.C. 431(18)).**

The term *clearly identified* means the candidate's name, nickname, photograph, or drawing appears, or the identity of the candidate is otherwise apparent through an unambiguous reference such as ''the President,'' ''your Congressman,'' or ''the incumbent,'' or through an unambiguous reference to his or her status as a candidate such as ''the Democratic presidential nominee'' or ''the Republican candidate for Senate in the State of Georgia.''

3. 11 CFR Part 100 is amended by adding section 100.22 to read as follows:

**§ 100.22   Expressly advocating (2 U.S.C. 431(17)).**

*Expressly advocating* means any communication that—(a) Uses phrases such as ''vote for the President,'' ''re-elect your Congressman,'' ''support the Democratic nominee,'' ''cast your ballot for the Republican challenger for U.S. Senate in Georgia,'' ''Smith for Congress,'' ''Bill McKay in '94,'' ''vote Pro-Life'' or ''vote Pro-Choice'' accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, ''vote against Old Hickory,'' ''defeat'' accompanied by a picture of one or more candidate(s),

''reject the incumbent,'' or communications of campaign slogan(s) or individual word(s), which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s), such as posters, bumper stickers, advertisements, etc. which say ''Nixon's the One,'' ''Carter '76,'' ''Reagan/Bush'' or ''Mondale!''; or

(b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—

(1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

(2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

## PART 106—ALLOCATION OF CANDIDATE AND COMMITTEE ACTIVITIES

4. The authority citation for 11 CFR Part 106 continues to read as follows:

**Authority:** 2 U.S.C. 438(a)(8), 441a(b), 441a(g).

5. 11 CFR Part 106 is amended by revising paragraph (d) of section 106.1 to read as follows:

### § 106.1 Allocation of expenses between candidates.

\* \* \* \* \*

(d) For purposes of this section, *clearly identified* shall have the same meaning as set forth at 11 CFR 100.17.

\* \* \* \* \*

## PART 109—INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 434(c))

6. The authority citation for 11 CFR Part 109 continues to read as follows:

**Authority:** 2 U.S.C. 431(17), 434(c), 438(a)(8), 441d.

7. 11 CFR Part 109 is amended by revising paragraphs (b)(1), (b)(2) and (b)(3) of section 109.1 to read as follows:

### § 109.1 Definitions (2 U.S.C. 431(17)).

\* \* \* \* \*

(b) For purposes of this definition—
(1) *Person* means an individual, partnership, committee, association, qualified nonprofit corporation under 11 CFR 114.10(c), or any organization or group of persons, including a separate segregated fund established by a labor organization, corporation, or national bank (see part 114) but does not mean a labor organization, corporation not qualified under 11 CFR 114.10(c), or national bank.

(2) *Expressly advocating* shall have the same meaning as set forth at 11 CFR 100.22.

(3) *Clearly identified* shall have the same meaning as set forth at 11 CFR 100.17.

\* \* \* \* \*

## PART 114—CORPORATE AND LABOR ORGANIZATION ACTIVITY

8. The authority citation for Part 114 continues to read as follows:

**Authority:** 2 U.S.C. 431(8)(B), 431(9)(B), 432, 437d(a)(8), 438(a)(8), and 441b.

9. 11 CFR Part 114 is amended by revising paragraph (b) of section 114.2 to read as follows:

### § 114.2 Prohibitions on contributions and expenditures.

\* \* \* \* \* \* \*

(b) Except as provided at 11 CFR 114.10, any corporation whatever or any labor organization is prohibited from making a contribution or expenditure as defined in 11 CFR 114.1(a) in connection with any Federal election.

\* \* \* \* \*

10. 11 CFR Part 114 is amended by adding section 114.10 to read as follows:

### § 114.10 Nonprofit corporations exempt from the prohibition on independent expenditures.

(a) *Scope.* This section describes those nonprofit corporations that qualify for an exemption from the prohibition on independent expenditures contained in 11 CFR 114.2. It sets out the procedures for demonstrating qualified nonprofit corporation status, for reporting independent expenditures, and for disclosing the potential use of donations for political purposes.

(b) *Definitions.* For the purposes of this section—
(1) *The promotion of political ideas* includes issue advocacy, election influencing activity, and research, training or educational activity that is expressly tied to the organization's political goals.

