# SUPPLEMENTAL PLAINTIFFS' EXHIBIT 3

APR 2 3 2001

## BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matter of | ) |
| | ) MUR 4624 |
| The Coalition | ) |
| National Congressional Campaign Committee, *et al*. | ) |

SENSITIVE

### GENERAL COUNSEL'S REPORT

**I.**    **ACTIONS RECOMMENDED:** Take no further action and close the file.

**II.**    **SUMMARY OF DEPOSITIONS**

    In a General Counsel's Report dated June 9, 2000, this Office recommended subpoenas to depose 30 persons in connection with this matter. On July 11, 2000, the Commission approved subpoenas to depose nine of those 30 persons. Six of those persons submitted motions to quash those subpoenas and to dismiss. The Commission denied those motions on August 22, 2000. This Office conducted the depositions of all but one witness from September through December of 2000.[1] With respect to the remaining witness, Dan Danner, the Commission judicially enforced the deposition subpoena. On February 2, 2001, the district court granted the Commission's petition to compel Mr. Danner to attend his deposition. This Office deposed Mr. Danner on March 14, 2001.

    The deponents for the most part denied or could not recall any discussions with Representative Boehner, other party leaders, or candidates about the formation of the Coalition, the Coalition's ads or activities, the AFL-CIO ad campaign or a response to that campaign. The

---

[1] The depositions were originally scheduled for August 28 through September 11, 2000. Six of the witnesses (Bruce Josten, Dirk Van Dongen, Alan Kranowitz, Linda Mays, Fred Nichols, and Charles Greener) filed Motions to Quash their subpoenas, which the Commission denied on August 22, 2000. Subsequent to the Commission's action, those six witnesses complied with the Commission's subpoenas, and their depositions commenced on September 12 and were completed on December 20, 2000. A seventh witness (Dan Danner) filed several motions in an effort to prevent the Commission from taking his deposition. The Commission denied those motions on October 31, 2000.

MUR 4624
General Counsel Report
Page 2

deponents, however, revealed more extensive contacts then previously known, and provided

further circumstantial evidence of possible coordination.  For instance, as each wave of Coalition

ads was aired, full sets of tapes of each of the ads were sent to Representative Boehner's assistant

at the House Republican Conference, Joyce Gates, with the understanding that she would

disseminate them to the 37 candidates in whose districts the Coalition aired its ads.  Further, the

Coalition's pollster, Brian Tringali, acknowledged that his survey in connection with work paid

for by Rep. Ganske's campaign, influenced his decision the next day to recommend that the

Coalition conduct surveys and air test ads in that district.  And, shortly after one of the

Coalition's founding members received a fax from Rep. Boehner's Republican Conference

containing a script for an AFL-CIO ad airing in Rep. Nethercutt's district, the Coalition prepared

and aired a test ad responding to the AFL-CIO ad in Rep. Nethercutt's district.

        As discussed in more detail below, the facts obtained thus far provide circumstantial

evidence that the activities of the Coalition were loosely coordinated with the Republican Party

leaders, specifically Representative John Boehner and other candidates.  Indeed, the facts make

for a compelling coordination case under the approach in place at the time of the activity at issue.

*See* 11 C.F.R. §109.1.  The evidence obtained, however, does not appear to meet the test for

coordination set out in *Federal Election Commission vs. The Christian Coalition,* 52 F. Supp.2d

45 (D.D.C.1999), or the regulation (11 C.F.R. § 100.23) that the Commission approved last year.

*See infra* fn. 8.  This Office believes that it is highly unlikely that further testimony will yield

evidence that will meet the current test.  For instance, it is doubtful that the persons not yet

deposed who were most involved, including Rep. Boehner and his staff members Joyce Gates

and Barry Jackson, will provide much more detailed information than did the Coalition leaders

MUR 4624
General Counsel Report
Page 3

whom we have already deposed. Indeed, the memories of Rep. Boehner and Barry Jackson are

unlikely to be any clearer now than when they submitted their signed statements in 1999 and

2000 respectively. Although the facts surrounding the Coalition's decisions about airing its test

ads in the districts of Representatives Ganske and Nethercutt are especially troubling, *see infra*

*pp.* 44-45, given the relative lack of significance of such activities and the limited time left to

investigate in light of 2 U.S.C. § Section 2462, *see* fn. 2, this Office does not recommend

pursuing them further. Accordingly, this Office recommends that the Commission take no

further action and close the file.

## III.    PROCEDURAL BACKGROUND[2]

This matter was generated by a complaint filed by the Democratic National Committee on

March 17, 1997. The case was activated on November 24, 1997. The complaint alleged that in

1996 the Coalition, a group of in excess of 30 trade and business associations, coordinated its

five million dollar advertising and direct mail effort with Republican party leaders, party

campaign committees and 37 candidate campaign committees in whose districts the Coalition

undertook its activities. The numerous respondents denied the allegations in their responses.

Based upon the allegations in the complaint, public information and the responses, on

June 9, 1998, the Commission found reason to believe that the Coalition, Bruce Josten and 28

members of the Coalition's Executive Committee violated 2 U.S.C. § 441(b) by making

corporate contributions to the National Republican Congressional Committee and its treasurer

---

[2]  When the complaint in this matter was filed the Statute of Limitations date was estimated to be March 1, 2001, the time when the Coalition was believed to have been formed. Based on the facts uncovered thus far, this Office has determined that the Statute of Limitations date should be June 20, 2001, five years from the date of the Coalition's first known expenditure. Most of the expenditures, however, were made from September 4, 1996 through November 4, 1996. Thus, the statute of limitations date for most of the expenditures will be after September 4, 2001.

MUR 4624
General Counsel Report
Page 4

("NRCC") and candidate committees. The Commission found reason to believe that the NRCC, and seven campaign committees and their treasurers, violated 2 U.S.C. § 441(b) by accepting the in-kind corporate contributions from the Coalition. The Commission found reason to believe that the Coalition violated 2 U.S.C. § 441d(a) by failing to place disclaimers on its advertisements. The Commission took no action at that time regarding thirty other candidate committees, the Republican National Committee ("RNC"), and numerous other persons and entities.

Also on June 9, 1998, the Commission approved Subpoenas and Orders to the Coalition, the Coalition's 28 Executive Committee members, House Republican Conference Chair Representative John Boehner, his chief of staff Barry Jackson, Coalition consultants the Tarrance Group ("Tarrance"), National Media, Inc. ("NMI"), Gannon, McCarthy and Mason, Ltd. ("GMM"), American Viewpoint ("AV"), Chuck Greener/Porter Novelli, Frank Luntz/Luntz Communications, and individual employees or principals of the consultants (collectively "consultants"), the NRCC and the NRCC's Mario Cino and Ed Brookover, 37 candidate committees and their treasurers, and others.

In June of 1998, nearly all of the subpoenaed parties filed motions to quash their Subpoenas and Orders. See General Counsel's Reports ("GCR"), dated July 10, 1998 and July 22, 1998.[3] On December 8, 1998, the Commission denied some of the June 1998 motions to

---

[3] The Commission's decision on the June 1998 motions was held over for several months to permit new Commissioners to familiarize themselves with the facts of this and other complex matters and to review this Office's analysis of the state of the law regarding coordination and other issues at that time.

MUR 4624
General Counsel Report
Page 5

quash.[4] Specifically, the Commission denied the motions to quash submitted by the Coalition, Bruce Josten, and the five members of the Coalition's decision-making body (the "Management Committee"): the U.S. Chamber of Commerce ("Chamber"), the National Association of Manufacturers ("NAM"), the National Restaurant Association ("Restaurant Association"), the National Association of Wholesaler-Distributors ("NAWD") and the National Federation of Independent Business ("NFIB"). The Commission also denied the motions to quash of the NRCC and its treasurer, Maria Cino, Ed Brookover, Tarrance, GMM, NMI and their employees/principals, and nine candidate committees and their treasurers. The Commission, however, took no action regarding the numerous other motions to quash, including those submitted by all the remaining candidate committees and trade associations.

The Commission took no action regarding the July 1998 motions to quash submitted by Representative John Boehner and his chief of staff Barry Jackson. Beginning in December of 1998, the Commission sought voluntary compliance from Rep. Boehner and Mr. Jackson. After several months of attempting to obtain voluntary compliance, on April 20, 1999, the Commission issued more narrowly-drawn subpoenas and orders to Rep. Boehner and Mr. Jackson. Rep. Boehner and Mr. Jackson submitted new motions to quash. The Commission denied such motions on May 25, 1999. Then on June 25, 1999, the Commission and Rep. Boehner reached an agreement, whereby he voluntarily submitted sworn responses in exchange for the Commission withdrawing its Subpoena and Order. See General Counsel's Report ("GCR"), dated July 23, 1999, Attachment 1. Mr. Jackson refused to comply, and suit was filed against

---

[4] In August and September of 1998, the Coalition and its members submitted two lengthy documents setting forth various arguments seeking to rescind or vacate the Commission's findings, withdraw the Subpoenas and terminate this matter. Those motions were also denied on December 8, 1998.

MUR 4624
General Counsel Report
Page 6

him. After the district court ordered Mr. Jackson to comply, he submitted his sworn response on June 21, 2000.

At the Commission's instruction, this Office was extremely flexible with the parties for whom motions to quash had been denied and discovery proceeded, i.e., the Coalition, Mr. Josten, the Chamber, NFIB, NAWD, NAM, Restaurant Association, NRCC, GMM, Tarrance and NMI. Those Office reached discovery agreements with most of the respondents and witnesses from late December, 1998 through January, 1999. Under such discovery agreements, this Office made numerous concessions and limited the scope of the subpoenas and orders, always reserving the right to again broaden the scope if necessary.

The subpoenaed parties against whom the Commission voted to proceed began producing documents and sworn responses in January of 1999. While most of the documents were produced by March of 1999, documents were still trickling in through August of 1999. Moreover, several of the key parties, i.e., the Coalition and its Management Committee, the NRCC, Tarrance, NMI and GMM provided incomplete responses and refused to provide documents and answers under the agreed terms. In a series of detailed letters written over a several month period, this Office explained to the parties why their productions were not in accord with our agreements. See GCR, dated December 23, 1999, Attachments 2-4. Although the responses were deficient in numerous respects, in the hope of achieving compliance, this Office focused its follow-up requests on only the most crucial requests. Despite these efforts, for the most part the parties steadfastly refused to comply.

