# SUPPLEMENTAL PLAINTIFFS' EXHIBIT 7



**FEDERAL ELECTION COMMISSION**
Washington, DC 20463

## MEMORANDUM

| | |
|---|---|
| TO: | Commissioners<br>General Counsel Norton<br>Staff Director Pehrkon |
| FROM: | Office of the Commission Secretary |
| DATE: | December 19, 2001 |
| SUBJECT: | Statement of Reasons for MUR 4994 |

Attached is a copy of the Statement of Reasons for MUR 4994 signed by Commissioner Scott E. Thomas. This was received in the Commission Secretary's Office on <u>Wednesday, December 19, 2001 at 12:40 p.m.</u>

cc: Vincent J. Convery, Jr.
OGC Docket
Press Office
Public Information
Public Records

Attachments



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463



In the Matter of

| | | |
|---|---|---|
| Ashcroft Victory Committee and | ) | |
| D. Jan McBride, as treasurer; | ) | |
| Missouri Republican State Committee and | ) | |
| Harvey M. Tettlebaum, as treasurer; | ) | |
| Stabenow for U.S. Senate and | ) | |
| Angela M. Antera, as treasurer | ) | |
| Michigan Democratic State Central Committee and | ) | |
| Roger Winkleman, as treasurer; | ) | |
| Michigan Senate 2000 and | ) | |
| James P. Fox, as treasurer; | ) | |
| Santorum Victory Committee | ) | |
| and D. Jan McBride, as treasurer; | ) | |
| Friends of Giuliani Exploratory Committee and | ) | |
| John H. Gross, as treasurer; | ) | |
| Giuliani Victory Committee and | ) | |
| D. Jan McBride, as treasurer; | ) | |
| New York Republican Federal Campaign | ) | MUR 4994 |
| Committee and Michael Avella, as treasurer; | ) | |
| National Republican Senatorial Committee | ) | |
| and Stan Huckaby, as treasurer; | ) | |
| New York Senate 2000 and | ) | |
| Andrew Grossman, as treasurer; | ) | |
| Hillary Rodham Clinton for U.S. | ) | |
| Senate Committee, Inc. and William J. | ) | |
| Cunningham, III, as treasurer; | ) | |
| New York State Democratic Committee and | ) | |
| David Alpert, as treasurer; | ) | |
| New York Democratic Victory 2000 and | ) | |
| Andrew Tobias, as treasurer; | ) | |
| Democratic Senatorial Campaign Committee and | ) | |
| James P. Fox, as treasurer | ) | |

STATEMENT OF REASONS
COMMISSIONER SCOTT E. THOMAS

## STATEMENT OF REASONS
## IN MUR 4994
## COMMISSIONER SCOTT E. THOMAS

Those who believe in the campaign finance restrictions passed by Congress and in the rule of law should look closely at this matter. The Federal Election Commission ("FEC" or "Commission") used to treat party ads like those involved in this case as contributions or coordinated expenditures subject to limits and 'hard money' sourcing. Beginning with 1999 decisions involving a Montana Senate race and the audits of the Clinton and Dole presidential campaigns, certain commissioners began to resist the FEC's precedents. This was compounded when those commissioners repealed portions of the FEC's regulations defining coordination and provided no new guidance for party ads. The result has been complete chaos. A string of split votes litters the landscape.

As a result, at the time the activity in question was occurring, the parties and candidates could not have had a clear picture of whether their plans would be treated as a violation of the coordinated expenditure limits. Nonetheless, relying on the language of the statute and consistent with prior cases, the Office of General Counsel laid out a plausible legal theory for finding reason to believe violations had occurred. Commissioner McDonald and I voted to approve such findings with the understanding that the best course of action thereafter would be to take no further action and close the file. This would have established henceforth the legal principle that ads like those at issue-- clearly designed to influence a particular election-- must count against the parties' coordinated expenditure limits if coordination is proven. At the same time, it would have recognized the mangled state of the law at the time the respondents acted, and would have avoided any unfair punishment.

Looking towards the 2002 election cycle of party activity, our approach would have sent word that there once again is a majority at this agency that will apply the law as it was intended. Four of our colleagues voted against this approach. With the 2002 election less than a year away, it appears that once again the Commission may stand idly by while millions of dollars in soft money will be raised and spent on candidate-specific candidate ads.

### I.

The Federal Election Campaign Act ("FECA" or "the Act") limits the contributions that may be made by political party committees to or on behalf of candidates for federal office. For the most part, such contributions are limited to $5,000 per election. *See* 2 U.S.C. § 441a(a)(2)(A). For Senate races, the national party and its senatorial committee counterpart share an overall $17,500 limit for the election cycle. *See* 2 U.S.C. § 441a(h).

