# SUPPLEMENTAL PLAINTIFFS' EXHIBIT 8

105TH CONGRESS }    SENATE    { REPT. 105–167
2d Session                    Vol. 4

# INVESTIGATION OF ILLEGAL OR IMPROPER ACTIVITIES IN CONNECTION WITH 1996 FEDERAL ELECTION CAMPAIGNS

---

# FINAL REPORT

OF THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE

TOGETHER WITH

## ADDITIONAL AND MINORITY VIEWS

### Volume 4 of 6



MARCH 10, 1998.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1998

47–004

5926

## PART 2  INDEPENDENT GROUPS

### Chapter 9: Overview and Legal Analysis

#### FINDINGS

(1) Independent groups, including tax-exempt organizations, corporations and unions, spent large sums of money to influence the public's perception of federal candidates and campaigns and the outcome of certain elections in 1996.

(2) During the 1996 election cycle, tax-exempt organizations spent tens of millions of dollars on behalf of Republican and Democratic candidates under the guise of issue advocacy, in violation of the spirit and possibly the letter of the tax code and election laws. Despite their election-related activity, none of these organizations registered with or disclosed their activities to the FEC. Moreover, because of restrictions in the tax code with respect to such tax-exempt organizations, these organizations may have violated their tax status.

(3) Although many groups conduct activities that influence the public's perception of federal candidates and campaigns, they either are not required, or do not, register with or disclose their activities with the FEC.

#### OVERVIEW OF FOLLOWING CHAPTERS

One of the striking differences between the 1996 elections and prior elections was the prominent role played by groups that never registered with the Federal Election Commission (FEC) as campaign organizations.[1] These groups included tax-exempt charities, social welfare organizations, labor unions and corporations. Some groups ran television ads attacking candidates, conducted direct mail and telephone bank operations targeting voters, distributed voter guides, increased voter turnout, advised campaigns, and attended weekly meetings discussing candidates and campaign strategy. These groups spent millions of dollars on activities designed to affect the outcome of federal elections in 1996, yet none disclosed their contributions or expenditures to the public or acknowledged that federal campaign laws applied to their operations.

The Committee hearings provided an invaluable opportunity to examine the role of these groups during the 1996 election cycle. The hearings could have examined, in a systematic way, whether national political parties used these groups to circumvent federal contribution limits and disclosure requirements; whether the persons directing the organizations deliberately evaded federal election law requirements or abused an organization's tax-exempt status; and whether the relevant federal election or tax laws require strengthening. Instead, the Majority failed to conduct a vigorous investigation, rejected Minority requests to hold hearings on specific groups, and left the legislative issues largely unexamined.

One key difficulty was the refusal of many groups to cooperate with the Committee's investigation.[2] Some simply asserted that they had never engaged in election-related activity and were outside the scope of the Committee's investigation. Others claimed

---

Footnotes at end of chapter.

5927

that the First Amendment protected them from inquiry. The vast majority of subpoenaed groups refused, in whole or in part, to respond to Committee requests for interviews and documents. Faced with widespread resistance, the Majority lacked the political will to enforce the subpoenas issued, compel document production and deposition testimony, or hold public hearings and confront the groups. It settled instead for four days of hearings in which academics and public interest organizations discussed the problem generally and urged campaign finance reform.[3]

Despite the absence of a vigorous investigation and in-depth hearings, available evidence demonstrates that a number of independent groups engaged in partisan, election-related activities in 1996, that some of these groups coordinated their activities with a political party or candidates, and that additional investigation by the U.S. Departments of Justice and Treasury and the FEC is warranted. The evidence also demonstrates that legislation is needed, not to halt election-related activities by independent groups, but to bring their efforts within the existing legal requirements for contribution limits and disclosure.

### 1996 election-related activities

During the 1996 election cycle, both parties benefited from the expenditures and activities of independent groups. The most visible example is televised ads. A study conducted by a nonpartisan organization, the Annenberg Public Policy Center, estimated that, during the 1996 election cycle, independent groups spent between $67 and $82 million on televised ads that split about evenly in their support of the two parties.[4] Almost 90 percent of these ads named specific candidates.[5] Groups like the AFL–CIO, Citizen Action, Citizens for Reform, and Citizens for the Republic Education Fund each spent millions of dollars on these televised ads.

While both parties benefited from the activities of independent groups, the evidence before the Committee indicates that the Republican National Committee ("RNC") organized and financed independent group activities to a much greater extent than did the Democratic National Committee ("DNC") during the 1996 election cycle. For example, FEC records indicate that, in 1996, the RNC gave nearly $6 million to tax-exempt organizations,[6] or 30 times more than the DNC which gave less than $185,000.[7] Documents produced by the parties indicate that, while both asked supporters to make contributions to sympathetic groups, the RNC explicitly planned to raise millions of dollars for certain pro-Republican groups and actually collected and delivered specific checks to them.[8] Documents produced to the Committee also indicate that the Republican Party worked to identify, on a national and regional level, the groups most likely to help Republican candidates win office;[9] instructed its candidates to develop formal "coalition plans" with sympathetic groups;[10] and distributed a "coalition building manual" to help them do so.[11] No comparable manual, memoranda or any other evidence before the Committee indicates this level of effort by the Democratic Party. The evidence before the Committee also suggests that the RNC undertook a wide variety of specific election-related activities with independent groups, including joint issue advocacy efforts, joint polling and joint election strategy ses-

5928

sions; the evidence does not support a similar level of coordination between the DNC and independent groups sympathetic to Democratic candidates.[12]

The following chapters describe the parties' interactions with independent groups, the 1996 election-related activities of a few of the most active organizations, and a brief description of allegations involving other groups. Because the Committee did not hold hearings or enforce its document and deposition subpoenas, the available information is limited, and many unanswered questions remain. However, the types of campaign activities undertaken, the unmistakable signs of coordination with political parties and candidates, and the millions of dollars involved provide overwhelming evidence that independent groups were significant players in the 1996 election cycle.

On the Republican side, the following chapters chronicle how the RNC developed plans and worked with outside groups to affect the outcome of the 1996 elections; Americans for Tax Reform used $4.6 million in RNC soft dollars to conduct a direct mail and telephone bank operation in 150 Congressional districts countering anti-Republican ads on Medicare; Triad Management formed and directed two tax-exempt organizations to run over $3 million in televised ads attacking Democratic candidates; and the Christian Coalition spent at least $22 million and distributed 45 million voter guides before election day, manipulating the information in those guides to favor Republican candidates. On the Democratic side, the chapters examine the AFL–CIO's $35 million televised ad and get-out-the-vote efforts; Ickes' recommendation that Warren Meddoff contribute $1 million to specified pro-Democratic groups; the Teamsters' contribution-swapping schemes with other independent groups and attempt to involve the DNC; and contributions directed by Democratic officials to Vote Now '96.

Corporations, unions and other independent groups are legally permitted to participate in federal election activity if they comply with federal requirements for contribution limits and disclosure. The complaint with these groups in the 1996 election cycle is that they sought to affect election outcomes, while evading the contribution limits and disclosure requirements that apply to other entities engaged in campaign activities. It is this evasion of the law, and the resulting erosion of public confidence in the federal campaign finance system, that has made the election activities of independent groups such a serious concern.

## LEGAL ANALYSIS

Some of the activities engaged in by independent groups during the 1996 election cycle raise issues invoking both federal election law and federal tax law. While some of the campaign restrictions set out in these laws are clear, other provisions provide insufficient guidance on what conduct is lawful, while ambiguities in other provisions may hinder criminal prosecutions and civil enforcement actions in this area. As with the provisions banning foreign contributions, legislation is needed to strengthen and clarify the laws applicable to independent groups engaged in campaign activity.

*Categories of independent groups*

The groups examined include a variety of organizations whose common denominator is a claim of independence from any political party, candidate or campaign committee, and a refusal to report contributions or expenditures to the Federal Election Commission.

Two types of groups that raised considerable concern during the 1996 elections are charitable and social welfare organizations exempt from taxation under section 501(c) of the Internal Revenue Code.[13] Historically, these organizations have not engaged in significant election activity due to constraints in federal tax law.

Section 501(c)(3) exempts from taxation organizations organized and operated for "religious, charitable, scientific . . . educational" and similar purposes. Unique among 501(c) tax exempts, donors to 501(c)(3) charitable organizations are allowed to deduct from their federal income tax a portion of their donations. The statute explicitly prohibits these charitable organizations from engaging in any campaign activity, stating that the exemption covers only an organization "which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office."[14] In addition, the statute prohibits section 501(c)(3) charitable organizations from operating for the benefit of any private interest, including a political party.[15] Conferring such a private benefit violates the organization's tax exempt status and provides grounds for denying or terminating an exemption.[16] Examples of charitable organizations active during the 1996 election cycle are Vote '96 and the Americans for Tax Reform Foundation.

Social welfare organizations are exempt from taxation under section 501(c)(4) of the Internal Revenue Code. To qualify for this exemption, social welfare organizations must engage in activities that promote "the common good and general welfare of the people of the community."[17] The implementing regulation states, "The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office."[18] This regulation has been interpreted as prohibiting social welfare organizations from engaging in campaign activity as their primary pursuit, but allowing them to engage in it as a secondary pursuit.[19] Any campaign activity engaged in must be nonpartisan, so that the organization does not confer a private benefit on a particular political party.[20] In contrast to charitable organizations under section 501(c)(3), donations to 501(c)(4) organizations are not deductible by the donor. Examples of 501(c)(4) organizations active during the 1996 election cycle are Americans for Tax Reform and Citizen Action. Others, including the National Policy Forum and Christian Coalition, presented themselves as 501(c)(4) organizations, despite the fact that during the 1996 election cycle their applications were still pending before the IRS.

Two other types of independent groups are labor unions and corporations. Both are prohibited under 2 USC 441b from making campaign contributions or expenditures except through a separately established political committee or segregated fund that registers with the FEC, complies with contribution limits, and discloses its contributions and expenditures.[21] Campaign restrictions

5930

on corporations have been part of federal law for 90 years, while restrictions on unions have been in place for more than 50 years.[22] The Supreme Court has repeatedly upheld their constitutionality.[23] Despite this history, the advent of the soft money and issue advocacy loopholes led to an explosion in corporate and union spending and activism during the 1996 election cycle.[24] Two examples in the 1996 election cycle are the AFL–CIO and Triad Management.

Each of these four types of groups—charitable and social welfare organizations, unions and corporations—has social and economic objectives apart from electioneering. They are not campaign organizations like the RNC, DNC, candidate committees, and corporate and union PACs, which register with the FEC under 2 USC 431(4) for the purpose of influencing federal elections and which file under section 527 of the federal tax code for groups organized and operated for the purpose of influencing elections.[25] But all four have become increasingly important players in federal elections.

*Disclosure*

RNC chairman Haley Barbour announced at a press conference on October 29, 1996, "Disclosure of contributions and expenditures, shining the bright light of public scrutiny, is the fundamental principle underlying our campaign finance laws."[26] During the 1996 election cycle, however, many independent groups never disclosed their election-related activities, contending primarily that they were engaged in issue advocacy efforts outside the jurisdiction of federal election laws. Efforts by the media to investigate televised ads attacking candidates on the eve of election day, sponsored by groups with unfamiliar names and no readily available spokesperson, were time-consuming and often unsuccessful.[27] Even after a year-long Senate investigation, due to the absence of FEC reports and the groups' defiance of Senate subpoenas, this Committee has limited information about their 1996 election activities.

