# SUPPLEMENTAL PLAINTIFFS' EXHIBIT 9



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

In the Matter of )
)
) MUR 4624
The Coalition )
National Republican Congressional Committee, et al. )

## STATEMENT OF REASONS

### COMMISSIONER SCOTT E. THOMAS
### CHAIRMAN DANNY LEE MCDONALD

On May 17, 2001, the Commission approved the General Counsel's recommendation to take no further action and close the file with respect to the above-captioned matter. At issue was whether the Coalition had "coordinated" certain election-related public communications during the 1996 election cycle when it spent millions of dollars in support of Republican congressional candidates. Under the Federal Election Campaign Act of 1971, as amended, ("the Act"), corporations and labor organizations may not make contributions (which includes coordinated expenditures) in connection with federal election campaigns. 2 U.S.C. § 441b.

The Commission dropped its case against the Coalition, in essence, because of new Commission regulations defining coordination. Based upon the standard for coordination recently created by Commissioners Mason, Sandstrom, Smith and Wold, *see* 66 Fed. Reg. 23537 (May 9, 2001), the Office of General Counsel concluded that the evidence uncovered and developed in its investigation might not establish coordination. By contrast, the Office of General Counsel noted that this same evidence may well have constituted coordination under the test for coordination in effect at the time of the Coalition's 1996 election activity and employed by the Office of General Counsel during its ensuing investigation. Applying our colleagues' new standard for coordination, the Office of General Counsel recommended that the Commission take no further action and close the file in this matter.

This case illustrates the central problem with the Commission's new definition of coordination. A case that, in the Office of General Counsel's view, probably contained coordination under the Commission's old regulations, suddenly does not appear to contain coordination under the Commission's new regulations. By too narrowly defining

what constitutes coordination, these new regulations stifle rational analysis and encourage future widescale evasion of the restrictions carefully crafted by Congress.

Because these new regulations are on the books, however, we had little choice but to approve the Office of General Counsel's recommendation to take no further action in this matter. With one of our colleagues recused and two of our other colleagues indicating their belief that there is no coordination under the Commission's new definition, it seemed very unlikely that there would be four votes for pursuing this matter at the probable cause to believe stage. Accordingly, it made little sense to us to require the Office of General Counsel to expend any more of its limited enforcement resources on a matter effectively rendered moot by the Commission's new coordination regulations.

## I.

On March 17, 1997, the Democratic National Committee filed a complaint with the Federal Election Commission alleging that the Coalition, "an organization of national trade, professional and business associations established in the spring of 1996," Complaint at 2, had violated various provisions of the Act. The complaint stated that "[u]nder the guise of an 'educational campaign,' the Coalition raised and spent $4 million on advertising intended to support Republican candidates for the U.S. House of representatives in the 1996 elections." Complaint at 2-3 *citing Congressional QuarterlyWeekly Report*, (October 26, 1996). The complaint alleged the Coalition was formed at the urging of Republican congressional leaders and had coordinated its expenditure campaign with the National Republican Congressional Committee ("NRCC"), the Republican National Committee ("RNC"), and 37 Republican congressional candidates. The complaint asserted that these coordinated expenditures constituted corporate contributions made and accepted in violation of 2 U.S.C. § 441b. The complaint further alleged that the Coalition was a "political committee" which had failed to register and report as such in violation of 2 U.S.C. §§ 433 and 434.

In April of 1998, the Office of General Counsel prepared a report for Commission consideration that contained a factual and legal analysis of the allegations presented in the complaint as well as responses to the complaint received from respondents. At the outset, the report noted that "[t]he Coalition does not deny that during 1996 it spent millions of dollars on advertisements, direct mail, and what it has characterized as grassroots activities in numerous Congressional districts. Nor does it deny that corporate funds were the source of the funds used to conduct such activity." April 21, 1998 First General Counsel's Report at 16. Against this backdrop, the Report considered (1) whether the Coalition's spending was coordinated with the NRCC and the candidate committees; (2) the liability of the recipient committees; and (3) whether the Coalition is a "political committee" under the Act.

The First General Counsel's Report made a preliminary finding that coordination might well exist between the Coalition, the NRCC and the candidate committees in

2

whose districts the Coalition undertook its activities. In reaching this conclusion, the Report discussed a number of factors. First, the Report pointed out "[i]nformation on hand suggests that the Coalition may have been formed upon the urging of and after private consultations with Republican leaders." *Id.* at 19. Second, the Report found that there "is substantial information that suggests, in a variety of ways, Republican leaders and Coalition members may have shared campaign strategy." *Id.* at 20. Finally, the Report found that the NRCC and the Coalition used some of the same vendors for their efforts. In particular, the Report found that "the advice and polls of consultant Frank Luntz were reportedly relied upon by both the Republican Party and the Coalition." *Id.* at 24. Because the Coalition's expenditures were made from corporate funds and apparently were coordinated, the First General counsel's Report recommended that the commission find reason to believe that the Coalition violated 2 U.S.C. §441b

With respect to the NRCC, the First General Counsel's Report suggested "the Coalition's advertisement's and other spending constituted in-kind contributions to the NRCC, which the NRCC knowingly accepted." *Id.* at 38. In support of this, the Report stated:

> As discussed in detail at pages 16-31 of this report, the information at hand suggests that Mr. Boehner may have been acting as an agent of the NRCC and may have been the primary person through which coordination between the Coalition and the NRCC occurred. In addition, the NRCC reported retaining some of the same consultants as the Coalition (American Viewpoint and the Tarrance Group).

