# SUPPLEMENTAL PLAINTIFFS' EXHIBIT 11

These are important and legitimate questions, and I intend here to clarify the lines drawn in the bill. It is a key purpose of the bill to stop the use of soft money as a means of buying influence and access with federal officials. As an important part of this goal, we have taken federal officials, including Members of Congress, out of the business of raising soft money for political parties, political committees and candidates. Federal candidates and officeholders, furthermore, cannot establish or control political committees that raise or spend soft money.

We recognize that Federal officeholders and candidates raise money for nonprofit organizations. The bill applies some restrictions to such fundraising activities when the principal purpose of the organization involves get-out-the-vote and voter registration activities, or where the solicitation is specifically for the purpose of the funds being used for GOTV and voter registration activities. In addition, federal officeholders and candidates cannot raise money for nonprofit organizations to use on public communications that mention a federal candidate.

SOLICITATIONS FOR PARTY COMMITTEES

The basic rule in the bill is that federal candidates and officials cannot raise non-federal (or soft) money donations—that is, funds that do not comply with federal contribution limits and source prohibitions.

Thus, the rule for solicitations by federal officeholders or candidates for party committees is simple: federal candidates and officeholders cannot solicit soft money funds for any party committee—national, state or local.

Federal candidates and officeholders also cannot raise funds in connection with a non-Federal election, unless those funds comply with federal contribution limits and source prohibitions. Thus, if a Federal candidate or officeholder raises money for a state candidate, the amounts solicited need to comply with the source and amount limitations in federal law.

This, of course, means that a federal candidate or official can continue to solicit hard money for party committees. So a federal officeholder can, on behalf of his or her national party committees, including their congressional campaign committees, solicit individuals for contributions of up to $25,000 per year, or $50,000 per election cycle, per committee (subject, of course, to a donor's aggregate hard money contribution limit of $57,500 to all party committees in a two-year cycle).

A federal official can also solicit individuals for hard money donations to state party committees—under the bill of up to $10,000 per year, or $20,000 per cycle, from an individual subject again to the donor's aggregate contribution limit, and up to $5,000 per year or $10,000 per cycle from a federal PAC. These funds can be spent by the state party for activities in connection with a federal election, including for federal election activities.

A federal official can, in addition, solicit money for a state party to spend on non-federal elections, as long as the funds comply with federal limits and source prohibitions. This would allow a federal official to solicit up to $10,000 a year from an individual, or up to $5,000 per year from a PAC, to donate to the state party non-federal account, even if that same individual has already given a similar amount to the state party hard money account.

The Levin amendment expressly provides that federal candidates and officeholders can not solicit the funds authorized to be spent under the Levin amendment.

Similarly, a federal official can solicit money for state candidates, but such solicitations would be subject to the federal contribution limits and source prohibitions—$2,000 per election from individuals and $5,000 per election from PACs, and no contributions from corporations or labor unions.

SOLICITATIONS FOR OUTSIDE GROUPS

The bill allows federal officials and candidates to make general solicitations without restriction for outside non-profit groups (those exempt from taxation under the Internal Revenue Code, such as 501(c)(3) and (c)(4) groups), so long as the group is not one with a principal purpose of conducting get-out-the-vote or voter registration activities, and so long as the money is not solicited specifically for the purpose of conducting GOTV and voter registration activities. The general solicitation cannot specify how the funds will or should be spent.

An official can also make a solicitation for non-profit groups that do principally engage in such voter activities, or for funds specifically to be spent for GOTV or voter registration activities, but the solicitation must be made only to individuals, and is no more than $20,000 per year. An official cannot solicit funds from a corporation or labor union for such purposes.

These restrictions apply to the solicitation of funds by a federal candidate or official. A federal official can sit on the board of a non-profit or otherwise participate in the activities of the nonprofit, so long as he or she was not engaged in raising money for the non-profit on election-related activities. A federal candidate or officeholder cannot direct the expenditure of such funds.

Mr. KILDEE. Mr. Chairman, this is a historical day for this House and for this country.

Today we have the opportunity to limit the scandalous infusion of money into the electoral process.

