**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
CHRISTOPHER SHAYS and                   )
MARTIN MEEHAN                           )
                                        )
              Plaintiffs,               )
                                        )
        v.                              )
                                        )  Civil Action No. 06–CV–1247 (CKK)
FEDERAL ELECTION COMMISSION,            )
                                        )
              Defendant.                )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES OF**
**U.S. SENATORS JOHN McCAIN AND RUSSELL D. FEINGOLD AS**
*AMICI CURIAE* **OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

J. GERALD HEBERT
(D.C. Bar No. 447676)
PAUL S. RYAN
(D.C. Bar No. 502514)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave. NW, Suite 650
Washington, DC  20036
Tel: (202) 736-2200
Fax: (202) 736-2222

Counsel for *Amici Curiae*
   Senators John McCain and Russ Feingold

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

ARGUMENT ........................................................................................................................1

   I.  FEC "Coordination" Regulation Violates FECA, BCRA, and the APA. ............................1

     A.  FEC "Coordination" Analysis in the Pre-BCRA Era Did Not Rely on an "Express Advocacy" Content Standard. ..........................................................................................1

     B.  BCRA's Legislative History and the Supreme Court's *McConnell* Decision Make Clear That Effective Regulation of Coordinated Spending Is Vital to the Integrity of Federal Campaign Finance Law—and that the "Express Advocacy" Test Is Functionally Meaningless and Ineffective. ..................................................................6

     C.  FEC Has Failed to Explain and Justify Numerous Deficiencies of the "Coordination" Regulation Including, But Not Limited To, Its Dependence on the Express Advocacy Test. ...............................................................................................8

   II.  BCRA's Language, Structure and Legislative History, Together with the Supreme Court's *McConnell* Decision, Make Clear That Federal Candidates Are Prohibited From Soliciting "Soft Money" at State Party Fundraising Events. ...................................11

   III. FEC "Federal Election Activity" Regulations—As Interpreted in Advisory Opinion 2006–19—Clearly and Unduly Compromise BCRA's "Soft Money" Ban and Violate the APA. ..............................................................................................................................17

CONCLUSION .....................................................................................................................20

EXHIBITS

# TABLE OF AUTHORITIES

**Cases:**

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................ *passim*

*Colo. Republican Fed. Campaign Comm. v. FEC,* 518 U.S. 604 (1996) ......................................1

*FEC v. Christian Coalition*, 52 F. Supp. 2d 45 (D.D.C. 1999) ......................................................3

*FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431 (2001) ...................................1, 7

*McConnell v. FEC*, 540 U.S. 93 (2003)........................................................................ *passim*

*Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005) ....... *passim*

**Statutes, Legislation and Legislative History:**

2 U.S.C. § 431(9)(A)(i) ............................................................................................2

2 U.S.C. § 441a(a)(7)(B)(ii)........................................................................................6

2 U.S.C. § 441i(b) .................................................................................................20

2 U.S.C. § 441i(e) ..........................................................................................13, 14, 15, 20

Administrative Procedures Act (APA), codified at 5 U.S.C. §§ 551 *et seq.* ........................ *passim*

Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107–155, 116 Stat. 81 ..... *passim*

Federal Election Campaign Act (FECA), codified at 2 U.S.C. §§ 431 *et seq.* ..................... *passim*

Federal Election Campaign Act, 1976 Amendments, Pub. L. No. 94–283, 90 Stat. 475................2

147 Cong. Rec. S3240 (daily ed. Apr. 2, 2001)...............................................................20

148 Cong. Rec. S2144–45 (daily ed. Mar. 20, 2002) .....................................................6, 7

148 Cong. Rec. S2139 (daily ed. Mar. 20, 2002) ..........................................................14

148 Cong. Rec. H409 (daily ed. Feb. 13, 2002) ........................................................19, 20

**Regulations and Agency Materials:**

11 C.F.R. § 100.22(b) .............................................................................................11

11 C.F.R. § 100.23 ..................................................................................................4

11 C.F.R. § 100.24(a)...............................................................................................17

11 C.F.R. § 109.1(b) (1980)................................................................................2

11 C.F.R. § 300.64(b) ...................................................................................12

FEC Advisory Opinion 1982–56 ....................................................................3

FEC Advisory Opinion 1983–12 ....................................................................3

FEC Advisory Opinion 1988–22 ....................................................................3

FEC Advisory Opinion 1990–5 ......................................................................3

FEC Advisory Opinion 2006–19 ...............................................................17, 18

65 Fed. Reg. 76138 (Dec. 6, 2000) ...............................................................4

66 Fed. Reg. 23537 (May 9, 2001) ...............................................................4

67 Fed. Reg. 35654 (May 20, 2002) ............................................................14

70 Fed. Reg. 37649 (June 30, 2005) ...........................................................12

70 Fed. Reg. 56599 (Sept. 28, 2005) ..........................................................16

71 Fed. Reg. 13926 (Mar. 20, 2006)............................................................16

Commissioner Bradley A. Smith, "Statement For The Record for MUR 4624" in *In re The Coalition, et al*., MUR 4624 (Nov. 7, 2001)................................4

Statement of Reasons of Commissioners Mason and Smith in *In re Alabama Republican Party et al.*, MUR 4538 (FEC May 23, 2002) ........................4, 5, 6

Statement of Reasons of Commissioner Sandstrom in *In re Alabama Republican Party et al.*, MUR 4538 (FEC August 13, 2002).........................5, 6

Statement of Reasons of Commissioners Wold, Elliot, Mason and Sandstrom, *On the Audits of "Dole For President Committee, Inc." et al.* (June 24, 1999) ...........6

**Miscellaneous Sources:**

Center for Competitive Politics *Amicus* Brief ...............................................2, 3, 4, 5

*FEC v. Christian Coalition*, No. 96–1781, PLAINTIFF FEC'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Oct. 8, 1998)................3

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nearly three years ago, *amici* Senators McCain and Feingold filed a brief *amici curiae* with this Court in the "related case" *Shays v. FEC* ("*Shays I*"), 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005), urging the Court to invalidate numerous regulations promulgated by Defendant Federal Election Commission (FEC) to implement the Bipartisan Campaign Reform Act of 2002 (BCRA).[1]  *Amici* once again ask this Court to recognize, for reasons detailed herein, that the FEC's re-promulgated rules regarding "coordinated communication," federal candidate and officeholder solicitation at state party fundraising events, and "federal election activity" undermine and unduly compromise the purposes and intent of BCRA and the Federal Election Campaign Act[2] (FECA).  On this basis, *amici* respectfully urge this Court to deny Defendant FEC's motion for summary judgment.

