

**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

## MEMORANDUM

TO:      **The Commissioners**
               **Staff Director**
               **Deputy Staff Director**
               **General Counsel**

FROM:    **Office of the Commission Secretary**

DATE:     **November 7, 2001**

SUBJECT:   **Statement For The Record for <u>MUR 4624</u>**

      Attached is a copy of the Statement For The Record for

MUR 4624 signed by Commissioner Bradley A. Smith.

      This was received in the Commission Secretary's Office on

<u>Wednesday, November 7, 2001 at 3:26 p.m.</u>

cc: Vincent J. Convery, Jr.
    Information Division
    Press Office
    Public Disclosure

Attachment



**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| | ) **MUR 4624** |
| | ) |
| The Coalition | ) |
| National Republican Congressional Committee, *et al.* | ) |

## STATEMENT FOR THE RECORD

## COMMISSIONER BRADLEY A. SMITH

### I.

I voted in favor of the General Counsel's Report of April 20, 2001 recommending that the file be closed. However, while some commissioners seem to feel this case indicates that the Commission's rules regarding coordination and political committees do not sufficiently restrain political speech and participation,[1] I believe that this case is illustrative of the need for still further protections for Americans wishing to participate in the political life of our nation. In particular, limiting the Commission's reach in cases involving allegations of coordinated public communications to communications involving express advocacy,[2] is, in my view, sound interpretation of both the statute and judicial precedent, and is required by the Constitution.

---

[1] *See* Statement of Reasons of Commissioner Scott E. Thomas and Chairman Danny L. McDonald, (hereinafter "Thomas/McDonald Statement"); Statement for the Record of Commissioner Karl J. Sandstrom (hereinafter "Sandstrom Statement").

[2] The term "express advocacy" stems from the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1 (1976). In that case, the court limited the reach of sections 608(e)(1) and 434(e) of the FECA to those communications that "in express terms advocate the election or defeat of a clearly identified candidate," *id.* at 44, then held that a cap on section 608(e)(1) expenditures, even as narrowed, was unconstitutional. As examples of express advocacy, the Court offered such terms as "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Buckley* at 44, n.52. This limitation on the reach of regulation has been reaffirmed by the Supreme Court, *see Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) (hereinafter "*MCFL*"), and countless lower courts, *see infra* note 27. The question in this case is whether or not this limitation applies to communications that are coordinated with the campaign.

The broad facts and procedure of this case are substantially as put forth in the Statement of Reasons filed by Commissioner Thomas and Chairman McDonald.[3] In March of 1997, the Democratic National Committee ("DNC") filed a complaint alleging that various Republican Party affiliated committees, and a large number of business and trade associations supportive of the general agenda of Republicans in Congress, had in 1996 committed massive violations of the Federal Election Campaign Act of 1971, as amended ("FECA" or "the Act"). This triggered a four-year investigation of more than 60 committees and organizations plus several individual respondents. The Commission's attorneys took nine depositions, collected thousands of pages of documents, and interviewed numerous other witnesses, before this case came to its merciful end.[4]

Despite the fact that the Commission has now found no violations in this case, I strongly suspect that the original complainant, the Democratic National Committee, considers its complaint to have been a success. The complaint undoubtedly forced their political opponents to spend hundreds of thousands, if not millions of dollars in legal fees, and to devote countless hours of staff, candidate, and executive time to responding to discovery and handling legal matters. Despite our finding that their activities were not coordinated and so did not violate the Act, I strongly suspect that the huge costs imposed by the investigation will discourage similar participation by these and other groups in the future.[5]

We cannot fault the complainant DNC for pursuing its political goals through the legal tools made available to it, but nor can we on the Commission blind ourselves to the fact that the substantial majority of the complaints filed with the Commission are filed by political opponents of those they name as respondents. These complaints are usually filed as much to harass, annoy, chill, and dissuade their opponents from speaking as to vindicate any public interest in preventing "corruption or the appearance of corruption."[6] This knowledge makes it particularly important that we be sensitive to the possibility that

---

[3] *See* Thomas/McDonald Statement at 2-4.

[4] I joined the Commission on June 26, 2000, at which time the case had been going on for over three years. Two weeks later, on July 11, 2000, I joined in a 5-0 Commission vote in favor of an additional round of discovery. I now recognize the error of that vote, and, for the reasons stated below, will no longer lend my vote to any matter that prolongs the legal agony of citizens and groups whose communications do not contain express advocacy.

[5] Several of the Respondents in this MUR have also expressed their belief that the General Counsel's Report of April 20, 2001, while ultimately recommending that no action be taken against them, unfairly maligns their actions and insinuates illegal conduct. *See* Letter of Jan Witold Baran to Commission, June 13, 2001; Letter of Benjamin L. Ginsberg, et al. to Acting General Counsel Lois G. Lerner, July 5, 2001. I share the concerns of these respondents that reports to the Commission ought not be used to impugn the activities and motives of respondents when the evidence does not support continuing with the case or when no violation is found, and I believe that this type of tone will further discourage individuals and groups from participating in political activity in the future.

[6] The phrase "corruption or appearance of corruption" comes from *Buckley v. Valeo*, 424 U.S. 1, 25 (1976), and serves as the constitutionally valid rationale for regulating political speech in the form of campaign contributions and expenditures. Although this case involves the DNC complaining about Republican candidates and organizations and their allies, it goes without saying that Republicans file charges against Democrats.

2

our interpretations of the Act can, and sometimes do, chill what is and ought to be constitutionally protected political speech.

In this case, the Office of General Counsel concluded that it could not prove that the activities and disbursements of the respondents were coordinated with candidates and committees pursuant to the regulations promulgated by the Commission only last December. *See* 11 C.F.R. § 100.23. These coordination rules were themselves a salutary effort to address problems of vagueness and overbreadth in the Commission's prior practices, which lacked any clear definition of "cooperation, consultation, or concert," *see* 2 U.S.C. § 441a(a)(7)(B)(i), and provided inadequate guidance to groups and individuals as to what activities would be deemed "coordinated" under the Act. *See Federal Election Commission v. Christian Coalition*, 52 F. Supp.2d 45 (D.D.C. 1999); *see also Clifton v. Federal Election Commission*, 114 F.3d 1309 (1st Cir. 1997). Groups and individuals who petition the government, contact their elected representatives, or perhaps are friends or acquaintances of representatives or Congressional staffers, former staffers, or friends and acquaintances of the same, need guidance on what conduct falls short of coordination without concluding that the only clear way to avoid liability is to refrain from making independent expenditures. The conduct standard implemented by the new coordination rule is a vast improvement over the past practices of the Commission, providing much-needed guidance to makers of independent expenditures.[7]

Unfortunately, in promulgating 11 C.F.R. § 100.23, the Commission provided scant guidance to groups engaged in issue advocacy,[8] by not addressing the question of whether a content standard, as well as a conduct standard, would be required before coordinated public communications would be subject to the rule.[9] This failure is

---

[7] Commissioners Thomas and McDonald, who voted against adoption of the regulations, complain that the regulations are unduly strict. Thomas/McDonald Statement at 4-14. For reasons I state below, I believe they comply with the Act and that our old practices exceeded the scope of both the Act and the Constitution. Commissioners Thomas and McDonald also argue that the Commission has thwarted the will of the Senate, Thomas/McDonald Statement at 17, by implementing these regulations in the wake of the Senate's passage of S.27, the McCain-Feingold bill. Section 214 of S. 27 would effectively repeal the coordination rule of 11 C.F.R. 100.23. We are not, of course, entrusted with implementing the will of the Senate, at least not until such time as the House of Representatives manifests the same "will" and the President has either signed the bill, allowed it to become law without his signature, or had his veto over-ridden by the necessary two-thirds majority of each house. *See generally, INS v. Chadha*, 462 U.S. 919 (1983). I note that although the Senate received the proposed final rule on December 7, 2000, it did not "disapprove" the rule by resolution within thirty legislative days of its receipt, as it was free to do pursuant to 2 U.S.C. § 438(d).

[8] As terms of art, "independent expenditures" expressly advocate the election or defeat of a candidate. Though not limited in amount, they are subject to other provisions of the Act. "Issue advocacy," on the other hand, is political discussion that does not contain explicit words of advocacy of election or defeat, and so has been protected by the Supreme Court from regulation. *See Buckley*, 424 U.S. at 44, n.52; *MCFL*, 479 U.S. at 249. The issue here is whether an issue ad, if coordinated with a candidate, becomes subject to the Act.

