**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

**MEMORANDUM**

TO:     The Commissioners
        Staff Director
        Deputy Staff Director
        General Counsel

FROM:   Office of the Commission Secretary

DATE:   May 28, 2002

SUBJECT: Statement Of Reasons for <u>MUR 4538</u>

Attached is a copy of the Statement Of Reasons for MUR 4538

signed by Chairman David Mason and Commissioner Bradley Smith.

This was received in the Commission Secretary's Office on

<u>Friday, May 24, 2002 at 1:43 p.m.</u>

cc: Vincent J. Convery, Jr.
    OGC Docket (5)
    Information Division
    Press Office
    Public Disclosure

Attachment



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

## FEDERAL ELECTION COMMISSION

| | |
|---|---|
| *In re* Alabama Republican Party and Timothy R. Baer, as treasurer; Parker for Congress and Stan McDonald, as treasurer; William R. Archer, Jr.; Wayne Parker, Jr. | ) ) ) ) MUR 4538 ) ) ) |

### STATEMENT OF REASONS OF CHAIRMAN DAVID M. MASON, and COMMISSIONER BRADLEY A. SMITH

On September 19, 2001, the Commission voted 4-2[1] to take no further action with respect to the Alabama Republican Party and Timothy Baer, as treasurer, regarding violations of 2 U.S.C. §§ 441a(a)(2)(A), 441b(a) and 441a(f), and 11 CFR 102.5; and to take no further action regarding coordination allegations with respect to Parker for Congress and Stan McDonald, as treasurer. Because of the recent history of Commission action on matters of mass media communications allegedly coordinated between political parties and their candidates, we could not vote to proceed against the Respondents in this matter consistent with fundamental fairness. We write to explain the proceedings that led to this conclusion.

### History of Commission Action on Coordination of Political Parties with their Candidates

Relevant Commission action with respect to coordination of mass media advertising by political parties with their candidates had its genesis in the 1996 elections. Throughout the recent history of party coordination matters, Commissioners maintained differing but largely individually consistent positions with respect to the threshold for finding a communication to be a coordinated contribution. Former Commissioner Elliot and Commissioner Smith, who replaced her, refused to make coordination findings in the absence of express advocacy because of First Amendment overbreadth concerns. Commissioner Sandstrom refused to make coordination findings absent express advocacy

---

[1] Vice-Chairman Mason and Commissioners Sandstrom, Smith and Wold voted in favor of the motion. Commissioner Michael Toner succeeded Commissioner Wold before the issuance of this Statement of Reasons. Chairman McDonald and Commissioner Thomas voted against the motion.

because of due process (notice) concerns. Commissioner Thomas required communications to be "for the purpose of influencing" an election in order to be considered coordinated communications. Commissioners Mason and Wold focused on the degree or amount of coordination.

In the audits of the Clinton and Dole presidential campaign committees the Commission did not seek a repayment of presidential matching funds under 2 U.S.C. § 441a(b) even though the national party media ads at issue appeared to have been coordinated with their respective candidates. The Commission's decision was based on the notice and overbreadth concerns of Commissioners Sandstrom and Elliot, joined by Commissioners Mason and Wold in regard to the Commission's previous advisory opinion-derived, vague and overbroad "electioneering message" standard for determining whether a coordinated ad is truly a "contribution," i.e., for the "purpose of influencing" an election, 2 U.S.C. § 431(8)(A), (9)(A).[2] Statement of Reasons of Vice Chairman Darryl R. Wold and Commissioners Lee Ann Elliot, David M. Mason and Karl J. Sandstrom on the Audits of "Dole for President Committee, Inc. (Primary), *et al.*

Before a Statement of Reasons was issued in any subsequent party coordination matter, the court in *FEC v. Christian Coalition*, 52 F.Supp.2d 45 (D. D.C. 1999) narrowly construed the scope of regulable coordinated expenditures. In so doing it rejected as constitutionally "overbroad" a significant part of the Commission's regulatory definition of coordination: "any consultation between a potential spender and a federal candidate's campaign organization about the candidate's plan's, projects, or needs." *Id.* at 89 (referring to the prior version of 11 CFR 109.1(b)(4)). The court also gave short shrift to the Commission's argument that two similarly worded FECA provisions – 2 U.S.C. §§ 431(17)[3] and 441a(a)(7)(B)(i)[4] – support 11 CFR 109.1(b)(4), by referring to the "First Amendment, not the Act," as the proper dividing line separating prohibited and protected "issue-oriented" expenditures. *Id.* at 89-90. The court then defined the scope of regulable coordinated expenditures upon First Amendment grounds:

> I take from *Buckley* [v. *Valeo*, 424 U.S. 1 (1976)] and its progeny the directive to tread carefully, acknowledging that considerable coordination

---

[2] Then-Vice Chairman Wold, Commissioners Elliot, Mason also did not believe there was a basis for ordering repayment under the Presidential Primary Matching Payment Account, 26 U.S.C. § 9031 *et seq.* Memorandum from Commissioner Mason, *Dole and Clinton Audits – Repayment Determinations*, Agenda Document 98-92; Nov. 25, 1998; Supplemental Reply Memorandum from Commissioner Mason, *Dole and Clinton Audits: Why "Excess Expenditures" is not a Basis for Repayment Determinations*, Agenda Doc. 98-92A, Nov. 25, 1998.

