or constructing a State or local party office building. It is the intent of the authors that State law exclusively govern the receipt and expenditure of non-Federal donations by State or local parties to pay for the construction or purchase of State or local party office buildings. Thus, non-Federal donations received by a State or local party committee in accordance with State law could be used to purchase or construct a State or local party office building without any required match consisting of Federal contributions.

CLARIFYING TERMS IN THE BILL

Ms. COLLINS. Madam President, I would like to ask the sponsors a question concerning the term "refers to" in certain provisions of the bill. I have heard the argument made that the definitions of "Federal election activity" and "electioneering communication" are somehow vague because they are defined to include a communication that "refers to a clearly identified candidate for Federal office." Can the sponsors address that argument?

Mr. FEINGOLD. I would be happy to respond to my friend from Maine, and I appreciate her question. In the bill, the phrase "refers to" precedes the phrase "clearly identified" candidate. That latter phrase is precisely defined in the Federal Campaign Election Act to mean a communication that includes the name of a federal candidate for office, a photograph or drawing of the candidate, or some other words or images that identify the candidate by "unambiguous reference." A communication that "refers to a clearly identified candidate" is one that mentions, identifies, cites, or directs the public to the candidate's name, photograph, drawing, or otherwise makes an "unambiguous reference" to the candidate's identity.

SECTION 213

Mr. THOMPSON. Madam President, I would like to ask the sponsors to explain section 213 of the bill concerning independent and coordinated expenditures made by party committees. Can the sponsors also discuss how this provision is consistent with the Supreme Court's decision in the Colorado cases?

Mr. McCAIN. I would be happy to respond to the Senator's question. Section 213 of the bill allows the political parties to choose to make either coordinated expenditures or independent expenditures on behalf of each of their candidates, but not both. This choice is to be made after the party nominates its candidate, when the party makes its first post-nomination expenditure—either coordinated or independent—on behalf of the candidate.

This provision is entirely consistent with the Supreme Court's rulings in the two Colorado Republican cases. In the first of those cases, the Court held that a party had a constitutional right to make unlimited independent expenditures, using hard money funds, on behalf of its candidates. But of course, those party expenditures must be fully and completely independent of the candidate and his campaign. The second Colorado Republican case held that Congress may limit the size of coordinated expenditures made by parties on behalf of their candidates, in order to deter corruption and the appearance of corruption that could result from unlimited expenditures that are coordinated.

This provision fully recognizes the right of the parties to make unlimited independent expenditures. But it helps to ensure that the expenditure will be truly independent, as required by Colorado Republican I, by prohibiting a party from making coordinated expenditures for a candidate at the same time it is making independent expenditures for the same candidate. We believe that once a candidate has been nominated a party cannot coordinate with a candidate and be independent in the same election campaign. After the date of nomination, the party is free to choose to coordinate with a candidate, or to operate independently of that candidate. If it chooses the former, it is subject to the limits upheld in Colorado Republican II. If it chooses the latter, it is free to exercise its right upheld in Colorado Republican I to engage in unlimited hard money spending independent of the candidate.

Section 213 provides, for this purpose only, that all the political committees of a party at both the state and national levels are considered to be one committee for the purpose of making this choice. This will prevent one arm of the party from coordinating with a candidate while another arm of the same party purports to operate independently of such candidate. This provision is intended to ensure that a party committee which chooses to engage in unlimited spending for a candidate is in fact independent of the candidate.

Mr. FEINGOLD. I agree with the Senator from Arizona's answer to the question from the Senator from Tennessee.

SECTION 214

Mr. LIEBERMAN. Madam President, I would like to ask the sponsors a question concerning section 214 of the bill, which deals with coordination. Some concern has been expressed about this provision by outside groups that participate in the legislative process through lobbying and grassroots advertising and also participate in electioneering through their PACs, or currently, through sham issue ads. Can the sponsors explain what is intended by section 214, and answer the concerns expressed by some of these organizations?

Mr. FEINGOLD. I would be happy to address this question, and I thank the Senator from Connecticut for raising it. It is important that our intent in this provision be clear.

