## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHRISTOPHER SHAYS and )
MARTIN MEEHAN, )
            )
        Plaintiffs, )
            )   Civil Action No. 06-CV-1247 (CKK)
        v. )
            )   REPLY
FEDERAL ELECTION COMMISSION, )
            )
        Defendant. )

_____

### DEFENDANT FEDERAL ELECTION COMMISSION'S REPLY
### MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
_____

Thomasenia P. Duncan
Acting General Counsel

Richard B. Bader
Associate General Counsel

David Kolker
Assistant General Counsel

Vivien Clair
Attorney

Greg J. Mueller
Attorney

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

March 16, 2007

# TABLE OF CONTENTS

Page

I. THE COORDINATED COMMUNICATION REGULATIONS
ARE LAWFUL ........................................................................................ 2

A. The New Content Regulation Is Broader Than the Only
Congressional Requirement, That "Coordinated Communication"
Include Coordinated Express Advocacy and Coordinated
Electioneering Communications ............................................................ 3

1. Congress Did Not Require the Commission to Regulate
More Speech as Coordinated Communications Than
in the Pre-BCRA Regime ......................................................... 3

2. The Coordination Regulation Follows BCRA's Structural
Changes in Defining and Regulating Political Advertising ........ 8

3. Overall, the Revised Coordination Regulation Covers More
Content Than the Commission's Pre-BCRA Approach and
Provides a More Objective Test ................................................ 12

4. Plaintiffs Rely Upon Irrelevant Examples by Overlooking How
the Coordination Regulations Work in Tandem With Other
Provisions of the Act ................................................................ 17

5. The Commission's Line Drawing Was Reasonable ................. 19

B. The Commission's Data Analysis Was Sound ...................................... 23

C. The "Common Vendor" and "Former Employee" Conduct
Standards Are Reasonable .................................................................... 29

D. The Firewall Conduct Regulation Reasonably Accommodates the
Rights of Political Committees While Safeguarding Against
Unlawful Coordination ......................................................................... 32

II. THE REGULATORY DEFINITIONS OF "VOTER REGISTRATION
ACTIVITY" AND "GET-OUT-THE-VOTE ACTIVITY" SATISFY
CHEVRON AND APA REVIEW AND SERVE THE FECA'S
PURPOSES .............................................................................................. 34

III. THE REVISED EXPLANATION AND JUSTIFICATION FOR
11 C.F.R. 300.64 SATISFIES THE APA'S REASONED ANALYSIS
REQUIREMENT ....................................................................................... 40

CONCLUSION ..................................................................................................... 44

# TABLE OF AUTHORITIES

Page

**CASES**

Air Line Pilots Ass'n, Int'l v. Dep't of Transportation, 791 F.2d 172 (D.C. Cir. 1986) ............................................................................................................12

American Coke and Coal Chemicals Institute v. EPA, 452 F.3d 930 (D.C. Cir. 2006) ................................................................................. 23

American Public Communications Council v. FCC, 215 F.3d 51 (D.C. Cir. 2000) ........................................................................... 23, 27

AT&T Corp. v. FCC, 349 F.3d 692 (D.C. Cir. 2003)....................................44

Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438 (2002) ...............................6

Barnhart v. Thomas, 540 U.S. 20 (2003) ................................................21, 22

Board of Governors v. Dimension Fin. Corp., 474 U.S. 361 (1986)...............7

Bolden v. Blue Cross & Blue Shield Ass'n, Inc., 848 F.2d 201 (D.C. Cir. 1988) .........4

Branch v. FCC, 824 F.2d 37 (D.C. Cir. 1987)...............................................20

Buckley v. Valeo, 424 U.S. 1 (1976).....................................................passim

Chapin v. Knight-Ridder, Inc., 993 F.2d 1087 (4th Cir. 1993) .......................2

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)........................................................................passim

Colorado Republican Federal Camp. Comm. v. FEC, 518 U.S. 604 (1996)....18, 33, 42

Columbia Falls Aluminum Co. v. EPA, 139 F.3d 914 (D.C. Cir. 1998).....................27

Common Cause v. FEC, 842 F.2d 436 (D.C. Cir. 1988)................................20

Conley v. U.S. Bank National Ass'n., 2006 WL 3690209 *4 (6th Cir. 2006) .............27

Connecticut v. Teal, 457 U.S. 440 (1982) .....................................................27

Core Communications, Inc. v. Level 3 Communications, 455 F.3d 267 (D.C. Cir. 2006) ...................................................................4

Covad Commc'ns Co. v. FCC, 450 F.3d 528 (D.C. Cir. 2006)....................................45

Dombrowski v. Pfister, 380 U.S. 479 (1965) ................................................15

Ethyl Corporation v. EPA, 541 F.2d 1 (D.C. Cir. 1976) ...............................23

FEC v. Christian Coalition, 52 F.Supp.2d 45 (D.D.C. 1999) ..........................78, 16, 17

FEC v. Colorado Republican Federal Camp. Comm.,
    59 F.3d 1015 (10th Cir. 1995) ................................................13

FEC v. Colorado Republican Federal Campaign Comm., 533 U.S. 431 (2001)....13, 42

Fresno Mobile Radio, Ind. v. FCC, 165 F.3d 965 (D.C. Cir. 1999) ...........................19

Friedrich v. City of Chicago, 888 F.2d 511 (7th Cir. 1989) ...........................6

Gray Panther Advisory Committee v. Sullivan, 936 F.2d 1284 (D.C. Cir. 1991)..........5

Hill v. Colorado, 530 U.S. 703 (2000)........................................................15

Hutchins v. District of Columbia, 188 F.3d 531 (D.C. Cir. 1999) (en banc) ...............19

Industrial Union Dep't., AFL-CIO v. Hodgson, 499 F.2d 467  (D.C. Cir. 1975) ........23

International Union v. Donovan, 746 F.2d 855 (D.C. Cir. 1984)...................................4

Lamie v. United States Trustee, 540 U.S. 526 (2004) ..................................42

Maine Right to Life Comm., Inc. v. FEC, 98 F.3d 1 (1st Cir. 1996).............................11

McConnell v. FEC, 251 F.Supp.2d 176 (D.D.C. 2003)...........................................24, 25

McConnell v. FEC, 540 U.S. 93 (2003) ................................................................passim

Milk Indus. Found. v. Glickman, 132 F.3d 1467 (D.C. Cir. 1998) .............................19

National Home Equity v. OTS, 373 F.3d 1355 (D.C. Cir. 2004) .................................31

Oceana Inc. v. Evans, 384 F.Supp.2d 203 (D.D.C. 2003) .............................................27

O'Connell v. Shalala, 79 F.3d 170 (1st Cir. 1996) ..........................................................2

Orloski v. FEC, 795 F.2d 156 (D.C. Cir. 1986)........................................................15, 21

Overnight Transpt. v. NLRB, 140 F.3d 259 (D.C. Cir. 1998).......................................24

Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development
    Comm'n, 461 U.S. 190, 220 (1983) ........................................................6

Perot v. FEC, 97 F.3d 553, 559-60 (D.C. Cir. 1996) )....................................................34

Piney Mtn. Coal Co. v. Mays, 176 F.3d 753 (4th Cir. 1999).........................................31

Public Citizen v. FAA, 988 F.2d 186 (D.C. Cir. 1993) .................................................44

Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,
    485 U.S. 495 (1988)........................................................................................4

Randall v. Sorrell, 126 S.Ct. 2479 (2006).....................................................................28

Rust v. Sullivan, 500 U.S. 173 (1991) ..........................................................................31

Sabre, Inc. v. Department of Transportation, 429 F.3d 1113 (D.C. Cir. 2005)...........42

Segar v. Smith, 738 F.2d 1249 (D.C. Cir. 1984) .........................................................26

Senior Resources v. Jackson, 412 F.3d 112 (D.C. Cir. 2005) .....................................42

Shays v. FEC, 337 F.Supp.2d 28 (D.D.C. 2004) ...............................................35, 30, 40

Simpson v. Young, 854 F.2d 1429 (D.C. Cir. 1988) ....................................................44

Smiley v. Citibank (South Dakota), 517 U.S. 735 (1996) ............................................31

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998)...........................28

Sullivan v. Everhart, 494 U.S. 83 (1989).....................................................................34

Teamsters v. United States, 431 U.S. 324 (1977).........................................................27

United States Air Tour Ass'n v. FAA, 298 F.3d 997 (D.C. Cir. 2002) ........................31

United States v. Sun-Diamond Growers of Calif., 526 U.S. 398 (1999)..................2, 22

Virginia Society for Human Life, Inc. v. FEC, 263 F.3d 379 (4th Cir. 2001) ..............11

## STATUTES AND REGULATIONS

Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155,
    116 Stat. 81 (2002).............................................................................passim

Federal Election Campaign Act, of 1971, as amended, 2 U.S.C. 431-55.............passim

2 U.S.C. 431(9)(A)(i)...................................................................................................16

2 U.S.C. 431(8) .............................................................................................................5

2 U.S.C. 431(20)(A)(i)............................................................................................32, 38

2 U.S.C. 431(20)(A)(ii) ...................................................................................38

2 U.S.C. 431(20)(A)(iii) ..................................................................................38

2 U.S.C. 431(22) .............................................................................................38

2 U.S.C. 434(f)(3)(A)(ii) .................................................................................10

2 U.S.C. 434(f)(3)(C) ........................................................................................9

2 U.S.C. 437f ...................................................................................................34

2 U.S.C. 437f(c)(B) .........................................................................................39

2 U.S.C. 437g(a)(8) ..........................................................................................34

2 U.S.C. 441a(a)(7)(C) .......................................................................................4

2 U.S.C. 441b(b)(2) ......................................................................................8, 30

2 U.S.C. 441b(c)(1) ..........................................................................................30

2 U.S.C. 441a(d) ........................................................................................18, 33

2 U.S.C. 441i(b)(2) ..........................................................................................35

2 U.S.C. 441i(e) ...............................................................................................44

2 U.S.C. 441i(e)(1) ...........................................................................40, 43, 44

2 U.S.C. 441i(e)(3) ...........................................................................40, 41, 43

39 U.S.C. 3210(a)(6)(A) ..................................................................................10

BCRA § 201(a) .................................................................................................10

BCRA § 202 .......................................................................................................8

BCRA § 214 .....................................................................................................30

BCRA § 214(c) .......................................................................................3, 9, 31

BCRA § 214(c)(A) ..............................................................................................9

BCRA Title I .......................................................................................................1

BCRA Title II .....................................................................................................2

11 C.F.R. 100.22 ........................................................................................10, 11

11 C.F.R. 100.22(a)................................................................................11

11 C.F.R. 100.24(a)(2)............................................................................34

11 C.F.R. 100.24(a)(3)............................................................................34

11 C.F.R. 100.24(b)(3)............................................................................38

11 C.F.R. 106.4(g)..................................................................................32

11 C.F.R. 106.7(c)..................................................................................37

11 C.F.R. 106.7(b)..................................................................................37

11 C.F.R. 106.7(c)(5)..............................................................................37

11 C.F.R. 106.7(d)..................................................................................37

11 C.F.R. 106.7(d)(3)(i-iv)......................................................................37

11 C.F.R. 109.20....................................................................................17

11 C.F.R. 109.21..............................................................................17, 31

11 C.F.R. 109.21(c)(2)..............................................................................9

11 C.F.R. 109.21(d)(4)............................................................................29

11 C.F.R. 109.21(d)(5)............................................................................29

11 C.F.R. 109.21(h)................................................................................32

11 C.F.R. 114.4(c)(5)..............................................................................17

11 C.F.R. 300.2(i)..................................................................................37

11 C.F.R. 300.33(b)................................................................................37

11 C.F.R. 300.33(c)(1)............................................................................39

11 C.F.R. 300.64........................................................................40, 41, 44

11 C.F.R. 300.64(b)................................................................................40

## LEGISLATIVE HISTORY

Bipartisan Campaign Finance Reform Act of 2001, H.R. 380,
    107th Cong. § 206(a)(1)...........................................................5

Bipartisan Campaign Reform Act of 2002 (Engrossed as Agreed to or
    Passedby House),  H.R. 2356, 107th Cong. § 214 ....................................................6

Bipartisan Campaign Reform Act of 2001, S.27, 107th Cong. § 214(a)(1) ...................5

Bipartisan Campaign Reform Act of 2001 (Engrossed as Agreed to or
    Passed by Senate), S.27, 107th Cong. § 214(a)(1)(C) ...........................................5, 6

147 Cong. Rec. S3184-3185 (Mar. 30, 2001)...................................................................4

148 Cong. Rec. S1530 (March 5, 2002) ..........................................................................4

148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) ........................................................6, 7

S. Rep No. 93-461, 1973 WL 12675 (1973)...................................................................10

**MISCELLANEOUS**

Advisory Opinion 1984-15 [Transfer Binder] Fed. Election Camp.
    Guide (CCH)  ¶ 5766 (May 31, 1984) ...................................................................13

