UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHRISTOPHER SHAYS,

    Plaintiff,

      v.

UNITED STATES FEDERAL ELECTION
COMMISSION,

    Defendant.

Civil Action No. 06–1247 (CKK)

**MEMORANDUM OPINION**
(September 12, 2007)

Currently pending before the Court are cross-motions for summary judgment filed by

Plaintiff, Christopher Shays ("Shays" or "Plaintiff"), a member of the United States House of

Representatives, and Defendant, the Federal Election Commission ("FEC" or "Commission" or

"Defendant"). Plaintiff's Complaint in this action challenges the FEC's alleged "continuing

failure to promulgate lawful regulations" implementing Titles I and II of the Bipartisan

Campaign Reform Act ("BCRA")–specifically regulations governing "coordinated

communications," "Federal election activity," and solicitations of nonfederal money by federal

officeholders and candidates at state, district, and local fundraising events. Compl. ¶ 2.[1] The

above-captioned action represents Plaintiff's second challenge to these regulations–Plaintiff

previously filed a related action, *Shays v. Federal Election Commission*, Civil Action No. 02-

1984 (CKK), in which he challenged the then-effective versions of these regulations. *See Shays*

---

[1] The Court explains the term "nonfederal" money or funds, commonly referred to as
"soft money," *infra* at note 3.

1

*v. FEC*, 337 F. Supp. 2d 28, 35 (D.D.C. 2004) ("*Shays I*").[2]  This Court granted-in-part and

denied-in-part each party's motion for summary judgment in *Shays I*, and invalidated and

remanded fifteen regulations promulgated by the FEC, including the regulations at issue in the

instant action.  *See id.* at 130-31.  The FEC subsequently appealed this Court's summary

judgment decision in *Shays I* with respect to five rules, only one of which is challenged herein,

and on July 15, 2005, the United States Court of Appeals for the District of Columbia Circuit

affirmed this Court's "invalidation of all five rules at issue."  *See Shays v. FEC*, 414 F.3d 76, 82,

105 (D.C. Cir. 2005) ("*Shays I Appeal*").

Following the decisions in *Shays I* and the *Shays I Appeal*, the Commission initiated

rulemaking proceedings for each of the regulations challenged herein, and either promulgated a

revised regulation or retained its previous regulation while revising the accompanying

---

[2] Like *Shays I*, the above-captioned action was jointly filed by Plaintiff Shays and Martin
Meehan ("Meehan"), a former Member of the United States House of Representatives from the
Fifth Congressional District of the Commonwealth of Massachusetts.  Pl.'s Statement of Material
Facts As To Which Plaintiffs Contend There is No Genuine Issue ¶ 14.  Meehan was first elected
to Congress in 1992, was re-elected every two years thereafter, and, along with Plaintiff Shays,
was one of the principal House sponsors of the legislation enacted as BCRA.  *Id.* ¶¶ 15, 17.
However, it has come to the Court's attention (through no effort of the parties) that Meehan
resigned from Congress on July 1, 2007, *see* http://clerk.house.gov/member_info/
vacancies_pr.html?pr=house&vid=4, to become the Chancellor of the University of
Massachusetts at Lowell, *see* http://www.uml.edu/about/leadership/meehan.html.  It appears to
the Court that, in light of his resignation from Congress, Meehan lacks standing to pursue this
action.  The FEC is not contesting Plaintiff Shays' standing to bring this action, *see* Def.'s Mem.
in Support of its Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Br.") at 15
n.7; however, both the D.C. Circuit and this Court determined that Shays and Meehan had
standing in *Shays I* because "'the regulations [at issue] shape the environment in which [they]
must operate' as officeholders and candidates."  *Shays v. FEC*, 414 F.3d 76, 82 (D.C Cir. 2005)
(quoting *Shays I*, 337 F. Supp. 2d at 44).  As the Court lacks any indication that Meehan is still
either an officeholder or a candidate, it appears that his environment is no longer shaped by the
regulations at issue.  The Court shall therefore assume that the instant action is brought solely by
Plaintiff Shays.

Explanation and Justification ("E&J"). Plaintiff's Complaint in this action challenges the FEC's alleged "continuing failure to promulgate lawful regulations . . . as required by the opinions and judgment in *Shays I* and by [BCRA]." Compl. ¶ 2. Upon searching consideration of the parties' briefing, the administrative record of the relevant rulemaking proceedings, the relevant case law and statutes, and the entire record herein, the Court shall grant-in-part and deny-in-part Plaintiff's Motion for Summary Judgment and shall grant-in-part and deny-in-part Defendant's Motion for Summary Judgment.

### Summary of Conclusions

The Court concludes that the revised coordinated communications content standard contained in 11 C.F.R. § 109.21(c)(4) survives *Chevron* analysis, but does not meet the Administrative Procedure Act's ("APA") requirement of reasoned decisionmaking. *See infra* at 35-55. With respect to the revised coordinated communications conduct standards at 11 C.F.R. § 109.21(d), the Court finds that the revised temporal limit for the common vendor and former employee conduct standards in 11 C.F.R. §§ 109.21(d)(4) and (d)(5) survives *Chevron* step two analysis but is nevertheless arbitrary and capricious, in violation of the APA. *See infra* at 55-61. The Court further concludes that the new firewall safe harbor included in the conduct standards fails *Chevron* step two analysis and is also arbitrary and capricious, in violation of the APA. *See infra* at 61-69. As to the exemption for solicitation by federal candidates and officeholders at state, district, or local party fundraising events, found at 11 C.F.R. § 300.64(b), the Court concludes that the provision survives APA review. *See infra* at 69-79. Finally, the Court finds that the definitions of "voter registration activity" and "get-out-the-vote activity" contained in the Commission's regulations governing "Federal election activity," 11 C.F.R. §§ 100.24(a)(2)-

(a)(3), fail both *Chevron* step two and APA analysis.  *See infra* at 79-93.  The Court therefore

remands the following regulations to the Commission for further action consistent with this

Memorandum Opinion and the accompanying Order: 11 C.F.R. § 109.21(c); 11 C.F.R.

§109.21(d); 11 C.F.R. § 100.24(a)(2); and 11 C.F.R. § 100.24(a)(3).

## I.  BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to

the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h)).  As such, in resolving the

instant cross-motions for summary judgment, the Court "assumes that facts identified by the

moving party in the statement of material facts are admitted, unless such a fact is controverted in

the statement of genuine issues filed in opposition to the motion."  LCvR 56.1; 7(h).

Specifically, the Court looks to each party's statement to cull out the relevant undisputed facts

and to determine those facts that are conceded by the cross-moving party.

The Court further notes that the events, statutes, and case law underlying this action have

been the subject of numerous opinions of this Court, the United States Court of Appeals for the

District of Columbia Circuit, and the United States Supreme Court.  *See McConnell*, 540 U.S.

93; *Shays I*, 337 F. Supp. 2d 28; *Shays I Appeal*, 414 F.3d 76.  Accordingly, the Court shall recite

herein only those facts that are relevant in resolving the instant cross-motions for summary

judgment.

### A.    *Events Prior to Shays I*

The Bipartisan Campaign Reform Act, H.R. 2356, was signed into law on March 27,

2002, and amended the Federal Election Campaign Act of 1971 (the "Act" or "FECA").  *Shays I*,

337 F. Supp. 2d at 36-37.  The Federal Election Commission is the independent agency of the

United States government with exclusive jurisdiction to administer, interpret, and civilly enforce FECA. *Id.* at 37. As directed in BCRA, the Commission initiated rulemaking proceedings and subsequently promulgated regulations implementing BCRA. *Id.* Those regulations included, *inter alia*, rules governing Federal election activity of state, district, and local parties, and solicitation by federal candidates and officeholders at state, district, and local party fundraising events, all of which became effective on November 6, 2002, as well as a rule governing "Coordinated and Independent Expenditures," which became effective on February 3, 2003. *Shays I*, 337 F. Supp. 2d at 37-38; Pl.'s Statement of Material Facts As To Which Plaintiffs Contend There is No Genuine Issue ("Pl.'s Stmt.") ¶¶ 4-5; Def.'s Stmt. of Material Facts Not in Genuine Dispute ("Def.'s Stmt.") ¶¶ 3-6.

Plaintiff Christopher Shays is a citizen of the United States, a Member of Congress, candidate, voter, recipient of campaign contributions, fundraiser, and member of a political party. Pl.'s Stmt. ¶ 18. Plaintiff Shays is a Member of the United States House of Representatives from the Fourth Congressional District of the State of Connecticut. *Id*. ¶ 14. He was first elected in 1987, was re-elected in 1988, has been re-elected every two years thereafter, and is running for re-election in November 2008. *Id*. Plaintiff is subject to regulation under FECA, BCRA, and the Commission's implementing regulations. *Id*. ¶ 18. Along with Martin Meehan, the former Member of the United States House of Representatives from the Fifth Congressional District of Massachusetts, *id.* ¶ 15, Plaintiff Shays was one of the principal House sponsors of the legislation enacted as BCRA and spent many years seeking to promote its enactment, *id.* ¶ 16. Shays and Meehan, along with other co-sponsors of BCRA, submitted written comments on the FEC's proposed rules implementing BCRA's provisions, including the rulemaking proceedings

5

undertaken in response to the decisions of this Court in *Shays I* and the D.C. Circuit in the *Shays I Appeal*. *Id.* ¶ 17.  The Commission did not adopt some of Shays' and Meehan's views in its final rules. *Id.*; Def.'s Stmt. of Gen. Issues ("Def.'s Resp. Stmt.") ¶ 17.

### B. Shays I

Plaintiff's Complaint and Amended Complaint in *Shays I* challenged a number of the Commission's regulations implementing Titles I and II of BCRA.  *Shays I*, 337 F. Supp. 2d at 35. This Court's September 18, 2004 Memorandum Opinion and Order invalidated some of those regulations including, *inter alia*, 11 C.F.R. §§ 100.24(a)(2) and (a)(3), 109.21(c), and 300.64(b), the regulations governing Federal election activity, coordinated communications, and solicitation by federal officeholders and candidates at state, district, and local fundraising events.  *Id.* at 55-65, 88-93, 97-107, 129-30.[3]  The FEC appealed this Court's resolution of Plaintiff's challenge to the coordinated communications regulations, as well as with four other regulations, and on July 15, 2005, the United States Court of Appeals for the District of Columbia Circuit affirmed this Court's invalidation of those regulations.  *Shays I Appeal*, 414 F.3d at 97-102.[4]

---

[3] As the Court explained in *Shays I*, the terms "nonfederal money" and "soft money" refer to donations that "the FEC permitted national and state party committees to solicit and accept . . . outside of FECA's source and amount limitations . . . provided that these moneys were placed in separate accounts from federal funds."  337 F. Supp. 2d at 73 (quoting *McConnell*, 251 F. Supp. 2d at 196 (per curiam) (footnote omitted)).  The Court refers to such funds as "nonfederal money" or "nonfederal funds."  In contrast, "federal funds" are "funds subject to the limitations, prohibitions, and reporting requirements of" FECA.  2 U.S.C. § 441i(b)(1); *see also McConnell*, 251 F. Supp. 2d at 197. ("Federal funds are those monies regulated under FECA, as amended") (per curiam).

[4] The FEC did not appeal this Court's resolution of Plaintiff's challenge to the regulations governing Federal election activity and solicitation by federal candidates and officeholders at state, district, and local party fundraisers, 11 C.F.R. §§ 100.24(a)(2)-(a)(3) and 300.64(b).  *See* Def.'s Stmt. ¶ 9.  Plaintiff notes that he and Meehan filed a Notice of Cross-Appeal with the intent of challenging this Court's resolution of those issues, but moved for voluntary dismissal of

### C.    Post-Shays I Rulemaking Proceedings

#### 1.    Solicitation At Party Fundraising Events

On February 24, 2005, the Commission issued a Notice of Proposed Rulemaking ("NPRM") on "Solicitation at State, District, and Local Party Fundraising Events" by federal candidates and officeholders. Def.'s Stmt. ¶ 11; Pl.'s Stmt. ¶ 7. The NPRM proposed revisions to the E&J for the existing regulation, 11 C.F.R. § 300.64 (2003), and alternatively proposed revising the regulation to prohibit federal officeholders and candidates from soliciting or directing nonfederal funds when attending or speaking at state, district, or local party fundraisers. Def.'s Stmt. ¶ 12. The Commission received written comments, Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶ 7, and held a public hearing on its fundraiser NPRM on May 17, 2005, at which it heard testimony from various witnesses, Def.'s Stmt. ¶¶ 14-15; Pl.'s Stmt. ¶ 7. After conducting an open meeting on June 23, 2005, the Commission voted to approve a revised E&J for the fundraiser regulation. Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 7. The Commission's revised E&J for final rule 11 C.F.R. § 300.64 was published in the Federal Register on June 30, 2005. Def.'s Stmt. ¶ 17; Pl.'s Stmt. ¶ 8; *see also* Candidate Solicitation at State, District, and Local Party Fundraising Events, 70 Fed. Reg. at 37,649-54.

#### 2.    Federal Election Activity

On May 4, 2005, the FEC published its NPRM regarding "Federal election activity" ("FEA") of state and local parties, including definitions of the terms "voter registration activity" and "get-out-the-vote activity" ("GOTV activity"). Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶ 8. The

---

that cross-appeal after the FEC decided to begin new administrative proceedings rather than pursue an appeal of those regulations. Pl.'s Resps. and Objs. to Def.'s Stmt. of Mat'l Facts Not in Gen. Dispute ("Pl.'s Resp. Stmt.") ¶ 9.

Commission's NPRM did not propose any changes to the regulatory definition of the term voter registration activity, but indicated that it would issue an expanded E&J for the definition. Def.'s Stmt. ¶ 19. The NPRM proposed certain changes to the regulatory definition of the term GOTV activity. *Id.* ¶ 20. The Commission received written comments, *id.* ¶ 21, Pl.'s Stmt. ¶ 8, and held a public hearing on the FEA NPRM on August 4, 2005, at which it heard testimony from various witnesses, Def.'s Stmt. ¶ 22; Pl.'s Stmt. ¶ 8. On August 30, 2005, the FEC published a notice to reopen the comment period on the FEA NPRM for 30 days, after which the Commission received two additional written comments. Def.'s Stmt. ¶ 23. After conducting an open meeting, the FEC adopted the revised final rules on the definition of FEA, along with an expanded E&J, on February 9, 2006. *Id.* ¶ 24; Pl.'s Stmt. ¶ 8. On February 10, 2006, the Commission transmitted to Congress, and on February 22, 2006, promulgated in the Federal Register, its final rules defining voter registration activity and GOTV activity along with an expanded E&J. Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 8; *see also* Definition of Federal Election Activity, 71 Fed. Reg. at 8,926-32. These regulations became effective on March 24, 2006. Pl.'s Stmt. ¶ 8.

### 3.    *Coordinated Communications*

On December 14, 2005, the Commission published a NPRM that proposed seven alternatives addressing coordinated communications. Def.'s Stmt. ¶ 26; Pl.'s Stmt. ¶ 9. The NPRM "specifically invite[d] comments in the form of empirical data that show the time periods before an election in which electoral communications generally occur," as well as "examples of communications from previous election cycles demonstrating that an alternative may be either underinclusive or overinclusive," and information as to whether "early electoral communications, for example, that occur more than 120 days before an election, have an effect on election

results." Def.'s Stmt. ¶ 27; Pl.'s Resp. Stmt. ¶ 27. The Commission received many written

comments, Def.'s Stmt. ¶ 28; Pl.'s Stmt. ¶ 9, and held a public hearing on January 25 and 26,

2006, at which it heard testimony from 18 witnesses, Def.'s Stmt. ¶ 28; Pl.'s Stmt. ¶ 9.

### a.    *National Journal Articles*

One of the written comments included a submission of articles from the *National Journal*

describing the scripts, timing, cost, and strategy of 236 television and radio advertisements by

federal candidates, political parties, and outside interest groups from the 2004 and 2006

congressional elections and the 2000, and 2004 presidential elections (hereinafter the "*National*

*Journal* articles"). Pl.'s Resp. Stmt. ¶ 29; 12/8/06 Decl. of David L. Anstaett in Support of Pl.'s

Mot. for Summ. J. ¶ 16; Pl.'s Ex. ("PX") 15 (1/13/06 Comments on Notice 2005-28:

Coordinated Communications submitted by the Campaign Legal Center, Democracy 21, and the

Center for Responsive Politics) (hereinafter "1/13/06 Joint Comments") at 18; PX 132 (2/1/06

Suppl. Comments on Notice 2005-28: Coordinated Communications) (hereinafter "2/1/06 Suppl.

Joint Comments") at 1.[5] The commenters submitting the *National Journal* articles (the

---

[5] The *National Journal* articles were submitted in six separate Appendices, and are
included in that format in the administrative record filed by the FEC in this action at A.R. 1011-
33, 1064-1112, 1270-1397, 1400-29, and 2071-98. *See* Anstaett Decl. ¶ 16. The ads are also
included, although not separated into Appendices, as Plaintiff's Exhibits 18 though 131 in
support of his Motion for Summary Judgment. According to the Joint Comments, Appendix I
contains ten *National Journal* articles describing more than eighteen ads broadcast in at least one
state more than 120 days before that state's 2000 presidential primary election; Appendix II
contains thirteen *National Journal* articles describing ads broadcast in at least one state after that
state's 2000 presidential primary election, but more than 120 days before the general election,
*i.e.*, in the "gap period" between the primary and general elections; Appendix III contains twenty-
two *National Journal* articles describing more than twenty-five ads broadcast in at least one state
more than 120 days prior to that state's 2004 presidential primary; Appendix IV contains sixty-
one *National Journal* articles describing more than seventy ads broadcast in at least one state
after that state's presidential primary election but more than 120 days before the general election;
Appendix V contains fifty-five *National Journal* articles describing more than sixty-five

Campaign Legal Center, Democracy 21, and the Center for Responsive Politics, hereinafter the "Joint Commenters") asserted that they constituted "evidence of election-influencing advertising broadcast more than 120 days prior to the election the ad was intended to influence."  PX 15 (1/13/06 Joint Comments) at 18.[6]

In connection with his Motion for Summary Judgment, Plaintiff asserts that the *National Journal* articles constitute "compilations of advertising during particular time periods, as gathered by the highly respected, nonpartisan *National Journal*."  Pl.'s Resp. Stmt. ¶ 29.[7]  In contrast, the FEC describes the *National Journal* articles as a "cherry-picked collection of press reports" that are "inherently unreliable because they are based on statements from campaigns and often merely reflect their hopes or goals for the future."  Def.'s Br. at 47 n.24 (citing PX 54, PX 70, and PX 76).  Plaintiff defends his reliance on the *National Journal* articles in his Reply brief by stating that they are "actual ads" that "actually ran" and that the Joint Commenters "reviewed

---

television and radio ads broadcast more than 120 days prior to the 2004 primary and general congressional elections; and Appendix VI contains the scripts of fourteen ads running more than 120 days prior to the 2006 congressional primary elections.  PX 15 (1/13/06 Joint Comments) at 20, 22, 24, 26-27.

[6] After the January 26, 2006 public hearing, the Joint Commenters submitted Supplemental Comments in which they clarified that, although all of the articles submitted describe ads aired more than 120 days before a primary or general election in 2000, 2004, or 2006, twelve of the ads described in Appendix II and fifty-three of the ads described in Appendix IV fell within 120 days prior to a "convention or caucus of a political party that has authority to nominate a candidate" and therefore would have been covered by the FEC's content standard. PX 132 (2/1/06 Suppl. Joint Comments) at 2-3 (citing 11 C.F.R. § 109.21(c)(4)(ii) (2003)). According to the Joint Commenters, there remained "171 discrete ads in the Appendices attached to our comments which were run outside the 120 day window in the Commission's existing content rule."  *Id.* at 3.

[7] As discussed below, these articles comprise much of the basis for Plaintiff's challenges to the FEC's revised rule on coordinated communications.

all *National Journal* coverage in two Presidential cycles (1999-2000 and 2003-04) and two

Congressional cycles (2003-04 and 2005-06), and included all ads that would have run outside

the Commission's revised pre-election windows."  Pl.'s Reply Mem. in Support of Pl.'s Mot. for

Summ. J. and Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Reply Br.") at 25.