(2) A corporation's *express purpose* includes:
(i) The corporation's purpose as stated in its charter, articles of incorporation, or bylaws, except that a statement such as ''any lawful purpose,'' ''any lawful activity,'' or other comparable statement will not preclude a finding under paragraph (c) of this section that the corporation's only express purpose is the promotion of political ideas;

(ii) The corporation's purpose as publicly stated by the corporation or its agents; and

(iii) Purposes evidenced by activities in which the corporation actually engages.

(3) (i) The term *business activities* includes but is not limited to:
(A) Any provision of goods or services that results in income to the corporation; and
(B) Advertising or promotional activity which results in income to the corporation, other than in the form of membership dues or donations.

(ii) The term *business activities* does not include fundraising activities that are expressly described as requests for donations that may be used for political purposes, such as supporting or opposing candidates.

(4) The term *shareholder* has the same meaning as the term *stockholder*, as defined in 11 CFR 114.1(h).

(c) *Qualified nonprofit corporations.* For the purposes of this section, a qualified nonprofit corporation is a corporation that has all the characteristics set forth in paragraphs (c)(1) through (c)(5) of this section:

(1) Its only express purpose is the promotion of political ideas, as defined in paragraph (b)(1) of this section;

(2) It cannot engage in business activities;

(3) It has:
(i) No shareholders or other persons, other than employees and creditors with no ownership interest, affiliated in any way that could allow them to make a claim on the organization's assets or earnings; and

(ii) No persons who are offered or who receive any benefit that is a disincentive for them to disassociate themselves with the corporation on the basis of the corporation's position on a political issue. Such benefits include but are not limited to:
(A) Credit cards, insurance policies or savings plans; and
(B) Training, education, or business information, other than that which is necessary to enable recipients to engage in the promotion of the group's political ideas.

(4) It:
(i) Was not established by a business corporation or labor organization;

(ii) Does not directly or indirectly accept donations of anything of value from business corporations, or labor organizations; and

(iii) If unable, for good cause, to demonstrate through accounting records that paragraph (c)(4)(ii) of this section is satisfied, has a written policy against accepting donations from business corporations or labor organizations; and

(5) It is described in 26 U.S.C. 501(c)(4).

(d) *Permitted corporate independent expenditures.*

(1) A qualified nonprofit corporation may make independent expenditures, as defined in 11 CFR part 109, without violating the prohibitions against corporate expenditures contained in 11 CFR part 114.

(2) Except as provided in paragraph (d)(1) of this section, qualified nonprofit corporations remain subject to the requirements and limitations of 11 CFR part 114, including those provisions prohibiting corporate contributions, whether monetary or in-kind.

(e) *Qualified nonprofit corporations; reporting requirements.*

(1) *Procedures for demonstrating qualified nonprofit corporation status.* If a corporation makes independent expenditures under paragraph (d)(1) of this section that aggregate in excess of $250 in a calendar year, the corporation shall certify, in accordance with paragraph (e)(1)(ii) of this section, that it is eligible for an exemption from the prohibitions against corporate expenditures contained in 11 CFR part 114.

(i) This certification is due no later than the due date of the first independent expenditure report required under paragraph (e)(2). However, the corporation is not required to submit this certification prior to making independent expenditures.

(ii) This certification may be made either as part of filing FEC Form 5 (independent expenditure form) or by submitting a letter in lieu of the form. The letter shall contain the name and address of the corporation and the signature and printed name of the individual filing the qualifying statement. The letter shall also certify that the corporation has the characteristics set forth in paragraphs (c)(1) through (c)(5) of this section.

(2) *Reporting independent expenditures.* Qualified nonprofit corporations that make independent expenditures aggregating in excess of $250 in a calendar year shall file reports as required by 11 CFR 109.2.

(f) *Solicitation; disclosure of use of contributions for political purposes.* Whenever a qualified nonprofit corporation solicits donations, the solicitation shall inform potential donors that their donations may be used for political purposes, such as supporting or opposing candidates.

(g) *Non-authorization notice.* Qualified nonprofit corporations making independent expenditures under this section shall comply with the requirements of 11 CFR 110.11.

Dated: June 30, 1995.

**Danny L. McDonald,**

*Chairman.*

[FR Doc. 95–16502 Filed 7–5–95; 8:45 am]

**BILLING CODE 6715–01–M**