For example, during negotiations, the Coalition and its Management Committee agreed to answer a key interrogatory seeking information about communications between the Coalition and

MUR 4624
General Counsel Report
Page 7

Republican party leaders, including Rep. Boehner or any candidates regarding the Coalition and

its efforts in 1996. See GCR, dated December 23, 1999, Attachment 2 at p. 34. Yet the

Coalition and its Management Committee did not comply with the terms of the discovery

agreement. Their responses stated only that they were "not aware of any such contacts *in*

*advance* of [The Coalition's] activities." *Id.* at p. 72. (emphasis added).

With respect to Tarrance, NMI and GMM, one of the key interrogatories/document

requests sought information about all communications between those consultants and specific

persons and entities, including, among others, the RNC, NRCC, the Republican Conference and

Representative John Boehner. See GCR, dated December 23, 1999, Attachment 4 at pp. 53 and

58. Counsel, who represented all of the consultants, specifically agreed that the scope would be

limited to communications "regarding the Coalition and its efforts and/or regarding a response to

the AFL-CIO's advertising campaign." *Id.* at pp. 53, 76 and 115. In response to this request,

each of the consultants stated under oath that it/he "cannot recall any such communications,

conferences, meetings or discussions during 1996 regarding the Coalition and its efforts and/or

regarding a response to the AFL-CIO's advertising campaign." *Id.* at pp. 39-40, 88-89, and 132.

After this Office discovered documents inconsistent with those sworn responses, it sought

clarification. *Id.* at pp. 12-15, 70-72 and 109-11. In response, counsel stated that:

> this question is not "either" the Coalition "or" responses to the AFL-CIO ad
> campaign. As we have repeatedly discussed with you, your questions must be
> related to the Coalition - you cannot ask general questions unrelated to this MUR.

*Id.* at pp. 10-11, 68-69 and 108.

In letters sent to counsel on August 6, 1999, this Office, citing the Random House

Dictionary, pointed out that the words "and/or" are defined to mean "either or both of the things

MUR 4624
General Counsel Report
Page 8

mentioned may be affected or involved." *Id.* at pp. 6, 65, and 104. Even when provided with a

second opportunity to explain or defend this interpretation, counsel offered nothing in support of

this interpretation, stating:

> We have reached new legal boundaries when arguments on subpoena compliance,
> such as yours on [the interrogatory at issue] are based on the Random House
> Dictionary (we hope on your next excursion through that tome you'll enlighten us
> as to what the meaning of "is" is).

*Id.* at pp. 2, 63, and 103. In addition, after producing what was represented to be all of its

responsive documents, this Office learned that the Tarrance Group had withheld documents.

Tarrance refused to produce such documents, claiming they were proprietary information. See

GCR, dated December 23, 199, pp. 42-43.

In its document production proposal, the NRCC stated that "[w]ith respect to computer

records, we propose that we provide only the 'hard' version." See GCR, dated December 23,

1999, Attachment 3 at p 5. After the Commission and the NRCC agreed to a discovery plan,

however, the NRCC stated that it had not reviewed any of its computer files. *Id.* at p. 21. The

NRCC asserted that it had changed its computer system, and all 1996 computer files were stored

only on computer back up tapes. The NRCC stated that a search of such tapes would be futile

because, in its view, there was no reason to believe the tapes would contain responsive material.

*Id.* The NRCC further claimed that reviewing the tapes would be burdensome, informing this

Office, for the first time, that the tapes were not compatible with its current hardware. *Id.* In a

letter dated February 11, 1999, NRCC's counsel asserted that shortly before election day 1996,

the NRCC learned that the computer back up tapes had been out of alignment for some time. *Id*

at p. 78. The NRCC refused to review its computer files, claiming it was too expensive. The

Commission then offered to pay the cost of transcribing the tapes and to permit the tapes to

MUR 4624
General Counsel Report
Page 9

remain in the possession of a vendor of the NRCC's choice. *Id.* at pp. 93 and 99. The NRCC

still refused. *Id.* at p. 101.

In resisting compliance, several of the parties relied in part on the district court's August

2, 1999, decision in *Christian Coalition, 52 F. Supp.2d 45.*

On January 11, 2000, the Commission authorized this Office to file civil suit to enforce

pertinent portions of the Subpoenas and Orders issued in June of 1998 to the Coalition, Bruce

Josten, the Coalition's Management Committee, the NRCC, Tarrance, NMI and GMM. By

March of 2000, the Coalition had finally complied with the 1998 agreement, submitting

supplemental responses with new information. The NRCC, Tarrance, NMI and GMM submitted

revised responses by March of 2000, also with additional information. But document production

continued up until the Summer of 2000. The production included documents finally produced by

the NRCC from its back up tapes.[5]

As discussed above, on July 11, 2000, the Commission approved subpoenas to depose

nine persons. This Report will analyze the facts obtained during the course of this investigation.

---

[5]  Even after suit was authorized, it was only after many months of substantial efforts through meetings and extensive
wrangling that the NRCC complied with the Commission's Subpoena by producing responsive computer-generated
documents. By March 14, 2000, the NRCC finally agreed to review and produce non-privileged responsive
documents. By June and/July of 2000, this Office finally received the responsive documents. Due to the substantial
narrowing of the subpoena during negotiations, the documents produced were limited. For example, the NRCC did
not produce the attached NRCC document which indicates that Rep. Boehner was scheduled to give a short speech
on behalf of the NRCC regarding "Labor Unions and the '96 Elections." See Attachment 10. The attached
document was brought to our attention by the General Counsel's litigation staff. It was discovered within the
document production of the RNC in a litigation matter in which the Commission is a defendant (*Republican National
Committee v. Federal Election Comm.*, No. 98-CV-1207 (D.D.C. filed April 19, 1998)).

MUR 4624
General Counsel Report
Page 10

## IV.    APPLICABLE LAW

The Federal Election Campaign Act of 1971, as amended (the "Act" or the "FECA")

prohibits a corporation from making a contribution in connection with a federal election.

2 U.S.C. § 441b(a); 11 C.F.R. § 114.2(b).  With respect to corporate expenditures for

communications made independently from any candidate or his or her agent, the Supreme Court

has held that they are prohibited only if the message conveyed by such expenditures "expressly

advocates" the election or defeat of a clearly identified candidate. *Federal Election Commission*

*v. Massachusetts Citizens for Life ("MCFL")*, 479 U.S. 238, 249 (1986), *citing Buckley*, 424 U.S.

1 (1976); *see also* 11 C.F.R. § 100.22(a).

An "independent expenditure" is defined in the Act as:  an expenditure by a person

expressly advocating the election or defeat of a clearly identified candidate which is made

without cooperation or consultation with any candidate, or any authorized committee or agent of

such candidate, and which is not made in concert with, or at the request or suggestion of, any

candidate or agent of such candidate.  2 U.S.C. § 431(17).  The Commission's regulations at the

time of the activity defined "made with the cooperation or with the prior consent of, or in

consultation with, or at the request or suggestion of, a candidate" to mean any "arrangement,

coordination, or direction by the candidate or his or her agent prior to the publication,

distribution, display, or broadcast of the communication."  11 C.F.R. § 109.1(b)(4)(i).[6]

---

[6]  The Commission's regulation at 11 C.F.R. § 109.1(b)(4)(i)(A) and (B) provided a presumption that expenditures
are coordinated if they are based on information about the candidate's plans, projects, or needs provided to the
expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made, or
made by or through any person who is, or has been, authorized to raise or expend funds, who is or has been, an
officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement
from the candidate, the candidate's committee or agent.

MUR 4624
General Counsel Report
Page 11

The Commission has considered potential coordination that took place prior to the effective date of 11 C.F.R. § 100.23 under the standards set forth in *FEC v. Christian Coalition*, 52 F. Supp. 2d 45 (D.D.C. 1999). In addressing the issue of what constitutes "coordination" with a candidate, the *Christian Coalition* court discussed two general ways in which coordination could occur: first, that "expressive coordinated expenditures made at the request or the suggestion of the candidate or an authorized agent" would be considered coordinated; and second, "absent a request or suggestion, an expressive expenditure becomes 'coordinated' where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over, a communication's: (1) contents; (2) timing; (3) location, mode or intended audience (e.g., choice between newspaper or radio advertisement); or (4) 'volume' (e.g., number of copies of printed materials or frequency of media spots." *Id.* at 92. The court also found that coordination might be established if an individual had a certain level of decision-making authority for both the spender and the campaign and the spender made the expressive expenditures to assist the campaign. *Id.* at 96-97.[7]

In devising its legal standard for coordination, the Court drew a distinction between "'expressive,' 'communicative' or 'speech-laden' coordinated expenditures" at issue in that case, which are subject to the highest form of First Amendment protection, from "non-communicative materials" and from situations in which the spender finances materials for a

---

[7]    In the *Christian Coalition* decision, the court also rejected the assertion that "express advocacy" was required for expenditures to be considered coordinated. *Christian Coalition*, 52 F. Supp.2d at 87-89. The district court stated that "importing the 'express advocacy' standard into § 441b's contribution prohibition would misread *Buckley* and collapse the distinction between contributions and independent expenditures in such a way as to give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions." *Christian Coalition*, 45 F. Supp.2d at 88.

MUR 4624
General Counsel Report
Page 12

candidate's campaign. *Christian Coalition*, 52 F. Supp.2d at 85, fn. 45. The court made explicit that its standard only applied to expressive coordinated expenditures. *Id.* at 91.[8]

## V. SUMMARY OF FACTS

### The Thursday Group & The "Power Five"

After the Republican party gained a majority in the House in 1994, Representative John Boehner (R-Ohio) became Chairman of the House Republican Conference (or "Republican Conf."). Beginning in 1995, Republican Conf. Chair Boehner held meetings each Thursday with various business and trade associations and other groups to "discuss legislative strategy to gain passage of provisions of the Contract With America," and how to "mobilize" members of such groups. Attachment 14 at p. 7 (Affidavit of Bruce Josten dated May 9, 1997,). Rep. Boehner's weekly meetings and/or those in attendance became known as the "Thursday Group." *Id.* The Thursday Group meetings continued through 1996, though they ceased in the weeks just before the November elections.

Those who regularly attended the Thursday Group included representatives of the Chamber, NAM, the Restaurant Association, NAWD and NFIB. Those associations are sometimes referred to within the business community as the "power five." Attachment 1 (Alan Kranowitz Depo.) at p. 9.[9] They were represented by Bruce Josten (Chamber), Dirk Van Dongen (NAWD), Alan Kranowitz (NAWD), Elaine Graham (Restaurant Assoc.), Paul Huard (NAM),

---

[8]  On November 30, 2000, the Commission approved a final rule that generally follows the *Christian Coalition* standard for coordination. 65 C.F.R. 76138 (December 6, 2000). Although 30 legislative days have passed, the Commission has not yet issued the Notice of Effective Date of Regulation.