Apart from the contribution allowances, the Act permits the national and state committees of the political parties to make so-called coordinated expenditures in connection with the general election campaigns of the parties' candidates. *See* 2 U.S.C. § 441a(d); 11 C.F.R. § 110.7. The dollar limitations on coordinated party expenditures are determined by a set formula.[1] National party committees in the 2000 election cycle could make coordinated expenditures of up to $274,902 in Missouri, $493,391 in Michigan, and $929,355 in New York for a United States Senate candidate. The state party also could spend a like amount on party coordinated expenditures.[2]

Taken together, the state party's contribution and coordinated expenditure allowances, and the national party's contribution and coordinated expenditure allowances provide a healthy role for the party structure. When the combined limits are exceeded by a party committee, the additional amounts are treated as excessive contributions. This stems from the language of 2 U.S.C. § 441a(a)(7)(B)(i) which treats any expenditure made "in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents" as a contribution. Once the special ("Notwithstanding any other provision of law") coordinated expenditure allowance of §441a(d) is used, the contribuion limits apply.

The Act also requires that political party committees report all contributions or coordinated expenditures made under § 441a(a), (d) and (h) to aid in monitoring adherence with these limits. 2 U.S.C. § 434(b)(6)(B). Candidate committees must report the receipt of contributions, but not allowable party coordinated expenditures. 2 U.S.C. § 434(b)(3)(B); *see also* FEC Campaign Guide for Congressional Candidates and Committees (1996), p.22.

Finally, political committees that make expenditures "in connection with both federal and non-federal elections" either must establish separate federal and non-federal accounts, or set up a single account which receives only contributions subject to the

---

[1] Section 441a(d) provides in pertinent part:
   (1) Notwithstanding any other provision of law with respect to limitations on expenditures or limitations on contributions...
   (3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—
      (A) in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of—
         (i) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or
         (ii) $20,000....

[2] FEC Record at 14-15 (March, 2000). As is often the practice of both major parties, the congressional campaign committee of the party could be authorized by the national and state party committees to expend their respective § 441a(d)(3) allowance on their behalf. *See FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27 (1981)("*FEC v. DSCC*").

3

limitations and prohibitions of the Act. 11 C.F.R. § 102.5. If separate federal and non-federal accounts are established, all expenditures made in connection with federal elections must be made from the federal account, and only funds subject to the limitations and prohibitions of the Act may be used. 11 C.F.R. § 102.5(a)(1)(i).

On April 4, 2000, Common Cause and Democracy 21 filed a joint complaint with the Federal Election Commission alleging that a number of political committees had violated various provisions of the Act. In particular, the complaint alleged "ongoing violations of the federal election laws committed by both major party Senate candidates in New York and their political party committees." Complaint at 1. The complaint further alleged "[t]hese violations are likely to continue throughout the 2000 election, and similar violations are likely to occur in other Democratic and Republican Senate campaigns as well." *Id.*

The complaint charged:

> Respondents are each engaged in a concerted scheme to raise and spend soft money for the purpose of influencing federal elections in violation of 2 U.S.C. 441a, which provides for limits on contributions that may be used for the purpose of influencing federal elections, and 2 U.S.C. 441b, which prohibits the use of corporate and treasury funds in connection with federal elections.

Complaint at 3. The complaint explained that respondents were involved in a

> scheme [which] involves agreements or understandings among the participants that the Senate candidate will solicit and raise soft money to be used in his or her race, and that the candidate's national party campaign committee, or the candidate's state party, will spend these federally illegal contributions on television advertising and other campaign activities to promote the Senate candidate or attack the candidate's opponent.
>
> This concerted scheme amounts to an organized and systematic effort by federal candidates, through so-called "joint fundraising" committees, to inject "soft money"—funds that do not comply with the contribution limits and source prohibitions of federal law—directly into their 2000 Senate elections. Under this scheme, federal candidates are and will be systematically raising soft money directly for their own campaigns, and using their national and state party committees as pass-through conduits to launder the money into their federal campaigns. Thus, in essence, this scheme is being used, and will be used, by Senate candidates to raise and spend federally illegal soft money on their federal campaigns.

*Id.* at 2.

4

On September 11, 2001, the Office of General Counsel submitted a report for Commission consideration which contained a factual and legal analysis of the allegations presented in MUR 4994. The report concluded that three senatorial campaigns coordinated certain party expenditures made on their behalf. In Missouri, the report stated the Missouri Republican State Committee ("MRSC") "appears to have made expenditures of both federal and non-federal funds for a television advertisement that clearly identified both its nominee, Senator Ashcroft, and his opponent, Governor Callahan, and that was intended at least in part to influence the Senate election in Missouri." General Counsel's Report at 46. Finding that "[a] vendor common to both Ashcroft 2000 and the MRSC apparently participated in creating the advertisement," the report concluded:

> This fact combines with the apparent flow of money from [the Ashcroft Victory Committee] through the NRSC and the MRSC to the same vendor at roughly the same time as the broadcasting of the advertisement to provide *reason to believe that Ashcroft 2000 and the MRSC coordinated the advertisement.* Thus, it appears that the MRSC's expenditures for the advertisement may have constituted coordinated party expenditures on behalf of the Ashcroft campaign.