The initial legal analysis is to determine, on a case-by-case basis, whether any of these groups violated federal election law disclosure requirements. The issues include whether a particular group qualified as a political committee under 2 USC 431(4) subject to the reporting obligations in 2 USC 434(a); or whether the group made "independent expenditures" expressly advocating the election or defeat of a clearly identified candidate subject to the reporting obligations in 2 USC 434(c). While straightforward in some respects, these federal disclosure requirements contain many ambiguities that render enforcement uncertain and difficult. These provisions would clearly benefit from legislation clarifying when groups must register as political committees and what expenditures qualify as independent expenditures, including better statutory tests to distinguish between candidate versus issue advocacy. Another possible approach is legislation which, rather than improving the tests for distinguishing candidate versus issue advocacy, would instead require greater disclosure of issue advocacy efforts that name candidates or take place close in time to federal elections.[28]

*Coordination*

Another relevant legal inquiry concerns coordination, specifically whether any of the independent groups was coordinating its efforts

5931

during the 1996 election cycle with a political party, political committee or candidate. In *Buckley* v. *Valeo*, 424 U.S. 1, 47 (1976), the Supreme Court held that "expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate" are to be treated "as contributions subject to the limitations" on contributions in federal election law. The Court held that this approach was necessary to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." [29] The Court explicitly upheld disclosure requirements directed to independent groups—"individuals and groups that are not candidates or political committees"—for expenditures on "communications that expressly advocate the election or defeat of a clearly identified candidate," and for coordinated political expenditures "authorized or requested by a candidate or his agent." [30]

Twenty years later, in *Colorado Republican Federal Campaign Committee* v. *FEC*, 116 S.Ct. 2309 (1996), the Supreme Court reaffirmed this approach. The Court upheld the constitutionality of contribution limits "that apply both when an individual or political committee contributes money directly to a candidate and also when they indirectly contribute by making expenditures that they coordinate with the candidate." [31] The Court distinguished between "coordinated" and "independent" expenditures, holding that only coordinated expenditures are limited by the Federal Election Campaign Act ("FECA"). [32] The Court also rejected the proposition that party expenditures should be treated, without exception, as having been coordinated with the party's candidates, holding instead that a party has a constitutional right to make independent expenditures and must be given an opportunity to demonstrate the absence of candidate coordination with respect to a particular party expenditure.

Section 441a(a)(7)(B)(i) of FECA states that, for purposes of applying the law's contribution limits, "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidates."

The significance for independent groups is twofold. First, if an independent group coordinates expenditures with a political party, campaign committee or candidate, its expenditures must be considered contributions subject to FECA's contribution limits and disclosure requirements. Second, if the independent group hides its coordinating activity, the group opens itself up to the charge that it is hiding contributions and deliberately circumventing federal contribution limits and disclosure requirements.

The issue of what actions constitute coordination is still largely unresolved. New regulations, ongoing litigation and FEC enforcement actions are tackling a variety of questions in this area. For example, in March 1996, the FEC issued new regulations which state in part that a corporation or union distributing candidate voting guides to the general public "shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates." [33] In *Clifton* v. *FEC*, 114 F.3d 1309 (1st Cir. 1997), the First Circuit struck down the part

5932

of the regulation that completely prohibited oral contact with a candidate as overly restrictive and without statutory authorization.[34] The court held that, while it "readily accept[s] that the government has an interest in unearthing disguised contributions,"[35] contacts such as simply asking a candidate for his or her position on an issue are not enough to establish coordination:

> [E]xpenditures directed by or 'coordinated' with the candidate could be treated as contributions; but 'coordination' in this context implie[s] some measure of collaboration beyond a mere inquiry as to the position taken by a candidate on an issue.[36]

The FEC is currently engaged in drafting regulations on coordination, but has yet to issue them.

A few FEC enforcement actions provide further guidance. In July 1996, for example, the FEC brought an enforcement action in federal court alleging that the Christian Coalition had coordinated expenditures during the 1990, 1992 and 1994 election cycles with federal House, Senate and Presidential candidates and their campaigns, thereby, *inter alia,* making illegal corporate contributions in violation of 2 USC 441b.[37] The complaint cited coordinated expenditures made by the Christian Coalition for voter identification and get-out-the vote efforts, the preparation and distribution of voter guides, and public communications expressly advocating the election or defeat of clearly identified candidates. To date, no court has ruled on the merits of this complaint. The FEC has also settled two enforcement actions against independent groups for coordinating their actions with candidates, obtaining conciliation agreements in which each group admitted violating FECA. One action was brought against Americans for Tax Reform ("ATR") in 1986 for coordinating with candidates on the timing and distribution of media advisories related to ATR's Taxpayer Pledge Program.[38] Another was brought ten years later, in 1996, against the Hyatt for Senate campaign committee and Hyatt Legal Services corporation for using a campaign media adviser to re-write television commercials broadcast by the corporation.[39] These two settlements were not tested in court.

A key legal issue now being litigated is the question of whether the Supreme Court holdings on coordination are limited to coordinated expenditures which expressly advocate the election or defeat of a candidate or whether they extend to expenditures for issue advocacy. On September 25, 1997, several federal election law experts testified before the Committee that, while the law is unsettled on this point, their view was that the Supreme Court holdings did extend to issue advocacy.[40] Lawrence Noble, the FEC's general counsel, testified that it is the FEC's position that issue advocacy paid for by an independent group and coordinated with a candidate may result in a contribution to the candidate, if the issue advocacy contains an "electioneering message."[41] He testified that an issue ad with no electioneering content would not be affected by FECA, using the example of an ad broadcast by the Red Cross and coordinated with a candidate in which the candidate urges the public to join a blood drive.[42] He testified that, in the view of the FEC, coordinated issue ads which fall short of expressly advocating the

5933

election or defeat of a candidate, but which do convey an electioneering message benefiting the candidate, result in a contribution. He said that the FEC was currently involved in litigation to determine if this position is correct. A second witness, former FEC Chairman Trevor Potter, testified that "whether it is express advocacy, or issue advocacy, or anything else, it is relevant to ask in the case of a nonparty organization whether the spending . . . was, in fact, directed and controlled by the candidate."[43] Both Noble and Potter testified that a different legal analysis would apply to coordination involving only a party and its candidate—and not an independent group—due to a longstanding legal presumption that coordination between a party and its candidates is permissible and appropriate.[44]

Given the lack of certainty, clarifying legislation on the types of actions that should be considered coordination and how coordinated issue advocacy should be treated would provide needed guidance and clear statutory authority to FEC enforcement efforts.[45]

Once coordination is established between an independent group and a political party, political committee or candidate, a coordinated expenditure becomes a contribution subject to the contribution limits in FECA. For example, if the expenditure were made by a corporation or union, the resulting contribution could be a violation of law—FECA's ban on corporate and union contributions. Alternatively, if coordination were not established, the expenditure could nevertheless qualify as an "independent expenditure" under 2 USC 431(17) subject to disclosure under 2 USC 434(c).[46] Expenditures or contributions exceeding $1,000 during a calendar year could trigger requirements that a group register with the FEC as a political committee and comply with disclosure requirements in 2 USC 434(a).[47]

Coordination by an independent group with a political party, political committee or candidate is not, in and of itself, improper or illegal. But coordinated expenditures resulting in a contribution trigger requirements for the independent group to comply with relevant contribution limits and disclosure requirements. Coordinated expenditures without this compliance can constitute misconduct.

*Circumvention*

A third legal issue focuses on coordination undertaken by political parties, specifically, whether a political party or campaign coordinated with independent groups on issue advocacy spending during the 1996 elections. Political parties are required by the FEC to pay for their issue advocacy efforts with a mix of hard and soft dollars.[48] The FEC determined in 1995 that, in a presidential election year, a political party must pay 65 percent of the cost with hard dollars that meet FECA contribution limits and disclosure requirements. The FEC reasoned that issue ads sponsored by a political party are either administrative expenses or generic voter drive efforts designed to "urge the general public to register, vote or support candidates of a particular party or associated with a particular issue."[49] In the case of issue advocacy paid for by an independent group but coordinated with a political party, the questions that must be asked are, not only whether the independent group has violated federal contribution limits and disclosure requirements as

5934

discussed above, but also whether the political party deliberately circumvented federal hard money requirements by having the independent group serve as the nominal sponsor. For example, the chapter on Americans for Tax Reform describes a multi-million dollar issue advocacy effort on Medicare which was nominally sponsored by ATR, but coordinated with the RNC and paid for with an RNC soft money donation of $4.6 million. If the RNC had sponsored the Medicare effort directly, it would have had to use hard dollars for 65 percent of the cost; it instead financed the ATR-sponsored effort entirely with soft dollars.

*Third party contributions*

A fourth issue involving independent groups arose when the Committee received evidence indicating that both political parties suggested to supporters that they make contributions to sympathetic groups. Although pending campaign finance reform measures such as S. 25, the McCain-Feingold bill, would outlaw this practice, there is currently no statutory or regulatory provision that explicitly prohibits a political party from suggesting that a person make a contribution to an independent group, such as a charitable or social welfare organization. The suggestion alone, without more, does not establish a coordinated expenditure, unreported contribution, or circumvention of election law limits and disclosure requirements.

If, in addition to the fact that a contribution was recommended, evidence is found that the political party controlled the timing of the contribution or made the contribution contingent upon the recipient taking action at the suggestion of, or in concert with, the party or a candidate, it is possible that coordination occurred and compliance with contribution limits and disclosure requirements was required.

*Violations of tax law*

A fifth set of issues involves federal tax law. Charitable and social welfare organizations exempt from taxation engaged in a number of election-related activities during the 1996 election cycle. An initial legal analysis is whether any of these groups violated their tax-exempt status by engaging in partisan political activity and conferring benefits on a particular political party. For social welfare organizations under section 501(c)(4), an additional question is whether campaign activities were a dominant or secondary pursuit. A third question is whether any of these groups made false statements to the Internal Revenue Service in violation of 26 USC 7206, for example by indicating in an application for tax exempt status that the organization had not spent and did not plan to spend any money attempting to influence elections.[50] While the statutory restrictions on campaign activity are clear for charitable organizations under section 501(c)(3), social welfare organizations under section 501(c)(4) must rely on a number of regulatory interpretations that would benefit from legislation clarifying the campaign restrictions applicable to them.

Another concern that arose during the course of the Committee's investigation involves the problems associated with obtaining accurate information about an organization's tax exempt status. While

5935

section 6104 of the tax code makes available to the public successful applications under section 501(c) and related IRS materials, no similar public disclosure requirement applies to organizations whose applications are pending or ultimately rejected. The evidence before the Committee indicates, for example, that the National Policy Forum ("NPF") held itself out and operated as a 501(c)(4) social welfare organization for four years, from 1993 to 1997, while its application was pending before the IRS. The IRS decision letter ultimately rejecting the NPF application describes the standards used for granting 501(c)(4) status, as well as the results of an IRS investigation into NPF activities. This information is as important to the public as materials associated with successful 501(c) applicants, particularly since during the four-year period the NPF application was pending, NPF held itself out to the public as a 501(c)(4) tax-exempt organization as allowed by law. The same issues apply to the Christian Coalition, whose application for 501(c)(4) status has been pending for seven years. The public has a right to know during these long periods of time the basis for an organization's application, its status, and the IRS' evaluation of the applicant. To solve the problem, section 6104 could be amended to authorize the release of the same information for all 501(c) applications, rather than just for the successful ones. Alternatively, section 501(c) could be amended to prohibit organizations from holding themselves out as charities or social welfare organizations until their application for that status is actually approved by the IRS.