Earlier, the Report had stated "[t]he information on hand further suggests Representative John Boehner may have been one of the Republican leaders involved in the formation of the Coalition. Mr. Boehner is the fourth ranking Republican House member, the Republican Conference Chair, and *ex officio board member of the NRCC.*" *Id.* at 19 (emphasis added). Because "the funds used by the Coalition appear to have been from corporate sources," *id.* at 38, the Office of General Counsel recommended that the Commission find reason to believe the NRCC and its treasurer violated § 441b. The Report also recommended the Commission find 'reason to believe' under § 441b against seven of the 37 candidate committees in whose districts both the NRCC and the Coalition engaged in spending because there was "additional evidence of specific instances of coordination." *Id.* at 39.

Finally, the First General Counsel's Report recommended the Commission find reason to believe the Coalition violated 2 U.S.C. §§ 433 and 434 for failing to register as a political committee and report its receipts and disbursements. The Report reasoned: "[t]here is no indication that the Coalition was formed for any purpose other than building or maintaining public support for certain candidates." April 21, 1998 First General Counsel's Report at 33-34. The First General Counsel's Report recommended that an investigation of this and the other findings be conducted through document and deposition subpoenas, as well as informal discovery where possible.

3

On June 9, 1998, the Commission approved the First General Counsel's recommendation to find reason to believe the Coalition violated 2 U.S.C. § 441b. Commissioners Elliott and McGarry joined us in the vote, while Commissioner Aikens recused. The Commission also approved the General Counsel's recommendation to find reason to believe the NRCC and seven candidate committees violated 2 U.S.C. § 441b and to conduct a thorough investigation of these matters. On the other hand, a motion to approve the General Counsel's recommendation to find reason to believe the Coalition violated §§ 433 and 434 by failing to register and report as a political committee failed to secure the four affirmative votes needed. 2 U.S.C. § 437g(a)(2). We voted with Commissioner McGarry to approve the General Counsel's recommendation. Commissioner Elliott opposed the recommendation and Commissioner Aikens recused. (There was one vacancy on the Commission at the time.)

On November 30, 2000, with four new commissioners on board, the Commission approved new regulations defining the term "coordination" by a 4-2 vote. Commissioners Mason, Sandstrom, Smith, and Wold voted to approve the new regulations while we voted against the regulations. The rules were transmitted to Congress on January 4, 2001, for legislative review. *See* 2 U.S.C. § 438(d). The effective date for the new coordination definition was May 9, 2001. 66 Fed. Reg. 23537 (May 9, 2001).

On April 20, 2001, the Office of General Counsel recommended that the Commission take no further action against the Coalition, the NRCC, and the other respondents in MUR 4624. The Office of General Counsel believed that the facts of the case might not support violations of the Act in the wake of the Commission's new definition of coordination. On May 17, 2001, the Commission approved a motion to take no further action and close the file in MUR 4624. We joined Commissioners Mason, and Smith in support of the motion. Commissioner Sandstrom opposed the motion, and Commissioner Wold recused.

Absent 'probable cause' briefing, *see* 2 U.S.C. § 437g(a)(3), we do not know whether we would have ultimately proceeded against the respondents in this matter. With two Commissioners indicating that there was no coordination under the Commission's new regulations and one Commissioner recused, however, we could see no scenario under which there would be four votes for the Commission to proceed at the probable cause to believe stage. In order not to waste limited resources on an apparently futile continuation of this matter, we agreed with the General Counsel's recommendation to take no further action and close the file.

## II.

In our view, the stringent requirements of the Commission's new coordination regulations create a large loophole in the limitations, prohibitions and reporting

4

requirements of the Act. As we explain hereafter, this approach is not sound as a matter of law or policy.

### A.

The definition of "coordination" found in the Commission's new regulations directly undercuts the Supreme Court's guidance in this area. In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court upheld limits on contributions to federal candidates but ruled that a similar limitation on independent expenditures was unconstitutional. The Court recognized, however, that its ruling created many opportunities for evasion of the contribution limitations. If a would-be spender was able to pay for a television advertisement provided by a candidate, for example, this "coordination" would convert what is supposed to be an "independent" expenditure into nothing more than a disguised contribution. Indeed, the *Buckley* Court warned that the contribution limitations would become meaningless if they could be evaded "by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities." *Id.* at 46.

In order to "*prevent attempts to circumvent the Act through* prearranged or *coordinated* expenditures amounting to disguised contributions," *id.* at 47 (emphasis added) the *Buckley* Court treated "coordinated expenditures... as contributions rather than expenditures." *Id.* at 46-47 (emphasis added). Thus, the *Buckley* Court drew a specific distinction between expenditures made "*totally independently*" of the candidate and his campaign" and "coordinated expenditures" which could be constitutionally regulated. The Court defined "contribution" to "include not only contributions made directly or indirectly to a candidate, political party, or campaign committee ... but also *all* expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate." *Id.* at 78 (emphasis added).