Our Founding Fathers never foresaw this existing system for democratic elections.

Today we can move closer to the principles of those Founding Fathers.

Vote for the substitute offered today by Mr. SHAYS and Mr. MEEHAN.

This may be our last best chance.

Mr. FALEOMAVAEGA. Mr. Chairman, I rise today in support of the Shays-Meehan substitute and want to explain one provision in the bill which will clarify campaign finance law with respect to contributions to federal candidates by U.S. nationals.

American Samoa is the only jurisdiction under U.S. authority in which a person can be born with the status of U.S. national. A national is a person who owes his or her allegiance to the United States, but is not a citizen. U.S. nationals travel with U.S. passports and are eligible for permanent residence in the United States. They are not foreign citizens or foreign nationals. In fact, they have most of the same privileges and immunities as U.S. citizens. However, federal campaign law was enacted before American Samoa had representation in the U.S. Congress and current law fails to address the issue of contributions from U.S. nationals.

Mr. Chairman, federal campaign law currently specifies that U.S. citizens and permanent resident foreign nationals may make contributions to candidates for federal office. Although there is an advisory opinion from the Federal Election Commission which interprets current law to allow U.S. nationals to contribute to federal elections, a federal court could at any time interpret the law to exclude U.S. nationals. Our failure to amend current law could also be interpreted to mean that Congress originally intended to prohibit U.S. nationals from contributing to federal elections.

Mr. Chairman, I do not believe it was or is the intent of Congress, or the law, to exclude U.S. nationals from contributing to federal campaigns. Congress simply enacted a law before American Samoa had representation in the U.S. Congress. Now it is time to amend the law to specifically address the issue of U.S. nationals. Therefore, I urge my colleagues to support this technical change in any bill which moves forward.

Mr. RAMSTAD. Mr. Chairman, today we are casting historic votes on the most important campaign finance reforms since the Watergate reforms of 25 years ago.

Today, we will finally have the opportunity to eradicate the biggest cancer on the federal campaign finance system—soft money.

Shays-Meehan will go a long way in reducing the disproportionate and undue influence of unregulated and unlimited soft money.

We should pass this common-sense reform legislation to restore people's trust in the system and give the American people a bigger voice in their government.

Mr. Chairman, let's get real honest for a minute! The truth is that both political parties are addicted to soft money, and campaign finance reform gives both parties heartburn.

But the political parties will survive and continue to flourish with these reforms, and public faith in the political process will be enhanced.

Let's do the right thing! Let's rid the system of unregulated, unlimited soft money. Let's pass Shays-Meehan.

The American people deserve nothing less!

Mr. SHAYS. Mr. Chairman, I rise to discuss one of the key sections of the Shays-Meehan substitute, the soft money provisions relating to national and state parties. The state party provisions contain a section, commonly referred to as the Levin amendment, that I want to take this opportunity to explain. In addition, some who oppose campaign finance reform characterize the Levin amendment as a major loophole in the Shays-Meehan substitute. They are wrong. This discussion is intended to spell out what the Levin amendment does and does not allow.

SHAYS-MEEHAN'S TREATMENT OF NATIONAL PARTY SOFT MONEY

The soft money provisions of the Shays-Meehan bill regarding the national political parties operate in a straight-forward way. The national parties are prohibited entirely from raising or spending any soft money. At the national party level, the ban on soft money is complete. This ban covers not only the national party committees themselves, but also the congressional campaign committees of the national parties. And it covers any officer or agent acting on behalf of the national party committees, as well as any entity that is established, financed, maintained or controlled by a national party committee.

The purpose of these provisions is simple: to put the national parties entirely out of the soft money business. The provision is intended to be comprehensive at the national party level. Simply put, the national parties, and anyone operating for or on behalf of them,

are not to raise or spend, nor to direct or control, soft money. This ban covers all activities of the national parties, even those that might appear to affect only non-federal elections. Because the national parties operate at the national level, and are inextricably intertwined with federal officeholders and candidates, who raise the money for the national party committees, there is a close connection between the funding of the national parties and the corrupting dangers of soft money on the federal political process. The only effective way to address this problem of corruption is to ban entirely all raising and spending of soft money by the national parties.