## ARGUMENT

I.     **FEC "Coordination" Regulation Violates FECA, BCRA, and the APA.**

A.     **FEC "Coordination" Analysis in the Pre-BCRA Era Did Not Rely on an "Express Advocacy" Content Standard.**

In 1976, the Supreme Court recognized that, to be effective, any limitations on campaign contributions must apply to expenditures made in coordination with a candidate and construed the FECA contribution limits to include "all expenditures placed <u>in cooperation with or with the consent of</u> a candidate, his agents or an authorized committee of the candidate …." *Buckley v. Valeo*, 424 U.S. 1, 46–47 n.53 (1976) (emphasis added); *see also id.* at 78.[3]  Congress codified the *Buckley* Court's treatment of coordinated expenditures when it amended FECA in 1976 to

---

[1] Pub. L. No. 107–155, 116 Stat. 81.
[2] Codified at 2 U.S.C. §§ 431 *et seq.*
[3] The broad language of *Buckley* regarding coordination was echoed in subsequent Supreme Court decisions on the same topic.  *See, e.g.*, *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 614–17 (1996); *see also FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 443–47 (2001).

provide that an expenditure made "in cooperation, consultation, or in concert with or at the request or suggestion of a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate."  Pub. L. No. 94–283, § 112, 90 Stat. 475 (codified at 2 U.S.C. § 441a(a)(7)(B)(i)).

For more than 25 years, regulation of coordinated spending under federal law focused principally on the <u>conduct</u> of the spenders and candidates involved; the only relevant <u>content</u> standard was that which is inherent in the statutory definition of "expenditure"—"any purchase, [or] payment … made by any person <u>for the purpose of influencing</u> any election for Federal office."  2 U.S.C. § 431(9)(A)(i) (emphasis added).  The FEC's promulgation in 2002 of a separate <u>content</u> test for "coordinated communications"—largely resting on an "express advocacy" standard for communications disseminated outside of specified pre-election time periods—marked a substantial departure from and narrowing of the agency's historic analysis of coordinated spending.  *Amicus* Center for Competitive Politics (CCP) misrepresents the history of the FEC's regulation of coordinated spending, arguing that "[p]re-BCRA, the Commission consistently, if not formally, applied the express advocacy content standard when determining whether allegedly coordinated expenditures qualified as 'contributions[.]'"  CCP *Amicus* Brief at 1–2.  The FEC's pre-BCRA regulations, litigation briefs, Advisory Opinions (AOs) and public documents pertaining to enforcement actions all belie CCP's claim.

In 1980, the FEC promulgated a regulation interpreting the 1976 FECA coordination amendments noted above.  Under the 1980 <u>conduct</u>-based regulation, an expenditure was not considered "independent" if made pursuant to "any arrangement, coordination or direction by the candidate or his or her agent prior to the publication, distribution, display or broadcast of the communication."  11 C.F.R. § 109.1(b) (1980).

The FEC's interpretation of this regulation for nearly 20 years—as <u>not</u> requiring "express advocacy"—is aptly reflected by FEC AOs in the 1980s and 1990s employing the statutory "for the purpose of influencing" content test in the context of coordinated spending.[4]  The district court decision in *FEC v. Christian Coalition*, 52 F. Supp. 2d 45 (D.D.C. 1999), acknowledged the FEC's longstanding position that "any consultation between a potential spender and a federal candidate's campaign organization about the candidate's plans, projects, or needs renders any subsequent expenditures made <u>for the purpose of influencing</u> the election 'coordinated,' i.e., contributions."  *Id.* at 89 (emphasis added).  Indeed, the FEC explicitly rejected the "express advocacy" position that CCP attributes to it, arguing in *Christian Coalition* that the limitation of its "coordination" regulation to "express advocacy" would defeat the purposes of FECA.  *See FEC v. Christian Coalition*, No. 96–1781, PLAINTIFF FEC'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT 8–9 (Oct. 8, 1998).

Although the district court in *Christian Coalition* found the FEC's <u>conduct</u>-based regulation of coordinated expenditures to be unconstitutionally overbroad, because a spender could trigger it "merely by having engaged in some consultations or coordination with a federal candidate," which prompted the court to formulate its own "narrowly tailored" <u>conduct</u>-based definition of coordination, *see* 52 F. Supp. 2d at 91–92,[5] the court definitively and correctly rejected the Christian Coalition's argument that the "express advocacy" standard was applicable as a <u>content</u> test in the coordinated expenditure context.  *See Christian Coalition*, 52 F. Supp. 2d

---

[4] *See*, *e.g.*, AO 1982–56 (EX 1), AO 1983–12 (EX 2), AO 1988–22 (EX 3), and AO 1990–5 (EX 4).

[5] The district court's "narrowly tailored" <u>conduct</u>-based definition of coordination provided that coordination could be found only where an expenditure was "requested or suggested" by a candidate, or where there had been "substantial discussion or negotiation between the campaign and the spender over" a communication's contents, timing, audience or the like, "such that the candidate and the spender emerge as partners or joint venturers in the expressive expenditure …."  *Christian Coalition*, 52 F. Supp. 2d at 92. The *Christian Coalition* court's coordinated conduct analysis was seriously flawed; but is not at issue in this case.