[9] In the Explanation and Justification of the final rule, the Commission claims that it is "addressing the constitutional concerns raised in *Buckley* by creating a safeharbor for issue discussion." *See* Notice #2000-21, Final Rule on General Public Political Communications Coordinated with Candidates and Party Committees; Independent Expenditures, 65 Fed. Reg. 76138, 76141 (Dec. 7, 2000). This statement is true but applies only with respect to 11 CFR section 100.23(d), which makes clear that a candidate's response to

3

important, because as this case demonstrates, the conduct standard alone does not provide an adequately bright line to prevent the specter of investigation and litigation from chilling constitutionally protected speech. When a person decides to make independent political expenditures, he opens himself up to two potential burdens under the Act. The first burden is to report those independent expenditures in excess of $250.00. *See* 2 U.S.C. § 434(c). The second is to defend against allegations that the advocacy was somehow authorized by or coordinated with a candidate which, if true, would lead to still greater limits on the person's political activity. *See* 2 U.S.C. § 431(17). Respondents can spend substantial sums defending themselves against such allegations, and this possibility will cause many speakers to avoid engaging in what ought to be constitutionally protected speech. Thus, a bright line test is needed. A content test—express advocacy—provides such a bright line. If a financier of general public communications is not willing to defend against charges that his speech was authorized by a candidate, or prefers not to disclose the sources of his funding, *see e.g. NAACP v. Alabama*, 357 U.S. 449 (1958), *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), he can simply delete from his message words of express advocacy and speak on any other topic of his choosing. If he is investigated nonetheless, he can be assured that the investigation will be short, non-intrusive, and inexpensive, merely by demonstrating the absence of express advocacy in his communications. Absent a content standard, however, no such immediate defense is available if the Commission launches an investigation into the alleged coordination with candidates. Further, such an investigation is likely to be highly intrusive, as is demonstrated by this case and another recent high-profile matter eventually resulting in no finding of a violation, MUR 4291 (American Federation of Labor and Congress of Industrial Organizations). The investigation can include extensive rifling through the respondents' files, public revelations of internal plans and strategies, depositions of group leaders, and the like. Such allegations and investigations may be avoided only by completely avoiding all contact with candidates, because even minimal contact could trigger a credible allegation. Oddly, the less immediately obvious evidence there is that the conduct would meet the standard of 11 C.F.R. § 100.23, the more intrusive the investigation is likely to be, as the Commission searches for evidence of the veracity of the complaint. The effect of the rule becomes essentially the same as that of the rule struck down in *Clifton*; "it treads heavily upon the right of citizens, individual or corporate, to confer and discuss public matters with their legislative representatives or candidates for such office," and is therefore, "patently offensive to the First Amendment." 114 F.3d 1309, 1314 (1st Cir. 1997), *cert. denied*, 522 U.S. 1108 (1998).

---

an inquiry regarding her position on issues will not suffice to establish coordination. *Id.* Otherwise, the Commission has not provided an adequate safeharbor for issue discussion, for it has not, as of yet, determined the content standard necessary for regulating coordinated communications. *See id.*, at 76141 ("The Commission is not adopting any content standard as part of these rules *at this time*.")(emphasis added). The Commission's conscious decision not to address a content standard should not be read as a presumption that the Commission has made a final decision against requiring a content standard, however, for as the Explanation & Justification also explains, "the Commission may revisit the issue of a content standard for all coordinated communications when it considers candidate-party coordination." 65 Fed Reg. at 76141.

With that in mind, I believe that the Act, the Constitution, judicial precedent, and sound public policy require us to limit our enforcement to cases in which communications, whether or not coordinated with a candidate, expressly advocate the election or defeat of candidates for federal office. Failure to include such a content standard has and will have a chilling effect on political participation and speech.

## II.

Institutional competence and prudence requires that executive agencies charged with enforcing the law, even more than the courts, ought to adhere to the general precept of not unnecessarily deciding Constitutional issues. Thus I first analyze our authority under the statute. I believe that the statute, as interpreted by the Supreme Court, does not authorize us to regulate issue advocacy, even when such advocacy is coordinated with a candidate.

Corporate expenditures and contributions are prohibited under section 441b of the Act. The phrase "contribution or expenditure" in section 441b is defined separately in 2 U.S.C. section 441b(b)(2).[10] Nevertheless, in *Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. 238 (1986)("*MCFL*"), the United States Supreme Court looked to the general definitions section of the Act, 2 U.S.C. section 431, to define the scope of the term "expenditure" as used in section 441b. *See* 479 U.S. at 245-46. The *MCFL* Court also held that "an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of 441b." *Id.* at 249. There is no reason to believe that section 431, the general definitions section, is not as applicable in construing the term "contribution" in section 441b as it is in construing the term "expenditure" in 441b. Section 431(8)(B)(vi) states that the term "contribution" does not include "any payment made or obligation incurred by a corporation or labor union which, under section 441b(b) of this title, would not [first] constitute an expenditure by such corporation or labor organization." 2 U.S.C. § 431(8)(B)(vi). Because the Court has determined that the term "expenditure," as used in section 441b, is limited to communications containing express advocacy, and because the Coalition did not engage in express advocacy, the corporate respondents in this MUR did not make prohibited "expenditures" under section 441b. They therefore cannot have made prohibited in-kind "contributions" under section 441b, by way of section 441a(a)(7)(B)(i). Likewise, the committees involved in this MUR could not have accepted in-kind corporate contributions from the Coalition in violation of 2 U.S.C. section 441b.

---

[10] 2 U.S.C. § 441b(b)(2) provides as follows:

> For the purposes of this section ... the term 'contribution or expenditure' shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money or any other services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section. ...

Nor do I believe that non-corporate respondents violate the Act through coordinated issue advocacy. In *Buckley,* the Supreme Court held that the phrase "'for the purpose of influencing' an election or nomination," appearing in the definition of "expenditure" at 2 U.S.C. section 431(9)(A)(i), limited the meaning of "expenditure" to communications containing express advocacy, at least when, as in this case, the speaker was not a political committee. 424 U.S. 1 at 79-80. After the *Buckley* decision was handed down, Congress, fully aware of the Court's restrictive interpretation of the term "expenditure" in section 431(9)(A)(i), used the term "expenditure" in amending section 441a(a)(7)(B)(i). Section 441a(a)(7)(B)(i) provides that "*expenditures* made by any person in cooperation, consultation, or concert with … a candidate … shall be considered to be a contribution to such candidate." (emphasis added). Congress's post-*Buckley* use of the term "expenditure"—where the statutory definition of the term as interpreted by the Supreme Court is limited to communications containing words of express advocacy— indicates that even coordinated public communications must contain express advocacy before they can be transformed into regulable in-kind contributions.[11]

Indeed, Congress has responded to the courts on this topic before. After *Buckley*, Congress limited the disclaimer provisions to apply specifically to express advocacy communications, 2 U.S.C. § 441d(a), even where those communications are coordinated with a candidate.[12] If Congress had intended for coordinated issue advocacy communications to be within the jurisdiction of the FECA, it surely would have required a disclaimer for such communications.

Finally, that the Act as currently written requires express advocacy before coordinated public communications are subject to its terms is evidenced by the fact that, in pending legislation, the Senate has approved an amendment to do away with any requirement of express advocacy in the coordination provisions of the Act.[13]

---

[11] Additionally, section 431(8)(A)(i) of the Act limits the definition of "contribution" to any gift, etc. "made … for the purpose of influencing" a federal election. 2 U.S.C. § 431(8)(A)(i). This is the same statutory phrase as is used in the definition of "expenditure," 2 U.S.C. § 431(9)(A)(i), and which was construed by the *Buckley* Court to require a showing of express advocacy. The *Buckley* Court referred to 2 U.S.C. § 431(8)(A)(i) and 2 U.S.C. § 431(9)(A)(i) as "parallel provisions." *Buckley* at 77.

[12] *See* Pub. L. No. 94-283, 90 Stat. 497, May 11, 1976 (amending 2 U.S.C. § 441d). 2 U.S.C. § 441d(a)(2) provides in pertinent part:

> Whenever any person makes an expenditure for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate … such communication … (2) if paid for by other persons but authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the communication is paid for by such other persons and authorized by such authorized political committee.

Prior to *Buckley*, the Second Circuit had also held that issue advocacy could not be subject to the disclosure provisions of the FECA, *United States v. National Committee for Impeachment*, 469 U.S. 1135 (2d Cir. 1972).

[13] *See* S. 27, Sec. 214, 107th Congress, 1st Session (commonly known as the "McCain-Feingold" bill) (amending the Act's definition of "contribution" to include "any coordinated expenditure or other disbursement made by any person in connection with a candidate's campaign, regardless of whether the expenditure or disbursement is a communication that contains express advocacy.")