[3] The Commission was relying upon a partial converse of the definition of "independent expenditure" in 2 U.S.C. § 431(17), which provides that such is an "expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate . . . and which is not made in concert with, or at the request or suggestion of, any candidate."

[4] 2 U.S.C. § 441a(a)(7)(B)(i) provides that, for purposes of the FECA's contribution limits, "expenditures made by any person in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, . . . shall be considered to be a contribution to such candidate."

will convert an expressive expenditure into a contribution but that the spender should not be deemed to forfeit First Amendment protections for her own speech merely by having engaged in some consultations or coordination with a federal candidate.

First Amendment clarity demands a definition of "coordination" that provides the clearest possible guidance to candidates and constituents, while balancing the Government's compelling interest in preventing corruption of the electoral process with fundamental First Amendment rights to engage in political speech and political association. . . .

In the absence of a request or suggestion from the campaign, an expressive expenditure becomes "coordinated" where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over, a communication's: (1) contents; (2) timing; (3) location, mode, or intended audience (e.g., choice between newspaper or radio advertisement); or (4) "volume" (e.g., number of copies of printed materials or frequency of media spots). Substantial discussion or negotiation is such that the candidate and spender emerge as partners or joint venturers in the expressive expenditure, but the candidate and spender need not be equal partners. This standard limits § 441b's contribution prohibition on expressive coordinated expenditures to those in which the candidate has taken a sufficient interest to demonstrate that the expenditure is perceived as valuable for meeting the campaign's needs or wants. [*Id.* at 91-92.][5]

The *Christian Coalition* standard became the basis upon which the Commission promulgated 11 CFR 100.23, which defines the conduct of what can be considered coordinated mass media communications between *non-parties* and candidates.[6] The

---

[5] By refusing to fall back on or even address the sufficiency of the statutory language standing alone, the court would appear to have tacitly held that these provisions standing alone suffered from some constitutional defect that only a narrowing construction, which it was to provide, would remedy.

[6] 11 CFR 100.23 provides:
Sec. 100.23 Coordinated General Public Political Communications.
   (a) Scope—(1) This section applies to expenditures for general public political communications paid for by persons other than candidates, authorized committees, and party committees.
   (2) Coordinated party expenditures made on behalf of a candidate pursuant to 2 U.S.C. 441a(d) are governed by 11 CFR 110.7.
   (b) Treatment of expenditures for general public political communications as expenditures and contributions. Any expenditure for general public political communication that includes a clearly identified candidate and is coordinated with that candidate, an opposing candidate or a party committee supporting or opposing that candidate is both an expenditure under 11 CFR 100.8(a) and an in-kind contribution under 11 CFR 100.7(a)(1)(iii).
   (c) Coordination with candidates and party committees. An expenditure for a general public political communication is considered to be coordinated with a candidate or party committee if the communication—
       (1) Is paid for by any person other than the candidate, the candidate's authorized committee, or a party committee, a

3

regulation explicitly excluded political parties from its coverage because of anticipated Supreme Court review of the constitutionality of the FECA's party coordinated expenditure limits, 2 U.S.C. § 441a(d). The Court upheld these limits in *FEC v. Colorado Republican Fed. Campaign Comm.*, 121 S.Ct. 2351 (2001).

Applying the *Christian Coalition* standard, the Commission in MUR 4378, on a 2-3 vote,[7] failed to support the General Counsel's recommendation to find probable cause to believe that the National Republican Senatorial Committee had made excessive in-kind contributions to Montanans for Rehberg through coordinated media ads. Then-Vice Chairman Wold and Commissioners Elliot and Mason could not find probable cause because the "General Counsel conclude[d] that 'there was no prior coordination with regard to specific content, timing and placement of the individual NRSC advertisements' and that the ads 'were apparently produced without the [candidate's] prior knowledge or approval as to content, timing and target audiences.'" Statement of Reasons of Vice Chairman Darryl R. Wold and Commissioners Lee Ann Elliot and David M. Mason at 3 (quoting GC's PC Br. at 30, 53). The General Counsel's recommendation was also based on the by-then rejected "electioneering message" standard.