The concept of "coordination" has been part of Federal campaign finance law since Buckley versus Valeo. It is a common-sense concept recognizing that when outside groups coordinate their spending on behalf of a candidate with a candidate or a party, such spending is indistinguishable from a direct contribution to that candidate or party. Accordingly, such coordinated spending by outside groups is, and should be, treated as a contribution to the candidate or party that benefits from such spending. As such, it is subject to the source and amount limitations under federal law for contributions to federal candidates and their parties. An effective restriction on outside groups coordinating their campaign-related activities with federal candidates and their political parties is needed to prevent circumvention of the campaign finance laws.

The bill bans soft money contributions to the national political parties, which totaled $463 million during the 2000 election cycle. Specifically, under the bill, corporations and unions can no longer donate amounts from their treasuries to the national parties, and wealthy individuals can no longer write six-figure checks to the national parties. The legislation shuts down the soft money loophole in order to prevent the corruption and unseemly appearances that arise when national parties and Federal officeholders solicit unlimited donations from special interests and then spend those donations to support federal candidates.

Absent a meaningful standard for what constitutes coordination, the soft money ban in the bill would be seriously undermined. In the place of outside special interests donating six-figure checks to the national parties to be spent on Federal elections, these entities could simply work in tandem with the parties and Federal candidates to spend their own treasury funds—soft money—on federal electioneering activities. This would fly in the face of one of the main purposes of the bill to get national parties and Federal candidates out of the business of raising and spending soft money donations.

Unfortunately, based on a single district court decision, the Federal Election Commission's current regulation defining when general public political communications funded by outside groups are considered coordinated with candidates or parties fails to account for certain types of coordination that may well occur in real-world campaigns. The FEC regulation is premised on a very narrowly defined concept of "collaboration or agreement" between outside groups and candidates or parties.

This current FEC regulation fails to cover a range of de facto and informal coordination between outside groups and candidates or parties that, if permitted, could frustrate the purposes of the bill. For example, if an individual involved in key strategic decision-making for a candidate's political advertising resigned from the candidate's campaign committee, immediately thereafter joined an outside organization, and then used inside strategic information from the campaign to develop the organization's imminent soft

money-funded advertising in support of the candidate, a finding of coordination might very well be appropriate. The FEC regulation, however, would find coordination neither in this circumstance nor in various other situations where most reasonable people would recognize that the outside entities' activities were coordinated with candidates. This would leave a loophole that candidates and national parties could exploit to continue controlling and spending huge sums of soft money to influence federal elections.

The dangers of coordinated soft money spending were noted by Senator FRED THOMPSON during his Committee's review of 1996 election activity. The Minority Report of the Senate Committee on Governmental Affairs states:

The fact that coordination of soft money spending and fundraising has become commonplace and expected should be examined by Congress. By permitting such coordinated efforts to raise soft money and spend it on political activities that advance the interests of presidential campaigns, the federal election laws create a tremendous loophole to both contribution limits and spending limits. As the Chairman [Senator Thompson] has acknowledged:

Acceptance of this activity would allow any candidate and his campaign to direct and control the activities of a straw man . . . . For such activity, these straw men could use funds subject to no limit and derived from any source . . . . If the interpretation is that this is legal and this is proper, then we have no campaign finance system in this country anymore.

To remedy this problem, the bill requires the FEC to reexamine the coordination issue and promulgate new coordination rules. These rules need to make more sense in light of real life campaign practices than do the current regulations. The bill accordingly repeals this FEC regulation and requires that the Commission promulgate a replacement regulation. The bill does not change the basic statutory standard for coordination, which defines and sets parameters for the FEC's authority to develop rules describing the circumstances in which coordination is deemed to exist.

Section 214 directs the FEC to promulgate new regulations on coordinated communications and lists four specific subjects that the FEC must address in those new regulations. It does not dictate how the Commission is to resolve those four subjects.

On one issue, section 214 does direct the outcome of the Commission's deliberations on new regulations. The current FEC regulations say that a communication will be considered to be "coordinated" if it is created, produced or distributed "after substantial discussion" between the spender and the candidate about the communication, "the result of which is collaboration or agreement." This standard is now contained in 11 C.F.R. § 100.23(c)(2)(iii).