Advisory Opinion 1985-14, [Transfer Binder] Fed. Election Camp. 13
    Guide (CCH) ¶  5819 (May 24, 1985) ...................................................................13

Advisory Opinion 1990-5, [Transfer Binder] Fed. Election Camp.
    Guide (CCH) ¶  5982 (April 27, 1990))..................................................................13

Advisory Opinion 2006-19, 2 Fed. Election Camp. Fin.
    Guide (CCH) ¶ 6505 (June 5, 2006) ................................................................37, 39

67 Fed. Reg. 49,064 (July 29, 2002) ...........................................................................39

Rules of the House of Representatives, Rule XXIV(8) ................................................10

Standing Rules of the Senate, Rule XL(1)...................................................................10

Statement of Reasons of Commissioner MacDonald in MUR 4553 et al. .................14

Statement of Reasons of Commissioners Mason and Smith in MUR 4538 ................14

Statement of Reasons of Commissioners Wold, Elliott, Mason, and Sandstrom
    in Audits of Dole and Clinton Campaign Committees ...........................................14

Supplemental Explanation & Justification Regarding Political Committee Status,
    72 Fed. Reg. 5595 (Feb. 7, 2007) ........................................................................10

## GLOSSARY

| | | |
|---|---|---|
| A.R. | = | Administrative Record |
| AO | = | Advisory Opinion |
| APA | = | Administrative Procedure Act |
| BCRA | = | Bipartisan Campaign Reform Act of 2002 |
| CCP | = | Center for Competitive Politics |
| CMAG | = | TNS Media Intelligence/CMAG |
| DNC | = | Democratic National Committee |
| E&J | = | Explanation and Justification |
| EXH. | = | Defendant FEC's exhibits submitted 3/16/07 in support of motion for summary judgment |
| FEC | = | Federal Election Commission |
| FECA | = | Federal Election Campaign Act of 1971, as amended, 2 U.S.C. 431-455 |
| GOTV | = | Get out the vote |
| PASO | = | Promote, attack, support, or oppose |
| PX | = | Plaintiffs' Exhibit |
| RNC | = | Republican National Committee |
| Shays I | = | Shays v. FEC, 337 F.Supp.2d 28 (D.D.C. 2004) |
| SOR | = | Statement of Reasons |
| SPX | = | Supplemental Plaintiffs' Exhibit |
| SSA | = | Social Security Administration |

Plaintiffs' memorandum in opposition to the Commission's summary judgment brief suffers from two repeated, fatal flaws. First, in argument after argument, plaintiffs ask the Court to focus on disaggregated bits of evidence and single aspects of the complex, interrelated legal structure that governs the activity about which plaintiffs profess concern. The individual provisions of the Federal Election Campaign Act, 2 U.S.C. 431-55 ("FECA" or "Act"), and the implementing regulations promulgated by the Federal Election Commission ("Commission" or "FEC"), do not function in a vacuum; each one is not expected to carry out the goals of the Act by itself, but to work in tandem with the others. When the regulations at issue in this case are properly understood in the relevant factual and legal context, it is clear that plaintiffs' speculative fears are unfounded. The lines drawn by the Commission are reasonable and should be upheld.

Second, plaintiffs repeatedly argue or assume that when Congress enacted the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81 (2002), it directed the Commission to regulate more speech or promulgate stricter regulations than Congress actually required. In fact, Congress gave the Commission wide discretion to resolve the questions addressed by the regulations at issue, and the Commission properly based its decisions on the available evidence, an accommodation of the competing policy interests the Commission is entrusted to implement, and its regulatory experience and expert judgment. In particular, when Congress directed the Commission to promulgate new rules about coordinated communications, it explicitly granted the Commission unusually broad discretion. The statute Congress finally enacted does not require the Commission to include within the definition of "coordinated communications" anything beyond coordinated electioneering communications and coordinated express advocacy. Nevertheless, as explained below, the Commission's revised content regulation is far broader than that.

The Supreme Court has consistently examined the kinds of provisions at issue here in

their full legal context.  For example, in <u>Buckley v. Valeo</u>, 424 U.S. 1, 27-28 (1976), the Court placed the Act itself in a broader context and explained that the Act's contribution and expenditure limits, as well as its disclosure provisions, complement other federal regulation such as anti-bribery statutes.  More recently, in <u>McConnell v. FEC</u>, 540 U.S. 93, 133 (2003), the Court explained how the majority of the provisions in Title I of BCRA "largely reinforce" the "cornerstone" of Title I:  the prohibition on "national party committees … from soliciting, receiving, directing, or spending any soft money" (citing 2 U.S.C. 441i(a)).  In turn, Title II of BCRA complements Title I.  <u>See</u> <u>McConnell</u>, 540 U.S. at 124-25, 127-28 & n.20.

As explained in more detail below, plaintiffs' misguided focus on how individual provisions of this statutory and regulatory system would operate in isolation leads them to ignore how the Act's integrated whole addresses the kind of exaggerated abuses that plaintiffs predict. "A magnifying glass is no aid to appreciating a Seurat, and the pattern of a complex structure is often discernable only at some distance."  <u>Chapin v. Knight-Ridder, Inc.</u>, 993 F.2d 1087, 1098 (4th Cir. 1993).  <u>See</u> <u>also</u> <u>O'Connell v. Shalala</u>, 79 F.3d 170, 176 (1st Cir. 1996) ("While one can focus with Cyclopean intensity [on one provision,]… statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose").  When each regulation at issue here is viewed in the proper context, it becomes clear why "a narrow, rather than a sweeping, prohibition is more compatible with the fact that [each provision at issue] is merely one strand of an intricate web of regulations, both administrative and criminal."  <u>United States v. Sun-Diamond Growers of Calif.</u>, 526 U.S. 398, 409 (1999).

## I.    THE COORDINATED COMMUNICATION REGULATIONS ARE LAWFUL

The revised content standard in the Commission's regulations goes far beyond the minimum requirements that Congress enacted in BCRA.  Although nothing in BCRA or its legislative history requires the content standard to reach beyond coordinated express advocacy

and electioneering communications, the revised standard also includes republication of campaign materials whenever they are disseminated and any communication that refers to a clearly identified candidate or political party and is publicly distributed in the relevant jurisdiction 90 days before a House or Senate election or 120 days before a presidential primary (and continuing until the general election).  The Commission thus enlarged the content standard when it exercised the very broad discretion that Congress explicitly delegated to the agency.

We first explain below that plaintiffs err by presuming that Congress directed the Commission to define the content of coordinated communications more broadly than the minimum statutory requirements or than the Commission's prior regulation.  Second, we show how the new content standard nevertheless expands upon Congress's electioneering communication content requirement and is broader than the pre-BCRA regime.  Third, we show that plaintiffs' narrow focus on the early periods outside the regulation's 90/120-day windows causes them to overlook the true breadth of this regulation.  Fourth, we demonstrate that, by ignoring both the broader context within which the coordinated communication regulations operate and the internal workings of the regulations themselves, plaintiffs make unsupported predictions of future circumvention of the Act.  Finally, we explain why the Commission's data analysis was sound and why the lines it drew are reasonable.

### A. The New Content Regulation Is Broader Than the Only Congressional Requirement, That "Coordinated Communication" Include Coordinated Express Advocacy and Coordinated Electioneering Communications

#### 1. Congress Did Not Require the Commission to Regulate More Speech as Coordinated Communications Than in the Pre-BCRA Regime

Plaintiffs' arguments are based on the erroneous premise that BCRA requires the Commission's coordination regulation to cover more content overall than it did before BCRA became law.  Although Congress required the Commission to "address" four topics as part of a new regulation governing coordinated communications, BCRA § 214(c), it did "not dictate what

3

the FEC should decide." 148 Cong. Rec. S1530 (March 5, 2002) (statement of Senator McCain). The only content <u>requirement</u> that Congress added regarding coordinated communications was that a disbursement made for a coordinated electioneering communication must be treated as contribution. BCRA § 202; 2 U.S.C. 441a(a)(7)(C). As previously explained (FEC Br. 32-34), Congress expressly delegated broad authority for the Commission to determine what constitutes a coordinated expenditure.[1] The Commission's interpretation is entitled to deference under <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984), and its progeny, and its predictive judgments about the behavior of those it regulates are entitled to "particularly deferential" review, <u>Core Communications, Inc. v. Level 3 Communications</u>, 455 F.3d 267, 282 (D.C. Cir. 2006). <u>See</u> <u>also</u> FEC Br. 12-14, 40-42. The ultimate question — to which the answer is "yes" — is whether the Commission's coordination regulation is within the "permissible range of interpretations" of its delegated authority. <u>Bolden v. Blue Cross & Blue Shield Ass'n, Inc.</u>, 848 F.2d 201, 205 (D.C. Cir. 1988).

Plaintiffs have not pointed to a single word or phrase in BCRA's actual language specifying that coordinated expenditures must include communications beyond those involving coordinated express advocacy or electioneering communications.[2] Indeed, the very fact that Congress believed it necessary to specify that coordinated electioneering communications be treated as contributions indicates that, in the absence of that provision, the statute would not have

---

[1]     "There is one thing I want to make very clear and reiterate: While this amendment instructs the FEC to consider certain issues in the new rule-making, it doesn't require the FEC to come out any certain way or come to any definite conclusion one way or another." 147 Cong. Rec. S3184-3185 (Mar. 30, 2001) (statement of Sen. Feingold).

[2]     <u>See</u> <u>Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.</u>, 485 U.S. 495, 501 (1988) ("unenacted approvals, beliefs, and desires are not laws"); <u>International Union v. Donovan</u>, 746 F.2d 855, 860-61 (D.C. Cir. 1984) ("issue here is not how Congress expected or intended the Secretary to behave, but how it <u>required</u> him to behave, through … the enactment of legislation").

required the Commission to treat them as such.  Nor have plaintiffs pointed to any statutory language or applicable legislative history that requires the new regulation overall to expand the amount of speech falling within the definition of "coordinated communication."  Cf. Gray Panther Advisory Comm. v. Sullivan, 936 F.2d 1284, 1287-88 (D.C. Cir. 1991) (reviewing rulemaking under statute requiring new regulation to be "at least as strict" as old one).

Moreover, BCRA's language and legislative history contradict plaintiffs' suggestion (Reply 6) that Congress rejected any reliance on express advocacy in the context of coordinated expenditures.  When BCRA was first introduced in the House and the Senate, both bills contained language providing that express advocacy should not be a limiting criterion in determining whether a coordinated communication would be treated as a contribution.  The original Senate bill introduced on January 22, 2001, would have added the following definition of "coordinated activity" to the definition of "contribution" in 2 U.S.C. 431(8):

> "Coordinated activity" means anything of value provided by a person in connection with a Federal candidate's election who is or previously has been within the same election cycle acting in coordination with that candidate, … (regardless of whether the value being provided is in the form of a communication that expressly advocates a vote for or against a candidate)….

Bipartisan Campaign Reform Act of 2001 (Introduced in Senate, Jan. 22, 2001), S.27, 107th Cong. § 214(a)(1) (emphasis added) (Exh. 1 at 1).  The original House bill would have added virtually identical language.  Bipartisan Campaign Finance Reform Act of 2001 (Introduced in House, Jan. 31, 2001), H.R. 380, 107th Cong. § 206(a)(1) (Exh. 2 at 1).[3]

The version of the bill passed by the Senate in 2001 contained a similar provision adding coordinated expenditures as a type of disbursement that must be treated as contributions:

---

[3]    As the bills progressed, they included similar language about express advocacy.  See Bipartisan Campaign Reform Act of 2001 (Referred to House Committee after being Received from Senate, May 22, 2001), S.27, 107th Cong. § 214(a)(1)(C) (Exh. 3 at 1); Bipartisan Campaign Reform Act of 2001 (Reported in House, July 10, 2001), H.R. 2356, 107th Cong. § 214(a)(1)(C) (Exh. 4 at 1).

> any coordinated expenditure or other disbursement made by any person in connection with a candidate's election, <u>regardless of whether the expenditure or disbursement is for a communication that contains express advocacy</u>…

Bipartisan Campaign Reform Act of 2001 (Engrossed as Agreed to or Passed by Senate, April 22, 2001), S.27, 107th Cong. § 214(a)(1)(C) (emphasis added) (Center for Competitive Politics ("CCP") Amicus Exh. E at 1).