The Court has reviewed the *National Journal* articles and notes that, although they do

appear to be based in some cases on press reports and statements by candidates to the *National

Journal*, *see, e.g.*, PX 70, PX 76, each article includes the script of the ad or ads described, the

date on which the ads were planned to run, often a description of the strategy behind the ad, and a

link that enables the reader to view the video or listen to the audio of the ad, *see* PX 18-104.  The

articles describing 2006 congressional ads also include information on the ads' producers,

running times, debut dates, ad buys, and, where available, cost.  *See e.g.*, PX 106.  In addition,

the articles relating to the 2004 ads note that "Ad Spotlight has the latest commercials from the

2004 campaigns, issue/advocacy groups and searchable archives dating back to 1997."  *See, e.g.*,

PX 104.  All of these are indicia that the ads were, at the very least, produced in connection with

the elections in question.  The Court therefore credits the *National Journal* articles as evidence of

ads produced in connection with the 2000 and 2004 presidential election and the 2004 and 2006

congressional elections.  However, as the FEC correctly notes, Plaintiff provides no information

as to the percentage of total ads run in connection with each of those elections that is represented

in the ads described in the *National Journal* articles.  *See* Def.'s Reply Br. at 26.[8]  The Court

---

[8] During the January 25, 2006 public hearing on the FEC's coordinated communication regulation, one of the Joint Commenters acknowledged that he did not know how many ads were run during the relevant time periods.  *See* A.R. 1548-49 (1/25/06 Public Hrg Tr., Test. of Paul Ryan, Assoc. Legal Counsel, Campaign Legal Center).

therefore lacks a factual predicate on which to judge the statistical significance of the ads

described in the *National Journal* articles.

### b.    *CMAG Data*

After the comment period closed, the FEC published on its website a Supplemental

Notice of Proposed Rulemaking ("SNPRM") dated March 13, 2006, which made public data that

the FEC had licensed from TNS Media Intelligence/CMAG ("CMAG") regarding television

advertising by presidential, Senate, and House of Representatives candidates during the 2004

election cycle.  Def.'s Stmt. ¶ 30; Pl.'s Stmt. ¶ 9.  The parties do not dispute that data provided

by CMAG are generally reliable, rather, they agree that CMAG is a leading provider of political

advertising tracking as well as media analysis services to a wide variety of clients, including

national media organizations, foundations, academics, and Fortune 100 companies.  Def.'s Stmt.

¶ 32; Pl.'s Resp. Stmt. ¶ 32.  In addition, the parties agree that CMAG provided the data used for

the 2000 "Buying Time" study, which was relied upon by BCRA's principal sponsors in

formulating BCRA's provisions, and that CMAG data were heavily relied upon by the courts in

*McConnell*.  Def.'s Stmt. ¶ 34 (citing *McConnell*, 540 U.S. at 206; 251 F. Supp. 2d at 583-87

(Kollar-Kotelly, J.); *id.* at 796-98 (Leon, J.)); Pl.'s Resp. Stmt. ¶ 34.  Indeed, in *McConnell*, this

Court "accept[ed] the CMAG data as a legitimate source of data for use in studies seeking to

understand the contours of political advertising, recognizing it has certain limitations," including

that its "coverage is not universal," *McConnell*, 251 F. Supp. 2d at 583-84 (Kollar-Kotelly, J.).

The Court reaches that same conclusion again.

Plaintiff, while not challenging the validity of the CMAG data itself, nevertheless raises a

number of challenges to the manner in which the FEC used the CMAG data during the

rulemaking on the coordinated communications regulation, as well as the conclusions that the

FEC drew from the CMAG data.  To the extent that these constitute legal arguments, the Court

addresses them below; however, insofar as they constitute factual challenges, the Court addresses

them at this point.  CMAG currently monitors more than 560 television stations in 101 major

markets,[9] 21 hours per day (between 5:00 a.m. and 2:00 a.m.).[10]  Def.'s Stmt. ¶ 33; Pl.'s Resp.

Stmt. ¶ 33.  "For each market, CMAG monitors the four major broadcast networks (ABC, CBS,

NBC, and Fox), as well as 42 national cable networks," but does not monitor local cable

advertising.  *McConnell*, 251 F. Supp. 2d at 720 (Kollar-Kotelly, J.); Def.'s Reply Br. at 25-26.

Plaintiff asserts that the FEC's use of the CMAG data suffers from "general methodological

flaws" because the CMAG data involve only TV ads (not radio ads, internet ads, or direct mail),

and focus only on candidate ads (not on ads run by political parties and outside groups).  Pl.'s Br.

at 34-35.  According to Plaintiff, this constitutes a flaw because the *National Journal* articles

describe early ads run on media other than TV, as well as early ads run by non-candidates.  *Id.*

However,  Plaintiff offers no evidence that the pattern of electoral advocacy differs on television

and radio, or that the pattern of electoral advocacy by non-candidates differs from that of

candidates themselves.  Def.'s Br. at 50.  Without such evidence, the Court cannot conclude that

the CMAG data are in any way less reliable because they include only candidate TV ads.

　　　　Plaintiff next asserts that the "CMAG 2004 Presidential primary data that are selectively

---

[9] A list of the 101 media markets monitored by CMAG, which include markets in 34 states, is found at A.R. 2204 and at PX 134 (FEC CMAG Data Graphs, Pres. Graph Notes at 4-5).

[10] At the time of this Court's opinion in *McConnell*, CMAG monitored "political television advertising in the top 75 media markets, containing more than 80 percent of U.S. residents."  *McConnell*, 251 F. Supp. 2d at 720 (Kollar-Kotelly, J.).

relied on by the Commission understate early primary advertising expenditures in several respects." Pl.'s Br. at 35.[11]   First, in analyzing the CMAG data, the Commission "decided to limit the data [it considered] to those States in which the 2004 Presidential race was the most highly contested." 71 Fed. Reg. at 33,195 & n.21.  The Commission therefore focused on the states determined to be the 2004 "battleground" states.  *Id.*; *see also* PX 134 (FEC CMAG Data Graphs, Pres. Graphs – Notes) (hereinafter "PGN") at 6.[12]   Plaintiff challenges this focus on battleground states, claiming that it excludes states with "historically important primaries simply because they were not 'battlegrounds' in the 2004 *general* election."  Pl.'s Br. at 35.  As an initial matter, the FEC persuasively suggests that its approach may actually have been "statistically conservative" because battleground states "would be presumed to have the most advertising, even if they are not representative of the entire nation," such that the relative percentages of early advertising might drop if non-battleground states were included.  Def.'s Br. at 51.

In any event, Plaintiff does not attempt to demonstrate how the FEC's analysis would change if non-battleground states were included.  Nor does Plaintiff submit data from any non-battleground states suggesting that the timing of advertising varies between battleground and non-battleground states.  Most significantly, the complete CMAG presidential primary data set–which is not limited to battleground states–is part of the administrative record submitted by

---

[11] The Court notes that Plaintiff's arguments regarding the Commission's presidential primary data analysis methodology have no bearing on the Commission's analysis of congressional data.

[12] The 2004 "battleground" states include Arizona, Arkansas, Colorado, Florida, Iowa, Louisiana, Maine, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Washington, West Virginia, and Wisconsin.  71 Fed. Reg. at 33,195 & n.21.

the FEC in this matter, and has been available on the FEC's website since the SNPRM was

published.  *See* Def.'s Reply Br. at 24 & n.15; *see also* 71 Fed. Reg. at 13,306 (3/15/06 SNPRM);

Data Related to SNPRM, *available at* http://www.fec.gov/pdf/nprm/coord_commun/

suppNPRMdata.shtml.  Nevertheless, Plaintiff has not performed any analysis of his own with

the presidential primary data in order to substantiate his speculation that the FEC's analysis

understates early primary advertising expenditures because it focuses on battleground states.  As

a result, the Court lacks a factual predicate on which to conclude that the FEC's focus on

battleground states in any way skews or biases its analysis.

Plaintiff further argues that the Commission's presidential primary methodology is flawed

because the FEC only considered 2004 presidential primary advertisements run in media markets

fully contained within a single battleground state.  Pl.'s Br. at 35.  The 101 media markets

monitored by CMAG correspond to Nielsen Media Research Designated Market Areas

("DMAs"), PX 134 (PGN at 1), which are "exclusive geographic area[s] of counties in which

the home market television stations hold a dominance of total hours viewed," *see* Neilsen Media

Research, Glossary of Media Terms and Acronyms, http://www.nielsenmedia.com (follow

"Acronyms & Glossary" hyperlink).  In many cases a DMA, and thus a CMAG media market, is

comprised of counties located in more than one state, *see* PX 134 (PGN at 4-5); however, the

CMAG data for media spots in those DMAs do not specify which state's primary or caucus is

relevant for any given media spot, *id.* at 1.  As a result, the Commission limited its analysis to

media markets fully contained within a single battleground state because the Commission could

safely assume that all presidential primary advertisements within such media markets would

relate to the relevant battleground state.  *Id.*  According to the FEC, "there would have been no

simple way to match broadcasts to particular state primary elections when those broadcasts reached more than one state." Def.'s Br. at 51 n.29.

Plaintiff claims that this restriction is flawed because it narrows the list of twenty-one battleground states to eleven states and because it excludes media markets within the remaining eleven battleground states where those markets extend across state lines. Pl.'s Br. at 35. As Plaintiff notes, although three Pennsylvania media markets (Harrisburg, Johnstown, and Wilkes-Barre) are included in the media markets analyzed by the FEC, the Philadelphia and Pittsburgh media markets are not because they cover multiple states. *Id.* Furthermore, although New Hampshire is a battleground state, it is excluded from the FEC's analysis of presidential primary advertising because it has no media market fully contained within its borders. *Id.* at 35-36.[13] Again, however, Plaintiff does not provide evidence of differences between the patterns of presidential primary advertising in media markets included in, and excluded from, the FEC's analysis, nor does Plaintiff attempt to show how considering more media markets would alter the FEC's analysis. Plaintiff thus fails to demonstrate that the FEC's methodological approach results in any skewing of the CMAG data. The Court therefore lacks a factual basis on which to conclude that the FEC's presidential primary advertising methodology resulted in a skewing of its analysis.[14]

_____

[13] The Court notes that the list of the 101 DMAs/media markets monitored by CMAG does not include a DMA located in New Hampshire. New Hampshire counties appear to fall within the Boston, Massachusetts, Burlington, Vermont, and Portland, Maine DMAs; however, none of these DMAs are located in a battleground state and each is comprised of counties located in multiple states. PX 134 (PGN at 4-5)

[14] In addition, the Court notes that the FEC's focus on media markets fully contained within a single state appears reasonable in light of the fact that the CMAG data do not identify the relevant primary for a given media spot.

Finally, Plaintiff raises a challenge to the FEC's congressional primary methodology. The FEC analyzed the CMAG data by creating Merged Data files that contain both the CMAG data and information from official state materials provided to the FEC by each state regarding primary and general election ballot lists. *See* Data Related to SNPRM, Notes – Merged Data at 1, *available at* ftp://ftp.fec.gov/FEC/coordinated_communication/MERGED_DATA_ READ_ME.PDF . The FEC then used the Merged Data files to create graphs representing the CMAG data. *Id.* These Merged Data files contain no advertisements by 2004 congressional candidates broadcast in 2003. Pl.'s Stmt. ¶ 11; Def.'s Resp. Stmt. ¶ 11. Plaintiff argues that this represents a shortcoming in the CMAG data because the *National Journal* articles describe advertisements by 2004 congressional candidates that were broadcast in 2003. Pl.'s Br. at 36. For its part, the FEC asserts that it "omitted nothing from the data sets," Def.'s Reply Br. at 25, that it requested 2003 ads from CMAG, and that "those that were run in the CMAG monitored media markets were provided," Def.'s Resp. Stmt. ¶ 11.

The Court has reviewed the *National Journal* articles and cannot conclude that they reveal an actual discrepancy in the CMAG data. First, many of the purported 2003 advertisements identified by Plaintiff are radio advertisements, but CMAG monitors only TV advertisements. *See, e.g.,* Pl.'s Br. at 19-20 (describing radio ad run by Senator Arlen Specter (R-PA), at PX 79); Def.'s Reply Br. at 25. Second, many of the purported 2003 ads were planned to run in media markets not included in the 101 markets monitored by CMAG. For instance, the *National Journal* articles describe TV ads run by Senate Majority Leader Tom Daschle (D-SD) beginning on July 9, 2003, *see* Pl.'s Br. at 19 (citing PX 87, 89, 90-91, 93); however, CMAG does not monitor any South Dakota media markets, *see* PX 134 (PGN at 4-5).

17

Therefore, while these ads highlight the limitations of the CMAG data, they do not indicate that advertisements are missing from the CMAG data that should have been included. In contrast, some of the *National Journal* articles describe television advertisements run in media markets tracked by CMAG. *See*, *e.g.*, PX 102 (describing tv ad run in the Greensboro, North Carolina media market by Republican congressional candidate). Still, the Court cannot determine that these ads represent discrepancies in the CMAG data because the *National Journal* articles do not indicate the station on which the ads purportedly ran, and CMAG does not track local cable stations. Def.'s Reply Br. at 25. In sum, the Court lacks a basis for concluding that the CMAG data omit relevant advertisements or are unreliable as a result. *See McConnell*, 251 F. Supp. 2d at 583 (Kollar-Kotelly, J.) (accepting CMAG as a legitimate source of data despite the fact that its "coverage is not universal [and] that advertisements can be, and apparently are, missed" because opponents of CMAG data had "not demonstrated how these shortcomings affect a majority of the conclusions that can be drawn from the CMAG data.").

Having concluded that the CMAG data represent a reliable source of data regarding political advertising and that Plaintiff has provided no evidence demonstrating that the FEC's analysis of the CMAG data is generally skewed or unrepresentative, the Court notes the following conclusions drawn by the parties regarding the 2004 election cycle, based on the FEC's analysis of the CMAG data:

- Presidential candidates aired 8.44% (3,838 ads out of a total of 45,474) of their pre-primary ads more than 120 days prior to the relevant primary elections. Pl.'s Stmt. ¶ 12 (citing PX 134 (FEC Graph P7)); Def.'s Resp. Stmt. ¶ 12.

- The 3,838 ads aired more than 120 days before the relevant primary elections were valued at more than $802,544 (4.89% of $16,411,945, the

18

total cost of the ads aired prior to the 2004 presidential primaries). Pl.'s Stmt. ¶ 12 (citing PX 134 (FEC Graph P8)); Def.'s Resp. Stmt. ¶ 12.

- Of the 3,838 ads aired more than 120 days before the relevant primary elections, 2,968 (77%) were run in Iowa. The 2,968 early Iowa ads were valued at $486,709 (61% of the total value of the early ads included in the CMAG data analyzed by the FEC). Pl.'s Stmt. ¶ 12; Def.'s Stmt. ¶ 12.

- The 2,968 early Iowa ads constituted sixteen percent (16%) of the total 18,657 ads run in Iowa before the 2004 Iowa caucus. Pl.'s Stmt. ¶ 13; Def.'s Stmt. ¶ 13.

- The Republican presidential candidate spent almost $9.5 million on ads aired during the "gap period," *i.e.*, between some primaries and the start of the 120-day period before the general election. Def.'s Stmt. ¶ 39; Pl.'s Resp. Stmt. ¶ 39. This represented 14% of the Republican presidential candidate's total post-primary spending in those media markets. Def.'s Stmt. ¶ 39; Pl.'s Resp. Stmt. ¶ 39.

- Democratic presidential candidates spent $1,221,045 on advertisements during the gap period. Def.'s Stmt. ¶ 39; Pl.'s Resp. Stmt. ¶ 39.

- Senate candidates aired 0.87% and 0.39% of their campaign ads more than 90 days prior to their primary and general elections, respectively. Def.'s Stmt. ¶ 37 (citing FEC Graphs S1 and S3).[15] This advertising represented 0.66% and 0.15% of the total estimated costs of advertisements run by Senate candidates before the primary and general elections, respectively. *Id.* (citing FEC Graphs S2 and S4).

- House of Representative candidates aired 8.56% and 0.28% of their advertisements more than 90 days prior to their primary and general elections, respectively. Def.'s Stmt. ¶ 38 (citing FEC Graphs H1 and H3). This advertising represented 3.79% and 0.13% of the total estimated costs of advertisements run by House candidates before the primary and general elections, respectively. *Id.* (citing FEC Graphs H2 and H4).

- The 8.56% of advertisements aired by House candidates more than 90 days before their respective primaries were valued at $653,892 (3.79% of

---

[15] Plaintiff asserts that the statistics for congressional candidates are inherently unreliable because the FEC's merged data sets do not include any TV ads run during 2003 by 2004 congressional candidates. Pl.'s Resp. Stmt. ¶ 37. However, as discussed above, Plaintiff has not established that the CMAG data are incomplete.

19

$17,253,099, the total cost of ads aired prior to the 2004 congressional primaries). Pl.'s Resp. Stmt. ¶ 38 (citing FEC Graph H2).

The SNPRM was published in the Federal Register on March 15, 2006, Def.'s Stmt. ¶ 30; Pl.'s Stmt. ¶ 9, and gave commenters through March 22, 2006 to comment on the CMAG data, Def.'s Stmt. ¶ 31; Pl.'s Stmt. ¶ 9. The FEC received twelve additional comments in response to the SNPRM. Def.'s Stmt. ¶ 31. After conducting an open meeting, the Commission adopted its revised coordinated communications regulations on April 7, 2006. Pl.'s Stmt. ¶ 10. The final regulations were transmitted to Congress on June 2, 2006 and published in the Federal Register on June 8, 2006. *Id.*; *see also* Coordinated Communications, 71 Fed. Reg. at 33,190-211. The coordinated communications regulations became effective on July 10, 2006. *Id.*

The FEC's coordinated communications regulation includes both a "content standards" prong and a "conduct standards" prong. *See* 11 C.F.R. § 109.21. In *Shays I*, Plaintiff challenged certain aspects of the content standards, 11 C.F.R. § 109.21(c), but did not challenge any aspects of the conduct standards, 11 C.F.R. § 109.21(d). *Shays I*, 337 F. Supp. 2d at 56-65; *Shays I Appeal*, 414 F.3d at 97-102. The FEC's December 14, 2005 NPRM included proposed revisions to the conduct standards of the coordinated communications regulation, about which the FEC received written comments and heard testimony during the January 25 and 26, 2006 public hearing. Def.'s Stmt. ¶ 47. The Commission's revisions to the conduct standards were adopted, transmitted to Congress, published in the Federal Register, and became effective along with the rest of the coordinated communications regulation. *Id.*

### D.    *Procedural History*

Plaintiff filed his Complaint in this action on July 11, 2006. In compliance with the

briefing schedule entered by the Court, Plaintiff filed his Motion for Summary Judgment on December 8, 2006, and on January 19, 2007, the FEC filed its Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment.  On February 16, 2007, Plaintiff filed a combined Reply Memorandum and Opposition to Defendant's Motion, and on March 16, 2007, the FEC filed its Reply.[16]

On June 25, 2007, the Supreme Court issued its decision in *Federal Election Commission v. Wisconsin Right to Life*, 551 U.S. __ (2007) ("*WRTL*").  On July 6, 2007, this Court issued an Order seeking the parties' opinions as to the relevance of the *WRTL* decision on the pending cross-motions for summary judgment in this case.  *Shays v. FEC*, Civil Action No. 06-1247, Order (D.D.C. July 6, 2007).  On July 13, 2007, both Plaintiff and Defendant filed Notices with the Court indicating that the *WRTL* decision is not directly relevant to the instant case because *WRTL* deals with the regulation of independent expenditures, while the instant case involves only coordinated expenditures.  *See* Pl.'s Notice; Def.'s Notice.  Accordingly, the Court declined to order additional briefing on the application of *WRTL* to the instant case, and deemed the cross-motions for summary judgment ripe for consideration.

## II.  LEGAL STANDARD

### A.     *Summary Judgment*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

---

[16] In addition, the Court granted motions for leave to file *amicus curiae* briefs to movants the Center for Competitive Politics ("CCP") and United States Senators John McCain and Russell Feingold.  *See* Minute Orders, *Shays v. FEC*, Civil Action No. 06-1247 (D.D.C. Jan. 29, 2007 and Mar. 6, 2007).

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  In ruling upon a motion for summary judgment, the Court must view the

evidence in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bayer v. United States Dep't of Treasury*, 956

F.2d 330, 333 (D.C. Cir.1992).  Furthermore, in ruling on cross-motions for summary judgment,

the court shall grant summary judgment only if one of the moving parties is entitled to judgment

as a matter of law upon material facts that are not genuinely disputed.  *See Rhoads v. McFerran*,

517 F.2d 66, 67 (2d Cir. 1975); *Long v. Gaines,* 167 F. Supp. 2d 75, 85 (D.D.C. 2001).  Each

moving party discharges its burden to support its motion by "informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any' which it believes

demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986)  (quoting Fed. R. Civ. P. 56(c)).  In opposing a motion for summary judgment, a

party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers

to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'"  *Id.* at 324.