[9]  Consistent with the usual practice, this Office has attached only cited portions of the deposition transcripts and documents. Complete sets of the deposition transcripts, along with hundreds of pages of documents produced in this matter, are available for review in the Central Enforcement Docket located on the sixth floor.

MUR 4624
General Counsel Report
Page 13

Dan Danner (NFIB) and others. Citizens for a Sound Economy ("CSE") and Americans for Tax Reform ("ATF") also attended the meetings regularly. The Thursday Group provided these and other groups an opportunity to shape the House's legislative agenda.

### AFL-CIO Advertising Campaign & GOP Response

In early 1996, the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") announced its plan to spend $35 million on media advertisements and other communications denouncing the voting records of certain incumbent Members of Congress. The AFL-CIO's media efforts targeted districts of freshman members of Congress. Attachment 14 at pp. 1-2. A total of 75 freshman members of Congress were targeted, all of them members of the Republican party.

When the investigation began, this Office noted that Rep. Boehner's role in responding to the AFL-CIO ads was widely reported in the press. See First General Counsel's Report, dated April 21, 1998 ("FGCR"), pp. 7 and 38. Rep. Boehner had reportedly accepted the task of "taking on organized labor," and encouraging the business community to oppose labor's efforts See Attachment 9 (Wall Street Journal, May 10, 1996, The Buffalo News, April 10, 1996, The Buffalo News, May 22, 1996) Rep. Boehner was said to have been "House Speaker Newt Gingrich's designated hitter on the issue" of responding to the AFL-CIO's ad campaign. See FGCR, Attachment 4 at pp. 27-28, 60. "Boehner has been making the rounds of business groups in Washington, sounding the alarm." Id. at p. 27. Rep. Boehner's Chief of Staff, Barry Jackson was quoted in the Wall Street Journal as crediting Rep. Boehner with prodding "business lobbyists to act when he 'planted an idea' that 'it would behoove our [pro-business allies] to do something' to fend off the unions." FGCR, Attachment 4 at p. 60. It was reported that after Rep.

MUR 4624
General Counsel Report
Page 14

Boehner agreed to take on the unions, his "shop immediately geared up its widespread faxing system, firing off frequent anti-union broadsides." *Id.* at p. 61.

There is evidence confirming that beginning in the Spring of 1996, Rep. Boehner played a role within his party with respect to responding to the AFL-CIO ad campaign. He made speeches to the business community and party leaders, warning them about union efforts in connection with the then upcoming 1996 elections. Specifically, on March 26, 1996, Rep. Boehner spoke before the Chamber. There he warned the audience of union efforts in 1996 to "defeat the Republican Majority in Congress and re-elect their proxy to the White House." FGCR, at Attachment 2. Then, on April 30, 1996, Rep. Boehner was a featured speaker at an NRCC briefing of business donors on campaign finance reform. The topic of Rep. Boehner's speech was "Labor Unions and the 96 Elections." Attachment 10. The documents produced suggest that those invited included representatives of the Restaurant Association and five other trade associations that were, or would later become, members of the Coalition. Also invited were many of the members of Congress in whose districts the Coalition would later air its advertisements. Four weeks later, on June 3, 1996, Rep. Boehner's Republican Conference authored a document regarding the union threat. Attachment 11. The document, entitled "Washington Union Boss Watch, Buying Back Congress for the Liberal Democrats," is from "House Republican Conference, John Boehner, Chairman." The twelve page document, among other things, warns "Americans" to prepare for the "negative and false advertising" campaign that would be undertaken by the labor union bosses in an attempt to gain control of Congress. The document was produced by one of the founding Coalition members, NAM.

MUR 4624
General Counsel Report
Page 15

### March 1996 FAX from RNC

Prior to the official formation of the Coalition, someone in the "political shop" of the RNC faxed scripts of AFL-CIO and AFSCME ads, which had run in November and December 1995, to Fred Nichols of NAM. Attachment 12. The scripts were faxed in March of 1996. Mr. Nichols requested the information. Attachment 7 (Fred Nichols Depo) at pp. 5-7. He does not recall the name of the person who faxed the scripts to him, and testified that he did not keep the cover page of the six-page fax. Consequently, this Office does not know the identity of the RNC staff person Mr. Nichols spoke to about obtaining a copy of the AFL-CIO ad scripts. Mr. Nichols claims that he did not do anything with the ad scripts and he does not believe that he made a copy of the scripts for anyone associated with the Coalition. *Id.* at p. 7. Yet, identical copies of the RNC fax to Nichols were found in the files produced by the Chamber and the NFIB.

### Formation of the Coalition

The AFL-CIO ad campaign posed a serious threat to members of the Thursday Group, specifically to their planned agenda for legislation in Congress. Specifically, five members of the Thursday Group were so concerned that they joined together and formed the Coalition. The founding members were the Chamber, NAWD, NAM, NFIB and the Restaurant Assoc. ("the power five"). As discussed earlier, these five founding members became the Coalition's "Management Committee"—its decision-making body. Two other Thursday Group members, CSE and ATR, were also members of the Coalition. The Coalition's "urgent" fundraising letter warned the AFL-CIO might "'unseat' the pro-business majority in Congress." See FGCR, Attachment 1 at p. 1.

MUR 4624
General Counsel Report
Page 16

The Coalition reportedly formed in early April of 1996, several weeks after Rep. Boehner made his speech to the Chamber, and within the same time frame as Rep. Boehner's business donor speech on behalf of the NRCC. According to the documents produced, and the testimony of those instrumental to its formation, the Coalition had its first acknowledged meeting on April 24, 1996. See Attachment 13.

There was a dearth of documents related to the formation of the Coalition. In fact, there was just one memorandum announcing the meeting on April 24, 1996. As there was such a lack of documents, this Office asked many of the leaders under oath if they had discussed the idea of forming the Coalition at the Thursday Group or with Rep. Boehner. Despite the fact that the AFL-CIO ad campaign posed a serious threat to the Republican control of Congress, and to the goals of the Thursday Group and the "power five," most of the Coalition leaders denied or could not recall whether they ever discussed the AFL-CIO ads, responding to those ads, the Coalition or its activities. See Attachment 1 (Kranowitz Depo.) at pp. 11-13 ; Attachment 2 (Bruce Josten Depo) at p 2-3; Attachment 3 (Dirk Van Dongen Depo.) at pp.2-3. Mr. Van Dongen stated that there may have been a "mention" of the Coalition. Attachment 3 at p. 4.

The NFIB's Dan Danner, who was the only Coalition leader represented by separate counsel, testified that there was discussion of AFL-CIO ads at one or more Thursday Group meeting. See Attachment 5 (Dan Danner Depo.) at pp. 2-3. Mr. Danner testified that the ads were discussed due to their "serious impact" on legislative issues. *Id.* at p.3. Despite the serious concerns, Mr. Danner claimed that while he was present at Thursday Group meetings there was no discussion about how its members might respond to such ads, or that they were in fact doing so via the Coalition. *Id* . at p. 4.

MUR 4624
General Counsel Report
Page 17

The Coalition appeared to acknowledge in its response to the complaint that it was aware that Rep. Boehner was charged with mobilizing the business community, when, in responding to a story about Rep. Boehner, it stated: "The fact that leaders of the Republican Party both criticized the business community for its inactivity and urged the business community to respond to AFL-CIO allegations is not itself indicative of coordination." Coalition response to Complaint in MUR 4624, dated May 9, 1997. At his deposition, NAWD's Dirk Van Dongen acknowledged only that Rep. Boehner was one of the Republican leaders who had "expressed concern from time to time as to the impact of the AFL-CIO initiative." Attachment 3 at p. 14. Despite their close working relationship with Rep. Boehner, the Coalition leaders for the most part testified that they had no idea whether Rep. Boehner was involved in countering the union efforts. Attachment 1 at pp. 3-7; Attachment 2 at pp. 26-32; Attachment 3 at pp.13-14. Moreover, the Coalition leaders testified that neither Rep. Boehner nor any other Republican leader encouraged them to respond to the AFL-CIO efforts. Attachment 1 at p.8-8A; Attachment 2 at pp. 2, 3 and 29; Attachment 3 at p. 19.

At least some Members of Congress apparently believed Rep. Boehner had some role within his party regarding countering unions efforts and that he had some connection to the Coalition. Specifically, Rep. Boehner averred that certain House Members approached him in an attempt to get the Coalition to run ads in their districts. As Rep. Boehner stated in his sworn response:

> I do recall that on more than one occasion a candidate approached me asking me to have the coalition run ads for that individual. However, my actions were under a microscope in 1996 and I was unwilling to take any chances. Thus, my answer was always the same. Specifically, I told them: 1) I could not tell the Coalition where to run ads; 2) that I could not communicate with the Coalition, and 3) that they should not communicate with the Coalition either.

MUR 4624
General Counsel Report
Page 18

At this time, however, I do not recall who approached me or the dates upon which I was approached, but to the best of my recollection these were face to face communications which took place in passing. I have no documents which relate to these communications.

GCR, July 23, 1999 Attachment 1 at pp. 6-7.

### Structure of the Coalition

The Coalition eventually garnered over thirty organizations as members, called its "Executive Committee."[10] These organizations sought funds from their own members, businesses and individuals, and eventually raised approximately five million dollars. The Coalition conceded that such funds were from corporate sources. See FGCR at pp. 10-11. The stated purpose of the Coalition was:

> to counter the campaign of misinformation promulgated by the militant leadership of the AFL-CIO and its allies, which will spend $35 million in compulsory union dues to criticize those who stand for economic growth, job creation and individual opportunity, to set the record straight on the positions taken by pro-business members of Congress, and on the need to reduce the size, scope and cost of the federal government.

GCR, dated December 23, 1999, Attachment 1 at pp. 31-33.

While the Management Committee was the decision-making authority, it delegated decisions concerning where ads should air to the Site Selection Task Force. The Coalition also organized various "working groups" including: Communications, Fundraising, Opposition

---

[10] There were also private members of the Coalition. The Coalition refused to identify the private members. This Office obtained some of the names of those members from another respondent, and verified that they did not include any candidates or political committees.

MUR 4624
General Counsel Report
Page 19

Research, Grassroots and Recruitment. See GCR, dated December 23, 1999, Attachment 2 at pp.

49-60.