*Id.* (emphasis added).

Similarly, the report concluded that expenditures for an advertisement in Michigan may have constituted coordinated party expenditures on behalf of the Stabenow campaign. The report pointed out that the Michigan Democratic State Central Committee ("MDSCC") and the Stabenow campaign ran advertisements during that same time frame which featured "the same family, the Lukers; the same issue, managed care; and, most importantly, virtually identical language." General Counsel's Report at 36. The report found that "[t]hese similarities raise questions as to whether the Stabenow committee and the Michigan Democratic State Central Committee cooperated or consulted with each other in the development of MDSCC's 'Last days' ad." *Id.* The report further found that the funding relationships between the Stabenow committee, Michigan Senate 2000, the Democratic Senatorial Campaign Committee and the MDSCC "potentially plac[ed] Stabenow in the position of a 'joint venturer' who raises some of the capital for the venture." *Id.* at 37.

Finally, the report stated the New York State Democratic Committee ("NYSDC") "in 1999 and 2000 made expenditures of both federal and non-federal funds for at least two television advertisements that clearly identified federal candidates and that were intended to influence the 2000 election for the U.S. Senate in the State of New York." General Counsel's Report at 27. The report found "[t]here is evidence that the NYSDC may have coordinated these advertisements with Clinton for Senate." *Id.* In particular, the report relied upon press statements that "there was an apparent sharing of film by the [Clinton] campaign's media advisor with the NYSDC, as well as possible final script approval by the Clinton campaign, plus more general discussion between the state party

5

and the campaign about the party's planned advertising." General Counsel's Report at 16. Additionally, the report stated:

> circumstantial evidence that NYSDC and Clinton for Senate may have coordinated [advertising] is to be found in the combination of the participation of the candidate committee in New York Senate 2000, Senator Clinton's active involvement in the raising of funds by the joint fundraising committee, and the timing and amounts of the transfers of funds from the DSCC to the NYSDC in relationship to the latter committee's expenditures for the November television advertisement featuring Senator Clinton."

*Id., see also* General Counsel's Report at 20-21.

Based upon the foregoing evidence, the report recommended the Commission find reason to believe that:

(1) the New York State Democratic Committee and David Alpert, as treasurer, violated 2 U.S.C. §§ 434(b), 441a(a), 441a(f), and 441b(a), and 11 C.F.R. § 102.5;
(2) Hillary Rodham Clinton for U.S. Senate Committee, Inc. and William J. Cunningham, III as treasurer, violated 2 U.S.C. §§ 434(b), 441a(f) and 441b(a);
(3) the Democratic Senatorial Campaign Committee and James M. Jordan, as treasurer, violated 2 U.S.C. §§ 434(b), 441a(f), 441a(h), and 441b(a), and 11 C.F.R. § 102.5;
(4) the Michigan Democratic State Central Committee/Federal Account and Roger Winkleman, as treasurer, violated 2 U.S.C. §§ 434(b), 441a(a), and 441a(f), and 11 C.F.R. §102.5;
(5) Stabenow for U.S. Senate and Angela M. Autera, as treasurer, violated 2 U.S.C. §§ 434(b) and 441a(f);
(6) the Missouri Republican State Committee and Harvey M. Tettlebaum, as treasurer, violated 2 U.S.C. §§ 434(b), 441a(a), 441a(f), and 441b(a), and 11 C.F.R. 102.5;
(7) Ashcroft 2000 and Garrett M. Lott, as treasurer, violated 2 U.S.C. §§ 434(b), 441a(f) and 441b(a); and
(8) the National Republican Senatorial Committee and Stan Huckaby, as treasurer, violated 2 U.S.C. §§ 434(b), 441a(f), 441a(h), and 441b(a), and 11 C.F.R. § 102.5.