A related legislative concern involves indications by some organizations whose application for 501(c)(4) was rejected that they will instead claim tax exemption under section 527 of the tax code.[51] Section 527, as explained earlier, exempts from taxation groups organized and operated primarily for the purpose of influencing elections. The failed 501(c)(4) applicants apparently intend to argue that they operate to influence elections through the use of issue advocacy, rather than candidate advocacy. In this way, the groups apparently plan to avoid payment of taxes under section 527, while also avoiding the disclosure requirements in federal election law that otherwise subject campaign organizations to public scrutiny. Their aim, apparently, is to engage in election-related activities without paying taxes and without disclosing their activities to the IRS, FEC or public. This plan may succeed since, currently, section 527 grants a tax exemption without any required filing or public disclosure—it does not have a requirement similar to section 501 that organizations file formal applications for the exemption or annual information returns; it does not require through section 6104 public disclosure of applications or annual returns (since none is filed); and it does not require organizations claiming the exemption to meet the disclosure requirements of the Federal Election Campaign Act. Corrective legislation could amend section 527 to limit the availability of the tax exemption to organizations that have registered with the FEC or the equivalent state body as a political committee. Legislation could also require organizations claiming the exemption to file applications and annual information returns under section 527 in the same manner now required under section 501. These filings would strengthen the ability of the IRS to detect tax avoidance and false statements.

5936

## FOOTNOTES

[1] On the first day of the Committee's hearings, Senator Glenn named misuse of independent organizations as a key concern that needed to be investigated. 7/8/97 Hrg. p. 20. Senator Torricelli stated that the "single greatest change in the political culture of the 1996 elections . . . was the use of non-profit, tax-free organizations." 7/8/97 Hrg. p. 98.

[2] See Chapter 40.

[3] See hearings on September 23, 24, 25 and 26, 1997.

[4] See Annenberg Public Policy Center, "Issue Advocacy Advertising During the 1996 Campaign: A Catalog," Report Series No. 16 (9/16/97), p. 7. The Center estimated that parties and independent groups together spent between $135 and $150 million on issue ads. Since the two parties together spent about $68 million on issue ads, that leaves the total for independent groups alone between $67 and $82 million. See also *Washington Post*, 2/9/97, which estimated total election-related spending by independent groups at $70 million.

[5] Annenberg Public Policy Center, "Issue Advocacy Advertising During the 1996 Campaign: A Catalog," Report Series No. 16 (9/16/97), p. 7.

[6] According to FEC records, in 1996, the RNC gave $4.6 million to Americans for Tax Reform; $650,000 to the National Right to Life Committee; and $600,000 to American Defense Institute which later returned the funds.

[7] According to FEC records, in 1996, the DNC gave $117,500 to the National Coalition of Black Voter Participation; $20,000 to the African American Institute; $10,000 to the Stonewall Gay and Lesbian Club; $10,000 to the Congressional Black Caucus; and $4,000 to the Hispanic Caucus.

[8] See, for example, undated document produced by the RNC entitled "Soft Money Fundraising Strategy," R003215, indicating that the RNC would raise "miscellaneous revenue" totaling $7.7 million for Americans for Tax Reform, National Right to Life Committee and American Defense Institute; Exhibit 2400: memorandum from RNC finance chair Jo-Anne Coe to RNC chairman Haley Barbour and other RNC officials, regarding the delivery of checks to these organizations; an undated document produced by the RNC, 10/17/96, R021609, analyzing whether contributions to five tax-exempt organizations are tax deductible and whether they would have to be reported to the public; an undated document, DFP004244, which lists four pro-Republican tax-exempt organizations and indicates for each organization a large dollar figure which, when added together, total $15.1 million. See also Chapter 10.

[9] See for example, Exhibit 2365: memorandum from RNC director of campaign operations Curt Anderson to RNC chairman Haley Barbour, entitled "Group of 12, or Council of Trent, or Whatever," 3/4/96, R006050.

[10] Exhibit 2363: memorandum from RNC director of campaign operations Curt Anderson to RNC chairman Haley Barbour, 4/23/96.

[11] Exhibit 2367, Coalition Building Manual, authored by Curt Anderson.

[12] See following chapters.

[13] Subsection 501(c) authorizes an exemption from taxation for over two dozen types of organizations.

[14] See 26 U.S.C. 501(c)(3) and 26 CFR 1.501(c)(3)–1; *Association of the Bar of the City of New York v. Commissioner*, 858 F.2d 876 (2d Cir. 1988), (even insubstantial political activity endangers an organization's exemption under section 501(c)(3)).

[15] 26 USC 501(c)(3) and 26 CFR 1.501(c)(3)–1(d)(1)(ii) ("it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests"); *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989) (organization operated for the benefit of Republican organizations or candidates does not qualify for tax exemption under section 501(c)(3)).

[16] *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989) (organization operated for the benefit of Republican organizations or candidates does not qualify for tax exemption under section 501(c)(3)); *Regan v. Taxation with Representation*, 461 U.S. 540 (1983) (tax exemption is a privilege that can carry severe restrictions).

[17] 26 USC 501(c)(4); 29 CFR 1.501(c)(4)–1.

[18] 26 CFR 1.501(c)(4)–1.

[19] Rev. Rul 81–95, 1981–1 Cumulative Bulletin 332. The statute states that, to qualify for a tax exemption under 501(c)(4), an organization must be "operated exclusively for the promotion of social welfare" (emphasis added). The implementing regulation, 26 CFR 1.501(c)(4)–1(a), states that, "[a]n organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community" (emphasis added). It is this regulatory language that is cited as permitting 501(c)(4) organizations to engage in campaign activity as a secondary pursuit.

[20] See IRS decision letter disqualifying National Policy Forum from tax exemption under section 501(c)(4) due to partisanship, 2/21/97; Chairman Thompson, 7/23/97 Hrg. p. 225 ("In a 501(c)(4), you are allowed some political activity. It is not supposed to be partisan political activity, but you are allowed some. But you are not supposed to be a subsidiary of a party."). See also endnotes 15 and 16, supra.

[21] 2 USC 441b(a). Unions and business organizations such as a Chamber of Commerce may also be exempt from taxation under section 501(c)(5) or (6) of the Internal Revenue Code, but their exemption does not carry any prohibition against campaign activity. Unlike charitable and social welfare organizations, campaign restrictions on unions and corporations are contained in federal election law, not federal tax law.

[22] See, for example, Tillman Act of 1907, prohibiting corporate contributions. Campaign restrictions on unions date from 1943. Congressional Research Service Report No. 90–199A, "Campaign Financing & Corporate Expenditures: Analysis of Austin v. Michigan State Chamber of Commerce" (4/10/90).

5937

[23] See, for example, *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986); *Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652 (1990).

[24] See Part 4 on soft money and issue advocacy, infra.

[25] 26 USC 527(e).

[26] "Haley Barbour, Chairman of the Republican National Committee, Discusses Democratic National Committee Refusal of Pre-Election FEC Report," Presidential Campaign Press Materials, Federal Document Clearing House, Inc., 10/29/96.

[27] See, for example, *Arkansas Democrat-Gazette*, 10/24/96; Kansas City Star, 10/27/96; *Fresno Bee*, 11/3/96; *Wall Street Journal*, 2/5/97; *Washington Post*, 3/9/97.

[28] See S. 25, the McCain-Feingold bill, which proposes a number of legislative remedies to this problem; statement by Senator Carl Levin of Michigan, Congressional Record, 10/6/97, pp. S10409–16. See also Part 4 on issue advocacy, infra.

[29] 424 U.S. at 46.

[30] 424 U.S. at 80.

[31] 116 S.Ct. at 2321.

[32] See, for example, Parts II and III of the prevailing opinion. Some Justices suggested, in *dicta*, that parties should be able to make unlimited coordinated expenditures with their candidates, but no ruling was made by the Court on that issue. See, for example, opinion by Justice Kennedy.

[33] 11 CFR 114.4(c)(5).

[34] The court also struck down a requirement in the regulation that the voting guides provide substantially equal space and prominence to each candidate.

[35] 114 F.3d at 1314.

[36] 114 F.3d at 1311 (citations omitted).

[37] *FEC v. Christian Coalition*, Civil Action No. 96–1781 (D.D.C.), 7/30/96.

[38] FEC MUR 3975. See also chapter 11 discussing Americans for Tax Reform.

[39] FEC MUR 3918.

[40] See, for example, *Buckley v. Valeo*, 424 U.S. 1, 80 (1976), discussed above, in which the Supreme Court identified two separate categories of expenditures by independent groups which could constitutionally be subjected to disclosure requirements: express advocacy communications, and expenditures coordinated with candidates. By mentioning coordinated expenditures in a separate category, apart from express advocacy communications, the Court implied that coordinated expenditures which do not reach the threshold of express advocacy may qualify as candidate contributions subject to contribution limits and disclosure requirements.

[41] Lawrence Noble, 9/25/97 Hrg., pp. 34–40.

[42] Lawrence Noble, 9/25/97 Hrg., p. 38.

[43] Trevor Potter, 9/25/97 Hrg., p. 36.

[44] Lawrence Noble and Trevor Potter, 9/25/97 Hrg., pp. 35–36, 39–40. Potter testified that the FEC had traditionally "presumed all party spending was coordinated with candidates" and had deemed coordination between the two irrelevant, concentrating instead on determining whether specific party expenditures were generic party-building efforts that could not be attributed to individual candidates or candidate-specific spending subject to contribution limits. 9/25/97 Hrg., p. 22. See also legal analysis provided in Part 5, *infra*.

[45] S. 25, the McCain-Feingold bill, proposes a number of legislative remedies to clarify what actions constitute coordination and result in contributions subject to FECA.

[46] 2 USC 431(17) defines an "independent expenditure" as "an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate, or any authorized committee or agent of such candidate, and which is not made in concert with, or at the request or suggestion of, any candidate, or any unauthorized committee or agent of such candidate."

[47] See 2 USC 431(4); *Buckley v. Valeo*, 424 U.S. 1, 79 (1976); *Akins v. FEC*, 101 F.3d 731 (D.C. Cir. 1996).

[48] FEC Advisory Opinion 1995–25.

[49] FEC Advisory Opinion 1995–25.

[50] See, for example, item 15 on IRS Form 1024, "Application for Recognition of Exemption Under Section 501(a)."

[51] See, for example, *Roll Call*, 10/20/97, p. 1.

5967

## PART 2   INDEPENDENT GROUPS

### Chapter 10: The Republican Party and Independent Groups

One of the striking differences between the 1996 elections and prior elections was the prominent role played by so-called "independent groups" that were not registered with the Federal Election Commission as political organizations. Typically, these groups ran campaign ads under the guise of "issue advocacy." By operating in that fashion, they were able to circumvent federal restrictions on campaign financing. Evidence before the Committee shows that the Republican National Committee closely coordinated with several ostensibly independent groups, channeled millions of dollars (from the RNC and from Republican donors) to such groups, and even established front organizations.

Additionally, a number of conservative groups acted as fronts for Republican donors, enabling the donors to circumvent the campaign finance laws. Many of these purported to be grassroots organizations but were actually shell organizations established by professional fundraisers for the purpose of running attack ads.

Several of the organizations mentioned in this chapter are discussed at greater length in other parts of the Minority Report. The purpose of this chapter is to examine how purportedly independent groups have served as fronts or proxies for the Republican National Committee and/or Republic donors.

### FINDINGS

(1) The Republican Party financed and participated in election-related activities by tax-exempt organizations, in part to evade the limits of federal election laws and to use the organizations as surrogates for delivering the Republican Party's message.

(2) The RNC directly funded, for purposes that benefited the Republican Party, a number of tax-exempt organizations that were supposed to operate in a non-partisan manner.

(3) The RNC also solicited, collected and delivered third-party funds to tax-exempt organizations for election-related activities to benefit the Republican Party.

(4) The RNC instructed and helped Republican candidates to coordinate their campaign activities with independent groups.

### INTRODUCTION

A significant number of nonprofit organizations that claimed to be nonpartisan played an active role in the 1996 elections, spending millions of dollars on behalf of political parties or specific candidates. These groups were not registered with the Federal Election Commission as political organizations and most of them claimed to be "social welfare" or charitable organizations, registered with the Internal Revenue Service as either 501(c)(4) or 501(c)(3) tax-exempt entities.