Thus, 25 years ago the Supreme Court gave assent to a broad definition of coordination – relying on mere cooperation or consent and recognizing that a person serving as a candidate's agent, such as a party committee working closely with a candidate, could be the vehicle for coordinating activity. Reacting to these judicial concerns, Congress enacted as part of the Federal Election Campaign Act Amendments of 1976 a definition of "independent expenditure" now codified at 2 U.S.C. § 431(17). Concerned that independent expenditures could be used to circumvent the contribution limitations,[1] Congress preserved the distinction drawn by the Supreme Court between

---

[1] *See, e.g.*, Federal Election Campaign Act Amendments, 1976: Hearings on S.2911, et al., Subcommittee on Privileges and Elections of the Senate Committee on Rules and Administration, 94th Cong., 2d Sess. 74 (remarks of Sen. Kennedy); 77 (remarks of Sen. Cannon); 77 (remarks of Sen. Scott); 85 (statement of Sen. Mondale); 89 (remarks of Sen. Griffin); 98 (remarks of Sen. Buckley); 107-08, 130 (remarks of then Assistant Attorney General Scalia).

those expenditures which were "totally independent" of the candidate's campaign and those which were not.[2]

The current language of the Act reflects the judicial and legislative concern that independent expenditures are not turned into disguised contributions through coordination with the candidate or his campaign. The Act squarely states that an expenditure made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate" and subject to the contribution limitations. 2 U.S.C. § 441a(a)(7)(B)(i). Moreover, section 431(17) of the statute defines "independent expenditure" as:

> [A]n expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made *without cooperation or consultation* with any candidate, or any authorized committee or agent of such candidate, *and which is not made in concert with, or at the request or suggestion of,* any candidate, or any authorized committee or agent of such candidate.

2 U.S.C. § 431(17)(emphasis added).

Former section 109.1(b)(4)(i) of the Commission's regulations "clarif[ied] this language," *FEC v. National Conservative Political Action Committee*, 647 F.Supp. 987, 990 (S.D.N.Y. 1986), and explained that an expenditure will not be considered independent if there is "[a]ny arrangement, coordination, or direction by the candidate or his... agent prior to the publication, distribution, display or broadcast of the communication." 11 C.F.R. § 109.1(b)(4)(i)(2000). The former regulations further stated that an expenditure was presumed not to be independent if:

> (A) Based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made; or
> (B) Made by or through any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agent.

*Id.*

Only once has the Supreme Court actually decided whether coordination existed based upon a factual record. In *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996), the Court considered whether expenditures made by the

---

[2] H.R. Conf. Rep. 94-1057 at 38 (1976). Specifically, the Conference Report states: "The definition of the term 'independent expenditure' in the conference substitute is intended to be consistent with the discussion of independent political expenditures which was included in *Buckley v. Valeo*." *Id.*

Colorado Republican Party were actually "independent." The Court concluded that the state party's "expenditure, for constitutional purposes, [was] an 'independent' expenditure, not an indirect campaign contribution." 518 U.S. at 614. In reaching this conclusion, the Court found that the "advertising campaign was developed by the Colorado Party independently and not pursuant to *any general* or particular *understanding* with [any candidates or their agents]." *Id.* (emphasis added).

The Commission's new regulations, however, cast a blind eye toward the *Buckley* and *Colorado Republican* decisions and the broad statutory language. Instead, these new regulations are based upon the decision of a single district court in *FEC v. Christian Coalition*, 52 F.Supp.2d 45 (D.D.C. 1999), which effectively created its own definition of coordination. This judicially created definition of coordination bears little semblance to either the "totally independent" or "general understanding" standards articulated by the Supreme Court in *Buckley* and *Colorado Republican* or the language of the statute.

In its lawsuit, the Commission charged the Christian Coalition repeatedly spent its corporate treasury funds to influence federal elections in violation of the FECA. Based on the record evidence, the Commission alleged the Christian Coalition's leadership and its staff repeatedly cooperated and consulted about campaign strategy and activities with several different Republican candidates, their campaigns, and the National Republican Senatorial Committee. (The Commission alleged these coordinated expenditures constituted in-kind corporate campaign contributions made in violation of 2 U.S.C. § 441b. The Commission also detailed, based on the record, numerous instances where it believed the Christian Coalition unambiguously advocated the election or defeat of specific clearly identified candidates in violation of the Act's prohibition on independent corporate campaign expenditures.)

With respect to coordination, the district court ruled against the Commission on five of the six coordinated expenditure allegations and found that there was a contested issue of fact on the sixth. In the opinion of the district court, the Supreme Court in *Buckley* did not address "the First Amendment concerns that arise with respect 'to expressive coordinated expenditures." 52 F.Supp.2d at 85. The district court speculated: "It can only be surmised that the *Buckley* majority purposely left this issue for another case. In many respects this is that case." *Id.* As a result the district court felt free to ignore the § 441a(a)(7)(B)(i) standard of coordination as well as the Commission's regulations.