SHAYS-MEEHAN'S TREATMENT OF STATE PARTY SOFT MONEY

The treatment of the state parties is different. This is because state parties obviously engage in activities which are purely directed to non-federal elections. The Shays-Meehan bill does not regulate the kind of money that can be raised by the state parties. That is left to state law. What the bill does do is direct the state parties to spend only hard money on those activities which affect, even in part, federal elections. This is necessary to prevent blatant evasion of the federal campaign finance laws.

This approach is in many ways similar to current law. Currently, if a state party engages in activity that directly affects federal elections—such as running an ad that says "vote for Congressman Smith"—the state party would be required to spend hard money on these activities. Similarly, if the state party engages in activity that purely affects state elections—such as an ad that says "vote for Governor Smith"—it could spend whatever non-federal money is permitted under state law.

The Shays-Meehan bill does not change either one of these propositions.

But there is a range of activities that state parties engage in that, by their very nature, affect both federal and non-federal elections. These are the familiar "party building activities," such as get-out-the vote drives or voter registration drives. These activities—registering voters to vote in elections that have both federal and non-federal candidates, or engaging in activities designed to bring them to the polls to vote for federal and non-federal candidates—clearly have an impact on both federal and non-federal elections.

Under current law, state parties pay for these "mixed" activities using a mixture of both hard and soft money pursuant to allocation formulae set by the Federal Election Commission. But these allocation rules have proven wholly inadequate to guard against the use of soft money to influence federal campaigns. Much state party "party building activity" is directed principally to influence federal elections, and all of the party voter activity inevitably does have a substantial impact on federal campaigns. Further, the state parties run TV and radio ads, purportedly as "issue ads," that directly praise or criticize federal candidates by name without using words like "vote for" or "vote against"—and the FEC has taken the unrealistic position that such ads have an impact on both federal and non-federal elections, and should accordingly be funded with an allocated mixture of hard and soft money.

The Shays-Meehan bill addresses these problems by simply applying the principle of current law—that state parties must use solely hard money to pay for activities that affect federal elections—to a category of activities which clearly affect federal elections and which the bill defines as "federal election activities." Section 101(b) of the bill defines these activities as the following:

(i) Voter registration activity in the last four months before a Federal election,

(ii) Voter identification, GOTV, and generic campaign activity (i.e., activity relating to a party not a specific candidate) that is conducted in an election in which a Federal candidate appears on the ballot,

(iii) Public communications (also a defined term that includes communications by radio, TV, newspapers, phone banks and other methods of public political advertising) that refer to a clearly identified Federal candidate and that promotes or supports, or attacks or opposes, a federal candidate for that office.

(iv) Services provided by employees of a state or local party who spend more than 25 percent of their compensated time on Federal elections.

This definition of "Federal election activities" is significant because in section 101(a) of the bill (new section 323(b) of the Act), there is a requirement that state parties spend only Federal money (hard money) on "Federal election activities." That is how the Shays-Meehan bill prevents soft money from being injected into federal races through the state parties.

Again, the bill does not restrict fundraising by state parties. That is left as a matter of state law. But it does say to the state parties that when they spend money on activities that affect federal elections, including the defined category of "Federal election activities," they must spend solely hard money for those activities.

The lack of a state party soft money provision is a fundamental shortcoming of the proposal of Mr. NEY and Mr. WYNN. The restrictions on state parties using soft money to influence federal elections is one of the most important features of the Shays-Meehan bill. Much of the soft money being raised today by the national parties is transferred to state parties to be spent on activities that influence federal elections. An effective effort to address state party soft money spending to influence federal elections is absolutely essential to real campaign finance reform and solving the soft money problem.