3

at 88.  Further, the FEC's papers in *Christian Coalition* make clear that the FEC was not employing an "express advocacy" standard in the pre-BCRA era; on the contrary, the FEC argued strenuously against an "express advocacy" standard in that case.

Following the *Christian Coalition* decision, the FEC repealed its longstanding coordination regulation and codified a version of the court's <u>conduct</u> standard into a new rule. *See* 65 Fed. Reg. 76138 (Dec. 6, 2000); *see also* 66 Fed. Reg. 23537 (May 9, 2001); 11 C.F.R. § 100.23.  Although the conduct standard of the new rule was even narrower than that employed by the district court (*i.e.*, under the 2000 rule, coordination could only be found as a result of an actual "agreement or collaboration"),[6] the FEC's coordination regulation <u>still contained no separate content standard</u>.  As had been the case since the 1970s, when the "coordination" doctrine came into existence, the only <u>content</u> restriction employed by the FEC was its broad definitional language of the term "expenditure"—*i.e.*, "for the purpose of influencing."

Although CCP's *amicus* brief contends that an "express advocacy" standard had been employed by the FEC in the pre-BCRA era, it fails to acknowledge that CCP's co-founder Bradley A. Smith, who was an FEC Commissioner from 2000 until 2005, observed in a 2001 document that the FEC had "so far not adopted" the express advocacy content test for the regulation of coordinated spending.[7]

CCP's erroneous assertion that the FEC employed an "express advocacy" content standard in the pre-BCRA era relies heavily on its characterization of a Statement of Reasons signed by two Commissioners as the formal adoption by "the Commission" of an "express advocacy" content standard.  CCP *Amicus* Brief at 4–5.  To be certain, Commissioners Mason and Smith indicated in their joint MUR 4538 Statement of Reasons their unwillingness to take

---

[6] This regulation was subsequently repealed by section 214 of BCRA.
[7] *See* Commissioner Bradley A. Smith, "Statement For The Record for MUR 4624" in *In re The Coalition, et al.,* MUR 4624 (Nov. 7, 2001) (EX 5).

4

enforcement action against the Alabama Republican Party, because the Party's ads did not contain express advocacy.[8]  But a third Commissioner who voted against further enforcement action, Commissioner Sandstrom, did not join the Mason-Smith Statement and instead wrote a separate Statement explaining that he voted not to proceed against the Party because of "concerns about due process" (*i.e.*, concerns that the FEC had not made clear what standards govern in the regulation of coordinated spending);[9] and the fourth Commissioner who voted to take no further action, Commissioner Wold, left the FEC without authoring or signing a Statement of Reasons as to why he voted to take no further action against the party.  The Mason-Smith Statement indicated that Commissioner Wold had historically focused his coordination analysis on <u>conduct</u>—not on an express advocacy <u>content</u> test[10]—and that Commissioner Wold had initially voted in the Alabama Republican Party action to find "probable cause" that a violation had occurred even though the ads at issue contained no express advocacy.[11]  Thus, Commissioners Mason and Smith were alone in their employment of an "express advocacy" standard—and the opinion of two Commissioners falls far short of constituting the position of "the Commission."  Remarkably, CCP argues, "there can be little doubt that <u>the Commission</u> understood for years before BCRA was implemented that coordinated expenditures only violated FECA if they expressly advocated the election or defeat of a candidate."  CCP *Amicus* Brief at 2 (emphasis added).  Yet CCP fails to identify a single instance in which a <u>majority</u> of the

---

[8] *See* Statement of Reasons of Commissioners Mason and Smith in *In re Alabama Republican Party et al.*, MUR 4538 (FEC May 23, 2002) (EX 6).

[9] *See* Statement of Reasons of Commissioner Sandstrom in *In re Alabama Republican Party et al.*, MUR 4538 (FEC August 13, 2002) (EX 7).

[10] "Throughout the recent history of party coordinated matters, Commissioners maintained differing but largely individually consistent positions with respect to the threshold for finding a communication to be a coordinated contribution. … Commissioners Mason and Wold focused on the degree or amount of coordination."  Statement of Reasons of Commissioners Mason and Smith in *In re Alabama Republican Party et al.* 1–2, MUR 4538 (FEC May 23, 2002) (EX 6).

[11] *Id.* at 6 n.11.

Commission actually employed an express advocacy standard in the context of regulating coordinated spending.[12]

This pre-BCRA history of federal statutes, court decisions, FEC regulations and FEC enforcement actions makes clear that from the *Buckley* Court's 1976 acknowledgment of the need to regulate coordinated spending until 2002, the regulation of coordination was not limited by the express advocacy test. The incorporation of an express advocacy content standard into the post-BCRA "coordination" rule, and retention of that standard in the revised rule at issue in this case, constitutes a significant departure from, and a narrowing of, the Commission's historic regulation of "coordination"—which undermines and violates FECA, BCRA and the Administrative Procedures Act (APA), 5 U.S.C. §§ 551 *et seq*.