Given that the respondents in this case did not engage in express advocacy, this should have ended the matter in the spring of 1997, without the extensive investigation that followed. The Commission may only pursue violations of the FECA. *See* 2 U.S.C. § 437g(a)(2). For me this is adequate to dismiss the case.[14] However, recognizing that the statute is not a model of clarity in this regard, and in light of the apparent certainty of other commissioners that the Act at least allows for regulation of coordinated issue advocacy, I believe it worthwhile to set forth more fully why it is both wise policy, and constitutionally required, to limit our enforcement efforts to communications including express advocacy.

### III. A.

The starting point for any analysis of the constitutional and policy issues involved in enforcing the FECA is the recognition that "[t]he Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." *Buckley*, 424 U.S. at 14. With that in mind, a key concern of the Supreme Court's *Buckley* decision was to prevent the Act from having a "chilling" effect on speech pertaining to public issues and affairs. *See* 424 U.S. at 41, n. 47. The Court noted that:

> vague laws may not only 'trap the innocent by not providing fair warning' or foster 'arbitrary and discriminatory application' but also operate to inhibit protected expression by inducing 'citizens to steer far wider of the unlawful zone... than if the boundaries of the forbidden areas were clearly marked.' 'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'

424 U.S. at 41, n. 48 (citations omitted).

In *Buckley*, the Supreme Court accepted contribution limits as constitutionally permissible, but struck down limits on expenditures as violations of the First Amendment. There were three major reasons for providing greater protection to expenditures than to contributions. First, the Court noted that limits on contributions were a lesser burden on speech because a contribution, unlike an expenditure for public communications, did not "communicate the underlying basis for the support." 424 U.S. at 21. Second, limits on expenditures "reduce [] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. Limits on contributions to candidates, on the other hand, do not necessarily have the effect of materially reducing political discussion because they "leave the contributor free to become a member of any political association" and permit such associations "to aggregate large sums of money to promote effective advocacy." *Id.* at 22. Finally, limits on contributions "focus [] precisely on the problem of ...

---

[14] The Commission also made "reason to believe" findings under section 441d for failure to make disclaimers. As section 441d, by its express terms, only applies to "communications expressly advocating election or defeat," this charge could have been easily dismissed as well.

corruption....." By contrast, limitations on expenditures raise the concerns of vagueness that cause "citizens to steer far and wide of the unlawful zone." *Id.* at 41, n. 48.

Thus, in analyzing section 608(e)(1) of the Act, which provided that "[n]o person may make any expenditure ... relative to a clearly identified candidate during a calendar year which ... exceeds $1,000," the Court held that "the use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech." *Id.* at 41. It continued:

> The constitutional deficiencies [of vagueness] can be avoided only by reading §608(e)(1) as limited to communications that include explicit words of advocacy of election or defeat of a candidate. ... [F]unds spent to propagate one's views on issues without expressly calling for a candidate's election or defeat are thus not covered.... [I]n order to preserve the provision against invalidation on vagueness grounds, §608(e)(1) must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office.

*Buckley* at 43-44.

These same concerns arose when the Court considered the Act's disclosure provisions. Once again, the Court could have regulated issue advocacy, but did not. Rather, the Court chose again to give the term 'expenditure' a limiting construction. The Court stated:

> [T]he [disclosure] provision raises serious problems of vagueness, ... [that] may deter those who seek to exercise protected First Amendment rights. Section 434(e) applies to '[e]very person ... who makes contributions or expenditures.' 'Contributions' and 'expenditures' are defined ... in terms of money or other valuable assets 'for the purpose of influencing' the nomination or election of candidates for federal office. It is the ambiguity of this phrase that poses constitutional problems.

> ***

> There is no legislative history to guide us in determining the scope of the critical phrase 'for the purpose of ... influencing'.... Where the constitutional requirement of definiteness is at stake, we have the further obligation to construe the statute, if that can be done consistent with the legislative purpose, to avoid the shoals of vagueness.

> ***

When we attempt to define 'expenditure' ... we encounter line-drawing problems of the sort we faced in §608(e)(1). Although the phrase 'for the purpose of ... influencing' an election or nomination, differs from the language used in §608(e)(1), it shares the same potential for encompassing both issue discussion and advocacy of a political result.

*Id.* at 76-79. (Citations omitted). The Court worried that the "general requirement that 'political committees' and candidates disclose their expenditures could raise similar vagueness problems, for 'political committee' is defined only in terms of the amount of annual 'contributions' and 'expenditures,' and could be interpreted to reach groups engaged purely in issue discussion." *Id.* at 79. However, because the vagueness problems associated with the term "political committee" had already been largely resolved due to narrow readings of the statute by lower courts, it was not the effect upon groups defined as "political committees" under the Act that particularly concerned the Court.

The Court was more concerned about the effects that a vague and overbroad law could have upon the otherwise lawful First Amendment activities of other groups and individuals.[15] The Court, therefore, narrowed the term "for the purpose of influencing" to save the definition of the terms "expenditure" and "contribution" from being unconstitutionally overbroad: "To insure that the reach of §434(e) is not impermissibly broad, we construe "expenditure" ... in the same way we construed the terms of §608(e)— to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80. Thus, the Court concluded:

[Section] 434(e) as construed imposes independent reporting requirements on individuals and groups only in the following circumstances: (1) when they make contributions earmarked for political purposes or authorized or requested by a candidate ... to some person other than a candidate or political committee, and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.

\*\*\*

As [constitutionally] narrowed, §434(e), like §608(e)(1), does not reach all partisan discussion for it only requires disclosure of those expenditures that expressly advocate a particular election result.

*Buckley* at 80.

In reviewing the *Buckley* decision then, we see that each time the *Buckley* Court considered the definition of "expenditure," it narrowly interpreted the term to avoid

---

[15] *See Buckley* at 79. Our new coordination regulations deal specifically with groups and individuals, exempting party committees and authorized committees. 65 Fed. Reg. 76141-76142.

vagueness or overbreadth.[16] Concerns of vagueness and overbreadth were foremost in the *Buckley* Court's thinking in interpreting all aspects of the FECA. Most importantly, it found that the qualifying phrase "for the purpose of influencing," which is also part of the Act's definition of "contribution," 2 U.S.C. § 431(8)(A)(i), could be saved from vagueness problems only by construing it as applying to "words that in express terms advocate ... election or defeat."

The *Buckley* Court referenced coordinated communications only in passing. In arguing *Buckley*, the parties defending the Act contended that its limitation on independent expenditures was necessary to prevent would-be contributors from avoiding the contribution limitations of the Act by paying directly for media advertisements or other portions of the candidate's campaign activities. The Court addressed this concern with a brief statement that "controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act" under Section 608(c)(2)(B), *id.* at 46 (emphasis added), noting that "§608(e)(1) does not apply to expenditures 'on behalf of a candidate' within the meaning of §608(c)(2)(B). The latter subsection provides that expenditures 'authorized or requested by the candidate' ... are to be treated as expenditures of the candidate and contributions by the person making the expenditure." *Id.* at 46, n.53.

What the Court did not specifically address is whether it intended the same limiting construction of the term "expenditure" it had applied to sections 608(e)(1) and 434(e) to apply to section 608(c)(2)(B). Clearly the Court did not intend for independent issue advocacy to be regulated, but one might argue that in holding that authorized or requested "expenditures" are "contributions" under the Act, the Court meant to include coordinated issue advocacy. However, the *Buckley* Court's example of a coordinated "expenditure" that would be treated as a contribution, itself taken from the legislative history of the Act, is an express advocacy ad.

> [A] person might purchase billboard *advertisements endorsing a candidate*.... [I]f the advertisement was placed in cooperation with the candidate's campaign organization, then the amount would constitute a gift by the supporter and an expenditure by the candidate—just as if there had been a direct contribution enabling the candidate to place the advertisement himself.

*Buckley* at 46, n. 53 (emphasis added). Nothing suggests that the Court did not intend to extend to section 608(c) the narrow definition of "expenditure" it had given the term in section 608(e). Of course, it is possible that the Court never considered that a candidate would request or authorize "media advertisements" that did not expressly advocate the election or defeat of one candidate or another. After all, the legal distinction between

---

[16] *See also Federal Election Commission v. Survival Education Fund*, 65 F.3d 285, 294-95 (2d Cir. 1995) (holding that the phrase "contributions ... earmarked for political purposes" must, for reasons of vagueness, also be limited to contributions earmarked for communications that expressly advocate the election or defeat of candidates for office).

express ads and issue ads did not exist before *Buckley*, so there would have been no reason for a campaign to request an ad that did not expressly advocate election or defeat. Still, the most probable interpretations of *Buckley* are that it either limited the term "expenditure" in section 608(c)(2)(B) to disbursements for express advocacy, or simply did not address the issue. That the Court intended to find coordinated issue ads to be covered by the Act seems the least probable interpretation.