---

       (2) Is created, produced or distributed—
          (i) At the request or suggestion of the candidate, the candidate's authorized committee, a party committee, or the agent of any of the foregoing;
          (ii) After the candidate or the candidate's agent, or a party committee or its agent, has exercised control or decision-making authority over the content, timing, location, mode, intended audience, volume of distribution, or frequency of placement of that communication; or
          (iii) After substantial discussion or negotiation between the creator, producer or distributor of the communication, or the person paying for the communication, and the candidate, the candidate's authorized committee, a party committee, or the agent of such candidate or committee, regarding the content, timing, location, mode, intended audience, volume of distribution or frequency of placement of that communication, the result of which is collaboration or agreement. Substantial discussion or negotiation may be evidenced by one or more meetings, conversations or conferences regarding the value or importance of the communication for a particular election.

(d) Exception. A candidate's or political party's response to an inquiry regarding the candidate's or party's position on legislative or public policy issues does not alone make the communication coordinated.

(e) Definitions. For purposes of this section:
       (1) General public political communications include those made through a broadcasting station (including a cable television operator), newspaper, magazine, outdoor advertising facility, mailing or any electronic medium, including the Internet or on a web site, with an intended audience of over one hundred people.
       (2) Clearly identified has the same meaning as set forth in 11 CFR 100.17.
       (3) Agent has the same meaning as set forth in 11 CFR 109.1(b)(5).

[7] Then-Chairman Thomas and Commissioner McDonald voted in favor of the General Counsel's recommendation. Vice Chairman Wold and Commissioners Elliot and Mason voted against the recommendation. Commissioner Sandstrom abstained.

When the allegations of coordination between the respective national parties and the Clinton and Dole presidential campaign committees were later addressed in the enforcement context, the Commission, on 3-3 votes,[8] failed to find reason to believe that the presidential committees had accepted excessive contributions in the form of media ads paid for by the respective national political parties and allegedly coordinated with those campaigns. MURs 4969 and 4713. Chairman Wold and Commissioner Mason, two of the three Commissioners who were willing to go forward, found reason to believe the parties had engaged in excessive coordination on the basis of the statutory language, 2 U.S.C. § 441a(a)(7)(B)(i), as narrowly construed in *Christian Coalition*. Commissioner Thomas appears to have applied a "purpose of influencing" test. Commissioners Elliot and Sandstrom refused to vote for findings based on the content concerns described above.

Commissioner McDonald refused to find reason to believe because of his perception that the law was unsettled and the "apparent inconsistent application of the law [a reference to MUR 4378 and the different treatment of the Dole and Clinton campaigns in the audit and enforcement tracks] governing whether ads are made 'for the purpose of influencing' an election and improperly coordinated." Statement of Reasons of Vice Chairman Danny L. McDonald at 5. While it may be true that the application of the previous version of 11 CFR 109.1(b)(4) would have yielded a different result in MUR 4378, what Chairman McDonald observes is not "inconsistency" but a focused inquiry under the *Christian Coalition* standard into the facts and the effect of prior communications between parties and their candidates concerning mass media advertisements.

In MUR 4503, the Commission, in a rare display of unity on party coordination matters, voted unanimously to find probable cause to believe that the South Dakota Democratic Party had made excessive contributions to Tim Johnson for South Dakota through certain coordinated media ads. At Commissioner Thomas's suggestion, however, the Commission had restricted its investigation to communications that contained express advocacy and took no action with respect to coordinated communications that did not contain express advocacy. Such a limit concerning the content of the communications apparently removed concerns raised by Commissioner Sandstrom (due process), Commissioner Smith (overbreadth) and Chairman McDonald (consistency).

The same day, however, in MUR 4476, the Commission failed, on a 3-3 vote,[9] to find probable cause to believe the Wyoming Democratic State Central Committee had

---

[8] Then-Chairman Wold and Commissioners Mason and Thomas voted to approve the General Counsel's recommendations.
  Vice-Chairman Mason and Commissioners Thomas and Wold voted in favor of the General Counsel's recommendation. Chairman McDonald and Commissioners Sandstrom and Smith voted against it.

coordinated media ads with the Karpan for Wyoming campaign. Even though there was no express advocacy, coordination was incontrovertibly present:

> [T]he Karpan Committee discussed the contents of the State Party's anti-Enzi [Karpan's opponent] ads and mailings with the State Party and with the State Party's consultants, suggesting subjects for the ads and suggesting changes to the wording of some ads and mailings; gave input regarding the placement of some of the media ads and into the number of media ads and target of mailings; and sought financing for the ads and mailings from [the] DSCC which transferred funds to the State party to help pay for the communications. The Karpan Committee sought to ensure the accuracy of the communications to prevent any harm to the Karpan campaign caused by any inaccuracies in the communications, and its role in consulting on the content of the communications appears to have helped ensure that the topics of the anti-Enzi communications echoed positions and actions that raised the most doubts with voters about Mike Enzi. [GC's Rep. #7 at 4.]