The FEC's narrowly defined standard of requiring collaboration or agreement sets too high a bar to the finding of "coordination." This standard would miss many cases of coordination that result from de facto understandings. Accordingly, section 214 states that the Commission's new regulations "shall not require agreement or formal collaboration to establish coordination." This, of course, does not mean that there should not be a finding of "coordination" in those cases where there is "agreement or formal collaboration." But it does mean that specific discussions between a candidate or party and an outside group about campaign-related activity can result in a finding of coordination, without an "agreement or formal collaboration."

Existing law provides that a campaign-related communication that is coordinated with a candidate or party is a contribution to the candidate or party, regardless of whether the communication contains "express advocacy." Accordingly, the bill provides that an "electioneering communication" that is coordinated with a candidate or party is considered a contribution to the candidate or party.

Mr. McCAIN. If the Senator from Wisconsin would yield, let me elaborate a bit on his discussion, with which I completely agree, and address the specific concern raised by some of these groups.

It is important for the Commission's new regulations to ensure that actual "coordination" is captured by the new regulations. Informal understandings and de facto arrangements can result in actual coordination as effectively as explicit agreement or formal collaboration. In drafting new regulations to implement the existing statutory standard for coordination—an expenditure made "in cooperation, consultation or concert, with, or at the request or suggestion of" a candidate—we expect the FEC to cover "coordination" whenever it occurs, not simply when there has been an agreement or formal collaboration.

On the other hand, nothing in the section 214 should or can be read to suggest, as some have said, that lobbying meetings between a group and a candidate concerning legislative issues could alone lead to a conclusion that ads that the group runs subsequently concerning the legislation that was the subject of the meeting are coordinated with the candidate. Obviously, if the group and the candidate discuss campaign related activity such as ads promoting the candidate or attacking his or her opponent, then coordination might legitimately be found, depending on the nature of the discussions. We do not intend for the FEC to promulgate rules, however, that would lead to a finding of coordination solely because the organization that runs such ads has previously had lobbying contacts with a candidate.

Section 214 represents a determination that the current FEC regulation is far too narrow to be effective in defining coordination in the real world of campaigns and elections and threatens to seriously undermine the soft money restrictions contained in the bill. The FEC is required to issue a new regulation, and everyone who has an interest in the outcome of that rulemaking will be able to participate in it, and appeal the FEC's decision to the courts if they believe that is necessary.

CONTRIBUTIONS BY MINORS

Ms. COLLINS. Madam President, I wanted to ask the sponsors about a provision that was not included in the Senate bill—the prohibition on contributions by minors. Can you explain the justification for this new provision?

Mr. McCAIN. The Senator is correct that section 318 was added in the House. It is an important provision, and the Senator from Wisconsin and I supported it being included in the bill.

Under the FEC's current regulations at 11 C.F.R. § 110.1(i)(2), children under the age of 18 may make contributions to political candidates and committees as long as the child knowingly and voluntary makes the decision to contribute. In addition, the child must make the contribution out of his or her own funds, which the child is in control of, such as the proceeds of a trust or money in a savings account in the child's own name.

Unfortunately, notwithstanding these regulations, we believe that wealthy individuals are easily circumventing contribution limits to both political candidates and parties by directing their children's contributions. Indeed, the FEC in 1998 notified Congress of its difficulties in enforcing the current provision. Its legislative recommendations to Congress that year cited "substantial evidence that minors are being used by their parents, or others, to circumvent the limits imposed on contributors."

Accordingly, Section 318 of the bill prohibits individuals 17 years old or younger from making contributions or donations to and a candidate or a committee of a political party.

We believe it is appropriate for Congress to prohibit minors from contributing to campaigns because we agree with the Commission that there is substantial evidence that individuals are evading contribution limits by directing their children to make contributions. According to a Los Angeles Times study, individuals who listed their occupation as student contributed $7.5 million to candidates and parties between 1991 and 1998. Upon further investigation, some of these contributions where made by infants and toddlers. In another instance, the paper found that two high school sisters contributed $40,000 to the Democratic Party in 1998. When asked about the contribution, the high school sophomore answered that it was a "family decision."

We believe that this and other examples justify the prohibition on minor contributions that is included in the bill as a way to prevent evasion of the contribution limits in the law. In our view, this provision simply restores the