In the final stages of the legislative process, however, Congress deleted the requirement that express advocacy <u>not</u> be a touchstone for whether a coordinated communication is a contribution, and the final language enacted as Section 214 of BCRA was approved without any such restriction. Bipartisan Campaign Reform Act of 2002 (Engrossed as Agreed to or Passed by House, Feb. 14, 2002), H.R. 2356, 107th Cong. § 214 (Exh. 5 at 1-2); Bipartisan Campaign Reform Act of 2002 (Placed on Calendar in Senate, Feb. 27, 2002), H.R. 2356, 107th Cong. § 214 (Exh. 6 at 1-2). Thus, regardless of Senator Feingold's personal understanding about express advocacy under "[e]xisting law" (Pls. Reply 8-9) at the time BCRA was enacted, 148 Cong. Rec. S2145 (daily ed. Mar. 20, 2002) (PX 8), the actual legislative history and language of BCRA evidence a considered congressional choice <u>not</u> to require the Commission to define the <u>content</u> of coordinated communications more broadly than coordinated express advocacy and electioneering communications. See <u>Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm'n</u>, 461 U.S. 190, 220 (1983) ("it would, in this case, appear improper for us to give a reading to the Act that Congress considered and rejected"). This provision was one of many that emerged in final form through congressional compromise, and the "[C]ourt's duty [is] to give effect to the compromise, not to give proponents a victory that had eluded them in the legislative arena." <u>Friedrich v. City of Chicago</u>, 888 F.2d 511, 518 (7th Cir. 1989). See <u>also</u> <u>Barnhart v. Sigmon Coal Co., Inc.</u>, 534 U.S. 438, 441 (2002) ("The deals brokered … during a Committee meeting, on the floor of the two Houses, during a joint

House and Senate Conference, or in negotiations with the President are not to be second-guessed

by this Court"). As the Supreme Court explained in <u>Chevron</u>, 467 U.S. at 865:

> Perhaps [Congress] consciously desired the [agency] to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question, and those on each side decided to take their chances with the scheme devised by the agency. For judicial purposes, it matters not which of these things occurred.

<u>See</u> <u>also</u> <u>Board of Governors v. Dimension Fin. Corp.</u>, 474 U.S. 361, 374 (1986) ("Congress may

be unanimous in its intent to stamp out some vague social or economic evil; however, because its

Members may differ sharply on the means for effectuating that intent, the final language of the

legislation may reflect hard-fought compromises").

Finally, plaintiffs and their amici emphasize (<u>see</u> Amicus Brief of Senators McCain and

Feingold ("McCain Br.") at 7) Senator McCain's floor statement that "we expect the FEC to

cover 'coordination' whenever it occurs, not simply when there has been an agreement or formal

collaboration." 148 Cong. Rec. at S2145 (McCain Exh. 9). But this remark, especially when

read in the context of his full floor statement, was about the collaborative <u>conduct</u> necessary to

rise to the level of "coordination." In the sentence immediately preceding the one just quoted,

Senator McCain talked about behavior, not content: "Informal understandings and de facto

arrangements can result in actual coordination as effectively as explicit agreement or formal

collaboration." <u>Id.</u> And when Senator Feingold spoke just before Senator McCain, his remarks

focused on the Commission's then-current regulation, based in part on the decision in <u>FEC v.</u>

<u>Christian Coalition</u>, 52 F.Supp.2d 45 (D.D.C. 1999), that concentrated on the extent and degree

of contact and negotiation necessary to constitute "coordination." 148 Cong. Rec. at S2144-45.

In explaining why the bill would repeal that regulation, Senator Feingold stated his view that the

"FEC's narrowly defined standard of requiring collaboration or agreement sets too high a bar to

the finding of 'coordination.'  This standard would miss many cases of coordination that result from de facto understandings."  None of these remarks about collaborative conduct is relevant to the <u>content</u> prong of the regulation, the provision at issue here.[4]

### 2.    The Coordination Regulation Follows BCRA's Structural Changes in Defining and Regulating Political Advertising

Plaintiffs fail to acknowledge the importance of the paradigm shift that Congress created in the rules governing the financing of political advertising.  In the regulation of both independent and coordinated political advertising, Congress steered away from the "shoals of vagueness," <u>Buckley</u>, 424 U.S. at 78, that had originally led to the express advocacy standard and adopted a more objective, administrable framework.  When Congress enacted BCRA, it supplemented the ban on using corporate and union general treasury funds to make independent expenditures (which must include express advocacy) with a ban on using such funds for objectively-defined electioneering communications.  2 U.S.C. 441b(b)(2).  And as explained above, Congress added a parallel provision specifying that coordinated electioneering communications must be treated as contributions.  BCRA § 202.  Thus, for both independent and coordinated expenditures, Congress explicitly supplemented the existing restrictions to capture an additional class of communications that was defined by the same specific, objective criteria.

Plaintiffs' repeated and isolated focus on the time <u>outside</u> the "period of heightened pre-election regulation" (Reply 3) ignores the fact that the Commission's regulation is modeled upon, but goes far beyond, the minimum content requirement for coordinated communications that Congress added in BCRA.  When Congress required coordinated electioneering

---

[4]    Similarly, plaintiffs rely (Reply 13) upon the <u>Christian Coalition</u> decision's references to "fact-intensive" inquiries, 52 F.Supp.2d at 88-89, but those references were clearly directed to the kind of inquiry necessary to determine whether there has been sufficient collaboration to constitute "coordination," not to anything about the content of a communication, which is apparent from its text.

communications to be treated as contributions, it drew a content-based bright line. That line explicitly requires a broader definition of coordinated expenditures during specific, limited pre-election time periods: 30 days before a primary and 60 days before a general election. If Congress had wanted to <u>require</u> the Commission to treat as coordinated expenditures similar communications that occurred at any time in the election cycle, it could have chosen different time periods or specified that the electioneering communication content standard would apply without regard to the time limits in the definition of that term.[5]

The Commission greatly <u>expanded</u> Congress's electioneering communication content requirement, but adhered to the use of objective criteria, just as Congress did, including one based on timing. In addition to extending coverage to much longer time periods (90/120 days), the regulation's content prong is satisfied with a reference to a political party (not just a federal candidate); it applies to any type of public communication (not just radio and television); and it does not require the "targeted" audience to be 50,000 or more people (<u>compare</u> 2 U.S.C. 434(f)(3)(C)). Thus, this part of the regulation goes far beyond the core concern and mandate of Congress, which was to treat as contributions coordinated broadcast communications that occurred within 60 days of a general election. It is also supported by the Supreme Court's finding that "almost all" broadcast election ads the Court considered were disseminated within 60 days of the general election: The "conclusion that [the] ads were specifically intended to affect election results was confirmed by the fact that almost all of them aired in the 60 days immediately preceding a federal election." <u>McConnell</u>, 540 U.S. at 127.[6] Thus, in light of the

---

[5]    Indeed, Congress did <u>not</u> <u>require</u> that even the "republication of campaign materials," BCRA § 214(c)(A), be treated at all times as a coordinated communication, but simply required the Commission to "address" how such materials should be treated, BCRA § 214(c). The Commission ultimately included them within the definition of "coordinated communication," regardless of when they are distributed. 11 C.F.R. 109.21(c)(2); A.R. 2179.

[6]    The 90/120-day periods are consistent with congressional judgments underlying the statutory provision and congressional rules on use of the franking privilege during a member's

coordination regulation's broad reach within the 90/120-day campaign periods, plaintiffs' suggestion (see Reply 5-9) that the regulation as a whole is limited to or relies primarily upon express advocacy, or that the Commission argued in its opening brief that the regulation must be so limited, is plainly false.[7]

Finally, plaintiffs take issue (Reply 9-12) with the Commission's reliance upon its regulation, 11 C.F.R. 100.22, that defines express advocacy more broadly than the wooden test of "magic words" found wanting in McConnell.  There is nothing "post hoc" (Pls. Reply 10), however, about relying upon a regulation that has been on the books for years and was not modified in BCRA.  See BCRA § 201(a); 2 U.S.C. 434(f)(3)(A)(ii) ("Nothing in this subparagraph shall be construed to affect the interpretation or application of section 100.22(b) of Title 11").  Despite the view of some that the express advocacy regulation covers too much speech, the Commission continues to rely upon it.  See, e.g., Supplemental Explanation & Justification Regarding Political Committee Status, 72 Fed. Reg. 5595, 5604 (Feb. 7, 2007).  The plaintiffs here are clearly not arguing that 11 C.F.R. 100.22 is invalid, and McConnell's holding

---

campaign for re-election.  Members of the Senate may not use the franking privilege for mass mailing within 60 days before the date of any primary election or general election in which the member is a candidate, and members of the House of Representatives may not make such mailings within 90 days of an election in which they are a candidate.  39 U.S.C. 3210(a)(6)(A); Standing Rules of the Senate, Rule XL(1) (60-day rule); Rules of the House of Representatives, Rule XXIV(8) (90-day rule).  The legislative history for these provisions shows that these were prophylactic measures enacted "in order to avoid any trace of abuse" of the franking privilege for campaign purposes.  S. Rep No. 93-461, 1973 WL 12675 at *2909 (1973).  Thus, it was Congress's judgment, like the Commission's, that communications within the few months before an election are much more likely to be for electoral purposes.

[7]     Amici rely (McCain Br. 8) upon the Supreme Court's conclusion in McConnell that a "magic words requirement is functionally meaningless," 540 U.S. at 193.  That conclusion was reached, however, while analyzing the brief pre-election periods when "almost all" of the election ads were actually run.  Id. at 127.  The Commission's coordination regulation expands those periods to 90 and 120 days, and McConnell simply did not address the merits of partial reliance upon express advocacy outside those times.  Of course, by limiting the definition of "electioneering communication" to 30- and 60-day windows, Congress itself continued to rely upon express advocacy for independent expenditures during 21 months of every election cycle.

that express advocacy is not a constitutional requirement, 540 U.S. at 190-92, overrules the

central rationale of the two appellate decisions that previously found the regulation

unconstitutional.[8]  See Virginia Society for Human Life, Inc. v. FEC, 263 F.3d 379 (4th Cir.

2001); Maine Right to Life Comm., Inc. v. FEC, 98 F.3d 1 (1st Cir. 1996).

Moreover, amici are simply wrong when they argue (McCain Br. 9 n.14) that the recent

full-page ad for John Edwards (McCain Exh. 11) does not contain express advocacy under the

Commission's regulation.  (This ad is not part of the administrative record and was therefore not

before the Commission during the rulemaking.)  Toward the bottom of the black box in the ad,

the "JOHN EDWARDS08" logo — complete with the swoosh and star used in the logo on his

official campaign website, see http://www.johnedwards.com/ — plainly appears.  Under 11

C.F.R. 100.22(a), that slogan is a "campaign slogan[] or individual word[] … such as 'Carter

'76' … or 'Mondale!'"  Once again, plaintiffs and their amici underestimate the true scope of the

regulation they challenge.

In sum, the Commission was well within its discretion to follow Congress's lead,

change its approach when defining what constitutes a coordinated expenditure, and adopt a more

objective test that relies upon, inter alia, the timing of a communication, republication of

campaign materials, and express advocacy.

> An initial agency interpretation is not instantly carved in stone.  On the contrary,
> the agency, to engage in informed rulemaking, must consider varying
> interpretations and the wisdom of its policy on a continuing basis.

Chevron, 467 U.S. at 863-64 (citations omitted).  Especially in light of Congress's decision not

to require any expansion of the content of coordinated communications beyond treating

---

[8]    While plaintiffs are correct (Reply 12) that a PASO standard ("promote," "attack," "support," "oppose") would be broader than 11 C.F.R. 100.22, the latter paints a brighter line.  It requires either magic words, campaign slogans, or other language that "unambiguous[ly]" advocates the election or defeat of a clearly identified candidate.  The Commission was certainly within its discretion to choose a standard that was easier to understand, interpret, and enforce.

coordinated electioneering communications as contributions, as well as its decision to delete language that would have foreclosed an express advocacy standard, the Commission's interpretation is entitled to deference and should be upheld. See Air Line Pilots Ass'n, Int'l v. Dep't of Transportation, 791 F.2d 172, 175 (D.C. Cir. 1986) ("agency's change in policy here came in response to Congress' change in the statute from which that policy derived"); Paralyzed Veterans of America v. D.C. Arena L.P., 117 F.3d 579, 586 (D.C. Cir. 1997).

### 3. Overall, the Revised Coordination Regulation Covers More Content Than the Commission's Pre-BCRA Approach and Provides a More Objective Test

As explained above, Congress did not require the Commission's new regulation to extend beyond coordinated express advocacy and coordinated electioneering communications. More generally, aside from the new requirement that coordinated electioneering communications be treated as contributions, Congress did not require or forbid any content change from the prior regulation. Despite the new regulation's clear compliance with this congressional directive, plaintiffs devote several pages (Reply 5-9) to explaining their view of the Commission's historical interpretation of what constitutes a coordinated expenditure. Because the Commission's pre-BCRA approach is not the issue before this Court, and the statute does not purport to restrict the Commission's discretion to alter it, most of plaintiffs' historical argument is simply irrelevant. Even it if were relevant, however, the important point, which plaintiffs overlook, is that overall the Commission's new regulation defines more speech as "coordinated communications" than its previous approach — and with none of the uncertainty about the test that hampered earlier enforcement efforts.