> **B.**     ***Administrative Agency Review***

Plaintiff's challenge to the FEC's regulations implementing Titles I and II of BCRA is

analyzed pursuant to the two standards of review applied by this Court in *Shays I* and by the D.C.

Circuit in the *Shays I Appeal*: *Chevron* review and the Administrative Procedures Act.   Under

*Chevron* review, so-called after the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural*

*Res. Def. Council*, 467 U.S. 837 (1984), the central question for the reviewing court "is whether

22

the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843). In applying *Chevron* analysis, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *see also id*. at 843 n.9 ("[A]dministrative constructions which are contrary to clear congressional intent" must be rejected by the court). In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *American Fed'n of Labor & Congress of Indus. Orgs. v. Federal Election Commission*, 333 F.3d 168, 173 (D.C. Cir. 2003) ("*AFL-CIO*").

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. "A statute is considered ambiguous if it can be read more than one way." *AFL-CIO*, 333 F.3d at 173. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Therefore

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges-who have no constituency-have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests

such responsibilities in the political branches."

*Id*. at 866 (quoting *TVA v. Hill*, 437 U.S. 153, 195 (1978)).  However, "[i]f the FEC's

interpretation unduly compromises the Act's purposes, it is not a 'reasonable accommodation'

under the Act, and it would therefore not be entitled to deference."  *Orloski v. FEC*, 795 F.2d

156, 164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845); *see also Chevron*, 467 U.S. at 845

(providing that if the agency's "choice represents a reasonable accommodation of conflicting

policies that were committed to the agency's care by the statute, we should not disturb it unless it

appears from the statute or its legislative history that the accommodation is not one that Congress

would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)); *Common*

*Cause v. Federal Election Commission*, 692 F. Supp. 1391, 1396 (D.D.C. 1987) ("[W]here the

agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court

may–indeed must–intervene and correct the agency.").

　　　　In addition to his *Chevron* challenge, Plaintiff also claims that the Commission, in

promulgating the challenged regulations, failed to engage in the "reasoned analysis" required for

a regulation not to be rendered "arbitrary and capricious."  The Administrative Procedure Act

("APA") provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

　　　　The scope of review under the "arbitrary and capricious" standard is narrow and a
　　　　court is not to substitute its judgment for that of the agency.  Nevertheless, the agency
　　　　must examine the relevant data and articulate a satisfactory explanation for its action
　　　　including a rational connection between the facts found and the choice made.  In
　　　　reviewing that explanation, we must consider whether the decision was based on a
　　　　consideration of the relevant factors and whether there has been a clear error of
　　　　judgment.  Normally, an agency rule would be arbitrary and capricious if the agency

has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (hereinafter "*State Farm*") (internal citations and quotation marks omitted); *see also Cellco P'ship v. Federal Communications Commission*, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (noting "arbitrary and capricious" review is "highly deferential . . . presum[ing] the validity of agency action . . . [which] must [be] affirm[ed] unless the Commission failed to consider relevant factors or made a clear error in judgment."). The "reasoned analysis" requirement is "not 'particularly demanding,'" and "is satisfied if the agency 'enables us to see what major issues of policy were ventilated and why the agency reacted to them as it did.'" *Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 407 (D.C. Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997) (quoting *Public Citizen, Inc. v. Federal Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("*Public Citizen v. FAA*") (internal punctuation omitted)). The degree of deference a court should pay an agency's construction is, however, affected by "the thoroughness, validity, and consistency of an agency's reasoning." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981). Moreover, this Circuit has noted that "a permissible statutory construction under *Chevron* is not always reasonable under *State Farm*: 'we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.'" *Republican Nat'l*

25

*Comm.,* 76 F.3d at 407 (quoting *Arent*, 70 F.3d at 620 (Wald, J., concurring)).

As the D.C. Circuit explained in the *Shays I Appeal*, the "inquiry at the second step of *Chevron* . . . overlaps with the arbitrary and capricious standard . . . for whether a statute is unreasonably interpreted is close analytically to the issue whether an agency's actions under a statute are unreasonable." 414 F.3d at 96 (internal quotations and citations omitted). Thus, where an agency has "given no rational justification for [its regulations], as required by the APA's arbitrary and capricious standard," a court "need not decide whether [those regulations] represent altogether impermissible interpretations of the [relevant statutes]." *Id.* at 97.

### C.    *Law of the Case*

When issues have been resolved at a prior stage in the litigation, courts generally decline to revisit these issues, based upon principles of judicial economy. *See New York v. Microsoft*, 209 F. Supp. 2d 132, 141 (D.D.C. 2002) (Kollar-Kotelly, J.). More than a mere rule-of-thumb, the "'law-of-the-case-doctrine' refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not reopen questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995). "The doctrine bars reconsideration of the court's explicit decisions, as well as those issues decided by necessary implication." *Microsoft*, 209 F. Supp. 2d at 141 (citing *LaShawn A. v. Barry*, 87 F.3d 1389, 1394 (D.C. Cir. 1996) (en banc) ("The law-of-the-case doctrine, the Supreme Court said, turns 'on whether a court previously decide[d] upon a rule of law  . . . not whether, or how well, it explained the decision.'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (alteration in *Christianson*)).

26

There are two important considerations when dealing with the "law-of-the-case doctrine." First, the doctrine applies only where "an issue is . . . litigated and decided . . . ." *Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 510 n.3 (D.C. Cir. 1984) (quotation omitted). Second, "[l]aw of the case is a prudential rule rather than a jurisdictional one; in the words of Justice Holmes, the doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Crocker*, 49 F.3d at 739-40 (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912); citing *Arizona v. California*, 460 U.S. 605, 618 (1983)). Thus, although a "court has the power to revisit prior decisions of its own . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817 (quoting *Arizona*, 460 U.S. at 618 n.8).

In *Shays I*, this Court reached numerous conclusions regarding the regulations at issue in the instant action. Specifically, as discussed below, the Court concluded that the FEC's regulation on coordinated communication, 11 C.F.R. § 109.21, survived *Chevron* step one review and represented a facially permissible construction of BCRA Section 214. *See Shays 1*, 337 F. Supp. 2d at 58-62. The D.C. Circuit affirmed these conclusions in the *Shays I Appeal*, *see* 414 F.3d at 98-100, and Plaintiff therefore does not challenge them. *See* Pl.'s Mem. in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Br.") at 3-4 n.3. In *Shays I*, this Court also concluded that the Commission's regulation regarding solicitation at state, district, and local party fundraisers, 11 C.F.R. § 300.64, satisfies *Chevron* steps one and two review, 337 F. Supp. 2d at 88-92, and that the relevant portions of the Commission's regulations defining voter registration activity and GOTV activity, 11 C.F.R. §§ 100.24(a)(2) and (a)(3) survive *Chevron* step one review and

27

represent facially permissible readings of BCRA, *id.* at 98-100, 102-03, 105.

Plaintiff notes, correctly, that the D.C. Circuit did not consider this Court's conclusions with respect to the latter two regulations because the Commission elected not to appeal. Pl.'s Br. at 3-4 n.3. Nevertheless, Plaintiff raises his *Chevron* "step one challenges again in this action," arguing that he "could not have obtained earlier appellate review of this Court's *Chevron* step one determinations." *Id.* The FEC opposes Plaintiff's effort to have the Court revisit its earlier rulings. Def.'s Br. at 14-15. The Court agrees that Plaintiff's *Chevron* step one challenges have been "litigated and decided," *Nat'l Souvenir Ctr., Inc.*, 728 F.2d at 510 n.3, and that Plaintiff has not identified any "extraordinary circumstance" that would merit the Court revisiting any of its prior rulings. Accordingly, the Court declines to reconsider its rulings in *Shays I* with respect to the definition of FEA and solicitation at state, district, and local party fundraisers, and shall address herein only those issues left open in *Shays I* or raised by the FEC's revised regulations.

### III. DISCUSSION

#### A.    *Justiciability*

In the *Shays I Appeal*, the D.C. Circuit affirmed this Court's conclusion in *Shays I* that Plaintiff had standing to challenge the regulations at issue in that case. *See Shays I Appeal*, 414 F.3d at 83-95; *Shays I*, 337 F. Supp. 2d at 38-47. Accordingly, although the FEC disputes some of the factual assertions on which Plaintiff purports to ground standing in this action, *see* Def.'s Resp. Stmt. ¶¶ 18-23, the Commission does not, "at this time" contest Plaintiff's standing, Def.'s Br. at 15 n.7. The Court therefore does not revisit its conclusions in *Shays I* regarding standing. Furthermore, the Commission does not challenge Plaintiff's assertion that his claims are ripe for review, *see* Pl.'s Br. at 5; 53-54, and the Court notes that Plaintiff's claims are fit for review

because they present legal questions, the consideration of which would not benefit from a more concrete setting. *See Shays I*, 337 F. Supp. 2d at 47-51; *see also Atlantic States Legal Found. v. Envtl. Prot. Agency*, 325 F.3d 281, 284 (D.C. Cir. 2003).

### B.    Contested Regulations

The Court turns now to the merits of this case. Plaintiff challenges aspects of a number of regulations implementing BCRA, each of which was promulgated by the FEC following *Shays I* and the *Shays I Appeal*. The Court addresses each in turn.

### 1.    Regulations Governing Coordinated Communications

For "obvious" reasons, "FECA has long restricted coordination of election-related spending between official campaigns and outside groups." *Shays I Appeal*, 414 F.3d at 97. "Without a coordination rule, politicians could evade contribution limits and other restrictions by having donors finance campaign activity directly–say, paying for a TV ad or printing and distributing posters." *Id.* Therefore, Congress and the courts have recognized that expenditures by a noncandidate that are "controlled by or coordinated with the candidate and his campaign," *id.* at 46, "may be treated as indirect contributions subject to FECA's source and amount limitations," *McConnell*, 540 U.S. at 219. Accordingly, FECA provides that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate" 2 U.S.C. § 441a(a)(7)(B)(i), and defines "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office," *id.* § 431(9)(A)(i). In sum, "if someone makes a purchase or gift with the purpose of influencing an

29

election and does so in coordination with a candidate, FECA counts that payment as a campaign contribution." *Shays I Appeal*, 414 F.3d at 97.

The regulation on coordinated communications in effect prior to BCRA placed significant weight on "whether the candidate had engaged in 'substantial discussion or negotiation' with an outsider, resulting in 'collaboration or agreement.'" *Id.* (quoting *Shays I*, 337 F. Supp. 2d at 55-56 & n.25). Section 214 of BCRA repealed that regulation and instructed the FEC to

> promulgate new regulations on coordinated communications paid for by persons other than candidates, authorized committees of candidates, and party committees. The regulations shall not require agreement or formal collaboration to establish coordination. In addition to any subject determined by the Commission, the regulations shall address--
> (1) payments for the republication of campaign materials;
> (2) payments for the use of a common vendor;
> (3) payments for communications directed or made by persons who previously served as an employee of a candidate or a political party; and
> (4) payments for communications made by a person after substantial discussion about the communication with a candidate or a political party.

2 U.S.C. § 441a note; BCRA § 214(b)-(c).

In response, the FEC promulgated a regulation providing that a "communication is coordinated with a candidate, an authorized committee, a political party committee, or an agent" when it (1) is paid for by someone other than that candidate, authorized committee, political party committee, or agent; (2) meets one of the "content standards" specified in the regulation; and (3) meets one of the "conduct standards" specified in the regulation. 11 C.F.R. § 109.21 (2003); *see also Shays I Appeal*, 414 F.3d at 98. In turn, a communication satisfied the "content standard" if it was

(1) A communication that is an electioneering communication under 11 CFR

30

100.29.[17]

(2) A public communication that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate, the candidate's authorized committee, or an agent of any of the foregoing . . . .

(3) A public communication that expressly advocates the election or defeat of a clearly identified candidate for Federal office.

(4) A communication that is a public communication, as defined in 11 CFR 100.26, and about which each of the following statements in paragraphs (c)(4)(i), (ii), and (iii) of this section are true.

> (i) The communication refers to a political party or to a clearly identified candidate for Federal office;
> (ii) The public communication is publicly distributed or otherwise publicly disseminated 120 days or fewer before a general, special, or runoff election, or 120 days or fewer before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate; and
> (iii) The public communication is directed to voters in the jurisdiction of the clearly identified candidate or to voters in a jurisdiction in which one or more candidates of the political party appear on the ballot.

11 C.F.R. § 109.21(c)(1)-(4) (2003).

The 2002 regulation also provided a number of ways in which the "conduct standard" prong could be met, including the so-called "common vendor" and "former employee" conduct standards. *Id.* §§ 109.21(d)(4)-(5). The common vendor conduct standard was satisfied where:

> (i) The person paying for the communication, or an agent of such person, contracts with or employs a commercial vendor . . . to create, produce, or distribute the communication;
> (ii) That commercial vendor, including any owner, officer, or employee of the commercial vendor, has provided [certain] services to the candidate who is clearly identified in the communication, or his or her authorized committee, or his or her opponent or the opponent's authorized committee, or a political party committee,

---

[17] An "electioneering communication" is (1) a broadcast, (2) referring to a clearly identified candidate for federal office, (3) aired within 30 days of a primary election or 60 days of a general election, (4) that is targeted to the electorate of the candidate mentioned. 2 U.S.C. § 434(f)(3).

31

or an agent of any of the foregoing, in the current election cycle . . . ;[18] and
(iii) That commercial vendor uses or conveys to the person paying for the
communication

>    (A) Information about the clearly identified candidate's campaign plans,
>    projects, activities, or needs, or his or her opponent's . . . or a political
>    party committee's campaign plans, projects, activities, or needs and that
>    information is material to the creation, production, or distribution of the
>    communication; or
>    (B) Information used previously by the commercial vendor in providing
>    services to the candidate . . . [that] is material to the creation, production,
>    or distribution of the communication.

*Id.* § 109(d)(4).  Similarly, the former employee conduct standard was satisfied where (1) the

person paying for the communication employed a person who was a former employee of the

candidate, his or her authorized committee, his or her opponent, or a political party committee

during the "current election cycle"; and (2) the former employee used or conveyed material

information to the person paying for the communication.  *Id.* § 109.21(d)(5).

In *Shays I*, Plaintiff challenged the content standards of the coordinated communications

regulation on the ground that communications made outside of the 120-day window before an

election, primary, or convention that did not contain "express advocacy"[19] or republish a

---

[18] The "current election cycle" began "on the first day following the date of the previous
general election for the office or seat which the candidate [sought]" and ended "on the date on
which the general election for the office or seat that the individual [sought was] held."  11 C.F.R.
§ 100.3(b).

[19] As this Court explained in *Shays I*, "express advocacy" is a test that emerged out of
*Buckley v. Valeo*, 424 U.S. 1 (1976), wherein the Supreme Court interpreted vague provisions
involving limits on individual or group expenditures related to a clearly identified candidate and
disclosure of expenditures to cover only "communications that include explicit words of
advocacy of election or defeat of a candidate."  *McConnell*, 540 U.S. at 190-91 (quoting *Buckley*,
424 U.S. at 43); *see also McConnell*, 251 F. Supp. 2d at 594-97 (Kollar-Kotelly, J.) (discussing
the *Buckley* Court's formulation of the "express advocacy" test).  The *Buckley* Court provided
examples of words of express advocacy "such as 'vote for,' 'elect,' 'support,' . . . 'defeat,' [and]
'reject.'"  *McConnell*, 540 U.S. at 191 (quoting *Buckley*, 424 U.S. at 44), which subsequently
became known as the *Buckley* "magic words," because their presence or absence determined

32

candidate's own materials were completely unregulated, regardless of the level of actual coordination between the candidate and the outside spender. *Shays I*, 337 F. Supp. 2d at 57-58. This Court rejected Plaintiff's *Chevron* step one argument, concluding that Congress had not directly spoken to the issue, *id.* at 61-62, and further found under *Chevron* step two that the FEC's construction of BCRA was "facially permissible," *id.* at 62. This Court nevertheless found that the content standard regulation failed *Chevron* step two review because "to exclude certain types of communications regardless of whether or not they are coordinated would create an immense loophole that would facilitate circumvention of the Act's contribution limit, thereby creating 'the potential for gross abuse.'" *Id.* at 64-65 (quoting *Orloski*, 795 F.2d at 165).

On appeal, the D.C. Circuit, "reach[ed] the same result, though for slightly different reasons." *Shays I Appeal*, 414 F.3d at 98. Under *Chevron* step one, the D.C. Circuit found that, although it seemed "hard to imagine that Representatives and Senators voting for BCRA would have expected regulations like these"–in part because the regulations "resurrect[ed]" the express advocacy standard that was disavowed by BCRA's "electioneering communications" provisions and described as "functionally meaningless" by the Supreme Court in *McConnell*–Congress had not spoken directly to the issue of content standards. *Id.* at 98-99. Turning to *Chevron* step two, the Court of Appeals disagreed with what it viewed as this Court's conclusion that "nothing in

---

whether a communication constituted "express advocacy" and was consequently subject to FECA's strictures. *See McConnell*, 251 F. Supp. 2d at 591-92 (Kollar-Kotelly, J.). In *McConnell*, the Supreme Court rejected the argument that it had drawn "a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech," and declared that the First Amendment does not "erect[] a rigid barrier between express advocacy and so-called issue advocacy." *McConnell*, 540 U.S. at 192-93. Instead, the *McConnell* Court observed that "the unmistakable lesson from the record in this litigation . . . is that *Buckley*'s magic-words requirement is functionally meaningless." *Id.* at 193.

BCRA permits . . . content-based exclusions" from the definition of coordinated

communications. *Id.* at 98. Noting that under FECA an expenditure must be undertaken "for the

purpose of influencing a federal election," the D.C. Circuit observed that "time, place, and

content may be critical indicia of communicative purpose," *id.* at 99 (internal quotations

omitted), and concluded that "the challenged regulation's fatal defect is not that the FEC drew

distinctions based on content, time, and place, but rather that, contrary to the APA, the

Commission offered no persuasive justification for the . . . 120-day time-frame and the weak

restraints applying outside of it." *Id.* at 100.

The D.C. Circuit therefore affirmed this Court's invalidation of the content standard, and

suggested questions for the FEC to consider on remand in order to "establish, consistent with

APA standards, that its rule rationally separates election-related advocacy from other activity

falling outside FECA's expenditure definition." *Id.* at 102. Specifically, the D.C. Circuit

instructed the Commission that it "must carefully consider" the following:

> (1) "Do candidates in fact limit campaign-related advocacy to the four months
> surrounding elections, or does substantial election-related communication occur
> outside that window?"
> (2) "Do congressional, senatorial, and presidential races–all covered by this
> rule–occur on the same cycle, or should different rules apply to each?"
> (3) "And, perhaps most important, to the extent election-related advocacy now
> occurs primarily within 120 days, would candidates and collaborators aiming to
> influence elections simply shift coordinated spending outside that period to avoid
> the challenged rules' restrictions?"

*Id.* at 102.

As noted above, Plaintiff did not challenge the 2002 conduct standards in *Shays I*. *Shays

I*, 337 F. Supp. 2d at 56-65; *Shays I Appeal*, 414 F.3d at 97-102. However, during the post-*Shays

I* rulemaking on coordinated communications, the Commission considered and adopted certain

revisions to the conduct standards. Plaintiff now challenges both the revised content standards and the revised conduct standards. The Court discusses each in turn below.

### a.    Content Standards

In revising the coordinated communications regulation, 11 C.F.R. § 109.21, the FEC "decided to retain the existing content prong, but revise the applicable time frames in the fourth content standard at 11 C.F.R. 109.21(c)(4)" to create "separate time frames for communications based on whether they refer to (1) Congressional candidates, (2) Presidential candidates, or (3) political parties." 71 Fed. Reg. at 33,193. The fourth content standard contained in 11 C.F.R. § 109.21 now provides in relevant part:

> (i) References to House and Senate candidates. The public communication refers to a clearly identified House or Senate candidate and is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general, special, or runoff election, or primary or preference election, or nominating convention or caucus.
> (ii) References to Presidential and Vice Presidential candidates. The public communication refers to a clearly identified Presidential or Vice Presidential candidate and is publicly distributed or otherwise publicly disseminated in a jurisdiction during the period of time beginning 120 days before the clearly identified candidate's primary or preference election in that jurisdiction, or nominating convention or caucus in that jurisdiction, up to and including the day of the general election.