### Chamber's Bruce Josten Meets With "Freshman Class"

According to Mr. Josten's calendar, he met with the "Freshman Class" on Thursday, May

2, 1996. GCR, dated December 23, 1999, Attachment 1 at p. 72. This was shortly after the

Coalition was formed. As noted, it was the Freshman class that was the target of the AFL-CIO

ads. This meeting was, according to Mr. Josten's calendar, held shortly before a "Thursday

Group" meeting. The meeting was sponsored by the "NRCC." *Id.*

During his deposition, Mr. Josten stated that two freshmen Members, Rep. Dick Chrysler

and Rep. Helen Chenoweth, told him they were quite upset about the $35 million that the AFL-

CIO was going to use to unseat the Republican majority in Congress. In addition, Rep. Chrysler

felt that he didn't hear what he thought Mr. Josten had come there to say, in terms of countering

the union advertising campaign. Attachment 2 at pp.5-6. Rep. Chrysler suggested that given the

millions of businesses in this country, if you solicited a dollar from each one, you would have

ample funds to engage the unions on their issue campaign. Mr. Josten testified that he did not

respond to Rep. Chrysler's suggestion. Attachment 2 at p. 6. Mr. Josten could not recall what

Rep. Chenoweth said, but he remembered her "expressing some of the same dissatisfaction with

[his] remarks." *Id.* Mr. Josten testified that he could not remember more about what was said at

that meeting. Attachment 2 at pp. 4-7.

### Choosing the Coalition Consultants

The Coalition's Management Committee chose Chuck Greener to coordinate the selection

of consultants and vendors for the Coalition's efforts. Mr. Greener also advised the Coalition on

MUR 4624
General Counsel Report
Page 20

the use of its consultants and on other issues. See GCR, dated December 23, 1999, Attachment 2

at p. 63. Mr. Greener was not compensated for his consulting duties for the Coalition. At the

time, Mr. Greener was General Manager of Porter Novelli, a public relations firm. Greener had

recently left the RNC (in November of 1995), where he had served as Communications Director.

While at the RNC, Greener worked closely with Chairman Haley Barbour. Mr. Greener

remained in contact with Mr. Barbour after joining Porter Novelli. During 1996, Mr. Greener

received copies of what "were really Haley's [Mr. Barbour's] talking points." See Attachment 4

at p. 3. Mr. Greener would read over Mr. Barbour's talking points and give comments to

Barbour's subordinates. In June of 1996, Mr. Barbour issued "urgent" written appeal about the

AFL-CIO ads. See Attachment 15. Although that memo was produced by Mr. Greener in

response to the Commission's Subpoena, he could not recall if he reviewed that document.

Attachment 4 at pp. 7-8.

Mr. Greener also remained in contact with Ed Gillespie, the Communications Director

and Suzi De Francis, the Deputy Communications Director. Attachment 4 at pp. 2A-3. Mr.

Greener testified that he did not recall discussing the Coalition or AFL-CIO ads with Mr.

Barbour or the other RNC staff. *Id.* at p 4.

Mr. Greener also had a long-standing relationship with Rep. Boehner; he worked with

Rep. Boehner on his first campaign and subsequent campaigns, and socialized with him and his

family. Mr. Greener testified, however, that he did not recall speaking with Rep. Boehner about

the Coalition or AFL-CIO ads. Attachment 4 at p. 2.

Mr. Greener sent requests for proposals to several pollsters and media consultants for the

Coalition. The proposals contained statements such as: "Thank you for the opportunity to

MUR 4624
General Counsel Report
Page 21

present two [advertisements] to your campaign to re-elect a pro-business Congress;" "the first

major objective [of the Coalition's project] calls for an examination of the electorate's views

towards the nominees of the political parties;" and "the second major objective calls for the

determination of voter responses to specific media messages." See GCR, dated December 23,

1999, Attachment 1 at pp. 4-8 and 120-132.

After reviewing proposals and seeing presentations, the Coalition chose the Tarrance

Group and American Viewpoint as pollsters and National Media Inc. and Gannon McCarthy and

Mason as media consultants/time buyers.

By the time Tarrance was hired by the Coalition, it had already conducted focus groups

on the AFL-CIO ads for the RNC in March of 1996. In its undated, eight page "Research

Proposal," Tarrance informed the Coalition that it had "already conducted electronic focus group

testing of one of the AFL-CIO ads on behalf of the Republican National Committee." See GCR

dated December 23, 1999, Attachment 1 at p. 4. It appears that Tarrance provided the Coalition

with a copy of the RNC work product related to its testing of AFL-CIO ads, shortly after its

interview with the Coalition on May 17, 1996. Attachment 16.

The NRCC retained Tarrance in March of 1996, before it was retained by the Coalition.

GCR, dated December 23, 1999, Attachment 3 at p. 34. Tarrance continued providing services

to the NRCC through December of 1996. *Id.* Additionally, by the time that it was retained by

the Coalition, Tarrance had already provided services to three committees of candidates in whose

districts the Coalition would later run ads: Representatives Christensen, Cremeans and Seastrand.

After being hired by the Coalition, Tarrance went on to provide polling services to four other

committees of candidates in whose districts the Coalition aired ads: Representatives Cubin,

MUR 4624
General Counsel Report
Page 22

Ganske, Gutknecht and Nethercutt.[11]  AV had also provided survey research to the RNC and

NRCC at the time it was hired.

The media consultants NMI and GMM were also simultaneously retained by the party

committees or some of the candidates.  According to the NRCC, it hired NMI to undertake media

purchases and ad placement from September 24 through November 1, 1996.  See GCR, dated

December 23, 1999, Attachment 3 at p. 34.  NMI did not identify the NRCC as a client, however,

and at his deposition Alex Castellanos could not recall doing any work for the NRCC in 1996.

Attachment 6 (Alex Castellanos Depo.) at p.2.  NMI and GMM both provided services to the

RNC during 1996.  GMM also provided services to the campaigns of Representatives George

Nethercutt and Ed Whitfield, both candidates in districts in which the Coalition disseminated its

public communications.

### Testing the Coalition's Messages

Tarrance conducted a national survey for the Coalition from June 11-13, 1996.  Also in

June of 1996, Tarrance and AV conducted a series of focus groups in which ads were tested.  The

ads tested included Coalition ads, AFL-CIO ads, and an ad produced for the campaign of

Congressman Steve Chabot.[12]  The Coalition paid for focus groups to determine which clearly

identified federal candidates the participants would vote for, and even tested whether specific

---

[11]  Tarrance claimed that, pursuant to a "compartmentalization policy," Mr. Tringali was the only non-administrative Tarrance employee involved in the Coalition and that Dave Sackett and Ed Goeas were not involved.  But documents Tarrance and others produced contradict that claim.  See GCR, dated December 23, 1999, Attachment 4 at p. 13. Moreover, Mr. Tringali, who admittedly was the key Tarrance employee to work on the Coalition project, provided services directly to the campaigns of Representatives Cremeans, Ganske, and Gutknecht.

[12]  During depositions, the deponents could not tell this Office how the Coalition came to possess copies of Congressman Chabot's ad.  See Attachment 1 at pp. 14-14A; Attachment 2 at pp. 11-12; Attachment 3 at pp. 9-10; Attachment 6 at pp. 3-4; Attachment 8 at pp. 9-10.  The Congressman was one of those in whose districts the Coalition undertook its activities.

MUR 4624
General Counsel Report
Page 23

Coalition and AFL-CIO advertisements would make participants more or less likely to vote for such candidates. See GCR, dated December 23, 1999, Attachment 1 at pp. 18-26.

At the conclusion of those focus groups, Tarrance recommended to the Coalition that it run ads in two test markets: Des Moines, Iowa and Erie, Pennsylvania. To measure the effectiveness of the ads within the Congressional districts, Tarrance recommended that the Coalition conduct surveys before and after the ads were aired.

Tarrance's memo recommending testing of ads in the two districts was dated June 28, 1996. GCR, dated December 23, 1999, Attachment 1 at pp. 18-19. At that very time, Tarrance was retained by Rep. Ganske's re-election campaign and had just completed a survey for Congressman Ganske. That survey was dated June 27, 1996, just one day prior to when Tarrance made the recommendation. Attachment 17 at p. 1. Tarrance went on to conduct more research in Rep. Ganske's district in October of 1996 for the NRCC. *Id.* at p. 2. Brian Tringali, the Tarrance partner who was primarily responsible for providing services to the Coalition, was also responsible for the surveys conducted in Rep. Ganske's district.

Mr. Tringali stated that he did not remember sharing with the Coalition any information from his June 27th survey for Rep. Ganske. Attachment 8 (Brian Tringali Depo.) at pp. 2-2A. Mr. Tringali acknowledged that his prior work for Rep. Ganske "may have" influenced his recommendation that the Coalition air the test ads in Rep. Ganske's district. *Id.* at pp. 4-5. Mr. Tringali stated that he was worried about Ganske, who apparently was seriously ill at the time. *Id.* Another factor was the amount of money being spent in Rep. Ganske's district by the AFL-CIO. *Id.* at 3 and 5. When asked if anyone from the Ganske campaign requested that his district be used for testing ads, Mr. Tringali said "[m]y recollection is not." *Id.* at p. 6. When asked if

MUR 4624
General Counsel Report
Page 24

anybody from the Ganske campaign asked the Coalition to run ads in his district, Mr. Tringali

stated: " [n]ot to me directly, but honestly I think they probably wouldn't have asked me directly.

I mean I wouldn't be the person they would have asked. Attachment 8 at p. 7. When asked of if

anyone from the Ganske campaign suggested that he pass on such a request to run ads, Mr.

Tringali responded: "Not that I remember. It could have happened, but not that I remember.

And the odds are that I wouldn't pass that information along." *Id.* Mr. Tringali testified that he

communicated with the Ganske's campaign's general consultant John Maxwell regarding his

work for the Ganske campaign. *Id.* at pp. 12B-12C.

Apparently to mask this conflict, Tarrance recommended to the Coalition that AV

conduct the Coalition surveys in Congressman Ganske's district and that Tarrance conduct the

Coalition surveys in the other district. Yet one of the memoranda presenting the results of the

post-survey research for both districts indicates that it was from Mr. Tringali and Tarrance as

well as AV. Attachment 18. During his deposition, Mr. Tringali denied any involvement in the

joint memo. And although his name appears on the joint memo, he claimed that he did not recall

ever seeing it. Attachment 8 at pp. 7-8. As noted, Mr. Tringali went on to perform additional

surveys for the Ganske's campaign in the Fall of 1996. Information obtained from the Coalition

test ads in Ganske's district would undoubtedly be valuable to the Ganske campaign. Mr.

Tringali claimed not to remember whether Coalition test ads were even aired in Rep. Ganske's

district. Attachment 8 at pp. 8A-8B. Later in his deposition, Mr. Tringali recalled Coalition ads

and discussing them with Ganske campaign consultant John Maxwell. *Id.* at pp. 12B-12C.