A motion to adopt the Office of General Counsel's recommendations but take no further action and close the case failed to secure the four affirmative votes needed. 2 U.S.C. § 437g(a)(2). Commissioners Thomas and McDonald supported the motion while Commissioners Mason, Sandstrom, Smith and Wold opposed.[3] The Commission

---

[3] Several Commissioners questioned whether it was appropriate for the Office of General Counsel to consider information received or developed after the date the complaint was filed, such as evidence that certain ads indeed were run and paid for, in part, with soft money. Section 437g(a)(2) of the statute states that the Commission may find "reason to believe that a person has committed, *or is about to commit*, a violation" of the Act. *Id.* (emphasis added). This clearly indicates congressional intent to permit

then voted 5-1 to reject the Office of General Counsel's 'reason to believe' recommendations.[4] Finally, based on the preceding votes, the Commission voted unanimously to take no action with respect to these respondents and close the file.[5]

## II.

The central issue in MUR 4994 was whether party-paid television advertisements like those at issue, clearly intended to influence elections to the United States Senate and apparently coordinated with the parties' nominees for United States Senator, constituted contributions or coordinated party expenditures subject to the limitations of 2 U.S.C. §§ 441a(a), (d) and (h), and payable only with federally permissible funds. 11 C.F.R. § 102.5.

The Office of General Counsel concluded that state party and/or national party committee expenditures may have constituted contributions or coordinated party expenditures in three states. In reaching this conclusion, the General Counsel's Report presented considerable evidence regarding apparent coordination between party committees and candidate committees in Missouri, General Counsel's Report at 42-48, Michigan, *id.* at 32-40, and New York, *id.* at 11-30. Based upon its findings, the Office of General Counsel recommended that the Commission find reason to believe respondents violated various provisions of the Act and that the Commission conduct an investigation of this matter primarily directed at proving coordination.

I agreed with the Office of General Counsel's 'reason to believe' recommendations regarding activity in the states of Missouri, Michigan and New York. In my view, the General Counsel's Report presented facts indicating that the so-called "issue ads" in these states were intended to influence federal elections and may have been coordinated between political party committees and candidate committees. Findings in these matters would have provided political party committees and candidate committees in the regulated community with much-needed Commission guidance as to what constitutes party contributions or coordinated expenditures.

---

complainants and the Commission to act based on the likelihood of a future violation, not just apparent past violations. Information received after a complaint was filed would certainly seem probative of whether a respondent was "about to commit" a violation of the Act when the complaint was filed. *Id.* Indeed, it would be most unusual for an enforcement entity to so tie its hands and ignore such information— particularly where time has passed and shows, in fact, that what was alleged did take place.

[4] Commissioner McDonald apparently was willing to join in this vote because it corresponds to his votes in the various party spending cases that followed the calamitous actions of four of his colleagues in MUR 4378 and the audits of the Clinton and Dole campaigns. *See* discussion *infra*. Having tried here to work a better solution for future enforcement, but failed, he apparently wanted to reflect that he is not willing to treat similarly situated respondents differently.

[5] The Commission unanimously accepted the Office of General Counsel's recommendation to make no reason to believe findings against a number of other respondents. They included Rudolph Giuliani; the Friends of Giuliani Exploratory Committee and John H. Gross, as treasurer; the Giuliani Victory Committee and D. Jan McBride, as treasurer; the Santorum Victory Committee and D. Jan McBride, as treasurer; and the New York Democratic Victory 2000 and Andrew Tobias, as treasurer.

7

Although I supported the Office of General Counsel's conclusions regarding 'reason to believe' findings, I did not support the recommendation that the Commission conduct an investigation and possibly pursue penalties. Under the circumstances, I did not think it was fair to place such burdens on the respondents in this matter. As I discuss below, the elimination of prior Commission guidance and inconsistent Commission votes over what constitutes coordination in a party committee context make it wholly inappropriate to punish this set of respondents.

### A.

Not too long ago, the Commission had functional approaches in place for determining whether a particular communication constituted a party contribution or coordinated expenditure. These guideposts helped define the terms "expenditure" and "coordination" in this context. In so doing, they provided important guidance to the regulated community as to whether certain activity would be considered subject to the limitations and sourcing requirements of the Act.

Under the Act, the term "expenditure," as used regarding contributions (§ 441a(a)(7)(B)(i)) or coordinated expenditures (§ 441a(d)), is a payment, advance or gift of anything of value made "for the purpose of influencing any election for Federal office. 2 U.S.C. § 431(9). For coordinated expenditures, the statute also requires the expense to be "in connection with the general election campaign" of a candidate for Federal office." 2 U.S.C. § 441a(d). Since 1985, the Commission had interpreted this statutory language to apply whenever a communication both "(1) depicted a clearly identified candidate and (2) conveyed an electioneering message." Advisory Opinion 1985-14, Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5819 ("Electioneering messages include statements 'designed to urge the public to elect a certain candidate or party,'" *quoting United States v. United Auto Workers*, 352 U.S. 567, 587 (1957)).