The Republican National Committee had close ties to several of these groups. It coordinated with a number of them and often provided financial support—directly or by raising money from conservative donors. The RNC and the independent groups were able to engage in these activities by exploiting the two most important

5968

gaps in the campaign finance laws: the soft-money loophole and the issue-advocacy loophole.

The federal campaign finance laws clearly state who is allowed to contribute to candidates and how much money those donors are allowed to give and require candidates to identify individuals who contribute in excess of $2,000 to the Federal Election Commission.[1] Although the rules seem clear-cut, they are easily circumvented. The biggest loophole is by way of so-called "soft money," which can be contributed in unlimited amounts to the political parties and can even be contributed by corporations, which are barred from making contributions to specific candidates. Although soft money is only supposed to be used on behalf of state-level candidates or for generic, party-building purposes (such as get-out-the-vote drives), it has become routine for both major parties to spend these funds in ways that benefit specific candidates (see Chapter 23).

Issue advocacy is the second most significant loophole. As long as ads avoid using "express advocacy" terms like "elect" and "defeat," the advertisers have been able to argue successfully that they are not running campaign ads—even if the ads are obviously intended to benefit specific candidates. When an ad falls into the "issue advocacy" category, the campaign finance laws do not apply: Virtually anyone can contribute money to independent groups to pay for such ads, there are no limits on how much money a donor can give, and there is no disclosure of the donor's identity. Thus, many organizations that run "issue ads" are not required to or do not register with the Federal Election Commission as political organizations, despite running television ads attacking candidates, conducting mail and telephone operations targeting voters, and spending millions of dollars on activities which affect election outcomes.

Although the issue-advocacy loophole was exploited on behalf of both Democratic and Republican candidates, the evidence before the Committee indicates that there were some major differences. Whereas the Democratic National Committee does not appear to have engaged in extensive coordination with independent groups, evidence before the Committee shows that the Republican National Committee actually established two nonprofit groups and that it engaged in a high level of coordination with several others. Documents produced to the Committee indicate that the Republican Party worked to identify, on a national and regional level, the groups most likely to help Republican candidates win office; instructed its candidates to develop formal "coalition plans" with sympathetic groups; and distributed a "Coalition-Building Manual" to help them do so. In addition to general organizational and planning efforts encouraging Republican candidates to coordinate their campaign efforts with independent groups, the RNC undertook a wide variety of specific election-related activities with particular organizations, including joint mailings, joint issue advocacy efforts, joint media events, and joint polling.

The contrast between the DNC and RNC is even sharper on the financial side. Federal Election Commission records show that the DNC contributed less than $185,000 to nonprofit groups in 1996. The RNC, by contrast, contributed close to $6 million (of which

---

Footnotes at end of chapter.

5969

$600,000 was returned) to nonprofits in the weeks before the November election. The RNC also raised millions of dollars for "independent" groups from major Republican Party donors, sometimes actually collecting and forwarding donors' checks to the recipient organizations.

By using outside groups as proxies and surrogates, the RNC was able to foster the impression that independent, "grassroots" organizations were backing the party's agenda and its candidates. The RNC was also able to circumvent federal campaign finance laws by channeling "soft money" to outside groups which, in turn, used the funds for issue advocacy. If the RNC had conducted the same activities itself, it would have been obliged under FEC rules to use a mixture of soft dollars and hard dollars. In short, the Republican Party worked with and financed nonprofit organizations as part of an organized effort to circumvent the campaign finance laws.

Many of the conservative organizations investigated by the Committee were organizations that purported to be independent, grassroots groups. However, the Committee found that several such groups were created mainly, or exclusively, for the purpose of running attack ads. Donors who contributed to such groups were able to spend money on behalf of political candidates without limit and without disclosure. Professional fundraisers played a key role in setting up and running such organizations.

Several of the conservative groups mentioned in this chapter are discussed at length in subsequent chapters of the Minority Report, notably Americans for Tax Reform, the Christian Coalition, and Triad Management Services. The purpose of this chapter is to examine how such groups have served as fronts for the Republican Party and/or Republican donors, thus operating as mechanisms to circumvent the federal campaign finance laws.

### RNC TIES TO INDEPENDENT GROUPS

*Coalition plans*

Haley Barbour, a long time Republican lobbyist, became chairman of the Republican National Committee in January 1993 and served a four-year term. Throughout his tenure, Barbour encouraged Republican candidates to work closely with conservative organizations, which are referred to in RNC documents as "coalition" groups.

During Barbour's tenure, the party urged Republican campaigns to develop coalition plans to organize the campaign's ties to such groups as the National Right to Life Committee, the Christian Coalition, and the National Rifle Association. Coalition plans served many purposes, the principal one being to convince voters that "independent" groups were supporting GOP candidates. A "Coalition-Building Manual," issued in 1994, notes that "what we say about ourselves is suspect, but what others say about us is credible."[2] The manual was prepared by the National Republican Senatorial Committee ("NRSC"), a division of the RNC.

When messages come from a third party, there are other advantages, not mentioned in the NRSC manual:

- If a Republican candidate runs hard-hitting attack ads, he can be accused of negative campaigning. When a third party

5970

runs such ads, the Republican candidate can disavow any responsibility—and can even denounce the advertiser—while, at the same time, benefitting from the attack ads. Perhaps the best-known example of this was the Willie Horton television ad in the 1988 presidential campaign. The ad, which attacked Democratic nominee Michael Dukakis, was widely criticized because of perceived racial overtones.[3] But the Bush campaign averted blame, because the ad was run by an independent group.

• Republican contributors are able to avoid limits on campaign contributions by donating to ostensibly "nonpolitical" groups engaged in issue advocacy. Since these donations are not classified as campaign contributions, corporations, which are forbidden to contribute to candidates, are free to donate; there are no limits on the size of contributions; and donors can hide their identities.[4]

RNC documents provided to the Committee show that the RNC worked to identify, on a national and regional level, the groups most likely to help Republican candidates win office; instructed its candidates to develop formal "coalition plans" with sympathetic groups; and distributed the NRSC's Coalition-Building Manual to help its candidates coordinate their campaign efforts with outside organizations.

On March 4, 1996, Curt Anderson, RNC political director and head of campaign operations, sent a memo to RNC Chairman Haley Barbour entitled, "Group of 12, or Council of Trent, or Whatever."[5] In it, Anderson wrote:

> You had asked us in Atlanta to come up with ideas for a group that would encompass the leadership of the base Republican coalition. . . . Membership should be restricted to groups that actually have troops in the field that they can motivate, activate, and deliver, or groups that have a track record of expending significant resources to do the same.

Anderson then listed possible members for a coalition composed of the leaders of pro-Republican outside groups. Although the list is heavily redacted, it includes Americans for Tax Reform ("ATR"), the National Right to Life Committee ("NRTLC"), the Christian Coalition, and Citizens for a Sound Economy. That this list was compiled for campaign purposes is demonstrated by some of the descriptions of possible members. For example, the memorandum proposes as a member, the Christian Coalition's "national field director [who] works with campaigns and the actual field organization."[6]

It appears that approximately 40 individuals were later reviewed by Barbour, Anderson, RNC co-Chairman Evelyn McPhail, RNC Communications Director Edward Gillespie, and RNC chief strategist Donald Fierce. Their support for, opposition to, and comments on each of the proposed persons are tallied on an undated, two-page document produced by the RNC to the Committee.[7] Two persons had unanimous support: Ralph Reed of the Christian Coalition and Wayne LaPierre of the National Rifle Association. Republican officials considered working with several other individuals, including representatives of ATR, NRTLC, the United Seniors Association, the U.S. Chamber of Commerce, GOPAC (House Speaker Newt Gingrich's "leadership PAC"), the National Federation of

5971

Independent Business, the Republican Governors Association, NRCC, NRSC, and a person from "Tobacco." (The NRCC—which stands for the National Republican Congressional Committee—is, like the NRSC, part of the Republican National Committee.) Anderson urged that the coalition include "only folks with troops in the field." Fierce agreed, suggesting that the group "only include people who have large coalitions that are organized that can help us." Fierce also suggested keeping the group "small enough so you can have confidential conversations." [8] Because no RNC official provided testimony to the Committee on these issues, it is unclear whether this evaluation process resulted in a formal coalition of pro-Republican group leaders which the RNC used to coordinate campaign efforts.

Several Republican candidates took the RNC's advice and worked closely with independent groups. As Anderson noted in an April 23, 1996, memo:

Today, most of our campaigns lead off with their coalition plan when you meet them.

We no longer treat coalition planning as if it is an ancillary activity, or a quaint way of getting well meaning but ignorant people involved.

We teach [in the RNC's campaign management college] that campaigns must include both a thematic and tactical approach to including the combined efforts of every coalition group that they can conceivably appeal to. We additionally demand that each campaign have a senior person—campaign manager, deputy, etc.—who has line item responsibility for the execution of the coalition plan.

Every state party Victory '96 plan is required to have a coalition component.

Every Regional Field Representative is in the process of putting together the definitive list of the 5 top reachable coalition groups in each state, and their approximate size . . . [Redacted] will be on this list for most states, as will the [redacted], and [NRTLC]. Christian Coalition will make the list in about ½ of the states.

At virtually all of our field meetings we have put together day long meetings in which we bring the decision makers from the biggest coalition groups. We generally spend an hour with each of them comparing notes on races

. . .

I should add at this point, that while [redacted] did do some work in the OR race, both Dave Hansen and Wes were *very* frustrated at their unwillingness to think outside the lines and consider expanding their activities in the way that some of the other groups did.

While it has always been true that our coalition groups need direction on how they can best effect the outcome of elections, many of the larger groups are becoming increasingly sophisticated in their approach and they employ competent professionals who know how to make things happen. [9]

5972

This exchange between the two top RNC officials in charge of the 1996 campaign operations leaves no doubt that the RNC deliberately planned for its candidates to coordinate with sympathetic independent groups to affect the outcome of elections.