Instead, the district court created its own standard of coordination and applied it to a new concept, which it also developed, known as "expressive coordinated expenditures." The district court concluded "the First Amendment requires different treatment for 'expressive,' 'communicative' or 'speech-laden' coordinated expenditures, which feature the speech of the spender, from coordinated expenditures on non-communicative materials, such as hamburgers or travel expenses for campaign staff." *Id.* at 85 n.45. The district court then defined an "expressive coordinated expenditure" as an expenditure "for a communication made for the purpose of influencing a federal election in which the

7

spender is responsible for a substantial portion of the speech and for which the spender's choice of speech has been arrived at after coordination with the campaign." *Id.* The court then developed its own test for coordination:

> In the absence of a request or suggestion from the campaign, an expressive expenditure becomes "coordinated[]" where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over, a communication's: (1) contents; (2) timing; (3) location, mode, or intended audience (e.g., choice between newspaper or radio advertisement); or (4) 'volume' (e.g., number of copies of printed materials or frequency of media spots). Substantial discussion or negotiation is such that the candidate and spender emerge as partners or joint venturers in the expressive expenditure, but the candidate and the spender need not be equal partners. This standard limits §441b's contribution prohibition on expressive coordinated expenditures to those in which the candidate has taken a sufficient interest to demonstrate that the expenditure is perceived as valuable for meeting the campaign's needs or wants.

*Id.* at 92. Based upon this analysis, and not the statute or the Commission's regulations, the district court found that there was no improper coordination between the Christian Coalition and Bush-Quayle '92, Helms for Senate, Inglis for Congress, Hayworth for Congress, or the National Republican Senatorial Committee.

It scarcely need be said, the district court's view that the Supreme Court did not address the First Amendment concerns involving "expressive" communications is odd at best. The whole analysis in *Buckley* was about expressive communications! Indeed, given the Court's reference to independent express advocacy and dangers of evasion through payment for "media advertisements," 424 U.S. at 46, the district court's premise is wholly unfounded.

The new Commission definition of "coordination" draws heavily from the badly flawed *Christian Coalition* decision. The new rule provides:

<u>Coordination with candidates and party committees</u>. A general public political communication is considered to be coordinated with a candidate or party committee if the communication—
(1) Is paid for by any person other than the candidate, the candidate's authorized committee, or a party committee, and
(2) Is created, produced or distributed—
   (i) At the request or suggestion of the candidate, the candidate's authorized committee, a party committee, or the agent of any of the foregoing;
   (ii) After the candidate or the candidate's agent, or a party committee or its agent, has exercised control or decision-making authority over the content,

8

       timing, location, mode, intended audience, volume of distribution, or frequency of placement of that communication; or

(iii) After substantial discussion or negotiation between the creator, producer or distributor of the communication, or the person paying for the communication, and the candidate, the candidate's authorized committee, a party committee, or the agent of such candidate or committee, regarding the content, timing, location, mode, intended audience, volume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement. Substantial discussion or negotiation may be evidenced by one or more meetings, conversations or conferences regarding the value or importance of the communication for a particular election.

11 C.F.R. § 100.23(c).

     The Commission's new test for coordination weakens important provisions of the Act. For example, suppose that Candidate Smith is slightly behind in the polls, low on money, and needs help. It is the week before the election and he knows that a corporation is planning to run an "issue" advertisement to assist the Smith campaign. Smith contacts the president of the corporation and complains that nobody has focused on an important matter in the campaign: various problems in the personal life of his opponent, Congressman Jones. Because of this oversight, candidate Smith believes that Congressman Jones is viewed in a better light by the electorate. Candidate Smith, however, does not want to run such an advertisement himself for fear of being accused of negative advertising.

     During his meeting with candidate Smith, the wealthy supporter says, "That's a great idea! Thanks for the information." After the meeting, the wealthy supporter changes the advertisement to say: "Congressman Jones is a liar, tax cheat and a wife-beater—keep that in mind on Tuesday." The advertisement runs on the weekend before the election. Is this a coordinated expenditure? As we understand the Commission's new regulations, there would be no coordination between the candidate and the spender since there was no "substantial discussion or negotiation" and no "request or suggestion" indicating "that a communication with a *specified content* would be valuable to a candidate or committee." 11 C.F.R. § 100.23(c)(2)(iii); 65 Fed. Reg. 76138, 76143 (Dec. 6, 2000)(emphasis added).

     Obviously, it is almost impossible to secure such evidence or meet such a high standard to establish coordination. Moreover, if a finding of coordination requires some sort of "collaboration or agreement" between a candidate and a spender, a candidate could set up a meeting with an organization known to be planning campaign ads, and could discuss campaign strategy and the development of issues crucial to the campaign. The organization could then make "independent" expenditures based on this detailed knowledge and information. The only apparent restriction would be that a campaign could not "agree on" the final finished ad or actually authorize a buy for the timing and

9

placement of the ad. Such a limited approach renders the coordination standard—and thus, the contribution limits—meaningless.

The Commission's earlier definition of coordination, however, would have produced a much different result. Under the Commission's former regulations, this expenditure would be treated as a disguised contribution and coordinated activity because it was "based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate's agents, with a view toward having an expenditure made." 11 C.F.R. § 109.1(b)(4)(i) (2000).[3] This would appear to be the more appropriate result especially given the ease with which "coordination," and thus, the contribution limits, can be so easily evaded under the Commission's new definition of coordination.

To its credit, the district court in *Christian Coalition* recognized the difficulty as well as the importance of its task and virtually invited the Commission to file an interlocutory appeal on the matter to the United States Court of Appeals for the District of Columbia Circuit: "This Court is of the opinion that this Order in relation to Counts I, II, and III involves controlling questions of law as to which *there is substantial ground for difference of opinion and that an intermediate appeal from the order may materially advance the ultimate termination of the litigation.*"52 F.Supp.2d at 98 (emphasis added). Commissioners Elliott, Mason, Sandstrom, and Wold, however, voted to end the Commission's enforcement litigation against the Christian Coalition and not appeal the matter.