THE LEVIN AMENDMENT

Critics have contended that the state parties should not be prevented from spending money that is legal in their state on activities that are designed to improve voter turnout and assist state candidates in a state election. When the McCain-Feingold bill was considered in the Senate last year, Senator CARL LEVIN of Michigan, a long-time and strong supporter of the bill, worked with the sponsors of the legislation to craft a provision to allow limited spending of soft money by state parties on a limited subset of state party activities. On the Senate floor, Senator LEVIN explained that his amendment:

. . . will allow the use of some non-Federal dollars by State parties for voter registration and get out the vote, where the contributions are allowed by State law, where there is no reference to Federal candidates, where limited to $10,000 of the contribution which is allowed by State law, and where the allocation between Federal and non-Federal dollars is set by the Federal Election Commission.

Senator LEVIN also specified: "These are dollars not raised through any effort on the part of Federal officeholders, Federal candidates, or national parties. These are non-Federal dollars allowed by State law."

CHANGES TO THE LEVIN AMENDMENT IN SHAYS-MEEHAN

In addressing the Levin amendment in our substitute, the sponsors of the Shays-Meehan bill wanted to accomplish two things. First, we wanted to respect the original intent and purpose of the Levin amendment. Second, we wanted to make sure that it did not create a new loophole for corporations, unions, wealthy individuals to exploit. In our view, those purposes were not in conflict, since Senator LEVIN made it clear it was not his intent to undermine the campaign finance reform effort, but only to support legitimate state party activities that promote voter participation by allowing a limited amount of non-federal money to be used for those purposes.

The changes in the Levin amendment incorporated in our substitute have been agreed on with the sponsors of the Senate bill. They do not change the essential thrust of the Levin amendment, but they do provide additional restrictions to help ensure that the amendment will not become a new loophole in the law.

DESCRIPTION OF REVISED LEVIN AMENDMENT

With that background in mind, let me describe the Levin amendment, as modified in the Shays-Meehan substitute. New section 323(b)(2)(A) of the FECA permits state parties to spend non-federal money (soft money) on certain Federal election activities, as long as the spending is made up of both Federal money (hard money) and soft money in a ratio to be prescribed by the FEC. The activities that state and local parties can pay for under this exception are voter registration in the last 120 days prior to an election, and certain GOTV and other activities specified in new section 301(20(A)(ii).

Under new section 323(b)(2)(B)(i), the exception applies only if the activity paid for does not refer to a clearly identified Federal candidate. In addition, under new section 323(b)(2)(B)(ii), the exception does not apply to any activity that involves a broadcast, cable or satellite communication, unless that communication refers only to state and local candidates. In other words, GOTV efforts paid for in part with so-called "Levin money" may mention state or local candidates or contain a generic party message, but they cannot mention Federal candidates. And if these efforts are carried out through radio or TV ads they must mention clearly identified state or local candidates only, or they will be subject to the state party soft money restrictions and no "Levin money" can be used. To be clear, "Levin money" cannot be used by state parties to pay for broadcast ads that mention federal candidates.

In addition, the soft money or "Levin money" portion of the spending is subject to a number of restrictions. Under new section 323(b)(2)(B)(iii), it must be legally raised under state law, and no person can give more than $10,000 per year to a individual state or local committee, even if state law permits greater contributions. So if a state allows direct corporate or labor union contributions to political parties corporations and unions can make contributions of up to $10,000 or the state limit, whichever is lower, to the party committee each year. Obviously, if a state prohibits corporate or labor union contributions to political parties, the Levin amendment does not supersede that prohibition, and corporate

or union contributions of "Levin money" would be banned.

After the Senate passed the Levin amendment, the question arose whether the amendment was intended to limit a donor to a single $10,000 contribution to all of the non-Federal political committees in a state, or to permit separate contributions to the state committee and local committees. Since the Senate appears to have intended that there is not a single per donor limit on all contributions to party committees in a state, further restrictions on the raising and spending of "Levin money" by the committees are imposed in order to prevent the Levin amendment from becoming a new loophole.

Accordingly, under new section 323(b)(2)(B)(iv), the version of the amendment contained in the Shays-Meehan substitute, all of the non-Federal and Federal money spent on the activities authorized by the Levin amendment must be raised solely by the committee doing the spending. Transfers of money between committees are not permitted. Thus, a county committee of a political party may accept a $10,000 contribution, but it must raise and spend that money itself, and it cannot work with any other party committee in raising or spending that money. It cannot transfer that money to the state committee. Furthermore, it must itself raise the hard money allocation required by the FEC, and it may not accept a transfer of hard money from a state or national party committee to satisfy that allocation requirement.