> **B.      BCRA's Legislative History and the Supreme Court's *McConnell* Decision Make Clear That Effective Regulation of Coordinated Spending Is Vital to the Integrity of Federal Campaign Finance Law—and that the "Express Advocacy" Test Is Functionally Meaningless and Ineffective.**

Through enactment of BCRA in 2002, Congress extended FECA's coordination provisions beyond candidates to include expenditures coordinated with party committees. *See* 2 U.S.C. § 441a(a)(7)(B)(ii). More importantly, section 214 of BCRA repealed the FEC's narrow 2000 coordination rule and directed the FEC to promulgate broader coordination rules. *Amicus* Sen. Feingold gave a lengthy, detailed explanation of the intent behind this provision on the floor of the Senate. *See* 148 Cong. Rec. S2144–45 (daily ed. Mar. 20, 2002) (EX 9). Sen. Feingold made clear that effective restrictions on coordination are needed "to prevent circumvention of the

---

[12] CCP first cites the Statement of Reasons signed by four Commissioners in *On the Audits of "Dole For President Committee, Inc." et al.* (FEC June 24, 1999) (EX 8), which never even hints that the Commission employed the express advocacy test. CCP then cites the *Christian Coalition* litigation, conveniently failing to mention that the FEC argued strenuously and successfully against the express advocacy test in that case. Finally, CCP cites two separate Statements of Reasons (EX 6 and EX 7)in the Alabama Republican Party enforcement action, signed by a total of three—not a majority of four— Commissioners, and one of which is based on "concerns about due process," not express advocacy.

campaign finance laws[,]" and that "[a]bsent a meaningful standard for what constitutes coordination, the soft money ban in the bill would be seriously undermined." *Id.* at S2144. Sen. Feingold further made clear that the FEC's pre-BCRA coordination regulations failed to cover coordinated activities "that, if permitted, could frustrate the purposes of the bill[,]" *id.*, and that, "[t]o remedy this problem," the FEC's new coordination rules "need to make more sense in the light of real life campaign practices than do the current regulations." *Id.* at S2145.

*Amicus* Sen. McCain shared Sen. Feingold's sentiments, adding: "we expect the FEC to cover 'coordination' whenever it occurs, not simply when there has been an agreement or formal collaboration[,]" and that "the current FEC regulation is far too narrow to be effective in defining coordination in the real world of campaigns and elections and threatens to seriously undermine the soft money restrictions contained in the bill." *Id.*

BCRA section 214 was challenged on First Amendment grounds in *McConnell v. FEC*, 540 U.S. 93 (2003), where plaintiffs/appellants argued that BCRA section 214 and the mandated new implementing regulations were "overbroad and unconstitutionally vague because they permit a finding of coordination even in the absence of an agreement." *Id.* at 220. The Court rejected this conduct-based argument, explaining that "expenditures made after a 'wink or nod' often will be as useful to the candidate as cash[,]" and "[f]or that reason, Congress has always treated expenditures made 'at the request or suggestion of' a candidate as coordinated." *Id.* at 221–22 (quoting *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 446 (2001)).

Elsewhere in the *McConnell* decision, the Court revisited the express advocacy test, in the context of rejecting the plaintiffs'/appellants' claim that BCRA's "electioneering communication" provisions are unconstitutional because they regulate independent non-express advocacy. *McConnell*, 540 U.S. at 190. After explaining that the *Buckley* Court had employed

the express advocacy test in narrow circumstances (not in the context of coordinated expenditures[13]), the *McConnell* Court further explained that the "express advocacy limitation" was "the product of statutory interpretation rather than a constitutional command." *McConnell*, 540 U.S. at 191–92. The Court continued:

> Nor are we persuaded, independent of our precedents, that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy. That notion cannot be squared with our longstanding recognition that the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad. Indeed, the unmistakable lesson from the record in this litigation, as all three judges on the District Court agreed, is that *Buckley*'s magic words requirement is functionally meaningless. Not only can advertisers easily evade the line by eschewing the use of magic words, but they would seldom choose to use such words even if permitted. … *Buckley*'s express advocacy line, in short, has not aided the legislative effort to combat real or apparent corruption, and Congress enacted BCRA to correct the flaws it found in the existing system.

*Id.* at 193–94 (internal citations and footnotes omitted) (emphasis added).

The *McConnell* Court's observations regarding both the ineffectiveness of the express advocacy standard and Congress's intent to address this ineffectiveness through enactment of BCRA make clear that the current coordination rule's dependence on the express advocacy test is ineffective and undermines the purposes and intent of BCRA and FECA.

### C.    FEC Has Failed to Explain and Justify Numerous Deficiencies of the "Coordination" Regulation Including, But Not Limited To, Its Dependence on the Express Advocacy Test.

The D.C. Circuit Court in *Shays I* took issue with two aspects of the content prong of the FEC's coordination regulation—"the 120-day time frame" and "the weak restraints outside of it." 414 F.3d at 100. Plaintiffs in the present case have addressed "the 120-day time frame" issue, aptly demonstrating that many candidates, political parties and outside spenders have paid

---

[13] The *Buckley* Court narrowly construed the definition of "expenditure" to include only express advocacy as applied to expenditures made independently of candidates by individuals and groups without a "major purpose" of influencing elections. *See Buckley*, 424 U.S. at 78–80. As explained above, *see infra* section I(A), the *Buckley* Court treated coordinated expenditures as in-kind contributions and found no need to narrowly construe FECA's regulation of such in-kind contributions. *See id.* at 78.

for campaign ads that ran outside the FEC's pre-election windows in prior elections. *Amici* principally target our comments in this brief, as we did in comments submitted to the FEC during the 2006 coordination rulemaking, to the "weak restraints" outside of the pre-election window. *See* Sens. McCain and Feingold and Reps. Shays and Meehan, Comments on Notice 2005–28 (Jan. 13, 2006) (EX 10). In repealing an ineffective coordination standard and directing the FEC to issue a new one through enactment of BCRA section 214, *amici* did not expect that the FEC would issue a rule that was, in important ways, even weaker than the one Congress repealed when it enacted BCRA. Yet that is precisely what the Commission did.

The FEC's 2002 and 2006 coordination rules are deeply flawed—allowing much coordinated activity clearly meant to influence an election to escape any regulation at all. One problem with the 2002–03 rule was that, as a matter of law, no ad running more than 120 days before an election or convention would be considered to be coordinated, no matter how coordinated in fact the ad really was, unless the ad met the "functionally meaningless" express advocacy test or constituted republication of campaign materials. The Commission exacerbated this problem in 2006 by reducing the pre-congressional election timeframe to 90 days (and maintaining the 120 day pre-primary period for the presidential election).