The question we face is whether, in light of Congress's actions, the holdings in *Buckley* and its progeny, the Constitutional concerns raised by the Supreme Court and lower courts, and our position as officials of the executive branch who have independently taken an oath to uphold the Constitution,[17] we can or should interpret the Act as reaching coordinated spending for issue advocacy communications.

In considering the question, I note first that each of the Constitutional concerns raised by the *Buckley* Court as reasons for providing greater protection to expenditures than to contributions is present in the context of coordinated issue advocacy disbursements. First, the coordinated issue advocacy disbursements do more than merely "serve as a general expression of support;" they do in fact "communicate the underlying basis for the support." *See Buckley*, 424 U.S. at 21. Second, restrictions on coordinated issue advocacy spending are, as a practical matter, likely to lead to a "reduc[tion] in the quantity of expression by restricting the number of issues discussed." *See id.* at 19. Arguably, of course, these groups might simply run their ads independently, so that no such speech reduction would result. As we know, however, groups regularly work with members of Congress to promote shared agendas. As the *Buckley* Court recognized, "[d]iscussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections." *Id.* at 43, n. 50. If the Act applies to coordinated issue advocacy, many groups will be unable both to work with elected representatives and to run ads attempting to influence public opinion on issues of mutual interest. In short, the groups will be asked to surrender either their rights of free speech and association or their rights of speech and to petition for redress. As already noted, the threat of investigation is itself often sufficient to chill speech. It is exactly our job, as the administrative agency with expertise in enforcing the Act, to recognize the practical effects of differing interpretations of the Act and to set policy accordingly.

Most importantly, efforts to regulate coordinated issue advocacy raise exactly the vagueness concerns at the heart of *Buckley*. For example, if Common Cause, having coordinated its legislative efforts with Senator McCain, were to also run advertisements in support of its agenda that mentioned the Senator, whether or not their ads would violate the Act would depend upon whether or not the Commission believed that they

---

[17] Unlike some of my colleagues, I do not interpret that oath to mean that we can fulfill our constitutional obligations simply by ignoring constitutional considerations until and unless we are bound by judicial ruling. Rather, as representatives of a co-equal branch of government, our obligation requires us to consider the constitutional implications of our actions even when we have not been bound by judicial decisions.

were "for the purpose of influencing an election." This is the exact standard that the Supreme Court found, without more, to be unacceptably vague even in terms of the less burdensome disclosure provisions of the Act.

Because of the resulting vagueness, *see Buckley*, 424 U.S. at 41, n. 48, we can anticipate that groups will, in the future, "'steer far wider of the unlawful zone'...than if the boundaries of the forbidden areas were clearly marked." The present case illustrates that only too well. The enormous costs, imposition, and length of the investigation that has occurred in this case suggests that at least some of the more than 60 respondents involved, and who knows how many other groups and individuals that have witnessed the debacle, will "steer far wide" rather than risk a lengthy investigation, even if that investigation does ultimately lead to a finding of "no probable cause."[18]

At one time, a majority of the Commission seems to have recognized this vagueness problem. On June 24, 1999, Commissioners Wold, Mason, and Sandstrom, joined by then Commissioner Elliott,[19] issued a statement of reasons rejecting the enforcement of coordination cases under a vague, "electioneering message" content standard.[20] The Commission majority at that time correctly concluded that the vague "electioneering message" standard offered no guideposts for free discussion, even in cases where such discussion was coordinated or presumably coordinated with a candidate, writing:

> The vagueness and overbreadth problems of the "electioneering message" and "relative to" standards are thus two sides of the same counterfeit coin. They are vague because it is not clear when they encompass issue discussion and not candidate advocacy. They are overbroad because, given the nature of campaigning, they will inevitably encompass both. For the same substantive reasons that the Supreme Court held the "relative to" standard in the FECA to be unconstitutional, the Commission may not employ the "electioneering message" standard. *Even in the context of coordinated, or presumably coordinated, communications in which the "electioneering message" test has generally been proposed* (see 11 C.F.R. §114.49c)(5)(ii)c)(5)(ii)(B)(E) (regulation of voter guides)), *the Commission may not ignore these constitutional requirements.*

Statement of Reasons of Vice Chairman Darryl R. Wold, and Commissioners Lee Ann Elliott, David M. Mason, and Karl J. Sandstrom on the Audits of "Dole for President Committee, Inc." (Primary), "Clinton/Gore '96 Primary Committee, Inc.," "Dole/Kemp '96, inc." (General), Dole/Kemp '96 Compliance Committee, Inc." (General),

---

[18] Everyone at this Commission is well aware of a favorite saying of the practicing campaign finance law bar: "The process is the punishment."

[19] I did not join the Commission until June of 2000.

[20] This appears to have been the standard used by the Commission in deciding whether or not coordinated issue advocacy was subject to the Act prior to adoption of 11 CFR § 100.23. *See* Advisory Opinion 1985-14 [1976—1990 Transfer Binder] Fed. Elec. Camp. Fin. Guide (CCH), ¶ 5819 at 11185.

"Clinton/Gore '96 General Election Legal and Compliance Fund" at 6, (June 24, 1999) (emphasis added).

Shortly thereafter, the Federal District Court for the District of Columbia decided *Federal Election Commission v. Christian Coalition*, 52 F. Supp.2d 45 (D. D.C. 1999). That decision held that corporate expenditures for coordinated issue ads were subject to the contribution prohibitions of 2 U.S.C. section 441b.[21] *Id.* Because this single district court decision seems to have contributed to a re-evaluation of the Commission's previously expressed appreciation for and insistence upon definite content standards, I will address this decision and related precedent at some length.[22]

### III. B.

In *MCFL* the Supreme Court had held that issue advocacy by corporations and unions does not constitute an "expenditure" pursuant to the Act. 479 U.S. at 249. Thus, corporate and union communications lacking express advocacy are not only not "independent expenditures"[23] under Section 441b—they are not "expenditures" at all. Nevertheless, the *Christian Coalition* court concluded that whether or not corporate or union activity is prohibited or protected turns upon whether the activity is "in connection with an election," and not whether the activity is an "expenditure," under the Act because, "[t]he real issue ... is whether an expenditure is 'authorized' by a campaign or 'coordinated' with the campaign." 52 F. Supp.2d at 87-88. The *Christian Coalition* court went on to argue that "*Buckley*, in its treatment of coordinated expenditures as in-kind contributions, left undiscussed the First Amendment concerns that arise with respect to 'expressive coordinated expenditures.' ... It can only be surmised that the *Buckley* majority purposely left this issue for another case."[24] 52 F. Supp.2d at 85.

---

[21] In doing so the district court failed to address the impact of 2 U.S.C. § 431(8)(B)(vi) in light of the Supreme Court's holding in *MCFL, supra*. *See ante* pp. 4-5.

[22] I presume that the *Christian Coalition* case was a factor in this change as all three Commissioners still on the Commission reversed course on the need for clear content standards after that opinion. Another possibility is that these commissioners believe that vagueness and overbreadth can be cured by a content standard somewhere between the "electioneering message" standard they specifically rejected and the express advocacy test they have so far not adopted, though to date no such standard has been proposed.

[23] The district court stated that "corporations and unions can make *independent expenditures* that are related to a federal election campaign so long as those expenditures are not for communications that advocate the election or defeat of a clearly identified candidate." *Christian Coalition* at 48 (emphasis in the original). Because the term "independent expenditure" is defined within the FECA as requiring express advocacy, *see* 2 U.S.C. § 431(17), and section 441b prevents corporations and unions from making *any* FECA "expenditures," we know that the district court meant "issue advocacy" by its use of the term "independent expenditures" in the above sentence.

[24] The *Buckley* Court allowed contributions to be carved from First Amendment protection largely because contribution limits "involve [] little direct restraint on [one's] political communication [and] does not in any way infringe on the contributor's freedom to discuss candidates and issues." *Buckley* at 21. Investigating issue advocates on the theory that their communications may be coordinated with a candidate is a direct restraint on a speaker's freedom to discuss candidates and issues.