In MUR 4872, the Commission failed, in a 3-2 vote,[10] to find probable cause to believe that the Republican Party of Louisiana made excessive coordinated expenditures, which involved express advocacy. Commissioners Smith and Wold, who voted not to find probable cause in this matter based their decision, in part, on the legal basis for the General Counsel's theory, i.e., that use of selected quotations from an earlier coordinated communication in a subsequent but otherwise independent communication (after the party and candidate had parted ways), without more, transforms the independent expenditure into a coordinated contribution. Had the coordination been otherwise present, it appears that the Commission would have found probable cause because of the presence of express advocacy.

### Alabama Republican Party

As mentioned above, the Commission voted 4-2 to take no further action against the Alabama Republican Party regarding alleged violations of 2 U.S.C. §§ 441a(a)(2)(A), 441b(a) and 441a(f), and 11 CFR 102.5, and to take no further action regarding coordination allegations with respect to Parker for Congress. The initial vote on this matter was 4-2[11] to find probable cause. The ads at issue did not contain express advocacy, but substantial decision-making authority was exercised by a vendor common to both the party and the candidate over ad scripts, distribution and timing. After, having opposed coordinated findings on non-express advocacy communications in MURs 4476,

---

[10] Chairman McDonald, Vice-Chairman Mason and Commissioner Thomas voted in favor of the General Counsel's recommendation. Commissioners Smith and Wold voted against it while Commissioner Sandstrom was not present at the meeting.

[11] Chairman McDonald, Vice Chairman Mason and Commissioners Thomas and Wold initially voted in favor of the General Counsel's recommendation. Commissioners Sandstrom and Smith voted against it.

4713 and 4969, citing consistency concerns, Chairman McDonald was now willing to go forward against the Alabama Republican Party even though express advocacy was not present. In light of this apparent change of course, Vice Chairman Mason moved to reconsider the vote, which eventually resulted in the present outcome.

Whatever consistency concerns may have existed in February of 2000 when the Commission disposed of MURs 4713 and 4969 have only been heightened since that time. The extensive patterns of direct communications among the party, candidate and vendor regarding the ads at issue in MUR 4476 was no less compelling evidence of coordination than the indirect communication presumed by virtue of the functions exercised by a common vendor in the present matter. In addition, Commissioner Sandstrom has consistently raised notice concerns (citing Advisory Opinion 1995-25) as a bar to prosecution of parties for coordination of non-express advocacy communications. Commissioners Mason and Smith agree that those notice concerns are substantial and that they, too, have been exacerbated by the record of Commission action on party coordination matters over the past two years.

In only one instance -- MUR 4503, where the communications at issue contained express advocacy -- has the Commission found party communications to be coordinated contributions to a campaign. A majority of the Commission could not agree to make reason-to-believe or probable-cause findings regarding non-express advocacy communications in that matter and others preceding it where evidence for coordination was, in some matters, far more compelling. In light of this record, it would be fundamentally unfair to proceed against the Alabama Republican Party. In addition, for pending matters, the Commission's actions leave express advocacy as the de facto content standard for determining whether communications are for the purpose of influencing an election, even when coordination is present.

The Commission's uncertain policy guidance and the absence of a consistent enforcement policy have, separately or together, made it impossible for the Commission to cite political parties for coordinating non-express advocacy communications with candidates. Recognizing some of our concerns, Commissioner Thomas has suggested that a proper course would be to make findings against party committees that have coordinated non-express advocacy communications but not seek penalties. The problem with this approach is that, absent some agreement about the basis for such findings, it would not provide any more adequate guidance than now exists. Further, while some taint might attach to such findings (raising fairness concerns in our minds), it is arguable that no judicially-cognizable injury would result, frustrating the process of judicial review that normally is available to ensure that our standards and actions comply with constitutional and statutory requirements. *See* 2 U.S.C. § 437g(a)(8). If a consensus does exist regarding a specific standard for determining when party communications become contributions to candidates by virtue of coordination, the Commission should announce that standard through the regulatory process and apply it prospectively rather than making ad hoc retrospective judgments through our enforcement process.

7

Given the state of affairs in which the Commission presently finds itself, we cannot proceed against the Respondents in this matter, and we will not be making party coordination findings on further matters arising out of 1998 and 2000 elections absent express advocacy communications.

May 23, 2002

_____
David M. Mason
Chairman

_____
Bradley A. Smith
Commissioner