The record in McConnell and the comprehensive data analyzed by the Commission in this rulemaking conclusively demonstrate that the overwhelming majority of campaign ads are run in the two months before an election. See FEC Br. Addendum (A.R. 2191-2223). Under the

Commission's new content standard, any ad that merely refers to a federal candidate or political party is regulable as a coordinated expenditure if its meets the other criteria for coordination. Consequently, virtually all ads run within the 90/120 pre-election periods that are even remotely connected with the election will be regulable because the rule requires absolutely <u>no</u> parsing of any other content of the ad:  no analysis is needed about whether the ad contains a lobbying message or an electioneering message, whether it promotes or attacks a candidate, whether it exhorts the audience to vote for or against a candidate, or whether its election advocacy is sufficiently explicit.  Thus, this part of the regulation alone will cover the vast majority of coordinated campaign advertising.

In the years leading up to BCRA, however, things were not so simple.  There was great confusion about the content requirement for coordinated expenditures, and no one could seriously argue that, under the earlier regime, during the 90/120-periods leading up to an election all that mattered in terms of content was whether the ad contained a reference to a candidate or political party.  Indeed, this confusion is demonstrated by the amicus briefs in this case, which present plausible arguments for contradictory views of the test the Commission was applying. <u>See</u> McCain Br. 1-6; CCP Br. 2-9.  The Court need not, however, resolve their dispute to distill the only two points that are important here:  The earlier regime (1) employed some sort of content standard far more demanding than a mere reference to a clearly identified candidate or political party, and (2) created so much uncertainty that it ultimately undermined the Commission's ability to enforce the statute effectively.

In a series of advisory opinions addressing coordinated expenditures by political parties, the test articulated by the Commission for whether coordinated spending constituted a coordinated expenditure turned on whether there was an "electioneering message" — <u>in addition to</u> the requirement of clearly identifying a candidate.  In Advisory Opinion ("AO") 1990-5, [Transfer

Binder] Fed. Election Camp. Guide (CCH) ¶ 5982 (April 27, 1990) (Exh. 7), for example, the

Commission addressed whether newsletters published by a company owned by the candidate

might result in such contributions.  The Commission's opinion rested on a content criterion that

clearly demanded more than just a reference to the federal candidate.  See id. at 6-7.  See also,

e.g., AO 1984-15, [Transfer Binder] Fed. Election Camp. Guide (CCH) ¶ 5766 (May 31, 1984)

(Exh. 10); AO 1985-14, [Transfer Binder] Fed. Election Camp. Guide (CCH) ¶ 5819 (May 24,

1985) (Exh. 11).  Thus, the Tenth Circuit explained in FEC v. Colorado Republican Federal

Camp. Comm., 59 F.3d 1015, 1022 (10th Cir. 1995) (emphasis added), vacated on other grounds,

Colorado Republican Federal Camp. Comm. v. FEC ("Colorado I"), 518 U.S. 604 (1996):

> Giving deference to the FEC's interpretation, we hold that § 441a(d)(3)
> applies to coordinated spending that involves a clearly identified candidate
> and an electioneering message, without regard to whether that message
> constitutes express advocacy.

By the late 1990s, however, a consensus emerged among the Commissioners that there

was no clear standard for assessing whether a coordinated communication had been made "for

the purpose of influencing" an election.  In 1999, in the context of audits of the Clinton and Dole

campaign committees, four of the Commissioners "express[ed their] disagreement with the use

of 'electioneering message' as a test to determine whether communications are 'for the purpose

of influencing' elections and, therefore, constitute expenditures or contributions under the

[FECA]."  Statement of Reasons ("SOR") of Commissioners Wold, Elliott, Mason, and

Sandstrom in Audits of Dole and Clinton Campaign Committees (June 24, 1999) at 2 (McCain

Exh. 8).  See also SOR of Commissioner MacDonald in MUR 4553 et al. at 3 (Exh. 8); SOR of

Commissioners Mason and Smith in MUR 4538 (May 23, 2002) (summarizing the various

Commissioners' "differing but largely individually consistent positions with respect to the

threshold for finding a communication to be coordinated contribution") at 1 (McCain Exh. 6).

Thus, while there was no clear consensus among the Commissioners during the years

immediately leading up to BCRA about the content requirement for coordinated communications, it is indisputable that the Commission required more than a reference to a clearly identified candidate or political party, even within 90 or 120 days of an election.  In this regard, the new content standard captures vastly more speech than the previous standard. Plaintiffs' determined focus exclusively on the time outside the 90/120-day pre-election periods causes them to lose sight of this critically important, wider breadth of the new regulation during the period that matters most — the months leading up to the election when the overwhelming majority of campaign advertising occurs.

Moreover, the new content standard serves fundamental First Amendment interests by eliminating vagueness. "A bright-line prophylactic rule may be the best way…, by offering clear guidance and avoiding subjectivity, to protect speech itself."  Hill v. Colorado, 530 U.S. 703, 729 (2000) (emphasis added).  See also Dombrowski v. Pfister, 380 U.S. 479, 486 (1965) ("[A] … prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms.").  In other words, the new regulation is easier for political actors to obey and easier for the Commission to enforce.  This clarity serves the purposes of the statute by drastically reducing the possibility that the Commission will ever have to dismiss an administrative complaint because of uncertainty about the scope of the content covered by the definition of "coordinated communication."  This helps ensure that the new regulation's full breadth will be enforceable — another reason why it does not create a potential for abuse.  See Orloski v. FEC, 795 F.2d 156, 165 (D.C. Cir. 1986) ("Administrative exigencies mandate that the FEC adopt an objective, bright-line test[,]… necessary to enable donees and donors to easily conform their conduct to the law and to enable the FEC to take the rapid, decisive enforcement action that is called for in the highly-charged political arena."); Buckley, 424 U.S. at 41 ("'[p]recision of regulation … must be

the touchstone in an area so closely touching our most precious freedoms'") (quoting <u>NAACP v. Button</u>, 371 U.S. 415, 438 (1963)).

Finally, plaintiffs place great emphasis (Reply 6-8) on the Commission's litigating position in <u>Christian Coalition</u>, but that position does not undermine the Commission's new regulation or current arguments before this Court.  In briefing that case the Commission certainly refuted the defendant's arguments that express advocacy was a statutory or constitutional prerequisite for treating any disbursement as a coordinated expenditure, and the new regulation's breadth in the 90/120-day pre-election periods shows that the Commission's position on that question has not changed.  To demonstrate that the disbursements in <u>Christian Coalition</u> were coordinated expenditures in that pre-BCRA case, the Commission argued that there was sufficient collaboration and sharing of information to constitute "coordination," and that the disbursements met the statutory definition of "expenditure" —  2 U.S.C. 431(9)(A)(i) ("for the purpose of influencing any election for Federal office") — regardless of whether they contained express advocacy.  <u>See</u>, <u>e.g.</u>, Pls. Supp. Exh. 1 at 9 (FEC Opp. Br. in <u>Christian Coalition</u> at 7).

What plaintiffs overlook is that the disbursements in <u>Christian Coalition</u> occurred shortly before election day, so if those same facts were repeated today, the applicable content prong would not be limited to express advocacy or the republication of campaign materials.  Indeed, under the new regulation's content prong, a repetition of those same facts would likely lead the Commission to the same conclusion, albeit after application of a different test.[9]  The bulk of the alleged coordinated communications in <u>Christian Coalition</u> involved the distribution of millions of "voter guides."  <u>See</u> 52 F.Supp.2d at 48.  Those voter guides clearly identified candidates,

---

[9]      The adverse coordination rulings in <u>Christian Coalition</u> were based on insufficient evidence of collaboration and cooperation, not a holding that the content of the communications brought them outside the definition of coordinated expenditures.  <u>See</u> 52 F.Supp.2d at 89-97. Because plaintiffs are now challenging only the content prong of the new regulation, the new <u>conduct</u> prong's application to the facts of <u>Christian Coalition</u> is not relevant to the issues here.

they were distributed in large numbers in the jurisdictions in which those candidates were running for federal office, and they were distributed fewer than 90 days before the general election. See id. at 48, 70, 73, 76, 79, 80.[10]  Thus, although the new content prong applies certain objective criteria that were not directly applicable when that case was litigated, the end result would likely be the same.[11]

> **4.    Plaintiffs Rely Upon Irrelevant Examples by Overlooking How the Coordination Regulations Work in Tandem With Other Provisions of the Act**

Plaintiffs' central example of the supposed flaw in the Commission's coordination regulation is the advertising campaign allegedly coordinated between President Clinton's campaign and the Democratic National Committee ("DNC") in 1995 and 1996.  Plaintiffs discuss it repeatedly (Reply 23-28) in highly negative terms, but this advertising campaign is irrelevant to the regulation at issue now that BCRA is on the books.  What is "astonishing" (Reply 27) is not the small attention the Commission paid to it, but plaintiffs' repeated discussion of this incident without ever acknowledging that other provisions of BCRA now make it impossible to recur.

Even if everything the press reported about this episode is true, the simple fact is that Title I of BCRA now prevents the DNC from receiving or spending a dollar of soft money.  Thus, to the extent that the DNC used vast amounts of soft money to do what the Clinton campaign could not have done itself, BCRA's ban on soft money has plugged that "loophole"

---

[10]     Although a Commission regulation allows corporations and unions to distribute voter guides in some circumstances, it does not apply when there is coordination with candidates.  See 11 C.F.R. 114.4(c)(5).

[11]     To the extent the Commission's argument in Christian Coalition involved coordinated spending on equipment or other expenses that were not communications (see Pls. Reply 7, quoting FEC Br. in Christian Coalition at 8-9), it was making the obvious point that an express advocacy test makes no sense in that context because such spending involves no expression at all.  Such non-communicative coordinated expenditures are not addressed by the regulation now before this Court, which covers only coordinated communications.  11 C.F.R. 109.21.  Other kinds of coordinated expenditures are addressed in 11 C.F.R. 109.20.

and the Commission's coordination regulation does not need to plug it twice. With only hard money in its coffers, the DNC can use those funds for express advocacy or any other lawful purpose; it thus has no incentive to find clever ways to influence federal elections with soft money that it can no longer have.

Moreover, plaintiffs ignore another key development since the DNC's advertising took place: the Supreme Court's decision in Colorado I. That decision was handed down on June 26, 1996, after the "early" DNC ads had come to an end. Before that case was decided, the Commission had a regulation providing that national political parties were incapable of making independent expenditures in support of their own candidates, see Colorado I, 518 U.S. at 619-23, so the parties were limited for such spending by the coordinated expenditure limits in 2 U.S.C. 441a(d). Thus, at the time of the 1995-96 DNC ads, there was a much greater incentive (from the parties' perspective) to find ways around the FECA's restrictions, because the section 441a(d) limits were assumed to be an absolute cap on hard money expenditures in support of the parties' own candidates. Colorado I completely changed that dynamic by opening the door for political parties to make unlimited independent expenditures to support their own candidates, and no similar program has been undertaken by any political party since then. This is yet another reason why the DNC episode is unlikely to recur, and the Commission's coordination regulation need not, by itself, carry the burden of preventing another similar episode.[12]

Plaintiffs also rely (Reply 25) upon an anecdote about early spending by Steve Forbes in the 2000 presidential election, but it makes no sense to extrapolate from the spending pattern of an extraordinarily wealthy individual on his own campaign to predict coordinated spending by others. Since Buckley, 424 U.S. at 51-53, individuals have been free to spend as much of their

_____

[12]    Later, BCRA § 307 substantially raised the limits on contributions of federal funds to national party committees. The parties' ability to accept more federal funds enhances the likelihood that they will use independent expenditures to communicate whatever message they like and lowers the incentive for them to search for ways to avoid the Act's restrictions.

personal fortunes as they like in support of their own campaigns. Steve Forbes, whose net worth was estimated to be more than $440 million in 1999, had essentially unlimited funds to spend on his own campaign. See Exh. 9. While Forbes may well have felt he could afford the luxury of very early advertising, plaintiffs offer no suggestion why his unique circumstances would provide a reasonable basis for drawing conclusions about the relative value that other candidates put on early advertising, let alone the likelihood that outside spenders would be inclined to follow his lead when making coordinated expenditures. Buckley's holding about the First Amendment right of individuals to spend their personal wealth on their own campaigns is a matter of constitutional law, not an indication that a "loophole" needs to be plugged based on a tenuous extrapolation to the context of coordinated expenditures.

### 5.    The Commission's Line Drawing Was Reasonable

Despite presenting no evidence of circumvention or abuse of the Commission's coordination regulation since it has been in effect, plaintiffs rest their case on their fear that this is a hypothetical possibility (see, e.g., Reply 4-5). The future is uncertain, but it is the Commission, not the plaintiffs, that is entitled to deference for such predictive judgments.

> When an agency must balance a number of potentially conflicting objectives…, judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives and its decisionmaking process was regular.… [A]n agency's predictive judgment regarding a matter within its sphere of expertise is entitled to "particularly deferential" review.

Fresno Mobile Radio, Ind. v. FCC, 165 F.3d 965, 971 (D.C. Cir. 1999) (quoting Milk Indus. Found. v. Glickman, 132 F.3d 1467, 1478 (D.C. Cir. 1998)). Accord Hutchins v. District of Columbia, 188 F.3d 531, 542 (D.C. Cir. 1999) (en banc).