11 C.F.R. § 109.21(c)(4)(i)-(ii). The Commission's revised content standard thus shortens the time period in which a public communication referring to a congressional candidate may be deemed coordinated from 120 days to 90 days, and retains the "gap period" between primary night and the general election window. In contrast, for presidential candidates, the Commission has closed the "gap period," while retaining the 120-day window prior to primary elections. Again, outside of the applicable windows, communications will not be deemed coordinated

unless they republish a candidate's own campaign materials or "expressly advocate[] the election

or defeat of a clearly identified candidate for Federal office."  *Id.* § 109.21(c)(2)-(3).[20]

Plaintiff asserts that the FEC's revised content standard "once again violates both

*Chevron* step two and the APA's requirements for reasoned decisionmaking." Pl.'s Br. at 10.[21]  It

is clear, based on the *Shays I Appeal*, that the Commission's reliance on content standards does

not, *per se,* violate *Chevron* step two.  *See* 414 F.3d at 99-100 (quoting *Shays I*, 337 F. Supp. 2d

---

[20] In a footnote in his opening brief, Plaintiff asserts that he is also challenging the fact that, even within the relevant pre-election windows, communications will only be deemed coordinated if they clearly identify a candidate or political party by name.  Pl.'s Br. at 11-12 n.13. Beyond noting that this aspect of the coordinated communication content standard is referenced in his Complaint, however, Plaintiff offers no substantive argument in support of his purported challenge, and does not even identify the grounds on which it is based.  *Id.*  Despite the Commission's pointed argument in its opening brief that Plaintiff has waived any claim on this issue by failing to offer substantive argument, Def.'s Br. at 48 n.26, Plaintiff's reply brief offers no more substantive challenge.  The Court therefore does not address this aspect of the coordinated communications regulation as violating either *Chevron* or the APA as Plaintiff provides no argument on these issues.

[21] Plaintiff's Complaint includes an additional challenge under the APA: that the Commission failed to provide adequate opportunity for parties to comment on the CMAG data when it gave interested parties only five business days for comment on the SNPRM.  *See* Compl. ¶¶ 37-38.  Plaintiff's opening brief, however, asserts that he is "putting to one side the Commission's improper last minute procedures in adding these data to bolster its case," and offers only a footnote containing a string of case citations in support of his purported claim of procedural irregularity.  Pl.'s Br. at 12-13 & n.29.  The Commission's opening brief convincingly argues both that Plaintiff may have waived this challenge by failing to raise it in comments before the agency, and that to challenge this alleged procedural deficiency, Plaintiff must demonstrate prejudice.  *See* Def.'s Br. at 52-53 (citing *Covad Commc'ns*, 450 F.3d at 549 ("It is well established that issues not raised before the agency are waived and this Court will not consider them.") and *Personal Watercraft Indust. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 544 (D.C. Cir. 1995) ("Agencies may develop additional information in response to public comments and rely on that information without starting anew unless prejudice is shown.  The party objecting has the burden of indicating with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity.")).  Because Plaintiff does not respond to either of these arguments in his reply brief, the Court assumes he is not pursuing his procedural challenge.

at 65).  Plaintiff's *Chevron* step two argument, though, is more narrow; Plaintiff asserts that the revised content standard "unduly compromises the purposes" of BCRA and FECA, *see Orloski*, 795 F.2d at 164, by creating "an immense opportunity for candidates and parties to engage in massive, unregulated coordination" outside of the pre-election windows.  Pl.'s Br. at 11. According to Plaintiff, the potential for circumvention of FECA and BCRA created by the revised content standard is demonstrated by the "extensive record evidence . . . that many federal candidates, political parties, and outside interest groups have run electioneering ads" outside the pre-election windows included in the revised content standards.  *Id.* at 12.

Plaintiff bases his *Chevron* step two argument primarily on the *National Journal* articles, which, as discussed above, represent credible evidence that ads were produced in connection with the 2000 and 2004 presidential election and the 2004 and 2006 congressional elections outside of the pre-election windows.  However, because Plaintiff provides the Court with no means of judging the statistical significance of the ads described in the *National Journal* articles, the Court lacks a factual predicate on which to conclude that they represent a sufficient "potential for *gross* abuse" or "*unduly* compromise[]" the Act.  *Orloski*, 795 F.2d at 164-65 (emphasis added).

Plaintiff's *Chevron* step two argument also relies heavily on accounts of coordination between President William Jefferson Clinton and the Democratic National Committee ("DNC") during 1995 in connection with the 1996 presidential election.  *See* Pl.'s Br. at 13, 16-17 & n.18. According to Plaintiff, the administrative record before the Commission during the coordinated communications rulemaking demonstrates that, "in August 1995, the President's reelection campaign began a carefully coordinated nationwide media advertising campaign sponsored by

37

the DNC and funded with soft money solicited by the President, Vice President, and other party

leaders–well over 120 days before any of the caucuses or primaries began." Pl.'s Br. at 13.

Plaintiff claims that this alleged coordination represents evidence of *actual* coordination between

a candidate and an outside spender, as well as conclusive proof that candidates value advertising

run more than 120 days prior to primary elections. *See* Pl.'s Reply Br. at 25. If true, these

accounts would certainly present compelling evidence that, if left to their own devices, federal

candidates would likely coordinate their communications with outside spenders. However, as the

Commission points out, BCRA has dramatically changed the legal landscape in which federal

candidates and outside spenders interact.[22] As a result, evidence of pre-BCRA coordination is of

limited evidentiary and persuasive value, and therefore not sufficient to demonstrate a current

"potential for gross abuse." *Orloski*, 795 F.2d at 165.

　　Finally, the Court notes that neither Plaintiff nor any of the written comments submitted

during the coordinated communications rulemaking adduced evidence of actual coordination

---

[22] Indeed, insofar as Plaintiff complains that the DNC used nonfederal funds to pay for ads benefitting President Clinton, that "loophole" has now been plugged because Title I of BCRA prohibits the DNC from soliciting, receiving, directing, or spending any soft money. 2 U.S.C. § 441(a); *see also* Def.'s Reply Br. at 17-18. Furthermore, the Commission argues that "the DNC episode is unlikely to recur" because the Supreme Court's decision in *Colorado Republican Federal Campaign Committee v. Federal Election Commission*, 518 U.S. 604 (1996) ("*Colorado I*") clarified that political parties have the right to make unlimited independent expenditures in support of their own candidates, and BCRA subsequently raised the limits on contributions of federal funds to national party committees, thereby lowering the parties' reliance on coordinated expenditures. Def.'s Reply Br. at 18 & n.12. The Court is not convinced that these changes have eliminated the incentives for parties and candidates to coordinate advertisements. *See McConnell*, 540 U.S. at 176 ("Experience under the current law demonstrates that Congress' concerns about circumvention are not merely hyptothetical."). Nevertheless, it is clear that developments in campaign finance law since the alleged Clinton-DNC coordination–including BCRA itself–have significantly altered the playing field for candidates and those with whom they might seek to coordinate communications.

outside of the pre-election windows while the FEC's 2002 coordination rules were in effect.  *See* Def.'s Br. at 40 (citing A.R. 2167-68 (71 Fed. Reg. at 33,196-97)).  Indeed, when the Joint Commenters were specifically asked during the public hearing about the ads described in the *National Journal* articles, they "acknowledged that there was no evidence that any of these advertisements had been coordinated with a candidate or a political party committee." *Id.*  (citing A.R. 2168 (71 Fed. Reg. at 33,197); AR. 1617-18 (1/25/06 Public Hrg Tr., Test. of Paul Ryan); A.R. 1619 (1/25/06 Public Hrg. Tr., Test. of Marc Elias)).  That no such evidence has yet been identified is far from a guarantee that no such evidence will develop in the future.  Nevertheless, at this point in time, the Court has not been presented with evidence of coordination in circumvention of the Commission's regulations since the passage of BCRA.  While the *National Journal* articles certainly suggest that the revised content standard may create the potential for abuse of BCRA, the Court nevertheless lacks a factual predicate on which to conclude either that *actual* abuse of BCRA has occurred as a result of the Commission's previous content standard, or that the revised content standard "*unduly* compromises" the Act or "create[s] the potential for *gross* abuse." *Orloski*, 795 F.2d at 164, 165.  As a result, based on this record, the Court must conclude that the revised content standard survives *Chevron* step two analysis.

The Court next considers whether the revised content standard violates the APA's requirement of reasoned decisionmaking.  The *Shays I Appeal* left the FEC with specific instructions on remand, to "establish, consistent with APA standards, that its rule rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition."  414 F.3d at 101-102.  While the *Shays I Appeal* certainly left the door open for the FEC to draw a bright-line rule within which communications are subject to more stringent

39

regulation, *id.* at 101, it also made clear that to do so, the FEC would need to provide "assurance that [the time period it chose] reasonably defines the period before an election when non-express advocacy likely relates to purposes other than 'influencing' a federal election" *id.*, such that its "standard does not permit substantial coordinated expenditure," *id.* at 102.

As an initial matter, the Court addresses Plaintiff's contention that the Commission's reliance on the CMAG data was, in and of itself, arbitrary and capricious. *See* Pl.'s Br. at 34-37. The Court concluded above that, as matter of fact, the CMAG data are a reliable source of data concerning political advertising, and that Plaintiff's allegations of methodological flaws in the Commission's analysis of the CMAG data fail to demonstrate how or even if those alleged flaws skewed the FEC's analysis. *See supra* at 12-20. Moreover, as a matter of law, Plaintiff's allegations of methodological flaws do not establish that the FEC acted in an arbitrary and capricious manner in relying on the CMAG data or in analyzing the data as it did. Although the CMAG data clearly has inherent limitations, because no commenter provided the FEC with an alternative source of similarly comprehensive data, the FEC was well within its discretion to rely upon the CMAG data. *See Am. Public Commc'ns Council v. Fed. Commc'ns Comm.*, 215 F.3d 51, 56 (D.C. Cir. 2000) ("Where existing methodology or research . . . is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information.") (quoting *Indus. Union Dep't, AFL-CIO v. Hodgson*, 499 F.2d 467, 474-75 (D.C. Cir. 1974)).

Plaintiff presses an additional legal challenge to the FEC's methodology–that the "Supreme Court has instructed that campaign finance laws must be evaluated not on the basis of 'the *average* campaign,' but from the perspective of their impact on '*strongly contested*'

40

campaigns." Pl.'s Br. at 36-37 (quoting *Randall v. Sorrell*, 126 S. Ct. 2479, 2496 (2006))

(emphasis in Pl.'s Br.). The Court initially notes that it appears that the FEC attempted to do just

that by focusing its analysis of the CMAG data on battleground states, and that, ironically,

Plaintiff now describes that analytical approach as a methodological flaw. *See* 71 Fed. Reg. at

33,195 & n.21 (indicating that Commission "decided to limit the data [it considered] to those

States in which the 2004 Presidential race was the most highly contested."). Moreover, *Randall*

does not announce as broad a principle as Plaintiff posits. *Randall* addressed the narrow question

of whether contribution limits included in Vermont's Campaign Finance Reform Act were so

low as to prevent effective campaigning, thus unnecessarily burdening First Amendment rights

and indicating a lack of careful tailoring. 126 S. Ct. at 2479. In that particular factual context

and in light of the legal issue raised, the Supreme Court noted that the critical inquiry was not the

"*average* effect of contribution limits on fundraising," but rather the "ability of a candidate

running against an incumbent officeholder to mount an effective *challenge*." *Id.* at 2496

(emphasis in original). *Randall* presents a distinguishable factual and legal predicate, and

therefore does not suggest that in analyzing the CMAG data the FEC was required to isolate or

pay particular attention to contested races. As a result, the Court lacks any basis, either factual

or legal, on which to conclude that the FEC's very reliance on the CMAG data was arbitrary and

capricious.

      The Court, then, turns to the conclusions drawn by the Commission based on its analysis

of the CMAG data. The FEC's E&J in support of the revised content standards purports to use

that analysis to answer the three questions raised by the D.C. Circuit regarding candidates'

spending patterns and the likelihood that those spending patterns would shift in response to a

bright-line rule.  From its analysis, the Commission draws three main conclusions: (1) "Senate and House candidates conduct nearly all campaign-related advocacy within 60 days of an election;" (2) "Campaign advertising in presidential races occurs on a different cycle than in Senate and House races;" and (3) "The minimal value of advertising outside of the revised time frames limits the risk of corruption from candidates and collaborators shifting coordinated spending to outside the time frames."  71 Fed. Reg. at 33,194-96.  The Commission's first two conclusions relate to the bright lines drawn in the revised content standard, that is, the 90- and 120-day pre-election windows, while the third aims at addressing the restraints applied outside those windows.

Plaintiff attempts to mount a wholesale attack on all of the Commission's conclusions by arguing that they "fly in the face of extensive record evidence demonstrating that many federal candidates, political parties, and outside interest groups have run electioneering ads" outside of the 90- and 120-day pre-election windows.  Pl.'s Br. at 12.  Plaintiff's "extensive record evidence," however, again consists of the advertisements described in the *National Journal* articles and Plaintiff's allegations of coordination between the DNC and President Clinton during 1995 and 1996.  And, again, because Plaintiff presents no evidence of the statistical significance of the advertisements described in the *National Journal* articles, and in light of the limited evidentiary value of the alleged Clinton-DNC coordination, the Court lacks a basis on which to conclude that this evidence actually undermines the first two conclusions drawn by the FEC based on the CMAG data.[23]

---

[23] The Court notes that it is not possible to determine how, if at all, the advertisements described in the *National Journal* articles relate to the advertisements included in the CMAG data.  First, the *National Journal* articles describe advertisements produced in connection with

To be sure, as the D.C. Circuit recognized in the *Shays I Appeal* and as Plaintiff himself recognizes, *see* Pl.'s Reply Br. at 1-2, there are benefits inherent in an "objective, bright-line test [that] does not unduly compromise the Act's purposes."  414 F.3d at 99 (citing *Orloski*, 795 F.2d at 165) (alteration in *Shays I Appeal*).  Moreover, the CMAG data appear to support the Commission's first two conclusions, and thus the bright lines drawn in the revised content standard.  Specifically, the FEC's analysis reveals that in connection with the 2004 elections, Senate candidates aired 0.87% and 0.39% of their campaign ads more than 90 days prior to their primary and general elections, respectively.  71 Fed. Reg. at 33,194; *see also* FEC Graphs S1 and S3).  This advertising represented 0.66% and 0.15% of the total estimated costs of advertisements run by Senate candidates before the primary and general elections, respectively.  71 Fed. Reg. at 33,194; *see also* FEC Graphs S2 and S4.  In addition, House of Representative candidates aired 8.56% and 0.28% of their advertisements more than 90 days prior to their primary and general elections, respectively.  71 Fed. Reg. at 33,194; *see also* FEC Graphs H1 and H3.  This advertising represented 3.79% and 0.13% of the total estimated costs of advertisements run by House candidates before the primary and general elections, respectively.  71 Fed. Reg.

---

three election cycles, while the CMAG data include only ads run during the 2004 election cycle. Second, CMAG monitors only television advertisements run in 101 media markets on the four major broadcast networks and 42 national cable networks, and the *National Journal* articles do not include sufficient detail to determine whether the ads they describe are included in that subset of advertisements.  Finally, because the *National Journal* articles describe a total of 236 discrete ads run over three election cycles, the portion of those ads run during the 2004 election cycle is unlikely to be statistically significant given the size of the CMAG data pool.  *See* FEC Graphs P7 (45,474 total ads run prior to 2004 presidential primary elections); P9 (204,688 total ads run prior to 2004 presidential general election); S1 (89,606 total ads run prior to 2004 Senate primary elections); S3 (149,310 total ads run prior to 2004 Senate general election); H1 (35,205 total ads run prior to 2004 House primary elections); and H3 (131,665 total ads run prior to 2004 House general election).

33,194; *see also* citing FEC Graphs H2 and H4.  The FEC thus reasonably concluded, based on this data, that a vast majority of candidate advertising occurred within the 90 days prior to primary and general elections.[24]

The Commission's conclusions regarding the differences in the patterns of advertising in presidential and congressional elections appear similarly reasonable.  The CMAG data demonstrate that in 2004, "the Republican Presidential candidate spent a total of $9,475,679 on television advertisements run during the gap period, which amounted to 14 percent of the total costs of media spots aired by the Republican Presidential candidate in those media markets after the State primaries."  71 Fed. Reg. at 33,195 (citing FEC Graph P11, *available at* A.R. 2155).  In addition, "Democratic Presidential candidates spent $1,221,045 on post-primary television advertisements that occurred during that gap period.  Thus nearly $10.7 million was spent by Presidential candidates on television advertisements during the gap periods."  *Id.* (citing FEC Graph P11 and CMAG data).  The Commission's revised content regulation now covers, on a state-by-state basis, the period of time 120 days prior to that State's primary election through the general election.  11 C.F.R. § 109.21(c)(4).  As the Commission states in the E&J, the CMAG

---

[24] Indeed, the FEC's analysis of the CMAG data indicates that the vast majority of Senate and House candidate advertising occurs within 60 days of an election.  71 Fed. Reg. at 33,194.  The data reveals that Senate candidates aired 91.60% and 94.73% of their advertisements within 60 days of the primary and general elections, respectively, and that this advertising represented 93.32% and 97.20% of the estimated costs of advertisements run by Senate candidates before the primary and general elections, respectively.  *Id.* (citing FEC Graphs S1, S2, S3, and S4).  The data also reveals that House candidates aired 88.16% and 98.09% of their advertisements within 60 days of the primary and general elections, respectively, and that this advertising represented 92.68% and 98.75% of the estimated costs of advertisements run by House candidates before the primary and general elections, respectively.  *Id.* (citing FEC Graphs H1, H2, H3, and H4).  Nevertheless, "in order to foreclose the possibility that candidates and groups will shift spending outside the applicable time frame, the Commission . . . determined to set the Congressional time frame at 90 days."  *Id.* at 33,196.

data demonstrates that "in the 2004 election cycle, over 99 percent of the estimated media spot

spending by Presidential candidates fully contained within individual 'battleground' States

occurred during" the time period covered by the revised content standard for presidential races.

71 C.F.R. at 33,195 (citing FEC Graphs P8 and P10).  The CMAG data are also consistent with

the majority of comments received by the Commission during the rulemaking.  *See id.* at 33,194.

Plaintiff argues that the CMAG data "demonstrate only the obvious–that most TV ads run

by candidates are run in the period immediately leading up to the primary or general election,"

but do not demonstrate that "ads run earlier in the election cycle are *insubstantial*."  Pl.'s Br. at

33.  As support for this argument, Plaintiff highlights that the CMAG data show that House

candidates aired 8.56% of their pre-primary TV ads more than 90 days before the relevant

primaries, that 8.44% of all TV ads aired by candidates prior to the 2004 presidential primaries

were aired outside the 120-day pre-primary window, Pl.'s Br. at 33, and that 16% of all TV ads

run by presidential candidates in Iowa before the January 2004 caucuses were aired more than

120 days prior to the caucuses, Pl.'s Reply Br. at 15.  These statistics are valid and, as discussed

below, demonstrate that candidates *do* spend money on advertisements outside the revised pre-

election windows.  However, the *Shays I Appeal* left the door open for the FEC to develop a

bright-line rule with respect to coordinated communications, *see* 414 F.3d at 101, and as the

Commission correctly notes, "whenever a line is drawn, events will occur on both sides of it,"

Def.'s Br. at 46; *see also Barnhart v. Thomas*, 540 U.S. 20, 29 (2003) ("Virtually *every* legal (or

other) rule has imperfect applications in particular circumstances.").  To the extent that the FEC

may, consistent with the First Amendment and with the goal of administrative ease, draw a

bright-line rule, *see Orloski*, 795 F.2d at 165, it appears to have drawn the line in a reasonable

place based on the data available to it.  The Court cannot therefore conclude that the FEC's first

two conclusions, and its consequent selection of the pre-election windows included in the revised

content standard were arbitrary and capricious.

The revised content standard, however, contains more than just the pre-election windows,

within which communications are held to a higher standard.  Under the revised content standard,

outside of the pre-election windows, communications will not be deemed coordinated unless they

republish a candidate's own campaign materials or "expressly advocate[] the election or defeat of

a clearly identified candidate for Federal office."  *Id.* § 109.21(c)(2)-(3).  As Plaintiff correctly

points out, the E&J (and the Commission's opening brief) "reads as if the Commission faced

only one assignment on remand: identifying and justifying when a pre-election period of

heightened regulation of coordinated expenditures should begin. . . . But the D.C. Circuit made

clear that the Commission was required to address *two* distinct (though related) issues: (1) 'the

120-day time frame,' and (2) 'the weak restraints appl[ied] outside of it.'"  Pl.'s Br. at 26-27

(quoting *Shays I Appeal*, 414 F.3d at 100).  The Court therefore turns to whether the third

conclusion included in the Commission's E&J represents reasoned decisionmaking.