MUR 4624
General Counsel Report
Page 25

As discussed above, the other district in which Tarrance recommended that the Coalition test its ads was Erie, Pennsylvania. GCR, dated December 23, 1999, Attachment 1 at p. 19. But this is not where the test ads were eventually aired. Instead, they were aired in Spokane, Washington, in the Congressional district of Rep. George Nethercutt.

Within the Chamber's document production was a facsimile, transmitted on June 26, 1996, that might explain the Coalition's decision about where to test their ads. Attachment 19. The facsimile contains a script of an AFL-CIO ad that was run in Congressman Nethercutt's district from June 27-July 10, 1996. Attachment 25. The top of the document indicates that it was sent by the "Conference Republica[n]" Attachment 19. This Office determined that the telephone number at the top of the document belonged to the House Republican Conference. Although it was a three page fax, only two pages were produced. The cover sheet, which would normally contain information such as the sender and the intended recipient and often other important information, was not produced. This Office requested that the Chamber search its files for the cover sheet, but the Chamber's attorneys stated that it produced all documents in its possession.[13]

Tarrance conducted its pre-ad survey in Rep. Nethercutt's district on July 9-10, 1996. AV conducted its pre-ad survey in Rep. Ganske's district on July 9-10, 1996. The Coalition aired television ads in the two Congressional districts from July 13 through July 22, 1996. Attachment 20. The Coalition ad entitled "Flag" aired in Rep. Nethercutt's district. The ad

---

[13] The script for the AFL-CIO's ad in Nethercutt's district was also included in an "Urgent" memorandum which the RNC/Haley Barbour wrote to "Republican Leaders." See Attachment 15 at page 5. The memo was dated June 28, 1996. According to the memo, Rep. Nethercutt's district was just one of numerous districts in which the AFL-CIO aired the ad. This memo was provided to the Commission by Mr. Greener. What appears to be a follow-up fax from the RNC regarding the AFL-CIO ad was found within the documents produced by the Chamber. Attachment 24.

MUR 4624
General Counsel Report
Page 26

entitled "Follow the Millions" was aired in Rep. Ganske's district. *Id.* The post-ad surveys were
conducted on July 22-23 (Ganske) and 23-24 (Nethercutt). The surveys focused on determining
which clearly identified federal candidates the participants would vote for in the upcoming
election. The post-ad surveys showed that Congressman Nethercutt's numbers improved, while
Congressman Ganske's declined. When shown copies of the surveys and how they focused on
the candidates' standings in the polls, the Chamber's Bruce Josten insisted that the ads were not
undertaken to aid candidates but to set the record straight on issues. Attachment 2 at 18-21.

### Discussion of Coalition's Public Communications

After running the advertisements in two test districts in July, 1996, the Coalition next
aired "Follow The Millions" in the D.C. media market for "inside the beltway" fundraising.
Attachment 20 at p. 1. This ad aired near the end of July, 1996. This ad apparently differed from
the ad of the same name which aired in Congressman Ganske's district. It was a "Washington
D.C. Version." In producing this ad, the Coalition used footage purchased from the RNC. The
RNC invoice indicates that NMI received "Union Package footage for Chuck Greener." GCR,
dated December 23, 1999, Attachment 1 at p. 27. And NMI's invoice indicates that the footage
was used for the Coalition's inside the beltway ad. The RNC footage cost the Coalition $500.

During his deposition, Alex Castellanos of NMI testified that the invoice referred to
union demonstration footage that was obtained from the RNC. According to Mr. Castellanos, the
RNC was not the only place where NMI could have obtained the union demonstration footage.
Attachment 6 (Castellanos Depo.) at pp. 10-11.

The Coalition began its broader advertising campaign in the weeks leading up to the
November 1996 elections. The Coalition's ad campaign began in early September, 1996, and

MUR 4624
General Counsel Report
Page 27

aired through November 4, 1996. See GCR, dated December 23, 1999, Attachment 1 at pp. 91-98. The advertisements aired in approximately 41 Congressional districts in eight increments (excluding the test ads). See Attachment 20, see also FGCR at p. 11 and Attachment 8.

The Coalition ran the ad entitled "Flag" in various Congressional districts throughout the Fall campaign. It did not run the ad entitled "Follow the Millions" in those districts. Instead, it developed new ads: "8MM," "The Truth," and "Congratulations." Copies of the scripts are attached. Attachment 21.

Alan Kranowitz, the chairman of the Coalition's Site Selection Task Force, acknowledged that the Coalition focused its expenditures on "competitive seats" in order to ensure that organized labor did not control the agenda in Congress. Attachment 1 at pp. 30-38. And the Coalition did not run ads in a district in which the candidate could not win. Id. at pp. 34-35.

The Coalition also undertook a direct mail campaign. See GCR, dated December 23, 1999, Attachment 1 at p. 31, 104-111. In its "Report of Accomplishments," the Coalition acknowledged that it mailed nearly two million "report cards" on candidates "ten days before the election, just when many undecided voters were in their decision-making process," and appears to take credit for the successful re-election of members of Congress "defended by Coalition advertising." GCR, dated December 23, 1999, Attachment 1 at p. 31. The two million "report cards" were mailed to 44 Congressional districts.

### Screening the Ads for Rep. Boehner and the Thursday Group

The investigation uncovered that Coalition leader Dirk Van Dongen (NAWD) personally delivered to Rep. Boehner the Coalition's initial television ads for the two test districts.

MUR 4624
General Counsel Report
Page 28

Attachment 1 at p. 15. Mr. Van Dongen also screened the ads for Rep. Boehner. Attachment 3

at p. 11. This was just one day prior to when the ads were aired in the Congressional districts of

Reps. Greg Ganske and George Nethercutt. It was also shortly after Tarrance and AV conducted

surveys within those districts to test, among other things, who those surveyed intended to vote for

in the November elections. Mr. Van Dongen's calendar indicates that his meeting with Rep.

Boehner was to take place shortly before a Coalition Management Committee meeting on Friday

July 12, 1996. GCR, dated December 23, 1999, Attachment 1 at p. 56. In his signed statement,

Mr. Van Dongen stated that he played the two ads for Rep. Boehner to "refute the stories and

assumptions that the business community had conceded the battle of issues and messages to

labor." GCR, dated June 9, 2000, Attachment 2 at p. 25. Though he showed Rep. Boehner these

two Coalition test ads designed to counter the AFL-CIO's ads, Mr. Van Dongen claimed he "did

not discuss the contents of the ads or where (or whether) these or any other ads would ever be run

again." *Id.* When asked why he chose to show the ads to Rep. Boehner, Mr. Van Dongen stated:

> Congressman Boehner is a friend. Congressman Boehner had
> responsibility in some sense for dialogue and outreach to the
> business community. Congressman Boehner, among others, had
> expressed concern about the AFL-CIO initiative.

Attachment 3 at p. 12. Mr. Van Dongen stated that he believed it was acceptable to show the ads

once they were made public.

The Coalition ads were also shown at a Thursday Group meeting held on either July 18 or

25, 1996. See GCR, dated June 9, 2000, Attachment 2 at pp. 13 and 15. Mr. Van Dongen

introduced the ads. Mr. Josten played the tape. Those in attendance included Rep. Boehner, and

his aides Barry Jackson and Joyce Gates. The RNC's Don Fierce was also present.

Approximately ten to fifteen Thursday Group regulars attended the meeting. *Id.* According to

MUR 4624
General Counsel Report
Page 29

the Chamber's Lonnie Taylor, the attendees laughed about the way in which one ad portrayed the AFL-CIO's John Sweeney. *Id.* at 15. Those in attendance also congratulated the Coalition representatives for "finally countering labor's message." *Id.* The Chamber's Lonnie Taylor claims that the attendees discussed the ads only for a couple of minutes. *Id.* Messrs. Josten and Taylor assert that they did not discuss the Coalition's future plans. *Id.* at pp. 13-15.

During his deposition, Mr. Josten stated that he did not believe there was any discussion after the tape was played, though there may have been "some comments or chortles or chuckles." Attachment 2 at p. 16. He did not remember the comments that were made. Mr. Josten claims that he instructed everyone present that "there is not going to be a discussion of our activities." *Id.* He also stated that he believed that it was acceptable to show the ads once they had been made public.

Rep. Boehner's sworn response does not disclose that he had privately screened the Coalition ads on these two occasions. He averred that to the best of his personal recollection he had no communications at all with Bruce Josten or Dirk Van Dongen regarding advertisements paid for or authorized by the Coalition that referenced or related to any Member of Congress who ran for election in 1996. See GCR, July 23, 1999, Attachment 1.

As discussed above, Barry Jackson was reportedly at the Thursday Group meeting at which the Coalition ads were screened in July of 1998. Messrs. Josten, Van Dongen and others were also present. After the court ordered Mr. Jackson to respond to the Commission's Subpoena, he stated that he could not recall any "specific conversations" about Coalition ads with Bruce Josten, Dirk Van Dongen or other specifically identified members of the Coalition Management Committee. Attachment 22. He stated, however, that he believed that he

MUR 4624
General Counsel Report
Page 30

"sometimes received copies of advertising sponsored by the coalition after the advertising had appeared publicly." *Id*. at p. 2.

### Copies of Coalition Ads Provided to Republican Leaders and Candidates

The Coalition's Alan Kranowitz and Dirk Van Dongen acknowledged sending tapes of the Coalition ads to the House Republican Conference. According to Mr. Kranowitz, the Coalition's Management Committee decided that the House Republican Conference should have "copies of all the tapes" of Coalition ads. Attachment 1 at p. 17. The tapes were sent to Rep. Boehner's assistant Joyce Gates. Mr. Kranowitz claimed that the only discussion he had with Ms. Gates relating to the Coalition ads was when he called to ask her where she would like him to send the tapes. *Id*. at pp. 19-20. Mr. Kranowitz claims he did not send any correspondence with the tapes, only his business card. *Id* at p. 22.

The Coalition sent these tapes after each wave of ads went on the air with the understanding that Ms. Gates would provide them to the individual members in whose districts the Coalition ran its ads. Attachment 1 at pp. 17-21, 23-25.[14] The Coalition aired ads favoring 37 candidates in seven waves of ads. As some ads were aired more then one time in a candidate's district, up to 42 tapes were sent to the Republican Conference and then given to the individual House Members. Mr. Kranowitz testified that the Coalition; Management Committee sent the tapes to "show the Republican Members of the House that we were, indeed, doing something, after the fact." Attachment 1 at p. 25.