Through the years, the courts deferred to the approach established by the Commission in Advisory Opinion 1985-14. For example, in *Democratic Congressional Campaign Committee v. FEC*, 645 F.Supp. 169, 175 (D.D.C. 1986), *aff'd in part and remanded*, 831 F.2d 1131 (D.C. Cir. 1987), Judge Sporkin stated: "I find that the NRCC mailer conveys an 'electioneering message' as defined by the FEC's own advisory opinions and as interpreted by its General Counsel. Thus, the FEC's dismissal of the plaintiff's complaint was contrary to law." Similarly, in *FEC v. Colorado Republican Federal Campaign Committee*, 59 F.3d 1015, 1022 (10th Cir. 1995), *vacated on other grounds*, 518 U.S. 604 (1996), the Tenth Circuit expressly deferred to the Commission's long-standing "construction of § 441a(d) as regulating political committee expenditures depicting a clearly identified candidate and conveying an electioneering message . . . ." The court stated: "Giving deference to the FEC's interpretation, we hold that § 441a(d)(3) applies to coordinated spending that involves a clearly identified candidate *and an electioneering message*, without regard to whether that message constitutes express advocacy." *Id.* (emphasis added). Citing Advisory Opinion 1985-14, and quoting from the Supreme Court's decision in *United States v. United Auto Workers, supra*, the Tenth

8

Circuit concluded that the Colorado Republican Party's 1986 advertisements in opposition to then Senator Timothy Wirth's record "unquestionably contained an *electioneering message*." 59 F.3d at 1023 (emphasis added).

On June 24, 1999, however, Commissioners Elliott, Mason, Sandstrom and Wold issued a statement rejecting the use of the "electioneering message" approach in the enforcement of party spending limits. In their opinion, the electioneering message concept was "both too vague and too broad to have a sufficiently definite meaning." Statement of Reasons of Vice Chairman Wold and Commissioners Elliott, Mason, and Sandstrom on the Audits of "Dole for President Committee, Inc." (Primary), "Clinton/Gore '96 Primary Committee, Inc.," "Dole/Kemp '96, Inc." (General), Dole/Kemp '96 Compliance Committee, Inc." (General), "Clinton/Gore '96 General Election Legal and Compliance Fund" at 2 (June 24, 1999). In reaching this conclusion, my colleagues did not address those cases where the courts expressly relied upon the "electioneering message" analysis. Having applied it, the courts obviously did not conclude it was constitutionally flawed with vagueness problems. Substituting their constitutional judgment for that of the Article III courts, however, my colleagues concluded that "the phrase 'electioneering message' should not be used to describe the content of communications which the Commission would determine to be 'for the purpose of influencing' an election to Federal office." *Id.*

Having undermined the FEC's approach for analyzing whether particular party-paid ads should be treated as "for the purpose of influencing" or "in connection with" a federal election, my colleagues' votes in particular cases were free to wander. In MUR 4378, involving NRSC ads costing over $300,000, Commissioners Mason and Wold rationalized that the communications were "expressly lobbying." *See* MUR 4378 Statement of Reasons of Commissioners Wold, Elliott and Mason at 12 (Oct. 28, 1999). Yet the ads in question were typical campaign attack pieces. They accused Sen. Baucus of staying in Washington "for twenty-one long years," accused him of raising taxes "by more than $2,600 per family," and said, "Tell him it's time to vote for term limits." *See* MUR 4378 Statement of Reasons of Commissioners Thomas and McDonald (Aug. 10, 1999), www.fec.gov/members/thomas. Related NRSC press releases and statements made abundantly clear the ads were to influence the Senate race. *Id.*[6]

---

[6] A candidly-worded press release issued by the NRSC bluntly stated that it intended to target certain Democratic Senators with these negative campaign ads in connection with the 1996 Senate elections. Under the heading, "GOP SENATE CAMPAIGN COMMITTEE PREPARING TO USE CLINTON 'TAXED TOO MUCH' COMMENT *IN 1996 SENATE RACES*," John Heubusch, Executive Director of the NRSC, stated "[w]e plan on letting *voters* know their Senator supported the Clinton tax increase and, that now, the President said the tax increase was too big." September 2, 1997, Response of Dennis Rehberg to Document Request (emphasis added). The NRSC Press Release expressly indicated that "[p]ossible ad targets include Senator Max Baucus/MT...." *Id.* Mr. Heubusch promised that:

> We will ensure that *voters* know their Democratic Senator and Democratic Senate *candidates* 'raised taxes too much.' This is a great issue for the GOP because *voters* always suspected it was true—and now the President has himself confirmed it.

9

Subsequently, Commissioners Mason and Wold were willing to find ads paid for by the DNC and RNC on behalf of the Clinton and Dole campaigns to be excessive contributions or coordinated expenditures. Yet the content of the ads in question and the surrounding evidence of an election influencing purpose was no more suggestive than was the case in MUR 4378. *See* MUR 4553 et al. Statement of Reasons of Commissioner Thomas (May 25, 2000), www.fec.gov/members/thomas.