The memorandum also illustrates the RNC's attempt to use only certain groups that clearly supported Republican candidates and that the RNC distrusted truly independent endeavors, even by conservative organizations. Barbour had made the same point in an urgent memorandum to "Republican Leaders," dated March 5, 1996, warning against "independent expenditure campaigns." [10] Barbour wrote:

> As we approach the time when it may become clear who our nominee will be, it is crucial our supporters do not get suckered into participating in any "independent expenditure" campaigns that purport to be helping the Republican nominee for president. . . . First, the party (the RNC and our state party organizations) are allowed to run issue and generic party advertising, and we have a sizeable (though it needs to be bigger) budget for that. We are scheduled to begin in April. Second, the party can coordinate our generic advertising with anybody, but an independent expenditure group is not allowed to coordinate or consult with the nominee's campaign or the party. It must be truly independent. That means it is not only unaccountable, but could actually turn out to be a loose cannon saying something very different from what the message should be. [11]

The evidence before the Committee shows that the RNC not only instructed its candidates to develop formal coalition plans, it provided them with the NRSC's "Coalition Manual," [12] which contained instructions on *how to coordinate* their campaign efforts with outside groups. The 29-page manual, which was written by Anderson when he worked at the NRSC, states that coalition groups can:

> Contact their members on your behalf—and at no cost to you—using mail, phones, even earned media
> Make their membership lists available to you so the campaign can contact them with a message directly from the candidate
> Register new voters
> Provide a source of campaign volunteers to complement the campaign operation
> Increase the turnout of their members . . .
> Publicly endorsing your candidacy, allowing you to use their endorsement in your campaign materials included in your advertising and mail
> Private endorsement in the groups' "internal media" (e.g. newsletters, meetings, phone trees, mailings)
> Providing surrogate speakers for your campaign
> Generating public attacks on the Democrat opponent . . .
> Direct mail solicitation of their membership for contributions to your campaign
> Provide contributor lists to your campaign
> Host fundraising events among their constituents. [13]

5973

The manual also provides a list of specific organizations that "have been the most active in encouraging their constituents to support Republican candidates."[14] The manual states that this list excludes groups that "do not really engage in voter contact" and notes that additional information can be obtained on what specific groups "have done in previous campaign cycles."[15] The groups are divided into two categories, "those who endorse candidates and those who do not."[16] In discussing the groups that do not endorse candidates, the manual states that "[s]ome groups will bend their rules for specific candidates," while others will nevertheless "communicate favorable and unfavorable messages about candidates to their members."[17] For example, the manual classifies the Christian Coalition as a group which does not endorse candidates, while noting that the Coalition conducted "some of the most effective and hard-hitting mail and phone programs last cycle."[18]

Still other documents demonstrate the RNC's deliberate coordination with carefully selected outside groups. For example, an undated internal RNC memorandum entitled, "Outreach, Auxiliaries, Coalitions," states:

> The five coalition organizations that have distinguished themselves and we have to pay special attention to are: National Rifle Association, National Right to Life Committee, National Right to Work Committee, National Federation of Independent Businesses, Christian Coalition.[19]

A March 6, 1996, RNC memorandum to Anderson is entitled "Coalitions" and lists specific independent groups categorized by issue areas.[20] Although the contents of the document were heavily redacted by the RNC before it was produced to the Committee, one entry that did remain describes "Family issues." That entry states: "Christian Coalition/Eagle Forum/Pro-Life groups/in-state PACs. In this community alone, there are probably two dozen different organizations. What we ask them to do would be very different than what we ask pro-gun groups to do."

### Coordination during the 1996 election cycle

During the 1996 campaign cycle, RNC officials also met frequently with representatives of "independent" conservative groups to compare notes about campaign strategy and tactics. One important venue for information exchange was the headquarters of Americans for Tax Reform, a nonprofit organization headed by Grover Norquist, a Republican activist with close ties to Speaker Gingrich (see Chapter 11). Norquist hosted weekly meetings at the headquarters of ATR where representatives of conservative organizations met with Republican candidates, operatives, and party officials. Republican Party officials attended these Wednesday meetings along with 50 to 70 conservative activists at a time. At the meetings, discussions took place concerning specific candidates, races, and election strategy.[21]

The RNC also undertook a wide variety of specific election-related activities with particular organizations. These activities included joint polling, joint mailings, joint issue advocacy efforts, and joint media events. An RNC internal memorandum dated March 30, 1996, to the RNC's Evelyn McPhail describing a "Seniors Pro-

5974

gram" illustrates the type of coordination undertaken.[22] (Some of the seniors groups mentioned in the memo are discussed in Chapter 15 of the Minority Report.) The memorandum states:

> We had a great meeting w. Haley. He was extremely supportive and wanted us to "go all the way" with this. . .
> 3/25–3/27 Meetings with Coalition Groups
> U.S. Seniors— . . . Interested in developing political strategy as to where and how we reach senior voters in key states. I think they want to do the mail for the campaign effort.
> 60 Plus— . . . They give awards to "senior friendly" members of congress and publicize them. . .
> Seniors Coalition— . . . They were very interested in sponsorship of our conference. They offered to help take on some financial obligations as well. They asked us to determine where we think they should do their next poll (Kellyanne has done research in CA & FL on how Medicare and senior issues are playing). They indicated a willingness to give us some input into the questions asked as well. Per Judy, I discussed this with Wes Anderson and he recommended we suggest Illinois, based on the fact that it is a key battleground state which leans slightly Democratic, and could provide for a good sample.[23]

This memorandum alone provides evidence that the RNC engaged in joint mailings, joint media event, and joint polling with independent groups.

*RNC funding of independent groups*

The RNC not only coordinated with conservative groups, it provided them with millions of dollars of financing—further undermining these organizations' assertions that they are "independent" and "nonpartisan." An organization that receives financial help from the Republican Party is, of course, less likely to stray from the party line. Moreover, the practice of financing independent groups enabled the RNC to circumvent limits on how soft money can be spent, as noted elsewhere in this chapter.

The RNC's practice of donating party money to conservative organizations did not begin in the 1996 election. In 1990, the RNC contributed $64,000 in seed money to the Christian Coalition, which had been founded the year before by religious broadcaster Marion G. ("Pat") Robertson, a former Republican presidential candidate. The Christian Coalition holds itself out as a "nonpartisan" organization, and yet it spends millions of dollars on behalf of Republican candidates (see Chapter 14).

In 1992, the National Republican Senatorial Committee contributed to the American Defense Institute, a 501(c)(3) charitable organization that conducts get-out-the-vote drives among retired and serving military people. After the donation became public, ADI was criticized for accepting Republican funding of an allegedly nonpartisan voter registration effort.[24] (The Democratic Party has also provided support to get-out-the-vote organizations, as discussed elsewhere in the Minority Report.)

5975

Also in 1992, the NRSC contributed to the National Right to Life Committee, a 501(c)(4) organization.[25] Like other recipients of RNC contributions, the NRTLC claims to be nonpartisan, but it is closely associated with the National Right to Life PAC, a political action committee that is a major donor to Republican candidates. (During the 1996 campaign, for example, nearly all of the PAC's $180,000 in political contributions went to Republican candidates.[26]) While the National Right to Life PAC donates "hard money" to Republican candidates, the National Right to Life Committee helps some of the same candidates through "issue advocacy" activities.

In 1994, the NRSC contributed $175,000 to the National Right to Life Committee during the week before the November election.[27] A few months later, Senator Phil Gramm of Texas, then chairman of the NRSC, told the *Washington Post* that the party made this donation because it knew the funds would be used on behalf of several specific Republican candidates for the Senate. Senator Gramm, in the *Post's* words, said that he had "made a decision. . .to provide some money to help activate pro-life voters in some key states where they would be pivotal to the election."[28] He later told the newspaper that the money had only been given because the NRTLC's "message conformed to the Republican message."[29]

### RNC funding of independent groups in the 1996 election cycle

During the 1996 election cycle, the Republican National Committee provided an unprecedented amount of money to "independent" groups. It also arranged for Republican donors to contribute millions of dollars to such groups.

An undated document produced by the RNC analyzes whether contributions to six tax-exempt organizations, including Americans for Tax Reform, the National Right to Life Committee, American Defense Institute, and the City of San Diego, would be tax-deductible and whether they would have to be reported to the public.[30] (San Diego hosted the Republican National Convention in August 1996.) Another undated RNC document lists five tax-exempt organizations, providing for each its address, telephone and fax numbers, contact person. The RNC document also states for each group whether it has section 501(c)(3) or (c)(4) tax-exempt status, whether contributions to the group are tax-deductible, followed by a large dollar figure.[31] The listed organizations and corresponding dollar amounts are:

- ATR—$6 million;
- NRTLC—$2 million;
- ADI—$700,000;
- the City of San Diego—$4 million; and
- the United Seniors Association—$2.4 million.

The figures, when added together, total $15.1 million.

Another RNC document prepared during the 1996 campaign is entitled "Soft Money Fundraising Strategy"[32] and it suggests various ways in which soft money could be raised for the party, including direct mailings to corporations and solicitations by members of Congress and business leaders.

The most intriguing part of the document is a section headed "Miscellaneous Revenue." This section appears to outline a plan for the RNC to raise several million dollars from corporations and

5976

wealthy individuals. The document proposes that "Haley," "Newt," "Team 100," "V96" (possibly the GOP's Victory '96 fundraising committee), and a "cigarette company," among others, assist in the fundraising. Four tax-exempt organizations are identified as possible recipients of the funds raised and includes, along with the amounts of money they were apparently slated to receive:

- Americans for Tax Reform—$6 million;
- National Right to Life Committee—$1 million;
- American Defense Institute—$700,000; and
- the City of San Diego—$4 million.

Because no RNC official provided testimony to the Committee about RNC fundraising practices, the precise meaning of these documents remains unclear. When viewed together, however, they suggest explicit planning, research, and fundraising goals by the RNC in an organized effort to provide millions of dollars in financing to the named organizations. The facts suggest that the RNC took steps to execute these fundraising plans.

*RNC contributions and fundraising help in 1996*

Shortly before the November 1996 election, the RNC made transfers of nearly $6 million to groups mentioned in the "Soft Money Strategy" document. The RNC gave $4.6 million to Americans for Tax Reform, $650,000 to the National Right to Life Committee, and $600,000 to the American Defense Institute.[33] This direct payment to tax-exempt organizations is an unprecedented amount. It is roughly 30 times the DNC's donations to tax-exempt organizations in all of 1996,[34] and it dwarfs all prior party transfers to tax-exempt groups in the 20 years the Federal Election Campaign Act has been on the books. Prior to 1996, no party had given even $1 million to a tax-exempt organization. Apparently, the transferred funds consisted entirely of soft money paid over the course of the two months before election day.

ADI returned the $600,000 in late October. Months later, when a reporter asked ADI President Eugene B. ("Red") McDaniel why the donation was returned, he said that "we didn't want to be controversial and we had funding from other sources."[35] He failed to mention that the "funding from other sources" had been arranged by the RNC. (Not only was McDaniel's statement to the press suspect, so was an ADI document relating to the return of the donation. A $600,000 check from ADI to the RNC, dated October 25, 1996, includes the notation on the memo line: "Repayment of loan."[36])

RNC Chairman Haley Barbour raised $500,000 for ADI from Philip Morris and collected checks totalling $510,000 from other donors, according to an internal RNC document discussed below. ADI's McDaniel has confirmed to the press that ADI did, in fact, receive $500,000 from Philip Morris and that Barbour "could have" helped solicit it.[37] McDaniel also apparently provided to the press a copy of an October 1996 letter from Jo-Anne Coe, the RNC's deputy finance chair, enclosing six checks from prominent Republicans totalling $530,000.[38] This letter has not been produced to the Committee by the RNC. The checks identified in the letter apparently exactly match the checks described in the October 17 memorandum, with the addition of one new check for $100,000 from an RNC

5977

finance chair.[39] The letter reportedly asks McDaniel to "[p]lease send an acknowledgment to each individual as well as a receipt for their use in claiming deductions on their tax returns."[40]

The evidence indicates that the RNC steered about $1 million to ADI, which is roughly the same amount that of money ADI spent on its entire voter turnout effort, according to an estimate by McDaniel.[41] These facts suggest that the RNC essentially provided the funding for ADI's entire voter effort in the 1996 elections. McDaniel told the press that his organization was "apolitical" and "had asked for money from both parties," but received funding only from the RNC. "Asked why the RNC provided him with so much financial support, McDaniel said, "Maybe they think it helps them."[42] McDaniel did not explain why ADI allegedly asked the RNC for funding, but then later returned it. One possible explanation is that ADI returned the $600,000 to the RNC—after receiving $530,000 in checks from prominent Republicans delivered by the RNC finance chair—to avoid public disclosure of the RNC's role in financing ADI's allegedly nonpartisan effort with partisan dollars.

ADI was just one of several "independent" groups whose contributions had apparently been organized by the RNC. On several other occasions, RNC officials solicited donors and, at times, even forwarded checks to the recipient groups.