Our colleagues should not have dropped a significant enforcement action such as the *Christian Coalition* case and wrested resolution of these important issues away from the Article III courts.[4] As the recent decision of the Supreme Court in *FEC v. Colorado Republican Federal Campaign Committee*, 531 U.S. 923 (2001), illustrates, it is not unusual for erroneous lower court decisions to be overturned on appeal.[5] Would the

---

[3] It has been suggested that the Commission's previous coordination regulations were too broadly drafted and that the Commission has somehow been too aggressive in applying these regulations to the regulated community. Yet, the record paints a far different picture. If any conclusion can be reached, it is that the Commission has been reluctant to proceed on a coordination theory in even the most obvious cases. *See, e.g.*, MUR 2272 (American Medical Association Political Action Committee and Williams for Congress Committee); MUR 2766 (Auto Dealers and Drivers for Free Trade PAC and Friends of Connie Mack); MUR 3069 (National Security Political Action Committee and Bush-Quayle '88); MUR 4204 (Americans for Tax Reform and Lewis for Congress); MUR 4282 (Archdiocese of Philadelphia and Santorum '94); and MUR 4378 (NRSC). Having failed to go forward in matters based upon the "broadly drafted" regulations of old, it is difficult to imagine the Commission garnering four votes to proceed upon its new coordination regulations.

[4] The decision of a single district court certainly cannot resolve these important issues. Indeed, the decision of the district court in *Christian Coalition* is not binding precedent on any other federal court, even in the same district. *See, e.g., In re Korean Air Line Disaster*, 829 F.2d 1171, 1176 (D.C.Cir. 1987)("Binding precedent for all [circuits] is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit"), *aff'd*, 490 U.S. 122 (1989).

[5] Through the years, there have been a number of important cases the Commission has lost in the lower courts but has won on appeal. *See, e.g., Bread Political Action Committee v. FEC*, 635 F.2d 621 (7th Cir.

10

Commission have similarly prevailed on appeal in the *Christian Coalition* case? Would the appellate courts have upheld the Commission's original regulations defining coordination? By refusing to follow normal litigation practice and appeal this important matter, it appears that our colleagues did not want to take that chance.

### B.

In its summary of the investigation in MUR 4624, the April 20, 2001 General Counsel's Report stated "the facts make for a compelling coordination case under the approach in place at the time of the activity at issue. *See* 11 C.F.R. § 109.1." The General Counsel's Report reached this conclusion because:

> *The facts gathered through this investigation show that from the inception of the Coalition through November of 1996, there was a pattern of communications and interactions between the Coalition's leaders and Rep. Boehner, the Republican Conference, Congressional candidates, and the RNC.* Apparently under pressure from Republican leaders and candidates to respond to the AFL-CIO's 35 million dollar ad campaign, the business community pooled their resources and formed the Coalition.

April 20, 2001 General Counsel's Report at 36 (emphasis added). The General Counsel's Report concluded that "[t]he pattern of communications suggests that there was a 'general or specific understanding' between the parties about the Coalition's activities. *Colorado Republican Campaign Committee v. FEC*, 116 S.Ct. 2309 (1996)." *Id.* at 36-37. The Report went on to find that:

> Under the Commission regulations in effect at the time of the activity at issue, there might well be coordination in this matter, due to both the information provided by the Republican leaders to the Coalition and its leaders "with a view towards having an expenditure made" and due to the overlapping consultant relationships. *See* 11 C.F.R. § 109.1(b)(i)(A) and (B).

---

1980)(en banc), *rev'd*, 455 U.S. 577 (1982)(reversing lower court's decision allowing expedited consideration of an action under 2 U.S.C. § 437h); *FEC v. National Right to Work Committee*, 665 F.2d 371 (D.C.Cir. 1981), *rev'd* 459 U.S. 197 (1982)(rejecting lower court construction of the term "member" to include certain individuals described by the NRWC as active members); *Democratic Senatorial Campaign Committee v. FEC*, 660 F.2d 773 (D.C.Cir. 1980), *rev'd* 454 U.S. 27 (1981)(overturning decision that FEC acted contrary to law in dismissing complaint); *FEC v. Ted Haley Congressional Committee*, 654 F.Supp. 1120 (W.D. Wash. 1987), *rev'd* 852 F.2d 1111 (9th Cir. 1988)(rejecting lower court decision holding loan guarantees were not contributions under FECA); *FEC v. Furgatch*, No. 83-0596-GT-M)(S.D. Cal. Nov. 20, 1984), *rev'd*, 807 F.2d 857 (9th Cir.), *cert. denied*, 484 U.S. 850 (1987)(reversing lower court's grant of a motion for dismissal); *see also United States v. Kanchanalak*, 41 F.Supp. 2d 1 (D.D.C. 1999), *rev'd*, 192 F.3d 1037 (D.C.Cir. 1999)(reversing the district court and concluding that 2 U.S.C. § 441e prohibits foreign contributions for non-federal as well as federal elections).

11

*Id.* at 37.[6]

Although there might well be coordination under the previous regulatory definition of coordination, the General Counsel's Report found that "under the present state of the law the result is different." *Id.* After a review of the evidence at hand, the General Counsel's Report explained:

> The foregoing facts provide circumstantial evidence that the Coalition was in some ways a "joint venture" between the trade association members and Rep. Boehner and Republican party leaders. But the *Christian Coalition* decision and the Commission-approved regulation require that there be coordination, or a joint venture, with respect to "the expressive expenditure" or "general public political communication." *Christian Coalition*, 52 F.Supp. at 92; 11 C.F.R. § 100.23(c). This requires substantial discussion or negotiation over an expressive communication's content, timing, location, volume etc. The deponents denied such discussions.