Finally, and very importantly, in new section 323(b)(2)(C), we affirm that federal candidates or officeholders and the national parties may not participate in the raising or spending of the soft money that is permitted to be spent under the Levin amendment. In addition, joint fundraisers between state committees or state and local committees are not permitted. Prohibiting Members of Congress and Executive Branch officials from being involved in soft money fundraising is one of the central purposes of the campaign finance reform effort. Consistent with Senator LEVIN's original intent, this new provision will ensure that that central purpose of the bill is not undermined. The joint fundraising prohibition will prevent a single fundraiser for multiple state and local party committees.

Mr. Chairman, let me address two additional questions that have arisen as to the interpretation of the Levin amendment. First, the $10,000 per year limit applies collectively to a corporation and its subsidiaries, and to a union and its locals, in the same way as contributions from PACS set up by subsidiaries and local unions are treated under current law. See 2 U.S.C. §441a(a)(5). To allow a separate contribution limit to apply to subsidiaries of a corporation or locals of a union would completely undermine the $10,000 limit as a check against the Levin amendment being used to continue the unlimited contributions that the soft money system now permits.

Second, while state and local committees may accept separate contributions of up to $10,000 per year from donors permitted to give that much under state law, state and local committees are not allowed to create their own multiple subsidiary committees to raise separate $10,000 contributions under this provision. The proliferation of new state party committees (e.g., the Northern California Republican Party Committee, the Southern California Party Committee or the New York Democratic Committee A, Committee B, Committee C, etc.) would be in complete contradiction to the provision, which allows only limited amounts of non-federal money to be given to a state or local committee for limited party-building activities that do not refer to federal candidates.

Mr. KLECZKA. Mr. Chairman, today, at long last, the House of Representatives will finally get a fair vote on campaign finance reform legislation. In order to reach this point, 218 Members had to sign a discharge petition to force the anti-reform Republican leadership to bring this measure to the floor for a debate and hopefully passage. H.R. 2356, the Bipartisan Campaign Reform Act of 2001, is necessary if we are to remove the undue influence of soft money on our political process and the unregulated issue advertisements that inundate our airwaves during each election season.

When Congress passed the Federal Election Campaign Act (FECA) of 1971 it included a provision that allowed national political parties to use unregulated contributions, "soft money," for generic party-building activities such as get-out-the-vote drives and voter registration efforts. Initially, the parties adhered to the restrictions on the use of soft money, but soon began shifting soft money contributions to state parties to be used for paid television and radio campaign advertisements. Under FECA, such advertisements were supposed to be paid for by regulated hard money that is raised through limited contributions to political parties and candidates.

We have recently seen an unacceptable increase in the amount of soft money used in campaigns. In the year 2000 elections alone, $495 million in soft money was spent by the parties, an amount that is nearly double the $262 million spent four years earlier. The steadily increasing use of soft money to skirt federal campaign contribution laws has given it a growing role in our system of elections that cannot be allowed to continue.

An equally troubling aspect of today's campaign system is the number of issue advertisements broadcast on the television and radio. Although these ads technically adhere to federal campaign regulations, they violate the spirit of the law. Issue ads are supposed to be used to discuss issues of legislation, not to attack or support candidates, like they often do today. Through this loophole, corporations, unions, and other organizations have avoided federal reporting and disclosure laws by running ads that avoid the magic words "vote for," "vote against," "support," and "defeat." Since the ads are technically campaign ads, the people paying for them do not need to identify themselves or their supporters, which is contrary to the basic tenets of campaign-finance regulations.

H.R. 2356 would fill in the gaps left by FECA. First, it would ban all national party use of soft money. In order to ensure that get-out-the-vote drives and other genuinely generic party activities are not hindered, it would allow state and local parties to spend soft money on these activities. Individuals, corporations, and labor unions can give $10,000 in soft money to party committees organized at the state, county, and local level for these legitimate efforts.