It is *amici*'s experience as candidates that campaign ads are in fact run earlier than 90 days before congressional elections, and more than 120 days before presidential primary elections—by parties, by outside groups, and by candidates themselves.[14] Plaintiffs have offered an abundance of evidence confirming *amici*'s experience. *See* MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT at 12–26. The FEC's rule, which

---

[14] Indeed, the "John Edwards for President" committee ran a full-page ad in *Roll Call* on Jan. 24, 2007— approximately one <u>year</u> prior to the first primary election. (EX 11) The Edwards ad did not contain express advocacy and, under the FEC's existing "coordinated communication" regulations, could have been fully and overtly coordinated with and paid for by a corporation, labor union, or any other group or individual without being considered a contribution to the Edwards campaign.

applies only a "functionally meaningless" express advocacy test outside the pre-election time frames, allows "a coordinated communication free-for-all for much of the election cycle." *Shays*, 414 F.3d at 99.

In an effort to eliminate this "coordinated communication free-for-all," *amici* urged the FEC in its 2006 rulemaking to adopt a non-express-advocacy-dependent rule that would provide appropriate and realistic coverage of election-related advertising, without infringing on other activities, such as lobbying. Specifically, *amici* proposed that an ad meeting the coordination "conduct" standard be regulated as a "coordinated communication" if the ad is:

- sponsored by a federal <u>political committee</u> and is an "expenditure" (*i.e.*, for the purpose of influencing the election of the candidate with whom it is coordinated), <u>regardless of when it is distributed</u>;

- sponsored by any person <u>other than a federal political committee</u> (*e.g.*, a 527 group not registered as a political committee, an individual, corporation, labor union or other non-profit group), is <u>distributed within 30 days of a primary election or 60 days of a general election</u> and is targeted to the electorate of the candidate or the candidate of the party with whom it is coordinated, <u>regardless of whether the ad refers to a candidate or party;</u>[15]

- sponsored by any person <u>other than a federal political committee</u> and is distributed <u>during the period</u> beginning 120 days prior to the primary election and ending on the day of the general election, the ad <u>refers to a clearly identified candidate or political party</u>, and is targeted to the electorate of the identified candidate or the identified party's candidate(s) (this is similar to current rule for presidential candidates);

- sponsored by a 527 group not registered as a political committee, distributed <u>prior</u> to the 120-day time period, the ad <u>promotes, attacks, supports or opposes</u> a clearly identified candidate or party and is targeted to the electorate of the identified candidate or the identified party's candidate(s); or

- sponsored by any person <u>other than a federal political committee or 527 group</u>, distributed <u>prior</u> to the 120-day time period, the ad comments on the <u>character or the qualifications or fitness for office</u> of a clearly identified federal candidate or party, and is targeted to the electorate of the identified candidate or the identified party's candidate(s).

---

[15] This point is to address a flaw in the 2002 rule that the plaintiffs in the *Shays I* litigation brought to the court's attention. Plaintiffs argued that the 2002 rule permitted coordination right up to the day of the election on "thematic" ads—ads that echo a candidate's positions on key issues but do not mention the name of the candidate (or party). Such ads, the plaintiffs argued, could be of significant benefit to the candidate, particularly if coordinated. The D.C. Circuit acknowledged this problem as well. *Shays*, 414 F.3d at 98.

*See* Sens. McCain and Feingold and Reps. Shays and Meehan, Comments on Notice 2005–28 at 3–4 (EX 10). The FEC ignored *amici*'s recommended alternative to the express advocacy test and arbitrarily re-promulgated a rule that not only continues to allow the "coordinated communication free-for-all for much of the election cycle," but expands the free-for-all by shrinking the congressional pre-election timeframe from 120 to 90 days.

It is no answer for the FEC to argue that its new-found use for 11 C.F.R. § 100.22(b), which defines "expressly advocating" somewhat more broadly than the so-called "magic words" test, remedies the problem of the coordination regulation's dependence on the express advocacy test. *See* DEFENDANT FEC'S MOTION FOR SUMMARY JUDGMENT at 48; *see also* 11 C.F.R. § 100.22(b) (EX 12). Even this slightly broader definition of "expressly advocating" will not capture some of the most obvious types of political advertising that candidates would find most helpful.[16] It is a simple matter to write an ad script containing enough ambiguity that three or more FEC commissioners would deem it to fall short of "expressly advocating" a candidate's election, but that undoubtedly would influence a candidate's election.[17] For this reason, it is critical that the FEC's coordination regulations steer clear of the "express advocacy" standard.

## II.    BCRA's Language, Structure and Legislative History, Together with the Supreme Court's *McConnell* Decision, Make Clear That Federal Candidates Are Prohibited From Soliciting "Soft Money" at State Party Fundraising Events.

This Court held in *Shays I* that the FEC's regulation allowing federal candidates to speak at state party fundraisers "without restriction or regulation" (*i.e.*, overtly solicit soft money) was arbitrary and capricious because the Commission had failed to explain why distinguishing

---

[16] *E.g.*, the Jan. 24, 2007 *Roll Call* ad, *supra* note 14 (EX 11).

[17] *See, e.g.*, "First General Counsel's Report" and "Certification," *In re Bush for President, Inc., et al.*, MUR 4982 (FEC 2001–02) (applying 11 C.F.R. § 100.22(b) but finding no "reason to believe" federal law had been violated); *see also* "First General Counsel's Report" and "Certification," *In re Suburban O'Hare Commission*, MUR 4922 (FEC 1999–2000) (applying 11 C.F.R. § 100.22(b) but finding no "reason to believe" federal law had been violated).

between solicitation and other speech would "in any way [be] more vexing in the context of state political party fundraisers than … outside of such venues where nonfederal money solicitation is almost completely barred."  337 F. Supp. 2d at 92; *see also* 11 C.F.R. § 300.64(b).  The FEC responded to the *Shays I* decision by retaining the 2002 rule and issuing a new Explanation and Justification (E&J) for the rule.  *See* 70 Fed. Reg. 37649.  Like the 2002 E&J, the 2005 E&J fails to adequately explain <u>why</u> distinguishing between solicitations and other speech at a state party fundraising event is more difficult than in other contexts, and why it would be especially intrusive for the Commission to enforce BCRA's soft money ban in the context of state party fundraisers.  Consequently, the rule remains arbitrary and capricious in violation of the APA.