In addressing the issue, the *Christian Coalition* court next recognized a need to differentiate between "expenditures on non-communicative materials, such as hamburgers or travel expenses for campaign staff," which, like direct contributions to the candidate, do not communicate the underlying basis of support, and expenditures "in which the spender is responsible for a substantial portion of the speech." *Id.* at 85, n. 45. The latter, which the court termed "expressive coordinated expenditures," are speech-laden or communicative, and therefore different from other non-communicative in-kind contributions. *Id.* Ultimately, however, the court concluded that coordinated issue advocacy could be regulated, believing that it is the "fact of coordination" that is significant, not the character of the underlying item that is coordinated. The court seemed to conclude that the lesson of *Buckley* is that it is the independence of the speech, rather than its communicative value, that determines its level of constitutional protection. In other words, the court focused only on the corruption side of the coin, but not on the First Amendment side. Thus, the court found that independent speech is deserving of clear content standards, but where independence fades—or at least a complainant alleges it has faded—speech may be extensively investigated regardless of its content and without regard for whether that speech constitutes speech of the spender. *See id.* at 87, n. 50.

The district judge in *Christian Coalition* reasoned that *Buckley* specifically read an express advocacy standard only into the statutory provisions regarding *independent* expenditures 'relative to' a clearly identified candidate and 'for the purpose of influencing any election for Federal office.' 52 F. Supp.2d at 87, n.50. Therefore, the court concluded, for all other parts of the FECA, the *Buckley* Court must have "used the term 'expenditure' advisedly, leaving intact the normal, broad meaning Congress had given it." *Id.* But what "normal, broad meaning" had Congress given the definition of "expenditure"? Webster's Dictionary defines "expenditure" as "the act of expending; a spending or using up of money, time, etc.; disbursement." *Webster's New Twentieth Century Dictionary of the English Language*, p. 644, 2d ed., 1977. Clearly the Act did not intend, nor would it be constitutional to prohibit all expenditures or contributions by a person in excess of $1000, at least not in the broad, everyday meaning of the terms. Thus Congress had limited the scope of both the terms "expenditure" and "contribution" to, "[a]nything of value ... *for the purpose of influencing any election for Federal office.*" 2 U.S.C. §§ 431(9)(A)(i) and 431(8)(A)(i) (emphasis added). The *Buckley* Court, however, found that the phrase "for the purpose of influencing" was still insufficiently precise to overcome concerns of vagueness and overbreadth,[25] and so narrowed it to cover only express advocacy. 424 U.S. at 79. If, as the *Christian Coalition* court maintained, the *Buckley* Court defined that critical phrase only with regard to *independent* expenditures, then that phrase must still be imbued with some semblance of meaning before deciding which coordinated disbursements are regulable "expenditures," and therefore "contributions" subject to the Act.

---

[25] "There is no legislative history to guide [the courts] in determining the scope of the critical phrase 'for the purpose of influencing,'" *Buckley*, at 77, yet "[i]t is the ambiguity of this phrase that poses constitutional problems." *Id.*

When a group engages in public discussion of political issues and coordinates its activity with a candidate or committee, the critical phrase that turns the speech into prohibited or limited activity is that it is speech "for the purpose of influencing an election." The court in *Christian Coalition* seemed to assume that because the Supreme Court did not specifically define the phrase as being limited to express advocacy in the context of coordinated expenditures, it must have decided that groups that are alleged to have engaged in coordinated speaking are not faced with the same concerns of vagueness and overbreadth. In fact, the Supreme Court has simply never specifically answered the question.[26]

There is no normal, accepted meaning of the phrase, "for the purpose of influencing," and Congress has not provided one. An "unconstitutionally overbroad statute may not be enforced *at all* until an acceptable construction has been obtained." *McGautha v. California*, 402 U.S. 183, 259 (1971), *reh'g. denied*, 406 U.S. 978 (1972). Either the Commission or the courts must give the phrase "for the purpose of influencing" some prospective, content-based meaning.[27]

## IV.

The approach to coordinated expenditures adopted by Commissioners Thomas and McDonald would relieve the Commission from any need to clearly define which speech is "for the purpose of influencing" elections until after an extensive investigation. They would have this determination made by the Commission on a case-by-case basis after an investigation, which would be, in effect, a search for evidence of the respondent's true intent based upon a totality of the circumstances. These Commissioners believe a complete investigation in this case, for example, could have shown that the "the Coalition's communications were undertaken for the purpose of influencing federal elections" because the Coalition "aired ads in the weeks before the election;" "dropped

---

[26] *See ante* at 13.

[27] In the context of FECA, the courts have consistently used an "express advocacy" test to give meaning to the Act's vague or overly broad provisions. *See e.g. Buckley v. Valeo*, 424 U.S. 1 (1976); *Massachusetts Citizens for Life*, 479 U.S. 238 (1986); *Maine Right to Life v. FEC*, 98 F.3d 1 (1st Cir. 1996), *cert. denied* 118 S. Ct. 52 (1997); *FEC v. Christian Action Network, Inc.*, 92 F.3d 1178 (4th Cir. 1996) (*summarily affirming* 894 F. Supp. 947 (W.D. Va. 1995); *Faucher v. FEC*, 928 F.2d 468 (1st Cir.), *cert. denied*, 502 U.S. 820 (1991); *FEC v. Central Long Island Tax Reform Immediately Comm.*, 616 F.2d 45 (2d Cir. 1980) (*en banc*); *Colorado Republican Fed. Campaign Comm.*, 839 F. Supp. 1448 (D. Co.), *rev'd on other grounds*, 59 F.3d 1015 (10th Cir. 1995), *vacated on other grounds*, 116 S. Ct. 2309 (1996); *Right to Life of Michigan v. Miller*, 23 F. Supp.2d 766 (W.D. Mich. 1998); *FEC v. National Org. for Women*, 713 F. Supp. 428 (D. D.C. 1989); *FEC v. American Fed'n of State, County & Mun. Employees*, 471 F. Supp. 315 (D. D.C. 1979). *See also FEC v. National Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985) (holding that the First Amendment prohibits limits on independent expenditures that expressly advocate the election or defeat of a candidate, and noting in dicta "[t]he fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages ... can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view."); *Clifton v. FEC*, 114 F.3d 1309 (1st Cir. 1997) (holding that the Commission's efforts to regulate "issue advocacy" as "contributions" exceeded its powers under the FECA, and stating, "we do not take Congress to have authorized rules that sacrifice First Amendment interests.")

direct mail ten days before the election;" and "took credit" for the reelection of many members of Congress. Thomas/McDonald Statement, at 12, n. 6, (internal citations omitted). Additionally, they would find that "[t]here is no indication that the Coalition was formed for any purpose other than building ... public support for certain candidates [and] nothing suggesting that the Coalition engaged in ... issue discussion outside the context of elections." Thomas/McDonald Statement at 15. The capstone for the Commissioners is a quote from the Coalition itself: "Our ultimate objective is to return a pro-business, fiscally responsible majority for the 105th Congress." Thomas/McDonald Statement at 16 (emphasis omitted), quoting *The Washington Post*, August 8, 1996.[28]

These criteria offer no prospective guidance and contribute little if anything to overcoming the vagueness problem. Because, as the Supreme Court noted in *Buckley*, "campaigns themselves generate issues of public interest," 424 U.S. at 42, and because public interest in issues is often highest close to an election, the logical time to engage in issue advocacy is close to an election.[29] Similarly, groups will ultimately hope that if politicians do not adopt their positions on issues, the voters will turn against them. Surely, we cannot regulate issue ads simply because they will affect what issues and stances voters think are important. That does not make their conduct "for the purpose of influencing" a federal election as the meaning of that crucial phrase has been defined to avoid vagueness problems in the context of independent expenditures. *See Federal Election Commission v. GOPAC*, 917 F. Supp. 851 (D. D.C.) (1996). Thus the type of criteria on which Commissioners Thomas and McDonald would rely fails, even after the

---

[28] Commissioners Thomas and McDonald also cite these facts for the proposition that the Coalition was a "political committee" that must register under 2 U.S.C. § 433 and report its activity under 2 U.S.C. § 434. Thomas/McDonald Statement at 15-17. The Act defines "political committee" as "any ... association ... of persons which receives *contributions* ... or makes *expenditures* aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A) (emphasis added). The *Buckley* Court cautioned that the broad statutory definition of 'political committee,' which turns on the terms contribution and expenditure and on the phrase "for the purpose of influencing any election" had the potential for encompassing "both issue discussion and advocacy or a political result" and thus might encroach upon First Amendment freedoms. *Buckley* at 79. Therefore, to fulfill the purposes of the Act, the term political committee "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* While an organization's purpose may be evidenced by its public statements of its purpose, *see MCFL* at 262, such an inquiry is secondary to the requisite of finding "expenditures" or "contributions" in excess of $1,000. So "[e]ven if the organization's major purpose is the election of a federal candidate or candidates [, as Commissioners Thomas and McDonald insist the evidence would conclude,] the organization does not become a "political committee" *unless* or *until* it makes *expenditures* in cash or in kind." *See Machinists* at 392. The argument that "major purpose" alone is enough to make a group a "political committee" or make disbursements into "expenditures" as defined by the Act was specifically rejected in *Federal Election Commission v. GOPAC*, 917 F. Supp. 851, 861-62 (1996)("As a matter of law, the Commission ... failed to demonstrate that GOPAC became a political committee within the meaning of the Act by *spending or receiving* $1,000 or more and engaging in 'partisan politics' and 'electioneering.'")(emphasis added).