Plaintiffs misconstrue (Reply 13) the guidance from the D.C. Circuit regarding this regulation and trivialize the First Amendment concerns that the Commission took seriously. The appellate court agreed with the Commission that it has an "obligation to 'attempt to avoid

unnecessarily infringing on First Amendment interests.'" Shays v. FEC, 414 F.3d 76, 101 (D.C. Cir. 2005) (quoting AFL-CIO v. FEC, 333 F.3d 168, 179 (D.C. Cir. 2003)). Plaintiffs essentially want the Commission to ignore this obligation and regulate any communication that could conceivably have even a tiny electoral effect, but the court of appeals required no such rule. Rather, the Commission merely has to establish that "its rule rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition." Id. (emphasis added). When the D.C. Circuit ruled, it did not have the comprehensive data and analysis that are now before this Court, so the court then found that the record did not adequately demonstrate that the rule would "not permit substantial coordinated expenditure." Id. (emphasis added). As our opening brief explains (at 34-42), the revised rulemaking data support that conclusion.[13]

Plaintiffs also attempt (Reply 16-17) to equate the Commission's line drawing here with the creation of the kind of de minimis exception that the court of appeals rejected with regard to allocation of certain kinds of spending with "Levin funds." 414 F.3d at 112-115. But that analogy is not apt. The Commission's regulation does not affirmatively authorize identifiable spending that a literal reading of BCRA prohibits. Instead, the Commission has drawn a rational line to separate, in an inherently gray area concerning First Amendment activity, spending that is

---

[13]     Plaintiffs are mistaken when they argue (Reply 13 n.14) that the "Commission's First Amendment avoidance argument waives its claim to Chevron deference." An agency "does not have jurisdiction to declare statutes unconstitutional" but it "may be influenced by constitutional considerations in the way it interprets or applies statutes." Branch v. FCC, 824 F.2d 37, 47 (D.C. Cir. 1987). During the rulemaking, the Commission did not claim that the decision it reached was required by the First Amendment or that the statute would be unconstitutional if construed more broadly, but simply that, as required under AFL-CIO, its construction was designed in part to avoid unnecessarily infringing on First Amendment interests. A.R. 2168. In Common Cause v. FEC, 842 F.2d 436, 448 (D.C. Cir. 1988), the court deferred to a narrow FEC construction of the statute that accommodated the "countervailing consideration[]" of "allow[ing] the maximum of First Amendment freedom of expression in political campaigns commensurate with Congress' regulatory aims." The cases relied upon by plaintiffs involved statutory interpretations necessary to avoid constitutional conflicts or a court's refusal to defer to an agency's construction of prior judicial precedent. Neither of those situations is present here.

likely to be for the purpose of influencing an election from spending that is not. Rather than creating an exception to a "rigid regime," 414 F.3d at 114, in which Congress has specified exactly what kinds of funds have to be allocated for specific types of activity, the Commission here has simply adopted a rational construction of the comparatively elastic term "expenditure" in the context of coordinated expenditures.

The dispositive precedent on this point is <u>Orloski</u>, which plaintiffs all but ignore. In a footnote (Reply 2 n.2), plaintiffs fail to rebut the Commission's demonstration in its opening brief (at 43-44) that the coordination regulation involves the same sort of line drawing, and is entitled to the same deference, as in <u>Orloski</u>. Both here and in <u>Orloski</u>, the Commission was not creating a <u>de minimis</u> exception but filling "a large gap between the obviously impermissible and the obviously permissible." 795 F.2d at 164. In both situations, the Commission drew a line that distinguished campaign spending from non-campaign spending and gave breathing space for First Amendment activity, and in both cases there is admittedly an area of potential overlap. As the court noted in <u>Orloski</u>, "<u>any</u> corporate funding of congressional events indirectly influences the election." <u>Id.</u> at 163 (emphasis added). Despite plaintiffs' attempt (Reply 2 n.2) to dismiss this breathing space as being merely about donations of hamburgers and potato salad, the Commission's line drawing in <u>Orloski</u> did not depend upon the size of the corporate funding but instead articulated a general principle to distinguish electoral from non-electoral spending and relied in part upon the express advocacy standard — the same partial reliance to which plaintiffs object so strongly here.

In <u>Barnhart v. Thomas</u>, 540 U.S. 20, 28-29 (2003), the Supreme Court deferred to the Social Security Administration's ("SSA") statutory interpretation in similar circumstances. The SSA had narrowly interpreted "disability" to disqualify workers for disability benefits if they were able to return to their previous work, even if the previous work no longer existed in the

economy. Because a claimant's ability to do his or her previous work in the "vast majority" of cases served as an "effective and efficient administrative proxy for the claimant's ability to do some work that does exist in the national economy," the SSA's interpretation was reasonable under Chevron. Id. at 28. Here, where the Commission has the additional obligation to avoid unnecessarily infringing on First Amendment rights — not present in Barnhart — it is doubly reasonable for the Commission to have drawn a bright line that captures the vast majority of election-related advertising and that relies upon objective timing and content criteria that the Supreme Court agreed in McConnell represent a reasonable proxy for determining electoral purpose and effect. As the Court in Barnhart further explained, 540 U.S. at 29:

> To generalize is to be imprecise. Virtually every legal (or other) rule has imperfect applications in particular circumstances…. The proper Chevron inquiry is not whether the agency construction can give rise to undesirable results in some instances (as here both constructions can), but rather whether, in light of the alternatives, the agency construction is reasonable.

Finally, the Supreme Court in Sun-Diamond Growers found a provision of the anti-gratuity statute, which like FECA is designed to prevent corruption, consistent with a regulation that permits some gifts to be accepted. Rejecting a broad interpretation of the statute that would have foreclosed the permissive regulation, the Court explained, 526 U.S. at 412:

> [T]his regulation, and the numerous other regulations and statutes littering this field, demonstrate that this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions. Given that reality, a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter. Absent a text that clearly requires it, we ought not expand this one piece of the regulatory puzzle so dramatically as to make many other pieces misfits.

The same reasoning applies to the Commission's coordination regulation, which is entirely reasonable as "one piece of the regulatory puzzle," despite plaintiffs' refusal to acknowledge the larger picture that puzzle depicts.

B.      The Commission's Data Analysis Was Sound

In its opening brief (at 34-42), the Commission explained how it reasonably relied on the CMAG data when it determined that the overwhelming majority of candidates' campaign advertising took place during the 90- and 120-day periods defined in the coordination rule.  Plaintiffs concede (Reply 2) that the CMAG data can reliably be used in promulgating campaign finance regulations.[14]  Despite this concession, plaintiffs rely upon the limitations inherent in the CMAG data as if these limitations were somehow unique to this rulemaking or created by the Commission.  Plaintiffs fail to provide their own analysis of the data or to point to other comparably systematic data that would undermine the Commission's analysis.

Because, as plaintiffs agree, the CMAG data set comprises the most comprehensive and complete available data, the Commission is entitled to rely upon it.  See American Public Communications Council v. FCC, 215 F.3d 51, 56 (D.C. Cir. 2000) ("agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information"); Industrial Union Dep't., AFL-CIO v. Hodgson, 499 F.2d 467, 475 n.18 (D.C. Cir. 1975); American Coke and Coal Chemicals Institute v. EPA, 452 F.3d 930, 943 (D.C. Cir. 2006) ("determinations do not appear arbitrary and capricious in light of the technological limitations on measuring very low concentration levels"); see also id. at 942 (upholding rule despite "limitations of record data"); Ethyl Corporation v. EPA, 541 F.2d 1, 28 (D.C. Cir. 1976)

---

[14]     In McConnell, plaintiffs championed the use of CMAG data to support the bright-line electioneering communication provisions in BCRA.  For example, plaintiffs described "the CMAG data [as] represent[ing] the most comprehensive body of research on political television advertising ever conducted."  Br. of Reps. Shays and Meehan at 66, McConnell v. FEC, No. 02-1674 (2003).  See also Br. of Reps. Shays and Meehan at I-129, McConnell v. FEC, 02-0582 (D.D.C. 2002) (describing the CMAG data as "[t]he largest database of political advertising ever accumulated, it encompasses every political television ad run in 1998 and 2000 in the country's top 75 media markets (comprising approximately 80 percent of the nation's population), as well as every political ad run on the top 42 cable channels or on national television....  It offers an extraordinarily rich and detailed picture of the patterns of political broadcast advertising").  As described below, the data in this rulemaking are even more comprehensive than the data were in McConnell.

(upholding rule based on "theoretical projections from imperfect data"). Indeed, in <u>McConnell</u> even the challengers' expert witness agreed that no source offered more complete data than CMAG. <u>See</u> 251 F.Supp.2d 176, 725 n.195 (according to Dr. Goldstein, "no comprehensive information is available for the [stations not covered by CMAG]" ); <u>id.</u> at 722 ("Dr. Gibson ... does not suggest a better source of data for this type of study") (citations omitted).

Plaintiffs have not identified a better source of data or a better way to use the data that CMAG has actually collected. In its opening brief (at 50), the Commission showed that it was plaintiffs' burden to rework the data or present their own proof. Instead of doing so, plaintiffs engage in an "effort [that] is not unlike that of a piñata party." <u>McConnell</u>, 251 F.Supp.2d at 584 (CKK) (finding that plaintiffs there failed to conduct "their own similar study, or even replicate a discrete portion [of the studies before the court], despite the fact that the underlying materials were provided to them"). For example, plaintiffs assert (Reply 22 n.26) that the Commission did not analyze significant media markets captured by CMAG in its analysis of presidential races that focused on certain battleground states. Despite the fact that all presidential data captured by CMAG (not limited to battleground states) are part of the administrative record, plaintiffs chose not to perform any analysis of their own with the presidential data.[15] If a different analysis would have supported plaintiffs' position in this case, it is reasonable to assume they would have presented it to the Court. <u>Cf.</u> <u>Overnight Transpt. v. NLRB</u>, 140 F.3d 259, 267 (D.C. Cir. 1998) (adverse inference rule is based on theory that "a party will of his own volition introduce the strongest evidence available to prove his case").

---

[15]    The complete data sets, as delivered to the Commission by CMAG, are part of the administrative record that is before the Court. <u>See</u> Administrative Record filed on October 31, 2006, Docket #17. The data supplied by CMAG were from 101 media markets in 34 states. Vol. III, Doc. 55, A.R. 2204. The Commission's battleground analysis was based on 23 media markets in 11 states. A.R. 2203.

In this rulemaking, the data are far more complete than what this Court and the Supreme Court relied upon in <u>McConnell</u>.  CMAG has significantly expanded the number of stations and markets it monitors since 1998 and 2000, the years examined in <u>McConnell</u>.  Now, the CMAG data cover "over 560 stations in 101 major markets .… The monitored stations constitute the principal stations in each market, typically including the network affiliates and major independents."  FEC Fact 33; <u>see</u> Vol. III, Doc. 55, A.R. 2204-05 (listing 101 major markets).  At the time of <u>McConnell</u>, CMAG only monitored stations "in the top 75 media markets, containing more than 80 percent of U.S. residents."  251 F.Supp.2d at 720 (CKK).  Thus, CMAG has added 26 major markets to its coverage since 2000.

Plaintiffs miss the point when they argue (Reply 22) that "House and Senate data sets for some unexplained reason omit all 2003 data with respect to ads broadcast in connection with the 2004 campaign."  No such ads appear in the data sets because <u>no such early ads were run</u> in the media outlets that CMAG captures.  The Commission omitted nothing from the data sets, which included all candidate-sponsored ads from stations CMAG monitored for all federal races — House, Senatorial, and Presidential — from November 6, 2002, through November 2, 2004.  <u>See</u> FEC Facts 33 & 35.  Although plaintiffs rely upon press accounts and cite a few examples of ads from 2003, these are not ads that CMAG would have been expected to capture:  Most were radio ads (CMAG only monitors television) or were on small local cable channels (CMAG monitors approximately the top 40 cable channels).

Contrary to plaintiffs' rhetoric (Reply 23), the House and Senate data sets are not "worthless."  Rather, they reflect advertising that actually aired in major television markets, as observed by an independent, reputable organization.  The paucity of early advertising in the CMAG data supports the Commission's line drawing, not any problems in the Commission's methodology.  As our opening brief explained (at 49-50), what matters is whether the data are

unrepresentative or skewed, not whether CMAG captured every ad from every radio station or small cable channel.  See Segar v. Smith, 738 F.2d 1249, 1276-77 (D.C. Cir. 1984) (where there was no reason to believe that among experienced personnel one racial group was more likely to possess certain prior work experience, it did not matter that a statistical analysis failed to control for that qualification).  In their opposition, plaintiffs do not contest this critical legal principle (or that the courts in McConnell relied upon CMAG data despite even greater limits of the data's sources at that time), but instead rely again upon anecdotes and descriptions of campaign advertising plans from press releases, which may reflect a campaign's most optimistic hopes rather than actual airings.  In any event, plaintiffs have offered nothing to suggest that the overall pattern of campaign advertising on radio, in small media markets, or on small cable channels differs from the pattern in the broadcasting captured by CMAG.  In the absence of such evidence, it is plaintiffs' anecdotes that are "worthless" in understanding the relative frequency and distribution of campaign advertising.