To reiterate, FECA provides that expenditures that are coordinated with a candidate

constitute campaign contributions, 2 U.S.C. § 441(a)(a)(7)(B)(i), and, in turn, defines an

"expenditure" as "*any* purchase, payment, distribution, loan, advance, deposit, or gift of money

or anything of value, *made by any person for the purpose of influencing any election for Federal

office*," *id.* § 431(9)(A)(i) (emphasis added).  As the D.C. Circuit summarized, "if someone

makes a purchase or gift with the purpose of influencing an election and does so in coordination

with a candidate, FECA counts that payment as a campaign contribution."  *Shays I Appeal*, 414

46

F.3d at 97.  The relevant goal, then, in designing regulations defining coordinated

communication is to "capture the universe of electorally oriented communication."  *Id.* at 100;

*cf.* 71 Fed. Reg. at 33,191 ("The purpose of the content prong is to ensure that the coordination

regulations do not inadvertently encompass communications that are not made for the purpose of

influencing a Federal election, and therefore are not expenditures subject to regulation under the

Act.") (internal quotation omitted).

        The FEC's E&J, however, fails to provide any assurance that its revised content standards

actually "capture the universe" of communications made for the purpose of influencing a federal

election.  Here, the *National Journal* articles proffered by Plaintiff are relevant because,

regardless of their statistical significance in comparison with the CMAG data, they provide

irrebuttable evidence that candidates produce advertisements outside the pre-election

windows–presumably for the purpose of influencing federal elections.  Nevertheless, the E&J

contains only a cursory dismissal of the *National Journal* articles, treatment that skates

dangerously close to the line of arbitrary and capricious decisionmaking.  The E&J dismisses the

advertisements described in the *National Journal* as not "empirical data," 71 Fed. Reg. at 33,192,

and because there was no evidence that the advertisements had been coordinated with a candidate

or political party, *id.* at 33,196-97.  However, the *National Journal* articles are directly

responsive to the FEC's NPRM, which requests "examples of communications from previous

election cycles demonstrating that an alternative may be either underinclusive or overinclusive,"

and information as to whether "early electoral communications, for example, that occur more

than 120 days before an election, have an effect on election results."  70 Fed. Reg. at 73,949.

Furthermore, the *National Journal* articles describe 236 discrete advertisements, and represent

the only evidence of candidate spending–other than the FEC's own CMAG data–introduced during the rulemaking.

An agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems." *Covad Commc'ns Co. v. Fed. Commc'ns Comm.*, 450 F.3d 528, 550 (D.C. Cir. 2006) (citation omitted); *see also Canadian Ass'n of Petroleum Producers v. Fed. Energy Reg. Comm'n*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("Unless the Commission answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned."). The advertisements described in the *National Journal* articles "on their face seem legitimate," *Canadian Ass'n of Petroleum Producers*, 254 F.3d at 299, and may "raise significant problems," *Covad Commc'ns Co.*, 450 F.3d at 550. The FEC's minimal attention to this body of evidence suggests that the Commission may have failed to consider adequately an important aspect of the problem. *See id.*, 450 F.3d at 550 ("The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.") (citations omitted).

Moreover, the evidentiary value of the *National Journal* articles is compounded by facts revealed by the FEC's own analysis of the CMAG data: that House candidates aired 8.56% of their pre-primary TV ads more than 90 days before the relevant primaries, that 8.44% of all TV ads aired by candidates prior to the 2004 presidential primaries were aired outside the 120-day pre-primary window, and that 16% of all TV ads run by presidential candidates in Iowa before the January 2004 caucuses were aired more than 120 days prior to the caucuses. These percentages translate into significant numbers of advertisements and amounts of money–the 3,838 ads aired more than 120 days before the 2004 presidential primaries included were valued

48

at more than $802,544, *see* FEC Graph P8, and the 3,013 advertisements aired by House

candidates more 90 days before their respective primaries were valued at $653,892, *see* FEC

Graph H2.  It is clear from both the *National Journal* articles and the CMAG data that candidates

spend money on advertisements aired outside the pre-election windows.  The question, then, is

whether the E&J provides a "persuasive justification" for the "weak restraints appl[ied] outside

[of the pre-election windows]."  *Shays I Appeal*, 414 F.3d at 100.

      Significantly, the Commission's own regulations and E&J make clear that timing alone

does not dictate whether a communication is made for the purpose of influencing federal

election.   The third prong of the content standard is satisfied by a public communication that

constitutes express advocacy, regardless of when such a communication is made, 11 C.F.R. §

109.21(c)(3), because the Commission "concluded that express advocacy, no matter when such

communications are made, can be reasonably construed only as for the purpose of influencing an

election." 71 Fed. Reg. at 33,191.  The Commission thus inherently acknowledges that some

communications made outside of the pre-election windows are intended to influence federal

elections.  Moreover, the Commission's E&J makes no attempt to suggest that the candidate

advertisements evidenced by the *National Journal* articles and the CMAG data as having been

run outside the pre-election windows were aired for purposes *other than* influencing federal

elections.  To the contrary, the E&J posits that "[a]ny time a candidate uses campaign funds to

pay for an advertisement, it can be presumed that this advertisement is aired for the purpose of

influencing the candidate's election."  71 Fed. Reg. at 33,193.

      Instead, the E&J attempts to discount the significance of the evidence of candidate

advertising outside the pre-election windows by claiming that a "minimal amount of activity

occurs" outside of the windows, and that "outside of those time periods where candidate advertising occurs, there is little risk that coordinated activity presents the risk or appearance of corruption." *Id.* at 33,194, 33,196. This argument, however, is logically flawed. As the Supreme Court recognized in *McConnell*, expenditures "made after a 'wink or nod' often will be 'as useful to the candidate as cash.'" 540 U.S. at 221-222. Where advertisements are coordinated with, and controlled by, a candidate, the risk is present that they will be "given as a *quid pro quo* for improper commitments from the candidate." *Id.* at 221. The Commission's third conclusion in its E&J–that "the minimal value of advertising outside of the revised time frames limits the risk of corruption from candidates and collaborators shifting coordinated spending to outside the time frames"–turns this logic on its head. *See* 71 Fed. Reg. at 33,196. According to the Commission, the fact that candidates spent proportionally less on advertisements outside the pre-election windows indicates that they value those advertisements less, and therefore are less likely to engage in *quid pro quo* arrangements with respect to those advertisements. *Id.* This conclusion, however, considers only the comparative value of that advertising, and not its absolute value. It is obvious that *more* advertisement occurs as elections approach, but that truism does not negate that *some* candidate spending *does* occur outside the pre-election windows, indicating that candidates *do* place some value on early advertisements. As a result, a risk or appearance of corruption is still present with respect to advertising outside of the pre-election windows.

The E&J also suggests that the ultimate vindication of the FEC's rule is the lack of evidence in the administrative record of actual coordination since the Commission's coordinated communication regulations took effect. *See* 71 Fed. Reg. at 33,197. That no such evidence has yet been identified, however, is far from a guarantee that such evidence will not develop in the

future.  Indeed, BCRA was passed in response to more than twenty years of campaign finance

history that "persuaded Congress that further legislation was necessary to regulate the role that

corporations, unions, and wealthy contributors play in the electoral process," *McConnell*, 540

U.S. at 122, to which evidence from a single electoral cycle pales in comparison.  Furthermore,

while the Commission stresses the fact that it "has received very few complaints" alleging

coordination between candidates and outside groups on communications that ran between 90 and

120 days before a congressional election, *id.*, this is hardly surprising in light of the fact that the

2002 rules established an absolute "safe harbor" for communications publicly disseminated more

than 120 days before an election, regardless of the level of coordination they involved, *see Shays

I*, 337 F. Supp. 2d at 58 (citing 68 Fed. Reg. at 430 n.2).  Finally, the FEC's third conclusion in

its E&J–that the value candidates place on advertising is tied to the risk of corruption inherent in

that advertising, *see* 71 Fed. Reg. at 33,196–itself demonstrates that the Commission's emphasis

on the lack of evidence of actual coordination is misplaced.  By demonstrating that candidates

spend money on advertisements aired outside the pre-election windows, the CMAG data and the

*National Journal* articles indicate that candidates value such advertising and that, as a result, a

risk of corruption is present if such advertisements may be coordinated with candidates free from

regulation by virtue of a safe harbor.  The record evidence, then, shows the *risk* of corruption or

the appearance thereof, regardless of whether it establishes actual corruption.

      Finally, although the E&J does not argue as much, the Commission's briefs claim that the

revised content regulation is adequate because the Commission was required to "'rationally,' not

perfectly, capture election-related activity so as to prevent a 'substantial' amount of such

communication from evading regulation."  Def.'s Br. at 32 (citing *Shays I Appeal*, 414 F.3d at

102).  According to the Commission, its rule does just that, and has the added benefit of

minimizing the risk that non-election speech will be chilled or punished.  *Id.*  However, the

Commission offers no reason for declaring "insubstantial" either the 8.56% of advertisements

(3,013 advertisements valued at $653,892) aired by House candidates more than 90 days prior to

the 2004 primaries, or the 8.44% of advertisements (3,838 advertisements valued at $802,544)

aired by presidential candidates more than 120 prior to the 2004 primaries.  Furthermore, the

*Shays I Appeal* clearly stated that "[n]otwithstanding its obligation to attempt to avoid

unnecessarily infringing on First Amendment interests, the Commission must establish,

consistent with APA standards, that its rule rationally separates election-related advocacy from

other activity falling outside FECA's expenditure definition."  414 F.3d at 101-102 (internal

quotation omitted).  The FEC therefore cannot simply cite the First Amendment as an excuse for

failing to explain how its regulation satisfies FECA's statutory command.

     The Court now comes to the nub of the question of whether the Commission's E&J meets

the APA's standard of reasoned decisionmaking.  The administrative record, including both the

*National Journal* articles and the CMAG data, demonstrates that candidates do advertise–and

thus engage in activity intended to influence a federal election–outside of the pre-election

windows included in the revised content standards.  Nevertheless, outside those windows, the

revised content standards continue to regulate only republication of a candidate's own materials

and "express advocacy."  11 C.F.R. § 109.21(c).  By continuing to rely on the express advocacy

standard–which the Supreme Court has declared to be "functionally meaningless," *McConnell*,

540 U.S. at 193–the Commission has essentially concluded that communications made outside of

the pre-election windows require virtually no regulation at all.  *See id.* ("Not only can advertisers easily evade the line by eschewing the use of magic words, but they would seldom choose to use such words even if permitted.  And although the resulting advertisements do not urge the viewer to vote for or against the candidate in so many words, they are no less clearly intended to influence the election."); *Shays I Appeal*, 414 F.3d at 100.

The E&J itself makes no attempt whatsoever to justify the Commission's continued reliance on the express advocacy standard.  As a result, the various arguments pressed by the FEC in its briefs in support of that continued reliance all amount to *post hoc* rationalizations, on which the Court cannot rely, and which certainly do not demonstrate that the Commission's E&J represents reasoned decisionmaking.  "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," and that "courts may not accept . . . counsel's *post hoc* rationalizations for agency action."  *State Farm*, 463 U.S. at 50 (citations omitted).  In any event, none of these *post hoc* rationalizations have merit.  The most substantial of the Commission's arguments is that the revised content standard is defensible because, although "nothing in BCRA or its legislative history requires the content standard to reach beyond coordinated express advocacy and electioneering communications," the Commission nevertheless regulated more broadly, encompassing both republication and communications within the pre-election windows that clearly identify a candidate and are publicly distributed in the relevant jurisdiction.  Def.'s Reply Br. at 2-3.[25]  This argument, however, goes not to whether

---

[25] The Commission advances two other *post hoc* rationalizations, which the Court finds similarly lacking in merit.  The FEC first suggests that its use of the express advocacy standard is not tainted by the weakness of the magic words test because the "Commission's regulation interpreting 'express advocacy' is broader than the 'magic words' approach."  Def.'s Br. at 48 (citing 11 C.F.R. § 100.22(b)).  Under 11 C.F.R. § 100.22, a communication may be considered

the Commission engaged in reasoned decisionmaking in adopting the revised content standard, but rather whether the Commission's interpretation of BCRA is a permissible one. That question was conclusively resolved in the Commission's favor by this Court in *Shays I* and by the D.C. Circuit in the *Shays I Appeal*. *See Shays I*, 337 F. Supp. 2d at 61-62; *Shays I Appeal*, 414 F.3d at 98-100. As a result, the relevant inquiry at this point is not whether the Commission was required to regulate more than express advocacy, but whether, if it chose not to do so, it met its burden under the APA of establishing "that its rule rationally separates election-related advocacy from other activity falling outside FECA's expenditure definition." *Shays I Appeal*, 414 F.3d at 102.

The Commission has simply failed to meet this burden. The record before the FEC during the rulemaking demonstrates that candidates do run advertisements–which do not necessarily include express advocacy, but are nevertheless intended to influence federal

---

"express advocacy" if it either uses magic words or "[w]hen taken as a whole and with limited reference to external events . . . could only be interpreted by a reasonable person as containing advocacy of the election or defeat of . . . [a] candidate." 11 C.F.R. § 100.22(b). However, the Commission makes no attempt to suggest that even this broader construction of express advocacy would capture the universe of expenditures, which are statutorily defined as activity intended to influence a federal election.

In addition, the Commission (along with *amicus curiae*, The Center for Competitive Politics) appears to make a legislative reenactment argument that, prior to BCRA, the FEC informally applied an express advocacy content standard when determining whether allegedly coordinated communications constituted contributions, and that Congress legislated based on this understanding. *See* Center for Competitive Politics *Amicus* Br.; Def.'s Reply Br. at 13-17. However, as this Court discussed in detail in *Shays I*, "[t]o freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place." *See* 337 F. Supp. 2d at 60-61 (quoting *American Fed'n of Labor & Congress of Indus. Orgs. v. Brock*, 835 F.2d 912, 916 (1987)). The Commission does not present evidence of such a "strong affirmative indication," or that the "legislature had its attention directed to the administrative interpretation upon reenactment." *Id.* at 916 n.6. Accordingly, the legislative reenactment argument put forth by the Commission and the *amicus* must fail.

54

elections–outside of the pre-election windows included in the revised content standard.  The E&J

presents no persuasive justification for writing off that evidence and does not suggest that it

would somehow be captured by the "functionally meaningless" express advocacy standard.[26]  As

such, the E&J fails to meet the APA's standard of reasoned decisionmaking.

> ### b.    Conduct Standards

Despite the fact that Plaintiff did not challenge the content standards of the coordinated

communications regulation in *Shays I*, in its post-*Shays I* NPRM, the "Commission took the

opportunity to seek comment on how certain aspects of the conduct prong have worked in

practice since the coordination regulations were promulgated in 2002." 71 Fed. Reg. at 33,202.

Plaintiff now challenges two of the Commission's amendments to the conduct standards

> ### i.    "Common Vendor" and "Former Employee" Time Limit

First, the Commission decided to "revise the temporal limit in the common vendor and

former employee conduct standards to encompass 120 days rather than the entire 'current

election cycle.'" 71 Fed. Reg. at 33,203.  The revised "temporal limit begins on the last day of

the most recent employment or provision of services," and "[i]f the former employee or

commercial vendor performs any work for the candidate or political party committee after the

---

[26] The Court takes the opportunity to note that the coordinated communications NPRM proposed seven alternatives for retaining or revising the content standards, and that the Commission ultimately adopted a combination of Alternatives 1 and 2, while rejecting the other five Alternatives.  *See* 71 Fed. Reg. at 33,199-200.  These included removing the time frame from the fourth content standard, as well as substituting other tests in the fourth content standard. The Commission's consideration of other tests–including a test based on whether a communication promotes, supports, attacks, or opposes ("PASOs") a political party or clearly identified federal candidate and a test that relies on the statutory language "made for the purpose of influencing a Federal election," *see id.*–demonstrates that standards other than express advocacy do, in fact, exist.  However, the Court is not opining on their merit.

official termination of employment or contract . . . the calculation of the 120-day period will restart from that date." *Id.* at 33,204. Plaintiff asserts that this revision violates both *Chevron* step two and the APA's standards of reasoned decisionmaking. Pl.'s Br. at 41.

Although Plaintiff does not argue the point, the Court initially notes that the revised temporal limit survives *Chevron* step one. Pursuant to FECA, expenditures are to be considered contributions if they are made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate." 2 U.S.C. § 441a(a)(7)(B)(i). In enacting BCRA, Congress repealed the previous regulation, 11 C.F.R. § 100.23(c)(2) (2001), and ordered the FEC to promulgate new regulations that did not "require agreement or formal collaboration to establish coordination." 2 U.S.C. § 441a note; BCRA § 214(b)-(c). Congress also specifically instructed the FEC that the new regulations were to address "payments for communications directed or made by persons who previously served as an employee of a candidate or a political party." *Id.* However, because Congress provided no express guidance as to how the Commission was to "address" those topics, the Court finds that the statute is "silent . . . with respect to the specific issue." *Chevron*, 467 U.S. at 843.

Turning to *Chevron* step two, "the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute." *Id.* Plaintiff does not forcefully argue that the Commission's interpretation is an impermissible one, and given that Congress afforded the agency clear discretion in "addressing" the topics of common vendors and former employees, the Court finds that the FEC's construction of the statute is facially permissible. Plaintiff argues, however, that the revised temporal limit will "work to undermine[] the central purposes of FECA and BCRA," Pl.'s Br. at 41, because outside of "periods of actual

overlapping services and for 120 days after the employee or vendor stops providing services to one of the overlapping parties," "even 'material' inside information can be conveyed and actually used without restriction." Pl.'s Reply Br. at 31-32. Beyond this hypothetical, Plaintiff offers only evidence that, in 1995, an individual left a high-placed position with the Republican National Committee and went to work for an organization creating issue ads on behalf of Republican candidates. *Id.* at 32-33. As discussed above, allegations of pre-BCRA abuses are of significantly lower evidentiary value in this post-BCRA era, particularly because the advertising Plaintiff describes the organization as running would now be prohibited "electioneering communications" regardless of whether it was coordinated with a candidate or party, and because the individual's alleged "carrying on back-channel coordination with his friends and former colleagues at the RNC" would be evidence of active coordination and thus covered by the coordinated communication regulation's other content standards. Def.'s Reply Br. at 30-31. Because Plaintiff therefore fails to present the Court with evidence sufficient to determine that the revised temporal limit represents the potential for gross abuse or unduly compromises the Act's purpose, *Orloski*, 795 F.2d at 164-65, the Court concludes that the regulation survives *Chevron* step two.

Furthermore, Plaintiff's challenge to the revised temporal limit focuses more on his claim that the Commission's E&J fails to explain "*how* its new common vendor and former employee regulations would not 'unduly compromise the Act's purposes' or 'create the potential for gross abuse.'" Pl.'s Br. at 42 (quoting *Orloski*, 795 F.2d at 165). The Court therefore turns to considering whether the FEC has provided a "rational justification for [its regulation], as required by the APA's arbitrary and capricious standard." *See Shays I Appeal*, 414 F.3d at 96-97. As an

57

initial matter, Plaintiff argues that the Commission's revision "is an obvious example of agency deregulation that triggers the 'presumption . . . *against* changes in current policy that are not justified by the rulemaking record.'"  Pl.'s Reply Br. at 33 (citing *State Farm*, 463 U.S. at 42) (emphasis in original).  As the Commission stresses, however, "change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."  *Smiley v. Citibank (South Dakota)*, 517 U.S. 735, 742 (1996). Indeed, "an agency must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances,'" *State Farm*, 463 U.S. at 42 (citing *Permian Basin Area Rate Cases*, 390 U.S. 747, 784 (1968)), and an "agency's interpretation of a statute is entitled to no less deference . . . simply because it has changed over time," *National Home Equity Mortgage Association v. Office of Thrift Supervision*, 373 F.3d 1355, 1360 (D.C. Cir. 2004).  Nevertheless, pursuant to the APA, the agency at all times retains a responsibility to "provide a 'reasoned analysis' for its change in course." *Id.* (quoting *State Farm*, 463 U.S. at 57).

The FEC's E&J presents two primary explanations for the revised temporal limit.  First, the Commission notes that the temporal limit in the common vendor and former employee conduct standards was never intended to function as a "cooling off" period during which employment was forbidden.  71 Fed. Reg. at 33,204 (citing 2002 Coordination Final Rules, 68 Fed. Reg. at 438).  According to the FEC, however, "many commenters noted that the 'election cycle' temporal limit operated in practice as a 'period of disqualification'" and had a "'chilling effect on the retention of consultants and employees." *Id.* As a result, the E&J posits, the Commission concluded that "an 'election cycle' limit is overly broad and unnecessary to the effective implementation of the coordination provisions," and that the "more appropriate

58

temporal limit . . . is 120 days." *Id.* The Commission's briefs argue that the revision was thus a fine-tuning of the previous regulation in an effort to ensure that the temporal limit was "carefully tailored to reflect the actual marketplace for political consultants and employees." Def.'s Br. at 53-56. But, because BCRA was not enacted for the benefit of political consultants and employees, the Commission is certainly not at liberty to accommodate such individuals at the expense of BCRA's statutory goals. *See* Pl.'s Reply Br. at 33.