---

[14] Mr. Kranowitz initially stated that the tapes were for the Republican Conference. Attachment 1 at pp. 17-18. But upon further questioning, Mr. Kranowitz revealed that the tapes were sent to Ms. Gates at the Republican Conference with the understanding that she would disseminate them to each House member who was on a tape. *Id*. at pp. 24-25. Mr. Kranowitz also initially contended that he did not order extra copies of the tapes to pass on to the House members; but later he admitted that when he requested copies of the tapes for each wave of ads, he intended to send one set of the tapes to Ms. Gates. *Id*. at pp. 39-42.

MUR 4624
General Counsel Report
Page 31

Mr. Kranowitz claimed that the tapes were sent out only after the ads were publicly released. This Office requested copies of the invoices for the courier services used to deliver these tapes. Such courier invoices would, among other things, aid in confirming where and how many tapes of the ads were sent and whether they were actually sent after they were made public. NAWD's attorney, however, asserts that NAWD does not have such records.

During his deposition, Mr. Kranowitz offered an explanation of why the Coalition provided the tapes to Ms. Gates:

> Mr. Boehner had been under attack from Republican Members of Congress, as the media reported, for not getting his so-called allies in the business community to respond to the AFL-CIO. Mr. Boehner had no knowledge of what it was that his allies in the business community were doing. So after the fact we sent up the ads so he could, indeed, see what his allies in the business community were doing about which he knew nothing beforehand.

Attachment 1 at pp. 18-19.

As Mr. Kranowitz claimed that he did not know whether Rep. Boehner had any role in responding to the union threat, this Office asked Mr. Kranowitz why the Coalition tapes were sent to Rep. Boehner's offices.[15] Mr. Kranowitz claimed that they were sent to him in his capacity as Republican Conference chair, whose duty it was to disseminate information "meant for the membership as a whole." Attachment 1 at p. 28. Mr. Kranowitz could not explain why the tapes were not sent to Messrs. Paxon or Barbour, chairman of the NRCC and RNC respectively. *Id.*

---

[15] When shown copies of news articles reporting that Rep. Boehner had a role in responding to the union threat and enlisting assistance from the business community, Mr. Kranowitz stated that he did not know whether such reports were accurate. Attachment 1 at pp. 2-5.

MUR 4624
General Counsel Report
Page 32

According to Mr. Van Dongen, the purpose of sending tapes of the later ads to Ms. Gates was to inform Rep. Boehner about the Coalition's activities. Attachment 3 at pp. 15-16. Mr. Van Dongen did not recall ever speaking with Ms. Gates about the tapes, and believed that the Coalition initiated the process of sending the tapes on its own and without any request by her. *Id.* at p. 17.

Mr. Van Dongen also provided tapes of the Coalition ads to then RNC Political Director, Curt Anderson. He gave the tapes to Mr. Anderson either on July 22 (at the Capital Hill Club) or September 9, 1996 (at the RNC). Mr. Van Dongen claims that he only discussed past Coalition activities and provided the tapes in response to criticism about the business community doing nothing to respond to the AFL-CIO. See GCR, dated June 9, 2000, Attachment 2 at p. 25; Attachment 3 at pp. 5-7.[16]

### Unidentified Packages Sent to Sen. Coverdell and Carl Parks

The late Senator Paul Coverdell and his aide, Carl Parks, were regular attendees at Thursday Group Meetings. NMI sent packages referenced "Coalition" to "Paul Coverdell" at his Senate office on August 27 and September 13, 1996. See GCR, dated December 23, 1999, Attachment 1 at pp. 49-50. The Coalition appears to have been invoiced for at least one of the deliveries made to Carl Parks at Senator Coverdell's office. *Id.* at Attachment 1 at pp. 52-53. A package delivered to Carl Parks' residence referenced "Coalition" but, according to hand-written notes, appears to have been charged to "RNC." *Id.* Attachment 1 at p. 48. Those deposed could

---

[16] Probably because the Coalition tapes were apparently disseminated to House offices of the candidates and not to their campaign committees, none of the nine candidate committees which received Commission subpoenas and orders produced copies of the Coalition tapes, or indicated that they had received copies of such tapes.

MUR 4624
General Counsel Report
Page 33

not provide any information about what was in the packages. See Attachment 6 at pp. 8-9;

Attachment 4 at pp. 5-6.

### Pre-Election Meetings

Days before election day November 5, 1996, there were meetings between Coalition

representatives and staff of 13 of the members of Congress in whose districts the Coalition ran

ads and sent direct mail. According to the memoranda produced by the respondents, the subject

of these meetings was the Coalition's activities. See GCR dated December 23, 1999, Attachment

1 at pp. 1-3. The candidates were Steve Chabot, Saxby Chambliss, Helen Chenoweth, Tom

Coburn, John Ensign, John Fox, David Funderbunk, Greg Ganske, J.D. Hayworth, John

Hostettler, George Nethercutt, Rick White and Ed Whitfield. See GCR, dated December 23,

1999, Attachment 1 at pp. 1-3. The meetings with staff were scheduled for October 30 through

November 4, 1996, and appear to have been held at the Congressional offices of the various

members, all of whom were candidates for re-election.

Notes from the Coalition's Fred Nichols, apparently recorded during the meetings,

suggest that the content of the meetings included discussion about the effectiveness of spending

by the Coalition. See GCR, December 23, 1999, Attachment 1 at pp. 82, 86, and 88. During his

deposition, Mr. Nichols stated that someone from the Coalition would explain what the Coalition

was, what it has been doing and, specifically, what it had been doing in the Congressman's

district to counter the AFL-CIO. Attachment 7 (F. Nichols Depo.) at pp. 12-48. In addition, the

Coalition representatives tried to show the ads to the Congressman's aide. The Coalition's

representatives would also listen to the aide's remarks regarding the AFL-CIO's ad campaign and

the Coalition's response. *Id.*

MUR 4624
General Counsel Report
Page 34

This Office informally interviewed some of the Congressional staff whose names appeared on the Coalition memoranda. Of the nine persons interviewed, only one acknowledged attending such a meeting. The others denied or could not recall attending such a meeting. The person who recalled attending the meeting, Chris Cox, was then employed by Rep. Saxby Chambliss. Mr. Cox explained that the meeting was probably a Coalition update. Attachment 23 at p. 5. He believed that the Coalition representatives present probably informed him of a mailing that they had disseminated in Rep. Chambliss' district. *Id*. In his 1996 calendar, Mr. Cox found an entry that read "50,000 househo.(sic)....2/3 to 3/4.. all voting households." *Id*. at p. 8. Mr. Cox also stated that he would not be surprised if other meetings occurred, probably in June of 1996. Attachment 23 at p. 4. He thought that the Coalition may have pitched themselves saying "You could get killed by the unions" and "We think this is about specific races." *Id*. Mr. Cox believed that the Coalition was trying to get credit for their fight.

### Other Meetings

Mr. Van Dongen's calendar indicates that he met several times with Senator Coverdell, including on October 15, 1996 regarding "the Bus. Coalition" GCR, dated December 23, 1999, Attachment 1 at p. 57. Mr. Van Dongen, however, cannot recall whether he ever discussed the AFL-CIO ad campaign or the Coalition's activities with Senator Coverdell. Attachment 3 at p. 18. Mr. Van Dongen acknowledged discussing the Coalition with Scott Reed, who was then managing Bob Dole's Presidential campaign. *Id*. at p. 8.

The calendars of Coalition leaders indicate that numerous times between May and October, 1996, the Coalition met the same day as a scheduled Thursday Group meeting, or the day after. Coalition meetings were reportedly held on the following Thursdays in 1996: May 9,

MUR 4624
General Counsel Report
Page 35

23, and 30; June 6, 13, and 20; July 11 and 18; August 1 and 29; and, Sept. 5 and 19. GCR,

dated December 23, 1999, Attachment 1 at pp. 59-78. Coalition meetings were also held on

Friday, May 3 and Friday, June 14. *Id.* at 72 and 75.

## VI.    ANALYSIS

To determine whether the Coalition's expenditures constituted a corporate contribution,

we first examine whether they were for the purpose of influencing a federal election and then

whether they were coordinated.[17]

### Purpose of the Coalition's Communications

The facts set out above establish that the Coalition's communications were undertaken for

the purpose of influencing federal elections, e.g., the Coalition's requests for proposal and

responses center on how to aid candidates, they aired ads in the weeks just prior to election that

named clearly identified candidates, they dropped direct mail "ten days before the election, just

when many undecided voters were in their decision-making process," and the Coalition took

credit for the successful reelection of members of Congress "defended by Coalition advertising."

See GCR, dated December 23, 1999, Attachment 1 at pp. 4-8, 31, 104-111, 120-132.

The testimony of Alan Kranowitz, the Coalition's Site Selection Committee Chairman,

further indicates that the Coalition's ads had a federal election-influencing purpose. Kranowitz

stated that the Coalition focused its expenditures on "competitive seats" in order to ensure that

organized labor did not control the agenda in Congress. Attachment 1 at p. 37. Mr. Kranowitz

also agreed that to ensure the Coalition's mission of preventing organized labor from controlling

---

[17] There is no indication that any of the Coalition's ads or other communications contained express advocacy. See
GCR, dated December 23, 1999, at p. 9. But express advocacy is not required for a finding of coordination. *See
Christian Coalition,* 52 F. Supp.2d at 87-89.

MUR 4624
General Counsel Report
Page 36

Congress, a Republican majority had to be re-elected to the House, because there were "more pro-business Members of the Republican majority." *Id* at 38. While Mr. Kranowitz's testimony on this issue was credible, Mr. Josten's was not. Although the Coalition's surveys explicitly measured whether Coalition ads positively or negatively affected the candidates' chances of re-election, Mr. Josten insisted that was not significant to the Coalition's goals. Attachment 2 at pp. 19-23. In fact, Mr. Josten testified that the Coalition was not hoping its ads would have a positive impact on a candidate's re-election chances. *Id.* at p. 23.

### Evidence of Coordination

The facts gathered through this investigation show that from the inception of the Coalition through November of 1996, there was a pattern of communications and interactions between the Coalition's leaders and Rep. Boehner, the Republican Conference, Congressional candidates, and the RNC. Apparently under pressure from Republican leaders and candidates to respond to the AFL-CIO's 35 million dollar ad campaign, the business community pooled their resources and formed the Coalition. Once the Coalition's ad campaign was underway, it promptly reported its efforts to the Republican leaders and to the benefiting candidates, and later updated staff of House members in whose districts the Coalition disseminated its public communications. The Coalition's efforts appear to be the result of the business community's attempt to keep secure their relationship with the office holders, presumably for continued legislative access. *See Buckley v. Valeo*, 424 U.S. 1 at 26-27. The pattern of communications suggests that there was a "general or specific understanding" between the parties about the

MUR 4624
General Counsel Report
Page 37

Coalition's activities.[18]  *Colorado Republican Campaign Committee v. FEC*, 116 S. Ct. 2309

(1996).