Having seen my colleagues eliminate fifteen years of FEC precedent and guidance, the regulated community has patiently waited for them to issue a new content standard. As of this writing, the regulated community is still waiting. Indeed, in the two and a half years since my colleagues eliminated the clearly identified candidate/ electioneering message approach as too vague, they still have not issued a new standard in its place. It is difficult to understand how no standard is somehow less vague than the standard applied by the FEC for fifteen years and endorsed by the federal courts.

Obviously, the failure of my colleagues to replace the clearly identified candidate/electioneering message analysis has created tremendous uncertainty and confusion for political party committees. I do not believe it is fair to penalize the players when the referee has abandoned the field. Under these circumstances, I voted not to pursue the respondents with an investigation and potential penalties even though I consider the communications at issue to be made "for the purpose of influencing an election" and "in connection with a federal election."

**B.**

Through a number of irreconcilable decisions over the years, the Commission also has managed to create considerable confusion as to what sort of activity constitutes coordination. Initially, these decisions primarily involved alleged coordinated activity between candidates and non-party committee entities. In the aftermath of *Colorado Republican Federal Campaign Committee v. FEC ("Colorado I")*, 518 U.S. 604 (1996) (FEC could not presume conclusively that party committees coordinate ads with candidates), the Commission began to consider more frequently the issue of coordination between candidates and their political parties. The inconsistencies found in these decisions--both in the non-party and party committee context--undoubtedly has confused the regulated community.

---

*Id.* (emphasis added). Elaborating for the *Washington Times*, Mr. Heubusch enthusiastically explained: "*We're going to hammer the Democrats* who voted for this and ask them if they are going to apologize too. He's [President Clinton] created *a great 1996 election issue.*" *Washington Times*, October 20, 1995 (emphasis added). Despite this evidence, Commissioners Mason and Wold insisted that the 1996 NRSC advertisements were simply lobbying efforts and not communications made in connection with a federal election.

10

**I.**

In a matter involving a Senate candidate from the 1994 election cycle, the Commission failed to make even a preliminary 'reason to believe' finding regarding activity that, according to the Office of General Counsel, appeared to constitute coordination. More specifically, in MUR 4282 the Santorum for Senate Committee contacted the Archdiocese of Philadelphia about a printed brochure about to be distributed by the Archdiocese. The Santorum Committee reviewed, commented on, and critiqued the brochure, and ultimately expressed to the Archdiocese its disagreement with the proposed brochure because it portrayed Senator Wofford (Mr. Santorum's 1994 opponent), *according to the Santorum Committee,* "in a better light than then-Congressman Santorum." MUR 4282, December 14, 1995 Response of Santorum Committee. After its discussion with the Santorum Committee, the Archdiocese destroyed 150,000 printed copies of the draft brochure and printed a new version which removed any reference to Santorum. In the new version, the Archdiocese also eliminated one issue on which Senator Wofford had supported the Archdiocese position--reducing Senator Wofford's agreement with the Archdiocese to 2 out of 5 issues, rather than the 3 out of 5 votes which was in the original version. After these changes, it was clear Senator Wofford no longer was portrayed "in a better light." The General Counsel's recommendations to pursue this matter failed by a vote of 3-2 with my Republican colleagues opposing.[7] Without four votes to pursue the matter, the Commission voted on September 10, 1996, to close the file in this matter without taking any action.

Three weeks later, on October 1, 1996, the General Counsel's recommendations to pursue apparent coordinated activity in MUR 4204 also failed by a vote of 3-2 with my Republican colleagues once again opposing. MUR 4204 involved Americans for Tax Reform ("ATR"), the National Republican Congressional Committee ("NRCC"), and Republican Congressional candidate Ron Lewis. There was evidence ATR used the same vendor for a radio advertisement it ran the weekend before the election as the NRCC used when it ran advertisements on behalf of Mr. Lewis, who was the Republican Party nominee at the time. The NRCC reported the expenditures for its pro-Lewis ads, totaling $58,590, as coordinated party expenditures made on behalf of Lewis. It appears that in making such expenditures the NRCC was acting as Mr. Lewis' agent. The Commission's regulations and precedent presumed coordination if an expenditure is made by or through a person that is being compensated by the candidate or the candidate's agent. 11 C.F.R. §109.1(b)(4)(i)(B) (2000). Accordingly, there was a presumption that ATR coordinated with the Lewis campaign through the use of a common vendor compensated by the

---

[7] It is important to note that in a case where there has been a split vote, the Commission has not exercised, by a majority vote of four members, any of its duties or powers and taken a substantive position on the contested issues. *See* 2 U.S.C. § 437c(c). Thus, as a matter of law, an enforcement action where there has been a split vote does not create an official agency position. *See also Common Cause v. Federal Election Commission,* 842 F.2d 436, 449 n.32 (D.C.Cir. 1988)(An opinion of less than four Commissioners is "not binding legal precedent or authority for future cases. The statute clearly requires that for any *official* Commission decision there must be at least a 4-2 majority.")(emphasis in the original). As a practical matter, however, the Commission's split votes undoubtedly send a very confusing message to the regulated community on whether an advertisement should be considered a contribution or coordinated expenditure.