In the weeks leading up to the November election, the RNC arranged for pro-Republican donors to give large donations to three groups listed in the "Soft Money" document:[43] Americans for Tax Reform, the National Right to Life Committee, and the American Defense Institute. The RNC's role in these donations is made clear in a memorandum dated October 17, 1996—and marked "confidential"—from Jo-Anne Coe, the RNC's deputy finance chair, and addressed to three other RNC officials: Chairman Haley Barbour, Sanford McAllister, and Curt Anderson. In the memo, Coe discusses her efforts to forward a number of checks from third parties to ATR, NRTLC, and ADI.[44] With respect to ADI, Coe states that "the following checks for ADI are en route to me," listing five checks which "will bring the total for ADI to $510,000—plus the $500,000 Haley obtained from Philip Morris."[45]

The RNC also collected and delivered checks from third parties to Americans for Tax Reform and the National Right to Life Committee. The October 17 memorandum from Coe to Barbour, McAllister, and Anderson describes Coe's intention to forward a $100,000 check from businessman Carl Lindner to ATR and a second $100,000 check from Lindner to NRTLC.[46] Two letters written by Coe on October 21—which, unlike the ADI letter, were produced to the Committee—indicate that these checks were delivered.[47] The first letter is addressed to Grover Norquist, president of ATR, and the second to David O'Steen, executive director of NRTLC. Each states that a $100,000 check from Lindner to the organization is enclosed. Coe also states in each, "Glad to be of some help. Keep up the good work." According to bank records produced to the Committee, ATR deposited a $100,000 check on October 23.[48] Since no NRTLC bank records were obtained by the Committee, the evidence is not conclusive that NRTLC received and deposited the

5978

$100,000 check, but there is currently no reason to believe otherwise.

The evidence before the Committee suggests that the RNC was not merely collecting and delivering checks to ATR, NRTLC, and ADI, it may have also been using the checks as leverage to persuade the three organizations to cooperate or participate in certain activities. The October 17 memorandum from Coe to Barbour, McAllister, and Anderson asks the three RNC officials for a quick response to several questions about the checks being forwarded to the three organizations "so I can put this project to bed." [49] The "project" itself is not described in the memorandum; however, a second document may provide additional information. It is an October 21, 1996, memorandum from Coe to Barbour. This memorandum states:

> As soon as we meet and hopefully come to some resolution on the joint state mail project, I will forward these checks to the three organizations. In the meantime, I am respectfully withholding delivery of the checks until we have the opportunity to discuss this matter. [50]

Could the "joint state mail project" be the "project" referred to in the October 17 memo from Coe to Barbour? The fact that the RNC finance director was "respectfully withholding" checks to "three organizations"—presumably ATR, NRTLC, and ADI—may be evidence that the RNC was attempting to use the checks as leverage to persuade these organizations to participate in a "joint state mail project." Unfortunately, because Coe, McAllister, Anderson, and other top RNC officials refused to provide testimony to the Committee, the questions raised by these documents remain unanswered. (Barbour did testify, but his testimony was limited to issues surrounding the National Policy Forum, a nonprofit set up by the RNC. The Minority sought to question him later about other issues, but was unsuccessful.)

Despite unanswered questions, the evidence before the Committee establishes that the RNC provided, both directly and indirectly, millions of dollars to independent groups in the last two months before the 1996 election. The RNC's direct payments to three of these groups exceeded $5 million. The evidence suggests that the RNC intended to and perhaps succeeded in directing another $10 million in undisclosed third-party contributions to five groups. In the absence of Committee enforcement of its document and deposition subpoenas, however, the extent to which the RNC obtained contributions for pro-Republican independent organizations and what it received in return for this fundraising remain unexplored.

*Circumventing campaign finance laws*

Although RNC officials refused to submit to questioning by the Committee, there have been published reports in which party officials commented on RNC "donations" to nonprofit groups. For example, Barbour, as noted below, described the donations as simply contributions to "like-minded" organizations.

In fact, the Committee has found that millions of dollars channeled to "independent" groups were used on behalf of Republican candidates during the weeks leading up to the November 1996 elec-

5979

tion. Americans for Tax Reform—the largest recipient of RNC funds—received $4.6 million, as noted above. ATR used this money to conduct a massive "issue advocacy" campaign aimed at helping the Republicans. With Republican Party money, ATR sent 19 million pieces of mail to voters and arranged for telemarketers to make four million telephone calls. ATR also paid for a television commercial attacking then-Representative Robert Torricelli (NJ), a Democratic candidate for the Senate. (see Chapter 11)

By operating through surrogates like ATR, the RNC was able to circumvent federal campaign finance laws. When a political party broadcasts issue ads, it is required to pay for them with a combination of hard dollars and soft dollars. If an outside group runs such ads, there are no such restrictions—even if the funding comes from the RNC. Thus, the RNC was able to use 100 percent soft money to pay for ads by outside groups. By channeling money to outside groups and having them run issue ads, the RNC was able to conserve precious hard dollars and circumvent federal restrictions on how soft money can be spent.

Shortly before the November election, Barbour acknowledged, in effect, that the RNC's contribution to Americans for Tax Reform made it possible for the party to circumvent the campaign finance laws. At an October 1996 press conference, Barbour was asked about the RNC's $4.6 million transfer to ATR and he made the following statement:

> You'll see in our FEC report . . . that we've made contributions to a number of organizations that are like-minded, share our views, promote our ideas. . . . [W]hen we do advocacy, no matter what we do, we typically have to pay for it, either totally with FEC dollars or a mixture of FEC and non-FEC dollars. . . . [W]e often find ourselves in the position where we cannot match up non-FEC funds with enough FEC funds. So, when we came to that point, we decided we would contribute to several groups who are like-minded and whose activities we think, while they're not specifically political, we think are good for the environment for us.[51]

Barbour's benign description of the RNC as simply supporting like-minded groups is overshadowed by his admission that it was the RNC's shortage of "FEC funds," or hard money, to match its "non-FEC funds," or soft money, that led to its giving excess soft dollars to groups to undertake activities "good" for the Republican Party. This explanation is close to an admission that the RNC gave soft money to independent groups primarily to circumvent federal election requirements that parties use hard money in federal campaigns.

## THE RNC'S FRONT ORGANIZATIONS

One problem with outside groups is that they cannot always be controlled, as Barbour noted in the March 5, 1996, memo mentioned earlier. One solution is to channel money to independent groups, with the understanding that the recipient will follow the party line. During Barbour's tenure, the RNC also used an even

5980

bolder tactic: It actually established two nonprofit organizations that served as arms of the Republican Party.

*The National Policy Forum*

In May 1993, four months after Barbour became RNC chairman, he launched the National Policy Forum as a "think tank" to develop conservative ideas and policies[52] (see Chapter 3). The NPF applied to the Internal Revenue Service for tax-exempt status as a 501(c)(4) organization, asserting in its application that it was a nonpartisan, social welfare organization.

Contrary to what the NPF told the IRS, the NPF was, in fact, an arm of the Republican National Committee—created by RNC officials, chaired by Barbour, and operated in such a way that its work dovetailed with the RNC's. Perhaps most importantly, the NPF relied heavily on the party for financial support, receiving millions of dollars in gifts and loans from the RNC. (For these and other reasons, the IRS eventually denied the NPF's application for 501(c)(4) status.[53]).

Although the NPF was not involved in running issue-advocacy ads, it did provide services to the party related to political campaigning. The NPF's main activity was organizing "forums" where Republican officials and others could discuss various public policy options and where Republican donors were able to meet with members of the GOP congressional leadership. In addition, the NPF conducted focus groups and commissioned public opinion surveys which were useful to the party's strategic planning. In fact, the RNC's chief strategist, Donald Fierce, was a founding board member of the NPF.[54]

One of the most intriguing aspects of the NPF is its fundraising operation, which was clearly intertwined with the RNC's efforts. On several occasions, prospective donors were told they could support the party by giving to the NPF. Major donors to the RNC were also told that one of the benefits of donating was the chance to attend NPF forums.

The close connection between NPF and RNC fundraising can be illustrated with two examples.

• In July 1995, a company controlled by the family of Ted Sioeng, a businessman from Indonesia, donated $50,000 to the National Policy Forum (see Chapter 7). The next day, Speaker Gingrich attended a luncheon in Beverly Hills hosted by Sioeng. When Committee staff asked Sioeng's daughter about the donation, she indicated that she viewed it as a donation to the Republicans. "I don't care what department" the money goes to, she said.[55]

• Stephen Wynn, chairman and chief executive officer of Mirage Resorts, Inc., a major casino company in Las Vegas, is the subject of an internal RNC memo obtained by the Committee.[56] This memo discusses a $1 million pledge from Wynn and suggests three possible ways in which the money could be allocated. It says that Wynn could give some of it in the form of soft money to the RNC and some of it in the form of a donation to the NPF. The proportions could be changed, depending, in part, on Wynn's desire for anonymity (since the NPF donations would not be disclosed).

5981

*Coalition for our children's future*

While there is no doubt that the National Policy Forum was a tool of the RNC, it was, at least, a "real" organization, with an office and a large staff. The same cannot be said of another RNC creation: Coalition for Our Children's Future ("CCF"), a nonprofit organization founded in May 1995.[57] Although its name suggested that it was a grassroots organization of concerned citizens, CCF was, in fact, established and controlled by RNC officials.

In 1995 and 1996, CCF ran a series of "issue ads" on such subjects as Medicare and the balanced budget, as discussed in Chapter 13 of the Minority Report. In August 1995, CCF received a $500,000 donation from the National Republican Congressional Committee, part of the RNC.[58] Additional money for the issue ads was raised by RNC Chairman Barbour and Speaker Gingrich. Among the donors were major Republican contributors, including large corporations. The Republican party therefore financed these ads but because the ads were run by CCF, the RNC was able to create the illusion that the message was coming from an "independent" organization of concerned citizens, rather than from a national political party. Moreover, if the RNC had run the ads itself, it would have been obliged to pay for them with a mixture of hard and soft money.

The Coalition for Our Children's Future was also one of several nonprofit groups active in the 1996 campaign that served as vehicles for Republican donors who wanted to influence elections.

### FRONTS FOR CONSERVATIVE DONORS

The RNC was not alone in using "independent" groups as fronts to circumvent the campaign finance laws. Several Republican donors contributed money to nonprofit organizations that ran purported "issue ads" aimed at helping specific Republican candidates win election in 1996. These nonprofits were typically put forth as "grassroots" organizations but several were, in fact, established for the main—or sole—purpose of running political ads under the guise of issue advocacy.

*CCF's attack ads*

Shortly before the November 1996 election, Coalition for Our Children's Future received a large contribution from an anonymous donor and used the money to run a series of ads attacking Democratic candidates for the Senate and House of Representatives. (It also operated on the state level—attacking Democratic candidates for the Minnesota House of Representatives.)

When witnesses knowledgeble about CCF's ad campaign were deposed by the Committee, they testified that all the funds came from a single donor, but they refused to identify the donor. The Committee later obtained evidence suggesting that the "sole donor" was actually an entity called the Economic Education Trust.

The Economic Education Trust was established by Washington lawyer Benjamin Ginsberg, who is outside counsel to the National Republican Senatorial Committee and a former general counsel to the RNC. Ginsberg arranged for several individuals involved in the attack ads to sign confidentiality agreements forbidding them to re-

5982

veal the identity of the donor. According to a press report, Ginsberg "said it was done [this way] to protect aided politicians from charges of quid-pro-quos if they also helped the donors." [59] This seems to be an admission by Ginsberg that the trust, by funding CCF, was really making de facto campaign contributions.

The Economic Education Trust was also a major donor to two tax-exempt organizations controlled by a company called Triad Management Services ("Triad"), which is discussed in Chapter 12 of the Minority Report.

*Triad's attack ads*

Triad is a for-profit business established in the Washington area in 1995 by Carolyn Malenick, a former fundraiser for Oliver North, a figure in the Iran-Contra scandal and, in 1994, an unsuccessful candidate for a Senate seat in Virginia.