*Id.* at 42-43. The Report further explained that:

> [W]hile some documents are missing, i.e., fax cover sheets, and much of the testimony is less than credible, the documents produced do not disclose evidence of coordination that meets the test. Given our prior deposition experience in this matter, it is highly unlikely that obtaining further testimony at this time from other key players, e.g., Rep. Boehner, or his former staff Joyce Gates and Barry Jackson, will yield anything further.

*Id.* at 43. As a result, the General Counsel's Report stated, "this Office does not recommend further investigation on these issues." *Id.*[7]

---

[6] The General Counsel's Report also concludes "the Coalition's communications were undertaken for the purpose of influencing federal elections." *Id.* at 35. For example, the Report points out that:
> the Coalition's requests for proposal and responses center on how to aid candidates, they aired ads in the weeks just prior to election that named clearly identified candidates, they dropped direct mail "ten days before the election, just when many undecided voters were in their decision-making process," and the Coalition took credit for the successful reelection of members of Congress "defended by Coalition advertising." See GCR, dated December 23, 1999, Attachment 1 at pp. 4-8, 31, 104-111, 120-132.

*Id.* at 35.

[7] We note that counsel for the respondents in this matter have submitted letters strongly criticizing the Office of General Counsel for its characterizations of the evidence in this case and the degree of cooperation by respondents or witnesses during the investigation. Letter of June 13, 2001 from Jan Witold Baran and Thomas W. Kirby and letter of July 5, 2001 from Benjamin L. Ginsberg, Mitchell R. Berger and Michael T. Wood, referencing the General Counsel's Report of April 23, 2001. First, by the nature of their comments, we are confident they would have written the report with no less apparent skepticism. Second, they know well that this case, along with the case involving allegations of coordination between the AFL-CIO and Democratic candidates, presented the potential for massive violations of the campaign finance laws. No government attorney should be faulted for zealously trying to do the public's business under these

While we appreciate the dilemma faced by the General Counsel's Office, we are more optimistic that coordination could be proven even under the strictures of the Commission's new regulations. For example, there is strong circumstantial evidence that the communications paid for by the Coalition with corporate funds were requested or suggested by the Republican Party. It appears that the Coalition was brought into existence at the behest of the Republican Party leadership. Republican Party operatives were fully apprised of the operation as it was functioning. Additionally, the Coalition hired many of the same vendors—such as media buyers and pollsters—as those hired by the Republican Party. And with respect to some candidates, it is clear that people working for particular Republican congressional candidates were involved in requesting several of the Coalition advertisements. Even under the current regulations, there may well be enough to meet the "request or suggestion" standard.[8]

To understand the various connections between the Coalition and Republican candidates or the Republican Party, one need only look at several specific races. In Iowa's Fourth Congressional District, for example, Brian Trinagli worked for *both* the Coalition and the congressional campaign of Representative Greg Ganske. The investigation done by the Office of General Counsel revealed "the Coalition's pollster, Brian Tringali, acknowledged that his survey in connection with work paid for by Rep. Ganske's campaign, *influenced his decision the next day to recommend that the Coalition conduct surveys and air test ads in that district.*" April 20, 2001, General Counsel's Report at 2 (emphasis added). It would appear likely that the Coalition made a prohibited

---

circumstances. Third, to the extent they believe the discovery requests started out too broadly, the criticism should be directed to the commissioners who approved those requests, not the FEC lawyers who were willing to reach accommodation time and time again. Finally, as experienced practitioners, they know that evaluating an extensive factual record is not a science, and reasonable minds can differ on the value of particular pieces of testimony, documentation or circumstantial evidence.

  One particular comment deserves additional response. Counsel for the Coalition rely on the D.C. Circuit's opinion in *In re Sealed Case*, 237 F.3d 657 (D.C. Cir. 2001), apparently for the proposition that the Office of General Counsel is bent on publicizing allegations that are unfounded because of some political motivation. First, the panel opinion in that case badly mischaracterized the FEC's actions in this investigation. Any careful observer of the FEC's practice over the last 25 years would note that the FEC consistently has filed its subpoena enforcement actions in open court *regardless of the political stripes of the person involved*. The panel was simply wrong in hinting the FEC's subpoena enforcement efforts in this case were "politically motivated" or "externally motivated." Second, given that it takes four commissioners for approval of any finding or subpoena, given that the FEC conducted a parallel investigation of the AFL-CIO's ties with Democratic candidates (lasting 36 months versus 35 months for MUR 4624), and given that every objective analysis of the FEC's operations funds a lack of partisan tilt (see Thomas and Bowman, *"Obstacles to Effective Enforcement of the Federal Election Campaign Act,"* 52 ADMIN. LAW REVIEW No. 2 at 606 (A. U. 2000)), we don't see a case for prosecutorial misconduct or political vendetta.