H.R. 2356 would also prevent corporations and organizations from skirting the law with unregulated issue advertisements by requiring that all campaign ads for federal office be paid for with publicly disclosed and regulated campaign funds that are subject to federal contribution limits. This would be achieved by expanding the definition of "campaign advertisement" to include any ads that clearly identify a federal candidate made within 60 days of a general election or 30 days of a primary and are targeted to that candidate's electorate.

Some of my colleagues claim that these regulations would violate the freedom of speech guaranteed by the First Amendment. That is simply untrue. Corporations, labor unions, and other organizations would still be permitted to use any funds they have to run ads that discuss issues of legislation, so long as they do not specifically refer to a candidate for federal office. If they do mention a candidate by name, all they have to do is to use hard money, which is regulated, subject to contribution limits and disclosure laws. These groups may also fund advertisements that do attack or support a specific candidate, the only requirement being that they do so through the established regulated process using hard money donations to their political action committees.

This bill would also retain several important hard money contribution limits. Individuals would still be permitted to contribute only $1000 per election to candidates for the House of Representatives and political action committees would be restricted to the current $5000 per election limit.

This day has been a long time coming. We need to reduce the influence of unregulated money which has been flowing at an increasing rate into our political system. H.R. 2356 reigns in soft money and issue advertising that has operated outside the framework of our campaign-finance laws. I urge my colleagues to support the amendments that the reform measure's authors must offer in order to get the complete bill to the floor under the GOP leadership's rule. Similarly, I urge Members to oppose those "poison pill" amendments designed to kill the bill, and instead support final passage of this important measure.

Mr. SHAYS. Mr. Chairman, I rise to address the scope of an exception to the definition of "electioneering communications" set out in section 201(3)(B), which include (i) news distributed by broadcast stations that are not owned or controlled by a candidate, (ii) independent expenditures, (iii) candidate debates and forums and (iv) "any other communication exempted under such regulations as the Commission may promulgate . . . to ensure appropriate implementation of this paragraph." I wish to discuss the purpose of the fourth exception.

The definition of "electioneering communication" is a bright line test covering all broadcast, satellite and cable communications that refer to a clearly identified federal candidate and that are made within the immediate pre-election period of 60 days before a general election or 30 days before a primary. But it is possible that thee could be some communications that will fall within this definition even though they are plainly and unquestionably not related to the election.

Section 201(3)(B)(iv) was added to the bill to provide Commission with some limited discretion in administering the statute so that it can issue regulations to exempt such communications from the definition of "electioneering

communications" because they are wholly unrelated to an election.

For instance, if a church that regularly broadcasts its religious services does so in the pre-election period and mentions in passing and as part of its service the name of an elected official who is also a candidate, and the Commission can reasonably conclude that the routine and incidental mention of the official does not promote his candidacy, the Commission could promulgate a rule to exempt that type of communication from the definition of "electioneering communications." There could be other examples where the Commission could conclude that the broadcast communication in the immediate pre-election period does not in any way promote or support any candidate, or oppose his opponent.

Charities exempt from taxation under Section 501(c)(3) of the Internal Revenue Code are prohibited by existing tax law from supporting or opposing candidates for elective office. Notwithstanding this prohibition, some such charities have run ads in the guise of so-called "issue advocacy" that clearly have had the effect of promoting or opposing federal candidates. Because of these cases, we do not intend that Section 201(3)(B)(iv) be used by the FEC to create any per se exemption from the definition of "electioneering communications" for speech by Section 501(c)(3) charities. Nor do we indent that Section 201(3)(B)(iv) apply only to communications by section 501(c)(3) charities.

But we do urge the FEC to take cognizance of the standards that have been developed by the IRS in administering the law governing Section 501(c)(3) charities, and to determine the standards, if any, that can be applied to exempt specific categories of speech where it is clear that such communications are made in a manner that is neutral in nature, wholly unrelated to an election, and cannot be used to promote or attack any federal candidates.

We urge the Commission to exercise this rulemaking power within 90 days of the effective date of the bill. We also expect the Commission to use its Advisory Opinion process to address these situations both before and after the issuance of regulations.