BCRA's language, structure and legislative history make clear that federal candidates are prohibited from soliciting "soft money" at state party fundraising events.  Despite a statute that contains an explicit <u>prohibition</u> on soft money solicitations by federal candidates and officeholders, the FEC issued a rule <u>permitting</u> federal candidates and officeholders to engage in overt and blatant solicitation of soft money, so long as they do so in the context of a state party fundraising event.  As this Court found in *Shays I,* this is contrary to the "natural reading" of the statute.  337 F. Supp. 2d at 91.

In generally prohibiting a candidate from "solicit[ing]," but in allowing a candidate to "attend" or "speak" at a state party fundraiser, Congress provided a clearly delimited safe harbor for federal candidates to be present and to speak at a state party fundraiser; but plainly stopped short of authorizing such candidates to solicit non-federal funds at the fundraiser.  To "speak" and to "solicit" are very different terms; the statutory language authorizes the former, but prohibits the latter.  The FEC's current regulation conflates the two, based on the erroneous assumption that in authorizing a candidate to <u>speak</u> at a fundraiser, the statute necessarily

authorizes the candidate to <u>solicit</u> as well.  There is no basis in the statute or its legislative history to support this reading.  Congress is familiar with the term "solicit" and knows how to use it, as is evident elsewhere in BCRA, but chose not to use it in the state party fundraiser provision.

BCRA states that a federal candidate or officeholder may "speak" at a state party fundraiser, not that such a person may "speak without restriction or regulation."  Accordingly, the "natural reading" of section 441i(e)(3) is that, while federal candidates can attend, speak or be a featured guest at a state party event, they may not solicit, receive, direct, transfer or spend non-federal funds in connection with that event.  BCRA's structure reinforces this conclusion.  The section immediately following the state party fundraiser provision <u>explicitly</u> sets forth circumstances in which federal candidates and officeholders are permitted to make solicitations for soft money.  *Compare* 2 U.S.C. § 441i(e)(3) (entitled "Fundraising Events") *with* 2 U.S.C. § 441i(e)(4) (entitled "Permitting Certain Solicitations").  The latter section expressly allows solicitations by federal candidates and officeholders on behalf of nonprofit organizations, pursuant to specified conditions and restrictions.  The juxtaposition of these two provisions, and the different ways in which they are drafted, indicates that while section 441i(e)(4) is a limited exception to the general ban on soft money solicitation, section 441i(e)(3)—the state party fundraiser provision—is not such an exception, and accordingly, does not permit solicitations under such circumstances.[18]

BCRA's legislative history and Congress' evident purpose in section 441i(e) similarly confirm that Congress neither intended nor authorized the Commission-created exemption from BCRA's prohibition of soft money solicitation.  BCRA was intended to eliminate corruption and

---

[18] To the same effect is the provision immediately preceding the state party fundraising provision, section 441i(e)(2), which allows "solicitation" by a federal officeholder or candidate who is also a candidate for state office, subject to various restrictions.  Again, this illustrates that when Congress intended to allow federal candidates or officeholders to solicit non-federal funds, it said so directly and explicitly.

appearance of corruption resulting from federal officeholders and candidates raising soft money for themselves or for party organizations. To this end, BCRA established a rule that is both clear and "simple: Federal candidates and officeholders cannot solicit soft money funds, funds that do not comply with Federal contribution limits and source prohibitions, for any party committee— national, State, or local." 148 Cong. Rec. S2139 (daily ed. Mar. 20, 2002) (statement of Sen. McCain). The Commission's initial 2002 proposed rule correctly relied on this legislative history, and cautioned that, "while [federal candidates or officeholders] may attend, speak, or be a featured guest at a State or local party fundraising event, they cannot solicit funds at any such event." Notice of Proposed Rulemaking (NPRM) 2002-7, Prohibited and Excessive Contributions: Non-Federal Funds or Soft Money, 67 Fed. Reg. 35654, 35672 (May 20, 2002).

More generally, as the Supreme Court recognized in *McConnell*, BCRA was designed to "plug the soft-money loophole," through which "parties have *sold* access to federal candidates and officeholders … giv[ing] rise to the appearance of undue influence." *McConnell*, 540 U.S. at 133, 153-54 (emphasis in original). The Court explained further that without "restriction on solicitations, federal candidates and officeholders could easily avoid FECA's contribution limits by soliciting funds from large donors and restricted sources to like-minded organizations engaging in federal election activities." *Id.* at 182-83. The Court in *McConnell* recognized that Congress had carved out a <u>single exception</u> to the general ban on soft money solicitation, permitting certain "limited solicitations of soft money" for 501(c) nonprofit organizations. *Id.* at 183. *See also* 2 U.S.C. § 441i(e)(4). After recognizing this exception to the solicitation ban, the Court noted that the provision which allows federal candidates and officeholders to attend and speak at state party fundraisers, along with the provision that allows them to solicit hard money contributions in connection with nonfederal elections, together "preserve the traditional

fundraising role of federal officeholders by providing <u>limited</u> opportunities for federal candidates and officeholders to associate with their state and local colleagues through joint fundraising activities." *McConnell*, 540 U.S. at 183 (emphasis added). *See also* 2 U.S.C. §§ 441i(e)(1)(B) and 441i(e)(3). This discussion, and the Court's juxtaposition of section 441i(e)(3) with section 441i(e)(1)(B), makes clear that the Court did not interpret section 441i(e)(3) to permit federal candidates to solicit <u>soft</u> money at state party events, but rather to attend and speak at party fundraisers, but to solicit only federal funds permitted by section 441i(e)(1)(B).