[29] Furthermore, Congress is often still in session within, for example, 60 days of an election, and engaged in more than the usual number of floor votes while attempting to wrap up the session. *See* Bradley A. Smith, *Soft Money, Hard Realities: The Constitutional Prohibition on a Soft Money Ban*, 24 J. Legis. 179, 192 n. 85 (1998); *See also Mills v. Alabama*, 384 U.S. 214 (1966)(striking down a limited ban on express advocacy close to an election).

22.04.406.0183

fact, to provide any meaningful distinctions that would not chill constitutionally protected speech.

Equally important, "[n]o matter what facts [the Commission] finds through [an] investigation, the requisite jurisdiction for the investigation itself must stand or fall on the purely legal claim...." *Federal Election Commission v. Machinists Non-Partisan Political League,* 655 F.2d 380, 390 (D.C. Cir. 1981) (hereinafter *"Machinists"*). In *Machinists,* the Circuit Court of Appeals for the District of Columbia had to determine whether to enforce a Commission subpoena against a "draft" committee where it was unclear whether the Commission had statutory authority to regulate draft committees at all. *Id.* The Court stated that any alleged compelling interests the Commission may assert in seeking information, can be compelling and granted effect if the Commission first has authority to regulate a particular type of speech or activity. *Id.* But the Court held that "the highly sensitive character of the information sought simply makes it all the more important that the court be convinced that jurisdiction exists." *Id.* at 389.

In the current MUR, the purely legal claim is that coordinated issue advocacy is "for the purpose of influencing elections" and so subject to regulation under the FECA. In deciding the question of Commission jurisdiction, the *Machinists* Court warns us that "[i]n this delicate first amendment area, there is no imperative to stretch the statutory language, or read into it oblique references of Congressional intent...." Rather, "[a]chieving a reasonable, constitutionally sound conclusion in this case requires just the opposite. 'It is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality.'" *Id.* at 394, quoting *Richmond v. United States,* 275 U.S. 331 (1928).

Certainly we, as Commissioners, should equally avoid interpretations of the statute that raise constitutional questions, at least absent a clear expression of intent from Congress. We are obliged to be certain we are acting within the confines of the FECA and the Constitution. We cannot use ambiguities to expand our regulatory authority. Even if Commissioners do not believe that the *Buckley* Court limited the phrase "for the purpose of influencing" to express advocacy when applied to coordinated communications, they must concede that our guidance in this area is at a minimum. To avoid serious constitutional concerns, we should adopt an objective, bright line express advocacy standard as a predicate to investigating allegedly coordinated issue discussion.

Indeed, the D.C. Circuit has also admonished this agency to use clear, bright line standards, not only to address constitutional concerns, but for more mundane, practical reasons as well. In *Orloski v. F.E.C.,* 795 F.2d 156, 165 (D.C. Cir. 1986), the Court of Appeals wrote that, "[a]dministrative exigencies mandate that the FEC adopt an objective, bright-line test for distinguishing between permissible and impermissible corporate donations." Certainly this would apply to permissible and impermissible non-corporate donations as well. The *Orloski* court went on to add that, "an objective test is required to coordinate the liabilities of donors and donees. The bright-line test also is necessary to enable donees and donors to easily conform their conduct to the law and to

enable the FEC to take the rapid, decisive enforcement action that is called for in the highly-charged political arena." *Id.* Each of these concerns apply in the context of coordinated issue advocacy—as the naming of over 60 respondents and the length of the investigation in this MUR show, without an objective content standard neither donees nor donors can "easily conform their conduct to the law," and the FEC cannot take "rapid, decisive enforcement action." And, of course, *Orloski* also warned of the need for a bright line to avoid a chilling effect on protected speech: "A subjective test based upon the totality of the circumstances [such as that favored by Commissioners Thomas and McDonald in this MUR] would inevitably curtail permissible conduct." *Id.*

In fact, *Orloski* warned of other practical problems with a subjective test, many of which are on exhibit in this case. Wrote the court:

"[A subjective test] would also unduly burden the FEC with requests for advisory opinions ... and with complaints by disgruntled opponents who could take advantage of a totality of the circumstances test to harass the sponsoring candidate and his supporters. It would further burden the agency by forcing it to direct its limited resources toward conducting a full-scale, detailed inquiry into almost every complaint, even those involving the most mundane allegations. It would also considerably delay enforcement action. Rarely could the FEC dismiss a complaint without soliciting a response because the FEC would need to know all the facts bearing on motive before making its "reason to believe" determination.

*Id.* at 165. These considerations, and in particular the chilling effect on speech of this uncertainty, argue for an objective, express advocacy test over the vague, *post hoc*, subjective test favored by Commissioners Thomas and McDonald.

Commissioner Sandstrom, in his turn, voices a concern for vagueness and overbreadth, but argues that the "express advocacy test is a *subjective*, content-based test about which reasonable minds can on occasion reach different results," and for that reason, ought to be applied "only where more objective criteria are unavailable." Sandstrom Statement at 6. Commissioner Sandstrom then argues that the objective criteria should be whether the ads were tested for their effect on voters' candidate preferences. Based on this, he voted against the General Counsel's recommendation to take no further action in this case.

First, Commissioner Sandstrom errs in thinking that the express advocacy test is subjective. A subjective test depends on the mental impression of the respondent at the time his communications were made. An objective test relies on independently verifiable facts, such as whether or not a communication contains express words of advocacy of election or defeat. While it is true that the inexactness of language means that reasonable minds can sometimes reach differing results on whether or not certain words are express

words of advocacy of election or defeat,[30] in the overwhelming majority of cases the express advocacy standard is very easy to apply. The occasional disagreement does not mean that the express advocacy test is "subjective," that it fails to provide notice to the regulated community, or that it fails to provide courts a standard of reviewing the actions of legislatures, regulatory commissions, prosecutors, and inferior courts. By an "objective" test, it is not meant that every adjudicator will reach the same result in every case, but rather that the test will not rely on the subjective motives of the speaker. Commissioner Sandstrom's proposed objective criteria — whether or not the ad was tested for effect on voter candidate preferences — is, like the express advocacy test, objective in that it does not rely on intent, but is, like the express advocacy test, subject to disagreement as to whether it has been met.[31]

More important, Commissioner Sandstrom's proposed standard provides no guidance to a group that had not so tested its ads. That is, the presence of such testing might quickly allow the Commission to find a purpose to influence a federal election, but its absence would not allow the respondent to quickly demonstrate no such purpose. (I do not think that Commissioner Sandstrom means to propose that *only* issue ads that are tested for effect on voters' candidate preferences would be subject to regulation). Nor would the Commission be expected to routinely accept a respondent's denial of such testing without an investigation. Respondents would therefore continue to be subject to extensive investigations on the basis of allegations filed by their political adversaries. Thus, the chilling effects on speech, not to mention the other problems outlined in *Orloski*, would still be present. Furthermore, groups engage in issue advocacy in the ultimate hope of changing government policy. One way to assure that issue ads will be effective is to test them on voters to see if they are likely to encourage voters to put the desired pressure on legislators and candidates to adopt the favored positions. The right to engage in political issues discussion would lose much of its meaning if groups and individuals were limited to communications that were not effective in mobilizing voters.

The express advocacy test is an instrument of law designed to further constitutional aims by limiting actions of legislatures and regulatory bodies that would chill protected political speech through their overbreadth and vagueness. The existence of express advocacy is a threshold requirement for regulating the communicative expenditures of unions, corporations, groups or individuals. No matter the degree of dissatisfaction with the results the test yields, we are not permitted, nor would it be wise, to jettison the express advocacy test simply because we might believe in any given case that "more objective criteria" are available.[32]

---

[30] *See e.g. Federal Election Commission v. Furgatch*, 807 F.2d 857 (9th Cir. 1987), *cert den.* 484 U.S. 850 (1987); MUR 4922 (Suburban O'Hare Commission).