Indeed, plaintiffs implicitly concede that their collection of ads is not representative of political advertising in general.  They purportedly reviewed all "Ad Spotlight" coverage from nationaljournal.com for the 2003-2004 election cycle and only selected "ads that would have run outside the Commission's revised pre-election windows."  Reply 25 (emphasis added).  But since plaintiffs ignored the ads that ran inside those pre-election periods, we have no way of knowing whether the ads they chose to highlight represent 1% or .01% of all the election ads run during the election cycle.[16]  Ultimately, the small number of ads plaintiffs rely upon, consisting

---

[16]     Plaintiffs argue (Reply 23-28) that the Commission acted arbitrarily and capriciously in "disregarding" their examples of advertising outside the 90- or 120-day time periods.  They variously describe these examples as amounting to "dozens" (Reply 11) or "hundreds" (Reply 26).  But the bottom line is that the "Ad Spotlight" service does not specify how many times these ads ran.  Indeed, when plaintiffs claim (Reply 24) that "these are actual ads" that "actually ran," they cannot be so sure:  plaintiffs' online source relied upon campaign press releases and the plans of political campaigns that were subject to change, not a monitoring of actual advertising, as CMAG did.

of a few dozen ads, provides very little value.  See Conley v. U.S. Bank National Ass'n., 2006 WL 3690209 *4 (6th Cir. 2006) (unpublished) ("small sample size gives [plaintiffs'] statistics little or no probative value").  Courts have long recognized that the probative value of statistical evidence varies with sample size.  See Connecticut v. Teal, 457 U.S. 440, 463 n.7 (1982) (citing Teamsters v. United States, 431 U.S. 324, 340 n.20 (1977)).  The very small number of ad scripts presented by the plaintiffs — which do not even purport to be representative of the overall election cycle — compares unfavorably with the more than half a million airings documented in the CMAG data sets that systematically captured all candidate ads in the 101 largest markets during the entire election cycle.  See FEC Fact 35.  Contrary to plaintiffs' accusations, the Commission did consider their evidence and described it in its Explanation & Justification ("E&J") (Vol. III, Doc. 52, A.R. 2163), but the Commission is entitled to choose not to rely upon data that it considers unreliable.  See American Public Communications, 251 F.3d at 56 ("it was prudent and reasonable for the Commission to decide that ... the existing ... data was not reliable enough").

Because the Commission relied on what is indisputably the most comprehensive data available — data that measured actual airings of advertisements, not predictions — plaintiffs' reliance (Reply 22) upon Columbia Falls Aluminum Co. v. EPA, 139 F.3d 914 (D.C. Cir. 1998), is misplaced.  In that case, EPA used a model that predicted results "orders of magnitude" less than the concentration of certain chemicals actually measured in practice.  Id. at 922 (quotation marks and citation omitted).  Here, in contrast, the only real data issue is whether the small percentage of broadcasts that CMAG does not capture systemically skews the data in a manner that would undermine the Commission's findings, and plaintiffs have not presented any evidence of such a problem, let alone one that suggests there is a data skew that involves multiple orders of magnitude.  See Oceana Inc. v. Evans, 384 F.Supp.2d 203, 221 (D.D.C. 2003) (refusing to apply the rule from Columbia Falls Aluminum despite "flawed or limited" data that included a

number of "uncertainties").

Plaintiffs' final criticism of the Commission's data depends largely on their focus on Iowa and New Hampshire and the presidential race.  First, it is unclear whether the Court has jurisdiction to rule on plaintiffs' challenge to the portion of the regulation governing the presidential election because neither Congressman Shays nor Meehan has ever been, or stated any intention to be, a candidate for president.[17]  Second, while it is true that there was a comparatively large amount of early advertising in Iowa, the Commission is not required to design its regulation to account for each state's particular characteristics.[18]  To the contrary, when the Supreme Court in Buckley upheld the Act's contribution limits, it explained that the "provisions might well have been structured to take account of the graduated expenditure limitations for House, Senate, and Presidential campaigns.  Congress' failure to engage in such fine tuning does not invalidate the legislation."  424 U.S. at 30.  It was similarly reasonable for the Commission to assess the overall pattern of campaign advertising and draw lines that would apply nationwide regardless of when particular states choose to hold their primaries.

Third, plaintiffs' reliance upon Randall v. Sorrell, 126 S.Ct. 2479 (2006), is misplaced. That case evaluated whether certain contribution limits were so low as to prevent effective

---

[17]    Although the Commission has not challenged plaintiffs' standing, the Court has its own obligation to determine that it has jurisdiction over each of plaintiffs' claims.  "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception."  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95 (1998) (internal quotation marks, alteration, and citation omitted).

[18]    Plaintiffs argue (Reply 19) that the Commission's analysis is flawed because it did not include data from New Hampshire, but none of the media markets CMAG monitors is in New Hampshire; thus, the Commission simply had no data to include from that state.  And, of course, both plaintiffs and the courts relied on CMAG data in McConnell, even though that data included fewer markets and also omitted New Hampshire.  A number of other states also could not be included in the Commission's analysis, but Iowa — the other very early caucus or primary state for the presidential race — was included.  Overall, plaintiffs present no evidence that such early states are systemically underrepresented in the data used in the Commission's analysis.

campaigning, and in that context the Court was concerned about the limits' effect on the most competitive races. Here, the Commission was balancing the competing concerns of preventing corruption and leaving breathing space for protected First Amendment activity, while at the same time drawing a bright line defining the content of speech subject to regulation on a nationwide basis. In McConnell, when the Supreme Court analyzed whether the electioneering communication provision was overbroad, it did not question whether the provision would be more or less overbroad depending upon whether the ads were being run in competitive or uncontested elections. That same level of analysis is appropriate in this facial challenge. In any event, as our opening brief explained (at 51), by focusing on "battleground" states for the presidential general election, the Commission took a statistically conservative approach because such states would be presumed to have the earliest and most advertising, even if they are not representative of the entire nation.

Finally, as in their opening brief, plaintiffs' opposition brief points to absolutely no evidence, anecdotal or otherwise, of coordination in connection with any of the early ads that they argue were omitted from the Commission's analysis of the 2004 election cycle or from the CMAG data, and upon which they place such heavy reliance.

In sum, the Commission acted well within its discretion by choosing to rely upon the best available data to promulgate a regulation that demonstrably serves the goals of the Act while avoiding unnecessary infringement on speech. This is more than enough to satisfy "arbitrary and capricious" review, and the coordination content regulation should therefore be upheld.

### C. The "Common Vendor" and "Former Employee" Conduct Standards Are Reasonable

Plaintiffs' argument regarding the common vendor/former employee rule, 11 C.F.R. 109.21(d)(4), (5), is another example of their failure to acknowledge how this rule fits into the overall regulatory framework. Plaintiffs complain that under the revised regulation "the Com-

mission has used its rulemaking power to exempt from effective regulation <u>precisely</u> the kinds of coordinated activities that moved Congress to enact BCRA." Reply 33 (emphasis in original). To support this assertion, plaintiffs rely upon the Business Coalition advertising campaign from 1996 (Reply 32-33), but they point to nothing in BCRA's legislative history to suggest that Congress targeted the Coalition's activity when it enacted BCRA § 214. As explained below, Congress indeed prohibited such activity in BCRA, but it did so by enacting the "electioneering communication" provision, not by changing the coordinated expenditure provision.

Under BCRA, the Coalition's advertising would be prohibited "electioneering communications," regardless of whether it was coordinated with a candidate or political party. <u>See</u> 2 U.S.C. 441b(b)(2). "The Coalition's ad campaign began in early September 1996, and aired through November 4, 1996" with "advertisements aired in approximately 41 Congressional districts .... " SPX 3 at 26-27. Since the general election was on November 5, 1996, these ads — which identified federal candidates, <u>see id.</u> at 30-31 & n.14 — were broadcast within the 60-day electioneering communication period. Thus, under BCRA, the Coalition could not finance such advertising, regardless of whether the Coalition itself was a corporation (see 2 U.S.C. 441b(b)(2)) or whether its funds were donated by corporate entities (2 U.S.C. 441b(c)(1)). <u>See</u> SPX 3 at 18 ("The Coalition conceded that [its] funds were from corporate sources"). Although plaintiffs insist (Reply 32) that this example is not "hypothetical" because it actually occurred more than 10 years ago, the example is nevertheless irrelevant to the issues before this Court because BCRA's electioneering communication provision already ensures that such disbursements are unlawful, with or without coordination.

Plaintiffs compound the irrelevancy of this example by emphasizing (Reply 32) the allegation that a former RNC employee went to work for the Coalition "while carrying on back-channel coordination with his friends and former colleagues the RNC." But such behavior is

evidence of active coordination that would be covered by the regulation's other conduct standards, so it need not be covered under the former employee (or common vendor) rule.  In other words, if the spending is made at the "request or suggestion of," with the "material involvement" of, or after "substantial discussion" with a candidate or party committee, the conduct would be covered by other portions of the conduct prong of the coordination regulation, 11 C.F.R. 109.21(d)(1)-(3), regardless of whether a former employee or common vendor is involved.

Plaintiffs also argue (Reply 33) that because this regulation covers a more narrowly tailored time period than the prior rule, it is subject to a "presumption" against changes in policy. Even if such a presumption exists, it would not apply here because Congress explicitly directed in BCRA § 214(c) that the Commission give new consideration to the treatment of common vendors and former employees.  But even without such statutory direction, "an agency's interpretation of a statute is entitled to no less deference … simply because it has changed over time."  National Home Equity v. OTS, 373 F.3d 1355, 1360 (D.C. Cir. 2004).  "[C]hange is not invalidating, since the whole point of Chevron is to leave the discretion provided by ambiguities of a statute with the implementing agency."  Smiley v. Citibank (South Dakota), 517 U.S. 735, 742 (1996).  Accord United States Air Tour Ass'n v. FAA, 298 F.3d 997, 1006 (D.C. Cir. 2002) ("[t]he Supreme Court has rejected the argument that an agency's interpretation is not entitled to deference because it represents a sharp break with prior interpretations of the statute in question."  (citing Rust v. Sullivan, 500 U.S. 173, 186 (1991))).  Indeed, "[a]n agency willing to study a statute and legislative history and, where appropriate, to amend its interpretation is more deserving of the respect and deference of the courts than an agency that foolishly stays on the wrong path merely because it is well worn."  Piney Mtn. Coal Co. v. Mays, 176 F.3d 753, 767 (4th Cir. 1999).  Accord National Home Equity , 373 F.3d at 1360 (agency "must consider varying interpretations and the wisdom of its policy on a continuing basis") (quoting Chevron,

467 U.S. at 863-64).  The Commission is only required to do what it did here:  support its revision of the rule with "reasoned analysis."  Id. (citing Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 57 (1983)).

Finally, plaintiffs mistakenly claim (Reply 35) that the Commission arbitrarily chose the 120-day period during which common vendor and former employee status indicates coordination.  In its E&J (Vol. III, Doc. 52, A.R. 2175-76), the Commission explained that the time period is supported by the analysis in the Commission's polling regulations, in which only five percent of a poll's value remains between 61 and 180 days, and after that, drops to zero. 11 C.F.R. 106.4(g).  The Commission also took into account testimony it received that material information does not remain material for long periods of time, both because "national and local events" render plans obsolete quickly and because campaigns change their focus significantly as they progress, particularly as they move from a primary election to a general election.  A.R. 2175-76.  Indeed, the same 120-day period is used elsewhere in BCRA, particularly in the part of the definition of "Federal election activity" that governs voter registration activity.  2 U.S.C. 431(20)(A)(i).  It was reasonable for the Commission to take into account factors showing the decreased value of information over time, as well as the significant comments showing the practical burdens the old rule imposed on consultants and employers.  See FEC Br. 55.  All of this reasoned analysis, coupled with the agency's enforcement experience, supports the Commission's rule and its predictive judgment that the 120-day period would be effective without leading to circumvention of the Act.

### D. The Firewall Conduct Regulation Reasonably Accommodates the Rights of Political Committees While Safeguarding Against Unlawful Coordination

Plaintiffs reiterate (Reply 36-38) their criticism of the firewall regulation, 11 C.F.R. 109.21(h), but fail to address the Commission's showing that this regulation reasonably

accommodates both the right of political parties and other political committees to make independent expenditures and the need to prevent unlawful coordination. Specifically, plaintiffs ignore the Commission's showing in its opening brief (at 56-57) that, after <u>Colorado I</u>, political parties and other political committees have the right to make both unlimited independent expenditures and limited coordinated expenditures. <u>See</u> 518 U.S. at 614, 618; 2 U.S.C. 441a(d). <u>See also</u> <u>McConnell</u>, 540 U.S. at 213-214. To enable political committees to exercise these rights, the Commission struck a balanced approach that ensures that the firewall provision does not permit unlawful coordination.