Second, the E&J argues that "reducing the temporal limit to 120 days will not undermine the effectiveness of the conduct standards and will not lead to circumvention of the Act" because the rulemaking record "indicates that material information regarding candidate and political party 'campaigns, strategy, plans, needs, and activities' does not remain 'material' for long during an election cycle." 71 Fed. Reg. at 33,204. This assertion does not support a revision to the temporal limit, however, because if information becomes stale over the passage of time, it will not be "*material* to the creation, production, or distribution of the communication." 11 C.F.R. § 109.21(d). Stale information, therefore, will always fall outside the reach of the common vendor and former employee conduct standards. *Id.* Moreover, even if supported by the rulemaking comments, the Commission's generalization that material information does not remain material for long overlooks the possibility that *some* information–for instance, a detailed state-by-state master plan prepared by a chief strategist–may very well remain material for at least the duration of a campaign. *See* Pl.'s Br. at 41-42.

Finally, the Commission provides absolutely no "persuasive justification" for its conclusion that "a limit of *120 days* is more than sufficient to reduce the risk of circumvention of the Act." 71 Fed. Reg. at 33,205 (emphasis added). Although the Commission claims that

material information does not "remain 'material' for long during an election cycle, this "bromide[] provides no independent basis for the rule [because] a bright line can be drawn in the wrong place," *Shays I Appeal*, 414 F.3d at 101-02, and the Commission offers no reason for believing that 120 days actually represents how "long" information remains material.  The E&J's only other explanation for the 120-day period is that the "approach is consistent with the Commission's polling regulations, which recognize that polling information quickly loses its value with the passage of time." 71 Fed. Reg. at 33,205 (citing 11 C.F.R. § 106.4(g)).  Yet this observation, while correct, "has no bearing on the issue before us."  *Shays I Appeal*, 414 F.3d at 100.  The Commission adduces no evidence that polling data and other types of information lose value at the same rate.  Even more significantly, the polling regulation on which the Commission relies does not actually include a 120-day time frame, but rather allocates different values to polling information based on whether the information is between sixteen and sixty days old, sixty and 180 days old, or more than 180 days old.

Although a Court's review of an agency's "reasoned analysis" is quite deferential, "an agency's action is arbitrary and capricious [if] the agency has not considered certain relevant factors or articulated any rationale for its choice."  *Republican Nat'l Comm.*, 76 F.3d at 407 (internal quotation marks omitted).  In the case where an agency has "chang[ed] its course[, it] must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."  *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (quoting *Greater Boston Television Corp. v. Federal Communications Commission*, 444 F.2d 841, 852 (D.C. Cir. 1970)).  Here, the Commission has revised the temporal limit for the common vendor and former employee content standards, reversing its

earlier position that the "election cycle [temporal limit] provides a clearly defined period of time that is reasonably related to an election." 68 Fed. Reg. at 436. The Commission has done so without adequately explaining how its revised regulation will capture the universe of communications made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate." 2 U.S.C. § 441a(a)(7)(B)(i). The Court therefore concludes that the Commission's revised temporal limit is arbitrary and capricious, and in violation of the APA.

### ii.      *Firewall Safe Harbor*

Following *Shays I*, the Commission also created a new general safe harbor, which provides that "[t]he conduct standards in paragraph (d) of [11 C.F.R. § 109.21] are not met if the commercial vendor, former employee, or political committee has established and implemented a firewall that meets the requirements of paragraphs (h)(1) and (h)(2) of this section." 11 C.F.R. § 109.21(h). In turn, paragraphs (h)(1) and (h)(2) provide:

> (1) The firewall must be designed and implemented to prohibit the flow of information between employees or consultants providing services to the person paying for the communication and those employees or consultants currently or previously providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee; and

> (2) The firewall must be described in a written policy that is provided to all relevant employees, consultants, and clients affected by the policy.

*Id.* In addition, the regulation states that the safe harbor "does not apply if specific information indicates that, despite the firewall, information about the candidate's or political party committee's plans, projects, activities, or needs that is material to the creation, production, or distribution of the communication was used or conveyed to the person paying for the

communication." *Id.* Plaintiff argues that this new safe harbor violates *Chevron* step two because it "is so vague as to lead to almost certain circumvention," and further argues that "the Commission has failed to adequately explain how this provision furthers BCRA's purposes," in violation of the APA. Pl.'s Br. at 43.

Again, although Plaintiff does not argue the point, the Court notes that the firewall safe harbor survives *Chevron* step one. As discussed above, BCRA provided the Commission with an "open-ended directive," *Shays I Appeal*, 414 F.3d at 98, to promulgate new regulations that did not "require agreement or formal collaboration to establish coordination" and to consider certain topics in so doing. 2 U.S.C. § 441a note; BCRA § 214(b)-(c). Congress provided no express guidance, however, on the use of firewalls, and the Court therefore finds that the statute is "silent . . . with respect to the specific issue." *Chevron*, 467 U.S. at 843. Turning to *Chevron* step two, Plaintiff again does not forcefully argue that the Commission's adoption of the firewall safe harbor represents an impermissible interpretation of FECA or BCRA and, in light of the broad and clear discretion afforded the Commission by Congress, the Court finds that the FEC's construction of the statute is facially permissible.

The Court next turns to Plaintiff's argument that the firewall safe harbor threatens to unduly compromise BCRA's purposes because "the Commission fails to provide even a modicum of guidance to the regulated community as to what actually constitutes an 'effective' firewall." Pl.'s Br. at 45. The Commission takes the opposite view of its regulation, asserting that

> the specific requirements of the firewall safe harbor are demanding. Any firewall must actually effective: it must be established before any information has been shared between relevant employees, and described in a written policy that is

> distributed to all employees, consultants, and clients affected by the policy before
> those employees begin work on the communication referencing the candidate or
> political party.

Def.'s Br. at 57-58 (citing 11 C.F.R. § 109.21(h)(2)).  These so-called "requirements," however, are far from concrete–they provide "no details about how, precisely, the policy must be implemented, what the policy must say, or what measures an organization must take to ensure that the policy is not breached."  Pl.'s Br. at 45.  The Commission acknowledges as much in the E&J when it states that the "safe harbor provision does not dictate specific procedures required to prevent the flow of information referenced in new 109.21(h) because a firewall is more effective if established and implemented by each organization in light of its specific organization, clients, and personnel."  71 Fed. Reg. at 33,206.

The E&J further explains that the "safe harbor codifies the Commission's conclusions in MUR 5506 (EMILY's List)" and that "[o]ne example of procedures that, if implemented, would satisfy [the firewall safe harbor's requirements] is the firewall described by EMILY's List in MUR 5506."  MUR 5506 involved allegations of "coordination between Betty Castor, a 2004 Senate candidate in Florida, and Emily's List, a political action committee," which EMILY's List defended against by "claim[ing] that its internal policies and procedures ensured that no coordination occurred."  MUR 5506, First General Counsel's Report at 1, 6 ("MUR 5506") (PX 137).  The Commission's briefs argue that the E&J's reference to the EMILY's List MUR provides additional guidance to the regulated community in applying the firewall safe harbor.  *See* Def.'s Br. at 58; Def.'s Reply Br. at 33-34.  However, the EMILY's List MUR does not actually supply concrete guidelines.  Rather, as the E&J itself describes, EMILY's List's "firewall procedures stated that employees, volunteers, and consultants who handle advertising

63

buys were 'barred as a matter of policy, from interacting with Federal candidates, political party committees, or the agents of the foregoing . . . [and] with others within EMILY's List regarding specified candidates or officeholders." 71 Fed. Reg. at 33,206 (quoting MUR 5506 at 6-7).

Accordingly, neither the E&J, including its description of the EMILY's List MUR, nor the General Counsel's Report on the EMILY's List MUR establishes the features a firewall must have to be deemed "effective."  By failing to providing organizations with concrete guidelines, the Commission's safe harbor offers little guarantee to an organization that its particular firewall will merit protection.  Even more significantly, the firewall safe harbor operates to entirely remove a communication from the purview of the coordinated communication regulation when an organization asserts that it has a firewall in place.  But, because the firewall safe harbor includes no objective standards, it is dubious to assume that any given firewall in fact prevents the passage of material information between individuals working on behalf of a candidate or political party and those working on behalf of an outside spender.  Indeed, the likelihood that organizations will develop actually effective firewalls is lessened by the fact that the E&J specifically provides that the firewall need not be complete, as "common leadership or overlapping administrative personnel does not defeat the use of a firewall."  71 Fed. Reg. at 33,207.

Where "the Commission provides no guidance whatsoever . . . the potential for abuse, intended or no, is obvious." *Common Cause*, 692 F. Supp. at 1396.  Plaintiff argues this potential for abuse is compounded because the safe harbor allows "any group to simply allege it has an internal 'firewall,'" and thereby avoid application of the conduct standards. Pl.'s Br. at 44.  This argument lacks merit, however, because the E&J specifies that in an enforcement action

a person "seeking to use the firewall safe harbor should be prepared to provide reliable information, (*e.g.*, affidavits) about an organization's firewall, and how and when the firewall policy was distributed and implemented." 71 Fed. Reg. at 33,206-07. Plaintiff's fears that the Commission will rely on unsubstantiated firewall claims in defense of enforcement actions also appears unfounded because according to the Commission, in the EMILY's List MUR, "the Commission relied upon detailed statements submitted to the Commission by EMILY's List and the Castor Committee . . . [including] a detailed description of [EMILY's List's] policies and organizational structure." Def.'s Reply Br. at 33 (citing MUR 5506 at 6).

      In contrast, it appears that the potential for abuse created by the Commission's lack of guidance *is* compounded by the preclusive effect of the firewall safe harbor. As the E&J explains, "[o]nce a firewall has been established, for the firewall to be vitiated and the safe harbor to be inapplicable, material information about the candidate's or political party committee's plans, projects, activities, or needs must pass between persons on either side of the firewall." 71 Fed. Reg. at 33,207 (citing 11 C.F.R. § 109.21(h)). Although the FEC's briefs suggest that in an enforcement proceeding the Commission may determine "that the firewall was inadequately designed," Def.'s Br. at 58, the E&J does not describe a mechanism for examining the effectiveness of an organization's firewall in the absence of "specific information" indicating that material information has passed, 71 Fed. Reg. at 33,206-07. The firewall safe harbor therefore appears to effectively shift the burden from the organization seeking to invoke the safe harbor to a party seeking to challenge an organization's alleged firewall.

      Pursuant to FECA, expenditures count as contributions when they are made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate." 2

U.S.C. § 441a(a)(7). Notwithstanding this broad statutory mandate, the Commission has created

a firewall safe harbor that serves to entirely exempt communications from scrutiny if the

organization creating them asserts that it has a firewall in place, without providing substantive

guidance to the regulated community on how to design an effective firewall. Furthermore, the

firewall safe harbor allows for the possibility that information may pass through the common

leadership or administrative personnel of an organization, and sets a high evidentiary standard for

overcoming the presumption created by the firewall. The Court concludes that this combination

creates the "potential for gross abuse" and "unduly compromises the Act's purposes," *Orloski*,

795 F.2d at 164-65, and that the firewall safe harbor therefore fails *Chevron* step two review.

Turning now to whether the firewall safe harbor E&J fails to meet the APA's requirement

of reasoned decisionmaking, Plaintiff correctly notes that, despite the obvious risks identified

above that the firewall safe harbor will undermine BCRA's purposes, the E&J contains no

substantive discussion of this risk or of how the firewall safe harbor might instead further

BCRA's purposes.[27] In particular, the E&J provides no explanation for the Commission's

decision to exempt common leadership and administrative personnel from the safe harbor

requirement. Rather, the E&J argues that the firewall safe harbor is justified because

commenters suggested that a safe harbor would "reduce the 'chilling effect' of the coordination

rules with regard to organizations conducting lobbying-related meetings with office holders who

are also candidates," and provide "a way for organizations to respond to speculative complains

---

[27] The E&J does note that commenters suggested that a safe harbor would "encourage and enhance compliance with the coordination regulations," 71 Fed. Reg. at 33,206; however, because the E&J does not elaborate upon this statement, it provides no assurance that the safe harbor will actually foster, rather than undermine, BCRA's purposes.

alleging coordination." 71 Fed. Reg. at 33,206. As discussed above, however, because BCRA was not enacted to benefit political consultants or lobbyists, these concerns cannot overcome the Commission's obligation to remain faithful to its statutory mandate.

The E&J further argues that the firewall safe harbor is justified because "the Supreme Court has recognized that political party committees have the right to make unlimited independent expenditures and that establishing firewalls and similar screening policies is an effective way to simultaneously protect that right and avoid improper coordination." 71 Fed. Reg. at 33,206. The Commission is, of course, correct that, in *Colorado I*, the Supreme Court clarified that political parties have the right to make unlimited independent expenditures in support of their own candidates. *See Colorado I*, 518 U.S. 604. However, the Commission cannot simply point to the First Amendment in support of its rule, rather it must "establish, consistent with APA standards," that its rule furthers–and certainly does not impede–BCRA's purposes. *See Shays I Appeal*, 414 F.3d at 101-02. That political parties have a right to make unlimited independent expenditures does not explain why a firewall safe harbor is necessary or appropriate for organizations that work only with candidates and outside spenders, and the E&J therefore "provides no assurance" that the firewall safe harbor does not "toss[] out the proverbial baby . . . with the bath water." *Id.* at 102.

In addition, the Commission does not explain how its concern for the First Amendment rights of political consultants, lobbyists, and political parties relates to the concerns that occupied Congress when it enacted BCRA. "In exercising [its] decisionmaking authority, the [agency] is certainly free to consider factors that are not mentioned explicitly in the governing statute, yet [it] is not free to substitute new goals in place of the statutory objectives without explaining how

these actions are consistent with [its] authority under the statute." *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987); s*ee also State Farm*, 463 U.S. at 43 ("an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider").  The E&J simply fails to demonstrate how the firewall safe harbor will advance BCRA's purposes.

Moreover, as Plaintiff stresses, the E&J ignores the fact that, in promulgating the 2003 conduct standards, the "Commission considered and rejected proposals to establish rebuttable presumptions and safe harbors in the common vendor conduct standard."  70 Fed. Reg. at 73,955 (Coordinated Communication NPRM); *see also* Pl.'s Br. at 43, 46.  In its briefs, the FEC challenges Plaintiff's claim that the proposal considered during the 2003 rulemaking was "identical" to the new rule, asserting that the 2003 proposal instead "contemplated a common vendor signing an agreement promising to maintain the confidentiality of information received from a client."  Def.'s Br. at 59.  However, the specifics of the 2003 proposal notwithstanding, in rejecting that proposal, the Commission stated that it did "not agree that the mere existence of a confidentiality agreement or ethical screen should provide a *de facto* bar to the enforcement of the limits on coordinated communications imposed by Congress.  Without some mechanism to ensure enforcement, these private arrangements are unlikely to prevent circumvention of the rules."  Coordinated and Independent Expenditures, 68 Fed. Reg. at 437.  The E&J does not even discuss the proposal rejected in 2003, let alone attempt to distinguish it from the firewall safe harbor, and certainly does not provide a "persuasive justification" for the Commission's apparent conclusion that the fear of circumvention that caused it to reject the 2003 proposal is no longer of concern.  As discussed above, "[a]n agency's view of what is in the public interest may change,

either with or without a change in circumstances.  But an agency changing its course must supply

a reasoned analysis."  *State Farm*, 463 U.S. at 57 (quoting *Greater Boston Television Corp.*, 444

F.2d at 852).  Because the E&J fails to do so, the Court concludes that the firewall safe harbor is

arbitrary and capricious, in violation of the APA.

### 2.      *Regulation Governing State Party Fundraisers*

BCRA restricts the ability of federal candidates and officeholders to raise, solicit, receive,

direct, or spend nonfederal money "in connection with an election for Federal office."  2 U.S.C. §

441i(e), (b)(2)(C).  "Notwithstanding [these restrictions], a candidate or an individual holding

Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district,

or local committee of a political party."  *Id*. § 441i(e)(3).  The Commission's regulation

implementing this exception provides that "[c]andidates and individuals holding Federal office

may speak at such events without restriction or regulation."  11 C.F.R. § 300.64(b).  The

Commission's original E&J for this regulation asserted that the FEC's interpretation was

"compelled by the plain language of the section and the structure of the section within BCRA,"

and that anything less than a total exemption would "require the Commission to regulate and

potentially restrict what candidates and officeholders say at political events . . . and raise serious

constitutional concerns."  Prohibited & Excessive Contributions, 67 Fed. Reg. at 49,108.

Plaintiff challenged this regulation in *Shays I* under *Chevron* steps one and two, as well as

the APA.  *Shays I*, 337 F. Supp. 2d at 88.  Examining the provision, the Court found it to be

ambiguous, and therefore to survive *Chevron* step one, because

> [r]ead in the context of the other provisions of the Act, [it] can be read to either
> be a carve-out for unabashed solicitation by federal candidates and officeholders
> at state, district or local committee fundraising events, or to simply make clear

69

that merely attending, speaking, or being the featured guest at such an event is
not to be construed as constituting solicitation *per se*.

*Id.*  Under *Chevron* step two, the Court noted that "the Commission's interpretation likely

contravenes what Congress intended when it enacted the provision, as well as what the Court

views to be the more natural reading of the statute."  *Id.* at 91.  Nevertheless, given the paucity of

the record on point, the Court found no basis for concluding that the regulation represented an

impermissible construction of FECA or unduly compromised the Act's purposes, and therefore

found that it survived *Chevron* review.  *Id.* at 91-92.  Considering whether the regulation met the

APA's requirement of reasoned decisionmaking, the Court found the regulation deficient in two

respects.  First, the E&J's reasoning was faulty in determining that the Commission's

interpretation of 2 U.S.C. § 441(e)(3) was mandated by the terms of the statute.  *Id.* at 92-93.

Second, the FEC failed to explain "how examining speech at fundraising events implicates

constitutional concerns that are not present when examining comments made at other venues."

*Id.* at 93.  As a result, the Court concluded that the regulation was arbitrary and capricious under

the APA.  *Id.*

The FEC did not appeal this Court's rulings with respect to state, district, and local party

fundraisers, but rather issued a NPRM in which it proposed revisions to the E&J for the existing

regulation and alternatively proposed revising the regulation to prohibit federal officeholders and

candidates from soliciting or directing nonfederal funds when attending or speaking at state,

district, or local party fundraisers.  *See* Candidate Solicitation at State, District, and Local Party

Fundraising Events, 70 Fed. Reg. at 37,650 (hereinafter the "Revised E&J").  Ultimately, the

Commission decided to retain the exemption in 11 C.F.R. § 300.64(b) permitting Federal

officeholders and candidates to attend, speak, or be featured guests at state, district, and local

party fundraising events without restriction, and issued a Revised E&J for the regulation.  *Id.*

Plaintiff asserts that the Revised E&J, while "undeniably wordier" than the original E&J,

"provides little new in the way of actual reasoning justifying the Commission's blanket

authorization for federal candidates and officeholders to solicit unlimited soft money donations at

state party fundraisers."  Pl.'s Br. at 48.   The Court therefore considers the arguments pressed by

the Commission in the Revised E&J in support of its decision to retain the total exemption in 11

C.F.R. § 300.64(b).   The Revised E&J first revisits the Commission's earlier argument that the

"notwithstanding" phrase in Section 441i(e)(3) suggests that Congress intended the provision to

be a complete exemption.   Although Plaintiff suggests that this argument is foreclosed by the

Court's conclusion in *Shays I* that such an interpretation was not "mandated" by the terms of

BCRA, Pl.'s Br. at 41 (citing 337 F. Supp. 2d at 92-93), the Court also concluded in *Shays I* that

the Commission's interpretation was not barred by BCRA's statutory language, *id.* at 90.[28]   The

Commission's continued reliance on the "notwithstanding" phrase in Section 441i(e)(3) is

therefore not foreclosed by *Shays I*, but still fails to provide conclusive proof that the FEC has

adopted the proper interpretation of the Section.