Under the Commission regulations in effect at the time of the activity at issue, there

might well be coordination in this matter, due to both the information provided by the

Republican leaders to the Coalition and its leaders "with a view towards having an expenditure

made" and due to the overlapping consultant relationships.  *See* 11 C.F.R. § 109.1(b)(i)(A) and

(B).  As discussed below, however, under the present state of the law the result is different.

A.  <u>Coalition Expenditures Made at the Request or Suggestion of Party Leaders</u>

The *Christian Coalition* test and the Commission-approved regulation provide that

coordination occurs if expenditures are made at the request or suggestion of the candidate or

candidate's agent.  See *Christian Coalition*, 52 F. Supp.2d at 91; 11 C.F.R.

§ 100.23(c)(2)(i).  See fn. 8, *supra*.  The "request or suggestion" language is derived from

2 U.S.C. § 431(17).

The investigation has developed strong circumstantial evidence that the Coalition was

formed "at the request or suggestion" of Rep. Boehner and other party leaders.  Prior to the

formation of the Coalition, Rep. Boehner spoke at the Chamber, warning the business

community that the AFL-CIO was attempting to take over Congress and the White House in

1996.  The speech at the Chamber was just prior to the formation of the Coalition.  The following

---

[18]  Rep. Boehner appears to have been acting on behalf of the Congressional candidates in whose districts the Coalition disseminated its communications.  At the outset of this investigation, this Office examined whether Rep. Boehner may have been acting as an agent of the NRCC.  See FGCR. p. 38.  However, the evidence at hand suggests that he may have been acting directly for the candidates involved, rather than through the NRCC.  For instance, Boehner was approached by candidates who requested that he arrange for Coalition ads to air in their districts.  And Rep. Boehner's Republican Conference apparently provided to House candidates copies of Coalition ads that were obtained from the Coalition.

MUR 4624
General Counsel Report
Page 38

month, Rep. Boehner made another speech about the unions and the 1996 elections at an NRCC

event, that was apparently attended by several Coalition members and candidates in whose

districts the Coalition aired its ads. There is evidence that House members believed that Rep.

Boehner had some role in, or connection with, the Coalition; they approached him and requested

that he have the Coalition air ads in their districts. And the five founding members of the

Coalition met with Rep. Boehner weekly.

Further indication that the Coalition was formed at the request of Rep. Boehner and party

leaders, on behalf of Republican candidates, is evidenced by the Coalition's reporting its efforts

to Rep. Boehner and other Republican leaders throughout the 1996 election cycle. In May, a

leader of the Coalition, Bruce Josten, spoke to candidates who were under attack by AFL-CIO

ads, and listened to their concerns. When the Coalition developed its test ads, it screened them

and provided them to Rep. Boehner. The Coalition then arranged to have seven full sets of

between three and nine tapes sent to Rep. Boehner's Republican Conference, with the

understanding that his office would disseminate them to the 37 individual candidates. Days prior

to the election, Coalition representatives met with staff of 13 Congressman who were under

attack by the AFL-CIO. The purpose of these meetings was for the Coalition to remind the

House members that it had made expenditures to defend their campaigns.

The assertions by Messrs. Josten, Kranowitz and Van Dongen that they were unaware

that Rep. Boehner played any role within his party as far as responding to the AFL-CIO ads are

difficult to accept, and raise doubts about their credibility. These persons met with Rep. Boehner

weekly from the outset of the AFL-CIO ad campaign, the inception of the Coalition and while

both the AFL-CIO and the Coalition were airing their ads. Many of these persons were present

MUR 4624
General Counsel Report
Page 39

when Rep. Boehner gave his motivational speech at the Chamber about the AFL-CIO ad

campaign and the upcoming 1996 elections. And if these Coalition leaders were unaware of Rep.

Boehner's unofficial role as the motivator for the business community, it is unclear why they

twice screened their ads for him and thereafter provided his House Republican Conference office

copies of ads for each of the candidates in whose districts the Coalition disseminated its

communications—presumably including those candidates who requested that Rep. Boehner have

the Coalition run ads on their behalf.[19]

Despite their many acknowledged contacts with Rep. Boehner and other party leaders

about the Coalition, and their weekly meetings with Rep. Boehner, the deponents denied that he

urged, requested or suggested that the power five form the Coalition. They also denied that any

other Republican party leader urged the formation of the Coalition. Though aspects of the

testimonies raise doubts, these deponents provided no specific affirmative evidence that Rep.

Boehner or other party leaders or candidates requested the formation of the Coalition.

Even if there is a basis, based upon circumstantial evidence, to conclude that the

Coalition was formed, and its public communications were created and aired, at the suggestion of

Rep. Boehner and party leaders, this would not appear to amount to coordination under the

Commission-approved regulations. The Explanation and Justification suggests that not only

must there be a request or suggestion, but that it should indicate "that a communication with a

---

[19] Although at one point Mr. Kranowitz denied any knowledge that Rep. Boehner played any role within his party in
connection with responding to the union threat, he later acknowledged seeing news articles indicating that Rep.
Boehner was "under attack" from members of his party for not "getting his allies in the business community to
respond to the AFL-CIO." Attachment 1 at pp. 3-5, 18-19. Indeed, Mr. Kranowitz claimed to have sent the
Coalition tapes to Rep. Boehner's Conference office to correct the record. *Id.* at pp. 24.

MUR 4624
General Counsel Report
Page 40

specified content would be valuable to a candidate or committee." *See* 65 Fed. Reg. 76143.[20]

With two possible exceptions discussed below at pp. 44-45, there is insufficient evidence that

Rep. Boehner, any other party representative, candidate or their agent, made a request or

suggestion regarding a specific expenditure.

### B. Evidence of Substantial Negotiation or Discussion

The *Christian Coalition* test and Commission-approved regulation also provide that a

general public political communication or an expressive expenditure becomes "'coordinated;'

where the candidate or her agents can exercise control over, or where there has been substantial

discussion or negotiation between the campaign and the spender over" the content, timing,

location or volume of a communication. *Christian Coalition*, 52 F. Supp.2d at 92; 11 C.F.R.

100.23(c)(2).

The Coalition leaders interacted regularly with Rep. Boehner, other Republican leaders,

candidates and their agents. An open line of communication existed from the inception of the

Coalition up to shortly before election day. Representatives of the Coalition's Management met

weekly with Rep. Boehner. From that weekly meetings emerged five of the business

organizations that founded the Coalition. The Coalition's Bruce Josten met in May with some of

the candidates in whose districts the Coalition ads would air, getting feedback on the AFL-CIO

ads and general suggestions. In May and June, the Coalition retained consultants who had

worked on AFL-CIO issues for the Republican party campaign committees; and consultants who

---

[20] Rep. Boehner's speech at the Chamber warning of the AFL-CIO's agenda to take back Congress does not alone amount to a request or suggestion. The legislative history of Section 431(17) makes clear that a reference in a speech urging the defeat of an opponent should not be viewed as a "suggestion" for purposes of 2 U.S.C. § 431(17). See H. Rep. No. 917, 94th Cong. 2d Sess. 5 (1976). Moreover, the content of Rep. Boehner's speech would not amount to a request or suggestion under the Commission-approved regulation at 11 C.F.R. § 100.23.

MUR 4624
General Counsel Report
Page 41

simultaneously worked for the Coalition, Republican party campaign committees and candidates

in whose districts the Coalition aired its ads. In June, Rep. Boehner's House Republican

Conference provided one of the Coalition founders with a script of the ads airing in Rep.

Nethercutt's district.

In July, pollster Brian Tringali, retained by both Congressman Ganske's committee and

the Coalition, recommended Rep. Ganske's district be a test market for Coalition surveys and ads

days after conducting a survey for that candidate. In July, the Coalition purchased footage from

the RNC for one of the first Coalition television ads and sent packages with unknown materials

to Senator Coverdell and his aide (both Thursday Group attendees). Also in July, the Coalition

screened its test ads for Rep. Boehner and provided them to him, the Coalition's Dirk Van

Dongen provided tapes of test ads to the RNC's Curt Anderson, and the Coalition provided

copies of ads to Rep. Boehner's House Republican Conference for each of the candidates in

whose districts the Coalition aired its ads. And just prior to election day, the Coalition's leaders

met with staff of House members in whose districts it aired ads to discuss the Coalition and its

efforts.

The deponents denied discussing the Coalition with Rep. Boehner or other party leaders.

One deponent, Dirk Van Dongen, asserted that the Coalition may have been "mentioned" at a

Thursday Group meeting. For the most part, those deposed denied or could not recall even

discussing the AFL-CIO ad campaign at the Thursday Group meetings. Only one deponent, Dan

Danner, who was represented by separate counsel from all of the other Coalition representatives,

acknowledged that the AFL-CIO ad campaign was discussed at a Thursday Group meeting.

Those who formed the Coalition worked closely with Rep. Boehner on a weekly basis through

MUR 4624
General Counsel Report
Page 42

the Thursday Group. The AFL-CIO ad campaign jeopardized the entire agenda of the Thursday Group. It also jeopardized Rep. Boehner's position as Chair of the Republican Conference. Given the long-standing relationship between these Thursday Group members, their common interest, the extent of their efforts, and the fierce battle that was then being fought, it is highly probable that the discussion was more substantial than the deponents have remembered or admitted.

Discussion of test ads permits an opportunity for significant input on content, location or timing of future ads. The ads screened for Rep. Boehner and the Thursday Group tested messages used in the subsequent waves of ads that aired from September through election day. After reviewing the test ads, Rep. Boehner's office received complete sets of each wave of Coalition ads aired in each candidate's district. As the Coalition created new ads after the test ads were aired, some of the tapes that the Coalition sent to Rep. Boehner's office in September and October were different. In light of the circumstances, and the lack of credibility and inconsistencies in portions of the deponents' testimonies, it is difficult to accept that no one discussed the Coalition's ads, either at subsequent Thursday Group meetings or in some other forum.

The foregoing facts provide circumstantial evidence that the Coalition was in some ways a "joint venture" between the trade association members and Rep. Boehner and Republican party leaders. But the *Christian Coalition* decision and the Commission-approved regulation require that there be coordination, or a joint venture, with respect to "the expressive expenditure" or "general public political communication." *Christian Coalition,* 52 F. Supp at p. 92; 11 C.F.R. § 100.23(c). This requires substantial discussion or negotiation over an expressive

MUR 4624
General Counsel Report
Page 43

communication's content, timing, location, volume, etc. The deponents denied such discussions.