11

candidate's agent, thus making a prohibited corporate contribution to that campaign. Once again, without four votes to pursue the matter, the Commission voted to close the file without taking any action.

There were, however, four votes to pursue a coordination matter involving the United States Senate campaign of Democratic candidate Joel Hyatt and Hyatt Legal Services ("the Firm"). In MUR 3918, the Commission found certain radio advertisements run by the Firm constituted excessive contributions to the Hyatt for Senate Committee. The basis for the Commission's unanimous finding was that the Firm's advertisements were coordinated with the candidate and referred to issues raised in the campaign. More specifically, a consultant for the campaign had reviewed the law firm ads to insure the ads would not be considered campaign related. The consultant's review of the ads was virtually indistinguishable from the review undertaken by the Santorum Committee in MUR 4282. Yet, there were votes to pursue the Hyatt Committee and not the Santorum Committee. On June 17, 1997, the Commission unanimously accepted a conciliation agreement with respondents which called for the payment of a civil penalty and the admission of a violation.

Similarly, on December 9, 1997, there were four votes to find probable cause to believe that coordination existed between the Senate campaign of Democratic candidate Charles Robb and the National Council of Senior Citizens ("NCSC") in MUR 4116. Indeed, the Commission's coordination finding was unanimous despite the fact there was no concrete evidence the Robb campaign authorized or approved either the specific text of the NCSC ads or their timing and placement. In fact, the campaign broadly denied any coordination with NCSC regarding the advertisements. The campaign's request for an endorsement from NCSC, coupled with discussion of message content at a joint press conference, provided the only evidence that the candidate's campaign had discussed the general content of the ads and that it would like to see the ads run. Yet, this slender evidence was certainly no more compelling than the evidence of coordination found with regard to the Santorum Senate Committee in MUR 4282 and the Republican congressional candidate in MUR 4204.

I can find no principled distinction explaining why there was coordination in some cases but not others. If there was sufficient evidence of coordination in MURs 3918 and 4116, there certainly was sufficient evidence of coordination in MURs 4282 and 4204. At best, this lack of consistency confused the regulated community; at worst, these inconsistent decisions created a lack of confidence in the impartiality of Commission decisionmaking.

ii.

In the aftermath of *Colorado I, supra*, the Commission began to consider the issue of coordination between candidates and their political parties. In *Colorado I*, the Supreme Court held that political parties were capable of making independent expenditures and that such expenditures were not subject to the coordinated expenditure

.12

limitations of 2 U.S.C. § 441a(d). *Id.* at 614-616. In the case before it, the Court found the "advertising campaign was developed by the Colorado Party *independently* and not pursuant to *any general or particular understanding* with [the candidate and their agents]." *Id.* at 614 (emphasis added). In so holding, the Court rejected a Federal Election Commission regulation that presumed coordination between political parties and their candidates. Based upon this presumption, the regulation stated that party committees shall "not make independent expenditures . . . in connection with the general election campaign of a candidate" for federal office.[8] Because of "the lack of coordination between the candidate and the source of the expenditure" or "other convincing evidence," the Court held that party independent expenditures, as with independent expenditures by other committees, could not constitutionally be limited." 518 U.S. at 617.

The first real test for my colleagues came in MUR 4378, discussed *supra*, which involved the Republican Senate campaign of Montanans for Rehberg and advertisements run by the NRSC attacking Democratic Senate candidate Max Baucus. After a full investigation of the matter, the General Counsel recommended that the Commission find probable cause to believe the NRSC violated § 441a(h) by making a total of $309,292 in coordinated expenditures on behalf of the Rehberg campaign. Despite evidence that representatives of the NRSC and the Rehberg campaign met to discuss "specifics" of the 1996 NRSC media campaign, MUR 4378 General Counsel's Probable Cause Report at 37 (November 13, 1998), Commissioners Mason and Wold rejected the General Counsel's factual conclusion that coordination existed (*id.* at 52-55) and, instead, found a "lack of evidence of coordination" between the NRSC and the Rehberg campaign. MUR 4378 Statement of Reasons of Commissioners Wold, Elliott and Mason at 12 (October 28, 1999); *compare* MUR 4378 Statement of Reasons of Commissioners Thomas and McDonald (Aug. 10, 1999), www.fec.gov/members/thomas. Commissioner Sandstrom abstained.