Triad managed two tax-exempt organizations whose names suggested they were large, grassroots organizations: Citizens for Reform and Citizens for the Republic Education Fund. In fact, both entities were shell companies with no offices, no employees, and no members. They were established in the spring of 1996 for the sole purpose of running attack ads—under the guise of "issue advocacy"—to help Republican candidates win election to Congress.

Triad officials refused requests by the Committee to identify its donors, arguing that the donations did not constitute campaign contributions. In fact, there is overwhelming evidence that these so-called "issue ads" were but one tool in a carefully orchestrated campaign to spend money on behalf of specific Republican candidates without adhering to federal election laws.

Although Triad would not disclose its donors, the Committee has been able to identify some of them through a review of bank documents. The records show that several Triad donors had contributed the legal maximum in "hard dollars" to candidates who benefited from ads run by Triad's tax-exempt organizations. This is further evidence that the ads were de facto campaign ads—and that the "donations" to the tax-exempts were de facto campaign contributions.

By operating through Triad, these donors were able to avoid complying with federal rules limiting the size of campaign contributions and requiring disclosure of those contributions.

*Triad's donors*

Triad's largest donor appears to be the family of Robert L. Cone of Elverson, Pennsylvania, former chairman of Graco Children's Products,[60] a privately held company in which the Cone family held a large stake until it was sold in 1996. The Committee found that Cone and members of his family had, on many occasions, made the maximum legal contributions ("maxed out") to candidates who benefitted from the Triad-orchestrated attack ads.

The second largest donor to Triad's tax-exempt groups appears to be the Economic Education Trust which, as noted above, also contributed to Coalition for Our Children's Future. The Committee has developed circumstantial evidence suggesting that the Economic Education Trust was funded in whole or in part by Charles and David Koch, the controlling shareholders of Koch Industries of

5983

Wichita, Kansas,[61] as discussed in Chapter 12 of the Minority Report. For example, many of the candidates who benefited from attack ads run by Triad's tax-exempts and by CCF received thousands of dollars in campaign contributions from Charles Koch, David Koch, and/or their company's political action committee. (The Kochs were also active fundraisers: David Koch raised money for Bob Dole, the Republican presidential nominee, and served as vice chairman of the Dole campaign.)

Koch Industries, a major oil company with annual revenues of nearly $30 billion, has been described as the second largest privately held company in the United States.[62] The Koch brothers are major political donors and have contributed millions of dollars to public-policy and lobbying groups of various kinds, as discussed in an endnote to this chapter.[63]

The Committee has been unable to confirm that the Kochs funded the Economic Education Trust. On September 30, 1997, the Minority staff wrote to Charles Koch asking for his assistance with the investigation and he received no reply. When journalists contacted Koch Industries, spokesmen declined to say whether or not it had funded Triad's "issue advocacy" campaign. Benjamin Ginsberg, the lawyer who set up the Economic Education Trust, also declined to identify the donor or donors who funded the trust.[64] Although it is impossible to say who funded the Economic Education Trust, it is clear that the donor (or donors) went to great lengths to avoid exposure—channeling money through at least two layers of shell companies. It is noteworthy that similar techniques were used to obscure the money trail in the Iran-Contra case and that a few individuals involved in Iran-Contra or with its principal architect, Oliver North, were later involved in Triad's or CCF's questionable "issue advocacy" activities during the 1996 campaign.[65]

## CONCLUSION

The evidence collected by this Committee shows clearly that there were really two campaigns conducted during the 1995/96 cycle. There was an "overt" campaign and a "covert" campaign.

In the "overt" campaign, all contributors—whether they were individual donors or political action committees—revealed their names, their occupations, and the size of their donations to the Federal Election Commission. All donors to specific candidates were subject to strict limits on how much they could give.

In the "covert" campaign, the rules were utterly different. In this parallel campaign, there was no disclosure and there were no limits on how much money could be contributed. Tax-exempt "issue advocacy" groups and other conduits were systematically used to circumvent the federal campaign finance laws.

Although the secret donors in the covert campaign were invisible, they had a powerful impact. These anonymous contributors poured millions of dollars into House, Senate, and presidential campaigns. In many cases, the secret donors financed massive advertising blitzes in the closing weeks of the campaign—boosting certain candidates and undermining their opponents. There is every reason to believe that these de facto campaign contributions determined the outcome of some of the close races.

5984

The secret flows of money used to pay for these attack campaigns severely undermine our campaign finance laws and corrupt the electoral process. What is particularly disturbing is that Republican Party officials were, in many cases, witting participants, sometimes using party money to finance these schemes and were, by and large, unwilling to cooperate with the Committee's exploration of these important issues.

## FOOTNOTES

[1] Rosenberg, Lisa. *A Bag of Tricks: Loopholes in the Campaign Finance System.* Washington, D.C.: The Center for Responsive Politics, 1996: "Labor unions have been barred from contributing to candidates since 1943. In addition, the post-Watergate campaign finance law caps individual contributions at $25,000 per calendar year, and permits individuals to give no more than $20,000 to a national party, $5,000 to a political action committee (PAC), and $2,000 to a candidate. (Contributions of up to $1,000 each for primary and general elections are permitted.)" *See also*, 2 U.S.C. 434(b)(3)(A) (1977).

[2] Coalition Building Manual, Overview section, R 1824.

[3] During Dukakis's tenure as governor of Massachusetts, Horton, a convicted murderer, was released from a state prison on a weekend furlough program. He then raped a Maryland woman and attacked her fiance. Horton is black and his face was featured prominently in the television ad. His victims were white. Many observers felt the Republican ad was racist.

[4] The RNC's *own* donations to outside groups were reported to the Federal Election Commission but the donations *raised* by the RNC from Republican donors were not disclosed.

[5] Exhibit 2365: Memorandum from RNC political director and head of campaign operations Curt Anderson to RNC chairman Haley Barbour, regarding "Group of 12, or Council of Trent, or Whatever," 3/4/96, R006050.

[6] Exhibit 2365.

[7] Untitled and undated document tallying support for, opposition to and comments by RNC officials on proposed members in a coalition of independent group leaders, R021559–60.

[8] Untitled and undated document tallying support for, opposition to and comments by RNC officials on proposed members in a coalition of independent group leaders, R021559–60.

[9] Untitled and undated document tallying support for, opposition to and comments by RNC officials on proposed members in a coalition of independent group leaders, R021559–60.

[10] Memorandum, from RNC chairman Haley Barbour to "Republican Leaders" on "Independent Expenditure Campaigns," 3/5/96, R028572–73.

[11] Memorandum, from RNC chairman Haley Barbour to "Republican Leaders" on "Independent Expenditure Campaigns," 3/5/96, R028572–73.

[12] Exhibit 2367: Coalition Building Manual, authored by Curt Anderson, R01821–49.

[13] R01823.

[14] R01841.

[15] R01841.

[16] R01841.

[17] R01841, R01846.

[18] R01847.

[19] Exhibit 2353: undated memorandum from "Blaise" to "Pat," regarding "Outreach, Auxiliaries, Coalitions," R51299–30.

[20] Exhibit 2362: memorandum dated 3/6/96 from "Hopper" to RNC political director and head of campaign operations Curt Anderson, regarding "Coalitions," R056245.

[21] See Chapter 11. See also, for example, Drew, pp. 1–6, 14, 33, 82–88, 167–69.

[22] Exhibit 2364: Memorandum from "Howard & Phil" to "Evelyn and Judy" regarding the "Seniors Program," 3/30/96, R033753–54.

[23] Exhibit 2364: Memorandum from "Howard & Phil" to "Evelyn and Judy" regarding the "Seniors Program," 3/30/96, R033753–54.

[24] *Washington Post*, 12/10/96.

[25] See *Washington Post*, 2/12/95. After the election, the Democratic Senate Campaign Committee filed a complaint with the FEC charging the NRSC with transferring the funds to the groups to circumvent federal limits on coordinated expenditures by the Republican Party on behalf of its Senate candidate.

[26] FEC records.

[27] *Washington Post*, 12/12/95, citing FEC records.

[28] *Washington Post*, 12/12/95, citing FEC records.

[29] *Washington Post*, 12/12/95, citing FEC records.

[30] Undated and untitled document, R021609. The other two organizations are the United Seniors Association and "CCRI" the California ballot initiative on affirmative action.

[31] Document DFP004244. This document was not produced by the RNC, but was produced by the Dole for President campaign.

[32] Undated RNC document headed "Soft Money Fundraising Strategy," R 3215.

[33] FEC records.

[34] According to FEC records, in 1996, the DNC gave a total of less than $185,000 to tax-exempt organizations, including $117,500 to the National Coalition of Black Voter Participation; $20,000 to the African American Institute; $10,000 to the Stonewall Gay and Lesbian Club; $10,000 to the Congressional Black Caucus; and $4,000 to the Hispanic Caucus.

[35] *Washington Post*, 10/23/97.

5985

³⁶ RNC documents provided to the Committee include a copy of a check from ADI to RNSEC for $600,000 dated 10/25/96. The memo line says: "Repayment of loan," R61404.

³⁷ Washington Post, 10/23/97.

³⁸ This letter is described in the Washington Post, 10/23/97. The six checks are from the following persons: (1) $100,000 from Jack C. Taylor, identified as founder of Enterprise Rent-a-Car; (2) $100,000 from Max Fisher, who is a longtime supporter of the Republican Party and, in 1996, honorary chair of the RNC's premier donor organization, Team 100; (3) $50,000 from a "foundation controlled by former defense secretary Donald Rumsfeld"; (4) $30,000 from "Houston oil executive Patrick R. Rutherford;" (5) $100,000 from "billionaire investor Kirk Kerkorian;" and (6) $150,000 from John Moran, a national finance chair of the RNC and head of Victory '96, one of the RNC's key fundraising committees.

³⁹ That check was from John Moran. See previous note.

⁴⁰ Washington Post, 10/23/97.

⁴¹ Washington Post, 10/23/97.

⁴² Washington Post, 10/23/97.

⁴³ Washington Post, 10/23/97. The RNC's role in funneling donors' money to "independent" groups is also mentioned in several RNC and Dole for President memos. See Chapter 11.

⁴⁴ Exhibit 2400: memorandum from RNC finance chair Jo-Anne Coe to RNC chairman Haley Barbour and other RNC officials, regarding the delivery of checks to ADI, ATR and NRTLC, 10/17/96, DFP004240. This document was produced to the Committee by the Dole for President campaign.

⁴⁵ Exhibit 2400: The five checks are identified in the memorandum as follows: $100,000 from Jack Taylor; $100,000 from Max Fisher; $50,000 from Don Rumsfeld; $30,000 from Pat Rutherford; and $100,000 from "Lincy Foundation (Kirk Kerkorian)."

⁴⁶ Exhibit 2400: Memorandum from RNC Finance Chair Jo-Anne Coe to RNC Chairman Haley Barbour and other RNC officials, regarding the delivery of checks to ATR, NRTLC and ADI, 10/17/96, DFP004240.

⁴⁷ DFP004241 & DFP004243.

⁴⁸ ATR/R00850. A second check for $100,000 was deposited on 10/28/96. Document ATR/R00854.

⁴⁹ Exhibit 2400: memorandum from RNC finance chair Jo-Anne Coe to RNC chairman Haley Barbour and other RNC officials, regarding the delivery of checks to ATR, NRTLC and ADI, 10/17/96, DFP004240.

⁵⁰ Exhibit 2402: Memorandum from RNC Finance Chair Jo-Anne Coe to RNC Chairman Haley Barbour, 10/21/96, DFP004242.

⁵¹ "Haley Barbour, Chairman of the Republican National Committee, Discusses Democratic National Committee Refusal of Pre-Election FEC Report," Presidential Campaign Press Materials, Federal Document Clearing House, Inc., 10/29/96.