[8] In MUR 4291 *et al.*, where there were indications the AFL-CIO was a partner in the Democratic Party's 'coordinated campaign,' there was scant evidence tying AFL-CIO public communications to the AFL-CIO's involvement with the 'coordinated campaign.' The AFL-CIO certainly was participating with the Democratic Party and indicating that it would do its part through internal communications to its membership—communications permissible under 2 U.S.C. § 441b(b)(2)(A)—to bolster candidates supported by the AFL-CIO. In terms of public communications, however, evidence of coordination was lacking.

in-kind contribution to the Ganske campaign as a result of the "suggestion" from an agent of the Ganske campaign that an expenditure be made on its behalf.

Likewise, there appeared to be coordination, albeit less directly, between the Coalition and the Republican congressional candidate in Washington's Fifth Congressional District, Representative George Nethercutt. Based upon evidence uncovered in its investigation, the Office of General Counsel found that "shortly after one of the Coalition's founding members received a fax from Rep. Boehner's Republican Conference containing a script for an AFL-CIO ad airing in Rep. Nethercutt's district, the Coalition prepared and aired a test ad responding to the AFL-CIO ad in Rep. Nethercutt's district." *Id.* In fact, the interaction between the House Republican Conference was such that:

> [A]s each wave of Coalition ads was aired, full sets of tapes of each of the ads were sent to Representative Boehner's assistant at the House Republican Conference, Joyce Gates, with the understanding that she would disseminate them to the 37 candidates in whose districts the Coalition aired its ads.

*Id.* Representative Nethercutt was a member of the House Republican Conference and, as such, the Conference was acting in his interest and on his behalf. As with the Ganske campaign, it appears likely that the Coalition made a prohibited contribution to the Nethercutt campaign as a result of a "suggestion" made from an agent of the candidate that an expenditure be made on his behalf.

Of course, it is procedurally premature to suggest what analysis the Commission, or even the General Counsel, might have settled on and eventually approved. For example, the General Counsel had not yet prepared or sent a General Counsel's Brief setting forth a "position on the factual and legal issues of the case and containing a recommendation on whether or not the Commission should find probable cause to believe that a violation has occurred." 11 C.F.R. § 111.16(a). Nor had the respondents filed a brief "setting forth respondent[s'] position on the factual and legal issues of the case." 11 C.F.R. § 111.16(c). Nor had the General Counsel, after reviewing the respondents' brief, advised the Commission on whether "to proceed with the recommendation or to withdraw the recommendation from Commission consideration." 11 C.F.R. § 111.16(d).

As a practical matter, however, the Commission's new regulations effectively shut down this matter. In light of those regulations, there certainly were not four votes (as there were at the 'reason to believe' stage under the Commission's old coordination regulations) for proceeding against the Coalition. Moreover, the Commission was facing an expiring statute of limitations. As a result, a vote against the General Counsel's recommendation to close these matters would have been pointless.

## III.

As a historical footnote, this case also presented the very important issue of whether the Coalition should be deemed a "political committee" under the Act. As a "political committee," the Coalition itself would have been prohibited from accepting corporate contributions.

The Act defines a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4). In construing this statutory term, the Supreme Court has held that an organization is not a political committee unless, in addition to crossing the $1,000 statutory threshold of federal contributions or expenditures, the organization is under the control of a candidate or its *major purpose* is the nomination or election of candidates to any public office.[9] Thus, once an organization has received more than $1,000 in contributions or made more then $1,000 in expenditures and has met the major purpose test, it becomes a political committee pursuant to § 431. Any organization that qualifies as a political committee must register with the Commission and file periodic reports of all its federal election receipts and disbursements for disclosure to the public. 2 U.S.C. §§ 433 and 434. A political committee is subject to limits when making expenditures in coordination with a candidate, but may make unlimited expenditures on behalf of a candidate if no coordination is involved. 2 U.S.C. §§ 441a(a)(1)(A), (2)(A) and (B).

The First General Counsel's Report recommended in 1998 that the Commission find reason to believe the Coalition violated 2 U.S.C. §§ 433 and 434 for failing to register as a political committee and report its receipts and disbursements. The Report reasoned:

> There is no indication that the Coalition was formed for any purpose other than building or maintaining public support for certain candidates. For instance, there is nothing suggesting that the Coalition engaged in lobbying members of Congress or issue discussions outside the context of elections. Given that the Coalition spent most of the millions of dollars it received in 1996 on ads and direct mailings designed to influence the

---

[9] In *Buckley v. Valeo*, 424 U.S. 1, 79 (1976)(emphasis added), the Court stated: "To fulfill the purposes of the Act [the term 'political committee'] need only encompass organizations that are under the control of a candidate or the *major purpose* of which is the nomination or election of a candidate." The Court reaffirmed this approach in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 252, n.6 (1986): "[A]n entity subject to regulation as a 'political committee' under the Act is one that is either 'under the control of a candidate or the major purpose of which is the nomination or election of a candidate.'" The Court observed that "should [an organization's] independent spending become so extensive that the organization's *major purpose* may be regarded as *campaign activity*, the [organization] would be classified as a political committee." 479 U.S. at 262 (emphasis added).

> outcome of federal elections by returning the majority in Congress and that, after apparently lying dormant since the 1996 elections, it now appears to be gearing up for the 1998 Congressional elections, there is evidence that the organization's sole purpose, let alone "major purpose" is the election and defeat of clearly identified federal candidates. [*Buckley v. Valeo*, 424 U.S. 1, 79 (1976)]. As noted, the Coalition spent well in excess of $1,000 on expenditures and contributions.