The CHAIRMAN. All time has expired.

The question is on the amendment in the nature of a substitute offered by the gentleman from Connecticut (Mr. SHAYS).

The question was taken; and the Chairman announced that the noes appeared to have it.

RECORDED VOTE

Mr. SHAYS. Mr. Chairman, I demand a recorded vote.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 240, noes 191, not voting 3, as follows:

[Roll No. 21]
AYES—240

Abercrombie
Ackerman
Allen
Andrews
Baca
Baird
Baldacci
Baldwin
Barcia
Barrett
Bass
Becerra
Bentsen
Bereuter
Berkley
Berman
Berry
Bishop
Blagojevich
Blumenauer
Boehlert
Bonior
Borski
Boswell
Boucher
Boyd
Brady (PA)
Brown (FL)
Brown (OH)
Capito
Capps
Capuano
Cardin
Carson (IN)
Carson (OK)
Castle
Clay
Clayton
Clement
Clyburn
Condit
Conyers
Costello
Coyne
Cramer
Crowley
Cummings
Davis (CA)
Davis (FL)
Davis (IL)
DeFazio
DeGette
Delahunt
DeLauro
Deutsch
Dicks
Dingell
Doggett
Dooley
Doyle
Edwards
Engel
Eshoo
Etheridge
Evans
Farr
Fattah
Filner
Foley
Ford
Frank
Frelinghuysen
Frost
Ganske
Gephardt
Gilchrest
Gilman
Gonzalez
Gordon
Graham
Green (TX)
Greenwood
Grucci
Gutierrez
Hall (OH)
Harman
Hastings (FL)
Hill
Hinchey
Hinojosa
Hoeffel
Holden
Holt
Honda
Hooley
Horn
Houghton
Hoyer
Inslee
Israel
Jackson (IL)
Jackson-Lee (TX)
Jefferson
John
Johnson (CT)
Johnson (IL)
Johnson, E. B.
Jones (OH)
Kanjorski
Kaptur
Kennedy (RI)
Kildee
Kilpatrick
Kind (WI)
Kirk
Kleczka
Kucinich
LaFalce
Lampson
Langevin
Lantos
Larsen (WA)
Larson (CT)
LaTourette
Leach
Lee
Levin
Lewis (GA)
LoBiondo
Lofgren
Lowey
Lucas (KY)
Luther
Lynch
Maloney (CT)
Maloney (NY)
Markey
Mascara
Matheson
Matsui
McCarthy (MO)
McCarthy (NY)
McCollum
McDermott
McGovern
McHugh
McIntyre
McKinney
McNulty
Meehan
Meek (FL)
Meeks (NY)
Menendez
Millender-McDonald
Miller, George
Mink
Moore
Moran (VA)
Morella
Nadler
Napolitano
Neal
Oberstar
Obey
Olver
Ortiz
Osborne
Ose
Owens
Pallone
Pascrell
Pastor
Payne
Pelosi
Petri
Phelps
Platts
Pomeroy
Price (NC)
Quinn
Ramstad
Rangel
Reyes
Rivers
Rodriguez
Roemer
Ross
Rothman
Roukema
Roybal-Allard
Rush
Sabo
Sanchez
Sanders
Sandlin
Sawyer
Schakowsky
Schiff
Scott
Serrano
Shays
Sherman
Simmons
Skelton
Slaughter
Smith (MI)
Smith (WA)
Snyder
Solis
Spratt
Stark
Stenholm
Strickland
Stupak
Tanner
Tauscher
Taylor (MS)
Thompson (CA)
Thune
Thurman
Tierney
Towns
Turner
Udall (CO)
Udall (NM)
Upton
Velazquez
Visclosky
Walsh
Wamp
Waters
Watson (CA)
Watt (NC)
Waxman
Weiner
Weldon (PA)
Wexler
Wolf
Woolsey
Wu