It is untenable to conclude, as the FEC has done, that in a law designed to close loopholes, Congress *sub silentio* authorized a loophole allowing federal candidates and officeholders to solicit unlimited amounts of soft money at any state party fundraising event.[19] Had Congress intended that result, it surely would have said so expressly—as it very easily could have done by adding "solicit" to the activities listed in the state party fundraiser provision.

Finally, the Commission's justification for this soft money loophole—that distinguishing between solicitations and other speech at a state party fundraising event is more difficult than in other contexts—is belied by the Commission's approach to regulating federal candidate and officeholder solicitations at <u>other</u> types of non-federal soft money fundraising events. During the Commission's 2005–06 rulemaking on the definitions of "solicit" and "direct," mandated by this Court's decision in *Shays I*, the Commission noted:

> In certain advisory opinions, the Commission has permitted attendance and participation by Federal candidates and officeholders at fundraising events for non-Federal funds held by State and local candidates, or by non-Federal political

---

[19] The opportunity for abuse of this loophole is exacerbated by the lack of any definition of what constitutes a "fundraising event for a State, district, or local committee of a political party." 2 U.S.C. § 441i(e)(3). Thus, nothing prevents a federal candidate or officeholder from calling together a group of wealthy donors, labeling the gathering a "fundraising event for a State, district, or local committee of a political party," and conducting unrestricted solicitation of soft money at such an event. This Court in *Shays I* noted that it "shares Plaintiffs' concern" that this scenario "could lead to widespread abuse …." 337 F. Supp. 2d at 91 n.60.

organizations, so long as the solicitations included, or were accompanied by, a disclaimer adequately indicating that the Federal candidate or officeholder was only asking for Federally permissible funds. *See* Advisory Opinions 2003–03, 2003–05, and 2003–36. The Commission requests comment on whether these advisory opinions, allowing attendance and limited participation at such functions, subject to various restrictions and disclaimer requirements, struck the proper balance.

NPRM 2005–24, Definitions of "Solicit" and "Direct," 70 Fed. Reg. 56599, 56602 (Sept. 28, 2005) (footnote omitted). The Commission's response to comments received on the effectiveness of the "disclaimer" requirements, published several months later in the Final Rule and E&J in the "solicit" and "direct" rulemaking, is worth quoting at length.

The Commission sought comment on whether the principles enunciated in these [disclaimer] advisory opinions should be incorporated into the Commission's regulations or should be superseded. … One commenter favorably characterized the disclaimers as a "safe harbor" enabling Federal candidates to participate and speak at such events "in a way that complies with the statute." …

Some commenters urged the Commission to incorporate the disclaimers into regulations and observed that the advisory opinions provided detailed guidance "without having caused any known abuse or confusion."

The incorporation of the disclaimer requirements into a rule applicable to non-party committee fundraisers was first addressed in the rulemaking on Federal candidate solicitations at party fundraising events. During the hearings on that rulemaking, a commenter observed that the disclaimer requirements are "understood" and "the community is complying with them," a view echoed in the current rulemaking. In the Explanation and Justification for the Party Committee Events Final Rules, the Commission indicated that it was not necessary "to initiate a rulemaking to address the issues in Advisory Opinions 2003–03, 2003–05, and 2003–36 at this time." The Commission continues to stand by that determination.

Definitions of "Solicit" and "Direct," Final Rules and E&J, 71 Fed. Reg. 13926, 13930–31 (Mar. 20, 2006) (internal citations omitted) (emphasis added).

The Commission's well-understood disclaimer requirements applicable to federal candidate and officeholder attendance at state candidate and non-party political organization soft money fundraisers have for years "provided detailed guidance" for the regulated community

16

"without having caused any known abuse or confusion"—while maintaining the integrity of the BCRA soft money ban.  Thus, the Commission has at its ready disposal an effective means of facilitating federal candidate and officeholder attendance at state party fundraisers without undermining the BCRA soft money ban—these same disclaimer requirements.   The Commission's unwillingness to employ these disclaimer requirements in the context of state party fundraisers is inexplicable, arbitrary, capricious and in violation of BCRA and the APA.

III.    **FEC "Federal Election Activity" Regulations—As Interpreted in Advisory Opinion 2006–19—Clearly and Unduly Compromise BCRA's "Soft Money" Ban and Violate the APA.**

The FEC's regulatory definitions of the terms "voter registration activity" and "get-out-the-vote activity" (GOTV), two types of "federal election activity" (FEA), are critical to the effectiveness of BCRA's soft money ban.  *See* 11 C.F.R. §§ 100.24(a)(2)–(3).  Plaintiffs in *Shays I* challenged the FEC's 2002 rules defining these terms and this Court concluded that the challenge was not ripe for review because "the exact parameters of the Commission's regulation [we]re subject to interpretation."  *Shays I*, 337 F. Supp. 2d at 100.  The Commission has now confirmed—through issuance of AO 2006–19—that its regulations allow state and local parties to use soft money to fund activities that undoubtedly influence federal elections.  We agree with plaintiffs Shays and Meehan that their challenge to these regulations is now ripe for review, and the Commission's regulation is inconsistent with and unduly compromises BCRA's purposes.