[31] For example, my standard for determining what constitutes "test[ing] an ad's influence on voters' choice of federal candidate" may differ from Commissioner Sandstrom's. Does it include, for example, asking generically whether a voter would be more or less inclined to favor a candidate who takes particular positions? Or asking not if the ad would affect one's vote or even preference, but merely the respondent's opinion of the individual in question? Or suppose that the ads are tested for voters using candidates in a Senate race, but then run in a House race? I am sure many more variations are available.

[32] It goes without saying that there is no basis in the statute or judicial interpretations of the statute for

It is true that the express advocacy test often yields results with which some individuals are unhappy. Many observers fear that coordinated issue advocacy has the potential to corrupt candidates and officeholders. The *Christian Coalition* court, for example, warned that were the express advocacy standard "imported" into section 441b's contribution prohibition, "it would open the door to unrestricted corporate or union underwriting of numerous campaign-related communications that do not expressly advocate a candidate's election or defeat." 52 F. Supp.2d at 88. This would, feared the court, "present real dangers to the integrity of the electoral process." *Id.* at 92. Of course, all of this is nothing more than the district court saying that its concern about *quid pro quo* corruption overrides the vagueness and overbreadth problems inherent in regulating issue advocacy. The Supreme Court faced the same issues in *Buckley* and reached the opposite conclusion, recognizing that issue advocacy would be used to influence campaigns: "It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign." 424 U.S. at 45. Regulating coordinated issue advocacy, no matter how much it may or not benefit a campaign, plunges the discussion of issues back into a morass of regulation and resuscitates the concerns of vagueness and overbreadth the Court addressed in *Buckley*. A content standard is needed to alleviate this problem, but at this time our coordination regulations possess no content standard beyond the vague statutory language that expenditures be made for the purpose of influencing a federal election.[33] This is effectively no content standard at all, as the *Buckley* Court held in discussing the disclosure provisions of the Act, and as another Supreme Court case, cited extensively in *Buckley,* makes clear.

In *Thomas v. Collins*, 323 U.S. 516 (1945), Thomas, a national union leader, was accused of violating a Texas statute requiring "all labor union organizers operating in ... Texas ... to file [for an organizer's card] with the Secretary of State before soliciting any members for his organization." *Id.* at 519, n. 1. The statute required organizers to carry the card whenever "soliciting" members, and to exhibit the same when requested to do so by prospective members. The statute was invalidated because speakers would not know in what ways they could speak about the labor movement, or about labor issues, without

---

Commissioner Sandstrom's proposal to define groups as political committees by essentially redefining "expenditure" and "contribution" to include ads tested for their effect on voter candidate preferences. Commissioner Sandstrom is also justifiably concerned that the rules be made clear. Sandstrom Statement at 4-5. In addition to being well grounded in judicial precedent, the express advocacy test has the advantage of being clear, simple to understand for the inexperienced, easy to apply in the overwhelming majority of cases, and familiar to regular participants in campaigns.

[33] Some have suggested that "the purpose of influencing" be found in 'any ad featuring a candidate's name or likeness.' But this is little improvement, for reasons of overbreadth, over the 'relative to a candidate' standard the Court rejected as vague in deciding *Buckley*. Limiting the content standard to any ad containing a clearly-identified candidate is unconstitutionally overbroad for as the Court observed in *Buckley*, "[c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest." 424 U.S. at 42.

carrying a card. In short, the statute was invalidated because it lacked a definite content standard.

The Court suggested that had the statute included a precise content standard, equivalent to the express advocacy test later adopted in *Buckley*, the regulation could have been valid under the State's police power because, "[a] speaker in such circumstances could avoid the words 'solicit,' 'invite,'[or] 'join.'" *Id.* at 534. However,

> [w]ithout such a limitation, the statute forbids any language which conveys, or reasonably could be found to convey, the meaning of invitation. How one might 'laud unionism' as the State and State Court concede Thomas was free to do, yet in these circumstances not imply an invitation, is hard to conceive. ... In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation, puts the speaker in these circumstances wholly at the mercy of his hearers. ... Such a distinction offers no security for free discussion.

*Id.* at 535.

The Court made the point most relevant to the problem posed by our current coordination regulations:

> The vice [in a statute prohibiting the issuing of invitations without an organizer's card] is not merely that invitation ... is speech. It is also that its prohibition forbids or restrains discussion which is not or may not be invitation. The sharp line cannot be drawn surely or securely.

*Id.* at 535-36 (emphasis added). Similarly, the "vice" in the coordination regulations is not that they regulate ads that a candidate may authorize or request. The vice of the regulations is that unless they are limited to phrases of a particular kind, speakers who want to discuss more generic matters will not know whether they will be investigated under the regulations. A speaker seeking to discuss issues without risking investigation can avoid words such as 'vote for,' 'elect,' 'vote against,' or 'defeat.' But absent a content standard, our regulations provide no guidance as to which types of phrases will be deemed to "influence the outcomes of elections," and our regulations will limit or chill much speech that is not or may not be "for the purpose of influencing" a federal election.

Nor can the lack of a content standard can be effectively offset through a restrictive test for coordination. While other considerations lead me to support a conduct test for coordination similar to that enunciated in *Christian Coalition* and since incorporated into our regulations at 11 C.F.R. § 100.23, the truth is that such a restrictive test for proving coordination can, absent a content standard, actually make investigations more intrusive and chilling of speech. The reason is because the more difficult evidentiary burden the Commission faces to prove coordination requires a more intrusive investigation to gather facts that are usually in control of the respondent. Thus, while the

coordination rule of *Christian Coalition* solves the *notice* problem of the Commission's old "insider trading" standard, it does not address the fundamental *vagueness* problem. "The objectionable quality of vagueness and overbreadth does not depend [just] upon [the] absence of fair notice to a[n] accused ... but [more importantly] upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a ... statute susceptible of sweeping and improper application." *NAACP v. Button*, 371 U.S. 415, 432-433 (1963). A content standard provides advance notice to actors of what kind of speech the FEC may investigate, and reduces the risk of arbitrary, discriminatory, or capricious enforcement far more effectively than a purely conduct based standard.

Absent a content standard, it does not appreciably warm the environment for speech to say that the standard for actually proving and punishing coordination "must be restrictive," as the court did in *Christian Coalition*. 52 F. Supp.2d at 88. This is because a restrictive conduct standard does nothing to alleviate the ease with which allegations may be made and intrusive, expensive investigations launched. The Supreme Court in *Thomas v. Collins,* assessing the chilling effect of the Texas statute upon speech, did not discuss the defendant's likelihood of success at trial, or the difficulty that the State would have in proving whether the defendant violated the organizer-card ordinance, or the elements involved in that proof. The mere threat of prosecution was sufficient to chill speech and make the statute unconstitutional. ("The threat of ... arrest ... hung over every word." *Id.* at 534.) Because the threat of prosecution (or investigation) can itself chill speech, *see Virginia v. American Booksellers Ass'n.,* 484 U.S. 383, 392-93 (1998), a tough conduct standard does not eliminate the need for a clear content standard. A precise content standard along with the new conduct standards outlined in 11 CFR § 110.23 would work as bookends in enforcing the Act while removing an unconstitutional chill from protected speech and associational activities.

## V.

Investigations into allegations of coordination will often involve demands for access to an organization's detailed legislative and political plans, including intrusion into the most sensitive internal political discussions. *See generally, AFL-CIO, et al. v. FEC,* Civ. Action No. 01-1522 (GK), Dist. Ct., District of Columbia. The express-advocacy content standard ensures that investigations into allegations of coordination are only visited upon those groups, corporations or unions who first cross a bright, content line.

The dangers to the First Amendment posed by such broad government investigations of political activity have been recognized time and again by the federal courts. *See e.g., F.E.C. v. Larouche Campaign,* 817 F.2d 233, 234 (2d Cir. 1987)(recognizing that the Commission's investigative authority should be constrained or clearly delineated due to the sensitive nature of the activities the agency regulates, and holding that where a case implicates First Amendment concerns, "the usual deference to the administrative agency is not appropriate and protection of the constitutional liberties of the target of the subpoena calls for a more exacting scrutiny of the justification offered by the agency.") In *Buckley*, the Supreme Court recognized that "compelled disclosure

[of political activities], in itself, can seriously infringe on privacy of associations and belief guaranteed by the First Amendment." 424 U.S. at 64. Justice Frankfurter made the same point over forty years ago: "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigatory process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of association, and freedom of communication of ideas." *Sweezy v. New Hampshire*, 354 U.S. 234, 235 (1957) (Frankfurter, J., concurring). Investigations into such areas of constitutional sensitivity ought to be triggered only where respondents can know that they have crossed a bright line.[34]

The suggestion that a bright line can be found by the fact of communicating with a candidate—in other words, that a speaker can find a safeharbor by not communicating at all with a candidate in the two, four or six year period between elections, is not realistic.[35] Indeed, one reason for our passing the new coordination regulation was the recognition that our old enforcement standard, presumptively finding coordination based on any contact between the speaker and the candidate, was unrealistic. For example, in seeking to prove coordination between the Christian Coalition and various Republican candidates, the Commission's evidence included the fact that public officials addressed meetings of the organization. *See Christian Coalition,* 52 F. Supp.2d at 68, 71, 76. Public officials have a legitimate need to communicate with their constituents, these constituents have a right to listen to their elected officials, and "nowhere in the Act did Congress expressly limit an incumbent's right to communicate with his constituency." *Orloski v. Federal Election Commission,* 795 F.2d 156, 163 (D.C. Cir. 1986). Groups and candidates talk all the time, and to force groups to choose between talking to candidates or losing their safeharbor is likely to be as chilling on the First Amendment rights to speak and to petition the government as the conduct standard the Commission just rejected.