Plaintiffs' arguments (Reply 36-38) are premised on a faulty description of the regulation at issue and a distortion of the Commission's analysis in the EMILY's List MUR (number 5506). Although plaintiffs dismiss (Reply 36) the firewall requirements as "simply litigation spin," the regulation itself and the Commission's E&J make clear that the firewall must be established before any information has been shared, must be described in a written policy distributed to all relevant employees or consultants, and most important, must be effective: <u>i.e.</u>, the safe harbor will be vitiated if there is any specific information indicating that, despite the firewall, material information has passed through it. Vol. III, Doc. 52, A.R. 2178. The E&J explains that a person seeking to use such a firewall must be prepared to support it with reliable information. <u>Id.</u>

Plaintiffs distort (Reply 36) the Commission's analysis in the EMILY's List MUR in claiming that an organization's mere "assertion" that it has a firewall will pretermit a Commission investigation. As explained in the General Counsel's report cited by plaintiffs (PX 137), in that MUR the Commission relied upon detailed statements submitted to the Commission by EMILY's List and the Castor Committee that provided "enough facts to sufficiently rebut the complaint." <u>Id.</u> at 6. EMILY's List provided a detailed description of its policies and organizational structure, and the Castor Committee submitted a detailed statement

explaining how its ad placement decisions were based on public information. Id. at 7. The Commission considered all of this information — far more than a mere assertion — weighed its credibility, and determined that the allegations in the complaint against EMILY's List were sufficiently rebutted by the respondents. Id. at 8.

Taken together, the regulation's text, the Commission's E&J, and the EMILY's List MUR provide ample guidance to a committee seeking to implement an effective firewall. The burden remains on the committee seeking to take advantage of the regulation to produce reliable evidence that it has properly implemented its own firewall.[19] As we previously explained (Br. 59), if any organization is unsure whether its firewall is adequate, it can seek an advisory opinion from the Commission. See Perot v. FEC, 97 F.3d 553, 559-60 (D.C. Cir. 1996) (organization "acts at its peril, unless it first secures an FEC advisory opinion pursuant to 2 U.S.C. § 437f"). Plaintiffs do not dispute this important point, but simply assume that the Commission will not enforce its own regulation. However, the Court "must presume, in this facial challenge," that the Commission will apply its regulations "in good faith," Sullivan v. Everhart, 494 U.S. 83, 94 (1989). If the Commission were to misapply it in any particular case, judicial review would be available to the complainant at that time under 2 U.S.C. 437g(a)(8). Accordingly, plaintiffs have failed to sustain their burden of demonstrating that the Commission's firewall regulation is "arbitrary and capricious" under the APA.

## II.    THE REGULATORY DEFINITIONS OF "VOTER REGISTRATION ACTIVITY" AND "GET-OUT-THE-VOTE ACTIVITY" SATISFY CHEVRON AND APA REVIEW AND SERVE THE FECA'S PURPOSES

In its opening brief (at 15-23), the Commission showed that, properly viewed, the regula-tions defining "voter registration activity" and "get-out-the-vote activity" ("GOTV") 11 C.F.R.

---

[19]    Plaintiffs' argument that courts have rejected the sufficiency of firewalls in other contexts is irrelevant. Reply at 36-37 & n.37. The Commission, too, has made it clear that if it finds a purported firewall ineffective, it may proceed with an enforcement action. Vol. III, A.R. 2178.

100.24(a)(2), (3), are consistent with the FECA and serve the statute's purposes. Plaintiffs'

opposition reveals the same narrow perspective shown in their challenge to the Commission's

other regulations. Contrary to plaintiffs' claims, the Commission's definitions of "voter

registration activity" and "GOTV activity" create no huge loophole, and plaintiffs have presented

no evidence that the risk of circumvention is real. As we show below, these regulations, in

combination with other restrictions, capture much more activity than plaintiffs acknowledge.

   Plaintiffs do not dispute that in Shays I, this Court concluded that under Chevron step two

these definitions were "not impermissible" constructions of the statute, 337 F.Supp.2d at 100,

103, 105, and that "it is possible to read the term 'voter registration activity' to encompass those

activities that actually register persons to vote, as opposed to those that only encourage persons

to do so without more," id. at 99. The Court reached a similar conclusion regarding "GOTV

activity" because the term could mean either "any activity that is intended to get people to go out

and vote, including encouraging them to do so" or "activities that actually physically get[ ]

people to the polls." Id. at 103.

   Plaintiffs rely (Reply 44-45) upon the Levin Amendment, codified at 2 U.S.C. 441i(b)(2),

as though it resolves the issues concerning the definitions of "voter registration activity" and

"GOTV activity." But the Levin Amendment does not define or elucidate those terms, nor does

any other provision of BCRA. Rather, Congress left a gap for the Commission to fill, and this

Court suggested that if the Commission interpreted its regulations to include a party committee's

taking steps beyond mere encouragement to assist citizens actually to register to vote or to get

out to vote, the regulations would fully satisfy Chevron step two. 337 F.Supp.2d at 100. As the

Commission's expanded E&J makes clear, that is just how the Commission interprets its voter

registration and GOTV regulations. See Vol. I, Doc. 27, A.R. 424-25.[20]

---

[20]    Plaintiffs implicitly acknowledge (Reply 43) that the Commission may exclude mere
encouragement from the regulatory definitions of "voter registration activity" and "GOTV

In attacking the Commission's "voter registration activity" and "GOTV activity" regulations, plaintiffs rely heavily (Reply 43) upon a speculative scenario from which they draw unfounded conclusions. "[W]ithin days of a federal election," plaintiffs hypothesize, a state party sends out "multiple direct mailings to every potential voter sympathetic to its cause urging them to register and vote." Reply 43 (internal quotation marks omitted). The same state party "blanket[s] the state with automated telephone calls by celebrities identifying the date of an election and exhorting recipients to get out to vote." Id. This sketchy scenario fails to describe clearly the contents of the hypothetical communications, and plaintiffs and their amici — who themselves are experienced federal candidates — offer no evidence that any political party has ever done anything like this. Nor do they explain why a political party committee would choose to undertake what they characterize (Reply 43) as "expensive efforts" to deliver such a neutral message: one that only reminds the recipient to vote on a specified date and does not clearly identify any candidate or tout any political party, or offer any instructions on when or where to vote, or offer any assistance in getting to the polls.[21]  In the absence of such evidence, there is no basis for the Court to decline to defer to the Commission's predictive judgment on this question.

Perhaps more important, plaintiffs vastly overstate the consequences of certain activities

---

activity." They conclusorily assert that "[i]t is not difficult … to draft a rule that excludes these sorts of incidental, routine exhortations," but they offer no suggestions for such a rule, and they erroneously claim that the Commission has "go[ne] to the extreme of also excluding, e.g., expensive telephone bank campaigns." Id. The terms "GOTV" and "voter registration" plainly do not depend on how much is spent, and as we explain below, the Commission has indicated that telephone bank campaigns would come within the GOTV regulation under certain circumstances.

[21]    Plaintiffs' hypothetical scenario is particularly contrived in its assumption that a state party committee would include an exhortation to register to vote only days before an election. Of the 50 state jurisdictions and the District of Columbia, only four or five permit registration within a few days of an election. The United States Election Assistance Commission has compiled a list of state voter registration deadlines as part of its updated National Voter Registration Form. Go to www.eac.gov/docs/NVRA%20Update%2009-12-06.pdf; the list is found at pp. 3-20 of the Form pamphlet.

falling outside the definitions of "GOTV activity" or "voter registration activity." Even if it were

clear that the activities sketched in plaintiffs' hypothetical scenario do not come within these

definitions or any other definition of activity constituting "federal election activity," plaintiffs

would still be wrong in asserting (Reply 43) that the hypothetical state party committee's "efforts

can … be funded entirely with soft money." 11 C.F.R. 106.7(b) provides in relevant part

(emphasis added):

> State, district, and local party committees that make expenditures and
> disbursements in connection with both Federal and non-Federal elections
> for activities that are not Federal election activities pursuant to 11 CFR
> 100.24 may use only funds subject to the prohibitions and limitations of the
> Act, or they may allocate such expenditures and disbursements between
> their Federal and their non-Federal accounts.

See also 11 C.F.R. 106.7(c)(5) (expenses for voter registration, GOTV drives, and "any other

activities that urge the general public to register or vote … [and] that do not qualify as Federal

election activities … must be paid with Federal funds or may be allocated between the

committee's Federal and non-Federal accounts"). Thus, plaintiffs' hypothetical state party

committee would still be required to finance its activities with federal funds only or with an

allocation of federal and nonfederal dollars. If the state party committee chooses to allocate, the

pertinent allocation formula would depend, just as it does when Levin funds are used, on which

federal offices were on the ballot, see 11 C.F.R. 106.7(c), (d), and the percentage of the costs that

must be paid with federal dollars would be the same. Compare 11 C.F.R. 106.7(d)(3)(i-iv) to

11 C.F.R. 300.33(b).[22] The primary difference would simply be that, if the party committee

chooses to allocate, it would not be limited to Levin funds in paying the nonfederal portion. Id.[23]

---

[22] See 11 C.F.R. 300.2(i) (definition of "Levin funds"); 71 Fed. Reg. 18,591 n.19 (2006) (explanation of Levin funds).

[23] Thus, amici are simply wrong in asserting (McCain Br. 17) that the requester in AO 2006-19, 2 Fed. Election Camp. Fin. Guide (CCH) ¶ 6505 (June 5, 2006), "was free to pay for the activities entirely with soft money." They repeat that error at page 18.

Moreover, plaintiffs' hypothetical is misleading to the extent it suggests that a broad range of similar activity would fall outside the scope of 2 U.S.C. 431(20)(A)(i) or (ii). For example, if party communications do not mention particular candidates but nevertheless urge the recipients to support a particular political party, the communications would fall within the "generic campaign activity" category of "federal election activity." Because "generic campaign activity" and "get-out-the-vote activity" are treated identically under section 431(20)(A)(ii), the fact that an ad may fall within the former but not the latter has no regulatory significance.

Amici rely upon exactly this kind of hypothetical scenario (McCain Br. 19), yet they ignore the consequences of the Act's treatment of generic campaign activity. Their example clearly involves such activity: A "robo-call" provides the following message: "'Today is election day. Polls are open from 7 a.m. until 8 p.m. Don't forget to get-out-and-vote Democratic/ Republican!'" Amici assert (Br. 18) that this hypothetical message could be financed entirely by nonfederal funds, but, as we have just explained, the party committee would be required to pay the costs for such generic campaign activity with federal funds only or a mixture of federal and Levin funds.[24]

Other close variations on plaintiffs' hypothetical facts would bring the activities clearly within the scope of other regulatory provisions. For example, if the mass mailings and automated telephone calls urge the recipients to "Vote for [a clearly identified federal candidate]," those communications are undeniably federal election activity that must be paid for entirely with federal funds. 2 U.S.C. 431(20)(A)(iii); 431(22) (definition of "public communication"); 11 C.F.R. 100.24(b)(3) (public communication that promotes or supports a

---

[24]     This treatment of amici's hypothetical telephone message is not in conflict with AO 2006-19. Not only did that opinion not involve generic campaign activity, but, unlike amici's hypothetical calls, the telephone messages in AO 2006-19 did not include the times the polls would be open, a material fact, and were to be made between four and fifteen days before the election.

candidate for federal office); 11 C.F.R. 300.33(c)(1). Or, if the calls offered to help find transportation to a person's polling place, such an offer of "assistance" would bring the calls within the GOTV regulation.

Plaintiffs also ignore the fact that a communication's focus on candidates for state office will not necessarily immunize the communication from being considered voter registration or GOTV activity. For example, GOTV efforts by a state or local party committee can satisfy the regulation's "assist" and "individual contact" requirements even if the only clearly identified candidate is a state or local candidate. See 67 Fed. Reg. 49,064, 49,070 (July 29, 2002) (Final Rules; Prohibited and Excessive Contributions; Non-Federal Funds or Soft Money) (excluding from an exception to the definition of "federal election activity" "a telephone bank on the day before an election where there is a Federal candidate on the ballot and where GOTV phone calls are made to over 500 voters, even if the calls only refer to a State or local candidate.").[25]

In sum, plaintiffs' speculative predictions rest on incorrect or incomplete facts and an unduly narrow view of the law that fails to take into account all the relevant provisions of the regulatory scheme. The definitions of "voter registration activity" and "GOTV activity" fully support the Act's purposes when they are viewed, as they must be, as part of that regulatory

---

[25]     Amici do not mention this passage from the 2002 E&J when discussing AO 2006-19. McCain Br. 17-18. Like plaintiffs, they minimize the importance of the factual circumstances in AO 2006-19 and improperly generalize about the Commission's views and intentions from that one limited advisory opinion. When the Commission opines that the Act and the implementing regulations permit certain proposed activity, that opinion may be relied upon only by the persons involved in the proposed undertaking and by any person involved in a transaction or activity that is "indistinguishable in all its material aspects from the transaction or activity" that was the subject of the AO. 2 U.S.C. 437f(c)(B) (emphasis added). In AO 2006-19, the Commission stressed the fact-dependent nature of its opinion: "The Commission emphasizes that if there is a change in any of the facts or assumptions presented, and such facts or assumptions are material to a conclusion presented in this advisory opinion, then the requester may not rely upon that conclusion as support for its proposed activity." 2 Fed. Election Camp. Fin. Guide (CCH) ¶ 6505, at 17,242.

scheme governing the financing of federal election activities.  Therefore, the Commission's

regulation satisfies the deferential review applied under <u>Chevron</u> and the APA.