In a new argument based on statutory construction, the Revised E&J asserts that

"construing section 441i(e)(3) to be a complete exemption from the solicitation restrictions in

---

[28] In addition, the *amicus* brief filed by Senators John McCain and Russell D. Feingold
devotes much attention to arguing that "BCRA's language, structure, and legislative history make
clear that federal candidates are prohibited from soliciting "soft money" at state party fundraising
events."  *See* McCain/Feingold Amicus Br. at 11-15.  These arguments are inapposite, however,
because, as discussed above, the Court considered them in *Shays I*, and ultimately concluded that
the relevant provision was ambiguous.  *See* 337 F. Supp. 2d at 89-90.

section 441i(e)(1) gives the exception content and meaning beyond what section 441i(e)(1)(B)

already permits." 70 Fed. Reg. at 37,651. Section 441i(e)(1)(B) provides that federal candidates

and officeholders may "solicit, receive, direct, transfer, or spend funds in connection with" a non-

federal election, *i.e.*, a state or local election, if those funds comply with FECA's amount

limitations and source prohibitions. 2 U.S.C. § 441i(e)(1)(B). According to the Revised E&J,

the Commission has interpreted this provision to mean that Federal officeholders and candidates

may "speak and solicit funds at a State party fundraiser for the non-Federal account of the State

party in amounts permitted by FECA and not from prohibited sources." *See* 70 Fed. Reg. at

37,6551 (citing Advisory Opinions ("AO") 2003-3, 2003-5, and 2003-36). As a result, the

Commission argues,

> [i]nterpreting section 441i(e)(3) merely to allow candidates and officeholders to
> attend or speak at a State party fundraiser, but not to solicit funds without
> restriction, would render it largely superfluous because Federal candidates and
> officeholders may already solicit up to $10,000 per year in non-Federal funds
> from non-prohibited sources for State parties under section 441i(e)(1)(B).

*Id.* Plaintiff challenges this argument by asserting that "[a]ny apparent surplusage is occasioned

only by the Commission's *post hoc* interpretation of § 441i(e)(1)(B), not by Congressional

action," and that "an agency cannot render part of a statute 'superfluous.'" Pl.'s Reply Br. at 41-

42 n.41. The Court agrees with Plaintiff's argument in theory, but Plaintiff has not offered an

alternative reading of Section 441i(e)(1)(B). To the contrary, as discussed below, Plaintiff has

embraced the use of disclaimers by federal candidates and officeholders attending certain

fundraisers in order to ensure that they avoid soliciting any funds beyond those authorized by

FECA. Pl.'s Reply Br. at 40-41 (citing AO 2003-3, 2003-5, and 2003-36). Because Plaintiff

thus appears to endorse the Commission's interpretation of Section 441i(e)(1)(B), the Court has

no basis on which to conclude that it is not, at least, permissible.  In turn, it appears that the

Commission's effort to read Sections 441i(e)(1)(B) and 441i(e)(3) in a harmonious manner is

also permissible.

Moving beyond statutory construction arguments, the Revised E&J stresses three factors

in response to the Court's conclusion in *Shays I* that the original E&J failed to explain "how

examining speech at fundraising events implicates constitutional concerns that are not present

when examining comments made at other venues." *Shays I*, 337 F. Supp. 2d at 93.  They are: (1)

the traditional role of federal officeholders and candidates in raising money for their state parties;

(2) the unique relationship between federal officeholders and candidates and their state parties;

and (3) the inherent fundraising nature of state, district, and local party fundraising events.  *See*

70 Fed. Reg. at 37,651-53.

The Supreme Court recognized the first of these factors in *McConnell*, noting that BCRA

Section 323(e) contains "valid anticircumvention measures" that address Congress' "concerns

while accommodating the individual speech and associational rights of federal candidates and

officeholders."  540 U.S. at 182-83.  The Supreme Court specifically noted that  2 U.S.C. §§

441i(3)(1)(B) and 441i(e)(3)) "preserve the traditional role of federal officeholders by providing

limited opportunities for federal candidates and officeholders to associate with their state and

local colleagues through joint fundraising activities." *Id.* at 183.  The Revised E&J argues that

the Commission's fundraiser regulation "effectuates the careful balance Congress struck between

the appearance of corruption engendered by soliciting sizeable amounts of soft money, and

preserving the legitimate and appropriate role Federal officeholders and candidates play in

raising funds for their political parties." 70 Fed. Reg. at 37,651.  In addition, with respect to the

second factor, the Revised E&J accurately reports that a number of commenters emphasized that having federal candidates and officeholders attend state, district, and local party fundraising events "mainly serve[s] to energize grass roots volunteers vital to the political process."  *Id.*[29]

The Revised E&J devotes significant attention to the third factor, arguing that "[b]y definition, the primary activity in which persons attending or speaking at State party fundraising events engage is raising funds for the State parties."  70 Fed. Reg. at 37,651.  As a result, according to the Revised E&J, "[d]etermining what specific words would be merely 'speaking' at such an event without crossing the line into 'soliciting' or 'directing' non-Federal funds raises practical enforcement concerns."  *Id.*[30]  In particular, the Revised E&J notes that commenters indicated that "[a]s a featured speaker, an officeholder is expected to thank the attendees for their past and continued support of the party," and that the word "'support' may be construed as a solicitation when spoken at a fundraising event but not when spoken at other types of events," leading to difficulty for both candidates and the Commission in parsing "words of general support" from "words of solicitation."  *Id.*  The Revised E&J further stresses that an alternative

---

[29] For comments to this effect, *see* A.R. 506-07 (Comments of Mark Brewer, President, Ass'n of State Dem. Chairs) ("State and local party committees rely on their officeholders and candidates to demonstrate their commitment to the party by speaking at party events even though there may be no direct benefit to the candidate or officeholder); A.R. 524 (5/17/06 Public Hrg. Tr., Test. of W. McGinley, General Counsel to Nat'l Repub. Senatorial Comm.) ("I've heard these events described as unique opportunities for interaction and characterized as 'watering the grass roots.'").

[30] The Commission's regulations define the term "solicit" as meaning "to ask, request, or recommend, explicitly or implicitly, that another person make a contribution, donation, transfer of funds, or otherwise provide anything of value," 11 C.F.R. § 300.2(m), and define the term "direct" as meaning "to guide, directly or indirectly, a person who has expressed an intent to make a contribution, donation, transfer of funds, or otherwise provide anything of value, by identifying a candidate, political committee or organization, for the receipt of such funds, or things of value," *id.* at § 300.2(n).

rule would leave candidates' speech at state, district, and local party fundraising events subject to interpretation by listeners, and that the resulting "legal jeopardy" might "cause Federal officeholders and candidates to refuse to participate in State party fundraising events for fear that political rivals will attempt to seize on something in a speech as impermissible solicitation." *Id.* at 37,650-52.[31]

Plaintiff does not dispute the validity of any of the concerns pressed in the Revised E&J. Instead, Plaintiff argues that the E&J does not explain *why* these concerns are more significant in the context of state, district, and local party fundraisers, and notes that "all of these 'distinctive factors' apply with equal force to state *candidate* fundraisers, which fall outside the terms of the statutory safe harbor regarding state *party* fundraisers." Pl.'s Reply Br. at 39 (emphasis in original). Plaintiff's argument is initially appealing because the Commission has not created a complete carve-out for solicitation by federal officeholders and candidates at state candidate fundraisers. Instead, the Commission has concluded that a federal candidate or officeholder may attend, speak at, and participate in state candidate fundraisers "provided that by his own speech and conduct" he complies with the amount limitations and source restrictions included in Section 441i(e)(1)(B), and has suggested that to avoid soliciting funds not permitted under Section 441i(e)(1)(B), the federal candidate or officeholder may employ written or oral disclaimers indicating FECA's limits. *See* AO 2003-3, 2003-5, 2003-36.

However, Plaintiff's argument that the concerns inherent in state party fundraisers also apply to state candidate fundraisers ignores the fact that "Congress, not the Commission, singled

---

[31] For comments to this effect, *see, e.g.,* A.R. 500-01 (Comments of the Repub. Nat'l Comm.); A.R.504-10 (Comments of Mark Brewer).

out attendance by federal officeholders and candidates at state, district, and local party

fundraising events for special treatment under the statute." Def.'s Reply Br. at 41. This

argument appears to justify the Commission's disparate treatment of federal candidate

appearances at state party fundraisers and state candidate fundraisers.[32] Moreover, the

Commission effectively argues that Plaintiff's assertion that the "distinctive factors" described in

the Revised E&J "apply with equal force to state *candidate* fundraisers," Pl.'s Reply Br. at 39,

need not be taken as gospel. In particular, the Commission notes that "[u]nlike a state or local

candidate, whose relationship with federal officeholders or candidates is individualized and often

short-lived, state and local parties are institutions with long histories and futures," and that

"unlike state and local candidates, state party committees generally have a role in selecting

federal candidates." Def.'s Reply Br. at 42 (citing *FEC v. Colorado Republican Fed. Campaign

Comm.*, 533 U.S. 431, 449 (2001) and *Colorado I*, 518 U.S. at 613-14).

The Revised E&J provides a detailed explanation of the factors that the Commission

believes justifies its regulation creating a complete carve-out for solicitation by federal

candidates and officeholders at state, district, and local party fundraising events, and Plaintiff

---

[32] Plaintiff and *amici* Senators John McCain and Russell D. Feingold suggest that the Commission could address its concerns about federal candidates and officeholders appearing at state, district, and local party fundraisers by adopting a disclaimer approach similar to that suggested in AO 2003-3, 2003-5, and 2003-36. *See* Pl.'s Reply Br. at 41; McCain/Feingold Amicus Br. at 15-17. While a disclaimer approach might, as a practical matter, alleviate a number of the Commission's professed concerns about state party fundraisers, as the Commission points out, the fact Section 441i(e)(3) singled out state, district, and local party fundraisers for special treatment undercuts any suggestion that the Commission is *required* to treat them in the same manner it treats other fundraising events. *See* Def.'s Reply Br. at 43.

does not meaningfully respond to these concerns.[33]  In addition, the Revised E&J provides a

number of explanations for the FEC's conclusion that its regulation does not create a risk of

abuse or actual corruption, none of which Plaintiff attempts to rebut.  *See* 70 Fed. Reg. at 37,653-

54.  First, the Commission notes that "there is no evidence that the operation of [the fundraiser]

exemption in the past election cycle in any way undermined the success of BCRA . . . ."  *Id.*  at

37,653.  In addition, the Commission argues that there appears to be little additional benefit to

regulating the speech by federal candidates or officeholders once they are already at state, district,

or local party fundraising event.  To this end, the Commission notes comments indicating that

"without any overt solicitation, the candidate's appearance at the event already makes clear the

importance that she attaches to the party's overall campaign activities," and that, in most cases,

"a contribution to the State party [is] the cost of admission" and "the funds have already been

received by the party committee before the Federal candidate and officeholder speaks at the

event."  *Id.*  Finally, the Commission highlights a comment suggesting that most state, district,

---

[33] The Revised E&J also responds to arguments raised by commenters that federal officeholders and candidates are required to distinguish between permissible speech and impermissible solicitation when involved in political activity pursuant to the Hatch Act, 5 U.S.C. § 7323, and under the Senate Code of Official Conduct.  *See* 70 Fed. Reg. at 37,653.  Plaintiff does not challenge the Commission's treatment of the latter.  As to the Hatch Act, the Revised E&J asserts that "the Hatch Act is a narrower standard that provides clear guidance to speakers to distinguish permissible speech" because the "implementing regulations for the Hatch Act contain a narrow definition of 'solicit' meaning 'to request expressly' that another person contribute something." *Id.* (citing 5 C.F.R. §§ 734.208, 734.101).  The E&J also argues that the Hatch Act is distinguishable because "in order to violate the Hatch Act, a Federal employee must 'knowingly' solicit contributions."  *Id.*  Plaintiff argues that these distinctions fail to "explain why a '*complete* exemption' from the BCRA solicitation ban is either necessary or appropriate" in Section 441i(e)(3).  Pl.'s Br. at 50-51.  At the very least, however, the Commission's arguments establish that because the Hatch Act and Section 441i(e)(3) include different definitions of "solicit," it is not directly relevant that the Hatch Act allows federal employees to speak but not solicit, while the fundraising regulation does not do so.

77

and local party fundraising events are "small-dollar events targeted at grass roots volunteers

where donations are usually less than $100, and do not include corporations or single-interest

groups," and are therefore unlikely to foster the *quid pro quo* contributions that BCRA seeks to

curb. *Id.* at 37,654.

The "scope of review under the 'arbitrary and capricious' standard is narrow and a court

is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Moreover,

the "requirement is satisfied if the agency 'enables us to see what major issues of policy were

ventilated and why the agency reacted to them as it did.'" *Republican Nat'l Comm.*, 76 F.3d at

407 (quoting *Public Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)) (internal punctuation

omitted). Here, the Commission's Revised E&J explains the various considerations that led the

Commission to retain its regulation permitting federal officeholders and candidates to attend,

speak, or be featured guests at State party fundraising events without restriction or regulation.

Ultimately, much of the Commission's Revised E&J rests on the fact that, by enacting Section

441i(e)(3), Congress opted to treat state, district, and local party fundraisers differently from

other fundraising events–a point that cannot be disputed. While it is quite clear that Plaintiff

disagrees with the Commission's fundraising regulation, "at bottom," his "arbitrary-and-

capricious challenge boils down to a policy disagreement." *Public Citizen, Inc. v. Nat'l Highway

Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004) ("*Public Citizen v. NHTSA*).

Despite the Court's continued suspicion that "the Commission's interpretation likely contravenes

what Congress intended when it enacted the provision," *Shays I*, 337 F. Supp. 2d at 91, because

the Court finds that the Commission's fundraising regulation "is both supported by the record

and rationally explained," the Court has "no basis for substituting" Plaintiff's view for that of the

FEC. *See Public Citizen v. NHTSA*, 374 F.3d at 1263. The Commission's fundraiser regulation

thus survives APA review.

### 3.    Regulations Governing "Federal Election Activity"

In enacting BCRA, Congress sought to prevent circumvention of its ban on national

political parties' involvement with nonfederal money by prohibiting "state and local party

committees from using such funds for activities that affect federal elections." *McConnell*, 124 S.

Ct. at 654-55. To that end, Congress identified activities having such an effect as "Federal

election activity" ("FEA") and defined that term as:

> (i) voter registration activity during the period that begins on the date that is
> 120 days before the date a regularly scheduled Federal election is held and
> ends on the date of the election;
> (ii) voter identification, get-out-the-vote activity, or generic campaign
> activity conducted in connection with an election in which a candidate for
> Federal office appears on the ballot (regardless of whether a candidate for
> State or local office also appears on the ballot);
> (iii) a public communication that refers to a clearly identified candidate for
> Federal office (regardless of whether a candidate for State or local office is
> also mentioned or identified) and that promotes or supports a candidate for
> that office, or attacks or opposes a candidate for that office (regardless of
> whether the communication expressly advocates a vote for or against a
> candidate); or
> (iv) services provided during any month by an employee of a State, district,
> or local committee of a political party who spends more than 25 percent of
> that individual's compensated time during that month on activities in
> connection with a Federal election.

2 U.S.C. § 431(20). Generally, state, district, and local party committees must pay for FEA

solely with federal funds. 2 U.S.C. § 431(20). However, pursuant to the Levin Amendment to

BCRA, codified at 2 U.S.C. § 441i(b)(2), state and local parties may finance certain types of

FEA–including voter registration activity and GOTV activity–with a mixture of federal funds and

so-called "Levin funds," "allocated" based on the relative state and federal components of the

activity.  2 U.S.C. § 441i(b)(2); 2 U.S.C. § 431(20); 11 C.F.R. § 300.33.  Levin funds are

"[a]vailable to state and local party organizations in sums up to $10,000 per donor per year, . . .

exempted from federal disclosure requirements and restrictions," and "subject to far less onerous

controls than" federal funds.  *Shays I Appeal*, 414 F.3d at 112-13.

        In *Shays I*, Plaintiff challenged many of the regulations promulgated by the Commission

regarding FEA, including the regulations defining voter registration activity and GOTV activity.

The Court invalidated each of those provisions in *Shays I*, finding that the Commission violated

the APA's notice requirements in promulgating them because interested parties could not

reasonably have anticipated the FEC's final rulemakings from its NPRM.  *See* 337 F. Supp. 2d at

100-01, 105-06.  On remand, the Commission re-promulgated its regulations defining voter

registration activity and GOTV activity (with minimal alterations to the definition of GOTV

activity), and issued an expanded E&J ("Expanded E&J").  Plaintiff now challenges again the

Commission's regulations defining voter registration activity and GOTV activity.

### i.    *Voter Registration Activity*

        The Commission's regulation defines voter registration activity as:

> Contacting individuals by telephone, in person, or by other individualized means
> to assist them in registering to vote.  Voter registration activity includes, but its
> not limited to, printing and distributing registration and voting information,
> providing individuals with voter registration forms, and assisting individuals in
> the completion and filing of such forms.

11 C.F.R. § 100.24(a)(2).  In *Shays I* Plaintiff argued that the Commission's requirement

"impermissibly narrows the definition of 'voter registration activity' because it excludes from its

reach encouragement that does not constitute actual assistance."  337 F. Supp. 2d at 98.  The

Court, however, found that the provision survived *Chevron* step one because it "is possible to

read the term 'voter registration activity' to encompass those activities that actually register

persons to vote, as opposed to those that only encourage persons to do so." *Id.* at 99-100.

With respect to *Chevron* step two, the Court concluded that "while the Commission's

construction may not functionally maximize Congress' purpose, it is not an impermissible

construction of the statute." *Id.* at 100.  The Court then noted that

> the exact parameters of the Commission's regulation are subject to interpretation.
> While it is clear that mere encouragement does not fall within the scope of the
> regulation, it is possible that encouragement coupled with a direction of how one
> might register could constitute "assistance" under the provision. Such an
> interpretation could remedy what might otherwise be a regulation that "unduly
> compromises the Act."

*Id.* (quoting *Orloski*, 795 F.2d at 164).  The Court therefore concluded that it could not, "without

violating the ripeness doctrine, determine whether the regulation fails *Chevron* step two review."

*Id.*  The Court nevertheless remanded the regulation defining voter registration activity to the

FEC, finding that it violated the APA's notice requirement because interested parties could not

reasonably have anticipated the final rulemaking from its NPRM.  *Id.* at 100-01, 105-06.

On remand, the Commission did not modify the definition of voter registration activity,

but instead opted to "provide a fuller explanation of what this term encompasses in response to"

this Court's decision in *Shays I.*  Definition of Federal Election Activity, 71 Fed. Reg. at 8,926.

The Expanded E&J explains that the Commission retained the "assist" requirement in the

definition of voter registration activity out of concern that a definition making "mere

encouragement" to register to vote FEA "would be overly broad, is not necessary to effectively

implement BCRA, and could have an adverse impact on grassroots political activities."  *Id.* at

8,928-29.  In particular, the Commission noted comments suggesting that a broader definition of

voter registration activity would be particularly burdensome for local party committees, which are "small volunteer-centered organizations" that lack "the resources to comply with the complexities of Federal law," and therefore avoid activities that might trigger obligations under FECA. *Id.* at 8,928. The Expanded E&J further argues that retaining the "assist" requirement is appropriate because the Commission "found no evidence that Congress intended to capture every State or local party event where an individual ends a speech with the exhortation, 'Don't forget to vote!'" in the definition of voter registration activity. *Id.* As a result, the Expanded E&J claims that the Commission's regulation sufficiently guards against circumvention of FECA by prohibiting the use of nonfederal funds for activities that *actually* register people to vote, and presents no risk of actual or apparent corruption of federal candidates or officeholders. *Id.* at 8,929. Finally, the revised E&J argues that the Commission's definition promotes "the public policy goal of encouraging civic participation through voter registration and voting," and provides the precision required because the regulation affects First Amendment rights. *Id.*

In order to "provide more guidance on which activities are, and are not, covered" by the definition of voter registration activity, the Expanded E&J also includes three illustrative examples, stating:

> The following are examples of activity that *are* Type I FECA voter registration activity:
> 1. At a county fair, a local political party committee sponsors a booth. The booth has banners reading, "Don't forget to register to vote!" Party staff at the booth provides voter registration forms and answers questions about completing and submitting the forms. They also accept completed forms and mail them to the appropriate government agency.
> 2. A State party committee conducts a phone bank contacting possible voters. The party staff making the calls encourages the individuals to register to vote, provides information about how to register to vote, and offers to mail registration forms with a prepaid postage envelope to the individuals.