And while some documents are missing, i.e., fax cover sheets, and much of the testimony is less

then credible, the documents produced do not disclose evidence of coordination that meets the

test. Given our prior deposition experience in this matter, it is highly unlikely that obtaining

further testimony at this time from other key players, e.g., Rep. Boehner, or his former staff Joyce

Gates and Barry Jackson, will yield anything further. Accordingly, this Office does not

recommend further investigation on these issues.[21]

## C. Two Test Districts

The facts surrounding where the Coalition aired its test ads offer the strongest indication

of a violation. Tarrance's Brian Tringali acknowledged that the results of the June 1996 survey

that he conducted on behalf of Rep. Ganske's campaign influenced his decision just days later to

recommend that the Coalition conduct surveys and air test ads in that district. Mr. Tringali was

unsure whether anyone from the Ganske campaign suggested to him that the Coalition test or air

ads in Ganske's district. Attachment 8 at pp. 6-8. It is also unclear whether Mr. Tringali passed

on to the Ganske campaign or its agents any information that he may have received about the

Coalition surveys that AV conducted in Rep. Ganske's district in July. As discussed above, the

---

[21] Although the Coalition was greatly outspent by the AFL-CIO, they nonetheless contributed $85,000 to an entity
known as "Citizens for Life, Liberty and Property." Attachment 26 (Coalition Treasurer's Report and checks).
According to the Chamber's Bruce Josten, who issued the two checks totaling $85,000, the Reverend
Louis P. Sheldon (president of the Traditional Values Coalition) asked him for some financial support for travel and
to produce "information flyers" for distribution to members of his churches across the country. Attachment 27 at p.
1. Mr. Josten testified that he did not know whether the flyers complied with federal election law. *Id.* at pp. 1-2. It
is unclear whether the flyers expressly advocated the election or defeat of any clearly identified federal candidates.
If so, they should have contained a disclaimer indicating that they were paid for by the Coalition. *See* 2 U.S.C. §
441d(a) and 11 CFR § 110.11. Given that this information only recently came to light (now almost five years since
the checks were issued) and that these expenditures amounted to only two percent (2%) of the Coalition's total
expenditures, this Office recommends that the Commission exercise its prosecutorial discretion and not pursue this
issue.

MUR 4624
General Counsel Report
Page 44

names of Tarrance and Mr. Tringali appeared on an AV memo that discussed the survey results

in Rep. Ganske's district. Attachment 18.

Mr. Tringali did not appear to have decision-making authority in either the Coalition or

the Ganske campaign. *See Christian Coalition*, 52 F. Supp. 2d at pp. 96-97. Yet it is not clear

whether he was involved in "discussion or negotiation" regarding the specific expenditures, see

*Christian Coalition* 52 F. Supp 2d at pp.96-97, or had passed information about non-expressive

information expenditures, i.e., survey information, to either the Coalition or the Ganske

campaign. To investigate this activity further, it would be necessary to depose Ganske campaign

consultant John Maxwell, and perhaps members of the Ganske campaign staff.

Regarding the Coalition's other test district, although Tarrance recommended that the

Coalition ads be tested in Erie Pennsylvania, the Coalition chose the district of George Nethercutt

(Spokane, Washington). That decision was made shortly after the Coalition received a fax from

Rep. Boehner's House Republican Conference containing a script for an AFL-CIO ad airing in

Rep. Nethercutt's district. Thus, Rep. Boehner's House Republican Conference may have made

a "suggestion" about where the Coalition should air its test ad. To investigate this activity, this

Office would recommend deposing persons associated with the House Republican Conference,

i.e., Rep. Boehner, Barry Jackson and Joyce Gates, and the Coalition consultant involved in

creating the ad, Larry McCarthy.

Although this Office might ordinarily recommend further investigation of these two fact

patterns, in light of the statute of limitations and the proportionally small amount at issue, this

Office recommends that the Commission exercise its prosecutorial discretion and decide not to

MUR 4624
General Counsel Report
Page 45

pursue this further.  Accordingly, this Office recommends that the Commission take no further

action against the respondents, and close the file.[22]

## VII    RECOMENDATIONS

1.   Take no further action against and close the file as to:

   a)   the Coalition
   b)   Bruce Josten
   c)   United States Chamber of Commerce
   d)   Associated Builders and Contractors
   e)   National Federation of Independent Business
   f)   Associated General Contractors of America
   g)   National Restaurant Association
   h)   Business Leadership Council
   i)   National Association of Manufacturers
   j)   Environmental Industry Associations
   k)   National Association of Wholesaler-Distributors
   l)   Food Distributors International
   m)  Americans for Tax Reform
   n)   International Franchise Association
   o)   Citizens for a Sound Economy
   p)   International Mass Retail Association, Inc.
   q)   American Bakers Association
   r)   National Association of Convenience Stores
   s)   American Furniture Manufacturers Association
   t)   National Association of Independent Insurers
   u)   The American Insurance Association
   v)   National Council of Chain Restaurants
   w)   American Petroleum Institute
   x)   National Paper Trade Association
   y)   American Trucking Associations, Inc.
   z)   Association for Suppliers of Printing and Publishing Technologies
         f/k/a National Printing Equipment and Supply Association
   aa)  American Wholesale Marketers Association
   bb)  National Retail Federation, Inc.
   cc)  National Roofing Contractors Association
   dd)  Printing Industries of America, Inc./Master Printers of America.

---

[22] Two of the candidate campaign committees which the Commission never pursued, Friends of Jim Bunn and Longley for Congress '96, were inadvertently terminated in 2000.  As this Office now recommends closing the file as to them, this Office advised the Reports Analysis Division not to request that such committees begin filing reports again until this matter is closed.

MUR 4624
General Counsel Report
Page 46

    ee)  National Republican Congressional Committee
    ff)  Donna Anderson, as treasurer
    gg)  Jon Christensen for Congress Committee and Gene Garrelts, as treasurer
    hh)  Cubin for Congress and Richard Bratton, Sr. as treasurer
    ii)  Cremeans for Congress and Steven B. Chapman, as treasurer
    jj)  Gutknecht for US Congress Committee and Dr. David Byer, as treasurer
    kk)  Nethercutt for Congress '96 Lowell V. Ruen, as treasurer
    ll)  Seastrand '96 and Betty Presley, as treasurer
    mm)  Randy Tate for Congress Committee and Kevin Shannon, as treasurer

2. Close the file as to:

    a)  Bass Victory '98 Committee and Alexander Bass, as treasurer
    b)  Van Hilleary for Congress and Bob Nichols, as treasurer
    c)  Peter Blute for Congress and Susan Copeland, as treasurer
    d)  Friends of John Hostettler and Timothy R. Deisher, as treasurer
    e)  Friends of Jim Bunn and Jim Hall, as treasurer
    f)  Longley for Congress' 96 and Richard R. Gosselin, as treasurer
    g)  Steven J. Chabot for Congress and Donald B. Bush, as treasurer
    h)  Friends of Jack Metcalf and Frank McCord, as treasurer
    i)  Chambliss for Congress and David R. Tyndall, as treasurer
    j)  Neumann for U.S. Senate and Scott Heins, as treasurer
    k)  Chenoweth for Congress Committee and Richard W. Jackson, as
    l)  Bob Ney for Congress and Cynthia L. Fregiato, as treasurer
    m)  Dick Chrysler for Congress and John r. Bennett, as treasurer
    n)  Norwood for Congress and Abram J. Serotta, as treasurer
    o)  Tom Coburn for Congress Committee, and Wade A. Stubbs, as treasurer
    p)  Frank Riggs for Congress and Daniel J. Christensen, as treasurer
    q)  People for English Committee and Edward E. Smith, as treasurer
    r)  Friends of Steve Stockman and John Hart, as treasurer
    s)  John Ensign for U.S. Senate and Saundra J. Johnson, as treasurer
    t)  Todd Tiahrt for Congress and George Bruce, as treasurer
    u)  Fox for Congress Committee, and Frank W. Jenkins, as treasurer
    v)  Citizens for Peter Torkildsen Committee and Edward P. McGuire, as treasurer
    w)  Franks for Congress and Martin Berber, as treasurer
    x)  Walsh for Congress Committee and Edward J. Moran, as treasurer,
    y)  Funderburk for Congress '96 and Donald Schroeder, as treasurer
    z)  Friends of Rick White and Dawna Munson, as treasurer
    aa)  People for Ganske and Steve Irwin, as treasurer
    bb)  Whitfield for Congress Committee and E.O. Whitfield, as treasurer
    cc)  Committee to Re-elect J.D. Hayworth and Kirk Knight, as treasurer
    dd)  Friends for Franks and James R. Sanders, as treasurer.
    ee)  Republican National Committee and Alec Poitevint, as treasurer.

MUR 4624
General Counsel Report
Page 47

    ff)  The National Policy Forum, the Thursday Group, the Tarrance Group, Brian Tringali, Alejandro Castellanos and Charles Greener.

    gg)  Representatives John Boehner, Jon Christensen, Barbara Lynn Cubin, Gilbert W. Gutknecht, Frank Riggs and Rick White.

3.       Approve the appropriate letters.

_____ 4/20/01 _____                         _____
Date                                            Lois G. Lerner
                                              Acting General Counsel

Staff Assigned: Team 2

Attachments:

1. Kranowitz Depo.
2. Josten Depo.
3. Van Dongen Depo.
4. Greener Depo.
5. Danner Depo.
6. Castellanos Depo.
7. Nichols Depo.
8. Tringali Depo.
9. News Articles
10. NRCC Briefing, April 30, 1996
11. House Repub. Conf doc., June 3, 1996
12. March 13, 1996 RNC fax of AFL-CIO Scripts
13. Coalition meeting notice
14. Aff. of Bruce Josten
15. RNC "Urgent" Memo, June 28, 1996
16. Tarrance letter with RNC materials, May 17, 1996
17. Tarrance Invoices for Ganske campaign
18. Joint AV/Tarrance Memo, July 29, 1996
19. House Repub. Conf. fax of AFL ads, June26, 1996
20. Coalition Media buys, October 25, 1996
21. Coalition scripts
22. Barry Jackson's Response
23. ROI, Chris Cox

MUR 4624
General Counsel Report
Page 48

24. RNC Fax. Re. AFL ads
25. Nat. Media Fax, July 9, 1996
26. Coalition Treasurer's report and checks
27. Josten's testimony re. $85,000 conurbation