To make matters worse, on May 3, 2001, Commissioners Mason, Sandstrom, Smith and Wold voted to approve new coordination regulations that eliminated the Commission's previous coordination regulations and expressly did not apply to coordinated expenditures by party committees. *See* 65 Fed. Reg. 76138, 76142 (Dec. 6, 2000).[9] As a result of their action, there are currently no Commission regulations defining coordination for political party committees. Nor is there any chance that new regulations will be in place for the 2002 elections. Indeed, is it possible that no regulations will even be in place for the 2004 elections. As they did with the content standard, my colleagues simply abolished the previous regulatory scheme and left nothing in its place. I fail to see how no regulations—and the resulting uncertainty in the

---

[8] 11 C.F.R. § 110.7(a)(5)(1996); *cf. FEC v. DSCC*, 454 U.S. at 28 n.1 ("Party committees are considered incapable of making 'independent' expenditures in connection with the campaigns of their party's candidates.").

[9] Commissioner McDonald and I opposed this approach because, as we have written elsewhere, the new coordination regulations are seriously flawed. *See, e.g.,* MUR 4624 Statement of Reasons of Commissioners Thomas and McDonald (September 7, 2001), www.fec.gov/members/thomas.

13

regulated community— are somehow better than the previous regulations which had served the Commission and the courts for so many years. *See, e.g., FEC v. National Conservative Political Action Committee*, 647 F.Supp. 987, 990 (S.D.N.Y. 1986)(Citing the 2 U.S.C. § 431(17) definition of "independent expenditure," the court stated the Commission's regulations "clarify this language."). In my view, the Commission would have been far better off if it simply applied those regulations already on the books in a fair and consistent manner.

This brings us to the instant matter. In order to provide some guidance as to what constitutes coordinated activity for party committees, Commissioner McDonald and I voted to approve the General Counsel's recommendations and find "reason to believe" violations were committed by both Democratic and Republican respondents in this case. In view of the inconsistent history in such matters, though, we would not have approved a lengthly coordination investigation or pursued a civil penalty against respondent committees in the enforcement process. Our effort failed, however, when our colleagues indicated they were not willing to make 'reason to believe' findings against any of the respondents in this matter. Interestingly, one of our colleagues initially indicated that a 'reason to believe' finding was appropriate *only* for the Hillary Rodham Clinton for U.S. Senate Committee and the New York State Democratic Committee and for no other respondents. He took this position even though in the Ashcroft factual situation, for example, the very same media ad consultant who crafted the candidate's ads and was paid by the Ashcroft campaign was also working on the party ads at issue. *See* General Counsel's Report at 46.

Through its inconsistent decisions, the Federal Election Commission has sent confusing signals and given the impression that the law has not been applied even-handedly. In addition, four members of the Commission have chosen to abolish the very regulations which provide guidance on what activity constitutes coordination. In view of the inconsistent decisionmaking and the absence of regulations, it would have been inappropriate to investigate and pursue a civil penalty against any of the respondents in this matter.

### III.

In *Federal Election Commission v. Colorado Republican Federal Campaign Committee*, 121 Sup.Ct. 2351 (June 25, 2001) ("*Colorado II*"), the Supreme Court upheld the coordinated expenditure limitation for party committees. The Court held that "a party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of contribution limits." *Id.* at 2371. As a result, party committees cannot spend unlimited amounts on political advertisements coordinated with candidates.

Unless the Commission takes action, however, the *Colorado II* decision soon may become meaningless. Through its inconsistent handling of enforcement cases and its failure to provide a workable definition of coordination, the Commission has allowed

14

party-paid ads that are not "truly independent," *id.*, to escape the coordinated expenditure limitations just upheld by the Supreme Court in *Colorado II.* Obviously, such a cramped approach would render the coordinated expenditure limitation useless.

It was my hope that the Commission could have used this MUR to provide notice that advertisements like those at issue here, if coordinated, are subject to the coordinated expenditure limits and must be paid *in full* with hard money. Having provided inconsistent enforcement decisions and eliminated clarifying regulations, this would seem to be the least the Commission could do.

The FEC is supposed to enforce the law passed by Congress. The agency's record in the area of party-paid ads is troubling at best. Aside from neglecting the overall limits on coordinated expenditures, the FEC's record of inaction since 1999 has allowed huge sums of soft money to be used to pay the lion's share of candidate-specific political ads. The irony is that both sides of the aisle would have found ways to live with effective enforcement of the coordinated expenditure limits. Now, hundreds of millions of soft dollars later, the FEC is no closer to doing its job than it was in 1999 when this slide began.

12/19/01
Date

Scott E. Thomas
Commissioner

15