⁵² NPF filed its articles of incorporation in Washington, D.C., on 5/24/93.

⁵³ Exhibit 353: IRS letter to NPF, 2/21/97, NPF 3375-3387.

⁵⁴ Exhibit 257: NPF's articles of incorporation.

⁵⁵ Staff interview with Jessica Elnitiarta, 6/19/97.

⁵⁶ Exhibit 327: Memo from Kevin Kellum of Team 100 to Haley Barbour re "Stephen Wynn, CEO, Mirage Resorts," 2/23/96, R 13574.

⁵⁷ Abstract of filing by Coalition for Our Children's Future with Virginia Secretary of State.

⁵⁸ FEC records.

⁵⁹ Associated Press, 11/1/97.

⁶⁰ According to bank records, Cone contributed at least $325,000 to Triad, while his brother Edward gave at least $404,000. In addition, a trust believed to be funded by the Cone family gave at least $150,000 to Triad, $400,000 to Citizens for Reform, and $200,000 to Citizens for the Republic Education Fund.

⁶¹ In addition to the circumstantial evidence developed by the Committee, there is documentary evidence that Koch Industries gave a small amount of money to Triad: The company sent a $2,000 check to Triad on 10/29/96.

⁶² Forbes, 10/13/97.

⁶³ Koch Industries is affected by governmental action in a myriad of ways, including taxation and environmental regulation. In 1995, the U.S. Department of Justice filed "a $55 million civil suit against Koch [Industries] for causing more than 300 oil spills over a five-year period," according to a report in Business Week, 4/1/96.

Koch Industries has also been criticized on Capitol Hill. In 1989, the company was accused by a Senate committee of stealing oil from Indian lands. Final Report and Legislative Recommendations: A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs, United States Senate, 101st Congress, 1st Session, 10/20/89, p. 105.: "Koch Oil ('Koch'), a subsidiary of Koch Industries and the largest purchaser of Indian oil in the country, is the most dramatic example of an oil company stealing by deliberate mismeasurement and fraudulent reporting."

The same allegation is made in a qui tam (false claims) suit filed in 1989 on behalf of the United States Government by a company controlled by William I. Koch, a former Koch Industries shareholder and a brother of Charles and David Koch. United States of America ex rel. The Precision Company et al. v. Koch Industries, Inc., et al. United States District Court for the Northern District of Oklahoma, Civil Action No. 91-C-763-B.

Koch Industries denies the oil-theft allegations.

Since the 1970s, the Kochs have donated millions of dollars to the Cato Institute, a Libertarian think tank that promotes deregulation and tax cuts. Cato, which was founded in 1977 with financial backing from Charles Koch, has received more than $21 million from the Kochs, according to The Nation, 8/26/96. In 1980, David Koch was the Libertarian Party's candidate for vice president in 1980.

5986

The Kochs have also donated millions of dollars to Citizens for a Sound Economy, a pro-business organization in Washington that promotes deregulation. Lewis, Charles and the Center for Public Integrity. *The Buying of the President*. New York: Avon Books, 1996, p. 127.

Around the time of the 1989 Senate investigation, the Kochs became major donors to the Republican party and to Republican politicians, some of whom defended Koch Industries against the oil-theft allegations:

• In late 1989, Senators Bob Dole (R-Kans.), Nancy Kassebaum (R-Kans.), Don Nickles (R-Okla.), and David L. Boren (D-Okla.), sent two letters to Senator Dennis DeConcini, chairman of the Special Committee conducting the investigation (the "DeConcini Committee"), in which they challenged the reliability of testimony given to the committee. One letter was dated October 24, the other November 2.

• On March 26, 1990, Senator Dole gave a speech on the Senate floor in which he attacked the DeConcini investigation and characterized Koch Industries as a "solid corporate citizen." Senator Dole said he was speaking on behalf of himself and Senators Kassebaum, Boren, and Nickles.

• On August 13, 1992, Senators Dole, Nickles, Kassebaum, and Boren sent a pro-Koch letter to Senator Daniel K. Inouye, chairman of the Select Committee on Indian Affairs, in which they recommended attaching an addendum to the DeConcini Committee's 1989 report that would clear Koch Industries.

[54] See Chapters 12 and 13

[55] Some of the techniques used to conceal donors to dubious "issue advocacy" groups are reminiscent of methods used to hide donors to the Nicaraguan Contras during the 1980s. In Iran-Contra, the conduits included tax-exempt corporations. In "issue advocacy" schemes of the 1990s, some of the funds used to pay for purported "issue ads" were channeled through tax-exempt corporations and secret trusts. Another parallel is that a few individuals who were involved with Iran-Contra or Oliver North were also involved in the purported "issue advocacy" activities of either Triad or Coalition for Our Children's Future.

• Fred Sacher, a California businessman, contributed an estimated $400,000 to the Contras and was also a donor to the 1994 Senate campaign of Oliver North, a central figure in the Iran-Contra affair. In 1996, he contributed heavily to Triad's tax-exempts: Bank records show that he gave $50,000 to Citizens for Reform and $150,000 to Citizens for the Republic Education Fund.

• J. Curtis Herge, a Virginia lawyer who has represented numerous conservative groups, helped to form the National Endowment for the Preservation of Liberty ("NEPL"), a tax-exempt entity which served as an illegal conduit for aid to the Contras. As a result, the head of NEPL, Carl R. ("Spitz") Channell, pleaded guilty to conspiracy to defraud the United States, a felony. Herge, who was never accused of wrongdoing, served as a trustee for Oliver North's legal defense trust. During the 1990s, Herge served as counsel to Coalition for Our Children's Future.

• Lyn Nofziger, a longtime Reagan aide, ran a public relations firm in Washington after leaving the White House staff. As a consultant to Spitz Channell, the head of NEPL, Nofziger assisted in fundraising for the Contras by arranging for some of Channell's donors to meet with President Reagan at the White House, according to a spokesman for Channell (*Chicago Tribune*, 5/5/87). In 1996, Nofziger was named director and spokesperson for a Triad-controlled tax-exempt: Citizens for the Republic Education Fund.

• Carolyn Malenick, the owner of Triad, had been a fundraiser for Oliver North's legal defense trust during the Iran-Contra prosecution. In 1994, she was finance director of his unsuccessful campaign for the Senate. She then established Triad, which used two tax-exempt corporations to run attack ads under the guise of issue advocacy.

| 105TH CONGRESS 2d Session | SENATE | REPT. 105–167 Vol. 6 |
|---|---|---|

# INVESTIGATION OF ILLEGAL OR IMPROPER ACTIVITIES IN CONNECTION WITH 1996 FEDERAL ELECTION CAMPAIGNS

———

# FINAL REPORT

OF THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE

TOGETHER WITH

## ADDITIONAL AND MINORITY VIEWS

### Volume 6 of 6



MARCH 10, 1998.—Ordered to be printed

———

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1998

47–006

8944

age, CAGW, and a small number of other groups at a reported postage cost of $80,000 per million letters.[33] Additionally, the donor lists may have been worth $40,000 or more to the Dole campaign.[34]

Citizens Against Government Waste made two small, incomplete productions on September 8 and 9—three weeks beyond the due date.

*The Heritage Foundation*

The Heritage Foundation is registered with the IRS as a 501(c)(3) charitable organization, meaning that contributions to it are tax-deductible and that the organization is strictly forbidden to engage in partisan campaign activity. Heritage is being investigated by the IRS for allegedly engaging in improper political activities.[35] The Minority believes that Heritage may have exceeded limits on political activity, misrepresented facts to obtain tax exempt status, failed to register as political committee, improperly coordinating expenditures, and circumvented federal campaign spending limits.

As noted above, Heritage, like a number of other not-for-profit organizations, apparently paid for mailings and provided the Dole campaign with donor lists after Dole signed a fundraising letter. The letter was mailed in 1995 on Dole's letterhead at Heritage's expense. In it, Dole said, "I want to get Washington off your back and out of your pocket."[36] In addition to the potential violation of the tax laws, such activities might also constitute an illegal in-kind contribution to the Dole campaign. As noted earlier, an estimated ten million letters were mailed by Heritage, CAGW, and several other groups at a reported postage cost of $80,000 per million letters.[37] Additionally, the donor lists may have been worth $40,000 or more to the Dole campaign.[38]

On August 15, one week early, the Heritage Foundation produced two volumes of documents consisting primarily of publicly available material. Heritage supplemented this production on August 25.

*The Coalition: Americans Working for Real Change*

The Coalition: Americans Working for Real Change ("Coalition") is composed of approximately 30 business organizations, including the U.S. Chamber of Commerce and the National Association of Manufacturers.[39] The Minority believes the Coalition may have engaged in partisan activity, failed to register as a political committee, improperly coordinated expenditures, improperly engaged in issue advocacy, and circumvented federal campaign spending limits.

According to its spokesman, the Coalition was formed to counterbalance issue ads run by the AFL–CIO.[40] To do so, it reportedly spent at least $4.5 million, supported 23 Republican incumbents, and criticized the voting records of four Democrats in tight races.[41] The Coalition's ads also contained nearly identical language to that used in ads broadcast by the National Republican Congressional Coalition ("NRCC"), a division of the RNC. In addition, the Coalition's ads were run at the same time as the NRCC's ads and in districts where the Republican incumbent's seat was vulnerable.[42] Although the Coalition's ads avoided the so-called "magic words" of

express advocacy, the ads are a prime example of partisan activities by a nonprofit organization.[43] In addition, there are indications that the Coalition was primarily engaged in political activities, meaning that it should have complied with the registration and reporting requirements of the Federal Election Campaign Act ("FECA").[44]

The Coalition and the U.S. Chamber of Commerce forwarded written objections to the Committee's subpoena on September 16, three weeks beyond the return date on the subpoena. They never complied with the subpoena.[45]

### American Defense Institute / American Defense Foundation

The American Defense Institute ("ADI") and the American Defense Foundation ("ADF") are tax-exempt organizations operated from the same offices under the same management. The difference between the organizations is that ADI is a 501(c)(3) and ADF is a 501 (c)(4).[46] Press reports indicate these organizations have both received large sums of money from the RNC and the National Republican Senatorial Committee ("NRSC"), a division of the RNC, shortly before election cycles, including special elections.[47]

ADI and ADF conduct get-out-the vote drives aimed at military personnel through mailings and "public service announcements." ADI received $600,000 from the RNC in the last election cycle.[48] ADI had received similar contributions in 1992 and been criticized for its assistance to Republican candidates, leading it to return the money, but not until just after it had received $530,000 from six individual donors funneled through the RNC.[49] In short, the allegation is that the ADI/ADF were used by the RNC during the 1996 election cycle to conduct election-related activities after the RNC has "maxed out" in a particular state.

ADI/ADF requested clarification instructions on September 5, two weeks beyond the required due date, but never produced any documents.[50]

### Citizens for a Sound Economy

Citizens for a Sound Economy ("CSE") is a 501(c)(4) chaired by C. Boyden Gray, former White House Counsel in the Bush Administration. CSE was founded in 1984 as a think tank and grass-roots organization, and while the group has a number of members, most of its funding comes from a few major corporations, including foundations associated with the Koch family of Kansas. Koch interests gave more than $8 million to CSE and contribute on average $750,000 annually.[51] The Minority also believes that the Kochs have been important supporters of Triad, which is discussed in Chapter 12 in this Minority Report.

CSE also reportedly cultivated close ties with the Republican leadership. According to press reports, former Majority Leader Bob Dole's Better America Foundation gave CSE $50,000 in 1995. Dole also signed a fundraising letter for the group. In return, CSE provided Dole with its contributors" names.[52] CSE also joined forces with House Majority Leader Richard K. Armey on the flat-tax bill in 1995 who "estimated CSE would spend about $2 million on the campaign."[53]