April 21, 1998 General Counsel's Report at 33-34. The General Counsel's Report further recommended that an investigation of this issue be conducted through document and deposition subpoenas, as well as informal discovery where possible.

We agreed with the General Counsel's recommendation to find reason to believe that the Coalition failed to register as a political committee. It appeared that the major purpose of the Coalition was the nomination or election of candidates for public office. Indeed, according to Bruce Josten, Senior Vice President of the U.S. Chamber of Commerce and an organizer of the Coalition, "this is the first pro-business Congress since 1928 and from a pure business perspective, getting them [re]elected is important. *Our ultimate objective is to return a pro-business, fiscally responsible majority for the 105th Congress.*" *Washington Post*, August 8, 1996 (emphasis added).

There were not, however, four votes to find reason to believe the Coalition violated 2 U.S.C. §§ 433 and 434. *See* 2 U.S.C. § 437g(a)(2). On June 8, 1998, a motion to approve that recommendation failed by a vote of 3-1. *Supra*, p.4.[10]

---

[10] Despite several requests from the Office of General Counsel, the declining Commissioner never provided a statement of reasons explaining the rationale for her opposition to the General Counsel's recommendation. Commissioner Elliott was replaced on June 25, 2000.

Ordinarily, when a commissioner blocks a recommendation to proceed, the "declining-to-go-ahead" commissioner must file such a statement of reasons. *Common Cause v. FEC*, 842 F.2d 436, 439 (D.C.Cir. 1988). Moreover, the Commission's Regulations explicitly require that these opinions "will be made available no later than 30 days from the date on which a respondent is notified that the Commission has voted to take no further action and to close such an enforcement file." 11 C.F.R. § 5.4(a)(4). The Commission unanimously reaffirmed this principle by adopting internal guidelines which state: "The deadline for completion of the statement will be the 30-day time period following notification to the respondent at which time the entire file of the closed MUR will be released to the public." FEC Open Meeting Minutes at 7 (February 5, 1987). In MUR 4624, these letters were sent out on June 6, 2001.

Failure to file a statement places complainants, who may wish to exercise their statutory rights under 2 U.S.C. § 437g(a)(8), in the untenable position of not knowing the reasoning of the "declining-to-go-ahead" commissioner and thus, whether the failure to proceed is contrary to law. By itself, Commissioner Elliott's failure to file a statement of reasons, despite a clear judicial and regulatory mandate to do so, would appear to justify a default finding that her inaction in MUR 4624 was contrary to law.

16

We understand Commissioner Sandstrom voted against closing the file in this matter because he believed the Coalition should be viewed as a political committee and its receipts should be considered violations of 2 U.S.C. § 441b. We agree with this legal theory as evidenced by the 3-1 vote over three years ago. Since this legal issue already had been dealt with by the Commission and since two of the other commissioners now sitting indicated they would not support a new 'reason to believe' finding on this theory, in our view it made little sense to vote against closing this matter. The real issue before the current Commission was whether the Coalition's ads should be deemed coordinated with any candidates, and the answer to this was preordained by the Commission's new regulation.

## IV.

On April 2, 2001, the United States Senate passed S. 27, the Bipartisan Campaign Reform Act of 2001, also known as the "McCain-Feingold bill." During debate, Senator Feingold voiced his opposition to the Commission's new coordination regulations and pointed out that "many observers of campaigns who are concerned about evasions of the law think [it] is far too narrow to cover what really goes on in campaigns." 147 Cong. Rec. S3184 (daily ed. March 30, 2001)(remarks of Sen. Feingold). Reflecting this concern, section 214 of the bill as passed by the Senate would repeal the Commission's new coordination regulations and would direct the Commission to promulgate new coordination rules within 90 days to take their place. These new rules would almost certainly differ significantly from the Commission's regulations based on the *Christian Coalition* decision.

Despite the plain rejection of its coordination regulations by the United States Senate, the Commission nevertheless went ahead and approved final promulgation of the new coordination regulations. On May 3, 2001, Commissioners Mason, Sandstrom, Smith, and Wold voted to make the new coordination regulations immediately effective upon publication in the Federal Register. The undersigned opposed. We agree with Senator Feingold that the new regulations are far too narrowly drafted and will make evasion of the Act commonplace. At the very least, we believe our colleagues should have waited until the conclusion of the legislative process and not rushed to promulgate new rules that, at the present time, are in such obvious conflict with the will of the United States Senate.

As MUR 4624 demonstrates, these regulations seriously weaken enforcement of the limitations, prohibitions and reporting requirements of the Act. Millions of dollars in corporate funds were received, spent and never reported by the Coalition. This activity did not appear to be undertaken "totally independently" of candidates and their agents. *Buckley*, 424 U.S. at 47. To the contrary, this activity appeared to be undertaken pursuant to a "general understanding", *Colorado*, 518 U.S. at 614, with the candidates and their agents and may well have been covered by the Commission's prior definition of coordination. Yet, under the Commission's new coordination regulations, this activity

17

was never subjected to proper legal scrutiny. In MUR 4624, likely violations under the original regulation turned into unlikely violations under the new regulation. It is this legacy of non-enforcement we fear will be repeated as long as these new regulations remain in effect.

9/7/01
Date

*[signature]*
Scott E. Thomas
Commissioner

09/07/01
Date

*[signature]*
Danny Lee McDonald
Chairman

18