NOES—191

Aderholt
Akin
Armey
Bachus
Baker
Ballenger
Barr
Bartlett
Barton
Biggert
Bilirakis
Blunt
Boehner
Bonilla
Bono
Boozman
Brady (TX)
Brown (SC)
Bryant
Burr
Burton
Buyer
Callahan
Calvert
Camp
Cannon
Cantor
Chabot
Chambliss
Coble
Collins
Combest
Cooksey
Cox
Crane
Crenshaw
Culberson
Cunningham
Davis, Jo Ann
Davis, Tom
Deal
DeLay
DeMint
Diaz-Balart
Doolittle
Dreier
Duncan
Dunn
Ehlers
Ehrlich
Emerson
English
Everett
Ferguson
Flake
Fletcher
Forbes
Fossella
Gallegly
Gekas
Gibbons
Gillmor
Goode
Goodlatte
Goss
Granger
Graves
Green (WI)
Gutknecht
Hall (TX)
Hansen
Hart
Hastings (WA)
Hayes
Hayworth
Hefley
Herger
Hilleary
Hilliard
Hobson
Hoekstra
Hostettler
Hulshof
Hunter
Hyde
Isakson
Issa
Istook
Jenkins
Johnson, Sam
Jones (NC)
Keller
Kelly
Kennedy (MN)
Kerns
King (NY)
Kingston
Knollenberg
Kolbe
LaHood
Largent
Latham
Lewis (CA)
Lewis (KY)
Linder
Lipinski
Lucas (OK)
Manzullo
McCrery
McInnis
McKeon
Mica
Miller, Dan
Miller, Gary
Miller, Jeff
Mollohan
Moran (KS)
Murtha
Myrick
Nethercutt
Ney
Northup
Norwood
Nussle
Otter
Oxley
Paul
Pence
Peterson (MN)
Peterson (PA)
Pickering
Pitts
Pombo
Portman
Pryce (OH)
Putnam
Radanovich
Rahall
Regula
Rehberg
Reynolds
Rogers (KY)
Rogers (MI)
Rohrabacher
Ros-Lehtinen
Royce
Ryan (WI)
Ryun (KS)
Saxton
Schaffer
Schrock
Sensenbrenner
Sessions
Shadegg
Shaw
Sherwood
Shimkus
Shows
Shuster
Simpson
Skeen
Smith (NJ)
Smith (TX)
Souder
Stearns
Stump
Sununu
Sweeney
Tancredo
Tauzin
Taylor (NC)
Terry
Thomas
Thompson (MS)
Thornberry
Tiahrt
Tiberi
Toomey
Vitter
Walden
Watkins (OK)
Watts (OK)
Weldon (FL)
Weller
Whitfield
Wicker
Wilson (NM)
Wilson (SC)
Wynn
Young (AK)
Young (FL)

NOT VOTING—3

Cubin
Riley
Traficant

□ 1607

Ms. HART and Mr. SKEEN changed their vote from "aye" to "no."

So the amendment in the nature of a substitute was agreed to.

The result of the vote was announced as above recorded.

The CHAIRMAN. Under the rule, the substitute is finally adopted.

(By unanimous consent, Mr. LARGENT was allowed to speak out of order.)

FAREWELL REMARKS

Mr. LARGENT. Mr. Chairman, this being my last week to serve in Congress, I wanted to make just a brief statement to my friends and colleagues.

Last week my youngest son Kramer completed an essay on Mark Twain. I was struck by how many facts about Mark Twain's life reminded me of my 7 years in Congress. Samuel Clemens was born at the appearance of Halley's Comet in 1835 and died the next time it came around in 1910. I thought about that as I prepare to cast my last vote in Congress on campaign finance reform and harken back to the days of 1994 when the first vote I cast was on GATT, the last vote of the 103rd Congress.

In my son's report I also learned something I did not know, that Samuel Clemens' alias, Mark Twain, was actually a nautical term that was used by riverboat crews, and it denoted two fathoms, or 12 feet, the depth necessary for safe passage.

We in Congress often refer to our Nation as our ship of state, and we hear pollsters ask questions to voters, do you think that the ship is headed in the right direction or the wrong direction? I ran for Congress in 1994 because I believed our country was headed in the wrong direction, and I wanted to