In AO 2006–19, the Commission made clear that the "assist" through "individualized means" requirement in its regulations defining "GOTV" and "voter registration activity" amounts to an "individualized content" standard.  The Commission advised the Los Angeles County Democratic Party (LACDP) that it need not treat proposed robo-calls and direct mail as federal "GOTV" activity and, consequently, was free to pay for the activities entirely with soft money.  Although the Commission claims to have relied on four separate factors to conclude that

17

the LACDP's proposed activities did not constitute "GOTV" activity, the "individualized" factor can only be understood as a threshold requirement that precludes consideration of any other factors if not met. The Commission concluded that "[t]he proposed direct-mail piece is a 'form letter' that will not provide any individualized information to any particular recipient (such as the location of the particular recipient's polling place)," and that the proposed robo-calls "are the functional equivalent of a 'form letter' and, similarly, do not provide any individualized information to any particular recipient." "Thus," the Commission concluded, "the planned communications are generic in nature and do not provide any individualized assistance to voters." AO 2006–19 at 4 (emphasis added) (EX 13).

The importance of this analysis can not be overstated. In one stroke of the keyboard, the Commission made clear how incredibly narrowly it views its definitions of "GOTV activity" and, by extension, "voter registration activity"; the definitions of <u>both terms</u> in the FEC's regulations apply only to the act of "contacting registered voters by telephone, in person, or by other individualized means." The Commission in AO 2006–19 interpreted the "individualized means" of contact requirement as an <u>individualized content</u> requirement, and concluded that an individual's phone number or home address is not sufficiently unique to the recipient to meet the regulation's "individualized" requirement. Therefore, the Commission will only apply BCRA's "GOTV" and "voter registration activity" provisions to communications containing <u>content</u> unique to the recipient—"such as the location of the particular recipient's polling place." AO 2006–19 at 4. Under AO 2006–19, a state party could use entirely soft money to pay for direct mail and robo-calls, even on election day, so long as the same piece of mail or the same robo-call is sent to all recipients and, therefore, does not constitute an "individualized means" of assistance. For example, the following robo-call, which would provide no "individualized

information to any particular recipient," would not constitute "GOTV activity": "Today is election day.   Polls are open from 7 a.m. until 8 p.m.   Don't forget to get-out-and-vote Democratic / Republican!"   Consequently, the FEC's regulations defining "voter registration" and "GOTV" activity clearly and unduly compromise BCRA's soft money ban and are arbitrary and capricious in violation of the APA.

Finally, the FEC argues that its limitation of these FEA definitions to include only activities that "assist" through "individualized means" is necessary to "preserve the traditional role of state and local party organizations" and to "avoid unnecessarily infringing on their First Amendment interests."  *See* DEFENDANT FEC'S MOTION FOR SUMMARY JUDGMENT at 16.  *Amici* agree with the FEC that state party First Amendment rights should not be infringed. Congress fully recognized the important role that state and local parties play in our electoral system; but Congress also recognized that BCRA's soft money ban would be meaningless if state and local parties were permitted to spend soft money on activities influencing federal elections. To this end, Congress incorporated the Levin Amendment into BCRA precisely for the purpose of facilitating important state and local party "voter registration" and "GOTV" activities without compromising BCRA's soft money ban.  Plaintiff Rep. Shays explained:

> [T]here is a range of activities that state parties engage in that, by their very nature, affect both federal and non-federal elections …   such as get-out-the vote drives or voter registration drives.   These activities—registering voters to vote in elections that have both federal and non-federal candidates, or engaging in activities designed to bring them to the polls to vote for federal and non-federal candidates—clearly have an impact on both federal and non-federal elections.

148 Cong. Rec. H409 (daily ed. Feb. 13, 2002) (EX 14).   Rep. Shays further explained that, under pre-BCRA law:

> [S]tate parties [paid] for these "mixed" activities using a mixture of both hard and soft money pursuant to allocation formulae set by the Federal Election Commission.   But these allocation rules [had] proven wholly inadequate to guard

> against the use of soft money to influence federal campaigns.  Much state party
> "party building activity" [had been] directed principally to influence federal
> elections, and all of the party voter activity inevitably does have a substantial
> impact on federal campaigns.

*Id.* Congress closed this soft money loophole by requiring that state and local parties use federal hard dollars to pay for "a category of activities which clearly affect federal elections and which the bill defines as 'federal election activities.'"  *Id.*  BCRA's Levin Amendment, however, allows state and local party committees to raise funds under their respective states' campaign finance laws, up to $10,000 per donor, to pay for certain FEA.  *See* 2 U.S.C. § 441i(b)(2).  One of the Levin Amendment's original co-sponsors, Sen. Ben Nelson, explained:

> The ability of state parties to carry out traditional activities such as voter
> registration, is another issue addressed by the Levin Amendment, which I was
> pleased to join as an original sponsor.  State and local candidates rely on get-out-
> the-vote efforts and voter registration activities which are usually funded by the
> state party.  Since this campaign finance reform bill, prior to the Levin
> Amendment, would have severely limited state parties, it became apparent that we
> needed to ensure that such crucial activities are not abolished as well.

147 Cong. Rec. S3240 (daily ed. Apr. 2, 2001) (EX 15).

BCRA's legislative history is clear—Congress understood that state and local party "voter registration" and "GOTV" activity influences federal elections and could undermine BCRA's soft money ban.  Accordingly, Congress purposefully brought these activities within the scope of BCRA, and incorporated the Levin Amendment specifically to facilitate the continuation of such important state and local party activities without compromising BCRA's soft money ban.  For this reason, it is unnecessary for the Commission to narrow the reach of BCRA's FEA provisions in order to preserve the important role of state and local parties.

## CONCLUSION

The Court should deny Defendant FEC's motion for summary judgment.

20

Respectfully submitted,


/s/ J. Gerald Hebert
J. GERALD HEBERT
(D.C. Bar No. 447676)
PAUL S. RYAN
(D.C. Bar No. 502514)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave. NW, Suite 650
Washington, DC  20036
Tel: (202) 736-2200
Fax: (202) 736-2222

Counsel for *Amici Curiae*
  Senators John McCain and Russ Feingold

**Dated:  Feb. 16, 2007**