---

[34] I do not suggest that the Commission may make no inquiries at all until it is sure that express advocacy exists. The Commission could conduct a *Reader's Digest* inquiry, even to the point of enforcing subpoenas, to be certain no express ads were run. *See Reader's Digest Ass'n. v. FEC,* 509 F. Supp. 1210 (S.D.N.Y) (where factual questions existed regarding whether the Commission had statutory authority to conduct a full investigation, the court adopted a two-step process to govern its continuation; the first stage of the investigation would be solely for the purpose of determining whether statutory authority existed). As a factual matter, complaints are normally filed because someone—usually the speaker's political opponent—has seen the ads in question. The ads are described in or attached to the complaint, so even a *Reader's Digest* inquiry will be rare. When the ads are not shown by the complaint to be issue ads, the respondent can typically attach the ads to the response, and if they do not include express advocacy, the enforcement ends there at very low cost to both respondent and Commission.

[35] Chairman McDonald and Commissioner Thomas state that the Act and the *Buckley* Court required only a "general understanding" to find coordination and presumably would state that persons speaking with legislative officials or candidates in the 2, 4 or 6 years between elections do so at their own risk. *See* Thomas/McDonald Statement at 7. I disagree with this conclusion, for the reasons stated in *Clifton. See* 114 F.3d 1309 at 1314. The district court in *Christian Coalition* also seemed not to appreciate the First Amendment dilemma in this area, mischaracterizing the choice as one between "lobbying the *campaign* on issues but spending no money on the election … or remaining walled off from the *campaign* so that all campaign-related expenditures are clearly independent." *Christian Coalition,* 52 F. Supp. 2d at 89, n. 53 (emphasis added). Approximately fifty percent of all "campaigns" involve office holders who make up "the government," and with whom the speaker may wish to confer on legislative issues pursuant to the First Amendment right to "petition for a redress of grievances." U.S. CONST. amend. I.

23

Issue discussion ought not, and constitutionally cannot, be regulated merely because an issue ad may be of benefit to the candidate or his campaign. Issue discussion will almost always, at some point, benefit some campaign, as the *Buckley* Court understood. The purpose of the express advocacy test is not to neatly separate those communications that are intended to influence a campaign from those that are not, but to protect the rights of all citizens to engage in protected speech. In this respect, the test is similar to many other prophylactic tests found in the law. For example, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court recognized that "to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, at 467.[36] The warnings that law enforcement officials have been required to give to suspects ever since are not a sifting screen to divine the subjective intent of the suspect; not one tool among many for determining whether his confession was voluntary. Likewise, the express advocacy test is not a sifting screen to divine the subjective intent of a respondent, to determine whether in his mind the speech he engaged in was for the purpose of influencing an election. Rather, both the *Miranda* warnings and the express advocacy test are objectively ascertainable threshold requirements promulgated by Courts to protect the constitutional rights of citizens. Neither test is disposable, even though there may be other evidence that a confession was voluntary, or that a respondent's speech was "for the purpose of influencing" an election. As stated by the Court in *Miranda*, the "privilege is so fundamental to our system of constitutional rule and the expedient of giving adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given." *Miranda* at 468. The First Amendment is no less fundamental,[37] and the expedient of applying the express advocacy test so simple, that we may not and ought not pause to inquire in individual cases whether *speech* can be "for the purpose of influencing" an election without first finding express advocacy.[38]

Campaign finance laws and regulations have, over time, become weapons in the arsenals of candidates and party committees, and we should not quickly minimize the far-reaching aspects of these regulations. In 2000 the Congressional Committee Chairman of one major political party went so far as to sue his counterpart under the RICO statute.[39] If

---

[36] The *Miranda* warnings were re-affirmed last year as a constitutionally based approach for determining the admissibility of statements made during a custodial interrogation that could not be overruled by statutory enactment. *Dickerson v. United States* 530 U.S. 428 (2000).

[37] *See e.g.*, *Buckley v. Valeo*, 424 U.S. at 14 ("Discussion of public issues and debate [is] integral to the operation of the system of government established by our Constitution.")

[38] The law is full of blanket rules, in addition to *Miranda*, that are adopted in order to protect rights or to provide for increased accuracy or efficiency, even if in a particular case the application of the rule does not seem to achieve its purpose. For example, statutes of limitations may prevent an action even when evidence is not stale; the exclusionary rule often prevents evidence from being used in trials though it is known to be probative; the parole evidence rule may make a contract unenforceable though the evidence is clear that such a deal was made, to name just a few.

[39] In 2000, DCCC Chairman, Patrick Kennedy (D-R.I.) sued the NRCC and Tom DeLay (R-Tx.) under the

our coordination regulations proceed without an adequate content standard, it will take the political elite about three minutes to deduce that nearly all allegations of coordination will be followed by an FEC investigation, to which the respondent can offer no affirmative defense that will quickly terminate the investigation. Given that groups frequently have contacts with officeholder/candidates, credible allegations of coordination will be easy to make. If the complaint is reasonably well-crafted,[40] the Commission will have no choice but to find "reason to believe" that a violation has occurred. This is low-hanging fruit for any party, candidate, person or group seeking to silence and harass opposing voices in an election cycle.

Whether express advocacy is present in any written or broadcast message, however, is a legal question susceptible of a quick preliminary determination by the Commission. It therefore acts as an affirmative defense the Commission can accept or reject in the initial stages of the MUR. Absent such a test, a respondent's preliminary denial of coordination, even when backed by signed affidavits, will never amount to anything more than a self-serving factual (not legal) representation. If in the future the Commission adopts an incorrect content standard, or effectively no content standard, there will be no affirmative defense that could save an advocate from a protracted investigation. The express advocacy bright line serves as that affirmative defense. If the Commission abandons that bright line, any group or individual which seeks to both engage in issue discussion and has even a passing contact with elected officials may be subject to allegations that will trigger the type of massive investigation, and corresponding costs, seen in this MUR. Thus it will be among the most aggressive moves the Commission has taken towards chilling debate in the United States.

The expensive, intrusive, lengthy investigation of MUR 4624, like the similar four-year investigation in MUR 4291, would have been readily avoided by the simple application of an express advocacy content standard. Adopting this standard is, in my view, required by both the statute and the Constitution. But even if not required, it is certainly a permissible standard under the statute, and offers many benefits. It provides clear notice to the community; it should result in fewer Advisory Opinion requests than the mere conduct standard; it will result in fewer expansive investigations which eat up Commission resources; it will reduce the role of litigation in campaigns; and most importantly, it avoids any concerns about constitutionality, and will not have the chilling effect on speech of an approach without a clear content standard.

Thus I would have ended this MUR on much simpler grounds, at a much earlier date, by finding that the Coalition's spending for issue advocacy, whether or not

---

RICO statute. *See* Juliet Eilperin, *House Democrats Sue DeLay; Action Accuses Whip of Extortion, Money Laundering in Fundraising,* THE WASHINGTON POST, May 4, 2000, at A06.

[40] Commission policy has been to treat complaints liberally. If the complainant swears an affidavit (as he is essentially required to do in swearing out a complaint, *see* 2 U.S.C. §437g(a)), the Commission will nearly always be required to launch into a full investigation to fairly decide whether the complainant or respondent has the better factual representation. "Rarely could the FEC dismiss a complaint ... because the FEC would need to know all the facts bearing on motive before making its ... determination." *Orloski* at 165.

otherwise coordinated, was as a matter of law not for the purpose of influencing an election and not subject to regulation under the FECA.


_____          __11/6/01__
Bradley A. Smith, Commissioner            Date