## III.   THE REVISED EXPLANATION AND JUSTIFICATION FOR 11 C.F.R. 300.64 SATISFIES THE APA'S REASONED ANALYSIS REQUIREMENT

The Commission's regulation concerning state, district, and local party committee

fundraising events provides in pertinent part that federal candidates and officeholders "may

speak at [a fundraising event for those party organizations] without restriction or regulation."

11 C.F.R. 300.64(b).  The regulation implements 2 U.S.C. 441i(e)(3), in which Congress created

a special exception from 2 U.S.C. 441i(e)(1)(B), a generally applicable provision limiting the

amount of nonfederal funds that can be solicited by federal candidates and officeholders.

Congress's explicit language in section 441i(e)(3) exempting state and local party fundraising

events from the general statutory limit on solicitations of nonfederal funds supports the

Commission's conclusion that this solicitation limit does not apply to a federal candidate's or

officeholder's speech during such an event.  Thus, in <u>Shays I</u>, this Court found that the regulation

satisfies <u>Chevron</u> steps one and two.  337 F.Supp.2d at 90, 92.  Plaintiffs "agree that this Court's

earlier <u>Chevron</u> rulings about this exception [11 C.F.R. 300.64] are the law of the case" (Reply

42 n.42).[26]  Plaintiffs assume, without support in the statute or legislative history, that Congress

directed the Commission to interpret narrowly the explicit exemption that Congress provided.

In our opening brief (at 23-31), we addressed the remaining issue:  whether the

Commission's revised E&J for the regulation (Vol. II, Doc. 23, A.R. 673-78) satisfies the APA's

reasoned analysis requirement.  In their reply, plaintiffs do not contest any of the following

important points:  (1) 2 U.S.C. 441i(e) was meant to preserve the traditional associational and

---

[26]     Plaintiffs add (Reply 42 n.42) that the law-of-the-case doctrine is "a rule of practice, not a mandatory bar to reconsideration" but they offer no reason why this Court should not follow the usual practice in this case, since plaintiffs had a full opportunity in <u>Shays I</u> to argue vigorously that the regulation does not pass <u>Chevron</u> review.  Amici devote most of their discussion of 11 C.F.R. 300.64 to repeating the arguments that plaintiffs then made.  <u>See</u> McCain Br. 12-15.

fundraising roles of federal officeholders and candidates at state, district, and local party gatherings (FEC Br. 26; A.R. 675); (2) most other fundraising venues do not present the same kind of potential for ambiguity as a federal candidate's or officeholder's appearance at a state, district, or local party fundraising event (Br. 30; A.R. 676); (3) other statutes, such as the Hatch Act, that regulate political speech differ significantly from the FECA (Br. 31; A.R. 677); and (4) the Commission's revised definitions of "solicit" and "direct" have heightened the concern about unnecessarily chilling the speech of federal officeholders and candidates while appearing at state, district, or local party fundraising events (Br. 27; A.R. 677). Nor have plaintiffs provided any real-life examples of problems with this regulation.

Instead, plaintiffs rest their case on the Commission's decision not to treat federal officeholders' or candidates' speech at state <u>party</u> fundraisers the same as at state <u>candidate</u> fundraisers. <u>See</u> Pl. Reply Br. 39-41. But <u>Congress</u>, not the Commission, singled out attendance by federal officeholders and candidates at state, district, and local political party fundraising events for special treatment under the statute, and contrary to plaintiffs' assumption, the Commission was not required to interpret this special exception to provide the least possible protection for officeholders' and candidates' speech. In 2 U.S.C. 441i(e)(3), Congress specified that those individuals "may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party." The provision's express terms include fundraisers for state, district, or local parties but not for state or local candidates. As the Commission explained in its revised E&J (A.R. 675-77), 11 C.F.R. 300.64 reflects that congressional policy choice. Indeed, if the permissible scope of a federal officeholder's activities were the same for <u>all</u> state and local fundraising, as plaintiffs suggest, that would amount to removing Congress's limiting phrase ("State, district, or local committee") from section 441i(e)(3). It is well settled that "read[ing a] term … out of the statute" is "a result

contrary to basic principles of statutory interpretation." Senior Resources v. Jackson, 412 F.3d

112, 117-18 (D.C. Cir. 2005).[27]

The Commission's E&J also explains that the relationship between federal officeholders

and candidates and state, district, and local parties is "unique" (Vol. II, Doc. 23, A.R. 675, 676),

and the testimony before the Commission supports that conclusion.  Representatives of both

major political parties commented that these state and local party fundraising events are essential

to engage volunteers in the political process and to motivate them.  See Vol. II, Doc. 18, A.R.

523-26; A.R. 675.  As the E&J notes (A.R. 675), "party fundraising events … energize grass

roots volunteers vital to the political process."  The relationship between federal officeholders or

candidates and state, district, and local party committees is ongoing and rests on a long-term

affinity of interests.  See A.R. 676 (federal officeholders' and candidates' "special identification

with" those party committees).  Unlike a state or local candidate, whose relationship with federal

officeholders or candidates is individualized and often short-lived, state and local parties are

institutions with long histories and futures.  Their existence and vitality do not depend on any

one individual, and federal officeholders and candidates have an interest in supporting their

continued health and development.  See FEC v. Colorado Republican Federal Campaign Comm.,

533 U.S. 431, 449 (2001) ("There is no question about the closeness of candidates to parties.").

Moreover, unlike state and local candidates, state party committees generally have a role in

selecting federal candidates.  See, e.g., Colorado I, 518 U.S. at 613-14.  Thus, a speech by a

_____

[27]    Plaintiffs minimize the importance of interpreting a statutory scheme so that no part is
superfluous or insignificant.  The two cases on which they rely do not involve, as here, a
construction that would eliminate the effect of limiting language Congress wrote into an explicit
statutory exception.  In Lamie v. United States Trustee, 540 U.S. 526, 535-36 (2004), the
Supreme Court decided that, although a new version of a bankruptcy statute was awkward,
ungrammatical, and included one term that might well be surplusage, the plain language of that
version controlled because it was not ambiguous and did not lead to absurd results.  In Sabre,
Inc. v. Department of Transportation, 429 F.3d 1113, 1122 (D.C. Cir. 2005), the D.C. Circuit
concluded that the Department permissibly interpreted a seemingly redundant phrase in a
statutory definition as Congress's way of emphasizing the breadth of the definition.

federal officeholder or candidate at a fundraising event for a state party committee will be understood as reflecting the close, unique relationship between that speaker and the party committee.  Consequently, as the Commission found (A.R. 676), that relationship makes "parsing speech" at state fundraising events "more difficult than in other [fundraising] contexts."

Plaintiffs argue (Reply 40-41) that the Commission should have included a disclaimer requirement in its regulation similar to the disclaimer that several AOs suggest federal officeholders and candidates should provide at other fundraising events, including fundraisers for state and local candidates.  Amici echo this argument (McCain Br. 15-17).  However, the argument fails for several reasons.  First, as discussed above, Congress expressly singled out state, district, and local party fundraising events for an exemption from the generally applicable prohibition of 2 U.S.C. 441i(e)(1); if federal officeholders and candidates were subject to the same requirements at those party fundraisers as at other fundraisers that Congress excluded from the exception, then Congress's special treatment of those party events would be nullified.[28] Second, as the Commission stated in its E&J, the "notwithstanding" phrase in 2 U.S.C. 441i(e)(3) "suggests Congress intended the provision to be a complete exemption" (A.R. 675), and Congress included none of the restrictions advocated by plaintiffs in the language of that statutory exemption.  Third, requiring such a disclaimer would make section 441i(e)(3) largely superfluous.  As we previously explained (Br. 25-26 & n.15; A.R. 675), even without section 441i(e)(3), section 441i(e)(1)(B) permits federal officeholders and candidates to solicit limited amounts of funds in connection with nonfederal elections for state, district, and local party committees.  The Commission harmonized these two statutory provisions and gave section 441i(e)(3) independent significance in the statutory scheme by allowing federal officeholders

---

[28]    Plaintiffs do not challenge the Commission's decisions in the various AOs that federal officeholders or candidates should make disclaimers at certain fundraising events, including a fundraiser for a state candidate.  See Reply 40-41 & n.40.  Rather, the gist of plaintiffs' argument is that similar disclaimers should be required at fundraisers for state or local parties.

and candidates to speak without limitation only at state or local party fundraising events.[29]

In sum, "the requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result," but this is not "particularly demanding." Public Citizen v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993). "[T]he agency need only state the main reasons for its decision and indicate it has considered the most important objections." Id. (quoting Simpson v. Young, 854 F.2d 1429, 1435 (D.C. Cir. 1988)). In justifying its regulation, the Commission reasonably emphasized the importance of the special relationship between federal officeholders and candidates and their state, district, and local political party committees, and the consequences of that relationship for those individuals' participation in fundraising events by and for those party organizations. The Commission also explained that it interpreted the interrelated provisions of 2 U.S.C. 441i(e) to implement Congress's intent to treat state, district, and local party fundraising events differently from other kinds of fundraising events — an interpretation that this Court has already found satisfies Chevron review. Therefore, in accordance with APA requirements, the revised E&J presents a reasoned analysis of the regulation, 11 C.F.R. 300.64.

## CONCLUSION

The task of this Court "is to ask whether the Commission made choices reasonably within the pale of statutory possibility." AT&T Corp. v. FCC, 349 F.3d 692, 699 (D.C. Cir. 2003) (citation and quotation marks omitted). Because the Commission has shown that its

---

[29]    Plaintiffs attribute (Reply 41 n.41) the potential redundancy to the Commission's interpretation of 2 U.S.C. 441i(e)(1)(B) rather than to the statute's plain language, but the statutory language itself clearly allows federal officeholders and candidates to solicit a limited amount of funds in connection with nonfederal elections. Even if the language of section 441i(e)(1)(B) were not so clear, plaintiffs have embraced the Commission's opinion that disclaimers should be made in certain fundraising contexts and therefore have not challenged the Commission's conclusion that such fundraising is generally permissible outside the party fundraiser context when accompanied by adequate disclaimers limiting the entire fundraising solicitation to federally permissible funds.

choices are reasonable, sufficiently explained, and contradict nothing in the statute, this Court

should grant the Commission's motion for summary judgment and deny plaintiffs' motion for

summary judgment "even if the agency's reading differs from what the court believes is the best

statutory interpretation." Covad Communications Co. v. FCC, 450 F.3d 528, 537 (D.C. Cir.

2006) (citation and quotation marks omitted).


Respectfully submitted,

/s/ Thomasenia P. Duncan
Thomasenia P. Duncan
Acting General Counsel

/s/ Richard B. Bader
Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

/s/ David Kolker
David Kolker
Assistant General Counsel
(D.C. Bar # 394558)

/s/ Vivien Clair
Vivien Clair
Attorney

/s/ Greg J. Mueller
Greg J. Mueller
Attorney
(D.C. Bar # 462840)

March 16, 2007                    FOR THE DEFENDANT
                                  FEDERAL ELECTION COMMISSION
                                  999 E Street, N.W.
                                  Washington, D.C. 20463
                                  (202) 694-1650

# GLOSSARY

| | | |
|---|---|---|
| A.R. | = | Administrative Record |
| AO | = | Advisory Opinion |
| APA | = | Administrative Procedure Act |
| BCRA | = | Bipartisan Campaign Reform Act of 2002 |
| CCP | = | Center for Competitive Politics |
| CMAG | = | TNS Media Intelligence/CMAG |
| DNC | = | Democratic National Committee |
| E&J | = | Explanation and Justification |
| EXH. | = | Defendant FEC's exhibits submitted 3/16/07 in support of motion for summary judgment |
| FEC | = | Federal Election Commission |
| FECA | = | Federal Election Campaign Act of 1971, as amended, 2 U.S.C. 431-455 |
| GOTV | = | Get out the vote |
| PASO | = | Promote, attack, support, or oppose |
| PX | = | Plaintiffs' Exhibit |
| RNC | = | Republican National Committee |
| Shays I | = | Shays v. FEC, 337 F.Supp.2d 28 (D.D.C. 2004) |
| SOR | = | Statement of Reasons |
| SPX | = | Supplemental Plaintiffs' Exhibit |
| SSA | = | Social Security Administration |