*Id.* According to the Expanded E&J, these activities constitute voter registration activity (if

conducted within 120 days of a federal election) because the state, district, or local party

committee "is providing potential voters with personal assistance in registering to vote," that

goes "beyond general statements encouraging voter registration." *Id.* In contrast, as an example

of conduct that is not voter registration activity, the third situation involves a "guest speaker at a

local party committee rally for a mayoral candidate [who] extols the virtues of the candidate and

concludes his remarks by stating: 'Don't forget to register and vote!'" *Id.*

Plaintiff argues that the Commission's definition of voter registration activity violates

both *Chevron* step two and the APA's requirement of reasoned decisionmaking. Pl.'s Br. at 56-

57. With respect to *Chevron* step two, Plaintiff argues that the Commission's definition

threatens to undermine BCRA's purposes because the Expanded E&J suggests a narrow reading

of Section 100.24(a)(2)'s assistance requirement and demonstrates that "more than providing

information, direction, and encouragement is necessary" to constitute voter registration activity.

Pl.'s Br. at 56.[34] In response, the Commission essentially reiterates the arguments included in the

Expanded E&J, stressing that the "regulation itself is very broad," and that the examples included

---

[34] Plaintiff also posits a hypothetical, suggesting that under the Commission's definition, "within days of a federal election a state party can send out multiple direct mailings to every potential voter sympathetic to its cause urging them to register and vote, and can blanket the state with automated telephone calls by celebrities identifying the date of an election and exhorting recipients to get out to vote, without being deemed to be engaged in voter registration or GOTV activity." Pl.'s Br. at 55. As discussed in greater detail below, this hypothetical may demonstrate the risk that the Commission's definition of GOTV activity will unduly compromise BCRA's purposes. However, as the Commission points out, its potential for gross abuse is less obvious with respect to voter registration activity because "[o]f the 50 state jurisdictions and the District of Columbia, only four or five permit registration within a few days of an election." *See* Def.'s Reply Br. at 36 n.21 (citing www.eac.gov/docs/ NVRA%20Update%2009-12-06.pdf). As a result, a state or local party is unlikely to spend money on an effort that merely encourages people to register to vote within days of an election.

in the Expanded E&J are "nonexclusive." Def.'s Br. at 17. The Commission accurately notes

that the regulation defines voter registration relatively broadly, as "[c]ontacting individuals by

telephone, in person, or by other individualized means to assist them in registering to vote," and

contains a non-exclusive list of examples, including "printing and distributing registration and

voting information, providing individuals with voter registration forms, and assisting individuals

in the completion and filing of such forms." 11 C.F.R. § 100.24(a)(2). However, Plaintiff is also

correct that the Expanded E&J's examples–each of which describes multiple means of

"assist[ance]" by "individualized means"–suggest a much narrower interpretation and describe

situations that obviously meet the definition of voter registration activity. 71 Fed. Reg. at 8,929.

At the other end of the spectrum, the Expanded E&J repeatedly stresses that an event should not

be transformed into FEA simply because a speaker exhorts the crowd "Don't forget to register

and vote!" *Id.* The Expanded E&J, however, provides no guidance with respect to activities

falling in the gray area between these two extremes.

  As the Supreme Court recognized in *McConnell*, BCRA's restrictions on state, district,

and local party committees use of nonfederal funds in connection with activities that influence

federal elections was "designed to foreclose wholesale evasion" of BCRA's prohibition on

national party committees using nonfederal funds for the same activities, and was "based on the

evidence . . . that the corrupting influence of soft money does not insinuate itself into the political

process solely through the national party committees. Rather, state committees function as an

alternative avenue for precisely the same corrupting forces." 540 U.S. at 161, 164. Moreover, as

the Supreme Court stated, "[c]ommon sense dictates . . . that a party's efforts to register voters

sympathetic to that party directly assist the party's candidates for federal office," and that state

and local party voter registration activities "have a significant effect on the election of federal

candidates." *Id.* at 167-68 (citing *McConnell*, 251 F. Supp. 2d at 459-61) (Kollar-Kotelly, J.).

Nevertheless, the Expanded E&J does not address the vast gray area of activities that state

and local parties may conduct and that may benefit federal candidates. For instance, based on the

regulation and the Expanded E&J it is impossible to determine whether it would constitute voter

registration activity for local party staff, sitting under a banner reading "Don't forget to register to

vote!" at a county fair, to hand out registration forms and answer questions on how to complete

them, but not collect the forms and return them to the government agency. While the regulation

suggests that such an activity might meet the Commission's definition, the Expanded E&J makes

that conclusion much less certain. Nor does the Commission, in either its Expanded E&J or its

briefs, attempt to demonstrate that activities falling within the gray area between the two

extremes do not "have a significant effect on the election of federal candidates," or cannot "be

used to benefit federal candidates directly." *Id.* As a result, the Expanded E&J indicates that the

Commission's regulation "unduly compromises the Act" and therefore violates *Chevron* step

two. *See Orloski*, 795 F.2d at 164.

For the same basic reason, the Expanded E&J fails to provide a "rational justification [for

the Commission's definition], as required by the APA's arbitrary and capricious standard."

*Shays I Appeal*, 414 F.3d at 97. By failing to explain how the Commission's definition operates

in the gray areas between activities that clearly are voter registration activity and those that

clearly are not, the Expanded E&J provides no assurance that its definition encompasses the

universe of activity that the Supreme Court concluded Congress could constitutionally regulate,

and indeed intended to regulate in BCRA–those activities by state and local parties that "confer

substantial benefits on federal candidates" and thus create "a significant risk of actual and apparent corruption." *McConnell*, 540 U.S. at 168.  Instead of providing such an explanation, the Expanded E&J argues that the Commission's definition is justified by the need for precise regulation in areas affecting First Amendment interests, and by the "public policy goal of encouraging civic participation through voter registration and voting." 71 Fed. Reg. at 8,929.[35] However, the Commission "is not free to substitute new goals in place of the statutory objectives without explaining how these actions are consistent with [its] authority under the statute." *Indep. U.S. Tanker Owners Comm.*, 809 F.2d at 854; s*ee also State Farm*, 463 U.S. at 43.[36]

The Commission's Expanded E&J focuses on straw men, citing only examples falling at the far ends of the spectrum of potential voter registration activity without explaining how its definition, which apparently excludes the significant amount of activity in between, either supports or does not undermine BCRA's purposes.  As such, it fails to meet the APA's requirement of reasoned decisionmaking.

### ii.    *Get-Out-The-Vote Activity*

---

[35] To this end, the Expanded E&J correctly notes that both FECA and the Commission's regulations interpreting FECA exempt from the definition of "expenditure" non-partisan voter registration efforts and GOTV activity.  *See* 2 U.S.C. § 431(9)(B)(ii); 11 C.F.R. § 100.133. However, these provisions represent an altogether different balancing of interests because non-partisan voter registration activity and GOTV activity presumably do not favor the candidates of any political party.  *Cf. McConnell*, 540 U.S. at 167 ("Common sense dictates . . . that a party's efforts to register voters sympathetic to that party directly assist the party's candidates for federal office).

[36] Moreover, as Plaintiff correctly notes, in light of the fact that the Levin Amendment represents the balance struck by Congress in allowing the use of some nonfederal funds for efforts by state and local parties to register voters and turn them out for elections involving both state and federal offices, the Commission's purported efforts to re-balance the competing policies is particularly misplaced.  *See* Pl.'s Reply Br. at 44.

The Commission's regulation defines GOTV activity as:

[C]ontacting registered voters by telephone, in person, or by other individualized means, to assist them in engaging in the act of voting.  Get-out-the-vote activity includes, but is not limited to:

> (i) Providing to individual voters information such as the date of the election, the times when polling places are open, and the location of particular polling places; and
> (ii) Offering to transport or actually transporting voters to the polls.

11 C.F.R. § 100.24(a)(3).  The first example in the Commission's 2002 definition of GOTV activity included an additional phrase that read, "providing to individual voters, *within 72 hours*, information such as the date of the election . . . ."  11 C.F.R. § 100.24(a)(3)(i) (2003) (emphasis added).  In *Shays I*, Plaintiff challenged the "assist" requirement included in the definition of GOTV activity and specifically objected to the Commission's perceived "effort to engraft in certain circumstances a 72-hour rule onto the definition of GOTV."  337 F. Supp. 2d at 102 (internal quotations omitted).  The Court rejected Plaintiff's *Chevron* step one challenges to both the "assist" requirement and the 72-hour provision, the former for the reasons discussed above in connection with the definition of voter registration activity, and the latter in light of the Commission's insistence that the examples provided in the definition were non-exhaustive.  *Id.* at 103.  With respect to *Chevron* step two, the Court concluded that Plaintiff's challenge was not ripe because, although the Commission's definition represented a permissible interpretation of BCRA, it was unclear how the Commission would treat activity conducted outside of the 72-hour window.  *Id.* at 105.  The Court nevertheless remanded the definition of GOTV activity to the Commission, finding that it had violated the APA's notice requirements in promulgating the regulation.  *Id.* at 106.

On remand, the Commission sought comment on the 72-hour provision and, ultimately, opted to remove the phrase "within 72 hours of an election" from the first example in 11 C.F.R. § 100.24(a)(3). The Commission otherwise left the definition of GOTV activity intact, in relevant part, and discussed the definition in its Expanded E&J.[37] The Expanded E&J provides a single explanation, discussed in detail above, for both its definition of voter registration activity and its definition of GOTV activity. *See* 71 Fed. Reg. at 8,927-29. In addition, however, the Expanded E&J explains the Commission's decision to remove the 72-hour provision from the definition of GOTV activity, clarifying that no time limit exists with respect to GOTV activity, and, as an example of activity that would meet the definition of GOTV activity, states:

> A State party committee could hire a consultant a month prior to the election to design a GOTV program for the State party committee and recruit volunteers to drive voters to the polls on election day. The consultant's work performed well before the 72-hour time period would be considered Type II FEA . . . Also, the definition of "GOTV activity" would apply equally to actions taken with regard to absentee balloting or early voting.

*Id.* at 8,929.

Subsequently, in June 2006, the Commission issued Advisory Opinion 2006-19, in which it reviewed a local party committee's proposal to "make pre-recorded, electronically dialed telephone calls and send direct mail to all voters registered as Democrats in Long Beach[, California] between four and fifteen days prior to" a non-partisan general election held on the same day as a federal primary election. *See* AO 2006-19 at 1-2 (PX 147). The telephone script and the direct-mail piece each informed registered Democrats of the date of the election, that

---

[37] Although not relevant here because Plaintiff does not challenge it, the Commission removed the exception to the definition of GOTV activity for associations or other similar groups of candidates for state and local office. *See* 71 Fed. Reg. at 8,927.

certain municipal candidates were endorsed by the Democratic Party, and urged voters to vote for those candidates.  *Id.* at 2.  The Commission concluded that the planned communications did "not constitute 'Federal election activity' that must be paid for entirely with Federal funds or a mix of Federal funds and Levin funds.  Accordingly [the local party committee] may pay for the planned communications entirely out of non-Federal funds."  *Id.*  The Commission's conclusion turned on its determination that the "proposed communications do not constitute assisting voters in engaging in the act of voting by individualized means," which was in turn based on four factors:

> First, the communications promote the election of only non-Federal candidates.  Second [the local party committee] will conduct the proposed communications four or more days prior to the election; the more removed from election day, the less effect the communications are likely to have on motivating recipients to go to the polls. . . . Third, there is no indication that [the local party committee] has engaged in any activity to target these communications to any specific subset of Democratic voters . . . the planned communications are generic in nature and do not provide any individualized assistance to the voters . . . Fourth, the communications contain only the date of the election and do not include such additional information as the hours and location of the individual voter's polling place.  Merely including the date of an election in a communication that advocates the election or defeat of only State and local candidates does not turn that communication into GOTV activity.

*Id.* at 4.

Plaintiff posits that, via AO 2006-19, the Commission "has effectively read into the definition of GOTV activity a requirement that a communication be tailored to provide 'individualized information' beyond the date of an election to each individual recipient or 'subset' of recipients in order to fall within the regulation's requirement to 'assist' a voter by 'individualized means.'" Pl.'s Br. at 55.  According to Plaintiff, this requirement "removes from regulation many of the most far-reaching and sophisticated . . . GOTV activities" and "unduly

compromises the Act's purposes." *Id.* at 55-56.  Plaintiff also claims that the Commission has

failed to provide a rational justification for its definition, in violation of the APA's arbitrary and

capricious standard. *Id.* at 56-57.

Turning to whether the Commission's definition of GOTV activity unduly compromises

BCRA's purposes, the Commission again reiterates the rationale advanced in the Expanded E&J,

and stresses that the definition of GOTV activity provides a list of non-exhaustive examples that

include providing individual voters with information such as the date of the election, the times

when polling places are open, and the location of particular polling places, as well as offering to

transport or actually transporting voters to the polls.  Def.'s Br. at 21 (citing 11 C.F.R. §

100.24(a)(3)).  Like the Commission's definition of voter registration activity, the Commission's

definition of GOTV activity, on its face, offers the possibility of a broad interpretation.

However, in AO 2006-19, the Commission concluded that the planned communications did not

constitute GOTV activity in part because "the communications contain only the date of the

election and do not include such additional information as the hours and location of the

individual voter's polling place."  AO 2006-19 at 4 (PX 147).  AO 2006-19 thus suggests that the

Commission has adopted an even more restrictive view of its regulation than this Court

previously understood in *Shays I*, when it stated that the Commission had "made clear that

providing a person with the date of the election constitutes GOTV activity if it occurs within 72

hours of an election."  337 F. Supp. 2d at 105.

The Court acknowledges the Commission's assertion that an "advisory opinion concerns

only a 'specific transaction or activity' and may be relied upon only by the requester or another

person 'involved in any specific transaction or activity which is indistinguishable in all its

90

material aspects' from that examined in the AO."  Def.'s Br. at 23 (citing 2 U.S.C. § 437f(c)(1);

11 C.F.R. § 112.1(b), (c); 11 C.F.R. 112.5(a)(1)(2)).  However, even if AO 2006-19 does not

constitute binding legal precedent, it nevertheless suggests a narrower interpretation of the

definition of GOTV activity than might otherwise be presumed based on the face of the

definition.  At the very least, AO 2006-19 indicates that, in determining whether an activity

constitutes GOTV activity, the Commission will consider "communication[s] made several days

prior to an election [as] more likely to be a 'general exhortation' to vote or 'mere encouragement'

to vote, as opposed to a communication that assists a voter in the act of voting by individualized

means," and will examine the extent to which the communication provides "individualized

information to any particular recipient," as well as whether the communication provides

information other than the date of the election.  AO 2006-19 at 4 (PX 147).

Even putting aside AO 2006-19, however, the Expanded E&J does not explain how the

Commission's definition of GOTV activity would apply to activities that fall in the gray area

between a "general exhortation" or "mere encouragement" to vote and activities that clearly

constitute GOTV activity.  Neither the regulation itself nor the Expanded E&J addresses, for

instance, Plaintiff's hypothetical that

> within days of a federal election a state party can send out multiple direct
> mailings to every potential voter sympathetic to its cause urging them to . . . vote,
> and can blanket the state with automated telephone calls by celebrities
> identifying the date of an election and exhorting recipients to get out to vote,
> without being deemed to be engaged in . . . GOTV activity.

Pl.'s Br. at 55.  As the Supreme Court stated in *McConnell*, it is "clear that federal candidates

reap substantial rewards from any efforts that increase the number of like-minded registered

voters who actually go to the polls."  540 U.S. at 167-68 (citing *McConnell*, 251 F. Supp. 2d at

91

460 (Kollar-Kotelly, J.) ("A campaign need not mention federal candidates to have a direct effect

on voting for such a candidate")).  Nevertheless, the Expanded E&J makes no attempt to address

whether activities falling into the gray area might indeed "confer substantial benefits on federal

candidates" and thus create "a significant risk of actual and apparent corruption." *Id.* at 168.  Nor

does the Expanded E&J demonstrate why, if they do so, such activities should not be funded, as

required, solely with federal funds or with an allocated ratio of federal funds and Levin funds.[38]

As such, the Expanded E&J fails establish that the Commission's definition of GOTV activity

will not "unduly compromise[] the Act's purposes."  *Orloski*, 794 F.2d at 164.

Furthermore, for the reasons discussed above in connection with the Commission's

definition of voter registration activity, the Court concludes that the Commission violated the

APA's requirement of reasoned decisionmaking in promulgating the definition of GOTV

activity.  Specifically, the Expanded E&J provides no assurance that the Commission's definition

---

[38] The Commission attempts to downplay Plaintiff's claim that its hypothetical scenario could be financed entirely with nonfederal funds if it did not constitute GOTV activity by pointing to 11 C.F.R. § 106.7(b).  Def.'s Reply Br. at 37.  That provision provides that "[s]tate, district, and local party committees that make expenditures and disbursements in connection with both Federal and non-Federal elections for activities that are not [FEA] may use only [federal] funds, or they may allocate such expenditures and disbursements between their Federal and their non-Federal accounts."  11 C.F.R. § 106.7(b).  According to the Commission, the primary impact of determining that an activity does not constitute FEA is that "if the party chooses to allocate, it would not be limited to Levin funds in paying the nonfederal portion."  Def.'s Reply Br. at 37.  However, the Commission's argument overlooks the fact that AO 2006-19 concluded that, because the phone bank in question did not constitute FEA, the local party committee could "pay for the planned communications entirely out of non-Federal funds."  AO 2006-19 at 2 (PX 147).  Moreover, even if 11 C.F.R. § 106.7(b) only permits a state, district, or local party committee to pay for a portion of an expenditure that does not constitute FEA with nonfederal funds, it nevertheless undermines Congress' determination that activities that "confer substantial benefits on federal candidates [and thereby create] a significant risk of actual and apparent corruption," *McConnell*, 540 U.S. at 168-69, are to be funded solely by federal funds or by an allocated ratio of federal and Levin funds.

encompasses those activities by state, district, and local party committees "that can be used to benefit federal candidates directly." *McConnell*, 540 U.S. at 167.  Instead, the Expanded E&J focuses on policy concerns not articulated in BCRA, "without explaining how these actions are consistent with [its] authority under the statute."  *Indep. U.S. Tanker Owners Comm.*, 809 F.2d at 854; s*ee also State Farm*, 463 U.S. at 43.  As such, the Commission fails to provide a "rational justification for [its definition of GOTV activity], as required by the APA's arbitrary and capricious standard."  *Shays I Appeal*, 414 F.3d at 97.

### C.     Remedy

The Court has found that a number of the Commission's regulations–the content and conduct standards contained in the coordinated communications regulation, as well as the definitions of voter registration activity and GOTV activity contained in the regulation on FEA–violate either *Chevron* review or the APA.  Plaintiff's Complaint requests that the Court "enjoin the operation of [the relevant regulations] until such time as those regulations have been corrected to comply with governing law," "order the Commission to commence expedited rulemaking proceedings and to adopt appropriate interim regulations to govern during the pendency of its rulemaking proceedings," and "retain jurisdiction over this matter to ensure the Commission's timely and sufficient compliance with the Court's decision." Compl. ¶¶ 72.B-72.D.  These requests are echoed in the proposed order accompanying Plaintiff's Motion for Summary Judgment.  Pl.'s Proposed Order at 2.

However, as the Court noted in *Shays I*, "[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with

93

the corrected legal standards." 337 F. Supp. 2d at 130 (quoting *County of Los Angeles v. Shalala*,

192 F.3d 1005, 1011 (D.C. Cir.1999)) (internal citation omitted).  Notwithstanding Plaintiff's

argument that the length of time that has passed since Congress ordered the Commission to

promulgate regulations pursuant to BCRA has frustrated Congress' goals with respect to the

2004 and 2006 elections, *see* Pl.'s Br. at 59-60 n.43, the Court does not believe that there is a

basis for granting Plaintiff's request for relief, and shall remand the case to the Commission for

further action consistent with this opinion.  The Court assumes that, on remand, the Commission

will act promptly, in light of the impending 2008 elections.

## IV.  CONCLUSION

For the foregoing reasons, the Court shall grant-in-part and deny-in-part Plaintiff's

Motion for Summary Judgment and shall grant-in-part and deny-in-part Defendant's Motion for

Summary Judgment.  Specifically, the Court concludes that the following regulations fail

*Chevron* review or violate the APA and are therefore remanded to the Commission for further

action consistent with this Memorandum Opinion and accompanying Order: 11 C.F.R. §

109.21(c) (coordination content regulations), *see supra* at 35-55; 11 C.F.R. §109.21(d)

(coordination conduct regulations), *see supra* at 55-69; 11 C.F.R. § 100.24(a)(2) (definition of

"voter registration activity"), *see supra* at 80-87; and 11 C.F.R. § 100.24(a)(3) (definition of

"get-out-the-vote activity"), *see supra* at 87-93.  An appropriate Order accompanies this

Memorandum Opinion.

Date:   September 12, 2007

                                          _/s/_____
                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge